**EXHIBIT 209 TO DECLARATION OF VALERIE SCHUSTER**

עמנואל גרוס / מאבקה של דמוקרטיה בטרור – היבטים משפטיים ומוסריים



DEFENDANT'S
EXHIBIT
Gross 3A
9/28/10 sc



# עמנואל גרוס

# מאבקה של דמוקרטיה בטרור

## היבטים משפטיים ומוסריים

**נבו הוצאה לאור בע"מ**

נבו

Emanuel Gross

# The Struggling of Democracy Against Terrorism: Legal and Moral Dimensions

ISBN 965-442-031-7 מסת״ב



זכויות היוצרים שמורות למחבר
תשס״ר-2004

נבו הוצאה לאור בע״מ
ת״ד 108 שריגים-ליאון 99835
טל׳ 02-9992099; פקס׳ 02-9992088
nevo@nevo.co.il

פרק רביעי

## הרשעות על סמך ההודאות בחקירה

### א. בישראל

כפי שכבר הובהר לעיל, על מנת לקבל הודאות נאשמים יש להוכיח כי ההודאה נגבתה חופשית ומרצון[151]. כך למשל, ב-9.3.1994 פסל שופט בית המשפט המחוזי הודאה של נחקר, מכיוון שחוקרי השב״כ הודו כי נמנעה מהנחקר שינה למשך 27 שעות[152].

מכיוון שלא היה קיים חיעוד לחקירות, נאלצו השופטים להסתמך על עדותם של חוקרי השב״כ, על האופן בו נגבתה ההודאה, על מנת להכריע אם היא קבילה. אולם בעקבות ועדת לנדוי, התבדר כי במשך שנים חוקרי השב״כ נהגו להעיד עדות שקר בפני בית המשפט, בנוגע לדרך בה נגבתה ההודאה, כפי שכבר צוין לעיל.

> ״כאשר הודאת של נאשם בחקירתו היא חומר הראיה העיקרי כנגדו, הרי מטבע הדברים כפירתו של הנאשם באשמתו בבית המשפט טענה שהודאתו בפני החוקרים נתקבלה ממנו בדרכים בלתי כשרות ולפיכך היא פסולה ואין לקבלה כראיה נגדו. טענה כזו מחייבת ניהולו של ׳משפט זוטא׳ בדבר קבילותה של ההודאה. מאליו יובן שבתנאים אלה משפט הזוטא הוא כל עיקרו של המשפט עצמו והכרעה בו היא למעשה הכרעה במשפט כולו לשבט או לחסד... מקרמת דנא אין חוקרי השידורת עוסקים בדישומן וגבייתן של הודאות... החוקרים עוסקים בחקירתו של הנאשם במיתקני החקירה שלהם... משהם שלב זה בהצלחה והנחקר אכן מוכן להודות, הוא מועבר לידי חוקר משטרתי וזה האחרון רושם מפיו את ההודאה כרת וכדין. אותה הודאה מוצגת לאחר מכן בפני בית המשפט באמצעות השוטר שרשם אותה, המופיע כעד מטעם התביעה... שוטר זה יכול היה להעיד בלב שקט ובמצפון נקי שבמסגרת השלב שבו היה הוא מעורב, דהיינו רישום ההודאה, התנהל הכל על מי מנוחות והנאשם אכן מסר את ההודאה באופן חופשי ומרצון...״[153].

151   פקדת הראיות [נוסח חדש], תשל״א-1971, סעיף 12.

152   תיאור תוצאת המשפט (משפט זוטא בת״פ 201/93) אוזכר בגינבר (לעיל הערה 81), בעמ׳ 19.

153   ראו דוח ועדת לנדוי (לעיל הערה 31), בעמ׳ 17-18.

181

מאבקה של דמוקרטיה כנגד טרור – היבטים משפטיים ומוסריים

עם הזמן החלו יותר ויותר סנגורים לטעון כי האמצעים הפסולים לא היו בעת גביית ההודאה, אלא בשלבים של החקירה לפני כן. טענה זו אילצה את חוקרי השב"כ עצמם להעיד בבית המשפט על דרך החקירה. השירות הקפיד על מידור מוחלט של פעילות אנשיו. כך, כל מה שנערך במסגרת השירות לא הובא לידיעת אף אדם חיצוני לשירות:

> "...עתה, בפעם הראשונה, מצאו עצמם אנשי החקירות בפני דילמה קשה:
> בעומדם על דוכן העדים בבית המשפט נשאלו שאלות רבות לגבי תהליכי
> החקירה שעליהן נדרשו להשיב תחת שבועה או אזהרה. החוק חייב אותם,
> כמובן, כמו כל עד המעיד בפני בית המשפט, להעיד את האמת כולה ואת
> האמת בלבד. מאידך – עדות אמת היה בה כדי לפגוע בכלל המקודש של
> מידור מוחלט שהושרש ושנון לכל חוקר מרגע שנתקבל לשירות... מכאן
> שבעומדו על דוכן העדים, ראה החוקר סכנה כפולה באמירת האמת: הן
> חשיפת שיטות החקירה והלחץ הפיסי והן פסילת ההודאה וזיכוי של
> הנאשם. מבחינתו של השירות כל אחת מתוצאות אלה הייתה קשה ובלתי-
> רצויה, כשאנשי השירות משוכנעים, על יסוד מידע אמין שהאיש אשם במה
> שהואשם.
>
> הפתרון שהחוקרים מצאו לעצמם לדילמה זו היה, מבחינתם, הפשוט והקל
> ביותר: הם העלימו את עקרון המידור המוחלט על פני החובה לומר אמת
> בבית המשפט, ומעל דוכן העדים הכחישו הפעלת כל לחץ פיסי שהוא על
> הנחקרים. במילים בוטות יותר – הם פשוט שיקרו..."[154].

חוקרים שהעידו בפני ועדת לנדוי לא יכלו להצביע בוודאות על אותו רגע שבו החלו לנהוג כך בשירות. השיטה של עדות השקר נוצרה כאילו מאליה, וגדרה את החוקרים לתוכה כדבר מובן מאליו. עד מהירה הפכה עדות השקר להיות נורמה שאין עודדין עליה. בזיכרון דברים מדיון שהתקיים בין ראש השירות וראש יחידת החקירות, ושהובא בפני הוועדה, נכתב במפורש שבמשפטי הוטא החוקרים יכחישו כל ניצוע של שיטת חקירה הכוללת לחץ פיסי, ויטענו כי נהגו על פי המקובל לאור נוהלי הכלא אז בית המעצר. בכך, לא רק שניתנה הוראה מפורשת לשקר, אלא גם הנחייה מהו אותו שקר שיאמר. רוח ועדת לנדוי מציין כי הסיבה הראשונה והעיקרית לכך שחוקרי השב"כ שיקרו הייתה הצורך המעשי שלא לחשוף את שיטות החקירה. הסיבה השנייה טמונה בכך שהמשפט יקום וייפול בדרך כלל על קבילות ההודאה. השב"כ ראה לנגד עיניו מצב שבו נאשם, אשר לפי אמונתו היה אכן אשם, ישתחרר, אם תיחשף השיטה שבה הוצאה ההודאה ממנו. הסיבה השלישית היא שהשיטה

154 ראו שם, כעמ' 18-19.

חקירת טרוריסטים – התוויית הגבול בין חקירה מותרת לבין עינוי אסור

פשוט עלתה יפה. במשך שנים זכו החוקרים לאמון מלא של השופטים, ולכן לא התעודד כל
צורך לחפש שיטה אחרת[155].

הוועדה קבעה כי על נוהל זה של עדויות שקר בבית המשפט להיפסק לאלתר. כמו כן,
נקבע כי הצמרת של השירות נכשלה מלהבין שאנשיה אינם מעל לחוק, ושהמשימה החיונית
המופקדת בידי השירות הנה משימה שמקרשת חלק מהאמצעים, אך לא את כולם, ודאי לא
את האמצעי של מתן עדות שקר. בנוסף המליצה הוועדה לדון מחדש בעניין שמירת רשומות
של תיק חקירה בשב"כ. בעבר, הנוהג היה, שלאחר החקירה עצמה, החוקר היה רושם את
הדברים שנראו לו כדלוונטיים מתוך החקירה כולה. לא היו מנהלים יומני חקירה תוך כדי
מהלך החקירה ולא היו מתעדים באופן מקוף את החקירה בשלמותה. לאחר שהחוקר היה
מגיש את הדוח המסכם, תיק החקירה כולו היה מושמד כדבר שבשגרה[156].

מנגד יש המצריקים את שיטות החקירה של השב"כ באופן כללי. הפעלת לחץ פיסי מתון
בחקירות הפך להיות כלי מקובל, ונחשב ככלי היחידי, שבעזרתו ניתן למנוע התקפות
עתידיות על חפים מפשע, ותפיסה של האנשים האחראים על הפעילות האלימה. טרודיים
מושווה, על פי גישה זו, למלחמה ללא חוקים[157]. כך גם, העינויים לכאורה המתקיימים על
ידי השב"כ, אינם ניתנים להשוואה כלל לעינויי החשודים במדינות ערב. אולם אין כל מקום
לחקירות בלחץ פיסי מתון בכל דרגה שהיא, במדינה דמוקרטית ומתורבתת, וזאת ללא קשר
למצב הטרור באותה המדינה. לכן, יש להציב לפחות פיקוח על החקירות ולשמור שהגבול
בין לחץ פיסי מתון לבין עינויים יישמר[158].

יש הטוענים כי במדינה דמוקרטית לא מתקבלת הגישה שיש להפעיל אמצעי כלשהו על
נחקרים, בכדי להגיע לחקר האמת. יש מחיר שחברה דמוקרטית לא מוכנה לשלם. חקירה
סבירה הנה חקירה נטולת עינוי. אמנם הדמוקרטיה לעתים צריכה להילחם עם יד אחת
קשורה והדבר מקשה עליה, אולם ללא שמירה על החוק וכיבוד וכויותיהם של האנשים,
הדמוקרטיה, אשר עליה מנסים לשמור, בסופו של דבר תיפגע[159].

---

155   ראו שם, בעמ' 20-26.

156   ראו שם, בעמ' 34-37.

157   יש להעיד כי במצב מלחמה זכויות האדם נתונות להגבלות נוספות, מאשר משברים אחרים
      בזמן שלום, ראו G.J. Alexander "The Illusory Protection of Human Rights by National
      Courts during Periods of Emergency" 5 *Hum. Rts. L.J.* (1984) 1, p. 7.

158   Editorials "Moderate Torture" 149 *N.J. L.J.* (1997) 26, p. 46.

159   J.R. Schmertz "Citing International Human Rights Conventions, Supreme Court of
      Israel Bars Use of Several Interrogational Pressure Techniques Sometimes Used by
      General Security Service when questioning terrorist suspects such as vigorous shaking
      and 'Shabach' Position" 6(3) *International L. Update* (2000).

183

שיפוט טוחדייסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם הבדלים מבחינת החוק בין סוגים שונים של עבריינים. כל העוברים על החוק שווים בפניו וצפויים לאותו יחס של מערכת שופטת: לזכות להליך משפטי הוגן.

כלומר, מעקרון השוויון גזורה מדינה דמוקרטית את מבנה בתי המשפט שלה – גוף אחד ולא גופים נפרדים בהתאמה לסוגים נפרדים של עבריינים/עבירות !

הקמה של טריבונלים מיוחדים לסוגים מסוימים של עבירות מפרה עיקרון מרכזי אחר העומר בבסיסה של כל מדינה דמוקרטית: עקרון הפרדת הרשויות[62], וביחוד החשיבות לעצמאותה של המערכת השופטת במדינה דמוקרטית. לכן, חוששים בתי המשפט הכלליים מהקמתם של טריבונלים מיוחדים:

"The standing and constitutional role of the Court as 'third and independent arm' of government are in process of being diminished. The creation by the Executive through Parliament of these new specialist tribunals can impair judicial independence in the widest sense, that is to say, as distinct from thew independence of judges as such, inasmuch as it serves to prevent the operation of the judicial process according to law in the widest sense for the administration of justice"[63].

ניתן להמחיש את הסכנה שביציצרת טריבונלים מיוחדים לעקרונות בסיסים של משטר דמוקרטי תקין בדוגמה של טריבונל צבאי, מיוחד[64]: לא כל השופטים היושבים בהרכב הם שופטים מקצועיים, חלקם הם קצינים בצבא. התובעים אינם עובדי רין פרטיים אלא משרתים, כמו השופטים ויחד עמם בצבא. ההפרדה בין הרשות השופטת לרשות המבצעת נפגעת: היערד התלות של הרשות השופטת ברשות המבצעת וזרועותיה נחלש, כתוצאה מכך נפגעת העצמאות של המערכת השופטת. בכך אין ר'י, ההפרדה בתוך הרשות השופטת עצמה בין שופטים לתובעים הקיימת בכל מערכת משפט תקינה במטרה למנוע משוא פנים וניגוד עניינים, אינה קיימת בטריבונל מיוחד–צבאי.

עקרון השוויון בפני החוק ממנו כאמור, מחייבת הקמת מערכת בתי משפט אחידה עבור כולם, מחייב להעניק יחס שווה לאנשים שווים. בהיערד שוויון בנתונים יחס שונה אין משמעותו אפליה פסולה. כלומר, הפליה פסולה היא יחס בלתי שווה כלפי שווים[65].

62   בג"ץ 3267/97 רובינשטיין נ' שר הביטחון, פ"ד נב(5) 481, בעמ' 515.
63   "Victorian Supreme Court's concern over development of specialist tribunals" 64 The Australian L.J. (1990) 385-386
64   ראו רין נזחב בנושא להלן בפרק 4.
65   ב' ברכה "שיויון הכול בפני החוק" עיונים בזכויות האזרח בישראל (האגודה לזכויות האזרח בישראל, 1988), 3.

437

מאבקה של דמוקרטיה בטחור – היבטים משפטיים ומוסדריים

כך, ניתן לטעון שהקמת מערכת שפיטה נפרדת עבור סוג מסוים של עבירות איננה הפליה פסולה. סוג מסוים של עבירה הוא בחינת נתון שונה ולכן מאפשר יחס שונה. יחס זה הוא הבחנה מותרת בין סוגי עבירות. והבחנה מותרת אינה עומדת בסתירה לערכים דמוקרטיים. טיעון מסוג זה היה עשוי להיות מוצדק אם אכן יחס שונה לסוגים שונים של עבירות היה בבחינת הבחנה מותרת. הרי לא ייתכן ששוני בין עבריינים הנעוץ בכך שהם נאשמים בביצוע סוג מסוים של עבירות יהפוך אותם לשונים, כך שמוצדק יהא לשופטם בפני טריבונל שונה מהטריבונל השופט את "הכלל". כל עבירה שונה מרעותה, לכן קיימות עבירות שונות בחוק פלילי של כל מדינה (עבירות של שוד ומרמה, עבירות נגד ביטחון המדינה וכו') – האם די בכך שיהא שוני בין עבירות כדי להצריך שיפוט בפני טריבונלים שונים?

השאלה איננה אם קיים שוני בין עבירות אלא אם השוני מצדיק יחס שונה. אם השוני אינו רלוונטי לצורך ההסדר שבו מדובר, הרי שהסתמכות עליו לצורך החלת דין שונה פוגעת בעקרון השוויון וגוררת להפליה פסולה. רק שוני רלוונטי מצדיק יחס שונה ויחשב להבחנה מותרת[66].

"עקרון השוויון, אשר אינו אלא הצד השני של מטבע ההפליה ואשר המשפט של כל מדינה דמוקרטית שואף, מטעמים של צדק והגינות, להמחישו, משמעותו, כי יש להתייחס לצורך המטרה הנדונה, יחס שווה אל בני אדם, אשר לא קיימים ביניהם הברלים של ממש, שהם רלוונטיים לאותה מטרה..."[67].

סוגים שונים של עבירות פליליות אינם מצדיקים יחס שונה, קרי, הקמתם של טרדבונלים שופטים נפרדים. וכל זאת מרוע ? ראשית, כפי שהסבונו אין סוגים של עבירות פליליות אלא יש עבירות פליליות שונות וכולן מאוגדות תחת קורקס פלילי אחד. שנית, וחשוב יותר, הוא שההיפוש אחר שוני רלוונטי המצדיק יחס שונה תלוי במערכת הערכים המקובלים על חברות מתוקנות. ביטוי למערכת ערכים אלה בייחוד במדינות דמוקרטיות ניתן למצוא בחוקות שיצדה כל מדינה וביחוד בהכרזות האוניברסליות על זכויות אדם שהן פרי עידון של מדינות דמוקרטיות. אמנם, בהכרזות אלה לא נאסרה במפורש הפליה על בסיס של קריטריונים שונים של עבירות, אך האפקט המצטבר של הטעיפים השונים בהצהרות אלה והרגש על הליך משפטי הוגן, בפרט בהליכים פליליים, יוצרים את הרושם שבחברות דמוקרטיות היוקקות לקריטריון של סוג עבירה פלילית כדי לבסס יחס שונה כלפי עבריין לצורך העמדה לדין עשויה להיחשב הפליה פסולה.

66   שם, בעמ' 4.
67   ד"צ 10/69 בורונובסקי נ' הרבנים הראשיים לישראל, פ"ד כה(1) 7, בעמ' 35.

שיפוט טוטריטטטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

כך, למשל, סעיף 14 לאמנה בדבר זכויות אזרחיות ופוליטיות חוזר ומרגיש לגבי הליך פלילי[68]:

> "(1) All persons shall be equal before the courts and tribunals. In the determination of any *criminal charge* against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law…
>
> (2) Everyone charged with a *criminal offence* shall have the right to presumed innocent until proved guilty according the law.
>
> (3) In the determination of *any criminal charge* against him, everyone shall be entitled to the following minimum guarantees, in full equality…".".

הסעיף ממשיך ומפרט זכויות דיוניות בסיסיות העומדות לכל נאשם העומד לדין פלילי. כגון, הזכות להיות מודע לאישום נגדו בשפה שאותה הוא מבין, הזכות להתייעץ עם עורך דין לפי בחירתו, הזכות להיות נוכח במשפטו והזכות לחקירה נגדית[69]. ערובות שהן מינימום הכרחי לכל הליך פלילי תהא העבידרה אשר תהא. כלומר, כאשר המטרה היא העמדה לדין וניהול משפטו פלילי אין שוני דלוונטי בין עברייניים. כולם נאשמים בכך שעברו על סעיפים מסוימים בחוק הפלילי והחוק יתייחס אליהם באופן שווה, קרי יעמידם בפני אותו בית משפט/טריבונל ללא הבחנה בסוג העבידרה.

שילוב בין העקרונות העומדים בבסיס מדינה דמוקרטית: הפרדת רשויות שלטון החוק וזכויות אדם מובילים למסקנה שהכלל הוא שיפוט בפני פורום מרכזי אחד עבור כל העברייניים, עבור כל העבידרות. לכל כלל יש יוצא מן הכלל. אך, כל הרוצה לסטות מהכלל ומעניין לייחד טריבונל שופט לסוג מסרים של עבידרה חייב להסביר את הטעמים שמצדיקים להפוך את הכלל ליוצא מן הכלל. האם אין לומד שכיום, במציאות שבה אנו חיים תחת סיכון גבוה להתקפות טרור הרסניות, שיקולי הביטחון של אזרחי המדינה הם טעם המצדיק יצירת פורום שיפוטי מיוחד עבור עבידרה פלילית מסוימת – טרור, טעם המצדיק סטייה מהכלל ומהעיקרון העומד בבסיס שיטת המשפט במדינה דמוקרטית – שוויון בפני החוק??

> "אין לשכוח כי ביטחון אינו רק צבא. גם דמוקרטיה היא ביטחון. כוחנו הוא בעוצמתנו המוסרית ובדבקותנו בעקרונות הדמוקרטיה דווקא כאשר הסכנה רבה סבבנו. אכן ביטחון אינו מטרה העומדת בפני עצמה. ביטחון הוא

68   סעיף 14 ל-(23.3.76) International Covenant on Civil and Political Rights.
69   שם, סעיף 14(3).

439

מאבקה של רמוקרטיה בטרור – היבטים משפטיים ומוסריים

אמצעי. המטרה היא המשטר הדמוקרטי, שהוא משטר העם המגריש את חירויות הפרט...".[70]

בהמשך שער זה אנסה להוכיח שעבירת הטרור אינה שונה מכל עבירה פלילית אחרת. ייחור פורום שיפוטי עבורה הוא פסול ולא ניתן להוכיח קשר ישיר בינו לבין המטרה אשר בשמה הוקם ביטחון המרינה. השפעתו של פורום מיוחד לשיפוט טרוריסטים על ביטחון המרינה ואזרחיה מתמצה לכל היותר בשיפור תחושת הביטחון של האזרחים ולא בחיזוק הביטחון בשטח ממש.

לשם הוכחה זו אפנה תחילה לבחינת השפעותיהן של סטיות מהתפיסה העקרונית הנהוגה להפעלת הליך משפטי במדינה רמוקרטית ותפיסת הצדק הפרוצדורלי הראויה לה, על זכויות דיוניות העומרות לנאשם.

70    בג"ץ 680/88 שניצר נ' הצנזור הצבאי הראשי, פ"ר מב(4) 623.

פרק שלישי

## אופיו של פורום שופט והשלכותיו על זכויות דיוניות העומדות לנאשם

קשה להבין את הביקורת הרבה הנשמעת ברחבי ארצות-הברית על הצו הנשיאותי המקים טריבונלים צבאיים מיוחדים לשיפוט טרוריסטים, מבלי לברוק אם אופיו של פורום שיפוט משפיע על זכויות דיוניות של העומד לדין. בהמשך אראה כי התשובה לכך היא חיובית. לצורך הרגמה הרבר אשתמש בבית הרין הצבאי האמון על שיפוט חיילים בישראל ואראה כיצד אידאולוגיה ברלנית, של שונות המערכת הצבאית מהאזרחית, הביאה ליצירתה של מערכת שיפוט צבאית נפררת. בהמשך אראה כי מערכת נפררת בטקשה להצריק שימוש בסררי רין שונים מאלו הקבועים במערכת הפלילית האזרחית. סררי רין שונים אלו גרמו, כמעט בהכרח, לפגיעה בזכויות הריוניות של החיילים, ובעיקר בזכותם החוקתית להליך ראוי.

### א. אופיו של פורום שיפוט צבאי

מערכת שפיטה צבאית עומרת ביחס למערכת שפיטה אזרחית באחת משלוש צורות:
1. מערכת המוטמעת בתוך המערכת האזרחית אשר שופטת בין היתר חיילים.
2. מערכת המשולבת במערכת האזרחית אך שומרת על מירה מסוימת של אפיון ייחורי לשפיטה הצבאית.
3. מערכת הנפררת ללא כל זיקה ארגונית למערכת האזרחית, אם כי מאפשרת בררך כלל הליכי ערעור מהערכאה השיפוטית הצבאית הגבוהה לערכאה האזרחית העליונה במרינה[71].

הרין יתמקד במערכת השיפוט הצבאי בישראל, שבה מערכת המשפט הצבאית נפררת ממערכת המשפט האזרחית[72].

סמכות השיפוט של מערכת השפיטה הצבאית היא כפולה ומקפלת בתוכה סמכות שיפוט ייחורית בעבירות צבאיות[73] וסמכות שיפוט מקבילה למערכת השפיטה האזרחית בשאר העבירות הפליליות[74].

---

71 ע׳ מודריק "שפיטה צבאית בישראל מ׳אוריינטציה פיקודית׳ ל׳בית המשפט׳" פלילים א (1990) 83, בעמ׳ 84.

72 ראו לעניין זה חוק השיפוט הצבאי, תשט"ו-1955 (להלן – חוק השיפוט הצבאי).

מאבקה של דמוקרטיה בטחור – היבטים משפטיים ומוסריים

מערכת השפיטה הצבאית שונה ממערכת המשפט האזרחית בשני תחומים עיקריים:
האחד, בסררי הרין השונים שנקבעו במפורש בחוק השיפוט הצבאי[73] (לגבי דיני הראיות
וההגנות במשפט הצבאי יש לציין שאלו נשאבו מהמשפט הפלילי הכללי והוחלו בדרך כלל
על דרך ההפניה אל הרין הכללי[76]). השני, בהרכב השופטים. בעור שבמערכת המשפט
האזרחית יושבים בדין שופטים מקצועיים הרי שבמערכת המשפט הצבאית מכהנים גם
שופטים שאינם משפטנים.

אמנם התפיסה הרמוקרטית הרצויה היא שחייל, ככל אזרח, נושא בחובות אזרחיות
וזכאי לקבל הגנה על כל זכויות האזרח, אך בכל זאת העובדה שחייל הוא חלק ממנגנון
המופקר על ביטחון המרינה והגנתה הופכת אותו לשונה מאזרח שאיננו חייל: מעצם
תפקידו, סיכון גבוה נשקף לחייו, ועל־כן חייב הוא בוויתור מכללא על הזכות הבסיסית של
כל אדם – הזכות לחיים[77]. החייל, בניגור לאזרח, חייב לבצע את משימתו כמעט בכל תנאי,
בעור שהאזרח רשאי לנטוש את תפקידו אם רצונו בכך. בצבא מתקיימת חלות הררית ואמון
הררי – כולם סומכים על כולם וכולם תלויים בכולם. ללא אמון זה אין המערכת הצבאית
יכולה לתפקר. כרי לקיים את יחסי האמון והתלות ההררית, ולהבטיע סטנדרטים התנהגותיים
מסוימים יש צורך במערכת שפיטה נפררת מהמערכת האזרחית: הטעמים העיקריים
שמצדיקים מערכת שפיטה נפררת לחיילים הם לרוב שיקולים מעשיים או שיקולי יעילות –
העובדה שמערכת צבאית חייבת להיות מסוגלת לענות על צרכיה ללא התניה כלשהי, היא
לא יכולה להיות תלויה ברבר, היא חייבת להיות גמישה ולהביא בחשבון לוח זמנים
המתחשב בתוכנית אימונים ובמשימות ספציפיות. מעבר לכך, מערכת שפיטה צבאית נפררת
מאפשרת לנצל את פוטנציאל כוח הארם שהרי חייל שנענש בבית דין צבאי נשאר במסגרת
הצבא, והצבא יכול להמשיך להפיק ממנו את שנדרש עבורו בהתאם לצרכיו[78].

הניגמק החשוב ביותר להצדקת מערכת שפיטה נפררת היא הצורך בהסררת התנהגות
החיילים באורח מיוחר לצבא כתנאי הכרחי להשגת יערי הצבא – יש הכרח שחיילים
יישפטו בידי מפקרים, אנשי צבא ולא שופטים מקצועיים, שכן לאנשי הצבא היכולת
להעריך נכונה את טיב התנהגות החייל ובידיהם נתונה אחריות כוללת לנעשה בצבא, לרבות
קיום המשמעת בו. כמו כן, לעתים אינטרס הצבא עשוי להיות עריף על אינטרס החייל
כפרט, ולכן בזמן שהשפיטה האזרחית מקפידה על הגנת זכויות הפרט במשפט הפלילי,

73   סעיף 1 לחוק השיפוט הצבאי.
74   סעיף 14 לחוק השיפוט הצבאי.
75   סעיף 461 לחוק השיפוט הצבאי.
76   סעיף 476 לחוק השיפוט הצבאי.
77   סעיף 9 לחוק־יסור: כבור הארם וחירותו.
78   מורריק (לעיל הערה 71), בעמ' 87-90.

שיפוט טרדיטיסטים – הצדקה לכללי שיפוט שתים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

מערכת המשפט הצבאית מגבילה אותו ככל שמתקיים אינטרס צבאי עדיף וחשוב המכתיב את פעולתו של הצבא[79].

אחת ההצדקות האפשריות למערכת שיפוט צבאית נפרדת היא שהצבא הוא מערכת מקיפה שמרחב ההתנהגות המיוחד לה משתרע על פני מכלול עניינים מגוון ביותר. לכך מצטרפת ההווי הצבאית המיוחדת. אלו מצדיקים לכאורה מערכת שפיטה ספציפית, נפרדת. אלא שחייבים לבחון אם קיומה של מערכת שפיטה נפרדת גוררת אחריה בהכרח גם סדרי דין שונים וכללי ראיות שונים העשויים לפגוע בזכויותיו הדיוניות של הנאשם העומד לדין.

בישראל "הערכה כוללת מראה שכף המאזניים נוטה במידה מרובה אל קרבה מהותית (של מערכת השפיטה הצבאית) לבית משפט שהוא חלק מן הרשות השופטת"[80]. סדרי הדין וכללי הראיות דומים[81], כך גם הפונקציה שממלאות מערכת התביעה והסנגוריה הצבאית וחשוב מכל העוברה שקיימת ביקורת של מערכת השפיטה האזרחית על דרך של ערעור לבית המשפט העליון[82].

ועדיין לא ניתן להתעלם מה"חסר" הקיים במערכת השפיטה הצבאית והשוני שנובע מהרכבו ומאופיו של בית דין, שיש בו כדי להשפיע על זכויות דיוניות של העומד לדין בפניו, ובמבחן התוצאה השפעה על זכויותיו המהותיות: כבודו וחירותו של החייל נפגעים אף שאין חולק שזכויות האדם הן גם זכויות החייל כאדם[83].

כך, למשל, אף שחוק השיפוט הצבאי קובע את העיקרון שמשפט נפרד בפני בית דין צבאי נערך כרגילותים פתוחות וקובע סמכות לסגירת הדלתים מטעמים הקבועים בחוק כרומה לערכאה רגילה[84], הוא אינו מסתפק בכך ומוסיף סמכות גם לדרג הפיקודי להורות על דין סגור מטעמים של פגיעה בביטחון המדינה[85]. אין ספק שהוספת סמכות זו עשויה להיות בעלת השלכות מוגענות בזכויות הנאשם להליך פומבי שלא לצורך שהרי הרשות איננה חייבת לנמק את החלטתה ובית הדין הצבאי בפניו יידון הנושא לא יבקר אותה. הביקורת

---

79   Westmoreland & Prough "Military Justice" 3 *Har. J. of L. & Pub. Policy* (1970) 1, p. 50.

80   מורריק (לעיל הערה 71), בעמ' 116.

81   סעיף 476 לחוק השיפוט הצבאי קובע: "דיני הראיות המחייבים בעניינים פליליים בבתי המשפט של המדינה מחייבים גם בבית-דין צבאי ולפני שופט שופט חוקר, והוא כשאין הוראה אחרת בחוק".

82   סעיף 440 לחוק השיפוט הצבאי (תיקון מס' 17), תשמ"ו-1986.

83   ע' מהדריק שפיטה צבאית (משרד הביטחון, תשנ"ג), 56.

84   סעיף 325 לחוק השיפוט הצבאי.

85   סעיף 324 לחוק השיפוט הצבאי.

443

מאבקה של דמוקרטיה בטרור – היבטים משפטיים ומוסריים

השיפוטית נתונה רק לבית המשפט הגבוה לצדק שאינו נוהג להתערב בשיקול הרעת של הדרג הפיקורי בצבא[86].

לרעתי, פגיעה זו אינה הכרחית, וניתן ודאי להסתפק בחריגים שקובע חוק השיפוט הצבאי לדרון פורמבי הנתונים לשיקול הרעת של בית הרין בלא מתן סמכות נפרדת לדרג הפיקורי. החשש של שימוש לרעת בסמכותו של הדרג הפיקורי והחשש הנלווה לפגיעה בערובות החוקתיות של נאשם בהליך הוגן דורשים זהות בין כלל הפומביות וחריגיו הנהוגים במערכת המשפט האזרחית לבין כלל זה במערכת השפיטה הצבאית.

במקום אחר הסברתי את הפער הקיים בין דיני המעצר בצבא לבין דיני המעצר במערכת המשפט הפלילי הכללית[87]. כך לדוגמה, בזמן ששיקולי הרחצה ויעילות נשללו בדיני המעצר האזרחיים והוכרזו כבלתי חוקים[88], מהות השירות הצבאי ואופיו כנראה ממשיכים להצדיק כשלעצמם מעצרו של חייל רק משיקולי הרחצה או יעילות המערכת המשפטית[89]. אותם צירורקים שמצאנו להקמתה של מערכת שפיטה נפרדת משמשים עתה להצדיק מעצר עד תום הליכי משפטם של נאשמים אשר הואשמו בעבירות שבגינן לא היו נעצרים בבתי המשפט האזרחיים[90].

לרעתי, הצירוקים למערכת שפיטה צבאית נפרדת לא יכולים לשמש גם כצירוקים לפערים בין דיני המעצר וסדרי הדין החלים במערכת המשפט האזרחית לבין אלה החלים במערכת המשפט הצבאית.

הזכויות הריונויות של כל נאשם בהליך משפטי לא להיעצר עד תום ההליך רק משום האשמתו בעבירה חמורה ולמען יראו ויראאו, פועלת גם לגבי מערכת המשפט הצבאית: מעצר משיקולי הרחצה נוגר את התפיסה הבסיסית של חפות החלה על כל אזרחי המרינה – מעצר לפני הכרעת דין מוצדק רק על בסיס מניעתי. ההנמקה שלפיה המעצר עד תום הליכי המשפט הוא דרך להבעת מורת רוחו של הצבא מעבירות הפוגעות במשמעת שהיא תנאי הכרחי לתפקודרו התקין של הצבא, היא הנמקה מקוממת המשרדת מסר של הוראה בכישלון ההליך הפלילי בצבא, משמעותה היא שעל אף הכח הרב שההליך הפלילי מוסד בירי רשויות השפיטה, הוא אינו אפקטיבי כשלעצמו בהעברת מסר הרתעתי, ושהחיילים אינם מסוגלים להבין את משמעותם של עמירה לדין והרתעה הגלומה בעצם קיומה של הוראה עונשית בחוק[91].

86   ראו, לדוגמה, בג״ץ 2888/99 הולנדר נ׳ היועץ המשפטי לממשלה (טרם פורסם).

87   ע׳ גרוס ״היבטים חוקתיים של דיני המעצר בצבא״ משפט וממשל ה (תש״ס) 437.

88   ראו לעניין זה בש״פ 537/95 גנימאת נ׳ מרינת ישראל, פ״ר מט(3) 355 ; בש״פ 8087/95 זאדה נ׳ מרינת ישראל, פ״ר נ(2) 133.

89   גרוס (לעיל הערה 87), בעמ׳ 450.

90   ע״מ15/97/ טוהי׳ יעקב רמרי נ׳ התובע הצבאי הראשי (לא פורסם).

91   גרוס (לעיל הערה 87), בעמ׳ 437.

444

שיפוט טוחדריסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

לפיכך, מעצר חייל רק בשל החשד שעבר עבירה חמורה, חרף אי־מסוכנותו האישית, יש בו משום פגיעה חמורה בחירותו של אדם אשר ייתכן שיצא זכאי בדינו עם סיום הבירור המשפטי.

איני סבור שיש לבחון את הגבלת חירותו של חייל על פי הצפיות של גורמי הצבא כדבר האמצעי שיסייע בידם לקידום המשמעת וההרתעה בצבא. המבחן הנכון צריך להיות האם הפגיעה המוצעת הכרחית והאם היא הולמת את תפיסות היסור של החברה. על כך אני משיב, כאמור, בשלילה.

הכרל אחד שראוי לציינו ענייננו בזכות החשוד לבוא בפני שופט לאחר מעצרו הראשוני. במערכת האזרחית משך המעצר לפני הבאת העצור בפני שופט לא יעלה על 24 שעות[92] ואילו במערכת הצבאית קוצר משך הזמן משמונה ימים[93] ל־96 שעות[94] ולבסוף בעקבות פסיקת בית המשפט העליון ל־48 שעות[95]. איני יכול להעלות בדעתי כל טעם ענייני הקשור דווקא לאופי השירות, אשר בעטיו אפשר להשתכנע בדבר שוני בין שתי מערכות השפיטה. ההכרל קיים רק מפאת העובדה שנועד לשרת צרכים של צד אחד בלבד – נוחות של המערכת, ונוחות זו לא יכולה להצדיק אי הבאתו של החייל תוך 24 שעות ולא 48 שעות בפני שופט.

המסקנה המתבקשת היא שאופיו של הפורום השומם אכן יש בו כדי להשפיע על הערובות החוקתיות של העומדים לדין בפניו.

## ב. פורום שיפוטי מיוחד לעבירות הטרור

מצאנו שהחברה מצדיקה את השיפוט המהיר בכך שהיא מבקשת להגשים תכלית אחרת, ראויה לא פחות מזכויותיו של נאשם, והיא – ביטחון המדינה ואזרחיה על ידי השבת יעילות דיון מרבית והרתעה. כך, למשל, במקרה של חייל שנחשד שבגד בחבריו בזמן מלחמה – חשוב שהמערכת תגיב מהר ותעמידיר לדין במהירות כדי שתושב יעילות, גם אם יעילות זו מכרסמת בערובות החוקתיות העומדות לנאשם. ברומה לכך חשב הנשיא בוש ששיפוט מהיר של טוחדריסטים יהיה בבחינה תגובה מהירה ויעילה במלחמה בטרור[96]. שיפוט מהיר זה – מעין בית דין שדה – יגשים, כך חושבים, את המטרה שכן הוא ירתיע את העוסקים בטרור, בחינת יראו מה קורה למי שנחשד בפעילות טרוריסטית וייראו. האם אכן פגיעה

92   סעיף 29(א) לחוק סדר הדין הפלילי (סמכויות אכיפה – מעצרים), תשנ״ו-1996.

93   חוק השיפוט הצבאי (תיקון מס׳ 32), תשנ״ו-1996, ס״ח 366.

94   חוק השיפוט הצבאי (תיקון מס׳ 32) (תיקון), תשנ״ח-1998, ס״ח 278.

95   בג״ץ 6055/95 צמח נ׳ שר הביטחון, פ״ד נג(5) 241.

96   A. Woolner "Model Trial? 1942 Tribunal Hid More Than State Secrets" *American Lawyer Media, L.P* (December 5, 2001)

שיפוט טרדיציסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

בסעיף 66 של אמנת ז'נבה הרביעית בכפוף לכך שבתי המשפט יוקמו בצורה תקינה, אינם פוליטיים באופיים ויושבים לדין בערכאה ראשונה בשטח הכבוש.

הסעיפים הבאים לאמנה הם בעלי אפקט מצטבר של הגנה רחבה על קיומם של הליכים פליליים תקינים: כך למשל, נדרשים בתי המשפט הצבאיים להחיל רק הוראות חוק שהיו בנות תחולה לפני ביצוע העבירה ושמתחייבות עם עקרונות משפט כלליים. מידת העונש חייבת להיות פרופורציונלית לעבירה ובית המשפט הצבאי יביא בחשבון את העובדה שהנאשם אינו אזרח של המדינה הכובשת[136]. ניהול המשפט חייב להיות תקין ויש למסור לנאשם בהקדם ובכתב בשפה המובנת לו את פרטי האישום[137]. יש לאפשר לו להביא ראיות להגנתו ולהסתייע בסנגור ובמתורגמן[138]. יש להתיר זכות ערעור או עתירה לרשות מוסמכת של המדינה הכובשת[139].

הוראות נוספות בנושא זה מופיעות בסעיפים 11 ו-75 לפרוטוקול המשלים[140]: חזקת החפות שלפיה כל אדם הנו בחזקת זכאי כל עוד לא הורשע בדין, שיפוט בנוכחות הנאשם, וחיסיון מפני הפללה עצמית שלפיו אין לאלץ אדם להעיד כנגד עצמו או להודות באשמה.

## ב. מערכת המשפט שהפעילה מדינת ישראל בשטחים הכבושים

מדינת ישראל היא צד מתקשר באמנת ז'נבה ולכן ההסכם חל על כל השטחים שנכבשו על ידה במלחמת ששת הימים ושנשארו בשליטתה. עם זאת יש לציין, שממשלת ישראל נקטה עמדה שאין היא מודה בתחולת האמנה על השטחים הללו, מאחר שמעולם לא הכירה בזכויותיהן של מצרים וירדן על חלק כלשהו של ארץ ישראל[141]. אך עמדה זו לא עולה בקנה אחד עם הוראות אמנת ז'נבה הרביעית שאינה מתנה את תחולתה בהכרה בזכויות קנייני אלא חל על כל מקרה של כיבוש חלקי או מלא של טריטוריה של צד מתקשר[142]. והנה ב־1971 בסימפוזיון בין־לאומי לזכויות אדם, הודיע היועץ המשפטי לממשלה רשמית, כי ממשלת ישראל החליטה (בלי לחזור בה מעמדתה המשפטית העקרונית) לנהוג בפועל בהתאם להוראות ההומניטריות של אמנת ז'נבה הרביעית[143].

136  סעיף 67 להסכם ז'נבה הרביעי.
137  שם, סעיף 71.
138  שם, סעיף 72.
139  שם, סעיף 73.
140  הפרוטוקול המשלים הראשון (לעיל הערה 45).
141  M. Shamgar "The Observance of International Law in the Administered Territories" 1 Isr. Y.B. Hum. Rts. (1971) 262, p. 263
142  סעיף 2 לאמנת ז'נבה הרביעית (לעיל הערה 33).
143  Shamgar (לעיל הערה 141), בעמ' 266.

459

מאבקה של דמוקרטיה בטרור – היבטים משפטיים ומוסדריים

לצד זה יש להזכיר שכיוון שמרבית הוראותיה של אמנת ג'נבה הרביעית הן קונסטיטוטיביות, הרי שכל עוד אין בישראל חקיקה הקולטת את ההסכם לתוך המשפט הפנימי, אין להוראות הקונסטיטוטיביות תחולה אוטומטית במישור הלאומי[144]. למרות זאת ציין בית המשפט העליון כי "שעת הוא לחשוב... כי אמנת ג'נבה אינה חלה על יהודה ושומרון. היא חלה, אף כי... אין היא שפיטה בבתי המשפט הישראליים"[145].

ואכן, לאחר שמדינת ישראל כבשה בשנת 1967 את אזור יהודה שומרון וחבל עזה, היא הקימה בהם מערכת בתי משפט צבאיים בהתאם להכרה של המשפט הבין-לאומי בצורך להבטיח את שלטון החוק בהיבט של ציות לחוק גם בתנאים של כיבוש ותפיסה לוחמתית. את קיומו של מנגנון משפטי ושיפוטי נאות ותקין, אשר ישמש כלי עצמאי ובלתי תלוי להשלטת החוק לשם הבטחת הביטחון, הסדר הציבורי, טובת האוכלוסיה ורווחתה באה להבטיח מדינת ישראל במנגנון השיפוטי הצבאי שכוננה באזורי יהודה שומרון וחבל עזה, כמו גם בהמשך קיומם של בתי המשפט המקומיים באזור.

כלומר, בהתאם לעקרונות של המשפט הבין-לאומי שרנו בהם, נשמרה עם כניסת צה"ל לאזורי יהודה שומרון וחבל עזה, המערכת השיפוטית המקומית, על סמכויות השיפוט שלה, על פי הדין המקומי – כפי שעמד בתוקפו ערב תפיסת האזורים על ידי צה"ל. במקביל למערכת זו כוננה מערכת בתי משפט צבאיים בכל אזור ואזור בידי מפקד כוחות צה"ל באזור – אלוף הפיקוד המהווה, כאמור על פי כללי המשפט הבין-לאומי הרשות העליונה באזור הכבוש, וככזה בידיו סמכויות השלטון, החקיקה והביצוע החל מרגע תחילת הכיבוש. כך, במנשר בדבר סדרי השלטון והמשפט, שפורסם ביהודה, בשומרון ובחבל עזה על ידי שני מפקדי האזורים ראו נקבע[146]: "כל סמכות של שלטון, חקיקה, מינוי ומנהל לגבי האזור או תושביו תהא מעתה נתונה בידי בלבד, ותופעל על די או על ידי מי שיתמנה לכך על ידי או יפעל מטעמו".

במסגרת סמכויות החקיקה, פרסמו שני מפקדי האזור כל אחד באזורו את הצו בדבר הוראות ביטחון, תש"ל-1970[147] ולפיו כוננו בכל אזור בתי משפט צבאיים של ערכאה ראשונה. מאוחר יותר הוקם בית משפט צבאי לערעורים.

## 1. סמכויות בתי המשפט הצבאיים

הצו בדבר הוראות ביטחון הסמיך את בתי המשפט הצבאיים לדון בכל עבירה שהוגדרה בתחיקת הביטחון ובכל עבירה שהוגדרה בדין (הדין המקומי כפי שעמד בתוקף ערב כניסת

---

144 ד' לפידות "המשפט הבינלאומי במשפט הישראלי" משפטים יט (תש"ן) 807, בעמ' 826.

145 בג"צ 390/79 דויקאת נ' ממשלת ישראל, פ"ד לד(1) 1, בעמ' 29.

146 א' גרום "מערכת בתי משפטי הצבאיים ביהודה שומרון וחבל עזה" סקידה חודשית: ירחון לקציני צה"ל לו(5) (1989) 12, בעמ' 13.

147 צו זה החליף צו קודם שהוצא בשנת 1967, בימים הראשונים של שלטון צה"ל באזורים אלה.

שיפוט טרוריסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

כוחות צה"ל לאזור) בכפוף לאמור בתחיקת הביטחון[148]. כלומר, לגבי עבירות על הדין המקומי קיימת סמכות שיפוט מקבילה לבתי המשפט הצבאיים ולבתי המשפט המקומיים שהמשיכו לפעול באזור גם לאחר כניסת כוחות צה"ל[149]. הבחירה היכן יועמד עברייני שעבר על הדין המקומי לדין נתונה בידי רשויות התביעה המוסמכות[150]. בדרך כלל כאשר העבירה היא בעלת אופי ביטחוני יוגש כתב האישום לבית המשפט הצבאי. מדובר בעבירות הפוגעות על פי טיבן וטבען בביטחון האזור, בסדר הציבורי בו, בכוחות הביטחון או בגורמים שונים הפועלים בשיתוף פעולה עם גורמי הביטחון, באזורחים ישראלים או בכל אינטרס חשוב אחר של הממשל הצבאי באזור[151].

יש להדגיש, סמכותם של בתי המשפט הצבאיים מתפשטת בנסיבות מסוימות גם מעבר לתחומי האזור, לדוגמה במקרה שהתבצע מחוץ לתחומי האזור ומהווה עבירה על פי תחיקת הביטחון אילו בוצע בתוך תחומי האזור או על פי הדין המקומי התל בו, ואותו מעשה פגע או נוער לפגוע בביטחון האזור או בסדר הציבורי בו, תהא סמכות לבית משפט צבאי!

## 2.  הרכב בתי המשפט

בראש כל אחד מהם עומד נשיא בית משפט, ולצדו מכהן נשיא תורן, הממלא את תפקידיו של הנשיא במקרה שהוא נעדר. שופטים אלה מתמנים על ידי מפקד כוחות צה"ל באזור על פי המלצת הפרקליט הצבאי הראשי[152]. כשופט משפטאי בבית המשפט הצבאי יכול להתמנות קצין צה"ל בדרגת סרן ומעלה, שהוא בעל הכשרה משפטית, וכנשיא בית המשפט שופט משפטאי שדרגתו אינה נמוכה מסא"ל. נשיאי בתי המשפט והנשיאים התורנים הם שופטים בשירות סדיר, בעוד שעיקר הכות השיפוטי, מבחינה כמותית מתבסס על עורכי דין שהם אנשי מילואים של הפרקליטות הצבאית[153].

הדיון בכתבי האישום המוגשים לבתי משפט אלה יהיה בפני שלושה שופטים שברכבכם ישב לפתחת שופט משפטאי אחד שישמש כאב בית הדין, ושני השופטים האחרים יהיו קציני צה"ל שאינם רווקא בעלי הכשרה משפטית[154] או בפני רך יחיד שהוא שופט משפטאי[155]: מבחינת הסמכות העניינית אין כל הבדל, בשני המקרים מוסמך בית המשפט הצבאי לדון

148.  ראו סעיף 7 לצו בדבר הוראות ביטחון (להלן – הצו).
149.  מ' רדור "סמכות שיפוט פלילית מקבילה בשטחים המוחזקים" הפרקליט לב (תשל"ט) 386.
150.  בג"ץ 412/71 נסיראאט ג' מפקד כוחות צה"ל ברצועת עזה וצפון סיני (לא פורסם).
151.  גרוס (לעיל הערה 146), בעמ' 14. ראו גם בג"ץ 481/76 ליפטאאר ג' שר הביטחון, פ"ד לא(1) 266.
152.  ראו סעיף 3 לצו.
153.  גרוס (לעיל הערה 146), בעמ' 14.
154.  נשים לב שהסדר זה רומה להסדר התל בבתי הדין הצבאיים לפי חוק השיפוט הצבאי, חשט"ו-1955, כפי שהצגנו אותם בפרק הראשון.
155.  ראו סעיפים 3א, 4 לצו.

בכל העברות שהוגררו בתחיקת הביטחון וכרין המקומי כפוף לתחיקת הביטחון. ההכרל
הוא בסמכות הענישה, סמכותו של רן יחיר מוגבלת יותר – רן יחיר לא יכול לגזור על
הנאשם עונש מוות. סמכות זו מצויה רק בהרכב של שלושה שופטים כאשר שניים מהם הם
שופטים משפטאים וגזר הרין יינתן פה אחר !

הבחירה בפני איזה הרכב (רן יחיר או שלושה) יירון כתב האישום נתונה לתביעה
הצבאית כלבר[156].

### 3. סררי הרין וההראיות

כללי הרין הם כפי שנקבעו בצו ברבר הוראות ביטחון או על פי סררי הרין הנראים
לבית המשפט כמתאימים ביותר לעשיית רין צרק[157]. נקבעו הוראות מפורשות הנוגעות
לעקרון פומביות הריון[158], לזכותו של הנאשם להיות נוכח בכל הליכי המשפט[159], להעמרת
מתורגמן לנאשם שאינו מבין עברית[160], לזכותו של הנאשם להיעזר בסנגור על פי
בחירתו[161]. יתרה מזאת כשרובר בעבירה חמורה, והנאשם לא בחר לעצמו סנגור ולא מונה
לו סנגור על ירי היעוץ המשפטי באזור, בית המשפט הצבאי בהסכמת הנאשם (והסנגור
המיעיר) ימנה לו סנגור.

### 4. זכות הערעור

ער 1.4.1989 לא היה ניתן להגיש ערעור על פסק רין של בית המשפט הצבאי לערכאה
שיפוטית כלשהי[162]. מי שהורשע יכול לפנות למפקר כוחות צה"ל באור כבקשות שונות

---

156  כג"ץ 372/88 פוקס נ' הפרקליט הצבאי הראשי, פ"ר מכ(3) 154 : בעתירה זו נטען שהחלטת
התביעה הצבאית להעמיר לרין את הנאשם בפני רן יחיר לוקה בחוסר סבירות קיצוני.
העתירה נרחתה מן הטעם שבחירת האישום והערבאה השיפוטית שתירון בו מסורות ביךי
התביעה הצבאית.

157  ראו סעיפים 9, 10 לצו.

158  סעיף 11 לצו קובע: "(א) בית משפט צבאי יקיים את הריונים הנערכים בפניו כרלחיים
פתוחות, אולם רשאי בית המשפט צבאי לצוות כי הרין כפניו יתקיים כולו או מקצתו,
כרלתיים סגורות, אם הוא סבור כי מן הראוי לעשות כן מטעמים של ביטחון כוחות צה"ל,
ביטחון הציבור, הגנה על המוסר או שלומו של קטין, או אם הוא סבור כי הרין הפומבי עלול
להרתיע או מלהעיר ערות חופשית או להעיר כבלל". נשים לב שאצלנו הכלל הוא רין פומבי,
כעור שכאצרות-הברית כיום הכלל הוא רין סגור.

159  סעיף 35 לצו.

160  סעיף 12 לצו.

161  סעיף 8 לצו.

162  כפי שהסברתי המשפט הבין-לאומי מסעיף 73 לאמנת ג'נבה הרביעית לא קבע חובה לקיים
ערכאת ערעור, הוא אפשר לפנות לרשות המוסמכת של המעצמה הכוכשת, ורשות מוסמכת זו
אינה ערכאה שיפוטית נוספת.

שיפוט טוחדיסטטיס – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

הנוגעות לפסק הדין. למפקד האזור ניתנה סמכות להתערב בפסק הדין בין בדרך של זיכוי הנאשם או ביטול פסק הדין וקיום משפט חדש.

הקמת ערכאת ערעור נוספת באה בעקבות דיון בבית המשפט הגבוה לצדק בישראל בעתירה שהגישו שניים שהורשעו בבית המשפט הצבאי ברמאללה[163] – שם למרות שרחבה בג״ץ את העתירה ולא מצא מקום להתערב לאור העוברה שכללי המשפט הבין-לאומי לא מחייבים ערכאת ערעור, הציג בג״ץ את עמדתו המצדרת בהקמת ערכאת ערעור צבאית באזור יהודה ושומרון וחבל עזה. עמדה זו נבעה מתרומתה של זכות הערעור לחיזוק יסודות ההגינות והסבירות שבהליך משפטי. מדריב הערעור נחשב בשיטות נאורות כחלק יסורי ומהותי מן השפיטות ההוגנת, הכנסתו למערכת המשפט הצבאית תעלה את קרנה ותבליט את אי חלותם. כמו כן לאור ״דוקטרינת הכיבוש הארוך״ שלפיה ככל שהכיבוש ארוך יותר בזמן יש ליתן משקל לצורכי האוכלוסיה המקומית על ידי שינוי חוקים קיימים ופרסום חדשים בהתאם לצורכי החברה המשתנים במרוצת הזמן קבע הנשיא שמגר: ״הנהגתה של זכות ערעור מבטאת את ההסתלקות מאמצעי חירום קיצוניים, המתחייבים בתקופה הראשית של ממשל צבאי, אך אינם מוצדקים בממשל צבאי הקיים כבר עשרים שנה ויותר... אין למצוא סיבה והגיון בכך, שדווקא מערכת השיפוט הצבאית, קרי הכלי לעשיית הצדק מטעם השלטון הישראלי, תוסיף לשאת, יותר מכל מערכת שלטונית אחרת, את תוויות ההיכר של המלחמה, של הארעיות, של ההגבלות הנובעות מזמן החירום, שביטויה בהיעררך של התכונות המשלימות את מהותה ומראית פניה של שיטת משפט הוגנת ומושלמת״[164].

כתוצאה מפסק דין זה תוקן הצו בדבר הוראות ביטחון[165], והוסף החל מה-1.4.1989. בית משפט צבאי לערעורים אחר ששירות את שני האזורים. לצורך ערעור יש להבחין בין פסק דין שניתן על ידי דן יחיד לבין פסק דין שניתן על ידי הרכב של שלושה. באחרון הערעור הוא בזכות בעוד שלגבי דן יחיד הערעור הוא ברשות[166]. זכות הערעור או בקשת רשות לערער נתונה הן למי שנמצא אשם והן לתביעה הצבאית. ערעור אוטומטי יתקיים כאשר ניתן פסק דין המטיל עונש מוות, אפילו לא הוגש ערעור בידי הנאשם[167].

מוסד זה הוא חשוב ביותר ומחזק כאמור את ההליך המשפטי ההוגן הוא מאפשר העברתן של החלטות שיפוטיות שניתנו על ידי הערכאה הראשונה בכור היתוך נוסף, שבסופו ייפסלו החלטות שיימצא בהן פגם, ואילו ההחלטות שיעמדו בבחינה הנוספת תצאנה מחוזקות יותר. ערכאה חדשה זו מחזקת את עצמאותה של המערכת השיפוט הצבאית ואת אי תלותה בגורדמים חיצוניים.

163 בג״ץ ארג'וב (לעיל העדה 97).
164 שם, בעמ׳ 375-376 (ההרגשה שלי – ע׳ ג׳).
165 ראו סעיף 4ב לצו.
166 סעיף 240 לצו.
167 סעיף 140 לצו.

מאבקה של דמוקרטיה בטרור – היבטים משפטיים ומוסריים

דבים רואים את הליכי המשפט שמקיימת מדינת ישראל בשטחים המוחזקים כמאמץ וניסיון אמיתי לשלול את האמרה הידועה שלפיה "משפט צבאי דומה למשפט, כשם שמוסיקה צבאית דומה למוסיקה"[168].

אני סבור, שמדינת ישראל אכן עשתה מאמץ רציני לקיים מערכת משפט הוגנת בשטחים המוחזקים. העובדה שהקימה מערכת שיפוט מיוחדת לעבירות ביטחוניות – מערכת השיפוט הצבאית[169] – איננה מעורדת חשר ממשי, שכן שיפוט של עבירות ביטחוניות על ידי מערכת השיפוט המקומית בשטח הכבוש הייתה נגועה בניגוד עניינים ומשוא פנים מובהק, אין צפיות סבירה מבתי משפט מקומיים לשפוט באופן אובייקטיבי בעבירות נגד ביטחון האזור !

יתרה מכך, מדינת ישראל בחרה לשמור על הערובות החוקתיות של נאשם העומד לדין ולצמצם למינימום אפשרי את השפעתו של פורום השיפוט על זכויותיו הדיוניות של הנאשם.

השאלה היא מדוע מדינת ישראל פעלה לצמצום השפעת הפורום השופט ולא לנטרול השפעה זו באופן מוחלט, מדוע בכל זאת קיים זה פער ? הרי לא ניתן להתעלם מהעובדה שהשפעה זו בכל זאת קיימת כיוון שהשופטים אינם שופטים מקצועיים – ההרכב הוא מעורב משופט מקצועי וממשפטרים צבאיים שאינם בעלי הכשרה משפטית.

אמנם, מדינת ישראל בחרה לקיים ערובות חוקתיות העומדות לנאשם בבית המשפט צבאי בשטח כבוש ברובה לערובות חוקתיות העומדות לנאשם בדין צבאי בישראל, זאת על אף שיכולה לקיים משפט פלילי בטריבונל צבאי על פי סדרי דין וראיות החלים בבית משפט פלילי מקומי שבשטח הכבוש. נשים לב שמדינת ישראל קבעה שריני ראיות הראיות שיחולו בבית משפט צבאי יהיו אותם דינים החלים בבית משפט בישראל[170]. לעומת זאת זכות העצור לפי הצו להיות מובא בפני שופט שונה מכוחות של אזרח ישראלי בשטחי מדינת ישראל להיות מובא בפני שופט. בעוד שבישראל יש להביא את העצור בפני שופט תוך 24 שעות מהמעצר[171], הרי שלפי הצו אפשר לעצור אדם ורק לאחר 96 שעות לקבל פקודת מעצר לגביו[172]. פגיעה חמורה יותר היא שקצין משטרה מוסמך לתת פקורת מעצר עד 7 ימים[173], הוראה דומה אין בחוק החל בישראל – שם צו מעצר ניתן על ידי שופט בלבד.

168   אמרה זו מיוחסת לצדפתי קלמנסו, ראו גרדס (לעיל הערה 146), בעמ' 21.
169   הסברנו שממכות השיפוט של בתי המשפט הצבאיים היא מקבילה לבתי המשפט המקומים אך בעברדות ביטחוניות הסמכות היתה בדרך כלל של בתי המשפט הצבאיים.
170   סעיף 9 לצו מוהד : "בדיני הראיות ינהג בית משפט צבאי לפי הכללים המחייבים בעניים פלילים בבתי המשפט של מדינת ישראל".
171   סעיף 29(א) לחוק סדר הדין הפלילי (סמכויות אכיפה – מעצרים), תשנ"ו-1996.
172   סעיף 78(ג) לצו.
173   סעיף 78(ר)(1) לצו.

שיפוט טרודיסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

פעד נוסף בין סדרי דין החלים לפי החוק בישראל לבין הצו בדבר הוראות ביטחון קיים בזכות העצור להיפגש עם עורך דין: החוק החל בבתי המשפט בישראל מאפשר השהיית הפגישה בין עצור לחשוד בעבירות ביטחון לבין עורך דינו עד 10 ימים באישור הקצין הממונה[174] ועד 21 יום באישור נשיא בית המשפט המחוזי עם זכות ערר לבית המשפט העליון[175]. לעומת זאת לפי הצו בדבר הוראות ביטחון רשאי הממונה על החקירה לדחות הפגישה בין העצור לעורך הדין עד 15 ימים מטעמי ביטחון האזור או טובת החקירה ורשות מאשמת רשאית להאריך תקופה זו ב־15 ימים נוספים. כלומר ניתן לדחות הפגישה עד 30 ימים[176] ;

פערים אלה והשלכותיהם כפי שנראה מיד, מבליטים בהחלט קיומה של סטייה מהאיזון בין צורכי הביטחון לבין זכויות של חשוד/נאשם להליך הוגן ולהגנה על העדרובות החוקתיות העומדות לו לשם הבטחתו של הליך זה: אדגון בצלם הציג בשנת 1989 רוח אשר התבסס על תצפית שערכו עורכי דין מטעמו בבתי המשפט הצבאיים. ממצאי הרוח משקפים את הסכנה שבה אנו עוסקים: "המצב החמור, שבו רוב הדיונים נדחים וכחורש ימים בשל אי הבאת נאשמים עצורים או בשל אי התייצבות עדי התביעה פוגע בזכותו הבסיסית של האדם שלא להיענש במעצר ממושך עד אשר תוכרע אשמתו בהליך משפטי תקין. העונשה לפיכך קודמת להרשעה ובית המשפט מצטייד רק כקובע מועד סיום לעונש, ולא כמכריע בשאלת אשמה וחפות"[177].

דבריו של שופט צבאי במילואים אריה קוקס מבליטים עוד יותר את הסכנה שבמערכת של שיפוט צבאי: "בדות שבית המשפט הזה אינו בית משפט טבעי ורגיל, אלא איזשהו פתרון שהממשל הצבאי מצא לצורך אכיפת שלטון הכיבוש. העבודה שנעשית שם אינה שיפוטית טהורה: למעשה, כל המצב בבית המשפט הצבאי בעזה נראה כמו משהו שלא מן העולם הזה. מאות בני משפחה בחוץ, עשרות אסירים בפנים, רובם מאד צעירים, והרושם הוא שהם איבדו את האמון במערכת והם אפילו לא מנסים להתגונן. הם מודרים בכל. הסנגורים שלהם, שבהרבה מקרים הם ומירות פתטיות, משלימים גם הם עם המצב ונושים למעשה עבורו של חיווך לצורך עניישה. מצאתי שם סימביוזה מוחלטת בין התביעה, השופטים ועורכי הדין. כשהנאשמים בצד, והכול מתנהל בהשלמה סטואית. מצאנו נאשמים, מצאנו להם גם עבידות מתאימות, ומה שיש לעשות עכשיו זה למצוא להם עונש מתאים עוד יותר"[178].

174   סעיף 35(ג) לחוק סדר הדין הפלילי (סמכויות אכיפה – מעצרים), תשנ"ו-1996.
175   סעיף 35(ד), שם.
176   סעיף 78(ג) לצו.
177   "דו"ח מהדצר האאחורית" סובודיציה 1 (1992) 30.
178   ש' ליטבביך־דד "אין משפט צדק בשטחים, מלה של שופט" מוסף חדשות (11.10.1991) 6.

465

מאבקה של דמוקרטיה בטרור – היבטים משפטיים ומוסריים

אין עוד ספק המציאות הוכיחה שההשפעה המרכזית של אופיו של הפורום השופט על
זכויות הנאשם נובעת מהרכבו – בבית משפט צבאי אשר בו השופטים ממונים על ידי מפקד
צבאי יוצא שהשופטים והתובעים שהם מהפרקליטות הצבאית הצבאית כפופים למפקד אחד ותלויים
בנורם אחד לקידומם, ומכאן, שמערכת הפדרת הדרשויות בין השופטים לתובעים הקיימת
בבית משפט אזרחי רגיל, נעלמת כאשר מדובר בבית משפט צבאי: "בבת משפט צבאיים,
למשל, הקשורים בין השופט לתובע הם קשרים קרובים, לפעמים רק קיד רק מפריד בין חדרו
של הנתבע לחדר של שופט. הם ממש נמצאים אחד בתוך השני. מאחד שהפדרת רשויות
היא עיקרון בסיסי של כל מערכת משפט, היערדה מהווה את אחת הסיבות העיקריות לכך
שאלמנט השיפוט בשטחים לא טהור"[179].

מתצפיות שערך ארגון בצלם באותה תקופה עולה שרוב המשפטים לא מתבססים על
עדים והדרשעות מתבססות על הוראות נאשמים. ממצא כזה מטיל ספק רב האם ההליך בפני
בית משפט צבאי למרות ההוראות שראינו להחיל סדרי דין וראיות כפי שקבועים במשפט
הישראלי, אכן מביא בפועל למשפט צדק: "בניגור למערכת בתי המשפט האזרחיים, היכולת
של שופט צבאי בשטחים לברוק אם הוא אכן עושה משפט צדק והאם הנאשמים עברו את
כל העבירות שביצעו, היא אפסית, מפני שבדרך כלל יש הוראה טוטלית וסיטונית בכל
העבירות. כך נשללת מהשופט היכולת לברוק האם הארם שנמצא לפניו ביצע את העבירות,
את כולן, את מקצתן או שהוא חף מפשע. כלומר, השופט למעשה לא יכול לבדר את האמת
ולעשות משפט צדק. בתחום הזה של העבירות יש עוד חוליה, ראשונית וסבוכה לא פחות
מאלה שבאות אחריה. אל חלק גדול מהעבידות החוקרים מגיעים דרך "הלשנות". אנשים
מורים שם בכל דבר, ומהוראה להוראה הם מפלילים אנשים אחרים. זה מאר מסוכן ולא
בטוח לחרוץ את גודלו של אדם על סמך "הלשנה". ועל סמך ההלשנות האלו מוגשים כתבי
אישום. זו תנובה שרשורת: הלשנה, כתב אישום, הוראה, עונש. ואם מזכירים עונש הרי שגם
רמת הענישה אינה בבחינת צדק שוויוני. כשיהודי הודג ערבי הוא יכול לקבל מאסר של
שנה. כשערבי זורק אבן ולא נגרם שום נזק, הוא מקבל עונש רומה. זה לא משפט צורק"[180].

זו התוצאה בפועל של שיפוט צבאי השונה בהרכבו משיפוט אזרחי רגיל, הגם שמתיימר
להחיל סדרי דין רומים לסדרים החלים בבית משפט אזחדי רגיל – ההשלכות מכרסמות
באופן עמוק בזכות הבסיסית של כל נאשם להליך הוגן. תוצאה כזו עומרת בסתירה
לעקרונות העומדים בבסיסה של מרינה דמוקרטית. מה תהא התוצאה במקרה שבו לא רק
שההרכב השופט נאשמים (טרוריסטים) שונה מהרכב היושב במערכת האזדחית הרגילה –
אלא גם הרין מאפשר התלה של סדרי דין וראיות שונים הפועלים לטובת צר אחד בלבר –
התביעה – כפי שמורה נשיא ארצות-הברית? לתוצאה כזו לא תהא כל יכולת לעמוד מול

179 שם.
180 שם.

שיפוט טרוריסטים – הצדקה לכללי שיפוט שונים: האיזון שבין שיקולי ביטחון לבין זכויות אדם

כללים בסיסים של משטר דמוקרטי אמיתי שמחפש צדק ואמת, שהרי התוצאה תהא ידועה מראש והתהום בינה לבין משהו שקרוב לאמת עמוקה.

להשלמת התמונה של מערכת השיפוט בעבירות ביטחון כפי שקבעה מדינת ישראל יש לציין שלצר שיפוט של השורים של עבירות ביטחון בבתי משפט צבאיים באזורים המוחזקים, יש לבתי המשפט של מדינת ישראל סמכות לדון נאשמים בעבירות ביטחון, ביניהם טרוריסטים על פי החוק הישראלי[181], ובמקרים אלה חולש המשפט הפנימי המקומי של מדינת ישראל ולא המשפט הבין-לאומי. אך חשוב להרגיש, שלמרות שמרינת ישראל נתונה להתקפות רבות, שכיחות ומזעזעות של טרוריסטים היא לא מצאה לנכון להקים טריבונלים מיוחדים בעלי סמכות ייחודית לשיפוטם. סמכות השיפוט נתונה לבתי המשפט הרגילים השופטים כל עבירה פלילית אחרת ולצר אלה קיימת סמכות שיפוט מקבילה לבית משפט צבאי מיוחד – בית המשפט הצבאי בלוד.

בית המשפט הצבאי בלוד כונן ופועל מכוח תקנות ההגנה (שעת חירום), 1945[182].

מרבית הנאשמים הבאים בשעריו הם ערבים תושבי ישראל ואזרחיה שביצעו עבירות על תקנות ההגנה או ערבים תושבי השטחים שביצעו עבירות כאמור בשטח מדינת ישראל[183].

עובדת היותו של בית המשפט בעל סמכות מקבילה ולא ייחורית לשיפוט טרוריסטים (מכוח הפרתם את תקנות ההגנה) מוררה במעט את עצמת החשד שהייתה אוחזת בנו לו היה בעל סמכות ייחורית, אך החשד לא נעלם לגמרי – מדוע לא ניתן היה להסתפק בסמכות השיפוט של מערכת המשפט הרגילה?

כאמור, הסברתי שאיני מוצא צירוק לקיומו של טריבונל נפרד, אלא אם הנושא דורש מומחיות מסוימת שאין בידי כל שופט בבית משפט רגיל או שהמניע להקמת טריבונל נפרד הוא קירום עשייה של צדק. נראה שאף לא אחר משני הצירוקים הללו מהווים בסיס לקיומו של בית המשפט הצבאי בלוד, מה שמסביר את חוסר פעילותו והיעדר הפניית כתבי אישום אליו – בפועל שיפוט טרוריסטים בתוך שטחי מדינת ישראל בהתאם לחוק הפלילי נתון בידי מערכת השיפוט הרגילה, והדרך למחיקתו של בית הדין הצבאי בלוד מספר החוקים במרינת ישראל קצרה.

181   ראו, למשל, סימן ב ור לפרק ז לחוק העונשין, חשל"ז-1977 וכן סעיפים 146-147 לחוק האמור;תקנות 58, 59, 62, 64, 66, 67, 84, 84, 85 לתקנות ההגנה (שעת חירום), 1945 ; סעיפים 2-4 לפקודרה למניעת טרדר, תש"ח-1948.

182   סעיפים 12-15 לתקנות.

183   ע' בן חיים "ענוש המות בפסיקה במי המשפט הצבאים בישראל ובאיזורים המוחזקים" משפט וצבא 10 (חשמ"ט) 35, בעמ' 42.

Emanuel Gross / The Struggle of Democracy against Terrorism: Legal and Moral Dimensions







# EMANUEL GROSS

## THE STRUGGLE OF DEMOCRACY AGAINST TERRORISM: LEGAL AND MORAL DIMENSIONS

Nevo Publishers Ltd.



# EMANUEL GROSS

# THE STRUGGLE OF DEMOCRACY AGAINST TERRORISM: LEGAL AND MORAL DIMENSIONS

ISBN 965-442-031-7

©

Copyright reserved by the author
5764-2004

Nevo Publishers Ltd.
PO 108 Srigim-Leon 99835
Tel. 02-9992099; fax: 02-9992088
nevo@nevo.co.il



pages 181-183

## Chapter Four

## Convictions Based on Confessions under Interrogation

### A.    In Israel

In order to accept defendants' confessions, as already clarified above, it must be proven that the confession was collected freely and willingly.[1] Thus, for example, on March 9, 1994, the district court judge disqualified an interrogee's confession after the GSS interrogators admitted that the interrogee had been denied sleep for 72 hours.[2]

Because interrogations were not documented, the judges were obliged to rely on the testimony of the GSS interrogators regarding the manner in which the confession was collected, in order to determine whether this was admissible. Following the Landau Commission, however, it emerged that GSS interrogators had for years customarily committed perjury before the court regarding the manner in which the confession was collected, as already noted above.

> "When the confession of a defendant in his interrogation is the principal evidential matter against him, the defendant's denial of guilt in court naturally implies the claim that his confession before the interrogators was obtained from him in improper ways and, accordingly, is invalid and not to be admitted as evidence against him. Such a claim requires the pursuit of a 'trial within a trial' regarding the admissibility of the confession. It will be obvious that, in these circumstances, the trial within a trial forms the entire essence of the trial itself, and the determination therein is effectively a determination in the entire trial, whether of acquittal or conviction... Since the earliest times, the interrogators of the Service have not engaged in the recording and collections of confessions... The interrogators engage in the interrogation of the defendant in their interrogation facilities... Once this stage has been completed successfully and the interrogee is ready to confess, he is transferred to a police interrogator, and the latter records the confession properly. That same confession is later presented before the court by the policeman who recorded it, who appears as a witness for the prosecution... This policeman may testify confidently and with a clean conscience that, in the framework of the stage in which he was involved, viz. the recording of the confession, everything proceeded calmly, and the defendant indeed delivered the confession freely and willingly..."[3]

---

[1]     Evidence Ordinance [New Version], 5731-1971, section 12

[2]     The description of the outcome of the trial (a trial within a trial in Criminal Case 201/93 was mentioned in Ginbar (aforementioned note 81), p. 19.

[3]     See the Report of the Landau Commission (aforementioned note 31), pp. 17-18

Over time, an increasing number of defense counsels began to claim that the improper means were used not during the collection of the confession, but during the stages of the preceding interrogation. This claim required the GSS interrogators themselves to testify in court regarding the manner of the interrogation. The Service insisted on the total compartmentalization of the operations of its personnel. Accordingly, nothing that happened in the framework of the Service was brought to the knowledge of any person external thereto:

> "... Now, for the first time, the interrogation personnel found themselves faced with a difficult dilemma: As they stood on the witness stand in the court, they were asked numerous questions about the processes of interrogation, which they were required to answer under oath or warning. The law required them, of course, as any witness testifying before the court, to testify the whole truth and nothing but the truth. Conversely, true testimony might violate the sacred rule of the total compartmentalization that had been ingrained and repeated to every interrogator from the moment he was accepted to the Service... Hence, as he stood on the witness stand, the interrogator saw a double danger in telling the truth: both the exposure of the methods of interrogation and physical pressure and the disqualification of the admission and acquittal of the defendant. From the standpoint of the Service, either of these outcomes was difficult and undesirable, when the Service personnel were convinced, on the basis of reliable information, that the defendant was guilty of that as charged.
>
> The solution the interrogators found themselves to this dilemma was, from their standpoint, the simplest and easiest: They preferred the principle of the total compartmentalization over the obligation to tell the truth in court, and on the witness stand they denied using any physical pressure whatsoever against the interrogees. In more forceful language – they simply lied..."[4]

Interrogators who testified before the Landau Commission were unable to indicate with certainty the moment at which the Service began to behave in this manner. The method of perjury was created ex nihilo, as it were, drawing the interrogators into it as a matter of course. Perjury rapidly became an unchallenged norm. In a memorandum from a discussion between the head of the Service and the head of the Interrogations Unit, which was brought before the commission, it was explicitly stated that in the trials within trials, the interrogators were to deny any use of an interrogation method including physical pressure, and were to claim that they acted customarily in accordance with the procedures of the prison or detention center. Thereby, not only was an explicit instruction given to lie, but also guidance as to what lie was to be uttered. The Report of the Landau Commission notes that the first and principal reason why the GSDS interrogators lied was the practical need not to reveal the interrogation methods. The second reason lies in the fact that the trial will generally stand or fall on the admissibility of the confession. The GSS envisioned a situation in which a defendant, whom the Service believed was indeed guilty, would be released if the method used to extract the confession from him were revealed. The third reason is that the

---

4       See ibid., pp. 18-19

Convictions Based on Confessions under Interrogation

pages 181-183

method simply worked well. For years, the interrogators enjoyed the full trust of the judges, and, accordingly, no need arose to search for another method.[5]

The Commission determined that this procedure or perjury in court must stop immediately. It was also determined that the senior echelon of the Service had failed to understand that its personnel are not above the law, and that the vital task with which the Service has been charged is one that justifies some means, but not all means, and certainly not the means of committing perjury. The Commission further recommended that the matter of the maintenance of records of the interrogation file in the GSS be reconsidered. In the past, the practice was that, after the interrogation itself, the interrogator would record matters that seemed relevant to him from the entire interrogation. They did not maintain interrogation logs during the course of the interrogation, and they did not document the interrogation comprehensively and in its entirety. After the interrogator submitted the concluding report, the entire interrogation file was routinely destroyed.[6]

Conversely, there are those who generally justify the interrogation methods of the GSS. The use of moderate physical pressure in interrogations has become an accepted tool, and is considered the sole tool by which future attacks on innocent persons may be prevented and those responsible for violent activity seized. According to this approach, terrorism is likened to a war without rules.[7] Moreover, the torture that is ostensibly practiced by the GSS cannot even be compared to the torture of suspects in Arab states. In a democratic and civilized state, however, there is no room for interrogation using moderate physical pressure of any degree, regardless of the terror situation in that state. Accordingly, at the least, inspection should be imposed on interrogations, and the boundary between moderate physical pressure and torture should be maintained.[8]

There are those who argue that, in a democratic state, the approach that any means must be applied to interrogees in order to extract the truth is unacceptable. There is a price that a democratic society is unwilling to pay. A reasonable interrogation is one free of torture. Indeed, a democracy must sometimes fight with one hand tied behind its back, and this makes it harder for it; however, without observance of the law and respect for the rights of defendants, the democracy that such means seek to protect will ultimately be harmed.[9]

---

[5] See ibid., pp. 20-26

[6] See ibid., pp. 34-37

[7] It should be noted that in a state of war, human rights are subject to additional restrictions that apply in other crises during peacetime. See: G.J. Alexander, "The Illusory Protection of Human Rights by National Courts during Periods of Emergency" 5 *Hum. Rts. L.J.* (1984) 1, p. 7.

[8] Editorials "Moderate Torture" 149 *N.J. L.J.* (1997) 26, p. 46

[9] J.R. Schmertz "Citing International Human Rights Conventions, Supreme Court of Israel Bars Use of Several Interrogational Pressure Techniques Sometimes Used by General Security Service when questioning terrorist suspects such as vigorous shaking and 'Shabach' Position" 6(3) *International L. Update* (2000).

437-445

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

differences in terms of the law between different types of offenders, All those who break the law are equal before it and expect the same treatment from a judicial system: to enjoy due legal process.

In other words, a democratic state derives the structure of its courts from the principle of equality – a single body, and not separate bodies according to different types of offenders/offenses!

The establishment of special tribunals for specific types of offenses violates another key principle forming a foundation of any democratic state: the principle of the separation of powers,[1] and, particularly, the importance of the independence of the judicial system in a democratic state. Accordingly, the general courts are concerned over the establishment of specialist tribunals:

> "The standing and constitutional role of the Court as 'third and independent arm' of government are in process of being diminished. The creation by the Executive through Parliament of these new specialist tribunals can impair judicial independence in the widest sense, that is to say, as distinct from thew [sic] independence of judges as such, inasmuch as it serves to prevent the operation of the judicial process according to law in the widest sense for the administration of justice."[2]

The danger posed by the creation of specialist tribunals to basic principles of a proper democratic regime may be illustrated by the example of a special military tribunal:[3] Not all the judges who sit on the panel are professional judges; some are army officers. The prosecutors are not private attorneys, but serve in the army, as do the judges together with them. The separation between the judicial arm and the executive arm is impaired: the independence of the judicial arm from the executive arm is weakened, leading to a concomitant decline in the independence of the judicial arm. Moreover, the separation within the judicial arm itself between judges and prosecutors, which is maintained in any proper legal system with the goal of preventing bias and conflict of interests, does not exist in a special military tribunal.

The principle of equality before the law, which, as noted, requires the establishment of a uniform court system for all, mandates the granting of equal treatment to equal persons. In the absence of equality of data, different treatment does not constitute improper discrimination. In other words, improper discrimination is unequal treatment of equals.[4]

---

[1]  HCJ 3267/97 Rubinstein v Minister of Defense, PD 52(5) 481, p. 515

[2]  "Victorian Supreme Court's concern over development of specialist tribunals" 64 *The Australian L.J.* (1990) 385-386.

[3]  For an extensive discussion of this subject, see Chapter Four below

[4]  B. Bracha "Equality of All before the Law" *Studies in Civil Rights in Israel* (the Association for Civil Rights in Israel, 1988), 3.

437

The Struggle of Democracy against Terrorism: Legal and Moral Dimensions

Thus, it can be argued that the establishment of a special judicial system for a specific type of offense is not improper discrimination. A specific type of offense is tantamount to a different datum and, hence, permits different treatment. This treatment is the permitted distinction between types of offenses, and a permitted distinction is not contrary to democratic values.

This type of argument may be justified if, indeed, different treatment for different types of offenses truly constitutes a permitted distinction. After all, it is untenable that a difference between offenders amounting to the fact that they are accused of committing a specific type of offense will make them different in such a manner that it will be justified to prosecute them before a different tribunal from that which judges "general" offenders. Each offense differs from its fellows and, accordingly, different offenses exist in the criminal law of each state (offenses of robbery and fraud, offenses against state security, etc.) – is a difference between offenses sufficient to justify judgment before different tribunals?

The question is not whether a difference exists between offenses, but whether the difference justifies different treatment. If the difference is not relevant for the purpose of the arrangement under discussion, relying on this difference before the purpose of imposing a different law violates the principle of equality and causes improper discrimination. Only a relevant difference justifies different treatment and will be considered a substantive distinction:[5]

> "The principle of equality, which is nothing more than the obverse side of the coin of discrimination, and which, on the grounds of justice and fairness, the law of any democratic state seeks to concretize implies that, for the purpose of the goal under discussion, all persons among whom there are no substantive differences relevant to that goal are to be treated equally..."[6]

Different types of criminal offenses do not justify different treatment, viz. the establishment of separate judicial tribunals. The reason for this, firstly, as we have explained, is that there are not different types of criminal offenses; rather, there are different criminal offenses, all of which are collected together under a single criminal code. Secondly, and more importantly, the search for a relevant difference justifying different treatment depends on the system of accepted values of civilized societies. An expression of this value system, particularly in democratic states, may be found in the constitutions created by each state and, especially, in the universal declarations of human rights, which are the product of encouragement by democratic states. While these declarations do not explicitly prohibit discrimination on the basis of different criteria of offenses, the cumulative effect of the different articles of these declarations, and the emphasis on due process of law, particularly in criminal proceedings, creates the impression that, in democratic societies, drawing on the criterion of the type of criminal offense in order to substantiate different treatment of an offender for the purpose of prosecution may be considered improper discrimination.

---

5    Ibid., p. 4

6    AH 10/69 Boronovsky v Chief Rabbis of Israel, PD 25(1) 7, p. 35

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

Thus, for example, Article 14 of the Covenant on Civil and Political Rights reiterates, regarding the criminal proceeding:[7]

> "(1) All persons shall be equal before the courts and tribunals. In the determination of any *criminal charge* against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law…
>
> (2) Everyone charged with a *criminal offence* shall have the right to presumed innocent until proved guilty according to the law.
>
> (3) In the determination of *any criminal charge* against him, everyone shall be entitled to the following minimum guarantees, in full equality…".

The article subsequently details basic procedural rights enjoyed by any defendant subject to criminal prosecution, such as the right to be aware of the charge against him in a language he understands; the right to consult with an attorney of his choice; the right to be present in court; and the right to cross-questioning.[8] These guarantees constitute an essential minimum for any criminal proceeding, whatever the offense. In other words, when the goal is criminal prosecution and management of a criminal trial, there is no relevant difference between offenders. All are accused of violating specific articles of the criminal code, and the law treats all equally, i.e. it will prosecute them before the same court/tribunal without distinction according to the type of offense.

The combination of the underlying principles of a democratic state – the separation of powers, the rule of law, and human rights – leads to the conclusion that the rule is that of judgment before a single central forum for all offenders and for all offenses. All rules have exceptions, but anyone wishing to deviate from the rule and interested in specifying a judicial tribunal for a specific type of offense must explain the grounds that justify making an exception to the rule. Should it not be stated that, today, in a reality in which we live under high threat of destructive terror attacks, the security considerations of the citizens of the state constitute grounds justifying the creation of a specialist judicial forum for a specific criminal offense – terror, and that such grounds justify deviating from the rule and underlying principle of the legal system in a democratic state – equality before the law?!

> "It must not be forgotten that security is not just the army. Democracy is also security. Our strength lies in our moral might and in our adherence to the principles of democracy, precisely when there is great danger around us. Indeed, security is not a goal that stands on its own.

---

7       Article 14 of the International Covenant on Civil and Political Rights (March 23, 1976)

8       Ibid., Article 14(3)

437-445

The Struggle of Democracy against Terrorism: Legal and Moral Dimensions

> Security is a means. The goal is the democratic system, which is the system of the people and emphasizes individual liberties..."[9]

Below in this chapter, I shall attempt to prove that the offense of terror is no different from any other criminal offense. Setting aside a judicial forum for this offense is improper, and no direct connection can be proven between such a step and the goal for which state security was established. The influence of a specialist forum for the judgment of terrorists on the security of the state and its citizens is limited, at best, to enhancing the sense of security of citizens, and not to strengthening actual security on the ground.

To prove this, I shall first turn to an examination of the impact on procedural rights enjoyed by a defendant of deviations from the principled approach customarily employed for the pursuit of legal proceedings in a democratic state, and from the proper perception of procedural justice therefore.

---

[9]    HCJ 680/88 Schnitzer v Chief Military Censor, PD 42(4) 623

437-445

## Chapter Three

## The Ramifications of the Character of a Judicial Forum for the Procedural Rights Enjoyed by the Defendant

It is difficult to understand the extensive criticism heard in the United States regarding the presidential order establishing specialist military tribunals for the judgment of terrorists without examining whether the character of a judicial forum influences the procedural rights of the defendant. As I shall show below, the answer to this question is positive. For the purpose of illustration, I shall draw on the military tribunal responsible for judging Israeli soldiers, showing how a separatist ideology that emphasized the divergence of the military system from its civilian peer led to the creation of a separate military judicial system. I shall then show that the separate system sought to justify the use of different judicial procedures than those established in the civil criminal system. Almost inevitably, these different judicial procedures led to injury to the procedural rights of the soldiers and, particularly, to their constitutional right to due process.

### A.    The Character of a Military Judicial Forum

A military judicial system can maintain one of three forms of affinity to a civilian judicial system:

1.    A system embedded within the civilian system which, inter alia, judges soldiers.
2.    A system integrated in the civilian system while maintaining a certain degree of unique character in the judgment of soldiers.
3.    A separate system, without any organizational affinity to the civilian system, although, in most cases, appeals proceedings from the highest military judicial level may be submitted to the supreme civilian level in the state.[10]

Our discussion will focus on the military judicial system in Israel, where the military judicial system is separate from the civilian judicial system.[11]

The military judicial system has double judicial authority, combining sole judicial authority in military offenses[12] with parallel judicial authority to that of the civilian judicial system in other criminal offenses.[13]

---

[10]    E. Modrik "Military Judgment in Israel, from a 'Command Orientation' to a 'Court'" **Plilim** A (1990) 83, p. 84.

[11]    On this aspect, see the Military Justice Law, 5715-1955 (hereinafter – the Military Justice Law)

[12]    Article 1 of the Military Justice Law

[13]    Article 14 of the Military Justice Law

The Struggle of Democracy against Terrorism: Legal and Moral Dimensions

The military judicial system differs from its civilian counterpart in two principal areas: Firstly, the different judicial procedures established explicitly in the Military Justice Law[14] (regarding the laws of evidence and defense in a military trial, it should be noted that these procedures were drawn from civilian criminal law and, in most cases, were applied by way of reference to general law;[15]) and, secondly, in the composition of the judicial panel. While in the civilian legal system the judges are professionals, in the military legal system, one also sees judges serving who are not professional jurists..

The desirable democratic perspective indeed holds that a soldier, like any citizen, bears civil obligations, and is entitled to enjoy protection of all civil rights. However, the fact that a soldier forms part of a mechanism charged with state security and the protection of the state renders him different from a civilian who is not a soldier. By virtue of his function, he faces a greater danger to his life and, accordingly, he is required implicitly to waive the basic right of any person: the right to life.[16] In contrast to a civilian, a soldier must perform his function in almost all conditions, whereas a civilian is permitted to abandon his function if he so wishes. An army is marked by mutual dependence and mutual trust – all trust all, and all are dependent on all. The military system cannot function without such trust. In order to maintain the relations of trust and mutual dependence, and to demand certain behavioral standards, there is a need for a separate judicial system from the civilian system. The principal grounds justifying a separate judicial system for soldiers are mainly practical considerations, or ones of efficiency – the fact that the military system must be capable of meeting its needs without any conditioning; it cannot be dependent on any aspect; it must be flexible and take into account schedules that reflect a training plan and specific tasks. Moreover, a separate military judicial system enables the utilization of personnel potential, since a person penalized by a military tribunal remains within the military framework, and the army can continue to extract from him such matters as are required for it in accordance with its needs.[17]

The most important grounds justifying a separate judicial system are the need to regulate soldiers' behavior in a particular manner for the army, as an essential condition for securing the army's objectives – it is essential that soldiers be tried by commanders who are army personnel, rather than professional judges, since army personnel can properly evaluate the quality of the soldier's behavior and bear overall responsibility for actions in the army, including the maintenance of discipline therein. Furthermore, the army's interest may sometimes be superior to that of the individual soldier and, accordingly, while the civilian judicial system emphasizes the protection of individual rights in a

---

[14]     Article 461 of the Military Justice Law

[15]     Article 476 of the Military Justice Law

[16]     Article 9 of the Basic Law: Human Dignity and Liberty

[17]     Modrik (aforementioned note 71), pp. 87-90

437-445

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

criminal trial, the military legal system restricts such protection insofar as a superior and important military interest pertains that dictates the army's actions.[18]

One of the possible justifications for a separate military judicial system is that the army forms a comprehensive system whose unique domain of behavior extends over the most diverse range of matters. This is compounded by the unique character of the army. These considerations ostensibly justify a specific and separate judicial system. However, it must be examined whether the existence of a separate judicial system inevitably incurs different judicial procedures and different rules of evidence liable to injure the defendant's procedural rights.

In Israel, "a general evaluation shows that the scales largely tip in favor of a substantive proximity (of the military judicial system) to a court forming part of the judicial authority."[19] The judicial procedures and rules of evidence are similar,[20] as is the function played by the military prosecution and defense system. Most importantly, the civilian system maintains review by means of an appeal to the Supreme Court.[21]

Nevertheless, the existing "lack" in the military judicial system may not be overlooked; neither may be the difference in the composition and character of a tribunal, which may influence the procedural rights of the defendant before this tribunal. In applying the test of the practical outcome in terms of the impact on substantive rights, the soldier's dignity and liberty are injured, although no-one would deny that human rights are also the rights of the soldier as a human.[22]

Thus, for example, although the Military Justice Law establishes the principle that the trial before a military tribunal is held in camera, and establishes the authority to close the proceedings on grounds established by law, similarly to an ordinary court,[23] it does not confine itself to this, but also adds the authority of the command echelon to order a discussion in camera on grounds of injury to state security.[24] There can be no doubt that the inclusion of this authority may have injurious and unnecessary ramifications in terms of the defendant's right to a public proceeding, since the authority is not required to give grounds for its decision and the military tribunal before which the defendant is judged will not review this decision. Judicial review rests solely with the High Court of Justice, which does not customarily intervene in the discretion of the command echelon in the army.[25]

---

[18]    Westmoreland & Prough "Military Justice" 3 *Har. J. of L. and Pub. Policy* (1970) 1, p. 50

[19]    Modrik (aforementioned note 71), p. 116

[20]    Article 476 of the Military Justice Law establishes: "The binding rules of evidence in criminal matters in the state courts are also binding in a military court and before an investigative judge, when the Law includes no other provision."

[21]    Article 440 of the Military Justice Law (Amendment No. 17), 5746-1986

[22]    E. Modrik *Military Judgment* (Ministry of Defense 5753), p. 56

[23]    Article 325 of the Military Justice Law

[24]    Article 324 of the Military Justice Law

[25]    See, for example, HCJ 2888/99 Hollander v Attorney General (unpublished)

The Struggle of Democracy against Terrorism: Legal and Moral Dimensions

In my opinion, this injury is not essential; it is possible and desirable to confine such instances to the exceptions to a public hearing established by the Military Justice Law at the discretion of the tribunal, without granting separate authority to the command echelon. Concern at the abuse of authority of the command echelon, and accompanying concern of injury to the defendant's constitutional guarantees of due process, require that the rule of public hearings, and the exceptions thereto, as current in the civilian judicial system be identical to those in the military judicial system.

I have explained elsewhere the gap that exists between the laws of detention in the army and the laws of detention in the general criminal legal system.[26] Thus, for example, while considerations of deterrence and efficiency are negated in the civilian laws of detention and have been declared unlawful,[27] the essence and character of military service apparently continue in themselves to justify the detention of a soldier merely out of considerations of deterrence or the efficiency of the legal system.[28] The same justifications that were found for the establishment of a separate judicial system are now employed to justify detention pending completion of the trial proceedings of defendants accused of offenses on account of which they would not have been detained by the civilian courts.[29]

In my opinion, the justifications for a separate military judicial system cannot also serve as justifications for the gaps between the laws of arrest and the judicial procedures applying in the civilian legal system and those applying in the military legal system.

The procedural rights of any defendant in a legal proceeding not to be detained pending completion of the proceeding merely because he is charged of a serious offense, for the purpose of general deterrence, also apply with regard to a military legal system: Detention on the basis of considerations of deterrence contradicts the basic assumption of innocence enjoyed by all citizens of the state; detention prior to a judicial ruling is justified solely on preventative grounds. The justification that detention pending completion of the trial proceedings constitutes an expression of the army's distaste for offenses that injure discipline, which is a vital condition for the proper functioning of the army, is an outrageous one, conveying a message of failure regarding the criminal proceeding in the army. It implies that, despite the considerable power granted to the judicial authorities by the criminal proceeding, this is not in itself effective in conveying the message of deterrence, and that soldiers are incapable of understanding the significance of prosecution and the inherent deterrence embodied in the presence of the punitive provision in law.[30]

---

[26]   E. Gross "Constitutional Aspects of the Laws of Detention in the Army" *Mishpat U-Mimshal* E (5760), p. 437

[27]   On this aspect, see Sundry Crim. App. 537/95 Ghaneimat v State of Israel, PD 49(3) 355; Sundry Crim. App. 8087/95 Zada v State of Israel, PD 50(2) 133

[28]   Gross (aforementioned note 87), p. 450

[29]   Adm. Appeal 15/97 Private Yaacov Damari v Chief Military Prosecutor (unpublished)

[30]   Gross (aforementioned note 87), p. 437

437-445

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

Accordingly, the detention of a soldier merely because of the suspicion that he committed a grave offense, in the absence of any personal danger, constitutes grave injury to the liberty of a human who may be found innocent in his trial after the completion of the legal clarification.

I do not believe that the restriction of a soldier's liberty should be examined on the basis of the expectations of army sources regarding a means that will assist them in promoting discipline and deterrence in the army. The proper test must be whether the proposed injury is essential, and whether it is consonant with basic societal attitudes. As noted, my answer to this test is in the negative.

A further difference that deserves mention relates to the right of a suspect to be brought before a judge after his initial arrest. In the civilian system, the duration of detention prior to the detainee's being brought before a judge is not to exceed 24 hours,[31] while in the military system the period of time was first reduced from eight days[32] to 96 hours,[33] and finally to 48 hours.[34] I cannot conceive of any substantive reason relating to the specific nature of military service that can convince us of this difference between the two judicial systems. The difference exists merely because it is intended to serve the needs of only one side, namely, the convenience of the system, but this convenience cannot justify the failure to bring a soldier before a judge within 24 hours, and instead waiting 48 hours. The obvious conclusion is that the character of the judicial forum may indeed influence the constitutional guarantees of those prosecuted before this forum.

## B.    A Special Judicial Forum for Terror Offenses

We have found that society justifies rapid judgment since it seeks to realize another purpose that is no less proper than the defendant's rights, namely – the security of the state and its citizens, this by securing maximum procedural efficiency and deterrence. Thus, for example, in the case of a soldier suspected of betraying his comrades in wartime, it is important that the system respond quickly and prosecute the soldier rapidly in order to secure efficiency, even if this efficiency erodes the constitutional guarantees enjoyed by the defendant. Similarly, President Bush believed that the rapid judgment of terrorists would constitute a quick and efficient response in the war on terror.[35] This rapid judgment – akin to a field court – will, it is felt, realize the goal, since it will deter those involved in terror, insofar as they will see what becomes of those suspected of terrorist activity and be duly fearful. Does the injury indeed

---

[31]    Article 29(A) of the Criminal Procedures Law (Enforcement Authorities – Detentions), 5756-1996

[32]    Military Justice Law (Amendment No. 32), 5756-1996, SB 366

[33]    Military Justice Law (Amendment No. 32) (Amendment), 5756-1998, SB 278

[34]    HCJ 6055/95 Tzemach v Minister of Defense, PD 53(5) 241

[35]    A. Woolner "Model Trial? 1942 Tribunal Hld More than State Secrets" *American Lawyer Media, L.P.* (December 5, 2001)

459-468

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

In Article 66 of the Fourth Geneva Convention subject to which courts are to be properly constituted, non-political in character and to sit for deliberation in the lower court in the occupied area.

The following Articles of the Convention have a cumulative effect of a broad defense in the existence of criminal proceedings: thus for example, military courts are required to apply only provisions of law which were applicable prior to the offense, and which are in accordance with general principles of law. The extent of the penalty shall be proportional to the offense, and the military court shall take into consideration the fact that the accused is not a national of the occupying country.[136] The conduct of the trial must be proper and the accused shall be promptly informed, in writing, in a language he understands, of the details of the charges.[137] The accused shall have the right to bring evidence for his defense and to be assisted by a lawyer and interpreter.[138] The accused shall be allowed the right of appeal or petition to a competent authority of the occupying country.[139]

Further instructions on this topic appear in Article 11 and 75 of the Additional Protocol[140] The presumption of innocence according to which every person is presumed innocent until proven guilty by law, a trial in the presence of the accused, and immunity from self incrimination according to which a person shall not be compelled to testify against himself or to confess guilt.

**B.     System of Judgment Established by the State of Israel in the Occupied Territories**

The State of Israel is a contracting party to the Geneva Convention and therefore the agreement applies to all the territories that were occupied by it in the Six Day War and that remained under its control. With that said, it should be pointed out that the Government of Israel took a position that it does not acknowledge the applicability of the Convention to these territories, because it never recognized the rights of Egypt and Jordan to any part of the land of Israel.[141] However this position is not consistent with the provisions of the Fourth Geneva Convention that does not make its applicability conditional on the recognition of property rights but applies it to every case of partial or full occupation of territories by a Contracting Party.[142] And in 1971, in an international symposium for human rights, the official legal advisor to the government announced that the State of Israel decided (without retreating from its legal position in principle) to behave in practice in accordance with the humanitarian provisions of the Fourth Geneva Convention.[143]

---

[136] Article 67 of Fourth Geneva Convention.

[137] Ibid., Article 71.

[138] Ibid., Article 72.

[139] Ibid., Article 73.

[140] The First Additional Protocol (aforementioned note 45).

[141] M. Shamgar, "The Observance of International Law in the Administered Territories" 1 .Isr Y.B. Hum. Rts (1971) 262, p.263

[142] Article 2 of the Fourth Geneva Convention (aforementioned note 33).

[143] Shamgar, (aforementioned note 141), p. 266.

459-468

Democracy's Struggle Against Terrorism – Legal and Moral Aspects

Together with that it should be mentioned that most of the provisions of the Fourth Geneva Convention are constitutive; indeed as long as there is no legislation that absorbs the agreement into the internal law, the constitutive provisions do not have automatic applicability at the international level.[144] Despite that, the Supreme Court cited that "It is a mistake to think... that the Geneva Convention does not apply to Judea and Samaria. It applies, even though... it is not subject to jurisdiction in Israeli courts."[145]

And so, after the State of Israel occupied the areas of Judea and Samaria and the Gaza Strip in 1967, it established a system of military courts in accordance with the recognition of international law for the purpose of guaranteeing the rule of law from the aspect of also obeying the law when under conditions of conquest and military occupation.

The existence of an enlightened and proper legal judicial organization, which would serve as an independent tool for imposing the law to ensure security, public order, and the good of the population and its welfare, also eventually led to the existence of local courts in the area.

In other words, in accordance with the principles of international law that we have discussed, with the entrance of the IDF into the areas of Judea, Samaria and the Gaza Strip, the local judicial system, with its judicial responsibilities, according to the local legal system, was preserved – just as it was immediately before the occupation of the areas by the IDF. In parallel to that system a system of military courts was established in every area in the hands of an IDF officer in the area – the Commanding General who constitutes, as said, according to the rules of International Law, the supreme authority in the occupied area, and in that role has governmental powers, the legislation and its execution beginning from the minute the occupation began. Thus, in the manifest on government and legal procedure, which was published in Judea, Samaria and in the Gaza Strip by two commanding officers in the areas at that time, it was determined[146]: "Every authority of government, legislation, appointment and administration regarding the area or its residents will from now on be placed in my hands alone, and will be handled by me or by whoever will be appointed for that purpose by me or whoever will act on my behalf."

In the framework of legislative powers, two commanding officers, each one in his area, published the directive regarding security instructions in 1970[147] according to which military courts of the first instance were established in every area.  Later a military court of appeals was established.

## 1.  Powers of the Military Courts

The decree regarding security instructions gave the military courts authority to sit in judgment on every violation that was defined in the Security Legislation and every violation defined in the law (the local law) as it existed immediately before the entrance of

---

[144] R. Lapidot "International Law in Domestic Law" **Mishpatim** (1990 5750) 807, p.826.

[145] High Court of Justice 390/79 **Dwikat v. Government of Israel, 34(1) P.D. 1**, p. 29

[146] O. Gross "The Military Courts' System in Judea, Samaria and the Gaza Strip" Monthly Review: Journal for IDF Officers 36(5) (1989) 12, p.13.

[147] This directive replaced the earlier directive that was published in 1967, in the first days of the IDF's rule in these areas.

IDF forces into the area) subject to the said security legislation.[148] In other words, regarding violations, the military courts have a parallel judgment authority to the local courts that continued operating in the area after the entrance of the IDF forces.[149] The choice therefore where a criminal who violated the local law will be tried is in the hands of the authorized prosecution authorities.[150] In general when a violation has a security issue an indictment will be presented in the military court. This relates to violations that harm, according to their nature and the nature of the security in the area, the public order of the area, the security forces or different factors operating in cooperation with security factors, Israeli citizens or any other important interests of the military government in the area.[151]

It should be emphasized that the powers of the military courts also extend under certain circumstances beyond the area, for example in a case that took place outside of the area and would have constituted a violation according to the security legislation if it had been carried out within the area or according to the local law that applies there, and that same act harmed or was intended to harm the security of the area or the public order there, it would fall under the authority of the military court!

## 2. Composition of the Military Courts

At the head of every one of them is a court president, and at his side presides a president on duty, who substitutes for the president when he is absent. These judges are appointed by the IDF command forces in the area in accordance with the recommendation of the Military Advocate General.[152] As a judge, a jurist in the military court can be appointed by an IDF officer with the rank of Captain and higher, when he has judicial training, and as president of the court a judicial judge whose rank is no lower than lieutenant-colonel. Presidents of the courts and the presidents on duty are judges in the regular army, while the main part of the judicial force, from the point of view of quantity, is based on lawyers who are in the reserve army of the military attorney's office.[153]

The judgment of the indictments presented to these courts takes place before three judges whose composition includes at least one judicial judge who serves as head of the court, and two other judges are IDF officers who do not necessarily have judicial training[154] or in front of a lone judge who is a judicial judge[155]: From the point of view of authority on the issues there is no difference, in both cases the military court has the authority to judge

---

[148] See paragraph 7 of the Decree Regarding Security Instructions (hereinafter – the Decree)

[149] M. Drori "Parallel Criminal Judgment Powers in the Occupied Areas" HaPraklit 32 (1979) 386.

[150] High Court of Justice 412/71 Nasirat v IDF Command Forces in Gaza Strip and Northern Sinai (not published).

[151] Gross (the aforementioned note 146), p. 14. See also High Court of Justice 481/76 Liptovy v Security Service, P R 31 (1) 266.

[152] See paragraph 3 of the Decree.

[153] Gross (the aforementioned note 146), p.14.

[154] We will pay attention that this arrangement is similar to an arrangement that applies in the military courts according to the Military Judgment Law, 1955, as I presented in the first section.

[155] See paragraphs 3a, 4 of the Decree

all the violations that have been defined in the security legislation and in the local law subject to the security legislation. The difference is in the penalty authority, a lone judge's authority is more restricted – a lone judge cannot sentence the accused to a death penalty. This authority is found only in a composition of three judges when two of them are judicial judges and the sentence is given unanimously!

The choice before which composition (lone judge or three) the indictment will be judged is only granted to the military prosecution[156]

## 3. Judgment and Evidence Arrangements

The rules of judgment are those that were determined in the injunction regarding security issues or according to judgment arrangements that seem to the court the most appropriate for a just judgment.[157] Specific instructions pertaining to the principle of holding a public trial[158], to the right of the accused to be present during all the proceedings of the trial[159], to the provision of an interpreter for a defendant who doesn't understand Hebrew were established[160], for the right of the defendant to be assisted by an attorney of his choice[161] were determined. Furthermore, if there was a serious violation and the defendant did not select an attorney himself and a defense attorney was not appointed to him by the judicial adviser in the area, the military court with the agreement of the accused (and the intended defense attorney) will appoint a defense attorney for him.

## 4. The Right of Appeal

Until April 1, 1989, there was no way to appeal a verdict of the military court for any kind of judicial proceeding[162]. Whoever was accused could turn to the commander of the IDF forces in the area with various requests

---

[156] High Court of Justice 372/88 Fox v the Military Advocate General, P R 42(3) 154: In this petition it was claimed that the decision of the military prosecution to bring to trial the accused before a lone judge was extremely lacking in reasonability. The petition was postponed on grounds that the choice of the charge and the judicial court that sits in judgment has been passed into the hands of the military prosecution.

[157] See paragraphs 9, 10 of the Decree.

[158] Paragraph 11 of the Decree determines: "(A) A military court will hold the trials brought before with open doors, but the military court is entitled to order that the trial before it will take place, entirely or partially, behind closed doors, if it thinks that it is best to do this due to for the sake of the security of IDF forces, the security of the public, the protection of morality or of the peace of a minor, or if it thinks that a public trial might prevent a future witness of giving free testimony or giving testimony at all." We will pay attention that we have a principle of public trial, while in the United States today the rule is a closed trial

[159] Paragraph 35 of the Decree.

[160] Paragraph 12 of the Decree.

[161] Paragraph 8 of the Decree.

[162] As I explained the international law in Article 73 of the Fourth Geneva Convention did not establish an obligation for an appeal proceeding, it made it possible to turn to the responsible authority of the occupying power, and that responsible authority is not an additional judicial proceeding.

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

in relation to the verdict. The area commander has the authority to intervene in the verdict by acquitting the accused or cancelling the verdict and fixing a new trial.

Establishing an additional appeal proceeding comes as a result of a deliberation in the High Court of Justice in Israel in a petition presented by two people who were convicted in a military court in Ramallah[163] -- there despite the fact that the high court rejected the petition and did not find a place to interfere in light of the fact that the rules of international law do not obligate an appeals proceeding, the Supreme Court presented its position in support of establishing a military appeals proceeding in the area of Judea and Samaria and Gaza Strip. This position came from the contribution of the right of appeal to reinforce the foundations of fairness and reasonability that are in the legal proceeding. The factor of appeal is considered in enlightened systems as a basic and essential part of fair judgment. Bringing it into the military judicial system will raise its capital and highlight its lack of dependence. Likewise, in light of "the doctrine of a long occupation" according to which the longer the occupation goes on the more weight has to be given to the needs of the society that changes with the passing of time President Shamgar determined: "Instituting the right of appeal expresses the disappearance of extreme emergency measures, which are obligatory in the main period of military government, but are not justified in a military government existing already twenty years and more ... no reason or logic can be found in it, that the military system of justice, that is to say the tool for carrying out justice on behalf of the Israeli government, more than any other system of government, continues to carry the hallmark of the war, the temporariness, the limitations that arise from the emergency time, whose expression in the absence of the traits that complement its essence and show the face of a decent and complete system of justice."[164].

As a result of this ruling, the injunction regarding security instructions[165] was corrected; beginning from 1 April 1989 one military court of appeals was added to serve the two areas. For the purpose of appeal a distinction should be made between verdicts given by a lone judge and verdicts given by a composition of three. With the latter the appeal is a right, while in the case of a lone judge the appeal is by permission[166]. The right of appeal or a request from the authority to appeal is given both to whomever was found guilty and to the military prosecution. Automatic appeal will exist when a verdict that imposes the death penalty is given, even if an appeal was not presented by the accused[167].

This institution has the utmost importance and strengthens as said the fair judicial proceeding that enables judicial decisions to be passed that were given by the lower court in another melting pot, where in the end, decisions that were found to be flawed will be disqualified, and those decisions that stand this additional test will come out stronger. This new proceeding strengthens the independence of the military judicial system and the lack of dependence on external factors.

---

[163] High Court of Justice ARJOV (aforementioned note 97)

[164] Ibid., pp. 375-376 (the emphasized places are mine – A G

[165] See paragraph 4B in the Decree.

[166] Paragraph 40B in the Decree.

[167] Paragraph 40 in the Decree.

Case 1:05-cv-04622-DLI-RML Document 267-16 Filed 03/22/12 Page 49 of 288 PageID #: 8336

459-468

### Democracy's Struggle Against Terrorism – Legal and Moral Aspects

Many see the judicial proceedings that the State of Israel conducts in the occupied territories as a genuine effort and attempt to negate the well known adage that "Military justice is to justice as military music is to music."[168]

I suppose that the State of Israel really made a serious effort to establish a fair system of justice in the occupied territories. The fact that it established a special judicial system for security violations – the military judicial system[169] -- does not raise a real suspicion, that judgment of security violations by the local judicial system in the occupied area was affected by a clear conflict of interest and prejudice, there is no reasonable hypocrisy from the local courts in objectively judging violations against the security of the area!

Furthermore, the State of Israel chose to preserve the legislative guarantees of the accused standing trial and to constrict as much as possible the influence of the judicial forum upon the procedural rights of the accused.

The question is why did the State of Israel work to reduce the influence of the judicial forum and not to neutralize this influence absolutely, why is there still a gap? It cannot be ignored that this influence still exists because the judges are not professional judges – the composition is a mix of a professional judge and army officers with no judicial training.

True, the State of Israel chose to preserve the same constitutional safeguards to a defendant in a military court in the occupied territories in the same ways as constitutional guarantees are provided to a defendant in a military court in Israel, this even though it could have conducted the criminal proceedings in a military tribunal according to the rules of procedure and evidence that apply in local criminal courts in the territories. We note that the State of Israel determined that the laws of evidence that apply in a military court are the same laws that apply in an Israeli court. [170] On the other hand the right of the detainee according to the Decree to be brought before a judge is different from the right of an Israeli citizen in the areas of the State of Israel to be brought before a judge. While in Israel the detainee must be brought before a judge within 24 hours of the arrest[171], the fact is that according to the Decree, in the military system it is possible to arrest a person and only to obtain the warrant of arrest after 96 hours.[172] The more serious harm is that a police officer is authorized to issue an arrest warrant within 7 days[173]. There is nothing similar in the laws that apply in Israel – there an arrest warrant is only issued by a judge.

---

[168] This saying is attributed to the Frenchman Clemenceau, See Gross (aforementioned note 146), p. 21.

[169] We explained that the judicial authority of the military courts is parallel to the local courts but regarding security violations the authority generally belongs to the military courts.

[170] Paragraph 9 of the Decree instructs: "In the laws of evidence the military courts will act according to the obligatory rules for criminal cases in the judicial courts of the State of Israel."

[171] Section 29(A) of the Criminal Procedure Law (Enforcement Authority - Arrests) 1996 (5756)

[172] Paragraph 78(3) of the Decree

[173] Paragraph 78(4)(1) of the Decree

Another gap exists between the procedures of law that apply in the courts in Israel and the Decree regarding Security Provisions about the right of a detainee to meet with a lawyer: the law that applies in the courts in Israel allows postponement of the meeting between the detainee suspected of security violations and his lawyer up to 10 days with the authorization of the officer in charge[174] and up to 21 days with the authorization of the president of the district court subject to a right of appeal to the Supreme Court[175]. On the other hand according to the Decree about Security Provisions the person in charge of investigations is permitted to postpone the meeting between the detainee and his lawyer up to 15 days on grounds of the security needs in the region or for the needs of the investigation and the authority is entitled to extend this period by another 15 days. Therefore, it is possible that the meeting can be delayed up to 30 days[176]!

These discrepancies and their ramifications as we will see immediately, certainly emphasize the existence of a departure from the balance between security needs and the rights of a accused to a fair trial and to the protection of constitutional safeguards that guarantee a fair trial: the organization B'Tselem presented in 1989 a report that was based on observations made by lawyers for the organization concerning trials in the military courts. The report's findings reflect the dangers discussed here: "The serious situation, in which a majority of hearings are delayed by about a month because of the failure to bring accused detainees or due to the failure of witnesses for the prosecution to appear violates the basic right of a person not to be punished by prolonged detention prior to his guilt being established in a fair judicial proceeding. The punishment therefore precedes the conviction and the court seems to only determine the date of the end of the punishment, and does not act as the decision-maker on the question of guilt or innocence"[177].

The words of the reserve duty military judge Aryeh Cox emphasize even more the danger within the military judicial system: "It's clear that this court is not a natural and regular court, but some kind of solution that the military government found for the purpose of enforcing the government of occupation. The work that is done there is not purely judicial: in practice, the entire situation in the military courts in Gaza seems like something that is not from this world. Hundreds of family members outside, dozens of prisoners inside, most of them very young, and the impression is that they have lost faith in the system and do not even try to defend themselves. They confess to everything. Their defense attorneys, who in many cases are pathetic figures, also resign themselves to the situation and in fact do the work of middlemen for purposes of punishment. I found a complete symbiosis between the prosecution, the judges and the lawyers. With the accused on the sidelines, everything is handled with stoic resignation. We found accused, we also found suitable offenses for them, and what's left to do now is to find even more suitable punishments for them."[178]

There is no more doubt that evidence in the field has shown that the primary influence exerted by the character of the judicial forum on the rights of the accused is a result of its composition – in the military court, where the judges in it are appointed by a military officer, it follows that the judges and the

---

[174] Section 35(3) of the Criminal Procedure Law (Enforcement Authority - Arrests) 1996 (5756).

[175] Section 35 (4), ibid.

[176] Paragraph 78G (3) of the Decree

[177] "Report from the Backyard" Subjudiciary 1 (1992) 30.

[178] Shay Leibowitz-Dr. "No Just Trial in the Territories, Word of a Judge" Hadashot Supplement (11 Oct. 1991) 6.

prosecutors who serve in the Military Advocate's Unit are subordinate to one commander and are dependent on one authority for their advancement, and likewise, the whole system of the separation of powers between the judges and the prosecutors that exists in regular civil courts disappears when it comes to a military court: "In military courts, for example, the ties between the judge and the prosecutor are close, sometimes only a thin wall separates between the prosecutor's room and the judge's room. They are really enmeshed. Because the separation of powers is a basic principle of every judicial system, its absence constitutes one of the main reasons for the fact that the element of adjudication in the territories is not pure."[179]

From observations that the organization B'Tselem conducted during the same time period it appears that the majority of the trials are not based on witness testimony while convictions are based on confessions by the accused. This finding casts great doubt on the conclusion that proceedings before military courts indeed lead to a just trial, notwithstanding the provisions we have already discussed that apply the rules of procedures and evidence prevailing in Israeli law to the military courts. "Contrary to the civil court system, the ability of a military judge in the territories to check whether he indeed carries out a just trial and whether the accused committed all the violations that were carried out, is nil, because generally there is a total and wholesale confession for each violation. This deprives the judge of the ability to examine whether the person standing in front of him committed the violations, in whole or in part, or whether he is innocent. That is, the judge cannot actually unearth the truth and conduct a just trial. In this area of violations there is another factor, fundamental and no less complex from those that follow it. The investigators discover most of the violations using 'informers.' People confess everything, and from confession to confession they incriminate other people. This is very dangerous and uncertain to decide the fate of a person on the basis of an 'informer.' And indictments are presented on the basis of these informers. This is a chain reaction: informer, indictment, confession, punishment. And if we mention punishment, the level of punishment too does not give rise to equal justice. When a Jew kills an Arab he can receive a year in prison. When an Arab throws a stone and no damage is caused, he receives a similar penalty. This is not a just trial."[180]

This is the practical result of a military trial that is different in composition from a regular civil trial, even when it purports to apply procedures that are similar to the procedures that apply in the regular civil courts – the outcome is deep erosion in the basic right of every defendant to a fair trial. Such an outcome contradicts the tenets of a democratic state.

What will be the result in a case where not only is the component that is judged (terrorists) different from the component that sits in the regular civil system, but also where the law allows application of different judgment and evidence arrangements that work for the good of only one side – the prosecution – as the president of the USA teaches? This result will not be able to stand against the basic rules of a genuine democratic government that seeks justice and truth, and the result will be known in advance and the chasm between it and something that's close to the truth is deep.

To complete the picture of the system of judgment for security violations as it was determined by the State of Israel it should be noted that alongside the judgment of suspects of security violations in military courts in the occupied territories, the courts of the State of Israel have the authority to try those

[179] Ibid.
[180] Ibid.
466

Judgment of Terrorists – Justification for Different Judgment Rules: Balancing Security Considerations and Human Rights

accused of security violations, among them terrorists as defined by Israeli law,[181] and in these cases the internal local courts of the State of Israel rule and not international law. But it is important to emphasize, that in spite of the fact that the State of Israel is subject to many frequent and shocking terrorist attacks, it has not found it right to establish special tribunals with unique authority to judge them. The authority for judgment is given to the regular courts that judge every other criminal violation. Alongside this there exists the parallel judicial authority of the special military courts – the military court in Lod.

The military court in Lod was established and operates by virtue of the 1945 Defense (Emergency) Regulations[182].

Most of the accused who enter its gates are Arab residents of Israel and its citizens who committed violations of the defense regulations or Arab residents of the territories who committed violations as said in the area of the State of Israel.[183]

The fact of there being a court with parallel authority and not unique to the judgment of terrorists (by virtue of their violation of the defense regulations) somewhat lessens the power of the suspicion that would grip us if it had unique authority, but the suspicion does not go away completely – why was the judicial authority of the regular judicial system not sufficient?

As said, I explained that I do not find justification for the existence of a separate tribunal unless the matter requires a certain expertise that is not held by every judge in the regular court or that the motive for establishing a separate tribunal is to further the conduct of justice. It seems that neither one of these two justifications constitutes a basis for establishing a military court in Lod, which explains the lack of activity and the absence of referral of these indictments – in practice the judgment of terrorists within the areas of the State of Israel is in accordance with the criminal law that resides in the hands of the regular judicial system, and the way to the erasure of the military court in Lod from the Book of Laws in the State of Israel is short.

---

[181] See, for example, Sign B and D of section 7 of the Penal Law 1977-5737 and also paragraphs 146-147 of the said law: regulations 58, 59, 62, 64, 66, 67, 84, 85, of the 1945 Defense (Emergency) Regulations; paragraphs 4-2 of the Order for the Prevention of Terror, 1948-5708.

[182] Paragraphs 12-15 of the Regulations.

[183] A. Ben Hayim "Capital Punishment in the Verdicts of the Military Courts in Israel and in the Occupied Territories" The Law and the Army 10 (1989 5749) 35, p. 42



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "The Struggle of Democracy against Terrorism: Legal and Moral Dimensions" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew to English.

Pearl Leo

Sworn to before me this
September 27, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2013

Stamp, Notary Public



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARGELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Jennifer Bucci, hereby certify that the document "The Struggle of Democracy Against Terrorism, pp. 181-183" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew to English.

Jennifer Bucci

Sworn to before me this
September 27, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2012

Stamp, Notary Public



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Pearl Leo, hereby certify that the document "The Struggle of Democracy against Terrorism, pp. 437-445" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew to English.

Pearl Leo

Sworn to before me this
September 27, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2012

Stamp, Notary Public



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Elissa Feldman, hereby certify that the following is to the best of my knowledge and belief, a true and accurate translation of the following document from Hebrew into English:

"Excerpt from 'The Rule of Law and Terrorism'"

Elissa Feldman

Sworn to before me this
10th Day of September 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2⁄3

Stamp, Notary Public

**EXHIBIT 210 TO DECLARATION OF VALERIE SCHUSTER**

# Expert Report

## Of

# Evan F. Kohlmann

www.globalterroralert.com – evan@globalterroralert.com

***Weiss v. National Westminster Bank, Plc* 05 CV 4622 (CPS)(MDG)**
***Strauss v. Crédit Lyonnais, S.A.* 06 CV 702 (CPS)(MDG)**
***Applebaum v. National Westminster Bank, Plc* 07 CV 916 (CPS)(MDG)**
***Wolf v. Crédit Lyonnais, S.A.* 07 CV 914 (CPS)(MDG)**

# Expert Report

**I.**      **Professional Background and Qualifications**...........................................Page 3

**II.**     **Research and Archival Methodology**...........................................................Page 5

**III.**    **Applying Research Methodology to Plaintiffs' Cases**............................ Page 6

**IV.**    **Summary of Conclusions**……………………………………………Page 8

**V.**     **The Role of the Internet for the Islamic Resistance Movement (Hamas)**………………………………………………………………...Page 9

**VI.**    **The Web Footprint of Hamas**…..………………………….................Page 10

**VII.**   **The Culpability of Hamas and its Operational Sub-Branches in Executing Terrorist Attacks Identified by Plaintiffs**……………….Page 28

**VIII.**  **Conclusions**................................................................................................Page 44

# I.    Professional Background and Qualifications

My full name is Evan Francois Kohlmann. I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I currently work as an investigator with the Nine Eleven Finding Answers (NEFA) Foundation and as an on-air analyst for NBC News in the United States. I also run an Internet website Globalterroralert.com that provides information to the general public relating to international terrorism. I am author of the book <u>Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network</u> (Berg/Oxford International Press, London, 2004), which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites. I have testified on ten occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, and Bosnia-Herzegovina. I have testified once as an expert witness in a U.S. civil case, <u>Gates v. Syrian Arab Republic</u>, before the U.S. District Court for the District of Columbia. I have additionally testified as an approved expert witness in United States federal and military courts in fifteen criminal cases:

- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2004)
- <u>United States v. Ali Timimi</u> (Eastern District of Virginia, 2005)
- <u>United States v. Uzair Paracha</u> (Southern District of New York, 2005)
- <u>United States v. Ali Asad Chandia</u> (Eastern District of Virginia, 2006)
- <u>United States v. Yassin Aref</u> (Northern District of New York, 2006)
- <u>United States v. Sabri Benkhala</u> (Eastern District of Virginia, 2007)
- <u>United States v. Rafiq Sabir</u> (Southern District of New York, 2007)
- <u>United States v. Emaddedine Muntasser</u> (District of Massachusetts, 2007)
- <u>United States v. Hassan Abu Jihaad</u> (District of Connecticut, 2008)
- <u>United States v. Mohammed Amawi et al.</u> (Northern District of Ohio, 2008)
- <u>United States v. Salim Hamdan</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Ali Hamza al-Bahlul</u> (Guantanamo Bay Military Commissions, 2008)
- <u>United States v. Mohamed Shnewer et al.</u> (District of New Jersey, 2008)

- United States v. Oussama Kassir (Southern District of New York, 2009)
- United States v. Syed Haris Ahmed (Northern District of Georgia, 2009)

In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a *Daubert* hearing on my qualifications as an expert witness and issued a ruling, concluding:

> Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and… Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence.

Likewise, in United States v. Hassan Abu Jihaad, Federal District Judge Mark Kravitz held a *Daubert* hearing on my qualifications as an expert witness and issued a ruling, concluding:

> Mr. Kohlmann is certainly qualified to provide expert testimony… Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism… Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda… and the other subjects on which he will offer testimony.  Indeed… it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects… Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded.

Similarly, in United States v. Syed Haris Ahmed, Federal District Judge William S. Duffey Jr. held a *Daubert* hearing on my qualifications as an expert witness, and noted in his published ruling:

> Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed.  His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors... A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT.

4

I am being compensated by Plaintiffs in these cases according to an hourly billable rate of $350.00.

I confirm that I have no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude my giving impartial evidence.

## II.    Research and Archival Methodology

The methodology employed in formulating this report is derived from techniques taught to me by the late Dr. Joseph Lepgold, a senior faculty member from the Department of Government of the Edmund A. Walsh School of Foreign Service (SFS) at Georgetown University, as part of official coursework towards the completion of my Georgetown University Senior Honors Thesis, "The Legacy of the Arab-Afghans: A Case Study." Sources of research in the field of terrorism and terrorist organizations can loosely be divided into three sub-categories: primary sources, secondary sources, and tertiary sources. Primary sources are generally considered to be the most credible and most authentic sources of information for objective analysis. Examples of primary sources would include a face-to-face interview with the leader of a terrorist organization, an in-person visit to a training camp, or directly witnessing a terrorist attack. However, because international terrorist organizations are, by their very nature, secretive organizations which operate clandestinely, access to primary sources is rare and inconsistent. As such, frequently, terrorism analysts must instead turn to secondary sources in order to gain a deeper understanding of these groups. Examples of secondary sources would include an original video or audio recording of a terrorist leader, published written communiqués, or an official magazine/website created by a terrorist organization. Secondary sources can occasionally be self-authenticating (*i.e.* a high-resolution video of an unmasked individual speaking) or can require deductive reasoning in order to determine their authenticity. Beyond primary and secondary sources, there is one further category of research: tertiary sources. Examples of tertiary sources would include a newspaper article, a television news report, or a book or magazine published by a reputable third party. However, because the information offered in tertiary sources often comes through a convoluted or unclear chain of custody, I limit my own use of tertiary sources to add additional context to information already confirmed by primary or secondary sources.

In order to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as "comparative analysis." This requires me to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes. By drawing from a wide assortment of primary and secondary sources, I establish a single, objective narrative—while simultaneously noting any significant factual discrepancies or conflicting data. During a May 2009 *Daubert* hearing before Judge William S. Duffey Jr. in the Northern District of Georgia, I explained the process of "comparative analysis" and how I rely upon it when making determinations of fact. This testimony was subsequently summarized by Judge Duffey in his own published ruling qualifying me as an expert:

5

The basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information, through websites, primary interviews, books, news articles and journals, and other information. His testimony essentially synthesizes these concepts, and through the use of the comparative analysis methodology, Kohlmann has developed an understanding of terrorist organization structures, operations, and membership… Kohlmann testified in detail regarding the methodology of comparative analysis, how it is relied upon by experts in social sciences, and how the particular information he gathers allows him to perform reliable analysis. He specifically testified to how he gathers and analyzes information from primary, secondary, and tertiary sources, and he explained the difference between the sources and why and how he relies on each differently. He further explained how comparative analysis is performed: assimilating the relevant information and comparing and contrasting sources against one another to form a cohesive whole. The sources Kohlmann uses and the methodology he employs to analyze those sources, are identical to those used by other experts in his field. Kohlmann explained his methodology and how he used the methodology to arrive at his opinions in this case. The defendants did not offer any evidence at the hearing or subsequent to it to suggest that Kohlmann's methodology is not sound or is not the same methodology typically relied upon by other social scientists… Mr. Kohlmann's ability to synthesize that information through comparative analysis establishes his qualification as an expert.

## III.   Applying Research Methodology to Plaintiffs' Cases

In May 2009, Plaintiffs' counsel requested that I provide an expert opinion on the use of the Internet and other media by the Islamic Resistance Movement (Hamas, a/k/a "the Martyr Ezzadeen al-Qassam Brigades")[1] in order to disseminate propaganda, claim responsibility for various terrorist attacks, and/or glorify deceased or imprisoned members of its organization. I have specifically been requested to:

- Identify key websites which, in my expert opinion, are directly controlled by Hamas, set forth their provenance, and summarize their agenda and purpose.

---

[1] As used in this report, "Hamas" refers to Harakat al-Muqawama al-Islamiya, a Palestinian Islamist movement that is an outgrowth of the Palestinian branch of the Egypt-based Muslim Brotherhood. The United States designated Hamas a Specially Designated Terrorist (SDT) in 1995, a Foreign Terrorist Organization (FTO) in 1997 and a Specially Designated Global Terrorist (SDGT) in 2001. The official name of the military wing of Hamas, spelled herein as "the Ezzedeen al-Qassam Brigades," can also be transliterated from Arabic into English in a variety of other spellings, including "the Izzadeen al-Qassam Brigades" and "the Izz al-Din al-Qassam Brigades."

6

- Describe how Hamas and its co-conspirators use the Internet and other media, including specific websites and Internet discussion forums, to facilitate Hamas's terrorist operations.

- Explain and opine upon the meaning and significance of certain texts, websites, videos, audio files and other media used by Hamas (including Hamas-controlled or related persons, organizations, or entities).

- Offer an expert opinion regarding whether Hamas has claimed responsibility through its websites and other media for the following specific terrorist attacks from 2001-2004 (the "Attacks"), and—if so—to provide an expert opinion on the reliability and credibility of those claims:

  o March 28, 2001 – Gas Station Bombing near Kfar Saba
  o August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
  o December 1, 2001 – Ben Yehuda Bombings in Jerusalem
  o March 27, 2002 – Park Hotel Bombing, Netanya
  o May 7, 2002 – Sheffield Club Bombing, Rishon Letzion
  o July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem
  o January 29, 2003 – Shooting Attack on Route 60
  o March 5, 2003 – Haifa Bus #37 Bombing
  o March 7, 2003 – Shooting in Kiryat Arba
  o April 30, 2003 – Mike's Place Bombing, Tel Aviv
  o May 18, 2003 – Commuter Bus #6 Bombing
  o June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem
  o June 20, 2003 – Shooting Attack on Route 60
  o August 19, 2003 – Jerusalem Bus #2 Bombing
  o September 9, 2003 – Bombing at Café Hillel in Jerusalem
  o October 22, 2003 – Tel Romeida Shooting Attack
  o January 29, 2004 – Jerusalem Bus #19 Bombing
  o September 24, 2004 – Mortar Strike in Neve Dekalim

In order to apply my research and analytical methodology to Plaintiffs' cases, I have reviewed my own stored archive of Hamas websites and relevant propaganda materials (accessed from 2001 until the present). Both on a manual basis and simultaneously using automated web spidering software known as "WinHTTrack," I have gradually compiled an open source historical record of now-defunct Hamas-related websites and e-mail lists. Those materials stored on my own information server have been supplemented by other available online archives of those same websites and materials (primarily hosted by the Internet Archive, www.archive.org). To provide further context, I have also thoroughly examined the current iteration of the official Hamas Internet website, Alqassam.ps, and its accompanying web discussion forum Almoltaqa.ps. On a logistical level, in order to address any issues concerning original documents written in the Arabic language, I have been directly assisted in reviewing these documents and formulating the subsequent report by my researcher, a graduate

7

student and native of Jordan who is fluent in modern standard Arabic and has worked in the past as an Arabic-English language tutor.

After identifying the array of official websites used by Hamas over time, I have systematically reviewed copies of communiqués (or "bayans") stored in their online archives, comparing the style, language, and content of those statements to official assessments from the Ministry of Foreign Affairs of the State of Israel, and to other documents published by Hamas—such as the infamous al-Qassam "Glory Record"— video-recorded "martyrdom" wills, photographs, and biographical information about the alleged perpetrators of attacks. This review was conducted both to determine whether Hamas had ever issued legitimate claims of credit for particular terrorist attacks, and equally, whether Hamas had specifically denied involvement in other terrorist attacks. It is a reasonable assumption that the more occasions Hamas claims responsibility for an individual operation, and the more specific detail Hamas can provide about the planning and execution of that operation, the more likely it is that its claims are legitimate.

## IV. Summary of Conclusions

Based upon the information, research, and analysis presented in this report, I have reached several key conclusions:

- Since at least 2001, the Palestinian Hamas organization—a designated Foreign Terrorist Organization (FTO) otherwise known as the "Islamic Resistance Movement" and "the Ezzedeen al-Qassam Brigades"—has maintained a regular presence on the Internet through the use of fixed websites, online newsletters, and virtual discussion forums. The most notable of these entities are the Palestine-info.net website, the Alqassam.ps website (also formerly known as Qassamiyoon.com, Kataeb-ezzeldeen.net, Ezzedeen.net, etc.), and the Almoltaqa.ps social networking forum. Hamas has employed these venues to disseminate its propaganda, to conduct public interviews with senior Hamas officials, to facilitate communication and coordination among Hamas supporters, and to assist in illicit terrorist financing schemes. Hamas's web presence is one of its most vital material resources, serving as a massive "force multiplier" for its membership.

- Since 2001, Hamas, together with persons or entities controlled by, or related to Hamas, has utilized certain texts, websites and other media (many of which will be discussed and analyzed *infra*) for the purpose of advertising its involvement and responsibility in various violent "operations," including attacks that are alleged to have injured the Plaintiffs in these actions. In my expert opinion, these texts, websites and media can be attributed to Hamas and have particular significance to Hamas on both a symbolic and operational level, including their use in connection with acknowledging Hamas's involvement and/or contribution to particular violent acts.

- Using the above-mentioned means (namely websites, newsletters, and forums), Hamas has distributed authentic claims of responsibility—accompanied by other evidence in the form of high-resolution photographs, original video recordings, and the personal accounts of eyewitnesses—which demonstrate its culpability in the execution of particular terrorist attacks identified by Plaintiffs that have occurred between 2001 and 2004. Those attacks include (but are not limited to) the:

  o March 28, 2001 – Gas Station Bombing near Kfar Saba
  o August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
  o December 1, 2001 – Ben Yehuda Bombings in Jerusalem
  o March 27, 2002 – Park Hotel Bombing, Netanya
  o May 7, 2002 – Sheffield Club Bombing, Rishon Letzion
  o July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem
  o January 29, 2003 – Shooting Attack on Route 60
  o March 5, 2003 – Haifa Bus #37 Bombing
  o March 7, 2003 – Shooting in Kiryat Arba
  o April 30, 2003 – Mike's Place Bombing, Tel Aviv
  o May 18, 2003 – Commuter Bus #6 Bombing
  o June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem
  o June 20, 2003 – Shooting Attack on Route 60
  o August 19, 2003 – Jerusalem Bus #2 Bombing
  o September 9, 2003 – Bombing at Café Hillel in Jerusalem
  o October 22, 2003 – Tel Romeida Shooting Attack
  o January 29, 2004 – Jerusalem Bus #19 Bombing
  o September 24, 2004 – Mortar Strike in Neve Dekalim

With regard to the above-mentioned means (namely websites, newsletters, and forums), neither Hamas nor any of its sub-branches (such as the Ezzedeen al-Qassam Brigades) has ever issued any rejection or credible denial of its culpability in executing the aforementioned series of eighteen terrorist attacks that occurred between 2001 and 2004.

## V.    The Role of the Internet for the Islamic Resistance Movement (Hamas)

Prior to the emergence of the Internet and the modern digital frontier, international terrorist organizations such as Hamas faced serious obstacles in matters of communication, coordination, and media access. A fixed television channel or radio station is an easy target for an organized military force, as the Israeli government has proven with its repeated strikes on the Hezbollah broadcast company known as "Al-Manar" in Lebanon. Years of effort and hard-earned financing channeled to build the physical infrastructure necessary to support traditional media and communications methods can be obliterated in an instant by a single laser-guided missile dropped from an enemy aircraft. Even inviting mainstream media to do their own independent interviews and reporting can present some serious risks. On various occasions, journalists have been secretly employed as spies (or assassins, as in the case of the late Afghan warlord Ahmad

Shah Massoud), and terrorist groups like Hamas have little control over the message of the media once journalists leave the conflict zone. Propaganda videos that take Hamas months to film, edit, and create are boiled down into 30-second cable news segments that present an incomplete picture of what the organization is attempting to achieve.

As such, the advent of the Internet has caused a revolutionary democratization of media, especially among Foreign Terrorist Organizations with limited fixed resources like Hamas. The leaders of Hamas can now speak directly to a broad, globalized audience without worrying about imminent security dangers or the filtering effect of Al-Arabiya, Al-Jazeera, and Western news agencies. Potential recruits and would-be donors can be solicited far from the narrow confines of mosques and Islamic universities in the West Bank and Gaza Strip. Hamas can re-shape its own public image, and present raw information about its ongoing endeavors. It can even use social networking forums in order to facilitate communication between and among Hamas members operating within the borders of Gaza—allowing them to instantly pool their intelligence, resources, and experience. Charging forward on the frontline of information technology, Hamas has also experimented with other innovative strategies such as themed video games and online children's literature in order to expand the potential reach of its recruitment drives.

Much like other urbanized populations at large, the Internet and the World Wide Web have pervaded every aspect of the lives of Hamas members, whether on a personal or political level. The Internet has become an integral communications tool and a critical low-cost force multiplier for Hamas. The sudden absence of that tool would be catastrophic, and perhaps the best testament to that fact is how quickly Hamas has resurrected its primary website following various attacks over time by hackers and law enforcement agencies. It is no longer simply a curiosity or a sideshow—rather, the Internet has now evolved into serving as the primary mouthpiece to the world for Hamas.

## VI.     The Web Footprint of Hamas

The Islamic Resistance Movement ("Hamas") is divided into several operational sub-branches and wings, each of which maintains its own unique presence on the Internet.

- **The Hamas Political Wing (www.palestine-info.net, et. al)**

Like other analogous terrorist groups, Hamas has both a political and military wing. Though there are frequent cross-overs in terms of their leadership and activities, the general purpose of the Hamas political wing is to spread the ideological doctrine of Hamas, to recruit new activists and members, to negotiate relationships with foreign governments and other outside parties, and to help solicit material resources needed to finance the military operations of Hamas. On December 1, 1997, Hamas supporters based in Beirut, Lebanon established a new organization on the Internet, the Palestinian Information Center (PIC). The website of the group—alternatively located at Palestine-info.net, Palestine-info.com, Palestine-info.org, Palestine-info.info, and elsewhere—was

initially published in Arabic only, but later was complemented with an English-language version starting on January 1, 1998.

Though the PIC has never explicitly acknowledged being affiliated with Hamas, it has been identified as such by senior Hamas officials, the U.S. government, and other Western governments. In an online interview in May 2003, Hamas senior spokesman Ismail Abu Shanab stated, "on the internet there are many websites and pages that represent Hamas activities. You can find them on www.palestine-info.info."[2] Likewise, in March 2004, federal prosecutors in Idaho filed a second superseding criminal indictment against Sami Omar al-Hussayen, alleging that an Internet website under his administration was soliciting donations to Hamas: "Participate with money, and this is [via] The Palestinian Information Center (the official mouthpiece of the Islamic Resistance Movement, HAMAS), which opens the door of donations for all Muslims to assist their brothers in their honorable jihad against the dictatorial Zionist Jewish enemy."[3] The Open Source Center (OSC)—a U.S. government open-source intelligence service, formerly known as the Foreign Broadcast Information Service (FBIS)—refers to Palestine-info.net in its official database as a "HAMAS-affiliated site." This affiliation has correspondingly been recognized by European law enforcement authorities. The 2003 annual "Report of the Office for the Protection of the Constitution" from the German Interior Ministry addressed the website under a section titled "Means of agitation and communication," explaining: "The Palestinian Information Centre (PIC) provides daily reports and news from the Palestinian perspective. The Palestinian Hamas also posts its communiqués and other articles on this site. It [Hamas] no longer has its own website and now publishes its material exclusively on the PIC's site."[4] Finally, it should be noted that, at the time of the writing of this report in June 2009, a Google web search for the phrase "hamas website" turned up www.palestine-info.com in Arabic among its top five results.

The Internet domain name "Palestine-info.net" was first registered with Network Solutions Inc. in November 1998 on behalf of the Palestinian Information Center in Beirut by U.S. resident Ziyad Helmi Khaleel.[5] While living in the United States, Khaleel was a public activist for the Hamas front group Islamic Association for Palestine (IAP) and an associate of Ahmed Abu Marzouq, nephew of the Deputy Chief of the Hamas Political Bureau, Musa Abu Marzouq. Shortly thereafter, in December 1999, Ziyad Khaleel was arrested by authorities in Jordan as an alleged "procurement agent" for Al-Qaida leader Usama Bin Laden.[6] Khaleel was later identified in documents exhibited

---

[2] "Interview with Ismail Abu Shanab, Senior Spokesman and Policymaker of the Islamic Resistance Movement (Hamas) on "The Roadmap and the Palestinians' Right of Return." IslamOnline. May 28, 2003. http://www.islamonline.net/livedialogue/english/Browse.asp?hGuestID=BH3h8q.
[3] Second Superseding Indictment. United States v. Sami Omar al-Hussayen. No. 03-040 (D. Idaho, 2004). Page 9.
[4] "Means of agitation and communication." German Federal Ministry of the Interior. Annual Report of the Office for Protection of the Constitution: 2003. Page 224.
[5] Internet domain records. (http://www.networksolutions.com/cgi-bin/whois/whois/)
[6] Lorch, Donatella and Daniel Klaidman. "The Plot Thickens." Newsweek. February 7, 2000.

11

during <u>United States v. Usama Bin Laden et al.</u> as having purchased a satellite telephone and accessories for Bin Laden's personal use in Afghanistan.[7]

Visitors to the Palestinian Information Center Internet homepage were immediately offered access to a number of sub-sections, one of which is labeled "Hamas." The "Hamas" sub-section offered a number of options—including access to profiles and photos of senior Hamas leaders, copies of official Hamas communiqués (in English and Arabic), Hamas propaganda posters, and the Hamas "Glory Record."[8] The infamous "Glory Record" serves as an annual tally of operations undertaken by the Hamas military wing (the Ezzadeen al-Qassam Brigades). It includes such entries as the following:



http://www.palestine-info.info/photo/resistance_photo/images_respho/1a.gif
**Sample image from Hamas's website**

- "Al-Affouleh Operation: It was the first operation in a series of revenge operations for the Al-ibraheemy Holy Shrine massacre on 6 April 1994. The militant Ra'ed Abdallah Zakarneh, a member of Al Qassam Brigades, drove a booby-trapped vehicle with an Israeli registration plate into Al:affouleh bus station at 12:25 p.m. and detonated it. Nine Israelis were killed and more than 150 were injured. A statement revealed that the car was carrying 57 kilograms of explosives."[9]

- "Dezenkov Street Operation: In an immediate reaction to the previous operation, the militant Saleh Abdelraheem Sawy bombed an Israeli bus at Dezenkof Street in downtown Tel Aviv on 19 October 1994. The explosion was rather violent, leaving 22 Israelis dead, 47 injured and seriously damaging many shops. Israelis were confused and shocked by this operation, causing Yitzhak Rabin to shorten his visit to London."[10]

The Palestine-info.net website contained substantial information on senior Hamas leaders, including numerous photographs and extensive personal biographies available in

---

[7] <u>United States v. Usama Bin Laden et al.</u> (SDNY, 2001). Trial Transcript, Pages 3028-3038, 3478-3480, 3482, and 3485.
[8] http://web.archive.org/web/19990202113708/http://www.palestine-info.org/hamas/index-h html and http://web.archive.org/web/19990826043235/http://www.palestine-info.net/hamas/. As of July 2009, the PIC website appears to have quietly removed much of its once-flourishing Hamas content.
[9] http://web.archive.org/web/20000109170449/http://www.palestine-info.net/hamas/glory/index htm. January 2000.
[10] http://web.archive.org/web/20000109170449/http://www.palestine-info.net/hamas/glory/index htm. January 2000.

both Arabic and English.  In fact, the website dedicated more than one sub-section to profiling Hamas leaders and extolling their resumes.[11]  The following individuals are some of those identified by the Palestinian Information Center website as senior Hamas leaders, along with relevant information from their personal profiles posted on Palestine-info.net:

- Shaykh Ahmed Yassin[12]

  - o  The late Shaykh Ahmed Yassin heads the list of Hamas leaders and is credited by Palestine-info.net as a "Founder of Hamas."  The website also acknowledges that Yassin was convicted by an Israeli military court in 1991 of involvement in various crimes, "including inciting others to kidnap and murder Zionist soldiers and the establishment of Hamas and its military and security apparatus."

- Khalid Meshaal[13]

  - o  Syria-based Hamas leader Khalid Meshaal is referred to by Palestine-info.net as the "President" of "the Hamas Political Bureau."  The website also describes him as "one of the founders of the Islamic Resistance Movement (Hamas)," a "Member of [the] Hamas Political Bureau since it was established," and "Chairman of the Bureau" since 1996.

- Musa Abu Marzouq[14]

  - o  Syria-based Hamas leader Musa Abu Marzouq is identified by Palestine-info.net as a "member of [the] Hamas Political Bureau" who was "elected as Chairman of [the] Hamas Political Bureau in 1991."  The website also acknowledges that Marzouq was "arrested by the U.S. authorities at New York's JFK International Airport" in 1995 based upon evidence that Abu Marzouq was responsible for "issuing commands and transferring money to the military wing of Hamas."

---

[11] See: http://web.archive.org/web/19981205033122/http://www.palestine-info.org/hamas/romooz html, http://web.archive.org/web/20040619112356/http://www.palestine-info.com/arabic/hamas/leaders/leaders htm, and http://web.archive.org/web/20000818174847/http://www.palestine-info.net/hamas/leaders/index htm.
[12] See: http://web.archive.org/web/20001030024835/http://www.palestine-info.org/hamas/leaders/yaseen htm and http://web.archive.org/web/20040814181502/http://www.palestine-info.com/arabic/hamas/leaders/yaseen htm.
[13] See: http://web.archive.org/web/19981203071355/http://www.palestine-info.org/hamas/leaders/mashal html and http://web.archive.org/web/20040626095003/http://www.palestine-info.com/arabic/hamas/leaders/khalid htm.
[14] See: http://web.archive.org/web/19981201042041/http://www.palestine-info.org/hamas/leaders/mosa html and http://web.archive.org/web/20040626095413/http://www.palestine-info.com/arabic/hamas/leaders/abomarzouq.htm.

13

- o The website further notes, "An American federal court ordered to extradite him to the Zionist occupation authorities.  In January 1997, Dr. Abu Marzook decided not to appeal the extradition order against him after having spent 18 months in a solitary confinement cell at a New York federal jail."  The Palestine-info.net website includes several photos of Musa Abu Marzouq being held prisoner in the United States while awaiting extradition.

- Ibrahim Ghousheh[15]

  - o According to the Palestine-info.net website, Ibrahim Ghousheh is a "Hamas Spokesman" and has served in this role since 1992.  The site also indicates that Ghousheh is a "Member of [the] Hamas Political Bureau."  Ghousheh, normally based in Jordan, was deported by the Jordanian government for eighteen months in 1999 for his ties to Hamas.

- Abdelaziz al-Rantisi[16]

  - o According to the Palestine-info.net website, the late Abdelaziz al-Rantisi is identified as the "Hamas Spokesman in Gaza" who was one of those responsible for "found[ing] the Islamic Resistance Movement, Hamas, in 1987."  Al-Rantisi was killed in a targeted Israeli military airstrike on April 17, 2004.

- Mohammed Nazzal[17]

  - o Amman-based activist Mohammed Nazzal was one of the founders of the Hamas political office in Jordan.  According to the Palestine-info.net website, Nazzal has served as the "Hamas Representative in Jordan" since 1992 and is a "Member of Hamas Political Bureau."  In August 1999, the Jordanian government temporarily closed the Hamas office in Amman and issued an arrest warrant (later rescinded) for Nazzal.

---

[15] See: http://web.archive.org/web/20001214155000/http://www.palestine-info.org/hamas/leaders/ghoshe html and
http://web.archive.org/web/20040814181530/http://www.palestine-info.org/arabic/hamas/leaders/ghoseh htm.
[16] See: http://web.archive.org/web/19981203144807/http://www.palestine-info.org/hamas/leaders/ranteesi html and
http://web.archive.org/web/20040517064728/http://www.palestine-info.com/arabic/hamas/leaders/rantisi htm.
[17] See: http://web.archive.org/web/20001207082600/http://palestine-info.org/hamas/leaders/nazzal html and http://web.archive.org/web/20040626100049/http://www.palestine-info.com/arabic/hamas/leaders/nazzal.htm.

14

- Jamal Mansour[18]

  - According to the Palestine-info.net website, the late Jamal Mansour was "a Hamas leader in the West Bank", "a Hamas spokesman in the West Bank," and a "Spokesman of Hamas delegation to the dialogue with the Palestinian Authority." In 1992, Israel deported Mansour along with more than 400 other Palestinian extremists to refugee camps in southern Lebanon. Mansour's violent opposition to the Oslo peace accords led to his imprisonment in a Palestinian Authority-run jail for at least two years and more than five years in Israeli jails in total. Mansour was eventually killed in a targeted Israeli military airstrike in July 2001 for his role in militant activities.

- Imad al-Alamy[19]

  - According to the Palestine-info.net website, Imad al-Alamy is a "Member of Hamas Political Bureau." After being deported from the Gaza Strip in 1991 and moving his base of operations to Damascus, Syria, al-Alamy has served as a critical link between Hamas, its various state sponsors, and other Islamic militant organizations active in the region.

- Salah Shehadeh[20]

  - According to the Palestine-info.net website, Salah Shehadeh was a "Founder of Hamas' military apparatus." Shehadeh was killed in a targeted Israeli military airstrike in July 2002 for his role in terrorist activities. At the time of his death, Shehadeh was the supreme commander of the Hamas military wing, the Ezzadeen al-Qassam Brigades.

- Ismail Haniya[21]

  - Based in the Gaza Strip, Ismail Haniya is the Prime Minister of the Hamas government in Gaza and is a senior political leader of Hamas. Haniya's recent Hamas speeches and biography are cited on Palestine-info.com.

---

[18] See: http://web.archive.org/web/19981203100225/http://www.palestine-info.org/hamas/leaders/jamalmans.html and
http://web.archive.org/web/20040626095818/http://www.palestine-info.com/arabic/hamas/leaders/jamal.htm.

[19] See: http://web.archive.org/web/20001207034900/http://palestine-info.org/hamas/leaders/emadalmy.html and http://web.archive.org/web/20040626095643/http://www.palestine-info.com/arabic/hamas/leaders/alalami htm.

[20] See: http://web.archive.org/web/19981202120441/http://www.palestine-info.org/hamas/leaders/salah.html and http://web.archive.org/web/20040814181418/http://www.palestine-info.com/arabic/hamas/leaders/salah.htm.

[21] http://web.archive.org/web/20060213060854/http://www.palestine-info.net/arabic/hamas/leaders/2005/haneya.htm.

15

- Shaykh Khaled al-Haj[22]

  o Operating in the West Bank, Khaled al-Haj has allegedly served as a senior Hamas leader and coordinator between Hamas and other terrorist organizations in and around the town of Jenin.  As a result of his militant activities, Al-Haj has spent nearly three years in Palestinian Authority prisons and additional time as a prisoner in Israeli jails.  According to Palestine-info.net, al-Haj is listed as a "spokesman for the Islamic Resistance Movement, Hamas, in the Jenin district."

- Rifat Nasif[23]

  o Rifat Nasif is a top Hamas political leader in the town of Tulkarem.  He has served jail terms in both Israeli and Palestinian Authority-run prisons for his role in militant activities.  According to Palestine-info.net, Nasif "joined the ranks of the Islamic Resistance Movement, Hamas, at the beginning in 1987, and since then has been one of the most prominent Hamas leaders in the city of Tulkarem."

In addition to these individual profiles and biographies, the Palestine-info.net website run by the Palestinian Information Center also regularly carried general news updates, both in Arabic and in English, concerning the recent activities (and legal predicaments) of senior Hamas leaders.  For example, in 1999, when the Jordanian government arrested and eventually expelled a number of locally-based Hamas leaders (including Khalid Meshaal, Ibrahim Ghousheh, Ezzat Risheq, and Sami Khater), an entire new Arabic-language sub-section was created at www.palestine-info.net/jordanissue in order to identify the Hamas leaders affected by the arrests and expulsions, address the underlying issues, and appeal for support from others.[24]  Individual Hamas leaders were also identified in official Hamas statements (published in Arabic and in English) on the Palestine-info.net website.[25]



**Banner  image taken from Palestine-info.net promoting the cause of Hamas leaders facing expulsion from Jordan**

---

[22] See: http://web.archive.org/web/20041102211459/http://www.palestine-info.net/arabic/hamas/leaders/khaled_Haj.htm and
http://web.archive.org/web/20040626095847/http://www.palestine-info.com/arabic/hamas/leaders/khalidalhag htm.
[23] http://web.archive.org/web/20041102211347/http://www.palestine-info.net/arabic/hamas/leaders/rafat1.htm.
[24] http://web.archive.org/web/20000309021136/http://palestine-info.com/jordanissue/index.html.
[25] For example: http://web.archive.org/web/20001217020600/http://www.palestine-info.net/hamas/communiques/comm_text/1999/24_11_99 htm.   November 14, 1999.

16

- **The Ezzadeen al-Qassam Brigades**

The "Ezzadeen al-Qassam Brigades" (in Arabic, "Kataeb Ezzedeen al-Qassam") is the military wing of the Hamas movement.  According to the April 2003 edition of the U.S. State Department Publication <u>Patterns of Global Terrorism</u>:

> Various HAMAS elements have used both political and violent means, including terrorism, to pursue the goal of establishing an Islamic Palestinian state in place of Israel… HAMAS activists, especially those in the Izz al-Din al-Qassam Brigades, have conducted many attacks—including large-scale suicide bombings—against Israeli civilian and military targets…  The group has not targeted US interests—although some US citizens have been killed in HAMAS operations.[26]

- **Qassamiyoon.com**

In approximately July 2001, the Ezzadeen al-Qassam Brigades established its first Internet website located at the domain http://www.qassamiyoon.com.  The emergence of the Arabic-language website was announced, among other places, on an online discussion forum run by the Muslim Brotherhood[27], http://www.ikhwan.net.[28]   In early July, users on the Ikhwan.net forum began posting messages with corresponding links to qassamiyoon.com under the title, "The Kataeb al-Qassam online website will soon appear, God willing."[29]  Once ready for the public, under its main series of sub-sections, the Qassamiyoon.com website listed two initial offerings for first time visitors: "Who Are We?" and "Who Are You?"  Those who selected "Who Are We?" were told, "this is the path – this is the voice of Hamas… the Brothers from the Martyr Ezzadeen al-Qassam Brigades."[30]  With regards to "Who Are You?" the website beseeched:

---

[26] Office of the Secretary of State and Office of the Coordinator for Counterterrorism.  <u>Patterns of Global Terrorism 2002</u>.  U.S. Department of State.  Released April 2003.  Page 107.

[27] The "Muslim Brotherhood" refers to Jamiat al-Ikhwan al-Muslimeen, a religious and political organization founded by Hassan al-Banna in 1928.  It opposed the movement toward secularism that was occurring in the Muslim world at the time and encouraged a return to Islamic societies predicated on Quranic precepts.

[28] "The Muslim Brotherhood Websites are a group of websites launched by the Muslim Brotherhood of Egypt or any organization around the world claiming to be endorsing the Muslim Brotherhood ideology. These websites are announced by a Muslim Brotherhood entity as an official representative of the organization or one of its branches. They are either run by individuals or groups affiliated with the Muslim Brotherhood… The Muslim Brotherhood began using cyberspace as a new and effective means of communication at a time when most attempts to have a media outlet have failed to find their way into official recognition…  The ikhwan.net website, http://ikhwan.net, was launched on Jan, 21st, 2001. The domain information showed it was registered in the name a person in Al-Rayah street , Jiddah, Kingdom of Saudi Arabia. The ikhwan net website expanded its network and launched Saraya Al-Ikhwan Al-Muslimeen room on the Middle East domain on the well-known PalTalk program."
http://www.ikhwanweb.com/Article.asp?ID=18865&SectionID=0.

[29] http://www.ikhwan net/archive/showthread.php?t=2648.  July 8, 2001.

[30] http://web.archive.org/web/20011027084734/http://www.qassamiyoon.com/we/index.htm.  December 2001.

> …Are you among those who spend their wealth in the path of Allah?
> …Are you among those who sacrifice their lives in the cause of Allah?
> …Are you prepared to leave your wife, your parents, your children, and follow the lions on the path of glory and martyrdom?  …Have you decided yet???!!![31]

The Qassamiyoon.com website offered another sub-section, labeled "Communiques," which was described as "devoted to the publications of the Martyr Ezzadeen al-Qassam Brigades, which record the glorious history of these steadfast brigades."[32]  Also available for download were lengthy insider biographies of the late Hamas master bomb-maker Yahya Ayyash[33] and a Palestinian Arab-Afghan commander credited with having helped establish Hamas in the late 1980s, Shaykh Abdullah Azzam.[34]  Demonstrating the authenticity of its credentials, the Qassamiyoon.com site even carried an "exclusive interview" with Saleh Shehadeh, the chief of the Ezzadeen al-Qassam military wing in Gaza.[35]  During his interview, Shehadeh appealed for website readers to personally render their support to the cause of Hamas:

> We call upon people to donate their time and money to aid in the smuggling of weapons into Palestine—as here in Palestine, the bullet for a Kalashnikov can cost three dollars and that of an M-16 costs $1.50, perhaps even up to two dollars.  However, with regards to defensive weapons, we have no weapons to counter tanks or jets.  If they ever become available to us, this is a rare occurrence and they fetch unimaginable prices…  So, I tell all the Muslims and Arabs—and I believe in the goodness in them—to be generous with their wealth and weapons, or to facilitate or ease the smuggling of weapons, as we are in the frontline of those who are defending Jerusalem, Al-Aqsa, and the soil of occupied Palestine.[36]

Further material published on the Qassamiyoon.com website contained detailed technical analyses of weapons and tactics used by the Ezzadeen al-Qassam Brigades—information that appeared to come directly from those Brigades.  On November 13, 2001, the site published a report on "remotely-detonated explosive devices… a new tactic that has been developed in the war with the occupation."[37]  A day later, on November 14,

---

[31] http://web.archive.org/web/20011110055154/http://www.qassamiyoon.com/you/index.htm.  November 2001.

[32] http://web.archive.org/web/20011221003349/qassamiyoon.com/byanat/center htm.  November 2001. (See e.g.: http://web.archive.org/web/20011212023310/qassamiyoon.com/byanat/26-11-2001 htm)

[33] http://web.archive.org/web/20011027195233/http://www.qassamiyoon.com/document/ayash/index htm. October 2001.

[34] http://web.archive.org/web/20011016085158/http://www.qassamiyoon.com/shohadaa/center.htm. October 2001.

[35] http://www.qassamiyoon.com/chat/salah htm.  October 2001.  See also: http://web.archive.org/web/20020623074026/http://www.qassam.net/chat/salah.htm.

[36] http://www.qassamiyoon.com/chat/salah htm.  October 2001.  See also: http://web.archive.org/web/20020623074026/http://www.qassam.net/chat/salah.htm.

[37] http://web.archive.org/web/20011212094911/http://qassamiyoon.com/tagrer/index htm.  November 2001.

18

Qassamiyoon.com released a second "special report" on "the ingenuity of the mujahideen in developing weaponry to resist the occupation."[38]  According to that report:

> Over the past few years, the military wing of the Hamas Movement has been able to develop its own weapons and home-grown fighting methods that were previously unattainable, and the mujahideen were able to utilize them during the al-Aqsa Intifada.  The [Hamas] Movement has shown particular advancement in its techniques of preparing and detonating explosive devices.  This is one of the weapons born from the ingenuity of the mujahideen, despite their lack of resources and capabilities, especially by utilizing mobile phones to serve as an electric circuit to detonate the explosive from a distance just by dialing the phone number of the device—in addition to changing the shapes of the devices, which are known as 'smart bombs'… Sources from the military wing of the Hamas Movement confirm that the engineers of our movement were also able to build hand grenades of unique quality [made] of plastic and iron to make the intensity of explosions more powerful than the Mills and F1-type Grenades.  And that's not all—the mujahideen were also able to develop a launcher for these devices, an idea based on the principle of a teargas launcher, and the scope of the launched device extends at least 150 meters… It is fair to say that the [Hamas] Movement has been able to setup workshops which have turned into factories for producing light weapons and for the purpose of inventing new weapons suiting its present needs, or to add modifications on weapons designed for special missions such as building expanded ammunition clips, and explosive belts.[39]

Underscoring the authenticity of the Qassamiyoon.com website as the online voice for Hamas's al-Qassam Brigades, over the period of its year-long existence, it was frequently cited as such in regional mainstream media and by Palestinian non-governmental organizations.  On December 26, 2001, the Al-Rai newspaper in Amman, Jordan published a list of Internet websites serving as the official mouthpieces for terrorist organizations.  The article identified the official website of the Ezzadeen al-Qassam Brigades as www.qassamiyoon.com.  Likewise, on several instances, the Palestinian Human Rights Monitoring Group (PHRMG) has re-published copies of Arabic-language communiqués from the Ezzadeen al-Qassam Brigades, crediting them to Qassamiyoon.com.[40]

---

[38] http://web.archive.org/web/20011211204612/http://qassamiyoon.com/tagrer/tagrer14_11_01.htm. December 2001.

[39] http://web.archive.org/web/20011211204612/http://qassamiyoon.com/tagrer/tagrer14_11_01 htm. December 2001.

[40] http://www.phrmg.org/PHRMG%20Documents/Suicide%20bombers/kata%27ib%20al-qassam.htm; http://www.phrmg.org/arabic/documents/assassination/Testimonies/mahmoud_abu_hnoud htm.

o **Qassam.org**

In the spring of 2002, the Qassamiyoon.com website suddenly came to a halt for unknown reasons.  Visitors to the site were eventually greeted with a short message in Arabic: "Brothers and sisters ... Dear visitors, we invite you to follow up on our new address, http://www.qassam.org.  You can contact us via email: qassam@qassam.org and webmaster@qassam.org."[41]   Along with the qassam.org web domain, the administrators of the new site also registered a host of other parallel domains—such as qassam.net and qassam.ps—that served as mirror locators to reach the same website.  Every message on the Qassam.org site "welcoming visitors" was signed in Arabic by "the brothers from the Martyr Ezzedeen al-Qassam Brigades, the military wing of the Islamic Resistance Movement, Hamas."[42]   Under its main series of sub-sections, the qassam.org/qassam.net website listed the same two initial offerings for first time visitors as had Qassamiyoon.com: "Who Are We?" and "Who Are You?"  Those who selected "Who Are We?" were told, "this is the path – this is the voice of Hamas… the Brothers from the Martyr Ezzadeen al-Qassam Brigades."[43]

In the same tradition of its Qassamiyoon.com predecessor, the Qassam.org site contained a wide range of original content published by the Ezzadeen al-Qassam Brigades that was either highly unusual or entirely unique.  The website included a main sub-section reserved for the systematic distribution of official Hamas communiqués: "This section is devoted to the publications of the Martyr Izzadeen al-Qassam Brigades, which record the glorious history of these steadfast brigades."[44]   At its zenith, the qassam.net/qassam.org website offered visitors the opportunity to download copies of all Qassam Brigades communiqués issued from March 2001 through the late spring of 2002.[45]   In May 2002, the Qassam website distributed exclusive "documents from the archives of the Martyr Ezzadeen al-Qassam Brigades in Jenin.  These are identity cards belonging to the well-known [Israeli] soldiers who were killed during the battle in the Jenin refugee camp."[46]   No other website in operation at that time offered anything approximating the quality and range of Hamas-related content available for download on qassam.net and qassam.org.

In April 2002, a new announcement in Arabic was posted on the Qassam website under the "Hamas – Communiqués" sub-section.[47]   According to that document:

> The great country of terrorism, America…   America has declared that it will provide the Zionist entity with $200 million urgently, from an original sum of $72 billion, to kill more Palestinian, scatter them, and quash their

---

[41] http://web.archive.org/web/20020524231122/http://qassamiyoon.com/.  May 2002.

[42] http://web.archive.org/web/20011213134358/http://www.qassam.org/.  December 2001.

[43] http://web.archive.org/web/20020803105011/www.qassam.net/we/index htm.  August 2002.

[44] http://web.archive.org/web/20020206105419/http://www.qassam.org/byanat/center htm.  February 2002.

[45] http://web.archive.org/web/20020206105419/http://www.qassam.org/byanat/center htm.  February 2002.

[46] http://www.qassam.org/qassam_story/jeneen/index.htm.  May 2002.  See also:
http://web.archive.org/web/20020619184901/www.qassam net/qassam_story/jeneen/index.htm.

[47] http://web.archive.org/web/20020425102224/http://www.qassam.org/hamas/bayanat/tabar3.htm.  April 2002.

resistance to the occupation. Meanwhile, the mujahideen in Palestine barely have the money to pay for some bullets and explosives to destroy the Zionist-American project. The Ezzedeen al-Qassam Brigades give their thanks to everyone who has contributed and who are still contributing supplies in support of the mujahideen in Palestine. To support the mujahideen in Palestine: contact us on address: support@qassam.org. An important advertisement to those who would like to donate: to our dear brothers and sisters, we have discovered that several account numbers have been published in the forums, and we—the website of the Ezzedeen al-Qassam Brigades—do not have any knowledge of this, and we declare that they do not have any connection with us… in any way. Accordingly… whoever would like to donate must directly go through the website and to contact at support@qassam.org. We ask you to spread this news in all forums.[48]

The Arabic page described above contained a single link to yet another page hosted on the Qassam website. This second page offered a similarly-themed message in English:

The Martyr Ezzadeen el-Qassam Brigades, your own defending brigades, the military wing of Hamas movement in Palestine, is calling upon you to donate with what you can to assist the cause of Jihad and resistance until the occupation is eliminated and every span of the Muslim Palestine is liberated. While the Martyr Ezzadeen el-Qassam Brigades are calling upon you for donation, we put between your hands some of the difficulties that your mujahideen brothers are facing to get the equipments and logistics. The price of Kalashnikov bullet is $3 and the price of the Kalashnikov gun itself now is $2,000 and it was $3,500 couple of months ago, and do you know that the price of R-B-G is $12,000 and the price of T.N.T that's used by your mujahideen brothers is $100 a kilo, also the Martyr Ezzadeen el-Qassam Brigades now manufacture Al-Qassam surface-to-surface missiles in different sizes and also the anti-shields Al-Banna bomber. The Martyr Ezzadeen el-Qassam Brigades also supervise the development of fighting, defensive and attacking weapons and other much projects mustn't be elaborated for confidentiality purposes. Martyr Ezzadeen el-Qassam Brigades after getting you informed of what Palestine is facing, we call upon all Muslims all over the world to give a hand to their mujahideen brothers in Palestine who sacrifice their bloods and persons for your dignity and guard the front line to defend the Arab and Muslim Ummah… My Mujahideen brothers all over the world: now you can contribute to building a strong Islamic army. Thousands and thousands of mujahid youth in Palestine long for carrying any kind of weapons to defend the Ummah's dignity, but no one is giving a hand. Now you can contribute in providing weapons to the mujahideen whose ammunition run out while facing the Zionists. Hundreds of men sold the

---

[48] http://web.archive.org/web/20020425102224/http://www.qassam.org/hamas/bayanat/tabar3.htm. April 2002.

21

jewelry of their wives and sisters to equip as many fighters as possible to defend your honor and dignity. My mujahideen brothers ... you'll have no excuse in front of Allah, So contribute with what you can. The Martyr Ezzadeen el-Qassam Brigades is calling upon the righteous people from the Arab and Muslim Ummah to collect donations in Mosques, and from those who are financially able to donate, then send these donations to the mujahideen in Palestine. Dear donator brother, send us at the e-mail available at Martyr Ezzadeen el-Qassam Brigades' web site and send us a fake name and the amount that you want to donate and we will secure handing this money to the mujahideen. You can send any inquiries to (support@qassam.org).[49]

The decision of the Qassam website to post a copy of its fundraising appeal in English was, no doubt, aimed at broadening the pool of potential donors. However, it also attracted the attention of mainstream Western journalists and bloggers intent on shutting down the Hamas infrastructure on the Internet. An article subsequently published in <u>USA Today</u> reported that potential donors who attempted to contact the Qassam website in response were told to wire their funds to "Ahmed Mohammed Ali, Elbatech Bank, account no.: 38926/9/510 Arab Bank -- Gaza branch -- Palestine… Please tell us the field in which you prefer your money to be spent on such as: martyrdom attacks; buying weapons for the mujahadeen; training the youth; or inventing and developing missiles, mortars (and) explosives." According to <u>USA Today</u>, "the account name and number appear to change every 48 to 72 hours."[50] Likewise, an American blogger who contacted the Qassam website at the time reported receiving similar instructions: "Dear donor, We assure you that all the money will be given to nobody but to all the Mujahideen in Palestine. This is the bank account: Name: Ayman ataya Mansoor. Bank account no.: 38924/2/510 Arab bank- Gaza branch- Palestine."[51]

o **Kataeb-ezzeldeen.com**

During the fall of 2002, the Qassam.net/Qassam.org website began to experience service outages, allegedly due to pressure from U.S. law enforcement agencies and cybervigilantes. In due course, the site was replaced with a new web domain registered as www.kataeb-ezzeldeen.com. A note added to the sidebar of the revamped website in October 2002 explained, "the website administrators thank everyone who helped in completing the website with its new look, and those who labor to provide assistance, support, and continuous fruitful work. They have worked long nights for nothing more than the grace of Allah… We also wish to mention the brother from our hosting company who put priceless efforts into keeping the website online for you."[52] Like its Qassam.org predecessor, the Kataeb-ezzeldeen.com website included sub-sections for sermons by senior Hamas leaders (such as Dr. Abdelaziz al-Rantisi) and a complete

---

[49] http://www.qassam net/tabaro3.htm. April 2002.
[50] Kelley, Jack. "Militants wire Web with links to jihad; Islamic groups using Internet to recruit, solicit money, send terrorism instructions." <u>USA Today</u>. July 10, 2002.
[51] http://www.enterstageright.com/archive/articles/0502/0502terrbankacct htm.
[52] http://web.archive.org/web/20021017082932/http://www.kataeb-ezzeldeen.com/. October 2002.

database of official Ezzedeen al-Qassam communiqués issued from September 24, 2002 onwards.[53]   Underscoring the official relationship between Kataeb-ezzeldeen.com and Hamas, on November 18, 2002, the website posted a new official communiqué from the Ezzedeen al-Qassam Brigades titled, "Beware of Rogue Publications, and Protect the Unity of our People and our Struggle."[54]  According to that statement, "recently, deceitful forces have attempted to publish false statements and attribute them to our Ezzedeen al-Qassam Brigades… and al-Qassam Brigades would like against this to assure that… the official communiqués which originate from us are published on the Internet website of the al-Qassam Brigades.  Any statements from now on that contradict our policies and are not published on our website are considered illegitimate and inaccurate statements, and we consider this a clear statement of our unchanging position."[55]

Days later, on November 28, 2002, the Kataeb-ezzeldeen.com website posted a new announcement titled, "An Appeal for Contributions from the Martyr Ezzedeen al-Qassam Brigades, the military wing of the Islamic Resistance Movement (Hamas)."[56] Akin to previous appeals posted on the Qassam.org site, the statement called on "you Muslim brothers and Muslim sisters to allocate a part of your money for the mujahideen who are fighting to protect the honor and pride of the Muslim nation.  If you cannot do jihad with us, then the least you can do is to donate from the money Allah trusted you with.  At a time when forces are waging a war against Islam in order to destroy it, we call upon you to support your brothers in Palestine.  For more inquiries contact us at our e-mail address: support@kataeb-ezzeldeen.com."[57]

o  **Ezzedeen.net**

In January 2003, the reigning Qassam website hosted at the domain Kataeb-ezzeldeen.com experienced another mysterious fatal meltdown.  Once again, in a matter of only days, the site was resurrected at a new Internet domain, www.ezzedeen.net.  The domain name itself was first registered on January 28, 2003 by "Ahmed Salim" (vip_man999@hotmail.com) with the contact address: "Ezzedeen.net, Gizaa Bomar Cyrcl 59, Cairo, Egypt 41211, 056582895."[58]  A notice in Arabic, posted in the website sidebar, addressed "our dear brothers, supporters, and frequent visitors to the al-Qassam website":

We celebrate with you the news of our return despite the great hardships and tribulations that aimed to shut down this Hamas platform in order to

---

[53] http://web.archive.org/web/20021211191827/http://www.kataeb-ezzeldeen.com/bayanat/index.asp. December 2002.

[54] http://www kataeb-ezzeldeen.com/bayanat/Bayan.asp?BayanID=158.  December 2002.  See also: http://www.alqassam.ps/arabic/statments.php?id=164.

[55] http://www kataeb-ezzeldeen.com/bayanat/Bayan.asp?BayanID=158.  December 2002.  See also: http://www.alqassam.ps/arabic/statments.php?id=164.

[56] http://web.archive.org/web/20021201101143/http://www.kataeb-ezzeldeen.com/Ads/Tabar3.asp. November 28, 2002.

[57] http://web.archive.org/web/20021201101143/http://www.kataeb-ezzeldeen.com/Ads/Tabar3.asp. November 28, 2002.

[58] WHOIS search on EZZEDEEN.NET.  March 10, 2004.

23

bury the words of truth, power, and freedom. We vow to Allah never to forgo any effort in order to preserve this shining monument. It draws the Islamic nation towards jihad, fires up its determination, and pushes it towards victory and power, Allah-willing. On behalf of your brothers, the administrators of the al-Qassam Website.[59]

Unlike its relatively short-lived predecessor Kataeb-ezzeldeen.com, the Ezzedeen.net website remained active and online from January 2003 until at least May 2004.

As with previous Qassam domains, the Ezzedeen.net website offered users a meticulously-organized library of Hamas propaganda content and even the opportunity to interact directly with Hamas operatives in the field. On March 25, 2004, the Ezzedeen.net website posted an announcement of the "martyrdom" of Hamas spiritual leader Shaykh Ahmad Yassin "who ascended to the rank of the righteous martyrs after he was bombarded in a Zionist attack shortly after dawn prayers on Monday morning… To participate in the celebration and mourning of the Mujahid Shaykh, please e-mail the following address: news_ezz01@hotmail.com."[60] As a result of their continuing efforts, the Ezzedeen.net web team received the dubious honor of being recognized by the U.S. Foreign Broadcast Information Service (FBIS)—the open source arm of the Central Intelligence Agency (CIA)—as the official "web site of Izz-al-Din al-Qassam Brigades, HAMAS military wing."[61]

The emergence of the Ezzedeen.net incarnation of the Qassam website also heralded a series of new developments on the site itself—eventually including an English-language section for visitors originating from outside the Arab world. In fact, the English-language section of the Ezzedeen.net site was prominently labeled, "Copyrights © 2004, Ezzedeen Al-Qassam Brigades Official Website."[62] According to an "About Us" page on the English section of the website, "we are the grandsons of the former Mujahideen and the Companions of Prophet Mohammed… We carried our weapons to defend the Ummah honour, its bright history, and its holy sites and mosques… Therefore, the most difficult and painful path was adopted: the path of resisting the well-armed and well-equipped Israeli occupation till we achieve either splendid victory or martyrdom and paradise… Jihad is our path and martyrdom for the sake of Allah is our best wishes. We do not mind even if our blood is the price since it is in the cause of Allah, al-Aqsa, Palestine, defending our women, kids and properties."[63] The English-language version of the Qassam website hosted at Ezzedeen.net also offered visitors content on the topics of "the Hamas Movement", "Jihad & Terrorism", and "Martyrdom Bombing."[64] According to the administrators of Ezzedeen.net, "this home page was constructed to renew the energies and to inflame and revive hearts, which were about to be stained with the sickness of loving life and hating death."[65]

---

[59] http://web.archive.org/web/20030204152954/http://www.ezzedeen.net/. February 2003.
[60] http://web.archive.org/web/20040328112250/ezzedeen net/. March 24, 2004.
[61] E.g.: United States Foreign Broadcast Information Service (FBIS) daily update. August 21, 2003.
[62] http://web.archive.org/web/20040315171106/www.ezzedeen net/english/aboutus.htm. March 2004.
[63] http://web.archive.org/web/20040315171106/www.ezzedeen net/english/aboutus.htm. March 2004.
[64] http://web.archive.org/web/20040315171106/www.ezzedeen net/english/aboutus.htm. March 2004.
[65] http://web.archive.org/web/20040315171106/www.ezzedeen net/english/aboutus.htm. March 2004.

Over the length of its existence, the Ezzedeen.net website also saw a dramatic expansion of the online video library available to Hamas supporters. Broadening their range beyond a scattered handful of low-resolution rocket launches, Ezzedeen.net administrators added their first (exclusive) live recording of a suicide car bomb attack on an Israeli military checkpoint in Gaza by 23-year old Palestinian Tareq Hmeid.[66] On March 8, 2004, the online video library hosted on the Ezzedeen.net site received yet another new addition: "martyrdom" wills read in English by two British nationals who had executed a suicide bomb attack on April 30, 2003 at "Mike's Place," a waterfront bar in Tel Aviv popular with English-speaking Israelis and Western visitors.[67] Though one of the bombers failed to detonate, the attack nonetheless killed three people and wounded 55 others. According to 22-year old Asif Mohamed Hanif's speech in the video, because the "dirty Jews" were eligible for service in Israel's military, they deserved to be murdered: "It's a great honour to kill one of these people… We have problems and we ask Tony Blair and George Bush to help us. Who is Tony Blair and George Bush? I wish God either to guide them or for his wrath to come upon these people." The failed bomber, 27-year old Omar Khan Sharif, laughs at the comments of his British companion and then proceeds to threaten, "We will take revenge and we will get the Jews and the Crusaders out of the land of Islam. Fellow Muslims, we left Britain to look for martyrdom."[68] This video is, at least in part, an effort to convince other Muslims from Europe—and particularly the United Kingdom—to travel to conflict zones in the Islamic world and join extremist organizations, with the intention of becoming unlawful combatants and suicide bombers. At the close of the video of the two British suicide bombers, the official logo of the Ezzedeen al-Qassam Brigades is shown, alongside the URL: "www.ezzedeen.net."[69]

o   **Alqassam.com/Alqassam.ps**

The final and current iteration of the Qassam website, alqassam.com (a.k.a. alqassam.net, alqassam.com, alqassam.info, alqassam.ws, qassam.info, qassam.ps), emerged in early June 2004 when the old Ezzedeen.net domain finally was knocked offline by unknown parties. By particularly registering a .PS (Palestinian Territories) domain, the Ezzedeen al-Qassam Brigades web administrators have established greater insurance against digital hijackings and de-registrations by law enforcement agencies and cybervigilantes. Nonetheless, the content of the mirrored "Alqassam" websites are virtually indistinguishable from the former and now defunct Ezzedeen.net domain. Even the English-language pages created by Ezzedeen.net administrators were simply subtly edited to read instead, "Copyrights © 2004. Ezzedeen Al-Qassam Brigades Official

---

[66] http://web.archive.org/web/20040511011338/http://www.ezzedeen.net/movies/mpg/tareq.WMV. April 2004. See also: http://ezzedeen net/movies/open.php?cat=1&book=53.
[67] "Bomb Britons appear on Hamas tape." BBC News. March 8, 2004.
http://news.bbc.co.uk/2/hi/uk_news/3543269.stm.
[68] http://www.ezzedeen net/movies/mpg/part2.wmv. March 2004. (A copy of this video is attached as an Appendix to this report.)
[69] http://www.ezzedeen net/movies/mpg/part2.wmv. March 2004. (A copy of this video is attached as an Appendix to this report.)

Website, english@alqassam.ws."[70]   Later, in 2006, the attribution was further appropriately modified to read, "Copyrights © 2006.  Ezzedeen Al-Qassam Brigades Official Website, english@alqassam.ws."  In December of that year, the Alqassam.ws website published an exclusive English-language "interview with one of the Ezzedeen al-Qassam Brigades Field Troops," "Abu al-Mu'tasim"—"a man who is working in the field and on the frontlines."  When asked if he had a message for readers, Abu al-Mu'tasim replied, "First of all, I would like to thank the readers for following up on the Palestinian issue through this web site.  And I hope that each and everyone will be an ambassador for Palestine."[71]

As a result, the current series of Alqassam.ws/.info/.com/.ps domains have been accepted by virtually all parties as, without question, the official Internet frontend of the Ezzedeen al-Qassam Brigades.  In a February 2006 article titled "Hamas Web site says group received Hizbollah money," the Reuters news service described the website Alqassam.ws as "run by the group's armed wing, Izz el-Deen al-Qassam."[72]  Likewise, according to an official report from the Office of the National Coordinator for Counterterrorism (NCTb) in the Netherlands, "the majority of jihadi groups have a presence on the Internet and, of course, they do their very best, in a number of ways, not only to win over souls but also to persuade individuals that they will be ready to participate in the violent jihad.  Thus, the military arm of Hamas has its own site, entitled alqassam.com, aimed at recruitment."[73]  As of the time of the writing of this report, the principle active Hamas web domain is http://www.alqassam.ps, registered on April 11, 2005 to "Ehab Ahmad" in the Gaza Strip.[74]

In April 2009, the Ezzedeen al-Qassam Brigades issued the second edition of its online English-language magazine.  The magazine contained, among other things, a detailed Q&A about the website alqassam.ps:

Q: "Why you decided to have a site?"
A: "As you know, during the last ten years there was a revolution on the internet, we began to notice that international opinion formed by reading news or analyzing texts, etc. the site became an important mean to the propaganda against the Zionist aggression.  We want the people in the West to know our cause and to support us…  Our voice didn't reach to the entire world.  Every language in the world takes information from the English sites so the pronounced people became wider.  The number of the people who is using the internet is getting larger and larger…"
Q: "What is the purpose of your site?"
A: "It is not one purpose; we have many purposes: defending the resistance name from the Zionist media, which described it as 'terrorism';

---

[70] http://web.archive.org/web/20050718080234/http://www.alqassam.ws/english/aboutus.htm.  July 2005.
[71] http://www.alqassam.ps/english/?action=showinet&inid=1.  June 2009.
[72] Al-Mughrabi, Nidal.  "Hamas Web site says group received Hizbollah money."  Reuters.  February 15, 2006.
[73] "Jihadis and the Internet."  Report issued by the Office National Coordinator for Counterterrorism (NCTb); Ministry of Justice, Netherlands.  January 16, 2007.
[74] WHOIS search on ALQASSAM.PS.  May 2009.

26

exposing the Zionist crimes and massacres against the Palestinian civilians; providing researchers with some real facts about the Palestinian resistance; keeping readers in the picture of the ongoing matters in the OPT; make communications with the intellectuals; exposing our suffering in the Zionist jails, torture, and humiliation; and, explaining why we fight the Zionist entity… This Website mainly aims at justifying our resistance against the Zionist occupation forces according to the international laws…"

Q: "Did this site bring you advantages?"

A: "Of course."

Q: "Do you have blocked by the 'Israelis'?"

A: "We succeeded to foil several electronic attacks on our site. They tried but they failed till now. They realize the important of it. So they will keep trying and we will keep defending."

Q: "Last thing; tell me how I can donate."

A: "If you want to donate, send us your details and we will deal with you very well.  You can contact us on: english@alqassam.ps.  For donations: fund@alqassam.ps."[75]

This information is likewise reflected in Arabic on the alqassam.ps website under the "Contact Us" content subsection: "The Brigades of the Martyr Izz el-Deen al-Qassam, the military wing of Islamic Resistance Movement, Hamas, in Palestine—to contact us please e-mail to the following addresses: info@alqassam.ps (management of the site and general correspondence), press@alqassam.ps (for media), design@alqassam.ps (for technical contributions), and fund@alqassam.ps (for providing support and donations)."[76]

   o  **Almoltaqa.ps**

The second edition of the al-Qassam Brigades' online English magazine released in April 2009 also included a prominent advertisement, urging readers, "for more information, visit our forum: www.almoltaqa.ps."[77]  Almoltaqa.ps is a multi-lingual discussion and social networking web forum which operates using database-driven commercial software known as "VBulletin."  It is hosted by the same Internet provider in Saudi Arabia, Shabakah.net, as the official Ezzadeen al-Qassam website (qassam.ps); in fact, their Internet Protocol addresses are almost sequential.  The IP address of Qassam.ps is 89.144.96.68, while the IP for Almoltaqa.ps is 89.144.96.37.  Both web domains were leased using the same registrar service in Gaza, "mektab."[78]  Likewise, there are prominent hyperlinks to the almoltaqa.ps discussion forum on the Ezzadeen al-Qassam Brigades main site (http://www.alqassam.ps/arabic), and vice versa.  The front page of the Arabic-language section of the almoltaqa.ps forum is clearly labeled with a footnote

---

[75] "Ask Us … about the Palestinian cause, you'll have weekly reports."  Ezzedeen Al Qassam Brigades Newsletter.  Issue: April 2007.  http://www.alqassam.ps.

[76] http://www.alqassam.ps/arabic/contact_us.php.  May 2009.

[77] "Ask Us … about the Palestinian cause, you'll have weekly reports."  Ezzedeen Al Qassam Brigades Newsletter.  Issue: April 2007.  http://www.alqassam.ps.

[78] WHOIS and DNS searches on Qassam.ps and Almoltaqa.ps.

in Arabic, "Copyright, the Media Office of the Martyr Ezzadeen al-Qassam Brigades."[79] Conversely, the front page of the English-language section of the almoltaqa.ps forum is labeled with a footnote in English, "Copyright 2000-2009, Jelsoft Enterprises Ltd.  The Media Office of the Izzadeen al-Qassam Brigades."[80]   Users who attempt to register as forum participants in the English-subsection of almoltaqa.ps are asked to first review a series of guidelines and rules for the forum.  According to the first rule in that list, "this is the official forum of the Al-Qassam Brigades; however, the opinions expressed here are entirely personal and do not necessarily express the views of the Brigades of Hamas."[81]

## VII.   The Culpability of Hamas and its Operational Sub-Branches in Executing Terrorist Attacks Identified by Plaintiffs

- **March 28, 2001 – Gas Station Bombing near Kfar Saba**



On March 28, 2001, a suicide bomber detonated himself at the Mifgash Hashalom gas station, east of Kfar Saba, killing two bystanders.  On April 12, 2001, the Ezzedeen al-Qassam Brigades published an Arabic-language statement claiming responsibility for a series of ten suicide operations, including the March 28 attack near Kfar Saba—a document which has been posted, among other places, on Hamas's alqassam.ps website.  The communiqué identified the bomber as 23-year old Fadi Attallah Yusif Omar (pictured at right), and a photo of Omar was likewise later added to the Alqassam.ps website.[82]

The statement released by the Ezzedeen al-Qassam Brigades directly addressed the unexpected delay in claiming credit for the blast: "at the time, we refrained from mentioning the name of our courageous martyr, the third in the chain of ten martyrs who have delivered good news to the media, for security reasons imposed on us by the nature of the battle in our blessed land.  We have vowed to Allah and to you to avenge the death of our martyr Fadi and the other martyrs before him… and we have shown Sharon and his miserable council of swine that our operations and the actions of our mujahideen will shake their beds until they leave our country defeated and humbled."[83]   A copy of the identical Arabic-language communiqué was also posted on the Hamas website Palestine-info.net.[84]

Alongside the Hamas communiqué and a photo of the bomber, the Alqassam.ps website has also printed a detailed personal biography of Fadi Omar and a summary of his relationship with Hamas.[85]   According to that document, in the wake of his martyrdom, Hamas organized "a symbolic event mourning [him].  People gathered in

[79] http://www.almoltaqa.ps.  June 2009.
[80] http://www.almoltaqa.ps/english.  June 2009.
[81] http://almoltaqa.ps/english/register.php.  June 2009.
[82] http://www.alqassam.ps/arabic/sohda5.php?sub_action=sera&id=101.  June 2009.
[83] http://www.alqassam.ps/arabic/sohda5.php?sub_action=byan&id=101.  June 2009.
[84] http://web.archive.org/web/20040810063327/www.palestine-info.info/arabic/hamas/glory/bayant.htm
[85] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.  June 2009.

front of the residence of the family of the martyr Fadi Omar, the comrade from the Ezzedeen al-Qassam Brigades, and the house was draped in green banners.  Also on them were banners for the Islamic Resistance Movement Hamas, which declared that Hamas mourned its fallen comrade Fadi."  In a public ceremony, the director of the Hamas Political Bureau, Khalid Meshaal, cited the importance of the Kfar Saba bombing: "I send my greetings to our people in Qalqiliya for this Martyr Fadi, whose name carries the highest meanings of courage and sacrifice."[86]

- **August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem**

In the early afternoon of August 9, 2001, a suicide bomber entered a Sbarro pizzeria at the corner of King George Street and Jaffa Road in downtown Jerusalem, and detonated a guitar case packed with 5-10kg of explosives—killing 15 and wounding at least 130 others.[87]  On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the Sbarro restaurant attack, a copy of which was later posted on the Alqassam.ps website operated by Hamas. According to that statement, "By the grace of Allah and his support, on the afternoon of Thursday August 9, 2001, this mujahid from al-Qassam executed the martyrdom operation in the middle of the Sbarro Restaurant in the heart of occupied Jerusalem, causing a large  number of dead and wounded among the ranks of the Zionists, and this was revenge for the bloodshed of our women, children, and the elderly—and in defense of Jerusalem and Palestine, as a tribute to the souls of our righteous martyrs."[88]  The communiqué further threatened that the Sbarro attack would only be the beginning of "a chain of attacks by al-Qassam that will teach the Jews a lesson they will never forget, as a punishment for their cowardly actions in assassinating mujahideen and members of the Palestinian resistance."[89]

In addition to the Hamas statement itself, the Alqassam.ps website also offered a detailed personal biography of the bomber behind the Sbarro explosion, 22-year old Ezzedeen Shuhail Ahmad al-Masri (pictured above).  According to that biography, Ezzedeen's "jihadi journey" began when he "joined the Martyr Ezzedeen al-Qassam Brigades under the command of the al-Qassam Engineer Qais Adwan Abu Jabal, and began working in total secrecy… The Brigades had begun preparations for a revenge operation… and the martyrs began preparing to rise up to the paradise virgins—and Ezzedeen al-Masri was amongst them."[90]  Alongside the biography, the Hamas website Alqassam.ps also published a high-resolution photo spread showing Ezzedeen al-Masri dressed in what appears to be a suicide bomb vest and carrying an assault rifle, wearing

---

[86] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.  June 2009.
[87] http://www mfa.gov.il/MFA/MFAArchive/2000_2009/2000/10/Suicide%20bombing%20at%20the%20 Sbarro%20pizzeria%20in%20Jerusale
[88] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=250.  June 2009.
[89] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=250.  June 2009.
[90] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=250.  June 2009.

the green headband of Hamas and with a similarly-themed Hamas banner hanging on the wall behind him (as depicted in the images below).[91]



- **December 1, 2001 – Ben Yehuda Bombings in Jerusalem**

Late on the evening of Saturday, December 1, 2001, a pair of suicide bombers entered a pedestrian mall on Ben Yehuda Street in central Jerusalem and detonated explosive devices that killed 11 young bystanders and wounded over 188 others. The suicide attack was followed by a nearby car bombing approximately 20 minutes afterward.[92] On the same day, an Arabic-language statement was published by the Ezzedeen al-Qassam claiming responsibility for the twin suicide bombings on Ben Yehuda Street. Matching copies of that communiqué, titled "The Blood of Our Martyrs' is Not Water," were distributed online through both the Palestine-info.net and the Alqassam.ps websites.[93] The document identified the two bombers as Usama Muhammed Eid Bahr and Nabeel Mahmud Jameel Halabiyyah and explained that the two men had "carried out… a courageous, painful attack against one of the enemy's dens in occupied west Jerusalem, and this was revenge for the blood of our martyrs."[94] In the

[91] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=250.  June 2009.
[92] http://www mfa.gov.il/MFA/MFAArchive/2000_2009/2001/12/Suicide%20bombing%20at%20the%20 Ben-Yehuda%20pedestrian%20mall
[93] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.
[94] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.

communiqué, Hamas threatened further suicide attacks aimed at "punishing the reckless officials from our enemy's military and government ministries."[95]

Aside from the statement itself regarding the Ben Yehuda bombings, the Alqassam.ps website also offered visitors a series of high-resolution photographs of Usama Bahr and Nabeel Halabiyyah (as seen below) and biographies of the two men issued as part of an "Al-Qassam Special Report."[96]   This "special report" likewise noted that "on the website of the Hamas movement, the al-Qassam Brigades declared their responsibility for the Jerusalem operation" executed by Bahr and Halabiyyah.[97]

 

Images of Usama Muhammed Eid Bahr and Nabeel Mahmud Jameel Halabiyyah, the Hamas suicide bombers responsible for the December 2001 Ben Yehuda bombings.

- **March 27, 2002 – Park Hotel Bombing, Netanya**

On March 27, 2002, a suicide bombing at the Park Hotel in the city of Netanya killed thirty and wounded at least 140 others in the midst of celebrations for the Passover holiday.   On April 14, 2003, an Israeli court sentenced four alleged Hamas members to 29 life terms and an additional 20 years in prison for helping to plan the attack.[98]   On several occasions in the wake of the bombing, the Ezzadeen al-Qassam Brigades have claimed responsibility for it and have provided personal details about the bomber and his mission.   On the same day as the bombing, the website Palestine-info.net published an official English-language communiqué signed by Hamas and watermarked with its logo describing the Park Hotel bombing as a "modest gift" to Ariel Sharon, timed to occur in the midst of a regional summit of Arab leaders in Beirut, Lebanon.   Furthermore, according to that document:

---

[95] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.

[96] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=115.  June 2009.

[97] http://www.alqassam.ps/arabic/shohdaa5.php?sub_action=sera&id=115.  June 2009.

[98] http://www mfa.gov.il/MFA/MFAArchive/2000_2009/2002/3/ Passover%20suicide%20bombing%20at%20Park%20Hotel%20in%20Netanya.

…What the Zionist entity and its ally America call 'innocent civilians' are called in our Brigades and our Palestinian people's lexicon settlers and usurpers of our lands. They will only receive death and displacement and if they wish to save their lives they have to pack up and leave before they regret it.  Our operation… is a clear message to our Arab rulers that our Mujahid people have chosen their road and known how to regain lands and rights in full depending on Allah only. Our people do not accept other than Jihad and resistance as the main path to regain usurped rights… occupation crimes against our people that are struggling for regaining usurped rights will not pass unpunished and we will spread death in lines of the Zionists everywhere in the streets, buses, hotels, restaurants and discos. They will not find a safe place until they leave our lands, cities and villages.[99]

The statement posted on the Palestine-info.net website was confirmed by a second Arabic-language communiqué—titled "The Zionists Will Not Enjoy Security Until Our People Enjoy it in Practice"—posted separately on the Ezzadeen al-Qassam Brigades' website (which can still be found on the present iteration of the al-Qassam website).[100] That website identified the bomber as 25-year old Tulkarem resident Abdel Baset Mohammed Qassem Odeh, and offered an in-depth biography of Odeh and exclusive photos (attached below) of him holding an automatic weapon while standing in front of Hamas propaganda posters and wearing a Hamas headband.[101]  A copy of the Arabic-language communiqué is presented in the appendix to this report, along with a selection of photos of Odeh released on the Ezzadeen al-Qassam website.

 

---

[99] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/27mar02.htm.  December 2002.
[100] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=99.  June 2009.
[101] http://www.alqassam.ps/arabic/sohdaa5.php?id=99.  June 2009.

 

Images of Abdel Baset Odeh, the Hamas suicide bomber responsible for the Park Hotel bombing in Netanya, March 2002

In February 2008, the Media Office of the Ezzedeen al-Qassam Brigades published a special issue of their Arabic-language online magazine to mark the 20th anniversary of the military wing of Hamas.  It summarizes the twenty-year history of the al-Qassam Brigades, and offers data and many statistics regarding Hamas military operations.[102] One of the operations covered in the magazine issue was the bombing of the Park Hotel. According to that document:

> The Martyr Abdel Baset Odeh was able to break through all the Zionist security cordons and reached the Park Hotel in the city of Netanya, exploding his pure body amongst a crowd of settlers, and his operation resulted in the deaths of 25 Zionists and wounding more than 190 others. Of them, forty are in critical condition and of ten of them are comatosed. Zionist sources have reported that, at the time of the explosion, there were more than 300 settlers in the hall, that the intensity of the explosion caused the ceiling to collapse, and that there were injuries to those outside the hall.  This operation is considered one of the most devastating martyrdom operations that has tormented the enemy and [they] still talk about it and its aftermath.[103]

- **May 7, 2002 – Sheffield Club Bombing, Rishon Letzion**

Late in the evening of May 7, 2002, a suicide bomber entered an unlicensed casino in Rishon Letzion known as the "Sheffield Club" and detonated "a suitcase of explosives, spiked with shrapnel and nails to cause maximum injury"—killing 15 and wounding 55 others.[104]   More than six years later, the Ezzedeen al-Qassam Brigades issued a communiqué (dated June 7, 2008) claiming credit for a series of past operations, including the attack on the Sheffield Club.[105]   The statement identified the bomber as Nablus-resident Mohammed Jameel Nabil Muammar and added, "in claiming

---

[102] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.
[103] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.
[104] http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2002/2/Rahamim+Kimhi htm.
[105] http://www.alqassam.ps/arabic/statments.php?id=3921.  June 2009.

responsibility for these heroic operations years after their execution, the al-Qassam Brigades has demonstrated that—despite purported claims for the operations by others— we chose to remain silent until the appropriate time in order to preserve the integrity of the mujahideen, and this is only the tip of the iceberg of our undeclared operations."[106]

- **July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem**

On July 31, 2002, a bomb exploded without warning in the Frank Sinatra cafeteria at the Mt. Scopus campus of Hebrew University in the middle of a crowded lunch, killing nine people and wounding 85 others, fourteen of them seriously.[107]  Shortly thereafter, the Palestine-info.net website published an official English-language communiqué signed by Hamas and watermarked with its logo claiming responsibility for the attack: "Here we surface again from the ruins and debris to plant terror in hearts of the Zionists… [and] teach Sharon and Ben Eliezer the only lesson that they understand.  The Qassam Brigades declare with the grace and strength of Allah full responsibility for the blast in the cafeteria of the Hebrew University's Law Faculty."[108]  The statement further described the bombing as one of:

> …a series of Qassam destructive retaliatory strikes to the Gaza massacre and liquidation of general commander Sheikh Salah Shehada…  The Qassam Brigades have decided that avenging the assassination of any leader of our Jihad Movement the Islamic Resistance Movement, Hamas, or any commander of our Brigades the Qassam Brigades would be: killing 100 Zionist usurpers at least…  Terrorist statements by the American administration, topped by criminal Bush, that backed the Zionist enemy would not terrorize people loving and yearning for martyrdom and not caring less about those who describe our legitimate resistance as terrorism.[109]

The English statement posted on the Palestine-info.net website was confirmed by a second Arabic-language communiqué—titled "The Zionists Will Not Enjoy Security Until Our People Enjoy it in Practice"—posted separately on the Ezzadeen al-Qassam Brigades' website (which can still be found on the present iteration of the al-Qassam website).[110]  The latter document identified the bomber as Mohammed Odeh, a former painter at the university, who placed the bomb with the assistance of accomplice Wael Qassim, and who later detonated the bomb remotely with a cell phone-activated detonator.[111]  According to the communiqué, "It is not a coincidence that this device was used in this particular cafeteria.  This was a device built with careful forethought, gathered intelligence, and precise preparation."[112]

---

[106] http://www.alqassam.ps/arabic/statments.php?id=3921.  June 2009.
[107] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/7/ Terrorist%20bombing%20at%20Hebrew%20University%20cafeteria htm.
[108] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/31jul02 htm.  December 2002.
[109] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/31jul02 htm.  December 2002.
[110] http://www.alqassam.ps/arabic/operations2.php?id=23.  June 2009.
[111] http://www.alqassam.ps/arabic/operations2.php?id=23.  June 2009.
[112] http://www.alqassam.ps/arabic/operations2.php?id=23.  June 2009.

- **January 29, 2003 – Shooting Attack on Route 60**

On January 29, 2003, unknown assailants fired automatic weapons at an Israeli vehicle traveling on Route 60 near the town of Ofra, wounding two Israeli civilians.[113] Approximately 10 months later, in December 2003, the Hamas website Palestine-info.net published a new document titled, "The Zionists admit: The arrested Hamas cells in Ramallah stand out in terms of their great expertise, superior planning, conduct, and complete secrecy."[114]   The report released on Palestine-info.net detailed the activities of several Hamas terror cells in the area of Ramallah, including one cell in particular based in the town of Silwad comprised of approximately five local Palestinian youths all between the ages of 27-28—most of whom were already known as Hamas operatives. Among the various attacks attributed to the Silwad terror cell by Palestine-info.net was the January 29, 2003 Route 60 attack near Ofra.[115]

Further specifics about the incident near Ofra were revealed in another separate document later posted on the official Ezzedeen al-Qassam Brigades website Alqassam.ps, titled "Special Reports: The Most Complex Cell in the History of the [Zionist] Entity in Ramallah."[116]   The document labeled the January 2003 Route 60 attack as "the Sinjal Junction Operation" and narrated the events that took place in remarkable detail:

> The Mujahidun Muayad Hamad, Yaser Hamad, Farah Hamad, and Khaled al-Najjar - after observing the Sinjal Junction on Route 60, where settlers used to pass by - went to action and waited for the target, a car carrying four settlers.  When the proper target emerged on the horizon, the cell leader gave instructions to the other Mujahidin to get ready to begin their mission.  When the car reached the appropriate landmark, the Mujahidin began firing their weapons relentlessly on the vehicle at a very close range from a distance of no more than a few meters.  This operation resulted in the injury of one settler, shot in the spine and permanently paralyzed, called Dvir Kinarti, and serious injuries to another settler when his arm was shattered from the elbow down and another was injured and he is Jacob Steinmetz.[117]

- **March 5, 2003 – Haifa Bus #37 Bombing**

On March 5, 2003, a suicide bomber detonated an explosive vest aboard Egged Bus #37 in the Carmel neighborhood of Haifa, en route to Haifa University—killing seven passengers and wounding 53 others.[118]   The Ezzedeen al-Qassam Brigades have issued at least two communiqués (both



---

[113] http://www.israelemb.org/articles/2003/December/2003122400 htm.

[114] http://www.palestine-info.info/arabic/hamas/glory/ramalah htm.  July 2009.

[115] http://www.palestine-info.info/arabic/hamas/glory/ramalah htm.  July 2009.

[116] http://www.alqassam.ps/arabic/special.php?id=2102.  July 2009.

[117] http://www.alqassam.ps/arabic/special.php?id=2102.  July 2009.

[118] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/ Suicide%20bombing%20of%20Egged%20b us%20No%2037%20in%20Haifa%20-%205-Ma.

35

dated March 7, 2003) claiming responsibility for the bombing, which are still available on the Alqassam.ps website. While the first statement merely references the Haifa bombing amid a series of other Hamas military operations, the second communiqué offers specific details of the attack and the bomber, identified as 20-year old Mahmoud Imran Salim al-Qawasmi (pictured above), a resident of the Hebron suburbs.[119] The latter document threatens follow-up terrorist attacks in "Haifa, Jaffa, Jerusalem": "We emphasize that this response is only the first in a series of strikes by the Al-Qassam [Brigades] which will teach the Jews a lesson they won't forget for their crimes against our defenseless people."[120] The Ezzedeen al-Qassam Brigades have also published a lengthy biography of "the Martyr" al-Qawasmi, which notes, "After the bombing, occupation authorities found parts of Martyr Mahmoud's ID card and a piece of paper with his handwriting stating that the al-Qassam Brigades, to which he belongs, was responsible for the attack."[121]

- **March 7, 2003 – Shooting in Kiryat Arba**

On March 7, 2003, two assailants disguised as Jewish Yeshiva students infiltrated Kiryat Arba through an electronic checkpoint and broke into an Israeli household during Shabbat dinner, firing their weapons on the family they found inside. The attack killed two and wounded five others.[122] On the same day, March 7, 2003, the Ezzedeen al-Qassam Brigades claimed responsibility for "successfully infiltrating the… Kiryat Arba settlement occupying the former territory of Hebron in retaliation for the spilling of the blood of innocents and the defenseless, safe in their homes in Gaza and the West Bank— and in response to the policies of home demolition and arrests carried out by this cowardly and arrogant enemy."[123] A copy of the Hamas communiqué was later posted, among other places, on the Alqassam.ps website.[124]

- **April 30, 2003 – Mike's Place Bombing, Tel Aviv**

On April 30, 2003, a suicide bomber blew himself up at the entrance to Mike's Place, a British-themed bar near the waterfront in Tel Aviv, killing three civilians and wounding over 50 others.[125] In an Arabic-language statement released through the Palestine-info.net website, the Ezzedeen al-Qassam Brigades claimed joint responsibility for the attack in cooperation with the Al-Aqsa Martyrs Brigades.[126] While the communiqué did not name the bomber himself, Hamas reassured its supporters that "this martyr" was indeed part of the al-Qassam Brigades and further details would be provided

---

[119] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=bayan&id=274. July 2009. See also: http://www.alqassam.ps/arabic/statments.php?id=245. July 2009.

[120] http://www.alqassam.ps/arabic/statments.php?id=245. July 2009.

[121] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=274. July 2009.

[122] http://www.mfa.gov.il/MFA/Government/Communiques/2003/ Senior+Hamas+terrorists+killed+in+Hebron+-+9-Sep-2 htm.

[123] http://www.alqassam.ps/arabic/statments.php?id=246. July 2009.

[124] http://www.alqassam.ps/arabic/statments.php?id=246. July 2009.

[125] http://www.mfa.gov.il/MFA/Government/Communiques/2003/Details+of+April+30- +2003+Tel+Aviv+suicide+bombing.htm.

[126] http://www.palestine-info.net/arabic/hamas/statements/2003/30_4_03.htm. September 2003.

in the future.[127]   The same Arabic-language statement claiming credit for the "Mike's Place" bombing—titled, "Our Weapons Will Not Go Down Until the Occupation Goes Down"—was also released directly through the website of the al-Qassam Brigades, and can still be found on the present iteration of the official al-Qassam website.[128]   The communiqué threatened, "our resistance will continue and escalate, and our weapons will continue to target those who have usurped our lands and stolen our wealth… The popular masses today are ready to respond with full force against anyone who tries to stand in the way of the resistance in order to appease their Zionist and American masters."[129]

Almost a year later, on March 8, 2004, the online video library hosted on the Qassam Brigades website Ezzedeen.net was modified to include a new addition:  "martyrdom" wills read in English by two British nationals who had executed the suicide April 2003 bomb attack at "Mike's Place."[130]   According to 22-year old Asif Mohamed Hanif, "It's a great honour to kill one of these people… We have problems and we ask Tony Blair and George Bush to help us.   Who is Tony Blair and George Bush?   I wish God either to guide them or for his wrath to come upon these people."   A second failed bomber, 27-year old Omar Khan Sharif, laughs at the comments of his British companion and then proceeds to threaten, "We will take revenge and we will get the Jews and the Crusaders out of the land  of Islam.   Fellow Muslims, we left Britain to look for martyrdom."[131]

This video is, at least in part, an effort to convince other Muslims from Europe— and particularly the United Kingdom—to travel to conflict zones in the Islamic world and join extremist organizations, with the intention of becoming unlawful combatants and suicide bombers.  At the end of the video of the two British suicide bombers, the official logo of the Ezzadeen al-Qassam Brigades is shown, alongside the URL: "www.ezzedeen.net."[132]

---

[127] http://www.palestine-info.net/arabic/hamas/statements/2003/30_4_03.htm.   September 2003.

[128] http://www.alqassam.ps/arabic/statments.php?id=266.   June 2009.

[129] http://www.alqassam.ps/arabic/statments.php?id=266.   June 2009.

[130] "Bomb Britons appear on Hamas tape."   BBC News.   March 8, 2004.
http://news.bbc.co.uk/2/hi/uk_news/3543269.stm.

[131] http://www.ezzedeen.net/movies/mpg/part2.wmv.   March 2004.

[132] http://www.ezzedeen.net/movies/mpg/part2.wmv.   March 2004.

- **May 18, 2003 – Commuter Bus #6 Bombing**

On May 18, 2003, seven people were killed and 20 others wounded in a suicide bombing attack on Egged Bus #6 near the French Hill neighborhood of Jerusalem.[133]  On the same day, the Ezzedeen al-Qassam Brigades issued a statement claiming credit for the French Hill bombing and identifying the assailant as 19-year old Basim Jamal al-Takruri.[134]  According to a detailed biography posted on Alqassam.ps, Palestine-info.net, and other Hamas websites, the Bus #6 attack was the response of the Ezzedeen al-Qassam Brigades to "the massacres of the



Zionist occupiers in Gaza … This was a painful Qassami triple response to the Israeli Minister's statements, according to which the Jews would soon be permitted to desecrate the courtyards of the noble Al-Aqsa mosque and to perform prayers in it. As a result, three al-Qassam soldiers seized their [explosive] belts, disguised themselves, wearing settlers' clothes and crossed through the gates of glory and immortality."[135]  Al-Takruri's resume posted online by Hamas suggested that he had been part of a trio of closely-linked bombers, all of whom wore the traditional clothing of Israeli settlers while carrying out their operations.[136]

- **June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem**

On June 11, 2003, a suicide bomber detonated himself aboard Egged Bus #14A on Jaffa Road in central Jerusalem, killing seventeen and wounding over 100 others.[137]  Days later, on June 13, the Ezzedeen al-Qassam Brigades published a statement claiming responsibility for the suicide bombing in Jerusalem, which it labeled a revenge mission for the failed assassination of senior Hamas leader Dr. Abdelaziz al-Rantisi.[138]  According to the communiqué, the bomber responsible for "the Jerusalem operation" was 18-year old Abdel Muti Mohammed Saleh Shabaneh, of Hebron.[139]  It also threatened that "the Jerusalem operation is only the beginning of a new series of attacks which will avenge the Zionist effort to grab all of our country."[140]  On the Hamas website Alqassam.ps, the statement claiming credit for the Jaffa Road bombing is accompanied

---

[133] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/5/Palestinian+Terrorism-+A+Wave+of+Suicide+Bombings.htm.
[134] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=309.  See also: http://www.alqassam.ps/arabic/statments.php?id=284.
[135] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=308.  See also: http://www.palestine-info.info/arabic/hamas/shuhda/2003/takrory/syrah.htm.  See also: http://www.palestine-info.com/arabic/spfiles/suhada_2005/shuhda_khaleel/basim.htm.
[136] http://www.alqassam.ps/arabic/sohdaa5.php?id=308.
[137] http://www.mfa.gov.il/MFA/Terrorism-%20Obstacle%20to%20Peace/Palestinian%20terror%20since%202000/Suicide%20and%20Other%20Bombing%20Attacks%20in%20Israel%20Since.
[138] http://www.alqassam.ps/arabic/statments.php?id=295.  June 2009.
[139] http://www.alqassam.ps/arabic/statments.php?id=295.  June 2009.
[140] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=315. June 2009.

by several high-resolution images of Abdel Muti Shabaneh (as seen below)[141] and a lengthy personal biography.[142]

Though the website did not offer a copy for download, the biography posted on Alqassam.ps described a "recorded video of the martyr reading his will to his people and to the military leaders and politicians." It further boasted of "claims by enemy intelligence of prior planning for the operation by the Al-Qassam Brigades, especially since the response came so quickly to the attempted assassination of [Abdelaziz] Rantisi. This was merely to justify the failure of military intelligence… Abdel Muti, a simple student who knew little of the streets in the city of Jerusalem successfully infiltrated through all the military cordons, despite the high state of alert."[143]



Images of Abdel Muti Mohammed Saleh Shabaneh, the Hamas suicide bomber responsible for the June 2003 Jaffa Road bus bombing

- **June 20, 2003 – Shooting Attack on Route 60**

On June 20, 2003, another Israeli vehicle was fired upon by unknown assailants while it was traveling on Route 60 near Ofra. According to the Israeli government, the

---

[141] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.  June 2009.

[142] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=315.  June 2009.

[143] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=315.  June 2009.

same Silwad-based Hamas cell involved in the January 29, 2003 "Sinjal Junction Operation" was also implicated in this remarkably similar follow-up attack.[144]  Though Hamas does not appear to have released a separate and distinct communiqué regarding this attack, it has nonetheless expressed a claim of responsibility.  In the "Glory Record" of the Ezzedeen al-Qassam Brigades—a yearbook recording the group's military achievements—Hamas reported carrying out an attack on June 20, 2003 "targeting a car with settlers, resulting in the death of one settler and wounding others."[145]  The Hamas "Glory Record" also appeared to confirm that the Route 60 attack had indeed been carried out by a Silwad-based cell from the Ezzedeen al-Qassam Brigades, corroborating the account of the Israeli government.[146]

- **August 19, 2003 – Bombing of Bus #2, Jerusalem**



On August 19, 2003, a suicide bomber aboard Egged Bus #2 detonated a 5kg explosive device packed with ball bearings in the Shmuel Hanavi neighborhood of Jerusalem, killing 23 and wounding more than 130 others.[147]  The Ezzedeen al-Qassam Brigades website Alqassam.ps later published a copy of a communiqué from the group claiming responsibility for the bombing, and explaining that the attack had been carried out as revenge for the killing of Hamas leaders by the Israeli military despite calls for a cease-fire:

In memory of the burning of the blessed al-Aqsa Mosque; in response to the Jewish desecration of the Masra of the beloved [Prophet]; to avenge the soul of the courageous martyr Abdullah Abdul-Qader Qawasmeh (Abu Ayman), and the al-Qassam martyrs in Nablus, for the assassination of the Saraya al-Quds commander martyr Mohammed Ayyub Sadr; and, in light of the continuous Sharon-Israeli violations of the announced truce by the Palestinian resistance factions, with the help and grace of Allah, the martyr-cell of Abdullah al-Qawasmeh carried out this modest reaction in the Islamic city of Jerusalem… With divine power, Quranic determination, and Qassami-steadfastness, the Martyr Ezzedeen al-Qassam Brigades present to the paradise virgins of eternity the Martyr and the one who

---

[144] http://www.israelemb.org/articles/2003/December/2003122400 htm.

[145] http://www.palestine-info.info/arabic/Hamas/glory/ramalah htm.  July 2009.

[146] http://www.palestine-info.info/arabic/Hamas/glory/ramalah htm.  July 2009.

[147] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/8/ Suicide%20bombing%20of%20No%202%20Egged%20bus%20in%20Jerusalem%20-%201.

memorized the book of Allah, the mujahid teacher Raed Abdulhamid Mesk (Abu al-Mumin).[148]

The statement concluded, "we assure everyone that we are still abiding by the announced truce, and every crime committed by the enemy will result in a painful response, so expect nothing from us other than the language of blood and bullets."[149] The websites Ezzedeen.net and Alqassam.ps both also published a biography and final will of the bomber, identified as 29-year old schoolteacher Raed Mesk (pictured to the right and below), a series of intimate photos of Mesk, and a propaganda poster for the Ezzedeen al-Qassam Brigades featuring Mesk.[150]

In February 2008, the Media Office of the Ezzadeen al-Qassam Brigades published a special issue of their Arabic-language online magazine to mark the 20th anniversary of the military wing of Hamas. It summarizes the twenty-year history of the al-Qassam Brigades, and offers data and many statistics regarding Hamas military operations.[151] One of the operations covered in the magazine issue was the August 2003 bombing of Bus #2 in Jerusalem. According to the magazine, "Hafiz Quran Raed Mesk carried out this martyrdom operation in occupied Jerusalem inside of an articulated bus, killing 23 and wounding 125 others."[152]



- **September 9, 2003 – Bombing at Café Hillel in Jerusalem**

On September 9, 2003, a suicide bomber detonated an explosive just before midnight in a restaurant, the Café Hillel, in the German Colony neighborhood in Jerusalem, killing seven bystanders and wounding over 50 others.[153] The Ezzedeen al-Qassam Brigades have issued at least two communiqués (dated respectively September 9 and September 10, 2003) claiming responsibility for the bombing, which are still

---

[148] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750. June 2009.
[149] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750. June 2009.
[150] http://www.ezzedeen.net/shohada/2003/raed_mesk/raed_mesk htm. December 2003. See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=750. June 2009.
[151] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf. June 2009. Page 20.
[152] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf. June 2009. Page 20.
[153] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/9/Suicide%20Bombings-%20Tzrifin%20and%20Jerusalem%20-%20Septembe.

available on the Alqassam.ps website.  While the first statement merely references the bombing in brief along with an accompanying attack in Tel Aviv, the second communiqué offers specific details of the attack and the bomber, identified as 22-year old Ramez Fihmi Ezzedeen Abu Saleem.[154]   According to the latter document, the Café Hillel bombing was only "the beginning of our response to the crimes committed by the enemy on our people, especially the assassination of Engineer Commander Ismail Abu Shanab, and the attempted assassinations on… Shaykh Ahmed Yassin, Mr. Ismail Haniyeh, and dozens of other leaders and field commanders from the Martyr Ezzedeen al-Qassam Brigades."  It continued, "We affirm to all our resistance cells that, from now on, it is permissible to target Israeli homes and residential buildings… in response to the enemy policy of targeting the homes of our people in Khan Younis, Hebron, and Nablus—which have escalated until the latest incident that occurred today, when they targeted the house of Dr. Mahmud al-Zahar."[155]  The Alqassam.ps website also features a detailed biography of Ramez Abu Saleem, which notes, "Hamas succeeded in carrying out twin simultaneous operations (one at five in the afternoon, and the other at half past eleven in the evening), confirming that all of the Zionist procedures and policies designed to prevent martyrdom operations—a weapon of the Intifada and the primary method of greatest impact—have failed to achieve their objectives."[156]

- **October 22, 2003 - Tel Romeida Shooting Attack**

On October 22, 2003, a single assailant launched a shooting attack on two Israeli nationals at the entrance to the Tel Romeida neighborhood of Hebron, moderately wounding both.   Though Hamas has never released an explicit communiqué or statement claiming responsibility for the Tel Romeida attack, it has nonetheless posted the "martyr" biography of the assailant—23-year old Rafiq Mohammed Ziyad Qanibi—multiple times on multiple iterations of the official Hamas website.[157]  The biography includes an original photograph of Qanibi (shown at right) and describes him as both an "al-Qassam mujahid" and "an al-Qassam martyr."[158] 
According to the biography posted online by Hamas, Qanibi was carrying a rifle hidden under his jacket while walking near Tel Romeida.  When he reached "Jewish soil," he began firing on a group of soldiers gathered in the settlement until he was cut down in the cross-fire.[159]  The document also noted that Qanibi's bedroom was decorated with images of other "martyrs" from Hamas's Ezzedeen al-Qassam Brigades and he would often "close the door on himself and spend long hours meditating there."[160]

---

[154] http://www.alqassam.ps/arabic/statments.php?id=340.  July 2009.  See also: http://www.alqassam.ps/arabic/statments.php?id=336.  July 2009.
[155] http://www.alqassam.ps/arabic/statments.php?id=340.  July 2009.
[156] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=477.  July 2009.
[157] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/rafeeq/syrah htm.  July 2009.  See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[158] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[159] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[160] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.

- **January 29, 2004 – Jerusalem Bus #19 Bombing**

In the morning hours of January 29, 2004, a suicide bomber wearing an explosive vest detonated himself on Egged Bus #19 at the corner of Gaza and Arlozorov streets in Jerusalem, killing 11 and wounding over 50 others.[161]   The Hamas website Palestine-info.net later published an Arabic-language communiqué claiming credit for the Bus #19 bombing titled "He Who Fails to Protect Himself, Fails to Protect Others" and identifying the bomber as 25-year old Bethlehem resident and former Palestinian policeman Ali Muneer Yusif Jaarah (shown at right and below).[162]   The statement posted on Palestine-info.net repeatedly boasted of the "advanced planning and preparation" carried out by "the martyr Jaarah and his al-Qassam Brigades."[163]



A second Arabic-language communiqué published on the Alqassam.ps website likewise claimed credit for the bombing and indicated that the attack was targeted near the personal residence of Israeli Prime Minister Ariel Sharon in order to avenge a massacre of Palestinians at Hayy al-Zaytun.[164]   The statement took pains to address an apparently conflicting claim of responsibility for the same bombing issued by the al-Aqsa Martyrs Brigades, a military wing of the Palestinian Fatah movement: "We condemn the hasty way in which our brothers from the al-Aqsa Martyrs Brigades claimed credit [for this operation], which is why we have delayed our own declaration until the correct brothers responsible could be identified.  Images of the Martyr and his connection to the al-Qassam Brigades were provided to the media and were… displayed on the website of the al-Qassam Brigades."[165]

The Hamas website Alqassam.ps also features a wealth of material relating to Bus #19 bomber Ali Jaarah, including a special report on the attack, Jaarah's last will and testament, and an in-depth biography.[166]   In that biography published online, Hamas once again addressed the issue of the conflicting claims for the attack from the Al-Aqsa Martyrs Brigades: "On Friday, the spokesman for the Fatah movement appeared on Al-Manar television and apologized for his group claiming credit for the operation and apologized to the al-Qassam Brigades, rejecting any



[161] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/ Suicide%20bombing%20of%20Egged%20bus%20no%2019%20in%20Jerusalem%20-.

[162] http:// www.palestine-info.info/arabic/hamas/shuhda/2004/ali/syrah.htm.  August 2004.

[163] http:// www.palestine-info.info/arabic/hamas/shuhda/2004/ali/syrah.htm.  August 2004.

[164] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.  June 2009.

[165] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.  June 2009.

[166] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=378.  June 2009.

links to the Fatah movement.  This has also been confirmed by a Fatah spokesman in the Gaza Strip."[167]

- **September 24, 2004 – Mortar Strike in Neve Dekalim**

On September 24, 2004, a surprise mortar bombardment from assailants in Khan Younis targeted the Gush Katif settlement of Neve Dekalim, killing a 24-year old Israeli woman.[168]  The Ezzedeen al-Qassam Brigades have issued at least two communiqués (both dated September 24, 2004) claiming responsibility for the mortar attack, which are still available on the Alqassam.ps website.[169]  The first document simply claims credit for "launching three 100mm mortar shells towards the Neve Dekalim settlement at exactly 10:30 in the morning."[170]  The second document repeats this information and adds that the attack "had the impact of killing an enemy soldier and moderately wounding two others."[171]

## VIII.  Conclusions

Based upon the information, research, and analysis presented heretofore in this report, I have reached several key conclusions:

- Since at least 2001, the Palestinian Hamas organization—a designated Foreign Terrorist Organization (FTO) otherwise known as the "Islamic Resistance Movement" and "the Martyr Ezzedeen al-Qassam Brigades"—has maintained a regular presence on the Internet through the use of fixed websites, online newsletters, and virtual discussion forums.  The most notable of these entities are the Palestine-info.net website, the Alqassam.ps website (also formerly known as Qassamiyoon.com, Kataeb-ezzeldeen.net, Ezzedeen.net, etc.), and the Almoltaqa.ps social networking forum.  Hamas has employed these venues to disseminate its propaganda, to conduct public interviews with senior Hamas officials, to facilitate communication and coordination among Hamas supporters, and to assist in illicit terrorist financing schemes.  Hamas' web presence is one of its most critical material resources, serving as a massive "force multiplier" for its membership.

- Since 2001, the Hamas movement—together with persons or entities controlled by, or related to Hamas—has utilized certain texts, websites and other media (many of which have been discussed and analyzed herein) for the purpose of advertising its involvement and responsibility in various violent "operations," including attacks that are alleged to have injured the Plaintiffs in these actions.  In my expert opinion, these texts, websites, and media can be attributed to Hamas

---

[167] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=378.  June 2009.

[168] http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2004/Tiferet+Tratner htm.

[169] http://www.alqassam.ps/arabic/statments.php?id=755.  July 2009.  See also: http://www.alqassam.ps/arabic/statments.php?id=754.  June 2009.

[170] http://www.alqassam.ps/arabic/statments.php?id=754.  June 2009.

[171] http://www.alqassam.ps/arabic/statments.php?id=755.  July 2009.

and have particular significance to Hamas on both a symbolic and operational level, including their use in connection with acknowledging Hamas's involvement and/or contribution to particular acts.

- Using the above-mentioned means (namely websites, newsletters, and forums), Hamas has distributed authentic claims of responsibility—accompanied by other evidence in the form of high-resolution photographs, original video recordings, and the personal accounts of eyewitnesses—which demonstrate its culpability in the execution of particular terrorist attacks identified by Plaintiffs that have occurred between 2001 and 2004. Those attacks include (but are not limited to) the:

  o March 28, 2001 – Gas Station Bombing near Kfar Saba
  o August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
  o December 1, 2001 – Ben Yehuda Bombings in Jerusalem
  o March 27, 2002 – Park Hotel Bombing, Netanya
  o May 7, 2002 – Sheffield Club Bombing, Rishon Letzion
  o July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem
  o January 29, 2003 – Shooting Attack on Route 60
  o March 5, 2003 – Haifa Bus #37 Bombing
  o March 7, 2003 – Shooting in Kiryat Arba
  o April 30, 2003 – Mike's Place Bombing, Tel Aviv
  o May 18, 2003 – Commuter Bus #6 Bombing
  o June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem
  o June 20, 2003 – Shooting Attack on Route 60
  o August 19, 2003 – Jerusalem Bus #2 Bombing
  o September 9, 2003 – Bombing at Café Hillel in Jerusalem
  o October 22, 2003 – Tel Romeida Shooting Attack
  o January 29, 2004 – Jerusalem Bus #19 Bombing
  o September 24, 2004 – Mortar Strike in Neve Dekalim

- With regard to the above-mentioned means (namely websites, newsletters, and forums), neither Hamas nor any of its sub-branches (such as the Ezzedeen al-Qassam Brigades) has ever issued any rejection or credible denial of its culpability in executing the aforementioned series of eighteen terrorist attacks that occurred between 2001 and 2004.

9 8 09
_____
Date

_____
Evan F. Kohlmann

45

**EXHIBIT 211 TO DECLARATION OF VALERIE SCHUSTER**

# Exhibit 1 To Expert Report Of Evan Kohlmann

# Curriculum Vitae Of Evan Kohlmann

# Evan Francois Kohlmann

(206)202-4911 – evan@globalterroralert.com – http://www.globalterroralert.com

## EDUCATION

**University of Pennsylvania Law School,** Philadelphia, Pennsylvania
> J.D. (Juris Doctor) 2004; James Wilson Scholarship Recipient.

**Georgetown University,** Washington, DC
> Edmund A. Walsh School of Foreign Service, BSFS 2001, ***Magna Cum Laude***
- <u>Major</u>: International Politics, concentration in International Security Studies.
  - <u>Minor</u>: Islamic Studies (Center for Muslim Christian Understanding, Georgetown University)
- <u>Honors & Awards</u>: Honors in International Politics; Georgetown University Rhodes Scholar Nominee, 2000.
- Research assistant for Dr. Mamoun Fandy in the Center for Contemporary Arab Studies (CCAS) (Fall 2000).

## EXPERIENCE

*Senior Investigator*                                                      August 2005 – present
**The Nine/Eleven Finding Answers (NEFA) Foundation,** New York, NY
- The NEFA Foundation is a non-profit organization created after the attacks of September 11, 2001. The Foundation strives to help prevent future tragedies in the U.S. and abroad by independently tracking those responsible for planning, funding, and executing terrorist activities, with a particular emphasis on Islamic militant organizations. The Foundation plays a role in the fight against terror through cohesive and comprehensive efforts to research, analyze, and disseminate information pertaining to past and current terrorist activities.

*On-Air Terrorism Analyst*                                                October 2004 – present
**NBC News / MSNBC,** New York, NY
- NBC News is the news division of the U.S. television network NBC Universal. It has ranked as the top-rated broadcast news division in the United States for over ten years. MSNBC is NBC Universal's 24-hour cable news and information network.  Provided frequent on-air analysis and discussion regarding ongoing news stories relating to international terrorism. Assisted in the production of both evening news segments and full-length television documentaries relating to international terrorism.

*Founder, President*                                                      February 2004 – present
**Globalterroralert.com,** New York, NY
- Globalterroralert.com was founded in early 2004 as an exclusive information clearinghouse on international terrorism. Globalterroralert.com is regularly cited as a source by prominent worldwide media outlets—including NBC News, the BBC, the Washington Post, the Los Angeles Times, and the Associated Press.
- Researched terrorist fundraising and recruitment networks using sources including declassified intelligence documents, exhibits submitted in terror-related legal cases, Lexis-Nexis, the World Wide Web, the Foreign Broadcast Information Service (FBIS), and other information retrieval sources.  Interviewed alleged terrorist recruiters, terrorist facilitators, and cooperating defendants in criminal cases.  Drafted public news articles and unclassified memoranda for international law enforcement and intelligence agencies examining international terrorism, its sponsors, and its causes.

*Consultant*                                                              May 2005 – June 2005
**Office of the High Representative (OHR),** Sarajevo, Bosnia-Herzegovina
- The OHR is the chief civilian peace implementation agency in Bosnia-Herzegovina. I was hired as a short-term consultant by OHR to personally travel to Sarajevo and give briefings to intelligence analysts based at Camp Butmir on the status of foreign mujahideen veterans in the Balkans and the ongoing role of foreign charitable organizations.  Assisted in the analysis of confidential intelligence documents, and provided original documentation to add to their records. Gathered firsthand intelligence data in various regions of central Bosnia-Herzegovina concerning suspect corporate entities under criminal investigation by local authorities.

*Senior Terrorism Consultant*                                             February 1998 – January 2004
**Investigative Project,** Washington, DC
- The Investigative Project is an open source counterterrorism think-tank and policy group founded in 1995.
- Researched terrorist fundraising and recruitment networks using sources including Lexis-Nexis, the World Wide Web, FOIA requests, Foreign Broadcast Information Service (FBIS), etc.  Interviewed alleged terrorist recruiters and terrorist facilitators for Al-Qaida, Hamas, and other groups (including notorious UK-based clerics Abu Hamza Al-Masri and Shaykh Omar Bakri Mohammed).

**INVOLVEMENT IN U.S. LEGAL CASES:**

| | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|:---:|:---:|:---:|
| **U.S. V. JEFFREY BATTLE ET AL.** (DISTRICT OF OREGON, 2003) | X | | |
| **U.S. V. MASOUD KHAN ET AL.** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | X | |
| **U.S. V. RANDALL ROYER** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | |
| **U.S. V. SABRI BENKHALA** (EASTERN DISTRICT OF VIRGINIA, 2004) | X | | X |
| **U.S. V. ALI TIMIMI** (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | X |
| **U.S. V. UZAIR PARACHA** (SOUTHERN DISTRICT OF NEW YORK, 2005) | X | | X |
| **U.S. V. AHMED OMAR ABU ALI** (EASTERN DISTRICT OF VIRGINIA, 2005) | X | | |
| **U.S. V. HAMID HAYAT** (EASTERN DISTRICT OF CALIFORNIA, 2006) | X | | |
| **U.S. V. ALI ASAD CHANDIA** (EASTERN DISTRICT OF VIRGINIA, 2006) | X | | X |
| **U.S. V. YASSIN AREF ET AL.** (NORTHERN DISTRICT OF NEW YORK, 2006) | X | | X |
| **U.S. V. SABRI BENKHALA** (EASTERN DISTRICT OF VIRGINIA, 2007) | X | | X |
| **U.S. V. RAFIQ SABIR** (SOUTHERN DISTRICT OF NEW YORK, 2007) | X | | X |
| **U.S. V. JOSE PADILLA ET AL.** (SOUTHERN DISTRICT OF FLORIDA, 2007) | X | | |
| **U.S. V. NURADIN ABDI** (SOUTHERN DISTRICT OF OHIO, 2007) | X | | |
| **U.S. V. EMADEDDINE MUNTASSER ET AL.** (DISTRICT OF MASSACHUSETTS, 2007) | X | | X |
| **U.S. V. HASSAN ABU JIHAAD** (DISTRICT OF CONNECTICUT, 2008) | X | | X |
| **U.S. V. MOHAMMED AMAWI ET AL.** (NORTHERN DISTRICT OF OHIO, 2008) | X | | X |
| **U.S. V. CHRISTOPHER PAUL** (SOUTHERN DISTRICT OF OHIO, 2008) | X | | |
| **U.S. V. SALIM HAMDAN** (GUANTANAMO BAY MILITARY COMMISSIONS, 2008) | X | | X |
| **U.S. V. ALI HAMZA AL-BAHLUL** (GUANTANAMO BAY MILITARY COMMISSIONS, 2008) | X | | X |
| **U.S. V. MOHAMED SHNEWER ET AL.** (DISTRICT OF NEW JERSEY, 2008) | X | | X |
| **U.S. V. ZUBAIR AHMED ET AL.** (NORTHERN DISTRICT OF OHIO, 2009) | X | | |
| **U.S. V. WESAM DELAEMA** (DISTRICT OF COLUMBIA, 2009) | X | | |
| **U.S. V. OUSSAMA KASSIR** (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | | X |
| **U.S. V. MOHAMMED ABDULLAH WARSAME** (DISTRICT OF MINNESOTA, 2009) | X | | |
| **U.S. V. SYED HARIS AHMED** (NORTHERN DISTRICT OF GEORGIA, 2009) | X | | X |
| **U.S. V. EHSANUL SADEQUEE** (NORTHERN DISTRICT OF GEORGIA, 2009) | X | | X |
| **U.S. V. ABDUL TAWALA IBN AL-ISHTARI** (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | | |
| **U.S. V. SYED HASHMI** (SOUTHERN DISTRICT OF NEW YORK, 2009) | X | *(UPCOMING)* | |
| **U.S. V. ISLAMIC AFRICAN RELIEF AGENCY ET AL.** (WESTERN DISTRICT OF MISSOURI, 2009) | X | *(UPCOMING)* | |
| **U.S. V. AL-HARAMAIN FOUNDATION ET AL.** (DISTRICT OF OREGON, 2009) | X | *(UPCOMING)* | |
| **U.S. V. BABAR AHMED** (DISTRICT OF CONNECTICUT, 2010) | X | *(UPCOMING)* | |

| INVOLVEMENT IN INTERNATIONAL LEGAL CASES: | HIRED AS EXPERT CONSULTANT | TESTIFIED AS FACT WITNESS | TESTIFIED AS EXPERT |
|---|---|---|---|
| INTERNATIONAL PROSECUTORS V. ABDULADHIM MAKTOUF (SUPREME COURT OF BOSNIA-HERZEGOVINA, 2005) | X | | X |
| REGINA V. MOHAMMED AJMAL KHAN AND PALVINDER SINGH (SNARESBROOK CROWN COURT, U.K., 2006) | X | | X |
| REGINA V. AL BASHIR MOHAMMED AL-FAQIH (WOOLWICH CROWN COURT, U.K., 2007) | X | | |
| REGINA V. TSOULI, DAOUR, AND MUGHAL (WOOLWICH CROWN COURT, U.K., 2007) | X | X | |
| REGINA V. RAJA, MALIK, IQBAL, ZAFAR, AND BUTT (OLD BAILEY, U.K., 2007) | X | | |
| H.M.A. V. MOHAMMED ATIF SIDDIQUE (GLASGOW HIGH COURT, SCOTLAND, 2007) | X | | X |
| REGINA V. SAMINA MALIK (OLD BAILEY, U.K., 2007) | X | | X |
| REGINA V. HASSAN MUTEGOMBWA (OLD BAILEY, U.K., 2007) | X | | X |
| REGINA V. DITTA AND BILAL (LEEDS CROWN COURT, U.K., 2008) | X | | |
| PROSECUTOR FOR SERIOUS ECONOMIC CRIMES V. AL-AQSA ASSOCIATION (THE HIGH COURT, COPENHAGEN, DENMARK, 2007) | X | | X |
| REGINA V. BILAL KHAZAAL (SUPREME COURT OF NEW SOUTH WALES, AUSTRALIA, 2008) | X | | X |
| REGINA V. AABID KHAN ET AL. (BLACKFRIARS CROWN COURT, U.K., 2008) | X | | |
| REGINA V. IMAD SHOUBAKI ET AL. (SOUTHWARK CROWN COURT, U.K., 2008) | X | | X |
| PUBLIC PROSECUTOR V. HAMMAD KHURSHID ET AL. (COURT OF GLOSTRUP, COPENHAGEN, DENMARK, 2008) | X | | X |
| INTERNATIONAL PROSECUTORS V. RASIM DELIC (INTERNATIONAL CRIMINAL TRIBUNAL FOR THE FORMER YUGOSLAVIA, 2008) | X | | |
| REGINA V. ABDUL NACER BENBRIKA ET AL. (SUPREME COURT OF VICTORIA, AUSTRALIA, 2009) | X | | |
| PUBLIC PROSECUTOR V. HAMMAD KHURSHID ET AL. (RETRIAL) (COURT OF GLOSTRUP, COPENHAGEN, DENMARK, 2009) | X | | X |
| INTERNATIONAL PROSECUTORS V. RIJAD RUSTEMPASIC ET AL. (SUPREME COURT OF BOSNIA-HERZEGOVINA, 2010) | X | | |

## BOOKS AND PAPERS

- Author - *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, (Berg Publishers, September 2004)
  - *[Dr. Marko Hoare, History Faculty, University of Cambridge and author of How Bosnia Armed]:* "Written by a genuine expert in the subject...this is a lucid and informed account of the involvement of the mujahedin in Bosnia, one that lays the myths to rest... This excellent book is essential reading for anyone wishing to understand the truth about an episode of the Bosnian war that is so frequently misrepresented by those with a political motive for doing so."[1]
  - *[Political Science Quarterly (PSQ)]:* "About [Al-Qaida's] operations in Europe, Evan F. Kohlmann has written an illuminating book... Kohlmann is at his best in exhaustively reporting the details of such terrorist episodes. He has compiled prodigious research about the perpetrators and their support networks. Moreover, he never loses sight of the strategy behind the individual attacks... [a] genuine historical analysis."[2]
  - *[Studies in Conflict and Terrorism]:* "This book is a pathbreaking piece of research... Kohlmann addresses the issue in unprecedented detail, exploiting a wide variety of available sources to piece together a largely neglected segment of contemporary Bosnian history... [which] provide critical insights into terrorist preferences, motives, and interests... The book... is descriptive and empirically rich."
  - *Al-Qaida's Jihad in Europe* has consistently been used as a required or recommended course text in numerous undergraduate and graduate courses in North America, Europe, and Australia, including the following courses:
    - (Spring 2005) - "Terrorism, Security, and Intelligence"
      - Course taught by former NSC counterterrorism czar Richard Clarke and former White House Senior Director for Combating Terrorism Rand Beers at Harvard University's Kennedy School of Government.[3]
    - (Fall 2006) - "South Asia, Al Qaeda and the Rise of International Terrorism"
      - Course taught by Peter Bergen at the School of Advanced International Studies at Johns Hopkins University.[4]
    - (Spring 2007) – "Terrorism and Modern Society"
      - Course taught by Dr. Keith Hayward and Professor Frank Furedi at the School of Social Policy, Sociology, and Social Research at the University of Kent (Canterbury campus).[5]

- (Fall 2007) – "Jihad and the End of the World."
  - Course taught by Dr. David Cook (author of <u>Understanding Jihad</u>) at Rice University.
- (Spring 2008) – "Militant Islamism."
  - Course taught by Dr. Thomas Hegghammer (currently a fellow at Harvard's Kennedy School of Government) at Princeton University.

- <u>Major Papers</u>:
  - ***"Trends in Anti-American Terrorism."*** Co-authored with John Eubanks.  <u>Journal of Counterterrorism and Security International</u>.  January 1999.
  - ***"The Legacy of the Arab-Afghans: A Case Study***."  Georgetown University International Politics Honors Thesis, April 2001.
  - ***"Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations, and Charities."*** Testimony before the U.S. House Committee on Financial Services, Subcommittee on Oversight and Investigations. March 11, 2003.
  - ***"Gulbuddin Hekmatyar and Ahmad Shah Massoud: Islamic Patriots or Ambitious Opportunists?"*** Final course paper for Dr. Brian Spooner's graduate seminar in "Afghanistan and Islamism" at the University of Pennsylvania.  April 2004.
  - ***"The Bosnian Mujahideen: Origins, Training and Implications."*** Published as a chapter in The Making of a Terrorist, edited by Director of Terrorism Studies at the United States Military Academy Dr. James JF Forest. Praeger Security International, 2005.
  - ***"Al-Qaida in Saudi Arabia: 2002-2003."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  December 2005.
  - ***"The Role of Islamic Charities in International Terrorist Recruitment and Financing."*** Danish Institute for International Studies (DIIS) Working Paper 2006; January 2006.
  - ***"The Afghan-Bosnian Mujahideen Network in Europe."*** Paper presented before the Swedish National Defence College Center for Asymmetric Threats (CATS) Workshop; May 2006.
  - ***"The Jihadists of Pakistan: Jaish-e-Muhammad (JEM), Harakat ul-Mujahideen (HUM), and Anjuman Sipah-e-Sahaba (SSP)."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. August 2006.
  - ***"The Real Online Terrorist Threat."*** <u>Foreign Affairs</u>.  Vol. 85; No. 5.  September/October 2006.
  - ***"The North African Mujahideen Network of the Western Balkans."*** <u>Bosnian Security After Dayton: New Perspectives</u>.  Edited by Michael Innes.  Routledge; October 2006.
  - ***"Two Decades of Jihad in Algeria: the GIA, the GSPC, and Al-Qaida."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. May 2007.
  - ***"State of the Sunni Insurgency in Iraq: August 2007."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  September 2007.
  - ***"Dossier: The Libyan Islamic Fighting Group (LIFG)."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. October 2007.
  - ***"Al-Qaida's 'MySpace': Terrorist Recruitment on the Internet."*** <u>CTC Sentinel</u>.  Vol 1. No. 2.  January 2008.  Combating Terrorism Center, United States Military Academy (West Point).
  - ***"Dossier: Shaykh Mustafa Abu al-Yazid (a.k.a. 'Shaykh Saeed')."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - ***"An Interview with Ahmad Said al-Hamed, Spokesman for the Political Wing of 'Hamas al-Iraq.'"*** Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - ***"An Interview with the Al-Rashideen Army."*** Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. June 2008.
  - ***"An Interview with 'the Islamic Army in Iraq' (IAI)."*** Exclusive NBC News interview, a transcript of which was later published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation. July 2008.
  - ***"Jihad Networks in Pakistan and Their Influence in Europe."*** Presentation before the III  International Course on "Jihad Terrorism: Contingency Plans and Response", organized by the Pablo Olavide University and the Granada University in Spain; subsequently published as an Occasional Report by the Nine Eleven Finding Answers (NEFA) Foundation.  July 2008.
  - ***"'Homegrown' Terrorists: Theory and Cases in the War on Terror's Newest Front."*** <u>Terrorism: What the Next President Will Face</u>.  The ANNALS of the American Academy of Political and Social Science.  Vol. 618; No. 1.  July 2008.
  - ***"Anatomy of a Modern Homegrown Terror Cell: Aabid Khan et al."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  September 2008.
  - ***"Inside As-Sahaab: The Story of Ali al-Bahlul and the Evolution of Al-Qaida's Propaganda."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  December 2008.
  - ***"Pakistani militants deny role in Mumbai terror attacks: An Interview with Lashkar-e-Taiba."*** <u>NBC News</u>.  December 4, 2008.
  - ***"'The Eleven': Saudi Guantanamo Veterans Returning to the Fight."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  February 2009.
  - ***"Shabaab al-Mujahideen: Migration and Jihad in the Horn of Africa."*** Occasional Report published by the Nine Eleven Finding Answers (NEFA) Foundation.  May 2009.

---

- o ***"Sunni spokesman open to better ties with U.S.: An interview with the Islamic Army of Iraq (IAI)."*** <u>NBC News</u>. August 13, 2009.  http://www msnbc.msn.com/id/32404074/ns/dateline_nbc-the_hansen_files_with_chris_hansen.
- o ***"A Web of Lone Wolves."*** <u>Foreign Policy</u>. November 13, 2009. http://www foreignpolicy.com/articles/2009/11/13/a_web_of_lone_wolves


- <u>Online Blogs and Social Networking</u>:
  - o ***The Counterterrorism Blog.***  http://counterterrorismblog.org/experts/evan-kohlmann/.
  - o ***IntelTweet.***  http://www.twitter.com/IntelTweet.

**EXHIBIT 212 TO DECLARATION OF VALERIE SCHUSTER**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,              )
                                       )
        Plaintiff,                     )    CR. NO. 05-53
                                       )
    vs.                                )
                                       )
AHMED OMAR ABU ALI,                    )
                                       )
            Defendant.                 )
_____)

TRANSCRIPT OF MOTIONS

October 28, 2005

- - -

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    BY: DAVID LAUFMAN, ESQ.
                        STEPHEN CAMPBELL, ESQ.
                        MARLA TUSK, ESQ.
                        JERRY DEMAIO, ESQ. (DOJ)
                    2100 Jamieson Ave.
                    Alexandria, Virginia  22314


FOR THE DEFENDANT:  ASHRAF NUBANI, ESQ.



- - -


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON, RMR, CRR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314

1          THE COURT:  So, the evidence you have that

2     this is al-Qaeda cell is just through Mr. Kohlmann?

3          MR. LAUFMAN:  No, sir.  We are going to rely

4     on the confession evidence, if that comes into evidence,

5     his own confessions that he knew and understood that

6     these individuals were al-Qaeda.

7          But, we don't take anything for granted with

8     this jury.

9          The defense --

10         THE COURT:  No, I guess if -- I'm not trying

11    to pry into your trial strategy, but I'm trying to

12    understand why Mr. Kohlmann is necessary.

13         If I've read what has been submitted to me

14    correctly, he's never been to Saudi Arabia.  And even if

15    he has, he hasn't met with terrorist or been involved

16    with any al-Qaeda activities.

17         So the fact he read about it in my view

18    doesn't make him an expert on al-Qaeda, just that he

19    read about it.

20         MR. LAUFMAN:  Well, I would disagree with

21    the Court respectfully with respect to whether scholarly

22    work is a basis for qualifying an expert in the field of

23    assessing terrorist organizations.

24         But, setting aside his academic and

25    professional work that he now services as a consultant,

RENECIA A. SMITH-WILSON, RMR, CRR

1   October 24th letter, I can give you a ruling right now.

2          If you would like to have an opportunity to

3   present some evidence, I'll be happy to do that perhaps

4   next Friday.  But I don't -- at this moment, there's no

5   way I'm going to let him to come in testify about what

6   he read about, what he wrote in his own -- his book that

7   he probably published himself and that he works for the

8   government, and the government pays him to testify, to

9   do things for them.

10          That to me doesn't make him an expert in

11   al-Qaeda.

12          MR. LAUFMAN:  Your Honor -- pardon.  He's

13   been qualified by this court as an expert on al-Qaeda.

14   I understand that Your Honor hasn't qualified him.

15          THE COURT:  The judgment of a district judge

16   concerning expert witnesses is governed by Rule 702 of

17   the Federal Rules of Evidence.

18          And the judge has to make a judgment whether

19   a person is qualified by experience, education or

20   training to offer reliable testimony about a subject

21   matter that's beyond the kin of the average juror.

22          If what you've shown me -- if what you've

23   shown me is your proffer, I'm prepared to make a

24   judgment right now.

25          I've invited you to present some evidence,

1    but I -- I have difficulty with the idea that someone

2    who has never done any real law enforcement or

3    intelligence work where he has infiltrated terrorist

4    cells or worked with terrorists or had contact with them

5    is going to come in here and tell the jury that based

6    upon what he's read on the Internet and his -- his own

7    writings that he thinks that this al-Fak'asi cell and

8    Qahtani cell belong to al-Qaeda, if that's all you have,

9    it's not going to happen in this courtroom.  Maybe it

10   happened in another courtroom, but not in this one.

11             MR. LAUFMAN:  May I continue, please.

12             THE COURT:  Well, I'm asking you to make a

13   judgment now.  Do you want me to rule or do want to have

14   a chance to put on some testimony?

15             MR. LAUFMAN:  Well, I'd like to have a

16   chance to proffer to the Court some additional

17   information that I plan to proffer.

18             THE COURT:  Okay.  I can go forward with the

19   proffer if you'd like.

20             MR. LAUFMAN:  First of all, I want to make

21   clear for the record that Mr. Kohlmann has twice been

22   qualified as an expert in this court on --

23             THE COURT:  Expert in what?  Tell me --

24             MR. LAUFMAN:  As an expert on al-Qaeda among

25   other subjects.  Based on the same qualifications we

1    an ability to bring in more reliable evidence on how

2    these groups relate without being a part of those groups

3    than to get things on the Internet.

4              Of course, I don't think that it's reliable

5    at all.

6              THE COURT:  All right, Mr. Nubani, I think I

7    have what I need to make a judgment now.

8              All right.  This matter is before the Court

9    on the defense motion to exclude the testimony of

10   Mr. Evan Kohlmann, who has been proffered by the

11   government.

12             And I'm reading from the October 24th letter

13   of the prosecutor to Mr. Nubani which says, "Evan F.

14   Kohlmann will testify as an expert witness concerning

15   the history and structure of al-Qaeda, its organization

16   and operations in the Arabian Peninsula and the basis

17   for concluding that the terrorist cell headed by Ali

18   Abdi Alramian, al-Fak'asi al-Ghami and Sultan Jubran,

19   Sultan Al Qahtani was an al-Qaeda cell and I provide the

20   court reporter with a copy of the letter so they can

21   spell the names.

22             The Court has reviewed the resumé of

23   Mr. Kohlmann which has been proffered, and the

24   transcript proffered by the government of a March 8,

25   2004 hearing before Judge Brinkema in the Benkahla case.

1    And on page 195, she says at line nine, "Are

2  you tending Mr. Kohlmann as an expert in modern Afghan

3  politics?  Mr. Kromberg:  Yes".  Answer, line 12, "All

4  right.  I'm going to accept him.  And, I've accepted him

5  as an expert in the other trial.  And clearly he's

6  written enough and studied enough on this.  I'm going to

7  accept him as an expert, so you can get on with your

8  questions ".  That's line 15.

9    I recognize that Judge Brinkema has tried

10  the Benkahla case and the Al-Tamimi case.  What I'm

11  being asked to do today is to make a judgment about

12  whether or not Mr. Kohlmann is qualified to render an

13  opinion within the meaning of the Federal Rule of

14  Evidence 702.

15    I've also been provided with the

16  cross-examination of Mr. Kohlmann, transcripts from

17  pages 672 to 683.  And, what -- what strikes me in

18  reviewing this question is Federal Rule of Evidence 702

19  says that the trial judge is to make a determination and

20  I'm going to read what the rule says, "If scientific,

21  technical or other specialized knowledge will assist the

22  trier of fact to understand the evidence or to determine

23  a fact in issue, a witness qualified as an expert" and

24  I'm going to underline, "by knowledge, skill,

25  experience, training or education", and I underline all

1    four of those, "may testify thereto in forming an

2    opinion or otherwise, if, one, the testimony is based

3    upon sufficient facts or data; two, the testimony is the

4    product of reliable principles and methods, and three,

5    the witness has applied the principles and methods

6    reliably to the facts of the case".

7              This Judge is not persuaded that

8    Mr. Kohlmann's study of subject matter of terrorism,

9    whatever that is in terms of if it's a global subject

10   matter, but I believe it has to do with groups that are

11   organized to carry out political acts of violence

12   against governments but that are not organized

13   government or entities themselves.  That's what I think

14   a terrorist is and that they're designated foreign

15   terrorist organization al-Qaeda.  There's no contest in

16   this trial what al-Qaeda is.

17             The question is whether Mr. Kohlmann,

18   because he has a law degree from Penn which he earned in

19   2004 and because he graduated from Georgetown in 2001

20   with a major in politics and international security

21   studies and a minor in Islamic studies, in and of itself

22   makes him a person who could assist the jury with

23   reliable information about the operation of al-Qaeda.

24             I note that first of all, as far as we

25   can -- been proffered here today, Mr. Evan Kohlmann has

RENECIA A. SMITH-WILSON, RMR, CRR

1    never meet anyone from al-Qaeda, has not infiltrated

2    al-Qaeda, has not done any research where he's had

3    contact with someone who was in al-Qaeda to know just

4    what they do or do not do.

5              He's read about it on the Internet and

6    scholarly books.  And certainly a person can qualify

7    based upon reading and education.

8              He's never been to Pakistan, never been to

9    Saudi Arabia, does not speak Arabic, does not speak

10   Urdu, can't read Urdu or Lakishur websites, can't read

11   Arabic websites and has to have them translated for him.

12             He has read many books about the subject

13   matter of terrorism, and he reads and has collected

14   many, many websites from the Internet.  And this is a

15   part of his basis for his conclusions about how al-Qaeda

16   and other terrorist groups operates.

17             The Court does not think that the Internet,

18   particularly the postings that he has described here, in

19   and of themselves have any -- there's no way to test the

20   reliability of them.  There's no way to know who post

21   them.  There's no way to knows who maintains them.

22   There is no way to know whether the information there is

23   accurate or not.

24             And that he has published a book, self

25   published a book, I note, in and of itself does not make

RENECIA A. SMITH-WILSON, RMR, CRR

1    him an expert.  And, the fact that the government has

2    hired him to testify as an expert witness in cases

3    including U.S. versus Battleford, Benkhala, Randall

4    Royer, Massoud, Al-Tamimi does not with this Judge sit

5    as a basis to qualify him as an expert in al-Qaeda,

6    particularly where he has had no contact with someone

7    from al-Qaeda.

8              All he has done is to read about it.  My

9    jury could do an Internet search on Google and read

10   about al-Qaeda.

11             I'm sure that Mr. Kohlmann could probably

12   summarize it for them in a way that could be very

13   helpful, but I'm not of the opinion that Mr. Kohlmann is

14   an expert because he is not qualified by training,

15   because he has none other than what he is self taught.

16             He has not qualified because of the methods

17   that he's gathered his information, reading the Internet

18   and reading books in and of itself may be a way to learn

19   engineering, but at some point, the engineer has to

20   actually handle a device.

21             Here we have a person who has just read

22   about these things and is being offered to tell the

23   Court about a cell, the Ali Abdi Alramian al-Fak'asi

24   cell and the Sultan Jubran cell.  He is going to make a

25   judgment that these cell were al-Qaeda cells.

RENECIA A. SMITH-WILSON, RMR, CRR

1    He'd never been to Saudi Arabia, never

2  interviewed any one from either of these cells, has no

3  personal knowledge about whether these cell were

4  affiliated with al-Qaeda or anyone else.

5    So for all those reasons, the motion to

6  exclude Mr. Kohlmann's testimony will be granted.

7  Exception's preserved.

8    I think that that covers what we have for

9  trial, so I'll see you all on Monday at 10 o'clock.

10    We're in recess.   Thank you.

11    (Proceeding concluded at 1:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 213 TO DECLARATION OF VALERIE SCHUSTER**

```
                                                              1
     5B95PAR1
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,
3
4              v.                      03 CR 01197
4
5    UZAIR PARACHA,
5
6              DEFENDANT.
6
7    ------------------------------x
7
8                                 New York, N.Y.
8                                 November 9, 2005
9                                 11:15 a.m.
9
10
10   Before:
11
11              HON. SIDNEY H. STEIN,
12
12                                 District Judge
13
13                        APPEARANCES
14
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   KARL METZNER
17   ERIC B. BRUCE
17        Assistant United States Attorneys
18
18   ANTHONY L. RICCO
19   EDWARD DAVID WILFORD
19        Attorneys for Defendant Uzair Paracha
20
20   ALSO PRESENT:   JANELLE MILLER, Special Agent, FBI
21
22
23
24
25

          SOUTHERN DISTRICT REPORTERS (212) 805-0300
```

EXHIBIT
Kohlmann 5
12/2/10 CL
PENGAD 800-631-6989

AQPK-000720

HA 09114

KOHLMANN002376

86

5b90par2                    Kohlmann - direct

1    A.  I left the Investigative Project in early 2004 to continue

2    pursuing my work, really, on an independent basis.  So now I

3    work as an independent consultant to parties that are

4    interested in studying virtually the same thing I was doing

5    there.

6    Q.  Do you operate a website, currently?

7    A.  Yes I do.

8    Q.  What is that website?

9    A.  Globalterroralert.com.

10   Q.  Describe the website, please.

11   A.  I set up the website in early 2004 to be an information

12   clearinghouse to international terrorism.  I felt that there

13   was a major lack of original material out there from terrorist

14   groups, video audio recordings, translations of terrorist

15   communication, the kind of material that is very compelling.

16   And that is in short supply.  And I felt that there needed to

17   be somewhere on the internet to help disseminate this kind of

18   information to the public at large, to policymakers, to law

19   enforcement, to the same audience that I produced my other

20   material for.

21   Q.  And your website focuses on original sources?

22   A.  Yeah, it primarily publishes original audio and video

23   recordings from terrorist groups.

24   Q.  And does your present work focus on any particular

25   terrorist organization?

SOUTHERN DISTRICT REPORTERS (212) 805-0300

AQPK-000733

HA 09127

KOHLMANN002389

87

5b90par2                    Kohlmann - direct

1   A.   Yeah.   Again, I mean I focused on a wide variety of Arab

2   Afghan groups, but virtually all of them are either al Qaeda al

3   Qaeda affiliates.

4   Q.   Do you do any consulting work for any media organizations?

5   A.   Yeah.   I work as on-air terrorism analyst for NBC MSNBC.

6   Q.   What do you do in that capacity?

7   A.   I go on television, talk about ongoing terrorism issues.   I

8   discuss what is going on in the news.   I reflect upon past

9   history, pretty much the same analysis and distillation that

10  goes into the products that I -- other products I put out, such

11  as memorandums and material on my website.

12  Q.   Approximately how long have you been on-air consultant for

13  NBC and MSNBC.

14  A.   I have been on television since about 2003, but I have been

15  employed by NBC MSNBC since October 2004.

16  Q.   During the course of your career, have you written any

17  books on terrorism-related subjects?

18  A.   Yes, I have.

19  Q.   What is the name of the book you have written?

20  A.   I'm author of al Qaeda Jihad in Europe, the Afghan Bosnian

21  network.

22  Q.   Can you briefly described the thrust of that work for us?

23  A.   Sure.   My book was meant to take off somewhere where my

24  thesis had left off in analyzing the roots of the Arab Afghans

25  and al Qaeda and Afghan assistance in 1980s, and try to trace

SOUTHERN DISTRICT REPORTERS (212) 805-0300

AQPK-000734

HA 09128

KOHLMANN002390

**EXHIBIT 214 TO DECLARATION OF VALERIE SCHUSTER**

992

1    matters.

2            And from what I know of his CV and of what he

3    wrote, he has no experience, background or training in

4    military matters whatsoever.  He has never served in the

5    military, he has never been a military expert or official.

6    He has written on--

7            THE COURT:  Well, I have already ruled that he is

8    qualified to testify in this area.

9            NOTE:  The side-bar discussion is concluded;

10   whereupon the case continues before the jury as follows:

11   BEFORE THE JURY

12           MR. LAUFMAN:  Evan Kohlmann.

13           NOTE:  The witness is sworn.

14           EVAN F. KOHLMANN, called by counsel for the United

15   States, first being duly sworn, testifies and states:

16       DIRECT EXAMINATION

17   BY MR. LAUFMAN:

18       Q.   Good morning.

19       A.   Good morning.

20       Q.   Would you please state your name and spell it.

21       A.   My name is Evan F. Kohlmann.  E-v-a-n, F.,

22   K-o-h-l-m-a-n-n.

23       Q.   Mr. Kohlmann, where you do you reside?

24       A.   New York, New York.

25       Q.   What is your current occupation?

Norman B. Linnell   OCR-USDC/EDVA   (703) 549-4626

AQPK-001647

EXHIBIT
Kohlmann 11
12/3/10 SC
PENGAD 800-631-6989

HA 09269

KOHLMANN001605

995

1   recruiters who was responsible for helping found

2   Lashkar-e-Taiba.

3       Q.   And have you previously been qualified as an expert

4   in this court on the subject of Lashkar-e-Taiba and Islamic

5   extremist organizations?

6       A.   Yes, I have.

7           MR. LAUFMAN:   Okay.  Your Honor, I understand there

8   is no challenge to Mr. Kohlmann's qualifications.  We would

9   move into evidence Government's Exhibit 108, which is his

10  curriculum vitae.

11          MR. MILLER:   Your Honor, there is the issue that

12  was raised previously, of course.

13          THE COURT:   Well, of course.  It is admitted.

14          MR. LAUFMAN:   Thank you, Your Honor.  We proffer

15  Mr. Kohlmann then as an expert on Islamic extremism,

16  Lashkar-e-Taiba and the use of the Internet to track the

17  activities of Islamic terrorist organizations.

18  BY MR. LAUFMAN:  (Continuing)

19      Q.   Mr. Kohlmann, when did India obtain its

20  independence from Great Britain?

21      A.   In approximately 1949.

22      Q.   What is the dominant religion in India?

23      A.   The dominant religion is Hinduism.

24      Q.   And what country to the west of India was

25  established in 1947 at or around the time that India became

HA 09272

KOHLMANN001608

**EXHIBIT 215 TO DECLARATION OF VALERIE SCHUSTER**

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
 2
      *  *  *  *  *  *  *  *  *  *  * Criminal Docket
 3    UNITED STATES OF AMERICA,       *   No. 3:07CR57(MRK)
                  Plaintiff           *
 4            vs.                     * February 14, 2008
      HASSAN ABUJIHAAD,               * 10:47 o'clock a.m.
 5                Defendant           *
      *  *  *  *  *  *  *  *  *  *  * New Haven, Connecticut
 6

 7                      DAUBERT HEARING

 8         BEFORE THE HONORABLE MARK R. KRAVITZ
                UNITED STATES DISTRICT JUDGE
 9
      Appearances:
10    For the Plaintiff:  STEPHEN BENJAMIN REYNOLDS, ESQ.
                          Assistant U.S. Attorney
11                        915 Lafayette Boulevard
                          Bridgeport, CT 06604
12                        WILLIAM J. NARDINI, ESQ.
                          Assistant U.S. Attorney
13                        157 Church Street
                          New Haven, CT 06510
14                        ALEXIS L. COLLINS, ESQ.
                          U.S. Dept. Of Justice Counterterrorism Section
15                        950 Pennsylvania Avenue, NW Room 2649
                          Washington, DC 20530
16
      For the Defendant:  DAN E. LABELLE, ESQ.
17                        Halloran & Sage
                          315 Post Rd. West
18                        Westport, CT 06880
                          ROBERT GERARD GOLGER, ESQ.
19                        Quatrella & Rizio
                          One Post Rd., PO Box 320019
20                        Fairfield, CT 06432

21
      Court Reporter:     Thea Finkelstein RMR, CRR
22                        141 Church Street
                          New Haven, CT 06510
23                        TheaFinkelstein@aol.com

24

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```



EXHIBIT
Kohlmann 12
12/3/10 SC

PENGAD 800-631-6989

KOHLMANN000001

```
 1          MS. COLLINS:  -- submit something else?  Yes, your
 2   Honor.
 3          THE COURT:  I mean, it's a lengthy report.  A lot of
 4   it is history and background.  But if there are particular
 5   opinions beyond that that you are going to elicit from him, I
 6   would just as soon get that out so I know what it is.
 7          MS. COLLINS:  Your Honor, I'm not sure that that's
 8   possible because the way the government plans to put on Mr.
 9   Kohlmann is to use him to explain what the jurors may see in a
10   particular exhibit.
11          THE COURT:  I see.  Which exhibits are we talking
12   about?
13          MS. COLLINS:  These would be exhibits from web pages
14   from Azzam Publications, perhaps the videos.  Just to put
15   those in context so the jurors understand what they are and
16   what it is they're looking at.
17          THE COURT:  Okay.  I see.  So I guess if he says
18   that Azzam is the premier provider of information, I suppose
19   that's an opinion in a sense but you are principally providing
20   Mr. Kohlmann to provide sort of context and background about
21   the various players in this movement?
22          MS. COLLINS:  Yes, your Honor.  For example, just
23   taking --
24          THE COURT:  I guess I should also ask, is there
25   anything in his report that you actually now decide you are
```

**KOHLMANN000047**

1    not going to go into?  Because we should know that, too.

2            MS. COLLINS:  Well, I think, your Honor, a lot of

3    the detail we may not go into.

4            THE COURT:  Okay.

5            MS. COLLINS:  You know, for example, with one of the

6    exhibits on our list is the "The Declaration of War:  Expel

7    the Polytheists from the Arabian Peninsula," by Usama Bin

8    Laden, we would ask him to explain who is Usama Bin Laden,

9    just explain the context of that so the jurors understand what

10   it is.  That's my understanding.

11           May I have one moment?

12           THE COURT:  Sure.

13           MS. COLLINS:  Your Honor, the way we picture

14   structuring his testimony is using the web pages that we are

15   admitting in the particular exhibits and grounding whatever he

16   says about that, because I doubt that any juror has any idea

17   about the nature of the Chechnian conflict.  So you put a

18   document that talks about the fight in Chechnya before them

19   and they won't understand what that is.

20           THE COURT:  So he would explain what is going on in

21   Chechnya, the role of the mujahideen.

22           MS. COLLINS:  In very summary fashion, just to

23   provide a basic education for the jury.  The detail that's

24   contained in the expert report, the purpose of that was,

25   number one, to show that his body of knowledge about it and

KOHLMANN000048

1    also to educate the defense, but we have no intention of going

2    into each and every detail that's in here.

3              THE COURT:  Okay.  All right.  I guess since his

4    focus is going to be, I take it, on these materials, the focus

5    of which I gather is principally the Arab-Afghan areas,

6    Chechnya, Bosnia, Afghanistan, you know, other than a passing

7    reference to 9/11, I take it you do not intend to have him

8    talking about 9/11?

9              MS. COLLINS:  I don't anticipate that, no.

10             THE COURT:  I think we should stay away from that, I

11   guess I would say, is a good guide.  All right, Mr. Kohlmann?

12             THE WITNESS:  Of course, your Honor.

13             THE COURT:  Mr. LaBelle.

14   CROSS-EXAMINATION

15   BY MR. LaBELLE:

16   Q    Mr. Kohlmann, starting at the end of your testimony, you

17   were asked whether the opinions expressed in the report that

18   you issued for this case have been reviewed by your colleagues

19   or other scholars.  Do you recall that question?

20   A    Yes, I do.

21   Q    And you indicated that the opinions had been reviewed?

22   A    That's correct, they have been.

23   Q    Has the actual report been reviewed?  Did you give this

24   report to other scholars and ask them to take a look at it and

25   get feedback?

KOHLMANN000049

**EXHIBIT 216 TO DECLARATION OF VALERIE SCHUSTER**



5817

1

2

3                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
4    - - - - - - - - - - - - - - - - - - -

5    UNITED STATES OF AMERICA

6        -vs-                        CRIMINAL NUMBER:

7    MOHAMAD IBRAHIM SHNEWER,         07-CR-00459
     DRITAN DUKA,
8    ELJVIR DUKA,
     SHAIN DUKA, AND
9    SERDAR TATAR,

10       Defendants.

11   Mitchell H. Cohen United States Courthouse
     One John F. Gerry Plaza
12   Camden, New Jersey 08101
     December 9, 2008
13

14

15   B E F O R E:   THE HONORABLE ROBERT B. KUGLER
                    UNITED STATES DISTRICT JUDGE
16

17

18   A P P E A R A N C E S:

19   CHRISTOPHER J. CHRISTIE UNITED STATES ATTORNEY
          BY: WILLIAM E. FITZPATRICK
20            MICHAEL A. HAMMER
          ASSISTANT UNITED STATES ATTORNEYS
21

22

23        ROCCO C. CIPPARONE, JR., ESQUIRE
          Attorney for Defendant
24        Mohamad Ibrahim Shnewer
                    Carl J. Nasi, CSR
25                  U. S. Official Court Reporter

United States District Court
Camden, New Jersey

---

5818

1    MICHAEL N. HUFF, ESQUIRE
     Attorney for Defendant Dritan Duka
2

3    TROY A. ARCHIE, ESQUIRE
     Attorney for Defendant Eljvir Duka
4

5    MICHAEL E. RILEY, ESQUIRE
     Attorney for Defendant Shain Duka
6

7    RICHARD SPARACO, ESQUIRE
     Attorney for Defendant Serdar Tatar
8

9

10

11

12

13

14

15      EXHIBIT

16   Kohlmann 13
17   12/3/10  SC
18

19

20

21

22

23

24

25

United States District Court
Camden, New Jersey

---

5819

1

2    EVAN F. KOHLMANN                              5821

3    DIRECT EXAMINATION OF MR. KOHLMANN BY MR.     5821

4    FITZPATRICK

5    CROSS EXAMINATION OF MR. KOHLMANN BY MR.      5889

6    CIPPARONE:

7    CROSS-EXAMINATION OF EVAN KOHLMANN BY MR. HUFF   5938

8    CROSS-EXAMINATION OF EVAN KOHLMANN BY MR. ARCHIE 5955

9    CROSS-EXAMINATION OF EVAN KOHLMANN BY MR. RILEY  5972

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

Camden, New Jersey

---

5820

1            (Open court)

2            THE DEPUTY COURT CLERK:  All rise.

3            THE COURT:  Are we ready?  Good morning.

4    MR. HAMMER:  Yes, sir.

09:28AM 5    MR. FITZPATRICK:  Yes.

6            THE COURT:  Let's get the jury.

7            (Brief pause)

8            THE DEPUTY COURT CLERK:  All rise.

9            (Jury present)

09:30AM 10   THE COURT:  Have a seat, ladies and gentlemen.  Next

11   witness, please.

12           MR. FITZPATRICK:  Your Honor, the United States calls

13   Evan Kohlmann.

14           THE COURT:  You want to come up here?  Right up here

09:32AM 15   in front of the bench.  Right up here.  The clerk will

16   administer an oath to you.

17           THE WITNESS:  Thank you, Your Honor.  Evan F.

18   Kohlmann.  K-o-h-l-m-a-n-n.

19           THE COURT:  Mr. Kohlmann, come over and have a seat

09:32AM 20   please.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  I appreciate it if you would try to speak

23   into that microphone so everyone can hear what you have to

24   say.

09:32AM 25   THE WITNESS:  Thank you.

United States District Court

Camden, New Jersey

KOHLMANN003635

5829

1    MR. FITZPATRICK: Your Honor, at this time I would
2    offer Mr. Kohlmann to the Court as an expert in the field of
3    Islamic terrorism and the use of digital media to promote
4    terrorism.
5              THE COURT: Counsel have any questions?
6              MR. CIPPARONE: No, your Honor.
7              THE COURT: Any objections?
8              MR. CIPPARONE: No, your Honor.
9              THE COURT: All right, you may so proceed to his
10   findings and his opinions.
11   BY MR. FITZPATRICK:
12   Q.   Mr. Kohlmann, in preparing for your testimony today did
13   you review a mirror hard drive recovered from defendant
14   Mohamad Shnewer's computer?
15   A.   Yes, I to.
16   Q.   And preparation for your testimony today did you also
17   review a mirrored hard drive recovered from defendant Eljvir
18   Duka's desktop computer?
19   A.   Yes, I did.
20   Q.   Did you also review certain transcripts in which videos
21   from those computers were discussed?
22   A.   That's correct, yes.
23   Q.   Having reviewed the Shnewer computer, can you just give
24   the jury a general description of the types of materials that
25   you found?

United States District Court
Camden, New Jersey

5830

1    A.   Yeah. I would describe it as a fairly large compendium
2    and a very wide compendium of jehadi propaganda videos, of
3    terrorist propaganda videos put out by a variety of different
4    organizations. You have everything from al Qaeda's
5    central command in Afghanistan to shorter clips put out by al
6    Qaeda in Iraq, in Iraqi insurgent groups of actual armed
7    confrontations with U. S. military forces in Iraq and
8    elsewhere. It ranges everywhere from propaganda videos
9    extolling the virtues of al Qaeda, of jehad, of the mujahideen
10   the holy warriors, to again actual military operations
11   targeting and killing U. S. service men.
12   Q.   And how would you characterize the volume of those
13   materials?
14   A.   It's a fairly substantial volume. I actually remarked
15   that I -- if you take a very particular period of time in
16   which these videos were issued, this is a large cross-section
17   of the total number of videos that was released during this
18   time. In fact, you could describe the collection really on
19   both these computers as being some of the classics that have
20   been put out by these organizations in this time, some of
21   their best videos, some of their most impactful videos, both
22   military operations and also propaganda.
23   Q.   And with respect to the Eljvir Duka computer, the desk
24   top computer, can you describe the types of materials that you
25   viewed there?

United States District Court
Camden, New Jersey

5831

1    A.   Again, you have a combination of both the videos
2    themselves and also evidence of links to the videos, the same,
3    basically -- in some cases the very same videos. You have a
4    collection again of propaganda style videos from al Qaeda
5    central leadership in Afghanistan extolling the virtues of
6    jehad, extolling the virtues of the mujahideen, explaining
7    that it is one's obligatory duty to join in this struggle.
8    And then as well as that you have the shorter clips from
9    groups primarily in Iraq where you have improvised explosive
10   device attacks, you have suicide bombing attacks, sniping
11   attacks. Most of the time the targets here are either U. S.
12   service men or Iraqi security forces.
13   Q.   Mr. Kohlmann, what if any conclusion were you able to
14   draw regarding the use of these materials in a potential
15   domestic terrorist act?
16   A.   Well, it's been my experience that these videos,
17   particularly the videos that were selected on these computers,
18   that I found on these computers, in my opinion are the kind of
19   videos that would be useful to an individual or individuals
20   seeking to either prepare or carry out a home-grown act of
21   terrorism. I say this not just because this is my opinion but
22   because in several cases the people who have created these
23   videos have basically created them with the stated latent
24   that we want people to watch this and we want to incite people
25   into carrying out their own missions as a result of watching

United States District Court
Camden, New Jersey

5832

1    this, study this and then learn how to do this yourself.
2    Q.   Let's just take a quick second and just define a few
3    terms that we've heard and a few names that we've heard
4    routinely. First of all, just for the record, really what is
5    al Qaeda?
6    A.   Al Qaeda is an Arabic word which means the base. It's an
7    organization that was founded in September of 1988 in
8    Afghanistan by a Saudi exile Osama Bin Laden alone with
9    primarily a group of Egyptians and other Muslim exiles from
10   different parts of the Middle East. The purpose of
11   establishing this organization was to quote-unquote decapitate
12   the regimes of the Middle East which al Qaeda and its
13   leadership viewed as being apostate, as being too overly
14   western oriented. But, al Qaeda's philosophy is that you can
15   decapitate the apostate regimes of the Middle East and remove
16   of the state of Israel without first getting rid of their
17   primary foreign benefactor. And in al Qaeda's view, the
18   primary foreign benefactor of the apostate regimes in the
19   Middle East as well as Israel is the United States. So until
20   you get rid of the United States, until you evict the U. S.
21   from the Muslim world you can't achieve any forward progress
22   or any of their other goals. So that's their primary mission
23   right now.
24   Q.   And Osama bin Laden just briefly, who is he, what is his
25   role within al Qaeda?

United States District Court
Camden, New Jersey

KOHLMANN003638

**EXHIBIT 217 TO DECLARATION OF VALERIE SCHUSTER**

638

```
941Wkas1
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,
 3
 4              v.                        04 CR 356 (JFK)
 4
 5   OUSSAMA ABDULLAH KASSIR,
 5   a/k/a "Abu Abdullah,"
 6   a/k/a "Abu Khadija,"
 7              Defendant.
 7
 8   ------------------------------x
 8
 9                                       New York, N.Y.
 9                                       April 21, 2009
10                                       10:10 a.m.
10
11
11   Before:
12
13                     HON. JOHN F. KEENAN,
14
14                                       District Judge
15
15
16                     APPEARANCES
16
17   LEV L. DASSIN
17        Acting United States Attorney for
18        the Southern District of New York
18   MICHAEL FARBIARZ
19   ERIC BRUCE
19        Assistant United States Attorneys
20
20   DAY PITNEY,  LLP
21        Attorneys for Defendant
21   EDGARDO RAMOS
22        -and-
22   MARK DeMARCO
23
24   ALSO PRESENT:
25   SIMA NABULSI, Interpreter (Arabic)
25   FOUAD ELSHIEKH, Interpreter (Arabic)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```



EXHIBIT
Kohlmann 14
12/3/10  SC
PENGAD 800-631-6989

KOHLMANN001692

704

94L3KAS4                    Kohlmann - direct

1   Q.  When did you start doing that, roughly?
2   A.  Approximately 1997.
3   Q.  Have you ever been admitted as an expert to testify about
4   your investigation of terrorist Web sites?
5   A.  Yes.  Very frequently so, yes.
6           MR. BRUCE:  Your Honor, at this point the government
7   will tender Mr. Kohlmann as an expert witness in the following
8   subject matters:  The history, structure and leadership of al
9   Qaeda; recruiting and training methods used by al Qaeda; al
10  Qaeda trade craft and operational methodology; the use of the
11  Internet by al Qaeda; and certain computer forensic techniques.
12          THE COURT:  I'll permit Mr. Kohlmann to give his
13  opinion in those areas.
14          MR. BRUCE:  Thank you, your Honor.
15  Q.  Mr. Kohlmann, let's start very basic.  What is al Qaeda?
16  A.  Al Qaeda is an Arabic word that means the base or the solid
17  foundation.  It is a military or a paramilitary organization
18  which was founded in approximately September of 1988 by a group
19  of Islamic activists along the Afghan Pakistani border.
20  Q.  In your opinion, what is the single most important
21  historical event that eventually led to the creation of al
22  Qaeda?
23  A.  Well, the single most important or the single most critical
24  historical event was almost certainly the December of 1979
25  invasion of Afghanistan by the Army of the former Soviet Union.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

KOHLMANN001758

**EXHIBIT 218 TO DECLARATION OF VALERIE SCHUSTER**



ENGLISH

الرئيسية | من نحن | اتصل بنا | المنتقى

أخبار وتقارير | طلقة الجهاد | واحة الشهداء | ملفات خاصة

اليوم الصور | مهارات وهنايات | كتب واصدارات | حوارات | احصائيات وأرقام | فيديو

الأخبار الاحتلال يفرض حظر التجول على قريتين جنوب نابلس الاحتلال يحتجز طاقما صحفيا شمال

صاحب الرد على مجزرة الزيتون





• علي منير جعارة
• مجاهد قسامي
• 2004-01-29

بيان الشهيد    صور الشهيد    فيديو الشهيد    سيرة الشهيد

الاستشهادي القسامي :علي منير جعارة

صاحب الرد على مجزرة الزيتون

القسام - خاص



عندما حالفنا الحظ بالوصول إلى مسجد عمر بن الخطاب وسط مدينة بيت لحم كانت مهد المسيح تئن تحت وطأة الاجتياح الصهيوني ففي اليوم التالي لليوم الذي نفذ فيه المجاهد علي جعارة عمليتة في مدينة القدس جحافل التتار الجدد تطوق القرى والبلدات والمخيمات الفلسطينية بأكثر من ثلاثين دبابة، وكانت العشرات من الوحدات العسكرية تتمركز في مداخلها.

لم نتمكن من العبور إلى المدينة عبر طريق عصيون ولا حتى عن طريق وادي النار، لقد كانت طريقنا عبر بلدة تقوع شرق الخليل — طريق بعيدة ومواصلات مضاعفة ولا يصطحبنا سوى عثرات الطريق والرعب الدائم نصعد جبالا وننزل أخرى حتى مادت الأرض بنا ونحن ننتقل من بلدة إلى أخرى ومن حاجز إلى آخر.

ميلاده ونشأته

لقد فاجأ الجميع... فهذا البطل الهادئ... الشاب الحنون... والداعية الصبور استطاع أن يكسر حواجز الأمن لدى الصهاينة، ويخترق حصونه، حمل رسالة القسام على جسده ووضعها أمام منزل شارون ،كأنه البرق الخاطف( علي منير يوسف جعارة) من مواليد مخيم العروب الذي يبعد 9كلم عن مدينة الخليل بتاريخ 1979/1/30م، لقد كان أخو المعاناة والألم وصاحب الهم الفلسطيني.

درس علي حتى الصف التاسع ثم اتجه للعمل وبعد مجيء السلطة الفلسطينية بعامين التحق بجهاز الشرطة الفلسطينية وهو يعمل في إطارها منذ 6أعوام، وقد اعتاد علي أن يذهب صباحا للعمل في جهاز الشرطة الفلسطينية ويعود في المساء إلى بيته في مخيم عايدة للاجئين والذي يقع في الجزء الشمالي لمدينة بيت لحم.

وتقول أمه (أم علي) أنها خطبت له مرتين ولم يحصل نصيب، لقد اهتم بمشاعرنا وسار معنا ولكن روحه كانت تحلق في مكان آخر.

الداعية الزاهد

وتقول أم علي أنه كان يؤثر على نفسه ولو كان به خصاصة وكان لا يدع في جيبه قرشا وهو يعلم أن أحدا يحتاج إلى هذا القرش، وكان كثيرا ما يعطي ما في جيبه إلى المحتاج وهو نفسه بأمس الحاجة إلى هذا العطاء.

وتضيف أم علي أنه كان دائم الدعوة إلى الله إذا رفع سماعة الهاتف وتحدث إلى أي شخص كان يسأل ( كيف أنتم والصلاة ) وعندما كان يشاهدني أجلس أمام التلفاز كان يقول لي يا أمي هذا لا ينفعك اجعلي عينيك على التلفاز وقلبك مع الله... ما المانع من أن تذكري الله وتسبحي، أما شقيقات الشهيد فقد كن يرتدين الحجاب كأنهن الحمائم وقلن ان علي كان يدعوهن للبس الحجاب كلما وقعت عينه على إحداهن ويذكرن أنه اشترى لهن الزي الشرعي وقال لهن الدنيا لن تغني عن الآخرة وقد أقسمن أنهن سيعملن بوصيته وسوف يتمسكن بهذا الحجاب، وتقول أم علي أنه كان يعطيهن المواعظ و دروس في الدين والأخلاق والآداب ولا يتوانى في مساعدة الآخرين وكان إذا رأى معاقا أو ذا حاجة يقف على الطريق كان يمد له يد العون والمساعدة.

## محافظ على الصلاة بالمسجد

كان علي حبيب الجميع دائم الصلاة والذكر وكان لا يصلي الصلاة إلا في المسجد وتقول أم علي أنه كان يذهب للصلاة أوقات القصف الصهيوني وفي المواجهات مع جنود الاحتلال وكنت أنها خوفا عليه فيقول سأذهب للصلاة ولن يمنعي أحد، من كتب له الموت قد يتقدم ذلك ولا يتأخر.

وكان يصلي الاستخارة قبل كل فعل يود القيام به وكان قلبه معلق بالمساجد حتى كأنها قطعة منه. وتقول عمته سارة أنها شاهدته قبل استشهاده بأسبوع في عزاء جدته حيث نقل لها تعازيه وسألها إذا التحقت بالجامعة أم لا وتقول أنه عاش آخر لحظاته أمامها وهو يصلي.

وتقول سارة أن لكل إنسان طريقته الخاصة في التعبير عن حب لوطنه وقد عبر علي عن حبه بالطريقة التي أحبها.

وتقول شقيقته (علا )أن علي كان حنونا للغاية ورقيقا إلى أبعد الحدود لم يرَ ساخطا أو غاضبا إلا لله ، يسير حياته بما يرضي ربه وضميره.

أما شقيقته فريال فقد قالت أنها شاهدت شقيقها علي في الليلة الأولى لاستشهاده فسألته هل أنت شهيد يا علي؟ فرد عليها قائلا: نعم أنا شهيد.

## آخر اللحظات

تقول أم علي أنه اعتاد دائما أن يقبل يدها ويطلب يدها رضاها، وكذلك فعل في مساء يوم الأربعاء 2004/1/28 فقد كان صائما وتناول إفطاره في البيت وتقول شقيقته (علا) أنه طلب منها أن تعطيه ( كمية من البزر) وفي فجر الخميس استيقظ في الساعة الرابعة فجرا ثم تناول السحور وخرج مسرعا للصلاة في المسجد ثم عاد إلى المنزل وارتدى ملابسه وغادر المنزل مبكرا على غير عادته وتشير أن علي لم يصدر أي تصرف يثير الشكوك بل كان عاديا جدا.

وتقول سارة أنها شعرت بالفخر والفرح حينما سمعت أن الاستشهادي الذي فجر نفسه في مدينة القدس هو ابن شقيقها، الفخر لأنه استشهادي ويطل في آن واحد والفرح لأنه نال الشهادة التي طالما تمناها.

وتقول والدته أنه وعد جدته أن يوقظها لصلاة الفجر لكنه لم يفعل وكان دائما ينصحها بأن تستغل الكلام الذي تنطقه في ذكر الله وقول الخير.

## عائلة مجاهدة

بالرغم من أن الجميع يعلم أن عائلة جعارة هي من العائلات الصامدة والمجاهدة في مخيم العروب وبالرغم من التاريخ الجهادي الطويل لها إلا أن أحد منها لم يتوقع أن يقدم علي على ما أقدم عليه غير أن سارة تقول بأن علي زاد العائلة شرفا وفخرا فهو ابن أخ المجاهد المبعد جهاد جعارة الذي حاصرته سلطات الاحتلال مع العشرات من المجاهدين في كنيسة المهد في شهر نيسان (2002) وكان يعاني من إصابة خطيرة في القدم وقد تعفن جرحه مع الحصار ثم أبعد بعد جهاد إلى قبرص ومن ثم إلى ألمانيا ولازال كذلك وتأمل سارة من وسائل الإعلام أن تعيد قضيته مع إخوانه المبعدين إلى واجهة الإعلام وتتساءل لماذا نسيهم العالم وأنطوت صفحاتهم ولماذا لم يعد أحد يتحدث عنهم.

وتصيف لقد تألم علي على فراق عمه وكان يهتز من كل موقف تتأثر منه إنسانية الإنسان.

وتقول أمه أنه تألم كثيرا لمجزرة حي الزيتون في غزة ولا استغرب أنه قام بالعملية هذه ردا عليها.

لقد تألم لدم كل شهيد سقط على أرض فلسطين وخاصة المجازر التي كانت ترتكب في غزة ونابلس وجنين.

## شارون بنخط

أضافت عملية شارع غزة في القدس المحتلة نوعا جديدا من التكتيك والاستراتيجية إلى سجل عمليات القسام، ففي كل عملية يتجدد التخطيط وتتغير الوجوه وتنجح المهمة، كذلك الحال بالنسبة إلى علي جعارة فهو شرطي هادئ من عائلة معروفة بتاريخها الجهادي وانتمائها إلى حركة فتح ولم يكن هناك ثمة آخر للعملية هو توحيد صفوف المقاومة بالدم والوحدة تماما كما انطلقت ريم الرياشي ابنة القسام الباسلة واشتركت في عمليتها الباسلة مع كتائب الأقصى التابعة لحركة فتح ، ولا أحد يعلم من عائلة جعارة ما الذي حصل بالضبط غير أنهم ازدادوا فخرا بهذا المارد الذي انتفض وحطم أسطورة العدو واخترق جداره الفاصل وحصونه المحصنة وجهاز شباكة الهزيل ووقف في حافلة رقم (19) وتحديدا في نفس الحي الذي يقطنه مرتكب المجازر شارون ومن لم فجر جسده.

ولكن المصطلون الصهاينة قللوا من أهمية هذا الأمر واعتبروا أن هذه العملية التفجيرية وقعت بالصدفة في مكان قريب من المنزل ولكي تذر الرمال في العيون قالت مصادر صحفية أن شارون كان في مزرعة البقر التي يملكها في جنوب فلسطين.

وقيل ذلك نجحت كتائب القسام بالوصول إلى منزل شارون واستطاعت خلية القدس القسامية أن تزرع عبوة ناسفة في محل لبيع الوجبات السريعة على مقربة من منزل شارون قبل ما يقارب العام والنصف وقد انفجرت العبوة وأصابت العديد من الصهاينة بجروح.

## القسام يؤكد

في بيان القسام صدر التأكيد الذي اعداد عليه الشعب الفلسطيني بأن علي جعافرة هو ابن القسام الصامت الذي لم يتكلم إلا بالدم وأكدوا أن العملية استهدفت منزل الإرهابي شارون وأنه ليس بعيد عن انتقام القسام وأصدر القسام بيانه بعد فترة قليلة من تبني حركة فتح للشهيد وللعملية غير أن وصية الشهيد المكتوبة والمسجلة والصور التي ظهرت وهو يضع شارة القسام على رأسه ويقول في الشريط المسجل أنه نفذ عملية انتقام للشهداء نادر الجواريش وعلاء عباد وموفق بداونة.

ويوم الجمعة اتصل متحدث باسم حركة فتح بقناة المنار الفضائية واعتذر عن تبني الحركة للعملية واعتذر من كتائب القسام ونفى أي علاقة لحركة فتح بالعملية وهذا أيضا ما أكده ناطق باسم حركة فتح في غزة .

### اجتياح المدينة

منذ اللحظة الأولى ظهرت بصمات القسام على العملية من حيث التخطيط والتنفيذ حيث أشارت الخطوط الأولى إلى عمليات الشهيد القائد على علان الذي أرسل الشهيد القسامي نائل أبو هليل قبل أكثر من عام فتشابهت العمليتان وهذا يشير إلى تلاميذ على علان هم من يقفون وراء العملية.

وبعد العملية بلحظات اجتمع الإرهابي شارون مع طاقم وزراء وقرر اجتياح مدينة بيت لحم لمعرفة من يقف وراء العملية وتحديد هويته وفي الساعة الثالثة فجرا كانت أكثر من 30 دبابة ومجنزرة تجتاح مخيم عايدة للاجئين وتتمركز في مدينة بيت لحم وبلدة الخضر وبلدة تقوع إلى الشرق وتشن حملة اعتقالات بين صفوف الفلسطينيين

قبل اجتياح المدينة تم توجيه إنذار إلى عناصر الشرطة الفلسطينية لكي تخلي مواقعها وهذا ما تم بالفعل ثم حاصرت القوات الصهيونية منزل الاستشهادي على جعافرة وأثناء ذلك تصدى شبان المخيم للقوات الصهيونية لمنعها من تنفيذ ذلك وجرت مواجهات في المكان إلا أن قوات الاحتلال فجرت المنزل المكون من طابقين كانت من المقرر أن يسكن أحدهما (علي ) بعد زواجه وقد تم تدمير المنزل على محتوياته.

### وصية الشهيد

بسم الله الرحمن الرحيم

( فتلوهم بعدهم الله بأيديكم ويخزهم وينصركم عليهم ويشف صدور قوم مؤمنين) صدق الله العظيم

أنا الشهيد الحي " علي منير يوسف اجعار "أبو محمد"، أقوم بعمليتي هذه إبتغاء مرضاة الله عز وجل.

وأقول لشارون الحقير:

| سنظل نكتب بالدماء وباللهب | سنظل بالرصاص وبالغضب |
|---|---|
| فالقدس في الأرواح شوق جارف | وحرائق أشلائنا فيها الحطب |
| وهي القسام إذ تنادي للوغى | داع الجهاد ترك معترك الكرب |

باسم مجموعة الشهيد المهندس يحيى عياش بأن هذه العملية ردا على المجازر اليومية في غزة وجنين القسام ونابلس جبل النار.

وإننا في كتائب القسام سنكون كما عهدتمونا، سندك حصون بني صهيون في كل مكان وكل زمان، دفاعا عن القدس والأقصى.. ومن أجل قضيتنا .. ومن أجل أن تنالوا حريتكم كما الشهداء الذين سبقوني.. فما ليت كانت دماني قبل دمائكم، لكنها الأقدار..

ولعل هذا الشريط بذاع الآن وأنا بين أيديهم، فيا لها من فرحة أن أنضم إليهم..

وكتائب القسام لن تستسلم يوما ولن تستسلم ولن تسلم الأمر للواقع، فقد كانت ترد بقوة، وسترد بعنف وبكل الوسائل المتاحة إن شاء الله، دفاعا عن نفسها وعن أمها ووطنها وقادتها ومقدساتها.

والمعركة لم تنتهي بعد وهي متواصلة لأن مسلسل الدماء لم يتوقف ولن يتوقف حتى يتوقف شارون عن الاغتيالات وتدمير المنازل والاجتياحات..

وأقول لشارون الحقير الخنزير وأعوانه.. لن يحسوا بالأمان أبدا، وأن جند القسام وجند يحي عياش سوف يحرقون الأخضر واليابس تحت أقدامه وجنوده ومستوطنيه.

وإذا ظل على سفك الدماء والاغتيالات سوف نظل على العمليات الاستشهادية وسيكون كل وزير صهيوني وعلى رأسهم شارون مطلوب لجند القسام.

والعين بالعين والسن بالسن والبادئ أظلم.

وأهدي هذه العملية الاستشهادية إلى أرواح الشهداء الأبطال:

الشهيد البطل / علي علان

الشهيد البطل / علاء عباد

الشهيد البطل / موفق بداونة

الشهيد البطل / نادر الجواريش

سأثأر لكن لرب ودين        وأمضي على سنتي في يقين

فإما إلى النصر فوق الأنام        وإما إلى الله في الخالدين

بـــم الله الرحمن الرحيم

( ولا تحسبن الذين قتلوا في سبيل الله أمواتاً، بل أحياء عند ربهم يرزقون، فرحين بما آتاهم الله من فضله ويستبشرون بالذين لم يلحقوا بهم من بعدهم ألا خوف عليهم لا هم يحزنون) صدق الله العظيم

وداعاً يا أحبتي ويا إخوتي ويا كل أصدقائي.. وكونوا مجاهدين؛

الله أكبر ... الله أكبر... الله أكبر

كتائب الشهيد عز الدين القسام

مجموعة الشهيد يحيى عباش

ملاحظة//

لشارون والشعب الإسرائيلي   انتظروا انفجارات مزلزلة وقاسية سوف تهز الكيان الصهيوني.   سوف يكون يوماً أسود على إسرائيل لن تستطيع إحصاء جثتها فيه.

جميع الحقوق محفوظة لدى المكتب الإعلامي لكتائب القسام 2010

Main      About Us   Contact Us      Forum                                   English

News and Reports   Jihad Fiqh      Martyrs Oasis          Special Files      Video          Statistics   and
Numbers   Dialogues         Battles and Operations    Books and Publications    Photo Album



 [News] The Occupation imposes a curfew on two villages south of Nablus

 The Occupation detains a news crew north of [text cut off]

The retaliator against Al-Zaytoun Massacre

- Ali Mounir Ja'ara
- Al-Qassam Fighter
- 01-29-2004

Biography of the Martyr        Martyr Statement   Martyr Photos       Martyr Video
Al-Qassam Martyr: Ali Mounir Ja'ara
Retaliator against Al-Zaytoun Massacre

[The Oasis of Martyrs]

Search the Oasis of Martyrs
Name of Martyr
Search

Martyrs' Memory
The Kind Hearted and Noble Mannered



- Hammam Taha Al-Sha'er
- Al-Qassam fighter
- 01-27-2007

Mailing List

Subscription

Al-Qassam – Special:

When we were lucky to reach Omar Bin Al-Khattab Mosque, in downtown Bethlehem, the Cradle of Christ was groaning under the burden of the Zionist invasion. On the day following Ali Ja'ara's operation in Jerusalem, the hoards of new Tartar were surrounding Palestinian villages, cities and camps with more than thirty tanks, and tens of military units were stationed at its entrance.

We were unable to pass into the city through Asyoun Road, or even through Wadi Al-Nar Road. Our way through Taqou' Village east of Hebron was far with double transportation. With only road pitfalls and constant terror as companions, we went up and down mountains, until we felt the land sway under our feet moving from one city to another and from one roadblock to another.

### His birth and early years

He surprised everyone… this quiet hero… the kind young man… and the patient preacher was able to break the security barracks of the Zionists and penetrate their strongholds. He carried the message of Al-Qassam on his body and placed it in front of Sharon's home. He was like swift lightening (Ali Mounir Youssef Ja'ara), born in Al-Urub Camp, 9 km away from Hebron on 1/30/1979. He was a suffering brother, carrying the Palestinian burden.

He studied until the ninth grade, and then went to work. Two years after the advent of the Palestinian Authority he joined the Palestinian Police Force, where he had been working for the last 6 years. He used to go to work in the morning at the Palestinian Police Force, and return at night to his home at Aida Refugee Camp, on the northern part of Bethlehem City.

His mother (Umm Ali) said that she had attempted two engagements for him, but there was no luck. He cared for our feelings and walked with us, but his spirit was soaring at another place.

### The Ascetic Preacher

Umm Ali says that he didn't keep anything to himself even if he liked it, and wouldn't keep a penny in his pocket if he knew that anyone needed it. He often gave his money to the needy when he needed it most.

Umm Ali adds that he constantly preached the word of God, and if he called anyone on the phone he would ask, "How are prayers?", and when he saw me sitting in front of the television he would tell me, "Mother, this is not good for you. Keep your eyes on the television and your heart with God… why not remember God and praise him?" As for the martyr's sisters, they wore the veil like pigeons and said that Ali called them to wear the veil whenever he saw any one of them, and they remember that he bought the religious costume for them and told them that life is not a substitute for the afterlife. They swore to follow his advice and adhere to this veil. Umm Ali says that he preached to them and gave


EXHIBIT
Kohlmann  19
12/3/10  SC
PENGAD 800-631-6989

them lessons in religion, manners, and mannerisms, and did not hesitate to help others. If he saw a disabled person or someone needy standing at the side of the road, he would help him.

### Always prayed at the mosque

Ali was beloved by all, and he constantly prayed and praised God. He only prayed at the mosque, and Umm Ali said that he went to pray at times of Zionist bombing, and during confrontations with the occupation soldiers. I used to try to stop him fearing for his life, but he would say, I will go to pray and will not be stopped. If I'm destined to die, death will not come early, nor will it be delayed.

He used to pray "Istikhara" [asking guidance from God] before anything he wanted to do, and his heart was attached to mosques as if they were a part of him. His aunt Sara said that she saw him one week before his martyrdom at his grandmother's funeral where he conveyed his condolences and asked her whether she had joined the university or not. She says he lived his last minutes in front of her praying.

Sara says that every person has his own personal way of expressing his love for his country, and he expressed his love in the way he liked.

His sister (Ola) says he was very kind and extremely tender. He was never seen indignant or angry except for God, and he led his life in a way to satisfy his God and his conscience.

His sister, Feryal, said that she had seen her brother, Ali, the first night following his martyrdom and asked him, "Are you a martyr Ali?" He answered, "Yes, I am a martyr."

### The Last Moments

Umm Ali said that was accustomed to kissing her hand and asking for her approval, which is what he did on the evening of Wednesday 1/28/2004. He was fasting and ate breakfast at home. His sister (Ola) said that he asked her to give him (an amount of seed), and at dawn on Thursday, he woke up at four in the morning, ate Sohour, and hurried out to pray at the mosque. He then returned home, got dressed, and left early, contrary to habit. She said that Ali did not act in any way suspicious, but was very normal instead.

Sara said that she felt pride and joy when she heard that the martyr who blew himself up in Jerusalem city was her nephew, pride in that he was a martyr and a hero at the same time, and joy because he became a martyr as he had always wanted.

His mother said that he promised his grandmother to wake her up for the dawn prayer, but he didn't, and that he always advised her to use the words she utters to pray to God and say good things.

### A Family of Fighters

Although everyone is aware that the Ja'ara family is one of the most steadfast fighting families in Al-Urub and Aida Camp, and despite its long history of struggle, no one in it expected Ali to attempt what he did. However, Sara says that Ali made the family more proud and honored. He is the nephew of the banished fighter, Jehad Ja'ara, who was surrounded by the occupation authorities with tens of fighters inside the Church of the Nativity in April (2002), and who suffered a serious injury in his foot, with his wound developing gangrene during the siege. He was then banished to Cyprus and then to Germany where he remains still now. Sara hopes that the media will reopen his case with his banished brothers and bring it to the forefront of the news. She wonders why the world has forgotten them and turned their page, and why no one speaks of them anymore. She adds that Ali was hurt by his uncle's banishment, and he was affected by every humane situation.

His mother says that he was greatly pained by the Al-Zaytoun massacre in Gaza, and it is no surprise that he carried out this operation in retaliation for it.

He was pained by the blood of every martyr who fell in Palestine, especially the massacres committed in Gaza, Nablus, and Jenin.

### Sharon Staggering

The Gaza Street operation in occupied Jerusalem added a new type of tactic and strategy to Al-Qassam's operations record. In every operation, there is a new plan, faces change, and the mission succeeds. The same applies to Ali Ja'ara. He was a quiet policeman from a family known for its fighting history and affiliation with the Fatah Movement. Perhaps there was another objective for the operation, which was to unify the fighting ranks with blood and unity, exactly as it launched Reem Al-Rayashi, the brave daughter of Al-Qassam, who participated in her brave operation with the Al-Aqsa Troops of the Fatah Movement. None of the Ja'ara family knows exactly what happened, but they have felt more pride in that giant who erupted and shattered the legend of the enemy, penetrated his separating wall, his fortified forts, and his weak Shabak force. He stood in bus no. (19) in exactly the same quarters where Sharon, who committed the massacres, lives, and then blew himself up.

But the Zionist analysts undermined the importance of that matter and considered that it was a coincidence for this operation to have taken place at a place close to the house, and to throw sand in the eyes, news sources said that Sharon was at the cow ranch he owns in the south of Palestine.



Before that, Al-Qassam Brigades succeeded in reaching Sharon's house, and the Al-Quds cell of Al-Qassam managed to plant an explosive device in a fast food shop close to Sharon's house almost a year and a half ago, which exploded and wounded many Zionists.

### Al-Qassam Confirms

In a statement by Al-Qassam that was issued with the confirmation the Palestinian people are accustomed to, it stated that Ali Ja'ara is the silent son of Al-Qassam, who only spoke in blood, and confirmed that the operation targeted the house of the terrorist Sharon, and that is he is not far from Al-Qassam's revenge. Al-Qassam issued its statement shortly after the Fatah Movement claimed responsibility for the martyr and the operation. However, the written and recorded will of the martyr, and the photos that show him wearing an Al-Qassam symbol around his head, stating in the recorded tape that he carried out an operation in retaliation for martyrs, Nader Al-Jawarish, Alaa Ayad, and Mowaffaq Badawna [state otherwise].

On Friday, a Spokesman of the Fatah Movement called the Al-Manar Satellite Channel and apologized for the movement's claiming responsibility for the operation, apologized to Al-Qassam Brigades, and denied any link between the Fatah Movement and the operation, which was also confirmed by a Fatah Movement spokesman in Gaza.

### Invasion of the City

From the first moment, Al-Qassam's prints were clear on the operation with respect to the planning and execution, where the first lines pointed to the operations of the martyr, leader Ali Alan who sent Al-Qassam martyr, Na'el Abou Helel, more than a year ago, the similarities between the two operations were obvious, which indicates that the students of Ali Alan are the ones behind the operation.

Minutes after the operation, the terrorist Sharon met with a group of ministers and decided to invade the city of Bethlehem to find out who was behind the operation and determine his identity. At 3 AM, more than 30 tanks and armored vehicles invaded Aida Refugee Camp, congregated in Bethlehem, Al-Khedr Town, and Taqu' Town to the east, and arrested Palestinians.

Prior to the invasion of the city, a warning was directed to the elements of the Palestinian Police to vacate their posts, which indeed took place, and then the Zionist forces surrounded the home of the martyr, Ali Ja'ara. At the same time, the youth of the camp confronted the Zionist forces to prevent them from doing that. There were confrontations in the place, but the occupation forces blew up the two story house, where (Ali) was supposed to live in one of those two levels after his marriage. The house and all its contents were destroyed.

### The Martyr's Will

In the Name of God, the Merciful, the Compassionate

(Fight them and Allah will torture them at your hands, defeat them and grant you victory over them, and heal the hearts of believers) God Almighty spoke the truth

I, the living martyr "Ali Mounir Youssef Ja'ara "Abou Mohamed," carry out my mission seeking Almighty God's approval, and tell lowly Sharon:

We will continue to write in blood and fire

We will continue with bullets and anger

Jerusalem in the heart is a searing longing

And the fire of the pieces of our body its firewood

As Al-Qassam calls to battle

The call to Jihad took over the realm of anguish

In the name of martyr Engineer Yehia Ayyash's Group, this operation is in retaliation for the daily massacres in Gaza, Jenin al-Qassam, and Nablus Jabal Al-Nar.

We, of the Al-Qassam Brigades, will be as you are accustomed to us. We will break down the forts of the sons of Zion everywhere and at all times, defending Jerusalem and Al-Aqsa … and for our cause … and you to get your freedom as did the martyrs before me … I hope that my blood was before yours, but it is fate.

Perhaps this tape is being broadcasted now when I'm between your hands; what a joy to join you.

Al-Qassam Brigades will never surrender, never surrender, never surrender to the status quo. It answered with strength, and will answer violently, and by all means available, God willing, to defend itself, its nation, its homeland, its leaders, and its holy places.

The battle has not ended yet. It continues because the blood series has not stopped, and it will not stop until Sharon stops the assassinations, destruction of homes, and invasions.

I tell the lowly pig Sharon and his followers … they will never feel safe, and the soldiers of Al-Qassam and the soldiers of Yehia Ayyash will burn green and dry under his feet and those of his soldiers and his settlers.

And if he continues with spilling blood and assassinations, we will continue with the martyr operations, and every Zionist minister, with Sharon in the lead, a target for Al-Qassam soldiers.

Ezzeldeen Al-Qassam Brigades – the Media Office                     Page 4 of 4

An eye for an eye, a tooth for a tooth, and he who starts takes the blame.
I dedicate this martyr operation to the souls of the martyr heroes:
Martyr Hero / Ali Alan
Martyr Hero / Alaa Ayyad
Martyr Hero / Mowaffaq Bedawna
Martyr Hero / Nader Al-Jawarish

I will take my revenge but for god and religion

And continue with my religion without doubt

Either to victory over people

Or to God with the immortals

In the Name of God, the Merciful, the Compassionate
(Do not think of those killed for God as dead. They are alive and well with their God, rejoicing in the bounty God bestowed on them, rejoicing in those who have not joined after them, but for fear for them, and they are not sad) God Almighty spoke the truth
Goodbye my beloved, my brothers, and all my friends… and be fighters,
God is Great… God is Great… God is Great

Ezzeldeen Al-Qassam Brigades
Martyr Yehia Ayyash Group

Note//
To Sharon and the Israeli people… expect earth shaking and cruel explosions that will shake the Zionist entity. It will be a black day for Israel in which it will not be able to count its bodies.

:: News and reports :: Martyrs Oasis :: Al-Qassam prisoners :: Enemy press :: Video :: Audio :: Statistics and numbers :: Battles and operations :: Qassami industries
Books and publications :: Interviews :: Articles :: Military statements :: Military reports :: Photo album :: Al-Qassam Forum

All rights reserved to the Al-Qassam Brigades Media Office 2010



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Anne Fang, hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the following document, "Ja'ara typed will", from Arabic into English.

Anne Fang

Sworn to before me this

Wednesday, November 24, 2010

Signature, Notary Public

KEVIN M KELLEY JR
Notary Public - State of New York
No. 01-KE-6229268
Qualified in Queens County
Commission Expires October 4 2014

Stamp, Notary Public

**EXHIBIT 219 TO DECLARATION OF VALERIE SCHUSTER**



# THE NATIONAL COUNTERTERRORISM CENTER
# COUNTERTERRORISM CALENDAR 2010









PROFILES • GROUPS • METHODS AND TACTICS

**Front Cover**

**Top:** Indian fire brigade officials and bystanders look toward the Taj Mahal Palace hotel in Mumbai, India, on 29 November 2008, as smoke and flames billow out from a section of the building during a four-day assault on India's financial capital. (AFP, Indranil Mukherjee)

**Bottom Left:** South Korean protesters hold placards during the anti-al-Qa'ida rally outside the Foreign Ministry in Seoul on 19 March 2009 after a suicide bomber attacked a South Korean delegation, just days after a bombing at a historic tourist site killed four South Koreans. (AFP, Kim Jae-Hwan)

**Bottom Center:** An image from a security camera at the Ritz-Carlton Hotel in Jakarta, Indonesia, shows an alleged suicide bomber walking with luggage in the lobby on 17 July 2009, minutes before a deadly blast. Indonesian police announced that the suicide bomber was a member of Jemaah Islamiya. (AFP, Indonesian TV ONE)

**Bottom Right:** Onlookers stand at the site of a massive truck bomb that was detonated on 25 August 2009 in Kandahar, Afghanistan. The attack killed 43 civilians, wounded another 65 people, almost all civilians, brought down buildings, trapped people under rubble, and destroyed homes and shops. (AFP, Hamed Zalmy)

**Back Cover**

Pakistani volunteers move an injured person to the hospital after a car bomb blast outside a cinema in Peshawar, Pakistan, on 22 May 2009. The explosion in the congested marketplace killed at least three people and wounded 70 others. (AFP, Tariq Mahmood)



# THE NATIONAL COUNTERTERRORISM CENTER
# COUNTERTERRORISM
## CALENDAR 2010

### Spelling of Arabic Names and Terms
While there is no universally accepted transliteration of Arabic names and terms, this edition of the Counterterrorism Calendar adheres to a transliteration system that is generally used throughout the US Government. In this system, the letters "u" and "a" are preferred over "o" and "e." For example, the name of the al-Qa'ida operative who was detained on 1 March 2003 is Khalid Shaykh Muhammad, not Sheikh Mohammed. We have retained, however, the spellings used on the Rewards for Justice and FBI Web pages; these are designed for easy recognition and therefore do not strictly conform to these rules.

### Islamic Calendar and Holiday Observance
The Islamic calendar is based on the movement and observation of the moon. The Islamic year contains 12 months, none of which can exceed 30 days. Each month starts when the lunar crescent is first seen after a new moon. Because 12 lunar months multiplied by 29.53 days equals 354.36 days, the Islamic calendar will always be approximately 11 days shorter than the Western, or Gregorian, calendar. For example, 1 Muharram, the first day of Islamic year 1432 (known in the West by the Latin term Anno Hegirae, or A.H.), falls on 8 December 2010; in A.H. 1433, 1 Muharram falls on 27 November 2011. As explained in the footnotes of this calendar, holidays begin the sundown of the previous day. Because of lunar observation and differences in time zones, the observance of Islamic holidays may vary from region to region.

### Map Boundaries
Boundary representation is not necessarily authoritative.



The US National Counterterrorism Center presents the 2010 edition of the Counterterrorism (CT) Calendar. This edition, like others since the Calendar was first published in daily planner format in 2003, contains many features across the full range of terrorism-related topics: terrorist groups, wanted terrorists, and technical pages on various threat-related issues. The Calendar marks dates according to the Gregorian and Islamic calendars, and contains significant dates in terrorism history as well as dates that terrorists may believe are important if planning attacks to commemorate particular events.

The CT Calendar is designed as a ready reference guide for law-enforcement, intelligence, military and security personnel, contingency planners, or simply citizens concerned by terrorist threats. The CT Calendar is oriented primarily to readers in the United States, but we hope it will also be useful for citizens of other countries. Readers are invited to visit the interactive version of the calendar at *http://www.nctc.gov.*

**2010**                                                                                        **January**

1987, Lebanon: Jesse Turner, Alan Steen, Robert Polhill, Mithileshwar Singh kidnapped in Beirut

Sunday

24

*8 Safar*

1993, US: Mir Amal Kansi kills two and wounds three outside CIA Headquarters in McLean, Virginia

Monday

25

*9 Safar*

Tuesday

26

*10 Safar*

2003, Afghanistan: Armed militants attack UN convoy, kill two security officer escorts
2002, Israel: Fatah female suicide bomber kills one and wounds more than 150 in Jerusalem

Wednesday

27

*11 Safar*

Thursday

28

*12 Safar*

2008, Pakistan: Abu Layth al-Libi, al-Qa'ida senior military commander and spokesperson, killed
2004, Israel: Al-Aqsa Martyrs Brigade bus bomb in Jerusalem kills 11, wounds 50

Friday

29

*13 Safar*

Saturday

30

*14 Safar*

**EXHIBIT 220 TO DECLARATION OF VALERIE SCHUSTER**

# EXHIBIT A

**BRIAN MICHAEL JENKINS**

Brian Michael Jenkins initiated the RAND Corporation's research program on international terrorism in 1972.  He currently serves as Senior Advisor to the President of RAND.  From 1989 to 1998, Mr. Jenkins was the Deputy Chairman of Kroll Associates, an international investigative and consulting firm.  Before that, he was Chairman of RAND's Political Science Department from 1986 to 1989 and from 1972 to 1989, he also directed RAND's research on political violence.

Mr. Jenkins has a B.A. in Fine Arts and a Masters Degree in History, both from UCLA.  He studied at the University of Guanajuato in Mexico and in the Department of Humanities at the University of San Carlos in Guatemala where he was a Fulbright Fellow and recipient of a second fellowship from the Organization of American States.

Commissioned in the infantry at the age of 19, Mr. Jenkins became a paratrooper and ultimately a captain in the Green Berets. He is a decorated combat veteran having served in the Seventh Special Forces Group in the Dominican Republic during the American intervention, and later as a member of the Fifth Special Forces Group in Vietnam (1966-1967).  He returned to Vietnam on a special assignment in 1968 to serve as a member of the Long Range Planning Task Group; he remained with the Group until the end of 1969 receiving the Department of the Army's highest award for his service.  Mr. Jenkins returned to Vietnam on third special assignment in 1971.

In 1983, Mr. Jenkins served as an advisor to the Long Commission, convened to examine the circumstances and response to the bombing of the U.S. Marine Barracks in Lebanon.  In 1984, he assisted the Inman Panel in looking at the security of American diplomatic facilities abroad and in 1985-86, he served as a member of the Committee of the Embassy of the Future, which established new guidelines for the construction of U.S. diplomatic posts.  In 1989, Mr. Jenkins served as an advisor to the national commission established to review terrorist threats following the bombing of PanAm 103. In 1993, Mr. Jenkins served as a member of the team contracted by the New Jersey-New York Port Authority to review threats and develop new security measures for the World Trade Center following the February bombing.

In 1996, President Clinton appointed Mr. Jenkins to be a member of the White House Commission on Aviation Safety and Security.  From 1999-2000, he served as an advisor to the National Commission on Terrorism and since 2000, he has served as a member of the U.S. Comptroller General's Advisory Board. Mr. Jenkins also is the Director of the National Transportation Security Center at the Mineta Transportation Institute, and since 1997 has directed the institute's continuing research on protecting surface transportation against terrorist attacks.

Mr. Jenkins serves as a Special Advisor to the International Chamber of Commerce and a member of the advisory board of the ICC's investigative arm, the Commercial Crime Services.  Over the years, Mr. Jenkins also has served as a consultant to or carried out assignments for a number of government agencies including the Departments of State, Defense, and Homeland Security and the Nuclear Regulatory Commission.  As part of its international project to create a global strategy to combat terrorism, the Club of Madrid in 2004 appointed Mr. Jenkins to lead the international working group on the role of intelligence.

A large portion of Jenkins work has addressed the role of intelligence in combating terrorism.  He has written about the organization of intelligence collection, international cooperation, constraints on domestic collection, and methods of analysis.

Jenkins also has addressed the threat of nuclear terrorism.  He wrote his first essay on the topic *"Will Terrorists Go Nuclear?"* in 1975.  From 1976 to the late 1980s, Jenkins directed a research effort on behalf of Sandia Laboratories and the Department of Energy, examining potential threats to U.S. nuclear programs.  DOE officials later indicated that this research formed the basis for the department's security planning.  Jenkins also led RAND's work on the behavioral analysis of communicated nuclear threats, which later became a component of the DOE's credibility assessment procedures.  Following 9/11, Jenkins returned to the topic of deterring non-state actors with weapons of mass destruction.

Mr. Jenkins is the author of *International Terrorism: A New Mode of Conflict,* the editor and co-author of *Terrorism and Personal Protection,* co-editor and co-author of *Aviation Terrorism and Security,* and a co-author of *The Fall of South Vietnam.*  His book *Unconquerable Nation: Knowing Our Enemy, Strengthening Ourselves* was published in 2006.  A second volume is forthcoming.  His latest book, *Will Terrorists Go Nuclear?* was published in September 2008. He is also the author of over 200 articles, book chapters, and published research reports on conflict and crime.

**EXHIBIT 221 TO DECLARATION OF VALERIE SCHUSTER**

# EXHIBIT B

## Brian Jenkins - Prior Publications

**Testimony**

- Jenkins, Brian Michael, *The al Qaeda-Inspired Terrorist Threat: An Appreciation of the Current Situation*, Testimony presented before the Canadian Senate Special Committee on Anti-terrorism, December 6, 2010, Santa Monica, CA: RAND Corporation reprinted as CT-353. http://www.rand.org/content/dam/rand/pubs/testimonies/2010/RAND_CT353.pdf

- Jenkins, Brian Michael, *No Path to Glory: Deterring Homegrown Terrorism*, testimony presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, May 26, 2010, Santa Monica, CA: RAND Corporation reprinted as CT – 348. http://www.rand.org/pubs/testimonies/2010/RAND_CT348.pdf

- Jenkins, Brian Michael, *Going Jihad: The Fort Hood Slayings and Home-Grown Terrorism*, presented before the Senate Homeland Security and Governmental Affairs Committee, November 19, 2009, Santa Monica, CA: RAND Corporation reprinted as CT-336. http://www.rand.org/pubs/testimonies/CT336/

- Jenkins, Brian Michael, *Terrorists Can Think Strategically: Lessons Learned From the Mumbai Attacks* presented before the Senate Homeland Security and Governmental Affairs Committee, January 28, 2009, Santa Monica, CA: RAND Corporation reprinted as CT-316. http://www.rand.org/pubs/testimonies/CT316/

- Jenkins, Brian Michael, *Basic Principles for Homeland Security* presented before the House Appropriations Committee, Subcommittee on Homeland Security, January 30, 2007, Santa Monica, CA: RAND Corporation reprinted as CT-270. http://www.rand.org/pubs/testimonies/CT270/

- Jenkins, Brian Michael, *Building an Army of Believers: Jihadist Radicalization and Recruitment* presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, January 30, 2007, Santa Monica, CA: RAND Corporation reprinted as CT –278 –1. http://www.rand.org/pubs/testimonies/CT278-1/

- Jenkins, Brian Michael, *Defining the Role of a National Commission on the Prevention of Violent Radicalization and Homegrown* Terrorism presented before the House Homeland Security Committee, Subcommittee on Intelligence, Information Sharing and Terrorism Risk Assessment, June 14, 2007, Santa Monica, CA: RAND Corporation reprinted as CT-285. http://www.rand.org/pubs/testimonies/CT285/

- Jenkins, Brian Michael, *Terrorism and the Security of Public Surface Transportation* presented before the Senate Committee On Judiciary, April 8, 2004, Santa Monica, CA: RAND Corporation reprinted as CT-226. http://www.rand.org/pubs/testimonies/2004/RAND_CT226.pdf

- Jenkins, Brian Michael, *Remarks Before the National Commission on Terrorist Attacks Upon the United States* presented before the National Commission on Terrorist Attacks Upon the United States, March 31, 2003, Santa Monica, CA: RAND Corporation reprinted as CT – 203. http://www.rand.org/pubs/testimonies/2005/CT203.pdf

- Jenkins, Brian Michael, *Terrorism: Current and Long Term Threats* presented before the Senate Armed Services Subcommittee on Emerging Threats, November 15, 2001,

Santa Monica, CA: RAND Corporation reprinted as CT-187.
http://www.rand.org/pubs/testimonies/2005/CT187.pdf

**Publications**

- Brian Michael Jenkins, "Why Terrorists Attack Airports," *CNN.com*, January 25, 2011.
- Brian Michael Jenkins, "Moscow Airport Blast: Apparent Terror Attack," *Washingtonpost.com*, January 24, 2011.
- Brian Michael Jenkins, "Book Review: 'Fallout' by Catherine Collins and Douglas Frantz," *Los Angeles Times*, January 9, 2011.
- Brian Michael Jenkins, *The Tenth Year: A Briefing on Terrorism Issues to New Members of the 112th Congress*, RAND, Santa Monica, CA, January 8, 2011.
- Brian Michael Jenkins, "Our Foes Cannot Destroy This Nation," *NationalJournal.com*, September 27, 2010.
- Brian Michael Jenkins, "Denying Homegrown Terrorists the Glory," *RAND.org* and *GlobalSecurity.org*, June 24, 2010.
- Brian Michael Jenkins, "5 Reasons We're Safer From Terrorists," *AOL News*, May 12, 2010.
- Brian Michael Jenkins, "Jihadist Threat Keeps Evolving," *NationalJournal.com*, May 10, 2010.
- Jenkins, Brian Michael (2010), *Would-Be Warriors: Incidents of Jihadist Terrorist Radicalization in the United States Since September 11, 2001*, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "Introduction," Andrew C. Harmon et. al. (eds.), Toward a Grand Strategy Against Terrorism, New York: McGraw-Hill Books, 2010.
- Brian Michael Jenkins, *Transportation Security,* WORLD IN MOTION, Mineta Transportation Institute, Vol. 16, No. 2, at 4, (Spring 2010).
- Brian Michael Jenkins, "Al Qaeda Tipping Point? Still a Long Way to Go," *NationalJournal.com*, April 26, 2010.
- Brian Michael Jenkins, Bruce Butterworth and Cathal Flynn, "A better route to aviation security," *The Washington Post*, March 26, 2010, A23.
- Brian Michael Jenkins, "Jihad Jane and the Risk of Domestic Terrorism," *AOL News*, March 12, 2010.
- Brian Michael Jenkins, "How Can We Keep Los Angeles Secure?" *LAmag.com*, March 5, 2010.
- Brian Michael Jenkins and Bruce Robert Butterworth, MTI Report #WP 09-02: *Explosive and Incendiaries Used in Terrorist Attacks on Public Surface Transportation: A Preliminary Empirical Analysis*, San Jose, CA: Mineta Transportation Institute, March 2010.
- Brian Michael Jenkins, Bruce Robert Butterworth and Karl S. Shrum, MTI Report #WP 09-01: *Terrorist Attacks on Public Bus Transportation: A Preliminary Empirical Analysis*, San Jose, CA: Mineta Transportation Institute, March 2010.
- Brian Michael Jenkins, Bruce R. Butterworth, and Jean-Francois Clair, MTI Report #09-12: *Off the Rails: The 1995 Attempted Derailing of the French TGV (High-Speed*

2

*Train) and A Quantitative Analysis of 181 Rail Sabotage Attempts*, San Jose, CA: Mineta Transportation Institute, March 2010.

- Brian Michael Jenkins, Bruce R. Butterworth, and Dr. Frances Edwards, MTI Report #09-04: *Implementation and Development of Vehicle Tracking and Immobilization Technologies*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Brian Michael Jenkins, Bruce R. Butterworth and Larry N. Gerston, MTI Report #09-05: *Supplement to MTI Study on Selective Passenger Screening in the Mass Transit Rail Environment*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #09-03: *Potential Uses of Highway-Borne Hazardous Materials*, San Jose, CA: Mineta Transportation Institute, January 2010.
- Jenkins, Brian Michael (2009), *The Lessons of Mumbai*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2009), *Could Mexico Fail?* HOMELAND SECURITY TODAY, Vol. 6., No. 2, at 26-31, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "How a Decade of Terror Changed America," *AOL News*, December 30, 2009.
- Brian Michael Jenkins, "Afghanistan: A Marathon, Not a Prize Fight," *RAND.org*, December 1, 2009.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #S-09-01: *Rail Passenger Selective Screening,* San Jose, CA: Mineta Transportation Institute, October 2009.
- Brian Michael Jenkins, "How Russia Can and Can't Help Obama," *ForeignPolicy.com*, August 26, 2009.
- Brian Michael Jenkins, "Who Has the Will to Fight Piracy," *GlobalSecurity.org*, April 21, 2009.
- Brian Michael Jenkins, "The Torture Debate, Redux," *GlobalSecurity.org*, April 1, 2009.
- Brian Michael Jenkins, *Transportation Security – Mumbai Attack Creates New Challenges for Security,* WORLD IN MOTION, San Jose, CA: Mineta Transportation Institute, Vol. 15, No. 3, at 3 (Spring 2009).
- Brian Michael Jenkins, Bruce R. Butterworth and Joseph E Trella, "Outside View: Info-sharing crucial for DHS," *United Press International* (Washington), February 26, 2009.
- Brian Michael Jenkins, "The Obama Withdrawal From Iraq: How Fast?" *NationalJournal.com*, December 16, 2008.
- Brian Michael Jenkins, "Outside View: Mumbai's terrifying logic," *United Press International* (Washington), December 9, 2008.
- Brian Michael Jenkins, "How Will Obama First Be Tested?" *NationalJournal.com*, December 8, 2008.
- Brian Michael Jenkins, "Obama's First International Crisis," *The San Diego Union-Tribune*, November 16, 2008.
- Brian Michael Jenkins, "Georgia war derails bid to stop nukes," *Providence Journal-Bulletin* (Rhode Island), October 6, 2008, 4.
- Brian Michael Jenkins, "Assessment of the TEW's Contribution," in John P. Sullivan & Alain Bauer (eds.) *Terrorism Early Warning: 10 Years of Achievement in Fighting*

*Terrorism and Crime,* Los Angeles, CA, Los Angeles County Sheriff's Department, October 2008.

- Brian Michael Jenkins, "Outside View: Will terrorists go nuclear?" *United Press International* (Washington), September 11, 2008.
- Brian Michael Jenkins, "A Nuclear 9/11?" *CNN.com*, September 11, 2008.
- Lee H. Hamilton, Bruce Hoffman, Brian Michael Jenkins, Paul R. Pillar, Xavier Raufer, Walter Reich, and Fernando Reinares, "Making the Grade: From A to F, How the U.S. Measures Up in its Struggle Against Global Extremism," *The National Interest*, March 2008 - April 2008.
- BRIAN MICHAEL JENKINS, WILL TERRORISTS GO NUCLEAR? (Prometheus Books 2008).
- Jenkins, Brian Michael (2008), *Counterterrorism: Wage a Sustainable Campaign*, RAND REVIEW, Vol. 32, No. 3, at 16-17, Santa Monica, CA.
- Brian Michael Jenkins, "A New Tact on Iraq," *Washingtonpost.com*, August 24, 2007.
- Brian Michael Jenkins, "Outside View: Combating radicalization," *United Press International Energy* (Washington), August 23, 2007.
- Brian Michael Jenkins, "Nuclear terror: How real?" *The Washington Times*, May 13, 2007, B03.
- Brian Michael Jenkins, "Not Every Tragedy Has a Solution," *Washingtonpost.com*, April 18, 2007.
- Brian Michael Jenkins and Bruce R. Butterworth, MTI Report #06-07: *Selective Screening of Rail Passengers,* San Jose, CA: Mineta Transportation Institute, February 2007.
- Brian Michael Jenkins, "Old Front Against Terrorism," *The San Diego Union-Tribune*, January 14, 2007.
- Brian Michael Jenkins, "Foreword," Mitchell Silber and Arvin Bhatt, Radicalization in the West: The Homegrown Threat, New York: NYPD, 2007.
- Brian Michael Jenkins, "Outside View: Terror war uncertainties," *United Press International* (Washington), October 6, 2006.
- Brian Michael Jenkins, "The State of the Jihad address," *Los Angeles Times*, September 11, 2006, B11**.**
- Brian Michael Jenkins, "Safer, but not safe; Entire jihadist cycle must be disrupted," *The San Diego Union-Tribune*, September 10, 2006, G-1.
- Brian Michael Jenkins, "Jihad Targets Wallets; But Lasting Oil Price Boosts Come From Armed Conflict, Embargoes, Basic Economics," *Pittsburgh Post-Gazette* (Pennsylvania), March 14, 2006, A-8
- Brian Michael Jenkins, "Outside View: The threat of oil jihad," *United Press International* (Washington), March 4, 2006.
- Brian Michael Jenkins, "Lessons for Intelligence in the Campaign Against al Qaeda," *Vanguard*, March 1, 2006.
- Brian Michael Jenkins, "Bin Laden and al-Qaida are still a force," *The Record* (Kitchener-Waterloo, Ontario), January 31, 2006, A7.
- Brian Michael Jenkins, "U.S. is long way from end of war on terror," *The Times Union* (Albany), January 30, 2006, A7.

4

- Brian Michael Jenkins, "Tape shows war on terror has just begun," *Deseret Morning News* (Salt Lake City), January 28, 2006.
- Brian Michael Jenkins, "Just starting: The war against terror; Al-Qaida is weaker since 9-11, but the new Osama bin Laden tape shows the group is far from impotent," *Newsday* (New York), January 25, 2006, A33.
- BRIAN MICHAEL JENKINS, UNCONQUERABLE NATION: KNOWING OUR ENEMY, STRENGTHENING OURSELVES (RAND Corporation 2006).
- Brian Michael Jenkins, "Improving Public Surface Transportation:  What Do We Do Now?" in Russell D. Howard et. al. (eds.) Homeland Security and Terrorism: Readings and Interpretations, New York:  McGraw-Hill Books, 2006.
- Brian Michael Jenkins, "The New Age of Terrorism," in David G. Kamien (ed.) The McGraw-Hill Homeland Security Handbook, New York:  McGraw-Hill Books, 2006, pp. 117-130.
- Jenkins, Brian Michael (2006), *The New Age of Terrorism*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2006), *Fear Cannot Counter Terror*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2006), *To Counter Terror, We Must Conquer Our Own Fear*, RAND, Santa Monica, CA.
- Brian Michael Jenkins and Gregory F. Treverton, "Misjudging The Jihad: Briefing Osama on All the War's Wins and Losses," *San Francisco Chronicle*, November 13, 2005.
- Brian Michael Jenkins, "Outside view: Responses to terror," *United Press International* (Washington), October 28, 2005.
- Brian Michael Jenkins, MTI Report #S-05-02: *Third National Transportation Security Summit: Rail Security – A Symposium on Terrorism and Business Continuity*, San Jose, CA: Mineta Transportation Institute, September 29, 2005.
- Brian Michael Jenkins and Jack Weiss, "Let Sgt. Friday fight terror," *Los Angeles Times*, September 25, 2005, M6.
- Brian Michael Jenkins, "Democracy's defense: Values and justice," *The Baltimore Sun*, September 11, 2005, 31A.
- Brian Michael Jenkins, "Four years after 9/11, war on terror slogs on," *The San Diego Union-Tribune*, September 11, 2005, G-1.
- Brian Michael Jenkins, "Democracy's Defense: Values and Justice," *Baltimore Sun*, September 11, 2005.
- Brian Michael Jenkins, "Done right, searches aid our security," *The Advocate* (Baton Rouge, Louisiana), July 31, 2005, 13-B.
- Brian Michael Jenkins, "Selecting for security; The key to guarding against terrorism lies in making vigilant, not blind, choices of whom to monitor and how," *Newsday* (New York), July 26, 2005, A31.
- Brian Michael Jenkins, "The lessons of London," *The San Diego Union-Tribune*, July 17, 2005, G-1.
- Brian Michael Jenkins, "Strategy: Political Warfare Neglected," *The San Diego Union-Tribune*, June 26, 2005.

- Brian Michael Jenkins, "Can the Iraq beast be tamed?" *The Boston Globe*, May 18, 2005, A17.
- Brian Michael Jenkins, "The men who pursued paradise in destruction; Perfect Soldiers The Hijackers: Who They Were, Why They Did It," *Los Angeles Times*, May 15, 2005, R8.
- Brian Michael Jenkins, Meg Williams and Ed Williams, "Iraq kidnapping strategically effective; We can expect to see the continued accumulation of hostages in Iraq and the commercialization of hostages as cash ransoms increasingly become part of the demands of terrorist kidnappers," *Chicago Tribune*, April 29, 2005, C25.
- Brian Michael Jenkins, "Bin Laden and his special effects; His words still have the power," *Chicago Tribune*, February 4, 2005, C23.
- Brian Michael Jenkins, "Iraq: Not Terrorist Central," *Pittsburgh Post-Gazette*, January 30, 2005.
- Jenkins, Brian Michael (2005), *Three Years After: Next Steps in the War on Terror*, RAND, Santa Monica, CA.
- Brian Michael Jenkins, "Intelligence," in Confronting Terrorism: The Club of Madrid Series of Democracy and Terrorism, Vol. II Madrid:  The Club of Madrid, 2005.
- Brian Michael Jenkins, "The Four Defensive Measures Against Terrorism," *24 Chasa*, September 24, 2004.
- Brian Michael Jenkins, "The view from Ground Zero: Is America safer?" *The San Diego Union-Tribune*, September 12, 2004, G-1.
- Brian Michael Jenkins, "World becomes the hostage of media-savvy terrorists," *USA TODAY*, August 23, 2004, 11A.
- Brian Michael Jenkins, "Looking for 'High Noon' in a Hundred Years' War," *The San Diego Union-Tribune*, August 22, 2004, G-1.
- Brian Michael Jenkins, "Don't Move Too Fast on Intelligence Reform," *The Hill*, August 17, 2004.
- Brian Michael Jenkins, and Paul K. Davis, "A System Approach to Deterring and Influencing Terrorists," in *Conflict Management and Peace Science,* Vol. 21, No. 1, Spring 2004.
- Brian Michael Jenkins, "Trains, buses and terror; Madrid-like bombing possible in U.S. unless we take precautions," *San Jose Mercury News* (California), May 3, 2004, 7B.
- Brian Michael Jenkins, "Terrorism; Bin Laden May Be Fishing for Allies on Europe's Secular Left; The Al Qaeda leader set aside his usual religious rhetoric in favor of phrases from the Marxist revolutionary lexicon," *Los Angeles Times*, April 25, 2004, M3.
- Brian Michael Jenkins, "Nations ponder whether terrorism 'works'," *Chattanooga Times Free Press* (Tennessee), March 28, 2004, F2.
- Brian Michael Jenkins, "Does terrorism work? Violent groups have won some battles; ultimate goals have stayed out of reach," *San Jose Mercury News*, March 25, 2004.
- Brian Michael Jenkins, "War of Words: 'Axis of Evil' Versus 'Chain of Evil'; In recent speeches, both President Bush and Osama bin Laden defended war as their most important mission," *Los Angeles Times*, February 1, 2004, M3.

- Brian Michael Jenkins (2004), *Redefining the Enemy: The World Has Changed, But Our Mindset Has Not*, RAND Review, Vol. 28, No. 1, at 16-23, Santa Monica, CA.
- Brian Michael Jenkins, "From 'white' Christmas to 'orange' Christmas," *The San Diego Union-Tribune*, December 25, 2003, B-7:7; B-5:1; B-9:2; B-13:6.
- Brian Michael Jenkins, "Killing bin Laden, et al, Is No Help," *Newsday* (New York), December 3, 2003, A37.
- Brian Michael Jenkins, "Imperfect airline security; improvements needed, but risks will persist," *Lexington Herald Leader* (Kentucky), October 26, 2003, D1.
- Brian Michael Jenkins, "Air security is no sure thing," *The Star-Ledger* (Newark, New Jersey), October 23, 2003, 15.
- Brian Michael Jenkins, "Breach of Airline Security is Nothing to Panic About," *Los Angeles Times*, October 21, 2003, B15.
- Brian Michael Jenkins and Frances Edwards-Winslow, MTI Report #02-06: *Saving City Lifelines: Lessons Learned in the 9-11 Terrorist Attacks*, San Jose, CA: Mineta Transportation Institute, September 2003.
- Brian Michael Jenkins, "Connect the cops to connect the dots," *The San Diego Union-Tribune*, June 1, 2003, G-1.
- Brian Michael Jenkins, "All citizens now first responders," *USA TODAY*, March 24, 2003, 19A.
- Brian Michael Jenkins, "What if We Don't Attack Iraq?" *Pittsburgh Post-Gazette*, March 16, 2003.
- Jenkins, Brian Michael (2003), *The Influence Component of Counterterrorism*, RAND REVIEW, Vol. 27, No. 1, at 12-15, Santa Monica, CA.
- Brian Michael Jenkins, "Looking at al Qaeda from the Inside Out:  An Annotated Briefing," Defense Adaptive Red Team Working Paper #03-4, 2003.
- Brian Michael Jenkins, "The US Response to Terrorism and Its Implications for Transatlantic Relations," in Gustav Lindstrom (ed.) *Shift or Rift, Assessing US-EU relations after Iraq*, Paris: European Union Institute for Security Studies, 2003.
- Brian Michael Jenkins, *Corporate Security in the Post 9-11 World,* London, International Chamber of Commerce (ICC), 2003.
- Brian Michael Jenkins, MTI Report #S-01-04: *Nature and Severity of the Terrorist Threat – California Transportation Security Summits*, San Jose, CA: Mineta Transportation Institute, March 28 and 29, 2002.
- Brian Michael Jenkins, et.al., *California's Vulnerability to Terrorism,* Santa Monica, CA, RAND Corporation, 2002.
- Jenkins, Brian Michael (2002), *Countering al Qaeda*, RAND, Santa Monica, CA.
- Jenkins, Brian Michael (2002), *Deterrence & Influence in Counterterrorism*, RAND, Santa Monica, Ca.
- Brian Michael Jenkins, *Deterrence, Protection, and Preparation: The New Transportation Security Imperative,* Washington, D.C., Transportation Research Board, 2002.
- Brian Michael Jenkins, "A resilient nation recovers. Now, on to building a defense and attacking the threat; Strategies in the shadow war against al-Qaeda," *The San Diego Union-Tribune*, September 8, 2002, G-1.

- Brian Michael Jenkins, "Countering al-Qaeda: The Next Phase in the War," *The San Diego Union-Tribune*, September 8, 2002.
- Brian Michael Jenkins, "Fliers Have Reason to Jettison Jitters," *Atlanta Journal-Constitution*, September 3, 2002.
- Brian Michael Jenkins**,** "Get used to it: Airports are vulnerable," *The Record* (Bergen County, New Jersey), August 2, 2002, L11.
- Brian Michael Jenkins, "The benefits, limits of airport security," *The Ithaca Journal* (Ithaca, New York), August 1, 2002, 10A.
- Brian Michael Jenkins, "Airtight security an unreachable goal," *Milwaukee Journal Sentinel* (Wisconsin), July 30, 2002, 13A.
- Brian Michael Jenkins, "Where to draw the line on public security," *Sun-Sentinel* (Fort Lauderdale, FL), July 30, 2002, 13A.
- Brian Michael Jenkins, "Put Brains Behind Airway Safety," *New York Daily News*, July 30, 2002.
- Brian Michael Jenkins, "Get used to it: Our Airports are Vulnerable to Terrorism; We can lessen but not eliminate the risk of attacks," *Los Angeles Times*, July 25, 2002, 13.
- Brian Michael Jenkins, "Face Terror with Better Spying, Not Moats of Fear," *Los Angeles Times*, July 10, 2002, 13.
- Brian Michael Jenkins, MTI Report #01-14: *Protecting Public Surface Transportation Against Terrorism and Serious Crime: An Executive Overview*, San Jose, CA: Mineta Transportation Institute, October 2001.
- Brian Michael Jenkins and Larry N. Gersten, MTI Report #01-07: *Protecting Public Surface Transportation Against Terrorism and Serious Crime: Continuing Research on Best Security Practices,* San Jose, CA:  Mineta Transportation Institute, September 2001.
- Brian Michael Jenkins, "Safeguarding the skies," *The San Diego Union-Tribune*, September 30, 2001, G-1.
- Brian Michael Jenkins, "This time is it different," *Copley News Service*, September 17, 2001.
- Brian Michael Jenkins, "This Time It's Different," *The San Diego Union-Tribune*, September 16, 2001, G-1.
- Brian Michael Jenkins, "Society under siege, A confounding complex tragedy," *The San Diego Union-Tribune*, June 17, 2001, G-1.
- Brian Michael Jenkins, "Disloyalty Feeds on Cash, Flesh and Thrills," *Los Angeles Times*, February 22, 2001.
- Brian Michael Jenkins, "Terrorist Trials Serve U.S. Strategy," *Los Angeles Times*, January 7, 2001, M5.
- Brian Michael Jenkins, "Foseco gets to grips with global 'glitches,'" *Strategic Direction*, Jan. 2001, Vol. 17, No. 1, pp. 17-19.
- Jenkins, Brian Michael (2001), *Stop Selling Out Aviation Security*, RAND REVIEW, Vol. 25, No. 3, at 20-21, Santa Monica, CA.
- Brian Michael Jenkins, "The Organization Men: Anatomy of a Terrorist Attack," in James F. Hoge, Jr., and Gideon Rose (eds.) *How Did This Happen? Terrorism and the New War,* New York, Public Affairs, 2001.

- Brian Michael Jenkins, "Terrorism and Beyond: a 21st Century Perspective," *Studies in Conflict & Terrorism*, 24:321-327, 2001.
- Brian Michael Jenkins, "Colombia: Crossing a Dangerous Threshold," *The National Interest*, Winter 2000/2001.
- Brian Michael Jenkins, "U.S. credibility on line in oil probe," *The Times Union* (Albany, New York), Nov. 7, 2000, A15.
- Brian Michael Jenkins, "Oil Greases the Way for Corruption," *Los Angeles Times*, October 31, 2000, B9.
- Brian Michael Jenkins, "Military's role in responding to catastrophic terrorism," *United Press International* (Los Angeles), June 18, 2000.
- Brian Michael Jenkins, "U.S. Must Use Terrorist Informants," *Plain Dealer* (Cleveland, Ohio), June 16, 2000, 9B.
- Brian Michael Jenkins, "Unsavory Characters a Necessary Evil," *Contra Costa Times* (California), June 11, 2000, P11.
- Brian Michael Jenkins, "War on Terror Needs Unlikely Allies," *Newsday* (New York), June 8, 2000, A43.
- Brian Michael Jenkins, "Perspective on Terrorism; Prepare for Worst in a Dangerous World; Bring in Even Unsavory Characters to Juice up the Quantity and Credibility of our Intelligence Gathering," *Los Angeles Times*, June 6, 2000, Home Edition, B9.
- Brian Michael Jenkins, "Preparing for tomorrow's terrorism," *United Press International*, June 6, 2000.
- Brian Michael Jenkins, "Perspective on Policing; Elite Units Troublesome, But Useful; We Need them for Tough Assignments, But They Require Skillful Management, Strong Leadership," *Los Angeles Times*, March 27, 2000, B5.

**EXHIBIT 222 TO DECLARATION OF VALERIE SCHUSTER**

# Expert Report
## Of
# Shaul Naim

shaulnaim1@gmail.com

***Weiss v. National Westminster Bank*, 05 CV 4622 (CPS)(MDG)**
***Applebaum v. National Westminster Bank*, 07 CV 916 (CPS)(MDG)**

# Expert Report

**I. Professional Background and Qualifications**.................................................. 3

**II. Summary of Expert Report**.............................................................. 5

**III. How Israel Investigates and Tries Terrorism Suspects**............................. 8

    **A. Israeli Legal System**.................................................................... 8

    **B. The Role of the ISA**..................................................................... 8

    **C. The Role of the Police**............................................................... 9

    **D. The Role of Police Investigators**.................................................. 10

    **E. Standards for Proceeding to Indictment**................................... 12

    **F. Trial**............................................................................................ 13

    **G. Maintaining the Files**................................................................ 13

**IV. Files Reviewed Related to Each Relevant Attack**.......................... 14

**V. Conclusion**........................................................................................ 25

## I.   PROFESSIONAL BACKGROUND AND QUALIFICATIONS

My full nam e is Shaul Nai m. I received a   B.A. from the Faculty of Law at Hebrew University in Jerusalem  in 1976, and a year    later was ad mitted to p ractice law and became a member of the Israel Bar Association.  Between 1975-77, I jo ined the police as a student-policem an, and then spent a year in    terning at s everal Jeru salem law f irms. Beginning in late 1977 and continuing through  1985, I joined the police force and served as a police prosecutor in Jerusalem  , handling  traffic cases, crim inal cas es, and juv enile affairs.  During that time, I underwent a six-month police officers' training course, and in 1985, took a Comm and and Control Course.  In 1986, I was appointed head of the Litigation Bureau in Jerusalem, at the rank of  Superintendent, placing me in charge of all criminal an d traf fic-related lawsu its in the Je rusalem Distric t.  Five years late r, my position was redef ined as head of  the Jerus alem District's Litigation Branch, and  I was given the rank of Chief Superintendent, while    also inf ormally serv ing as the Distric t's Legal Counsel.  During  that tim e I gained  familiarity with the types of  documents and reports generated, and received by, my office,    and the m anner in which such m aterials were generated/received, retained, and retrieved as necessary.

In 1998, I was appointed the Jerusalem  District's Investigation Depa rtment Officer, and continued to serve as the District's Legal  Counsel (until the year  2000), working at times with the District Attorney, though I was not  prosecuting cases as I did between 1977 and 1985.  As the District's Investigations Depa        rtment Officer, I was in charge of all investigations and laws uits in the District.    I also supervised the Forensic Science unit, which gathered and exam ined all evidence fr om crim e sc enes, including fingerprints, blood, instrum ents of the crim  e, etc.  Som e of the other units that were directly subordinate to m e were the Fraud Squad, the  Suits Unit, and the Intelligence Desk.  The Fraud Squad dealt with cases of fraud.  The  Suits Unit consisted of lawyers who handled the prosecution of crimes with  the District Attorney.  The Intelligence Desk took the information obtained from    investigation f iles, spoke with suspects, and gathered intelligence to assist in the investigation of other cases.

I also was the professio nal in ch arge of i nvestigations of the "E thnic Minorities' Unit". The Ethnic Minorities Unit worked together with  the Is raeli Security Agency ("ISA ") in handling threats and crimes carried out by terrorists, criminals and ethnic minorities.  The Ethnic Minorities Unit focuse d particularly on crim es i nvolving Arabs, including terror attacks and inciden ts in East Jerusalem .  The Ethnic Minorities Unit was com prised of Arabic-speakers, including Arab-Israelis.

Regarding the lev el of professional subordi nating, each of the un its I have d escribed above has a commander.  For instance, the Central Squad ("Ya mar") oversees the Ethnic Minorities' Unit.  The Investigations         Department commander is professionally responsible for the police investigators, in cluding guiding, instructing and directing the investigators, and is responsible for appointing teams for different criminal cases.

In 2004, I becam e the Comm ander in charge of a ll investigations and intelligence of the Jerusalem District, which included investigat ions, inte lligence, f raud, forensic science

and litigation. I retired from the police in 2006 with a ra nk of Comm ander, and then began private practice as a lawyer.

Throughout the course o f my career, I have b een familiar with categories of docum ents and reports and other item s that have been generated or collected by law enforcem ent entities, and the m anner in which th ose materials are g enerated, collected, retained, and retrieved.

In the course of m y s ervice with the Police, I was prof essionally involved in m any lawsuits, of ten workin g with the Distric t Attorn ey. I was directly in charg e of investigating complex cases involving murder and other serious crimes. By virtue of m y position as the District's Investigation and Intelligence Department Officer, I handled the investigations following the many terror attacks that occurre d in the District throughout the Second Intifada (20 00-2005). For each attack that occu rred in Jerusalem during this time, I was in charge of the investigation. T ypically, I would arrive at the scene of the attack, and give orders to pol ice investigators ga thering ev idence. I would also sp eak with the IS A to collaborate and coordinate regarding inform ation learned. I w ould continue to direct the investigation in orde r so that I and th e Police cou ld obtain a full "picture" of the attack. I also regularly worked with the Institute of Forensic Medicine in Abu Kabir in identifying bodies. Additionally, as part of my job I rou tinely met with the General Commander of the Jerusalem police to discuss the terrorist investigation.

I have vast experience with terrorism investig ations, and, as part of my professional responsibilities, regularly evaluated interrogations, confessions, police and ISA investigations and interviews , as well as court testim ony. As noted above, that experience has m ade me very f amiliar with the docum ents that ar e collected, generated, and retained in connection with the i nvestigation, and prosecution and crim inal sentencing processes. I have paid close attention to the co ntents, appearance, patterns and distin ctive characteris tics of docum ents generated, collected, m aintained, and retrieved in various police and court files with r espect to ter rorist a ttack investigatio ns, prosecutions, and sentencings. My work has also required me to gain familiarity with the types of records, reports, statem ents, and othe r information that deta ils: the activ ities of offices, departm ents, agencies and courts involved in te rrorism investig ations and prosecutions. I am also familiar with the types of information observed and recorded by these offices, departm ents, agencies, and cour ts (because they are usually oblig ated as a legal m atter to docum ent and report such in formation), including in particular being familiar with the types of f actual f indings r esulting f rom terrorism inves tigations. Furthermore, I am familiar with the routin e activities of law enf orcement, prosecuto rial, and court agencies in connection with te rrorism investigations, prosecutions, and sentencings, and am usually able to determ ine whether it was the regular practice of such entity to ge nerate, co llect, and /or mainta in such m emorandum, repor t, r ecord, or ot her information.

As a result, I have m any years of e xperience in determ ining whether a docum ent that I am reviewing constitutes an accu rate and au thentic docum ent collected or generated by law enforcem ent, a prosecutor, or a cou rt (referred t o her ein coll ectively as "Law

4

Enforcement"), and am also fam iliar w ith the process es used by Law Enforcem ent entities in generating or collecting such materials, and how s uch documents are retained. In analyzing certain documents in this case, I have applied my knowledge and experience of both Israeli Law Enforcem ent processes generally, and Israeli Law Enforcem ent's document management practices specifically, to opine on whether certain materials do, in fact, appear to be authentic and reliable.

I am being compensated by Plaintiffs in these cases according to an hourly billable rate of $275.00. I confirm that I have no previous professional or pe rsonal connection or relationship with any of the par ties or witn esses in these cases th at would preclude m y giving impartial evidence. I have not written any publications over the past 10 years, and have tes tified one time (by depo sition in th e com panion *Strauss* and *Wolf* Cr edit Lyonnais cases) as an expert in the last four years.

## II.    SUMMARY OF EXPERT REPORT

This Expert Report:

1. Describes the standards, practices, techniques and procedures used by Law Enforcement in Israel to c onduct investigations of terro rist attacks and prosecute and sentence the alleged perpetrators;

2. Describes the types of docum ents generated, retained, and retrievable by Israeli Law Enforcem ent. These include docum ents seized and held by Israeli law enforcement, confessions or witness statements collected by law enforcement, and other docum ents (such as reports, m emorandum, indictm ents, com plaints and other filings) that ar e generated by law enf orcement, including civil an d military prosecutors;

3. Identifies relevant Israeli laws con cerning crim inal jurisdiction, evidence gathering, confessions, indictm ents, hearin g protocols, and ve rdicts, that govern these investigations and prosecutions;

4.  Reviews police and court files, and th eir contents, concerning certain attack s (the "Attack Files")[1];

5. Provides an opinion, based on my professi onal experience, whether the Attack Files constitute or contain authentic r ecords collected, generated, and maintained by Israeli Law Enforcement, including Israeli courts.

During m y career with the Isra eli police, I was physically   present and involved in the investigation of certain of the attacks discussed in this Report.  Specifically, the following Attack Files listed in Section IV     are att acks where I was person   ally invo lved in investigating the matter:

- The attack in the Hebrew University in Jerusalem, on July 31, 2002
- The attack in Jerusalem on Bus 6 on May 18, 2003
- The attack in Jaffa Street, Jerusalem, Bus 14A, on June 11, 2003
- The attack in Jerusalem, Bus 2, on August 19, 2003
- The attack in Café Hillel, in Emek Refa'im Street in Jerusalem, on September 9, 2003
- The attack in Jerusalem, Bus 19, on January 29, 2004

In addition, though I was not pe rsonally involved in the inve stigation of the following attacks, I reviewed and have conducted exte nsive research on the following attacks in order to ascertain whether m y opinion rega rding the au thenticity of the docum ents contained in the f ollowing Attac k Files  li sted in Section IV     of this Report is commensurate with my professional experience:

- March 27, 2002 - Park Hotel Bombing, Netanya

---

[1] Although Section s III o f this Report discuss es generally ho w Israeli law enforce ment and courts collect and retain m aterials, and  thus create "attack files" pertinent to   each terrorist attack, as us ed in th is Report, the term  "Attack F ile" is no t intended to sug gest that docum ents lis ted in  the Appendix for each   individual attack constitute a particular Israeli court, prosecutor, law enf orcement agency, or m ilitary official's complete file of documents that such en tity ha s gen erated, colle cted, ar chived and/or c atalogued f or a given attack.  Instead, as used in this Repor      t, the phras e "Attack File " is an inte rnal reference fo r the co llection of docum ents of each attack   in the Report f or which I am opining that such docum ents appear, in m y professional opinion, to be authentic records maintained by Israeli Law Enf orcement (including police officers, prosecutors, courts, or military officials), depending on where the relevant document(s) were maintained.

6

- May 7, 2002 - Sheffield Club Bombing, Rishon Letzion
- January 29, 2003 - Shooting Attack on Route 60
- March 5, 2003 - Bus No. 37 Bombing, Haifa
- March 7, 2003 - Shooting in Kiryat Arba
- April 30, 2003 - Mike's Place Bombing, Tel Aviv
- June 20, 2003 - Shooting Attack on "Route 60"
- October 22, 2003 - Tel Romeda Shooting in Hebron
- September 24, 2004 - Mortar attack in Neve Dekalim in Gaza

In each case, whether it was an attack I was personally familiar with as an investigating officer, or an attack where I had not personally been involved in the investigation but nevertheless reviewed independently, in order to consider whether the documents set forth in Section IV of this Report are authentic, in addition to my professional experience and knowledge of law enforcement processes (including document management and retention processes), I reviewed, where available, the following items:

- the Israeli indictments submitted against the alleged perpetrators;
- hearing protocols from both Jerusalem and Tel-Aviv District Courts and Military courts;
- the police investigation files, including confessions (including confessions made to ISA and police investigators) by certain terrorists who planned and executed the attacks;
- the verdicts and the sentencing of various terrorists who were convicted of involvement in the relevant attacks;
- prison interviews that were given by certain terrorists;
- the Expert Report of Evan Kohlmann regarding certain Hamas claims of responsibility;
- the report issued by the ISA;
- websites that published the occurrence of the attack;
- the video footage of the suicide bombers;
- publications in Israeli and foreign media; and
- interviews with investigators.

I conclude that in my professional opinion, in each of the above cases, all of the documents for each Attack File listed in my Appendix are authentic records of Israeli Law Enforcement (including Israeli judicial agencies and offices). In making this determination, I relied on my three decades of experience in working in the police investigation field with these types of documents on a daily basis to ensure that the documents were authentic, official records.

### III.   HOW ISRAEL INVESTIGATES AND TRIES TERRORISM SUSPECTS

### A.   Israeli Legal System

The Israeli legal system is largely based on laws and regulations adopted from British and American law.  In terrorism cases, whether in c ivil or m ilitary court, the proceedings are conducted before a three-judge panel.  [2] The State is repres ented by a prosecuto r, who prepares and then submits the indictment to the court.  The defendant can hire an attorney or ask that one be appointed for him or her,   and every defendant is given a presum ption of innocence and a right against self-incrimination.

### B.   The Role of the ISA

Terrorism in Israel dep arts from "ordinary " or "comm on" crim e, and even o rganized crime, in several im portant procedural aspect s. The ISA is the organization in charge of thwarting te rror a ttacks and tr ying to uncover terror cells.   [3] W hen a terro rist attack occurs, th e police sup ervise the c rime scene in  coordina tion with the I SA, but it is the ISA that makes arrests and conduc ts the initial suspect interviews that become part of the investigation file.  In many re spects, the ISA functions like the American FBI, but unlike the FBI, it d oes not inve stigate any other type of crim e but those relating to ter rorism of all kinds.

When a terr or attack is comm itted, the ISA d eals with: in th e case of a s uicide bombing, identifying the bom ber, the org anization h e was af filiated with and h is d ispatchers, a nd determining whether other terrorists were dispatched at the same time to perpetrate other attacks. The ISA also      searches for any other information th         at m ight help the investigation, such as search   ing the terror ist's addres s, identif ying his relatives and family, etc.

---

[2] According to the Israel Courts Law (Section 37a), the   district court deliberates in  a panel of three judges with res pect to m ore severe crim inal offe nces, in  other wo rds, o ffences of seri ous cri me – an of  fence punishable by death or imprisonment for 10 years or more. A panel of three judges is appointed due to the complexity of the case and the seve rity of the action – for exam ple, cases such as m urder, rape, vi olent robbery – as w ell as in  order to p revent mistakes.  In the case of terro   rist attacks, whic h in essence are murders with a terrorist backdrop, there will always be a panel of three judges, whether at the military court or civil court (district).

[3] The  General Security Services (GSS) La w defines th e authority of the ISA, an  d, *inter a lia*, d etermines that th e ISA is th e in stitute resp onsible  for t hwarting t errorist activ ity, as well as   the in terrogation of terrorists.  *See* Sections 7(a), 7(b)(1), 8(T)(d) at: http://shabak.gov.il/about/yoamash/pages/law.aspx.

## C.     **The Role of the Police**[4]

The police arrive at the scene of the terrorist attack; close off the area; keep citizens away to prevent their being injured from other possible explosive devices or ambushes; help to evacuate victim s; and collect evidence fr      om eyewitnesses that is gath      ered b y investigators, reviewed by an officer, and included as part of the attack file later given to the prosecutor.  In the case   of a bombing, the f  irst people who enter the scene are the police sappers from  the bom b squad unit, whose aim   is to search for m   ore explosive devices, check the kind of explosive m aterial used, and gather forensic evidence relating to the explo sives used.  Then the Forens   ic Science Laboratory officers take over and document the scene and gather foren sic evidence.[5] Simultaneously, investigators are sent to all the h ospitals to c ollect sta tements from the surviv ing victim s and their f amilies. Investigators are also se nt to the Ins titute of Forensic Medicine in Abu Kabir to ide ntify the bodies.

At the scene of the terrorist attack a Fr      ont Command Post (FCP-"Chapak") is set up, headed by the District Comm    ander.  Likewise, an FCP of the Police Investigations Department ("Achak") is established at the police headquarters, where all the information from the scene is gathered.

The Achak commander has m any roles after a  terror attack, including responsibility for the investigation process: arriving at the scene of the attack , sending investigating teams (that were appointed in advan ce) to investigate the injured parties where helpful, sending some investigation tea ms to the Institu  te  of Forensic M edicine in Abu Kabir – who cooperate with the investigators for the purpos e of identifying thos e killed – and setting up "Chapak Achak" in the headqua rters for collecting all the data that relates to the terror attack.

After ensuring there are no booby traps in the ar ea of the scene of the attack, the Achak orders its people – the crim inal identifying investigators – to enter the scene of the attack and document it by video photos and stills that, after being developed, become part of the

---

[4] The  police operate accordi ng to the la ws of the Stat e of Israel a nd the police ordi nances which define police authority, including rules the police follow when investigating regular criminal offences and acts of terror. Authorities include the Police Ordinance (New Version) 5731 – 1971, Second Chapter: Organization of Duties and Authorities and Chapter Three dealing with the duties of the po lice. The Israeli Police handle prevention a nd det ection of offe nces, ap prehension an d pr osecution of offenders,  the safeke eping o f prisoners, and maintaining the public order and safety of people and property.  The practice of investigating a scene where an act of te rror took place was acquired over the years in li ght of all of the terrorist acts that occurred in the country. It differs from the practice use d in the scene of a criminal offence, due to t he fact that no rmally  an act of terror is a m  ultiple v ictim ev ent, where m any casu alties and wounded are  being treated.  Obviously, t he p olice i n a ny e vent ope rate acc ording t o  standards,  procedures an d  protocols dictated by the law and by i nternal pol ice orders and  protocols (acc ording to the af orementioned Po lice Ordinance).

[5] For example, despite the intense heat and pressure caused by the detonation of a suicide belt, police have sometimes recove red i dentifying i tems fro m t he body o f a bom ber or  have been a ble t o det ermine t he disguise used (e.g., Israeli army uniform, ultra-orthodox Hasidic dress).

Attack File.  In add ition, the c riminal identifying investigators take blood samples from the corpses (including the terrorist's corp    se). Then, the blood    samples are sent to laboratories to de termine the id entity of the  terrorists, and  with th e he lp of the Z akas' staff (which identifies the bodies), the bodies and organs are taken to Abu Kabir, where they are ex amined by doctors who   prepare re ports that are given to the police to be included in the police's file .  Where possible, the body parts of the te rrorist are separated from the victim  rem ains and taken by separate am   bulance to Abu Kabir.  The police findings pertaining to the physic al scene of the a ttack are docum ented at the scene and then included within the police's file for the attack.

The ISA and Achak rem    ain in contact regarding intelligence inform    ation as to the terrorist and his cohorts.  As different media sites are advertising different declarations of terror organizations taking re  sponsibility for the attack,    and other m edia is show ing suicide terrorists seen reading their wills  before departing for their m ission, the Chapak Achak is exam ining those statem ents and publications for reliability and credibility.  All of the statem ents, videos, and other intelligen ce also is given to  the police, and becomes part of the police's file for the attack.

## D.    The Role of Police Investigators

As stated previously, IS A officers conduct the  initial investigations of people suspected of terrorist activity.  During       their investigation, the IS    A drafts a protocol of the investigation,[6] after which the suspects are transferred to the custody  of the po lice.  The police investigators are then required to advise the suspect that he or she is not obligated to say anything; that anything he  or she says m ay be used as evidence in court; and  that the suspect has the right to remain silent and consult a lawyer.

The activity of the interrogator emanates from the Judges Law and Regulations. The duty to advise the suspect of  his rights was adopted as  an obligatory judici al ruling from the "Judges Regulations" – a co  llection of regulations com piled under English Law. [7]  The

---

[6] The ISA interrogator's protocol is in fact a type of unofficial memorandum, usually not sent to the police, which constitutes a su mmary and brief of the interrogation. These memoranda are used for the rest of the interrogation, in order to compare and contrast the suspects' versions so as to verify them and to confront the suspects with discrepancies.  These protocols (memoranda) do not serve as testimony in the court and are no t part of th e  Attack File o r evidence o f th e case . At tim es the  content of the  se m emoranda are delivered to a  police investigator that is tak ing a formal statement. This formal statement may constitute a statement o r co nfession to  be u sed du ring th e d eliberation in  cou rt  or th e m ilitary co urt. Th e ISA interrogator's work is carried out according to their own internal procedures.

[7] The o nly reference in criminal law to the warning of a su spect is located in Section 28 to the Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996:

> 28. Hearing the detainee
> (a) The supervising officer shall not make a decision regarding the arrest of a person, the continuation of a pe rson's arrest or release by way of bail, and the type of bail, amount and c onditions shall not be   determined, un less the a foresaid pe rson first receive d a n opportunity to spea k, a fter t he aforesaid  person was wa rned that he or she was n   ot obligated to say anything of self-incriminatory nature, and anything said by the aforesaid

Israeli judicial ruling adopt ed the Judges Regulations as   "guiding provisions" for the police.[8]

Following the advisement of rights, the po lice assess the likelihood of a confession, and determine whether the suspect should rem ain in custody. [9]  In the re alm of terroris t attacks, the Ethnic Min orities Unit typica lly investigates and handles this step.  Their expertise is necessary because the confession must be read back to each suspect, often in Arabic, and the suspe ct must be ask ed if they understand, and then sign the document at the end.  If a confession is given, the police  investigator asks questions sufficient enough to prepare a report, and then types the confe ssion, usually with 1-2 copies m ade and the original maintained in the court in which the matter proceeds as part of the file if the case continues.  Otherwise, the or iginal copy usually stays with   the police.  Copies of the confession are obta ined, including in this c ase, by subm itting a f ormal request with a power of attorney directed to  the court, or the police if they saved a co py as well.  The confessions usually are videotaped and photographed, and document those present during the process.

Everything the investigators do is supervised  by their overseeing o fficer, and during my time with the Jerusalem police, I regularly oversaw the work of investigators.  All of their written wor k is in cluded in the  po lice's f ile f or the attac k.  At the sam e tim e as a confession is being elicited, th e police continue to collect ev idence, prepare their file and refer the c ase to the p rosecution (Prosecutor's Office or M ilitary Prosecution).  Usually, most cases are sent to the Office of Mi        litary Prosecution,   though there are a few exceptional cases sent to the civil district court.        [10]  For example, Abas El-Said, th     e mastermind of the Park Hotel attack, was brou     ght before the Tel Aviv District Court, whereas the members of his terrorist cell were brought before a military court.

---

person may be used agai nst him or her as evi dence, and that his or he r refusal to ans wer questions may reinforce any evidence against him or her.

[8] In th is regard, it is im portant to  note th at th e Military Ju dicial Law,  5715 - 1955, explicitly ad opted provisions on this subject from the Judges Regulations. With regard to the right to an atto rney, Section 32 of the Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996, specifies to the detainee his or her rights, including the right to have a notice delivered regarding his or her arrest to a member of kin and to an attorney, and his or her right to meet with an attorney.  Sections 34-36 regulate the subject of the detainee's right to meet with an attorney, with careful attention paid to the meetings with an attorney in the case of security-related offences.

[9] The E vidence Or dinance ( New Version), 57 31-1971, regulates  the s ubject of th e admissibility of a suspect's confession, and determines that the con fession has to be of the suspect's free will (Section 12(a) to the Evidence Ordinance).

[10] The legal advisor to the government and attorney general decide which cases shall be brought before a civil court and not a military one. Terrorists living in the West Bank or Gaza who carry out terror attacks in Israel are  usually b rought before a m ilitary co urthouse near th eir home. In certain ou tstanding cases, usually for leaders such as Abas El-Said, terrorists are brought before a civil court.

The decision of which cases will g o to which court (military or civil) is de termined as follows: When the of fense is committed inside the Palestinian terr itories, the indic tment is submitted to th e military court.  W hen the o ffense is co mmitted inside Israel proper, the indictment is submitted either to the military court or a district court depending on the terrorist's involvement.[11]

## E.    Standards For Proceeding to Indictment

After the ev idence is co llected, the investigators and their superiors review the m aterial, and when they reach the conclusion that        there is enough eviden ce to establish an indictment, the inves tigators send their en tire original file to the distric t attorney (in the event that a civil court was decided upon)        [12] or to a m ilitary cour thouse so that the prosecutor can rev iew the police's files and  prepare an indictment against the defendants within the period of  th eir d etainment.  Th e p rosecutor d etermines if  the ev idence is sufficient to indict the defendant, in which case the prosecution will commence, unless he decides not to prosecute on the grounds of l    ack of public interest, which requires the authorization of the District Attorney and      the police officer serv  ing as head of   the prosecution unit.[13]

The indictment, which must satisfy the "b  eyond a reasonable doubt" standard in both civil and military court, is pr epared by the  prosecutor based on the  evidence in the file, and submitted by the prosecutor to the relevant  court.  The Court m aintains the o riginal copy of the indictment and provides copies upon a formal request similar to the procedure followed for obtaining copies of a confession.   The defendant's attorney also is given the right and opportunity to copy the file to assist in their defense.

Upon the submission of an indictment, the court  the indictment was submitted can order the arrest of the defendant, who will be held   until the end of the le gal proceedings, if i t finds one of the following: (1) reasonable grounds  to fear that releasing the defendant or failing to apprehend him m ay disrupt the cour t proceedings, lead to avoidance of the proceedings or a sen tence, or lead  to the   disappearance o f property,  influence ov er a witness, or harm to any othe r evidence; (2) reas onable grounds to fear  that the defendant may pose a  risk to the safety of another in      dividual, or the public safety or national security; or (3) the defendant is accused of      an offence punishable by  death or life in

---

[11] Th e Palestinian  territo ries are lo  cated in  th e  West  Bank an d  Gaza Strip . In  th e territories, th  e administrators of the population are the Palestinian Authority, however Israel is r esponsible for all th at is security related. Karnei Shom ron and Beitar Ilit ar e Jewish settle ments within the  West Bank and  Gaza areas. Palestinians who carry out attacks against Jews in the territories, or who leave those areas in order to carry out attacks within the State of Israel, are normally tried in a military courthouse in the territories.

[12] Criminal Procedure Law (Combined Version), 5742 – 1982, Section 60(a).

[13] Criminal Procedure Law (Combined Version), 5742 – 1982, Section 62(a).

prison, a security-related offence, certain drug offenses, domestic violence, or an offence perpetrated with severe violence or cruelty or with the use of a weapon.[14]

**F. Trial**

The procedures for trial are defined in the Criminal Procedure Law (Combined Version), 5742 – 1982. The trial at the m ilitary courthouse takes place in front of a panel of three judges, the same as with the civil court. The defendant hires a defense attorney, and if he cannot afford one, a defense attorney is appoi nted for him by the S tate. The trial begins with the re ading of the indic tments, to whic h the defendant confesses or denies. In the event that he confesses, a judgm ent is given a nd then the sentence is delivered after each party brings forth evidence with regard to the punishment.

If the defendant denies culpability for the claims, the trial opens, witnesses are brought on behalf of the prosecution, and then witnesses are brought on behalf of the defendant. The defendant is of course entitle d to testify. At the end of th e defense testimony, each party summarizes its argum ents and, following deliber ations, the court delivers its verdict of acquittal or conviction d epending on whether the prosecution has proven guilt b eyond a reasonable doubt. If the defendant is convicte d, each side presents argu ment with regard to what the punishm ent should be, and follo wing the argum ents the court sentences the defendant. The entire trial is recorded by vi deo, and in the case of a defendant who does not speak Hebrew, every word is translated for him or her during the proceedings.

When a terrorist attack was involved, normally the court sentences a convicted terrorist to a life senten ce for each civilian killed as a re sult of an attack. For example if 30 people were killed, as in the Park Hotel bom bing, th en the court gives 30 life sentences. The verdicts, a long with any written s entences, are created and m aintained by the cou rt in which the matter took place.

**G.     Maintaining the Files**

Upon the completion of the trial, th e court in which the trial took place m aintains in their archives th e orig inal co py of the entire file for that p rosecution. Th e court's file will include the portion prov ided by the polic e, an d will also include the indictm ent, c ourt protocols, verdict, and other docum ents ge nerated during the prosecution. The c ourt's file, in m y experience, may be requested w ith a legitim ate purpose given for needing to review and/or copy the documents.

The police m aintain their files for the attack as well, though it is not always com plete. While the court gets all of the police doc uments, the police som etimes do not always obtain all of the records generated during th e prosecution and court proceedings. T hus the only file guaranteed to be complete is the one maintained by the court. Nonetheless, a copy of the police's file m ay be requested throu gh the offic er in charge of investigators.

---

[14] Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996, Sections 21(a), 21(a)(4).

As I used to hold this position, requests were often made to me for copies of the file, and I would have my assistant handle these requests.

## IV.    FILES REVIEWED RELATED TO EACH RELEVANT ATTACK

(References to the attached Appendix are indicated below as "Naim XXXXXX-X")

- **March 27, 2002 – Park Hotel Bombing, Netanya**

| | |
|---|---|
| Exhibit A: | Memorandum #3 dated July 22, 2002, written by a Druze investigator named Lutuf Mari, to his commander, the chief investigator for Shomron (Samaria, or the northern west bank), containing recollections of his interrogation of Abas al-Said on May 12, 2002 (Naim 000053-55) |
| Exhibit B: | Abas al- Said's statement to the police re the attack. Given to the investigator, Lutuf Mari, on May 12 and 13, 2002. (Naim 000056-70) |
| Exhibit C: | Memorandum #1 of Abas al-Said's investigating officer, Lutuf Mari (Naim 000071) |
| Exhibit D: | Abas al-Said's Court Ruling (Naim 000072-155) |
| Exhibit E: | Mu'amar Shahruri's first statement to the police re attack (Naim 000156-175) |
| Exhibit F: | Mu'amar Shahruri's second statement to the police re attack (Naim 000176-184) |
| Exhibit G: | Mu'amar Shahruri's Indictment (Naim 000185-202) |
| Exhibit H: | Fathi Raja Ahmad Khasib's first statement to the police (Naim 000203-215) |
| Exhibit I: | Fathi Raja Ahmad Khasib's Indictment (Naim 000216-232) |
| Exhibit J: | Naser Sami Abd al-Razeq Yataima's first statement to the police (Naim 000233-236) |
| Exhibit K: | Naser Sami Abd al-Razeq Yataima's second statement to the police (Naim 000237-241) |
| Exhibit L: | Naser Sami Abd al-Razeq Yataima's third statement to the police (Naim 000242-244) |
| Exhibit M: | Naser Sami Abd al-Razeq Yataima's Indictment (Naim 000245-262) |
| Exhibit N: | Muhanad Talal Mansur Sharim's first statement to the police (Naim 000263-278) |
| Exhibit O: | Muhanad Talal Mansur Sharim's second statement to the police (Naim 000279-291) |
| Exhibit P: | Muhanad Talal Mansur Sharim's third statement to the police (Naim 000292-308) |
| Exhibit Q: | Muhanad Talal Mansur Sharim's Indictment (Naim 000309-327) |
| Exhibit R: | Court Ruling of Fathi Khasib, Mu'amar Shahruri, Muhanad Talal Mansur Sharim and Naser Sami Abd al-Razeq Yataima (Naim 000328-349) |
| Exhibit S: | Tariq Zidan's first statement to the police (Naim 000350-364) |
| Exhibit T: | Tariq Zidan's second statement to the police (Naim 000365-373) |

| | |
|---|---|
| Exhibit U: | Tariq Zidan's third statement to the police (Naim 000374-377) |
| Exhibit V: | Nadil Qalaq's first statement to the police (Naim 000378-382) |
| Exhibit W: | Nadil Qalaq's second statement to the police (Naim 000383-390) |
| Exhibit X: | Nadil Qalaq's third statement to the police (Naim 000391-394) |
| Exhibit Y: | Ahmad Jayusi's Revised Indictment (Naim 000395-416) |
| Exhibit Z: | Sentencing of attack accomplices (Naim 000417-419) |
| Exhibit AA: | Letter from Military Prosecutor to Ronen Family concerning the Verdict of those involved in the attack. (Naim 002246) |
| Exhibit BB: | Letter from Military Prosecutor to the Ben Aroya Family concerning the sentencing of those involved in the attack. (Naim 002247) |
| Exhibit CC: | Court Ruling of Ahmad Jayusi concerning his involvement in the bombing. (Naim 002248-2267) |
| Exhibit DD: | Naser Yataima's Court Record. (Naim 002268-2351) |
| Exhibit EE: | Fathi Khatib's Court Record. (Naim 002352-2490) |
| Exhibit FF: | Muhanad Sharim's Court Record. (Naim 002491-2555) |
| Exhibit GG: | Abas al-Said – Verdict. (Naim 002556-2762) |
| Exhibit HH: | Abas al-Said – Revised Indictment. (Naim 002763-2764) |
| Exhibit II: | Abas al-Said – Indictment. (Naim 002765) |
| Exhibit JJ: | Translation into Hebrew of Fathi Khatib's 1st Statement. (Naim 002766-2778) |

- **May 7, 2002 – Sheffield Club Bombing, Rishon Letzion**

| | |
|---|---|
| Exhibit A: | Abdalla Barghuthi's Indictment (Naim 000420-462) |
| Exhibit B: | Abdalla Barghuthi's Court Ruling (Naim 000463) |
| Exhibit C: | Abdalla Barghuthi's Sentencing (Naim 000464-471) |
| Exhibit D: | Muhammad Hasan Arman's Indictment (Naim 000472-502) |
| Exhibit E: | Yusuf Abdalla Nimer Anjas's Indictment (Naim 000503) (This is page 2 of a four-page document, which appears in full in Hebrew University's Exhibit F: Naim 000639-642) |
| Exhibit F: | Muhammad Arman's and Walid Anjas's Sentencing (Naim 000504-515) |
| Exhibit G: | Sentencing of the accused in the Hebrew University and Sheffield Club bombings (Naim 000516-543) |
| Exhibit H: | A handwritten statement in Arabic (08/22/2003) by Wisam al-Abasi, in which he confesses to executing several terror attacks, including this one. (Naim 001382-83) |
| Exhibit I: | Statement #1 to the police (08/19/2002) by Wisam al-Abasi, in which he describes the Sheffield Club terror attack. (Naim 001384-94) |
| Exhibit J: | Statement to the police (08/21/2002) by Wael Kasem (Naim 001395-1401) |
| Exhibit K: | Statement #2 to the police (08/21/2002) by Wisam al-Abasi (Naim 001402-07) |
| Exhibit L: | Second Statement to the police (08/22/2002) by Wisam al-Abasi (Naim 001408-13) |

| | | |
|---|---|---|
| Exhibit M: | A two-page handwritten statement to the police, written in Arabic by Wael Kasem, in which there are details of the terror attacks he executed.  (Naim 001414-15) | |
| Exhibit N: | Statements to the police by Muhammad Uda (A "Siluan" cell member): (duplicate of Hebrew University's exhibit L) (Naim 001416-31): | |
| | 1) Handwritten statement in Arabic - 08/19/2002 | |
| | 2) Statement #1 to the police - 08/19/2002 | |
| | 3) Statement #2 to the police - 08/26/2002 | |
| Exhibit O: | Statements to the police by Alaa Abasi (A "Siluan" cell member) (Naim 001432-48): | |
| 1) | 8/19/2002 | |
| 2) | 8/26/2002 | |
| 3) | 1/9/2002 | |
| | + Two handwritten statements and their Hebrew translation: | |
| 1) | 8/18/2002 | |
| 2) | 8/26/2002 | |
| Exhibit P: | Statements to the police by Abdalla Barguthi, in which he admits to manufacturing the explosive device and explosive belt used in the attack (Naim 001449-92): | |
| 1) | 3/12/2002 | |
| 2) | 3/13/2002 | |
| 3) | 3/30/2002 | |
| 4) | 5/12/2002 | |
| 5) | 5/15/2002 | |
| 6) | 5/22/2002 | |
| Exhibit Q: | Muhammad Hasan Ahmad Arman's Court File. (Naim 002779-2863) | |
| Exhibit R: | Yusuf Anjas's Court File. (Naim 002864-2879) | |

- **July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem**

| | |
|---|---|
| Exhibit A: | Muhammad Hasan Arman's Indictment (Naim 000544-574)  (Duplicate of Sheffield Bombing Exhibit D) |
| Exhibit B: | Muhammad Hasan Arman's and Walid Abd al-Aziz Anjas's Sentencing (Naim 000575-586) (Duplicate of Sheffield Bombing Exhibit F) |
| Exhibit C: | Abdallah Barghuthi's Indictment (Naim 000587-629)  (Duplicate of Sheffield Bombing Exhibit A and of Ben Yehuda Exhibit A) |
| Exhibit D: | Abdallah Barghuthi's Court Ruling (Naim 000630)  (Duplicate of Sheffield Bombing Exhibit B) |
| Exhibit E: | Abdallah Barghuthi's Verdict (Naim 000631-638)  (Duplicate of Sheffield Bombing Exhibit C) |
| Exhibit F: | Yusuf Abdalla Nimer Anjas's Indictment (Naim 000639-642)  (Duplicate of Sheffield Bombing Exhibit E) |

| | |
|---|---|
| Exhibit G: | Verdict of the accused in the Hebrew University and Sheffield Club bombings (Naim 000643-670)  (Duplicate of Sheffield Bombing Exhibit G) |
| Exhibit H: | Handwritten statem ent by W     ael Qasem   (  08/21/2002) (+Hebrew translation), in which ad mits to perpetrating the Hebrew University attack as well as other attacks.  (Naim 001493-96) |
| Exhibit I: | Statements to the police by Muhammad Uda (A "Siluan" cell member): (duplicate of Sheffield's exhibit N)  (Naim 001497-1512) |
| | 1) Handwritten statement in Arabic - 08/19/2002 |
| | 2) Statement #1 to the police - 08/19/2002 |
| | 3) Statement #2 to the police - 08/26/2002 |
| Exhibit J: | Statements to the police by Muhamed Arman from (Naim 001513-74): |
| | 08/21/2002 |
| | 08/26/2002 |
| | 09/05/2002 |
| | 09/20/2002 |
| | 09/22/2002 |
| | 09/26/2002 (the 3-page statement is missing page #2) |
| | 09/26/2002 (second statement that was made the same day) |
| | 10/2/2002 |
| See also: | Sheffield Bombing Exhibit G: Indictm ent and  verdict from the J erusalem District Court, against Wael Qasem (head of the "Siluan" cell) and his cell members. |
| | Sheffield Bombing Exhibit Q: Mu hammad Hasan Ahmad Arman's Court File. |
| | Sheffield Bombing Exhibit R: Yusuf Anjas's Court File. |

- **January 29, 2003 – Shooting Attack on Route 60**

| | |
|---|---|
| Exhibit A: | Jaser Ismail Musa Barghuthi's Revised Indictment (Naim 000671-708) (duplicate of the Route 60 – June 2003 Attack, exhibit C) |
| Exhibit B: | Muayyad Shikri Abd al-Hamid Hamad's Sentencing (Naim 000709-721) |
| Exhibit C: | Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 000722-745)  (duplicate of the Route 60 – June 2003 Attack, exhibit E.) |
| Exhibit D: | Khaled Abd al-Mua'z Zein al-Din Omar's statement #1 (12/24/2003) to the police (Naim 000746-769) (duplicate of the Route 60 – June 2003 Attack, exhibit F.) |
| Exhibit E: | Khaled Abd al-Mua'z Zein al-Din Omar's statement #2 to the police (12/31/2003) (Naim 000770-786)  (duplicate of the Route 60 – June 2003 Attack, exhibit G.) |
| Exhibit F: | Police confirmation of documentation of damage done to property (Naim 000787). |

Exhibit G:     Revised Indictment from the Military Court against Ahmad Mustafa Salah Hamed (Na'jar) (duplicate of the Route 60 – June 2003 Attack, exhibit A.) (Naim 001575-93)

Exhibit H:     Statement to the police by Ahm        ad Mustafa Salah Ham     ed (Najar) (12/30/2003) and a m emorandum following an ISA investigation of Najar (12/21/2003).  (Naim 001594-1611)

Exhibit I:     Statements to the police by Jaser Barghuthi, from (Naim 001612-35): 12/22/2003 01/18/2004 11:00 a.m 01/18/2004 19:55 p.m. 01/22/2004 01/29/2004

Exhibit J:     Statements (including handwritten statements in which Omar confessed and lead the police to a weapons' hideout) to the police by Khaled Omar from (Naim 001636-79): 12/24/2003 12/31/2003 01/05/2004 01/06/2004

Exhibit K:     Statements to the police by Rab'i Khalifa (Naim 001680-86): 12/20/2003 01/11/2004

Exhibit L:     Statements  made  to  the police (12/23/2003,     12/24/2003, 12/28/2003, 12/31/2003) by Farah Hamed.  (Naim 001687-1709)

Exhibit M:     Statement made to the police by Majdi N'asan (Naim 001710-24):
 12/17/2003
               12/31/2003

Exhibit N:     An ISA m      emorandum (01/04/2003) following Mahm        ud Saa   d's investigation.  (Naim 001725-30)

Exhibit O:     Statements to the police by Morad Barghuthi (Naim 001731-53): 12/21/2003 12/25/2003 12/28/2003 12/29/2003 (first at 10:45am, second at 1:30pm)

Exhibit P:     Statements to the police by Nimer Hamida (Naim 001754-78): 12/22/2003 12/25/2003 (also includes a handwritten statement)

Exhibit Q:     Statements to the police by Yasser Hamed (Naim 001779-89): 12/28/2003 12/31/2003 (two statements made the same day)

Exhibit R:     Statements made to the police by Ahmad Khaled Daud Hamed (Naim 001790-1802): 12/28/2003 12/31/2003 01/01/2004 01/15/2004

Exhibit S:       Verdict from the Shomron Mil itary Court against  Ahmad Mustafa Salah Hamed.  (Naim 001803-12)

Exhibit T:       Sentencing of Ahmad Mustafa Salah Hamed.  (Naim 001813-16)

Exhibit U:       Statement to the police by Hisham Hijazi (02/10/2004); ISA memoranda following his investigation on 12/21/2003, 12/22/2003, 12/23/2003, 12/29/2003, 01/04/2004 (two investigations), 01/05/2004 (two investigations), 01/06/2004 (two investigation) and 01/07/2004.  (Naim 001817-53)

Exhibit V:       Hisham Abd al-Qader Ibrahim Hijazi's Revised Indictment. (Naim 002880-2908)

Exhibit W:       Yaser Hasan Muhammad Hamad's Revised Indictment. (Naim 002909-2926)

Exhibit X:       Ahmad Khaled Dawud Hamed's Revised Indictment. (Naim 002927-2938)

Exhibit Y:       Hisham Abd al-Qader Ibrahim Hijazi's Verdict. (Naim 002939-2940)

Exhibit Z:       Hisham Abd al-Qader Ibrahim Hijazi's Sentencing. (Naim 002941-2949)

Exhibit AA:      Jaser Isma'il Musa al-Barghuthi's Verdict. (Naim 002950-2969)

Exhibit BB:      Khaled Abd al-Mua'z Zein al-Din's Verdict. (Naim 002970-2972)

Exhibit CC:      Yaser Hasan Muhammad Hamad's Sentencing. (Naim 002973-2975)

Exhibit DD:      Mua'yed Shukri Hamed's Conviction and Arrest Order. (Naim 002976-2988)

Exhibit EE:      Murad Walid Khaled Barghuthi's Sentencing. (Naim 002989-2992)

Exhibit FF:      Ahmad Khaled Dawud Hamed's Verdict and Sentencing. (Naim 002993-3020)

Exhibit GG:      Ballistic Reports Pertaining to the Different Attacks that the Cell Committed. (Naim 003021-3065)

Exhibit HH:      Weapons Caught in Silwad and al-Mazra'a al-Sharqiya. (Naim 003066-3081)

Exhibit II:      Hisham Abd al-Qader's Interrogation by the ISA on December 20th. (Naim 003082-3092)

Exhibit JJ:      Judea and Samaria's Military Court Spokesperson Office's Announcement on Jaser Isma'il Musa al-Barghuthi and Murad Walid Khaled Barghuthi's Sentencing. (Naim 003093)

Exhibit KK:      Judea and Samaria's Military Court Spokesperson Office's Announcement on Mua'yed Shukri Abd al-Hamid Hamed's Sentencing. (Naim 003094)

Exhibit LL:      Mua'yed Shukri Abd al-Hamid Hamed – Revised Indictment. (Naim 003095-3112)

Exhibit MM:      Khaled Abd al-Muaz Zin al-Din Omar – Revised Indictment. (Naim 003113-3136)

See also:        Route 60 – June Attack, Exhibit B: Ahmad Khaled Dawud Hamed's Indictment (Naim 001018-1019).
                 Route 60 – June Attack, Exhibit D: Jaser Isma'il Musa al-Barghuthi's Sentence (Naim 001058-1070).

- **March 5, 2003 – Haifa Bus #37 Bombing**

| | |
|---|---|
| Exhibit A: | Indictment against Faadi Muhamed Ibrahim Jo'aba (Naim 000788-798) |
| Exhibit B: | Indictment against Munir Ben-Farid Rajbi (Naim 000799-802) |
| Exhibit C: | Verdict rejecting appeal filed by Munir Rajbi (Naim 000803-808) |
| Exhibit D: | Sentence against Munir Rajbi (Naim 000809-814) |
| Exhibit E: | Sentence against Maed Wael Taleb Abu Sharakh (Naim 000815-823) |
| Exhibit F: | Sentencing arguments against Maed Wael Taleb Abu Sharakh (Naim 000824-825) |
| Exhibit G: | Verdict against Fadi Muhamed Ibrahim Jo'aba (Naim 000826-828) |
| Exhibit H: | Muadh Wael Taleb Abu Sharakh Indictment. (Naim 003137-3147) |
| Exhibit I: | Fadi Muhammad Ibrahim al-Ju'ba – Court Record. (Naim 003148-3273) |
| Exhibit J: | Muadh Wael Taleb Abu Sharakh – Court Record. (Naim 003274-3433) |

- **March 7, 2003 – Shooting in Kiryat Arba**

| | |
|---|---|
| Exhibit A: | Revised Indictment against Abdalla Ahmad Mahmud Abu Sif (Naim 000829-837) |

- **April 30, 2003 – Mike's Place Bombing, Tel Aviv**

| | |
|---|---|
| Exhibit A: | Dr. Arian Davidson's report on the perpetrators' DNA (Naim 000838-842) |
| Exhibit B: | Dr. Chen Kugel's forensic pathology report on Asef Muhammad Hanif's body (Naim 000843-847) |
| Exhibit C: (Naim | Dr. Yehuda Hess's forensic pathology report on Omar Khan Sharif's body 000848-853) |
| Exhibit D: (Naim | Passport stamps of Asef Muhammad Hanif and Omar Khan Sharif 000854-860) |
| Exhibit E: | Police Wanted Poster and copies of passports of Asef Muhammad Hanif and Omar Khan Sharif (Naim 000861-863) |
| Exhibit F: | ISA detailed report on Palestinian suicide bombers (Naim 000864-948) |
| Exhibit G: | Summary of the Police's investigation file (09/03/2003).  (Naim 001854-63) |
| Exhibit H: | Mike's Place investigation file, including documents sent to the Scotland Yard to get more information regarding the two terrorists, who were British citizens, and testimony gathered of victims and eyewitnesses who were present at the attack.[15] (Naim 003434-3976). |

---

[15] This includes the testimony of IDF soldiers who encountered the terrorists entering through the "Allenby" Bridge and "Erez" Checkpoint.

- **May 18, 2003 – Commuter Bus Bombing, Jerusalem**

Exhibit A:    Amjad Taher Salah Arfa's Indictment (Naim 003977-3979)
Exhibit B:    Ramzi Walid Salah Arfa's Indictment (Naim 003980-3983)
Exhibit C:    Samer Abd al-Sami' Ahmed Atrash's Revised Indictment (Naim 003984-3994)
Exhibit D:    Samer Abd al-Sami' Ahmed Atrash's Court Record (Naim 003995-4040)
Exhibit E:    Samer Abd al-Sami' Ahmed Atrash's Verdict (Naim 004041)
Exhibit F:    Samer Abd al-Sami' Ahmed Atrash's Sentencing (Naim 004042-4045)
Exhibit G:    Basel Muhammad Shafiq al-Qawasmeh's Indictment (Naim 004046-4047)
Exhibit H:    Basel Muhammad Shafiq al-Qawasmeh's Conviction (Naim 004048-4050)
Exhibit I:    Muhammad N'saim 'Isa Dawud Abu Sneina's Interrogation (Naim 004051-4058)
Exhibit J:    Steven Averbach's July 29, 2003 Police Statement (Naim 004059-4060)

- **June 11, 2003 - Jaffa Road Bus 14A Bombing, Jerusalem.**

Exhibit A:    Umar Salah Muhammad Sharif's Indictment (Naim 000949-964)
Exhibit B:    Umar Salah Muhammad Sharif's Court Ruling (Naim 000965-966)
Exhibit C:    Umar Salah Muhammad Sharif's Sentencing (Naim 000967-970)
Exhibit D:    Statements to the police by Bilal Sublaban (Naim 000971-991) 06/25/2003 (summary in Hebrew; and Handwritten in Arabic) 07/02/2003 (Hebrew and Handwritten in Arabic)
Exhibit E:    Statement to the police by Amer Nasr A-Din (07/15/2003 – Hebrew and Arabic) (Naim 000992-998)
Exhibit F:    Omar Salah Muhammad Sharif – Full Court File: (Naim 004061-4129)

- **June 20, 2003 – Shooting Attack on Route 60**

Exhibit A:    Ahmad Mustafa Saleh Hamed's (Najar) Revised Indictment (Naim 000999-1017)  (duplicate of the Route 60 – January Attack, exhibit G.)
Exhibit B:    Ahmad Khaled Dawud Hamed's Indictment (Naim 001018-1019) (duplicate of the Route 60 – January Attack, exhibit W).
Exhibit C:    Jaser Isma'il Musa al-Barghuthi's Revised Indictment (Naim 001020-1057)  (duplicate of the Route 60 – January Attack, exhibit A)
Exhibit D:    Jaser Isma'il Musa al-Barghuthi's Sentence (Naim 001058-1070) (duplicate of the Route 60 – January Attack, exhibit X).
Exhibit E:    Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 001071-1094)  (duplicate of the Route 60 – January Attack, exhibit C).

Exhibit F:      Khaled Abd al-Mua'z Zein al-Din Omar's statement #1 to the police (Naim 001095-1118) (duplicate of the Route 60 – January Attack, exhibit D.)

Exhibit G:      Khaled Abd al-Mua'z Zein al-Din Omar's statement #2 to the police (Naim 001119-1135) (duplicate of the Route 60 – January Attack, exhibit E.)

See also        Route 60 – January 29, 2003 Attack, Exhibits B, H-U, V-MM

- **August 19, 2003 – Bombing of Bus #2, Jerusalem**

Exhibit A:      Nasim Rashed Abd al-Wudud Za'tari's Indictment  (Naim 001136-1151)
Exhibit B:      Majdi Barakat Abd al-Ghafer Za'tari's Indictment (Naim 001152-1165)
Exhibit C:      Abdallah Adnan Yihya Sharbati's Indictment (Naim 001166-1176)
Exhibit D:      Jalal Jamal Hilmi Yaghmur's Indictment (Naim 001177-1181)
Exhibit E:      Ramzi Walid Salah Arfa's Indictment (Naim 001182-1185)
Exhibit F:      Amjad Taher Salah Arfa's Indictment (Naim 001186-1188)
Exhibit G:      Abdallah Adnan Yihya Sharbati's Court Record (Naim 004130-4215)
Exhibit H:      Nasim Rashed Abd al-Wudud Za'tari's Court Record (Naim 004216-4298)
Exhibit I:      Jalal Jamal Hilmi Yaghmur's Court Record (Naim 004299-4398)
Exhibit J:      Majdi Barakat Abd al-Ghafer Za'tari's Court Record. (Naim 004399-4475)
Exhibit K:      Police confirmation document for damage caused to property as a result of an act of terror - Hannah Nathansen. (Naim 004476)
Exhibit L:      Police confirmation document for damage caused to property as a result of an act of terror - Shoshana Nathansen. (Naim 004477)
Exhibit M:      Police confirmation document for damage caused to property as a result of an act of terror - Judith Nathansen. (Naim 004478)
Exhibit N:      Police confirmation document for damage caused to property as a result of an act of terror - Matanya Nathansen. (Naim 004479)
Exhibit O:      Police confirmation document for damage caused to property as a result of an act of terror - Moshe Strauss. (Naim 004480)

- **September 9, 2003 – Bombing at Café Hillel in Jerusalem**

Exhibit A       Indictment against Salah Subahi Daud Musa  (Naim 001189-1196)
Exhibit B       Verdict against Salah Subahi Daud Dar Musa (Naim 001197-1201)
Exhibit C       Verdict against Ahmad Abid and Nael Abid (Naim 001202-1212)
Exhibit D       Statement to the Police by Muhammad Anati – 10/17/2004 (Naim 001213-1217)
Exhibit E       ISA Memorandum following the interrogation of Nael Abid – 10/13/2004 (Naim 001218-1223)

| Exhibit F | Revised indictment against Ahmad Abid and Nael Abid (Naim 001224-1227) |
| Exhibit G | Revised indictment against Abdul Aziz (Ben Muhamad) Amru (Naim 001228-1230) |
| Exhibit H | Statement to the police (10/10/2004) by Ahmad Abid (Naim 001231-34) |
| Exhibit I | Statement to the police (10/14/2004) by Ahmad Abid (Naim 001235-38) |
| Exhibit J | Statement to the police (10/28/2004) by Ahmad Abid (Naim 001239-41) |
| Exhibit K | Statement to the police (09/26/2004) by Ahmad Abid (Naim 001242-49) |
| Exhibit L | Revised indictment against Jamal Othman Muhammad Abu Salim (Naim 001250-1253) |
| Exhibit M | Revised indictment against Muhamad Latif Ahmad Balut (Naim 001254-1264) |
| Exhibit N | Indictment against Ibrahim Muhammad Yunes Dar Musa (Naim 001265-75) |
| Exhibit O | Indictment against Marry Subahi Juvadat Abu Saida (Naim 001276-86) |
| Exhibit P | Indictment against Fuaz Machmud Ali Na'atzer (Naim 001287-95) |
| Exhibit Q | Statement (09/26/2004) made to the police by Nael Abid (Naim 001864-68) |
| Exhibit R | Statements made by Muhammad Anati to the Police. (Naim 001869-73) |
| Exhibit S | Fahmi Izz al-Din – Appeal to the Supreme Court. (Naim 004481-4484) |
| Exhibit T | Abd al-Aziz Amru – Appeal to the Supreme Court. (Supreme Court File no. 2005/06) (Naim 004485-4494) |
| Exhibit U | Abd al-Aziz Amru – Verdict.  (Naim 004495-4497) |
| Exhibit V | Abd al-Aziz Amru – Sentencing. (Naim 004498-4500) |
| Exhibit W | Fawaz Mahmud Ali Naser – Appeal.  (Naim 004501-4504) |
| Exhibit X | Abd al-Aziz Muhammad Amru – Court Ruling, Verdict, Appeal.  (Naim 004505-4520) |
| Exhibit Y | Ibrahim Muhammad Yunas Dar Musa – Sentencing after Appeal.  (Naim 004521-4524) |
| Exhibit Z | Bahij Bader – Court File. (W_S097190 - W_S097201)  (Naim 004525-4536) |

- **October 22, 2003 - Tel Romeda Shooting Attack**

The police station in Hebron opened an investigation, gathered evidence, and documented the scene. The terrorist's corpse was transferred for an autopsy at the Abu Kabir, Institute of Forensic Medicine, and both the weapon and bullets used by the terrorists were transferred to the Forensic Department National Headquarters.  I reviewed the witness statements for the attack (Naim 001874-97).

I also reviewed:

| Exhibit A | Indictment of Bashar Hafez Awf Zaheda. (W_S007529 - W_S007532) |
| Exhibit B | Indictment of Bahaa Muhammad Fadel Awf Zaheda. (W_S007533 - W_S007539) |

- **January 29, 2004 – Jerusalem Bus # 19 Bombing**

Exhibit A:     Indictment against Ahmad Salah Ahmad Salah (Naim 001296-307)
Exhibit B:     Indictment against Ali Muhamed Hamed Abu Alail (Naim 001308-27)
Exhibit C:     Indictment against Abdel El Rachman (Zahher) Joseph Abdel El Rachman
                Mikaded (Naim 001328-42)
Exhibit D:     Indictment against Muhammad Issa Muhammad Maali (Naim 001343-56)
Exhibit E:     Indictment against Ali Muhammad Hamed Abu Halil (Naim 001357-73)
Exhibit F:     Hilmi Abd al-Karim Muhammad Hamash's Indictment.  (Naim 004537-4546)
Exhibit G:     Ahmad Salah Ahmad Salah Abu Ghadab's Indictment.  (Naim 004547-4563)
Exhibit H:     Nofal Jihad Nofal Adawin's Court Record. (Naim 004564-4678)
Exhibit I:     The Court's Decision to deny Nashash's Appeal on his Sentencing. (Naim 004679-4680)
Exhibit J:     The Court's Reasoning behind Nashash's Verdict. (Naim 004681-4683)
Exhibit K:     Ahmad Salah's Verdict and Sentencing. (Naim 004684-4685)
Exhibit L:     Firas Adawin's Interrogation. (Naim 004686-4703)
Exhibit M:     Mahmoud Azia's Interrogation. (Naim 004704-4709)

- **September 24, 2004 – Mortar Strike in Neve Dekalim**

Following the mortar attack from the Gaza Strip towards Neve Dekalim, a police investigation was opened at Erez police station: P.A File 3640/04, during which evidence was collected from witnesses residents, including testimony from a rescue doctor from Gaza, and a police report that I reviewed (Exhibit A - Naim 001374-1381) was generated. The investigation revealed a videotape that appears to be from Hamas, with images of three terrorists masked in uniform, shooting the mortars, one of which hit Neve Dekalim. The individuals have not been found nor prosecuted.

## V.    **CONCLUSION**

Based upon the information, research, and analysis presented in this report, I have reached the following conclusion:

Based on my familiarity through three decades of experience gathering, collecting, and maintaining the same types of materials, it is my opinion that all of the documents referenced in Section IV, and attached hereto, appear to be authentic records maintained by Israeli law enforcement and Israeli military and district courts in their files.   As discussed in Section III, the original records, including confessions, indictments, and verdicts, are kept in the ordinary course of business with the court in which the prosecution took place, and are obtained upon a formal request made to the respective court.

_____
    29 | 12 | 10
        Date

Shaul Naim

**EXHIBIT 223 TO DECLARATION OF VALERIE SCHUSTER**

*MOSES STRAUSS, et al. VS.*

*CREDIT LYONNAIS, S.A.*

---

*SHAUL NAIM*

*October 6, 2010*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 94897.TXT*

*Min-U-Script® with Word Index*

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 13

NAIM

1    NAIM
2    authentic.  When I say it's authentic, I
3    express what I thought was what the document
4    looked like when I saw them.
5        INTERPRETER BEYLER: When the
6    documents were authentic when I saw
7    them.
8    A.  I wrote I read many documents
9    and many indictments for many years and when
10   I received the documents, they appeared -- on
11   the face they appeared to be authentic.
12   Q.  From whom did you receive these
13   documents?
14   A.  I received them -- I received
15   some of them from the plaintiff from the
16   lawyers, from the plaintiffs' lawyers and
17   also I personally found them myself.
18   Q.  And the ones that you found
19   yourself, where did you find them?
20   A.  At least three cases that I
21   found I found them, I copied them in the
22   police station.
23   Q.  What three documents are those?
24   A.  I am talking about the terror
25   attack in Mike's Place.

Page 14

1    NAIM
2        MR. SHALOV: Note my objection
3    to the form of the question.
4    Q.  What documents are the ones --
5    let me go back.  You said at least --
6    A.  I can continue?
7    Q.  The question is --
8    A.  I'm not done, please.  You
9    asked and I want to reply.
10   Q.  I wanted to make sure you
11   remembered the question?
12   A.  I tried to.  Mike's Place and
13   then two more cases, one in Kiriyat Arba and
14   Tel Romeda.
15   Q.  In your report you identify --
16   let's look at your supplemental report.  You
17   identify documents relating to Mike's Place.
18   Did you find all of these documents in the
19   police station?
20   A.  As far as I remember, yes.  I
21   also spoke with the officer who was
22   responsible on the special investigation
23   unit.
24   Q.  What police station was that?
25   A.  In Tel Aviv. As far as I

Page 15

1    NAIM
2    remember it's in Tel Aviv.
3    Q.  What's the name of the officer
4    in the special investigations unit you spoke
5    to?
6    A.  His name is Dudi Bar.  He was a
7    major and he was promoted to chief
8    superintendent in the police.
9    Q.  Did you know him before you
10   spoke with him in connection with this case?
11   A.  Not personally even though I
12   heard about him and I heard his name. When
13   you are in the police, you get to know
14   officers.  He was the head of the fraud
15   division.  When I met him, he was the head of
16   the investigative unit.
17   Q.  All of the Mike's Place
18   documents listed on page 8 of Exhibit 2 you
19   received from Dudi Bar?
20       MR. SHALOV: Objection to form.
21   You can answer.
22   A.  No.  Dudi Bar does not
23   distribute documents.  I photocopied the
24   documents which the head of the investigative
25   unit authorized me to copy in Tel Aviv and

Page 16

1    NAIM
2    his name is Meir Cohen and he's the chief
3    superintendent.
4    Q.  In Tel Aviv?
5    A.  In Tel Aviv.  I do not remember
6    100 percent if I photocopied all the
7    documents or I was given some of the
8    documents, but what's important is that I
9    spoke with him about the case after I read
10   the material so we trade forces what I
11   already knew and it reinforced the
12   information I already knew.
13   Q.  From reading the documents?
14   A.  From reading the documents,
15   from talking to him, and from seeing many
16   things related to the terror attack.  In this
17   case I remember it well.  I did not always
18   have all the confessions on video, but here
19   in this case there were two British Muslims
20   who came here to Arab countries in order to
21   do the terror attack and they were
22   interviewed before the attack in Gaza and
23   they came and told why they are going to do
24   the terrorist attack so in terms of the
25   material and the information, everything went

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 17

1       NAIM
2   together in an excellent way for me.
3   Q.   You also said that the other
4   matters for which you got documents from
5   police stations were relating to the Tel
6   Romeda attack and Neve Dekalim attack,
7   correct?
8       MR. SHALOV: Shaul, I have to
9   caution you again to wait until Mr.
10  Friedman's questions are translated
11  from English into Hebrew so just wait
12  for that process to be completed
13  before you answer even though you
14  understand to some extent what Mr.
15  Friedman is asking you.
16  Q.   Let me put the question again.
17  You said the two other matters for which you
18  obtained the documents that you identified
19  other than from plaintiffs' counsel but
20  rather at police stations pertain to the Tel
21  Romeda attack and the Neve Dekalim attack,
22  correct?
23  A.   No, I said Tel Romeda and I
24  said Kiriyat Arba.
25  Q.   My mistake, I apologize.

Page 18

1       NAIM
2   Q.   The documents relating to Tel
3   Romeda are the ones identified on page 11 of
4   your report supplemental report?
5   A.   Yes.
6   Q.   The ones relating to Kiriyat
7   Arba is the one document identified on page 8
8   of your supplemental report, correct, the top
9   of page 8, I'm sorry?
10  A.   Yes.
11  Q.   Tell me how did you get this
12  document related to Kiriyat Arba?
13  A.   I called because I was in the
14  police for many years and it was easier for
15  me to communicate and speak directly with the
16  officers of the investigations who were
17  responsible for the investigations.  Some of
18  them worked with me together previously in
19  Jerusalem and they got promoted and received
20  different roles among which Ben Moshe who is
21  the chief investigator and the information
22  officer for the Hebron station I sent him a
23  formal request to photocopy so it would not
24  be like he's doing me a favor and he
25  authorized that I photocopy the material and

Page 19

1       NAIM
2   I photocopied all the case, all the material
3   in the case.
4   Q.   Did you photocopy documents
5   other than the one document you identify on
6   page 8 of your report?
7   A.   I'm not sure what you mean.
8   Q.   You identify on page 8 one
9   document relating to Kiriyat Arba. I'm asking
10  you whether there were other documents that
11  you photocopied?
12  A.   On page 8?
13  Q.   On page 8 you identify one
14  document pertaining to the Kiriyat Arba
15  attack.  I believe you just testified that
16  you were permitted to photocopy all the
17  material in the case at the file at the
18  police station.  My question is is that
19  right, did you photocopy more documents than
20  the one that's identified here?
21      MR. SHALOV: Objection to form.
22  You can answer.
23  A.   In general?
24  A.   Yes.
25  A.   Yes.

Page 20

1       NAIM
2   Q.   Where are those documents today
3   that you photocopied?
4   A.   Some of them I have, for
5   example, I took most of the indictments, most
6   of the military indictments who went in front
7   of a military court.
8   Q.   Mr. Naim, are you talking about
9   the Kiriyat Arba attack because that's all
10  I'm asking about so let me go back because I
11  think you misunderstood my question.
12  A.   Okay.
13  Q.   You've identified in your
14  report one document relating to Kiriyat Arba.
15  You said earlier that you copied the
16  documents plural that were in the file.  I'm
17  asking where those documents -- those other
18  documents that you photocopied that are not
19  this one Exhibit A for Kiriyat Arba, where
20  are those today?
21      MR. SHALOV: Objection to form.
22  You can answer.
23  A.   If we're talking about Kiriyat
24  Arba I received the material, the Kiriyat
25  Arba material.  What I did, I went to the

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 25

1      NAIM
2  Place and afterwards I spoke with Meir Cohen.
3  In Hebron I spoke with -- I spoke with a
4  large number of officers and nobody refused
5  to give me the material.
6  Q.  Let me go back to my question
7  because it was much narrower and I would ask
8  that you focus on my question and answer my
9  question.  Did you make a formal request with
10  respect to Kiriyat Arba and if so, who did
11  you address it to?
12  A.  I said before and I will say
13  again I requested a formal request and in
14  parenthesis I did not want any favors from
15  the chief investigative unit of the Hebron
16  station.  His name is Yakov Ben Moshe and the
17  title is chief superintendent.
18  Q.  Did you make a formal request
19  with respect to Tel Romeda?
20     MR. SHALOV: Objection to form.
21  Not sure what you mean by formal
22  request.
23  Q.  Did you make a written request?
24  A.  Yes.
25  Q.  Did you make a written request

Page 26

1      NAIM
2  with respect to Mike's Place?
3  A.  Mike's Place as far as I
4  remember I did request -- it's possible that
5  the material was received directly by the
6  plaintiff, but I had the material when I
7  spoke with the head of the investigation.
8  Q.  I just want to go back and make
9  sure I'm clear. I believe you testified
10  earlier that the documents identified in your
11  supplemental report you received from
12  plaintiffs' counsel except for the documents
13  related to Mike's Place, Tel Romeda and
14  Kiriyat Arba you obtained those yourself; is
15  that correct?
16     MR. SHALOV: Objection to form.
17  A.  I want to say clearly so that I
18  will not make a mistake and I won't mislead
19  you.  As far as Tel Romeda and Kiriyat Arba,
20  I personally presented a formal request and I
21  received answers.  As far as Mike's Place is
22  concerned, I'm not sure if I received or I'm
23  not sure. I don't want to guarantee.
24  Q.  The rest of the documents you
25  received from plaintiffs' counsel; is that

Page 27

1      NAIM
2  correct?
3  A.  In principal, yes, but don't
4  forget by myself I also received many
5  indictments doubly so I can double check.
6  Q.  What do you mean by double
7  check?
8  A.  In more than was necessary,
9  more than was necessary.  I went to the
10  military court in Ofer and after I prepared
11  the list of all the indictments in the
12  military files that were taking place against
13  all the terrorists in a number of attacks I
14  wanted to see how it happened there
15  technically and I received from them most of
16  the indictments that I already had after they
17  stamped that it conforms to the original and
18  this I say that it was beyond what was
19  necessary.
20  Q.  Of the documents you list in
21  your supplemental report for the attacks
22  other than Kiriyat Arba, Tel Romeda and
23  Mike's Place, can you tell by looking at your
24  report which documents you double checked and
25  which you did not?

Page 28

1      NAIM
2     MR. SHALOV: Do you want him to
3  go through the whole report?
4     MR. FRIEDMAN: I'm asking
5  whether he's able to tell me that as a
6  matter of principal and then we can go
7  to specifics.
8  A.  I can tell you this.  I read
9  all the material and it was a lot of
10  material.  I took all the material that
11  included military indictments and I only
12  wrote the case number of the military court
13  in Judea and there's a military court in
14  Samaria.  I had a list of maybe 40 case
15  numbers.  I have it at home.  I did not bring
16  it with me.  I went and I requested from the
17  secretary of the military court the whole
18  list of all the files and give me the whole
19  file.
20     I sat down with a clerk, a
21  judge clerk in front of her computer and she
22  typed most of the list, but not all of it.
23  She had a problem in the computer.  Some she
24  didn't know the codes to get the indictment
25  out, but what she took out about 30 and I

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 41

```
 1      NAIM
 2      THE VIDEOGRAPHER: This is tape
 3   two of the deposition of Mr. Shaul
 4   Naim.  We are now on the record.  The
 5   time is 11:10 a.m., October 6, 2010.
 6   Q.   Mr. Naim, before the break you
 7   said that I think you used the phrase any
 8   interested party can apply to the police or a
 9   court to get access to documents.
10      MR. SHALOV: Objection to form.
11   Q.   Are these files open to the
12   general public or does one have to show that
13   they meet certain criteria to get these
14   files?
15   A.   A person has to meet certain
16   criteria in order to photocopy a file.
17   Q.   What are those criteria?
18   A.   I'll give you an example.  If
19   there is a conflict between a husband and
20   wife in a civil case, the husband stands a
21   civil trial, the wife has all the rights to
22   know what is going on in the trial and at the
23   end of the trial if she wants to file a
24   lawsuit she can ask for this file either from
25   the police or from the court.
```

Page 42

```
 1      NAIM
 2   Q.   Can you give me any other
 3   examples of the criteria one has to meet in
 4   order to get access to these files?
 5   A.   A file in a vehicle accident,
 6   car accident, the victim is allowed to
 7   photocopy through his attorneys the police
 8   file in order to sue the insurance company or
 9   the person who caused this accident.  This is
10   what is referred to as an interested party.
11   Q.   Who decides whether a person
12   making a request to see police or court files
13   qualifies as an interested party to have
14   access?
15   A.   In a criminal case, criminal
16   police case either the district or the
17   regional head of the investigative unit and
18   in the court file it's the court clerk.
19   Q.   Did you consult any prosecutor
20   files in the course of your work in these
21   cases?
22      MR. SHALOV: Objection to the
23   word consult.  Answer if you can.
24   Q.   Did you look at any prosecutor
25   files in the course of your work in these
```

Page 43

```
 1      NAIM
 2   cases?
 3   A.   Prosecutor's file?
 4   Q.   Did you go to any prosecutor's
 5   office to look at any prosecutor files?
 6   A.   I did not go there, but I
 7   talked to prosecutors who handle these cases.
 8   Q.   You made requests to look at
 9   police files in some instances and court
10   files in some instances, correct?
11      MR. SHALOV: Objection to form.
12   A.   I submitted requests to
13   photocopy files to the heads of the
14   investigative divisions either in their
15   region or the district where the attacks took
16   place.
17   Q.   Also to courts where court
18   cases related to the attacks took place,
19   correct?
20      MR. SHALOV: Objection to form.
21   A.   I prepared such requests.  I
22   received the verdicts from the courts through
23   the plaintiffs' attorneys, the verdicts of
24   the courts.
25   Q.   Just to make sure I'm clear,
```

Page 44

```
 1      NAIM
 2   Mr. Naim, the only requests you made were of
 3   -- the only requests made for access to files
 4   were requests to police authorities, not to
 5   courts?
 6   A.   I prepared requests to courts
 7   as well, however, I did not receive any
 8   answers from the courts, from the court
 9   clerks, but I received the materials from my
10   attorneys and therefore I did not pressure
11   them.
12   Q.   So just to make sure I'm clear,
13   the only authorities to which you made
14   requests and received responses and were
15   granted access were police authorities,
16   correct?
17      MR. SHALOV: Objection to form.
18   You can answer.
19   A.   Yes.
20   Q.   So those police authorities
21   accepted you as an interested party permitted
22   to have access to these files, correct?
23      MR. SHALOV: Objection to form.
24   Asks for speculation.
25   A.   Yes.
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 45

NAIM

1  NAIM
2  Q.  When you made these requests,
3  did you believe you were an interested party
4  entitled to look at these files?
5  A.  Absolutely.
6  Q.  What was your basis for
7  believing that to be, in other words, what
8  made you an interested party in your view?
9  A.  If I or the attorneys I work
10 with represent the victims and they intend to
11 file a lawsuit against anybody they consider
12 fit hence they have the right and they are
13 considered an interested party.
14 Q.  New topic.  The photocopying
15 that was done of materials from police files
16 for you, who physically did that
17 photocopying?
18 A.  Who photocopied it, the law
19 offices I work with work with various
20 entities and they saw to making the copies.
21 Q.  I'm not sure I understand.  You
22 have testified that you were given access to
23 certain files from police authorities.  Where
24 physically did you look at those files, at
25 the police stations themselves?

Page 46

NAIM

1  NAIM
2  MR. SHALOV: Objection to form.
3  You can answer.
4  A.  Inside the police station, for
5  example, in Hebron after I submitted the
6  request they took out the files, we
7  photocopied them, then I returned to my
8  office and read them.
9  Q.  That was an example of how the
10 procedure worked at each police station that
11 you went to, correct?
12 A.  How the procedure works because
13 it's so to this day.
14 Q.  Who did the photocopying, a
15 police employee or you?
16 A.  Usually when you come to
17 photocopy something there are photocopy
18 machines at the police station and you do the
19 photocopying.
20 Q.  I'm not asking about usual
21 practice, I'm asking with respect to the
22 documents that you got from police stations
23 that you looked at at police stations,
24 physically who photocopied those?
25 A.  My representative, a

Page 47

NAIM

1  NAIM
2  representative on my behalf.
3  Q.  Who is --
4  A.  After I coordinated it with the
5  police officer.
6  Q.  Who is that person?
7  A.  Somebody who was working with
8  me.
9  Q.  Were you physically present
10 when the photocopying took place?
11 A.  No.
12 Q.  Did the photocopying take place
13 on the same day as your review?
14 MR. SHALOV: Objection to form.
15 A.  Yes.
16 Q.  So is it fair to say you looked
17 at the files you were shown, you selected
18 certain documents for photocopying and then
19 you had your assistant photocopy them right
20 on that same day?
21 A.  What happens is that the
22 district attorney's office or the police or
23 whoever gives you the documents that you have
24 the right to copy.  They don't give you
25 internal correspondence of the investigators,

Page 48

NAIM

1  NAIM
2  for example, that's not allowed.
3  Q.  I'm focusing on what you
4  actually did, I'm not talking about general
5  practice.  Let's take it step by step.  How
6  many police stations did you go to to look at
7  documents?
8  A.  In order to copy them?
9  Q.  To look at them and to copy
10 them?
11 A.  I said I went to the Tel Aviv
12 district where I saw Dudi Bar, the head of
13 the special investigations team.
14 Q.  What other police stations --
15 A.  I didn't go to Hebron -- just a
16 moment, but the file was photocopied for me
17 in Hebron.  I talked to the special
18 investigations officer and he gave me the
19 permission to copy the file.
20 Q.  But the copying was done by the
21 police official and mailed to you?
22 A.  It was given to me by hand
23 after it was photocopied.
24 Q.  Other than the Tel Aviv
25 district and the Hebron station, are there

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 49

1        NAIM
2    any other police offices from which you
3    received documents?
4    A.  No.
5    Q.  The documents from the Tel Aviv
6    district, you were shown certain files,
7    correct?
8    A.  No.
9    Q.  Tell me how it worked?
10   A.  At the Tel Aviv district I sent
11   a request to the investigation division head
12   to photocopy files relating to Tel Aviv
13   attacks which is what we're talking about,
14   the Mike's Place attack.
15   Q.  Just the one attack?
16   A.  Yes.  I received a permit to
17   make the copies and I sent my people, I
18   received the material and afterwards I had a
19   conversation with the head of investigation
20   unit himself after I had the material before
21   me.
22   Q.  That's Dudi Bar?
23   A.  Correct.
24   Q.  What did you discuss with Dudi
25   Bar?

Page 50

1        NAIM
2    A.  Actually I discussed with him
3    the entire file.  Correction the entire case.
4    The Scotland Yard became involved because
5    there were also British citizens involved.
6    Q.  You said you sent your people
7    to make copies.  Are those people employed by
8    your law office?
9    A.  No, various people with whom I
10   work from time to time.
11   Q.  Who are they?
12   A.  I can give you names.  If I
13   give you a name, will it tell you something?
14   One of them his name is Meir.
15   Q.  These are people who work for
16   you?
17   A.  Occasionally.  Not on a
18   permanent basis.
19   Q.  Who made the decision as to
20   what documents you were permitted to have
21   from the Tel Aviv district?
22   A.  There is a permit in principal
23   that I received from the head of
24   investigation division in Tel Aviv and there
25   is the person in charge of the police archive

Page 51

1        NAIM
2    who knows the procedures of what is allowed
3    to be given and what is not allowed to be
4    given to a person, to an attorney, to an
5    interested party.
6    Q.  So that person decided which of
7    the documents related to the Mike's Place
8    attack you were permitted to see?
9    A.  Yes.
10   Q.  The other police station from
11   which you got documents or the other police
12   office from which you got documents was
13   Hebron, right?
14   A.  Correct.
15   Q.  What attack or attacks did
16   those documents relate to?
17   A.  Two attacks, Kiriyat Arba and
18   Tel Romeda.
19   Q.  And you made a written request
20   for documents?
21       MR. SHALOV: From this police
22   station?
23       MR. FRIEDMAN: Yes.
24   A.  Yes, you asked me before and I
25   answered yes.

Page 52

1        NAIM
2    Q.  And you received documents hand
3    delivered to you from the police station?
4        MR. SHALOV: Objection to form.
5    A.  That's right.
6    Q.  The decision as to which
7    documents you were given concerning those two
8    attacks was made by the police officer in
9    charge of deciding what you could have,
10   correct?
11       MR. SHALOV: Objection.
12   A.  Correct.
13   Q.  Just to make sure I'm clear
14   from the documents you received from the Tel
15   Aviv district concerning the Mike's Place
16   attack you made a written request for those
17   as well?
18       MR. SHALOV: Objection to form.
19   A.  Yes.
20   Q.  Do you have at your offices
21   copies of those written requests?
22   A.  I believe so.
23   Q.  Other than the documents you
24   received from the Tel Aviv district and the
25   documents you received from the Hebron

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 53

NAIM

1    NAIM
2    police, all of the other documents identified
3    in your supplemental report you received from
4    plaintiffs' counsel?
5        MR. SHALOV: Objection to form.
6    Asked and answered multiple times.
7    Answer again.
8    A.  That's right.
9    Q.  Focusing on the documents that
10   you received from plaintiffs' counsel, what
11   if anything did you do to determine the
12   authenticity of those documents?
13       MR. SHALOV: That's a very open
14   ended question.  If you are prepared
15   for a lengthy answer, that's fine.
16       MR. FRIEDMAN: Let me try to
17   narrow it down.
18   Q.  Did you go to any police
19   offices to check the documents you got from
20   plaintiffs' counsel against documents at
21   police offices?
22   A.  No.
23   Q.  Did you go to any courts to
24   check the documents you got from plaintiffs'
25   counsel against documents in court files?

---

Page 54

1    NAIM
2    A.  No.
3    Q.  Did you go to any prosecutor's
4    offices in order to check the documents you
5    got from plaintiffs' counsel against
6    documents in prosecutor's files?
7    A.  No.
8    Q.  Looking at the universe of
9    documents you received from plaintiffs'
10   counsel, did you check those documents
11   against other versions of those same
12   documents from anywhere?
13       MR. SHALOV: Objection to form.
14   A.  I don't understand the
15   question.
16       MR. FRIEDMAN: Let me rephrase
17   the question so the record is clear.
18   Q.  You've told me you did not
19   check these documents against documents in
20   police files, you didn't check these
21   documents against documents in court files,
22   you didn't check these documents against
23   documents in prosecutor's files and by these
24   documents I'm referring to the documents you
25   received from plaintiffs' counsel.  Let me

---

Page 55

1    NAIM
2    just stop there and then I'll finish my
3    question.
4        MR. SHALOV: Objection to form
5    to the extent it mischaracterizes his
6    testimony.
7    Q.  Did you check the documents
8    that you received from plaintiffs' counsel
9    against documents that you got from any other
10   source?
11       MR. SHALOV: Objection to form.
12   You can answer.
13   A.  What do you mean by other
14   sources, do you mean from the press, you mean
15   from personal knowledge, what do you mean?
16   Q.  I mean did you compare the
17   documents that you received from plaintiffs'
18   counsel against any other versions of those
19   documents?
20   A.  I already responded to it, but
21   some of the documents I received indictments
22   which came from the plaintiffs' counsel  I
23   compared them with the indictments found in
24   the military court where the trials took
25   place and I saw that it was completely

---

Page 56

1    NAIM
2    consistent.
3    Q.  I'm confused, Mr. Naim, because
4    you told me you did not go to any courts a
5    few moments ago, but now you're telling me
6    you compared this with the indictments with
7    documents in military courts?
8        MR. SHALOV: Objection to form.
9    Mischaracterizes his testimony.  You
10   can answer.
11   A.  Right, maybe I did not explain
12   myself correctly, however, regarding my last
13   sentence I meant -- when I said no, I meant
14   the civil court, not the military court.
15   Q.  So you did go to military
16   courts and you compared indictments that you
17   received from plaintiffs' counsel with
18   indictments in the files in the military
19   courts, correct?
20   A.  That's right.
21   Q.  With respect to what attacks
22   did you do that?
23       MR. SHALOV: Can he refer to
24   his exhibit?
25       MR. FRIEDMAN: He can look at

---

Page 57

1   NAIM
2   anything.
3      MR. SHALOV: Take your time.
4   A.  From what I'm looking at the
5   list.
6   Q.  On Exhibit 2?
7   A.  I'm looking at the supplement
8   and I see all the attacks and I see that the
9   files that I -- the indictments that I
10  received from the plaintiffs' counsel I
11  checked in the military courts. Not only the
12  indictments, also the verdicts and the
13  sentences.
14  Q.  Okay.
15  A.  So I double checked the
16  military court, the indictment, the verdict
17  and the sentence of the attack on Ben Yehuda.
18     MR. SHALOV: You asked him
19  which attacks.
20  Q.  Why don't you first list the
21  attacks and then we'll go back and talk about
22  the documents so why don't you tell me which
23  attacks?
24  A.  So I'm saying I checked the
25  attacks on Ben Yehuda and the indictments and

Page 58

1   NAIM
2   the sentences. I did not find everything,
3   but I found a large portion of it. Park
4   Hotel, for example, the entire verdict and
5   sentence of the co-defendants I found there,
6   the four co-defendants of the leader, right.
7   I checked it regarding Sheffield Club.
8   Sheffield Club the indictment which again is
9   the same for Ben Yehuda and Sheffield Club
10  regarding Barghuthi, but I checked it. I
11  checked the indictment on Route 60, the first
12  one and also the second one. One occurred in
13  January and one occurred in June. I also
14  checked the indictment on Line 14A. I also
15  checked the indictment -- actually several
16  indictments of Sbarro's.
17  Q.  The Sbarro attack is not listed
18  here?
19  A.  Correct.
20  Q.  Where is Line 14A, I cannot
21  find that one?
22  A.  Just a second. I'll finish and
23  then I'll refer you. Line 6 is here.
24  Q.  What page is that on?
25  A.  It's here. Oh, 14 is on page

Page 59

1   NAIM
2   8.
3   Q.  Right and where is Line 6?
4   A.  Line 2 that we said -- let's
5   leave 6 aside for a moment. Line 2. Line
6   19. I really don't see Line 6 here, but I
7   know I encountered it during the examination.
8   Maybe while I was checking everything I
9   encountered it so I took it.
10  Q.  Let's go to page 3 of the
11  supplemental report. Which military court
12  did you go to?
13  A.  I went to the Ofer military
14  court.
15  Q.  How did you get access to its
16  files?
17  A.  The military files?
18  Q.  Yes.
19  A.  I went there. I introduced
20  myself as somebody who handles attack files.
21  I said I needed to compare indictments,
22  sentences and the verdicts that I had in my
23  possession and they issued those verdicts for
24  me with certification that they were
25  consistent with the original.

Page 60

1   NAIM
2   Q.  Did you attach those
3   certifications to either of your reports?
4   A.  No, I said I had done it only
5   above and beyond what was required and
6   therefore I did not touch them.
7   Q.  Does the public have access to
8   military court files or is it limited to
9   interested parties as you said earlier for
10  other files?
11  A.  I believe it's only for an
12  interested party.
13  Q.  The basis on which you believed
14  you were an interested party with respect to
15  the military courts is the same as the basis
16  you told me earlier for the police files?
17     MR. SHALOV: Objection to form.
18  A.  I believe so.
19  Q.  Now looking at the description
20  in your supplemental report of Exhibits A
21  through C for the Ben Yehuda bombings, which
22  of these did you check against copies in the
23  court files?
24     MR. SHALOV: Objection to form.
25  A.  Regarding Ben Yehuda I said I

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 65

1     NAIM
2  Q.  Let's go to the next Route 60
3  shooting attack of June 2, 2003 which has
4  exhibits listed on pages 8 through 10 of your
5  supplemental report. What military court did
6  you go to for these documents?
7  A.   Again, I went to the same court
8  which is the Judea court in the Ofer camp.
9  Q.  That was the same visit as for
10  the other attacks?
11  A.  That's right.
12  Q.  Which of the documents listed
13  here on pages 8 through 10 were you shown?
14  A.  What I see here is A, B, E.
15  That's what I remember.  I photocopied a
16  portion of them.
17  Q.  Let's go to the next one you
18  identified on page 10, the bus line number 2
19  attack.  What military court did you go to
20  for documents relating to that attack?
21  A.  I went to the military court in
22  Judea.
23  Q.  The Ofer court?
24  A.  Correct.
25  Q.  The same visit as for the other

Page 66

1     NAIM
2  attacks?
3  A.  Correct.
4  Q.  Which of these documents were
5  you shown?
6  A.  To the best of my recollection
7  I was shown and I also received A, D and F.
8  It's possible the others as well, but I
9  remember them less.  These I really remember,
10  but I would have to see it.
11  Q.  Last let's go to the other
12  attack you identified as one for which you
13  went to a military court, the bus 19 bombing
14  on pages 11 and 12.
15  A.  I went to the Judea military
16  court in Ofer.
17  Q.  The same visit as you described
18  earlier?
19  A.  Right.
20  Q.  Which of these documents were
21  you shown?
22  A.  I was shown the indictments of
23  Ahmad Salah Ahmad Salah, that's his name
24  twice, that's E.
25  Q.  That's Exhibit A?

Page 67

1     NAIM
2  A.  A.
3        INTERPRETER KOHN: Interpreter's
4  mistake, that was A, not E.
5  A.  B, Abu Halil, C, and E.  I'm
6  not sure regarding D, but these I remember
7  receiving.  I had the materials relating to
8  bus line 19 at my office and then I compared
9  them.
10  Q.  The documents you were shown by
11  the military courts all corresponded to
12  documents that you had already -- for which
13  you already had copies?
14        MR. SHALOV: Objection.  You
15  can answer.
16  A.  A large portion of the
17  documents that I had received them also
18  from the military court and I compared them.
19  Q.  Okay so --
20  A.  I received some from the court
21  that I did not have among my own materials
22  and there were also some -- there was some
23  that I didn't have and I received from them.
24  Q.  On that same visit to the Ofer
25  camp?

Page 68

1     NAIM
2  A.  I spent several hours there.
3  Q.  Are any of those documents that
4  you received at the Ofer camp for which you
5  did not previously have copies, are any of
6  those identified in your supplemental report?
7  A.  No.
8  Q.  What was your basis for not
9  including those documents in your
10  supplemental report?
11  A.  I don't understand your
12  question.
13  Q.  You said you received documents
14  from the military court that you did not
15  identify in your supplemental report and I'm
16  asking what was your basis for deciding not
17  to include those documents in your report?
18  A.  I went to the military court
19  after I prepared the report and therefore I
20  did not include it.
21  Q.  Going back to the Tel Aviv
22  district, did you receive any documents from
23  the Tel Aviv district that you did not
24  identify in your report?
25  A.  No.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 77

1      NAIM
2  A.  I did not go through the whole
3  list of all the documents.  I have to see
4  what's there, what I remember and what I
5  don't remember.
6  Q.  Is there any source from which
7  you received the documents to which you refer
8  other than plaintiffs' counsel, the Tel Aviv
9  district police, the Hebron district police
10  or the Ofer military court, is there any
11  other source?
12  A.  No.
13      MR. FRIEDMAN: This is as much
14  a question for plaintiffs' counsel as
15  it is for Mr. Naim, but I think I
16  understand the intent of his
17  conclusion, but let me ask you the
18  conclusion on page 12 references
19  Section 4, but there is no Section 4
20  in the supplemental report.  Am I to
21  understand that he's giving his
22  authenticity opinion with respect to
23  the revised version of documents that
24  was previously in Section 4 of the
25  original report, the revised version

Page 78

1      NAIM
2  being pages 3 through 12 of the
3  supplemental report, in other words,
4  does what's listed on pages 3 through
5  12 substitute for what was previously
6  in Section 4 of the authenticity
7  opinion? That's how I understand this
8  and I just want to confirm this.
9      MR. SHALOV: Why don't we take
10  a look at the reports, Larry, and do
11  our best to respond to your inquiry.
12      MR. FRIEDMAN: Then I'll ask
13  the witness.
14  Q.  Mr. Naim, do you see the
15  conclusion on page 12 of your report,
16  supplemental report?
17  A.  Yes.
18  Q.  This refers to the documents
19  referenced in Section 4, do you see that in
20  your conclusion?
21      MR. SHALOV: I think we can cut
22  through this and confirm your
23  observation is correct.
24      MR. FRIEDMAN: I withdraw my
25  question because your counsel has

Page 79

1  answered it for me.
2  Q.  Look at the last sentence on
3  page 12.
4      MR. SHALOV: Before you answer,
5  can I read the prior question to make
6  sure of the accuracy of my
7  certification.
8      MR. FRIEDMAN: Yes.
9      MR. SHALOV: I just want to
10  make clear that we understand each
11  other and that this agreement about
12  what he's referring to --
13      MR. FRIEDMAN: Let me take
14  another shot at it, Lee and Steve.  I
15  think that I'm -- that what is being
16  said here is that whereas in his
17  original report he expressed an
18  authenticity opinion with respect to
19  the documents listed in Section 4, we
20  are now substituting the documents
21  listed on pages 3 through 12 of the
22  supplemental report for what was
23  previously listed in 4.
24      MR. SHALOV: I think that's

Page 80

1      NAIM
2  correct.  I think one way to interpret
3  this is simply to delete the reference
4  to Section 4 in this conclusion and
5  simply say all of the documents
6  referenced herein.
7      MR. FRIEDMAN: Okay.
8      MR. SHALOV: And attached
9  hereto, I don't think there are any
10  documents attached hereto, but all the
11  documents referenced herein appear to
12  be authentic.
13  Q.  Look at the last sentence of
14  page 12 and read that to yourself.  Are you
15  referring here only to the documents that you
16  saw in Ofer?
17  A.  In the last sentence?
18  Q.  Yes.
19  A.  No.
20  Q.  Are you referring to more than
21  those documents?
22  A.  Only to the documents that
23  appear in the attachment.
24  Q.  You are referring to all of the
25  documents on pages 3 through 12?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 81

1       NAIM
2   A.   Yes.
3   Q.   How do you know that those
4   documents are maintained in court files if
5   you did not see the court files?
6   A.   I know indictments.  I was
7   myself a prosecutor for many years.  I
8   prepared hundreds of indictments.  I had met
9   over 30 lawyers who prepared indictments and
10  I personally would check them, at least the
11  new ones.  I read the sentencings --
12  verdicts.  I saw materials.  I read
13  testimonies taken by some of my investigators
14  and I spoke with those investigators who took
15  the testimonies and I spoke with
16  investigators who transported -- who took
17  defendants to hiding places for weapons and
18  so forth.  I understand how an indictment has
19  to be formulated so when I read the material
20  and I see an indictment and it appears on the
21  face of it as authentic because I know it.
22  Q.   Are you currently --
23       MR. SHALOV: I would
24  respectfully ask that you let him
25  answer the question.  I think he had

Page 82

1       NAIM
2   more to answer based on the open ended
3   nature of the question.  I think it
4   requires a lengthy response so please
5   don't cut him off.
6       MR. FRIEDMAN: Maybe with that
7   coaching, yes, but I looked at the
8   witness and I think he was done with
9   his answer.
10  Q.   Were you done with your answer?
11  A.   If you interrupt me and you
12  continue, I will not force an answer.  I have
13  a lot to say.
14  Q.   Did I interrupt you?
15  A.   It's all right.
16  Q.   Okay.  Did you have anything
17  more to say in response to my last question?
18  A.   I wanted to say that after 30
19  years as a prosecutor in the police and
20  responsible for investigations and management
21  of investigation yourself, you can know when
22  you read material if you read authentic
23  material or not otherwise it's as if the 30
24  years did not exist.
25  Q.   Have you finished your answer?

Page 83

1       NAIM
2   A.   Yes.
3   Q.   Are you currently an employee
4   of any Israeli civilian court?
5   A.   Employee in the court?
6   Q.   Yes.
7   A.   No.
8   Q.   Are you currently an employee
9   of any military court in Israel?
10  A.   No.
11  Q.   Have you ever been an employee
12  in a civilian court or a military court?
13  A.   No.
14  Q.   You are currently a lawyer in
15  private practice, correct?
16  A.   Correct.
17  Q.   That was your employment when
18  you signed your original and supplemental
19  reports, correct?
20  A.   Correct.
21  Q.   At the end of this last
22  sentence on page 12 you refer to the records
23  as being obtained upon a formal request to
24  the respective court.  Are you referring
25  there to a request made by what you described

Page 84

1       NAIM
2   earlier as an interested party?
3   A.   The requests made for materials
4   were by an interested party.
5   Q.   The court records you are
6   referring to are not available to anyone in
7   the public?  In order to have a request
8   granted you have to establish that you are to
9   use your term an interested party, correct?
10      MR. SHALOV: Objectionable.
11  A.   Part of the materials in my
12  possession any citizen can get them on the
13  internet.  Some of the material you need to
14  be an interested party to receive testimonies
15  and so on.
16  Q.   What materials described in
17  your report can any citizen get on the
18  internet?
19  A.   Court rulings are published on
20  legal sites, transcripts, citizens can
21  receive them especially lawyers who go on to
22  these legal sites. Testimonies and other
23  police materials are related to interested
24  party.
25  Q.   Are limited to interested

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 89

```
 1      NAIM
 2   the sentencing or the court ruling and I also
 3   see the indictments, a list of testimonies
 4   that were given to investigators on given
 5   dates so I have no doubt that they exist
 6   therefore I noted them.  Unfortunately for me
 7   to get them physically I was not able to do
 8   that therefore because I was unable to get
 9   them physically I excluded them.
10      MR. FRIEDMAN: Why don't we
11   break for lunch and try to come back
12   at a quarter to two.
13      THE VIDEOGRAPHER: We are now
14   off the record. The time is 1:02 p.m.,
15   October 6, 2010.
16      (Luncheon recess taken at 1:02
17   p.m.)
18
19
20
21
22
23
24
25
```

---

Page 90

```
 1      NAIM
 2   A F T E R N O O N  S E S S I O N
 3      (Time Noted: 1:54 p.m.)
 4
 5   S H A U L  N A I M, resumed and testified
 6   as follows:
 7
 8   CONTINUED EXAMINATION
 9      BY MR. FRIEDMAN:
10      THE VIDEOGRAPHER: We are now
11   back on the record.  The time is 1:54
12   p.m., October 6, 2010.
13      MR. FRIEDMAN: Good afternoon.
14   I presume if I would ask Mr. Naim what
15   he was told as to where plaintiffs
16   obtained the documents that they gave
17   to him about which he testified this
18   morning you will direct him not to
19   answer?
20      MR. SHALOV: That would be
21   correct.
22   Q.  How did you first become
23   involved in these lawsuits?
24   A.   A senior police officer
25   contacted me.  It was shortly after I retired
```

---

Page 91

```
 1      NAIM
 2   from the police a year or two after, I don't
 3   remember exactly.
 4   Q.  When did you retire?
 5   A.  Four years ago, but this was
 6   about two years ago more or less.  He told me
 7   a law firm is looking for somebody with your
 8   background.
 9   Q.  What is that police officer's
10   name?
11   A.  I'm not sure whether -- I'm not
12   sure he would want me to divulge his name,
13   but I don't think it's important.
14   Q.  Will you tell me his name?
15   A.  If you insist I will.
16   Q.  Please do.
17   A.  His name is Hezi Leder,
18   brigadier general. He retired.
19   Q.  Was he retired when you spoke
20   to him about this subject?
21   A.  Yes.
22   Q.  Did he tell you how he knew
23   that there were lawyers who were looking for
24   someone with your background?
25      MR. SHALOV: Objection to form.
```

---

Page 92

```
 1      NAIM
 2   A.  That's what I said before
 3   didn't I?
 4   Q.  Did he tell you how he knew
 5   that?
 6   A.  I did not ask for any
 7   superfluous detail and he did not tell me.
 8   Q.  With what service was he a
 9   brigadier general?
10   A.  He was the head of intelligence
11   for the Israeli police.
12   Q.  For which -- in Hebrew what
13   Israeli police agency are you referring to?
14   A.  I don't understand the
15   question.
16   Q.  Are you referring to Shin Bet?
17   A.  Regarding whom?
18   Q.  The agency that Mr. Leder was a
19   brigadier general in?
20   A.  I said the head of intelligence
21   in the Israeli police headquarters, that's
22   what I said.
23   Q.  Where is that office?
24   A.  In Jerusalem.
25   Q.  What happened next that brought
```

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 93

NAIM

1      NAIM
2   you to be appearing in this case after your
3   conversation with Mr. Leder.
4   A.  Representatives from the law
5   firm contacted me.  I met with them.  We
6   talked and that's how I started working.
7   Q.  Give me please the names of the
8   lawyers who contacted you?
9      MR. SHALOV: You can identify
10  the names.
11  A.  Gary Osen.
12  Q.  Any others?
13  A.  In the first few months it was
14  Gary Osen.
15  Q.  Was it someone else after that?
16  A.  Yes.
17  Q.  Who is that?
18  A.  There was Stephen Schwartz who
19  is sitting with us and there is an attorney
20  by the name of Joel Israel like Israel the
21  country.
22  Q.  I know Joel.  Anyone else?
23     MR. SHALOV: Do you want the
24  name of every plaintiff's lawyer he
25  was ever contacted about this case?

Page 94

1      NAIM
2      MR. FRIEDMAN: Who else he met
3   with.
4   A.  No, I haven't met Joel, I only
5   talked to him.
6      MR. FRIEDMAN: Let me ask the
7   reporter to mark --
8   A.  I only met with -- okay.
9   Q.  With Gary and Stephen?
10  A.  Yes.
11     MR. FRIEDMAN: Let me ask the
12  reporter to mark as Naim Exhibit 3
13  documents bearing the Naim production
14  numbers 2226 through 9.
15     (Naim Exhibit 3, Invoices,
16  Bates labeled Naim 2226 through 2229,
17  marked for Identification.)
18  Q.  Looking at Exhibit 3, are these
19  all of the invoices that you have submitted
20  to plaintiffs' counsel in these cases?
21  A.  Yes, to the best of my
22  recollection, yes.
23  Q.  These invoices reflect a total
24  of 20 hours of travel.  What travel are you
25  referring to in these invoices?

Page 95

NAIM

1      NAIM
2   A.  I met Gary in Tel Aviv several
3   times.  I met with Dudi Bar in Tel Aviv.  I
4   also met with Gary in other places such as
5   Modiyin.  It's a Shilat intersection close to
6   there.
7   Q.  Where is your office located?
8   A.  In Jerusalem.
9   Q.  Have you described to me all
10  the travel that is reflected here?
11  A.  As much as I can remember at
12  this moment.
13  Q.  How did you travel to the Ofer
14  military court?
15  A.  In a vehicle.
16  Q.  Is that travel time reflected
17  in these invoices?
18  A.  No.
19     MR. FRIEDMAN: I'm going to ask
20  the reporter to mark as Naim Exhibit 4
21  documents that bear the production
22  number Naim 2230 through 37 which we
23  were told are Mr. Naim's time sheets.
24     (Naim Exhibit 4, Time Sheets,
25  Bates labeled Naim 2230 through 2237,

Page 96

1      NAIM
2   marked for Identification.)
3   Q.  Is this the universe of your
4   time sheets for your work on these cases?
5      MR. SHALOV: Objection to form.
6      MR. FRIEDMAN: Let me rephrase
7   the question.
8   Q.  Are these your time sheets for
9   your work on these cases?
10  A.  Yes, to the best of my
11  recollection, yes.
12  Q.  Look at the first page.  Do you
13  see on the first page you refer to a meeting
14  with Dudi Bar Kuli and then a meeting with
15  Brian?
16  A.  Dudi Bar Kuli?
17  Q.  Let me withdraw that question.
18  You refer to a meeting that you had with Dudi
19  Bar, correct, on the first page?
20  A.  Yes, it says travel to Tel Aviv
21  to meet a potential witness superintendent
22  Dudi Bar.
23  Q.  Is that the same Dudi Bar you
24  spoke about this morning?
25  A.  Yes.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 97

1      NAIM
2  Q.   Why did you describe him here
3  as a potential witness?
4  A.   First of all, I went to him to
5  talk about the case when he was the head of
6  the investigation division.  Later on I
7  marked for myself a few people who could be
8  considered as witnesses some time in the
9  future as needed.
10  Q.   Is Dudi Bar still with the Tel
11  Aviv police?
12  A.   Yes.
13  Q.   What did you speak with Dudi
14  Bar about at this meeting that's described on
15  this page?
16      MR. SHALOV: Mr. Naim, I just
17  have to ask you, I'm assuming that
18  there were no plaintiffs' lawyers
19  present at this initial meeting with
20  Mr. Bar; is that correct?
21      THE WITNESS: Correct.
22      MR. SHALOV: Proceed.
23  Q.   Tell me what you said to him
24  and what he said to you?
25  A.   I did a lot of operations

---

Page 98

1      NAIM
2  regarding these files or these cases and
3  among other things in this meeting I wanted
4  to hear first hand what exactly -- I mean
5  what he could tell me, what he could add to
6  my knowledge and several questions that arose
7  through my review of the material I wanted to
8  ask him, I wanted to know about.
9  Q.   That was with respect to the
10  Mike's Place attack, right?
11  A.   Correct.
12  Q.   Did you rely on anything he
13  told you for purposes of your report?
14      MR. SHALOV: Objection to form.
15  You can answer.
16  A.   No.
17  Q.   This also refers to a meeting
18  with Brian?
19  A.   What do you mean meeting with
20  Brian?
21  Q.   Doesn't this refer to a meeting
22  with someone named Brian in June 2009 on the
23  first page, it's under item two, is it Ryan
24  or Brian?
25  A.   Afterwards a meeting with

---

Page 99

1      NAIM
2  Brian.
3  Q.   Who is Brian?
4      MR. SHALOV: Let's wait one
5  second.  One for the translation and
6  two for Clara to translate this entry
7  for me so I understand what it says in
8  English.  If we could just wait one
9  second, I would appreciate it.
10  Q.   Who is Brian?
11  A.   Brian is a guy who works with
12  Gary.
13  Q.   Do you know his last name?
14  A.   If I remember correctly it's
15  something complicated, Finkelstein or
16  Funkelstein.
17  Q.   Do you understand him to be one
18  of plaintiffs' lawyers?
19  A.   No.
20  Q.   What did you talk with Brian
21  about?
22      MR. SHALOV: Mr. Naim, I just
23  want to make sure that when you were
24  talking to Brian there were no
25  representatives from plaintiffs'

---

Page 100

1      NAIM
2  counsel there; is that correct?
3      THE WITNESS: Correct.
4      MR. SHALOV: You can answer.
5  A.   You asked whether Brian was an
6  attorney I said no, not to the best of my
7  knowledge.
8  Q.   What did you and Brian talk
9  about?
10  A.   I talked more to Gary, not to
11  Brian.
12  Q.   But what did you talk to Brian
13  about?
14      MR. SHALOV: Mr. Naim, I just
15  need to clear something up because I'm
16  not sure I understand completely.
17  This meeting that's referenced in your
18  time sheets that Mr. Friedman is
19  asking you about, was Mr. Osen present
20  when you were speaking to Brian?
21      THE WITNESS: As far as I
22  remember, yes, however I didn't write
23  it down so I'm not sure.
24      MR. SHALOV: Let's be clear so
25  we all understand that this meeting

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 137

NAIM

1     NAIM
2  A.  In principal in English, but
3     also in Hebrew.
4  Q.  Have you ever read the
5  transcript of any other witnesses deposition
6  in these cases?
7  A.  No.
8  Q.  Do you know Arieh Spitzen?
9  A.  I heard the name, but I don't
10  know him.
11  Q.  Where did you hear the name?
12  A.  In my conversation with my
13  lawyers I heard the name.
14  Q.  Have you ever met him?
15  A.  If I saw him it was in random.
16  I don't connect between the name and the face
17  so I don't think so.
18  Q.  Have you ever met Ronny Shaked?
19  A.  Personally I did not meet him,
20  but I know who he is.
21  Q.  How do you know who he is?
22  A.  He's a reporter for the Yediot
23  Aharonot.
24  Q.  Have you ever met Emanuel
25  Gross?

---

Page 138

NAIM

1     NAIM
2  A.  No.
3  Q.  Have you ever met Alex Stein?
4  A.  No.
5  Q.  Have you ever met Matthew
6  Levitt?
7  A.  No.
8  Q.  Do you expect to testify as a
9  fact witness in these cases?
10     MR. SHALOV: Objection to form.
11  A.  No.
12  Q.  You're a licensed lawyer in
13  Israel?
14  A.  Yes.
15  Q.  You're a solo practitioner, you
16  have your own legal practice?
17  A.  Yes.
18  Q.  Are there any other lawyers in
19  your office or is it just you?
20  A.  Just me.
21  Q.  Is there any particular area of
22  law that you practice?
23  A.  I retired four years ago.  I
24  started working about two years later.  I
25  deal in particular with traffic law and small

---

Page 139

NAIM

1     NAIM
2  number of criminal cases.
3  Q.  Involving what types of crimes?
4  A.  Especially light criminal
5  cases, not so serious offenses because this
6  is from clear position that I still have not
7  done the switch.
8  Q.  I don't understand.
9  A.  I dealt with heavy offenders in
10  addition to terrorists, murderers and other
11  violators on the other side so internally
12  it's hard for me today to defend the
13  murderers and the crime families.
14  Q.  Have you ever represented a
15  client before a military court in the
16  occupied territories?
17  A.  Yes.
18  Q.  Tell me about that?
19     MR. SHALOV: Larry and Mr.
20  Naim, I just want to interject if
21  there is any privilege or
22  confidentiality between you and a
23  client that would forbid you from
24  disclosing your representation of that
25  client or clients, then you should not

---

Page 140

NAIM

1     NAIM
2  feel compelled to disclose that
3  information to Mr. Friedman.  If you
4  have no concerns about confidentiality
5  or privilege, you can answer the
6  question.
7  A.  I can answer the question
8  because it was a simple matter.  I
9  represented somebody who was caught with a
10  fraudulent identity card and legal residency,
11  attempt for legal residency in Israel --
12  attempt for illegal entry into Israel.  I
13  thought it would be a civil matter in front
14  of the magistrate court, but it turned out
15  that he went to the military court in Ofer so
16  that's where I appeared.  I sat there for a
17  few hours and I heard the proceedings there.
18  Q.  Did you represent this client
19  before the military court?
20  A.  Yes, it was in front of a
21  military judge.
22  Q.  When was this?
23  A.  A few months ago.
24  Q.  What was the outcome of the
25  case?

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 141

NAIM

1
2  A.  It was a plea bargain.
3  Q.  With a conviction pursuant to a
4  plea bargain?
5  A.  Yes, he received a slight
6  penalty punishment.
7  Q.  When you were in government
8  service, did you -- were you involved with
9  any cases before the military courts in the
10  occupied territories?
11  A.  When you say involved, what do
12  you mean?
13  Q.  Did you prosecute any cases in
14  the military courts?
15  A.  No.
16  Q.  What if anything was your
17  involvement with any cases before the
18  military courts while you were in government
19  service?
20  A.  I will explain.  Professionally
21  I was responsible for minorities who
22  investigated -- ethic minorities units, they
23  investigated suspects and many cases that
24  were investigated were transferred to a
25  military court.  It was decided that because

Page 142

NAIM

1
2  of the terrorist attacks took place in the
3  center of -- in Judea Samaria because some of
4  the cases of the terrorist attacks took place
5  there, they brought the cases to that
6  particular area.  I would receive a report on
7  these cases and it would go to the court in
8  Judea Samaria and more than once I would
9  receive as an officer the indictment of the
10  military court and I would follow the results
11  and I would receive regular reports on the
12  files so when I received the military
13  indictments I would know what it was about.
14  Q.  That was during the period 1998
15  to 2000 when you were the Jerusalem district
16  investigation department officer?
17  A.  Until 2006 -- from 1998 to
18  2006.
19  Q.  Other than what you just said,
20  did you have any other involvement with cases
21  before the military courts in the occupied
22  territories during that period?
23  A.  No, it's separate military
24  legal system.
25  Q.  Have you ever served in the

Page 143

1      NAIM
2  IDF?
3  A.  It's obligatory.
4  Q.  When did you serve in the IDF?
5  A.  I served three years, three
6  full years from '68 to '71.  First I was in
7  Golani infantry and then I was moved to
8  intelligence.
9  Q.  Are you currently a reservist?
10  A.  First I was in the reserves
11  after the military, but once you are part of
12  the police force in general they give up on
13  you.  There are agreements with the military.
14  Q.  Since you left the military,
15  have you been enrolled in the reserves?
16      THE INTERPRETER: He wants me to
17  tell you he's too old.
18  Q.  Please take a look at Exhibit
19  1, your first report.  On page 4 of your
20  first report in the first full paragraph you
21  wrote as follows: by virtue of my position as
22  the district's investigation and intelligence
23  department officer I handled many terror
24  attacks that occurred in the district
25  throughout the second intifada, 2000-2005.

Page 144

1      NAIM
2  For each attack that occurred in Jerusalem
3  during this time I was in charge of the
4  investigation, arriving at the scene and
5  giving orders to police investigators
6  gathering evidence, speaking with the ISA to
7  collaborate on information learned and
8  continuing to direct the investigation to
9  obtain a full picture of the attack.  Do you
10  see that?
11  A.  Yes.
12  Q.  To what extent if any were you
13  involved in investigating who perpetrated the
14  attack?
15  A.  I was involved from A to Z
16  including who perpetrated the attack.
17  Q.  Did you ever interrogate any
18  suspects?
19  A.  Do you mean suspects in
20  terrorist attacks?
21  Q.  Suspects in attacks during the
22  second intifada?
23  A.  I will explain myself.
24  Whomever investigates terror suspects in the
25  first investigation is the Israeli

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

---

Page 169

```
 1      NAIM
 2   nature of your involvement in the Hebrew
 3   University attack equally applicable to  your
 4   involvement in this bus 14A attack?
 5 A.   That's right.
 6 Q.   I take it you never spoke to
 7   anyone accused of involvement in the attack;
 8   is that right?
 9 A.   Correct.
10 Q.   I take it you did not
11   personally create any documents related to
12   the investigation of this attack?
13 A.   Right.
14 Q.   Was a report submitted to the
15   commander concerning the investigation of
16   this attack, that is of the same nature as
17   the report you described with respect to the
18   Hebrew University attack?
19 A.   Right.
20 Q.   If I wanted to I could not get
21   a copy of that report, correct?
22 A.   That's right because these are
23   internal reports.
24 Q.   And you have not seen this
25   report since you left the police, correct?
```

Page 170

```
 1      NAIM
 2 A.   The truth is I didn't see the
 3   contents, but I visited my office after I
 4   retired and I visited the person who took my
 5   place and I saw those binders attack on bus
 6   number 2, attack such and such.  This
 7   reminded me of forgotten old times.
 8 Q.   But you did not look at the
 9   specific report after you left the police?
10 A.   No.
11 Q.   Remember you testified this
12   morning about the concept of interested
13   parties who were entitled to have access to
14   police files?
15      MR. SHALOV: Objection to form.
16 A.   Right.
17 Q.   Is the concept that you
18   described of only interested parties being
19   given access to these police files, is that
20   recorded in any statute or regulation?
21 A.   Yes, it doesn't come out of
22   thin air, it comes from police ordinances and
23   regulations that establish who is an
24   interested party and when and what he's
25   entitled to photocopy.
```

Page 171

```
 1      NAIM
 2 Q.   And what he's entitled to see
 3   at all, correct?
 4 A.   Yes.  Also the regulations of
 5   the attorney general talk about the right to
 6   review.  It's called the right to review.
 7 Q.   You referred first to police
 8   ordinances and regulations on this subject.
 9   Can you identify them with any greater
10   specificity than that?
11 A.   Let's get organized.  Paragraph
12   74 of the law of the criminal or penal
13   procedure gives permission to a defendant or
14   his attorney to copy material after he's
15   indicted, not before.  Now regarding
16   complainants and an interested party, it's
17   not this paragraph, it's in the guidelines of
18   the attorney general and the internal police
19   guidelines.  It's called the headquarters
20   procedures.
21 Q.   Are the headquarters procedures
22   a public document?
23 A.   Basically when a person wants
24   to receive material or obtain material and he
25   is refused it and he's denied access, he can
```

Page 172

```
 1      NAIM
 2   ask the police or the state for the
 3   procedures in order to rebut the procedures.
 4 Q.   In that circumstance are the
 5   procedures made available to the requesting
 6   party?
 7 A.   Yes.
 8 Q.   How could I get a copy of those
 9   if I wanted to get a copy?
10 A.   You submit an application to
11   the legal advisor -- legal advisor for the
12   police and you ask him for the procedure
13   because you are being denied at the local
14   police station and they will provide it to
15   you, otherwise you may file an appeal with
16   the Supreme Court as an appeal to the Supreme
17   Court.
18 Q.   Is there any other way to get a
19   copy of the procedures by which -- or the
20   guidelines by which the police decide who
21   gets access to what?
22 A.   You mean independently to
23   obtain these guidelines independently?
24 Q.   Yes.
25 A.   I don't want to make a
```

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 173

```
 1      NAIM
 2   commitment and test my memory, it's possible
 3   that you can obtain some of the materials not
 4   everything through the internet.
 5   Q.  By the materials you are not
 6   referring to the contents of the police file,
 7   you are referring to the guidelines according
 8   to which access is decided?
 9   A.  I meant the guidelines.
10   Q.  You also referred to guidelines
11   of the attorney general on this subject?
12   A.  Yes.
13   Q.  How could I get access to
14   those?
15   A.  I think that you can get the
16   attorney general's guidelines without any
17   problems.  They are contained in a booklet.
18   If my memory is correct, I remember it from
19   before I left the police and everybody can
20   get it.
21   Q.  Is there any other body of
22   regulations or rules other than what you just
23   described that applies to who can get access
24   to police files and under what circumstances
25   apart from also Section 74 of the penal law?
```

Page 174

```
 1      NAIM
 2   A.  I said police ordinances, there
 3   are also guidelines of the investigations
 4   division that explain how to do all these
 5   things, how to obtain materials.
 6   Q.  Where can I get those?
 7   A.  Through the national
 8   headquarters.
 9   Q.  Of the police?
10   A.  Headquarters.
11   Q.  So you have described so far
12   paragraph 74 of the penal law which applies
13   to the defendant and his attorney?
14   A.  The right to review.
15   Q.  You have described the
16   headquarters procedures or the police
17   ordinances that govern this subject.  You
18   described the guidelines of the investigation
19   division, and you have described the attorney
20   general guidelines.  Is there any other body
21   of law or regulations that you're aware of
22   that governs who can get access to what from
23   police files?
24   A.  To the best of my recollections
25   these are the guidelines and the regulations
```

Page 175

```
 1      NAIM
 2   that deal with right to review.
 3   Q.  Police files?
 4   A.  Yes.
 5   Q.  And you believe that if I ask
 6   in the right place I should be able to get
 7   copies of all of these, correct?
 8      MR. SHALOV: Objection to form.
 9      MR. FRIEDMAN: Let me withdraw
10   that question.
11   Q.  You believe that if I pursue
12   the avenues that you described to me I should
13   be able to get copies of all those, correct?
14      MR. SHALOV: Objection to form.
15   A.  If you meet the criteria as an
16   eligible party as it is described in the
17   guidelines.
18   Q.  I'm not asking about getting
19   the files themselves, I'm asking about how I
20   could get copies of the guidelines to learn
21   what the guidelines are?
22   A.  I believe that some of the
23   documents I talked about you can get as a
24   result of an application with an explanation
25   why you need them.
```

Page 176

```
 1      NAIM
 2   Q.  Is that true with respect to
 3   the attorney general's guidelines?
 4   A.  To the best of my recollection
 5   there is no problem with the attorney
 6   general's guidelines.
 7   Q.  Those are publicly available?
 8   A.  It's publicized, yes.  The rest
 9   I'm not sure about.  The rest of them are a
10   little more problematic.
11   Q.  So the rest of them you don't
12   know whether they are publicly available or
13   not?
14   A.  I'm not sure, correct.
15   Q.  For the rest of them you might
16   have to make an application to justify
17   getting copies of the regulations that govern
18   whether you can get copies of underlying
19   police files?
20   A.  Correct.
21   Q.  Let's turn to court files.
22   Let's talk about civilian court files and
23   military court files.  Access to civilian
24   court files is limited to defendants and
25   interested parties?
```

Case 1:05-cv-04622-DLI-RML   Document 267-16   Filed 03/22/12   Page 218 of 288 PageID #: 8505

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 177

1      NAIM
2  A.  Correct.
3  Q.  What are the rules that --
4  withdrawn.  Where could I find the rules that
5  govern the ability of interested parties to
6  get access to civilian court files?
7  A.  You are asking where are the
8  regulations?
9  Q.  Yes.
10  A.  I think that in every clerk's
11  office of every courthouse there are
12  regulations of the court director which lists
13  who can receive copies of a transcript,
14  files.
15  Q.  Do they differ from court to
16  court?
17  A.  No, these are joint
18  regulations.  The court director manages all
19  the courts.
20  Q.  Turning to military courts and
21  specifically the military courts in the
22  occupied territories, not the military courts
23  that adjudicate soldier offenses, are there
24  -- how can I find the rules and regulations
25  that govern who can get what from the files

Page 178

1      NAIM
2  of military courts in the occupied
3  territories?
4  A.  The courts in the occupied
5  territories operate according to the security
6  legislation in the territories.  They have
7  procedures including procedures of the right
8  to copy and photocopying.
9  Q.  And also looking at?
10  A.  Review of course and
11  photocopying and as I said a few hours ago
12  more and more they are going -- procedurally
13  they are going more and more in the way of
14  the Israeli civilian court.
15  Q.  If I wanted to see those
16  regulations, where could I find them?
17  A.  The IDF has so-called chief
18  military prosecutor and there is a chief
19  justice of the military court that's in
20  charge of all the judges procedurally.  I
21  think that between these two entities you can
22  find the procedures.  I'm not sure, but I
23  believe so.
24  Q.  You believe the procedures are
25  common across all of the military courts in

Page 179

1      NAIM
2  the occupied territories?
3  A.  That's right.
4  Q.  I'd like you to turn your
5  attention now to the next bullet point in
6  this list on page 5 of Exhibit 1, the attack
7  on egged bus number 2.  Were you involved in
8  the investigation of that attack?
9  A.  I was.
10     MR. SHALOV: Didn't we already
11  do that one?
12     MR. FRIEDMAN: No.
13  Q.  Was the nature of your
14  involvement the same as what you described
15  for the Hebrew University attack and the bus
16  14A attack?
17  A.  Right.
18  Q.  And you did not speak to any
19  suspects or persons accused of involvement in
20  that attack, correct?
21  A.  Correct.
22  Q.  You did not create any
23  documents relating to the investigation of
24  that attack, correct?
25  A.  Correct.

Page 180

1      NAIM
2  Q.  And was there a report sent to
3  the commander with respect to the
4  investigation of this attack that was similar
5  in nature of the reports you described for
6  the other attacks?
7  A.  Right.
8  Q.  And you have not seen that
9  report since you left the police?
10  A.  Right.
11  Q.  That's an internal police
12  report to which someone such as I could not
13  get access, correct?
14  A.  I believe that even I cannot
15  gain access.
16  Q.  So none of these reports that
17  go to the commander, none of them is
18  available to the public?
19  A.  That's right because they are
20  internal.
21  Q.  None of these reports would be
22  available even to interested parties,
23  correct?
24  A.  No, because they are not
25  connected with the evidence based on which an

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

SHAUL NAIM
October 6, 2010

Page 189

NAIM

1    NAIM
2    not charged with causing the death of the
3    nine or 11 people that were killed in the
4    attack on bus line 19.  He also has attempted
5    -- attempts of causing death in other events,
6    but regarding this particular event he was
7    accused with not preventing a crime therefore
8    it's very possible since his participation is
9    relatively small I don't really remember him,
10   but I definitely remember the people who did
11   perpetrate this attack of bus line number 19.
12   Q.   So you don't --
13   A.   Like for example, Rahman Makdad
14   who is mentioned here item 28, like Muhammad
15   Allah that's also mentioned in 28, and these
16   are the heads of the gang that perpetrated
17   the attack on bus line number 19.  He was the
18   smaller link and relatively marginal compared
19   with the others.
20   Q.   Okay.
21   Q.   You don't remember having seen
22   this before?
23       MR. SHALOV: Objection to form.
24   A.   I don't remember.  It's
25   possible I have seen it.

Page 190

1    NAIM
2    Q.   You do not identify this in
3    either of your reports, correct?
4    A.   If I did not include it, it's
5    because as I said he was marginal, that's why
6    I did not include him.
7    Q.   But you did not include it in
8    your reports?
9    A.   Possibly.
10       MR. SHALOV: We will confirm
11   for plaintiffs that that document is
12   not referenced in his reports.
13   A.   There was a question whether we
14   agree or we consent, I'm just checking my
15   English.
16   Q.   How do you pronounce this man's
17   name?
18   A.   I didn't want to hurt you.
19   Adawin.
20   Q.   Did you ever see Mr. Adawin's
21   conviction in connection with the bus 19
22   attack?
23       MR. SHALOV: Objection to form.
24   A.   If my recollection is correct,
25   I photocopied Nofal's indictment in the Ofer

Page 191

1    NAIM
2    court.  The name Nofal rings a bell.  This
3    happened recently.
4    Q.   When you went to the Ofer
5    court?
6    A.   Yes.
7    Q.   Why did you do that?
8    A.   I don't know.  I'm not sure.  I
9    would just have to see the documents so I
10   don't know.
11   Q.   You went to the Ofer camp in
12   order to check documents that you had cited
13   in your reports, correct?
14   A.   I said above and beyond the
15   requirements I went to do it.
16   Q.   But the documents you were
17   looking to check were documents that you had
18   identified in your reports, correct?
19       MR. SHALOV: Objection to form.
20   A.   Correct, but she brought out
21   even more for me.  Maybe by mistake she gave
22   me this particular indictment without me
23   asking for it, but for some reason I recall
24   this name.
25   Q.   Are you a notary?

Page 192

1    NAIM
2    A.   No.
3    Q.   Have you ever been a member of
4    the secretariat of any Israeli court?
5    A.   No.
6    Q.   You were not an Israeli civil
7    servant at the time you signed your reports,
8    right?
9    A.   Correct.
10   Q.   Did you personally make
11   photocopies of any of the documents attached
12   to your reports from documents that were in
13   police or court files?
14       MR. SHALOV: I object.  I don't
15   understand the question.  If you can
16   understand it, go ahead and answer it.
17   A.   What did you ask, whether I
18   physically copied them myself?
19   Q.   Yes.
20   A.   No.
21       MR. FRIEDMAN: Why don't we
22   stop there for the day.
23       THE VIDEOGRAPHER: This
24   concludes the deposition.  We are off
25   the record.  The time is 5:58 p.m.,

**EXHIBIT 224 TO DECLARATION OF VALERIE SCHUSTER**

April 14, 2011

## SUPPLEMENTAL REBUTTAL REPORT OF MOSHE AZOULAY

I submit this supplement to my rebuttal report dated March 3, 2011 (the "Rebuttal Report") in the lawsuits captioned Weiss, et al. v. National Westminster Bank Plc (Case No. 05-cv-4622 (DLI)(MDG)) and Applebaum, et al. v. National Westminster Bank Plc (Case No. 07-cv-916 (DLI)(MDG)), which I understand are pending in the U.S. District Court for the Eastern District of New York.  This supplement updates the status of requests I have made to Israeli civilian and military judicial and law enforcement authorities to review records they maintain regarding certain attacks at issue in these cases, as presented on pages 110-114 of my Rebuttal Report.

**A.**     **My requests for perusal of Israeli and military court files**

For the purpose of this report and especially in order to evaluate Naim's opinion regarding the level of accessibility of the public to the files issued by Israeli courts and by military courts in the Occupied Territories, I prepared and submitted requests for perusal of several files as described at pages 110-111 in the Rebuttal Report.

**1.1**     **The status of the requests**

The following information describes recent developments pertaining to the status of the requests since I signed my rebuttal report.

**1.1.1**     **The request before the Supreme Court**

- On March 3, 2011 I received a copy of a request of the State Advocacy to the Supreme Court to postpone the response to my perusal request until March 30. That postponing request was coordinated with me by phone and I gave my consent to it.[1]

**1.1.2**     **The request before the Tel Aviv District Court**

---

[1] A copy of the postponing request is attached as Annex D18

- On March 3, 2011 I conducted a phone conversation with the main office of the State Advocacy in Jerusalem in order to verify whether they would respond to this request as well.  They proposed to send a copy of the request and the decision of the Tel Aviv District Court directly to Rachel Matar Adv., who handles the appeal before the Supreme Court on behalf of the State. Accordingly, I submitted the request and the decision to her.[2]

- By the end of March 2011, I received a phone call from an assistant of Adv. Rachel Matar who informed me that they received my request but I still need to apply to the Supreme Court and they will submit their response to my application only after the Supreme Court asks them to do so.

### 1.1.3   The request before the Jerusalem District Court

- On March 21, 2011 I submitted to a legal services company an order to locate the file and to coordinate with me the date of perusal and photocopying the file.[3]

- On March 28, 2011 I perused and copied the Jerusalem district court file SC 776.04.  The process of perusal, the findings in that file and my conclusions regarding Naim's reports are detailed in Section B below.

### 1.1.4   The request before the Haifa District Court

- On March 21, 2011 I submitted to a legal services company an order to locate the file and to coordinate with me the date of perusal and photocopying the file.[4]  As of the date of signing this supplemental report, the file is not available for my perusal.

## B.  The perusal of the court file SC 776.04 regarding the September 9, 2003 attack

### 1.1 The perusal process

In order to receive the file for perusing and copying, I had to follow the following process before the court secretariat:

---

[2] A copy of the correspondence is attached as Annex D19
[3] A copy of the order is attached as Annex D20
[4] A copy of the order is attached as Annex D21

1.1.1   I was requested to present the decision that allowed the perusal.

1.1.2   I was requested to identify myself as the lawyer who submitted the request for perusal.

1.1.3   The secretary verified my identity and the decision with the court's records.

1.1.4   I was requested to sign a declaration and a commitment not to take any document out of the file and not to take the file out of the court hall.

1.1.5   I received the file only after completing this entire procedure.

## 1.2 The findings in the court's file

The court's file contained the following documents:[5]

1.2.1   The court's file actually contains two separate files.  One is the "main" file and the second contains several documents, including arrest motions, subpoenas and a copy of the indictment.

1.2.2   **The main file contains the following documents**:

- The original indictment
- A revised indictment
- Hearing records
- Plea bargain
- Legal summary of the prosecution and the defendants
- The verdict
- The sentence

## 1.3 Findings and conclusions regarding the Naim Reports

1.3.1   The court's file does not contain any Police statements made by any of the defendants nor any ISA memorandum, as Naim listed on pages 22-23 of his Report as part of the "Attack File" maintained by Israeli law enforcement and Israeli courts.

1.3.2   The findings in the court's file contradict several of Naim's statements:

In paragraph G on page 13 of his primary report, Naim inaccurately stated that: "the court gets all of the police documents . . . ."  At the same paragraph,

---

[5] The complete file is attached as Annex D22

Naim inaccurately stated: "thus the only file guaranteed to be complete is the one maintained by the court."

As detailed above, I found no police file, statement or interrogation in the court's file, which according to Naim is the only "Attack File" guaranteed to be complete.

1.3.3   Moreover, after reviewing the complete court file, I noticed that there were some privileged documents that were mentioned in the court record dated February 24, 2005 [Annex D22, p. 40], but that were not found in the court file.

In that hearing, the prosecutor is recorded as saying that: "The file contains privileged materials that we [the prosecution] intended to issue a privilege certificate for.  The defendant's counsel is aware of that."

Regarding the fact that no privileged documents were found in the file, I may conclude that these materials were taken out of the file by the prosecution, and I was not able to peruse or copy them.

1.3.4   In paragraph 4 of section II of Naim's primary report, Naim explained that he was asked by the plaintiffs to:  "**Review police and court files**, and their contents, concerning certain attacks (the 'Attack Files')" [emphasis added].

On the same page, Naim also stated that: "During my career with the Israeli police, I was physically present and involved in the investigation of certain of the attacks discussed in this Report."

Naim stated that the Attack File for the September 9, 2003 attack listed in Section IV of his report was one in which he was personally involved in investigating the matter.

Naim referred in his reports to only two of the documents I found in the court file: the revised indictment [Exhibit F of Naim's Supplemental Report] and the verdict [Exhibit C of Naim's Supplemental Report].  On the other hand, Naim referred to several other documents that were not found in the court's file [Naim Exhibits E (an ISA memorandum), Exhibits H-K (police interrogations) and Exhibit Q (a statement of Na'al Abid [Ubeid] to the police)].

These findings lead to one of two possible conclusions.

- Naim did not review the court file, or

- He decided to exclude from his reports certain documents found in the court file, and include in his reports other documents he received from other sources.

Any of the conclusions above call into question the statement of Naim that he reviewed the relevant court file for the September 9, 2003 attack.

Dated: April 14, 2011
     7 Rival St.
     Tel Aviv, Israel

                                         Moshe Azoulay

**EXHIBIT 225 TO DECLARATION OF VALERIE SCHUSTER**

<div dir="rtl">

שאול נעים, עו"ד

רחוב החייל 54/5, י-ם. סלולרי: 050-5839030 פקס: 025323733

26/04/2009

ק. אח"מ מחוז י־ם ל ע ן פ י ש
נצ"מ שמעון גבאי
באמצעות פקס: 02-5391166

אדון נכבד:

**הנדון: בקשה לעיון וצילום תיק חקירה של כנופיית סילוואן ( תיק בימ"ש פח
5071/02 מדינת ישראל נגד ואאל קאסם ואח')**

אבקש לאפשר לי או למי מטעמי, לעיין ו/או להעתיק את כל החומר הרלוונטי בתיק החקירה בתיק של כנופיית סילוואן וזאת

מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים ואף ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות ההרוגים והפצועים אמריקאנים וישראלים
אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.

5. אני משמש כנציגם וב"כ בארץ של משרד עו"ד האמריקנים (רצ"ב ייפוי כח המאשר זאת ).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם ע"פ חוק חופש המידע זכאים הם להעתיק חומר הרלוונטי לכך,
אבקש לאשר זאת ולהודיעני מתי ולאן אוכל לבוא ע"מ לצלם חומר זה.

בברכה:
שאול נעים, עו"ד ב"כ התובעים

</div>



EXHIBIT
PENGAD 800-631-6989
Naim 7
5/26/11

Naim002238

-בלמ״ס-

| מטה | מחז | ירושלים |
|---|---|---|
| לשכת | ק/ | אח״מ |
| | 06/05/2009 | |

טלפון: 5391252-02
פקס: 5391611-02
אח״מ 843/09

לכבוד
שאול נעים, עו״ד
פקס/ 5323733

א.נ.

הנדון: בקשה לעיון וצילום תיק חקירה – כנופיית סילואן

1. הריני לאשר קבלת פנייתך מתאריך 26.4.09.

2. פנייתך נבדקה והובר כי חתיקים נשוא פנייתך נמצאים בטיפול בביהמ״ש עופר
אצל ראש לשכת תביעות צבאית – יעל.

בברכה,

שמעון גבאי,        ניצב משנה
קצין אח״מ  מחז  ירושלים

העתק : סרמ״פ מתיים

(3)

שאול נעים, עו"ד

רחוב החייל 54/5, י-ם. סלולרי: 050-5839030 פקס: 025323733

26/04/2009

קק. אח"מ מחוז י-ם
נצ"מ שמעון גבאי
באמצעות פקס: 02-5391644

אדון נכבד:

## הנדון: בקשה לעיון וצילום תיק חקירה של כנופיית סילוואן ( תיק בימ"ש פ"ח 5071/02 מדינת ישראל נגד ואאל קאסם ואח')

אבקש לאפשר לי או למי מטעמי, לעיין ו/או להעתיק את כל החומר הרלוונטי בתיק החקירה של כנופיית סילוואן וזאת

מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים ואף ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקאנים וישראלים אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2005-2000.

5. אני משמש כנציגם וב"כ בארץ של משרד עו"ד האמריקנים (רצ"ב ייפוי כח המאשר זאת ).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם ע"פ חוק חופש המידע זכאים הם להעתיק חומר הרלוונטי לכך, אבקש לאשר לאשר זאת ולהודיעני מתי ולאן אוכל לבוא ע"מ לצלם חומר זה.

בברכה:
שאול נעים, עו"ד ב"כ התובעים

שאול נעים, עורך דין
SHAUL NAIM, ADVOCATE
מס' רישיון 8501

(4)

**שאול נעים, עו"ד**

רחוב החייל 54/5, י-ם. סלולרי: 050-5839030 פקס: 025323733

26/04/2009

ק. אח"מ מחוזי [illegible]
נצ"מ שמעון גבאי
באמצעות פקס: 02-5391[illegible]

אדון נכבד:

**<u>הנדון: בקשה לעיון וצילום תיק חקירה של כנופיית סילוואן ( תיק בימ"ש פח 5071/02 מדינת ישראל נגד ואאל קאסם ואח')</u>**

אבקש לאפשר לי או למי מטעמי, לעיין ו/או להעתיק את כל החומר הרלוונטי בתיק החקירה של כנופיית סילוואן וזאת מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.
2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים ואף ישראלים.
3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס.
4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקאנים וישראלים אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.
5. אני משמש כנציגם וב"כ בארץ של משרד עו"ד האמריקנים (רצ"ב ייפוי כח המאשר זאת).
6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם ע"פ חוק חופש המידע זכאים הם להעתיק חומר הרלוונטי לכך, אבקש לאשר זאת ולהודיעני מתי ולאן אוכל לבוא ע"מ לצלם חומר זה.

בברכה:

שאול נעים, עו"ד ב"כ התובעים [illegible]

[illegible]

שאול נעים, עורך דין
SHAUL NAIM, ADVOCATE
8501 נוסי' רשיון

[illegible]

22/6/[illegible]

Naim002241

(5)   08-9279267

שאול נעים, עו"ד

רחוב החייל 54/5, י-ם. סלולרי: 5839030-050 פקס: 025323733

לכבוד
נצ"מ אבי מנצור, עו"ד
ק. אח"מ
מחוז מרכז
באמצעות פקס :

ח.נ.

<u>הנדון: בקשה לעיין וצילום תיק פיגוע מלון פארק בנתניה מיום 27/3/02</u>

אבקש לאפשר לי או למי מטעמי, לעיין ו/או לצלם את כל החומר הרלוונטי בתיק החקירה הנ"ל (לא ידוע לי מס' פ.א) זאת מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים וגם ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס או אחרים מטעמם.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקנים וישראלים אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.

5. אני משמש כעדיג וכ"כ בארץ של משרד עו"ד האמריקני (רצ"ב יפויי כוח המאשר זאת).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם על פי חוק חופש המידע זכאים הם להעתיק חומר רלוונטי לכך אבקש אישורך לצלם את תיק הפיגוע של מלון פארק וכן להודיעני בהקדם מתי ולאן אוכל להגיע או לשלוח את נציגיי, על מנת לצלם התיק.

בברכה,
שאול נעים, עו"ד
SHAUL NAIM, ADVOCATE
מס' רשיון 8501

25/6/09

SHADI NAIM, ADVOCATE
8501

שאול נעים, עו"ד

רחוב החייל 54/5, י-ם. סלולרי: 050-5839030 פקס: 025323733

לכבוד
נצ"מ אבי מנצור, עו"ד
ק. אח"מ
מחוז מרכז
באמצעות פקס :

ח.נ.

הנדון: בקשה לעיון וצילום תיק פיגוע מלון פארק בנתניה מיום 27/3/02

אבקש לאפשר לי או למי מטעמי, לעיין ו/או לצלם את כל החומר הרלוונטי בתיק החקירה הנ"ל (לא ידוע לי מס' פ.א) וזאת מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים וגם ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס או אחרים מטעמם.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקנים וישראלים אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.

5. אני משמש כנציגם וב"כ בארץ של משרד עו"ד האמריקני (רצ"ב יפויי כוח המאשר זאת).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם על פי חוק חופש המידע זכאים הם להעתקת חומר רלוונטי לכך אבקש אישורך לצלם את תיק הפיגוע של מלון פארק וכן להדיעני כהקדם מתי ולאן אוכל להגיע או לשלוח את נציגיי, על מנת לצלם התיק.

בברכה,
שאול נעים, עו"ד

[stamp: שאול נעים, עו"ד / SHAUL NAIM, ADVOCATE / מס' רשיון 8501]

25/6/09

שאול נעים, עו"ד

‎03-6802424

רחוב החי"ל 54/5, י-ם. סלולרי: 050-5839030 פקס: 025323733

26/04/2009

ק. אח"מ מחוז ת"א
נצ"מ איתמר שימייסי
באמצעות פקס:

אדון נכבד:

**הנדון: בקשה לעיון וצילום תיק בימ"ש תפח (ת"א) 1147/02 מדינת ישראל**
**נגד פבאס בן מוחמד אל סייד**

אבקש לאפשר לי או למי מטעמי, לעיין ו/או להעתיק את כל החומר הרלוונטי בתיק החקירה הנ"ל  וזאת מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים ואף ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשומות כסף אשר הופקד ע"י ארגון החמאס.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקאנים וישראלים

    אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.

5. אני משמש כנציגם ובי"כ בארץ של משרד עו"ד האמריקניף ( רצ"ב ייפוי כח המאשר זאת ).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם ע"פ חוק חופש המידע זכאים הם להעתיק חומר הרלוונטי לכך.

אבקש לאשר זאת ולהודיעני מתי ולאן אוכל לבוא ע"מ לצלם חומר זה.

בברכה:

שאול נעים, עו"ד
ב"כ התובעים

שאול נעים, עורך דין
SHAUL NAIM, ADVOCATE
מס' רישיון 8501

025323733
P.1

27-MAY-2009 12:12  FROM AHAK TEL-AVIV          TO 025323733          P.01

Naim002245
11/14/2010 SUN 04:17 [TX/RX NO 5969] Ø008

שאול נעים, עו"ד

רחוב החיל 54/5, י-ם. סלולרי: 5839030-050 פקס: 025323733

26/04/2009

ק. אח"מ מחוז ת"א
נצ"מ איתמר עומיסי
באמצעות פקס: -

אדון נכבד:

## הנדון: בקשה לעיון וצילום תיק ביימ"ש תפח (ת"א) 1147/02 מדינת ישראל
## נגד עבאס בן מוחמד אל סייד

אבקש לאפשר לי או למי מטעמי, לעיין ו/או להעתיק את כל החומר הרלוונטי בתיק החקירה הנ"ל וזאת מהנימוקים הבאים:

1. בארה"ב מתנהלות מס' תביעות אזרחיות גדולות נגד החמאס.

2. תביעות אלו מתנהלות ע"י מס' עו"ד אמריקנים ואף ישראלים.

3. התביעות הינן נגד מס' בנקים בארה"ב המחזיקים ברשותם כסף אשר הופקד ע"י ארגון החמאס.

4. מטרת התובעים להוציא כסף זה מחזקת הבנקים ולהעבירם לידי משפחות הרוגים ופצועים אמריקאנים וישראלים אשר נפגעו בפיגועים אשר התרחשו בארץ בין השנים 2000-2005.

5. אני משמש כנציגם וב"כ בארץ של משרד עו"ד האמריקנים (רצ"ב ייפוי כח המאשר זאת).

6. מאחר והתובעים הינם "צד מעוניין" בתיק ומאחר וגם ע"פ חוק חופש המידע זכאים הם להעתיק חומר הרלוונטי לכך,

אבקש לאשר זאת ולהודיעני מתי ולאן אוכל לבוא ע"מ לצלם חומר זה.

בברכה:
שאול נעים, עו"ד
ב"כ התובעים

שאול נעים, עורך דין
SHAUL NAIM, ADVOCATE
מס' רשיון 8501

[handwritten:]  (1)

## Shaul Naim, Esq.

Hahayal 54/5, Jerusalem      Cellular: 050-5839030 Fax: 025323733

April 26, 2009

Investigations and Intelligence Department Officer, [handwritten] Jerusalem Region
Deputy Commander Shimon Gabai
By fax: 02-5391166

Dear Sir:

### Re: Request to view and photocopy the investigation file on the Silwan Gang (Court Case PH [Serious Crime] 5071/02, State of Israel v. Wael Qasem et al.)

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant material in the investigation file on the Silwan Gang for the following reasons:

1. A number of large civil claims are being pursued in the United States against Hamas.

2. These claims are being pursued by a number of American as well as Israeli attorneys.

3. The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization.

4. The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5. I am the representative and power of attorney for an American Law Office (the authorizing power of attorney is attached).

6. Because the claimants are an "interested party" in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material, I would therefore ask you to authorize this and to notify me as to when and where I can come in order to photocopy this material.

Yours sincerely,
[Signature]
Shaul Naim, Esq. power of attorney for the claimants



EXHIBIT
Naim 7-A
5/26/11

Naim002238

[logo:] Ready to protect – Proud to serve

-Non-classified-

| | | |
|---|---|---|
| **Headquarters** | **Region** | **Jerusalem** |
| **Bureau** | **K** | **Investigations & Intelligence** |

**May 6, 2009**

| | |
|---|---|
| **Telephone:** | **02-5391252** |
| **Fax:** | **02-5391611** |

**Investigations & Intelligence 843/09**

To
Shaul Naim, Esq.
<u>Fax: 5323722</u>

[handwritten:]
[illegible]

Dear Sir,

**Re: <u>Request to view and photocopy the investigation file – Silwan Gang</u>**

1. I hereby acknowledge receipt of your letter dated April 26, 2009.

2. Your request has been considered and it has been ascertained that the files that are the subject of your letter are being dealt with in the Ofer Court by the head of the military claims bureau – Yael.

[handwritten:] [illegible]
5884242

**Yours faithfully,**

**Shimon Gabai, Deputy Commander**

**Investigations and Intelligence Officer Jerusalem Region**

c.c. Deputy Chief Criminal Division, Central Office

Naim002239

[handwritten:] (3)

## Shaul Naim, Esq.

Hahayal 54/5, Jerusalem      Cellular: 050-5839030 Fax: 025323733

April 26, 2009

[handwritten] To Captain Meital Zrihan [?] Fax: 02-5884455

Investigations and Intelligence Department Officer, Jerusalem Region
Deputy Commander Shimon Gabai
By fax: 02-5391[handwritten:]611

Dear Sir:

### Re: Request to view and photocopy the investigation file on the Silwan Gang (Court Case PH [Serious Crime] 5071/02, State of Israel v. Wael Qasem et al.)

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant material in the investigation file on the Silwan Gang for the following reasons:

1.  A number of large civil claims are being pursued in the United States against Hamas.

2.  These claims are being pursued by a number of American as well as Israeli attorneys.

3.  The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization.

4.  The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5.  I am the representative and power of attorney for an American Law Office (the authorizing power of attorney is attached).

6.  Because the claimants are an "interested party" in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material, I would therefore ask you to authorize this and to notify me as to when and where I can come in order to photocopy this material.

Yours sincerely,

Shaul Naim, Esq. power of attorney for the claimants

[stamp:] **Shaul Naim, Advocate**
         **License No. 8501**

(4)

# Shaul Naim, Esq.

Hahayal 54/5, Jerusalem      Cellular: 050-5839030 Fax: 025323733

April 26, 2009

Investigations and Intelligence Department Officer, [handwritten:] Jerusalem Region
Deputy Commander Shimon Gabai
By fax: 02-5391[handwritten:]611

Dear Sir:

### Re: Request to view and photocopy the investigation file on the Silwan Gang (Court Case PH [Serious Crime] 5071/02, State of Israel v. Wael Qasem et al.)

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant material in the investigation file on the Silwan Gang for the following reasons:

1. A number of large civil claims are being pursued in the United States against Hamas.

2. These claims are being pursued by a number of American as well as Israeli attorneys.

3. The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization.

4. The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5. I am the representative and power of attorney for an American Law Office (the authorizing power of attorney is attached).

6. Because the claimants are an "interested party" in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material, I would therefore ask you to authorize this and to notify me as to when and where I can come in order to photocopy this material.

Yours sincerely,

Shaul Naim, Esq. power of attorney for the claimants

[signature]

[stamp:] **Shaul Naim, Advocate License No. 8501**

[handwritten:]
To the secretariat of the district court – criminal division

As the power of attorney of the victims in these operations and as the representative of a law office in the United States that is claiming [illegible] and the money held by banks in the United States, I would like to photocopy all the relevant material in the serious crimes case 5071/02, Sate of Israel v. Wael Qasem et al. by representatives of [illegible]

With thanks

June 22, 2009
Naim002241

[handwritten:] (5)   08-9279267

## Shaul Naim, Attorney

Hahayal 54/5, Jerusalem      Cellular: 050-5839030 Fax: 025323733

Deputy Commander Avi Manzur, Advocate
Investigations and Intelligence Department Officer,
Central Region
By fax:

Dear Colleague,

<u>Re: Request to view and photocopy the file on the terrorist attack on the park Hotel, Netanya on
March 27, 2002</u>

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant
material in the above investigation file (I don't know the file number) for the following reasons:

1.  A number of large civil claims are being pursued in the United States against Hamas.

2.  These claims are being pursued by a number of American as well as Israeli attorneys.

3.  The claims are against a number of banks in the United States that are holding money
    deposited by the Hamas organization or others on their behalf.

4.  The aim of the claimants is to remove this money from the banks and transfer it to the
    families of the dead and injured Americans and Israelis who were the victims of attacks that
    took place in Israel between 2000 and 2005.

5.  I am the representative and power of attorney for an American Law Office (the authorizing
    power of attorney is attached).

6.  Since the claimants are an "interested party" in the case and since also under the Freedom of
    Information Law they are entitled to copies of the relevant material, I would therefore ask
    you to authorize this and to notify me as to when and where I can come in order to photocopy
    this material.

Yours sincerely,                                                  06/25/09
[signature]
Shaul Naim, advocate
Power of attorney for the claimants

[signature]

[stamp:] **Shaul Naim, Advocate**
        **License No. 8501**

Naim002242

[handwritten document]

By fax: 02-99694661                    (6)

[illegible]

To                                              [illegible]
Deputy Commander Yaakov Ben Moshe
Investigations and Intelligence Department Officer, Hebron Region

Re: Photocopying of material from [illegible] (I don't have a number) and serious crime file (I don't have a number) – shooting attack in Tel Romeida on October 22, 2002 and shooting attack on March 7, 2003 in Kiryat Arba.

[redacted]

I would like to photocopy the evidence [illegible] and/or all other relevant information (including: photographs, tapes, disks etc.) for the following reasons:

1. A number of large civil claims are being pursued in the United States against Hamas.

2. These claims are being pursued by a number of American as well as Israeli attorneys.

3. The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization or others on their behalf.

4. The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5. I am the representative and power of attorney for an American Law Office.

6. Because the claimants are an interested party in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material, I would like your authorization to photocopy the material [illegible].

7. Please notify me as to when I can come or someone on my behalf in order to photocopy this material.

[signature]
[stamp:] **Shaul Naim, Advocate**
          **License No. 8501**                                    July 2, 2009

Naim002243

[handwritten:](7)

## Shaul Naim, Esq.

Hahayal 54/5, Jerusalem   Cellular: 050-5839030 Fax: 025323733

To
Deputy Commander Avi Manzur, Esq.
Investigations and Intelligence Department Officer
Central Region
By fax:

Dear Sir:

Re: Request to view and photocopy the file on the March 27, 2002 attack on the Park Hotel, Netanya

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant material in the above investigation file (I do not know the file number) for the following reasons:

1.  A number of large civil claims are being pursued in the United States against Hamas.

2.  These claims are being pursued by a number of American as well as Israeli attorneys.

3.  The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization or others on their behalf.

4.  The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5.  I am the representative and power of attorney for an American Law Office (the authorizing power of attorney is attached).

6.  Because the claimants are an "interested party" in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material, I would therefore like your authorization to photocopy the file on the attack on the Park Hotel and for you to notify me as to when and where I can come in order to photocopy the file.

Yours sincerely,

[signature]
Shaul Naim, Esq. and power of attorney for the claimants

[signature]
  [stamp:] **Shaul Naim, Advocate**
      **License No. 8501**

[handwritten:] [illegible]                          June 25, 2009

Naim002244

[handwritten:] To Brian 03-5272321 (8)

[handwritten:] 03-6802424

## Shaul Naim, Esq.

Hahayal 54/5, Jerusalem    Cellular: 050-5839030 Fax: 025323733

April 26, 2009

Investigations and Intelligence Department Officer Tel Aviv Region
Deputy Commander Itamar Omeisi
By fax:

Dear Sir:

**<u>Re: Request to view and photocopy the serious crimes file (Tel Aviv) 1147/02, State of Israel</u>**
**<u>v. Abas ben Muhmad el Said</u>**
[handwritten:] File No.9161/03

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant
material in the above investigation file for the following reasons:

1. A number of large civil claims are being pursued in the United States against Hamas.

2. These claims are being pursued by a number of American as well as Israeli attorneys.

3. The claims are against a number of banks in the United States that are holding money
   deposited by the Hamas organization or others on their behalf.

4. The aim of the claimants is to remove this money from the banks and transfer it to the
   families of the dead and injured Americans and Israelis who were the victims of attacks that
   took place in Israel between 2000 and 2005.

03-5454416

5. I am the representative and power of attorney for an American Law Office (the
   authorizing power of attorney is attached).

6. Because the claimants are an " interested party" in the case and also because under the
   Freedom of Information Law they are entitled to copies of the relevant material.

   I would therefore like you to authorize this and to notify me as to when and where I can come
   in order to photocopy the file.

9/6/03

[handwritten:] 30.04.03    [illegible]
[illegible]    03-5454433    ›

Yours sincerely,

Authorize photocopying of the file
for attorney Shaul Naim. Please
[signature]    arrange a time with him [illegible]
Shaul Naim, Esq.    [signature]    [illegible]
Power of attorney for the claimants    [stamp:] **Meir Cohen, Deputy**
**Commander**

[signature]    [illegible]

[stamp:] **Shaul Naim, Attorney**
**License No. 8501**

[handwritten:] 03-6803617 · [handwritten:] (9)
[illegible]

## Shaul Naim, Esq.

Hahayal 54/5, Jerusalem    Cellular: 050-5839030 Fax: 025323733

April 26, 2009

To
Investigations and Intelligence Department Officer Tel Aviv Region
Deputy Commander Itamar Omeisi
By fax: [handwritten:] 03-6802420 (Fax/Tel 03-6802424)

Dear Sir:

### Re: Request to view and photocopy the serious crimes file (Tel Aviv) 1147/02, State of Israel v. Abas bin Muhmad el Sayed

I would like you to allow me or someone on my behalf to view and/or photocopy all the relevant material in the above investigation file for the following reasons:

1. A number of large civil claims are being pursued in the United States against Hamas.

2. These claims are being pursued by a number of American as well as Israeli attorneys.

3. The claims are against a number of banks in the United States that are holding money deposited by the Hamas organization.

4. The aim of the claimants is to remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005.

5. I am the representative and power of attorney for an American Law Office (the authorizing power of attorney is attached).

6. Because the claimants are an "interested party" in the case and also because under the Freedom of Information Law they are entitled to copies of the relevant material.

   I would like you to authorize this and notify me as to when and where I can come in order to photocopy this material.

   [illegible]

Yours sincerely,

Shaul Naim, Esq.

Power of attorney for the claimants

[signature]
   [stamp:] **Shaul Naim, Attorney**
              **License No. 8501**



**T**RANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOGOTA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
CLEVELAND
COLUMBUS
DALLAS
DENVER
DUBAI
DUBLIN
DUESSELDORF
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
LYON
MEXICO CITY
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC
ZURICH

City of New York, State of New York, County of New York

I, Joe Zelasko, hereby certify that the document "Naim002238 – Naim002246" is, to the best of my knowledge and belief, a true and accurate translation from Hebrew into English.

Joe Zelasko

Sworn to before me this
December 3, 2010

Signature, Notary Public

KRISTIN MILORO
Notary Public - State of New York
No. 01MI6212799
Qualified in New York County
Commission Expires Oct 19, 2014

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

**EXHIBIT 226 TO DECLARATION OF VALERIE SCHUSTER**

## TZVI WEISS, et al. VS.
## NATIONAL WESTMINSTER BANK, PLC

---

## SHAUL NAIM
## May 26, 2011

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*To open files, click on the desired file type in bookmark on left.*
*For quick saving or searching multiple files, click attachments tab (or paperclip) on left.*
*For best viewing/searching, use Adobe Reader/Acrobat ver. 9 or higher*
*(www.adobe.com).*

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

SHAUL NAIM
May 26, 2011

Page 17

1      NAIM
2    attacks.
3        MR. FRIEDMAN: Aaron, you previously
4    represented -- or plaintiffs previously
5    represented to us that Mr. Naim is only
6    expressing an opinion on the authenticity of
7    the documents attached to his report.  Are
8    you proffering him for any other opinions?
9        MR. SCHLANGER: No.
10       MR. GLATTER: I think that there -- for
11   what it's worth, there may be a semantical
12   confusion here.
13       MR. FRIEDMAN: I understand.
14   Q.   Mr. Naim, have you performed any work
15   for plaintiffs in these cases, other than the
16   preparation of your report in the CL cases or the
17   NatWest cases?
18   A.   What do you mean by "other work"?
19   Q.   Did you do any other projects or written
20   reports, or anything?
21       MR. SCHLANGER: Objection to form.
22   A.   I did not write any other reports.
23   Q.   Did you perform any consulting work for
24   plaintiffs?
25       MR. SCHLANGER: On a non-waiver basis

Page 18

1      NAIM
2    I'll allow the witness to answer the question
3    yes or no.
4    A.   Yes.
5        MS. ECKSTUT: Will you allow him to tell
6    the subject matter?
7        MR. GLATTER: I think we have to take it
8    question by question.  There is a work
9    product issue to the extent that Mr. Naim may
10   perform consulting -- I'll represent to you,
11   just so that there's -- we are not playing
12   games, that Mr. Naim has done consultancy
13   work with plaintiffs' counsel in the Arab
14   Bank case, which there's an overlap of
15   plaintiffs.  I'll even represent to you, on a
16   non-waiver basis, that that involves some
17   collection of materials.
18       MS. ECKSTUT: Okay.
19       MR. GLATTER: To the extent that they
20   relate to attacks in this case, you can go --
21   we'll pursue that, but you can understand the
22   delicacy in terms of trying to respect a work
23   product protection volume line.
24       So we'll take it question by question,
25   and again, try to give you the -- as much

Page 19

1      NAIM
2    latitude as we can but on a non-waiver basis.
3        MS. ECKSTUT: Sure.
4        MR. GLATTER: Thanks.
5    Q.   Can you tell me what consulting work you
6    did for plaintiffs relating to the 15 attacks in
7    this case?
8        MR. SCHLANGER: When you say, just for
9    clarification, "the 15 attacks," are you
10   saying that are in his report or in his
11   agreement?
12       MS. ECKSTUT: That are in his report.
13   A.   Can you repeat?  I didn't hear the
14   question.
15   Q.   Can you please tell me what consulting
16   work you did for plaintiffs relating to the 15
17   attacks in your report?
18   A.   There were questions that the
19   plaintiffs' attorneys asked me.  It might have
20   been material pertaining to some of the attacks.
21   Maybe finding people that could help with lawsuit.
22   And coordinating all kinds of thing.  It's a --
23   all kinds of things.  It's routine.
24   Q.   And that was only for the Arab Bank
25   cases?

Page 20

1      NAIM
2        MR. SCHLANGER: Object to the form.
3    A.   No.  I'm talking in general.
4    Q.   Did you spend more time working on these
5    consulting -- working on consulting than you did
6    on your expert reports, on drafting your expert
7    reports?
8        MR. SCHLANGER: Objection to form.
9    A.   I didn't do a balance -- balance sheet
10   of the time of the things that I did.  Whenever it
11   was needed, I did.
12   Q.   Okay.  Can you give me a general idea,
13   estimate?
14       MR. SCHLANGER: Objection to form.
15   A.   I haven't done it yet.
16   Q.   You haven't done the estimate yet or the
17   work yet?
18   A.   I haven't done the estimate, and I
19   haven't done the work.
20   Q.   And you're referring to the work in the
21   NatWest cases or the Arab Bank cases?
22   A.   I'm talking in general.  I haven't done
23   it either in NatWest or Arab Bank.
24   Q.   So the consulting work you described to
25   us earlier, that's work that you haven't already

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

SHAUL NAIM
May 26, 2011

Page 21

NAIM
1    NAIM
2    done, or have you done it?
3        MR. SCHLANGER: Objection to form.
4    A.   I haven't done all the work.  I've done
5    it up -- as of until I came here.  And I haven't
6    done the estimate.  I sent something, so they'll
7    have something in their hand.
8    Q.   So you mean you haven't finished?
9    A.   The estimate of the time and the hours
10   and the work, not yet.
11       (Time sheet bearing Bates number Naim
12   4716 was marked Naim Exhibit 5 for
13   identification, as of this date.)
14       (Translation of time sheet bearing Bates
15   number Naim 4716  was marked Naim Exhibit 5 A
16   for identification, as of this date.)
17   Q.   Okay.  I'm going to hand you what the
18   court reporter has marked as Exhibit 5 and 5 A,
19   document Bates-stamped Naim 4716, and a certified
20   translation.
21   A.   Yes, this is.
22   Q.   This is a time sheet for the work you
23   performed in December 2010?
24   A.   Right.  As of the date when I sent it
25   in, that was -- these were the hours, but these

Page 22

NAIM
1        NAIM
2    are not all the hours.
3    Q.   You worked more hours before December
4    2010?
5    A.   On the first, in expert opinion?
6    Q.   Yes, on either the CL or NatWest
7    opinions.
8    A.   The first expert opinion before the
9    first deposition I sent in, and it was very many
10   hours.
11   Q.   Okay.  Did you perform any work for
12   these cases, either the NatWest cases or the CL
13   cases, between your deposition on October 6 and 7
14   and the work you indicated on that time sheet?
15       THE INTERPRETER: Until now?
16       MS. ECKSTUT: No.
17       THE INTERPRETER: Until October?
18       MS. ECKSTUT: December 2010.
19   A.   You're asking whether I performed
20   additional work between that and this?
21   Q.   Between the deposition and December
22   2010.
23       MR. SCHLANGER: Just for clarification,
24   I assume you mean other than what's reflected
25   on Exhibit 5, correct?

Page 23

NAIM
1        NAIM
2        MS. ECKSTUT: Right.  As far as I can
3    tell, there are only two days of work on
4    Exhibit 5.
5    A.   That's right.  That's right.  After I
6    sent this in, I continued working, doing work on
7    the new deposition.
8    Q.   Okay.  But my question is before
9    December 2010.
10   A.   Before December 2010?  Before I sent
11   this in, indicating Exhibit 5?
12   Q.   Did you perform any work on the CL or
13   NatWest cases in October or November of -- of
14   2010?
15   A.   No, October or November of 2010?
16   Q.   Right.
17   A.   Don't understand.  I don't want to -- I
18   don't understand what you are trying to ask me
19   this question.
20   Q.   Okay.  I wanted to know -- you were
21   deposed in the CL cases in the beginning of
22   October 2010, correct?
23   A.   Correct.
24   Q.   Okay.  And the work that you performed,
25   reflected in this time sheet, was for work you did

Page 24

NAIM
1        NAIM
2    on December 27 and 28, 2010; is that right?
3    A.   Correct.
4    Q.   I'm asking you whether you performed any
5    work related to your CL or NatWest reports between
6    October 7, which was the last day of your
7    deposition, and December 27, which is the first
8    day of the work reflected on this invoice -- I
9    mean time sheet?
10   A.   Not to the best of my recollection.
11   Q.   Okay.  Did you perform any work for
12   these cases after December 28, 2010?
13   A.   Yes.
14   Q.   Okay.  And did you draft any time sheets
15   reflecting that work?
16   A.   I have jotted them down, but I haven't
17   edited them, and I haven't sent them.
18   Q.   You haven't sent them to plaintiffs?
19   A.   No, I haven't.
20   Q.   But you have them in your files?
21       MR. SCHLANGER: Objection to form.
22   A.   I have it in my records.
23       RQ       MS. ECKSTUT: Okay.  And we'll request
24   those in a letter later.
25       MR. SCHLANGER: We'll take it under

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

SHAUL NAIM
May 26, 2011

Page 45

1     NAIM
2   Mr. Tariq Zidan, Exhibit U.  Mr. Nadil Qalaq,
3   Exhibit V.
4     THE INTERPRETER: What was the other
5   name?
6   Q.  Nadil Qalaq.  Mr. Abas al-Said,
7   Exhibit GG.  Why didn't you include court records
8   for them?
9   A.  Okay.  Abas al-Said is the leader of the
10  group, the terrorist group, that perpetrated the
11  Park Hotel attack.  He was tried in civilian court
12  in Tel Aviv, the district court.  He's -- he's
13  testified as a witness against his people, against
14  the four members of his group.  Maybe that will
15  explain it.  By the way, they, Tamimi and Shakhur,
16  were witnesses against him in district court.
17     Here in the military court they brought
18  his -- they brought his verdict from the district
19  court, from the civilian court.  Therefore, so
20  that you're not confused, you can see -- in the
21  military court you can see as witnesses against
22  him, his partners.  They -- during the trial they
23  testified against him, but --
24     THE INTERPRETER: The interpreter got
25  confused.

Page 46

1     NAIM
2   A.  -- in the -- the military court he was
3   supposed to testify against them, but he did not
4   testify against them, so they submitted all the
5   materials that he talked about to the police.
6     MS. ECKSTUT: Take a break.
7     THE VIDEOGRAPHER: Is everyone off the
8   record?  This is the end of Tape 1.  We are
9   off the record at 11:39 a.m.
10    (A recess was taken.)
11    THE VIDEOGRAPHER: This is Tape
12  Number 2.  We are now on the record at
13    11:55 a.m.
14  Q.  Mr. Naim, please turn to pages 17
15  through 19 of your NatWest report.
16  A.  Before that I would like to make a
17  clarification.  On page 13 in Exhibit 1 I wrote
18  that the court keeps in its possession, in its
19  file, all the -- all the documents and the records
20  that are there.  And I wanted to clarify that I
21  meant the court keeps only the records that
22  were submitted by the prosecutor.
23     Of course if the defendant or the
24  defendants plead guilty, then they -- that's how
25  the case ends, they get convicted, and the

Page 47

1     NAIM
2   prosecutor does not have to submit all the
3   documents that he has in the prosecutor's office,
4   or the police.
5     If that's what I wrote, it's just a
6   mistake in my formulation, but that's not what I
7   meant.
8   Q.  Are you referring to the sentence where
9   you write, "Thus, the only file guaranteed to be
10  complete is the one maintained by the court," at
11  the bottom of page 13?
12  A.  Yes.
13  Q.  Okay.  Please turn to page 17 of your
14  NatWest report.
15  A.  This one?
16  Q.  Exhibit 1.  And actually, if you turn to
17  page 19, Exhibits V through MM, for the shooting
18  on Route 60 attack on January 29, 2003, were not
19  included in your CL reports, correct?
20  A.  I'll check.
21    (The witness read.)
22  A.  Correct.
23  Q.  When did you first obtain these
24  documents?
25  A.  I received these documents from the

Page 48

1     NAIM
2   plaintiffs' attorneys.
3   Q.  What, if anything, did you do to verify
4   whether they were authentic?
5   A.  Yes.  What I did was that I compared the
6   large number of the indictments with the ones in
7   the possession of the military court.
8   Q.  Did you compare anything other than the
9   indictments against documents in the military
10  court?
11  A.  No.  It's mostly the documents that are
12  talking about the indictment, the verdict, and the
13  sentence.
14  Q.  So you compared indictments, verdicts,
15  and sentences against documents maintained by the
16  military court?
17  A.  I compared the documents that I received
18  from the plaintiffs' attorney pertaining to the
19  indictments, verdicts, and sentences with the ones
20  maintained at the military court.
21  Q.  What do you mean by "pertaining"?
22  A.  No.  The indictment, the verdict, and
23  the sentence I had, I compared that to what was at
24  the military court.
25  Q.  Did you receive any documents relating

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

SHAUL NAIM
May 26, 2011

Page 73

NAIM

1   NAIM
2   region, et cetera, and Hebron, whatever I see.
3      Some of the answers I received, I was
4   referred to the military court, and therefore, I
5   went there.  And these are the records.  These are
6   my requests.
7   Q.  Is it fair to say you included in these
8   requests what you thought you needed to include in
9   order for the requests to be granted?
10     MR. SCHLANGER: Objection to form.
11  A.  I did not understand your question.
12  Q.  Is it fair to say that you included in
13  these requests in front of you the information you
14  thought you needed to include in order for the
15  requests to be granted?
16  A.  I sent a request with specification of
17  what I needed, what I wanted.  For some of them I
18  received responses.  For some I did not.
19  Q.  Why did you include the information
20  about these cases that you included?
21  A.  I don't understand the question.
22  Q.  Why did you provide information about
23  the cases in these requests?
24     MR. SCHLANGER: Objection.
25  Q.  The cases in the U.S.

Page 74

1   NAIM
2      MR. SCHLANGER: Objection to form.
3   A.  I still don't understand.
4   Q.  Okay.  Why did you include Items
5   Number 1 through 4 in these requests, information
6   contained in Items Number 1 through 4?
7      MR. SCHLANGER: Objection to form.
8   A.  What I see Number 1 is, I'm asking to
9   review and photocopy files, the file in the Silwan
10  case.  That's Number 1.
11  Q.  I'm sorry, Mr. Naim, I'm referring to
12  paragraphs Number 1 through 4 in the document
13  Bates-stamped Naim 2238.
14     THE INTERPRETER: Interpreter's mistake.
15  A.  238 at the end, right, so?
16  Q.  The information in paragraphs 1 through
17  4, why did you include that in these requests?
18  A.  So they would -- so that they would have
19  the entire picture.
20  Q.  Fair to say you included this
21  information because you thought it was what you
22  needed to include in order for your request to be
23  granted?
24     MR. SCHLANGER: Objection to form.
25  A.  I submitted the request so it would be

Page 75

1   NAIM
2   granted.
3   Q.  Did you believe that it was necessary to
4   include these descriptions of the U.S. lawsuits to
5   get the information you were requesting?
6      MR. SCHLANGER: Objection to form.
7   A.  In my opinion, it was important to
8   indicate these things.
9   Q.  And Naim 2238 is a request to the
10  Jerusalem police office requesting the
11  investigation file related to the Silwan gang, or
12  the Silwan cell?
13     (Discussion off the record.)
14  Q.  This is a request to the Jerusalem
15  police office requesting the investigation file
16  related to the Silwan gang?
17  A.  This request?
18  Q.  Naim 2238.
19  A.  In this request I asked to review the
20  file related to the Silwan gang, correct.
21  Q.  And in paragraph Number 1, you say, "A
22  large number of civil claims are being pursued in
23  the United States against Hamas."
24  A.  That's correct, I indicated that.
25  Q.  Where did you get this information?

Page 76

1   NAIM
2   A.  It's publicized.  It's not confidential
3   information.  Everybody knows it.
4   Q.  You're referring to the NatWest and
5   Credit Lyonnais lawsuits?
6      MR. SCHLANGER: Objection to form.
7   A.  I -- I meant all the lawsuits.
8   Q.  What other lawsuits?
9   A.  All -- all -- there are lawsuits in the
10  United States against banks by the families of the
11  people who were killed and injured.
12  Q.  So you're referring to the lawsuits
13  against NatWest, Credit Lyonnais, and Arab Bank?
14     MR. SCHLANGER: Objection to form.
15  A.  Mainly, but not only.
16  Q.  And what's the basis for your statement
17  in paragraph Number 1?
18  A.  What do you mean?
19  Q.  Where did you get this information?  I
20  mean, why --
21     MR. SCHLANGER: Objection.  Asked and
22  answered already.
23  Q.  You can answer.
24  A.  First of all, I knew about the lawsuits,
25  and secondly, I also knew it from the plaintiffs.

**EXHIBIT 227 TO DECLARATION OF VALERIE SCHUSTER**

# Expert Report
## Of
# Shaul Naim

shaulnaim1@gmail.com

*Strauss v. Crédit Lyonnais, S.A.* **06 CV 702 (CPS)(MDG)**
*Wolf v. Crédit Lyonnais, S.A.* **07 CV 914 (CPS)(MDG)**

# <u>Expert Report</u>

**I. Professional Background and Qualifications**.................................................. 3

**II. Summary of Expert Report**.............................................................. 4

**III. How Israel Investigates and Tries Terrorism Suspects**............................. 7

    **A. Israeli Legal System**……………………………..………………….7

    **B. The Role of the ISA**……………………………..…………………...7

    **C. The Role of the Police**……………………………................................ 8

    **D. The Role of Police Investigators**……………………...................... 9

    **E. Standards for Proceeding to Indictment**…………………………… 11

    **F. Trial**……………………………………………………................. 12

    **G. Maintaining the Attack Files**…………………………................... 12

**IV. Files Reviewed Related to Each Relevant Attack**........................................ 13

**V. Conclusion**.................................................................................. 20

## I.   PROFESSIONAL BACKGROUND AND QUALIFICATIONS

My full name is Shaul Naim.  I received a B.A. from the Faculty of Law at Hebrew University in Jerusalem in 1976, and a year later was admitted to practice law and became a member of the Israel Bar Association.  Between the years 1975-77, I joined the police as a student-policeman, and then spent a year interning at several Jerusalem law firms.  Beginning in late 1977 and continuing through 1985, I joined the police force and served as a police prosecutor in Jerusalem, handling traffic cases, criminal cases, and juvenile affairs.  During that time, I underwent a six-month police officers' training course, and in 1985, took a Command and Control Course.  In 1986, I was appointed head of the Litigation Bureau in Jerusalem, and in that position my rank was Superintendent, placing me in charge of all criminal and traffic-related lawsuits in the Jerusalem District.  Five years later, my position was redefined as head of the Jerusalem District's Litigation Branch, and I was given the rank of Chief Superintendent while also informally serving as the District's Legal Counsel.  During that time I gained familiarity with the types of documents and reports generated by my office, and the manner in which such materials were generated, retained, and retrieved as necessary

In 1998, I was appointed as the Jerusalem District's Investigation Department Officer, and continued to serve as the District's Legal Counsel (until the year 2000), working at times with the District Attorney though I was not prosecuting cases as I did between 1977 and 1985.  As the District's Investigations Department Officer, I was in charge of all investigations and lawsuits in the District, and also supervised the Forensic Science unit, which gathered and examined all evidence from crime scenes, including fingerprints, blood, instruments of the crime, etc.  Some of the other units which were directly subordinate to me were Fraud Squad, Suits, and the Intelligence Desk.  The Intelligence Desk took the information they got from investigation files, spoke with suspects, and gathered intelligence to assist in the investigation of other cases.  The Fraud Squad dealt with cases of fraud, and the Suits unit consisted of lawyers handling the prosecution of crimes with the District Attorney.

I also was the professional in charge of investigations of the "Ethnic Minorities' Unit", which worked together with the Israeli Security Agency ("ISA") in handling threats and crimes carried out by terrorists, criminals and ethnic minorities.  They focused particularly on crimes involving Arabs, including terror attacks and incidents in East Jerusalem, and that squad consists of Arabic-speakers, including Arab-Israelis.

Regarding the level of professional subordinating, each of these units has a commander, for instance the Central Squad ("Yamar") oversees the Ethnic Minorities' Unit.  The Investigation Department commander is professionally responsible for the police investigators, including guiding and instructing and directing the investigators, and is responsible for appointing teams for different criminal cases.

In 2004, I became the Commander in charge of all investigations and intelligence of the Jerusalem district, which included investigations, intelligence, fraud, forensic science and litigation.  I retired from the police in 2006 with a rank of Commander and then began

private practice as a lawyer.  Throughout the course of my career, I have been familiar with categories of documents and reports and other items that have been generated or collected by law enforcement entities, and the manner in which those materials are generated, collected, retained, and retrieved.

In the course of my service with the Police, I was professionally involved in many lawsuits, often working with the District Attorney, and I was directly in charge of investigating complex cases involving murder and other serious crimes.  By virtue of my position as the District's Investigation and Intelligence Department Officer, I handled the many terror attacks that occurred in the District throughout the Second Intifada (2000-2005).  For each attack that occurred in Jerusalem during this time, I was in charge of the investigation, arriving at the scene and giving orders to police investigators gathering evidence, speaking with the ISA to collaborate on information learned, and continuing to direct the investigation to obtain a full "picture" of the attack.  I also regularly worked with the Institute of Forensic Medicine in Abu Kabir in identifying bodies, and as part of my job, met with the General Commander of the Jerusalem police to discuss the terrorist investigation.

I have vast experience with terrorism investigations, and regularly evaluated interrogations, confessions, police and ISA investigations and interviews, and court testimony as part of my job, and, as noted above, am familiar with the documents that are collected, generated, and retained in connection with that process.  As a result, I have many years of experience in determining whether a document that I am reviewing constitutes an accurate and authentic document collected or generated by law enforcement, and am also familiar with the processes used by law enforcement entities in generating or collecting such materials, and how such documents are retained.  In analyzing certain documents in this case, I have applied my knowledge and experience of both Israeli law enforcement processes generally, and Israeli law enforcement's document management practices specifically, to opine on whether certain materials do, in fact, appear to be authentic and reliable.

I am being compensated by Plaintiffs in these cases according to an hourly billable rate of $275.00.  I confirm that I have no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude my giving impartial evidence.  I have not written any publications over the past 10 years, and have not testified (at trial or by deposition) as an expert in the last four years.

## II.   <u>SUMMARY OF EXPERT REPORT</u>

I was asked by the Plaintiffs to:

>    1. Describe the standards, practices, techniques and procedures used by law enforcement in Israel to conduct investigations of terrorist attacks and prosecute the alleged perpetrators;

2. Describe the types of documents generated, retained, and retrievable by Israeli law enforcement. These include documents seized and held by Israeli law enforcement, confessions or witness statements collected by law enforcement, and other documents (such as reports, memorandum, indictments, complaints and other filings) that are generated by law enforcement, including civil and military prosecutors;

3. Identify relevant Israeli laws concerning criminal jurisdiction, evidence gathering, confessions, indictments, hearing protocols, and verdicts, that govern these investigations and prosecutions;

4. Review police and court files, and their contents, concerning certain attacks (the "Attack Files");

5. Provide an opinion based on my professional experience whether the Attack Files appear to be or contain authentic records collected, generated, and maintained by Israeli law enforcement and Israeli courts.

I was physically present and involved in the investigation of the following relevant attacks during my service with the Israeli police, and have reviewed the Attack Files for each case:

- The attack on Ben Yehuda, December 1, 2001
- The attack in the Hebrew University in Jerusalem, on July 31, 2002
- The attack in Jaffa Street, Jerusalem, Bus 14A, on June 11, 2003.
- The attack in Jerusalem, Bus 2, on August 19, 2003.
- The attack in Café Hillel, in Emek Refa'im Street in Jerusalem, on September 9, 2003.
- The attack in Jerusalem, Bus 19, on January 29, 2004.

In addition, though I was not personally involved in the investigation of the following attacks, I reviewed and have conducted extensive research on the following relevant Attack Files in order to ascertain whether my opinion regarding the authenticity of their contents is commensurate with my professional experience:

- March 27, 2002 - Park Hotel Bombing, Netanya.
- May 7, 2002 - Sheffield Club Bombing, Rishon Letzion.
- January 29, 2003 - Shooting Attack on Route 60.
- March 5, 2003 - Bus No. 37 Bombing, Haifa, Israel.

- March 7, 2003 - Shooting in Kiryat Arba.
- April 30, 2003 - Mike's Place Bombing, Tel Aviv.
- June 20, 2003 – Shooting Attack on "Route 60".
- October 22, 2003 – Tel Romeda Shooting in Hebron.
- September 24, 2004 – Mortar attack in Neve Dekalim in Gaza.

In each case, whether it was an Attack File I was personally familiar with as an investigating officer, or those that I reviewed independently, in order to consider whether the documents in the Attack Files were authentic, in addition to my professional experience and knowledge of law enforcement processes (including document management and retention processes) I reviewed where available the following items:

- the Israeli indictments submitted against the alleged perpetrators;
- hearing protocols from both Jerusalem and Tel-Aviv District Courts and Military courts;
- the police investigation files, including confessions (including confessions made to ISA and police investigators) by certain terrorists who planned and executed the attacks;
- the verdicts and the sentencing of various terrorists who were convicted of involvement in the relevant attacks;
- prison interviews that were given by certain terrorists;
- the Expert Report of Evan Kohlmann regarding Hamas claims of responsibility;
- the report issued by the Israeli Security Agency ("ISA");
- websites that published the occurrence of the attack;
- the video footage of the suicide bombers;
- publications in Israeli and foreign media; and
- interviews with investigators.

I conclude that in my professional opinion, in each of the above cases, all of the documents, as described later in this report with regards to each attack, are authentic records of Israeli law enforcement and judicial agencies and offices. In making this determination, I relied on my three decades of experience in working in the police investigation field with these types of documents on a daily basis to ensure that the documents were authentic, official records.

### III.     HOW ISRAEL INVESTIGATES AND TRIES TERRORISM SUSPECTS

#### A.     Israeli Legal System

The Israeli legal system is largely based on laws and regulations adopted from British and American law.  In terrorism cases, whether in civil or military court, the proceedings are before a three-judge panel.[1]  The State is represented by a prosecutor, who prepares and then submits the indictment to the court.  The defendant can hire an attorney or ask that one be appointed for him or her, and every defendant is given a presumption of innocence and a right against self-incrimination.

#### B.     The Role of the ISA

Terrorism in Israel departs from "ordinary" or "common" crime, and even organized crime, in several important procedural aspects. The ISA is the organization in charge of thwarting terror attacks and trying to uncover terror cells.[2]  When a terrorist attack occurs, the police supervise the crime scene in coordination with the ISA, but it is the ISA that makes arrests and conducts the initial suspect interviews that become part of the investigation file.  In many respects, the ISA functions like the American FBI, but unlike the FBI, it does not investigate any other type of crime but those relating to terrorism of all kinds.

When a terror attack is committed, the ISA deals with: in the case of a suicide bombing, identifying the bomber and the organization he was affiliated with; identifying the bomber's dispatchers; and determining whether other terrorists were dispatched at the same time to perpetrate other attacks. The ISA also searches for any other information that might help the investigation, such as searching the terrorist's address, identifying his relatives and family, etc.

---

[1] According to the Israel Courts Law (Section 37a), the district court deliberates in a panel of three judges with respect to more severe criminal offences, in other words, offences of serious crime – an offence punishable by death or imprisonment for 10 years or more. A panel of three judges is appointed due to the complexity of the case and the severity of the action, as well as in order to prevent mistakes. This includes, for example, cases such as murder, rape, violent robbery, etc. In the case of terrorist attacks, which in essence are murders with a terrorist backdrop, there will always be a panel of three judges, whether at the military court or civil court (district).

[2] The General Security Services (GSS) Law defines the authority of the ISA, and, *inter alia*, determines that the ISA is the institute responsible for thwarting terrorist activity, as well as the interrogation of terrorists. *See* Sections 7(a), 7(b)(1), 8(T)(d) at: http://shabak.gov.il/about/yoamash/pages/law.aspx.

## C.   **The Role of the Police**[3]

The police arrive at the scene of the terrorist attack; close off the area; keep citizens away to prevent them from being injured from other possible explosive devices or ambushes; help in evacuating victims; and collect evidence from eyewitnesses, which is gathered by investigators, reviewed by an officer, and included as part of the Attack File later given to the prosecutor.  In the case of a bombing, the first people who enter the scene are the police sappers from the bomb squad unit, whose aim is to search for more explosive devices, check the kind of explosive material used, and gather forensic evidence relating to the explosives used.  Then the Forensic Science Laboratory officers take over and document the scene and gather forensic evidence.[4] Simultaneously, investigators are sent to all the hospitals to collect statements from the surviving victims and their families. Investigators are also sent to the Institute of Forensic Medicine in Abu Kabir to identify the bodies.

At the scene of the terrorist attack a Front Command Post (FCP-"Chapak") is set up, headed by the District Commander.  Likewise, an FCP of the Police Investigations Department ("Achak") is established at the police headquarters, where all the information from the scene is gathered.

The Achak commander after a terror attack has many roles, including the responsibility for the investigation process: arriving at the scene of the attack, sending investigating teams (that were appointed in advance) to investigate the injured parties where helpful, sending some investigation teams to the Institute of Forensic Medicine in Abu Kabir – who cooperate together with the investigators for the purpose of identifying those killed, and setting up "Chapak Achak" in the headquarters for collecting all the data that relates to the terror attack.

After ensuring there are no booby traps in the area of the scene of the attack, the Achak orders its people - the criminal identifying investigators – to enter the scene of the attack and document it by video photos and stills that, after being developed, become part of the

---

[3] The police operate according to the laws of the State of Israel and the police ordinances which define police authority, including rules the police follow when investigating regular criminal offences and acts of terror. Authorities include the Police Ordinance (New Version) 5731 – 1971, Second Chapter: Organization of Duties and Authorities and Chapter Three dealing with the duties of the police. The Israeli Police handle prevention and detection of offences, apprehension and prosecution of offenders, the safekeeping of prisoners, and the maintaining of public order and safety of people and property. The practice of investigating a scene where an act of terror took place was acquired over the years in light of all of the terrorist acts that occurred in the country. It differs from the practice used in the scene of a criminal offence, due to the fact that normally with regard to an act of terror it is a multiple victim event, where many casualties and wounded are being treated. Obviously, the police in any event operate according to standards, procedures and protocols dictated by the law and by internal police orders and protocols (according to the Police Ordinance abovementioned).

[4] For example, despite the intense heat and pressure caused by the detonation of a suicide belt, police have sometimes recovered identifying items from the body of a bomber or have been able to determine the disguise used (e.g., Israeli army uniform, ultra-orthodox Hasidic dress).

Attack File.  In addition, the criminal identifying investigators take blood samples from the corpses (including the terrorist's corpse).  Then, the blood samples are sent to laboratories to determine the identity of the terrorists, and with the help of the Zakas' staff (which identifies the bodies), the bodies and organs are taken to Abu Kabir, where they are examined by doctors who prepare reports that are given to the police to be included in the Attack File.  Where possible, the body parts of the terrorist are separated from the victim remains and taken by separate ambulance to Abu Kabir.  The police findings pertaining to the physical scene of the attack are documented at the scene and then included within the Attack File.

The ISA and Achak remain in contact regarding intelligence information as to the terrorist and his cohorts.  As different media sites are advertising different declarations of terror organizations taking responsibility for the attack, and other media is showing suicide terrorists seen reading their wills before departing for their mission, the Chapak Achak is examining those statements and publications for reliability and credibility.  All of the statements, videos, and other intelligence also is given to the police, and becomes part of the Attack File.

## D.    **The Role of Police Investigators**

As stated previously, ISA officers conduct the initial investigations of people suspected of terrorist activity.   During their investigation, the ISA drafts a protocol of the investigation,[5] after which the suspects are transferred to the custody of the police. The police investigators are then required to advise the suspect that he or she is not obligated to say anything; that anything he or she says may be used as evidence in court; and that the suspect has the right to remain silent and consult a lawyer.

The activity of the interrogator emanates from the Judges Law and Regulations. The duty to advise the suspect as to his rights was adopted as an obligatory judicial ruling from the "Judges Regulations" – a collection of regulations compiled under English Law.[6]   The

---

[5] The ISA interrogator's protocol is in fact a type of unofficial memorandum, usually not sent to the police, which constitutes a summary and brief of the interrogation. These memoranda are used for the rest of the interrogation, in order to compare and contrast the suspects' versions so as to verify them and to confront the suspects with discrepancies.  These protocols (memoranda) do not serve as testimony in the court and are not part of the Attack File or evidence of the case. At times the content of these memoranda are delivered to a police investigator that is taking a formal statement. This formal statement may constitute a statement or confession to be used during the deliberation in court or the military court. The ISA interrogator's work is carried out according to their own internal procedures.

[6] The only reference in criminal law to the warning of a suspect is located in Section 28 to the Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996:

　　28. Hearing the detainee
　　(a) The supervising officer shall not make a decision regarding the arrest of a person, the continuation of a person's arrest or release by way of bail, and the type of bail, amount and conditions shall not be determined, unless the aforesaid person first received an opportunity to speak, after the aforesaid person was warned that he or she was not obligated to say anything of self-incriminatory nature, and anything said by the aforesaid person may be used against him or

Israeli judicial ruling adopted the Judges Regulations as "guiding provisions" for the police.[7]

Following the advisement of rights, the police then assess the likelihood of a confession, and determine whether the suspect should remain in custody.[8]  In the realm of terrorist attacks, the Ethnic Minorities Unit typically investigates and handles this step.  Their expertise is necessary because the confession must be read back to each suspect, often in Arabic, and the suspect must be asked if they understand and then to sign the document at the end.  If a confession is given, the police investigator asks questions sufficient enough to prepare a report, and then types the confession, usually with 1-2 copies made and the original maintained in the court in which the matter proceeds as part of the Attack File if the case proceeds.  Otherwise, the original usually stays with the police.  Copies of the confession are obtained, including in this case, by submitting a formal request with a power of attorney directed to the court, or the police if they saved a copy as well.  The confessions usually are videotaped and photographed, and document those present during the process.

Everything the investigators do is supervised by their officer, and during my time with the Jerusalem police, I regularly oversaw the work of investigators.  All of their written work is included in the Attack File.  At the same time as a confession is being elicited, the police continue to collect evidence, prepare the Attack File and refer it to the prosecution (Prosecutor's Office or Military Prosecution).  Usually, most cases are sent to the Office of Military Prosecution, though there are a few exceptional cases sent to the civil district court.[9]  For example, Abas El-Said, the mastermind of the Park Hotel attack, was brought before the Tel Aviv District Court, whereas the members of his outfit were brought before a military court.  The decision of which cases will go to which court (military or civil) is determined as follows: When the offense is committed inside the Palestinian territories, the indictment is submitted to the military court.  When the offense

---

her as evidence, and that his or her refusal to answer questions may reinforce any evidence against him or her.

[7] In this regard, it is important to note that the Military Judicial Law, 5715 - 1955, explicitly adopted provisions on this subject from the Judges Regulations. With regard to the right to an attorney, Section 32 of the Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996, specifies to the detainee his or her rights, including the right to have a notice delivered regarding his or her arrest to a member of kin and to an attorney, and his or her right to meet with an attorney.  Sections 34-36 regulate the subject of the detainee's right to meet with an attorney, with careful attention paid to the meetings with an attorney in the case of security-related offences.

[8] The Evidence Ordinance (New Version), 5731-1971, regulates the subject of the admissibility of a suspect's confession, and determines that the confession has to be of the suspect's free will (Section 12(a) to the Evidence Ordinance).

[9] The legal advisor to the government and attorney general decide which cases shall be brought before a civil court and not a military one. Terrorists living in the West Bank or Gaza who carry out terror attacks in Israel are usually brought before a military courthouse near their home. In certain outstanding cases, usually for leaders such as Abas El-Said, terrorists are brought before a civil court.

is committed inside Israel proper, the indictment is submitted either to the military court or a district court depending on the terrorist's involvement.[10]

## E.     Standards For Proceeding to Indictment

After the evidence is collected, the investigators and their superiors review the material and when they reach the conclusion that there is enough evidence to establish an indictment, the investigators send to the district attorney (in the event that a civil court was decided upon)[11] or to a military courthouse the entire original Attack File so that the prosecutor can review it and prepare an indictment against the defendants within the period of their detainment.  The prosecutor determines if the evidence is sufficient to indict the defendant, in which case the prosecution will commence unless he decides not to prosecute on the grounds of lack of public interest, which requires the authorization of the District Attorney and the police officer serving as head of the prosecution unit.[12]

The indictment, which must satisfy the "beyond a reasonable doubt" standard in both civil and military court, is prepared by the prosecutor based on the evidence in the file, and submitted by the prosecutor to the relevant court, who maintains the original in the Attack File and provides copies upon a formal request similar to the procedure followed for obtaining copies of a confession.  The defendant's attorney also is given the right and opportunity to copy the Attack File to assist in their defense.

Upon the submission of an indictment, the court where the indictment was submitted can order the arrest of the defendant, who will be held until the end of the legal proceedings, if it finds one of the following: (1) reasonable grounds to fear that releasing the defendant or failing to apprehend him may disrupt the court proceedings, lead to avoidance of the proceedings or a sentence, or lead to the disappearance of property, influence over a witness, or harm to any other evidence; (2) reasonable grounds to fear that the defendant may pose a risk to the safety of another individual, or the public safety or national security; or (3) the defendant is accused of an offence punishable by death or life in prison, a security-related offence, certain drug offenses, domestic violence, or an offence perpetrated with severe violence or cruelty or with the use of a weapon.[13]

---

[10] The Palestinian territories are located in the West Bank and Gaza Strip. In the territories, the administrators of the population are the Palestinian Authority, however Israel is responsible for all that is security related. Karnei Shomron and Beitar Ilit are Jewish settlements within the West Bank and Gaza areas. Palestinians who carry out attacks against Jews in the territories, or who leave those areas in order to carry out attacks within the State of Israel, are normally tried in a military courthouse in the territories.

[11] Criminal Procedure Law (Combined Version), 5742 – 1982, Section 60(a).

[12] Criminal Procedure Law (Combined Version), 5742 – 1982, Section 62(a).

[13] Criminal Procedure Law (Enforcement Authorities – Arrests), 5756 – 1996, Sections 21(a), 21(a)(4).

F.  **Trial**

The procedures for trial are defined in the Criminal Procedure Law (Combined Version), 5742 – 1982. The trial at the military courthouse takes place in front of a panel of three judges, the same as with the civil court. The defendant hires a defense attorney, and if he cannot afford one, a defense attorney is appointed for him by the State. The trial begins with the reading of the indictments, to which the defendant confesses or denies. In the event that he confesses, a judgment is given and then the sentence is delivered after each party brings forth evidence with regard to the punishment.

If the defendant denies culpability for the claims, the trial opens, witnesses are brought on behalf of the prosecution, and then witnesses are brought on behalf of the defendant.  The defendant is of course entitled to testify. At the end of the defense testimony, each party summarizes its arguments and, following deliberations, the court delivers its verdict of acquittal or conviction depending on whether the prosecution has proven guilt beyond a reasonable doubt.  If the defendant is convicted, each side presents argument with regard to what the punishment should be, and following the arguments the court sentences the defendant.  The entire trial is recorded by video, and in the case of a defendant who does not speak Hebrew, every word is translated for him or her during the proceedings.

When a terrorist attack was involved, normally the court sentences a convicted terrorist to a life sentence for each civilian killed as a result of an attack. For example if 30 people were killed, as in the Park Hotel bombing, then the court gives 30 life sentences.  The verdicts, along with any written sentences, are created and maintained by the court in which the matter took place.

G.  **Maintaining the Attack Files**

Upon the completion of the trial, the court in which the trial took place maintains in their archives the original copy of the entire Attack File, including the portion of the file provided by the police as well as the indictment, court protocols, verdict, and other documents generated during the prosecution.  The Attack File, in my experience, may be requested with a legitimate purpose given for needing to review and/or copy the documents.

The police maintain the Attack File as well, though it is not always complete.  While the court gets all of the police documents, the police sometimes do not always obtain all of the records generated during the prosecution and court proceedings, and thus the only Attack File guaranteed to be complete is that maintained by the court.  Nonetheless, a copy of the police's Attack File may be requested through the officer in charge of investigators.  As I used to hold this position, requests were often made to me for copies of the file, and I would have my assistant handle these requests.

## IV.   FILES REVIEWED RELATED TO EACH RELEVANT ATTACK

In investigating these terror attacks, the Attack Files I reviewed contained the following official documents and information I collected, read and reviewed are as follows:
(* = documents to be provided subsequent to this report)
(references to the attached Appendix are indicated below as "Naim XXXXXX-X")

- **December 1, 2001 – Ben Yehuda bombings**

Exhibit A:     Abdalla Barghuthi's Indictment (Naim 000001-43)
Exhibit B:     Abdalla Barghuthi's Court Ruling (Naim 000044)
Exhibit C:     Abdalla Barghuthi's Sentencing (Naim 000045-52)

- **March 27, 2002 – Park Hotel Bombing, Netanya**

Exhibit A:     Protocol of a page written by Abas al-Said (Naim 000053-55)
Exhibit B:     Abas al- Said's announcement re the attack (Naim 000056-70)
Exhibit C:     Protocol concerning Abas al- Said's investigation (Naim 000071)
Exhibit D:     Abas al-Said's Court Ruling (Naim 000072-155)
Exhibit E:     Mu'amar Shahruri's first confession re attack (Naim 000156-175)
Exhibit F:     Mu'amar Shahruri's second confession re attack (Naim 000176-184)
Exhibit G:     Mu'amar Shahruri's Indictment (Naim 000185-202)
Exhibit H:     Fathi Raja Ahmad Khasib's first confession (Naim 000203-215)
Exhibit I:     Fathi Raja Ahmad Khasib's Indictment (Naim 000216-232)
Exhibit J:     Naser Sami Abd al-Razeq Yataima's first confession (Naim 000233-236)
Exhibit K:     Naser Sami Abd al-Razeq Yataima's second confession
               (Naim 000237-241)
Exhibit L:     Naser Sami Abd al-Razeq Yataima's third confession (Naim 000242-244)
Exhibit M:     Naser Sami Abd al-Razeq Yataima's Indictment (Naim 000245-262)
Exhibit N:     Muhanad Talal Mansur Sharim's first confession (Naim 000263-278)
Exhibit O:     Muhanad Talal Mansur Sharim's second confession (Naim 000279-291)
Exhibit P:     Muhanad Talal Mansur Sharim's third confession (Naim 000292-308)
Exhibit Q:     Muhanad Talal Mansur Sharim's Indictment (Naim 000309-327)
Exhibit R:     Court Ruling of Fathi Khasib, Mu'amar Shahruri, Muhanad Talal Mansur
               Sharim and Naser Sami Abd al-Razeq Yataima (Naim 000328-349)
Exhibit S:     Tariq Zidan's first confession (Naim 000350-364)
Exhibit T:     Tariq Zidan's second confession (Naim 000365-373)
Exhibit U:     Tariq Zidan's third confession (Naim 000374-377)
Exhibit V:     Nadil Qalaq's first confession (Naim 000378-382)
Exhibit W:     Nadil Qalaq's second confession (Naim 000383-390)
Exhibit X:     Nadil Qalaq's third confession (Naim 000391-394)
Exhibit Y:     Ahmad Jayusi's Revised Indictment (Naim 000395-416)
Exhibit Z:     Sentencing of attack accomplices (Naim 000417-419)
*Exhibit AA:  Abas al- Said Indictment
*Exhibit BB:  Abas al-Said Confession

*Exhibit CC:   Ahmad Jayusi Confession


- **May 7, 2002 – Sheffield Club Bombing, Rishon Letzion**

Exhibit A:      Abdalla Barghuthi's Indictment (Naim 000420-462)
Exhibit B:      Abdalla Barghuthi's Court Ruling (Naim 000463)
Exhibit C:      Abdalla Barghuthi's Sentencing (Naim 000464-471)
Exhibit D:      Muhammad Hasan Arman's Indictment (Naim 000472-502)
Exhibit E:      Yusuf Abdalla Nimer Anjas's Indictment (Naim 000503)
Exhibit F:      Muhammad Arman's and Walid Anjas's Sentencing (Naim 000504-515(
Exhibit G:      Sentencing of the accused in the Hebrew University and Sheffield Club bombings (Naim 000516-543)
*Exhibit H:    A written report in Arabic, (08/22/2003) by Va'sem El Abas, in which he confesses to executing several terror attacks, including this one
*Exhibit I:     A Confession (08/19/2002) made to the police, by Va'sem Abas, in which he describes the Sheffield Club terror attack
*Exhibit J:     Confession (08/21/2002) made to the police by Vael Kasem
*Exhibit K:    Confession (08/21/2002) made to the police by Vasem Abissi
*Exhibit L:     Second Confession (08/22/2002) made to the police by Vasem Abissi
*Exhibit M:    A two-page letter, written in Arabic, by Vael Kasem, in which there are the details of the terror attacks he executed
*Exhibit N:    Confession (08/19/2002) made to the police by Muhamad Uda (A "Siluan" cell member)
*Exhibit O:    Confessions (08/17/2003, 08/18/2003), made to the police by Alaa Abass (A "Siluan" cell member)
*Exhibit P:     A one page letter in Arabic, written by Machmud Elabassi, in which he describes the terror attacks in which he was involved
*Exhibit Q:    Confession (03/13/2002) made to the police by Abdalla Barguthi, in which he admits to manufacturing the explosive device and explosive belt used in this attack


- **July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem**

Exhibit A:      Muhammad Hasan Arman's Indictment (Naim 000544-574)
Exhibit B:      Muhammad Hasan Arman's and Walid Abd al-Aziz Anjas's Verdict (Naim 000575-586)
Exhibit C:      Abdallah Barghuthi's Indictment (Naim 000587-629)
Exhibit D:      Abdallah Barghuthi's Court Ruling (Naim 000630)
Exhibit E:      Abdallah Barghuthi's Verdict (Naim 000631-638)
Exhibit F:      Yusuf Abdalla Nimer Anjas's Indictment (Naim 000639-642)
Exhibit G:      Verdict of the accused in the Hebrew University and Sheffield Club bombings (Naim 000643-670)
*Exhibit I:     Indictment and verdict from the Jerusalem District Court, against Va'el Kaasem (head of the "Siluan" cell) and his cell members

14

*Exhibit J:    Confession (08/21/2002) made to the police by Va'el Kaasem

*Exhibit K:   Two letters written in Arabic in which Kaasem admits to perpetrating the Hebrew University attack as well as others

*Exhibit L:   Confessions (08/19/2002, 08/26/2002) made to the police, and a letter in Arabic language written by Muhamad Uda (08/26/2002), in which he admits to putting the explosives in Hebrew University

*Exhibit M:  Confessions (08/26/2002, 09/05/2002, 09/20/2002, 09/22/2002, 10/21/2002) made to the police by Muhamed Arman

*Exhibit N:   Letter (09/20/2002) written by Muhamed Arman in which he admits participating in the Hebrew University attack

- **January 29, 2003 – Shooting Attack on Route 60**

Exhibit A:    Jaser Ismail Musa Barghuthi's Indictment (Naim 000671-708)

Exhibit B:    Jaser Ismail Musa Barghuthi's Sentencing (Naim 000709-721)

Exhibit C:    Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 000722-745)

Exhibit D:    Khaled Abd al-Mua'z Zein al-Din Omar's confession (1) (Naim 000746-769)

Exhibit E:    Khaled Abd al-Mua'z Zein al-Din Omar's confession (2) (Naim 000770-786)

Exhibit F:    Police confirmation of documentation of damage done to property (Naim 000787)

*Exhibit G:  Indictment from Military Court against Achmad Matztafa Zalach Hamed (Na'jar)

*Exhibit H:  Confessions (12/21/2003) made to the ISA by Achmad Matztafa Zalach Hamed (Na'jar)

*Exhibit I:   Confessions (12/22/2003, 01/18/2004 11:00 a.m., 01/18/2004 19:55 p.m., 01/22/2004), made to the police by Jaser Barghuthi

*Exhibit J:   Confessions made to the police by Haled Omar (12/24/2003, 12/31/2003, 01/06/2004)

*Exhibit K:  A protocol (12/21/2003) made by the ISA

*Exhibit L:   Confession made to the police (12/20/2003), by Ravia Halifa

*Exhibit M:  Confessions made to the police (12/23/2003, 12/24/2003, 12/28/2003, 12/31/2003) by Perach Hamed

*Exhibit N:  Confessions made to the police by Magdi Naasan (12/17/2003, 12/31/2003)

*Exhibit O:  A protocol (01/04/2003) made to the ISA by Machmud Saad

*Exhibit P:   Confession made to the police (12/21/2003), by Morad Barghuthi

*Exhibit Q:  Confession made to the police (12/22/2003), by Nimar Hamida

*Exhibit R:   Confession made to the police (12/28/2003), by Yasser Hamed

*Exhibit S:   Confessions made to the police (12/28/2003, 12/29/2003, 12/31/2003, 01/01/2004) by Achmad Hamed

*Exhibit T:   Indictments and Verdicts from the Shomron Military Court against the Achmad Mustafa Tzalach Hamed cell members

- **March 5, 2003 – Haifa Bus #37 Bombing**

Exhibit A:     Indictment against Faadi  Muhamed Ibrahim Joaba (Naim 000788-798)
Exhibit B:     Indictment against Munir Ben-Farid Ragbi (Naim 000799-802)
Exhibit C:     Verdict rejecting appeal filed by Munir Ragbi (Naim 000803-808)
Exhibit D:     Sentence against Munir Ragbi (Naim 000809-814)
Exhibit E:     Sentence against Maaed Vael Taleb Abu Sharach (Naim 000815-823)
Exhibit F:     Sentencing arguments against Maaed Vael Taleb Abu Sharach
               (Naim 000824-825)
Exhibit G:     Verdict against Faadi Muhamed Ibrahim Joaba (Naim 000826-828)
*Exhibit H:    Indictment submitted to the Military Court against Maaed Vael Abu
               Sarach
*Exhibit I:    Investigation of police into Munir Ragbi
*Exhibit J:    Indictment against Ismail Rajbi
*Exhibit K:    Verdict and Sentence against Ismail Rajbi


- **March 7, 2003 – Shooting in Kiryat Arba**

Exhibit A:     Amended Indictment of Abdalla Achmad Machmud Abu Sif
               (Naim 000829-837)
*Exhibit B:    Verdict and Sentence of Abdalla Achmad Machmud Abu Sif
*Exhibit C:    Confessions of Abdalla Achmad Machmud Abu Sif (05/15/2003,
05/18/2003, 05/29/2003)
*Exhibit D:    Confession of Abed Allah al-Qader Qawasmeh
*Exhibit E:    Confession of Jamil Zacri Salaiima
*Exhibit F:    Confession of Basel Shaafik Qawasmeh


- **April 30, 2003 – Mike's Place Bombing, Tel Aviv**

Exhibit A:     Dr. Arian Davidson's report on the perpetrators' DNA (Naim 000838-842)
Exhibit B:     Dr. Chen Kugel's forensic pathology report on Asef Muhammad Hanif's
               body (Naim 000843-847)
Exhibit C:     Dr. Yehuda Hess's forensic pathology report on Omar Khan Sharif's body
               (Naim 000848-853)
Exhibit D:     Passport stamps of Asef Muhammad Hanif and Omar Khan Sharif
               (Naim 000854-860)
Exhibit E:     Police Wanted Poster and copies of passports of Asef Muhammad Hanif
               and Omar Khan Sharif (Naim 000861-863)
Exhibit F:     Shabak detailed report on Palestinian suicide bombers (Naim 000864-948)
*Exhibit G:    Investigation file conducted by the police investigation team (09/03/2003)

*Exhibit H:     The investigation file, including documents sent to the Scotland Yard to get more information regarding the two terrorists, who were British citizens

*Exhibit I:     Testimony gathered of victims and eyewitnesses who were present at the attack[14]

- **June 11, 2003 - Jaffa Road Bus 14A Bombing, Jerusalem.**

Exhibit A:     Umar Salah Muhammad Sharif's Indictment (Naim 000949-964)
Exhibit B:     Umar Salah Muhammad Sharif's Court Ruling (Naim 000965-966)
Exhibit C:     Umar Salah Muhammad Sharif's Sentencing (Naim 000967-970)
Exhibit D:     Bilal Yusuf Rateb Sub Leban's Interrogation (Naim 000971-991)
Exhibit E:     Amer Basem Yusuf Naser al-Din's Interrogation (Naim 000992-998)
*Exhibit F:    Umar Salah Muhammad Sharif's Confessions
*Exhibit G:    Confessions made to the police (06/25/2003, 07/02/2003) by Balal Subelban
*Exhibit H:    Confession made to the police (07/15/2003) by Amer Naatzer A-din

- **June 20, 2003 – Shooting Attack on Route 60**

Exhibit A:     Ahmad Mustafa Saleh al-Najar's Indictment (Naim 000999-1017)
Exhibit B:     Ahmad Khaled Dawud Hamed's Indictment (Naim 001018-1019)
Exhibit C:     Jaser Isma'il Musa al-Barghuthi's Indictment (Naim 001020-1057)
Exhibit D:     Jaser Isma'il Musa al-Barghuthi's Sentence (Naim 001058-1070)
Exhibit E:     Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 001071-1094)
Exhibit F:     Khaled Abd al-Mua'z Zein al-Din Omar's confession (1)  (Naim 001095-1118)
Exhibit G:     Khaled Abd al-Mua'z Zein al-Din Omar's confession (2)  (Naim 001119-1135)
*Exhibit H:    Confessions (12/21/2003) made to the ISA investigator by Ahmad Mustafa Zalach Hamed (Na'jar)
*Exhibit I:    Confessions (12/17/2003, 12/23/2003, 12/24/2003, 12/28/2003, 12/31/2003) made to the police investigators by Farech Hamed
*Exhibit J:    Confessions (12/28/2003, 12/31/2003) made to the police by Ahmad Khaled Dawud Hamed
*Exhibit K:    Confessions made to the police by Haled Omar (12/24/2003, 12/31/2003, 01/06/2004)
*Exhibit L:    Confessions made to the police by Yasser Hamed (12/28/2003, 12/31/2003)

---

[14] This includes the testimony of IDF soldiers who encountered the terrorists entering through the "Allenby" Bridge and "Erez " Checkpoint.

*Exhibit M:     Indictments and Verdicts from the Shomron Military Court against cell members mentioned above

- **August 19, 2003 – Bombing of Bus #2, Jerusalem**

Exhibit A:      Nasim Rashed Abd al-Wudud Za'tari's Indictment  (Naim 001136-1151)
Exhibit B:      Majdi Barakat Abd al-Ghafer Za'tari's Indictment (Naim 001152-1165)
Exhibit C:      Abdallah Adnan Yihya Sharbati's Indictment (Naim 001166-1176)
Exhibit D:      Jalal Jamal Hilmi Yaghmur's Indictment (Naim 001177-1181)
Exhibit E:      Ramzi Walid Salah Arfa's Indictment (Naim 001182-1185)
Exhibit F:      Amjad Taher Salah Arfa's Indictment (Naim 001186-1188)
*Exhibit G:     Verdict and sentence against  Abdallah Adnan Yihya Sharbati.
*Exhibit H:     Confession (09/15/2003, 10/01/2003) made by Sharbati
*Exhibit I:     Written report made by Sharbati regarding the sequence of events and a drafting of the terror attack area
*Exhibit J:     Report made to the investigators describing the terror attack scene, by Sharbati and Majdi Barakat Abd al-Ghafer Za'tari
*Exhibit K:     Video cassettes and pictures which document the terror attack scene
*Exhibit L:     Confessions (03/15/2003, 09/14/2003, 10/01/2003) made to the police by Nasim Rashed Abd al-Wudud Za'tari
*Exhibit M:     Confessions (09/14/2003, 09/15/2003, 09/30/2003) made to the police by Majdi Barakat Abd al-Ghafer Za'tari
*Exhibit N:     Verdict and sentence in military court against Majdi Barakat Abd al-Ghafer Za'tari
*Exhibit O:     Verdict and sentence in military court against Nasim Rashed Abd al-Wudud Za'tari
*Exhibit P:     Confessions (12/28/2003) made to the police, by Ramzi Arfa

- **September 9, 2003 – Bombing at Café Hillel in Jerusalem**

Exhibit A       Indictment against Tzalach Tzubachi Daud Mussa  (Naim 001189-1196)
Exhibit B       Verdict against Tzalach Tzubachi Daud Dir Mussa (Naim 001197-1201)
Exhibit C       Verdict against Achmad Ben Muhamad Abbid and Naa'el Ben Sallamma Abbid (Naim 001202-1212)
Exhibit D       Police Interview of Muhamad Anati (Naim 001213-1217)
Exhibit E       Police Interview of Nael Abid (Naim 001218-1223)
Exhibit F       Amended indictment against Achmad Ben Muhamad Abbid and Naa'el Ben Sallamma Abbid (Naim 001224-1227)
Exhibit G       Amended indictment against Abdul Aziz (Ben Muhamad) Amru (Naim 001228-1230)
Exhibit H       Confession to police (10/10/2004) by Achmad Abbid (Naim 001231-34)
Exhibit I       Confession to police (10/14/2004) by Achmad Abbid (Naim 001235-38)
Exhibit J       Confession to police (10/28/2004) by Achmad Abbid (Naim 001239-41)
Exhibit K       Confession to police (09/26/2004) by Achmad Abbid (Naim 001242-49)

| Exhibit L | Amended indictment against Gamal Othman Muhamad Abu Salim (Naim 001250-1253) |
| Exhibit M | Amended indictment against Muhamad Latif Achmad Balut (Naim 001254-1264) |
| Exhibit N | Indictment against Ibrahim Muhamad Yunes Dir Mussa (Naim 001265-75 |
| Exhibit O | Indictment against Marry Tzubachi Juvadat Abu Saida (Naim 001276-86) |
| Exhibit P | Indictment against Fuaz Machmud Ali Na'atzer (Naim 001287-95) |
| *Exhibit Q | Confession (09/26/2004) made to the police by Nael Abid |
| *Exhibit R | Indictment submitted to the military Court against Jammel Othman Muhamad Abu Salim |
| *Exhibit S | Confession (10/14/2003, 10/18/2003) made to the police by Jammel Othman Muhamad Abu Salim |
| *Exhibit T | Confession (09/19/2004, 09/26/2004, 10/11/2004) made to the police by Ibrahim Muhamad Yunes Dir Mussa |

- **October 22, 2003 - Tel Romeda Shooting Attack**

The police station in Hebron opened an investigation, gathered evidence, and documented the scene. The terrorist's corpse was transferred for an autopsy at the Abu Kabir, Institute of Forensic Medicine, and both the weapon and bullets used by the terrorists were transferred to the Forensic Department National Headquarters.  Because the terrorist died while executing the attack, no one was prosecuted in court and the police investigation file was closed.  I reviewed the witness statements for the attack.

- **January 29, 2004 – Jerusalem Bus # 19 Bombing**

| Exhibit A: | Indictment against Achmad Tzalach Achmad Tzalach (Naim 001296-307) |
| Exhibit B: | Indictment against Ali Muhamed Hamed Abu Alail (Naim 001308-27) |
| Exhibit C: | Indictment against Abdel El Rachman (Zahher) Joseph Abdel El Rachman Mikaded (Naim 001328-42) |
| Exhibit D: | Indictment against Muhamad Issa Muhamad Maali (Naim 001343-56) |
| Exhibit E: | Indictment against Ali Muhamad Hamed Abu Halil (Naim 001357-73) |
| *Exhibit F: | Verdict and Sentence against Ali Muhamad Hamed Abu Halil |
| *Exhibit G: | Confessions made to the police (03/06/2004, 03/08/2004, 03/09/2004, 03/11/2004, 03/28/2004, 03/29/2004) by Ali Muhamad Hamed Abu Halil |
| *Exhibit H: | Verdict and Sentence against Muhamad Issa Muhamad Maali |
| *Exhibit I: | Confessions made to the police (03/30/2004, 04/15/2004) by Muhamad Issa Muhamad Maali |
| *Exhibit J: | Verdict and Sentence against Achmad Tzalach Achmad Tzalach |
| *Exhibit K: | Confessions made to the police by Achmad Tzalach Achmad Tzalach |
| *Exhibit L: | Verdict and Sentence against Abdel El Rachman (Zahher) Joseph Abdel El Rachman |
| *Exhibit M: | Confessions made to the police (03/07/2004, 03/08/2004, 03/09/2004, 03/24/2004) by Abdel El Rachman (Zahher) Joseph Abdel El Rachman |

19

- **September 24, 2004 – Mortar Strike in Neve Dekalim**

Following the mortar attack from the Gaza Strip towards Neve Dekalim, a police investigation was opened at Erez police station: P.A File 3640/04, during which evidence was collected from witnesses residents, including testimony from a rescue doctor from Gaza, and a police report that I reviewed (Exhibit A - Naim 001374-1381) was generated. The investigation revealed a videotape that appears to be from Hamas, with images of three terrorists masked in uniform, shooting the mortars, one of which hit Neve Dekalim. The individuals have not been found nor prosecuted.

## V.    CONCLUSION

Based upon the information, research, and analysis presented in this report, I have reached the following conclusion:

Based on my familiarity through three decades of experience gathering, collecting, and maintaining the same types of materials, it is my opinion that all of the documents referenced in Section IV, and attached hereto, appear to be authentic records maintained by Israeli law enforcement and Israeli military and district courts in their Attack Files. As discussed in Section III, the original records, including confessions, indictments, and verdicts, are kept in the ordinary course of business with the court in which the prosecution took place, and are obtained upon a formal request made to the respective court.

_10 |12 |09_
Date

_Shaul Naim_

20

**EXHIBIT 228 TO DECLARATION OF VALERIE SCHUSTER**

# Supplemental Expert Report
### Of
# Shaul Naim

*Strauss v. Crédit Lyonnais, S.A.* **06 CV 702 (CPS)(MDG)**
*Wolf v. Crédit Lyonnais, S.A.* **07 CV 914 (CPS)(MDG)**

I am providing the below supplemental Appendix of Documents (the "Supplement") to supplement the Appendix I prepared as part of my December 10, 2009 report (the "Report").  By way of explanation I edited the final version of the Report in English. Though I reviewed the Report (including its Appendix) before signing it, shortly after it was issued, I realized that it contained some inadvertent errors with respect to certain documents listed in the Appendix, which this Supplement updates.  I also realized that certain terms used in the Report may not communicate a concept with the degree of precision that I intended to convey in the Report, and thus this Supplement clarifies and explains such terminology.  This Supplement also amends the Report's translation of certain individuals' names, to again avoid confusion, and assist in ensuring that all documents referenced in the Report's Appendix are characterized accurately.

Accompanying this Supplement are copies of certain documents that were initially accompanied by an "asterisk" in the Report.  After the Report was finalized, I realized that some of the documents listed in the Report's Appendix were duplicates of other documents.  Accordingly, this Supplement corrects and harmonizes duplicative documents.  By way of example, this Supplement harmonizes those documents associated with the two "Route 60" shootings in January and June 2003.

I also realized after the Report was issued that certain of the documents identified with an asterisk in the Appendix were not documents that I had a chance to review and opine upon, but instead were documents that I believed I possessed.  They were in fact documents that, in my professional experience, I believed had been generated or collected by the relevant Israeli entities, and I was seeking to confirm if such was the case, obtain or otherwise review copies, and opine upon them. Having realized shortly after its issuance that the Report's Appendix inadvertently, but incorrectly, cited certain materials that I have not yet reviewed, this Supplement corrects the list so that it provides a complete list of all documents that I reviewed and provided to counsel for the Plaintiffs. I reserve the right to further supplement the Report if additional documents, including but not limited to any documents in the Report's original Appendix which were incorrectly identified as falling within the scope of my opinions, come to my attention.

Finally, this Supplement clarifies and further explains the Report's reference to the term "Attack File".  Although Sections II and III of the Report discuss generally how Israeli law enforcement and courts collect and retain materials, and thus create "attack files" pertinent to each terrorist attack, as used in the Report, the term "Attack File" was and is not intended to suggest that documents listed in the Appendix for each individual attack constitute an Israeli court, prosecutor, law enforcement agency, or military official's complete file of documents that such entity has generated, collected, archived and/or catalogued for a given attack.  As used in the Report, the phrase "Attack File" simply is my internal reference for the collection of documents of each attack in the Report for which I am opining that such documents appear, in my professional opinion, to be authentic records maintained by Israeli law enforcement, prosecutors, courts, or military officials, depending on where the relevant document(s) were maintained.

**FILES REVIEWED RELATED TO EACH RELEVANT ATTACK**
(references to the attached Appendix are indicated below as "Naim XXXXXX-X")

- **December 1, 2001 – Ben Yeifuda bombings**

Exhibit A:    Abdalla Barghuthi's Indictment. This document includes charges concerning Sheffield Club, Hebrew University, and three other terror attacks not relevant here (Sbarro's Pizza, Moment Cafe, and the shooting of Bus #4 in Tel Aviv). (Naim 000001-43) This document, and the next two (exhibits B and C), are duplicates of the Sheffield Club Bombing Exhibits A-C and Hebrew University Cafeteria Bombing Exhibits C-E.

Exhibit B:    Abdalla Barghuthi's Court Ruling (Naim 000044)

Exhibit C:    Abdalla Barghuthi's Sentencing (Naim 000045-52)

- **March 27, 2002 – Park Hotel Bombing, Netanya**

Exhibit A:    Memorandum #3 dated July 22, 2002, written by a Druze investigator named Lutuf Mari, to his commander, the chief investigator for Shomron (Samaria, or the northern west bank), containing recollections of his interrogation of Abas al-Said on May 12, 2002 (Naim 000053-55)

Exhibit B:    Abas al- Said's statement to the police re the attack. Given to the investigator, Lutuf Mari, on May 12 and 13, 2002. (Naim 000056-70)

Exhibit C:    Memorandum #1 of Abas al-Said's investigating officer, Lutuf Mari (Naim 000071)

Exhibit D:    Abas al-Said's Court Ruling (Naim 000072-155)

Exhibit E:    Mu'amar Shahruri's first statement to the police re attack (Naim 000156-175)

Exhibit F:    Mu'amar Shahruri's second statement to the police re attack (Naim 000176-184)

Exhibit G:    Mu'amar Shahruri's Indictment (Naim 000185-202)

Exhibit H:    Fathi Raja Ahmad Khasib's first statement to the police (Naim 000203-215)

Exhibit I:    Fathi Raja Ahmad Khasib's Indictment (Naim 000216-232)

Exhibit J:    Naser Sami Abd al-Razeq Yataima's first statement to the police (Naim 000233-236)

Exhibit K:    Naser Sami Abd al-Razeq Yataima's second statement to the police (Naim 000237-241)

Exhibit L:    Naser Sami Abd al-Razeq Yataima's third statement to the police (Naim 000242-244)

Exhibit M:    Naser Sami Abd al-Razeq Yataima's Indictment (Naim 000245-262)

Exhibit N:    Muhanad Talal Mansur Sharim's first statement to the police (Naim 000263-278)

Exhibit O:    Muhanad Talal Mansur Sharim's second statement to the police (Naim 000279-291)

Exhibit P:    Muhanad Talal Mansur Sharim's third statement to the police (Naim 000292-308)

Exhibit Q:     Muhanad Talal Mansur Sharim's Indictment (Naim 000309-327)
Exhibit R:     Court Ruling of Fathi Khasib, Mu'amar Shahruri, Muhanad Talal Mansur
               Sharim and Naser Sami Abd al-Razeq Yataima (Naim 000328-349)
Exhibit S:     Tariq Zidan's first statement to the police (Naim 000350-364)
Exhibit T:     Tariq Zidan's second statement to the police (Naim 000365-373)
Exhibit U:     Tariq Zidan's third statement to the police (Naim 000374-377)
Exhibit V:     Nadil Qalaq's first statement to the police (Naim 000378-382)
Exhibit W:     Nadil Qalaq's second statement to the police (Naim 000383-390)
Exhibit X:     Nadil Qalaq's third statement to the police (Naim 000391-394)
Exhibit Y:     Ahmad Jayusi's Revised Indictment (Naim 000395-416)
Exhibit Z:     Sentencing of attack accomplices (Naim 000417-419)

- **May 7, 2002 – Sheffield Club Bombing, Rishon Letzion**

Exhibit A:     Abdalla Barghuthi's Indictment (Naim 000420-462)
Exhibit B:     Abdalla Barghuthi's Court Ruling (Naim 000463)
Exhibit C:     Abdalla Barghuthi's Sentencing (Naim 000464-471)
Exhibit D:     Muhammad Hasan Arman's Indictment (Naim 000472-502)
Exhibit E:     Yusuf Abdalla Nimer Anjas's Indictment (Naim 000503)  (This is page 2
               of a four-page document, which appears in full in Hebrew University's
               Exhibit F: Naim 000639-642)
Exhibit F:     Muhammad Arman's and Walid Anjas's Sentencing (Naim 000504-515)
Exhibit G:     Sentencing of the accused in the Hebrew University and Sheffield Club
               bombings (Naim 000516-543)
Exhibit H:     A handwritten statement in Arabic (08/22/2003) by Wisam al-Abasi, in
               which he confesses to executing several terror attacks, including this one.
               (Naim 001382-83)
Exhibit I:     Statement #1 to the police (08/19/2002) by Wisam al-Abasi, in which he
               describes the Sheffield Club terror attack.  (Naim 001384-94)
Exhibit J:     Statement to the police (08/21/2002) by Wael Kasem  (Naim 001395-
               1401)
Exhibit K:     Statement #2 to the police (08/21/2002) by Wisam al-Abasi (Naim
               001402-07)
Exhibit L:     Second Statement to the police (08/22/2002) by Wisam al-Abasi (Naim
               001408-13)
Exhibit M:     A two-page handwritten statement to the police, written in Arabic by Wael
               Kasem, in which there are details of the terror attacks he executed.  (Naim
               001414-15)
Exhibit N:     Statements to the police by Muhammad Uda (A "Siluan" cell member):
               (duplicate of Hebrew University's exhibit L) (Naim 001416-31):
               1) Handwritten statement in Arabic - 08/19/2002
               2) Statement #1 to the police - 08/19/2002
               3) Statement #2 to the police - 08/26/2002
Exhibit O:     Statements to the police by Alaa Abasi (A "Siluan" cell member) (Naim
               001432-48):
               1) 8/19/2002

4

                2) 8/26/2002
                3) 1/9/2002
                + Two handwritten statements and their Hebrew translation:
                1) 8/18/2002
                2) 8/26/2002

**Exhibit P:** Statements to the police by Abdalla Barguthi, in which he admits to manufacturing the explosive device and explosive belt used in the attack (Naim 001449-92):
1) 3/12/2002
2) 3/13/2002
3) 3/30/2002
4) 5/12/2002
5) 5/15/2002
6) 5/22/2002

- **July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem**

**Exhibit A:** Muhammad Hasan Arman's Indictment (Naim 000544-574)  (Duplicate of Sheffield Bombing Exhibit D)

**Exhibit B:** Muhammad Hasan Arman's and Walid Abd al-Aziz Anjas's Sentencing (Naim 000575-586) (Duplicate of Sheffield Bombing Exhibit F)

**Exhibit C:** Abdallah Barghuthi's Indictment (Naim 000587-629)  (Duplicate of Sheffield Bombing Exhibit A and of Ben Yehuda Exhibit A)

**Exhibit D:** Abdallah Barghuthi's Court Ruling (Naim 000630)  (Duplicate of Sheffield Bombing Exhibit B)

**Exhibit E:** Abdallah Barghuthi's Verdict (Naim 000631-638)  (Duplicate of Sheffield Bombing Exhibit C)

**Exhibit F:** Yusuf Abdalla Nimer Anjas's Indictment (Naim 000639-642)  (Duplicate of Sheffield Bombing Exhibit E)

**Exhibit G:** Verdict of the accused in the Hebrew University and Sheffield Club bombings (Naim 000643-670)  (Duplicate of Sheffield Bombing Exhibit G)

**Exhibit H:** Handwritten statement by Wael Qasem (08/21/2002) (+Hebrew translation), in which admits to perpetrating the Hebrew University attack as well as other attacks.  (Naim 001493-96)

**Exhibit I:** Statements to the police by Muhammad Uda (A "Siluan" cell member): (duplicate of Sheffield's exhibit N) (Naim 001497-1512)
1) Handwritten statement in Arabic - 08/19/2002
2) Statement #1 to the police - 08/19/2002
3) Statement #2 to the police - 08/26/2002

**Exhibit J:** Statements to the police by Muhamed Arman from (Naim 001513-74):
08/21/2002
08/26/2002
09/05/2002
09/20/2002
09/22/2002

|               | 09/26/2002 (the 3-page statement is missing page #2) |
|               | 09/26/2002 (second statement that was made the same day) |
|               | 10/2/2002 |

See also:      Sheffield Bombing Exhibit G: Indictment and verdict from the Jerusalem District Court, against Wael Qasem (head of the "Siluan" cell) and his cell members.

- **January 29, 2003 – Shooting Attack on Route 60**

Exhibit A:     Jaser Ismail Musa Barghuthi's Revised Indictment (Naim 000671-708) (duplicate of the Route 60 – June 2003 Attack, exhibit C)

Exhibit B:     Muayyad Shikri Abd al-Hamid Hamad's Sentencing (Naim 000709-721)

Exhibit C:     Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 000722-745)  (duplicate of the Route 60 – June 2003 Attack, exhibit E.)

Exhibit D:     Khaled Abd al-Mua'z Zein al-Din Omar's statement #1 (12/24/2003) to the police (Naim 000746-769) (duplicate of the Route 60 – June 2003 Attack, exhibit F.)

Exhibit E:     Khaled Abd al-Mua'z Zein al-Din Omar's statement #2 to the police (12/31/2003) (Naim 000770-786)  (duplicate of the Route 60 – June 2003 Attack, exhibit G.)

Exhibit F:     Police confirmation of documentation of damage done to property (Naim 000787).

Exhibit G:     Revised Indictment from the Military Court against Ahmad Mustafa Salah Hamed (Na'jar) (duplicate of the Route 60 – June 2003 Attack, exhibit A.) (Naim 001575-93)

Exhibit H:     Statement to the police by Ahmad Mustafa Salah Hamed (Najar) (12/30/2003) and a memorandum following an ISA investigation of Najar (12/21/2003).  (Naim 001594-1611)

Exhibit I:     Statements to the police by Jaser Barghuthi, from (Naim 001612-35):
               12/22/2003
               01/18/2004 11:00 a.m
               01/18/2004 19:55 p.m.
               01/22/2004
               01/29/2004

Exhibit J:     Statements (including handwritten statements in which Omar confessed and lead the police to a weapons' hideout) to the police by Khaled Omar from (Naim 001636-79):
               12/24/2003
               12/31/2003
               01/05/2004
               01/06/2004

Exhibit K:     Statements to the police by Rab'i Khalifa (Naim 001680-86):
               12/20/2003
               01/11/2004

| | |
|---|---|
| Exhibit L: | Statements made to the police (12/23/2003, 12/24/2003, 12/28/2003, 12/31/2003) by Farah Hamed.  (Naim 001687-1709) |
| Exhibit M: | Statement made to the police by Majdi N'asan (Naim 001710-24): 12/17/2003 12/31/2003 |
| Exhibit N: | An ISA memorandum (01/04/2003) following Mahmud Saad's investigation.  (Naim 001725-30) |
| Exhibit O: | Statements to the police by Morad Barghuthi (Naim 001731-53): 12/21/2003 12/25/2003 12/28/2003 12/29/2003 (first at 10:45am, second at 1:30pm) |
| Exhibit P: | Statements to the police by Nimer Hamida (Naim 001754-78): 12/22/2003 12/25/2003 (also includes a handwritten statement) |
| Exhibit Q: | Statements to the police by Yasser Hamed (Naim 001779-89): 12/28/2003 12/31/2003 (two statements made the same day) |
| Exhibit R: | Statements made to the police by Ahmad Khaled Daud Hamed (Naim 001790-1802): 12/28/2003 12/31/2003 01/01/2004 01/15/2004 |
| Exhibit S: | Verdict from the Shomron Military Court against Ahmad Mustafa Salah Hamed.  (Naim 001803-12) |
| Exhibit T: | Sentencing of Ahmad Mustafa Salah Hamed.  (Naim 001813-16) |
| Exhibit U | Statement to the police by Hisham Hijazi (02/10/2004); ISA memoranda following his investigation on 12/21/2003, 12/22/2003, 12/23/2003, 12/29/2003, 01/04/2004 (two investigations), 01/05/2004 (two investigations), 01/06/2004 (two investigation) and 01/07/2004.  (Naim 001817-53) |
| See also: | Route 60 – June Attack, Exhibit B: Ahmad Khaled Dawud Hamed's Indictment (Naim 001018-1019). Route 60 – June Attack, Exhibit D: Jaser Isma'il Musa al-Barghuthi's Sentence (Naim 001058-1070). |

- **March 5, 2003 – Haifa Bus #37 Bombing**

| | |
|---|---|
| Exhibit A: | Indictment against Faadi Muhamed Ibrahim Jo'aba (Naim 000788-798) |
| Exhibit B: | Indictment against Munir Ben-Farid Rajbi (Naim 000799-802) |
| Exhibit C: | Verdict rejecting appeal filed by Munir Rajbi (Naim 000803-808) |
| Exhibit D: | Sentence against Munir Rajbi (Naim 000809-814) |
| Exhibit E: | Sentence against Maed Wael Taleb Abu Sharakh (Naim 000815-823) |
| Exhibit F: | Sentencing arguments against Maed Wael Taleb Abu Sharakh (Naim 000824-825) |

Exhibit G:        Verdict against Fadi Muhamed Ibrahim Jo'aba (Naim 000826-828)

- **March 7, 2003 – Shooting in Kiryat Arba**

Exhibit A:        Revised Indictment against Abdalla Ahmad Mahmud Abu Sif
                  (Naim 000829-837)

- **April 30, 2003 – Mike's Place Bombing, Tel Aviv**

Exhibit A:        Dr. Arian Davidson's report on the perpetrators' DNA (Naim 000838-842)
Exhibit B:        Dr. Chen Kugel's forensic pathology report on Asef Muhammad Hanif's
                  body (Naim 000843-847)
Exhibit C:        Dr. Yehuda Hess's forensic pathology report on Omar Khan Sharif's body
                  (Naim 000848-853)
Exhibit D:        Passport stamps of Asef Muhammad Hanif and Omar Khan Sharif
                  (Naim 000854-860)
Exhibit E:        Police Wanted Poster and copies of passports of Asef Muhammad Hanif
                  and Omar Khan Sharif (Naim 000861-863)
Exhibit F:        ISA detailed report on Palestinian suicide bombers (Naim 000864-948)
Exhibit G:        Summary of the Police's investigation file (09/03/2003).  (Naim 001854-
                  63)
Exhibit H:        The investigation file, including documents sent to the Scotland Yard to
                  get more information regarding the two terrorists, who were British
                  citizens (to be provided)
Exhibit I:        Testimony gathered of victims and eyewitnesses who were present at the
                  attack[1] (to be provided)

- **June 11, 2003 - Jaffa Road Bus 14A Bombing, Jerusalem.**

Exhibit A:        Umar Salah Muhammad Sharif's Indictment (Naim 000949-964)
Exhibit B:        Umar Salah Muhammad Sharif's Court Ruling (Naim 000965-966)
Exhibit C:        Umar Salah Muhammad Sharif's Sentencing (Naim 000967-970)
Exhibit D:        Statements to the police by Bilal Sublaban (Naim 000971-991)
                  06/25/2003 (summary in Hebrew; and Handwritten in Arabic)
                  07/02/2003 (Hebrew and Handwritten in Arabic)
Exhibit E:        Statement to the police by Amer Nasr A-Din (07/15/2003 – Hebrew and
                  Arabic) (Naim 000992-998)

- **June 20, 2003 – Shooting Attack on Route 60**

Exhibit A:        Ahmad Mustafa Saleh Hamed's (Najar) Revised Indictment (Naim
                  000999-1017)  (duplicate of the Route 60 – January Attack, exhibit G.)

---

[1] This includes the testimony of IDF soldiers who encountered the terrorists entering through the "Allenby"
Bridge and "Erez" Checkpoint.

Exhibit B:    Ahmad Khaled Dawud Hamed's Indictment (Naim 001018-1019) (duplicate of the Route 60 – January Attack, exhibit W).

Exhibit C:    Jaser Isma'il Musa al-Barghuthi's Revised Indictment (Naim 001020-1057)  (duplicate of the Route 60 – January Attack, exhibit A)

Exhibit D:    Jaser Isma'il Musa al-Barghuthi's Sentence (Naim 001058-1070) (duplicate of the Route 60 – January Attack, exhibit X).

Exhibit E:    Khaled Abd al-Mua'z Zein al-Din Omar's Revised Indictment (Naim 001071-1094)  (duplicate of the Route 60 – January Attack, exhibit C).

Exhibit F:    Khaled Abd al-Mua'z Zein al-Din Omar's statement #1 to the police (Naim 001095-1118) (duplicate of the Route 60 – January Attack, exhibit D.)

Exhibit G:    Khaled Abd al-Mua'z Zein al-Din Omar's statement #2 to the police (Naim 001119-1135) (duplicate of the Route 60 – January Attack, exhibit E.)

See also

- Route 60 – January 29, 2003 Attack, Exhibit H: Statement to the police by Ahmad Mustafa Salah Hamed (Najar) (12/30/2003) and a memorandum following an ISA investigation of Najar (12/21/2003).
- Route 60 – January 29, 2003 Attack, Exhibit L: Statements to the police (12/23/2003, 12/24/2003, 12/28/2003, 12/31/2003) by Farah Hamed.
- Route 60 – January 29, 2003 Attack, Exhibit R: Statements made to the police by Ahmad Khaled Daud Hamed:
    12/28/2003
    12/31/2003
    01/01/2004
    01/15/2004
- Route 60 – January 29, 2003 Attack, Exhibit J: Statements (including handwritten statements in which Omar confessed and lead the police to a weapons' hideout) to the police by Khaled Omar from:
    12/24/2003
    12/31/2003
    01/05/2004
    01/06/2004
- Route 60 – January 29, 2003 Attack, Exhibit Q: Statements to the police by Yasser Hamed (duplicate of the route 60 – June Attack, exhibit L).
    12/28/2003
    12/31/2003 (two statements made the same day)
- Route 60 – January 29, 2003 Attack, Exhibit S: Verdict from the Shomron Military Court against Ahmad Mustafa Salah Hamed
- Route 60 – January 29, 2003 Attack, Exhibit B: Muayyad Shikri Abd al-Hamid Hamad's Sentencing (Naim 000709-721)
- Route 60 – January 29, 2003 Attack, Exhibit I: Statements to the police by Jaser Barghuthi:

9

12/22/2003
01/18/2004 11:00 a.m
01/18/2004 19:55 p.m.
01/22/2004
01/29/2004

- Route 60 – January 29, 2003 Attack, Exhibit K: Statements to the police by Rab'i Khalifa:
  12/20/2003
  01/11/2004
- Route 60 – January 29, 2003 Attack, Exhibit M: Statements made to the police by Majdi N'asan:
  12/17/2003
  12/31/2003
- Route 60 – January 29, 2003 Attack, Exhibit N: An ISA memorandum (01/04/2003) following Mahmud Saad's investigation
- Route 60 – January 29, 2003 Attack, Exhibit O: Statements to the police by Morad Barghuthi:
  12/21/2003
  12/25/2003
  12/28/2003
  12/29/2003 (first at 10:45am, second at 1:30pm)
- Route 60 – January 29, 2003 Attack, Exhibit P: Statements to the police by Nimer Hamida:
  12/22/2003
  12/25/2003 (also includes a handwritten statement)
- Route 60 – January 29, 2003 Attack, Exhibit T: Sentencing of Ahmad Mustafa Salah Hamed.
- Route 60 – January 29, 2003 Attack, Exhibit U: Statement to the police by Hisham Hijazi (02/10/2004); ISA memorandums following his investigation on 12/21/2003, 12/22/2003, 12/23/2003, 12/29/2003, 01/04/2004 (two investigations), 01/05/2004 (two investigations), 01/06/2004 (two investigation) and 01/07/2004.

- **August 19, 2003 – Bombing of Bus #2, Jerusalem**

Exhibit A:   Nasim Rashed Abd al-Wudud Za'tari's Indictment  (Naim 001136-1151)
Exhibit B:   Majdi Barakat Abd al-Ghafer Za'tari's Indictment (Naim 001152-1165)
Exhibit C:   Abdallah Adnan Yihya Sharbati's Indictment (Naim 001166-1176)
Exhibit D:   Jalal Jamal Hilmi Yaghmur's Indictment (Naim 001177-1181)
Exhibit E:   Ramzi Walid Salah Arfa's Indictment (Naim 001182-1185)
Exhibit F:   Amjad Taher Salah Arfa's Indictment (Naim 001186-1188)

- **September 9, 2003 – Bombing at Café Hillel in Jerusalem**

Exhibit A     Indictment against Salah Subahi Daud Musa  (Naim 001189-1196)

| Exhibit B | Verdict against Salah Subahi Daud Dar Musa (Naim 001197-1201) |
|---|---|
| Exhibit C | Verdict against Ahmad Abid and Nael Abid (Naim 001202-1212) |
| Exhibit D | Statement to the Police by Muhammad Anati – 10/17/2004 (Naim 001213-1217) |
| Exhibit E | ISA Memorandum following the interrogation of Nael Abid – 10/13/2004 (Naim 001218-1223) |
| Exhibit F | Revised indictment against Ahmad Abid and Nael Abid (Naim 001224-1227) |
| Exhibit G | Revised indictment against Abdul Aziz (Ben Muhamad) Amru (Naim 001228-1230) |
| Exhibit H | Statement to the police (10/10/2004) by Ahmad Abid (Naim 001231-34) |
| Exhibit I | Statement to the police (10/14/2004) by Ahmad Abid (Naim 001235-38) |
| Exhibit J | Statement to the police (10/28/2004) by Ahmad Abid (Naim 001239-41) |
| Exhibit K | Statement to the police (09/26/2004) by Ahmad Abid (Naim 001242-49) |
| Exhibit L | Revised indictment against Jamal Othman Muhammad Abu Salim (Naim 001250-1253) |
| Exhibit M | Revised indictment against Muhamad Latif Ahmad Balut (Naim 001254-1264) |
| Exhibit N | Indictment against Ibrahim Muhammad Yunes Dar Musa (Naim 001265-75) |
| Exhibit O | Indictment against Marry Subahi Juvadat Abu Saida (Naim 001276-86) |
| Exhibit P | Indictment against Fuaz Machmud Ali Na'atzer (Naim 001287-95) |
| Exhibit Q | Statement (09/26/2004) made to the police by Nael Abid (Naim 001864-68) |
| Exhibit R | Statements made by Muhammad Anati to the Police.  (Naim 001869-73) |

- **October 22, 2003 - Tel Romeda Shooting Attack**

The police station in Hebron opened an investigation, gathered evidence, and documented the scene. The terrorist's corpse was transferred for an autopsy at the Abu Kabir, Institute of Forensic Medicine, and both the weapon and bullets used by the terrorists were transferred to the Forensic Department National Headquarters.  Because the terrorist died while executing the attack, no one was prosecuted in court and the police investigation file was closed.  I reviewed the witness statements for the attack (Naim 001874-97).

- **January 29, 2004 – Jerusalem Bus # 19 Bombing**

| Exhibit A: | Indictment against Ahmad Salah Ahmad Salah (Naim 001296-307) |
|---|---|
| Exhibit B: | Indictment against Ali Muhamed Hamed Abu Alail (Naim 001308-27) |
| Exhibit C: | Indictment against Abdel El Rachman (Zahher) Joseph Abdel El Rachman Mikaded (Naim 001328-42) |
| Exhibit D: | Indictment against Muhammad Issa Muhammad Maali (Naim 001343-56) |
| Exhibit E: | Indictment against Ali Muhammad Hamed Abu Halil (Naim 001357-73) |

Exhibit D:        Indictment against Muhammad Issa Muhammad Maali (Naim 001343-56)
Exhibit E:        Indictment against Ali Muhammad Hamed Abu Halil (Naim 001357-73)

- **September 24, 2004 – Mortar Strike in Neve Dekalim**

Following the mortar attack from the Gaza Strip towards Neve Dekalim, a police investigation was opened at Erez police station: P.A File 3640/04, during which evidence was collected from witnesses residents, including testimony from a rescue doctor from Gaza, and a police report that I reviewed (Exhibit A - Naim 001374-1381) was generated. The investigation revealed a videotape that appears to be from Hamas, with images of three terrorists masked in uniform, shooting the mortars, one of which hit Neve Dekalim. The individuals have not been found nor prosecuted.

## II.    CONCLUSION

Based upon the information, research, and analysis presented in this report, I have reached the following conclusion:

Based on my familiarity through three decades of experience gathering, collecting, and maintaining the same types of materials, it is my opinion that all of the documents referenced in Section IV, and attached hereto, appear to be authentic records maintained by Israeli law enforcement and Israeli military and district courts in their Attack Files. As discussed in Section III, the original records, including confessions, indictments, and verdicts, are kept in the ordinary course of business with the court in which the prosecution took place, and are obtained upon a formal request made to the respective court.

_12/1/10_
Date

_____
Shaul Naim

12

**EXHIBIT 229 TO DECLARATION OF VALERIE SCHUSTER**

**Moshe Azoulay, Adv.**                                    **Tel: 972 3 6398008**
**7 Rival St. Tel Aviv 67778**                             **Fax: 972 – 3 6398007**
**Israel**                                                 **Email: azou@azou.co.il**

**BAR ADMISSION**
Member, Israel Bar Association, March 1995

**LEGAL EDUCATION**
TEL-AVIV UNIVERSITY, Tel-Aviv, Israel, (LAW & PHILOSOPHY)
LL.B. Degree,  June 1, 1993

**LEGAL EXPERIENCE**
OMER, AZOULAY & CO. ADVOCATES
PARTNER, 1995 – 1997

Leading partner. Concentrating in commercial and land taxation law, legal and business advising to private companies, especially in the fields of construction projects and for industrial companies for the construction market. Initiating, establishing and advising to unions of employers / industrial / Man Power companies. Leading lawsuits for plaintiffs and defendants in commercial and labor disputes as well as in "white collar" criminal cases.

**Moshe Azoulay, Law Offices**
OWNER, 1997 - 2009

Founder & owner, the office gives legal services to commercial and private clients in various fields, especially:

- **Labor law** – including all aspects of employer – employee relationship, litigation, contracts, employment of foreign workers, unions of employers etc.
- **Commercial law** – advising & supporting the process of varied transactions between companies' shareholders, land transactions, construction contractors, tax influences. Handling lawsuits (as plaintiffs or defendants in the fields of the private / commercial law and in some of their criminal aspects - white collar offences. Bankruptcy depts. And procedures.
- **Arbitration** – serving as arbitrator between companies and other entities in commercial, private and family disputes.
- **Family & personal status** – including inheritance & wills & trusts procedures.
- **Foreign Employees status** – Advising and representing against the state authorities. This service is done as humanitarian basis on almost a cost / non profit basis.

**OTHER EXPERIENCE**

**DEFENSE & SECURITY**

- **IDF** – ARMORED & INFANTRY FORCES,  MAJOR, RET. (1972 – 1978).
- **ISA** – SPECIAL OPERATIONS, (1979 – 1988)
- **RESERVE SERVICE** (IDF) 1979 – 1984, ( MOSSAD & ISA)  1989  – 2009

**BUSINESS ACTIVITIES**

- ALUTON LTD. CEO, (1991 – 1995)
- OSIRAK, CONSTRUCTION LTD.. – PARTNER & DIRECTOR, (1995 – 1998).
- SHAHAM, THE ISRAELI SCREEN ACTORS ORGANIZATION, INITIATOR & CHAIRMAN, 1999 – 2005
- LAWYERS FUND FOR CONTINUING EDUCATION LTD. DIRECTOR ON BEHALF OF THE MINISTER OF FINANCE, (2002 – 2005)
- TOPAZ GLASS LTD. EXTERNAL DIRECTOR, (2005 – 2008)
- ASI - ADVANCED SECURITY INTEGRATION LTD., PARTNER & DIRECTOR (2005 – 2008).
- AZCOM CONSULTANTS LTD. PARTNER & DIRECTOR (SINCE 2008)