## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TZVI WEISS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 05-cv-4622 (DLI) (MDG) |
| | : | |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| NATAN APPLEBAUM, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 07-cv-916 (DLI) (MDG) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SAYLES WERBNER P.C.
1201 Elm Street
Suite 4400
Dallas, TX 75270

Attorneys for *Applebaum Plaintiffs*

- and -

ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036

Attorneys for *Weiss Plaintiffs*

January 30, 2012

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................ 2

    I.       HAMAS AND INTERPAL'S FORMATION ........................................2

    II.     NATWEST'S LONGSTANDING, AND EVER-INCREASING, BELIEF
            THAT ITS CUSTOMER FUNDED TERRORISTS ...............................3

    III.    THE CHARITY COMMISSION'S INVESTIGATIONS OF INTERPAL ..........10

    IV.   NATWEST CONTINUALLY DISREGARDED EVIDENCE THAT ITS
            SDGT CUSTOMER WAS, IN FACT, SUPPORTING A TERRORIST
            ORGANIZATION ...............................................................................13

    V.     NATWEST'S SPECIAL RELATIONSHIP WITH INTERPAL ...........................15

ARGUMENT .................................................................................................. 21

    I.       SUMMARY JUDGMENT AND DAUBERT STANDARDs..............................21

    II.     NATWEST IMPROPERLY SEEKS SUMMARY JUDGMENT
            REGARDING ITS STATE OF MIND....................................................22

          A.       State-of-Mind Rarely Warrants Rule 56 Relief .........................23

          B.       There Is One Unitary Standard for Mens Rea for ATA Civil
                 Liability, Recklessness, and Plaintiffs Will Satisfy It................24

          C.       NatWest's Conduct is a Textbook Example of Recklessness....................26

          D.       Triable Issues Exist Concerning NatWest's Mens Rea Under Any
                 Applicable Standard....................................................................29

          E.       The Role of Expert Testimony Regarding Defendant's State-of-
                 Mind............................................................................................34

    III.    NATWEST'S REMAINING GROUNDS FOR SUMMARY JUDGMENT
            ARE NOTHING MORE THAN A REPRISE OF IDENTICAL,
            UNAVAILING, ARGUMENTS MADE BY CL IN ITS MOTION FOR
            SUMMARY JUDGMENT ...................................................................37

    IV.   NATWEST's ACTIONS PROXIMATELY CAUSED PLAINTIFFS'
            INJURIES, GRANTING PLAINTIFFS STANDING TO PURSUE THESE
            CLAIMS ...........................................................................................37

A.   Proximate cause requires only that NatWest ultimately provided some assistance to HAMAS............................................................38

B.   NatWest transferred funds to HAMAS....................................................40

 1.   Dr. Levitt's and Spitzen's expert testimony is the admissible end product of reliable methods....................................................40

 2.   Dr. Levitt's and Spitzen's testimony is compelling evidence that HAMAS controlled most if not all the organizations in question. .........................................................................................41

 3.   Dr. Levitt's and Spitzen's testimony does not encroach on a jury question...............................................................................43

V.   A REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS .................................................................................................43

A.   Shaked's and Kohlmann's Expert Opinions are Admissible....................45

B.   Plaintiffs present substantial additional admissible evidence aside from expert opinion.................................................................................48

CONCLUSION....................................................................................................... 50

# **TABLE OF AUTHORITIES**

**Page**

*Abecassis v. Wyatt*, 2011 WL 1227780 (S.D. Tex. Mar. 31, 2011)....................................39

*Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257 (E.D.N.Y. 2007)......................................34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................21, 34

*Austin v. U.S.*, 509 U.S. 602 (1993)...................................................................................45

*Beer v. Islamic Republic of Iran.*, 574 F.Supp.2d 1 (D.D.C. 2008)..................................46

*Belkin v. Islamic Republic of Iran.*, 667 F.Supp.2d 8 (D.D.C. 2009) ..............................46

*Boim v. Holy Land Foundation for Relief and Development*,
   291 F.3d 1000 (7th Cir. 2002) ...................................................................................26

*Boim v. Holy Land Foundation for Relief and Development*,
   549 F.3d 685 (7th Cir. 2008) ....................................................................25-28, 44-47

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2nd Cir. 1996)....................................37

*Brown v. Henderson*, 257 F.3d 246 (2nd Cir. 2001)........................................................23

*Estate of Klieman v. Palestinian Authority*, 424 F.Supp.2d 153 (D.D.C. 2006) ..............24

*Flatow v. Islamic Republic of Iran.*, 999 F.Supp. 1 (D.D.C. 1998)..................................46

*Freier v. Westinghouse Electric Corp.*, 303 F.3d 176 (2nd Cir. 2002) ............................28

*Friedman v. Meyers*, 482 F.2d 435 (2nd Cir. 1973) ........................................................23

*Gallick v. Baltimore & Ohio Railroad*, 372 U.S. 108 (1963)............................................38

*Gallo v. Prudential Residential Services*, 22 F.3d 1219 (2nd Cir. 1994) .........................21

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011).......................24, 25, 30

*Goldberg v. UBS AG*, 660 F.Supp.2d 410 (E.D.N.Y. 2009).................................25, 26, 40

*Goldberg v. UBS AG*, 690 F.Supp.2d 92 (E.D.N.Y. 2010)...............................................25

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .....................................................29

*Hatzakos v. Acme Am. Refrigeration, Inc.*, 2007 WL 2020182

iii

(E.D.N.Y. July 6, 2007) ............................................................................21

*Higazy v Templeton*, 505 F.3d 161 (2nd Cir. 2007)........................................38

*Holder v. Humanitarian Law Project*, 130 S.Ct. 2705 (2010) ...........................33, 37, 39

*Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ..................32

*In re Agape Litig.* 773 F. Supp. 2d 298 (E.D.N.Y. 2011)..................................29

*In re Chiquita Brands International, Inc. Alien Tort Statute And Shareholder De-*
 *rivative Litigation*, 690 F.Supp.2d 1296 (S.D. Fla. 2010) ...........................25

*In re Chiquita Brands International, Inc. Alien Tort Stature and Shareholder De-*
 *rivative Litigation*, 792 F.Supp.2d 1301 (S.D. Fla. 2010) ...........................34

*In re DDVAP Direct Purchaser Antitrust Litigation*, 585 F.3d 687 (2nd Cir. 2009) ........24

*In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3rd Cir. 2007) ..................49

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72 (1991)...........39

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2nd Cir. 2010) ...........................34

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
 376 F.3d 1123 (D.C. Cir. 2004) ...............................................................39

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ......................................22

*Lelchook v. Commerzbank AG*, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011)................39

*Linde v. Arab Bank plc*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) ......................29, 33, 38, 39

*Lippe v. Bairnco Corp.*, 2002 WL 15630 (S.D.N.Y. Jan. 7, 2002) .......................35

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*,
 268 F.3d 58 (2nd Cir. 2001).....................................................................42

*M&T Mortg. Corp. v. White*, 736 F.Supp.2d 538 (E.D.N.Y. 2010) ......................30

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2nd Cir. 1995) .......................22, 36

*Milton-Abeles v. Creekstone Farms*, 2009 WL 875553 (E.D.N.Y. Mar. 30 2009)..........22

*National Council of Resistance of Iran v. Dep't of State*,
 373 F.3d 152 (D.C. Cir. 2004) ................................................................42

iv

*Owens v. Republic of Sudan*, 412 F.Supp.2d 99 (D.D.C. 2006) .........................................34

*Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27 (D.D.C. 2010)..............................44

*Parsons v. Palestinian Authority*, 651 F.3d 118 (D.C. Cir. 2011)..............................44, 49

*Pension Committee of University of Montreal Pension Plan v. Banc of America Sec., LLC, et al.*, 652 F.Supp.2d 495 (S.D.N.Y. 2009).................................24

*Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46 (D.D.C. 2003) ..........................46

*Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2nd Cir. 1999)..................24

*Rand v. Volvo Fin. N. Am., Inc.*, 2007 WL 1351751 (E.D.N.Y. May 8, 2007)................22

*Reeves v Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).................................34

*Rodriguez v. City of New York*, 72 F.3d 1051 (2nd Cir. 1995).........................................24

*Rothstein v. UBS AG*, 647 F.Supp.2d 292 (S.D.N.Y. 2009).................................................39

*Rothstein v. UBS AG*, 772 F. Supp. 2d 511 (S.D.N.Y. 2011) ............................................39

*S.E.C. v. Kelly*, 765 F.Supp.2d 301 (S.D.N.Y. 2011) ........................................................24

*Silverman v. United Torah Academy Vyirah, Inc.* (*In re Allou Distributors, Inc.*), 446 B.R. 32 (Bankr. E.D.N.Y. 2011)..............................................................24

*Simpson v. Socialist People's Libyan Arab Jamarihiya*, 362 F.Supp.2d 168 (D.D.C. 2005) ................................................................47

*Strauss v. Credit Lyonnais*, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006) ............31, 38, 39

*Townes v. Cove Haven, Inc.*, 2003 WL 22861921 (S.D.N.Y. Dec. 8, 2003)....................21

*U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275 (11th Cir. 2001).......................................45

*U.S. v. Abdi*, 498 F.Supp.2d 1048 (S.D. Ohio 2007) .........................................................47

*U.S. v. Ali*, 2011 WL 4583826 (D. Minn. Sept. 30, 2011)................................................46

*U.S. v Aref*, 2007 WL 603508 (N.D.N.Y. Feb. 22, 2007)................................................47

*U.S. v. Damrah*, 412 F.3d 618 (6th Cir. 2005) ....................................................40, 41, 47

*U.S. v. Defreitas*, 2011 WL 317964 (E.D.N.Y. Jan. 31, 2011)...................................41, 47

*U.S. v. El-Mezain et al.*, 2011 WL 6058592
(5th Cir. Dec. 7, 2011 as revised Dec. 27, 2011) ...................................................22, 38

*U.S. v. Ferguson*, --- F.3d. ---, 2011 WL 6351862 (2d Cir. Dec. 19, 2011).....................29

*U.S. v. Gagliardi*, 506 F.3d 140 (2nd Cir. 2007) ....................................................49

*U.S. v Kassir*, 2010 WL 901767 (S.D.N.Y. Apr. 2, 2009) ................................................47

*U.S. v. Lara-Velasquez*, 919 F.2d 946 (5th Cir. 1990) ........................................24

*U.S. v. Mahaffy*, 2007 WL 2808555 (E.D.N.Y. Jun. 15, 2007).........................................29

*U.S. v. Paracha*, 2006 WL 12768 (S.D.N.Y. January 3, 2006)...................................45, 48

*U.S. v. Pluta*, 176 F.3d 43 (2nd Cir. 1999) ......................................................49

*U.S. v. Sabir*, 2007 WL 1373184 (S.D.N.Y. May 10, 2007) ..........................................47

*U.S. v. Svoboda*, 347 F.2d 471 (2nd Cir. 2003) ........................................................24, 29

*U.S. v. Tin Yat Chin*, 371 F.3d 31 (2nd Cir. 2004) ...........................................49

*U.S. v. Williams*, 506 F.3d 151 (2nd Cir. 2007)........................................................ 45-46

*Viscusi v. Procter & Gamble*, 2007 WL 2071546 (E.D.N.Y. July 16, 2007)...................22

*Weiss v. National Westminster Bank*, 453 F.Supp.2d 609 (E.D.N.Y. 2006) .........32, 38, 42

*Woodman v. WWOR-TV*, 411 F.3d 68 (2nd Cir. 2005)...............................................29, 30

*Wultz v. Islamic Republic of Iran*, 755 F.Supp.2d 1 (D.D.C. 2010) .................................39

*Zerega Avenue Realty Corp. v. Hornbeck Offshore Transport, LLC*,
571 F.3d 206 (2nd Cir. 2009).........................................................................37

## FEDERAL STATUTES

28 U.S.C. § 271(b) .......................................................................................25

31 C.F.R. §597.319 .......................................................................................31

Model Penal Code § 2.02 ...............................................................................25, 26

Restatement of Torts (Third) § 876 ...............................................................29

## PRELIMINARY STATEMENT

Like the defendant in the companion case against Credit Lyonnais ("CL"), Defendant National Westminster Bank Plc ("NatWest" or the "Bank") makes arguments for summary judgment which, if accepted, would leave the Anti-Terrorism Act ("ATA") a dead letter and frustrate Congress's intent to stop the flow of money to terrorists at every link in the financing chain. NatWest, like CL, argues that Plaintiffs cannot prove HAMAS's responsibility for attacks where HAMAS itself claimed responsibility and published "martyrdom" videos and photos of the suicide bomber dressed in HAMAS regalia, and where other HAMAS members, who aided the bomber, confessed and were convicted by Israeli courts. NatWest, also like CL, attempts to relitigate issues it already lost at the Motion to Dismiss stage and argues, contrary to the law of the case and near-unanimous precedent, that to prove proximate cause Plaintiffs must demonstrate that the precise dollars that NatWest transferred to HAMAS front groups were spent on the specific attacks that injured Plaintiffs.

However, there is one significant distinction between NatWest's Motion for Summary Judgment ("MSJ") and CL's: unlike CL, NatWest did not destroy the emails of its anti-money laundering ("AML") group from the relevant period of time. There is thus a real-time record of NatWest's growing concerns, over a 15-year period, that one of the Bank's most profitable clients was a terrorist front group that was using the Bank to move millions of dollars to fund terrorism in Israel and the Palestinian Territories. This has deprived NatWest of the argument employed by CL that its AML concerns stemmed from generic "money laundering" suspicions instead of terrorism financing, and NatWest has been reduced to arguing that, while it *suspected* its customer of financing terrorism, these suspicions never amounted to "knowledge." But the ATA does not require Plaintiffs to show that a defendant possessed existential certainty that the beneficiary of its material support was a terrorist; if it did, only banks whose employees

personally witnessed customer's terrorist conduct could be liable under the law. The Court should reject NatWest's attempt to keep Plaintiffs' mountain of evidence from the jury, particularly on issues like scienter and proximate cause, which are "generally issues for the trier of fact." Pre-Motion Conference Tr. at 11-12, June 23, 2011.

**STATEMENT OF FACTS**

**I.     HAMAS AND INTERPAL'S FORMATION**

Sheikh Ahmed Yassin formed HAMAS (an Arabic acronym for "Islamic Resistance Movement") in the Gaza Strip in 1987, as a competitor to the PLO, the secular umbrella organization representing Palestinian nationalist movements. HAMAS seeks to destroy Israel and establish an Islamic state in all of what is today Israel and the Palestinian Territories. Accordingly, HAMAS violently opposed the 1993 Israeli-PLO peace agreement—which called for non-violence and the division of land into separate Jewish and Arab states—and began a series of sensational and widely-reported suicide bombings targeting civilians in Israel. As a result, President Clinton designated HAMAS a Specially Designated Terrorist ("SDT") in 1995, and the U.S. designated HAMAS a Foreign Terrorist Organization ("FTO") in 1997.  Neither the U.K. nor the EU placed any part of HAMAS on terrorist lists until after September 11, 2001, and until September 2003, the EU only outlawed HAMAS's paramilitary arm, Izz al Din al Qassam. Plaintiffs' Local Rule 56.1(b) Statement of Facts as to Which There is a Genuine Issue to be Tried ("SOF") ¶¶ 1-5. In addition to its paramilitary arm, HAMAS maintains a political bureau and a network of social and religious institutions, referred to as the "Da'wa," which provides social services and operates mosques in the Palestinian Territories, but is also used by HAMAS to recruit operatives and build its political base of support. For example, many HAMAS leaders hold "day jobs" at Da'wa institutions, and Da'wa kindergartens have been documented to spread HAMAS propaganda and even dress students in suicide bomber costumes. SOF ¶ 3.

2

One of HAMAS's most important funding sources is a network of "charitable" fronts it coordinates in the Middle East, Europe, and elsewhere, soliciting donations from Muslim communities.  Since Interpal's precursor, the Palestinian and Lebanon Relief Fund (the "PLRF"), began banking with NatWest in 1987, Interpal has been HAMAS's principal U.K. fundraiser.[1] Israel outlawed Interpal in 1997 due to its HAMAS affiliation, and declared it a terrorist organization a year later for the same reason. SOF ¶¶ 6-8.

## II.     NATWEST'S LONGSTANDING, AND EVER-INCREASING, BELIEF THAT ITS CUSTOMER FUNDED TERRORISTS

Although NatWest continued to maintain accounts for Interpal for nearly 20 years, and closed them only after Judge Sifton denied its motion to dismiss, the Bank's suspicions that Interpal funded Middle East terrorism date back to at least May 1990, when NatWest created a suspicious activity report ("SAR") in its internal database documenting its concerns with Interpal.  In March 1992, NatWest submitted a disclosure to the British authorities under the Prevention of Terrorism Act of 1989 ████████████████████████████████████████ ████████████████████████████████████████████.  SOF ¶¶ 9-11.  NatWest indisputably learned no later than 2001 that Jarada was the alleged leader of HAMAS' "military" wing in the Sudan.  SOF ¶ 12.  The disclosure also noted that U.K. police's terrorism branch████ ████████████████████████ SOF ¶ 10.  In 1996, a NatWest compliance employee attached to the SAR a *Financial Times* article that reported allegations made by the Government of Israel that Interpal was financing HAMAS, which at the time was garnering headlines with a wave of suicide bombings targeting civilians in Israel.  SOF ¶¶ 15-20.  NatWest performed no further diligence on the accounts, beyond normal maintenance, for the rest of the decade.  SOF ¶ 13.

---

[1] In 2003, the U.S. designated Interpal as a Specially Designated Global Terrorist ("SDGT").  The SDGT designation listed PLRF as one of Interpal's recognized aliases, and NatWest both referred to it as a "connected charity" and in a 2001 internal suspicious activity report referred to Interpal solely as PLRF.  SOF ¶¶ 8, 57, 151.

In late 2000, a violent Palestinian uprising erupted against Israel following the failure of the Camp David peace summit. This uprising, known as the "Second Intifada," included the bloodiest wave of suicide bombings and other terrorist attacks in Israel's history. HAMAS perpetrated many, and the bloodiest, of these attacks, which were prominently reported in the U.K., and NatWest's compliance employees involved with Interpal knew of the attacks through media reports. SOF ¶¶ 28-39.

Simultaneously, Interpal's activity in its NatWest accounts exploded, with Interpal increasing its transfers to HAMAS-linked entities from approximately $640,000 in 1999 to over $3.14 million in 2001. At the same time, Interpal's receipt of funds from HAMAS-affiliated fundraisers such as the ███████████████████████ and the Al Aqsa Foundation soared, from ███████ in 1999 to over ████████ in 2001. SOF ¶ 42. In June 2001, NatWest opened an additional U.S. dollar account for Interpal listing the "Union of Good," the umbrella fundraising group established to support HAMAS in the Second Intifada, as an account holder, without performing any due diligence. SOF ¶¶ 6, 48.

Within a few weeks of September 11, 2001, Michael Hoseason, the head of the AML group in NatWest's Fraud Office, obtained a copy of a South African National Intelligence Agency report (the "SA Intelligence Report") that appeared on the website of Cryptome.org, a precursor to Wikileaks that publicly posted secret documents like the reports of various countries' intelligence agencies. SOF ¶¶ 50-52. The SA Intelligence Report, created for South Africa's president in 1998, described HAMAS's global fundraising, including a detailed account of Interpal's critical role in providing, and coordinating, international support for HAMAS. The SA Intelligence Report provided a number of details, including Interpal's account numbers at NatWest, a list of the organization's officers and directors, and a description of the funds flow

between Interpal and other HAMAS entities, that NatWest easily could have verified by reference to documents that it already possessed.  SOF ¶¶ 53-57.  There is no evidence that the Bank questioned the Report's authenticity or accuracy at any time.  SOF ¶ 61.

Hoseason was sufficiently alarmed by the SA Intelligence Report that, rather than taking the time to follow standard practice and complete an official disclosure form, he immediately submitted a letter to the U.K. National Criminal Intelligence Service ("NCIS")[2] with ███████ ██████████████████████████   the only occasion which Hoseason could recall in which he made a disclosure to NCIS in this manner.  Hoseason also represented to NCIS that NatWest ████████████████████████████████████████████ a statement Hoseason admits was designed to reassure law enforcement "that the bank was on top of this."  SOF ¶¶ 58-60.  Nonetheless, though he can describe now what such a review would have involved, neither Hoseason nor any other employee recalls actually undertaking this thorough review, checking to see whether the easily verifiable facts in the SA Intelligence Report were consistent with NatWest's own records (they were), or even speaking to Belinda Lane, Interpal's Relationship Manager ("RM") at NatWest.  SOF ¶¶ 61-64, 70.

The same day that he sent the letter to NCIS, Hoseason opened a case in "Goalkeeper," NatWest's database for organizing terror financing and other suspicions, and on October 15, 2001, he submitted a disclosure to NCIS stating that ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████   SOF ¶ 65.  Despite the explicit admission that the Bank ██████████████████████████████████ and Hoseason's awareness at the time of the typology whereby terrorist groups moved money through charitable

_____

[2] The NCIS gathers and analyzes intelligence on serious and organized crime.  NCIS was subsequently merged into the Serious Organized Crime Agency ("SOCA").

fronts, SOF ¶ 148, there is no record that the Bank made any effort at the time to learn more about Interpal's counterparties, even to the extent of running a simple search on Google.  SOF ¶ 66.  Moreover, the October 15 disclosure ████████████████████████████████████ ██████████████████████████████████████████  ███████████  ████████████ ███████████████████████████████████████████████████████████ ████████████████████████████  SOF ¶¶ 67-69.  By contrast to its decision to partially disclose information about Interpal to NCIS and failure to perform due diligence, NatWest <u>did</u> at that time demonstrate its ability to conduct thorough internet and media research to provide itself comfort that it was not providing services to terrorist-linked entities.  That research, however, was limited to purported associates of Osama Bin Laden.  SOF ¶ 71.

Over the next eight months, three <u>additional</u> internal terror-financing SARs relating to Interpal were sent by NatWest employees in the field to members of Hoseason's AML team, and each was recorded in Goalkeeper.  NatWest's compliance personnel who received an internal SAR about a customer were trained to search Goalkeeper for any previous SARs involving that customer.  SOF ¶ 79.  Each Goalkeeper report included a section where the entities and individuals involved received two color-coded flags ranging from green to red.  The procedural manual for Goalkeeper II, in place from 2000-04, stated that a red risk rating means "[e]xtreme caution is advised" and "[t]he nature of the incident gives serious grounds for concern."  The procedural manual for Goalkeeper III, in place after 2004, stated that a red risk rating meant "[f]irm evidence of wrongdoing."  SOF ¶¶ 72-80.  In almost all of NatWest's Interpal reports, Interpal was color-coded red in both locations.  SOF ¶ 76.  Nevertheless, none of these reports resulted in any discernible increased due diligence or account monitoring.

The first of these internal SARs was filed on November 19, 2001, and explicitly cited

"suspected terrorist funding."  It further reported on two transfers from abroad, one from ███████

for ███████ and another in the amount of ███████ from an individual in ███████ identified as

███████████████████  SOF ¶ 82.  A month later, Doug Hartley, a member of

Hoseason's team, added a remark to the report, noting that "hopefully!" a relationship manager

was looking after the customer, and given the $3 million in turnover that year, the Bank

"need[ed] to gain a clear understanding of the activities here and full details behind some of the

sizeable transactions."   Though Hartley also acknowledged at the time that the "KYC/DD"

(Know Your Customer/Due Diligence) for Interpal "appears deficient," and acknowledges now

that his notes were a request for further action, the Goalkeeper Report and attachments do not

include any indication of what, if anything, was done in response.  SOF ¶¶ 82-4.  This is despite

a follow-on note, dated February 5, 2002, in the same Goalkeeper Report that reiterated the spike

in Interpal's transfers to and from the Middle East and remarked that "[g]iven the current volatile

situation in Palestine we are concerned that as the source of funds cannot be verified; there may

be vulnerability to terrorist funding."   SOF ¶ 85.   Notwithstanding these stated concerns,

NatWest decided that there were "insufficient grounds to make a financial disclosure" to NCIS,

even though in addition to the two transfers cited in the report, ███████ and ███████ had made

███████████████████ in prior inbound payments to Interpal's NatWest accounts.

Thereafter, Interpal received, and disbursed, ███████████████████ from ███████ and

███████.  SOF ¶¶ 85-6, 89.[3]

   By early 2002, NatWest appeared to regard expressions of terrorism concerns relating to

Interpal as routine.  AML employee Martin Wiltshear, on January 17, 2002, referred to an

---

[3] Though not pertaining to Interpal, it nonetheless comes as no surprise that on November 19, 2002, the U.K. Financial Service Authority ("FSA") assessed a £750,000 financial penalty against NatWest's parent company, RBS, after determining that it was violating FSA money laundering rules pertaining to obtaining and retaining sufficient customer information.  SOF ¶ 119.

Interpal suspicion report as "unsurprising," noting that "[t]he concern is <u>obviously</u> terrorist funding especially given the volatile climate of the area" and the outbreak of Palestinian terrorism.  SOF ¶¶ 90-1 (emphasis added).  In contrast to Hoseason and Hartley, Wiltshear <u>did</u> ask Lane for her recent due diligence of Interpal, and Lane provided a barebones account and a request for "further guidance" that was never provided.  SOF ¶ 90.

On ███████, Interpal received a transfer of █████ from ███████████ of the ███████████████████████████████████ (referred to herein as the ███████████████ SOF ¶¶ 93-4.  This precipitated yet another internal SAR, as well as two duplicative Goalkeeper cases, with NatWest employees noting yet again the possibility of "funding terrorism in Middle East" and the nature of the payments from high-risk countries, including the connection between █████ and Al Qaeda. SOF ¶¶ 95-6.

Although NatWest ███████████████████ it told authorities █████████ ███████████████████████████████████████████ ███████████████████████████████████████ ████████████  SOF ¶ 97.  In fact, far from being unusual, Interpal received over █████ from █████ in two separate transfers on █████ and █████ – within a week of the █████ transfer that was reported – and had received transfers of a combined █████ on █████ and █████ Interpal had also received approximately █████ from various Al Aqsa Foundation entities prior to the disclosure, and over █████ thereafter.  SOF ¶ 99.  Nonetheless, <u>none</u> of the other transfers was disclosed to NCIS.[4]



---

[4] Even when NatWest made Interpal-related disclosures to NCIS, with the exception of an August 2003 disclosure ███████████████ none was marked "fast-track," a failure which, as NatWest knew, virtually assured that they would go to the bottom of a pile of disclosures submitted to NCIS, which operated under an enormous backlog.  SOF ¶¶ 136-8.  Additionally, NatWest never used the option available to it under British law to

The AML group did seek a "detailed report" from Belinda Lane regarding her knowledge of Interpal, and the request included a reminder that it was an "offence" to notify Interpal about the investigation.  SOF ¶ 100.  Nevertheless, Lane contacted Interpal for information about ███ ████████, and then, instead of a "detailed report" about Interpal, merely passed on without comment Interpal's characterization of its benefactor (named by Interpal as the ████████ ██████████████████████████████████████ as "an aid agency in ██████" SOF ¶ 103.  Remarkably, even when this purported "aid agency" was designated a terrorist organization by both the U.S. and U.K. in late May 2003, NatWest took no action.  It is undisputed that NatWest contemporaneously learned of these designations, whereby the Al Aqsa Foundation (with ████████████████████████████████████████ ████████████████████ all listed among the A/K/As in the press release announcing the designation) was accused of funneling funds to HAMAS and had its assets frozen even by the U.K. Government.  SOF ¶ 110.

Still, the Bank's "investigation" of the original ██████ transfer merely continued on until August 2003, a 14-month period that Hoseason concedes was extraordinarily and inexplicably long, and during which NatWest continued to process transactions between Interpal on the one hand and both ██████ and ██████ on the other, <u>even after</u> the Al Aqsa Foundation's designation by the Bank of England.  SOF ¶ 108.  On ████████████ for instance, Interpal received a ██████ transfer from the ████████████████████ and a week later received a ██████ from ██████ Moreover, 10 days prior to the designation, Interpal received a ██████ transfer from the ██████████████████████ None of these transactions was disclosed to law enforcement, prompting an admission by Hoseason at deposition that he was "not

---

submit a request to NCIS for pre-authorization to complete a suspicious transaction.

comfortable" that the Bank took no action, and not "enthusiastic" about the fact that its customer's counterparty was designated by the U.K. and U.S. governments, and by the fact that Interpal had earlier falsely characterized this organization to NatWest merely as an "aid agency in ███ " SOF ¶¶ 112-14.

## III.    THE CHARITY COMMISSION'S INVESTIGATIONS OF INTERPAL

HAMAS's campaign of suicide bombings inside Israel in the 1990s received widespread attention in the international, as well as the British, media. In the U.K. in particular, the allegations that Interpal was HAMAS's chief paymaster in Europe also garnered significant attention. SOF ¶¶ 15-18, 20, 25, 27. In addition to the *Financial Times* article appended to NatWest's 1992 SAR, the *Times of London* reported on March 6, 1996 that the U.K.'s foreign intelligence agency was investigating Interpal for funneling money to HAMAS. This resulted in an order by the U.K. Charity Commission freezing Interpal's accounts at NatWest. SOF ¶¶ 15-16. The Commission subsequently unfroze the bank accounts and issued a report deeming Interpal a "well run" charity. However, the report also made clear that the Commission was <u>not</u> concerned with whether Interpal funds were going to HAMAS supporters and the families of suicide bombers "so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas." SOF ¶ 21.

There is, in any event, no evidence that anyone at NatWest read the 1996 Charity Commission report. SOF ¶ 23. Instead, the only evidence that anyone at NatWest was even aware of the Commission's conclusions comes from a phone call that Gerald Matthews, who was Belinda Lane's predecessor as Interpal's RM, had with the Charity Commission in 1996 shortly after the Commission concluded its investigation of Interpal. During this phone conversation, which Matthews subsequently memorialized, an official from the Charity Commission informed

10

Matthews that ████████████████████████████████████████████████

████████████████████████████████  SOF ¶ 22.  Matthews does not recall asking the

official why ████████████████████████████████████████  and instead

merely included this derogatory claim in an Appraisal Form he completed two years later which

NatWest used to process (and ultimately grant) Interpal's request for a $300,000 line of credit.

*Id*.  None of the other NatWest officials who reviewed the Appraisal Form or request had any

reaction to the significance of the Charity Commission's observation that █████████████

█████████████████████████.  In fact, there is no evidence that NatWest undertook any

additional due diligence after the allegations that its customer raised money for HAMAS, even

when Interpal's Chairman admitted to the *Guardian* newspaper in 1997 that some of Interpal's

beneficiaries had been established by HAMAS and compared the relationship between these

groups and the armed wing of HAMAS to the one between Sinn Fein and the terrorist arm of the

IRA, a symbiotic relation with which the British public, long familiar with IRA terror attacks,

would understand.  SOF ¶¶ 23-27.

     More than seven years later, during another wave of HAMAS suicide bombings in Israel,

the Charity Commission was again forced to respond to allegations that Interpal functioned as a

fundraising arm for HAMAS.  On August 19, 2003, a HAMAS suicide bomber attacked a bus in

Jerusalem, killing 13 and hospitalizing 102 others, including six Plaintiffs in this case. SOF ¶

150.  On August 22, President Bush announced that, "by claiming responsibility for th[is]

despicable act of terror," HAMAS "reaffirmed that it is a terrorist organization," and OFAC

designated various HAMAS leaders and entities as SDGTs. The designated SDGTs included

Interpal, which OFAC described as HAMAS's fundraising coordinator, and the conduit through

which money from sources such as the Al Aqsa Foundation flowed to HAMAS.  SOF ¶¶ 151-5.

After the U.S. designation, the Charity Commission ordered Interpal's accounts frozen until September 24, when it lifted the freeze after concluding that it had no "clear evidence showing Interpal had links to Hamas' political or violent militant activities," but making no mention of the allegation that Interpal was linked to and supported HAMAS's social wing.[5] SOF ¶¶ 161, 164. As with the Commission's published 1996 report, there is no evidence that anyone at NatWest read the 2003 report.  SOF ¶ 165.  Irvine Rodger, head of the money laundering unit in the Bank's Corporate Banking and Financial Markets ("CBFM") division in which Interpal's accounts resided beginning in 2002, testified that "lots of reports come to my attention. I don't read them all."  SOF ¶ 180.

The day after the accounts were unfrozen, it was business as usual for Interpal and NatWest, with Interpal transferring over ▮▮▮▮▮ from its accounts to nine HAMAS institutions in the Palestinian Territories and Lebanon.  SOF ¶ 166.  The money continued to flow unabated despite an October 3, 2003 letter from the Bank of England, responding to an earlier letter from the Bank that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ advising Richard Gossage, the head of the Bank's Risk Management unit, that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  SOF ¶ 169.  On October 28, Gossage responded by: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] In 2006, the BBC television program "Panorama" aired a report on Interpal's continued support for HAMAS-controlled social services organizations.  In response to this program (entitled "Faith, Hate, and Charity"), which blasted the Charity Commission's tolerance of Interpal's support for a terrorist organization, and reported upon how charities were linked to HAMAS, helped build support for the movement by spreading HAMAS's Islamist ideology, and included video evidence of young girls at an event organized by one of Interpal's partner charities being encouraged to sing: "... we answer your call and make of our skulls a ladder to your glory, a ladder" and other exhortations to violent martyrdom, (*see also* Israel Dec. Ex. 172 ("Commission Takes a Charitable View of Terrorism," *Daily Telegraph*, 3/28/09)), the Commission undertook a third investigation of Interpal.  This resulted in a 2009 published report, in which the Commission explained that its two prior investigations of Interpal were limited in scope, and only focused upon whether Interpal provided services that were, facially, humanitarian in nature, and whether Interpal had discernible links to HAMAS's military or political wings (rather than any connection to HAMAS). In fact, the Commission flatly conceded that "the allegations reported in the Panorama program raised issues that were broader than the Commission's regulatory remit."  Israel Dec. Ex. 173 at 6.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████.  SOF ¶ 170.  Though NatWest now contends that Gossage's claim of ████████

████████████ was a reference to the Charity Commission investigation (the report of which

there is no evidence that Gossage or anyone else at NatWest read), actual contemporaneous

correspondence indicates that NatWest wanted to assure the Bank of England of its own

diligence, but that having failed to investigate the accounts, it simply echoed the misleading

assurances of ████████████████ that it had made to British law enforcement two years earlier,

in late 2001.  SOF ¶¶ 171-2.  As Amanda Holt, head of Group Enterprise Risk ("GER"), later

conceded, in reference to the Interpal accounts, "we were aware that we had accounts for people

connected to HAMAS, but not HAMAS itself."  SOF ¶ 249.

Thus, NatWest continued to transfer money from Interpal to HAMAS social institutions

in the Middle East, and on ████████████, Interpal made 13 transfers totaling ████████

████████████████ to such Palestinian entities as the Jenin Zakat Committee, which, as

NatWest learned no later than July 13, 2004, had earlier been declared an Unlawful Association

in Israel and with whom Interpal transacted more than ████████████ through NatWest between

1997 and 2006.  At no time did NatWest disclose any of those transfers to British authorities.

SOF ¶¶ 181, 223.

## IV.   NATWEST CONTINUALLY DISREGARDED EVIDENCE THAT ITS SDGT CUSTOMER WAS, IN FACT, SUPPORTING A TERRORIST ORGANIZATION

NatWest's decision to continue serving as a conduit for Interpal to transfer millions of

dollars to Palestinian entities about whom Defendant "knew very little" was due, at least in part,

to its dismissive and disdainful attitude towards U.S. law.  NatWest's compliance employees,

both at the time and later at deposition, referred to U.S. terrorist designations as: (1) serving U.S.

"political interests"; (2) being a "U.S. thing" with "no bearing in the UK"; (3) reflecting U.S. "foreign policy" rather than legitimate security concerns; (4) simply a suspicion of the U.S. authorities; and (5) not "material to the activities" of, or "relevant to," the Bank.  SOF ¶¶ 185-198.

This contemptuous attitude toward the U.S. designation continued manifesting itself in the months and years after Interpal was designated, as NatWest employees manufactured one pretext after another to disregard each additional piece of evidence that tied Interpal to HAMAS and to terrorism.  The Bank's compliance officials also openly questioned the utility of any enhanced due diligence of Interpal.  In October 2003, RBS Fraud employee Tony O'Hear asked Stephen Foster, Guy Cole, and Irvine Rodger if Interpal's payment traffic could be monitored formally or even informally.  SOF ¶ 173.  Although Foster would have expected Cole and Rodger to have conducted a thorough investigation of the accounts, there was no response to O'Hear's email for over six months.  SOF ¶¶ 137, 178-9.  Finally, in late April 2004, Ben Norrie, who reported to Foster, asked if any monitoring or enhanced due diligence had been done of Interpal.  SOF ¶ 206.  He was told that it had not, and in fact that the Bank had "no ability to filter or efficiently monitor payments," an admission which Norrie forwarded to Foster five minutes later with the acknowledgment, "we undertook with the BoE ███████████████  ████████  To date we have not put anything in place (my fault, this one slipped my attention).  From the below it looks like this might not be straightforward."  SOF ¶ 207.[6]

Instead of making good on its promise to the Bank of England ███████████  ████████  NatWest satisfied itself with a selective, retroactive look at transactions in Interpal's

---

[6] Cole further acknowledged on May 17, 2004 that "I realise due to the US terrorist designation of Interpal, that we should be wary of the payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM."  SOF ¶ 208.  Nevertheless, Cole continued recommending that NatWest allow Interpal to continue banking with NatWest.

accounts approximately every six months.  When even this limited review revealed additional proof of Interpal's role in the HAMAS funding superstructure, NatWest channeled the Charity Commission's attitude, going out of its way to discount the bona fides of the evidence.  For example, Cole dismissed Israel's outlawing of the *Al Islah* Charitable Association as "opinion" and "background information," and regarded any conclusion by the Israeli Government about Interpal's links to HAMAS and terrorism as unreliable because he believed Israel to be biased against Palestinian organizations.  SOF ¶ 211.  He later characterized the fact that *Al-Mujama Al-Islami*, which had received more than ▮▮▮▮▮ from Interpal's NatWest accounts by late 2004, had been declared a terrorist group by Israel and was founded by HAMAS's spiritual leader, Sheikh Yassin, as "speculation" and "mainly unsubstantiated commentary."  SOF ¶ 257.

## V.   NATWEST'S SPECIAL RELATIONSHIP WITH INTERPAL

It is impossible to understand NatWest's steadfast refusal to close Interpal's accounts without considering the fact that these accounts were extraordinarily profitable for NatWest, a fact of which the Bank's employees were acutely conscious.  Interpal consistently was one of Belinda Lane's top-earning accounts, producing one of the highest incomes for the Bank, and its profitability was enhanced because of Interpal's strict adherence to Islamic religious law's prohibition on the collection of interest.  This allowed NatWest to simply pocket the interest to which Interpal's large balances would have entitled it.  The disproportionate profitability of Interpal's accounts was an important factor in Lane's annual reviews, and she was promoted due in part to exceeding her income target in 2000 and 2001.  SOF ¶¶ 224-5.

As a result, any complaint by Interpal drew a furious response from Lane, who was extraordinarily solicitous to her client even after NatWest's compliance department had repeatedly communicated its suspicions to Lane about Interpal's connections to terrorism.  For

example, on the same day that the Charity Commission unfroze Interpal's accounts in September 2003, Lane wrote the Bank's Cricklewood Branch, advising that she had received an email from Interpal regarding the unhelpfulness of the branch, and noting that there was "no excuse for rudeness or unhelpfulness…In view of the fact that this is my largest income earning customer by virtue of the credit balances which they maintain with the Bank, I should be grateful if you would arrange to forward to them an urgent apology and also offer to discuss with them, either in person or by phone, some solutions for you both.  I look forward to receiving your comments and also a copy of your apology letter."  SOF ¶ 228.[7]

Significantly, after the SDGT designation, Interpal and NatWest discussed Interpal's interest in preventing U.S. officials from seizing money that Interpal held in U.S. dollars.  Cole, for example, suggested that Interpal close its U.S. dollar account to minimize the risk of American officials freezing Interpal's assets.  SOF ¶¶ 230-1.  Jihad Qundil later attempted to recruit the Bank's assistance in a scheme to sneak U.S. dollar transfers past U.S. regulators by disguising the source of the transfers.   In November 2004 Qundil approached Lane, who continued to regard the Bank's relationship with Interpal as "very valuable" even after it was declared an SDGT, and asked Lane to open an account, denominated in U.S. dollars, that would be controlled by Interpal but did not state Interpal's name.  SOF ¶ 237.  The express purpose of this arrangement was to evade the restrictions that U.S. law placed on Interpal as an SDGT. Although there is no evidence that NatWest actually carried through with this plan, there is also no evidence that it informed its "very valuable" customer that such evasion would be unlawful or

---

[7] Earlier, in May 2003, Lane's assistant Terry Woodley had responded to a complaint from Interpal's secretary Jihad Qundil by writing branch employees "I should be grateful if you would give the matter your urgent attention as the customer is in our Top 5 fee earners for the bank."  This echoed another email Lane sent on February 26, 2003, in which she remarked "if Terry didn't tell you these custs are my top income earners - £9kpm!" SOF ¶ 227.  Extrapolating from this monthly figure over the course of NatWest's relationship with Interpal, the Bank would have earned millions of dollars in profit from maintaining Interpal's accounts.

informed authorities in either the U.K. or the U.S. about its customer's attempt to enlist the Bank's aid in a criminal conspiracy. SOF ¶¶ 236-7. Instead, NatWest continued to service Interpal for years after that illicit request, even after Interpal's payments began to be refused by banks in Arab countries because of its U.S. designation. SOF ¶ 199.

The cozy nature of the relationship between NatWest and Interpal also is evidenced by their collaboration in the closing of Interpal's dollar account in a manner which minimized the risk of U.S. authorities seizing the funds. In late 2004, Jihad Qundil asked Lane whether NatWest could transfer Interpal's U.S. dollar balance into an account maintained by another organization in U.S. dollars at a different bank in London without exposing the funds to seizure by U.S. law enforcement. Lane answered that, while NatWest could effectuate such a transfer, she could not guarantee that the U.S. would remain unaware of it and suggested that Interpal either withdraw the funds in cash or convert them to pounds. SOF ¶¶ 241-3. Ultimately, on ████████ NatWest transferred ████████ on behalf of Interpal to ████████ another member of the HAMAS umbrella organization the Union of Good[8], routing the money through ████████. SOF ¶¶ 245-6. In spite of nearly every conceivable sign of criminality – from government designations to overt efforts to launder money – Lane testified that she "never" had the "teeny weeniest bit of suspicion about Interpal." SOF ¶ 244.

Another measure of NatWest's unusually close, solicitous relationship with Interpal is the Bank's willingness to disregard its own norms and violate its own internal policies in order to keep Interpal's accounts open and functioning. In the process, any dissenting voices within the Bank were ignored, overpowered or brushed aside. For example, in May 2004, Rob Davies, an AML employee in Group Risk Management sent an email expressing the worry that "it may look

---

[8] The Union of Good was designated an SDGT by the U.S. Treasury Department in November 2008.

a little inconsistent going forward if we have to block USD payment (i.e., Interpal is OFAC listed) but are happy to maintain a relationship with them as a customer." There is no record of anyone replying to Davies' email, and at his deposition, Rodger averted the issue by dismissing Davies as a "junior person" who did not understand the issue. SOF ¶¶ 216-7. In December 2004, Group Risk Management decided to allow Interpal's accounts to remain open despite the explicit recognition that "maintaining the relationship will still put us outside Group Standards." SOF ¶ 247. In 2005, the Bank made the policy decision to close the accounts of any non-U.S. customers designated by OFAC because of the "increasing importance of the U.S. to our business." SOF ¶ 263. Nevertheless, the Bank continued to keep Interpal's highly lucrative accounts open, and the profits that the Bank derived from its relationship with Interpal were never far from employees' minds. For example, on December 13, 2004, Rodger wrote an email to the Head of RBS's Corporate Banking & Financial Markets division, noting that Interpal was "quite a big income earner" for Belinda Lane, who would only accept closure of the Interpal accounts "provided her target could be adjusted accordingly." SOF ¶ 254. The profitability of the Interpal accounts was thus explicitly a factor in NatWest's internal deliberations about whether to leave the accounts open, despite the U.S. designation and these same employees' admitted awareness of the potential terrorism connections with these accounts.

When confronted with this evidence at deposition, NatWest/RBS compliance officials involved described an artificial and impracticable internal standard that required the Bank to know with "absolute certainty" that a customer was financing terrorist attacks before it could take action. Hoseason testified that the Bank would close an account only when it "knew with absolute certainty that the customer was engaged in any kind of illegal activity." According to Hoseason, the clear evidence of criminal misconduct that would be necessary for NatWest to exit

18

a relationship would exist if a customer was "convicted in a court of law." Hoseason could not conceive of circumstances short of a criminal conviction that would have caused him to recommend the Bank stop providing financial services to a customer suspected of terror financing, although when asked about the unconvicted (and then-living) Bin Laden, he described him as a "slightly different kettle of fish." Amanda Holt echoed these sentiments, testifying that she would require "cast-iron fact" of Interpal financing terrorism before ordering accounts closed. SOF ¶¶ 275-281. At the same time, however, NatWest compliance employees admitted that the Bank had discretion to close accounts at any time for almost any reason, and that no law or governmental authority in the U.K. obligated or even requested that the Bank keep the Interpal accounts open. Instead, NatWest intentionally and willfully made the choice not to conclude its relationship with Interpal until 2007. SOF ¶ 282. Both NatWest's ability to freely discontinue the relationship and the special treatment it accorded Interpal are underscored by the fact the Bank apparently closed at least five other accounts with potential links to terrorism, none of which satisfied the strict internal standard articulated by Hoseason. SOF ¶¶ 278-9; 284-6.

In fact, NatWest's approach to customers suspected of terrorism involvement but not listed by the Bank of England was governed by criteria unrelated to the strength of the evidence against the particular customer. This is illustrated by the Bank's treatment of an RBS customer called Friends of Al-Aqsa ("FoAA"), a pro-Palestinian organization whose background the Bank said it could not establish and who, in 2002, held a joint conference with Interpal collaborator and Bank of England designee the Al-Aqsa Foundation. SOF ¶ 288. On December 9, 2004, the Bank informed FoAA that it was closing FoAA's accounts, only to reverse its decision when elements within the Muslim community in Britain threatened protests. In the face of these planned protests, and concerned about potential violence and adverse publicity, NatWest

19

reversed course, apologized to FoAA, proposed conducting joint community service projects, and reopened the accounts.  SOF ¶¶ 289-98.

This reversal was admittedly motivated by concerns about the fallout of the account closure and was unrelated to any change in the Bank's evaluation of FoAA's risk for financing terrorism.  During the FoAA episode, Irvine Rodger, who had recommended that NatWest maintain Interpal's accounts even post-SDGT designation, noted RBS's inconsistent approach to FoAA and Interpal, commenting that this showed "that the Group is dysfunctional" since "CBFM rightly keeps Interpal going when it could be argued, there are greater grounds [for exit]."  SOF ¶ 292.  Rodger later suggested that NatWest use its relationship with Interpal to fight any accusation of anti-Islamic bias, stating that "there should be an awareness that CBFM[9] has deliberately maintained its relationship with Interpal (Charity to relieve the suffering of Palestinians) despite US and Israeli sanctions."  SOF ¶ 300 (emphasis added).

Finally, NatWest contemporaneously justified its decision to continue servicing an SDGT by distinguishing between the British and American approaches to terrorism in general, and to the Israeli-Palestinian conflict in particular.  Discussions of whether to maintain Interpal's accounts were punctuated with repeated references to the "differences between UK and US approaches to Israel/Palestine issues" and the "different stance towards the Palestinian issue between the US and UK."  SOF ¶¶ 251-2.  Bank employees' attitudes also reflected the fact that, unlike American anti-terrorism law, the U.K. long distinguished between the paramilitary "wings" of terrorist organizations, like the Izz al Din al Qassam Brigades and the IRA, and the civilian "wings" of terrorist organizations, like the Sinn Fein and HAMAS's Da'wa.  Hoseason therefore admitted that there was no evidence that would have satisfied him that transfers by

---

[9] While CBFM was the RBS Group division Interpal banked with via its NatWest accounts, FoAA's accounts were assigned to RBS Group's "Retail" division.

Interpal were supporting terrorism "short of evidence that the funds were used to buy bullets or explosives." SOF ¶ 277.

## ARGUMENT

### I.   SUMMARY JUDGMENT AND *DAUBERT* STANDARDS

In considering a summary judgment motion, "the court must view all facts in the light most favorable to the nonmoving party. Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Hatzakos v. Acme Am. Refrigeration, Inc.*, 2007 WL 2020182, at *3 (E.D.N.Y. July 6, 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986)) (citations omitted). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs*, 22 F.3d 1219, 1224 (2d Cir. 1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.

Like CL, NatWest's brief entirely omits this standard, instead using its brief to misstate the legal standards under the ATA and attack Plaintiffs' expert witnesses. By focusing so much on Plaintiffs' experts, NatWest makes two fundamental errors. First, it ignores mountains of probative non-expert evidence proffered by Plaintiffs. *See Townes v. Cove Haven, Inc.,* 2003 WL 22861921, at *2 (S.D.N.Y. Dec. 8, 2003) (declining to rule on motion to strike expert where other evidence in record indicated disputed issues of material fact). Second, it levels attacks against Plaintiffs' experts that, even if true, would go to the weight, not the admissibility, of the

expert testimony.[10]  *Rand v. Volvo Fin. N. Am., Inc.*, 2007 WL 1351751, at *3 (E.D.N.Y. May 8, 2007) ("It is not for the court to decide which expert opinion is more persuasive" because "conflicting opinions merely create a credibility question for the jury to resolve.").

But Defendant's attacks on Plaintiffs' experts are also baseless. Under Fed. R. Evid. 702, expert testimony must: (1) be relevant, "aid[ing] the factfinder in answering the questions at issue in the case;" (2) be delivered by a witness "qualified as an expert by knowledge, skill, experience, training or education;" and (3) have "the required indicia of scientific reliability." *Viscusi v. Procter & Gamble*, 05–CV–01528, 2007 WL 2071546, at *6 (E.D.N.Y. July 16, 2007) (internal citations omitted) (quoting Second Circuit law that "rejection of expert testimony is 'the exception rather than the rule'"). Expert testimony is "reliable" under *Daubert* when the expert utilizes a methodology generally accepted in the relevant field. *Viscusi*, 2007 WL 2071546 at *7 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993)); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999)). Plaintiffs' experts easily meet these requirements. Indeed, their testimony travels the same terrain that the Fifth Circuit Court of Appeals recently approved in connection with a criminal prosecution for ATA violations.  *See U.S. v. El-Mezain et al.*, 2011 WL 6058592, at *28-34 (5th Cir. Dec. 7, 2011 as revised Dec. 27, 2011).

## II.   NATWEST IMPROPERLY SEEKS SUMMARY JUDGMENT REGARDING ITS STATE OF MIND

NatWest's arguments and representations concerning the scienter element of Plaintiffs' claims are thoroughly incorrect.  Defendant's distortions and misrepresentations of the facts and

---

[10] *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [expert's] credentials, faults in his use of . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). Weight is not an appropriate consideration on summary judgment.  *See also Milton-Abeles v. Creekstone Farms*, 2009 WL 875553, at *12 (E.D.N.Y. Mar. 30, 2009) (JFB) (denying summary judgment where expert evidence was not "so unreliable as to deem it inadmissible" and citing Second Circuit's comment that "*Daubert* 'advanced a bias in favor of admitting evidence short of that solidly and *indisputably* proven to be reliable'") (quoting *Borowick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)) (emphasis added).

the law are unsurprising, given that the record indisputably demonstrates:

- NatWest's knowledge that Interpal, and Interpal's counter-parties, were connected to terrorism and terrorist organizations generally, Palestinian terrorism specifically, and the terrorist organization HAMAS in particular.

- NatWest's deliberate, conscious and voluntary decision to continue transferring money for Interpal despite its awareness that Interpal and its counter-parties were officially designated as terrorist organizations by the U.S. and Israel.

For all of its bluster, NatWest's scienter arguments add up to little more than a baseless, renewed demand for this Court to apply U.K. law (notwithstanding Judge Sifton's rejection of such pleas years ago), the false suggestion that scienter in civil ATA cases can only be proved through direct evidence of actual, affirmative knowledge (rather than reckless disregard of known risks), and the irrelevant observation that the U.K. has not punished NatWest for its conduct. To accept NatWest's scienter arguments, this Court would have to rule that a foreign financial institution with an active U.S. presence which: (1) had documented terrorism-specific risks for its customer since at least 1992; (2) was fully aware of U.S. law and U.S. designations; and (3) provided vast material support to HAMAS can avoid civil liability under a statute with explicit and intentional extraterritorial reach because a foreign government did not choose to criminalize that activity or did criminalize the activity but chose not to prosecute the Bank. This Court should not and must not grant such a license.

## A.     State-of-Mind Rarely Warrants Rule 56 Relief

As the Court noted at the pre-motion hearing, state of mind is rarely an issue appropriate for disposition at summary judgment. Pre-Motion Conference Tr. at 11-12, June 23, 2011. This is especially true where, as here, summary judgment is sought on the basis of inferences that each party seeks to draw with respect to questions of motive, intent, and subjective feelings and reactions. *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973). *See also Brown v. Henderson*,

257 F.3d 246, 251 (2d Cir. 2001) (explaining that summary judgment should be used sparingly when the defendant's state of mind is at issue "because of juries' special advantages over judges in this area").   The Second Circuit urges lenience in allowing state-of-mind issues to withstand summary judgment even when – and markedly unlike these cases – they are based only upon "fairly tenuous inferences."  *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d 687, 693 (2d Cir. 2009); *S.E.C. v. Kelly*, 765 F. Supp. 2d 301, (S.D.N.Y. 2011) (denying Rule 56 relief and *citing Press v. Chem Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir. 1999).  Indeed, even if facts are undisputed, where competing inferences can be drawn from such facts, summary judgment is generally improper.  S*ee Rodriguez v. City of New York*, 72 F.3d 1051, 1064 (2d Cir. 1995).[11]   This is particularly the case where inferences drawn from the evidence may support several potential *mens rea* states.[12]

### B.     There Is One Unitary Standard for *Mens Rea* for ATA Civil Liability, Recklessness, and Plaintiffs Will Satisfy It

Contrary to NatWest's false suggestion, no bifurcated or tripartite standard exists for ATA civil claims.  Intent, knowledge, willful blindness,[13] and/or recklessness can each alone

---

[11]  Because state of mind inherently turns on delicate, subjective assessments of circumstantial evidence, summary judgment is generally disfavored even where a party must prove actual, affirmative knowledge. *See Silverman v. United Torah Academy Vyirah, Inc. (In re Allou Distributors, Inc.)*, 446 B.R. 32 (Bankr. E.D.N.Y. 2011) (direct evidence of actual knowledge is not necessary in fraud claim; actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of fact to infer that the defendant actually knew of the underlying fraud).  *See also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC, et al.*, 652 F. Supp.2d 495, 503–04  (S.D.N.Y. 2009) (actual knowledge may be shown by circumstantial evidence and the lack of an admission of knowledge does not entitle a defendant to summary judgment); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp.2d 153, 167 (D.D.C. 2006) (issues of fact precluded summary judgment on issue of whether defendants' acts satisfied §2331(1)'s statutory definition of international terrorism).  Even if one mistakenly concluded that the culpable mental state required proving actual knowledge, the record here demands credibility assessments and judgment calls regarding whether the facts suggest excusable error, disregard of risks, actual knowledge, or efforts to avoid knowledge and maintain a veneer of plausible deniability. Any such assessment is impossible to determine at the current procedural juncture.

[12] *See U.S. v. Svoboda*, 347 F.2d 471, 480 (2d Cir. 2003) ("Of course, 'the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct.'") quoting *U.S. v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990).

[13]  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069 (2011) (persons who know enough to blind

satisfy the standard. *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009) ("*Goldberg I*") (civil ATA liability will lie where record demonstrates that facts known to a person provided notice of a risk) citing *Boim v. Holy Land Found. for Relief and Dev.* ("*Boim III*"), 549 F.3d 685, 693 (7th Cir. 2008) (en banc).[14] *See also Goldberg v. UBS AG,* 690 F. Supp. 2d. 92, 113 ("*Goldberg II*") (E.D.N.Y. 2010) (Sections 2339A and 2339B "make clear Congress' intent that the intentional (or reckless) provision of material support to a terrorist organization fulfills each prong of Section 2331(1)'s definition of 'international terrorism' and therefore suffice to establish liability under Section 2333(a)"). *Accord In re Chiquita Brands International, Inc. Alien Tort Statute And Shareholder Derivative Litigation* ("*Chiquita*"), 690 F. Supp. 2d 1296, 1312-13 (S.D. Fla. 2010) (adopting *Boim III* recklessness standard).[15]

Rather than NatWest's unsupported, multiple *mens rea* standard, the civil remedy section of the ATA establishes a <u>unitary</u> scienter standard; a plaintiff pursuing claims under § 2333(a) is

---

themselves to proof of critical facts in effect have actual knowledge of such facts). *See also* American Law Institute, Model Penal Code § 2.02(7) ("when knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes it does not exist.").

[14] *See also Boim III*, 549 F.3d at 694-95 (explaining that in context of a civil ATA claim, recklessness is found where person disregards those risks of which he is aware).

[15] At footnote 2 of its brief, NatWest wrongly insists that recklessness as explained in *Boim III* and adopted in *Goldberg I* is identical to willful blindness. As the Supreme Court explained in *Global-Tech*, a willfully blind defendant takes deliberate actions to avoid confirming a high probability of wrongdoing (and thus can almost be said to have actually known the critical facts) whereas a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing. *Global-Tech*, 131 S. Ct. at 2070. Judge Posner's recklessness standard squares with this principle by requiring that Plaintiffs demonstrate NatWest knew (rather than negligently overlooked) risks. Further, any argument presented by NatWest that *Global-Tech* prohibits recklessness from satisfying the ATA's scienter requirements in civil cases should be rejected; *Global-Tech* is a patent lawsuit focusing upon the specific question of whether deliberate indifference to a known risk that a patent existed satisfied 28 U.S.C. § 271(b)'s requirement that "whoever actively induces infringement of a patent shall be liable as an infringer." <u>Nothing</u> in the decision remotely suggests that the Court was announcing a one-size-fits-all rule for any criminal or civil statute carrying an implied or explicit *mens rea* element. *See, e.g., Apeldyn Corp. v. AU Optronics Corp.*, --- F. Supp. 2d ----, 2011 WL 5552520, *10 (D. Del. Nov 15, 2011) ("The Supreme Court has recently articulated that the doctrine of willful blindness applies in civil lawsuits <u>for induced patent infringement,</u> and has provided "an appropriate limited scope that surpasses recklessness and negligence.") (emphasis added, quoting *Global-Tech*, 131 S. Ct. at 2070). Both *Boim III* and *Goldberg* focus upon the *mens rea* element of § 2333(c), and specifically address why criminal recklessness satisfies the standard for a civil ATA claim. Plainly the consequences of recklessness with respect to connections to terrorist organizations pose qualitatively different risks than those concerning intellectual property infringement.

alleging a violation of § 2331(1). In the context of civil ATA litigation, §§ 2339A-C merely amplify conduct <u>already</u> illegal under § 2331(1).  In its first *Boim* decision (*Boim v. Holy Land Foundation for Relief and Dev.*, 291 F.3d 1000, 1016 (7th Cir. 2002)), which Judge Sifton quoted in *Goldberg I*,[16] the Seventh Circuit explained that §§ 2339A and 2339B provide criminal liability for the provision of material support, whereas section 2333 establishes civil liability. As such, §§ 2339A-B do not serve as independent sources of liability under § 2333, but simply amplify what Congress meant when it used the term "international terrorism" in the latter and thereby merely elucidate conduct already prohibited by § 2333.

### C.    NatWest's Conduct is a Textbook Example of Recklessness

Under Model Penal Code § 2.02(2)(c), persons act "recklessly" when they are aware of the risk of harm but make a conscious decision to act anyway. That standard is consistent with the standard for civil ATA claims echoed by *Boim III* and its progeny, and aptly describes NatWest's conduct vis-à-vis Interpal.  The record demonstrates that from at least 1990 until it finally exited its relationship with Interpal <u>seventeen years later</u>, NatWest was increasingly conscious of the high likelihood that Interpal and its counterparties were connected to terrorism and terrorist organizations.   Indeed, that is the veritable linchpin of NatWest's defense; it concedes such concerns, but asks this Court to conclude that filing a few selective, minimalist disclosures with British law enforcement sufficiently addressed them. Fundamentally, NatWest <u>chose</u> to maintain its customer relationship with Interpal while fully aware of the risks to HAMAS's potential victims.   NatWest <u>also</u> <u>chose</u> to continue sending million of dollars to HAMAS at Interpal's direction while maintaining the profitable accounts even in the face of Interpal's complaints that NatWest wasn't sufficiently assisting it with evading the U.S.

---

[16] 660 F. Supp. 2d at 427-28.

designation. NatWest's conduct falls squarely into the archetype described by Judge Posner in *Boim III*:

> So it would not be enough to impose liability on a donor for violating section 2333, even if there were no state-of-mind requirements in sections 2339A and 2332, that the average person or a reasonable person would realize that the organization he was supporting was a terrorist organization, if the actual defendant did not realize it.  That would just be negligence.  But if you give a gun you know is loaded to a child, you know you are creating a substantial risk of injury and therefore your doing so is reckless and if the child shoots someone you will be liable to the victim.

*Boim III,* 549 F.3d at 693 (emphasis added).  NatWest cannot claim it had no idea that Interpal was likely connected to a terrorist organization; that is precisely why it filed several disclosures with British law enforcement and created internal SARs on Interpal. But all the while the Bank continued facilitating funds transfers to Interpal's counterparties, counterparties that constituted the backbone of HAMAS's social services infrastructure, including *Al Mujama Al Islami*, which, as NatWest knew, was the very birthplace of HAMAS itself.

Further, NatWest's efforts to paint the U.K. Charity Commission's 1996 and 2003 reports as demonstrating its innocent state of mind are transparently false.  First, there is no evidence that NatWest ever read those reports.  Second, the Charity Commission did not order the Bank to continue its relationship with Interpal, or in any way suggest it do so; it merely allowed NatWest to resume services to Interpal.  Moreover, the Commission's inquiries were limited to whether Interpal was connected to HAMAS's "political or violent military activities," and even acknowledged that Interpal may well have given money to HAMAS supporters.  The Commission's decisions could not have provided any comfort for NatWest regarding its own suspicions.  All the Commission's decisions could have done (and likely did do) is reinforce for NatWest the fact that U.K. policies in place at the time concerning HAMAS were far more permissive than those of the U.S.  Nothing about the Charity Commission's reports conflicted

with NatWest's (accurate) belief that Interpal and its counterparties were connected to an FTO.

To use Judge Posner's analogy, NatWest kept providing "bullets" (in the form of hundreds of funds transfers) to children with loaded guns (here, Interpal and its HAMAS-controlled beneficiaries).  NatWest now asks this Court to sanction such conduct on the theory that its own liability is obviated by the fact that U.K. law enforcement <u>might</u> or <u>could</u> have <u>independently</u> leapt in front of such bullets before they hit anyone.  That "narrative" wrongly suggests NatWest cannot be held accountable for its <u>own</u> recklessness and/or willful conduct.

NatWest's conduct is the quintessence of recklessness and/or willful blindness; the Bank plainly comprehended the risks, including to its expanding U.S. operations, posed by its customer and its transactions, yet made repeated, conscious business decisions to maintain that relationship for years. But having made its calculated decision to continue providing financial services to Interpal, NatWest cannot now complain about the prospect of civil liability in the U.S.  It weighed the obvious risk that sending millions of dollars to HAMAS might pose "a problem," made the cynical, macabre cost-benefit analysis that the risk was tolerable as long as the money transferred by the Bank would not be traceable directly to "bullets or explosives," and <u>chose</u> instead to continue collecting its fees. Whatever the ramifications of NatWest's decisions under criminal law, they are the epitome of ATA civil liability as to *mens rea*.  Permitting a scenario where banks can blithely process transactions for FTOs, and claim that their concerns amount to no more than "mere suspicions," because the funds cannot be traced directly to the purchase of bullets or explosives would be outrageous; nearly every bank could claim that no matter how detailed and specific its concerns, they were simply "suspicions."  *Boim III* and its progeny confirm the futility of such arguments.[17]

---

[17] NatWest cites a plethora of inapposite case law in an effort to suggest that mere suspicion is not sufficient to satisfy the scienter requirements. *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176 (2d Cir. 2002) is wildly off-

**D.     Triable Issues Exist Concerning NatWest's *Mens Rea* Under Any Applicable Standard**

As noted above, a party's state of mind is frequently proven through circumstantial evidence. *See Woodman v. WWOR-TV*, 411 F.3d 68, 77 n.8 (2d Cir. 2005).[18] Here, the record is replete with ample evidence of NatWest's scienter under <u>any</u> applicable standard; evidence suggesting recklessness may often equally permit inferences of actual knowledge or willful blindness. *See U.S. v. Ferguson*, --- F.3d. ---, 2011 WL 6351862, at *10 (2d Cir. Dec. 19, 2011) (red flags concerning transaction's legitimacy can suggest both actual knowledge and willful blindness); *U.S. v. Svoboda*, 347 F.2d. 471, 480 (2d Cir. 2003) (evidence raising inferences that defendant actually knew illegal conduct ordinarily raises inference that defendant consciously avoided such knowledge).

Arguably, the Court need not even grapple with the question of whether the Bank's conduct also can be construed as willful blindness, because the record described above indicates NatWest affirmatively knew that its customer was connected to HAMAS.  NatWest argues that there is no evidence of affirmative knowledge, and instead insists that its conduct reflects merely "suspicion" on its part.  However, this argument rests on an artificial and contorted definition of

---

point; in that decision the Second Circuit addressed when plaintiffs' CERCLA claims accrued, concluding that "mere suspicion" on the part of the plaintiffs did not equate to a determination that the plaintiffs "should have known" a substance caused their injuries. *Id*. at 206. *Freir* has no application to determining whether a bank faces liability for ignoring known risks, addressing instead whether a party "should have known" risks, which is not an element of a claim under § 2333(a).  Nor is *In re Agape Litig*. 773 F. Supp. 2d 298 (E.D.N.Y. 2011) relevant. *Agape* addressed pleading standards for aiding-and-abetting fraud claims under New York State law, and specifically observed that the "actual knowledge" element was a "distinct requirement" of a New York State claim for aiding-and-abetting fraud, acknowledging that scienter for the underlying fraud claim could be satisfied by demonstrating recklessness. Plaintiffs are not presently prosecuting claims for aiding-and-abetting against NatWest, and even if they were, the scienter element would be governed by federal common law as set forth in Restatement of Torts (Third) § 876(b), which only requires proof of the accessorial defendant's "general awareness." *See Linde v. Arab Bank plc*, 384 F. Supp. 2d 571, 584 (E.D.N.Y. 2005) citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983). The bottom line is that the precedents cited at pp. 8, fn. 5 and 14 are so glaringly irrelevant to the scienter analysis here that they frame perfectly NatWest's desperation in the face of the evidentiary record it must concede.

[18] That principle is reflected in standard jury instructions in this District advising juries that scienter "is hardly ever capable of proof by direct evidence simply because we have not yet invented a machine that permits us to look into a person's mind to see what his intent is." *U.S. v. Mahaffy*, 2007 WL 2808555 at 50-51 (E.D.N.Y. Jun. 15, 2007).

"knowledge," which would require a mathematical certainty rarely achievable in the real world. As the Second Circuit put it, "the law does not equate 'knowledge' with certitude," *Woodman*, 411 F.3d at 77 n.8. This distinction apparently is lost on Defendant and its AML officers, such as Holt and Hoseason, who testified, respectively, that they would require "cast-iron fact" and "absolute certainty" before closing the account of a customer allegedly financing terrorism.

This is even more true with respect to willful blindness. Both *Global-Tech* and the Model Penal Code correctly recognize that willful blindness turns on the subjective belief of the existence of a "high probability" of certain facts; neither requires a demonstration of absolute certainty. *See Global-Tech*, 131 S. Ct. at 1070. And here, it is simply absurd for NatWest to suggest that the record could not support the inference that NatWest was aware of the high probability of Interpal's connections to HAMAS. Even if NatWest could plausibly claim that its "suspicions" were so vague and undefined that they could not constitute "knowledge" under the ATA, that would only constitute one possible conclusion a jury could draw. *See M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 567 (E.D.N.Y. 2010) ("[T]he range of permissible inferences that might be drawn [regarding state of mind] demonstrates that summary judgment is not an appropriate disposition."). As far back as the early 1990s, NatWest gathered evidence unequivocally stating Interpal's connection to HAMAS. No evidence suggests that NatWest doubted the accuracy of that information, or took any independent steps to vet it; to the contrary, NatWest chose to occasionally communicate that information to U.K. law enforcement while making unfulfilled promises of further investigations designed to reassure the U.K. government.

NatWest concedes that it knew Israel had designated Interpal a terrorist.[19] It concedes

---

[19] NatWest claims that it understood "correctly" that Israeli sanctions did not have jurisdictional reach over its conduct. The question, however, is not whether NatWest might face legal consequences in Israel, but whether its awareness of Israel's designations of Interpal and Interpal's counterparties demonstrates Defendant's knowledge of its customer's (and customer's counter-parties') connections to a U.S.-designated terrorist organization. Judge Sifton

that it knew the U.S. designated Interpal a terrorist.[20]   It had in hand ample information that would have verified the accuracy of information set forth by the U.S. and Israeli governments and reflected in the SA Intelligence Report it forwarded to the British government.  Its witnesses concede that they understood HAMAS was a terrorist organization that perpetrated numerous suicide bombings and other violent attacks between 2000-2004.  Interpal's customer relationship manager at NatWest was even curiously advised by Interpal that the organization was seeing an uptick in donations because of increased media attention to terrorism. And it is undisputed that NatWest facilitated transfers from the U.K. and U.S.-designated Al Aqsa Foundation to Interpal, including Al Aqsa Foundation transfers ███████████████████████████████████ █████████████.

In the face of all of this overwhelming evidence, NatWest asks this Court to find <u>no</u> triable issue of fact as to its state of mind because it claims that inaction by U.K. law enforcement and regulators against Interpal somehow negates all of its own knowledge. This is the same position NatWest presented at the motion to dismiss stage, and it remains incorrect for the same reasons Judge Sifton expressed when he denied Defendant's motion to dismiss:

> Defendant argues, however, that the Charity Commission's unfreezing of Interpal's accounts after completing an investigation and concluding that Interpal espoused "no ... pro-terrorist or anti-Israeli propaganda" and that trustees and staff "were motivated by

_____

held as much when he found that Israeli designations sufficed to support allegations that NatWest "knew of Interpal's terrorist activities prior to any of the specific transactions or terrorist attacks alleged in this case." 453 F.Supp.2d at 630.  In short, NatWest believes that it has *carte blanche* to knowingly provide material support to terrorist organizations as long as the Bank of England and its home country regulators do not object. This is not only morally repugnant but antithetical to the purpose and intent of the ATA.

[20] With regard to extraterritoriality and NatWest's (like CL's) tortured legal reasoning related to it, the fact that Plaintiffs point to Interpal's designation as an SDGT and HAMAS fundraiser as additional evidence of NatWest's <u>state of mind</u> has nothing to do with whether certain OFAC regulations apply extraterritorially, but instead frames why NatWest <u>knew that it was providing material support to HAMAS</u>.  Having conceded knowledge of the SDGT designation, NatWest effectively concedes that it understood that Interpal was "…. a terrorist organization under the standards of this country."  *Strauss v. Crédit Lyonnais*, S.A., 2006 WL 2862704, at *15 (E.D.N.Y. Oct. 6, 2006). And, like Crédit Lyonnais, and notwithstanding that violations of OFAC regulatory requirements are not at issue, NatWest sidesteps the fact that relevant OFAC regulations regarding FTOs and their agents (of which Interpal unquestionably qualifies) apply to banks "doing business" in the United States. *See* 31 C.F.R. §597.319(b).

faith and altruism rather than fanaticism" precludes any allegation that NatWest knew of Interpal's terrorist identity, since NatWest justifiably relied on the Charity Commission's findings.

Plaintiffs respond that because the British government and the Charity Commission's definition of a terrorist organization differs materially from the American definition of a terrorist organization a finding by the Charity Commission does not establish that Interpal was something other than a terrorist organization under American law. The British distinguish in the case of an organization able to establish a wall between a terrorist wing of an organization and a charitable wing.  In contrast, the American government has refused to make such a distinction because "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive."  *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000).   <u>This different approach is highlighted by the fact that in 2003 the United Stated Government designated Interpal an SDGT, but even after examining the evidence against Interpal provided to it by the United States government, the Charity Commission again found that Interpal was not a terrorist organization.  Thus, the Charity Commission's report does not establish as a matter of law and beyond dispute that Interpal was not a terrorist organization.</u>

*Weiss v. Nat'l Westminster Bank*, 453 F. Supp. 2d 609, 630-31 (E.D.N.Y. 2006) (emphasis added).[21]

NatWest's Motion for Summary Judgment shows that, six years after Judge Sifton's opinion, Defendant still refuses to acknowledge the proper standard.   While Judge Sifton correctly noted that the U.K.'s refusal to designate Interpal as a terrorist organization after examining evidence provided to it by the U.S. "highlighted" the "different approach" to terrorism between the two countries, NatWest continues to ask this Court to endorse the British approach.   NW Mem. at 13 (arguing that Interpal has not yet been designated by the U.K.).   Moreover, NatWest continues to hew to the British approach distinguishing between support for

---

[21]   As discussed above, NatWest suggests repeatedly, and falsely, that the Charity Commission concluded that Interpal lacked any discernible ties to HAMAS.  *See* NW Mem. at 6-9.   The suggestion is <u>false</u>; the Charity Commission <u>only</u> concluded that it lacked "clear evidence showing Interpal had links to HAMAS's political or violent military activities."  Nor is there any evidence indicating that NatWest employees read the Commission's 1996 and 2003 reports.  Thus the absence of such evidence suggests the equally plausible – and damning – inference that NatWest deliberately stuck its head in the sand and knowingly failed to apprize itself of the specifics of the Charity Commission's conclusions, which merely reflected the Commission's decision to establish a "wall" between HAMAS's violent and non-violent activities, <u>precisely</u> the wall eschewed explicitly by U.S. anti-terrorism law.

a terrorist organization's violent and non-violent activities, and falsely contending that the ATA requires Plaintiffs to prove that NatWest intended that the funds it transferred on behalf of Interpal "would be used to perpetrate Hamas terrorist attacks." NW Mem. at 2.  This echoes Hoseason's chilling testimony that he would have recommended exiting the relationship with Interpal only if he "had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets."  SOF ¶ 277.  This is not only morally reprehensible but also incontrovertibly antithetical to U.S. law. *See Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2717 (2010) ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities.").

NatWest's argument that its disclosures to British law enforcement evince a lack of knowledge about Interpal's support of terrorism, "because aiding terror financing is a crime in the UK" and the Bank wouldn't have reported its suspicions to British authorities if it wanted to continue to assist Interpal to support terrorism, is directly undercut by the "Hoseason Standard" requiring "clear evidence" of "buying bullets."  NW Mem. at 2.  The record makes clear that NatWest clearly appreciated the distinction between the British and American approaches to terrorism financing in general, and to the Israeli-Palestinian conflict in particular.  Put another way, the evidence suggests that NatWest may have had reservations about assisting Interpal if it believed the funds it was transmitting were to be directly used to perpetrate HAMAS terrorist attacks rather than "merely" support HAMAS.  A jury could reasonably conclude that NatWest was motivated to continue doing business with one of its most profitable customers because it recognized, and exploited, the difference between U.S. (and Israeli) policies toward Interpal and

HAMAS and those employed by the U.K.[22]

Plaintiffs concede that NatWest can cobble together testimony[23] and arguments standing for the unremarkable and irrelevant proposition that the U.K. did not demand that NatWest cease doing business with Interpal, and that NatWest was unlikely to face criminal or civil sanctions in Britain.  But that only highlights why NatWest is <u>not</u> entitled to Rule 56 relief.  This case is about NatWest's business decisions and is governed by U.S. law.  There is no dispute that NatWest was the ultimate arbiter of whether to <u>voluntarily</u> continue maintaining a relationship with a suspected terrorist, and was not in any way compelled to do so by U.K. law enforcement.[24]

### E.      The Role of Expert Testimony Regarding Defendant's State-of-Mind

The documentary record and percipient fact witness testimony contain sufficient evidence

---

[22] In any case, motive is not a requirement in a civil ATA case.  *See Linde v. Arab Bank plc*, 384 F. Supp. 571, 585 (E.D.N.Y. 2005) ("[P]laintiffs need not prove motive in order to succeed in their claims."). *Compare In re Chiquita Brands Intern. Alien Tort Stature and S'holder Deriv. Litig.*, 792 F. Supp. 2d 1301, 1349 (S.D. Fla. 2010) ("The fact that Chiquita may not have had a military objective of its own, or that it was motivated by financial gain, is not dispositive. A 'lack of motive does not negate intent to assist the underlying acts that may be war crimes.'") (citation omitted). *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 292 (E.D.N.Y. 2007). *See also Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 113-115 (D.D.C. 2006).  The two cases cited at n. 4 of NatWest's Memorandum do not require otherwise; both cases address statutorily heightened pleading standards for securities fraud class action claims under the Private Securities Litigation Reform Act of 1995, and are not even relevant for Rule 12(b) purposes for civil ATA claims, let alone under a Rule 56 analysis.

[23] At page 10 of its Memorandum, NatWest presents a few manicured sound bites of witness testimony, all purportedly standing for the proposition that such testimony "confirms" that NatWest did not know that Interpal was funding HAMAS, and that had NatWest known, it would have closed the accounts.  Obviously, only a jury can determine whether the select testimony deserves to be credited in light of NatWest's acknowledged suspicions of its customer, its knowledge of HAMAS and the Second Intifada, and its undisputed decision to continue providing services to Interpal even after learning that both the United States and Israel had designated Interpal a terrorist organization.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (in reviewing the evidence and the inferences that may reasonably be drawn, the court "may not make credibility determinations or weigh the evidence .... 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"), *citing Reeves v Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986)).

[24] This is illustrated by the FoAA episode, described above, where NatWest independently reached its decision to close and later reopen the account; no evidence indicates law enforcement suggested a closure, or was even investigating Friends of Al Aqsa. *See* SOF ¶¶ 288-299. Indeed, during the FoAA closure, Defendant's employees commented on what they perceived as incongruent treatment between FoAA and Interpal, stating that it shows "that the group is dysfunctional if its Palestinian linkage was the reason for exit and CBFM rightly keeps Interpal going when it could be argued, there are greater grounds."  SOF ¶ 292.

to deny NatWest's summary judgment motion without need to consider opinions presented by two of Plaintiffs' expert witnesses, Gary Walters and Professor Clive Walker; as such the Court need not concern itself with Defendant's Fed. R. Evid. 703 and *Daubert* challenges to these witnesses.   But when the Court does address their testimony, it should reject NatWest's challenges and allow the jury to hear and consider Walters' and Walker's opinions.

Both experts' opinions are relevant, and NatWest's claim that they constitute opinions regarding NatWest's state-of-mind is false.   Walters' case-in-chief opinion describes basic banking concepts and terminology, explains how British law enforcement conducts certain types of investigations, and discusses banks' risk management functions generally and Defendant's specifically. These are all areas and issues with which lay jurors are unlikely to be familiar, and provide context, definition, and explanation.[25]

Walters' rebuttal expert report responds to the distorted and incorrect analyses offered by Defendant's experts, Jon Holland and Jonathan Burchfield. Though Walters identifies what he believes to be multiple, material failures on NatWest's part, he offers no opinions regarding NatWest's state of mind.  He simply describes what are, in his opinion, objective failures on the Bank's part from the law enforcement perspective, leaving the factfinder to assess whether such failures indicate any particular state of mind.   This should come as no surprise, given that Walters responds in large measure to Holland's preposterous conclusion that it is "difficult to see" what more NatWest could have done.   These are plainly relevant and appropriate opinions, particularly given that: (1) NatWest's experts laud the Bank's conduct; and (2) NatWest insists that U.K. law enforcement's failure to act against Interpal therefore means that NatWest lacked a

---

[25] *See Lippe v. Bairnco Corp.*, 2002 WL 15630, at *2 (S.D.N.Y. Jan. 7, 2002) (expert permitted to testify as to industry customs and standards, and opine as to how party's conduct measured up to such standards).

culpable state of mind.  Walter's rebuttal opinion appropriately addresses such arguments.[26]

Professor Walker only offers a rebuttal expert opinion addressing Holland and Burchfield's characterizations of the Charity Commission (both generally and specifically in the context of its actions concerning Interpal).  His opinion does not address NatWest's state of mind, and tellingly, Defendant does not challenge seriously the relevancy of his opinions, instead attacking his qualifications and methodology.

Walker and Walters are highly qualified professionals amply suited to present their opinions.  Walker is a leading expert on terrorism, and terrorism financing.  The fact that he has not specifically taught a course focused exclusively on "Charity Law" has no bearing on his ability to accurately research and address the subject, particularly as it arises in a terrorism context.  Walters has deep experience investigating financial institutions and financial crimes pertaining to a host of forensic, fraud, and money laundering issues, is intimately familiar with U.K. law enforcement agencies' practices, jurisdiction, and techniques, and is plainly qualified to address risk management systems and procedures at banks. Ultimately, NatWest's attacks on their credentials, at most, concern the weight a jury may attach to their testimony, not its admissibility.[27]

Likewise, NatWest's attack on Walker's and Walters' methodologies is both unfounded and a matter for the factfinder.  Neither expert based his conclusions solely upon "ipse dixit" or a superficial, layperson review of the record. Instead, they each used their experience and knowledge to explain the actual practices in which the Bank and/or Charity Commission engaged to both place them in proper context, and (when appropriate) to evaluate them against

---

[26] As demonstrated in response to ¶¶ 149-188 of NatWest's Rule 56.1 Statement, Defendant's criticisms of Walters' methodology and claims of mistakes in his report are largely based on distortions of his report and testimony.

[27] "Disputes as to the strength of [an expert witness's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."  *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)

those standards and practices reflective of global approaches to terror financing, money laundering, and financial fraud obligations during the relevant time period. Though NatWest baselessly asserts that the conclusions Walters and Walker reach are "unfounded," that is, again, at most a matter for jury consideration.[28]

## III. NATWEST'S REMAINING GROUNDS FOR SUMMARY JUDGMENT ARE NOTHING MORE THAN A REPRISE OF IDENTICAL, UNAVAILING, ARGUMENTS MADE BY CL IN ITS MOTION FOR SUMMARY JUDGMENT

In addition to scienter, NatWest asks this Court to grant summary judgment because of Plaintiffs' purported inability to show proximate cause, standing, and HAMAS responsibility for the attacks that injured them and murdered their family members.   These arguments merely regurgitate, in most instances verbatim, the same meritless claims made by CL in its summary judgment motion.   Plaintiffs fully responded to these arguments in their opposition to CL's motion for summary judgment, and rather than burdening the Court with another identical recitation of their responses, instead set forth the primary reasons why summary judgment is inappropriate.

## IV. NATWEST'S ACTIONS PROXIMATELY CAUSED PLAINTIFFS' INJURIES, GRANTING PLAINTIFFS STANDING TO PURSUE THESE CLAIMS

NatWest's proximate cause argument—largely an attempt to re-litigate legal arguments it (and CL) lost at the motion to dismiss stage—fails. Substituting the presiding judge does not erase the law of the case, and it certainly does not erase the unanimous judicial precedent on which Judge Sifton based his opinions. Plaintiffs' experts will testify—based on research that

---

[28] *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 214 (2d Cir. 2009) (holding that an expert's "unfounded" assumptions go to the weight, not the admissibility, of the testimony); *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996) ("[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.") (internal quotations and citations omitted).

represents the "gold standard" in the field of terrorism studies[29]—to the degree of control that HAMAS exercised over the 13 organizations at issue here, rendering those organizations either alter egos or agents of HAMAS.  Payments to the same organizations formed the basis of the U.S. designations of the Holy Land Foundation, Interpal and CBSP. In the case of the former, the Fifth Circuit recently upheld HLF and its officers' criminal convictions for providing material support to HAMAS based on largely identical expert testimony and documentary evidence.[30] Because NatWest transferred millions of dollars to HAMAS, and HAMAS is responsible for each of the attacks at issue, a reasonable jury applying the well-established proximate cause standard in ATA cases can easily find that NatWest's actions caused Plaintiffs' injuries.[31]

### A.   Proximate cause requires only that NatWest ultimately provided some assistance to HAMAS.

Following unanimous precedent, Judge Sifton held that, in the ATA context, "proximate cause [requires] only that defendant provided material support to, or collected funds for a terrorist organization which brought about plaintiffs' injuries." *Strauss v. Crédit Lyonnais*, 2006 WL 2862704, at *18 (E.D.N.Y. Oct. 5, 2006).[32]  Terrorist organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates" terrorism, *Weiss*, 453 F.Supp.2d at 626, and because of the fungibility of terrorist funds, a requirement that plaintiffs

---

[29] In *Holder*, Chief Justice Roberts cited one of Plaintiffs' experts, Dr. Matthew Levitt, in connection with his analysis of the relationship between HAMAS's social services network and its overall operations, quoting Dr. Levitt's observation that "[I]nvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts" and also highlighting Dr. Levitt's conclusion that: "Muddying the waters between its political activism, good works, and terrorist attacks, Hamas is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations."  130 S. Ct. at 2725.

[30] *U.S. v. El-Mezain, supra*.  Among other things, the Fifth Circuit resoundingly approved the admission of Dr. Levitt's expert testimony, *id.* at *34.

[31] Even if there were a dispute whether NatWest's conduct is sufficiently causally connected to Plaintiffs' injuries, it should be reserved for trial. *Gallick v. Baltimore & Ohio Railroad*, 372 U.S. 108, 116 (1963) (plaintiff's evidence of causation need only be "plausible" to present to jury); *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) ("foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication").

[32] Therefore, there is no requirement of "but-for" causation. *See, e.g., Linde*, 384 F. Supp. 2d at 584-85; *Goldberg*, 660 F. Supp. 2d at 429; *Weiss*, 453 F. Supp. 2d at 631; *Boim III*, 549 F.3d at 695-97.

demonstrate a "particular dollar given to a terrorist is actually used" would "eviscerate" Section 2333(a)'s stated purpose. *Id*. at 632; *Strauss*, 2006 WL 2862704 at *18.[33]

NatWest clutches to a lonely outlier among ATA decisions, which <u>explicitly</u> distinguishes the facts of our cases. *See* NW Mem. at 21-32 (citing *Rothstein v. UBS AG*, 772 F. Supp. 2d 511 (S.D.N.Y. 2011) ("*Rothstein II*")). In his prior opinion in the *Rothstein* litigation, Judge Rakoff explained that, unlike *Rothstein*, the parallel lawsuit brought against Crédit Lyonnais "involve[s] direct involvement between the defendant banks and the terrorist organizations or 'fronts' those organizations directly controlled." *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009) ("*Rothstein I*") (citing *Strauss*, 2006 WL 2862704; *Linde*, 384 F. Supp. 2d 571).[34] Moreover, *Rothstein*'s status as a judicial outlier, even in the Southern District, was underscored just last August when Judge Hellerstein rejected a defendant's reliance on *Rothstein II* for the proper ATA proximate cause standard. *See Lelchook v. Commerzbank AG*, 2011 WL 4087448, at *1 (S.D.N.Y. Aug. 2, 2011).

NatWest compounds its misplaced reliance on *Rothstein II* by turning to general causation principles developed well outside the terrorism funding context, arguing that Plaintiffs

---

[33] Judge Sifton later explained that if standing existed only where a defendant was a "primary or . . . relatively significant" causal actor, "federal courts would lack jurisdiction over any case or controversy where several acts each independently would have sufficed to cause the harm." *Goldberg*, 660 F. Supp. 2d at 418. *Every* other court to face the question agrees. *See, e.g., Abecassis v. Wyatt*, 2011 WL 1227780, at *29 (S.D. Tex. Mar. 31, 2011); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 53 (D.D.C. 2010); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004); *see also Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2725 (2010) (money is fungible, and FTOs with a dual structure often highlight the civilian and humanitarian purpose of funds while ultimately supporting terrorist operations).

[34] According to NatWest, when Judge Rakoff distinguished *Strauss*, "he did so based upon Judge Sifton's description of plaintiffs' claims in addressing CL's dismissal motion," while at this stage of the case it is clear that Plaintiffs' allegations are based on NatWest's "indirect" support to HAMAS through the 13 organizations. NW Mem. at 29 n.24. This is nonsense, as Judge Rakoff's distinction was based on the direct contact that the banks had with their terrorist front *customers*, here Interpal, not merely the counterparty organizations. 647 F. Supp. 2d at 294. In *Rothstein*, the allegation was only that UBS transferred money to Iran and Iranian *counterparties*, not that it had a terrorist *customer*. *Id*. at 293. Moreover, Judge Sifton's opinion made clear that Plaintiffs alleged that CL executed transfers to organizations with names different than "HAMAS," and even set forth the names of these organizations, which are the same as those here. *See Strauss* 2006 WL 2862704 at *11. Thus, NatWest's attempt to suggest that Judge Rakoff misunderstood the facts of CL when he distinguished it from *Rothstein* fails.

lack standing.  In doing so, NatWest ignores both Judge Sifton's and Judge Trager's exacting analyses of Article III standing in *Goldberg* and the fundamental principle that "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 78 (1991). Plaintiffs' standing to sue NatWest for its support of HAMAS terrorism must be determined under the ATA, rather than Defendant's largely worthless generalizations about standing. *See Goldberg*, 660 F. Supp. 2d at 417 (citing *Heldman v. Sobel*, 962 F.2d 148, 156 (2d Cir. 1992)).

**B.      NatWest transferred funds to HAMAS**

Through the proper testimony of two experts, Dr. Levitt and Arieh Spitzen, and the documents and other evidence on which they rely, Plaintiffs show that 13 organizations in the Palestinian Territories funded by Interpal, <u>itself</u> HAMAS's fundraising coordinator, were controlled by HAMAS.   Like the *Holy Land Foundation* defendants, NatWest cites no affirmative evidence that <u>any</u> of the 13 organizations is independent of HAMAS, instead relying on unfounded attacks on Plaintiffs' experts, attacks that, <u>at best</u>, would go to the weight, and not the admissibility of this testimony.

**1.      Dr. Levitt's and Spitzen's expert testimony is the admissible end product of reliable methods.**

Dr. Levitt's and Spitzen's testimony is clearly relevant: it links the 13 organizations to which NatWest transferred Interpal funds to HAMAS, the perpetrator of the relevant attacks,[35] and NatWest does not challenge Levitt's or Spitzen's qualifications. Both experts also easily satisfy the third Rule 702 factor: contrary to NatWest's contentions, the methods that both employed to reach their conclusions about the 13 organizations' ties to HAMAS (Levitt opines as to 12 of the 13) mirror those of other professional researchers in the terrorism financing field.

---

[35] NatWest's opening salvo, characterizing Levitt's and Spitzen's testimony as irrelevant, is nothing more than a restatement of NatWest's incorrect proximate cause standard.  *See* NW Mem. at 32.

Federal courts have rightly described Dr. Levitt's methodology as "the gold standard in the field of international terrorism." *U.S. v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) ("*Damrah II*") (quoting N.D. Ohio opinion, below). In fact, this very Court has qualified Dr. Levitt to provide similar expert testimony. *See U.S. v. Defreitas*, 2011 WL 317964, at *6-7 (E.D.N.Y. Jan. 31, 2011) (praising Dr. Levitt's "high level of intellectual rigor"). NatWest's attempt to distinguish the multitude of cases where courts allowed Dr. Levitt to provide expert testimony fails: Dr. Levitt is routinely qualified to offer testimony linking various terrorist individuals and organizations—precisely what he offers here.  Nor was Dr. Levitt's methodology here a departure from the scholarly methodology he has employed in the numerous cases where courts have accepted his expert opinion.

NatWest's attack on Spitzen is equally baseless, and serially mischaracterizes Spitzen's deposition testimony.  For example, NatWest suggests that Spitzen failed to consider all 18 factors in the standard he used for judging HAMAS control over organizations, when Spitzen has made clear those identical data sets are simply not equally available for each of the 13 organizations considered, not surprising, given the "secretive nature of terrorists." *Damrah II*, 412 F.3d at 625 (quoting *Damrah I*).  Moreover, NatWest does not even purport to identify any substantive fault with the test employed by Spitzen, which reflects the same fundamental analysis he has employed throughout his 35 years in the field and is consistent with analyses used by other experts in the field.

### 2.    Dr. Levitt's and Spitzen's testimony is compelling evidence that HAMAS controlled most if not all the organizations in question.

Besides providing the jury with insight into how HAMAS and its Da'wa operate, Dr. Levitt and Spitzen—and the sources that inform their opinions—firmly link the 13 organizations and Interpal itself, to HAMAS, easily allowing a reasonable jury to conclude that the thirteen

organizations were controlled by HAMAS.[36] As Judge Sifton explained in denying NatWest's

Motion to Dismiss, and as the Bank now admits (*see* NW Mem. at 24):

> "Ordinary principles of agency law are fairly encompassed by the alias concept under AEDPA," and . . . "the requisite relationship for alias status is established at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former." Factors to [consider] include whether the organizations share leadership [and] whether they commingle finances, publications, offices, etc.

*Weiss*, 453 F. Supp. 2d at 623 (citing *National Council of Resistance of Iran v. Dep't of State*,

373 F.3d 152, 157-59 (D.C. Cir. 2004)).[37]

Like Judge Sifton, Plaintiffs' experts emphasize the role of shared leadership to

determine control.  Spitzen considers the leadership of each of the 13 entities one of the two most

important factors in his 18-factor analysis. 56.1 Resp. at ¶¶ 447-49.  His report and testimony are

replete with analysis of the shared leadership of HAMAS and the organizations, and Levitt's

analysis reveals similar focus on the shared leadership of HAMAS and the organizations.

Applying Levitt's and Spitzen's careful analysis of the ties between HAMAS and the 13

organizations—including, among other things, the presence of key HAMAS figures in the

organizations' leadership—to the control and alter ego tests Judge Sifton described, a reasonable

jury will readily conclude that HAMAS controls these organizations. That Levitt and Spitzen

---

[36] Given the pattern of transfers from Interpal to these organizations over the years, even if a jury found that only some of the organizations were controlled by HAMAS, proximate cause could be satisfied as to all of the attacks.

[37] Judge Sifton also identified a third factor, "whether one operates as a division of the other." *Id.* (citing *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403 (1960)). Unlike the other two factors, collected from then-Judge Roberts' opinion in *National Council of Resistance of Iran*, the third comes from outside the terrorism context. It is unsurprising that this factor—invoking the corporate formalities of *wholly legitimate* organizations—bears less relation to the workings of HAMAS and its fundraising network. As Spitzen explained, "it would be suicide" for HAMAS's alter-egos to formally reveal themselves as such, because "they would be shut down." Israel Dec. Ex. 171 (Spitzen Dep. 96:15-23, July 20, 2011); Resp. to NW SOF ¶ 330. Still, both Spitzen and Levitt discuss at length how the charities form an integral part of the Da'wa and thus are part of HAMAS, meaning that, in practice, they "operate as a division" of HAMAS.  *See* Resp. to NW SOF ¶¶ 319-28.

For the same reason, NatWest is wrong when it contends that Plaintiffs "must" address a 10-factor alter ego test used by the court in *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001), a case applying New York corporate law on veil-piercing.  *See* NW Mem. at 21-2.

both also conceded that the 13 organizations "actually provided the social services that they said they were providing," *see* NW Mem. at 30, shows their credibility as impartial experts, but does not provide NatWest any reprieve under the governing proximate cause standard.

### 3. Dr. Levitt's and Spitzen's testimony does not encroach on a jury question.

Finally, there is no merit to NatWest's contention that Levitt and Spitzen somehow usurp the jury's role in determining ultimate legal liability. *See* NW Mem. at 27. These experts' reports and testimony will <u>assist</u> the jury by describing the extent of HAMAS's control over the 13 organizations, a complicated factual question requiring expertise in the structure of HAMAS and its constituent bodies.

## V. A REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS

Plaintiffs proffer overwhelming evidence establishing HAMAS's responsibility for the terrorist attacks at issue. In addition to appropriate expert testimony, Plaintiffs proffer HAMAS's own claims of responsibility; videotaped "wills" the HAMAS suicide bombers recorded prior to the attacks, dressed in HAMAS regalia and posed in front of HAMAS propaganda posters; handwritten confessions of senior HAMAS terrorists responsible for recruiting, arming and transporting the bombers; and Israeli police and court records. If this evidence is insufficient to establish HAMAS attribution, no terrorist attack could ever form the basis of an ATA suit.

Despite the fact that for 10 of the 15 attacks at issue NatWest does not claim that there is even evidence of <u>possible</u> involvement by any terrorist group other than HAMAS,[38] the Bank pretends that victims of suicide terrorist attacks have the ability to call as witnesses members of the responsible terror groups and then accuses <u>the victims</u> of cynicism for purportedly attempting

---

[38] *See* Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 2 at pp. 5-7).

to use expert evidence as a "shortcut" to prove attribution instead of calling "witnesses with personal knowledge of these attacks" or relying on "other admissible physical or documentary evidence." NW Mem. at 37. The Court must reject this deeply cynical attempt by NatWest to render the civil provision of the ATA unenforceable.

The evidence of HAMAS responsibility for the attacks in this case is far greater than the attribution evidence found sufficient in other civil ATA cases. In *Boim III*, the Seventh Circuit deemed a single 12-page expert declaration by Dr. Reuven Paz sufficient to attribute an attack to HAMAS <u>as a matter of law</u>. Dr. Paz based his conclusions largely on his review of HAMAS-controlled websites and two court documents: an unsigned set of notes prepared by a U.S. foreign service officer who attended one of the terrorist's trials in a Palestinian Authority court and an Israeli court verdict pertaining to one of the perpetrators of the attack. 549 F.3d at 702–705. Similarly, in *Parsons v. Palestinian Authority*, 651 F.3d 118, 133 (D.C. Cir. 2011) ("*Parsons II*"),[39] the D.C. Circuit found the following attribution evidence sufficient to defeat summary judgment: (1) an FBI forensic report containing no conclusions as to responsibility for the attack; (2) a Palestinian security officer's notes of the interrogation of one alleged perpetrator of the attack in which he admitted that he prepared to plant a bomb in approximately the same location as the bomb that killed Parsons but denied actually planting that bomb; and (3) a two-page memo with an unidentified author addressed to the "Director General of the Preventive Security Service" of the Palestinian Authority.

In stark contrast to *Boim III* and *Parsons II*, Plaintiffs' evidence includes 400 pages of

---

[39] In another telling example of NatWest's skewed presentation on summary judgment, its brief repeatedly cites the *Parsons* district court opinion granting summary judgment, 715 F. Supp. 2d 27 (D.D.C. 2010) ("*Parsons I*"), but the only reference to the appellate decision reversing summary judgment is in the obligatory full initial citation to *Parsons I*, which adds "*aff'd in part, rev'd in part on other grounds*", 2011 WL 3528749 (D.C. Cir. Aug. 12, 2011)." NW Mem. at 39. Even this cursory treatment is misleading, as *Parsons II* reversed summary judgment <u>precisely</u> on the ground that *Parsons I* applied an inappropriately high attribution standard. 651 F.3d at 122-6.

responsibility claims by HAMAS (including multiple claims from official HAMAS sources for nine of the attacks); videotaped "wills" of seven suicide bombers involved in the relevant attacks; scores of official court records (including countless documents reflecting the convictions and sentencing of HAMAS operatives who participated in the planning and/or execution of 11 of the attacks); and police reports on 10 of the attacks. *In addition*, Plaintiffs submitted two expert reports with which NatWest attempts to take issue: Ronni Shaked's 140-page report—buttressed by an appendix totaling 1,143 pages—and Evan Kohlmann's 45-page report and 324-page appendix. Characterizing this evidence as insufficient to raise a triable attribution issue simply flies in the face of precedent.

## A.  Shaked's and Kohlmann's Expert Opinions are Admissible

Notwithstanding NatWest's overheated rhetoric to the contrary, both Shaked and Kohlmann are amply qualified, provide insight into material that is the proper subject of expert testimony, and apply appropriate methodologies under *Daubert*.  NatWest's reliance upon *U.S. v. Mejia* and *U.S. v. Paracha* is demonstrably misplaced. *See* NW Mem. at 38-40 (citing *Mejia*, 545 F.3d 179 (2d Cir. 2008) and *Paracha*, 2006 WL 12768 (S.D.N.Y. January 3, 2006)). Both were criminal cases where the proffered expert testimony was found to contravene the Confrontation Clause.[40] In civil cases like *Boim III*, courts have routinely accepted expert testimony of the kind offered in this case. Moreover, the majority of documents on which Shaked and Kohlmann rely are not inadmissible hearsay. Finally, *Mejia* and *Paracha* explicitly endorsed expert testimony of the kind provided here, with the *Paracha* court allowing Kohlmann <u>himself</u> to provide the same type of testimony for which he is offered in this case.

---

[40] *See Austin v. U.S.*, 509 U.S. 602, 608 (1993) ("The protections provided by the Sixth Amendment are explicitly confined to criminal prosecutions."); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1287 n.13 (11th Cir. 2001) ("[o]f course, the Confrontation Clause is not applicable to civil cases"); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 373 n.31 (3d Cir. 2007) ("We note that the Confrontation Clause raises some additional issues about admissibility of such testimony in a criminal case, but those concerns are irrelevant in this civil case.").

Both Shaked and Kohlmann easily satisfy the Rule 702 standards. First, both possess the "specialized training, knowledge, experience and skill" necessary to "attribut[e] responsibility for committing a terrorist attack." *See* NW Mem. at 40 (citing *U.S. v. Williams*, 506 F.3d 151, 158-62 (2d Cir. 2007). Both are internationally-recognized terrorism experts, who have been qualified by federal courts and retained by the FBI on multiple occasions. Israel Dec. Ex. 149 (Shaked Tr. at 52:15-54:15); Schuster Dec. Ex. 210 (Kohlmann Rep. at 3-4).  In addition, Shaked served 13 years in the ISA, Israel's internal security service, and authored one of the seminal books on HAMAS. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1). Both as a journalist and as an Israeli intelligence official, Shaked interviewed countless Palestinian terrorists, including members of HAMAS. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1-5). Kohlmann authored one of the seminal textbooks on terrorism,[41] and has provided expert testimony in 15 federal criminal terrorism cases, two federal civil terrorism cases, two military tribunals at Guantanamo Bay, and eleven foreign terrorism cases. Schuster Dec. Ex. 210 (Kohlmann Rep. at 3-4).[42]  In addition, he has consulted for the FBI, Department of Justice, Treasury Department and National Security Council. Israel Dec. Ex. 147 (Kohlmann Tr. at 158:18-159:23).[43]

Second, Courts <u>routinely</u> permit expert attribution testimony in terrorism cases. S*ee, e.g.*, *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 50-54 (D.D.C. 2003) (allowing expert testimony that Hezbollah carried out a terrorist attack); *Flatow v. Islamic Republic of Iran.*, 999 F. Supp. 1 (D.D.C. 1998) (same for PIJ attack); *Belkin v. Islamic Republic of Iran.*, 667 F. Supp. 2d 8, 12-18 (D.D.C. 2009) (same); *Beer v. Islamic Republic of Iran.*, 574 F. Supp. 2d 1, 6-7

---

[41] This text is used in post-graduate seminars at Harvard's Kennedy School, Princeton University, and Johns Hopkins University. Schuster Dec. Ex. 210 (Kohlmann Rep. at 4-5).

[42] Since Kohlmann filed his report in this case, courts have continued to qualify him to offer expert opinions in terrorism cases. *See U.S. v. Ali*, 2011 WL 4583826 (D. Minn. Sept. 30, 2011); Israel Dec. Ex. 165 (excerpt from Oct. 28, 2010, Transcript in *Owens v. Sudan*, CA No. 01-2224 (D.D.C. 2010), at 212-15).

[43] Contrary to NatWest's efforts to paint Kohlmann as an expert on Al Qaeda alone, Kohlmann has assisted these government agencies in identifying HAMAS financing networks, websites and propaganda videos. *Id.*

(D.D.C. 2008) (same for HAMAS attack). Indeed, *Boim III* affirmed attribution to HAMAS as a matter of law based solely on expert testimony. 549 F.3d at 702-5.

Third, Shaked and Kohlmann utilized reliable methodologies that they delineated in their expert reports and deposition testimony.  Their methodologies track those repeatedly endorsed by courts in terrorism cases, conform to Fed. R. Evid. 702 and 703 and are based upon sufficient data and reliable principles. NatWest's complaint that they consider and rely on inadmissible hearsay—besides being false—is routinely rejected by federal courts (including *Boim III*) that recognize that these materials are precisely the type on which terrorism experts <u>should</u> rely.[44]

NatWest repeatedly mischaracterizes Shaked's methodology.  It devotes significant space to falsely portraying Shaked as "ignoring the competing claim by HAMAS's rival, the al-Aqsa Martyrs Brigades (the 'AAMB')" for the Bus No. 19 attack, NW Mem. at 42, when it is Shaked himself who <u>produced</u> the materials indicating the AAMB's role in the attack, and explained that both it and HAMAS were responsible for the attack, *see* Schuster Ex. 179 (Shaked NW Rep. at 16, 128-140).   Equally false is Defendant's claim that Shaked provides "no genuine expert analysis" and "by his own admission … has not personally investigated these attacks," particularly where Shaked has interviewed many HAMAS operatives, including personal interviews with the HAMAS bombmakers and masterminds behind a number of the attacks at issue.  Schuster Dec. Ex. 179 (Shaked NW Rep. at 27-39, 48-49, 115).

NatWest's attacks on Kohlmann are equally baseless, as they ignore 16 of the 17 federal

---

[44] *See, e.g., Damrah II*, 412 F.3d at 626 (affirming district court's finding that "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon. Indeed, Damrah himself failed to suggest any."); s*ee also U.S. v. Defreitas*, 2011 WL 317964, at *6 (E.D.N.Y. Jan. 31, 2011); *Simpson v. Socialist People's Libyan Arab Jamarihiya*, 362 F. Supp. 2d 168, 177 (D.D.C. 2005) (confirming that experts in the "field of foreign policy and terrorism analysis reasonably rely on newspaper articles to gather and analyze information on newsworthy events"); *U.S. v. Kassir*, 2010 WL 901767, at *7 (S.D.N.Y. Apr. 2, 2009); *U.S. v. Sabir*, 2007 WL 1373184, at * 9 (S.D.N.Y. May 10, 2007); *U.S. v. Abdi*, 498 F. Supp. 2d 1048, 1068-70 (S.D. Ohio 2007); *U.S. v. Aref*, 2007 WL 603508, at *16 (N.D.N.Y. Feb. 22, 2007).

courts who have qualified him to provide expert testimony on terrorist groups' use of the internet and mischaracterize the 17th, *U.S. v. Paracha*. There, the court permitted Kohlmann to give exactly the sort of testimony at issue here, about the organization and activities of a terrorist group (there Al Qaeda). The *Paracha* court did limit Kohlmann's testimony in one respect in that he was not permitted to testify about the roles of two co-conspirators, because his opinion on their involvement derived almost exclusively from "unclassified summaries of statements . . . disclosed to the defendant as . . . a substitution for his constitutional right to present testimony from those witnesses." *Paracha*, 2006 WL 12768, at *22. Obviously, that limitation is inapposite in this case, and the *Paracha* court praised Kohlmann's methodology, the same *Daubert*-compliant methodology that Kohlmann uses here.[45]

Finally, much of NatWest's criticism of Shaked's and Kohlmann's methodologies relies on the conclusion offered by its putative rebuttal expert Brian Michael Jenkins that a terrorist group's claims of responsibility for attacks are unreliable. Even were Jenkins to qualify as a rebuttal expert despite his <u>extremely</u> limited knowledge of HAMAS and Palestinian terrorist groups generally, the reliability of HAMAS's claims of responsibility would be a matter for the jury to decide, not for summary disposition.

---

[45] Improperly using the report of a never-disclosed rebuttal expert witness, NatWest accuses Kohlmann of lying that he collected the communiqués at the time they were issued. *See* NW Mem. at 46. But Kohlmann specifically states that he collected his database until the present time, Schuster Dec. Ex. 210 (Kohlmann Rep. at 7), and that he reviewed materials archived on the Internet Archive website, which "upon studying the way the internet archive works . . . are equally as authoritative and accurate and credible as the ones that [he] saved directly." Israel Dec. Ex. 147 (Kohlmann CL Dep. at 494:12-20). He further explained that starting in 1998:

> we have regularly used the internet archive and material stored on the archive . . . to supplement what we have in our own database because of the fact like I said we simply have not had the good fortune to save every single last file so we've used—it's pretty consistent use of the internet archive to supplement also because of the fact that in many cases it's easier to reproduce materials from the internet archive than it is from our database simply because the internet archive very clearly is time date stamped, it's publicly available, it can be exported and sent to other people and it could be independently verified so for our purposes in a number of ways in which we were using this data using copies distributed by the internet archive provided us benefit.

*Id.* at 493:7-494:2. NatWest's argument is just pretext: if the date on which a particular website was added to the archive was an issue, Defendant was free to ask Kohlmann for this information at his deposition. It did not do so.

**B.     Plaintiffs present substantial additional admissible evidence aside from expert opinion**

NatWest's dogged focus on Shaked and Kohlmann is also unavailing because Plaintiffs present a mountain of <u>direct</u> evidence that is either already independently admissible, or capable of being made so, including most of the documents on which Plaintiffs' experts rely. As *Parsons II* correctly noted, "to defeat summary judgment, a party need only produce evidence 'capable of being converted into admissible evidence.'" 651 F.3d at 133.

Specifically, much of the material that NatWest claims to be inadmissible hearsay is either non-hearsay or subject to exceptions to the hearsay rule, and most of the materials that Plaintiffs' experts rely upon can be authenticated. Notably, Rule 901's threshold for authentication "is not particularly high," *U.S. v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007), and proof of authentication "may be direct or circumstantial," *U.S. v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004). *See also U.S. v. Pluta,* 176 F.3d 43, 49 (2d Cir. 1999) ("authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity ... the standard for authentication, and hence for admissibility, is one of reasonable likelihood") (citation omitted). Plaintiffs' expert Shaul Naim can authenticate any Israeli court documents that are not self-authenticating.[46] Although NatWest (predictably) disparages Naim's report and testimony,[47] NatWest retained its own expert, Moshe Azoulay, to review and in some cases independently obtain the same records, and (predictably) did not challenge the authenticity of

---

[46] Of course, even absent such authentication, Shaked's and Kohlmann's consideration and reliance on these documents as data points is plainly appropriate pursuant to Fed. R. Evid. 703.

[47] According to NatWest, Naim, a 30-year veteran of the Israeli criminal justice system with vast experience in terrorism investigations, is unqualified to offer an authenticity opinion because he spent his police career working in the Jerusalem District, NW Mem. at 49, a specious attack on the qualifications of an expert who has seen and used countless documents of the type in question and is eminently qualified to opine on their authenticity. Schuster Dec. Ex. 222 (Naim Rep. at 3-4). NatWest also falsely alleges that "plaintiffs refused to allow Naim to testify concerning the origin" of the documents that he authenticates, NW Mem. at 49, but the deposition testimony cited for that proposition shows only that Plaintiffs properly enforced the parties' stipulation that neither would question experts about the content of their communications with counsel. *See* Resp. to NW SOF ¶ 847.

any document reviewed by Plaintiffs' experts.[48]  This is par for the course for NatWest, which, while contesting the provenance of Plaintiffs' evidence for tactical reasons, doesn't truly contend that the Israeli court records are forgeries, any more than it contests that the websites in question are truly HAMAS sites or, for that matter, offers any evidence that HAMAS was not responsible for the terrorist attacks at issue, and instead falls back on the mantra that it is Plaintiffs' burden to prove attribution.

## CONCLUSION

These cases are exactly the reason why Congress passed the ATA, and provided private litigants a civil remedy. NatWest's arguments would render the law a dead letter, and provide license to global financial institutions doing billions of dollars in U.S. business to conduct business with terrorists at their discretion. NatWest's motion for summary judgment, premised upon false representations of fact, incorrect statements of law, and utter disregard for the standards governing Rule 56, should be denied in all respects.

Dated:  January 30, 2012

Respectfully Submitted,

SAYLES WERBNER

By: _Mark S Werbner_
Mark S. Werbner
Joel Israel
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

---

[48] In fact, as set forth in his expert report, Azoulay personally reviewed all the materials submitted by the Plaintiffs and concluded that according to the verdicts of military courts "HAMAS was responsible for [nine of the attacks at issue here]." Schuster Dec. Ex. 205 (Azoulay Rep. at 13). Azoulay's report itemizes all of the documents discussed by Naim and while he asserts – irrelevantly – that various records have not been authenticated in a manner that meets the requirements of Israeli domestic evidence law, he does not claim that any of the records are forgeries or otherwise lack authenticity. *Id.*

HEIDEMAN NUDELMAN & KALIK, P.C.
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 463-1818

STONE BONNER & ROCCO LLP
James P. Bonner
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

Attorneys for *Applebaum* Plaintiffs

ZUCKERMAN SPAEDER LLC

By: _____
Aitan D. Goelman
Andrew Caridas
1800 M Street NW, Suite 1000
Washington, DC 20036
(202) 778-1800

OSEN LLC
Gary M. Osen
Joshua D. Glatter
Aaron Schlanger
Ari Ungar
2 University Plaza, Suite 201
Hackensack, NJ 07601-6211
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

51

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue
Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for *Weiss* Plaintiffs