**EXHIBIT 1 to Declaration of Joel Israel**



**FROM THE OFFICE OF PUBLIC AFFAIRS**

August 22, 2003
JS-672

**U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities**

Present Bush today announced that the U.S. Treasury is designating five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists (SDGTs), freezing any assets in the U.S. and prohibiting transactions with U.S. nationals. "By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people," President Bush stated.

"Hamas' leaders and those who provide their funding again have the blood of innocents on their hands," U.S. Treasury Secretary John Snow stated. "Empty words cannot wash them clean. As they resist the road map for peace, Hamas is devastating the dreams of the Palestinian people for freedom, prosperity, and an independent state."

The United States will continue to work with our allies to encourage the recognition of Hamas as a terrorist organization and to shut down their sources of funding and support.

The following individuals are designated as SDGTs by today's action:

1. **Sheik Ahmed Yassin**, the leader of Hamas in Gaza.
2. **Imad Khalil Al-Alami**, a member of the Hamas Political Bureau in Damascus, Syria.
3. **Usama Hamdan**, a senior Hamas leader in Lebanon.
4. **Khalid Mishaal,** head of the Hamas Political Bureau and Executive Committee in Damascus, Syria.
5. **Musa Abu Marzouk**, Deputy Chief of the Political Bureau in Syria.
6. **Abdel Aziz Rantisi,** a Hamas leader in Gaza reporting to Sheik Yassin.

The following charities that provide support to Hamas and form part of its funding network in Europe are designated as well:

1. **Commite de Bienfaisance et de Secours aux Palestiniens (CBSP),** of France.
2. **The Association de Secours Palestinien (ASP)**, of Switzerland. (An organization related to CBSP)
3. **The Palestinian Relief and Development Fund, or Interpal,** headquartered in the United Kingdom.
4. **The Palestinian Association in Austria,** PVOE.
5. **The Sanabil Association for Relief and Development**, based in Lebanon.

Today's action follows several actions taken against Hamas previously, including the designation of several entities that formed part of the Hamas network such as Holy Land Foundation for Relief and Development and the Al Aqsa Foundation, key sources of financial support for Hamas.

ATTACHED: Fact Sheet

**END**

NWП-000048

**Fact Sheet**

**HAMAS**

HAMAS is a terrorist organization that has intentionally killed hundreds of innocent civilians and continues to kill and maim with the aim of terrorizing a civilian population. HAMAS was formed in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood. HAMAS activists have conducted many attacks – including large-scale suicide bombings – against Israeli citizens and military targets. In the early 1990s, they also targeted U.S. citizens, suspected Palestinian collaborators and Fatah rivals.

During 2002, more than 370 persons -- including 10 US citizens -- were killed in Israel, the West Bank and the Gaza Strip by acts of terrorism. HAMAS was responsible for carrying out more than 50 of these attacks, including shootings, suicide bombings, and standoff mortar-and-rocket attacks against civilian and military targets. The group was responsible for the most deadly Palestinian terrorist attack of the year – the suicide bombings of a Passover gathering at a Netanya hotel that killed 29 Israelis, including one dual US-Israeli citizen. HAMAS's bombing of a cafeteria on the Hebrew University campus, which killed nine, including five US citizens, demonstrated its willingness to stage operations in areas frequented by students and tourists, including US citizens.

In addition, HAMAS's rejectionist policies and terrorist actions are aimed at derailing the peace process in the Middle East. On April 30, 2003, the U.S. government released the roadmap for peace between Israel and the Palestinians, which constitutes a crucial step in international efforts to actively support movement towards peace in the region. HAMAS, however, has since the mid-90s purposefully worked against all regional peace efforts by engaging in suicide attacks and other acts of the most violent type of terrorism. On June 8 and June 11 HAMAS took credit for attacks against Israelis. The organization also took credit for four suicide bombings in a 24-hour period during the weekend preceding May 20th.

On June 29th, HAMAS and two other designated terrorist groups announced a cease-fire. On August 19th, a suicide bomber detonated his bomb in the back of a double-length city bus near the border between east and west Jerusalem. According to a CNN report, HAMAS said that it was committed to the cease-fire, but also claimed responsibility, stating that "the man was a member of its military wing, the Izzedine al-Qassam Brigades, and the attack came in revenge for the killing of two of its members." As noted by the Human Rights Watch, "the Hamas leadership has pursued attacks against civilians as a conscious policy. A group that pursues multiple, intentional attacks against civilians as a matter of policy is responsible for crimes against humanity." *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians* at 67 (October 2002).

Under Executive Order 13224, the United States government may block the assets of HAMAS (which it has done) and the assets of individuals and entities owned or controlled by; acting for or on behalf of; or providing support, financial or otherwise, to designated terrorists and terrorist organizations. HAMAS has been designated as a Foreign Terrorist Organization (66 Fed. Reg. 51088) and as a Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, or Support Terrorism."

The United States government has credible evidence that the following six HAMAS leaders that command and control terrorist activity.

**Sheik Ahmed YASSIN**

Yassin is the head of HAMAS in Gaza. He maintains a direct line of communication with other HAMAS leaders on coordination of HAMAS's military activities and openly admits that there is no distinguishing the political and military wings of Hamas. Yassin also conveys messages about operational planning to other Palestinian terrorist organizations.

Surrounding Yassin is an entourage of personal "bodyguards," including many

implicated in providing information and supplies to fugitives, recruiting personnel to undertake military operations, planning terrorist cells, attacking settlements, and manufacturing weapons and explosives.

**Imad Khalil AL-ALAMI**

Imad al-Alami is a member of HAMAS's Political Bureau, located in Damascus, Syria and a military operations leader. As part of HAMAS's external leadership, he is part of the most effective and powerful wing of HAMAS because it controls the West Bank and prison branches of HAMAS and has gained total financial control.

Al-Alami has had oversight responsibility for the military wing of HAMAS within the Palestinian territories. As a HAMAS military leader, al-Alami directs sending personnel and funding to the West Bank and Gaza.

**Usama HAMDAN**

Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad. He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters.

Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian "martyrs" have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel.

**Khalid MISHAAL**

Mishaal is the chief of HAMAS's Political Bureau in Damascus, Syria and heads HAMAS's Executive Committee and Special Office. Cells in the military wing based in the West Bank that are under Mishaal's control have been implicated in efforts by HAMAS to plan large attacks that would undermine the "road map" peace plan.

Mishaal has been responsible for supervising assassination operations, bombings and the killing of Israeli settlers. To execute HAMAS military activities, Mishaal maintains a direct link to Gaza-based HAMAS leader, Abdel Aziz Rantisi (*see* below). He also provides instructions to other parts of the HAMAS military wing.

Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian martyrs have been transferred to the bank account of Mishaal and used to support HAMAS military operations in Israel.

**Musa Abu MARZOUK**

Musa Abu Marzouk is the Deputy Chief of HAMAS's Political Bureau based in Damascus, Syria. His activities include directing and coordinating terrorist acts by HAMAS against soldiers and civilians in Israel and the West Bank and Gaza. Marzouk maintains relationships with other terrorist organizations.

The Holy Land Foundation for Relief and Development, designated as an SDGT under EO 13224 in December 2001 based on its support of HAMAS, received start-up funding and instructions from Marzouk. Marzouk is implicated in receiving financing for HAMAS terrorist attacks, funds that have been used to mobilize military activity inside Israel and the West Bank/Gaza.

**Abdel Aziz RANTISI**

Rantisi is part of the HAMAS leadership in Gaza, operating directly under HAMAS Leader Shaykh Yassin (*see* above) with whom he maintains a direct line of communication for the coordination of military operations. Mishaal (*see* above) has also issued orders for HAMAS terrorist activities through Rantisi.

NWII-000050

In October of 2002, Rantisi was reported in Al-Hayat as personally claiming responsibility for the assassination of a Palestinian Authority Police Colonel. In December 2002, he was calling for Iraq to prepare thousands of martyrdom cells to fight the United States and its allies in the event of war.

**HAMAS Fundraising**

HAMAS raises tens of millions or dollars per year throughout the world using charitable fundraising as cover. While HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes. HAMAS relies on donations from Palestinian expatriates around the world and private benefactors located in moderate Arab states, Western Europe and North America. HAMAS uses a web of charities to facilitate funding and to funnel money. Charitable donations to non-governmental organizations are commingled, moved between charities in ways that hide the money trail, and then often diverted or siphoned to support terrorism.

The funds pouring into HAMAS coffers directly undermine the Middle East peace process. These funds allow the group to continue to foment violence, strengthen its terrorist infrastructure, and undermine responsible leadership.

The political leadership of HAMAS directs its terrorist networks just as they oversee their other activities. HAMAS leader Yassin confirms this relationship, stating to al-Sharq al-Awsat on August 12, 2002: "When we make decisions on the political level and convey them to the military wing, it abides by it normally." The intensity of this relationship is reflected in Yassin's words quoted by Reuters on May 12, 1998:

> We can not separate the wing from the body. If we do so, the body will not be able to fly. HAMAS is one body.

A report issued by Human Rights Watch has also noted the unified nature of HAMAS:

> In the case of Hamas, there is abundant evidence that the military wing is accountable to a political steering committee . . . . Yassin himself, as well as Salah Shehadah, the late founder and commander of the 'Izz al-Din al-Qassam Brigades, have confirmed in public remarks that the military wing implements policies that are set by the political wing." *Erased in a Moment: Suicide Bombing Attacks Against Israeli Civilians* at 63 (October 2002).

Fundraising may involve community solicitation in the United States, Canada, Europe and the Middle East or solicitations directly to wealthy donors. While some donors may be aware of the intended use of their donations, too many innocent donors who intend for their money to be used to provide humanitarian services here or abroad, are unwittingly funding acts of violence when these funds are diverted to terrorist causes.

HAMAS fundraising directly undermines Prime Minister Mahmud Abbas's ability to clamp down on this terrorist organization. One of the obstacles and threats to establishing a meaningful dialogue toward peace comes from terrorist groups such as HAMAS, which view peace discussions as inimical to their interests and are intent on undermining the multilateral work on the roadmap by fomenting violence. In order to support momentum towards peace, to strengthen the ability of the new Palestinian leadership to take the actions it must take against HAMAS, the assets of groups like HAMAS must be frozen, as well as the assets of organizations raising funds for such terrorist groups.

E.O. 13224 provides a means to disrupt the financial-support network funding terrorist attacks committed by HAMAS. Under this Order, the United States

government may block the assets of HAMAS (which it has done) and the assets of individuals and entities owned or controlled by; acting for or on behalf of; or providing support, financial or otherwise, to designated terrorists and terrorist organizations. HAMAS has been designated as a Foreign Terrorist Organization (66 Fed. Reg. 51088) and as a Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, or Support Terrorism."

The United States government has credible evidence that the following five organizations are part of a web of charities raising funds on behalf of HAMAS and using humanitarians purposes as a cover for acts that support HAMAS. Funds are generated by, and flow through, these organizations on behalf of HAMAS.

**Commite de Bienfaisance et de Secours aux Palestiniens (CBSP) and Association de Secours Palestinien (ASP)**

CBSP and ASP are primary fundraisers for HAMAS in France and Switzerland, respectively. Founded in France in the late 80s/early 90s, CBSP acts in collaboration with more than a dozen humanitarian organizations based in different towns in the West Bank and Gaza and in Palestinian refugee camps in Jordan and Lebanon. ASP, a subsidiary of CBSP, was founded in Switzerland in 1994. The group has collected large amounts of money from mosques and Islamic centers, which it then transfers to sub-organizations of HAMAS. Khalid Al-Shuli is the president of CBSP and ASP .

**Palestinian Relief and Development Fund (Interpal)**

Interpal, headquartered in the UK, has been a principal charity utilized to hide the flow of money to HAMAS. Reporting indicates it is the conduit through which money flows to HAMAS from other charities, *e.g.*, the Al Aqsa Foundation (designated under EO 13224 on May 29th) and oversees the activities of other charities. For example, the Sanabil Association for Relief and Development (designated as part of this tranche), represents Interpal in Lebanon. Reporting indicates that Interpal is the fundraising coordinator of HAMAS. This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy.

**Palestinian Association in Austria (PVOE)**

PVOE is controlled by the leader of HAMAS in Austria. The money is targeted to support members of HAMAS and is funneled through other charities in Lebanon, the West Bank and Gaza or other areas of the Middle East in order to ensure the transfer of funds is undetected and reaches its intended recipients. PVOE is part of the HAMAS network of charitable organizations that includes the Al Aqsa Foundation.

**Sanabil Association for Relief and Development**

The Sanabil Association for Relief and Development (Sanabil), based in Sidon, Lebanon, receives large quantities of funds raised by major HAMAS-affiliated charities in Europe and the Middle East and, in turn, provides funding to HAMAS. For example, Sanabil has received funding from the Al Aqsa Foundation (designated as an SDGT under EO 13224 in May 2003); the Holy Land Foundation for Relief and Development (designated as an SDGT under EO 13224 in December 2001), and Interpal (designated as an SDGT under EO 13224 as part of this tranche). HAMAS recruits permanent members from the religious and the poor by extending charity to them from organizations such as Sanabil.

At the request of a HAMAS political leader, Sanabil began opening offices in all of the Palestinian refugee camps in Lebanon in August of 2001 in order to increase the foundation's role inside the camps. After starting by providing basic necessities the charity eventually began asking poor families within the camps to fill out

application forms, particularly those who had worked with the Islamic Movement (Al-Haraka al-Islamiyya) and HAMAS. As a result of these efforts, Sanabil has increased its scope of influence within the camps.

**EXHIBIT 2 to Declaration of Joel Israel**

52650 Federal Register / Vol. 62, No. 195 / Wednesday, October 8, 1997 / Notices

## DEPARTMENT OF STATE

### Office of the Coordinator for Counterterroism

[Public Notice 2612]

### Designation of Foreign Terrorist Organizations

**AGENCY:** Department of State.

**ACTION:** Designation of Foreign Terrorist Organizations.

Pursuant to Section 219 of the Immigration and Nationality Act (''INA''), as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, § 302, 110 Stat. 1214, 1248 (1996), and amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, 110 Stat. 3009 (1996), I hereby designate, effective October 8, 1997, the following organizations as foreign terrorist organizations:

*Abu Nidal Organization*

also known as the ANO, also known as Black September, also known as Fatah Revolutionary Council, also known as the Arab Revolutionary Council, also known as the Arab Revolutionary Brigades, also known as the Revolutionary Organization of Socialist Muslims

*Abu Sayyaf Group*

also known as Al Harakat Al Islamiyya

*Armed Islamic Group*

also known as GIA, also known as Groupement Islamique Arme, also known as AIG, also known as Al-Jama'ah al-Islamiyah al-Musallah

*Aum Shinrikyo*

also known as Aum Supreme Truth, also known as A.I.C. Sogo Kenkyusho, also known as A.I.C. Comprehensive Research Institute

*Democratic Front for the Liberation of Palestine-Hawatmeh Faction*

also known as the Democratic Front for the Liberation of Palestine, also known as the DFLP, also known as the Red Star Forces, also known as the Red Star Battalions

*Euzkadi Ta Askatasuna*

also known as Basque Fatherland and Liberty, also known as ETA

*Gama'a al-Islamiyya*

also known as the Islamic Group, also known as IG, also known as al-Gama'at, also known as Islamic Gama'at, also known as Egyptian al-Gama'at al-Islamiyya

*HAMAS*

also known as the Islamic Resistance Movement, also known as Harakat al-Muqawama al-Islamiya, also known as Students of Ayyash, also known as Students of the Engineer, also known as Yahya Ayyash Units, also known as Izz Al-Din Al-Qassim Brigades, also known as Izz Al-Din Al-Qassim Forces, also known as Izz Al-Din Al-Qassim Battalions, also known as Izz al-Din Al Qassam Brigades, also known as Izz al-Din Al Qassam Forces, also known as Izz al-Din Al Qassam Battalions

*Harakat ul-Ansar*

also known as HUA, also known as al-Hadid, also known as al-Hadith, also known as al-Faran

*Hizballah*

also known as Party of God, also known as Islamic Jihad, also known as Islamic Jihad Organization, also known as Revolutionary Justice Organization, also known as Organization of the Oppressed on Earth, also known as Islamic Jihad for the Liberation of Palestine, also known as Organization of Right Against Wrong, also known as Ansar Allah, also known as Followers of the Prophet Muhammad

*Japanese Red Army*

also known as Nippon Sekigun, also known as Nihon Sekigun, also known as the Anti-Imperialist International Brigade, also known as the Holy War Brigade, also known as the Anti-War Democratic Front, also known as the JRA, also known as the AIIB

*al-Jihad*

also known as Egyptian al-Jihad, also known as Vanguards of Conquest, also known as Vanguards of Victory, also known as Talai'i al-Fath, also known as Tala'ah al-Fatah, also known as Tala'al al-Fateh, also known as Tala' al-Fateh, also known as Talaah al-Fatah, also known as Tala'al-Fateh, also known as New Jihad, also known as Egyptian Islamic Jihad, also known as Jihad Group

*Kach*

also known as the Repression of Traitors, also known as Dikuy Bogdim, also known as DOV, also known as the State of Judea, also known as the Committee for the Safety of the Roads, also known as the Sword of David, also known as Judea Police

*Kahane Chai*

also known as Kahane Lives, also known as the Kfar Tapuah Fund, also known as The Judean Voice

*Khmer Rouge*

also known as the Party of Democratic Kampuchea, also known as the National Army of Democratic Kampuchea

*Kurdistan Workers' Party*

also known as the PKK, also known as the Partiya Karkeran Kurdistan

*Liberation Tigers of Tamil Eelam*

also known as LTTE, also known as Tamil Tigers, also known as Ellalan Force

*Manuel Rodriguez Patriotic Front Dissidents*

also known as the FPMR/D, also known as the Frente Patriotico Manuel Rodriguez—Autonomos, also known as the FPMR/A, also known as the Manuel Rodriguez Patriotic Front, also known as the Frente Patriotico Manuel Rodriguez, also known as the FPMR

*Mujahedin-e Khalq Organization*

also known as MEK, also known as MKO, also known as Mujahedin-e Khalq, also known as People's Mujahedin Organization of Iran, also known as PMOI, also known as Organization of the People's Holy Warriors of Iran, also known as Sazeman-e Mujahedin-e Khalq-e Iran

*National Liberation Army*

also known as the ELN, also known as the Ejercito de Liberacion Nacional

*Palestine Islamic Jihad-Shaqaqi Faction*

also known as PIJ-Shaqaqi Faction, also known as PIJ, also known as Islamic Jihad in Palestine, also known as Islamic Jihad of Palestine, also known as Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis

*Palestine Liberation Front—Abu Abbas Faction*

also known as the Palestine Liberation Front, also known as the PLF, also known as the PLF-Abu Abbas

*Popular Front for the Liberation of Palestine*

also known as the PFLP, also known as the Red Eagles, also known as the Red Eagle Group, also known as the Red Eagle Gang, also known as the Halhul Gang, also known as the Halhul Squad

*Popular Front for the Liberation of Palestine—General Command*

also known as PFLP-GC

*Revolutionary Armed Forces of Colombia*

also known as FARC, also known as Fuerzas Armadas Revolucionarias de Colombia

*Revolutionary Organization 17 November*

also known as 17 November, also known as Epanastatiki Organosi 17 Noemvri

*Revolutionary People's Liberation Party/Front*

also known as Devrimci Halk Kurtulus Partisi-Cephesi, also known as the DHKP/C, also known as Devrimci Sol, also known as Revolutionary Left, also known as Dev Sol, also known as Dev Sol Silahli Devrimci Birlikleri, also known as Dev Sol SDB, also known as Dev Sol Armed Revolutionary Units

*Revolutionary People's Struggle*

also known as Epanastatikos Laikos Agonas, also known as ELA, also known as Revolutionary Popular Struggle, also known as Popular Revolutionary Struggle

*Shining Path*

also known in Spanish as Sendero Luminoso, also known as SL, also known as the Partido Comunista del Peru en el Sendero Luminoso de Jose Carlos Mariategui (Communist Party of Peru on the Shining Path of Jose Carlos Mariategui), also known as Partido Comunista del Peru (Communist Party of Peru), also known as PCP, also known as Socorro Popular del Peru (People's Aid of Peru), also known as SPP, also known as Ejercito Guerrillero Popular (People's Guerrilla Army), also known as EGP, also known as Ejercito Popular de Liberacion (People's Liberation Army), also known as the EPL

*Tupac Amaru Revolutionary Movement*

also known as the Movimiento Revolucionario Tupac Amaru, also known as the MRTA

I further direct that these designations be published in the **Federal Register** on October 8, 1997, as required by section 219(a)(2)(A)(ii) of the INA.

Dated: October 2, 1997.

**Madeleine K. Albright,**

*Secretary of State.*

[FR Doc. 97–27030 Filed 10–7–97; 5:00 pm]

BILLING CODE 4710–25–P

**EXHIBIT 3 to Declaration of Joel Israel**

ALPHABETICAL LISTING OF SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS:

This publication of Treasury's Office of Foreign Assets Control ("OFAC") is designed as a reference tool providing actual notice of actions by OFAC with respect to Specially Designated Nationals and other entities whose property is blocked, to assist the public in complying with the various sanctions programs administered by OFAC. The latest changes may appear here prior to their publication in the Federal Register, and it is intended that users rely on changes indicated in this document that post-date the most recent Federal Register publication with respect to a particular sanctions program in the appendices to chapter V of Title 31, Code of Federal Regulations. Such changes reflect official actions of OFAC, and will be reflected as soon as practicable in the Federal Register under the index heading "Foreign Assets Control." New Federal Register notices with regard to Specially Designated Nationals or blocked entities may be published at any time. Users are advised to check the Federal Register and this electronic publication routinely for additional names or other changes to the listings. Entities and individuals on the list are occasionally licensed by OFAC to transact business with U.S. persons in anticipation of removal from the list or because of foreign policy considerations in unique circumstances. Licensing in anticipation of official Federal Register publication of a notice of removal based on the unblocking of an entity's or individual's property is reflected in this publication by removal from the list. Current information on licenses issued with regard to Specially Designated Nationals and other blocked persons may be obtained or verified by calling OFAC Licensing at 202/622-2480.

7TH APRIL CARD BOARD FACTORY, Tajoura, Libya [LIBYA]

17 NOVEMBER (a.k.a. REVOLUTIONARY ORGANIZATION 17 NOVEMBER; a.k.a. EPANASTATIKI ORGANOSI 17 NOEMVRI) [FTO][SDGT]

32 COUNTY SOVEREIGNTY COMMITTEE (a.k.a. 32 COUNTY SOVEREIGNTY MOVEMENT; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; a.k.a. REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. REAL OGLAIGH NA HEIREANN; a.k.a. RIRA) [FTO][SDGT]

32 COUNTY SOVEREIGNTY MOVEMENT (a.k.a. 32 COUNTY SOVEREIGNTY COMMITTEE; a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION; REAL IRA; a.k.a. REAL IRISH REPUBLICAN ARMY; a.k.a. REAL OGLAIGH NA HEIREANN; a.k.a. RIRA) [FTO][SDGT]

A. BORTOLOTTI & CO. S.P.A. (a.k.a. BORTOLOTTI), Cremona, Italy [LIBYA]

A. BORTOLOTTI & CO. S.P.A. (a.k.a. BORTOLOTTI), Via Predore, 59, 24067 Sarnico, Bergamo, Italy [LIBYA]

A.I.C. COMPREHENSIVE RESEARCH INSTITUTE (a.k.a. AUM SHINRIKYO; a.k.a. A.I.C. SOGO KENKYUSHO; a.k.a. ALEPH; a.k.a. AUM SUPREME TRUTH) [FTO][SDGT]

A.I.C. SOGO KENKYUSHO (a.k.a. AUM SHINRIKYO; a.k.a. A.I.C. COMPREHENSIVE RESEARCH INSTITUTE; a.k.a. ALEPH; a.k.a. AUM SUPREME TRUTH) [FTO][SDGT]

A.T.E. INTERNATIONAL LTD. (f.k.a. RWR INTERNATIONAL COMMODITIES), 3 Mandeville Place, London, England [IRAQ]

A.W.A. ENGINEERING LIMITED, 3 Mandeville Place, London, England [IRAQ]

AARAN MONEY WIRE SERVICE INC., 1806 Riverside Ave., 2nd Floor,

HACHITO SANCHEZ, Angel Alberto, c/o COPSERVIR LTDA., Bogota, Colombia; DOB: 09 Nov 1962; Cedula No. 17634454 (Colombia) (individual) [SDNT]

HACIENDA LA NOVILLERA (a.k.a. NOVILLERA; a.k.a. NOVILLERA GANADERA), Carrera 4 12-41 piso 15, Edificio Seguros Bolivar, Cali, Colombia; Paso de la Bolsa, Jamundi, Valle del Cauca, Colombia [SDNT]

HACIENDA SANDRANA (a.k.a. SANDRANA; a.k.a. SANDRANA GANADERA), Carrera 4 12-41 piso 15, Edificio Seguros Bolivar, Cali, Colombia; San Pedro, Valle del Cauca, Colombia [SDNT]

HAGGAR ASSALAYA SUGAR FACTORY, Haggar Assalaya, Sudan [SUDAN]

HALHUL GANG (a.k.a. POPULAR FRONT FOR THE LIBERATION OF PALESTINE; a.k.a. HALHUL SQUAD; a.k.a. PALESTINIAN POPULAR RESISTANCE FORCES; a.k.a. PFLP; a.k.a. PPRF; a.k.a. RED EAGLE GANG; a.k.a. RED EAGLE GROUP; a.k.a. RED EAGLES) [SDT] [FTO][SDGT]

HALHUL SQUAD (a.k.a. POPULAR FRONT FOR THE LIBERATION OF PALESTINE; a.k.a. HALHUL GANG; a.k.a. PALESTINIAN POPULAR RESISTANCE FORCES; a.k.a. PFLP; a.k.a. PPRF; a.k.a. RED EAGLE GANG; a.k.a. RED EAGLE GROUP; a.k.a. RED EAGLES) [SDT] [FTO][SDGT]

HALU MESRU SAVUNMA KUVVETI (HSK) (a.k.a. KURDISTAN WORKERS' PARTY; a.k.a. PARTIYA KARKERAN KURDISTAN; a.k.a. PKK; a.k.a. THE PEOPLE'S DEFENSE FORCE) [FTO][SDGT]

HAMADI, Hamed Yussef (a.k.a. AL-HAMMADI Hamid Yusif), Minister of Culture and Information; Iraq (individual) [IRAQ]*

HAMAS (a.k.a. ISLAMIC RESISTANCE MOVEMENT; a.k.a. HARAKAT AL-MUQAWAMA AL-ISLAMIYA; a.k.a. STUDENTS OF AYYASH; a.k.a. STUDENTS OF THE ENGINEER; a.k.a. YAHYA AYYASH UNITS; a.k.a. IZZ AL-DIN AL-QASSIM BRIGADES; a.k.a. IZZ AL-DIN AL-QASSIM FORCES; a.k.a. IZZ AL-DIN AL-QASSIM BATTALIONS; a.k.a. IZZ AL-DIN AL QASSAM BRIGADES; a.k.a. IZZ AL-DIN AL QASSAM FORCES; a.k.a. IZZ AL-DIN AL QASSAM BATTALIONS) [SDT][FTO][SDGT]

HAMEIAH, Jamel (a.k.a. HAMEIAH, Jamil; a.k.a. HAMEIAH, Mamil; a.k.a. HAMEIEH, Jamil; a.k.a. HAMEIH, Jamill; a.k.a. HAMER, Jamil; a.k.a. HAMIAEH, Jamil; a.k.a. HAMIAH, Jamiel; a.k.a. HAMIE, Jamil Abdulkarim; a.k.a. HAMIE, Jamil; a.k.a. HAMIE, Jamile; a.k.a. HAMIEAH, Jamiel; a.k.a. HAMIEAH, Jamil; a.k.a. HAMIEH, Jamal; a.k.a. HAMIEH, Jamiel; a.k.a. HAMIEH, Jamil; a.k.a. HAMIEH, Mamil; a.k.a. HAMIEL, Jamil; a.k.a. HAMIEYE, Jamil; a.k.a. HAMIEYYEH, Jamil; a.k.a. HAMIL, Jamil; a.k.a. HAMIYA, Abdul Jamil; a.k.a. HAMIYE, Jamil; a.k.a. HAMIYYAH, Jamil; a.k.a. HAMIYYEH, Jamil; a.k.a. HAMYH, Jamil; a.k.a. KARIM, Jamil Abdul; a.k.a. NAZIM, Abou; a.k.a. NEZAM, Abu; a.k.a. NIZAM, Abou); DOB Sep 1938 (individual) [SDNTK]

HAMEIAH, Jamil (a.k.a. HAMEIAH, Jamel; a.k.a. HAMEIAH, Mamil; a.k.a. HAMEIEH, Jamil; a.k.a. HAMEIH, Jamill; a.k.a. HAMER, Jamil; a.k.a. HAMIAEH, Jamil; a.k.a. HAMIAH, Jamiel; a.k.a. HAMIE, Jamil Abdulkarim; a.k.a. HAMIE, Jamil; a.k.a. HAMIE, Jamile; a.k.a. HAMIEAH, Jamiel; a.k.a. HAMIEAH, Jamil; a.k.a. HAMIEH, Jamal; a.k.a. HAMIEH, Jamiel; a.k.a. HAMIEH, Jamil; a.k.a. HAMIEH, Mamil; a.k.a. HAMIEL, Jamil; a.k.a. HAMIEYE, Jamil; a.k.a. HAMIEYYEH, Jamil; a.k.a. HAMIL, Jamil; a.k.a. HAMIYA, Abdul Jamil; a.k.a. HAMIYE, Jamil; a.k.a. HAMIYYAH, Jamil; a.k.a. HAMIYYEH, Jamil; a.k.a. HAMYH, Jamil; a.k.a. KARIM, Jamil Abdul; a.k.a. NAZIM, Abou; a.k.a. NEZAM, Abu; a.k.a. NIZAM, Abou); DOB Sep 1938 (individual) [SDNTK]

HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany [IRAN], and all offices worldwide, including, but not limited to:

DEUTSCH-IRANISCHE HANDELSBANK AG (n.k.a. EUROPAEISCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran [IRAN]

EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) Depenau 2, W-2000 Hamburg 1, Germany [IRAN], and all offices worldwide, including, but not limited to:

EUROPAEISCH-IRANISCHE HANDELSBANK AG (f.k.a. DEUTSCH-IRANISCHE HANDELSBANK AG) (Representative Office), 23 Argentine Square, Beihaghi Bulvard, P.O. Box 15815/1787, Tehran 15148, Iran [IRAN]

HOUSING BANK (of Iran) (a.k.a. BANK MASKAN), Ferdowsi St., Tehran, Iran [IRAN]

IRAN OVERSEAS INVESTMENT BANK LIMITED (f.k.a. IRAN OVERSEAS INVESTMENT CORPORATION LIMITED), 120 Moorgate, London EC2M 6TS, England [IRAN], and all offices worldwide, including, but not limited to:

IRAN OVERSEAS INVESTMENT BANK LIMITED (Representative Office), 1137 Avenue Vali Asr off Park-e-SAll, P.O. Box 15115/531, Tehran, Iran [IRAN]

IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Suite 3c Olympia House, 61/63 Dame Street, Dublin 2, Ireland [IRAN]

IRAN OVERSEAS INVESTMENT BANK LIMITED (Agency), Improgetti, Via Germanico 24, 00192 Rome, Italy [IRAN]

IRAN OVERSEAS TRADING COMPANY LIMITED (Subsidiary), 120 Moorgate, London EC2M 6TS, England [IRAN]

IRAN OVERSEAS INVESTMENT CORPORATION LIMITED (n.k.a. IRAN OVERSEAS INVESTMENT BANK LIMITED), 120 Moorgate, London EC2M 6TS, England [IRAN]

THE CENTRAL BANK OF IRAN (a.k.a. BANK MARKAZI JOMHOURI ISLAMI IRAN), Ferdowsi Avenue, P.O. Box 11365-8551, Tehran, Iran [IRAN]

WORKERS WELFARE BANK (of Iran) (a.k.a. BANK REFAH KARGARAN), Moffettah No. 125, P.O. Box 15815 1866, Tehran, Iran [IRAN]

For further information contact the:

OFFICE OF FOREIGN ASSETS CONTROL
U.S. DEPARTMENT OF THE TREASURY
1500 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20220

202/622-2420

date: 12/04/2001
•

**EXHIBIT 4 to Declaration of Joel Israel**

# COUNCIL DECISION

## of 22 December 2003

## implementing Article 2(3) of Regulation (EC) No 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2003/646/EC

(2003/902/EC)

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to Council Regulation (EC) No 2580/2001 of 27 December 2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism [1], and in particular Article 2(3) thereof,

Whereas:

(1) On 12 September 2003, the Council adopted Decision 2003/646/EC implementing Article 2(3) of Regulation (EC) No 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2003/480/EC [2].

(2) It is desirable to adopt an updated list of persons, groups and entities to which Regulation (EC) No 2580/2001 applies,

HAS DECIDED AS FOLLOWS:

*Article 1*

The list provided for in Article 2(3) of Regulation (EC) No 2580/2001 shall be as follows:

1. PERSONS

   1. ABOU, Rabah Naami (a.k.a. Naami Hamza; a.k.a. Mihoubi Faycal; a.k.a. Fellah Ahmed; a.k.a. Dafri Rèmi Lahdi) born 1.2.1966 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)
   2. ABOUD, Maisi (a.k.a. The Swiss Abderrahmane) born 17.10.1964 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)
   3. AL-MUGHASSIL, Ahmad Ibrahim (a.k.a. ABU OMRAN; a.k.a. AL-MUGHASSIL, Ahmed Ibrahim) born 26.6.1967 in Qatif-Bab al Shamal, Saudi Arabia; citizen Saudi Arabia
   4. AL-NASSER, Abdelkarim Hussein Mohamed, born in Al Ihsa, Saudi Arabia; citizen Saudi Arabia
   5. AL YACOUB, Ibrahim Salih Mohammed, born 16.10.1966 in Tarut, Saudi Arabia; citizen Saudi Arabia
   6. ARIOUA, Azzedine, born 20.11.1960 in Constantine (Algeria) (Member of al-Takfir and al-Hijra)
   7. ARIOUA, Kamel (a.k.a. Lamine Kamel) born 18.8.1969 in Constantine (Algeria) (Member of al-Takfir and al-Hijra)
   8. ASLI, Mohamed (a.k.a. Dahmane Mohamed) born 13.5.1975 in Ain Taya (Algeria) (Member of al-Takfir and al-Hijra)
   9. ASLI, Rabah born 13.5.1975 in Ain Taya (Algeria) (Member of al-Takfir and al-Hijra)
   10. ATWA, Ali (a.k.a. BOUSLIM, Ammar Mansour; a.k.a. SALIM, Hassan Rostom), Lebanon, born 1960 in Lebanon; citizen Lebanon
   11. DARIB, Noureddine (a.k.a. Carreto; a.k.a. Zitoun Mourad) born 1.2.1972 in Algeria (Member of al-Takfir and al-Hijra)
   12. DJABALI, Abderrahmane (a.k.a. Touil) born 1.6.1970 in Algeria (Member of al-Takfir and al-Hijra)
   13. EL-HOORIE, Ali Saed Bin Ali (a.k.a. AL-HOURI, Ali Saed Bin Ali; a.k.a. EL-HOURI, Ali Saed Bin Ali) born 10.7.1965 alt. 11.7.1965 in El Dibabiya, Saudi Arabia; citizen Saudi Arabia
   14. FAHAS, Sofiane Yacine born 10.9.1971 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)
   15. IZZ-AL-DIN, Hasan (a.k.a. GARBAYA, AHMED; a.k.a. SA-ID; a.k.a. SALWWAN, Samir), Lebanon, born 1963 in Lebanon, citizen Lebanon
   16. LASSASSI, Saber (a.k.a. Mimiche) born 30.11.1970 in Constantine (Algeria) (Member of al-Takfir and al-Hijra)
   17. MOHAMMED, Khalid Shaikh (a.k.a. ALI, Salem; a.k.a. BIN KHALID, Fahd Bin Adballah; a.k.a. HENIN, Ashraf Refaat Nabith; a.k.a. WADOOD, Khalid Adbul) born 14.4.1965 alt. 1.3.1964 in Pakistan, passport No 488555
   18. MOKTARI, Fateh (a.k.a. Ferdi Omar) born 26.12.1974 in Hussein Dey (Algeria) (Member of al-Takfir and al-Hijra)
   19. MUGHNIYAH, Imad Fa'iz (a.k.a. MUGHNIYAH, Imad Fayiz), Senior Intelligence Officer of HIZBALLAH, born 7.12.1962 in Tayr Dibba, Lebanon, passport No 432298 (Lebanon)
   20. NOUARA, Farid born 25.11.1973 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)

[1] OJ L 344, 28.12.2001, p. 70. Regulation as last amended by Commission Regulation (EC) No 745/2003 (OJ L 106, 29.4.2003, p. 22).
[2] OJ L 229, 13.9.2003, p. 22.

21. RESSOUS, Hoari (a.k.a. Hallasa Farid) born 11.9.1968 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)

22. SEDKAOUI, Noureddine (a.k.a. Nounou) born 23.6.1963 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)

23. SELMANI, Abdelghani (a.k.a. Gano) born 14.6.1974 in Algiers (Algeria) (Member of al-Takfir and al-Hijra)

24. SENOUCI, Sofiane born 15.4.1971 in Hussein Dey (Algeria) (Member of al-Takfir and al-Hijra)

25. SISON, Jose Maria (a.k.a. Armando Liwanag, a.k.a. Joma, in charge of NPA) born 8.2.1939 in Cabugao, Philippines

26. TINGUALI, Mohammed (a.k.a. Mouh di Kouba) born 21.4.1964 in Blida (Algeria) (Member of al-Takfir and al-Hijra)

2. GROUPS AND ENTITIES

1. Abu Nidal Organisation (ANO), (a.k.a. Fatah Revolutionary Council, Arab Revolutionary Brigades, Black September, and Revolutionary Organisation of Socialist Muslims)

2. Al-Aqsa Martyrs Brigade

3. Al-Takfir and Al-Hijra

4. Aum Shinrikyo (a.k.a. AUM, a.k.a. Aum Supreme Truth, a.k.a. Aleph)

5. Babbar Khalsa

6. Gama'a al-Islamiyya (Islamic Group), (a.k.a. Al-Gama'a al-Islamiyya, IG)

7. Great Islamic Eastern Warriors Front (IBDA-C)

8. Hamas (including Hamas-Izz al-Din al-Qassem)

9. Holy Land Foundation for Relief and Development

10. International Sikh Youth Federation (ISYF)

11. Kahane Chai (Kach)

12. Kurdistan Workers' Party (PKK)

13. Lashkar e Tayyaba (LET)/Pashan-e-Ahle Hadis

14. Mujahedin-e Khalq Organisation (MEK or MKO) (minus the 'National Council of Resistance of Iran' (NCRI)) (a.k.a. The National Liberation Army of Iran (NLA, the militant wing of the MEK), the People's Mujahidin of Iran (PMOI), Muslim Iranian Student's Society)

15. New Peoples Army (NPA), Philippines, linked to Sison Jose Maria C. (a.k.a. Armando Liwanag, a.k.a. Joma, in charge of NPA)

16. Palestine Liberation Front (PLF)

17. Palestinian Islamic Jihad (PIJ)

18. Popular Front for the Liberation of Palestine (PFLP)

19. Popular Front for the Liberation of Palestine-General Command, (a.k.a. PFLP-General Command, a.k.a. PFLP-GC)

20. Revolutionary Armed Forces of Colombia (FARC)

21. Revolutionary People's Liberation Army/Front/Party (DHKP/C), (a.k.a. Devrimci Sol (Revolutionary Left), Dev Sol)

22. Shining Path (SL) (Sendero Luminoso)

23. Stichting Al Aqsa (a.k.a. Stichting Al Aqsa Nederland, a.k.a. Al Aqsa Nederland)

24. United Self-Defense Forces/Group of Colombia (AUC) (Autodefensas Unidas de Colombia)

*Article 2*

Decision 2003/646/EC is hereby repealed.

*Article 3*

This Decision shall be published in the *Official Journal of the European Union*.

It shall take effect on the day of its publication.

Done at Brussels, 22 December 2003.

*For the Council*

*The President*

A. MATTEOLI

**EXHIBIT 5 to Declaration of Joel Israel**

**From:** CONNODB on behalf of Connor, Damien (Group Risk Mgmt)
**Sent:** Wednesday, September 24, 2003 6:34:31 AM
**To:** Brener, Alan (Retail Comp); Richardson, Lesley; Grierson, John; Bishop, Stephen, Coutts; 'robert.irvine@ulsterbank.com'; 'Ken.Turbitt@citizensbank.com'; 'peter.atkinson@directline.com'; McKay, Dave (Ops Risk); RODGER, Irvine, CBFM Compliance; Webb, Richard (RIS Compliance); Webb, Richard (RIS Compliance)
**CC:** Wilson, Martin, (Group Chief Executive Ulster Bank); 'annette.court@directline.com'; 'duncan.mackechnie@directline.com'; Higgins, Benny; Stewart, Dunlop; Lestiuk, Lydia; Fisher, Mark (Chief Exec. Manufacturing); 'ray.entwistle@adambank.com'; Pell, Gordon; McCarthy, Letitia (Group Risk Mgmt); McKenzie, Arlene (Group Risk Mgmt); Middlemist, Graham (Group Risk Mgmt); Williamson, Finlay F; Beattie, Charles (IFS); Richardson, Peter (Op Risk); Williams, Tony (HR); Roden, Neil; Pyrke, Nick; Trantum, Neil; Feachen, David; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard; Brunner, Hanspeter, Coutts; 'Marion.Bolster@citizensbank.com'; 'Glenna.Scaramozza@CITIZENSBANK.com'; 'carole.lyons@directline.com'; 'Jackie.Henderson@directline.com'; Hoseason, Michael (Group Fraud); LEWIS, Derek, Lombard; Craft, Peter; Mackie, Richard; Sludden, Tom; Gayle, Sonia (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt; Brand, Derek; Sanders, Stephen (Group Risk Mgmt); Gillespie, David; Grant, Michael (Group Risk Mgmt); SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts; 'Alison.Rayner@directline.com'; Middleton, Iain; Gilbert, Colin; COLE, Guy, CBFM Compliance; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; BINKS, Martin, MDO-NWS; CROWE, Brian, FM; GOLDFARB, Sheldon, GCM; FOGLE, Edward, GCM; BAYLISS, Mark, (RBS) COMP; HEMSLEY, Julie, (RBS) COMP; HOLT, Amanda, Group Risk Mgmt (nee Turner); CAMERON, John A N (CBFM); O'Hear, Tony; 'Greg.Sargent@CITIZENSBANK.com'; 'Christine.Kelly-Hill@CITIZENSBANK.com'; Shields, Christine; HIGGINBOTTOM, Simon, CBFM Compliance; Nell, Dedrei (Group Risk Mgmt)
**Subject:** HAMAS issue by Bank of England on 22 September 2003 - FYI

Hi All,

The name **HAMAS ( including Hamas-Izz al-Din al-Qassem )** was officially reported by the Bank of England on the 22 September 2003. Please note that both HAMAS was previously issued via OFAC listing on 2 November 2002. The Bank of England did not provide any additional information regarding HAMAS, therefore there will be no requirement to re-search this name. The name Hamas-Izz al-Din al-Qassem was previously issued by the Bank of England on the 15 September 2003, therefore no additional requirement to re-search this list name seperately.

Regards

Damien

**EXHIBIT 6 to Declaration of Joel Israel**

**Palestinians Relief & Development Fund**

- Registered charity acc opened 1994 – there was a former connected charity which held an acc from the mid 80's – relationship tf to commercial from retail with myself in 3/2002
- Impeccable acc operation – presently [redacted] cr bals across [redacted] accs - $ 261k € 465k
- Historically no transmission chgs as custs are by religion unable to earn interest on their monies
- 2002 income £80k purely from cr bals
- Bankline in place and urgent tfs utilised
- Only other facility is occasional request for doc cr facility
- Principal activity is collection of donations mainly from muslim community in UK, Saudia Arabia & USA, which is then passed on to the poor & needy in Palestine, The West Bank, Gaza Strip & refugee camps in Jordan & Lebanon by way of food parcels and the creation of medical, welfare & educational centres
- Operate from l/h premises in Cricklewood with 7 employees
- TNW @ 12/01 = £2.255m, donations totalled £4.2m and net income £291k
- Main contact is Jihad Qundil – age 43 – finance mgr & part of executive committee but not a trustee
- KYC has been completed
- Acc was reported to Fraud office in 1/2002 as they received a money laundering report ivo the large no of US$ tfs to & from the Middle East. In 7/2002 Fraud office also reported the acc to the authorities but I have heard nothing since
- Customers appear to be very open about the situation and have advised me that they were fully investigated by the Charities commision in 1996 due to the nature of their work but found to be clear.
- I visit custs twice a year but they are very undemanding and not complicated to manage

**EXHIBIT 7 to Declaration of Joel Israel**

## Case Summary

Help

**Money laundering suspicion** NCIS

**Case Summary** | Record Data | Subject Data | Notes & Conclusion | Key Corresp

**Incident Data**

| | | | |
|---|---|---|---|
| **Control Authority** | Payment Operations | **Status** | Open **Source: [GK2:647655]** |
| **Review Date** | | **by** | |
| **Remote Delivery Channel** | N | **High Profile** | Y 06 Feb 2002 00:00 |
| **Created on** | 19 Nov 2001 00:00 | **by** | ReavleyL |
| **Last Modified on** | 05 Feb 2002 00:00 | **by** | RBS_Hartlda |

**Linked Cases**

617044 NONE

710397 Business auto-linked

Maintain Links

| Queries | Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | Yes |

**Money laundering suspicion Record**

| | | | |
|---|---|---|---|
| **Submitting Branch** | | **Submitted By** | OLNA LEEMING |
| **Submitting Unit Sortcode** | | **Contact No** | 780676841 |
| **Submitting Department** | Payment & Trade Operations | **Legislation** | DTA 94 |
| **Estimated Laundering Total** | [redacted] <Unknown> | | |

**Reason(s) for Suspicion**

High non cash turnover

Suspected terrorist funding

**Transactions GBP 0.00** Add

| Date | Type | Amount | Currency | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | Edit |
| [redacted] | [redacted] | [redacted] | [redacted] | Edit |

**Set All Risk Ratings to the the same value of:-** Amber Blue Green Indigo Red

**Personal Data** Add

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| DAHHAN | FAWZI HASSAN AHMED | | | NONE | Red | Red | Edit |
| MUSTAFA | E | | M | NONE | Red | Red | Edit |

**Business Data** Add

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|
| PALESTINE & LEBANON RELIEF FUND | | UNITED KINGDOM | NONE | Red | Red | Edit |

HIGHLY CONFIDENTIAL

**Telephone Data** Add

| Phone No. | Owner | Type | Risk | Adj | |
|---|---|---|---|---|---|
| 0208 4521197 | PALESTINE & LEBANON RELIEF FUND | Other | Red | Red | Edit |

**Address Data** Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|---|---|---|---|---|---|---|
| 130 | GLENGALL RD | LONDON | NW6 7HH | Red | Red | Edit |

**Account Data** Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| PALESTINE & LEBANON RELIEF FUND | 04156838 | 60-06-22 | Current (Non Personal) | British Pound | Green | Green | Edit |

**Miscellaneous Data** Add

**-None-**

**Case Notes** Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Case notes | 05 Feb 2002 | Migrated | 21/12 - According to ISS records there is an LRS Manager at | View |
| Summary and Assessment | 05 Feb 2002 | Migrated | This account is a charitable account for people affected by | View |
| Conclusion | 05 Feb 2002 | Migrated | From the information available at the date of this record, i | View |

**Key Correspondence**

| Upload Doc Title | Author | User | Date | | Add |
|---|---|---|---|---|---|
| Suspicion report | ReavleyL | GK2 | 21 Nov 2001 | View | Edit |
| Suspicion report | ReavleyL | GK2 | 21 Nov 2001 | View | Edit |

**No NCIS Disclosures**

**No CIFAS Reports**

**1. User:** Migrated **On:** 05 Feb 2002 00:00 Print Copy Delete

**Note:** 21/12 - According to ISS records there is an LRS Manager at Islington Business Centre who (hopefully!) looks after this customer. With $3 million turnover during 2001 I think we need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions. I have not sent the disclosure as yet in the hope that we can get some meaningful info in the short term. DH17 Jan memo sent to Rm for background info in particular the activity seen on the usd account.mw5/2/02 - Existing case for this customer discovered somewhat belatedly. Probably no merit in disclosing again at this time but it won't do any harm for the RM to follow through our recent request as the KYC/DD info appears deficient. DH

**1. User:** Migrated **On:** 05 Feb 2002 00:00 Print Copy Delete

**Note:** This account is a charitable account for people affected by the troubles in Lebanon & Palestine. Funds are received into a US Dollar account by international transfer from various locations in the Middle East and at the moment a large balance has acumulated without outward transfer. Given the current volatile situation in Palestine we are concerned that as the sources of funds cannot be verified, there may be a vulverability for terrorist funding.

**1. User:** Migrated **On:** 05 Feb 2002 00:00 Print Copy Delete

**Note:** From the information available at the date of this record, it is considered that there are insufficient grounds to make a financial disclosure. Please see attached documents for further information relating to the suspicion report. This information may be of relevance when considering any business approaches or dealings with the above named parties.



64-7655

19 NOV 2001

FORM A Arm City, BC

SUSPICION REPORT FORM (ACCOUNT-HOLDING CUSTOMERS)

Branch/Department — Sort Code 60 06 22

Surname/Business Name: PALESTINE & LEBANON RELIEF FUND.

Forename(s):

Male/Female — Nationality (if known) — Date of Birth:

Address (include Postcode): 130 GLENGALL ROAD, LONDON NW6 7HH

Additional/Previous Addresses:

Telephone No: 0208 457 2119 ?

No & Country of issue of Passport or other ID document type/source of introduction/reference taken:

Companies - Date & Country of Incorporation/Registered No:

| Account No(s) | Account Type | Date Opened |
|---|---|---|
| | | |

Date when Relationship with Bank started

Stated Occupation

Name & Address of Employer.

| Additional Associated Names | Date of Birth | In A/C | Address, esp P/Code/Passport No etc |
|---|---|---|---|
| | | | |

Transaction Details — Account No:

| Date | Amount | Dr/Cr | Source/Destination eg Cash/Chq/UT/ST/Chaps to/from....) |
|---|---|---|---|
| | | | |

Introduced December 1996 — PM35 (Unit Operations and Controls - Volume 1) — (continued)

...asons for Suspicion

Large inland payments received.

Security and Safe Custody held (brief details only)

Boxes and Parcels held

Special signing instructions (eg third party mandates)

(if a company, partnerships, etc attach copy of mandate)

Other accounts known to be held (including Building Societies)

Status Enquiries received

| Nature of Suspected Offence (tick as appropriate, but may be left blank) | Drug Trafficking |
|---|---|
| | Terrorism |
| | Other Crime |

Branch/Department Ref:

Name of Contact: OLIVIA LEEMING

Tel/ITS Ext No: 78067 6841

Signed: [signature]

Senior Officer/Manager: PAYMENTS MANAGER STEWART HARDY

Date: 15/11/01

(continued)

HIGHLY CONFIDENTIAL

**EXHIBIT 8 to Declaration of Joel Israel**



## Case Summary

Help

Delete Case | **Money laundering disclosure** | CIFAS | NCIS

**Case Summary** | Record Data | Subject Data | Notes & Conclusion | Key Corresp

**Incident Data**

| | | | |
|---|---|---|---|
| **Control Authority** | Group Financial Crime 1 | **Status** | Closed **Source: [GK3:4124]** |
| **Review Date** | | **by** | |
| **Remote Delivery Channel** | N | **High Profile** | N |
| **Created on** | 12 May 1990 00:00 | **by** | Fox |
| **Last Modified on** | 12 Mar 1999 00:00 | **by** | Fox |

**Linked Cases**

**-None-**

Maintain Links

| **Queries** | **Refer To** | **Tel No.** | **Business** | **Unable to contact ?** |
|---|---|---|---|---|
| | | | NONE | Yes |

**Money laundering disclosure Record**

| | | | |
|---|---|---|---|
| **Submitting Branch** | | **Submitted By** | |
| **Submitting Unit Sortcode** | | **Contact No** | |
| **Submitting Department** | None | **Legislation** | POTA |
| **Estimated Laundering Total** | <Unknown> | | |

**Reason(s) for Suspicion**

Please see attachments and/or Case Notes where available for further information

**Transactions GBP 0.00** Add

**-None-**

**Set All Risk Ratings to the the same value of:-** Amber Blue Green Indigo Red

**Personal Data** Add

| **Surname** | **Forenames** | **Date Of Birth** | **Sex** | **Key Information** | **Risk** | **Adj** | |
|---|---|---|---|---|---|---|---|
| HAFEZ O MR | | | | NONE | Red | Red | Edit |
| MUSTAFA E MR | | | | NONE | Red | Red | Edit |
| PALESTINE & LEBANON RELIEF FUND | | | | NONE | Red | Red | Edit |
| QUNDIL | J | | M | NONE | Red | Red | Edit |

**Business Data** Add

**-None-**

**Telephone Data** Add

**-None-**

**Address Data** Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|---|---|---|---|---|---|---|
| | | | E13 OQW | Red | Red | Edit |
| PO BOX 542 | | LONDON | E130QW | Red | Red | Edit |

**Account Data** Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| PALESTINE & LEBANON RELIEF FUND | | 60-08-22 | Current (Personal) | British Pound | Green | Green | Edit |

**Miscellaneous Data** Add

**-None-**

**Case Notes** Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Conclusion | 12 Mar 1999 | Migrated | This record has been created as the result of a financial di | View |

**Key Correspondence**

| Upload Doc Title | Author | User | Date | | Add |
|---|---|---|---|---|---|
| wp1204_a.jpg | Fox | GK2 | 23 Aug 2000 | View | Edit |
| wp1204_b.jpg | Fox | GK2 | 23 Aug 2000 | View | Edit |
| wp1204_c.jpg | Fox | GK2 | 23 Aug 2000 | View | Edit |

**No NCIS Disclosures**

**No CIFAS Reports**



https://www.gk3.web.rbsgrp.net/GK3Web/default.jsp
User Options
CASE:4124
PALESTINE & LEBANON RELIEF FUND
NONE
QUNDIL
NONE
Business Data
Telephone Data
Address Data
Bldg No. & Name
PO BOX 542
Account Data
Account Name
PALESTINE & LEBANON R
Miscellaneous Data
Case Notes
Type
Date
Conclusion
Key Correspondence
Upload Doc Title
wp1204_a.jpg
wp1204_b.jpg
wp1204_c.jpg
Fax
GK2
23 Aug 2000
View
No NCIS Disclosures
No CIFAS Reports
View Case Notes History -- Web Page Dialog
Conclusion History for Case: 4124
No:3502163 User: Migrated On: 12 Mar 1999 00:00
Note: This record has been created as the result of a financial disclosure to the authorities. Please see attachment(s) for a copy of the disclosure and any other relevant information. This information may be of relevance when considering any business approaches or dealings with the above named parties.
Cancel
Summary
Basic
Case
Notes
Done
start

HIGHLY CONFIDENTIAL NW 191803

NATIONAL WESTMINSTER BANK PLC

Money-Laundering – Prevention of Terrorism Act 1989

Suspicious circumstances reported in accordance with Action Sheet 97

Branch FINSBURY PARK Sort Code 60-08-22

| Field | | | |
|---|---|---|---|
| Account Titles (if more than three use additional form) | | | |
| Account Number | | | |
| Type of Account | | | |
| Present Balance | | | |
| Debit turnover: Last two half yrs: Half year to date: Total: | | | |
| Address (including postcode) | | | |
| Date Account opened with Bank & Branch | | | |
| Date of birth | | | |
| Nationality Passport No and country of issue (if known) | | | |
| Stated occupation | | | |

Reasons for suspicion

... numerous transfers abroad, these include:-

It has been noted that Bob Stevens at Special Branch ...

**Reference No WP:** 1204

I T WICKENS, Fraud Intelligence Manager

(For Group Audit Use)

30/3/92

HIGHLY CONFIDENTIAL NW 191805

W/ 1.2.4

**

FINANCIAL TIMES WEDNESDAY MARCH 13 1996

**NEWS:** INTERNATIONAL

# Palestinian charity in UK under attack

By Julian Ozanne in Tel Aviv and Clay Harris in London

Israel yesterday stepped up its attack on foreign fund-raising for Palestinian causes. Israeli military intelligence claimed that Interpal, a UK-based charity whose bank accounts were frozen last week by the Charity Commission, had masterminded fund-raising for the Hamas Islamic movement in Europe.

Israeli police, meanwhile, released documents about financial support given to the families of three Hamas military activists by two Nazareth-based charities which they claim are funded by Interpal.

A senior military officer said Interpal, also known as the Palestinian Relief and Development Fund, raised money exclusively for Hamas institutions and directly provided support to families of Hamas guerrillas and suicide bombers. "Interpal is the main source of funds for Hamas outside the [Palestinian] territories," he said.

In London, Mr Abdul Rahman Daya, Interpal chairman, said: "What is their proof? I don't know what they are talking about. I don't know what the Israelis are trying to achieve."

Charity Commission officials will today visit Interpal's offices in north London to study its records. After a meeting with Interpal trustees yesterday, the commission said: "The charity can continue to function and fund projects undertaken on their behalf by various Palestinian charities." For the time being, all spending must be approved by the commission.

The Israeli military officer alleged that Interpal was directly connected to the Finance Committee of Hamas, which decides the spending priorities of the movement together with the Internal Committee, and gave directions to other Hamas fund-raising groups in Europe. "All the European funds are co-ordinated by Interpal," he said. Mr Daya described this contention as "rubbish".

Last week police named Interpal and Al Aqsa, based in Germany, as the source of funds to Mr Suleiman Agbariah, who has been placed under house arrest by Israeli authorities and had his telephone cut off pending the results of an investigation. Police say have they have more than 60 cases proving that Mr Agbariah's charities – the Islamic Salvation Fund and the Islamic Rescue Fund – gave money to the families of Hamas guerrillas.

They provided documents from three cases which they allege prove a link between Mr Agbariah and his charities with known activists in the Izz el-Deen al-Qassam Brigades, the military wing of Hamas which has claimed responsibility for recent suicide attacks in Israel. Mr Daya said neither charity appeared in Interpal's own records or bank records.

The documents, written in Arabic, are application forms filled out by the families of Hamas "martyrs" seeking aid from Mr Agbariah's funds. All three are from families of young men who died in Hamas military activities. One application came from the mother of 20-year-old Iman Salah Salame Atallah, who died in a suicide mission in Gaza in 1993, in which two Israeli soldiers were killed.

Police say in all cases money was approved from Mr Agbariah's charities, often more significant sums than recommended by charity field workers in the documents.

The intelligence officer said Israel had material evidence that some of the money sent by Interpal to registered schools, clinics, orphanages and welfare societies had been diverted to the families of Hamas guerrillas.

He said several lists of orphans who receive charity included people above the age of 18 who were known Hamas activists.

In London, Mr Daya said Interpal supported no orphans over the age of 15. Asked if any of the 36 charities which Interpal funds were linked to Hamas, he said: "Maybe." Interpal did not screen recipients to exclude those with links to Hamas activists. "A poor family is a poor family," Mr Daya said. "We do not check on why the family has been made poor."

The Israeli officer said it was impossible to divulge material evidence because it would put informants at risk. But he said evidence had been passed to the UK government and other European countries which proved the link between the European charities and funding of the Hamas military campaign.

**EXHIBIT 9 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

TZVI WEISS, *et al.*,

Plaintiffs,

- against -

NATIONAL WESTMINSTER BANK PLC,

Defendant.

CV 05-4622 (DLI) (MDG)

---------------------------------------------------------- X

NATAN APPLEBAUM, *et al.*,

Plaintiffs,

- against -

NATIONAL WESTMINSTER BANK PLC,

Defendant.

CV 07-916 (DLI) (MDG)

---------------------------------------------------------- X

**RESPONSES AND OBJECTIONS BY DEFENDANT NATIONAL WESTMINSTER BANK PLC TO PLAINTIFFS' SECOND SET OF INTERROGATORIES (CONTENTION INTERROGATORIES)**

Defendant National Westminster Bank Plc ("NatWest") responds to Plaintiffs' Second Set of Interrogatories Directed to Defendant National Westminster Bank Plc dated April 29, 2011 (the "Contention Interrogatories") as follows:

**RESERVATION OF RIGHTS**

1. To the extent that NatWest responds to any of the Contention Interrogatories, it does so without conceding the materiality, admissibility or relevance of any such responses.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – NOT TO BE USED, COPIED OR DISCLOSED EXCEPT AS AUTHORIZED BY COURT ORDER**

2. NatWest reserves all objections to the use of these responses. All such objections may be interposed by NatWest at the time of trial or as otherwise required by the rules or orders of the Court.

3. NatWest reserves the right to amend, supplement or withdraw its responses and objections to the Contention Interrogatories.

4. NatWest does not intend to waive any privilege or right by virtue of these responses. Insofar as a response by NatWest may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular response only.

5. Pursuant to the Weiss Protective Order entered on February 16, 2006, and the Applebaum Protective Order entered on July 18, 2007, the answers to the Contention Interrogatories are designated "HIGHLY CONFIDENTIAL."

**GENERAL OBJECTIONS**

Each of NatWest's responses to the Contention Interrogatories is subject to the following General Objections, and each such General Objection is incorporated by reference in NatWest's answers to each of the Contention Interrogatories as if fully set forth therein, unless such response specifically states that it is made notwithstanding such objections (in which case such objections are reserved but not relied upon to withhold information):

1. NatWest objects to all definitions, instructions and requests that purport to impose obligations beyond those required or permitted by Rule 34 of the Federal Rules of Civil Procedure and Local Civil Rule 26.3 of the U.S. District Court for the Eastern District of New York.

2. NatWest objects to each of the Contention Interrogatories to the extent it seeks information that is not relevant to a claim or defense of any party, as required by Fed. R. Civ. P. 26 and 33.

3. NatWest objects to each of the Contention Interrogatories to the extent it is so vague and unclear in identifying information requested as to be impermissible under Fed. R. Civ. P. 26 and 33.

4. NatWest objects to each of the Contention Interrogatories to the extent it is vague, ambiguous, overly broad or unduly burdensome, and/or seeks information without reference to a time period or subject matter and thus is outside the scope of permissible discovery under Fed. R. Civ. P. 26 and 33.

5. NatWest objects to each of the Contention Interrogatories to the extent it purports to impose a burden on NatWest to identify all information in the public domain and not in the exclusive possession, custody or control of NatWest. Such a request is beyond the scope of permissible discovery, would impose an undue burden on NatWest and is an attempt to require NatWest to prepare Plaintiffs' case. Such information is as available to Plaintiffs as it is to NatWest.

6. NatWest objects to each of the Contention Interrogatories to the extent it calls for information concerning events occurring after the date of the filing of the initial Complaints in these lawsuits, on the grounds that such requests are overbroad and beyond the scope of the allegations in the pleadings.

7. NatWest objects to each of the Contention Interrogatories to the extent it purports to seek information not presently in the possession, custody or control of NatWest, but in the possession of third parties or separate legal entities.

8. NatWest objects to each of the Contention Interrogatories to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine or any other applicable privilege, law or rule, in that such material is not properly discoverable under Fed. R. Civ. P. 26 and 33. The inadvertent disclosure of any privileged or otherwise protected information shall not be deemed or construed to constitute a waiver of any claim or privilege or other protection as to such information, and NatWest reserves the right to request the return of any such information inadvertently produced in response to the Interrogatories. NatWest further reserves the right to demand the destruction of any such information inadvertently produced in response to the Contention Interrogatories.

9. The failure of NatWest to make a specific objection to a specific Contention Interrogatory is not, and shall not be construed as, an admission that responsive information exists.

10. Any response by NatWest to the Contention Interrogatories shall not be deemed or construed in any way to be an adoption, admission or agreement by NatWest of or to any such definition or term used by Plaintiffs in the Contention Interrogatories, or the materiality, admissibility or relevance thereof.

## SPECIFIC RESPONSES AND OBJECTIONS

**Contention Interrogatory No. 1:**

**Do You contend that any of the attacks[1] set forth in the operative complaints were not Terrorist Activities? If Your answer is affirmative, identify: each listed attack You contend was not a Terrorist Activity; the factual and legal basis for Your contention, including all documents, Testimony, and Witnesses supporting Your contention; and all persons or entities known by you to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 1:**

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest does not contend that any of the attacks set forth in the operative

complaints were not Terrorist Activities.

**Contention Interrogatory No. 2:**

**Do You contend that any of the attacks set forth in footnote 1 were not perpetrated in whole or in part by Hamas? If Your answer is affirmative, identity: the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

---

1      The Jerusalem Egged Bus #2 Bombing on August 19, 2003;
2.     The Shooting Attack on Route #60 on June 20, 2003;
3.     The Jaffa Road Bus #14A Bombing on June 11, 2003;
4.     The Commuter Bus Bombing on May 18, 2003;
5.     The Mike's Place Bombing in Tel Aviv on April 30, 2003;
6.     The Shooting Attack on Route #60 on January 29, 2003;
7.     The Hebrew University Cafeteria Bombing on July 31, 2002;
8.     The Sheffield Club Bombing on May 7, 2002;
9.     The Passover Massacre at the Park Hotel in Netanya on March 27, 2002;
10.    The Tel Romeda Shooting in Hebron on October 22, 2003;
11.    The Bombing of Bus Number 19 on January 29, 2004;
12.    The Shootings in Kiryat Arba on March 7, 2003;
13.    The Bombing of Bus No. 37 in Haifa on March 5, 2003;
14.    The Bombing at Café Hillel on September 9, 2003; and
15.    The Mortar Bombing of Neve Dekalim on September 29, 2004.

**Response to Contention Interrogatory No. 2:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "perpetrated" is vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest contends that there is evidence to show that a person or entity other than Hamas was the perpetrator of the following attacks alleged in the Plaintiffs' complaint.

The report of Ronni Shaked and the expert report of Brian Jenkins, and the sources cited therein, indicate that Hezbollah may have been responsible for the commission of the January 29, 2003 and June 20, 2003 attacks on Route 60. See Expert Report of Ronni Shaked (Dec. 30, 2010) at 58-65, 98-101, Appendix No. 1 pp. 559-596, 597-614; Expert Report of Brian Michael Jenkins (March 4, 2011) at 35, 56.

The report of Evan Kohlmann and the sources cited therein indicate that the Al-Aqsa Martyrs Brigades may have been responsible for the commission of the April 30, 2003 attack on Mike's Place Restaurant in Tel Aviv. See Expert Report of Evan F. Kohlmann (Sept. 8, 2009) at 36.

The expert report of Brian Jenkins and the sources cited therein indicate that Palestinian Islamic Jihad ("PIJ") may have been responsible for the commission of the August 19, 2003 attack on Bus No. 2. See Jenkins Report at 24.

The report of Ronni Shaked, the report of Evan Kohlmann, the report of Shaul Naim, the expert report of Brian Jenkins and the rebuttal expert reports of Moshe Azoulay, and the sources cited therein, indicate that the Al-Aqsa Martyrs Brigades of Fatah may have been responsible for the January 29, 2004 attack on Bus No. 19. See Shaked Report at 16, 128-39, Appendix No. 1 pp. 931-56, 999 - 1002; Kohlmann Report at 43-44, Appendix p. 336; Expert Report of Shaul

Naim (Dec. 29, 2010) at 24, January 29, 2004 Exhibits A - E (Naim 001296-373); Jenkins Report at 35-42, 51-54; Rebuttal Report of Moshe Azoulay (March 3, 2011) at 32-33, 119-43, Annex B.

NatWest is not in possession of any additional information concerning whether or not any of the attacks set forth in the operative complaints was or was not perpetrated by Hamas, other than the information produced by Plaintiffs and/or their purported expert witnesses on this subject and the information referred to in the expert reports of Moshe Azoulay, dated December 29, 2010 and March 3, 2011 and Brian Jenkins, dated March 4, 2011. NatWest contends that this information does not constitute admissible evidence sufficient to support the conclusion that any of the attacks set forth in the operative complaints was perpetrated in whole or in part by Hamas.

**Contention Interrogatory No. 3:**

**Do You contend that at any time during the Relevant Period NatWest policy permitted You to process Funds Transfers on behalf of or for the benefit of an FTO provided that (1) the Funds Transfer were not cleared through the U.S.; and (2) You did not detect evidence that such Funds Transfer was to be used in the commission of a Terrorist Act? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 3:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest responds as follows:

NatWest contends that its policies during the Relevant Period did not prohibit NatWest from transferring Sterling or Euro denominated funds on behalf of or for the benefit of a UK customer that was not listed on the Bank of England's "Consolidated List" of sanctioned persons and entities. NatWest's policies during the Relevant Period provided that NatWest was legally required to comply with sanctions imposed by the United Nations, the European Union, the Bank

of England and HM Treasury. NatWest's policies during the Relevant Period further provided that NatWest was legally required to comply with UK sanctions and terrorist financing legislation, including the Prevention of Terrorism (Temporary Provisions) Act 1989, the Terrorism Act 2000 and the Terrorism (United Nations Measures) Order 2001. Neither the United Nations, European Union, Bank of England and HM Treasury sanctions, nor the UK sanctions and terrorist financing legislation, prohibited a UK bank from transferring Sterling or Euro denominated funds on behalf of or for the benefit of a UK customer that was designated as an FTO in the United States but was not included on the Bank of England's "Consolidated List" of sanctioned entities and persons. See NW000084 – NW000111, NW000112 – NW000143, NW196319 – NW196358, NW212047 – NW212073; Wickens Tr. 95:15 – 22, June 23 2008; Trantum Tr. 92:17 – 25, July 13, 2010; Foster Tr. 41:16 -42:1, 43:14 – 44:1, 44:15 - 45:14, July 16, 2010; Holt Tr. 46:25 – 47:25, 118:1 – 119:15, July 23, 2010; Expert Report of Jon Holland (Dec. 6, 2010) ¶¶ 10.1 – 10.2; Expert Report of John Barker (March 2, 2011) ¶¶ 16-22.

To the best of NatWest's knowledge, Ian Wickens, Neil Trantum, Stephen Foster, Amanda Holt, Jon Holland and John Barker have knowledge of relevant facts supporting these contentions.

**Contention Interrogatory No. 4:**

**Do you contend that, after obtaining a copy of the Cryptome Report, NatWest undertook a review of its records in an attempt to determine the accuracy, or lack thereof, of the information concerning Interpal contained in the Cryptome Report? If Your answer is affirmative, describe the nature and scope of the investigation, including all facts and specific documents reviewed by NatWest at that time, as well as all Witnesses and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 4:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "investigation" is vague and ambiguous.

Subject to and without waiving the above Reservation of Rights and General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest does not contend that it attempted to determine the accuracy, or lack thereof, of the information concerning Interpal contained in the Cryptome Report, which was published by unknown person(s) on an anonymous website. NatWest contends that it had no obligation to conduct an investigation into the accuracy of the allegations contained in the Cryptome Report. The 2001 JMLSG Guidance advised that a bank should consider relevant information available within the bank about the customer in order to determine whether there were any facts to dispel a suspicion, but did not advise that a bank should conduct an investigation to determine whether a suspicion was justified. It was the responsibility of UK law enforcement and regulators, including the NDIU, NCIS, SOCA, Special Branch, the NTFIU, the Charity Commission, the Bank of England and HM Treasury (collectively, "UK Law Enforcement and Regulators") to assess the information that NatWest provided in its disclosures and to decide what action, if any, to take, including in this instance the information that NatWest disclosed [REDACTED]. See Holland Tr. 123:17 – 24, 131:15 – 134:13, May 18, 2011; Holland Report ¶¶ 3.29 - 3.30, 5.14 – 5.19.

After obtaining a copy of the anonymously-authored Cryptome Report, Michael Hoseason submitted a disclosure regarding Interpal's accounts to NCIS on September 27, 2001. The September 27 NCIS disclosure, with reference number 140425, [REDACTED] The NCIS disclosure stated [REDACTED]



[redacted]

See NW212124.

On October 15, 2001, NatWest made a further disclosure regarding Interpal's accounts. The October 15, 2001 disclosure stated that, [redacted] UK Law Enforcement and Regulators did not respond further to NatWest's September 27 or October 15 disclosures, nor did any of them make any requests for further information on this subject. See NW008356 – NW008366, NW013679 – NW013682, NW052056 – NW052066.

To the best of NatWest's knowledge, Michael Hoseason, Doug Hartley and Jon Holland have knowledge of relevant facts supporting these contentions.

**Contention Interrogatory No. 5:**

**Do You contend that any of the factual assertions in the Cryptome Report with regard to accounts You maintained for Interpal were inaccurate? If Your answer is affirmative, state the factual basis for Your contention as to each factual assertion You contend was inaccurate, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 5:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "factual assertions" is vague and ambiguous.

Subject to and without waiving the above Reservation of Rights and General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that Interpal's address on page 23 of the Cryptome Report is misspelled as "Criclewood," rather than "Cricklewood." NatWest has no basis for asserting that

the anonymously-authored Cryptome Report is accurate or inaccurate with respect to its statements about Interpal or its alleged activities beyond listing the names and numbers of its accounts at NatWest. See Hoseason Tr. 250:14 – 251:5, July 15, 2010.

To the best of NatWest's knowledge, the person who may have knowledge of the relevant facts supporting this contention is Michael Hoseason.

**Contention Interrogatory No. 6:**

**Do you contend that, as of January 1, 2001, You did not know that Hamas had been designated an FTO by the United States? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 6:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent it seeks information concerning the knowledge of NatWest employees other than those persons with relevant knowledge pertaining to Interpal's customer relationship with NatWest. NatWest also specifically objects to any requirement that it inquire of such persons as to whether any of them know of the subject matter of this Contention Interrogatory.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest does not contend that as of January 1, 2001, none of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest did not have knowledge that Hamas had been designated an FTO by the United States. NatWest is unaware of any evidence that any of these persons knew, as of January 1, 2001, that Hamas had been designated an FTO by the United States, and NatWest does not know when any of these persons obtained

any such knowledge. As of December 3, 2001, NatWest maintained a list of entities designated by OFAC, which included the information that Hamas had been designated as an FTO. See NW084649 – NW084859.

Olha Leeming currently is aware that Hamas was a terrorist organization during the Relevant Period. Doug Hartley understood Hamas to be a terrorist organization in Palestine, but does not recall whether that was his understanding during the Relevant Period. Neil Trantum knew that Hamas was involved in terrorism but does not know when he gained that knowledge. Michael Hoseason understood Hamas to be a terror organization in September 2001 but does not recall specifically that Hamas was on terrorist lists of a number of countries from 2001 through 2003. Stephen Foster knew by late 2002 that Hamas had been declared a terrorist organization by many governments. Tony O'Hear knew that Hamas was on the OFAC list, but does not know that Hamas was designated an "FTO." Irvine Rodger understood that Hamas is commonly regarded as being a terrorist organization by the United States and the European Union, but does not recall whether that was his understanding as of 2001. Amanda Holt was aware that Hamas was listed on certain terrorist lists, but does not recall which lists or when she became aware of that fact. Sonia Gayle was aware that Hamas was designated a terrorist organization by the United States and the United Kingdom, but does not recall when she gained that awareness. See Leeming Tr. 47:23 – 48:3, May 21, 2009; Hartley Tr. 79:15 - 80:1, July 12, 2010; Trantum Tr. 73:10 – 74:9, July 13, 2010; Hoseason Tr. 95:13 – 96:11, 111:24 – 112:4, July 14, 2010; Foster Tr. 65:25 – 66:4, July 16, 2010; O'Hear Tr. 29:24-30:2, July 21, 2010; Rodger Tr. 53:16 – 54:2, July 22, 2010; Holt Tr. 51:10 – 53:17, July 23, 2010; Gayle Tr. 111:22 – 112:10, Oct. 27, 2010.

NatWest is unaware of any of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest who have knowledge about these subjects other

than Olha Leeming, Doug Hartley, Neil Trantum, Michael Hoseason, Stephen Foster, Tony O'Hear, Irvine Rodger, Amanda Holt and Sonia Gayle.

**Contention Interrogatory No. 7:**

**Do you contend that, as of January 1, 2001, You did not know that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks, including suicide bombings, in Israel and the Palestinian Territories? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 7:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent it seeks information concerning the knowledge of NatWest employees other than those persons with relevant knowledge pertaining to Interpal's customer relationship with NatWest. NatWest also specifically objects to any requirement that it inquire of such persons as to whether any of them know of the subject matter of this Contention Interrogatory. NatWest also specifically objects that the term "perpetrating" is vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest does not contend that as of January 1, 2001, none of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest did not have knowledge that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks in Israel and the Palestinian Territories. NatWest is unaware of any evidence that any of these persons knew, as of January 1, 2001, that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks in Israel and the Palestinian Territories and NatWest does not know when any of these persons obtained any such knowledge. Michael Hoseason was aware in

September 2001 that Hamas claimed responsibility for attacks that were directed at civilians. Hoseason Tr. 217:5-8, July 14, 2010.

NatWest in unaware of any of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest who has knowledge that Hamas claimed responsibility for terrorist attacks in Israel and the Palestinian Territories other than Michael Hoseason.

**Contention Interrogatory No. 8:**

**Do You contend that any of the findings (or any portion thereof) contained in the U.S. Government's Press Release designating Interpal an SDGT on August 22, 2003 (available at http://www.treasury.gov/press-center/press-releases/Pages/js672.aspx) are factually inaccurate? If Your answer is affirmative, identify: each finding (or any portion thereof) You contend is inaccurate; the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 8:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest responds that it is not in possession of any information indicating that any of the findings or any portion thereof contained in the U.S. Government's Press Release designating Interpal an SDGT on August 22, 2003 is not a correct or accurate statement of the conclusions of the U.S. government at that time, and NatWest is not in possession of any information indicating that such findings or any portions thereof are correct or incorrect, or accurate or inaccurate, except to the extent NatWest understands that no such findings have been made by the United Kingdom or the European Union, despite the conduct of multiple investigations of Interpal by UK Law Enforcement and Regulators.

**Contention Interrogatory No. 9:**

**Do You contend that between August 22, 2003 and December 31, 2004, NatWest had reason to believe any of the findings (or any portion thereof) contained in the U.S.**

**Government's Press Release designating Interpal an SDGT on August 22, 2003 (available at   http://www.treasury.gov/press-center/press-releases/Pages/js672.aspx)   was   factually inaccurate? If Your answer is affirmative, identify: each finding (or any portion thereof) You contend NatWest believed to be factually inaccurate during that time period; the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 9:**

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest responds that between August 22, 2003 and December 31, 2004, it did not

possess any information indicating that any of the findings or any portion thereof contained in

the U.S. Government's Press Release designating Interpal an SDGT on August 22, 2003 was not

a correct or accurate statement of the conclusions of the U.S. government at that time, and

NatWest was not in possession of any information indicating that such findings or any portions

thereof were correct or incorrect, or accurate or inaccurate, except to the extent NatWest

understood that no such findings had been made by the United Kingdom or the European Union,

despite the conduct of multiple investigations of Interpal by UK Law Enforcement and

Regulators.

**Contention Interrogatory No. 10:**

**Do You contend that NCIS or any other U.K. governmental entity requested that NatWest continue to maintain accounts for Interpal at any point in time between January 1, 2000 and December 31, 2004? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 10:**

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest does not contend that NCIS or any other UK governmental entity requested

that NatWest continue to maintain accounts for Interpal at any point in time between January 1, 2000 and December 31, 2004.

**Contention Interrogatory No. 11:**

**Do You contend that following the creation of the 1992 Report You performed any further investigation regarding the account specified therein? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 11:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "investigation" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it wrongly implies that the accounts specified in the 1992 Report were Interpal's accounts. The accounts specified in the 1992 Report were Palestine and Lebanon Relief Fund accounts [REDACTED] and [REDACTED].

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest does not contend that it performed further investigation on the Palestine and Lebanon Relief Fund accounts [REDACTED] and [REDACTED] after submitting the 1992 Report. On March 26, 1992, Ian Wickens signed a suspicious activity report pursuant to the Prevention of Terrorism Act 1989 concerning the Palestine and Lebanon Relief Fund accounts [REDACTED] and [REDACTED], which were opened with NatWest in 1987 and 1990, respectively, which, to the best of NatWest's knowledge, was submitted to the NDIU. UK Law Enforcement and Regulators did not respond to NatWest's disclosure of the 1992 Report, nor did they make any requests of NatWest for further information. See NW191804 – NW191805.

**Contention Interrogatory No. 12:**

**Do You contend that in 1996 NatWest performed any investigation regarding Interpal's accounts with NatWest during or after the Charity Commission's investigation of Interpal? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 12:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "investigation" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited only to actions NatWest took in 1996.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest responds as follows:

NatWest contends that following the Charity Commission's 1996 investigation, NatWest made four disclosures to NCIS regarding Interpal, updated its "know your customer" information on Interpal, aided the Charity Commission in the Charity Commission's 2003 investigation of Interpal and, beginning in May 2004, conducted semi-annual reviews of all of Interpal's outgoing payments. NatWest further understood from UK Law Enforcement and Regulators that they were investigating Interpal and that UK Law Enforcement and Regulators would request further information from NatWest regarding Interpal if they required additional information, but they did not do so, other than one production order issued by the Metropolitan Police in 2003.

On March 6, 1996, The Times published an article stating that MI5 officers were "studying police intelligence on alleged links between Hamas militants" and Interpal. To NatWest's understanding, the March 6 article prompted the Charity Commission to open an investigation of Interpal, during which the Charity Commission temporarily froze Interpal's bank

accounts. The Charity Commission reported that it had scrutinized Interpal's controls and records and carried out checks of payments from Interpal's bank statements. The Charity Commission concluded that Interpal was a "well run and committed organization which carried out important work in a part of the world where there is great hardship and suffering" and that allegations that Interpal funded terrorist activities were not substantiated. The Charity Commission's conclusions were published in the Charity Commission's 1996 Annual Report. See NW014516; Burchfield Tr. 64:4-15, May 20, 2011; Expert Report of Jonathan Burchfield (Dec. 3, 2010) ¶¶ D.1.a - g.

Michael Hoseason submitted NCIS disclosure 140425 on September 27, 2001, regarding [REDACTED] The disclosure stated that [REDACTED] Doug Hartley entered an undated note into Goalkeeper report 617044 regarding NCIS disclosure 140425, which stated that "Special Branch are investigating." See NW008359, NW013680, NW052059, NW212124; Hartley Tr. 85:9-20, July 12, 2010.

Michael Hoseason made a further disclosure to NCIS on October 15, 2001, with reference number 142909, which stated that, [REDACTED]. NatWest received no further

responses from UK Law Enforcement and Regulators, nor any requests for further information in response to disclosures 140425 and 142909. See NW008362 – NW008366, NW013683, NW052062 – NW052066.

On November 15, 2001, Olha Leeming filed an internal suspicious activity report ("SAR") based on a suspicion of terrorist funding due to two large overseas credits received into Interpal's accounts. Goalkeeper report 647655 was created on November 19, 2001, which attached the SAR. On December 21, 2001, Doug Hartley noted in the Goalkeeper report that there was a need to gain a "clear understanding of the activities here and full details behind some of the sizeable transactions." Hartley noted that he had not submitted a disclosure yet because he hoped to gain meaningful information about the customer before doing so. Hartley later entered a note into Goalkeeper report 647655 on February 5, 2002 that an existing disclosure had been discovered for Interpal, and there was therefore "[p]robably no merit in disclosing again at this time . . . ." See NW008367 – NW008373, NW013683 – NW013684, NW052067 – NW052073.

Martin Wiltshear followed up on Hartley's December 21 note on January 17, 2002, when he sent an email to Belinda Lane, Interpal's relationship manager, requesting "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account." Lane responded to Wiltshear's email by providing information on Interpal and stating that she had scheduled a January 21, 2002 meeting with Jihad Qundil, Interpal's Secretary, at Interpal's premises, where she would discuss Interpal's use of the US dollar account. See NW008369, NW012954, NW013335, NW013684, NW052069.

Lane met with Qundil at Interpal's premises on March 20, 2002. Qundil told Lane that Interpal received donations from the Muslim community mainly around the festivals of Ramadan, just before Christmas, and Haj in March, and provided assistance to various charities

mainly in the West Bank, Gaza and Lebanon. Qundil also told Lane that Interpal had been investigated fully and cleared by the Charity Commission in 1996. Qundil stated that he would forward the identification information for each of the signatories to Interpal's accounts at NatWest, along with addresses. See NW013637 – NW013638, NW068905 – NW068906; Lane Tr. 144:12 -145:9, June 24, 2008.

On March 29, 2002, Belinda Lane completed further "know your customer" documentation, which included the driver's licenses, passports and addresses of Mahfuzh Safiee and Jihad Qundil, two of Interpal's signatories. Lane's documentation also included notes on the nature of Interpal's business, which was the "collection of donations and distribution of funds to charities in Westbank, Gaza, and Lebanon." The documentation attached Interpal's Trust Deed, as well as several account statements. Lane noted in the documentation that she had placed Interpal's 2000 Annual Report in the bank's files and that turnover through Interpal's accounts was consistent with the activity seen in Interpal's audited accounts. See NW008300 – NW008355.

On June 7, 2002, N. Morrison filed an internal SAR based on suspicion of terrorist financing due to a credit of [redacted] received from [redacted] into Interpal's accounts. NatWest reviewed Morrison's SAR twice, once on June 14, 2002 and again on June 17, 2002. On June 17, 2002, Charlotte McComas created Goalkeeper report 666814 and entered a note that referred to the October 15, 2001 NCIS disclosure regarding Interpal. McComas wrote that she had "ordered ledgers on sterling accounts and transactions are of the same vein so will not add value to disclosure to include them again." See NW008374 – NW008380, NW008381 – NW008398, NW013685 – NW013691, NW052074 – NW052091, NW052133 – NW052139.



Doug Hartley submitted NCIS disclosure 207993 on July 4, 2002, which referred to NCIS disclosure 142909 and stated [REDACTED]. The disclosure further stated that [REDACTED] On August 5, 2002, a note was entered into Goalkeeper report 666814 stating that NatWest [REDACTED], and that the disclosure [REDACTED]. See NW008381 – NW008398, NW013685 – NW013691, NW052074 - NW052091.

Hartley entered notes into Goalkeeper report 666814 on July 4, 2002, stating that NatWest needed to seek a "detailed report" from the relationship manager on her knowledge of Interpal. On July 9, 2002, Charlotte McComas sent a memo to Belinda Lane attaching Goalkeeper report 666814 and informing her that a decision had been made to report the transaction to the authorities, and that under no circumstances should the account holder be advised of the action. On July 15, 2002, Lane sent McComas a memo containing information on Interpal, attaching Interpal's mandate and Lane's notes from her March 20, 2002 meeting with Jihad Qundil. Lane's July 15 memo also noted that Qundil and Safiee recently had been re-identified in accordance with "know your customer" procedures. See NW008381 – NW008398, NW012952, NW012953, NW013332, NW013333, NW013685 – NW013691, NW052074 - NW052091; McComas Tr. 34:25 – 35:3, Oct. 5, 2010.

McComas wrote a letter to Lane requesting further information on the [REDACTED] payment to Interpal on August 1, 2002. On August 6, 2002, E. Mustafa, a trustee of Interpal, wrote to Lane that the [REDACTED] credit was a donation from "an aid agency in [REDACTED] called the [REDACTED]

[redacted] for charitable and humanitarian projects . . . ." Mustafa attached six pages of supporting documentation, which explained in further detail the purpose of the donation. Lane sent Mustafa's August 6, 2002 letter to McComas on August 9, 2002. Doug Hartley entered a note into Goalkeeper report 666814 on August 10, 2002 that paperwork had been received advising that the [redacted] payment to Interpal was a donation for health, medical and education projects. Hartley wrote that in looking at Interpal's US dollar account, there were "a number of subsequent payments to hospitals, for example, which would tend to substantiate the comments." See NW008381 – NW008398, NW013346 – NW013355, NW013685 – NW013691, NW052074 - NW052091, NW068227 – NW068234.

Tony O'Hear entered a note into Goalkeeper report 666814 on September 17, 2003 that the Islamic Charitable Society for the Support of Al-Aqsa, while not designated at the time of the June 2002 payment, had been designated by the Bank of England on May 29, 2003, almost one year later. O'Hear noted that he had spoken to Mark Ashtown at the NTFIU Special Branch regarding the designation of Al-Aqsa and that Ashtown [redacted] O'Hear wrote to Dedrei Nell on September 17, 2003 about his conversation with Ashtown, further noting that Ashtown [redacted] See NW008384, NW012976, NW013698, NW013699, NW052077.

Belinda Lane met again with Interpal on January 27, 2003, at Interpal's premises. Lane's interview notes referred to her interview notes dated March 20, 2002, and noted that the details

of Interpal's operations remained more or less the same. Lane met again with Interpal on November 18, 2004, at Interpal's premises. See NW053384, NW068903, NW068211.

On May 2, 2003, Doug Hartley submitted NCIS disclosure 276926 regarding a customer named [REDACTED]. The NCIS disclosure [REDACTED]. See NW052092 – NW052104; NW083859 – NW083862.

Kevin Shiels at Group Investigations and Fraud faxed to Tim Kennelly at the Fraud Team a production order served by the Metropolitan Police Special Branch on July 7, 2003 and requested the account statements for seven separate Interpal accounts, in order to comply with the production order. Shiels created Goalkeeper report 704079 on July 7 and appended the production order. On July 18, 2003, Shiels entered a note into Goalkeeper report 704079 that the requirements of the production order had been completed. See NW008412 – NW008420, NW052105 – NW052113.

NatWest received the order from the Charity Commission freezing Interpal's accounts on August 26, 2003. A E Chittock, Senior Litigation Officer at NatWest, responded to the Charity Commission on August 27, 2003 that [REDACTED] Terry Woodley received further instructions from the Charity Commission on August 27, 2003. See NW013033 – NW013038, NW013055 – NWNW013061, NW013659, NW013660 – NW013661, NW067962 – NW067963, NW067980 – NW067986.

Tony O'Hear submitted NCIS disclosure 315666 on August 28, 2003, based on a suspicion of terrorist financing. The disclosure stated [REDACTED]

[redacted] The disclosure further stated [redacted] O'Hear requested that the disclosure [redacted] NCIS disclosure 315666 was appended to Goalkeeper report 710368. See NW008430 – NW008439, NW013692 – NW013694, NW052114 – NW052123.

On August 28, 2003, O'Hear entered a note into Goalkeeper report 710368 reporting that he had received a phone call from DS Neill Bennett of the NTFIU at Special Branch, [redacted] On August 29, 2003, O'Hear entered a note into Goalkeeper report 710368 that he had spoken to Terry Woodley about ensuring that no items would be paid from Interpal's' accounts [redacted] While the freezing order was in effect, O'Hear liaised with Interpal's relationship manager [redacted] See NW008433, NW013052, NW013707, NW013708, NW052117, NW052574, NW067972 – NW067974, NW067977, NW068036 – NW068038, NW068053, NW068056; O'Hear Tr. 146:2-8, 156:6-17, July 21, 2010.

Richard Gossage, Director of Group Risk Management of RBS wrote to Tom Dawlings, of the Financial Sanctions Unit of the Bank of England, on September 5, 2003 to inform Dawlings that [redacted]



[redacted]. See NW013674 – NW013678, NW014500 – NW014504.

Tony O'Hear wrote to Terry Woodley on September 17, 2003, stating that an NCIS disclosure had been submitted in June 2002 concerning [redacted] and asking Woodley to check if funds had been received by Interpal from [redacted] over the prior 12 months. On September 19, 2003, Terry Woodley asked Jane Edwards at the International Banking Center and Noreen Bullock at the Enfield Customer Service Team to order Interpal's account statements for the past 12 months so that the debits could be reviewed in connection with the Charity Commission's investigation. Woodley does not recall whether he received the account statements but believes he would have followed up on his request if he had not received them. O'Hear testified that he played a "key touch point role" between NatWest and the Charity Commission during the time of the Charity Commission's investigation by referring to the Charity Commission on a daily basis [redacted]. See NW012976, NW012977 – NW012980, NW068018, NW068019 – NW068022; O'Hear Tr. 182:18-21, 187:9-22, July 21, 2010; Woodley Tr. 147:13 – 22, 184:12 – 185:21, Oct. 4, 2010.

The Charity Commission completed its investigation of Interpal and published its inquiry report on September 24, 2003. The Charity Commission explained in its inquiry report that it had carried out a detailed examination of Interpal's practices and record keeping and unfroze

Interpal's bank accounts in the absence of any clear evidence showing that Interpal had links to Hamas' political or violent militant activities. The Charity Commission also reported that it had investigated Interpal's relationship with the Al-Aqsa Foundation and concluded that funds received from the Al-Aqsa Foundation were for humanitarian work already carried out by Interpal and invoiced to the Al-Aqsa Foundation. The Charity Commission informed NatWest on September 24, 2003 that [REDACTED] See NW012942, NW012943 – NW012945, NW012946, NW013641 – NW013644, NW013646 – NW013647, NW013701, NW013702, NW013703, NW013704 – NW013705, NW013942 – NW013943, NW013944 – NW013945, NW013946 – NW013947, NW013948, NW014011 – NW014012; Burchfield Report ¶¶ D.2.a - d.

On October 3, 2003, Dawlings responded to Gossage, noting that [REDACTED] Dawlings further advised Gossage that [REDACTED] Dawlings concluded by noting that [REDACTED] On October 28, 2003, Gossage responded to Dawlings that [REDACTED] Gossage stated that [REDACTED]

[REDACTED]' See NW013815, NW014505 - NW014506.

On May 20, 2004, Guy Cole completed a thorough review of the beneficiaries of Interpal's foreign payments for the prior six months. Thereafter he completed such a review on a semi-annual basis. On each occasion, he checked each beneficiary against available information in the Worldcheck and KYC Check databases, as well as information available on Google. His review did not reveal any evidence that Interpal had made payments to any terrorist groups during the prior six months. See NW016767 – NW016774, NW017138 – NW017146, NW018476 – NW018483, NW066732 – NW066739, NW066780 – NW066787.

In December 2004, Amanda Holt, Head of Group Enterprise Risk, Stephen Foster, Head of Anti-Money Laundering in Group Risk Management, Graeme Wyles, Director of Risk for Commercial Banking, Kevin Love, Global Head of Enterprise Risk for Corporate Banking and Financial Markets, Alan Dickinson, Managing Director of Corporate Banking and Head of Core Corporate Bank, and John Cameron, Chief Executive of Corporate Banking and Financial Markets, discussed the bank's relationship with Interpal, including the rationale for maintaining the relationship, the steps being taken to monitor the accounts and the bank's regulatory position in respect of the United States. Guy Cole completed his second semi-annual review of Interpal's payments on December 16, 2004. Cole reviewed Interpal's payments for the prior six months and checked Interpal's beneficiaries against the UK and US financial sanctions and terrorist financing lists, the Complicheck and World Check databases, and information available on Google, and found that none of Interpal's payments had been made to an entity or individual designated by the UK or US. NatWest determined that there was no evidence showing that Interpal had funded any terrorist groups, and decided to maintain the customer relationship,

while closing Interpal's US dollar account. NW066667 – NW066671, NW066672 – NW066676, NW066677 – NW066681, NW066682 – NW066686, NW066687 – NW066690, NW066691 – NW066695, NW066696 – NW066700, NW066721 – NW066723, NW066788 – NW066794, NW066800 – NW066806, NW066807 – NW066813, NW066820 – NW066821, NW066843, NW066844 – NW066846, NW066847 – NW066852.

Guy Cole completed his third semi-annual review of Interpal's payments for the prior six months on Interpal's accounts on July 6, 2005. Cole once again found no evidence that Interpal was funding terrorist groups. He noted that Interpal had made a payment to an entity that subsequently had been designated by the Bank of England, and therefore Cole would review Interpal's account activity going forward on a quarterly, rather than semi-annual basis. See NW066701 – NW066704, NW066705 – NW066711, NW066712 – NW066717, NW066740 – NW066742, NW066773 – NW066774, NW066777 – NW066779.

To the best of NatWest's knowledge, the people and entities who may have knowledge of the relevant facts supporting these contentions are Guy Cole, Michael Hoseason, Tony O'Hear, Tom Dawlings, Richard Gossage, Amanda Holt, Stephen Foster, Graeme Wyles, Kevin Love, Alan Dickinson, John Cameron, Belinda Lane, Terry Woodley, Kevin Shiels, A E Chittock, Olha Leeming, Martin Wiltshear, N. Morrison, Interpal, the Charity Commission, NCIS, Special Branch and the Bank of England.

**Contention Interrogatory No. 13:**

**Do You contend that You performed any research into the background or identity of the entities referenced at NW052057 and NW052060 to whom Interpal was transferring funds? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 13:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "research" is vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest submitted an NCIS disclosure with reference number 142909 on October 15, 2001, which informed NCIS that [redacted] The NCIS disclosure [redacted] See NW008362 – NW008366, NW013683, NW052062 – NW052066.

Guy Cole checked the entities Al Islah Charitable Association and Islamic Charitable Society against the databases Worldcheck and KYC Check, as well as information available on Google, in May 2004. Guy Cole checked the entity Nablus Zakat Committee against the databases Complicheck and World Check, as well as information available on Google, and against the UK and US financial sanctions and terrorist financing lists in December 2004 and again in July 2005. NatWest received no instructions or further requests for information from UK Law Enforcement and Regulators regarding these transactions or entities. See NW016767 – NW016774, NW017138 – NW017146, NW018476 – NW018483, NW066696 – NW066700, NW066721 – NW066723, NW066732 – NW066739, NW066740 – NW066742, NW066777 – NW066779, NW066780 – NW066787.

NatWest contends that it fully complied with its legal and regulatory obligations in the UK to report suspicious transactions to UK Law Enforcement and Regulators, which had the

responsibility to assess the information provided to them and to decide what action, if any, to take. NatWest had no obligation to research or investigate the counterparties to Interpal's transactions. See Hoseason Tr. 309:17 – 24, July 15, 2010; Holland Tr. 123:17 – 24, May 18, 2011; Holland Report ¶¶ 3.29 - 3.30, 3.59, 5.17, 8.24; Expert Report of Michael Hyland (March 2, 2011) ¶¶ 56 - 61.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Guy Cole, Michael Hoseason, Jon Holland and Michael Hyland.

**Contention Interrogatory No. 14:**

**Do You contend that You undertook any monitoring and evaluation of both outgoing and incoming transactions and "Know Your Customer" (KYC) (as described in ¶¶ 33-35, 58 and 61 of the Expert Report of Michael Hyland) on the Interpal accounts in response to Doug Hartley's GK2-647655 entry in December, 2001 (NW052069)? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 14:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that it wrongly suggests that the Expert Report of Michael Hyland states that NatWest had any legal or regulatory obligation in December 2001 to proactively monitor Interpal's incoming and outgoing payments.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that it undertook additional "know your customer" procedures in response to Doug Hartley's December 21, 2001 entry in Goalkeeper report 647655. In response to the internal SAR submitted by Olha Leeming on November 15, 2001 based on large payments received into Interpal's accounts, Doug Hartley entered a note into Goalkeeper report 647655

stating, "With $3 million turnover during 2001 I think we need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions. I have not sent the disclosure as yet in the hope that we can get some meaningful info in the short term." Pursuant to Hartley's note, Martin Wiltshear sent an email to Belinda Lane on January 17, 2002, requesting "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account." Lane responded to Wiltshear's email by providing information on Interpal and stating that she had a January 21, 2002 meeting scheduled with Jihad Qundil, Interpal's Secretary, at Interpal's premises, where she would discuss Interpal's use of the US dollar account. See NW008367 – NW008373, NW012954, NW013335, NW013683 – NW013684, NW052067 – NW052073.

Lane met with Qundil at Interpal's premises on March 20, 2002. Qundil told Lane that Interpal received donations from the Muslim community mainly around the festivals of Ramadan, just before Christmas, and Haj in March, and provided assistance to various charities mainly in the West Bank, Gaza and Lebanon. Qundil also told Lane that Interpal had been investigated fully and cleared by the Charity Commission in 1996. Qundil stated that he would forward the identification information for each of the signatories to Interpal's accounts at NatWest, along with addresses. See NW013637 – NW013638, NW068905 – NW068906; Lane Tr. 144:12 -145:9, June 24, 2008.

On March 29, 2002, Belinda Lane completed further "know your customer" documentation, which included the driver's licenses, passports and addresses of Mahfuzh Safiee and Jihad Qundil, two of Interpal's signatories. Lane's documentation also included notes on the nature of Interpal's business, which was the "collection of donations and distribution of funds to charities in Westbank, Gaza, and Lebanon." The documentation attached Interpal's Trust Deed,

as well as several account statements. Lane noted in the documentation that she had placed Interpal's 2000 Annual Report in the bank's files and that turnover through Interpal's accounts was consistent with the activity seen in Interpal's audited accounts. See NW008300 – NW008355.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Olha Leeming, Belinda Lane, Doug Hartley and Martin Wiltshear.

**Contention Interrogatory No. 15:**

**Do You contend that during the period from January 1, 1996 to December 31, 2004 no account activity in Interpal's accounts warranted any disclosures or SARs to NCIS, or any other U.K. governmental entity, other than those disclosures evidenced by NW083859-62, NW008362-66, NW008381-98, and NW008430-39? If Your answer is affirmative, state the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention. If Your answer is negative, identify each account activity that You contend warranted disclosure to NCIS or any other U.K. governmental entity and state the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 15:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "warranted" is vague, ambiguous and purports to have any legal connotation in this context.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that during the period from January 1, 1996 to December 31, 2004, it was not aware of any activity in Interpal's accounts that NatWest was legally obligated to disclose to UK Law Enforcement and Regulators other than those disclosures evidenced by

NW083859-62, NW008362-66, NW008381-98 and NW008430-39. See Holland Report ¶¶ 3.59, 8.24.

From January 1, 1996 through February 18, 2001, NatWest was legally obligated to report knowledge or suspicion of terrorist financing to NCIS pursuant to the Prevention of Terrorism (Temporary Provisions) Act 1989. From February 19, 2001 through December 19, 2001, NatWest was legally obligated to report knowledge or suspicion of terrorist financing offences to NCIS under the Terrorism Act 2000. After December 20, 2001, NatWest was legally obligated under the Anti-Terrorism, Crime and Security Act 2001 to submit a report to NCIS if it knew or suspected, or had reasonable grounds for knowing or suspecting, that another person had committed a terrorist financing offence. After October 10, 2001, NatWest was legally obligated to report to HM Treasury knowledge or suspicion that a customer or person with whom it had business dealings was designated by HM Treasury or committed, attempted to commit or facilitated or participated in the commission of acts of terrorism, under the Terrorism (United Nations Measures) Order 2001. See Holland Report ¶¶ 3.8 – 3.9, 3.28, 3.32 – 3.34, 8.4 – 8.9.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Michael Hoseason, Tony O'Hear and Jon Holland.

**Contention Interrogatory No. 16:**

**Do You contend that between October 3, 2003 and October 28, 2003, You completed a full investigation of payments made by Interpal? If Your answer is affirmative, state the factual basis for Your contention, including identifying each document reviewed in the course of Your investigation, all other facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 16:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "full investigation" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited to the period between October 3, 2003 and October 28, 2003.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that it assisted the Charity Commission with the Charity Commission's thorough investigation in 2003 of payments made by Interpal.

NatWest received the order from the Charity Commission freezing Interpal's accounts on August 26, 2003. A E Chittock, Senior Litigation Officer at NatWest, responded to the Charity Commission on August 27, 2003 that [REDACTED] Terry Woodley received further instructions from the Charity Commission on August 27, 2003. See NW013033 – NW013038, NW013055 – NWNW013061, NW013659, NW013660 – NW013661, NW067959 – NW067960, NW067962 – NW067963, NW067980 – NW067986.

On August 28, 2003, Tony O'Hear submitted NCIS disclosure 315666, based on a suspicion of terrorist financing. The disclosure stated that [REDACTED]. The disclosure further stated [REDACTED]

[redacted] NCIS disclosure 315666 was appended to Goalkeeper report 710368. On August 28, 2003, O'Hear entered a note into Goalkeeper report 710368 reporting that he had received a phone call from DS Neill Bennett, of the NTFIU at Special Branch, [redacted] and that Bennett asked O'Hear [redacted]. See NW008430 – NW008439, NW013692 – NW013694, NW052114 – NW052123.

On August 29, 2003, O'Hear entered a note into Goalkeeper report 710368 reporting that he had spoken to Terry Woodley about ensuring that no items would be paid from Interpal's accounts [redacted]. During the period of the Charity Commission's freezing order, O'Hear liaised with Interpal's relationship manager [redacted] See NW008433, NW013052, NW013707, NW013708, NW052117, NW052574, NW067972 – NW067974, NW068036 – NW068038, NW068053, NW068056; O'Hear Tr. 146:2-8, 156:6-17, July 21, 2010.

Richard Gossage, Director of Group Risk Management of RBS wrote to Tom Dawlings, of the Financial Sanctions Unit of the Bank of England, on September 5, 2003 to inform Dawlings [redacted] Gossage explained that [redacted]



[redacted]. See NW013674 – NW013678, NW014500 – NW014504.

Tony O'Hear wrote to Terry Woodley on September 17, 2003, stating that an NCIS disclosure had been submitted in June 2002 concerning [redacted] and asking Woodley to check if funds had been received by Interpal from [redacted] over the prior 12 months. On September 19, 2003, Terry Woodley asked Jane Edwards at the International Banking Center and Noreen Bullock at the Enfield Customer Service Team to order Interpal's account statements for the past 12 months so that the debits could be reviewed in connection with the Charity Commission's investigation. Woodley does not recall whether he received the account statements but believes he would have followed up on his request if he had not received them. O'Hear testified that he played a "key touch point role" between NatWest and the Charity Commission during the time of the Charity Commission's investigation by referring to the Charity Commission on a daily basis [redacted]. See NW012976, NW012977 – NW012980, NW068018, NW068019 – NW068022; O'Hear Tr. 182:18-21, 187:9-22, July 21, 2010; Woodley Tr. 147:13 – 22, 184:12 – 185:21, Oct. 4, 2010.

The Charity Commission completed its investigation of Interpal and published its inquiry report on September 24, 2003. The Charity Commission explained in its inquiry report that it had carried out a detailed examination of Interpal's practices and record keeping and unfroze Interpal's bank accounts in the absence of any clear evidence showing that Interpal had links to Hamas' political or violent militant activities. The Charity Commission also reported that it had investigated Interpal's relationship with the Al-Aqsa Foundation and concluded that funds

received from the Al-Aqsa Foundation were for humanitarian work already carried out by Interpal and invoiced to the Al-Aqsa Foundation. The Charity Commission informed NatWest on September 24, 2003 [REDACTED]. The Charity Commission provided an internet link to its inquiry report, which it published on its website. See NW012942, NW012943 – NW012945, NW012946, NW013641 – NW013644, NW013646 – NW013647, NW013701, NW013702, NW013703, NW013704 – NW013705, NW013942 – NW013943, NW013944 – NW013945, NW013946 – NW013947, NW013948, NW014011 – NW014012; Burchfield Report ¶¶ D.2.a - d.

On October 3, 2003, Dawlings responded to Gossage, noting that [REDACTED] Dawlings further advised Gossage that [REDACTED] Dawlings concluded by noting [REDACTED] On October 28, 2003, Gossage responded to Dawlings that [REDACTED] Gossage stated that [REDACTED] See NW013815, NW014505 - NW014506.

To the best of NatWest's knowledge, the persons and entities who may have knowledge of the relevant facts supporting these contentions are Tony O'Hear, Terry Woodley, Belinda Lane, A E Chittock, Richard Gossage, Tom Dawlings, Special Branch, NCIS, the Charity Commission and the Bank of England.

**Contention Interrogatory No. 17:**

**Do You contend that on or after September 17, 2003 You reviewed Interpal's accounts to check if any other funds were received from the Islamic Charitable Society for the Support of Al-Aqsa in the 12 months preceding September 17, 2003? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 17:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

See the Response to Contention Interrogatory No. 16 above.

**Contention Interrogatory No. 18:**

**Do You contend that during the Relevant Period, You fully complied with the U.K. legal requirements (as described in ¶ 47 of the Expert Report of Michael Hyland) to freeze and report to the Bank of England Sanctions Unit transactions involving persons and entities on the Bank of England's "Consolidated List" of sanctioned persons and entities (consolidated from the UN, EU and UK lists)? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 18:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that paragraph 47 of the Expert Report of Michael Hyland discusses legal requirements in effect after October 10, 2001 and not during the period January 1, 2000 through October 9, 2001. NatWest also specifically objects to this Contention

Interrogatory to the extent that it seeks information concerning transactions not relating to Interpal or other entities which have been the subject of discovery in these cases. NatWest specifically objects to any requirement that it gather information responsive to the subject matter of this Contention Interrogatory other than the information that has already been provided to Plaintiffs in the course of discovery.

NatWest also specifically objects to this Contention Interrogatory to the extent that it incorrectly states that UK laws required banks during the Relevant Period to proactively monitor incoming and outgoing transactions of their customers.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that it fully complied with UK legal requirements to freeze the assets of and report to the Bank of England Sanctions Unit any persons or entities that appeared on the Bank of England's "Consolidated List" of sanctioned persons and entities for which the bank held assets or to whom the bank provided financial services during the Relevant Period. NatWest contends that it did not hold assets for or provide financial services to any person or entity during the Relevant Period that appeared on the Bank of England's "Consolidated List" of sanctioned persons and entities.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Michael Hyland, Jon Holland, Dedrei Nell, Stephen Foster and Amanda Holt.

**Contention Interrogatory No. 19:**

**Do You Contend that You were not required to report to the Bank of England Sanctions Unit or any other U.K. governmental entity the transactions indicated in NW012108-28 and NW012129-52 in accordance with UK legal obligations (as described in ¶ 47 of the Expert Report of Michael Hyland) to freeze and report to the Bank of England**

**Sanctions Unit transactions involving persons and entities on the Bank of England's "Consolidated List" of sanctioned persons and entities (consolidated from the UN, EU and UK lists)? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 19:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that it was not required to report to the Bank of England Sanctions Unit or any other UK governmental entity the transactions indicated in NW012108-28 and NW012129-52. NatWest was required under UK law to freeze the assets of and report to the Bank of England Sanctions Unit any person or entity for whom it held assets or to whom it provided financial services that appeared on the Bank of England's "Consolidated List" of sanctioned persons and entities. The transaction indicated in NW012129-52 is a [REDACTED], [REDACTED] transfer of [REDACTED] from [REDACTED] to Interpal's account 140/00/04156838. The entity [REDACTED] did not appear on the Bank of England's "Consolidated List" of sanctioned persons and entities as of June 13, 2003. The transaction indicated in NW012108-28 is a [REDACTED], [REDACTED] transfer of [REDACTED] from [REDACTED] to Interpal's account 140/00/04156838. The person [REDACTED] did not appear on the Bank of England's "Consolidated List" of sanctioned persons and entities as of June 23, 2003. See Second Expert Report of Jon Holland (Feb. 28, 2011) ¶¶ 6.3, 6.5.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Michael Hyland and Jon Holland.

**Contention Interrogatory No. 20:**

**Apart from (1) a direct request from U.K. law enforcement or U.K. regulatory authorities to do so; (2) a criminal conviction in the U.K. of the customer; or (3) clear evidence demonstrating that specific customer funds were to be utilized to buy bullets or explosives; do You contend that Your policies during the Relevant Period provided any other basis for closing a customer's account based on terrorism financing concerns? If Your answer is affirmative, state the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify the number of customers whose accounts were closed during the Relevant Period and the basis for closing each customer's account and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 20:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that NatWest's policies evolved during the Relevant Period. NatWest also specifically objects to this Contention Interrogatory to the extent that it incorrectly implies that the three bases listed in the Contention Interrogatory were included in a particular NatWest policy, as opposed to being legal requirements in the UK. NatWest also specifically objects to this Contention Interrogatory to the extent that the term "basis" and the phrase "terrorism financing concerns" are vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that as of January 29, 2001, its policies provided that NatWest was legally required to comply with sanctions imposed by the United Nations and the European Union. As of May 28, 2002, NatWest's policies provided that NatWest additionally was legally required to comply with sanctions imposed by HM Treasury and the Bank of England. Pursuant to its legal obligations, if NatWest had knowledge that a customer was engaged in terrorism financing, it was prohibited from providing financial services to that customer. NatWest was entitled at any time on a non-discriminatory basis, and subject to the customer's contractual

rights, to close an account for business reasons, including avoiding legal risks and legal defense costs from unmerited lawsuits. See NW000084 – NW000111, NW000112 – NW000143, NW196319 – NW196358, NW212047 – NW212073; Foster Tr. 133:23 – 134:12, 209:20 - 24, 231:21 – 232:2, July 16, 2010; Rodger Tr. 128:10 – 15, 129:2 - 4, 130:11 – 21, July 22, 2010; Holt Tr. 212:19 – 213:2, July 23, 2010; Gayle Tr. 80:5 - 13, 81:11 - 17, 105:24 - 106:12, Oct. 27, 2010; Hyland Tr. 141:9 - 20, June 10, 2011, Holland Tr. 217:5-25, May 18, 2011.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Stephen Foster, Irvine Rodger, Amanda Holt, Sonia Gayle, Michael Hyland and Jon Holland.

**Contention Interrogatory No. 21:**

**Do You contend that at all times during the Relevant Period, You adequately obtained sufficient KYC data (as described in ¶¶ 33-35 of the Expert Report of Michael Hyland) to establish customer identities and retained such KYC documentation? If Your answer is affirmative, state the factual and legal basis for Your contention, and include all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 21:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that it seeks information concerning customer accounts other than Interpal or other entities which have been the subject of discovery in this litigation. NatWest also specifically objects to any requirement that it gather information responsive to the subject matter of this Contention Interrogatory other than the information that has already been provided to Plaintiffs in the course of discovery.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that at all times during the Relevant Period, it adequately obtained and retained sufficient "know your customer" documentation, as described in ¶¶ 33-35 of the Expert Report of Michael Hyland, concerning Interpal. A copy of Interpal's Trust Deed, as filed with the Charity Commission, Interpal's Annual Reports for the years 1996 – 2003, Interpal's newsletters to donors and the relationship manager's notes on Interpal were maintained in NatWest's relationship file for Interpal. See NW008300 – NW008355, NW013064 – NW013104, NW013423 – NW013624, NW013636, NW068100 – NW068122, NW068139 – NW068181.

Before the Relevant Period, Abdel Rahman Daya and Essam Yousef Mustafa signed account opening documents on September 30, 1994, in which they provided their full names, addresses and phone numbers. In March 1998, Gerald Matthews met with Jihad Qundil and Essam Mustafa and wrote in a letter that was maintained in NatWest's relationship file for Interpal that he became "more fully informed of the funds activities." Matthews informed Qundil that NatWest required positive identification such as a driver's licence or passport, along with evidence of the addresses, for any new signatories to Interpal's account. On September 16, 1998, Jihad Qundil, Ibrahim Brian Hewitt, Mahfuzh Safiee and Essam Mustafa submitted Interpal's "Clubs, Societies and Associations Mandate" form to Gerald Matthews at NatWest. In May 1999, Qundil sent to Matthews a list of Interpal's past and present trustees, their dates of appointment and where applicable, their resignation dates. See NW014510 – NW14513, NW053453 – NW053456, NW068708, NW068714 – NW068716, NW068887.

Lane met with Qundil at Interpal's premises on March 20, 2002. Qundil told Lane that Interpal received donations from the Muslim community mainly around the festivals of Ramadan, just before Christmas, and Haj in March, and provided assistance to various charities

mainly in the West Bank, Gaza and Lebanon.  Qundil also told Lane that Interpal had been

investigated fully and cleared by the Charity Commission in 1996.  Qundil stated to Lane that he

would forward the identification information for each of the signatories to Interpal's accounts at

NatWest, along with addresses.  On May 29, 2002, Lane completed further "know your

customer" documentation, which included the driver's licenses, passports and addresses of

Mahfuzh Safiee and Qundil, two of Interpal's signatories.  Lane's documentation also included

notes on the nature of Interpal's business, which was the "collection of donations and

distribution of funds to charities in Westbank, Gaza, and Lebanon," and appended Interpal's

Trust Deed, as well as several account statements.  Lane noted in the documentation that she had

placed Interpal's 2000 Annual Report in the bank's files and that turnover through Interpal's

accounts was consistent with the activity seen in Interpal's audited accounts.  Lane met again

with Interpal on January 27, 2003, at Interpal's premises.  Lane's interview notes referred to her

interview notes dated March 20, 2002, and stated that the details of Interpal's operations

remained more or less the same.  Lane met again with Qundil at Interpal's premises on

November 18, 2004.  Lane additionally testified that her assistant completed "know your

customer" procedures with respect to Interpal's accounts and she or another manager would have

checked those procedures.  See NW008300 – NW008355, NW068211, NW068903, NW068904,

NW068905 – NW068906; Lane Tr. 395:2-11, June 25, 2008.

To the best of NatWest's knowledge, the persons who may have knowledge of the

relevant facts supporting these contentions are Michael Hyland, Gerald Matthews and Belinda

Lane.

**Contention Interrogatory No. 22:**

**Do you contend that, at any time during the Relevant Period, NatWest closed any customer accounts on the basis of suspicions of terrorism or terrorist financing? If Your**

**answer is affirmative, identify: the factual basis for closing such accounts, including whether such customer or customers had been designated as terrorists by any governmental entity, and all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention. (In answering this Interrogatory, you may redact the specific name, address and other personal data such as phone number, government identification number etc.)**

**Response to Contention Interrogatory No. 22:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that it seeks information concerning customer accounts other than Interpal or other entities which have been the subject of discovery in this litigation. NatWest also specifically objects to any requirement that it gather information responsive to the subject matter of this Contention Interrogatory other than the information that has already been provided to Plaintiffs in the course of discovery.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that as of January 7, 2005, it had closed at least five accounts for suspected links to terrorism. NatWest closed the accounts of Friends of Al Aqsa in December 2004, but shortly thereafter reversed its decision in January 2005, following senior level review of the decision process, which found no evidence of money laundering or terrorist financing. NW180854 - NW180857, NW190202 - NW190205.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting this contention are Amanda Holt and Stephen Foster.

**Contention Interrogatory No. 23:**

**Do You contend that, by processing Funds Transfers on behalf of or for the benefit of Interpal, NatWest did not violate the Antiterrorism Act (ATA) as amended by the AEDPA (*see e.g.*, 18 U.S.C. §§ 2339B and 2339C) even after NatWest knew that the United States had designated Interpal as an SDGT due to its role as the principal charity utilized**

**to hide the flow of money to HAMAS and as the fundraising coordinator of Hamas? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 23:**

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, and to the best knowledge of NatWest, NatWest responds as follows:

NatWest contends that its processing from the UK of funds transfers on behalf of or for the benefit of Interpal after NatWest knew of Interpal's SDGT designation did not constitute a violation by NatWest of 18 U.S.C. §§ 2339B or 2339C. OFAC SDGT designations and the regulatory consequences of those designations apply only to the activities of "U.S. persons." They do not apply to the activities of foreign persons, such as NatWest, outside the U.S. NatWest's processing from the UK of funds transfers on behalf of or for the benefit of Interpal were activities of a foreign person and thus not subject to OFAC jurisdiction. The scienter requirements of 18 U.S.C. §§ 2339B and 2339C are not satisfied by NatWest's knowledge of OFAC's designation of Interpal as an SDGT. Any contrary conclusion would be inconsistent with the limitations on OFAC's jurisdiction and the territorial reach of its designations, by the fact that Interpal was designated as an SDGT, not as a Foreign Terrorist Organization, and by Section 597.101(c) of the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597 (the "FTOSR"), which implement AEPA and Section 597. 202(d)(2) of the FTOSR. See Barker Report ¶¶ 1-22; Holland Report ¶¶ 10.1 – 10.2.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are John Barker and Jon Holland.

Contention Interrogatory No. 24:

**Do You contend that other than transactions cleared through the U.K. Charity Commission between August 2003 and October 2003, You sought consent authority from the Charity Commission, or NCIS or any other U.K. governmental entity, to proceed with any transactions involving Interpal at any time during the Relevant Period? If Your answer is affirmative, identify: the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

Response to Contention Interrogatory No. 24:

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest does not contend that other than transactions cleared through the Charity Commission between August 2003 and October 2003, it sought consent authority from the Charity Commission, NCIS or any other UK governmental entity to proceed with any transactions involving Interpal at any time between January 1, 2000 through January 31, 2005. NatWest does contend that, as a result of its own disclosures and otherwise, UK Law Enforcement and Regulators were aware that NatWest was conducting transactions pursuant to instructions provided by Interpal and made no objection to this.

Contention Interrogatory No. 25:

**Do You contend that the statements contained in Interpal's August 6, 2002 letter to You (NW068227) pertaining to Interpal's receipt of £180,939 from the Islamic Charitable Society for the Support of Al-Aqsa diminished Your concerns regarding this transaction? If Your answer is affirmative, identify: the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

Response to Contention Interrogatory No. 25:

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the phrase "diminished Your concerns" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it suggests that NatWest had concerns regarding the transaction.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest responds as follows:

NatWest complied with its legal obligation to report suspicious transactions to NCIS when Doug Hartley submitted NCIS disclosure 207993 on July 4, 2002. The NCIS disclosure [redacted]. The disclosure further stated that [redacted] NCIS acknowledged the disclosure on August 5, 2002 and [redacted]. See NW008381 – NW008398, NW013685 – NW013691, NW052074 - NW052091.

Interpal's August 6, 2002 letter to NatWest provided further information on the transaction, in response to NatWest's efforts to ascertain the nature of the transaction. Mr. E. Mustafa, a Trustee of Interpal, wrote that the [redacted] credit was a donation from "an aid agency in Yemen called the [redacted] (the holy Aqsa Mosque) for charitable and humanitarian projects . . . ." Mustafa attached six pages of supporting documentation, which explained in further detail the purpose of the donation. Doug Hartley reviewed the information received from Interpal and noted that Interpal's account activity substantiated the information Interpal had provided. See NW008381 – NW008398, NW013348 – NW013355, NW013685 – NW013691, NW052074 – NW052091, NW068227 – NW068234.

To the best of NatWest's knowledge, the persons who may have knowledge of the relevant facts supporting these contentions are Doug Hartley and Charlotte McComas.

Dated: New York, New York
July 5, 2011

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ______________________
Lawrence B. Friedman
A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

VERIFICATION

I, Craig Berry, certify and verify as follows:

1. I am Senior Counsel at The Royal Bank of Scotland plc, the parent company of defendant National Westminster Bank Plc ("NatWest"). In that capacity, I am providing internal legal representation to NatWest in the Weiss and Applebaum lawsuits in which I am submitting this verification on behalf of NatWest. I have read and know the contents of the answers in NatWest's Responses and Objections to Plaintiffs' Second Set of Interrogatories. The factual content of those answers is true to the best of my knowledge, information and belief.

2. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed in London, England, on 29 June 2011.

[signature]
Craig Berry

**EXHIBIT 10 to Declaration of Joel Israel**

**In The Matter Of:**

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.*

---

*MIKE HOSEASON*

*Vol. 1*

*July 14, 2010*

---

*Original File 140710 Mike Hoseason v1.txt*

**Min-U-Script® with Word Index**

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
Defendant.

VIDEOTAPED DEPOSITION OF MIKE HOSEASON VOLUME 1
Wednesday 14 July 2010
At: 10:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom

HIGHLY CONFIDENTIAL Page 2

A P P E A R A N C E S

For Plaintiff Tzvi Weiss:

STEPHEN SCHWARTZ, ESQ.
Kohn, Swift & Graf PC
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107-3304
Tel: 419 246 0528

For Plaintiff Natan Applebaum:

MARK WERBNER
Sayles & Werbner
4400 Renaissance Tower
1201 Elm St.
Dallas, Texas 75270
Tel: 214 939 8763

For Plaintiff Tzvi Weiss:

AITAN GOELMAN
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036-5807
Tel: 202 778 1996

For Defendant National Westminster Bank, PLC:

JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470
Tel: 212 225 2000

Also Present:

COURT REPORTER:

AILSA WILLIAMS
European Deposition Services
59 Chesson Rd
London, W14 9QS

Telephone: 44 (020) 7385 0077

HIGHLY CONFIDENTIAL Page 3

VIDEOGRAPHER: DAVID ROSS

HIGHLY CONFIDENTIAL Page 4

I N D E X

MIKE HOSEASON . ... ... ... ... ... ... ... ... ... ..6
DIRECT EXAMINATION BY MR. WERBNER: . ... ... ... ... ... ... ..6
CROSS-EXAMINATION BY MR. GOELMAN: . ... ... ... ... 155

INDEX OF EXHIBITS

Hoseason 1 NW000149-164 ... ... ... ... ... ... ... .47
Hoseason 2 NW000233-261 ... ... ... ... ... ... ... .74
Hoseason 3 NW052140-176 ... ... ... ... ... ... ... .80
Hoseason 4 NW196915-932 ... ... ... ... ... ... ... 100
Hoseason 5 NW212124 ... ... ... ... ... ... ... ... 101
Hoseason 6 NW052016-17 ... ... ... ... ... ... ... 120
Hoseason 7 NW008356-366 ... ... ... ... ... ... ... 124
Hoseason 8 NW052067-073 ... ... ... ... ... ... ... 140
Hoseason 9 NW052074-91 ... ... ... ... ... ... ... 151
Hoseason 10 NW000285-293 .. ... ... ... ... ... ... 157
Hoseason 11 37 Page Website Download "From Anonymous" (No Bates No.) ... ... ... ... ... ... 207

Min-U-Script® European Deposition Services (1) Page 1 - Page 4
Tel: +44 207 385 0077 www.european-depositions.com

THE VIDEOGRAPHER: Good morning. This is the beginning of tape one, volume one, in the video deposition of Mr. Mike Hoseason. This is being taken at the offices of Cleary, Gottlieb, 55 Basinghall Street, London on 14 July, 2010, at 10:00 am, as indicated on the video screen.
The caption in this case is Tzvi Weiss et al Westminster Bank plc, Natan Applebaum against National Westminster Bank plc. This is being heard before the United States District Court, District of New York. The action number is 05 c.v 4622 (DGT) (MDG).
The court reporter is Ailsa Williams and the videographer is David Ross, both contracted through European Deposition Services. Would counsel all introduce themselves, please.
MR. WERBNER: My name is Mark Werbner of the Dallas law firm of Sayles Werbner. I represent the Applebaum family plaintiffs as well as other families.
MR. GOELMAN: Aitan Goelman of the law firm Zuckerman Spaeder, Washington DC, for the Weiss plaintiffs.
MR. SCHWARTZ: Stephen Schwartz, Kohn, Swift & Graf, Philadelphia, Pennsylvania for the Weiss plaintiffs.
MR. BLACKMAN: Jonathan Blackman and my

colleague Susie Rhee from Cleary, Gottlieb, Steen, Hamilton, representing the defendant NatWest and the witness, Mr. Hoseason.
THE EXAMINER: Would the court reporter please swear in the witness.
MIKE HOSEASON
Having been duly sworn,
Testified as follows:
DIRECT EXAMINATION BY MR. WERBNER:
MR. WERBNER : Mr. Hoseason, how are you employed at the current time?
A. I am currently employed by the Royal Bank of Scotland.
Q. How long have you been employed by the Royal Bank of Scotland, and I am including the period when it was called NatWest?
MR. BLACKMAN: Objection to the form of the question. It is a little vague. "When it was called NatWest" is a little imprecise, but you can answer.
A. I joined NatWest in 1982 and I have been employed with them in their different guises ever since, and I still am today.
Q. The acquisition by Royal Bank of Scotland of NatWest occurred in the year 2000, approximately, is that right?

A. That is correct.
Q. So you have in your banking career worked for NatWest for about 18 years and then with the Royal Bank of Scotland for approximately another 9 or 10 years, correct?
A. That is correct.
Q. What is your current job position?
A. Risk Manager.
Q. Describe what those duties entail?
A. I manage a team of risk managers located in various offices around the country. Their job or role is to test that various processes and procedures are being adhered to and to coach those staff or train staff where they may have fallen short in any way.
Q. At any time since your banking career at NatWest began in 1982, have you been involved with the bank's efforts to prevent money laundering?
A. I have.
Q. Tell me when that was and what your role was?
A. Every member of staff has a responsibility to prevent money laundering, but specifically I worked with our Group Fraud -- again it had various names -- from approximately 1993.
Q. That continued until when?

A. Until 2006.
Q. Were you a member or leader within the department you just mentioned of a group called the Money Laundering Team?
MR. BLACKMAN: Objection to the form of the question, it is compound, but you can answer.
A. I did work or performed various roles on the Money Laundering Team that dealt with Money Laundering Suspicion Reports during that time.
Q. Would you tell us, please, the timeframe that you were involved with the Money Laundering Team?
A. That would be between some time in 1999 through until about 2003/2004.
Q. Did you have a title during that period?
A. Various job descriptions but no specific title.
Q. Without being precise and trying to tell me how it was written in some book somewhere, can you tell me generally the job title in that period when you were working from 1999 to 2003?
A. Money laundering suspicion team leader.
Q. Under the NatWest and Royal Bank of Scotland procedures, this Anti-money Laundering Team had as its duty, as well as other things, looking for suspicions for terror financing, correct?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 21

MR. BLACKMAN: The word "proved" does not appear in this thing about amber. So that was just an example of a completely misleading question, totally inappropriate, mischaracterizing and misstating a document, which you refused to show the witness and, by the way, "red" doesn't say "proved" either, Mr. Werbner. So I am reading from NW00237, the Goalkeeper II Complex User Guide. You are entitled to ask questions but I don't think it is fair or proper for you to mislead the witness by asking him about something that is not in a document and says "isn't it true that ... " So continue your deposition. Do it properly.

MR. WERBNER: Mr. Hoseason, from your preparation for this deposition, isn't it true that NatWest put red flags on Interpal on numerous internal bank records?

MR. BLACKMAN: Objection to the form of the question. I don't know what "numerous" means, but you can answer.

A. Your question said the preparation for the deposition, isn't it true that we did something?

Q. Let me repeat the question. Isn't it true, from your recently looking at Goalkeeper reports concerning Interpal, that your recollection has been refreshed that NatWest put red flags on its customer,

HIGHLY CONFIDENTIAL Page 22

Interpal?

MR. BLACKMAN: Objection, question has been asked and answered but you can answer it again. The question did --

A. I have seen documents. My recollection has not been refreshed to the extent that I could answer the question under oath. I would have to revisit the document.

Q. But you have seen, and I will be happy to show them to you in a minute, but you know that there are Goalkeeper records of NatWest that have red flags for the Interpal account, true?

A. I would have to refresh my memory by looking at the document.

Q. So is it your sworn testimony that as you sit here right now you cannot say whether or not any of the Goalkeeper records red flagged Interpal?

A. Correct.

Q. Assume for the moment there are such documents. Can you explain why NatWest put red flags on Interpal on numerous Goalkeeper records, yet continued to provide Interpal with financial services?

MR. BLACKMAN: Again, I object, as I did to a similar question a while ago. It is argumentative, but you can answer, and also so far hypothetical, since

HIGHLY CONFIDENTIAL Page 23

you have not shown him the document, but you can answer the question.

A. There was no reason not to continue to provide financial services to a customer that had a red flag against them.

Q. Explain that?

MR. BLACKMAN: In general terms now or about Interpal? Can you clarify the question, Mr. Werbner? No, he won't clarify the question. Mr. Werbner is shaking his head. He does not wish to clarify the question. I am going to just object and say the question is unclear whether we are talking about Interpal or customers in general. To the extent you can answer, given that deliberate unclarity, you certainly may, Mr. Hoseason.

A. So, whether it was Interpal or any other customer who may have had a red flag against them in Goalkeeper, that doesn't mean there was necessarily any reason to stop providing them with financial services.

Q. Well, what did it take during the period that you worked on the Money Laundering Team to stop NatWest from providing a customer with financial services?

A. There were a number of scenarios in which we might cease to provide to the customer or were no

HIGHLY CONFIDENTIAL Page 24

longer prepared to provide financial services. That would include physical or verbal abuse directed at members of bank staff, it might include where we were unhappy with the conduct of their account in terms of the operation, continually trying to withdraw funds that they did not have in their account, or where the reputational risk to maintain an account might outweigh the risk of asking them to rebank.

Q. You mentioned, as I understand it, three circumstances. Are there any others that you can recall?

A. If we knew with absolute certainty that the customer was engaged in any kind of illegal activity then we would also ask them to rebank.

Q. Was that the standard, in the period 1999 to 2003, that your Money Laundering Team used before the bank would close a customer's account that was suspected of criminal activity, namely "absolute certainty"?

A. Sorry, can you repeat the question?

MR. BLACKMAN: Object to the form of the question because it misstates and mischaracterizes the prior answer, which also gave at least one point i.e. reputational risk, another reason why an account might be closed, but you can answer.

A. So we would not close an account purely on

Min-U-Script® European Deposition Services (6) Page 21 - Page 24
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 25

the basis that we had suspicions that they may have engaged in any form of unlawful activity.
Q. What did you mean when you said "absolute certainty" would be a circumstance where the bank would close a customer's account?
A. If we knew for a fact that a customer had been engaged in unlawful activity then we would ask them to rebank.
Q. During your period on the Money Laundering Team from 1999 to 2003, did that occur?
A. I can't recall any specific instances.
Q. Do you recall in general whether that occurred during that period?
A. I don't know.
Q. Who within the Group Crime area would have had the authority to close a customer's account in those circumstances?
MR. BLACKMAN: Objection to the form of the question. It lacks foundation because it is making an assumption that the Group Crime area would close an account, but you may answer.
A. The Group Crime area, as you describe it, would not themselves close the account. They would make a recommendation that that be done, if we felt that the appropriate grounds existed.

HIGHLY CONFIDENTIAL Page 26

Q. To whom would the Money Laundering Team make such a recommendation to close a customer's account due to suspicions of terror financing?
A. If we were in a position where we were going to make a recommendation, we would make a recommendation to senior management within the business that was responsible for the ownership of that account.
Q. Did your team or group have the authority to close a customer's account because of a suspicion of terror financing without regard to the commercial senior management within the business?
A. No, we didn't.
Q. In the case of Interpal, during 1999 to 2003, when you were involved with the Money Laundering Team, did anyone to your knowledge recommend the closure of Interpal's account to the commercial business in charge of their account?
A. Not that I am aware of.
Q. Was there a Goalkeeper II and a Goalkeeper III system at NatWest and Royal Bank of Scotland during the period we are discussing, from 1999 to 2003?
A. I seem to recall there was a Goalkeeper II. I don't recall a Goalkeeper III.
Q. Do you know approximately at what period

HIGHLY CONFIDENTIAL Page 27

the Money Laundering Team was using Goalkeeper II versus Goalkeeper III?
A. No.
Q. During some period of 1999 to 2003, when you were on the Money Laundering Team, was Goalkeeper III in use?
A. As I said before, I don't recall there being a Goalkeeper III, so I don't know.
Q. I take it then that you cannot explain the difference, if any, between Goalkeeper II and Goalkeeper III, correct?
MR. BLACKMAN: Objection to the form of the question. You can answer.
A. That is correct.
Q. Did you -- strike that. Isn't it true that during your work on the Money Laundering Team looking for, among other things, suspicions of terror financing, the red flags represented that there were serious grounds for concern?
MR. BLACKMAN: I object. First of all, the question in some form has been asked and answered. Secondly, it misstates the prior testimony. The witness specifically told you that his job was not to look for terror financing but to respond to suspicious activity reports and, as appropriate, make disclosures and make

HIGHLY CONFIDENTIAL Page 28

other responses. So, I mean, I am just going to keep objecting because you seem determined to misstate the testimony, but you can answer.
A. Could I ask you to repeat the question?
(Read back)
A. Not necessarily.
Q. What do you mean by that answer? Please explain?
A. As I mentioned before, red flags could be utilized because a customer or entity had appeared on multiple occasions. It wouldn't necessarily suggest any heightened degree of risk.
Q. You are not testifying that it is better that a customer appear on a Money Laundering Suspicion Report more times than a customer that appears less, are you?
MR. BLACKMAN: Objection, argumentative. You can answer.
A. I am not sure I understand the question.
Q. Let me have it read back and if you still don't understand it I will try to clarify.
(Read back)
MR. BLACKMAN: Objection to form. Same objection, you can answer.
A. Could I ask you to rephrase the question?

Min-U-Script® European Deposition Services (7) Page 25 - Page 28
Tel: +44 207 385 0077 www.european-depositions.com

Q. Yes. Isn't it true that a NatWest customer who is appearing multiple times on the bank's Money Laundering Suspicion Reports should be of greater concern to the bank than a customer who has not appeared multiple times?

MR. BLACKMAN: Objection, argumentative, you may answer.

A. No.

Q. Please explain?

MR. BLACKMAN: Is that a question, "Please explain"? What don't you understand about the answer, Mr. Werbner? You can answer, I suppose, if you are capable of reading Mr. Werbner's mind about his problem, since he won't articulate it. You may answer.

A. An internal Suspicion Report could be generated by or could be created by any member of bank staff. Those individuals may or may not have or have varying degrees of knowledge of the customer. They might therefore submit multiple Suspicion Reports for no good reason.

Q. Are you testifying that was the case concerning the bank's customer, Interpal?

MR. BLACKMAN: Objection, argumentative. You deliberately did not ask him questions about Interpal. Now you are asking a question about Interpal. You can answer the question.

A. I don't know.

Q. There are times when specific -- excuse me, strike that.

There are times when a Money Laundering Suspicion Report is made on a bank customer that the bank determines to submit that information to the regulatory authorities, correct?

A. Yes.

Q. And there are times when a Money Laundering Suspicion Report is created by the bank where the disclosure to the regulatory authorities is not made, correct?

A. Yes.

Q. Isn't it true that a Money Laundering Suspicion Report that is disclosed to the regulatory authorities is a more serious situation than one that is not disclosed?

MR. BLACKMAN: Object to the form but you may answer.

A. I wouldn't say it was more serious, no.

Q. What would you say is the distinction between NatWest and Royal Bank of Scotland taking a Money Laundering Suspicion Report and sending it to the criminal authorities versus not doing so?

A. As I think I mentioned earlier, so where we consider that there may be grounds to suspect then we will make a Suspicion Report. If we are not able to entirely satisfy ourselves as to the detail of the underlying transaction or activity, then we will report it. That doesn't necessarily mean that it is more or less serious.

Q. Are you confident of that?

MR. BLACKMAN: Objection, that is just -- object to the form of the question. You can answer.

A. Am I confident of that as a fact?

Q. Yes.

A. I am confident that that is the basis on which I operated.

Q. What did you mean earlier in your testimony when you mentioned the "reputational risk" to the bank?

A. So there may be customers who engaged in activity that the general public, other customers of ours, may or may not disapprove of. That activity isn't necessarily illegal, but depending on your viewpoint may or may not be acceptable. If the majority of our customers and the general public perhaps objected to that kind of activity, then it would not be in the bank's -- necessarily in our best interests to continue

to provide financial services to that customer or entity.

Q. During your work on the Money Laundering Team, from 1999 to 2003, if you had suspicions of a customer engaged in terror financing, would you under any circumstance continue to provide that customer with financial services because of reputational risk to the bank?

A. If it was mere suspicion we would have no grounds to withdraw any kind of financial services provision.

Q. What if it was clear evidence of wrongdoing by the customer?

A. If it were proven that they were engaged in unlawful activity then we would, as I have mentioned before, be looking to exit the relationship.

Q. What do you mean by "proven", in the context of your last answer?

A. Convicted in a court of law.

Q. So unless a customer has been convicted in a court of law of terror financing, NatWest would have continued to provide financial services to a customer, even when it red flagged the customer and had serious concerns about the customer using the bank for terror financing. Is that your testimony?

MR. BLACKMAN: That is so argumentative and it is just sort of piling argument upon argument, leaving out prior things that were testified to and we are not, you know, Mr. Werbner, we are not in front of a jury here. This is supposed to be a discovery deposition, you are supposed to be getting facts, not making speeches. So if the witness wants to hear the question again and answer it, he certainly can do so, but the question, as you well know, is completely out of bounds.

Q. I will ask the court reporter to please read the question so that we can hear the witness' answer, beginning with "So unless a customer..."

MR. BLACKMAN: Also misstates the prior testimony because he didn't in fact say any of those things, but go ahead.

(Read back)

A. It is a difficult question to answer without confusing the issue. If a customer had been convicted in a court of law of any kind of unlawful activity, then that would be grounds on which we would ask them to make alternative banking arrangements.

Q. Was there any circumstances, less than a criminal conviction, by which NatWest would stop rendering financial services to a customer that the bank had serious concerns was engaged in terror financing?

A. It was a hypothetical question. Each case would be looked at on its individual merits.

Q. From the position that you played were there circumstances that you in your role as the leader of the Money Laundering Team, less than a criminal conviction, that would cause you to recommend the bank stop providing financial services to a customer suspected of terror financing?

A. None that I am aware of.

Q. Isn't it true that the bank continued to provide financial services to Interpal even when it had red flagged its account and stated in internal bank records that it was suspected of terror financing because of the bank's concern of "reputational risk"?

MR. BLACKMAN: Object to the form of the question, lacks foundation. We don't know what records you are talking about. Also, to the extent that it is based on Interpal having the account red flagged, it has been asked and answered, I think close to ten times. We can spend time reasking questions and making speeches but I have got to tell you this. We agreed to two days for this thing because in an excess of caution that you might need it, but you have spent most of the first hour making speeches, and we may just cut this off at some point if we don't move on to something other than

reasking argumentative questions. You can answer the question one more time if you can.

MR. WERBNER: I would ask the court reporter to please read the question pending to the witness.

(Read back)

A. I think I have already said, without looking at the record, I can't under oath say whether we had a red flag against the Interpal record on Goalkeeper. It was not a red flag against the account. We did continue to provide financial services. We had made a report to the authorities. It didn't mean that we had -- I think your words were "serious grounds", it meant that we had discharged our regulatory legal obligations to make that report.

Q. From your work on the Money Laundering Team, in the period 1999 to 2003, do you ever remember a Money Laundering Suspicion Report being submitted to the regulatory authorities when the risk was color coded less than red?

A. I couldn't say without examining all the records that were submitted to the authorities between those dates.

Q. From your work on the Money Laundering committee during the period 1999 to 2003, do you recall or can you say that every customer's account that was

red flagged for terror financing was disclosed and submitted to the regulatory authorities?

MR. BLACKMAN: Objection to the form of the question. Red flagging accounts is not something that I think has been identified as a concept, much less testified about. There is no Money Laundering Committee. His testimony was that he was part of an Anti-money Laundering Unit. Maybe this is just you just don't even care what the testimony has been, but I object to the form of the question. It lacks foundation. You can answer.

MR. WERBNER: Would you please read the question to the witness.

(Read back)

A. It was a Money Laundering Suspicion Reporting Team. It was not a committee of any sort. Again, without reviewing every single record I could not under oath tell you whether every single account that was red flagged was reported.

Q. Are you aware that around August 2003 the United States Government declared Interpal, the bank NatWest's customer, to be an organization engaged in terror financing?

MR. BLACKMAN: Object to the form of the question. Actually there was a specific designation

what Interpal was, which you have I guess chosen for some reason not to use, but you can answer the question.

MR. WERBNER: Please reread the question.

(Read back)

A. I am aware that around that time that they appeared on a list of some description. I don't believe that that list specifically related to persons and entities engaged in terrorist financing. I think it was a list of people and entities that were suspected of being so.

Q. Were you in the summer of 2003 involved in reviewing documents that related to the United States declaration, whether it was suspicion or determination of Interpal's involvement in terror financing?

A. I don't recall having been involved in anything like that.

Q. You didn't get memos or e-mails concerning that topic in the summer of 2003, as you recall?

A. I don't recall any.

Q. How did you become aware, if you did, that there was some type of United States declaration about Interpal as involved in terror financing?

A. I can't remember.

Q. But was that something that you learned in 2003 or 2004?

MR. BLACKMAN: The question was asked and answered about five questions ago. You can answer it again.

A. I seem to recall something, but as I say it is quite a long time ago and I couldn't tell you under oath when it was that I discovered that.

Q. But at some point, without being precise as to the date, you did discover that the United States Government had declared Interpal to either be engaged in terror financing or to be suspected of that, correct?

A. Correct.

Q. Now, even after the US Government made that declaration about NatWest's customer, NatWest continued to render financial services, isn't that right?

A. Correct.

Q. For more than a year, isn't that true?

MR. BLACKMAN: I am not going to even bother to object to the argumentative nature of these questions. You know the answer to these questions and this is supposed to be a discovery deposition. We will stipulate to that fact. But if you think that it is somehow important or impressive to ask these "even if" questions you are certainly free to spend your time doing that.

MR. WERBNER: Would you read back the question, please. First, I accept the stipulation, but would you read the question to the witness because I would like his answer as well.

(Read back)

A. I don't know exactly how long.

Q. Do you know generally how long?

A. No.

Q. How do you explain that conduct of NatWest?

MR. BLACKMAN: Why does he have to explain it, Mr. Werbner? I would ask you to explain the question. The question lacks foundation because it assumes that an English bank should stop providing financial services to a customer to whom it is lawfully entitled to provide those services in the UK, because the United States Government, in a regulation which on its face does not apply in that situation, has put the customer on a list. That is why the question lacks foundation, as you know. So to ask him to explain it implies that there is something to explain. Having made that objection, you may answer the question.

MR. WERBNER: Would you please read the question to the witness.

MR. BLACKMAN: Also lacks foundation because

it assumes that he is the decision maker and that he is required to defend the action of a bank of which he is an employee, but you may answer the question.

A. My view would be that the situation largely remained unchanged, in that we had already made a report, a Suspicious Activity Report to the authorities, and the fact that they had now appeared on a list of suspected, suspected of that activity didn't change the situation any further for the bank.

Q. Well, at some point NatWest did stop providing financial services to Interpal, even without a criminal conviction, isn't that true?

A. I understand that the account was closed or is now closed, but I don't know when that happened or the reason for the decision.

Q. You don't know the reason for the decision?

A. No.

Q. At the time that occurred, were you still involved in the Group Financial Crime area?

A. I don't know because I don't know when the account was closed.

Q. When did you stop being in the Group Financial Crime Money Laundering area?

A. About the end of 2004.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 65

A. Sorry, yes.
Q. What does that mean, "Case Checker", in that context?
A. The mechanism by which a disclosure was made to the authorities is that the individual Case Handlers would complete the case, input the details into the case. They would make an assessment based on their own understanding and knowledge of whether or not a disclosure was appropriate. It would then be passed to a Case Checker and at the conclusion was then put in by the Case Checker, and that person would generally then be responsible for releasing the disclosure to the authorities, and they went electronically at this stage.
Q. Were you a Case Checker at any time?
A. I was.
Q. At what time?
A. From 1999 through to when I stopped working for the team.
Q. Which was in 03 or 04?
A. To the end of 04, we established.
Q. Were there any other Case Checkers than you during that period of time?
A. There were.
Q. Who were the others?
A. I couldn't give you everybody's specific

HIGHLY CONFIDENTIAL Page 66

name. As the volume of cases increased or the size of the organization increased we had more Checkers. Certainly my predecessor was. Ian Wickens, my line manager, was also a Case Checker, and over time Doug Hartley was a Case Checker, and so was a gentleman called John Ribbon.
Q. How common was it while you were the team leader to be a Case Checker of these Goalkeeper reports? Is that something you did rarely, frequently, or put into our your own words so that we have an understanding of that?
A. Initially I would have been the primary Case Checker. As time went on the role was delegated to additional individuals.
Q. What was the person called that passed on the report to the Case Checker for review and submission?
A. The person who would have completed the manual data input into Goalkeeper was generally referred to as a Case Handler.
Q. Were you ever a Case Handler while you were leading the Money Laundering Team?
A. On occasions where we had particularly high volumes of reports to manage, I would certainly have helped out.

HIGHLY CONFIDENTIAL Page 67

Q. Did the Case Checker get involved in color coding the risk on Goalkeeper forms or was that solely the function of the Case Handler?
A. Sometimes.
Q. So it could have been either or both in certain instances?
A. It could.
Q. Would you turn to the top of page 156. That is a continuation of section 3, so feel free to look at the full amount of it, but the part I am interested in is at the top of 156. Would you read out loud that first paragraph there, please.
A. The first paragraph of page 156 is:
"Group Function Crime may consider that there is a risk to the Group in retaining the relationship (e.g high risk activity, numerous previous disclosures) and in these circumstances will give instructions that the account should be closed. Standard letters are held to cover various closure options".
Q. Would you explain your understanding of what that means?
A. Precisely as it says. So in circumstances where we consider that there is a risk to the Group retaining the relationship, there may be a financial risk, may be a reputational risk, may be a regulatory

HIGHLY CONFIDENTIAL Page 68

risk, then we would give instructions that the account should be closed.
Q. So is a fair reading of that that Group Financial Crime of NatWest had the authority under these circumstances to give instructions that an account be closed?
A. We certainly give the instructions. The final decision would be made by senior management within the business responsible for the account itself.
Q. To your recollection, was there ever any discussion or consideration given to give instructions that the Interpal accounts be closed?
MR. BLACKMAN: I think the question was asked and answered but you can answer it again.
A. As I say, not that I am aware of or recall.
Q. Were you familiar, while you led the Money Laundering Team, with the standard letters to cover the various closure options?
A. Certainly aware of the letters. I can't recall the specific detail in each option now.
Q. What role did you have, if any, in marking the Goalkeeper reports of Interpal as a High Profile Report?
A. I can't recall.

Min-U-Script® European Deposition Services (17) Page 65 - Page 68
Tel: +44 207 385 0077 www.european-depositions.com

than one record in relation to this customer would not necessarily be significant.

Q. Given your last answer, I have to ask you this. Are you aware that NatWest suspicions of Interpal go back well before 9/11?

MR. BLACKMAN: Objection to the form of the question. Mr. Werbner, he is not the bank. He is a witness. I know your technique is to make him a spokesman and make him defend this case, but he is not here to do that. He is supposed to answer factual questions, and his testimony was that he did not get into this function until 2000. So we can spend your time however you want but I am going to continue to make objections to these argumentative questions, which are a technique that you have that is inappropriate. You may answer the question.

MR. WERBNER: Would you please read the pending question to the witness.

(Read back)

A. I don't know if I was aware at the time of that or not.

Q. You could have been and forgotten?

A. Yes. I mean, we are talking some years ago now.

Q. Once you became the leader of the Money

Laundering Team in -- wasn't it 1999?

A. Yes.

Q. So you were there a couple of years before September 11, 2001, correct?

A. Correct.

Q. And at any point from 1999 to through 2004, when you headed the Money Laundering Team, you could have, through your access to Goalkeeper, seen all the reports on Interpal whenever they were done, if they were in the system, right?

A. I might have done, but I wouldn't necessarily have done so.

Q. You were involved in submitting or modifying or creating certain Goalkeeper reports on Interpal, right?

A. I believe so.

Q. Did you, in connection with that, look for prior Goalkeeper reports on Interpal?

A. I couldn't say now with the passage of time whether I specifically did that.

Q. Wasn't that the standard operating procedure, namely to look at prior linked cases when dealing with a customer and submitting a Goalkeeper report on an NCIS disclosure?

A. It was.

Q. So, if you followed that routine, and I know you don't specifically remember, you would have looked at the prior Money Laundering Reports on Interpal, correct?

MR. BLACKMAN: Objection to the form of the question. What reports are we talking about? Lack of foundation. I am aware of one pre-2001 report that does not actually talk about Interpal, so maybe it is just sloppiness but I don't think it is. I think you make these things up. You refer to reports but there are not reports. That is why I object for lack of foundation to your question.

MR. WERBNER: Would you read the pending question?

(Read back)

MR. BLACKMAN: Same objection.

A. If there were any, and I conducted the search, then I would expect I would have looked at them, but as I said I can't specifically hand on heart say I did or didn't do that.

Q. But that would have been the standard operating procedure, correct?

A. As laid down in the operating manual that you showed me.

Q. And that would be applicable to the team

members that worked under you who were dealing with Interpal as well, correct?

A. That is what I would expect them to do, yes.

MR. BLACKMAN: I think it is time to take our lunch break.

MR. WERBNER: Fine.

THE VIDEOGRAPHER: Going off the record at 1:18 pm.

(Break for Lunch.)

THE VIDEOGRAPHER: We are back on the record at 2:04 pm, as indicated on the video screen.

MR. WERBNER: Are you ready to resume the deposition?

A. I am.

Q. During the time that you were the NatWest Money Laundering Team leader, did you believe that financial institutions played an important role in preventing terror financing?

MR. BLACKMAN: Objection to the form. You can answer.

A. I did, yes, and still do.

Q. Did you then agree -- strike that. Did you then believe that without the full cooperation of financial institutions it would be more difficult for

HIGHLY CONFIDENTIAL Page 93

law enforcement to locate and seize money that was related to terrorist causes?
A. Yes, I would agree with that statement.
Q. There was an intense period of violence in Israel and the Palestinian territories in 2001, 2002, 2003, which was sometimes referred to as an Intifada. Did you ever hear about such a period of violence?
A. No, I certainly don't recall hearing about it.
Q. You were not aware in that timeframe, and I will be more restrictive, 2001 though 2003, of suicide bombings occurring rather frequently in Israel in connection with the Israeli/Palestinian dispute?
MR. BLACKMAN: Objection to form, you can answer.
A. Not specifically.
Q. What do you mean when you say "not specifically"?
A. You referred to suicide bombings in a particular part of the world. There was at that time a considerable amount of terrorist activity, I believe, around the world, and as I said here today I can't specifically recall being aware of suicide bombings in that particular part of the world.
Q. Correct me if I am wrong, but are you

HIGHLY CONFIDENTIAL Page 94

saying that in 2001 through 2003, while you were NatWest Money Laundering leader, you were not aware of an intense period of violence in Israel and the Palestinian territories?
MR. BLACKMAN: Object to the form of the question. You can answer.
A. I am saying I don't recall specifically being aware. That is not to say I was not.
Q. What do you mean it is not to say that you were not?
A. I don't know, as I sit here today, I can't remember 7 years ago.
Q. In that period did you typically stay up with current events?
MR. BLACKMAN: Objection to the form of the question. You can answer.
A. I read newspapers and kept in touch with the media.
Q. So in that period would you have considered yourself fairly well informed of current events that were being reported in the media you followed?
MR. BLACKMAN: Objection to the form of the question. You can answer.
A. I think I have kind of answered that

HIGHLY CONFIDENTIAL Page 95

question already.
Q. Let me have the court reporter read it to you and be sure we are clear.
(Read back)
A. Reasonably so.
Q. In that timeframe of 2001 to 2003, when you headed NatWest Money Laundering Team, had you heard of Hamas?
A. I have heard of that name before, yes.
Q. Had you heard of it while you were the leader of NatWest Money Laundering Team?
A. I would expect so.
Q. Is it your recollection that Hamas in that timeframe of 2001 through 2003 was on designated terror lists of a number of countries?
A. I don't recall specifically.
Q. That wouldn't surprise you though, would it?
A. If that was the case then I wouldn't be surprised.
Q. Well, I will represent to you that it was, but you don't really recall?
A. No.
Q. It was part of your duties as the NatWest leader of the Money Laundering Team to be familiar with

HIGHLY CONFIDENTIAL Page 96

organizations that were on the terror list of the Bank of England and other regulatory bodies around the world?
MR. BLACKMAN: Object to the form of the question.
A. As I recall, some of them were quite long lists, so certainly there was no expectation that I would be able to recall every one of those names, and there was a process in place which was run by an entirely different department of the bank to mine to periodically satisfy itself that we didn't have any relationships.
MR. BLACKMAN: I think the answer was there was no expectation or there was not. You can go on.
MR. WERBNER: You mentioned just now that there was another department or area of NatWest that dealt with screening or watching transactions if they might violate one of these lists. Is that what you were saying?
MR. BLACKMAN: Objection to form.
A. No, what I was saying was that taking whatever action was required by the bank in order to meet its regulatory obligations in relation to any of the sanctions lists was a responsibility of a different department.
Q. Which department?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 101

question. Compound. You asked him three different questions.

A. I see my name on the front page. I can't see anything there that I specifically recall being directly involved with. The issues overall certainly I do recollect.

Q. What are the issues?

A. Following Suspicion Reports being at an all time high, and the fact that we were getting a number of Suspicion Reports that perhaps had not been adequately researched by the front line, I suspect that was probably a consequence of the general concern or unease at the time about being seen to have fallen short in terms of suspicion reporting.

(Exhibit Hoseason 5 marked for identification)

Q. I will hand you another document being marked as Hoseason Exhibit 5. For the record, it has Bates number NW212124. Is that your signature on the exhibit?

A. It certainly looks like it.

Q. Under your signature we have the typed name and it says: "Senior Consultant Group Investigations & Fraud". What is that title? Is that the same as the team leader or is that some other position?

HIGHLY CONFIDENTIAL Page 102

A. It is effectively the same.

Q. What is the date of this document you signed?

A. The document is dated 27 September, 2001.

Q. Does this reflect your -- strike that. Does this refresh your recollection that in September 2001 you were aware of Hamas?

A. When you say it refreshes my recollection, it indicates that they have been brought to my attention.

Q. So this document, Exhibit 5, shows that on September 27, 2001, you had information that Interpal was allegedly linked with Hamas, is that true?

A. We had had it brought to our attention that there was a website suggesting that, yes.

Q. And that was of sufficient importance to you that you wrote to the National Criminal Intelligence Service at the end of September 2001 that [redacted] correct?

MR. BLACKMAN: Objection to form, you can answer.

A. In the days immediately preceding (sic) 9/11, anything and everything that was vaguely

HIGHLY CONFIDENTIAL Page 103

associated with or linked to anything that could possibly be connected to extremism of any description was being reported.

Q. So NatWest intensified in a significant way its scrutiny of suspicious terror financing as a result of September 11, 2001, is that correct?

A. I would say we intensified the level of reporting.

Q. Here in your letter marked Exhibit 5, dated September 27, 2001, you inform the National Criminal Intelligence Service that [redacted]

A. That is what it says there.

Q. So it was not just taking an intense look for reporting purposes; it was an intense review of accounts of customers allegedly linked to Hamas, right?

MR. BLACKMAN: Objection to the form of the question, totally misstates the last answer. You may answer.

A. No, we informed the authorities [redacted]

Q. Did you do that?

A. I imagine so.

HIGHLY CONFIDENTIAL Page 104

Q. What do you mean you imagine so? You are not sure?

A. I don't remember specifically investigating these.

Q. I am not asking you if you specifically remember. I have placed before you a letter that you acknowledge you signed to the National Criminal Intelligence Service. Do you have any reason to doubt that, as stated in this letter, [redacted]

MR. BLACKMAN: Object to the form of the question. It is completely argumentative. You may answer.

A. I have no reason to doubt that it didn't happen.

Q. And about that same time a Goalkeeper report was done on Interpal, right?

MR. BLACKMAN: Objection, lack of foundation. You can answer.

A. I would imagine so, but without scrutinizing the Goalkeeper records I couldn't tell you when.

Q. In preparation for this deposition you reviewed the Goalkeeper reports for Interpal, didn't

Min-U-Script® European Deposition Services (26) Page 101 - Page 104
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

MIKE HOSEASON -  Vol. 1
July 14, 2010

---

1  was, if I showed it to him in connection with his
2  preparation for the deposition. You know this. We are
3  going to not go on for two days with this kind of
4  questioning, sir. So ask him questions about this
5  document. You are free to do that. He wrote it. You
6  can ask him anything you want. You started to do that.
7  We are not going to get into what documents I did or did
8  not choose to show him in connection with preparation
9  for this deposition. Period. If you can quote me, by
10 the way, some authority that says you are allowed to ask
11 those questions, I will be prepared to reconsider, but I
12 don't think you can.
13     MR. WERBNER: Would you read the question
14 pending to the witness.
15          (Read back)
16     A. I have been instructed not to answer the
17 question so I am not going to.
18     Q. I didn't hear counsel instruct you.
19     MR. BLACKMAN: I didn't. I am instructing him
20 now. You can ask him other than in connection with the
21 preparation for his deposition if he recalls when the
22 last time he saw this was.
23     MR. WERBNER: Mr. Hoseason, in the first
24 sentence you stated: ██████████████████
25 ██████████████████████████████████████

---

1  Do you see that.
2     A. I do.
3     Q. Who alerted you to that website?
4     A. I don't know.
5     Q. It says ██████████████████████
6  ████████████████████████████████████████
7  ████████████████████████████████████████
8  ████████████████████████████████
9     A. I don't.
10    Q. Did this information that you described in
11 Exhibit 5 concern you?
12    MR. BLACKMAN: Objection to form. You can
13 answer.
14    A. No.
15    Q. It didn't concern you at all?
16    MR. BLACKMAN: Objection to form. You can
17 answer.
18    A. We had it brought to our attention. There
19 are various allegations made and it was a trigger or
20 a prompt to review the activity, which is what we did.
21    Q. Pending that, did the bank continue to
22 render financial services to Interpal?
23    MR. BLACKMAN: Objection, question was asked
24 and answered. We can spend time with every document
25 asking whether after he got it the bank continued to

---

1  render services. You know the answer. If that is how
2  you want to spend your time, ask the questions. You may
3  answer the question.
4     A. It did.
5     Q. How could it not concern you, as the team
6  leader of Money Laundering at NatWest, to have
7  information that linked Hamas to one of your customers?
8     MR. BLACKMAN: Objection to form. You can
9  answer.
10    A. The article made allegations of links.
11    Q. Didn't that concern you?
12    MR. BLACKMAN: Objection to form, asked and
13 answered. Answer it again. You have been arguing with
14 him for a while.
15    A. I wouldn't say concerned.
16    Q. What would you say?
17    A. It was a trigger to investigate.
18    Q. And you did?
19    A. That is what we put here.
20    Q. Did you do what you said?
21    A. We have been through that. The answer
22 that I gave earlier was I have no reason to doubt that
23 we didn't.
24    Q. Is it fair to say from reading Exhibit 5
25 that you understood Hamas to be a terror organization at

---

1  that time?
2     MR. BLACKMAN: Objection to form, lack of
3  foundation. You can answer.
4     A. I would say yes.
5     Q. With reference to this letter you wrote,
6  27 September, 2001, marked Exhibit 5, was it common for
7  you or your team to be communicating with NCIS before
8  making a full disclosure?
9     MR. BLACKMAN: Objection to form. You can
10 answer.
11    A. Not routinely common, no.
12    Q. So to that degree, Exhibit 5 was an
13 unusual communication you had, is that right?
14    MR. BLACKMAN: Objection to form. You can
15 answer.
16    A. It was not normal to communicate in this
17 way. This was a few days after the events of 9/11, and
18 any information at all that we thought might even be
19 vaguely of use to law enforcement we were bringing it to
20 their attention. We had not got enough information at
21 that stage I believe to provide a full disclosure. We
22 were therefore bringing this to their attention, as the
23 letter states.
24    Q. September 27, 2001 was not the first time
25 that you became aware of Interpal and a terror financing

---

HIGHLY CONFIDENTIAL Page 121

A. It is a Goalkeeper record. It has been created as a result of, as it suggests at the top of the page, external data.
Q. At the top of page 2, does it show the business to be "Holy Land Foundation for Relief and Development"?
A. It says: "Business/organization name", yes.
Q. And is that a reference to you on the first page on the "last modified" line, 28 July 2004?
A. It is.
Q. Why were you involved in modifying it?
A. I don't know.
MR. WERBNER : I have been told that the tape is about out so why don't we take a break.
THE VIDEOGRAPHER: This is the end of tape two, volume one, in the video deposition of Mr. Mike Hoseason. Going off the record at 2:53 pm, as indicated on the video screen.
(A short break).
THE VIDEOGRAPHER: This is the beginning of tape three, volume one, in the video deposition of Mr. Mike Hoseason. Back on the record at 3:10 pm, as indicated on the video screen.
MR. WERBNER: Did you ever speak to Belinda

HIGHLY CONFIDENTIAL Page 122

Lane or anyone else at the branch, the Commercial branch about Interpal.
MR. BLACKMAN: Objection, compound. You may answer.
A. I don't remember speaking to Belinda.
Q. Do you know her?
A. No.
Q. That website that was mentioned in the earlier exhibit, your letter of September 2001, do you see that?
MR. BLACKMAN: Talking about Exhibit 5 now?
MR. WERBNER: Right.
A. Yes.
Q. Did you review that article?
A. I expect so.
Q. For among other reasons it mentions in your letter, page 23, correct?
A. Yes.
Q. So that suggests you actually reviewed it to some extent before writing to NCIS about it?
MR. BLACKMAN: Objection to form, you can answer.
A. I would expect so, yes.
Q. Is it correct that some Money Laundering Suspicion Reports arose out of the commercial banks and

HIGHLY CONFIDENTIAL Page 123

were transmitted to your department and some were initiated within the department?
MR. BLACKMAN: Objection, compound question. You may answer.
A. Staff across the bank are required to send an internal Money Laundering Suspicion Report if they are concerned or suspicious about a particular transaction. As you can see from the letter, if other things were brought to our attention then we would act on them.
Q. But were there occasions when somebody on the Money Laundering Team investigated a NatWest customer to look into the possibility of criminal activity?
MR. BLACKMAN: Objection to form, lack of foundation. You may answer.
A. Generally, the work of the team was reactive, based on receipt of internal Money Laundering Suspicion Reports. If someone had specifically identified something which gave them cause for concern then I have no doubt they would have looked into it.
Q. Do you know if someone on the Money Laundering Team that you led on his or her own initiative began looking at Interpal?
A. I don't know.

HIGHLY CONFIDENTIAL Page 124

Q. Other than Exhibit 5, can you recall any other instances of [redacted] to NCIS while you were NatWest team leader of Money Laundering?
A. I don't recall any specific instances of reporting websites in the context of money laundering.
Q. So if that is true, would it be fair to say that not only was your writing in Exhibit 5 unusual, but [redacted] was also unusual?
MR. BLACKMAN: Objection to form, lack of foundation, argumentative. You can answer.
Q. Let's have the question --
A. I was just saying it was not common.
Q. All right. Let me ask that this next document be marked as an exhibit.
(Exhibit Hoseason 7 marked for identification)
What is that?
A. It is a summary of a Goalkeeper record.
Q. Were you involved with that document at all?
A. It would appear from the first page that I probably created the initial case.
Q. Is there any doubt that you created this Goalkeeper report on 27 September 2001?
A. I would have created the initial case so I

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 125

can't say whether all the detail was put in by me or by somebody else.
Q. When was the last time you saw this Goalkeeper report marked deposition Exhibit 7?
MR. BLACKMAN: Again, omit your preparation for the deposition, if you can.
A. I don't know then.
Q. You have seen this recently enough, it is not the first time in 9 years that you have looked at it, isn't that true?
A. Correct.
Q. Isn't this Goalkeeper report marked Exhibit 7 that you created on 27 September 2001 exactly the same day that you wrote the National Crime Group, as we saw in deposition Exhibit 5?
A. That is right.
Q. That was not a coincidence, was it?
A. No. As I have said, I would have created the initial case, so that could be as simple as entering two or three lines of initial data so that we have a case for somebody to work.
Q. Do you know that and remember that or --
A. No.
Q. Are you just speculating?
A. That is my supposition.

HIGHLY CONFIDENTIAL Page 126

Q. Do you remember that?
A. No.
Q. Look at the long list of linked cases on the front page of Exhibit 7 of this Goalkeeper report you created in September 2001. Do you see that?
A. I do.
Q. Do you agree that that is an unusually long list of linked cases?
MR. BLACKMAN: Objection to form. You can answer.
A. I wouldn't say it was a particularly long list.
Q. You don't think that is atypical, to have that many linked cases on a Goalkeeper report?
MR. BLACKMAN: Objection. You can answer. I object to the form of the question.
A. In short, without having a look at a cross-section of Goalkeeper cases, I couldn't tell you whether it was a particularly long list or not, but it doesn't strike me as an unusually long list, no.
Q. This Goalkeeper report, deposition Exhibit 7 under "High Profile" says "Y. 7 September 2001." Do you see that?
A. I do.
Q. Does the "Y" there mean "Yes"?

HIGHLY CONFIDENTIAL Page 127

A. It does.
Q. Does the date indicate that the High Profile designation was made on 27 September 2001?
A. I would expect so.
Q. And since that is the day we know that you created the report, is it fair to assume you were the person who designated this report and account as "High Profile"?
A. It would seem reasonable, yes.
Q. Who is the individual that is shown to have last modified the report, if you know?
A. I think that is Garry Meyrick.
Q. Was he on your team?
A. He was.
MR. BLACKMAN: Objection, asked and answered this morning. Answer again.
A. He was.
Q. Read what this Goalkeeper report you created at the end of September 2001 says at the bottom of the first page as the "Reason for suspicion"?
A. "Suspected terrorist funding. Please see attachments and/or case notes, where available, for further information".
Q. Did you do any of the color coding risk on this report?

HIGHLY CONFIDENTIAL Page 128

A. I don't remember.
Q. If you look on the page Bates number 8358, you will see in the case notes box under the "User" column the word "Migrated". Do you see that?
A. Yes, I do.
Q. I have seen that on a number of other Goalkeeper reports. Can you tell me what the word "Migrated" means under the "User" column on these Goalkeeper reports?
A. No, I can't.
Q. If you will turn to page 8360, you will see a note. Does the date indicate there 7 February 02, would that be the date that note was created?
A. I don't know.
Q. Did you write any portion of the note on that page?
A. I don't know.
Q. Did you ever review that note?
A. I don't know.
Q. This Goalkeeper report marked deposition Exhibit 7 concerns the accounts of Interpal, correct, among others?
MR. BLACKMAN: Objection to form. You can answer.
A. It does reference the accounts of

Min-U-Script® European Deposition Services (32) Page 125 - Page 128
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 137

(Read back)
A. That is correct.
Q. Were you aware that the commercial bankers at NatWest handling the Interpal account didn't want it closed because of the profitability of that account?
MR. BLACKMAN: Objection, lack of foundation. Absolutely no foundation for that question. You may answer it.
A. I was not aware and I don't know if that is the case or not.
Q. Assume that it is the case. Would you approve of that conduct by a bank?
MR. BLACKMAN: I object and instruct him not to answer that one. I will take my chances on that one.
A. I will follow my lawyer's advice.
Q. Were you aware while dealing with the Interpal NatWest accounts that the bank was not paying interest on the funds to Interpal because of their religious position about not receiving interest?
MR. BLACKMAN: Objection to form. You can answer.
A. I don't know if I was aware or not.
Q. You don't remember?
A. That is right.
Q. When you learned -- strike that. Did you

HIGHLY CONFIDENTIAL Page 138

learn in late August or early September 2003 that the United States Government had designated Interpal as a terror organization, one involved in terror financing?
MR. BLACKMAN: Objection, asked and answered. You may answer one more time.
A. I don't believe they had. I think they put them on a list of suspected organizations.
Q. Suspected of terror financing?
A. Yes.
Q. Did you become aware of that in late August or early September 2003?
MR. BLACKMAN: Asked and answered. You may answer.
A. I can't remember.
Q. Would it be fair that you became aware of it around the time the designation occurred?
A. Again, I can't remember.
Q. But at some point you became aware of it?
A. Yes.
Q. And you were still the leader of the Money Laundering Team?
A. I don't know.
Q. Were you concerned when you learned of that, given that you had been involved with Interpal, where despite all these red flags and Goalkeeper reports

HIGHLY CONFIDENTIAL Page 139

the bank was allowing the customer to continue to have the bank's financial services?
MR. BLACKMAN: I object, argumentative. Objection to the form of the question. You may answer.
A. I was satisfied that the bank and I had met our regulatory obligations in terms of reporting that suspicion, and that there was no additional evidence that would lead us to believe that that was the wrong decision.
Q. And if you had it all to do over again would you do it the same way?
MR. BLACKMAN: Objection. You are not to answer that question either.
MR. WERBNER: I insist on an answer.
MR. BLACKMAN: You are not going to insist. I am instructing not to answer.
MR. WERBNER: Read the question.
(Read back)
MR. BLACKMAN: I object for lack of foundation. The testimony has been clear that Mr. Hoseason did not make any of these decisions about keeping the account open or closing the account. This kind of argumentation is not an appropriate question at this deposition with a witness who did not have anything to do with it. You are just asking for his personal

HIGHLY CONFIDENTIAL Page 140

opinion about the case. That is not proper and I am instructing him not to answer.
A. I will follow my lawyer's advice and decline to answer.
Q. Are you critical of anything that you or your Money Laundering Team did or did not do with respect to Interpal?
MR. BLACKMAN: He personally, critical of his team? You can answer that one. I object strongly but you may answer the question.
A. No.
(Exhibit Hoseason 8 marked for identification)
Q. Do you have deposition Exhibit 8 in front of you?
A. I do.
Q. For the record, it bears Bates numbers NW52067 through 073 and it is a color copy that was produced by the bank, and I would request that color copies be made for the copies of the deposition distributed. Take a moment to look over that, then I will have some questions.
MR. BLACKMAN: So this is Exhibit 8?
MR. WERBNER: Yes. Are you ready?
A. I am.
Q. Let's look together for a moment at

Min-U-Script® European Deposition Services (35) Page 137 - Page 140
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 141

deposition Exhibit 7 and deposition Exhibit 8. There is a NatWest identification number that is unique to each Goalkeeper report, isn't that right?
A. There is.
Q. And on Exhibit 7, for example, in the box on the front page we would see that number here to be 617044, correct?
A. Yes.
Q. And on Exhibit 8 the reference number is 647655, correct?
A. Correct.
Q. Now, if we look at Exhibit 7, this Money Laundering disclosure that you created on 27 September 2001 lists as one of the linked cases Exhibit 8, doesn't it?
A. It does.
Q. And Exhibit 8 that was created on 19 November 2001, it has as a linked case the report marked "Exhibit 7". Do you see that?
A. It does.
Q. So this is an example of how the linked cases are used at NatWest?
MR. BLACKMAN: Objection to form. What do you mean it is an example. It shows linked cases. Is that what your question is directed to?

HIGHLY CONFIDENTIAL Page 142

MR. WERBNER: Would you read the question to the witness please.
(Read back)
A. It demonstrates that the two cases have been linked.
Q. And what utility does that have to your Money Laundering Team, if any?
A. They would be able to identify the previous cases, take that into account to help their decision making process.
Q. Access more information on the subject as they handle the matter, is that a fair statement?
A. Among other things, yes.
Q. Deposition Exhibit 8 is a NatWest Money Laundering Suspicion Report, is that true?
A. It is.
Q. And once again Interpal has been given a red flag, has it not?
A. It has.
MR. BLACKMAN :
MR. BLACKMAN: Actually I am going to have to object. You keep saying "a red flag" and the witness has testified it is a red risk. I don't know why you do that but I will just have a standing objection to your use of red flag when you talk about the red risk rating,

HIGHLY CONFIDENTIAL Page 143

to save time. Is that okay with you, Mr. Werbner.
MR. WERBNER: Mr. Hoseason --
MR. BLACKMAN: Then I will object each time.
MR. WERBNER: Mr. Hoseason, turn to the page with the identification 52070.
A. Yes.
Q. Would you read the note made there on 5 February 2002.
A. It says: "Note. This account is a charitable account for people affected by the troubles in Lebanon and Palestine. Funds are received into a US dollar account by international transfer from various locations in the Middle East, and at the moment a large balance has accumulated without outward transfer. Given the current volatile situation in Palestine, we are concerned that as the sources of funds cannot be verified there may be a vulnerability for terrorist funding".
Q. Who wrote that note?
A. I don't know.
Q. Did you?
A. I don't know.
Q. If you wrote that would you remember or is that something you are saying you may have written but don't recall?

HIGHLY CONFIDENTIAL Page 144

MR. BLACKMAN: Objection to the form. You may answer.
A. I don't know.
Q. Wasn't it the practice -- strike that. Was it your practice when entering a note in a Goalkeeper report to put your initials or name following the note?
A. Do you know, I can't remember.
Q. What is your understanding of the reference to "the current volatile situation in Palestine"?
MR. BLACKMAN: I am going to object for lack of foundation, because if he didn't write this then you are asking him to speculate about what somebody else wrote. That is my objection. You may answer.
A. I don't know specifically because I don't know who wrote it.
Q. You had access to this Goalkeeper report in 2002, didn't you?
A. Yes.
Q. And you had been involved in creating a Goalkeeper report on Interpal just a few months before this note, correct?
A. Yes.
Q. And you communicated about Interpal on

Min-U-Script® European Deposition Services (36) Page 141 - Page 144
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 145

behalf of NatWest just a few months before to the National Criminal Agency, correct?
MR. BLACKMAN: NCIS, I think, is that what you are talking about?
A. Yes, National Criminal Intelligence Service, that is right.
Q. So wouldn't it be likely that you either wrote or reviewed this February 5, 2002 note contained in deposition Exhibit 8?
MR. BLACKMAN: Objection to form, calls for speculation. You may answer.
A. I don't know, but there is no particular reason why I would have.
Q. Did any member of your team come to you in late 2001 or in 2002 and inform you that a NatWest customer, specifically Interpal, was suspected of terrorist funding?
MR. BLACKMAN: Just a moment. Objection to form but you can answer.
A. I don't know.
Q. Turn back to the first page of Exhibit 8, this Money Laundering Suspicion Report. I believe you will find in the middle box two reasons that the bank has given for its suspicion of Interpal. Do you see that?

HIGHLY CONFIDENTIAL Page 146

A. Yes.
Q. What are the two reasons that the NatWest document gave for its suspicion of Interpal?
A. The two sentences under the heading: "Reasons for suspicion" are "High non-cash turnover" and "suspected terrorist funding".
Q. What is your understanding of what "High non-cash turnover" means?
MR. BLACKMAN: Objection, lack of foundation. You can answer.
A. Movements of funds in and out of the account by means other than cash, which is larger than we have seen in the past. Every case file would have required a reason or reasons for suspicion, and there were standard settings, standard statements to select from.
Q. Look at page 52069 of deposition Exhibit 8. There is another note there. Do you see that?
A. Yes.
Q. Do you know what the "21/12" means?
A. I would imagine that was the date.
Q. The first sentence reads: "According to ISS records". What does "ISS" mean, if you know.
A. I can't remember what the ISS specifically

HIGHLY CONFIDENTIAL Page 147

stands for but it is basically our primary database on which we hold records for customers.
Q. It goes on to say -- I will just start again. Strike that.
It says:
"According to ISS records, there is an LRS Manager at Islington Business Center who (hopefully!) looks after this customer". Do you see that.
A. I do.
Q. What is an LRS Manager?
A. I can't remember.
Q. Based on your knowledge of the workings of your team at this time, who do you believe wrote this note?
MR. BLACKMAN: Objection to form. You can answer.
A. It is not clear.
Q. Do you recognize the initials "DH"?
A. I see the initials "DH".
Q. And that didn't mean anything to you?
A. It was a member of my team called Doug Hartley, but I can't tell from this whether he wrote that first sentence or the second bit.
Q. But based on the routine and practice of Doug Hartley, as you worked with him on the Money

HIGHLY CONFIDENTIAL Page 148

Laundering Team, was it typical when he wrote a note to indicate after a sentence he wrote his initials?
A. He would often do that, yes.
Q. Look at the last 2 pages of Exhibit 8, please. They are handwritten, are they not?
A. They are.
Q. Do you know whose handwriting is on those 2 pages?
A. I don't know for certain.
Q. What is your best belief?
A. Best bet would be the individual whose name appears at the foot of the document, which says "Name of contact".
Q. What is that name?
A. It generally means it is the person who should be contacted if you have got any --
Q. I can't read it. I am just asking for help in reading it. Is there a name on there?
A. I believe it says Olna Leeming.
Q. I see. How about to the left there, is that her signature or is that somebody else?
A. I don't know.
Q. Help me understand this. How does this Form A, as it is called, these last two pages of Exhibit 8, entitled "Suspicion Report form", interact

Min-U-Script® European Deposition Services (37) Page 145 - Page 148
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1
July 14, 2010

HIGHLY CONFIDENTIAL Page 149

with or relate to the Goalkeeping that is more of a computer field entry?

A. As I explained before, my team were responsible for assessing internal Money Laundering Suspicion Reports and making disclosure to NCIS. Front line staff and staff working in back and middle office have an obligation to report instances where they believe or have reason to suspect there is potential money laundering or other illegal activity occurring, and to do that at the time they completed this paper based form. When it was received by my team they created a Goalkeeper record, which is effectively a case management mechanism for managing that report. On this occasion Exhibit number 8, the Case Summary, is still headed "Money Laundering Suspicion", because it never became a disclosure because no disclosure was made. This one is headed "Money Laundering Disclosure" because a disclosure was subsequently made.

Q. You were referring to 7?

A. Yes, sorry.

Q. So, focusing still on the last 2 pages of Exhibit 8, Olna Leeming, what does she show her job title to be?

A. I don't know that she does.

MR. BLACKMAN: The title is someone else --

HIGHLY CONFIDENTIAL Page 150

A. It says "Payments Manager". I don't know whether that was Olna or whether it was Stewart Hardy, whose name appears below that.

Q. Correct me if I am wrong, you are saying that the last 2 pages of Exhibit 8 are filled out by someone in some other part of the bank that transfers, the branch, someone, and it is transmitted to your Money Laundering Team, who then takes those 2 pages and if appropriate makes entries into Goalkeeper, is that right?

MR. BLACKMAN: Objection to form. You can answer.

A. A case would always be entered into Goalkeeper, regardless of the activity that took place afterwards, yes. This would be generated, as I say, by front, middle and back office staff and they would report it to Financial Crime Team/Money Laundering Team, and they would then make an assessment as to whether a disclosure was warranted.

Q. From your training and experience, did you become aware that entities or people who are engaged in terror financing often used charities as a front to conceal that criminal activity?

MR. BLACKMAN: Objection to form. You may answer.

HIGHLY CONFIDENTIAL Page 151

A. I was aware that it was a typology.

Q. Did you work with Tony O'Hear at any point while you were serving as the team leader in Money Laundering?

A. I did.

Q. During what period of time?

A. I can't remember when Tony started working with us.

Q. Was he on the team below you or a boss above you?

A. He reported to me.

Q. Would you please mark this next document as our next deposition exhibit.

MR. BLACKMAN: We are about due for a break.

MR. WERBNER: Let's take a break and when we come back we will look at deposition Exhibit 9, Mr. Hoseason.

THE VIDEOGRAPHER: Going off the record at 4:10 pm as indicated on the video screen.

(Exhibit Hoseason 9 marked for identification).

(A short break)

THE VIDEOGRAPHER: We are back on record at 4:25 pm.

MR. WERBNER: Can you identify deposition Exhibit 9, please, Mr. Hoseason.

HIGHLY CONFIDENTIAL Page 152

A. I can. It is headed: "Money Laundering Disclosure."

Q. Is this another NatWest record where there is money laundering suspicion of Interpal?

MR. BLACKMAN: Objection to form. You can answer.

A. Yes.

Q. This one has the identification code we can see from the front page of Exhibit 9, "666814", correct?

A. It does.

Q. And it is noting as a reason for suspicion the high non-cash turnover again. Do you see that on the front page of Exhibit 9?

A. I do.

Q. And then we see Mr. Ibrahim Hewitt and Mr. E. Mustafa, officials of Interpal again being red flagged, correct?

MR. BLACKMAN: Objection to form. My red flag objection.

A. Red risk rating, yes.

Q. And likewise the red alert there for the Palestine Relief and Development Fund, correct?

MR. BLACKMAN: Objection to form, misstates the testimony, and I repeat what the red is --

Min-U-Script® European Deposition Services (38) Page 149 - Page 152
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 161

A. Almost daily.
Q. Would you or Mr. Hartley field all of those phone calls?
A. Not all of them. They would also be received by other members of the team.
Q. If you can recall, can you tell me what some of the topics of these phone calls related to, without obviously naming particular customers?
A. I mean they were frequently around questions as to should they be reporting something to us or not. Sometimes they were asking for details or, you know, looking for us to follow up on reports that they had submitted. That was the general nature of the phone calls.
Q. We have seen in some of the exhibits today attached to the Goalkeeper reports forms that are labeled, I believe, "Suspicious Activity Reports". Correct?
A. Yes.
Q. So before someone in the field would file such a report they might call your unit to find out if they needed to do so?
A. Yes, sometimes they would telephone.
Q. Okay.
A. In general, advice was if they are

HIGHLY CONFIDENTIAL Page 162

suspicious then complete the form so that we have an enduring record, rather than relying on what they have told us over the telephone.
Q. Was the advice ever the opposite, that you would hear what the concerns were and you would say: "You know what, don't bother. It is not of concern"?
A. Generally not. It is better to have an enduring record.
Q. Why then, if you know, were the people in the field actually given your phone numbers?
A. Staff do like somewhere to be able to contact if they have got queries.
Q. The disclosures to law enforcement of money laundering suspicions, did they come from any other part of the bank in or about 2001, besides your group?
A. In the UK, no. I am aware of one other Compliance Officer who one evening decided or felt it necessary to make a report to the authorities.
Q. Directly?
A. She took it upon herself to do it directly. I don't recall it was related to this particular case.
Q. You don't recall it was related to this particular case?

HIGHLY CONFIDENTIAL Page 163

A. No.
Q. And that was the last time she did that?
A. As far as I am aware, yes.
Q. Is it fair to say that the role of your unit was not to serve as merely a conduit for the Suspicious Reports, the internal reports that you received, not merely to be a conduit, take them and transfer them to the authorities?
A. So we did not routinely pass everything on. Our role was to assess them before taking the appropriate action, which may or may not have included making a disclosure to the authorities.
Q. Before deciding whether or not to make a disclosure of a particular internal Suspicious Report, you or someone in your unit would use their professional judgment as to whether or not a disclosure should be filed. Correct?
A. That is correct.
Q. And that judgment was informed by their or your professional experience?
A. Their training, professional experience, attendance at conferences, trade association advice, guidance.
Q. I think it may be Hoseason Exhibit 1 is labeled: "Group Financial Crime Procedures Manual"?

HIGHLY CONFIDENTIAL Page 164

Correct. I am not going to ask you any questions about that right now but you indicated earlier that you did not recognize that, correct, as a stand-alone document?
A. That is correct.
Q. And you were not aware of the existence of such a Procedures Manual from when you were in the Money Laundering Team?
A. That is right.
Q. Were you aware of other written documents that -- withdrawn. Did you take part in training new employees or new arrivals to your unit in how to decide whether or not a disclosure was merited in individual cases?
A. I would have done, yes.
Q. Would that have been one on one training or would that have been kind of a --
MR. BLACKMAN: The record should note that Mr. Werbner is leaving.
MR. WERBNER: Good night.
MR. GOELMAN: Is that something that was a one on one thing or was that something that was more formalized?
A. Generally one on one training, using live examples.
Q. And can you sitting here today recall what

Min-U-Script® European Deposition Services (41) Page 161 - Page 164
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1
July 14, 2010

HIGHLY CONFIDENTIAL Page 165

kind of guidance you would give new arrivals to the Anti-money Laundering Team in deciding whether or not a disclosure was merited?

A. The key thing is whether one, you know, can we identify a clear and legitimate reason for the activity or transaction that has been reported. So the front line, middle and back office will report something which just viewed in isolation might be regarded as suspicious, a large credit to an account, you know. From further investigation it may well be that we can absolutely ascertain the underlying purpose of that transaction, why it occurred, and satisfy our initial suspicion, in which case it would not be appropriate to report. If we were unable to dispel that suspicion, then we would generally report.

Q. What tools did you and your subordinates have at your disposal to see if those suspicions could be dispelled?

A. There would be access to bank systems, contact staff, some of whom may or may not have had direct contact with the customer, Goalkeeper, the Internet.

Q. When you say contact with staff, some of whom may or may not have direct contact with the customer, could you or someone working for you have

HIGHLY CONFIDENTIAL Page 166

called up the Relationship Manager and ask that additional information be obtained from the customer?

A. Yes, in certain circumstances we would do that, though we would have to be mindful of the tipping off provisions of legislation.

Q. When you say "the Internet", did each of the investigators have -- I don't want to call them investigators if they were not. Did each of the people working for you have an Internet connected computer on their workstation?

A. Yes, they had access to the Internet, yes.

Q. And you at least knew how to search the Internet, true?

A. Yes.

Q. And you are confident all your people did as well?

A. Yes.

Q. Can you look at Hoseason Exhibit 1, please, and turn to page NW155. The top says: "A number of factors may have bearing." Do you see that first line?

A. Yes.

Q. And I believe that is a bearing as to whether there should be an immediate disclosure to the authorities, from the previous page, is my

HIGHLY CONFIDENTIAL Page 167

understanding. Correct?

A. That is right.

Q. So: "A number of factors may have a bearing on whether or not there should be immediate disclosure", and the first among those is: "Are there any existing Goalkeeper records for this customer?" Right?

A. That is what it says, yes.

Q. Which way, if you know, would the existence of previous Goalkeeper records for a customer militate in terms of whether or not to make an immediate disclosure?

A. It could go either way. So, for example, if there is an existing record it may be that the activity that has been reported has been reported previously and recently, and it may even be exactly the same activity that has been reported, because a transaction may be identified by several staff at a different stage in its life cycle. So clearly if it had been reported already or the connection had been reported only recently before, then we wouldn't necessarily be looking to make a further disclosure.

If on the other hand there had been previous disclosure and the content of those was relevant, it could influence our thinking that we would need to make

HIGHLY CONFIDENTIAL Page 168

another disclosure.

Q. Okay. You are speaking about whether or not there had been a disclosure to law enforcement previously, correct?

A. Yes.

Q. The first bullet point there is: "Are there existing Goalkeeper records for this customer?" Right?

A. That is right.

Q. So Goalkeeper records we have seen can involve cases that a disclosure was made or cases where a disclosure was not made, true?

A. That is right.

Q. So is there a particular way that the existence of Goalkeeper records, as distinct from whether or not it was disclosed before would impact the decision on whether to disclose immediately, or could that also work both ways?

A. A Goalkeeper record could relate not just to a disclosure, it could relate to a Suspicion Report that somebody has already assessed and discounted, and the information in that case might then explain the activity that had been reported this time around. Goalkeeper records might also include a fraud case, for example, so a customer may have previously been

Min-U-Script® European Deposition Services (42) Page 165 - Page 168
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 173

is: "Check GK and FMS for any connected cases. Ensure links are established."
A. Yes.
Q. "GK" is of course Goalkeeper, right?
A. Yes.
Q. And we have heard what FMS stands for. I just cannot remember.
A. Fraud Management System.
Q. Okay. Were both of those systems accessible from all of the desktop computers of the people working for you?
A. They were.
Q. And from your own computer as well?
A. Yes.
Q. And it says: "Ensure links are established". Is it fair to say that when considering whether or not to make a disclosure to law enforcement -- strike that. Is it fair to say that when someone in your unit received a Suspicious Activity Report from the field, that person was supposed to check for prior disclosures for the subject of that, for the subject of that Suspicious Action Report?
A. Supposed to check for other cases --
Q. Yes.
A. -- which might include Suspicious Activity

HIGHLY CONFIDENTIAL Page 174

Report disclosures.
Q. So it was not an option that they could or could not employ; that was part of what they were supposed to do to do their job properly?
A. That is correct.
Q. And they could look for these prior reports through a number of different fields, true?
A. Yes.
Q. Goalkeeper was not just a case management system, it also had a search capacity, right?
A. That is correct.
Q. You could search by the name of the account, right?
A. Yes.
Q. You could search by the name of any of the principals of the account?
A. You can search by names of entities, associated individuals, phone numbers, post codes. For the purpose of this people would generally search by the account name.
Q. And you could search by account numbers as well, true?
A. I believe you could, yes.
Q. Can you turn to page 162, please. Are you familiar with the term "consent transactions"?

HIGHLY CONFIDENTIAL Page 175

A. I am.
Q. And what does that mean?
A. The introduction of the Proceeds of Crime Act included certain provisions that banks and other financial institutions were required to obtain prior consent before allowing a prohibited transaction to take place, so it was an act within the movement of funds through a bank account that was connected with or could be construed as money laundering or could be related to any other criminal activity. Clearly that can only apply to a transaction that you have got prior knowledge of rather than one that has been reported to you having already taken place.
Q. It was your understanding that banks could or at least the law gave banks the ability to temporarily delay processing a transaction in order to give NCIS a chance to object?
A. Yes, I wouldn't say it was the ability, it was the burden.
Q. But they had the legal right and obligation to do so, is that fair?
A. Yes.
Q. And there are three criteria listed down below as examples of features of transactions that might cause banks to seek consent before processing

HIGHLY CONFIDENTIAL Page 176

a transaction. Do you see that?
A. Yes.
Q. And one of those is requests for CHAPS or overseas payments?
A. Yes.
Q. What is CHAPS?
A. Clearing House Automated Payment System. It is a same day value electronic payment system within the UK between banks.
Q. Okay. And overseas payments refers to outflows from the account at NatWest to banks overseas?
A. Yes, wire transfers, in US terminology.
Q. You talked about the increase after the terrorist attacks of September 11 in the number of disclosures that banks made to NCIS, is that right?
A. Yes.
Q. And what is the basis for your belief that there was an increase?
A. I know there was an increase. Clearly, (i) all banks wanted to do as much as they possibly could to assist the law enforcement effort in tracking down those responsible, (ii), we clearly did not want to find ourselves in a position where we had failed to report something that later proved to be of or could have been of use to law enforcement, and I would say

Q. In addition to Complinet and whatever publications by law firms that you read in the months after 9/11, did you follow the 9/11 investigation in the regular media?
A. Not specifically.
Q. Did you get a daily paper at the time?
A. No. I travel into work by motorcycle. It is kind of difficult to read on a bike.
Q. Talk about risk. Okay. What about reading articles or media reports on line?
A. Yes, I mean I did get -- I did have some on line subscriptions but I can't remember which ones they were. We got stuff from the British Bankers Association.
Q. Like mainstream general purpose press, did you have a habit of reading -- trying to think -- The Times, The Guardian or any dailies?
A. I didn't specifically sit down to trawl through them, no.
Q. Would there be articles in the mainstream press that had to do with the 9/11 investigation that made their way to your desk, someone would pass them along to you?
A. I expect so but I can't specifically remember anybody bringing one to me.

Q. What about news broadcasts? I assume you cannot listen to the radio when you are on your motorcycle on the way into work?
A. No.
Q. Did you watch the evening news?
A. If I got home in time, yes.
Q. Did you hear in the weeks or months after 9/11 about any suspected London connection to the 9/11 terrorist attacks?
A. Yes, I seem to recall something.
Q. And what is that?
A. I don't know.
Q. Just recall in general there was a connection, you don't remember what the connection was?
A. To be honest, it kind of blurs into the subsequent July attacks on London Underground and buses.
Q. You are referring to the July 2005 attacks?
A. Yes.
Q. Are you familiar with the name Zacharius Musawi?
A. Yes, I think I can picture him.
Q. Do you recognize him as someone who has been described as "The 20th Highjacker" on 9/11?

A. I couldn't have told you that but it doesn't surprise me.
Q. Do you know whether Mr. Musawi or did you hear that Mr. Musawi spent time in London?
A. I can't specifically remember.
Q. You don't remember hearing that?
A. But again it doesn't surprise me.
Q. What about a man named Richard Reed, also referred to as "the shoe bomber"?
A. I know he was of UK origin.
Q. And are you aware that -- not just UK origin, he was from London?
A. Now you mention it, it rings a bell. Again, if you had asked me I couldn't have told you which part of the country he was from.
Q. Now that I mention it, do you recall hearing that Mr. Reed worshiped at the same mosque as Mr. Musawi?
A. No.
Q. Do you recall reading articles after 9/11 that talked about the mosque in Finsbury Park as a connection point for various Islamic terrorists?
A. I do, yes.
Q. Did you learn about a police raid on that mosque in or about January 2003 in connection with

a plot to commit terrorist acts using the poison Ricin?
A. Rings a bell, but again I could not specifically have said I was aware of a raid in connection with that.
Q. What about the name Abu Hamza Al Mazri. Does that ring a bell?
A. It does.
Q. And are you aware that he was for a time the Imam of the Finsbury Park mosque?
A. Again, I couldn't have -- if you had asked me that this afternoon I couldn't have told you what that individual's name was, but again it doesn't surprise me.
Q. But without regard to whether or not you remember the name, do you remember that the Imam of that mosque was sentenced to 7 years in prison for inciting murder and race hate?
A. No.
Q. You don't remember that. Is it fair to say you know that at least in London the mosque at Finsbury Park became quite notorious in the late 90s and early 2000's as a hot bed of Islamic radicalism?
MR. BLACKMAN: Object to the form because I strongly suspect there is more than one mosque in Finsbury Park, but you can answer.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1 July 14, 2010

HIGHLY CONFIDENTIAL Page 201

than one person?
A. Writing on behalf of the bank.
Q. So the "we", when you wrote letters on behalf of the bank you would use the first person plural pronoun to refer to the bank?
A. Yes.
Q. There is nothing in this letter -- sometimes letters say "via fax" or "by hand delivery". There is nothing on this letter that indicates how it was delivered to NCIS, correct?
A. No, correct.
Q. What would have been your practice in delivering a letter to NCIS?
A. At this time the majority of disclosures to the authorities would have been delivered in hard copy. Certainly around this date, because of the volume of disclosures that were being made to the authorities, I would quite often drop them off on my way home, since I pass the end of the road where NCIS are based. So I could well have delivered it by hand along with a number of other disclosures that we may have made.
Q. So was it your practice on the way home on your motorcycle to stop off at NCIS and drop off the day's disclosures?
A. It was not a daily event but when we had

HIGHLY CONFIDENTIAL Page 202

got a number to be delivered, then yes.
Q. So sometimes it would be every couple days or on a weekly basis or something?
A. Yes, depending how many we had got. Certainly around this time it was more frequent.
Q. Would you just -- is there a mail box or you just drive up and park the bike and --
A. No, I made sure that they reached the Economic Crime desk.
Q. Would you have to go into NCIS and actually find the Economic Crime desk?
A. Yes. They would not let me wander around, as you can imagine, so generally they came down and collected them from me.
Q. Do you know if that was the common way that banks in London submitted their disclosures?
A. No, it was not the usual way.
Q. I know you answered some questions about this earlier but we have seen a number of disclosures, disclosure forms for disclosures that the bank made to NCIS, right?
A. Yes.
Q. And this is the only letter that we have seen that has gone to NCIS. Do you recall in your years with the Anti-money Laundering Team any other occasion

HIGHLY CONFIDENTIAL Page 203

where instead of using the form provided you submitted a letter to NCIS?
A. No.
Q. Is it fair to conclude that the reason you did it this way on this occasion is that you felt there was some urgency to convey this information to NCIS?
A. Yes.
Q. Can you explain why you would have felt that there was some urgency to convey this information to NCIS?
A. It was very shortly after the events of 11 September. We were making a significant number of disclosures to NCIS at the time. As I think I mentioned before, we were very concerned not to fall short in terms of our reporting obligations. The reason I suggest that we sent this letter was because with a certain amount of further review to be done, we were not in a position to put together anything more meaningful at the time. The form itself, the disclosure form did not really suit putting that kind of information into it, so it was more expedient to produce a short letter like this.
Q. Couldn't you have just put -- I understand you had not had a chance to fully research everything that you would have liked to before making a disclosure,

HIGHLY CONFIDENTIAL Page 204

but couldn't you have used the form just to input whatever information you had at the time and still told NCIS: [redacted]
A. I think the format, although we were delivering them electronically, the format which the disclosures were made pre-populates certain fields in Goalkeeper, so eventually when we got an electronic link to NCIS we used to pull the information out of Goalkeeper and it would go electronically from Goalkeeper to NCIS. At this time we had not got the electronic link up, so the disclosure would be keyed into Goalkeeper and then printed, and I would suggest that probably we had insufficient information to be able to create a proper disclosure that would allow it to be printed.
Q. And would the format of -- strike that.
When you are going through, when you are inputting something, when you are creating a disclosure using the Goalkeeper system, you have to click through different fields?
A. Yes.
Q. And if you didn't have enough information to reliably fill out a particular field, could you skip it or put "NA", or somehow indicate that you didn't have

Min-U-Script® European Deposition Services (51) Page 201 - Page 204
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 205

enough information at the time? Do you know if that was an option?

A. I don't think it was an option. It was kind of a failsafe to ensure that we didn't end up submitting a disclosure that had key information missing.

Q. Would NCIS ever reject disclosures because they were incomplete or didn't give enough information?

A. I am not aware they have ever rejected any of our disclosures.

Q. Are you aware of them rejecting disclosures of other banks?

A. I don't know.

Q. I don't know if this is an inaccuracy in LiveNote but it says on line 8 of the previous page: "I think the format, although we were delivering them electronically, the format which the disclosures were made", do you mean you were not delivering them electronically at the time?

A. That is right. Let me explain. Ultimately we finished up sending the disclosures electronically. I seem to recall at this time, although we were creating the disclosures, rather than putting it on to a paper based report, we were creating them in Goalkeeper, but because the electronic link was not up

HIGHLY CONFIDENTIAL Page 206

and running we could not hit the "Go" button. We had to then print that report and hand deliver it.

Q. Do you remember when the electronic link got up and running?

A. No, I don't.

Q. Was everything that you have submitted, all the disclosures you submitted submitted to the Duty Desk?

A. Yes. The National Criminal Intelligence Service has a number of departments. The department that we are required to submit the disclosures to is the Economic Crime Unit, and specifically they go to the Duty Desk.

Q. So that is where all the disclosures go?

A. This is why this would have been addressed as such, so it reached the right person, rather than someone else.

Q. You write in this letter:

[REDACTED].

Why did you choose to include that statement in the letter, that [REDACTED]

HIGHLY CONFIDENTIAL Page 207

due course?

A. I think we were making the point that we [REDACTED] So we would be reviewing the activity before so that we can provide some meaningful input, and that we would be making a full disclosure, as opposed to a sort of shortened format letter subsequently.

Q. By that sentence did you also want to reassure NCIS that the bank was on top of this?

A. Yes, I think that would be fair.

Q. I want to mark a printout from a website as Hoseason Exhibit 11.

(Exhibit Hoseason 11 marked for identification)

Unlike most of the exhibits that you will see, this one does not have a Bates stamp because it was not produced by the bank?

A. Okay.

Q. This is one of those relatively long documents. I am going to ask you just to flip through it and take as much time as you want to get familiar with it. You don't need to read every word now if you don't want to.

A. Okay.

Q. My first question is do you know what a URL is?

HIGHLY CONFIDENTIAL Page 208

A. I think so.

Q. It is an internet address?

A. Um hum.

Q. Can you compare the URL on Hoseason Exhibit 5 and Hoseason Exhibit 1, please?

A. Yes, they are the same.

Q. And for the record they are "http://cryptome.org/za-hamas.htm."

MR. BLACKMAN: For the record, you should note that this was downloaded on July 5, 2010. I note that for the record because in the earlier examination there was some questions about some Goalkeeper reports which similarly have the relevant website and were downloaded at dates long after the document was created.

MR. GOELMAN: The document being Hoseason Exhibit 5, you mean?

MR. BLACKMAN: Or Hoseason Exhibit 9 or any of these downloaded --

MR. GOELMAN: This was done in preparation for the deposition.

MR. BLACKMAN: Yes.

MR. GOELMAN: So stipulated.

MR. BLACKMAN: I am noting it because your friend seemed to deliberately overlook that fact in some of his questions, but I just want the record to reflect

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 1
July 14, 2010

HIGHLY CONFIDENTIAL Page 209

that.

MR. GOELMAN: The website that this document appears to have been resident on is called "cryptome.org". Do you see that.

A. Um hum.

Q. Are you familiar with this website?

A. No.

Q. Do you recall ever going to this website on any other occasion?

A. No.

Q. Do you know what it does?

A. No.

Q. You indicated earlier that you would have read the article at the link [redacted] right?

A. If I wrote this letter then I would have read the article, yes.

Q. Okay. Would you also, if you had gone to that website and read the article, would you have checked out the website itself, you know how websites have a Home Page that describes in many cases what their purpose is?

A. I might have done, I would think, yes. It says we were alerted to the website. I can't recall, so therefore I can't say with any certainty whether

HIGHLY CONFIDENTIAL Page 210

somebody directed me to look at the website, whether they printed the content of that website off and brought it to our attention in that way. So I may have received it like this or I may have looked at it online.

Q. I know you testified that you don't have a current recollection of who brought this article to your attention.

A. That is right.

Q. Can you tell me if in this period of time you were receiving information from sources outside the bank about potential terrorist financing?

A. We were getting -- people were picking up information from open intelligence sources, such as the media. This is headed up "South African National Intelligence Agency". Certainly we were not getting anything from them.

Q. Okay. But I mean were there people in law enforcement who you were having conversations with at the time about tips about terrorist financing?

A. Yes, I think when you say "conversations" it makes it sound very covert, doesn't it? So not specifically with us, but NCIS would be, as I have mentioned before, providing advice or asking if people had information about particular aspects of a case they may be looking at, but that request would go to all

HIGHLY CONFIDENTIAL Page 211

financial institutions, it wouldn't just be to NatWest or RBS.

Q. Were you having conversations at the time about terrorist financing and potential ways of detecting it with other Compliance Officers, with other banks, of other banks?

A. I can't remember to what extent we were talking to other Compliance Officers at the time. To be blunt, we were pretty much snowed under with internal Suspicion Reports.

Q. You make an explicit reference in your letter to page 23 of this report, true?

A. Yes.

Q. Page 23 includes, as you write: "Details of a NatWest connection with Interpal." Right?

A. Yes.

Q. With the understanding that you don't remember who alerted you to this article, was it the NatWest connection that precipitated the notification of you to this article?

A. I would expect so but I can't -- because I don't know who brought it to our attention, I don't know what the underlying reason for that was.

Q. But if somebody has written an article about Hamas that does not mention NatWest, there isn't

HIGHLY CONFIDENTIAL Page 212

any obvious reason why they would alert you to it. Is that fair to say?

A. That would seem reasonable.

Q. Can you turn to page 22, please. Actually I am going to have to -- this document has pages that are internal, appear to be from the South African document, and then they have pages that comport to the printout out of 37, so I am going to be referring to the page number out of the printout. Okay?

A. So the number at the top right-hand corner?

Q. Yes.

A. Yes.

Q. First of all, actually, start at page 3, please. Do you understand that the line three-quarters of the way down that page purports to separate the introduction from the website from the text of the actual document from the National Intelligence Agency of South Africa?

MR. BLACKMAN: I am just going to object as I did in the earlier deposition because we don't know what this is or who prepared it or whatever. You are entitled to ask him questions about it but clearly we object to it. The authenticity particularly of this purported intelligence report is completely unclear.

Min-U-Script® European Deposition Services (53) Page 209 - Page 212
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 213

MR. GOELMAN: Let me make clear, I am not suggesting that you can authenticate a South African intelligence report. I am just saying that from your reading of this on the website did you understand that that is what it purported to be, and that that division was -- that line was, you know, everything above that line purported not to be from that report and everything below that line was purported to be from that report?
A. I think as I said before I don't actually have any specific recollection of reading either the website or if it came to me in paper format, so to say did I understand that this was kind of two separate bits, the answer has to be no, because I don't know.
Q. Okay. Looking at it now, is it clear that that is what it purports to be?
MR. BLACKMAN: Same objection. You can answer.
A. It seems to be a suggestion by the author that this stuff from page 3 downwards where it says "Cover Page, Secret" purports to have come from a document that was prepared for the South African President.
Q. You mentioned before that you don't remember whether someone printed this document out for you or you read it on the website. Would you have --

HIGHLY CONFIDENTIAL Page 214

A. Or indeed if somebody went through it and then wrote that for me to sign.
Q. What do you mean?
A. You asked me earlier if I remembered whether I wrote that and I said that I could well have done but equally someone could have written it for me to sign, so they could equally have been the person that either visited that website or looked at the document, if it came to us in that format.
Q. Would you have signed and submitted a letter to NCIS without ever even checking out this website?
A. I would have checked it out but I wouldn't have necessarily -- this is what I am saying to you -- have read through every last page. It says in here there is quite clearly a lot of allegations of links to Hamas, which is what we have put in here.
Q. "In here"? I am sorry, you have to refer --
A. Sorry, in Hoseason 5, and there is mention of the NatWest accounts held at one of our branches on page 23, which is clearly on here.
Q. Okay. So your point is that if you had written this letter then you would have read the article, but you don't remember whether or not you

HIGHLY CONFIDENTIAL Page 215

personally wrote the letter so therefore you cannot say that you read the article?
A. I may not have read the article from cover to cover.
Q. In any case you would have looked at the article?
A. Yes.
Q. Is it fair to say that someone at the bank would have read the article cover to cover before this letter was submitted to NCIS?
A. I would expect so.
Q. Can you turn to page 22 out of 37, please. I refer you to the two short paragraphs at the bottom. The first one says:
"The most important of these Hamas front organizations are the International Palestine Relief and Development Fund (Interpal) based in London."
Do you see that?
A. Yes.
Q. And is it fair to say that you understand and understood in 2001 that a front organization was something that a criminal organization might establish to hide their identity?
A. Yes.
Q. The paragraph above that ends with a line

HIGHLY CONFIDENTIAL Page 216

that says:
"Funds are also used to establish new cell structures and command structures around the globe and to fund military and social programs in Palestine and other countries".
Do you see that?
A. I do.
Q. Did you have an understanding of what Hamas considered "military training" in September 2001?
A. I believe so.
Q. And was your understanding that Hamas considered the murder of innocent civilians to be part of their military program?
A. Certainly that Hamas had engaged in attacks against the civilian population.
Q. And that they considered those military actions, correct?
A. I had not specifically been informed of that.
Q. Whether you had been specifically informed of that, if someone had talked to you about a Hamas military action in September 2001, would you have been aware that that military action could include an attack on innocent civilians?
MR. BLACKMAN: I am going to object to the

**In The Matter Of:**

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.*

---

*MIKE HOSEASON*

*Vol. 2*

*July 15, 2010*

---

*Original File 150710 Mike Hoseason v2.txt*

*Min-U-Script® with Word Index*

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 232

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
Defendant.

VIDEOTAPED DEPOSITION OF MIKE HOSEASON, VOLUME 2
Thursday 15 July 2010
At: 9:30 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom

HIGHLY CONFIDENTIAL Page 233

A P P E A R A N C E S

For Plaintiff Tzvi Weiss:

STEPHEN SCHWARTZ, ESQ.
Kohn, Swift & Graf PC
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107-3304
Tel: 419 246 0528

For Plaintiff Natan Applebaum:

MARK WERBNER
Sayles & Werbner
4400 Renaissance Tower
1201 Elm St.
Dallas, Texas 75270
Tel: 214 939 8763

For Plaintiff Tzvi Weiss:

AITAN GOELMAN
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036-5807
Tel: 202 778 1996

For Defendant National Westminster Bank, PLC:

JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470
Tel: 212 225 2000

Also Present:

COURT REPORTER:

AILSA WILLIAMS
European Deposition Services
59 Chesson Rd
London, W14 9QS

Telephone: 44 (020) 7385 0077

HIGHLY CONFIDENTIAL Page 234

VIDEOGRAPHER: DAVID ROSS

HIGHLY CONFIDENTIAL Page 235

I N D E X

MIKE HOSEASON (Cont.) . ... ... ... ... ... ... ... 237
CROSS-EXAMINATION BY MR. GOELMAN (Cont.) .. ... ... ... ... 237
CROSS-EXAMINATION BY MR. BLACKMAN: .. ... ... ... ... ... ... 430
FURTHER CROSS-EXAMINATION BY MR. GOELMAN: .. ... ... ... ... 439

INDEX OF EXHIBITS

Hoseason 12 NW013279 .. ... ... ... ... ... ... ... 253
Hoseason 13 NW009755-757 .. ... ... ... ... ... ... 264
Hoseason 14 NW012772 .. ... ... ... ... ... ... ... 270
Hoseason 15 NW191801-806 .. ... ... ... ... ... ... 279
Hoseason 16 NW052874-86 ... ... ... ... ... ... ... 317
Hoseason 17 NW012954 .. ... ... ... ... ... ... ... 322
Hoseason 18 NW008374-380 .. ... ... ... ... ... ... 327
Hoseason 19 Bank of England News Release (No Bates No.) .. ... ... ... ... 342
Hoseason 20 NW009934-42 ... ... ... ... ... ... ... 347
Hoseason 21 NW012129-152 .. ... ... ... ... ... ... 354
Hoseason 22 NW012108-128 .. ... ... ... ... ... ... 357
Hoseason 23 NW051994-997 .. ... ... ... ... ... ... 361
Hoseason 24 NW012925-38 ... ... ... ... ... ... ... 365
Hoseason 25 "Press Room, US Department of the Treasury", (No Bates Nos.) ... ... ... ... ... ... 376
Hoseason 26 NW088194-197 .. ... ... ... ... ... ... 384

Min-U-Script® European Deposition Services (1) Page 232 - Page 235
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 240

exactly when it was introduced. But my recollection is that from when it was introduced one of the criteria was that if it was a case that had been disclosed under anti-terrorism laws then it went on as a High Profile.

Q. Were there any other genres of -- withdrawn.

Were there any other specific criminal legislation that automatically put a case into the High Profile kind of category?

A. No.

Q. Why was terrorism automatically labeled a High Profile Case?

A. I would suggest it was regarded more seriously than other cases.

Q. Is it fair to say that your unit received Suspicious Activity Reports about a relatively wide variety of types of suspicion?

A. Yes.

Q. And did the amount of time and work that your unit spent on a particular case vary, based on the seriousness of that case?

A. I would say the amount of time that was spent on each individual case varied depending on the complexity of the case and the nature of the additional enquiries and research that was required.

Q. As a general rule, would cases involving more

HIGHLY CONFIDENTIAL Page 241

serious crime be accorded more time and resources by the Anti-money Laundering Group than cases involving less serious crimes?

A. Part of the work that the team would have done would have been to form a view as to the nature of the activity, whether it was considered suspicious and in what context it was considered suspicious, so at the outset we would not necessarily have formed a view as to what piece of legislation it might in particular relate to.

Q. Putting aside the particular legislation that it related to, if a Suspicious Activity Report came in involving a crime that involved millions of dollars, would the Group be more likely to spend more resources investigating that Suspicious Activity Report than a report filed when somebody passed a bad check for 50 pounds?

A. Not necessarily.

Q. So it didn't depend on the amount of money at stake?

A. Not solely, no.

Q. Partly?

A. It was a consideration, along with everything else.

Q. In Hoseason Exhibit 11, the report that we talked about yesterday from the internet made allegations that the NatWest customer, Interpal, was one of the primary

HIGHLY CONFIDENTIAL Page 242

funders of the terrorist group Hamas, true?

MR. BLACKMAN: I am going to continue my objection yesterday. I will not spend time on it but again to note that this is an unauthenticated document with all kinds of statements in it, as to which there has been no foundation laid that Mr. Hoseason ever even read it, and I object to therefore asking him questions about its content, unless they happen to be things that he knows about other than reading them here, but having said that once I will not belabor the point.

MR. GOELMAN: Thank you. The question is explicitly characterizes the statements here as allegations, so I want to know if it is fair to say that this report made allegations that NatWest customer, Interpal, was one of the primary funders of the terrorist group, Hamas?

A. Yes.

Q. And would you agree that that allegation at least was an allegation of a very serious crime?

A. Yes.

Q. Nothing less than an allegation of facilitating mass murder, true?

MR. BLACKMAN: Objection, form.

A. It is an allegation of funding terrorism.

Q. And it is something that came to the bank's attention only weeks after thousands of Americans were

HIGHLY CONFIDENTIAL Page 243

killed in the terrorist attacks of 9/11?

A. It was brought to our attention on or around 27 September 2001, yes.

Q. So 16 days after the attacks of 9/11, correct?

A. Yes.

Q. In that context, do you have Hoseason Exhibit 5 in front of you. When your letter to NCIS dated September 27, 2001, [redacted]

A. Looking at each of the accounts for that particular customer, considering the type of activity passing through it, source of funds, destination of funds, velocity of funds passing through the account.

Q. So "activity" suggests both inflows and outflows of funds?

A. Yes.

Q. And would a thorough review include some attempt to see who the counterparties were on these transactions?

A. We would certainly look at the names, where they were available, on the transactional data.

Q. What about some effort to see if the beneficiaries of monies from Interpal were affiliated with Hamas?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2
July 15, 2010

HIGHLY CONFIDENTIAL Page 248

those account numbers are correct, I can't say today.
Q. And if they were incorrect, is that something that you would have noted in your letter to NCIS?
MR. BLACKMAN: Objection.
A. Again, I don't know.
Q. Wouldn't you want law enforcement to have the benefit of any information that the bank had about the accuracy of the allegations in Hoseason 11?
MR. BLACKMAN: I object on grounds that it is argumentative and clearly assumes a lot of facts that are not in evidence.
A. Should I answer? The answer would be I don't know.
Q. You don't know if you would have wanted law enforcement to have the benefit of any information that the bank had about the accuracy of the allegations?
MR. BLACKMAN: Objection. Which allegations? This purported document, and we have no idea who prepared it, is 37 pages long. Most of it doesn't have anything to do with NatWest. Most of it doesn't have anything to do with Interpal. Much of it has allegations, and I don't want to belabor this, but just opening it at random page 31 it says that: "Imam Ibrahim, black teacher in Seshego, volenteer [spelled wrong] for military training". We could go through allegation by allegation and we could ask the

HIGHLY CONFIDENTIAL Page 249

witness: "Is this something that you could have verified", et cetera. Your question is really misleading and because it is so broad it is impossible to answer.
MR. GOELMAN: I don't know, I can't stop you making objections like that. I will not try to cut you off but the record will reveal especially when and if the witness incorporates your -- let me finish, I didn't interrupt you -- especially if the record reveals that the witness incorporates your coaching in his answer, it is going to show exactly what the strategy here is. So I would ask you, if you have an objection, state the objection, state the grounds, as the rules require you to, and then let the witness answer.
MR. BLACKMAN: I was not --
MR. GOELMAN: I don't believe that my question was at all misleading. I asked whether or not he would want, not whether or not he could corroborate everything in this report but whether or not he would want law enforcement to have the benefit of the bank's information relevant to these allegations. That is a question he can answer.
MR. BLACKMAN: That is not quite the question you asked but you can answer it. I was making my objections, so the record is clear, as to the basis of the objection. It was not to coach him.
A. Can I ask you to repeat the question, please?

HIGHLY CONFIDENTIAL Page 250

Q. Yes. Would you have wanted, when you made the disclosures on September 27, 2001, law enforcement to have the benefit of any information that NatWest had that could corroborate or disprove allegations in this article?
A. It is not our position to corroborate or disprove the contents of this article. Our job was to consider whether it was appropriate to submit a Money Laundering Suspicion Report to the authorities.
Q. Let me understand this. If you had read the account information, and when you checked to see if these accounts really were held at NatWest, and it turned out that some of the information had been wrong, you might or might not have told NCIS about that?
A. In our disclosure we state [redacted] I don't believe that I would have necessarily pointed out to them any inaccuracy. For example, I believe there is an error in the spelling of the address.
Q. You mean "Cricklewood" should be Circlewood?
A. Cricklewood has a "K" in it, I believe. We are not an investigative function in the way that law enforcement are. Our job is not to pass a view on the accuracy or otherwise of this report or anything else.

HIGHLY CONFIDENTIAL Page 251

Q. But as part of your job you told NCIS that you would undertake a thorough review of the activities of the account, true?
A. The activity through all the accounts for our customer, not of this document.
Q. I want to refer you to the bottom of page 23. Do you see the list of "Important Figures"?
A. Yes.
Q. And there are a number of names after there?
A. Yes.
Q. Including, I am just going to read them phonetically Abd El Rahman Abou Daya, listed as Chairman?
A. Yes.
Q. Essam Yossef Mustafa, listed as international liaison responsible for South Africa?
A. I see that, yes.
Q. M Safi'a.
A. Yes.
Q. M. Tulaba?
A. Yes.
Q. A. Saker?
A. Yes.
Q. And then, if you turn the page, number six is Abed El Rahim Nasseralla?
A. Yes.

Min-U-Script® European Deposition Services (5) Page 248 - Page 251
Tel: +44 207 385 0077 www.european-depositions.com

Q. There is no evidence in Hoseason 11 to support that these funds were being used to support terrorist activity?
A. No.
MR. BLACKMAN: I am going to object. Let's not argue with the witness about a document that we don't know what it is, and now you are arguing whether he thinks the document does or does not support -- do what you want. My objection is noted.
MR. GOELMAN: I am just trying to understand his answer. You believe that there is no evidence in Hoseason 11, the report, that these funds were being used to support terrorist activity?
MR. BLACKMAN: Which funds?
MR. GOELMAN: Yes, which funds?
MR. BLACKMAN: The last question was about transfer to the Holy Land Foundation.
A. You were talking about transactions between these parties.
Q. The Al-Aqsa parties you mean?
A. Yes.
Q. Interpal and the Al-Aqsa foundations?
A. Yes, that is what you were talking about.
Q. Right. And your position is that there is no evidence in Hoseason 11 that transactions between Al-Aqsa

and Interpal were used to fund terrorism?
A. Yes. You are asking me to state whether there is anything in here that corroborates the validity of the allegations that are made in this document, and I am saying I don't believe there are. We were suspicious, we made a report to the authorities. That is all we are required to do so.
Q. That was not my question. My question was, in one of your answers you talked about evidence of the purpose of these transfers. I am asking you what you meant by that, what type of evidence do you have in mind that would show the purpose of transfer of [REDACTED] o the Holy Land Foundation?
A. Evidence, proof that it was being used, that those monies were being used for illegal purposes.
Q. Okay. But what type of evidence are you talking about?
A. As I said, I am not a police officer, I am not a prosecutor.
Q. I understand what your job title was at the time but I am trying to follow-up on a statement that you made in an answer to a question, where you talked about proof of the purpose of these transfers. I can't get from you an answer as to what you have in mind when you say you have proof of the purpose of the transaction. I mean,

financial transactions don't generally say: "This is going for a house, this is going for a bullet", right, do they?
MR. BLACKMAN: I am going to object to the question as being argumentative, and I would have to point out that the reason we have gone down this road is that you started asking him to read a document that there is no proof he ever saw, there is no evidence that any of the contents of it are true, that is authored by someone called "Anonymous", and reach conclusions about whether anything in it corroborates some proposition that you want to make. He was trying to answer your question. Now you don't like the road you have gone down. I agree it is a very unprofitable road, but that is why we are there. Please answer the question. Maybe we can move on to something that is remotely admissible evidence.
A. Can I ask you to repeat the question?
Q. Yes. When you say "proof of the purpose of the transfers", what type of proof do you have in mind that would provide proof of the purpose of the transfer?
A. So if I had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets, as you put it, then that would be clearer evidence.
Q. Okay. Short of that, short of evidence that the funds were used to buy bullets or explosives, is there

anything else that you would consider to be proof of the nefarious purposes of the transfers?
A. No.
MR. BLACKMAN: Objection to the form of the question.
Q. Your answer is "no"?
A. No.
Q. Can you turn to page 28 of 37, please, kind of midway, middle top of the page, the paragraph starting with: The AIF expect Mounir Jarada @ Abu Achmed El-Raghman (the head of Hamas military operations in Sudan) after Ramhadaan (February 97) to assist in military training in South Africa".
Do you have before you -- Mark, did you mark 4124 yesterday?
MR. WERBNER: I don't recall.
MR. GOELMAN: I don't want to remark exhibits. I am handing a document to the court reporter and ask that it be marked Hoseason 15.
(Exhibit Hoseason 15 marked for identification)
Please take your time in reviewing Hoseason 15, for the record Bates stamp NW191801 through 191806.
A. Okay.
Q. Can you tell me if you recognize Hoseason Exhibit 15, just in terms of the type of document it is?

A. I do.
Q. What is it?
A. It is a Goalkeeper record of a Money Laundering disclosure that was made back in 1992.
Q. As with other Goalkeeper reports, is this a document that NatWest made and kept in the ordinary course of its business?
A. It is.
Q. Can you turn to the page Bates stamped NW191804. Is that the first page of a disclosure made to the authorities in 1992 that you described?
A. Yes, that is what it looks like.
Q. Do you see 5 paragraphs from the bottom the paragraph beginning with "Also"?
A. Yes.
Q. Can you read that into the record please?
A. Third paragraph says:
[redacted]
Q. Can you now turn back to page 28 of 37 of Hoseason 11.
A. Yes.

Q. The portion of that page that I read before, talks about someone named "Mounir Jarada @ Abu Achmed El-Raghman" as being the head of Hamas military operations in Sudan. Is that right?
MR. BLACKMAN: Objection to form, same objection as I have repeatedly stated.
A. That is what it says, yes.
Q. Any doubt in your mind that the "Mounir Jarada" mentioned on page 28 of 37 in Hoseason 11 is the [redacted]
MR. BLACKMAN: Object to form, you can answer.
A. It would appear likely.
Q. So is it fair to say that at the time that you were alerted to the existence of Hoseason 11, in 2001, the bank already knew that its customer had transferred money to Mr. Jarada?
MR. BLACKMAN: Objection to form. The customer actually listed here is not -- is an entity called "Palestine and Lebanon Relief Fund".
MR. GOELMAN: Let me address that. Goalkeeper had a search function, did it not?
A. It did.
Q. And you could search, as we talked about yesterday, through a number of fields?

A. Yes.
Q. And one of those fields was the name of the account holder, true?
A. Yes.
Q. One of those fields included names of the principals, is that right?
A. Yes.
Q. Do you know what fuzzy spelling is, in terms of search engines?
A. I understand the principle, yes.
Q. What is it?
A. If you put in "Smith" it will return things that look like or sound like "Smith".
Q. And if you put in "Quindil", Q-U-I-N-D-I-L, it would return things with Q-U-N-D-I-L?
A. It could, depending on the setting.
Q. If you put in "Mustafa", if there was a Goalkeeper report with "Mustafa", it would pull up other Goalkeeper reports with "Mustafa"?
A. Yes.
Q. So is it fair to say that this Goalkeeper report 4124, marked as Hoseason 15, was something that you or whoever was assisting you in the thorough review you were conducting in the fall of 2001 could have called up through use of the Goalkeeper system?

A. Could have.
Q. And the disclosure in 4124, Hoseason 15, was signed by someone named Mr. I.T. Wickens, is that right?
A. Yes.
Q. He was the gentleman who for a time was your supervisor?
A. Correct.
Q. And he was a Fraud Intelligence Manager at the time of the submission?
A. Yes.
Q. And the document reveals that he thought the [redacted]
MR. BLACKMAN: Objection to form. You may answer.
A. He certainly approved the disclosure in 1992. He will have -- would have felt that we had grounds or reasonable grounds to make a disclosure to the authorities.
Q. Do you know from looking at this document whether Mr. Wickens was the Case Checker?
A. The team was structured differently at that time, I understand, but effectively he was approving the report to the authorities, yes.
Q. Can you tell from this document if there was someone who I think you described it as the Case Handler?
A. No, I can't.

HIGHLY CONFIDENTIAL Page 284

Q. This disclosure in Hoseason 15 was a disclosure of suspicious circumstances under the Prevention of Terrorism Act of 1989, true?
A. It was.
Q. And that was some 9 years before 9/11?
A. It was.
Q. Can you turn to the article on the back, please. This article is an article that was attached to the Goalkeeper report that is contained in Exhibit 15, is that right?
A. That would appear to be the case, yes.
Q. And it is an article from March 13, 1996?
A. Yes.
Q. The article explicitly mentions Interpal by name, does it not, in the first paragraph?
MR. BLACKMAN: Object to form, document speaks for itself.
A. It does.
Q. And reflects a claim by Israeli military intelligence that Interpal had masterminded fundraising for the Hamas Islamic movement in Europe, true?
MR. BLACKMAN: Same objection. You can answer.
A. That is what the article says, yes.
Q. So at least as of 1996 the bank knew that Israeli intelligence alleged that Interpal masterminded fund

HIGHLY CONFIDENTIAL Page 285

raising for Hamas?
MR. BLACKMAN: Objection to form. You may answer.
A. So the bank was aware in 1996 that that is what Israeli military intelligence was claiming, yes.
Q. And if you go 2 paragraphs down it says:
"A senior military officer said Interpal, also known as the Palestinian Relief and Development Fund, raised money exclusively for Hamas institutions".
Do you see that?
MR. BLACKMAN: Objection, same objection. You may answer.
A. Again, that is what the article says.
Q. So at least as of the date of this article, 1996, the bank knew that the Israeli military claimed that the money Interpal raised was exclusively for Hamas institutions?
MR. BLACKMAN: Same objection.
A. Again, that is what the article says.
Q. Can you turn to the front page of the exhibit please, Mr. Hoseason. Does this reflect that the Goalkeeper report was opened in May 1990?
A. It would appear to have been, yes.
Q. From your knowledge of the way that the Anti-money Laundering -- withdrawn.
From your knowledge of the way that Suspicious

HIGHLY CONFIDENTIAL Page 286

Activity Reports were dealt with internally at the bank, does that mean that in May 1990 someone in the bank filed a Suspicious Activity Report on this case?
A. I don't know.
Q. Isn't that the way the system worked?
MR. BLACKMAN: Objection to form. You may answer.
A. I don't know because this record would have been migrated across from another system. There is no record of a disclosure being made in 1990.
Q. Right, no record of a disclosure, but doesn't the fact that the case was opened in 1990 suggest that there was at least an internal Suspicious Activity Report filed?
A. I don't know.
Q. Because of your unfamiliarity with that system?
A. Correct.
Q. Is it fair to say that there was some action in this case to cause a report to be opened in 1990?
A. There is a record of some description opened, appears to have been opened on May 12, 1990, but I can't speculate as to what that record was.
Q. And Mr. Wickens made a disclosure in 1992, correct?
A. Yes.
Q. And then the article was published in -- the

HIGHLY CONFIDENTIAL Page 287

article on the back was published in 1996, true?
A. Yes.
Q. And then, if you turn to the front page again, the Goalkeeper report was modified again in March 1999?
MR. BLACKMAN: Objection to form. You may answer.
A. Yes, I don't know the nature of the modification.
Q. When it says "Last modified on 12 March 1999", does that mean that somebody accessed the report on that date and made some change?
A. I believe so. If recollection serves me rightly, this was around the time that records were being migrated from the old system to the new one, the new one being Goalkeeper. It is my belief that it is probably in 1999 that the documents, the 3 J-Peg documents here were scanned to the Goalkeeper system.
Q. Doesn't the scanning date indicate 23 August 2000? I am referring to page 191802.
A. Yes, it could. I don't know what preparatory work would have been done.
Q. Sorry?
A. I don't know what if any preparatory work would have been done.
Q. Okay, but it is fair to say that Goalkeeper 4124, Hoseason 15, reflects more than one action by people

on the Anti-money Laundering Team with regard to this account. Is that fair?
A. It is a record of a disclosure having been made in 1992 and somebody has appended a newspaper article in 1996.
Q. And we have already established that in September 2001 you had access to the Goalkeeper system, right?
A. Yes.
Q. And that you knew how to search it?
A. Yes.
Q. And whoever was helping you with the thorough review that you described in the letter would also have had access to the Goalkeeper system, true?
A. Yes.
Q. And would also have known how to search it?
A. Yes.
Q. And you could search Goalkeeper from your desktop computer at the time, right?
A. Yes.
Q. How long would it have taken you to retrieve a Goalkeeper report from the database, sitting at your desktop?
A. Having identified it?
Q. Yes.

A. Seconds.
Q. You could do it without ever leaving your office?
A. Yes.
Q. So is it fair to say that Hoseason 15 was quite literally at your fingertips in September 2001?
MR. BLACKMAN: Objection to form. You can answer.
A. It could have been.
Q. Do you know if you or anybody working for you as part of that purportedly thorough review retrieved this document?
A. I don't.
Q. As part of your thorough investigation, did you take any steps to try to determine the reliability of the information contained in the South Africa report?
MR. BLACKMAN: Objection to form, same objection, which I will not repeat at length.
MR. GOELMAN: Thank you.
A. Can you repeat the question, please?
Q. As part of your thorough review, part of your purportedly thorough review, did you take any steps to try to determine the reliability of information contained in the South African report?
MR. BLACKMAN: Same objection.
A. I don't know.

Q. Can you turn back to Hoseason 15, please.
A. Yes.
Q. This Goalkeeper report was last modified on 12 March 1999, right?
A. That is what it says on the front, yes.
Q. And at that point in time the individuals listed here were -- Mr. Blackman objects to the term "flag" -- the individuals were classified as "red". Is that right?
A. That is what they are showing as, yes.
Q. Mr. Hafez, Mr. Mustafa, as well as Palestine and Lebanon Relief Fund was classified as red, true?
A. Yes.
Q. So some time on or before March 12, 1999, someone in NatWest with Complex User access to Goalkeeper decided that these individuals and this organization should be classified as red, true?
A. No.
Q. Can you explain that?
A. Yes.
Q. Would you?
A. Yes. So when the records were migrated from the old system to the new, I don't know what criteria we used in terms of matching data across so I don't know whether or how the risk ratings were determined, based on

historical records that went across to Goalkeeper records, because we didn't have a risk rating functionality in the old system, as I understood it.
Q. So Goalkeeper II, as you understand it, was the first system that had that risk rating capability?
A. I don't know if it was I or II Goalkeeper had the risk rating capability. The previous system that the suspicions and disclosures were recorded on did not.
Q. Is that Fox?
A. I think it was Fox, yes.
Q. And do you recall when the bank switched from Fox to Goalkeeper, the first edition of Goalkeeper?
A. It was around the end of 1999, beginning of 2000.
Q. So your speculation is that it was a part of that transfer that caused these individuals and this organization to be classified as red?
MR. BLACKMAN: Object to the form and the characterization of the testimony, but you can answer.
A. I think your earlier question was that somebody had made an assessment.
Q. Right.
A. In relation to this individual case, and I said no, I think it is where the automated migration from Fox -- thank you for reminding me -- to Goalkeeper took

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 292

place. So at some point some criteria or structure around how the records would be represented when they were moved across were probably made, so that was probably a generalization rather than a specific review of that file. That would be my --

Q. And that would have been, that migration would have been some time 1999 or 2000?

A. Yes.

Q. In any event before 9/11?

A. Yes.

Q. As part of that migration, there was an insertion of color codes into records that had not contained color codes at the time they were created in Fox?

A. Yes, so Fox didn't have a risk rating functionality, as I understand it. So as the record came across it needed something, and then it must have been some criteria, I don't know what they were, that that drove how that migration was conducted and how the record was reflected when it came across.

Q. As part of that migration, would there have been a human being who was looking at each record and deciding what color code to apply as part of, you know, with whatever criteria existed?

A. I don't know. Given the number of records, I would be very surprised.

HIGHLY CONFIDENTIAL Page 293

Q. So it could have been just a machine process where the -- I am sorry, you have to let me finish the question -- where there is a consideration of different criteria, and then the machine decided: "These people or this institution should be red. This should be green, this should be amber"?

MR. BLACKMAN: Objection to form. There are some assumptions in there that I don't think there has been testimony about, but you may answer.

A. I don't know. I don't know what --

Q. Are you familiar with the concept in banking of "enhanced due diligence"?

A. I understand what you mean by it.

Q. What is your understanding of what enhanced due diligence is?

A. It would be additional due diligence over and above that which would be carried out as a matter of routine.

Q. Are there certain situations that in your experience call for enhanced due diligence?

A. Yes.

Q. What are those situations?

A. There is an expectation that higher risk connections, relationships would need to be subject to additional enquiries, and due diligence over and above that

HIGHLY CONFIDENTIAL Page 294

would ordinarily be carried out.

Q. And would those higher risk connections include allegations of a customer's facilitation of terrorism?

A. The due diligence is part of the initial client take on. This activity is subsequent to that.

MR. BLACKMAN: You are referring to the Anti-money Laundering work that you do? You have to be clear when you say "this activity".

A. Sorry, so the activity that was being reported in 1992.

Q. Was after the account was already taken in?

A. The account had already been established. I believe the document Hoseason 15, Bates page 191804 indicates that the account, the sterling account was opened 23 June, 1987.

Q. Can't developments after initial opening of accounts lead to the need to implement enhanced due diligence?

A. Know Your Customer is an ongoing process.

Q. So is the answer to my question yes?

A. It could.

Q. And is one of the circumstances that could require enhanced due diligence on a customer is the discovery of allegations of connections with a terrorist

HIGHLY CONFIDENTIAL Page 295

group?

A. It could.

Q. Did you, after being alerted to the article contained in Hoseason Exhibit 11, give anybody instructions to use enhanced due diligence with the Interpal account?

A. I don't know.

Q. Is that something that from time to time your unit did, advised the field that particular customers should be subject to enhanced due diligence?

A. I don't think we used the terminology "enhanced due diligence". We would from time to time ask them to revert to their customer and make additional enquiries about the account activity.

Q. What about work performed actually within the Anti-money Laundering Team, as opposed to the field. If you were alerted to a possible evidence of illegality for a customer, would you have your own people practice any kind of enhanced due diligence or special scrutiny on that customer in the future?

A. Not over and above the establishing whether it was an appropriate course of action to make a Suspicious Report to the authorities, no.

Q. So you considered, after deciding whether or not to make a disclosure, the bank's responsibility was over?

Min-U-Script® European Deposition Services (16) Page 292 - Page 295
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 296

MR. BLACKMAN: Objection to form.
A. It didn't fall within the remit of my team.
Q. Did it fall within the remit of any place in the bank?
A. Yes.
Q. Where?
A. Customer owning business.
Q. And would your team be involved in instructing the customer owning business as to what steps it should take to keep a closer eye on a particularly problematic customer?
MR. BLACKMAN: Objection to form. You may answer.
A. We would not give them specific instructions, no.
Q. Would you give them general instructions?
A. As I think I have already said, we would ask them from time to time to go back and establish some more detail around the account activity, the nature of the activity, et cetera. We wouldn't go back and give them specific instructions around the enhanced due diligence.
Q. Do you have the deposition exhibits from yesterday there?
A. I do.
Q. Can you turn to Hoseason Exhibit 7, please. This is the Goalkeeper report that you created on September or that you opened on September 27, 2001, right?

HIGHLY CONFIDENTIAL Page 297

A. It is, yes.
Q. The same day that you made the disclosure to NCIS about the article on the website, right?
A. Yes.
Q. At the bottom of this document it says: "Reasons for suspicion", and under that it says "Suspected terrorist funding". Do you see that?
A. I do.
Q. Is it fair to say at least by the date that this Goalkeeper report was opened that the bank suspected that its customer, Interpal, was engaged in funding terrorists?
A. That was the allegation that was made in the document. It would have been under the terrorist legislation we were making the disclosure, and therefore the standard almost appropriate standard reason for suspicion would have been suspected terrorist funding.
Q. Can you answer my question now, please?
A. Can you repeat the question?
Q. Is it fair to say that at least as of September 27, 2001, the date that this Goalkeeper report was opened, that the bank suspected that its customer, Interpal, was funding terrorists?
A. We had sufficient grounds to suspect involvement in terrorist funding to warrant a disclosure to

HIGHLY CONFIDENTIAL Page 298

the authorities, yes.
Q. And you did not mention in the -- withdrawn. This Goalkeeper report 617044, as contained in Hoseason 7, does not mention the letter that you sent to NCIS on September 27, 2001, does it?
A. I don't see any reference to it.
MR. BLACKMAN: Objection, misstates the document. There is a reference in the NCIS disclosure to a previous disclosure and ID140425.
MR. GOELMAN: What page is that on?
MR. BLACKMAN: On Bates number 008362. It is the first page of the NCIS disclosure for case 17044, and it refers to "Our previous disclosure".
MR. GOELMAN: Thank you for that. Mr. Blackman has repeatedly emphasised that the actual Goalkeeper report does not include the NCIS disclosure, so can you tell me whether or not the Goalkeeper report itself, which I understand --
MR. BLACKMAN: Again, there is a reference to 008359 to the Finlog for this, but anyway, ask your question.
MR. GOELMAN: You sent a letter to NCIS on September 27, 2001, [redacted] correct?
A. That is right.
Q. That website is not mentioned anywhere in this

HIGHLY CONFIDENTIAL Page 299

Goalkeeper report as part of Hoseason 7, is it?
A. I don't see any reference to it.
Q. Why wouldn't that be included in the Goalkeeper report?
MR. BLACKMAN: Objection to the form of the question. There is an implication in it, but you may answer.
A. I don't know.
Q. Wouldn't that have been a useful piece of information for whomever in your unit was working on the case after September 27, 2001?
MR. BLACKMAN: Objection.
A. It would have been useful. I don't know whether -- I can't demonstrate from that whether they had it or not.
Q. If they had it, where would it be?
A. Sorry, where would it be?
Q. When you say "I can't demonstrate whether or not they had it", meaning the website link?
A. There is no reference to it in here. Your question was, I believe, would it have been useful to them?
Q. Right.
A. The answer was yes.
Q. Okay, and the further explanation was that just because it is not in Goalkeeper does not mean they

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2
July 15, 2010

HIGHLY CONFIDENTIAL Page 300

didn't have it, is that your point?
A. Yes.
Q. And if you had provided the link to someone in your unit, would there be some documentary evidence of that?
A. Not necessarily. I may have provided them with the link. As I said in my testimony yesterday, I don't know whether we were looking at it from the link or whether somebody provided it in a paper format, as you had, in which case it would have been handed to them.
Q. Did you communicate with people in your unit through e-mail in September and October 2001?
A. We used e-mail. Most of them weren't further away from me than you are now. It wouldn't have been usual. I would have tended to have spoken with them.
Q. Most of them were not further away than we are?
A. That is correct.
Q. So you guys were physically near each other?
A. Yes.
Q. And you had your own office at the time?
A. No.
Q. You were part of a kind of bigger space?
A. Open plan office, yes.
Q. And were all of the people who were on the Anti-money Laundering Team within that same open office

HIGHLY CONFIDENTIAL Page 301

space?
A. Yes.
Q. Everyone had their own desk?
A. Yes.
Q. Cubicles?
A. No.
Q. Really open?
A. Yes.
MR. GOELMAN : I am told that they need to switch tapes. This would be a good time for a break.
THE VIDEOGRAPHER: Going off the record 11:35 am. End of tape one, volume 2 of the deposition.
(A short break)
THE VIDEOGRAPHER: This is the beginning of tape two, volume 2 in the video deposition of Mr. Mike Hoseason. Back on the record at 11:52 am, as indicated on the video screen.
MR. GOELMAN: Mr. Hoseason, do you still have before you Hoseason deposition Exhibit 7?
A. I do.
Q. The pages Bates stamped NW8362 is the first page of the disclosure. Is that correct?
A. Yes.
Q. The last line of the disclosure says:
[redacted]

HIGHLY CONFIDENTIAL Page 302

[redacted]
Do you see that?
A. I do.
Q. And then there are a number of organizations listed in the disclosure, beginning on page 8365, including [redacted] Do you see that?
A. I do.
Q. And going on to the next page there [redacted]
A. I do.
Q. Do you understand those to be at least some of the organizations to which Interpal was sending money about which the bank stated it knew very little?
A. Yes, because [redacted]
Q. How did, if you know, whoever filed this disclosure decide which organizations to list in the disclosure?
A. Typically the purpose of putting those details in would be to provide the authorities with a picture of where funds were going. So this would have, for example, if a dozen payments were made in one particular month and they

HIGHLY CONFIDENTIAL Page 303

were all going to one place, then we would have specified that particular beneficiary. If there were a range of beneficiaries then we would have given them a sort of snapshot of each of then, so they have a clear picture of what the activity is through the account.
Q. So this was not an effort to present the authorities with an exhaustive list of every counterparty that Interpal had?
A. No, that is not the purpose of a disclosure.
Q. And in order to decide which beneficiaries were included in the disclosure, that would require a human being to exercise judgment, discretion. True?
A. Yes.
Q. The top of the NCIS disclosure says that it was submitted by yourself on 15 October 01. Do you see that on page 8362?
A. Yes.
Q. And it says:
"Core NCIS details created on 15 October 2001 by Connell J."
A. It does.
Q. And we have already established that is Janine Connell?
A. We have.
Q. Who was one of the people who worked under you

Min-U-Script® European Deposition Services (18) Page 300 - Page 303
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2
July 15, 2010

HIGHLY CONFIDENTIAL Page 304

in the Anti-money Laundering Unit in October 2001?
A. That is right.
Q. So does that tell you what part of this disclosure Ms Connell would have entered or created?
A. It tells me that she would have pulled the information across from Goalkeeper into the disclosure document.
Q. So it doesn't tell you that she was actually the person who would have entered the information?
A. It depends on the way in which Goalkeeper captures that. I can't remember whether it would be her that initially created the disclosure, opened the file, if you like, or whether she would have been the last person to have touched it. I don't know. So if there was more than one person involved, I don't know how that would be represented.
Q. You are the person who it reflects submitted the disclosure, right?
A. Yes.
Q. Would you have reviewed it before submitting it?
A. Yes.
Q. Did you want to know more about any of the organizations in the West Bank in Gaza that Interpal was sending money to?

HIGHLY CONFIDENTIAL Page 305

MR. BLACKMAN: Objection to form. You can answer.
A. Can you rephrase the question so that I understand what you are aiming at?
Q. Sure. The disclosure says that: [redacted]
Right?
A. Yes.
Q. My question is did you want to know more about those beneficiaries of Interpal payments?
A. It could have been useful.
Q. Did you do any research on any of those recipients of Interpal monies?
A. I can't remember.
Q. And you similarly cannot remember if you directed anybody else to do any research?
A. Correct.
Q. If somebody, either you o someone at your direction had Googled any of the recipients' organizations of Interpal money, would those results of a Google search be included somewhere in the Goalkeeper report?
A. Not generally. Again, we are not a law enforcement investigative body, as we have discussed. Our role was to ascertain whether there was sufficient information to warrant making a Suspicious Activity Report,

HIGHLY CONFIDENTIAL Page 306

which is what we did. In terms of finding out more about the specific activities of those particular charities, that would have been a matter for law enforcement.
Q. But when we started talking yesterday, you and I, I asked you about what tools the unit had at its disposal to conduct its searches, right, and one of them you indicated was the Internet?
A. Um hum.
Q. My question is if somebody in your unit had Googled and done an Internet search on any of the beneficiaries of Interpal's money, would the results of that search, as a matter of standard operating procedure in your unit, have been saved somewhere?
MR. BLACKMAN: The question was asked and answered. Answer it again.
A. I don't know if they would have saved them or not.
Q. Was there a procedure, was there a standard practice when conducting Google searches as parts of an investigation of a Suspicious Activity Report to save those?
MR. BLACKMAN: Objection to form.
A. As a generalization, the approach to retaining information is that if it can be recreated again subsequently then we would not look to retain it, purely because of challenges around storage. So, for example, if

HIGHLY CONFIDENTIAL Page 307

we obtained historic account information on paper based ledgers or something, having used that material we would not retain it, because the bank could, if it needed to, again recreate that.
Q. So the bank would -- people in Anti-money Laundering Unit would destroy that material after reading it?
MR. BLACKMAN: Objection to form, misstates the testimony.
MR. GOELMAN: What would they do with it if they did not retain it?
A. If, for example, the example I used was paper ledgers of account activity, when they finished using it for the purposes of preparing a Suspicion Report or assessing a Suspicion Report before making a disclosure, when they had finished with that then they would have disposed of it in the confidential waste.
Q. And is that also true for Internet searches that they performed while they are conducting an investigation of a Suspicious Activity Report?
A. If they had printed any Internet searches, it would be my supposition that that is what they would do, yes.
Q. That they would destroy it after reading it.
You indicated earlier that sometimes you get calls from the

Min-U-Script® European Deposition Services (19) Page 304 - Page 307
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 308

field about activities that they thought might be suspicious, right?
A. Yes, with the guidance, that sort of thing.
Q. Your practice when you got those calls was generally to instruct the person in the field to put it in writing and submit a Suspicious Activity Report. True?
A. That is correct.
Q. And the reason for that is that you wanted to have a record of this, right?
A. That is right.
Q. Wouldn't it have been important, if somebody in your unit is finding out information by using the Internet to have some record of what that information was?
A. One of the reasons that it is important that a member of staff and we have a record of the fact that a member of staff has submitted a Suspicion Report, that both the bank and the individual need to be able to demonstrate that they have fully met their legal obligations in terms of reporting. So if a member of staff has involvement with a transaction that they are suspicious of, then it is important, even if we subsequently don't believe there are grounds to make a disclosure to the authority, that it is a matter of record that that member of staff has discharged their obligations in terms of reporting internally. That is why we are always very keen to ensure

HIGHLY CONFIDENTIAL Page 309

that if they have the faintest suspicion that they submitted a report to us.
Q. If someone on your team had done an Internet search on any of the beneficiaries of the Interpal monies, and discovered information or allegations of connections to Hamas, would that have been included in the disclosure?
A. It might have been.
Q. And it might not have been?
A. Correct.
Q. What would it depend on?
A. Their judgment.
Q. What kind of judgment? Wouldn't it have been -- strike that.
Wouldn't it have been prudent, if such information was discovered, to include it in the NCIS disclosure?
MR. BLACKMAN: Objection to form. You may answer.
A. The basis on which the disclosure has been made were providing NCIS with a snapshot of the account activity and an explanation as to why we consider it to be suspicious. In terms of investigating the beneficiaries, investigating the activities of those beneficiaries, the true activities of those beneficiaries, rather than anything which might appear on the Internet or in a newspaper, there is a job for law enforcement, not for us.
Q. Can you turn to -- I am trying to find the

HIGHLY CONFIDENTIAL Page 310

reference. Right, on the same page:
"Further to our previous disclosure (ID140425)." Do you see that?
A. I see that, yes.
Q. What does that refer to, if you know?
A. So when a disclosure is made to the authorities they allocate what was described as a Finlog, and later became a disclosure IDU unique reference number, and they advised us what reference number they had allocated to it. That would suggest that a previous disclosure had been allocated a reference number of 140425.
Q. Also, if you look at 8359 -- are you looking for the other reference to the Finlog?
MR. BLACKMAN: Page 8359. Since Mr. Goelman mentioned it, I am allowed to tell you without coaching.
MR. GOELMAN: I just told him.
MR. BLACKMAN: I know if I had told him you would have said I was coaching.
MR. GOELMAN: That is not what I would have said.
MR. BLACKMAN: Yes, you would have, because -- I should not criticize you, that is unfair. You have been on the whole conducting a proper examination.
A. It would appear that the same Finlog reference, 140425, has been allocated to this.
Q. To what? When you say "this" are you talking

HIGHLY CONFIDENTIAL Page 311

about Exhibit 7, the disclosure in Exhibit 7?
A. Yes, it is on the case note. It says: "Finlog reference 140425. Special Branch are investigating, DH."
Q. So that is a note that Doug Hartley presumably created on February 7, 2002?
A. I don't know what "User migrated on" means. This Finlog appears to have been or the same Finlog number appears to have been attached to this case.
Q. So, from your memory in dealing with NCIS, was it the procedure that they would assign the same Finlog number to multiple disclosures?
A. No, generally not. It is a wild guess, I suspect that Finlog may have been allocated to the earlier letter.
Q. Is that the letter?
MR. BLACKMAN: Referring to Exhibit 5.
A. Sorry?
MR. GOELMAN: Does Exhibit 5 contain that Finlog?
A. No, it doesn't, because when we sent the letter we wouldn't know what reference number they had.
Q. How would the Finlog number have been communicated to you?
A. At that time, if I recall correctly, we used to get a letter back in relation to every single disclosure that we made, quoting the Finlog number, which was not very

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 320

Activity Report filed by Olna Leeming that you reviewed yesterday, located in Hoseason Exhibit 8.
A. Yes.
Q. And the receipt of that SAR should have, if standard practices were followed, have caused whoever within your unit received it to immediately search for prior Goalkeeper reports on Interpal, true?
A. Sorry, receipt of which SAR?
Q. The Olna Leeming SAR that you just looked at on Exhibit 8, page 52072?
A. As part of the process they would ordinarily search to see if there had been any prior reports made, yes.
Q. To your knowledge, did anybody in NatWest ever do an Internet search on the recipients of the urgent payment abroad orders contained within Hoseason Exhibit 16?
A. I don't know.
Q. To your knowledge, did anyone ever go back to the South African report contained in deposition Exhibit 11 and check if any of the groups to which Interpal was transferring money in December were mentioned as Hamas front groups in that report?
MR. BLACKMAN: Objection to the characterization of the report but you can answer.
A. I don't know.
Q. Yesterday you answered some questions from

HIGHLY CONFIDENTIAL Page 321

Mr. Werbner about separating from the client which you referred to as asking the client to "rebank". Do you recall those questions?
A. I certainly recall talking about it, yes.
Q. Setting aside the concept of rebanking, after you learned of the alleged connection between Hamas and Interpal, in September 2001, did you ever give instructions to anyone in your unit to monitor the money that Interpal was sending to Gaza on the West Bank?
A. I don't remember.
Q. We talked yesterday briefly about consent provisions that you characterized as both a right and obligation of the bank under law. Do you recall that?
A. Yes.
Q. And were those consent provisions available to the bank in the fall of 2001?
A. I don't think they were.
Q. Do you know when they came on line?
A. I can't remember, I think the Proceeds of Crime Act was 2002. I can't remember the date on which it received Royal Assent and became effective.
Q. We will mark another exhibit. I ask this be marked as Hoseason Exhibit 17, please. Mr. Hoseason, if you are getting hungry or want to break for lunch --
MR. BLACKMAN: I think we are due for a break in

HIGHLY CONFIDENTIAL Page 322

about ten minutes.
MR. GOELMAN: Let's deal with this exhibit then.
MR. BLACKMAN: That is fine.
A. Okay.
(Exhibit Hoseason 17 marked for identification.)
Q. If you turn to the first e-mail on Hoseason Exhibit 17 -- I neglected to identify it, NW1294, but if you look at the bottom there is an e-mail from Martin Wiltshear to Belinda Lane. Do you see that, Mr. Hoseason?
A. Yes, I do.
Q. And Mr. Wiltshear, was he one of the people who worked for you in the Anti-money Laundering Unit in January 2002?
A. Yes.
Q. He writes that:
"Belinda, unsurprisingly we have been sent a Money Laundering Suspicion Report on the above connection".
Is it true that the first thing Mr. Wiltshear would have done if he was following procedures when he got this Suspicion Report he referred to is to look for other Goalkeeper reports involving the same party?
A. I would have expected him to, yes.
Q. If you turn now to the top, that reflects or at least appears to reflect an e-mail from Belinda Lane to Mr. Wiltshear. Do you see that?

HIGHLY CONFIDENTIAL Page 323

A. I do.
Q. In the fourth bullet point down she is describing the Palestine Lebanon and Relief Fund. Is that right, that is what the subject line is?
A. Yes.
Q. And she says:
"Provide charitable relief to refugees in Israel, West Bank and Gaza and Lebanon - developed out of former charity which provided relief to Kuwait."
Do you see that?
A. Yes.
Q. Are you done with your answer?
A. Yes.
Q. Yesterday you testified that you were aware that the use of charities to finance a terrorist organizations was -- you used the word "typology". Do you recall that?
A. I do.
Q. What do you mean by "typology"?
A. So it is a recognized means by which monies are moved, and I used the terminology of fronts, it is a recognized means by which monies can be used, moved around using the guise of a charity.
Q. And is that a typology that you were aware of in January 2002?

Min-U-Script® European Deposition Services (23) Page 320 - Page 323
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 324

A. I would expect so.
Q. Do you know how you first became aware of that typology of terrorists using charities as fronts to move money around?
A. Probably from one of the -- probably I would suspect from NCIS.
Q. From NCIS?
A. I would imagine so.
Q. Do you recall that or you are just --
A. I don't recall it, that is my supposition. NCIS used to share typologies with Financial Services sector to help them identify things that they could be looking out for.
Q. In the media coverage of 9/11, do you remember seeing or hearing information that the 9/11 attack was financed at least in part by money moved through charitable fronts?
A. I wouldn't be surprised but I don't remember specifically, no.
Q. Sitting here today, you don't remember that?
A. No.
Q. Are you familiar with an organization called FATF?
A. Yes.
Q. What do you know that to be?

HIGHLY CONFIDENTIAL Page 325

A. Financial Action Task Force.
Q. As part of your job as head of the Anti-money Laundering Unit, NatWest, 2001, would you keep abreast of developments in FATF guidance?
A. Yes.
Q. Were you aware of the FATF issuance of Special Recommendations involving terror financing in October 2001?
A. Probably. I can't remember specifically.
Q. But if there were --
A. Are they the eight Special Recommendations?
Q. They were eight and then there was a ninth added at some later point, I am not sure when.
A. Certainly sounds familiar.
Q. And in fact, the eight that were issued in October 2001, would you have read them?
A. Yes.
Q. Do you recall sitting here today FATF guidance advising vigilance in charitable organizations being used to front terrorism?
A. Yes.
Q. What do you recall about that?
A. Just that.
Q. No details?
A. Not specifically, no.
Q. Is that something that you would have

HIGHLY CONFIDENTIAL Page 326

communicated to your team?
A. I would expect so but I have no specific recollection of having done so.
Q. Do you see the seventh bullet point in Ms Lane's e-mail?
A. Yes.
Q. It says: "Main contact is the secretary, Mr. Jehad Qundilizo"?
A. Yes.
Q. Do you recognize that first name as being the same Arabic word that you identified yesterday as your understanding meaning Holy war?
A. "Jihad"?
Q. Um hum?
A. I am aware that Jihad means Holy war. It is a strange forename.
Q. Did Mr. Wiltshear ever talk to you about this particular Suspicious Action Report or any Goalkeeper that he created from it?
A. Not that I recall.
Q. Would you conclude from his e-mail here had he was acting as the Case Handler for this Suspicious Activity Report?
A. That would be my understanding, yes.
MR. GOELMAN : I don't have any more questions on

HIGHLY CONFIDENTIAL Page 327

this. This is a convenient time to take a break.
THE VIDEOGRAPHER: Going off the record at 12:38 pm, as indicated on the video screen.
(Break for Lunch.)
THE VIDEOGRAPHER: We are back on the record at 1:29 pm, as indicated on the video screen.
MR. GOELMAN: I am going to ask the court reporter to mark this exhibit as Hoseason Exhibit 18.
For the record, this document begins with Bates stamp NW8374 and goes through Bates stamp 8380.
A. Sorry, can you give me those Bates numbers again?
Q. 08374 through 08380. Is that not what you have?
A. That is not what I have, no.
MR. GOELMAN: Do you have the right one?
MR. BLACKMAN: Yes.
MR. GOELMAN: Thank you.
(Exhibit Hoseason 18 marked for identification)
MR. GOELMAN: John, 8375, is that omitted for privilege reasons?
MR. BLACKMAN: I don't know.
MS RHEE: We produced a full version of this at a later Bates number.
MR. GOELMAN: Really?

HIGHLY CONFIDENTIAL Page 328

MS RHEE: Let me just check to see what is missing.
MR. GOELMAN: Is this the version you have?
MR. SCHWARTZ: It is a big production. I may have missed it but I have never seen ...
MR. BLACKMAN: I have an idea why it was omitted. Does that have a number?
MS RHEE: We produced this in full color with no pages omitted at the Bates range starting at NatWest 052133.
MR. SCHWARTZ: Perhaps you could be so kind as to print one for us.
MR. BLACKMAN: We will be happy to do that, even though you have it in your production.
MR. SCHWARTZ: Even though I don't have my production at my fingertips, whereas I believe Susie does.
MR. WERBNER: I want to lodge an objection to bringing these cookies in here, trying to fatten us up.
MR. BLACKMAN: You are not required to have them.
MR. GOELMAN: Do you want to stay on the record while Susie does this?
MR. BLACKMAN: Well, we can talk about whatever we want, but she is printing the document for you. I can tell you if you want to start your questions that all she will give you is the names of Interpal and some of the other accounts that are the subject of this Goalkeeper.

HIGHLY CONFIDENTIAL Page 329

MR. GOELMAN: Okay. Let's start then, thank you. Have you had a chance to review Hoseason 18?
A. Yes, I have.
Q. Is this another Goalkeeper report that NatWest made and kept in the ordinary course of its business?
A. Yes.
Q. And do you see your own name on that report anywhere?
A. Last modified by myself, it would appear.
Q. And that was on August 22, 2003?
A. Yes.
Q. Would you turn to Bates stamp 8377, please. That entry carries a date of August 22, 2003, and also carries a notation "Migrated". Do you see that?
A. Sorry?
Q. 8377.
A. Yes.
Q. Is it safe to assume that because you are the user who last modified the Goalkeeper, and it was on August 22, 2003, that you are the user who inputted that note on 8377?
A. It would appear quite likely.
Q. This note reads:
"This connection was reported due to sizable credit originating from [redacted] which was received into

HIGHLY CONFIDENTIAL Page 330

the account on [redacted] "
You, whoever, but likely you are writing this on August 22, 2003. Do you see that?
A. I do.
Q. Is that an extraordinarily long period of time for the investigation of one sizable credit, between June 2002 and August 2003?
MR. BLACKMAN: Object to the form. You can answer.
A. It certainly is. I can't explain it.
Q. "Palestinian Development Fund has been the subject of previous disclosures and we are aware NTFIU are undertaking their own investigations?"
Would you, as part of your role in this particular Goalkeeper report have reviewed the previous disclosures that you refer to here?
A. I could have done.
Q. Could have but would not necessarily have?
A. Correct.
Q. Would someone in your group have reviewed the previous disclosures made for Interpal when working on this Goalkeeper case?
A. Whoever wrote this must have been aware of them, otherwise they wouldn't have known to have referenced them, so the extent to which they then reviewed the level of

HIGHLY CONFIDENTIAL Page 331

detail that went into it, I can't comment.
Q. But would it have been standard practice not just to be aware of but also to retrieve and read prior Goalkeeper reports filed for the same customer?
A. I think the phrase or the best description would be to say that they would be reviewed.
Q. Okay. It is written here:
"We are aware NTFIU are undertaking their own investigations."
Do you see that.
A. Yes.
Q. And "NTFIU" refers -- do you know what "NTFIU" refers to?
A. I do: National Terrorist Financial Investigation Unit.
Q. What is their role?
A. They are a law enforcement body, part of the police force. Their specialism is investigating terrorism or suspected terrorism.
Q. And not necessarily acts of terror but financial aspects of terrorism, is that fair?
A. Yes.
Q. And they are distinct from the Special Branch that was referred to in an earlier entry?
A. I think from recollection they were sort of an

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

MIKE HOSEASON -   Vol. 2
July 15, 2010

HIGHLY CONFIDENTIAL                        Page 332

1   offshoot.  Special Branch previously had responsibility for
2   terrorist type investigations, and I think Special Branch
3   morphed into the NTFIU.
4        Q.  Do you know approximately when that happened?
5        A.  I don't.
6        Q.  Can you turn to the page Bates stamped 8380.
7   This is the second page of a Suspicious Activity Report that
8   gave rise to the Goalkeeper case, true?
9        A.  It is.
10       Q.  And the top of page 8380, if you can read the
11  handwriting, please read it, if you can read the
12  handwriting?
13       A.  "Continuation, interview notes of 27.2.01."
14  Something about "A cheque was accepted with payee as Jihad
15  (= Holy War)."
16       Q.  So I/V is in your understanding short for
17  interview notes?
18       A.  Interview note, yes.
19       Q.  And do you see that interview note anywhere in
20  this exhibit?
21       A.  No.
22       Q.  Is that something that would have been
23  forwarded to your unit from whoever conducted the interview?
24       A.  It would probably be an electronic interview
25  note.

HIGHLY CONFIDENTIAL                        Page 333

1        Q.  What is an electronic interview note?
2        A.  Notes on our back office system.  So it
3   wouldn't have been a note that was placed in a paper file.
4        Q.  Who inputs the interview notes into the back
5   office system?
6        A.  Generally the person who is making the record
7   will have had firsthand knowledge of it so, for example, if
8   something is noteworthy and it was a cashier that has
9   firsthand knowledge of it, then it would be the cashier that
10  entered the note.
11       Q.  So the people dealing with the customers, the
12  customer facing personnel would have access to the back
13  office --
14       A.  Or the Relationship Manager or somebody in the
15  back office, anybody who has got access to back office and
16  has the functionality to update it or amend it can create an
17  interview note.
18       Q.  So people working in the branches would have
19  access to the back office?
20       A.  Yes, I believe so.
21       Q.  If you still have Hoseason Exhibit 9 before
22  you, please.
23       A.  I have it here.
24       Q.  This report, this Goalkeeper contained within
25  Hoseason Exhibit 9 was created on June 17, 2002, right?

HIGHLY CONFIDENTIAL                        Page 334

1        A.  It was.
2        Q.  By -- do you recognize that abbreviation?
3        A.  I believe it is probably somebody called
4   Charlotte McComas.
5        Q.  If you turn back to Hoseason Exhibit 18, that
6   Goalkeeper report was created on June 14, 2002 by someone
7   using the user name "Alan BC"?
8        A.  It was.
9        Q.  Who is Alan BC?
10       A.  I don't know.  I don't recognize the
11  reference.
12       Q.  Why would two different Goalkeeper reports
13  have been created within a space of three days, if you know?
14       A.  Appears to be a duplication.
15       Q.  What would cause that duplication, if you
16  know?
17       A.  I don't know.  It appears to be two copies of
18  the same internal Suspicion Report.
19       Q.  So the same internal Suspicion Report gave
20  rise to two different Goalkeeper reports?
21       A.  It certainly looks that way, yes.
22       Q.  And they were worked by different -- I don't
23  want to say teams because that would be --
24       A.  Different people.
25       Q.  They were worked by different people within

HIGHLY CONFIDENTIAL                        Page 335

1   your unit?
2        A.  Yes.  We have got to 2002 now, haven't we, and
3   the unit had expanded.  I can't remember the exact timing,
4   but there were people in different locations now carrying
5   out the receipt and assessment of internal Suspicion
6   Reports.
7        Q.  How were internal Suspicion Reports submitted
8   to your unit?
9        A.  Fax, internal mail.
10       Q.  So in the normal course would one internal
11  Suspicion Report have been delivered to both locations that
12  your unit was working out of?
13       A.  No.
14       Q.  Can you turn to page NW052077, please.  About
15  two-thirds of the way down in that box are the initials "DH
16  17.9.03"?
17       A.  Yes.
18       Q.  And we have already established that Doug
19  Hartley was one of your subordinates?
20       A.  We have.
21       Q.  After that it reads:
22       "When completing a further disclosure on this
23  connection, see Goalkeeper ref 710368.  A review of all
24  linked disclosures was undertaken.  The ███ payment of
25  ████████ originated from the ████████████

HIGHLY CONFIDENTIAL Page 344

referring to?
A. It would appear to be the case, yes.
Q. And the Bank of England press release reads:
"The Bank of England, as agent for Her Majesty's Treasury, has today directed financial institutions that any funds which they hold for or on behalf of Al-Aqsa Foundation, full identifying details provided below, must be frozen. This is because the Treasury have grounds for suspecting that Al-Aqsa Foundation is or may be a person who commits, attempts to commit, facilitates or participates in the commission of acts of terrorism".
Do you recall seeing the letter from -- the letter explaining the details or providing Interpal's explanation for the details of their receipt of money from Al-Aqsa, right.
MR. BLACKMAN: What are we talking about, which document?
MR. GOELMAN: It is Exhibit 9, Bates stamped 52081, that lists the payment was a donation.
A. Yes, I am looking at that page.
Q. So is it fair to say that one of Interpal's regular donators was, according to the British Treasury, an organization that it had reasonable grounds to suspect committed, attempted to commit, facilitate or participated

HIGHLY CONFIDENTIAL Page 345

in acts of terrorism?
MR. BLACKMAN: Objection, form. Say what the document says.
A. That was the designation the Bank of England applied on 29 May 2003, yes.
Q. Can you turn back to Hoseason 9, please, 52083. This is a letter that appears on Interpal stationery to Belinda Lane, correct?
A. Yes.
Q. And the "Re" line is: "Transfer from abroad: your query." True?
A. Yes.
Q. And then the first full paragraph says:
"I confirm that the transfer of [redacted] [looks like that says pounds] is a donation from an aid agency in [redacted] called the [redacted] [redacted] for charitable and humanitarian projects, as detailed in the translation of the correspondence attached. In brief, the funds are for help in medical and education projects".
So Interpal, the customer has characterized the [redacted] [redacted] as an aid agency in [redacted] right?
A. That is what that letter says, yes.

HIGHLY CONFIDENTIAL Page 346

Q. According to the Bank of England, as agent for Her Majesty's Treasury, that organization, they have reasonable grounds to believe that that organization is a facilitator of terror?
MR. BLACKMAN: Asked and answered. You can answer again.
A. They suspect that, yes.
Q. Is that a concern, would that have been a concern for you, that your customer is telling you that an organization that receives money from an aid agency and the British Government, in the form of the Bank of England, is saying that they have reasonable grounds to suspect that that foundation is a facilitator of terrorism?
A. It is certainly not something that we would be enthusiastic about, no.
Q. Would it be a concern?
A. Yes, but it would certainly heighten our suspicion.
Q. In your experience, is it important that the bank be able to rely on the truth of representations made to it by its customers when there is some suspicion of illegal activity by those customers?
MR. BLACKMAN: Object to form. Pretty broad, but you can answer.
A. Obviously, the honesty of our customers is of

HIGHLY CONFIDENTIAL Page 347

interest to us.
Q. I am handing a document that I would like to be marked as Hoseason Exhibit 20, please.
(Exhibit Hoseason 20 marked for identification)
Tell me when you have had a chance to glance over this, please.
A. Okay.
Q. Do you recognize what type of document this is?
A. I recognize the content. I have not seen it in this format before.
Q. So you don't know whether these are printouts from a screen that NatWest maintains to record payment details?
A. Yes, I recognize they are records from Propay. I have not seen them in this format before.
Q. But you do recognize them as records of Propay?
A. Yes.
Q. What is Propay?
A. It is a payment system.
Q. That was used by NatWest in or about 2003?
A. Yes.
Q. So those records are ones that the bank made and kept in the ordinary course of its business?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 348

A. Yes.
Q. Can you tell me if the documents that are contained within Hoseason Exhibit 20 reflect a payment from Interpal to the [redacted]? It may be from the [redacted]
A. I think -- I believe it appears that the credit was being applied to the account of Interpal.
Q. So it was money coming from the [redacted] to Interpal?
A. That would be my understanding, yes.
Q. If you turn to the last page of Exhibit Hoseason 20, it contains the details of the [redacted] in terms of the address, correct?
A. It provides some of the address, yes.
Q. Would you look now back on Hoseason 19, the Bank of England press release, and confirm, if you would, that that is the same address as listed for the designated body, [redacted] its [redacted] address contained on the second page of Hoseason Exhibit 19?
A. It is part of the same address, yes.
Q. So does this reflect a payment of [redacted] and some change -- no, pounds, strike that. Does this reflect a transfer of over [redacted] from the [redacted] to Interpal 10 days before the [redacted] was placed on the Bank of England's list

HIGHLY CONFIDENTIAL Page 349

of suspected terrorists?
A. Correct.
Q. Are you familiar with the process that the Bank of England went through before listing persons or organizations on its list of suspected terrorists?
A. No.
Q. Are you aware of whether or not the organizations were able to get advance notice that they were being considered to be listed?
A. No.
Q. You don't know one way or the other about that?
A. I don't.
Q. Okay. This transfer of [redacted] from the [redacted] to Interpal was not disclosed in -- I think it was Hoseason 9 -- the disclosure that we just reviewed, true?
MR. BLACKMAN: The disclosure is dated 17 June 2002, if we are looking at the same document.
MR. GOELMAN: That is a fair point.
MR. BLACKMAN: I was referring to 052089.
MR. GOELMAN: Yes. The payment of the transfer of [redacted] from the [redacted] was not included in the note dated September 17, 2003 on page NW8384, was it?

HIGHLY CONFIDENTIAL Page 350

MR. BLACKMAN: Which page?
MR. GOELMAN: 08384. It contains a note.
A. Sorry, which of my exhibits are we on?
MR. BLACKMAN: We are dealing with Exhibit 9 and the note I am reading is on 052077, if we are talking about the note in the Goalkeeper, the one dated September 17. Are you talking about something else?
MR. GOELMAN: I don't know. This is not marked Exhibit 9. This is something else marked 18.
MR. BLACKMAN: Exhibit 9. I thought that is what we were talking about, the Goalkeeper created on June 17, 2002, last modified on 17 September 2003.
MR. GOELMAN: Yes, it is the same document with different Bates stamps.
MR. BLACKMAN: Right, and that is the one --
MR. GOELMAN: The one that is marked is the one you are talking about with 52077.
MR. BLACKMAN: Right, and that is the one that says that a year after the payment that is mentioned here the organization was listed, and you read into the record afterwards that Mr. Ashtown [redacted]
MR. GOELMAN: Yes, and I read into the record that he confirmed the above. [redacted]

HIGHLY CONFIDENTIAL Page 351

MR. BLACKMAN: Yes.
MR. GOELMAN: I read the whole thing into the record.
MR. BLACKMAN: You did read the whole thing into the record, that is why I am not coaching the witness by just reminding him that you read it into the record, but maybe it can move things along.
MR. GOELMAN: My question is really about which payments are referenced in this note and which payments are not. This note references a payment made in the [redacted]
A. It does.
Q. And then there is a payment made in [redacted] the designation, of over [redacted] correct?
A. Correct.
Q. Which is not mentioned here?
A. That is right.
Q. My question is, do you know if NatWest ever disclosed that payment to the authorities?
A. I don't.
Q. Another thing in this note is, it says: "This organization, [referring to the [redacted] albeit not at the time, in June 2002, now appears on a list of named/suspected

Min-U-Script® European Deposition Services (30) Page 348 - Page 351
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 352

terrorists." Do you see that?
A. Yes.
Q. So would you agree with me that the inference is that the customer, Interpal, was transacting with an organization that was at least at that time not designated by the Bank of England at the time of the transaction?
A. That is correct.
Q. Would it be more alarming to the bank if the customer was transacting or attempting to transact with an organization after it was listed by the Bank of England?
A. It would certainly be worthy of looking into.
Q. Would it be more alarming?
A. Strange choice of words. It would be something we would need to look into.
Q. But you won't go with me with "alarming"?
A. No.
Q. What would alarm you, as Chief of the Anti-money Laundering Unit? What kind of evidence would actually alarm you?
A. I don't know.
Q. Can you think of anything? A guy walking into the branch with an AK47?
MR. BLACKMAN: Objection.
A. That might concern me a little.
MR. BLACKMAN: I will object.

HIGHLY CONFIDENTIAL Page 353

MR. GOELMAN: I will withdraw the question.
MR. BLACKMAN: You can argue about what adjectives people should place on things. That is hardly an admissible use of our time here.
A. Sorry, are you --
Q. Is it fair to say you are someone that does not get alarmed by much?
A. I don't know about that. Can you try and rephrase the question?
MR. BLACKMAN: He wants you to agree that it is alarming. You don't have to agree. You can use your adjective.
MR. GOELMAN : I welcome any adjective you want to use.
MR. BLACKMAN: And you already did tell him --
MR. GOELMAN: Coaching.
MR. BLACKMAN: No, not coaching.
MR. GOELMAN: You want him to use the same words.
MR. BLACKMAN: I want him to use whatever his words are, not your words. It is getting late.
A. If it was brought to our attention then I would certainly want to look into it further.
MR. GOELMAN: Mission accomplished, John. He used the same words.
MR. BLACKMAN: He didn't. Come on, that is

HIGHLY CONFIDENTIAL Page 354

totally unfair. The question about alarming is to me a little bit silly but anyway we can go, we can argue about adjectives.
MR. GOELMAN: Okay. I am going to ask that this be marked as Hoseason 21.
(Exhibit Hoseason 21 marked for identification)
Have you had a chance to review that, sir?
A. I have, thank you.
Q. Do you recognize the type of document that is contained within Hoseason Exhibit 21?
A. I do.
Q. What is it?
A. Details of a payment made through -- we see through Propay.
Q. And again, reference that the bank would have made and kept in the ordinary course of business?
A. Yes.
Q. Can you tell me what transaction is reflected in these documents?
A. It appears to be an attempted transaction. I am not sure if it ever took place, because on the last page is reference to there being insufficient funds, and I am not quite sure I understand that reference. It appears to be a payment of [redacted] being received. It would appear Interpal were the intended beneficiary.

HIGHLY CONFIDENTIAL Page 355

Q. I am sorry, Interpal being the intended beneficiary and the organization that was trying to send Interpal the money was named, if you look at NW12142, [redacted] [redacted] " Correct?
A. Yes.
Q. Now, you don't I assume speak Arabic?
A. No.
Q. Do you know what that means, the translation is in English?
A. No.
Q. If an organization is listed on Western countries sanctions lists as a suspected terrorist organization, in your experience, is one of the ways that that organization might try to get around the ban to use a name in a different language?
A. It would make sense, wouldn't it.
Q. Or to omit its address from the transfer order?
A. It could, yes.
Q. And this transfer or attempted transfer, since you cannot tell if it actually went through, took place on [redacted]?
A. Yes.
Q. [redacted] the Bank of England placed the

Min-U-Script® European Deposition Services (31) Page 352 - Page 355
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 356

various international chapters of the Al-Aqsa foundation on its list of suspected terrorist organizations?
A. Yes.
MR. GOELMAN: We have a little time left on the tape and I am done with this document so now would be a good time for a break.
MR. BLACKMAN: I am going to object since we have not established what this entity is or, for that matter, the transfer. I am not sure that we have, other than saying this is a business record, laid a foundation for any of the questions, but whatever you want to do.
THE VIDEOGRAPHER: This is the end of tape two, volume 2 in the video deposition of Mr. Mike Hoseason. We are going off the record at 2:34 pm, as indicated on the video screen.
(A short break)
THE VIDEOGRAPHER: This is the beginning of tape three of volume 2 of the deposition of Mr. Mike Hoseason. Back on the record at 2:47 pm, as indicated on the video screen.
MR. GOELMAN: Mr. Hoseason, let me hand the court reporter another group of documents that I am going to ask be marked Hoseason Exhibit 22. I only have two copies of these because I borrowed it from my co-counsel so I will ask you to share it with your lawyer if you will.

HIGHLY CONFIDENTIAL Page 357

A. No problem.
(Exhibit Hoseason 22 marked for identification).
Tell me when you have had a chance to look at that.
A. Okay.
Q. Did you have a chance to look at that, Mr. Hoseason?
A. I have, thank you.
Q. Are these also records from NatWest's Propay database?
A. Yes.
Q. For the record, these are Bates stamped NW12108 through NW12128. So these are also -- the documents in Hoseason Exhibit 22 are also records made and kept in NatWest's ordinary course of business?
A. Yes.
Q. Does this reflect a [redacted] transaction that took place on or about [redacted]?
A. Yes.
Q. Can you tell from this record who the beneficiary was?
A. It quotes the beneficiary as "Interpal".
Q. Can you tell who the party that sent the money to Interpal was?
A. [redacted]

HIGHLY CONFIDENTIAL Page 358

Q. Do you still have before you Hoseason 9?
A. I do.
Q. Can you turn to Bates stamp 52078.
A. Yes.
Q. And does that reflect that the [redacted] payment in [redacted] that was the subject of a previous Goalkeeper report carried remittal details of [redacted]?
A. It did.
Q. And is that [redacted] transaction, [redacted] the same transaction as the one that -- withdrawn.
Is that [redacted] transaction, [redacted] the one that was sent by the Islamic Charitable Society for the [redacted]
A. The aid agency in [redacted] yes, it would appear to be the same transfer.
Q. The Al-Aqsa Foundation was designated, as we saw by the Bank of England on May 29, 2003, correct?
MR. BLACKMAN: He just wants to know whether -- he is repeating the question. He is setting you up for the punch, so yes, I will stipulate that that designation occurred, but if you want him to answer you can.
MR. GOELMAN: I will be satisfied with the stipulation.
A. Okay, I was just checking my facts.

HIGHLY CONFIDENTIAL Page 359

Q. And then about three and a half weeks later there was a payment from an individual named [redacted] again, to Interpal [redacted] the organization was designated, true?
A. That is correct.
Q. And [redacted] is listed in the Goalkeeper report that is encompassed in Hoseason 9, on page 52075, is he not, as one of the people that personal data is supplied about?
A. That is correct.
Q. And he is given a red risk rating, true?
A. Correct.
Q. So [redacted] the organization is designated, the very same person who sent the earlier payment on behalf of the [redacted] sends another payment to Interpal, using his own name, correct?
A. That is what it would appear to be, yes.
Q. And the bank does what with that?
A. I don't know.
Q. Are you alarmed yet, Mr. Hoseason?
MR. BLACKMAN: Bank of England does not seem to have been alarmed, since they didn't list Mr. Sadoon as an aider or abettor or material supporter --
MR. GOELMAN: Objection. Move to strike.

Min-U-Script® European Deposition Services (32) Page 356 - Page 359
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 360

MR. BLACKMAN: I agree with the motion. I consent to your motion.
MR. GOELMAN: I withdraw the motion to strike. I just object. Can I just have an answer?
MR. BLACKMAN: No, actually we will leave it on the record, whoever reads it can read my comment and your response.
MR. GOELMAN: Fair enough. Can I get an answer?
A. I am thinking. Am I alarmed? Certainly not comfortable with it, no.
MR. BLACKMAN: You are saying that from sitting here today or how you felt then? That is a fair question.
MR. GOELMAN: You have already indicated you are going to ask questions after I am done.
MR. BLACKMAN: I am allowed to ask --
MR. GOELMAN: You are not allowed to interrupt my examination and ask questions.
MR. BLACKMAN: I am allowed to ask you to put a timeframe on a question. That is appropriate.
MR. GOELMAN: That is appropriate. Asking a witness a question in the middle of another lawyer's --
MR. BLACKMAN: Could you put some timeframe around your "Are you alarmed?" question?
MR. GOELMAN: No, I couldn't. You will have an opportunity to redirect, and feel free.

HIGHLY CONFIDENTIAL Page 361

MR. BLACKMAN: Fine. If you need a timeframe around these sort of "Are you alarmed?" argumentative questions, please ask, and maybe he will be more cooperative with you. He will have to be.
MR. GOELMAN: I am going to mark another exhibit. This will be Hoseason 23.
(Exhibit Hoseason 23 marked for identification).
Please take a look at that and when you have had a chance to review it let me know.
Q. Have you had a chance to look at that?
A. I have, yes.
Q. Are the first 3 pages of Hoseason Exhibit 23 a Goalkeeper report?
A. A Goalkeeper case, yes.
Q. Sorry, a Goalkeeper case. And then the fourth and final page appears to be an article that was attached to that report?
A. Yes.
Q. And that is consistent with your testimony that the Goalkeeper database allowed Complex Users to scan and attach extrinsic documents to Goalkeeper cases?
A. Yes.
Q. And then those documents, along with the Goalkeeper report itself, would have been maintained in the regular course of the Anti-money Laundering Unit's business?

HIGHLY CONFIDENTIAL Page 362

A. We wouldn't have maintained this record necessarily.
Q. What do you mean?
A. Well --
Q. Kept, when I say "maintain" I meant kept?
A. It would have remained on the Goalkeeper database, yes.
Q. And can you tell me who from your unit was involved in creating this particular Goalkeeper report?
A. No, I don't know if it was anyone from my unit or not at the time.
Q. People from outside your unit could create Goalkeeper cases?
A. I can't remember if they could or not at that stage.
Q. On the first page of this exhibit, it says "By RBS Feurtij". Do you recognize that person's user name or the user name of that person first page?
A. I think that is probably Lisa Fertado, who did work on my team certainly in the early years. She moved on to other roles in the department over time. I don't recall when that was.
Q. And then "Shiels K" is Kevin Shiels?
A. Yes, I believe so.
Q. Also of your department?

HIGHLY CONFIDENTIAL Page 363

A. Not part of my team no.
Q. Not part of your team?
A. No.
Q. Where did he work?
A. Another part of what was then I think referred to as Group Financial Crime.
Q. Do you remember which part?
A. I think he was on what was described at the time as Legal Process Team.
Q. The fourth page of this document, Bates stamped 51997, appears to be an article from the website Complinet. Is that true?
A. Yes.
Q. And you testified yesterday about Complinet --
A. I made reference to them, yes.
Q. As one of the databases that you used to keep apace of developments in the Banking Compliance realm?
A. Yes, it was a source, if you recall, I didn't subscribe myself, people passed to me.
Q. Okay. Have you read this particular Complinet article?
A. Had I or have I?
Q. Have you today had a chance to read it?
A. I have scanned through it. Let me read it in detail.

Min-U-Script® European Deposition Services (33) Page 360 - Page 363
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 368

MR. BLACKMAN: Do you want a copy?
MR. GOELMAN: Yes, do you have a copy of Exhibit 18? I have a copy with a different Bates stamp.
MR. SCHWARTZ: 18 is 593.
MR. GOELMAN: Yes, but it is the first edition of 593. I have the black and white one. Can you turn to the third page of that exhibit, Mr. Hoseason?
A. Yes.
Q. Does that indicate that someone with the mysterious initials "MH" entered a note on August 22, 2003?
MR. BLACKMAN: Which page?
MR. GOELMAN: It doesn't? The third page of this version.
MR. BLACKMAN: "MH"? What page?
MR. GOELMAN: Yes, third page, 8376.
A. There is a note that says: "Agreed no disclosure."
MR. BLACKMAN: I have it.
A. The note says: "Agreed no disclosure, MH." You recall we spoke earlier about this and I could not explain the timing, so I don't know the relevance or the meaning of the terminology "User migrated on".
Q. In any case, the date 22 August 2003 appears just above your note "Agreed no disclosure"?
A. It does, but I am not necessarily reading into

HIGHLY CONFIDENTIAL Page 369

that that that is the date of the comment that was inserted.
Q. I understand. The first page of this Goalkeeper report indicates it was last modified on 22 August 2003?
A. It does.
Q. And do you see any later modifications than -- I guess they are all 8.22.2003?
A. All done on that date.
Q. You can put that aside. Earlier you were asked and you testified that you did at some point hear or learn about the designation by OFAC of Interpal as a specially designated global terrorist, true?
A. Yes.
Q. And I believe you testified that you couldn't recall when you learned that?
A. That is correct.
Q. Or how?
A. Correct.
Q. Is it a fair inference, from Exhibit 24, that you learned that by e-mail on August 26, 2003?
A. I could have done.
Q. Does that mean maybe, maybe not? Does it mean yes, that is probably what happened?
A. It means I don't know.
Q. When you got e-mails from Group Risk

HIGHLY CONFIDENTIAL Page 370

Management --
A. Copied into e-mail from Group Risk Management.
Q. Right. Let me ask you a different question then. In August, 2003, Interpal was a customer that had been known to you since at least September 2001, true?
A. Yes.
Q. A customer that your unit had received a number of Suspicious Activity Reports concerning, correct?
A. Yes.
Q. A customer who your unit had filed a number of disclosures about, correct?
A. Yes.
Q. And a customer about whom your unit had had a number of communications from law enforcement about, correct?
A. Yes.
Q. So when, to the best of your recollection, did you learn that Interpal had been designated a specially designated global terrorist?
A. I don't know.
Q. And how to the best of your recollection did this fact come to your attention?
A. I don't know.
Q. When you did learn, do you recall what your -- strike that. When you did learn that NatWest's customer,

HIGHLY CONFIDENTIAL Page 371

Interpal, had been designated by OFAC as a specially designated global terrorist, what was your reaction?
A. I can't remember.
Q. Were you surprised by the decision by OFAC to designate Interpal as specially designated global terrorist?
A. I don't know if I was surprised or not.
Q. In 2003 you had been with the bank for 21 years, is that right?
A. Yes, about that, yes.
Q. Do you recall any time during those 21 years that any other customer of NatWest or after the merger RBS had been designated a specially designated global terrorist by OFAC?
A. No.
Q. When you learned that Interpal was designated a specially designated global terrorist by OFAC, did you consider asking them to rebank?
MR. BLACKMAN: Objection to form. We have had prior testimony about who does the asking to rebank.
MR. GOELMAN: I will rephrase the question. When you heard, when you learned the designation by OFAC of Interpal as a specially designated global terrorist, did you consider recommending that Interpal look elsewhere for its banking services?
A. No.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 372

Q. Why not?
A. Because at that point the department with the responsibility for dealing with the sanctions and designated individuals and entities was not mine, it was Group Risk Management.
Q. And when did that responsibility change?
MR. BLACKMAN: Objection to form, lack of foundation.
MR. GOELMAN: Was that responsibility once your department's?
A. No.
Q. So earlier you had talked about your unit's ability to recommend terminating a customer if there was, I think you said "Clear evidence of criminality", correct?
A. Yes.
Q. Did you consider -- and you still had that authority in August 2003, correct?
A. We could certainly still recommend that customers were asked to rebank, yes.
Q. At the time that you learned that OFAC (sic) was designated by OFAC, you still were in a position where you could recommend that the bank quit the relationship, true?
A. I could have done, but the decision based on the information that had come to light was not mine to make.

HIGHLY CONFIDENTIAL Page 373

It rested with Group Risk Management.
Q. Could you not have made a recommendation to the banking business line that retained the relationship that they terminate the customer?
A. I would suggest it would not have been within my remit to have done so.
Q. Why not?
A. As I have already stated twice, the responsibility for dealing with sanctions issues sat with Group Risk Management, not my department. It was suspected.
Q. What was suspected?
A. The designation is that they were suspected of being a terrorist organization.
Q. So in your view the OFAC designation did nothing to change the level of suspicion that the customer was involved in terrorism, is that fair?
A. I think it reinforced the basis of our earlier suspicion, yes.
Q. And why wouldn't that be enough for you to recommend terminating the client?
A. Because the responsibility for dealing with sanctions rested with Group Risk Management.
Q. So your authority to recommend termination of a client extended to all types of criminality except for customers who were listed on a sanctions list?

HIGHLY CONFIDENTIAL Page 374

MR. BLACKMAN: Objection to form but you can answer, if you can follow the question.
A. The authority, as you describe it, was not written down, designated, categorized in the way you describe.
Q. Were you comfortable with NatWest continuing to provide banking services to a customer that you knew had been designated by OFAC as a specially designated global terrorist?
MR. BLACKMAN: I am going to object. You are asking him personally as someone who was not, as he has just testified, so I am not coaching, not responsible for making the decision about how to deal with sanctions.
MR. GOELMAN: I am asking him was he personally comfortable with that.
A. I was comfortable with leaving it in the hands of the area of the bank that was responsible for it, yes.
Q. And when they didn't --
A. That is where the expertise rests, sanctions related issues, that is where the expertise rested.
Q. Wouldn't you say that you had as much expertise as anyone in the bank about allegations of Interpal's connections with terrorist financing?
A. We are talking here about expertise in relation to sanctions?

HIGHLY CONFIDENTIAL Page 375

Q. I am talking about expertise in relation to a customer that numerous Suspicious Action Reports where terrorist financing had been filed against them?
A. But we are talking about a customer where we had suspicions of about a customer who we had disclosed to the authorities on, as you put it, more than one occasion or numerous occasions I think you said. Our customer had not been designated by the Bank of England. This was another Government's designation. On that basis it was a sanctions issue, and to be dealt with by Group Risk Management, who had responsibility for -- where responsibility for compliance with sanctions rested.
Q. You testified yesterday and again today that your understanding of the specially designated global terrorist issued by OFAC as involving people who were suspected of terrorist financing, is that right?
A. Yes.
Q. What is the basis of that understanding? Where are you deriving that understanding of what the SDGT list of OFAC is?
A. I can't remember where I have learned that.
Q. Was it from OFAC itself?
A. I can't remember.
Q. Did you ever attend any Compliance seminars where OFAC Compliance was discussed?

Min-U-Script® European Deposition Services (36) Page 372 - Page 375
Tel: +44 207 385 0077 www.european-depositions.com

HIGHLY CONFIDENTIAL Page 380

word "suspected" or suspicious, right?
A. It does, in relation to Al-Aqsa, yes.
Q. But it is a different verbiage than used by OFAC, true?
A. Different words from in that press release document, yes.
Q. And is it fair to say that you in 2003 believed that the level of suspicion necessary for somebody to end up on a Bank of England list was essentially identical to the level of suspicion that would be required to end up on an OFAC list?
MR. BLACKMAN: I object. How can you ask --
MR. GOELMAN: I am asking what he believed in 2003, John. It is a completely appropriate question.
MR. BLACKMAN: No, I mean belief has to be based on something. He has testified under oath that this is not his area and that he never saw the OFAC press releases, and I think he testified or you asked him that he has no idea of the difference, if any, between OFAC's criteria and the Bank of England's criteria. Maybe you should ask him that before you start asking him questions about his comparative understanding.
MR. GOELMAN: I would take issue with the speaking objection and another completely coaching objection. I think that after going into somewhat of a remission for part

HIGHLY CONFIDENTIAL Page 381

of the deposition the "evil" John has taken back over control of your body.
MR. BLACKMAN: That is because the usually well behaved Aitan has started departing into questioning that really goes beyond the scope of what is fair or appropriate for this witness.
MR. GOELMAN: I understand you would like to script out what the witness testifies to, but that is not your role. Your role is to object and state the grounds for your objection. That is what you are here to do.
MR. BLACKMAN: You have asked the witness to compare apples and oranges without laying any basis that he even knows what the apple is about.
MR. GOELMAN: This witness is perfectly capable of deciding what he does and does not know about.
MR. BLACKMAN: Fine. Let him go. I am not --
A. Can I ask somebody to repeat the question, please?
(Read back.)
A. I don't know, but I certainly regarded them as two distinctly different lists.
Q. Yesterday you testified that if you knew with "absolute certainty" that a customer was engaged in an illegal activity, you would recommend exiting the relationship. Do you recall that testimony?

HIGHLY CONFIDENTIAL Page 382

A. Yes.
Q. And I believe Mr. Werbner followed up and asked what it would take to achieve that kind of certainty, and you said a criminal conviction. True?
A. Yes. Sounds familiar.
Q. Do you consider Osama Bin Laden to be a suspected terrorist or an actual terrorist?
MR. BLACKMAN: I object strongly but you can answer the question.
MR. GOELMAN: Thank you for not writing out his answer, John.
MR. BLACKMAN: Also object on grounds of relevance because, despite various efforts, no one has gotten an Al Qaeda involvement into this case.
MR. GOELMAN: Take back my expression of gratitude.
A. It is a slightly different kettle of fish though. I think if he maintained a bank account with us, you know, it certainly would have been frozen, and if he was available and, you know, still at large and utilizing the account, and we were able to contact him and ask him to rebank, I am sure law enforcement would have taken some action. So the decision would have been kind of made for us and we would at that point have a clear indication.
Q. But do you consider Mr. Bin Laden to be

HIGHLY CONFIDENTIAL Page 383

a suspected terrorist? Is that how you would define his status?
A. Yes, I think he is kind of -- if I recall, I think he has almost acknowledged it himself, hasn't he?
Q. So it doesn't necessarily take a criminal conviction to convince you that somebody is a real live terrorist?
A. I think you have to take each case on its individual merits.
Q. What would it take? Leaving the Bin Laden question aside, what would it take to convince you? We have gone over lots and lots of documents related to Interpal and seen lots and lots of things that the bank knew. I want you to tell me what you think it would have taken for you to come to the conclusion that Interpal was facilitating terrorism?
MR. BLACKMAN: You are asking him personally, since it is not his job to make that determination? Him personally.
MR. GOELMAN: I don't necessarily agree that it is not his job to make the determination, but that is who I am asking.
A. And the answer I will give is I don't know.
Q. You don't have any idea?
MR. BLACKMAN: It is a hypothetical question, but

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 384

you can answer.
A. It is a hypothetical question but, you know, it is like when people say "What can I do to make you comfortable with something"? What is there there, and then you can make a decision based on it.
Q. But, and this is not a hypothetical, an OFAC designation isn't enough to convince you that someone is an actual facilitator of terrorism?
A. No.
MR. GOELMAN : Looking for my next document, this might be a good time to take a break. Let's take a break now so I don't waste time on the record.
THE VIDEOGRAPHER: Going off the record at 3:43 pm.
(A short break)
THE VIDEOGRAPHER: Back on the record at 3:58, as indicated on the video screen.
MR. GOELMAN: I am handing the court reporter a document that I am going to ask be marked Hoseason 26.
(Exhibit Hoseason 26 marked for identification)
For the record, this is NW88194 through 88197. My questions are going to be limited to the second page of the document. Mr. Hoseason, is this an e-mail that you were copied on that was sent on June 3, 2003?
A. It is.

HIGHLY CONFIDENTIAL Page 385

Q. And it is from someone named Dedrei Nell, is that correct?
A. Yes.
Q. Do you know Ms Nell?
A. I recall the name. I don't know her.
Q. And she attached a Consolidated List of Sanctions with Terrorism Names to this e-mail, correct?
A. Yes.
Q. On the second page of this document, NW88195, the first bullet point reads:
"Following a Group decision to cover all Terrorism categories of the OFAC SDN List, the names of Foreign Terrorist Organizations (FTO's) and Specially Designated Terrorists (SDTs) have been added to the database (60 entries). The control numbers of the additional entries are noted in the summary of movements below".
Were you aware of a group decision to "cover all Terrorism categories of the OFAC SDN List"?
A. I seem to recall we were searching against a broad range of terrorism categories.
Q. Do you recall that being a change from the previous practice of the Group?
A. I think I do, yes.
Q. And do you know who at Group made the decision

HIGHLY CONFIDENTIAL Page 386

to make that change?
A. No, I don't.
Q. Do you know what the basis for that decision was?
A. I think it was in relation to obligations concerning dollar payments.
Q. What is the basis of that belief of yours?
A. It is on the basis that all dollars clear through New York. As I understand it, if an individual or entity appears on the OFAC list, whilst that doesn't prevent us transacting with them in the UK, if they are not on a UN or EU or UK Government list, it would prevent us from transacting in dollars with them.
Q. And what is the basis of that understanding?
A. Do you mean where did I learn that?
Q. Yes.
A. I think at some stage it must have been explained to me.
Q. By whom?
A. I can't recall.
Q. Was it in writing or orally?
A. No.
Q. Sorry, what was your answer?
A. No.
Q. I said was it in writing or orally and you

HIGHLY CONFIDENTIAL Page 387

said "no"?
A. Sorry.
MR. BLACKMAN: That is why I object to compound questions, although I missed this one, but you can answer.
A. No, I don't believe it was in writing.
Q. What was your -- strike that. This refers to two different OFAC SDN lists, the FTO list and SDT list. True?
A. It does, yes.
Q. What was your understanding of the distinction between the names on the FTO list and the names on the SDT list?
A. I don't know.
Q. You were aware that the OFAC list was not coterminus with the Bank of England list, correct?
A. Correct.
Q. I will ask the court reporter to mark this as Hoseason 27.
MR. BLACKMAN: I think this is the same document that is part of Exhibit 24.
MR. GOELMAN: Okay.
MR. BLACKMAN: If you look at 012934, yes, it is exactly the same document.
MR. GOELMAN: It is? Okay. So let's not re-mark that, let's just use the one in Exhibit 24. From page 19234

Min-U-Script® European Deposition Services (39) Page 384 - Page 387
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 388

on Exhibit 24, please Mr. Hoseason. So can we strike Hoseason Exhibit 27, please.
Do you see the last 3 pages or 4 pages of this exhibit are various circulation lists?
A. This is Master Circulation List.
Q. And you are one of two people in Group Investigations & Fraud who are included in that list on 12937?
A. I am.
Q. Plus Tony O'Hear. Under number 4, on page 12934, is written:
"For these purposes, appropriate action is defined as searching all records, i.e. manual or electronic, in accordance with the sanctions in Terrorist Financing Group Policy and Search Procedures Guidance".
Do you see that?
A. Under section 4, yes.
Q. Are you familiar with the -- and that is a capitalized document, correct, the guidance referred to there?
A. What do you mean by capitalized?
Q. I mean that it is referring to an actual proper name of a document?
A. I believe so, yes.
Q. Are you familiar with that document?

HIGHLY CONFIDENTIAL Page 389

A. No.
Q. Let me see if I can familiarize you with it. This is the real Hoseason Exhibit 27 and it is: "Sanctions and Terrorist Financing Search Procedure Guide."
(Exhibit Hoseason 27 marked for identification)
Can you flip through that and first tell me if it is something that you remember seeing while you were head of the Anti-money Laundering Group and the Group Investigations & Fraud Department?
A. It rings a bell.
Q. Okay. In what context does it ring a bell?
A. I remember there being some debate around the convention for certain titles.
Q. Can you explain what you mean by that, please?
A. So the multiple spellings of Mohammed, if you look at Bates 000134.
Q. Can you turn to page NW131, please, and number 3 on that page, under the "Executive Summary" says:
"Searches are requested in respect of two categories of individual or entity: Category 1 - Those subject is to UN Sanctions. Category 2 - Those named as suspected terrorists or engaged in terrorist financing."
Do you see that?
A. I do.
Q. Do you agree that as of August 2003, Interpal

HIGHLY CONFIDENTIAL Page 390

fell into Category 2?
A. They were placed in category 2, which I believe the previous document, Hoseason 24, indicates that they were.
Q. You can put that away, Mr. Hoseason. I will ask that this be marked as Hoseason 28.
(Exhibit Hoseason 28 marked for identification)
You don't have to read the whole minutes. Let me just ask some preparatory questions. If you feel the need to take time to review the Exhibit I will let you take that time. This is NW190131 through 0138. This is an e-mail from John Ribbon of Group Risk Management, sent to you and a number of other people on February 23, 2005.
A. It certainly looks like that, yes.
Q. What was your position in February 2005, Mr. Hoseason?
A. Just trying to remember. I was on the Intelligence & Coordination Team at that time.
Q. Intelligence & Coordination Team?
A. Yes.
Q. As part of that, was it your practice to -- were you a member of the Anti-money Laundering Action Group?
A. I seem to recall that I moved from the Money Laundering Team across to the Intelligence & Coordination team, I think as I testified previously, around the end of

HIGHLY CONFIDENTIAL Page 391

2004, beginning of 2005, so I think -- I seem to recall my involvement with the Anti-money Laundering Action Group was based on my previous role, although I did attend a couple of meetings after I had moved on, I seem to remember.
Q. What was the Anti-money Laundering Action Group's purpose?
A. I would have to look at the terms of reference to be specific. Broadly speaking, it had representatives from each of the business areas, who would discuss any particular challenges or concerns they might have in relation to Anti-money Laundering Policy Procedures. It was an opportunity to share with them any difficulties that as a central team we might be experiencing with our units. So, by way of an example, we talked earlier about Suspicion Reports being made where they had been ill thought through, and this was an opportunity to raise and discuss that with relatively senior Compliance people from those business areas and talk about what they could do to improve the situation.
Q. And when was the Anti-money Laundering Action Group formed?
A. I can't remember. It would have been running two or maybe three years by this time.
Q. So you were still at the Money Laundering Group in Group Investigations & Fraud when the Action Group

Min-U-Script® European Deposition Services (40) Page 388 - Page 391
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2
July 15, 2010

HIGHLY CONFIDENTIAL Page 392

was formed?
A. I was.
Q. Do you remember who chaired the Action Group at that time?
A. It was a lady from Group Risk Management. I can picture her. I can't remember her name.
Q. Is it clear in your mind that the Anti-money Laundering Action Group was formed some time after the terrorist attacks of 9/11?
A. Yes.
Q. Do you recall any terror financing issues, in particular, that were considered or brought up at the Anti-money Laundering Action Group's meetings?
MR. BLACKMAN: At any time?
MR. GOELMAN: Yes.
A. The only discussions I definitely recollect are around some of the operational challenges with undertaking the search activity that is referred to in some of these earlier documents.
Q. The implementation of the Consolidated --
A. The GRM Consolidated Lists.
Q. Can you turn to page NW190133, and under number 1, do you see that "Apologies"?
A. Yes.
Q. And my question is were you genuinely sorry to

HIGHLY CONFIDENTIAL Page 393

miss this meeting?
MR. BLACKMAN: Objection.
MR. GOELMAN: I will withdraw the question.
A. I don't remember.
Q. Can you turn over. I actually have a real question. Can you turn over to page 190135, please. Under 6, third paragraph it says "SF". Is that a reference to Stephen Foster?
A. I would imagine so.
Q. "SF stated that he was currently putting together a paper for GRC which sets out the suggested approach for ensuring compliance with OFAC requirements, and in particular the effect of US anti-terrorism laws on jurisdictions outside the US". Do you see that?
A. I do.
Q. Did you have an understanding in February 2005 what the effect of US anti-terrorism laws on jurisdictions outside the United States was?
A. Beyond what I explained to you earlier, no.
Q. And what you explained to me earlier was simply that if transactions were denominated in dollars, they could not be sent to people listed by OFAC, is that right?
A. Yes.
Q. And it was your understanding that non-dollar

HIGHLY CONFIDENTIAL Page 394

denominations, that RBS would and did process transactions in other denominations outside the US to and from people listed on OFAC lists?
A. I think so but I don't know.
Q. You just don't remember one way or the other?
A. Correct.
Q. Do you remember any discussions about whether or not the bank should apply OFAC lists outside the US in non-dollar denominated transactions?
A. I am aware that the internal debate, if you like, was going on. I was not involved or party to it.
MR. BLACKMAN: It is probably not necessary in light of your answer, but to the extent that you were involved in or ever saw any legal advice on the subject, you should exclude that from your answer and not discuss that with my opposing counsel.
MR. GOELMAN: How are you aware of the internal debate that was going on? What is the source of your awareness?
A. I can't remember.
Q. Have you ever read any report written by the British Charities Commission about Interpal?
A. I can't remember if I read the report. I am aware there was one. I think there was more than one.
Q. And how are you aware of the existence of more

HIGHLY CONFIDENTIAL Page 395

than one report?
A. I can't remember how I heard about it.
Q. Did you ever read any press reports about reports written by the British Charities Commission?
A. I don't know.
Q. Do you know when you first heard about any report by the British Charities Commission with regard to Interpal?
A. No, I can't.
Q. Please mark this as Hoseason 29.
(Exhibit Hoseason 29 marked for identification)
I think you are only copied on the first two e-mails of this e-mail exchange.
A. Yes, it appears so.
MR. BLACKMAN: First three actually.
MR. GOELMAN: Correct, first three e-mails. For the record this is NW13939 through NW13941. Have you had time to look at this?
A. Yes.
Q. Do you recall this e-mail exchange?
A. No.
Q. On October 9, 2003, Mr. Foster wrote you and a couple of other people an e-mail with the subject "Interpal" and said:
"FYI, the BoE have written to us acknowledging the

Min-U-Script® European Deposition Services (41) Page 392 - Page 395
Tel: +44 207 385 0077 www.european-depositions.com

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 420

discussions or decision making process.
Q. But did it come to your attention, during your role in the follow-up as to why Retail Compliance decided to ask him and Friends of Al-Aqsa to rebank?
A. I can't remember. As I think I have already said, my recollection would suggest that they regarded it as reputationally a concern.
Q. If you recall, what was the nature of the reputational concern about continuing to have Friends of Al-Aqsa as a customer?
A. I can't tell you what the specific elements of that reputational concern were that Retail Compliance considered.
Q. Was it a concern that the Friends of Al-Aqsa organization might have something to do with terrorist organizations?
MR. BLACKMAN: Objection to form, calls for speculation. You may answer.
A. It could have been.
Q. For some reason I have this in two exhibits but it is consecutively Bates stamped and really belongs in one exhibit. This is going to be Hoseason Exhibit number 34.
(Exhibit Hoseason 34 marked for identification)
MR. BLACKMAN: It says: "Attached is the short

HIGHLY CONFIDENTIAL Page 421

update."
MR. GOELMAN: Again, please take whatever time you need to re-acquaint yourself with this document. Are you ready sir?
A. Yes.
Q. Can you turn to the last two pages, NatWest 180856 and 180857.
A. Yes.
Q. Is that the executive briefing note that Leslie Richardson sent to you and a number of other people on January 10, 2005?
A. Yes, that is what it would appear to be, yes.
Q. Would you have read it at the time?
A. I can't remember doing so but I would expect so.
Q. Can you turn to the "Background" section, please. It says:
"We regularly have to review accounts for the purposes of anti-money laundering and other sanctions and terrorist financial investigations".
Do you have an understanding as to what the "we" referred to there is?
A. Retail Compliance.
Q. The third bullet point in that section says:
"The most common reason for exiting is

HIGHLY CONFIDENTIAL Page 422

suspicion of money laundering, although five accounts have been closed for suspected links to terrorism."
Do you understand that to be a reference, the exiting, do you understand that to be a reference to what you call asking a customer to rebank?
A. Yes.
Q. So is it fair to say that between the middle of 2003 and the end of 2004, RBS closed five accounts for suspected links to terrorism?
MR. BLACKMAN: Objection to form. That is not what he said. End of 2003 to end of 2004.
MR. GOELMAN: Did I?
MR. BLACKMAN: It says in the 18 months to the end of December 2004.
MR. GOELMAN: You know what, check out your --
MR. BLACKMAN: Oh, "middle". I heard you say "end". Maybe I was falling asleep. Okay, sorry.
MR. GOELMAN: Can you reread the question.
(Read back)
A. That is what the briefing note says.
Q. And do you know whether any of those five accounts that were closed involved parties that were convicted in a court of law of terrorist offences?
A. I don't know.
Q. If one of NatWest's customers had been

HIGHLY CONFIDENTIAL Page 423

convicted in a court of law of supporting terrorism, is that something that would have come to your attention?
A. It could well have done.
Q. The next section says: "In this particular case, in May 2003, the Al-Aqsa Foundation worldwide was designated by UK and US governments is a 'financier of a terrorist organization'".
Do you see that?
A. I see that bullet point, yes.
Q. Having read the Bank of England designation of Al-Aqsa worldwide earlier in your deposition, would you agree with that characterization of the UK action in May 2003?
MR. BLACKMAN: Objection. I am going to let him answer the question, but asking him to agree with someone else's characterization when he knows nothing about the subject and is just reading it on a piece of paper is obviously an improper question. I understand you want to end on a high note but it is not a proper question. You may answer.
A. Can you read the question again, please.
(Read back)
MR. BLACKMAN: Are we talking about the exhibit here?
MR. GOELMAN: Yes. Are you going to ask me what

Min-U-Script® European Deposition Services (48) Page 420 - Page 423
Tel: +44 207 385 0077 www.european-depositions.com

it was? It is actually Hoseason 19.
A. Obviously, those are not my words. The word "suspected" is absent.
Q. Next bullet point is:
"A review by Group Financial Crime highlighted a potential common donor between Al Aqsa Foundation and Friends of Al-Aqsa. This led to a Suspicion Activity Report (SAR) being submitted by Group Financial Crime to NCIS on the Friends of Al-Aqsa account in May 2003. No further contact received from the police".
Is it fair to say that the Friends of Al-Aqsa -- strike that.
Is it fair to say that Group Financial Crime discovered a potential common donor between Al-Aqsa Foundation and Friends of Al-Aqsa. Is that fair to say?
A. That is what the words say.
Q. Interpal we have seen had numerous transactions with the actual Al Aqsa Foundation, both before and after its designation by the Bank of England, true?
MR. BLACKMAN: Objection to the form of the question, it is argumentative, but you can answer it.
A. That is correct.
Q. Can you turn over to the second page, 180857. Do you see "Action taken"?

A. Yes.
Q. The first bullet point reads:
"Senior level review of the decision process. This showed facts as above. However, in view of the reputational risk if the litigation was pursued, together with the weight of public contacts (over 200 including threats to close accounts) press coverage and intimated demonstrations, it was clear that the reputational and financial risk of closure had been underestimated".
Was it clear to you then that the Friends of Al-Aqsa and Mr. Patel were attempting to stir up public outrage amongst the Muslim community in the UK against the bank?
MR. BLACKMAN: Objection to the form of the question, particularly the reference to the "Muslim community". Actually other people might find what went on here offensive, such as The Guardian, but you may answer.
MR. GOELMAN: There is the Muslim News.
MR. BLACKMAN: The Guardian isn't a Muslim newspaper.
MR. GOELMAN: No, the Muslim News.
MR. BLACKMAN: But The Guardian, the newspaper everyone in my neighbourhood reads, all nice liberals, don't like people being stereotyped or branded based on this sort of stuff, but you may answer the question.

A. Can I trouble you to read me the question again.
(Read back)
A. I think it was clear that they were looking to stir up or to make an issue with the fact that we had asked them to -- Retail Compliance were asking them to rebank.
Q. And when you say "make an issue", you are talking about make a public issue, create a controversy, true?
A. To exert leverage, presumably, to get the decision reversed.
Q. And is it fair to say that they succeeded?
MR. BLACKMAN: Objection to form.
A. As I think I said before, I think the initial decision was inadequately thought out and, yes, it is a matter of record that the decision was reversed at the Morning Meeting.
Q. Was the reason that the decision was reversed that this public campaign persuaded the bank that the reputational and financial risk of closure had been underestimated when the decision to close the account was taken?
MR. BLACKMAN: Objection to form. You may answer.
A. I can only quote what was in the briefing note from the people who were at the meeting:

"A plan was agreed through the morning meeting. This was to request clarification on three round amount payments from the business account, together with an update on the constitution of Friends of Al-Aqsa. This evidence was readily provided and enabled us to establish there was no evidence of money laundering on the business account or the Friends of Al-Aqsa acting as a linked party to a proscribed organization."
Q. But is it accurate that the reason that the decision was reversed was because of the pressure that had been brought to bear as a result of the publicity campaign and threats of demonstrations and apparently threat of litigation as well?
MR. BLACKMAN: Objection to form, misstates the answer that you just got. You may answer.
A. It states here that having made further enquiries the evidence was readily provided and they were satisfied that there was no evidence of money laundering on the business account or the Friends of Al-Aqsa acting as a linked party to a proscribed organization.
Q. What is your understanding of the statement:
"It was clear that the reputational and financial risk of closure had been underestimated."
MR. BLACKMAN: Objection to form, to the extent that this is apparently -- I think this is someone else's

HIGHLY CONFIDENTIAL Page 436

websites for them to help them perform their services in law enforcement?
A. No, they did not.
Q. If they had asked you, would you have done that?
A. I don't know.
Q. Let me direct your attention to the next one of these, which is a Goalkeeper report that has been marketed as Exhibit 8. Do you see that? This is a suspicion so let's pass that one and move on to Exhibit 9, which is a disclosure. Do you see that?
A. Yes.
Q. The disclosure section of this begins on page NW052089. Do you see that?
A. Yes.
Q. And that is something that based on the bank's practice and your familiarity with the document was submitted by Mr. Hartley on July 4, 2002?
A. Correct.
Q. And you were still in the Anti-money Laundering Unit at that time?
A. I was.
Q. And did anyone ever report to you that NCIS had contacted them, contacted the bank following this and told you to close the Interpal account?

HIGHLY CONFIDENTIAL Page 437

MR. GOELMAN: Objection, asked and answered, and to form.
A. Not that I am aware of or recall.
Q. Incidentally, I think you have testified before, but just so I understand I am correct in my recollection, is it your understanding that NCIS has a database?
MR. GOELMAN: Objection, foundation.
Q. You can answer.
A. They do have a database.
Q. How do you know that?
A. They have told me about it.
Q. Do you understand that they store these disclosures on that database?
MR. GOELMAN: Objection, foundation.
Q. You can answer and then tell me how?
A. I am told that they do.
Q. Do you have any reason to think that they don't cross-check against the disclosures that are filed and stored on their database?
MR. GOELMAN: Objection, leading and foundation.
A. They claim that they do.
Q. They claim, they have told you that?
A. Yes.
Q. So you are not just guessing about what NCIS

HIGHLY CONFIDENTIAL Page 438

does?
MR. GOELMAN: Objection.
A. That is not a guess. I have been told that.
Q. If we could look at Exhibit 18, which is a Goalkeeper, to which is attached --
MR. GOELMAN: Which Goalkeeper is it? This is the one I was missing before.
MR. BLACKMAN: This is another Suspicion. We are going to move on to 31. I am not going to ask the question. Look at Exhibit 31. This is a Goalkeeper to which is attached at the beginning on page 191812 a disclosure.
A. Yes.
Q. Let me ask you, does NCIS to your knowledge also receive information about entities that have been put on the OFAC sanctions list?
MR. GOELMAN: Objection, foundation.
A. I don't know.
Q. Do you have reason to think that the Bank of England receives the OFAC sanctions list?
MR. GOELMAN: Same objection.
A. I don't know but I would imagine so.
Q. Why would you imagine that?
A. I don't know, to be honest.
Q. You have not ever been told that the Bank of England has put Interpal on its sanctions list, have you?

HIGHLY CONFIDENTIAL Page 439

A. No, I don't recall ever being told that.
Q. Do you think that is because the Bank of England wants to support alleged terrorists, that they have not done that?
MR. GOELMAN: Objection, argumentative, evasion. Form.
MR. BLACKMAN : You don't like the question? I have no further questions.
MR. GOELMAN: I actually have a couple.
MR. BLACKMAN: Go ahead. Now that you have given me license to object.
FURTHER CROSS-EXAMINATION BY MR. GOELMAN:
MR. GOELMAN: Mr. Hoseason, I just have a couple of questions. Your lawyer asked you if you ever recall hearing that NCIS made a request to the bank to close the accounts of Interpal. Is that correct?
A. He did ask that, yes.
Q. Can you please turn to Hoseason Exhibit 34.
A. Yes.
Q. Can you turn to 180856, please. The third bullet point under "Background" references five accounts that were closed for suspected links to terrorism. Do you see that?
A. Yes, I do.
Q. Do you have any information suggesting that on

TZVI WEISS, et al - NATAN APPLEBAUM, et al v NATIONAL WESTMINSTER BANK, PLC.
MIKE HOSEASON - Vol. 2 July 15, 2010

HIGHLY CONFIDENTIAL Page 440

any of those occasions NCIS directed or instructed or other ways communicated to the bank that it should close those accounts?

A. No.

Q. So the bank has, as far as you know, never been instructed to close an account based on suspicions of terrorism?

MR. BLACKMAN: Objection to form. You may answer.

A. No.

Q. But the bank has in fact closed accounts because of suspicions of connections to terrorism?

A. That is what it says there, yes.

Q. Do you have any reason to think that is inaccurate?

A. No.

Q. You spoke yesterday, quite eloquently, about the responsibility of everybody in a bank to try to detect money laundering. Do you recall that?

A. I do.

Q. That is in your understanding a responsibility that is borne by everybody who is employed by a bank?

MR. BLACKMAN: Objection, asked and answered many times, but you can answer it again.

A. Yes.

Q. And that responsibility extends to detecting

HIGHLY CONFIDENTIAL Page 441

to the extent possible and -- withdrawn.

Did detection of money laundering include the detection of terror financing? Do you agree with that.

MR. BLACKMAN: Objection to form.

A. The movement of -- it is around suspicious activity. You could include the movement of funds for that purpose, yes.

Q. Is that responsibility extinguished when the bank files a disclosure with NCIS?

A. Yes.

Q. It is extinguished? Once you file something with NCIS, your responsibility is over?

A. The responsibility for identifying it and for reporting it, yes.

MR. BLACKMAN: The particular matter --

A. Yes.

Q. Is your responsibility for detecting any form of money laundering by the same customer extinguished by filing an NCIS disclosure?

A. If we report you because we are suspicious that you have paid in a large sum of money into your bank account, then that is one event and we would report it. If there was subsequently another suspicious event that sufficiently warranted a further disclosure, then we should do that.

HIGHLY CONFIDENTIAL Page 442

Q. But barring any different future event, your understanding is that the bank's obligation to detect money laundering and prevent money laundering is over at the time that it discloses its suspicions to law enforcement?

MR. BLACKMAN: Objection to form. It does misstate the testimony, but you may answer.

A. It is only a suspicion in the circumstances I have described.

Q. Okay. I am sorry, I am not asking about suspicion versus any other level of certainty. I am asking about the bank's obligation to detect and prevent money laundering. Is that obligation completed and fulfilled for a particular customer when you disclose to law enforcement your suspicions?

A. In relation to that transaction, yes.

MR. GOELMAN: Thanks. I have nothing further.

MR. BLACKMAN: I have one question. Look at the camera. I don't want to move around. Has it ever come to your attention that Interpal has been charged with any crime in the United Kingdom?

A. Not that I am aware of, no.

Q. Has it ever come to your attention that Interpal has been indicted for any crime in the United States, if you know?

MR. GOELMAN: Objection, foundation.

HIGHLY CONFIDENTIAL Page 443

MR. BLACKMAN: If you know.

MR. GOELMAN: Okay, withdraw that objection.

A. Not that I am aware of.

MR. BLACKMAN: No further questions.

THE VIDEOGRAPHER: This is the end of tape four, volume 2, and the video deposition of Mr. Mike Hoseason. We are now going off the record at 6:14 pm, as indicated on the video screen.

Min-U-Script® European Deposition Services (53) Page 440 - Page 443
Tel: +44 207 385 0077 www.european-depositions.com