**EXHIBIT 11 to Declaration of Joel Israel**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TZVI WEISS, et al., | : |
| Plaintiffs, | : Case No. 05-cv-4622 (DGT) (MDG) |
| - against - | : |
| NATIONAL WESTMINSTER BANK, PLC, | : |
| Defendant. | : |
| NATAN APPLEBAUM, et al., | : |
| Plaintiffs, | : |
| - against - | : Case No. 07-cv-916 (DGT) (MDG) |
| NATIONAL WESTMINSTER BANK, PLC, | : |
| Defendant. | : |

## STIPULATION

Plaintiffs, by and through their counsel, and Defendant National Westminster Bank Plc ("NatWest"), by and through its counsel, hereby stipulate and agree that NatWest shall not object pursuant to Fed. R. Evid. 901, 902 or 1001-1004 to the admissibility in evidence of the document attached hereto as Exhibit A as a true and authentic copy of what was depicted at the web address http://cryptome.org/za-hamas.htm when the existence of that web address was ████████████████████████████████████, as set forth in the document produced by NatWest in these lawsuits, bearing production number NW212124, and from September 24, 2001 through August 16, 2010.

00067451.DOC

Dated: August 25, 2010

By: _____

Stephen H. Schwartz
Barbara L. Moyer
Kohn, Swift & Graf, P.C.
One South Broad Street
Philadelphia, PA 19107
Telephone: (215) 238-1700

Gary M. Osen
Joshua D. Glatter
Osen LLC
700 Kinderkamack Road
Oradell, New Jersey 07649
Telephone: (201) 265-6400

Andrew D. Friedman, Of Counsel
Glancy Binkow & Goldberg LLP
430 Park Avenue
New York, New York 10022
Telephone: (212) 308-6300

Aitan D. Goelman
Zuckerman Spaeder LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807
Telephone: (202) 778-1800

Counsel for Weiss Plaintiffs

Mark S. Werbner
Joel Israel
Sayles Werbner P.C.
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8700

Richard D. Heideman
Noel J. Nudelman
Tracy R. Kalik
Heideman Nudelman & Kalik, P.C.
1146 19th Street, NW, 5th Floor

00067451.DOC

Washington, DC 20036
Telephone: (202) 463-1818

James P. Bonner
Shalov Stone Bonner & Rocco LLP
485 Seventh Avenue
Suite 1000
New York, NY 10018
Telephone: (212) 239-4340

Counsel for the Applebaum Plaintiffs

By: _____

Avi E. Luft
Jonathan I. Blackman
Lawrence B. Friedman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: 212-225-2000

Counsel for Defendant National Westminster Bank Plc

00067451.DOC

**<u>EXHIBIT A</u>**

24 September 2001

From Anonymous

The briefing document below was prepared for the South African President, Thabo Mbeki, during 1998 in response to the Muslim uprising in the Western Cape Province to protest the decline in Law and Order under his administration, principally organized drug dealing, murder, prostitution and rape (South Africa has the highest murder, rape and HIV-infection statistics globally). An amalgamation of devout Muslim groups with some Christians, part of Mbeki's African National Congress (ANC) 'Alliance' with the Communist Party (SACP), formed an organization, People Against Gangsterism and Drugs (PAGAD). Mbeki was a member of the SACP Politbureau.

The report examines international Muslim militancy and its presence locally. It was drawn up on the relayed order of the Minister of Intelligence, Joe Nhlanhla (since suffered a stroke), by the section of the National Intelligence Agency (NIA) that reports directly to the Office of the President.

This section also monitors the democratic opposition in South Africa (communications, foot and vehicular surveillance and records sexual conduct videographically), journalists (their detention, recruitment and expulsion in the case of one foreign accredited writer) and his own Cabinet (Deputy President Jacob Zuma and Public Works Minister Jeff Radebe with whose wife he is close. Radebe was Mbeki's colleague on the Central Committee of the SACP, along with Govan Mbeki, the President's father who is recently deceased).

Mbeki had grown anxious at the loss of mulatto support in Western Cape where they are the electoral majority. The legislative capital is in Cape Town. He was convinced that they were being organized by Hamas and Islamic Jihad. His concerns where triggered on the advice of the Muslim-Communists, Essop Pahad (Deputy Minister in his office and confidant), the brother of Essop, Aziz (Deputy Minister of Foreign Affairs), Dullah Omar (Minister of Justice, now Minister of Transport) and Kadar Asmal (Minister of Water Affairs and Forestry, now Education Minister). These Muslim-Communists were alarmed at the eroding support for the ANC-SACP in the Western Cape and escalating use of force by PAGAD against the drug gangs and their leaders and their street propaganda against the ANC-SACP. Coinciding with American aerial bombing of Iraq, PAGAD cells were believed to be behind the bombing of the Plant Hollywood restaurant in Cape Town, a symbol of the United States. PAGAD refutes the allegations claiming NIA and Security Police provocateurs were responsible. PAGAD has been a priority target for the Mbeki apparatus and several of its members have been indicted on serious criminal charges while investigating the bombings in Cape Town. Among these was the arrest by traffic police of an NIA agent who was transporting pipe bombs from Johannesburg (Jhb) to Cape Town. Criminal trials against PAGHAD are in progress in the Western Cape.

PAGAD is not organizationally linked with the International Islamic Militants who prefer to keep South Africa a rear base for military training, convalescence, fund raising, media and proselytizing. They have an understanding with the ruling ANC-SACP. PAGAD arose out of the local, mostly Islamic opposition to criminality and the contradictions within the ANC-SACP.

The NIA briefing was not well received by the President's Office, in part for mentioning the presence of militants (page 34) at the two Islamic Conference held in consecutive years in the Muslim ghetto, Laudium, near Pretoria, the executive capital. Present under protection of the NIA, the South African Secret Service (SASS), the Security Police (SAPS) and the President's Office were Hamas, Al Qaeda, Islamic Jihad, Taliban, Islamic Salvation Front (Algeria), Hezbollah and Chechen rebels at the time

engaged against the Russian military in Grozne. The surveillance against Muslim extremists mentioned in the report, with the exception of those in PAGAD was suspended. Embassy surveillance against Islamic states supportive of terrorism remained intermittent or non existent, the preferred focus remaining on the following diplomatic premises and staffers by the NIA Counter Espionage (NIA (CE)) section headed by a mulatto Hilton "Tim" Dennis (in order of priority):

1. USA
2. Israel
3. United Kingdom
4. France
5. Germany
6. Italy
7. Portugal

After Nhlanhla's stroke and the public discovery of an NIA (CE) surveillance camera aimed at the German embassy in Pretoria, Dennis was promoted by Mbeki to head the SASS, the South African equivalent of the CIA. In this role Dennis has strengthened links with Libya's Musa/Moosa Kusa (wanted for conspiracy in the downing of a French airliner over Africa). Kusa heads Mohammar Ghadafi's Jamahirya Security Organization and is a frequent guest of SASS in Pretoria.

Mbeki believes himself adept at handling both the internal contradictions of the ANC-SACP and international politics, particularly between African-based Islamic fundamentalism and the West. South Africa holds both the chair the Non Aligned Movement and the British Commonwealth. Relations with the United States were easier under the Clinton Administration and his Under Secretary of State for Africa, Suzan Rice. Symbolically Mbeki's power to persuade the US embassy to lower its flag to half staff in mourning for the death of the head of the SACP in April 1993 was viewed across the continent as an indicator of his growing influence over Washington, the more so when it was learned that Ambassador, Princeton Lyman, had to lower the flag himself after the US Marine non-commissioned guards refused to do so. The later establishment of a USA-SA bi-national commission was considered a crowning diplomatic achievement by the ANC-SACP until it was ended earlier this year by US Vice President Richard Cheney.

Rice's successor, Walter Kanstiener, who wished to be Ambassador to South Africa wants the bi-national commission resurrected. Previously he had drafted a glowing background brief paper on Mbeki for President-elect Bush before their meeting with at the Bush ranch near Austin, Texas. Communist and ANC leaders who organized the two Islamic Conferences in Pretoria were concerned that that Kantstiener's book "South Africa: Revolution or Reconciliation" (1988) indicated a strong Republican Party perspective. In his work Kanstiener attacked the ANC-SACP as a group of "violent revolutionaries" engaged in an "unjustified" and "Marxist" struggle without a mandate from the people. Further he urged each American to "resist the temptation to become (...) a romantic revolutionary supportive of violent revolutionary tactics". His subsequent shift in perspective and sudden U-turn on dealing with the South African government was attributed by the Hamas, Taliban and Hezbollah supporters in the ANC-SACP government to his benefiting from the privatization deal last year (since stalled on implementation) for American companies to buy out the South African state telecommunications company, Telkom. Kanstiener is to direct the diplomatic effort the United States makes in Africa to defeat Islamic terrorist networks alongside Mbeki's administration.

The NIA briefing report provides insight into the international, clandestine organization of Islamic extremists. Based on composite source documents from the NIA/SASS archive, it outlines the type of structure and organization Washington intends confronting during the second phase of the "New War on Terrorism". Also the networking between Islamic militant organizations is mentioned in some detail.

Much of the information was provided by the declared, CIA head of station in Pretoria under the bilateral agreement with NIA/SASS and the Israeli intelligence representative at a time the Mossad (Central Institute for Intelligence and Special Duties) was completing its re-organization.

---

*Cover Page*

SECRET

National Intelligence Agency

THE GENERAL MANAGER SPECIAL PROJECTS

[no handling instruction: single recipient]

HAMAS (ISLAMIC RESISTANCE MOVEMENT) AL-MUJII AL ISLAMIYAJ

[index redacted] [ideography retained]

*Page 1*

HAMAS (ISLAMIC RESISTANCE MOVEMENT) / AL- MUJII AL ISLAMIYAJ

HAMAS is a Palestinian based organisation which was formed with the purpose of fighting for the Palestinian people because of the oppression they experienced by the Jewish state and Palestinian government.

BACKGROUND

Prior to the formation of HAMAS, the Muslim Brotherhood (MB) felt the need for an internal organization to oppose Israeli occupation. Several cell structures, such as "al-Majd" (intelligence) and "al-Mujahidun" (commando) which was formed in 1983, were formed to fill this void. Israeli forces however managed to infiltrate and crack several of these units soon after their formation. On 1987-12-14 Ahmed YASSIN formed the PALESTINIAN ISLAMIC RESISTANCE MOVEMENT as an offshoot of the MB. HAMAS structures took over the secret MB cell structures which were already in place, including "al-Majd" (intelligence) and "al-Mujahidun" (commando).

HAMAS was formed from two previous groups started by Sheikh YASSIN:

- the ISLAMIC COMPOUND;

- the ISLAMIC AID SOCIETY;

- served as the principle instrument for the activities of the MUSLIM BROTHERHOOD (founded in Egypt in 1928) in Palestine, setting up a network of kindergartens, schools, seminaries and mosques, and the ISLAMIC AID SOCIETY, all of which were used to recruit Palestinians who regarded the PLO leadership as tainted and corrupt.

HAMAS was found by Sheik Ahmad YASSIN on 14 December 1987, shortly after the uprising in Palestinian refuge camps in the Gaza strip (a few days after the INTIFADA began).

*Page 2*

HAMAS is supported by the smaller ISLAMIC JIHAD and the POPULAR FRONT.

HAMAS is an outgrowth of the EGYPTIAN IKHWAN ORGANISATION. HAMAS also has recruited members of the former followers of the DFLP.

HAMAS is a fanatical splinter group that also attracted Palestinian recruits after the 1982 Israeli invasion of Lebanon. Working behind the scenes was the fundamentalist regime in IRAN which sought to create a sympathetic movement among Palestinians in Southern Lebanon.

The Israeli government used the HAMAS to undermine those arguing for negotiations between Israel and the PLO. The Israeli authorities saw the Israeli military tolerated the HAMAS until 1988 when the HAMAS influence spread to the Israeli-controlled WEST BANK and GAZA STRIP. Here it was argued, was an organisation whose existence denied ARAFAT's claim to represent all Palestinians. The HAMAS is now regarded as the "SWORN DESTROYER OF ISRAEL" and the Israeli's are now too aware of the danger the HAMAS poses.

In 1983, Sheikh YASSIN was arrested for establishing a military wing for the movement, known as AL-MUJAHEDIN AL FALESTINIIN (THE PALESTINIAN FIGHTERS), and for have hidden weapons in his home.

At the start of the Palestinian uprising, INTIFADA, in December 1987, Sheikh YASSIN brought together the AL-MUJII/AL-MUJAHEDIN groups under the umbrella of a group called the HAMAS.

In 1989 the HAMAS movement was outlawed by the Israeli government authorities.

On 20 December 1992, since the beginning of the INTIFADA, HAMAS and Arafat's FATAH FACTION of the PLO joined forces "AGAINST THE ISRAELI OPPRESSION IN ORDER TO BRING BACK DEPORTED BROTHERS". HAMAS also capitalises on Palestinian frustrations.

*Page 3*

IRAN believes that the HAMAS to be the group most able to thwart US policies for peace in the Middle East.

IDEOLOGY

In August 1988 HAMAS published the "ISLAMIC CHARTER" within which it defines itself as the Palestinian branch of the Muslim Brotherhood. HAMAS ideology as reflected is basically identical with that of the main stream brotherhood. However in the course of the INTIFADA its priorities have changed and this is manifest in the charters articles: HAMAS gives priority to the Islamic Charter of Palestine and emphasizes the need for immediate entering the "JIHAD" stage and sees this as the only solution for the Palestinian problem. On this bases they consider any Jewish target whether it be military or civilian, local or abroad as justified for action.

HAMAS strives to raise "THE BANNER OF ALLAH OVER EVERY INCH OF PALESTINE" which was considered to be "PART OF THE ETERNAL ISLAMIC HERITAGE".

The HAMAS sees itself as the spearhead of a mass movement fighting against the "WARMONGERING JEWS" and "WORLD ZIONISM".

HAMAS reject all initiatives and so-called peaceful solutions and international conferences on the issue of Palestine. It considers these to be "A WASTE OF TIME AND VAIN ENDEAVOURS" -- no part of the territory may be given up.

In 1992 IRAN steered HAMAS towards a closer alliance with the SHIITE HEZBOLLAH movement in Lebanon.

In short HAMAS has the following aims and objectives:

i) Establishing an Islamic state;

*Page 4*

ii) Liberating Palestine;

iii) Liberation of West Bank and Gaza Strip;

iv) Islamization of society;

v) Establishing the legitimacy of the armed struggle;

vi) Continuation of the INTIFADA;

vii) Preserving national unity between all Palestinians regardless of religion;

viii) Activating Arab and Muslim backing for the Palestinian cause;

ix) Release of detainees;

x) Establishing political legitimacy;

xi) Rejection of expulsion policy;

xii) The complete withdrawal of Israeli forces from the occupied territories;

xiii) Disarming ail Jewish settlers and dismantling of settlements;

xiv) The deployment of international peacekeeping forces on the green line;

xv) End to detention and brutalization of civilians and detainees;

xvi) End to occupational policies, such as travel restrictions, corruption, prostitution, etc;

xvii) Free general elections; and

xviii) Representation in negotiations for Palestine.

POLITICAL OBJECTIVES

The HAMAS refuses to accept the legitimacy of a permanent Jewish presence in Palestine. HAMAS

strategy remained one of "wearing down the enemy, confusing him so that he does not grow comfortable and reminding the world that there is a homeland under occupation".

STRUTURE/STRENGTH

Based in the GAZA and WEST BANK.

In February 1993 HAMAS claimed the allegiance of up to 40% of the Palestinians in the

*Page 5*

HAMAS' leadership in the Gaza Strip is rather independent in its decision-making, though there is a certain degree of coordination with the West Bank. The importance of the latter has increased in the course of the uprising, also because most of the senior activists in the Gaza Strip were arrested (late September - October 1988) Hebron has emerged as the old-new centre of HAMAS activity.

Sheikh Ahmad YASSIN the spiritual leader of HAMAS' to a great extent shapes the movement's concepts and determines the main characteristics of its activity. It appears, that the next generation of leaders has started to emerge particularly on the West Bank.

Based upon this, signs of a split are emerging at the top of the HAMAS structure between pragmatists and conservatives over which political and military strategy will be best. Sheikh Ahmed YASSIN said he was prepared to call for the end of all military activities, including suicide attacks if Israel agreed to withdraw from the West Bank including Jerusalem and the Gaza Strip. His view is shared by Muza Abu MARZOUK. This marks the first time HAMAS is willing to discuss a cease-fire with Israel (officially HAMAS does not recognize Israel). Supporters of the conservative trend include Khalid MESHAAL, Abdelaziz RANTISSI and the military wing of HAMAS, Ezzedin al-Qassatn, who support the jihad to establish an Islamic state. But YASSIN changed his position again afterwards.

Mohammed Jamal NATSHI (Security-General of HAMAS, NATSHI also acts as spokesperson in Al Khalil (Hebron)[1]. Abdul Aziz RANTISI is one of the more militant HAMAS spokesmen inside the Gaza Strip.

---

1 Information received from Intelligence Unit Gauteng 1997-09-01.

HAMAS is controlled and guided by the world wide MUSLIM BROTHERHOOD's MAJIS AL-SHURA (Council of Sages), particularly the Jordanian branch.

*Page 6*

The Jordanian Council once included Mussa Muhammad Abu-MARZOOK.

Musa Abu MARZOUK (Chief of HAMAS' Political Bureau/Committee)[2]. Abu-MARZOOK's position has been taken over by Khaled MASHA'L (resides in Jordan).

---

2 MARZOOK was in prison in the United States and deported to Jordan.

Case 1:05-cv-04622-DLI-RML  Document 272-2  Filed 03/22/12  Page 12 of 386 PageID #: 8826

Other prominent activists residing in Jordan includes Muhummas SIAM and Khiri AL-AA'.

The Political committee or "POLITBUREAU" (main base is in Jordan) of HAMAS directs its strategic policy which deals mainly with foreign relations with other movements and organizations, government bodies and various Islamic clerical bodies. Subordinate to the political committee are 5 main frameworks:

i) HAMAS infrastructure in the occupied territories (HAMAS as part of the Muslim Brotherhood, adopted a similar organizational structure comprising of two parallel organizational frameworks:

a) Clandestine -- The internal clandestine operation is divided into 5 main apparatuses:

> 1) Military Apparatus who is responsible for military activities operates the EZZIDIN AL-QASSAM (formerly called ABDALLAH AZAM) that has head quarters in both Libya and Iran with its training base in Sudan numbering around three thousand personnel. This structure operate independently from the main HAMAS operations. This military wing operate in cells of two to three persons per cell. EZZEDIN AL QASSAM BRIGADES (HAMAS military wing) has approximately 100 members, and has carried out numerous bloody attacks on Israeli soldiers, citizens and Palestinians who collaborated with the Jewish state. Ezzidin Al-Qassam is headed by Ibrahim MAKADMEH[3].

---

3 MAKADMEH disappeared in October 1997. It is believed that he may be detained by the Palestinian Authority, although he is wanted by both the Palestinian and Israeli security services.

*Page 7*

> 2) Security Apparatus who is responsible for collecting intelligence, counterintelligence among other organizations in the territories, interrogation and surveillance of collaborators, guarding people and documents. This apparatus is responsible for securing the activities of the other apparatuses. It is very active in prisons.

> 3) "Activity" Apparatus who is responsible for uprising related activities.

> 4) Israeli Arabs -- HAMAS views Israeli Arabs as its fifth column.

> 5) Dawa Apparatus is responsible for recruiting and training activists, and operating all the movements institutional civilian activities. HAMAS consider this apparatus as the most important -- it is manned by the most qualified people with the highest budget.

b) Overt or public. As mentioned Dawa are being considered as the focus point of this organization -- it is mostly carried out by lawful institutions. Overt public activities have two main overall objectives:

> 1) Controlling and shaping religious life based upon fundamentalism. To this end HAMAS has taken control of, and or established charity committees and foundations, mosques, educational institutions (from kindergarten to academic institutes), it has recruited clerics and senior Waqf officials to establish the Palestinian Association of Religious Sages (which has pretensions of being some kind of supreme religious authority).

> 2) Acquiring power bases and positions of power in Palestinian politics and society. HAMAS built its own 'super' institutions to establish independent and separate systems in the

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 13 of 386 PageID #: 8827

following spheres:

- Health

- "Medical Science Association"

- Education

- "Islamic Association for Culture and Sciences" and

- Economics

- "Palestinian Beit El-Mal Society".

HAMAS has also nominated its own candidates in elections for civilian bodies and institutions, such as trade bureaus, trade unions, workers

*Page 8*

committees and student councils, with the purpose of gaining control. To achieve these goals, HAMAS established:

- A Financial system based on a wide source of Islamic financial resources, bodies to syphon funds in the Persian Gulf, the United States and Britain and supervision over funds transferred from the 'outside' to the 'inside'.

- A sophisticated Propaganda machine, that includes a news agency ('QUDS PRESS) in Britain with offices in the territories and Jerusalem; an official (FALESTIN EL-MOUSLIMA) and unofficial (SAWT EI-KHAK WAEL-KHOURIA, newspaper of the ISLAMIC MOVEMENT Israel); propaganda mouthpieces through local and international publishing houses and libraries. Through its civilian activities, HAMAS has succeeded in establishing its own institutions that are separate and independent of both the civil administration and currently of the Palestinian Authority. These institutions provide medical, educational, welfare and cultural services to a large part of the population. These institutions provide to the population's daily needs that created a direct affiliation between the movement and service recipients. This resulted in an increase in recruits.

HAMAS has inter alia the following departments:

i) Shura Council

ii) Leading bureau, that encompasses several technical departments:

* Administrative;
* Information;
* Charity;
* Political;
* Security;

*Page 9*

* Military

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 14 of 386 PageID #: 8828

Each department has its own subdivision. In Palestine each region is comprised of families and branches. They are answerable to an administrative centre.

HAMAS members fall into four distinct categories:

i) INTELLIGENTSIA -- The intelligence unit has the following directives:

a) Surveillance of collaborators and drug dealers;

b) Castigate informers, prostitutes and drug dealers (verbal to execution);

c) Distribution of information leaflets;

d) Warn people against Israel recruitment policies and collaboration;

e) Write and disburse communiqués;

f) Manage logistics; and

g) Monitor crime in the occupied territories.

ii) COMMANDO UNITS:

a) Establish usar (families) and underground cells;

b) Gather information on the IDF and their activities for use in future operations;

c) Conduct training sessions; and

d) Carry out military operations.

iii) SHEIKS (religious leaders)

iv) YOUNG LEADERSHIP CANDIDATES

v) ACTIVISTS

Both the intelligence and command units operate inside the territories and Israel. The "al Maktab al-l'Lami (Information Department)" and the "al-Maktub al-Siyassi (Political Department)" operate from outside the borders. The information department, located in Jordan, is responsible for preparing and disseminating press releases and publications. The political department deals with HAMAS' foreign relations.

*Page 10*

Based upon an analysis HAMAS' overt and clandestine activities the following conclusion can be made:

* Most of HAMAS' personnel and material resources are channelled into overt public activities (for example Dawa), and only a small share of these resources are utilized in clandestine activities.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 15 of 386 PageID #: 8829

* The military activity depends on the public and religious sphere in order to spot possible activists, to educate and train these activists and to collect material and aid.

* All of HAMAS' activities (religious or military) is directed and financed by the HAMAS directorate overseas, mainly in Jordan, Britain and the United States.

## HAMAS' INTERNATIONAL STRUCTURE

HAMAS' overseas infrastructure is based on directorates: The Political Bureau; the Internal Committee; and the Propaganda Committee, in addition to nationwide local bodies in various countries.

## INTERNAL COMMITTEE

Its main function is to direct HAMAS activities in the territories, including the civilian apparatuses and infrastructure. The Committee acts on a number of levels:

i) Political level that guide the HAMAS directorate in the territories on the peace process, autonomy, and the Palestinian Authority.

ii) Terrorist level that provide long-distance control, it also direct aid to the terrorist apparatus.

iii) The Civilian level direct the civilian infrastructure to form an alternative to the PLO.

iv) Financial aid -- transferring funds to overall HAMAS activities and infrastructure in an orderly and controlled manner.

*Page 11*

The Committee is header by Imad Al-ALAMI, who operates from Damascus. The following sections are under his control:

i) Secretariat and Communications -- operates in London under Hafez AJAJ. This section is responsible for communications between the Western countries and the territories, it also does the bookkeeping, including the balancing of the budget and deals with transferring funds.

ii) Planning and Research -- operates in London under Mouhamad Kazam SAWALHA (former head of the terrorist apparatus in the territories), who engages in political activities, propaganda and financial coordination relating to terrorist activities.

iii) Security -- operates from London under Maher Gawad SALEH.

iv) Recruitment -- operates from Amman under Khaled El-MASHA'L (Abu-MARZOOK's deputy).

v) Students -- operates from Sudan under Alaa RIFATI. It engages in students administrative matters around the world.

## 2. PROPAGANDA COMMITTEE

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 16 of 386 PageID #: 8830

This body manages all HAMAS' propaganda in the territories and abroad. It operates from Amman under HAMAS spokesman Ibrahim GHOUSHA.

The Committee operates in two main spheres:

i) Verbal Propaganda -- Conferences, events and media interviews. Verbal propaganda is broadcast by the Arab radio stations.

ii) Written Propaganda -- Publications, newspapers and pamphlets. For example HAMAS's weekly newspaper AL RISALAH, with editor Ghazi HAMAD.

The Committee uses 2 communication channels for this purpose:

i) 'QUDS PRESS NEWS AGENCY with branches in the territories and throughout the world whose purpose is to collect information, feed the media,

*Page 12*

mainly its own press and publications.

ii) 'FALASTIN AI-MUSLIMA' gathers information in Jordan and published and distributed in Britain. This movement also distributes newspapers in other countries and is known to be the most prominent propaganda tool and leadership mouthpiece. Propaganda work is also done in mosques, religious centres and universities.

3. FINANCE COMMITTEE

The Finance Committee is the central financial body that authorizes and distributes the HAMAS budget. It operates in Jordan, Britain, the United States and in Saudi Arabia under the control of the MUSLIM BROTHERHOOD.

The Committee raises funds through foundations and representations throughout the world, some of it is earmarked for apparatus' activities and some for the civilian infrastructure.

HAMAS' financial sources are divided into a number of main groups:

i) International Islamic communities

ii) Non-Islamic charity bodies throughout the world

iii) Private donors

iv) Official donors.

Funds are distributed from source to syphon funds serving mainly HAMAS around the world. Many of these are primary funds like the INTERNATIONAL PALESTINIAN RELIEF AND DEVELOPMENT FUND -- INTERPAL (former PALESTINE RELIEF AND WELFARE FUND) in London and the HOLYLAND FOUNDATION in Texas. Other are secondary funds in Germany, France and Jordan.

Funds are transferred from the different sources through the syphon funds to the territories through one or more of the following channels:

*Page 13*

   i) Bank transfers to banks in Jordan or the territories;

   ii) Money changes -- deposits overseas are cashed in the territories against receipts;

   iii) Couriers mainly from Jordan and the United States; or

   iv) A combination of any of the above mentioned 3 channels in order to blur the traces.

There are two main channels via which funds are transferred:

   i) Apparatus funds -- Authorization is given in the United States, the funds are transferred from Britain to Jordan, or directly to the territories in coordination with Hafez AJAJ to Riad ABU-AL-ABD (Imam AL-ALAMI's deputy).

   ii) Civilian infrastructure funds -- Requests for funds are made directly by HAMAS-related institutions in the territories to the financial institutions abroad, who authorize, collect and transfer the allocated funds to each institution.

Transfer of funds:

   i) From EUROPE -- Funds are transferred from Europe through two secondary foundations which are responsible for raising funds:

      a) AL-AQSA Foundation in Germany, which raises funds in the Netherlands and Belgium;

      b) CBSP FOUNDATION in France, which raises funds in Austria and Switzerland.

         • Funds from Scandinavia are directly transferred to INTERPAL in Britain.

         • Finances are directed in Britain.

  ii) From the United States

      a) Funds from the United States are transferred through the HOLYLAND FOUNDATION in Richardson, Texas and other branches throughout the United States.

      b) Funds that are directed by the foundation in the United States originated in the JERUSALEM FOUNDATION in Canada, in various Islamic

*Page 14*

   institutions in the United States for example MERCY INTL, the SAAR FOUNDATION, and a fund in Brazil that is responsible for fundraising in South America.

c) The HOLYLAND FOUNDATION also invests in a number of its own projects.

d) A bank account in the name of T.A.I.T. (a company) channels funds to HAMAS apparatuses and infrastructure in the territories.

iii) From the Gulf States

a) Most of the Islamic financial institutions with the MUSLIM BROTHERHOOD operate in the Gulf States (Saudi Arabia, Kuwait and the United Arab Emirates).

b) Money from the Gulf are mainly channelled according to the world wide deployment of branches of those institutions. For example the El' MOUNASERA FUND in Kuwait transfers funds via INTERPAL in Britain (its overseas branch). The AMMAN-based charitable works authority in the UAE transfers funds through the authority's branch in Jordan. Official funds are transferred from Saudi Arabia to the territories through INTERPAL in Britain and the HOLYLAND FOUNDATION in the United States.

c) Gulf funds are unofficially divided into Muslim or private funds, except for Saudi Arabia, where the source of some of the funds transferred to HAMAS is official.

iv) From Iran

a) Iran transfers a few million dollars annually to HAMAS, as well as assistance in the form of training and weapons.

b) Although the route through which the money is channelled is not known, funds are raised by HAMAS representatives in Lebanon, Syria and Jordan through the Iranian embassies.

c) Iran also transfers money to HAMAS via the FALLEN SOLDIERS FUND in Lebanon (a financial body that serves HEZBOLLAH).

*Page 15*

v) From Africa

a) Pro-HAMAS financial activity in Africa is centred in Sudan through the head office of the ISLAMIC RELIEF AGENCY (ISRA).

b) ISRA transfers money to the territories through its Jordan branch, headed by Walid KASEGH to the ISRA's representative in the territories, Gamil HAMAMI (head of the ISLAMIC ASSOCIATION FOR CULTURE AND SCIENCES).

vi) From the Far East

a) Funds are transferred from HAMAS in Malaysia, Indonesia, India, Philippines, Hong Kong and Thailand.

b) Funds are transferred from Malaysia to the MEDICAL SCIENCE ASSOCIATION in the territories headed by ABD AL-WADOUD TAMIMI.

It is widely assumed that money for HAMAS comes largely from IRAN and rich Islam orientated benefactors in the GULF STATES, but HAMAS also raises considerable funds within the territories, particularly the GAZA STRIP.

The ISLAMIC REFORM SOCIETY raises money for HAMAS through charity organisations and also on a social-security/welfare system.

The Saudi Arabians have diverted financial support from the PLO to HAMAS, although the Saudis deny such assistance is being given.

Funding also comes from Muslim communities abroad -- USA, UK and FRANCE.

Late December 1992 - early January 1993 IRAN and HAMAS representatives signed a draft agreement on IRANIAN financial, political, moral and military support for HAMAS.

The organisations main funding cones from Iran and Saudi Arabia, while additional funding

*Page 16*

comes from fundamentalist Muslim organisations in the West (30% of the organisations funds come from such organisations). The main organisation collecting funds in South Africa is AL-AQSA, based in Johannesburg.

## 4. HAMAS CLANDESTINE INFRASTRUCTURE

HAMAS' clandestine infrastructure abroad is aimed at training a hard core of activists for religious and nationalist activities and some for the PLO. This infrastructure operates tinder cover of overt activity, including propaganda and education. Clandestine activists are also involved in overt activities.

The infrastructure is headed by one person who is responsible for the national network. Subject to him are the regional heads who operate cells of 3-5 activists in their region. The level of secrecy is so high that cells do not know of each others activities.

Cell activists are usually recruited in mosques from amongst the overall population of HAMAS activists and supporters who turn up for regular activities. Candidates for clandestine activity are spotted in the crowd and directed towards cell activities.

Activities include mainly religious studies, nationalist lectures and other general subjects.

Investigations revealed that many of the activists belonging to HAMAS secret cells in the United States had undergone terrorist training.

HAMAS has an office in Sudan from where HAMAS members travel to various African countries including South Africa, to forge closer links with the Muslim communities in these countries.

The leader of HAMAS in Sudan is Imad-Eddin EL-AYYOUBY[4].

---

4 EL-AYYOUBY is a Syrian national with a B.Sc degree in Argucultural Engineering

*Page 17*

According to information received from Port Elizabeth HAMAS is an unified leading bureau that resorts to a higher authority namely the "Shura council" that is directly elected:

* Security and military systems are formed as part of the technical system of the structure.

MILITARY OPERATIONS

HAMAS members receive military training in HAMAS bases in Sudan, Libya and Iran. The main provider of military aid is the Iranian Presidential Guard.

According to HAMAS operators there are no differences between military and civilian targets.

Mosques serve as a focal point for terrorist activities: As DLB's; for transferring weapons and messages; and for the training of people for suicide missions.

LOCATION

HAMAS recruits are being trained in LEBANON, SUDAN and IRAN.

In 1992 the Iranian government has pledged its full support to HAMAS, and pledged to train thousands of HAMAS fighters in urban guerilla warfare although Iran has not recognised HAMAS as the "SOLE LEGITIMATE REPRESENTATIVE OF THE PALESTINIAN PEOPLE" (the PLO's traditional title).

LINKS

HAMAS has close ties with:

    i) PFLP

*Page 18*

    ii) PFLP-GC (Ahmed JIBRIL)

The overtures of PFLP-GC towards HAMAS on the basis of their common basic opposition to any political negotiations and compromises with Israel, have led to a certain level of ties between them, despite the basic differences in their policies. It was the PFLP-GC that initiated and pushed for cooperation with HAMAS. After Abu JIHAD's assassination, contacts between the two organizations somewhat improved and this was manifest in covert coordinations, particularly on the subject of the political process.

    iii) DFLP -- which have tended to reject the idea of a compromise with Israel.

    iv) PLO -- relations with the PLO has been less positive as the two have been jostling for supremacy in Gaza's refugee camps and towns for several years. But none of the official

Case 1:05-cv-04622-DLI-RML Document 272-2 Filed 03/22/12 Page 21 of 386 PageID #: 8835

statements made by senior HAMAS activists since tile beginning of the uprising have questioned the PLO's status as the legal representative of the Palestinian people.

The HAMAS Charter stresses its being a unifying body and expresses its willingness to place its members at the disposal of the PLO as 'soldiers' once the organization abandons the secular path. The 'conflict' is based upon the fact that HAMAS advocates a "total solution" to the dispute with the Jews, to be achieved through the liberation of all of Palestine by means of jihad (and not by political negotiations), and the establishment of an Islamic society and regime.

Palestinian Authority (PA) -- based upon the PA crackdown on HAMAS (the closing of 16 of HAMAS's institutions and the arrest of 100 of HAMAS's activists during the raid of September 1997), it is a possible trend that HAMAS will turn against the PA. Even within tile military wing there is a splinter group, called the "Secret Cells" led by Sheikh Ibrahim MAKADMEH, who openly advocates the assassination of top Palestinian officials.

v) HAMAS has good connections with the PALESTINIAN NATIONALIST ELEMENTS

*Page 19*

in the REJECTIONIST FRONT (anti-peace talks).

vi) HAMAS has strong links with the powerful MUSLIM BROTHERHOOD in JORDAN, its main base. HAMAS headquarters in JORDAN is situated in the ISLAMIC MOVEMENT PARLIAMENTARY OFFICE in AMMAN under the protection of the MUSLIM BROTHERHOOD.

vii) In 1993 Ibrahim GHOSHESH claimed that HAMAS also established close ties in TURKEY, PAKISTAN and NORTH AMERICAN countries, indeed "everywhere where there is an Islamic power".

STRATEGIC INFORMATION

HAMAS members receive military training in the Sudan from the NIF. They send approximately 1000 members for training at one time. In mid 1991 HAMAS began attacking both military and civilian Israeli targets.

In April 1993, the USA government declared HAMAS as a terrorist group in its annual terrorist report citing its increasing use of lethal tactics such as fire-arms and car bombs, and its responsibility for attacks on Israeli civilian and military targets.

HAMAS WORLD-WIDE INFRASTRUCTURE

Jordan -- The main centre for HAMAS activity outside the territories. It includes the offices of the Movement's three Central Committees and directs terrorist activity and intensive financial activity. Activities are based on the local MUSLIM BROTHERHOOD infrastructure where it greatly influences the movement.

Syria -- The main thrust of the movement includes aiding the terrorist apparatus by transferring weapons, money and activists. The movements representative also engages in political activity

*Page 20*

including contact with Syria's regime and other Palestinian organizations.

Lebanon -- Most of the activities involve military and political connections with HEZBOLLAH through HAMAS' representative Moustafa LIDAWI, political activity and transfer of funds from Iran.

Iran -- Activities manifest through military training and the supplying of funds and weapons for attacks. These support are channelled though Osam HAMDAN, the HAMAS representative in Iran.

Sudan -- HAMAS' activities focus on military training. Based upon widespread religious and nationalist student activities in Khartoum, Sudan is a fertile ground for HAMAS activities.

Egypt -- Egypt host an infrastructure of collaborators who help with the smuggling in and out of HAMAS activists. There is also a pro-HAMAS financial activity in Egypt.

Yemen -- Through the influence of Mouhamad SIAM (the HAMAS representative in Yemen), HAMAS make use of a broad student infrastructure and other political activities.

Libya -- Assists wanted HAMAS activists staying in Libya, who are on their way to the territories. Libya also transfer funds to HAMAS.

Saudi Arabia -- HAMAS' financial activities is based in Saudi Arabia through official and non-official institutions and private sources.

Kuwait and the UAE -- HAMAS activities centre around the transferring of funds from institutions and non-official sources.

Britain -- HAMAS infrastructure in Britain centre around financial activities, propaganda and Internal Committee activities, through a wide basis of activists and institutions.

*Page 21*

Germany -- HAMAS activities includes fundraising, propaganda and clandestine activities *[text missing]* the call for training to be used in terrorist activities was uncovered. Host the AL-AQSA FUND responsible for Western Europe.

France -- An organization known as CBSP is responsible for HAMAS propaganda and fund raising.

Belgium and the Netherlands -- HAMAS fundraising through the AL-AQSA FUND based in Germany.

Spain -- The SYRIAN MUSLIM BROTHERHOOD based in Madrid provide an infrastructure for HAMAS.

Greece -- HAMAS has an activist infrastructure in Athens and Pairs. Greece also host the LEBANESE GAMILYA EL-ISLAMIYA activists.

Scandinavia -- HAMAS activities in Denmark is limited to the providing of funds. It is also known that Sweden host an Islamic Palestinian infrastructure.

India -- HAMAS has an activist/student infrastructure in India that has an input in terrorist activities.

HAMAS is also using India as a springboard for HAMAS activists that received military training in Afghanistan.

Malaysia -- A HAMAS cell operates in coordination with the JERUSALEM MEDICAL SCIENTIFIC ASSOCIATION. On a previous occasion HAMAS attempted to open an official office for financial purposes.

Philippines and Thailand -- Most of HAMAS' activities is of a financial nature.

Australia -- Based upon information received in 1994 HAMAS has a cell in Canberra that have

*Page 22*

access to weaponry as well as intelligence referring to Jewish interests in Australia.

South America -- HAMAS has infrastructures in Venezuela, Brazil and the Border Triangle. Brazil channels funds to HAMAS through the HOLYLAND FOUNDATION.

Canada -- The HAMAS infrastructure in Canada forms part of the infrastructure in the United States. The JERUSALEM FUND operating in Ontario is a source of funds for the HOLYLAND FOUNDATION in the United States.

HAMAS FRONT ORGANIZATIONS

HAMAS, with the aim of achieving operational independence from secular bodies in the occupied territories established and controls several front organizations throughout the world. Most of these organizations are used to collect funds to sponsor HAMAS operatives who are busy with military and religious training and who are hiding from prosecution in other countries. Funds are also used to establish new cell structures and command structures around the globe and to fund military and social programmes in Palestine and other countries.

The most important of these HAMAS front organizations are the INTERNATIONAL PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL) based in London.

Other smaller front organizations include the HOLY LAND FOUNDATION based in Texas in the UNITED STATES OF AMERICA.

*Page 23*

1. INTERNATIONAL PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL)

ADDRESS:
112 Criclewood Lane
Box 3333
London NW2 2DP
London NW6 1RW
TEL 01814508002
FAX 01814508004

BANK PARTICULARS

NATIONAL WESTMINSTER BANK with the following INTERPAL accounts:

    i) INTERPAL Main STG Account: 95142940

    ii) INTERPAL Administrative Account: 95142983

    iii) INTERPAL Children Account: 95142975

    iv) INTERPAL Zakaat Fund: 95142967

    v) INTERPAL Interest Money Account: 95142959

    vi) INTERPAL US Dollar Account 140-00-04156838

IMPORTANT FIGURES[5]:

    i) Abd El Rahman Mouhmad Abou DAYA (Chairman)

    ii) Essam Yossef MUSTAFA (International liaison = responsible for South Africa)

    iii) M Safi'a

    iv) M Tulaba

    v) A Saker

---

5 It is important to note that the most prominent members are from the Gulf states, in particular Saudi Arabia.

*Page 24*

    vi) Abed (Abd) El Rahim NASSERALLA

- Member of the Trustees of INTERPAL

- Originally from Saudi Arabia

- According to information (IS) NASSERALLA is the covert head of INTERPAL.

- Could be identical to "MISRALA" mentioned in the report[6] from Port Elizabeth.

---

6 Report nr. 1843 (1997-10-30) -- According to the report Agmat Sharief NOEL had contact with Sheikh MISRALA.

INTERPAL could be described as the HAMAS fund in Western Europe.

HAMAS through INTERPAL operate on an international basis through a global network of AL-AQSA

structures (HAMAS = INTERPAL = AL-AQSA).

i) In Western Europe the base of AL-AQSA is in Germany with sub-bases in the Netherlands and Belgium.

AL-AQSA INTERNATIONAL FOUNDATION AAIF/AIF

The AL-AQSA INTERNATIONAL FOUNDATION 's head office is London and it supports HAMAS's terror campaign against Israel and regard Yasser ARAFAT as a sell-out.

An information note was sent from the AL-AQSA Foundation, P.O. Box 2364, Islamabad, Pakistan (tel : 92-51-261091, fax: 261092) to all relevant Muslim organisations in South Africa. (in the information note the suicide bombings are condoned, because it is not against the teachings of Islam. The QURAN is used as justification for the suicide bombings. The Quran states that any Muslim who offers his life for the good of Islam and Allah, or to sow dissention and confusion within enemy ranks, will be assured a place in heaven. This is in contract with normal Islamic teachings which condemns suicide as being against the patience and religious virtues as preached in the Quran.)

*Page 25*

AL-AQSA is active in South Africa since 1992, with the visit of Sheikh Muhammed Mahmoud SEYOM (the former Imam of the Grand AL-AQSA MOSQUE in Jerusalem, in 1988 he was banned to SUDAN where he opened a similar office) was accompanied by Abu YUSUF (director of the "PALESTINE AND LEBANON RELIEF FUND"). Abu YUSUF opened a few mosques and addresses in Walmer Estate, Woodstock.

This organisation is a front for HAMAS in South Africa. The political wing of HAMAS are in control of this office. It is important to note that South Afican Al-Aqsa International foundation forms part of a network: AIF ISLAMABAD - AIF JORDAN - AIF SOUTH AFRICA.

AL-AQSA INTERNATIONAL FOUNDATION offices in South Africa:

AMOCA GARDENS BUILDING
2de Floor Mint Ave 40 (- 14)
Fordsburg Johannesburg

P O BOX 421082
FORDSBURG 2033
Fax : (011) 8342918

South African AL-AQSA INTERNATIONAL FOUNDATION board of Trustees exist out of the following individuals:

- Whadan Amin Aref KHUNFUR a Abu Ahmed

- SAI GABRIELS

- Dr. E Muhammed - Muntuz UL - Moulana Mumzal AL HAQ.

*Page 26*

This front organisation has a bank account at First National Bank, Industria account nr 9000028878. Funds are deposit in South Africa by supporters of HAMAS, where after these funds are being transferred to HAMAS in their struggle against Israel.

Funds are being channelled from the USA through AIF to organisations who:

- Who oppose the government;

- Where Muslims are in the minority

- Where Islam is under threat; and

- Where Muslims fight against an illegitimate government or system.

Abdul ACHMAD member of HAMAS (exiled Palestinian. AL-AQSA INTERNATIONAL FOUNDATION, AMOCA GARDENS Building, Johannesburg). Asked for financial assistance for HAMAS in Israel, during a meeting of "THE COMMITTEE TO STOP THE HOLOCAUST AGAINST MUSLIMS".

During a meeting (1996-03-04, Bosmont Mosque, Jhb) of militant leaders[7], Abu ACHMED was introduced as the HAMAS contact person in South Africa. Abdul ACHMAD member of HAMAS (exiled Palestinian).

---

7 Militant leaders included: Sheik Murshid DAVIDS Sheik YAHYAN Iqbal JAS SAT Sheik ISMAIL Sheik Iqbal JHAZBHAY Abu ACHMED Bilaal MOTSAU, Abu ACHMED was introduced as the HAMAS contact person in South Africa.

During a meeting (1996-03-04, Bosmont Mosque, Jhb) of militant leaders, Whadan Amin Aref KHUNFUR a Abu ACHMED[8] was introduced as the HAMAS contact person in South Africa.

---

8 Whadan Amin Aref KHUNFUR @ Abu AHMED was in 1993 in Sudan from where he travelled to South Africa.

[Symbol @ as written.]

ACHMED would be responsible for receiving news from Palestine

*Page 27*

about HAMAS activities, and counter measures from the Israeli government. This information will be locally used to counter Jewish propaganda.

* According to Bilaal MOTSAU, HAMAS problem would become known to Muslims all over South Africa, with the help of ACHMED.

* This would enable Muslims in South Africa to understand the problem and come up with constructive ideas on how to solve them.

\* Those present were instructed to tell their followers that they should put everything into the struggle to protect Islam against the "total onslaught".

\* ACHMED is in contact with Murshid DAVIDS (Vereeniging) and Sheik YAHYAH (Berea).

AL-AQSA has embarked on a petition campaign amongst the Muslim Community of South Africa, which commenced on 1996-05-17 at most Mosques in the country. The purpose of this campaign is to request the United Nations via the South African Government from having the leader of HAMAS extradited from the USA. That if the United Nations fails to prevent the extradition then the South African Muslim Community will use other means to stop the extradition.

During June 1996 a delegation of HAMAS's political wing led by Dr.Rusdie DIAD OSMAN @ Abu Mohammed visited South Africa[9] which is presently visiting South African Muslim businessmen, and requesting financial assistance from them.

---

9 Dr. Rusdie DIAB OSMAN is a Jordanian national (passport: 92/51261092). He is also the head of the AL-AQSA INTERNATIONAL FOUNDATION in Islamabad and the director of Population Science at the University of Islamabad, Pakistan.

Prof. OTHMAN has informed the Muslim community of Kwa Zulu/Natal that HAMAS is presently in need of financial and material assistance from the South African Muslim community and that the time is not yet right for South African Muslims to be used physically in the fight against the Jews.

*Page 28*

1996-07-11 : OTHMAN visited the Muslim community of Pietermaritzburg at the Muslim mosque in Nirvana, Pietersburg and asked Muslims not only for financial and material assistance but also to participate in the Holy War.

OTHMAN tasked JUSUF (teacher at the Pietersburg mosque) to identify individuals for military training and to send them to NATAL from where they will be send to PAKISTAN.

\* Iman IBRAHIM (black teacher in Seshego) volunteer for military training.

OTHMAN also visited LouisTrichardt,Venda and Tzaneen.

Sheik Yusuf ABDUL from the Westbank, Israel visited South Africa. ABDUL was the speaker at a HAMAS meeting at the Mayfair Jumma Masjid, c/o Hanover Street and 11 Ave, Mayfair on 1996-07-10.

ABDUL called on Muslims in South Africa to be part of the struggle against Zionism. He also asked Muslims to assist HAMAS financially in their struggle against Israel. Funds should be paid in at the offices of AL-AQSA INTERNATIONAL FOUNDATION, Fordsburg, Johannesburg.

Finally he called on Muslims in South Africa to put more pressure on Jewish missions in South Africa.

1997-02-01 : Wahdan Ahmed KHUNFHUR returned from Saudi Arabia to South Africa. During a feedback meeting on 1997-02-06 KHUNFHUR mentioned that funds for the AIF and other extremist organisations in South Africa will be channelled from INTERPAL in England to the "World Assembly of Muslim Youth (WAMY)" in Saudi Arabia to South Africa through front companies.

- The AIF expect Mounir JARADA @a Abu Achmed EL-RAGHMAN (the head of HAMAS military operations in Sudan) after Ramhadaan (February 1997) to assist in military training in South Africa.

*Page 29*

1997-03 : Sheikh Yahyah Ibrahim ADAM (Sudanese) are involved in AIF activities.

1997-08-10/17 : The delegation to Israel and Palestine will consist out of the following individuals:

    Aref Amin KHUNFHUR @a Abu AHMED

    Ebrahim GABRIEL

    Shafiq MORTON

    Hamid ADAM

    Ismael Abobaker KALLA

    Shokat THOKAN

    Ghora ARBEE

    Solly DANGOR

    Moosa DAYA

    Abu Baber DAWJEE

    Asim KHAN

    Faried SAALe

    Yusuf PATEL

    Abid DAWRAY

* Asim KHAN of Al-Aqsa is assisting Abobaker DAWJEE of KwaZulu/Natal who is the coordinator for the visit.

* The HAMAS contact person in Jerusalem is Najah BAKIRAT @ Abu MALIK[10].

---

10 Born in 1958. ID nr: 08043368; Passport nr: 20638471 (issued in September 3, 1995). Former leader of the "ISLAMIC HERITAGE".

* After the tour Ismail KALLA planned to visit the USA to met with members of Crescent International and other Muslim organizations i.c.w Anwar HADDAM (FIS).

1997-08-21/25 : Amin Aref KHUNFUR, Salim FIQIRI and Mohammed Asim KHAN met

*Page 30*

with Qibla and IUC members during their visit in the Western Cape, these individuals include:

Hamid ADAM

Ebrahim GABRIEL

Nazeem MOHAMMED (met at the offices of the MJC)

Shaffiqq MORTON

Moulana MOHAMMED HUSSEIN

1997-08-29 : Salim FIQIRI[11] is currently staying at the safe-house of Al-Aqsa International Foundation (Adamson Centrum 202, Crownweg 54, Fordsburg).

---

11 Salim FIQIRI was involved in the first military activities in South Africa military training camp in Mpumalanga (1997-07-11/13). FIQIRI is a Palestinian citizen, stayed 8 years in Turkey, and studied at the University in Karachi and the University in Sudan.

According to information Salim FIQIRI plan to leave SA for 2 months (Istanbul, Turkey).

Mohamed Aasim KHAN[12] (South African citizen working at the office of A1Aqsa) arranged for a telephone for FIQIRI.

---

12 ID 7305295 13208403; Address India Crescent 11, Mayfair.

1997-08-29 : Abid DAWRAY (Kimberley - Islamic Research Centre) contacted Amin Aref KHUNFUR @a Abu AHMED in connection with 2 HAMAS members who are on their way to the Al-Aqsa office in Johannesburg (train) from Cape Town. Route to SA:

Libya Mauritania

Ivory Coast

Namibia.

1997-09-03 : Mufti Nizamudeen SHAAMZI (head legal advisor of the Taliban in Afghanistan) gave a lecture[13] at the Mayfair Mosque. Moulana Ebrahim BHAM (Jumaitul Ulama) acted as interpreter, BHAM also met with Amin Aref KHUNFUR @a Abu AHMED and Salim FIQIRI prior to the lecture.

---

13 SHAAMZI mainly concentrated on the legal aspects of the Shari'a, as the only legitimate law. Muslims

cannot live in a society governed by Western laws.

*Page 31*

PARA-MILITARY TRAINING

1997-07-11/13 : Para-military training conducted on a farm in Mpumalanga (owned by Dr. Faried SALEY). The following individuals were involved:

> Asim KHAN (AIF/HAMAS office in Fordsburg);

> Imad Ahmed AL-AYOUBI

> Wadah KHUNFUR @ Abu AHMED (Director-General)

> Yusuf PATEL (Hospitaal Str 1, Baberton)

> Salim FIQIRI (International Islamic Federation of Student Organizations IIFSO, Istanbul, Turkey).

AL-AQSA INTERNATIONAL FOUNDATION: KWAZULU/NATAL

1996-07 : Prof. OTHMAN has informed the Muslim community of Kwa Zulu/Natal that HAMAS is presently in need of financial and material assistance from the South African Muslim community and that the time is not yet right for South African Muslims to be used physically in the fight against the Jews.

1996-07-11 : OTHMAN tasked JUSUF (teacher at the Pietersburg mosque) to identify individuals for military training and to send them to NATAL from where they will be send to PAKISTAN.

\* Iman IBRAHIM (black teacher in Seshego) volenteer for military training.

1997-01 : The Al-Aqsa fundraising campaign is planned for KwaZulu/Natal during January 1997.

\* A Palestinian delegation (members of HAMAS political wing) will arrive in South Africa via the Al-Aqsa head office in London to hold talks at Mosques in KwaZulu/Natal.

1997-01-06/22 : The AL-AQSA delegation will visit mosques in Durban, Stanger, Umzinto, Pietermaritzburg, Escort and Newcastle and consist of:

- Asim JETHAM (Al-Aqsa International Foundation, Fordsburg; Tel: (011) 836 2918)

*Page 32*

- Imad ALAYOUBI (Al-Aqsa International Foundation, Fordsburg; Tel: (011) 836 2918)
- Sheikh Raid SALAAH (from Umul Faham in Palestine) A B DAWJEE (031) 902 4523 & (031) 902 9174 was responsible for the arrangements.

1997-04-23 : Wahdan Abu Ahmed KHUNFUR[14] (Director-general of AIF) left for KwaZulu to contact "Maktoor" (the latter will receive $100 000 to smuggle to Palestine). The money will be deposited by

Isam Yusuf MUSTAFA Q Abu Yusuf in London office of the PALESTINE RELIEF AND DEVELOPMENT FUND (INTERPAL). From where it will be send to Palestine.

---

14 Blue VW Jetta: PRN 925 T.

AL-AQSA INTERNATIONAL FOUNDATION : WESTERN CAPE

1996-12-18 : During an Al-Aqsa meeting in Fordsburg it was decided that Sheikh Ebrahim GABRIELS will be responsible for Al-Aqsa activities in the Western Cape. During the meeting GABRIELS said that a delegation should visit Palestine as soon as possible to engineer better communication.

* AIF communicate with GABRIELS per fax (021) 6968502 at the MUSLIM JUDICIAL COUNCIL (Cape Athlone).

1996-12-28 : Ganief HENDRIKS (Western Cape) contacted Wandwa Abu Ahmad KUNFHUR (Palestine) the director general of Al-Aqsa International Foundation in Fordsburg to send a Khari from Palestine to the Western Cape during the month of RAMADAAN.

1997-01-10 : The IUC fund-raising under Ganief HENDRIKS to help Muslims in Rustenburg was successful, but according to HENDRIKS Rustenburg do not need the money. HENDRIKS

*Page 33*

negotiate with the IUC to channel the funds to the AIF. It is a known fact that 10% of funds are channeled to "IZ AL-DIN AL QASSEM" (the military wing) who channel these funds to cells.

FUNDRAISING IN SOUTH AFRICA

AL-AQSA INTERNATIONAL FOUNDATION normally embarks on two (2) fundraining campaigns per year in South Africa. The fundraising campaigns are launched each year during the Islamic month of RAMADAAN,

The Al-Aqsa fundraising campaign is planned for KwaZulu/Natal during January 1997.

A Palestinian delegation (members of HAMAS political wing) will arrive in South Africa via the Al-Aqsa head office in London to hold talks at Mosques in KwaZulu/Natal.

HAMAS IN SOUTH AFRICA (STRATEGIC OVERVIEW)

According to information HAMAS members in South Africa does not recognise the MUSLIM YOUTH MOVEMENT (MYM) as the official organ representing the Muslim youth in South Africa. HAMAS is of the opinion that the MYM have lost their control of the youths representation. Based upon this situation HAMAS, with the help of the INTERNATIONAL ISLAMIC FEDERATION OF STUDENT ORGANIZATIONS (IIFSO) are busy to establish institutions for the Muslim youth in South Africa to take over the role of the MYM. These youth centres are implemented in Pretoria and Cape Town.

*Page 34*

HAMAS

According to information Uman SHUBAIJHA attended the Islamic Conference in Laudium in April 1996 on behalf of HAMAS.

SHUBAIJHA reportedly stated that a HAMAS office would be opened in Pretoria once 5 000 members have been recruited.

After the conference, Sheikh Thaafier NAJAAR was appointed to coordinate the recruitment of Hamas members in South Africa. (NAJAAR is an executive member of the AFRICA MUSLIM PARTY and a member of the ISLAMIC COUNCIL OF SOUTH AFRICA - ICSA).

Active recruitment drives have allegedly already been launched at the

   * University of Durban-Westville (UDW)

   * University of the Witwatersrand (Wits) , confirmed, headed by Yusuf MOOSA (member of the MUSLIM STUDENTS ASSOCIATION - MSA) and Naeem (member of the MSA and the MUSLIM YOUTH MOVEMENT).

   At this stage, the recruitment is done secretively and is progressing very slowly.The students currently targeted for recruitment are mainly MSA or MYM members who support the ISLAMIC UNITY CONVENTION.

   * University of Cape Town (UCT)

   * Recruitment has also started in Lenasia and Laudium and is being conducted by Ismail PATEL (member of the Lenasia branch of the CALL OF ISLAM - COI) and Yusuf AHMED (attached to CRESCENT INTERNATIONAL).

Additional to the recruitment drive, two unidentified foreign members of Hamas reportedly reside in Gauteng and are awaiting a third member, Khalu NOUTAR (also believed to be a

*Page 35*

member of EZEDEEN AL-QASSAM - the military wing of Hamas) to arrive in South Africa. The eventual plan is to open an office, once the recruitment drive has proven to be successful.

Sheikh Abu ABDULA, a representative of HAMAS and alleged deputy general of HAMAS (residing in Dewsbury, London) visited South Africa to promote HAMAS as an organisation, recruit new members and to collect funds for both HAMAS and the ISLAMIC JIHAD.

ABDULA visited PE from 4-5 July 1996 and was hosted by Moulana Adam Bin ADAM (imam of Mansoor Mosque), Moulana Sali BABOO (attached to the Bloemendaal Mosque) and Ansar MIA (attached to the Malabar Mosque).

During a closed meeting with these individuals ABDULA stated that HAMAS has decided to open an office in PE under cover of the AL-AQSA INTERNATIONAL FOUNDATION (AIF). The HAMAS office will be opened next to the Mansoor Mosque.

Yunus AMOD (executive member of the MYM) and Mohamed LOMBARD (chairperson of the Malabar Mosque) will be involved in this initiative.

Apart from the meeting with the mentioned Muslim leaders, ABDULA also paid a visit to the paramilitary camp at Greenbushes, where he mentioned that the facility was to basic and needed to be upgraded.

It is not clear if ABDULA's visit and the planned establishment of the HAMAS office is by any means connected to the initiative of Sheikh Thaafier NAJAAR (Executive member of the AFRICA MUSLIM PARTY, member of the Islamic Council of South Africa and Imam at the Muir. Steet Mosque in Cape Town) to establish a HAMAS office and recruit HAMAS members at universities.

Sheik Yusuf ABDUL from the Westbank, Israel visited South Africa. ABDUL was the speaker at a HAMAS meeting at the Mayfair Jumma Masjid, c/o Hanover Street and 11 Ave, Mayfair on 1996-07-10.

ABDUL called on Muslims in South Africa to be part of the struggle against Zionism. He also asked Muslims to assist HAMAS financially in their struggle against Israel. Funds should be paid in at the offices of AL-AQSA INTERNATIONAL

*Page 36*

FOUNDATION, Fordsburg, Johannesburg.

Finaly he called on Muslims in South Africa to put more pressure on Jewish missions in SouthAfrica.

ii) Mohammed Ali ZAKEY (from Egypt and visit SA regularly to recruit members for HAMAS in Libya and Iran. Contact tel nr. 092955321436), involved in para-military training ISLAMIC MILITARY JIHAD, Lenasia.

HAMAS : CAPE TOWN

1996-11 : HAMAS plan to open an office in Cape Town and use two base offices from where they operate:

- SILK PUBLISHERS, Langmarkstreet, Cape town.

- QILBA offices, Barkley Sentrum, Athlone.

Other Hamas members active in South Africa:

* Abdul ZAHAR (orginaly from London, received his training in Sudan) involved with IMPACT INTERNATIONAL.

* Haroon KALLA (from the MUSLIM INSTITUTE in Sudan, also associated with the GLOBAL ISLAMIC MOVEMENT).

HAMAS INVOLVEMENT IN PORT ELIZABETH

Individuals involved in HAMAS activities:

* LUCKMAAN[15] (originally from Port Elizabeth)

---

15 LUCKMAAN received his religious training at the Muslim training camp in Greenbushes, Port Elizabeth).

* Dr. Yusaf PEER (Chairperson of Border Islamic Society).

* Shahied MEERA[16] (originally from KWZulu/Natal). The purpose of Asief KAHAAR's visit was to inform Muslim leaders on the activities of Hamas:

*Page 37*

- The aims and objectives of HAMAS;

- Mosque activities;

- Political and informational activities; and

- HAMAS's network through institutions

---

16 MEERA received military training in Pakistan.

The following Muslim leaders from Port Elizabeth accompanied KAHAAR on his visit to East London and Queenstown:

* Sulliman Umar DOUGLAS[17] (he is a Palestiniaan and a member of IGWAAN NOEL MUSLIMEEN);

* bubaker Mohammed (originates from the former Ciskei);

* Yusuf BHANJEE (executive member of PADAV);

* Moulana ADAM (Imam at the Masjied Mansoor in Malabar, Port Elizabeth); and

* Moulana Nazier DESAI (Amir of South African Mujahideen).

---

17 DOUGLAS hosted KAHAAR at no: 32 Saulstreet, Gelvanpark, Port Elizabeth during his stay in Port Elizabeth.

1997-08-27 : Information indicates the involvement of HAMAS[18] in Port Elizabeth through Dr. HABBAS as the contact person.

---

18 HAMAS members will attempt to forge ties with the N'Mujahideer) members, which could improve their paramilitary capabilities.

Agmat Sharief NIDEL under the directive of Mogamed ZAHAR[19].

---

19 Mogamed ZAHAR is identical to Mahmoud Khaled EL-ZAHER - Medical doctor and lecturer at the Islamic University in Gaza (this university is known as a strategic base of HAMAS). - HAMAS spokesperson in the Gaza Strip.

Information received during a Padav executive meeting on 1997-10-25 indicate that Sheikh CARLOO was asked for a progress report and stated that Agmat SHARIEF (member of

· Page 38

Hamas present at the meeting) was in contact with Sheikh MISRALA[20] over the past view weeks and that they have pledged to support Padav in the fight for Muslim unity. He continued to say that there were talks that Hamas fighters could come hide away in South Africa when it becomes to 'hot' for them abroad and vice versa for South African Mujahideen. Through the involvement of LAGERDIEN @ CAT it was decided that Padav delegation would meet with senior Hamas members to formalize this agreement.

- During the same meeting it was mentioned that a top Hamas operative from Egypt.

- Agmat SHARIEF had also been in contact with a Hamas commander Sheikh Nabir BEHARI (who looked forward to meet with South African Muslims).

---

20 Could be identical to Abd El Rahin NASSERALLA Hamas member in Saudi Arabia and "silent" head of INTERPAL.

HAMAS INVOLVENT IN CAPE TOWN

HAMAS members (through AL-AQSA) have contact with members of the ISLAMIC UNITY CONVENTION and QIBLA.

According to Faisal BODI in London the following South Africans were trained in Sudan by Hamas and Hezbollah operatives, who are currently in Cape Town:

Taufique ALI

Riaz GAMEELDIEN

Shamsudien ARIEFDIEN

Moeaath GABIER.

**EXHIBIT 12 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 37 of 386 PageID #: 8851



Copyright 1996 Times Newspapers Limited
The Times

March 6, 1996, Wednesday

**SECTION:** Overseas news

**LENGTH:** 384 words

**HEADLINE:** MI5 study 'charity cash link to Hamas'

**BYLINE:** By Stewart Tendler and Christopher Walker

**BODY:**

MI5 OFFICERS are studying police intelligence on alleged links between Hamas militants and a Palestinian fund-raising organisation registered in London with the Charity Commissioners.

Police sources believe up to Pounds 1 million a year is being raised by the Palestinians Relief and Development Fund, also known as Interpal. Some of the cash is transferred from funds raised in other countries, passed through London banks and sent to Palestinian refugee camps.

Special Branch officers are concerned about the final destination of the cash. Money may go to Hamas schools and projects in the Palestinian refugee camps but there is concern that funds could be diverted to fund terrorist attacks against Israel.

The information collected by Special Branch officers also raises questions over alleged links between the charity, based in Cricklewood, north London, and a number of Palestinian refugees described as former Hamas militants living in London.

At the centre of the group is a refugee described by intelligence sources as an alleged former high-ranking member of the military wing of Hamas. He is now understood to be seeking political ayslum in Britain.

The man has been in this country for four or five years and there are up to a dozen other former members of the military group in Britain.

Michael Heseltine, the Deputy Prime Minister, disclosed that Hamas activists are being monitored in Britain. Standing in for John Major, he told MPs: "We are carefully monitoring the situation of Hamas activists."

Yesterday a spokesman for Interpal said it had nothing to do with Hamas and was solely a charitable organisation.

Since Hamas was founded in the occupied Gaza Strip in 1987, the Islamic Resistance Movement has expanded into a well-financed welfare and guerrilla group. Its wings are notionally split in a way similar to Sinn Fein and the Provisional IRA.

According to a senior Israeli army officer who has studied the group, Hamas can count on about $60 million (Pounds 40 million) a year in private donations. About 85 per cent of it is used to run schools, medical centres, hospitals, youth clubs and mosques.

"Without the support and activity of the civilian wing, the military wing could not exist," the officer said.

**LOAD-DATE:** March 7, 1996

W_S157762

**EXHIBIT 13 to Declaration of Joel Israel**



Copyright 1996 Times Newspapers Limited
The Times

March 9, 1996, Saturday

**SECTION:** Home news

**LENGTH:** 335 words

**HEADLINE:** Charity's funds are frozen over alleged Hamas link

**BYLINE:** Stewart Tendler, Crime Correspondent

**BODY:**

THE Charity Commissioners have frozen the bank accounts of a Palestinian fundraising organisation after allegations of possible links with Hamas militants.

Last night a spokesman for the commissioners said that bankers for the Palestinians Relief and Development Fund, also known as Interpal, have been told not to release any money. The spokesman said the action was not "accusatory". He said: "It is merely protective and temporary. An order is placed on the bankers not to release funds without our say-so."

The charity's officials would now have discussions with the commissioners about the charity and allegations. The spokesman said the decision to suspend the accounts was "a precautionary thing to protect the funds".

The charity, which has offices in Cricklewood, northwest London, denies that it has any links with Hamas and says that it is purely a charitable organisation. It was founded in 1994 and aims to provide aid in Britain and abroad.

On Wednesday The Times reported that MI5 was studying police intelligence alleging that up to Pounds 1 million a year was being raised by the charity.  Some cash is transferred from funds raised in other countries, passed through London banks and sent to Palestinian refugee camps.

Special Branch officers are concerned about the final destination of the cash. Money may go to Hamas social and welfare projects in the camps but there is concern that cash could be diverted for terrorist attacks against Israel. There are also questions over possible links between the charity and a group of Palestinian refugees described as former Hamas activists.

At the centre of the group is a young Palestinian said to be seeking political asylum and described by intelligence sources as an alleged former high-ranking member of the military wing of Hamas. The man has been in this country for some years.

There are up to a dozen other members of the group living as students and also seeking refugee status.

**LOAD-DATE:** March 10, 1996

W_S157765

**EXHIBIT 14 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 41 of 386 PageID #: 8855



Copyright 1996 Guardian Newspapers Limited
The Guardian (London)

March 9, 1996

**SECTION:** THE GUARDIAN HOME PAGE; Pg. 5

**LENGTH:** 387 words

**HEADLINE:** PALESTINIAN CHARITY FUNDS FROZEN OVER 'HAMAS LINK'

**BYLINE:** Richard Norton-Taylor And Ian Black

**BODY:**

THE Charity Commissioners last night froze the assets of a London-based Palestinian fundraising organisation amid suspicions that money is being channelled to supporters of Hamas, the extremist group which has claimed responsibility for suicide bombs in Israel.

Bank accounts of the Palestinian Relief and Development Fund, known as Interpal, had been frozen "as a precautionary measure", a spokesman said last night. The commissioners expect to have talks with the organisation early next week.

The move follows pressure from the Foreign Office and the Israeli government which this week urged European Union countries to tighten up on Palestinian fundraising agencies.

Interpal, which is believed to raise about pounds 1 million annually, has been closely monitored by MI5 and Special Branch.   However, Whitehall sources say the commissioners have not received any specific evidence of Interpal's fundraising for Hamas.

Last Thursday, Michael Howard, the Home Secretary, said there was no evidence of money raised in Britain being used for terrorism.

An Interpal spokesman said last night: "Interpal is purely charitable and humanitarian." Projects included health schemes, care for the elderly and handicapped, and meat shipments.

**LOAD-DATE:** March 9, 1996

W_S157766

**EXHIBIT 15 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 43 of 386 PageID #:
8857



**March 15, 1996**

# ROOTS OF TERROR: A special report.;Alms and Arms: Tactics in a Holy War

### By JOHN KIFNER

**JERUSALEM, March 14—** Hamas, the main force behind the suicide bombers who have thrown the shaky Middle East peace talks into crisis, is an organization with deep roots, a popular base that feeds on misery and resentment, an international support network, and a clear goal: to turn the nascent Palestine into an Islamic state.

Mosques, hospitals and schools are its weapons as much as bombs, and Yasir Arafat, as much as Israel, is its target.

As world leaders united this week in a show of anti-terrorist resolve, even the experts who study groups like Hamas say the nature of the organization presents a daunting quandary: Do you attempt to co-opt the religious and civilian side, thus isolating the militants, as Mr. Arafat has sought to do? Or do you seek to crush Hamas whole, as Mr. Arafat's American and Israeli partners are now pressing him to do?

No one knows as well as Israel that either method can backfire.

In the 1970's and early in the Palestinian uprising, Israel allowed the surging Islamic movement to flourish and even covertly supported it, calculating that Muslim groups would undermine and draw support from Mr. Arafat's P.L.O., which was then the more immediate threat.

The tactic failed. Hamas, with its tight-knit cells and devotion to Islam, proved much harder to infiltrate and influence than Mr. Arafat's more secular and corrupt P.L.O.

But cracking down was hardly more successful. In 1992, in an attempt to decimate Hamas, Israel deported 415 of its activists to a snowy hillside in Lebanon.

Many of the deported militants enrolled in guerrilla training camps, and returned to Israel with their grievances and their skills honed to a fine edge.

Indeed, it was the assassination of Hamas's chief bomb-maker that brought the latest wave of suicide bombings, breaking a seven-month lull in terror attacks.

Hamas, the major Islamic militant organization, is linked to three of the four suicide bombings in the last two weeks that have left 62 people dead, including the bombers, and now looms as the gravest immediate threat to a Middle East peace.

Many who study the group fear proponents of peace -- Israel, Mr. Arafat, and the others who joined hands at the anti-terrorism conference Wednesday in Egypt -- are again in danger of outsmarting themselves by misjudging Hamas.

Although its organization and military operations are deliberately murky, interviews with a wide range of Palestinian, Israeli and Western experts present a portrait of Hamas that is more cohesive and intricate than is generally believed:

*Most of Hamas's estimated $70 million annual budget goes to support a network of hundreds of mosques, schools, orphanages, clinics and hospitals that permeates virtually every village, town and refugee camp on the West Bank and Gaza Strip. But these social services provide both a cover and a recruiting ground for young terrorists. One of the important uses of charitable donations to Hamas is to provide lifetime annuities to the families of suicide bombers.

*Hamas receives financial and other support from an array of sources, including Iran, Palestinians living in America and Europe, and prominent figures in Saudi Arabia and other oil-rich Gulf states. Much of the money is channeled through neighboring Jordan where the fudamentalist Muslim Brotherhood is strong.

W_S157773
6/21/2010 12:26 PM

*Attempts to behead Hamas by arresting or killing its leaders have tended to spawn revenge attacks and produce more radical new leaders. Mohammed Mousa Abu Marzook, now in custody in New York, came to power after a roundup of other leaders, and virtually reinvented Hamas as the financial and military organization that carried out the post-Oslo attacks on Israel.

*Efforts to counter Hamas are hampered, too, by family loyalties and shared experiences of battling Israel, including prison time. One example: Mr. Arafat is under extremely heavy pressure from the Americans to arrest Mohammed Dief, the current Hamas military chief, who has been operating from Gaza. The policeman in charge of the search, Col. Mohammed Dahlan of Mr. Arafat's security service, is a childhood friend of Mr. Dief and fellow inmate of Israeli jails who has been seen sipping coffee with the wanted man during the recent wave of bombings.

*Currently, there appear to be tactical divisions within Hamas, with the leadership based abroad pressing for more attacks and some leaders in Gaza and the West Bank willing to accept a truce, at least for the short term, in order to protect the mosques and charity institutions that from their political base. But it is unclear if these differences can be exploited, because underlying the tactics is a common goal: the ouster of Mr. Arafat and the creation of an Islamic Palestinian state.

*Above all, Hamas thrives on misery and frustration. The harsh Israeli blockade of Palestinian areas, along with flaws in the hastily organized peace plan and disappointment with Mr. Arafat's rule, which has brought little improvement in the lives of Palestinians, will only strengthen it.

The Rivals A Challenger To the P.L.O.

"Hamas is much better organized than the P.L.O. ever was," said a Western official closely monitoring the situation. "Their leadership has outsmarted Arafat. Their goals are to destroy the Labor government, destroy the P.L.O., destroy the peace process."

"Hamas supporters cross both tribal patterns and family patterns among Palestinians," he added, outlining what he described as "an incredible crisis" for Mr. Arafat. "Its not unusual for the same family to have brothers in different organizations. Many of the P.L.O. people were fighting shoulder to shoulder during the intifada with people from the military wing of Hamas."

Nor is Hamas operating in a vacuum. It has strong support from Islamic movements in neighboring countries, including Jordan, which both Palestinian and Israeli intelligence officers say is the main conduit of smuggled money and directives, and financial backing from Iran.

Hassan Habibi, the vice president of Iran, met in Damascus during the week between the two Jerusalem bus bombings with Emad al-Alami, a 40-year old engineer from Gaza who is the main leader of Hamas, and Ramadan Abdullah Shalah, the leader of Islamic Holy War, the other main Islamic group mounting terror attacks in Israel, as well as leaders of the Lebanese Party of God, according to Western intelligence reports. The meeting, held in the Iranian Embassy, was to discuss future tactics.

Mr. Habibi was accompanied by Hussein Sheikholeslam, an Iranian Foreign Ministry official who was among the hostage-takers at the American Embassy in Teheran in 1979 and whose duties include spreading Islamic revolution, according to the intelligence reports. Money changed hands at the meeting, according to the reports.

"The Islamic resistance movement is in for a glorious future," Mr. Sheikholeslam told the Iranian news service, I.R.N.A., after the meeting. "There is no peaceful solution. The Israelis must return to the countries they came from."

Mr. Arafat had been attempting, with some apparent success, to co-opt Hamas's political leadership, appointing some of its preachers to key posts, among other things. In December, with Israeli approval, he met with Hamas leaders in Cairo to work out a reconciliation. The intransigence of Hamas leaders from abroad blocked a hoped-for written statement, but there was a verbal agreement that Hamas would not launch any attacks that would embarrass Mr. Arafat's Palestinian Authority, a promise broken after the killing, presumably by Israeli security, of Hamas's military leader in January.

But now, under severe pressure from Israel and the United States, -- including a visit from a high-ranking Central Intelligence Agency delegation -- Mr. Arafat has launched a public crackdown on the Hamas infrastructure, rounding up some 600 of the usual suspects among public Hamas figures, replacing fiery sheiks in some 40 Gaza mosques with his own more conciliatory preachers and sending his police, trailed by television cameras, kicking down the doors of what turned out to be a kindergarten.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 45 of 386 PageID #: 8859

A Hamas bomb-maker's monument in Gaza was bulldozed by masked men, and Palestinian police displayed captured weapons, bombs and documents they said described a Hamas plot to overthrow Mr. Arafat.

But Israeli officials are skeptical of how long the Hamas people will stay in jail, and Palestinian officials declared that Mr. Dief and other fugitives, if caught, would not be extradited.

"These people must be rooted out ruthlessly," a Western official said of Hamas. "We pleaded and begged and warned Arafat that the militants were going to do him in, but he chose to co-opt rather than confront. He hasn't been able to realize that these people have a totally different agenda, to destroy the peace process."

But it remains unclear to many experts whether an all-out attack on the civil and well as military activities of Hamas is realistic or even the best way to reduce future terrorism.

"Islamic Holy War is weak, and, if Arafat chooses, it could be eradicated within a few days," Brig. Gen. Yaacov Amidor of Israeli military intelligence told a parliamentary committee, "but Hamas is difficult to get rid of. You can trim its branches, but you can't pull out its roots."

The Origins Roots in Charity And Religious Zeal

The militant Islamic movement here, like many in the Arab world, traces its roots to the Muslim Brotherhood founded in Egypt during the 1920's by Hassan al-Bana. The brotherhood has strong followings in Egypt and Jordan today, and has spawned movements in other countries.

Typically, the Brotherhood's strategy is to fight what it sees as Westernization and corruption of Arab governments by running its own schools, hospitals and other services in order to spread its beliefs.

Sheik Ahmed Yassin and the other founders of Hamas were Muslim Brotherhood followers running welfare, social and educational services through their mosques when the Palestinian uprising broke out against Israeli occupation of the West Bank and Gaza Strip in 1987.

Stone-throwing youths flocked to the P.L.O. banner and the rival Islamic Holy War taunted the Brotherhood for inaction. Fearful of losing his following to the P.L.O., Sheik Yassin formed a new organization, naming it Hamas, an Arabic acronym for Islamic Resistance Movement, which means "zeal." Its military wing was called the Ezzadin al-Qassem brigade, after a Muslim preacher in Haifa who led an Arab revolt against both British rule and Zionist settlement in the 1930's, dying in battle.

Ironically, the Israeli authorities had quietly supported the Islamic movements, both during the 1970's and in the early days of the uprising, in hopes of undermining the nationalism of the Palestine Liberation Organization.

"There was a conscious decision to build up the Islamic groups as a counterweight to the P.L.O. and to increase divisions within Palestinian society," said a long-serving Western diplomat. "The Ministry of Defense gave the okay for all these Islamic institutions which became the financial and institutional infrastructure behind the Qassem brigades. These institutions were allowed to flourish and function and this has come back in a terrible way to haunt the Israelis."

Hamas swiftly became a problem, and in 1989 the Sheik Yassin was thrown into an Israeli jail where he has remained ever since. A further wave of arrests was meant to decimate the leadership but failed, and in December, 1992, Israel deported 415 Hamas activists, dumping them on a barren, snowy hillside in Lebanon.

The arrest of Sheik Yassin and other leaders brought to power a lower ranking activist, Mohammed Mousa Abu Marzook, who was to substantially change the organization.

Described by those who know him as an ambitious, charismatic figure, Mr. Marzook reorganized the structure of Hamas, Israeli and Palestine intelligence officials say, setting up outside fund-raising channels and concentrating virtually all political, financial and military power in his own hands.

Mr. Marzook operated for a time from the United States, living in Springfield, Va., where he was active in an Islamic organization called the United Association for Studies and Research. He then set up a major Hamas support office in Amman, Jordan until, under American pressure, the authorities expelled him in early 1995, after two suicide bombers killed 21 Israelis, most of them soldiers at a bus stop.

W_S157775

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 46 of 386 PageID #: 8860

With the Oslo accords in the fall of 1993, the situation here had changed dramatically. While Mr. Arafat's followers prepared to take over Palestinian enclaves in the West Bank and Gaza Strip, Hamas and Islamic Holy War launched a wave of suicide car bombings, kidnappings and shootings that have killed some 213 Israelis since the peace was signed, far more than in the troubled years of the uprising.

After leaving Jordan, Mr. Marzook traveled between Damascus and Dubai in the United Arab Emirates, among other places. On July 28 of last year, he landed at Kennedy Airport in New York on a flight from London, and an immigration inspector spotted his name on a computer watch list of suspected terrorists. He has been held since at the Federal Metropolitan Correctional Center in Manhattan as Israel presses for his extradition.

His place as the leader of the "outside" Hamas leadership, although apparently not all of his power, has been taken by his former deputy, Mr. Alami. He is said to operate primarily from Damascus, although he also travels to Teheran.

The Money Complex Network Fills the War Chest

However, according to Israeli intelligence officials, the financial networks organized by Mr. Marzook that channel funds from abroad to Hamas are still intact. The Israelis estimate that roughly 95 per cent of the estimated $70-million a year goes into such charities as hospitals, clinics and schools, with only a small portion siphoned off to pay for weapons and military operations.

One charitable activity, however, is vital to the military operations: the support payments granted to the families of suicide bombers and others killed in clashes with Israel. These stipends are believed to play an important role in recruiting. Last week, Israel put the director of an Israeli Arab charity under house arrest, charging he had channeled millions of shekels to the families of Hamas guerrillas.

"This is the most critical part," an Israeli Army officer said. "They have to make sure these families are taken care of."

Israeli officials say that among the key Hamas fund-raising operations are the Holy Land Foundation of Richardson, Texas and the London-based Palestine and Lebanon Relief Fund, known, for its telex address, as Interpal. Other money, they say, comes from Saudi Arabia and the Gulf, both from Moslem charities and wealthy individuals.

Much of the money, both Palestinian and Israeli intelligence officers say, is funneled through Jordan, where Hamas maintains an operation headed by Ibrahim Ghosheh, a Jordanian citizen, and a fund called the Islamic Aid Committee. In Amman, Hamas operates in conjunction with the Muslim Brotherhood, which has become a political force with a sizable representation in Parliament and municipal offices. Funds are smuggled across the three bridges over the Jordan River or transferred between banks or money changers.

Iran, operating primarily through its embassy in Iran, where it deals with the Lebanese Party of God and Palestinian factions opposed to the peace agreements, has also given money to Hamas, the intelligence officers say, although adding that Hamas in the past has been wary of political direction from Teheran.

In Gaza and the West Bank, Hamas operates on several levels.

One involves what are known as Dawa activities -- from the Arabic word for the call to prayer. These include the issuance of pamphlets and staging of ceremonies to spread Islamic doctrine.

The major effort, employing hundreds of people, is the social and welfare network. These include the Medical and Scientific Association, which runs hospitals and clinics where only a nominal fee is charged, and the Sciences and Culture Association, which runs Islamic schools. There is a Y.M.C.A.-like Young Islamic Association where boys can play soccer and learn martial arts, and an Islamic Cultural Center for Women, some of whose members have lately been complaining that girls do not get a chance to be suicide bombers.

An organization of some 164 clerics, outlawed by Israel, called the Council of Religious Sages, coordinates sermons so that similar political messages come from the mosques. Tape cassettes circulating of recent sermons bear such titles as: "P.L.O. high treason: Oslo and beyond."

All of this has been open and public. The military operations of the Qassem brigades are by nature clandestine. They are believed to be coordinated by what is known as the "Inside Committee" headed by Mr. Alami. Some directives, by telephone or fax, are passed through private telephone switching businesses in Cyprus.

W_S157776
6/21/2010 12:26 PM

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 47 of 386 PageID #: 8861

But there had been no bombings or other attacks here since last Aug. 21, when a bus in Jerusalem was blown up, killing six people and wounding more than 100. That was only a month after Mr. Abu Marzook, who tightly controlled operations, was taken into custody at Kennedy Airport, suggesting this disrupted the leadership. At the same time, Mr. Arafat was seeking to draw leaders in Gaza to him, persuading one key figure, Emad Falaji, to cross over.

"Arafat was gradually, successfully neutralizing the Hamas leadership," said Khalil Shikaki, a respected Palestinian polling expert who is also the brother of the slain leader of Islamic Holy War. "There was internal dissent, turmoil among them. The total lack of response to their call for a boycott of elections was a blow to their prestige and credibility. Some, as long as their infrastructure was safe, might be willing to trade off the military."

The Reprisals A Shadow War Erupts Into Open

The pause in bombings was to end in the wake of two dramatic assassinations of Islamic terrorist leaders. Smiling Israeli officials pointedly did not deny responsibility. The first to be killed was Fathi Shikaki Islamic Holy War leader, in Malta on Oct. 26. As he sauntered out of the luxury hotel where he was registered under a false name as a Libyan businessman, a gunman calmly pumped several shots from a silenced 9-millimeter pistol into his head, then sped away on the back of a waiting motorcycle.

The second was yet more spectacular. Yahya Ayyash, the chief Hamas bomb-maker known as the Engineer, was in his hiding place in Gaza on the morning of Jan 5. He took a call from his father on a cell phone, which suddenly exploded. This killing was widely attributed to Israel's internal security service, Shin Bet, which had been smarting over its failure to protect Prime Minister Yitzhak Rabin from an assassin last fall; the day after Mr. Ayyash's death, the director of the secret agency submitted his long-expected resignation, after having partially recouping his agency's prestige.

At the time, there was widespread expectation on both sides that the killings would prompt revenge attacks. "Of course there will be revenge against Israel," said Mahmoud al-Zahar, the Hamas political leader in Gaza. "The principles of the Hamas movement command us not to lose Palestinian blood without revenge."

The bombings to avenge Mr. Ayyash, Palestinian and Israeli intelligence operatives believe, were organized by Hassan Salami, known as Abu Ahmed, who had left Gaza to escape arrest during the uprising. He received training in Sudan, which under the leadership of Hassan al-Turabi has become a gathering place for Islamic revolutionaries, including veterans of the Afghan guerrilla movement eager to continue their struggle. He is believed to have infiltrated into Gaza -- where most of the bombings have been planned -- through Syria.

"He is a very dangerous guy," an Israeli officer said. "Young, but dangerous."

Mr. Salami recruited Mohammed Abu Warda -- who was captured by the Palestinian police, sentenced to life imprisonment within 24 hours and confessed on Israeli television -- in the West Bank town of Ramallah. He, in turn, found three young suicide bombers. They were equipped simply, with old Egyptian-issue land mines dug up from the Sinai desert, carried in a duffle bag, wired to nine-volt batteries. They passed unnoticed in Israeli army uniforms, with one wearing an earring for extra authenticity.

The last bombing on Tel Aviv's Dizengoff Street was carried out by Islamic Holy War, with the bomber being smuggled out of Gaza in an Israeli Arab's truck past a lax military checkpoint. An Islamic Holy War statement issued in Beirut said it would be "one of a series" to avenge Mr. Shikaki.

The funeral of Mr. Ayyash demonstrated Mr. Arafat's political problems. Over 100,000 people swarmed through Gaza's fetid streets, carrying Mr. Ayyash's coffin, screaming "Death to Israel. We are all Yahya Ayyash, we are all Ezzadin Qassem" and scattering baseball card-like pictures of the Hamas military leader. He was a folk hero and legends were told of his exploits and escapes, sometimes disguised as a woman, an old man, or an Orthodox Jew. When he emerged unscathed from the accidental demolition of one of his own bomb factories, he was said to have been guarded by angels.

Mr. Arafat visited the bereaved family, declared Mr. Ayyash a "holy martyr," ordered a 21-gun salute and sent ranking members of his Palestinian authority to the funeral. Reporters spotted at least 10 wanted terrorists in the crowd, including Mr. Dief.

In effect, said a European diplomat well-versed in the area, Mr. Arafat has begun to reproduce in Gaza the atmosphere of his days in Beirut, with an administration marked by inefficiency, corruption and cronyism, trying to keep all power to himself while juggling various warlords, including half a dozen paramilitary police agencies, the armed Islamic militants

W_S157777
6/21/2010 12:26 PM

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 48 of 386 PageID #: 8862

and criminal bands that control their own turf for narcotics and car theft operations.

"This is a fight for the very nature of Palestinian society," said Emmanuel Sivan, an Israel expert on Islamic militancy. It is posed for Hamas, he said, in rhyming Arabic contrasts -- usuliyya, meaning a righteous Islam, and wusuliyya, connoting the decadent life of the noveau rich. And they add the new term jahaliyya, meaning a pre-Islamic state of barbarism and ignorance. The word is used by the Muslim Brotherhood in Egypt to sanction revolt against Arab rulers they regarded as Westernized and corrupt.

While other Palestinians frolicked on the Gaza Strip's sandy beaches after the Israeli withdrawal, Hamas supporters were appalled at the mixed bathing. When not fighting Israel, they may busy themselves cutting the wires to television satellite dishes.

"Arafat was trying to co-opt Hamas with classic divide-and-rule tactics and he was having success. He made a truce with them," he said. "But now they have betrayed him. His dilemma is that he has no other option but to move against them. But should they retaliate against the Palestinian Authority there could be armed struggle in the streets."

Mr. Shikaki, the polling expert whose research had shown a sharp decline in support for violence among Palestinians over the last year, offered a similarly gloomy assessment of the immediate future.

If Mr. Arafat "goes against the mosques, he would be making enemies of a large part of the Palestinian population. Gaza and the West Bank could be turned into another Algeria. People will be asking 'What kind of an Authority do we have, what kind of peace?' "

Photos: Children studying verses from the Koran at an Islamic schoolfounded and paid for by Hamas in the Gaza Strip. Young and needy Muslims are the beneficiaries of the tightly woven organization, but Israelis have been its victims. (Rina Castelnuovo for the New York Times)(pg. A9); Hamas, the militant Islamic group, has emerged as the strongest supporter of peace accords between Israel and the P.L.O. Hamas supporters are shown rallying under a wall bearing anti-Israeli graffiti. (Rina Castelnuovo for The New York Times) (pg. A1) Chart/Photos: "BEHIND THE SCENES -- Hamas: A Family Tree" Terrorist organizations do not publish organizational charts, and Hamas is particularly secretive about its leadership. The following guide to its history and leaders is compiled from Israeli, Western and Palestinian sources. EARLY INSPIRATIONS Hassan al-Bana Founder of the Moslem Brotherhood in the 1920's in Egypt, an anti-Western, anti-corruption movement that spread its beliefs through schools and social services and still has followers in Egypt, Jordan and elsewhere. Sheikh Ezzadin al-Qassem An early hero, a Moslem preacher in Haifa who led revolts against British rule and Zionist settlers in the 1930's, dying in battle. Military wing of modern Hamas took his name. HAMAS Sheikh Ahmed Yassin Crippled in childhood, he was a Muslim Brotherhood leader in GAZA?? running welfare and educational services in 1987 when the Palestinian uprising against Israeli occupation began. He formed Hamas, Arabic acronym for Islamic resistance movement, with civic programs and a military wing. Arrested in 1989 and remains jailed in Israel. Mohammed Mousa Abu Marzook After arrest of Yassin and others this American-educated engineer, a native of Gaza, took over Hamas, centralizing control and nurturing foreign funding. Operating from United States, Jordan, Damascus and elsewhere he led resumption of suicide bombings in protest of 1993 Oslo accords. Arrested in New York in 1995, remains jailed pending Israel's request for extradition. Emad al-Alami Engineer from Gaza, took over as overall leader after arrest of Marzook, but is believed to have less control over all elements of Hamas. Based mainly in Damascus. MILITARY Yehiya Ayyash Known as "the engineer," led military wing and was chief bomb designer. Killed on Jan. 5 in Gaza by telephone bomb, presumably set by Israelis. Mohammed Dief Succeeded Ayyash as military head, operates out of Gaza and is now the most wanted. CIVILIAN Mahmoud el-Zahar Political leader of Hamas in Gaza, operated openly, now under arrest by Palestinians in current crackdown. ISLAMIC HOLY WAR Fathi Shkaki Was leader of Islamic Jihad, a much smaller group devoted solely to military struggle. Killed, presumably by Israeli agents, in Malta last October. Ramadan Abdullah Shalah New leader of Islamic Jihad, which claims credit for recent Tel Aviv bombing. Now based in Syria, he has lived and studied in United States, Great Britain and Egypt. Map/Diagram: "Home-Grown Roots and Foreign Support" Hamas is a mass movement with solid support among perhaps 15 percent to 20 percent of the two million Palestinians in Gaza and the West Bank. Leadership is divided between those inside the territories and those operating outside, mainly from Damascus. The organization depends heavily on outside funds, with half of its estimated $70 million annual budget coming from the oil-rich Gulf states and another 35 percent from Europe, mainly England, and the United States, according to Israeli estimates. Most of this goes to Hamas charitable, religious and civic groups, but some is used to support the families of suicide bombers and a small fraction is used for arms. Iran Government gives money to Hamas and other fundamentalist groups, and provides offices in Teheran for Hamas officials. Jordan Major trans-shipment point for funds to Hamas from Gulf states, Europe and United States, with money transfered via Jordanian banks, or carried across border. Hamas political leaders operate openly. Syria A major base for Hamas and other fundamentalist groups. Sudan A military training

W_S157778
6/21/2010 12:26 PM

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 49 of 386 PageID #: 8863

ground for Hamas and other fundamentalist groups. Saudi Arabia Private charities here and in neighboring Gulf states provide substantial funds.

Copyright 2010 The New York Times Company | Home | Privacy Policy | Search | Corrections | **XML** | Help | Contact Us | Back to Top

W_S157779
6/21/2010 12:26 PM

**EXHIBIT 16 to Declaration of Joel Israel**

Contact name:   GERALD MATTHEWS          ITS:   4627X2602          Response required by:          URGENT

## Appraisal Form - New
**To be used where all facilities fall outside Credit Scoring Criteria**

| | | | |
|---|---|---|---|
| Account    PALESTINIAN RELIEF & DEVELOPMENT FUND | Main A/C Number    95142940 | | |
| Domicile Branch    FINSBURY PARK | Controlling Office    ISLINGTON BUSINESS CENTRE | | |
| Relationship Manager: Sequence No    42 | Sort Code    600822 | | |
| Main Business Activity    CHARITY FOR RELIEF OF PALESTINIANS IN GAZA & WEST BANK, ISRAEL | SIC   8530P | Date   11/03/98 | |

### Section 1

| Facilities | Present Position | Existing Limit/Max and Term | Limits/Max and Term Sought/Agreed (UDP) | | Accounts dated | Audited/Management/Draft |
|---|---|---|---|---|---|---|
| C/A | | | | | Surplus Resources | |
| DOC. CR. | | | | | Gearing Ratio | |
| CHILDREN A/C | | | | | Turnover | |
| INT. MONEY | | | | | NPBT/(Loss) after Drawings | |
| ZAKAT FUND | | | | | Retained Cash Flow | |
| ADMIN. | | | | | Total DP Security | |
| FAMILIES | | | | | Written down security value | |
| Totals | 268043 cr. | | | | Additional Security to come | |

| Other Credit Balances/Deposits (within Group) | Other Liabilities nil | Suretyship Liabilities | Nominal £ | Reliance £ |
|---|---|---|---|---|
| | | Mandate number & date    NWB1017   23/11/94 | | |
| | | M & AA Dated (Ltd Co. only) | | |

## 2  Key Issues

| Issues:   Matters outstanding from/arising since last review.   Synopsis of discussion with customer. |
|---|

- Request for Documentary Letter of Credit FOR ▓▓▓▓▓ subject to charge over equivalent US Dollars balance to puchase tinned meat from New Zealand for shipping to Israel to Palestininian refugees.
- MLMA: Top income earner in portfolio.
- Significant credit balances maintained in Sterling and US Dollars on current account.  Turnover for ▓▓▓▓▓ of which ▓▓▓▓ received in US Dollars mainly from Saudia Arabia, but also some from USA.

## 3  Non-Financial Developments

Non-Financial Information Form up to date?          ☒ Yes          ☐ No          If No, enclose new NFIF

| Issues:   Changes to trading activities/marketplace/management etc. |
|---|

This is a Muslim charitable trust where interest cannot be earned on balances for religious reasons.
In account at Finsbury Park since the mid-1980's but the original trust was closed last year, the present one set up in 1994.
Provides charitable relief to Palestinian areas of Israel i.e. Gaza, and the West Bank.  Recently some relief to refugee camps in Lebanon.  Relief is usually food or allowances for children's education.  Distribution is monitored by local charities and representatives.

Two major times of the year for receipts are Ramadam (in January this year and at Easter time.  These bring in half the annual income.

In 1996 the Charity was investigated by the Charities Commission on an allocation of funds used for terrorism, ▓▓▓

HIGHLY CONFIDENTIAL

**Appraisal Form - New** (continued)

**4   Account Operation**

| | | | | | | |
|---|---|---|---|---|---|---|
| 4a | Excesses seen | ☐ Yes | ☒ No | Escalating trend | ☐ Yes | ☒ No |
| | Hardcore present | ☐ Yes | ☒ No | If yes, level £ | | |
| 4b | Items returned in last 12 months? | ☐ Yes | ☒ No | If yes, date of last item returned unpaid | | |
| 4c | No. of items returned in last 12 months N/A | | | | | |

�e Issues   Does hardcore / account trend indicate losses/fixed assets being purchased from overdraft?   Consider transfer to loan ▄

- First class account operation with significant balances up to ▮▮▮▮▮
- Behavioural score 1.
- No pressure on the balances.

**5   Trading Performance**
**5a Financials**

| | | |
|---|---|---|
| Have any up to date figures been provided? | ☒ Yes | ☐ No |
| Are these realistically based on your knowledge of the business? | ☒ Yes | ☐ No |
| Do you hold any figures for the two preceding accounting periods? | ☒ Yes | ☐ No |

If yes, compare the two sets of figures, considering any significant change in the following:

Source of current information: dated 31/12/96    ☒ Annual Accounts    ☐ VAT Returns
☐ Management Figures
Source of previous information: dated    ☐ Annual Accounts    ☐ VAT Returns
☐ Management Figures

| | | | | |
|---|---|---|---|---|
| Turnover | ☒ Increased | ☐ Decreased | ☐ No change | ☐ Not available |
| Gross Profit | ☒ Increased | ☐ Decreased | ☐ No change | ☐ Not available |
| Net Profit after drawings | ☒ Increased | ☐ Decreased | ☐ No change | ☐ Not available |
| Surplus Resources (debt) | ☒ Improved | ☐ Worsened | ☐ No change | ☐ Not available |
| Liquidity | ☒ Increased | ☐ Decreased | ☐ No change | ☐ Not available |
| Debtor Days | ☐ Increased | ☐ Decreased | ☒ No change | ☐ Not available |
| Creditor Days | ☐ Increased | ☐ Decreased | ☒ No change | ☐ Not available |
| Stock Days | ☐ Increased | ☐ Decreased | ☒ No change | ☐ Not available |

If any of the above information is 'not available', is it reasonable that earlier figures have not been provided to the Bank?
☐ Yes    ☐ No

What other information is available?
☐ None - New Business    ☐ VAT Return Figures only    ☐ Other (please specify)

**Appraisal Form - New (continued)**

**5b Current Figures**

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| **Debtors** | - well spread? | ☐ Yes | ☐ No | ☒ N/A |
| | - considered collectable? | ☐ Yes | ☐ No | ☒ N/A |
| **Creditors** | - well spread? | ☐ Yes | ☐ No | ☒ N/A |
| | - paid up to date? | ☐ Yes | ☐ No | ☒ N/A |
| Stock readily saleable? | | ☐ Yes | ☐ No | ☒ N/A |
| Are **profits being retained** after drawings? | | ☒ Yes | ☐ No | |
| Are **profit margins** steady or increasing? | | ☒ Yes | ☐ No | |
| **Sales** in excess of **break-even** with a margin? | | ☒ Yes | ☐ No | |
| Cash **generated** from operating activities? | | ☒ Yes | ☐ No | |
| **Interest cover** greater than 2.5 times? | | ☒ Yes | ☐ No | |

> Issues:    Consider Working Capital, Liquidity, Sales, Profit Margins, Break Even, Cash Generation, Gearing, Interest Cover, accuracy of previous information

- Very cash solvent charity. Overheads well covered and whilst 1996 receipts were 5% up on 1995, 1997 income was up by 50% on 1996, due to doubling of US Dollar receipts.

## 6 Proposition

> Issues:    Details of proposition including customer's contribution.   Consider type and term of product against purpose and proposition.   Consider Net Working Asset position in relation to future funding.

- Request Irrevocable Documentary Letter of Credit for ██████ TO EXPIRE 31 May 1998.  (The facility maybe made up to two separate Letters of Credit).  Funds will be transferred into a separate US Dollar currency current account in the name of the Bank and a charge obtained over this.

- Funds will continue to be received to provide cashflow particularly over Qurbani (at Easter).  Clause D (VIII) of the trust deed provides power to borrow money and we understand from Legal Services that this is in order.

> Issues:    Consider environmental/policy implications, settlement risk (Action Directory  Settlement Risk)

HIGHLY CONFIDENTIAL

**Appraisal Form - New** (continued)

**7   Repayment and Projections**

Do any of the facilities applied for replace existing commitments?   ☐ Yes   x  No

*if yes, how do the new repayments compare?*   ☐ More   ☐ Same   ☐ Less

Has customer repaid previous liabilities successfully?   ☐ Yes   ☐ No   x  N/A

Is a Capital Repayment Holiday required?   ☐ Yes   x  No

*If yes, for how long?*   ___N/A___   *Months*

> **Issues:** Comment on viability of repayment to include source and timing. If projections held consider against past performance, assumptions, seasonality, impact of changes in sales/costs etc. on future borrowing/profits.

**Letter of Credit:** Drawings will be paid by us releasing the funds over which a charge will be held.  It is anticipated that there will only be one drawing.   If there are two letters of credit then separate accounts will probably be opened for each.

**8   Security**

8a   Security surplus £ nil   Acceptable?   x  Yes   ☐ No   ☐ N/A

Security formula being met?   x  Yes   ☐ No   ☐ N/A

What is The Security Formula?

8b   Make-up of total security figure (use written down values in accordance with AS 982, 984, 994, 1045)

Land & buildings £   ☐ Mortgage Debenture £   ☐ Life policy £

Stocks & Shares £   ☐ Unsupported Guarantee £   ☐ Supported Guarantee £

x  Other ▓▓▓▓▓▓ charge over credit balance   x

8c   Are S/R Specifications/ISS Notes Up-To-Date? If No, give details

> **Issues:** Overview of security cover. Detail of new security offered or steps to address an unsatisfactory security position. Consider retention of Title on Stock, environmental implications (AS293), third party security implications (AS113).

- To come Charge over credit balance for ▓▓▓▓▓▓

**Appraisal Form - New** (continued)

**9  Pricing**

Current Pricing:
Matrix Core Price          Matrix Market Risk Price               Total Price:
Agreed Pricing:

| Arrangement Fees: | Lending - Scale | £925.93 | Agreed | £NIL |
|---|---|---|---|---|
| | Security - Scale | £ 34.00 | Agreed | £NIL |

**Issues          Adequacy of interest margin/fees in relation to risk/management time**

**Letter of Credit** fee is 0.5% i.e. sterling equivalent of £925.93.  However customer has repeatedly made the point that we do not pay them interest (their choice) although they receive free banking as a result overall there is an activity surplus.

At last transmission review 12 months ago WE038 pricing showed a surplus of ▮▮▮ with credit balances.  Since then credit balances have increased (current WE038 are awaited) but MLM value is ▮▮▮.  Therefore I am agreeable to refunding the fee.

**10 Risk Assessment     (Existing GAPP grade     3)                    (Previous BSRG grade   1)**

Overall Attitude towards customer -   ☐ Pro-active     x     Supportive     ☐ Cautious     ☐ Manage Out

Summarise strengths/weaknesses in terms of:

The business          (management, products, markets, financial strength, track record)
The proposition          (amount, purpose, repayment, projections, remuneration, security)

Positive Features:
- Cash positive charity with significant value to the Bank.
- Good balances held.
- 1996 accounts received.  Continued growth in 1997.

Negative Features:
- The Charity services a very volatile area.

**11 Recommendation and Way Forward (include action plan for U/R and unsatisfactory accounts)**

     x   Recommended          ☐ Agreed          ☐ Declined          ☐ Overview Required

**Reason for Overview**

**Issues:    Recommended way forward (and any alternative courses of action considered) to include explanation of attitude towards customer.  Explain why you have agreed the borrowing request.**

- Recommend that the Documentary Letter of Credit facility is made available subject to a charge over credit balance for full cash cover.
- The account earns higher than average income on the credit balances.

HIGHLY CONFIDENTIAL

**Appraisal Form - New** (continued)

**12 Monitoring/Terms and Conditions**

Issues   Are lending formulae being met/appropriate?

Not applicable.

**13 Sales - Bank Services**

Action Points
| | | | | |
|---|---|---|---|---|
| 1 | Update ISS - EIN/UFA/EMN | | 4 | Take Fees |
| 2 | Prepare Advice of Borrowing Terms letter/CCA forms | | 5 | Raise diary notes |
| 3 | Mark Limits - ELR/ERR/SPR | | | |

Signed _____   Name   GERALD MATTHEWS   Position   BUSINESS MANAGER

**14 For Regional/Overview Comments/Counter signature Only:**

Signed _____   Name _____   Position _____

HIGHLY CONFIDENTIAL

**EXHIBIT 17 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.*

---

*GERALD ROGER MATTHEWS*

*Vol. 1*

*October 5, 2010*

---

*European Deposition Services*

*59 Chesson Road*

*London W149QS*

*England*

*United Kingdom*

Original File Matthews5thOctober.txt

**Min-U-Script® with Word Index**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 59 of 386 PageID #: 8873

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.                GERALD ROGER MATTHEWS -  Vol. 1
NATIONAL WESTMINSTER BANK, PLC.                              October 5, 2010

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

TZVI WEISS, et al,                )
                   Plaintiffs,    )    Action No:
                                  )    05cv4622(CPS)(MDG)
v.                                )
                                  )
NATIONAL WESTMINSTER              )
BANK, PLC.,                       )
                   Defendant.     )

---

NATAN APPLEBAUM, et al,           )
                   Plaintiffs,    )
                                  )
v.                                )
                                  )
NATIONAL WESTMINSTER              )
BANK, PLC.,                       )
                   Defendant.     )

---

VIDEOTAPED DEPOSITION OF GERALD ROGER MATTHEWS

VOLUME I

Tuesday, October 5, 2010

AT:  9:03 a.m.

Taken at:

CLEARY, GOTTLIEB, STEEN & HAMILTON
55 Basinghall Street, London
United Kingdom

Page 2

A P P E A R A N C E S

For Plaintiff Tzvi Weiss:

        AITAN D. GOELMAN
        Zuckerman Spaeder LLP
        1800 M Street, NW
        Washington, DC 20036-5802
        Tel: 202.778.1800

For Plaintiff Natan Applebaum:

        JOEL L. ISRAEL
        Sayles & Werbner
        4400 Renaissance Tower
        1202 Elm St.
        Dallas, Texas 75270
        Tel: 214 939 87631

For Defendant National Westminster Bank, PLC:

        JONATHAN I. BLACKMAN ESQ.
        VALERIE SCHUSTER
        Cleary, Gottlieb, Steen & Hamilton LLP
        One Liberty Plaza
        New York, NY 10006-1470
        Tel: 302 351 9415

COURT REPORTER:

        GEORGINA FORD, ACR, MAVSTTR, MBIVR
        European Deposition Services
        59 Chesson Road
        London, W14 9QS
        Tel: 44 (020) 7385 0077

        VIDEOGRAPHER: SIMON RUTSON

        THE EXAMINER: ADRIAN HUGHES, QUEEN'S

COUNSEL

Page 3

I N D E X

| DEPONENT | PAGE |
|---|---|
| GERALD ROGER MATTHEWS | 5 |
| Examination by MR. GOELMAN | 5 |
| Examination by MR. ISRAEL | 110 |

E X H I B I T S

| No. | Description | PAGE |
|---|---|---|
| Exhibit 1 | Letter dated 2 May 1996 | 19 |
| Exhibit 2 | Letter dated 9 October 1996 | 22 |
| Exhibit 3 | Letter dated 18 March 1998 | 32 |
| Exhibit 4 | Appraisal form | 37 |
| Exhibit 5 | Bates NW052805 | 73 |
| Exhibit 6 | Bates NW191801 - 191806 | 77 |
| Exhibit 7 | Letter dated 16 September 1998 | 86 |
| Exhibit 8 | Clubs, societies and associations mandate | 86 |
| Exhibit 9 | Credit assessment | 91 |
| Exhibit 10 | Bates NW052813 | 98 |

Page 4

1    THE VIDEOGRAPHER: This is the beginning of tape
2  1, volume 1 in the deposition of Mr. Gerald Matthews taken
3  on 5 October 2010 at 9:03 a.m. as indicated on the video
4  screen.
5        This deposition is being taken in the matters of
6  Tzvi Weiss et al, plaintiffs, against National Westminster
7  Bank PLC, defendant, case number 1:05-CV-04622 (DTG) (MDG).
8        Also the deposition is being taken in the matter
9  of Natan Applebaum et al, plaintiffs, against National
10 Westminster Bank PLC, defendants, case number 1:07-CV-00916
11 (DTG) (MDG).  The deposition is taking place at the offices
12 of Cleary Gottlieb Steen & Hamilton in London, England.
13       The videographer is Simon Rutson, the Court
14 Reporter is Georgina Ford on behalf of European Deposition
15 Services.
16       Would counsel present please introduce themselves.
17       MR. GOELMAN: Aitan Goelman of the law firm
18 Zuckerman Spaeder in Washington DC for the Weiss plaintiffs.
19       MR. ISRAEL: Joel Israel from Sayles & Werbner for
20 the Applebaum plaintiffs.
21       MR. BLACKMAN: Jonathan Blackman and Valerie
22 Schuster from Cleary Gottlieb Steen & Hamilton for the
23 defendant and the witness.
24       THE VIDEOGRAPHER: Would the examiner please
25 introduce himself.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 60 of 386 PageID #: 8874

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

GERALD ROGER MATTHEWS - Vol. 1
October 5, 2010

Page 41

1 your portfolio?
2      MR. BLACKMAN: Objection to form.
3      THE WITNESS: Yes, it was.
4 BY MR. GOELMAN:
5   Q.  Do you know if that was the single greatest
6 turnover in any of the accounts in your portfolio in 1997?
7   A.  I don't know now.
8   Q.  It says:
9       [redacted] received in U.S. dollars mainly from
10 Saudi Arabia, but also some from U.S.A."
11      Where would the information in terms of the source
12 of Interpal's money have come from?
13   A.  I can't recall that now.
14   Q.  You can't recall if you learned that from Interpal
15 or --
16   A.  Or from the bank's own records as to where the
17 money was remitted in from.
18   Q.  But it is fair to say that as of March of 1998 you
19 knew that a sizeable portion of Interpal's funds came from
20 Saudi Arabia?
21      MR. BLACKMAN: Objection to form.
22      THE WITNESS: I can't recall that.
23 BY MR. GOELMAN:
24   Q.  Is it fair to say that from looking at the
25 document?

Page 42

1      MR. BLACKMAN: Objection to form, calls for
2 speculation.
3      THE WITNESS: I'm sorry, I can't say that.
4 BY MR. GOELMAN:
5   Q.  You wrote that this is a Muslim Charitable Trust.
6 Can you see the issues under 3?
7   A.  Yes.
8   Q.  Muslim Charitable Trust where interest cannot be
9 earned on balances for religious reasons.  Do you see that?
10   A.  Yes.
11   Q.  Was it your understanding when you filled out this
12 form that Interpal, even if it was entitled to interest from
13 the bank, had chosen not to accept interest payments?
14   A.  That's correct.
15   Q.  And the reason for that was its interpretation of
16 Islamic law?
17   A.  Yes.
18   Q.  Did you have any other customers that declined to
19 accept interest that they otherwise would be entitled to?
20   A.  I can't recall if that was the case when I worked
21 at Islington but in a previous post I can recall an account
22 where that happened.
23   Q.  Was that an account of an individual?
24   A.  No, it was a business.
25   Q.  A business that could not accept interest because

Page 43

1 of --
2   A.  Because of their adherence to the Muslim law.
3   Q.  You write:
4       "In account at Finsbury Park since the mid-1980's
5 but the original trust was closed last year, the present one
6 set up in 1994."
7       Do you know why the principal of Interpal had
8 decided to close the previous trust and open up a new one?
9   A.  No, I don't.
10   Q.  Were you the business manager for the previous
11 trust?
12   A.  I can't recall.
13   Q.  The last paragraph on this first page says:
14       "In 1996 the Charity was investigated by the
15 Charities Commission on an allocation of funds used for
16 terrorism, [redacted]
17 [redacted]
18       When did you find out about the 1996 investigation
19 by the Charities Commission?
20   A.  We became aware of it because they contacted us
21 and the accounts were frozen.
22   Q.  The Charities Commission contacted you?
23   A.  I can't remember if it was via a head office
24 department or direct but then we had a direct dealing with
25 them because of -- I can't remember all the detail, I'm

Page 44

1 afraid, but I know the accounts were frozen for a period of
2 time.
3   Q.  In 1996?
4   A.  I don't know if it's 1996 but at some stage whilst
5 I was responsible for the account.
6   Q.  Do you recall whether you personally talked to
7 someone from the Charities Commission during that period of
8 time?
9   A.  Yes.
10   Q.  On how many occasions did you do that?
11   A.  I can't recall that.
12   Q.  What do you recall about that?  Was that
13 a telephone conversation?
14   A.  Yes.
15   Q.  How many phone conversations did you have with the
16 Charities Commission about their investigation of the
17 account?
18   A.  I honestly can't recall.
19   Q.  Do you recall what you learned during that phone
20 conversation?
21   A.  I'm sorry, I don't.
22   Q.  You were the business manager for Interpal at the
23 time of that investigation?
24   A.  Yes.
25   [redacted]

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 61 of 386 PageID #: 8875

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

GERALD ROGER MATTHEWS - Vol. 1
October 5, 2010



Page 45

Page 47

Page 48

BY MR. GOELMAN:

Q.   Did you discuss that phone call with anyone else at the bank after you had it?

A.   I can't recall doing so.

Q.   Do you recall during -- let me withdraw that.

In the course of your 31 years with NatWest, how many times was a customer of NatWest's account frozen because of allegations of terrorism?

A.   I can't recall that either.

Q.   Sorry?

A.   Terrorism?

Q.   Yes.

A.   I can't recall any other.

Q.   Did you have any discussions internally at the bank at the time that Interpal's accounts were frozen by the Charities Commission because of allegations of terrorism?

A.   Could you restate the question?

Q.   Yes.  At the time that the Charities Commission investigation of these allegations of terrorism were ongoing -- was ongoing, did you have any conversations with anyone else at the bank about that fact?

A.   I can't recall the specifics of which department we had to refer it to but there would have been someone somewhere probably.  So I don't know.  I just can't recall that.

Q.   Did you take any notes of that phone call?

A.   I don't recall that.

Q.   Do you know if you documented that phone call in any way back when you had it?

A.   Sorry, I can't recall.

Q.   When the person from the Charities Commission said that the allegation against Interpal was from a Jewish source, was it your understanding that in their opinion that made the allegation somehow less credible?

**EXHIBIT 18 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

TZVI WEISS, *et al.*,

                Plaintiffs,

        - against -

NATIONAL WESTMINSTER BANK PLC,

              Defendant.

                          CV 05-4622 (DLI) (MDG)

-------------------------------------------------------- X

NATAN APPLEBAUM, *et al.*,

                Plaintiffs,

        - against -

NATIONAL WESTMINSTER BANK PLC,

              Defendant.

                          CV 07-916 (DLI) (MDG)

-------------------------------------------------------- X

### SUPPLEMENTAL RESPONSES AND OBJECTIONS BY DEFENDANT NATIONAL WESTMINSTER BANK PLC TO PLAINTIFFS' SECOND SET OF INTERROGATORIES (CONTENTION INTERROGATORIES)

Defendant National Westminster Bank Plc ("NatWest") makes these supplemental responses to Plaintiffs' Second Set of Interrogatories Directed to Defendant National Westminster Bank Plc dated April 29, 2011 (the "Contention Interrogatories") as follows:

### RESERVATION OF RIGHTS

These responses are made subject to, and without waiver of, the reservation of rights and objections set forth in NatWest's Responses And Objections To Plaintiffs' Second Set of Interrogatories, dated July 5, 2011.

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – NOT TO BE USED, COPIED OR DISCLOSED EXCEPT AS AUTHORIZED BY COURT ORDER**

## SPECIFIC RESPONSES AND OBJECTIONS

**Contention Interrogatory No. 3:**

**Do You contend that at any time during the Relevant Period NatWest policy permitted You to process Funds Transfers on behalf of or for the benefit of an FTO provided that (1) the Funds Transfer were not cleared through the U.S.; and (2) You did not detect evidence that such Funds Transfer was to be used in the commission of a Terrorist Act? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 3:**

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest supplements its July 5, 2011 response as follows:

The policies NatWest described in its July 5, 2011 response were the same for U.S.

Dollar denominated funds except to the extent that a designation issued pursuant to the OFAC

regulations applied to a transaction, in which event NatWest's policies provided that the

requirements of those regulations were to be observed.  No such instances arose in connection

with the Interpal accounts.

**Contention Interrogatory No. 6:**

**Do you contend that, as of January 1, 2001, You did not know that Hamas had been designated an FTO by the United States? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 6:**

In addition to the foregoing General Objections, NatWest specifically objects to this

Contention Interrogatory to the extent it seeks information concerning the knowledge of NatWest

employees other than those persons with relevant knowledge pertaining to Interpal's customer

2

relationship with NatWest.  NatWest also specifically objects to any requirement that it inquire of such persons as to whether any of them know of the subject matter of this Contention Interrogatory.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest supplements its July 5, 2011 response as follows:

NatWest does not contend that, as of January 1, 2001, none of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest knew that Hamas had been designated as an FTO by the United States.

NatWest is unaware of any evidence that any of these persons did know, as of January 1, 2001, that Hamas had been designated an FTO by the United States, and NatWest does not know when any of these persons obtained any such knowledge.  As of December 3, 2001, NatWest maintained a list of entities designated by OFAC, which included the information that Hamas had been designated as an FTO.  See NW084649 – NW084859.

Olha Leeming currently is aware that Hamas was a terrorist organization during the Relevant Period.  Doug Hartley understood Hamas to be a terrorist organization in Palestine, but does not recall whether that was his understanding during the Relevant Period.  Neil Trantum knew that Hamas was involved in terrorism but does not know when he gained that knowledge.  Michael Hoseason understood Hamas to be a terror organization in September 2001 but does not recall specifically that Hamas was on terrorist lists of a number of countries from 2001 through 2003.  Stephen Foster knew by late 2002 that Hamas had been declared a terrorist organization by many governments.  Tony O'Hear knew that Hamas was on the OFAC list, but does not know that Hamas was designated an "FTO."  Irvine Rodger understood that Hamas is commonly regarded as being a terrorist organization by the United States and the European Union, but does

3

not recall whether that was his understanding as of 2001. Amanda Holt was aware that Hamas was listed on certain terrorist lists, but does not recall which lists or when she became aware of that fact. Sonia Gayle was aware that Hamas was designated a terrorist organization by the United States and the United Kingdom, but does not recall when she gained that awareness. <u>See</u> Leeming Tr. 47:23 – 48:3, May 21, 2009; Hartley Tr. 79:15 - 80:1, July 12, 2010; Trantum Tr. 73:10 – 74:9, July 13, 2010; Hoseason Tr. 95:13 – 96:11, 111:24 – 112:4, July 14, 2010; Foster Tr. 65:25 – 66:4, July 16, 2010; O'Hear Tr. 29:24-30:2, July 21, 2010; Rodger Tr. 53:16 – 54:2, July 22, 2010; Holt Tr. 51:10 – 53:17, July 23, 2010; Gayle Tr. 111:22 – 112:10, Oct. 27, 2010.

NatWest is unaware of any of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest who have knowledge about these subjects other than Olha Leeming, Doug Hartley, Neil Trantum, Michael Hoseason, Stephen Foster, Tony O'Hear, Irvine Rodger, Amanda Holt and Sonia Gayle.

**Contention Interrogatory No. 7:**

**Do you contend that, as of January 1, 2001, You did not know that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks, including suicide bombings, in Israel and the Palestinian Territories? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 7:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent it seeks information concerning the knowledge of NatWest employees other than those persons with relevant knowledge pertaining to Interpal's customer relationship with NatWest. NatWest also specifically objects to any requirement that it inquire of such persons as to whether any of them know of the subject matter of this Contention

4

Interrogatory. NatWest also specifically objects that the term "perpetrating" is vague and ambiguous.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest supplements its July 5, 2011 response as follows:

NatWest does not contend that, as of January 1, 2001, none of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest knew that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks in Israel and the Palestinian Territories.

NatWest is unaware of any evidence that any of these persons did know, as of January 1, 2001, that Hamas was an organization that claimed responsibility for perpetrating terrorist attacks in Israel and the Palestinian Territories and NatWest does not know when any of these persons obtained any such knowledge. Michael Hoseason was aware in September 2001 that Hamas claimed responsibility for attacks that were directed at civilians. Hoseason Tr. 217:5-8, July 14, 2010.

NatWest in unaware of any of its employees with relevant knowledge pertaining to Interpal's customer relationship with NatWest who has knowledge that Hamas claimed responsibility for terrorist attacks in Israel and the Palestinian Territories other than Michael Hoseason.

**Contention Interrogatory No. 12:**

**Do You contend that in 1996 NatWest performed any investigation regarding Interpal's accounts with NatWest during or after the Charity Commission's investigation of Interpal? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

5

**Response to Contention Interrogatory No. 12:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "investigation" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited only to actions NatWest took in 1996.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest supplements its July 5, 2011 response as follows:

NatWest is unaware of any additional responsive information concerning its conduct in 1996 other than with respect to the actions it took pursuant to the Charity Commission's orders freezing Interpal's accounts and then terminating the initial freezing order, and NatWest's regular reviews of Interpal's accounts during that year.

**Contention Interrogatory No. 16:**

**Do You contend that between October 3, 2003 and October 28, 2003, You completed a full investigation of payments made by Interpal? If Your answer is affirmative, state the factual basis for Your contention, including identifying each document reviewed in the course of Your investigation, all other facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 16:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the term "full investigation" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited to the period between October 3, 2003 and October 28, 2003.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest supplements its July 5, 2011 response as follows:

6

NatWest confirms its understanding that Mr. Gossage's use of the phrase "full investigation" refers to the Charity Commission's inquiries.

**Contention Interrogatory No. 25:**

**Do You contend that the statements contained in Interpal's August 6, 2002 letter to You (NW068227) pertaining to Interpal's receipt of £180,939 from the Islamic Charitable Society for the Support of Al-Aqsa diminished Your concerns regarding this transaction? If Your answer is affirmative, identify: the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 25:**

In addition to the foregoing General Objections, NatWest specifically objects to this Contention Interrogatory to the extent that the phrase "diminished Your concerns" is vague and ambiguous. NatWest also specifically objects to this Contention Interrogatory to the extent that it suggests that NatWest had concerns regarding the transaction.

Subject to and without waiving the foregoing Reservation of Rights and the General Objections, NatWest supplements its July 5, 2011 response as follows:

NatWest concluded that Interpal's August 6, 2002 letter to NatWest addressed the suspicions NatWest had regarding the transaction at issue.

Date: August 5, 2011

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

Lawrence B. Friedman
A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

7

**EXHIBIT 19 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                          :

TZVI WEISS, *et al.*,                  :

                Plaintiffs,    :

             - against -    :     CV 05-4622 (DLI) (MDG)

NATIONAL WESTMINSTER BANK PLC,  :

             Defendant.   :
                          :
-------------------------------------------------------- X
NATAN APPLEBAUM, *et al.*,     :

                Plaintiffs,    :

             - against -    :     CV 07-916 (DLI) (MDG)

NATIONAL WESTMINSTER BANK PLC,  :

             Defendant.   :
                          :
-------------------------------------------------------- X

## SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS BY DEFENDANT NATIONAL WESTMINSTER BANK PLC TO PLAINTIFFS' SECOND SET OF INTERROGATORIES (CONTENTION INTERROGATORIES)

Defendant National Westminster Bank Plc ("NatWest") makes these second supplemental responses to Plaintiffs' Second Set of Interrogatories Directed to Defendant National Westminster Bank Plc dated April 29, 2011 (the "Contention Interrogatories") as follows:

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – NOT TO BE USED, COPIED OR DISCLOSED EXCEPT AS AUTHORIZED BY COURT ORDER**

## RESERVATION OF RIGHTS

These responses are made subject to, and without waiver of, the reservation of rights and

objections set forth in NatWest's Responses And Objections To Plaintiffs' Second Set of

Interrogatories, dated July 5, 2011.

## SPECIFIC RESPONSES AND OBJECTIONS

**Contention Interrogatory No. 3:**

**Do You contend that at any time during the Relevant Period NatWest policy permitted You to process Funds Transfers on behalf of or for the benefit of an FTO provided that (1) the Funds Transfer were not cleared through the U.S.; and (2) You did not detect evidence that such Funds Transfer was to be used in the commission of a Terrorist Act? If Your answer is affirmative, identify: the factual and legal basis for Your contention, including all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

**Response to Contention Interrogatory No. 3:**

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest supplements its July 5, 2011 and August 5, 2011 responses as follows:

The policies NatWest described in its July 5, 2011 response were the same for transfers

of U.S. Dollar denominated funds on behalf of or for the benefit of a UK customer that was

designated as an FTO in the United States, except to the extent that a designation issued pursuant

to the OFAC regulations applied to a transaction, in which event NatWest's policies provided

that the requirements of those regulations were to be observed.  No such instances arose in

connection with the Interpal accounts.  <u>See</u> NW000084-111, NW0000112-43, NW196319-58;

Wickens Tr. 95:15-22, 99:25-100:3, 293:5-13, June 23, 2008; Trantum Tr. 92:17-25, July 13,

2010; Foster Tr. 41:16-42:1, 43:14-44:1, 44:15-45:14, 170:23-25, 180:16-21, July 16, 2010.

**Contention Interrogatory No. 12:**

**Do You contend that in 1996 NatWest performed any investigation regarding Interpal's accounts with NatWest during or after the Charity Commission's investigation**

2

**of Interpal? If Your answer is affirmative, state the factual basis for Your contention, including all facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

## Response to Contention Interrogatory No. 12:

In addition to the foregoing General Objections, NatWest specifically objects to this

Contention Interrogatory to the extent that the term "investigation" is vague and ambiguous.

NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited

only to actions NatWest took in 1996.

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest supplements its July 5, 2011 and August 5, 2011 responses as follows:

The documents that support NatWest's supplemental response to this contention

interrogatory include W_S081305-29, NW014516 and NW016495-500.

## Contention Interrogatory No. 16:

**Do You contend that between October 3, 2003 and October 28, 2003, You completed a full investigation of payments made by Interpal? If Your answer is affirmative, state the factual basis for Your contention, including identifying each document reviewed in the course of Your investigation, all other facts, documents, Witnesses, and Testimony supporting Your contention; and identify all persons or entities known by You to have knowledge of relevant facts supporting Your contention.**

## Response to Contention Interrogatory No. 16:

In addition to the foregoing General Objections, NatWest specifically objects to this

Contention Interrogatory to the extent that the term "full investigation" is vague and ambiguous.

NatWest also specifically objects to this Contention Interrogatory to the extent that it is limited

to the period between October 3, 2003 and October 28, 2003.

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest supplements its July 5, 2011 and August 5, 2011 responses as follows:

3

NatWest's understanding of Mr. Gossage's use of the phrase "full investigation" is based

on NatWest's reading of his October 28, 2003 letter where he used that phrase, as well as

NatWest's understanding of the issue at the time.

## Contention Interrogatory No. 22:

**Do you contend that, at any time during the Relevant Period, NatWest closed any customer accounts on the basis of suspicions of terrorism or terrorist financing? If Your answer is affirmative, identify: the factual basis for closing such accounts, including whether such customer or customers had been designated as terrorists by any governmental entity, and all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention. (In answering this Interrogatory, you may redact the specific name, address and other personal data such as phone number, government identification number etc.)**

## Response to Contention Interrogatory No. 22:

In addition to the foregoing General Objections, NatWest specifically objects to this

Contention Interrogatory to the extent that it seeks information concerning customer accounts

other than Interpal or other entities which have been the subject of discovery in this litigation.

NatWest also specifically objects to any requirement that it gather information responsive to the

subject matter of this Contention Interrogatory other than the information that has already been

provided to Plaintiffs in the course of discovery.

Subject to and without waiving the foregoing Reservation of Rights and the General

Objections, NatWest supplements its July 5, 2011 response as follows:

After undertaking a reasonable search NatWest is unaware of any additional information

responsive to this request.

Date: August 16, 2011

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

Lawrence B. Friedman
A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

**EXHIBIT 20 to Declaration of Joel Israel**



```
GSI Production
File  Edit  Setting  Help

   IW7CE/1                 CUSTOMER EVENT DETAILS              As at 05/10/02

   Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

   Date of Contact : 07/03/1996
   Customer Contact:                      Bank Contact: CHERYL/NLLC/BT
   Account Number:            Account Type:        Sort Code:
   Event Details -
     PHONE CALL RECV'D FROM 'MR SIMON HAYWOOD' CHARITY COMMISSION RE THIS A/C.


   Action Summary -


   Additional Details -


   OPT . CIN/CRN 1143476903/HTS10441

   F1=Hlp F2=Exit F12=CDA Menu
   TN3406                                                        22/006
```

HIGHLY CONFIDENTIAL

NW 014516

**EXHIBIT 21 to Declaration of Joel Israel**

```
IW7CR/L                    CUSTOMER EVENT LIST            As at 05/10/02

Customer Short Name:  Palestinians Relie

S TYPE                              DATE   LOCATION  USER ID

. INT Interview Free Format        09/04/1996 600822   SG31
  special in [REDACTED] from abbey nat 090300 pay to [REDACTED] prod paid 10:00

. INT Interview Free Format        13/03/1996 600822   MT33
  with regards to inv note 7/3-credits ok to pass without referal

. CSP Correspondence Free Format   07/03/1996 600822   YY41
  STOP ON AC PER CHARITY COMMISSION

. CSP Correspondence Free Format   12/02/1996 600822   LSA1
  Refund of charges/Group a/c to be opened

. CSP Correspondence Free Format   12/02/1996 600822   LSA1
  See i/n 95142940 re charges

OPT .. CIN/CRN 1143476903/HTS10441

F1=Hlp F2=Exit F8=Up F9=Down F12=CDA Menu                    MORE
```

HIGHLY CONFIDENTIAL

NW 016495

```
IW7CE/1                    CUSTOMER EVENT DETAILS            As at 05/10/02

Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

  Date of Contact : 09/04/1996
  Customer Contact:                     Bank Contact:
  Account Number:          Account Type:        Sort Code:
  Event Details -




  Action Summary -



  Additional Details -



  OPT .. CIN/CRN 1143476903/HTS10441

  F1=Hlp F2=Exit F12=CDA Menu
```

HIGHLY CONFIDENTIAL

NW 016496

```
IW7CE/1                    CUSTOMER EVENT DETAILS            As at 05/10/02

Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

   Date of Contact : 13/03/1996
   Customer Contact:                     Bank Contact: maria smo
   Account Number:          Account Type:        Sort Code:
   Event Details -




   Action Summary -


   Additional Details -


   OPT .. CIN/CRN 1143476903/HTS10441

   F1=Hlp F2=Exit F12=CDA Menu
```

HIGHLY CONFIDENTIAL

NW 016497

IW7CE/1                    CUSTOMER EVENT DETAILS            As at 05/10/02

Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

   Date of Contact : 07/03/1996
   Customer Contact:                    Bank Contact: CHERYL/NLLC/BT
   Account Number:           Account Type:        Sort Code:
   Event Details -
     PHONE CALL RECV'D FROM 'MR SIMON HAYWOOD' CHARITY COMMISSION RE THIS A/C.

   Action Summary -


   Additional Details -


   OPT .. CIN/CRN 1143476903/HTS10441

   F1=Hlp F2=Exit F12=CDA Menu

HIGHLY CONFIDENTIAL

NW 016498

IW7CE/1                    CUSTOMER EVENT DETAILS              As at 05/10/02

Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

Date of Contact : 11/01/1996
Customer Contact: Mr  Qundil            Bank Contact: L.Wiechula
Account Number:              Account Type:        Sort Code:
Event Details -
   Met cust & agreed to refund charges passed totalling ████ on 6 a/cs owing
   to val cr bals(████ against ACT obj (████ .Have req a/cs be put into chgs
   gp & FIIC,future chgs to be waived in view of surplus,with this expected to
   remain consistent.Uninterested in Res a/cs on religious grounds
Action Summary -
   NL Service-open group a/c(for 6 a/cs),with FIICS
   NL Lending-order Group TAF
Additional Details -


OPT .. CIN/CRN 1143476903/HTS10441

F1=Hlp F2=Exit F12=CDA Menu

HIGHLY CONFIDENTIAL

```
IW7CE/1                    CUSTOMER EVENT DETAILS            As at 05/10/02

Customer Short Name:  Palestinians Relie

                              CUSTOMER NOTE

  Date of Contact : 11/01/1996
  Customer Contact: Mr J Qundil           Bank Contact: L.Wiechula
  Account Number:            Account Type:        Sort Code:
  Event Details -




  Action Summary -



  Additional Details -



  OPT .. CIN/CRN 1143476903/HTS10441

  F1=Hlp F2=Exit F12=CDA Menu
```

HIGHLY CONFIDENTIAL

NW 016500

**EXHIBIT 22 to Declaration of Joel Israel**



163 of 197 DOCUMENTS

Copyright 1997 Guardian Newspapers Limited
The Guardian (London)

August 7, 1997

**SECTION:** THE GUARDIAN FOREIGN PAGE; Pg. 11

**LENGTH:** 1347 words

**HEADLINE:** CLOSE TRUST, ISRAEL PLEADS;
Britain is being asked to clamp down on Palestinian fundraisers. Julian Borger in Jerusalem reports

**BYLINE:** Julian Borger In Jerusalem

**BODY:**

ISRAEL will demand the closure of a Palestinian charity in Britain on the grounds that it is helping fund terrorism in the Middle East, a senior Israeli intelligence source said yesterday.

The source said the charity, Interpal, was controlled by Hamas, a militant Islamist organisation which Israel believes carried out the suicide-bombing of a Jerusalem market last week.

Ibrahim Hewitt, an Interpal trustee living in Leicester, denied the claims: "Our money goes to the poor and needy in the occupied territories. We don't want to get sucked into politics. It's outrageous if a foreign country is trying to put pressure on a registered charity here."

Israel last year accused Interpal, or the Palestinian Relief and Development Fund, of having links with Hamas. Interpal's British accounts were frozen, but after a two-month inquiry, the Charity Commission gave it a clean bill of health in May 1996.

"They were well organised and we found no evidence of any donation that could not be accounted for, or that had been given for political reasons," the commission's 1996 annual report said, adding that its staff appeared to be "motivated by faith and altruism rather than fanaticism".

Israeli intelligence says the commission's investigation was superficial. It insists that Interpal is Hamas's main financier in the West, not only raising funds but also channelling donations from Muslims in Saudi Arabia and in the United Arab Emirates.

An Israeli intelligence source said Israel had asked the Britain to shut Interpal last year, but was told there were "political obstacles".

"If you give money to organisations that kill people who aren't British, then that's OK it seems," the official said. "We have asked for this to be dealt with several times.   We are going to ask again in the wake of the bombing."

An Israeli foreign ministry official was unable to confirm yesterday whether a request to close Interpal would be submitted through diplomatic channels.

Interpal workers said they raised about pounds 1 million last financial year, which funded 40 to 50 charities in the West Bank and the Gaza Strip. They said they could not release the charities' names without their permission.

Mr Hewitt said it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by Hamas, but argued that Hamas runs a social welfare and religious network separate from its military wing, Izz el-Deen al-Qassam.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 87 of 386 PageID #: 8901

CLOSE TRUST, ISRAEL PLEADS;Britain is being asked to clamp down on Palestinian fundraisers. Julian Borger in Jerusalem reports The Guardian (London) August 7, 1997

"It's like the difference between Sinn Fein and the IRA," Mr Hewitt said.

Since its emergence in 1988, Hamas has built its support base on social welfare societies and mosques. It rejected the secular nationalism of Yasser Arafat's Palestine Liberation Organisation (PLO), and opposes the 1993 Oslo peace accords with Israel.

Israel claims that much of the money donated to Hamas-run charity organisations is diverted to the families of Hamas fighters, or siphoned directly to al-Qassam, which has taken responsibility for 10 bombing and shooting incidents since 1994.

Israeli intelligence admits, however, that it does not have conclusive evidence that Hamas was behind last week's market bombing, which killed 13 people. The remains of the two suicide bombers have still not been identified, nor have the explosives used.

The intelligence services suspect Hamas because the two other possible suspects, Islamic Jihad and the Lebanese-based Hizbullah, have both denied responsibility.

The call for Interpal's closure is one of a series of security and punitive measures Israel has taken aimed at forcing Mr Arafat, the Palestinian Authority president, to crack down on Islamic militants. Israel has sealed off Palestinian-run areas and withheld tax and tariff payments owed to the authority.

Despite appeals from Jordan's Crown Prince Hassan yesterday during a peace-making visit to Jerusalem, the Israeli prime minister, Binyamin Netanyahu, said he would not relent until the authority had met "its obligations" to fight terrorism.  "We stand by our measures," he said.

* Five UN peacekeepers were killed when their helicopter crashed in Israel's occupation zone in south Lebanon yesterday. One was named by the Irish defence forces as Sergeant John Lynch, aged 34, from Co Kildare. The others were thought to be Italian.

Meanwhile, Lebanon's pro-Iranian Hizbullah fired more than 30 Katyusha rockets towards Israel late last night, a pro-Israeli militia source said.

**LOAD-DATE:** August 7, 1997

W_S157787

**EXHIBIT 23 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 89 of 386 PageID #: 8903





### Suicide bombers linked to London

Article from: **The Sunday Telegraph London**   Article date: **August 17, 1997**
Author: **JESSICA BERRY**

AN ISRAELI security chief has flown to London to investigate claims that the latest suicide bombings in Jerusalem were planned in Britain.

Ami Ayalon, the head of Israel's Shin Bet internal security service, is liaising with MI5 agents investigating the activities of Palestinian militants in London, which has acquired a reputation as an international centre for Islamic extremists.

Israeli security forces are still trying to discover the identities of the two bombers who killed themselves and 14 other people and wounded 150 in a Jewish market in Jerusalem at the end of July. Mr Ayalon flew to Britain following reports that the terrorists had entered Israel on British passports. The Israelis have also re-interrogated an Arab held since April last year after being badly injured in an east Jerusalem hotel room while allegedly constructing a bomb. The suspect entered Israel on a stolen British passport having travelled via Switzerland. The Palestinian Islamist group Hamas, based in Gaza, claimed responsibility for the July bombings. At first, Israeli officials thought the bombers were two young Palestinian men who vanished from the West Bank village of Dahariya about 15 months ago. But genetic tests showed the attackers were not the missing men. Arabic newspapers in London reported that the bombers had come from a Palestinian refugee camp in Lebanon. Security chiefs are now working on the basis that the attackers received financial aid and training from abroad. They had large amounts of Jordanian dinars in their pockets, and the tags in their clothing had been ripped out. Officers believe they may have flown to Israel from Europe after acquiring British passports, and are investigating reports that the attack was planned by Arab extremists based from London. Israeli officials are said to have become increasingly frustrated by what they see as British foot-dragging in curbing the activities of Palestinian hard-liners. The Israeli government has made repeated calls for action to be taken against militants, said to be operating freely in the British capital. The Foreign Office said last week there was no evidence to support the Israeli allegations, and called on the Jewish state to hand over any evidence it had. However, British security sources revealed at the end of last week that they had begun to review Hamas's status following Israeli pressure to outlaw the organisation in Britain. Hamas - unlike other Middle East organisations such as the Iran-funded Hizbollah in Lebanon - is not listed as a terrorist organisation here. According to the Israelis, more than pounds 7 million a year is donated in Britain or goes through the London banking system to help Hamas. A London office, operating under the name of Interpal, a registered charity, channels money collected in Saudi Arabia and the Gulf states to assist Hamas prisoners and their families. Interpal's accounts were frozen last year, but a two-month Charity Commission inquiry cleared it of any wrongdoing. Israeli suspicions of foreign involvement will come as a relief to Yasser Arafat, president of the Palestinian Authority, who has insisted that the suicide attacks could not have been plotted from areas under his control. Israel imposed tough economic and security sanctions on Palestinians in the West Bank and Gaza after the bombings, and accused Mr Arafat of encouraging terrorist attacks by not cracking down on militant Islamic groups in these areas.

Copyright 2009 The Sunday Telegraph London. Provided by ProQuest LLC. For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, a part of The Gale Group, Inc. © Copyright 2010. All rights reserved.
www.HighBeam.com
The HighBeam advertising network includes: womenstoturye.com GlamFamily

**EXHIBIT 24 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.*

---

*NEIL TRANTUM*

*Vol. 1*

*July 13, 2010*

---



*Original File 130710 Neil Trantum.txt*

*Min-U-Script® with Word Index*

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 92 of 386 PageID #: 8906

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

## Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3                    Action No: 05cv4622(DGT)(MDG)

 4   - - - - - - - - - - - - - - - - - - - -

 5   TZVI WEISS, et al,
                          Plaintiffs,
 6   against

 7   NATIONAL WESTMINSTER BANK, PLC.,
                          Defendant.
 8   - - - - - - - - - - - - - - - - - - - -

 9   NATAN APPLEBAUM, et al.,

10                     Plaintiffs,

11   against

12   NATIONAL WESTMINSTER BANK, PLC.,

13                     Defendant.

14

15

16         VIDEOTAPED DEPOSITION OF NEIL TRANTUM

17              Tuesday 13 July 2010

18               At:  10:00 am

19               Taken at:

20         Cleary, Gottlieb, Steen & Hamilton LLP
                55 Basinghall Street, London
21                  United Kingdom

22

23

24

25
```

## Page 2

```
 1              A P P E A R A N C E S

 2   For Plaintiff Tzvi Weiss:

 3         STEPHEN SCHWARTZ, ESQ.
           Kohn, Swift & Graf PC
 4         One South Broad Street, Suite 2100
           Philadelphia, Pennsylvania 19107-3304
 5         Tel: 419 246 0528

 6   For Plaintiff Natan Applebaum:

 7         MARK WERBNER
           Sayles & Werbner
 8         4400 Renaissance Tower
           1201 Elm St.
 9         Dallas, Texas 75270
           Tel: 214 939 8763
10

11   For Plaintiff Tzvi Weiss:

12         AITAN GOELMAN
           Zuckerman Spaeder LLP
13         1800 M Street, NW, Suite 1000
           Washington, DC 20036-5807
14         Tel: 202 778 1996

15   For the Plaintiffs:

16         STEPHEN LOBEL and HANNAH GRAV

17         Finers, Stephens & Innocent LLP

18   For Defendant National Westminster Bank, PLC:

19         JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
20         Cleary, Gottlieb, Steen & Hamilton LLP
           One Liberty Plaza
21         New York, NY 10006-1470
                Tel: 212 225 2000
22

23

24

25
```

## Page 3

```
 1

 2   Also Present:

 3         EXAMINER: ADRIAN HUGHES

 4         COURT REPORTER:

 5         AILSA WILLIAMS
 6         European Deposition Services
           59 Chesson Rd
 7         London, W14 9QS

 8         Telephone:  44 (020) 7385 0077

 9         VIDEOGRAPHER: DAVID ROSS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1
     NEIL TRANTUM .. ... ... ... ... ... ... ... ..7
 2
     DIRECT EXAMINATION BY MR. ... ... ... ... ...7
 3              GOELMAN:

 4              INDEX OF EXHIBITS

 5   Trantum 1 NW212124 ... ... ... ... ... ... .54

 6   Trantum 2 NW008356-366 ... ... ... ... ... .57

 7   Trantum 3 NW191801-806 ... ... ... ... ... .63

 8   Trantum 4 NW012952 ... ... ... ... ... ... .75

 9   Trantum 5 NW008374-380 ... ... ... ... ... .78

10   Trantum 6 NW008412-420 ... ... ... ... ... .82

11   Trantum 7 NW088194-97 ... ... ... ... ... .93

12   Trantum 8 NW051130-36 ... ... ... ... ... 101

13   Trantum 9 NW000149-164 ... ... ... ... ... 113

14   Trantum 10 NW014025-36 ... ... ... ... ... 118

15   Trantum 11 NW012925-38 ... ... ... ... ... 118

16   Trantum 12 NW196915-932 ... ... ... ... ... 128

17   Trantum 13 NW190202-205 ... ... ... ... ... 132

18   Trantum 14 NW180856-57 ... ... ... ... ... 135

19   Trantum 15 NW180811-815 ... ... ... ... ... 135

20

21

22

23

24

25
```

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM -  Vol. 1
July 13, 2010

HIGHLY CONFIDENTIAL                                           Page 33

1    A.  I can't really recall but I can tell you
2  that the Abacha Inquiry that the FSA undertook, at
3  around that time was when I think this all started
4  kicking off.
5    Q.  So it was in some respects a reaction to
6  that Inquiry, the bank started doing defensive
7  reporting?
8    A.  Not just that Inquiry.  As I said to you,
9  the FSA had a focus on money laundering.
10    Q.  When was the FSA -- when did it get
11  responsibility for money laundering investigations?
12    A.  I don't think it has had responsibility
13  for money laundering investigations.  It has
14  responsibility for supervising financial institutions.
15  It took the banking ones over from the Bank of England
16  in I think in 1998.  I am not entirely sure, but around
17  that time.
18    Q.  When you were supervising Mr. Wickens and
19  he was in charge of the Money Laundering Team, do you
20  recall any occasions where he would elevate a decision
21  about whether or not to report to you or he would get
22  your opinion on whether or not it was something that
23  should be reported?
24    A.  I don't recall a case, sorry.  It is
25  a long time ago.

HIGHLY CONFIDENTIAL                                           Page 34

1    Q.  Okay.  I am not asking if you recall
2  specific case.  Do you think that happened from time to
3  time or do you think that he pretty much made those
4  decisions or his team made those decisions on their own?
5    A.  Largely, he would have dealt with those
6  things without any referral to me.  If there was
7  something of significance I am sure he would have
8  discussed it with me, and he had close liaisons with the
9  law enforcement authorities on active cases where they
10  needed information, not necessarily ones that we
11  disclosed.
12    Q.  Did Mr. Wickens' team have responsibility
13  for reporting suspicions of terror financing as well as
14  generic money laundering?
15    A.  I don't think there was a distinction
16  made, especially in those days.
17    Q.  You think terror financing fell under the
18  rubric of money laundering?
19    A.  Yes, as you know, when fraud has occurred,
20  isn't that money laundering, and if funds are being
21  laundered and you suspect they are, how do you know
22  whether it is terrorist financing or fraud or anything?
23  Trying to distinguish between the two is almost
24  impossible.
25    Q.  Would the forms that the bank reported

HIGHLY CONFIDENTIAL                                           Page 35

1  suspicions on require the reporter to check a particular
2  statute that was potentially implicated, like the
3  Prevention of Terror Act or the Proceeds of Crime Act?
4    A.  I don't believe in those early days that
5  that was at all the case.  In fact, I am not even sure
6  all of the laws existed in those days.  Certainly the
7  later forms, if somebody felt that it could be terrorist
8  financing, it was highlighted in some way.
9    Q.  When Mr. Wickens left, whenever it was,
10  did Mike Hoseason replace him as team leader of the
11  Money Laundering Group?
12    A.  I believe he did.
13    Q.  And was he the team leader of the Money
14  Laundering Group throughout the rest of your time with
15  Group Investigations & Fraud?
16    A.  I can't remember.  I left Group
17  Investigations & Fraud, went into Group Security & Fraud
18  and I went into a unit called Group Intelligence.  Mike
19  at some stage left Group Security & Fraud and moved into
20  the Corporate business.
21    Q.  Okay.  Do you recall when approximately
22  you went into Group Intelligence?
23    A.  2006, maybe.
24    Q.  At some point there are certain functions
25  of Group Investigations & Fraud that were moved to

HIGHLY CONFIDENTIAL                                           Page 36

1  Edinburgh, correct?
2    A.  Sorry, to?
3    Q.  Edinburgh?
4    A.  Edinburgh, yes.
5    Q.  After the point where it moved, those
6  functions moved to Edinburgh, were you sill in charge of
7  Group Investigations & Fraud for a period of time?
8    A.  I am not entirely clear.  I think I was
9  but I am not entirely sure.
10    Q.  Did you actually have to commute or work
11  out of Edinburgh at all?
12    A.  I went up to Edinburgh quite regularly.
13    Q.  Did Tony O'Hear replace Mr. Hoseason as
14  team leader of the Anti-money Laundering Team while you
15  were still in charge?
16    A.  I don't know whether I was in charge, but
17  Tony O'Hear certainly had a role as a team leader in the
18  Money Laundering.  I think he started off in the Alert
19  side, Money Laundering Alerts.
20    Q.  You said that in 2006 or approximately
21  2006 you went to Group Intelligence, is that right?
22    A.  Yes.
23    Q.  How long were you there?
24    A.  Until I left, in 2007.
25    Q.  Do you recall approximately when in 2007

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 94 of 386 PageID #:
8908
TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.
NEIL TRANTUM -  Vol. 1
July 13, 2010

1      A. I don't know for certain.  I read it in
2  the paper, so yes is the answer you are looking for, but
3  it is not my personal knowledge.
4      Q. Right.  Obviously you have not been on the
5  ground and in Palestinian territories watching this
6  happen.  As far as you know, from what you have read,
7  does that violence include suicide attacks against
8  Israeli civilians?
9      A. Yes.
10      Q. Do you regard Hamas to be a terrorist
11  organization?
12      MR. BLACKMAN: I think that is utterly
13  irrelevant but you can answer the question.
14      A. I think it is a difficult question.
15  Involved in terrorism, yes, certainly over a period of
16  time.  Obviously, over a period of time things change
17  and I think there is a period of change happening, and I
18  don't know how long it will go on for.  It is a bit like
19  looking at the Northern Ireland dispute over here, but I
20  think the answer to your question is yes.
21      Q. Okay.  And you don't recall when you first
22  heard of Hamas, just approximately?
23      A. Sorry?
24      Q. This article is written in 1996.  Do you
25  see that?

1      A. Yes.
2      Q. Would you have been familiar with -- there
3  is the term again -- would you have known who Hamas was
4  in or around 1996?
5      MR. BLACKMAN: Are you asking him whether he
6  did know?
7      Q. Yes.  Did you?
8      MR. BLACKMAN: If you recall.
9      A. I believe so but I cannot be certain.
10      Q. And you recognize Hamas as an Islamic
11  group, as religiously motivated, right?
12      MR. BLACKMAN: Objection to the form of the
13  question.
14      A. Do I answer?
15      MR. BLACKMAN: You can answer if you want.
16      A. Sorry, what was the question?
17      Q. You recognize Hamas as a religiously
18  motivated Islamic group?
19      A. I recognize that that is part of their
20  motivation.
21      Q. In other words, they are not secular?
22      MR. BLACKMAN: Objection.
23      THE EXAMINER: I think this is going outside
24  the scope and it is probably an appropriate moment to
25  stop because the tape has finished.

1      THE VIDEOGRAPHER: This is the end of tape
2  one, volume one, in the video deposition of Mr. Neil
3  Trantum.  Going off the record now at 12:12 pm, as
4  indicated on the video screen.
5      (A short break)
6      THE VIDEOGRAPHER: This is the beginning of
7  tape two, volume one, of the video deposition of
8  Mr. Neil Trantum.  We are on the record again at 12:23
9  pm, as indicated on the video screen.
10      MR. GOELMAN: Mr. Trantum, I want to mark
11  another exhibit?  This is a one page exhibit, Bates
12  stamp NW012952, and I am handing it to the court
13  reporter and asking that it be marked as Trantum
14  Exhibit 4.
15      (Exhibit Trantum 4 marked for identification)
16      Have you had a chance to look at that?
17      A. I have.
18      Q. Have you ever seen that document before,
19  Mr. Trantum?
20      A. No.
21      Q. It is addressed to: "C. McComas, Group
22  Investigations & Fraud."  Do you see that?
23      A. Yes.
24      Q. And that was the group that you were head
25  of on July 15, 2002?

1      A. Yes.
2      Q. Do you know who C. McComas was?
3      A. The name is familiar.
4      Q. Did a woman named Charlotte McComas work
5  for you?
6      A. I think so.
7      Q. Do you recognize the name Belinda Lane?
8      A. No.
9      Q. Do you have any recollection of
10  a Ms McComas consulting with you about the topic of this
11  memo?
12      A. No.
13      Q. Do you see the fourth line, fourth bullet
14  point down says: "Jihad Qundil has been only point of
15  contact."  It starts with that.
16      A. No.
17      Q. If you were ever consulted about a case
18  concerning a customer whose first name was Jihad, is
19  that something you would remember?
20      MR. BLACKMAN: Objection.  That is really an
21  outrageous question and I would ask that you rephrase
22  it.
23      MR. GOELMAN: No, I don't see why that is
24  objectionable.
25      MS SMITH: As opposed to what, Abraham, Isaac?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

HIGHLY CONFIDENTIAL                                    Page 89

1      A.  Different countries?  I am aware of the UN
2   sanctions list.
3      Q.  Okay.  Are you aware of a list by the Bank
4   of England that the Bank of England maintains?
5      A.  Yes.
6      Q.  When did you become aware of not the
7   particular list with names, I am just talking about the
8   existence of that practice of having these lists.  When
9   did you become aware of that?
10      A.  Before I joined NatWest.
11      Q.  And are you aware then, in addition to
12   Bank of England lists and UN lists, that the United
13   States Government has its own list of suspected
14   terrorists?
15      A.  No.
16      Q.  Are you familiar with an entity called
17   OFAC?
18      A.  Yes.
19      Q.  What do you understand OFAC to be?
20      A.  A list -- well, actually I don't know.
21   You have asked me what I understand it to be.  I don't
22   know this right, my understanding was it was a list
23   of things we should not be dealing with.  I could not
24   have told you whether it was terrorism, fraudsters or
25   what.

HIGHLY CONFIDENTIAL                                    Page 90

1      Q.  You understood OFAC to maintain lists that
2   the United States Government did not want people to deal
3   with?
4      A.  My understanding is, from an RBS/NatWest
5   view, dollar payments cleared through the US, and
6   therefore you need to comply with the OFAC list for
7   dollar payments.
8      Q.  Okay.  But I mean the OFAC list itself,
9   you understood that to be a list of institutions and
10   people, is that right?
11      A.  Actually I have never seen it but --
12      Q.  Okay.  Whether or not you have seen it, do
13   you understand it had names of people and institutions
14   on it?
15      A.  Yes.
16      Q.  And that was a list -- whether or not you
17   know what the actual acronym OFAC stands for, did you
18   understand it was part of the American Government?
19      A.  In its widest sense, yes.
20      Q.  Wider sense?
21      A.  Is the Bank of England part of the UK
22   Government?  Is it independent?
23      Q.  You would know that better than I would.
24      MR. BLACKMAN: I think what you are getting
25   at --

HIGHLY CONFIDENTIAL                                    Page 91

1      A.  I knew it was part of the authorities.
2   Whether it was independent of the Government or whether
3   the Government can influence it, I have no idea.
4      Q.  And what was your understanding of the
5   effect of the OFAC list on NatWest?
6      A.  As I said, dollar payments was where it
7   would hit NatWest.
8      Q.  Okay.
9      A.  When I joined NatWest, that is.
10      Q.  Was it your understanding that if there
11   was a person or organization that was on an OFAC list,
12   it was okay for NatWest to maintain that person or
13   organization as a customer?
14      A.  It didn't necessarily follow one way or
15   the other.  The OFAC list is for dollar payments, it is
16   a US thing.  In the UK that is not necessarily the be
17   all and end all.
18      Q.  So is your answer then that you believed
19   that it was acceptable for the bank to maintain an OFAC
20   designated person or institution as a customer?
21      A.  I didn't say it was acceptable.  It would
22   depend on the circumstances.
23      Q.  So the fact that someone was on the OFAC
24   list was not determinative of whether or not the bank
25   could maintain them as a customer?

HIGHLY CONFIDENTIAL                                    Page 92

1      A.  Absolutely.
2      Q.  What about transferring money?  This is
3   a different situation from someone being a customer, but
4   transferring money to somebody on the OFAC list, is your
5   answer the same?
6      MR. BLACKMAN: Dollars or sterling?
7      MR. GOELMAN: Non-dollars, sterling.
8      A.  Same answer as before.  It might be, it
9   might not be.
10      Q.  The fact that someone is on the OFAC list
11   was not determinative of whether or not it was okay to
12   transfer that person or institution non-dollar
13   transactions?
14      A.  Yes.
15      Q.  And what was your understanding of that
16   based upon?
17      A.  The group comply with UK laws and
18   regulations and required its subsidiaries overseas or
19   offices overseas to comply with the Group's UK
20   legislations and local legislations as well.  In certain
21   parts of the world, OFAC has no bearing.
22      Q.  And is the UK part of the world where OFAC
23   has no bearing?
24      A.  For non-dollar payments, OFAC has no
25   bearing in the UK.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

---

1  you whether everyone on this list is familiar with
2  something?
3        MR. GOELMAN: I object to the blatant
4  coaching.
5        A. I am not sure what it means. Okay, it
6  could be that a decision has been made by the Group,
7  i.e. Amanda Holt and Group Risk Management, whoever
8  needed to do that.
9        Q. Okay, and you --
10       A. And, you know, we are now aware a decision
11  has been made.
12       Q. But sitting here today you don't recall
13  such a decision?
14       A. No.
15       Q. To cover the OFAC?
16       A. No, I don't know even now what that
17  decision was to cover. Does that mean we were going to
18  be complying with it across the whole Group? Does it
19  mean we are going to be searching and then deciding what
20  to do with each item? I have no idea. I don't recall.
21       Q. And you don't recall any discussion about
22  whether or not to honor the OFAC lists?
23       MR. BLACKMAN: Objection to the form of the
24  question. "Honor" is completely vague. You may answer.
25       A. For the US clearing of US funds, the Group

---

1  was always to comply with it.
2        Q. And do you recall actual discussions or
3  decisions about that or do you just recall that being
4  the way the bank conducted its business?
5        A. I recall the Group putting in place an
6  electronic system to try and filter on electronic
7  payments. I was not involved with it but I was aware of
8  it.
9        Q. Do you know what that system was called?
10       A. No idea.
11       Q. Do you know about when it was put into
12  place?
13       A. I don't know.
14       Q. But your recollection sitting here today
15  is that it was the Group's policy to allow payments to
16  OFAC listed parties as long as they were not designated
17  in US dollars?
18       A. I don't know what the Payments Department
19  allowed and did not allow, I am sorry.
20       Q. As head of Group Investigations & Fraud,
21  do you know what the bank's policy was about maintaining
22  accounts for persons or organizations that were listed
23  by OFAC but not listed by the Bank of England?
24       MR. BLACKMAN: Asked and answered the
25  question, ten minutes ago, but you can answer again.

---

1        A. I don't think it made -- the policy made
2  a distinction about OFAC account holders.
3        Q. What do you mean, didn't make
4  a distinction? They were treated just like people who
5  were not on the OFAC list?
6        A. I don't think the policy mentioned OFAC,
7  you know, opening accounts, having people as customers.
8  I don't think that the policy -- I don't recall the
9  policy mentioning OFAC. It might have. As I said
10  earlier, it will have mentioned complying with local
11  legislation in the US.
12       Q. But in terms of if somebody came to you in
13  2002 and said "This customer, not in the US, this
14  customer in England is on the OFAC list, what shall we
15  do about it," your answer would be "Nothing"?
16       MR. BLACKMAN: Objection to the form of the
17  question.
18       Q. Is that fair?
19       MR. BLACKMAN: Asked and answered and in
20  substance before. You can answer one more time.
21       A. Sorry, what was the question again?
22       Q. That if you are head of Group
23  Investigations & Fraud --
24       MR. BLACKMAN: He is not in charge of opening
25  accounts, by the way.

---

1        MR. GOELMAN: 2002 -- thank you for that
2  coaching. If one of your subordinates came to you in
3  2002 and said: "This customer that we already have, it
4  has come to my attention that they have been listed by
5  OFAC," your response would have been essentially "So
6  what?"
7        MR. BLACKMAN: Objection, question is
8  hypothetical. You can answer.
9        A. No, we would have wanted to know to start
10  with whether they were dealing with US dollars.
11       Q. Okay. Aside from the concern about US
12  dollars transactions?
13       A. I don't think it ever came up.
14       Q. Okay. If it had, your understanding was
15  that there is nothing wrong with having an OFAC
16  designated customer as long as they are not dealing in
17  US dollars?
18       A. No.
19       MR. BLACKMAN: Object, hypothetical.
20       THE EXAMINER: Can we let the witness give
21  a very clear answer to this in his own words.
22       A. I am not saying that it would or would not
23  be. I think you would do -- you would ask more
24  questions, fin out more.
25       Q. What kinds of questions?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

---

HIGHLY CONFIDENTIAL                                     Page 109

1  memo to Citizens, I am sorry.  Citizens are on the
2  distribution list.
3      Q.  Right.
4      A.  So Welf includes all the Welf businesses.
5      Q.  The first page of this exhibit, last
6  number, number 5, says:
7          "On receipt of a positive return, Group Risk
8  Management will advise you in writing of any further
9  action to be taken, i.e. freezing bank accounts."
10         Do you see that.  Do you understand the
11  reference to "positive return" to be a match to a name
12  on one of the lists that is being distributed?
13     A.  You may be right but it is not an
14  assumption I would draw.  I just recall some sanctions
15  lists, names on sanctions were very poor, so somebody,
16  "Mohammed" for instance, and if you search the NatWest
17  customer base for Mohammed you would come up with
18  hundreds, sorry, probably thousands of hits.  So you
19  then would have to do a lot more research, so what it
20  means by "a positive" I don't know, that would have been
21  determined by the procedures that this document refers
22  to earlier.
23     Q.  In terms of a human being actually going
24  through and filtering out --
25     A.  No, what a positive return is, it might be

---

HIGHLY CONFIDENTIAL                                     Page 110

1  any match or it might be ones that you have matched,
2  done some research and meet certain criteria.  I don't
3  know, I can't recall.
4      Q.  Okay.  When it says "Group Risk Management
5  will advise you in writing of any further action to be
6  taken, i.e freezing bank accounts", do you know what
7  factors could militate in favor of Group Risk Management
8  recommending a freeze or ordering a freeze on
9  a particular bank account?
10     A.  I don't know the factors, but obviously if
11  it is on the Bank of England list it would have needed
12  to be frozen, because it should have been frozen
13  already, for instance, but I don't know how they
14  applied.
15     Q.  Were you involved in any situation where
16  the bank did freeze --
17     A.  The department was, yes, because of the
18  consent provisions.
19     Q.  Meaning?
20     A.  Group Investigations & Fraud.  So if you
21  submit a Suspicious Activity Report and then somebody
22  wanted to do something on that account, you would have
23  to block it, unless you got permission of the
24  authorities.  This didn't apply throughout my time there
25  but it did at some point, and in order to block the

---

HIGHLY CONFIDENTIAL                                     Page 111

1  account you would have to make sure nothing was put
2  through; you would have to freeze it.
3      Q.  Let me switch gears slightly from a freeze
4  to terminating a relationship with a customer.  During
5  your period of time as head of Group
6  Investigations & Fraud, were you ever involved in
7  a decision to actually terminate a customer, tell
8  a customer to look elsewhere for banking services?
9      A.  We didn't have the authority to do that.
10  We could make a recommendation but it was for the
11  businesses to decide whether they terminated
12  a relationship or not.
13     Q.  When you say "the business", it was not
14  any function within Group that had the final say?  It
15  was the constituent business lines?
16     A.  It was the business.  Obviously, if the
17  Group Chief Executive was aware of an issue and decided
18  that it should not be, then whatever he said would go,
19  but generally it would be, it is the business.  It
20  became a bit more problematical when a customer banks
21  across different businesses.
22     Q.  When you say: "We had the authority to
23  make a recommendation for termination of the customer",
24  did that from time to time occur while you were head of
25  Group Investigations & Fraud?

---

HIGHLY CONFIDENTIAL                                     Page 112

1      A.  Yes, well, it will have done.
2      Q.  It did?
3      A.  Yes.
4      Q.  About how frequent was that?
5      A.  I don't know.  There would have been stats
6  produced which would have shown that, but I don't know.
7      Q.  From your recollection -- if the bank had
8  decided or Group Investigations & Fraud had made
9  a determination "We should terminate the customer", is
10  that something you would have to have been consulted
11  about?
12     A.  No.
13     Q.  No, even that could have come below your
14  pay grade?
15     A.  Yes.
16     Q.  Do you recall being personally involved in
17  the decision to recommend terminating a customer?
18     A.  Yes, but through the Investigations
19  function, not through the Money Laundering side.
20     Q.  And what reasons, without obviously naming
21  the particular customer, what types of reasons could
22  lead to that recommendation?
23     A.  Thinking he is a fraudster.  Thinking he
24  is money laundering.
25     Q.  And was it your understanding that the

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM -  Vol. 1
July 13, 2010

HIGHLY CONFIDENTIAL                                         Page 113

1   bank had a right to terminate a relationship with the
2   customer if it thought that was the appropriate thing to
3   do?
4           A.  Yes.
5           Q.  I want to have this exhibit marked as
6   Trantum 9, please.
7           (Exhibit Trantum 9 marked for identification)
8           Q.  This is a long document and you can take
9   all the time you want to look at it.  I am going to be
10  asking questions about page 161, number 9 in that list.
11  For the record, this is Bates stamped NW149 through
12  NW164.
13          A.  Do we know when these are dated?
14          Q.  If you look at page 162 there is
15  a reference to the Proceeds of Crime Act in July 2002,
16  so by my powerful deductive reasoning that would be
17  after that, but I cannot be any more specific.  You can
18  also refer to page 163, Mr. Trantum.  At the bottom it
19  names various employees.  "Fleur Baugh or Doug Hartley,
20  or in their absence Mike Hoseason or Jane Stuart".  I
21  don't know if that would give you a context in terms of
22  timing.
23          MR. BLACKMAN:  Is there a question pending?
24          Q.  I thought he was still reviewing it.  Just
25  let me know when you are done, Mr. Trantum.  Have you

HIGHLY CONFIDENTIAL                                         Page 114

1   had a chance to review that?
2           A.  I have.
3           Q.  It looks like you actually reviewed it
4   pretty thoroughly.  Is there anything -- did your review
5   cause you to want to change or supplement any of your
6   answers up to now?
7           A.  I have not seen this before that I can
8   recall, and this is not quite in line with my
9   understanding at the time.
10          Q.  In what way does it differ with your
11  understanding at the time?
12          A.  I didn't think Group
13  Investigations & Fraud, Group Financial Crime could
14  instruct business to do anything.  It could recommend
15  but it could not require.  We didn't have executive
16  authority to close accounts.
17          Q.  So, on page NW161, number 9, when it --
18          A.  It says "insist on".
19          Q.  Insisting on termination of relationship?
20          A.  Yes.
21          Q.  That is something that you --
22          A.  I don't recall.
23          Q.  -- do not recall being within the
24  authority of Group?
25          A.  Yes.

HIGHLY CONFIDENTIAL                                         Page 115

1           Q.  Okay, of Group Financial Crime?
2           A.  Group Financial Crime, yes.
3           Q.  Were you aware that this document existed,
4   that this Procedure Manual for the Money Laundering
5   Reporting Group existed?
6           A.  I can't recall.
7           Q.  Would that have been something that would
8   have, if one of the constituent groups in your
9   department was creating a Procedures Manual, would it
10  have crossed your desk for your review?
11          A.  It may have done, may not have done.  This
12  is quite detailed.  I think you asked previously about
13  the integration between the two banks.  This could have
14  been produced for that integrating the two teams and the
15  systems behind it.
16          Q.  Are you on page 161?  It says at the top:
17  "Number 1:  Check GK and FMS for any connected cases".
18  Do you recognize "FMS"?  Do you know what that stands
19  for?
20          A.  Fraud Management System.
21          Q.  And do you know what types of information
22  would be on the Fraud Management System?
23          A.  Fraud cases, suspected fraud cases.
24          Q.  Is that something that was an RBS database
25  or a NatWest database?

HIGHLY CONFIDENTIAL                                         Page 116

1           A.  It was originally an RBS database but
2   became a Group database.  I think there was, if I recall
3   correctly, I think RBS had an FMS system and then there
4   was a new FMS created for the combined Group, so there
5   was probably an FMS Mark 1 and then an FMS Mark II, if
6   that makes sense.
7           Q.  Yes.  Number 2, it says "High profile
8   Case" and then in parens:  "Refer to High Profile Case
9   definition document".  Do you know what the criteria for
10  a case being categorized as a High Profile Case was?
11          A.  I can't recall.  I would have known but I
12  can't recall.
13          Q.  Do you remember whose decision it was to
14  say "This is a High Priority Case, this is not"?
15          MR. BLACKMAN:  High profile?
16          MR. GOELMAN:  I am sorry, "High Profile Case,
17  this is not".
18          A.  For these procedures to work it must have
19  been somebody doing initial assessment.
20          Q.  So that the Suspicious Activity Report
21  comes in from the field, and whoever in Anti-money
22  Laundering takes it would look at it and say:  "This is
23  a High Profile Case, this is not"?
24          A.  It met certain criteria, so it is High
25  Profile.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 99 of 386 PageID #: 8913

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

---

HIGHLY CONFIDENTIAL                    Page 133

1    Q. And he sent it to Mr. Orr and copied you?
2    A. Yes.
3    Q. Can you tell me, and you may have already
4  described this, what the reporting relationship between
5  Mr. Hoseason and Mr. Orr and yourself was, in or
6  about January 2005?
7    A. I can't recall. I know Jim Orr was my
8  boss.
9    Q. Okay.
10   A. But I can't remember when my role
11 specifically changed, when Mike stopped reporting to me
12 and when he reported elsewhere.
13   Q. So Jim was definitely your boss?
14   A. Yes.
15   Q. You don't know whether Jim was Mike
16 Hoseason's direct boss or whether you were still in
17 between them?
18   A. I can't remember. When Jim came in, you
19 know, when the restructuring took place -- sorry, I just
20 can't recall.
21   Q. Mr. Hoseason copied you on an e-mail
22 exchange relating to a group called Friends of Al-Aqsa.
23 Do you see that?
24   A. Yes.
25   Q. Do you know why Mr. Hoseason copied you on

---

HIGHLY CONFIDENTIAL                    Page 134

1  this particular e-mail exchange?
2    A. I was Jim's deputy. It is part of my role
3  as head of Coordination, so when Jim came in -- I might
4  have needed to be aware in case Jim was not around or
5  somebody asked me because he was not there.
6    Q. Do you sitting here today recall this
7  issue with the Friends of Al-Aqsa coming up?
8    A. No.
9    Q. Do you recall, at any point during your
10 tenure with NatWest and RBS, a customer, whether
11 Interpal or any other customer being a customer of the
12 bank being designated by OFAC?
13   A. I am sure there must have been but I don't
14 recall any, but the whole search criteria that went on,
15 I am sure that must have thrown some up, or potentially
16 some which would have needed to be investigated to find
17 out whether they were in fact the same people.
18   Q. Sitting here today, do you have
19 a recollection of that ever occurring?
20   A. A recollection, no, but you saw an extract
21 of a list earlier that you have shown me.
22   Q. Right.
23   A. So I am sure things would have come up but
24 I don't recall.
25   Q. You are sure that what, just as a matter

---

HIGHLY CONFIDENTIAL                    Page 135

1  of odds that there would have been somebody on the OFAC
2  list who was one of your customers?
3    A. Yes, and either in the US or somewhere
4  else around the world, even if the name was the same, it
5  might be a different individual, so you would get a hit
6  and then you would have to investigate.
7    Q. It might be a false positive?
8    A. Yes.
9    Q. My question is different. Do you recall
10 any occasion when there was a real positive where, you
11 know, it turned out that the customer really was the
12 person who was designated by OFAC?
13   A. I don't recall any, apart from obviously
14 we have talked about Interpal today.
15   Q. I want to show you another two documents
16 related to the episode with the Friends of Al-Aqsa. I
17 understand that sitting here today you don't have any
18 recollection of this.
19   (Exhibit Trantum 14 marked for identification)
20   This is Trantum Exhibit 14, please, and this
21 is Trantum Exhibit 15.
22   (Exhibit Trantum 15 marked for identification)
23   A. I seem to have the same document twice
24 here.
25   MR. GOELMAN: There should be an 11-page

---

HIGHLY CONFIDENTIAL                    Page 136

1  document which is Trantum 14, just the memo and then one
2  5-page document.
3    A. It seems to be the same as -- this was the
4  document, you had one missing. I now have two of them.
5    MR. BLACKMAN: Now we have total confusion
6  because we now have the same document marked Trantum 13
7  and Trantum 15.
8    MR. GOELMAN: 13?
9    A. You know you said you had a 13 missing, we
10 would have to share, I think we have found out where it
11 got to.
12   MR. GOELMAN: Wasn't 13 --
13   THE EXAMINER: Bates stamp 190202.
14   MR. BLACKMAN: Right.
15   THE EXAMINER: 15 is 180811.
16   A. I have not got that.
17   MR. BLACKMAN: We now have confusion
18 because --
19   MR. GOELMAN: We have two things marked as 13.
20   MR. BLACKMAN: No. 13 has also been marked 15
21 for some reason.
22   A. I don't have your 15.
23   MR. BLACKMAN: The other 15.
24   MR. GOELMAN: The real 15 is 180811.
25   MR. BLACKMAN: Why don't we get rid of the

TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.

NEIL TRANTUM - Vol. 1
July 13, 2010

1     MR. BLACKMAN: Objection, form of the
2  question. Vague as to what "legitimate" means. You can
3  answer.
4     A. The reputational risk would be more about
5  if you left it open; that would be the more likely
6  reputational risk you would be concerned about.
7     Q. This says "the reputational risk of
8  closure"?
9     A. This is very unusual. I was not aware of
10  this, but the fact is that I am not aware of this coming
11  up hardly at all.
12     Q. So in your experience reputational risk
13  militates in favor of closure, not in favor of keeping
14  an account open?
15     A. What I am saying is when you are
16  considering whether to close an account, the
17  reputational risk is normally around keeping it open,
18  not what is the reputational risk if you close it.
19  There are some instances where that happens, like
20  ██████████████ for instance, whichever way
21  you go you have got a reputational risk.
22     Q. What is ████████████████████]
23     A. Knew you were going to ask that.
24     Q. Sorry.
25     A. ████████████████████]

1  would not want to be involved in it, ethically or
2  reputationally.
3     Q. Okay. So in addition to you would not
4  have done it, you also don't ever remember it being
5  questioned in a terrorist financing case where -- I am
6  sorry, I have to finish my question -- in a case where
7  there is potential terrorist financing, you never
8  remember there being an issue of what are the
9  reputational risks of closure?
10     MR. BLACKMAN: Object to the form of the
11  question because you stuck in, quite deliberately, the
12  word "potential". The witness' testimony was about
13  knowing about terror financing. You have now switched
14  it to "potential", and that is a very different thing,
15  as you well know. So I object to the form of the
16  question, it lacks foundation, it is deliberately
17  misleading. You may answer.
18     A. I think Mr. Blackman made the point I was
19  going to make. If you have got a higher degree of
20  suspicion that it is close to being more positive, then
21  you would not want to be involved. Where your suspicion
22  is very tenuous, then it is more difficult.
23     Q. Okay. Well, is it a legitimate concern --
24  is reputational risk of closure a legitimate concern if
25  your suspicion is tenuous, as opposed to a higher degree

1     Q. It is an animal cruelty issue?
2     A. Yes. So if you keep the account open
3  because they are not doing anything wrong, you have got
4  all the demonstrators trying to get other people to
5  boycott banking with you, et cetera, et cetera, whereas,
6  if you close it, the customer has not done anything
7  wrong, he is within the law, but is it ethically right,
8  and a whole bunch of other customers saying: "We don't
9  want to bank with you." You cannot win whichever way
10  you go, unless you have got, you know, a policy that you
11  are public about.
12     Q. So in terms of terror financing, were you
13  ever part of or ever aware of any discussions in the
14  bank about a reputational risk of "If we close this
15  account because of potential terrorist financing we
16  could be risking reputational damage"?
17     A. To be really clear here, we would never
18  have had that discussion. If we thought terrorist
19  finance was going on, it would have just been closed.
20  It would not have been: "Let's have a think about what
21  the risks are from a reputational point of view."
22     Q. Why is that?
23     A. Because, you know, the terrorist finance,
24  you cannot be doing it anyway, knowingly, and the risks
25  if you do end up doing it are just catastrophic and you

1  of certainty?
2     A. I want to make sure I have got that the
3  right way, what you are asking me.
4     Q. You distinguished between -- I think Mr.
5  Blackman made the point I was going to make. You said:
6  "If you have got a higher degree of suspicion that is
7  close to being more positive, then you would not want to
8  be involved. Where your suspicion is very tenuous, then
9  it is more difficult". That is what you just testified
10  to. My question is, is reputational risk of closing the
11  account and being accused of some kind of bias, is that
12  a legitimate concern in the second of those two
13  categories, where it is more tenuous?
14     A. It may be, given certain factors. You
15  know, I think you would have to look at it on a case by
16  case basis. What I don't want to do is make
17  a generalization here. Because these type of things can
18  be very different, one case to another, so I think you
19  would have to look at the case on its merits, the risks
20  involved.
21     Q. Let me move away from the "would"
22  question. And I think you may have kind of answered
23  this. I just want to get a kind of clear answer.
24  During your tenure at the bank, whether it was called
25  NatWest or RBS, was there ever an occasion where

**EXHIBIT 25 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*IAN WICKENS*
*Vol. 1*
*June 23, 2008*

---



Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 103 of 386 PageID #: 8917

TZVI WEISS, et al – NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS –  Vol. 1
June 23, 2008

Page 0

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK

 3   -------------------------------------------------x

 4   TZVI WEISS, et al.,

 5                    Plaintiffs,

 6        -against-

 7   NATIONAL WESTMINSTER BANK, PLC,

 8                    Defendant.

 9   -------------------------------------------------x

10   NATAN APPLEBAUM, et al.,

11                    Plaintiffs,

12        -against-

13   NATIONAL WESTMINSTER BANK, PLC,

14                    Defendant.

15   -------------------------------------------------x

16

17                * HIGHLY CONFIDENTIAL *

18

19

20            VIDEOTAPED DEPOSITION of IAN WICKENS,

21        taken before Cheryll Kerr, a Notary Public

22        and a Shorthand Reporter, held at the offices

23        of Cleary, Gottlieb, Steen & Hamilton, LLP,

24        located at 55 Basinghall Street, London,

25        England on Monday, the 23rd day of June,
```


```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
 3   -------------------------------------------------x
 4   TZVI WEISS, et al.,
 5                    Plaintiffs,
 6   NATIONAL WESTMINSTER BANK, PLC,
 7                    Defendant.
 8   NATAN APPLEBAUM, et al.,
 9                    Plaintiffs,
10        -against-
11   NATIONAL WESTMINSTER BANK, PLC,
12                    Defendant.
13   -------------------------------------------------x
14                * HIGHLY CONFIDENTIAL *
15
16
17            VIDEOTAPED DEPOSITION of IAN WICKENS,
18        taken before Cheryll Kerr, a Notary Public
19        and a Shorthand Reporter, held at the offices
20        of Cleary, Gottlieb, Steen & Hamilton, LLP,
21        located at 55 Basinghall Street, London,
22        England on Monday, the 23rd day of June,
23        2008, at 9:36 a.m.
24
25
```

HIGHLY CONFIDENTIAL                                              Page 3

```
 1                         INDEX

 2   EXAMINATION BY                                      PAGE

 3   MR. WERBNER                                            9

 4   MR. A. FRIEDMAN                                      256

 5

 6

 7                       EXHIBITS

 8   WICKENS
 9   FOR ID      DESCRIPTION                             PAGE

10   No. 1       Document bearing Bates Nos.            142
                 NW 017199 through 17204
11
12   No. 2       Document bearing Bates Nos.            146
                 NW 16216 through 16228
13   No. 3       Document bearing Bates Nos.            147
                 NW 1118 through 1337
14
15   No. 4       Document beginning with               164
                 Bates No. NW 14014
16   No. 5       Document bearing Bates Nos.            158
                 NW 8367 through 8373
17
18   No. 6       Document bearing Bates Nos.            164
                 NW 8381 through 8398
19   No. 7       Document bearing Bates Nos.            166
                 NW 13685 through 13686
20
21   No. 8       Document bearing Bates Nos.            235
                 NW 8374 through 8378
22   No. 9       Document bearing Bates                235
                 No. NW 13197
23
24
25   (Continued)
```

HIGHLY CONFIDENTIAL                                              Page 2

```
 1   APPEARANCES:

 2   KOHN, SWIFT & GRAF, P.C.
          Attorneys for Plaintiff Tzvi Weiss
 3        One South Broad Street, Suite 2100
          Philadelphia, Pennsylvania  19107-3304
 4
 5   BY:   STEPHEN H. SCHWARTZ, ESQ.

 6   SAYLES WERBNER, P.C.
          Attorneys for Plaintiff Natan Applebaum
 7        4400 Renaissance Tower
          1201 Elm Street
 8        Dallas, Texas   75270

 9   BY:   MARK S. WERBNER, ESQ.

10
11   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
          Attorneys for Defendant National
12        Westminster Bank, PLC
          One Liberty Plaza
13        New York, New York  10006-1470

14   BY:   LAWRENCE B. FRIEDMAN, ESQ.
          PATRICK SHELDON, ESQ.
15
16   GLANCY BINKOW & GOLDBERG, LLP
          Attorneys for Plaintiff Tzvi Weiss
17        1430 Broadway, Suite 1603
          New York, New York  10018

18   BY:   ANDREW FRIEDMAN, ESQ. (OF COUNSEL)

19
     Also Present:  Jackie Sheftali, NatWest;
20   Simon Rutson, Videographer

21

22             *****     *****     *****

23

24

25
```

HIGHLY CONFIDENTIAL                                              Page 4

```
 1   WICKENS
     FOR ID      DESCRIPTION                             PAGE
 2
 3   No. 10      Document bearing Bates                 236
                 No. NW 13636
 4   No. 11      Document bearing Bates Nos.            237
                 NW 51994 through 51997
 5
 6   No. 12      Document bearing Bates Nos.            240
                 NW 14465 through 14467
 7   No. 13      Document bearing Bates                 241
                 NW 50721, 722, 725, 726
 8
 9   No. 14      Document bearing Bates Nos.            242
                 NW 14468 through 14497
10   No. 15      Document bearing Bates Nos.            244
                 NW 13969 through 13973
11
12   No. 16      Document bearing Bates Nos.            245
                 NW 1082 through 1099
13   No. 17      Document bearing Bates                 245
                 NW No. 8417
14
15   No. 18      Document bearing Bates Nos.            247
                 16216 through 16228
16   No. 19      Document bearing Bates Nos.            248
                 16216 through 16228
17
18   No. 20      Document bearing Bates                 250
                 No. 13659
19   No. 21      Document bearing Bates Nos.            251
                 NW 12965 through 12966
20
21   No. 22      Document bearing Bates                 251
                 No. NW 12976
22   No. 23      Document bearing Bates Nos.            252
                 NW 17217 through 17218
23

24

25   (Continued)
```

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 104 of 386 PageID #: 8918

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS - Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                    Page 5

| 1 | WICKENS |  |  |
| 2 | FOR ID | DESCRIPTION | PAGE |
| 3 | No. 24 | Document | 254 |
| 4 | No. 25 | Document bearing Bates Nos. NW 233 through 261 | 190 |
| 5 | No. 26 | Document bearing Bates Nos. NW 051984 through 052010 | 294 |
| 6 |  |  |  |
| 7 | No. 27 | Document bearing Bates Nos. NW 000262 through 000277 | 300 |
| 8 | No. 28 | Document regarding Knowing Your Customer | 302 |
| 9 |  |  |  |
| 10 | No. 29 | Document bearing Bates Nos. NW 000285 through 000293 | 306 |
| 11 | No. 30 | Document bearing Bates Nos. NW 000149 through 000232 | 308 |
| 12 |  |  |  |
| 13 | No. 31 | Document regarding the intelligence and probation team | 312 |
| 14 | No. 32 | Document regarding money laundering | 320 |
| 15 |  |  |  |
| 16 | No. 33 | Contacts list | 320 |
| 17 | No. 34 | Document bearing Bates Nos. NW 3335 through 3336 | 322 |
| 18 | No. 35 | Document bearing Bates NW 000337 | 328 |
| 19 |  |  |  |
| 20 | No. 36 | Document bearing Bates Nos. NW 000147 to 000148 | 329 |

(Continued)

HIGHLY CONFIDENTIAL                                    Page 6

REQUESTS FOR INFORMATION

| DESCRIPTION | PAGE |
| --- | --- |
| Color computer screen prints for Goalkeeper documents | 178 |
| Supporting glossary for the UID system | 180 |
| UID system documents from linked cases, if not previously produced | 182 |

*****     *****     *****

HIGHLY CONFIDENTIAL                                    Page 7

THE VIDEOGRAPHER: This is the beginning of Tape 1, Volume 1, in the deposition of Mr. Ian Wickens, taken on the 23rd of June, year 2008, at 9:36 a.m., as indicated on the video screen.

This deposition is being taken in the matter of Tzvi Weiss, et al., versus National Westminster Bank PLC, Civil Action No. 05-CV 4622 (CPS) and (KAM), also being heard in the matter of Natan Applebaum, et al., versus National Westminster Bank PLC, Civil Action No. 07-CV 916 (CPS) (KAM), being held in the United States District Court, Eastern District of New York, the office -- the deposition is taking place at the offices of Cleary Gottlieb in London, England.

The court reporter is Cheryll Kerr. The videographer is Simon Rutson, both from European Deposition Services.

Would counsel please introduce themselves?

MR. WERBNER: My name is Mark Werbner from the Dallas, Texas law firm of Sayles Werbner. My firm and I are representing a

HIGHLY CONFIDENTIAL                                    Page 8

group of the plaintiffs in the Applebaum versus NatWest case.

MR. SCHWARTZ: My name is Steven Schwartz from the law firm of Kohn, Swift & Graf, in Philadelphia, Pennsylvania. We represent the Weiss group of plaintiffs.

MR. A. FRIEDMAN: My name is Andrew Friedman. I'm with Glancy, Binkow & Goldberg, New York -- 430 Park Avenue, New York, New York, and I am also of counsel for the Weiss plaintiffs.

MR. L. FRIEDMAN: Lawrence Friedman from Cleary, Gottlieb, Steven, Hamilton, on behalf of defendant National Westminster Bank.

THE VIDEOGRAPHER: Thank you. Would the court reporter like to swear in the deponent, please?

MR. L. FRIEDMAN: Let me note that with me is my colleague Patrick Sheldon, also from Cleary Gottlieb, and Jackie Sheftali, who is internal counsel at National Westminster Bank.

IAN WICKENS,

HIGHLY CONFIDENTIAL                                    Page 37

1    sort of top-level documents and built into
2    the local procedures manuals, business
3    requirements manuals, whatever they called
4    them in the businesses across the group.
5    Principally, ones -- ones in the UK, based
6    closely on ones outside the UK following
7    the headline principles, but then, of
8    course, subject to their own local laws
9    and regulations, which they must obviously
10   obey to the letter within their own
11   jurisdictions.
12  BY MR. WERBNER:
13   Q.   What is the difference or interplay
14   between anti-money laundering and anti-terror
15   financing, as you have come to understand it in the
16   work you do with the bank?
17   A.   For a long time, they were coterminous,
18   really, because the approach we adopted to the
19   reporting of suspicion was the same.  The tools
20   within the various bits of legislation in terms of
21   what was available to law enforcement to come to us
22   with various types of law to say we need this, this.
23   What act it was under was almost immaterial.
24     We just -- they were very similar powers and
25   produced the same sort of responses.  Subsequently,

HIGHLY CONFIDENTIAL                                    Page 38

1    of course, you've got a growing sanctions regime,
2    which didn't always necessarily have to do with
3    terrorism, but nevertheless has to some extent, and
4    that evolved independently, because initially it had
5    nothing to do with money laundering directly,
6    because it could have been for other reasons, and
7    generally was.
8      But increasingly after what, 2001, you find
9    those sort of impositions by way of sanctions lists,
10   you know, names you have got to search, and it's
11   coming more and more into -- into the picture.
12     Sort of sitting alongside and complimentary to
13   the existing body of legislation on anti-money
14   laundering and combatting terror -- terrorist
15   financing insofar as they are all sort of meshed
16   together as sort of money laundering issue.
17   Q.   How long has it been true at NatWest Bank
18   that the personal staff have a duty to report to
19   your office any suspicions they have about terror
20   financing or money laundering or other criminal
21   activity?
22        MR. L. FRIEDMAN: Could you read that
23        back, please?
24        (Thereupon, the record was read by
25        the reporter.)

HIGHLY CONFIDENTIAL                                    Page 39

1        MR. L. FRIEDMAN: Object to the form.
2        THE WITNESS: They have been required
3    to do that ever since that first bit of
4    legislation came in.  Not because the
5    legislation explicitly, as I've already
6    said, required it, but because we -- we
7    needed to do it to protect -- to protect
8    them, basically.
9        So it has been around in its earliest
10   forms since 1987.  At the time it was
11   restricted to drug trafficking.  It picked
12   up wider crime and anti-terrorism or
13   terror financing a bit later on, so the
14   first bit of terrorist legislation was
15   1989.
16  BY MR. WERBNER:
17   Q.   Would it be fair to say by the year 2000,
18   it was widely known and understood at NatWest that
19   personal staff had a duty to report such suspicions?
20   A.   Yes.
21   Q.   And would that include relationship
22   managers of customers?  Business customers?
23   A.   Yes.
24   Q.   And these suspicions had to be reported
25   by those staff to the fraud and money laundering

HIGHLY CONFIDENTIAL                                    Page 40

1    group?
2        MR. L. FRIEDMAN: Object to the form.
3        THE WITNESS: They -- they were
4    reported to the -- to the designated
5    internal function, which for most UK
6    companies in the group was the bank's
7    fraud office.
8   BY MR. WERBNER:
9    Q.   And were there forms --
10   A.   Yes.
11   Q.   -- that --
12        MR. L. FRIEDMAN: Let him finish.
13   Let him finish.
14  BY MR. WERBNER:
15   Q.   Describe in the period of --
16        MR. L. FRIEDMAN: Well, once you
17   finish the question: "There were forms
18   that" --
19        MR. WERBNER: Well, you have
20   interrupted me.
21        MR. L. FRIEDMAN: No, no, I didn't.
22        MR. WERBNER: Well, you are
23   interrupting me now.  Let me state what I
24   was stating --
25        MR. L. FRIEDMAN: Okay.

HIGHLY CONFIDENTIAL                                            Page 45

1     A.   There's been a series of them.  These
2   days there's a vast amount of them out there, but
3   initially, going way back, it was largely the
4   British Bankers Association that mediated these
5   things to a sort of industry-produced video.  First
6   one came out in what, '93 time, something like that.
7   Might have been even earlier than that, to be
8   honest.  It was revised over time.
9     These days, there's a lot of providers of this
10   type of material.  After 2000, I couldn't begin to
11   tell you what different businesses were using,
12   because it was very much down to them what they --
13   what they chose to employ.  To date, there's no
14   obligation to use video at all.  You might be using
15   some sort of desktop training package, some
16   computer-based package, may have had video clips in
17   it or may not.
18     You know, there was a lot of -- there's a lot
19   of media out there from which to choose and use, but
20   video's been part of the scene almost since the
21   beginning, certainly since the early '90s, anyway.
22     Q.   Has RBS or NatWest produced -- I mean
23   created and disseminated any of its own videos on
24   the subject to the employees?
25     A.   Yes, yes.  I wasn't personally involved

HIGHLY CONFIDENTIAL                                            Page 46

1   in it, but certainly the retail banking arm produced
2   one, two or three years ago, and I doubt whether
3   that was the first.
4     We produced fraud ones years ago, but we didn't
5   produce our own money laundering one in my time.  We
6   used generic industry ones, but certainly there has
7   been internal material produced both in the retail
8   and the corporate unit.
9     Q.   Are those maintained in some sort of
10   library?  Who is the custodian of that?
11     A.   It would be the anti-money laundering
12   function for the particular business area concerned.
13     Q.   So is there an anti-money laundering
14   function within a retail banking --
15     A.   Yes.  The -- Royal Bank of Scotland is
16   divided into divisions, and it's all evolving again
17   with the merger with ABN Amro Bank, but as it was,
18   we have been split into a number of divisions over
19   recent years, of which retail banking is the major
20   one.  Corporate Banking, Ulster Bank Group, Citizens
21   Financial Group, Wealth Management -- you know,
22   constantly reorganize and realign here and there,
23   but basically those -- those would be the principal
24   ones.
25     Then you have got an anti-money laundering

HIGHLY CONFIDENTIAL                                            Page 47

1   function in each of those divisional areas, and
2   sometimes in -- one step down as well.
3     Q.   You mentioned earlier that you were no
4   longer in the certain group, and that's why you
5   didn't know what they might be calling something
6   now.  I didn't fully understand what you meant.
7     A.   Because I have been in a group function
8   since 2001, and we have had a more clearly sort of
9   pyramidical structure (indicating), if I may put it
10   that way, I have been sitting at the bit at the top.
11     There's all these functions underneath us.  I
12   mean, our own function is about eight strong, nine
13   strong.  That obviously has varied as well over
14   time, but beneath us, you have got within those
15   various divisions anti-money laundering teams, and
16   you know, it funnels down from there again, so
17   there's, you know, a whole -- whole network.
18     So you know, increasingly, I became a bit
19   detached from what was being done at the grass roots
20   in terms of some of these things, and it's a -- it's
21   not to my office that these suspicion reports go,
22   because I am within the sort of policy and issue
23   management, if you like, part of it, what -- what
24   was the sort of compliance sort of things, whereas
25   our operational side in group security and fraud,

HIGHLY CONFIDENTIAL                                            Page 48

1   the successor to the old fraud offices, has
2   continued to be the recipient of the suspicion
3   reports.
4     Q.   Who heads that?
5     A.   What, at the moment?  There's a chap
6   called Mike Smith.  He's -- you know, he heads up
7   our rather operational matters as well.
8     Q.   Who was before him in that position?
9     A.   At the time -- I mean, what, do you want
10   to specify a time here?  Because I -- you know, I
11   could give you a whole range of names over a whole
12   range of periods.
13     Q.   All right.  Why don't you do that, then.
14     A.   Well, for years, it's me.  And when --
15   when I was in fraud office, yes, I was what was then
16   described as the -- as the money laundering
17   reporting officer, although that term has changed
18   its meaning, but I was -- I was the person to whom
19   they sent these reports and I had a team of people
20   that were reviewing them.
21     After I left the -- by the time I left fraud
22   office, it had been first group fraud, then group
23   investigations of fraud, and it was a combined
24   operation of the Royal Bank and NatWest after the
25   two banks had come together.

HIGHLY CONFIDENTIAL                                      Page 49

1    I left there in July 2001, and my successor,
2    bit of an overlap, was Mike Hoseason, who continued
3    in that function of receiving or being the manager
4    responsible for the unit receiving these reports.
5    He carried on doing that for three or four years
6    after that.
7         (Informal discussion held off the
8         record.)
9              THE WITNESS: Mike Hoseason.
10   BY MR. WERBNER:
11   Q.   Can you spell that?
12   A.   Yeah, H-O-S-E-A-S-O-N.
13        And his title changed to head of operations
14   north, because the team that was receiving these
15   reports migrated from London, where it had been, to
16   Edinburgh.
17   Q.   That is north?
18   A.   It certainly is, yes.
19        Obviously the Royal Bank of Scotland, being a
20   Scottish bank, you know, we have more or less got
21   two head offices.  There's one in Edinburgh and one
22   in London, and you find that departments like mine,
23   in group security and fraud, are fairly evenly
24   spread across the two locations (indicating).  And,
25   you know, it's a matter of business decision, where

HIGHLY CONFIDENTIAL                                      Page 50

1    they place a particular function.
2         So this particular one, the report -- suspicion
3    reporting lockers moved from London to Edinburgh,
4    Mike Hoseason becomes head of operations north, and
5    he's rather often on an airplane, as far as I
6    recall, because he lives down here.
7         And then when he -- he was replaced 2-04, 2-05
8    by Tony Ohear, who is part of the Edinburgh setup
9    and is currently part of the central team, so he's
10   no longer involved in it, either.  And now after
11   that, it's become part of the bigger operational
12   function.
13   Q.   You mentioned AB Amro at some point.
14   What is that institution and how does it relate to
15   NatWest or Royal Bank of Scotland?
16   A.   Last year, last year?  It's this year,
17   isn't it?  The Royal Bank of Scotland Group acquired
18   the ABN Amro, Dutch bank, a very large bank.  We are
19   having a lengthy integration process, which we are
20   currently involved in at the moment, and which is
21   likely to see quite a substantial structural change
22   in the way we manage all sorts of things, because
23   they are a rather different type of bank to what we
24   are.
25   Q.   Mr. Wickens, if I understood you, you

HIGHLY CONFIDENTIAL                                      Page 51

1    were the money laundering reporting officer at
2    NatWest up through July 21st of 2000, correct?
3    A.   Yep.
4    Q.   For how long had you been in that role?
5    A.   Since I joined the bank's fraud office
6    in -- in August 1987.
7         I mean, that term, "money laundering reporting
8    officer," wasn't used initially.  That came along
9    later and eventually was to be highjacked by the FSA
10   and made to mean something different.
11        But that in effect it meant at the time the
12   person to whom the suspicion reports were submitted
13   and who might well be involved in other anti-money
14   laundering overview activities, which is why the
15   thing started to shift in another direction.
16        Within the regulations, the role was actually
17   referred to as that of the "appropriate person,"
18   which has since been replaced by the expression
19   "nominated officer," so in effect I was the
20   nominated officer in current money for what I then
21   did, yes.
22   Q.   When you stopped that function in
23   July 21st, 2000, how many people worked under you
24   reviewing these suspicious transaction reports?
25   A.   I had a team of -- I had a team of about

HIGHLY CONFIDENTIAL                                      Page 52

1    six people, I suppose.
2         I should just add here that actually, we had
3    had a structural change within the department prior
4    to my leaving, and by this time, I didn't actually
5    have any line manager responsibilities.  I had been
6    redesignated a consultant, because we started this
7    process of centralizing operational work within the
8    department, and it was one of the triggers to my
9    subsequent departure to group compliance, is that I
10   was actually doing the job which on a day-to-day
11   basis was becoming increasingly divorced from the
12   suspicion reporting process, which was happening
13   under a different line, although they constantly
14   referred to me as the font of knowledge on -- on
15   money laundering generally for opinions on the
16   merits of a particular report and so forth, and I
17   was still -- I was still reviewing reports that we
18   chose not to submit as well, so I had quite a close
19   involvement, but technically, it wasn't my team
20   anymore.  That evolved.
21   Q.   During that phase that you have just
22   described, who was the team that was actually doing
23   the day-to-day?
24   A.   Sorry, during which time?
25   Q.   Where you sort of were -- were sort of

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                    Page 57

1      But sometimes witness statements went beyond
2  that, because they were required to record matters
3  of our direct interaction with a customer and so on.
4  Not necessarily directly under money laundering
5  legislation, but under other criminal legislation
6  such as the Criminal Act of 1984 or the orders
7  served -- well, notices, as they were technically
8  called, by the Serious Fraud Office and 1987
9  Criminal Justice Act.
10      So you know, there were a variety of situations
11  in which witness statements came into being for use
12  in the judicial process that our team had sight of.
13  Q.   Had what of?
14  A.   Sight of.
15  Q.   Okay.  Did the team ever obtain a witness
16  statement from a bank employee in order to help make
17  the decision whether to report a suspicious activity
18  to the NCIS?
19  A.   No, that wasn't the purpose of them.
20  That was what that form was for.  That was their
21  statement, if you like, that -- that report.  But
22  when I say "witness statement," I am talking purely
23  in -- in sort of legal judicial terms that have
24  nothing to do with the internal reporting made by a
25  member of staff.

HIGHLY CONFIDENTIAL                                    Page 58

1      It was a signed document, they had to put their
2  name on it, so they were the -- the suspicion
3  report, but that was -- that was in no way a legal
4  document of any sort.  That was purely information
5  being passed to the center for the center to come to
6  a view on whether it merited disclosure to the
7  national FIU.
8  Q.   In the period of 2000 to 2005, who had
9  the authority to make the decision about whether
10  upon receipt of a -- a suspicion report, it was or
11  was not noticed to the NCIS?
12  A.   Certainly Mike Hoseason, but I couldn't
13  in that period say to whom otherwise that authority
14  may have been delegated, because I wasn't part of
15  the function by this time.
16  Q.   How about from 1995 through 2000?  Who
17  had that authority?
18  A.   That was me, him, and my other -- the
19  assistant manager that preceded him, Dennis Shepard.
20  Q.   Dennis Shepard?
21  A.   Yes.  I mean, this is -- Dennis was my
22  assistant manager for a number of years in the fraud
23  office, effectively managing the team that did these
24  reports, so he had the interaction.  When did he go?
25  He left the bank in about 1999 and was replaced by

HIGHLY CONFIDENTIAL                                    Page 59

1  Michael Hoseason.
2  Q.   How long had Dennis Shepard been your
3  assistant manager?
4  A.   About 10 years.
5  Q.   From about '89 to '99, roughly?
6  A.   Yes, even earlier than that, I think.  I
7  think he was on the scene from -- well, no, that's
8  probably about right.  It was '88 or '89, anyway.
9      In effect, remember I said that we had -- I had
10  a series of attachments by assistant inspectors who
11  came in to do this work.  Well, he was the first
12  established post to replace these, so he became
13  the -- the permanent member of staff, and for a
14  while again it was just him and me, and then
15  gradually the team built up and built up until we
16  had, you know, six or seven people.
17  Q.   Who else other than Dennis were among the
18  most senior in your function?
19          MR. L. FRIEDMAN: Object to the form.
20          THE WITNESS: Given that I was
21          involved, it was really only him and me.
22  BY MR. WERBNER:
23  Q.   Why did Dennis Shepard leave?
24  A.   He -- he chose to take early retirement
25  at the time that NatWest was making a number of

HIGHLY CONFIDENTIAL                                    Page 60

1  initiatives on that front, and he wasn't the only
2  one.  I lost about three members of the team in that
3  time.
4  Q.   Who else?
5  A.   Steve Akery went, and Susan George.
6  Q.   Do you know what Dennis Shepard is doing
7  today?  I mean he still living?  Is he working?  Is
8  he retired?
9  A.   I haven't been in touch with him for
10  quite some time.  He was doing odd bits of
11  consultancy work on the anti-money laundering front,
12  but that was really several years ago, and I have
13  not seen him just lately.
14  Q.   Does -- when you last knew of him, was he
15  living in London or just where?
16  A.   Yes, he lives in the London area, or did.
17  Q.   Do you know what part of the London area?
18  A.   Southeast London.
19  Q.   Where would, say, Neil Trantom fit in?
20  A.   He was my boss.  The fraud function was
21  quite a large one, as I mentioned to you some time
22  ago.  When I joined, senior manager of the
23  department was Tony Richardson.  He was replaced
24  fairly early on, he retired.  Worked with him for
25  about a year.  Then he was replaced in 1989 by

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 109 of 386 PageID #: 8923

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL Page 65

1    resumed reporting to Steven.
2       Q.   Was there a woman or a man named Reavley?
3       A.   Sorry, no, that name doesn't mean
4    anything to me at all.
5       Q.   Okay.
6       A.   Can you spell it?
7       Q.   R-E-A-V-L-E-Y.
8       A.   No, I have no clue who that is.
9       Q.   How about Ollna Leemming?  L-E-E-M-I-N-G.
10      A.   No.
11      Q.   I am going to show you some documents,
12   probably a little bit later, but for now, just sort
13   of getting the general picture.
14      How about Martin Wiltshire?  Do you know Martin
15   Wiltshire?
16      A.   No, it sort of rings a bell but I
17   can't --
18      Q.   It says on what I am looking at, group
19   investigations and fraud, and that was as of 2002.
20   Ground Floor Regent's House, London.  What would
21   be --
22      A.   Oh, well, he's a member, then, of the
23   then group investigations and fraud team after I've
24   gone.  I mean, he may already have been there, but I
25   don't know.

HIGHLY CONFIDENTIAL Page 66

1       Q.   So group investigations and fraud --
2    would that include the money laundering?
3       A.   Well, it included the suspicion reporting
4    bit of it, yes, and that was what I left behind.
5       I moved across to a -- if you like, a policy
6    and overview role, which is what group compliance
7    did as opposed to the nuts and bolts of dealing with
8    the suspicion reports on a day-to-day basis, so that
9    was the bit that I left behind.  This chap must have
10   been part of that operational function.
11      Q.   And this may be a stupid question, but
12   what is Regent's House?  Is that a headquarters --
13      A.   Regent's House is in Islington.  It was
14   one of the -- I suppose they still own it.  Not
15   sure.  It's -- it's one of the Royal Bank of
16   Scotland properties in London, is or was.  I'm not
17   sure if we still have it or not.  I think we do, and
18   we were relocated there to join the fraud team,
19   fraud anti-money laundering of Royal Bank after the
20   acquisition of NatWest.
21      We had been neighbors in King's Cross, so
22   the -- initially, the Royal Bank of Scotland team
23   came into King's Cross.  Couple of months later
24   after space had been available, we all moved down
25   the block to Regent's House as this combined group

HIGHLY CONFIDENTIAL Page 67

1    of investigations and fraud function, and they were
2    there for a while until they moved elsewhere.
3       Q.   Do you know what -- what would be the
4    Northeast Thames CBC?
5       A.   Northeast Thames CBC?
6       Q.   Yes.
7       A.   That would have been a corporate
8    banking -- banking center -- that's what the CBC
9    stands for -- operating somewhere in North London.
10   In other words, it would have dealt with corporate
11   business for a particular area in North London, but
12   I couldn't tell you exactly where.
13      Q.   Do you know a C. MacCulmous?
14      A.   I don't, no.
15      Q.   Charlotte MacCulmous?
16      A.   No.
17      Q.   What does it mean when someone is a fraud
18   officer?
19      A.   Just a generic job title for somebody
20   working in the department.
21      Q.   In which department?
22      A.   Well, the group investigations and fraud
23   department, as it was then called.  What would now
24   be group security and fraud operations.
25      Q.   I see.

HIGHLY CONFIDENTIAL Page 68

1       In this deposition, you have been designated to
2    be giving testimony as a representative of NatWest.
3    Do you understand that?
4       A.   Yep.
5       Q.   What's your educational background?
6       A.   My educational background is that I have
7    a degree in modern languages from the University of
8    Bradford, French and German.  I did the banking
9    exams, what was the standard set of banking exams,
10   after I joined the bank, so I am also what is
11   described as an ACIB, Associate Chartered Institute
12   of Bankers.
13      That apart, I don't have any formal
14   qualifications, certainly no legal ones or anything
15   like that.
16      Q.   Have you, during your many years working
17   with NatWest or the Royal Bank of Scotland, ever had
18   any involvement with an entity called Interpal?
19      A.   No, not personally, no.
20      Q.   Okay.  I mean -- you know that's an issue
21   in this lawsuit?
22      A.   Yes.
23      Q.   But during your years of employment, that
24   was not an issue that ever came before you?
25      A.   No, not to my recollection.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                    Page 77

1    compartments.
2        Sometimes the nature of the untoward
3    activity would jump out at you from the
4    page and it was blindingly obvious what we
5    were looking at, but that was rare.  Most
6    of the time you are looking at a pattern
7    of activity that is not consistent or a
8    particular transaction, which is out of
9    kilter from what is expected from that
10   customer.
11       That is the key principle which
12   governs the suspicion reports.  This is
13   not what you expect from that customer.
14   You may have no clue whatsoever of what
15   the underlying untoward activity is, if
16   any.  Lot of time it's just trying to
17   conceal monies from the tax man or
18   something when we are looking at the cash
19   runs.
20       So you know, we didn't try to
21   pigeonhole things to say oh, this is a
22   terrorist one, so we must do this, that
23   and the other.  I mean, we did have quite
24   a lot of reports particularly after Irish
25   atrocities, which tended to raise

HIGHLY CONFIDENTIAL                                    Page 78

1    awareness again of IRA activity, and where
2    we get all sorts of defensive reports from
3    people simply because they are Irish,
4    basically.
5        It was very difficult for us not to
6    report anything which carried a specific
7    terrorist tag, if it was identified in the
8    report, but very often the quality of
9    those reports was not good.  But simply
10   because we would never have wanted to not
11   report something which could have had a
12   terrorist connection, I am afraid an awful
13   lot of very perfectly innocent Irish
14   people got reported simply because a
15   member of staff had -- had developed a
16   concern really for no better reason than
17   that they were Irish and that -- you know,
18   had a bit of money or something.  But --
19   so it could be quite crude at times.
20       MR. L. FRIEDMAN: Mark, when it's a
21   convenient time, can we break?
22       MR. WERBNER: Let me ask one
23   question, and I will be happy to break, if
24   that's okay.
25       THE WITNESS: Yeah.

HIGHLY CONFIDENTIAL                                    Page 79

1    BY MR. WERBNER:
2        Q.   Would it be fair to say that there was
3    somewhat inherently of a partnership in NatWest
4    between the people who had the account relationships
5    with the customers and with the -- with the fraud
6    and the anti-money laundering group?
7           MR. L. FRIEDMAN: Object to the form.
8           THE WITNESS: Wait.  Partnership, not
9        quite sure that's the word I would use,
10       but yes, clearly we wanted to foster open
11       dialogue.  We were working hard -- you
12       know, to build up the culture of awareness
13       to ensure that people knew what they had
14       to do, that they were quick to pick the
15       phone up, that they were very welcome to
16       pick the phone up if they wanted to talk
17       about things before they submitted a
18       written report.  You know, we were there
19       to -- to help, so yes, I suppose in that
20       sense, partnership is a perfectly good
21       word, yes.
22   BY MR. WERBNER:
23       Q.   Did your group ever initiate
24   investigations to try to determine if there was
25   money laundering or -- or terror financing without

HIGHLY CONFIDENTIAL                                    Page 80

1    having first gotten a -- a suspicion report?
2        A.   Oh, yes.
3           MR. L. FRIEDMAN: Object to the form.
4           THE WITNESS: Information,
5        intelligence, if you like, would come to a
6        department like ours from various sources.
7        You might get a tipoff from another bank.
8        You might get a word to the wise from, you
9        know, a law enforcement officer.  You
10       might see something in a newspaper.  You
11       know, there could be various things which
12       would trigger you to start digging
13       proactively (indicating) from the center
14       outwards, rather than receiving
15       information inwards.
16          No, we were not limited in our
17       activity to purely what was -- what was
18       obtained from incoming suspicion reports.
19   BY MR. WERBNER:
20       Q.   Well, I definitely want to pick up there
21   when we come back from the break.  Can you say
22   during your tenure, though, before the break, in
23   general terms, was it 50/50, or 80/20?  I mean,
24   the -- the magnitude of investigating because of the
25   receipt from an employee of a suspicious activity

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                     Page 81

1   versus some other thing that triggered?
2       A.   No --
3            MR. L. FRIEDMAN: Object to the form.
4            THE WITNESS: -- I couldn't.
5   BY MR. WERBNER:
6       Q.   It was just common at both ways?
7       A.   It happened quite a bit, that's all I can
8   really say, yes.
9            MR. WERBNER: Let's take a break,
10   then.  Thank you.
11           THE WITNESS: Okay.
12           THE VIDEOGRAPHER: Going off the
13   record, 11:14.  This is the end of Tape 1,
14   Volume 1, in Mr. Ian Wickens' deposition.
15   (Recess taken at 11:14 a.m.)
16   (Resumed at 11:33.)
17           THE VIDEOGRAPHER: This is the
18   beginning of Tape 2, Volume 1, in the
19   deposition of Mr. Ian Wickens.  On the
20   record at 11:33.
21   BY MR. WERBNER:
22       Q.   Are you ready to continue, sir?
23       A.   Yes, I am.
24       Q.   Is there anything you wanted to add or
25   correct from what you've said since the break?

HIGHLY CONFIDENTIAL                                     Page 82

1       A.   I don't think so, no.
2       Q.   Right before the end of the break, you
3   made clear to us that the bank may investigate
4   something suspicious or potentially suspicious about
5   a customer even without necessarily having gotten a
6   suspicious activity report from a branch or a
7   banking activity, correct?
8            MR. L. FRIEDMAN: Object to the form.
9            THE WITNESS: Yes, it may happen.
10   BY MR. WERBNER:
11       Q.   You said it could be something stimulated
12   by a tip from the police or from another bank or
13   even something in the newspaper, correct?
14       A.   Yep.
15           MR. L. FRIEDMAN: Object to the form.
16   BY MR. WERBNER:
17       Q.   What other things can you think of in
18   your career that have stimulated such an
19   investigation at NatWest of a customer?
20           MR. L. FRIEDMAN: Object to the form.
21   BY MR. WERBNER:
22       Q.   Other than what you have already said.
23       A.   What I have already said probably covers
24   it.  Essentially, we are saying that -- what I am
25   saying is that something has come to us which

HIGHLY CONFIDENTIAL                                     Page 83

1   concerns one of our customers, and we are just
2   looking to see whether there's anything that we
3   ought to be concerned about.
4        It's not an in-depth investigation.  We are
5   just saying, you know, perhaps we ought to have a
6   look at this individual's account.
7       Q.   Did your team, to your recollection, ever
8   initiate an investigation simply on its own or as a
9   matter of course without a tip, or without a bank
10   calling, or without an activity report?
11           MR. L. FRIEDMAN: Object to the form.
12           THE WITNESS: Well, I can't say.  You
13   get these, say, third-party bits of
14   information coming to you from whatever
15   source.
16   I mean, before now I have arrived in
17   the office after having seen something in
18   the newspaper, saying huh, wondering if
19   that's such and such, just making a
20   connection between names possibly and
21   looking in our own fraud office database
22   just to see if we have got a particular
23   name, and if so, to just sort of start
24   driving one or two inquiries on it.
25   You know, we were not an

HIGHLY CONFIDENTIAL                                     Page 84

1   investigative function.  I wasn't trying
2   to suggest that we are looking for these
3   things to start doing some sort of
4   in-depth investigation, but if -- if -- if
5   something which is potentially untoward
6   concerned one of our customers, then at
7   the very least, it was useful to know
8   about it, and then to make some further
9   inquiry, if it appeared appropriate, and
10   sometimes it was constrained by time
11   considerations and the people available.
12   We couldn't be looking at everything all
13   the time.  I mean, there's too much else
14   to do.
15           MR. WERBNER: Objection,
16   nonresponsive.
17   BY MR. WERBNER:
18       Q.   You mentioned, though, that you might
19   look into the fraud office database.  What would
20   that be?
21       A.   It was simply the -- the system of record
22   on which we recorded the names of the cases that
23   came to us, both on the fraud and on the anti-money
24   laundering side of things, on the various systems
25   over time.  Quite a basic system when I first went

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

1    could be determined.
2        Q.    What -- what did it say, as best you
3    remember?
4        A.    It -- it defined the two categories of
5    name that was to be checked for.  It then said that
6    you -- it gave some indicative criteria of what you
7    needed to match against in order to say whether it
8    was a true match or not, because it had never been
9    defined in any law that we are aware of.  It's left
10   to the institutions to -- to decide on their own
11   initiative what they regard as what's a match and
12   how they will go to check it out.
13       But yes, if you get a match according to a
14   number of predefined criteria based on name, first
15   name or initial, date of birth, that sort of stuff,
16   then either discount them completely, because quite
17   clearly on further inquiry they were seen not to be
18   matches, or there was a middle category which had to
19   be recorded -- I think we recorded all these, mind
20   you, but the middle category was one which was, you
21   know, not conclusively discounted, but where on the
22   balance of probability, I think it was not a match,
23   and a record had to be kept of those, but no further
24   action.
25       Then if they were confirmed matches or what

1    appeared to be confirmed matches, because even
2    though there was sort of gray areas at the margin,
3    they were reported to our department and ultimately
4    would be reported to the Bank of England, and
5    that --
6            (Informal discussion held off the
7        record.)
8            THE WITNESS: These names would be
9        reported -- these matches would be
10       reported to the Bank of England and
11       appropriate instructions sought back.
12   BY MR. WERBNER:
13       Q.    What are the defined two categories?
14       A.    Suspected persons one and two.  To be
15   honest, I can't remember the fine detail of -- of
16   what those categories are.
17       Q.    Well, can you remember anything about the
18   two defined categories?
19       A.    You know, at the end of the day, the --
20   they are the names which we are being asked to
21   screen for, whether for financial sanctions
22   purposes -- in other words, nonterrorist related,
23   and terrorist related.
24       Oh, I think what it is, the second category
25   involves names which are published by other external

1    authorities which could therefore include NCIS and
2    other bodies, and indeed including overseas, where
3    our local operations would be subject to search
4    lists distributed within their own jurisdictions,
5    which they would be legally required to check, as in
6    the case of our United States subsidiaries were
7    being required to check their fact list.
8        Q.    So let's say as President George Bush or
9    the United States Treasury made announcements,
10   designations of persons or entities that were viewed
11   as terrorist, what mechanism at NatWest was there
12   for tracking that and -- and -- and dealing in any
13   way with that?
14           MR. L. FRIEDMAN: Object to the form.
15           THE WITNESS: If the same names got
16           into the list published by the Bank of
17           England, then obviously we were required
18           to act on them.  As far as names which
19           made it into the OFAC list, then United
20           States subsidiaries companies were legally
21           bound to take full note -- note of those.
22           Otherwise, we were not.
23   BY MR. WERBNER:
24       Q.    Well, I am not really asking you for a
25   legal opinion.  I am -- I am asking what NatWest did

1    or didn't do, whether legally obligated or not.
2        So with that clarification, my question is
3    simply: What did NatWest and the Royal Bank of
4    Scotland do, if anything, in regard to persons or
5    entities that the United States government
6    designated as terrorist?
7            MR. L. FRIEDMAN: Mark, I object to
8        the form.  Can I ask you a clarifying
9        question, Mark?
10           MR. WERBNER: Okay.
11           MR. L. FRIEDMAN: I mean, I -- I am
12       not sure what you are getting at.  You
13       might be getting at both things, because
14       in the two questions, first you asked what
15       did NatWest do, if anything, to learn
16       about whether these designations occurred,
17       and then the second was, what did NatWest
18       do upon those designations.
19       Should we break that up?  Because I
20       think you are asking about the logistics
21       of --
22           MR. WERBNER: Okay.  You wanted to
23       ask me a question.  Is that everything?
24           MR. L. FRIEDMAN: No, I am seeking a
25       clarification as to what you are asking

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                    Page 97

1    about.
2        MR. WERBNER: Okay.  Let me rephrase
3    the question.
4  BY MR. WERBNER:
5    Q.  Sir, regardless of what you claim NatWest
6  was legally obligated to do or not, I simply want to
7  know as the representative of NatWest what NatWest
8  did or didn't do, and the first question in that
9  regard is:  What did NatWest do, if anything, to
10  stay informed about persons and entities that the
11  United States was designating as terrorist or
12  involved in terror financing?
13    A.  We screened certain categories of payment
14  against that list.
15    Q.  What did you screen?
16    A.  We screened Financial Markets and other
17  Capital Markets payments going from -- going into
18  New York, basically.
19    Q.  And when did NatWest begin to do that?
20    A.  I think it had been doing it for some
21  time, since -- since we originally acquired software
22  in sort of 1997 time to respond to OFAC.
23    Q.  So would it be fair to say that -- and
24  correct me if I am wrong -- that at least by 1999,
25  NatWest had and did routinely monitor payments of

HIGHLY CONFIDENTIAL                    Page 98

1  its customers where those customers were listed on
2  the United States OFAC list?
3        MR. L. FRIEDMAN: Object to the form.
4        THE WITNESS: For certain limited
5    purposes, yes.
6  BY MR. WERBNER:
7    Q.  For what purposes was NatWest doing that
8  from at least 1999?
9    A.  For this traffic that I've just
10  mentioned, the -- the -- the Financial Markets
11  traffic cleared through New York, the payments, in
12  other words, going through New York.
13    Q.  And what were the nature of those
14  payments?  In dollars?
15    A.  Oh, yes.  They are dollars, yes.
16    Q.  So was NatWest monitoring any of its
17  customers that appeared on the United States OFAC
18  list, but where they were not engaged in clearing
19  dollars through the U.S.?
20        MR. L. FRIEDMAN: Object to the form.
21        THE WITNESS: Can you -- can you
22    repeat that again?  Because --
23  BY MR. WERBNER:
24    Q.  Yeah.  I am taking it from what you said,
25  that from '99, at least, if a NatWest customer was

HIGHLY CONFIDENTIAL                    Page 99

1  making a payment through New York, because it was a
2  dollar transaction, then that was the extent that
3  you did something, but not another way?  Just
4  clarify.  I can't --
5        MR. L. FRIEDMAN: Mark, again, just
6    so that this testimony is clear, can I
7    just get you to focus on one point?
8        MR. WERBNER: Well, let me -- don't
9    interrupt the questioning.  Let me
10    rephrase.
11        MR. L. FRIEDMAN: I am trying to --
12        MR. WERBNER: Let me rephrase.
13  BY MR. WERBNER:
14    Q.  Sir, explain to me the extent that
15  NatWest learned of and took action, if any, when it
16  saw a NatWest customer on the American OFAC list.
17    A.  That's a very sweeping question, isn't
18  it?
19        See, I am not as clear -- well, how do I put
20  this?  I don't want to keep repeating myself, but as
21  I said, we were screening restricted types of
22  transactions which did not include customer
23  transactions against the OFAC list where we are
24  talking about outside the --
25        Obviously the -- the subsidiaries within the

HIGHLY CONFIDENTIAL                    Page 100

1  United States had to obey OFAC requirements to the
2  letter, because they fell under United States
3  jurisdiction.  Over here, as a prudential matter, we
4  screened certain types of payments against that
5  list, which did not include customer payments.
6    Q.  What were the certain types of payments
7  that it did include?
8    A.  It included this -- the Capital Markets,
9  Financial Markets type of proprietary traffic, which
10  was being cleared through New York.
11    Q.  Elaborate what that kind of traffic is.
12        MR. L. FRIEDMAN: Meaning what
13    Capital Market, Financial Markets traffic?
14    Is that what you mean, Mark?
15        MR. WERBNER: I don't want to be
16    interrupted.
17  BY MR. WERBNER:
18    Q.  Go ahead, sir.
19    A.  It's -- I couldn't tell you the details
20  of the transaction, but basically, it relates to the
21  various trading activities they are involved in in
22  their own name, as I understand it.
23    Q.  Can you explain that any better?
24    A.  Not really, because I am in a sort of
25  area of grayness myself as regards to the nature of

HIGHLY CONFIDENTIAL                                    Page 101

1   the transactions that -- you know, Financial Markets
2   undertakes.
3        But what I am saying, it doesn't include where
4   a customer comes to you and says basically, transfer
5   X-amount of money to Y and wherever, then it doesn't
6   include that type of payment.
7        But it does include a number of payments
8   where -- or quite a lot of payments indeed where
9   they are sort of in-house, if you like, although
10  they may involve third-party American banks as
11  counterparties of the transaction, but where
12  Financial Markets is effectively conducting the
13  transaction in its own name.
14       Q.   Like through a corresponding account?
15       A.   Well, whether we were -- whether -- yes.
16  I mean, that -- including those, yes.  I mean,
17  whether they were clearing through our own operation
18  in New York or through their own -- you know,
19  whatever they have got there or through another
20  bank, but nevertheless, you have got at one end
21  Royal Bank of Scotland Group Financial Markets or
22  Capital Markets, so they are group functions, they
23  were the counterparty.  They were the actual
24  transacting party.  That's how I, in simple terms,
25  understand.

HIGHLY CONFIDENTIAL                                    Page 102

1        Q.   Before the acquisition of NatWest by the
2   Royal Bank of Scotland, how were NatWest and its
3   customers' dollar transactions cleared in New York?
4        MR. L. FRIEDMAN: Object to the form.
5        THE WITNESS: They would have -- I
6   mean, for a period we had a branch in New
7   York.  NatWest had a branch in New York.
8   BY MR. WERBNER:
9        Q.   What period?
10       A.   I couldn't say.  I mean, it was there for
11  most of my time in NatWest.  I can't remember when
12  it closed.
13       Q.   Well, give me approximately how -- was it
14  there in '75 when you started?
15       A.   Oh, yes, I think so, yes.  It was
16  there -- it was there through the '70s or part of
17  the '70s and the '80s, but I can't remember exactly
18  when it -- it went out of existence.
19       MR. L. FRIEDMAN: Madam Reporter,
20  just looking at the LiveNote feed, when
21  you have reference to Financial Markets or
22  Capital Markets, that should be
23  capitalized.
24       THE WITNESS: '70s, '80s, yes,
25  possibly into the '90s, but I couldn't

HIGHLY CONFIDENTIAL                                    Page 103

1   exactly say, so we would have cleared some
2   transactions through that unit.
3   BY MR. WERBNER:
4        Q.   And after that?
5        A.   After that, I imagine that would have
6   been done through other correspondent banks, but
7   Financial Markets had an operation of its own in New
8   York, part of which came later to be managed out of
9   London, as I believe.  I don't have any detailed
10  knowledge of that.
11       Q.   What do you mean, Financial Markets had
12  an operation in New York?  You mean the Financial
13  Markets division of NatWest?
14       A.   Well, Royal Bank of Scotland Group, yes.
15       Q.   Well, before we get to Royal Bank of
16  Scotland, how -- how did NatWest clear through New
17  York?
18       MR. L. FRIEDMAN: Object to the form.
19       THE WITNESS: I can't really add much
20  to what I've said, because I am a bit hazy
21  on the detail here.  We had a National
22  Westminster Bank branch in New York for
23  whatever period we had it.  We had quite a
24  lot of activity in the United States at
25  one time in NatWest.  We had a subsidiary

HIGHLY CONFIDENTIAL                                    Page 104

1   bank there, which we sold off at some time
2   in the late '80s or early '90s, I suppose.
3   BY MR. WERBNER:
4        Q.   What was that subsidiary?
5        A.   That was called National Bank of North
6   America.  We would have had doubtless some sort of
7   trading or Financial Markets function there, and
8   certainly that existed and still does.  The Royal
9   Bank Group has a Financial Markets office in New
10  York.  Exactly what it does, I couldn't actually
11  tell you.  It's a, you know, successor to some of
12  these operations as it existed in the past.
13       Q.   Where is it located?
14       A.   No idea, I'm afraid.
15       Q.   So when you say the Royal Bank of
16  Scotland has a Capital Markets in New York that's a
17  successor to some of those operations, what do you
18  mean?
19       MR. L. FRIEDMAN: Object to the form.
20       THE WITNESS: Well, purely that, as
21  far as I know, we have had a fairly
22  continuing presence in one form or another
23  in New York for a good many years.  Now,
24  whether it's actually continuous, I
25  couldn't say, and I'm quite sure that the

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

---

HIGHLY CONFIDENTIAL                                    Page 113

1    needed spelling out, but I cannot remember specific,
2    if you like, upfront due diligence guidance, because
3    it just didn't exist at that time in that sort of
4    way.  That -- at least that I can remember.
5        Q.    Who was involved in the 1993, 1995 time
6    frame at NatWest related to alertness of -- of
7    avoiding giving customer services that might be IRA
8    fundraising?
9              MR. L. FRIEDMAN: Object to the form.
10             THE WITNESS: I cannot elaborate,
11           really, on what I have said before.  There
12           was a general awareness.  If we got
13           specific leads within our office which we
14           needed to follow up, then obviously we
15           did.  We had an extremely close working
16           relationship with Special Branch, and
17           that -- these -- these cases took their
18           course.
19   BY MR. WERBNER:
20       Q.    And when you say Special Branch, that's
21   part of the national police or the Metropolitan
22   police?
23       A.    It's part -- it's not -- I don't think
24   it's purely part of the Metropolitan police, but
25   Metropolitan police have by far the largest

---

HIGHLY CONFIDENTIAL                                    Page 114

1    contingent, but the Special Branch offices I think
2    is assigned to Special Forces as well, but my memory
3    is rusty on that, the way they are organized, but it
4    was a new Scotland Yard based unit that was -- if
5    you like, predecessor of the current anti-terrorism
6    law enforcement agencies.
7        Q.    And no offense, but sort of like counter-
8    terrorism within the FBI?
9        A.    I wouldn't be able to --
10             MR. L. FRIEDMAN: Object to form.
11             THE WITNESS: -- be able to make the
12           comparison.
13   BY MR. WERBNER:
14       Q.    So --
15       A.    Possibly.
16       Q.    -- now, you know from your experience of
17   so many years against money -- anti-money
18   laundering, that someone isn't going to walk into a
19   NatWest branch to open an account in the name of the
20   IRA, the Irish Republican Army, correct?
21       A.    No.
22       Q.    I mean, the way that criminals, including
23   criminal terrorists -- they would understand that
24   they need to disguise their identity if they are
25   going to do business with a legitimate bank like

---

HIGHLY CONFIDENTIAL                                    Page 115

1    NatWest, correct?
2              MR. L. FRIEDMAN: Object to form.
3              THE WITNESS: Yes.  Well...
4    BY MR. WERBNER:
5        Q.    I mean, you don't have any quarrel with
6    what I just said, do you?
7        A.    Not particularly.  It's a generalization,
8    but yeah.
9        Q.    So what I am -- what I am driving at is
10   to the degree, from your experience, that NatWest --
11   what would they be looking at to -- to -- to try to
12   protect the bank and the public and guard against a
13   terrorist group like the IRA from using bank
14   accounts, if it's not to be looking for the name
15   IRA, what -- what tools does the bank use to -- to
16   be vigilant about that?
17       A.    I come back to what I said earlier, that
18   we don't, you know, compartmentalize suspicion.  You
19   know, the general level of awareness was good
20   amongst staff in relation to --
21       Q.    To what, the general level --
22             MR. L. FRIEDMAN: Let him finish.
23   Let him finish, please.
24             THE WITNESS: In relation to IRA
25   activity, and therefore suspicion reports

---

HIGHLY CONFIDENTIAL                                    Page 116

1    were received from staff which quite often
2    made reference to -- well, a very
3    half-formed suspicion that there might be
4    some Irish terrorist element involvement
5    to it.
6              As I have said before in this
7    testimony, these are fairly often
8    half-baked, these reports, because they
9    were often on the back of the latest
10   atrocity, and, you know, really based on
11   little more than the subjects were -- were
12   Irish or had done something which, you
13   know, could just in a pinch be regarded as
14   suspicious.
15             But you know, there was no -- the IRA
16   were very good at covering their tracks,
17   as you say.  They wouldn't open accounts
18   in that way, and they operated in all --
19   in all the classic laundering methods of
20   operating through companies and -- and
21   various means of activity, probably some
22   of it not even through the banking sector.
23   BY MR. WERBNER:
24       Q.    Well, what are the classic ways that --
25   that -- that terrorists and other criminals would --

---

HIGHLY CONFIDENTIAL                                    Page 117

1    would get the benefits of banking services without
2    disclosing who they really were?
3              MR. L. FRIEDMAN: Object to the form.
4              THE WITNESS: Some of them -- some of
5         it is other types of crime, pure and
6         simple.  I mean, I think -- you know,
7         terrorism, including Irish terrorists,
8         have, you know, made quite a bit of --
9         quite a lot of use of card frauds, for
10        example, as a fund raising technique.
11        Other types of fraud like mortgage fraud,
12        in that these things are pretty well
13        indetectable as being specifically related
14        to terrorism.  They are just
15        run-of-the-mill frauds that banks suffer
16        all the time, that they protect themselves
17        as best they can, but the profits of which
18        may well be diverted into terrorist
19        enterprises.
20   BY MR. WERBNER:
21   Q.   Well, just list for me all the classic
22   money laundering methods to disguise that you know
23   as a banker at NatWest in that field.
24   A.   Well, money laundering classically, of
25   course, has been defined in terms of three stages:

HIGHLY CONFIDENTIAL                                    Page 118

1    Placement, layering and integration.  It's like
2    oversimplification -- you know, but it's best to
3    cover all the range of activity that launderers get
4    into, whereby placement, the first stage is getting
5    money into the financial system usually by means of
6    cash deposit.
7       Having gotten money into the system, you then
8    swish it around a bit by what's known as layering
9    techniques, which is, you know, reinvesting the
10   funds in other forms of an instrument or doing lots
11   of money transfers all over the place to -- to hide
12   the trail.  Generally confuse the picture.
13      Then the final stage of integration whereby the
14   money, which has been diffused in this way, is --
15   then reenters the legitimate economy by what appears
16   to be -- by putting it into a business, which may be
17   a perfectly legitimate business, but perhaps which
18   has a large cash turnover.  We are back to pizza
19   parlors and where the whole laundering thing comes
20   from in the first place.
21      You know, it's the ability then to intermingle
22   funds which have been obtained from criminal sources
23   with the legitimate funds of an enterprise, which
24   makes it all more easier for the outfit with a lot
25   of cash involved in that, because it's a

HIGHLY CONFIDENTIAL                                    Page 119

1    cash-intensive business like bars, take-a-ways and
2    launderettes, literally, and in a whole range of
3    cash-intensive businesses.  Those are the sort of
4    classic techniques.
5    Q.   And not only is it done to conceal money
6    that's derived from criminal activity, but money
7    that's used to support criminal activity, correct?
8    A.   Yes.  Yes.
9    Q.   Is it your knowledge as a representative
10   of NatWest that those that are engaged in criminal
11   conduct, including terrorism, would -- would
12   disguise it through the use of phony or front
13   organizations or entities?
14             MR. L. FRIEDMAN: Object to the form.
15             THE WITNESS: Classically, that is
16        part of the very thing I have just been
17        talking about, but actually spotting where
18        that is the case, you might get, again,
19        one of the two red flags, like the fact
20        that companies are registered in rather
21        bizarre, exotic places, all that sort of
22        thing.  But yes, front companies
23        obviously, opaque corporate structures of
24        one sort or another, are all part of the
25        machinery.

HIGHLY CONFIDENTIAL                                    Page 120

1    BY MR. WERBNER:
2    Q.   Yes.  Now, certainly taking again, just
3    as an example, the Irish republican Army, you can't
4    as a bank say that everyone that's Irish or everyone
5    that's Catholic or everyone that lives in Ireland --
6    you can't stereotype and -- and simply turn that
7    into something to take action on, agreed?
8    A.   Yeah, self-evident, yeah.
9    Q.   Now -- but would it be fair that those
10   may be factors along with other things that -- that
11   could add up to a red flag?
12      For example, if you have a lot of cash or
13   unusual movements plus you have it being sent to
14   Belfast and -- and maybe in an unusual way?  You
15   follow my distinction?
16   A.   Yes.
17             MR. L. FRIEDMAN: Object to the form.
18             THE WITNESS: And you are right to
19        imply there the cumulative nature of
20        suspicion.  It's a buildup of factors in
21        which -- you know, there's a number of
22        pieces to the jigsaw, and you may be
23        adding two and two together and getting
24        five.  You probably quite often are.  But,
25        you know, cumulatively these things will

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 117 of 386 PageID #: 8931

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                   Page 121

1      come to a point where you think it's --
2      it's worth at least reporting.
3   BY MR. WERBNER:
4      Q.   Within your field at NatWest, when
5   suspicion is aroused about a customer, and let's
6   keep as an example, the IRA.  Let's say that one of
7   the bank people or -- or some other thing has
8   focused some suspicion on a -- you know, John
9   O'Riley, who is an account holder.
10     Would NatWest, as you called it earlier,
11  digging -- digging into it, look at where John
12  O'Riley was sending money to -- to try to see if
13  that reduces its suspicion or heighten its
14  suspicion?
15          MR. L. FRIEDMAN: Object to the form.
16          THE WITNESS: That's the purpose of
17     making such inquiries, is to try and sort
18     of flush out the picture a bit to see
19     whether objectively then you would arrive
20     at a conclusion that this is something
21     that ought to be reported.  We are still
22     not, of course, certain --
23  BY MR. WERBNER:
24     Q.   Right.
25     A.   -- of knowledge actually there is

HIGHLY CONFIDENTIAL                                   Page 122

1   something untoward there or not, but you -- you
2   arrive at a balanced conclusion as a result of those
3   inquiries that you make, to the extent you make
4   them, to say I will or I will not now take this any
5   further.
6      Q.   And so did NatWest routinely do that, at
7   least during the '90s and before, and after?
8          MR. L. FRIEDMAN: Object to the form.
9          THE WITNESS: Well, in the context of
10     suspicion reports coming in, there was
11     always -- or nearly always, anyway, and
12     that's the thing, to say well presented,
13     that there's nothing more that needed to
14     be done.  There was usually a degree of
15     further digging, inquiry, you know.  We
16     are not talking about investigating down
17     to the last degree.
18     We are talking about just making
19     those basic inquiries that were readily
20     available to us from desktop to search,
21     and from, you know, what could be
22     ascertained about the -- the customer or
23     his contacts, the transactions he had been
24     making to form that view as to whether
25     there was something we were concerned

HIGHLY CONFIDENTIAL                                   Page 123

1   about or not.
2   BY MR. WERBNER:
3      Q.   You certainly at NatWest didn't merely
4   rely upon a question to the customer, like in my
5   example, John O'Riley, hey, are you sending money to
6   the IRA?  That's not the approach that your
7   institution took?
8          MR. L. FRIEDMAN: Object to the form.
9          THE WITNESS: Generally speaking, for
10     almost obvious reasons, you wouldn't ask
11     that sort of question.  There is also the
12     issue that within the law, we have
13     something called tipping off, which would
14     actually be quite a serious restraint on
15     staff the way they phrased a question like
16     that.
17     That said, we have always made the
18     point that it is possible to ask questions
19     of a customer in order to improve the due
20     diligence on that customer without it
21     being said in an accusatory way or one
22     that implied that we did actually suspect
23     them of money laundering.  Of course, such
24     are conversations that are not so easy
25     frontline staff to have, but --

HIGHLY CONFIDENTIAL                                   Page 124

1   BY MR. WERBNER:
2      Q.   Why not?
3      A.   It depends on the circumstances.  I mean,
4   that material I wrote, you know, years ago had in it
5   if you've got the opportunity and you can clarify
6   with the customer, you know, why he is undertaking a
7   particular transaction, there's no reason why you
8   shouldn't do that.  You don't have to -- and sort of
9   being terrified of tipping off in that sort of
10  circumstance.
11     But even so, you are still asking a sort of lot
12  of frontline staff to -- to know the way to approach
13  what they might consider to be a bit of an awkward
14  situation, and they just prefer to sort of take note
15  of what they are hearing and seeing and report it up
16  and let the center take it from there.
17     Q.   If, in my example is Mr. O'Riley is -- is
18  suspected, but not really -- you know, more than
19  that, to be supporting Irish terrorism -- I mean,
20  and let's say large amounts of money are going to --
21  you know, the Irish Brotherhood in Belfast.
22     I mean, would it have been something that
23  NatWest in your division would have dug in and --
24  and sought to determine what is the Irish
25  Brotherhood in Belfast all about?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

1      MR. L. FRIEDMAN: Object to the form.
2      THE WITNESS: No.
3  BY MR. WERBNER:
4    Q.  Why not?
5    A.  Because that's not our job.  That's the
6  job of law enforcement.  We only take the thing so
7  far.
8    Q.  How far do you take it?
9    A.  We take it to a point where we decide,
10  are we sufficiently concerned about this to make a
11  suspicion report to -- disclosure to NCIS, and it is
12  then down to NCIS in conjunction with the
13  appropriate law enforcement agency to dig into it
14  further if they are disposed to do so.
15    Q.  Well, does NatWest ever cease providing
16  financial services?  For example, freeze an account
17  based on suspicion that it has, without having been
18  ordered to do so by British law enforcement?
19    A.  Occasionally, but it if --
20      MR. L. FRIEDMAN: Can you read that
21  back, please?
22      (Thereupon, the record was read back
23  by the reporter.)
24      MR. WERBNER: By being told to do so
25  by law enforcement or ordered to do so by

1      law enforcement.
2      THE WITNESS: Yes, but not routinely.
3  BY MR. WERBNER:
4    Q.  Well, whether it's routine or not,
5  NatWest has done that?
6    A.  We -- yes, we have done it on occasions,
7  yes.
8    Q.  Is there written material that describes
9  the circumstance for NatWest to do that on its
10  suspicion?
11    A.  No.  It's case by case on its merits.
12    Q.  Have you personally, during your years at
13  NatWest or the Royal Bank of Scotland, ever been
14  involved, in whole or in part, where the bank froze
15  or stopped providing financial services based on its
16  suspicion, even prior to receipt of a court order?
17      MR. L. FRIEDMAN: Object to the form.
18      THE WITNESS: Yes, I did say on a
19  number of occasions, as it happened more
20  wearing my advanced fee fraud hat than my
21  anti-money laundering hat, but the two
22  sort of come together at a point.
23  BY MR. WERBNER:
24    Q.  But you and the institution as a whole
25  have that authority and power, correct?

1      MR. L. FRIEDMAN: Object to the form.
2      THE WITNESS: Not exactly.  We are
3  taking a big risk doing that.  If you
4  freeze a customer's account without there
5  being any sort of legal instrument
6  compelling you to do so, you are -- you
7  are running the gauntlet, quite frankly,
8  but occasionally we saw it as the lesser
9  of two evils in that anti-fraud context
10  that I mentioned, because of the risk, as
11  we perceived it and perhaps saw it in a
12  rather exaggerated way on some occasions.
13      But being a constructive trustee
14  where the continuing of handling of -- of
15  money, of which we were deeply suspicious
16  of its origin led us on balance to the
17  conclusion that this -- this money was
18  going nowhere, and that we would -- we
19  would stop it and force the account holder
20  into giving us some sort of explanation.
21      I mean, to be honest, we didn't ever
22  do it other than the circumstances where
23  we knew damn well he wouldn't be able to
24  come up with a satisfactory explanation,
25  because the case was hitting you between

1  the eyes as to what it was all about,
2  because you have got -- you have got the
3  incriminating paperwork with it and
4  everything else.
5      But these -- these were fairly rare
6  events, but they did very occasionally
7  occur.
8  BY MR. WERBNER:
9    Q.  How many times, and at what point in
10  time, have you been involved where a bank's account
11  was frozen temporarily, at least, because of
12  suspicions without a court order?
13      MR. L. FRIEDMAN: You mean a
14  customer's account?
15      MR. WERBNER: Uh-huh.
16      MR. L. FRIEDMAN: You said a bank's
17  account.
18      MR. WERBNER: Yeah.  I meant a
19  customer account.
20      THE WITNESS: I personally
21  intervened, I suppose, in about half a
22  dozen cases during my time where there was
23  a significant amount of money involved,
24  which I was convinced that had been
25  obtained by fraudulent means, and where

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS - Vol. 1
June 23, 2008

---

HIGHLY CONFIDENTIAL                                  Page 137

1   is a reasonable one, yes.
2        Q.   And, for example, are you aware as a
3   representative of NatWest that in 2001, 2002, 2003,
4   there was a considerable amount of terrorism and
5   violence in the Palestinian-Israeli conflict?
6            MR. L. FRIEDMAN: Object to the form.
7            THE WITNESS: Yes, could not be
8        unaware of it.
9   BY MR. WERBNER:
10       Q.   It was something that was front page
11  news, BBC, CNN, where there were these suicide
12  bombings in Jerusalem, Tel Aviv, Gaza?  There -- was
13  obviously known to NatWest about that, periods of
14  violence called the Intifada, is that fair to say?
15       A.   We are certainly aware of that part of
16  the world as a trouble hotspot.
17       Q.   In particular, in 2001 and '02 and '03,
18  there was a flareup of that kind of contact, wasn't
19  there?
20           MR. L. FRIEDMAN: Object to the form.
21           THE WITNESS: Couldn't put dates on
22       it.  It seems to have been going on over a
23       long period.
24  BY MR. WERBNER:
25       Q.   Have you ever heard the phrase "the

---

HIGHLY CONFIDENTIAL                                  Page 138

1   Intifada" as it related to some periods of violence
2   in Palestine and Israel in 2001 and '2?
3        A.   I have heard that term.
4        Q.   Yes.
5        What did the Royal Bank of Scotland or NatWest
6   do to be alert that it wasn't providing financial
7   services to any of its customers that might be
8   supporting any of that violence?
9            MR. L. FRIEDMAN: Object to the form.
10           THE WITNESS: There would have been
11       this screening against the official lists,
12       the official watch lists.  Beyond that, I
13       mean, I don't know what size customer base
14       we've got from that part of the world.  I
15       very much doubt that we have many
16       customers that are actually resident in
17       Palestine.  I should think almost none at
18       all.
19  BY MR. WERBNER:
20       Q.   It would be very unusual, even for a bank
21  of this size, to have a customer doing a lot of
22  business in that region?
23           MR. L. FRIEDMAN: Object to the form.
24  BY MR. WERBNER:
25       Q.   From London?

---

HIGHLY CONFIDENTIAL                                  Page 139

1        A.   We have customers transacting, yes, we
2   have customers transact all over the world.
3        Q.   Well, how usual or unusual would it be to
4   have a customer that sent almost all of its -- its
5   funds to that region of the world?
6            MR. L. FRIEDMAN: Object to the form.
7            THE WITNESS: Well, I imagine it
8        would be unusual, but it might be usual
9        for specific customers.
10  BY MR. WERBNER:
11       Q.   Earlier I meant to ask you -- you said
12  something in reference to seeking consent from the
13  NCIS, and you sort of said like well, naturally,
14  they didn't give it.
15       Would you -- I'm not sure I understood.  Would
16  you explain what you meant by this sort of
17  expectation that they weren't going to give a
18  consent?
19       A.   I was going to mention consent earlier
20  and we got off the point.  Consent is part of the
21  fabric of the proceeds of the Crime Legislation Act
22  here, whereby in principle, at least, a bank, having
23  advanced notice of a transaction which hasn't yet
24  happened, and of which it is suspicious, is required
25  to seek consent from NCIS to undertake that

---

HIGHLY CONFIDENTIAL                                  Page 140

1   transaction.
2        It -- it was a sort of development of a
3   principle that existed under the earlier law, but
4   operated in a quite different way after 2002 to the
5   way it had in the past.  It has been a highly
6   contentious and very difficult area to the extent
7   banks have been lobbying consistently for change in
8   the law over the past four or five years to get it
9   changed to something a bit more workable.
10       But leaving aside all those politics, I will
11  just make the point generally that we in practice go
12  for consent on very, very few cases.  And we were
13  even doing it on a case-by-case basis before the
14  Crime Act came in, that on the whole, you go for
15  consent on those transactions where again, you can
16  see from your own inquiry on the face of it are so
17  egregious that almost certainly law enforcement will
18  exercise its right to refuse you the consent to
19  continue, because they want a chance to lay hands on
20  those monies if they possibly can.  It gives them
21  a -- a sporting chance to intervene, if you will.
22  It's -- what it's meant to do, to provide a window
23  in which law enforcement can intervene and say oops,
24  no.  Thanks, very much, we don't want that money
25  going anywhere.  Thanks.  But it -- it only happens

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                                    Page 141

1   in a very small number of cases in reality.
2      Q.   A bank's job is not to be law
3   enforcement, agreed?
4      A.   Exactly, yes.
5      Q.   But it's not up to law enforcement to do
6   the bank's job either, insofar as deciding who its
7   customers are, correct?
8      A.   No, yeah.
9      Q.   Did those half dozen times or so that you
10  felt that, based on the risk, you should freeze a
11  customer's account, did you ask law enforcement for
12  their opinion before you did that?
13     A.   All those cases were prior to this
14  existing consent regime, and it tended not to work
15  in quite the same way.  I did make reports to NCIS
16  on those particular cases, yes, but usually after we
17  had taken the step of stopping the account.
18          MR. WERBNER: Objection,
19      nonresponsive.
20  BY MR. WERBNER:
21     Q.   In the half dozen or so cases that you
22  can recall where you froze a customer's account --
23     A.   Uh-huh.
24     Q.   -- because of your suspicions, did you
25  ask law enforcement before you did that whether it

HIGHLY CONFIDENTIAL                                    Page 142

1   was a good idea for the bank to do that?
2      A.   No.
3      Q.   Let me ask you if you know Ben Norie
4   (phonetic).
5      A.   Yes.
6      Q.   Who is Ben Norie?
7      A.   He was a contractor working on our team
8   for two, maybe three periods between roughly 2002
9   and 2006, I would guess.
10     Q.   When you say "contractor," what does that
11  mean?
12     A.   Well, he worked on the permanent staff of
13  the bank.  He was employed as a temp, basically, but
14  as a fairly long-term temp.
15          (Thereupon, a document was marked by
16      the reporter as Wickens Exhibit No. 1 for
17      identification.)
18  BY MR. WERBNER:
19     Q.   Let me hand you what I have marked, and I
20  do have copies for counsel, if you will bear with me
21  for a moment, but I will like the witness to begin
22  looking at Wickens Exhibit No. 1.
23      It's a compilation of some emails that bear the
24  Bates number -- that's what we call these numbers at
25  the bottom -- NW 017199 through 17204.  I have a

HIGHLY CONFIDENTIAL                                    Page 143

1   copy of those pages for Mr. Friedman, and I think
2   enough for Mr. Sheldon as well.
3          MR. SCHWARTZ: Mr. Schwartz?
4          (Informal discussion held off the
5      record.)
6   BY MR. WERBNER:
7      Q.   You are welcome to look through --
8   through it, but some of -- it's a whole series of
9   emails, and really, where I am going is -- is the --
10  is the -- the last as it appears in the exhibit,
11  which may be the earliest in time.
12      But if you will see that on the last two pages,
13  down at the bottom of the -- of the page with the
14  Bates number 17203, it looks like in the string of
15  emails it begins on April 21st, 2004, where Ben
16  Norie is sending email on the subject of Interpal.
17  Do you see where I am?
18     A.   Yes, yes.
19          MR. L. FRIEDMAN: What page are you
20      on, Mark?
21          MR. WERBNER: The one that says
22      17203, at the bottom of that.  That's
23      where --
24          MR. L. FRIEDMAN: Got it.
25          MR. WERBNER: -- the first email

HIGHLY CONFIDENTIAL                                    Page 144

1      starts.
2   BY MR. WERBNER:
3      Q.   There he says, sir, that -- and I guess
4   he's addressing Guy Cole, Bill Durham, Tom Sluggen
5   with a copy to Tom Davies.  Do you know any of those
6   people?
7      A.   Yes, I know them all.
8      Q.   How do you know all of those people?
9      A.   Well, as colleagues broadly within
10  this -- the anti-money laundering community,
11  basically.
12     Q.   Uh-huh.  When he mentions "You may
13  remember the matches we have previously reported to
14  the Bank of England against Interpal and its various
15  a/k/as, including Education Aid for Palestine,
16  Palestinians Relief and Development Fund, et
17  cetera."
18      Do you see that?
19     A.   Yes.
20     Q.   Do you know what matches he's talking
21  about and when those reports to the Bank of England
22  occurred?
23          MR. L. FRIEDMAN: Object to the form.
24          THE WITNESS: No, I am afraid I
25      don't.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS - Vol. 1
June 23, 2008

---

HIGHLY CONFIDENTIAL                                    Page 173

1    Q.   So it wasn't a mass market account?
2    A.   Not a mass market account.
3    Q.   Someone was assigned responsibility to
4  service that account of Interpal, correct?
5         MR. L. FRIEDMAN: Object to the form.
6         THE WITNESS: Yes.  I should make the
7         point that relationship management doesn't
8         necessarily mean close and continuous --
9  BY MR. WERBNER:
10   Q.   Are you telling me that --
11        MR. L. FRIEDMAN: Let him finish the
12        answer, please.
13 BY MR. WERBNER:
14   Q.   Go ahead.
15   A.   -- continuous involvement with the
16 account holder.  So it's -- you know, there -- there
17 can be degrees of relationship management, and quite
18 often, the portfolio that any given individual
19 relationship manager has means that they won't in
20 practice devote a huge amount of time to the
21 account.  Depends upon what the commercial needs of
22 that account are, but in some cases, it will only be
23 an annual overview or something like that.
24   Q.   Well, thank you for volunteering that,
25 but do you have any personal knowledge of how

---

HIGHLY CONFIDENTIAL                                    Page 174

1  closely the Interpal accounts were managed by
2  NatWest?
3         MR. L. FRIEDMAN: Object to the form.
4         THE WITNESS: No, I don't.
5  BY MR. WERBNER:
6    Q.   Would you expect that one of the larger,
7  more profitable accounts of a relationship manager
8  would be among those that were paid most attention
9  to?
10        MR. L. FRIEDMAN: I object.  I also
11        wonder how this is within his designated
12        topics.
13 BY MR. WERBNER:
14   Q.   Go ahead.
15        MR. L. FRIEDMAN: I object to the
16        form as well.
17        THE WITNESS: Yes, I am not a
18        marketing manager and that would be for me
19        to speculate.  All I would say is that I
20        am sure there are a number of factors
21        which they take into account as to the
22        extent and depth of involvement with any
23        given relationship.
24 BY MR. WERBNER:
25   Q.   But as someone that's representing

---

HIGHLY CONFIDENTIAL                                    Page 175

1  NatWest here, among other things, on the subject of
2  the bank's anti-money laundering procedures and
3  practices, and someone who volunteered that you
4  don't know how much a various -- or relationship
5  manager might supervise an account, don't you think
6  that account or relationship managers will naturally
7  be quite familiar with those of their customers that
8  are among their largest and most profitable?
9         MR. L. FRIEDMAN: Object to the form.
10        THE WITNESS: It sounds a logical
11        proposition.
12 BY MR. WERBNER:
13   Q.   All right.
14   A.   But I will certainly say I am sure there
15 are a number of variable factors dependent upon
16 their needs.
17   Q.   All right.  What is the initials that I
18 see in some of these NatWest documents, CBFM?
19   A.   Corporate Banking and Financial Markets.
20   Q.   What is -- go ahead.
21   A.   That was the name of the division created
22 post-acquisition to cover the larger Corporate
23 Business and the Financial Markets business of the
24 sort that I was briefly alluding to this morning.
25 In other words, the various trading products and

---

HIGHLY CONFIDENTIAL                                    Page 176

1  Capital Market stuff that they get involved in.
2    Q.   When you say "Capital Market," then, is
3  there someone from NatWest or Royal Bank of Scotland
4  from New York so that they can invest the assets of
5  the bank in the New York Stock Exchange, for
6  example?
7         MR. L. FRIEDMAN: Object to the form.
8         THE WITNESS: There is an office of
9         Corporate Banking and Financial Markets in
10        New York.  I am not competent to state
11        exactly what its functions are, other than
12        it's an extension of the range of
13        activities that that division of the bank
14        gets involved in.
15 BY MR. WERBNER:
16   Q.   Leaving aside that you can't tell me the
17 exact nature, what can you tell me in general?
18        MR. L. FRIEDMAN: Object to the form.
19        THE WITNESS: Well, the business of
20        that division concerns the larger and more
21        significant corporate customers, but they
22        are ranked.  I mean, we have got sort of
23        commercial customers at the bottom
24        (indicating), which got to a certain size.
25        You've then got the much bigger

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS -  Vol. 1
June 23, 2008

HIGHLY CONFIDENTIAL                    Page 257

1    A.   Well, quite a range of people.  It was --
2  it was the specific brainchild of a manager called
3  Chris Hill, who is no longer with the group.
4  Various people, including myself, who were going to
5  be users of it, or got the previous system,
6  obviously had some input into the way it was
7  structured.  I can't really remember.
8    Fleur Baugh, B-A-U-G-H, was quite involved in
9  the project work when it was being developed as
10  well, and there were a lot of divisional
11  representatives for the -- representing the
12  potential users of the system who were involved in
13  the project group when it was being -- not when it
14  was being initially built, but when this latest
15  incarnation of it (indicating), or the one sort of
16  throughout this period, 2000, 2001 time.
17    That was quite a major development of it as it
18  previously existed, and it was a project managed in
19  quite a big way with representation of the divisions
20  that were going to be users of it.
21    Q.   Was this a program that was developed at
22  NatWest prior to its acquisition by Royal Bank of
23  Scotland?
24    A.   Originally, yes.
25    Q.   Okay, and approximately when was it that

HIGHLY CONFIDENTIAL                    Page 258

1  the system was developed?
2    A.   The very earliest form of it was
3  developed probably about 1998, but that was a very
4  simplified system.
5    Q.   And what was the original purpose of
6  developing that software system?
7    A.   The original purpose was simply to make
8  available, without a lot of phone calls -- let me
9  just explain what used to happen.  People would ring
10  me up and say "Have you ever heard of such and such
11  a party," and I would go to my computer, look it up,
12  see if we would know it or not, say yes or no, go to
13  a paper file, fish out the paper file and look to
14  see what -- what it was all about.
15    The very first cut of Goalkeeper was designed
16  as sort of an intranet sort of thing, sitting above
17  this database (indicating) so that people could
18  avoid that phone call and at least see whether the
19  name was known or not.  They wouldn't have been able
20  to get any background information.  They would still
21  have had to come and ask that.
22    So the subsequent releases of the system were
23  huge refinements and enhancements on that, whereby,
24  you know, documents could be scanned in.  We got
25  the -- the system had functionality to make its own

HIGHLY CONFIDENTIAL                    Page 259

1  disclosures to -- to NCIS off that system, rather
2  than by way of separate -- a separately created set
3  of documents and all that sort of thing.
4    We had a series of -- you could be a user at
5  either simple or complex level.  If you were a
6  complex user, then you had very much more access
7  rights to it than the simple user, who would just be
8  able to check whether a name was known or not known.
9  In other words, whether there was a prima facie
10  match against it or not.  The complex users
11  obviously had to be vetted to make sure they were
12  acceptable for looking at confidential data in a
13  system like that.
14    (Informal discussion held off the
15    record.)
16  BY MR. FRIEDMAN:
17    Q.   Were there several separate versions of
18  the Goalkeeper software?
19    A.   There were -- not so much -- well, yes,
20  if you say there were successive versions, yes.
21  There was that very simple one I mentioned.  Then
22  there was sort of a version two.  Then this
23  (indicating) -- when it got to this level of
24  sophistication, as demonstrated by the documents we
25  were looking at, where you got all sorts of case

HIGHLY CONFIDENTIAL                    Page 260

1  material, the ability to scan material and so forth,
2  that was the third or fourth.
3    Q.   Okay.
4    A.   Probably the third, yeah.
5    Q.   Well, the brochure that we looked at
6  earlier -- I don't remember exactly which exhibit it
7  was.  Says Goalkeep -- it's exhibit -- I guess it
8  was 25.
9    A.   Oh, yes, that's right.  Yeah.
10    Q.   It says "Goalkeeper 2."  Does that refer
11  to the second version of Goalkeeper?
12    A.   Yes.  In other words, that is the
13  basically the system (indicating) I think that is
14  there now.  Again, it may have been refined since,
15  but whereas Goalkeeper 1 was very a simple one, that
16  may have had some sort very minor enhancement which
17  didn't change its name from Goalkeeper 1, but
18  Goalkeeper 2, as I am reminded, was that very much more
19  detailed and sophisticated version that succeeded
20  the original one in, what, sort of 2000-odd.
21    Q.   So approximately what time frame was
22  Goalkeeper 2 in -- in use?
23    A.   From about 2000 onwards, I think.
24    Q.   Okay.  I did notice at the bottom of a
25  lot of documents it says "GK3."  Is that a reference

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IAN WICKENS - Vol. 1
June 23, 2008

1  to Goalkeeper 3?
2          MR. L. FRIEDMAN: Where do you see
3      that, Andrew?
4          MR. A. FRIEDMAN: On the document --
5          MR. L. FRIEDMAN: On the intranet
6      address.
7  BY MR. FRIEDMAN:
8      Q.   Turn to Exhibit 11.
9          At the bottom there, it will say www dot GK3
10  dot web, and then --
11      A.   Yes, that is -- yes, I think that's yet
12  the further development of it, but I don't think
13  it's a major departure from the system that this one
14  created (indicating).
15          So if there's a Goalkeeper 3, that's a sort
16  of -- it's this one (indicating) plus a few more
17  bells and whistles or something.
18      Q.   Do you know whether there's a similar
19  user guide for Goalkeeper 3 as similar to Exhibit 25
20  where -- the Goalkeeper 2?
21      A.   I would have thought there must be,
22  because unless this one still covered everything in
23  the same way, in other words, only enhancements
24  having affected the material that was in here, I
25  would have thought they would have done a new one,

1  but I answer the question for certain.
2      Q.   Do you know approximately when it was
3  that Goalkeeper 3 came about?
4      A.   I am losing track here now.  No, I can't
5  remember, but I think that's probably -- I have the
6  sense that it's about three years ago.
7      Q.   Okay, and do you have an understanding or
8  believe that the Goalkeeper 3 is simply improvement
9  and enhancement of Goalkeeper 2?
10      A.   Yes.
11      Q.   And do you know whether any of the main
12  provisions of Goalkeeper 2, such as the glossary of
13  terms and the corresponding color system -- has that
14  changed in Goalkeeper 2 to 3?
15          MR. L. FRIEDMAN: Object to form.
16          THE WITNESS: No, I don't believe so,
17      no.
18  BY MR. FRIEDMAN:
19      Q.   Could you identify for me the various --
20  let's start back with -- with the early stages in
21  the '90s of -- at NatWest.  The various computer
22  software systems that they may have used for -- for
23  the process for identifying customers reporting
24  suspicious activity -- reporting suspicious
25  activity?

1          MR. L. FRIEDMAN: Objection to the
2      form.
3          THE WITNESS: Originally, there were
4      no designated systems as such in support
5      of the reporting of suspicious activity.
6      It was purely manual, supported by
7      whatever management information tools were
8      available at the time.  There was one
9      particular printout, for example, that was
10      produced in NatWest branches --
11          (Informal discussion held off the
12      record.)
13
14          THE WITNESS: -- particular report,
15      management information report called the
16      WE, W-E, 016, which was a daily listing of
17      credits over 5,000 pounds, which was
18      co-opted as a useful tool, to help
19      identify potentially -- help identify
20      large transactions which might be worth a
21      second look, but it wasn't designed to
22      highlight suspicious activities as such.
23          It wasn't until the takeover of
24      NatWest by Royal Bank of Scotland, which
25      was in 2000, that more sophisticated

1      transaction monitoring software was
2      invested in.  Royal Bank of Scotland was
3      blazing the trail on that front.  It was
4      the first of the main banks in this
5      country to invest in a substantial system
6      of that sort, supplied from the outside
7      supplier, and it was then upscaled for
8      NatWest as well.
9  BY MR. FRIEDMAN:
10      Q.   And do you know the name of the NatWest
11  supplier?
12      A.   Yeah, SearchSpace.
13
14          (Informal discussion held off the
15      record.)
16          THE WITNESS: It was called.
17      SearchSpace, all one word.
18  BY MR. FRIEDMAN:
19      Q.   And when was the SearchSpace system first
20  developed?
21      A.   When was it first developed, or first
22  used?
23      Q.   Well, let's start with -- if you know
24  when it was first developed.
25      A.   Well, it was being developed for Royal

**EXHIBIT 26 to Declaration of Joel Israel**
**(Communication with U.K. Government, 1 page)**

**This document has been filed Under Seal**

**EXHIBIT 27 to Declaration of Joel Israel**

**In The Matter Of:**

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*TONY O'HEAR*
*Vol. 1*
*July 21, 2010*

---



Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 127 of 386 PageID #: 8941

TZVI WEISS, et al – NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

**HIGHLY CONFIDENTIAL**                                    Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3                   Action No: 05cv4622(DGT)(MDG)

 4   - - - - - - - - - - - - - - - - - - - -

 5   TZVI WEISS, et al,
                              Plaintiffs,
 6   against

 7   NATIONAL WESTMINSTER BANK, PLC.,
                              Defendant.
 8   - - - - - - - - - - - - - - - - - - - -

 9   NATAN APPLEBAUM, et al.,

10                            Plaintiffs,

11   against

12   NATIONAL WESTMINSTER BANK, PLC.,

13                            Defendant.

14

15

16        VIDEOTAPED DEPOSITION OF TONY O'HEAR

17             Wednesday 21 July 2010

18              At:  10:00 am

19               Taken at:

20        Cleary, Gottlieb, Steen & Hamilton LLP
                 55 Basinghall Street, London
21                     United Kingdom

22

23

24

25
```

**HIGHLY CONFIDENTIAL**                                    Page 2

```
 1              A P P E A R A N C E S

 2   For Plaintiff Tzvi Weiss:

 3        ARI UNGAR.
          Osen LLC
 4        700 Kinderkamack Road
          Oradell, NJ 07649
 5        Tel: 201 265 6400

 6

 7   For Plaintiff Tzvi Weiss:

 8        AITAN GOELMAN
          Zuckerman Spaeder LLP
 9        1800 M Street, NW, Suite 1000
          Washington, DC 20036-5807
10        Tel: 202 778 1996

11   For Defendant National Westminster Bank, PLC:

12

13        AVRAM E. LUFT and VALERIE SCHUSTER
          Cleary, Gottlieb, Steen & Hamilton LLP
14        One Liberty Plaza
          New York, NY 10006-1470
15              Tel: 212 225 2432

16   Also Present:

17

18        COURT REPORTER:

19        AILSA WILLIAMS
          European Deposition Services
20        59 Chesson Rd
          London, W14 9QS
21        Telephone:  44 (020) 7385 0077

22        VIDEOGRAPHER: FLOYD HUMPHREY

23

24

25
```

**HIGHLY CONFIDENTIAL**                                    Page 3

```
 1                   I N D E X

 2   TONY O'HEAR ... ... ... ... ... ... ... ...5

 3   DIRECT EXAMINATION BY MR. UNGAR: .. ... ... ...5

 4              INDEX OF EXHIBITS

 5   O'Hear 1 NW212124 .. ... ... ... ... ... ...32

 6   O'Hear 2 Website printout "From ... ... ...38
              Anonymous"
 7

 8   O'Hear 3 Press Release .. ... ... ... ... .65

 9   O'Hear 4 NW008381-98 .. ... ... ... ... ...69

10   O'Hear 5 NW008356-366 ... ... ... ... ... .93

11   O'Hear 6 NW008367-373 ... ... ... ... ... 124

12   O'Hear 7 NW008430-439 ... ... ... ... ... 129

13   O'Hear 8 NW068065-66 ... ... ... ... ... .137

14   O'Hear 9 NW013939-41 ... ... ... ... ... .147

15   O'Hear 10 NW014500-04 ... ... ... ... ... 168

16   O'Hear 11 NW013695-97 ... ... ... ... ... 176

17
```

**HIGHLY CONFIDENTIAL**                                    Page 4

1  THE VIDEOGRAPHER: This is the beginning of
2  tape one, volume one, in the video deposition of
3  Mr. Tony O'Hear, being held at the offices of Cleary,
4  Gottlieb, Steen & Hamilton, 55 Basinghall Street,
5  London.
6       This is being taken on 21 July, 2010, at 10:00
7  am, as indicated on the video screen.  In fact, it is
8  10:06 am, as indicated on the video screen.
9       This deposition is being taken in the matter
10  of Tzvi Weiss et al, National Westminster Bank plc,
11  Natan Applebaum versus National Westminster Bank plc et
12  al, case number 05cv4622 (DGT) (MGT), being heard before
13  the New York Eastern District Court.
14       The court reporter is Ailsa Williams of
15  European Deposition Services.  The videographer is Floyd
16  Humphrey of European Deposition Services.  Would counsel
17  please introduce themselves.
18       MR. UNGAR: Ari Ungar, Osen LLC, Oradell, New
19  Jersey, United States, on behalf of the Weiss
20  plaintiffs.
21       MR. GOELMAN: Aitan Goelman of the law firm
22  Zuckerman Spaeder, Washington D.C., for the Weiss
23  Plaintiffs.
24       MR. LUFT: Avi Luft, Cleary, Gottlieb, Steen &
25  Hamilton LLP, New York office, on behalf of National

1      Q. You mentioned that you received internal
2  Suspicious Activity Reports, is that true?
3      A. Yes.
4      Q. Can you tell me what that is, what are
5  Suspicious Activity Reports?
6      A. Branch staff -- there is a paper based
7  reporting process where branch staff will report in to
8  Group Investigations & Fraud, as they were known at the
9  time, of any particular situation that gives them cause
10  to suspect that it may involve money laundering.
11      Q. And when you mention "money laundering",
12  does that also include terror financing?
13      A. Yes.
14      Q. When you mention "any particular situation
15  that gives them cause to suspect that it may involve
16  money laundering", is there any written protocol in the
17  bank for the people in the branch network that would
18  identify situations that would constitute situations
19  that should cause them to suspect that there may be
20  money laundering occurring?
21      MR. LUFT: Objection, foundation.
22      A. There are documented policies and
23  procedures.
24      Q. Can you tell me what those procedures are,
25  if you know?

1      A. I would need to see the documents to give
2  you the detail there.
3      Q. What documents are those?
4      A. For the internal bank policies and
5  procedures.
6      Q. You mentioned before that your unit was
7  responsible for capturing on systems the Suspicious
8  Activity Reports. Can you tell me what systems you are
9  referring to?
10      A. The system was known as Goalkeeper.
11      Q. We will talk a bit more about Goalkeeper
12  a little bit later in the deposition. Finally, you said
13  that it would be your unit that would determine if you
14  should make reports to law enforcement. Is that
15  correct?
16      A. Yes.
17      Q. What branch or branches of law enforcement
18  are you referring to?
19      A. NCIS, now known as SOCA.
20      Q. Can you tell me what NCIS stands for? Is
21  it the National Criminal Intelligence Service? Does
22  that sound right?
23      A. That sounds right, yes.
24      Q. The individuals you mentioned before, it
25  is a little bit hard without the spelling to think

1  repeat all their names, but Christine Brannigan and the
2  other individuals you mentioned, they directly reported
3  to you during that time period, is that correct?
4      A. Yes.
5      Q. And did you report to anyone directly in
6  that time period, between 2002 and 2008?
7      A. I had a number of line managers during
8  that timeframe.
9      Q. Are you able to tell me within that 6-year
10  period who they were?
11      A. Initially, it was Mike Hoseason.
12      Q. I am sorry, can you tell me approximately
13  when, you know, which supervisor was your supervisor?
14      A. Yes, again it would only be
15  approximations.
16      Q. That is fine.
17      A. To 2005. Thereafter, Mike Smith to 2008,
18  and now Stephen Foster.
19      Q. Did you have regular meetings with the
20  people that you reported to? Let's start with
21  Mr. Hoseason.
22      A. Yes.
23      Q. About how frequently did you meet with
24  him?
25      A. It depends. Face to face or verbally?

1      Q. Let's start face to face.
2      A. Monthly, as a minimum.
3      Q. And where did you meet?
4      A. Edinburgh, in the main Edinburgh office,
5  where I was based.
6      Q. And how often did you talk, again
7  approximately, verbally?
8      A. Virtually every day.
9      Q. Was there typically anyone else present
10  when you met with Mr. Hoseason?
11      A. Not typically.
12      Q. Can you tell me the general substance,
13  speaking generally, the types of conversations you had
14  with Mr. Hoseason?
15      MR. LUFT: Objection, vague and ambiguous.
16      A. I would describe them as typical line
17  management conversations around team productivity, any
18  particularly complex cases that I needed advice on,
19  staff matters.
20      Q. In your meetings with Mr. Hoseason, did
21  anyone record what was said at those meetings? Let's
22  start with the face to face meetings?
23      A. Not from my recollection.
24      Q. How about your verbal meetings with
25  Mr. Hoseason?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

1      A. No.
2      Q. I assume when you were a manager in the
3  Group Investigations & Fraud there was no one who was
4  hierarchically at the same level as you, is that
5  correct?
6      A. Not when I started in the unit.
7      Q. At some point when you were in the unit,
8  did there come a time when someone was hierarchically at
9  the same level as you in the unit?
10      A. Yes, there was.
11      Q. What time period was that?
12      A. Again, I couldn't be specific about that.
13      Q. Could you give me your best approximation?
14      A. 2004, there was another manager, an
15  existing member of staff was promoted to manager, so
16  equivalent to myself at that time.
17      Q. What is his name?
18      A. Derek Brand.
19      Q. Did you have meetings in that period, from
20  2004 to 2005, while Mr. Hoseason was still your direct
21  supervisor, the three of you, that is you, Mr. Hoseason
22  and Derek Brand?
23      A. Yes, there would have been.
24      Q. Approximately how frequent were those
25  meetings?

1      A. As briefly outlined, exactly the same.
2      Q. In terms of both verbal and face to face
3  meetings?
4      A. Yes.
5      Q. To your recollection, did anyone record
6  the substance of those meetings?
7      A. Not to my recollection.
8      Q. Then you said from 2005 to 2008 you
9  reported to Mike Smith, is that correct?
10      A. Yes.
11      Q. And did you talk to him about with the
12  same frequency as you did with Mr. Hoseason?
13      A. Mike Smith was based in Edinburgh, so the
14  face to face meetings would have been more frequent, and
15  there actually was a process of daily short catch-up
16  meetings, so that the frequency increased.
17      Q. Did you discuss the same type of things
18  generally with Mr. Smith as you did with Mr. Hoseason?
19      A. Generally, yes.
20      Q. And Mr. Foster, I believe you mentioned
21  you reported to from 2008 to the present, is that
22  correct?
23      A. Yes.
24      Q. And was the frequency that you had with
25  Mr. Foster similar to what you had with Mr. Smith?

1      A. No. Stephen is the Group Head of AML.
2  I work within the Policy and Advisory section of that
3  team, so my direct reporting manager is an individual,
4  Tom Lee, and it would be Tom that I would -- so
5  I wouldn't directly speak to Stephen on a routine,
6  regular basis.
7      Q. About how frequently did you discuss
8  with -- did you talk to Stephen Foster though?
9      A. Sorry, could you repeat that?
10      Q. I understand that you did not have
11  discussions with Mr. Foster as frequently, because there
12  was a Tom Lee in between the two of you, is that
13  correct?
14      A. Yes.
15      Q. But about how frequently did you have
16  discussions with Mr. Foster?
17          MR. LUFT: You are talking about 2008 to the
18  present?
19          MR. UNGAR: Yes.
20      A. There was no pattern to those discussions.
21  It would just depend on what work streams I was involved
22  in. If Stephen had a particular interest or involvement
23  then that would drive a conversation. There was no
24  planned regular discussions between me and Stephen.
25      Q. Have you heard of an entity known as

1  Hamas?
2      A. Yes.
3      Q. When did you first hear of Hamas?
4      A. I couldn't be specific when I became aware
5  of that organization.
6      Q. Could you give me your best approximation
7  of when you first heard of Hamas?
8      A. 2000.
9      Q. What did you hear about Hamas at that
10  time, that is in 2000?
11      A. Only what I would read in the published
12  press and its involvement in terrorist activities.
13      Q. You mentioned the published press. What
14  published press did you read at that time?
15      A. It would be the main UK publications, so
16  for me that would be Glasgow Herald, Daily Record.
17      Q. With what frequency did you read the
18  Glasgow Herald at that time, that is around 2000?
19      A. At least once a week.
20      Q. And how about the Daily Record?
21      A. Virtually every day.
22      Q. And you mentioned Hamas' involvement in
23  terrorist activities, I believe was your phrase, is that
24  correct?
25      A. Yes.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

---

HIGHLY CONFIDENTIAL                                        Page 25

1   Q. Can you elaborate on that, what you read
2   at that time, that is in 2000, about Hamas' involvement
3   in terrorist activities?
4   A. I couldn't be specific.
5   Q. I understand this is a little while ago so
6   I am just looking for your best recollection of what you
7   read.
8   A. No more, as I say, no more than, you know,
9   the phrase "Hamas and terrorist activity" was clear
10  linkage. I couldn't go into any more detail than that.
11  Q. When you say "clear linkage", what do you
12  mean?
13  A. Well, in my own head I had made, from what
14  I had read, when I had seen, Hamas, I would make that
15  link to terrorism or potential terrorism activities.
16  Q. I am trying to understand, that Hamas
17  perpetrated terrorist activities, is that what you are
18  saying?
19      MR. LUFT: Objection, misstates his prior
20  testimony.
21  A. That was the suggestion of the articles
22  that I was reading, yes.
23  Q. Did you hear anything about Hamas
24  subsequent to that time in 2000 when you first heard of
25  Hamas?

---

HIGHLY CONFIDENTIAL                                        Page 26

1   A. Nothing specifically, as I say, other than
2   the ongoing press coverage that I would have been
3   picking up on, just as routine.
4   Q. Well, to your knowledge, is Hamas
5   a Palestinian organization?
6       MR. LUFT: Objection, foundation.
7   A. I couldn't answer that.
8   Q. Do you have any understanding of Hamas'
9   political goals?
10  A. No.
11  Q. None at all?
12  A. No.
13  Q. Are you familiar with peace negotiations
14  that occurred in the 1990s between the Palestinian
15  authorities and the State of Israel?
16      MR. LUFT: Objection, vague and over-broad.
17  A. So I have a recollection of them, yes,
18  from press coverage and media coverage.
19  Q. Can you tell me what your recollection is?
20  A. My basic recollections are clearly there
21  were civil unrest, war, and that these were the two
22  parties involved, and there were key issues over
23  territories in that part of the world. That is how
24  I would summarize it.
25  Q. When you say "in that part of the world",

---

HIGHLY CONFIDENTIAL                                        Page 27

1   are you referring to --
2   A. The Middle East.
3   Q. Did you understand Hamas to be opposed to
4   any type of peace negotiations between the Palestinian
5   authority and Israel?
6       MR. LUFT: Objection, foundation.
7   A. I wouldn't have that detailed
8   recollection, no.
9   Q. Do you think you ever knew the answer to
10  that question? I understand -- I want to make sure I
11  understand you now. You don't remember now. You don't
12  remember now, do you think that you ever had that
13  knowledge?
14      MR. LUFT: Objection, vague and ambiguous.
15  A. My recollection is that I wouldn't know
16  that level of detail.
17  Q. Do you consider Hamas to be a terrorist
18  organization?
19      MR. LUFT: Objection.
20      MR. UNGAR: What is the basis for the
21  objection?
22      MR. LUFT: Foundation. He is not an expert
23  witness. It is beyond the scope of his personal
24  knowledge and I don't think it is relevant. I don't
25  want to make speaking objections but if you are going to

---

HIGHLY CONFIDENTIAL                                        Page 28

1   ask me I will tell you.
2       MR. UNGAR: I asked. I appreciate it. You
3   can answer the question.
4   A. Can I have the question again.
5   Q. Do you consider Hamas to be a terrorist
6   organization?
7       MR. LUFT: Same objection.
8   A. I don't have enough information to make
9   that, to have a view on that, to be honest.
10  Q. I believe, tell me if -- I don't want to
11  cite you incorrectly -- that you had read about their
12  involvement in terrorist activities. I believe those
13  were your words. Having that access to that knowledge,
14  if those allegations that you had read in the newspaper
15  were correct, would you have deemed Hamas a terrorist
16  organization?
17      MR. LUFT: Objection, misstates his prior
18  testimony, calls for speculation and lack of foundation.
19  A. Yes, if those press reports that I had
20  read were accurate, then yes.
21  Q. Did you ever read that Hamas perpetrated
22  terrorist attacks, including suicide bombings, between
23  2000 and 2004?
24  A. Again, I couldn't give you any specifics,
25  but my recollection is generally that those were the

---

---

HIGHLY CONFIDENTIAL                    Page 61

1    internal Suspicion Report or any other client, so I
2    didn't have any specific Interpal responsibilities.
3        Q.  I understand that.  Because this case
4    focuses on Interpal, I will be asking you questions
5    about that.  I understand it might not have been
6    theoretically different than other clients, in your
7    mind, as we are discussing it now.  In terms of your
8    exposure to Interpal, what responsibilities did you
9    have, vis-a-vis that customer?
10       A.  There was a period in time when the
11   Charity Commission investigation was underway, where the
12   bank account was frozen, and all the items that were
13   passing through that bank account had to be authorized
14   by the Charity Commission, so there was ongoing
15   communications on a daily basis between the Relationship
16   Management area for the account, myself within Group
17   Investigations & Fraud, and the Charities Commission, to
18   relay the detail of the items that were being presented
19   for payment and passing through the bank account and, as
20   I say, get the authorization from the Charities
21   Commission for those transactions to proceed.
22       Q.  Do you know approximately when those
23   accounts were frozen?
24       A.  Again, without seeing any of the source
25   documentation ...

---

HIGHLY CONFIDENTIAL                    Page 62

1        MR. LUFT:  You are shaking your head.  The
2    court reporter cannot pick that up, so try to give an
3    audible response to Mr. Ungar's questions.
4        Q.  You mentioned the Charities Commission.
5    We are going to talk about that a little bit later, but
6    can I just ask you now, can you tell me what the
7    Charities Commission is?
8        A.  The Charities Commission is the regulatory
9    authority set up to govern and control the registration
10   of charities within the UK.
11       Q.  Within Group Investigations & Fraud, you
12   were the point person in terms of the handling of the
13   Charities Commission investigation, is that correct?
14       A.  For this particular client, yes, that is
15   fair.
16       Q.  And you had daily communications about
17   Interpal at this time period when the accounts were
18   frozen, is that what you said?
19       A.  Correct.
20       Q.  Were there any written sources that
21   detailed your responsibilities in terms of how to handle
22   your treatment of Interpal in a situation such as this,
23   with the accounts being frozen and your being involved
24   with the Charities Commission?
25       A.  The freezing order was a legal document,

---

HIGHLY CONFIDENTIAL                    Page 63

1    so in terms of whatever requirements were, it was all
2    outlined within the legally binding document, and in
3    terms of my involvement, conversations would have all
4    been captured on the Goalkeeper records.
5        Q.  Did you take any notes apart from the
6    Goalkeeper records, with regard to those daily
7    communications about the Interpal accounts, again
8    talking about the time period when the accounts had been
9    frozen by the Charities Commission?
10       A.  No.
11       Q.  Do you remember the substance of those
12   conversations?
13       A.  Simply obtaining information from the
14   Relationship Management area of the items in question,
15   so the checks, the amounts involved, who they were
16   payable to, and simply relaying that information back to
17   the Charities Commission, getting their response, and
18   again relaying that back to the relationship management
19   area to action.
20       Q.  Beyond that conduit role of information,
21   did you apply any judgment in that area in terms of the
22   propriety or -- withdraw that.  Was there any
23   application of judgment in this role that you had, being
24   the point person for Group Investigations & Fraud
25   vis-a-vis the Charities Commission, or was it merely

---

HIGHLY CONFIDENTIAL                    Page 64

1    serving as a conduit between, as a conduit?
2        MR. LUFT:  Objection, vague, compound.
3        A.  The key role in that particular case was,
4    as you say, as a conduit.  I would add, as a member of
5    staff, if there had been -- I would have had to comply
6    with Royal Bank policies and procedures, so therefore if
7    I was made aware of anything that I personally became
8    suspicious of then I would have to follow standard bank
9    processes.
10       Q.  Do you remember being suspicious of
11   anything at that time period?
12       A.  No, I don't recall any specific
13   suspicions.
14       Q.  Do you know that the United States
15   Government designated Interpal as a specially designated
16   global terrorist?
17       A.  Yes.
18       Q.  How did you learn that?
19       A.  My recollection is that the reason that
20   the UK Charities Commission had taken the steps it had
21   was a response to the fact that the entity had been OFAC
22   listed.
23       Q.  You mentioned OFAC.  Do you know what that
24   acronym stands for?
25       A.  The Office of Foreign Asset Control.

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

1        Q. Does that reflect that this is
2   a Goalkeeper case 666814?
3        A. Yes.
4        Q. And was this document prepared in the
5   ordinary course of business?
6            MR. LUFT: Objection, foundation.
7        Q. Were Goalkeeper reports generally prepared
8   in the ordinary course of NatWest or RBS's business?
9   Was it part of their ordinary course of business to
10  prepare these types of reports?
11       A. It is part of Group
12  Investigations & Fraud's remit, on the back of a receipt
13  of an internal Money Laundering Suspicion Report, then
14  it was absolutely standard practice to create
15  a Goalkeeper record.
16       Q. Do you see it says "Created on" towards
17  the top of the page. Do you see that?
18       A. Yes.
19       Q. And it says "17 June 2002", and then it
20  says: "By RBS Mcomcl." Do you see that?
21       A. Yes.
22       Q. Does that mean that this report was
23  created on June 17, 2002?
24       A. That is my understanding of it, yes.
25       Q. Do you know who that is referring to, the

1   "RBS Mcomcl"?
2        A. No, I don't recognize that user ID.
3        Q. We have established that you last modified
4   this report on September 17, 2003. Is that correct?
5        A. From reading this document, yes, that
6   would be my understanding.
7        Q. Directing your attention towards the
8   bottom of the page in the box that says "Transactions",
9   do you see it says "Date: ▮▮▮▮▮
10       A. Yes.
11       Q. And that of course refers to ▮▮▮▮▮
12  And it says "Amount, ▮▮▮▮▮   and then next to it
13  "Currency: ▮▮▮ ?. So does that refer to ▮▮▮▮▮
14  ▮▮▮   is that right?
15       A. That would be my understanding of it, yes.
16       Q. I want to direct your attention to the
17  next page, NatWest 008382. Do you see at the top it
18  says "Hewitt Ibrahim Brian"?
19       A. Yes.
20       Q. Are you familiar with that name?
21       A. No.
22       Q. And below that "Mustafa E". Are you
23  familiar with that name?
24       A. No.
25       Q. How about the name below that, "Qundil J"?

1        A. No.
2        Q. Or the name below that, ▮▮▮▮▮▮▮]
3   ▮▮▮▮?
4        A. No.
5        Q. And lastly the name below that, "Safiee
6   Habibah". Do you know that name?
7        A. No.
8        Q. In the box below that, where it says
9   "Business Data", it says: "Palestinians Relief and
10  Development Fund". Is that right?
11       A. Yes.
12       Q. And that is Interpal, right?
13       A. My understanding is that is another name
14  for Interpal, yes.
15       Q. Across from Palestinians Relief and
16  Development Fund, I see two headings, "Risk" and "ADJ".
17  Do you see that?
18       A. Yes.
19       Q. And in the box below "Risk" it says "Red".
20  Can you tell me, first of all, do you have an
21  understanding of what that refers to?
22       A. My understanding is that that is part of
23  the Goalkeeper system functionality. So when you key in
24  the name, then there is system calibration working in
25  the background that allocates these risk factors, these

1   risk ratings, call it what you will. My recollection is
2   that that functionality was not in use within the
3   department at that time. I am not even aware that it is
4   in use now. So these were system driven.
5        Q. I am not sure I follow you. Are you
6   saying that during this time period, let's say the
7   timeframe between this Goalkeeper report was created and
8   say when you modified it --
9        A. Yes.
10       Q. Your testimony is that this red indication
11  was not applicable. Is that what you are saying?
12           MR. LUFT: Objection, misstates the prior
13  testimony.
14       Q. I am just trying to understand the
15  testimony. I didn't want to put words in your mouth.
16  Can you maybe just say it a different way?
17       A. My understanding is that you would key in
18  information from the internal Suspicion Report, the
19  system in the background would come up with a risk
20  rating in this box, but in terms of the process at the
21  time, we did not -- we were not making use of that
22  functionality, so it did not play any part in the
23  creation of the case, the assessment of the case.
24       Q. Do you have an understanding of what that
25  red indication meant when it was being used?

1        MR. LUFT: Objection.

2        A.  My understanding is that it was not used.

3        Q.  Was it ever used?

4        A.  Not as far as I was aware, and certainly

5    not in the Money Laundering environment.

6        Q.  Do you know why it would be reflected on

7    this Goalkeeper report if it was not being used?

8        A.  Goalkeeper as a system was used to house

9    a lot of bank records, over and above money laundering,

10   so my recollection is that this was a piece of

11   functionality, and all I can say is it was not used, to

12   my recollection, within our assessment of money

13   laundering cases.

14       Q.  And money laundering cases encompassing

15   terror financing cases?

16       A.  Yes, sorry, yes.

17       Q.  The box next to "Risk", where it says

18   "ADJ", do you know what that stands for?

19       A.  I don't even know what that stands for.

20       Q.  And that says "Red" below that box also.

21   Do you know what criteria Goalkeeper used to determine

22   if there should be a red rating when it was used?

23       A.  No, I have got no recollection of using it

24   and no understanding how the system arrived at these

25   classifications.

1        Q.  So when you say that it was not used, do

2    you mean by that that Goalkeeper did not pay attention

3    to this red indication?

4        MR. LUFT: Objection to form and foundation.

5        Q.  When you say that Goalkeeper -- I am

6    sorry -- withdrawn.  When you say that it was not used,

7    this red indication, for lack of a better word, are you

8    saying then that Group Investigations & Fraud did not

9    make use of this indication in terms of how it

10   characterized the customer that it was describing in the

11   report?

12       A.  In terms of its assessment for money

13   laundering and terror financing cases, yes.

14       Q.  It did not take that into account?

15       A.  Yes.

16       Q.  I want to direct your attention to page

17   NW008384.  Maybe the most efficient way to do it is if

18   you read that to yourself and then I will ask you some

19   questions.  Did you have a chance to review that page?

20       A.  Yes, thanks.

21       Q.  I want to begin by focusing at the bottom

22   portion of that page, the last few letters, where it

23   says "TOH".  Do you see that at the end of the page?

24       A.  Yes.

25       Q.  To your knowledge, does that stand for

1    you, Tony O'Hear?

2        A.  Yes.

3        Q.  Is it possible to look at the document and

4    tell me where the entry that you made that concludes

5    with TOH begins?

6        A.  From reading this, my recollection would

7    be that my note would start from "When completing

8    a further disclosure in this connection".

9        Q.  And the notation five lines from the top,

10   where it says "GRM 29-05-03", that wouldn't reflect

11   someone else's entry?

12       A.  No, my understanding would be that is

13   Group Risk Management, and that is the reference number

14   for a list of named entities which Group Risk Management

15   issued from time to time.

16       Q.  So the last entry would begin "When

17   completing a further disclosure" and would run to the

18   end of the document?

19       A.  Yes.

20       Q.  Can you tell me when that entry would have

21   been made?

22       MR. LUFT: Are you asking for his recollection

23   or what he can tell from the document?

24       Q.  Does the document indicate to you when you

25   made that notation?

1        A.  No, it doesn't.  Sorry, the system prompt

2    reflects that I modified it in September 2003.  Ideally,

3    I would see that date on here, but my understanding

4    would be that that would be the date I would have put

5    that note on.

6        Q.  On September 17, 2003, that last portion?

7        A.  Yes.

8        Q.  And you write:

9        "When completing a further disclosure on this

10   connection," what connection are you referring to, or

11   were you referring to?

12       MR. LUFT: Again, asking for his recollection

13   at the time or what he thinks based on reading this

14   today?

15       MR. UNGAR: I am asking at the time.

16       MR. LUFT: You are asking if he recalls?

17       Q.  Right.  To the extent that you are the one

18   who modified this document and your name appears on it,

19   I am asking for your recollection going forward, your

20   recollection of these notes you made.

21       MR. LUFT: Do you understand he is asking if

22   you remember, not what you think based on reading,

23   sitting here today.  If he wants that he will ask

24   a different question.

25       A.  I don't recall.  I can't recall that far

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

---

1    Q.  Do you know that the Charities Commission
2  investigated Interpal in 1996?
3    A.  Yes.
4    Q.  Do you know if the Charities Commission
5  froze Interpal's accounts at NatWest during the course
6  of its investigation of Interpal in 1996?
7    A.  I have no knowledge of that.
8    Q.  Do you know if the Charities Commission
9  investigated Interpal in 2003?
10    A.  Yes.
11    Q.  To your knowledge, did the Charities
12  Commission publish a report based on its investigation
13  of Interpal?
14    A.  It is my understanding they did, yes.
15    Q.  Did you ever see that report?
16    A.  I don't recall.
17    Q.  I am handing the court reporter a document
18  with Bates range NW008430 to NW008439.  It will be
19  O'Hear Exhibit 7.
20    (Exhibit O'Hear 7 marked for identification)
21    If you can just take a moment to review the
22  document, and again I will direct you to any particular
23  parts we want to discuss.  Have you seen this document
24  before?
25    A.  I don't recall having -- I don't recall

---

1  that far back.
2    Q.  Do you see towards the top where it says:
3  "Last modified on 24 September 2003 by RBS O'Hear"?
4    A.  Yes.
5    Q.  Does that reflect that you were the last
6  one to modify this report and that that occurred
7  on September 24, 2003?
8    A.  Yes I would assume so.
9    Q.  And a few lines before that it says:
10  "GK2:710368".  Does that reflect that this is Goalkeeper
11  number 710368?
12    A.  Yes.
13    Q.  Is this the type of document that is
14  created in the ordinary course of RBS's business?
15    A.  Yes.
16    Q.  Under the middle of that first page 8430,
17  where it says "Reason for suspicion", do you see that it
18  says "Suspected terrorist financing"?
19    A.  Yes.
20    Q.  And directing your attention below that,
21  do you see the names "Hewitt, Mustafa, Qundil and
22  Safiee"?
23    A.  Yes.
24    Q.  Do you recall that we saw those names on
25  previous Goalkeeper reports we have talked about today

---

1  involving Interpal?
2    A.  Yes.
3    Q.  I want to direct your attention to
4  page 433.  Mr. O'Hear, I see your initials in several
5  places in the text on this page.  Is it fair to say that
6  you made the entries on this page?
7    A.  Yes, that is fair.
8    Q.  When it says "Agreed disclosure
9  27 August 2003," do you recall what you agreed to
10  disclose?
11    A.  The contents of this summary and
12  assessment, which is included here, is what I would have
13  been agreeing to disclose.
14    Q.  I see.  Do you see a reference to a phone
15  call with DS Neil Bennett, NTFIU at Special Branch.  Did
16  you make notes of your phone call with Neil Bennett?
17    A.  No, all notes would have been captured on
18  the Goalkeeper record.
19    Q.  So there wouldn't have been any notes
20  outside of the Goalkeeper record?
21    A.  No other records, no.
22    Q.  Do you recall if Neil Bennett told you how
23  he was fully aware of the Charities Commission freezing
24  order?
25    A.  I don't recall the specifics, no.

---

1    Q.  ███████████████████████████
2  ███████████████████████████████████
3    MR. LUFT: Objection.
4    Q.  In connection with Interpal.
5    MR. LUFT: Are you asking if he recalls that
6  or as he is reading it today?
7    Q.  Do you recall that information?
8    A.  That is my recollection, yes.
9    Q.  And do you recall if there were
10  transactions involving Interpal that were greater than
11  10,000 pounds?
12    A.  I don't recall that level of detail, no.
13    Q.  To your recollection, in your tenure in
14  Group Investigations & Fraud, can you recall another
15  customer who was on the OFAC list besides Interpal?
16    MR. LUFT: Objection, vague.
17    A.  I can't recall another similar situation
18  with an OFAC listed entity, no.
19    Q.  There is mention towards the middle of the
20  page, "Spoke to Terry Woodley".  Do you see that?
21    A.  Yes.
22    Q.  Do you remember that conversation that you
23  had with Mr. Woodley?
24    A.  I don't remember the detail of it.  When
25  I see that name now, in the context of the words I am

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR -  Vol. 1
July 21, 2010



HIGHLY CONFIDENTIAL                                        Page 145

1    A.  Having read the previous Goalkeeper
2  records, the conversations with the law enforcement
3  ████████████████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ███████████████████████████  so in my role my
8  understanding is I would have communicated that back to
9  the Relationship area, ████████████████████████
10  would have come from, ████████████████████████
11  ████████████████████████████████████████████
12  ████████████████████████████████████████████
13    Q.  From your experience as a manager in Group
14  Investigations & Fraud, do you think that there could
15  have been a transaction of less than 10,000 pounds that
16  could have constituted a risk for terror financing?
17    MR. LUFT: Objection, foundation, lack of
18  expertise, not calling for personal knowledge.
19    A.  I would say yes, there could be
20  transactions below that amount.
21    Q.  And that being the case, wouldn't you have
22  been concerned in your capacity, Group
23  Investigations & Fraud, of permitting a transaction of
24  less than 10,000 pounds to occur?
25    MR. LUFT: Objection, mischaracterizes the

HIGHLY CONFIDENTIAL                                        Page 146

1  prior testimony, lack of foundation.
2    A.  ██████████████████████████████████
3  ████████████████████████████████████████████
4  ████████████████████████████████████████████
5  ████████████████████████████████████████████
6  ████████████████████████████████████████████
7  ████████████████████████████████████████████
8  ████████████████████████████████████████████
9    Q.  The fact that the Charities Commission had
10  ████████████████████████████████████████████
11  ███████████████████████████████████████
12    A.  No.
13    Q.  I am sorry, the law enforcement --
14    A.  Yes.
15    Q.  I am sorry.  That does not mean that you
16  could not in your capacity have also reviewed lower
17  amounts than that threshold, is that true?
18    MR. LUFT: Objection, mischaracterizes the
19  prior testimony, assumes facts not in evidence.
20    A.  I think the phrasing here is, you know, to
21  say that I was only concerned with ██████████████
22  this may be being taken out of context.  There was
23  ████████████████████████████████████████████
24  ████████████████████████  and I would have
25  conveyed that to the RM.  So in terms of satisfying that

HIGHLY CONFIDENTIAL                                        Page 147

1  particular request, I was only interested in -- that is
2  what the request was.  I was not passing any comment on
3  ██████████████████████
4    Q.  So the language "he was only concerned"
5  means with regard to that 10,000 pound transaction
6  established by law enforcement.  That is what you are
7  saying?
8    A.  That very specific request.
9    Q.  Directing your attention to the bottom of
10  the page we were looking at, do you recall having any
11  conversations with Sulatha Maroli, listed as someone
12  from the Charities Commission?
13    A.  I don't recall the specifics of any
14  conversation.
15    Q.  Do you recognize any of those three names
16  listed as I guess being associated with the Charities
17  Commission Sulatha Maroli, Daniel Jeans or Natasha
18  Ayres?
19    A.  As I look at it today, no.
20    Q.  I am handing the court reporter a document
21  with the Bates range NW013939 to NW013941 and asking
22  that it be marked O'Hear Exhibit 9.
23    (Exhibit O'Hear 9 marked for identification)
24    Mr. O'Hear, if you could just take a moment to
25  familiarize yourself with that.

HIGHLY CONFIDENTIAL                                        Page 148

1    A.  Okay.
2    Q.  Have you seen this document before?
3    A.  I don't recall until you showed me it
4  today.  I don't recall this particular e-mail exchange.
5    Q.  You do see your name.  Is it fair to say
6  that this is an e-mail chain involving some RBS
7  employees?
8    A.  Yes.
9    Q.  And is it fair to say that your name
10  appears on several of these e-mails?
11    A.  Yes.
12    Q.  And you have no reason to believe that you
13  didn't see this document previously?
14    A.  Absolutely not, no.
15    Q.  If we turn to the page 940 and 941, that
16  would appear to be the first document from
17  a chronological perspective, is that true?
18    A.  Yes.
19    Q.  And that e-mail is sent by Stephen James
20  Foster, is that right?
21    A.  Yes.
22    Q.  Do you know who that is?
23    A.  Yes.
24    Q.  I think we mentioned him earlier, is that
25  right?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

---

HIGHLY CONFIDENTIAL                                      Page 149

1    A.  Yes.
2    Q.  In that e-mail, do you see the reference
3  where it says:
4        "FYI, the BoE have written to us acknowledging the



11                          We will probably need to reply.
12  Thanks."
13      Do you see that language?
14    A.  Yes.
15    Q.  Can you tell me what "BoE" stands, for if
16  you know?
17    A.  I would suggest that stands for Bank of
18  England.
19    Q.  Do you have an understanding of what
20  letter is being referenced there as having been sent to
21  the Bank of England?
22    A.  No.
23    Q.  Mr. Foster here indicates that the Bank of
24  England

---

HIGHLY CONFIDENTIAL                                      Page 150

1                         Do you see that?
2    A.  Yes.
3    Q.  To your knowledge, in your capacity of
4  work at Group Investigations & Fraud, were payments to
5  Hamas permitted before that date?
6      MR. LUFT: Objection, foundation.
7    A.  I would have no recollection.  I would
8  have no recollection of that prior to that.
9    Q.  Do you know if there ever came to be
10  a date that the -- withdrawn.
11    Mr. O'Hear, would the fact that the -- if the
12  Bank of England had not listed Hamas at a certain point
13  in time, would that mean to you, in your capacity of
14  work as a manager of Group Investigations & Fraud, that
15  a transaction was permissible with Hamas?
16    MR. LUFT: Objection, vague, calls for
17  speculation.  When you say "listed at some time", do you
18  mean listed as a terrorist organization?
19    MR. UNGAR: Listed on the Bank of England
20  terrorist entities list.
21    MR. LUFT: Same objection, vague and
22  ambiguous.
23    A.  As I sit here today, my understanding
24  would be if Hamas was on their list then it would be
25  illegal to permit any transactions.  If they were not on

---

HIGHLY CONFIDENTIAL                                      Page 151

1  their list then any transaction would be legal.  If you
2  are asking me would the bank have permitted that
3  transaction, that wouldn't have been a decision that
4  I would have been involved in.
5    Q.  Are you saying that there is no
6  circumstance where you could have been involved in
7  a determination of the propriety of a transaction being
8  processed for Hamas?  I want to understand your
9  testimony.  Is that what you are saying?
10    A.  At that time, unless someone reported
11  a specific transaction into the unit, I would have had
12  no visibility to what transactions were passing through
13  any bank account.
14    Q.  "Visibility" means knowledge, awareness?
15    A.  Yes.
16    Q.  If you did have an awareness of a
17  transaction involving Hamas before this date in late
18  September, when                        according to
19  Stephen Foster,
20                    would you have permitted that
21  transaction to occur?
22    MR. LUFT: Objection, incomplete hypothetical.
23  I have to say something.  It does not say that this is
24  the date that the Bank of England said that transactions
25  with Hamas were illegal.  Your question is just asking

---

HIGHLY CONFIDENTIAL                                      Page 152

1  him to speculate based on facts that are not even in the
2  document.  It is just not a fair question.
3    MR. UNGAR: Let me try to clarify that.
4  Before the Bank of England designated Hamas, whenever
5  that date was, whether that was in 2003 or 2004, if you
6  had become aware of a transaction involving Hamas, is it
7  your testimony that you would have permitted that
8  transaction to occur?
9    MR. LUFT: Objection, calls for speculation,
10  incomplete hypothetical, fails to tell him if there are
11  other legal entities that are involved and contradicts
12  his prior testimony that this is not his job.  You are
13  asking him, if this was his job, and are there other
14  laws that he should be aware of in this hypothetical,
15  with regard to Hamas.
16    MR. UNGAR: I believe he spoke about
17  visibility and situations where he might have
18  visibility.  I am asking --
19    MR. LUFT: No, he said he did not have
20  visibility.
21    MR. UNGAR: Except for a specific situation.
22    MR. LUFT: If you are going to ask him to do
23  this hypothetical you need to tell him if there are any
24  laws.  That is what he needs to know, if you are going
25  to ask him for this.  I don't want him to give testimony

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010



HIGHLY CONFIDENTIAL                                      Page 169

1  can certainly look at all of it but my question will pertain
2  to the first page. The videographer has indicated the need
3  to change the tape so let's just change the tape and I am
4  ready to start whenever you are.
5          THE VIDEOGRAPHER: Going off the record at
6  4:41 pm.
7              (A short break)
8          THE VIDEOGRAPHER: This is the beginning of
9  tape 4, volume one in the deposition of Mr. Tony O'Hear.
10 We are back on record at 4:51 pm.
11         MR. UNGAR: I just want to ask you a couple of
12 questions before you turn to Exhibit 10. In O'Hear
13 Exhibit 9, if you pull that up, on page 940, it should
14 be the middle page in the e-mail at the top of the page,
15 where you wrote to Mr. Foster and copy Mr. Norrie, you
16 said:
17         "There was a question mark around a payment
18 received from an aid agency in [REDACTED] called the [REDACTED]
19 [REDACTED] Is that
20 correct, true?
21     A. That is what it says here, yes.
22     Q. And where did you get the idea that the
23 [REDACTED]
24 was an aid agency in [REDACTED]?
25     MR. LUFT: Objection.

HIGHLY CONFIDENTIAL                                      Page 170

1      A. I don't recall.
2      Q. If you turn for a moment to your
3  Exhibit 4, that was Goalkeeper 666814.
4      A. Yes.
5      Q. If you turn to the page that ends in 390,
6  and would you just take a moment to review that page.
7      A. Okay.
8      Q. Does that appear to you to be a letter
9  from Mr. Mustafa to a Belinda lane? Is that what it
10 appears to you to be?
11     A. Yes.
12     Q. In the second paragraph, Mr. Mustafa is
13 writing on Interpal's letterhead. Is that true?
14     A. Yes.
15     Q. He is cited as the Vice Chair of the Board
16 of Trustees.
17     A. Yes.
18     MR. LUFT: Document speaks for itself.
19     Q. The second paragraph, do you see where
20 Mr. Mustafa says:
21     "I confirm that the transfer of [REDACTED] is
22 a donation from an aid agency in [REDACTED] called the [REDACTED]
23 [REDACTED]
24 [REDACTED] for Humanitarian projects as detailed
25 in the translation of the correspondence attached."

HIGHLY CONFIDENTIAL                                      Page 171

1          Do you see that language?
2      A. Yes.
3      Q. Do you think that you might have learned
4  or do you think that you might have -- withdrawn.
5          Do you think that this indicates that you
6  might have gotten the idea that the [REDACTED] we
7  have been talking about is an aid agency from Interpal?
8      MR. LUFT: Objection, calls for speculation.
9  Mischaracterizes Exhibit 9.
10     A. My understanding, looking at these
11 documents today is yes, that would be the case, that the
12 customer has been challenged on that transaction and
13 that is the explanation that the bank has been provided
14 with.
15     Q. Do you see that the date on that document,
16 the letter from Mr. Mustafa is August 6, 2002?
17     A. Yes, I can see that.
18     Q. Are you aware in May 2003 that the Bank of
19 England listed the Al-Aqsa Foundation, including its
20 Yemen branch, on its list of suspects for terrorist
21 financing?
22     A. Yes, that is my understanding.
23     Q. Are you also aware that in May 2003 the
24 Al-Aqsa Foundation was listed on the OFAC list by the
25 United States Government?

HIGHLY CONFIDENTIAL                                      Page 172

1      A. I don't recall that, having that
2  knowledge, so I can't comment.
3      Q. When you wrote O'Hear Exhibit 9, and
4  referenced the [REDACTED]
5  [REDACTED] as an aid agency, is it fair to say
6  that you were appropriating the same characterization of
7  [REDACTED] as used by Interpal?
8      MR. LUFT: Objection, lack of foundation,
9  calls for speculation. Are you asking him if he used
10 the same words or the words are based on what he read in
11 that document, if he read that document.
12     Q. Did you use the same words to characterize
13 the [REDACTED] as Interpal had used?
14     MR. LUFT: Objection, the documents speak for
15 themselves.
16     A. I can't recall if I specifically
17 referenced these documents as I prepared that e-mail. I
18 can't recall.
19     Q. The e-mail, O'Hear Exhibit 9,
20 dated October 13, 2003, in that e-mail you refer to the
21 [REDACTED] as
22 an aid agency in [REDACTED] Is that true?
23     A. Yes, that is what it says here, yes.
24     Q. You have testified that you knew that
25 in May 2003 the Al-Aqsa Foundation, including Al-Aqsa

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

TONY O'HEAR - Vol. 1
July 21, 2010

---

HIGHLY CONFIDENTIAL                              Page 173

1  Foundation Yemen, had been listed on the Bank of England
2  list of suspects, terrorist financing list.  Is that
3  true?
4          A.  Yes, that is my understanding.
5          Q.  Can you explain to me why you didn't put
6  that information, that is that the Al-Aqsa Foundation
7  had been listed in May 2003 on the Bank of England's
8  list of suspects of terrorist financing in
9  your October 13, 2003 e-mail?
10         MR. LUFT: Objection, lack of foundation.
11         A.  I guess, as I look at it coldly today,
12  Stephen Foster and Ben Norrie were within the department
13  that issued those lists, so that actual information they
14  would have had, so they would have known that.  That was
15  the unit that issued those lists.
16         Q.  And you thought that because they would
17  have been privy to those lists, for the reason you just
18  specified, it wouldn't be necessary to include that
19  information in your October 13, 2003 e-mail.  Is that
20  a fair characterization?
21         MR. LUFT: If you recall.
22         A.  I can't.  I can't recall.
23         MR. LUFT: I am not coaching here but your
24  questions are not clear.  You are asking him what he
25  recalls.  We have been all day asking him to make

---

HIGHLY CONFIDENTIAL                              Page 174

1  assumptions about what he thinks sitting here today.
2          MR. UNGAR: Many of which are documents he
3  worked on.
4          MR. LUFT: Whatever it is, if he doesn't
5  recall it the does not recall it, so you need to be clear
6  which one you are asking.
7          MR. UNGAR: I think that they are clear, but
8  let's turn back to O'Hear Exhibit 10.
9          Have you seen this document before,
10  Mr. O'Hear?
11         A.  No.
12         Q.  Is it fair to say it appears to be
13  a September 5, 2003 letter from Richard Gossage to TR
14  Dawlings.  Is that fair?
15         A.  Yes, that is what appears here, yes.
16         Q.  Do you know who Richard Gossage is?
17         A.  He was the bank's Group Risk Director at
18  that time.
19         Q.  How about TR Dawlings?
20         A.  Yes, my understanding now today is he is
21  part of what is now the HMT Asset Freezing Unit that was
22  the Bank of England at that time.
23         Q.  And it appears from the document that when
24  this letter was written he was in the Financial
25  Sanctions Unit of the Bank of England.  Is that what it

---

HIGHLY CONFIDENTIAL                              Page 175

1  says?
2          A.  That is what the letter says, yes.
3          Q.  Is it fair to say, Mr. O'Hear, that in
4  this letter Mr. Gossage ████████████████████
5  ████████████████████████████████████████████
6  █
7          MR. LUFT: Objection.  I am just going to
8  state this.  He says he has never seen this document.
9  Now you are just asking him to read the documents and
10  make comments about what it says.  This is not an
11  appropriate line of questioning for this witness.
12         MR. UNGAR: He is in a document that is
13  related to this document that comes after it, and I am
14  showing this document to him to give him some context.
15  I think this will make it easier for the witness, to
16  show him this document than to just show him the next
17  document.  I am actually happy to go to the next
18  document which he appears on, if that is your
19  preference.  I think this would make it easier for the
20  witness to follow the enquiry.
21         MR. LUFT: I think you should ask him about
22  what he knows.  If he does not know it -- I don't know
23  what your question is and I don't know how this makes it
24  easier or doesn't make it easier.  Even if you think
25  this relates to it or whatever else, what he has told us

---

HIGHLY CONFIDENTIAL                              Page 176

1  is that he does not know this document, so to just ask
2  him if certain things are in the document, then the
3  document speaks for itself.  If you would like him to
4  review the document to answer one of your other
5  questions, that is fine, but I don't want him to just
6  sit here and read what is written on a piece of paper.
7          MR. UNGAR: Again, I think that would have
8  just made it a little bit more coherent but I am happy
9  to move to the next document.  Hopefully he will be able
10  to follow without that document.
11         I am handing the court reporter a document
12  with the Bates range NatWest 013695 to NatWest 013697,
13  and asking that be marked O'Hear Exhibit 11.
14         (Exhibit O'Hear 11 marked for identification)
15         When you get the document, if you could just take
16  a moment to review it, please.  Mr. O'Hear, have you seen
17  this document before?
18         A.  No.
19         Q.  Is it fair to say it appears to be an
20  e-mail chain between several RBS employees
21  of October 28, 2003?
22         MR. LUFT: Mischaracterizes the testimony.
23         Q.  I am sorry, it actually appears to
24  encompass October 27, 2003 and October 28, 2003.
25         A.  It is e-mail traffic from --

---

**EXHIBIT 28 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.*

---

*DOUGLAS HARTLEY*

*Vol. 1*

*July 12, 2010*

---



*Original File 120710 Douglas Hartley.txt*

*Min-U-Script® with Word Index*

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 141 of 386 PageID #: 8955

TZVI WEISS, et al – NATAN APPLEBAUM, et al v  
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY – Vol. 1  
July 12, 2010

---

HIGHLY CONFIDENTIAL                                    Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3                    Action No: 05cv4622(DGT)(MDG)

 4   - - - - - - - - - - - - - - - - - - - - - -

 5   TZVI WEISS, et al,
                              Plaintiffs,
 6   against

 7   NATIONAL WESTMINSTER BANK, PLC.,
                              Defendant.
 8   - - - - - - - - - - - - - - - - - - - - - -

 9   NATAN APPLEBAUM, et al.,

10                    Plaintiffs,

11   against

12   NATIONAL WESTMINSTER BANK, PLC.,

13                    Defendant.

14

15

16        VIDEOTAPED DEPOSITION OF DOUGLAS HARTLEY

17              Monday 12 July 2010

18              At:  10:00 am

19              Taken at:

20        Cleary, Gottlieb, Steen & Hamilton LLP
                55 Basinghall Street, London
21                  United Kingdom

22

23

24

25
```

---

HIGHLY CONFIDENTIAL                                    Page 2

```
 1              A P P E A R A N C E S

 2   For Plaintiff Tzvi Weiss:

 3        STEPHEN SCHWARTZ, ESQ.
          Kohn, Swift & Graf PC
 4        One South Broad Street, Suite 2100
          Philadelphia, Pennsylvania 19107-3304
 5        Tel: 419 246 0528

 6   For Plaintiff Natan Applebaum:

 7        MARK WERBNER
          Sayles & Werbner
 8        4400 Renaissance Tower
          1201 Elm St.
 9        Dallas, Texas 75270
          Tel: 214 939 8763
10

11   For Plaintiff Tzvi Weiss:

12        AITAN GOELMAN
          Zuckerman Spaeder LLP
13        1800 M Street, NW, Suite 1000
          Washington, DC 20036-5807
14        Tel: 202 778 1996

15   For Defendant National Westminster Bank, PLC:

16
          JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
17        Cleary, Gottlieb, Steen & Hamilton LLP
          One Liberty Plaza
18        New York, NY 10006-1470
                    Tel: 212 225 2000
19

20   Also Present:

21
          COURT REPORTER:
22
          AILSA WILLIAMS
23        European Deposition Services
          59 Chesson Rd
24        London, W14 9QS

25        Telephone:  44 (020) 7385 0077
```

---

HIGHLY CONFIDENTIAL                                    Page 3

```
 1        VIDEOGRAPHER: DAVID ROSS

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

HIGHLY CONFIDENTIAL                                    Page 4

```
 1                    I N D E X

 2   DOUGLAS HARTLEY ... ... ... ... ... ... ... ...5

 3   DIRECT EXAMINATION BY MR. ... ... ... ... ...5
                    SCHWARTZ:
 4
     CROSS-EXAMINATION BY MR. WERBNER: ... ... ... 138
 5

 6              INDEX OF EXHIBITS

 7   Hartley 1 NW000149-232 ... ... ... ... ... ...59

 8   Hartley 2 NW191-801-806 ... ... ... ... ... ...73

 9   Hartley 3 NW008356-66 ... ... ... ... ... ...83

10   Hartley 4 NW212124 ... ... ... ... ... ... ...88

11   Hartley 5 NW008367-73 ... ... ... ... ... ...90

12   Hartley 6 NW052416 ... ... ... ... ... ... .. 100

13   Hartley 7 NW008374-80 ... ... ... ... ... ... 101

14   Hartley 8 NW008381-98 ... ... ... ... ... ... 101

15   Hartley 9 NW008399-411 ... ... ... ... ... ... 117

16   Hartley 10 NW052031-33 ... ... ... ... ... ... 122

17   Hartley 11 NW052034-39 ... ... ... ... ... ... 122

18   Hartley 12 NW052040-45 ... ... ... ... ... ... 122

19   Hartley 13 NW008430-39 ... ... ... ... ... ... 130

20   Hartley 14 NW185976-988 ... ... ... ... ... ... 133

21   Hartley 15 NW052056-66 ... ... ... ... ... ... 144

22

23

24

25
```

---

HIGHLY CONFIDENTIAL                                      Page 9

1    A.  I think I understood the question, that is
2  fine.  When I joined the bank in 78 I worked in a branch
3  in the West End of London, and for the next 12 years or
4  so that was -- I worked in that, and subsequently other
5  branches in the West End of London.  I worked in four
6  different branches in the West End of London, sort of
7  moving on about every four or five years.
8    Throughout the 90s I then moved out of the branch
9  network and spent a number of years working in service
10  centers, which were processing centers where a lot of the
11  old style branch functions were centralized, so I spent the
12  90s working in those type of centers.
13    Then, in March 2000, I joined -- I can't even
14  remember what it was called now back in 2000, Security
15  and Fraud Department, initially in those first two or
16  three years working in the Money Laundering Team and
17  then in 2002/2003 the money laundering process or Money
18  Laundering Team moved site, and had been obviously based
19  in London but then moved to Edinburgh.
20    I helped with the facilitation of that move
21  and once that move had taken place I then remained in
22  London.  I have been working in Fraud Investigations for
23  the last 7 years.
24    Q.  So from 2003 on you were in Fraud
25  Investigations?

---

HIGHLY CONFIDENTIAL                                     Page 10

1    A.  Yes, that is right, which is where I am
2  today.
3    Q.  Do you remember when in 2003?
4    A.  No, I can't remember.
5    Q.  Approximately?
6    A.  It would have been late 2003, thinking
7  about it, because I do recall travelling to Edinburgh to
8  facilitate some training, so it would have been late
9  2003 when my role in London commenced, the permanent
10  move into Fraud.
11    Q.  As much as possible, if you could keep
12  your voice up for my poor old ears, I would appreciate
13  it, plus I have to work with an English accent.
14    MR. BLACKMAN:  He has to work with yours.
15    A.  That should make it easier for you.
16    Q.  You know what they say: "Two countries
17  separated by a common language", really true.
18    So from 2000 to 2003 the period in which you
19  were working with what you call Security and Fraud, that
20  is correct?
21    A.  Sorry, just to clarify, it has all been
22  Security and Fraud.  Within Security and Fraud back
23  then, well, still now, they had a Money Laundering
24  section, a Fraud section, and there was other teams as
25  well that make up Security and Fraud.  Obviously there

---

HIGHLY CONFIDENTIAL                                     Page 11

1  was security teams as well, but within that, within
2  Security and Fraud, say, for those first 3 years, I was
3  working in the Money Laundering Team.  That part of the
4  unit moved to Edinburgh so I then undertook a Fraud
5  Investigations role from 2003 onwards, but I have
6  effectively been in the same unit of the bank since
7  from March 2000 to date.
8    Q.  The move to Edinburgh, first of all, do
9  you know Mr. Hoseason?
10    A.  Yes, I know Mike Hoseason, yes.
11    Q.  During the period 2000 to 2003, you worked
12  with Mr. Hoseason?
13    A.  Yes, I did.  Yes.
14    Q.  In what you call Security and Fraud?
15    A.  Yes.
16    Q.  Was he your boss at that time?
17    A.  He was.  When I joined in 2000 he was my
18  immediate line manager, as we call it, yes.
19    Q.  Did he move to Edinburgh in 2002/03?
20    A.  I can't recall the specific timing but he
21  did time in Edinburgh overseeing some of the parts of
22  Security and Fraud that were based in Edinburgh, but
23  specific timings as to when he commenced that role and
24  when he finished, I can't be clear about that.
25    Q.  Did all money laundering reporting move to

---

HIGHLY CONFIDENTIAL                                     Page 12

1  Edinburgh, to the best of your knowledge at that time?
2    A.  Yes, to the best of my knowledge it did,
3  yes.
4    Q.  So you stayed in London and from then on
5  your business has been fraud, is that correct?
6    A.  Yes, that is right, yes.
7    Q.  And after the move of the Money Laundering
8  Team to Edinburgh, did you have anything further to do
9  with money laundering?
10    A.  In the first few months I would have had
11  some involvement, again, because just from the point of
12  view of a little bit of coaching and a referral, but as
13  time went on my involvement became less and less.
14    Q.  During your time with the Money Laundering
15  Team, did you have specific cases that were assigned to
16  you?
17    A.  Initially when I joined the team, yes,
18  I would have had specific cases that would have been
19  assigned to me.  More latterly, I would have -- I had
20  more of a role of overseeing cases that were dealt with
21  by other case handlers within the team.
22    Q.  All right.  Let's start at 2000, please.
23  I would like to explore what was the nature of your job
24  duties and responsibilities during the time that you
25  were with the Money Laundering Reporting Team?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

HIGHLY CONFIDENTIAL                              Page 37

1   of Suspicious Transaction Reports, and they would be
2   allocated around the team.
3       Q.   And so certain of them would be allocated
4   to you?
5       A.   Yes.
6       Q.   How many would you say a day.  Is there
7   a typical number?
8       A.   I can't recall.  I mean, I think there
9   were -- it is difficult to recall specifics, it is
10  a long time ago now.  I think we used to receive sort of
11  30 or 40 a day, something like that.
12      Q.   The whole team received 30 or 40 a day?
13      A.   Yes.
14      Q.   So then each person might get five or six?
15      A.   Yes.  Potentially, yes.
16      Q.   So the post would come in, there would be
17  30 or 40 Suspicious Activity Reports.  They would be
18  allocated to the team, including some to you, and then
19  what would you do?
20      A.   Then I would just work the cases one by
21  one.
22      Q.   How would you do that?  How would you work
23  the case?
24      A.   Initially, the first -- pretty much the
25  first step in investigating any case would be to search

HIGHLY CONFIDENTIAL                              Page 38

1   Goalkeeper, to search for existing cases for that
2   particular customer, because, you know, whatever
3   existing cases there might be could prove a factor in
4   your decision making process.  Then, having done that,
5   you would then look more specifically at the case in
6   question, the report, read carefully why it had been
7   submitted, what the suspicion was, and then you would,
8   based on all the facts, come to a decision at the end of
9   the day about whether it was felt appropriate to
10  disclose, and if it was felt appropriate then to put
11  that disclosure together.
12      Q.   Did you personally have the authority to
13  submit disclosures to the NCIS?
14      A.   Initially, no, but over time then, as
15  I say, as my level of responsibility grew, I was then
16  effectively given the ability to submit, not just
17  prepare but also to submit disclosures to NCIS, yes.
18      Q.   But in your initial stages of your
19  employment you had to show them to Mr. Hoseason, is that
20  correct?
21      A.   Yes.
22      Q.   And then he would say: "Yes, you are
23  right" or "No, you are wrong"?
24      A.   Yes.
25      Q.   Is it possible to arrive at what you would

HIGHLY CONFIDENTIAL                              Page 39

1   call a sort of a typical percentage of cases referred to
2   the NCIS from those received?
3       A.   Oh, dear.  Well, there was certainly a lot
4   more disclosed than weren't disclosed, but specific
5   percentages, 80, 80 percent plus maybe would be
6   disclosed. I could be wrong with that but that is
7   a guess.
8       Q.   You are saying approximately 80 percent of
9   the Suspicious Activities Reports you received
10  ultimately became disclosures to the NCIS, is that
11  correct?
12      A.   Yes.  As I say, I could be on the low side
13  with that.
14      Q.   I understand.  I am speaking again of you
15  personally, your duties.  Once you have referred a case
16  to the NCIS, did you have any follow-up
17  responsibilities?
18      A.   What, in relation to a specific disclosure
19  or generally?
20      Q.   Starting with a specific disclosure.  In
21  other words, you said you reviewed approximately, to the
22  best of your recollection, 80 percent of them were then
23  referred to the NCIS?
24      A.   Yes.
25      Q.   So several or a few at least of the ones

HIGHLY CONFIDENTIAL                              Page 40

1   that you had reviewed in any given day were severed to
2   the NCIS.  So my question is then did you have any --
3   once you had referred them to the NCIS, did you have any
4   follow-up responsibilities?
5       MR. BLACKMAN:  For that referral?
6       A.   Yes, again, it would depend on the nature
7   of the case, but some would be, yes, some of them we
8   would be requesting -- in relation to NCIS itself then
9   obviously NCIS would subsequently advise us, they would
10  give us a reference number for the disclosure, and they
11  would advise us where the disclosure -- where the case
12  had been allocated to, which we would make a record of
13  on Goalkeeper.
14      Q.   Excuse me.  What do you mean "where the
15  case had been allocated to"?
16      A.   NCIS would obviously receive the case and
17  they would, based on obviously several factors within
18  the disclosure, most of them -- probably the principal
19  determinant would normally be geographic, but they
20  then allocate that disclosure to City of London Police,
21  to Greater Manchester Police, to Strathclyde Police in
22  Scotland, depending on where it was felt appropriate to
23  do so.  So they would allocate a case to an area of law
24  enforcement in the UK and they would advise us which
25  area of law enforcement the case had been allocated to,

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

HIGHLY CONFIDENTIAL Page 69

1  obviously, you know, make the disclosure and await their
2  response.
3      Q.  During the 3 years -- let me withdraw
4  that.  I mean, according to this page you had some sort
5  of responsibility, along with Ms Baugh, for transactions
6  where prior consent needed to be signed.  Is that
7  correct?
8      A.  Yes.
9      Q.  And during the time that you had this
10 responsibility, were there such transactions?
11     A.  Did I ever get myself involved in
12 a consent disclosure?
13     Q.  Yes?
14     A.  Yes.
15     Q.  Were there many such disclosures?
16     A.  I can't recall.
17     Q.  How long a period were you involved with
18 this?
19     A.  It would have only been within -- it was
20 only the latter part of my tenure at the Money
21 Laundering Team, because obviously this was on the back
22 of the Proceeds of Crime Act in 2002.
23     MR. SCHWARTZ : I am informed that we have
24 five minutes left on the tape so why don't we take
25 a quick break.  Let's change the tape and then we will

HIGHLY CONFIDENTIAL Page 70

1  do another session and then have lunch.
2      THE VIDEOGRAPHER: This is the end of tape
3  one, volume one, video deposition of Mr. Douglas
4  Hartley, now going off the record at 11.56 am, as
5  indicated on the video screen.
6          (A short break)
7      THE VIDEOGRAPHER: This is the beginning of
8  tape two of volume one of the video deposition of
9  Mr. Douglas Hartley, back on the record at 12:06 pm, as
10 indicated on the video screen.
11     MR. SCHWARTZ: Mr. Hartley, could you take
12 a look, please at page 161, NW000161.  This is the page
13 you say you helped draft, is that correct?
14     A.  Yes.
15     Q.  Number 1 there, what does "FMS" refer to?
16     A.  FMS is another database that the bank has.
17 FMS stands for Fraud Management System.
18     Q.  Here it is connected to Money Laundering,
19 so it is involved also, not just Fraud but also Money
20 Laundering.
21     A.  Well, there would be yes, I mean FMS, it
22 is Fraud Management System but that system has cases
23 other than fraud on them, on it.
24     Q.  What is the nature of the Fraud Management
25 System?

HIGHLY CONFIDENTIAL Page 71

1      A.  Again, that is a system that is used
2  primarily for fraud cases.  So in my current role as
3  a fraud investigator, that is the primary case
4  management system that I will use in my current role.
5      Q.  Is it different from Goalkeeper?
6      A.  Yes.
7      Q.  In what ways is it different?
8      A.  I am no techy so I don't think I can be
9  too specific.  In some respects, one was viewed as
10 a fraud system and the other one was used as a money
11 laundering system, but they are not as distinct as that.
12     Q.  Could you look at 9.
13     A.  Yes.
14     Q.  In talking about the response, it says
15 that -- I guess this means a Money Laundering Reporting
16 Officer "may recommend or insist on termination of
17 relationship".  Is that correct?
18     A.  Yes.
19     Q.  So during the years that you were in the
20 money laundering unit, did you have the capacity to
21 recommend that an account be closed?
22     A.  Yes, yes.  Well, to recommend, yes.
23     Q.  To recommend?
24     A.  Yes.
25     Q.  Let's say "insist on".  Did you have the

HIGHLY CONFIDENTIAL Page 72

1  authority to insist that an account be closed?
2      A.  Again, I can't recall any instances where
3  we may have insisted on.  That is not to say we didn't,
4  but I can't recall.
5      Q.  But you personally never insisted that an
6  account be closed?
7      A.  As I say, I can't recall.
8      Q.  Do you recall whether you ever recommended
9  that an account be closed?
10     A.  Again, I wouldn't want to be specific but
11 I am sure there must have been occasions.  That was
12 a more regular sort of instruction, if you like, so I am
13 sure there would have been occasions where we would
14 recommend, but again I wouldn't like to hazard a guess
15 about numbers.
16     Q.  I am sorry, I don't understand what you
17 mean by "a regular sort of instruction"?
18     MR. BLACKMAN: He didn't say "regular sort of
19 instruction".
20     MR. SCHWARTZ: That is what he said on the
21 text.  What did he say?
22     A.  I can't recall now.  I would need to see
23 the text again.
24     MR. BLACKMAN: I think you said "recommend".
25 I think it got transcribed as "regular".

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

HIGHLY CONFIDENTIAL                                      Page 77

1      Q. Sitting here today, have you ever seen
2  them before?
3      A. No.
4      Q. What about the article that is attached,
5  191806, have you ever seen that article before?
6      A. No.
7      Q. Would you take a minute and read the
8  article, please. I would like to know whether some of
9  the facts in it were ever familiar to you prior to
10  today.
11      MR. BLACKMAN: I am going to object to the
12  form of the question.
13      MR. SCHWARTZ: I have not asked a question.
14      MR. BLACKMAN: You did, you wanted to know
15  about facts.
16      MR. SCHWARTZ: I didn't ask any question. Go
17  ahead.
18      MR. BLACKMAN: We don't know whether any of
19  the things in it are factual.
20      MR. SCHWARTZ: Excuse me, I get your point.
21      A. Okay.
22      Q. Mr. Hartley, have you had a chance to read
23  this article?
24      A. Yes, I have.
25      Q. Have you ever heard of the entity called

HIGHLY CONFIDENTIAL                                      Page 78

1  "Interpal" referred to therein?
2      A. Yes.
3      Q. What do you know of Interpal?
4      MR. BLACKMAN: Object to the form of the
5  question, it is broad and vague, but he can answer it.
6      A. Only I know now that it is another name
7  for the Palestinian Relief and Development Fund.
8      Q. And you say you know now, you mean as
9  a result of reading the article?
10      A. No, as a result of obviously, you know,
11  being summoned to this deposition and obviously previous
12  knowledge of this case.
13      Q. During the three years that you were part
14  of the money laundering unit, did you ever do any work
15  on any matters concerning Interpal?
16      A. Do you mean Interpal as in Interpal or
17  Interpal as in the Palestinian Relief and Development
18  Fund.
19      Q. I mean either.
20      MR. BLACKMAN: Why don't you distinguish in
21  your answer.
22      A. As I said earlier, I have some
23  recollection of the Palestinian -- of the name the
24  Palestinian Relief and Development Fund, but I don't
25  recall -- and that is not to say it didn't happen -- I

HIGHLY CONFIDENTIAL                                      Page 79

1  don't recall specifically using or having knowledge of
2  the term Interpal during the three years that I was
3  working in the Money Laundering Team.
4      Q. In the article it says, in the first
5  column:
6      "A senior military officer said Interpal, also
7  known as the Palestinian Relief and Development Fund, raised
8  money exclusively for Hamas institutions and directly
9  provided support to families of Hamas guerillas and suicide
10  bombers. Interpal is the main source of funds for Hamas
11  outside Palestinian territories."
12      MR. BLACKMAN: He said.
13      MR. SCHWARTZ: Have you ever heard of Hamas?
14      A. Yes.
15      Q. What do you understand Hamas to be?
16      A. It is a terrorist organization in
17  Palestine.
18      Q. Were you familiar during the years that
19  you were in the money laundering unit with the name
20  Hamas?
21      A. Yes.
22      Q. Were you familiar at that time -- let me
23  withdraw that. Was it your understanding at that time
24  that it was then considered to be a terrorist
25  organization?

HIGHLY CONFIDENTIAL                                      Page 80

1      A. I can't recall specifically, no.
2      Q. Were you ever aware during that time, 2000
3  to 2003, or let's say the time that you worked on
4  Palestinian Relief and Development Fund matters, did it
5  ever come to your attention that the Palestinian Relief
6  and Development Fund had been accused of raising money
7  for Hamas?
8      A. I don't know, I can't answer that.
9      Q. If you look back, please, at 191802, that
10  is page 2. Do you see the account named there as
11  "Palestine and Lebanon Relief Fund"?
12      A. Yes.
13      Q. Did you ever work on an account called
14  Palestine and Lebanon Relief Fund?
15      A. I don't know, I cannot be specific.
16      Q. When you were looking at Palestine Relief
17  and Development, did you do Goalkeeper research on that
18  name?
19      A. I don't know. I don't know. I can't
20  recall specifically.
21      Q. It was number 1 in the list that you said
22  you helped draft, so wouldn't it be likely that you
23  would have done Goalkeeper research?
24      MR. BLACKMAN: Wait. What was number 1 on the
25  list he drafted?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

---

HIGHLY CONFIDENTIAL                                                 Page 93

1  details behind some of the sizable transactions".  Do
2  you remember writing that?
3       A.  Clearly I don't remember writing it, no.
4       Q.  You have no doubt that you did write that
5  though, right?
6       A.  Yes, the evidence suggests that I did, but
7  obviously you will forgive me if I can't recall
8  specifically doing that.
9       Q.  That is all right, I will forgive you.
10  Were you writing that to someone in particular?
11       A.  No.  In the main that is -- it is what we
12  call a case note, so for anyone who wanted to look at
13  the case to see where we are, then that will be
14  a reference point to them as to at what stage we are at
15  in relation to working this Suspicious Activity Report.
16       Q.  I understand.  It appears to me that it is
17  a request for further action or it is a recommendation
18  for further action.  Is that a fair statement?
19       A.  The way that -- yes, I think that is
20  a fair assumption.
21       Q.  I am trying to find out whether as
22  a result of that recommendation someone would have taken
23  action to gain a clear understanding of the activities
24  here and full details behind?
25            MR. BLACKMAN: Are you asking him the

---

HIGHLY CONFIDENTIAL                                                 Page 94

1  question?
2            MR. SCHWARTZ: I am asking him.
3            MR. BLACKMAN: Well, ask him the question.
4  What if anything do you know happened afterwards?
5       A.  Yes, I mean, I don't know.  The subsequent
6  note on 17 January suggests that something was sent to
7  the relationship manager requesting information, but
8  whether that was the next action on that case, or
9  something happened in between, I don't know.
10       Q.  It says further down:
11            "Existing case for this customer discovered
12  somewhat belatedly".
13       Do you know what that is referring to?
14       A.  No, I do not understand that.
15       Q.  It also says, further down:
16            "The KYC, I don't know what "DD" means,
17  "info appears deficient."  What does the "DD" mean
18  there?
19       A.  Due diligence.
20       Q.  "The KYC due diligence appears deficient."
21  Do you remember why you wrote that?
22       A.  No.
23       Q.  If you look at the next page, do you know
24  who wrote that?
25       A.  No.

---

HIGHLY CONFIDENTIAL                                                 Page 95

1       Q.  Not you?
2       A.  No, I don't know, no.
3       Q.  Do you know, in the previous page -- sorry
4  to keep jumping back and forth -- back to 8369, do you
5  know why you added the word "hopefully" into that note?
6       A.  No, I don't know that, no.
7       Q.  On 8370, this is going to be a general
8  question which we will see if you can answer.  Whoever
9  wrote this says at the very end:
10            "Given the current volatile situation in
11  Palestine, we are concerned that as the sources of
12  funds cannot be verified there may be [I assume that
13  is] vulnerability for terrorist financing".
14            Is it your understanding from your training
15  that where sources of funds cannot be verified, that is
16  a cause for suspicion?
17       A.  We would always be more suspicious if we
18  could not verify the sources of funds but --
19       Q.  How do you understand that sentence?
20       A.  I don't know.
21       Q.  It is in Goalkeeper?
22            MR. BLACKMAN: I know, but why don't you just
23  ask him what he knows, because asking someone to
24  understand what someone else wrote --
25            MR. SCHWARTZ: I want his understanding.

---

HIGHLY CONFIDENTIAL                                                 Page 96

1            MR. BLACKMAN: I know, but your understanding,
2  if he didn't ever --
3            MR. SCHWARTZ: He is an officer.
4            MR. BLACKMAN: That doesn't matter.  He is not
5  required to speculate.
6            MR. SCHWARTZ: It is not up to you.  You are
7  not taking this deposition.
8            MR. BLACKMAN: Object to the form of the
9  question.
10            MR. SCHWARTZ: Fine.
11            MR. BLACKMAN: There is no foundation asking
12  a witness about understanding of a document someone else
13  wrote that he does not remember ever seeing.  Ask him
14  what he knows, not what he understands someone else
15  wrote.  That's not so hard.
16            BLACKMAN:
17            MR. SCHWARTZ: I am not asking you what
18  someone else wrote.
19            MR. BLACKMAN: Yes, you are.
20            MR. SCHWARTZ: All right, let me see if we can
21  satisfy Mr. Blackman too.  First of all, during the time
22  that you were a Money Laundering Officer, were you aware
23  of anything in the way of trouble going on in Israel and
24  Palestine at that time?
25       A.  Yes.

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

---

HIGHLY CONFIDENTIAL                    Page 97

1    Q. What were you aware of?
2    A. That there was conflict, yes, so it was
3  a -- and that, well, yes, that is as much as -- what
4  else do you want me to say? I was obviously aware that
5  it was a volatile region and that there was conflict
6  between the two countries.
7    Q. Someone made the assessment that --
8  withdraw that.
9        If you look at pages 8372 and 3, this is
10 a Suspicious Activity Report, correct?
11   A. Yes, it is.
12   Q. This is an internal RBS document?
13   A. Yes.
14   Q. And someone filled this out. We talked to
15 Miss Leeming earlier. Miss Leeming filled this out
16 because she saw a couple of transactions that struck her
17 as suspicious.
18   A. Yes.
19     MR. BLACKMAN: Just guessing but --
20   A. Yes.
21     MR. SCHWARTZ: That is what appears -- that is
22 what this document would tell you?
23   A. Yes, the reasons for suspicion, she has
24 put in "Large payments received". I can only speculate
25 beyond that.

---

HIGHLY CONFIDENTIAL                    Page 98

1    Q. If you look at 8367, someone has filled in
2  reasons for suspicion "Suspected terrorist financing or
3  suspected terrorist funding." Do you see that?
4    A. Yes.
5    Q. But that is not -- if you look back at 72
6  and 73, the person who filled out the suspicious
7  activity report did not say that?
8    A. No.
9    Q. So that was added by whoever filled out
10 this Goalkeeper report?
11     MR. BLACKMAN: Objection. If you know.
12 I mean just you -- are asking him to speculate.
13     MR. SCHWARTZ: I am asking him --
14     MR. BLACKMAN: You are totally. Go ahead,
15 answer the question.
16   A. Yes.
17   Q. When you filled out Goalkeeper reports did
18 you make a determination as to what was the reason for
19 the suspicion?
20   A. Of course, yes, we would. I mean, that
21 was our job. We wouldn't obviously just rely on the
22 information provided by the author of a suspicion report
23 who had obviously, you know -- we would occasionally
24 obviously add information, if we felt it was appropriate
25 to do so.

---

HIGHLY CONFIDENTIAL                    Page 99

1    Q. Do you see the name on page 1, "Reevely
2  L"?
3    A. Yes.
4    Q. Do you know who that is?
5    A. No. I vaguely remember the name as
6  obviously presumably being someone in the team at the
7  time but I can't remember who that was, no.
8    Q. And you have no recollection why you were
9  looking at this on February 5?
10     MR. BLACKMAN: Of 2002.
11     MR. SCHWARTZ: Of 2002, or why you wrote these
12 notes on that page?
13     MR. BLACKMAN: As we sit here, in July 2010?
14     MR. SCHWARTZ: Giving testimony in
15 a litigation, yes.
16   A. Obviously, I don't mind speculating
17 because obviously the last of the three notes that are
18 included in 8369, is dated, which is also by myself, was
19 dated 5th of the 2nd, and that is when it says it was
20 last modified by.
21   Q. To the best of your knowledge, sitting
22 here today, did you do any research on this matter at
23 all?
24   A. I can't recall, no.
25   Q. And from your recollection of your job

---

HIGHLY CONFIDENTIAL                    Page 100

1  duties at that time would you say it is likely that you
2  did any research that you don't remember doing?
3      MR. BLACKMAN: Objection to the form. You can
4  answer.
5    A. I don't think it is fair to ask that.
6  I could have done and obviously there would obviously be
7  cases that would provoke, you know, more research than
8  others, but I can't comment about specific cases.
9      MR. SCHWARTZ : All right. Why don't we take
10 a lunch break here. It is one o'clock.
11     THE VIDEOGRAPHER: Going off the record at
12 1:01 pm, as indicated on the video screen.
13         (Break for Lunch.)
14     THE VIDEOGRAPHER: Back on the record at 1:52
15 pm, as indicated on the video screen.
16     MR. SCHWARTZ : Mr. Harley, did you have
17 a good lunch?
18   A. I did, thank you very much.
19   Q. More than I can say. If you look back,
20 please, at the last exhibit, that is Hartley 5, 8367,
21 I know you said you don't remember working on this, and
22 that is fine. I am just asking you now your experience
23 as a member of the unit, looking at this document,
24 whoever drafted this document, from your team, added the
25 term "Suspected terrorist funding". Correct?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY -  Vol. 1
July 12, 2010

---

HIGHLY CONFIDENTIAL                              Page 105

1      Q.  And you see the name on 8395, N. Morrison?
2      A.  Yes.
3      Q.  Do you know N. Morrison?
4      A.  No.
5      Q.  And pages 8396 through 8398?
6      A.  Yes.
7      Q.  This is an NCIS disclosure, correct?
8      A.  Yes.
9      Q.  Prepared by your team at RBS?
10     A.  Yes.
11     Q.  In fact, this one says submitted by you,
12  correct?
13     A.  Yes, that is right.
14     Q.  Do you remember preparing this form?
15     A.  No.  I wouldn't have prepared it.  If that
16  needs clarifying, it would have been prepared by the
17  other individual named at the top there, and submitted
18  by me was that meant that I had pressed the button and
19  submitted it to NCIS.
20     Q.  Is that because the person who is named
21  there, I believe that is Charlotte McComas, did not have
22  authority, or why would you have submitted it?
23     A.  Because I had the authority to actually
24  send it, to submit, to press the button to submit the
25  disclosure, yes.

---

HIGHLY CONFIDENTIAL                              Page 106

1      Q.  Again, you don't remember but would you
2  typically have reviewed it before submitting it?
3      A.  Yes, I would like to think so.
4      Q.  What would you have been looking for?
5      A.  Just reviewing it generally to make sure
6  that it was appropriate to be submitted a disclosure.
7      Q.  Would you have reviewed the substance of
8  the report as well as the form?
9      A.  Yes.
10     Q.  You see where it talks about "Remitter
11  details", here in the first -- there is a little
12  paragraph "Further to our disclosure", on the same page:
13  ████████████████████████████████
14  ████████████████████████████████████
15  ████████████████████████████████████
16  ██████" Do you know where ██████ is?
17     A.  I don't actually, no.
18     Q.  It is in ██████  Would the fact that this
19  payment came from ██████ have --
20     A.  I don't know if the fact that it came from
21  ██████ if anyone -- would have been the principal reason
22  for the disclosure, I don't know.
23     Q.  First of all, if you look at 8379 and 80,
24  on Exhibit 7, and compare it to 8394 and 8395, it
25  appears to be the same Suspicious Activity Report.  Do

---

HIGHLY CONFIDENTIAL                              Page 107

1  you agree with that?  It looks like some language has
2  been added, but otherwise --
3      A.  Yes, that appears to be correct.
4      Q.  It is the same report, right?
5      A.  I think it is, yes.
6      Q.  So if you notice also the first one,
7  Exhibit 7, says "Money laundering suspicion".
8      A.  Yes.
9      Q.  Exhibit 8: "Money Laundering Disclosure."
10     A.  Yes.
11     Q.  So the question I have is do you know why
12  two separate Goalkeeper reports follow on the same
13  Suspicious Activity Report?
14     A.  No, I don't know that.
15     Q.  Again, if you notice on 8374, page one of
16  Exhibit 7, it says: "Reasons for suspicion payment to or
17  from blacklisted and high risk countries."
18     A.  Yes.
19     Q.  But you do not recall ██████ as being
20  a country on a blacklist at that time?
21     A.  I can't specifically recall.  It may well
22  have been.  I can't specifically recall this far down
23  the line.
24     Q.  Do you see on page 8375, do you have any
25  idea why that page was intentionally omitted?

---

HIGHLY CONFIDENTIAL                              Page 108

1      A.  No.
2      Q.  If you look, please, at Exhibit 8, 8384 is
3  the page I want to look at.  We are back at the case
4  notes.
5      A.  Okay.
6      Q.  Why don't you take a look and read that
7  note, please.
8      A.  Okay.
9      Q.  There are two DH's in this note.  That
10  would be you?
11     A.  Yes.
12     Q.  So these are notes that you wrote, is that
13  correct?
14     A.  Yes.
15     Q.  But do you have any recollection of
16  writing these notes?
17     A.  No.
18     Q.  You have no recollection of working on
19  this matter?
20     A.  No.  No.
21     Q.  Do you see where it says just before the
22  first DH: "I will need to comment on the High Profile
23  Report"?
24     A.  Yes.
25     Q.  Can you explain what you were saying

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010



HIGHLY CONFIDENTIAL                                Page 109

1   there, if you remember?
2        A.  No.
3        Q.  You have no idea?
4        A.  I don't remember, no.
5        MR. BLACKMAN: Is this part of your comment or
6   is your comment the one that follows your initial and
7   the date, if you know.
8        A.  Normally the initials would go at the end
9   of the note rather than the beginning, so where "DH" is,
10  before "5.8.02", then that is the end of my note.
11       Q.  So following up on Mr. Blackman's
12  question, my understanding would be that your note began
13  with "See case"?
14       A.  No.
15       Q.  Where would your note begin?  "Disclosure
16  confirmed"?
17       A.  I think possibly, again, I don't know for
18  certain, but where it begins at 4702: "Disclosure
19  confirmed", and then the subsequent text, but I can't
20  say for certain.
21       Q.  And the reason, I know you don't remember
22  but given your job responsibility at the time, why would
23  you have been commenting on this particular case?
24       A.  Because again that was part of my role
25  that I would have -- the fact that I have keyed a note

HIGHLY CONFIDENTIAL                                Page 110

1   that says "disclosure confirmed" is that part of my
2   responsibility was to annotate on every case whether
3   yes, disclosure was confirmed or not confirmed.  If
4   I had chosen to -- that I didn't agree with the case
5   handler's decision, then I would have commented in such
6   a fashion there.
7        Q.  If you look at 8385, you will note that it
8   says: "Remitter details, ▇▇▇▇▇▇▇▇▇▇▇ Earlier
9   I asked you about whether in a situation like this the
10  researcher for this case would have been likely to or it
11  would have been their responsibility to research whether
12  other payments had been received from ▇▇▇▇▇▇▇▇▇▇
13  ▇▇▇▇  so let me ask the question again.  Would it have
14  been protocol, policy in your unit at that time for this
15  researcher to have looked up ▇▇▇▇▇▇▇▇▇▇ in
16  Goalkeeper, let's say?
17       A.  Yes, potentially, that should have
18  happened, yes.
19       Q.  Or to look and see whether other payments
20  had been received from ▇▇▇▇▇▇▇ in ▇▇▇▇?
21       A.  Yes.
22       Q.  It would have been likely the policy?
23       MR. BLACKMAN: If you know.
24       A.  Yes, it is difficult to be specific about
25  what the policy was around remitters names, but it is

HIGHLY CONFIDENTIAL                                Page 111

1   possible.
2        Q.  You did research in cases like this,
3   correct?
4        A.  Yes.
5        Q.  If you had been researching this case,
6   would you have looked to see whether other payments had
7   been received from ▇▇▇▇▇▇▇▇▇▇▇▇
8        A.  Yes.
9        Q.  Yes, you would have?
10       A.  Yes, I think I would have done, yes.
11       Q.  On 8384, please, near the end of the
12  paragraph, it says:
13       "The ▇▇▇▇▇▇▇▇▇▇▇▇▇ originated
14  from the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15  ▇▇▇▇▇▇  This organization, albeit not at the time,
16  in June 2002, now appears on a list of named/suspected
17  terrorists."
18       Do you see that?
19       A.  Yes.
20       Q.  I will ask this question the way I asked
21  the last one.  If you had been doing the research and
22  you saw that the client had previously received funds
23  from an entity that was subsequently added to the Bank
24  of England's terrorism list, would you have researched
25  whether other payments had been received from the same

HIGHLY CONFIDENTIAL                                Page 112

1   entity?
2        MR. BLACKMAN: At what time?
3        MR. SCHWARTZ: During the time that he was
4   there.
5        MR. BLACKMAN: No, in connection with what?
6        MR. SCHWARTZ: This is about a payment that
7   was received in June 2002.
8        MR. BLACKMAN: I know, but put some time frame
9   on it.  Would you have -- you understand the objection?
10       MR. SCHWARTZ: Okay --
11       MR. BLACKMAN: You are not asking him when he
12  is supposed to be doing research --
13       MR. SCHWARTZ: We will get to the designation
14  of this entity but for the moment, believe me, it took
15  place in May of 2003.
16       A.  What took place?
17       Q.  The designation of this entity, ▇▇▇▇▇
18  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ just
19  like it says here, you see, on 5.29.03?
20       A.  Yes.
21       Q.  So at that time it was designated by the
22  Bank of England and OFAC, we will look at that, but you
23  will see that I am not making it up.
24       A.  Yes.
25       Q.  My question is when that came out, and

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

DOUGLAS HARTLEY - Vol. 1
July 12, 2010

HIGHLY CONFIDENTIAL                                      Page 157

1   Fund.  If you keyed that name in as a search then you
2   should find any disclosure on which their name is
3   included.
4        Q.  So you are not limited to just the linked
5   cases on the report?
6        A.  No.
7        Q.  All right.  Let me ask you about freezing
8   an account.  Now, freezing an account for the purpose of
9   the next questions, I mean preventing a customer from
10  using the account.  While you worked on the Money
11  Laundering Team, was there ever an occasion where an
12  account was frozen due to suspicious activity, without
13  waiting for the NCIS to consent to the use of the
14  account?
15       A.  Sorry, without -- before they consented or
16  what?
17       Q.  Right, let me be sure you are clear.
18  During the time you were on the Money Laundering Team,
19  would there be occasions where, because of suspicious
20  activity, the bank froze the account, regardless of
21  dealing with Special Branch?
22       A.  I don't know.  I can't recall.  I can't
23  recall specifically.
24       Q.  Do you know if the Money Laundering Team
25  had that authority?

HIGHLY CONFIDENTIAL                                      Page 158

1        A.  What, to freeze accounts?
2        Q.  Yes, sir.
3        A.  No, the team itself wouldn't have the
4   authority.  That goes for any department in the bank.
5   You could only freeze an account if you have been
6   properly authorized by an external body or you believe
7   that you have got the right to do so.
8        Q.  Who within the bank would have the
9   authority to freeze a customer's account, if the Money
10  Laundering Team was recommending that?
11       A.  It would be unlikely that we would give an
12  instruction to freeze an account if we were not acting
13  on an external recommendation, so that, you know,
14  wouldn't be solved in the bank just unilaterally, making
15  that decision, it would be because we had been
16  instructed, because we had received a legal order, for
17  example, or a specific advice by law enforcement.  So
18  the bank would be reluctant to freeze an account without
19  that sort of authority because of potential -- there
20  could be other problems that potentially could ensue.
21       Q.  Such as?
22       A.  A customer could always sue the bank for
23  breach of contract if we froze their account without due
24  reason for doing so.
25       Q.  Let's leave aside "reluctant" and even

HIGHLY CONFIDENTIAL                                      Page 159

1   that normally if not always it was through the external
2   authority.  If someone on the Money Laundering Team
3   felt, because of suspicious activity, that the account
4   should be immediately frozen, do you know who would have
5   the authority?
6        A.  As I said, I can't recall.  I genuinely
7   cannot recall examples of where we would give authority,
8   where we would give an authority to freeze an account.
9        Q.  Do you know, and if you don't just tell
10  me, do you know who would have the authority to freeze
11  an account?
12       MR. BLACKMAN: I am going to object for lack
13  of foundation because I think, with all respect, your
14  questions are not responding to the answers, which are
15  that he didn't think that they could just freeze an
16  account because they felt like it.  I think that is the
17  testimony.
18       MR. SCHWARTZ: Would you read the question
19  back, please.
20            (Read back)
21       A.  I don't know, no.
22       Q.  Do you have any recollection of discussing
23  the Interpal account with Mike Hoseason?
24       A.  No.
25       Q.  Do you have any recollection of discussing

HIGHLY CONFIDENTIAL                                      Page 160

1   the Interpal account with anyone at the bank?
2        A.  No.  As I said, no, I will repeat what
3   I said earlier on, that is not to say I might not have
4   done, that is not to say I might have done, but I don't
5   specifically recall, this far down the line.
6        Q.  I am not asking you what you specifically
7   recall or what you might have done.  My question,
8   Mr. Hartley, is do you have any recollection of
9   discussing Interpal with Mike Hoseason?
10       A.  No.
11       Q.  Do you have any recollection of discussing
12  Interpal with anybody else at the bank?
13       A.  No.
14       Q.  Would those answers be the same if I said
15  Palestine Development Fund, rather than Interpal?
16       A.  Yes.
17       Q.  Earlier you were asked some questions
18  about the different teams that were in the Financial
19  Fraud Group, and you mentioned Money Laundering and you
20  mentioned Fraud but you could not remember others.  My
21  question is do you know how many different teams?  Were
22  there like three, six, 10?
23       A.  Probably about four or five, I think, no
24  more than that.  Fraud and Money Laundering made up the
25  majority of the teams.  There was, yes, I mean, I guess

HIGHLY CONFIDENTIAL                                   Page 161

1    more information is coming back to me. There was the
2    Legal Orders Team as we called it, which dealt with
3    obviously production orders, and the like, that would
4    come in from external bodies. That was another one of
5    the teams that was within the unit.
6        Q. Do you remember ever taking a position one
7    way or the other about Interpal, as far as whether it
8    should be disclosed or anything else?
9        A. No.
10       MR. BLACKMAN: Objection to the form.
11       A. No, I don't.
12       MR. WERBNER: I will pass the witness, thank
13   you.
14       MR. BLACKMAN: I have no questions.
15       THE VIDEOGRAPHER: This is the end of tape
16   three, volume one, in the video deposition of
17   Mr. Douglas Hartley. Going off the record at 4:00 pm,
18   as indicated on the video screen.
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL                                   Page 162

1
2                CERTIFICATE OF DEPONENT
3
4    I, Douglas Hartley, hereby certify that I have read the
5    foregoing pages, numbered 1 through 163, of my
     deposition of testimony taken in these proceedings on 12
6    July, 2010, and, with the exception of the changes
     listed on the next page and/or corrections, if any, find
7    them to be a true and accurate transcription thereof.
8
9
10
11   Signed:   ........................
12   Name:   Douglas Hartley
13   Date:   ........................
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL                                   Page 163

1
2           CERTIFICATE OF COURT REPORTER
3
     I, AILSA WILLIAMS, an Accredited LiveNote Reporter with
4    European Deposition Services, London, England, hereby
     certify that the testimony of the witness Douglas
5    Hartley in the foregoing transcript, numbered pages 1
     through 163, taken on 12 July, 2010 was recorded by me
6    in machine shorthand and was thereafter transcribed by
     me; and that the foregoing transcript is a true and
7    accurate verbatim record of the said testimony.
8    I further certify that I am not a relative, employee,
     counsel or financially involved with any of the parties
9    to the within cause, nor am I an employee or relative of
     any counsel for the parties, nor am I in any way
10   interested in the outcome of the within cause.
11
12
13
14
15   Signed:   ........................
16   AILSA WILLIAMS
17   Dated:   ........................
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL                                   Page 164

1
2                    E R R A T A
3           Deposition of Douglas Hartley
4    Page/Line No.      Description       Reason for
5    change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22   Signed:   ....................
23   Name:   Douglas Hartley
24   Date:   ....................
25

**EXHIBIT 29 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*IRVINE RODGER*
*Vol. 1*
*July 22, 2010*

---



Case 1:05-cv-04622-DLI-RML  Document 272-2  Filed 03/22/12  Page 154 of 386 PageID #: 8968

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                    Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF NEW YORK
 3                Action No: 05cv4622(DGT)(MDG)
 4   - - - - - - - - - - - - - - - - - - - -
 5   TZVI WEISS, et al,
                          Plaintiffs,
 6   against
 7   NATIONAL WESTMINSTER BANK, PLC.,
                          Defendant.
 8   - - - - - - - - - - - - - - - - - - - -
 9   NATAN APPLEBAUM, et al.,
10                        Plaintiffs,
11   against
12   NATIONAL WESTMINSTER BANK, PLC.,
13                        Defendant.
14
15          VIDEOTAPED DEPOSITION OF IRVINE RODGER
16              Thursday 22 July 2010
17                 At:  10:00 am
18                  Taken at:
19
20         Cleary, Gottlieb, Steen & Hamilton LLP
                 55 Basinghall Street, London
21                   United Kingdom
22
23
24
25
```

HIGHLY CONFIDENTIAL                    Page 2

```
 1            A P P E A R A N C E S
 2   For Plaintiff Tzvi Weiss:
 3            ARI UNGAR
              Osen LLC
 4            700 Kinderkamack Road
              Oradell, NJ 07649
 5            Tel: 201 265 6400
 6
 7   For Plaintiff Tzvi Weiss:
 8            AITAN GOELMAN
              Zuckerman Spaeder LLP
 9            1800 M Street, NW, Suite 1000
              Washington, DC 20036-5807
10            Tel: 202 778 1996
11   For Defendant National Westminster Bank, PLC:
12
              AVRAM E. LUFT and VALERIE SCHUSTER
13            Cleary, Gottlieb, Steen & Hamilton LLP
              One Liberty Plaza
14            New York, NY 10006-1470
                   Tel: 212 225 2432
15
16   Also Present:
17
              COURT REPORTER:
18
              AILSA WILLIAMS
19            European Deposition Services
              59 Chesson Rd
20            London, W14 9QS
21            Telephone:  44 (020) 7385 0077
22            VIDEOGRAPHER: FLOYD HUMPHREY
23
24
25
```

HIGHLY CONFIDENTIAL                    Page 3

```
 1                I N D E X
 2   IRVINE RODGER . . . ... ... ... ... ... ...6
 3   DIRECT EXAMINATION BY MR. ... ... ... ... ...6
        GOELMAN:
 4
 5            INDEX OF EXHIBITS
 6   Rodger 1 NW014458-59 . . ... ... ... ... ...30
 7   Rodger 2 NW088194-97 . . ... ... ... ... ...38
 8   Rodger 3 NW051168-69 . . ... ... ... ... ...47
 9   Rodger 4 NW051994-97 . . ... ... ... ... ...65
10   Rodger 5 NW012925-38 . . ... ... ... ...68
11   Rodger 6 NW000130-143 . . ... ... ... ...74
12   Rodger 7 Press Release . . ... ... ... .83
13   Rodger 8 NW013052 . . ... ... ... ... ...89
14   Rodger 9 NW185976 . . ... ... ... ... ...91
15   Rodger 10 NW014038-48 . . ... ... ... ...91
16   Rodger 11 NW014013 . . ... ... ... ... ...94
17   Rodger 12 NW013701 . . ... ... ... ... ...95
18   Rodger 13 NW013939-41 . . ... ... ... .100
19   Rodger 14 NW017151-54 . . ... ... ... .107
20   Rodger 15 NW018476-83 . . ... ... ... .149
21   Rodger 16 NW017191-95 . . ... ... ... .159
22   Rodger 17 NW066847-52 . . ... ... ... .175
23   Rodger 18 NW067946-47 . . ... ... ... .189
24   Rodger 19 NW066844-46 . . ... ... ... .196
25   Rodger 20 NW066807-13 . . ... ... ... .202
```

HIGHLY CONFIDENTIAL                    Page 4

```
 1   Rodger 21 NW066721-23 . ... ... ... ... .213
 2   Rodger 22 NW066795-96 . ... ... ... ... .220
 3   Rodger 23 NW181032-35 . ... ... ... ... .225
 4   Rodger 24 NW066777-79 . ... ... ... ... .233
 5   Rodger 25 NW069060-62 . ... ... ... ... .241
 6   Rodger 26 NW066764-69 . ... ... ... ... .243
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                    Page 5

1      THE VIDEOGRAPHER: This is the beginning of
2   tape one, volume one in the video deposition of Irvine
3   Rodger, being held at the offices of Cleary, Gottlieb,
4   Steen & Hamilton, 55 Basinghall Street, London.
5      This is being taken on 22 July at 10:08 am.
6   This deposition is being taken in the matter of Tzvi
7   Weiss et al National Westminster Bank plc, Natan
8   Applebaum versus National Westminster Bank plc et al,
9   case number 05cv4622 (DGT) (MDG), being heard before the
10  Eastern District Court of New York.
11      The court reporter is Ailsa Williams of
12  European Deposition Services Limited.  The videographer
13  is Floyd Humphrey of European Deposition Services.
14  Would counsel introduce themselves, please.
15      MR. GOELMAN: Aitan Goelman, Zuckerman
16  Spaeder, Washington DC, for the Weiss plaintiffs.
17      MR. UNGAR: Ari Ungar, Osen LLC, Oradell,
18  United States, also on behalf of the Weiss plaintiffs.
19      MR. LUFT: Avi Luft, Cleary, Gottlieb, Steen &
20  Hamilton, New York, on behalf of National Westminster
21  Bank and the witness, Irvine Rodger, and with me is my
22  colleague, Valerie Schuster.
23      THE VIDEOGRAPHER: Would the court reporter
24  please swear in the witness.
25

HIGHLY CONFIDENTIAL                                    Page 6

1                IRVINE RODGER
2            Having been duly sworn,
3            Testified as follows:
4      DIRECT EXAMINATION BY MR. GOELMAN:
5      MR. GOELMAN: Good morning, Mr. Rodger.
6      A. Morning.
7      Q. Can you state your name and spell it for
8   the record, please?
9      A. Irvine Neil Rodger.  I-R-V-I-N-E, Neil
10  N-E-I-L, Rodger R-O-D-G-E-R.
11      Q. Mr. Rodger, I represent a group of
12  plaintiffs that has sued NatWest Bank in this case.  I
13  want to kind of describe some of the rules of the
14  deposition.  Have you ever been deposed before?
15      A. No.
16      Q. I will be asking questions and you will be
17  giving answers.  I am going to try not to talk over your
18  answers and I ask you to try not to talk over my
19  questions, so the court reporter can get a clean
20  transcript.
21      A. Okay.
22      Q. From time to time your attorney may
23  interpose an objection.  I may in response to that
24  objection restate the question, I may not.  If your
25  attorney tells you that you can answer the question,

HIGHLY CONFIDENTIAL                                    Page 7

1   then go ahead and answer it, even though there will be
2   an objection on the record.  Objections are made so that
3   the court back in the United States can rule on them
4   ultimately.  Okay.
5      We will be taking regular breaks every hour or so.
6   If you need more frequent breaks or if you need a break for
7   any particular reason, just let me know and we will take
8   one.  I ask only that if there is a question pending we not
9   take a break until you have completed your answer to that
10  question.  Okay?
11      A. Yes.
12      Q. Your attorney may make objections to the
13  form of certain of my questions.  If he says that you
14  can answer the question, you can go ahead and answer it,
15  but I don't want you to answer the question if you don't
16  understand it, so if there is something about any of my
17  questions that you don't understand, to the extent that
18  you cannot answer it, please let me know and I will try
19  to restate.  Okay?
20      A. Okay.
21      Q. If you do answer my question I will just
22  assume that you understood it.  Is that fair?
23      A. Yes.
24      Q. One other thing.  I will be showing you
25  some documents today.  Some of the documents are rather

HIGHLY CONFIDENTIAL                                    Page 8

1   voluminous.  I will be drawing your attention to
2   particular sentences or paragraphs, so you don't need to
3   read each of these documents cover to cover.  At the
4   same time I want you to feel comfortable that you have
5   an opportunity to review the documents if you want.  So
6   if you ever want more time to go through a document just
7   let me know and you can look at any part of a document
8   you want.  Okay?
9      A. Okay, yes.
10      Q. Can you start off just by telling me about
11  your educational, professional background?
12      A. I graduated from Aberdeen University in
13  1987, having got a degree in Economics and International
14  relations.  After graduation I joined Deloitte,
15  qualifying as a chartered accountant and performing
16  audit tasks.
17      Then my career kind of changed, from various
18  banks, institutions in the City of London, including Waco
19  International, a Japanese securities firm, London
20  subsidiary.
21      Then I went and joined the Financial Services
22  Authority for three years.  I left Financial Services
23  Authority to join PaineWebber, just as it was being taken
24  over by UBS, so I ended up leaving that to join
25  a Japanese -- the London branch of the Industrial Bank of

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                       Page 9

1  Japan, which is now part of Masumo Bank.
2      Then, in 2001, I joined RBS, July 2001, RBS.
3  I joined RBS to become a Compliance Clerk, with compliance
4  responsibilities for the RBS offshore branches, which are
5  Jersey, Guernsey, Isle of Man and such like.  But in spring
6  2002 my role changed because I was awarded the role of
7  heading what was a brand new function called the Money
8  Laundering Prevention Unit, MLPU.  I started that from
9  scratch and I have effectively been doing that role since,
10  although the role has now extended, the global remit of the
11  role has extended, so it is now a global remit rather than
12  just UK.
13      Q.  Okay, thank you.  Going back to something
14  you said at the beginning of your answer you said that
15  you majored in international relations and economics, is
16  that right?
17      A.  Yes.
18      Q.  Was the international relations that you
19  studied focused on any particular issue or part of the
20  world?
21      A.  No, I would probably say major focus was
22  on NATO, Soviet Union and European Union.
23      Q.  What years did you work for the FSA, if
24  you can give an approximation?
25      A.  1997 to 2000.

HIGHLY CONFIDENTIAL                                      Page 10

1      Q.  What did you do for them?
2      A.  Just general supervision for -- it ended
3  up being supervision for the major Japanese companies
4  and then latterly the American companies.
5      Q.  And then later the American companies?
6      A.  American securities houses, so like Morgan
7  Stanley, and I think also I had a little part of Chase
8  Manhattan, as it was called then, the London securities
9  subsidiary of Chase Manhattan.
10      Q.  Can you describe for the record what the
11  FSA is?
12      A.  Financial Services Authority.  At the
13  moment it is the UK's sole financial services regulator,
14  covering all financial institutions regulated in the
15  City of London.
16      Q.  When you were regulating or supervising
17  American banks, those were American banks with branches
18  in London, is that right?
19      A.  No, these were UK subsidiaries.  So it was
20  Morgan Stanley International Limited, which was a UK
21  company, and the same with Chase Manhattan.  I think it
22  was Chase Manhattan International Limited, UK subsidiary
23  of Chase Manhattan.
24      Q.  And your focus when you were with the FSA
25  was on ensuring that the banks under your supervision

HIGHLY CONFIDENTIAL                                      Page 11

1  complied with UK regulations?
2      A.  UK rule book, yes.  It was UK conduct of
3  business rules effectively.
4      Q.  What position did you hold with
5  PaineWebber?
6      A.  I joined PaineWebber, but when I joined it
7  was on its way out, so I actually didn't very much.
8  So it was three months -- it was the worst role of my
9  life because there was nothing, doing nothing, but I did
10  get made redundant, so it was worth it, so the role was
11  nothing.
12      Q.  You said that when you joined RBS,
13  in July 2001, you became responsible for Compliance for
14  RBS's offshore branches, is that right?
15      A.  Yes.
16      Q.  Did that include compliance with
17  anti-money laundering regulations?
18      A.  The focus of the work was on conduct of
19  business roles, kind of trading roles, insider trading
20  and sort of recording of transactions, that type of
21  thing, just in general securities kind of compliance.
22  Nothing was money laundering or financial sanctions.
23      Q.  Okay.  Before you were offered the
24  position to head the newly created Money Laundering
25  Prevention Unit, in spring 2002, what was your

HIGHLY CONFIDENTIAL                                      Page 12

1  experience and training with regard to anti-money
2  laundering?
3      A.  When I was at the FSA, one of the last
4  jobs I did was to review the money laundering
5  infrastructure which existed within Chase Manhattan
6  International Limited.  That was one of my last things
7  to do.  Based on that knowledge, I joined -- I had that
8  knowledge, just to clarify, I had that knowledge and
9  then later on I got this job as being Group Head of
10  Compliance for Industrial Bank of Japan.  As soon as
11  I got to IBJ, I realized they were facing severe
12  enforcement action from the FSA, because the FSA had
13  instructed them to do something to improve their
14  internal controls regarding KYC, but they had done
15  nothing.  They decided to put their head in the sand and
16  did nothing.  So I kind of rectified that and helped put
17  it right for them and in the end the enforcement action
18  didn't happen.
19      Q.  When you were reviewing the Money
20  Laundering infrastructure for Chase Manhattan, did that
21  infrastructure include within Money Laundering the
22  prevention of terror financing?
23      A.  It was purely purely Anti-money
24  Laundering, KYC type of things.  KYC, there are criminal
25  laws in the UK about the need to do KYC.  Unfortunately,

HIGHLY CONFIDENTIAL                                   Page 13

1   it is the case that some firms at the time were not
2   actually complying as well as they could have done, so
3   that is why I was reviewing -- sanctions and terrorism
4   just didn't apply.  This was 2000 --
5        Q.  When you were picked to head the MLPU, and
6   if I say that you will understand I mean Money
7   Laundering Prevention Unit?
8        A.  Yes.
9        Q.  In 2002, did you get any training in
10  Anti-money Laundering or Terror Financing Compliance
11  measures?
12       A.  I got general training, joining various
13  industry courses.  The British Bankers Association held
14  Money Laundering courses and such like, but certainly
15  mostly it was a chance for me just to get stuck in
16  really, because there was things to do.  It was fairly
17  obvious there was things to do.
18       Q.  When you say you joined various industry
19  courses, you mean you enrolled in courses?
20       A.  Yes.  Obviously they advertise courses for
21  Money Laundering professionals, and they are quite
22  regular, so you would say: "Okay, I would like to do
23  that course."
24       Q.  Do you remember any particular courses?
25       A.  They were all generic, nothing was

HIGHLY CONFIDENTIAL                                   Page 14

1   specialist.
2        Q.  And these were courses that were provided
3   by the British Bankers Association?
4        A.  Yes.  It could be Linklaters had a course,
5   I was briefly on it.  Again, it was for everyone, it was
6   not specialized.  It was for the market on a generalist
7   kind of basis.  Nothing was bespoke or in depth.
8        Q.  When did you first take one of those
9   courses?
10       A.  I can't recall.
11       Q.  Is that something you have been doing
12  throughout your career or just after you became head of
13  the MLPU?
14       A.  You always maintain your technical
15  knowledge, as things happen, particularly the UK focus,
16  because that is our primary responsibility is UK, but
17  also we need to be aware of developments in other
18  regions of the globe.
19       Q.  When you got the job as head of the MLPU
20  at RBS, what was your understanding of your
21  responsibilities?
22       A.  You said "Head of MLPU at RBS".  That is
23  misleading because it was not RBS, it was what was
24  called Corporate Banking Financial Markets Division of
25  RBS, so it is different from RBS.  My role was to ensure

HIGHLY CONFIDENTIAL                                   Page 15

1   the best degree of compliance with three strands which
2   were under my control, which were the sanctions, the
3   money laundering, anti-money laundering and the data
4   protection, which was a bit of an outlier, but that was
5   there as well.
6        Q.  At that point did your responsibility for
7   anti-money laundering also encompass measures to combat
8   terror financing?
9        A.  Yes, terror financing.
10       Q.  Did you receive any particular training in
11  terms of combating terror financing?
12       A.  Not more than what I have already
13  described, like the training courses I did.  When I took
14  the role, there were various courses which are out there
15  in the marketplace, so generalist courses, nothing
16  specific.
17       Q.  You said that you were head of the MLPU
18  for the Corporate Banking and Financial Markets
19  Division, is that right?
20       A.  Yes.
21       Q.  Did each division of RBS have its own MLPU
22  as of 2002?
23       A.  Each division of RBS will have had
24  different arrangements.  The view within CBFM was to
25  create a centralized team, which was a center of

HIGHLY CONFIDENTIAL                                   Page 16

1   excellence really effectively for the division.  Other
2   divisions tended to have smaller teams throughout the
3   business.  The CBFM took the view it was better, one
4   centralized team that had overall responsibilities,
5   which I think was the right decision.
6        Q.  When you say it was a center of excellence
7   for the division, what do you mean by that?
8        A.  It was the one team within the division
9   which was the team which was responsible for compliance
10  with AML and sanctions, and can be regarded as the kind
11  of -- it is the one team that is the undoubted authority
12  for compliance, and if there was anything we could not
13  do, we would obviously escalate it to Group or whatever
14  else.
15       Q.  And you believe from your experience that
16  this system with the centralized team is more effective
17  in Anti-money Laundering Compliance than the more
18  diffuse authority that was in the other divisions?
19       A.  Yes, I think so.  Other divisions followed
20  the CBFM approach to have more centralized, so I think
21  it was recorded as being the way forward.  So I don't
22  think there is any part of -- to this day I don't think
23  there is any part of the Group which would want to turn
24  back the clock, having a diffuse way to manage AML,
25  because the skills are fairly specialist and you cannot

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

1    Q. Who did you report to when you began as
2    the manager of the MLPU?
3    A. Ultimately the Head of GBFM Legal that
4    I reported to. No sorry, GBFM is what it is now called.
5    CBFM and Legal, sorry. She was head of CBFM Legal and
6    Compliance but her role was head of CBFM Legal.
7    Q. You reported to the head of CBFM Legal and
8    Compliance?
9    A. Yes.
10   Q. Who was that in 2000?
11   A. That was Helen Cockcroft.
12   Q. Did you have a dotted line reporting
13   responsibility to anyone else?
14   A. I would have had dotted reporting lines
15   into the Group functions, so possibly that would be
16   Amanda Holt, Head of Group Enterprise and Risk, and she
17   was overall in charge of AML at Group level, but that
18   was only a dotted line rather than a solid line. I was
19   very much a CBFM man, not a Group person.
20   Q. How long did you report to Ms Cockcroft?
21   A. RBS divisions are in a state of constant
22   revolution. It changes all the time. I think Helen's
23   era ended middle of 2003, and ended up changing to
24   someone called Alan Greatbatch, who was head of CBFM
25   Regulatory Risk. Then that moved from head of CBFM

1    Regulatory Risk to someone called Kevin Love, who was
2    head of CBFM Enterprise Risk, which is effectively
3    Operational Risk plus AML. That continued until the
4    summer of 2008, when my reporting line transferred to
5    someone called Nancy Turner, who was head of Compliance
6    for the new integrated ABN AMRO RBS function.
7    Since November last year that has changed to Penny Lamb,
8    who is the Global Head of Compliance for what is now
9    called GBM.
10   Q. Is it fair to say from approximately 2003
11   to 2008 you reported to Kevin Love, who was head of CBFM
12   Enterprise Risk?
13   A. Yes.
14   Q. Do you know what an MLRO is?
15   A. Money Laundering Reporting Officer, yes.
16   Q. And were you or are you now the MLRO for
17   CBFM?
18   A. I am not the MLRO for CBFM. No one has
19   ever been the MLRO for CBFM. However, I am about to be
20   made MLRO for GBM Money Laundering, but that has not
21   happened yet.
22   Q. What is GBM?
23   A. Global Banking Market, the new name for
24   Financial Markets.
25   Q. You understand that MLRO is a position

1    that was statutorily required of British banks?
2    A. Yes.
3    Q. To establish an MLRO?
4    A. Yes.
5    Q. And was that true as of the time that you
6    took over the MLPU in 2002?
7    A. Yes.
8    Q. So why was there not an MLRO established
9    for CBFM?
10   MR. LUFT: Objection, foundation.
11   Q. If you know.
12   A. The reason why there was not, because the
13   legal obligations on the entity, and the entity is RBS
14   plc, and that is held by someone else, whereas my CBFM
15   was only a sub-strata of CBFM, of RBS, sorry.
16   Q. So was there one MLRO for RBS in 2002?
17   A. One MLRO for RBS.
18   Q. Who was that, in or about 2002, if you
19   recall?
20   A. I always forget his name. When I first
21   started it was someone else but then from summer of 2002
22   it changed to Richard Gossage, who was head of Risk --
23   the first guy kind of the overlap with me was going back
24   two or three months, and I don't recall his name.
25   I would know it if I saw it but I can't recall it.

1    Q. Was Mr. Gossage the designated MLRO from
2    whenever he took over in around 2002 until say 2006?
3    A. I think he was designated MLRO for 2002
4    until 2005/06, that period.
5    Q. Did you have any reporting
6    responsibilities to Mr. Gossage because of his title as
7    MLRO?
8    A. No.
9    Q. What was your understanding of what his
10   status as MLRO meant, in terms of the AML work you were
11   doing?
12   A. I reported into his team, underneath which
13   was headed by Stephen Foster, and he would then further
14   escalate that to Richard Gossage, as required. So the
15   need for me to have a direct reporting line into Richard
16   did not exist, did not apply.
17   Q. Did you receive any training about what
18   the responsibilities of an MLRO were?
19   A. The responsibilities for the MLRO are all
20   set out in statute and the FSA Rule Book. I don't think
21   training is necessarily required. You know what the
22   role means and what the requirements are.
23   Q. What are the requirements and what is the
24   role, to your understanding?
25   A. The Money Laundering Reporting Officer is

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                                Page 29

1  really the main thing which I know.  I don't recall
2  anything else.
3      Q.  Are you familiar with the term "extra
4  territoriality?
5      A.  Yes.
6      Q.  Do you know whether US law purports to
7  place any extra territorial obligations in terms of the
8  USA Patriot Act or OFAC regulations?
9          MR. LUFT: Objection, calls for a legal
10  opinion.
11      Q.  You can answer, unless you are instructed
12  not to.
13          MR. LUFT: I am not instructing you not to
14  answer, just making my objection that it calls for
15  a legal opinion.
16      A.  The extra territoriality of US laws, it is
17  an issue which does exist, I know, but something all
18  firms around the world need to address if they want to
19  operate within the US market, and then they need to be
20  aware of these restrictions.  I think some of the
21  prominent ones recently were possible extra territorial
22  rules being applied.
23      Q.  Do you understand that it is illegal under
24  US law to help somebody evade OFAC restrictions?
25      A.  I imagine it would be, yes.  I am not

HIGHLY CONFIDENTIAL                                                Page 30

1  certain but it rings true that there would be such
2  a provision.
3      Q.  Sounds familiar to you?
4      A.  Yes, sounds familiar.
5      Q.  I am going to hand you an exhibit that I
6  am going to ask the court reporter to mark as Rodger
7  Exhibit 1.
8      (Exhibit Rodger 1 marked for identification)
9      You should feel free to look at this as long as
10  you want but I am going to call your attention to particular
11  parts of this.  For the record this is Bates stamp NW14458
12  through 14459.  Have you had a chance to look at that?
13      A.  Yes.
14      Q.  Does that appear to be part of an e-mail
15  chain between various people at the CBFM?
16      A.  Yes.
17      Q.  Can you turn to the first page, NW14458,
18  please, and look at the e-mail that starts in the middle
19  of the page sent by Julie French.  Do you see that?
20      A.  Yes.
21      Q.  Who is Ms French?
22      A.  That was Ms Aspinall, Mrs Aspinall.
23  I mentioned Julie Aspinall; her married name is
24  Aspinall.
25      Q.  Her maiden name was French?

HIGHLY CONFIDENTIAL                                                Page 31

1      A.  Yes.
2      Q.  She worked in the MLPU under you?
3      A.  Yes.
4      Q.  The date of the e-mail is January 7, 2003.
5  You were head of the MLPU at that time?
6      A.  Yes.
7      Q.  Can you go to the body of Ms French's
8  e-mail.  It says:
9      "The group list is out of date as sanctions
10  against Angola have been dropped recently.  The Group site
11  also excludes OFAC countries but due to the international
12  nature of CBFM's business, MLPU believes that the list
13  should be inclusive (UN, EU and OFAC sanctioned countries.)"
14      Do you see that?
15      A.  Yes.
16      Q.  Do you have an understanding as to what
17  "OFAC countries" plural means?
18      A.  Countries, I think basically they are
19  countries where -- I think OFAC does not designate
20  countries as such.  It is more complex.  The provisions
21  are more complex than that.  But certain countries that
22  America places more restrictions on, has tougher rules
23  on, and these are the ones that were listed.
24      Q.  And Ms French writes that:
25      "Due to the international nature of CBFM's

HIGHLY CONFIDENTIAL                                                Page 32

1  business, MLPU believes the list should be inclusive."
2      Is that a decision that the list should include
3  OFAC countries that you recall being involved in?
4      A.  That was a decision that Helen Cockcroft
5  originally espoused to me back in 2001?
6      Q.  And do you recall why Ms Cockcroft
7  espoused that position to you in 2001?
8      A.  Basically, for the reasons cited.  It is
9  an international division that we cannot be doing -- we
10  cannot enter into transactions with countries which the
11  OFAC has a particular concern with, without being
12  very -- being aware of the sensitivities.  Some
13  countries, like Cuba, for example, there are no UK
14  restrictions on Cuba, but obviously there are for the
15  US.  At that time, I mean Cuba -- Cuba is now regarded
16  just as a no-no country now, but at the time Cuba was
17  not regarded as being too out of step.
18      Q.  So when you talk about the international
19  nature of CBFM's business, what do you mean by that?
20      A.  I mean it is basically -- it has got the
21  operations and countries throughout the globe, and the
22  US, Singapore, Hong Kong, France, Germany, Italy, Spain,
23  and that is what I was meaning.
24      Q.  If you look up at the top part of this
25  page, the first e-mail from someone named Margaret Webb.

---

HIGHLY CONFIDENTIAL                                            Page 49

1  right?
2      A.  Um hum.
3      Q.  And it had been on a previous list sourced
4  from the Bank of England, true?
5      A.  Yes.
6      Q.  So you understood that there was some
7  overlap between the Bank of England and OFAC lists?
8      A.  Yes.
9      Q.  That there were certain people that were
10  included on both lists?
11      A.  Yes, as you would expect.
12      Q.  And you also understood that those lists
13  were not coterminus, true?
14      A.  What does "coterminus" mean.
15      Q.  There were people on the OFAC list that
16  were not on the Bank of England list and vice versa?
17      A.  Yes.
18      Q.  Did you understand that sometimes one
19  country, that the UK or the US would list a person or an
20  entity before the other country?
21      A.  Yes.
22      Q.  These names, the one in English says
23  "Charitable Society to help the Noble Al-Aqsa"?
24      A.  Um hum.
25      Q.  And under that it says Nusrat Al-Aqsa

---

HIGHLY CONFIDENTIAL                                            Page 50

1  Al-Sharif?
2      A.  Yes.
3      Q.  You understood that those two entities
4  were listed by both Bank of England and OFAC as
5  terrorists, true?
6      A.  I see what this says, but if you asked me
7  beforehand I would have said I don't know.  I presume
8  this is true.  I just don't know.
9      Q.  But it is described here as listed by OFAC
10  as SDGT's?
11      A.  Yes, but I don't know the name of all the
12  SDGT's.  I don't know the names of every one on the Bank
13  of England list.  There is a few thousand of them and I
14  don't know them all.
15      Q.  Is it fair to say when you received this
16  e-mail, in June 2003, you would have recognized
17  "Charitable Society to help the Noble Al-Aqsa" as an
18  Islamic charity?
19      A.  I would have looked at that and would have
20  thought this is a charity to help Al-Aqsa.  It sounds
21  very Arab, so I would have thought it was a charity to
22  do with an Arab state.
23      Q.  Do you know what FATF is or GAFI?
24      A.  FATF, yes.
25      Q.  What is that?

---

HIGHLY CONFIDENTIAL                                            Page 51

1      A.  An interaction task force.
2      Q.  Did you as part of your role on the MLPU
3  follow FATF guidance and developments?
4      A.  We had regard to them.
5      Q.  You had regard to them?
6      A.  We would have reviewed the OFAC -- not
7  OFAC, FATF pronouncements, and would have reviewed what
8  FATF had to say.
9      Q.  You would have kept abreast?
10      A.  We would have kept abreast of it.  Not
11  actually every dot and comma that FATF say, unless Group
12  required us to.
13      Q.  In the fall of 2001 you were not yet at
14  RBS, correct?
15      A.  I had joined July 2001.
16      Q.  You joined July 2001.
17      A.  Yes.
18      Q.  So about two months before the terrorist
19  attacks in the United States?
20      A.  Yes, I remember that day well.
21      Q.  Did you follow press reports of those
22  terrorist attacks and the subsequent investigation?
23      A.  I don't recall I read every detail of
24  press reports.  My feeling at the time was it was
25  Palestinian, but I have no real interest to want to know

---

HIGHLY CONFIDENTIAL                                            Page 52

1  every single detail of every terrorist organization
2  which might exist within the West Bank or anywhere else
3  in the Arab world.
4      Q.  When you say your feeling at the time was
5  it was Palestinian, what do you mean by that?
6      A.  You look at who could possibly have
7  perpetrated this and the obvious candidates were Iraq
8  and Palestinian organizations.  In my judgment, Iraq
9  would have been unlikely to, because it seemed
10  a terribly big -- to me personally I would have regarded
11  that as being just completely out of line with the
12  normal kind of behaviour you would expect of Saddam
13  Hussain, whereas Palestinians seemed to be the more
14  likely.
15      Q.  And why in your judgment did Palestinians
16  seem to be more likely to be behind 9/11?
17      A.  I think I would have thought at the time
18  that -- I would have thought there was the continuing
19  terrorist strife within the Palestinian region, which I
20  think possibly these organizations, these terrorist
21  organizations may regard the US as somehow culpable.
22  Why, I don't know.  It doesn't make sense to me, but
23  I imagine that they will have a body of thought that
24  they might have said that the US was actually somehow
25  responsible.  It could well be actually, in memory, this

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

1 is jogging my memory, whether I thought Afghanistan
2 might be another source, but it is quite plausible
3 I would have thought Afghanistan as well.
4     Q. You said that you had no real interest to
5 want to know every single terrorist organization which
6 might exist within the West Bank or elsewhere in the
7 Arab world. Did you know of any particular terrorist
8 organizations which existed in the Palestinian
9 territories as of 2001?
10     A. I most certainly -- my feeling at that
11 time would have been Palestinian Liberation
12 Organization, PLO, was the terrorist organization which
13 I would have -- maybe there was other ones which were
14 prominent in the media at the time, but PLO is the clear
15 one.
16     Q. Were you familiar with an organization
17 called Hamas in the fall of 2001?
18     A. I can't recall.
19     Q. Did you become familiar with the
20 organization called Hamas at some point?
21     A. Hamas' position became more prominent as
22 the decade progressed.
23     Q. Okay, and in what way did Hamas' position
24 become more prominent?
25     A. I think it was commonly regarded as being

1 a terrorist organization, not just by the US but also
2 the EU as well.
3     Q. Were you aware of -- are you familiar with
4 the word "Intifada"?
5     A. Yes.
6     Q. And what do you understand that word to
7 mean?
8     A. Palestinian uprising against Israeli
9 occupation.
10     Q. Had you in 2001 heard that an Intifada was
11 ongoing in the Palestinian territories and in Israel?
12     A. I can't recall.
13     Q. Do you recall an attempt to solve the
14 Palestinian/Israeli dispute by President Clinton in or
15 about 2000?
16     A. Yes.
17     Q. Do you recall that was unsuccessful?
18     A. Yes.
19     Q. Do you recall a round of violence breaking
20 out after that?
21     A. I recall Bill Clinton tried to do that
22 before he left office. He was unsuccessful. He blamed
23 Yasser Arafat, I think it was, and the repercussions of
24 that I do not recall.
25     Q. Do you recall reading or hearing about

1 various suicide bombings in Israel between 2000 and
2 2003?
3     A. There would have been suicide bombings,
4 but none particularly stand out, but I am aware that
5 there was an awareness that there were suicide bombings
6 and terrorism and such like Intifada kind of uprising,
7 so it was unstable at that period. The exact times of
8 when things happened, I don't recall the timescales.
9     Q. Do you recall a FATF summit or a meeting
10 in or about October 2001 on what financial institutions
11 could or should do to combat terror financing?
12     A. I recall that FATF did get together to
13 discuss what is going to happen about it, try and
14 prevent further events of 11 September 2001, and that
15 was really a conference to try and address the various
16 things, how the banks round the world can try and
17 improve their procedures, and Special Recommendations.
18     Q. So you are familiar with the Special
19 Recommendations that FATF issued coming out of that
20 conference?
21     A. Yes, I have got an over -- a very, very
22 high level understanding of them. In terms of the
23 actual detail, no.
24     Q. Do you have a general recollection that
25 one of the Special Recommendations dealt with the use of

1 charities as fronts by terrorist organizations?
2     A. It would not surprise me if there was
3 a Special Recommendation on charities.
4     Q. Did you recognize in late 2001 and in 2002
5 that terror funding by Islamic charities was a typology
6 identified by FATF?
7     A. Again, I don't know for sure but it would
8 not surprise me if that was a typology identified by
9 FATF. It is in line with my knowledge of the FATF
10 Special Recommendations, so it would have been the kind
11 of thing that they would have done.
12     Q. You said earlier that the bank would not
13 necessarily -- I think you were talking about the bank,
14 maybe you were talking about just the MLPU, would not
15 necessarily follow every comma from FATF
16 recommendations. Do you recall that?
17     A. Yes.
18     Q. How would you use FATF Special
19 Recommendations to inform your work, as head of the
20 MLPU?
21     A. You would have regard to the Special
22 Recommendations. You would have an understanding of it.
23 You would consider them, but I think basically we would
24 have regarded the kind of developments on that front to
25 really need to require to stem from Group Compliance,

HIGHLY CONFIDENTIAL | Page 57

1  because they are the ultimate people that direct the
2  Group.
3      Q.  Did Group Compliance issue any guidelines
4  or communications with respect to the Special
5  Recommendations on terror financing that FATF came out
6  with?
7      A.  I don't recall, but again it is quite
8  plausible that they would have done.
9      Q.  But sitting here today you don't recall
10  what those were?
11      A.  I can't recall, no.  I get so many e-mails
12  and communications, you know, they all blend into -- we
13  are talking about 2001/2002.
14      Q.  I understand.  Throughout the day I am
15  just asking for your best recollection on these
16  questions.
17      A.  Everything you say does kind of -- would
18  seem the kind of thing they would do, but for me to sit
19  here and say, "Yes, this definitely happened",
20  I couldn't say, I don't know.
21      Q.  Are you familiar with a database used by
22  RBS called Goalkeeper?
23      A.  Yes.
24      Q.  Did you have access to the Goalkeeper
25  database when you were manager of the MLPU?

HIGHLY CONFIDENTIAL | Page 58

1      A.  I had access to Goalkeeper database
2  intermittently in the period 2001 to, say, 2006, but not
3  since that, but I never really referred to it.  Other
4  people in my team used to do it, so I just -- if I
5  wanted someone to search Goalkeeper I would ask
6  a colleague to do it for me.
7      Q.  When you say you had access intermittently
8  in the period 01 to 06, what do you mean by that,
9  intermittently?
10      A.  You would get access to it.  If you don't
11  use it often enough in a particular period of time your
12  access is removed, so you have to then apply for more
13  access.  So ultimately I just decided we will not bother
14  going down the route of getting access because -- just
15  rely on other people to do it for me.
16      Q.  In those periods of time when you did have
17  access, did you actually at least on occasion use
18  Goalkeeper?
19      A.  Very occasionally.
20      Q.  And on those very rare occasions when you
21  used it, do you recall what kind of things you used it
22  for?
23      A.  It could have been that when we were
24  on-boarding a customer or came across a customer name,
25  and just to see if there was anything on that which

HIGHLY CONFIDENTIAL | Page 59

1  would have import.  It was in general corporate
2  customers because it was more likely to be fairly
3  detailed information on corporates.
4      Q.  You understood that Goalkeeper had
5  a search capability where you could look for
6  a particular customer and see if any prior reports had
7  been created on that customer?
8      A.  Yes.
9      Q.  And you understood that you could search
10  by various fields?
11      A.  Yes.
12      Q.  Including the name of the customer?
13      A.  Yes.
14      Q.  Name of the principals for that account?
15      A.  The search methodology of Goalkeeper is
16  absolutely very, very poor, so I don't really know
17  whether you can search on individuals.  Maybe you can,
18  but it is not the best.  So it could well be that the
19  individuals, if you know who the individuals are you can
20  search for them, but I doubt if you search on one
21  organization you will be able to -- they will have
22  a link to the directors of that organization.  I don't
23  know whether that would be the case.  I think you would
24  have to do a brand new search.
25      Q.  Okay.  When you say that the search

HIGHLY CONFIDENTIAL | Page 60

1  methodology is "absolutely very, very poor", what makes
2  you say that?
3      A.  There is only one Irvine Rodger who exists
4  in the UK.  They put my name into Goalkeeper and it
5  comes up with -- I think it was 120 possible matches,
6  and needless to say all 120 were false positives.  But
7  they put my full name on, I am the only person on the
8  electoral register in the UK, plus my date of birth, and
9  they still get that number of matches, which means the
10  searching on it is not the best.
11      Q.  I see.  Have you actually done that search
12  for "Irvine Rodger" on Goalkeeper?
13      A.  Yes.  It is one of my favorite anecdotes
14  when I am saying that Goalkeeper needs to be improved.
15  One of my things is -- my name, I am the only one on the
16  electoral register, how can it be my name gives 120
17  false positives, none of them being true positives?
18  I wouldn't be sitting here just now if they are.
19  I would have been sacked if there ever was a real
20  positive match.
21      Q.  I imagine that is true.  Do I understand
22  your testimony correctly that on most occasions when
23  Goalkeeper was used by the MLPU it would be someone else
24  using Goalkeeper, perhaps at your direction?
25      A.  When we worked with Goalkeeper, Goalkeeper

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                                   Page 77

1  actual match and needs to be reported to Group and to
2  the authorities?
3      A.  So what was the question again, please,
4  sorry?
5      Q.  Whether the MLPU would, when they were
6  investigating potential matches to the list, look to see
7  if there were any previous investigations on that
8  particular customer?
9      A.  Clearly, if there was an actual match then
10  that would be the case, but if it was a false positive
11  then that wouldn't be required.
12      Q.  Do you see on page 142 where it says
13  "Phase 4"?
14      A.  Yes.
15      Q.  It says: "Objective: to review all the
16  evidence held in respect of names where Phase 3 due
17  diligence has been undertaken."
18      A.  Um hum.
19      Q.  And then under there it says: "Reference
20  to a 'Cross Business' Panel, or equivalent".
21      A.  Yes.
22      Q.  Are you familiar with that phrase, a
23  "Cross Business Panel"?
24      A.  No.
25      Q.  It says here: "A Cross Business Panel

---

HIGHLY CONFIDENTIAL                                   Page 78

1  should consist of appropriately senior representatives
2  from relevant business areas, and the following
3  divisional functions, as appropriate."
4      Then it lists five different divisional functions.
5  Do you see that?
6      A.  Yes.
7      Q.  Did you in your work as head of the MLPU
8  ever assemble a Cross Business Panel or equivalent that
9  consisted of representatives from those divisional
10  functions?
11      MR. LUFT: Objection, foundation.
12      A.  Do I answer?
13      Q.  Yes, please.
14      A.  Sorry.
15      MR. LUFT: For clarity, if I think you should
16  not answer I will instruct you not to answer.
17      A.  Okay, yes.  Remind me what the question
18  was, please.
19      Q.  Whether you in your work as head of the
20  MLPU ever assembled a "Cross Business Panel or the
21  equivalent" that consisted of representatives from these
22  divisional functions?
23      A.  All five functions together, no.
24      Q.  Some of those functions?
25      A.  Depending on the case, it could well be

---

HIGHLY CONFIDENTIAL                                   Page 79

1  that Legal would be consulted, other times Operational
2  Risk.  It depended on the case itself.  Obviously, if it
3  was a case there Operations would not have had any
4  insight into it then there was no relevant need for
5  this.
6      Q.  Why didn't you ever assemble a Cross
7  Business Panel with representatives from all of those
8  divisional functions?
9      MR. LUFT: Objection, calls for speculation,
10  lack of foundation.
11      Q.  You can answer.
12      A.  When there are exact matches, it is clear
13  that it is an exact match, in my opinion, there is
14  little benefit from compiling five people to
15  a conference to discuss something, where the answer
16  actually -- the result is clear.  If I were to do that I
17  can imagine that that would be communicated to me, there
18  was no benefit to be gained.
19      Q.  You can put that exhibit down now, Mr.
20  Rodger.  Are you familiar with a CBFM customer called
21  Interpal?
22      A.  Yes.
23      Q.  Also known as the Palestinian Relief and
24  Development Fund?
25      A.  Yes.

---

HIGHLY CONFIDENTIAL                                   Page 80

1      Q.  When did you first hear of Interpal?
2      A.  When OFAC designated that as a terrorist
3  organization.
4      Q.  How did you hear of OFAC's designation of
5  Interpal?
6      A.  I can't recall the exact chain of events
7  but what I do recall is communications from the relevant
8  Group function, advising us that Interpal was a customer
9  of CBFM, and that is how I heard about it.
10      Q.  Wouldn't CBFM have advised Group that
11  Interpal was a customer?
12      A.  No, because this was a hot hot topic.  I
13  think -- my memory has been jogged -- that there was
14  a press article that NatWest had an account with
15  Interpal, and that resulted in Group escalating it down.
16      Q.  Was this the first time that one of CBFM's
17  customers was designated a terrorist by OFAC?
18      A.  I do not recall any other ones.
19      Q.  Had you in or about 2003 heard of
20  a customer of any other division of the bank that was
21  designated an SDGT by OFAC?
22      A.  No.
23      Q.  When you heard of the designation of
24  Interpal, what was your understanding of what such
25  a designation meant?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

```
 1         MR. LUFT: Objection, vague.
 2     A.  OFAC was of the opinion that the account
 3  should be closed, if it was in the US.  Obviously, it is
 4  a US office, US function, it was a US organization.  If
 5  it was based in New York, it would be closed.
 6     Q.  Did you understand that, by designating
 7  OFAC, the Government of the United States was
 8  alleging -- withdrawn.  Did you understand that by
 9  designating Interpal as a specially designated global
10  terrorist that the Government of the United States was
11  making clear its belief that Interpal was involved in
12  terrorism?
13     A.  Yes.
14     Q.  Did you talk to anybody at the bank about
15  the effect of an OFAC listing on a customer of CBFM?
16         MR. LUFT: I will just caution you that you
17  should exclude any conversation you may or may not have
18  had with lawyers.  So if it was with a lawyer it is
19  privileged, otherwise you can answer.
20     A.  Can you remind me what the question was?
21     Q.  Whether you talked to anybody at the bank
22  about the effect of OFAC listing a customer of CBFM?
23     A.  I do not recall, but it is likely I would
24  have had -- it would have been referred to.  It would
25  have been referred to when it happened.
```

```
 1     Q.  Okay.  When you say "it would have been
 2  referred to"?
 3     A.  What I mean by that is that, just talking
 4  about it hypothetically, when Interpal got designated,
 5  I would have asked the question: "What does this mean
 6  for CBFM?"
 7     Q.  To whom would you have asked that
 8  question?
 9     A.  I do not recall.
10     Q.  Your attorney noted that there are
11  questions about communications that you had with
12  lawyers. He doesn't want you to answer those questions,
13  okay, so I want to ask you if any of these people are
14  lawyers or what position these people held with the
15  bank.  Okay, do you know Steve Arkley?
16     A.  No.  Arkey or Arkley?
17     Q.  Arkley?
18     A.  Arkley, yes.
19     Q.  Who is he?
20     A.  He is a business manager for the
21  commercial business of CBFM.
22     Q.  Not an attorney?
23     A.  No.
24     Q.  Julie Aspinall was one of the people who
25  worked for you?
```

```
 1     A.  Yes.
 2     Q.  Not an attorney?
 3     A.  No.
 4     Q.  Fiona Miller?
 5     A.  Someone from Group, not an attorney.
 6     Q.  Did you speak or otherwise communicate
 7  with any of these people after the OFAC designation of
 8  Interpal about the effect of that designation?
 9     A.  I do not recall.
10     Q.  Whether or not you recall speaking with
11  these people, do you recall learning what the impact on
12  CBFM of such a designation was?
13         MR. LUFT: Objection, assumes facts not in
14  evidence.
15     A.  I do not recall.
16     Q.  I am going to hand the court reporter
17  a document I will ask be marked Rodger Exhibit 7,
18  please.
19         (Exhibit Rodger 7 marked for identification)
20     For the record, this is a printout from the US
21  Treasury website containing a press release dated August 23,
22  2003.  I am sorry, August 22, 2003.
23     First, Mr. Rodger, have you ever seen this
24  document before, whether on paper or on a computer
25  screen?
```

```
 1     A.  No.
 2     Q.  Did you understand when you found out that
 3  Interpal had been listed by OFAC as an SDGT that the
 4  allegation was that they had raised funds for Hamas?
 5     A.  I understood that was the allegation when
 6  I read about -- obviously not by just the Interpal being
 7  an SDGT, I needed to know more information, but I would
 8  have read that was the reason why, so at that point
 9  I did know.  Just to clarify, I didn't know
10  straightaway.  I had to know, understand why Interpal
11  was being listed.
12     Q.  Where would you have gone to for more
13  information that you needed?
14     A.  The information would have been public
15  information that Interpal was -- it wouldn't be --
16  public information in the sense that it was in the -- I
17  don't recall.  Group would have -- just to be clear,
18  Group would have advised whether it was -- what the
19  designation meant.  I doubt if it hit the media anyway,
20  so I withdraw the comment that it would have been public
21  information, because I suspect it wouldn't be in the
22  public, so I withdraw that.
23     Q.  In August 2003, were you aware that OFAC
24  had a website?
25     A.  Yes.
```

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

1    Q.  Did you go to that website after learning
2  that one of CBFM's customers had been designated
3  a terrorist by OFAC?
4    A.  No.
5    Q.  Why not?
6    A.  I don't regard that as being material to
7  the activities of CBFM, MLPU's business in the UK.
8    Q.  I am sorry, I did not understand that
9  answer.
10    A.  Maybe I didn't explain it very well.  I
11  didn't regard it as relevant to the UK situation.
12    Q.  You didn't regard what OFAC had concluded
13  about one of your customers to be relevant to CBFM's
14  situation?
15    A.  The designation as such was not -- in
16  actual fact, Interpal was designated by OFAC was
17  material, because obviously we would have regard to what
18  OFAC has to say about a customer, but in terms of us
19  taking action -- perhaps I am going ahead of the
20  questions -- with regard to possibly exiting the
21  Interpal account, the relevant authority in the UK is
22  obviously the Bank of England.  That is what I meant.
23  But obviously OFAC would be relevant, but Bank of
24  England is --
25    Q.  But when you learned that OFAC had

1  designated one of your customers a terrorist, didn't you
2  want to know why OFAC had so designated the customer?
3    MR. LUFT:  Objection, misstates his prior
4  testimony.
5    A.  The reason for OFAC assessing Interpal as
6  a terrorist organization, I can't recall exactly what my
7  train of thought was at the time, but I imagine that
8  someone on the team would have asked the question.
9  I would have asked the question of someone on the team
10  to find out a wee bit more.
11    Q.  And how would that person have found out
12  "a wee bit more"?
13    A.  Possibly that person --
14    MR. LUFT:  Objection, calls for speculation.
15  You can go ahead and answer.
16    A.  That person, to be honest, I do not know.
17    Q.  Sitting here today, you don't have any
18  recollection of asking anybody to find out why OFAC had
19  decided to designate one of your customers as
20  a terrorist organization?
21    A.  It was one moment from 9 years ago,
22  whenever it was, I can't recall.
23    Q.  But this was the only occasion during
24  your --
25    A.  Yes, but lots of things happen.  I don't

1  just exist to wait for this to happen.  If it was the
2  only thing I had to do, then yes, it would be something
3  I would recall, but lots of things happen on a daily
4  basis.
5    Q.  I am going to ask that -- I know it is
6  hard but I am going to ask that you wait until I am
7  finished the question before starting your answer, and I
8  will try to wait until you are done your answer before
9  I start a question, so the court reporter can get
10  everything down.  Okay?
11    Would you say that this was an unusual
12  occurrence, to have one of CBFM's customers designated
13  as a terrorist by the United States Government?
14    MR. LUFT:  Objection, vague and ambiguous.
15    A.  The designation of Interpal was an unusual
16  instance.  There were no other instances I can recall.
17    Q.  And was the designation of one of your
18  customers by the United States Government as a terrorist
19  something that, as manager of the MLPU, was significant
20  to your job?
21    MR. LUFT:  Objection, vague and ambiguous.
22    A.  It was something that I needed to know,
23  have knowledge of.
24    Q.  Can you answer my question now?
25    MR. LUFT:  Objection, he did answer the

1  question.  Is there something you are looking for.
2    Q.  I want to know if the designation of one
3  of your customers by the United States Government as a
4  terrorist was something that as manager of the MLPU was
5  significant to your job?
6    MR. LUFT:  Objection, vague and ambiguous.
7    A.  I do not understand what you mean by
8  "significant".
9    Q.  Important?
10    A.  "Important".  It was certainly an
11  important fact to know that OFAC designation, so
12  therefore it was important to me that I was aware of
13  that.  I don't know whether that is answering that
14  question.
15    Q.  Was it important to know, not just the
16  fact of the designation but the reason for the
17  designation?
18    A.  Yes, because the designation implied that
19  the reason for the OFAC's designation was for a purpose
20  and was for a reason, rather, correction, and it was
21  important that I understood that reason.
22    Q.  Can you please mark this as Rodger
23  Exhibit 8.
24    (Exhibit Rodger 8 marked for identification)
25    For the record, this is a one page e-mail Bates

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

1    The Palestine Development and Relief Fund,
2  Registered Charity No. 1040094, has now been included on the
3  Office of Foreign Assets Control (OFAC) list of specially
4  designated nationals and blocked persons because of alleged
5  links to Hamas.  This organization has been subject to
6  previous disclosures.  The bank has received a freezing
7  order from the Charities Commission, which effectively
8  transfers control of the account to the Commission.  The
9  Order Also requires the bank it provide details to law
10  enforcement of all debit transactions in excess of 10,000
11  pounds."
12       Did you know in or about September 2003 that
13  Interpal had been subject to previous disclosures?
14       A.  I don't recall.
15       Q.  If you were aware of this, would you have
16  gone back and read those previous disclosures?
17       MR. LUFT: Objection, foundation.
18       A.  Personally, no, but a member of the team
19  might have perhaps.
20       Q.  Are you done with your answer?
21       A.  Yes, I think so.
22       Q.  Why do you say a member of the team might
23  have read the previous disclosures?
24       MR. LUFT: Objection, calls for speculation.
25       A.  I can't recall.

1       Q.  Wouldn't the MLPU -- wouldn't you have
2  wanted to inform yourself in your group about previous
3  disclosures that the bank had made to law enforcement
4  about a customer of yours that had just been designated
5  a terrorist by the United States?
6       MR. LUFT: Objection, incomplete hypothetical.
7       A.  I can't recall.
8       Q.  I am handing the court reporter a one page
9  document that I ask be marked Rodger Exhibit 11.
10       (Exhibit Rodger 11 marked for identification)
11       For the record, it is Bates stamped NW014013.
12  Mr. Rodger, is this an e-mail from yourself to a group
13  of people in your unit, dated September 23, 2003?
14       A.  Yes.
15       Q.  Is this forwarding the e-mail from
16  Mr. Hartley that we just looked at, that is Rodger
17  Exhibit 9?
18       A.  Yes.
19       Q.  So is it fair to say that you forwarded
20  the Significant Case Commentary from August 2003 to
21  a number of people in your unit?
22       A.  Yes.
23       Q.  Why did you do that?
24       A.  Communications from Group, I generally
25  communicate them all to other members, as a matter of

1  course.
2       Q.  The people on this who you forwarded this
3  document to, were they all in the Money Laundering
4  Prevention Unit of CBFM?
5       A.  Yes.
6       Q.  Is there anyone missing from that list or
7  anyone in the unit who is not included in your
8  distribution list?
9       A.  It looks complete.
10       Q.  Okay.  Did you forward this list to your
11  unit because you wanted to call their attention to the
12  CBFM customer who had been designated by OFAC?
13       A.  I do not recall.
14       Q.  I am going to ask the court reporter to
15  mark this one page exhibit as Rodger 12.
16       (Exhibit Rodger 12 marked for identification)
17       Have you had a chance to review that?
18       A.  Yes.
19       Q.  Were you aware that after the OFAC
20  designation of Interpal the UK Charities Commission
21  began an investigation?
22       A.  Yes.
23       Q.  And at some point later that investigation
24  concluded?
25       A.  Yes.

1       Q.  And at that point the Charities Commission
2  no longer required RBS to clear transactions from those
3  accounts with the Commission?
4       A.  Yes.
5       Q.  How did you hear about the Charity
6  Commission's report?
7       A.  Probably from e-mails such as this.
8       Q.  There is no -- this is from Mr. Peter
9  Richardson?
10       A.  Um hum.
11       Q.  Who is Mr. Richardson?
12       A.  He is what was called Manufacturing, which
13  was more or less the back office function of RBS, RBS
14  Group, and he was in the Operational Risk side.
15       Q.  And Mr. Richardson just forwarded you what
16  appears to be a press report, correct?
17       A.  Yes.
18       Q.  There is no comments from Mr. Richardson
19  himself in this e-mail, is there?
20       A.  I can't see any.
21       Q.  Do you recall having any discussions with
22  Mr. Richardson before receiving this e-mail from him?
23       A.  No.
24       Q.  Sitting here today, do you recall
25  receiving this e-mail from Mr. Richardson?

---

**HIGHLY CONFIDENTIAL**      Page 97

1  A. No.

2  Q. Were you aware that the Charities
3  Commission published a report after it concluded its
4  investigation?

5  A. Yes.

6  Q. Did you read that report?

7  A. No.

8  Q. Why not?

9  A. Lots of reports come to my attention. I
10  don't read them all.

11  Q. Do you read some of them?

12  A. I am more likely to read something like
13  this, which is a summary of the key points, not the
14  actual report.

15  Q. When you say this you are talking about
16  this press article that was sent to you by Mr.
17  Richardson?

18  A. Yes.

19  Q. This article, if you go 3 paragraphs from
20  the top says:

21  "The affair has caused uproar among British
22  Muslims who have accused Washington and Israeli
23  authorities of trying to stop the charity's
24  humanitarian work".

25  Did you know in September 2003 that the

---

**HIGHLY CONFIDENTIAL**      Page 98

1  Interpal affair had caused uproar amongst British
2  Muslims.

3  A. No.

4  Q. Did you know that British Muslims had
5  accused Washington and Israel of trying to stop their
6  charitable work?

7  MR. LUFT: Objection, assumes facts not in
8  evidence.

9  A. No.

10  Q. If you go down another couple of
11  paragraphs, there is a one line paragraph that starts
12  with:

13  "Officials accused Interpal of being
14  a 'a principal charity utilized to hide the flow of money to
15  Hamas'".

16  Did you know that one of the US allegations at
17  the time that it listed Interpal as a specially
18  designated global terrorist was that Interpal was
19  a principal charity utilized to hide the flow of money
20  to Hamas?

21  A. I don't know for sure but I would imagine
22  that OFAC would have said that.

23  Q. Okay. Do you understand an accusation of
24  hiding the flow of money to an organization implies that
25  Interpal was secretly funneling money to Hamas?

---

**HIGHLY CONFIDENTIAL**      Page 99

1  MR. LUFT: Objection, mischaracterizes the
2  document, assumes facts not in evidence.

3  A. No.

4  Q. Would you understand that there is
5  a difference between openly sending money to Hamas and
6  hiding the flow of money to Hamas?

7  A. Yes.

8  Q. And that the American allegation was that
9  Interpal secretly sent money to Hamas, correct?

10  MR. LUFT: Objection, mischaracterizes the
11  document, assumes facts not in evidence.

12  A. I don't know details such as that.

13  Q. If you turn down to the third paragraph
14  from the bottom it says:

15  "The Commission investigated Interpal in 1996
16  because of similar allegations".

17  Do you see that?

18  A. Yes.

19  Q. Did you know in September 2003 about that
20  previous investigation by the Charities Commission in
21  1996?

22  A. I don't know.

23  Q. Did you ever read the report from that
24  investigation?

25  A. No.

---

**HIGHLY CONFIDENTIAL**      Page 100

1  MR. GOELMAN: Do you want to take a break now,
2  Mr. Rodger, or keep going for another 10 or 15 minutes?

3  A. We can go for another 10 or 15 minutes.

4  Q. Let me ask the court reporter to mark this
5  as Rodger Exhibit 13, please.

6  (Exhibit Rodger 13 marked for identification)

7  For the record, this is Bates stamped NW013939
8  through 013941. Does this appear to be an e-mail chain that
9  you were copied on in October 2003?

10  A. Yes.

11  Q. If you turn to page 13940, chronologically
12  the first e-mail in this chain was sent on October 9,
13  2003 from Stephen Foster?

14  A. Yes.

15  Q. And that e-mail was not -- you were not a
16  recipient of that e-mail but when you were copied on the
17  e-mail chain you would have received that earlier
18  e-mail. Is that fair to say?

19  A. Yes.

20  Q. Can you turn to the second paragraph of
21  Mr. Foster's e-mail. It states:

22  "However, they have reminded us that ███████
23  ████████████████████████████████████████
24  ██████████████

25  A. Which e-mail is this?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                        Page 101

1      Q.  Page 13940, the first e-mail
2  chronologically, which is the last e-mail on this
3  exhibit.
4      A.  Yes.
5      Q.  Referring to the Bank of England,
6  Mr. Foster writes:
7         "They have reminded us that ███████
8  ████████████████████████████████████████
9      Do you see that?
10     A.  Yes.
11     Q.  Did you have an understanding as to
12 whether payments to Hamas were permitted before the BoE
13 notice of late September 2003?
14     A.  No.
15     Q.  Do you remember hearing about the BoE
16 notice of late September 2003?
17     A.  No.  Which notice is this?
18     Q.  There is a notice referenced by
19 Mr. Foster, the BoE notice of late September, that
20 ██████████████████████████
21     A.  I don't recall.
22     Q.  Can you go to the e-mail from Derek Brand,
23 right above the e-mail from Mr. Foster.  Do you know who
24 Mr. Brand is?
25     A.  No.

---

HIGHLY CONFIDENTIAL                        Page 102

1      Q.  You don't recognize the name?
2      A.  I recognize the name but I have got no
3  idea who he is.
4      Q.  Do you recall receiving this e-mail chain?
5      A.  No.  I got 200 e-mails a day so ...
6      Q.  Can you turn to the first page of the
7  exhibit, please.  There is an e-mail from Mr. Foster to
8  Tony O'Hear and Ben Norrie.  Do you see that?
9      A.  Yes.
10     Q.  Do you know who Mr. Norrie is?
11     A.  I think, from what I recall, he works for
12 Stephen Foster.
13     Q.  Mr. Foster writes:
14        "Thanks for this.  I think the main concern
15 now is to ensure that no future payment is made to
16 Hamas.  With the restrictions lifted, is there any
17 formal (or even informal) monitoring of the traffic?
18 What scope is there to use the filtering technology we
19 have in GBS or Payment Ops to monitor?"
20        Do you have an understanding as to what
21 Mr. Foster was referring to when he talked about the
22 "filtering technology we have in GBS or Payment Ops"?
23     A.  It implies that he was referring to
24 payment filtering technologies that are used to identify
25 payments going out of the bank.

---

HIGHLY CONFIDENTIAL                        Page 103

1      Q.  And was that filtering technology that the
2  bank had in place in the fall of 2003?
3      A.  No.
4      Q.  When did that filtering technology come on
5  line?
6         MR. LUFT: Objection, foundation.
7      Q.  If you know?
8      A.  I can't recall.  2008, 09.
9      Q.  Not until 2008 or 09?
10     A.  The current incarnation, 2008 or 09.
11     Q.  In Mr. Foster referring to filtering
12 technology "we have in GBS or Payment Ops", was there
13 some type of filtering technology that as early as 2003
14 was available in GBS or Payment Ops?
15        MR. LUFT: Objection, foundation.
16     Q.  If you know?
17     A.  I don't know.
18     Q.  Fiona Miller writes an e-mail in the
19 middle of this first page of this exhibit to Mr. O'Hear,
20 and she writes:
21        "In similar cases in the past the customer
22 only Compliance function has been responsible for
23 monitoring.  In this case CBFM Compliance - Irvine
24 Rodger/Guy Cole should be able to assist."
25        So is it fair to say that this e-mail was

---

HIGHLY CONFIDENTIAL                        Page 104

1  forwarded to you by Mr. O'Hear to see if you could
2  assist in monitoring Interpal payments going forward?
3      A.  I don't know.
4      Q.  Mr. O'Hear writes:
5         "Guy/Irvine, is the monitoring of payment traffic,
6  as outlined by Stephen, possible here?"
7         I understand you don't recall getting this e-mail
8  from Mr. O'Hear.  Do you remember the issue of whether or
9  not it was possible to monitor Interpal's payment traffic
10 being brought up?
11     A.  I am trying to read between the lines of
12 the e-mail and my conclusion is I just do not know.
13     Q.  Whether or not you recall the specific
14 episode, do you know whether it was possible to monitor
15 payment traffic of --
16     A.  What we did within CBFM was --
17        MR. LUFT: Did you finish the question?
18        MR. GOELMAN: Effectively.  Go ahead.
19     A.  What we did within CBFM was payments to
20 Interpal were reviewed six months after they were made
21 by Guy Cole, which is akin to what is being referred to
22 here, but obviously that was not realtime, but that was
23 the best that we could do in the circumstances.
24     Q.  So was it your -- withdrawn.  So
25 Mr. Foster's suggestion about using filtering technology

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                    Page 105

1   to monitor and when Mr. O'Hear says "Is that possible?"
2   here, the answer in October 2003 was "no"?
3        A.  Yes -- no, the answer was no, it was not
4   possible.
5        Q.  Were you involved in any discussions in
6   the bank in 2002/03 about acquiring the technical
7   capability to implement realtime monitoring of payments?
8        A.  No.
9        Q.  So if in 2002 someone, one of RBS's
10  customers had tried to send money to Osama Bin Laden,
11  there was no technical way for the bank to intercept
12  that payment.  Is that true?
13       MR. LUFT:  Objection, foundation, calls for
14  speculation, incomplete hypothetical.
15       A.  I don't know.
16       Q.  You don't know of any filtering technology
17  that could have stopped payments before they actually
18  went?
19       A.  There was no --
20       MR. LUFT:  Objection, foundation, calls for
21  speculation, incomplete hypothetical.
22       A.  No knowledge which I have which would
23  answer that.
24       Q.  As part of your efforts to stay current in
25  the Anti-money Laundering field, is it fair to say that

HIGHLY CONFIDENTIAL                                    Page 106

1   there were banks who in 2003 had the technical
2   capability to filter transactions in realtime?
3        MR. LUFT:  Objection, foundation.
4        Q.  If you know.
5        A.  I don't know.
6        MR. GOELMAN: This is a good stopping place to
7   take a break for lunch.
8        THE VIDEOGRAPHER: Going off the record at
9   1:22 pm.
10            (Break for Lunch.)
11       THE VIDEOGRAPHER: We are back on the record
12  at 2:16 pm.
13       MR. GOELMAN: Good afternoon, Mr. Rodger.
14       A.  Afternoon.
15       Q.  Did you have a chance to get some tea?
16       A.  Yes.
17       Q.  Before we broke, you testified that "What
18  we did within CBFM was payments to Interpal were
19  reviewed six months after they were made, by Guy Cole".
20  Do you recall when that practice was implemented?
21       A.  I don't recall but I imagine it was
22  subsequent to the Charities Commission investigation
23  having been concluded.  That was the kind of undertaking
24  the Group gave to the Charities Commission, that that
25  work could be done.

HIGHLY CONFIDENTIAL                                    Page 107

1        Q.  Do you remember what precipitated the
2   initiation of that practice?
3        A.  The Charities Commission investigation, I
4   think Group was keen, because of the seriousness of the
5   allegations, Group was very keen to review all payments
6   coming out of Interpal, just to ensure that none of
7   these payments went to undesirables.
8        Q.  When you talk about the seriousness of the
9   allegations, you are talking about the seriousness --
10       A.  The OFAC allegations.
11       Q.  That Interpal was funding a terrorist
12  group?
13       A.  Yes.
14       Q.  I am going to hand the court reporter
15  a document I will ask be marked as Rodger Exhibit 14,
16  please.
17            (Exhibit Rodger 14 marked for identification).
18       For the record the Bates stamps are somewhat cut
19  off at the bottom but it is NW17151 through NW17054.
20       MR. LUFT:  From the looks of the document and
21  from the stamping it looks like this is one chain,
22  correct, even though there is a staple and then a page
23  is attached at the end?
24       MR. GOELMAN:  Yes.  The reason the page is not
25  part of the staple is it was stapled upside down so I

HIGHLY CONFIDENTIAL                                    Page 108

1   took it off and paper clipped it to the pages that were
2   right side up.
3        MR. LUFT: So we can just look at this as one
4   document.
5        Q.  Let me know when you have had a chance to
6   review this e-mail chain, Mr. Rodger.
7        A.  Okay.
8        Q.  Do you recognize Rodger Exhibit 14 as an
9   e-mail chain that precipitated the practice of 6-month
10  reviews of Interpal transfers that you previously
11  described?
12       A.  I don't recall the specific e-mail but
13  I do know that Guy Cole started doing 6-monthly reviews.
14       Q.  Does this reflect what caused Mr. Cole to
15  begin doing those reviews?
16       MR. LUFT: Objection, foundation.
17       A.  I don't know whether this triggered it but
18  Guy did 6-monthly reviews thereafter, or not thereafter
19  but afterwards, after the designation.
20       Q.  And these e-mails are dated from April 21,
21  2004 through May 20, 2004, true?
22       A.  Yes.
23       Q.  Does that reflect that these reviews that
24  Mr. Cole performed did not begin until approximately --
25  the first one was not until approximately nine months

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                   Page 109

1   after the OFAC designation of Interpal as an SDGT?
2        MR. LUFT: Objection, assumes facts not in
3   evidence.
4        A. I don't know.
5        Q. Can you turn to the first e-mail in the
6   chain, on the last page, from Ben Norrie to Guy Cole and
7   a number of other people.
8        A. Um hum.
9        Q. Do you see that?
10       A. Yes.
11       Q. In the middle of this or towards the end
12   of this e-mail Mr. Norrie writes:
13       "Can I ask you to investigate whether any enhanced
14   due diligence has been put in place over these accounts.
15   Not sure the above has been communicated, therefore suspect
16   not."
17       Did you have an understanding in April 2004
18   what "enhanced due diligence" meant?
19       A. Yes, enhanced due diligence is a thorough
20   thorough review of the key principals behind Interpal
21   and basically the purpose of the account and such like.
22       Q. Stepping back from the Interpal example,
23   do you have an idea in general what is your
24   understanding of what enhanced due diligence means?
25       A. Enhanced due diligence, what you would do,

HIGHLY CONFIDENTIAL                                   Page 110

1   you would investigate the key principals, the directors
2   and beneficial owners. You would also want to -- one
3   would, rather than saying "you", I will correct that by
4   saying "one", one would want to understand the nature of
5   the account, the types of transactions which go through
6   the account, types of expected account activity, that
7   type of manner of investigation.
8        Q. Is it fair to say that enhanced due
9   diligence includes extra scrutiny of a customer that
10   there is a reason to be suspicious of?
11       MR. LUFT: Objection, vague and ambiguous.
12       A. Not necessarily. When one does enhanced
13   due diligence one would have regard to previous
14   suspicions reported.
15       Q. The bank had an obligation to perform due
16   diligence on all of its customers, true?
17       A. Yes, at the time of account inception.
18       Q. What would require an extra level of
19   diligence? What would require enhanced due diligence?
20       A. At that time, which is 2004, the enhanced
21   due diligence would be triggered by perception of
22   increased risk.
23       Q. What kind of increased risk?
24       A. Increased risk that the customer may cause
25   the bank.

HIGHLY CONFIDENTIAL                                   Page 111

1        Q. Does that include increased regulatory
2   risk?
3        A. It would include all matters which would
4   increase the risk of that customer to the bank, so it
5   would include all factors which would result in
6   increased risk.
7        Q. It would include all kinds of risk?
8        A. Yes. It doesn't -- it is not limited to
9   one thing; it considers every possibility.
10       Q. Mr. Norrie writes: "Not sure the above was
11   communicated, therefore suspect not." In terms of
12   whether any due diligence was put in place over these
13   accounts, if Mr. Norrie wrote that on April 21, 2004,
14   was it accurate that there had been no enhanced due
15   diligence placed on the Interpal accounts between the
16   designation by OFAC in August 2003 and when Mr. Norrie
17   wrote this e-mail in April 2004?
18       MR. LUFT: Objection, foundation.
19       A. I really don't know where that comment
20   came from. I do not understand it.
21       Q. Let me ask it a different way. Do you
22   know of any enhanced due diligence measures that CBFM
23   put in place between August 2003 and April 2004?
24       A. I don't recall.
25       Q. If you turn to the second to last page of

HIGHLY CONFIDENTIAL                                   Page 112

1   this exhibit, Mr. Norrie writes, on May 6, 2004:
2        "Guy, have not heard back from you on the
3   below."
4        Do you see that?
5        MR. LUFT: If you don't mind, I will just
6   point to where "Guy" is on the bottom of the page, and
7   the rest is on the other page.
8        MR. GOELMAN: Thank you.
9        A. Okay.
10       Q. So this reflects Mr. Norrie following up
11   about two weeks later after his first e-mail, is that
12   right?
13       A. Looks like it.
14       Q. Was it typical for CBFM to simply ignore
15   enquiries from Group Enterprise Risk?
16       MR. LUFT: Objection.
17       Q. Sorry, from Group Risk Management.
18       MR. LUFT: Objection. Go ahead.
19       A. I don't think you should say that. No one
20   knows the reason why there was a delay. It could well
21   be Guy was out of the office. Who knows? It is just
22   a totally incorrect assumption.
23       Q. Okay.
24       A. Which I don't know whether that is true or
25   not.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

1    Q.  May 6, 2004, Mr. Cole sends an e-mail to
2  Mr. Norrie.  Do you see, right above where you read
3  before, it says:
4        "The Relationship Manager is aware of the
5  potential terrorism connections with this account, and
6  liaised with Derek Brand during the account freeze."
7        Do you understand the Relationship Manager to be
8  a reference to Belinda Lane?
9    A.  Yes.
10   Q.  Why would CBFM want to keep an account
11  open when it was aware of potential terrorism
12  connections with that account?
13       MR. LUFT: Objection.
14   A.  The situation regarding Interpal was that
15  it hadn't been listed by Bank of England, and one would
16  presume, which I don't know whether this is the case,
17  Bank of England would have done its own investigation.
18   Q.  But if as the e-mail states the
19  Relationship Manager was aware of the potential
20  terrorism connections, wouldn't that be in itself
21  a reason for the bank to exit the relationship?
22       MR. LUFT: Objection, foundation.
23   A.  I do not understand what Guy means.
24   Q.  By "Potential terrorism connections"?
25   A.  Yes.

1    Q.  So do you disagree with the statement that
2  as of May 6, 2004 Belinda Lane was aware of the
3  "Potential terrorism connections with the Interpal
4  accounts?
5    A.  Belinda will have been --
6        MR. LUFT: Objection, vague and ambiguous,
7  since he does not understand what that term means.
8    A.  Belinda would have been aware of the OFAC
9  designation.
10   Q.  Um hum.  And do you agree that the OFAC
11  designation was at least enough to alert the bank of
12  potential terrorism connections?
13       MR. LUFT: Objection, foundation.
14   A.  The bank -- I can't speak for how the bank
15  would have regarded that, to be honest.  All I would say
16  is the bank would be aware of the OFAC designation.
17   Q.  Can you tell me whether you regarded an
18  OFAC designation as enough to be aware of potential
19  terrorism connections with regard to Interpal
20  in May 2004?
21   A.  It is clear to me that OFAC did have
22  concerns, terrorist connection concerns.  Bank of
23  England didn't, because of their reaction not to list
24  it.  So that is the position that we were in, and Bank
25  of England was the relevant authority that would

1  determine how we proceed.
2    Q.  Okay.  Did you personally regard an OFAC
3  designation, and with the understanding that the Bank of
4  England had not listed Interpal as of May 2004, did you
5  regard an OFAC designation of Interpal as an SDGT to be
6  sufficient to at least qualify as awareness of
7  a potential terrorism connection?
8    A.  The OFAC designation was material because
9  OFAC had determined that it considered there were
10  terrorist connections, so that was something that would
11  have been considered.
12   Q.  And would it in your opinion have been
13  enough to conclude that there were at least potential
14  terrorism connections with Interpal?
15       MR. LUFT: Objection, asked and answered.
16   A.  I think the questions -- OFAC may have
17  terrorist connections, recorded them, the bank was aware
18  of these, Bank of England didn't make these connections.
19  So the OFAC designation would be one view of OFAC but
20  the material view was the Bank of England one, being
21  a UK bank.
22   Q.  When you say "the material view of the
23  Bank of England", what do you mean, "the material view"?
24   A.  It was not a very good word, I realized as
25  soon as I said it.  I realized "material" was not the

1  right word.  Because NatWest/RBS are both UK banks, as
2  UK banks they need to comply with UK laws.  That is what
3  I meant by "material".  "Salient" might have been
4  a better word.
5    Q.  The salient view is the one of Bank of
6  England, not of OFAC?
7    A.  Being UK banks, yes.
8    Q.  Reading on, it says:
9        "Although diligent in their interaction with the
10  customer, the RM has no ability to filter or efficiently
11  monitor payments".
12       So is it fair to say that not only was CBFM aware
13  of potential terrorism connections with Interpal, it
14  also aware that it had no ability to filter or efficiently
15  monitor payments made by Interpal?
16       MR. LUFT: Objection, compound, misstates the
17  document, misstates the prior testimony.
18   Q.  Do you need the question read back to you?
19   A.  Yes, say it again.  There was two
20  questions I think.
21        (Read back)
22   A.  With regard to the first line, "potential
23  terrorist connection allegations", I would say with
24  regard to Interpal, and secondly, for the payments going
25  out, that is correct, realtime payment filtering was not

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

1     A. Dundee. I have got no connection
2  whatsoever with the good George Galloway, if that is the
3  next question.
4     Q. It was not. My question was when you say
5  that Mr. Galloway was behind Interpal, what did you mean
6  by that phrase?
7     A. George Galloway always regarded Interpal
8  as being his inverted commas 'favorite charity'. He was
9  a rabble rouser, and that was possibly why I looked at
10  the Internet to see what it was, because he was a rabble
11  rouser. I just wanted to see if he was rousing the
12  rabble.
13     Q. And how did you come to learn that
14  Interpal was Mr. Galloway's favorite charity?
15     A. He commented on it on television. He
16  appeared on a reality TV program called Celebrity Big
17  Brother, and he made a complete fool of himself but he
18  said that he would give his appearance money to
19  Interpal, which I think was 75,000 pounds.
20     Q. Do you recall when that was?
21     A. That would have been January 2006.
22     Q. And was it after you were already familiar
23  with Interpal?
24     A. Yes.
25     Q. Mr. Norrie writes:

1     "Are the CBFM MLPU happy with the potential risks
2  in continuing this relationship."
3     Do you see that?
4     A. Where is that?
5     Q. The last line of the e-mail from Mr.
6  Norrie to Mr. Cole that we were reading.
7     A. Yes.
8     Q. And the MLPU refers to the unit that you
9  were a manager of?
10     A. Yes.
11     Q. Did you have an understanding in May 2004
12  of what the potential risks in continuing a relationship
13  with Interpal were?
14     MR. LUFT: Objection, vague.
15     A. I would ask the question what did Ben mean
16  by "potential risks", because I don't know what he means
17  by "potential risks".
18     Q. Without regard to what Mr. Norrie meant,
19  did you have any idea in May 2004 whether there were
20  potential risks for the bank in continuing with the
21  relationship with Interpal?
22     A. The major risk would be that Bank of
23  England, the bank had made a wrong judgment on Interpal,
24  and actually it was somehow managing to fund Hamas, and
25  that would have been very, very poor if that was the

1  case.
2     Q. "Very, very poor"?
3     A. We felt that we had put these transaction
4  reviews going through that we were actually satisfied
5  that was not happening.
6     Q. And when you say it would have been very,
7  very poor if that was the case --
8     A. "Poor" was an understatement.
9     Q. And you are talking about the potential
10  risk of a bank's customer sending money to a terrorist
11  group?
12     A. Not as -- yes, but the bank's customer,
13  the bank facilitating a customer making a payment to
14  a terrorist group, and that was what would be the risk.
15     Q. Can you turn to the second page of this
16  document, the e-mail from Mr. Cole to Mr. Norrie. The
17  second paragraph begins with "I realize". Do you see
18  that?
19     A. Yes.
20     Q. "I realize, due to the US terrorist
21  designation of Interpal, that we should be wary of the
22  payments from their accounts with us, but in reality I
23  believe there is very little we can effectively do to
24  prevent payments being made without a payment filtering
25  system, as the customer can initiate payments themselves

1  without needing to contact the RM."
2     Do you see that?
3     A. Yes.
4     Q. Did you agree in May 2004 that due to the
5  US terrorist designation of Interpal the bank should be
6  wary of payments from the Interpal accounts?
7     A. The OFAC designation was significant, and
8  the very fact that we were reviewing the transactions
9  indicated that we wanted to make sure that we were on
10  top of them, we meaning MLPU on behalf of our, well, RBS
11  Group, I suppose.
12     Q. Are you done with your answer, sir?
13     A. Yes, I have finished.
14     Q. The second part of that sentence, Mr. Cole
15  says:
16     "In reality I believe there is very little we can
17  effectively do to prevent payments being made without
18  a payment filtering system."
19     Do you see that?
20     A. Yes.
21     Q. Did you agree with that in May 2004?
22     A. Yes.
23     Q. Does that imply a disconnect between what
24  the bank should be doing and what the bank can do in
25  respect to ensuring that Interpal does not send money to

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

1    terrorist organizations?
2         MR. LUFT: Objection, vague and ambiguous and
3    calls for speculation.
4         A.  I don't know really.
5         Q.  Mr. Cole writes in the next paragraph:
6         "I think any decision to keep/close the account
7    must be carefully made, as closing the account without an
8    identifiable reason will most probably result in adverse
9    media attention.  Also, if a terrorism related payment is
10   identified as being made, we again would suffer untoward
11   regulatory/media attention".
12        Did you understand in May 2004 that it was
13   CBFM's decision as to whether or not to allow Interpal
14   to continue to bank with RBS?
15        A.  The decision to allow the account to stay
16   open would ultimately have rested with the Group
17   Compliance team.  They are the people that have got the
18   power.  CBFM, from a business angle, whether they wanted
19   to continue operating the account, the advice my team
20   gave was that we could manage the account.
21        Q.  But you are saying that the ultimate
22   decision on whether or not to allow Interpal to continue
23   to bank with RBS was not CBFM's, is that correct?
24        A.  Yes.
25        Q.  It was Group's?

1         A.  If Group didn't want the account to remain
2    open, it would be within Group's gift to say "No, close
3    it."
4         Q.  And you would have had to comply?
5         A.  We would have had to comply.
6         Q.  Mr. Cole writes you and others that:
7         "Closing the account without an identifiable
8    reason will most probably result in adverse media
9    attention."
10        Did you have an understanding -- first of all, did
11   you agree with that in May 2004, that closing the account
12   without an identifiable reason would probably result in
13   adverse media attention?
14        MR. LUFT: Objection.
15        A.  Yes.
16        Q.  And why was that your belief?
17        A.  The position of the Muslim minority in
18   this country.  They generally feel isolated and
19   sidelined and they would regard a national bank closing
20   down what they would regard as a good Muslim charity as
21   an aggressive act.  You have got people like George
22   Galloway who would highlight that to the media.  It was
23   unnecessary in my mind because the charity itself was
24   operating, as far as we could tell, were operating well.
25        Q.  When you say "an aggressive act", what do

1    you mean by that?
2         A.  What is the context of me saying that?
3         Q.  "The Muslim minority would regard
4    a national bank closing down what they would regard as a
5    good Muslim charity as an aggressive act?
6         A.  I think I would say, first of all,
7    elements of the Muslim minority, by no means the whole
8    Muslim minority, they would regard it as another example
9    of a Muslim organization being picked on.
10        Q.  Were you concerned about being accused
11   of -- strike that.  Were you concerned about the bank
12   being accused of anti-Muslim discrimination, if it
13   ordered the account closed?
14        A.  The answer to that is no, if there was
15   grounds for it to close then there would be absolutely
16   no problem at all, but if there were no grounds then
17   potential.
18        Q.  There is a potential to be accused of
19   being bigoted against Muslims?
20        A.  Yes.
21        Q.  And that was something that you were
22   concerned about in May 2004?
23        A.  If I just go back, the way the questioning
24   is going is not helpful.  A closure of Interpal without
25   reason would not be -- could be perceived to be bigoted

1    to Muslims.
2         Q.  Was that a concern of yours in May 2004?
3         A.  I suspect it was something which I would
4    have believed, yes.
5         Q.  You have talked about an identifiable
6    reason to close the account and how the absence of such
7    a reason might result in adverse publicity, correct?
8         MR. LUFT: Objection, misstates his prior
9    testimony.
10        A.  Just to make it clear, closing the
11   account, the account would be closed without any
12   hesitation if grounds were there to close it, regardless
13   of any Muslim feeling.  There is no way would that
14   account be kept open if the account was -- Interpal was
15   funding Hamas.
16        Q.  Earlier you said the answer to that is
17   "No, if there was grounds for it to close there would be
18   absolutely no problem at all, but if there are no
19   grounds then the potential", and something about being
20   accused of being bigoted against Muslims.  So is your
21   belief that if there was an identifiable, as Mr. Cole
22   calls it, an identifiable reason to close the account,
23   then the bank would not be risking that backlash that
24   you described?
25        MR. LUFT: Objection, misstates the prior

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                    Page 129

1  testimony, confusing.
2       A.  The bank would not keep the account open
3  if it was funding terrorism, end of story, absolutely no
4  doubt.
5       Q.  My question was whether you believed
6  in May 2004 that if there was an identifiable reason for
7  the bank to close the account then there wouldn't be the
8  same risk of negative publicity that you talked about
9  for if the bank closed it without an identifiable
10  reason?
11       A.  If there was an identifiable reason to
12  close the account then there would be no concerns
13  regarding the Muslim minority.  It would be irrelevant,
14  because the key thing is the financing of terrorism.
15       Q.  And you did not regard the designation by
16  OFAC of Interpal as an SDGT to be an identifiable reason
17  to close the account.  Is that true?
18       A.  It was Bank of England did not regard then
19  that designation as being a reason to list Interpal.  It
20  was not my decision.  I am not GOFI.  The resources of
21  Bank of England and OFAC can make that judgment, so all
22  you can do is rely on others that do.
23       Q.  Are you saying that the only identifiable
24  reason to close the account would be if Bank of England
25  listed Interpal as a terrorist organization?

HIGHLY CONFIDENTIAL                                    Page 130

1       MR. LUFT: Objection, misstates his prior
2  testimony.
3       A.  If Bank of England decided to list that
4  account there wouldn't be a debate, the account would be
5  closed.  Regardless of any disquiet in the Muslim
6  community, it would be closed, end of story.  Without
7  that Bank of England decision, the UK Government
8  presumably did not regard Interpal as being an account
9  worthy of closure, and I don't know the circumstances,
10  but European Union didn't follow OFAC either.
11       Q.  If the Bank of England or the European
12  Union had listed Interpal as a terrorist organization,
13  the bank would have been compelled to close the account,
14  true?
15       A.  Yes.
16       Q.  It wouldn't have required any use of
17  judgment on the bank's part, right?
18       A.  Yes.
19       Q.  You wouldn't have had any discretion to
20  leave the account open, true?
21       A.  Yes.
22       Q.  My question is, are there identifiable
23  reasons to close the account, even if you are still
24  legally entitled in the UK to operate the account?
25       MR. LUFT: Objection, vague.

HIGHLY CONFIDENTIAL                                    Page 131

1       A.  I don't know.
2       Q.  Can you look at Mr. Foster's e-mail right
3  above the e-mail we were just looking at.  He writes:
4       "Guy, Ben is away all week so I am replying on
5  this.  You are correct that filtering is a group wide issue
6  and that is why we have been working with key stakeholders
7  like Payment Operations to develop the filter and
8  capability.  This continues and we know that it is a very
9  important element of our counter-terrorism efforts".
10       Would you agree that filtering is a very important
11  element of counter-terrorism efforts?
12       A.  Yes.
13       Q.  And nevertheless is it true that
14  in May 2004 RBS didn't have filtering capability?
15       MR. LUFT: Objection, mischaracterizes the
16  document.
17       A.  RBS Group didn't have filtering
18  technologies back in 2004, not adequate ones.
19       Q.  And that was more than two and a half
20  years after the attacks of 9/11?
21       A.  Yes.
22       Q.  Was that a concern to you, in May 2004?
23       A.  The fact that the bank didn't have
24  filtering arrangements in place at that time was not out
25  of line with the other players in the UK market.

HIGHLY CONFIDENTIAL                                    Page 132

1       Q.  Was the bank's lack of that capability of
2  concern to you, in May 2004, as head of the MLPU?
3       A.  I don't recall.
4       Q.  Mr. Foster goes on to write Mr. Cole,
5  last sentence in the second paragraph:
6       "You are right to highlight the reputational
7  issues but if management decide they don't want the
8  relationship, there are ways to exit that might not
9  cause a problem."
10       When you received this e-mail from Mr. Foster
11  in May 2004, did you understand him to agree with
12  Mr. Cole that reputational issues to the bank were
13  important?
14       MR. LUFT: Objection, misstates the document.
15       A.  I honestly do not recall.
16       Q.  Mr. Foster writes:
17       "There are ways to exit that might not cause
18  a problem."
19       Do you see that?
20       A.  Yes.
21       Q.  Do you know what ways to exit Mr. Foster
22  had in mind?
23       A.  Absolutely no idea.  I would be
24  interested.  I would like to ask that question to
25  Mr. Foster.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                                Page 141

1  familiar with.  He says here that is what he did so ...
2     Q.  Let me go on to the next paragraph.
3        "I am content to leave the sterling and euro
4  accounts operating with a semi-annual review taking place
5  for foreign payments made from the accounts."
6        Do you see that?
7     A.  Yes.
8     Q.  "Consideration will need to be given
9  regarding the operation of the US dollar account, as
10 funds from this account will get frozen if they are
11 transferred by a US domiciled/owned counterparty."
12    A.  Yes.
13    Q.  Did you understand when you got this
14 e-mail that Mr. Cole was recommending at least
15 considering shutting down the US dollar account that
16 Interpal maintained at RBS?
17       MR. LUFT: Objection, misstates the document.
18    A.  The implication is that he did make that
19 recommendation.
20    Q.  And the reason for that recommendation is
21 that Mr. Cole was concerned about Interpal's funds being
22 frozen by the United States Government?
23    A.  The effect of maintaining the US dollar
24 account would result in the funds being frozen in the
25 US.

---

HIGHLY CONFIDENTIAL                                Page 142

1     Q.  And Mr. Cole's suggestion was to avoid
2  that happening, is that right?
3        MR. LUFT: Objection, misstates the document,
4  calls for speculation.
5     Q.  Is it your understanding that Mr. Cole
6  wanted the bank to help prevent the United States
7  Government from seizing Interpal's money?
8        MR. LUFT: Objection, calls for speculation.
9     A.  The effect of the OFAC designation meant
10 that the funds would be blocked in the US.
11    Q.  And was it your understanding Mr. Cole's
12 suggestion that the bank should consider shutting the US
13 dollar account to be motivated by an effort to prevent
14 that freezing from occurring?
15       MR. LUFT: Objection, confusing, misstates the
16 document, lack of foundation.
17    A.  The one thing I just want to say is that
18 no way would we -- would Guy Cole want to make an
19 arrangement that would circumvent the OFAC rules for
20 dollar funding, but the actual fact of having the dollar
21 account meant that the payments would get blocked.  I
22 think you said in an earlier statement, you said I think
23 a statement about, the statement before last was
24 implying that we were doing something to try and get
25 round the US Government.  It was not really the case of

---

HIGHLY CONFIDENTIAL                                Page 143

1  what we were doing.  It was more of a factual thing,
2  that the you US dollar payments would get blocked.  So I
3  don't think -- I would not describe it as trying to get
4  round the US Government.
5     Q.  How would you describe your understanding
6  of why Mr. Cole wanted the bank to consider shutting
7  down the US dollar account?
8        MR. LUFT: Objection, foundation.
9     A.  I don't know.
10    Q.  You recognize that shutting the US dollar
11 account would have the effect of preventing Interpal's
12 transfers from being frozen by the US Government, true?
13       MR. LUFT: Objection, misstates his prior
14 testimony.
15    A.  The effect of the OFAC Interpal -- the
16 OFAC designation meant payments in the US would get
17 blocked.
18    Q.  And if the bank shut down the US dollar
19 account that Interpal maintained with RBS, then that
20 freezing that you described couldn't happen, true?
21       MR. LUFT: Objection, vague and ambiguous, no
22 foundation.
23    A.  All I would say again, as I said before,
24 the OFAC designation would result in the payments being
25 blocked in New York.

---

HIGHLY CONFIDENTIAL                                Page 144

1     Q.  If they were US dollars?
2     A.  US dollar.
3     Q.  US dollar denominated transactions?
4     A.  Yes.  So it would have -- the effect of
5  having the US dollar account meant the payments would be
6  blocked in New York.
7     Q.  And the effect of closing the US dollar
8  account means that payments wouldn't be blocked in New
9  York, correct?
10       MR. LUFT: Objection, calls for speculation,
11 incomplete hypothetical, mischaracterizes prior
12 testimony.
13    A.  I don't know.
14    Q.  You do not know whether the effect of not
15 having a US dollar account open would mean that the
16 payments could not get blocked by OFAC?
17       MR. LUFT: Which payments?  Are we talking
18 about if there is no US dollar account?
19       MR. GOELMAN: My question stands.  It is clear
20 from the previous answer what I am asking.
21       MR. LUFT: Objection, incomplete hypothetical,
22 calls for speculation.
23       MR. GOELMAN: You can answer.
24    A.  I would really appreciate if you would
25 just roll back the time and get the question right from

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                          Page 145

1  the beginning, because it seems to be a question that
2  leads on to another and I have lost the plot of where
3  the original question arose.
4      Q.  Sure thing.  If the bank closed the US
5  dollar account that Interpal maintained, as Mr. Cole is
6  suggesting the bank consider doing, wouldn't that have
7  the effect of ensuring that the United States Government
8  could not seize Interpal's transfers to other parties?
9      MR. LUFT: Objection, assumes facts not in
10 evidence, incomplete hypothetical, calls for speculation
11 and misstates the facts as they are known.
12     A.  I think the combination of all these
13 things, I have doubt -- I would have to go back to the
14 basics.  The effect of the US dollar account for an OFAC
15 designated charity would mean that the payments would be
16 blocked in the US.
17     Q.  But you have difficulty in answering the
18 question of whether closing that account would mean that
19 payments could not get blocked in the US?
20     MR. LUFT: Objection, asked and answered,
21 misstates.
22     A.  You are saying things like this is going
23 to be seized by the US Government and all this sort of
24 thing.  That is the problem I have got with it, so that
25 is why I am going back to the original thing, is the

HIGHLY CONFIDENTIAL                          Page 146

1  closure of the US dollar account would mean that
2  payments would not get block in the US, because of the
3  OFAC designation.
4      Q.  Thank you.
5      A.  Which is very factual.
6      Q.  That is all I am asking.  He then writes:
7      "I believe Interpal is aware of the sensitivity of
8  their position and will be keen to ensure it does not breach
9  Bank of England sanctions."
10     Do you see that?
11     A.  Yes.
12     Q.  Did you have an understanding of what
13 Mr. Cole meant by the sensitivity of Interpal's
14 position?
15     A.  All I could do is speculate.
16     Q.  I don't want you to speculate, I just want
17 to know if when you got this you had an understanding of
18 what Mr. Cole meant.
19     A.  I don't know.
20     Q.  Okay.  Would you have discussed with
21 Mr. Cole whether or not you agreed with his
22 recommendation that the sterling and euro accounts be
23 permitted to continue operating?
24     A.  I don't recall.
25     Q.  You don't recall having that discussion?

HIGHLY CONFIDENTIAL                          Page 147

1      A.  No.
2      Q.  You might have, might not have or you
3  think you didn't?
4      MR. LUFT: Objection.
5      A.  I don't recall that.  The position of the
6  US dollar account would have been discussed between us
7  but whether all this predated or post dated this e-mail,
8  I don't recall.
9      Q.  The first e-mail in this exhibit, Rodger
10 14, is from Rob Davies, and it is to Mr. Foster and Mr.
11 Norrie.  You are not copied on that.  Do you see that?
12     A.  Yes.
13     Q.  Do you know who Mr. Davies is?
14     A.  Must be someone in Stephen Foster's team.
15     Q.  Was he someone who would from time to time
16 send you consolidated lists of sanctioned entities?
17     A.  I think he was one of the people that used
18 to do that, yes.
19     Q.  He writes:
20     "Another issue for us to consider with Interpal
21 could be payment filtering.  It may look a little
22 inconsistent going forward if we have to block US dollar
23 payments going to Interpal (i.e Interpal is OFAC listed) but
24 are happy to maintain a relationship with them as
25 a customer".

HIGHLY CONFIDENTIAL                          Page 148

1      Was that sentiment that Mr. Davies expresses there
2  ever expressed to you?
3      A.  The first thing I would say about Rob is
4  Rob was a junior person, so some of his commentary
5  doesn't really resonate, in the sense that I would
6  wonder to what extent he actually understood it, the
7  issue at hand.
8      Q.  What makes you say that?
9      A.  The fact he is referring to having to
10 block US dollar payments going to Interpal, when the
11 decision either was made at this time or was --
12 recommendation had been made to close the US dollar
13 account, so it was not really a relevant topic to raise.
14     Q.  Did anyone from Group Risk Management
15 raise with you at the time the concern that it would
16 look a little inconsistent for the bank to maintain
17 a relationship with Interpal while it had to block US
18 dollar payments going to Interpal?
19     A.  Not to my recollection.
20     Q.  Mr. Rodger, I asked you do you know who
21 Mr. Davies is, and you said he must be someone in
22 Stephen Foster's team.  Then after the next question you
23 stated: "The first thing I would say about Rob is Rob
24 was a junior person."  Do you know who Rob Davies is or
25 are you guessing?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                          Page 149

1    A. Rob Davies was a junior person.  I think
2 he was -- if I remember rightly, he was a Kiwi temp
3 working in London.
4    Q. "Kiwi" meaning a New Zealand resident?
5    A. Yes.
6    Q. You can put that exhibit away.  I am
7 handing the court reporter a document I will be asking
8 be marked Rodger Exhibit 15.
9    (Exhibit Rodger 15 marked for identification)
10    For the record, this is Bates stamped
11 NW18476 through 18483.  Have you had a chance to read that?
12    A. I have had a look through.
13    Q. Are you still reading it?
14    A. No.  I think it is same as previous.
15    Q. A lot of the e-mails you saw in the
16 previous e-mail chain.  This first e-mail on page
17 NW18476 is the one from Mr. Cole that we just finished
18 reviewing, correct?
19    A. Yes.
20    Q. And this document, unlike the Rodger
21 Exhibit 14, contains the analysis that Mr. Cole attached
22 to his e-mail, correct?
23    MR. LUFT: Objection, mischaracterizes the
24 document.
25    Q. Sorry, this contains the summary of

HIGHLY CONFIDENTIAL                          Page 150

1 Mr. Cole's review of Interpal foreign payments in the
2 last six months, true?
3    A. It contains what?
4    Q. Do you see the first page of Rodger
5 Exhibit 15, the third paragraph, I am sorry, the front
6 page, do you see the third paragraph?
7    A. "I attach..."
8    Q. Mr. Cole writes:
9    "I attach a summary of my review of Interpal
10 foreign payments in the last six months."
11    If you go to the last 3 pages or NW18480 to
12 NW18483, is that the summary of Interpal foreign payments
13 that Mr. Cole -- sorry, the summary of his review of
14 Interpal foreign payments that Mr. Cole attached to his
15 e-mail?
16    A. Um hum.  Okay.
17    Q. Do you recall in May 2004 or about that
18 time getting Mr. Cole's summary of the review that he --
19 do you recall in about May 2004 getting Mr. Cole's
20 summary of his 6-month review of outgoing payments from
21 Interpal?
22    A. I don't recall.
23    Q. You don't recall getting that from
24 Mr. Cole?
25    A. I don't recall.  The way it would have

HIGHLY CONFIDENTIAL                          Page 151

1 been communicated with me is I have a meeting with Guy
2 and he would tell me what was in these reports.
3    Q. Do you see that you are listed as
4 a recipient?
5    A. Yes, I may well be, but the way that he
6 would have communicated with me would be Guy would
7 discuss it with me.
8    Q. Okay, would you have --
9    A. There was nothing for him to hide.  I am
10 not trying to evade responsibility, just that is the way
11 that I operate.
12    Q. You don't have any reason to believe that
13 you did not get this?
14    A. I have no reason to believe I didn't get
15 it, no.
16    Q. The attachment.  Would you have read it at
17 the time that it was sent to you by Mr. Cole?
18    A. Guy would have discussed it with me.  As
19 I said, Guy would have walked me through it.
20    Q. So he would have sat down with you and the
21 document and walked you through it?
22    A. Whether he sat down and went through
23 a document, he might have described what the document
24 contains.
25    Q. Do you recall having a meeting with

HIGHLY CONFIDENTIAL                          Page 152

1 Mr. Cole where he described his review --
2    A. I don't recall.
3    MR. LUFT: Let him finish his question.
4    A. I am sorry.
5    Q. You don't recall having a meeting with
6 Mr. Cole in which you discussed his review?
7    A. No.
8    Q. But you believe that it happened?
9    A. The way I work is it is likely that
10 I would have had a meeting or discussion with him about
11 it.
12    Q. And is it likely that if you got this
13 e-mail from Mr. Cole, with this review of the six months
14 outgoing payments from Interpal attached to it, that you
15 would have looked at the actual document?
16    A. I don't really recall.
17    Q. You don't recall whether or not you did
18 it?
19    A. I don't recall whether I looked at the
20 document or not.  It is not automatically certain
21 I would have.
22    Q. Was it your practice to read documents
23 that were sent to you that you considered to be
24 important?
25    A. Yes, but you must remember that I get 200

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                        Page 153

1  e-mails a day, a lot of them with documents attached.
2  You have to try and manage that, manage the volume in
3  some way.  The way I dealt with this case was Guy would
4  tell me the material matters to be of concern, and if
5  material matters of concern were raised to me, at that
6  point I would have looked at this document.
7        Q.  We have already established that Interpal
8  was the only CBFM customer that was listed by OFAC as
9  a specially designated global terrorist.  True?
10       A.  Yes.
11       Q.  Would you have been likely to read an
12  e-mail from Mr. Cole and an attached review that related
13  to a customer of CBFM that was listed as a terrorist by
14  OFAC?
15       MR. LUFT: Objection, foundation, calls for
16  speculation.
17       A.  I can't recall.
18       Q.  You cannot recall if you did read it?
19       A.  I can't recall whether I did read it.
20       Q.  But can you tell me whether it was your
21  practice to read -- withdrawn.  Can you tell me whether
22  it was likely that you read such a document?
23       MR. LUFT: Objection, foundation.
24       A.  I really do not know whether I would have
25  looked at it or not, even though this was with the OFAC

HIGHLY CONFIDENTIAL                                        Page 154

1  designation.
2        Q.  Can you turn to the first page of the
3  analysis, 18480.  On that page there is a list from "A"
4  to "S" that lists a number of different organizations.
5  Do you see that?
6        A.  Yes.
7        Q.  Did you have an understanding in May 2004,
8  either from the document itself or from what Mr. Cole
9  may have told you in a meeting, as to what this list
10  represented?
11       MR. LUFT: Objection, mischaracterizes the
12  document, compound.
13       A.  The question, sorry?
14       Q.  Whether you had an understanding
15  in May 2004 what this list represented?
16       A.  As Guy says, it seems to be the recipients
17  of Interpal funds.
18       Q.  Can you turn the page to NW18481.
19  Actually, it starts at the bottom of 18480.  You
20  testified earlier that you were familiar with the
21  Worldcheck database.  Is that right?
22       A.  Yes.
23       Q.  The portion below the line on page 18480
24  and then stretching to all of 18481, do you recognize
25  that format to be one that you would find in Worldcheck,

HIGHLY CONFIDENTIAL                                        Page 155

1  if you look up a particular organization on that
2  database?
3        A.  It is in line with what I would expect.
4        Q.  And did you understand Mr. Cole to have
5  cut and pasted from the Internet searches that he
6  performed on the recipients of Interpal payments?
7        A.  It appears to be that is what he did.
8        Q.  Can you go to page 18481, please.
9        A.  Okay.
10       Q.  The bottom of that page says:
11       "The following information was reported in one or
12  more of the sources below".  Do you see that?
13       A.  Yes.
14       Q.  And if you turn -- sorry to keep making
15  you flip around -- if you turn back to 18480, this
16  appears to be an entry from Worldcheck for the World
17  Assembly of Muslim Youth?
18       A.  Okay.
19       Q.  WAMY, do you see that?
20       A.  Yes.
21       Q.  And then if you turn back to page 18481,
22  it says:
23       "Reportedly founded in 1972 in Riyadh, has funded
24  organizations the Federal Government and UN have
25  acknowledged aid and abet terrorism.  They include the

HIGHLY CONFIDENTIAL                                        Page 156

1  International Islamic Relief Organization, al-Haramain and
2  the Muslim World League has been connected with the funding
3  of al Qaeda, Hamas and Islamic Jihad.  It has also been
4  directly linked with the 1993 World Trade Center bombings,
5  headed by Mohammed Khalifa, Osama bin Laden's
6  brother-in-law."
7        Do you see that?
8        A.  Yes.
9        Q.  Is that something that Mr. Cole either
10  told you orally or conveyed to you through this document
11  in or about May 2004?
12       A.  I don't recall to be honest.
13       Q.  If Mr. Cole had informed you that
14  Worldcheck contained allegations that one of Interpal's
15  beneficiary organizations was alleged to have been
16  connected with al Qaeda, Hamas and Islamic Jihad, is
17  that something that you would remember being told?
18       MR. LUFT: Objection, calls for speculation.
19       A.  Worldcheck is not necessarily the most --
20  "reputable" is not the right word.  I can't think of the
21  word.  A lot of the information contained in Worldcheck
22  is of questionable accuracy.
23       Q.  If Mr. Cole had informed you, either in
24  writing or orally, that one of the organizations that
25  Interpal had sent money to in the last six months was

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                                      Page 161

1    I was paying attention to it.
2        Q. Thank you.  Can you turn back to
3    Exhibit 15 now, please.
4        A. Okay.
5        Q. The back page of Exhibit 15, NW18483,
6    under (a), under "Al-Islah Charitable Society", it says:
7        "The association, outlawed in 2002, is known for
8    its direct affiliation with Hamas."
9        Do you see that?
10       A. Yes.
11       Q. In other words -- do you know now, having
12   had a chance to read this entry, do you recall reading
13   it earlier, in May or June 2004?
14       A. I don't actually, no.
15       Q. Is it fair to say, sitting here today,
16   that this says: "The association is known for direct
17   affiliation" means that affiliation with Hamas is not
18   a secret?
19       MR. LUFT: Objection, calls for speculation,
20   vague and ambiguous.
21       A. This material has been lifted from this
22   website "www.intelligence.org.il".  Is that correct?
23       Q. I can't answer questions but that
24   understanding that you previously indicated --
25       A. It depends on how -- it says: "Known to

HIGHLY CONFIDENTIAL                                                      Page 162

1    have contacts with Hamas activities abroad."  Now, I
2    think if it was known to have these Hamas contacts then
3    presumably it would have been on the Bank of
4    England/European Union list.
5        Q. So if an organization was not listed by
6    the Bank of England, that would cause you to discount
7    other information that you received about that
8    organization being involved in terrorism.  Is that fair
9    to say?
10       MR. LUFT: Objection, misstates his prior
11   testimony.
12       A. The implication of what you were saying is
13   because this website says "is known to have" these
14   connections with Hamas, then you are saying -- you are
15   treating that as read that that was the case.  What I am
16   saying is that is not necessarily the case.  Just
17   because it is in the website does not necessarily mean
18   that, and the actual treatment of that charity by the
19   Bank of England is material, because they will have had
20   the resources to investigate and establish the veracity
21   or otherwise of the comments here.
22       Q. Do you understand the reference to
23   "outlawed in 2002" being to an Israeli decision to
24   outlaw that organization?
25       MR. LUFT: Objection.  Are you asking him if

HIGHLY CONFIDENTIAL                                                      Page 163

1    he recalls this or as he is reading it here?
2        MR. GOELMAN : He has already indicated he
3    does not recall reading it.
4        MR. LUFT: You are just asking him to
5    interpret it as he sits here?
6        MR. GOELMAN: I am asking if he understands
7    the reference to "outlawed in 2002", in the context of
8    this excerpt from a website, to refer to being outlawed
9    by the Government of Israel.
10       MR. LUFT: Okay.  Objection, lack of
11   foundation, calls for speculation.
12       A. Certainly, it looks like "outlawed" means
13   outlawed by Israel in 2002.
14       Q. Did you understand in 2004 that the
15   Israeli Government would outlaw organizations that it
16   thought -- that it concluded supported terrorism?
17       A. In 2004, and even today I don't know for
18   sure, but clearly one would have thought so.
19       Q. Did you in 2004 understand that the
20   Israeli Government maintained a publicly available list
21   in English of the organizations that it had concluded
22   funded terrorism?
23       A. I imagine that such a list does exist.
24       Q. Did you ever consult such a list?
25       A. We are talking about a UK bank, so the

HIGHLY CONFIDENTIAL                                                      Page 164

1    only list which is material or relevant or salient for
2    a UK bank is the UK list, and you could also say the
3    OFAC list does have -- because we have operations in the
4    US, then OFAC will be looked at and considered.  The
5    OFAC, the Australians will be, French, Germans, all the
6    other locations where RBS has a connection, but RBS has
7    got no connection or presence in Israel, therefore RBS
8    will not have any regard to an Israeli list.  It is
9    irrelevant.  So really we are dependent on what the Bank
10   of England or HMT, as it is today says.
11       Q. So let me -- I want to make sure I
12   understand your testimony.  Because RBS did not have any
13   operations in Israel, Israeli Government lists were
14   irrelevant, not salient and immaterial?
15       MR. LUFT: Objection, mischaracterizes the
16   testimony.  The testimony is what it is on the record.
17       A. There is no reason why RBS would have
18   regard to the US list -- not the US list, sorry,
19   apologies, that was a massive flaw.  No regard to the
20   Israeli list.
21       Q. You understood in 2004, did you not, that
22   the country most affected by Hamas attacks was Israel?
23       A. That is a statement of fact.
24       Q. And a statement of fact that you
25   understood in 2004?

HIGHLY CONFIDENTIAL                                    Page 165

1       A.  Yes.
2       Q.  So wouldn't it have been relevant to see
3   which organizations the Government of Israel had
4   concluded were affiliated with Hamas?
5       MR. LUFT: Objection, form.
6       Q.  In deciding whether or not your customer
7   Interpal's beneficiaries were Hamas front organizations?
8       MR. LUFT: Objection, foundation, calls for
9   speculation.
10      A.  I would go back to what I originally said.
11  It is a UK bank, therefore has regard to the UK list.
12      Q.  But wouldn't --
13      A.  Any bank that operates in the City of
14  London needs to give -- it cannot really be reasonably
15  expected to have regard to every single country's
16  terrorism list.  That would be completely unreasonable
17  to have such a stance.  Now, so the stance that RBS
18  takes, quite rightly, is it has regard to the list as on
19  the Bank of England, HMT.
20      Q.  If you wanted to know whether a particular
21  group was affiliated with ETA, the Basque terrorist,
22  wouldn't a natural place to look be what the Government
23  of Spain was saying about an organization?
24      MR. LUFT: Objection, foundation, calls for
25  speculation, incomplete hypothetical.

HIGHLY CONFIDENTIAL                                    Page 166

1       A.  It is hypothetical, in sense I have never
2   had the urge to ever find out organizations attached to
3   ETA.
4       Q.  I understand it is hypothetical but, will
5   you answer my question, please?
6       MR. LUFT: Objection, calls for speculation.
7       A.  If I was wanting to know more about ETA,
8   the Spanish Government would have obligations which
9   would be of interest.  I would also want to review other
10  publications.  There must be other UK dossiers on ETA
11  out there.  No doubt you would look at that as well; you
12  would not just take one thing by itself.
13      Q.  In 2004, wouldn't you have expected the
14  Government of Israel to have more information about
15  which organizations were fronts for Hamas than other
16  governments?
17      MR. LUFT: Objection, foundation, calls for
18  speculation.  Your own personal knowledge.
19      A.  If the Israeli Government had such
20  information -- I am sure it does -- it doesn't appear to
21  have been taken on board by other countries, the UK, the
22  European Union.
23      Q.  But wouldn't you in 2004 expect the
24  Government of Israel to have better information about
25  Hamas front groups than other governments, regardless of

HIGHLY CONFIDENTIAL                                    Page 167

1   whether certain other governments did or did not take
2   that on board?
3       MR. LUFT: Objection, foundation, calls for
4   speculation, calls for testimony beyond the witness'
5   personal knowledge.
6       A.  The UK Government would have made its
7   judgments based on a variety of sources.  I don't know
8   how the UK Government makes its judgments.  It is not my
9   role to do that.  I have no doubt, I am sure there are
10  fairly close intelligence contacts between the UK and
11  Israel, and I would have thought, if there was
12  information, that likely that information would have
13  been communicated to the UK Government and the rest of
14  the European Union as well, for that matter.
15      Q.  Can you turn back to the Al-Islah entry in
16  Rodger 15, please.
17      A.  Which page?
18      Q.  18483, the last page of the exhibit.
19      A.  Okay.
20      Q.  We are still under (a), the middle of
21  paragraph (a), starting with the word "Funds".  It says:
22      "Funds from various associations abroad have been
23  transferred to its account.  A significant share of those
24  funds originate from foundations outlawed both in Israel and
25  abroad, such as the Charity Coalition, (l'tilaf al-Khayr),

HIGHLY CONFIDENTIAL                                    Page 168

1   the Al-Aqsa Foundation and the London based Interpal
2   organization."
3       Do you see that?
4       A.  Yes.
5       Q.  In 2004, when you received this from
6   Mr. Cole, you were aware of Interpal, correct?
7       A.  Yes.
8       Q.  And it was accurate that Interpal was
9   a London based organization, true?
10      A.  Yes.
11      Q.  And you were already aware of the Al-Aqsa
12  Foundation, true.
13      A.  Al-Aqsa has name recognition but no more.
14      Q.  Do you recall reviewing the May 2003
15  documents reflecting Al-Aqsa's listing by the Bank of
16  England?
17      MR. LUFT: Objection, foundation, misleading.
18      A.  If prompted, without having looked at this
19  documentation, I would say no, but now that you look at
20  the documentation then Al-Aqsa is -- the greater memory
21  recognition takes place, but nothing is inherent in me
22  to know anything about Al-Aqsa.  I know nothing about it
23  at all.
24      Q.  But you did know in 2004 when you got this
25  e-mail that Interpal was based in London, correct?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                          Page 185

1    Q.  Who is APD?
2    A.  Alan Dickinson.  He was the Head of the
3  Corporate Bank.
4    Q.  He was the CEO?
5    A.  Senior executive.
6    Q.  He was CEO of CBFM?
7    A.  Yes, I think he was the deputy head of
8  CBFM.
9    Q.  Did Mr. Dickinson know of and approve the
10  continued links with Interpal, if you know?
11    MR. LUFT: Objection.
12    A.  I don't know, but presumably.
13    Q.  Your e-mail to Mr. Love, copying Mr. Cole,
14  which is the first e-mail in the exhibit on the first
15  page of Rodger 17.  Do you see that?
16    A.  Yes.
17    Q.  You write:
18    "Kevin, in answer to Amanda's questions, the
19  rationale for not exiting is that UK law enforcement does
20  not have any concerns with Interpal.  The Charities
21  Commission, which undertook a thorough review after Interpal
22  was listed with OFAC could find nothing wrong either and the
23  Bank of England has chosen not to follow the US lead".
24    Do you see that?
25    A.  Um hum.

---

HIGHLY CONFIDENTIAL                          Page 186

1    Q.  Did you write that?
2    A.  Yes.
3    Q.  What was the base for your statement that
4  "UK law enforcement does not have any concerns with
5  Interpal"?
6    A.  The very fact it was not listed by Bank of
7  England.  If the law enforcement did have concerns it
8  would be -- well, the UK Government would presumably be
9  trying to persuade the European Union to list Interpal.
10    Q.  Did you have any contacts with UK law
11  enforcement?
12    A.  No.
13    Q.  Did you ever look at any Goalkeeper
14  reports about Interpal that the bank had?
15    A.  I can't recall.
16    Q.  Is it true that Group
17  Investigations & Fraud would have had any communications
18  with British law enforcement about Interpal that the
19  bank had?
20    MR. LUFT: Objection, calls for speculation.
21    A.  I really don't know.
22    Q.  Do you know that Group
23  Investigations & Fraud are the ones who would have filed
24  any disclosures about Interpal with British law
25  enforcement?

---

HIGHLY CONFIDENTIAL                          Page 187

1    A.  Yes.
2    Q.  Do you know from your experience of the
3  bank that from time to time Group Investigations & Fraud
4  would get calls from law enforcement about disclosures
5  that they filed?
6    A.  I presume so.
7    Q.  Including calls from the National
8  Terrorism Financing Investigation Unit?  Are you
9  familiar with that body?
10    A.  Yes, I can imagine what it does.
11    Q.  Are you familiar with NCIS?
12    A.  Yes.  NCIS is no more, it is SOCA now, but
13  at the time NCIS was the body that you would make your
14  suspicions to.
15    Q.  Did you at any point contact Group
16  Investigations & Fraud and ask them whether UK law
17  enforcement had any concerns with Interpal?
18    A.  Personally, not.
19    Q.  Did you direct anybody to do that?
20    A.  Guy may have, but I don't know.
21    Q.  Do you recall telling Guy to do that?
22    A.  No.
23    Q.  How can you then state that "UK law
24  enforcement doesn't have any concerns with Interpal"?
25    MR. LUFT: Objection, argumentative.

---

HIGHLY CONFIDENTIAL                          Page 188

1    A.  What I was meaning by that was saying
2  because it didn't percolate through to the Bank of
3  England designation, or lack of Bank of England
4  designation implied that there were no concerns.
5    Q.  But you write that as well.  You write
6  "and the Bank of England has chosen not to follow the US
7  lead".  True?
8    A.  Yes.
9    Q.  So besides the fact that Interpal was not
10  listed by the Bank of England you did not have any
11  information about what UK law enforcement thought about
12  Interpal.  Correct?
13    A.  That is correct.
14    Q.  Did you write:
15    "There is a suspicion that the US is being
16  over-zealous in the Middle East (witness ███████████
17  ███"?
18    A.  The reference to ████████████████
19  refers to my earlier comment on extra-territoriality, so
20  that is what I was meaning, but as of today I can't
21  recall what I meant by that back in December 2004.
22    Q.  In December 2004 did you believe that the
23  United States was being over-zealous in the Middle East?
24    MR. LUFT: Objection, foundation.
25    A.  Again, I refer back to my earlier

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                    Page 193

1    perspective towards Interpal and Palestinian charities.
2    True?
3         A. Yes. You have to remember who I am
4    addressing this to. I am addressing it to Kevin Love,
5    who is by no stretch of the imagination a subject matter
6    expert, so you need to communicate it in such a way that
7    he would better understand.
8         Q. Mr. Love is relying on you to give him an
9    analysis of whether or not there were real grounds to
10   worry about Interpal supporting terrorism. Right?
11        MR. LUFT: Objection, misleading, calls for
12   speculation.
13        Q. Is that true?
14        MR. LUFT: Same objection.
15        A. This is my assessment of the Interpal
16   matter.
17        Q. You are not done yet?
18        A. This is my assessment of the Interpal
19   matter.
20        Q. Okay. But your assessment includes
21   telling Mr. Love that the Israeli perspective towards
22   Palestinian charities is essentially all these charities
23   perpetuate terrorism, correct?
24        MR. LUFT: Objection, misleading and
25   mischaracterizes the document, calls for speculation.

HIGHLY CONFIDENTIAL                                    Page 194

1         A. If you read what I said, I say: "The
2    perspective taken by Israel". I didn't say that they
3    were all doing that. I am saying it was a perspective
4    taken by Israel.
5         Q. What I am trying to find out is where you
6    got the idea that that was the perspective taken by
7    Israel?
8         MR. LUFT: Asked and answered.
9         A. I can't recall exactly where I got that
10   sentiment from, but I acknowledge that I did make that
11   statement.
12        Q. Do you believe that that statement is
13   true?
14        MR. LUFT: Objection, foundation, and the
15   witness' personal knowledge.
16        A. My personal knowledge, I really am not
17   close enough to the Israeli/Arab dispute to make proper
18   assessments. I can speak at length on things which are
19   Soviet Union and the Cold War and things like that, but
20   the Arab/Israeli dispute is not one of them.
21        Q. The last line of this first page says:
22        "There is of course a danger of adverse media
23   comment if we were to close a legitimate charitable
24   account."
25        Do you see that?

HIGHLY CONFIDENTIAL                                    Page 195

1         A. Yes.
2         Q. And danger of adverse media comment is in
3    bold, true?
4         A. Yes.
5         Q. Did you regard the danger of adverse media
6    comment if the Interpal accounts were to be closed to be
7    a particularly important point to convey to Mr. Love?
8         A. I think I would draw your attention to the
9    clause "a legitimate charitable account", and I should
10   have put "legitimate" in bold, if the truth be known.
11   "Adverse", the comment was in bold. "Legitimate
12   charitable account" should be in bold as well,
13   criticising my own e-mail.
14        Q. But at the time you wrote this e-mail did
15   you think that the danger of adverse media comment was
16   of particular importance that you wanted to flag it for
17   Mr. Love?
18        MR. LUFT: Objection, calls for speculation,
19   foundation.
20        A. As we discussed earlier today, if Interpal
21   was found to be funding terrorism there would be total
22   grounds to exit. If it was not then it wouldn't, and we
23   debated that earlier.
24        Q. I am giving the court reporter a document
25   that I ask be marked Rodger Exhibit 19, please.

HIGHLY CONFIDENTIAL                                    Page 196

1         (Exhibit Rodger 19 marked for identification).
2         Mr. Rodger, I am going to be asking you in
3    particular questions about the last half of page 2 and the
4    first portion of page 3, which I believe you wrote?
5         A. Okay.
6         Q. First of all, did you write that portion
7    of this exhibit that begins with "Kevin" and ends with
8    "Regards", on the third page?
9         A. It is -- some of the wording seems close
10   to that wording in document 18, so it does.
11        MR. LUFT: Just if you recall.
12        A. Pardon?
13        Q. I am asking if you can identify that as
14   something that you wrote.
15        A. There are some similarities in the wording
16   of some of it but not all of it.
17        Q. If you turn back to Rodger Exhibit 18,
18   Mr. Love, the top of that is an e-mail from Mr. Love to
19   you, which reads:
20        "Irvine, thanks for this. Just for clarity, can
21   you make your last sentence clear, please? I think you are
22   saying that you agree with the branch that this account
23   should not be exited. Also, can you give me a paragraph
24   maybe from their website which spells out exactly what
25   Interpal do, in their own words. Thanks and regards, Kevin

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                                    Page 197

1    Love."
2         Do you see that?
3    A.  Yes.
4    Q.  So after receiving this note from Mr. Love
5    did you go to the Interpal website and cut and paste
6    a portion of Interpal's description of itself?
7    A.  It implies that I did.
8    Q.  And on page 3 of Rodger Exhibit 19, those
9    bullet points, is that something that you got from
10   Interpal's website?
11   A.  It may well be.  I can't recall, to be
12   honest, but it may well be that is where it came from.
13   Q.  If you look on page 2 of this document:
14   "The RM is Belinda Lane from Romford Commercial", and it
15   has a phone number.  Do you see that?
16   A.  Yes.
17   Q.  Did you speak to Ms Lane after you got
18   Kevin Love's e-mail of December 13, 2004?
19   A.  This e-mail implies that I did.
20   Q.  And do you recall speaking to Ms Lane at
21   some point during the consideration of whether to keep
22   the Interpal account open?
23   A.  All I can do is refer to the e-mail.  That
24   is what it says in the e-mail, is what actually I
25   recall.  I don't recall anything over and beyond what is

HIGHLY CONFIDENTIAL                                    Page 198

1    in the e-mail.
2    Q.  This e-mail goes on to say:
3         "She is not concerned about the account holders.
4    She reiterated that the account has been investigated many
5    times without anything untoward coming to light.  However,
6    one irritation is developing increasing difficulties in
7    making payments to Palestine, because local banks there will
8    not accept them, due to OFAC."
9         Do you see that?
10   A.  Yes.
11   Q.  Do you recall learning from Ms Lane that
12   Interpal was having difficulty getting payments through
13   to its payees in Palestine because of the OFAC listing?
14   A.  That is what I seem to have reported, that
15   is what Belinda Lane told me.
16   Q.  After that it says:
17        "Consequently, though the account is quite a big
18   income earner for her, 50,000 pounds, it is becoming higher
19   maintenance."
20        You have talked earlier about the customer base in
21   CBFM being relatively large accounts, correct?
22   A.  Um hum.
23   Q.  You have to say yes, sir?
24   A.  Yes, sorry.
25   Q.  And is it fair to say that even amongst

HIGHLY CONFIDENTIAL                                    Page 199

1    the clientele of CBFM an account that resulted in 50,000
2    pounds of profit per year was above average in
3    profitability for your division of the bank?
4         MR. LUFT:  Objection, foundation and beyond
5    the scope of his knowledge.
6    A.  I wouldn't have thought that 50,000 was
7    a massive amount.
8    Q.  You would not have?
9    A.  In relation to the Corporate Banking CBFM.
10   Q.  Do you know what the average --
11   A.  I have no idea.
12   Q.  No idea --
13        MR. LUFT:  Just let him finish his question.
14   A.  Sorry.
15   Q.  "Taking everything into account, Belinda
16   would accept the loss of this customer, even though it
17   had done nothing wrong, provided her target can be
18   adjusted accordingly.  She did point out that the
19   charity would find it difficult to rebank due to OFAC
20   and the background to RBS kicking it out.  There is
21   consequently a danger of adverse media comment if we
22   were to close a legitimate charitable account."
23        Do you see that?
24   A.  Yes.
25   Q.  And again there the danger of adverse

HIGHLY CONFIDENTIAL                                    Page 200

1    media comment is highlighted?
2    A.  Yes.
3    Q.  Did it strike you as -- withdrawn.  Was it
4    your understanding that banks in Arab jurisdictions were
5    rejecting Interpal's attempted transfers because of
6    Interpal's presence on the OFAC list?
7         MR. LUFT:  Objection, foundation.
8    A.  I can only say that is what this e-mail
9    appears to be saying.
10   Q.  Would it strike you as odd that a British
11   bank would take less account of an OFAC listing of
12   a Palestinian charity than banks in Arab countries
13   would?
14        MR. LUFT:  Objection, lack of foundation,
15   calls for speculation.
16   A.  I really don't know what the motivations
17   of the local Arab banks were.
18   Q.  Can you turn to the first page of this
19   document, which reflects an e-mail from you to Mr. Cole
20   on December 13, 2004.  Do you see that?
21   A.  Um hum.
22   Q.  And you write: "Guy, please see the
23   latest."
24   A.  Um hum.
25   Q.  Sorry, you have to answer verbally.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -  Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                                           Page 201

    1        A.  Yes, sorry.
    2        Q.  Did you talk to Mr. Cole after forwarding
    3   him this e-mail chain?
    4        A.  I can't recall but I suspect not.
    5        Q.  Why do you suspect not?
    6        A.  It looks like a "for your information"
    7   type e-mail rather than anything else, rather than
    8   asking him to do anything about it.
    9        Q.  We have five minutes left on the tape
   10   before we go off the record, I think we have a little
   11   bit more than an hour left of questioning and I want to
   12   know if you feel up to that.
   13        A.  I could, I will just soldier on I suppose.
   14        Q.  I want to make sure that you feel up to
   15   it.  You feel capable of answering questions?
   16        A.  I feel capable of answering questions.
   17        Q.  You do?
   18        A.  Yes.
   19        MR. GOELMAN : Okay.
   20        THE VIDEOGRAPHER: Going off the record at
   21   5:27 pm.
   22             (A short break)
   23        THE VIDEOGRAPHER: This is the beginning of
   24   tape four, volume one in the deposition of Mr. Irvine
   25   Rodger.  We are back on the record at 5:36 pm.

---

HIGHLY CONFIDENTIAL                                           Page 202

    1        MR. GOELMAN: I am handing the court reporter
    2   an exhibit that I am going to ask be marked as Rodger
    3   Exhibit 20.
    4        (Exhibit Rodger 20 marked for identification)
    5        Let me know when you have had a chance to
    6   review the e-mails that you are copied on or you sent.
    7        A.  Okay.
    8        Q.  Mr. Rodger, do you recall in December 2004
    9   an article came to the bank's attention regarding
   10   Interpal and mentioning Interpal's banking with NatWest?
   11        A.  I don't recall it.
   12        Q.  You don't recall that episode, sitting
   13   here today?
   14        A.  I don't recall the article, no.
   15        Q.  Do you recall an article?
   16        A.  There have been media articles which I do
   17   recall, but that specific one I can't say I do.
   18        Q.  There have been media articles about
   19   Interpal that you recall?
   20        A.  There have been over the years, there have
   21   been, or certainly, talking about five or six years ago,
   22   there was an occasional press article about Interpal and
   23   NatWest, and I don't know if this was another one.
   24   Perhaps it was.
   25        Q.  Sitting here today, what do you recall the

---

HIGHLY CONFIDENTIAL                                           Page 203

    1   articles that you do remember saying about Interpal and
    2   NatWest?
    3        A.  It was basically, as far as I know, there
    4   were none that were really sensationalist.  I think they
    5   were generally just factual in nature, saying Interpal
    6   banked by NatWest and is on the OFAC SDN list, specially
    7   designated terrorist list.
    8        Q.  Did those articles make mention of the
    9   allegations that Interpal funded Hamas?
   10        A.  If it was decided it was on the OFAC list
   11   because it was funding Hamas, I am pretty sure it would
   12   have said that.
   13        Q.  Can you turn to Bates stamp 66809, please.
   14        A.  Yes.
   15        Q.  There is an e-mail in the middle of that
   16   page from a man named Derek Weir to several people,
   17   including yourself.  Do you see that?
   18        A.  Yes.
   19        Q.  Do you know who Mr. Weir is?
   20        A.  Derek Weir was the head of the Scotland
   21   Commercial business.  It is all Corporate business in
   22   Scotland but reported into Derek Weir, though why the
   23   hell he was involved in this, God only knows.
   24        Q.  But apparently he was involved with it?
   25        A.  Seems to have been.

---

HIGHLY CONFIDENTIAL                                           Page 204

    1        Q.  The last paragraph that he writes here is:
    2        "I don't think we can close the account unless we
    3   have some proof of the accusations."
    4        Do you see that?
    5        A.  Yes.
    6        Q.  "Closing the account would imply we
    7   believed they were funding terrorists, which would not
    8   be a good place to be".
    9        Do you have an understanding as to what kind of
   10   proof of the accusations Mr. Weir was looking for?
   11        MR. LUFT: Objection, foundation.
   12        A.  Presumably that would be payments going to
   13   Hamas linked organizations.
   14        Q.  And in terms of proof that the payments --
   15   that the beneficiaries were actually a Hamas linked
   16   organization, do you know what kind of proof would have
   17   satisfied Mr. Weir?
   18        A.  The analysis that Guy did would have
   19   indicated if any such payments were being made.
   20   Presumably that would have satisfied Mr. Weir.
   21        Q.  If Mr. Cole had concluded that the
   22   beneficiary organizations really were linked with Hamas?
   23        A.  I honestly cannot say what would have
   24   satisfied Mr. Weir, but what I could say is that Guy
   25   could tell him what he discovered.

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -   Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                              Page 217

1   England, EU and OFAC (US), although none of the below
2   organizations are subject to sanctions themselves".
3       So is it fair to say that Mr. Cole told you
4   that seven of the beneficiaries of Interpal's payments
5   in the last six months were listed as Hamas
6   organizations in a legal document filed by the United
7   States Department of Justice?
8       A.  I am sorry, I can't recall exactly what he
9   told me.  It would have been in line with this e-mail.
10      Q.  Is the inclusion of organizations in
11  an indictment by the United States Department of Justice
12  something that could be fairly easily verified using
13  that powerful Internet tool that you described before?
14      A.  I think probably what I would do with
15  these names is stick them into Complinet, you know, that
16  website that says exactly what the current state of play
17  is with regard to various sanctions in the world.  That
18  is the place I would start.
19      Q.  Did you do that in this case?
20      A.  I can't recall.  Guy kind of -- I think
21  Guy -- did he say that he had done that already?
22      Q.  Can you turn to the first page, please.
23  You write an e-mail to various people, including
24  Mr. Cole, on December 16, 2004, 1:06 pm.  True?
25      A.  Yes.

HIGHLY CONFIDENTIAL                              Page 218

1       Q.  You write:
2       "Dear all, Guy has completed his investigations
3   into the payments from Interpal.  He did a thorough job and
4   searched a number of databases, including Financial
5   Sanctions and  Terrorist Financing lists (UK and US),
6   Complicheck, Worldcheck and Google."
7       Do you see that?
8       A.  Yes.
9       Q.  "As you can see there were no direct
10  matches with any entities on Sanctions & Terrorist
11  lists.  He did however uncover some, mainly
12  unsubstantiated commentary on a number of recipients but
13  none of these are sanctioned names.  Please refer to
14  Guy's e-mail for detail."
15      Did you write that paragraph, Mr. Rodger?
16      A.  Yes.
17      Q.  Why did you characterize the commentary on
18  the recipients of Interpal's payments as "mainly
19  unsubstantiated"?
20      A.  I can't recall why I used
21  "unsubstantiated", bearing in mind the Department of
22  Justice indictment.
23      Q.  You would not consider a Department of
24  Justice indictment to be speculative, would you?
25      MR. LUFT: Objection.

HIGHLY CONFIDENTIAL                              Page 219

1       A.  No, what I said was I do not understand
2   why I used that word, bearing in mind the Department of
3   Justice.  I can't comment why I said that.  My last
4   paragraph kind of says what we were referring to
5   earlier, one strike and they are out, which means if
6   they have one payment to terrorists then they are
7   exited.
8       Q.  You are referring to: "I leave it to you
9   to decide the appropriate course of action but I would
10  recommend that we keep the account open and continue
11  performing similar thorough reviews of account
12  behaviour", and then you write: "One strike and they're
13  out."
14      A.  Yes.
15      Q.  What do you mean by "One strike and
16  they're out"?
17      A.  One instance of terrorists being financed
18  and that is it.
19      Q.  And what would qualify as a strike, in
20  terms of proof that terrorists were being financed?
21      A.  One single payment of 5p to a terrorist is
22  enough to say that is to exit the relationship.
23      Q.  And for to be a strike, how would you
24  determine whether or not the payee was indeed
25  a terrorist?

HIGHLY CONFIDENTIAL                              Page 220

1       A.  The analysis of the payee goes to someone
2   who is on the -- primarily the Bank of England list and
3   that would determine whether it was terrorist or not.
4   We are talking about 2004.  Standards are different now,
5   but in 2004 we would only have -- the prime regard would
6   be the Bank of England list.
7       Q.  And now standards are different in terms
8   of the attention paid to OFAC lists, is that what you
9   mean?
10      MR. LUFT: Objection, misleading,
11  mischaracterizes his testimony.
12      Q.  What do you mean when you say "standards
13  are different now"?
14      A.  New policies developed since then.
15      Q.  In what ways has it changed?
16      A.  The OFAC lists are given far greater
17  predominance within the group.
18      Q.  Than they were in 2004?
19      A.  Yes.
20      Q.  Can we mark this as Rodger 22, please.
21      (Exhibit Rodger 22 marked for identification)
22      For the record this is Bates stamped NW66795
23  through 66796.  Let me know when you have had a chance to
24  read through that, please.
25      A.  Thank you.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER - Vol. 1
July 22, 2010

HIGHLY CONFIDENTIAL                    Page 233

1    MR. LUFT: Objection, argumentative.
2    A.  It wouldn't be regarded as suspicious
3  because the payments were not in breach of sanctions,
4  the payments were not in breach of sanctions legislation
5  and at the time the payments were made we had no
6  suspicions.
7    Q.  What do you mean, "At the time the
8  payments were made we had no suspicions"?  Who had no
9  suspicions?
10   A.  The bank had no suspicions that there was
11  anything particularly amiss, remiss with that
12  organization.
13   Q.  I am going to hand the court reporter
14  another document and ask that this be marked as Rodger
15  Exhibit 24.
16   (Exhibit Rodger 24 marked for identification)
17   For the record, this is Bates stamp NW66777
18  through NW66779.  I want to draw your attention, Mr. Rodger,
19  because the time is getting late, to the last page of this
20  document, 66779, and the third paragraph there.
21   MR. LUFT: Take a second to read the document.
22   MR. GOELMAN: I am only going to be asking
23  questions about that paragraph on the back of
24  page 66779.  If you want to review the whole document
25  you can.  I will ask we go off the record then because

HIGHLY CONFIDENTIAL                    Page 234

1  we only have 18 minutes left.
2    MR. LUFT: I disagree with that.  He has been
3  prompt in answering your questions.
4    MR. GOELMAN: I am only going to ask about
5  that paragraph.
6    MR. LUFT: He needs to have a context.  It is
7  a one page document.
8    MR. GOELMAN: It is a 4-page document.
9    MR. LUFT: Then we are missing pages.  I don't
10  have 4 pages.
11   A.  I have got three.
12   MR. GOELMAN: It is a 3-page document, 66777
13  through 66779.
14   MR. LUFT: One is a cover e-mail transmittal
15  note.
16   A.  Okay.
17   Q.  Do you see the paragraph, page 66779, that
18  starts with "At a workshop..."?
19   A.  Okay.
20   Q.  Do you see that?
21   A.  Yes.
22   Q.  This is a memo written by Mr. Cole,
23  correct, on July 6, 2005?
24   A.  Yes.
25   Q.  And the subject is: "Semi-annual review of

HIGHLY CONFIDENTIAL                    Page 235

1  Interpal account activity."
2    A.  Yes.
3    Q.  Mr. Cole writes:
4    "At a workshop attended in June on 'Managing the
5  Risks of Funding Terror', Nick Ridley, the lead intelligence
6  analyst on the financing of terrorism at Europol advised
7  that a Government designation of an organization as a
8  financier of terrorism (as Interpal has been by OFAC) almost
9  certainly means that no financing of terrorism would take
10  place via the entity after the designation.  Therefore, the
11  result of OFAC's designation of Interpal as a supporter of
12  terrorism has actually reduced the risk of Interpal being
13  used to fund terrorism."
14   Do you see that?
15   A.  Yes.
16   Q.  Did you agree with Mr. Cole, in July 2005,
17  that OFAC's designation of Interpal as a supporter of
18  terrorism actually reduced the risks of Interpal being
19  used to fund terrorism?
20   MR. LUFT: Objection, lack of foundation.
21   A.  Guy was reporting back what he had been
22  told by this Nick Ridley person.  It was not something
23  that Guy invented.
24   Q.  I didn't say he invented it.
25   A.  These words did not come from Guy, they

HIGHLY CONFIDENTIAL                    Page 236

1  came from this Nick Ridley, the lead intelligence
2  analyst of financing of terrorism by Europol, so I can't
3  really say whether I agree or disagree with that.  That
4  is recording what he was told.
5    Q.  Did the presence of a NatWest customer on
6  the OFAC terrorism list give you comfort that that
7  customer was not actually supporting terrorism?
8    MR. LUFT: Objection, foundation and form.
9    A.  Can I just hear that sentence once more?
10   Q.  Actually, I will withdraw that question.
11  We will go on to something else.  In the middle of 2005,
12  at the time that you got this review from Mr. Cole, you
13  knew at that point that Interpal had sent money to
14  a number of groups that the American Department of
15  Justice claimed were affiliated with Hamas.  Correct?
16   MR. LUFT: Objection, misstates the prior
17  testimony.
18   A.  That is what the note says.
19   Q.  You knew that Interpal had sent money to
20  more than one group that the Bank of England later
21  banned for support of Hamas, true?
22   A.  That is what the note says.
23   Q.  You knew that Interpal had sent money to
24  Al-Mujamma, an organization that according to Mr. Cole's
25  research was founded by Hamas leader, Sheikh Yassin.

**TZVI WEISS, et al - NATAN APPLEBAUM, et al v**
**NATIONAL WESTMINSTER BANK, PLC.**

**IRVINE RODGER -  Vol. 1**
**July 22, 2010**

---

HIGHLY CONFIDENTIAL                    Page 237

1    True?
2         MR. LUFT: Objection, asked and answered.
3         A.  That is what the note says.
4         Q.  And you knew that the United States
5    Treasury had designated Interpal a specially designated
6    global terrorist two years earlier, correct?
7         MR. LUFT: Objection, asked and answered.
8         A.  Yes.
9         Q.  At that point did you believe that your
10   customer, Interpal, supported Hamas?
11        A.  No.
12        Q.  Why not?
13        MR. LUFT: Objection, argumentative.
14        A.  As I said, Guy did these payment reviews
15   and the payment reviews were clean, in the sense that
16   they were not made to terrorist organizations.
17        Q.  What kind of evidence would you have
18   needed to come to the conclusion that Interpal was
19   providing support to Hamas?
20        MR. LUFT: Objection, lack of foundation,
21   calls for speculation.
22        A.  Designations by Bank of England, European
23   Union and OFAC -- OFAC designations of these payees
24   would also be a matter for consideration.
25        Q.  Short of designation by the Bank of

---

HIGHLY CONFIDENTIAL                    Page 238

1    England, what kind of evidence would you have needed to
2    conclude that your customer, Interpal, was supporting
3    Hamas?
4         MR. LUFT: Objection, misstates his prior
5    testimony, and leaves out what he just said, and asked
6    and answered.
7         A.  As I have said, the key thing for me is
8    the Bank of England designation.
9         Q.  In your years --
10        A.  We have got a big organization to manage
11   so we have to deal with issues, and the compliance with
12   UK law is fairly persuasive.  It is not fairly
13   persuasive, it is persuasive, because there is
14   nothing -- there is a must, there is no argument about
15   compliance with UK law.
16        Q.  In your years at RBS, have there been
17   cases that you know of where the bank has asked
18   customers to rebank?
19        MR. LUFT: Objection, foundation.
20        A.  Interpal was certainly an example.
21   Whether there was any other ones I don't recall.
22        Q.  You cannot recall any other cases besides
23   Interpal that you know of that the bank exited
24   a relationship with a customer?
25        A.  For terrorist purposes?

---

HIGHLY CONFIDENTIAL                    Page 239

1         Q.  No, for any purposes?
2         A.  For any purposes there will have been
3    regularly.
4         Q.  Does that include cases where the bank has
5    exited a relationship even though the customer was not
6    listed on any Bank of England list?
7         MR. LUFT: Objection, argumentative.
8         A.  These customers who we asked to rebank or
9    the bank asked to rebank were not on any sanctions list,
10   US or UK.
11        Q.  Approximately how many customers, if you
12   can estimate, during your tenure at RBS were asked to
13   rebank?
14        MR. LUFT: For what reason?
15        Q.  For any reason?
16        MR. LUFT: Objection, foundation.
17        A.  I don't have that knowledge.
18        Q.  More than 50?
19        MR. LUFT: Objection, foundation.
20        A.  The answer to that, more than 50, yes.
21        Q.  What reasons can you think of that
22   customers in your experience have been asked to rebank?
23        MR. LUFT: Objection, foundation.
24        A.  A lot of these reasons are involvement in
25   fraud.

---

HIGHLY CONFIDENTIAL                    Page 240

1         Q.  Is it fair to say --
2         A.  Fraud against --
3         Q.  Sorry, go ahead.
4         A.  Fraud against the Government, fraud
5    against the bank, fraud against anyone really, to be
6    honest.  One of the biggest, one of the biggest frauds
7    was against the UK Government, Emtech frauds, and
8    billions of pounds were lost that way, and of course
9    anything like that we would exit, we would not tolerate
10   that.
11        Q.  Is it fair to say that you understood from
12   the time that you arrived at RBS that the bank had the
13   ability to exit any relationship with a customer that it
14   wanted to?
15        A.  The bank can always exit any relationship
16   with a customer if it wants to.
17        Q.  And the bank intentionally made the choice
18   not to exit the relationship with Interpal, correct?
19        A.  That is correct, until it did.
20        Q.  Until it did.  And that was after this
21   lawsuit was brought, is that right?
22        A.  Yes.
23        Q.  I ask that this be marked as Rodger
24   Exhibit 25.
25        (Exhibit Rodger 25 marked for identification)

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

IRVINE RODGER -   Vol. 1
July 22, 2010

---

HIGHLY CONFIDENTIAL                    Page 245

1      Q.  66766.
2      A.  All right.  Yes, 66766 okay.
3      Q.  You write:
4          "Phil, not sure if you are the right person but is
5   this account Retail's?  I ask because we have mounted an
6   investigation into another Palestinian charity, Interpal,
7   which is subject to OFAC sanctions (though not EU) and
8   decided that the account is operating satisfactorily and
9   that the OFAC sanctions were politically inspired.  Johnnie
10  Cameron has confirmed that the account may remain open
11  provided it is closely monitored.  Cheers, happy 2005".
12      Did you write that to Mr. Aitken on January 5,
13  2005?
14      A.  Yes.
15      Q.  Why did you tell Mr. Aitken that you had
16  decided that the OFAC sanctions were politically
17  inspired?
18      A.  Had I decided they were politically
19  inspired?
20      Q.  You write:
21          "We have mounted an investigation into
22  another Palestinian charity, Interpal, which is subject
23  to OFAC sanctions (though not EU) and decided that the
24  account is operating satisfactorily and that the OFAC
25  sanctions were politically inspired."

---

HIGHLY CONFIDENTIAL                    Page 246

1      A.  That was not a Royal "we", it was
2   a collective "we", and as our team regarded it was
3   possibly what I was meaning, although I don't know for
4   sure.
5      Q.  Did you have any information
6   in January 2005 that the OFAC sanctions on Interpal were
7   politically inspired?
8      A.  I can't recall that I did.  Looking back,
9   as of today's date, I can't look back in time and say
10  yes, they were politically inspired.
11      Q.  When you wrote that the OFAC sanctions
12  were politically inspired, what did you mean?
13      A.  Possibly, you see, the issue that we have
14  got is OFAC had sanctions against an organization and
15  other comparable organizations didn't, and it is very
16  difficult to make sense, so I don't know what I meant
17  then.
18      Q.  So you concluded that because OFAC had
19  sanctions against Interpal but Bank of England did not,
20  that the OFAC sanctions were politically inspired?
21      MR. LUFT:  Objection, misstates his prior
22  testimony, argumentative, lack of foundation.
23      A.  No, I wouldn't say that.  The thing which
24  I do not understand and still don't understand is why
25  Bank of England hasn't taken the same line as OFAC,

---

HIGHLY CONFIDENTIAL                    Page 247

1   because I know Americans share information with the
2   Brits, so I do not understand why they wouldn't have
3   shared that information.
4      Q.  Okay.  Is that the difference between the
5   Bank of England and OFAC -- what made you decide that
6   the OFAC sanctions were politically inspired?
7      MR. LUFT:  Objection, misstates his prior
8   testimony, argumentative, lack of foundation.
9      A.  I don't know.
10      Q.  Is it fair to say if you did not believe
11  the OFAC sanctions were politically inspired in 2005 you
12  would not have written that at the time?
13      MR. LUFT:  Objection, argumentative.
14      A.  I really cannot -- I don't know what my
15  mind was thinking of when I wrote that.
16      Q.  I understand but --
17      MR. LUFT:  How much time do we have left?
18      THE VIDEOGRAPHER:  A few seconds.
19      Q.  Last question.  Would you have written
20  that to Phil Aitken in 2005 if you didn't believe it.
21      A.  I really don't know.  I would not have --
22  I really don't know.  It is hard for me to just comment
23  on an e-mail which is sent 5 years ago.
24      MR. GOELMAN:  I have nothing further.
25      THE VIDEOGRAPHER:  This is the end of tape

---

HIGHLY CONFIDENTIAL                    Page 248

1   four, volume one in the video deposition of Mr. Irvine
2   Rodger.  We are going off the record at 7:01 pm.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**EXHIBIT 30 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al. v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*MARTIN WILTSHEAR*
*Vol. 1*
*June 9, 2010*

---

*European Deposition Services*
*59 Chesson Road*
*London W14 9QS - UK*
*Tel +442073850077*
*www.european-depositions.com*

Original File Martin Wiltshear - 9 June 2010.txt

**Min-U-Script® with Word Index**

**HIGHLY CONFIDENTIAL**

1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3                        Action No: 05cv4622(CPS)(MDG)

4    - - - - - - - - - - - - - - - - - - - - -

5    TZVI WEISS, et al,
                              Plaintiffs,
6    against

7    NATIONAL WESTMINSTER BANK, PLC.,
                         Defendant.
8    - - - - - - - - - - - - - - - - - - - - - -

9    NATAN APPLEBAUM, et al.,

10                        Plaintiffs,

11   against

12   NATIONAL WESTMINSTER BANK, PLC.,

13                        Defendant.

14

15

16        VIDEOTAPED DEPOSITION OF MARTIN WILTSHEAR

17             Wednesday 9 June 2010

18             At:  10:00 am

19                Taken at:

20        Cleary, Gottlieb, Steen & Hamilton LLP
                55 Basinghall Street, London
21                United Kingdom

22

23

24

25

**HIGHLY CONFIDENTIAL**

2

1                    A P P E A R A N C E S

2    For Plaintiff Tzvi Weiss:

3            STEPHEN SCHWARTZ, ESQ.
             Kohn, Swift & Graf PC
4            One South Broad Street, Suite 2100
             Philadelphia, Pennsylvania 19107-3304
5            Tel: 419 246 0528

6    For Plaintiff Natan Applebaum:

7            JOEL L. ISRAEL
             Sayles & Werbner
8            4400 Renaissance Tower
             1201 Elm St.
9            Dallas, Texas 75270
             Tel: 214 939 8763

10

11   For Defendant National Westminster Bank, PLC:

12

13           JONATHAN I. BLACKMAN ESQ.
             Cleary, Gottlieb, Steen & Hamilton LLP
             One Liberty Plaza
14           New York, NY 10006-1470
                     Tel: 302 351 9415

15

16   Also Present:

17

18           COURT REPORTER:

             AILSA WILLIAMS
19           European Deposition Services
             59 Chesson Rd
20           London, W14 9QS

21           Telephone:  44 (020) 7385 0077

22           VIDEOGRAPHER: SIMON ADDINSELL

23

24

25

**HIGHLY CONFIDENTIAL**

3

1

2                          I N D E X

3    MARTIN WILTSHEAR .. ... ... ... ... ... ... ... ... ..5

4    DIRECT EXAMINATION BY MR. . ... ... ... ... ... ... ..5
               SCHWARTZ:
5
     CROSS-EXAMINATION BY MR. ISRAEL: .. ... ... ... ... .34
6

7                    INDEX OF EXHIBITS

8    Wiltshear 1 Case Summary .. ... ... ... ... ... ... .19
               NW008356-66
9
     Wiltshear 2 GI&F Letter dated 27 .. ... ... ... ... .24
10              September, 2001

11   Wiltshear 3 Case Summary .. ... ... ... ... ... ... .24
               NW008367-73
12
     Wiltshear 4 E-mails NW012954 .. ... ... ... ... ... .28
13

14

15

16

17

18

19

20

21

22

23

24

25

**HIGHLY CONFIDENTIAL**

**4**

1              THE VIDEOGRAPHER:  This is the beginning of

2    tape one in volume one of the deposition of Martin

3    Wiltshear, in the matter of Tzvi Weiss et al,

4    plaintiffs, versus National Westminster Bank plc,

5    defendants, and also Natan Applebaum et al versus

6    National Westminster Bank plc, defendants.  The first

7    matter is case number 1:05cv04622 (DTG) (MDG).  The

8    second matter is 1:07cv00916 (DTG) (MDG).  This matter

9    is in the United States District Court, Eastern

10   District of New York.

11              Today's date is 9 June, 2010.  The time is

12   10:02 am.  This deposition is taking place at the

13   offices of Cleary Gottlieb in London.  The court

14   reporter is Ailsa Williams, the videographer is Simon

15   Addinsell, both from European Deposition Services.

16              Could counsel first introduce themselves for

17   the record, state what company they are with and who

18   they represent in this matter.

19              MR. SCHWARTZ:  Stephen Schwartz from Kohn,

20   Swift & Graf, Philadelphia, Pennsylvania, United

21   States of America representing the Weiss plaintiffs.

22              MR. ISRAEL:  Joel Israel from Sayles

23   Werbner, here on behalf of the Applebaum plaintiffs.

24              MR. LUFT:  Avi Luft, Cleary Gottlieb LLP,

25   with me is my colleague Susie Rhee, here on behalf of

**HIGHLY CONFIDENTIAL**

5

1   National Westminster Bank and the witness, Martin

2   Wiltshear.

3          THE VIDEOGRAPHER:  Would the court reporter

4   please swear the witness.

5                    MARTIN WILTSHEAR

6                 Having been duly sworn

7                 Testified as follows:

8          DIRECT EXAMINATION BY MR. SCHWARTZ:

9          THE VIDEOGRAPHER:  It is 10:03.  Please

10  begin.

11         Q.  Could you please state your name for the

12  record.

13         A.  Martin Wiltshear.

14         Q.  Mr. Wiltshear, as I mentioned, my name

15  is Stephen Schwartz.  I am a lawyer from Philadelphia

16  and I am here today to ask you some questions to find

17  out what you know about the facts which have given

18  rise to this lawsuit.

19         I don't suspect we are going to be here more

20  than a couple of hours but if you need a break at any

21  time, please ask.  Routinely we will probably take

22  breaks about once an hour.  I would also ask you if

23  possible to try to keep your voice up.  I have a hard

24  time with British accents.  You know what they say:

25  "Two countries separated by a common language".

**HIGHLY CONFIDENTIAL**

12

1        A.   When we analyzed cases it was always

2   a consideration.

3        Q.   Can you describe for me, please, how you

4   analyzed cases?

5        A.   A case was handed to me in my work

6   stack, I would look at the information and the

7   paperwork that was given to me.  I would make

8   enquiries of the specific accounts that were on the

9   forms.  I would try and gain background information,

10  key the data on to the system with any recommendations

11  that I made.

12       Q.   Please may I stop you for a second here.

13  When you say "key the data into the system", are we

14  talking about the goalkeeper system?

15       A.   Yes, we are.

16       Q.   So would it be fair to say that in all

17  cases that you analyzed you entered them into the

18  goalkeeper system?

19       A.   Yes, that would be fair.

20       Q.   Okay.  Go on, please.

21       A.   A recommendation would go to Mike

22  Hoseason, who would make the decision whether to send

23  a disclosure to the law enforcement agencies.

24       Q.   That would be NCIS?

25       A.   Yes.

**HIGHLY CONFIDENTIAL**

13

1      Q.   Was Mike Hoseason the only person with
2  the authority to decide to refer to NCIS?
3           MR. LUFT:   Objection, foundation.
4           MR. SCHWARTZ:   I mean --
5           MR. LUFT:   I don't think he knows.   I don't
6  think it is necessarily within his knowledge to know
7  who else at the bank may have.   He may know if he had
8  it.
9           MR. SCHWARTZ:   Do you know whether any one
10  besides Mike Hoseason within your department, let's
11  make that within your team, had the authority to refer
12  to the NCIS?
13      A.   I remember that Mike Hoseason did at
14  that time.   I can't remember if anyone else did.
15      Q.   Do you know the name Dennis Shepherd?
16      A.   No.
17      Q.   Do you know Doug Hartley?
18      A.   I do.
19      Q.   At this time, 2001, was he part of your
20  team?
21      A.   I remember him being in the wider
22  office.   I don't remember which team he was in at the
23  time but, you know, I don't remember if he was on that
24  team when I joined.
25      Q.   Okay.   How long were you part of that

**HIGHLY CONFIDENTIAL**

22

1   Group Investigation and Fraud?

2           A.  I can't see from this where this

3   originated from.

4           Q.  Did matters ever originate at Group

5   Investigation and Fraud?

6           A.  I can't remember.

7           Q.  During the course of your year in the

8   money laundering prevention unit, did you have cases

9   involving terrorist funding?

10          A.  Involving terrorist funding.

11          Q.  Where there was a suspicion of terrorist

12  funding?

13          A.  Yes, I did.

14          Q.  Did you have many?

15          MR. LUFT:  Objection, vague.

16          MR. SCHWARTZ:  More than one?

17          A.  I only remember one.

18          Q.  And what was that?

19          A.  Well, very generally, it related to the

20  IRA.

21          Q.  Did you have when you came to the

22  MLPU -- excuse me -- as part of that anti-money

23  laundering team, were you given any special training

24  in what to look for in anti-terrorism cases?

25          A.  Gary Merrick gave me all my training.

**HIGHLY CONFIDENTIAL**

23

1        Q.   Who is Gary Merrick?

2        A.   He was my immediate line manager when

3    I started on that job.

4        Q.   Was he between you and Mr. Hoseason in

5    authority?

6        A.   He was.

7        Q.   What training did he give you?

8        A.   He showed me how to investigate cases,

9    he showed me our processes for dealing with money

10   laundering.  He showed me the money laundering

11   guidelines.  He worked cases so I could watch to see

12   what happened, all the processes to deal with.  Then

13   he watched me deal with cases as well and supervised

14   my cases.

15       Q.   As part of your anti-terrorism financing

16   training, were you taught to focus on particular

17   regions in the world?

18       A.   There were regions that were higher risk

19   than others.  I can't remember what they are from 2001

20   at all, but there are many, many factors to take into

21   account.

22       Q.   If you look at page 1 of this goalkeeper

23   report, you see near the top "Last modified"?

24       A.   Yes.

25       Q.   "By"?

**HIGHLY CONFIDENTIAL**

28

1    goalkeeper report?

2            A.  A variety of reasons -- things happened.

3    I can only remember one case where I had to deal with

4    something after a disclosure was made.

5            Q.  What were the circumstances?

6            A.  That was the IRA case, which I really

7    cannot talk about.

8            Q.  Of course, and I am not interested in

9    hearing about it so it is just as well.

10           Did you ever have any dealings with the NCIS?

11           A.  No.

12           Q.  I am going to ask the reporter to mark

13   as an exhibit which will be Wiltshear 4 a document

14   that has been Bates numbered NW012954.

15           (Exhibit Wiltshear 4 marked for identification)

16           Mr. Wiltshear, have you had a chance to review

17   this document?

18           A.  I have, yes.

19           Q.  Have you ever seen this before?

20           A.  I don't recall this document, no.

21           Q.  This appears to be an e-mail and

22   a response.  Is that a correct assessment?

23           A.  Yes.

24           Q.  This appears to be an e-mail from you to

25   Belinda Lane, and Belinda Lane's response to you.  Is

**HIGHLY CONFIDENTIAL**

29

1    that also a correct assessment?

2              A.   Correct.

3              Q.   Do you know Belinda Lane?

4              A.   No.

5              Q.   Do you remember who she is?

6              A.   No.

7              Q.   Do you have any idea why you wrote this

8    letter, this e-mail?

9              MR. LUFT:   Sitting here today or?

10             MR. SCHWARTZ:   Sitting here today.

11             A.   I can't remember why I wrote that

12   letter.  I may have been asked by my manager to do so.

13   It may have been from a case I was dealing with.

14             Q.   But you don't remember dealing with this

15   case?

16             A.   No.

17             MR. SCHWARTZ :

18             MR. SCHWARTZ:   Let's take a break.   I may be

19   finished with this witness.   Mr. Israel may have a few

20   questions.

21             THE VIDEOGRAPHER:   Going off the record,

22   10:43.

23                       (A short break)

24             THE VIDEOGRAPHER:   We are back on the record

25   at 10:51.

**HIGHLY CONFIDENTIAL**

30

1          MR. SCHWARTZ:  Mr. Wiltshear, could you take

2     one more look, please, at Wiltshear Exhibit 4,

3     specifically the bottom half, which you wrote to

4     Belinda Lane.  Do you recall at all why you said

5     "Unsurprisingly, we have been sent a money laundering

6     suspicion report."

7          A.  No, I don't.

8          Q.  Do you have any recollection of why you

9     said: "The concern is obviously terror funding,

10    especially given the volatile climate of the area"?

11         A.  I don't recall it.

12         Q.  Okay.  Finished with that document.

13    During your time in the 2001 to 2002 period when you

14    were with the anti-money laundering team at Group

15    Investigation and Fraud, you said that your immediate

16    supervisor was Gary Merrick.  Is that correct?

17         A.  He was at the start, yes.

18         Q.  At the start, and then the overall

19    supervisor was Mike Hoseason.  Is that correct?

20         A.  Correct.

21         Q.  Did someone replace Mr. Merrick as your

22    supervisor?

23         A.  At some point, I don't know when, Doug

24    Hartley took over.

25         Q.  And he was then between you and Mike

**HIGHLY CONFIDENTIAL**

34

1          MR. SCHWARTZ:  -- subsequently.  You can

2    answer.

3          A.  I remember that the bank did close

4    accounts on the back of work we did, but I don't

5    remember any specifics.

6          Q.  Do you remember any particular reasons

7    why the bank may have closed accounts?

8          A.  Only one, and that was something called

9    VAT fraud.  I remember accounts closing because of

10   that.

11         Q.  And what is VAT fraud?

12         A.  It is a kind of tax evasion.

13         MR. SCHWARTZ:  I am finished with this

14   witness.  We are going to let Mr. Israel ask a few

15   questions.  Thank you.

16         A.  Pleasure.

17              CROSS-EXAMINATION BY MR. ISRAEL:

18         MR. ISRAEL:  Mr. Wiltshear, just a small

19   handful of questions.  My name is Joel Israel.

20   I represent the other plaintiff group in this case.

21   If you could quickly pull back out Exhibit 4, which is

22   the last exhibit we looked at.  I am referring to the

23   e-mail at the bottom, the first paragraph, where in

24   the last sentence the e-mail states: "The concern is

25   obviously terrorist funding, especially given the

**HIGHLY CONFIDENTIAL**

35

1    volatile climate of that area".  Do you see where I am

2    talking about?

3           A.  Sure.

4           Q.  Do you know to which area you were

5    referring in this e-mail?

6           A.  The e-mail says "Middle East" on it, so

7    I would assume there.

8           Q.  So, as of January 2002, did you know the

9    Middle East to have a volatile climate?

10          A.  It has always had a volatile climate.

11          Q.  And did you know that volatile climate

12   to lead to the possibility or the risk of terrorist

13   funding?

14          A.  Yes.

15          Q.  Why?

16          A.  Just something from the on the job

17   training really.  There is always a risk of that.  I

18   was told there was a risk of terrorist funding.

19          Q.  In the Middle East?

20          A.  Yes.

21          Q.  Do you recall who told you that?

22          A.  I don't recall anyone specific.  It

23   would have been one of my line managers.

24          Q.  Do you recall this coming up in formal

25   training or just something you would hear while you

**HIGHLY CONFIDENTIAL**

36

1    were working on specific cases?

2              A.   Just training from my line manager, as

3    I remember.

4              Q.   So just through one on one training, not

5    through formal training that the bank was giving you.

6    Correct?

7              MR. LUFT:   Objection, form.

8              Q.   This statement from your line manager,

9    this just came one on one to you, to your

10   recollection?

11             A.   To my recollection, yes.

12             MR. ISRAEL:   I have no more questions.

13             THE VIDEOGRAPHER:   End of tape one, volume

14   one in the deposition of Martin Wiltshear.   Going off

15   the record at 11 o'clock.

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 31 to Declaration of Joel Israel**

**LANE, Belinda, Bus Mgr**

**To:**        Wiltshear, Martin (RBS)
**Subject:**   RE: Palestine Lebanon & Relief Fund

- Acc opened with Bank 10/94
- Large funds have always been held on various current accs as, due to religious reasons they are unable to earn interest
- Registered charity no 1040094 - 8 trustees
- Provide charitable relief to refugees in Israel, West Bank & Gaza and Lebanon - developed out of former charity which provided relief to Kuwait
- Main donors are Muslim communities in the Uk, USA and Saudi Arabia
- Very much seasonal in that receipts usually at Ramadam and Easter
- Main contact is the secretary Mr Jehad Qundilizo
- Authorised signatories are Ibrahim Brian Hewitt, E Mustafa, J Qundil and Mahfouzh Safie - instructions are any 2 to sign
- Next meeting is Monday 21 January with Mr Qundil at the business premises when I will discuss present operations and use of the $ acc

Any further guidance in how to approach this would be welcomed - ITS 2302-2602

Belinda Lane
Senior Business Manager

> ——Original Message——
> **From:**    Wiltshear, Martin (RBS)
> **Sent:**    Thursday 17 January 2002 09:51
> **To:**      LANE, Belinda, Bus Mgr
> **Subject:** Palestine Lebanon & Relief Fund
>
> Belinda
>
> Unsurprisingly, we have been sent a Money Laundering Suspicion Report on the above connection. It is bases on the face that large US$ payments are being are coming and going from the Middle East in the USD a/c 04156838. The concern is obviously terrorist funding especially given the volatile climate of the area.
>
> I would be therefore be grateful if you would kindly provide me with some background info on this connection with details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account.
>
> I appreciate your assistance in this matter and look forward to hearing from you.
>
> Regards
>
> **Martin Wiltshear**
> **Group Investigations & fraud**
> *Ground floor*
> *Regents House*
> *London*
> *tel - 0207 615 7244*
> *fax - 0207 615 7287*

HIGHLY CONFIDENTIAL                                    NW 012954

**EXHIBIT 32 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*STEPHEN FOSTER*
*Vol. 1*
*July 16, 2010*

---



Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 210 of 386 PageID #: 9024

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                    Page 1

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF NEW YORK

3               Action No: 05cv4622(DGT)(MDG)

4     - - - - - - - - - - - - - - - - - - - - -

5  TZVI WEISS, et al,
                          Plaintiffs,
6  against

7  NATIONAL WESTMINSTER BANK, PLC.,
                          Defendant.
8     - - - - - - - - - - - - - - - - - - - - -

9  NATAN APPLEBAUM, et al.,

10                        Plaintiffs,

11 against

12 NATIONAL WESTMINSTER BANK, PLC.,

13                        Defendant.

14

15

16        VIDEOTAPED DEPOSITION OF STEPHEN FOSTER

17             Friday 16 July 2010

18             At:  10:00 am

19             Taken at:

20        Cleary, Gottlieb, Steen & Hamilton LLP
              55 Basinghall Street, London
21                United Kingdom

22

23

24

25

---

HIGHLY CONFIDENTIAL                                    Page 2

1              A P P E A R A N C E S

2  For Plaintiff Tzvi Weiss:

3        STEPHEN SCHWARTZ, ESQ.
         Kohn, Swift & Graf PC
4        One South Broad Street, Suite 2100
         Philadelphia, Pennsylvania 19107-3304
5        Tel: 419 246 0528

6  For Plaintiff Natan Applebaum:

7        MARK WERBNER
         Sayles & Werbner
8        4400 Renaissance Tower
         1201 Elm St.
9        Dallas, Texas 75270
         Tel: 214 939 8763
10

11 For Plaintiff Tzvi Weiss:

12       AITAN GOELMAN
         Zuckerman Spaeder LLP
13       1800 M Street, NW, Suite 1000
         Washington, DC 20036-5807
14       Tel: 202 778 1996

15 For Defendant National Westminster Bank, PLC:

16

17       JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
         Cleary, Gottlieb, Steen & Hamilton LLP
18       One Liberty Plaza
         New York, NY 10006-1470
19            Tel: 212 225 2000

20 Also Present:

21

22       COURT REPORTER:

23       AILSA WILLIAMS
         European Deposition Services
24       59 Chesson Rd
         London, W14 9QS

25       Telephone:  44 (020) 7385 0077

---

HIGHLY CONFIDENTIAL                                    Page 3

1         VIDEOGRAPHER: DAVID ROSS

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

HIGHLY CONFIDENTIAL                                    Page 4

1
2              I N D E X

3  STEPHEN FOSTER ... ... ... ... ... ... ...6

4  DIRECT EXAMINATION BY MR. ... ... ... ... ... ...6
      WERBNER:
5
   CROSS-EXAMINATION BY MR. ... ... ... ... ... .. 162
6       SCHWARTZ:

7  CROSS-EXAMINATION BY MR. ... ... ... ... ... .. 237
       BLACKMAN:
8

9          INDEX OF EXHIBITS

10 Foster 1 NW012925-33 ... ... ... ... ... ... .. .79

11 Foster 2 NW014025-36 ... ... ... ... ... ... .. 103

12 Foster 3 NW013700 ... ... ... ... ... ... .. 107

13 Foster 4 NW013695-97 ... ... ... ... ... .. 112

14 Foster 5 NW212124 ... ... ... ... ... ... .. 121

15 Foster 6 NW180808-10 ... ... ... ... ... .. 138

16 Foster 7 NW013939-41 ... ... ... ... ... .. 142

17 Foster 8 NW066667-71 ... ... ... ... ... .. 148

18 Foster 9 NW067948-49 ... ... ... ... ... .. 156

19 Foster 10 NW180827-29 ... ... ... ... ... .. 159

20 Foster 11 NW088194-97 ... ... ... ... ... .. 187

21 Foster 12 NW017151-54 ... ... ... ... ... .. 202

22 Foster 13 "Press Room, US Dpt of ... ... ... ... .. 220
      the Treasury, (No Bates Nos.)
23
   Foster 14 NW066829-32 ... ... ... ... ... .. 226
24

25

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                      Page 5

1   THE VIDEOGRAPHER: Good morning.  This is the
2   beginning of tape one, volume one in the video
3   deposition of Mr. Stephen Foster.  This is being taken
4   at the offices of Cleary Gottlieb in 55 Basinghall
5   Street, London, on July 16, 2010 at 9:59 am, as
6   indicated on the video screen.
7   The caption in this case is Tzvi Weiss et al,
8   National Westminster Bank, Natan Applebaum against
9   National Westminster Bank plc.  This is being heard
10  before the United States District Court, for the Eastern
11  District of New York.  The action number is 05cv4622
12  (DGT) (MDG).
13  The court reporter is Ailsa Williams and the
14  videographer is David Ross, both contracted through
15  European Deposition Services.  Would counsel introduce
16  themselves, please.
17  MR. WERBNER: My name is Mark Werbner from
18  Dallas Texas.  I represent the Applebaum family and the
19  others which have joined in with them in this lawsuit.
20  MR. SCHWARTZ: Stephen Schwartz, Kohn, Swift &
21  Graf, Philadelphia, Pennsylvania for the Weiss
22  plaintiffs.
23  MR. GOELMAN: Aitan Goelman from the law firm
24  of Zuckerman Spaeder, Washington DC, for the Weiss
25  plaintiffs.

HIGHLY CONFIDENTIAL                                      Page 6

1   MR. BLACKMAN: Jonathan Blackman, Cleary,
2   Gottlieb, Steen & Hamilton, with Susie Rhee,
3   representing the defendant NatWest and Mr. Foster.
4   THE VIDEOGRAPHER: Would the court reporter
5   please swear in the witness.
6   STEPHEN FOSTER
7   Having been duly sworn,
8   Testified as follows:
9   DIRECT EXAMINATION BY MR. WERBNER:
10  MR. WERBNER: Would you state your full name
11  for the record, please.
12  A.  Stephen James Foster.
13  Q.  Where do you live, Mr. Foster?
14  A.  In England.
15  Q.  What is your current job?
16  A.  My current job is head of Anti-money
17  Laundering Sanctions and Terrorism for the Royal Bank of
18  Scotland Group.
19  Q.  Have you ever worked for NatWest?
20  A.  No.
21  Q.  How long have you worked for the Royal
22  Bank of Scotland?
23  A.  For about 7 years, since December 2002.
24  Q.  What did you do before that?
25  A.  A number of jobs.  How much information

HIGHLY CONFIDENTIAL                                      Page 7

1   would you like?
2   Q.  Just an outline form, trace for me I guess
3   going back before you joined Royal Bank of Scotland for
4   let's say about 10 years?
5   A.  Okay, I will talk you through the 1990s,
6   is probably the best thing to do.  During that time I
7   was for five years with a firm of accountants who are
8   now known as Deloitte, responsible for primarily audit
9   and consulting relationships in the financial sector.
10  For two years I worked in a trade finance company
11  as a Financial Controller.  For five years I worked for the
12  UK regulator, the Financial Services Authority.
13  Q.  What years did you work, roughly, for the
14  UK regulators?
15  A.  1997 to 2002.
16  Q.  Was your position at Deloitte just before
17  you joined Royal Bank of Scotland?
18  A.  No, in Deloitte -- I left Deloitte in
19  1996.
20  Q.  What was the company you worked for just
21  before you joined the Royal Bank of Scotland in 2002?
22  A.  That was the Financial Services Authority.
23  The trade finance company, apologies for the timing, was
24  London Forfaiting Company plc from 96 to end of 97.
25  Q.  Are you a chartered accountant?

HIGHLY CONFIDENTIAL                                      Page 8

1   A.  I am, yes.
2   Q.  How long have you been a chartered
3   accountant?
4   A.  I qualified in 1985 but I have never
5   practised as an accountant.
6   Q.  What schools did you attend?
7   A.  I attended Brentwood School in Essex in
8   England, which was my primary and secondary education,
9   until 1977, and then for 4 years at Oxford University.
10  Q.  The famous Oxford University?
11  A.  I don't know.  Well, it is the Oxford
12  University in England, yes.
13  Q.  It is famous.  How long were you at
14  Oxford?
15  A.  For 4 years.
16  Q.  What did you study there?
17  A.  I studied what is known as Classics, so
18  effectively Latin, Greek and Ancient History.
19  Q.  Has that helped you be a chartered
20  accountant?
21  A.  As I say, I have never practised as
22  a chartered accountant, but it helps I think with some
23  logic.
24  Q.  I am just asking so I can pass on some of
25  this information to my son, who is starting College at

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                Page 9

1  Berkeley next month.
2     A.  I wish him well.
3     Q.  Thank you.  Do you live in Essex, England
4  now?
5     A.  I do.
6     Q.  How did your employment with the Royal
7  Bank of Scotland at the end of 2002 come about?
8     A.  I applied for a job, I was interviewed and
9  accepted for the role.
10     Q.  Who did you interview with?
11     A.  Individuals?
12     Q.  Can you name any?
13     A.  I can remember one of them, who turned out
14  to be my boss, a lady called Amanda Holt.
15     Q.  What was the position that you were
16  interviewing about when you talked with Amanda Holt?
17     A.  That was to be responsible for policy for
18  Anti-money Laundering and Sanctions in Terrorist
19  Financing in the Group Risk Management function in the
20  bank.
21     Q.  Have you stayed in that group your entire
22  career at Royal Bank of Scotland?
23     A.  I have not done that role for the entire
24  time, no.
25     Q.  How long did you play that role?

HIGHLY CONFIDENTIAL                               Page 10

1     A.  I played that role until the end of 2006.
2  Following that I moved to do what I would probably call
3  a wider financial crime role within the Group
4  until April 2009, since when I have held my current
5  position.
6     Q.  Which is?
7     A.  Group Head of Anti-money Laundering
8  Sanctions and Terrorist Financing.
9     Q.  Is it correct then that since you joined
10  the bank at the end of 2002, through the current time,
11  you have, as part of your job duties, Anti-money
12  Laundering and Terror Financing for the bank?
13     A.  In the period when I went to do the wider
14  Financial Crime role, I was not doing Anti-money
15  Laundering or Sanctions in Terrorism, so I would say it
16  was from 02 to 06 and then from 09 until now, but that
17  middle piece I was not involved in the Anti-money
18  Laundering.
19     Q.  What was your role in that middle period
20  of 2006 to 2009, which you have described as a "wider
21  Financial Crime area"?
22     A.  We have a division within the bank called
23  Global Banking and Markets, which is our investment
24  banking arm.  During that period it was considered
25  necessary to build a -- and at the time I was working in

HIGHLY CONFIDENTIAL                               Page 11

1  a Group Security & Fraud function -- it was considered
2  necessary to develop a closer working relationship in
3  matters of Fraud and Security with that Investment
4  Banking division, and my boss at the time decided that
5  that was a good role for me to play, so I would call it,
6  I guess, a management relationship building role during
7  that time.
8     Q.  Do you know a gentleman named Mike
9  Hoseason?
10     A.  I do, yes.
11     Q.  Tell me please how you know Mr. Hoseason?
12     A.  When I first joined the bank Mike was
13  responsible in the operations area for -- I have to cast
14  my mind back.  I can't remember exactly what he was
15  responsible for but I think he was in Group Security &
16  Fraud when I joined.
17     Q.  Was there a working between your area in
18  the Anti-money Laundering and Terror Financing and
19  Hoseason's area dealing in operations, Group Security &
20  Fraud?
21     A.  Did you say "why"?
22     Q.  Was there an interaction, if there was?
23     A.  Because the role of the group team was to
24  set the policy for the bank.  Divisions of the bank, be
25  it Retail or Corporate or Investment Banking, were

HIGHLY CONFIDENTIAL                               Page 12

1  responsible for implementing the policy, and at the time
2  we had a division which was called Manufacturing, which
3  was effectively the operating room of the bank.  It
4  carried out all the back office support functions in
5  order to service customers.  Group Security & Fraud were
6  part of that division, and Mike was responsible for some
7  of the Suspicious Activity Reporting, some of the Money
8  Laundering operating areas, and therefore we would have
9  had interaction with him.
10     Q.  I think I get it, but just to be sure, was
11  the group that you worked in from the end of 2002 until
12  the end of 2006 within Manufacturing Operations?
13     A.  It was not, no, it was a Group function.
14  So maybe if I explain.  I suppose there are three
15  distinct areas of the bank.  Group functions, which
16  would for example cover HR, Human Resources, Group
17  Communications, Group Risk, which is what I was in.
18     Secondly, you would have the business divisions
19  which were facing off to customers, as I said, Retail,
20  Corporate, Investment Banking and then Manufacturing, which
21  ran all the support operations for the group, and I just so
22  happened, so this is probably where you are confused, is
23  that Group Security & Fraud was within Manufacturing, not as
24  a Group function.  Sorry, I maybe did not explain that.
25     Q.  Now I understand.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                        Page 53

1   abreast of UK legislation, for example. I really don't
2   know specifically. I didn't do it myself.
3        Q. How many of the seven or so people on your
4   team had Internet access?
5        A. I don't know.
6        Q. Do you know of any of them that did not?
7        A. I don't know, no.
8        Q. Did you become aware, in August 2003 or
9   thereabouts, that the United States Government had
10  designated Interpal, a United Kingdom entity, as
11  supporting the terrorist group known as Hamas?
12       A. I was not aware at that time.
13       Q. How long after the US Department of
14  Treasury made that designation of Interpal did you
15  become aware of it?
16       A. I don't recall specifically but it was --
17  I can't remember the date but it was not at that time.
18       Q. Approximately when was it?
19       A. When a consideration was made of the
20  account I was asked some information, but that was
21  a while later I think.
22       Q. Do you think from your memory it was
23  weeks, months, years, after the designation?
24       MR. BLACKMAN: Object to form. You may
25  answer.

HIGHLY CONFIDENTIAL                                        Page 54

1        A. We will probably establish the various
2   timelines later and it will become clearer to me, yes.
3        Q. As you sit here now, was it a matter of
4   weeks, months or years?
5        MR. BLACKMAN: I am going to object again to
6   the form. I would invite you to show him the document.
7        A. Is there a document which would help me
8   answer that question?
9        Q. Which one?
10       A. The one you have there?
11       Q. I don't know but I will be happy to hand
12  it to you.
13       A. If it would help me answer the question.
14       Q. You cannot tell me if it was weeks, months
15  or years --
16       A. No.
17       Q. This is deposition Exhibit Hoseason 25.
18  Do you recognize that document?
19       A. No.
20       Q. Have you ever seen it?
21       A. No.
22       Q. Who told you that Interpal had been
23  designated as involved in a financing terror
24  organization known as Hamas?
25       A. I don't recall who specifically told me.

HIGHLY CONFIDENTIAL                                        Page 55

1        Q. In general, do you know who it was?
2        A. Well, it would have been -- I don't think
3   I was -- it is difficult to recall. It would have been
4   from the Corporate Banking Division.
5        Q. But you don't remember who?
6        A. No.
7        Q. So you don't know who told you, you don't
8   remember when it was that you learned that US Government
9   had designated Interpal as involved in financing the
10  terror group known as Hamas?
11       MR. BLACKMAN: Objection, asked and answered.
12  You may answer.
13       A. No.
14       MR. WERBNER : Let's pause for the fire drill.
15       THE VIDEOGRAPHER: Off the record 11:28. I
16  have not gone off.
17       MR. BLACKMAN: We are on and there is been no
18  fire.
19       THE VIDEOGRAPHER: Still on the record.
20       MR. WERBNER: When you learned that the United
21  States had declared that Interpal was involved in
22  financing the terror group known as Hamas, was NatWest
23  still rendering financial services at the time to
24  Interpal?
25       A. I don't remember when I found out about it

HIGHLY CONFIDENTIAL                                        Page 56

1   but we held an account for Interpal at that time, yes.
2        Q. And you were permitting them to execute
3   transactions in and out?
4        A. As a bank, yes.
5        Q. And how long after NatWest learned that
6   the US Government designated Interpal as involved in
7   financing the terrorist group known as Hamas did the
8   bank continue to execute transactions for Interpal?
9        A. I don't recall for specifically how long.
10       Q. Once your advice was sought, did you
11  advise others at NatWest that they did not need to stop
12  providing those financials services to Interpal?
13       A. I was not asked for that opinion.
14       Q. Did you express an opinion in any way?
15       A. No.
16       Q. What was your response when that matter
17  was brought to your attention?
18       A. I was asked as part of a review of the
19  account by Corporate Banking Division for my -- I was
20  told about it and I indicated to them that it was their
21  responsibility to make a decision on the account.
22       Q. So you just passed and said "not my job",
23  right?
24       A. No.
25       MR. BLACKMAN: Objection to the form of the

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

---

1  question, misstates the testimony.
2      Q. Your answer?
3      A. No.
4      Q. What did you do?
5      A. I don't specifically recall what I did.
6      Q. I am not asking you specifically. Do you
7  recall generally what you did when you were told that
8  NatWest customer, Interpal, had been designated as
9  involved in financing Hamas?
10     A. The Group had -- the Corporate Banking
11  Division, which held the customer's account, had made an
12  assessment of the account as a result of a second
13  Charities Commission investigation into the charity, and
14  it was as a result of that that the Corporate Banking
15  Division were making a decision as to whether to retain
16  the account.
17     Q. Well then why were you asked anything, if
18  you were not involved or your advice was not being
19  sought?
20     MR. BLACKMAN: Objection to form, misstates
21  the testimony, but you may answer.
22     A. I don't know.
23     MR. BLACKMAN: It would help, since we know
24  that there are documents dealing with this, if you
25  showed them. They might actually help him answer the

---

1  question in some more detail, but that is up to you.
2      MR. WERBNER : Did you ever seek information
3  about the US declaration of Interpal as an organization
4  involved in financing the Hamas terror group, after you
5  learned of that designation?
6      A. No.
7      Q. You didn't get on the computer to look at
8  the information provided by the US Department of
9  Treasury, who had made that designation?
10     MR. BLACKMAN: Objection, question just been
11  asked and answered, and the form of the question is
12  inappropriate. You may answer.
13     A. No.
14     Q. Why not?
15     A. The responsibility for maintaining the
16  account was with the Corporate Banking Divisions, and
17  they would have done that.
18     Q. Did you ever discuss the subject with
19  anyone?
20     A. Which subject?
21     Q. Interpal and the fact that it had been
22  designated by the US Government as involved in financing
23  the terror group known as Hamas?
24     A. I was aware of the Corporate Banking
25  review of the account.

---

1      Q. Who was doing it?
2      A. Individuals within Corporate Banking
3  Division. I can't remember their names.
4      Q. Not any of them?
5      A. Well, I understand Guy Cole, one of the
6  individuals in that team was involved.
7      Q. How do you know that Guy Cole was doing
8  it?
9      A. Because he was responsible within that
10  team for Anti-money Laundering Compliance.
11     Q. And what team was that?
12     A. The Anti-money Laundering Team within the
13  Corporate Banking Division.
14     Q. The one headed up by Mike Hoseason?
15     A. No.
16     Q. Which one?
17     A. Well, the divisional team responsible for
18  Anti-money Laundering within Corporate Banking.
19  Mr. Hoseason was in Group Security & Fraud within the
20  Manufacturing Division.
21     Q. Did you talk to him?
22     MR. BLACKMAN: Mr. Cole?
23     A. I don't recall. Yes, Mr. Cole?
24     Q. Were we talking about somebody else?
25     A. You just mentioned Mr. Hoseason. I was

---

1  not sure which one you meant.
2      Q. Let's do both. Did you ever talk to
3  Mr. Hoseason about the designation by the US Government
4  of Interpal as being involved in financing the terror
5  group known as Hamas?
6      A. I don't recall doing so.
7      Q. Did you ever talk to Mr. Guy Cole about
8  the United States declaration of Interpal as involved in
9  financing the terror financing group known as Hamas?
10     A. I don't recall so.
11     Q. Do you recall talking to anybody about
12  that?
13     A. I recall talking to Mrs Holt.
14     Q. Tell me about that conversation.
15     A. That would have been at the time of, as
16  I describe, the review by the Banking Division of their
17  relationship. She would have needed to have been aware
18  of it.
19     Q. What did you tell her?
20     A. I don't recall. Well, if anything,
21  I would have brought the information to her, but I don't
22  remember specifically what I told her at the time.
23     Q. Do you remember generally?
24     A. No.
25     Q. When you say "I don't recall what if

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

1  anything", what does that mean, "what if anything".  Is
2  it your testimony that you are not sure if you told
3  Amanda Holt anything about the US designation of
4  Interpal?
5        MR. BLACKMAN: Objection to the form.
6        A.  I would have told Amanda Holt about the
7  review within the Corporate Banking Division of the
8  relationship, because it had been mentioned, would have
9  been mentioned to me, but this was after the second
10 Charities Commission investigation.
11       Q.  When was that?
12       A.  I believe that was in 2003.
13       Q.  Did you tell Ms Amanda Holt about that in
14 person, on the phone, in a meeting, via e-mail?
15       A.  I don't recall.
16       Q.  What is your explanation as to why you
17 don't recall any of these things?
18       MR. BLACKMAN: Mr. Werbner, that is a totally
19 improper question.  You may answer but I object
20 strenuously.  How can someone -- never mind.
21       A.  It is a long time ago and there was lots
22 happening.  I was a busy person.  This would not
23 necessarily have stood out that much.
24       Q.  You were too busy?
25       A.  No.

1        Q.  What do you mean, you are a busy person?
2        A.  I just mean that this does not -- I can't
3  recall a lot of what happened that long ago.  It doesn't
4  mean there is anything specific that I was too busy,
5  I just don't recall it.
6        Q.  Working for NatWest in the area of
7  prevention of terror financing, was it not significant
8  at the time that you learned that transactions were
9  being done by the bank for Interpal, an entity
10 designated by the United States Government as financing
11 the terror group known as Hamas?
12       MR. BLACKMAN: Object to the form of the
13 question.
14       A.  Sorry, you need to repeat the question to
15 me.
16             (Read back)
17       A.  Well, I was not close to the operation of
18 the Interpal relationship at all.  When I was made aware
19 of it, as part of the Corporate Banking Division's
20 review, as we described, I would have mentioned it to
21 Mrs Holt.
22       Q.  It was significant to you, wasn't it?
23       MR. BLACKMAN: Objection to form.  You may
24 answer.
25       A.  It was something I dealt with.

1        Q.  It was not a minor matter, though, was it?
2        MR. BLACKMAN: Objection to form.
3        A.  We took account of the OFAC list and
4  therefore this was a factor in the Corporate Banking
5  Department's decision as to how to maintain that
6  account.
7        Q.  This was unusual, was it not, for you to
8  learn that a NatWest customer was listed as supporting
9  the Hamas terror organization while executing financial
10 transactions through the bank?
11       MR. BLACKMAN: Objection to form.
12       A.  I am not sure what you mean by "unusual".
13       Q.  I am asking you -- was it usual or not for
14 that type of information to come to you?
15       MR. BLACKMAN: Objection to form.
16       A.  It was unusual.
17       Q.  Had you ever been told by somebody at
18 NatWest that you had a customer that was executing
19 financial transactions through the bank that was listed
20 as financing a terror organization, according to the
21 United States Government?
22       A.  No.
23       Q.  Did you have any role, and I mean your
24 team as well, in contacting bank customers to ask
25 questions where they were suspected of terror financing?

1        A.  No.
2        Q.  Were there any changes in your group's
3  procedures or processes after the terror attacks in the
4  United States on September 11, 2001?
5        A.  It is difficult for me to remember, partly
6  because I joined in December 2002.  Would it help me to
7  answer the question if you showed me the document?
8        Q.  You have no idea what I am holding in my
9  hand, do you?
10       A.  No, I don't.
11       Q.  It could be an outline, it could be a note
12 to myself, so don't freak out every time I hold
13 a document in my hand.
14       A.  No, I am just trying to help.
15       Q.  Well, if there is a specific document you
16 want to see to give more accurate testimony, ask me or
17 your counsel, and we will see if that can be
18 accommodated, but I think we are wasting time when
19 I look at a piece of paper.  Okay?
20       MR. BLACKMAN: All right, so that we don't
21 waste time, what I would suggest is since we have
22 produced to you a whole chain of e-mails that goes into
23 considerable detail about the matter that Mr. Foster is
24 struggling to remember after 7 years about the
25 discussion of continuing to provide services to Interpal

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                         Page 65

 1  following the OFAC designation, that you show him them.
 2  I think that way you might actually get a better
 3  recollection than one can give sitting without it, so
 4  I would actually make that request.
 5      Q.  Mr. Foster, did you ever look at any
 6  documents pertaining to Interpal, and I mean bank
 7  documents, bank documents that were within the bank's
 8  files -- strike that.
 9      Mr. Foster, did you ever look at any records
10  that were possessed by NatWest that related to Interpal?
11      A.  I don't recall doing so.
12      Q.  Could you have done so if you had wanted?
13      A.  I could have done so, yes.
14      Q.  Did you ever look at a document in which
15  Mr. Hoseason discussed an article that linked Interpal
16  to Hamas?
17      A.  I don't recall doing that.
18      Q.  Heading up a team of people in NatWest who
19  were involved in the prevention of terror financing,
20  would it have concerned you to learn of links between
21  Interpal and Hamas?
22      MR. BLACKMAN: Objection to form.  You can
23  answer.
24      A.  If they -- yes, it would have done.
25      Q.  And you would have known by late 2002,

HIGHLY CONFIDENTIAL                                         Page 66

 1  when you joined NatWest, that Hamas had been declared to
 2  be a terrorist organization by many governments and
 3  entities, correct?
 4      A.  I would have known that, yes.
 5      Q.  And so any NatWest customer that NatWest
 6  believed was engaging in financial services with Hamas
 7  would have given the bank significant concern, correct?
 8      A.  If they had been engaged with Hamas, yes.
 9      Q.  Are you saying that the bank would have
10  been concerned only if the customer was dealing directly
11  with Hamas and not indirectly?
12      A.  It is difficult for me to answer that
13  because of the fact the policy was implemented within
14  divisions, but I think yes.
15      Q.  Under the policy that your team issued for
16  NatWest, would it have been okay for the bank to execute
17  financial transactions with an entity believed to be
18  a front for Hamas?
19      MR. BLACKMAN: Objection to form.
20      A.  In principle, no, but the policy that
21  I wrote, my team wrote, would not have gone into that
22  sort of detail.
23      Q.  What do you mean when you say "in
24  principle, no"?
25      A.  Well, because the bank's policy is not to

HIGHLY CONFIDENTIAL                                         Page 67

 1  support the financing of terrorism.
 2      Q.  Through direct dealings with a terror
 3  organization or through indirect dealings, correct?
 4      A.  Well, it would, yes.
 5      Q.  Based on your training and prior
 6  experience before coming to the bank, did you have any
 7  information that indicated terror groups often used
 8  charities as fronts to conceal their criminal
 9  activities?
10      A.  I had read newspaper articles to that
11  extent, yes.
12      Q.  And did you believe that to be the case at
13  the time you joined the bank in 2002?
14      A.  I had no reason to disbelieve it but I had
15  no evidence to suggest that that was the case.
16      Q.  In the training that your team conducted
17  or the materials that were issued, were bank staff
18  informed to be alert to dealing with charities to watch
19  for transactions that may be related to terrorism or
20  terror organizations?
21      A.  I don't recall if the training -- sorry,
22  was the question around charities specifically?
23      Q.  I think so, but let's have it read back so
24  there is no question about it.
25      (Read back)

HIGHLY CONFIDENTIAL                                         Page 68

 1      A.  My team did not conduct training for the
 2  divisions, that was the responsibility of the divisions,
 3  and I don't recall if it was specifically within the
 4  training that the divisions delivered.  I don't recall
 5  it.
 6      Q.  You attended training provided by NatWest
 7  in the area of prevention of terror financing, correct?
 8      A.  Possibly the training I attended was
 9  external.  I tended to have my training, so to speak,
10  from my on-the-job experience.
11      Q.  What external training did you receive in
12  the prevention of terror financing while you had your
13  career at the bank?
14      A.  It depends how you define "training".  I
15  have attended workshops and some conferences.
16      Q.  Anything else?
17      A.  No.
18      Q.  When did those occur?
19      A.  At various times over the past years.
20      Q.  Can you give me an estimate of when those
21  two things occurred, or maybe it was more than two
22  things?
23      A.  It is difficult.  On a number of occasions
24  in the past 7 years, some when I first joined, but I
25  can't remember the last one.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                    Page 69

1    Q.  Can you give me an estimate?  Are we
2  talking about a couple or five or six, more than ten?  I
3  don't know, can you try to tell me generally?
4    A.  Ten maybe.
5    Q.  Okay.  Were all of these conducted in
6  Great Britain?
7    A.  Yes, they were.
8    Q.  Have you ever travelled to the United
9  States in connection with your work for the bank?
10    A.  I have, yes.
11    Q.  For what purpose?
12    A.  To see the businesses over there who are
13  part of the group.
14    Q.  Which are what?
15    A.  We have Citizens Financial Group.  We have
16  an operation of a branch of RBS plc in New York.  We
17  have a securities broker dealer in Connecticut and
18  a merchant acquiring and card business in Atlanta,
19  Georgia.
20    Q.  What is the name of the broker dealer?
21    A.  RBS Securities Inc, I think.
22    Q.  How many branches of Citizens Bank
23  approximately are there in the United States?
24    A.  I don't know.
25    Q.  How often have you visited the United

HIGHLY CONFIDENTIAL                    Page 70

1  States for that purpose?
2    A.  Between 2002 and 2006, I maybe went four
3  times.
4    Q.  For a day or two or a week or so?
5    A.  It would have been a week or so.
6    Q.  Did you go with anyone?
7    A.  Generally, I would have gone sometimes on
8  my own, sometimes with a colleague.
9    Q.  Would the colleague have been within your
10  field of work?
11    A.  One of the occasions I recall was with my
12  boss, Mrs Holt.
13    Q.  What was the purpose of that trip?
14    A.  Generally, it would have been to see the
15  management of those businesses in America, to understand
16  their business.
17    Q.  Did it relate to the business that you and
18  Mrs Holt were involved in here in the UK?
19    A.  Yes.
20    Q.  And that included anti-money laundering
21  and anti-terror financing?
22    A.  We would speak to the individuals in those
23  businesses who had responsibility for that, yes.
24    Q.  Were you learning or were you teaching?
25    A.  We were exchanging views of issues and

HIGHLY CONFIDENTIAL                    Page 71

1  policy.
2    Q.  Who were the people in the US that you did
3  that with on those trips?
4    A.  A variety of people.
5    Q.  Can you recall the names of any?
6    A.  I can recall the name of the Banking
7  Secrecy Act Officer in Citizens Financial Group.
8    Q.  What is his or her name?
9    A.  Her name is Holly Dorr.
10    Q.  Can you give me an example, so I can
11  better understand the purpose of those meetings, as to
12  how they were conducted?
13    A.  They were not to give training, which I
14  think is what you were suggesting.  They were more to
15  understand the nature of the business and the
16  implementation of the policy within those institutions.
17    Q.  And was that two-way?  In other words, you
18  imparting that information to the US people and the US
19  people imparting it to you?
20    A.  Yes, it was an exchange of views, yes.
21    Q.  Was there any discussion about procedures
22  for or policies related to the prevention of terror
23  financing?
24    A.  Yes.
25    Q.  Give me an example, please?

HIGHLY CONFIDENTIAL                    Page 72

1    A.  We had a Group policy, as I have
2  described, and in those institutions in the United
3  States that I have just described there were also
4  policies and procedures to ensure compliance by that
5  business with anti-money laundering and sanctions in
6  terrorism requirements.
7    Q.  How did the two compare?
8    A.  The local businesses were meant to comply
9  with our policy in implementing theirs.
10    Q.  I am not sure I understand.  Could you
11  explain that?
12    A.  So the Group policy would be the minimum
13  standard, and local divisions were required to implement
14  their policy to their local requirements, but up to the
15  Group standard.
16    Q.  In the US, was there a Group level dealing
17  with anti-money laundering or anti-terrorism?
18    A.  It was not a Group function; it was done
19  in the businesses.
20    Q.  So in effect you were above those people,
21  as far as that area of being a representative of the
22  Group, is that correct?
23    A.  It depends what you mean by "above".  They
24  did not report to me.  We were a Group function and the
25  US policy was required to be implemented, but in the US,

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

1  obviously, we had to comply in full with the OFAC
2  requirements.
3       Q.  Did you discuss when you were in the
4  United States on those occasions, between 2002 and 2006,
5  the United States OFAC list of terrorists and terror
6  organizations and those financing them?
7       A.  We would have done so in general with
8  those businesses, yes.
9       Q.  Why?
10      A.  Because they are required to comply with
11  them.
12      Q.  What did you say to them about policies in
13  the UK about that?
14      A.  I don't recall discussing it with them.
15      Q.  Can you remember any other occasion than
16  Interpal when a NatWest customer was a charity that
17  became suspected of terror financing?
18      A.  No.
19          MR. WERBNER: Let's take a short break.  The
20  videographer indicates we need to make a change.
21          THE VIDEOGRAPHER: End of tape one, volume one
22  in the deposition of Mr. Stephen Foster.  Going off the
23  record at 11:56 am, as indicated on the video screen.
24          (A short break)
25          THE VIDEOGRAPHER: This is the beginning of

1  tape two, volume one in the video deposition of
2  Mr. Stephen Foster.  Back on the record at 12:09 pm, as
3  indicated on the video screen.
4          MR. WERBNER: Mr. Foster, before the break you
5  were telling me about the US operations of NatWest, do
6  you recall.
7       A.  Yes, I do.
8       Q.  And we discussed briefly your visits to
9  the United States to meet with those entities of the
10  bank, correct?
11      A.  Correct.
12      Q.  Did those US parts of NatWest need to
13  comply in regard to the prevention of terror financing
14  with the Bank of England sanction list?
15      A.  There was no obligation on them to comply.
16      Q.  Was it the policy?
17      A.  It was the policy, yes.
18      Q.  And you conveyed to those US operations of
19  NatWest in the United States that it was the policy of
20  the bank for them to comply in their anti-terror
21  financing with the Bank of England?
22      A.  Yes, I must admit I am trying to recall
23  the detail of how it was implemented, but that would
24  have been the case, yes.
25      Q.  Do you remember an Anti-money Laundering

1  Action Group?
2       A.  I do, yes.
3       Q.  What do you recall about that and the
4  role, if any, that you played with it?
5       A.  It was a group that I chaired from Group
6  Risk Management, and was a chance for heads of
7  Anti-money Laundering in the different divisions of the
8  Group to get together on a regular basis to discuss
9  matters of policy and practice, share knowledge.
10      Q.  How long did you head that Group?
11      A.  I think I took it over fairly soon after
12  I joined and I think until I moved on.
13      Q.  In late 2006?
14      A.  Yes, I think so, yes.
15      Q.  How often did the Anti-money Laundering
16  Action Group that you led for NatWest meet?
17      A.  I think, I recall at the beginning it was
18  quarterly, but I think I changed it to monthly actually
19  because -- or it may have the other way around, but it
20  was monthly at some stage.
21      Q.  About how many people attended that group?
22      A.  It varied, depending on who was available,
23  but it would have been maybe between 10 and 15 people.
24      Q.  Where did the meeting occur?
25      A.  Generally, I chaired it from London, and

1  people would dial in from various locations.
2       Q.  Were there agendas for those Group Action
3  meetings?
4       A.  I believe there were, yes.
5       Q.  Do you know who prepared those?
6       A.  I would have been partly responsible for
7  deciding what went on the agenda.
8       Q.  Were there minutes kept, and by that
9  I mean broadly notes made, summaries?
10      A.  There were minutes of those meetings, yes.
11      Q.  Who prepared those?
12      A.  I don't recall specifically who prepared
13  them, but they would have been in my team because
14  I chaired it.
15      Q.  Were they circulated beyond the members of
16  the Anti-money Laundering Action Group?
17      A.  Beyond the members?
18      Q.  Right.
19      A.  Not by me.  I might have given them to my
20  boss, but not by me.
21      Q.  As far as you know, was it pretty much
22  that the minutes were sent to the people who were
23  attending or their bosses, as opposed to beyond that?
24      A.  I recall that they would certainly have
25  been circulated to the people attending.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

---

HIGHLY CONFIDENTIAL                                          Page 77

1     Q. Do you know if they went beyond that?
2     A. I don't know.
3     Q. Who maintained those agendas and minutes,
4  as far as keeping them in a file?
5     A. It would have been in my team.
6     Q. Who on your team attended those Anti-money
7  Laundering Action Group meetings?
8     A. I recall that I did, predominantly because
9  I chaired it. I think Ian Wickens attended. I think
10 Mr. Hoseason sometimes attended, and then the divisional
11 heads of Anti-money Laundering. Sorry, you asked from
12 my team, which was only me, Mr. Wickens. I am not sure
13 of anybody else.
14    Q. You mentioned Mr. Hoseason. He was not on
15 your team or even the same group. He was in another
16 group, correct?
17    A. He was in another team within a division,
18 yes.
19    Q. And Mr. Hoseason's team in this other
20 group were the ones that dealt with dealing with
21 Suspicious Activity Reports and making disclosures when
22 appropriate to NCIS?
23    A. Yes.
24    Q. So this Anti-money Laundering Action Group
25 was a monthly or quarterly opportunity for those two

---

HIGHLY CONFIDENTIAL                                          Page 78

1  teams to come together, at least at the leadership
2  level, correct?
3     A. Yes.
4     Q. Was it Ms Holt that asked you to chair
5  that Group?
6     A. I don't recall.
7     Q. Anyone else you can think of that may have
8  done that?
9        MR. BLACKMAN: Objection.
10    A. What, asked me to chair it?
11    Q. Right.
12    A. It would only have been her.
13    Q. Is this Group still in existence today, to
14 your knowledge?
15    A. Not in that -- no, it has changed a lot,
16 so I would not say it is in existence.
17    Q. Do you know when its ending came or
18 change?
19    A. No.
20    Q. Did the group discuss terror financing?
21    A. In generality, yes. They wouldn't have
22 been specific.
23    Q. How long typically did these Anti-money
24 Laundering Action Group meetings that you chaired last?
25    A. I think I recall them being an hour or an

---

HIGHLY CONFIDENTIAL                                          Page 79

1  hour and a half.
2     Q. Was Interpal ever discussed at any of
3  those Action Group meetings that you chaired?
4     A. Not that I recall.
5     Q. Could we have this marked please as Foster
6  number 1.
7        (Exhibit Foster 1 marked for identification)
8     Take a minute to look that over and then I will
9  have some questions for you. Are you ready and have you had
10 enough time to look at it?
11    A. Yes.
12    Q. Can you identify this document, please,
13 sir?
14    A. In what way?
15    Q. Just generally describe what it is?
16    A. It is an e-mail sent from Group Risk
17 Management to a number of business areas, containing
18 a list of names which the divisions were required to
19 search against their records.
20    Q. And do what then?
21    A. If they identified them, they would need
22 to report them.
23    Q. To whom?
24    A. To my team.
25    Q. Did you receive this e-mail on or

---

HIGHLY CONFIDENTIAL                                          Page 80

1  about August 26, 2003?
2     A. I don't remember specifically receiving
3  it.
4     Q. Do you have any reason to doubt that you
5  received this exhibit on or about August 26, 2003?
6     A. No.
7     Q. From your review of it, do you have any
8  reason to doubt that this is a true and correct copy of
9  the e-mail sent to you and all these other people?
10       MR. BLACKMAN: Object to the form because it
11 has got a whole bunch of stuff that was redacted as
12 non-responsive, so obviously to that extent it is not
13 a true and correct copy.
14    A. I mean, I don't know where it has come
15 from but --
16    Q. It came from your counsel.
17    A. But it is weird that my e-mail address is
18 GS&F AML. I do not understand that because that is not
19 where I was at the time. So that slightly concerns me,
20 because it should have said Group Risk Management I
21 think, but it is very strange.
22    Q. A number of the people copied on this
23 e-mail of August 26, 2003 from Mr. Connor, from their
24 e-mail, appear to be employees of Citizens Bank in the
25 United States. Do you notice that?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

1  matter, right?
2      MR. BLACKMAN: Objection to form, lack of
3  foundation.  You may answer.
4      A.  We would have -- the bank and other
5  institutions would have had contact with the National
6  Terrorist Finance Investigations Unit as a matter of
7  routine, because they were one of the authorities with
8  whom we dealt.
9      Q.  It would still be serious when the bank
10  was communicating with Scotland Yard about a $180,000
11  payment that involved Interpal and the Islamic
12  Charitable Society for the Support of Al-Aqsa, right?
13      MR. BLACKMAN: Objection to form.  You may
14  answer.
15      A.  Well, I mean this is a conversation in
16  relation to a Suspicious Activity Report, which we did
17  as a routine part of our job, yes.
18      Q.  But that is a serious part of the job,
19  right?
20      A.  It is a very important part of our job to
21  submit Suspicious Activity Reports to the authorities,
22  yes.
23      Q.  Why?
24      A.  Because it allows them to use suspicions
25  we send in to investigate.

1      Q.  And it is up to the bank to determine
2  whether to allow the customer to continue to engage the
3  financial services of the bank, correct?
4      A.  On any occasion we have that ability.
5      Q.  Now, Dedrei Nell of your group, within an
6  hour of receiving the e-mail from Tony, forwards it on
7  to you, correct?
8      A.  It looks like it, yes.  It is interesting
9  that it is a different e-mail address, but we will not
10  go into that again.
11      Q.  No, I see what you have been saying about
12  that, and thank you for pointing that out.  Ms Nell, in
13  forwarding this to you in September 03, says: "FYI", for
14  your information, correct?
15      A.  I guess that was it, yes.
16      Q.  Would you have read this e-mail that she
17  sent to you?
18      A.  I may well have done but I can't remember.
19      Q.  All right.  So would this be a document
20  directed to you or at least sent to you that reflects
21  you would have known about Interpal and prior
22  disclosures to the criminal authorities and recent
23  discussions with them concerning Interpal?
24      MR. BLACKMAN: Objection, document speaks for
25  itself.  You may answer.

1      A.  As I think I have said, I don't know if
2  this was the first time that I heard of Interpal.
3  I would not have known that a SAR was submitted because
4  we didn't see the SARs when they were submitted to the
5  authorities, and I would not have known of any
6  conversations Tony or his team would have had with
7  people like the Special Branch.
8      Q.  Objection, not responsive.  If you read
9  this short e-mail, you would have known that
10  a disclosure about Interpal had been made to the
11  criminal authorities before September 03, correct?
12      A.  The implication from this is that we had
13  submitted a SAR, yes.
14      Q.  And if you had read this short e-mail you
15  would have known in the middle of September 2003 that
16  people on the Money Laundering Team were talking to
17  Scotland Yard about Interpal, correct?
18      A.  Yes.
19      Q.  And so are you willing to acknowledge
20  that, to the best of your recollection, you knew about
21  the Interpal situation at least by the middle
22  of September 2003?
23      MR. BLACKMAN: Object to form.  You can
24  answer.
25      A.  Yes, so as I think I said, I don't recall

1  when I first heard about it.  My recollection was that
2  it was when the Corporate Banking Division did their
3  review, and that still stands.
4      Q.  But when so much time has passed, six or
5  more years, wouldn't you think that the e-mails and
6  other internal documents of the bank that have your name
7  on it would be the best place to look for when you knew
8  about Interpal?
9      A.  They indicate that someone sent some
10  information to me, but as I say I just don't really
11  recall it.
12      Q.  I understand, but my question is to see if
13  you are willing to acknowledge that these e-mails that
14  were sent to you by people on your team, dating them and
15  addressing Interpal, do you have any reason to think
16  that information is unreliable?
17      A.  No.
18      Q.  I am going to ask the court reporter to
19  mark this document NW13695 as the next deposition
20  exhibit.
21      (Exhibit Foster 4 marked for identification)
22      What is the number on that?
23      A.  Exhibit number 4.
24      Q.  Can you identify deposition Exhibit number
25  4 for us, Mr. Foster?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

---

HIGHLY CONFIDENTIAL                                    Page 121

1      MR. BLACKMAN: I think Mr. Werbner was asking
2   you not about that investigation and not about what he
3   was previously asking, but something that occurred
4   before you even joined the bank.
5      A.  Absolutely.
6      MR. BLACKMAN: So just don't make assumptions
7   about that.  None of what you are saying now is within
8   your own knowledge anyway.
9      A.  I apologize.
10      MR. BLACKMAN: Answer the questions to the
11   best of your ability.
12      MR. WERBNER: Would you read it back, please?
13      MR. BLACKMAN: I think there is not a pending
14   question.  Do you have a question?
15      Q.  Are you sure that your bank did not have
16   information that linked Interpal to Hamas
17   in September 2001?
18      A.  I couldn't tell.  It is before I joined
19   the bank.
20      Q.  I was and I will in a moment ask you
21   a hypothetical based on what you knew to be the practice
22   of the bank from 2002 to 2006, but I want to show you
23   a document first, and it is NW212124.
24      (Exhibit Foster 5 marked for identification)
25      Q.  What is the exhibit number?

---

HIGHLY CONFIDENTIAL                                    Page 122

1      A.  Exhibit 5.
2      Q.  Looking at deposition Exhibit 5, do you
3   see it is a communication written by Mr. Hoseason of the
4   Group Investigations & Fraud area of the bank?
5      A.  Yes.
6      Q.  Do you see what the date is?
7      A.  I do.
8      Q.  What is it?
9      A.  27 September 2001.
10      Q.  And you know who the Economic Crime Unit
11   of the National Criminal Intelligence Services is,
12   correct?
13      A.  I do, yes.
14      Q.  That is who the bank communicates with
15   when they have suspicions about terror financing?
16      A.  Any suspicions of any form of criminal
17   activity are reported to NCIS, yes.
18      Q.  Including terror financing?
19      A.  Including terror financing, yes.
20      Q.  Do you see where Mr. Hoseason refers to an
21   article that gives details of a NatWest connection of
22   Interpal?
23      A.  Yes, I do.
24      Q.  Do you see where Mike Hoseason states in
25   reference to this article that there are allegations

---

HIGHLY CONFIDENTIAL                                    Page 123

1   that Interpal is linked with Hamas?
2      MR. BLACKMAN: Objection to form, misstates
3   the document, but you can read the document.
4      A.  Yes, the article to which he is drawing
5   the attention of NCIS makes allegations of links with
6   Hamas.
7      Q.  What does he state in the last paragraph,
8   that is Mr. Hoseason of the bank to the Criminal
9   Intelligence Service?
10      A.  He states that -- would you like me to
11   read it?
12      Q.  Please.
13      A.  "We are currently undertaking a thorough
14   review of the activity through all the accounts held for
15   the Palestinian Relief and Development Fund - Interpal,
16   with a view to making a full disclosure in due course."
17      Q.  Based on your working with Mr. Hoseason
18   when you joined the bank and serving on this Action
19   Group with him that you mentioned, do you have any
20   reason to doubt Mr. Hoseason's statement that the bank
21   was undertaking a thorough review of the activity in the
22   Interpal accounts?
23      A.  I have no reason.
24      MR. BLACKMAN: Before you answer the question
25   I need to make my objection.  Object to hypothetical

---

HIGHLY CONFIDENTIAL                                    Page 124

1   questions about documents the witness has never seen
2   about events before he joined the bank, and I don't
3   think it is proper to try to couch it in terms of what
4   you know of Mr. Hoseason, but you may answer the
5   question.
6      A.  Okay.  That is fair, because I was not
7   there at the time, but I wouldn't doubt what he said.
8      Q.  Once you joined the bank, if NatWest had
9   information that linked Interpal to Hamas, and was
10   suspicious that Interpal was using its NatWest accounts
11   for terror financing, would you want the bank to conduct
12   a thorough review of the activity through all of those
13   accounts?
14      MR. BLACKMAN: Object to the form of the
15   question.  You may answer.
16      A.  I think, as I have said, if we had been
17   suspicious of any customer then we would have been doing
18   that.
19      Q.  Including Interpal?
20      A.  Had we been suspicious.
21      Q.  So had the bank been suspicious that
22   Interpal was engaged in terror financing, the bank would
23   have been conducting a thorough review of the activity
24   in those accounts, correct?
25      MR. BLACKMAN: Strongly object to that

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

1   hypothetical question, which misstates testimony of
2   witnesses, who unlike this witness actually know what
3   was happening, and you are just inviting him to give you
4   speculative sound bites.
5       A.  Difficult to tell.
6       MR. BLACKMAN : You may answer the question.
7       MR. WERBNER: I will ask it be reread.
8           (Question and Answer Read back.)
9       A.  It is, I just don't know.
10      Q.  Why on earth would your bank, having
11  suspicions about a customer being involved in terror
12  financing, not conduct a thorough review?
13      MR. BLACKMAN: Objection to form,
14  argumentative.
15      A.  It would be a decision for the customer
16  holding divisions, but it really is difficult to judge,
17  given what you are showing me, because I was not here at
18  the time.
19      Q.  Forget what I was showing you.  I am
20  asking you, when you became the leader of the group that
21  was involved with preventing terror financing --
22      MR. BLACKMAN: Objection to form.
23      Q.  -- including the time that you were the
24  head of the Action Group --
25      MR. BLACKMAN: Objection to form.

1       MR. WERBNER: I am going to have to start
2   over, given the interruptions.
3       MR. BLACKMAN: I was not interrupting.
4   I thought you were ending your question, Mark.  Please
5   conclude your question.  I was not interrupting, I was
6   trying to make an objection.  I am allowed to do that,
7   despite your views to the contrary.
8       MR. WERBNER: Did you discuss with Mr.
9   Blackman anything concerning the lawsuit during the
10  lunch break?
11      A.  Anything concerning the lawsuit?  No.
12      Q.  Are you sure about that?
13      A.  It is funny because I was out of the men's
14  room --
15      Q.  I am not asking what you did in the men's
16  room?
17      A.  Mr. Blackman was hardly in the room over
18  lunch.
19      Q.  I am not asking about the men's room.  I
20  am not asking what you ate for lunch during the lunch
21  break.  Did you discuss with Mr. Freedman this lawsuit?
22      MR. BLACKMAN: Mr. Blackman.
23      MR. WERBNER: During the lunch break, did you
24  discuss with Mr. Blackman anything about this lawsuit?
25      A.  We talked about the morning, but not in

1   any detail.
2       Q.  Regardless of the details, during the
3   lunch break, did you discuss the lawsuit?
4       A.  Yes.
5       MR. BLACKMAN: I will be happy to give an
6   affidavit, if necessary, about exactly what I told
7   Mr. Foster over lunch, and I think you would like to
8   read it.
9       MR. WERBNER: All right, I would like to see
10  that.
11      Mr. Foster, what reason would the bank have if
12  it had a suspicion of a customer engaging in terror
13  financing to not thoroughly review the activities of
14  that customer in its NatWest accounts?
15      MR. BLACKMAN: Objection to form, to the
16  extent that you misstate prior testimony on the subject.
17      A.  Sorry, am I meant to answer?  Apologies, I
18  didn't realize.
19      MR. BLACKMAN: My objections are just designed
20  to make -- if we don't object to things then these
21  questions are allowed in, potentially.  I have to object
22  to them, because they are objectionable, but that
23  doesn't in any way preclude you from answering.
24      A.  That is all right.  You were objecting on
25  conjecture, which is difficult for me to talk about.

1       MR. BLACKMAN: I was objecting in part on
2   conjecture, but please answer.
3       A.  So if we had a suspicion of any form of
4   unusual activity, it was our obligation under the law to
5   send a report in to the authorities, who would do their
6   own detailed investigation, based on what we had sent
7   them, and they might come back to us with a Production
8   Order which is a legal document requiring us to disclose
9   information to them.  If we felt -- this was not
10  necessarily a policy, but if we felt that we wanted to
11  take a further look at a customer's accounts to be sure
12  that the activity was appropriate, then we were quite --
13  we would do that.
14      Q.  Was that something that you know was done
15  from time to time?
16      A.  That is done on a number of occasions
17  because that is what we do in order to make sure we are
18  not supporting criminal activity.
19      Q.  So, correct me if I am wrong, you are not
20  saying that NatWest only thoroughly reviewed activities
21  in a customer's account suspected of terror financing
22  when told to do so by the criminal authorities, are you?
23      A.  I am saying that we wouldn't do it just on
24  the basis of a request from the criminal authorities,
25  which is for information, not to do a review, but we may

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

1  do it ourselves depending on the nature of what we saw
2  as suspicious.
3      Q. I think I understand. Correct me if I am
4  wrong, you are saying that NatWest would conduct
5  a thorough review of a customer's account and the
6  activities in it if it suspected terror financing and
7  was requested to do it by the authorities, but that the
8  bank might also conduct that thorough review for that
9  purpose regardless of a request from the authorities.
10 Correct?
11     A. I think I understood that question but --
12 yes.
13     Q. Let's read it back and get an answer. It
14 is important.
15     A. Fine.
16     Q. And I don't want to have any confusion.
17 Go ahead. Please read it.
18         (Read back)
19     A. Yes, that is correct, it was in many cases
20 a suspicion, nothing more.
21     Q. And from Mr. Hoseason's letter,
22 Exhibit 5 --
23     A. Yes.
24     Q. -- it appears that in the case of Interpal
25 that thorough review of the activities of the account

1  were made, right?
2      MR. BLACKMAN: Objection, the question was
3  asked and answered. I assert the same objections as
4  before to this questioning about the document, but you
5  may answer.
6      A. Yes, it is difficult to tell because I was
7  not there, but the letter says that that is what is
8  happening.
9      Q. Even after the United States Government
10 declared that your customer, Interpal, was engaged in
11 financing a terrorist organization, NatWest continued to
12 provide financial services for a year or more, isn't
13 that true?
14     MR. BLACKMAN: Object, you may answer.
15     A. So, we maintained the account of Interpal
16 in the UK, the bank, not me, but became aware of that,
17 that Interpal had been added to the OFAC list, but that
18 does not mean we have to close the account.
19     Q. You didn't --
20     A. We took account of the OFAC list, as I
21 have said.
22     Q. And then, despite that US Government
23 declaration about Interpal, NatWest continued to provide
24 financial services to Interpal for at least a year,
25 correct?

1      MR. BLACKMAN: Same objections. You may
2  answer.
3      A. We didn't close the account when Interpal
4  were put on to the OFAC list.
5      Q. In fact, Interpal was allowed to continue
6  to use its account and conduct financial transactions
7  for more than a year, right?
8      MR. BLACKMAN: Objection. You may answer.
9      A. Yes, well, we took account of that
10 designation, we took account of the earlier Charities
11 Commission investigation, we took account of the second
12 Charities Commission investigation, we did a thorough
13 review of the account, both in 2001 and indeed after
14 that, and I don't think we did anything -- I think we
15 reacted very cautiously in order to make sure we were
16 not holding an account for someone who funded terrorism.
17     Q. I am not asking you for excuses. Would
18 you read the question back.
19     A. I was not giving excuses.
20     Q. What were you doing?
21     A. I was describing what we did.
22     MR. WERBNER : But I asked you something else.
23 Would you read the question back?
24         (Read back)
25     A. After the designation, yes.

1      Q. Did your team monitor in any way the
2  Interpal account after it knew the United States
3  Government had declared Interpal to be providing terror
4  financing to Hamas?
5      A. So my team did not do that because it was
6  not the job of my team.
7      Q. Did you participate in any way with
8  anybody at the bank in doing that?
9      A. I remember contact with Mr. Cole, who
10 undertook reviews of the account.
11     Q. Weren't you involved with another customer
12 in making decisions about whether to close the account
13 because of concerns about terror financing?
14     A. I don't know. I don't know what you mean.
15     Q. Well, from 02 to 06, was it or was it not
16 part of your duties to participate in decisions about
17 whether NatWest allowed customer accounts to be kept
18 open in the face of the United States Government
19 declarations about the customer being involved in terror
20 financing?
21     MR. BLACKMAN: Object to the form of the
22 question. You can answer.
23     A. My team was asked for advice and gave
24 advice on divisions when they were doing their work.
25     Q. Was that the case for Interpal?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                    Page 141

1       A.  Yes, as I say, it is difficult to answer
2   that but, in principle, if we were sufficiently
3   concerned about the activities of a customer, we would
4   close the account, yes.
5       Q.  All right.  Now, would you agree that
6   throughout your employment with NatWest and the Royal
7   Bank of Scotland, the bank has enormous resources to
8   prevent terror financing in the accounts of its
9   customers?
10      MR. BLACKMAN: Objection to form of the
11  question.  It is vague.
12      A.  Yes, it is difficult to answer that
13  because we have enormous resources but that doesn't mean
14  they would all be directed at preventing terror
15  financing, for example.
16      Q.  No, I understand that all of the enormous
17  resources of the bank are not and cannot be directed
18  merely to that, but I want to be clear that this is
19  a very large bank, that is experienced, with a lot of
20  resources to carry out its business.  Correct?
21      MR. BLACKMAN: Objection to form, irrelevant
22  and ambiguous question.  You may answer it.
23      A.  Yes, it is one of the largest retail
24  corporate banks in the country, yes.
25      Q.  And in the world?

HIGHLY CONFIDENTIAL                                    Page 142

1       A.  Fairly large, yes.
2       MR. WERBNER: Let's take a break at this point
3   and the tape will need to be changed as well.
4       THE VIDEOGRAPHER: This is the end of tape
5   two, volume one, in the video deposition of Mr. Stephen
6   Foster.  Going off the record at 2:42 pm, as indicated
7   on the video screen.
8       (A short break)
9       THE VIDEOGRAPHER: This is tape three, volume
10  one, in the video deposition of Stephen Foster.  We are
11  back on at 2.57 pm, as indicated on the video screen.
12      MR. WERBNER: Mr. Foster, let me hand you what
13  has been marked deposition Exhibit Foster 7.
14      (Exhibit Foster 7 marked for identification)
15      This is an e-mail chain in which you were
16  involved concerning Interpal, correct?
17      A.  Correct.
18      Q.  Do you recognize it?
19      A.  I don't remember it specifically happening
20  but --
21      Q.  Generally, you know of no reason to
22  suggest this is not authentic, do you?
23      A.  No.
24      Q.  Let's look first at the bottom e-mail, the
25  one that is first in the chain.  It is one you wrote on

HIGHLY CONFIDENTIAL                                    Page 143

1   9 October 2003, to Michael Hoseason, Derek Brand and Ben
2   Norrie.  Do you see that one?
3       A.  I do, yes.
4       Q.  Among other things, you say there is that
5   the Bank of England has reminded the bank that you work
6   for that payments to Hamas are prohibited under a Bank
7   of England Notice of late September.  Correct?
8       A.  Yes.
9       Q.  And then Derek Brand, on the same day,
10  a few minutes later, makes a response to you under the
11  subject "Interpal".  Correct?
12      A.  Correct.
13      Q.  And then you respond, thanking him, and
14  then Tony O'Hear writes to you around 5:30
15  on October 13, correct?
16      A.  Correct.
17      Q.  You write back a little after 6:00 pm,
18  October 13, 2003, thanking him.  What did you say after
19  that?
20      A.  I say here:
21      "I think the main concern now is to ensure
22  that no future payment is made to Hamas.  With the
23  restrictions lifted, is there any formal (or even
24  informal) monitoring of the traffic?"
25      Q.  When you said that, in reference to

HIGHLY CONFIDENTIAL                                    Page 144

1   Interpal, the main concern was to ensure that no future
2   payment is made to Hamas, did you mean to include
3   payments made directly or indirectly to Hamas?
4       A.  What I meant was that this is in relation
5   to the letter we received or Mr. Gossage received from
6   the Bank of England, indicating to him that there was no
7   reason why we should not continue our relationship with
8   Interpal, partly because probably by this time they had
9   been investigated again by the Charities Commission, who
10  found no evidence, but I recall the letter saying
11  something like: "Please remember that any payment to
12  Hamas is prohibited under our sanctions.  Therefore you
13  need to make sure that that does not happen".
14      Q.  My question, though, is a little
15  different, and here it is.  When you wrote
16  on October 13, 2003 about Interpal, and said to Tony
17  O'Hear that the main concern is to ensure that no future
18  payment is made to Hamas, did you intend that to mean
19  ensuring that no future payment was made directly or
20  indirectly to Hamas?
21      A.  Well, what I meant is that if according to
22  the Bank of England requirements Hamas was a prohibited
23  organization, and therefore we had to ensure that we did
24  not allow our customers to make funds available to
25  Hamas.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

---

1    Q. So one of the --
2    A. I am thinking of any specific areas. We
3 certainly developed over that time a project for the
4 filtering of payments, because that was becoming more
5 important. Industry practice was moving towards that in
6 the UK.
7    Q. There are some documents having to do with
8 that, which we will look at.
9    A. Okay.
10    Q. Those documents date that around 2004.
11 Does that comport with your recollection?
12    A. From my recollection, 2004/05, yes.
13    Q. Anything besides filtering of payments?
14    A. In 2005, maybe late 2005, early 2006, we
15 also issued a policy in respect of OFAC, which hitherto
16 we had not specifically had because it was not covering
17 the UK jurisdiction.
18    Q. And what was the policy you issued in
19 respect of OFAC?
20    A. The policy required -- enhanced our
21 capability, sorry, enhanced the requirements on
22 businesses in respect to terrorist financing to report
23 any accounts, specifically any accounts they had that
24 were on the OFAC list to the authorities.
25    Q. Do you know whether that included the

---

1 accounts in the name of Interpal and its aliases?
2    A. It would have done, but of course they had
3 been reported to the authorities already, and as we have
4 discussed we had a number of contacts with the
5 authorities prior to that, but the policy changed in
6 such a way that compliance with OFAC became more --
7 a tougher requirement for the UK business.
8    Q. Was that as a result of changes in UK law?
9    A. No, it wasn't. It was more a result of
10 increasing business in the United States, the increasing
11 importance of the US to our business, and greater
12 recognition, if we needed it, of the importance of
13 preventing terrorism.
14    Q. How did the increase in the bank's
15 business in the United States impact -- withdrawn. I am
16 asking this badly.
17     I am following up on what you said, which was
18 that increasing business in the United States caused the
19 bank to implement tougher policies with respect to OFAC.
20 Is that correct?
21    A. Outside the US, yes.
22    Q. Inside and outside the US?
23    A. Sorry, there was already compliance,
24 complete compliance in the US businesses with OFAC,
25 because that was a requirement.

---

1    Q. Of course.
2    A. What I am saying is that outside the US we
3 decided to follow the same practice.
4    Q. That being that you would not do business
5 with OFAC listed entities?
6    A. No, that being that if we identified an
7 OFAC listed entity we would report it to or send an SAR
8 to the authorities that we had that account.
9    Q. I see. So what you said then was that you
10 had already done that with Interpal and its aliases?
11    A. We did a couple of years before, but that
12 doesn't mean we didn't have to do it again if there was
13 suspicious activity, but in terms of reporting to the
14 authorities accounts held in the name of those on the
15 OFAC list, we would do it.
16    Q. Did the bank have accounts held in the
17 name of OFAC listed entities other than Interpal and its
18 aliases?
19    A. I don't recall very many at all. It was
20 not -- the business was predominantly UK based. I think
21 we had one other, I believe.
22    Q. You said earlier that, please correct me
23 if I say this incorrectly, but in the time period when
24 the Charity Commission was looking at Interpal, and its
25 accounts --

---

1     MR. BLACKMAN: We are in the late August,
2 September 2003?
3     MR. SCHWARTZ: That is correct, late 2003 now.
4 At around that time, it was your understanding that
5 OFAC, that a listing by OFAC was not applicable to UK
6 transactions. Is that correct?
7    A. The OFAC list did not apply in the UK.
8 Therefore we were allowed to hold an account for
9 Interpal, technically. One needed to be cautious of
10 dollar transactions, but there was no reason why we
11 could not hold the account in the UK under UK
12 legislation. It was not on the Bank of England list at
13 the time.
14    Q. And what is the basis of your belief that
15 that is correct?
16    A. That what is correct?
17    Q. That OFAC did not apply in the UK?
18    A. Because OFAC is issued by the United
19 States Treasury, which does not apply in the UK. It is
20 not a legislative framework that applies in the UK.
21    Q. I understand that. You said you are not
22 a lawyer?
23    A. Correct.
24    Q. So I am trying to find out how do you know
25 that that is true?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                      Page 193

1      A.  If it was a match to the Bank of England
2   list, we had specific things we had to do, which was to
3   freeze the account and report it to the Bank of England
4   Sanctions Unit, and not allow any transactions through
5   that account.
6      Q.  This was a search of prior transactions,
7   is that correct?
8      A.  No, this is a search of customer accounts,
9   account names.  This was not transactions.  This was
10   a search of a database that holds the name in which the
11   account is held.
12      Q.  I see.
13      A.  So if I had an account, it was called
14   "Stephen Foster", this process would search that name
15   against this list.
16      Q.  I believe you said earlier that the
17   creation of these lists, this search project was done
18   under your authority.  Is that correct?
19      A.  That is correct.
20      Q.  It did not pre-exist your arrival?
21      A.  It did pre-exist my arrival, yes,
22   absolutely.  These periodic searches happened before
23   I joined.  They were happening already, had been
24   happening for a number of years.
25      Q.  And these search lists were always

HIGHLY CONFIDENTIAL                                      Page 194

1   available to the various divisions within the bank,
2   weren't they?
3      A.  Yes.
4      Q.  So then why would a division have an
5   account open in the name of someone that was on one of
6   these lists?
7      A.  Because a name may have been added to
8   a list whilst we had held an account, and then a search
9   would be done, they would identify that we had that
10   account, and they would freeze it.  There were searches
11   as well when the account was opened, so I think it would
12   be very unlikely we would actually hold an account in
13   the first place, but new names were added all the time.
14      Q.  I see.  So this says the Group has made
15   a decision on or around June 2003 to add the OFAC
16   Terrorism categories to this list.  So if at this time
17   you received a match to a name on the OFAC lists, what
18   was the bank's policy in regard to that match?
19      A.  At that point we had no specific policy in
20   relation to OFAC, because it was outside the
21   jurisdiction of the UK, so if I recall correctly we
22   would be just recording that information.
23      Q.  For what purpose?
24      A.  For the purpose -- I honestly cannot
25   remember.

HIGHLY CONFIDENTIAL                                      Page 195

1      Q.  Did this search -- I probably can tell by
2   looking at the document, but it also went out to
3   Citizens?
4      A.  Yes, but Citizens were already searching
5   against the entire OFAC list anyway.
6      Q.  Because they were under US rules?
7      A.  Because they were under US rules, so in
8   a way it is a bit misleading just that they are on
9   there.  It doesn't really matter.
10      Q.  You can put that away.  Thank you very
11   much.  I want to return briefly, if I may, to the
12   exhibit that has been marked Foster 7, that is NatWest
13   013939.  It runs to 13941.  Thank you for your patience.
14   I don't think I will be much longer.
15      A.  That is okay.
16      Q.  Do you have that document before you?
17      A.  Yes, I do.
18      Q.  Do you want to review it again?
19      A.  I have just reviewed it again.  I think I
20   am comfortable to take any questions from you.
21      Q.  This again appears to be a chain of
22   e-mails.  Do you agree with that description?
23      A.  I do.
24      Q.  It includes -- let's start with the first
25   one, which is dated October 9, written from you to

HIGHLY CONFIDENTIAL                                      Page 196

1   Messrs Hoseason, Brand and Norrie.  Do you see that?
2      A.  Yes.
3      Q.  Do you remember writing that e-mail, sir?
4      A.  I don't remember specifically sitting at
5   my desk, but I am sure I wrote it.
6      Q.  You have no doubt that you wrote it?
7      A.  I have no reason to question that I wrote
8   it.  I am not trying to be difficult I just cannot
9   remember.
10      Q.  And would you have written that e-mail in
11   the ordinary course of your business?
12      A.  Yes.
13      Q.  Do you note that it refers to at the very
14   last sentence it is "However".  Why don't we read the whole
15   e-mail, it is very short:
16      "For your information, the Bank of England have
17   written to us
18   
19   
20   
21   
22   so we need to be freezing funds, reporting, et cetera."
23      We can stop there.  This Bank of England
24   Notice of late September, as I read this, it appears to
25   be referring to late September 2003.  Do you agree with

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                    Page 209

1  must be carefully made, as closing the account without an
2  identifiable reason will most probably result in adverse
3  media attention.  Also, if a terrorism related payment is
4  identified as being made, we again would suffer untoward
5  regulatory media attention."
6       Do you think that is what you were addressing
7  when you were speaking of "reputational issues"?
8       A.  Yes, because there are many reasons why we
9  might close an account for a customer.  If a customer
10 considers that that is unjustified, it is common
11 practice for them to go to the newspapers and try and
12 make a story out of it.  Any bank, not just us.  And
13 that is not a nice thing to see in the papers because
14 generally we cannot respond, so the case against us is
15 shown in a bad light.  Terrorism, we don't want to be
16 related to terrorism at all.
17      Q.  So you are perhaps kind of between a rock
18 and a hard place when you try to close an account like
19 this?  That is what you were saying?
20      A.  No, because if we had been concerned that
21 it was linked to terrorism we wouldn't have had any
22 hesitation in closing it.  The media attention for
23 closing an account related to terrorism wouldn't have
24 worried me.
25      Q.  So at least at this time then you were not

HIGHLY CONFIDENTIAL                    Page 210

1  really concerned that the accounts were linked to
2  terrorism?
3       A.  We had no evidence to suggest that,
4  because this is after two Charity Commission
5  investigations, a number of contacts with, as we have
6  seen before, Special Branch, which I was not involved
7  in, so our comfort at the time was that we could
8  continue to manage the account.
9       Q.  You did have a listing by OFAC?
10      A.  Yes, indeed.
11      Q.  So it was not no evidence, but you did not
12 consider it to be sufficient?
13      A.  That was a listing in the United States.
14 It doesn't necessarily mean it is a terrorist
15 organization, that it is actually financing terrorism.
16      Q.  What do you understand it to mean?
17      A.  That the US authorities suspect it might
18 be.
19      Q.  If you turn over to the first page, the
20 very last full paragraph, not the single sentence, and
21 this now -- let me ask you first, please, this appears
22 to be an e-mail from Guy Cole to you and to Ben Norrie?
23      A.  Yes.
24      Q.  Cc'd to Messrs Rodger, Davies and Richard
25 Jones, is that correct?

HIGHLY CONFIDENTIAL                    Page 211

1       A.  Yes.
2       Q.  Who was Mr. Davies?
3       A.  Rob Davies worked in my team for a period
4  looking after the administration of our sanctions lists.
5       Q.  And Mr. Jones?
6       A.  Mr. Jones was one of the members of the
7  MLPU we just discussed, the Money Laundering Prevention
8  Unit in Corporate Banking Division.
9       Q.  And Mr. Rodger was the head of that unit,
10 correct?
11      A.  Yes, at that time, yes.
12      Q.  You say in the second paragraph -- excuse
13 me.  Okay, now, this e-mail is, as I have just
14 described -- do you remember receiving it?
15      A.  I don't remember specifically receiving
16 it.
17      Q.  Do you have any doubt that you received
18 it, May 20, 2004?
19      A.  I have no reason to doubt that I received
20 it.
21      Q.  Would you have received this in the
22 ordinary course of your business?
23      A.  Yes, I would.
24      Q.  If you look at the next to last paragraph,
25 or the last full paragraph, Mr. Cole writes:

HIGHLY CONFIDENTIAL                    Page 212

1       "I am content to leave the sterling and Euro
2  accounts operating with the semi-annual review taking place
3  for foreign payments made from the accounts.  Consideration
4  will need to be given regarding the operation of the US
5  dollar account, as funds from this account will get frozen
6  if they are transferred via a US domiciled/owned
7  counterparty."
8       Do you understand what Mr. Cole meant when he
9  said: "Consideration will need to be given regarding the
10 operation of the US dollar account."
11      A.  I do, yes.
12      Q.  Could you explain, please?
13      A.  Given that Interpal was listed on OFAC, if
14 we tried to make a payment on behalf of our customer in
15 US dollars, it would need to go through the United
16 States, through a counterparty correspondent bank in the
17 United States, and would likely be frozen by that US
18 based institution, meeting their obligations under OFAC.
19      Q.  So is Mr. Cole suggesting here, to your
20 understanding, that you should consider advising the
21 customer to stop making dollar transactions?
22      MR. BLACKMAN: Objection.
23      A.  No, we wouldn't do that.
24      Q.  So what is he suggesting?
25      A.  So he is suggesting that the funds might

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

---

1   be frozen, the customer's funds might be frozen in the
2   United States.
3       Q.  But he is not suggesting a course of
4   action as a result of that?
5       A.  No.
6       MR. SCHWARTZ: We need to change the tape.
7       THE VIDEOGRAPHER: This is the end of tape
8   three, volume one.  Going off the record at 5:14 pm, as
9   indicated on the video screen.
10      (A short break).
11      THE VIDEOGRAPHER: This is beginning of tape
12  four, volume one, in the deposition of Mr. Stephen
13  Foster.  We are on the record at 5:27 pm.
14      MR. SCHWARTZ: Just a little follow-up, sir,
15  on 12, if you would.  I asked you if Mr. Cole was
16  suggesting that the bank should consider advising the
17  customer to stop making dollar transactions, and you
18  responded "No, we wouldn't do that".  Why wouldn't the
19  bank do that?
20      A.  It was not -- that would be suggesting
21  that the customer would avoid some form of legislative
22  requirement in the States, for example, and that is not
23  what we would advise our customer ever to do.  So we
24  would make them aware of the risk of funds being frozen
25  in the United States but we would not say to a customer

---

1   "Do not do that because you will break the law", if you
2   see what I mean, to avoid the law.
3       Q.  I understand.  Are you aware that the bank
4   ultimately did suggest that Interpal close its dollar
5   account?
6       A.  Indeed, yes, so we closed it, yes.  It was
7   the sensible thing to do.
8       Q.  That is different than what I was just
9   asking you about?
10      A.  No.  Well, it is different in as much as
11  we wouldn't have told the customer to avoid -- to use
12  a different currency to do its transaction.  That is
13  a separate thing to then say we closed the dollar
14  account, I think.
15      Q.  What is the difference?
16      A.  Because -- well, I wouldn't say that we
17  would close the dollar account in order -- because we
18  had said to them: "You need to use a different currency,
19  otherwise it will get frozen".  We would not do that.
20  We would have done it.  I don't know why we did it
21  ultimately.
22      Q.  If you don't know the answer then just say
23  so.
24      A.  I am sorry, I am trying to make the point
25  that we would not deliberately tell a customer to use

---

1   a different currency to avoid US funds being frozen or
2   something.  That is the point I am trying to make.
3       Q.  Again, I am not trying to be
4   argumentative, but isn't the effect of closing the
5   dollar account exactly the same?
6       A.  I guess you could, yes, but I am trying to
7   make a different distinction, because I don't
8   know why we closed the dollar account, but my point in
9   answer to your original question was -- and as it says
10  on this particular e-mail is we would not tell
11  a customer to do a transaction in a different currency
12  from dollars if they wanted to do it in dollars.  We
13  would not tell them to change the currency in order that
14  they would avoid US sanctions.
15      Q.  Why wouldn't you tell them that?
16      A.  Because we would be encouraging them to
17  avoid US sanctions, which we would not do.
18      Q.  Why not?
19      A.  Because that is not the right thing to do,
20  to encourage customers to breach laws in other
21  countries.  We would not do that.
22      Q.  Again, I am not trying to be
23  argumentative --
24      A.  I am trying to help.
25      Q.  What is the difference.  The effect of

---

1   closing the account was so that accounts would not be
2   frozen.
3       MR. BLACKMAN: Objection.  I don't want to
4   fuss with you but I think you are repeating your
5   question, which is fair, he has repeated his answer,
6   which is fair.  Try one more time.
7       A.  It has the same effect, but I suppose the
8   distinction I am trying to make is that we would not
9   have said to them: "Close your dollar account", I don't
10  know, "to enable you to avoid US sanctions".
11      Q.  Because that wouldn't be the right thing
12  to do?
13      A.  We would not encourage them to avoid US
14  sanctions, which would have happened if they had
15  processed, if they had tried to do a dollar transaction.
16      Q.  Or use their dollar account?
17      A.  Yes, use the dollar account.
18      Q.  If you look, still on 12, there, the very
19  last e-mail at the top, this appears to be an e-mail
20  from Mr. Davies to you and to Mr. Norrie.  Is that
21  a correct description?
22      A.  Yes, that is right.
23      Q.  Do you have any doubt that you received
24  this e-mail on May 12, 2004?
25      A.  I have no reason to doubt it.

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                                    Page 217

1     Q.  Would you have received this e-mail in the
2  ordinary course of your business, sir?
3     A.  I expect so, yes.
4     Q.  Mr. Davies says -- let's read it:
5     "Another issue for us to consider with Interpal
6  could be payment filtering.  It may look a little
7  inconsistent going forward if we have to block US dollar
8  payments going to Interpal, (i.e Interpal is OFAC listed)
9  but are happy to maintain a relationship with them as
10  a customer."
11     Do you understand what Mr. Davies was talking
12  about there?
13     A.  I am not -- I wouldn't know exactly what
14  he was indicating.
15     Q.  But what do you understand that to be
16  saying?  First of all, Mr. Davies was your employee?
17     A.  He was on my team looking after the
18  sanctions lists.
19     Q.  You were his superior?
20     A.  Indeed.
21     Q.  So what did you understand him to mean,
22  please?
23     A.  It is difficult to -- I guess it is the
24  relationship with our customer.  We are able to hold an
25  account for this charity in the UK and we wanted to --

HIGHLY CONFIDENTIAL                                    Page 218

1  we had made a decision that we wanted to continue
2  maintaining that account, and yet, if they had ever
3  wanted to make a dollar payment it would have been
4  blocked, for reasons we have discussed, so I guess they
5  might be a little bit annoyed that we were maintaining
6  their account but would not let them do dollar
7  transactions.
8     Q.  So what is Mr. Davies suggesting here?
9     A.  I am not sure.  I am truly not sure.
10     Q.  I understand.
11     A.  Because payment filtering is the
12  monitoring of payments in and out of the account.
13     Q.  Having nothing to do with currency?
14     A.  Indeed.
15     Q.  Would the bank ever have advised
16  a customer in this situation to avoid doing dollar
17  transactions?
18     A.  As I say, we would not have done that.
19     Q.  You would not have done that?
20     A.  No.
21     Q.  You mentioned also that at a later period,
22  when you decided to get a little more restrictive about
23  OFAC sanctions, you found that you had one other
24  customer who was OFAC listed.  Is that correct?
25     A.  That is correct.

HIGHLY CONFIDENTIAL                                    Page 219

1     Q.  Can you remember the name of that
2  customer?
3     A.  It was a small charity in Northern Ireland
4  which had alleged links to the Irish Republic Army.
5     Q.  What did the bank -- did the bank take any
6  action once they discovered that that account was OFAC
7  listed?
8     A.  We closed the account, and by this time we
9  were developing our policy on OFAC, to the extent that
10  even now we apply OFAC requirements globally in our
11  bank, but we identified it because we introduced
12  a policy around OFAC into the UK, identified any other
13  accounts that were on the OFAC list and exited them.
14     MR. BLACKMAN:  Can you put a timeframe on
15  that?
16     A.  The policy on OFAC came in early 2006,
17  from memory.
18     Q.  By then had you closed Interpal's
19  accounts, do you know?
20     A.  I don't recall, funnily enough.  I don't
21  recall when we closed the Interpal account, to be
22  honest.
23     Q.  But this policy would have also mandated
24  closing Interpal's accounts at that time, wouldn't it
25  have?

HIGHLY CONFIDENTIAL                                    Page 220

1     A.  I think, yes, it would have done, yes, but
2  there may have been other reasons, if we didn't close
3  it, then why we maintained it.
4     Q.  But the reason you closed the Irish
5  account was because it was listed on OFAC?
6     A.  Yes.
7     Q.  I believe earlier we looked at an exhibit
8  which was the press release from OFAC, which I don't
9  seem to have.  Is that correct?  Do you have all the
10  exhibits?
11     A.  I do.
12     MR. BLACKMAN:  That was a Hoseason exhibit.
13     MR. SCHWARTZ:  Why don't we introduce this as
14  Foster Exhibit 13.
15     (Exhibit Foster 13 marked for identification.)
16     Foster Exhibit 13 is not Bates numbered but it
17  is a press release from the Office of Public Affairs,
18  United States Department of Treasury, dated August 22,
19  2003.  Please take a moment and read that.  Have you had
20  a chance to look at this, Mr. Foster?
21     A.  I have, yes.
22     Q.  I know that Mr. Werbner may have asked you
23  this but have you ever seen this before?
24     A.  No, not before today, no.
25     Q.  So it is safe to assume that you also

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER - Vol. 1
July 16, 2010

1   Interpal in the UK."
2       There you are saying that the US and UK have
3   different foreign policies over Israel and Palestine,
4   is that correct.
5       A. That is what I am saying there, yes.
6       Q. What did you mean by that, sir?
7       A. I would guess it was the comment I made
8   a moment ago, which is that there will be different
9   views by different governments of issues around the
10  world.
11      Q. And what did you understand the US view to
12  be?
13      A. I would not have specifically gone into
14  any particular political detail there, but for me the
15  fact that it was on OFAC and not on the Bank of England
16  list showed a difference in attitude towards that
17  charity, because the UK Government had determined that
18  it had no links to terrorism.
19      Q. It doesn't really speak to foreign policy
20  though, does it?
21      A. No, it doesn't. To some extent it was
22  a throw away comment but, as I say, it typified for me
23  the difficulties we sometimes face with Government
24  policy in different countries.
25      Q. You understand, you know who Hamas is,

1   correct?
2       A. I do.
3       Q. What do you understand Hamas to be?
4       MR. BLACKMAN: Can I object here. I think
5   there has been a lot of questioning on that subject. I
6   object at this late hour to going down that road again,
7   but you can answer.
8       A. Sorry, it is an organization based in
9   Palestine with alleged links to terrorism.
10      Q. What do you mean by "alleged links to
11  terrorism"?
12      A. I don't know specifically enough about
13  Hamas to say what they do, so I am just using some of
14  the terminology that has been used before in newspaper
15  articles and things like that, and it is designated on
16  the Bank of England list and therefore we would block
17  any account with them.
18      Q. So it is your understanding, if the Bank
19  of England has designated them, that the Bank of England
20  considers them to be a terrorist organization?
21      A. The Bank of England administers the UK
22  Government Treasury sanctions list, which is based on
23  a number of international lists, including the United
24  Nations and the European Union, so the decision by the
25  UK Government would have been to put them on the list.

1   therefore we have to block it.
2       Q. Have you ever read in the news about any
3   of the acts of terrorism that Hamas has claimed credit
4   for?
5       A. I recall reading in the news about events
6   linked to Hamas, yes.
7       Q. If you may offer me a moment's latitude, I
8   have a client, the estate of Judy Greenbaum. She was
9   31 years old, three months pregnant, when she was
10  murdered in an act that Hamas claimed credit for, and in
11  that same bombing six babies were killed. So when we
12  speak of Hamas and terrorism, you understand that that
13  is what we are talking about?
14      A. I do very much understand that.
15      Q. Is it your understanding that there is any
16  law in England that obligated you to continue to operate
17  the Interpal accounts after they were designated by the
18  United States in 2003?
19      A. There is no law obligating us to maintain
20  an account for anybody.
21      Q. So then, at the time the accounts were
22  designated by the United States in 2003, it is your
23  understanding that the bank had discretion to close the
24  account if it wished to, isn't that correct?
25      A. Yes, we have a discretion to close

1   accounts at any time, for almost any reason, not
2   necessarily linked to terrorism.
3       Q. But the bank chose not to close those
4   accounts?
5       A. On this occasion, yes, after a thorough
6   review, internally and externally.
7       Q. A few more questions for my colleague and
8   then I think I will be finished. I had asked you about
9   your comment in Foster 9 that the US and the UK have
10  different foreign policies over Israel and Palestine.
11  You called that a "throw away comment", and their
12  handling of Interpal was what you were really talking
13  about. Is that correct?
14      A. Not necessarily.
15      Q. If you can just please illuminate a little
16  more what your understanding is of the differences in
17  the US and UK approaches?
18      MR. BLACKMAN: I am going to object to the
19  question. It is not a foreign policy seminar, but he
20  can answer.
21      MR. SCHWARTZ: That is true, but he made this
22  statement. I would like his understanding.
23      A. I will try to explain, but I am not
24  a politician, not hugely focused in politics, US or UK.
25  I utterly deplore any act of terrorism, including the

HIGHLY CONFIDENTIAL                                      Page 233

1    one you described to me, no matter who committed it.
2        Q. I appreciate that.
3        A. I really do, but for me this is probably
4    showing the difficulties we face as an institution,
5    trying to provide banking services to our customers,
6    when a customer is treated differently for different
7    reasons in different countries, driven to some extent by
8    foreign policy differences. It doesn't mean we would --
9        Q. I understand that, but what do you
10   remember the differences to be?
11       A. On this particular occasion the US
12   authorities had decided to designate Interpal on OFAC as
13   an entity to be blacklisted, but the judgment in the UK
14   was that that was not the case, because there was no
15   proof of their links, alleged links with terrorism.
16       Q. But outside of the Interpal designation
17   issue, is there any other differences you understand?
18       A. Not that I can think of. As I say, it is
19   not necessarily a deep and meaningful comment.
20       Q. You mentioned that the bank did a lot of
21   work to assess the risk posed to the bank by keeping the
22   account open, subject to subsequent -- to the OFAC
23   designation in 2003. Do you remember that?
24       A. I remember there was a view within
25   Corporate Market Division in relation to that, and

HIGHLY CONFIDENTIAL                                      Page 234

1    including the external review by the Charity Commission
2    the second time they looked at the Interpal charity
3    account, yes.
4        Q. Was your understanding that GI&F, that is
5    Mr. Hoseason's unit, also did a review?
6        A. I am not sure whether they were involved
7    in the review at that time. After the designation and
8    during the second Charity Commission account, I don't
9    know whether they were involved in that investigation,
10   which was led primarily by Corporate Markets Division.
11       Q. And that would be Mr. Rodger and
12   Mr. Cole's unit?
13       A. Yes.
14       Q. Do you know whether they -- withdrawn. Do
15   you understand that they had access to the Goalkeeper
16   database?
17       A. I am not sure whether they would have
18   done.
19         MR. BLACKMAN: They being Cole?
20         MR. SCHWARTZ: Cole and Rodger.
21       A. I am not sure whether they would have
22   done.
23       Q. Do you understand the Goalkeeper database
24   to be searchable?
25       A. In what respect, when you say

HIGHLY CONFIDENTIAL                                      Page 235

1    "searchable", what do you mean?
2        Q. I am just asking if you understand that
3    case information on the database can be searched?
4        A. Yes.
5        Q. So would you have expected that if
6    Mr. Cole and Rodger had access to the Goalkeeper
7    database that they would have done an exhaustive search
8    for Interpal matters?
9        A. I would have expected them to have sought
10   all sorts of evidence in their review of the account
11   relationship, and that may well have involved looking on
12   Goalkeeper, but I don't know.
13       Q. Certainly they should have looked at
14   history of payments received and payments made?
15       A. Yes. I don't know whether they did. They
16   should have done. My gut feeling is with Guy that he
17   would have done.
18       Q. One last thing, if you could look back at
19   Foster Exhibit 4. Is this a new version of 4? We had
20   a shortened version.
21         MR. BLACKMAN: This is the replaced version.
22   The other one should have been tossed so we don't have
23   it confused.
24       A. I have the full version.
25       Q. What I want you to look at, please, is the

HIGHLY CONFIDENTIAL                                      Page 236

1    letter from Tom Dawlings to Richard Gossage on 13696.
2          MR. BLACKMAN: The record should reflect that
3    there is an actual version produced of this letter on
4    the letterhead of Bank of England. I don't know what
5    the exhibit number is.
6          MR. SCHWARTZ: It was not produced in this
7    deposition, was it?
8          MR. BLACKMAN: It was not.
9          MR. GOELMAN: It was marked yesterday and
10   there was also in the discovery the actual letter from
11   the bank to the Bank of England on September 5.
12         MR. BLACKMAN: Yes, I just pointed it out.
13         MR. GOELMAN: I have that on the screen. If
14   he has never seen it before, we don't need it.
15         MR. SCHWARTZ: All we are going to ask you is
16   this letter from Paul Dawlings refers to a prior letter
17   to Tom Dawlings by Richard Gossage. Have you ever read
18   that letter?
19       A. I don't believe I have.
20       Q. Did you ever speak to Mr. Gossage about
21   the letter?
22       A. No, but my team would have supplied him
23   with the wording for the letter.
24       Q. And who within your team?
25       A. It probably would have been Mr. Norrie,

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

STEPHEN FOSTER -  Vol. 1
July 16, 2010

HIGHLY CONFIDENTIAL                        Page 237

1  most probably.  It would have been a standard letter to
2  the Bank of England in relation -- asking them if in
3  their view we could continue to operate the account.  It
4  would be no different from any other account, any other
5  letter we sent to them in relation to Sanctions
6  Compliance.  It wouldn't have been a special letter in
7  relation to Interpal, as far as I recall.
8          MR. SCHWARTZ: Okay.
9           CROSS-EXAMINATION BY MR. BLACKMAN:
10         MR. BLACKMAN: Very few questions for you,
11  Mr. Foster.  First of all, could you put before you
12  Exhibit 11 and Exhibit 1.
13         A.  Okay, I have them in front of me.
14         Q.  You were questioned about Exhibit 1 this
15  morning and about Exhibit 11 this afternoon.  Is the
16  substance of the two exhibits the same, with the
17  difference being that they would be different names
18  listed on the two exhibits as sanctions lists were
19  revised?
20         A.  Yes, they are aiming to do the same thing,
21  which is to get divisions to search their databases for
22  potential matches to those lists.
23         Q.  Next question, I think last question.  You
24  talked this morning and again this afternoon about OFAC
25  policies.  When I say "OFAC policies", I mean the policy

HIGHLY CONFIDENTIAL                        Page 238

1  that you were developing in the bank to deal with how to
2  respond to OFAC sanctions.
3          A.  Right, yes.
4          Q.  Was there such a policy
5  in August/September 2003, when you had to deal with the
6  response to the OFAC freezing of the Interpal account?
7          MR. SCHWARTZ: Objection to form.  What do you
8  mean by "such a policy"?
9          MR. BLACKMAN: Was there an OFAC policy, as
10  I just defined it?
11         MR. SCHWARTZ: A policy for dealing with OFAC
12  listing at the bank at that time?
13         MR. BLACKMAN: Yes.
14         A.  There was not a policy at that time.
15         Q.  I think you have testified, correct me if
16  I am wrong -- I don't want mean to lead you, I just want
17  to move this, given the hour -- that you were developing
18  such a policy I think you said in the period of 05/06?
19         A.  Correct.
20         Q.  Did there come a time when that policy
21  would have led the bank to simply automatically require
22  closure of an account of someone who had been listed by
23  OFAC?
24         A.  Yes, the policy developed over a number of
25  years.  As you described,  05/06, we had a policy

HIGHLY CONFIDENTIAL                        Page 239

1  approved by Group Risk Committee, specifically in
2  relation to compliance with OFAC obligations.  Our
3  policy has moved on now to the extent that globally we
4  have a policy which prohibits relationships with anybody
5  on the OFAC list.
6          Q.  When did that particular aspect of the
7  policy go into effect, if I may call it that?
8          A.  Under my recent leadership of the team,
9  which started from April 09 again, a new policy was
10  introduced in June 09 specifically confirming that.  I
11  have to say, I didn't look before then, because I was
12  not working there, but it may well have been in place
13  before then, but certainly from June 09 we have had
14  a policy globally that we will do no relationships with
15  anybody on the OFAC list.
16         Q.  In fact, is it the case that in terms of
17  closures of accounts of people that were on the OFAC
18  list, whether pursuant to the policy or otherwise, the
19  only entities you can recall are Interpal and this
20  Northern Ireland charity?
21         MR. SCHWARTZ: Objection, leading.
22         MR. BLACKMAN: You may answer.
23         A.  Yes, they are in that period, yes, they
24  are the only ones I can recall.
25         MR. BLACKMAN: I have no further questions.

HIGHLY CONFIDENTIAL                        Page 240

1          MR. SCHWARTZ: Just one question.  These more
2  stringent policies of which you were just speaking with
3  Mr. Blackman --
4          A.  Yes.
5          Q.  -- were they a response to increased
6  operations in the United States?
7          A.  No, I think they are more a desire to --
8  we just wanted to do it because it is a toughening of
9  our approach.
10         Q.  What do you mean by "a toughening of your
11  approach"?
12         A.  It means that nowhere in the world will we
13  allow our business, any of our businesses to do business
14  with an OFAC listed entity, but of course it is possible
15  for any institution in Singapore, for example, to do
16  business with an OFAC listed entity, if they want to.
17  We don't allow that.
18         Q.  Do these reflect a sentiment by the bank
19  that prior policies about OFAC were insufficiently
20  stringent?
21         A.  I am not sure it is that.  It is a change
22  in risk appetite.
23         MR. SCHWARTZ: I have no further questions.
24         MR. BLACKMAN: I have one more.  I realize you
25  are not a lawyer, but you adopted -- did you adopt these

**EXHIBIT 33 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*AMANDA HOLT*
*Vol. 1*
*July 23, 2010*

---



Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 235 of 386 PageID #: 9049

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

## Page 1

HIGHLY CONFIDENTIAL                                    Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NEW YORK

3                   Action No: 05cv4622(DGT)(MDG)

4     - - - - - - - - - - - - - - - - - - - - -

5  TZVI WEISS, et al,
                          Plaintiffs,
6  against

7  NATIONAL WESTMINSTER BANK, PLC.,
                          Defendant.
8     - - - - - - - - - - - - - - - - - - - - -

9  NATAN APPLEBAUM, et al.,

10                        Plaintiffs,

11 against

12 NATIONAL WESTMINSTER BANK, PLC.,

13                   Defendant.

14

15

16         VIDEOTAPED DEPOSITION OF AMANDA HOLT

17              Friday 23 July 2010

18              At:  10:00 am

19              Taken at:

20         Cleary, Gottlieb, Steen & Hamilton LLP
                55 Basinghall Street, London
21                   United Kingdom

22

23

24

25

## Page 2

HIGHLY CONFIDENTIAL                                    Page 2

1              A P P E A R A N C E S

2  For Plaintiff Tzvi Weiss:

3              ARI UNGAR
               Osen LLC
4              700 Kinderkamack Road
               Oradell, NJ 07649
5              Tel: 201 265 6400

6

7  For Plaintiff Tzvi Weiss:

8              AITAN GOELMAN
               Zuckerman Spaeder LLP
9              1800 M Street, NW, Suite 1000
               Washington, DC 20036-5807
10             Tel: 202 778 1996

11 For the Plaintiffs:

12             STEPHEN LOBEL

13             Finers, Stephens & Innocent LLP

14 For Defendant National Westminster Bank, PLC:

15

16             AVRAM E. LUFT and VALERIE SCHUSTER
               Cleary, Gottlieb, Steen & Hamilton LLP
17             One Liberty Plaza
               New York, NY 10006-1470
18                   Tel: 212 225 2432

19 Also Present:

20             COURT EXAMINER - ADRIAN HUGHES

21

22             COURT REPORTER:

23             AILSA WILLIAMS
               European Deposition Services
24             59 Chesson Rd
               London, W14 9QS

25

## Page 3

HIGHLY CONFIDENTIAL                                    Page 3

1

2         VIDEOGRAPHER: FLOYD HUMPHREY

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 4

HIGHLY CONFIDENTIAL                                    Page 4

1                   I N D E X

2  AMANDA HOLT ... ... ... ... ... ... ... ..8

3  DIRECT EXAMINATION BY MR. ... ... ... ... ... ... ... ..8
          GOELMAN:
4
   CROSS-EXAMINATION BY MR. LUFT: ... ... ... ... 222
5
   RE-DIRECT EXAMINATION BY MR. ... ... ... ... ... 229
6          GOELMAN:

7              INDEX OF EXHIBITS

8  Holt 1 NW012925-38 ... ... ... ... ... ... ... .60

9  Holt 2 NW185976 ... ... ... ... ... ... ... .66

10 Holt 3 NW014038-48 ... ... ... ... ... ... .67

11 Holt 4 Press Release ... ... ... ... ... ... .83

12 Holt 5 NW066682-686 ... ... ... ... ... ... .88

13 Holt 6 NW066667-70 ... ... ... ... ... ... 107

14 Holt 7 NW066672-76 ... ... ... ... ... ... 140

15 Holt 8 NW066820 ... ... ... ... ... ... ... 147

16 Holt 9 NW066721-23 ... ... ... ... ... ... 150

17 Holt 10 NW018476 ... ... ... ... ... ... ... 159

18 Holt 11 NW066687-90 ... ... ... ... ... ... 163

19 Holt 12 NW067948 ... ... ... ... ... ... ... 169

20 Holt 13 NW187287 ... ... ... ... ... ... ... 172

21 Holt 14 NW196319-20 ... ... ... ... ... ... 179

22 Holt 15 NW181060-63 ... ... ... ... ... ... 188

23 Holt 16 NW180811-15 ... ... ... ... ... ... 194

24 Holt 17 NW180828-29 ... ... ... ... ... ... 200

25 Holt 18 NW180854 ... ... ... ... ... ... ... 202

1 individual basis.  So I would not say that I would
2 necessarily have suspicions that they were laundering
3 money or financing terrorism, it is just they were not
4 an average run of the mill customer, as far as the
5 regulations were concerned, and I would feel that
6 I would want extra information to be absolutely sure
7 that the bank knew what their business was.  It didn't
8 mean that I was suspicious of criminal intent.  It is
9 just we would need extra information to make sure that
10 we could demonstrate we knew the customer's business.
11        Q.  And when you talk about the regulations
12 which were designed for the vanilla customers, are those
13 regulations KYC regulations?
14        A.  Yes.
15        Q.  Are you familiar with the FATF
16 organization?
17        A.  Yes.
18        Q.  And did you while you were at Deloitte,
19 between 2000 and 2002, keep abreast of developments in
20 FATF?
21        A.  I don't recall 2000 to 2002, I am afraid.
22        Q.  Are you familiar with the FATF Guidelines
23 on Money Laundering?
24        A.  I recall that whilst I was at RBS I was
25 very familiar with FATF and what the guidelines were and

1 what the regulations at that time were.  I recall
2 I spent time making sure I knew what the current FATF
3 requirements were.
4        Q.  But you place that after you arrived at --
5 you place that self-education after you arrived at RBS?
6        A.  As far as I recall, yes.  I am not saying
7 that I had not heard of FATF beforehand.  It is just
8 that I recall very clearly sitting at my desk and going
9 through the FATF requirements.
10        Q.  I know you started at RBS in 2002; do you
11 recall what month it was?
12        A.  End of January, last of January 2002.
13        Q.  So that was about four months after the
14 terrorist attacks in the United States, in September,
15 2001?
16        A.  Yes.
17        Q.  Do you recall learning, either while you
18 were at RBS or at the time about a FATF conference or
19 a FATF summit in October 2001 to deal with guidelines on
20 terror financing?
21        A.  I don't recall the conference in 2001, no.
22        Q.  Did you become familiar with Special
23 Recommendations that FATF issued with regard to the
24 bank's role in detecting terror financing?
25        A.  I don't recall anything specific.  I am

1 sorry, it is a long time ago.
2        Q.  When you started at RBS, in or
3 about January 2002, what was your title?
4        A.  Head of Group Enterprise Risk.
5        Q.  How did you come to get that job?
6        A.  The Bank of England or I suppose by that
7 stage it was Financial Services Authority had asked
8 Deloitte and Touche or had asked RBS to commission an
9 independent review of their Operational Risk function at
10 Group.  Deloitte and Touche were the auditors of RBS at
11 the time, and so RBS asked Deloittes to do that review,
12 and as I had done similar reviews whilst I was at
13 PriceWaterhouse Coopers I was asked to lead that review.
14 So that is how I came to know all of the Operational
15 Risk or do a review of the Operational Risk processes
16 across the bank, and as a result of that I was
17 approached or one of the recommendations was that they
18 needed to improve some areas, so they looked for a new
19 head or they created the new role, Head of Group
20 Enterprise Risk.  They went into the market and I was
21 asked whether or not I would put myself into that
22 selection process, which I did, and that is how I got
23 the job.
24        Q.  Had you done work for RBS while you were
25 at Deloitte?

1        A.  They were a client.
2        Q.  They were, and what kind of work did you
3 do for RBS while you were at Deloitte?
4        A.  As I said, Deloittes were their auditors,
5 so I would have done work as part of or I did work as
6 part of the audit.  So we looked at the IT, we looked at
7 their processes, and I did the review that was
8 commissioned by the FSA.  They used to be called
9 Section 39 reports, I can't recall what they were called
10 at that time, but they were regulatory, specific
11 regulatory reviews commissioned by the regulator, and I
12 had been asked to lead the one that Deloittes did.
13        Q.  And that was while you were still at
14 Deloittes?
15        A.  That was while I was still at Deloittes,
16 yes.
17        Q.  Do you remember when that was?
18        A.  It would have been in 2001.
19        Q.  Do you recall what the results of that
20 particular review were?
21        A.  I don't recall the specifics but I do
22 recall that there were some areas of improvement that
23 were recommended, and to actually act on those
24 recommendations that is when RBS decided to create this
25 new role, Head of Group Enterprise Risk, and they looked

---

HIGHLY CONFIDENTIAL                                    Page 25

1   for a new person to actually head up that function.
2      Q.  Is it accurate then that the review that
3   Deloitte performed was actually submitted to the FSA?
4      A.  Yes.
5      Q.  And in reaction to that the FSA made
6   certain recommendations to RBS?
7      A.  The report would have been submitted to
8   both RBS and the FSA, and RBS would have -- RBS agreed
9   to actually act on the recommendations.
10     Q.  And one of the recommendations was the
11  creation of this new position which you applied for and
12  were granted?
13     A.  That is correct, yes.
14     Q.  And then when you got to RBS you initiated
15  a different kind of review or another review of
16  Operational Risk?
17     A.  When I got to RBS I was -- trying to think
18  back -- I was largely implementing the recommendations
19  that I had made as part of the previous report, to be
20  perfectly honest, which is a lesson I think that all
21  consultants should have to do, so yes, it was going
22  through almost effectively reinterviewing the existing
23  people that were there and actually deciding what
24  I thought were the Operational Risk processes or
25  Enterprise Risk infrastructure that should be at the

---

HIGHLY CONFIDENTIAL                                    Page 26

1   bank.  Enterprise Risk was defined as aspects of risk
2   management that were not already covered by Market,
3   Credit or Liquidity Risk management processes.  I had no
4   specific responsibility at that time for Anti-money
5   Laundering or Sanctions in Terrorist Financing.
6      Q.  Would Anti-money Laundering and Sanctions
7   in Terrorist Financing fall under that residual category
8   of Enterprise Risk not already covered by Market, Credit
9   or Liquidity Risk.
10     A.  It could do, but at the time the people
11  responsible for oversight of those processes at Group
12  were the Group Compliance function, under a man called
13  David Swanney.
14     Q.  The people responsible for oversight of
15  which processes?
16     A.  Anti-money Laundering, Sanctions and
17  Terrorist Financing, in January 2002.
18     Q.  They were in Group Compliance?
19     A.  They were in Group Compliance.
20     Q.  And what was Mr. Swanney's title, if you
21  recall?  Was he Director of Group Compliance?
22     A.  Head of Group Compliance.
23     Q.  And you were Head of Group Enterprise
24  Risk?
25     A.  That is correct.

---

HIGHLY CONFIDENTIAL                                    Page 27

1      Q.  Who did you report to?
2      A.  The Head of Group Risk, Richard Gossage.
3      Q.  Did Mr. Swanney also report to
4   Mr. Gossage?
5      A.  No, he didn't.  I don't recall who he
6   reported to.  I think it was -- this is as far as I can
7   remember, it was Miller Maclean, Group Counsel.  He was
8   Head of Legal.  His exact title was Head of Legal.
9      Q.  Did any of the recommendations that you
10  made when you did your review when you were at Deloitte
11  involve the Anti-money Laundering Compliance function of
12  RBS?
13     A.  As far as I recall, no, nothing was that
14  specific.
15     Q.  Okay.  Do you recall what any of the
16  recommendations you made were?
17     A.  To be honest, I am afraid I don't.  The
18  focus of the review was around organization and Group
19  policy and procedure.  It wouldn't have got down to
20  a specific recommendation around a specific process.
21     Q.  When you joined RBS, in early 2002, did
22  you have people who reported to you at the time?
23     A.  I did.  Without a Group organigram it
24  would be difficult for me to recall, but I certainly had
25  a Head of Group Operational Risk reporting to me.

---

HIGHLY CONFIDENTIAL                                    Page 28

1      Q.  Do you recall about how many people were
2   in -- you said you had a Head of Group Operational Risk
3   reporting to you?
4      A.  Yes, because Operational Risk was viewed
5   as being a subset of Enterprise Risk.
6      Q.  Were there other subsets of Enterprise
7   Risk that reported to you?
8      A.  There was the Head of External Risk, but
9   that was an empty box on an organigram, that was for me
10  to recruit, and that is who I did -- sorry that was very
11  bad English -- and I recruited the Head of External
12  Risk.
13     Q.  And who did you recruit for that position?
14     A.  A man called Andy Brennan.  External Risk
15  was defined as, for want of a better phrase "Upstream
16  Risk Management", so looking at the bulk of regulation
17  and legislation that was being developed and coming down
18  the pipeline that the bank would have to comply with,
19  but at that point in time didn't have to comply with,
20  whereas Group Operational Risk was looking at the
21  current bulk of regulations and legislation that the
22  bank had to comply with.  So it was viewed as more
23  internally focused, whereas External Risk was more
24  externally focused.
25     Q.  Would External Risk be responsible for

---

HIGHLY CONFIDENTIAL                              Page 29

1   looking at and trying to predict future legislation and
2   regulation in the Anti-money Laundering and Terror
3   Financing area?
4         A. Initially, in if you like, February 2002,
5   that would have been done by the Compliance team.
6         Q. Mr. Swanney?
7         A. Mr. Swanney. What the Head of External
8   Risk would have been responsible for was making sure
9   that Group Compliance actually had their eye on that.
10  It was not their -- it was not his area of expertise.
11  We didn't duplicate within the bank, so if Compliance
12  were responsible for Anti-money Laundering, then we were
13  very clear that we would work together very closely, but
14  it was Group Compliance's responsibility.
15        Q. When you say it was not his area of
16  expertise, are you talking about Mr. Swanney?
17        A. I am talking about the Head of External
18  Risk, who eventually became Andy Brennan.
19        Q. Okay. You said that "initially"
20  in February 2002, the Anti-money Laundering and Terror
21  Financing predicting would have been done by the
22  Compliance team. By the word "initially", do you mean
23  to say that that changed at some point?
24        A. That did change later on in 2002, because
25  the responsibility of Compliance passed over to Richard

HIGHLY CONFIDENTIAL                              Page 30

1   Gossage, the Head of Group Risk. I genuinely cannot
2   remember exactly when, but in 2002.
3         Q. And did Mr. Swanney pass over with that
4   function?
5         A. No, he didn't. The function passed over
6   but David Swanney I think left the bank at the time.
7         Q. Okay, and whenever that function arrived
8   in -- did it arrive in Group Enterprise Risk?
9         A. No, it arrived in Group Risk.
10        Q. So that was not under your -- that was not
11  part of your remit?
12        A. Group Compliance was split, I was given
13  responsibility for ensuring that the Know Your Customer
14  requirements were being met, and then subsequently the
15  responsibility for Money Laundering Prevention and
16  Sanctions in Terrorist Financing was formally passed
17  over to Enterprise Risk later on in 2002. The rest of
18  Compliance, which was renamed Group Regulatory Risk, was
19  passed over to be under Richard Gossage, and there was
20  a new Head of Regulatory Risk recruited.
21        Q. Do you recall who that was?
22        A. Stephen Sanders.
23        Q. When you started at RBS, in early 2002,
24  was Stephen Foster one of the people who reported to
25  you?

HIGHLY CONFIDENTIAL                              Page 31

1         A. No, he was not.
2         Q. Did you hire him at some point?
3         A. I hired him, yes.
4         Q. Do you recall when that was?
5         A. Again, that was in 2002. It was when
6   I acquired responsibility for Money Laundering
7   Prevention and Sanctions in Terrorist Financing.
8         Q. And what were Mr. Foster's duties and
9   responsibilities?
10        A. I don't recall the detail. There would
11  have been a detailed job spec, but his title was Head of
12  Group Anti-money Laundering.
13        Q. And do you recall anybody else who
14  reported to you in or around late 2002, in Group
15  Enterprise Risk?
16        A. Just for clarity, is that with
17  responsibility for Anti-money Laundering and Financial
18  Crime or across the board?
19        Q. Let start just with responsibility for
20  Anti-money Laundering and Financial Crime?
21        A. Stephen Foster had responsibility for
22  Anti-money Laundering and Financial Crime. There was
23  a separate project going on I think. Towards the end of
24  2002 and 2003, the Joint Money Laundering Steering
25  Group, which is a regulatory body which has members

HIGHLY CONFIDENTIAL                              Page 32

1   consisting of banks, Government regulators, were
2   revisiting and reviewing all of the regulations for
3   anti-money laundering, so that was a big project to make
4   sure that the bank -- I think RBS was asked to actually
5   represent small banks as part of that Steering Group, so
6   the person I had who looked after representing those
7   banks, as those regulations were being discussed and
8   revised, was a man called Charlie Middleton. But that
9   was specifically around Anti-money Laundering rather
10  than Sanctions and Terrorist Financing, and those were
11  the only people who reported to me specifically around
12  Financial Crime, Anti-money Laundering, Sanctions and
13  Terrorist Financing.
14        Q. So I am sure I understand, was
15  Mr. Middleton the RBS representative on this Joint Money
16  Laundering Steering Group?
17        A. He ran the project for me. So he looked
18  at any change program that would be required within the
19  bank. The bank was big -- I felt at the time that the
20  bank was sufficiently large that you needed to have one
21  person looking specifically on the day-to-day making
22  sure the bank was compliant. That was Stephen Foster.
23  Any changes were a completely separate job, and that was
24  looked at by Charlie Middleton. He had been part of
25  Group Compliance. He had had a knowledge of Anti-money

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

1      THE VIDEOGRAPHER: Going off the record at
2  11:05 am.
3      (A short break)
4      THE VIDEOGRAPHER: Back on the record at 11:22
5  am.
6      MR. GOELMAN: After the Money Laundering
7  Compliance function came under your supervision, did you
8  try to stay abreast of press reports of terrorism
9  investigations in the UK and abroad?
10     A. I kept abreast of what was actually going
11  on in the newspapers. Anything that was deemed relevant
12  specific would have been brought to my attention by the
13  team. I didn't specifically go out of my way to look at
14  any specific press reports.
15     Q. Were there particular newspapers that you
16  read regularly in the latter part of 2002?
17     A. No specific newspapers. I think I had the
18  FT, as far as I recall, delivered to my desk every
19  morning, but nothing specific.
20     Q. What about trade publications in the
21  Compliance field? Did you regularly read -- are you
22  familiar with Complinet?
23     A. I am familiar with Complinet. I can't
24  recall whether or not I specifically had Complinet in to
25  my e-mail inbox or whether it came into the team, but

1  there were Complinet feeds into the team.
2      Q. And if some of the team thought there was
3  something that should be brought to your attention, they
4  would refer that to you?
5      A. Yes, they would do.
6      Q. I understand that when the terrorist
7  attacks of 9/11 happened you were not yet at RBS, is
8  that true?
9      A. That is true.
10     Q. Do you recall following press reports
11  about a London connection to the 9/11 attacks?
12     A. I don't recall anything specific that
13  wouldn't have been in the general newspapers.
14     Q. Do you know who Richard Reed is?
15     A. If by "Richard Reed" you mean Richard Reed
16  the shoe bomber, then I know of or I have read about
17  Richard Reed the shoe bomber, yes.
18     Q. At the time that that incident with the
19  shoe bomb happened, were you aware that Mr. Reed was
20  from the Finsbury Park section of London?
21     A. I was not specifically aware of where he
22  was from, not that I recall now.
23     Q. Did you follow reports in the media about
24  violence in Israel and the Palestinian territories in or
25  about the latter part of 2002?

1      A. I don't recall anything specific in terms
2  of -- I didn't follow anything specifically. I would
3  have read the newspapers, as far as I had time to read
4  the newspapers, but I don't recall anything specific.
5      Q. Do you recall just in general reading
6  about a series of terrorist attacks in Israel about that
7  time?
8      A. I don't recall anything specific from that
9  time.
10     Q. Are you familiar with the group called
11  Hamas?
12     A. I am familiar.
13     Q. Were you familiar with Hamas in or around
14  2002?
15     A. I would have been. I don't recall
16  specifically, but I would have been. It is such a long
17  time ago I can't actually put a specific date. I was
18  aware that Hamas was on the terrorist lists.
19     Q. And were you aware that Hamas was
20  a Palestinian group?
21     A. Yes.
22     Q. And was an Islamic group?
23     A. Yes.
24     Q. Are you familiar with the term "Intifada"?
25     A. I am familiar with that term.

1      Q. What do you understand that to mean?
2      A. I understood that to mean the protest,
3  violent protest by Palestinians.
4      Q. Were you familiar -- were you aware of the
5  Intifada that was going on in Israel and the Palestinian
6  territories in the period 2001 to 2004, say?
7      A. From reading the newspapers I would have
8  been aware, and I am sure -- I don't recall specifics,
9  but yes, I would have been aware. I tried to keep
10  abreast, particularly given my role, of the various
11  different world events that were going on.
12     Q. How did you do that? How did you try to
13  keep abreast of world events?
14     A. By watching the news and by reading the
15  newspapers. If there was anything specific that
16  I should have known about then I would have been briefed
17  by my team.
18     Q. You testified that you were aware that
19  Hamas was on the terrorist list, you just testified to
20  that, and I want to know which terrorist list in
21  particular you were aware of Hamas' inclusion on?
22     MR. LUFT: Objection, vague as to time.
23     Q. In 2002, say.
24     A. I can't say exactly when I became aware of
25  when they were on the list, okay, what I can say was

HIGHLY CONFIDENTIAL                    Page 69

1  contained in this paragraph?
2      A.  As far as I recall, yes.
3      Q.  And you indicated that your reaction to
4  Mr. Foster was that you wanted to know more about this
5  case?
6      A.  It is, yes.
7      Q.  You were familiar with what OFAC's role in
8  administering the American sanctions regime was
9  in September and August 2003, weren't you?
10     A.  I was aware of what OFAC was responsible
11 for doing, yes.
12     Q.  And is one of the things that you wanted
13 to know more about was why OFAC had decided to list
14 Interpal as a terrorist organization?
15     A.  Initially what I wanted to know was which
16 lists that the Group was subject to across the Group
17 globally Interpal was on, because I wanted to know which
18 part of the Group really needed to comply with, so
19 I knew which part of the Group, which team I had to talk
20 to more than anything else, to get more information.
21     Q.  Do you recall which part of the bank
22 Interpal was a customer of?
23     A.  As far as I recall, it was a part of CBFM,
24 Corporate Bank and Financial Markets.
25     Q.  Did you also want to know more about why

HIGHLY CONFIDENTIAL                    Page 70

1  OFAC had listed a customer of the bank as a specially
2  designated global terrorist?
3      A.  I am only pausing to try and think back.
4  My main concern was not to try and question OFAC, it was
5  more to understand exactly, as I said, which lists they
6  were on and which team I needed to talk to to get more
7  information from, and so then we could decide how the
8  bank would most appropriately respond to fulfill its
9  obligations.
10     Q.  Did you talk to the team at CBFM?
11     A.  Yes, I did.
12     Q.  Do you recall who you talked to in
13 particular?
14     A.  I don't recall who I spoke to when but
15 I do remember speaking to Irvine Rodger.
16     Q.  As best as you can recall, can you give me
17 an approximate, if not a date, at least how long after
18 you first learned of OFAC's designation of Interpal it
19 was when you spoke to Mr. Rodger?
20     A.  I can't give you any indication of time.
21 I do know that I would have done it as soon as
22 I possibly could.
23     Q.  Why is that?
24     A.  Mainly because, if there was an issue, we
25 needed to address it quickly.  There was absolutely

HIGHLY CONFIDENTIAL                    Page 71

1  no -- there was no tolerance within the bank for not
2  complying with the regulation and legislation.
3      Q.  Was there a specific concern for reacting
4  in a timely fashion because this involved potential
5  support of terrorism?
6      A.  Right, we would have reacted quickly, yes,
7  yes.  I am trying to think of the best way of expressing
8  this.  There was an acute awareness that the difference
9  between Anti-money Laundering and the Sanctions and
10 Terrorist Financing processes is that in most cases of
11 Enterprise Risk judgment you could take a risk based
12 judgment over things.  So whether or not -- not so much
13 in Know Your Customer, but certainly in terms of whether
14 or not you would, say, authorize a new product.  But in
15 terms of terrorist financing, there was no risk based
16 judgment.  If the name was on the list that you had to
17 comply with, you had to comply, and you had to make sure
18 that you could put in procedures as quickly as possible.
19 So I know I wouldn't have sat on it: "What should we do
20 about this?"  I would have reacted very quickly to get
21 the information we as team needed to make sure that the
22 bank acted quickly and appropriately.
23     Q.  You said if the name was on the list that
24 you had to comply with, are you talking about -- what
25 list are you referring to specifically there?

HIGHLY CONFIDENTIAL                    Page 72

1      A.  Different lists related to different parts
2  of the Group.
3      Q.  So are you specifically limiting that to
4  the list that the bank was legally obliged to follow in
5  that particular jurisdiction?
6      MR. LUFT:  Objection, vague, confusing.
7      A.  There was a legal minimum that the bank
8  had to comply with, which was very clear.  If a name was
9  on the Bank of England lists, it was very clear as to
10 the procedure that the bank had to follow.  Now, the
11 bank didn't just operate in the UK.  We had Group
12 responsibility, not just UK responsibility, and as
13 a Group function we needed to get the information
14 required to actually make the right decision for the
15 right part of the Group.  Okay?
16     Q.  If an organization was not on the Bank of
17 England list but there were other indications of
18 possible connections with terror financing, could the
19 bank then take a risk based judgment approach?
20     MR. LUFT:  Objection, incomplete hypothetical,
21 calls for speculation.
22     A.  As far as I recall, the bank did not
23 discount or it didn't take an easy decision in terms of:
24 "This is a UK customer, it is not on the Bank of England
25 list, we can therefore ignore them."  The bank took

Case 1:05-cv-04622-DLI-RML  Document 272-2  Filed 03/22/12  Page 241 of 386 PageID #: 9055

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                                 Page 73

1  a view which was: "This organization must have been put
2  on the list for a reason.  We will do further
3  investigation."  As far as I recall, that is what the
4  team in CBFM did, to actually fully understand as far as
5  we could the facts around Interpal.  It comes back down
6  to what I previously said.  We tried to make up our own
7  minds as to what was the best course of action.
8       Q.  You testified there was an acute awareness
9  that the difference between Anti-money Laundering and
10 the Sanctions in Terror Financing processes is that in
11 most cases of Enterprise Risk judgment you could take
12 a risk based judgment over things".
13      A.  Yes.
14      Q.  My question is, if there was a customer
15 that was not on the Bank of England list, but there was
16 reason to suspect was involved with terror financing,
17 could you in that case take a risk based judgment
18 approach that you could take in most Money Laundering,
19 Anti-money Laundering processes?
20      MR. LUFT:  Objection, misstates her prior
21 testimony and asked and answered.
22      A.  I didn't say risk based -- the exact
23 example I gave you was in a new product.  So you could
24 actually take a risk based decision: do we actually want
25 to authorize this new product or not?  What I actually

HIGHLY CONFIDENTIAL                                 Page 74

1  said was there was absolutely no scope for taking a risk
2  based decision when dealing with the Sanctions and
3  Terrorist Financing process, okay.
4       Q.  And does that involve --
5       MR. LUFT:  Are you done answering?  I just
6  want to make sure you are done with your answer.
7       A.  If I can remember back what I said, so
8  I thought I had answered your question by talking
9  specifically about this instance, which was what we
10 actually did was ask for more information and actually
11 do some further investigation so we actually understood
12 what the facts were.  At no point did I make any
13 reference to making a risk based decision.  We were
14 still at that stage fact gathering to make our own
15 decisions, not on a risk basis, but purely on the facts.
16      Q.  I am just trying to understand what you
17 meant by your previous answer when you drew
18 a distinction between kind of generic Money Laundering
19 and the applicability of a risk based judgment there,
20 right, as opposed to Sanctions and Terrorism, where it
21 was more binary.  Is that fair to say, that if something
22 is on the list you just cannot do it?
23      MR. LUFT:  Objection, misstates her prior
24 testimony.
25      A.  What I said in terms of taking the risk

HIGHLY CONFIDENTIAL                                 Page 75

1  based decision was aspects of Operational or Enterprise
2  Risk.  So the example I used was if you are deciding as
3  an organization to launch a new product, because one of
4  the aspects of Enterprise Risk that I was responsible
5  for was managing the new product approval process, you
6  could actually, say, take a risk based decision as to
7  whether or not you would actually launch a new product.
8  I was comparing that against Sanctions and Terrorist
9  Financing and saying that you could not take a risk
10 based decision with Sanctions and Terrorist Financing.
11 I am not including KYC in that at all.  I am saying new
12 products/sanctions in terrorist financing -- what I am
13 saying is we didn't take a risk based decision around
14 sanctions in terrorist financing.  The law for us was
15 very, very clear.  This was covered by law; it was not
16 covered by regulation in the UK.
17      Q.  My question is, does the policy of not
18 taking a risk based approach to terrorism and to
19 terrorism financing and sanctions extend to situations
20 like Interpal, where they were listed by OFAC but not
21 listed by Bank of England?
22      MR. LUFT:  Objection, vague and ambiguous.
23      A.  Could you repeat your question.  I am not
24 entirely sure.
25      Q.  Sure.  First, can you tell me what you

HIGHLY CONFIDENTIAL                                 Page 76

1  mean when you use the phrase "risk based approach"?
2       A.  Okay.  A business unit, an insurance
3  division wants to, rather than offer the existing
4  products just on its own account actually say: "We can
5  offer these products badged under a different badge,
6  a different organization.  We can do all of the back
7  office processing for this other organization and make
8  money out of it."  So rather than selling direct line
9  insurance processes, insurance products, the insurance
10 division could actually set up a separate area and say:
11 "We will use all of our direct line back office
12 processing but actually offer insurance on behalf of
13 Lloyd's TSB."
14      That is a new product.  It would come through
15 a full new product approval process, and in front of the
16 various different signatories, including me, could be:
17 "Well, there is an advantage in that there will be extra
18 revenue.  There is a potential risk, which is lack of
19 customer confidentiality, how you clearly apportion your
20 revenues, a number of different things."  As part of this
21 being a new business model, you would take a risk based
22 approach.  You could never manage those operational risks
23 down to zero unless you just didn't do the business at all.
24 So there was all always a trade off between the upside of
25 the income you would generate and the downside of potential

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

1  operational losses.  That was what I mean by a risk based
2  decision.
3       Q.  So a risk based decision necessarily
4  encompasses a weighing of the potential advantages to
5  the bank versus the potential risks of taking
6  a particular action.
7       A.  That is correct.
8       Q.  And in a case where the bank was not
9  legally obligated by the presence of a name on the Bank
10  of England sanctions list, but nevertheless had
11  information suggesting that there was a link to
12  terrorism, would such a weighing of potential advantage
13  versus potential risk to the bank be appropriate?
14       MR. LUFT: Objection, incomplete hypothetical.
15       A.  I can't say across the board, but I can
16  talk through exactly as far as I thought the thought
17  processes that went through with Interpal.
18       Q.  Okay, but you cannot tell me just as
19  a general matter whether a risk based approach would be
20  appropriate in that kind of scenario?
21       A.  I can recall a very clear statement across
22  the board, whether it was a Regulatory Risk policy or an
23  Enterprise Risk policy, that the bank had zero appetite
24  for regulatory breaches, let alone legislative legal
25  breaches.  So, for want of a better phrase, there was

1  a zero risk appetite for not complying with regulation
2  and legislation, as far as the Group could see it and
3  understood it, across the board.  Does that answer your
4  question?
5       MR. GOELMAN: We have to change the tape.
6  Time to take another break.
7       THE VIDEOGRAPHER: End of tape one, volume one
8  in the video deposition of Ms Amanda Holt.  Going off
9  record at 12:09 pm.
10       (A short break)
11       THE VIDEOGRAPHER: This is the beginning of
12  tape two, volume one in the video deposition of
13  Ms Amanda Holt.  Back on the record at 12:18 pm.
14       MR. GOELMAN: Ms Holt, before we broke or
15  several minutes before we broke you were talking about
16  a meeting that you recalled having with Mr. Rodger at
17  some point after Mr. Foster first alerted you to the
18  fact that Interpal had been listed by OFAC.  Do you
19  recall that?
20       A.  I recall saying that I had either talked
21  or met with Irvine, yes.
22       Q.  So either a phone conversation or an in
23  person meeting?
24       A.  Yes, it could even have been an e-mail,
25  but I definitely remember contacting Irvine.

1       Q.  And what was the purpose of you contacting
2  Irvine at that point?
3       A.  To confirm that Interpal was a customer of
4  CBFM, that he knew that there were concerns relating to
5  it, and to discuss what needed to be done to actually
6  determine the next course, the course of action.
7       Q.  What do you recall about the content of
8  that communication between yourself and Irvine Rodger?
9       A.  I can't remember the specific details but
10  I do remember that Irvine or a member of his team did
11  some further investigation of the Interpal account in
12  terms of monies in/monies out.
13       Q.  When you say "some further investigation",
14  what did that encompass, if you recall?
15       A.  I don't recall the detail, other than they
16  went to see exactly how the account was being operated
17  and, as I said, as far as they could, determine where
18  monies were coming in from and where payments were being
19  made, to see if there was any cause for suspicion.
20       Q.  Any cause for suspicion that what?
21       A.  That they were funding terrorism.
22       Q.  And specifically Hamas?
23       A.  Yes.
24       Q.  What do you recall?  Do you recall
25  subsequent communications between Mr. Rodger or anyone

1  working for him?
2       A.  Again, I don't recall the detail.  I don't
3  know whether now is the right time to say, but the way I
4  approached this, or any other concern that came to me
5  when I was in this role, was just because something
6  wasn't on a Bank of England list wouldn't actually have
7  meant that I just dismissed things.  The Group as
8  a whole and me as an individual had absolutely no
9  tolerance whatsoever, no risk based decision whatsoever,
10  funding terrorism.  If there was any thought whatsoever
11  that a customer of the bank was funding terrorism or was
12  getting involved in any type of financial crime, that
13  would have been reported straightaway.  It wouldn't
14  necessarily have mattered that they were not on a Bank
15  of England list.  I took my responsibilities very, very
16  seriously, not just because of the financial penalties
17  that went with sanctions and, you know, the terrorist
18  legislation.  If I was responsible for making sure that
19  the bank put in place procedures to detect terrorist
20  financing, then I would have taken those or I took --
21  not would have, I took those responsibilities very
22  seriously.
23       Q.  When you say "not just because of the
24  financial penalties that went with sanctions", what
25  other reasons?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

1          A.  As a matter of personal integrity.  I had
2     a job to do and I do it to the best of my ability, and
3     I felt that is what my team did as well.
4          Q.  And is it fair to say you were also aware
5     of the consequences of being wrong about a customer of
6     the bank facilitating terrorism, in terms of what that
7     would mean to the victims of that terrorism?
8          A.  Of course.
9          MR. LUFT: Objection, vague.
10         A.  I don't -- as an individual I could never
11    ever condone terrorism.  Okay?  It doesn't matter who is
12    doing it.  That is me as an individual and me as an
13    employee.
14         Q.  You testified that if there was any
15    thought whatsoever that a customer of the bank was
16    funding terrorism that would have been reported
17    straightaway.  Did you consider a listing by the United
18    States Department of Treasury of Interpal as a funder of
19    terrorism to be a thought that a customer was funding
20    terrorism?
21         A.  By that do you mean was the fact that
22    Interpal was on one of the FATF lists, did that cause me
23    to --
24         Q.  OFAC lists?
25         A.  OFAC lists, sorry.

1          Q.  You testified that --
2          MR. LUFT: Did you finish your answer?
3          A.  I was just asking for further
4     clarification, sorry.  By your question, did you mean
5     did I consider the fact that Interpal was on the OFAC
6     list would give me cause to suspect they were funding
7     terrorism?  I didn't understand your question.
8          Q.  Let me rephrase it.  You testified that if
9     there was any thought whatsoever that a customer of the
10    bank was financing terrorism, or was getting involved in
11    any type of financial crime, that would have been
12    reported straightaway.  My question was about the phrase
13    "if there is any thought whatsoever", and whether you
14    considered that a listing by OFAC that a bank customer
15    was funding terrorism was sufficient to be "a thought
16    whatsoever" in your estimation?
17         A.  I can't speak generally but I can speak
18    specifically about OFAC, which was that was what
19    prompted us, prompted me to ask Irvine to do a detailed
20    review of Interpal, or enhanced oversight, however you
21    want to phrase it, of the Interpal account.  I felt that
22    was above and beyond having a suspicion, because
23    a suspicion would have involved talking to or just
24    reporting to the relevant authorities.  Well, they
25    already would have been aware, so we were doing

1     additional work ourselves to get additional information
2     to a greater level of depth.
3          Q.  I am going to ask the court reporter to
4     mark this as Exhibit 4, please.
5          (Exhibit Holt 4 marked for identification)
6          For the record, this is a printout from the OFAC
7     Office of Public Affairs website.  Ms Holt, at any point
8     after RBS' customer, Interpal, was designated as a specially
9     designated global terrorist by OFAC, did you take any steps
10    to learn why OFAC believed that Interpal was a supporter of
11    terrorism?
12         A.  I don't recall.  I don't recall.
13         Q.  Were you aware when you were Head of Group
14    Enterprise Risk that OFAC had a website?
15         A.  I don't recall.  I genuinely don't recall.
16         Q.  Did you have access to the Internet from
17    your desktop computer?
18         A.  I did, yes.
19         Q.  Earlier you spoke of your general
20    philosophy of wanting to see things for yourself.  Do
21    you recall that?
22         A.  I do, yes.
23         Q.  Wouldn't a visit to the OFAC website have
24    been consistent with that approach?
25         A.  I can't recall exactly what I did in 2002

1     and 2003.
2          Q.  Can you turn to page 5 out of 6 of Holt
3     Exhibit 4, please.  At the bottom it says: "Palestinian
4     Relief and Development Fund- Interpal."  Do you see
5     that?  Bottom of page 5 out of 6, it just says:
6     "Palestinian Relief and Development Fund - Interpal."
7     Do you see that?
8          A.  I do see that.
9          Q.  If you turn over, the first sentence there
10    says:
11              "Interpal, headquartered in the UK, has been
12    a principal charity utilized to hide the flow of money
13    to Hamas."
14              Did you know in 2003 that OFAC had concluded
15    that Interpal was a principal charity utilized to hide
16    the flow of money to Hamas?
17         A.  I did know they had concluded that, yes.
18         Q.  Did you know, in particular, that OFAC had
19    concluded that Interpal was secretly funding Hamas?
20         MR. LUFT: Objection, assumes facts not in
21    evidence.
22         Q.  I will rephrase that.  When you say that
23    you knew that OFAC had concluded that Interpal was
24    a principal charity used to hide the flow of money to
25    Hamas, is it fair to say you knew that the allegation

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT -  Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                                    Page 85

1   was the funding of Hamas was something that Interpal was
2   keeping secret?
3        A.  I was aware that Interpal had appeared on
4   the OFAC lists, yes.
5        Q.  And were you aware that OFAC had concluded
6   that Interpal was secretly funding Hamas?
7             MR. LUFT: Objection, assumes facts not in
8   evidence.
9        A.  I don't recall that the word "secretly"
10  was ever used.  I was aware that Interpal was on the
11  OFAC list and I was aware that we reacted to that.
12       Q.  And you were aware that OFAC had concluded
13  that Interpal was a charity utilized to hide the flow of
14  money to Hamas, is that fair?
15       A.  I was aware that Interpal was registered
16  as a charity in the UK and that they had appeared on the
17  OFAC list.
18       Q.  Were you, as Head of Group Enterprise Risk
19  in 2002, aware that the use of charities to hide the
20  flow of money to terrorist organizations was
21  a recognized typology by FATF?
22       A.  I was aware that as far as the Group was
23  concerned, Group Enterprise Risk was concerned, it
24  didn't really matter whether it was a charity or whether
25  it was trade finance or what vehicle was used to

HIGHLY CONFIDENTIAL                                    Page 86

1   actually fund terrorism, that there were numerous
2   different typologies that could be used, all of which
3   the group was mindful of, so yes.
4        Q.  Were you aware that organizations or
5   people that funded terrorism often concealed that fact?
6        A.  Yes.
7        Q.  Were you aware that the Charities
8   Commission in 2003 temporarily froze Interpal's accounts
9   at RBS?
10       A.  I recall that the Charities Commission
11  investigated Interpal, absolutely.
12       Q.  And do you recall that a Charities
13  Commission issued a report after that investigation?
14       A.  I was aware that they -- yes.
15       Q.  Did you read that report?
16       A.  As far as I recall, yes, I did read the
17  report.  I can't remember the detail of that report.  I
18  have not seen it since that time, but I do remember
19  I did recall reading it.  It would have been part of my
20  briefing pack.
21       Q.  Would have been part of your what?
22       A.  Part of my briefing.
23       Q.  By Mr. Foster?
24       A.  Yes.
25       Q.  So you recall Mr. Foster providing you

HIGHLY CONFIDENTIAL                                    Page 87

1   with a copy of the report?
2        A.  Yes.
3        Q.  What would you have done with that
4   briefing pack after Mr. Foster provided it to you?
5        A.  Handed it back to Stephen.  Stephen and
6   I would have sat down and he would have actually --
7   I would have read the pack, he would have talked me
8   through it and I would have handed it back to him to
9   file.
10       Q.  Did Mr. Foster maintain a file on the open
11  cases that he was responsible for?
12       A.  Yes.
13       Q.  So that Charities Commission report
14  presumably would be included in a file on Interpal
15  maintained by Mr. Foster?
16       A.  As far as I recall that would be the case.
17  We were a group subject to Internal Audit, as was any
18  function in the Group, so we would have had to keep
19  our -- we kept our papers such that we could be audited.
20       Q.  Do you recall, sitting here today, what
21  the Charities Commission report said?
22       A.  As I have already said, I don't remember
23  the detail but I do remember it did not cause us to exit
24  the account.
25       Q.  Do you remember anything, any of the

HIGHLY CONFIDENTIAL                                    Page 88

1   substance of the report?
2        A.  I don't remember the substance of the
3   report, no.
4        Q.  I am going to be hand the court reporter
5   a document to be marked as Holt Exhibit 5, please.
6             (Exhibit Holt 5 marked for identification)
7        For the record, this is Bates stamped NW66682
8   through 6686.  As I said before, you can feel free to take
9   your time and review any part of this you want.  I am not
10  going to be asking you questions about the entire article.
11  The e-mail chain chronologically begins on the fourth page
12  of this exhibit.
13       A.  Okay.
14       Q.  Would you turn to the third page, Bates
15  stamped NW66684.  There is an e-mail sent
16  on December 10, 2004 from David Outhwaite to yourself
17  and someone named Graham Hardy.  Do you see that?
18       A.  I do.
19       Q.  And the subject is: "Forward Google alert
20  NatWest."
21       A.  Yes.
22       Q.  Do you recall getting that e-mail from
23  Mr -- is it "Outhwaite"?
24       A.  I don't know whether it is Outhwaite or
25  Outhwaite, but I do remember getting the e-mail.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT -  Vol. 1
July 23, 2010

1    Q.  Who is Mr. Outhwaite?

2    A.  I couldn't put a face to him but the Head

3  of Retail Media Relations means that he was responsible

4  for dealing with the media on behalf of the Retail Bank.

5  So if there had been any -- one of his responsibilities

6  was to look at what was out there in the newspapers and

7  see how it would have impacted on the bank, primarily

8  from a reputational perspective, so reputation.  He had

9  no regulatory background.  It was press relations.

10    Q.  Who was Graham Hardy?

11    A.  I don't know, or I don't recall.

12    Q.  What do you recall about getting this

13  e-mail from Mr. Outhwaite on December 10, 2004?

14    A.  As the e-mail dated December 10 at 11:14

15  am would imply, I was aware, just for clarity, I was

16  aware that the bank had accounts for people -- I should

17  put in here it was sloppy typing on my part -- allegedly

18  connected to Hamas but not Hamas itself, so we were

19  already aware of the allegations.

20    Q.  So Mr. Outhwaite sent this e-mail to you

21  at 10:19 am.  Is that right?

22    A.  Yes.

23    Q.  Would you have read the article that he

24  attached?

25    A.  My e-mail back to him says: "I can't see

1  the article", but if he sent it back to me at 6:23 on

2  the front, I would have.  I did read the article.

3    Q.  He sent his initial e-mail to you at 10:19

4  am on Friday December 10.

5    A.  Yes.

6    Q.  Do you know how he could have sent the

7  follow up e-mail with the article at 6:23 am?

8    A.  I have absolutely no idea, I am sorry.  I

9  have no idea.

10    Q.  You sent an e-mail responding to his

11  initial e-mail at 11:14 am, correct?

12    A.  That is correct.

13    Q.  And you copied Mr. Foster?

14    A.  Yes.

15    Q.  And Sharon Wilson?

16    A.  Yes.

17    Q.  And Sue Smith?

18    A.  Yes.

19    Q.  And who is Sue Smith?

20    A.  I don't remember a Sue Smith but she

21  was -- I don't remember a Sue Smith.  I am just looking

22  at the titles.  It says here she is Operational Risk

23  Manager, so she was in the Retail side of the business.

24    Q.  You commented earlier on the portion of

25  the e-mail, you say: "However, we were aware that we had

1  accounts of people connected to Hamas."

2    A.  Allegedly connected to Hamas.

3    Q.  You are saying "allegedly"?

4    A.  Yes.

5    Q.  But the e-mail says "for people connected

6  to Hamas", true.

7    A.  That is what the e-mail said, but I have

8  mistyped that e-mail.

9    Q.  I understand that is your testimony.  I am

10  asking you about this particular e-mail though.

11    A.  Sure.

12    Q.  The e-mail states:

13  "We were aware that we had accounts for people

14  connected to Hamas but not Hamas itself."  Correct?

15    MR. LUFT: Documents speaks for itself.

16    A.  That is what the e-mail says, yes.

17    Q.  And you sent that to four people, correct?

18    A.  Two or three people, copied to Sharon,

19  yes, one other.

20    Q.  And did any of those people ever correct

21  you about awareness of accounts for people connected to

22  Hamas?

23    A.  The person who would have corrected me

24  would have been Stephen, but as to whether or not he

25  actually felt the need to correct me, I don't recall,

1  because it was very clear between Stephen and I that the

2  meaning was allegedly connected, not actually connected.

3  If we had any accounts connected to Hamas we would have

4  already reported and exited them.

5    Q.  So is it your testimony that you don't

6  recall anybody correcting that purported error?

7    A.  My testimony is there would be no need for

8  anybody to correct because their understanding was that

9  "allegedly" should have been in there.

10    Q.  Regardless of whether or not there was

11  a need to correct, you don't sitting here today recall

12  anybody correcting you?

13    MR. LUFT: Objection, asked and answered.

14    MR. GOELMAN : Asked and not answered.

15    MR. LUFT: I am not going to argue with you,

16  Mr. Goelman.  I just make my objection.

17    A.  What I said was I don't recall Stephen

18  coming in and correcting me, no.  That is not to say

19  that he didn't.  I don't recall because there would have

20  been no need.

21    Q.  Later this e-mail was forwarded to other

22  people as well, including people in the CBFM, true?

23    A.  I have no idea who it was forwarded on to.

24    Q.  Do you recall at any point anybody,

25  Stephen Foster, Irvine Rodger, anybody correcting what

HIGHLY CONFIDENTIAL                                    Page 93

1    you now say was a mistake in saying: "We were aware that
2    we had accounts with people connected to Hamas"?
3         MR. LUFT: Objection, argumentative.
4         A. I can only say what I have already said,
5    which is I don't recall anybody correcting me because
6    there was no need to correct, because everybody
7    understood it was allegedly.
8         MR. GOELMAN : I will move to strike the last
9    portion of that as non-responsive.
10        MR. LUFT: I will object to your motion.
11        Q. You testified that you read this article
12   that was forwarded to you by Mr. Outhwaite?
13        A. Yes, I did.
14        Q. I want to refer you to the third paragraph
15   of this article. It says:
16        "The most active Hamas front organization
17   worldwide is the London based Interpal, which publishes
18   anti-American and anti-Israeli propaganda, and which in 2003
19   alone sent more than $23 million to different Hamas
20   organizations in the Palestinian territories. In addition
21   to fundraising in England in pounds sterling, Interpal lists
22   on its websites four different bank accounts to which
23   contributors can send money. All the accounts are with
24   NatWest Bank and the international scope of the organization
25   is evident by dedicated dollar and euro accounts."

HIGHLY CONFIDENTIAL                                    Page 94

1         My question is what was your reaction when you
2    read that part of this article when it was sent to you by
3    Mr. Outhwaite on December 10, 2004"?
4         A. That we needed to actually look at the
5    account. I don't remember whether we had already
6    started looking at the account or whether or not this
7    prompted further looking. What I do remember is an
8    overall sense of extreme -- "anger" is too strong,
9    "irritation" is too weak, in terms of the content of
10   this, purely for a lot of the derogatory language used
11   in this entire article. But I do remember consciously
12   putting aside the emotion that comes out of reading, to
13   be perfectly honest I would say 70 percent of any
14   newspaper article, and that is why we as a Group always
15   focused on the facts.
16        So what I am saying is that it doesn't really
17   matter whether or not I read a newspaper article that is
18   favorable or read a newspaper article that was favorable to
19   NatWest or derogatory for NatWest. You feel the emotion,
20   you get over that emotion, you put it to one side and you
21   say: "Okay, how much of this is fact?" So I don't know
22   whether or not -- I can't remember from a timing whether or
23   not the Group had already started to investigate Interpal,
24   but I would have gone back to the facts. People can make
25   allegations but what we as a Group function were responsible

HIGHLY CONFIDENTIAL                                    Page 95

1    for was to get back to the facts. Okay?
2         Q. You testified that: "I would say 70
3    percent of any newspaper article", and I do not
4    understand. "70 percent of any newspaper article" is
5    what?
6         A. That would cause some sort of emotion.
7    Newspaper articles are designed to cause a response in
8    the people who read them. That is why -- what I am
9    trying to do is explain to you the modus operandi of the
10   Group team at the time in RBS, that we would put aside
11   the emotion of whatever, we could not be held hostage to
12   newspaper articles, we had to come back to the law and
13   regulation and the fact. So we could not be held
14   hostage to what a particular newspaper thought, what
15   a particular executive or customer or lobbying group or
16   anybody thought.
17        So, yes, of course, I felt emotion reading this
18   article. You asked me what I thought and what I did.
19   I felt emotion, I put it to one side and said: "Okay, let's
20   have a look at the facts and see exactly what is true here.
21   What are the facts here?"
22        Q. And the emotion you felt on reading this
23   article was something between irritation and anger?
24        A. Yes.
25        Q. And that was irritation and anger at the

HIGHLY CONFIDENTIAL                                    Page 96

1    author of this article?
2         MR. LUFT: Objection, mischaracterizes the
3    witness' prior testimony.
4         Q. Who did you feel irritation and anger at?
5         A. Just wild, unsubstantiated accusations.
6         Q. When you first read this article you
7    regarded the accusations about Interpal to be wild and
8    unsubstantiated?
9         A. It starts right at the top:
10        "Tony Blair and the Europeans are focusing their
11   attention on the creation of a Palestinian state as the
12   magic formula for peace in the Middle East".
13        I am a European. How dare they speak on my
14   behalf? That is the type of irritation I am talking about.
15        Q. I understand. My initial question was
16   your reaction on reading the paragraph about Interpal.
17        A. I am talking about the whole article. My
18   testimony said "the whole article". You asked me what I
19   did.
20        Q. Do you recall what your reaction was on
21   reading the portion of the article that involved
22   NatWest's customer, Interpal?
23        A. As I have already said, my reaction was:
24   "Right, we need to -- let's get to the facts on this."
25   I understand why I am being forwarded the e-mail, okay,

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                    Page 109

1   doesn't -- how we worked, it didn't really matter.
2       Q.  Did you have the authority to instruct
3   Mr. Love to take certain decisions with respect to
4   accounts in the corporate bank?
5       A.  I could have done, yes.  I never had to
6   instruct, I just suggested or asked.
7       Q.  When you say "organogram", are you talking
8   about an org. chart?
9       A.  Yes.
10      Q.  Do you know someone named Ben Norrie?
11      A.  Yes, Ben was in Stephen's team at Group.
12      Q.  What about Rob Davies?
13      A.  He was also.
14      Q.  What about Guy Cole?
15      A.  He was in Irvine's team.
16      Q.  Mr. Foster writes:
17        "We do know the Interpal connection but I had
18  asked Ben earlier this week to draft a note to you
19  asking whether, given the risks involved, we, RBSG, should maintain this
20  connection, given the risks involved."
21        Did you know before receiving this e-mail
22  from Mr. Foster that Mr. Foster had asked Mr. Norrie to
23  draft a note to CBFM about whether or not the bank
24  should maintain the Interpal account?
25      A.  I don't recall.

HIGHLY CONFIDENTIAL                    Page 110

1       Q.  Do you recall any discussions with
2   Mr. Foster about that issue before the article was
3   brought to your attention?
4       A.  I recall a number of discussions with
5   Stephen about Interpal.  Whether or not they were before
6   or after the article, I don't recall.
7       Q.  Do you have an understanding as to what
8   Mr. Foster meant when he said "given the risks
9   involved"?
10      A.  I think you would have to ask Stephen.  I
11  don't recall.
12      Q.  You don't recall what your understanding
13  was when you received this e-mail in December 10 about
14  what Mr. Foster's reference to "risk involved" was?
15      A.  No.
16      Q.  "Following the Charity Commission
17  investigation of Interpal last year, we know there is
18  additional monitoring of account activity, but our own
19  recent review of outstanding ST issues prompted us to
20  ask whether (primarily from a reputational viewpoint but
21  also a risk of breach of terrorism laws) we want to
22  maintain an account with an organization cited on the
23  OFAC list as having links to Hamas".
24        First of all, do you recognize "ST" as
25  Sanctions in Terrorism?

HIGHLY CONFIDENTIAL                    Page 111

1       A.  Yes.
2       Q.  And that review of outstanding ST issues,
3   are you familiar with that review that Mr. Foster is
4   referring to?
5       A.  I don't recall.  I recall that there were
6   Sanctions in Terrorist Financing issues.  Which
7   Sanctions and Terrorist Financing issues he is referring
8   to, I don't recall.
9       Q.  Do you recall any particular review of
10  those issues going on in or about December 2004?
11      A.  I recall that there were at least
12  quarterly reviews of all sanctions and terrorists
13  matches, potential matches, any issues arising from any
14  process, so there were ongoing reviews.  I don't recall
15  a specific review.
16      Q.  When you described that quarterly review,
17  do you mean the consolidated lists that were sent out
18  quarterly and matched against the customer list?
19      A.  There were always at least quarterly
20  searches, if not more frequently, yes.  To clarify, what
21  I am trying to say is it is not as if there was only
22  ever one time that any issues relating to the Group
23  Sanctions and Terrorist Financing processes were
24  considered.  It was an ongoing process.  It wouldn't
25  have been prompted by any article.  It was something

HIGHLY CONFIDENTIAL                    Page 112

1   that was constantly on the team's radar, for want of
2   a better phrase.  Okay?
3       Q.  "Even allowing for the differences between
4   UK and US approaches to Israel/Palestine issues, and the
5   general push back against extra-territoriality of US
6   laws, I suggest as a Group we should look very carefully
7   at such connections before deciding to continue with
8   them."
9        Was there a discussion within the bank at the time
10  about "push back against the extra-territoriality of US
11  laws"?
12        MR. LUFT:  Objection, foundation.
13      A.  I have absolutely no recollection of
14  a discussion across the Group of extra-territoriality.
15      Q.  Do you have any recollection of
16  a discussion with Mr. Foster about the
17  extra-territoriality of US laws?
18      A.  I have a recollection of discussions with
19  Stephen about which regulation and which bits of
20  legislation applied where.
21      Q.  Does that discussion include the
22  application of US laws outside of the United States?
23      A.  It would include which parts of the Group
24  have to comply with which list.  I just don't recognize
25  your phrase extra-territoriality, because I don't -- any

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT -  Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                                      Page 117

1    question?
2        A.  Yes.
3        Q.  Putting aside the term "fundraising", were
4    you aware in December 2004 of any activities of CBFM
5    that were coming under the "OFAC microscope"?
6        A.  No, no.  The activities I was aware of
7    CBFM in the US is that it was a very, very large part of
8    the CBFM business, and CBFM was the part of the Group
9    that operated, apart from Citizens, operated in the US,
10   but I was not aware of any fundraising efforts or any
11   part of CBFM that would come under the OFAC microscope,
12   fundraising or otherwise, no.
13       Q.  Can you turn to the front page of this
14   exhibit please, and do you see your e-mail to Mr. Foster
15   and Mr. Love sent at 8:31, or supposedly 8:31 am
16   on December 13?
17       A.  I do.
18       Q.  You write:
19          "From my perspective, I am reassured that we are
20   aware of these customers.  However, the Group's policy is
21   that we will not have customers on the sanctions terrorist
22   lists of the Group covering both UK and US terrorist lists."
23          What did you mean by that when you -- first of
24   all, did you write that on December 13, 2004?
25       A.  I believe I did, yes.

HIGHLY CONFIDENTIAL                                      Page 118

1        Q.  And what did you mean when you wrote that:
2    "The Group's policy is that we will not have customers
3    on the sanctions terrorists lists of the Group covering
4    both UK and US terrorist lists"?
5        A.  The group terrorist list included or was
6    sourced from not just the UK, so the Bank of England
7    list, but we also considered EU lists, UN lists and OFAC
8    lists as appropriate.  It was not a consolidated list,
9    a complete amalgum of all the lists.  It was just
10   sourced from all of those lists.  Okay, so --
11       Q.  But there is a consolidated list that took
12   names from the lists that various countries had,
13   correct?
14       A.  Yes, as appropriate.
15       Q.  And when you wrote that "The Group's
16   policy is that we will not have customers on the
17   sanctions terrorists lists of the Group covering both UK
18   and US terrorist lists", did you mean that there was
19   a Group policy that it would not have customers if that
20   customer was listed on either the UK or US terrorist
21   list?
22       A.  No.  There was a Group list that was
23   sourced from UK, US terrorist lists.  It doesn't mean
24   that it was one list that covered the entire Group.
25   That is what I meant by it covered the Group as

HIGHLY CONFIDENTIAL                                      Page 119

1    appropriate.  So if a customer was in the UK it would
2    primarily -- it would be covered by the Bank of England,
3    the UN and the EU lists, which were a part of the Group
4    lists.  What that was trying to say is we didn't have
5    separate terrorist lists as maintained by individual
6    countries.  The group had an awareness of what the
7    population of terrorist lists the group was exposed to.
8    This was designed to make sure that we were not ignorant
9    of any name that was on a list across the Group, we as
10   a Group team.
11       Q.  But there was no Group policy that if
12   a customer appeared on the OFAC list, that the bank
13   would sever relationships with that customer?
14       A.  Not automatically, unless it was on the
15   Bank of England, the UN or EU list, no.
16       Q.  You continue:
17          "This is not a 'Cuba' OFAC issue, as this
18   organization is on the terrorist rather than general list."
19       A.  Yes.
20       Q.  What did you mean by that?
21       A.  Operationally, the Group, it was more
22   straightforward to search against names than it was
23   against countries, if that makes sense.  So there were
24   parts of the OFAC list -- it also covered FATF as well,
25   that if a country was put on the list it was more

HIGHLY CONFIDENTIAL                                      Page 120

1    operationally difficult.  It didn't mean the Group
2    didn't do it, it was just more operationally difficult
3    to search against countries than it was against
4    customers, because the records of the bank were held by
5    customer name.
6        Q.  Okay.  You continue to say:
7          "However, my understanding is that it is not a cut
8    and dried case either, due to the different stance towards
9    the Palestinian issue between the US and the UK."
10         What did you mean by the different stance towards
11   the Palestinian issue between the US and the UK?
12       A.  I was concerned that it was -- one of the
13   other things I was responsible for was reputational risk
14   comes under Enterprise Risk, so the bank could still
15   suffer damage if there was any reputational issue, and
16   that is what I was talking about in terms of CBFM and
17   the US.  CBFM was expanding in the US and I was very
18   mindful that the Group didn't want to take any action
19   that could have been parochially compliant in the UK but
20   would have been commercially damaging to the US
21   operations.  This was nothing to do with the zero
22   tolerance for not complying with regulation or
23   legislation.  It was a wider remit: how could the bank
24   suffer reputational damage?
25       Q.  And what did you mean by "different stance

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT -   Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                                    Page 129

 1   taken by the business.
 2        Q.  By the Board?
 3        A.  By the Board.
 4        Q.  Only the Board could authorize exits of
 5   relationships, as far as you recall?
 6        A.  I don't recall the detail but it is not
 7   the Risk function.
 8        Q.  You write:
 9        "What is the rationale for not exiting this
10   relationship, given there is a match with the Group's
11   lists."
12        What did you mean by that?
13        A.  I wanted CBFM, the CBFM Board to tell me
14   why were they not exiting the relationship.
15        Q.  And did the CBFM Board tell you that?
16        A.  I don't recall.  I don't recall whether or
17   not they did.  I certainly had that question answered by
18   the work that Irvine's team did in terms of from
19   a Sanctions and Terrorist Financing perspective, there
20   was no evidence that they could find that Interpal was
21   funding terrorism.
22        Now, CBFM could have still taken the decision to
23   exit, but on the basis of Sanctions and Terrorist Financing
24   there was no evidence we found for me to say: "You must exit
25   this relationship now."

HIGHLY CONFIDENTIAL                                    Page 130

 1        Q.  Did you have the authority to tell CBFM
 2   that they had to exit the relationship if you felt that
 3   it was necessary to protect the bank's interests?
 4        A.  I don't know whether I had the authority
 5   or not, but I would have done.
 6        Q.  From while you were in your position as
 7   chief of Group Enterprise Risk, did you ever tell
 8   a division that they had to exit a particular
 9   relationship with a customer?
10        A.  No, I didn't.
11        Q.  When you talk about a match with the
12   Group's lists, are you referring to the consolidated
13   list from the various governmental bodies?
14        A.  Yes.
15        Q.  "What steps are being taken to manage the
16   situation, e.g extra monitoring in the interim while
17   this decision is being taken."  When you say "e.g extra
18   monitoring", what did you mean by that?
19        A.  I wanted to know what CBFM were doing
20   above and beyond what the minimum regulatory
21   requirements were, because Interpal was not on the Bank
22   of England list, but I didn't want them to be complacent
23   and take no action.  So, from memory, Irvine's team were
24   actually having a look at actually what was going on in
25   the account, so who the payees were.  I didn't want CBFM

HIGHLY CONFIDENTIAL                                    Page 131

 1   to sit back and do nothing whilst this decision was
 2   taken, because if for a minute the situation changed and
 3   evidence was found that terrorism was being funded, then
 4   I wouldn't have waited for a decision.  If I could
 5   have -- I never had to but I could have escalated this
 6   all the way up to the RBS Group Board. I could have
 7   taken it straight up to Fred, or to the authorities, not
 8   that I ever had to but I could have done.
 9        Q.  You had the option of bringing items of
10   concern directly to the Group Board?
11        A.  Yes.  If you look at the organization
12   chart I had a dotted reporting line directly up to Sir
13   Fred.
14        Q.  And your testimony is that if there was
15   any evidence that the bank's customer, Interpal,
16   supported terrorism, that is what you would have done?
17        A.  If it had been shown to me, then yes.  If
18   I had become aware of it, I would have done, yes.
19        Q.  And you didn't do that, correct?
20        A.  Not that I recall, no, I didn't.
21        Q.  And is your testimony that the reason you
22   didn't do that because you never were shown any evidence
23   at all that Interpal was supporting terrorism?
24        MR. LUFT: Objection, misstates her prior
25   testimony.

HIGHLY CONFIDENTIAL                                    Page 132

 1        A.  I don't recall ever being shown evidence
 2   that Interpal was funding terrorism.
 3        Q.  When you write about "e.g extra
 4   monitoring" here, did you have in mind -- and tell me if
 5   you understand my question -- proactive monitoring or
 6   retrospective review of payments?
 7        A.  The monitoring was done at the time, so as
 8   far as I recall it was proactive monitoring.
 9        Q.  So it was before transactions were
10   actually executed, looking at who they were going to?
11        A.  I don't recall whether it was before the
12   transactions in terms of releasing funds or afterwards.
13   I meant in terms of -- I was not aware whether or not
14   the team went and trawled through the past 10 years or
15   whether they were just looking at the transactions that
16   were going through.  I don't recall exactly.
17        Q.  Did the bank have the ability before it
18   actually executed transactions that Interpal requested
19   to check out the counterparty?
20        MR. LUFT: Objection, foundation.
21        A.  I don't recall.  In CBFM, I don't recall.
22        Q.  Next thing you write is:
23        "What is the regulatory position, given our
24   increased presence in the US and the formation of the new US
25   organization structure".

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

AMANDA HOLT - Vol. 1
July 23, 2010

HIGHLY CONFIDENTIAL                                    Page 213

1   Bank of England's decision as to whether or not the
2   account is frozen or closed or whatever.
3        Q. Do you recall any occasions where the bank
4   had a customer that was listed on the Bank of England
5   list but the Bank of England did not require closure of
6   that account?
7        A. Not off the top of my head. I know of
8   accounts which were frozen but not closed, on the
9   instruction of the Bank of England.
10       Q. And those were accounts of persons or
11  organizations who were on the Bank of England list at
12  the time?
13       A. As far as I recall, yes, because if there
14  were funds in an account, and they were on the sanctions
15  list, you couldn't close the account and transfer the
16  money somewhere else because then you would be accused
17  of transferring funds. So what you had do was freeze it
18  and treat it as client money and await instruction as to
19  what to do with it.
20       Q. Do you recall on any of those occasions
21  after freezing the accounts on directions from the Bank
22  of England that the Bank of England subsequently allowed
23  the bank to unfreeze funds and make them available to
24  the account holder?
25       A. I don't recall.

HIGHLY CONFIDENTIAL                                    Page 214

1        Q. Were the Interpal accounts still open when
2   you left the bank in 2006?
3        A. I don't recall, but then I don't recall
4   them being closed.
5        Q. What would have been sufficient to
6   persuade you in 2005, short of a listing on the Bank of
7   England list, that Interpal was supporting terrorists
8   and the bank should stop doing business with them?
9        MR. LUFT: Objection, foundation.
10       A. It comes back again to -- you are asking
11  me to speculate on a time that -- I can only answer your
12  question by saying if I had had a genuine suspicion that
13  Interpal had been funding terrorism from the information
14  that had been provided to me, you would have had very,
15  very clear e-mails, memos to Johnnie, to Fred, to
16  potentially the Bank of England, it doesn't really
17  matter who, saying "I think this relationship, the bank
18  has got to exit this relationship".
19       I don't know whether it has come out from today
20  but I am not one to actually be quiet if I think something
21  needs to be done, you know. There was a reason why I had
22  a nickname the "Angel of Death". If I needed it to be
23  raised, it would have been raised.
24       Q. So is it then fair to say that at the time
25  that you were Head of Group Enterprise Risk at RBS -- I

HIGHLY CONFIDENTIAL                                    Page 215

1   want to get your phrasing right -- you never had any
2   genuine suspicion that Interpal had been funding
3   terrorism?
4        A. Not cast-iron fact, no. No, I didn't. I
5   didn't have anything that would have caused me to say
6   the bank needs to go to the Bank of England and say:
7   "This customer, you need to freeze this account." There
8   were discussions with the Bank of England as well, so
9   I could have gone to the Bank of England and said "You
10  need to put this organization on your Bank of England
11  list for these reasons", and that was what part of the
12  whole Sanctions and Terrorist Financing process was
13  designed to enable the bank to do. If I had really
14  thought there was a real issue there I would have raised
15  it. I was going to say, with anyone who would listen,
16  probably with a lot of people who didn't want to, but
17  I would have raised it.
18       Q. Did you think the standard for deciding to
19  end a relationship with a customer was that you needed
20  cast-iron facts that they were funding terrorism?
21       MR. LUFT: Objection, misstates her prior
22  testimony.
23       A. I felt that I needed evidence. Whether or
24  not you call that "cast-iron facts". I felt I needed
25  evidence that wouldn't have been subjected to -- it was

HIGHLY CONFIDENTIAL                                    Page 216

1   not that it wouldn't have been subjected to challenge.
2   In the job I did you expected challenge -- I was going
3   to say every day of the week, several times a day. I
4   had to feel comfortable standing in front of the people
5   who were going to challenge saying "I absolutely believe
6   we have irrefutable evidence here, that means we are not
7   subject to any particular vested interest that this
8   organization is funding terrorism". I applied exactly
9   the same standard to any of the customers, not just
10  Interpal. For any of them, whether it was an unpleasant
11  UK political party or not, you know, you had to.
12       Q. You have unpleasant political parties
13  here?
14       A. In my personal view, yes, but my personal
15  view might not be somebody else's personal view. That
16  was the whole reason why we tried to be as rigorous as
17  we could, because you had the whole spectrum of personal
18  views within the Group.
19       Q. Okay. But it is fair to say that in the
20  time that you were at the bank you didn't feel that you
21  had enough evidence to recommend that the bank stop
22  providing services to Interpal?
23       A. I didn't have that information, yes.
24       Q. I just want to ask you about one part of
25  this e-mail chain which you are not copied on. I know

HIGHLY CONFIDENTIAL                     Page 225

1     Q.  And Mr. Goelman read you from portions of
2   this paragraph, correct?
3     A.  He did.
4     Q.  Now, Ms Holt, if Guy Cole determined an
5   allegation regarding Interpal was unreliable, would you
6   have expected that allegation to be passed along to
7   senior management?
8       MR. GOELMAN: Objection to form and leading.
9     A.  If I have asked somebody to do an
10  investigation, or to do a piece of work, I don't expect
11  to have a complete rundown of "I did this, I did this,
12  I did this, I then decided this was not relevant".  What
13  I am looking for is a summary of the relevant matters,
14  the relevant facts.  So if Guy had actually looked at
15  Worldcheck, he had found something that was on
16  Worldcheck but he had found that the Worldcheck results
17  were unreliable, I would not have expected him to have
18  included that in a briefing.  In fact, it probably would
19  have been unhelpful to include information that was not
20  only not relevant but was actually misleading.
21    Q.  Ms Holt, your position was the Head of
22  Group Enterprise Risk?
23    A.  That is correct.
24    Q.  As the Head of Group Enterprise Risk, in
25  your experience, if the bank believed Interpal was

HIGHLY CONFIDENTIAL                     Page 226

1   funding terrorism, would the potential of negative media
2   attention from exiting have affected the bank's decision
3   as to whether to close the account?
4       MR. GOELMAN: Objection to the leading.
5     A.  I have no evidence to support this but
6   I never saw any evidence of the bank putting
7   reputational considerations above full compliance with
8   legal and regulatory requirements, so no, they would
9   never have actually said: "Well, on balance, we will not
10  comply because of the regulatory damage", and what is
11  more I certainly would not have either, and that was my
12  job as Group Head of Enterprise Risk.
13    Q.  Based on your experience at RBS, if
14  NatWest believed that Interpal was funding terrorism,
15  would they have kept NatWest on as a client?
16      MR. GOELMAN: Objection to form and to
17  leading.
18    A.  Could you say the question again?
19    Q.  Sure.  Based on your experience at RBS, if
20  NatWest believed that Interpal was funding terrorism,
21  would they have kept NatWest on as a client?
22    A.  Would they have kept --
23      THE EXAMINER: Kept who?
24      MR. GOELMAN: Same objections.
25    A.  NatWest was not a client of RBS.

HIGHLY CONFIDENTIAL                     Page 227

1       MR. LUFT: Sure, let me clarify.  I am sorry.
2   If the bank, and by the bank I mean NatWest and the
3   entity that owns it, RBS, if the bank believed that
4   Interpal was funding terrorism, would they have kept
5   NatWest -- excuse me -- would they have kept Interpal on
6   as a client?
7       THE EXAMINER: Yes, you were saying NatWest
8   which was causing the confusion.
9     A.  No, they wouldn't have.  I don't -- well,
10  I have no evidence to prove this but no, I absolutely
11  believe they would not have.  This is the last time I am
12  going to say this but, you know, for what its worth,
13  there is absolutely no way that I would let my job turn
14  me into a person that I despised, because I am the one
15  person I cannot escape from so, for what its worth, if I
16  thought they were funding terrorism, it would have been
17  very hard not to exit.  I would not have kept quiet.
18    Q.  Let me ask you, did you ever believe that
19  Interpal was sending money to Hamas?
20    A.  No, I didn't.
21    Q.  Were you ever told by people at the bank
22  that someone at the bank believed that Interpal was
23  sending money to Hamas?
24      MR. GOELMAN: Objection to form and to
25  leading.

HIGHLY CONFIDENTIAL                     Page 228

1     A.  Nobody at the bank gave me any evidence
2   that Interpal was paying funds, passing funds to Hamas.
3   Nobody actually who was close and who had done the
4   detailed work came to me and said "Look, Amanda, we
5   cannot find the evidence but really, we believe this is
6   what they are doing."  In fact, they told me completely
7   the opposite.  Also, if somebody had come to me and
8   said: "Look, we cannot prove it but all of the
9   circumstantial evidence makes this really smell, this is
10  not good.  We really believe that Interpal is funding
11  Hamas," there would have been a clear recommendation to
12  exit, not from reputational grounds, purely because
13  there was a really strong and clear and inconclusive
14  suspicion that Interpal was funding terrorism, but
15  nobody ever came to me with that.
16    Q.  Did you and the people that reported to
17  you ever make a decision not to investigate Interpal so
18  as to avoid gaining knowledge of whether Interpal was
19  sending money to terrorists?
20      MR. GOELMAN: Objection to form, leading.
21    A.  As far as I was concerned, my tenure at
22  the bank, I spent an inordinate effort making sure that
23  we had no ostriches with their heads in the sand.
24  Ignorance is not bliss.  So you had to have as far as
25  possible the full information in front of you to make

---

HIGHLY CONFIDENTIAL                                           Page 229

1   the decision.  Looking the other way was just not an
2   option, for whatever grounds, reputational, commercial
3   or whatever grounds.
4          MR. LUFT: I have no further questions.
5          RE-DIRECT EXAMINATION BY MR. GOELMAN:
6          MR. GOELMAN: I have just one thing I want to
7   follow up on.  At the beginning of the questioning by
8   the lawyer for yourself and the bank, you testified that
9   you would not consider unsubstantiated allegations
10  sufficient to exit a relationship.
11         A.  No.
12         Q.  Is that right?
13         A.  That is right.
14         Q.  Did you consider the listing of an
15  organization by the United States Department of Treasury
16  as a specially designated global terrorist to be an
17  unsubstantiated allegation?
18         A.  No, I didn't consider it to be
19  unsubstantiated, and I didn't ignore it, but it was one
20  of the many pieces of information that we factored in to
21  make our own decision.  I believe I deliberately didn't
22  ignore that, which is one of the reasons why I didn't,
23  from memory, insisted that all of the OFAC lists were
24  included in the group lists, and we had to get clarity
25  as to how they were going to be treated, so that it

---

HIGHLY CONFIDENTIAL                                           Page 230

1   couldn't look the other way, that it had to be
2   considered.  I would not -- would never completely
3   dismiss it.
4          Q.  But at no point during your tenure at the
5   bank did you personally develop the suspicion that
6   Interpal was funding Hamas?
7          A.  Not on the basis of the information that I
8   had been given.
9          MR. GOELMAN: Thank you.
10         THE EXAMINER: Has everyone asked all the
11  questions they require.  Thank you very much, Ms Holt,
12  for giving your evidence through a long day, and thank
13  you for assisting the American court and the trial judge
14  and the English court.  That completes the deposition
15  today and, counsel, thank you very much for your
16  efficient conduct of the examination through the day.
17         MR. GOELMAN: And thank you.
18         MR. LUFT: Absolutely, thank you very much.
19         THE VIDEOGRAPHER: End of tape four, volume
20  one in the video deposition of Ms Amanda Holt.  We are
21  going off the record at 5:30 pm.
22
23
24
25

---

HIGHLY CONFIDENTIAL                                           Page 231

1
2              CERTIFICATE OF DEPONENT
3
4   I, Amanda Holt, hereby certify that I have read the
    foregoing pages, numbered 1 through 233, of my
5   deposition of testimony taken in these proceedings on 23
    July, 2010, and, with the exception of the changes
6   listed on the next page and/or corrections, if any, find
    them to be a true and accurate transcription thereof.
7
8
9
10
11  Signed:  ........................
12  Name:    Amanda Holt
13  Date:    ........................
14
15
16
17
18
19
20
21
22
23
24
25

---

HIGHLY CONFIDENTIAL                                           Page 232

1              CERTIFICATE OF COURT REPORTER
2
3   I, AILSA WILLIAMS, an Accredited LiveNote Reporter with
    European Deposition Services, London, England, hereby
4   certify that the testimony of the witness Amanda Holt in
    the foregoing transcript, numbered pages 1 through 233,
5   taken on 23 July, 2010 was recorded by me in machine
    shorthand and was thereafter transcribed by me; and that
6   the foregoing transcript is a true and accurate verbatim
    record of the said testimony.
7
8   I further certify that I am not a relative, employee,
    counsel or financially involved with any of the parties
9   to the within cause, nor am I an employee or relative of
    any counsel for the parties, nor am I in any way
10  interested in the outcome of the within cause.
11
12
13
14
15  Signed:  ........................
16  AILSA WILLIAMS
17  Dated:   ........................
18
19
20
21
22
23
24
25

---

**EXHIBIT 34 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*SONIA GAYLE*
*Vol. 1*
*October 27, 2010*

---

*European Deposition Services*
*59 Chesson Road*
*London W149QS*
*England*
*United Kingdom*

Original File Sonia Gayle - 27 Oct 2010.txt
Min-U-Script® with Word Index

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 255 of 386 PageID #: 9069

TZVI WEISS et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE - Vol. 1
October 27, 2010

**Page 1**

```
 1              HIGHLY CONFIDENTIAL
 2          UNITED STATES DISTRICT COURT
 3          EASTERN DISTRICT OF NEW YORK
 4                    Action No: 05cv4622(DGT)(MDG)
 5   - - - - - - - - - - - - - - - - - -
 6   TZVI WEISS, et al,
                              Plaintiffs,
 7   against
 8   NATIONAL WESTMINSTER BANK, PLC.,
                              Defendant.
 9   - - - - - - - - - - - - - - - - - -
10   NATAN APPLEBAUM, et al.,
11                            Plaintiffs,
12   against
13   NATIONAL WESTMINSTER BANK, PLC.,
14                            Defendant.
15
16
17        VIDEOTAPED DEPOSITION OF SONIA GAYLE
18           Wednesday 27 October 2010
19              At:  2:00 pm
20              Taken at:
21      Cleary, Gottlieb, Steen & Hamilton LLP
22          55 Basinghall Street, London
                United Kingdom
23
24
25
```

**Page 2**

```
 1              A P P E A R A N C E S
 2   For Plaintiff Natan Applebaum:
 3        JOEL ISRAEL
          Sayles & Werbner
 4        4400 Renaissance Tower
          1201 Elm Street
 5        Dallas, Texas 75270
          Tel: 214 939 8763
 6
 7   For Plaintiff Tzvi Weiss:
 8        AITAN GOELMAN
          Zuckerman Spaeder LLP
 9        1800 M Street, NW, Suite 1000
          Washington, DC 20036-5807
10        Tel: 202 778 1996
11   For Defendant National Westminster Bank, PLC:
12
13        JONATHAN I. BLACKMAN and VALERIE SCHUSTER
          Cleary, Gottlieb, Steen & Hamilton LLP
14        One Liberty Plaza
          New York, NY 10006-1470
15             Tel: 212 225 2432
16   Also Present:
17   Examiner: ADRIAN HUGHES
18
19        COURT REPORTER:
20        AILSA WILLIAMS
          European Deposition Services
21        59 Chesson Rd
          London, W14 9QS
22
          Telephone:  44 (020) 7385 0077
23        VIDEOGRAPHER: SIMON RUTSON
24
25
```

**Page 3**

```
 1                  I N D E X
 2
 3   SONIA GAYLE ... ... ... ... ... ... ...6
 4   DIRECT EXAMINATION BY MR. ISRAEL: ... ... ...6
 5   CROSS-EXAMINATION BY MR. GOELMAN: ... ... 122
 6              INDEX OF EXHIBITS
 7   Gayle 1 Policy Note C1  ... ... ... ... ...63
                  NW000082-111
 8
 9   Gayle 2 Corporate Banking Money ... ... ...78
                  Laundering Policy NW000285-93
10   Gayle 3 High Level Procedures . ... ... ...82
11               Process Chart
12   Gayle 4 Memo NW016216-27  . ... ... ... ...88
13   Gayle 5 Memo NW083863-75  . ... ... ... ...92
14   Gayle 6 E-mails NW014013-24 . ... ... ...99
15   Gayle 7 E-mails NW012925-33 ... ... ... 101
16   Gayle 8 E-mails NW214836-47 ... ... ... 109
17   Gayle 9 E-mails NW214931  ... ... ... ... 111
18   Gayle 10 E-mails NW215652-57 ... ... ... 115
19   Gayle 11 E-mails NW214816-25 ... ... ... 119
20
21
22
23
24
25
```

**Page 4**

```
 1        THE VIDEOGRAPHER: This is the beginning of
 2   tape one, volume one in the deposition of Sonia Gayle,
 3   taken on 27 October, 2010, at 2:07 pm, as indicated on
 4   the video screen.
 5        This deposition is being taken in the matter
 6   of Tzvi Weiss, plaintiffs, versus National Westminster
 7   Bank, civil action number 05cv4622(DGT)(MDG).  This
 8   deposition is in the matter of Natan Applebaum, et al
 9   versus National Westminster bank.  This deposition is
10   taking place both at the offices of Cleary Gottlieb
11   Steen and Hamilton, London, England, and video
12   conference in Cleary Gottlieb's office in Washington DC.
13        The videographer is Simon Rutson, the court
14   reporter is Ailsa Williams of European Deposition
15   Services.
16        Would counsel and the Examiner please
17   introduce themselves.
18        THE EXAMINER: We will start this end.  I am
19   Adrian Hughes QC, the Court Examiner.  Can I ask
20   everyone present in the London office to introduce
21   themselves, please.
22        MR. BLACKMAN: Jonathan Blackman, Cleary
23   Gottlieb, Steen and Hamilton, representing NatWest and
24   representing Ms Gayle.
25        MS GILLETT: Fiona Gillett from Stewarts Law
```

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 256 of 386 PageID #: 9070

TZVI WEISS et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE - Vol. 1
October 27, 2010

**Page 9**

1 undertaking consumer research on financial services
2 related behavioural analysis.
3     Q. Would it be accurate to say that that work
4 was related to individuals as opposed to entities?
5     A. I am sorry, could you just elaborate?
6     Q. As policy manager for consumer research,
7 is it accurate to say that that policy was focused on
8 individuals as opposed to entities or corporations?
9     A. Well, the research was conducted for the
10 regulator, so it was not for a specific firm, it was not
11 for any specific individuals. It was effectively
12 research conducted for a regulatory authority, and that
13 research is in the public domain.
14     Q. Can you tell me briefly when you left FSA
15 in approximately the end of 2004, where did you go next?
16     A. I then joined Barclays Bank.
17     Q. Are you still with Barclays today?
18     A. Yes.
19     Q. What job title or titles have you had with
20 Barclays?
21     A. When in my initial engagement with
22 Barclays I was engaged as a program director, reporting
23 to the compliance director for retail bank.
24     Q. And you said in your initial engagement.
25 Did you have a period of time where you left Barclays?

**Page 10**

1     A. Yes.
2     Q. What did you do during that period of
3 time?
4     A. The initial engagement was for nine to ten
5 months, and then after that I joined Ernst & Young.
6     Q. And that would have been some time perhaps
7 in late 2005, is that correct?
8     A. Yes, I would need to be precise on the
9 dates, but that sounds about right.
10     Q. How long did you stay at Ernst & Young?
11     A. I left Ernst & Young in March 2010 this
12 year.
13     Q. And you went back to Barclays?
14     A. That is correct, yes.
15     Q. First of all, what is your current title
16 at Barclays?
17     A. Director of Compliance.
18     Q. And what title did you have at Barclays?
19     A. Sorry, is that the same question? Did
20 I mishear?
21     Q. I am sorry, no, I misspoke. What title
22 did you have at Ernst & Young?
23     A. My title at Ernst & Young was Senior
24 Regulatory Manager.
25     Q. When did you first join NatWest?

**Page 11**

1     A. I joined just after 9/11, which would have
2 been September, 2001.
3     Q. What was your title when you joined?
4     A. I was the Head of Group Regulatory Policy.
5     Q. Where were you working before you joined
6 NatWest?
7     A. Arthur Andersen.
8     Q. Arthur Andersen, and what position did you
9 have at Arthur Andersen?
10     A. Regulatory Manager.
11     Q. Covering what issues?
12     A. The focus was on retail banking and all
13 matters that would fall within the remit of compliance,
14 as defined by the FSA.
15     Q. So that the regulatory structure in which
16 you were ensuring compliance was the Financial Services
17 Authority, is that correct?
18     A. That is correct.
19     Q. And in any particular aspects of the FSA?
20     A. Focusing primarily on conduct of business
21 issues, so that would be on financial promotions, firms'
22 engagement with retail customers, product development
23 and marketing, regulatory reporting, and all other
24 matters pertaining to the compliance prove person
25 function.

**Page 12**

1     Q. How long were you employed by Arthur
2 Andersen?
3     A. Just over 18 months.
4     Q. During your time with Arthur Andersen, did
5 you address any money laundering or terror financing
6 issues?
7     A. Yes, that was part of our training, so we
8 would cover anti-money laundering at that time, which
9 would primarily focusing on banks take on of customers,
10 so around "Know Your Customer" policies and procedures,
11 recordkeeping, due diligence.
12     Q. In terms of the regulatory obligations of
13 banks pertaining to money laundering and terror
14 financing, while you were at Arthur Andersen, was the
15 Financial Services Authority your guide for handling
16 those responsibilities?
17     A. Well, obviously, yes, the Financial
18 Services Authority, and also we would be guided by the
19 Joint Money Laundering Steering Group as well, who set
20 the protocols in terms of anti-money laundering
21 compliance and broader financial crime matters, and of
22 course you have fraud considerations as well.
23     Q. Besides the Financial Services Authority
24 and the Joint Money Laundering Steering Group, any other
25 authorities that were guiding the job that you were

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 257 of 386 PageID #: 9071

TZVI WEISS et al – NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE - Vol. 1
October 27, 2010

Page 81

1  Investigations & Fraud.  The Group Money Laundering
2  Reporting Officer, which was David Swanney, and
3  subsequently Richard Gossage, over the course of 2002,
4  would support that decision, but that decision would be
5  made by not one individual.  It would be a number of
6  individuals, as the appropriate checks and balances.
7      Q.  I believe you described it as it is
8  a decision that the business division would implement as
9  opposed to making the decision itself.  Is that an
10  accurate characterization?
11      A.  The decision to close the account, the
12  instruction would come from the relevant regulatory
13  authority or indeed as directed.  So if the instruction
14  from NCIS or the Bank of England or the FSA is the
15  account be closed, then the account will be closed.
16  There is no -- you know, the bank, the instruction would
17  be quite clear in terms of the response to the MLRO.
18      Q.  Do you recall the bank closing any
19  accounts during the 2-year period you worked there on
20  suspicions that a customer was engaged in terrorist
21  financing.
22      MR. BLACKMAN: Objection to form, vague.  Do
23  you mean because of an instruction?  Do you mean
24  otherwise?
25      MR. ISRAEL: No.  I just mean any accounts

Page 82

1  that were closed during the 2-year period you worked at
2  the bank, because the bank suspected that a customer was
3  engaged in terror financing.
4      A.  I don't know.
5      Q.  You don't recall any examples?
6      A.  Not specific examples, no.
7      Q.  Do you recall that that happened, though?
8      A.  I recall that accounts were closed.
9  Whether they were closed for that reason I cannot say.
10      Q.  You mean you recall that accounts were
11  closed pertaining to terrorist financing, you just
12  cannot recall the reason, or you recall just generally
13  accounts were closed by the bank?
14      A.  Yes, the latter.  I recall that accounts
15  were closed, but the basis for closures I don't know.
16      Q.  Can I ask Ms Williams to hand you NW80
17  through 81.
18      (Exhibit Gayle 3 marked for identification)
19      Ms Gayle, do you have any recollection of having
20  seen either of these process charts before?
21      A.  I recollect seeing process charts but
22  whether it was these, I can't confirm.
23      Q.  Okay.  With regards to Group Compliance
24  Department, two arrows are drawn on the bottom, one of
25  which states on the left: "Makes decisions in

Page 83

1  consultation with CEO/6POC on the termination of
2  relationships following appropriate advice from Group
3  Legal."  The other states: "Makes decisions in
4  consultation with UK relevant authority on the freezing
5  of accounts following appropriate advice from Group
6  Legal".  Do you see where I am talking about?
7      A.  Is that the first page, the two boxes?
8      Q.  Yes.  To my knowledge, these documents
9  were produced consecutively.  They are undated but they
10  appear to be identical in language, but I am
11  specifically reading off the first page, NW80.
12      A.  Okay.
13      Q.  During the two years you were in the --
14  strike that.  During your period of time in the Group
15  Compliance Department, do you recall your department --
16      MR. BLACKMAN: The documents in fact are not
17  identical, but go on.
18      MR. ISRAEL: I should say that I believe the
19  language I am reading is identical.
20      MR. BLACKMAN: That appears to be correct.
21      MR. ISRAEL: Okay.  Ms Gayle, during the
22  period of time in which you were Head of Policy for
23  Group Compliance Department, do you recall Group
24  Compliance having the responsibility for making both of
25  those decisions?

Page 84

1      A.  I would have to say no.
2      Q.  Do you recall any other department within
3  the bank having responsibility for making those
4  decisions?
5      A.  My recollection is that there was not one
6  single department that would make that decision.
7      Q.  Do you recall Group Compliance being
8  a part of making that decision?
9      A.  Yes.
10      Q.  Do you recall the business divisions being
11  a part of making those decisions?
12      A.  Yes, as they would be --
13      THE EXAMINER: Sorry, can you let the witness
14  finish.  She was just in the middle of giving the
15  answer.
16      Q.  Absolutely.
17      A.  Yes, because the decision or the request
18  would come via the business, so they would be party to
19  those discussions.
20      Q.  As Head of Policy, were you informed when
21  a transaction was blocked for any reason?
22      A.  Can you elaborate?
23      Q.  Sure.  For instance, if a transaction
24  involving either a customer -- involving either
25  a transacting party or beneficiary of the bank was

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 258 of 386 PageID #: 9072

TZVI WEISS et al – NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE – Vol. 1
October 27, 2010

Page 97

1  money laundering related, it could relate to a name
2  match.
3      Q.  From a policy standpoint, other than
4  notifying parties, did you expect any investigation of
5  the customer to be undertaken within the bank?
6      A.  Could you clarify, when you refer to
7  "investigation"?
8      Q.  All I am asking, understanding you were
9  Head of Policy, was there any policy that guided the
10 bank what if any investigation it needed to conduct on
11 that customer, if they appeared on a suspected terrorist
12 list?
13     A.  Sorry, I have lost the thread of that
14 question.  My apologies.
15     Q.  What you have told me is that your
16 recollection is if there was a positive match there were
17 a number of parties who needed to be notified about the
18 possibility of the match.  What I am asking you is,
19 other than reporting that suspicion to the authorities,
20 did any part of the bank have the responsibility to do
21 anything further with regards to that customer?
22     A.  I don't know.  It would depend on the
23 nature of the report and the nature of the suspicion.
24     Q.  So a further investigation of that
25 customer and their transactional history was not

Page 98

1  automatically required, simply because there was a name
2  match?
3      A.  I don't know.  It may have been required.
4  I simply cannot remember that level of detail.
5      MR. BLACKMAN: Don't guess.
6      A.  So in short I don't know.
7      Q.  But at least based on this numbered item
8  5, it was Group Compliance who advised the business
9  divisions of any further actions that needed to be taken
10 with regards to that customer, correct?
11     A.  This is what is written here, but I don't
12 know whether this is a literal interpretation.  It may
13 have moved on from then.  From what I have seen there
14 were other parties involved.
15     Q.  So you are not sure whether or not this
16 statement is correct, is that right.
17     A.  I can't recollect if this was applicable
18 throughout the timeframe, so if this is an accurate
19 document, depending on whether or not this was
20 a standard template, and I don't know, I can't remember.
21 As I said, I don't recollect many of these going out.
22 This may be the only one that went out in my name, so I
23 am really not familiar with the underlying detail.
24     Q.  Okay.  Let me ask the court reporter to
25 mark for you NW14013.

Page 99

1      (Exhibit Gayle 6 marked for identification)
2      A.  Okay.
3      Q.  Ms Gayle, do you have any recollection of
4  having seen this e-mail and attachment?
5      A.  No.
6      Q.  I am correct that on the September 22,
7  2003 e-mail, you are one of the names in the "To" line,
8  correct?
9      A.  My name is noted, yes.
10     Q.  Do you recall receiving Significant Case
11 Commentaries on Money Laundering during your time with
12 the bank?
13     A.  Is that the title of this document?
14     Q.  It is?
15     A.  It looks familiar.
16     Q.  You don't recall this specific case
17 commentary, correct?
18     A.  Correct.
19     Q.  If you look on NW114019.
20     A.  Yes.
21     Q.  It discusses a customer named: "The
22 Palestinian Relief and Development Fund".  Do you see
23 that?
24     A.  Yes, I see that.
25     Q.  Are you familiar with a one time customer

Page 100

1  of the bank's named the Palestinian Relief and
2  Development Fund?
3      A.  Not based on this list, no.
4      Q.  Do you recall the bank having a customer
5  named Interpal?
6      A.  Not at the time, no.
7      Q.  When did you first hear that the bank had
8  a customer named Interpal?
9      A.  When I received these papers.
10     Q.  With regards to this deposition?
11     A.  Yes.
12     Q.  You were with the bank at least as of
13 late September 2003, correct?
14     A.  Yes.
15     Q.  Do you recall ever being advised that
16 a customer of the bank had been designated by OFAC in
17 the US as a Specially Designated Global Terrorist?
18     A.  Who are we referring to?
19     Q.  I am referring to do you ever recall that
20 happening, period?
21     A.  Sorry, could you repeat the question?
22     Q.  Sure.  Do you recall during the two years
23 you were with NatWest learning that a customer of the
24 bank had been designated by OFAC in the United States as
25 a Specially Designated Global Terrorist?

TZVI WEISS et al – NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE -  Vol. 1
October 27, 2010

---

Page 101

1      A.  No.

2      Q.  Do you recall ever being advised that

3  a customer of the bank had been designated by OFAC as

4  a terrorist, period?

5      A.  No.

6      Q.  Is that something you would have expected

7  to have been told?

8      MR. BLACKMAN: Objection to form, calls for

9  speculation.

10      A.  Over what period?

11      Q.  In the period you were at the bank.

12      A.  I can't comment.  As I have explained, my

13  involvement here would have been in the early part,

14  during 2001, and many of these responsibilities would

15  have been transferred to Group Risk.

16      Q.  Was it your practice to read these

17  Significant Case Commentaries when they arrived?

18      A.  Yes, I would have scanned them.

19      Q.  Can the court reporter hand Ms Gayle

20  Exhibit 7, which is NW12925.

21      (Exhibit Gayle 7 marked for identification)

22      A.  Okay.

23      Q.  Do you have any recollection of this

24  e-mail and attached document, Ms Gayle?

25      A.  No.

---

Page 102

1      Q.  Were you always included on sanctions and

2  terrorist financing search requests sent out during your

3  time with the bank, to your recollection?

4      A.  Some items I was cc'd on, but there would

5  have been other materials that would not have been sent

6  to me.

7      Q.  Was it your practice to review RBS Group

8  search requests on sanctions in terrorist financing when

9  you received it?

10      A.  I would read all documentation sent to me,

11  but unless something was marked specifically for my

12  action --

13      Q.  Okay.  You see on the second page of the

14  document, NW12926, that an entity named Interpal with

15  other AKA's was designated by OFAC as a Specially

16  Designated Global Terrorist.  Do you see that?

17      MR. BLACKMAN: "SDGT", anyway.

18      MR. ISRAEL: Do you know what an SDGT is,

19  Ms Gayle?

20      A.  Sorry, what am I looking at?

21      MR. BLACKMAN: The second page.

22      A.  I am not familiar with this document.

23      Q.  Do you know what an SDGT is?

24      A.  Off the top of my head, I don't recall.

25      Q.  If I tell you it is a Specially Designated

---

Page 103

1  Global Terrorist, does that refresh your recollection?

2      MR. BLACKMAN: You have to answer verbally.

3      MR. ISRAEL: I am sorry, I could not see you.

4      A.  I am sorry, I am struggling to understand

5  the question.  Are you asking me if I --

6      Q.  I am asking, if I tell you an SDGT is

7  a Specially Designated Global Terrorist, does that

8  refresh your recollection?

9      A.  My recollection of what?

10      Q.  Of what an SDGT is?

11      A.  You have just told me what it is.  Sorry,

12  am I missing your question?

13      Q.  We will move on.  Again, you don't recall

14  any customer of the bank having been designated by OFAC

15  in the United States, correct?

16      A.  Not to my knowledge.

17      Q.  As Head of Policy with Group Compliance

18  and then Group Risk Management, how was the bank

19  supposed to handle a customer that had been designated

20  by OFAC as a terrorist?

21      MR. BLACKMAN: Objection, lack of foundation.

22      A.  I would expect it to be handled in

23  accordance with the bank's requirements as stated in

24  policy.

25      Q.  Do you recall what those requirements

---

Page 104

1  were?

2      A.  Not in detail, no.

3      Q.  Do you recall being involved in helping to

4  draft or formulate those policies?

5      A.  On my arrival to the bank,

6  in September 2001, I would have been part of the group

7  who would have reviewed the existing policies with

8  a view to shaping those to reflect the changing

9  requirements at that time, but those responsibilities

10  and the team subsequently transferred from me during the

11  course of 2002.

12      Q.  Ms Gayle, have you heard of the UK Charity

13  Commission?

14      A.  I am aware of them.

15      Q.  Do you know what they are?

16      A.  I don't know --

17      Q.  They are a commission.  Do you know what

18  they do?

19      A.  I assume they approve charities but I am

20  not familiar with the organization personally.

21      Q.  So you don't know what authority they

22  have?

23      A.  In terms of the details of the scope of

24  their authorities, no.

25      Q.  Okay.  Do you ever recall during your

---

TZVI WEISS et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE - Vol. 1
October 27, 2010

Page 109

1    Q. With regards to either the Woolspur Group
2  or the Basle Committee, do you specifically recall
3  taking into account any of their guidance with regards
4  to terrorist financing when you were involved in
5  preparing NatWest policies?
6    A. I don't know.
7    Q. Let me have the court reporter hand you
8  214836, which is Exhibit 8.
9    (Exhibit Gayle 8 marked for identification).
10    Do you recall having received this e-mail and
11  attachment, Ms Gayle?
12    A. No, I don't recollect this specifically.
13    Q. Do you recall after September 11, 2001,
14  receiving lists of names to check on the potential
15  connections to Osama Bin Laden?
16    A. Sorry, could you elaborate on that
17  question?
18    Q. Do you recall after September 11, 2001,
19  investigating whether any customers of the bank had
20  potential links or connections to Osama Bin Laden?
21    A. No.
22    Q. Okay. Do you recall then whether or not
23  any searches were done, regardless of whether or not
24  those entities appeared on a governmental list -- let me
25  short circuit this. If you look at the third paragraph

Page 110

1  of Ms Baugh's e-mail, it says:
2    "These details were compiled mainly from
3  information found on the Internet and in various press
4  searches. It is therefore difficult at this point to assess
5  the reliability of the information."
6    So my question is do you recall searches being
7  done of entities or individuals because internet research,
8  as opposed to lists from governments, had turned up possible
9  connections?
10    A. Sorry, are you asking me ...
11    Q. I am asking you if after September 11 you
12  recall the bank searching its customers to determine if
13  any had possible links to Osama Bin Laden, based on
14  Internet research that had revealed these possible
15  connections?
16    MR. BLACKMAN: Objection to form.
17    A. I can only comment in the context of what
18  the policy requirements were at that time. Of course,
19  I also made reference to politically exposed persons, so
20  the bank would use information sources from various
21  areas to identify, so suspected persons were not just
22  suspected terrorists but it could also include
23  politically exposed persons. But again the policy and
24  the underlying protocols around the searches would
25  specify the detail of that.

Page 111

1    Q. Do you recall, did the policy require an
2  individual to appear on a list of suspected terrorists
3  or politically exposed persons in order for the bank to
4  research and determine if that individual was
5  a customer? In other words, could the bank search for
6  names beyond those that were included on governmental
7  lists of suspected terrorists or politically exposed
8  persons?
9    MR. BLACKMAN: Objection to form, lack of
10  foundation.
11    A. The requirements around searching and also
12  in terms of account opening, Know Your Customer et
13  cetera, would all be specified within policy, but I
14  can't comment on the detail.
15    Q. Let me ask the court reporter to hand you
16  NW214931, which will be Gayle Exhibit 9?
17    THE VIDEOGRAPHER: There is five minutes left
18  on the video. Do you want me to switch or wait a few
19  minutes.
20    MR. ISRAEL: Let's finish this document.
21    (Exhibit Gayle 9 marked for identification)
22    Q. Have you heard of an entity named Hamas?
23    A. Yes, I have heard of them.
24    Q. And were you aware that they were
25  designated a terrorist organization by both the US and

Page 112

1  the UK?
2    MR. BLACKMAN: Objection to form.
3    A. I have an awareness of that. The precise
4  date of when that took place, other than what is stated
5  here --
6    Q. But prior to seeing this e-mail you were
7  aware that Hamas had been designated a terrorist
8  organization?
9    A. Yes, I was aware that they had been
10  designated.
11    Q. And are you aware of Hamas' involvement in
12  terrorist attacks?
13    MR. BLACKMAN: Objection, asking for personal
14  knowledge or --
15    MR. ISRAEL: Yes.
16    A. No.
17    Q. I am sorry, did you say "no"?
18    A. That was "no".
19    Q. This e-mail indicates that Hamas was
20  reported by the Bank of England on September 22, 2003,
21  correct?
22    A. This is what is stated here, yes.
23    Q. Sure. If in fact that is accurate, would
24  NatWest, from a policy standpoint, have been able to
25  provide banking services for Hamas prior to that date?

Case 1:05-cv-04622-DLI-RML  Document 272-2  Filed 03/22/12  Page 261 of 386 PageID #: 9075

TZVI WEISS et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

SONIA GAYLE - Vol. 1
October 27, 2010

Page 125

1 were other reasons why I was appointed.
2      Q. But was Mr. Swanney in the audience when
3 you spoke about money laundering at a policy conference?
4      A. I was not aware of that.
5      Q. Did you later become aware of that?
6      A. Only after I joined the bank.
7      Q. Do you remember what you were speaking
8 about in particular at that policy conference?
9      A. I think financial crime, and there were
10 a number of other topics. It was a -- I can't remember.
11 I used to speak at a number of seminars and conferences
12 so I am not sure which one he was in attendance at.
13      Q. You testified a couple of times about
14 different inconsistencies or tensions between US
15 regulations or laws and ones that applied or UK or UN
16 regulations. I think you gave the example a couple of
17 times of sanctions against Cuba. Do you recall that?
18      A. Yes, I do recall that.
19      Q. Are you aware of any distinctions between
20 US law and UK law with regard to the treatment of Hamas?
21      A. No.
22      Q. You testified about your contact with the
23 Bank of England during the years that you were at RBS.
24 Do you recall that?
25      A. Yes, I do recall that.

Page 126

1      Q. You started just after -- you started at
2 RBS just after the attacks of 9/11, true?
3      A. True.
4      Q. Do you know who at RBS was the primary
5 contact with the Bank of England before that fell to
6 you?
7      A. No.
8      Q. You don't know who you replaced in that
9 regard?
10      A. I don't know who my -- I am not aware of
11 who my predecessor was or indeed if their role was the
12 same scope as mine.
13      Q. You testified that you believed that there
14 were meetings at RBS involving this, at which the
15 subject of terror financing was discussed, but that you
16 did not recall the details of those meetings. Is that
17 correct?
18      A. That is correct.
19      Q. I just want to make sure that we have
20 exhausted your recollection about those meetings. You
21 testified you don't recall the details of those
22 meetings. Do you recall anything at all about the
23 substance of any meetings at RBS where terror financing
24 was discussed?
25      A. There were many meetings at which the

Page 127

1 topic would have arisen and in various contexts.
2      Q. Do you remember any of the context where
3 terror financing was discussed.
4      A. It would have been in the context of
5 meetings with Legal, meetings with Group
6 Investigations & Fraud, meetings involving the Money
7 Laundering Reporting officers, broader meetings on sort
8 of policy framework and promulgation and training
9 sessions on policy and related technical issues.
10      Q. When there were meetings with Group
11 Investigations & Fraud, where the subject of terror
12 financing was discussed, do you remember who from Group
13 Investigations & Fraud participated?
14      A. No, I don't recollect the names.
15      Q. Do you recall any of the subject matters
16 of those meetings?
17      A. No.
18      Q. Do you recall the subject of American
19 anti-terror regulations arising at any of the meetings
20 that we are talking about?
21      A. Could you elaborate please?
22      Q. Yes. At any of the meetings with any of
23 the constituent groups that you described, and I want to
24 exclude Legal from this question, do you recall
25 discussing that or a topic of American anti-terrorism

Page 128

1 legislation or laws arising?
2      A. No.
3      Q. You testified about contact that you had
4 with Bank of England regarding clarification for when
5 there was a hit on a list and whether or not that was
6 a positive, a false positive or a real positive. Do you
7 recall that?
8      A. Yes.
9      Q. How often did you or someone at your
10 direction talk to the Bank of England about those
11 subjects?
12      A. Certainly in 2001 I would say weekly
13 members of my team, but I am aware that there were other
14 conversations with other parts of the bank, so I can't
15 say with any accuracy.
16      Q. When you say "with other parts of the
17 bank", other parts than what?
18      A. So Group Investigations -- other parts
19 other than Group Compliance.
20      Q. Okay, I understand. Was there
21 a particular part of the Bank of England that those
22 contacts were with?
23      A. Most of my contacts were with the policy
24 area of the Bank of England, who compiled the list of
25 names and put it on to their website.

**EXHIBIT 35 to Declaration of Joel Israel**



**Case Summary**

| | | Money laundering disclosure | | | NCIS |
|---|---|---|---|---|---|

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |
|---|---|---|---|---|

**Incident Data**

| | | | | | **Linked Cases** | |
|---|---|---|---|---|---|---|
| **Control Authority** | Group Financial Crime 1 | **Status** | Open **Source: [GK2:617044]** | | 276995 | Address auto-linked |
| **Review Date** | | **by** | | | 618425 | NONE |
| **Remote Delivery Channel** | N | **High Profile** | Y 27 Sep 2001 00:00 | | 647655 | NONE |
| **Created on** | 27 Sep 2001 00:00 | **by** | HoseasonM | | 666593 | NONE |
| | | | | | 666814 | NONE |
| **Last Modified on** | 07 Feb 2002 00:00 | **by** | RBS_Meyrgab | | 704079 | Account auto-linked |
| | | | | | 708047 | Address auto-linked |
| | | | | | 710368 | NONE |
| | | | | | 710397 | Address auto-linked |
| | | | | | 753294 | Address auto-linked |
| | | | | | 772682 | Address auto-linked |
| | | | | | 1748664 | Personal auto-linked |
| | | | | | 1975700 | Business auto-linked |
| | | | | | 2333235 | Business auto-linked |
| | | | | | 2400867 | Business auto-linked |
| | | | | | Maintain Links | |

| **Queries** | **Refer To** | **Tel No.** | **Business** | **Unable to contact ?** |
|---|---|---|---|---|
| | | | NONE | Yes |

**Money laundering disclosure Record**

| **Submitting Branch** | 600822/GI&F | **Submitted By** | MIKE HOSEASON |
|---|---|---|---|
| **Submitting Unit Sortcode** | | **Contact No** | |
| **Submitting Department** | None | **Legislation** | POTA |

HIGHLY CONFIDENTIAL

NW 052056



**Estimated Laundering Total** 386730 <Unknown>

**Reason(s) for Suspicion**
Suspected terrorist funding
Please see attachments and/or Case Notes where available for further information
Other (see Summary and Assessment field)

**Transactions GBP 100000.00**                                                   Add

| Date | Type | Amount | Currency | |
|------|------|--------|----------|---|
| | | | | Edit |
| | | | | Edit |
| | | | | Edit |
| | | | | Edit |

**Set All Risk Ratings to the the same value of:-**    Amber  Blue  Green  Indigo  Red

**Personal Data**                                                                Add

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
|---------|-----------|---------------|-----|-----------------|------|-----|---|
| HEWITT | IBRAHIM BRIAN | | | NONE | Red | Red | Edit |
| IL-MOBARAK | HABIBAH | | | NONE | Green | Green | Edit |
| MUSTAFA | E Y | 17 Nov 1955 | M | NONE | Red | Red | Edit |
| QUNDIL | J | | | NONE | Red | Red | Edit |
| SAFIEE | MAHFOUZH | | | NONE | Red | Red | Edit |
| ZAKAT MOOSA | | | | NONE | Green | Green | Edit |

**Business Data**                                                                Add

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
|-------------------|------------------|--------------------|-----------------|------|-----|---|
| AL-ISLAH CHARITABLE SOCIETY | | ISRAEL | NONE | Green | Green | Edit |
| BEITSAJJAR ZAKAT COMMITTEE | | ISRAEL | NONE | Green | Green | Edit |
| ISLAMIC CHARITABLE SOCIETY | | ISRAEL | NONE | Green | Green | Edit |
| JININ ISLAMIC CLUB | | ISRAEL | NONE | Green | Green | Edit |
| ▮▮▮▮▮▮▮ | | UNITED KINGDOM | NONE | Green | Green | Edit |
| NABLUS ZAKAT COMMITTEE | | ISRAEL | NONE | Green | Green | Edit |
| ▮▮▮▮▮▮▮ | | ISRAEL | NONE | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND | | UNITED KINGDOM | NONE | Red | Red | Edit |
| UNION FOR GOOD PROJECTS | | ISRAEL | NONE | Green | Green | Edit |

**Telephone Data**                                                               Add

**-None-**

HIGHLY CONFIDENTIAL

NW 052057

## Address Data — Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|---|---|---|---|---|---|---|
| 60 CLARK CRT | STILTON CRES | LONDON | NW10 8DJ | Red | Red | Edit |
| PO BOX 3333 | | | NW6 1RW | Red | Red | Edit |

## Account Data — Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| | | | | | Green | Green | Edit |
| PAL REL & DEV FUND INTERPAL FAMILIES | 95145397 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PAL REL & DEV FUND INTERPAL ADMIN | 95142983 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PAL REL & DEV FUND INTERPAL CHILDREN | 95142975 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PAL REL & DEV FUND ZAKAT | 95142967 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PAL REL & DEV FUND INTEREST | 95142959 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| INTERPAL UNION FOR GOOD | 140 00 08537933 | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |
| | | | | | Green | Green | Edit |
| | | | | | Green | Green | Edit |
| PAL REL & DEV FUND PARENT | 140 00 04156838 | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |

## Miscellaneous Data — Add

-None-

## Case Notes — Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Case notes | 07 Feb 2002 | Migrated | Finlog ref: 140425. Special Branch are investigating. DH | View |
| Summary and Assessment | 07 Feb 2002 | Migrated | Account 95142967 Regular credits to the account, mainly BGC' | View |
| Conclusion | 07 Feb 2002 | Migrated | On the basis of the information available to us at the prese | View |

## Key Correspondence

No Documents have been uploaded — Add

## NCIS Disclosures

| | Author | Date | |
|---|---|---|---|
| NCIS Disclosure 142909 (R) | ConnellJ | 15 Oct 2001 | Amend NCIS Number |

**No CIFAS Reports**

HIGHLY CONFIDENTIAL

NW 052058

Case notes History for Case 617044

| 1. User: | Migrated | On: | 07 Feb 2002 00:00 | Print | Copy | |
|---|---|---|---|---|---|---|
| Note: | Finlog ref: 140425. Special Branch are investigating. DH | | | | | |

HIGHLY CONFIDENTIAL

NW 052059

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 267 of 386 PageID #: 9081

**1. User:** Migrated     **On:**     07 Feb 2002 00:00          Print    Copy

**Note:** Account 95142967 Regular credits to the account, mainly BGC's made up of small individual cheques. One large cheque of ██████ drawn on ██████ and a chaps credits from the Zakat Moosa Family of £75000 and £21894 from Habibah IL Mobarak, Saudia ████ Small withdrawals made by of cheques t████████ and ████████████ Trust and a overseas payment to Beitsajjar Zakat Committee, Cairo Amman Bank Bethlehem.Account 95205748 Regular credits to the account, small individual cheques of ████████ Account 95142975 as above, mainly ████ credits, no withdrawalsAccount 95142983 Account fed by 95142959, sample of cheques issued shows a number of cheques to ████ ████████ Account 95142959 small deposits only, transfers to ████ 95142983Account 95145397 Small deposits only, no further deposits since ████ ████USD$ 04156838 -Considerable funds held, a sample of outward payments shows beneficiaries to be: Jinin Islamic Club (Sports Social & Cultural), Nablus Zakat Committee, Islamic Charitable Society, Al-Islah Charitable Society, ████████████ and the Union for Good Projects. All the payments went to Banks in Palestine. A further payment has been sent to the ████████████ for Interpal Orphans.USD$ 04183711 No balance held & last entry 16/12/94USD$ 08480117 Credit of ██████ made from (?)funds still held on the account.USD$ 08537933 1 credit received from ████████

HIGHLY CONFIDENTIAL

NW 052060

Conclusion History for Case 617044

| **1. User:** Migrated | **On:** | 07 Feb 2002 00:00 | Print | Copy | |
|---|---|---|---|---|---|

**Note:** On the basis of the information available to us at the present time, it is considered that the above incident / activity may constitute or involve money laundering and consequently a disclosure has been made to the National Criminal Intelligence Service or other appropriate authorities. Please see attached documents for further information concerning the financial disclosure. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL

NW 052061

### NCIS Disclosure for Case 617044 ( Received )

Close          Print

**Core NCIS details created on 15 Oct 2001 by ConnellJ          [ Submitted by HoseasonM on 15-OCT-01 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | Natwest |
| Disclosure Date | 15 Oct 2001 | | Group Investigations & Fraud |
| Branch / Outlet | Finsbury Park | | |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | Postcode | |

Text



HIGHLY CONFIDENTIAL

NW 052062

HIGHLY CONFIDENTIAL

NW 052063

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 271 of 386 PageID #: 9085



HIGHLY CONFIDENTIAL

NW 052064



HIGHLY CONFIDENTIAL

NW 052065

HIGHLY CONFIDENTIAL

NW 052066

**EXHIBIT 36 to Declaration of Joel Israel**

**UNITED STATED DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MOSES STRAUSS et al., | : | |
| Plaintiffs, | : | DOCKET NO. 06-cv-702 |
| v. | : | (CPS) (MDG) |
| CRÉDIT LYONNAIS, S.A. | : | |
| Defendant. | : | |
| | : | |
| BERNICE WOLF et al., | : | |
| Plaintiffs, | : | DOCKET NO. 07-cv-914 |
| v. | : | (CPS) (MDG) |
| CRÉDIT LYONNAIS, S.A. | : | |
| Defendant. | : | |
| | : | |
| TZVI WEISS et al., | : | |
| Plaintiffs, | : | DOCKET NO. 05-cv-4622 |
| v. | : | (CPS) (MDG) |
| NATIONAL WESTMINSTER BANK, PLC | : | |
| Defendant. | : | |
| | : | |
| NATAN APPLEBAUM et al., | : | |
| Plaintiffs, | : | DOCKET NO. 07-cv-916 |
| v. | : | (CPS) (MDG) |
| NATIONAL WESTMINSTER BANK, PLC | : | |
| Defendant. | : | |
| | : | |

## EXPERT REPORT OF WAYNE D. GEISSER, CPA, CVA, CFE

Prepared by:  WAYNE D. GEISSER, CPA, CVA, CFE
Nihill & Riedley, PC
The Public Ledger Building, Suite 800
150 So. Independence Mall West
Philadelphia, PA  19106
November 19, 2009



nihill & riedley
A Professional Corporation

# **TABLE OF CONTENTS**

**Page**

I.    BACKGROUND ........................................................................................    1

II.   STATEMENT OF ASSIGNMENT ..........................................................    1

III.  DOCUMENTS CONSIDERED .................................................................    2

IV.   QUALIFICATIONS – WAYNE D. GEISSER, CPA, CVA, CFE ...........    2

V.    ANALYSIS AND OPINION ....................................................................    3

    A.  Crédit Lyonnais – CBSP Accounts ...................................................    3

    B.  NatWest – Interpal Accounts ............................................................    4

EXHIBITS



nihill & riedley
A Professional Corporation

## I.  BACKGROUND

This Report is being submitted in connection with the cases captioned:

> *Strauss, et al. v. Crédit Lyonnais, S.A.,* 06-cv-702 (CPS)(MDG)
> *Wolf, et al. v. Crédit Lyonnais, S.A.,* 07-cv-914 (CPS)(MDG).
> *Weiss et al. v. National Westminster Bank, PLC,* 05-cv-4622 (CPS)(MDG)
> *Applebaum, et al. v. National Westminster Bank, PLC,* 07-cv-916 (CPS)(MDG)

Nihill & Riedley ("N&R"), has been retained by the Plaintiffs' counsel to review and analyze certain banking records, produced in discovery, reflecting transactions facilitated by Crédit Lyonnais, S.A. ("CL") and National Westminster Bank, PLC ("NatWest") , hereafter, collectively the "Defendants" and provide a report summarizing particular withdrawal transactions reflected in the records.

By way of general background, I understand that in each of the above captioned cases, Plaintiffs, each of whom allege injury by reason of an act of international terrorism, allege that the Defendants knowingly provided material support to Hamas, a terrorist organization officially designated by the United States government as a "Foreign Terrorist Organization."

I also understand that Plaintiffs further allege that Defendants maintained a relationship with customers that were designated by the United States government as a "Specially Designated Global Terrorist."   In the case of CL, that customer is an entity named the *Comité de Bienfaisance et de Secours aux Palestiniens* ("CBSP"). In the case of the NatWest, the customer is an entity named Interpal (a/k/a Palestine Relief and Development Fund).

I further understand that Plaintiffs allege that the Defendants provided illegal material support for the benefit of Hamas by transmitting funds at the direction of CBSP and Interpal to various organizations in the Palestinian Territories (the West Bank and Gaza Strip) which are alleged to be alter egos, affiliates, agents, departments, or otherwise controlled by Hamas, as well as to other Hamas controlled entities outside the Palestinian Territories.

The preceding paragraphs are purely intended to summarize my understanding of Plaintiffs' allegations in these cases. This Report (including its Exhibits) does not, and is not, intended to offer, express or suggest any opinion regarding the veracity of Plaintiffs' allegations, or any of Defendant's defenses and/or denials thereof.

## II. STATEMENT OF ASSIGNMENT

As noted above, we have been requested by Plaintiffs' counsel to review and analyze records produced in discovery in each of the above-listed cases that reflect transactions facilitated by CL and NatWest for their respective customers CBSP and Interpal.  We have been asked to summarize certain categories of transactions reflected in those records;  specifically those disbursements made from CBSP (from the CL records) and  Interpal (from the NatWest records) accounts to the following entities and individuals identified to N&R by Plaintiffs' counsel:



1

1. *Al-Mujama al-Islami* – Gaza (Islamic Complex)
2. 
3.
4.
5.
6.
7.
8.
9. Tulkarem Zakat Committee
10. Ramallah - Al-Bireh Zakat Committee
11. Al-Islah Charitable Society - Ramallah & Al-Bireh
12.
13.
14.
15.

N&R is being compensated at its standard hourly rates for the time spent working on this matter, which vary depending on the staff assigned. N&R is being compensated for my (Wayne D. Geisser) work on this matter at the rate of $325 per hour.

N&R confirms that it has no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude N&R from providing its analyses in a fair, accurate, and impartial manner. N&R reserves the right to supplement this Report and any Exhibits thereto should additional information come to our attention.

**III. DOCUMENTS CONSIDERED**

In connection with our engagement we have been provided with a substantial volume of records, produced principally in an electronic database format. The records that we have utilized in our analysis consist of various types of banking-related records including: account statements; deposit and disbursement records; wire transfer instructions; wire transfer confirmations and electronic payment messaging instructions. These records appear to have been generated in the ordinary course of the business. The records produced reflect Bates identification references that have been assigned by the parties and our analysis make references to these documents accordingly. The list of documents that we have considered is attached as **Exhibit E**.

**IV. QUALIFICATIONS – WAYNE D. GEISSER CPA, CVA, CFE**

I am a Certified Public Accountant, Certified Valuation Analyst and Certified Fraud Examiner. In my more than 20-year tenure with N&R and in my prior experience as a Branch Chief in the SEC Division of Enforcement, I have conducted and/or supervised hundreds of financial investigations that have involved the analysis of banking/financial transactions. I have also been qualified as an expert witness in numerous federal and state courts. I currently serve as a



Receiver and Special Master for the United States District Court for the Eastern District of Pennsylvania. My *curriculum vitae* is attached as **Exhibit F.**

## V.  ANALYSIS AND OPINION

Within the scope of our engagement, it is my opinion that the information provided in this Report and Exhibits constitutes an accurate summary of the results of our review and analysis of documents produced, including the transactions processed through the CBSP accounts maintained at CL, and the Interpal accounts maintained at NatWest.

## A.  Crédit Lyonnais – CBSP Accounts

In connection with our analysis we reviewed ▮▮▮▮ CBSP accounts[1] maintained at CL, each of these accounts was initially denominated in ▮▮▮▮▮▮▮.[2]  All of the transfers to the identified beneficiaries were made from account number ▮▮▮▮▮.[3]  The transfers (stated in dollars) from the CBSP account number ▮▮▮▮ to the entities that have been identified by counsel are summarized as follows:

| Ref # | Name[4] | Number of Transfer Transactions | Amount (in US Dollars)[5] |
|---|---|---|---|
| 1 | *Al-Mujama al-Islami* – Gaza (Islamic Complex) | | |
| | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | ▮▮▮▮▮▮▮ |
| 9 | Tulkarem Zakat Committee | | |
| 10 | Ramallah - Al-Bireh Zakat Committee | | |
| 11 | *Al-Islah* Charitable Society – Ramallah & Al-Bireh | | |
| | ▮▮▮▮▮▮▮▮▮▮ | | |
| | **Total** (rounded) | | ▮▮▮▮▮▮▮ |

---

[1] See CL 0004426.
[2] The CBSP CL accounts were switched from ▮▮▮▮▮▮▮▮▮ during September 2001.
[3] Our analysis identified numerous transfers between ▮▮▮ CBSP accounts.
[4] N&R has been advised by Plaintiffs' counsel that because the recipients listed above are all entities or persons (except for Interpal) whose names are or derive from Arabic, there may be occasions when transfer beneficiaries' names may be spelled or translated in a variety of ways.  Accordingly, whenever possible, we have cross-checked names and account numbers to confirm that an entity whose name was spelled differently in separate transactions is in fact the same entity.
[5] The transactions in the Crédit Lyonnais account were denominated in either ▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮.  We have converted the currency using the exchange rate applicable on the day of the transaction, using currency conversion data contained on the website: www.oanda.com.

Our summary of the transfers to the designated entities listed above, by year, is attached as **Exhibit A.** Our detailed analysis of the CBSP transfers on a transaction by transaction basis, is attached as **Exhibit B.** In the course of preparing our analysis of the CBSP accounts, we were unable to identify the beneficiaries for 16 transactions totaling $269,140.00.[6]

## B. NatWest – Interpal Accounts

Our analysis included ███████ Interpal accounts maintained at NatWest, which accounts made disbursements of more than ███████ in funds during the period examined.[7] The accounts were variously denominated in US Dollars ██; British Pounds Sterling ██ French Francs ██ and Euros ██ We identified transfers to designated beneficiaries as originating from one of the following four Interpal accounts:

1. Interpal, account number 95142940 (British Pounds Sterling);
2. Interpal Zakat Fund, account number 95142967 (British Pounds Sterling):
3. Interpal Children, account number 95142975 (British Pounds Sterling); and
4. Interpal, account number 140-00-04156838 (US Dollars).

The transfers from the Interpal accounts at NatWest to the entities that have been identified by counsel are summarized in the table below and include disbursements from one of the four accounts listed above.

| Ref # | Name | Number of Transfer Transactions | Amount (in US Dollars)[8] |
|-------|------|------|------|
| 1 | *Al-Mujama al-Islami* – Gaza (Islamic Complex) | | |
| 2 | ████████████████████ | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | ~~Al-Tadamun Charitable Society – Nablus~~ | | |
| 9 | Tulkarem Zakat Committee | | |
| 10 | Ramallah - Al-Bireh Zakat Committee | | |
| 11 | *Al-Islah* Charitable Society – Ramallah & Al-Bireh | | |
| 12 | ████████████████ | | |
| 13 | | | |
| 14 | | | |
| | **Total** (rounded) | | |

---

[6] The table totals do not include any transactions where the beneficiary could not be identified.

[7] The disbursements total includes transfers between various accounts.

[8] The transactions in the NatWest accounts were denominated in either U.S. Dollars or British Pounds Sterling. We have converted the Pounds Sterling accounts using the exchange rate applicable on the day of the transaction, using currency conversion data contained on the website: www.oanda.com.

Our summary of the transfers to the designated entities listed above, by year, is attached as **Exhibit C**.   Our detailed analysis of the Interpal accounts on a transaction by transaction basis is attached as **Exhibit D.** In the course of preparing our analysis of the Interpal accounts at NatWest we were unable to identify the beneficiary for 619 transfer transactions totaling approximately $10,170,600.15.[9]

---

[9] The table totals do not reflect any of the transactions were the beneficiary could not be identified.

# EXHIBIT  A

**Comité de Bienfaisance et de Secours aux Palestinians a/k/a Comité Bienfaisance pour la Solidarite avec la Palestiene ("CBSP")**
**Credit Lyonnais, S.A. - All Currencies**
**Summary of Identified Withdrawal Transactions for the Benefit of Selected Organizations**
**Revised August 19, 2010**

Annual Withdrawal Totals Presented in US Dollars
For the Time Period: October 1996 to February 2002

| Ref. ID | Organization Name | Annual Withdrawal Totals: | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | |
| 1 | Al-Mujama al-Islami - Gaza (Islamic Complex) | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| 9 | Tulkarem Zakat Committee | | | | | | | | |
| 10 | Ramallah - Al-Bireh Zakat Committee | | | | | | | | |
| 11 | Al-Islah Charitable Society - Ramallah & Al-Bireh | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | Transfers to Interpal | | | | | | | | |

Note: As of November 19, 2009, the totals above do not include 16 withdrawals, transferred between June 1996 and June 2001, with a US Dollar value of $269,140 for which a beneficiary was not identified.

Exhibit C

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Summary of Identified Withdrawal Transactions for the Benefit of Selected Organizations**

**Annual Withdrawal Totals Presented in US Dollars**
**For the Time Period: October 1996 to August 2005**

| Ref. ID | Organization Name | Annual Withdrawal Totals: | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | |
| ▮ | ███████████████ | ▮ ██ | ▮ ██ | ▮ ██ | ██ | ▮ ██ | ▮ ██ | ██ | ██ | ██ | ██ | ██ |
| ▮ | ████████████ | | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ▮ | ████████████ | | ▮ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ▮ | ███████████ | ██ | | ██ | ██ | ██ | ██ | ██ | ▮ | | ██ |
| ▮ | ████████████ | ▮ | | ██ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ▮ | █████████ | ▮ | | ██ | ██ | ██ | ██ | ██ | ██ | | |
| ▮ | █████████ | ▮ | ▮ | ██ | ▮ | ██ | ██ | ██ | ██ | | |
| ▮ | ███████████ | ▮ | | ██ | | ██ | ██ | ██ | ██ | | |
| ▮ | ████████ | ▮ | | | ██ | ██ | ██ | ██ | ▮ | | |
| ▮ | ███████ | ▮ | | | ██ | ██ | ██ | ██ | ██ | | |
| ▮ | ████████████ | ▮ | ▮ | ▮ | ▮ | ▮ | ██ | ██ | ██ | | |
| ▮ | █████████ | ▮ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | | |
| ▮ | ███████████ | ▮ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▮ | |
| ▮ | ██████ | ▮ | ▮ | ▮ | ██ | ██ | ██ | ▮ | ▮ | ▮ | ▮ | ██ |

Note: As of November 19, 2009, the totals above do not include 619 withdrawals, transferred between February 1995 and February 2005, with a US Dollar value of $10,170,600 for which a beneficiary was not identified.

# Exhibit D

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com

[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.

[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category   [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement   [C] |
| **1** | ████ | | | | | | | | | | | | | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | ████ | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ██████ | ████ | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | █ | ██████ | ██████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ██████ | | ████ |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | █ | ██████ | ██████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | ████ |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | ████ |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | ████ |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |
| | ██ | ████ | ███ | ████ | ███ | ███ | ███ | █ | ███ | ██ | █ | ███ | ███ | ███ | ████ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Notes:
[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

**Sorted by Organization Name and Current Account Statement Date**

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | ██████ | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | ██████ | █████ | | ████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | ██████ | ████ | | | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | | ██████ | ████ | ██████ | █ | ███████ | | ██████ | |
| ██ | ██████ | ████ | ███ | █████ | | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | ██████ | ██████ | | | ██████ |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | █ | ███████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | █ | ███████ | | | ██████ |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | █ | ███████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | █ | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | ██████ | ████ | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | █████ | | | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | █████ | ████ | █ | ████ | ██████ | ████ | ██████ | | | | ████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | █ | ██████ | | ██████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ████ | |
| ██ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ████ | █ | ████ | ██████ | ████ | ██████ | | ██████ | | ████ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 289 of 386 PageID #: 9103

Notes: [A] Source of the exchange rate is: www.oanda.com
[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

Sorted by Organization Name and Current Account Statement Date

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | ██████ | | | ████████ | ████████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | ██████ | | ██ | ████████ | ██████ | ████████ | ██████ |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | ██████ | | ██ | ████████ | ██████ | ████████ | ██████ |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | | | ████████ | ████████ | | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | ████ | ████ | | | | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | ████ | ████ | | | | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | ████ | ████ | | | | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | ████ | ████ | | | | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | ████ | █ ███ | | ████ | ████ | | | | |
| ████████████████ | | | | | █ | | ███████ | | | | | | | | |

████████████████████

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ████████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | █████ | ████ | █████ | █ | ████ | ██████ | █████ | ██████ | ████████ | ██████ | ██████ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Notes:
[A] Source of the exchange rate is: www.oanda.com
[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

Sorted by Organization Name and Current Account Statement Date

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | |
| Ref # | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ██ | ████████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ██ | ███████████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ██ | █████████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ████████ | ████ | ███ | ██████ | ████ | ██████ | | ███████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | █████████████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | █████████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ███████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ██████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ███████ | | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ██████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | ██ | ███████ | ██████ | ██████ |
| ██ | ██████ | █████ | ██ | ███████ | █████ | ██████ | ████ | ███ | ██████ | ████ | ██████ | | ██████ | ██████ | ██████ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category  [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement  [C] | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ███████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ██████████ | ████████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ██████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ███████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ████████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | █ | ████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ██████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ████████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ██████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | █ | ████████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ████████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | █████████ | ████████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ███████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ███████████ | ██████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ██████████ | ███████ | | |
| ██ | ██████ | ██████ | ██ | ██████ | █████ | █████ | ███ | █ | | ██████ | █████ | ██████ | ██ | ███████ | ██████ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | | ■ | | ■ |
| | ■ | | | | ■ | | | ■ | | | | | | | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category  [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement  [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | | | | | | | | | | | | | | | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | | ▬ |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ |
| ■ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| | | | | | | | | | | | | | ■ | | |
| | | | | | | | | | | | | | | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| Ref # | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category  [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement  [C] |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | | | ████ | ██████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | | | ████ | ██████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | | | ████ | ████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | | | ████ | ██████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | | | ████ | ██████████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ██████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ██████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ██████████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | | | | ████ | ████████ | | ██████ |
| | ██████████████████████ | | | | █ | | | ██████ | | | | | | | |

4 ██████████████████

| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ████ | ████ | ████ | ██████████ | ██████ | |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ██ | ████ | ████ | ██████████ | ██████ | |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ████ | ████ | ████ | ██████████ | ██████ | |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ████ | ████ | ████ | ██████████████ | ██████ | |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ████ | ████ | ████ | ██████████ | ██████ | |
| ██ | ██████ | ████ | ██ | ██████ | █████ | ██████ | ████ | █ | ██████ | ████ | ████ | ████ | ██████████ | ██████ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | ███ |
| ███████ | | | | | ██ | | | ███ | | | | | | | |
| ███████ | | | | | | | | | | | | | | | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |
| ███ | ███ | ███ | ██ | ███ | ███ | ███ | ███ | █ | ███ | ███ | ███ | ███ | ███ | ███ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■■ | ■■■■ | |
| ■■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■ | ■■■■ | ■■■■■ | | ■■■■ |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■ | ■■■■■■ | | | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■■ | | | | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■■■ | | | | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■■■■ | | | | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■ | ■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■ | ■■■ | ■■■ | ■■■■ | ■■■■ | | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■■■ | ■■■■ | ■■■■ | |
| ■ | ■■■■ | ■■■ | ■■ | ■■■■ | ■■■ | ■■■■ | ■■■ | ■ ■■■ | ■■■■ | ■■■ | ■■■ | ■■ | ■■■■ | ■■■■ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category  [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement  [C] |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ██████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ██████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ██ | █████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | | ██████ | | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ██████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ██████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | █████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ███████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ███████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ███████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ██ | ███████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ██ | ████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | █████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | █████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | █████████████ | █████████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ████ | ████████████ | ██████ | ██████ |
| ██ | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | ██ | ████████████ | ██████ | ██████ |
| Ref # | ██████ | ████ | ██ | ██████ | ████ | ████ | ███ | █ | ████ | ██████ | ███ | ████ | | ████████████ | ██████ | ██████ |

██ 6

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A] Source of the exchange rate is: www.oanda.com
[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ██████████ | ██████ | █████████ |
| ██ | ██████ | █████ | ██ | █████████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████████ | ██████ | █████████ |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ██████████████ | ████████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ███████████ | ████████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ██ | █████████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████████ | ███████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | █████████████ | ████████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ███████████ | ████████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | █████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | █████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ██████████ | ██████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ███████████████ | ██████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | █████████████ | ████████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | ████████ | | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ████ | █████████████ | ███████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | ██ | █████████ | ██████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | ██████ | █████ | ██████ | | ██████████ | █████ | |
| ██ | ██████ | █████ | ██ | ██████ | █████ | ██████ | ████ | █ ████ | | █████ | ██████ | | █████████ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.



**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A] Source of the exchange rate is: www.oanda.com

[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.

[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ██ | ██████ | ████ | ██ | █████ | ████ | █████ | | ████ | █ ███ | ██████ | █████ | █████ | █████ | █████████ | █████ | █████ |
| ██ | ██████ | ████ | ██ | █████ | ████ | █████ | | ████ | █ ███ | ██████ | █████ | █████ | █████ | █████████ | █████ | █████ |
| ██ | ██████ | ████ | ██ | ███████ | ████ | █████ | | ████ | █ ███ | ███████ | █████ | | █████ | ████ | █████ | █████ |
| | | | | | | | | ████ | █ | | | | | ████████ | █████ | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | █████ | | █████ |
| | | | | | | | | ████ | █ | | | | | ████████ | █████ | █████ |
| | | | | | | | | ████ | █ | | | | | ████████ | █████ | █████ |
| | | | | | | | | ████ | █ | | | | | ████████ | █████ | █████ |
| | | | | | | | | ████ | █ | ██████ | █████ | | █████ | ████ | █████ | █████ |
| | | | | | | | | ████ | █ | ██████ | █████ | | █████ | ████ | █████ | █████ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | | | | | ▮ | | | ▮ | | | | | | | |

**7** ▮

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category   [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement   [C] |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | | ██ | ██ | | ██ | | |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | | ██ | ██ | | ██ | | |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | | ██ | ██ | | ██ | | |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ | | ██ | ██ | | ██ | | |
| | ██████ | | | | ██ | | | ▐ ██ | | | | | | | |

8  ██████████

| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ ██ | | ██ | ██ | ██ | ██ | ██ | ██ | |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ▐ ██ | | ██ | ██ | ██ | ██ | ██ | ██ | |

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 305 of 386 PageID #: 9119

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Information from Transfer Forms: | | | | | | |
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | | | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Ref # | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.



**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A] Source of the exchange rate is: www.oanda.com
[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | ■ | ■ |
| | ■ | | | | ■ | | | ■ | | | | | | | |

**10** ■

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | ■ | ■ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ███████████████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | █████████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | █████████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | █████████████ | ███████ | |
| ██ | ███████ | █████ | ███ | ███████ | ████████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |
| ██ | ██████ | █████ | ███ | ███████ | █████ | ██████ | █████ | ██ | ██████ | █████ | █████ | ██████ | ██████████ | ███████ | ████████ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

[A]  Source of the exchange rate is: www.oanda.com
[B]  The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]  If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

Sorted by Organization Name and Current Account Statement Date

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | | | | | ▮ | | | ▮ | | | | | | | | |

**11** ▮▮▮▮▮▮▮▮▮▮▮▮▮

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ | | ▮ | | |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

Sorted by Organization Name and Current Account Statement Date

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | | ▮ | | ▮ |
| ▮ | | | | | ▮ | | | ▮ | | | | | | | |

**12** ▮

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | | ▮ | ▮ | ▮ |

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Withdrawal Transactions for the Benefit of Selected Organizations**

[A]   Source of the exchange rate is: www.oanda.com
[B]   The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.
[C]   If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

Sorted by Organization Name and Current Account Statement Date

| | Information from Account Statements: | | | | | | | | | Information from Transfer Forms: | | | | | | |
| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | ▇ | ▇ | | | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | ▇ | ▇ | | | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | ▇ | ▇ | | | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | | ▇ | ▇ | ▇ | | | |
| ▇▇▇▇▇▇ | | | | | ▇ | | | ▇▇ | | | | | | | |

**13** ▇▇▇▇▇▇▇▇

| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇ | ▇▇▇▇ | ▇ | |
| ▇▇▇▇▇▇ | | | | | ▇ | | | ▇▇ | | | | | | | |

# Palestinians Relief & Development Fund - Interpal
## NatWest Business Bank Accounts - All Currencies
### Identified Withdrawal Transactions for the Benefit of Selected Organizations

**Sorted by Organization Name and Current Account Statement Date**

[A] Source of the exchange rate is: www.oanda.com

[B] The beneficiary names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization and / or funds deposited into matching bank account number.

[C] If no withdrawal supporting documentation was provided, the beneficiary was identified from information presented on the current account statement.

| Ref # | Bates Number | Date | Year | Account Number | Currency | Withdrawal Amount | British Sterling to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Date | Transfer Number | Beneficiary's Account Number or IBAN | Beneficiary's Name / Category [B] | Beneficiary's Bank Name | Transaction Detail from Current Account Statement [C] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | |

**Totals for Selected Organizations**

**EXHIBIT 37 to Declaration of Joel Israel**

## UNITED STATED DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MOSES STRAUSS et al., | : | |
| Plaintiffs, | : | DOCKET NO. 06-cv-702 |
| v. | : | (CPS) (MDG) |
| CRÉDIT LYONNAIS, S.A. | : | |
| Defendant. | : | |
| | : | |
| BERNICE WOLF et al., | : | |
| Plaintiffs, | : | DOCKET NO. 07-cv-914 |
| v. | : | (CPS) (MDG) |
| CRÉDIT LYONNAIS, S.A. | : | |
| Defendant. | : | |
| | : | |
| TZVI WEISS et al., | : | |
| Plaintiffs, | : | DOCKET NO. 05-cv-4622 |
| v. | : | (CPS) (MDG) |
| NATIONAL WESTMINSTER BANK, PLC | : | |
| Defendant. | : | |
| | : | |
| NATAN APPLEBAUM et al., | : | |
| Plaintiffs, | : | DOCKET NO. 07-cv-916 |
| v. | : | (CPS) (MDG) |
| NATIONAL WESTMINSTER BANK, PLC | : | |
| Defendant. | : | |

## EXPERT REPORT OF WAYNE D. GEISSER, CPA, CVA, CFE, CFF

Prepared by: **WAYNE D. GEISSER, CPA, CVA, CFE**
**Nihill & Riedley, PC**
**The Public Ledger Building, Suite 800**
**150 So. Independence Mall West**
**Philadelphia, PA 19106**
**December 28, 2010**



nihill & riedley
A Professional Corporation

## **TABLE OF CONTENTS**

**Page**

I.     BACKGROUND ...................................................................................  1

II.    STATEMENT OF ASSIGNMENT ...................................................  1

III.   DOCUMENTS CONSIDERED ..........................................................  2

IV.    QUALIFICATIONS-WAYNE D. GEISSER, CPA, CVA, CFE, CFF ...................  2

V.     OPINION ...........................................................................................  2

VI.    ANALYSIS .........................................................................................  2

        Background ...................................................................................  2
        Account Statement Data and Transactional Records ............................  3
        Identified Depositors and Payees ........................................................  3
        Identified, Matching and Grouping of Transactions ................................  4
        Analyses Presented ..........................................................................  5

EXHIBITS



## I.  BACKGROUND

This Report is being submitted in connection with the cases captioned:

> *Weiss et al. v. National Westminster Bank, PLC,* 05-cv-4622 (CPS)(MDG)
> *Applebaum, et al. v. National Westminster Bank, PLC,* 07-cv-916 (CPS)(MDG)
> *Strauss, et al. v. Crédit Lyonnais, S.A.,* 06-cv-702 (CPS)(MDG)
> *Wolf, et al. v. Crédit Lyonnais, S.A.,* 07-cv-914 (CPS)(MDG).

Nihill & Riedley ("N&R"), has been retained by the Plaintiffs' counsel to review and analyze certain banking records, produced in discovery, reflecting transactions facilitated by National Westminster Bank, PLC ("NatWest"), hereafter, the "Defendant" and provide a report summarizing particular deposit and withdrawal transactions reflected in the account records. This Report supplements our prior reports of November 19, 2009 and August 19, 2010.[1]  The information contained in this Report is based upon documents produced in discovery that were either not available, or produced recently at the time the prior reports were prepared.

## II.  STATEMENT OF ASSIGNMENT

We have been requested by Plaintiffs' counsel to review and analyze records produced in discovery by NatWest, for its customer, Interpal and summarize all deposits and withdrawals that pertain to the following organizations/individuals:

1.
2.
3.
4.
5.
6.



7.

The transactions that we have identified and summarized are included in among  accounts maintained by Interpal at NatWest.[2]  Our summaries of the transactions that we have identified are included at **Exhibits A through E**.

---

[1] Our Report of August 19, 2010 pertains exclusively to transactions involving Crédit Lyonnais.
[2] See column "Account Number" appearing in **Exhibits D and E.**

N&R is being compensated at its standard hourly rates for the time spent working on this matter, which vary depending on the staff assigned. N&R is being compensated for my (Wayne D. Geisser) work on this matter at the rate of $325 per hour.

N&R confirms that it has no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude N&R from providing its analyses in a fair, accurate, and impartial manner. N&R reserves the right to supplement this Report and any Exhibits thereto should additional information come to our attention.

## III. DOCUMENTS CONSIDERED

In connection with our engagement, we have been provided with a substantial volume of records, produced principally in an electronic format. The records that we have utilized in our analysis consist of various types of banking-related records including: account statements; deposit and disbursement records; wire transfer instructions; wire transfer confirmations and electronic payment messaging instructions. These records appear to have been generated in the ordinary course of the business. The records produced reflect Bates Stamp identification references that have been assigned by the parties and our analysis make references to these documents accordingly. Our List of Documents Considered is attached as **Exhibit F**.

## IV. QUALIFICATIONS – WAYNE D. GEISSER CPA, CVA, CFE, CFF

I am a Certified Public Accountant, Certified Valuation Analyst, Certified Fraud Examiner and am Certified in Financial Forensics by the AICPA. In my 25-year tenure with N&R and in my prior experience as a Branch Chief in the SEC Division of Enforcement, I have conducted and/or supervised hundreds of financial investigations that have involved the analysis of banking/financial transactions. I have also been qualified as an expert witness in numerous federal and state courts. My *curriculum vitae* is attached as **Exhibit G.**

## V. OPINION

Within the scope of our engagement, it is my opinion that the information provided in this Report including the various schedules appended as Exhibits A through E, constitutes an accurate summary of the transactions that we have been asked to indentify, analyze and summarize.

## VI. ANALYSIS

### Background

Our Reports, dated November 19, 2009 and August 19, 2010, identified disbursements from ████████ Interpal accounts at Nat West made to fourteen (14) organizations/individuals. The names of the fourteen (14) organizations/individuals were supplied by counsel. Subsequent to the issuance of these Reports, counsel provided additional documents (in electronic format), identified as volumes 46 and 58.[3] We reviewed the document production and updated our

---

[3] See Listing of Documents Considered for Bates Stamp numbers.

**n**
nihill & riedley
A Professional Corporation

2

transactional database. Currently, the Nat West transaction database includes over 5,000 separate receipt/payment transactions.[4]

## Account Statement Data and Transactional Records

The initial transactional information was obtained from bank Account Statements. Information extracted from the Account Statements included: Nat West Interpal bank account numbers; transaction currency; transaction date; transaction amount; and if available the transfer number and organization/individual name associated with the transfer.

Additional information was obtained from the individual deposit and disbursement records, including wire transfer forms, hereafter collectively referred to as the "Transactional Records." The Transactional Records were matched to Account Statements using the date, amount, organization/individual name and the transfer number. Information found in the Transactional Records may have included, but not be limited to: Interpal bank account number; transaction date; transaction amount; IBAN (International Bank Account Number); transfer number; organization/individual name associated with the transfer; and any instructions regarding the transfer.

## Identified Depositors and Payees

As noted above, we have been asked to identify and summarize certain transactions reflected in Nat West records; specifically those receipts and disbursements made to/from one of ▇ accounts maintained at Nat West for Interpal for the specific depositors/payees that have been indentified to us. The specific accounts that the deposits and withdrawals that we have identified in our review are detailed in our analyses.[5] The deposits and withdrawals that we were asked to analyze pertain to the following seven (7) organizations/individuals:

1.
2.
3.
4.
5.
6.



7.



---

[4] With the inclusion of documents produced in volumes 46 and 58.
[5] See column "Account Number" in the attached analyses (**Exhibits D and E**).

3

n
nihill & riedley
A Professional Corporation

**Identification, Matching and Grouping of Transactions**

The transactions listed on the exhibited detailed schedules were identified by using the descriptions that appear on the Account Statements and Transactional Records. The transactions were combined through a sorting process that utilized information appearing on available documents.  For example, identical bank account numbers and the transactional amounts (i.e. same amount of dollars or Euros) provided us with a primary indication that the organization/individual was the same and as a result, the transactions were appropriately grouped together in the sorting process.

Due to the large volume and range of documents produced, names of the organizations/individuals may have reflected variance in titling; spellings; or Arabic to English translations on the various documents (i.e. Account Statement and Transactional Records).  We grouped transactions with such variations by cross-referencing available information including:

- Account names;
- Account numbers;
- Supporting deposit / disbursement records; and
- Source / destination bank / IBAN number.

We understand that the evidentiary basis for the grouping of the data has been developed through the discovery process and / or the use of other experts and will be presented at trial.  For purposes of this Report, counsel provided direction in the titling / grouping of transactions presented in the exhibited schedules.  The information supplied by counsel as to titling / grouping does not affect the recording and summarizing of the underlying transactions in the database or attached Exhibits.



nihill & riedley
A Professional Corporation

4

**Analyses Presented**

- **Exhibit A -** "Summary of Identified Receipt/Credit and Payment/Debit Transactions from/to Selected Organizations/Individuals" – Presents analysis that combines both "receipt/credit" (deposit-funds in) and "payment/debit" (withdrawals-funds out) for each indentified organization/individual.

- **Exhibit B** – "Summary of Identified Receipt/Credit Transactions from Selected Organizations/Individuals" - Presents analysis that summarizes by annual period funds deposited to the Interpal accounts by each identified organization/individual. The analysis accounts for 196 transactions totaling ██████████[6]

- **Exhibit C** – "Summary of Identified Payment/Debit Transactions from Selected Organizations/Individuals" - Presents analysis that summarizes by annual period funds paid to each identified organization/individual. The analysis accounts for 41 transactions totaling ████████

- **Exhibit D** – "Detail of Identified Receipt/Credit Transactions from Selected Organizations / Individual" – Presents information for the individual transactions for each of the identified organization. The information is derived from the Account Statements and Transaction Records. The analysis accounts for deposits totaling ████████

- **Exhibit E** – Detail of "Identified Payment/Debit Transactions from Selected Organizations/Individuals" - Presents information for the individual transactions for each identified organization. The information is derived from the Account Statements and Transactional Records. The analysis accounts for withdrawals totaling ████████

---

[6] All foreign currencies have been converted to U.S. Dollars.

n

nihill & riedley
A Professional Corporation

5

# EXHIBITS

nihill & riedley
A Professional Corporation

**Strauss, et al. v. Crédit Lyonnais, S.A.**
**Wolf, et al. v. Crédit Lyonnais, S.A.**
**Weiss, et al. v. National Westminster Bank, PLC**
**Applebaum, et al. v. National Westminster Bank, PLC**

**Exhibit List**

**Exhibit A -** Summary of Identified Receipt/Credit and Payment/Debit Transactions from/to Selected Organizations/Individuals

**Exhibit B -** Summary of Identified Receipt/Credit Transactions from Selected Organizations/Individuals

**Exhibit C -** Summary of Identified Payment/Debit Transactions from Selected Organizations/Individuals

**Exhibit D -** Detail of Identified Receipt/Credit Transactions from Selected Organizations / Individual

**Exhibit E -** Detail of Identified Payment/Debit Transactions from Selected Organizations/Individuals

**Exhibit F -** List of Documents Considered

**Exhibit G –** Curriculum Vitae - Wayne D. Geisser CPA, CVA, CFE, CFF



nihill & riedley
A Professional Corporation

# Exhibit A

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts – All Currencies**
**Summary of Identified <u>Receipt / Credit</u> and <u>Payment / Debit Transactions</u> from / to Selected Organizations / Individuals**



| Ref. ID | | Organization Name | Receipts / Credit Transactions | | Payment / Debit Transactions | | Total Transactions | |
|---|---|---|---|---|---|---|---|---|
| | | | US Dollar Value | No. of Transactions | US Dollar Value | No. of Transactions | US Dollar Value | No. of Transactions |
| I | | | | | | | | |
| II | | | | | | | | |
| III | | | | | | | | |
| IV | | | | | | | | |
| V | | | | | | | | |
| VI | | Al Aqsa Foundations: | | | | | | |
| | A | Al Aqsa Foundation of S.A. | $ | | | | | |
| | B | Al Aqsa (Belgium) [ASBL Al-Aqsa] | $ | | | | | |
| | C | Al Aqsa (Germany) | $ | | | | | |
| | D | Al-Aqsa Spannmal Stiftelse | $ | | | | | |
| | E | Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef | $ | | | | | |
| | F | Stichting Al-Aqsa (Al Aqsa Holland) | $ | | | | | |
| | G | Al Aqsa Foundation | $ | | | | | |
| VII | | | $ | | | | | |

Notes:

[A]   As of December 15, 2010, the totals above do not include 44 receipts / credits in excess of $1,000 each, received by Interpal between October 1994 and October 2004, with a US Dollar value of $1,897,606 for which a source of funds was not identified.

[B]   As of December 15, 2010, the totals above do not include 619 withdrawals (in excess of $1,000), transferred between January 1996 and February 2005, with a US Dollar value of $10,298,599 for which a beneficiary was not identified.

# Exhibit B

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Summary of Identified <u>Receipt / Credit Transactions</u> from Selected Organizations / Individuals**

| Ref. ID | | Organization Name | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | | | | | | | | | | | | | | |
| II | | | | | | | | | | | | | | |
| III | | | | | | | | | | | | | | |
| IV | | | | | | | | | | | | | | |
| V | | | | | | | | | | | | | | |
| VI | | Al Aqsa Foundations: | | | | | | | | | | | | |
| | A | Al Aqsa Foundation of S.A. | | | | | | | | | | | | |
| | B | Al Aqsa (Belgium) [ASBL Al-Aqsa] | | | | | | | | | | | | |
| | C | Al Aqsa (Germany) | | | | | | | | | | | | |
| | D | Al-Aqsa Spannmal Stiftelse | | | | | | | | | | | | |
| | E | Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef | | | | | | | | | | | | |
| | F | Stichting Al-Aqsa (Al Aqsa Holland) | | | | | | | | | | | | |
| | G | Al Aqsa Foundation | | | | | | | | | | | | |
| VII | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | $ |



Note: As of December 15, 2010, the totals above do not include 44 receipts / credits in excess of $1,000 each, received by Interpal between October 1994 and October 2004, with a US Dollar value of $1,897,606 for which a source of funds was not identified.

# Exhibit C

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Summary of Identified Payment / Debit Transactions from Selected Organizations / Individuals**



| Ref. ID | | Organization Name | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | | | | | | | | | | | | | | |
| II | | | | | | | | | | | | | | |
| III | | | | | | | | | | | | | | |
| IV | | | | | | | | | | | | | | |
| V | | | | | | | | | | | | | | |
| VI | | Al Aqsa Foundations: | | | | | | | | | | | | |
| | A | Al Aqsa Foundation of S.A. | | | | | | | | | | | | |
| | B | Al Aqsa (Belgium) [ASBL Al-Aqsa] | | | | | | | | | | | | |
| | C | Al Aqsa (Germany) | | | | | | | | | | | | |
| | D | Al-Aqsa Spannmal Stiftelse | | | | | | | | | | | | |
| | E | Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef | | | | | | | | | | | | |
| | F | Stichting Al-Aqsa (Al Aqsa Holland) | | | | | | | | | | | | |
| | G | Al Aqsa Foundation | | | | | | | | | | | | |
| VII | | | | | | | | | | | | | | |

Note: As of December 15, 2010, the totals above do not include 619 withdrawals (in excess of $1,000), transferred between January 1996 and February 2005, with a US Dollar value of $10,298,599 for which a beneficiary was not identified.

# Exhibit D

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | Information from Account Statements | | | | | | Information for Identified Receipt / Credit Transactions | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Page 1 of 9

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | | Information for Identified Receipt / Credit Transactions | | | | |
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

IV  World Assembly of Muslim Youth (WAMY)

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Palestinians Relief & Development Fund – Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | Information from Account Statements | | | | Information for Identified Receipt / Credit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Page 3 of 9

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Detail of Identified <u>Receipt / Credit Transactions</u> from Selected Organizations / Individuals**

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | Information from Account Statements | | | | | | Information for Identified Receipt / Credit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified <u>Receipt / Credit Transactions</u> from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| Information from Account Statements | | | | | | | | | Information for Identified Receipt / Credit Transactions | | | | | Transaction Detail from Account Statement (Source of same if no supporting documentation provided) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate  [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | |

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | | Information for Identified Receipt / Credit Transactions | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Information from Account Statements | | | | | | | | | | | |
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

| World Assembly of Muslim Youth (WAMY) Totals | | | | | | | | | | | | | |

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals**

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | | Information for Identified Receipt / Credit Transactions | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Information from Account Statements | | | | | | | | | | | |
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

**VI  Al Aqsa Foundations:**

**A - Al Aqsa Foundation of S.A.**



Al Aqsa Foundation of S.A. Totals

**B - Al Aqsa (Belgium) [ASBL Al-Aqsa]**



Al Aqsa (Belgium) [ASBL Al-Aqsa] Totals

**C - Al Aqsa (Germany)**



Al Aqsa (Germany) Totals

**D - Al-Aqsa Spannmal Stiftelse**



Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified Receipt / Credit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | Information from Account Statements | | | | Information for Identified Receipt / Credit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit   [B] | Bank Name | Comments | | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

|  | Al-Aqsa Spannmal Stiftelse Totals | | | | 6 | | | $ | 152,644.72 | | | | | | | |

**E - Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef**

|  | Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef Totals | | | | | | | | | | | | | | | |

**F - Stichting Al-Aqsa (Al Aqsa Holland)**

|  | Stichting Al-Aqsa Totals | | | | | | | | | | | | | | | |

**G - Al-Aqsa Foundation**

|  | Al-Aqsa Foundation Totals | | | | | | | | | | | | | | | |

**Al Aqsa Foundations (A through G) Totals**

**VII CBSP**

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Detail of Identified <u>Receipt / Credit Transactions</u> from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Information from Account Statements** | | | | | | | | **Information for Identified Receipt / Credit Transactions** | | | | |
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Receipts / Credit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number(s) | Donor's Account Number / IBAN | Source of Receipt / Credit  [B] | Bank Name | Comments | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CBSP Totals** | | | | | | | | | | | | | | |
| **Selected Organizations / Individuals ( I through VII) Totals** | | | 196 | | | | | | | | | | | |

Notes.
[A] - Source of exchange rate is www.oanda.com.

[B] - The names may have variations due to translating Arabic names into English, typographical errors, or branch office of main organization.

# Exhibit E

**Palestinians Relief & Development Fund - Interpal**
**NatWest Business Bank Accounts - All Currencies**
**Identified Payment / Debit Transactions from Selected Organizations / Individuals**

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | Information from Account Statements | | | | | | | | | Information for Identified Payment / Debit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Payment / Debit Amount | British Sterling / Euro to US Dollar Exchange Rate  [A] | Converted US Dollar Amount | | Bates Number | Transfer Number | Account Number or IBAN | Beneficiary's Name   [B] | Bank Name | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The source of receipt / credit names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization

Page 1 of 4

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Identified Payment / Debit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | Information from Account Statements | | | | | | | | | Information for Identified Payment / Debit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Payment / Debit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | | Bates Number | Transfer Number | Account Number or IBAN | Beneficiary's Name [B] | Bank Name | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |



IV  World Assembly of Muslim Youth (WAMY)

World Assembly of Muslim Youth (WAMY) Totals

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The source of receipt / credit names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Identified Payment / Debit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Information from Account Statements** | | | | | | | | **Information for Identified Payment / Debit Transactions** | | | | | |
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Payment / Debit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Transfer Number | Account Number or IBAN | Beneficiary's Name [B] | Bank Name | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |

Palestinian Association in Austria (PVOE) Totals — 0 — $ -

**VI  Al Aqsa Foundations:**

**A - Al Aqsa Foundation of S.A.**

| | | | | | | | 1.0000 | $ - | | | | | | |

Al Aqsa Foundation of S.A. Totals — 0 — $ -

**B - Al Aqsa (Belgium) [ASBL Al-Aqsa]**

| | | | | | | | 1.0000 | $ - | | | | | | |

Al Aqsa (Belgium) [ASBL Al-Aqsa] Totals — 0 — $ -

**C - Al Aqsa (Germany)**

| | | | | | | | 1.0000 | $ - | | | | | | |

Al Aqsa (Germany) Totals — 0 — $ -

**D - Al-Aqsa Spannmal Stiftelse**

| | | | | | | | 1.0000 | $ - | | | | | | |

Al-Aqsa Spannmal Stiftelse Totals — 0 — $ -

**E - Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef**

| | | | | | | | 1.0000 | $ - | | | | | | |

Al-Gameyah Al-Khereyah Lenasrat Al-Aqsa Al-Shareef Totals — 0 — $ -

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The source of receipt / credit names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization

Palestinians Relief & Development Fund - Interpal
NatWest Business Bank Accounts - All Currencies
Identified Payment / Debit Transactions from Selected Organizations / Individuals

Sorted by Organization / Individual Name and Transaction Date from Account Statements

| | | Information from Account Statements | | | | | | | Information for Identified Payment / Debit Transactions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ref # | Bates Number | Transaction Date | Year | Account Number | Currency | Payment / Debit Amount | British Sterling / Euro to US Dollar Exchange Rate [A] | Converted US Dollar Amount | Bates Number | Transfer Number | Account Number or IBAN | Beneficiary's Name   [B] | Bank Name | Transaction Detail from Account Statement (Source of name if no supporting documentation provided) |
| | | | | | | | | | | | | | | |

**F - Stichting Al-Aqsa (Al Aqsa Holland)**

| | | | | | | | 1.0000 | $      - | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stichting Al-Aqsa Totals | | | | | 0 | | | $      - | | | | | | |

**G - Al-Aqsa Foundation**

█████████████████████████████████████████████████████████████████████████

| Al-Aqsa Foundation Totals | ███████████████████████ |
|---|---|

| Al Aqsa Foundations (A through G) Totals | ████████████████████████████ |
|---|---|

**VII CBSP**

| | | | | | | $0.00 | 1.0000 | $      - | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBSP Totals | | | | | 0 | | | $      - | | | | | | |

| Selected Organizations / Individuals ( I through VII) Totals | ███████ | | $  2,146,292.87 |
|---|---|---|---|

Notes:
[A] - Source of exchange rate is www.oanda.com.

[B] - The source of receipt / credit names may have variations due to translating Arabic names into English, typographical errors, branch office of main organization

# Exhibit F

**Strauss, et al. v. Crédit Lyonnais, S.A.**
**Wolf, et al. v. Crédit Lyonnais, S.A.**
**Weiss, et al. v. National Westminster Bank, PLC**
**Applebaum, et al. v. National Westminster Bank, PLC**


**Documents Considered for Supplemental Report 12/28/10**

| | |
|---|---|
| NW000001 – NW192047 | Account applications; account statements; deposit and disbursement records; wire transfer instructions; wire transfer confirmations; and electronic payment messaging instructions for eighteen (18) Interpal Nat West bank accounts.  Various Nat West organization charts; e-mails; correspondents; reports; and banking manuals. |
| NW192046 – NW194092 | Volume 46 – Including information similar to documents described above. |
| NW201038 – NW212106 | Volume 58 – Including information similar to documents described above. |

# Exhibit G

# WAYNE D. GEISSER, CPA, CVA, CFE, CFF

## EXPERIENCE:

1989 – present    **Managing Director / Principal** - Nihill & Riedley, P.C.

1986 - 1989    **Associate**

Practice concentration in forensic accounting. Responsible for management, development and analysis of various accounting, auditing and financial evaluation cases, generally involving matters under litigation. Matters have included: evaluation of business and economic losses, shareholder disputes, various types of financial fraud, business valuations, preparation of financial projections, analysis of securities trading activities, employee dishonesty audits and investigations, studies of internal control, preparation of fidelity bond claims, evaluation of compliance with professional accounting / tax preparation standards. Provided analysis and opinions regarding misstated financial statements, including those involving publicly traded securities. Performed analysis of various private placement and tax shelter programs. Evaluated Medicare/Medicaid claims on behalf of various hospitals, physicians other health care providers and the government, including matters brought under the False Claims Act. Provided assistance to attorneys in analyzing records and interviewing witnesses in connection with various civil and criminal matters and internal corporate investigations. Served as Receiver and in other fiduciary capacities in various matters. Represented clients in connection with audits/investigations by various federal agencies including the U.S. Securities and Exchange Commission, Philadelphia Stock Exchange/FINRA, Internal Revenue Service, and the Departments of Defense and Health and Human Services. Served as consultant to the Pennsylvania State Treasurer in connection with various matters including review of internal controls associated with the Pennsylvania Short Term Investment Pool. Testified as an expert witness.

1982 - 1986    **Chief, Branch of Accountants and Investigators** - U.S. Securities and Exchange Commission.

1979 - 1982    **Senior Staff Accountant** - U.S. Securities and Exchange Commission (SEC).

Planned, conducted and supervised civil and criminal investigations involving violations of the federal securities laws. Cases involved a wide range of issues, including: dissemination of false financial statements by issuers, adequacy of audits conducted by certifying accountants, evaluation of securities offerings including "tax shelter" private placements, fraudulent brokerage practices, sale of unregistered securities and insider trading. Extensive experience in managing complex, document-intensive cases, taking investigative testimony and debriefing witnesses. Worked in close cooperation with SEC enforcement attorneys, U.S. Attorney's office, FBI and IRS. Successful resolution of investigations included criminal prosecutions, civil injunctive actions and administrative proceedings.



nihill & riedley
A Professional Corporation

**WAYNE D. GEISSER, CPA, CVA, CFE, CFF**
**Page 2**

1972 - 1979      **Revenue Agent** - Internal Revenue Service.

Performed audits of diverse range of federal corporate, partnership and individual tax returns. Prepared audit plans, audited returns, conducted closing negotiations and prepared cases for appeal. Assisted in grand jury investigations involving criminal tax violations.

## EDUCATION AND PROFESSIONAL AFFILIATIONS

- Certified Public Accountant licensed in Pennsylvania
- Certified Valuation Analyst, National Association of Certified Valuation Analysts
  - Certificate of Educational Achievement in Valuing Intangible Assets
- Certified Fraud Examiner, Association of Certified Fraud Examiners
- Certified in Financial Forensics, American Institute of Certified Public Accountants
- Graduate Studies in Accounting and Auditing, Drexel University
- Bachelor of Business Administration, Temple University
- Member, Pennsylvania Institute of Certified Public Accountants
- Member, American Institute of Certified Public Accountants

## OTHER

- Guest lecturer on accounting, auditing, economic damages and financial investigation topics at Villanova University School of Law; Temple University School of Law, Continuing Education Program; Temple University; Drexel University; St. Joseph's University; Philadelphia Association of Defense Counsel; and The Association of Certified Fraud Examiners.

- Letter of Commendation, William S. Sessions, Director Federal Bureau of Investigation.

- Letter of Commendation, William H. Webster, Director Federal Bureau of Investigation.

- Special Achievement Award - Outstanding Work in Fraud Program, Internal Revenue Service.



nihill & riedley
A Professional Corporation

**WAYNE D. GEISSER, CPA, CVA, CFE, CFF**
**Page 3**

## ALTERNATIVE DISPUTE RESOLUTION EXPERIENCE

➤ Trained and served as an Arbitrator for both the NASD and American Arbitration Association. Also retained independently to provide Alternative Dispute Resolution Services.

## COURT APPOINTMENTS

➤ Receiver, AYM Financial Corporation – In connection with the matter captioned: <u>Securities and Exchange Commission v. AYM Financial Corporation et al.</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable John R. Padova) 2000

➤ Receiver, Fountainhead Fund, LP / Fountainhead Asset Management, LLC – In connection with the captioned matter: <u>Securities & Exchange Commission v. Anthony Postiglione et al.</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable Legrome D. Davis) 2004

➤ Receiver, Payment Processing Center, LLC - In the connection with the matter captioned: <u>United States v. Payment Processing Center, LLC et al.</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable John R. Padova / Honorable R. Barclay Surrick) 2006

➤ Claims Master – In connection with the matter captioned: <u>Faloney v. Wachovia Bank</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable Timothy R. Rice) 2008

➤ Receiver, NHS Systems Inc. - In connection with the matter captioned: <u>Federal Trade Commission v. NHS Systems Inc.</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable Lewis H. Pollak) 2008

➤ Advisor to the Court - In connection with the matter captioned: <u>United States v. John P. Karoly, Jr.</u> - Appointed under the jurisdiction of the United States District Court, Philadelphia (Honorable Lawrence F. Stengel) 2010

➤ Temporary Custodian of Affairs - In connection with the matter captioned: <u>Cognetx Inc. v. Robert Houghton et al.</u> - Appointed under the jurisdiction of the Court of Common Pleas, Bucks County, PA (Honorable Robert J. Mellon) 2010


nihill & riedley
A Professional Corporation

**WAYNE D. GEISSER, CPA, CVA, CFE, CFF**
**Page 4**


## TESTIMONY GIVEN BY WAYNE D. GEISSER, CPA, CPA, CFE, CFF (since 2006)

- <u>Ronald J. Smolow, Individually and on behalf of all persons and entities similarly situated v. Barbara Hafer, Treasurer, Commonwealth of Pennsylvania</u>
  U.S. District Court for the Eastern District of Pennsylvania, testimony by deposition (2006)

- <u>United States of America v. Payment Processing Center, LLC et al.</u>
  U.S. District Court for the Eastern District of Pennsylvania (2006) (1), (2007) (1)

- <u>Postiglione v. Postiglione</u>
  Chester County Court of Common Pleas (2008)

- <u>Spiegel v. Sam Group Inc., et al.</u>
  Montgomery County Court of Common Pleas / Arbitration – ADR Options (2008)

- <u>Arrowood Indemnity Company, *f/k/a*, Royal Indemnity Company v. Hartford Fire Insurance Co.</u>
  U.S. District Court for the District of Delaware (2010), testimony by deposition

- <u>Strauss et al. v. Credit Lyonnais S.A.</u>
  U.S. District Court for the Southern District of New York (2010), testimony by deposition

- <u>Peter Bruni et al. v. Stifel Nicholas & Company Inc. et al.</u>
  FINRA Dispute Resolution Inc. (2010)

12.23.10



nihill & riedley
A Professional Corporation

**EXHIBIT 38 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v.*
*NATIONAL WESTMINSTER BANK, PLC.*

---

*BELINDA LANE*
*Vol. 1*
*June 24, 2008*

---



Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 353 of 386 PageID #: 9167

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                    Page 1

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ------------------------------------------------x
 3   TZVI WEISS, et al.,

 4                    Plaintiffs,

 5        -against-

 6   NATIONAL WESTMINSTER BANK, PLC,

 7                    Defendant.
     ------------------------------------------------x
 8   NATAN APPLEBAUM, et al.,

 9                    Plaintiffs,

10        -against-

11   NATIONAL WESTMINSTER BANK, PLC,

12                    Defendant.
     ------------------------------------------------x
13

14              * HIGHLY CONFIDENTIAL *

15              VIDEOTAPED DEPOSITION of BELINDA LANE,

16        taken before Cheryll Kerr, a Notary Public

17        and a Shorthand Reporter, held at the offices

18        of Cleary, Gottlieb, Steen & Hamilton, LLP,

19        located at 55 Basinghall Street, London,

20        England on Tuesday, the 24th day of June,

21        2008, at 9:38 a.m.

22

23

24

25
```

---

HIGHLY CONFIDENTIAL                                    Page 2

```
 1   APPEARANCES:

 2   KOHN, SWIFT & GRAF, P.C.
          Attorneys for Plaintiff Tzvi Weiss
 3        One South Broad Street, Suite 2100
          Philadelphia, Pennsylvania  19107-3304
 4
 5   BY:  STEPHEN H. SCHWARTZ, ESQ.

 6   SAYLES WERBNER, P.C.
          Attorneys for Plaintiff NATAN APPLEBAUM
 7        4400 Renaissance Tower
          1201 Elm Street
 8        Dallas, Texas  75270

 9   BY:  MARK S. WERBNER, ESQ.

10
     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
11        Attorneys for Defendant National
          Westminster Bank, PLC
12        One Liberty Plaza
          New York, New York  10006-1470
13
     BY:  LAWRENCE B. FRIEDMAN, ESQ.
14        PATRICK SHELDON, ESQ.

15
     GLANCY BINKOW & GOLDBERG, LLP
16        Attorneys for Plaintiff Tzvi Weiss
          1430 Broadway, Suite 1603
17        New York, New York  10018

18   BY:  ANDREW FRIEDMAN, ESQ. (OF COUNSEL)

19
     Also Present:  Jackie Sheftali, NatWest; Simon
20   Rutson, Videographer

21

22        *****    *****    *****

23

24

25
```

---

HIGHLY CONFIDENTIAL                                    Page 3

```
 1
 2   EXAMINATION BY:                              PAGE
 3   Mr. Werbner                                     7
 4              EXHIBITS
 5   LANE
     FOR ID      DESCRIPTION                      PAGE
 6
     Exhibit 1   Letter dated January 20             6
 7               2000, Bates No. NW 13431

 8   Exhibit 2   Credit assessment, Bates            6
                 Nos. NW 13316 - NW 13317
 9
     Exhibit 3   Meeting synopsis, March 20,         6
10               2002, Bates No. NW 13637

11   Exhibit 4   Transmission note, Bates            6
                 No. 13197
12
     Exhibit 5   Memorandum dated July 9,            6
13               2002, Bates No. NW 13333

14   Exhibit 6   Memorandum dated July 15,           6
                 2002. Bates No. NW 13332
15
     Exhibit 7   Memorandum dated August 1,          6
16               2002, Bates No. NW 13347

17   Exhibit 8   Fax dated August 6, 2002,           6
                 Bates Nos. NW 13347- 13355
18
     Exhibit 9   Document bearing Bates              6
19               No. 13346

20   Exhibit 10  Memorandum bearing fax              6
                 date October 10, 2005,
21               Bates No. NW 13636

22   Exhibit 11  Meeting synopsis, January 27,       6
                 2003, Bates No. NW 13639
23

24
     (Continued)
25
```

---

HIGHLY CONFIDENTIAL                                    Page 4

```
 1              EXHIBITS (Cont'd)
 2   LANE
     FOR ID      DESCRIPTION                      PAGE
 3   Exhibit 12  Document bearing Bates              6
                 No. NW 13357
 4
 5   Exhibit 13  Document bearing Bates              6
                 Nos. NW 12965-12966
 6
     Exhibit 14  Letter dated September 24,          6
 7               2003, Bates No. NW 17132

 8   Exhibit 15  (No document was marked)            6

 9   Exhibit 16  Letter dated June 20, 2001,         6
                 Bates No. NW 13415
10
     Exhibit 17  Document bearing Bates              6
11               No. NW 10642

12

13              REQUESTS FOR PRODUCTION

14
     DESCRIPTION                                  PAGE
15
     Bank Line Payment Manager                     143
16   applications

17

18

19

20

21

22

23

24

25
```

1     THE VIDEOGRAPHER: This is the
2  beginning of Tape 1 Volume 1 in the
3  deposition of Belinda Lane, taken on the
4  24th of June, 2008 at 9:38 a.m. as
5  indicated on the video screen.
6     This deposition is being taken in the
7  matter of Tzvi Weiss, et al., and National
8  Westminster Bank PLC, Civil Action
9  No. 05-CV4622, (CPS) (KAM), also in the
10  matter of Natan Applebaum, et al., against
11  National Westminster Bank PLC, Civil
12  Action No. 07-CV-916 (CPS) (KAM), both
13  being heard in the United States District
14  Court for the Eastern District of New
15  York.
16     The office -- the deposition is
17  taking place at the offices of Cleary
18  Gottlieb.  The court reporter is Cheryll
19  Kerr.  The videographer is Simon Rutson,
20  both of European Deposition Services.
21  Would counsel present please introduce
22  themselves?
23     MR. WERBNER: My name is Mark Werbner
24  from the Dallas law firm of Sayles &
25  Werbner.  I represent the Applebaum family

1  and other families that have brought a
2  case against NatWest.
3     MR. SCHWARTZ: My name is Stephen
4  Schwartz from the law firm of Kohn, Swift
5  & Graf, Philadelphia, Pennsylvania.  I
6  represent the Weiss plaintiffs.
7     MR. A. FRIEDMAN: Andrew Friedman of
8  Glancy Binkow & Goldberg, 430 Park Avenue,
9  New York, New York, and I also represent
10  the Weiss plaintiffs.
11     MR. L. FRIEDMAN: Lawrence Friedman
12  from Cleary, Gottlieb, Steen & Hamilton on
13  behalf of defendant, National  Westminster
14  Bank, and the witness.
15     THE VIDEOGRAPHER: Can you --
16     MR. L. FRIEDMAN: With me is my
17  colleague, Patrick Sheldon and also Jackie
18  Sheftali who is internal counsel at
19  National Westminster Bank.
20     (Thereupon, Lane Exhibits No. 1
21  through 17 were premarked by the reporter
22  for identification.)
23  B E L I N D A   L A N E,
24  called as a witness, having been duly
25  sworn, was examined and testified

1  as follows:
2     DIRECT EXAMINATION BY MR. WERBNER:
3     Q.   Would you state your full name, please,
4  ma'am?
5     A.   Belinda Lane.
6     Q.   Ms. Lane, as you just heard, my name is
7  Mark Werbner.  I am from Dallas, Texas, and I
8  represent a variety of families, a number of
9  families that have brought a lawsuit against the
10  NatWest Bank.  Are you aware of that?
11     A.   Yes.
12     Q.   Where do you currently live, personally?
13     MR. L. FRIEDMAN: You want her to
14  give her home address?
15     MR. WERBNER: Yes.
16     MR. L. FRIEDMAN: Okay.  We will mark
17  this transcript highly confidential, and
18  just so you know, in light of that, no one
19  is allowed to see what is in the
20  transcript other than the lawyers on the
21  case.
22     THE WITNESS: 134 Burnway,
23  Hornchurch, Essex.
24  BY MR. WERBNER:
25     Q.   How long have you lived at that address?

1     A.   About 15 years.
2     Q.   Have any plans to move?
3     A.   No.
4     Q.   Are you married or single?
5     A.   Single.  Divorced.
6     Q.   All right.  Do you have children?
7     A.   Yes.
8     Q.   All right.  What are their ages?
9     A.   Fourteen, a son.
10     Q.   One child?
11     A.   (Nodding).
12     Q.   Or you could have had twins that were 14.
13  That's why I --
14     How long have you worked for NatWest or
15  whatever the affiliate might have been called?
16     A.   Twenty-seven -- almost 27 years.
17     Q.   And what is your current job title and
18  for whom is that employment?
19     A.   I am senior commercial manager in real
20  estate finance in Gloucester Road -- sorry.
21  Grosvneror Street in Mayfair.
22     Q.   Have you ever worked at the Gloucester
23  Road?
24     A.   No.
25     Q.   Okay, because I was just by the NatWest

HIGHLY CONFIDENTIAL                                              Page 69

1    BY MR. WERBNER:
2        Q.   And were -- whether you were meeting
3    these income targets, was that something reviewed
4    with you on some kind of quarterly or annual basis?
5        A.   Yes, an annual basis, and generally, we
6    would have several meetings during the year as well
7    to discuss whether you were on target or not.
8        Q.   Who did you have those meetings with?
9        A.   Chris Cook and David Roe.
10       Q.   Would there be written materials about
11   that from time to time?
12            MR. L. FRIEDMAN: Object to the form.
13            THE WITNESS: Only annually.
14   BY MR. WERBNER:
15       Q.   What kind annually was there?
16       A.   We had an annual appraisal.
17       Q.   What did you call that?
18       A.   A and D.
19       Q.   A and D?
20       A.   Appraisal and development.
21       A.   Appraisal and development.  Thank you.
22            How were you doing?
23            MR. L. FRIEDMAN: Object to the form.
24            THE WITNESS: Good.
25   BY MR. WERBNER:

---

HIGHLY CONFIDENTIAL                                              Page 70

1        Q.   That's why you got promoted, right?
2        A.   One of the reasons.
3        Q.   Were you meeting all your income targets?
4        A.   I was at Islington three years.  I think
5    the last two years I certainly exceeded my income
6    target.
7        Q.   Which are the years you have in mind, by
8    virtue of your last answer?
9        A.   2000 through and 2001.
10       Q.   How did you do in '02 and '03?
11       A.   I was a new relationship manager in
12   commercial with a brand-new portfolio.  2002, I -- I
13   can't recall specifically.  I can't recall.  I think
14   I was thereabouts in 2002, and 2003 I can't
15   remember.
16       Q.   But these A and Ds -- annual appraisal
17   and developments -- should reflect that?
18       A.   Yes.
19       Q.   And who maintains custody of those?
20       A.   Either the area managers or -- I don't
21   know if they are sent to another department or not
22   now.
23       Q.   How was, in general, these income targets
24   measured and calculated?
25       A.   (No response.)

---

HIGHLY CONFIDENTIAL                                              Page 71

1        Q.   Let me tell you what I think, and only
2    because I am just trying to -- to get to it.
3            It sounded to me like you got monthly reports
4    that listed your customers and would show the income
5    for each customer that was being generated for the
6    bank, and then maybe those were automatically or
7    able to be summed up.
8            I mean, is that right or not?
9        A.   Yes.
10       Q.   Okay, so put it into your own words and
11   how you would therefore keep these monthly reports
12   and then track them to monitor your progress.
13           Put that in your own words.
14       A.   Each month we received a statement
15   detailing the income for each customer, and a total,
16   and that you -- compare that against mine, my annual
17   target.
18       Q.   And Interpal was among the top of your
19   customers through the time that you were in
20   Islington, at least, right?
21       A.   What do you mean by "top in my
22   customers"?
23       Q.   Income earning towards your goal.
24       A.   It had one of the highest incomes out of
25   all of my customers, yes.

---

HIGHLY CONFIDENTIAL                                              Page 72

1        Q.   So out of 300 or so customers, is it true
2    that Interpal was one of the very top income earners
3    towards your goal?
4            MR. L. FRIEDMAN: Object to the form.
5            THE WITNESS: Yes --
6    BY MR. WERBNER:
7        Q.   And --
8        A.   -- and no.  Can I expand a little?
9            Their income was pretty much the same for
10   several years, so although it was a top income-
11   earning customer, I have to expand and grow my
12   customers, and whilst --
13           Whilst it -- it was one of the higher income-
14   earning customers, it wasn't really contributing
15   towards my target, because it wasn't growing,
16   because each year, I have to increase the income
17   that each customer produces.
18       Q.   I mean, is that real clear in your mind,
19   thinking back four or five years, without having the
20   documents in front of you?  Are you that certain of
21   that?
22       A.   It is clear, because I chose not to take
23   Interpal with me, and my director instructed me to
24   bring it, because he could see that it was a high
25   income-earning customer, but because I felt there

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                    Page 73

1   was no potential for me to grow that customer, I
2   didn't want to bring it with me.
3      Q.   Did you -- did you say that to anyone?
4      A.   Yes, I did.
5      Q.   Who did you say that to?
6      A.   Paul.
7      Q.   Paul who?
8      A.   Paul -- Paul Croucher --
9      Q.   And what did he say?
10     A.   -- my director.
11     Q.   And what did he say?
12     A.   He instructed me to transfer the account
13  with me.
14     Q.   And what did you say?
15     A.   I had to do as I was instructed.
16     Q.   Were there any emails or memos concerning
17  that?
18     A.   There may have been.  I had to produce a
19  list for him of the top income earning customers.  I
20  don't recall whether I sent that by email or hand
21  wrote it.  I -- I can't clearly remember.
22     Q.   While you were at the Islington business
23  center, did you have an email on the NatWest system?
24     A.   No, I don't believe I did then.
25     Q.   How did you send email, then?

---

HIGHLY CONFIDENTIAL                                    Page 74

1      A.   Well, it was when I was at Romford I then
2   had email, so I am saying I may have sent one to
3   Paul Croucher.  I can't recall.  We may have just
4   had a discussion about it.
5      Q.   But how could you have sent an email at
6   Islington?
7      A.   I didn't say I sent an email at
8   Islington.
9      Q.   I am not saying that you said you did,
10  but did you have the ability --
11     A.   No.
12     Q.   -- to send email?
13        So you didn't send any emails while you were at
14  Islington?
15     A.   No.
16     Q.   Because you didn't have email?
17     A.   No.
18     Q.   That's right?
19     A.   Yes.
20     Q.   Did you have occasion to deliver typed
21  memoranda, or was everything that you presented
22  handwritten while you were at the Islington business
23  center?
24     A.   Oh, no.  I had access to Word and Excel.
25     Q.   And did you create documents during that

---

HIGHLY CONFIDENTIAL                                    Page 75

1   period of your work?
2      A.   Yes.
3      Q.   Did you do so on a routine basis?
4      A.   Yes.
5           MR. L. FRIEDMAN: Object to the form.
6   BY MR. WERBNER:
7      Q.   What kind of documents did you create on
8   a routine basis that would deal, say, with your
9   customers?
10     A.   Interview notes.
11     Q.   Anything else?
12     A.   Advances reports.
13     Q.   What is that?
14     A.   When we have to prepare an application
15  for credit facilities to our credit office.
16     Q.   Okay.  What --
17     A.   Letters.
18     Q.   Letters?  What else?
19     A.   Any table I might want to construct for
20  my -- for myself or spreadsheets, because we had
21  Excel.
22     Q.   Why was Interpal generating one of the
23  top income amounts of your portfolio of
24  300 customers?
25     A.   It was purely from credit balances.

---

HIGHLY CONFIDENTIAL                                    Page 76

1      Q.   And why was that so profitable for the
2   bank?
3           MR. L. FRIEDMAN: Object to the form.
4           THE WITNESS: They -- they -- because
5       of the volume of credit balances they
6       held.
7   BY MR. WERBNER:
8      Q.   Isn't it also because they did not, like
9   other customers, take interest on those large
10  deposits?
11     A.   Who is -- who is "they"?
12     Q.   Interpal.
13     A.   And who are "customers"?  Their
14  customers?
15     Q.   No, your other customers.
16     A.   Sorry.  Could you repeat the question?
17     Q.   Yeah.
18        Did Interpal, with those large balances at
19  NatWest -- were they paid interest?
20     A.   No.
21     Q.   Were most of the customers among your 300
22  that had large balances paid interest?
23     A.   Yes.
24     Q.   So this was a very special benefit to
25  NatWest as far as that Interpal accounts, right?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE -  Vol. 1
June 24, 2008

1      MR. L. FRIEDMAN: Object to the form.
2      THE WITNESS: I don't know what
3   "special" means.  It wasn't considered a
4   special account.
5  BY MR. WERBNER:
6   Q.  Well, among your 300 accounts that we
7  have been discussing while you were the relationship
8  manager at Islington, how many had large balances
9  that were not paid interest?
10   A.  I can't remember out of 300.
11     Oh, who didn't receive interest?  Interpal
12  would have been the only one.
13   Q.  So that was unusual?
14   A.  Yes.
15   Q.  And that enhanced your meeting your
16  target goals, because --
17   A.  No.
18   Q.  Well, if they had been paid interest,
19  that is, Interpal, on these large balances, like the
20  other 299 customers you had, then it would have been
21  less income for the bank, correct?
22      MR. L. FRIEDMAN: Object to the form.
23      THE WITNESS: No, because the
24      interest that we paid customers wasn't
25      taken into account in the calculation of

1      the income that we received.
2  BY MR. WERBNER:
3   Q.  Are you sure?
4   A.  Not 100 percent sure, I would want to
5  check that, but the income statements that we
6  received showed the benefit of -- showed -- showed
7  the income that the bank received for holding credit
8  balances for each customer, but it didn't offset the
9  interest that was paid.
10     So all I was -- all -- all we received on our
11  statements -- it wasn't like a complete balance
12  sheet (indicating).  We just purely got detail of
13  the income.
14   Q.  And --
15   A.  That -- I don't believe that was netted
16  off -- I can't be 100 percent certain.
17   Q.  All right, so in fairness, without
18  looking back at the PRS reports, you can't say?
19      MR. L. FRIEDMAN: Object to the form.
20      THE WITNESS: Not certainly, no.
21  BY MR. WERBNER:
22   Q.  And it would be the PRS reports that you
23  got, reviewed, and maintained monthly that would
24  reflect that?
25   A.  Reflect what?

1   Q.  How the income for the bank was
2  calculated for each customer, and whether or not as
3  to Interpal, where no interest was being paid by the
4  bank to Interpal, that resulted in that figure being
5  larger than for all the other customers who did get
6  interest for their deposits.
7      MR. L. FRIEDMAN: Object to the form.
8      THE WITNESS: Can you just clarify
9      what the question was again?
10      MR. WERBNER: Yeah.
11  BY MR. WERBNER:
12   Q.  Can you be sure, without having those PRS
13  reports in front of you --
14   A.  Uh-huh.
15   Q.  -- that the income that the bank was
16  receiving for Interpal wasn't larger on those
17  reports, because they weren't getting interest in
18  the way that all the other customers were?
19      MR. L. FRIEDMAN: Object to the form.
20      THE WITNESS: I -- I don't -- I don't
21      believe those statements would detail
22      whether it was netted off or not.
23      I think I would need to go beyond
24      those printouts and check with someone
25      centrally who produced them.

1  BY MR. WERBNER:
2   Q.  How would you do that?
3   A.  Well, I would -- I would speak to people
4  within the bank who produced those printouts.
5   Q.  Who was that?
6   A.  Oh, I can't remember.
7   Q.  I mean, what department?
8   A.  They -- it was -- they have been called
9  different names over the years.  It's changed so
10  many times.  I wouldn't -- I can't remember.
11   Q.  Well, just as best you can.
12     In other words, if -- if we want to try to go
13  back and --
14   A.  Even now, I would have to look it up.
15   Q.  How would you look it up?
16   A.  On -- on our intranet.
17   Q.  How would you do that?
18   A.  Switch on the computer and go into the
19  intranet.
20   Q.  And then what?
21   A.  Go into the Target and Rewards site, into
22  the PRS site, and there would probably be a contact
23  name on that site.
24   Q.  And what does Target and Rewards --
25   A.  That's just the -- the -- the name for

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                    Page 81

1   the whole system.
2        Q.   What system?
3        A.   The system under which PRS comes.  The
4   printouts are called PRS statements.
5        Q.   But regardless of whether the income that
6   NatWest was earning because of Interpal not taking
7   interest on their deposits -- regardless, it was
8   still among the largest of your customers in terms
9   of total income, right?
10       A.   Yes.
11            MR. L. FRIEDMAN: Object to the form.
12   BY MR. WERBNER:
13       Q.   Was it in the top 10 of those 300
14   customers?
15       A.   Yes, because it was on the list that I
16   provided to the director.
17       Q.   Where on the top 10 of your 300?
18       A.   I can't remember.
19       Q.   But somewhere in the top 10?
20       A.   Yes.
21       Q.   And was that the case during your entire
22   association with Interpal?
23       A.   That it was in the top 10?  No.
24       Q.   When did it get into the top 10?
25       A.   I don't know, because I only produced the

HIGHLY CONFIDENTIAL                                    Page 82

1   printout at one point for my director, so prior to
2   that, I don't know where it was, and subsequent to
3   that, I don't know where it was.
4        Q.   You don't remember?
5        A.   (Shaking head.)  I probably didn't even
6   look.
7        Q.   Well, from time to time, people asked
8   questions about Interpal, isn't that true?
9        A.   People?  Sorry.  I don't really
10   understand the question.
11       Q.   You don't remember people from NatWest
12   fraud and anti-money laundering from time to time
13   asking you questions about Interpal?
14            MR. L. FRIEDMAN: Object to the form.
15            THE WITNESS: Yes, I remember -- not
16       specifically, but I remember there were
17       phone calls from various departments, yes.
18   BY MR. WERBNER:
19       Q.   Well, what do you recall?
20       A.   I don't recall anything specific.  It was
21   a long time ago.  There were a number of phone
22   calls.  One occasion, for example, when I had to
23   stop -- stop the account at one point.
24       Q.   What do you remember about that?
25       A.   I was asked to stop the account.

HIGHLY CONFIDENTIAL                                    Page 83

1        Q.   By whom?
2        A.   I can't specifically remember.  It would
3   have been someone from the central unit, maybe money
4   laundering prevention unit, group legal.  I can't
5   remember specifically.
6        Q.   Wasn't that unusual?
7            MR. L. FRIEDMAN: Object to the form.
8            THE WITNESS: No.
9   BY MR. WERBNER:
10       Q.   You mean it wasn't unusual for the
11   central anti-money laundering unit to call you and
12   freeze the accounts of one of your customers?
13       A.   I meant it wasn't unusual to receive
14   instructions from someone.
15       Q.   Was it unusual that you got a call from
16   the central unit anti-money laundering, told that
17   the Interpal account was frozen?
18            MR. L. FRIEDMAN: Object to the form.
19            THE WITNESS: I'm not sure which unit
20       it was, but I understood that an
21       investigation was being undertaken, and
22       therefore the account had to be frozen.
23   BY MR. WERBNER:
24       Q.   Was that the first time that such a thing
25   had happened with one of your customers?

HIGHLY CONFIDENTIAL                                    Page 84

1        A.   No.
2        Q.   Was that unusual?
3            MR. L. FRIEDMAN: Object to the form.
4            THE WITNESS: It wasn't regular.
5   BY MR. WERBNER:
6        Q.   Was it unusual?
7            MR. L. FRIEDMAN: Object to the form.
8            THE WITNESS: I am not really sure --
9       it wasn't regular.  If that means unusual,
10      then yes, it wasn't regular.
11   BY MR. WERBNER:
12       Q.   How many times were you contacted from
13   the central unit about Interpal?
14       A.   I can't remember.
15       Q.   More than once?
16       A.   Yes.
17       Q.   More than twice?
18       A.   Yes.
19       Q.   More than three times?
20       A.   Yes.
21       Q.   More than four times?
22       A.   Probably.
23       Q.   More than five times?
24       A.   Probably.
25       Q.   More than 10 times?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                    Page 85

1    A.   Now I am not sure.
2    Q.   Was it unusual among your customers to be
3    getting those kind of inquiries?
4         MR. L. FRIEDMAN: Object to the form.
5         THE WITNESS: I wasn't receiving as
6    many inquiries on other customers, no.
7  BY MR. WERBNER:
8    Q.   So it was unusual concerning Interpal --
9         MR. L. FRIEDMAN: Object to the form.
10 BY MR. WERBNER:
11   Q.   -- fair?
12   A.   Irregular.
13   Q.   It was irregular?
14   A.   (Nodding.)
15   Q.   Correct?
16   A.   Yes.
17   Q.   And let me be sure I understand this,
18 Ms. Lane.
19      The income that a customer of yours like
20 Interpal was generating for NatWest would be more,
21 the larger their deposits were, correct?
22   A.   Yes.
23   Q.   And while you made the statement a short
24 time ago, I thought, that the Interpal deposits were
25 sort of flat, that's really not the case, is it?

HIGHLY CONFIDENTIAL                                    Page 86

1         MR. L. FRIEDMAN: Object to the form.
2         THE WITNESS: It -- it depends what
3    period you are -- you are -- you are
4    talking about.
5  BY MR. WERBNER:
6    Q.   Well, don't you recall, ma'am, that there
7    was a substantial increase in the amount of
8    Interpal's deposits at NatWest during 2001 and 2002
9    over prior years?
10        MR. L. FRIEDMAN: Object to the form.
11        THE WITNESS: I remember being told
12   by Interpal that deposits had gone up
13   following 9-11. I can't recall whether I
14   specifically checked that they had.
15 BY MR. WERBNER:
16   Q.   But you would have been kept apprised of
17 the specifics of their increasing revenues from
18 their annual reports that you reviewed, if there
19 were an increase, correct?
20   A.   Yes, but it would always be some
21 considerable time after the end of the year that we
22 received the annual accounts, so the annual accounts
23 I had on the file at the time could have been -- you
24 know, one or two years old.
25   Q.   Well, they could have been, but wasn't

HIGHLY CONFIDENTIAL                                    Page 87

1  it --
2       Do you recall that sometime in '02 you would
3    get the '01 report? Sometime in '03 you would get
4    the '02 report?
5    A.   One would like to think so, but -- but I
6    can't remember specifically for Interpal. I had a
7    lot of customers, and a lot of customers were three
8    or four years out of date sending me their annual
9    accounts.
10   Q.   How about Interpal?
11   A.   I can't remember specifically. I can't
12 remember what the last set I saw on the file were.
13   Q.   Well, what was expected by you for one
14 for your customers like Interpal --
15   A.   You would --
16   Q.   Go ahead:
17   A.   I apologize.
18      You would expect to receive them within
19 270 days.
20   Q.   All right, and so if this was a customer
21 that you found to be compliant and responsive to
22 your request, then you would have expected they were
23 giving you those annual reports at least sometime
24 during the next year for the prior year's income?
25   A.   Yes, but it wasn't so important for an

HIGHLY CONFIDENTIAL                                    Page 88

1  account that wasn't borrowing money.
2    Q.   But it was important for you to meet your
3    target goals if those accounts were earning more and
4    more money as the deposits increased, correct?
5         MR. L. FRIEDMAN: Object to the form.
6         THE WITNESS: If -- if -- if deposits
7    increased, then yes, the income that my
8    portfolio received would increase.
9  BY MR. WERBNER:
10   Q.   Was your salary impacted by the nature of
11 your meeting your -- your -- your quotas or your
12 targets?
13   A.   No.
14   Q.   Other than you were reviewed annually,
15 right, and those were discussed?
16   A.   Yes.
17   Q.   What happened to people that didn't make
18 them?
19        MR. L. FRIEDMAN: Object to the form.
20        THE WITNESS: I don't know.
21 BY MR. WERBNER:
22   Q.   They didn't get promoted, did they?
23        MR. L. FRIEDMAN: Object to the form.
24        THE WITNESS: I don't know. I don't
25   know other people's details.

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                    Page 89

BY MR. WERBNER:
1  BY MR. WERBNER:
2     Q.   Did your boss have targets?
3     A.   I would imagine so.  They weren't ever
4  discussed with me.
5     Q.   So your boss had a number of business
6  managers like yourself reporting to him or her,
7  correct?
8     A.   Which -- which boss are we talking about?
9  Generally, or --
10    Q.   While you were dealing with Interpal,
11 from '99 to '04.
12    A.   Right.
13    Q.   In that period of time, was your boss
14 having a number of people like you report and going
15 over their income targets with them?
16    A.   Yes.
17    Q.   And -- and did you understand that your
18 boss' annual reviews occurred also?
19    A.   Yes.
20    Q.   And that -- that if he wanted to be
21 promoted again, how well he was doing against his
22 targets were important, right?
23         MR. L. FRIEDMAN: Object to the form.
24         THE WITNESS: Important, one of the
25 important things, yes.

---

HIGHLY CONFIDENTIAL                                    Page 90

1  BY MR. WERBNER:
2     Q.   Who told you from Interpal that their
3  revenues were going up after 9-11?
4     A.   Jihad Qundil.
5     Q.   What did you say when he told you that
6  they were getting more money after 9-11?
7     A.   I can't remember.
8     Q.   But did he specifically say because of
9  9-11?
10    A.   Yes.
11    Q.   Now, was that surprising to you?
12    A.   No.
13    Q.   Why did you think Interpal's revenues
14 would go up, would have anything to do with the
15 attacks of September 11th, 2001?
16         MR. L. FRIEDMAN: Object to the form.
17         THE WITNESS: I didn't think that.
18 He told me.
19 BY MR. WERBNER:
20    Q.   Well, did you under-- strike that.
21         Did you understand this man from Interpal to be
22 telling you that the reason their revenues were
23 going up was because of the September 11th terror
24 attacks in New York?
25         MR. L. FRIEDMAN: Object to the form.

---

HIGHLY CONFIDENTIAL                                    Page 91

1          THE WITNESS: He told me that they
2  were increasing following 9-11, because
3  there was a lot more sympathy for the
4  people, and people felt more obliged to
5  make donations to help people.
6  BY MR. WERBNER:
7     Q.   Because of the attack on the World Trade
8  Center?
9          MR. L. FRIEDMAN: Object to the form.
10         THE WITNESS: I think it's just
11 because of the media at the time, that it
12 focused people's attention.
13 BY MR. WERBNER:
14    Q.   Didn't that seem unusual to you?
15         MR. L. FRIEDMAN: Object to the form.
16         THE WITNESS: No.
17 BY MR. WERBNER:
18    Q.   His explanation as to why Interpal's
19 donations were increasing was because in part
20 people's feelings about 9-11?
21         MR. L. FRIEDMAN: Object to the form.
22         THE WITNESS: I don't think it was
23 people's feelings specifically about 9-11.
24 We didn't have a very detailed
25 conversation about it.

---

HIGHLY CONFIDENTIAL                                    Page 92

1          He literally just told me that, you
2  know, following that situation, the -- the
3  deposits that they were receiving had just
4  increased, and I didn't find it unusual.
5  They are a charity.
6  BY MR. WERBNER:
7     Q.   Were they helping victims of 9-11?
8     A.   I don't know.
9     Q.   Were they helping people that lived in
10 New York City?
11    A.   I don't know.
12    Q.   You don't know?
13    A.   No.
14    Q.   Did you not look at all, during your time
15 on the Interpal account, with the identity of the
16 people they were sending money to?
17    A.   That wasn't my responsibility.
18    Q.   Did you do it?
19    A.   I believe I did it on one occasion
20 when --
21    Q.   Only -- go ahead.
22    A.   When -- when I was asked about a
23 particular transaction, and I had to contact
24 Interpal just to ask them the details of that
25 transaction.

Case 1:05-cv-04622-DLI-RML   Document 272-2   Filed 03/22/12   Page 361 of 386 PageID #: 9175

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE – Vol. 1
June 24, 2008

1    Q.    When was that?
2    A.    I -- I can't remember the exact date.
3    Q.    What was the nature of that particular
4    transaction that you were asked about?
5    A.    Again, I can't remember the specific
6    detail.  I hadn't previously recalled it, but I was
7    shown a document on Friday that -- that just sort of
8    jogged my memory a little bit, and I just remembered
9    telephoning the customer and asking them.
10        I -- I can't remember the -- the amounts and
11   the detail.  If -- if I was shown the document
12   again, I would probably recall again.
13   Q.    But was that the one and only time that
14   you, during your involvement with Interpal from '99
15   to '04, looked at all where they were sending money?
16         MR. L. FRIEDMAN: Object to the form.
17         THE WITNESS: I believe so.  That
18         wasn't the nature of my job.
19   BY MR. WERBNER:
20   Q.    Well, did you not consider that it was
21   your responsibility to make sure that your customer
22   wasn't doing anything suspicious?
23         MR. L. FRIEDMAN: Object to the form.
24         THE WITNESS: I don't have to -- I
25         have to report if I feel there is anything

1    suspicious.  I don't have to look every
2    day to see if there is anything
3    suspicious.  That isn't the nature of my
4    job.
5         The nature of my job is to build
6    relationships with customers.  I don't to
7    examine every transaction.  I have to have
8    a -- an idea of what their business is,
9    how they receive their income, how they
10   apply their income, but I don't have to
11   know the detail of each specific payment
12   that they make.  That -- that isn't --
13   that isn't my role.
14   BY MR. WERBNER:
15   Q.    I am not asking you about every detail of
16   every single payment they made.
17        Didn't you in general have to know how they
18   were applying their payments?
19   A.    I did know in general.
20   Q.    How were they applying their payments?
21   That is, Interpal?
22   A.    They sent payments to Palestine, the West
23   Bank, Gaza, Jordan.  I obtained that information
24   through talking to them, and they explained that
25   they sent money to these places to help with

1    children's orphanages, medical, welfare, and details
2    were also confirmed in the annual reports.
3    Q.    And you took it at face value, correct?
4         MR. L. FRIEDMAN: Object.  Object to
5         the form.
6         THE WITNESS: I did, yes.
7    BY MR. WERBNER:
8    Q.    Did you ever do anything other than
9    accept their statements, either that they gave to
10   you verbally, or that they put in their reports?
11   A.    I am not expected to.
12   Q.    Did you ever do so?
13   A.    I don't believe I did.
14   Q.    And nothing that they told you or put in
15   their annual report said anything about the fact
16   that they were sending money to New York City or
17   anybody else who was a victim of the 9-11 terror
18   attacks, did it?
19   A.    I don't recall that specifically, but
20   I -- I can't remember what was exactly in the annual
21   reports.
22   Q.    Well, what you just testified to when you
23   explained how they were applying their payments was
24   that they were sending it to Palestine and Gaza, the
25   West Bank, Jordan?

1    A.    Uh-huh.
2    Q.    You didn't say that they were sending any
3    money to the U.S., did you?
4    A.    No.
5    Q.    And you don't have any knowledge at any
6    time that they were, do you?
7    A.    No.
8    Q.    And so when you were given this
9    explanation for their increasing deposits after
10   2001, it was pretty lame, wasn't it, to say that it
11   was because of the 9-11, right?
12         MR. L. FRIEDMAN: I object to the
13         form.
14         THE WITNESS: It's not for me to
15         judge whether a statement someone makes is
16         lame.  I -- I -- I --
17   BY MR. WERBNER:
18   Q.    What did you think?
19   A.    Well, I believe that some of the deposits
20   came from America.
21   Q.    From the Holy Land Foundation?
22         MR. L. FRIEDMAN: Object to the form.
23         THE WITNESS: I don't know.
24   BY MR. WERBNER:
25   Q.    Where do you think they were coming from?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE -  Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                    Page 97

1      A.   It's not my duty to think where something
2   is coming from, and it's not my duty to investigate
3   where something comes from.  I just have to have a
4   general understanding of my client's business.
5   BY MR. WERBNER:
6      Q.   Well, from your general under --
7      A.   I have 300 customers.
8      Q.   But this was the No. 1 and only customer
9   that had large deposits that the bank wasn't paying
10  interest to, right?
11     A.   Yes.
12     Q.   This was --
13     A.   Not -- not the bank.  The only one of my
14  customers, yes.
15     Q.   And at the time that you were about to
16  leave, this was one of the top 10 income producers
17  among your 300, right?
18     A.   At the time I was about to leave
19  Islington, yes.
20     Q.   And at the time you were leaving,
21  Interpal was such a substantial income producer for
22  the bank that your new boss insisted that you bring
23  Interpal along with you into the new role, correct?
24          MR. L. FRIEDMAN: Object to the form.
25          THE WITNESS: Yes.

HIGHLY CONFIDENTIAL                                    Page 98

1   BY MR. WERBNER:
2      Q.   Based on all of that, when you made that
3   new role, isn't it true in that new position, that
4   in 2003, there was a substantial increase in
5   Interpal's revenues?
6          MR. L. FRIEDMAN: Object to the form.
7          THE WITNESS: I can't remember
8          whether their income specifically went up
9          in 2003.
10  BY MR. WERBNER:
11     Q.   Did you review that in preparation for
12  the deposition?
13     A.   No.
14     Q.   Now, were you aware around 2007 when
15  NatWest basically refused to any further provide
16  banking services for Interpal?
17          MR. L. FRIEDMAN: I object to the
18          form and substance.
19          As you know, that's outside the
20          discovery period in this case, but you can
21          go ahead and answer if you know.
22          THE WITNESS: I have been
23          subsequently made aware.
24  BY MR. WERBNER:
25  +  Q.   And how do you feel about that?

HIGHLY CONFIDENTIAL                                    Page 99

1          MR. L. FRIEDMAN: Were you made aware
2          by counsel of that?
3          THE WITNESS: Yes.
4          MR. L. FRIEDMAN: Okay.  I direct you
5          not to answer any questions about that.
6   BY MR. WERBNER:
7      Q.   I am asking you how do you feel about the
8   fact that NatWest has decided not to provide banking
9   services anymore to Interpal?
10          MR. L. FRIEDMAN: I object to the
11          question.  How are her feelings relevant
12          to the case?
13  BY MR. WERBNER:
14     Q.   Please answer the question.
15          MR. L. FRIEDMAN: I object to the
16          question.
17          If you have any feelings about it,
18          you can tell them.
19          THE WITNESS: I don't have any
20          feelings.  I haven't even considered it.
21  BY MR. WERBNER:
22     Q.   So it makes no difference to you one way
23  or the other, is that your testimony?
24     A.   Yes.
25          MR. L. FRIEDMAN: Objection.

HIGHLY CONFIDENTIAL                                    Page 100

1   BY MR. WERBNER:
2      Q.   Wasn't it reported in the British
3   newspapers that Interpal was no longer permitted to
4   have accounts at NatWest?
5      A.   I don't know.
6      Q.   All right.  Now, during your years of
7   dealing with Interpal, did you ever have even the
8   teeny weeniest bit of suspicion about Interpal?
9      A.   No, never.
10     Q.   Did you maintain a calendar during those
11  span of years that you dealt with Interpal?
12     I mean, I know you mentioned the diary.
13     A.   Uh-huh.
14     Q.   And I don't know if -- you know, but more
15  like a calendar or electronic or a -- what do they
16  call it?  A --
17     A.   The diary is my calendar.
18     Q.   Okay.
19     A.   Maybe I should have used the word
20  "calendar" as opposed to diary, but --
21     Q.   That's okay.
22     A.   -- but that's the only --
23     Q.   But I am trying to -- a Palm?
24     A.   But I only --
25     Q.   You know about the Palm?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

1    A.   Yes.
2    Q.   -- by looking at Lane Exhibit 16
3    (indicating)?
4    A.   Yes.
5    Q.   And that was a new U.S. dollar account
6    for Interpal, right?
7    A.   Yes.
8    Q.   Had they had U.S. dollar accounts at
9    NatWest before June 2001?
10   A.   I can't remember.
11   Q.   What was the currency in which their
12   accounts were when you became their relationship
13   manager in late 1999?
14   A.   I can't remember.  Main -- mainly
15   sterling, but I can't recall whether dollar accounts
16   were open at that time.
17   Q.   Among your 300 accounts while you were at
18   the Islington business center, did most of those
19   customers have dollar accounts?
20   A.   I had quite a lot of customers with
21   currency accounts.
22   Q.   And most of them had dollar accounts?
23        MR. L. FRIEDMAN: Object to the form.
24        THE WITNESS: I can't recall how
25   many.

1    BY MR. WERBNER:
2    Q.   Give me your best estimate.
3    A.   I am finding that difficult to do.  I
4    really -- I really can't member.
5    Q.   It wasn't usual?
6    A.   What -- what wasn't?
7    Q.   While you were at the Islington business
8    center to have customers with dollar accounts?
9    A.   No.
10   Q.   In Lane Exhibit 16, Interpal wanted to
11   open this new dollar account under the name of
12   I'tilafu al-Khayr, Union for Good, is that right?
13        THE WITNESS: If that's what it says
14        on this piece of paper.
15   BY MR. WERBNER:
16   Q.   Well, I am not purporting to be able to
17   speak Arabic, but looking at Lane Exhibit 16, how
18   would you read what they were asking NatWest to do
19   that you approved by your signature?
20        MR. L. FRIEDMAN: Object to the form.
21        THE WITNESS: Do you want me to read
22        it?
23   BY MR. WERBNER:
24   Q.   Did you approve what they were
25   requesting?

1    A.   Yes, I've signed it.
2    Q.   All right, and what did you approve of
3    them requesting?
4    A.   Well, I -- I've confirmed that the
5    account that's detailed on this letter could be
6    opened.
7    Q.   Under what name?
8    A.   It would have been -- the full name of --
9    of Interpal and then this -- do you want me to say
10   it?  I'tilafu al-Khayr, Union for Good, exactly as
11   it's printed there (indicating), would have been
12   added after the name Interpal.
13   Q.   Did they tell you why they wanted an
14   account under the Union of Good's name?
15        MR. L. FRIEDMAN: Object to the form.
16        THE WITNESS: It says in the letter
17        "to facilitate our latest international
18        fundraising campaign."
19   BY MR. WERBNER:
20   Q.   Did you ask them any questions about who
21   is the Union of Good?
22   A.   I can't remember.
23   Q.   Did you ask anybody to do a due diligence
24   on the Union for Good?
25   A.   I can't remember.

1    Q.   Do you have any records at NatWest to
2    reflect that you asked for any information about
3    Union for Good?
4    A.   We would -- we would have an account
5    opening file, so if we had, it would all be there in
6    that file.
7        MR. WERBNER: Objection,
8        nonresponsive.
9    BY MR. WERBNER:
10   Q.   Do you know whether NatWest ever obtained
11   any records in the 2001 time frame related to Union
12   for Good?
13   A.   I can't remember.
14   Q.   Now, they told you in Lane Exhibit 16
15   that it was a matter of urgency.
16     Did you ask them why it was so urgent for them
17   to open a NatWest account in dollars in the name of
18   Union for Good?
19   A.   I cannot remember the specific
20   transaction at all.
21   Q.   Sitting here today, do you have any idea
22   who is the Union for Good?
23   A.   Nope.
24   Q.   Who wrote BC, or 1BC?  Or is that IBC?
25   A.   It's IBC, which I imagine stands for

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                   Page 129

1 international banking center, because that's where
2 someone would have sent this document for the
3 account to have been opened, but I don't believe
4 that's my handwriting.
5     Q.   It wouldn't stand for the Islington
6 business center?
7     A.   Oh, it might do.
8     Q.   I don't know.
9     A.   It might do.
10    But I doubt it, because they have crossed out
11 the address for Islington business center.  I don't
12 know.
13    Q.   But would dollar accounts go to the IBC,
14 international banking?
15    A.   At that time, I believe it would have
16 been opened there, yes.
17    Q.   All right.
18    Let me hand you what's marked for
19 identification as Lane Exhibit 1, which is one page
20 Bates labeled NW 13431.
21    Do you recognize this as a letter you sent to
22 Interpal on or about 20 January, 2000?
23    A.   Yes.
24    Q.   And is the B there in your hand?
25    A.   Yes.

HIGHLY CONFIDENTIAL                                   Page 130

1     Q.   And was this part of a record that you
2 kept as far as your business was concerned for
3 NatWest dealing with Interpal in 2000?
4     A.   Yes.
5     Q.   And you routinely would keep copies of
6 letters like this (indicating) that you wrote to
7 your customers?
8     A.   Yes.
9     Q.   Now, this would have been very soon after
10 you became the relationship manager of Interpal,
11 right?
12    A.   Yes.
13    Q.   Was this the first meeting and
14 correspondence you think you had with Interpal after
15 you became their relationship manager in late 1999?
16         MR. L. FRIEDMAN: Object to the form.
17         THE WITNESS: I am not certain, but I
18         would think so.
19 BY MR. WERBNER:
20    Q.   Explain what you mean in the second
21 paragraph where you state "I apologize for the
22 delays which you have experienced in the past with
23 audit certificates and would suggest that future
24 audit requests are directed to my office in the
25 first instance in order that we can monitor the

HIGHLY CONFIDENTIAL                                   Page 131

1 completion of this document."
2     What is that?
3     A.   Okay.  An audit certificate is something
4 which is required by a business' accountant to help
5 them complete the annual accounts, and we are asked
6 various questions in it as to the amount of lending
7 or the amount of interest, and we just have to
8 complete those certificates.
9     I -- I think, although I don't remember
10 specifically in this instance, but I think what had
11 happened was that the -- the requests such as this
12 go directly to our service center.
13    They don't come to the business center.  All --
14 all of the processing and that are dealt with by our
15 service centers, so it would have gone directly to
16 the service center and for some reason must have got
17 held up or, presumably, Mr. Qundil complained that
18 it took a long time to produce it.
19    So what I was suggesting there was that they
20 initially send the request to my team at the
21 business center so that we can then track it and
22 make sure that it was completed on time.
23    Q.   At any time during your six or seven
24 years as the Interpal relationship manager, both at
25 Islington and then at Romford, did you have the

HIGHLY CONFIDENTIAL                                   Page 132

1 ability to look at, either electronically or
2 otherwise, their account data?
3     A.   Yes.
4     Q.   How could you do that, and was that over
5 the entire tenure?
6     A.   Yes.
7     Q.   So over the entire tenure, you had the
8 ability to look at their account transactions?
9     A.   Yes.
10    Q.   Did you ever do so?
11    A.   I would have looked at a printout before
12 I went out to see them, just to see how the account
13 was operating, not specific entries, just a printout
14 showing the maximum and minimum balances.
15    It wasn't part of my responsibility to examine
16 the account regularly or to look at specific
17 entries.
18         MR. WERBNER: Objection,
19         nonresponsive.
20 BY MR. WERBNER:
21    Q.   I am not asking if you ever looked at
22 account balance averages or high or low.
23    I am asking in the six or seven years that you
24 were Interpal's relationship manager for NatWest,
25 did you ever look at their account transaction data?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                Page 141

1    BY MR. WERBNER:
2       Q.   So it was clearly the top -- among the
3    top of the whole group's accounts, right?
4            MR. L. FRIEDMAN: Object to form.
5            THE WITNESS: It wasn't just a dollar
6        account they had.  They had a sterling
7        account as well.
8    BY MR. WERBNER:
9       Q.   So it was even more so, right?
10           MR. L. FRIEDMAN: Object to form.
11           THE WITNESS: It was a top MLM A
12       customer.
13   BY MR. WERBNER:
14      Q.   I mean, it was just -- the ▮▮▮▮
15   sterling was just in their dollar account, right?
16      A.   Yes.
17      Q.   And how much was in the sterling account?
18      A.   Don't know.
19      Q.   A lot, wasn't it?
20           MR. L. FRIEDMAN: Object to the form.
21           THE WITNESS: I don't know.
22   BY MR. WERBNER:
23      Q.   On the second page, it said they were
24   "interested in Bank Line Payment Manager and
25   Business Card."

---

HIGHLY CONFIDENTIAL                                Page 142

1        What does that mean?
2       A.   Bank Line Payment Manager is our computer
3    banking system, which enables you to make or enables
4    a customer to make transfers abroad.
5       Q.   And so you helped them get that ability?
6       A.   Yes.
7       Q.   And up to that time, they didn't have the
8    ability on their own to go on the computer and wire
9    money abroad?
10      A.   No.
11      Q.   And by virtue of this Lane Exhibit 2,
12   they got that service from NatWest?
13           MR. L. FRIEDMAN: Object to the form.
14           THE WITNESS: No.  This (indicating)
15       wouldn't specifically have secured that
16       service for them.  They would have had to
17       have completed a Bank Line application
18       form.
19   BY MR. WERBNER:
20      Q.   All right, so this merely reflects they
21   were interested in that?
22      A.   Yes.
23      Q.   Did they ultimately fill out those forms
24   in this time frame so that they could use that
25   service?

---

HIGHLY CONFIDENTIAL                                Page 143

1       A.   I believe they did.
2       Q.   And have those documents been produced as
3    they relate to Interpal, to your knowledge?
4       A.   I can't recall.
5            MR. WERBNER: Mr. Friedman, have they
6        been, to your knowledge.
7            MR. L. FRIEDMAN: I don't know.
8  *         MR. WERBNER: Well, they would
9    certainly be required if they relate to Interpal's
10   ability to wire funds internationally, so I would
11   request that we -- we look into that.
12   BY MR. WERBNER:
13      Q.   What did you mean on the second page,
14   Ms. Lane when you wrote in January of 2000 about
15   Interpal that they were cash rich?
16      A.   It's an expression we use in -- in the
17   bank, meaning that they don't borrow money and they
18   have cash -- they have cash balances, credit
19   balances.
20      Q.   Now, above your signature on the second
21   page of this exhibit you state that it is the top
22   MLM A customer in your portfolio.
23       Do you see that?
24      A.   Yes.
25      Q.   Was that a true statement?

---

HIGHLY CONFIDENTIAL                                Page 144

1       A.   If I wrote it, it must have been.
2       Q.   And you wanted, in light of that, to
3    "Ensure that facilities are available quickly for
4    customers once the final amount of the document
5    credit facility is known."
6        Correct?
7       A.   Yes.
8       Q.   And why did they need to have that credit
9    facility?
10       Oh, is that the lamb thing you told me?
11      A.   Yes.
12      Q.   Okay.  Let's go to Lane Exhibit 3, and
13   then maybe we will take our lunch break.  This is
14   just one page, NW 13637, and purports to be a
15   synopsis of a customer meeting on the 20th of March,
16   2002.
17       Can you confirm that that's what this exhibit
18   is (indicating)?
19      A.   Yes.
20      Q.   And is this an accurate record that you
21   made on or about March 20th, 2002 concerning your
22   meeting with Interpal?
23      A.   Yes.
24      Q.   And as far as you know, are the
25   statements in here (indicating) ones that you made

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                    Page 153

1   light of the receipt of that information, if any?
2      A.   Well, those countries didn't trigger
3   anything in my mind.  We are regularly provided with
4   lists with countries that perhaps the bank doesn't
5   deal with, or perhaps there's an issue going on, and
6   neither of those three triggered anything in my
7   mind, so I didn't do anything other than make the
8   interview note.
9      Q.   Well, you were specifically told
10  something about terrorism in connection with your
11  meeting with Interpal, weren't you?
12          MR. L. FRIEDMAN: Object to the form.
13          THE WITNESS: I wasn't told something
14      about terrorism.  I was -- I was just told
15      what I have noted here (indicating), that
16      he raised the issue of terrorism.
17  BY MR. WERBNER:
18     Q.   So you and Interpal in March of '02 were
19  discussing the issue of terrorism, correct?
20     A.   Not discussing it, no.  He told me.
21  He -- he made this statement (indicating).  We did
22  not discuss it.
23     Q.   Well, what did you do after Interpal
24  raised the issue of terrorism with you to verify, to
25  check it, to investigate it, if anything?

HIGHLY CONFIDENTIAL                    Page 154

1      A.   Nothing.  I don't know why I would.
2      Q.   So why did you put this in the report
3   marked Lane Exhibit 3 (indicating)?
4      A.   Because -- because it was the reason
5   for -- he was explaining to me a reason why their
6   credit balances would increase.
7      Q.   Because of terrorism?
8      A.   Well, that -- that is what he said.  He
9   said because of what was being reported in the media
10  about terrorism, it was just making people want
11  to -- to provide increased donations.  It was just
12  raising their awareness and wanting to -- to make
13  increased donations to them.
14     Q.   Did that make sense to you?
15     A.   Well, it -- it seemed a logical
16  explanation.
17     Q.   That because of terrorism, the --
18  Interpal was getting more money?  Is that what you
19  are saying?
20          MR. L. FRIEDMAN: Object to the form.
21          THE WITNESS: I think because of the
22      implications.
23  BY MR. WERBNER:
24     Q.   Well, actually, in Lane Exhibit 3
25  (indicating), about the fifth bullet point from the

HIGHLY CONFIDENTIAL                    Page 155

1   bottom, you put "Income has continued at a similar
2   level in 2001."  See that?
3      A.   Yes.
4      Q.   So are you sure you put this reference in
5   there to discussing terrorism because it was being
6   stated as an explanation for their increasing
7   revenues?
8          MR. L. FRIEDMAN: Object to the form.
9          THE WITNESS: No.  In this particular
10      instance (indicating), I mean, I have said
11      here that they had had -- they had had
12      calls from the media.
13  BY MR. WERBNER:
14     Q.   Now, elaborate what the Interpal people
15  told you in March of '02 about getting calls from
16  the media.
17     A.   I -- I can't remember.  I really can't
18  remember the conversations.  This interview note
19  (indicating) has -- I can remember obviously what's
20  on this interview note, because I can read it.  I
21  cannot remember the conversation.
22     Q.   Now, what I don't understand, though,
23  here is a reference to "They are interested in Bank
24  Line and Auto Pay" (indicating).  We had seen that
25  earlier in 2000.

HIGHLY CONFIDENTIAL                    Page 156

1      Does this refresh your recollection and suggest
2   that maybe they didn't actually sign up for the Bank
3   Line back in January of 2000?
4          MR. L. FRIEDMAN: Object to the form.
5          THE WITNESS: I can't remember when
6      they -- they signed up for it.
7   BY MR. WERBNER:
8      Q.   But they got it at some point --
9      A.   They did.
10     Q.   -- while you were their relationship
11  manager?
12     A.   Yes.
13          MR. WERBNER: Let's take a break for
14      lunch.  Thank you.
15          THE VIDEOGRAPHER: Going off the
16      record at 1:12.
17          (Recess taken at 1:12 p.m.)
18          (Resumed at 2:17 p.m.)
19          THE VIDEOGRAPHER: Back on the record
20      at 2:17.
21  BY MR. WERBNER:
22     Q.   Ms. Lane, would you outline for us,
23  please, your educational background?
24     A.   I went to Lowes Wong Junior School in
25  Southwell, Nottinghamshire, then went to Lilley and

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                Page 165

1   center in Romford.
2     A.   Okay.  The -- the area manager or the
3   director would advise us of any matters going on in
4   the bank, anything we should be aware of, anything
5   that was brought to their attention at their board
6   meeting.  Then we would discuss sales, staff issues,
7   hospitality events.  Normal sort of work in
8   progress, if anybody had some success stories.
9     Q.   All right, and how about if the -- is
10  that -- is that same at both --
11    A.   Yeah.
12    Q.   -- places?  Okay.
13     Were there written materials or emails or
14  agendas that pertained to the topics or the
15  scheduling or --
16    A.   Normally, the area manager would -- or
17  director would produce an agenda which he would
18  circulate before and ask anybody if they wanted to
19  raise anything.
20    Q.   In that time frame again, let's say
21  between 2001 and 2004, was Interpal ever discussed
22  at any of those meetings?
23    A.   I can't remember.
24    Q.   Was the subject of money laundering or
25  terror financing or steps that needed to be taken

---

HIGHLY CONFIDENTIAL                                Page 166

1   regarding those things ever discussed at any of
2   those meetings?
3     A.   I can't remember specifically, but I
4   would imagine we probably had discussions about it
5   after 9-11, because obviously everybody was made
6   very aware, and when -- you know, the terrorist
7   attacks happened in London as well, everybody was
8   sort of briefed about being very vigilant and -- you
9   know, be more cautious than ever and -- you know, if
10  ever, if they had any suspicions at all, to bring
11  them to the area manger's attention, or file money
12  laundering or, you know, suspicious activity
13  reports.
14     Around that sort of difficult period, it was
15  always very much sort of brought to the forefront of
16  our minds.
17    Q.   So that was definitely in your mind after
18  September 2001 and into 2002, that you needed to be
19  particularly alert and vigilant to anything that
20  might be suspicious related to terror financing?
21    A.   It would have been previously, as well.
22    Q.   Uh-huh.
23    A.   Any time you feel -- you know, suspicious
24  about anything, you wouldn't hesitate -- you know.
25  I have -- I have filed quite a number of suspicious

---

HIGHLY CONFIDENTIAL                                Page 167

1   activity reports in my time.
2     If ever I ever doubted anything, I would file
3   one.  You would have no reason not to.  You would
4   just want to protect yourself.
5     Q.   How many do you think you've filed?
6     A.   I would say over the course of my career,
7   I would say --
8     Q.   Sorry.  Go ahead.
9     A.   I would say at least 10.
10    Q.   And when was the first time, as best you
11  recall, that -- that you would have done that?
12    A.   I can't remember.  I can't remember at
13  all.
14    Q.   Before you ever went to Islington?
15    A.   Yes.
16    Q.   So by the time you became the
17  relationship manager for Interpal in late 1999, you
18  were certainly familiar with filing suspicious
19  activity reports?
20    A.   Definitely.
21    Q.   And you had done so?
22    A.   Yes.
23    Q.   And did you do so while you worked in
24  Islington?
25    A.   I can't recall a specific occasion.

---

HIGHLY CONFIDENTIAL                                Page 168

1     Q.   Did you do so while you worked in
2   Romford?
3     A.   Again, I can't -- I can't recall a
4   specific occasion.
5     Q.   Have you ever filed a suspicious activity
6   report where your suspicion was terror financing?
7     A.   No.
8     Q.   Are you sure?
9     A.   Yes.
10    Q.   Were there minutes made of the various
11  meetings that you would attend with the area
12  manager?
13    A.   Not always.  Sometimes things circulated
14  afterwards.
15    Q.   How were those minutes circulated after
16  the area manager meetings that you would attend?
17    A.   At Islington, we didn't have email, so
18  they would have been passed around.  In Romford, by
19  email.
20    Q.   Did you keep those, either in an
21  electronic folder or in hard copy?
22    A.   I kept them in hard copy for the year,
23  and then every Christmas, I would have a clear-out
24  of my drawers.
25    Q.   Did you ever raise any questions about

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                          Page 225

1    Q.   Did you ever go over to Regent's House?
2    A.   No.
3    Q.   In the memo addressed to you, they call
4    your branch Northeast Thames CBC.  What does that
5    mean?
6    A.   Northeast Thames Commercial Banking
7    Center.
8    Q.   So that was where, in Islington or
9    Romford?
10   A.   Romford.
11   Q.   And do you know Charlotte Macomus other
12   than this --
13   A.   No.
14   Q.   -- document?  No?
15        Did you receive this document on or about
16   July 9 of '02?
17   A.   I don't remember it.
18   Q.   Have any reason to doubt that you
19   received it?
20   A.   No, I don't have any reason to doubt I
21   received it.
22   Q.   Notice there's a "Received" stamp on the
23   document (indicating).  Do you see that?
24   A.   Yes.
25   Q.   Do you recognize that stamp?

---

HIGHLY CONFIDENTIAL                                          Page 226

1    A.   It is very similar to stamps that we use
2    within the offices, which we put on any
3    correspondence.
4    Q.   So to the best of your knowledge, was it
5    the routine while the account manager for Interpal
6    in Romford that someone in the office would stamp
7    with the Received and the date, material that came
8    to you like this (indicating)?
9    A.   Yes.
10   Q.   So any reason to doubt that you received
11   this on or about the date on this Received stamp?
12   A.   No.
13   Q.   Did you read this?
14   A.   Yes, I believe I would have done.  I
15   mean, it's asking more to forward a detailed report,
16   and I believe I did forward a report afterwards.
17   I -- I can't clearly remember it, but...
18   Q.   Well, actually, it's notifying you under
19   the heading "Money Laundering Suspicion, Account
20   Palestinian's Relief and Development Fund,
21   60-08-22," with a group fraud reference number, to
22   the fact that "The decision has been taken to report
23   the matter to the authorities."
24        Isn't that what it does?
25   A.   Uh-huh.

---

HIGHLY CONFIDENTIAL                                          Page 227

1         MR. L. FRIEDMAN: Object to the form.
2         THE WITNESS: Yes.
3    BY MR. WERBNER:
4    Q.   So you knew in or around the 11th of
5    July, 2002 that the Royal Bank of Scotland Group
6    that you worked with was reporting a money
7    laundering suspicion concerning Interpal to the
8    English authorities, correct?
9    A.   Yes, that's what -- that's what it says
10   (indicating).
11   Q.   Did that concern you?
12   A.   Well, I -- I didn't have any suspicions,
13   but obviously it made me aware that there was
14   something happening.  That's -- you know, it doesn't
15   tell me any more, so...
16   Q.   Did it concern you in July of 2002 that
17   the Royal Bank of Scotland Group investigation and
18   fraud unit was reporting to the English authorities
19   a money laundering suspicion concerning your
20   customer, Interpal?
21        MR. L. FRIEDMAN: Object to the form,
22        asked and answered.
23        THE WITNESS: I'm not quite sure how
24        to interpret "concerned."  I was made
25        aware of it, so I was aware of it, and I

---

HIGHLY CONFIDENTIAL                                          Page 228

1         did what I was instructed to do.  I can't
2         recall at the time whether I had a certain
3         feeling or not.
4    BY MR. WERBNER:
5    Q.   You were told in this exhibit that "This
6    matter must be treated in the strictest confidence,
7    and under no circumstances should the account holder
8    be advised of the action."  Do you see that?
9    A.   Yes.
10   Q.   So that conveyed to you, ma'am, did it
11   not, that this was a very significant and serious
12   matter?
13   A.   Yes.
14        MR. L. FRIEDMAN: Objection.
15   BY MR. WERBNER:
16   Q.   And you knew that the authorities
17   referred to were criminal authorities?
18   A.   Doesn't say that.
19   Q.   But you knew that?
20   A.   I'm not sure that I did.
21   Q.   Governmental authorities?
22   A.   But it doesn't say that.
23   Q.   I'm asking what you knew.
24   A.   I knew what it says on that letter
25   (indicating).

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                          Page 229

1    Q.   Well, did you know enough from your
2 training and your many years at NatWest, when you
3 received Exhibit 5 that the reference to the
4 authorities to whom the money laundering suspicion
5 report was made was the governmental authority?
6    A.   I can honestly say I don't know what
7 authority I thought it was.  I mean, one would
8 assume a government authority, but you don't assume
9 things in these cases.
10    It says "to the authorities," so they reported
11 it to the authorities.  I don't know which
12 authorities.
13    Q.   But you had gone to annual training.
14 Didn't you know from that and the manuals that you
15 were given from NatWest and the Royal Bank of
16 Scotland that when the group investigation fraud
17 unit reported a money laundering suspicion, they did
18 that to NCIS?
19    A.   But there's lots of different
20 authorities.
21    Q.   Can you answer my question, though?  I am
22 not trying to trick you, but didn't you know as --
23    A.   I can't -- I can't recall NCIS, no, I
24 can't.
25    Q.   Have you ever heard of that?

HIGHLY CONFIDENTIAL                                          Page 230

1    A.   I can't remember.
2    Q.   You can't sit here today and tell us if
3 you have ever heard of NCIS?
4    A.   I -- I can't remember.
5    Q.   Are you testifying --
6    A.   Can you tell me what NCIS stands for?
7    Q.   National Crime Information -- something.
8 I don't know.
9       MR. L. FRIEDMAN: Object to the form.
10 BY MR. WERBNER:
11    Q.   What's funny?
12    A.   We have lots of different initials for
13 lots of different departments, so you know, I'm sure
14 it would have been a high authority, but I can't --
15 I -- I can't recall if I know what NCIS is or,
16 sorry, whatever the initials were.
17    Q.   Well, based on your number of years of
18 experience at NatWest --
19    A.   Uh-huh.
20    Q.   -- as of the summer of 2002, to whom did
21 you think the bank reported money laundering
22 suspicions to?
23    A.   Well, yeah, government authorities, but
24 specifically which one, I don't know.  I mean,
25 obviously it's taken extremely seriously, and you

HIGHLY CONFIDENTIAL                                          Page 231

1 know, we know that it's reported at a higher level,
2 but I don't know which particular department.
3 That's not my responsibility.  That's dealt with by,
4 you know, group investigation and fraud.  All I know
5 is that it is reported onwards if they need to
6 report it onwards, but you know, I don't -- it's not
7 my responsibility to necessarily know which
8 departments, because I don't do the reporting.
9    I have to do a report to group investigation
10 and fraud.  That's my responsibility, and that's
11 what I did.
12    Q.   I was really just trying to find out your
13 state of mind in July when you got this (indicating)
14 and they said they had reported money laundering
15 suspicion concerning your customer, Interpal, to
16 whom you thought they had reported, and I will just
17 ask you finally:  Did you understand that they were
18 reporting that to governmental criminal authorities?
19       MR. L. FRIEDMAN: Object to the form.
20       THE WITNESS: I understood that they
21    were reporting it to an authority.
22    Beyond -- beyond that -- you know, I --
23    they would keep me appraised.  I didn't
24    need to know beyond that until they came
25    back to me and advised further.  I did

HIGHLY CONFIDENTIAL                                          Page 232

1       exactly what I was supposed to do upon
2       receipt of that -- that memo.
3 BY MR. WERBNER:
4    Q.   With all due respect, ma'am, I am not
5 asking you for what you needed to know.  I am asking
6 you what you did know, and I am asking you what you
7 did know as of July of '02 --
8    A.   Uh-huh.
9    Q.   -- as a long-time employee of NatWest as
10 to whom money laundering suspicious reports were
11 turned in to.  Did you know that they were turned in
12 to governmental criminal authorities for
13 investigation?
14    A.   Yes.
15    Q.   All right.  Why did it take us so long to
16 determine that?
17    A.   Because you were asking me a specific
18 department, and I wasn't sure if that specific
19 department was the correct one in this particular
20 instance.  I just wanted to be careful --
21    Q.   All right.
22    A.   -- of my answer.
23    Q.   So, fair enough.
24    In conclusion, looking at Lane Exhibit 5, you
25 knew in July of '02 that your bank was reporting to

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                     Page 237

```
 1    A.  No.
 2    Q.  All right.  Now, let me ask you this:
 3        What was the next contact that you remember
 4   having with NatWest or Royal Bank of Scotland's
 5   group investigation of fraud unit about Interpal?
 6    A.  I can't remember.
 7    Q.  Was this contact that you had from that
 8   unit about a money laundering suspicion of Interpal
 9   the first?
10        That is, was Lane Exhibit 5 the first time you
11   had had such a suspicion inquiry concerning
12   Interpal?
13    A.  I can't be totally clear, but I -- I
14   think it possibly was the first one I'd had, but
15   I -- I can't remember.
16    Q.  So I don't know why we had all that long
17   argument earlier today, but some of the contacts you
18   had certainly were before the lawsuit was filed,
19   right?
20    A.  Well, some.  This is one (indicating).
21    Q.  Right.
22    A.  And I said there was possibly one.
23    Q.  Well, we know there was at least one --
24    A.  I do now.
25    Q.  All right, and did you have information
```

HIGHLY CONFIDENTIAL                                     Page 238

```
 1   that there had been such suspicions before you
 2   became the relationship manager as to Interpal?
 3        MR. L. FRIEDMAN: Object to the form.
 4        THE WITNESS: I believe that
 5        somewhere I made a note that I've read
 6        today somewhere.  There was a note on the
 7        file, which I think I have repeated
 8        somewhere, that they were investigated by
 9        the Charities Commission back in -- I
10        can't remember.  I remember reading
11        something recently.
12   BY MR. WERBNER:
13    Q.  I am talking about, though, any
14   information that you had before July of '02 of
15   NatWest group investigation of fraud unit looking
16   into possible money laundering by Interpal.
17        Did you have any --
18    A.  I can't --
19    Q.  -- information?
20    A.  I can't remember anything.
21    Q.  Okay.  Because in your answer a few
22   moments ago, you said "I think" -- and you said in
23   reference to Exhibit 5, this was the first suspicion
24   that came to you as a report about Interpal?
25        MR. L. FRIEDMAN: I object to the
```

HIGHLY CONFIDENTIAL                                     Page 239

```
 1        form.
 2   BY MR. WERBNER:
 3    Q.  Did you?
 4    A.  I would have to ask for it to be
 5   repeated.  I can't remember.
 6    Q.  Well, let's move on.  I mean, did Lane
 7   Exhibit 5 just come out of the blue to you?
 8    A.  When?
 9        MR. L. FRIEDMAN: Object to the form.
10        THE WITNESS: Today, or at that time?
11   BY MR. WERBNER:
12    Q.  At that time.  You mean --
13    A.  Yes.
14    Q.  -- in July of '02 it just came out of
15   blue?
16    A.  Yes.
17    Q.  Struck you like a bolt of lightening?
18    A.  Yes.
19        MR. L. FRIEDMAN: Object to the form.
20   BY MR. WERBNER:
21    Q.  And let's move on, then, and see what you
22   noted in Lane Exhibit 7.  Let me hand you --
23        It's just one page with the Bates number
24   NW 13347, and it appears to be an August 1, 2002
25   document sent to you by this fraud officer,
```

HIGHLY CONFIDENTIAL                                     Page 240

```
 1   Charlotte Macomus.  Let me know when you have had a
 2   chance to look over that.
 3    A.  Yes.
 4    Q.  Can you -- can you verify that Lane
 5   Exhibit 7 is a true and correct copy of a document
 6   you got from fraud officer Charlotte Macomus
 7   concerning Interpal?
 8    A.  Yes.
 9        MR. L. FRIEDMAN: I object to the
10        form.
11   BY MR. WERBNER:
12    Q.  And again, do you see the Received stamp
13   bearing the date of August 2nd, 2002?
14    A.  Yes.
15    Q.  And would you, based on that, believe --
16   knowledge of the routine of your office, that you in
17   fact did get this on or about August 2nd, 2002?
18    A.  Yes.
19    Q.  And that would have been part of the
20   regular course of your business concerning the
21   relationship management for Interpal?
22    A.  Sorry?  What would be the -- just --
23    Q.  To be receiving and stamping it and --
24   and reviewing it?
25    A.  Yes.
```

TZVI WEISS, et al - NATAN APPLEBAUM, et al v.
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                     Page 245

1    Lane Exhibit 7, here you are in the summer of 2002,
2    right?  You have been the relationship manager for
3    several years for Interpal, right?
4        A.   Yes.
5        Q.   You know that it's a profitable account
6    for the bank, right?
7        A.   Yes.
8        Q.   Among the most profitable that you are
9    handling, right?
10            MR. L. FRIEDMAN: Object to the form.
11            THE WITNESS: Not at this time, no.
12   BY MR. WERBNER:
13       Q.   You know that there's some money
14   laundering suspicion -- suspicion -- about that
15   customer, correct?
16       A.   Yes.
17       Q.   You've gotten written notification of
18   that suspicion from your bank's fraud unit, correct?
19       A.   Yes.
20       Q.   You are directed -- your attention is
21   directed to a payment that Interpal has made or
22   received, I guess, for ▮▮▮▮▮ right?
23       A.   Yes.
24       Q.   That's come from ▮▮▮▮ correct?
25       A.   Yes.

---

HIGHLY CONFIDENTIAL                                     Page 246

1        Q.   And that was sent by something called the
2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3    ▮▮▮▮▮▮▮▮▮▮ correct?
4        A.   That was what I was told, yes.
5        Q.   And that there is an open group fraud
6    case number as referenced on Exhibit 7?
7        A.   Yes.
8        Q.   And you didn't become more scrutinizing
9    of Interpal as a result of that in the summer of
10   '02?
11            MR. L. FRIEDMAN: Object to the form.
12            THE WITNESS: I was instructed in
13   Lane Exhibit 5 to continue to operate the
14   account with normal banking practice until
15   I heard from them to the contrary, so I
16   continued to operate that account exactly
17   as I would any other account.  That's
18   exactly what I was instructed to do.
19   BY MR. WERBNER:
20       Q.   No different than accounts that weren't
21   getting hundreds of thousand of dollars from ▮▮▮▮
22   to support some so-called charity in Jerusalem
23   during the middle of suicide bombings there?
24            MR. L. FRIEDMAN: Object to the form.
25            THE WITNESS: I operated it with a

---

HIGHLY CONFIDENTIAL                                     Page 247

1        normal banking practice.
2    BY MR. WERBNER:
3        Q.   Just like any other account?
4            MR. L. FRIEDMAN: Object to form.
5    BY MR. WERBNER:
6        Q.   Is that right?
7            MR. L. FRIEDMAN: Object to form.
8            THE WITNESS: Like a normal banking
9        practice.
10   BY MR. WERBNER:
11       Q.   A moment ago -- you are not backing away
12   from your statement "Just like any other account,"
13   are you?
14            MR. L. FRIEDMAN: I object to the
15       form.
16            THE WITNESS: Well, that's very
17       vague, "Just like every other account."
18       Every account is operated differently.  I
19       might deal with different accounts
20       differently, so I operated this account as
21       I had done previously, in the normal --
22       within normal banking practice.  I can't
23       compare it with other accounts.
24   BY MR. WERBNER:
25       Q.   Did you change anything you were doing

---

HIGHLY CONFIDENTIAL                                     Page 248

1    with respect to your account -- with Interpal, after
2    receiving this Exhibit 6 and 7 in the summer of '02,
3    than you had done with respect to that customer
4    before getting the material from the group
5    investigation and fraud unit?
6        A.   I am always cautious in operating all my
7    accounts, so no, I didn't do anything differently,
8    just because I had received a suspicion report, no.
9        Q.   So your conduct and scrutiny with respect
10   to Interpal was no different after August of '02
11   than it had been back in '01?  Is that your
12   testimony?
13            MR. L. FRIEDMAN: Object to the form.
14            THE WITNESS: Yes.
15   BY MR. WERBNER:
16       Q.   Let me hand you Lane Exhibit 8, and it is
17   a -- material addressed to you from Interpal, and it
18   bears the Bates stamps NW 13348 through 355.  Take a
19   moment to look over that, please.
20        Have you reviewed that?
21       A.   Yes.
22       Q.   This Lane Exhibit 8 is an eight-page fax
23   that was sent to you by Interpal on August 6 of '02,
24   isn't it?
25       A.   Yes.

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

1    A.  I am sure they would have done.

2    Q.  Well, do you know?

3    A.  No.

4    Q.  All right, and all that the fraud unit

5 was basically told was what Mr. Mustafa had claimed

6 about it?

7    A.  But I'm sure these (indicating) would

8 have been sent on to group investigations and fraud.

9    Q.  All right.

10        MR. L. FRIEDMAN: Just a minute.

11 Just one second.

12        (Informal discussion held off the

13 record.)

14        MR. L. FRIEDMAN: Okay.  Go ahead.

15 BY MR. WERBNER:

16    Q.  Now, what your customer at Interpal

17 attaches as support to this fraud inquiry is an

18 Arabic document on the letterhead of Interpal with a

19 translation provided by Interpal, right?

20        MR. L. FRIEDMAN: Object to the form.

21        THE WITNESS: It appears to be.

22 BY MR. WERBNER:

23    Q.  I mean, did you or, to your knowledge,

24 did anybody else at NatWest look to try to verify

25 this?

---

1    A.  I can't remember.  I -- I don't -- I

2 honestly don't remember seeing it.

3    Q.  I mean, you knew from your many years of

4 employment and training at NatWest as of August of

5 '02 that it wasn't sufficient just to take the

6 customer's word for everything when there were

7 suspicions in the account, right?

8        MR. L. FRIEDMAN: Object to the form.

9 BY MR. WERBNER:

10    Q.  That's what due diligence and things like

11 that are all about, correct?

12        MR. L. FRIEDMAN: I object to the

13 form.

14        THE WITNESS: You are asking me to

15 make a judgment as to whether -- you said

16 is it right to take my customer's word.

17        Yes, we have to do lots of due

18 diligence, but I've -- I've done exactly

19 what I was asked to do by group

20 investigations and fraud.  I have asked

21 the customer the details surrounding that

22 payment.  I have provided that information

23 and the customer has sent the followup

24 information.

25        It's not for me to do anything else.

---

1        That's down to the investigation and fraud

2 unit.  That's why we have them.

3 BY MR. WERBNER:

4    Q.  Let's look at Lane Exhibit 9, and this is

5 one page with the Bates number NW 13346.

6    A.  Thank you.

7    Q.  What is that document?

8    A.  This document is a response to Exhibit

9 Lane 7, and presumably encloses Exhibit Lane 8.

10    Q.  And is that your initial B above the

11 signature line?

12    A.  Yes.

13    Q.  And so is Exhibit 9 a true and correct

14 copy of what you sent along with the attached

15 Exhibit 8?

16    A.  Yes.

17        MR. L. FRIEDMAN: Mark, when you have

18 a convenient breaking point?

19        MR. WERBNER: Let's do that now.

20        THE VIDEOGRAPHER: Going off the

21 record, 4:16.

22        (Recess taken at 4:16 p.m.)

23        (Resumed at 4:33 p.m.)

24        THE VIDEOGRAPHER: Back on the

25 record, 4:43.

---

1 BY MR. WERBNER:

2    Q.  Ms. Lane, during the time that you were

3 the NatWest relationship manager for Interpal, did

4 you ever go on the Internet and look at Interpal's

5 web site?

6    A.  No.

7    Q.  Did you ever give Interpal, while you

8 were their relationship manager, approval to use

9 NatWest's logo?

10    A.  No.

11    Q.  Did you learn around August 2003 that the

12 United States government had declared Interpal was a

13 funding of Hamas, the terrorist organization?

14        MR. L. FRIEDMAN: Object to the form.

15        THE WITNESS: No.

16 BY MR. WERBNER:

17    Q.  Did anyone ever tell you before this

18 lawsuit was filed that the United States government

19 sometime in August 2003 declared Interpal to be a

20 terrorist organization associated with Hamas?

21        MR. L. FRIEDMAN: Object to the form.

22        THE WITNESS: I -- I recall receiving

23 a phone call about the U.S. dollar

24 account, but I can't recall exactly what

25 date that was, so I don't know if it was

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

1    after -- I believe it was probably after
2    the -- when the lawsuit was filed.
3         MR. WERBNER: Would you read back my
4    question for her, please?
5         (Whereupon, the record was read back
6    by the reporter.)
7    BY MR. WERBNER:
8    Q.   Could you answer that question, please?
9    A.   Okay. I -- I understand the allegations
10   of the lawsuit. Nobody has ever told me that they
11   were a terrorist organization associated with Hamas,
12   but -- no -- well, no.
13        Sorry. The question confused me a little bit.
14   Q.   Well, I want to avoid any confusion. Let
15   me have the court reporter read it again, and if you
16   need me to clarify in any way before you answer it,
17   just let me know?
18   A.   Okay. Can I stop you after one point?
19        (Whereupon, the record was read back
20   by the reporter.)
21        THE WITNESS: Right. Sorry, I can't
22        remember specifically before and after
23        that bit, so that bit's difficult.
24        (Whereupon, the record was read back
25   by the reporter.)

1         THE WITNESS: No. I think the answer
2         is no, because -- because that specific
3         wording -- nobody ever told me that they
4         were a terrorist organization associated
5         with Hamas.
6              I was aware of the lawsuit and
7         what -- what the lawsuit was about, but I
8         don't think those words were ever used.
9    BY MR. WERBNER:
10   Q.   I am not asking about any civil lawsuits
11   against NatWest, okay?
12   A.   Uh-huh.
13   Q.   I am asking about a statement, a
14   designation, a declaration made by the United States
15   government --
16   A.   Uh-huh.
17   Q.   -- a declaration, statement that was made
18   by the U.S. government in August of 2003 about your
19   customer, Interpal.
20        Are you with me so far?
21   A.   Yes.
22   Q.   In August of 2003, the United States
23   government made an announcement that it determined
24   or it believed or it thought --
25   A.   Uh-huh.

1    Q.   -- that Interpal, based in the UK, was
2    supporting Hamas terror financing.
3         Are you with me so far?
4    A.   Yes.
5    Q.   Now, whether you agreed with it or not,
6    all I am asking is --
7    A.   Uh-huh.
8    Q.   -- did it come to your knowledge that the
9    United States government had taken that position
10   concerning Interpal?
11        MR. L. FRIEDMAN: Before this lawsuit
12        was filed.
13        THE WITNESS: Right.
14   BY MR. WERBNER:
15   Q.   Between August of '03 and two years
16   later, whenever the lawsuit was filed, '05, did that
17   United States position come to your knowledge?
18        MR. L. FRIEDMAN: Object to the form.
19        THE WITNESS: I was asked to close
20        the dollar account at one point, because
21        of -- the U.S. believed that Interpal was
22        associated with -- with terrorism or
23        something to that effect, but I can't
24        remember if it was before or after.
25   BY MR. WERBNER:

1    Q.   Well, it was in August of '03 --
2    A.   Right.
3    Q.   -- years before the lawsuit, I will
4    represent to you.
5    A.   Okay.
6    Q.   Accepting that representation, who asked
7    you to close the dollar account because of the
8    United States government position about Interpal?
9         MR. L. FRIEDMAN: We have to clarify
10        something, because I think you
11        misunderstood her answer.
12             We have to clarify whether this was
13        told to her before or after the lawsuit.
14        I think that's what she was referring to,
15        not the designation.
16        THE WITNESS: That's what --
17        (Informal discussion held off the
18        record.)
19        MR. WERBNER: Well, let me ask the
20        questions, please.
21             Would you read my question to the
22        witness now, please.
23        (Whereupon, the record was read back
24   by the reporter.)
25        THE WITNESS: I am not sure if I am

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

HIGHLY CONFIDENTIAL                                    Page 269

1          MR. WERBNER: I am going to hand
2     NatWest counsel Wickens Number 10, because
3     it's the same thing.
4          MR. L. FRIEDMAN: And this is
5     Lane 10?
6          MR. WERBNER: She's holding what's
7     been marked Lane Deposition --
8          MR. L. FRIEDMAN: I have got it.
9          MR. WERBNER: -- Exhibit 10.
10         MR. L. FRIEDMAN: I have got it.
11   BY MR. WERBNER:
12    Q.   Take a moment to look at that, and then I
13   will have some questions.
14    A.   I am ready.
15    Q.   Did you prepare this document?
16    A.   It looks like something I would have
17   written, yes.
18    Q.   And did you prepare it concerning
19   Interpal while you were the NatWest relationship
20   manager?
21    A.   Yes.
22    Q.   And would that have been in the ordinary
23   course of your business to make a memorandum like
24   this (indicating) concerning one of your customers
25   and maintain it in the files?

HIGHLY CONFIDENTIAL                                    Page 270

1     A.   I think I would have provided this for a
2    specific reason, because it's --
3         It's not one of my normal interview notes, but
4    I can't recall why.  I imagine it was probably a
5    report provided to group investigation and fraud,
6    something like that.
7     Q.   But it was provided as part of your
8    employment for NatWest concerning one of your
9    customers?
10    A.   Yes.
11    Q.   And you would have done this memo
12   (indicating) at or about the time of the events that
13   are reflected in here?
14         MR. L. FRIEDMAN: I object to the
15         form.
16         THE WITNESS: I'm not sure when I
17         prepared it.  I don't know why there's not
18         a date on it, but...
19   BY MR. WERBNER:
20    Q.   Well, it looks like, regardless of when
21   it was prepared, that on October 10th of 2005, it
22   was faxed along with 25 other pages to somebody.  Do
23   you see that in the fax header?
24    A.   Yes.
25    Q.   Do you know anything about the

HIGHLY CONFIDENTIAL                                    Page 271

1    circumstances under which this piece of paper, along
2    with the other 25 pages, was faxed?
3     A.   I can't recall it, no.
4     Q.   Do you recognize the fax number or phone
5    number that's within that fax header on the
6    document?
7     A.   Yeah.  That's Romford's fax number.
8     Q.   For your business, you meant?
9     A.   Yes.
10    Q.   And do you know to whom you faxed it?
11         MR. L. FRIEDMAN: Object to the form.
12         THE WITNESS: I might not have faxed
13         it.  It's possible --
14   BY MR. WERBNER:
15    Q.   Do you know to whom it was faxed?
16    A.   No.
17    Q.   Whose handwriting is that at the top
18   right?
19    A.   That's mine.
20    Q.   What does it say, please, ma'am?
21    A.   I think it says "Dollars, 261,000.  Euros,
22   485,000."
23    Q.   What does that mean?
24    A.   I -- I've just noted down that the credit
25   balances are across five accounts, and then I have

HIGHLY CONFIDENTIAL                                    Page 272

1    also added what the balance presumably of the dollar
2    account was and the balance of the euro account as
3    well.
4     Q.   Does this document refresh your
5    recollection that Interpal had approximately five
6    different accounts at NatWest?
7     A.   Yes.  I know they had a number of
8    accounts.
9     Q.   And can you confirm from this document or
10   otherwise that Interpal had had accounts at NatWest
11   in dollars, euros, and sterling?
12    A.   Yes.
13    Q.   And that Interpal, while you were its
14   relationship manager, at least at the time of this
15   document (indicating), had nearly a million pounds
16   of funds in those different currencies?
17    A.   What I am not sure about is whether I
18   have converted the euro in the dollar account.  Oh,
19   sorry, nearly a million -- yes, yeah.  What I am not
20   sure is if the 969 -- was that dollar in euro
21   balance or whether it's additional.  I have not
22   really made that very clear.
23    Q.   Well, what it says is "Presently, 969,000
24   sterling pounds, credit balances across five
25   accounts."  Do you see that?

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE -  Vol. 1
June 24, 2008

1     A.   Yes.
2     Q.   And that they were getting donations
3   totaling over 4 million pounds?
4     A.   Yes.
5     Q.   With net income of over 291,000 pounds?
6     A.   Yes.
7     Q.   So they had a total net worth, that is,
8   Interpal, in December of '01 at probably over
9   3 million dollars?
10    A.   No.  Oh, sorry, 3 million dollars, yes,
11  beg your pardon.
12    Q.   And they were getting -- when you say
13  total donations of 4.2 million pounds, was that per
14  year?
15    A.   That was that particular year, yes
16  (indicating).
17    Q.   The 2001 year?
18    A.   Yes.
19    Q.   That's a lot of money, isn't it?
20    I mean, could that be as much as 6, 7 million
21  dollars?
22         MR. L. FRIEDMAN: I object to the
23         form.
24         THE WITNESS: Depending on the
25         exchange rate at the time.

1   BY MR. WERBNER:
2     Q.   But, I mean, just more or less, wouldn't
3   in 2001, if they had annual donations exceeding
4   4 million pounds, that certainly exceeded 5 or
5   6 million dollars at the time, wouldn't it?
6          MR. L. FRIEDMAN: Object to the form.
7          THE WITNESS: Yes.
8   BY MR. WERBNER:
9     Q.   So that was a lot of money flowing into
10  their bank accounts, would you agree?
11    A.   I'm not sure whether I can really answer
12  whether it's a lot of money or not.  It would be a
13  lot of money if I had it, but compared to other
14  charities it might not be a lot of money, so I'm not
15  sure whether I can really answer yes or no to that
16  question.
17    Q.   Would it be a fair conclusion from what's
18  contained in this memo that you prepared this
19  sometime in 2002, since you referred to the December
20  '01 financial figures and noted a report to the
21  fraud office about Interpal in January of '02?
22         MR. L. FRIEDMAN: I object to the
23         form.
24         THE WITNESS: I -- I don't know when
25         I prepared it.

1   BY MR. WERBNER:
2     Q.   And then you say "It was in July of '02
3   that the fraud office reported the account to the
4   authorities."
5     Do you see that?
6     A.   Yes.
7     Q.   So certainly, it was prepared after July
8   of '02?
9     A.   Yes.
10         MR. WERBNER: Let's change tape.
11         THE VIDEOGRAPHER: Going off the
12         record, 5:15.  This is the end of Tape 3,
13         Volume 1 of Belinda Lane's deposition.
14         Thank you.
15         (Recess taken at 5:15 p.m.)
16         (Resumed at 5:24 p.m.)
17         THE VIDEOGRAPHER: This is the
18         beginning of Tape 4, Volume 1, and a
19         continuation in the deposition of Belinda
20         Lane.  On the record, 5:24.
21  BY MR. WERBNER:
22    Q.   Approximately what year was it, Ms. Lane,
23  when you went through your divorce?
24    A.   Do I have to answer that question?
25    Q.   What year?

1          MR. L. FRIEDMAN: Can you tell us
2          what that has to do with anything?
3   BY MR. WERBNER:
4     Q.   Well, I don't know.  Was it 2002, 2003,
5   2001, 1999?
6     A.   It was -- my actual divorce was -- again,
7   I can't -- I can't be clear on the date.  Probably
8   about 2005 or 6, but it -- my husband left before
9   that, so it took quite a long time for us to
10  eventually get around to divorce.
11    Q.   I don't mean to pry, but in your view,
12  does your marital or family situation have anything
13  to do with what you were doing or not doing as a
14  relationship manager with Interpal?
15    A.   No.
16    Q.   What is a Streamline account, as that
17  term was used by NatWest?
18    A.   Streamline is the system that's used for
19  receiving payments.  No, just a moment.  I am
20  getting confused here.
21    Streamline?  It's the system by which people
22  can receive credit card and debit card payments; so
23  if you go into a shop with your card and you want to
24  pay for something (indicating), they would use the
25  Streamline system, and they will have a Streamline

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                                    Page 285

1   machine and they will swipe your card and you will
2   pay.
3       Q.   So I am a lawyer doing business in London
4   with NatWest, and I want my client to be able to pay
5   my fees through a credit card.
6       Would I need to be somehow enrolled in a
7   Streamline account?
8       A.   Yes.
9       Q.   Did Interpal have a Streamline account at
10  NatWest so that they could get monies through credit
11  card charges?
12      A.   I believe they did.
13      I think there may have been a reference to
14  Streamline in one of these documents (indicating).
15      Q.   If there is a reference in these NatWest
16  documents about Interpal and a Streamline account,
17  it would be this ability to get monies through
18  credit card charges?
19      A.   Yes.
20      Q.   Let me hand you what's been marked as
21  Lane Exhibit 11, please, ma'am.  It has the Bates
22  number NW 13639.
23      A.   Thank you.
24      Q.   It's one page.
25      It appears to be a synopsis of a customer

---

HIGHLY CONFIDENTIAL                                    Page 286

1   meeting that you had with Interpal.  Let me know
2   when you have had a chance to look over that.
3       A.   Yes.
4       Q.   Is this, Lane Deposition Exhibit No. 12,
5   a true and correct copy of a --
6       A.   It's 6.
7       Exhibit No. 11, not 12.
8       Q.   I apologize.  Let me rephrase.
9       You have Lane Deposition Exhibit 11 in front of
10  you, correct?
11      A.   Yes.
12      Q.   Is that a true and correct copy of a
13  record you made on or about 27 January, 2003
14  concerning your meeting with Interpal?
15      A.   Yes.
16      Q.   And did you make this record in the
17  course of your business?
18      A.   Yes.
19      Q.   And did you keep a copy as part of the
20  regular business of being a relationship manager at
21  NatWest for Interpal?
22      A.   There would have been a copy placed in
23  the file, yes.
24      Q.   And that would have been your routine
25  business --

---

HIGHLY CONFIDENTIAL                                    Page 287

1       A.   Yes.
2       Q.   -- practice?
3       And is the handwriting on here something you
4   can recognize?
5       A.   That's not my handwriting, no.
6       Q.   Do you know whose it is?
7       A.   I don't know whose it is.  I could make
8   a --
9       Q.   Educated guess?
10      A.   -- guess.
11      Q.   Terry Woodley?
12      A.   Terry Woodley.
13      Q.   Is that in part because he was your
14  assistant and he attended the meeting as shown on
15  the exhibit?
16      A.   Yes.
17      Q.   So again, not holding you to life or
18  death, but is it your best belief that that's Terry
19  Woodley's handwriting?
20      A.   Yes.
21      Q.   And is Terry a he or a she?
22      A.   He.
23      Q.   And so does this record enable to you say
24  that at the end of January '03, Interpal was in
25  Cricklewood?

---

HIGHLY CONFIDENTIAL                                    Page 288

1       A.   Yes.
2       Q.   And as a result of that, are you better
3   able to say whether that was the new place or the
4   old place, or not really?
5       A.   That would have been the new place.
6       Q.   All right.  Do you know if -- if this
7   meeting at the end of January '03 was the first time
8   you had been at their new location in Cricklewood?
9       A.   No, because the -- Exhibit 3, 20th of
10  March 2002, also says Cricklewood.
11      Q.   All right.  Did the earlier meeting
12  indicate where their location was in an earlier
13  point in time?
14      A.   Not that I can recall.
15      Q.   All right.  When you say at the beginning
16  of this exhibit, "Please see interview note from
17  last year dated 20 March of '02," who are you saying
18  to please see?
19      Just the bank as a whole?
20      A.   I think -- yes, I think that's --
21      MR. L. FRIEDMAN: Object to the form.
22      THE WITNESS: -- just a note.
23      MR. L. FRIEDMAN: Go ahead.
24      THE WITNESS: I think that's just a
25  note referring to that interview note,

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.

BELINDA LANE - Vol. 1
June 24, 2008

---

HIGHLY CONFIDENTIAL                    Page 289

1        because that contains some detail.
2    BY MR. WERBNER:
3        Q.   But when you say "please see," you just
4    mean for the NatWest businesspeople?
5        A.   Yes.
6             MR. L. FRIEDMAN: Object to the form.
7    BY MR. WERBNER:
8        Q.   And you note in this deposition, Lane
9    Exhibit 11, that they are getting 40 percent of
10   their revenues from abroad, correct?
11       A.   Yes.
12       Q.   And you say they have renegotiated their
13   lease in Cricklewood for another five years.
14       Do you see that?
15       A.   Yes.
16       Q.   And you are noting that though you
17   haven't seen the audited accounts for '02, and of
18   course you are writing this still in January of '03,
19   right?
20       A.   Yes.
21       Q.   So you are expecting to receive those
22   later in '03 for the '02 year?
23       A.   I would -- I would hope to receive them
24   in 2003.
25       Q.   But they told you at the end of January

---

HIGHLY CONFIDENTIAL                    Page 290

1    '03, according to Lane Exhibit 11, that their
2    revenues were once again increasing, correct?
3        A.   Yes.
4        Q.   And that they were going to be more in
5    '02 than the 4.2 million pounds they had been in
6    '01?
7        A.   Yes.
8        Q.   And you noted that they were getting
9    monies from, among other places, from Saudi Arabia,
10   Yemen, Bahrain and Kuwait, correct?
11            MR. L. FRIEDMAN: Object to the form.
12            THE WITNESS: Yes, there's a few
13       other countries as well on there
14       (indicating) that --
15   BY MR. WERBNER:
16       Q.   Uh-huh.
17       A.   -- were not.
18       Q.   And there's a note here that -- that a
19   lot of people are -- are bringing cash to Interpal
20   into the NatWest branch in Cricklewood?  Is that a
21   correct reading of this memo?
22            MR. L. FRIEDMAN: Object to form.
23            THE WITNESS: No, it was customers of
24       Interpal taking their own deposits that
25       they received into the branch, not -- not

---

HIGHLY CONFIDENTIAL                    Page 291

1        other -- other people.
2    BY MR. WERBNER:
3        Q.   Clarify.  I'm not sure I understand.
4        A.   You say "people" --
5        Q.   Say it the right way.
6        A.   Right, so it was the staff of Interpal,
7    when they received the deposits, they would take
8    those monies into the branch.
9        Q.   In cash?
10       A.   Yes, they -- well, yes, coin and cash
11   (indicating).
12       Q.   And -- and these Interpal people were
13   bringing cash deposits to the NatWest branch located
14   in Cricklewood --
15       A.   Yes.
16       Q.   -- in North London?
17       A.   Yes.
18       Q.   And that was something that you noted in
19   Lane Exhibit 11?
20       A.   Yes.
21       Q.   Now, what is RMP (indicating) as referred
22   to down at the bottom of the memo?
23       A.   Oh, RMP is our internal paper to our
24   credit department when we request, for example,
25   documentary credit facilities.

---

HIGHLY CONFIDENTIAL                    Page 292

1        Q.   Do you know what RMP stands for --
2        A.   Oh --
3        Q.   -- more or less?
4        A.   Relationship manager platform.
5        Q.   Was that kind of some sort of software
6    to --
7        A.   Yes.
8        Q.   -- to -- and what is RM4?
9        A.   That was Terry Woodley's title.
10       Q.   What was your title?  You are like 007
11   and he's 008?  I mean --
12       A.   No.
13            MR. L. FRIEDMAN: Object to the form.
14            THE WITNESS: I was commercial
15       manager.
16   BY MR. WERBNER:
17       Q.   I mean -- but RM4 is -- is -- is a
18   reference to Terry Woodley?
19       A.   Yes.
20       Q.   Who was RM1, 2, and 3?
21       A.   We didn't have RMs 1, 2, and 3.  That was
22   just what they were called, RM4.
23       Q.   Oh, all of them?
24       A.   All of the assistants to the manager are
25   RM4.

---

**EXHIBIT 39 to Declaration of Joel Israel**

20/06 '01  14:51  ☏0000000                                                    ☐001



**INTERPAL**
الصندوق الفلسطيني للاغاثة والتنمية
HELPING PALESTINIANS IN NEED

P.O. Box 3333
London
NW6 1RW
Tel: 020 8450 8002
Fax: 020 8450 8004
E-mail: info@interpal.org
Website: www.interpal.org
**Our Ref: (5583)**
**Date:** 20 June 2001

Ms. Belinda Lane          IBC
Business Manager
NatWest PLC
Islington Business Centre
Fax No: 020-8344 1069

Dear Belinda,   IBC

## URGENT

### New US$ Sub-Account

The Trustees of INTERPAL wish to open a new US Dollar Sub-Account under the name I'tilafu al-Khayr (Union for Good) to facilitate our latest international fundraising campaign. We should be grateful if you could assist in this matter, and open this new sub-account at the earliest possile opportunity as a matter of urgency. The new account is to be a current account. We would require paying-in books, but not cheque books.

Thank you for your kind attention, and we look forward to your reply and receiving details of the new sub-account soon.

Yours sincerely;

J. Qundil
Secretary to the Trustees

I. Hewitt
Chairman of the Trustees

I confirm that the account can be opened.
Please link to 140 03302822

Beni

Registered Charity No. 1040094

HIGHLY CONFIDENTIAL                                                          NW 013415

**EXHIBIT 40 to Declaration of Joel Israel**

# M. YUNUS & CO.

Chartered Accountants & Registered Auditors

950 Romford Road
London E7 8BD
Tel: 020  8257 7400
Fax 020  8257 0040

The Manager
National Westminster Bank Plc
Finsbury Park
198 Seven Sisters Road
London
N4 2BW

*To: General Queries*
*D/W*
*Checked*
*& Note*
*31/8/01*

15 August 2001

Our Ref : MY

Dear Sir/Madam,

**Re : Palestinians Relief & Development Fund -Interpal -Y/E 31.12.2000**

In accordance with the agreed practice for provision of information
to auditors , please forward information on our above mutual client
as detailed below or behalf of the bank , its branches and subsidiaries .
This request and your response will not create any contractual or
other duty with us.

**Audit confirmation date : 31.12.2000**

Information required   Standard

The authority to disclose the information is already held by the bank

Yours faithfully,

M  Yunus & Co

HIGHLY CONFIDENTIAL

## Palestinian Relief & Development Fund - INTERPAL

Bank Details:     NatWest Bank PLC.
Finsbury Park Branch
298 Seven Sisters Road
London
N4 2AF
(Tel: 020-8805 7000)

Bank Sort Code Number:   60-08-22

## STERLING ACCOUNTS

### INTERPAL:

- Main Account No:          95142940

- Admin Account No:         95142983

- Children Account No:      95142975

- Zakat Account No:         95142967

- Families Account No:      95145397

- Interest Account No:       95142959

- ████████████████████

## FOREIGN CURRENCY ACCOUNTS

### INTERPAL:

- Main US$ A/C No:       140-00-04156838

- US$ A/C No:            ████████

- Families US$ A/C No:

- Islamic Heritage US$ A/C No:

- (Business Currency Reserve) A/C No:

- I'tilafu Al-Khayr US$ A/C No:   140-00-08537933

- Euro A/C No:           ████████

HIGHLY CONFIDENTIAL



**INTERPAL**
السندوق الفلسطينى للاغاثة والتنمية
HELPING PALESTINIANS IN NEED

PO BOX 5157
London
NW6 1RW
Tel  020 8450 8002
Fax  020 8450 8004
E-mail  info@interpal.org
Website: www.interpal.org

**Our Ref: (5801)**
**Date:** 15 August 2001

FAO: Ms. Belinda Lane
Business Manager
NatWest PLC
Islington Business Centre
Fax No. 020-8344 1069

Dear Belinda,

Please find attached a letter of information request from our Auditors sent to your bank.  As a matter of urgency we would be most appreciative should you follow this up.

For your convenience please also find attached a list of the bank accounts relating to INTERPAL.

Thank you for your kind attention and we look forward to your reply.

Yours sincerely,

J. Qundil
Secretary to the Trustees

HIGHLY CONFIDENTIAL

**EXHIBIT 41 to Declaration of Joel Israel**



# INTERPAL

الصندوق الفلسطيني للاغاثة والتنمية

P.O. Box 3333
London,  NW6 1RW
Tel: 0181 450 8002
Fax: 0181 450 8004
**Our Ref:** IBT/06/99
**Date:** 24 June 1999

## INTERPAL Board of Trustees
*Up-to-date List*

Please accept this as the current up-to-date list of the INTERPAL Board of Trustees as at 24 June 1999:

| Name | Date of Appointment | Date of Resignation |
|------|---------------------|---------------------|
| Mr. Essam Y. Mustafa (Founder) | July 1994 | --- |
| Mr. Mahfuzh Safiee (Founder) | July 1994 | --- |
| Dr. Issam Shaker (Founder) | July 1994 | --- |
| Mr. Ghassan Faour | 16 September 1997 | --- |
| Mr. Ismail Ginwala | 21 September 1996 | --- |
| Mr. Ibrahim Brian Hewitt | 21 September 1996 | --- |
| Mr. Shahan Izzat Husain | 21 september 1996 | --- |
| Dr. Abdul Karim Vania | 2 December 1997 | --- |
| Dr. Abdul Rahim Nassrullah (Founder) | July 1994 | 21 September 1996 |
| Dr. Mustafa Tolba (Founder) | July 1994 | 16 September 1997 |
| Mr. Abdel Rahman Abou Daya (Founder) | July 1994 | 28 February 1998 |

Signed;



J. Qundil
Administration Manager &
Secretary to the Trustees

Registered Charity No. 1040094

HIGHLY CONFIDENTIAL

NW 013279

**EXHIBIT 42 to Declaration of Joel Israel**
**(Bank Transfer, 9 pages)**

**This document has been filed Under Seal**