**EXHIBIT 55 to Declaration of Joel Israel**

## Case Summary



|  | Money laundering disclosure | | | | NCIS |
|---|---|---|---|---|---|

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |
|---|---|---|---|---|

**Incident Data**

| | | | | **Linked Cases** |
|---|---|---|---|---|
| **Control Authority** | Group Financial Crime 1 | **Status** | Open **Source:** [GK2:710368] | 617044 NONE Account |
| **Review Date** | | by | | 666593 auto-linked |
| **Remote Delivery Channel** | N | **High Profile** | Y 27 Aug 2003 00:00 | 666814 NONE Account |
| **Created on** | 27 Aug 2003 00:00 | by | EUROPA_Irelanp | 704079 auto-linked |
| **Last Modified on** | 24 Sep 2003 00:00 | by | RBS_Ohearaa | Maintain Links |

| Queries | **Refer To** | Tel No. | **Business** NONE | **Unable to contact ?** Yes |
|---|---|---|---|---|

**Money laundering disclosure Record**

| **Submitting Branch** | GI&F Edinburgh | **Submitted By** | TONY O'HEAR |
|---|---|---|---|
| **Submitting Unit Sortcode** | | **Contact No** | 0131 523 1565 |
| **Submitting Department** | None | **Legislation** | POTA |
| **Estimated Laundering Total** | 0 <Unknown> | | |

**Reason(s) for Suspicion**

Suspected terrorist funding

Please see attachments and/or Case Notes where available for further information

**Transactions  GBP  0.00**                                                                    Add

-None-

Set All Risk Ratings to the the same value of:-    Amber  Blue  Green  Indigo  Red

**Personal Data**                                                                                Add

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| HEWITT | IBRAHAM BRIAN | | M | NONE | Red | Red | Edit |
| MUSTAFA | E | 17 Nov 1955 | M | NONE | Red | Red | Edit |
| QUNDIL | J | | M | NONE | Red | Red | Edit |
| SAFIEE | MAHFOUZH | | M | NONE | Red | Red | Edit |

**Business Data**                                                                                Add

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|
| PALESTINIANS RELIEF & DEVELOPMENT FUND | | UNITED KINGDOM | NONE | Red | Red | Edit |

HIGHLY CONFIDENTIAL                                                          NW 052114

## Telephone Data

Add

-None-

## Address Data

Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|---|---|---|---|---|---|---|
| PO BOX 333 | | LONDON | NW6 1RW | Red | Red | Edit |

## Account Data

Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| PALESTINIANS RELIEF & DEVELOPMENT FUND | | 60-08-22 | Currency Account | Euro | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL UNION FOR | | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |
| PALESTINAINS RELIEF | | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL WAQF ACCOU | | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL FAMILIES | 95145397 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL ADMINISTRA | 95142983 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL CHILDRENS | 95142975 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL ZAKAT FUND | 95142967 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL INTEREST M | 95142959 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS RELIEF & DEVELOPMENT FUND - INTERPAL | 95142940 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |

## Miscellaneous Data

Add

-None-

## Case Notes

Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Case notes | 24 Sep 2003 | Migrated | Agree Disclosure 27 August 2003 - TOH TOH - 28 August receiv | View |
| Summary and Assessment | 24 Sep 2003 | Migrated | The Palestine Development and Relief Fund, Registered Charit | View |
| Conclusion | 24 Sep 2003 | Migrated | On the basis of the information available to us at the prese | View |

## Key Correspondence

| Upload Doc Title | Author | User | Date | Add |
|---|---|---|---|---|

HIGHLY CONFIDENTIAL

NW 052115

| OFAC LIST | EUROPA\Irelanp GK2 | | 17 Sep 2003 | View | Edit |
|---|---|---|---|---|---|
| Account Signatories | EUROPA\Irelanp GK2 | | 17 Sep 2003 | View | Edit |

| NCIS Disclosures | Author | Date | | | |
|---|---|---|---|---|---|
| NCIS Disclosure 315666 (R) | RBS\Ohearaa | 28 Aug 2003 | Amend NCIS Number | | |

**No CIFAS Reports**

HIGHLY CONFIDENTIAL                                                          NW 052116

Case notes History for Case 710368

Page 1 of 1

---

**1. User:** Migrated          **On:**      24 Sep 2003 00:00                    Print    Copy

**Note:** Agree Disclosure 27 August 2003 - TOH TOH - 28 August received phone call from DS Neill Bennett, NTFIU @ Special Branch, who was fully aware of ███ involvement of ███ ███ ████████████ telephone call 0207 230 3302, of all transactions above £10k. In Neill's absence we should speak to a Mark Ashtown.TOH - 29 Aug Spoke to Terry Woodley, Romford Commercial Office, Commercial Banking who is responsible for ensuring that no items are paid on the accounts that have not been authorised by the Charities Commission. He will send me details of all entries for info and ██ ███ ████ ████ ██████████ TOH - 24 Sep Advice now received that the Charities Commission has now unfrozen this charity's bank accounts. Consequently, the trustees are now free to operate the bank accounts without any further recourse to the Commission. For further info please see the the Commission's webpage www.charitycommission.gov.uk.

---

HIGHLY CONFIDENTIAL

NW 052117

**1. User:** Migrated          **On:**      24 Sep 2003 00:00                    Print    Copy

**Note:**

HIGHLY CONFIDENTIAL

NW 052118

Conclusion History for Case 710368

**1. User:** Migrated          **On:**    24 Sep 2003 00:00                          Print    Copy

**Note:** On the basis of the information available to us at the present time, it is considered that the above incident / activity may constitute or involve money laundering and consequently a disclosure has been made to the National Criminal Intelligence Service or other appropriate authorities.

HIGHLY CONFIDENTIAL

NW 052119

HIGHLY CONFIDENTIAL

NW 052120

## NatWest — ISV Account Enquiry

LBW Version

| | | | |
|---|---|---|---|
| Sort Code | | Branch Name | |
| Account No | | Account Name | |
| Group Code | | Signatory Name | |

Signatures returned

Account Type BUSINESS CURRENT

Large Size Images

Enter          Amend Enquiry     New Enquiry     Exit Group

Signing Rules

Last Updated

| Row Signatory | Designation | Signature | Last Updated | Signing Group |
|---|---|---|---|---|

HIGHLY CONFIDENTIAL

NW 052121

## NCIS Disclosure for Case 710368 ( Received )

Close          Print

**Core NCIS details created on 28 Aug 2003 by RBS\Ohearaa       [ Submitted by
RBS\Ohearaa on 28-AUG-03 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | GI&F |
| Disclosure Date | 28 Aug 2003 | | |
| Branch / Outlet | London, Finsbury Park | | |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | | Postcode |



Text

HIGHLY CONFIDENTIAL                                                          NW 052122

GK3 Edit NCIS Main

Page 2 of 2

Common Name ████████                                    Number ███

Postcode          NW6 1RW

HIGHLY CONFIDENTIAL

NW 052123

**EXHIBIT 56 to Declaration of Joel Israel**



## Case Summary

| | Intelligence and Suspect Approach | | | | NCIS |

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |

**Incident Data**

**Linked Cases**

| Control Authority | Group Enterprise Risk | **Status** | Closed **Source:** [GK2:710397] | 617044 | Address auto-linked |
| **Review Date** | | by | | | |
| **Remote Delivery Channel** | N | **High Profile** | N | 647655 | Business auto-linked |
| **Created on** | 27 Aug 2003 00:00 | by | EUROPA_Connodb | 713568 | Business auto-linked |
| **Last Modified on** | 25 Sep 2003 00:00 | by | EUROPA_Brandd | | |
| | | | | 1085898 | Business auto-linked |

Maintain Links

| Queries | **Refer To** | Tel No. | **Business** | **Unable to contact ?** |
| | | | NONE | Yes |

**Intelligence and Suspect Approach Record**

**Approach To**  RBS Group

**Reason For Concern:**

Other (see Summary and Assessment field)

Set All Risk Ratings to the the same value of:-   Amber  Blue  Green  Indigo  Red

**Personal Data**                                                                                          Add

-None-

**Business Data**                                                                                          Add

| **Business/Org Name** | Company Ref. No. | Legal Jurisdiction | Key Information | **Risk** | **Adj** | |
|---|---|---|---|---|---|---|
| AL-SANDUQ AL-FILISTINI LIL-IGHATHA | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| INTERPAL | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINE & LEBANON RELIEF FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINE DEVELOPMENT & RELIEF FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINE RELIEF & DEVELOPMENT FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINE RELIEF FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |

HIGHLY CONFIDENTIAL

NW 052124

| | | | | | | |
|---|---|---|---|---|---|---|
| PALESTINIAN AID & SUPPORT FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINIAN RELIEF & DEVELOPMENT FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PALESTINIAN RELIEF FUND | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| PRDF | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| RELIEF & DEVELOPMENT FUND FOR PALESTINE | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| WELFARE & DEVELOPMENT FUND FOR PALESTINE | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |
| WELFARE & DEVELOPMENT FUND OF PALESTINE | 1040094 | UNITED KINGDOM | NONE | Red | Red | Edit |

**Telephone Data**                                                                                          Add

-None-

**Address Data**                                                                                          Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|---|---|---|---|---|---|---|
| PO BOX 3333 | | LONDON, ENGLAND | NW6 1RW | Red | Red | Edit |

**Account Data**                                                                                          Add

-None-

**Miscellaneous Data**                                                                                     Add

-None-

**Case Notes**                                                                                             Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Case notes | 25 Sep 2003 | Migrated | Other Information:n.k.a INTERPAL (a.k.a. AL-SANDUQ AL-FILIST | View |
| Summary and Assessment | 25 Sep 2003 | Migrated | This name(s) appears on a Sanctions & Terrorism Financing Gr | View |
| Conclusion | 25 Sep 2003 | Migrated | Any approaches from or relationships held with the named par | View |

**Key Correspondence**

| Upload Doc Title | Author | User | Date | | |
|---|---|---|---|---|---|
| Search List | EUROPA\Connodb | GK2 | 27 Aug 2003 | View | Edit |

**No NCIS Disclosures**

**No CIFAS Reports**

HIGHLY CONFIDENTIAL

NW 052125

| **1. User:** Migrated | **On:** | 25 Sep 2003 00:00 | Print | Copy |
|---|---|---|---|---|

**Note:** Other Information:n.k.a INTERPAL (a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA; a.k.a. AL-SANDUQ AL-FILISTINI LIL-IGHATHA WA AL-TANMIYA; a.k.a. PALESTINE DEVELOPMENT AND RELIEF FUND; a.k.a. PALESTINE RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINE RELIEF FUND; a.k.a. PALESTINIAN AID AND SUPPORT FUND; a.k.a. PALESTINIAN RELIEF AND DEVELOPMENT FUND; a.k.a. PALESTINIAN RELIEF FUND; a.k.a. PALESTINE AND LEBANON RELIEF FUND; a.k.a. PRDF; a.k.a. RELIEF AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND FOR PALESTINE; a.k.a. WELFARE AND DEVELOPMENT FUND OF PALESTINE)Effective 24/09/03, the Charities Commision concluded their investigations into this Charity and their web site confirmed that no wrong doings were uncovered. In addition, contact made with the US Government to obtain tangible evidence to support their previous comments, was not forthcoming. The Bank has given agreement to release the block against all accounts held within this connection. Registered Charity No: 1040094

HIGHLY CONFIDENTIAL

NW 052126

| **1. User:** Migrated | **On:** | 25 Sep 2003 00:00 | | Print | Copy | |

**Note:** This name(s) appears on a Sanctions & Terrorism Financing Group-wide database search
instruction, circulated under Group Risk Management search reference GRM TER 26_08_03
(source: Bank of England, Terrorist Financing and Office of Foreign Assets Control (OFAC),
Terrorism Categories). Refer to the attachment on this file to view the electronic version of
the search list.

HIGHLY CONFIDENTIAL                                                              NW 052127

Conclusion History for Case 710397

Page 1 of 1

| **1. User:** Migrated | **On:** | 25 Sep 2003 00:00 | Print | Copy | |
|---|---|---|---|---|---|

**Note:** Any approaches from or relationships held with the named party(s) on this record should immediately be reported to Group Risk Management.

HIGHLY CONFIDENTIAL

NW 052128

**EXHIBIT 57 to Declaration of Joel Israel**

## Case Summary



| **Money laundering suspicion** | | | | · 外 % | **NCIS** |
|---|---|---|---|---|---|

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |
|---|---|---|---|---|

**Incident Data**

| | | | | | **Linked Cases** |
|---|---|---|---|---|---|
| **Control Authority** | Payment Operations | **Status** | Open | **Source:** [GK2:666593] | 617044 NONE |
| **Review Date** | | by | | | 666814 NONE |
| **Remote Delivery Channel** | N | **High Profile** | Y 22 Aug 2003 00:00 | | 704079 NONE |
| **Created on** | 14 Jun 2002 00:00 | by | RBS_Allenbc | | 710368 Account auto-linked |
| **Last Modified on** | 22 Aug 2003 00:00 | by | RBS Hoseasm | | 1748664 Account auto-linked |

Maintain Links

| **Queries** | **Refer To** | **Tel No.** | **Business** | **Unable to contact ?** |
|---|---|---|---|---|
| | | | NONE | Yes |

**Money laundering suspicion Record**

| **Submitting Branch** | 600822/ | **Submitted By** | FINSBURY PARK |
|---|---|---|---|
| **Submitting Unit Sortcode** | | **Contact No** | 7 8067 6840 |
| **Submitting Department** | Payment & Trade Operations | **Legislation** | POTA |
| **Estimated Laundering Total** | 0 <Unknown> | | |

**Reason(s) for Suspicion**

Payments to / from blacklisted or high risk countries

Please see attachments and/or Case Notes where available for further information

Other (see Summary and Assessment field)

| **Transactions** **GBP 0.00** | | | | | Add |
|---|---|---|---|---|---|
| **Date** | **Type** | | **Amount** | **Currency** | |
| ▬▬▬▬ | Transaction Other | | ▬▬▬▬▬▬ | | Edit |

**Set All Risk Ratings to the the same value of:-** Amber Blue Green Indigo Red

| **Personal Data** | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| -None- | | | | | | | |

| **Business Data** | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Business/Org Name** | **Company Ref. No.** | **Legal Jurisdiction** | **Key Information** | **Risk** | **Adj** | | |
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | | UNITED KINGDOM | NONE | Green | Green | | Edit |

| **Telephone Data** | Add |
|---|---|

HIGHLY CONFIDENTIAL

NW 052133

-None-

| Address Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Bldg No. & Name** | **Street** | | **Town** | **Postcode** | **Risk** | **Adj** | |
| | PO BOX 3333 | | LONDON | NW6 1RW | Green | Green | Edit |

| Account Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Account Name** | **Account No.** | **Sortcode** | **Account Type** | **Currency** | **Risk** | **Adj** | |
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | 95142983 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | 95142975 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | 95142940 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS DEVELOPMENT FUND-INTERHAL | 140 0 04156838 | 60-08-22 | Currency Account | US Dollar | Green | Green | Edit |

| Miscellaneous Data | Add |
|---|---|

-None-

| Case Notes | | | | Add |
|---|---|---|---|---|
| **Type** | **Date** | **User** | **Text** | |
| Case notes | 22 Aug 2003 | | Migrated Agreed, no disclosure. MH | View |
| Summary and Assessment | 22 Aug 2003 | Migrated | This connection was reported due to a sizeable credit origin | View |
| Conclusion | 22 Aug 2003 | Migrated | From the information available at the date of this record, i | View |

| Key Correspondence | | | | | |
|---|---|---|---|---|---|
| **Upload Doc Title** | **Author** | **User** | **Date** | | Add |
| SUSPICION REPORT | RBS\Allenbc | GK2 | 17 Jun 2002 | View | Edit |
| SUSPICION REPORT | RBS\Allenbc | GK2 | 17 Jun 2002 | View | Edit |

**No NCIS Disclosures**

**No CIFAS Reports**

HIGHLY CONFIDENTIAL

NW 052134

Case notes History for Case 666593

Page 1 of 1

| 1. **User:** | Migrated | **On:** | 22 Aug 2003 00:00 | | Print | Copy | Delete |
|---|---|---|---|---|---|---|---|
| **Note:** | Agreed, no disclosure. MH | | | | | | |

HIGHLY CONFIDENTIAL

NW 052135

Summary and Assessment History for Case 666593                                    Page 1 of 1

**1. User:** Migrated        **On:**      22 Aug 2003 00:00          Print    Copy    ░░░░░

**Note:** This connection was reported due to a sizeable credit originating from ░░░░░ which was received in to the account on ░░░░░░░. Palestinians Development Fund has been the subject of previous disclosures and we are aware NTFIU are undertaking their own investigations. The payment is consistent with our knowledge of this customer's humanitarian aid activities and a further disclosure is not considered necessary at this stage.

HIGHLY CONFIDENTIAL                                                      NW 052136

Conclusion History for Case 666593

Page 1 of 1

| **1. User:** Migrated | **On:** | 22 Aug 2003 00:00 | | Print | Copy | Delete |

**Note:** From the information available at the date of this record, it is considered that there are insufficient grounds to make a financial disclosure. Please see attached documents for further information relating to the suspicion report. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL

NW 052137

666593.

(HP ?)

**The Royal Bank of Scotland**

**Corporate Banking  Money Laundering Suspicion Report Form**

| Branch/Department | Crossfield PKR | | Sort Code | 60-08-32 |
|---|---|---|---|---|

Surname/Business name: Palestinians Development Fund - Interpal
Forename(s):
Date of Birth:

Male/Female | Nationality (if known)

Address (include postcode): PO Box 3333  London NW 6 - 1RW
Additional/Previous Addresses: Registered
Flat 60  Clark Court  Skelton Crescent  London NW10 - 525

Telephone No:

No & Country of issue of Passport or other ID document seen/source of introduction/reference taken.
Companies - Date of Country of Incorporation/registered No:

Account No(s):
1. - 95142360
2. - 95142975
3. - 95142973
4. - 9520574

Account Type

Date Opened
140/0/041 56238   550/0/08524852

Date when Relationship with Bank started: 4/10/1994.

Stated Occupation: as Name.

Name & Address of Employer:

| Additional/Associated Names: | Date of Birth: | In Account | Address, esp P/Code/Passport No etc. |
|---|---|---|---|

**Transaction Details** | **Account Number**

| Date | Amount | Dr/Cr. | Source/Destination e.g. Cash/Chq/UT/St/CHAPS to/from. |
|---|---|---|---|
| ██████████████████████████████████ | | | |

Reasons for Suspicion

Officials Names — E. Mustafa, Ibrahim Bman Hewitt, J Lundell, Mahfouzh Safeer

Direct access customer to IBC S.E. a City when contacted to advise of receipt of moneys Mr Lundell (see above) commented the funds had been expected from ████

Connection between ████, al Qaeda and present Middle East situation cannot be ignored.

HIGHLY CONFIDENTIAL

NW 052138

**The Royal Bank of Scotland**

## Corporate Banking  Money Laundering Suspicion Report Form

*...handwritten... not feel ... was accepted ... sign as fixed (is they not )*

**Security & safe Custody hold (brief details only)**

**Boxes & Parcels hold**

**Special Signing Instructions. e.g. Third party mandates.**

**If a company/partnership etc attach a copy of mandate**

**Other accounts known to be held (including Building Societies)**

**Status Enquiries Received**

| Nature of Suspected Offence | Drug Trafficking |
| *Possible connection - to funding terrorism in Middle East* | Terrorism ✓ |
| | Other crime |

| Branch / Depart Ref: *Inv... Agency* BC CITY | Name of Contact *N. MORRISON* | Tel/ ITS Ext. *7- 3082 -6543* |
| Signed: *N. Morrison* | Senior Officer/Manager | Date *3/4/2002* |

*Stewart Hawthorne Manager*

HIGHLY CONFIDENTIAL

NW 052139

**EXHIBIT 58 to Declaration of Joel Israel**
**(Bank Transfer, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 59 to Declaration of Joel Israel**
**(Bank Transfer, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 60 to Declaration of Joel Israel**
**(Bank Transfers, 61 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 61 to Declaration of Joel Israel**
**(Bank Transfers, 91 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 62 to Declaration of Joel Israel**

Branch

ITS No        601 165 12345
ITS Facsimile 601 165 7768
Telephone     0181 123 6 786

# internal memo

To  C McComas
     Group Investigations & Fraud

**♻ NatWest**

From  Belinda Lane
       Commercial Manager

Date  15 July 2002

Ref

## Palestinian Relief & Development Fund – Interpal – Group Fraud Ref: 666814

- Acc opened with NWB 10/94 – charity formed 8/94
- Registered charity no 1040094 – 8 trustees
- Copy of mandate attached (trust deed held if required)
- Jihad Qundil has been only point of contact who was recently re-identified together with M Safiee in accordance with KYC procedures
- Provide charitable relief to refugees in Israel, West Bank & Gaza and Lebanon – developed out of former charity which provided relief to Kuwait
- Main doners are Muslim communities in the UK, USA and Saudi Arabia
- Please see my iv note dated 20 March 2002 attached which explains the increased activity seen on the account
- Customers hold funds in current accounts as it is against their religion to earn interest

HIGHLY CONFIDENTIAL

**EXHIBIT 63 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | O'Hear, Tony |
| **Sent:** | Tuesday, October 14, 2003 3:57 AM |
| **To:** | COLE, Guy, CBFM Compliance; RODGER, Irvine, CBFM Compliance |
| **Cc:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | Interpal |

Guy/Irvine,

Is the monitoring of payment traffic, as outlined by Stephen, possible here ?

Tony O'Hear
Manager, Group Investigations & Fraud
0131 523 3401 Ext 23401

If you would like to know more about Group Investigations & Fraud, please access the Intranet link below.
http://www.manufacturing.rbs.co.uk/gsf/GIF/default.htm

-----Original Message-----
From:   Miller, Fiona (Op Risk)
Sent:   Tuesday, October 14, 2003 8:53 AM
To:     O'Hear, Tony
Subject:    RE: Interpal

Hi Tony,

Hope you had a good holiday - back to reality now!

In similar cases in the past the customer owning compliance function has been responsible for monitoring. In this case CBFM Compliance - Irvine Rodger/Guy Cole should be able to assist.

Hope this helps.

Fiona Miller
Manufacturing Risk Management
2nd Floor, The Broadstone
PO Box 17136
50, South Gyle Crescent
Edinburgh EH12 9UZ

Tel 0131 523 3344
Fax 0131 523 4039

http://www.manufacturing.rbs.co.uk/ManuOpsRisk/

-----Original Message-----
From:   FOSTER, Stephen James, Group Risk Mgmt
Sent:   Monday, October 13, 2003 6:14 PM
To:     O'Hear, Tony
Cc:     Norrie, Ben (Group Risk Mgmt)
Subject:    RE: Interpal

Thanks for this.
I think the main concern now is to ensure that no future payment is made to Hamas. With the restrictions lifted, is there any formal (or even informal) monitoring of the traffic?
What scope is there to use the filtering technology we have in GBS or Payment Ops to monitor?

   NW 013939

-----Original Message-----
From:   O'Hear, Tony
Sent:   13 October 2003 17:32
To:     FOSTER, Stephen James, Group Risk Mgmt
Cc:     Norrie, Ben (Group Risk Mgmt)
Subject:        FW: Interpal

Stephen,

There was no indication of payments being made to HAMAS.

There was a question mark around a payment received from an aid agency in ██████ called the ████████████ ██████████████████████ Following investigations into this particular payment the Charities Commission have been satisfied that this payment was in recompense for aid work already carried out by Interpal.

Happy to discuss further with Ben if required.

Tony O'Hear
Manager, Group Investigations & Fraud
0131 523 3401 Ext 23401

If you would like to know more about Group Investigations & Fraud, please access the Intranet link below.
<http://www.manufacturing.rbs.co.uk/gsf/GIF/default.htm>

-----Original Message-----
From:   FOSTER, Stephen James, Group Risk Mgmt
Sent:   Thursday, October 09, 2003 12:20 PM
To:     Brand, Derek; Hoseason, Michael (Group Fraud); Norrie, Ben (Group Risk Mgmt)
Cc:     O'Hear, Tony
Subject:        RE: Interpal

Thanks

 -----Original Message-----
From:   Brand, Derek
Sent:   09 October 2003 12:20
To:     FOSTER, Stephen James, Group Risk Mgmt; Hoseason, Michael (Group Fraud); Norrie, Ben (Group Risk Mgmt)
Cc:     O'Hear, Tony
Subject:        RE: Interpal

I am not aware of anything intimating that payments may have been made to Hamas.
Tony was running with this in great detail Stephen, but he is on holiday until Monday.
I've copied him into this response in case he can add value.

Regards

Derek Brand
CMAU, Group Investigations & Fraud,
Group Security & Fraud, Manufacturing
Tel - 0131 525 1642
Int - X 21642
Fax - 0131 523 2125

-----Original Message-----
From:   FOSTER, Stephen James, Group Risk Mgmt
Sent:   09 October 2003 12:12
To:     Hoseason, Michael (Group Fraud); Brand, Derek; Norrie, Ben (Group Risk Mgmt)
Subject:        Interpal

FYI tha BOE have written to us ████████████████████████████████████████████████████
████████████████████████████████████████████████

However, they have reminded us that ████████████████████████████████████████ so we need to

HIGHLY CONFIDENTIAL

be freezing funds, reporting etc.   Ben is looking out what we have but do you have anything on possible payments to Hamas?
We will prob need to reply.

Thanks

```
"*******************************************************************"
"     Visit our Internet site at <<http://www.rbsmarkets.com>>        "
"                                                                     "
" This e-mail is intended only for the addressee named above.        "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to      "
" retain, read, copy or disseminate this message or any part of it.  "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB   "
"      Regulated by the Financial Services Authority            "
"*********************************************************************"


"*******************************************************************"
"     Visit our Internet site at <http://www.rbsmarkets.com>          "
"                                                                     "
" This e-mail is intended only for the addressee named above.        "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to      "
" retain, read, copy or disseminate this message or any part of it.  "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB   "
"      Regulated by the Financial Services Authority            "
"*********************************************************************"


"*******************************************************************"
"     Visit our Internet site at http://www.rbsmarkets.com            "
"                                                                     "
" This e-mail is intended only for the addressee named above.        "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to      "
" retain, read, copy or disseminate this message or any part of it.  "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB   "
"      Regulated by the Financial Services Authority            "
"*********************************************************************"
```

HIGHLY CONFIDENTIAL

NW 013941

**EXHIBIT 64 to Declaration of Joel Israel**

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

**Treasury Designates Al-Aqsa International Foundation as Financier of Terror Charity Linked to Funding of the Hamas Terrorist Organization**

5/29/2003

FROM THE OFFICE OF PUBLIC AFFAIRS

JS-439

WASHINGTON, DC � The U.S. Treasury Department has designated the Al-Aqsa Foundation as a Specially Designated Global Terrorist (SDGT) entity under Executive Order 13224. As a result of this designation by Treasury�s Office of Foreign Assets Control (OFAC), all assets of the Al-Aqsa Foundation are blocked and transactions with the organization are prohibited.

�By designating the Al-Aqsa Foundation, we have deprived the Hamas terrorist organization of a vital source of funding and have shut off yet another pipeline of money financing terror. Today�s action demonstrates our commitment to prevent the perversion of charitable organizations for terrorist ends,� Secretary Snow stated.

Al Aqsa is a critical part of Hamas� terrorist support infrastructure. Through its headquarters in Germany and branch offices in the Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere, Al Aqsa funnels money collected for charitable purposes to Hamas terrorists.

Other nations, including the Netherlands, Germany, Denmark, Britain, Luxembourg and Switzerland, have also taken action against the Al-Aqsa Foundation.

The Al Aqsa Foundation is the 18th financier of terror disguised as a charitable organization designated by the Treasury Department. With today�s action, there are now 264 individuals and entities designated as SDGTs and over $137 million in their assets frozen worldwide.

Further details on the Al-Aqsa Foundation are attached.

Background: AL-AQSA FOUNDATION

AKAs: Al-Aqsa International Foundation, Al-Aqsa Charitable Foundation, Sanabil al-Aqsa Charitable Foundation, Al-Aqsa Sinabil Establishment, Al-Aqsa Charitable Organization, Charitable Al-Aqsa Establishment, Mu'assa al-Aqsa al-Khayriyya, Mu'assa Sanabil Al-Aqsa al- Khayriyya, Aqsa Society, Al-Aqsa Islamic Charitable Society, Islamic Charitable Society for al-Aqsa, Charitable Society to Help the Noble al-Aqsa, Nusrat al-Aqsa al-Sharif

The AL-AQSA FOUNDATION is a critical part of Hamas' transnational terrorist support infrastructure. Hamas is designated by the Secretary of State as a Foreign Terrorist Organization (66 Fed. Reg. 51088) and as Specially Designated Global Terrorist (SDGT) under Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons Who commit, Threaten to Commit, or Support Terrorism." Hamas is known to raise at least tens of millions of dollars per year throughout the world using charitable means as cover.

The AL-AQSA FOUNDATION, until recently headquartered in Germany, uses humanitarian relief as cover to provide support to the Hamas terrorist organization. Mahmoud Amr, the Director of the AL-AQSA FOUNDATION in Germany, is an active figure in Hamas. The AL-AQSA FOUNDATION also is known to maintain branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere. AL-AQSA FOUNDATION offices are included in lists of organizations that contributed to the Hamas-affiliated Charity Coalition in 2001 and 2002.

Since the summer of 2002, authorities in The Netherlands, Denmark, Germany and the U.S. have taken administrative and/or law enforcement action against the AL-AQSA FOUNDATION and some of its leaders based on evidence of the organization's support for Hamas and other terrorist groups. Pursuant to a July 31, 2002 administrative order, German authorities closed the AL-AQSA FOUNDATION in Germany for supporting Hamas. In April 2003, Dutch authorities blocked AL-AQSA FOUNDATION assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

Criminal charges against some AL-AQSA FOUNDATION officials were also filed. On January 1, 2003, the Danish government charged three AL-AQSA FOUNDATION officials in Denmark for supporting terrorism. Also, the head of the Yemeni branch of the AL-AQSA FOUNDATION, Shaykh Muhammad Ali Hassan AL-MUAYAD, was arrested for providing support to terrorist organizations including Al-Qaeda and Hamas in January 2003 by German authorities.

In Scandinavia, the Oslo, Norway-based Islamic League used the AL-AQSA FOUNDATION in Sweden to channel funds from some members of the Islamic community in Oslo, Norway to Hamas.

In late 2001 for example, a human courier was used to transfer funds from the Islamic League in Norway to the AL- AQSA FOUNDATION in Sweden. In another instance in 2002, money, gold and jewelry were collected by the Islamic League in (Oslo, Norway) and transferred to the AL-AQSA FOUNDATION in Sweden to be provided to Hamas.

At the Islamic League of Norway's annual conference held on May 18 and 19, 2002, the General Secretary of the Islamic League in Sweden urged all Muslims to provide support and to participate in continuing the suicide operations against Israel. He called for further financial support from all conference participants to the AL-AQSA FOUNDATION in Sweden, noting that this financial support could contribute to the destruction of Israel.

Strong ties have existed between the Hamas and AL-AQSA FOUNDATION offices in Yemen. Officials of the organizations met frequently and the AL-AQSA FOUNDATION was identified as a "Hamas-affiliate." As discussed in a previously unsealed FBI Affidavit, AL-MUAYAD, the head of the AL-AQSA FOUNDATION in Yemen, has allegedly provided money, arms, recruits and communication equipment for Al-Qaeda. At least until AL-MUAYAD's arrest, Ali Muqbil, the General Manager of the AL-AQSA FOUNDATION in Yemen and a Hamas official, transferred funds on AL-MUAYAD�s orders to Hamas, PIJ or other Palestinian organizations assisting "Palestinian fighters." The disbursements were recorded as contributions for charitable projects. Through channels such as this, AL-MUAYAD reportedly provided more than U.S. $3 million to the "Palestinian cause".

HEAD OFFICE:
Aachen, Germany

BRANCH OFFICES:
Rotterdam, Holland
Copenhagen, Denmark
Brussels, Belgium
San�a, Yemen
Malmo, Sweden
Johannesburg, South Africa
Islamabad, Pakistan

**EXHIBIT 65 to Declaration of Joel Israel**

UNCLASSIFIED Case Summary Page 1 of 3



## Case Summary

**External Data**

Delete Case    CIFAS    NCIS

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |

### Incident Data

| | | | |
|---|---|---|---|
| Control Authority | Group Financial Crime 1 | Status | Closed **Source:** [GK2:700799] |
| Review Date | | by | |
| Remote Delivery Channel | N | High Profile | N |
| Created on | 30 May 2003 00:00 | by | RBS_Feurtlj |
| Last Modified on | 30 May 2003 00:00 | by | EUROPA_Shielsk |

### Linked Cases

| | |
|---|---|
| 663643 | Business auto-linked |
| 670672 | Business auto-linked |
| 671626 | Business auto-linked |
| 700760 | Business auto-linked |
| 701141 | NONE |
| 702718 | NONE |
| 1033746 | Business auto-linked |
| 1061187 | Business auto-linked |
| 1061189 | Business auto-linked |
| 1061190 | Business auto-linked |
| 1061191 | Business auto-linked |
| 1061192 | Business auto-linked |
| 1061193 | Business auto-linked |
| 1061194 | Business auto-linked |
| 1061195 | Business auto-linked |
| 1168895 | Business auto-linked |

HIGHLY CONFIDENTIAL    NW 051994

| | | |
|---|---|---|
| 1206761 | Business auto-linked | |
| 1233910 | Business auto-linked | |
| 1918429 | Business auto-linked | |
| | Maintain Links | |

| Queries | Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | Yes |

## External Data Record

**External Information Source** — Other ( see summary and assessment field)

**Set All Risk Ratings to the the same value of :-** Amber Blue Green Indigo Red

### Personal Data [Add]

-None-

### Business Data [Add]

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|
| AL-AQSA AL-ISLAMIC BANK | | NONE | NONE | Green | Green | Edit |
| AL-AQSA FOUNDATION | | NONE | NONE | Green | Red | Edit |
| AL-AQSA MARTYRS BATTALION | | NONE | NONE | Green | Green | Edit |
| AL-AQSA MARTYRS BRIGADE | | NONE | NONE | Green | Amber | Edit |
| HAMAS | | NONE | NONE | Green | Red | Edit |

### Telephone Data [Add]

-None-

### Address Data [Add]

-None-

### Account Data [Add]

-None-

### Miscellaneous Data [Add]

-None-

### Case Notes [Add]

| Type | Date | User | Text | |
|---|---|---|---|---|
| Summary and Assessment | 30 May 2003 | Migrated | Taken from Complinet website:Chancellor Gordon Brown has ord | View |
| Conclusion | 30 May 2003 | Migrated | Public record information concerning the party (ies) named on | View |

### Key Correspondence

HIGHLY CONFIDENTIAL

NW 051995

| Upload Doc Title | Author | User | Date | | |
|---|---|---|---|---|---|
| | | | | | Add |
| Complinet Article | EUROPA\Shielsk | GK2 | 30 May 2003 | View | Edit |
| **No NCIS Disclosures** | | | | | |
| **No CIFAS Reports** | | | | | |

Summary and Assessment for Case 700799                    Page 1 of 1

| No:3954985 | User: | Migrated | On: | 30 May 2003 00:00 |
|---|---|---|---|---|
| | Note: | Taken from Complinet website:Chancellor Gordon Brown has ordered an immediate freeze on all assets held in UK firms belonging to the Al-Aqsa Foundation. Britain and other G20 counteries are acting on intelligence gathered about the foundation. See scanned image for full details.Lisa Moore GI&F 30 May 2003 | | |

Conclusion for Case 700799                    Page 1 of 1

| No:3954984 | User: | Migrated | On: | 30 May 2003 00:00 |
|---|---|---|---|---|
| | Note: | Public record information concerning the party(ies) named on this record is available from an external source. This information may be relevant when considering any business approaches from or dealings with these parties. | | |

HIGHLY CONFIDENTIAL



# complinet

**Money Laundering**

Other Complinet services

› Complinet home   › About us   › Careers at Complinet   › Contact us   › Terms & conditi

**Site Contents**
› Front page
› Jurisdictions
› Message boards
› Directory
› Events
› Recruitment
› USA PATRIOT Act
› Search

Taking the
SI Diploma

› Consultancy service
› Logout
› Editorial board
› Email Us

## HM Treasury finally freezes Al-Aqsa's UK assets

700799

Emily Brayshaw 30 May 2003

Chancellor Gordon Brown has ordered an immediate freeze on all assets held in UK firms belonging to the Al-Aqsa Foundation, more than ten months after Germany outlawed the bogus Islamic charity with ties to the terrorist group Hamas. *Complinet* asked HM Treasury why the UK had only just decided to freeze Al-Aqsa's money, when Europe and the US took action to outlaw the group almost one year ago but did not receive a straight reply.

"The Al-Aqsa Foundation describes itself as an organisation that helps widows and orphans but we have linked them to supporting terrorists. We've [the Treasury and the Bank of England] acted in conjunction with the US and have acted on intelligence evidence that has been gathered about the foundation. We have frozen Al-Aqsa's funds and have asked other G20 countries to act in a similar manner," a spokesman for HM Treasury told *Complinet*, declining further comment.

*Complinet* alerted its readers to the Al-Aqsa Foundation in August last year, when Germany's interior minister, Otto Schily, became the first public official to outlaw the association for allegedly financing terrorists. German authorities also raided Al-Aqsa's premises and board members' apartments and seized €300,000 from accounts in Aachen and Cologne which belonged to the group.

Days later, the Dutch secret service announced that it had started investigating Al-Aqsa for allegedly sending money to Hamas. In addition, Al-Aqsa has been on the US Office of Foreign Assets Control terrorist list since then under the following entries:

- AL-AQSA AL-ISLAMI BANK (a.k.a. AL-AQSA ISLAMIC BANK), P.O. Box 3753
  al-Beireh, West Bank; Ramallah II 970, West Bank

- AL-AQSA ISLAMIC BANK (a.k.a. AL-AQSA AL-ISLAMI BANK), P.O. Box 3753
  al-Beireh, West Bank; Ramallah II 970, West Bank

- AL-AQSA MARTYRS BRIGADE (a.k.a. AL-AQSA MARTYRS BATTALION)

- AL-AQSA MARTYRS BATTALION (a.k.a. AL-AQSA MARTYRS BRIGADE)

Sear
A

✉ Email this
» Discuss t message
🖨 Printable

**Late**

HM Treasu
Al-Aqsa's U

US agents
funds in fo

Regulator
failure to jo

FinCEN roc
gambling b
$350,000

Irish autho
laundering
credit unio

Blunkett ad
passports'

US to ease
systems fo
workers

Nigerians c
preparation
FATF

**Latest**

Verifying id
companies

Charities a
financing:
Professor H

http://www.complinet.com/ml/dailynews/display.html?rcf=46501                    30/05/03

HIGHLY CONFIDENTIAL                                                      NW 051997

**EXHIBIT 66 to Declaration of Joel Israel**

**Nell, Dedrei (Group Risk Mgmt)**

| | |
|---|---|
| **From:** | COLE, Guy, CBFM Compliance |
| **Sent:** | 16 June 2003 11:17 |
| **To:** | Nell, Dedrei (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt |
| **Cc:** | RODGER, Irvine, CBFM Compliance |
| **Subject:** | RE: Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 29_05_03 |

Stephen/Dedrei

Please find attached the Search Return for GRM TER 29_05_03 from CBFM with my own response summary. CBFM has had a nil return for the names contained in GRM TER 29_05_03.



Response Summary          GRM TER 29_05_03
GRM TER 29-05...          Search Return...

Kind Regards

Guy

**Guy Cole**
**CBFM Compliance MLPU**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T (020) 7375 5433**
**F (020) 7375 4641**
**<mailto:Guy.Cole@rbos.com>**


-----Original Message-----
**From:** Nell, Dedrei (Group Risk Mgmt) (RBS)
**Sent:** 29 May 2003 18:05
**To:** BRENER, Alan (RBS); Richardson, Lesley (RBS); PIPER, Alan, RBSGIFS; Grierson, John (RBS); Bishop, Stephen, Coutts; 'robert.irvine@ulsterbank.com'; 'Ken.Turbitt@citizensbank.com'; 'peter.atkinson@directline.com'; McKay, Dave (Ops Risk); RODGER, Irvine, CBFM Compliance; Webb, Richard (Bancassurance) (RBS); Webb, Richard (RIS Compliance)(RBS)
**Cc:** Wilson, Martin, (Group Chief Executive Ulster Bank); 'annette.court@directline.com'; 'duncan.mackechnie@directline.com'; Higgins, Benny (RBS); Stewart, Dunlop (RBS); Lestiuk, Lydia (RBS); Fisher, Mark (Chief Exec. Manufacturing) (RBS); 'jimpaton@rbsint.com'; 'ray.entwistle@adambank.com'; CARPENTER, Ben, GCM; LEVINE, Jay, GCM; Pell, Gordon (RBS); McCarthy, Letitia (Group Risk Mgmt) (RBS); McKenzie, Arlene (Group Risk Mgmt) (RBS); Middlemist, Graham (Group Risk Mgmt) (RBS); Pitcairn, Brian (Group Risk Mgmt) (RBS); Williamson, Finlay F (RBS); Beattie, Charles (IFS) (RBS); Richardson, Peter (Op Risk) (RBS); Williams, Tony (HR) (RBS); Roden, Neil (RBS); Roberts, Jonathon (Retail Credit) (RBS); ROWLAND, Lynn, (CBFM); Pyrke, Nick (RBS); Trantum, Neil (RBS); Feachen, David (RBS); JACKSON, Caroline, (RBS) COMP; RAY, Gary, Lombard; CLEMENT, Terry, Lombard; BOWEN, Neil, Lombard; BINKS, Martin, MDO-NWS; CROWE, Brian, FM; GOLDFARB, Sheldon, GCM; HIGGINBOTTOM, Simon, FM Compliance; Brunner, Hanspeter, Coutts; 'Marion.Bolster@citizensbank.com'; 'Glenna.Scaramozza@CITIZENSBANK.com'; 'carole.lyons@directline.com'; 'Jackie.Henderson@directline.com'; Hoseason, Michael (Group Fraud) (RBS); FOGLE, Edward, GCM; LEWIS, Derek, Lombard; Craft, Peter (RBS); Harrison, Keith, Coutts; Mackie, Richard (RBS); BAYLISS, Mark, (RBS) COMP; Sludden, Tom (RBS); Gayle, Sonia (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt; Brand, Derek (RBS); Sanders, Stephen, (Group Risk Mgmt)(RBS); HEMSLEY, Julie, (RBS) COMP; Gillespie, David; Grant, Michael (RBS); TURNER, Amanda, Group Risk Mgmt; SIMS, Claire, CBFM Compliance; Smith, Stephen, Coutts; CAMERON, John A N (CBFM); 'Carolyn.Book@CITIZENSBANK.com'
**Subject:** Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 29_05_03
**Importance:** High

HIGHLY CONFIDENTIAL

Please find attached to this email:

### GRM TER 29_05_03 Search Return

This document contains further information against which all Group business areas must search their records.

In respect of this document, please ensure that the necessary due diligence is completed and the **result** (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster, Head of Anti-Money Laundering Compliance) **by 16 June 2003.**

Please take note that we have simplified the sign-off process. Certification by the Designated Senior Management is now only required when you do the quarterly consolidated search. We will ask you to certify at that time that you have undertaken both the routine quarterly search and any other searches you have been asked to perform in the period. The certification of this search will be covered by the Q2 May 03 certification, for which a request will be issued in the near future.

Once again, thank you for your continued patience and assistance in this matter.

 << File: GRM TER 29_05_03 Memorandum.doc >>  << File: GRM TER 29_05_03 Search Return.xls >>

**NOTE - Please note that the pre-populated Excel file ('GRM TER 29_05_03 Search Return') is suitable for use in all future returns under GRM TER 29_05_03.**

**Regards**
**Dedrei Nell**

Group Risk Management
5th Floor, 280 Bishopsgate, London, EC2M 4RB
Tel: 020 7334 1460
Int: 7 6572 1460
Fax: 020 7375 4813

"*******************************************************************************"
"    Visit our Internet site at http://www.rbsmarkets.com          "
"                                                                  "
" This e-mail is intended only for the addressee named above.      "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to    "
" retain, read, copy or disseminate this message or any part of it. "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB    "
"    Regulated by the Financial Services Authority            "
"******************************************************************************* "

NW 050722

NW 050723

**RBS Group Search Request - GRM TER 29_05_03**

| | Business Area | Primary Contact | Secondary Contact(s) |
|---|---|---|---|
| **FM Sales & Trading** | Group Reference Data (GRD) | Paul Barnett | Kevin Roberts/ Mark Kane |
| | FM Sales & Trading | Claire McHugh | Jo Sullivan |
| | FM Futures | Steve Luxton | James Alexander |
| | Treasury Reserve Centre | Sue Leigh | Jane Brereton |
| **FM Capital Markets** | Debt Structuring | Anthony Rodriguez | Tristram Sutton |
| | High Yield Origination | David Chu | Nick Street |
| | Primary Markets Origination | Jonathon Peberdy | Dorothy Comery |
| | Private Placements | Teresa Di Falco | Jocelyn Monk |
| | Securitisation | Anil Idnani | Tristram Sutton |
| | Structured Credit Products | Cyrus Kateli | Tristram Sutton |
| | Asset Finance | Terry Clement | Gary Ray |
| **Corporate Bank** | Global Trade Services | Karen Cross | Leslie Whiting |
| | Global Travel Money Services | Ian McCall | Jim Gold |
| | Equity Finance | Ian McGillivray | Rachel Gallagher |
| | RBSCS & ESF | David Isaacs | Sue Titcombe |
| | Star Capital | Martina Lyons | Leigh-Ann Summers |
| | Trustee & Depositary Services (TDS) | Jim Neville | Caroline Guy/ Grant Chambers |
| **Overseas Branches /Businesses** | Europe | Chris Hunt | Helen Savvides |
| | Asia Pacific | William Thomson | Christopher Chee |

HIGHLY CONFIDENTIAL

NW 050724

| Response by | Date | Matched Items |
|---|---|---|
| Paul Barnett | 3-Jun-03 | Nil |
| Jo Sullivan | 10-Jun-03 | Nil |
| Steve Luxton | 2-Jun-03 | Nil |
| Sue Leigh | 4-Jun-03 | Nil |
| Anthony Rodriguez | 3-Jun-03 | Nil |
| David Chu | 3-Jun-03 | Nil |
| Dorothy Comery | 2-Jun-03 | Nil |
| Teresa Di Falco | 2-Jun-03 | Nil |
| Anil Idnani | 16-Jun-03 | Nil |
| Cyrus Kateli | 2-Jun-03 | Nil |
| Terry Clement | 12-Jun-03 | Nil |
| Leslie Whiting | 10-Jun-03 | Nil |
| Jim Gold | 3-Jun-03 | Nil |
| Ian McGillivray | 2-Jun-03 | Nil |
| David Isaacs | 11-Jun-03 | Nil |
| Martina Lyons | 16-Jun-03 | Nil |
| Jim Neville | 10-Jun-03 | Nil |
| Helen Savvides | 11-Jun-03 | Nil |
| Christopher Chee | 9-Jun-03 | Nil |

HIGHLY CONFIDENTIAL

Confidential

NW 050725

**RBSG Sanctions & Terrorist Financing Return**

| Title: | | Terrorist Financing: List of Suspects |
| GRM search ref: | | GRM TER 29_05_03 |
| Business area: | | *CBFM* |

| Search Item: | | | | | |
| Source | Last Name/ Entity Name | First Name | Other names | Place of Birth |
|---|---|---|---|---|
| Bank of England, Office of Foreign Assets Control (SDGT) | AL-AQSA FOUNDATION | | | |
| Bank of England, Office of Foreign Assets Control (SDGT) | AL-AQSA INTERNATIONAL FOUNDATION | | | |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

NW 050726

| Date of Birth | Address | Individual? | Other information | Search Return(s): | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Last name | First name | Other names | Place of Birth |
| | (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | | Nil | Nil | Nil | Nil |
| | (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

| Date of Birth | Address | Other information | Business sub-area | CRN / CIS | Account details | Bank Sort Code | Account activities |
|---|---|---|---|---|---|---|---|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

NW 050727

HIGHLY CONFIDENTIAL

Confidential

NW 050728

Bank of England,
Office of Foreign Assets Control (SDGT)

AL-AQSA CHARITABLE
FOUNDATION

Bank of England,
Office of Foreign Assets Control (SDGT)

SANABIL AL-AQSA
CHARITABLE FOUNDATION

Bank of England,
Office of Foreign Assets Control (SDGT)

AL-AQSA SINABIL
ESTABLISHMENT

HIGHLY CONFIDENTIAL

06/16/2003

Confidential

NW 050729

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

**Confidential**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

NW 050730

HIGHLY CONFIDENTIAL

Confidential

Bank of England,
Office of Foreign Assets Control (SDGT)

AL-AQSA CHARITABLE
ORGANIZATION


Bank of England,
Office of Foreign Assets Control (SDGT)

CHARITABLE AL-AQSA
ESTABLISHMENT


Bank of England

MU'ASSA AL-AQSA AL-
KHAYRIYYA

06/16/2003

NW 050731

HIGHLY CONFIDENTIAL

Confidential

NW 050732

| | | | | | |
|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

NW 050733

HIGHLY CONFIDENTIAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

Confidential

Bank of England,                                    MU'ASSA SANABIL AL-AQSA
Office of Foreign Assets Control (SDGT)             AL-KHAYRIYYA

Bank of England,                                    AQSSA SOCIETY
Office of Foreign Assets Control (SDGT)

Bank of England,                                    AL-AQSA ISLAMIC
Office of Foreign Assets Control (SDGT)             CHARITABLE SOCIETY

06/16/2003

NW 050734

HIGHLY CONFIDENTIAL

Confidential

NW 050735

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

Nil     Nil     Nil         Nil     Nil     Nil     Nil     Nil

Nil     Nil     Nil         Nil     Nil     Nil     Nil     Nil

Nil     Nil     Nil         Nil     Nil     Nil     Nil     Nil

06/16/2003

NW 050736

HIGHLY CONFIDENTIAL

**Confidential**

NW 050737

Bank of England,
Office of Foreign Assets Control (SDGT)

ISLAMIC CHARITABLE
SOCIETY FOR AL-AQSA

Bank of England

CHARITABLE SOCIETY TO
HELP THE NOBLE AL-AQSA

Bank of England

NUSRAT AL-AQSA AL-
SHARIF

HIGHLY CONFIDENTIAL

06/16/2003

NW 050738

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
|-----|-----|-----|-----|-----|-----|-----|-----|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

NW 050739

HIGHLY CONFIDENTIAL

Confidential

Bank of England                          AQSA CHARITABLE
                                         ESTABLISHMENT

Bank of England,                         AL-AQSA SPANM I
Office of Foreign Assets Control (SDGT)   STIFTELSE

Bank of England                          AL AQSA SPANMAL
                                         STIFTELSE

06/16/2003

NW 050740

HIGHLY CONFIDENTIAL

Confidential

NW 050741

| | | | | | |
|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

**Confidential**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

NW 050742

HIGHLY CONFIDENTIAL

Confidential

Bank of England,
Office of Foreign Assets Control (SDGT)

SWEDISH CHARITABLE
AQSA EST.

Office of Foreign Assets Control (SDGT)

AL-AQSA (ASBL)

Office of Foreign Assets Control (SDGT)

AL-AQSA APANMAL
STIFTELSE

06/16/2003

NW 050743

HIGHLY CONFIDENTIAL

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

NW 050745

HIGHLY CONFIDENTIAL

**Confidential**

NW 050746

Office of Foreign Assets Control (SDGT)          AL-AQSA E.V.

Office of Foreign Assets Control (SDGT)          AQSSA SOCIETY YEMEN

Office of Foreign Assets Control (SDGT)          CHARITABLE SOCIETY TO
                                                 HELP THE NOBLE AL-AQSA
                                                 NUSRAT AL-AQSA AL-
                                                 SHARIF

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

NW 050747

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqssa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

NW 050748

| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
|-----|-----|-----|-----|-----|-----|-----|-----|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

**Confidential**

| | |
|---|---|
| Office of Foreign Assets Control (SDGT) | FORENINGEN AL-AQSA |
| Office of Foreign Assets Control (SDGT) | MU'ASA AL-AQSA AL-KHAYRIYYA |
| Office of Foreign Assets Control (SDGT) | STICHTING AL-AQSA |

06/16/2003

HIGHLY CONFIDENTIAL

**Confidential**

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Aachen, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |
| (a) Al-Aqsa E.V., Kappellenstrasse 36, D-52066, Germany (Head Office); (b) Stichting Al-Aqsa, Gerrit V/D Lindestraat 103 A (or E), 3022 TH, Rotterdam, Holland (Branch); (c) Foreningen Al-Aqsa, P.O. Box 6222200KBKN, Copenhagen (Denmark Branch); (d) Al-Aqsa (ASBL) BD Leopold II 71, 1080 Brussels, Belgium (Branch); (e) Aqsa Society – Yemen, P.O. Box 14101, San'a (Branch); (f) Noblev (a.k.a. Nobelvagen) 79 NB, 21433 Malmo (Sweden Branch); (g) PO Box 421083 (and/or 421082), 2nd floor, Amoco Gardens, 40 Mint Road, Fordsburg 2033, Johannesburg, South Africa (Branch); (h) P.O. Box 2364, Islamabad, Pakistan (Branch) | No | A.k.a. for AL-AQSA FOUNDATION | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

Confidential

NW 050751

| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
|-----|-----|-----|-----|-----|-----|-----|-----|
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Nil | Nil | Nil | Nil | Nil | Nil | Nil | Nil |

06/16/2003

HIGHLY CONFIDENTIAL

**EXHIBIT 67 to Declaration of Joel Israel**

# In The Matter Of:

*TZVI WEISS, et al - NATAN APPLEBAUM, et al v. NATIONAL WESTMINSTER BANK, PLC.,*

---

*GUY COLE*
*June 8, 2010*

---

*European Deposition Services*

*59 Chesson Road*

*London W149QS*

*England*

*United Kingdom*

Original File Guy Cole - 8 June 2010.txt
Min-U-Script® with Word Index

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

---

HIGHLY CONFIDENTIAL                                    Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF NEW YORK

3                         Action No: 05cv4622(CPS)(MDG)

4       - - - - - - - - - - - - - - - - - - - - -

5       TZVI WEISS, et al,
                                    Plaintiffs,
6       against

7       NATIONAL WESTMINSTER BANK, PLC.,
                                    Defendant.
8       - - - - - - - - - - - - - - - - - - - - -

9       NATAN APPLEBAUM, et al.,

10                                  Plaintiffs,

11      against

12      NATIONAL WESTMINSTER BANK, PLC.,

13                         Defendant.

14

15

16          VIDEOTAPED DEPOSITION OF GUY COLE

17                 Tuesday 8 June 2010

18                   At:  9:00 am

19                   Taken at:

20          Cleary, Gottlieb, Steen & Hamilton LLP
                    55 Basinghall Street, London
21                       United Kingdom

22

23

24

25

---

HIGHLY CONFIDENTIAL                                    Page 2

1                  A P P E A R A N C E S

2       For Plaintiff Tzvi Weiss:

3               STEPHEN SCHWARTZ, ESQ.
                Kohn, Swift & Graf PC
4               One South Broad Street, Suite 2100
                Philadelphia, Pennsylvania 19107-3304
5               Tel: 419 246 0528

6       For Plaintiff Natan Applebaum:

7               JOEL L. ISRAEL
                Sayles & Werbner
8               4400 Renaissance Tower
                1201 Elm St.
9               Dallas, Texas 75270
                Tel: 214 939 8763

10

11      For Defendant National Westminster Bank, PLC:

12

13              JONATHAN I. BLACKMAN ESQ.
                Cleary, Gottlieb, Steen & Hamilton LLP
14              One Liberty Plaza
                New York, NY 10006-1470
15                   Tel: 302 351 9415

16      Also Present:

17

18              COURT REPORTER:

19              AILSA WILLIAMS
                European Deposition Services
20              59 Chesson Rd
                London, W14 9QS

21              Telephone:  44 (020) 7385 0077

22              VIDEOGRAPHER: SIMON ADDINSELL

23

24

25

---

HIGHLY CONFIDENTIAL                                    Page 3

1                      I N D E X

2       GUY COLE . .. ... .. ... ... ... ... ... ... ..5

3       CROSS-EXAMINATION BY MR. ISRAEL: .. ... ... .. 138

4       CROSS-EXAMINATION BY MR. .. ... ... ... ... 147
                BLACKMAN:

5

6                    INDEX OF EXHIBITS

7       Cole 1 E-mails NW013939-41 ... ... ... ... .38

8       Cole 2 E-mails NW066732-39 ... ... ... ... .44

9       Cole 3 Case Summary NW008356-66 ... ... ... .55

10      Cole 4 Case Summary NW008367-73 ... ... ... .65

11      Cole 5 GI&F Letter dated 27 ... ... ... ... .66
                September, 2001

12      Cole 6 "Anonymous" from Internet ... ... .. .67

13      Cole 7 New York Times Extract ... ... ... .. .82

14      Cole 8 E-mails NW050050-55 ... ... ... ... .95

15      Cole 9 E-mails NW155832 ... ... ... ... ... 108

16      Cole 10 E-mails NW066807-813 ... ... ... ... 111

17      Cole 11 E-mails NW066800-806 ... ... ... ... 115

18      Cole 12 E-mails NW066701-704 ... ... ... ... 122

19      Cole 13 E-mails NW066705-11 ... ... ... ... 126

20      Cole 14 E-mails NW181094-97 ... ... ... ... 131

21      Cole 15 E-mails NW066740-42 ... ... ... ... 136

22

23

24

25

---

HIGHLY CONFIDENTIAL                                    Page 4

1           THE VIDEOGRAPHER: This is the beginning of
2       tape one in volume one of the deposition of Guy Cole,
3       in the matter of Tzvi Weiss et al, plaintiffs, against
4       National Westminster Bank plc, defendants.  This is
5       case number 1:05-cv-04622 (DTG) (MDG) and also Natan
6       Applebaum et al, Plaintiffs, against National
7       Westminster Bank plc, this case number being
8       1:07cv00916 (DTG)(MDG).  This matter is before the
9       United States District Court, Eastern District of New
10      York.
11          Today's date is 8 June, 2010 the time is
12      9:10 am.  This deposition is taking place at the
13      offices of Cleary Gottlieb in London.  The court
14      reporter is Ailsa Williams, the videographer is Simon
15      Addinsell, both from European Deposition Services.
16          Could counsel please introduce themselves
17      for the record, stating what company they are with and
18      who they represent in this matter, please.
19          MR. SCHWARTZ: My name is Stephen Schwartz
20      with the law firm of Kohn, Swift & Graf, Philadelphia,
21      Pennsylvania, United States of America, representing
22      the Weiss plaintiffs.
23          MR. ISRAEL: Joel Israel, Sayles Werbner,
24      here on before of Applebaum plaintiffs.
25          MR. BLACKMAN: Jonathan Blackman, Cleary

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

---

HIGHLY CONFIDENTIAL                                    Page 9

1    First Boston?
2        A.  No, when I was at RBS, Royal Bank of
3    Scotland.
4        Q.  So did you leave Credit Suisse First
5    Boston prior coming to RBS?
6        A.  Yes.
7        Q.  Maybe this is easier.  When did you
8    graduate with your Bachelors degree?
9        A.  1999.
10       Q.  And what did you do between 1999
11   and May 2003 when you came to work for RBS?
12       A.  I spent six months working for Invesco
13   Asset Management in the City.  Then I spent probably
14   about four months working in the French Alps for a ski
15   company.  I came back and joined Credit Suisse First
16   Boston.  I left there probably December 2002 and
17   in February 2003 I joined HBOS Treasury Services as
18   a contractor to manage their remediation project for
19   clients, KYC, know your customer.  Then, I was in that
20   role until May, when I joined RBS.
21       Q.  When you joined RBS in May of 2003, what
22   was your first job?
23       A.  My first role was surveillance manager
24   which is like an team audit function, so like
25   a second line of review from a risk perspective.  So

---

HIGHLY CONFIDENTIAL                                    Page 10

1    you would have the business checking themselves, then
2    we check the business, then audit would check
3    everybody else, so I was the second area.
4        Q.  What kind of things would you check?
5        A.  We were checking businesses under the
6    team's responsibility, that they were following
7    procedures and processes correctly for money
8    laundering, so KYC processes predominantly.
9        Q.  Were you in a particular department at
10   RBS?
11       A.  Yes, it would have been the corporate
12   banking and financial markets compliance department.
13   That is what its name is.
14       Q.  Approximately how many other people, if
15   you know the answer to this question, about how many
16   other people were in the CBFM compliance department at
17   that time, I mean in compliance roles, not
18   secretaries.
19       A.  Approximately, it would be a global
20   function, so I would probably say 70 or 80.
21       Q.  When you say "a global function", what
22   do you mean?
23       A.  So that the head of our department had
24   global responsibility for the compliance teams around
25   the world.

---

HIGHLY CONFIDENTIAL                                    Page 11

1        Q.  You started you said initially -- I hope
2    I get this right -- in audit second line.  Is that
3    what you said?
4        A.  Well, no I started off in the money
5    laundering prevention unit.  That was the actual
6    sub-team within compliance, and I was doing audit type
7    activities, but my role was surveillance manager,
8    which was or is an FSA term for reviewing things.
9        Q.  All right.  So you were in the money
10   laundering prevention unit?
11       A.  Yes.
12       Q.  And what you would be doing would be
13   reviewing what others have filed, other kinds of
14   suspicious reports?
15       MR. BLACKMAN: Objection, lack of
16   foundation.
17       MR. SCHWARTZ: I am not asking that very
18   well, Mr. Blackman is correct.  I am trying to clarify
19   what it is exactly you did, not a trick question.  So
20   you said you were the second line, you were reviewing
21   what others had done.  So what kind of work were you
22   reviewing?
23       A.  At that time I think NatWest had just
24   been fined by the FSA for poor records for KYC, or
25   actually it was RBS, and so there what there was was

---

HIGHLY CONFIDENTIAL                                    Page 12

1    a project to review all client KYC to make sure it met
2    the legal requirements to know our client properly
3    under the law.
4        So the project was coming to near the end, the
5    conclusion, then we went or I went in to check, on
6    a sampling basis, to make sure that different offices around
7    the country had actually done what they said they were doing
8    and had met the requirements.
9        Q.  Were there standards in place for what
10   they were supposed to be doing?
11       A.  It would have been the bank's policy at
12   the time, yes.
13       Q.  And in order to prepare yourself did you
14   learn the bank's policies for the MLPU?
15       A.  I had copies of policies, yes.
16       Q.  Did you have any background in money
17   laundering prevention prior to starting at RBS?
18       A.  Yes.
19       Q.  What was that?
20       A.  As CSFB, when I worked for the MLRO,
21   money laundering reporting officer.
22       Q.  When did you get the diploma from the
23   compliance association, International Compliance
24   Association?
25       A.  I think it would be 2005.

---

---

HIGHLY CONFIDENTIAL                                      Page 17

1      Q.  And you understand that is part of the
2  United States Treasury?
3      A.  Yes.
4      Q.  And you are aware that OFAC has
5  a sanctions list, is that correct?
6      A.  Yes.
7      Q.  As part of your job, 2003 to 2005, did
8  you review the OFAC list as it came to the bank?
9      A.  No.
10      Q.  So did you familiarize yourself with the
11  OFAC list?
12      A.  Not directly, no.  Possibly at some
13  points, but it was not my responsibility to.
14      Q.  Whose responsibility was it?
15      A.  Group's.
16      Q.  So it was not CBFM's responsibility at
17  all?
18      A.  In relation to the sanction searches,
19  no.
20      Q.  Why don't you describe what the sanction
21  searches involved?
22      A.  Group would issue a list, internal
23  blacklist, which include Bank of England names and any
24  OFAC names or other names that they required to put on
25  the list, which I think at that time would have been

---

HIGHLY CONFIDENTIAL                                      Page 18

1  some of the OFAC names, not all of the OFAC names, and
2  then when there was an update to those sources they
3  would send a search request out, an Excel document, to
4  all the businesses, points of contacts within the
5  division saying: "Could you confirm whether you have
6  any clients on this list".  Then I would respond for
7  the business or for the databases that I was
8  responsible for.
9      Q.  So you received your lists then from
10  senior people at the bank, is that correct?
11      A.  Well, from a group function, yes.
12      Q.  And do you know what group function did
13  you receive it from?
14      A.  Yes, group enterprise risk or group risk
15  management.  Their name changes but it was group risk
16  management.
17      Q.  Did you have a contact at group
18  enterprise risk with whom you dealt?
19      A.  There were various people, yes.
20      Q.  Can you name some of them, please?
21      A.  Probably Ben Norrie, and that is
22  probably the only one I recall, but I can remember
23  different people, but Ben Norrie is one I would
24  remember the most.
25      Q.  Do you remember the name Stephen Foster?

---

HIGHLY CONFIDENTIAL                                      Page 19

1      A.  Stephen Foster, yes, I remember.  I know
2  Stephen Foster, yes.
3      Q.  Was he at group enterprise risk at this
4  time?
5      A.  Yes.
6      Q.  What about Irvine Rodger?
7      A.  No, he was my direct line manager.
8      Q.  He was in your department?
9      A.  Yes.
10      Q.  Was he senior to you?
11      A.  Yes.
12      Q.  Is he still at RBS in its current form?
13      A.  Yes.
14      Q.  Is he still in CBFM compliance?
15      A.  Well, the division that was CBFM, yes.
16      Q.  Is he like the head now of CBFM
17  compliance?
18      A.  No.
19      Q.  During the 2003 to 2005 period, if you
20  can remember, what was Mr. Rodger's role at that time?
21      A.  He was the head of the MLPU, so the
22  money laundering prevention unit.
23      Q.  Was he your boss?
24      A.  Yes.
25      Q.  Was he also the person to whom you

---

HIGHLY CONFIDENTIAL                                      Page 20

1  directly reported?
2      A.  Yes.
3      Q.  You said there were about 70 people at
4  your department at that time, is that correct?
5      A.  In the compliance department?
6      Q.  CBFM MLPU?
7      A.  No, in the compliance department.
8      Q.  In the compliance department, which is
9  a division of CBFM MLPU?
10      A.  No.  MLPU is a team within the
11  compliance department, was a team within the
12  compliance department.
13      Q.  Between 2003 and 2005?
14      A.  I think the name got disbanded at the
15  end of last year.
16      Q.  End of last year?
17      A.  Yes.
18      Q.  So you were on the MLPU team within the
19  group compliance or CBFM compliance?
20      A.  CBFM compliance.
21      Q.  And how many people were part of the,
22  approximately, the MLPU team within CBFM group
23  compliance?
24      A.  Within the CBFM division -- compliance
25  was a division -- there would have been probably less

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

1  don't I ask it this way.  Let me say, first of all,
2  what is your understanding of what terrorism is?  Can
3  you provide me with your understanding?
4        MR. BLACKMAN: I object to lack of
5  foundation.  I don't think you have established any
6  competence of Mr. Cole to discuss --
7        MR. SCHWARTZ: Let me address that.  You
8  said that prevention of terror financing was part of
9  your job.  Is that correct?
10       A. Yes.
11       Q. So, how did you do the job of preventing
12 terror financing?
13       A. When you were looking at your clients in
14 the business, you don't know the predicate activity or
15 the subsequent activity of what those clients are
16 doing.  You are looking at those clients.  So money
17 laundering prevention is to do with the proceeds of
18 crime.  Terrorist/terrorism aspect would be where we
19 are checking for clients who are on the Bank of
20 England or whatever other list as terrorists, but at
21 the same time we are just monitoring our clients for
22 any activities which are deemed suspicious against any
23 sort of any financial crime related sort of to
24 legislation in the UK, but not fraud.  We would not
25 cover fraud activities.

1        Q. You say monitoring the clients for
2  anything deemed suspicious.  So what would you deem
3  suspicious if you were looking for -- if you were
4  considering taking an interest in terror financing,
5  what would you deem suspicious?
6        A. Suspicion is normally the second stage.
7  It is looking for something unusual.  Is that client
8  acting out the ordering to other clients?  Are they
9  doing what we expect them to be doing with their
10 account.  At that stage you start saying: "What could
11 this be?"  We would not go out particularly looking
12 for terror financing but we would look at the client,
13 unless we were tipped off to say there is a potential
14 risk here.  We would look at all clients and then just
15 look for what was unusual, et cetera, but, you know,
16 as I said, our unit is primarily about advising on
17 clients that came in and doing the KYC and dealing
18 with escalated issues.  It was not our role day-to-day
19 to monitor accounts across the bank.  That was an
20 automated system in manufacturing.
21       Q. So the things that you worked on, were
22 they mostly referred to you from other parts of the
23 bank?
24       A. Yes.
25       Q. You said in the first stage the first

1  thing was to look for things out of the ordinary, is
2  that correct, and that figuring out what it might be
3  was the second stage.  Is that correct?
4        A. You were discussing about how would you
5  form suspicion.  A suspicion is normally formed by
6  finding something unusual and then investigating it
7  further.
8        Q. Okay.  Is "unusual" something for which
9  there is objective guidance within the bank?  Do you
10 understand what I am asking?  If I say what is
11 unusual, can you give me a list of things that were
12 deemed unusual?
13       A. No, I wouldn't be able to give you
14 a list now but it would be red flags.  There may be
15 red flags which could mean that there is something
16 suspicious happening, but predominantly we would rely
17 on the bank's staff knowing their client and knowing
18 what is out of the ordinary.  We would also rely on
19 the automated systems that monitored account
20 movements.
21       Q. Can you give me examples of what might
22 be out of the ordinary, the sort of red flags you are
23 talking about?
24       A. Clients wishing to deposit an awful lot
25 of cash or withdraw a lot of cash.

1        Q. So large movements of cash; those are
2  red flags?
3        A. That is one of the many, yes.
4        Q. What are others?
5        A. Could be a client from a high risk
6  jurisdiction, could be a client asking for an
7  uncommercial transaction where they are not actually
8  going to make any money.  It could be a very
9  convoluted ownership structure to an AC.  There is
10 various red flags.
11       Q. High risk jurisdiction?  Are there
12 particular jurisdictions that are high risk?
13       A. From a money laundering perspective,
14 yes.
15       Q. Can you name some of them?
16       A. Anybody that was on the NCCT list,
17 noncooperative countries and territories.  So Nigeria
18 at that time.  Russia probably at that time.
19 Countries where they didn't have proper anti-money
20 laundering regimes, the banks would not be complying
21 with the same standard or global standards, therefore
22 money or clients coming from those jurisdictions we
23 would not have much assurity about the origin of their
24 funds, et cetera.
25       Q. Were there particular red flags that

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

---

HIGHLY CONFIDENTIAL                                      Page 41

1  division, so these were the people perhaps in the call
2  centers and people handling documentation opening up
3  accounts, processing the payments, which would have
4  been the instructions, anything -- technology for the
5  group would be owned by manufacturing.
6      Q.  This chain of e-mails is asking
7  questions about the client named Interpal, is that
8  correct?
9      A.  It appears to be, yes.
10     Q.  And you know that this case concerns,
11 among other things, activities of Interpal within the
12 bank or the bank's representation of the customer,
13 Interpal?
14     A.  What is the question?
15     Q.  The question is, is it your
16 understanding that this case concerns Interpal?
17     A.  This e-mail or the whole --
18     Q.  The whole case?
19     A.  The case we are sat here for, yes.
20     Q.  It says here, Fiona Miller says:
21     "In similar cases in the past the customer
22 owning compliance function has been responsible for
23 monitoring".
24     So the customer owning compliance function
25 in the case of Interpal was CBFM, is that correct?

---

HIGHLY CONFIDENTIAL                                      Page 42

1      A.  Yes.
2      Q.  And that remained the same, 2003 to
3  2005?
4      A.  Yes.
5      Q.  This e-mail asks the question at the
6  very top, the one that is sent to you: "Is the
7  monitoring of payment traffic as outlined by Stephen
8  possible here?"
9      Do you remember receiving that question?
10     A.  No, I don't remember receiving that
11 question.
12     Q.  Do you remember responding?
13     A.  No, I don't remember responding to the
14 question.
15     Q.  Do you know whether you did respond?
16     A.  I don't believe I did.
17     Q.  There is a document later on saying you
18 only just got involvement.  We will look at that
19 but --
20     MR. BLACKMAN: Ask him about it.
21     Q.  -- to the best of your knowledge, you
22 did not respond to this question?
23     A.  To the best of my knowledge, yes.
24     Q.  Do you know, at this time, did you know
25 Fiona Miller?

---

HIGHLY CONFIDENTIAL                                      Page 43

1      A.  It is unlikely.
2      Q.  I am wondering how it would be that --
3  do you know why Fiona Miller mentioned you in addition
4  to Irvine Rodger, as opposed to other people within
5  your unit?
6      A.  No, I don't, no.  Well, I could presume
7  one thing if you want.
8      MR. BLACKMAN: Don't guess.
9      Q.  I am sorry, what were you going to say?
10     MR. BLACKMAN: He was going to guess and I
11 was of instructing him not to.
12     MR. SCHWARTZ: I don't know whether he was
13 going to guess.
14     MR. BLACKMAN: Do you have any knowledge or
15 were you just going to speculate?
16     MR. SCHWARTZ: Excuse me, Mr. Blackman --
17     MR. BLACKMAN: Surely you want information,
18 not guesses.
19     MR. SCHWARTZ: I want his answer without you
20 coaching him is what I want, Mr. Blackman.
21     A.  The answer I was going to give was
22 possibly on the same distribution list for the group
23 search requests, so she may have seen my name as
24 a recipient for the division on another e-mail.
25     Q.  Okay.  Mr. Cole, I am going to ask the

---

HIGHLY CONFIDENTIAL                                      Page 44

1  reporter to mark as Cole Exhibit 2 a document that has
2  been Bates numbered NW66732 through 739.
3      (Exhibit Cole 2 marked for identification)
4      Mr. Cole, have you had a chance to review this
5  document?
6      A.  Yes, I have.
7      Q.  Have you ever seen this document before?
8      A.  Yes, I should have done.  Well, yes.
9      Q.  Do you remember seeing this document
10 before?
11     A.  Yes.
12     Q.  This appears to be an e-mail chain.
13 A number of e-mails involve you.  Is that a correct
14 description?
15     A.  There appear to be, yes.
16     Q.  Let's start first of all on the first
17 page of this, there is what appears to be a document
18 attachment.  Of do you see that, "Doc1.doc"?
19     A.  Yes.
20     Q.  Can you look please at Bates number
21 66736 through 739.
22     A.  Sorry, which?
23     Q.  The last 4 pages of this.
24     A.  Yes.
25     Q.  Are these pages, these last 4 pages, are

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

1   they Doc1.doc?
2        A.  I believe they would be, yes.
3        Q.  So then you created these last 4 pages,
4   is that correct?
5        A.  Yes.
6        Q.  You remember doing that?
7        A.  Yes.
8        Q.  Okay.  Let's take a look, please, at
9   66735.  Mr. Norrie -- you said you know Mr. Norrie, is
10  that correct?
11       A.  Yes.
12       Q.  And he is at Mr. Foster's group, is that
13  correct?
14       A.  In his team, yes.
15       Q.  He says to you:
16       "You may remember the matches we have previously
17  reported to the Bank of England against Interpal and its
18  various AKA's."
19       At the time you received this, April 2004, did you
20  in fact remember the matches that had been reported, as
21  Mr. Norrie expected apparently?
22       A.  No.
23       Q.  You had no knowledge of the Interpal
24  account at that time?
25       A.  I don't believe I did, no.

1        Q.  Further down Mr. Norrie says:
2        "Can I ask you to investigate whether any enhanced
3   due diligence has been put in place over these accounts (not
4   sure the above was communicated, therefore suspect not) and
5   if not take steps to ensure that measures are put in place."
6        Did you investigate whether any enhanced due
7   diligence had been put in place over the Interpal accounts?
8        A.  I wouldn't be able to recall without
9   looking at this document.
10       Q.  Sorry?
11       A.  I would not be able to recall this event
12  without -- today, so the only thing I have got to go
13  on is this document.
14       Q.  Okay.
15       A.  I wouldn't remember that precise e-mail.
16       Q.  Can you tell from this document whether
17  enhanced due diligence had been put in place?
18       A.  Well, it depends what you define as
19  "enhanced due diligence".  By the end of this document
20  I had done enhanced due diligence because I had done
21  a review, so by the end of this e-mail chain there has
22  been enhanced due diligence.
23       Q.  So by May 2004 what you did producing
24  Doc1.doc, that was enhanced due diligence?
25       A.  Yes.

1        Q.  In the act of producing Doc1.doc, did
2   you look to see whether work like that had been done
3   previously?
4        A.  I expect I would have looked in
5   goalkeeper.
6        Q.  But you don't remember, is that correct?
7        A.  Yes, I don't remember.
8        Q.  So to the best of your knowledge you
9   don't know whether any enhanced due diligence had been
10  put in place prior to what you did?
11       A.  At that time, well, yes, I wouldn't
12  know.  Sorry, could you repeat that question?  I was
13  reading.
14       Q.  You said you are not sure what I mean by
15  enhanced due diligence and I don't mean anything other
16  than what Mr. Norrie means, Mr. Norrie asked you?
17       MR. BLACKMAN: He is not Mr. Norrie.
18       Q.  I understand, but Mr. Norrie asked you
19  the question whether enhanced -- so apparently
20  Mr. Norrie expected you to understand what he was
21  talking about.  Maybe you did not?
22       A.  No.
23       Q.  Did you understand what he was asking:
24  "Can you investigate whether any enhanced due
25  diligence has been put in place."  Did you understand

1   what he was asking you to look for?
2        A.  I presume he would have said: "Can you
3   look around to see what extra work has been done on
4   this case, this client."
5        Q.  So you presume that is what he meant?
6        A.  Yes.
7        Q.  Do you remember whether you called him
8   to ask him what he meant?
9        A.  I can't recall that.  I would presume
10  I would have done but I can't recall.
11       Q.  But when you received this e-mail asking
12  you to investigate, to investigate whether any
13  enhanced due diligence has been put in place, did you
14  understand what he asked?
15       MR. BLACKMAN: That question was just asked
16  and answered.  You can answer it again.
17       A.  Yes, I did.  I can presume what -- he
18  wanted to see what extra due diligence had been put in
19  place, so that is the question.
20       Q.  And do you remember what extra due
21  diligence had been put in place, if any?
22       A.  I don't remember.
23       Q.  If you turn to 66734, in the middle of
24  the page there is what appears to be an e-mail from
25  you to Ben Norrie, dated May 6, 2004, starting with

1  months of debits on Interpal accounts."
2      Do you see that sentence?
3      A. Yes.
4      Q. Then you say: "I have seen a couple of
5  payments that warranted further investigation,
6  particularly the below".
7      Do you remember writing that?
8      A. No.
9      Q. Do you remember looking through the last
10 six months of debits on Interpal accounts in May 2004?
11     A. I wouldn't -- I don't know if I would
12 remember that specific occasion but --
13     Q. This letter, this e-mail, reflects that
14 this is your introduction to the Interpal account, is
15 that correct?
16     A. Yes.
17     Q. Your first look at it?
18     A. I think so, yes.
19     Q. Did you do any research on the account
20 prior to looking at the last six months of payments?
21     A. As in looked at the account transactions
22 do you mean?  Do you mean the physical account or do
23 you mean the relationship?
24     Q. Let me ask it more generally then.  This
25 is now an account that has been sent to you for

1  investigation, is that correct?
2      A. It is to the -- well, as the e-mail
3  chain says, Ben asked if we have done any enhanced
4  due diligence.  I am saying we cannot do any payment
5  filtering.  I have said, at whatever point, "Call data
6  management".  He has come back, and as I have said
7  there I have not looked at this previously myself, and
8  this is me just taking an interest in that client.
9      Q. So when an account is assigned to you,
10 like this one has been, what would you normally do
11 first?
12     A. Firstly, I don't think I would say this
13 has been assigned to me.  I am looking at it.  You
14 know, I have not taken ownership of the -- it depends
15 what you mean by "assigned".  Secondly, this is
16 probably the only case where this scenario existed.
17 I would not -- this is the only client I ever
18 monitored in this regard, so it is not standard
19 procedure.
20     Q. All right.  Did you do any kind of
21 research on the account, besides looking at six months
22 of transactions?
23     A. You mean the account in our systems, did
24 I do any research on it?
25     Q. The customer, Interpal, did you do

1  any --
2      A. So the relationship you mean?  Did I do
3  research on the relationship?
4      Q. Yes.
5      A. As the later e-mail shows then I believe
6  so.
7      Q. So it says you did some research on
8  the --
9      A. To review the beneficiaries of payments.
10     Q. Do you do any research into Interpal
11 itself on the internet?
12     A. I would not recall.  I would have
13 expected I did, but I would rely on whatever is
14 written here.
15     Q. Would it have been -- you say this is
16 the first time you did this, so I can't really ask you
17 about common practice, so did you look into the
18 goalkeeper system to see if there were any reports on
19 Interpal?
20     A. I don't recall, but if I had access at
21 the time then I expect I would have done, but I don't
22 recall doing it.
23     Q. All right.  Back at the document we
24 looked at as Exhibit 3, that is this goalkeeper
25 report, you have never seen this before in any form --

1      A. No, I am saying --
2      Q. -- as a document or as a computer?
3      A. I am saying to you I don't recall seeing
4  it.
5      Q. You don't recall seeing it?
6      A. It is about memory, not about ever
7  seeing it.
8      Q. Okay.  If I look at the page marked
9  8358, the top 60 percent of that page appears to be
10 a list of accounts all held by Interpal.  Is that
11 a correct statement?
12     A. It appears to be, yes.
13     Q. When you did your research into the last
14 six months of payments did you do it for all of these
15 accounts?
16     A. I would have done it, you know, I would
17 have been working on this document, I would have
18 looked in our back office system, looking at the
19 relationship, and it would have shown you the accounts
20 related to that relationship, and those are the
21 accounts that I would have reviewed.
22     Q. You would have reviewed all of them?
23     A. Yes.
24     Q. You see where it says about two-thirds
25 of the way or three-quarters of the way down the list

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

1  it is them listed on that list, and I would have
2  reported it to the management. You know, although if
3  there is a payment beneficiary who was on a sanctions
4  list it would be in my report and that would be
5  considered by the group there to say, well, you know,
6  (i), if it was on there, would we report it, we would
7  report it to NCIS anyway, and (ii) we would then
8  consider whether we wanted to keep the relationship.
9      Q. Okay. So you are saying that finding
10  the name on a sanction list you would have considered
11  substantiation?
12      MR. BLACKMAN: Objection, misstates the
13  testimony.
14      A. No.
15      Q. Does that misstate your testimony?
16      A. I would say that a source but not the
17  only source.
18      Q. What other sources?
19      A. Well, if I found anything from the
20  Metropolitan Police, say, listing them as a terrorist
21  organization, I would look at the sources as they came
22  up and then decide whether these were worthy enough to
23  report up to the management of the bank.
24      Q. Okay. Did you review any sanctions
25  lists published by the country Israel?

1      A. I wouldn't -- I have never use the
2  sanction list issued by Israel. If a name came up for
3  a Google and it came up with that site, then that
4  would have been reviewed, but predominantly the main
5  sanctions list source we used was the KYC check in the
6  third paragraph.
7      Q. And what is the KYC check?
8      A. There is an organization called
9  Complinet. It is an industry source for compliance
10  for regulatory issues and anti-money laundering. They
11  have direct feeds into the databases of numerous
12  regulators, Government bodies, enforcement agencies,
13  lists of politically exposed people, and basically it
14  is a very easy source to pick up all the major --
15  watch lists and type in the name. It has got fuzzy
16  logic matching, so it would do variations of names
17  automatically. On that I am not sure whether it was
18  at the time but I think for instance, like SEBI in
19  India is on it. I am not sure when it started but the
20  securities exchange board in India is on it with their
21  enforcement actions and things like that. So it is
22  quite clear.
23      Q. What about the OFAC lists? Are they on
24  there?
25      A. Yes.

1      Q. Do you have an understanding of the
2  purpose of the OFAC list, that is why does OFAC put
3  out a list of sanctioned entities?
4      A. As in the purpose or the results of that
5  sort of thing? People are listed under different acts
6  in the US, like I don't know all the acts but dealing
7  with the NME and all those sort of acts, whatever they
8  are called, and there is different listings on there.
9  So you have, you know, there is various programs
10  against countries, against drug traffickers, against
11  terrorists, and each list or each entity there, the
12  programs do vary by, you know, the requirements vary
13  by program. Some is an asset freeze, some is to
14  reject the funds, et cetera, et cetera.
15      Q. Okay. So I believe you have just
16  testified that different OFAC lists have different
17  purposes. Is that correct?
18      A. They have different requirements.
19      Q. Different requirements, and what do you
20  mean by "requirements"?
21      A. I.e. if you pick up one of the OFAC
22  programs for, let's say, Iran, it will require US
23  institutions or US persons to do this, that and the
24  other, and there is a different program that tells
25  people to do different things. There is not

1  a standard response to the OFAC list.
2      Q. Okay. My question, I am trying to find
3  out, do you have an understanding of what OFAC is
4  trying to accomplish by putting out lists?
5      A. Probably political interests of the US,
6  the Government interests of the US.
7      Q. Yes.
8      A. That is what it is trying to achieve,
9  whatever the interests of the US Government are, that
10  is what it is trying to achieve.
11      Q. Does OFAC have a list of suspected
12  terrorist entities?
13      A. I don't know whether it uses the word
14  "suspected". It has got different designations. So
15  the designation that Interpal had, the FTO lists,
16  there is various lists.
17      Q. Are you aware of the fact that OFAC --
18  that Interpal was on an OFAC list?
19      A. Yes.
20      Q. Do you know whether at this time,
21  May 20, 2004, Interpal was on that OFAC list?
22      A. I believe it would have been, yes.
23      Q. In fact, you reference it here, I
24  believe, on page 66733:
25      "I realize due to the US terrorist

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

---

HIGHLY CONFIDENTIAL                                      Page 89

1  designation of Interpal ..."
2      Do you see those words?
3      A.  Yes.
4      Q.  So you were aware at this time that the
5  United States had designated Interpal an SGDT,
6  specially designated global terrorist.  Do you know
7  that term?
8      A.  Yes.
9      Q.  So then, in regard to that list of
10  specially designated global terrorists, do you have an
11  understanding of what OFAC was trying to accomplish by
12  putting out that list?
13      A.  It is not really something I can be
14  judging on, you know, the reasons for each individual
15  entry on that list or how that list is actually
16  governed or anything else.  You know, I am not in
17  a position to advise or even judge it.  I don't recall
18  that level of detail.
19      Q.  All right.  But the purpose of that
20  list, the purpose of the OFAC list, do you have an
21  understanding of why the Treasury puts that out?
22      MR. BLACKMAN: Objection, asked and
23  answered.  He answered that question already.
24      MR. SCHWARTZ: The answer is you don't know?
25      A.  No, I am saying I don't know all the

---

HIGHLY CONFIDENTIAL                                      Page 90

1  programs' list purposes.  If you have a match on it
2  then you review that program and the requirements of
3  that program.  So if there is an Iranian program there
4  is serious actions, sanctions against a number of
5  different countries and individuals.  If there is a
6  match on it, you review that match and read the
7  background information for it.
8      Q.  What about the designation of Interpal?
9  Do you have an understanding of why OFAC listed
10  Interpal as a specially designated global terrorist?
11      A.  I am not privy to the US Government's
12  information.
13      Q.  So the answer is "no"?
14      A.  No.  I am sure at some point I would
15  have read whatever the press releases would have been
16  but I don't recall what they would have been.
17      Q.  In your trawls for information on the
18  internet, if you had discovered that one of the names
19  of the payees was listed on an OFAC list, would you
20  have considered that substantiation and reported it?
21      A.  As you can see within the document I
22  have reported basically for every entity the
23  information I found, so if it was on the OFAC list it
24  would have been reported.
25      Q.  Okay.  If you look at the last

---

HIGHLY CONFIDENTIAL                                      Page 91

1  paragraph, besides the sign off, now we are on 66732,
2  you write:
3      "I am content to leave the sterling and euro
4  accounts operating with the semi-annual review taking
5  place for foreign payments made from the accounts.
6  Consideration will need to be given regarding the
7  operation of the US dollar account, as funds from this
8  account will get frozen if they are transferred via
9  a US domiciled/owned counterparty".
10      Do you see those sentences?
11      A.  Yes.
12      Q.  Do you remember writing that?
13      A.  No.  I can read it from this document.
14  I can't remember.
15      Q.  You have no doubt that you did write
16  that though?
17      A.  That is correct.
18      Q.  Is it your understanding -- look at the
19  second sentence:
20      "Consideration will need to be given
21  regarding the operation of the US dollar account, as
22  funds from this account will get frozen if they are
23  transferred via a US domiciled/owned counterparty".
24      What were you suggesting there?
25      A.  The closure of the account.

---

HIGHLY CONFIDENTIAL                                      Page 92

1      Q.  You were suggesting to close the dollar
2  account?
3      A.  Yes, you know, from my perspective, it
4  would be.  The consideration there is that we have got
5  US correspondent banks and we don't want to damage
6  those relationships or anything like that.  We don't
7  want to go out and breach US law or get our
8  correspondence banks to breach US law.  So there is no
9  point sending funds to the US if we know it is going
10  to get frozen.
11      Q.  So your understanding then was that if
12  you closed the dollar account you are complying with
13  US law?
14      A.  No.  By closing the dollar account it
15  will mean that the account won't -- no US entities
16  will be needed to transact with the Interpal accounts,
17  therefore they are not breaching US law.
18      Q.  And you considered that to be sufficient
19  compliance with US law at the time, is that correct?
20      MR. BLACKMAN: Objection to the form of the
21  question, lack of foundation.  There has been no
22  testimony that NatWest was required to comply with the
23  OFAC list, whatever that means.
24      Q.  Let me address Mr. Blackman's objection.
25  You make a statement, you make a recommendation, which

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

---

1   you are saying now was to close the dollar account?
2        A.  That we should not transact through the
3   US because of OFAC, listing of OFAC of Interpal, yes.
4        Q.  You said that would be so that your
5   correspondent banks would not get in trouble with US
6   law, et cetera?
7        A.  So that transactions actually go
8   through, because they should not go through in the US.
9   If they want to carry on doing business there is no
10  point them doing any dollar account.  Not only will it
11  damage our relations with the US, it would mean all
12  their money gets frozen as well, so their charities
13  would not get any money either, so the beneficiaries.
14       Q.  Is it your understanding that taking the
15  course of action that you recommend would constitute
16  sufficient compliance with US law?
17            MR. BLACKMAN: Objection to the form of the
18  question, lack of foundation.
19            MR. SCHWARTZ: Objection is stated.  I would
20  like an answer.
21            MR. BLACKMAN: I want to have the record
22  clear.  You are asking the witness, who is not
23  a lawyer, questions without any function about
24  compliance with US law and when there has been no
25  showing that NatWest is subject to any of these laws.

---

1            MR. SCHWARTZ: I am asking for your
2   understanding, Mr. Cole, and I would like an answer to
3   my question.  The objection is stated.
4        A.  Whose compliance, the US bank compliance
5   or ours?
6        Q.  The bank, the NatWest Bank that you work
7   for.  My question is, is it your understanding that
8   what you recommend constitutes sufficient compliance
9   with US law?
10            MR. BLACKMAN: By whom?
11            MR. SCHWARTZ: By the bank.
12       A.  That was not my analysis or my judgment.
13       Q.  So what was your analysis and judgment?
14       A.  That if we send funds through the US
15  they should get frozen by a US correspondent;
16  therefore we shouldn't be sending dollars through the
17  US for any transaction in dollars.
18       Q.  Did you ever speak to the addressees of
19  this note, Stephen Foster and Ben Norrie, about your
20  recommendation that you would be content to leave the
21  sterling and euro accounts operating but you should
22  close the dollar account?  Did you ever speak to them
23  subsequently about this?
24       A.  Yes, I would have expected that I would
25  have done.  I don't recall the conversations but

---

1   I would have expected we would have spoken about it.
2        Q.  Do you remember whether they agreed with
3   you?
4        A.  If they disagreed with me then I would
5   have done further work.
6        Q.  And you didn't do further work?
7        A.  At that time, yes.
8        Q.  You concluded they agreed with you?
9        A.  Yes, potentially they may have spoken to
10  Irvine Rodger, because he is my line manager.
11       Q.  But you don't remember speaking to
12  Irvine Rodger?
13       A.  I would have spoken to Irvine Rodger on
14  this because he is my direct line manager, so I would
15  have told him.  This is quite a sensitive piece of
16  work.  I would have kept him fully briefed.
17       Q.  To the best of your knowledge, did
18  Irvine Rodger agree with your recommendations?
19       A.  To the best of my knowledge, yes.
20       Q.  I am going to ask the reporter to mark
21  as Cole Exhibit 8 a document that has been Bates
22  numbered NW50050 through 50055.
23        (Exhibit Cole 8 marked for identification)
24        Please take a moment and read this, Mr. Cole.
25       A.  Okay.

---

1        Q.  Before we get to this I would like to
2   ask you just one more question about the document we
3   were previously looking at, which was Cole Exhibit 2.
4   I asked you about on the first page the sentence
5   starting with "Consideration will need to be given".
6   We talked about how you recommended that they close
7   the dollar account?
8        A.  That is how I have interpreted it today,
9   yes.  I don't say it there, do I?
10       Q.  That is correct.  My question is do you
11  recall seeking anyone's advice before making that
12  recommendation?
13       A.  Not that I recall.  But what I am saying
14  is "consider".  My recommendation is to consider,
15  isn't it, so ...
16       Q.  In other words you are recommending
17  "consider", that is what you are saying?
18       A.  That is what it says: "Consideration
19  needs to be given."  So all that is stating -- I am
20  not recommending anything about the operation.  I am
21  saying "consideration will need to be given".
22       Q.  And my question was --
23       A.  -- did I seek any advice to say we
24  should consider?
25       Q.  Consideration needs to be given?

---

TZVI WEISS, et al - NATAN APPLEBAUM, et al v
NATIONAL WESTMINSTER BANK, PLC.,

GUY COLE
June 8, 2010

HIGHLY CONFIDENTIAL                                Page 141

1          MR. BLACKMAN: Question is vague.  I object
2    to it.
3          A.  Can you rephrase the question?
4          Q.  Yes.  Am I correct in stating that you
5    never found it to be fact that Interpal was
6    a terrorist organization, correct?
7          A.  Correct, I never saw any activity that
8    made me believe they were a terrorist organization.
9          Q.  And what sort of information would it
10   have taken for you to consider Interpal a terrorist
11   organization?
12         MR. BLACKMAN: Objection, calls for
13   hypothetical.  Speculation.  You may answer if you
14   can.
15         A.  The purpose of my reviews was to look at
16   all those beneficiaries and try and find beneficiaries
17   or activity that would demonstrate that they were an
18   organization, and then at that point I would still
19   report it up to the Government authorities, et cetera.
20         Q.  But again, in your mind, the US
21   designation was not sufficient, correct?
22         A.  For my personal opinion?
23         Q.  Correct.
24         A.  I think it would give grounds for
25   suspicion, but from me looking at this relationship I

HIGHLY CONFIDENTIAL                                Page 142

1    didn't find anything that further, you know, further
2    evidence that, you know, I approached this in
3    a suspicious mind in those days.  I went to find
4    something basically when I looked at this account.
5          Q.  One more question on this document.
6    Looking at the second to last paragraph on the first
7    page, starting with "I am content".  Do you see where
8    I am talking about?
9          A.  Yes.
10         Q.  I believe Mr. Schwartz asked you this
11   morning if you knew whether or not NatWest could
12   continue to transact business for Interpal so long as
13   it did not include transactions that included US
14   dollars.  Correct?
15         A.  Yes, he asked me a similar question to
16   that, yes.
17         Q.  Am I correct in restating that your
18   answer to that question was yes, that NatWest could
19   transact business for Interpal after the US
20   designation so long as the transaction did not involve
21   US dollars?
22         A.  My belief would be NatWest could
23   continue with its relationship with Interpal, and if
24   it transacted in US dollars, which it would be
25   entitled to do of course, it would have then the

HIGHLY CONFIDENTIAL                                Page 143

1    consequences in the US of transacting in US dollars.
2    I don't think we as a UK bank were banned from dealing
3    in US dollars, but it would not be wise or conducive
4    to the business to do anything in dollars.
5          Q.  Did that belief come from your prior
6    training?  Did it come from attorneys with NatWest?
7    Where did you gain that understanding?
8          A.  I don't recall a specific occasion where
9    I would have got that, from reading the OFAC thing,
10   having it explained to me, but I would not be able to
11   recall a specific occasion.
12         Q.  You don't recall who explained it to
13   you?
14         A.  Exactly.
15         Q.  I want to ask you what I hope is
16   a straightforward question.  In the first hour this
17   morning we discussed that you were the surveillance
18   manager, and essentially the second line of monitoring
19   or auditing when you first joined RBS.  Correct?
20         A.  Yes.
21         Q.  If a suspicion of money laundering or
22   terror financing that was going to ultimately come
23   through you started on the branch level, can you give
24   me or can you explain to me the path that that
25   suspicion would follow, in terms of which departments

HIGHLY CONFIDENTIAL                                Page 144

1    or which positions within which departments would
2    review it up until the point it reached your desk?
3          A.  The procedure is that it should not come
4    to me.  The procedure is as you saw on one of the
5    previous exhibits, Cole 14, staff who have got access
6    to e-mail should send it directly to that mail box at
7    group level.  The function for reporting in the bank
8    is within that team, it is not within the divisional
9    team.  The only time I would be involved in it would
10   not be to assess the basis of any suspicion reports,
11   it would basically be to give support and guidance to
12   somebody submitting a form or wanting to investigate
13   a client further, so I am not part of the process.
14         Q.  Then let's move you out of the process.
15   Can you tell me how the suspicion would be
16   investigated, again starting at the branch level and
17   working its way up?
18         A.  Some of it would be speculation, because
19   I don't know all the procedures, but if there is
20   something unusual with a front line person, they will
21   try to make reasonable enquiries with the client and
22   through the accounts to see whether they can find
23   anything that will mitigate those concerns they have
24   and explain them.  If they have a suspicion, the
25   suspicion is personal to those individuals, then they

**EXHIBIT 68 to Declaration of Joel Israel
(Bank Transfer, 21 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 69 to Declaration of Joel Israel**
**(Bank Transfer, 24 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 70 to Declaration of Joel Israel**
**(Payment Instructions, 2 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 71 to Declaration of Joel Israel**
**(Payment Summary, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 72 to Declaration of Joel Israel**

# FINAL NOTICE

To:          **Royal Bank of Scotland plc**

Of:          **42 St Andrew Square**
             **Edinburgh**
             **EH2 2YE**

Date         **12 December 2002**

**TAKE NOTICE: The Financial Services Authority of 25 The North Colonnade, Canary Wharf, London E14 5HS ("the FSA") gives you final notice about a requirement to pay a financial penalty.**

## 1.    THE PENALTY

1.1    The FSA gave you a decision notice on 19th November 2002 which notified you that, pursuant to section 206 of the Financial Services and Markets Act 2000 ("the Act"), the FSA had decided to impose a financial penalty against you in the amount of £750,000.

1.2    You have informed us that you do not intend to refer the matter to the Financial Services and Markets Tribunal.

1.3    Accordingly, for the reasons set out below the FSA imposes a financial penalty on you in the amount of £750,000 ("the Penalty").

2.      **RELEVANT STATUTORY PROVISIONS AND REGULATORY RULES**

2.1     Section 2(2) of the Act includes among the FSA's regulatory objectives the reduction of financial crime.

2.2     Section 146 of the Act states:

*The Authority may make rules in relation to the prevention and detection of money laundering in connection with the carrying on of regulated activity by authorised persons.*

2.3     Rule 3.1.3(1) of the FSA's Money Laundering Rules ("the ML Rules") provides:

*A relevant firm must take reasonable steps to find out who its client is by obtaining sufficient evidence of the identity of any client who comes into contact with the relevant firm to be able to show that the client is who he claims to be.*

2.4     Rule 7.3.2(1) of the ML Rules provides:

*A relevant firm must make and retain...the following records...in relation to evidence of identity:*

          *(i)      a copy of the evidence of identity obtained under ML3; or*

          *(ii)     a record of where a copy of the evidence of identity can be obtained; or*

          *(iii)    when it is not reasonably practicable to comply with (i) or (ii), a record of how the details of the evidence of identity can be obtained; and*

                *when it has concluded it should treat a client as financially excluded (ML 3.1.5G to ML 3.1.7G Financial exclusion), a record of the reasons for doing so;...*

2.5     Section 206(1) of the Act states:

*If the Authority considers that an authorised person has contravened a requirement imposed on him by or under this Act, it may impose on him a penalty, in respect of the contravention, of such amount as it considers appropriate.*

3.      **REASONS FOR THE PROPOSED ACTION**

**Summary**

3.1     Following information provided by RBS which suggested to the FSA that RBS may

have contravened the ML Rules, being requirements imposed upon RBS under the Act, the FSA on 30 May 2002 appointed investigators under section 168 of the Act.

3.2   As a result of that investigation, which was based on a sample of accounts opened between January 2002 and May 2002, the FSA has concluded that RBS has contravened both Rule 3.1.3 and Rule 7.3.2 of the ML Rules.

3.3   In so doing RBS demonstrated failings which demand a significant financial penalty. These failings are viewed by the FSA as particularly serious in the light of the following factors:

- they occurred against a background where statutory requirements for firms to have in place anti-money laundering procedures, including procedures to identify their clients, had been in place for over eight years and where, in anticipation of the FSA's new powers to make Rules relating to the prevention of money laundering with effect from 1 December 2001, there had been a greatly increased emphasis on preventing the use of the financial system for financial crime;

- the high level of breaches between January and March 2002;

- notwithstanding the systems which RBS had in place, there was a failure adequately to monitor compliance with regulatory requirements;

- the FSA believes that the size of RBS and the retail banking market in which it operates presents a serious risk to the FSA's statutory objective to reduce financial crime.

3.4   Were it not for the prompt and effective remedial action taken by RBS once it had identified its failings and for the full and pro-active co-operation demonstrated by RBS in relation to the FSA's investigation, the financial penalty proposed would have been very substantially higher.

**Facts and Matters Relied On**

*The Statutory and Regulatory Background*

3.5   Statutory anti-money laundering requirements on financial sector firms were first imposed by The Money Laundering Regulations 1993 ("the Regulations"), which took effect on 1 April 1994. The Regulations require financial sector firms to have procedures for, among other things, the identification of their clients and the maintenance of records.

3.6   Further, from 1990 the Joint Money Laundering Steering Group, of which the British Bankers' Association is a member, provided advice on best practice in anti-money laundering controls by issuing Guidance Notes for the Financial Sector ("the

Guidance Notes"). Subsequent editions of the Guidance Notes took account of evolving best practice within the financial services industry. Since 1994 the Guidance Notes have provided advice and guidance on complying with the Regulations such that a court may take them into account in considering whether there has been a breach of the Regulations. Both the editions issued in 2001 reflected the provisions of the ML Rules that came into effect on 1 December 2001.

3.7     Prior to the ML Rules coming into force and in anticipation of the FSA's statutory objective to reduce financial crime, the FSA repeatedly stressed the importance of high standards of compliance with UK anti-money laundering requirements and that, once its new enforcement powers came into effect, they would be rigorously applied to deal with breaches of the ML Rules.

*RBS Actions*

3.8     RBS is an authorised deposit taking institution undertaking retail banking along with a wide range of other permitted activities. It forms part of the Royal Bank of Scotland Group ("RBS Group").

3.9     RBS Retail Banking ("RBS Retail") uses a process called the "New Account Sanctioner" ("NAS") when opening new accounts. NAS is intended to ensure that the 'Know Your Customer' ("KYC") information necessary for verifying identity is in place prior to an account being opened. NAS has been in place for five years.  The effectiveness of NAS is monitored by RBS Retail's compliance function.  The procedure used by RBS Retail has been independently audited by RBS Group Internal Audit ("GIA") a number of times.

3.10    In late 2001 RBS Group instigated a program of actions to reduce the level of KYC control failures across the RBS Group to satisfactory levels by 31 March 2002. This objective was in line with requirements set down by the FSA with regard to the NatWest Retail Banking.  One stream of the required work was a series of independent audits carried out by GIA.

3.11    GIA conducted testing of the NAS procedures in RBS Retail in December 2001. The tests were conducted on 241 accounts opened in November 2001. These tests identified a KYC failure rate of 11.2% i.e. either the customer's name or address (or both) had not been verified to the standards laid down in the NAS process within RBS Retail or the required records of identity had not been retained.

3.12    The results of the GIA tests were made available to RBS Group management, including the Group Compliance Department, in January 2002. In line with the Group-wide program of work to reduce KYC control failures to satisfactory levels, a remedial action plan aimed at ensuring adherence to the NAS process was immediately drawn up and implemented during the period January 2002 to March 2002.

3.13    The next round of testing, in March 2002, was conducted by Retail Compliance on accounts opened in January 2002, following the implementation of the action

plan. These tests indicated that the KYC failure rates had increased further.

3.14    On 10 April 2002 RBS Group informed the FSA of the failings identified by the GIA tests in December 2001 and gave a copy of the GIA report to the FSA.

3.15    The results of the March tests were orally reported to the FSA at a meeting on 23 April 2002.

3.16    The remedial action plan initiated in January 2002 has resulted in KYC failure rates being significantly reduced from April 2002.

*The FSA Investigation*

3.17    At the request of the FSA, RBS supplied account opening documentation in relation to 181 accounts opened between January and May 2002.  The accounts were those which were classified by GIA and Retail Compliance as failing against internal procedures from the sample of 2170 accounts which they had examined.

3.18    Each account file was examined, having regard to the identification criteria set out in the Guidance Notes to determine whether there was sufficient evidence to show that the client was who he had claimed to be.

3.19    Paragraph 4.72 of the Guidance Notes states that the true full name (and/or names used) and current permanent address should be established and independently validated for all private individuals whose identity needed to be verified. Paragraph 4.73 states that the information obtained should provide satisfaction that a person of that name exists at the address given and that the applicant is that person.

3.20    The FSA considers that a firm's failure adequately to establish and validate an applicant's name and permanent residential address constitutes a failure to take reasonable steps to find out who its client is and therefore constitutes a breach of ML 3.1.3.

3.21    Of the 181 account files examined, 89 were found to have insufficient evidence to show that the client was who he had claimed to be and therefore breached ML 3.1.3.

3.22    In respect of 7 account files, RBS was unable to supply copies or details of the documents it had used to verify identity.  These files therefore constituted breaches of ML 7.3.2.

3.23    Two of the seven files referred to in paragraph 3.22 were found to constitute breaches of both ML 3.1.3 and 7.3.2, making a total of 94 accounts with one or more failings.

4.      **RELEVANT GUIDANCE**

4.1     The principal purpose of the imposition of a financial penalty is to promote high

standards of regulatory conduct by deterring firms who have breached regulatory requirements from committing further contraventions, helping to deter other firms from committing contraventions and demonstrating generally to firms the benefit of compliant behaviour.

4.2    In determining whether a financial penalty is appropriate and its level, the FSA is required to consider all the relevant circumstances of the case.  ENF 13.3.3 indicates the factors that may be of particular relevance in determining the level of a financial penalty.  These are discussed in Part 5 below in respect of the circumstances of this case.

4.3    As the breaches of ML 3.1.3 and 7.3.2 also constitute breaches of the Money Laundering Regulations 1993, the FSA has considered whether the case is appropriate for a criminal prosecution.  In considering this, the FSA has applied the principles set out in ENF 15.5 and in the Code for Crown Prosecutors, namely the evidential and public interest tests.  Having regard to those tests, the FSA has concluded that a prosecution would not be appropriate in this case.

## 5.    FACTORS RELEVANT TO DETERMINING THE SANCTION

5.1    In determining that a financial penalty is appropriate and that the amount proposed is proportionate to RBS's contraventions the FSA considers the following factors to be particularly relevant in this case.

**The seriousness of the breaches**

5.2    The high level of breaches identified applied across the whole of the RBS Retail network and existed from at least December 2001 (as identified by the GIA report) until March 2002, with particularly high failure rates in January 2002 and March 2002.  RBS has stated that the rise in failure rates in March 2002 was partly due to the implementation of the remedial plan; the effect of the remedial plan in terms of reduced failure rates not being apparent until the following month.

5.3    The breaches revealed weaknesses in the RBS anti-money laundering control system.  The FSA considers the failure effectively to monitor the compliance of the RBS Retail network with the requirements of the Money Laundering Regulations 1993 and the FSA Money Laundering Rules to be a serious matter.  The seriousness of the breaches is exacerbated by the fact that they took place against a background of increased regulatory emphasis on the importance of effective anti-money laundering controls.

5.4    The FSA notes, however, that RBS itself discovered the breaches through its own GIA/Compliance testing in December 2001.  Additionally, in most cases some attempt had been made to identify the customers.

**The size, financial resources and other circumstances of the firm**

5.5     The FSA expects that a bank such as RBS should ensure that its anti-money laundering controls operate effectively across the whole of its network.  The FSA believes that a failure in anti-money laundering systems and controls in a large retail bank such as RBS is particularly serious in that it poses a greater risk that financial crime may be facilitated and therefore constitutes a greater risk to the FSA's statutory objective to reduce financial crime.

**Conduct following the contravention**

5.6     RBS informed the FSA of its contraventions and has co-operated fully and pro-actively with the FSA's investigation.

5.7     Once it had identified the problem, RBS took it seriously.  It devoted considerable resources at an early stage to correct the problem and instituted a remedial action plan of its own accord.  The FSA is satisfied that the remedial action plan has appropriately addressed the KYC non-compliance issue.

6.     **CONCLUSION**

6.1     Taking into account the seriousness of the contraventions and the risks they posed but also the prompt and effective remedial steps taken and the co-operation shown, the FSA has decided that a financial penalty of £750,000 be imposed. Without RBS's remedial actions and co-operation, the penalty would have been very substantially greater.

7.     **IMPORTANT NOTICES**

7.1     This Final Notice is given to you in accordance with section 390 of the Act.

**Manner of payment**

7.2     The Penalty must be paid to the FSA in full.

**Time for payment**

7.3     The Penalty must be paid to the FSA no later than 31st December 2002, being not less than 14 days beginning with the date on which this notice is given to you.

**If penalty not paid**

7.4     If all or any of the Penalty is outstanding on 1st January 2003, the FSA may recover the outstanding amount as a debt owed by you and due to the FSA.

**Publicity**

7.5    Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates.  Under those provisions, the FSA must publish such information about the matter to which this notice relates as the FSA considers appropriate.  The information may be published in such manner as the FSA considers appropriate.   However, the FSA may not publish information if such publication would, in the opinion of the FSA, be unfair to you or prejudicial to the interests of consumers.

7.6    The FSA intends to publish such information about the matter to which this Final Notice relates as it considers appropriate.

**FSA Contacts**

7.7    For more information concerning this matter generally, you should contact Carlos Conceicao at the FSA (direct line: 020 7676 1174 /fax: 020 7676 9723).

**Brian Dilley**
**Head of Deposit Taking & Financial Stability**
**FSA Enforcement Division**