**EXHIBIT 73 to Declaration of Joel Israel**

## Case Summary

| | Money laundering disclosure | CIFAS | NCIS |
|---|---|---|---|
| Delete Case | | | |

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |
|---|---|---|---|---|

**Incident Data**

| | | | | | **Linked Cases** | |
|---|---|---|---|---|---|---|
| **Control Authority** | RBS Retail Bank | **Status** | Closed | **Source:** [GK2:698074] | 725601 | Business auto-linked |
| **Review Date** | | **by** | | | | Business |
| **Remote Delivery Channel** | N | **High Profile** | N | | 779132 | auto-linked |
| **Created on** | 02 May 2003 00:00 | **by** | EUROPA_Dobsomj | | 1511040 | Business auto-linked |
| **Last Modified on** | 07 May 2003 00:00 | **by** | RBS_Hartlda | | 1766776 | Business auto-linked |
| | | | | | 2273567 | Phone auto-linked |
| | | | | | 2687376 | Business auto-linked |
| | | | | | Maintain Links | |

| Queries | Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|---|
| | | | NONE | Yes |

**Money laundering disclosure Record**

| **Submitting Branch** | | **Submitted By** | Alison Winter |
|---|---|---|---|
| **Submitting Unit Sortcode** | 16-26-21 | **Contact No** | 0191 232 1211 |
| **Submitting Department** | None | **Legislation** | DTA 94 |
| **Estimated Laundering Total** | 5000 <Unknown> | | |

**Reason(s) for Suspicion**

Please see attachments and/or Case Notes where available for further information

| **Transactions** | | | | | Add |
|---|---|---|---|---|---|
| **Date** | **Type** | | **Amount** | **Currency** | |
| | | | | | Edit |
| | | | | | Edit |
| | | | | | Edit |
| | | | | | Edit |



| Set All Risk Ratings to the the same value of:- | Amber | Blue | Green | Indigo | Red |
|---|---|---|---|---|---|

| **Personal Data** | Add |
|---|---|

HIGHLY CONFIDENTIAL

NW083850

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
|---------|-----------|---------------|-----|-----------------|------|-----|---|
| | | Redacted - Non-Responsive | M | NONE | Red | Red | Edit |

### Business Data — Add

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj | |
|-------------------|------------------|--------------------|----------------|------|-----|---|
| Redacted - Non-Responsive | | | | Green | Green | Edit |
| | | | | Green | Green | Edit |
| FRIENDS OF AL-AQSA | | UNITED KINGDOM | NONE | Green | Amber | Edit |
| INTERPAL CHILDREN | | UNITED KINGDOM | NONE | Green | Green | Edit |
| | | UNITED KINGDOM | NONE | Green | Amber | Edit |
| Redacted - Non-Responsive | | | | Green | Green | Edit |
| | | | | Green | Green | Edit |

### Telephone Data — Add

| Phone No. | Owner | Type | Risk | Adj | |
|-----------|-------|------|------|-----|---|
| Redacted - Non-Responsive | | Other | Red | Red | Edit |

### Address Data — Add

| Bldg No. & Name | Street | Town | Postcode | Risk | Adj | |
|-----------------|--------|------|----------|------|-----|---|
| Redacted - Non-Responsive | | | | Red | Red | Edit |
| | | | | Red | Red | Edit |

### Account Data — Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|--------------|-------------|----------|--------------|----------|------|-----|---|
| Redacted - Non-Responsive | | 16-26-21 | Credit Card | British Pound | Green | Green | Edit |
| | | 16-26-21 | Current (Personal) | British Pound | Green | Green | Edit |

### Miscellaneous Data — Add

-None-

### Case Notes — Add

| Type | Date | User | Text | |
|------|------|------|------|---|
| Case notes | 07 May 2003 | Migrated | 2/5 Branch to monitor account reporting to GI&F with any fur | View |
| Summary and Assessment | 07 May 2003 | Migrated | came to the bank attention after querying a switc | View |
| Conclusion | 07 May 2003 | Migrated | On the basis of the information available to us at the prese | View |

### Key Correspondence

| Upload Doc Title | Author | User | Date | | |
|------------------|--------|------|------|---|---|
| | | | | | Add |
| Memo to branch | EUROPA\Dobsomj | GK2 | 02 May 2003 | View | Edit |

HIGHLY CONFIDENTIAL

NW083851

| **1. User:** Migrated | **On:** | 07 May 2003 00:00 | Print | Copy | Delete |

**Note:** 2/5 Branch to monitor account reporting to GI&F with any further concerns. Excel.MD7/5 - Disclosure confirmed. DH

HIGHLY CONFIDENTIAL

NW083853



HIGHLY CONFIDENTIAL

NW083854

| **1. User:** Migrated | **On:** | 07 May 2003 00:00 | | Print | Copy | Delete |

**Note:** On the basis of the information available to us at the present time, it is considered that the above incident / activity may constitute or involve money laundering and consequently a disclosure has been made to the National Criminal Intelligence Service or other appropriate authorities. Please see attached documents for further information concerning the financial disclosure. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL                                                                                    NW083855

# Memorandum



**The Royal Bank of Scotland Group**

**Group Investigations & Fraud**

| | |
|---|---|
| **To:** | Alison Winter |
| **Branch/ Unit:** | Natwest<br>Newcastle upon Tyne  16-26-21 |
| **From:** | Mark Dobson |
| **Date:** | 2 May, 2003 |

7th Floor
1 Princes Street
London
EC2R 8PB

Telephone: 020 7714 4577
Facsimile: 020 7714 4549

---

### Re: Money Laundering Suspicion

**Account:** ████████████    *Redacted - Non-Responsive*

**Group Fraud Ref:**   698074

We refer to your/the attached report and advise the following:

**[X]** **The decision has been taken to report the matter to the Authorities.  The matter must be treated in the strictest confidence and under no circumstances should the account holder be advised of this action.**

**[ ]** Please update 'Know Your Customer' details and obtain an explanation for the transactions. Should you remain suspicious following your interview with the customer please revert to GI&F with a full explanation of your concerns.

**[ ]** Please ensure you review the Bank's 'Know Your Customer' and Due Diligence in respect of this connection.  You may wish to consider exiting the relationship unless you are entirely happy with your findings.

**[ ]** We consider this connection presents a serious risk to the Group, accordingly it is our view that you should exit the relationship at the earliest opportunity.  You may wish to use the attached wording.

**[X]** **Please monitor the activity on this account and revert to Group Investigations & Fraud if the activity alters significantly giving further cause for concern.**

**[X]** **You may continue to operate the account within normal banking practice unless you hear from us to the contrary**

**Please note it is an offence to advise the customer or any other 3rd party of your report to us, that a report has been made to the authorities, or of any subsequent investigation.**

Thank you for your assistance

Signed: .................................

The Royal Bank of Scotland Group plc
Registered in Scotland No 45551
Registered Office: 36 St Andrew Square Edinburgh EH2 2YB

698074

# Money Laundering Suspicion Report

**The Royal Bank of Scotland Group**

1. This Report should be used for both account holders and non account holders
2. Please complete all sections below
3. Please write clearly using capital letters with a black pen or use a word processor
4. If a section is not applicable, mark N/A. If you are unable to complete a section or provide any items requested, please provide an explanation
5. The report may be returned to the submitter, if not adequately completed. A member of staff will not be discharged from their obligation to report a suspicion until a satisfactorily completed report has been received by Group Investigations & Fraud.

| | | |
|---|---|---|
| **Send by Internal Mail to** Group Investigations & Fraud (GI&F) Royal Bank of Scotland Group Regent's House 42 Islington High Street London **Reports without attachments can continue** to be e-mailed via the Group intranet to -Group Fraud Money Laundering | **For GI&F Use Only** Case Record Number FRAUD SECTION **Priority: High / Med / Low** | **For GI&F Use Only** Nature of suspected offence ☐ Drug trafficking ☐ Terrorism ☐ Criminal Justice Act 1988 ☐ Other (please state) |

| **Submitting Business** | Submitting Branch | Submitting Sort Code: 162621 | **Direct Contact Number** |
|---|---|---|---|
| ✓ RBS Retail | Submitting Branch : Submitting Unit Location | | Internal: 0191 232 1211 |
| ☐ NW Retail | NEWCASTLE UPON TYNE | | |
| ☐ CB | | | |
| ☐ Retail Direct | Submitted by (Member of Staff) ALISON WINTER | External: N/A |
| ☐ Other (please state) | Date: 30.4.03 | |

| **Account Holding Branch/Unit** (or N/A for Non Account Holders) | **Sort Code** |
|---|---|
| NEWCASTLE UPON TYNE | 162621 |

**Reason for Suspicion** (including outcome of any discussions with customer, and where appropriate, evidence / explanation of the source of funds)

NatWest / CB – Refer to Process Manual 13, Section 22 for guidance – Attach 3 months ledgers prior to and including date of transaction(s)
RBS – Refer to Compliance Manual for guidance – Attach 3 months printouts of account history and covering prior to and including date of transaction(s)
Retail Direct – Depending on your business area, please refer to above guidance as appropriate

CUSTOMER RANG RE SWITCH PAYMENT TO 'AL-HIDAAYAH,
BIRMINGHAM' ON 29.4.03 WHICH TOOK THE ACCOUNT
OVERDRAWN. HE SAID HIS RELIGIOUS BELIEFS STOP HIM
FROM RECEIVING / PAYING INTEREST! ON LOOKING AT
THE PAYEES OF S/O'S + DIRECT BANKING PAYMENTS
THEY APPEAR TO BE TO BE MUSLIM, ETC. — FROM DOING
THE SAFE CUSTODY / TERRORISM RETURN I THOUGHT HE MAY
BE A SYMPATHISER.

If necessary, please continue on a separate sheet of paper and attach to this Report

| | |
|---|---|
| – Security and Safe Custody held (brief details only) NOTHING HELD | **Relationship Manager's Name** |
| – Boxes and Parcels held | WENDY LILLIE |
| **Special Signing Instructions – Provide details** | **Relationship Manager's Contact No** 0191 232 1211 |
| ☐ Third Party mandate | |
| ☐ Power of Attorney N/A | Ledgers / interview notes attached |
| ☐ Known Agent | ✓ Additional paperwork attached (Yes)/ No |
| ☐ Other known accounts held (eg Building Society) | Number of Pages 18 |

Please ensure the reverse page is completed

HIGHLY CONFIDENTIAL

NW083857

# Money Laundering Suspicion Report

**Non-Personal Customers**

Include known details of Directors, Signatories, Beneficial Owners in Personal Customers Section opposite. If necessary, please continue on a separate sheet of paper and attach to this Report

- Company Ltd / Plc (please delete when not applicable)
- Sole Trader
- Partnership
- Limited Liability Partnership (LLP)
- Charity
- Trust
- Other

Customer Name _____ N/A

Core Business Activity _____

Date of Incorporation _____
(if applicable)

Country of Incorporation _____
(if applicable)

Registered Number _____
(if applicable)

☑ Please enclose a copy of Account Opening Forms and Identification (and if applicable, Third Party / Agent details)

- Date when Relationship with Bank started: _____

**Personal Customers** (If more than one, please attach details as if necessary, please continue on a separate sheet of paper and attach to this Report)

Male / Female

Date of Birth *Redacted - Non-Responsive*
Or Approx. Age

Surname ███████████████████

Forenames ███████████████████

Nationality _____ *Redacted - Non-Responsive*

Passport Number _____ *Redacted - Non-Responsive*
(if known)

Occupation _____ *Redacted - Non-Responsive*

Employer _____

Employer's Address _____ *Redacted - Non-Responsive*

Contact number _____ *Redacted - Non-Responsive*

National Insurance Number _____
(if known)

*Redacted - Non-Responsive*

| Customer Address | Customer Additional / Previous Address (dates) | *Redacted - Non-Responsive* |
|---|---|---|
| *Redacted - Non-Responsive* | | |
| *Redacted - Non-Responsive* | | |
| Post Code  *Redacted - Non-Responsive* | Post Code  *Redacted - Non-Responsive* | |
| Tel:  *Redacted - Non-Responsive* | Tel:  *Redacted - Non-Responsive* | |
| Email:  *Redacted - Non-Responsive* | | |

**Customer Accounts**

| A/c Rel | Account Number | Sort Code | Type (e.g. current etc.) | Date Opened | Currency |
|---|---|---|---|---|---|
| 1) | *Redacted - Non-Responsive* | | | / / | |
| 2) | *Redacted - Non-Responsive* | 16.2621 | | / / | |
| 3) | | | | / / | |
| 4) | | | | / / | |

**Suspicious Transaction Details** — PAYEES OF STANDING ORDERS (SEE PRINT OUT)

| A/c Ref | Date | Amount | Transaction | Source / Destination of Funds (e.g. Cheque) |
|---|---|---|---|---|
| See above | | DPC — PAYEES ALSO HAVE | | |
| | | SUSPICIOUS NAMES | Dr/Cr | |
| | | | Dr/Cr | |
| | | | Dr/Cr | |
| | | | Dr/Cr | |

Attach copies of voucher(s), payment instruction(s) if readily available  Yes / No

Signed by Submitter _____ 537170   Print Name  ALISON WINTER

HIGHLY CONFIDENTIAL

NW083858

Case 1:05-cv-04622-DLI-RML   Document 272-5   Filed 03/22/12   Page 10 of 140 PageID #: 9431

**NCIS Disclosure for Case 698074 ( Received )**

Close                    Print

**Core NCIS details created on 02 May 2003 by EUROPA\Dobsomj**          **[ Submitted by**
**RBS\Hartlda on 07-MAY-03 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Drugs | Submitting Branch Address | Royscot |
| Disclosure Date | 02 May 2003 | | Newcastle upon Tyne |
| Branch / Outlet | Newcastle upon Tyne | | |
| Branch Code | 16-26-21 | | |
| Trust Indicator | N | | |
| Further Information | N | | Postcode |

Text

Postcode

**Information for  ANDREW SKINNER**

| Information Type | *Redacted - Non-Responsive* | Information Detail | *Redacted - Non-Responsive* |
|---|---|---|---|

HIGHLY CONFIDENTIAL

NW083859

Description



HIGHLY CONFIDENTIAL

NW083860

Case 1:05-cv-04622-DLI-RML   Document 272-5   Filed 03/22/12   Page 12 of 140 PageID #: 9433



HIGHLY CONFIDENTIAL

NW083861

HIGHLY CONFIDENTIAL

NW083862

**EXHIBIT 74 to Declaration of Joel Israel**



# *Interpal*

PO Box 3333, London, NW6 1RW
Tel: 020 8450 8002 ~ Fax: 020 8450 8002
info@interpal.org ~ www.interpal.org
Registered Charity No. 1040094

Dear Terry,

Please transfer the following amounts to the Main Account No: 95142940 <u>as a matter of urgency</u> –



1) ▮▮▮▮ from the Zakat Account No: 95142967
2) ▮▮▮▮ from the Children Account No: 95142975
3) ▮▮▮▮ from the ▮▮▮▮▮▮▮▮▮▮▮
4) ▮▮▮▮ from the Families Account No: 95145397
5) ▮▮▮ from the Interest Account No: 95142959

Two signatories shall be signing a copy of this e-mail to be faxed to you @ 01708-733 816.

Thank you for your kind attention, and I should be grateful for confirmation of receipt of this communication.

Best wishes;

Jihad Qundil
Executive Manager
INTERPAL
Helping Palestinians in Need

Transfer Requested by:

J. Qundil (Executive Manager)          E. Mustafa (Managing Trustee)

Sign. _[signature]_                    Sign. _[signature]_

Date. ▮▮▮▮▮▮                          Date. ▮▮▮▮▮▮

---

The contents of this e-mail are intended only for the named addressee. It contains information which is confidential and which may also be privileged. Unless you are the named addressee (or authorised to receive this e-mail by the named addressee) you must not copy, use, disclose or place any reliance on its contents. If you receive this e-mail in error please notify us immediately and delete it.

We make every effort to keep our network free from viruses. However, you do need to check this e-mail and any attachments for viruses. We accept no responsibility for any computer virus which may be transferred by this e-mail.

Any views or opinions contained in this e-mail are those of the author and do not necessarily represent those of INTERPAL.

HIGHLY CONFIDENTIAL

NW 013375

**EXHIBIT 75 to Declaration of Joel Israel**

UID Case Summary

Page 1 of 2

## Case Summary



| | **Legal Process** | | | | NCIS |
|---|---|---|---|---|---|

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |
|---|---|---|---|---|

### Incident Data

| | | | | | **Linked Cases** | |
|---|---|---|---|---|---|---|
| **Control Authority** | NatWest Retail Bank | **Status** | Closed | **Source:** [GK2:704079] | 617044 | Account auto-linked |
| **Review Date** | | by | | | 666593 | NONE |
| **Remote Delivery Channel** | N | **High Profile** | N | | 666814 | Account auto-linked |
| **Created on** | 07 Jul 2003 00:00 | by | EUROPA_Shielsk | | | Account |
| **Last Modified on** | 27 Aug 2003 00:00 | by | RBS_Eastonh | | 710368 | auto-linked |
| | | | | | 1748664 | Account auto-linked |
| | | | | | Maintain Links | |

| **Queries** | **Refer To** | **Tel No.** | **Business** | **Unable to contact ?** |
|---|---|---|---|---|
| | | | NONE | Yes |

### Legal Process Record

| **Legal Process Category** | Production Order | **Enquiry From** | Metropolitan Police Services |
|---|---|---|---|
| **Source / Enquiry Type** | Police | **Contact Name** | DS Garry Pepe |
| **Legislation** | Other | **Contact Number** | Not Known |
| **Comment** | | | |

| Set All Risk Ratings to the the same value of:- | Amber  Blue  Green  Indigo  Red |
|---|---|

### Personal Data      Add

-None-

### Business Data      Add

| **Business/Org Name** | **Company Ref. No.** | **Legal Jurisdiction** | **Key Information** | **Risk** | **Adj** | |
|---|---|---|---|---|---|---|
| PALESTINIANS DEVELOPMENT FUND INTERPAL | | UNITED KINGDOM | NONE | Green | Green | Edit |

### Telephone Data      Add

-None-

### Address Data      Add

| **Bldg No. & Name** | **Street** | **Town** | **Postcode** | **Risk** | **Adj** |
|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL

NW 052105

| PO BOX NO | | | LONDON | NW6 1RW | | Green | Green | Edit |

### Account Data

Add

| Account Name | Account No. | Sortcode | Account Type | Currency | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| PRDF ADM A/C | 95142983 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PRDF CHILDREN A/C | 95142975 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PRDF ZAKAT | 95142967 | 60-08-22 | Current (Non Personal) | British Pound | Green | Green | Edit |
| PRDF MONEY A/C | 95142959 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PALESTINIANS RELIEF | 95142940 | 60-08-22 | Current (Non Personal) | British Pound | Green | Amber | Edit |
| PRDF EURO A/C | 550-00-08524882 | 60-08-22 | Currency Account | British Pound | Green | Green | Edit |
| PRDF US$ A/C | 140-00-04156838 | 60-08-22 | Currency Account | British Pound | Green | Green | Edit |

### Miscellaneous Data

Add

-None-

### Case Notes

Add

| Type | Date | User | Text | |
|---|---|---|---|---|
| Summary and Assessment | 27 Aug 2003 | Migrated | 07/07/03 An investigation linked to Production Orders alread | View |
| Conclusion | 27 Aug 2003 | Migrated | A production order or equivalent has been served in respect | View |

### Key Correspondence

| Upload Doc Title | Author | User | Date | | |
|---|---|---|---|---|---|
| Police Fax | EUROPA\Shielsk | GK2 | 08 Jul 2003 | View | Edit |
| production order | RBS\Eastonh | GK2 | 27 Aug 2003 | View | Edit |
| 704079_Legal Order Instructions (central collation).doc | UID_OWNER | UID_OWNER | 27 Nov 2004 | View | Edit |

### No NCIS Disclosures

### No CIFAS Reports

Summary and Assessment History for Case 70407940                                Page 1 of 1

| 1. User: Migrated | On: | 27 Aug 2003 00:00 | Print | Copy |

**Note:** 07/07/03 An investigation linked to Production Orders already obtained by the Met Police received & handed to me by Emma Peek to take forward. Ok to comply. Have instructed Tim @ Enfield CSC to obtain copy statement from 01/01/02 to 07/07/03 on all the above accounts. Paperwork placed in diary for 14/07/03 in order to monitor progress. 15/07/03 Telephoned Tim @ Enfield CSC 09:15, he informs he's waiting for Post-Bic copy statements & expects to receive them on 17/07/03. Therefore have placed paperwork in diary for 18/07/03 in order to monitor progress. K Shiels GI&F.18/07/03 Telephoned Tim 11:45, who informs that the initail requirements of this Court order have been completed. K Shiels GI&F.

HIGHLY CONFIDENTIAL                                                          NW 052107

Conclusion History for Case 704079

**1. User:** Migrated   **On:**   27 Aug 2003 00:00   Print   Copy

**Note:** A production order or equivalent has been served in respect of the party(ies) listed on this record. This information may be of relevance when considering any business approaches or dealings with the above named parties.

HIGHLY CONFIDENTIAL

NW 052108



© Europol                                                              Page 9

HIGHLY CONFIDENTIAL

NW 052109



IN THE CROWN COURT

TERRORISM ACT 2000

PO2003/1192
Form JD1

PRODUCTION ORDER
(Sch 5, Para 5 Terrorism Act 2000)



HIGHLY CONFIDENTIAL                                                        NW 052110

# FAX MESSAGE (Central Collation)

**XX The Royal Bank of**
**XX Scotland Group**

|  |  |
|---|---|
| **To:** | Tim Kennelly, Fraud Team, Enfield CSC |
| **Fax No:** | 020 8344 1249 |
| **From:** | Kevin Shiels |
| **GI&F Ref:** | 704079 |
| **Date:** | 07/07/03 |
| **Pages:** | 4 |

**Group Investigations & Fraud**

Referrals & Due Diligence Team
7th Floor,
1 Princes Street,
London,
EC2R 8PB

Telephone: **020 7714 4578**
Facsimile: **020 7714 4549**

---

## Re: Request for Material Required for a Legal Order

**A Legal Order has been served on the Group and collation of the material required under this Order is being handled centrally by Group Investigations & Fraud (GI&F). Please action this request immediately and supply the material requested below to GI&F within 7.**

It is imperative that any difficulties providing the material requested within the above timescales are escalated immediately to your line manager and to Group Investigations & Fraud. **Delays in the provision of information could lead to contempt proceedings being brought against the Group.**

❖ Please provide GI&F with the material requested on the <u>specified account(s)</u> up to and including the date of the Order, as outlined below:

| Account Name | Account Number & Sort Code | Material Required |
|---|---|---|
| Palestinians Development Fund Interpal | 95142940 / 600822 | Copy statements from 01/01/02 to 07/07/03 |
| // | 95142959 / 600822 | / /      //      // |
| //      // | 95142967 / 600822 | //      //      //      // |
| //      // | 95142975 / 600822 | //      //      //      // |
| //      // | 95142983 / 600822 | //      //      // |
| //      // | 140/00/004156838 | //      //      // |
| //      // | 550/00/08524882 | //      //      // |

If you are aware of other accounts not listed above to which any of these parties are connected, please alert GI&F and obtain details in respect of these accounts where material on <u>all accounts</u> is requested.

If any of the material is unavailable please contact GI&F immediately.

**DO NOT under any circumstances advise the customer that a Legal Order has been served. Unauthorised disclosure could constitute a criminal offence. No charges are to be made to the customer in respect of material provided under a Legal Order, this could alert the customer that an Order has been served.**

**Do not put a stop on any accounts unless specifically instructed to do so by Group Investigations & Fraud and do not make any reference in customer notes to the fact that a Legal Order has been served on the account(s) in question.**

Where required to supply original documentation under an Order, ensure that copies are taken and are filed in the appropriate place so that they can be located again if required.

If you receive a Legal Order direct from Law Enforcement please contact GI&F on the above number for advice. If you receive any requests for additional information from Law Enforcement in connection with this

---

HIGHLY CONFIDENTIAL                                                                                       NW 052111

Order, please ask the Officer to contact Group Investigations & Fraud on 020 7714 4570 so the request can be recorded and monitored in line with Group procedures.

**Instructions in connection with this Order** :

> As the material becomes available send the items to the Group Investigations & Fraud (detailing what has been provided).

Please complete and return the Legal Order confirmation slip attached. If you have any queries or problems please call the Referrals and Due Diligence Team on 020 7714 4578 quoting the reference number supplied.

Regards,

**Referrals & Due Diligence Team**
**Group Investigations & Fraud**

HIGHLY CONFIDENTIAL

# GROUP INVESTIGATIONS & FRAUD

## Legal Order Confirmation

**To:**    **Referrals & Due Diligence Team**

**Fax:**    **020 7714 4549 (its 4940 4549)**

**GI&F Reference: 704079**

Please provide GI&F with name and telephone number of the person (and alternate) who we can contact in relation to this request (please fax back to 020 7714 4549):

Name:                    _____

Signed:                  _____

Position:                _____

Dated:                   _____

Alternate Name:          _____

HIGHLY CONFIDENTIAL

**EXHIBIT 76 to Declaration of Joel Israel**

Page 1

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF NEW YORK

4   Case No. CV-05-4622 (DLI)

5   Case No. CV-07-00916 (DLI)

6   -------------------------------x

7   TZVI WEISS and others;

8   NATAN APPLEBAUM and others,

9                   Plaintiffs,

10

11              vs.

12

13  NATIONAL WESTMINSTER BANK PLC,

14                  Defendant.

15  -------------------------------x

16

17                  May 18, 2011

18                  9:10 a.m.

19

20      Videotaped deposition of JONATHAN R.

21  HOLLAND, held at the offices of Zuckerman

22  Spaeder LLP, 1540 Broadway, New York, New

23  York, pursuant to notice, before Cary N.

24  Bigelow, RPR, a Notary Public of the State

25  of New York.

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4        ZUCKERMAN SPAEDER LLP
 5        Attorneys for Plaintiffs
 6             1800 M Street, N.W.
 7             Washington, D.C. 20036-5807
 8        BY:   AITAN D. GOELMAN, ESQ.
 9             SEMRA A. MESULAM, ESQ.
10
11        CLEARY GOTTLIEB STEEN & HAMILTON LLP
12        Attorneys for Defendant
13             City Place House
14             55 Basinghall Street
15             London EC2V 5EH
16        BY:   JONATHAN I. BLACKMAN, ESQ.
17                     -AND-
18        CLEARY GOTTLIEB STEEN & HAMILTON LLP
19             2000 Pennsylvania Avenue, N.W.
20             Washington, D.C. 20006-1801
21        BY:   VALERIE SCHUSTER, ESQ.
22
23
24
25
```

Page 3

1

2   A P P E A R A N C E S:

3

4      CLEARY GOTTLIEB STEEN & HAMILTON LLP

5      Attorneys for Defendant

6          One Liberty Plaza

7          New York, New York 10006

8      BY:   MARK GRUBE, ESQ.

9

10

11

12  ALSO PRESENT:

13     JAMES ROBERTS, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2

3

4

5

6        IT IS HEREBY STIPULATED AND AGREED, by

7   and between the attorneys for the respective

8   parties herein, that filing and sealing be

9   and the same are hereby waived.

10        IT IS FURTHER STIPULATED AND AGREED

11   that all objections, except as to the form

12   of the question, shall be reserved to the

13   time of the trial.

14        IT IS FURTHER STIPULATED AND AGREED

15   that the within deposition may be sworn to

16   and signed before any officer authorized to

17   administer an oath, with the same force and

18   effect as if signed and sworn to before the

19   Court.

20

21

22

23

24

25

Page 5

| | | |
|---|---|---|
| 1 | | |
| 2 | THE VIDEOGRAPHER:  Good morning.  We | 09:09:38 |
| 3 | are going on the record.  My name is James | 09:10:00 |
| 4 | Roberts of Veritext Reporting with offices | 09:10:02 |
| 5 | in New York City, New York.  Today's date is | 09:10:04 |
| 6 | May 18, 2011.  The time is approximately | 09:10:07 |
| 7 | 9:10 a.m. | 09:10:11 |
| 8 | This deposition is being held in the | 09:10:12 |
| 9 | office of Zuckerman Spaeder located at 1540 | 09:10:13 |
| 10 | Broadway, New York City, New York.  The | 09:10:17 |
| 11 | caption of the case is Tsvi Weiss, et al., | 09:10:21 |
| 12 | versus National Westminster Bank PLC in the | 09:10:24 |
| 13 | U.S. District Court, Eastern District of New | 09:10:28 |
| 14 | York.  The name of the witness is Jon | 09:10:30 |
| 15 | Holland. | 09:10:33 |
| 16 | At this time the attorneys will | 09:10:33 |
| 17 | identify themselves and the parties they | 09:10:35 |
| 18 | represent. | 09:10:36 |
| 19 | MR. GOELMAN:  Aitan Goelman and Semra | 09:10:38 |
| 20 | Mesulam for the Weiss plaintiffs. | 09:10:40 |
| 21 | MR. BLACKMAN:  Jonathan Blackman and | 09:10:41 |
| 22 | Valerie Schuster and Mark Grube for the | 09:10:46 |
| 23 | defendant and the witness. | 09:10:47 |
| 24 | THE VIDEOGRAPHER:  Our court reporter, | 09:10:49 |
| 25 | Cary Bigelow, also of Veritext, will please | 09:10:51 |

Page 11

```
 1                        J. Holland
 2      Q.    How would you define your practice area    09:16:02
 3   when you talk about involvement in those cases?     09:16:04
 4      A.    Well, I'm principally a                    09:16:10
 5   banking litigator from the U.K., head of the        09:16:14
 6   financial services litigation practice at Hogan     09:16:15
 7   Lovells, so my practice involves acting entirely    09:16:18
 8   for banks and other financial institutions, but     09:16:21
 9   primarily for banks and other financial             09:16:25
10   institutions, so it's a range of disputes that      09:16:27
11   banks and other financial institutions get          09:16:31
12   themselves involved in, which also encompasses      09:16:34
13   the subject matter of this deposition.              09:16:36
14           THE COURT REPORTER:  Could we go off        09:16:36
15       the record for just a minute?                   09:16:44
16           THE VIDEOGRAPHER:  Off the record,          09:16:44
17       9:17 a.m.                                       09:16:45
18           (Recess taken.)                             09:18:08
19           THE VIDEOGRAPHER:  Back on the record,      09:18:08
20       9:20 a.m.                                       09:20:00
21   BY MR. GOELMAN:                                     09:20:03
22      Q.    Mr. Holland, can you turn to paragraph     09:20:03
23   1.6 of Holland Exhibit 1, please.                   09:20:05
24      A.    Yes.                                       09:20:07
25      Q.    You write there "I am regarded by the      09:20:09
```

Page 12

J. Holland

| | | |
|---|---|---|
| 1 | | |
| 2 | key directories in the U.K. and internationally | 09:20:12 |
| 3 | as a leading lawyer in the areas of banking | 09:20:15 |
| 4 | litigation and contentious regulatory work." | 09:20:19 |
| 5 | Which directories do you regard as the | 09:20:20 |
| 6 | key directories? | 09:20:23 |
| 7 | A.    The directories that I had in mind when | 09:20:24 |
| 8 | I write that paragraph were -- there are two | 09:20:26 |
| 9 | directories in the U.K., one is called Chambers | 09:20:28 |
| 10 | and one is called Legal 500, and there's also | 09:20:31 |
| 11 | Chambers Global directory, and I'm listed in all | 09:20:35 |
| 12 | of those. | 09:20:39 |
| 13 | Q.    And you are listed in the categories of | 09:20:40 |
| 14 | banking litigation and contentious regulatory | 09:20:41 |
| 15 | work? | 09:20:45 |
| 16 | A.    I'd need to look at the directories to | 09:20:46 |
| 17 | confirm, but for banking litigation, certainly | 09:20:47 |
| 18 | for contentious regulatory work, in one of them, | 09:20:50 |
| 19 | I'm not sure which, and I'm not sure how Chambers | 09:20:54 |
| 20 | Global is divided up, so it may just have a | 09:20:57 |
| 21 | commercial litigation or a banking litigation | 09:21:01 |
| 22 | slot, I can't remember which. | 09:21:03 |
| 23 | Q.    Are you listed as a leading lawyer in | 09:21:04 |
| 24 | any directories in the area of terrorism finance | 09:21:07 |
| 25 | or sanctions? | 09:21:13 |

Page 13

J. Holland

2          MR. BLACKMAN:   Object to the form of        09:21:15

3     the question, lack of foundation.                09:21:17

4          You can answer.                             09:21:18

5     A.    I'm not sure the directories cut the       09:21:20

6     cake in that way, but not that I -- not that I   09:21:24

7     know of, no.                                     09:21:27

8     Q.    So you don't know whether or not there     09:21:28

9     are categories for terrorism finance lawyers or  09:21:30

10    lawyers specializing in sanctions?              09:21:34

11    A.    That's exactly right.                      09:21:36

12    Q.    You write here that you are regularly      09:21:39

13    invited to speak at conferences on issues related 09:21:39

14    to my practice area, including anti-terrorist    09:21:45

15    financing, anti-money laundering and financial   09:21:45

16    sanctions.                                       09:21:45

17         Do you see that?                            09:21:49

18    A.    Yes, I do.                                 09:21:50

19    Q.    Focusing on anti-terrorist financing,      09:21:50

20    can you tell me which conferences you were       09:21:53

21    invited to speak about that subject at?          09:21:55

22    A.    I couldn't give you a list of all of       09:22:05

23    them, but the one that I've spoken at most       09:22:07

24    recently was a combination of looking at         09:22:09

25    sanctions and terrorist financing, which was --  09:22:10

Page 14

1                        J. Holland

2    I'm trying to remember the name of the          09:22:16

3    organizers, it's an American conference -- the  09:22:17

4    American Conference Institute, does that make   09:22:20

5    sense?                                           09:22:23

6        Q.    ACI?                                   09:22:23

7        A.    I think it was them, but I'd need to go 09:22:26

8    back and check.                                  09:22:29

9        Q.    And when was that?                     09:22:29

10       A.    I would have said that was within the  09:22:31

11   last two years, it's probably 18 months ago in  09:22:34

12   London.                                          09:22:38

13       Q.    And did you have a title to your speech 09:22:38

14   or lecture?                                      09:22:43

15       A.    I will have done and I will have tried 09:22:46

16   to make it catchy, but I can't remember what it 09:22:48

17   was.                                             09:22:52

18       Q.    Okay.                                   09:22:52

19              Can you give me an estimate about how 09:22:52

20   many speaking engagements you have participated 09:22:54

21   in where antiterrorist financing law was the    09:22:56

22   subject or a part of the subject of your        09:23:02

23   presentation?                                    09:23:04

24       A.    Maybe two or three, but I can't give   09:23:09

25   you a precise figure.                            09:23:11

Page 15

                          J. Holland

1

2       Q.    Is it your practice when you speak at        09:23:13

3   these conferences to prepare a PowerPoint or some      09:23:16

4   other kind of audiovisual presentation?              09:23:20

5       A.    Yes, typically.                            09:23:25

6       Q.    And would you retain copies of that         09:23:27

7   presentation in your files?                          09:23:29

8       A.    Yes, I would.                              09:23:30

9       Q.    So you think that if you -- you think       09:23:31

10  you have in your files copies of any PowerPoints      09:23:35

11  or other materials that you prepared in              09:23:39

12  anticipation of speeches about antiterrorist         09:23:42

13  financing laws?                                      09:23:45

14      A.    Yes, I would.  Typically I would            09:23:47

15  have -- so the way that I would typically prepare     09:23:55

16  for a conference would be I would make manuscript     09:23:57

17  notes on the slide deck that I was going to use,      09:24:02

18  so I don't have a script because I don't like to      09:24:05

19  work that way, so typically I'd have the             09:24:06

20  PowerPoint slides and then notes just to remind       09:24:09

21  me of the points that I want to make in relation      09:24:12

22  to that.                                             09:24:14

23      Q.    Okay.                                       09:24:14

24      A.    Generally speaking, the subject matter      09:24:14

25  of the conferences has been sanctions, which of       09:24:16

Page 16

J. Holland

2  course has an intersection with terrorist          09:24:21

3  financing, it's a subset.                          09:24:24

4      Q.     But would terrorist financing, apart    09:24:26

5  from sanctions, be part of what you talked about   09:24:29

6  at those conferences?                              09:24:31

7      A.     I'm not sure I understand that          09:24:35

8  question.                                          09:24:36

9             Would you mind rephrasing it?   Sorry.  09:24:37

10     Q.     Sure.   And you should tell me when you 09:24:41

11 don't understand a question.                        09:24:42

12            In 1.6, you say that you are regularly  09:24:43

13 invited to speak at conferences on issues related  09:24:46

14 to my practice area including anti-terrorist       09:24:46

15 financing, anti-money laundering, and financial    09:24:51

16 sanctions.                                          09:24:51

17            Do you see that?                         09:24:52

18     A.     Yes.                                     09:24:53

19     Q.     And so the "and" implies that those are 09:24:53

20 three separate subareas; correct?                   09:24:56

21     A.     Well, sorry, I wasn't writing it as a   09:24:59

22 statute, so when I say I'm invited to speak at     09:25:02

23 conferences on issues relating to my practice      09:25:05

24 area, I'm often invited to speak at conferences    09:25:07

25 and in the last -- I would say in the last three   09:25:12

Page 17

J. Holland

2  to four years sanctions has been a topic that's        09:25:16
3  attracted a lot of attention and so I have been        09:25:21
4  asked to speak on sanctions, both U.K. sanctions       09:25:26
5  and the intersection between U.K.-E.U. sanctions       09:25:29
6  and U.S. sanctions, which is something I have          09:25:34
7  some familiarity with, and when you're talking on      09:25:37
8  that topic it's sometimes appropriate, often           09:25:40
9  appropriate to deal also with the area of              09:25:44
10 terrorist financing because typically that's a         09:25:47
11 subset of the sanctions regime.                        09:25:50
12      Q.    Okay.                                        09:25:52
13      A.    So I'm not sure I've answered the           09:25:53
14 question, but I --                                      09:25:55
15      Q.    In your report at some point, and I can     09:25:56
16 find the exact location at a break if you don't        09:26:00
17 remember this off the top of your head, but you        09:26:04
18 write about sanctions and terrorist financing         09:26:07
19 being related but also having the terrorist           09:26:10
20 financing -- anti-terrorist financing law having      09:26:14
21 separate obligations --                                09:26:17
22      A.    That's right.                               09:26:18
23      Q.    -- imposed on a financial institution;     09:26:19
24 correct?                                               09:26:21
25      A.    Yes.                                        09:26:21

Page 18

J. Holland

| | | |
|---|---|---|
| 1 | | |
| 2 | Q.     Have you spoken about those separate | 09:26:22 |
| 3 | terrorist -- anti-terrorist financing obligations | 09:26:26 |
| 4 | the financial institutions are tasked with? | 09:26:31 |
| 5 | A.     As a topic in their own right? | 09:26:34 |
| 6 | Q.     At any of these -- yeah, at any of the | 09:26:37 |
| 7 | conferences that you allude to in 1.6. | 09:26:40 |
| 8 | A.     I can't recall. | 09:26:45 |
| 9 | Q.     In 1.5 you say "I am the author of | 09:26:48 |
| 10 | various articles relating to anti-terrorist | 09:26:51 |
| 11 | financing, anti-money laundering and financial | 09:26:53 |
| 12 | sanctions." | 09:26:57 |
| 13 | Do you see that? | 09:26:58 |
| 14 | A.     Yes, I do. | 09:26:59 |
| 15 | Q.     And then "published articles in this | 09:27:00 |
| 16 | area in the past 10 years are," and you have A | 09:27:02 |
| 17 | through G? | 09:27:05 |
| 18 | A.     Yes. | 09:27:05 |
| 19 | Q.     Are those all of the published articles | 09:27:06 |
| 20 | on those topics that you have written in the past | 09:27:08 |
| 21 | 10 years? | 09:27:11 |
| 22 | A.     I believe they are. | 09:27:11 |
| 23 | Q.     And can you identify which of them you | 09:27:12 |
| 24 | believe relate to anti-terrorist financing? | 09:27:15 |
| 25 | A.     Not without going back and reading each | 09:27:20 |

Page 19

1                          J. Holland

2    of them, no.                                    09:27:22

3         Q.     Okay.                               09:27:23

4         A.     Have you been provided with copies of    09:27:24

5    those?                                          09:27:27

6         Q.     Yes.                                09:27:27

7         A.     Okay.                               09:27:28

8         Q.     From memory, looking at the titles of    09:27:29

9    these articles, you can't tell me which of them    09:27:32

10   you believe deal with anti-terrorist financing?    09:27:34

11        A.     As a specific topic?                09:27:37

12        Q.     Or just talk about anti-terrorist    09:27:39

13   financing in any way.                           09:27:42

14        A.     From memory, no.                    09:27:43

15        Q.     Have you ever undergone any formal or    09:27:48

16   informal training about anti-terrorist finance    09:27:53

17   law?                                            09:27:59

18               MR. BLACKMAN:   Object to form.     09:28:01

19               You can answer.                     09:28:03

20        A.     You mean -- well, sorry, do you mean    09:28:08

21   training by an external third party or --       09:28:12

22        Q.     Well, let's start with that, yeah.  09:28:16

23        A.     So have I ever attended a course, for    09:28:20

24   example, on anti-terrorist financing law?       09:28:24

25        Q.     Right.                              09:28:26

```
                                             Page 20

 1                    J. Holland

 2     A.    No.                             09:28:27

 3     Q.    A course or a CLE or anything like   09:28:28

 4  that?                                     09:28:30

 5     A.    No.                             09:28:32

 6     Q.    What about -- you defined that as   09:28:34

 7  external third party.                    09:28:38

 8           What about internal training?   09:28:39

 9     A.    No.                             09:28:42

10     Q.    Do you have any work experience dealing   09:28:43

11  with the subject of anti-terror financing?   09:28:52

12     A.    Yes.                            09:28:56

13     Q.    And can you describe what that is?   09:28:58

14     A.    In general terms, yes.          09:28:59

15           So I have advised a number of clients   09:29:02

16  on their obligations under the U.K. anti-   09:29:06

17  terrorist financing regime on -- well, on all   09:29:09

18  sorts of aspects relating to that.        09:29:15

19     Q.    And those clients have generally been   09:29:17

20  financial institutions?                   09:29:19

21     A.    Yes, they have.                 09:29:19

22     Q.    Have you, without telling me the names   09:29:21

23  of any clients, have you had a client that you've   09:29:24

24  advised about anti-terrorism financing law that   09:29:28

25  is not a financial institution?           09:29:33
```

Page 276

1                    J. Holland

2           So just so we're clear, we're in a          16:49:33

3    different time frame from the Lander report,       16:49:35

4    okay, from the SARs review, so --                  16:49:37

5       Q.    This is between 2001 and 2003 in          16:49:38

6    paragraph 3.59?                                     16:49:42

7       A.    Exactly.  And I don't know, I can't       16:49:44

8    remember, but I suspect that -- well, I won't      16:49:46

9    speculate about the Lander review, but I           16:49:51

10   mentioned just now the KPMG review that was        16:49:56

11   carried out in 2003, and one of the prompts --     16:50:02

12   yeah, in July 2003, one of the prompts for that    16:50:09

13   was a concern that SARs were, from the point of    16:50:12

14   view of those submitting them, disappearing into   16:50:23

15   a black hole, so -- and again, just for context,   16:50:27

16   this is before the introduction of the consent     16:50:30

17   regime in POCA.                                     16:50:32

18           I am just looking at the text.             16:50:34

19           When did POCA come into force?             16:50:35

20      Q.    2002.                                      16:50:40

21      A.    It was passed in 2002, but I think it     16:50:42

22   came into effect later.                             16:50:44

23           Yeah, it came into force on the 24th of    16:50:53

24   February 2003, so once the consent regime was      16:50:56

25   introduced, this problem was ameliorated to some   16:50:59

Page 277

1                    J. Holland

2    extent.                                        16:51:02

3              In the period -- that is addressed in    16:51:03

4    this paragraph, September 2001 and through to    16:51:05

5    August 2003, maybe not so much in the latter part    16:51:08

6    of the period, and certainly in the period    16:51:12

7    leading up to that, to a large extent, and in    16:51:16

8    particular after the rise in reports as a result    16:51:20

9    of the introduction of the objective test, SARs    16:51:21

10   were perceived by the people submitting them to    16:51:25

11   be disappearing into a black hole, so you would    16:51:28

12   file a SAR and you'd hear nothing back from the    16:51:32

13   police, you would get no response, you would have    16:51:35

14   no idea whether the SAR was interesting, not    16:51:40

15   interesting, had led to an investigation, had not    16:51:44

16   led to an investigation, simply no feedback at    16:51:45

17   all, and that was one of the reasons, from    16:51:47

18   memory -- we're now going back to the KPMG    16:51:49

19   report -- that KPMG were asked to examine the    16:51:51

20   reporting regime, and one of the conclusions --    16:51:58

21   again, entirely from memory, but you've probably    16:52:00

22   been, I assume you've been provided with a copy    16:52:01

23   of the report, so you can check this, but one of    16:52:03

24   the conclusions that was shocking at the time was    16:52:06

25   that a very large number -- tens of thousand,    16:52:10

Page 278

J. Holland

2  from memory -- of reports had simply been stored          16:52:13

3  or backed up somewhere on a database by NCIS, not          16:52:18

4  looked at and not disseminated to law enforcement,         16:52:23

5  so not only was there no feedback coming back to           16:52:27

6  the reporting sector from law enforcement, but in          16:52:32

7  fact, once KPMG lifted the bonnet, as we would            16:52:36

8  say, hood in your case, and looked underneath             16:52:40

9  they discovered the reports were not being acted           16:52:44

10  on because they were not being passed to law             16:52:46

11  enforcement for any action to be taken, so that's        16:52:49

12  the underpinning for that parenthetical in that          16:52:52

13  paragraph.                                               16:52:55

14      Q.   Was the KPMG report you just described          16:52:55

15  the same report that found that for SARs that            16:52:58

16  were not explicitly requested to be fast tracked,        16:53:01

17  there was a 10-month lag between the time they           16:53:05

18  went to NCIS and the time they were distributed          16:53:07

19  to the relevant law enforcement agency?                  16:53:10

20      A.   It may have been.  I can't recall               16:53:12

21  whether it was that report or the Lander report,         16:53:14

22  but it may have been.                                    16:53:16

23      Q.   But you do recall there being a                 16:53:17

24  10-month lag?                                            16:53:19

25      A.   I recall something along those lines,           16:53:20

Page 279

J. Holland

2   yeah, which, you know, if you think about it, is     16:53:22

3   absurd in the context of a system that is            16:53:25

4   intended to alert law enforcement to knowledge or    16:53:27

5   suspicion of criminal activity.  What is the         16:53:32

6   point of law enforcement getting hold of             16:53:36

7   intelligence that's 10 months out of date?  Hence    16:53:38

8   why the regime was being criticized at the time.     16:53:42

9       Q.    Certainly it does not inspire             16:53:44

10   confidence that the law enforcement agencies in      16:53:46

11   charge of evaluating this intelligence were          16:53:50

12   making use of it, true, making effective use of      16:53:54

13   it?                                                  16:53:56

14       A.    Well, I think the conclusion in the       16:53:57

15   KPMG report was that -- was that, generally          16:53:59

16   speaking, in the case of a very substantial          16:54:07

17   number of aliases were made of them, effective or    16:54:11

18   otherwise.                                           16:54:12

19       Q.    When you talk about consistent with       16:54:13

20   your experience, earlier you testified that you      16:54:14

21   had been involved in the preparation or advising     16:54:17

22   on the filing of somewhere between 10 and 20         16:54:22

23   SARs; is that right?                                 16:54:25

24       A.    Yes.                                       16:54:26

25       Q.    Did you -- did your clients or --         16:54:31

**EXHIBIT 77 to Declaration of Joel Israel**

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
Money Laundering Reporting

## Group Financial Crime - Money Laundering Reporting Team

i)      **Basic Money Laundering Awareness and Background**

ii)     **Money Laundering Suspicion Reporting & Case Handling Process**

iii)    **Money Laundering Disclosure Checking**

iv)     **Money Laundering High Profile Report**

v)      **Money Laundering Cases: Top Ten Must Do's**

vi)     **Proceeds of Crime Act – Consent**

NW 000149      HIGHLY CONFIDENTIAL

Section 4F p 1

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

## i) Basic Money Laundering Awareness

### What is Money laundering?

It is the process by which criminals attempt to conceal the true origin and ownership of the proceeds of their criminal activities. If undertaken successfully, it also allows them to maintain control over those proceeds and, ultimately, to provide a legitimate cover for their source of income.

### Criminal activity

Contrary to popular belief this is not just drug trafficking - criminal activity includes; terrorism, fraud, theft, extortion, blackmail, counterfeiting and illegal deposit taking.

### How does Money Laundering work?

There are 3 stages to money laundering;

**Placement:** The physical movement of the initial proceeds "cash" in order to get the money into the banking system. Not always as easy as it seems especially where the criminal has huge sums to dispose of. US Customs have, in the past, uncovered an entire warehouse full of rotting US $ which the criminals had been unable to "place" into the banking system. Cash deposits may be made in small amounts of only a few hundred pounds or they may be made in large single deposits. Often this surplus cash will be paid in along side the cash takings of a legitimate business. The surplus cash may then be paid away under the guise of a payment to an entity that has invested in the business or perhaps to a beneficiary who appears to be a trade debtor.

**Layering:** Moving the money around, creating a complex web of transactions in order to disguise the original source of the funds. Layering may involve only a few transactions but professional money laundering may involve dozens of transactions, often through overseas bank accounts, that make it difficult to follow the audit trail. Movements of funds for the purpose of layering will not have a genuine underlying transaction, although it may appear there is a transaction with invoices being raised etc. These transactions often involve substantial sums of money.

**Integration:** The mechanism by which criminals try to make their wealth appear to have been earned legitimately. The criminal, who lives in a large house, owns a yacht and a Ferrari does not pay for all these in cash (well not often!). Usually there is a seemingly legitimate business from which the individual's earnings appear to have been derived. It is for this reason that criminals are often associated with businesses with a high cash turnover such as casinos, Bars and Clubs. Less glamorous but for the same reasons are taxi firms, launderettes and takeaway restaurants.

These stages are often not as distinct as the above descriptions may make them appear. You are not expected or required to identify which stage of money laundering may be taking place. Neither are you expected to know, or find out, what criminal activity the monies might have been derived from.

### What does the Law require?

As private individuals it is an offence for any person to provide assistance to a criminal to obtain, conceal, retain or invest funds if that person knows, should have known, or suspected were the proceeds of crime.

**HIGHLY CONFIDENTIAL**

**NW 000150**

GROUP FINANCIAL CRIME: PROCEDURES MANUAL
**Money Laundering Reporting**

In addition to the above, persons or firms operating within the financial sector (you and the bank) have additional requirements imposed upon them which include;

> "Know your customers " (KYC)
> Record keeping , including ongoing
> Recognition of suspicious transactions and reporting procedures
> Education and training of employees

KYC requires that verification of identity and address is obtained for all new customers both personal and non-personal. The bank must know whom or what it is doing business with. Not only is this important for law enforcement to know as part of any subsequent investigation but is also important to the bank for marketing, credit control and fraud prevention purposes.

Ongoing KYC is having an understanding of what your customer does and the expected activity/type of transactions that are going to pass through their account(s). This information should be kept up to date as appropriate and when opportunities arise.

**KYC is therefore vital to the bank since without this information it is almost impossible to identify suspicious or unusual transactions.**

All suspicious transactions must be reported to the bank's Money Laundering Reporting Officer. The Suspicion Reporting team within GI&F fulfil this role for the reporting of such suspicions to the National Criminal Intelligence Service (NCIS). Disclosures made to NCIS are a statutory obligation and as such the legislation protects the bank from claims in respect of any alleged breach of customer confidentiality. This statutory protection will only cover disclosures that have been made in good faith and without negligence. It is therefore important that the Suspicion Reporting team properly investigate all reports prior to submitting a disclosure.

**High Risk Customers**

Effective KYC at the outset of a relationship enables the early identification of high-risk customers such as:

> Bureaux De Change
> Cheque encashment agencies
> Casinos, Clubs, Bars
> Investment or deposit taking activities
> Sales of arms/munitions
> Timeshare or overseas property companies
> Residents of less developed/stable countries
> Politicians/civil servants/government officials/senior military personnel from overseas
> Those known to have accounts in offshore tax havens
> Those who have irregular sources of income, especially if originating from overseas
> Those who originate from countries known to be subject to UN sanctions i.e. Iraq, Yugoslavia

**HIGHLY CONFIDENTIAL**

NW 000151

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

### What is a suspicious transaction?

Any transaction which is inconsistent with the expected activity through the account, based on the bank's knowledge of its customer (KYC).   That is not to say that there may not be a perfectly reasonable explanation for say a larger than average credit to an account, i.e. sale of a house, redundancy payment.   Clearly it would not be appropriate to report either of these - OR WOULD IT?.   From the bank's knowledge of its customer the sale of a property for say £1.5m might be considered unusual for someone who is a nurse working in a National Health hospital.

### How can you identify suspicious transactions?

Be alert to:

> Large and/or frequent cash transactions, especially those involving Scottish or Irish notes.   In the case of large encashments consider - where did the money come from?.
> Cash exchange transactions, especially those involving withdrawn note issues or damaged/mutilated notes.
> Large international payments, in or out, especially through personal accounts.   Beware of customers who readily admit to putting business transactions through a personal account to avoid charges.   It is easier for them to admit to that than money laundering!.
> Monies which are received to an account and paid away again almost immediately.
> Customers who are reluctant or refuse to explain the background to a transaction.
> The account holder may explain an unusual or apparently pointless transactions as "for tax reasons" - it is easier to explain something as a little tax problem than a little money laundering problem.   Remember tax evasion is a crime.

Consider whether the activity is consistent with what you would expect to see for the customer...

> Would you expect a bank manager to be paying in large sums of cash?
> How many 16 year olds have a BMW car to sell?
> Is it usual for a businessman to keep £199,000 in £20 notes at home as a float for their conservatory installation business?
> Is it likely that a Limited Company, which only started trading 3 weeks ago, and trades from the Directors home, will have a turnover of £5m per week?
> Why would a parent place £50,000 into a first reserve account which their 14 year old child opened only a few weeks ago?

Companies are often used as a front to move large sums of money and/or at the integration stage of the money laundering process.   Consider the following...

> Companies (or individuals) whose fortunes have suddenly changed for the better, a sudden injection of cash by an unknown investor perhaps.
> Companies (or individuals) who maintain accounts with several different banks, frequently moving monies between them.   This may be cross firing, explained as inter company loans or merely an attempt to secure the best interest rates.   On the other hand...
> Companies registered outside the UK (often in exotic locations such as Bahamas, Grand Cayman etc), yet the business operates in a different country.   If the place of business is outside the UK why do they require a UK based bank account.

**HIGHLY CONFIDENTIAL**

**NW 000152**

# GROUP FINANCIAL CRIME: PROCEDURES MANUAL
## Money Laundering Reporting

**How can you meet your obligations under the money laundering legislation?**

Working within GFC branches/units often telephone for guidance as to how to deal with unusual or suspicious transactions/requests. In addition to being alert to the possibilities of fraud please consider money laundering.

If information regarding the account activity is sparse ask the branch/unit to clarify the background to the underlying transaction with the customer. If appropriate ask the branch/unit to ensure that the bank's KYC is up to date.

*The customer should not be told that the bank is suspicious or that the matter has, or might be, reported internally or externally as this might constitute "tipping off." Nonetheless if challenged the customer can be advised that the bank is obliged to understand the nature of transactions passing through its books.*

If a satisfactory explanation cannot be obtained or is refused by the customer then report your suspicions to Suspicion Reporting team within GFC.

**Failure to comply with the bank's internal instructions in relation to reporting suspicions of money laundering constitutes gross misconduct.**

**Failure to comply with the law in respect of reporting suspicions of money laundering renders you liable to 5 years imprisonment**

**Background**

To adhere to the 1993 Money Laundering Regulations the bank must have internal arrangements in place for their staff to report suspicions of money laundering. It is a criminal offence if staff fail to report when they know or suspect that a customer may be laundering the proceeds of criminal conduct. Staff discharge their legal obligation by so reporting.

Suspicious transactions can be identified in two main ways:

- By staff from their general dealings with customers; for example in branches, on the telephone, in Service Centres.
- From the bank's Automated Profiling System (Searchspace). The system identifies activity considered to be outside the norm for each account, and generates an 'Alert' for investigation. These alerts are initially reviewed by the **Money Laundering Detection Unit.**

Within the Royal Bank of Scotland, most Group businesses within the UK submit Suspicion Reports to the Money Laundering Team within Group Investigations and Fraud. Suspicions of Money Laundering are reported on form 1391 (NatWest) or 04783 (RBS). Alternatively, some businesses can e-mail reports to general e-mail address ~ **Group Fraud, Money Laundering.**

When received, it is the responsibility of the Money Laundering Reporting Team to decide whether the activity identified should be reported (i.e. 'disclosed') to the authorities. These disclosures are sent to the National Criminal Intelligence Service (NCIS).

**HIGHLY CONFIDENTIAL**

NW 000153

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

| | |
|---|---|
| **ii) Money Laundering Suspicion Reporting & Case Handling Process** | |
| **1.** | When a Suspicion Report is received, search Goalkeeper with details of the account holder(s) to establish whether any previous cases have been keyed. If there are existing records these may have a bearing on how the latest case is dealt with. |
| **2.** | Key a new case to Goalkeeper as follows (referring to the 'Top Ten Must Do's' document, as this provides the framework for keying a case): |
| | **Control Authority**: Select the relevant business area from the drop-down list. |
| | **Record Type**: Select 'Money Laundering Suspicion'. |
| | **High Profile**: Certain types of case are defined as High Profile – refer to the High Profile Case Definition document. If High Profile criteria are met, select 'Yes'. |
| | **Link** the new case to any existing cases where the same customer is the main subject. |
| | **Submitting Unit**: Key unit name and sort code, or select from the drop-down list if appropriate. Enter name and phone number of the submitting member of staff. |
| | **Legislation**: Select relevant Act from the drop down list -: <br> CJA – Criminal Justice Act 1988 <br> DTA – Drug Trafficking Act 1994 <br> POT – Terrorism Act 2000 |
| | **Estimated Amount Laundered** – Calculate the total of the transactions that are under suspicion. In certain cases this may be the overall turnover for an account, for example where VAT fraud is suspected. **N.B.** If we have disclosed previously, ensure the figure quoted only covers the period since the previous disclosure |
| | **Reasons for Suspicion**: Select those appropriate to the case. There may be more than one. |
| | **Key Information Details** (names; addresses; telephone numbers; account details): Enter **full** details of the account holders. If a business name, ensure details of main directors/proprietors are included. Add other related names that are pertinent to the case and may also be under suspicion, for example names of individuals/companies that have remitted funds to or received funds from the account holder(s). Select appropriate Risk Rated colours (see Goalkeeper User guide). |
| | **Transactions**: Enter details of the transactions relevant to the case. Do not key **all** transactions if there are numerous – e.g. for VAT fraud cases a maximum of six (three Chaps debits, three credits) may suffice. |
| | Before proceeding further, you need to consider what action to take in connection with the Suspicion Report. Either – |
| | - There is enough information and sufficient concern to merit an immediate disclosure. |
| | - There is insufficient concern to justify a disclosure. |
| | - Further information is required before a decision can be made. |

HIGHLY CONFIDENTIAL

NW 000154

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
Money Laundering Reporting

| | |
|---|---|
| | A number of factors may have a bearing, for example: <br><br> - Are there any existing Goalkeeper records for this customer? <br><br> - Has a disclosure (or disclosures) been submitted previously? <br><br> - Does a Relationship Manager look after the account? Is it relevant to request further information from him/her? The report may have been submitted by someone with little overall knowledge of the customer, and whilst the activity may have genuinely appeared to be suspicious to the reporter, the RM may be in possession of information that will allay that suspicion. <br><br> **Case Notes**: Record key information as a case progresses, e.g. diary dates; details of discussions with other staff within the Group. A summary of the response to the Relationship Manager/account holding branch, including any recommendation for further action on their part, should also be recorded here. <br><br> **Summary and Assessment**: Complete when a decision has been made: <br><br> - If it has been decided **not** to disclose, this note should include details of the transactions/activity that provoked the suspicion, followed by a **detailed** explanation of the reasons why it is felt appropriate **not** to disclose. <br><br> - If a disclosure is deemed appropriate, this note should begin with an explanation of the transactions/activity that provoked the suspicion, and summarised using one of the Standard Phrases *wherever possible* (see Standard Phrases document). If the customer has been disclosed previously, this fact should be recorded at the beginning of the Summary and Assessment (include disclosure ID numbers). <br><br> Leave the **Conclusion** blank – the case checker will complete this. |
| 3. | **Responses** (using the standard tick-box letter) should be sent to: <br><br> - The submitter of the report to acknowledge receipt and to advise whether or not a disclosure has been made <br><br> - The Relationship Manager, or account holding branch if the customer is Core Market, to advise whether or not a disclosure has been made, and also to confirm what further action is recommended. The tick-box letter provides options based on the following: <br><br>      - Does the bank know, or has the customer provided an explanation for, the transactions/activity that prompted the Suspicion Report? Is it appropriate to ask (give consideration to possible tipping off)? <br><br>      - Is Know Your Customer up to date (i.e. does the bank have an understanding of the customer's business/employment/personal circumstances)? Send the 'KYC' document with our response to assist the Relationship/branch manager with this process. <br><br>      -The Relationship/branch manager may wish to consider exiting the relationship if he/she is unhappy with their findings when updating Know Your Customer/due diligence. |

**HIGHLY CONFIDENTIAL**

NW 000155

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

|  |  |
|---|---|
|  | - Group Financial Crime may consider that there is a risk to the Group in retaining the relationship (e.g. high-risk activity, numerous previous disclosures), and in these circumstances will give instructions that the account should be closed. Standard letters are held to cover various closure options.<br><br>- KYC/due diligence may be up to date, and an explanation for the transactions obtained (although there is still sufficient concern for a disclosure to have been submitted). In those circumstances it may merely be appropriate to request that the account be monitored for further suspicious activity. |
| 4. | Ensure the appropriate KYC spreadsheet is completed to reflect the advice recommended to the business. There are four spreadsheets:<br><br>- NatWest Retail<br>- RBS Retail<br>- CBFM<br>- Other. |
| 5. | **Scan** the Suspicion Report and attach these pages, together with the response letters, to the Goalkeeper case. |
| 6. | Begin completion of the **disclosure** by clicking on the 'Submit NCIS Disclosure' button at the top of the Goalkeeper case record.<br><br>- Select the 'Main Subject' (usually the account holder) as well as all other names that are required to be included within the disclosure.<br><br>- The disclosure 'type' should reflect the legislation selected in the case.<br><br>- Account holding branch details are completed on the left of the disclosure template, the reporting unit's details on the right.<br><br>- Select 'Yes' under Further Information if a previous disclosure has been submitted for this customer.<br><br>- Click on the 'Summary and Assessment' button to automatically transfer the comments from the Goalkeeper case into the disclosure. (NB. Space is limited, unlike in the case record itself, so ensure **all** the text has been copied).<br><br>- Add relevant additional information to the Main Subject, together with address(es) (copied from the case), supplementary information (keyed as new) and transaction details. In the initial transaction screen, include further information such as date account opened, balance, and turnover details where appropriate.<br><br>- Add relevant additional information to all linked names. This must include the association to the Main Subject (e.g. 'joint party to Main Subject's account'; 'source of funds'; 'remitter of funds').<br><br>Save the information. (Tip – click on the 'Save' button regularly when completing the disclosure to ensure all information is retained, especially before and after copying the Summary and Assessment from the Goalkeeper case record). |

**HIGHLY CONFIDENTIAL**

NW 000156

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

### iii) Money Laundering – Disclosure Checking

<u>Background</u>

There is significant reputational risk to RBSG if the quality and timeliness of Money Laundering disclosures is poor. In addition, there is an ongoing need to monitor the quality of reports from each individual member of staff to ensure they are meeting targets and reacting positively to feedback from line management.

<u>Process</u>

Checking of disclosures is closely linked to the Top Ten Must Do's document (see later):

Have **existing cases** been identified and linked?

**High Profile case?** Refer to High Profile Case Definition document.

Ensure the **Control Authority** is correct.

**Submitting unit** details should be selected from the 'submitting department' drop-down box wherever possible; otherwise branch and sort code (primarily for the Retail banks) should be keyed.

Carefully check the **Estimated Amount Laundered** figure. If we are reflecting overall turnover figures, and have disclosed previously, ensure the figure quoted only covers the period since the previous disclosure.

Have the correct **Reasons for Suspicion** been selected?

**Personal/Business data** – Ensure **all** relevant details have been included. Spellings of the main subjects are particularly important, not just from a reputational viewpoint, but also to ensure future name matches are accurate.

**Transaction** details correct? If the Suspicion Report refers to numerous transactions, or the case is related to overall activity, ensure that not too many transactions have been included (although in these situations the nature of the activity/transactions must be fully explained in the Summary & Assessment).

**Case notes -** If we have disclosed before, refer to the previous case(s) to check: a) that the member of staff appears to have reflected on the previous disclosure(s) in this latest report, and b) what advice was given to the business at the time of the previous disclosure(s). It is pointless sending continuous identical disclosures, likewise we shouldn't send similar responses to the business every time we disclose. For example, if previously we have asked the branch/Relationship Manager to 'update KYC and seek an explanation from the customer', have they done it? If not, why not? In these situations, ideally the member of staff should phone for feedback before putting the disclosure together.

This is especially relevant for Carousel Trading cases. We should not send disclosures every couple of months whenever there is a slight variation in turnover or when new trading names have been identified. We must try and get some feedback from the RM and make a **considered** decision as to whether it merits disclosing.

**HIGHLY CONFIDENTIAL**

NW 000157

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

The **Summary & Assessment** should include:

- A reference to previous NCIS ID numbers where the subject has been previously disclosed.

- A description of the transactions/activity that have provoked the suspicion.

- A Standard Phrase in summation wherever possible.

- Is the spelling and grammar correct? Is it apparent that the member of staff checks this aspect him/herself?

Ensure the **Response Letters** are correct. If there is no Relationship Manager, any request for further action should be sent to the account holding branch. The letters should be personalised wherever possible (and in the case of NWB branches, specify CSB to avoid them being wrongly diverted to Customer Service Centre's). If the disclosure has been completed by MLDU, consider whether a separate response letter is required

Select the appropriate **conclusion** to the case. If you are in agreement that a disclosure should be submitted, first convert the case to 'Money Laundering Disclosure'.

On the **disclosure** itself make sure, at the top, that the details on the left are the account holding branch, and on the right the submitting branch.

- Make sure the 'Further Information' box is clicked 'Yes' if we have disclosed previously.

- Check the Summary & Assessment. If this has been amended in any way, ensure the revised commentary replaces the existing record. Does it all fit into the restricted template?

- Ensure all the names other than the Main Subject have an association keyed against their name.

- The first transaction template should include additional account information, i.e. date opened, balance, turnover details.

- Ensure all relevant information has been copied across from the Goalkeeper case record and is included against the individual names in the disclosure.

- Additional data, for example telephone numbers and identification documents (e.g. passports), need to be entered manually.

When the check is complete, click on the 'Submit' button at the bottom of the disclosure template, and confirm the instruction.

**HIGHLY CONFIDENTIAL**

NW 000158

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

**iv) Money Laundering – High Profile Report**

<u>Background</u>

This monthly report is extracted from Goalkeeper and represents a summary of all money laundering cases keyed in the previous month with a High Profile marker (as defined by the High Profile Case Definition document). The report is designed to focus not just on the nature of disclosures submitted but also on the advice and guidance provided to the business by GI&F for purposes of trend/risk analysis.

The report is forwarded to nominated recipients by the 20th day of the following month.

<u>Process</u>

Click on 'High Profile Report' in Goalkeeper, and enter beginning and end dates of the previous month. When the Report has been generated, save as an Excel document.  Expand and reduce the fields within the template as appropriate.

Initially scrutinise the full report to identify cases that may have already been included in the previous month, or should **not** have been included (HP marker not appropriate?). Delete these cases.

Because of the volumes of certain case types, information regarding these is provided in summary form and are broken down in terms of the assessment/advice given to the business, as follows:

- **Customers previously disclosed within the last five years –**

    - Instruction to close in view of continuing concerns.

    - No specific action proposed/taken at the time of the previous disclosure. Relationship Manager/Branch to review connection/KYC/due diligence and consider exiting.

    - No major issues despite repeat disclosure; account to continue subject to monitoring by Relationship Manager/branch, reverting to GI&F in the event of future concerns.

- **VAT fraud (Carousel Trading) –**

    - Decision taken by Relationship Manager to close the account/connection

    - Recommendation to close provided by GFC

    - Request for Relationship Manager/Branch to review connection/KYC/due diligence and revert to GFC if still concerned.

    - Relationship to continue, reverting to GFC in the event of future concerns/changes in the pattern of activity.

- **Consent cases –**

    - Consent granted

    - Consent not provided.

HIGHLY CONFIDENTIAL

NW 000159

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

For all these three case types, calculate the total Estimated Amounts Laundered, and break this down as to the proportion that relates to cases for the Retail banks, and those for Corporate/Commercial.

When these summaries have been completed, the individual cases that the summaries cover should be deleted from the Report.

The remaining High Profile cases will form the main body of the Report. Review each case and amend the template as follows:

- Insert branch sort code and full bank/branch name

- MLDU referral? –

- Key 'Yes' if the case resulted from a MLDU Alert

- Key 'No' if the case resulted from a direct report from another unit.

- Key 'N/A' if the bank's automated profiling system does not currently cover the account holding branch in question.

- The Synopsis box will be automatically pre-filled with the text of the Summary & Assessment from the Goalkeeper case. Include comments on what further action has been recommended to the Relationship Manager/branch by GI&F. (NB. The synopsis box may need to be expanded to accommodate all the commentary).

In the final section at the end of the Report, detail any successes or positive feedback received where it is apparent that a disclosure or other information provided by GI&F has been of value to Law Enforcement.

**HIGHLY CONFIDENTIAL**

NW 000160

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
Money Laundering Reporting

## v) Money Laundering Disclosures – Top Ten Must Do's

| 1. | • Check GK & FMS for any **connected cases** – ensure links are established. |
|---|---|

| 2. | • **High Profile** case? (Refer to High Profile Case definition document).<br>  • If so, **ensure** case is prioritised at every stage in accordance with current guidelines. |
|---|---|

| 3. | • Select correct **Control Authority**.<br>• Ensure **submitting unit** details are correct.<br>  • Enter sort code in sort code box, or details of unit in 'Submitting Department' drop-down box (use wherever possible). **Do not** key information in both of these fields. |
|---|---|

| 4. | • **Estimated Laundered Total** should reflect overall turnover when **all** account activity is under suspicion, e.g. Carousel trading, but more generally should be the amount of the transaction(s) specifically provoking suspicion. |
|---|---|

| 5. | • Select correct **Reasons for Suspicion** – can be more than one. Care re: **MLDU** cases. |
|---|---|

| 6. | • **Personal/Business data** – this should include not only the account holder's details but also all third parties that are appropriate to the case, e.g. linked names, payees and remitters of transactions under suspicion.<br>• Ensure all relevant **addresses** are **verified** where possible<br>• Consider the appropriate **Transactions** to be keyed to the case – don't key too many.<br>  • If using Transaction Other (avoid if possible), ensure minus figure is keyed before amount for debits. |
|---|---|

| 7. | • **Case notes** should include relevant admin notes whilst case is being progressed, and a brief commentary of further action proposed when disclosure has been completed.<br>  • **Care re: text. Remember other business areas can view GK!**<br>• Prior to completing the **Summary and Assessment**, consider whether you have enough information.<br>  • Do we need feedback from a Relationship Manager?<br>  • Would further details on payments/cheques aid our assessment? |
|---|---|

| 8. | • In the **Summary and Assessment** be clear as to the reasons why the disclosure is being made.<br>  • Try to avoid merely listing transactions but look to say why a transaction or series of transactions is considered suspicious.<br>  • Include standard phrases to summarise wherever possible (refer to Standard Phrases document).<br>  • Spellchecked? |
|---|---|

| 9. | • Carefully consider the **response** to the submitting unit/Relationship Manager.<br>  • Recommend, or insist on, termination of relationship?<br>  • Does KYC need updating?<br>• Is it relevant to provide more specific guidance, e.g. for Carousel Traders and Hawalla Bankers? |
|---|---|

| 10. | • **All** relevant information should be transferred across to the **draft disclosure**.<br>  • Account holding branch and sort code correct?<br>  • Specify the association of any connected names to the Main Subject.<br>  • Ensure the details for the first transaction keyed include i) date account opened, ii) turnover, iii) balance as at date of disclosure (if relevant).<br>  • Any additional ID information to be included – passport? |
|---|---|

**HIGHLY CONFIDENTIAL**

NW 000161

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

**vi) The need for express consent from NCIS before a transaction can proceed.**

The Proceeds of Crime Act received Royal assent in July 2002, and the specific provisions within the Act are gradually being brought into force. Part 7 Sections 335 and 336, that became effective on 24/2/03, prohibit the bank from completing a "prohibited act" until a disclosure has been made and consent has been received from NCIS. The precise definition of a prohibited act is still being debated but could technically include any transaction to which law enforcement do not 'consent'.

The Act states that NCIS have **7 working days** after a disclosure has been made in which to 'consent' to a specified future transaction. If nothing is heard by the 8th day 'consent' to the transaction can be assumed. If the transaction is refused, law enforcement have 31 calendar days, from the day 'consent' was refused, to conduct further enquiries or obtain a restraint order. If nothing is heard within this period 'consent' to the transaction is assumed.

The aim of this legislation is to provide improved opportunities for Law Enforcement Agencies (LEA's) to restrain/seize the proceeds of crime. In practice, although the Act states NCIS have responsibility to give 'consent' it will be the Law Enforcement Agency (LEA), to whom the disclosure has been allocated, who will determine if 'consent' is appropriate.

Clearly it is not possible to obtain 'consent' for future transactions of which the money laundering reporting function has no prior knowledge. However there will be situations where branches and units contact the money laundering reporting team seeking advice regarding a transaction that has not yet taken place or a proposed future transaction. Examples of these include, but are not limited to:

- Unusually large credits expected
- Large encashments
- Requests for CHAPS, overseas payments

Where the transaction(s) requested or proposed have not taken place and the activity is of a suspicious nature, requiring a disclosure to NCIS then consideration must be given as to whether prior 'consent' to the transaction should be sought. Immediately refer the matter to Fleur Baugh, Doug Hartley or a member of the GI&F Management Team.

NW 000162

HIGHLY CONFIDENTIAL

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

When assessing whether the bank should seek prior 'consent' to a transaction the following issues must be considered:

- The level of suspicion attached to the transaction (objective test)
- Intended destination of funds, will they be outside the reach of UK Law Enforcement?
- Are the funds being used to purchase assets/property outside the reach of UK Law Enforcement?
- Are the funds being withdrawn in cash or to purchase easily portable/realisable assets such as diamonds?
- How pressing is the need to make the payment i.e. is the transfer being requested urgently/immediately (refusal to carry out an urgent transaction might 'tip off' the customer)?

Where the transaction(s), requested or proposed, meet one of the following criteria the bank should consider requesting prior 'consent':

- The bank has an enhanced degree of suspicion over and above that which merely requires a disclosure to be made.
- The size of the transaction(s) is/are such that the financial risk be defined as significant (link to High Profile Case definitions).
- Substantial cash withdrawals.
- Monies are to be sent overseas.

If, from a suspicion report or telephone call to this office, you identify a transaction that you feel generates sufficient concern to warrant a 'pre-event disclosure' –

- Immediately refer to Fleur Baugh or Doug Hartley, or in their absence, Mike Hoseason or Jane Stuart, who will closely monitor the process.

- Where instructed, **immediately** complete a **High Profile** disclosure and arrange immediate checking and releasing. Ensure the standard 'consent' phrase is included in the Summary & Assessment [*to be drawn up and checked with Group Legal*].

- Simultaneously telephone NCIS and fax the disclosure to them.

- Urgently establish the area of Law Enforcement to whom the disclosure has been allocated.

Section 4F p 15

NW 000163

HIGHLY CONFIDENTIAL

**GROUP FINANCIAL CRIME: PROCEDURES MANUAL**
**Money Laundering Reporting**

- Immediately contact the Law Enforcement officer involved in an effort to obtain consent in writing (or fax - *check this is acceptable from a legal perspective*). This should be sought as soon as possible, but certainly before the transaction in question takes place (although bear in mind that law enforcement are permitted a maximum of seven working days, from the day following the date of the disclosure, to respond).

✓ If consent is obtained, the Bank can then complete the transaction subject to usual commercial considerations

❖ If consent is withheld, the account will need to be frozen with immediate effect. Obtain confirmation, in writing, whether the bank may inform the customer as to reason for freezing the account. If such confirmation cannot be obtained, or is refused, the business should refer to Group Legal regarding the content of any communication to the customer advising why the transaction cannot take place

OR

❖ For whatever reason, consent cannot be confirmed before the transaction is due, the business should refer to Group Legal regarding the content of any communication to the customer advising why the transaction cannot take place.

❖ Where the account is to be stopped or a payment withheld GI&F must immediately advise the relationship unit and the MLPO for the customer owning division.

The bank may need to make an assessment as to whether the risk of withholding the transaction *pending* consent outweighs the risk of allowing the transaction to take place *without* consent. In this situation the MLRO / Group Enterprise Risk must be made aware of the case and agree to the decision reached.

HIGHLY CONFIDENTIAL

NW 000164

**EXHIBIT 78 to Declaration of Joel Israel**



*Interpal*

*Helping Palestinians in Need*

## Trustee's Annual Report & Audited Accounts
## For the Year Ending 31 December 2002



HIGHLY CONFIDENTIAL

NW 013444

# CONTENTS

**Legal & Administrative Information**                                    **4**

**Interpal Profile**                                                      **5**

    Interpal Aims & Objectives                        6
    The Organisational Structure                      6
    Towards Achieving Stated Objectives: Interpal Activities   6
    Statement Of Interpal Policies                    7
    Special Note: Restricted And Unrestricted Funds   9

**Interpal Activities & Achievements In The Year 2002**
**Trustees Report**                                                      **10**

    Introduction                                      11-12
    Interpal's Humanitarian Aid                       12
    Interpal's Aid To The Health & Medical Field      13
    Interpal's Support For The Education Field        14
    Interpal's Contribution Towards The Community Development Field   14
    Interpal's Work In Jordan And Lebanon             15
    Working In Partnership                            17
    Comments On The Statement Of Financial Activities Incoming Resources   18-19
    Statement Of Financial Activity & Accounting Policies   20
    Conclusion                                        20

**Financial Activities**                                                 **21**

    Auditor's Report To The Trustees Of Palestinian Relief And
    Development Fund – Interpal For The Year Ended 31st December 2002   22
    Statement Of Financial Activities For The Year Ended 31st December 2002   23
    Balance Sheet As At 31st December 2002            24
    Notes To The Accounts For The Year Ended 31st December 2002   25-27
    Flow of Funds Statement Year Ended 31 December 2002   28
    Analysis of Grants Made in 2002                   29-35

2

Palestinians Relief & Development Fund

## ANALYSIS OF GRANTS MADE IN 2002

HIGHLY CONFIDENTIAL

NW 013472

## ANALYSIS OF GRANTS MADE IN 2002

| Total Number of Grants 2002 | | | | |
|---|---|---|---|---|
| | Humanitarian Aid | Medical | Community Development | Education | Total |
| Individuals | 1 | - | - | 4 | 5 |
| Institutions | 412 | 19 | 54 | 65 | 550 |
| *Totals* | 413 | 19 | 54 | 69 | 555 |

| Total Value of Grants 2002 (Total Charitable Expenditure) | | | | |
|---|---|---|---|---|
| | Humanitarian Aid | Medical | Community Development | Education | Total |
| Individuals | | - | - | £1,300 00 | £1,300 00 |
| Institutions | £2,841,457 06 | £214,387 45 | £724,007.84 | £335,467.23 | £4,115,319.58 |
| *Totals* | £2,841,457.06 | £214,387.45 | £724,007 84 | £336,767 23 | £4,116,619.58 |

30

HIGHLY CONFIDENTIAL

NW 013473

| | Name of Beneficiary Organisation | Country | Humanitarian | | Medical | | Com Development | | Education | | Total Grants | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Grants | Amount | Grants | Amount | Grants | Amount | Grants | Amount | | |
| 1 | Al-Salah Islamic Association GAZA | Palestine | 14 | £359,359 29 | - | - | - | - | 1 | £8,387 01 | 15 | £367,746 39 |
| 2 | PFP Ltd – New Zealand (Qurbani Canned Meat Project) | Palestine | 3 | £324,278.06 | - | - | - | - | - | - | 3 | £324,278 06 |
| 3 | SANABIL ASSOCIATION  For Relief and Development | Lebanon | 14 | £238,009 48 | - | - | 3 | £21,032 26 | 4 | £14,001 61 | 21 | £273,043 35 |
| 4 | Humanitarian Relief Association - Beit Al-Maqadis | Palestine | 2 | £23,915 81 | 1 | £64,516 13 | 3 | £157,310 65 | - | - | 6 | £245,742 58 |
| 5 | Islamic Charitable Society - Al-Khalil | Palestine | 12 | £195,807 45 | - | - | 2 | £24,310 00 | 2 | £6,225 81 | 16 | £226,343 26 |
| 6 | Mercy Association for Children | Palestine | 12 | £174,513 84 | - | - | 1 | £13,900.00 | - | - | 13 | £188,413 84 |
| 7 | Social Reform Society - Jordan | Jordan | 12 | £153,712 23 | - | - | 1 | £1,290 32 | 1 | £3,225 81 | 14 | £158,228 35 |
| 8 | Al-Mujama Al-Islami - Gaza | Palestine | 11 | £105,337 03 | - | - | 1 | £13,900 00 | - | - | 12 | £119,237.03 |
| 9 | Al-Mujama Al-Islami - Khan Yunis | Palestine | 8 | £32,011 23 | - | - | 1 | £13,900 00 | 3 | £70,967.74 | 12 | £116,878 97 |
| 10 | Dar Al-Fadila Benevolent Home for Orphans | Palestine | - | - | - | - | 1 | £116,129.03 | - | - | 1 | £116,129 03 |
| 11 | Islamic Society - Gaza | Palestine | 8 | £64,462 13 | - | - | 2 | £31,250.00 | 1 | £9,677 42 | 11 | £105,389 55 |
| 12 | Jenin Zakat Committee | Palestine | 1 | £83,253 35 | - | - | - | - | 3 | £11,677 42 | 17 | £94,930 77 |
| 13 | Tulkarem Zakat Committee | Palestine | 12 | £61,635.26 | 2 | £10,122 81 | - | - | 3 | £9,951 61 | 17 | £81,709 68 |
| 14 | Islamic Heritage Committee | Palestine | 3 | £25,504 68 | - | - | 2 | £53,401 94 | - | - | 5 | £78,906.61 |
| 15 | Nablus Zakat Committee | Palestine | 14 | £72,055 48 | - | - | - | - | 2 | £6,225 81 | 16 | £78,281 29 |
| 16 | Al-Tadamun Charitable Society Nablus | Palestine | 6 | £39,860 16 | - | - | 2 | £32,640.00 | - | - | 8 | £72,500 16 |
| 17 | Islamic Society - Nusairat Camp | Palestine | 10 | £48,731 81 | 1 | £6,451.61 | 2 | £13,910 00 | 1 | £2,000 00 | 14 | £71,093 42 |
| 18 | Gaza Zakat Committee | Palestine | 9 | £53,011 00 | - | - | - | - | 1 | £2,000 00 | 10 | £55,011 00 |
| 19 | Al-Islah Charitable Society - Ramallah & Al-Bireh | Palestine | 2 | £30,591 61 | - | - | 2 | £22,570 00 | - | - | 4 | £53,161 61 |
| 20 | Students Friends Society | Palestine | - | - | - | - | - | - | 4 | £49,353.00 | 4 | £49,353 00 |
| 21 | Ramallah Zakat Committee | Palestine | 10 | £39,565 26 | - | - | - | - | 1 | £3,700 00 | 11 | £43,265 26 |
| 22 | Muslim Youth Society - Al Khalil | Palestine | 10 | £34,400 03 | - | - | - | - | 2 | £7,741.94 | 12 | £42,141.97 |
| 23 | Khan Yunis Zakat Committee | Palestine | 9 | £36,783 68 | - | - | - | - | 1 | £1,000 00 | 10 | £37,783 68 |

**Sub-analysis of Grants made to Institutions in 2002**  I/V

HIGHLY CONFIDENTIAL

NW 013474

| | Sub-analysis of Grants made to Institutions in 2002 | | | | | | | | | | II/V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Project Categories | | | | | | | | Total | Total Amount |
| | Name of Beneficiary Organisation | Country | Humanitarian | | Medical | | Com Development | | Education | | Grants | |
| | | | Grants | Amount | Grants | Amount | Grants | Amount | Grants | Amount | | |
| 24 | Al-Rahma Zakat Committee - Khan Yunis | Palestine | 5 | £33,320 48 | - | - | - | - | | | 5 | £33,320 48 |
| 25 | Al-Islah Charitable Social Society - Jericho | Palestine | 7 | £31,011 87 | - | - | - | - | 1 | £2,000 00 | 8 | £33,011 87 |
| 26 | Social Charitable Association - Rafah | Palestine | 6 | £28,640 29 | - | - | - | - | 1 | £1,500 00 | 7 | £30,140 29 |
| 27 | Muslim Women Society | Palestine | 1 | £6,897 00 | - | - | 2 | £16,425 81 | 1 | £6,451 61 | 4 | £29,774.42 |
| 28 | Orphan Care Society - Beitlehem | Palestine | 9 | £29,226 68 | - | - | - | - | | | 9 | £29,226 68 |
| 29 | Islamic Society - Rafah | Palestine | 3 | £11,655 06 | - | - | 1 | £13,900 00 | 1 | £2,500 00 | 5 | £28,055.06 |
| 30 | Islamic Charity Centre - Jordan | Jordan | 2 | £26,026 45 | - | - | - | - | | | 2 | £26,026.45 |
| 31 | Quran And Sunnah Society | Palestine | 6 | £22,425.16 | - | - | - | - | 1 | £3,225 81 | 7 | £25,650 97 |
| 32 | Al-Razi Hospital | Palestine | - | - | 3 | £25,606 68 | - | - | - | - | 3 | £25,606 68 |
| 33 | Islamic Welfare Association | Lebanon | 4 | £25,228 48 | - | - | - | - | - | | 4 | £25,228 48 |
| 34 | Tatfouh Charitable Society | Palestine | 5 | £9,116 68 | 1 | £14,838 71 | - | - | 1 | £81 00 | 7 | £24,036 39 |
| 35 | Science and Culture Center | Palestine | 1 | £3,448 00 | - | - | 2 | £19,354 84 | - | - | 3 | £22,802 84 |
| 36 | Islamic Society - Al-Qarara | Palestine | 3 | £10,767 97 | - | - | 1 | £9,677.42 | 1 | £1,935 48 | 5 | £22,380 87 |
| 37 | Bani Naim Charitable Society | Palestine | 4 | £21,316 03 | - | - | - | - | - | | 4 | £21,316 03 |
| 38 | Al-Lod Charitable Society | Palestine | 1 | £6,897 00 | - | - | 2 | £13,815 42 | - | | 3 | £20,712 42 |
| 39 | Islamic University of Gaza | Palestine | 1 | £10,345 00 | - | - | - | - | - | | 1 | £10,345 00 |
| 40 | WAMY - Gaza Office | Palestine | - | - | - | - | - | - | 1 | £20,000 00 | 1 | £20,000 00 |
| 41 | Qalqilya Society For Rehabilitation | Palestine | 4 | £19,718 23 | - | - | - | - | - | - | 4 | £19,718 23 |
| 42 | Charitable Society for the Support of Palestinian Students | Palestine | 1 | £25,460 00 | 1 | £16,174 93 | - | - | - | | 2 | £19,577 03 |
| 43 | Al-Islah Charitable Society - Jerusalem | Palestine | - | - | 1 | £19,354 84 | - | - | - | | 1 | £19,354 84 |
| 44 | Tarqoumia Zakat Committee | Palestine | 6 | £16,614 84 | - | - | - | - | 1 | £2,000 00 | 7 | £18,614.84 |
| 45 | Beit Fajjar Zakat Committee | Palestine | 5 | £10,711 35 | - | - | 1 | £2,580 65 | 2 | £5,170 97 | 8 | £18,462 97 |
| 46 | Islamic Society - Jabalia City | Palestine | 2 | £8,187 32 | - | - | 1 | £9,677.42 | - | - | 3 | £17,864 74 |

32

HIGHLY CONFIDENTIAL

NW 013475

| | | | Project Categories | | | | | | | | Total | |
| Name of Beneficiary Organisation | Country | Humanitarian | | Medical | | Com Development | | Education | | | Grants | Total Amount |
| | | Grants | Amount | Grants | Amount | Grants | Amount | Grants | Amount | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | Dura Zakat Committee | Palestine | 7 | £17,838 94 | - | - | - | - | | | 7 | £17,838 94 |
| 48 | El-Wafa Charitable Society | Palestine | 1 | £3,448 00 | - | - | 1 | £13,900 00 | - | | 2 | £17,348 00 |
| 49 | Al-Islah Charitable Social Society - Bethlehem | Palestine | 1 | £6,897.00 | - | - | 1 | £10,420 00 | - | | 2 | £17,317 00 |
| 50 | Orphans and Needy Welfare Society - Jericho | Palestine | 9 | £12,083 65 | - | - | - | | 3 | £5,225 81 | 12 | £17,309 45 |
| 51 | Tubas Zakat Committee | Palestine | 12 | £15,515.97 | - | - | - | | 1 | £1,700 00 | 13 | £17,215 97 |
| 52 | Dheisha Camp Zakat Committee | Palestine | 4 | £9,763 48 | - | - | - | | 3 | £6,516 13 | 7 | £16,279.61 |
| 53 | Tarqoumia Charitable Society - Hebron | Palestine | - | | 2 | £16,129.03 | - | | - | | 2 | £16,129.03 |
| 54 | Anebta Zakat Committee | Palestine | 8 | £15,703.42 | - | - | - | | - | | 8 | £15,703.42 |
| 55 | Jerusalem Central Zakat Committee | Palestine | 2 | £8,698 29 | - | - | - | | 1 | £6,451 61 | 3 | £15,149 90 |
| 56 | Nour El-Marifa El-Khiria | Palestine | 1 | £3,448 00 | - | - | - | | 1 | £10,967.74 | 2 | £14,415 74 |
| 57 | Islamic Society for Orphan Welfare - Yatta | Palestine | 4 | £14,204 42 | - | - | - | | - | | 4 | £14,204 42 |
| 58 | Islamic Society - Beit Hanoun | Palestine | - | | - | - | 1 | £14,193 55 | - | | 1 | £14,193 55 |
| 59 | Public Service Committee | Palestine | - | | - | - | 1 | £13,900 00 | - | | 1 | £13,900 00 |
| 60 | Yatta Zakat Committee - Al-Khalil | Palestine | 5 | £11,890 39 | - | - | - | | 1 | £2,000 00 | 6 | £13,890 39 |
| 61 | Arab Women Welfare Society | Palestine | 2 | £11,545 00 | - | - | - | | 1 | £2,200 00 | 3 | £13,745 00 |
| 62 | Al-Makassed Islamic Charitable Society - Hospital | Palestine | 1 | £6,451 61 | 1 | £6,897 00 | - | | - | | 2 | £13,348 61 |
| 63 | Yatta Medical Centre (See Al-Salah Society) | Palestine | - | | 2 | £12,951 61 | - | | - | | 2 | £12,951 61 |
| 64 | Qalqilya Zakat Committee | Palestine | 9 | £12,408 39 | - | - | - | | - | | 9 | £12,408 39 |
| 65 | Islamic Charitable Society - Dura Al-Khalil | Palestine | 6 | £9,948 68 | - | - | - | | 1 | £1,300 00 | 7 | £11,248 68 |
| 66 | Khalil Al-Rahman Women Society | Palestine | 4 | £10,930.58 | - | - | - | | - | | 4 | £10,930.58 |
| 67 | Scientific Medical Association | Palestine | - | | 1 | £10,345.00 | - | | - | | 1 | £10,345.00 |
| 68 | Al-Huda Women Society - Ramallah | Palestine | 1 | £10,345 00 | - | - | - | | - | | 1 | £10,345 00 |
| 69 | Misr Co - Egypt (Ramadan Food Parcels) | Jordan | 1 | £10,335 48 | - | - | - | | - | | 1 | £10,335 48 |

33

HIGHLY CONFIDENTIAL

NW 013476

| | Name of Beneficiary Organisation | Country | Humanitarian | | Medical | | Com Development | | Education | | Total Grants | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Grants | Amount | Grants | Amount | Grants | Amount | Grants | Amount | | |
| 70 | Zarka Private University | Jordan | - | - | - | - | - | - | 1 | £10,322.58 | 1 | £10,322.58 |
| 71 | Al-Ram Zakat Committee | Palestine | 2 | £10,122.81 | - | - | - | - | - | - | 2 | £10,122.81 |
| 72 | Dar Al-Quran Al-Kareem Wa Al-Sunah | Palestine | - | - | - | - | 1 | £9,677.42 | - | - | 1 | £9,677.42 |
| 73 | Friends of the Blind | Palestine | - | - | - | - | 2 | £9,677.42 | - | - | 2 | £9,677.42 |
| 74 | Saida Village Zakat Committee | Lebanon | - | - | - | - | 1 | £9,635.00 | - | - | 1 | £9,635.00 |
| 75 | Islamic Society - Khan Yunis | Palestine | 2 | £6,945.00 | - | - | - | - | 1 | £2,000.00 | 3 | £8,945.00 |
| 76 | Aqaba Village Mosque Committee | Palestine | - | - | - | - | 1 | £8,387.01 | - | - | 1 | £8,387.01 |
| 77 | Azoun Zakat Committee | Palestine | 4 | £8,247.01 | - | - | - | - | - | - | 4 | £8,247.01 |
| 78 | Kharas Zakat Committee | Palestine | 3 | £8,088.06 | - | - | - | - | - | - | 3 | £8,088.06 |
| 79 | South Society for Special Education, Ma'an | Jordan | 1 | £2,800.00 | - | - | 2 | £4,400.00 | - | - | 3 | £7,200.00 |
| 80 | Asamou Zakat Committee | Palestine | 6 | £7,184.65 | - | - | - | - | - | - | 6 | £7,184.65 |
| 81 | Markfield Institute of Higher Education | UK | - | - | - | - | - | - | 1 | £7,000.00 | 1 | £7,000.00 |
| 82 | Sour Baher Zakat Committee | Palestine | 1 | £6,897.00 | - | - | - | - | - | - | 1 | £6,897.00 |
| 83 | Patient's Friends Society Al-Ahli Hospital - Al-Khalil | Palestine | - | - | 1 | £6,897.00 | - | - | - | - | 1 | £6,897.00 |
| 84 | Al-Mustaqbul Association for Care & Rehabilitation of the Blind | Palestine | - | - | 1 | £3,448.00 | 1 | £3,225.81 | - | - | 2 | £6,673.81 |
| 85 | Al-Quds University | Palestine | - | - | - | - | - | - | 1 | £6,451.61 | 1 | £6,451.61 |
| 86 | Al-Aqsa Association for PMRW (Concecrated) | Palestine | 1 | £3,225.81 | - | - | 1 | £3,225.81 | - | - | 2 | £6,451.61 |
| 87 | Ithna Zakat Committee | Palestine | 3 | £0,733.39 | 1 | £700.00 | - | - | - | £2,000.00 | 5 | £6,433.39 |
| 88 | Asira Al-Shamiya Zakat Committee | Palestine | 3 | £5,849.19 | - | - | - | - | - | - | 3 | £5,849.19 |
| 89 | Al-Rajef Centre for Special Education - Maan, Jordan | Jordan | 1 | £2,240.00 | - | - | 1 | £2,240.00 | 1 | £1,280.00 | 3 | £5,760.00 |
| 90 | Patient Care Society | Palestine | 1 | £3,448.00 | - | - | 1 | £7,258.06 | - | - | 2 | £5,706.06 |
| 91 | Halhoul Zakat Committee | Palestine | 5 | £5,353.73 | - | - | - | - | - | - | 5 | £5,353.73 |
| 92 | Al-Khalil Villages | Palestine | 1 | £5,161.29 | - | - | - | - | - | - | 1 | £5,161.29 |

34

HIGHLY CONFIDENTIAL

NW 013477

| | Name of Beneficiary Organisation | Country | Humanitarian | | Medical | | Com Development | | Education | | Total Grants | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Grants | Amount | Grants | Amount | Grants | Amount | Grants | Amount | | |
| 93 | Al-Iman School | Palestine | - | - | - | - | - | - | 1 | £5,161 29 | 1 | £5,161 29 |
| 94 | Ein El-Hilwa Zakat Committee | LEBANON | 1 | £4,830.00 | - | - | - | - | - | - | 1 | £4,830 00 |
| 95 | Arourah Cultural Center | Palestine | - | - | - | - | 2 | £4,516 13 | - | - | 2 | £4,516 13 |
| 96 | Beit Kahil Zakat Committee | Palestine | 3 | £3,857 01 | - | - | - | - | - | - | 3 | £3,857 01 |
| 97 | Al-Khalil Zakat Committee | Palestine | 3 | £3,801 39 | - | - | - | - | - | - | 3 | £3,801 39 |
| 98 | Hamza Mosque - Al-Shobak | Jordan | - | - | - | - | 1 | £3,500 00 | - | - | 1 | £3,500 00 |
| 99 | Abu Hurayrah Computer Centre - Amman, Jordan | Jordan | - | - | - | - | 1 | £3,500 00 | - | - | 1 | £3,500 00 |
| 100 | Al-Ihsan Charity Society - Al-Khalil | Palestine | 1 | £3,448.00 | - | - | - | - | - | - | 1 | £3,448 00 |
| 101 | Beit Sahour Zakat Committee | Palestine | 4 | £3,342 16 | - | - | - | - | - | - | 4 | £3,342 16 |
| 102 | Al-Noor Nursery | Palestine | - | - | - | - | 1 | £3,225.81 | - | - | 1 | £3,225 81 |
| 103 | Al-Rashidya Camp - Lebanon | Lebanon | - | - | - | - | 1 | £3,150 00 | - | - | 1 | £3,150 00 |
| 104 | Islamic Charitable Society - Beit Oula | Palestine | 2 | £3,113 16 | - | - | - | - | - | - | 2 | £3,113 16 |
| 105 | Beit Oula Zakat Committee | Palestine | 3 | £2,941 94 | - | - | - | - | - | - | 3 | £2,941 94 |
| 106 | Al-Khansa Women Society - Ramallah | Palestine | 1 | £2,760.00 | - | - | - | - | - | - | 1 | £2,760 00 |
| 107 | Al-Khader Zakat & Sadaqat Committee | Palestine | 1 | £2,760.00 | - | - | - | - | - | - | 1 | £2,760 00 |
| 108 | Hibla Zakat Committee | Palestine | 5 | £2,129 94 | - | - | - | - | - | - | 5 | £2,129 94 |
| 109 | Islamic Charitable Society - Al-Shyoukh | Palestine | 1 | £1,995 00 | - | - | - | - | - | - | 1 | £1,995 00 |
| 110 | Sueer Zakat Committee | Palestine | 1 | £1,920 00 | - | - | - | - | - | - | 1 | £1,920 00 |
| 111 | Workers Association | Palestine | 1 | £1,400 00 | - | - | - | - | - | - | 1 | £1,400 00 |
| 112 | Kufur Rai Kindergarten | Palestine | - | - | - | - | - | - | 1 | £1,290.32 | 1 | £1,290 32 |
| 113 | Healthlink Worldwide | UK | - | - | - | - | - | - | 1 | £1,200 00 | 1 | £1,200.00 |
| 114 | Ard Al Insan Palestinian Benevolent Association | Palestine | - | - | - | - | - | - | 1 | £900 00 | 1 | £900 00 |
| 115 | Palestine Society - SOAS | UK | - | - | - | - | - | - | 1 | £500.00 | 1 | £500 00 |
| 116 | Silwad Zakat Committee | Palestine | 1 | £403 87 | - | - | - | - | - | - | 1 | £403 87 |
| 117 | Beita Zakat Committee | Palestine | 1 | £201 94 | - | - | - | - | - | - | 1 | £201 94 |
| 35 | **Totals** | | 412 | £2,841,457.06 | 19 | £214,387.45 | 54 | £724,007.84 | 65 | £335,467.23 | 550 | £4,115,319.58 |

**Sub-analysis of Grants made to Institutions in 2002** — V/V

Project Categories

HIGHLY CONFIDENTIAL

NW 013478

**EXHIBIT 79 to Declaration of Joel Israel
(Communication with U.K. Government, 2 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 80 to Declaration of Joel Israel**

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | Nell, Dedrei (Group Risk Mgmt) |
| **Sent:** | 17 September 2003 11:19 |
| **To:** | FOSTER, Stephen James, Group Risk Mgmt; Connor, Damien (Group Risk Mgmt) |
| **Subject:** | FW: Interpal |

Stephen - FYI

Damien - Could you please update the Interpal entries in the Reported Matches database with the additional details provided by Tony. Thanks

-----Original Message-----
| | |
|---|---|
| **From:** | O'Hear, Tony |
| **Sent:** | 17 September 2003 10:49 |
| **To:** | Nell, Dedrei (Group Risk Mgmt) |
| **Subject:** | Interpal |

Dedrei,

Apologies for the delay in getting back to you here.

I have today spoken to Mark Ashtown of the NTFIU, Special Branch, New Scotland Yard. Mark █

█████████████████████████████████████████████████████

*Redacted - Privileged*

I will update our Goalkeeper records with the details of the above telephone conversation.

Tony O'Hear
Manager, Group Investigations & Fraud
0131 523 3401 Ext 23401

If you would like to know more about Group Investigations & Fraud, please access the Intranet link below.
*http://www.manufacturing.rbs.co.uk/gsf/GIF/default.htm*

1

HIGHLY CONFIDENTIAL

**EXHIBIT 81 to Declaration of Joel Israel**

**Lane, Belinda**

| | |
|---|---|
| **From:** | Brand, Derek |
| **Sent:** | 24 September 2003 17:03 |
| **To:** | Lane, Belinda |
| **Subject:** | FW: Interpal |

**Importance:**     High

Hi Belinda,

Please see the e-mail below, which will hopefully suffice for your purposes.

Please don't hesitate to call if you require any further information or assistance.

Regards

**Derek Brand**
**CMAU, GI&F, Manufacturing**
**Tel - 0131 525 1642**
**Int - X 21642**
**Fax - 0131 523 2125**

-----Original Message-----
| | |
|---|---|
| **From:** | Brand, Derek |
| **Sent:** | 24 September 2003 16:02 |
| **To:** | RODGER, Irvine, CBFM Compliance, FOSTER, Stephen James, Group Risk Mgmt |
| **Cc:** | Hoseason, Michael (Group Fraud); O'Hear, Tony; Richardson, Peter (Op Risk); Miller, Fiona (Op Risk), Nell, Dedrei (Group Risk Mgmt) |
| **Subject:** | Interpal |
| **Importance:** | High |

Good afternoon,

As you may be aware, the above Charity a/c has been cleared by the Charities Commission of any wrong doing and/or links with Hamas.
I attach the links to web sites as confirmation -

http://www.charity-commission.gov.uk/

http://news.bbc.co.uk/1/hi/uk/3135392.stm


*Redacted - Privileged*


Regards

**Derek Brand**
**CMAU, GI&F, Manufacturing**
**Tel - 0131 525 1642**
**Int - X 21642**
**Fax - 0131 523 2125**

1

NW 012941

**EXHIBIT 82 to Declaration of Joel Israel**
**(Communication with U.K. Government, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 83 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-5   Filed 03/22/12   Page 80 of 140 PageID #:
9501

# The Charity Commission for England and Wales

# Palestinians Relief and Development Fund

Registered Charity No. 1040094 (INTERPAL)

## Introduction

1. This report is the statement of the results of the Charity Commission's Inquiry under Section 8 of the Charities Act 1993 ("1993 Act") into the affairs of the Palestinians Relief and Development Fund, known as Interpal.

2. Interpal was registered as a charity in August 1994. Interpal provides aid to, assists, guides and comforts poor and needy Palestinians in the West Bank and Gaza strip, Jordan and Lebanon. It aims to relieve the hardship and suffering of these distressed persons by co-operating or working with other charitable organisations in the region. Interpal is based in London. Its income for the year ended 31 December 2001 was in excess of £4 million.

## Background and issues

3. Interpal had been subject to a Charity Commission inquiry in 1996 into allegations that some of its funds had been misappropriated for the political or violent militant activities of Hamas in Palestine. This inquiry found no evidence of inappropriate activity, and the information available indicated that Interpal was a well-run organisation. A small number of suggestions were made on how the charity could further improve its procedures.

4. In April 2003 the Commission contacted Interpal's trustees because similar allegations had been made. The Commission's aim was to determine how Interpal's working practises had changed, if at all, since 1996, especially in light of the increased tensions during recent years in the region. Detailed examination of Interpal's practises and record keeping found that it had improved its procedures and record keeping since the Commission's previous Inquiry, although these procedures could be further enhanced by introducing a greater degree of independent verification of the work done by Interpal's partners in the region on its behalf.

4. During the course of this correspondence the Commission learned that Interpal had received funds from The Al-Aqsa Foundation in the Netherlands. The Al-Aqsa Foundations in the Netherlands and various other countries had their assets frozen under United Nations sanctions in May 2003 for allegedly supporting terrorist activities. Closer inspection of the records relating to Interpal's relationship with The Al-Aqsa Foundation in the Netherlands revealed that the funds received were in respect of humanitarian work already carried out by Interpal and then invoiced to The Al-Aqsa Foundation.

5. On 21 August 2003, in a Presidential decree, the Government of the United States of America (US Authorities) designated Interpal as a "Specially Designated Global Terrorist" organisation for allegedly supporting Hamas' political or violent militant activities. The Commission concluded that these were serious allegations and in line with its well-publicised policy opened an Inquiry into Interpal under section 8 of the Charities Act 1993 on 26 August. The principal aim of the Inquiry was to investigate these allegations with a view to determining what, if any, remedial action was necessary to address the issues.

## Actions taken

6. The Commission used its powers to act in the interests of charities and their beneficiaries under Section 18 of the 1993 Act by freezing Interpal's bank accounts as a temporary and protective measure on 26 August whilst it investigated the allegations. This 'freezing' order allowed Interpal to apply to the Commission for release of funds to fulfil its charitable purposes. In the course of the inquiry, Interpal applied for release of small amounts of funds. The Commission agreed to these releases.

7. Also, as part of its investigation, the Commission formally requested the US Authorities to provide evidence to support the allegations made against Interpal. The Commission is mindful of the possible consequences for Interpal's beneficiaries of the Commission's actions, and therefore requested the US Authorities to provide evidence to support their allegations within a reasonably short period of time.

Case 1:05-cv-04622-DLI-RML   Document 272-5   Filed 03/22/12   Page 81 of 140 PageID #:
9502

## Findings and outcomes

8. The US Authorities were unable to provide evidence to support allegations made against Interpal within the agreed timescale

9. The Commission concluded that in the absence of any clear evidence showing Interpal had links to Hamas' political or violent militant activities, Interpal's bank accounts should be unfrozen and the Inquiry closed. The bank accounts were 'unfrozen' and the Inquiry was closed on 24 September 2003.

## Wider issues

10. The Charity Commission is alert to the possibilities of charities being used to further or support terrorist activities. It will deal with any allegation of potential links between a charity and terrorist activity as an immediate priority. Where such allegations are made we will liase closely with relevant intelligence, security and law enforcement agencies to facilitate a thorough investigation. As an independent statutory regulator, the Commission will make its own decisions on the law and facts of the case.

11. The Commission's own work reveals that connections or links between registered charities in England and Wales and terrorist organisations are very rare. However, any links between charities and terrorist activity are totally unacceptable and corrosive of public confidence in charities. 'Links' in this case might include fundraising or provision of facilities, but also include formal or informal links to organisations 'proscribed' under the Terrorism Act 2000, and any subsequent secondary legislation.

12. Active collaboration between charities and terrorist organisations is a police matter that may lead to serious criminal charges. Where allegations are made to the Commission or suspicions arise as a result of the Commission's work, the Commission will inform the relevant law enforcement agencies immediately and co-operate fully with the criminal investigation.

13. Where a charity's activities may give, or appear to give, support or succour to any terrorist activity, the Commission expects the charity's trustees to take immediate steps to disassociate the charity from the activity. We expect trustees to be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. Examples include the use of a charity's premises for fundraising or meetings.

14. Charities should take all necessary steps to ensure their activities could not be misinterpreted. The Commission expects trustees and charities to ensure their activities are open and transparent, for example, when transferring assets abroad. We hold trustees accountable for ensuring that procedures are put in place to ensure that terrorist organisations cannot take advantage of a charity's status, reputation, facilities or assets.

© Crown Copyright 2007

**EXHIBIT 84 to Declaration of Joel Israel**

| | |
|---|---|
| **From:** | Sludden, Tom |
| **Sent:** | Thursday, October 02, 2003 10:46 AM |
| **To:** | Derham, Bill (Cards Risk) |
| **Cc:** | ZZCONNOR, Damien, Group Risk Mgmt |
| **Subject:** | FW: Retail Direct - Sanctions _Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03 |

Bill

Please refer to Damien's update re Interpal - can you arrange for block on chargebacks etc to be removed.

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

-----Original Message-----
From:    Connor, Damien (Group Risk Mgmt)
Sent:    02 October 2003 15:41
To:      Sludden, Tom
Cc:      Norrie, Ben (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt
Subject:    RE: Retail Direct - Sanctions _Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Tom,

The customer match of Education Aid for Palestine was an a.k.a for Interpal ( as you will be aware).  The blocking of 'Interpal' accounts was a direct result of a Charities Commission Order, and not an order via the Bank of England.  We therefore have not reported this account formally to the bank of England as part of our reporting process.  Please note that Interpal ( and its respective a.k.as) have now been cleared of any wrong doing or links with Hamas by the Charities Commission.  Group legal received a letter from the Charities Commission on the 25/09/03 confirming that they had ██████████████████████████████████████████████████████ A full report of the formal enquiry is available on the Commission's webpage - www.charitycommission.gov.uk.

Please call me to discuss if you have any further queries regarding this issue.

Regards

Damien

-----Original Message-----
From:    Sludden, Tom
Sent:    30 September 2003 12:10
To:      Connor, Damien (Group Risk Mgmt)
Subject:    Retail Direct - Sanctions _Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03

Damien

Apologies for delay in response - with exception of information previously reported for Streamline and Worldpay - all other RD bus areas have reported a Nil return.

Grateful if you could confirm whether the match on the Education Aid for Palestine streamline account has actually been reported to the Bank of England

HIGHLY CONFIDENTIAL

(main bank account previously reported to the Charities commission).

<< Message: GRM Terr 26 08 03 - Streamline and Worldpay matches >>

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

HIGHLY CONFIDENTIAL

NW 016750

**EXHIBIT 85 to Declaration of Joel Israel**
**(Communication with U.K. Government, 5 Pages)**

**This document has been filed Under Seal**

**EXHIBIT 86 to Declaration of Joel Israel**

## Woodley, Terry (CCB)

| | |
|---|---|
| **From:** | O'Hear, Tony |
| **Sent:** | 17 September 2003 11:56 |
| **To:** | Woodley, Terry (CCB) |
| **Cc:** | RODGER, Irvine, CBFM Compliance |
| **Subject:** | INTERPAL |

Terry,

A Money Laundering Disclosure was submitted on the above customer back in ▮▮▮▮▮ following receipt of a USD lodgement of ▮▮▮▮▮ The customer when asked confirmed that the payment originated from the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ I appreciate it may not be a straightforward exercise but are you able to check if any other funds have been received from this specific organisation over the last 12 mths ?

Tony O'Hear
Manager, Group Investigations & Fraud
0131 523 3401 Ext 23401

If you would like to know more about Group Investigations & Fraud, please access the Intranet link below.
*http://www.manufacturing.rbs.co.uk/gsf/GIF/default.htm*

7 aies

1

HIGHLY CONFIDENTIAL

NW 012976

**EXHIBIT 87 to Declaration of Joel Israel**
**(Communication with U.K. Government, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 88 to Declaration of Joel Israel**
**(Communication with U.K. Government, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 89 to Declaration of Joel Israel**

**DAVIES, Rob, Group Risk Mgmt**

From:            Stephen Foster [Fozzie6@ukgateway.net]
Sent:            28 October 2003 16:05
To:              NORRIE, Ben, Group Risk Mgmt; ROWLAND, Leah, Group Risk Mgmt
Subject:         Re: Text from letter

agreed
----- Original Message -----
From: "NORRIE, Ben, Group Risk Mgmt" <Ben.NORRIE@rbos.com>
To: "'Stephen Foster'" <Fozzie6@ukgateway.net>; "ROWLAND, Leah, Group Risk Mgmt"
<Leah.Rowland@rbos.com>
Sent: Tuesday, October 28, 2003 9:58 AM
Subject: RE: Text from letter


> Yes, confirmation received from Tony O'Hear in GI&F who performed
> investigation for RBS.
>
> Don't know if the second para is factually correct.  Perhaps the
> following would be better?
>

████████████████████████████████████████████████

>
> Don't know if we want to commit to the monitoring?  We have suggested,
> but not agreed this with the Division as yet.
>
> Ben.
>
> -----Original Message-----
> From: Stephen Foster [mailto:Fozzie6@ukgateway.net]
> Sent: 27 October 2003 22:33
> To: ROWLAND, Leah, Group Risk Mgmt
> Cc: NORRIE, Ben, Group Risk Mgmt
> Subject: Re: Text from letter
>
> Leah - I suggest a reply as follows (can you check that Ben gets this
> as well, because I would like him to check the e-mail traffic from, I
> recall, Mike Hoseason and Derek Brand confirming that their checks on
> the account revealed that no payments were being made to Hamas):
>

████████████████████████████████████████████████

>
> In the light of the comments in your letter, we have carried out
> further checks on the accounts we hold for Interpal and we have
> confirmed that payments are not being made to Hamas from those
> accounts.
>
> Yours sincerely,
>
>
> Richard Gossage etc.
>

1

```
> PLUS - could you please tell Charlie that I spoke to Amanda on Friday
about
> the User Requirements paper I gave to Amanda in draft last week, using
> the material that he and David Leahy had pulled together some time
> ago. Amanda said she would talk to Charlie about taking the paper
> forward in my
absence.
> If Charlei needs the paper, it is in J\Compliance\Assessment and
> Monitoring\UID. I can't recall its name but it is one of only very few
docs
> there.
>
> Thanks v much.
> ----- Original Message -----
> From: "ROWLAND, Leah, Group Risk Mgmt" <Leah.Rowland@rbos.com>
> To: <Fozzie6@ukgateway.net>
> Sent: Monday, October 27, 2003 3:38 PM
> Subject: Text from letter
>
>
> > Our ref: Terrorism73/TRD
> >
> > Dear Richard
> >
```

```
> > Your sincerely
> >
> > Tom Dawlings
> >
> > Leah Rowland
```

2

```
>  > Executive Secretary to Amanda Holt & Riccardo Rebonato Group Risk
>  > Management 5th floor, 280 Bishopsgate
>  > London EC2M 4RB
>  > Tel: 020 7334 1137  Fax: 020 7375 4106
>  > E-mail:  leah.rowland@rbos.com
>  >
>  >
>  >
>  >
>  >
>
**********************************************************************
>  ******
>  > This e-mail is intended only for the addressee named above. As this
>  > e-mail may contain confidential or privileged information, if you
>  > are not the named addressee, you are not authorised to retain, read,
>  > copy or disseminate this message or any part of it. The Royal Bank
>  > of Scotland plc is registered in Scotland No 90312 Registered
>  > Office: 36 St Andrew Square, Edinburgh EH2 2YB
>  >          Regulated by the Financial Services Authority
>  >
>  >          Visit our website at http://www.rbs.co.uk/CBFM/
>  >
>
**********************************************************************
>  ******
>  >
>  >
>
>
>
>
**********************************************************************
******
> This e-mail is intended only for the addressee named above. As this
> e-mail may contain confidential or privileged information, if you are
> not the named addressee, you are not authorised to retain, read, copy
> or disseminate this message or any part of it. The Royal Bank of
> Scotland plc is registered in Scotland No 90312 Registered Office: 36
> St Andrew Square, Edinburgh EH2 2YB
>          Regulated by the Financial Services Authority
>
>          Visit our website at http://www.rbs.co.uk/CBFM/
>
**********************************************************************
******
>
>
```

3

**EXHIBIT 90 to Declaration of Joel Israel**

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | Sludden, Tom |
| **Sent:** | 23 April 2004 15:25 |
| **To:** | NORRIE, Ben, Group Risk Mgmt |
| **Cc:** | DAVIES, Rob, Group Risk Mgmt; COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk) |
| **Subject:** | RE: INTERPAL |

Ben

We have not completed any additional due diligence on this connection as a result of previous instruction - please refer to attached email. In regard to money being paid from Interpal to Hamas, a review of the Interpal stramline connection would not shed any light on this as all funds rec'd to interpal by way of credit or debit card payments would be settled to a bank account in the name of Interpal (no third party payments possible from streamline account).

If there have been any payments to Hamas they would have to come from the main banking account.



FW: Retail Direct -
Sanctions ...

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

-----Original Message-----
**From:** NORRIE, Ben, Group Risk Mgmt
**Sent:** 21 April 2004 17 05
**To:** COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
**Cc:** DAVIES, Rob, Group Risk Mgmt
**Subject:** INTERPAL

Gentlemen,

You may remember███████we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc). There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity. At this time we attempted to confirm with the Bank of England ██████████████████████████████████████████. The Bank of England advised that ██████████████ ████████████████████████████████████████. We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear.

**Kind Regards,**
**Ben Norrie**

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0)20 7375 4813
Email:    ben.norrie@rbos.com

*****************************************************************************************
**********************

1

HIGHLY CONFIDENTIAL

NW 017173

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only  If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

*********************************************************************************

HIGHLY CONFIDENTIAL

NW 017174

*Attachment*

## DAVIES, Rob, Group Risk Mgmt

| | |
|---|---|
| **From:** | Sludden, Tom |
| **Sent:** | 02 October 2003 15:46 |
| **To:** | Derham, Bill (Cards Risk) |
| **Cc:** | ZZCONNOR, Damien, Group Risk Mgmt |
| **Subject:** | FW: Retail Direct - Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03 |

Bill

Please refer to Damien's update re Interpal - can you arrange for block on chargebacks etc to be removed.

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

-----Original Message-----
| | |
|---|---|
| **From:** | Connor, Damien (Group Risk Mgmt) |
| **Sent:** | 02 October 2003 15:41 |
| **To:** | Sludden, Tom |
| **Cc:** | Norrie, Ben (Group Risk Mgmt); FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | RE: Retail Direct - Sanctions & Terrorist Financing: New RBS Group Search Request – GRM TER 26_08_03 |

Tom,

The customer match of Education Aid for Palestine was an a.k a for Interpal ( as you will be aware).  The blocking of 'Interpal' accounts was a direct result of a Charities Commission Order, and not an order via the Bank of England.  We therefore have not reported this account formally to the bank of England as part of our reporting process.  Please note that Interpal ( and its respective a.k.as) have now been cleared of any wrong doing or links with Hamas by the Charities Commission   Group legal received a letter from the Charities Commission on the 25/09/03 confirming that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A full report of the formal enquiry is available on the Commission's webpage - www.charitycommission.gov.uk.

Please call me to discuss if you have any further queries regarding this issue.

Regards

Damien

-----Original Message-----
| | |
|---|---|
| **From:** | Sludden, Tom |
| **Sent:** | 30 September 2003 12 10 |
| **To:** | Connor, Damien (Group Risk Mgmt) |
| **Subject:** | Retail Direct - Sanctions & Terrorist Financing. New RBS Group Search Request - GRM TER 26_08_03 |

Damien

Apologies for delay in response - with exception of information previously reported for Streamline and Worldpay - all other RD bus areas have reported a Nil return.

Grateful if you could confirm whether the match on the Education Aid for Palestine streamline account has actually been reported to the Bank of England (main bank account previously reported to the Charities commission).

<< Message: GRM Terr 26 08 03 - Streamline and Worldpay matches >>

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497

1

HIGHLY CONFIDENTIAL

NW 017175

Fax: 0131 523 9784

2

HIGHLY CONFIDENTIAL

## DAVIES, Rob, Group Risk Mgmt

| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 26 April 2004 09:26 |
| **To:** | Sludden, Tom |
| **Cc:** | DAVIES, Rob, Group Risk Mgmt; COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk) |
| **Subject:** | RE: INTERPAL |

Thanks Tom.

Subsequent to the email attached we gave an undertaking to the BoE to monitor interpal going forward, where possible.

Understand that this might not be practical on the streamline terminal, however what about the cards held? (prompted to think about interpal by the match we have record on a recent card application).

Ben.

---
  -----Original Message-----
| | |
|---|---|
| **From:** | Sludden, Tom |
| **Sent:** | 23 April 2004 15:25 |
| **To:** | NORRIE, Ben, Group Risk Mgmt |
| **Cc:** | DAVIES, Rob, Group Risk Mgmt; COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk) |
| **Subject:** | RE: INTERPAL |

Ben

We have not completed any additional due diligence on this connection as a result of previous instruction - please refer to attached email. In regard to money being paid from Interpal to Hamas, a review of the Interpal stramline connection would not shed any light on this as all funds rec'd to interpal by way of credit or debit card payments would be settled to a bank account in the name of Interpal (no third party payments possible from streamline account).

If there have been any payments to Hamas they would have to come from the main banking account.

  << Message: FW: Retail Direct - Sanctions & Terrorist Financing: New RBS Group Search Request - GRM TER 26_08_03 >>

Tom Sludden
Retail Direct Finance
Governance Manager
24/25 St Andrew Square

Tel: 0131 525 1497
Fax: 0131 523 9784

  -----Original Message-----
| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 21 April 2004 17.05 |
| **To:** | COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom |
| **Cc:** | DAVIES, Rob, Group Risk Mgmt |
| **Subject:** | INTERPAL |

Gentlemen,

You may remember ████████ we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc). There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity. At this time we attempted to confirm with the Bank of England ████ ████████████████████████████████████████████████ The Bank of England advised that ████████ ████████████████████████████████████████████████ We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear.

1

HIGHLY CONFIDENTIAL

Kind Regards,
Ben Norrie

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel:      00 44 (0) 20 7334 1460
Fax:      00 44 (0)20 7375 4813
Email:    ben.norrie@rbos.com

*****************************************************************************************
************************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

*********************************************************************************

HIGHLY CONFIDENTIAL

NW 017178

**EXHIBIT 91 to Declaration of Joel Israel**

| | |
|---|---|
| **From:** | Norrie, Ben (Group Risk Mgmt) |
| **Sent:** | Thursday, October 09, 2003 9:34:18 AM |
| **To:** | FOSTER, Stephen James, Group Risk Mgmt |
| **CC:** | Connor, Damien (Group Risk Mgmt) |
| **Subject:** | RE: Interpal |

Have trawled the email archives and have not come up with anything on Hamas payments.

This is possibly symptomatic of a wider concern re payment screening.  The BoE, from their letter, and indeed as contained within statutory guidance require that we ensure that funds are not made available (to sanctioned or terrorist individuals or organisations).  While we are very good at screening accounts, I am not aware of the processes we have in relation to payments.  Is this my knowledge gap or an issue that needs addressing?

In relation to Interpal, I suggest that we have the CMAU monitor the transactions on this account going forward.

Ben.

-----Original Message-----
**From:** Brand, Derek
**Sent:** 09 October 2003 12:20
**To:** FOSTER, Stephen James, Group Risk Mgmt; Hoseason, Michael (Group Fraud); Norrie, Ben (Group Risk Mgmt)
**Cc:** O'Hear, Tony
**Subject:** RE: Interpal

I am not aware of anything intimating that payments may have been made to Hamas.
Tony was running with this in great detail Stephen, but he is on holiday until Monday.
I've copied him into this response in case he can add value.

Regards

**Derek Brand**
**CMAU, Group Investigations & Fraud,**
**Group Security & Fraud, Manufacturing**
**Tel - 0131 525 1642**
**Int - X 21642**
**Fax - 0131 523 2125**

-----Original Message-----
**From:** FOSTER, Stephen James, Group Risk Mgmt
**Sent:** 09 October 2003 12:12
**To:** Hoseason, Michael (Group Fraud); Brand, Derek; Norrie, Ben (Group Risk Mgmt)
**Subject:** Interpal

FYI tha BOE have written to us acknowledging the letter we sent them on Interpal (the letter merely told them ██████████████████████████████████████████

However, they have reminded us that ███████████████████████████████████ so we need to be freezing funds, reporting etc.   Ben is looking out what we have but do you have anything on possible payments to Hamas?
We will prob need to reply.

Thanks

"*************************************************************"
"     Visit our Internet site at <http://www.rbsmarkets.com>      "
"                                                                 "
" This e-mail is intended only for the addressee named above.     "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to   "
" retain, read, copy or disseminate this message or any part of it.  "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB    "
"     Regulated by the Financial Services Authority               "
"*************************************************************" "

"*************************************************************""

```
"
"      Visit our Internet site at http://www.rbsmarkets.com            "
"                                                                      "
" This e-mail is intended only for the addressee named above.     "
" As this e-mail may contain confidential or privileged information, "
" if you are not the named addressee, you are not authorised to   "
" retain, read, copy or disseminate this message or any part of it.  "
" The Royal Bank of Scotland is registered in Scotland No 90312"
" Registered office: 36 St Andrew Square, Edinburgh EH2 2YB   "
"       Regulated by the Financial Services Authority              "
"*********************************************************************** "
```

HIGHLY CONFIDENTIAL

NW 213358

**EXHIBIT 92 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | COLE, Guy, CBFM Regulatory Risk |
| **Sent:** | Thursday, May 20, 2004 10:34 AM |
| **To:** | FOSTER, Stephen James, Group Risk Mgmt; NORRIE, Ben, Group Risk Mgmt |
| **Cc:** | RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt; JONES, Richard, CBFM Regulatory Risk |
| **Subject:** | RE: INTERPAL |
| **Attachments:** | Doc1.doc |

Stephen/Ben

We have ascertained that the payment mentioned below has <u>not</u> gone to the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable Society.  Although similarly named, the recipient of this payment is a separate charity <http://www.icshebron.org/branches_e.htm>, which appears to be operating without any form of sanction placed on it.

From my trawls for information on the internet I have not found any information that substantiates beyond opinion that Interpal has made payments to terrorist groups.  It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities.  This charity is the predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998.  Looking at the accounts there are also a large number of small (e.g. £2) direct debits being paid into the charity's account from UK donators, and so a change of their banking arrangements will probably result in some form of media commentary.

I attach a summary of my review of Interpal foreign payments in the last six months. All of the recipients of these payments were checked in Worldcheck, KYC Check and reviewed against available Google information



Doc1.doc (113 KB)

In consideration of the information in the document attached above.  The background information for the Al-Islah charity, is a an unofficial opinion from an Israeli website and no other reports or recognition of this charity having links to terrorism are recorded on any other websites.  The Worldcheck information on ██████ is factually incorrect, they state that the US Federal government and UN have acknowledged that the charity aids and abets terrorism.  According to the KYC Check no sanctions have existed against this entity.  The source of Worldcheck's information is a student's journal at the University of California.  My recent experience of Worldcheck has been disappointing, I will probably write a separate email concerning my Worldcheck findings, but in this instance if your search for the ████████████ ██████against the WorldCheck 'part match' feature, no matches are found, if you then search for an 'exact match' one result is found.

I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts.  Consideration will need to be given regarding the operation of the US Dollar account, as funds from this account will get frozen if they are transferred via a US domiciled/owned counterparty. We should also be alert to any new Charity names being added to the Bank of England's terrorism list.  I believe Interpal is aware of the sensitivity of their position, and will be keen to ensure it does not breach Bank of England sanctions.

I'll assume you are happy with approach, unless I hear otherwise.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T  (020) 7375 5433**
**F  (020) 7375 4641**
**<mailto:Guy.Cole@rbos.com>**

-----Original Message-----
**From:**      FOSTER, Stephen James, Group Risk Mgmt
**Sent:**      17 May 2004 11:24
**To:**        COLE, Guy, CBFM Regulatory Risk; NORRIE, Ben, Group Risk Mgmt
**Cc:**        RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt
**Subject:**   RE: INTERPAL

Guy, Ben is away all week, so I am replying on this.
You are correct that filtering is a group wide issue and that is why we have been working with key stakeholders like Payment Operations to develop the policy and capability. This continues and we know that it is a very important element of our counter -terrorism efforts.

On the specific case of Interpal, I can understand the difficulties of filtering payments in the absence of an automated system. However, we do need to monitor account activity and I hope that the RM and MLPU can find a practical way to review the account movements periodically for odd items.  You are right to highlight the reputational issues but if management decides they don't want the relationship, there are ways to exit that might not cause a problem.

Please keep us in the loop with your investigations on the payments.

     -----Original Message-----
**From:**      COLE, Guy, CBFM Regulatory Risk
**Sent:**      17 May 2004 11:05
**To:**        NORRIE, Ben, Group Risk Mgmt
**Cc:**        FOSTER, Stephen James, Group Risk Mgmt; RODGER, Irvine, CBFM Regulatory Risk
**Subject:**   RE: INTERPAL

Ben

I understand the best people to speak to are either Shirley Ritson on 020 7672 6940 or Sarah Wallis on 020 7672 5826.           *Redacted - Privileged*

                              *Redacted - Privileged*

I realise due to the US terrorist designation of Interpal, that we should be wary of the payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM.

I have not been directly involved with the Interpal issue until your recent correspondence and so have not considered previously the risks myself.  I think any decision to keep/close the account must be carefully made, as closing the account without an identifiable reason will most probably result in adverse media attention, also if a terrorism related payment is identified as being made, we again would suffer untoward regulatory/ media attention.  I spent Friday looking through the last six months of debits on Interpal accounts, I have seen a couple of payments that warranted further investigation, particularly the below:

Transaction  Date:            ███████████
Transaction  Amount:          █████████████████
Transaction  Type:           ███ (Standard Transfer Foreign Payment)██
Transaction  References: +BTR/04/20-263
                        ██████████████████████

Further system investigation has shown the recipient accounts details are the below:
**EBANKGO04373632**
Bene acct name: Islamic Charitable Society - Dura
Bene acct nmbr: ███████████
Bene bank: ███████████████████████████████

I need to conduct further investigations to establish whether this account could be the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable Society. as this entity has been designated a terrorist group by the Bank of England.

Regards

HIGHLY CONFIDENTIAL

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T  (020) 7375 5433**
**F  (020) 7375 4641**
**<<mailto:Guy.Cole@rbos.com>>**

-----Original Message-----
| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 14 May 2004 10:03 |
| **To:** | COLE, Guy, CBFM Regulatory Risk |
| **Cc:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | RE: INTERPAL |

Do you have any contact in the Core Data Manager team that I could try?  Is there any kind of agreement between CBFM and Manufacturing that would serve as a mandate to have this work performed on an on-going basis?

Im and not sure whether you were aware but until a few weeks ago the NatWest logo was used prominently on the Interpal website in soliciting donations.  Did you or the RM have Interpal remove this?  Are the CBFM MLPU happy with the potential risks in continuing this relationship?

Ben

-----Original Message-----
| | |
|---|---|
| **From:** | COLE, Guy, CBFM Regulatory Risk |
| **Sent:** | 06 May 2004 16:51 |
| **To:** | NORRIE, Ben, Group Risk Mgmt |
| **Subject:** | RE: INTERPAL |

Ben

The Relationship Manager is aware of the potential terrorism connections with this account and liased with Derek Brand during the account freeze.  Although diligent in their interaction with the customer, the RM has no ability to filter or efficently monitor payments, I understand that this could be done in the Core Data Manager team in Manufacturing who control payment blocking and restrictions.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T  (020) 7375 5433**
**F  (020) 7375 4641**
**<<mailto:Guy.Cole@rbos.com>>**

-----Original Message-----
| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 06 May 2004 15:55 |
| **To:** | COLE, Guy, CBFM Regulatory Risk |
| **Subject:** | FW: INTERPAL |

Guy,

Haven't heard back from you on the below?

Ben.

HIGHLY CONFIDENTIAL

-----Original Message-----

**From:** NORRIE, Ben, Group Risk Mgmt
**Sent:** 21 April 2004 17:05
**To:** COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
**Cc:** DAVIES, Rob, Group Risk Mgmt
**Subject:** INTERPAL

Gentlemen,

You may remember ████████ we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc). There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity. At this time we attempted to confirm with the Bank of England ████████████████████████████ ██████████████ The Bank of England advised that t███████████████████████████████ ████████████████████████████████████ We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear.

**Kind Regards,**
**Ben Norrie**

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0) 20 7375 4813
Email:    ben.norrie@rbos.com

HIGHLY CONFIDENTIAL

**EXHIBIT 93 to Declaration of Joel Israel**

| | |
|---|---|
| **From:** | JONES, Richard, CBFM Regulatory Risk |
| **Sent:** | Tuesday, July 13, 2004 6:45 AM |
| **To:** | COLE, Guy, CBFM Regulatory Risk <Guy.COLE@rbos.com> |
| **Subject:** | FW: Bank Hapoalim |

thank you

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-----Original Message-----
**From:** Nolan, Ged
**Sent:** 13 July 2004 11:43
**To:** JONES, Richard, CBFM Regulatory Risk
**Cc:** Miles, Phil
**Subject:** Bank Hapoalim

Richard,

re our conversation we have been advised by Bank Hapoalim by Fax dated 11 July 2004 that 3 payments from NatWest have been blocked by Bank Hapoalim on the basis quote that the beneficiary, the Jenin Zakat Committee, was declared an "Unlawful Association" according to Defence (Emergency) Regulations with respect to terror activities. According to the above Regulations, Bank Hapoalim are obliged to hold the funds, pending receipt of instructions from the Israeli Government unquote.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Details of the payment are as follows:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| Date of MT103 | Amount | Value | TRN | Remitter | Beneficiary |
|---|---|---|---|---|---|
| | | | | | |

This is the first we have heard of this and Hapoalim state "that they are very much aware of the long period of time which has lapsed since the receipt of these transfers and apologise for the delay in informing you. Upon receipt of instructions from the Government, we will notify you immediately".

At this stage we have not responded to Hapoalim nor contacted Payments Operations.

Regards

Ged*

HIGHLY CONFIDENTIAL

**EXHIBIT 94 to Declaration of Joel Israel**

**RODGER, Irvine, CBFM Enterprise Risk**

| | |
|---|---|
| **From:** | LOVE, Kevin, CBFM |
| **Sent:** | Monday, December 13, 2004 08:34 AM |
| **To:** | RODGER, Irvine, MLPU |
| **CC:** | COLE, Guy, MLPU |
| **Subject:** | RE: Interpal |

Irv'

Thanks for this.  Just for clarity can you make your last sentence clearer please – I think that you are saying that you agree with the branch that this account should **not** be exited?

Also, can you give me a paragraph (maybe from their website) which spells out exactly what Interpal do in their own words.

Thanks and regards

**Kevin R. Love**
**Global Head of Enterprise Risk**
**Corporate Banking & Financial Markets**
**The Royal Bank of Scotland Group Plc**
**kevin.love@rbos.com**
**Work: +44 20 7085 4026 Mobile: +44 7769 931630**
**Pager: +44 7693 308651 Blackberry: +44 7793 858329**

-----Original Message-----
**From:** RODGER, Irvine, CBFM Enterprise Risk
**Sent:** 13 December 2004 13:17
**To:** LOVE, Kevin, CBFM
**Cc:** COLE, Guy, CBFM Enterprise Risk
**Subject:** Interpal

Kevin

The RM is Belinda Lane from Romford Commercial (01708 774529). .  The view from the branch is that it is a good income earner but it is declining.  Clive Bray, Belinda's assistant, says that the account has been investigated several times but nothing untoward has been uncovered.  He expressed the view that it would be a pity if we did exit but of course it would be accepted.

By way of background, there was an investigation by the **Charities Commission** and **Special Branch** into potential links with Hamas, but no action was taken against the charity.  The Bank of England has also confirmed that although the Terrorism Order 2001 does cover Hamas, it does not cover Interpal.

Guy has not found anything that substantiates beyond **opinion** that Interpal has made payments to terrorist groups. It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as **terrorists know that if they die their dependents will be looked after by the charities**.  Interpal is a predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998.

There is of course a **danger of adverse media comment** if we were to close a legitimate charitable account.

Taking everything into account, neither myself or Guy agree with the branch that the accounts should not be closed.  You may wish to get Derek and Alan to make the final decision.

Regards

_____

**Irvine Rodger**

**CBFM MLPU**
**The Royal Bank of Scotland plc**
**135 Bishopsgate, London, EC2M 3UR**
**Internal Extension  361082**
**Telephone  020 7085 1082**

Email: irvine.rodger@rbos.com

**The Royal Bank of Scotland plc**        www.rbos.com

HIGHLY CONFIDENTIAL

NW 067947

**EXHIBIT 95 to Declaration of Joel Israel**

## Lane, Belinda

| | |
|---|---|
| **To:** | Info; Bray, Clive |
| **Cc:** | Jihad Qundil |
| **Subject:** | RE: Cricklewood Branch |

Hi Adlin

I am extremely concerned to learn of the poor service which you have encountered and will be writing to the manager of the branch to seek their comments and apologies. I will be in touch as soon as I have received a reply.

-----Original Message-----
| | |
|---|---|
| **From:** | Info [SMTP:info@interpal.org] |
| **Sent:** | 12 January 2004 13.40 |
| **To:** | Lane, Belinda; Bray, Clive |
| **Cc:** | Jihad Qundil |
| **Subject:** | Cricklewood Branch |

**\*\*\* WARNING : This message originates from the Internet \*\*\***

PO Box 3333. London, NW6 1RW
Tel: 020 8450 8002 ~ Fax: 020 8450 8002
info@interpal.org <mailto:info@interpal.org> ~ www.interpal.org <http://www.interpal.org/>
Registered Charity No. 1040094

<< File: image001.png >> << File: image002.jpg >>

Dear Belinda,

I hope it is still not too late to wish you a Happy New Year. We were very sad to lose Terry as our first point of contact, but Clive has been marvelous in giving us a helping hand and we look forward to building a close relationship with him.

I write to ask if you remember that little incident at the NatWest Cricklewood Branch last year. If you do, then you won't be too surprised at what I am about to say. I've had complaints from our staff that the Cricklewood branch staff have been extremely rude and unhelpful over these last few months, especially during Ramadan when we had a lot of donations to bank, including cash.

Our policy is to bank donations as soon as practicable, especially cash as our insurance does not cover the loss of more than £1,000 in cash. We can understand the bank staff not being happy when we go during lunch time, but it seems they are not happy no matter what time we turn up. It is not always possible to avoid lunch time, and surely as a long standing NatWest customer we are at liberty to bank the donations when it suits our business rather than the other way around. And surely it is not unreasonable to expect some courtesy from the branch staff.

I should be grateful if you could raise this matter with the branch manager as soon as possible, and ask her to look into the matter. It would be greatly appreciated if she can ensure that her staff are more helpful and courteous. This is a very serious issue as we never feel welcome at that branch. The manager, to her credit, is about the only one who does not moan when presented with the donations that we bank. However, as you found out for yourself, service at the Cricklewood branch leaves much to be desired.

I look forward to your reply, and would be interested to know what the branch manager has to say.

1

HIGHLY CONFIDENTIAL

Best wishes;

Adlin Adnan

INTERPAL
Helping Palestinians in Need

----------------------------------------------------------------------------------------

The contents of this e-mail are intended only for the named addressee.  It contains information which is confidential and which may also be privileged.  Unless you are the named addressee (or authorised to receive this e-mail by the named addressee) you must not copy, use, disclose or place any reliance on its contents.  If you receive this e-mail in error please notify us immediately and delete it.
We make every effort to keep our network free from viruses.  However, you do need to check this e-mail and any attachments for viruses.
We accept no responsibility for any computer virus which may be transferred by this e-mail.
Any views or opinions contained in this e-mail are those of the author and do not necessarily represent those of INTERPAL.

HIGHLY CONFIDENTIAL
NW 017134

**EXHIBIT 96 to Declaration of Joel Israel**

# Fax



**Commercial Banking**

| | |
|---|---|
| **To:** | Helen/Pam |
| **Company:** | Natwest Cricklewood |
| **Fax No:** | 020 8452 0549 |
| **Phone No:** | |
| **From:** | Clive Bray<br>Assistant Manager<br>Commercial Banking |
| **Date:** | 21/01/04 |
| **No of Pages**<br>(including header): | 3 |
| **Subject** | |

Greater London East Commercial Banking Centre
P.O.Box 2401
1st Floor, 10 South Street
Romford
Essex, RM1 1BD

Tel:   01708 774529
Fax:   01708 733816
E-mail:  clive.bray@rbs.co.uk

**Please call us if this fax transmission is incomplete or illegible.**
This message is confidential and for use by the addressee only. The contents are not to be disclosed to anyone other than the addressee. Please advise the sender immediately by telephone of any error in transmission.

Dear Helen or Pam

Following our fax of 13/1/04 of which I attach a copy. We recently received a phone call from Pam explaining that the complaint had been dealt with over the phone.

Because of the value to the Bank of this connection we feel that an appropriately worded letter of apology is required and would appreciate it if you would issue such a letter and copy us in.

Thank you for your assistance.

Clive Bray
Assistant Manager
Commercial Banking

National Westminster Bank Plc ('the Bank') is a member of the NatWest and Gartmore Marketing Group. The only packaged products (life policies, unit trusts and other collective investment schemes and stakeholder and other pensions) the Bank advises on and sells are those of the Marketing Group, whose members are regulated by the Financial Services Authority. NatWest Stockbrokers Limited is also a Member of the London Stock Exchange.

National Westminster Bank Plc. Registered in England No 929027 Registered Office: 135 Bishopsgate, London EC2M 3UR

Agency agreements exist between members of The Royal Bank of Scotland Group.

HIGHLY CONFIDENTIAL

**EXHIBIT 97 to Declaration of Joel Israel**

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | RODGER, Irvine, CBFM Regulatory Risk |
| **Sent:** | 03 June 2004 19:04 |
| **To:** | FOSTER, Stephen James, Group Risk Mgmt, COLE, Guy, CBFM Enterprise Risk, NORRIE, Ben, Group Risk Mgmt |
| **Cc:** | DAVIES, Rob, Group Risk Mgmt; JONES, Richard, CBFM Enterprise Risk |
| **Subject:** | RE: INTERPAL |

Guy

This is good (analysis)   It is pleasing that you don't like to mince your words either..

Thanks

**Irvine Rodger**
CBFM MLPU
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T (020) 7334 1082
F (020) 7375 4641
E irvine.rodger@rbos.com>

     -----Original Message-----
     **From:**     FOSTER, Stephen James, Group Risk Mgmt
     **Sent:**     20 May 2004 16:34
     **To:**       COLE, Guy, CBFM Regulatory Risk; NORRIE, Ben, Group Risk Mgmt
     **Cc:**       RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt; JONES, Richard, CBFM Regulatory Risk
     **Subject:**  RE: INTERPAL

This is a very thorough appraisal of the position and I support the proposal, with one question - is semi-annual sufficient for the £ and Euro accounts?
Please send your views on Worldcheck.  They have asked me to meet a potential customer and I intend to tell them how it has been and is, warts and all.

     -----Original Message-----
     **From:**     COLE, Guy, CBFM Regulatory Risk
     **Sent:**     20 May 2004 15:34
     **To:**       FOSTER, Stephen James, Group Risk Mgmt; NORRIE, Ben, Group Risk Mgmt
     **Cc:**       RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt; JONES, Richard, CBFM Regulatory Risk
     **Subject:**  RE: INTERPAL

Stephen/Ben

We have ascertained that the payment mentioned below has not gone to the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable Society.  Although similarly named, the recipient of this payment is a separate charity <<http://www.icshebron.org/branches_e htm>>, which appears to be operating without any form of sanction placed on it.

From my trawls for information on the internet I have not found any information that substantiates beyond opinion that Interpal has made payments to terrorist groups   It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities.  This charity is the predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998.  Looking at the accounts there are also a large number of small (e.g. £2) direct debits being paid into the charity's account from UK donators, and so a change of their banking arrangements will probably result in some form of media commentary

I attach a summary of my review of Interpal foreign payments in the last six months  All of the recipients of these payments were checked in Worldcheck, KYC Check and reviewed against available Google information
     << File: Doc1 doc >>
In consideration of the information in the document attached above.  The background information for the Al-Islah charity, is a an unofficial opinion from an Israeli website and no other reports or recognition of this charity having links to terrorism are recorded on any other websites   The Worldcheck information on ▮▮▮▮▮ is factually incorrect, they state that the US Federal government and UN have acknowledged that the charity aids and abets terrorism.  According to the KYC Check no sanctions have existed against this entity   The source of Worldcheck's information is a student's journal at the University of California   My recent experience

HIGHLY CONFIDENTIAL

NW 017179

of Worldcheck has been disappointing, I will probably write a separate email concerning my Worldcheck findings, but in this instance if your search for the ███████████████ against the WorldCheck 'part match' feature, no matches are found, if you then search for an 'exact match' one result is found

I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts.  Consideration will need to be given regarding the operation of the US Dollar account, as funds from this account will get frozen if they are transferred via a US domiciled/owned counterparty  We should also be alert to any new Charity names being added to the Bank of England's terrorism list.  I believe Interpal is aware of the sensitivity of their position, and will be keen to ensure it does not breach Bank of England sanctions.

I'll assume you are happy with approach, unless I hear otherwise

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T  (020) 7375 5433**
**F  (020) 7375 4641**
**<<mailto:Guy.Cole@rbos.com>>**

-----Original Message-----
**From:**     FOSTER, Stephen James, Group Risk Mgmt
**Sent:**     17 May 2004 11:24
**To:**   COLE, Guy, CBFM Regulatory Risk; NORRIE, Ben, Group Risk Mgmt
**Cc:**   RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt
**Subject:**     RE: INTERPAL

Guy, Ben is away all week, so I am replying on this
You are correct that filtering is a group wide issue and that is why we have been working with key stakeholders like Payment Operations to develop the policy and capability  This continues and we know that it is a very important element of our counter -terrorism efforts

On the specific case of Interpal, I can understand the difficulties of filtering payments in the absence of an automated system. However, we do need to monitor account activity and I hope that the RM and MLPU can find a practical way to review the account movements periodically for odd items  You are right to highlight the reputational issues but if management decides they don't want the relationship, there are ways to exit that might not cause a problem

Please keep us in the loop with your investigations on the payments

-----Original Message-----
**From:**     COLE, Guy, CBFM Regulatory Risk
**Sent:**     17 May 2004 11:05
**To:**   NORRIE, Ben, Group Risk Mgmt
**Cc:**   FOSTER, Stephen James, Group Risk Mgmt; RODGER, Irvine, CBFM Regulatory Risk
**Subject:**     RE: INTERPAL

Ben

I understand the best people to speak to are either Shirley Ritson on 020 7672 6940 or Sarah Wallis on 020 7672 5826

*Redacted - Privileged*

*Redacted - Privileged*

I realise due to the US terrorist designation of Interpal, that we should be wary of the payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM

I have not been directly involved with the Interpal issue until your recent correspondence and so have not considered previously the risks myself  I think any decision to keep/close the account must be carefully made, as closing the account without an identifiable reason will most probably result in adverse media attention, also if a terrorism related payment is identified as being made, we again

2

would suffer untoward regulatory/ media attention   I spent Friday looking through the last six months of debits on Interpal accounts, I have seen a couple of payments that warranted further investigation, particularly the below

Transaction  Date  ███████████
Transaction  Amount ███████████████████████████
Transaction  Type·  S██████████████████████████████
Transaction  References.+BTR/04/20-263
                      ██████████████████████

Further system investigation has shown the recipient accounts details are the below
**EBANKGO04373632**
Bene acct name. ████████████████████████████
Bene acct nmbr. ███████████████████
Bene bank: (███████████████████████████████

I need to conduct further investigations to establish whether this account could be the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable Society. as this entity has been designated a terrorist group by the Bank of England.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T (020) 7375 5433**
**F (020) 7375 4641**
**<<<mailto:Guy.Cole@rbos.com>>>**

-----Original Message-----
| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 14 May 2004 10:03 |
| **To:** | COLE, Guy, CBFM Regulatory Risk |
| **Cc:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | RE: INTERPAL |

Do you have any contact in the Core Data Manager team that I could try?  Is there any kind of agreement between CBFM and Manufacturing that would serve as a mandate to have this work performed on an on-going basis?

Im and not sure whether you were aware but until a few weeks ago the NatWest logo was used prominently on the Interpal website in soliciting donations   Did you or the RM have Interpal remove this? Are the CBFM MLPU happy with the potential risks in continuing this relationship?

Ben

-----Original Message-----
| | |
|---|---|
| **From:** | COLE, Guy, CBFM Regulatory Risk |
| **Sent:** | 06 May 2004 16:51 |
| **To:** | NORRIE, Ben, Group Risk Mgmt |
| **Subject:** | RE: INTERPAL |

Ben

The Relationship Manager is aware of the potential terrorism connections with this account and liased with Derek Brand during the account freeze  Although diligent in their interaction with the customer, the RM has no ability to filter or efficently monitor payments, I understand that this could be done in the Core Data Manager team in Manufacturing who control payment blocking and restrictions.

Regards

Guy

**Guy Cole**

3

NW 017181

**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T (020) 7375 5433**
**F (020) 7375 4641**
**<<<mailto:Guy.Cole@rbos.com>>>**

-----Original Message-----
**From:**      NORRIE, Ben, Group Risk Mgmt
**Sent:**      06 May 2004 15:55
**To:**        COLE, Guy, CBFM Regulatory Risk
**Subject:**   FW: INTERPAL

Guy,

Haven't heard back from you on the below?

Ben

-----Original Message-----
**From:**      NORRIE, Ben, Group Risk Mgmt
**Sent:**      21 April 2004 17.05
**To:**        COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
**Cc:**        DAVIES, Rob, Group Risk Mgmt
**Subject:**   INTERPAL

Gentlemen,

You may remember ▮▮▮▮▮▮▮▮ we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc)  There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity.  At this time we attempted to confirm with the Bank of England that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The Bank of England advised that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  We therefore undertook to monitor the transactions going forward  Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place.  I have some details of the accounts and cards should you require.  Please contact me if any of the above is not clear.

**Kind Regards,**
**Ben Norrie**

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel:  00 44 (0) 20 7334 1460
Fax: 00 44 (0)20 7375 4813
Email:    ben.norrie@rbos.com

4

HIGHLY CONFIDENTIAL

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 29 April 2004 08 43 |
| **To:** | DAVIES, Rob, Group Risk Mgmt |
| **Subject:** | FW: INTERPAL |

makes that discount easy  .

-----Original Message-----

| | |
|---|---|
| **From:** | Derham, Bill (Cards Risk) |
| **Sent:** | 29 April 2004 08:34 |
| **To:** | Sludden, Tom |
| **Cc:** | NORRIE, Ben, Group Risk Mgmt |
| **Subject:** | FW: INTERPAL |

Tom

As you can see from Ian's note, we have nothing to monitor, the facility has now been terminated at request of the customer. No further action proposed on this

## Bill Derham

*Cards Business - Operational Risk*
Internal (788) 25405
External  0207 672 5405
Facsimile 0207 672 5432
E-mail bill.derham@rbs.co.uk

Cards Operational Risk
7th Floor
2 1/2 Devonshire Square
London EC2M 4BA

-----Original Message-----

| | |
|---|---|
| **From:** | Hibbett, Ian |
| **Sent:** | Wednesday, April 28, 2004 11 23 AM |
| **To:** | Derham, Bill (Cards Risk) |
| **Subject:** | RE· INTERPAL |

Bill

The details from Southend Commercial re the facility for Interpal is as follows:-

'Credit card account opened 13/01/04, this is an exact match with the address, but the account has subsequently been closed 3/3/04 upon the request of the point of contact  The account was never actually used, statements only show £30 card fee & £10 late pyt fee, which have been refunded.'

Do we need to monitor this?

-----Original Message-----

| | |
|---|---|
| **From:** | Derham, Bill (Cards Risk) |
| **Sent:** | 27 April 2004 08 54 |
| **To:** | Hibbett, Ian |
| **Subject:** | FW  INTERPAL |

Ian

We recently reported a Comm Card facility for Interpal, can find, add into the monitoring and have a quick chat

## Bill Derham

*Cards Business - Operational Risk*
Internal (788) 25405
External  0207 672 5405
Facsimile 0207 672 5432
E-mail bill.derham@rbs co uk

1

HIGHLY CONFIDENTIAL

NW 017183

Cards Operational Risk
7th Floor
2 1/2 Devonshire Square
London EC2M 4BA

-----Original Message-----
**From:**      NORRIE, Ben, Group Risk Mgmt
**Sent:**       Monday, April 26, 2004 9 26 AM
**To:**          Sludden, Tom
**Cc:**          DAVIES, Rob, Group Risk Mgmt, COLE, Guy, CBFM Regulatory Risk, Derham, Bill (Cards Risk)
**Subject:**   RE INTERPAL

Thanks Tom

Subsequent to the email attached we gave an undertaking to the BoE to monitor interpal going forward, where possible

Understand that this might not be practical on the streamline terminal, however what about the cards held? (prompted to think about interpal by the match we have record on a recent card application)

Ben

   -----Original Message-----
   **From:**      Sludden, Tom
   **Sent:**       23 April 2004 15:25
   **To:**          NORRIE, Ben, Group Risk Mgmt
   **Cc:**          DAVIES, Rob, Group Risk Mgmt; COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk)
   **Subject:** RE: INTERPAL

   Ben

   We have not completed any additional due diligence on this connection as a result of previous instruction - please refer to attached email   In regard to money being paid from Interpal to Hamas, a review of the Interpal stramline connection would not shed any light on this as all funds rec'd to interpal by way of credit or debit card payments would be settled to a bank account in the name of Interpal (no third party payments possible from streamline account).

   If there have been any payments to Hamas they would have to come from the main banking account

     << Message: FW: Retail Direct - Sanctions & Terrorist Financing  New RBS Group Search Request - GRM TER 26_08_03 >>

   Tom Sludden
   Retail Direct Finance
   Governance Manager
   24/25 St Andrew Square

   Tel: 0131 525 1497
   Fax: 0131 523 9784

     -----Original Message-----
     **From:**      NORRIE, Ben, Group Risk Mgmt
     **Sent:**       21 April 2004 17 05
     **To:**  COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk), Sludden, Tom
     **Cc:**  DAVIES, Rob, Group Risk Mgmt
     **Subject:**      INTERPAL

     Gentlemen,

     You may remember the matches we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine,  Palestinians Relief & Development Fund, etc)   There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity.  At this time we attempted to confirm with the Bank of England that there was no action required (INTERPAL is listed by OFAC only.  The Bank of England advised t███████████████████████████████████████████████████████████████████We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place   I have some details of the accounts and cards should you require.  Please contact me if any of the above is not clear

2

**Kind Regards,**
**Ben Norrie**

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0)20 7375 4813
Email:    ben.norrie@rbos.com

***********************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

*********************************************************************************

3

HIGHLY CONFIDENTIAL

NW 017185

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | 06 May 2004 16:56 |
| **To:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | FW: INTERPAL |

fyi

we undertook with the BoE to monitor interpal going forward   to date we have not put anything in place (my fault, this one slipped my attention).  from the below it looks like this might not be straightforward   any thoughts?

-----Original Message-----
**From:**     COLE, Guy, CBFM Regulatory Risk
**Sent:**     06 May 2004 16:51
**To:**       NORRIE, Ben, Group Risk Mgmt
**Subject:**  RE: INTERPAL

Ben

The Relationship Manager is aware of the potential terrorism connections with this account and liased with Derek Brand during the account freeze.  Although diligent in their interaction with the customer, the RM has no ability to filter or efficently monitor payments, I understand that this could be done in the Core Data Manager team in Manufacturing who control payment blocking and restrictions.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T (020) 7375 5433**
**F (020) 7375 4641**
**<mailto:Guy.Cole@rbos.com>**

-----Original Message-----
**From:**     NORRIE, Ben, Group Risk Mgmt
**Sent:**     06 May 2004 15:55
**To:**       COLE, Guy, CBFM Regulatory Risk
**Subject:**  FW: INTERPAL

Guy,

Haven't heard back from you on the below?

Ben.

-----Original Message-----
**From:**     NORRIE, Ben, Group Risk Mgmt
**Sent:**     21 April 2004 17:05
**To:**       COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
**Cc:**       DAVIES, Rob, Group Risk Mgmt
**Subject:**  INTERPAL

Gentlemen,

You may remember the matches we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc)   There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity.  At this time we attempted to confirm with the Bank of England that there was no action required (INTERPAL is listed by OFAC only).  The Bank of England advised that the Terrorism Order 2001 does cover Hamas (to which INTERPAL was purportedly linked) and any payments from INTERPAL to Hamas would constitute a breach of the sanctions legislation   We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in

1

NW 017186

place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear

**Kind Regards,**
**Ben Norrie**

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0) 20 7375 4813
Email:      ben.norrie@rbos.com

HIGHLY CONFIDENTIAL

NW 017187

**DAVIES, Rob, Group Risk Mgmt**

| | |
|---|---|
| **From:** | Derham, Bill (Cards Risk) |
| **Sent:** | 29 April 2004 08:34 |
| **To:** | Sludden, Tom |
| **Cc:** | NORRIE, Ben, Group Risk Mgmt |
| **Subject:** | FW: INTERPAL |

Tom

As you can see from Ian's note, we have nothing to monitor, the facility has now been terminated at request of the customer No further action proposed on this

## Bill Derham

*Cards Business - Operational Risk*
Internal (788) 25405
External 0207 672 5405
Facsimile 0207 672 5432
E-mail bill.derham@rbs.co.uk

Cards Operational Risk
7th Floor
2 1/2 Devonshire Square
London EC2M 4BA

-----Original Message-----
| | |
|---|---|
| **From:** | Hibbett, Ian |
| **Sent:** | Wednesday, April 28, 2004 11.23 AM |
| **To:** | Derham, Bill (Cards Risk) |
| **Subject:** | RE INTERPAL |

Bill

The details from Southend Commercial re the facility for Interpal is as follows.-

'Credit card account opened 13/01/04, this is an exact match with the address, but the account has subsequently been closed 3/3/04 upon the request of the point of contact The account was never actually used, statements only show £30 card fee & £10 late pyt fee, which have been refunded '

Do we need to monitor this?

-----Original Message-----
| | |
|---|---|
| **From:** | Derham, Bill (Cards Risk) |
| **Sent:** | 27 April 2004 08:54 |
| **To:** | Hibbett, Ian |
| **Subject:** | FW INTERPAL |

Ian

We recently reported a Comm Card facility for Interpal, can find, add into the monitoring and have a quick chat

## Bill Derham

*Cards Business - Operational Risk*
Internal (788) 25405
External 0207 672 5405
Facsimile 0207 672 5432
E-mail bill derham@rbs co uk

Cards Operational Risk
7th Floor
2 1/2 Devonshire Square
London EC2M 4BA

-----Original Message-----
| | |
|---|---|
| **From:** | NORRIE, Ben, Group Risk Mgmt |
| **Sent:** | Monday, April 26, 2004 9 26 AM |

1

HIGHLY CONFIDENTIAL

NW 017188

| To: | Sludden, Tom |
|---|---|
| Cc: | DAVIES, Rob, Group Risk Mgmt, COLE, Guy, CBFM Regulatory Risk, Derham, Bill (Cards Risk) |
| Subject: | RE INTERPAL |

Thanks Tom

Subsequent to the email attached we gave an undertaking to the BoE to monitor interpal going forward, where possible.

Understand that this might not be practical on the streamline terminal, however what about the cards held? (prompted to think about interpal by the match we have record on a recent card application)

Ben

> -----Original Message-----
> **From:** Sludden, Tom
> **Sent:** 23 April 2004 15:25
> **To:** NORRIE, Ben, Group Risk Mgmt
> **Cc:** DAVIES, Rob, Group Risk Mgmt; COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk)
> **Subject:** RE: INTERPAL
>
> Ben
>
> We have not completed any additional due diligence on this connection as a result of previous instruction - please refer to attached email. In regard to money being paid from Interpal to Hamas, a review of the Interpal stramline connection would not shed any light on this as all funds rec'd to interpal by way of credit or debit card payments would be settled to a bank account in the name of Interpal (no third party payments possible from streamline account)
>
> If there have been any payments to Hamas they would have to come from the main banking account.
>
> << Message FW. Retail Direct - Sanctions & Terrorist Financing New RBS Group Search Request - GRM TER 26_08_03 >>
>
> Tom Sludden
> Retail Direct Finance
> Governance Manager
> 24/25 St Andrew Square
>
> Tel: 0131 525 1497
> Fax: 0131 523 9784
>
> > -----Original Message-----
> > **From:** NORRIE, Ben, Group Risk Mgmt
> > **Sent:** 21 April 2004 17 05
> > **To:** COLE, Guy, CBFM Regulatory Risk, Derham, Bill (Cards Risk), Sludden, Tom
> > **Cc:** DAVIES, Rob, Group Risk Mgmt
> > **Subject:** INTERPAL
> >
> > Gentlemen,
> >
> > You may remember ▮▮▮▮▮▮▮ we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief & Development Fund, etc). There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity. At this time we attempted to confirm with the Bank of England that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Bank of England advised that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. We therefore undertook to monitor the transactions going forward. Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place. I have some details of the accounts and cards should you require. Please contact me if any of the above is not clear.
> >
> > **Kind Regards,**
> > **Ben Norrie**
> >
> > Group Risk Management
> > Royal Bank of Scotland Group
> > 5th Floor, 280 Bishopsgate

2

HIGHLY CONFIDENTIAL

London EC2M 4RB
Tel: 00 44 (0) 20 7334 1460
Fax: 00 44 (0)20 7375 4813
Email:    ben.norrie@rbos.com

**************************************************************************************************
********************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew
Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the
addressee only. If the message is received by anyone other
than the addressee, please return the message to the sender
by replying to it and then delete the message from your
computer. Internet e-mails are not necessarily secure. The
Royal Bank of Scotland plc does not accept responsibility for
changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the
transmission of viruses, it is the responsibility of the recipient to
ensure that the onward transmission, opening or use of this
message and any attachments will not adversely affect its
systems or data.  No responsibility is accepted by The Royal
Bank of Scotland plc in this regard and the recipient should carry
out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

**************************************************************************************

HIGHLY CONFIDENTIAL

NW 017190

**EXHIBIT 98 to Declaration of Joel Israel**

**RODGER, Irvine, CBFM Regulatory Risk**

| | |
|---|---|
| **From:** | COLE, Guy, CBFM Regulatory Risk |
| **Sent:** | Thursday, May 20, 2004 10:34 AM |
| **To:** | FOSTER, Stephen James, (GSF AML); NORRIE, Ben, Group Risk Mgmt |
| **Cc:** | RODGER, Irvine, MLPU; DAVIES, Rob, Group Risk Mgmt; JONES, Richard, MLPU |
| **Subject:** | RE: INTERPAL |
| **Attachments:** | Doc1.doc |

Stephen/Ben

We have ascertained that the payment mentioned below has not gone to the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable Society. Although similarly named, the recipient of this payment is a separate charity <http://www.icshebron.com/branches_e.htm>, which appears to be operating without any form of sanction placed on it.

From my trawls for information on the internet I have not found any information that substantiates beyond opinion that Interpal has made payments to terrorist groups. It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities. This charity is the predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998. Looking at the accounts there are also a large number of small (e.g. £2) direct debits being paid into the charity's account from UK donators, and so a change of their banking arrangements will probably result in some form of media commentary.

I attach a summary of my review of Interpal foreign payments in the last six months. All of the recipients of these payments were checked in Worldcheck, KYC Check and reviewed against available Google information

In consideration of the information in the document attached above. The background information for the Al-Islah charity, is a an unofficial opinion from an Israeli website and no other reports or recognition of this charity having links to terrorism are recorded on any other websites. The Worldcheck information on ▓▓▓▓▓ is factually incorrect, they state that the US Federal government and UN have acknowledged that the charity aids and abets terrorism. According to the KYC Check no sanctions have existed against this entity. The source of Worldcheck's information is a student's journal at the University of California. My recent experience of Worldcheck has been disappointing, I will probably write a separate email concerning my Worldcheck findings, but in this instance if your search for the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ against the WorldCheck 'part match' feature, no matches are found, if you then search for an 'exact match' one result is found.

I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts. Consideration will need to be given regarding the operation of the US Dollar account, as funds from this account will get frozen if they are transferred via a US domiciled/owned counterparty. We should also be alert to any new Charity names being added to the Bank of England's terrorism list. I believe Interpal is aware of the sensitivity of their position, and will be keen to ensure it does not breach Bank of England sanctions.

I'll assume you are happy with approach, unless I hear otherwise.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland

HIGHLY CONFIDENTIAL

135 Bishopsgate, London, EC2M 3UR
T  (020) 7375 5433
F  (020) 7375 4641
<mailto:Guy.Cole@rbos.com>

-----Original Message-----
From:      FOSTER, Stephen James, Group Risk Mgmt
Sent:      17 May 2004 11:24
To:        COLE, Guy, CBFM Regulatory Risk; NORRIE, Ben, Group Risk Mgmt
Cc:        RODGER, Irvine, CBFM Regulatory Risk; DAVIES, Rob, Group Risk Mgmt
Subject:   RE: INTERPAL

Guy, Ben is away all week, so I am replying on this.
You are correct that filtering is a group wide issue and that is why we have been
working with key stakeholders like Payment Operations to develop the policy and
capability. This continues and we know that it is a very important element of
our counter -terrorism efforts.

On the specific case of Interpal, I can understand the difficulties of filtering
payments in the absence of an automated system. However, we do need to monitor
account activity and I hope that the RM and MLPU can find a practical way to
review the account movements periodically for odd items.  You are right to
highlight the reputational issues but if management decides they don't want the
relationship, there are ways to exit that might not cause a problem.

Please keep us in the loop with your investigations on the payments.

-----Original Message-----
From:      COLE, Guy, CBFM Regulatory Risk
Sent:      17 May 2004 11:05
To:   NORRIE, Ben, Group Risk Mgmt
Cc:        FOSTER, Stephen James, Group Risk Mgmt; RODGER, Irvine, CBFM Regulatory Risk
Subject:   RE: INTERPAL

Ben

I understand the best people to speak to are either Shirley Ritson on 020 7672
6940 or Sarah Wallis on 020 7672 5826. *Redacted - Privileged*

*Redacted - Privileged*

I realise due to the US terrorist designation of Interpal, that we should be wary
of the payments from their accounts with us, but in reality I believe there is
very little we can effectively do to prevent payments being made without a
payment filtering system, as the customer can initiate payments themselves
without needing to contact the RM.

I have not been directly involved with the Interpal issue until your recent
correspondence and so have not considered previously the risks myself.  I think
any decision to keep/close the account must be carefully made, as closing the
account without an identifiable reason will most probably result in adverse
media attention, also if a terrorism related payment is identified as being
made, we again would suffer untoward regulatory/ media attention.  I spent
Friday looking through the last six months of debits on Interpal accounts, I
have seen a couple of payments that warranted further investigation,
particularly the below:

Transaction  Date:
Transaction  Amount:
Transaction Type:
Transaction  References:+BTR/04/20-263

Further system investigation has shown the recipient accounts details are the
below:
EBANKGO04373632
Bene acct name:

Bene acct nmbr: ████████████
Bene bank: ████████████████████████

I need to conduct further investigations to establish whether this account could
be the Islamic Charitable Society for al-Aqsa or Al-Aqsa Islamic Charitable
Society. as this entity has been designated a terrorist group by the Bank of
England.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T  (020) 7375 5433
F  (020) 7375 4641
<<mailto:Guy.Cole@rbos.com>>

 -----Original Message-----
From:     NORRIE, Ben, Group Risk Mgmt
Sent:     14 May 2004 10:03
To:    COLE, Guy, CBFM Regulatory Risk
Cc:    FOSTER, Stephen James, Group Risk Mgmt
Subject:     RE: INTERPAL

Do you have any contact in the Core Data Manager team that I could try?  Is there
any kind of agreement between CBFM and Manufacturing that would serve as a
mandate to have this work performed on an on-going basis?

Im and not sure whether you were aware but until a few weeks ago the NatWest logo
was used prominently on the Interpal website in soliciting donations.  Did you
or the RM have Interpal remove this?  Are the CBFM MLPU happy with the potential
risks in continuing this relationship?

Ben

 -----Original Message-----
From:     COLE, Guy, CBFM Regulatory Risk
Sent:     06 May 2004 16:51
To:    NORRIE, Ben, Group Risk Mgmt
Subject:     RE: INTERPAL

Ben

The Relationship Manager is aware of the potential terrorism connections with
this account and liased with Derek Brand during the account freeze.  Although
diligent in their interaction with the customer, the RM has no ability to filter
or efficently monitor payments, I understand that this could be done in the Core
Data Manager team in Manufacturing who control payment blocking and
restrictions.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T  (020) 7375 5433
F  (020) 7375 4641
<<mailto:Guy.Cole@rbos.com>>

 -----Original Message-----
From:     NORRIE, Ben, Group Risk Mgmt
Sent:     06 May 2004 15:55
To:    COLE, Guy, CBFM Regulatory Risk
Subject:     FW: INTERPAL

HIGHLY CONFIDENTIAL                                    NW 018478

Guy,

Haven't heard back from you on the below?

Ben.

-----Original Message-----
From:      NORRIE, Ben, Group Risk Mgmt
Sent:      21 April 2004 17:05
To:        COLE, Guy, CBFM Regulatory Risk; Derham, Bill (Cards Risk); Sludden, Tom
Cc:        DAVIES, Rob, Group Risk Mgmt
Subject:   INTERPAL

Gentlemen,

You may remember ███████████ we have previously reported to the Bank of England against INTERPAL and its various aka's (including Education Aid for Palestine, Palestinians Relief _Development Fund, etc).  There was an investigation by the Charities Commission and Special Branch in to potential links with Hamas, no action was taken against the charity.  At this time we attempted to confirm with the Bank of England that ███████████████████████████████████████ ██████████  The Bank of England advised that ███████████████████████ ██████████████████████████████████████████████████████████████  We therefore undertook to monitor the transactions going forward.  Can I ask you to investigate whether any enhanced due diligence has been put in place over these accounts (not sure the above was communicated, therefore suspect not) and if not take steps to ensure that measures are put in place.  I have some details of the accounts and cards should you require.  Please contact me if any of the above is not clear.

Kind Regards,
Ben Norrie

Group Risk Management
Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB
Tel:     00 44 (0) 20 7334 1460
Fax:     00 44 (0)   20 7375 4813
Email:      ben.norrie@rbos.com

HIGHLY CONFIDENTIAL



Recipients of principal payments made from the Interpal sterling account in the last six months, (the bold letters were the letters recorded on the system).  All names have been searched for on the Internet and any untoward information is recorded below

a. ███████████████
b. ███████████████
c. **Islamic Charitable** society
d. ██████████████████████████
e.
f.
g.
h. ████████████████
i.
j.
k.
l.
m. **Al Islah Charit**able association
n. ████████████████████
o.
p. **El-Wafa Charit**able society
q. ████████████████
r. **Tulkarem Zakat** Committee
s. ████████████████

C: <u>AL-AQSA FOUNDATION</u>
   -- aka  **Al-Aqsa Charitable Foundation**
   -- aka  **Sanabil al-Aqsa Charitable Foundation**
   -- aka  **Al-Aqsa Charitable Organization**
   -- aka  **Charitable Al-Aqsa Establishment**
   -- aka  **Aqssa Society**
   -- aka  **Al-Aqsa Islamic Charitable Society**
   -- aka  **Islamic Charitable Society for al-Aqsa**
   -- aka  **Charitable Society to Help the Noble al-Aqsa**
   -- aka  **Aqsa Charitable Establishment**
   -- aka  **Swedish Charitable Aqsa Est**
   -- aka  **AQSSA SOCIETY YEMEN**
   -- aka  **Al-Aqsa Charitable Organisation**
   **(EU)  Council Common Position 2001/931/CFSP**
   **(EU)  Council Regulation (EC) No 2580/2001**
   **(Bank of England)  Terrorist Financing - List of Suspects**
   **(OFAC)  Specially Designated Global Terrorists**
   **(Isle of Man FSC)  Sanctions Notice 9 - Afghanistan, Terrorism, Al-Qa'ida and Taliban**
   **(OSFI)  United Nations Suppression of Terrorism Regulations (UNSTR)**

G)
                                                                    * General Legal Notice

████████████████████████████████████████████████
LAST NAME: ███████████        CATEGORY:² TERRORISM

FIRST NAME:                    SUBCATEGORY: PEP

OFFICIAL LIST(S):

ALIAS(ES):

ALTERNATIVE SPELLING: ███████

TITLE:                         POSITION:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

AGE:                                    DOB:

PLACE OF BIRTH:                         DECEASED:

PASSPORT(S):

SSN:                                    COUNTRY:
                                        SAUDI ARABIA (SA)

LOCATION(S):
SAUDI ARABIA

Company(ies) reported in sources below:
AL QAIDA
AL-HARAMAIN FOUNDATION
AL-HARAMAIN ISLAMIC FOUNDATION
AL-HARAMAIN ISLAMIC FOUNDATION
AL-HARAMAIN ISLAMIC FOUNDATION
AL-SHAMAL ISLAMIC BANK
AMERICAN MUSLIM FOUNDATION
DAR AL-MAAL AL-ISLAMI
HAMAS
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION
MUSLIM WORLD LEAGUE
SANA-BELL, INC
SANABIL AL-KHAIR
SAUDI JOINT RELIEF COMMITTEE
SUCCESS FOUNDATION, INC
SUPREME COUNCIL FOR ISLAMIC REVOLUTION IN IRAQ
THE SAAR FOUNDATION
THE SAAR FOUNDATION USA

Reported to be linked to:[3]


AFANDI Ibrahim Muhammad          AL-ALI Sulaiman
AL-AQEEL Aqeel                   AL-KADI Mansour
AL-RAJHI Sulaiman Abdul Aziz     BAHFZALLAH Hassan AA
BASHA Adan                       EL-ASHI Arafat
INTERNATIONAL ISLAMIC RELIEF     ISLAMIC JIHAD
ORGANIZATION
JABALLAH Mohmous                 JOHANI Maneh Hammadal
KHALIFA Mohammed Jamal           NADA Youssef
OMEISH Mohamed S


The following information was reported in one or more of the sources below:
Reportedly founded in 1972 in Riyadh - has funded organizations the federal
government and UN have acknowledged aid and abet terrorism. They include the
International Islamic Relief Organization, al-Haramain and the Muslim World League -
has been connected with the funding of al Qaeda, Hamas and Islamic Jihad. It has
also been directly linked with the 1993 World Trade Center Bombings - headed by
Mohammed Khalifa, Osama bin Laden's brother-in-law. 2003.

Information Sources:
ARCHIVE http://www.calpatriot.org/may03/terror.htm
ARCHIVE http://www.takingitglobal.org/opps/orgdir.html?vieworg=226
         http://www.webcom.com/hrin/magazine/binladenrelatives.http:/...
ARCHIVE http://esa.un.org/socdev/unyin/countrya.asp?countrycode=sa

HIGHLY CONFIDENTIAL

**J: 100% AL-AQSA FOUNDATION**

-- aka  Aqssa Society
-- aka  Al-Aqsa Islamic Charitable Society
-- aka  Islamic Charitable Society for al-Aqsa
-- aka  Charitable Society to Help the Noble al-Aqsa
-- aka  AQSSA SOCIETY YEMEN
(OFAC)  Specially Designated Global Terrorists
(EU)  Council Common Position 2001/931/CFSP
(EU)  Council Regulation (EC) No 2580/2001
(Bank of England)  Terrorist Financing - List of Suspects
(Isle of Man FSC)  Sanctions Notice 9 - Afghanistan, Terrorism, Al-Qa'ida and Taliban
(OSFI)  United Nations Suppression of Terrorism Regulations (UNSTR)

**100% Revival of Islamic Heritage Society**

-- aka  Revival of Islamic Society Heritage on the African Continent
-- aka  Revival of Islamic Heritage Society 6
-- aka  Revival of Islamic Heritage Society (RIHS)
(OFAC)  Specially Designated Global Terrorists
(EU)  Council Regulation (EC) No 881/2002
(EU)  Council Regulation (EC) No 467/2001
(Bank of England)  Terrorist Financing - List of Suspects
(Isle of Man FSC)  Sanctions Notice 6 - Terrorism (United Nations Measures) (Isle of Man) Order 2001
(Isle of Man FSC)  Sanctions Notice 3 - Financial Sanctions against Afghanistan, Taliban & Usama Bin Laden
(Isle of Man FSC)  Sanctions Notice 9 - Afghanistan, Terrorism, Al-Qa'ida and Taliban
(United Nations)  Security Council Committee established pursuant to resolution 1267 (1999) concerning Afghanistan
(OSFI)  United Nations Suppression of Terrorism Regulations (UNSTR)

**100% JAM'YAH TA'AWUN AL-ISLAMIA**

-- aka  SOCIETY OF ISLAMIC COOPERATION
(OFAC)  Specially Designated Global Terrorists
(EU)  Council Regulation (EC) No 881/2002
(EU)  Council Regulation (EC) No 467/2001
(Bank of England)  Terrorist Financing - List of Suspects
(Isle of Man FSC)  Terrorist Financing - List of Suspects
(Isle of Man FSC)  Sanctions Notice 6 - Terrorism (United Nations Measures) (Isle of Man) Order 2001
(Isle of Man FSC)  Sanctions Notice 3 - Financial Sanctions against Afghanistan, Taliban & Usama Bin Laden
(Isle of Man FSC)  Sanctions Notice 9 - Afghanistan, Terrorism, Al-Qa'ida and Taliban
(United Nations)  Security Council Committee established pursuant to resolution 1267 (1999) concerning Afghanistan
(OSFI)  United Nations Suppression of Terrorism Regulations (UNSTR)

**K)** www.aloufok.net/article.php3?id_article=137

In Hebron, in Wad Al Kroom neighborhood, three Palestinians were arrested.

Among them are two brothers, Fou'ad and Mourad AL Natsha (17 and 18).



**M)**

http://www.intelligence.org.il/eng/c_t/ris_4_04.htm.

Al-Islah Charitable Association in Ramallah

  a.  The association, outlawed in 2002, is known for its direct affiliation with Hamas. It maintains an extensive network of contacts with Hamas activists abroad, who are responsible for the distribution of Hamas funds in the Palestinian Authority administered territories. The association has been active since February 2000. Funds from various associations abroad have been transferred to its account; a significant share of those funds originate from foundations outlawed both in Israel and abroad, such as the Charity Coalition ( I'tilaf al-Khayr ), the Al-Aqsa Foundation, and the London-based Interpal organization.

  b.  Senior Hamas operatives directly involved in military operations rank among the members of the Islamic Association in Al-Birah. The association provides financial assistance to families of killed or detained Hamas operatives; in addition, it sponsors the activity of the Islamic Bloc ( Al-Kutlah al-Islamiyyah ), the Hamas student movement in higher education establishments (outlawed in 2003). The association also finances conventions, demonstrations and memorial ceremonies of the Hamas movement, providing it with a fertile ground for incitement and recruitment of terrorist operatives.

  c.  The founder of the association in Ramallah, who also served as its leader until his arrest in April 2002, is Jamal Tawil. He was involved in the suicide bombing attack on the Ben-Yehuda pedestrian shopping street in the heart of Jerusalem (December 2001), in which 11 Israelis were killed and 170 were wounded. During interrogation, Tawil admitted that he had decided to open an Al-Islah branch early in 2000 in order to provide a legal cover for Hamas activity. Furthermore, Tawil pointed out that as part of his activity he had provided financial assistance to Hamas prisoners and their families, and that he had transferred funds to the heads of the Hamas operative headquarters in Ramallah.

HIGHLY CONFIDENTIAL