**EXHIBIT 125 to Declaration of Joel Israel**

| From: | VIBERT, Karen, Group Risk Mgmt |
|---|---|
| Sent: | Friday, June 11, 2004 10:08 AM |
| To: | RODGER, Irvine, CBFM Regulatory Risk <Irvine.Rodger@rbos.com> |
| Cc: | FOSTER, Stephen James, Group Risk Mgmt <Stephen.J.FOSTER@rbos.com>; WICKENS, Ian, Group Risk Mgmt <Ian.WICKENS@rbos.com>; COLE, Guy, CBFM Regulatory Risk <Guy.COLE@rbos.com>; JONES, Richard, CBFM Regulatory Risk <Richard.JONES@rbos.com>; Miles, Phil <Phil.Miles@rbs.co.uk> |
| Subject: | Commercial Bank of Syria (CBS) & Syrian Lebanese Commercial Bank |

Hi Irvine.

I think this is being taken out of context and my email may have been worded a little differently if I had understood it was being more widely circulated than my proposed comments offering some guidance to Ian and on which further discussion was held.

I will therefore now hopefully make the position a little clearer, although would just add in my own warning at this stage that I am not an expert in this area, so I am not making dogmatic statements.

I have not said or recommended that we should sever all ties with Syria. The comment Guy has highlighted in red purely relates to the immediate preceding findings outlined in that paragraph and as advised in the Federal Register; on that basis I therefore commented that it "*appeared*" the UK should not be transacting business. You will then note that my next line followed that through with a review of the BOE lists on which CBS & subsidiary were not evidenced and therefore I stated that we needed to "*exercise care*".

The point here is *not* that we need to totally sever links with CBS & subsidiaries, as there is as yet no UK/ EU requirement in this respect - we do however need to ensure that in our dealings with CBS & its subsidiaries that in no circumstances should we use our correspondent accounts in the US to route / transfer CBS (& its subsidiaries) monies. If we do there is a risk that the US can seize deposits / freeze our accounts, & even ultimately sever that relationship due to lack of compliance adherence.

I made the point that we "*could*" be in breach of UN sanctions - again reference to FinCEN and the Federal Register - based on the US allegations as raised earlier re Iraqi funds not being transferred to the Development Fund. Although I had looked at the BOE list I do not usually get involved with sanctions so it was a point raised for further appropriate review to check if similar sanctions applied.

Another thought is the need to consider the POCA & Terrorism Act requirements as we have effectively now been put on notice that CBS *may* be harbouring terrorist funds - as such we need to ensure enhanced due diligence is undertaken of this relationship, although I assume this is already the case as Syria is listed in our High Risk Country Policy.

At this time the following are for consideration:
(1) What are FM NY doing about this and can they confirm that they are comfortable with this relationship?
(2) What is the GBS / MLPU senior management view of this issue? Are they comfortable to continue this business relationship by way of other non USD currencies and the ability to route the business outside of the US? I note that volume and amounts exercised here are low.

(3) Obtaining a legal view on this issue of US extra territoriality? Perhaps you can take this forward with Jennifer Burke, Group Legal.

(4) Can you confirm enhanced due diligence procedures are being effected?

I don't wish to throw another spanner in the works, but you may also wish to check for any relationships with **Myanmar Mayflower Bank** and **Asia Wealth Bank** where the US imposed special measures effective May 12 2004. I had a further look at BOE website in respect of sanctions against Burma and note that these 2 banks are not listed in the financial sanctions orders. The EC regulations adopted basically list certain targeted individuals related to important government functions in Burma/Myanmar (and their associates) who are subject to the financial sanctions imposed.

HIGHLY CONFIDENTIAL

Hope this helps and that the situation is certainly not as damning as appeared may have been implied.

Regards.
Karen

-----Original Message-----
**From:** RODGER, Irvine, CBFM Regulatory Risk
**Sent:** 11 June 2004 12:44
**To:** VIBERT, Karen, Group Risk Mgmt
**Cc:** COLE, Guy, CBFM Regulatory Risk; JONES, Richard, CBFM Regulatory Risk; FOSTER, Stephen James, Group Risk Mgmt; Miles, Phil

**Subject:** RE: Patriot Act: Commercial Bank of Syria

Karen

My colleague, Guy Cole, has made some perceptive comments on your detailed note on CBS.

As you can see, he is seeking clarification on a number of points.  In particular, I am concerned about possible contradictory advice but do acknowledge that he may be missing something of which you are aware.  However, on the face of it, the effect of your recommendation to cease transacting business completely would effectively mean that UK trading ties with Syria would effectively cease (if all UK banks were to follow suit) as CBS is the dominant bank in the Syrian market for international business.  I think we need to avoid a knee-jerk reaction (to US politics) particularly as the EU (including UK) is seeking to develop trading ties with Syria.  The view of GBS is that it is comfortable with its Syrian correspondents (already classified as High Risk and so subject to a great deal of due diligence) so would be very reluctant to cease all business without good reason.

I should be grateful to receive your clarifications

Thanks

PS    I have copied in Phil Miles of GBS for his information

**Irvine Rodger**
**CBFM MLPU**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T** (020) 7334 1082
**F** (020) 7375 4641
**E** irvine.rodger@rbos.com>

-----Original Message-----
**From:** COLE, Guy, CBFM Regulatory Risk
**Sent:** 11 June 2004 10:26
**To:** RODGER, Irvine, CBFM Regulatory Risk; GREENFIELD, Katie, CBFM Regulatory Risk; JONES, Richard, CBFM Regulatory Risk; SIMS, Claire, CBFM Regulatory Risk

**Subject:** RE: Patriot Act: Commercial Bank of Syria

Irvine

I have reviewed Karen's email below.  It appears that the proposed Bank Secrecy Act amendment is somewhat similar to existing OFAC sanctions for Cuba and Iran, and to ensure we do not breach its requirements we should not offer US dollar services to CBS (which fortunately I believe we are not).

There was one comment in Karen's email that concerned me (which I have highlighted in red), in which she

NW 197098

has said UK institutions should not be transacting business with/via CBS.  I am not sure whether this is on the basis of the information she describes immediately before it regarding allegations from the US that CBS is a conduit for terrorist funds, or on specific information in the US notice that covers us dealing in a non US dollar currency with CBS which she has not detailed in her email.  We should seek clarification on this.  If the former, and she is correct in her assertion, then this would go against previous advice and have consequences on our relationships with entities such as Interpal (an OFAC SDGT).

Karen has also mentioned that we may be in breach of UN sanctions.  We should seek clarification on whether this was due to information she has seen, or a suggestion that we check to see if similar sanctions are in place.

Finally a point on briefly mentioned in Karen's email, is that the proposed amendment covers all of the subsidiaries of CBS, I think we should identify who these subsidiaries are, and what other connections we may have in GBS and elsewhere in the bank.


Regards


Guy


**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**The Royal Bank of Scotland**
**135 Bishopsgate, London, EC2M 3UR**
**T  (020) 7375 5433**
**F  (020) 7375 4641**
**<mailto:Guy.Cole@rbos.com>**

-----Original Message-----
**From:**  RODGER, Irvine, CBFM Regulatory Risk
**Sent:**  08 June 2004 14:30
**To:**  COLE, Guy, CBFM Regulatory Risk; GREENFIELD, Katie, CBFM Regulatory Risk; JONES, Richard, CBFM Regulatory Risk; SIMS, Claire, CBFM Regulatory Risk

**Subject:**  FW: Patriot Act: Commercial Bank of Syria

Dear All

Please review some detailed analysis from Karen Vibert on the Syrian Commercial Bank matter.  I think we should discuss it when next we meet.

Regards

**Irvine Rodger**
CBFM MLPU
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
T  (020) 7334 1082
F  (020) 7375 4641
E  irvine.rodger@rbos.com>

-----Original Message-----
**From:**  FOSTER, Stephen James, Group Risk Mgmt
**Sent:**  08 June 2004 13:24
**To:**  VIBERT, Karen, Group Risk Mgmt; WICKENS, Ian, Group Risk Mgmt
**Cc:**  RODGER, Irvine, CBFM Regulatory Risk
**Subject:**  RE: Patriot Act: Commercial Bank of Syria

Thanks, helpful summary.

I have copied this to Irvine for info, though I know MLPU is already on the case.

-----Original Message-----
**From:**   VIBERT, Karen, Group Risk Mgmt
**Sent:**   08 June 2004 13:21
**To:**   WICKENS, Ian, Group Risk Mgmt
**Cc:**   FOSTER, Stephen James, Group Risk Mgmt
**Subject:**   RE: Patriot Act: Commercial Bank of Syria

Ian, the notice of this proposed rulemaking was issued by FinCEN in the Federal Register 18/5/04.

The position as regards US entities is that they must terminate any correspondent accounts established, maintained, administered, or managed in the US for, or on behalf of, Commercial Bank of Syria; they must also guard against their indirect use by Commercial Bank of Syria.

Therefore as a minimum US financial institutions are required to:
1)Notify correspondent account holders that they may not provide Commercial Bank of Syria with access to the correspondent account maintained at the financial institution; and

2)Take reasonable steps to identify any indirect use of the correspondent accounts by Commercial Bank of Syria, to the extent that such indirect use can be determined from transactional records maintained in the financial institution 's normal course of business.

3)The US financial institution should take a risk-based approach when deciding what, if any, additional due diligence measures it should adopt to guard against the indirect use of its correspondent accounts by Commercial Bank of Syria.

4)If the US financial institution obtains knowledge that a correspondent account is being used by a foreign bank to provide indirect access to Commercial Bank of Syria, it must take all appropriate steps to block such indirect access, including, where necessary, terminating the correspondent account.

From a UK perspective, it could be possible for the U.S. government to claim jurisdiction over a non-U.S.entity's assets if that entity uses U.S. jurisdictional means in order to do business with a customer. We have already evidenced with RBSG that the U.S. government can seize deposits held in foreign correspondent accounts in U.S. banks for foreign bank's customers engaged in money laundering / terrorist activities impacting the U.S.  The US "extra-territorial jurisdiction" can apply to a financial transaction that occurs "in whole or part" in the U.S. if the funds involved were derived from money laundering /terrorism crimes that include drug trafficking, extortion, fraud against a foreign bank, kidnapping, robbery, or destruction of property by explosion or fire.

The Notice in the Federal Register advises that FinCEN does not require or expect US financial institutions to obtain certification from its correspondent account holders that indirect access will not be provided in order to comply with this notice requirement. They may however satisfy this requirement by transmitting a one-time notice to all of their correspondent account holders by way of mail, fax, or email, advising:

*"Notice:Pursuant to U.S.regulations issued under section 311 of the USA PATRIOT Act, 31 CFR 103.188, please be informed that you are prohibited from providing Commercial Bank of Syria or any of its subsidiaries including Syrian Lebanese Commercial Bank)with access to the correspondent account(s)that we maintain for or on behalf of your institution. Any failure to comply with this prohibition may result in the termination of the affected correspondent account."*

HIGHLY CONFIDENTIAL

In this case we are led to believe that CBS has been used by terrorists and/or persons associated with terrorist organisations; in addition, CBS has maintained accounts containing the proceeds from the illicit sale of Iraqi oil in violation of UN sanctions. Some of the money appears to have been used to purchase military weapons which may now be in use against coalition troops in Iraq. Funds have not be frozen and transferred to the Development Fund of Iraq. We are also advised that numerous transactions through accounts at CBS reference a reputed financier for Osama bin Laden. As such, it certainly appears that UK financial institutions should ***not*** be transacting business with / via the CBS.

I did not evidence CBS on the Bank of England list as yet, but it would appear that we do need to now exercise care.

It would therefore appear that:

- we can expect to receive notices from US financial institutions regarding this prohibition on correspondent accounts;
- we will need to ensure that we are not providing access to these for CBS;
- any failure on our part to comply with the notice could put our US funds at risk of being frozen by the US authorities;
- we could also be in breach of UN sanctions.

I would certainly suggest that this is something the BBA should take up with HMT, perhaps with some coverage on extra-territorial jurisdiction in the 3MLD, but specifically with regard to future similar requirements in this respect and in the nature of international co-operation and information sharing.

As mentioned earlier I have emailed Carolyn at CFG to see what, if any, written procedures they have in this respect, and will advise you accordingly when I receive her response.

Hope this helps.

Karen


-----Original Message-----
From: WICKENS, Ian, Group Risk Mgmt
Sent: 08 June 2004 11:03
To: RODGER, Irvine, CBFM Regulatory Risk; JONES, Richard, CBFM Regulatory Risk; Miles, Phil
Cc: FOSTER, Stephen James, Group Risk Mgmt; VIBERT, Karen, Group Risk Mgmt; NORRIE, Ben, Group Risk Mgmt
Subject: FW: Patriot Act: Commercial Bank of Syria


I think I should alert you to this fairly promptly noting the deadline for comment. We will give some thought to it also but any initial thoughts? We can envisage a flurry of activity from US correpondents demanding assurances that we do not transact with CBS.

regards

Ian
Ian Wickens
Senior Policy Consultant,
Anti-Money Laundering
Group Risk Management

HIGHLY CONFIDENTIAL

The Royal Bank of Scotland Group
5th Floor, 280 Bishopsgate
London EC2M 4RB

Tel: 020 7334 1409 (Internal 7 6572 1409)
E-mail: Ian.WICKENS@rbos.com

-----Original Message-----
From: Jeremy Thorp [<mailto:Jeremy.Thorp@bba.org.uk>]
Sent: 07 June 2004 09:45
To: administrator@bba.org.uk
Subject: Patriot Act: Commercial Bank of Syria

To: MLPG
    MLAP

Date: 7 June 2004

Please see the attached note on a recent decision by the US authorities affecting relations with the Commercial Bank of Syria and correspondent bank accounts with US banks.

Please let me know if this is an issue  affecting UK banks which we should raise either with the UK or US authorities.  The deadline for comments to the US is 17 June.

Jeremy Thorp
Director, Financial Crime, BBA
Tel: (020) 7216-8853
Email: jeremy.thorp@bba.org.uk

************************************************
Privileged/Confidential information may be contained in this email and is intended only for the use of the addressee.  If you are not the addressee, you may not copy, forward, disclose or otherwise use the information.  If you receive this email by mistake, please notify the sender immediately and delete it from your computer.

Any opinions expressed in this message and/or attachments are those of the author and do not necessarily represent those of the BBA.  The BBA does not accept responsibility for changes made to this message after it was sent, as Internet communications are not secure.  Replies to this email may be monitored by the BBA for operational or business reasons.

Although this email and attachments are believed to be free of any virus it is the responsibility of the recipient to ensure that they are virus free.  No responsibility is accepted by the BBA for any loss or damage arising in any way from receipt or use thereof.

Visit our website:  <http://www.bba.org.uk>
************************************************
 << File: 180757.DOC >>

HIGHLY CONFIDENTIAL

**EXHIBIT 126 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | Wyles, Graeme |
| **Sent:** | Friday, December 17, 2004 3:37 AM |
| **To:** | Dickinson, Alan (CB London); RODGER, Irvine, CBFM Enterprise Risk; Weir, Derek |
| **Cc:** | LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill |
| **Subject:** | RE: Interpal November Review |

And me

Graeme Wyles
Director Risk
Commercial Banking , UK
020 7672 0194
Mobile: 07887  898668
Pager 07693 266560
Depot 028

-----Original Message-----
From:   Dickinson, Alan (CB London)
Sent:   16 December 2004 13:09
To:     RODGER, Irvine, CBFM Enterprise Risk; Weir, Derek; Wyles, Graeme
Cc:     LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill
Subject:        RE: Interpal November Review

Ok by me.

Alan

-----Original Message-----
From:   RODGER, Irvine, CBFM Enterprise Risk
Sent:   Thursday, December 16, 2004 1:06 PM
To:     Dickinson, Alan (CB London); Weir, Derek; Wyles, Graeme
Cc:     LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk; Lewis, Jill
Subject:        FW: Interpal November Review

Dear All

Guy has completed his investigation into the payments from Interpal.  He did a thorough job and searched a number of databases including

Financial sanctions and Terrorist Financing lists (UK and US)
Complicheck
World Check
Google

As you can see there were no direct marches with any entities on Sanctions & Terrorist lists.  He did however uncover some, mainly unsubstantiated commentary on a number of recipients but none of these are sanctioned names.  Please refer to Guy's email for detail.

I leave it to you to decide the appropriate course of action but I would recommend that we keep the account open and continue performing similar thorough reviews of account behaviour.  One strike and they are out??

Please advise accordingly.

Regards

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)

HIGHLY CONFIDENTIAL

Tel:   (020) 7085 1082
Int:   361082
Fax: (020) 7085 4641
e:     irvine.rodger@rbos.com <mailto:irvine.rodger@rbos.com>


-----Original Message-----
From:   COLE, Guy, CBFM Enterprise Risk
Sent:   16 December 2004 11:43
To:     RODGER, Irvine, CBFM Enterprise Risk
Subject:       Interpal November Review

Irvine

I have just finished reviewing the payments for the last six months for Interpal.  There were over 60 organisations receiving funds from Interpal, none of these organisations were found to be listed in the Bank of England or OFAC (US) sanctions.  Additionally none of these organisations were found to be present in the external due diligence database Worldcheck.

As one might expect with charities operating in this region, speculation exists around some of the organisations being connected with terrorism, in particular Hamas.  The most significant of these are the following:

Al-Mujamma Al-Islami
Created in 1978 by the spiritual leader of Hamas Sheikh Ahmed Yassin, this is the largest charity operating in the Gaza Strip and is allegedly affiliated with the Hamas Civilian wing, Dawwa.  Annual budget of 50 million dollars, Al-Mujamma al-Islami is reported to provided assistance to 20,000 orphans, 50,000 families, 10,000 university students, 20,000 school children. It's bank accounts were frozen by the Palestinian Authorities in August 2003, although the funds were released earlier this year following a Supreme Court in Gaza ruling.

Interpal published details of their funding to this organisation in 2002, and consequently the relationship should have been reviewed by the Charities Commission and Law enforcement last year.  No action was been taken.

All of the below organisations, which have received Interpal funds in the last six months, were cited as Hamas organisations in the indictment of the US Islamic charity The Holy Land Foundation, which was prosecuted in the US for funding terrorism.  The Holy Land Foundation is subject to sanctions by the Bank of England, EU and OFAC (US), although none of the below organisations are subject to sanctions themselves. -
Al-Salah Association (Bank accounts were also frozen by the Palestinian Authorities in August 2003, although the funds were released earlier this year following a Supreme Court in Gaza ruling. Ramallah Office closed down in the summer 2004 by Israel forces for funding terror activities)
██████████████████████
Jenin Zakat Committee
Nablus Zakat Committee
██████████████████████████████████████████
Ramallah Zakat Committee (Funds held in this organisations accounts at Arab Bank, were confiscated by Israeli forces February 2004)
Tulkarem Zakat Committee (Funds held in this organisations accounts at Arab Bank, were confiscated by Israeli forces February 2004)

If you require further information or investigation, please advise.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
Tel.      (020) 7085 5433
Internal 76572 365433
Fax.         (020) 7085 4641

HIGHLY CONFIDENTIAL

NW 066722

<<mailto:Guy.Cole@rbos.com>>
CBFM MLPU Website: <http://cbfmweb.fm.rbsgrp.net/cbfmmlpu/> (Answers to many frequently asked questions can be found on this website)

****************************************************************************************************************************************
*************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

**********************************************************************************
****************************************************************************************************************************************
*************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

**********************************************************************************

HIGHLY CONFIDENTIAL

**EXHIBIT 127 to Declaration of Joel Israel**

**RODGER, Irvine, CBFM Enterprise Risk**

| | |
|---|---|
| **From:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Sent:** | Thursday, December 30, 2004 07:27 AM |
| **To:** | ZZLOVE, Kevin. Corporate Markets |
| **Cc:** | RODGER, Irvine, MLPU; NORRIE, Ben, Group Risk Mgmt |
| **Subject:** | RE: Interpal - Strictly Confidential |

OK.

-----Original Message-----
From: LOVE, Kevin, CBFM
Sent: 30 December 2004 12:27
To: FOSTER, Stephen James, Group Risk Mgmt
Cc: RODGER, Irvine, CBFM Enterprise Risk; NORRIE, Ben, Group Risk Mgmt
Subject: Re: Interpal - Strictly Confidential

Stephen,
I am not sure which meeting you are referring to? Also, the action we have taken
has satisfied Amanda so I do not understand why you still seem to have issues?
Can you please speak with Amanda so that we know what we are meant to be doing.
If GER now want us to exit then can you please give us a clear and joined up
view. Many thanks Kevin
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: FOSTER, Stephen James, Group Risk Mgmt <Stephen.J.FOSTER@rbos.com>
To: LOVE, Kevin, CBFM <Kevin.LOVE@rbos.com>
CC: RODGER, Irvine, CBFM Enterprise Risk <Irvine.Rodger@rbos.com>; NORRIE, Ben,
Group Risk Mgmt <Ben.NORRIE@rbos.com>
Sent: Thu Dec 30 12:04:55 2004
Subject: RE: Interpal - Strictly Confidential

Thanks for this.

I note that care is being taken over the relationship, which is good.

It is a shame that the meeting has been cancelled, as we need to discuss this.
Interpal is blacklisted by OFAC not BoE, the US and UK have different foreign
policies over Israel and Palestine, and the Commissioners have not found any
irregularities in the operation of Interpal in the UK.  However, with the RBS
plans to expand in the US, having relationships like this is going to cause us
problems - just look at the recent Structured Finance case where we could not
sign the OFAC questionnaire and so may face being excluded in future from such
deals.

We need to agree a sensible way forward, so an early 2005 meeting would be good.

 -----Original Message-----
From:     LOVE, Kevin, CBFM
Sent:     17 December 2004 17:11
To:     FOSTER, Stephen James, Group Risk Mgmt; HOLT, Amanda, Group Risk Mgmt (nee
Turner)
Cc:     RODGER, Irvine, CBFM Enterprise Risk; COLE, Guy, CBFM Enterprise Risk; JONES,
Richard, CBFM Enterprise Risk
Subject:     FW: Interpal - Strictly Confidential
Importance:     High

Fyi

Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking _Financial Markets
The Royal Bank of Scotland Group Plc

NW 067948

kevin.love@rbos.com
Work: +44 20 7085 4026 Mobile: +44 7769 931630
Pager: +44 7693 308651 Blackberry: +44 7793 858329


-----Original Message-----
From: Dickinson, Alan (CB London)
Sent: 17 December 2004 17:10
To: CAMERON, John A N (CBFM)
Cc: LOVE, Kevin, CBFM
Subject: Interpal - Strictly Confidential


Johnny,


In September 2003, the US Office of Foreign Asset Control ('OFAC') designated the
charity 'Interpal' a terrorist organisation due to links with HAMAS. Interpal
is a British registered charity, and CBFM NatWest customer. Interpal's accounts
were immediately frozen, and the Charities Commission and Special Branch
investigated the US allegations. The investigation found that there was
insufficient evidence to prove a link to terrorism, so no UK action was taken
against Interpal and it operates freely in the UK.

Following the outcome of the UK authorities investigation, CBFM Money Laundering
Prevention Unit ('MLPU') undertook to review Interpal accounts on a semi annual
basis to ensure that none of its funds were being sent to terrorist groups. The
most recent review was for the six months leading to November 2004. None of
Interpal's payments reviewed were found to have been made to a UK or US
designated terrorist organisation. Nor did the external due diligence database
Worldcheck contain adverse information on any of the recipients of Interpal's
funds.

Last week the RBS Retail Media Relations Team identified a recent US article
mentioning the Interpal accounts held at NatWest and escalated the article to
Group Enterprise Risk ('GER'). GER were already aware of this connection and
the monitoring being undertaken, but asked CBFM MLPU for confirmation that CBFM
were still content to maintain this relationship. Following the CBFM MLPU
Interpal review, a briefing on Interpal was sent to me for consideration of the
relationship. There were no adverse findings by the CBFM MLPU, and I have,
therefore, decided to maintain the Interpal Bank account and relationship with
them.

Derek Weir and I will ensure that this is closely monitored and referred to us so
that we can take appropriate action if any adverse findings do arise.

Alan

HIGHLY CONFIDENTIAL

**EXHIBIT 128 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | RODGER, Irvine, CBFM Enterprise Risk |
| **Sent:** | Monday, January 31, 2005 8:22 AM |
| **To:** | ZZLOVE, Kevin. Corporate Markets |
| **Cc:** | COLE, Guy, MLPU; JONES, Richard, MLPU |
| **Subject:** | RE: Residual Risk |

Kevin

I have thought of another two Interpal-like cases  - Commercial Bank of Syria and Myanmar Foreign Trade Bank.  We are exiting both/

Cheers

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:     HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


   -----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:    31 January 2005 10:03
To:       RODGER, Irvine, CBFM Enterprise Risk
Cc:       COLE, Guy, CBFM Enterprise Risk
Subject:        RE: Residual Risk
Importance:     High

Probably a fraud which is why I cc'd Debs

Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com
Work: +44 20 7085 4026
Mobile: +44 7769 931630


   -----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: 31 January 2005 09:50
To: LOVE, Kevin, CBFM
Cc: COLE, Guy, CBFM Enterprise Risk
Subject: RE: Residual Risk

What is the "Myanmar Embassy" one?


Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082

HIGHLY CONFIDENTIAL

Fax: (020) 7085 4641
e:     HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


 -----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:   31 January 2005 07:08
To:     JONES, Richard, CBFM Enterprise Risk; SEARS, Debbie, CBFM; COLE, Guy, CBFM Enterprise Risk;
GREENFIELD, Katie, CBFM Enterprise Risk
Cc:     RODGER, Irvine, CBFM Enterprise Risk; DANIEL, Jane, CBFM
Subject:        Residual Risk
Importance:     High

Please describe for me any residual risk that might exist relating to the following transactions:

Interpal
███████████████

In addition, if there are other transactions which we still have, are known to either GER or GFC and have residual risk
associated with them (typically of a Reputational nature) please advise me e.g. accounts we have not exited at the
decision of the business.

We will need to keep these recorded in the Residual Risk log going forward.
Thanks
Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com
Work: +44 20 7085 4026
Mobile: +44 7769 931630

HIGHLY CONFIDENTIAL

**EXHIBIT 129 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | LOVE, Kevin, CBFM |
| **Sent:** | Wednesday, June 29, 2005 11:33 AM |
| **To:** | RODGER, Irvine, CBFM Enterprise Risk; COLE, Guy, CBFM Enterprise Risk |
| **Subject:** | RE: Interpal Payments |

**Importance:**  High

OK, great thanks.

Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com
Work: +44 20 7085 4026
Mobile: +44 7769 931630


-----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: 29 June 2005 14:26
To: LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk
Subject: RE: Interpal Payments

Kevin

I think that a quarterly review would be appropriate (monthly over the top).

Regards

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:    HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


-----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:   29 June 2005 14:06
To:     RODGER, Irvine, CBFM Enterprise Risk; COLE, Guy, CBFM Enterprise Risk
Subject:       RE: Interpal Payments
Importance:    High

Irv/Guy,
I think that we should increase the frequency of the six monthly search to at least quarterly (would monthly be over-the-top?) as, with Interpal being on the OFAC list, there is a high likelihood that they will make payments to organisations that are subsequently put on the BoE lists, regardless of whether they are on the BoE list themselves.  Trust this is OK?
Cheers


Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com

HIGHLY CONFIDENTIAL

Work: +44 20 7085 4026
Mobile: +44 7769 931630


-----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: 29 June 2005 10:02
To: LOVE, Kevin, CBFM; COLE, Guy, CBFM Enterprise Risk
Subject: RE: Interpal Payments

Kevin

Belinda is the RM.  This is the account which Johnny agreed should be maintained.

We have found no evidence that Interpal is making payments to proscribed organisations in the past.  (Guy reviews payments on a six-monthly basis to check)

For these reasons, I think it remains appropriate that the account is kept open.

Regards

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:     HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


 -----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:   29 June 2005 06:13
To:        COLE, Guy, CBFM Enterprise Risk
Cc:        RODGER, Irvine, CBFM Enterprise Risk
Subject:        RE: Interpal Payments
Importance:     High

Guy,
Who is Belinda Lane?  I recall us discussing this account before – with hindsight should we have bailed out before it got to this?
Regards

Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com
Work: +44 20 7085 4026
Mobile: +44 7769 931630


-----Original Message-----
From: COLE, Guy, CBFM Enterprise Risk
Sent: 28 June 2005 16:12
To: Lane, Belinda
Cc: RODGER, Irvine, CBFM Enterprise Risk; LOVE, Kevin, CBFM; FOSTER, Stephen James, Group Risk Mgmt;
DAVIES, Rob, Group Risk Mgmt; Wyles, Graeme
Subject: Interpal Payments
Importance: High


Belinda

NW 066702

Yesterday, the Bank of England issued a notice that prevents funds or assets being made available to the Palestinian charity ▇▇▇▇▇▇▇ A number of name variations for the charity were issued (which I have detailed below), and one of these names, ▇▇▇▇▇▇▇▇▇▇▇▇▇ has matched as a recipient of a payments previously made by Interpal.



This is a link to the Bank of England press release http://www.bankofengland.co.uk/publications/news/2005/075.htm.

Please advise Interpal that no further payments (including indirectly) can be made to this charity, as doing so will constitute a criminal offence.

To ensure compliance and for prudence sake, we will require Interpal to confirm to us in writing that they will not make any funds, other financial assets, economic benefits or economic recourses available, either directly or indirectly to, or for the benefit of an entity or person targeted by the Bank of England under The Terrorism (United Nations Measures) Order 2001 .

We strongly suggest that Interpal subscribes to the Bank of England's Sanctions unit email service to receive notification of any changes to the list of entities or individuals suspected of terrorist financing.  This is a link to the Bank of England's Sanctions webpage, http://www.bankofengland.co.uk/publications/financialsanctions/index.htm.

I am currently undertaking my semi annual review of Interpal payments, and will be providing a report to a senior management in the next few weeks to consider the ongoing risk of maintaining the relationship

If you wish to discuss further please do not hesitate to call me, or Irvine Rodger (020 7085 1082) in my absence.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
Tel.      (020) 7085 5433
Internal 76572 365433
Fax.          (020) 7085 4641
<mailto:Guy.Cole@rbos.com>
CBFM MLPU Website: http://cbfmweb.fm.rbsgrp.net/cbfmmlpu/ (Answers to many frequently asked questions can be

found on this website)

HIGHLY CONFIDENTIAL

NW 066704

**EXHIBIT 130 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | COLE, Guy, CBFM Enterprise Risk |
| **Sent:** | Wednesday, July 06, 2005 10:41 AM |
| **To:** | LOVE, Kevin, CBFM |
| **Cc:** | RODGER, Irvine, CBFM Enterprise Risk; Wyles, Graeme; FOSTER, Stephen James, Group Risk Mgmt |
| **Subject:** | INTERPAL Account Activity Review |

**Attachments:**      Interpal memo july 2005.doc

Kevin

Please find attached a copy of my review of the activity on the accounts of INTERPAL, the UK charity that is subject to OFAC sanctions.



Interpal memo july
    2005.doc (1...

In light of the findings of May 2005 review, the CBFM MLPU has decided to increase monitoring to quarterly reviews, but recommends that the relationship is still maintained.

Regards

Guy

**Guy Cole**
**CBFM Money Laundering Prevent Unit**
**135 Bishopsgate, London, EC2M 3UR**
**Tel.      (020) 7085 5433**
**Internal 76572 365433**
**Fax.              (020) 7085 4641**
**Email: Guy.Cole@rbos.com**

HIGHLY CONFIDENTIAL

**※ RBS**
*The Royal Bank of Scotland*

# Memo

To: Kevin R. Love
Global Head of CBFM Enterprise Risk

**Corporate Banking & Financial Markets**
135 Bishopsgate
London EC2M 3UR

From: Guy Cole
Manager
CBFM MLPU

Tel:        020 7085 5433
Internal:   365433
Email:      guy.cole@rbos.com

Date: 6 July 2005

Subject: **Semi annual review of INTERPAL account activity**

The CBFM MLPU has completed the semi annual review of the activity on the INTERPAL accounts. In light of the findings of May 2005 review detailed below, the CBFM MLPU has decided to increase monitoring to quarterly reviews, but recommends that the relationship is still maintained.

**Purpose of the account review**

In September 2003, the US Office of Foreign Asset Control ('OFAC') designated the charity 'INTERPAL' a terrorist organisation due to links with HAMAS.  INTERPAL is a British registered charity, and CBFM NatWest customer.  INTERPAL's accounts were immediately frozen, and the Charities Commission and Special Branch investigated the US allegations.  The investigation found that there was insufficient evidence to prove a link to terrorism, so no UK action was taken against INTERPAL and it operates freely in the UK.

Following the outcome of the UK authorities' investigation, CBFM Money Laundering Prevention Unit ('MLPU') undertook to review INTERPAL accounts on a semi annual basis to ensure that none of its funds are being sent to terrorist groups.  This memo details the findings of the review taken in May 2005.

**Review of the account activity for the six months to May 2005**

In the six months to May 2005, none of the INTERPAL payments reviewed were, at the time of the payment, made to a Bank of England or OFAC designated terrorist organisation.

However, a recipient who received a payment from INTERPAL in ▇▇▇▇▇▇▇ has since been designated by the Bank of England as an organisation suspected of supporting terrorism.  As this payment was made by INTERPAL prior to the terrorist designation of the recipient in June 2005, there has been no breach of the Terrorism (United Nations Measures) Order 2001.

The recipient of the INTERPAL payment was a charity called ▇▇▇▇▇▇▇▇▇▇▇ this charity's name and address match against the Bank of England notice for the entity ▇▇▇▇▇
http://www.bankofengland.co.uk/publications/news/2005/075.htm

The transaction details were as follows:
Date
Value
Beneficiary Name        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Beneficiary Address     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Beneficiary Bank        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
Beneficiary Account     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

A Suspicious Activity Report has been submitted by CBFM MLPU to Group Financial Crime reporting the above transaction and some additional entities (see endnote[i]).  The additional entities reported are not designated as terrorist organisations by the Bank of England or OFAC, and information on the funding to these organisations is publicly available on the INTERPAL website.

No allegations were found on any other recipients of INTERPAL payments.  All payment recipients were checked against Complicheck, Worldcheck and subject to Internet research.

HIGHLY CONFIDENTIAL

NW 066778

In December 2004, The Israeli Intelligence and Terrorism Information Center issued an information bulletin[i] on INTERPAL.  No new insight into INTERPAL was given by the bulletin and the text on a whole is quite emotive.  No reference was made to INTERPAL's NatWest accounts or the RBS Group.

**CBFM MLPU Summary and Recommendation**

Although a payment was made to the ███████████ I do not believe that there has been an increase in the risk of INTERPAL funding terrorism or to the Bank's reputation in maintaining this relationship.

In January 2005 the US dollar account maintained by INTERPAL was closed at our request, which has reduced the exposure our relationship has to OFAC sanctions against INTERPAL.

At a workshop attended in June on 'Managing the Risks of Funding Terror', Nick Ridley the lead intelligence analyst on the financing of terrorism at Europol, advised that a government designation of an organisation as a financer of terrorism (as INTERPAL has been by OFAC), almost certainly means that no financing of terrorism would take place via the entity after the designation.  Therefore, the result of OFAC's designation of INTERPAL as a supporter of terrorism has actually reduced the risk of the INTERPAL being used to fund terrorism.

Following the terrorist organisation designation of ████████████████ we have now requested written confirmation from INTERPAL that they will not make any future payments to organisations suspected of terrorist financing by the Bank of England.  We have suggested that they register with the Bank of England's Sanctions Unit so that they receive email notification of any new designations made by the Bank of England.  INTERPAL has agreed to provide this letter.

CBFM MPLU recommends the continuation of the relationship with INTERPAL, but will now review the account activity on a quarterly basis (previously it has been semi annually).

---

[i]
— Al-Islah Charitable Association – Listed by Israeli as a terrorist organisation
— ████████████████ - Listed by Israeli as a terrorist organisation
— ████████████- listed as Hamas controlled during the Holy Land Foundation prosecution in the US
— Nablus Zakat Committee - listed as Hamas controlled during the Holy Land Foundation prosecution in the US
— Ramallah Zakat Committee- listed as Hamas controlled during the Holy Land Foundation prosecution in the US
— ████████████ - listed as Hamas controlled during the Holy Land Foundation prosecution in the US
— ████████████████ – purported to be terrorist linked in the media

[ii] http://www.intelligence.org.il/eng/sib/12_04/interpal.htm.  Parts 5 and 6 are the only sections that specifically discuss INTERPAL. The individual Essam Yussuf, described as central figure in INTERPAL, is not an INTERPAL trustee.

HIGHLY CONFIDENTIAL                                                                                        NW 066779

**EXHIBIT 131 to Declaration of Joel Israel**

NCIS Disclosure for Case 1748660 ( Received )

| Close | | Print | |

**Core NCIS details created on 06 Jan 2006 by EUROPA_neillsa**    **[ Submitted by RBS_ohearaa on 09-JAN-06 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | NWB |
| Disclosure Date | 09 Jan 2006 | | COMMERCIAL OFFICE |
| Branch / Outlet | FINSBURY PARK | | ROMFORD |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | Postcode | |

Text





HIGHLY CONFIDENTIAL

NW219319



HIGHLY CONFIDENTIAL

NW219320

NCIS Disclosure for Case 1748664 ( Received )

| Close | Print |

**Core NCIS details created on 21 Aug 2006 by EUROPA_mcgowrb    [ Submitted by EUROPA_mcgowrb on 22-AUG-06 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | NWB |
| Disclosure Date | 21 Aug 2006 | | COMMERCIAL OFFICE |
| Branch / Outlet | FINSBURY PARK | | ROMFORD |
| Branch Code | 60-08-22 | | |
| Trust Indicator | N | | |
| Further Information | Y | Postcode | |

Text

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

NW219322

**EXHIBIT 132 to Declaration of Joel Israel**

| From: | Richardson, Lesley <Lesley.Richardson@rbs.co.uk> |
|---|---|
| Sent: | Monday, January 10, 2005 5:45 AM |
| To: | JOLLY, Mark, Group Risk Mgmt <Mark.JOLLY@rbos.com>; Hoseason, Michael (GFC) <michael.hoseason@rbs.co.uk> |
| Cc: | SANDERS, Stephen, Group Risk Mgmt <Stephen.SANDERS@rbos.com>; FOSTER, Stephen James, Group Risk Mgmt <Stephen.J.FOSTER@rbos.com>; HOLT, Amanda, Group Risk Mgmt (nee Turner) <Amanda.HOLT@rbos.com>; McAdam, Carolyn <Carolyn.McAdam@rbs.co.uk>; Gannon, Ian <Ian.A.Gannon@rbs.co.uk>; Mistry, Vijay <Vijay.Mistry@rbs.co.uk> |
| Subject: | RE: Press Article re Closure of FoAA accounts |
| Attach: | Executive Briefing Note 7 jan_.doc |

Mark / Mike

Following on from my previous email, attached is the short update produced for Sir Fred on Friday.

Please call me should you wish to discuss.

Regards
Les *(EXT. 224917)*

**Note referred to:**

<<...>>

-----Original Message-----
**From:** JOLLY, Mark, Group Risk Mgmt
**Sent:** 06 January 2005 12:41
**To:** Hoseason, Michael (GFC); Richardson, Lesley; Mistry, Vijay
**Cc:** SANDERS, Stephen, Group Risk Mgmt; FOSTER, Stephen James, Group Risk Mgmt; HOLT, Amanda, Group Risk Mgmt (nee Turner); McAdam, Carolyn; Gannon, Ian

**Subject:** Press Article re  Closure of FoAA accounts

Mike, Lesley, Vijay

**For Information**

The FSA (John Trundle) telephoned this morning having seen the attached article in the Guardian and following receipt of an official complaint from the legal advisors to Mr Patel and the FoAA.   JT advised that the FSA will respond to the complaint advising that it is not within the FSA remit to engage in such issues, but was also keen to ensure that the Group was confident of the issues surrounding our decision to close the accounts.   **No response** to the FSA is required at this stage.

Stephen Foster has advised that our original decision has been reversed pending provision of additional information from Mr Patel and FoAA.

Following the FSA interest in this situation, it would be helpful if a short paper could be provided to myself detailing the background to this situation.  Mike/Lesley could one of you provide this for me?

Regards

*Mark*

Mark Jolly
Royal Bank of Scotland plc
Group Regulatory & Supervisory Support
Group Risk Management
5th Floor, 280 Bishopsgate
London, EC2R 4RB

Tel:   020 7085 1597
Fax:   020 7085 4813
Mobile: 07901 518867

Depot Code 028

<http://www.precise-media.co.uk/rbsretailbanking/pdfs/46526.pdf>

HIGHLY CONFIDENTIAL

**************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.

Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

*************************************************************************************

***************************************************************************************************************************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

*******************************************************************************

   << File: FoAA closure article Guardian 03.01.2005.pdf >>

HIGHLY CONFIDENTIAL

Executive Briefing Note
Friends of Al Aqsa and Related Accounts
7 January 2005

## Connection
- Friends of Al Aqsa (Limited Company, Business Current Account) – Director Ismail Patel
- ██████████ Cr. Opened 1998
-
- *Redacted - Non-Responsive*


All accounts held at RBS Leicester, Belgrave Gate.

## Background
- We regularly have to review accounts for the purposes of anti money laundering and other sanctions & terrorist financing investigations:
  - In the 18 months to end December 2004 we had reviewed 8675 connections covering 22548 accounts. Of these 242 connections and 697 accounts had been exited (167 RBS, 530 NatWest). Of these 13 were appealed, 1 of which was upheld, the other 12 were closed.
  - The most common reason for exiting is suspicion of money laundering although 5 accounts have been closed for suspected links to terrorism.

In this particular Case
- In May 2003 the Al Aqsa Foundation world-wide was designated by UK & US governments as a 'financier of a terrorist organisation'
- A review by Group Financial Crime (GFC) highlighted a potential common donor between Al-Aqsa Foundation and Friends of Al-Aqsa. This led to a Suspicious Activity Report (SAR) being submitted by Group Financial Crime (GFC) to National Crime Squad (NCIS) on the Friends of Al-Aqsa account in May 2003. No further contact received from the police.
- A routine review by Group Risk in November 2004 highlighted a possible link between Friends of Al-Aqsa and Al Aqsa Foundation South Africa. This was based on the Friends of Al Aqsa web site showing both organisations as being co-hosts of a Justice in Palestine conference held in South Africa in July 2002.  Group Risk advised that in their view there was insufficient evidence to exit the relationship at that time, but that this account should be monitored.
- A review of items paid from the Friends of Al Aqsa account did not identify any unusual transactions.
- However payments in to the account appeared to be uncontrolled as the account details were publicised on the Friends web site. This is not normal for a limited company, which should be able to identify and control the source of funds.
  - A review of the automated credits into the account against the 'Worldcheck' database[1] threw up 13 near name matches (surname and initial) and 21 possible name matches (surname only).  As these individuals do not bank with RBS or NatWest, we were unable to confirm or discount that they were listed individuals.
- In addition connected accounts of Mr I A Patel a Director of Friends of Al-Aqsa, were investigated.  A few significant round amount transactions were seen on the business account.
- The Retail Compliance review concluded that as a report of the jointly co-hosted conference was still on the web site there was a potential reputational risk that the Friends Al Aqsa would transpire to be still linked to Al Aqsa Foundation. This concern was heightened as the link to Al Aqsa Foundation had not been repudiated.

---

[1] *Worldcheck – Independent Group Approved database of politically exposed persons, individuals subject to UN / EU Sanctions and other listed individuals e.g. terrorists

1

HIGHLY CONFIDENTIAL

- In view of the website link, the uncontrolled acceptance of items into the Friends of Al-Aqsa account and the unusual transactions on the business account the reputational risk of retaining the accounts was viewed as greater than exiting the relationship.
- Therefore 30 days 'notice of closure' which was given on 15th December 2004. In addition a SAR was given to NCIS (no response received to date)
- On return from his holiday on 24th December Mr Patel appealed the notice of closure. In addition he initiated a legal claim together with a press and internet based public action campaign against the RBS decision. The campaign plan included demonstrations for 7th January at Head Office and 8th January at Leicester branch.
- The Guardian, Edinburgh Evening News and Glasgow Herald picked up on the story with articles appearing from 3rd January onwards.

## Action Taken

- Senior level review of the decision process. This showed facts as above. However in view the reputational risk if the litigation was pursued together with the weight of public contacts (over 200 including threats to close accounts), press coverage and intimated demonstrations it was clear that the reputational and financial risk of closure had been underestimated.
- A plan was agreed through the morning meeting.  This was to request clarification on three round amount payments from the business account together with an update on the constitution of Friends of Al Aqsa. This evidence was readily provided and enabled us to establish there was no evidence of money laundering on the business account or the Friends of Al- Aqsa acting as a linked party to a proscribed organisation.
- On 6th January we issued letters rescinding the notice of closure. Mr Patel issued a notice asking for all action against the bank to be stopped and stopping further press coverage.
- We have apologised  No compensation was paid (customer advised he did not wish to receive any personal gain) . In liaison with Howard Moody we have agreed to work with Mr Patel to establish if there are any community projects that the bank can support in the Leicester area as part of its community investment.
- We have agreed with Mr Patel a statement that can be used for all future customer, press and official contact.  'For obvious reasons, we are unable to discuss the detail, however following further discussions with Mr Patel, we are pleased to be able to continue our banking relationship'.
- Having completed all these actions the planned demonstrations were called off by the organisations acting in support of Mr Patel.

## Going Forward

- We will continue to monitor all of these accounts.
- We will continue to review our existing processes around forced account closures and take remedial action where appropriate. Going forward, a reactionary process will still be required in very limited instances due to the type and nature of the investigations involved.

HIGHLY CONFIDENTIAL

NW 180857

**EXHIBIT 133 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                :
TZVI WEISS, *et al.*,                           :
                                                :
                           Plaintiffs,          :
                                                :       CV 05-4622 (DLI) (MDG)
              - against -                       :
                                                :
NATIONAL WESTMINSTER BANK PLC,                  :
                                                :
                           Defendant.           :
                                                :
-------------------------------------------------------- X
                                                :
NATAN APPLEBAUM, *et al.*,                      :
                                                :
                           Plaintiffs,          :
                                                :
              - against -                       :
                                                :       CV 07-916 (DLI) (MDG)
NATIONAL WESTMINSTER BANK PLC,                  :
                                                :
                           Defendant.           :
                                                :
                                                :
-------------------------------------------------------- X

### FOURTH SUPPLEMENTAL RESPONSES AND OBJECTIONS BY DEFENDANT NATIONAL WESTMINSTER BANK PLC TO PLAINTIFFS' SECOND SET OF INTERROGATORIES (CONTENTION INTERROGATORIES)

Pursuant to the Court's Minute Order dated September 16, 2011, Defendant National

Westminster Bank Plc ("NatWest") makes this fourth supplemental response to Plaintiffs'

Second Set of Interrogatories Directed to Defendant National Westminster Bank Plc dated April

29, 2011 (the "Contention Interrogatories") as follows:

**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – NOT TO BE USED, COPIED OR DISCLOSED EXCEPT AS AUTHORIZED BY COURT ORDER**

## RESERVATION OF RIGHTS

These responses are made subject to, and without waiver of, the reservation of rights and

objections set forth in NatWest's Responses And Objections To Plaintiffs' Second Set of

Interrogatories, dated July 5, 2011.

**Contention Interrogatory No. 22:**

**Do you contend that, at any time during the Relevant Period, NatWest closed any customer accounts on the basis of suspicions of terrorism or terrorist financing? If Your answer is affirmative, identify: the factual basis for closing such accounts, including whether such customer or customers had been designated as terrorists by any governmental entity, and all documents, Testimony and Witnesses supporting your contention; and all persons or entities known by You to have knowledge of relevant facts supporting Your contention. (In answering this Interrogatory, you may redact the specific name, address and other personal data such as phone number, government identification number etc.)**

**Response to Contention Interrogatory No. 22**

NatWest's search of its Goalkeeper system has revealed the following information

concerning customer accounts that NatWest closed between January 1, 2000 and January 31,

2005 based on suspicions of terrorism or terrorist financing.

1. Name of customer: ███████████.

   Factual basis for closing account:  The relevant pages from the Goalkeeper system are attached, bearing production numbers NW219323 – NW219325.

   Persons or entities potentially having knowledge of relevant facts:  Douglas Hartley

2. Name of customer: █████████

   Factual basis for closing account:  The relevant page from the Goalkeeper system is attached, bearing production number NW219326.

   Persons or entities potentially having knowledge of relevant facts:  Tony O'Hear

Dated: November 2**}**, 2011

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
Lawrence B. Friedman
A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

3

**EXHIBIT 134 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 43 of 328 PageID #: 9747

## NCIS Disclosure for Case 687677 ( Received )

[ Close ]   [ Print ]

**Core NCIS details created on 13 Jan 2003 by RBS\Manchea        [ Submitted by RBS\Hartlda on 14-JAN-03 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | NatWest |
| Disclosure Date | 13 Jan 2003 | | Stratford Broadway |
| Branch / Outlet | Stratford Broadway | | |
| Branch Code | 60-20-36 | | |
| Trust Indicator | N | | |
| Further Information | N | Postcode | |

Text



HIGHLY CONFIDENTIAL                                                                        NW219323

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 44 of 328 PageID #: 9748



HIGHLY CONFIDENTIAL

NW219324

Case 1:03-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 45 of 328 PageID #: 9749



HIGHLY CONFIDENTIAL

NW219325

## NCIS Disclosure for Case 731767 ( Received )

[ Close ]    [ Print ]

**Core NCIS details created on 24 Feb 2004 by EUROPA\Evansdw    [ Submitted by RBS\Ohearaa on 27-FEB-04 ]**

| | | | |
|---|---|---|---|
| Disclosure Type | Terrorism | Submitting Branch Address | GROUP INVESTIGATIONS & FRAUD |
| Disclosure Date | 24 Feb 2004 | | MONEY LAUNDERING SUSPICION TEAM |
| Branch / Outlet | WIGAN | | EDINBURGH |
| Branch Code | 60-24-02 | | |
| Trust Indicator | N | | |
| Further Information | Y | Postcode | |

Text



HIGHLY CONFIDENTIAL

NW219326

**EXHIBIT 135 to Declaration of Joel Israel**



# Case Summary

## Money laundering disclosure

CIFAS    NCIS

Delete Case

| Case Summary | Record Data | Subject Data | Notes & Conclusion | Key Corresp |

### Incident Data

| | | | | |
|---|---|---|---|---|
| Control Authority | Group Financial Crime 1 | Status | Closed **Source:** [GK2:779132] | |
| Review Date | | by | NONE | |
| Remote Delivery Channel | N | High Profile | Y 25 Nov 2004 00:00 | |
| Created on | 25 Nov 2004 00:00 | by | EUROPA_Evansdw | |
| Last Modified on | 23 Dec 2004 10:56 | by | EUROPA_brannic | |

### Linked Cases

| | |
|---|---|
| 698074 | Business auto-linked |
| 1284095 | Phone auto-linked |
| 1766776 | Phone auto-linked |
| 2334383 | Personal auto-linked |

Maintain Links

### Queries

| Refer To | Tel No. | Business | Unable to contact ? |
|---|---|---|---|
| EUROPA_evansdw | 0131 523 8878 | Group Financial Crime 1 | Yes |

### Money laundering disclosure Record

| | | | |
|---|---|---|---|
| **Submitting Branch** | GROUP FINANCIAL CRIME | **Submitted By** | DAVID EVANS |
| **Submitting Unit Sortcode** | | **Contact No** | 0131 523 8878 |
| **Submitting Department** | None | **Legislation** | POTA |
| **Estimated Laundering Total** | 0   <Unknown> | | |

**Reason(s) for Suspicion**

High non cash turnover

Transactions inconsistent with Banks knowledge of customer

Suspected terrorist funding

### Transactions  GBP 50000.00

Add

| Date | Type | Amount | Currency |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | | |

Edit

### Set All Risk Ratings to the the same value of:-

Amber  Blue  Green  Indigo  Red

### Personal Data

Add

| Surname | Forenames | Date Of Birth | Sex | Key Information | Risk | Adj | |
|---|---|---|---|---|---|---|---|
| PATEL | ISMAIL ADAM | Redacted - Non-Responsive | M | NONE | Red | Red | Edit |

### Business Data

Add

| Business/Org Name | Company Ref. No. | Legal Jurisdiction | Key Information | Risk | Adj |
|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL

NW 191807

| ADAMS OPTICIANS | | UNITED KINGDOM | NONE | | Red | Red | Edit |
|---|---|---|---|---|---|---|---|
| FRIENDS OF AL-AQSA | | UNITED KINGDOM | NONE | | Red | Red | Edit |

| Telephone Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Phone No.** | **Owner** | | | **Type** | **Risk** | **Adj** | |
| *Redacted - Non-Responsive* | ISMAIL PATEL | | | Other | Red | Red | Edit |
| 0116 253 1882 | FRIENDS OF AL-AQSA | | | Other | Red | Red | Edit |

| Address Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Bldg No. & Name** | **Street** | **Town** | **Postcode** | | **Risk** | **Adj** | |
| 200 | MELBOURNE RD | LEICESTER | LE2 0DT | | Red | Red | Edit |
| *Redacted - Non-Responsive* | | | | | Red | Red | Edit |

| Account Data | | | | | | | Add |
|---|---|---|---|---|---|---|---|
| **Account Name** | **Account No.** | **Sortcode** | **Account Type** | **Currency** | **Risk** | **Adj** | |
| I PATEL T/A ADAM OPTICIANS | *Redacted - Non-Responsive* | | Current (Non Personal) | British Pound | Green | Green | Edit |
| I PATEL | *Redacted - Non-Responsive* | | Current (Personal) | British Pound | Green | Green | Edit |
| FRIENDS OF AL-AQSA | 10036370 | 16-23-20 | Treasury | British Pound | Green | Green | Edit |

| Miscellaneous Data | Add |
|---|---|
| -None- | |

| Case Notes | | | | Add |
|---|---|---|---|---|
| **Type** | **Date** | **User** | **Text** | |
| Case notes | 26 Nov 2004 | Migrated | 25/11 As the originator of this query, Rob Davies, states, t | View |
| Case notes | 03 Dec 2004 | EUROPA_brannic | Disclosure agreed but not submitted | View |
| Summary and Assessment | 26 Nov 2004 | Migrated | This customer is the contact for a business called 'Friends | View |
| Conclusion | 04 Dec 2004 | EUROPA_brannic | On the basis of the information available to us at the prese | View |

| Key Correspondence | |
|---|---|
| No Documents have been uploaded | Add |

| NCIS Disclosures | Author | Date | |
|---|---|---|---|
| NCIS Disclosure 487861 (R) | EUROPA\Evansdw | 15 Dec 2004 | Amend NCIS Number |

**No CIFAS Reports**

HIGHLY CONFIDENTIAL      NW 191808

| 1. **User:** Migrated | **On:** | 26 Nov 2004 00:00 | Print | Copy | Delete |

**Note:** 25/11 As the originator of this query, Rob Davies, states, this is probably not worthy of exiting at the moment, but it is certainly worthy of a disclosure, primarily for intelligence purposes. I have also completed a briefing note. DE

| 2. **User:** EUROPA_brannic | **On:** | 03 Dec 2004 18:14 | Print | Copy | Delete |

**Note:** Disclosure agreed but not submitted

HIGHLY CONFIDENTIAL

NW 191809

Case 1:05-cv-04622-DLI-RML    Document 272-7    Filed 03/22/12    Page 51 of 328 PageID #:
9755



HIGHLY CONFIDENTIAL

NW 191810



HIGHLY CONFIDENTIAL

NW 191811



## NCIS Disclosure for Case 779132 ( Received )

[ Close ]   [ Print ]

**Core NCIS details created on 25 Nov 2004 by EUROPA\Evansdw      [ Submitted by EUROPA_brannic on 16-DEC-04 ]**

| Disclosure Type | Drugs | Submitting Branch Address | ROYAL BANK OF SCOTLAND GROUP FINANCIAL CRIME |
| Disclosure Date | 15 Dec 2004 | | |
| Branch / Outlet | LEICESTER BELGRAVE GATE | | EDINBURGH |
| Branch Code | 16-23-20 | | |
| Trust Indicator | N | | |
| Further Information | N | Postcode | |

Text

HIGHLY CONFIDENTIAL

NW 191812

Description



HIGHLY CONFIDENTIAL

NW 191813



HIGHLY CONFIDENTIAL

NW 191814

**EXHIBIT 136 to Declaration of Joel Israel**

| | |
|---|---|
| **From:** | Hoseason, Michael (GFC) |
| **Sent:** | Thursday, January 6, 2005 8:10 AM |
| **To:** | Orr, James (Group Security & Fraud) <James.A.Orr@rbs.co.uk> |
| **Cc:** | Trantum, Neil <neil.trantum@rbs.co.uk> |
| **Subject:** | FW: Press Article re Closure of FoAA accounts |
| **Attach:** | FoAA closure article Guardian 03.01.2005.pdf;GFC briefing - Friends of Al-Aqsa779132.doc |

Jim.

Are you happy for me to provide Mark J with a copy of the initial briefing I did for you which went to MAF.(Copy attached)

<<...>>

I have not been privy to the detail relating to subsequent developments so this will need to come from Retail I would suggest.

Mike

-----Original Message-----
**From:** JOLLY, Mark, Group Risk Mgmt
**Sent:** 06 January 2005 12:41
**To:** Hoseason, Michael (GFC); Richardson, Lesley; Mistry, Vijay
**Cc:** SANDERS, Stephen, Group Risk Mgmt; FOSTER, Stephen James, Group Risk Mgmt; HOLT, Amanda, Group Risk Mgmt (nee Turner); McAdam, Carolyn; Gannon, Ian

**Subject:** Press Article re  Closure of FoAA accounts

Mike, Lesley, Vijay

**For Information**

The FSA (John Trundle) telephoned this morning having seen the attached article in the Guardian and following receipt of an official complaint from the legal advisors to Mr Patel and the FoAA. JT advised that the FSA will respond to the complaint advising that it is not within the FSA remit to engage in such issues, but was also keen to ensure that the Group was confident of the issues surrounding our decision to close the accounts.   **No response** to the FSA is required at this stage.


Stephen Foster has advised that our original decision has been reversed pending provision of additional information from Mr Patel and FoAA.


Following the FSA interest in this situation, it would be helpful if a short paper could be provided to myself detailing the background to this situation.  Mike/Lesley could one of you provide this for me?


Regards

*Mark*

Mark Jolly
Royal Bank of Scotland plc
Group Regulatory & Supervisory Support
Group Risk Management
5th Floor, 280 Bishopsgate
London, EC2R 4RB

Tel:    020 7085 1597
Fax:    020 7085 4813
Mobile: 07901 518867

Depot Code 028


↑↑ <http://www.precise-media.co.uk/rbsretailbanking/pdfs/46526.pdf>


************************************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.

Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender

HIGHLY CONFIDENTIAL

by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

**************************************************************************

******************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB. Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
http://www.rbs.co.uk/CBFM
http://www.rbsmarkets.com

**************************************************************************

<<...>>

HIGHLY CONFIDENTIAL

| | |
|---|---|
| Client: | RBS Retail Banking |
| Source: | guardian.co.uk |
| Date: | 03 January 2005 |
| Page: | N/A |
| Circulation: | N/A |

---

## Palestinian aid groups' accounts closed

Two British organisations set up to help the Palestinian people have had their bank accounts abruptly closed without explanation, the Guardian has learned. Neither is proscribed by the government, and both claim that their targeting is political. The groups, Friends of Al-Aqsa (FoAA) and the Palestine Solidarity Campaign, have been asked to find alternative banking arrangements, even though neither appears on watch lists held by the Home Office or the Bank of England. The head of FoAA has also had his personal and business accounts closed. Ismail Patel, chair of the Leicester-based FoAA, said he returned from holiday this week to find a letter from the  Royal Bank of Scotland  saying a review had been conducted and the bank was no longer willing to provide him with facilities. He was given 30 days to transfer his three accounts. 'It came out of the blue. There's nothing I can think of that I've done differently,' he said. 'I was shocked by the letter.' Mr Patel said he had held his personal and business accounts with the bank for more than 20 years and the FoAA account for 10, without incident. He had never even been overdrawn or had any complaints from the Royal Bank of Scotland. 'I think it is a political decision - they do not think it's favourable to be associated with those of us working for the victims of Israel,' said Mr Patel. RBS said it was not obliged to discuss reasons for closing an account, and stressed due notice was offered. It declined to discuss an individual case. Mr Patel fears his organisation may have been mistaken for one with a similar name. The Bank of England asks all banks to freeze the accounts of people and organisations subject to financial sanctions. Although neither Mr Patel nor FoAA appear on the watch list, a group called the Al-Aqsa Foundation, based in the Netherlands, is named on it. 'I would have thought they would have looked at it and told us at least. It's absurd. Without the bank disclosing their reasons we don't know anything,' said Mr Patel, who is now consulting lawyers. The Palestine Solidarity Campaign also had its account withdrawn, by the Alliance & Leicester. Zoe Mars, the treasurer for the PSC, said that at the end of 2003 the group sent 750 to a medical charity in Palestine. Five months later it got a letter from its bank saying the transaction had been interrupted by the US treasury, which wanted more information on the transfer. The money eventually went through, but three months later, in July 2004, the bank decided to close its account. 'We wondered if that worried them and they feared they'd be accused of money laundering,' said Ms Mars. 'They might have thought, this is more trouble than it's worth. Anything to do with Palestine just raises fears.' A bank spokesperson said it would not discuss its reasons but added: 'I can assure you ... that the Alliance & Leicester has not closed any accounts for racial or political reasons.' The PSC has written to its members asking them to transfer their standing orders, but so far only half have done so. FoAA estimates that it will cost more than 10,000 in lost subscriptions and reprinting costs.
Guardian Unlimited

HIGHLY CONFIDENTIAL

GROUP FINANCIAL CRIME BRIEFING NOTE – CONFIDENTIAL

**Subject:** Enquiries received by media relations from Muslim News and The Guardian regarding the bank's decision to close the accounts of *Redacted - Non-Responsive* and Friends of Al-Aqsa, held at RBS Leicester, Belgrave Gate.

**Purpose:** To advise the Executive of the background to the above enquiries received by Media Relations.

**Background:**

- Friends of Al-Aqsa first came to the attention of GFC in May 2003 when they were identified as one of a number of Muslim charities receiving donations from a ███████ The bank had no specific concerns regarding the source of funds into ██████ account, which appeared to be a regular salary payment via BACS. Nonetheless, a suspicious activity report (SAR) was made to The National Criminal Intelligence Service (NCIS) for intelligence purposes due to the volume of out goings to Muslim organisations. No specific concerns regarding activity through the account of The Friends of Al-Aqsa were identified at that time

- 17th November 2004 Friends of Al-Aqsa and connected accounts were brought to the attention of Retail Compliance by Group Risk Management. Group Risk Management did not feel there was enough to warrant exiting the relationship but felt as a minimum the customer should be added to the Retail PEP monitoring programme. The e-mail was copied to the Centrally Managed Accounts Unit within GFC

- Searches of the internet had indicated that Friends of Al-Aqsa are a fairly pro-Palistinian voice in the UK with a link to The Al-Aqsa Foundation, (The Al-Aqsa Foundation are listed by both the Bank of England and OFAC) in that they co-hosted a conference in 2002. Please see attached link: http://www.aqsa.org.uk (Note – websense, the bank's filtering software may not permit access to this site). The Friends of Al-Aqsa website also encourages their supporters to boycott the Alliance and Leicester for closing the accounts of another similar pro-Palestinian organisation

- The activity through the Friends of Al-Aqsa account was of no specific concern with numerous small value deposits via BACS, although cheques drawn on the account were in the main illegible, which may or may not have been intentional. The activity was similar to the way in which a charity account would be expected to operate however upon checking the Charity Commission website the Friends of Al-Aqsa did not appear to be a registered charity

- Mr Patel, the key contact for the Friends of Al-Aqsa also holds a business account , *Redacted - Non-Responsive* This account had seen some significant round amount transactions (largest ██████, which was not entirely consistent with the account of an opticians. Activity through Mr Patel's personal account was unremarkable

- In view of the above GFC submitted a further SAR to NCIS on 15th December 2004 highlighting all three accounts for intelligence purposes

- Retail Compliance, having independently reviewed the accounts took the decision to exit the entire relationship, a decision which was conveyed to Mr Patel via his business manager in letters dated 9th December 2004

- On 24th December 2004 Mr Patel replied to his business manager requesting:
  - a period of 3 months in which to make alternative banking arrangements
  - to know the basis on which he was no longer considered suitable for a bank account
  - details of the baking appeals process

- On 29th December 2004 media Relations received enquiries from both The Guardian and Muslim News, the latter making allegations about RBS targeting any supporters of the Palestinian cause Please see attached e-mail from Media Relations

FW  Media calls from
Muslim News and The

Mike Hoseason
Group Financial Crime
0207 714 4519
29 December 2004

**EXHIBIT 137 to Declaration of Joel Israel**

| | |
|---|---|
| **From:** | Hemsley, Richard (Director, Group Security and Fraud) |
| **Sent:** | Wednesday, January 5, 2005 11:07 AM |
| **To:** | HOLT, Amanda, Group Risk Mgmt (nee Turner) <Amanda.HOLT@rbos.com> |
| **Subject:** | FW: Possible Demonstation at 42 SAS |

Amanda

As discussed.  Stephen Foster also has the Threat Assessment from SIU that goes along with this.  We have additional guarding in place at 42 SAS, 36 SAS and the two key locations in Leicester.  We will also have on site representation from GSM in Leicester and Edinburgh.

Richard

---

**From:** Orr, James (Group Security & Fraud)
**Sent:** 05 January 2005 11:47
**To:** Hemsley, Richard (Director, Group Security and Fraud)
**Subject:** RE: Possible Demonstation at 42 SAS
**Importance:** High

Richard

Mike Hoseason has been unable to contact David Outhwaite.   However, in speaking with Leslie Richardson, Retail Compliance, he learned that at the Morning Meeting today, the exit decision in relation to Mr Patel was overturned subject to 'satisfaction regarding certain transactions'.   Also, that Feilim Mackle had discussed the issue with Sir Fred.

I believe that Watson's team - Graham Vance - should undertake the briefing and prepare an appropriate operational response to provide clarity - supported by an initial intelligence assessment and updates from the SIU.    As usual, Media Relations will need to consider an 'if asked' press release.

Jim

> -----Original Message-----
> **From:** Hemsley, Richard (Director, Group Security and Fraud)
> **Sent:** 05 January 2005 07:46
> **To:** Orr, James (Group Security & Fraud)
> **Subject:** RE:
>
> Jim
>
> Can you double check for me that someone (David Outhwaite?) has picked up with Feilim Mackle regarding 42 SAS.  Having said this I am not sure that Feilim is the right person; I am not sure that he works in 42 (he may have moved over there recently).  You may feel that it is the role of Watson's team to undertake the briefing and I would support that, perhaps supported by those that have been involved longer.  Watson has Graham Vance on the case.
>
> Richard
>
> -----Original Message-----
> From: Orr, James (Group Security & Fraud)
> Sent: 04 January 2005 21:00

To: Couzens, Michael
Cc: Hemsley, Richard (Director, Group Security and Fraud); Mcateer, Watson (GSM); Hoseason, Michael (GFC)
Subject: Re:

Mike

For you information. Mike Hoseason can provide you with copies of all relevant e-mail traffic. In regard to the alleged demonstration, an intelligence assessment would be appreciated (disregard if already in hand). Thanks.

Jim
JAMES ORR

Group Head of Financial Crime
The Royal Bank of Scotland Group
Tel:    0131 523 8939
Mob:   07795 237770
Fax:    0131 523 8798
E-mail: James.A.Orr@rbs.co.uk
If you would like to know more about Group Financial Crime, please access the Intranet link below:

http://www.manufacturing.rbs.co.uk/gsf/GFC/default.asp


-----Original Message-----
From: Outhwaite, David <David.Outhwaite@rbs.co.uk>
To: Hoseason, Michael (GFC) <michael.hoseason@rbs.co.uk>
CC: Hemsley, Richard (Director, Group Security and Fraud) <Richard.Hemsley@rbs.co.uk>; Orr, James (Group Security & Fraud) <James.A.Orr@rbs.co.uk>; Mcateer, Watson (GSM) <Watson.Mcateer@rbs.co.uk>

Sent: Tue Jan 04 17:41:31 2005
Subject: RE:

Feilim Mackle is probably the best person to take this forward.

David

-----Original Message-----
From:   Hoseason, Michael (GFC)
Sent:   Tuesday, January 04, 2005 5:20 PM
To:     Outhwaite, David
Cc:     Hemsley, Richard (Director, Group Security and Fraud); Orr, James (Group Security & Fraud); Mcateer, Watson (GSM)

Subject:        RE:

David.
Thank you for the update.
Given the threat of a demonstration at 42 St Andrew Sq. on Friday Group Security Management have been briefed to ensure security are up to speed but can you confirm Group Communications have/will be briefing the Exec / other staff @ 42 St Andrew Sq and do they expect any special guests / visitors that day?

Thanks and regards

Mike Hoseason
Group Financial Crime
7th Floor, 1 Princes Street
London, EC2R 8PB
Tel: 020 7714 4519
Mobile: 07899 746970


-----Original Message-----
From:   Outhwaite, David
Sent:   03 January 2005 22:23
To:     McAdam, Carolyn; Thomson, Agnes; CLARK, Graham, Streamline FF; Hoseason, Michael (GFC); Mackle, Feilim
Cc:     Outhwaite, David
Subject:     Fw:

For your information, our customer is intending to ensure that our decision here gets as wide coverage as possible.

So far only the edinburgh evening news, whilst many nationals will probably see this as one customer with a grudge, we need to ensure we are consistent across media, customer relations and branches in Leicester.


David


-----Original Message-----
From: david outhwaite <davidouth@yahoo.com>
To: Outhwaite, David <David.Outhwaite@rbs.co.uk>
Sent: Mon Jan 03 21:00:32 2005
Subject:

*** WARNING : This message originates from the Internet ***


The decision to ask the customer to find alternative bankers was based entirely on business reasons. We strongly refute the allegations being made against the bank. RBS has a first rate track record in providing banking services to all parts of the community.'


-----Original Message-----
From: Alan Roden <aroden@scotsman.com>
To: Outhwaite, David <David.Outhwaite@rbs.co.uk>
Sent: Mon Jan 03 15:25:52 2005
Subject: Friends of Al-Aqsa

*** WARNING : This message originates from the Internet ***

As discussed.
Alan.


HIGHLY CONFIDENTIAL

Press release
Attention: News desk / Business editor
Mon 3 January 2005
For immediate use


RBS being used as "tool" for pro-Israeli lobby

Protests planned outside bank's Edinburgh HQ over closure of pro-Palestinian group accounts

Protests have been planned against the Royal Bank of Scotland after it emerged that the bank had closed down the accounts of a leading pro-Palestinian group.


The Leicester-based Friends of Al-Aqsa (FoAA) received a curt letter from RBS explaining that they "no longer wished to provide banking facilities to you" and "were unwilling to enter into any further discussion with you on this mater (sic)".


The closure also affected FoAA Chairman Ismail Patel's personal and business accounts, which had been with the RBS for 24 years.


The decision has been condemned as politically motivated in favour of the pro-Israeli lobby.

Commenting Osama Saeed, Scottish spokesperson for MAB
said:

"It appears the Royal Bank of Scotland is being used as a tool against those that express sympathy with Israel's victims. No bank or institution should be allowed to get away with such anti-Palestinian or anti-Muslim bias."


FoAA Chair Ismail Patel called upon individuals and organisations to protest at what he calls the bank's "harassment and

intimidation":

"The very fact that we have been given no indication whatsoever of the reasons for the bank's outrageous decision suggests that the Royal Bank has something to hide."


Patel cited the recent case of the Alliance and Leicester shutting the Palestine Solidarity Campaign's account in London as evidence which for "the belief that the banks are bending to the pressure of Zionist lobby groups in what is a new and sinister twist to the ongoing struggle over the situation in the Holy Land."


Calls to Scotland Yard confirmed there was no legal or security reason behind the closure, while the accounts have always been in credit.


MAB and the Scottish Palestine Solidarity Campaign
(SPSC) have
confirmed
they will be protesting at the RBS HQ in Edinburgh at 2pm this Friday over the issue, at the same time as FoAA have planned one outside the bank's Leicester branch.

HIGHLY CONFIDENTIAL

For more information please contact Osama Saeed on
07813-036238

Alan Roden
Edinburgh Evening News
News Reporter
(0131) 620 8746
(0131) 620 8696 (fax)
www.edinburghnews.com

---

ALL-NEW Yahoo! Messenger - all new features - even more fun! http://uk.messenger.yahoo.com

HIGHLY CONFIDENTIAL

NW 180815

**EXHIBIT 138 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML    Document 272-7    Filed 03/22/12    Page 68 of 328 PageID #: 9772

 **Guardian**

# JANUARY 31

Go to: | Guardian Unlimited home | ⌄ | Go |

**Guardian**Unlimited   The Guardian



**UK news**

## Palestinian aid groups' accounts closed

**Faisal al Yafai**
**Monday January 3, 2005**
**The Guardian**



Two British organisations set up to help the Palestinian people have had their bank accounts abruptly closed without explanation, the Guardian has learned. Neither is proscribed by the government, and both claim that their targeting is political.

**Search this site**

The groups, Friends of Al-Aqsa (FoAA) and the Palestine Solidarity Campaign, have been asked to find alternative banking arrangements, even though neither appears on watch lists held by the Home Office or the Bank of England. The head of FoAA has also had his personal and business accounts closed.



Ismail Patel, chair of the Leicester-based FoAA, said he returned from holiday this week to find a letter from the Royal Bank of Scotland saying a review had been conducted and the bank was no longer willing to provide him with facilities. He was given 30 days to transfer his three accounts.

"It came out of the blue. There's nothing I can think of that I've done differently," he said. "I was shocked by the letter."

Mr Patel said he had held his personal and business accounts with the bank for more than 20 years and the FoAA account for 10, without incident. He had never even been overdrawn or had any complaints from the Royal Bank of Scotland.

"I think it is a political decision - they do not think it's favourable to be associated with those of us working for the victims of Israel," said Mr Patel.

RBS said it was not obliged to discuss reasons for closing an account, and stressed due notice was offered. It declined to discuss an individual case.

Mr Patel fears his organisation may have been mistaken for one with a similar name.

The Bank of England asks all banks to freeze the accounts of people and organisations subject to financial sanctions Although neither Mr Patel nor

**Advertiser links**

**Diet - Weight Watchers**
Discover the biggest change at Weight Watchers in years....
weightwatchers.co.uk

**Great Prices on Weight Loss Products**





Nobody
likes
waiting
around.



Check out the newest products on the market. Something for coralcalciumoffer.com

The Online Slimming Club. Weight loss club providing personalised diet programs. onlineslimmingclub.co.uk

FoAA appear on the watch list, a group called the Al-Aqsa Foundation, based in the Netherlands, is named on it.

"I would have thought they would have looked at it and told us at least. It's absurd. Without the bank disclosing their reasons we don't know anything," said Mr Patel, who is now consulting lawyers.

The Palestine Solidarity Campaign also had its account withdrawn, by the Alliance & Leicester.

Zoe Mars, the treasurer for the PSC, said that at the end of 2003 the group sent £750 to a medical charity in Palestine. Five months later it got a letter from its bank saying the transaction had been interrupted by the US treasury, which wanted more information on the transfer.

The money eventually went through, but three months later, in July 2004, the bank decided to close its account.

"We wondered if that worried them and they feared they'd be accused of money laundering," said Ms Mars. "They might have thought, this is more trouble than it's worth. Anything to do with Palestine just raises fears."

A bank spokesperson said it would not discuss its reasons but added: "I can assure you ... that the Alliance & Leicester has not closed any accounts for racial or political reasons."

The PSC has written to its members asking them to transfer their standing orders, but so far only half have done so.

FoAA estimates that it will cost more than £10,000 in lost subscriptions and reprinting costs.

**In this section**

Hoaxer's emails said missing loved ones were dead

UK news in brief

Anti-bullying group 'gagging members'

Reed cutters fight back as imports from east cut into a dying craft

Girl's death 'may be drug-related'

Tesco project gets Gerrards really Cross

Man held on Amy killing freed

Women keep deal on lower car insurance

Printable version | Send it to a friend | Save story

Daily sections

Weekly sections

**Report reveals birds' lengthy lives**

**Bank's 'technical glitches' dampen shoppers' sales spree**

Guardian Unlimited © Guardian Newspapers Limited 2005

HIGHLY CONFIDENTIAL

NW 190920

**EXHIBIT 139 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | RODGER, Irvine, CBFM Enterprise Risk |
| **Sent:** | Thursday, January 06, 2005 11:06 AM |
| **To:** | COLE, Guy, CBFM Enterprise Risk; LOVE, Kevin, CBFM |
| **Subject:** | RE: RBS CBFM |

I asked Retail Compliance about this yesterday but they have no responded to me...

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:    HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


-----Original Message-----
From:   COLE, Guy, CBFM Enterprise Risk
Sent:   06 January 2005 15:31
To:      COLE, Guy, CBFM Enterprise Risk; RODGER, Irvine, CBFM Enterprise Risk; LOVE, Kevin, CBFM
Subject:        RE: RBS CBFM

In addition to the below, I was speaking to Rob Davies today and mentioned this exit, he told me that the accounts are held in Retail and Retail took the decision to exit independently from GER.

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR
Tel.     (020) 7085 5433
Internal 76572 365433
Fax.            (020) 7085 4641
<mailto:Guy.Cole@rbos.com>
CBFM MLPU Website: http://cbfmweb.fm.rbsgrp.net/cbfmmlpu/ (Answers to many frequently asked questions can be found on this website)

-----Original Message-----
From:   COLE, Guy, CBFM Enterprise Risk
Sent:   06 January 2005 10:34
To:      RODGER, Irvine, CBFM Enterprise Risk; LOVE, Kevin, CBFM
Subject:        RE: RBS CBFM

Kevin/Irvine

I have checked Goalkeeper and record 779132 relates to this relationship.  The record case notes summarise as follows, Rob Davies in GER raised a query concerning this relationship and advised that the customer had held in 2002 a joint conference with The Al Aqsa Foundation (a Bank of England listed terrorist organisation), Rob advised that it was not worthy to exit, but should be reported to NCIS for intelligence purposes.  No other information in relation to exiting is recorded and the record status is closed.

Regards

Guy

Guy Cole
CBFM Money Laundering Prevent Unit
The Royal Bank of Scotland
135 Bishopsgate, London, EC2M 3UR

HIGHLY CONFIDENTIAL

Tel.      (020) 7085 5433
Internal 76572 365433
Fax.             (020) 7085 4641
<mailto:Guy.Cole@rbos.com>
CBFM MLPU Website: http://cbfmweb.fm.rbsgrp.net/cbfmmlpu/ (Answers to many frequently asked questions can be found on this website)

-----Original Message-----
From:   RODGER, Irvine, CBFM Enterprise Risk
Sent:   05 January 2005 09:54
To:     LOVE, Kevin, CBFM
Cc:     COLE, Guy, CBFM Enterprise Risk
Subject:        RE: RBS CBFM

Kevin

This must be a Retail account.  GER maybe tried to bully them to exit, even though there are no EU/OFAC sanctions.

It does show that the Group is dysfunctional if its Palestinian linkage was the reason for exit and CBFM rightly keeps Interpal going when it could be argued, there are greater grounds.

Cheers

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel: (020) 7085 1082
Int: 361082
Fax: (020) 7085 4641
e:    HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


-----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:   05 January 2005 09:41
To:     RODGER, Irvine, CBFM Enterprise Risk
Subject:        FW: RBS CBFM
Importance:     High

Irvine,
Please see the article "Bank Row With Palestinian Group".  Would welcome your thoughts given all the discussion around Interpal.  Should we highlight this to Stephen?
Cheers
Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
HYPERLINK "mailto:kevin.love@rbos.com"kevin.love@rbos.com
Work: +44 20 7085 4026 Mobile: +44 7769 931630
Pager: +44 7693 308651 Blackberry: +44 7793 858329

-----Original Message-----
From: Parker, Murray
Sent: 05 January 2005 09:22
To: # CBFM Press Cuttings
Subject: FW: RBS CBFM


-----Original Message-----
From:   Precise Media Monitoring HYPERLINK "mailto:[SMTP:info@precise-media.co.uk]"[SMTP:info@precise-media.co.uk]

HIGHLY CONFIDENTIAL                                                                    NW 069056

Sent:    05 January 2005 07:37
Subject:        RBS CBFM press cvoerage 050105

*** WARNING : This message originates from the Internet ***

RBS CBFM
05/01/05

Daily Summary <http://www.precise-media.co.uk/rbscbfm/pdfs/DailySummary_512005.Pdf>

Johnson buys Dewhirst corporate wear business for GBP22.5m
Financial Times, 05/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50595.pdf>

Johnson buys Dewhirst business
The Independent, 05/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50596.pdf>

Lenders back ExxonMobil/Qatar project in Wales to tune of GBP420m
Lloyd's List, 05/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50597.pdf>

Menzies bought by Japanese
The Birmingham Post, 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50598.pdf>

Japanese group buys hotel chain
Yorkshire Post, 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50599.pdf>

RBS EXPLOITS OPPORTUNITIES LEFT BY LETTERBOX BAN
Funds Europe, 01/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50600.pdf>

Project finance
International Trade Finance, 01/12/2004
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50601.pdf>

GBP20bn buyout boom is forecast
Nottingham Evening Post, 05/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50602.pdf>

Enjoy it... while it lasts
Corporate Finance, 01/12/2004
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50603.pdf>

The gilt edged solution
Structured Finance International, 01/11/2004
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50604.pdf>

Housing is 'biggest threat'
Metro, 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50605.pdf>

House price fall 'is biggest threat to economy'
The Birmingham Post, 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50606.pdf>

House price fall warning
Daily Record, 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50607.pdf>

Banks reassuring investors over IAS

HIGHLY CONFIDENTIAL

Financial Times, 05/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50608.pdf>

Bank row with Palestine group
The Herald (Glasgow), 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50609.pdf>

Fattest pay packets for those at helm of private companies
The Herald (Glasgow), 04/01/2005
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50610.pdf>

US probes Scots bankers' links to Enron scandal
Belfast Telegraph, 31/12/2004
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50611.pdf>

Workers lose their holidays
Burton Mail, 28/12/2004
image <http://www.precise-media.co.uk/rbscbfm/pdfs/50612.pdf>

Appointment of chief economist
Peterborough Evening Telegraph, 28/12/2004

image <http://www.precise-media.co.uk/rbscbfm/pdfs/50613.pdf>

HIGHLY CONFIDENTIAL

**EXHIBIT 140 to Declaration of Joel Israel**

| From: | FOSTER, Stephen James, Group Risk Mgmt |
|---|---|
| Sent: | Wednesday, January 5, 2005 2:48 AM |
| To: | Gannon, Ian <Ian.A.Gannon@rbs.co.uk>; DAVIES, Rob, Group Risk Mgmt <Rob.DAVIES@rbos.com> |
| Cc: | NORRIE, Ben, Group Risk Mgmt <Ben.NORRIE@rbos.com>; RILEY, Claire, (GS&F AML) <Claire.RILEY@rbos.com>; HOLT, Amanda, Group Risk Mgmt (nee Turner) <Amanda.HOLT@rbos.com>; Norman, John <John.Norman@rbs.co.uk>; Richardson, Lesley <Lesley.Richardson@rbs.co.uk> |
| Subject: | RE: Friends of Al-Aqsa |

Ian, Lesley, can you please make sure we are in the loop on discussions and decisions on matters such as this, particularly when the Group is dealing with alleged terrorist activities, as we may have information relevant to the discussions and may decide we need to be telling the Bank of England. We can't do that if we don't know.

Thank you.

-----Original Message-----
**From:** Gannon, Ian
**Sent:** 04 January 2005 16:08
**To:** DAVIES, Rob, Group Risk Mgmt
**Cc:** NORRIE, Ben, Group Risk Mgmt; FOSTER, Stephen James, Group Risk Mgmt; RILEY, Claire, Group Risk Mgmt; HOLT, Amanda, Group Risk Mgmt (nee Turner); Norman, John; Richardson, Lesley

**Subject:** RE: Friends of Al-Aqsa

Thanks Rob.

Press Office are already aware and Feilim Mackle is co-ordinating activity for Sir Fred.

Regards

Ian

*Ian Gannon*

Retail Compliance
" Lochside House, South Gyle , Edinburgh
DEPOT CODE 045
) Tel : 0131 523 4143 (ext 224143)
) Mob: 07768 615931
8 E Mail: ian.a.gannon@rbs.co.uk
Retail Compliance intranet site: http://www.retail.rbs.co.uk/Compliance/default.asp

-----Original Message-----
**From:** DAVIES, Rob, Group Risk Mgmt
**Sent:** Tuesday, January 04, 2005 4:01 PM
**To:** Gannon, Ian
**Cc:** NORRIE, Ben, Group Risk Mgmt; FOSTER, Stephen James, Group Risk Mgmt; RILEY, Claire, Group Risk Mgmt; HOLT, Amanda, Group Risk Mgmt (nee Turner)

**Subject:** RE: Friends of Al-Aqsa

Thanks Ian,

I think you may need to notify the Press Office on this if you haven't already done so. The Al-Aqsa website has changed to include a link to a Guardian news article:

<http://money.guardian.co.uk/news_/story/0,1456,1382497,00.html>

Regards
Rob

-----Original Message-----
**From:** Gannon, Ian
**Sent:** 04 January 2005 13:01
**To:** DAVIES, Rob, Group Risk Mgmt
**Cc:** NORRIE, Ben, Group Risk Mgmt
**Subject:** RE: Friends of Al-Aqsa

Rob,

This was a Retail Compliance decision based on reputational risk to the business given the background to this case. We had liaised with GFC on this who shared our view.

If you require further detail, please give me a call

Regards

Ian

*Ian Gannon*

Retail Compliance
* Lochside House, South Gyle , Edinburgh
DEPOT CODE 045
) Tel : 0131 523 4143 (ext 224143)
) Mob: 07768 615931
8 E Mail: ian.a.gannon@rbs.co.uk
Retail Compliance intranet site: <http://www.retail.rbs.co.uk/Compliance/default.asp>

HIGHLY CONFIDENTIAL

NW 180808

-----Original Message-----
**From:** DAVIES, Rob, Group Risk Mgmt
**Sent:** Tuesday, January 04, 2005 12:00 PM
**To:** Gannon, Ian
**Cc:** NORRIE, Ben, Group Risk Mgmt
**Subject:** FW: Friends of Al-Aqsa

Ian,

I thought it easier to send you some screen prints in a word document rather than fax. Please let me know if you still require the faxed copies.

You may be aware that there are now RBS and Natwest logos on the website's homepage stating that their accounts have been exited. We were unaware that this decision had been made, was there a formal decision made by Retail Compliance? There is also a 'complaints' email address of an RBS employee.

Thanks,
Rob

-----Original Message-----
**From:** DAVIES, Rob, Group Risk Mgmt
**Sent:** 17 November 2004 15:02
**To:** Aitken, Phil
**Cc:** NORRIE, Ben, Group Risk Mgmt; RILEY, Claire, Group Risk Mgmt; FOSTER, Stephen James, Group Risk Mgmt; RIBBON, John, Group Risk Mgmt; Brand, Derek
**Subject:** Friends of Al-Aqsa

Phil,

I have been reviewing the following retail accounts and felt it was appropriate to make you aware of the relationship:

**Friends of Al-Aqsa** (Mr Ismail Patel)
BSB: 16-23-20
Acct: 10036370

Linked accounts:

### *Redacted - Non-Responsive*

From the internet it can be seen that Friends of Al-Aqsa are a fairly prominent Pro-Palestine voice in the UK.  My initial concern was the similarity in names to a BoE and OFAC listed organisation called The Al-Aqsa Foundation. I subsequently found a potential link between the 2 organisations, where they jointly hosted a conference back in 2002.

<<http://www.aqsa.org.uk/JournalsDetail.aspx?id=57>>

<<http://www.hvk.org/articles/0603/64.html>>

I have copies of bank statements for the above accounts going back approx. 12 months. The Friends of Al-Aqsa accounts have small value deposits from various parties and then fairly regular cheques leaving the account, similar to the way a charity would operate. (I have checked the charity commission website and Friends of Al-Aqsa does not appear to be a registered charity)

The *Redacted - Non-Responsive* account has several large value, round number figures (largest £100,000) withdrawn from the account, which potentially could be suspicious in themselves.

The personal account for *Redacted - Non-Responsive* does not appear to have any suspicious activity

It should also be noted that Friends of Al-Aqsa are encouraging their supporters to boycott Alliance & Lester for closing the accounts of another similar Pro-Palestine organisation, so I assume they would follow the same course of action against RBS <http://www.aqsa.org.uk/page_detail.aspx?id=26>

Whilst I dont feel there is enough for us to exit the relationship, **we do feel that as a minimum we should consider adding this customer to the PEP monitoring program.**

Look forward to hearing your thoughts.

Regards, Rob Davies

*******************************************************************************************************************************

The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.

Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the

transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
<http://www.rbs.co.uk/CBFM>
<http://www.rbsmarkets.com>

*********************************************************************************
----------------------------------------------------------------------------------------------------
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the addressee only. If the message is received by anyone other than the addressee, please return the message to the sender by replying to it and then delete the message from your computer. Internet e-mails are not necessarily secure. The Royal Bank of Scotland plc does not accept responsibility for changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the transmission of viruses, it is the responsibility of the recipient to ensure that the onward transmission, opening or use of this message and any attachments will not adversely affect its systems or data.  No responsibility is accepted by The Royal Bank of Scotland plc in this regard and the recipient should carry out such virus and other checks as it considers appropriate.

Visit our websites at:
<http://www.rbs.co.uk/CBFM>
<http://www.rbsmarkets.com>

*********************************************************************************

<< File: Friends of Al-Asa screen prints.doc >>

HIGHLY CONFIDENTIAL

**EXHIBIT 141 to Declaration of Joel Israel**

**Unknown**

| | |
|---|---|
| **From:** | RODGER, Irvine, CBFM Enterprise Risk |
| **Sent:** | Friday, January 07, 2005 6:52 AM |
| **To:** | COLE, Guy, MLPU; ZZLOVE, Kevin. Corporate Markets |
| **Subject:** | FW: RBS CBFM |

Guy/Kevin

Retail has confirmed its exit of the Palestinian charity.

Regards

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:     HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


 -----Original Message-----
From:   Feachen, David
Sent:    07 January 2005 11:40
To:       RODGER, Irvine, CBFM Enterprise Risk
Subject:      RE: RBS CBFM

Irvine,
as I thought, this hit the fan on Tuesday of this week, and can confirm Retail have taken steps to exit.

I'll hold you to lunch, as long as it is not in one of the canteens.


David Feachen
Retail Compliance
Lochside House

Depot Code 045


 +   email : david.feachen@rbs.co.uk
 ( 221549/ 0131 525 1549
http://www.retail.rbs.co.uk/Compliance/default.asp

-----Original Message-----
From:   RODGER, Irvine, CBFM Enterprise Risk
Sent:    Friday, January 07, 2005 11:15 AM
To:       Feachen, David
Subject:      RE: RBS CBFM

David

The link is a pain.  You need to have the browser open and then click on the word "precise".  My colleague, Guy Cole has made some other enquiries - his views are attached.
 << Message: RE: RBS CBFM  >>
Our relationship is mainly with retail so it may be good if we could meet for lunch one of these times that you are next in London.

HIGHLY CONFIDENTIAL

Thanks

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:   irvine.rodger@rbos.com <mailto:irvine.rodger@rbos.com>


 -----Original Message-----
From:   Feachen, David
Sent:   07 January 2005 10:54
To:      RODGER, Irvine, CBFM Enterprise Risk
Subject:        RE: RBS CBFM

apologies, Irvine

I have been out of the office for the last couple of days.
I cannot access any of the attached URLs, can you confirm to me where we are with this account, what is the account number and sort code and I'll advise.
It may be that this has already surfaced and been dealt with, as their was some noise regarding a Palestinian organisation that was alleged to be funding suicide bombers at the beginning of the week.

David Feachen
Retail Compliance
Lochside House

Depot Code 045



 +   email : david.feachen@rbs.co.uk
 ( 221549/ 0131 525 1549
<http://www.retail.rbs.co.uk/Compliance/default.asp>

-----Original Message-----
From:   RODGER, Irvine, CBFM Enterprise Risk
Sent:   Wednesday, January 05, 2005 10:04 AM
To:      Feachen, David
Subject:        FW: RBS CBFM
Importance:     High

David

In Phil's absence

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:   irvine.rodger@rbos.com <<mailto:irvine.rodger@rbos.com>>


 -----Original Message-----
From:   RODGER, Irvine, CBFM Enterprise Risk
Sent:   05 January 2005 10:01
To:      Aitken, Phil

HIGHLY CONFIDENTIAL

Subject:       FW: RBS CBFM
Importance:    High

Phil

Not sure if you are the right person but is this account Retail's?  I ask because we have mounted an investigation into another Palestinian charity, Interpal, which is subject to OFAC sanctions (though not EU), and decided that the account is operating satisfactorily and that the OFAC sanctions were politically inspired.  Johnny Cameron has confirmed that the account may remain open provided it is closely monitored.

Cheers

PS     Happy 2005

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:   (020) 7085 1082
Int:   361082
Fax: (020) 7085 4641
e:     irvine.rodger@rbos.com <<mailto:irvine.rodger@rbos.com>>


 -----Original Message-----
From:   LOVE, Kevin, CBFM
Sent:   05 January 2005 09:41
To:     RODGER, Irvine, CBFM Enterprise Risk
Subject:       FW: RBS CBFM
Importance:    High

Irvine,
Please see the article "Bank Row With Palestinian Group".  Would welcome your thoughts given all the discussion around Interpal.  Should we highlight this to Stephen?
Cheers
Kevin R. Love
Global Head of Enterprise Risk
Corporate Banking & Financial Markets
The Royal Bank of Scotland Group Plc
kevin.love@rbos.com <<mailto:kevin.love@rbos.com>>
Work: +44 20 7085 4026 Mobile: +44 7769 931630
Pager: +44 7693 308651 Blackberry: +44 7793 858329

-----Original Message-----
From: Parker, Murray
Sent: 05 January 2005 09:22
To: # CBFM Press Cuttings
Subject: FW: RBS CBFM



-----Original Message-----
From:   Precise Media Monitoring [SMTP:info@precise-media.co.uk] <<mailto:[SMTP:info@precise-media.co.uk]>>
Sent:   05 January 2005 07:37
Subject:       RBS CBFM press cvoerage 050105

*** WARNING : This message originates from the Internet ***

RBS CBFM
05/01/05

Daily Summary <<<http://www.precise-media.co.uk/rbscbfm/pdfs/DailySummary_512005.Pdf>>>

HIGHLY CONFIDENTIAL

Johnson buys Dewhirst corporate wear business for GBP22.5m
Financial Times, 05/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50595.pdf>>>

Johnson buys Dewhirst business
The Independent, 05/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50596.pdf>>>

Lenders back ExxonMobil/Qatar project in Wales to tune of GBP420m
Lloyd's List, 05/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50597.pdf>>>

Menzies bought by Japanese
The Birmingham Post, 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50598.pdf>>>

Japanese group buys hotel chain
Yorkshire Post, 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50599.pdf>>>

RBS EXPLOITS OPPORTUNITIES LEFT BY LETTERBOX BAN
Funds Europe, 01/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50600.pdf>>>

Project finance
International Trade Finance, 01/12/2004
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50601.pdf>>>

GBP20bn buyout boom is forecast
Nottingham Evening Post, 05/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50602.pdf>>>

Enjoy it... while it lasts
Corporate Finance, 01/12/2004
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50603.pdf>>>

The gilt edged solution
Structured Finance International, 01/11/2004
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50604.pdf>>>

Housing is 'biggest threat'
Metro, 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50605.pdf>>>

House price fall 'is biggest threat to economy'
The Birmingham Post, 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50606.pdf>>>

House price fall warning
Daily Record, 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50607.pdf>>>

Banks reassuring investors over IAS
Financial Times, 05/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50608.pdf>>>

Bank row with Palestine group
The Herald (Glasgow), 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50609.pdf>>>

Fattest pay packets for those at helm of private companies
The Herald (Glasgow), 04/01/2005
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50610.pdf>>>

HIGHLY CONFIDENTIAL

US probes Scots bankers' links to Enron scandal
Belfast Telegraph, 31/12/2004
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50611.pdf>>>

Workers lose their holidays
Burton Mail, 28/12/2004
image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50612.pdf>>>

Appointment of chief economist
Peterborough Evening Telegraph, 28/12/2004

image <<<http://www.precise-media.co.uk/rbscbfm/pdfs/50613.pdf>>>


*********************************************************************************************************************************************
*************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh
EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the
addressee only. If the message is received by anyone other
than the addressee, please return the message to the sender
by replying to it and then delete the message from your
computer. Internet e-mails are not necessarily secure. The
Royal Bank of Scotland plc does not accept responsibility for
changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the
transmission of viruses, it is the responsibility of the recipient to
ensure that the onward transmission, opening or use of this
message and any attachments will not adversely affect its
systems or data.  No responsibility is accepted by The Royal
Bank of Scotland plc in this regard and the recipient should carry
out such virus and other checks as it considers appropriate.

Visit our websites at:
<http://www.rbs.co.uk/CBFM>
<http://www.rbsmarkets.com>

********************************************************************
*********************************************************************************************************************************************
*************
The Royal Bank of Scotland plc. Registered in Scotland No 90312. Registered Office: 36 St Andrew Square, Edinburgh
EH2 2YB.
Authorised and regulated by the Financial Services Authority

This e-mail message is confidential and for use by the
addressee only. If the message is received by anyone other
than the addressee, please return the message to the sender
by replying to it and then delete the message from your
computer. Internet e-mails are not necessarily secure. The
Royal Bank of Scotland plc does not accept responsibility for
changes made to this message after it was sent.

Whilst all reasonable care has been taken to avoid the
transmission of viruses, it is the responsibility of the recipient to
ensure that the onward transmission, opening or use of this
message and any attachments will not adversely affect its
systems or data.  No responsibility is accepted by The Royal
Bank of Scotland plc in this regard and the recipient should carry
out such virus and other checks as it considers appropriate.

HIGHLY CONFIDENTIAL

Visit our websites at:
<http://www.rbs.co.uk/CBFM>
<http://www.rbsmarkets.com>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL

NW 066769

**EXHIBIT 142 to Declaration of Joel Israel**

| **From:** | FOSTER, Stephen James, Group Risk Mgmt |
| **Sent:** | Thursday, January 6, 2005 8:46 AM |
| **To:** | JOLLY, Mark, Group Regulatory Risk <Mark.JOLLY@rbs.com>; RIBBON, John, (GS&F AML) <John.RIBBON@rbs.com>; HOLT, Amanda, Group Risk Mgmt (nee Turner) <Amanda.HOLT@rbos.com>; NORRIE, Ben, Group Risk Mgmt <Ben.NORRIE@rbos.com>; RILEY, Claire, (GS&F AML) <Claire.RILEY@rbs.com> |
| **Cc:** | Mistry, Vijay <Vijay.Mistry@rbs.co.uk> |
| **Subject:** | FW: Threat Assessment of security risks to the group following account closure of Ismail Patel |
| **Attach:** | Initial Threat Assessment_v0.1.doc |

FYI - on the Al Aqsa issue.

Please note that this must not be circulated wider.

-----Original Message-----

**From:**   Mistry, Vijay

**Sent:**   05 January 2005 13:20

**To:**   Hemsley, Richard (Director, Group Security and Fraud); Mcateer, Watson (GSM); Bischoff, Martin; McAdam, Carolyn

**Cc:**   Couzens, Michael; Orr, James (Group Security & Fraud); Vance, Graham; Wilson, Andrew (Group Communications); FOSTER, Stephen James, Group Risk Mgmt

**Subject:**   Threat Assessment of security risks to the group following account closure of Ismail Patel

Dear all,

please find attached a threat assessment of the above. This has taken into account the Group's actions to reinstate the accounts.

<<...>>

*Vijay Mistry*

Deputy Head of Strategic Intelligence Unit

Group Security and Fraud

**Royal Bank of Scotland Group**

Tel: +44 (0) 131 5237282

Fax: 0131 5238798

Mob: 07990795649

E-mail: vijay.mistry@rbs.co.uk

Email (internal): ~ SIU

HIGHLY CONFIDENTIAL

**CONFIDENTIAL**
**NOT FOR FURTHER DISSEMINATION**

# Threat Assessment

❊❊ **RBS**
*The Royal Bank of Scotland Group*

**Strategic Intelligence Unit**

| | | |
|---|---|---|
| **To:** | **Richard Hemsley** | 2nd Floor |
| | **Watson McAteer** | Drummond House |
| | **Martin Bischoff** | 1 Redheughs Avenue |
| | **Carolyn McAdam** | Edinburgh  EH12 9JN |

| | | |
|---|---|---|
| | | **Phone:**   0131 550 5325 |
| **From:** | Justina Hayes | |
| | | **SIU REF**   TO1/05 |
| **Cc:** | Michael Couzens | |
| | Jim Orr | |
| | Graham Vance | **Date:**   5th January 2004 |
| | Stephen Foster | |
| | Andrew Wilson | |

## Protest by Palestine and Muslim campaigners at Head Office, St Andrews Sq and Leicester Branch

Reference: Group Media Relations 29th December 2004

**CAVEAT:  Please copy in the originator on any further dissemination**

### INTRODUCTION

Group Media Relations were made aware of an issue following the decision to exit Mr Ismail Patel's personal and business account along with the Friends of Al Aqsa (FoAA) account on the 15th December 2004.   Mr Patel believes that the RBS actions are 'completely unjustified' and had been a 'political' decision.  As a result, demonstrations by the Scottish Palestine Solidarity Campaign and the Muslim Association of Britain were planned outside the Bank's headquarters (St Andrews Square) to coincide with protests by FoAA at the Leicester Belgrave Gate Branch on Friday 7th January.   This briefing assesses the risk to the Group should such protests go ahead.

### CONCLUSION

In light of the Bank's decision to reverse the withdrawal of banking facilities from Mr Ismail Patel and FoAA the proposed threat of protest action at both St Andrews Square and RBS Leicester Belgrave Gate Branch is significantly reduced.  However due to the short timescales for the bank to communicate its decision it is possible that protestors may still attend.   Consequently, business at these branches could be slightly disrupted on Friday 7th January.

### THE MODUS OPERANDI

There is limited intelligence on the size and type of the original protest planned.   The FoAA has urged supporters who hold accounts with the bank to consider transferring to another bank.   In March 2002 there was a similar protest planned against NW as a result of the withdrawal of banking facilities from the Islamic Party of Britain.   The MO was similar in that they again called upon supporters to consider moving their banking facilities.  This protest was cancelled as the Bank reversed its decision. The FoAA's membership is made up of mainly businessmen who would not resort to violence

1

Version 0.1 5th January 2005.

**CONFIDENTIAL**

**CONFIDENTIAL**
**NOT FOR FURTHER DISSEMINATION**

It should also be noted that the Alliance & Leicester exited the Palestine Solidarity Campaign in July 2004. The extent of the protest was the presentation of a letter to their main office in Leicester.

**THE THREAT TO RBSG**

The threat of protest has been assessed as follows:-

| Branch/Area | RISK | Reasons |
| --- | --- | --- |
| RBS Leicester Belgrave Gate | LOW | • Media coverage states the branch.<br>• This is the branch Mr Patel's accounts are held at. |
| 36 & 42 St Andrews Square | LOW | • Media coverage states the headquarters of RBS. |

**RECOMMENDATIONS**

It is recommended that:

- To avert protest action, communications with Mr Patel and FoAA should be undertaken immediately to advise them of the Banks decision. Group Communications should consider whether or not a press release is also required.

- Increased security should be considered for both St Andrew Square and Leicester Belgrave Gate, due to the short timescales involved.

- SIU to continue with open source monitoring and assess additional intelligence requirement which may be required.

2

Version 0.1 5th January 2005.

**CONFIDENTIAL**

**EXHIBIT 143 to Declaration of Joel Israel**

Unknown

---

**From:**   WILLIAMSON, Ed, CBFM Enterprise Risk
**Sent:**   Friday, June 10, 2005 9:33 AM
**To:**   RODGER, Irvine, MLPU
**Subject:**   RE: Letter of complaint submitted to Fred Goodwin

Irv -  i can't find them ,. can you send me the attachment as mentioned by claire - this may give acct numbers or sort-codes


thanks
ed



Ed Williamson

CBFM MLPU

Tel:  (020) 70853473

Int:  363473

-----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: 10 June 2005 14:14
To: WILLIAMSON, Ed, CBFM Enterprise Risk
Subject: FW: Letter of complaint submitted to Fred Goodwin




Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel:  (020) 7085 1082
Int:  361082
Fax: (020) 7085 4641
e:    HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com

-----Original Message-----
From: RODGER, Irvine, CBFM Enterprise Risk
Sent: 10 June 2005 13:29
To: RILEY, Claire, Group Risk Mgmt; Gannon, Ian
Cc: FOSTER, Stephen James, Group Risk Mgmt; RIBBON, John, Group Risk Mgmt
Subject: RE: Letter of complaint submitted to Fred Goodwin


Claire

We will see if this is one of ours but I do not recognise the names.

7/3/2008

HIGHLY CONFIDENTIAL                                                              NW 069060

If this is an anti-Islamic accusation against the Bank, there should be an awareness that CBFM has deliberately maintained its relationship with Interpal (Charity to relieve the suffering of Palestinians) despite US and Israeli sanctions.


Ed

Please investigate through BO.and revert to me.

Thanks

Irvine Rodger
CBFM MLPU
The Royal Bank of Scotland plc
135 Bishopsgate, London, EC2M 3UR (Depot 028)
Tel: (020) 7085 1082
Int: 361082
Fax: (020) 7085 4641
e:   HYPERLINK "mailto:irvine.rodger@rbos.com"irvine.rodger@rbos.com


-----Original Message-----
From: RILEY, Claire, Group Risk Mgmt
Sent: 10 June 2005 11:41
To: Gannon, Ian; RODGER, Irvine, CBFM Enterprise Risk
Cc: FOSTER, Stephen James, Group Risk Mgmt; RIBBON, John, Group Risk Mgmt
Subject: Letter of complaint submitted to Fred Goodwin


Ian / Irvine


For your information, a letter of complaint has recently been sent to Sir Fred Goodwin regarding the closure of accounts for the following linked accounts:



The letter was sent by an MP who had been approached by a representative of these companies.


The attached note provides some background to the closure of these accounts and the history behind previous complaints that have been submitted both the FOS and the FSA.


I would be grateful if you could confirm whether these accounts are Corporate or Retail connections, and also if

HIGHLY CONFIDENTIAL

you could keep us advised of any developments.

If you have any queries please let me know.

Kindest regards

Claire

Claire Riley

Manager

Anti-Money Laundering Risk Assessments & Monitoring

Group Enterprise Risk, Group Risk Management

Level 5

280 Bishopsgate

London

EC2M 4RB

Telephone No. 0207 085 1399

7/3/2008

HIGHLY CONFIDENTIAL

NW 069062

**EXHIBIT 144 to Declaration of Joel Israel**
**(Communication with U.K. Government, 1 Page)**

**This document has been filed Under Seal**

**EXHIBIT 145 to Declaration of Joel Israel**

*TZVI WEISS, et al. VS.*
*NATIONAL WESTMINSTER BANK, PLC*

---

*GARY WALTERS*
*June 8, 2011*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 96687.txt*
*Min-U-Script® with Word Index*

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------x
 3   TZVI WEISS, et al.,
 4                      Plaintiffs,
 5        -against-
 6   NATIONAL WESTMINSTER BANK, PLC,
 7                      Defendants.
     ----------------------------------x
 8   NATAN APPLEBAUM, et al.,
 9                      Plaintiffs,
10        -against-
11   NATIONAL WESTMINSTER BANK, PLC,
12                      Defendants.
     ----------------------------------x
13
14                 One Liberty Plaza
                   New York, New York
15
                   June 8, 2011
16                 9:30 a.m.
17
18           Videotaped Deposition of
19   GARY WALTERS, before Shari Cohen, a Notary
20   Public of the State of New York.
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                 REF: 96687
```

Page 2

```
 1   A P P E A R A N C E S :
 2
 3   STONE BONNER & ROCCO LLP
 4   Attorneys for Plaintiffs
 5        260 Madison Avenue
 6        New York, New York  10016
 7   BY:  JAMES P. BONNER, ESQ.
 8        PHONE  212-239-4340
 9        FAX    212-239-4310
10        EMAIL  jbonner@lawssb.com
11
12
13   SAYLES WERBNER
14   Attorneys for Plaintiffs
15        4400 Renaissance Tower
16        1201 Elm Street
17        Dallas, Texas  75270
18   BY:  JOEL L. ISRAEL, ESQ.
19        PHONE  214-939-8700
20        FAX    214-939-8787
21        EMAIL  jisrael@swtriallaw.com
22
23
24
25
```

Page 3

```
 1     A P P E A R A N C E S (CONT'D):
 2
 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP
 4   Attorneys for Defendants
 5   One Liberty Plaza
 6   New York, New York  10006
 7     BY: LARRY FRIEDMAN, ESQ.
 8   JAMIE RIETEMA, ESQ.
 9   VALERIE SCHUSTER, ESQ.
10   PHONE  212-225-2432
11   FAX   212-225-3999
12   EMAIL  lfriedman@cgsh.com
13
14
15     ALSO PRESENT:
16   DAN MACOM, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   ------------------ I N D E X -------------------
 2   WITNESS             EXAMINATION BY        PAGE
 3   GARY WALTERS       MR. FRIEDMAN       7, 302
 4                      MR. BONNER            300
 5
 6
 7   --------------- DOCUMENT REQUESTS --------------
 8   PAGE   52   Curriculum Vitae of Jeremy Hibbert
 9
10
11   ---------- INFORMATION TO BE FURNISHED ----------
12   PAGE  165   Location of statements in
13               deposition transcript
14
15
16   ---------------- E X H I B I T S ----------------
17   EXHIBIT      DESCRIPTION          FOR I.D.
18   Exhs. 1-43   Documents                    7
19   Exhibit 44   Document, Bates labeled    250
20               NW 13698
21
22     (Exhibits 15, 19, 21, 26 and 41 not used)
23
24
25           (EXHIBITS TO BE PRODUCED)
```

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 99 of 328 PageID #: 9803

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 5

```
 1    S T I P U L A T I O N S
 2
 3   IT IS HEREBY STIPULATED AND AGREED by
 4   and between the attorneys for the respective
 5   parties herein, that the filing, and sealing
 6   of the within deposition be waived.
 7   IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form of
 9   the question, shall be reserved to the time
10   of the trial.
11   IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to
13   and signed before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19      -oOo-
20
21
22
23
24
25
```

Page 6

```
 1    P R O C E E D I N G S
 2      THE VIDEOGRAPHER: This is tape
 3   one.  We are now on the record.  The
 4   time is 9:29 a.m.  Today is Wednesday,
 5   June 8, 2011.  This is the opening of
 6   the deposition of Mr. Gary Walters in
 7   the matter of Tzvi Weiss, et al.
 8   verses National Westminster Bank, PLC
 9   and also in the matter of Natan
10   Applebaum, et al. verses National
11   Westminster Bank, PLC.
12      This deposition is being held
13   at the offices of Cleary Gottlieb
14   Steen & Hamilton which is located at 1
15   Liberty Plaza in New York, New York.
16   The court reporter today is Ms. Shari
17   Cohen with Ellen Grauer Court
18   Reporting.  I'm the legal videographer
19   Dan Macom also with Ellen Grauer Court
20   Reporting.
21      Will counsel please introduce
22   themselves.
23      MR. BONNER: Jim Bonner with
24   Stone Bonner & Rocco for the
25   plaintiffs.
```

Page 7

```
 1      MR. ISRAEL: Joel Israel with
 2   Sayles Werbner here for the
 3   plaintiffs.
 4      MR. FRIEDMAN: Lawrence
 5   Friedman, Cleary Gottlieb for Nat
 6   West. With me are my colleagues
 7   Valerie Schuster and Jamie Rietema.
 8      THE VIDEOGRAPHER: Will the
 9   court reporter please swear in the
10   witness.
11   G A R Y   W A L T E R S, called as a witness,
12   having been duly sworn by the Notary
13   Public, was examined and testified as
14   follows:
15
16   EXAMINATION BY
17      MR. FRIEDMAN:
18      (Exhibits 1-43, Documents,
19   marked for Identification.)
20   Q.  Good morning, Mr. Walters.
21   A.  Good morning.
22   Q.   Have you ever had your
23    deposition taken before?
24   A.  Never.
25   Q.  I'll be asking you a series of
```

Page 8

```
 1      WALTERS
 2   questions today.  I'm going to do my best to
 3   make my questions as clear and understandable
 4   as I can.  If at any time you wish for me to
 5   repeat or rephrase one of my questions, I
 6   will or if you don't understand one of my
 7   questions please tell me otherwise the record
 8   will reflect that you understood my question
 9   and are answering it accordingly, is that
10   okay?
11   A.  Yes, thank you.
12   Q.  Let me show you what the
13   reporter has marked as Exhibit 1.  Do you
14   recognize this to be the first report you
15   submitted in these cases?
16   A.  Yes, I do.
17   Q.  Is that your signature that
18   appears on page 23?
19   A.  It is.
20   Q.  Is there anything in this
21   report you believe is incorrect?
22   A.  In reviewing this report in
23   preparation for this there is -- I think
24   there are one or two typing mistakes, maybe
25   one or two other bits where on reflection I
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 17

1     WALTERS
2  Q.  Was your retirement completely
3  voluntary?
4  A.  Completely voluntary.
5  Q.  When did Mr. Duthie first ask
6  you to consult with FRA, was it before you
7  ended your police career or after?
8  A.  In terms of actually -- we had
9  a few as I say very brief conversations about
10  what I was planning to do when I left, but it
11  was after I left that he said look, can we
12  find some time and have a proper conversation
13  about it and in terms of -- and that time I
14  was busy doing a lot of things and I -- so
15  probably about -- we intended meeting, but
16  just didn't seem to find the time, probably
17  six months after I left the police.
18  Q.  So that's around the middle of
19  2010?
20  A.  Yeah, as I said it's around
21  then.
22  Q.  Did the possibility of your
23  work on these cases come up in that first
24  conversation?
25  A.  He was non specific about

Page 18

1     WALTERS
2  cases.
3  Q.  When did the subject of your
4  working on this case first come up, these
5  cases?
6  A.  I think it was a couple of
7  months after our first conversation.  I don't
8  think we discussed it at what I would call a
9  proper meeting.
10  Q.  After the middle of 2010?
11  A.  Yes, I believe so.
12  Q.  When did you join FRA as a
13  consultant?
14  A.  I think I agreed to join them
15  in -- would have probably been August I
16  suppose or something.
17  Q.  I'll show you in a moment that
18  your first time sheet entry for work on these
19  cases is September 24, 2010.  Does that
20  enable you to be any more specific as to when
21  you started working with FRA?
22  A.  It would have been to work on
23  this so instead of August it was probably
24  September then.
25  Q.  The first work that you did

Page 19

1     WALTERS
2  with FRA was your work on these cases?
3  A.  Yes.
4  Q.  Have you done any other work
5  with FRA since joining the company?
6  A.  I have had a number of meetings
7  with them on general matters in terms of
8  money laundering and corruption, bribery and
9  attended things on their behalf really like
10  the book launch the other day was as a
11  consultant to them I said I would go and
12  attend, but no major pieces of work.
13  Q.  Have you worked on any client
14  engagements? Have you worked on any matters
15  for clients of FRA other than these cases?
16  A.  No.
17  Q.  When you say meetings with FRA
18  on general matters, you are talking about
19  internal meetings?
20  A.  Internal meetings.
21  Q.  To speak with your colleagues
22  at FRA about those matters?
23  A.  Yes.
24  Q.  Other than a book launch, what
25  other things have you attended on behalf of

Page 20

1     WALTERS
2  FRA?
3  A.  I think that's the only thing
4  outside internal meetings where I've
5  specifically been -- specifically sort of
6  representing them.
7  Q.  Do you work full-time for FRA?
8  A.  No, I don't.
9  Q.  What percentage of -- what else
10  do you do besides working for FRA?
11  A.  I have a number of other firms
12  in investigation and security who I meet with
13  and I have a couple of them who have asked me
14  to do some work on cases.
15  Q.  What are the names of those
16  firms?
17  A.  I'm just trying to think.  I'm
18  not avoiding, I'm just trying to think here
19  whether I feel comfortable disclosing who I'm
20  working for, quite small firms.
21  Q.  They are investigation and
22  security firms in the U.K.?
23  A.  One is in the U.K. and one is
24  abroad.
25  Q.  Where abroad?

Page 21

```
 1      WALTERS
 2  A.  Hong Kong.
 3  Q.  Does any of that work involve
 4   terror finance?
 5  A.  Not that I have spoken to them
 6   about, no.
 7  Q.  What percentage of your working
 8   time since you left the police at the end of
 9   2009 has been devoted to your work with FRA
10   as opposed to work apart from FRA?
11  A.  On the consultancy -- I have
12   some other work interests that are not
13   related to this work whatsoever.
14  Q.  First why don't you tell me
15   about those?
16  A.  Another position.  I work for
17   my family company.
18  Q.  What is that?
19  A.  It's a small firm engaged in
20   farming basically.
21  Q.  During calendar year 2010 and
22   thus far in 2011 can you apportion for me on
23   a percentage basis the amount of working time
24   you've spent on FRA as opposed to the two
25   investigation and consulting firms as opposed
```

Page 22

```
 1      WALTERS
 2   to your family company?
 3  A.  The family company stuff I
 4   would have to say is I don't keep hours, it's
 5   full-time in terms of my time, but it's very
 6   flexible.  In terms of consulting and what I
 7   would call my consultancy side FRA has
 8   probably been 80 percent.
 9  Q.  Of your consultancy work?
10  A.  Yes.
11  Q.  Your consultancy work as a
12   percentage of the whole is what of your
13   working time?
14  A.  I'm never good with time.
15  Q.  An approximation will do.
16      MR. BONNER: What time frame
17   you talking about?
18      MR. FRIEDMAN: Since he's left
19   the police.
20  A.  Since I've left the police I
21   was very busy, you know, I mean I find that
22   very difficult. I'm not being awkward, but I
23   find that very difficult to answer because I
24   had six months of doing nothing on
25   consultancy whatsoever beyond a small -- I
```

Page 23

```
 1      WALTERS
 2   also would say just for clarity, forgive me,
 3   going back, I also lecture for another
 4   company that's in international training on
 5   accountability and ethics in relation to
 6   grand corruption, bribery, money laundering,
 7   financial crime.
 8  Q.  What's the name of that
 9   company?
10  A.  That's RIPA.
11  Q.  What does that stand for?
12  A.  I really can't recall.  They
13   are part of a bigger group.
14  Q.  They are in the U.K.?
15  A.  They are in the U.K.
16  Q.  How many lectures have you
17   given?
18  A.  I think since I left the police
19   two.
20  Q.  So am I right that you're not a
21   full-time employee of FRA, you're a
22   consultant to FRA?
23  A.  I'm a consultant to FRA.
24  Q.  Is it your understanding you
25   were retained by FRA specifically to provide
```

Page 24

```
 1      WALTERS
 2   consulting services on these cases?
 3  A.  No, my understanding is I'm
 4   retained by them as a general consultant on
 5   all these types of matters.
 6  Q.  What is your compensation from
 7   FRA?
 8  A.  In general consultancy terms?
 9  Q.  Yes.
10  A.  400 pounds a month.
11  Q.  Regardless of how much time you
12   spend?
13  A.  Regardless of how much time I
14   spend.
15  Q.  There's no premium on top of
16   that if you spend additional time, if you
17   spend a lot of time?
18  A.  Because it's quite new and a
19   new field for both, certainly for me, it was
20   felt that we would start there and then
21   review it on a case by case basis and on a
22   project basis if other projects came in in
23   terms of lectures, conferences so we would
24   decide it on an on-going basis.
25  Q.  Let me show you what's been
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 25

1  WALTERS
2  marked as Exhibit 3. Have you ever seen this
3  before?
4  A. I don't believe I have.
5  Q. Do you have an office at FRA?
6  A. I have use of the office, yes.
7  Q. What office do you have the use
8  of?
9  A. The FRA offices.
10  Q. Where is that?
11  A. In Ely Place.
12  Q. In London?
13  A. London.
14  Q. Do you have a desk there that's
15  assigned to you?
16  A. I don't have an assigned desk,
17  no.
18  Q. In the last six months since
19  the beginning of this year, how many days
20  have you spent at the FRA office?
21  A. In the last six months, I have
22  to say I don't know. I would go up to London
23  about a day or two a week and sometimes I
24  would go up for longer.
25  Q. Where do you live?

Page 26

1  WALTERS
2  A. I live in Kent.
3  Q. Do you know what the street
4  address is of the FRA office at Ely Place?
5  A. It is Ely Place.
6  Q. Do you know of any other street
7  address?
8  A. No, I believe it's Ely Place.
9  Q. Do you know the telephone
10  number there?
11  A. I don't.
12  Q. I'm going to show you what's
13  been marked as Exhibit 4 and Exhibit 5 which
14  counsel has told us are the invoices and time
15  sheets underlying your reports. Have you
16  ever seen these before?
17  A. No.
18  Q. The last time reported for you
19  -- by the way, do you fill out time sheets
20  for your work?
21  A. No, I don't.
22  Q. In these -- you will see in
23  these exhibits there are time sheets with
24  your name that purport to describe the work
25  you did, the dates on which you did the work,

Page 27

1  WALTERS
2  the nature of the work and the hours that you
3  spent. Do you know where that information
4  comes from?
5  A. They have a system that
6  captures this.
7  Q. Can you describe that to me?
8  A. It's a web based, excuse my
9  ignorance, but I call it web based, internet
10  based secured site that you log in and then
11  you fill out hours.
12  Q. You do that when you work?
13  A. I try to remember to do that
14  when I work.
15  Q. How do you do that, from a home
16  computer?
17  A. I have done, yeah.
18  Q. So if you look at Exhibit 4 and
19  if you look at page 5 of 12, we see entries
20  beginning for you -- actually the first one
21  is 24 September, then 27, then 30, then 1
22  September, then 27 September so it's not
23  necessarily in chronological order, do you
24  see that?
25  A. Yes.

Page 28

1  WALTERS
2  Q. Could you tell me do you
3  believe that these reflect entries that you
4  made on the system that you described?
5  A. As far as I'm aware, yes.
6  Q. So there would be you believe a
7  corresponding entry -- there would be
8  something that you submitted on the FRA
9  system that corresponds to each of these
10  entries in these time sheets?
11  A. I would have expected so, yes.
12  Q. Do you maintain copies on your
13  computer or anywhere else of what you submit
14  to FRA for these purpose?
15  A. No.
16  Q. These are items that you put
17  indirectly to a system and you don't keep any
18  record of them?
19  A. That's true, yeah.
20  Q. Exhibit 5 I believe the last
21  entry for you is February 27, 2011. Have you
22  done any work -- and that shows up on page 2
23  of 3 of Exhibit 5. Have you done any work on
24  these matters since then?
25  A. Sorry, which page?

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 65

1      WALTERS
2   permanently evolving and changing and I do
3   know because I still speak to people that
4   it's changed a great deal so I don't know
5   when this was written.
6   Q.   This is the name of the team
7   you headed -- this is the team that you
8   headed in your last years with the MPS,
9   correct?
10  A.   Yes.
11  Q.   Go back to your CV in Exhibit
12  1.   Turn to page 2, please, the discussion of
13  the money laundering investigation team.  The
14  end of the first paragraph in that section it
15  says, "Some of MLIT's investigations
16  overlapped with terrorism cases and the
17  financing of terrorism", do you see that?
18  A.   Yes.
19  Q.   The terrorism cases and the
20  financing of terrorism that your team's
21  investigation overlapped with, those other
22  cases were handled by the NTFIU, correct?
23      MR. BONNER: Objection to form.
24  A.   Perhaps I can clarify that for
25  you.

Page 66

1      WALTERS
2   Q.   Before you clarify it.  This
3   says that your team's investigations
4   overlapped with cases in the terrorism and
5   terrorist financing area, correct?
6   A.   Yes.
7   Q.   My question is if you look at
8   this in terms of a ven diagram, I gather
9   there's a shaded area of overlap.  What's the
10  other -- what group within the MPS was the
11  other circle?  Who was conducting the other
12  investigations into -- who was conducting the
13  investigations into terrorism and financing
14  with which your team overlapped?  What was
15  the name of that group?
16      MR. BONNER: Objection to form.
17  Go ahead, you can answer.
18  A.   Sometimes there wasn't anybody
19  investigating that field of crime.
20  Q.   And other times?
21  A.   If I could finish.
22  Q.   Sure.
23  A.   The background to the offenses
24  that we would be dealing with would indicate
25  that perhaps there was terror financing

Page 67

1      WALTERS
2   involved, but it didn't mean that anybody
3   else was investigating terror financing.  If
4   I could just go back to the overlaps that
5   occurred in other fields of work there was a
6   specialist team and going back to your
7   previous page about the metropolitan police,
8   the dedicated, for example, the dedicated
9   check and plastic crime unit had
10  investigators, but we often dealt with cases
11  that in some ways they could have been
12  dealing with.
13  Q.   Understood.
14  A.   There was nobody investigating
15  it so we dealt with those issues.
16  Q.   I understand.  When there was a
17  case that involved terrorism and financing
18  terrorism, the counter terrorism team would
19  have primary responsibility for that,
20  correct?
21  A.   I would meet with them and
22  discuss the cases and I would -- and then a
23  decision would be made who would investigate
24  it.
25  Q.   Did your team have

Page 68

1      WALTERS
2   responsibility for cases that involved only
3   terrorism and terrorist financing?
4   A.   Again, I pause before answering
5   because it's really not that simple because
6   occasionally we would start out
7   investigations, for instance, with a cash
8   seizure under the cash seizure provisions
9   where circumstances would lead us or
10  intelligence would lead us and we would
11  recover money and at that stage we often
12  didn't know what we were dealing with beyond
13  it was suspicious and we would take action.
14      If that money turned out to be,
15  for instance, linked to major drug dealing, I
16  would go and see the teams that were focused
17  on drug crime and discuss with them does this
18  assist them in their investigations, do they
19  want to take it over, what would they like to
20  do and how would they like us to proceed and
21  then we would be in a dialogue.
22      In the same way if there is
23  indication of terrorist financing or anything
24  that may overlap, I would meet with the
25  anti-terrorist squad offices who I knew very

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 69

WALTERS

1   WALTERS
2   well because some of them had come from
3   exactly my background and discussed with them
4   this is what we are dealing with, this is
5   what we know so far and then we would keep
6   them in the loop.
7   Q.  In these instances of overlap
8   that are described in the sentence that
9   overlap was -- the folks involved in the
10  overlap in addition to your team were people
11  from the anti-terrorist squad, correct?
12  A.  Sorry, could you say that
13  again.
14  Q.  What I'm getting at is in this
15  area of overlap, in these instances of
16  overlap that's described in this sentence,
17  the other personnel outside of your team that
18  you would work with would be the
19  anti-terrorism squad of people, correct?
20  A.  Yes.
21  Q.  Did any of these overlapping
22  investigations involve questions relating to
23  banking practices, the practices of U.K.
24  banks?  Let me be more specific.
25  A.  I'm sorry.

Page 70

1   WALTERS
2   Q.  It was a bad question.  Let me
3   be more specific.  In these overlapping
4   investigations that you were involved with,
5   did you ever have occasion to have experience
6   with questions relating to the internal
7   practices of U.K. banks?
8       MR. BONNER: Objection to form.
9   You can answer.
10  A.  In just about -- in most cases
11  that we dealt with that's my team and the
12  anti-terrorist unit there was -- I'm trying
13  to think where there wasn't a regulated
14  entity it banks, lawyers, accountants,
15  other regulated bodies, but normally banks.
16  Majority of cases money is moved through
17  banks which always brought up issues with the
18  regulation of banks.
19  Q.  Did you ever have occasion to
20  investigate a bank's conduct in relation to
21  terrorist financing?
22  A.  I'd have to say I can't recall
23  a specific case where that happened.
24  Q.  If you look further down on
25  page 2, I'm sorry, if you look at the next

Page 71

1   WALTERS
2   sentence of what we were just looking at, the
3   second paragraph on page 2, it says, "He
4   regularly interacted with the national
5   terrorist financing intelligence unit."
6   Actually it says, "As such he regularly
7   interacted with the national terrorist
8   financing intelligence unit", do you see
9   that?
10  A.  Yes.
11  Q.  Do the words as such meaning
12  that in these overlapping cases you dealt
13  with the NTFIU?
14  A.  Yes.
15  Q.  The last section on this
16  page --
17  A.  Just to clarify that answer if
18  I may.  I also dealt with them in a more
19  generic way around meeting with them in
20  relation to generic anti-money laundering and
21  regulatory issues and met with them at
22  conferences and talks where we would discuss
23  what's going on within the arena and what
24  messages effectively corporately we needed to
25  or try to put across to the people we were

Page 72

1   WALTERS
2   meeting with so we just didn't purely
3   duplicate each other.
4   Q.  Let's look at the last section
5   on page 2 carry over to page 3 which
6   describes a case involving Sri Lankan --
7   funds relating to Sri Lanka and the Tamil
8   Tigers, do you see that?
9   A.  Yes.
10  Q.  Is there any other instance
11  that you recall in which you cooperated with
12  the NTFIU on a specific investigation other
13  than the one listed here?
14  A.  I should just clarify in giving
15  my answers that I feel both legally and duty
16  bound in some circumstances to be careful
17  with how I answer because I'm subject to the
18  Official Secrets Act and subject to
19  confidential information I obtained during my
20  time in the police so to qualify in that way
21  I dealt on a number of cases.
22      This one I feel able to talk
23  about in more detail because it went to
24  court, there were court hearings and it was
25  easier to deal with.

Page 77

```
 1      WALTERS
 2 Q.   You never worked for the FSA?
 3 A.   No, again, I worked with the
 4   FSA on a number of matters, but I was never
 5   in the FSA.
 6 Q.   On money laundering matters?
 7 A.   On money laundering and
 8   regulation matters, yes.
 9 Q.   You never worked for the NCIS?
10 A.   I was never a member of NCIS,
11   but again, I regularly worked on cases
12   alongside them.
13 Q.   Involving money laundering?
14 A.   Involving money laundering,
15   yes.
16 Q.   You never worked for SOCA?
17 A.   No, they came into being from
18   NCIS very similar, but I was never a member
19   of SOCA.
20 Q.   You never worked for the
21   Charity Commission?
22 A.   Never worked for the Charity
23   Commission.
24 Q.   You worked with the Charity
25   Commission on money laundering matters?
```

Page 78

```
 1      WALTERS
 2 A.   I had one particular case with
 3   money laundering matters where I worked with
 4   the charity.
 5 Q.   The Shah case?
 6 A.   No, that was the Baluchi case.
 7 Q.   You submitted a witness
 8   statement in that case?
 9 A.   On Baluchi?
10 Q.   Yes.
11 A.   I can't recall.  I can't
12   recall.
13 Q.   You did in the Shah case?
14 A.   In the Shah case I submitted a
15   couple of witness statements.
16 Q.   You ever work for Her Majesty's
17   Treasury?
18 A.   No, I worked very close with
19   them, again, but not worked for them.
20 Q.   On money laundering matters?
21 A.   On related financial crime
22   matters, yes.
23 Q.   Did you ever work for the
24   Financial Sanctions Unit of the Bank of
25   England?
```

Page 79

```
 1      WALTERS
 2 A.   No, I didn't.
 3 Q.   Look at paragraph 78 of your
 4   first report.  Is that accurate?
 5 A.   I believe it is, yeah.
 6 Q.   Paragraph 79, is that accurate?
 7 A.   I believe it is, yes.
 8 Q.   Based on your experience, were
 9   the members of special branch with whom you
10   worked competent?
11      MR. BONNER: Objection to form.
12 A.   In my career I worked with them
13   on a number of different things at different
14   times and there's different people.  I find
15   it very difficult to answer that.  There were
16   different people with different levels of
17   skill.  Some of them I worked with had skills
18   in different areas so very difficult to
19   answer that.
20 Q.   Do you know someone named Mark
21   Ashtown?
22 A.   I can't recall whether I met
23   him or not.
24 Q.   Bob Stevens?
25 A.   Again, I can't recall if I met
```

Page 80

```
 1      WALTERS
 2   him or not.
 3 Q.   Neil Bennett?
 4 A.   I can't recall whether I met
 5   him or not.
 6 Q.   Did you ever report to --
 7   withdrawn.  When you were in the Metropolitan
 8   Police Service, was there a mechanism whereby
 9   if you thought one of your colleagues was not
10   doing his or her job competently you could
11   report that to your superior or a superior?
12 A.   There were routes to address
13   performance issues.
14 Q.   Did you ever raise any
15   performance issues relating to people you
16   worked with in special branch?
17 A.   No, I didn't.
18 Q.   The anti-terrorist squad?
19 A.   No.
20 Q.   The NTFIU?
21 A.   I probably need to qualify that
22   a little bit because there are many ways of
23   raising performance issues and I from
24   addressing it directly myself if I was
25   witness to anything, from verbal advice there
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 81

```
 1       WALTERS
 2  and then even if it wasn't somebody directly
 3  in my area of work or speaking quietly to
 4  their own line managers and seniors.
 5  Q.  Did you ever make a formal
 6  report about anyone from NTFIU or the
 7  anti-terrorist squad or special branch?
 8  A.  No, I don't believe I did.
 9  Q.  NCIS?
10       MR. BONNER: Formal report you
11  talking about?
12  A.  Formal report?
13  Q.  Yes.
14  A.  No.
15  Q.  Did you ever make an informal
16  report complaining about the competence of
17  people in any of those areas?
18  A.  I don't recall making a
19  complaint, but I would provide feedback to
20  their senior officers and/or colleagues
21  around where I perhaps felt that performance
22  might be an issue, but informally.
23  Q.  Do you recall any specific
24  instance in which you did that with respect
25  to a member of special branch?
```

Page 82

```
 1       WALTERS
 2  A.  I can't recall any specific
 3  issues, no.
 4  Q.  Anti-terrorist squad?
 5  A.  No.
 6  Q.  NTFIU?
 7  A.  No.
 8  Q.  Anyone in the counter terrorism
 9  command?
10  A.  No, I can't recall any specific
11  issues.
12  Q.  SOCA?
13  A.  I can't recall any specific
14  issues.
15  Q.  Charity Commission?
16  A.  Again, I would have to say I
17  don't recall any specific issues.
18  Q.  FSA?
19  A.  I can't recall any specific
20  issues.
21  Q.  The highest rank you achieved
22  at Scotland Yard was detective inspector,
23  correct?
24  A.  Yes, it was.  I was on
25  different occasions temporary detective chief
```

Page 83

```
 1       WALTERS
 2  inspector and acting chief inspector.
 3  Q.  When the chief inspector
 4  position was empty?
 5  A.  Either when it was -- it was
 6  either, yeah, vacant in some way or covering
 7  for people and that happened elsewhere as
 8  well.
 9  Q.  Thereafter you were restored to
10  detective inspector?
11  A.  Yes.
12  Q.  Let me show you what's been
13  marked as Exhibit 10 which is something else
14  we took from the MPS website.  If you look at
15  the second page, there is a description at
16  the bottom of the rank structure of the MPS,
17  do you see that?
18  A.  Yes, I do.
19  Q.  Is that accurate?
20  A.  Yes, it is.
21  Q.  Was it accurate during 2005 to
22  2009?
23  A.  Yes, it was.
24  Q.  Was it accurate during 2003 to
25  2009?
```

Page 84

```
 1       WALTERS
 2  A.  Yes, I think it has not changed
 3  for many years.
 4  Q.  You were in the third position
 5  from the bottom of the page, you were an
 6  inspector with the prefix detective as
 7  described in the text at the bottom of the
 8  page, correct?
 9  A.  Yes.
10  Q.  Look at page 2 of your CV again
11  in Exhibit 1.  Read to yourself the first
12  paragraph under the heading Charity
13  Commission?
14  A.  Yes.
15  Q.  Did you work with the Charity
16  Commission on any case other than the Baluchi
17  case?
18  A.  During my full service I have
19  dealt with numerous crimes relating to
20  charities.  Sometimes -- often my office, you
21  know, maybe I need to be more specific.  I
22  would have offices investigating these cases
23  and I would be in charge of the case.
24  There's an element of supervision sometimes,
25  but I had a number of dealings and I can't
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 85

WALTERS

1    WALTERS
2    recall how many. I dealt with an awful lot of
3    crime, but particularly around frauds where
4    the Charity Commission or charities were
5    engaged and when that happened we would try
6    to engage with the Charity Commission because
7    we feel that they needed to know.
8    Q.  Did you ever have any --
9    withdrawn.  Did you ever work directly with
10   the Charity Commission other than in the
11   Baluchi case?
12   A.  I didn't, no.
13   Q.  Have you ever been employed by
14   a commercial or retail bank?
15   A.  No, I haven't.
16   Q.  Do you have any professional
17   training or education in bank policies?
18   A.  Beyond the diploma?
19   Q.  Correct.
20   A.  No formal education.
21   Q.  Do you have any professional
22   training on bank policies other than the
23   diploma?
24   A.  No formal training, no.
25   Q.  Other than the diploma,

Page 86

WALTERS

1    WALTERS
2    everything you know about the internal
3    policies and procedures of British banks
4    comes from your work with the MPS, correct?
5    A.  Yes, that's correct.
6    Q.  Other than your diploma,
7    everything that you know about the regulation
8    of British banks comes from your work with
9    the MPS, correct?
10   A.  That's correct, yes.  Again,
11   just so I qualify it just a fraction, I was
12   employed by the MPS. In a lot of fields I
13   would undertake background work so I was
14   employed by the MPS so I would inform myself
15   as it were through reading and speaking to
16   people.
17   Q.  Other than your diploma,
18   everything that you know about the regulation
19   of British banks comes from your work or
20   reading you did in connection with your
21   service with the Metropolitan Police Service,
22   correct?
23   A.  Thank you, yes.
24   Q.  Based on your experience, do
25   you agree that U.K. law enforcement agencies

Page 87

WALTERS

1    WALTERS
2    have more access to intelligence sources than
3    do private banks?
4    MR. BONNER: Objection to form.
5    A.  From my experience in working
6    with banks they are all very different, but
7    from my experience banks had databases at
8    times the police did not have and the police
9    had databases that banks didn't have.
10   Q.  What about governmental
11   intelligence sources, in your experience who
12   had greater access to those, U.K. law
13   enforcement authorities or banks?
14   A.  I think I would have to ask you
15   to qualify governmental -- what are
16   governmental intelligence sources?
17   Q.  Th intelligence information
18   gained by Her Majesty's Government, in your
19   experience who had greater excess to that
20   information, U.K. law enforcement or banks?
21   A.  Again, both those expressions
22   of governmental intelligence sources and law
23   enforcement are both very sweeping and to
24   some extent I would have to say within the
25   intelligence world would the banks depending

Page 88

WALTERS

1    WALTERS
2    on what's been worked on, I don't know if
3    banks have access to data that I'm unaware or
4    intelligence I'm unaware of.
5    Q.  You are familiar with an entity
6    known as MI5?
7    A.  I am, yes.
8    Q.  You are familiar with an entity
9    known as MI6?
10   A.  Yes.
11   Q.  In your experience did you come
12   across any instance in which MI5 or MI6
13   shared information with a bank that it did
14   not share with law enforcement agencies?
15   A.  I'm trying to think whether I
16   need to qualify my or whether I can answer
17   that.  I don't think I can answer that
18   question.
19   Q.  Why not?
20   A.  Because of confidentiality
21   issues.
22   Q.  Were you ever disciplined
23   during your career at the MPS?
24   A.  No.
25   Q.  Were you ever demoted from a

Page 93

1    WALTERS
2  Q.  Have you ever been asked to
3  serve as an expert witness in any court
4  proceeding in any country before these cases?
5  A.  Not that I can recall, no.
6  Q.  Other than the Shah case, have
7  you ever testified as a fact witness either
8  through written testimony or oral testimony?
9  A.  I have given evidence in an
10  awful lot of cases.
11  Q.  Criminal cases?
12  A.  Criminal cases in the U.K.
13  Q.  Cases that you were involved in
14  investigating as a member of the MPS?
15  A.  That's correct.
16  Q.  Have you ever testified in a
17  case other than one of those cases?
18  A.  All the testimony I've given
19  has been on cases I've been involved in
20  some way.
21  Q.  Mr. Walters, you're not
22  offering the opinion that Nat West knew that
23  Interpal was financing terrorism, are you?
24     MR. BONNER: Objection to form.
25  A.  That's not in my opinions.

Page 94

1    WALTERS
2  Q.  You're not offering the opinion
3  that Nat West knew that Interpal was
4  providing funds to Hamas, correct?
5  A.  That's not in my opinions.
6  Q.  You are not offering the
7  opinion that Nat West believed that Interpal
8  was financing terrorism, are you?
9  A.  That's not in my opinions.
10  Q.  You are not offering the
11  opinion that Nat West believed Interpal was
12  funding Hamas, correct?
13  A.  Yeah, that's correct.
14  q.  You are not offering any
15  opinions to the requirements of U.K. law, are
16  you?
17     MR. BONNER: Objection to form.
18  A.  I'm just thinking I'm not a
19  lawyer, but I have worked with the law for 30
20  years as a law enforcement officer.  I have
21  an awareness of the law, but in forming my
22  opinions I cannot divorce it completely from
23  what knowledge I do have of the law, but when
24  forming those opinions on the circumstances
25  that I looked at and the information that I

Page 95

1    WALTERS
2  have looked at I'm bringing that awareness as
3  well as what I experienced on a regular basis
4  when dealing with financial crime in
5  particular.
6  Q.  But you're not offering a legal
7  opinion as to what U.K. law requires, are
8  you?
9     MR. BONNER: Objection to form.
10  A.  I'm not offering a legal
11  opinion.
12  Q.  Look at your rebuttal report
13  paragraph 192.  Why don't you read that
14  paragraph to yourself.
15  A.  Can I just go back before we
16  move on to clarify something in an issue that
17  came up earlier.  When you presented to me
18  the list of ranks within the Metropolitan
19  Police Service, as I described earlier it's a
20  hierarchal structure, it's a rank structure
21  that's been around for a long time, but the
22  roles performed by people at the different
23  ranks are extremely different and varied with
24  areas of responsibility that vary
25  accordingly.

Page 96

1    WALTERS
2    Policing is increasingly a
3  complex area so the answer I gave or as you
4  pointed out if you'd like it's the third rank
5  up or the 10th or 20th rank down which ever
6  way you care to put it, but the roles and
7  responsibilities can vary greatly between
8  people of the same rank and in the roles I
9  was playing as a detective inspector, I had
10  big areas of responsibility and dealing with
11  matters that arguably would normally be dealt
12  with by chief officers because I regularly
13  met chief officers from other countries and
14  dealt with them at that sort of level so I
15  just wanted to clarify that point.
16    It's not as simple as someone
17  is down here or up there.  It's a more
18  complex equation.
19  Q.  The areas of responsibility
20  that you had are as stated in your CV plus
21  the four years that you supplemented this
22  morning, correct?
23  A.  On occasions I was also asked
24  to deal with sort of to represent the
25  metropolitan police at times on broader

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 97

```
1      WALTERS
2   topics.
3   Q.  Understood.  Look at paragraph
4   192 of your rebuttal report.
5   A.  Thank you.
6   Q.  Read that to yourself, please.
7   You see you refer to the global banking
8   standards published by Basel, Wolfsberg and
9   FATF, do you see those?
10  A.  I do.
11  Q.  When did you first read those?
12  A.  When I first -- when did I
13  first --
14  Q.  Read those?
15  A.  Read those terms?
16  Q.  Read those standards if ever?
17  A.  I can't recall.
18  Q.  Have you ever read what you
19  describe as the global banking standards
20  published by Basel, Wolfsberg and FATF?
21  A.  I have read a great deal of
22  material on -- I have read material from all
23  three and in relation to both, not so much
24  with Basel, but in relation to the Wolfsberg
25  group I was asked to attend a meeting of one
```

Page 98

```
1      WALTERS
2   of their working groups to discuss both
3   anti-money laundering policies, procedures
4   and that definitely, you know, also included
5   counter terror financing.
6       In relation to FATF, I had a
7   lot of dealings with FATF and their matters.
8   I can't recall with any of them when I first
9   became aware of them.
10  Q.  That wasn't my question.  My
11  question was when did you first read the
12  standards that you are referring to here?
13  A.  I can't recall.
14  Q.  Did you ever read them?
15  A.  I have read them.  Whether I
16  read them all or not I don't know.
17  Q.  What are the Basel standards
18  that you are referring to specifically?
19  A.  I can't tell you.
20  Q.  What are the Wolfsberg
21  standards you are referring to specifically?
22  A.  I can't tell you.
23  Q.  What are the FATF standards you
24  are referring to specifically?
25  A.  I cannot give them off rope.
```

Page 99

```
1      WALTERS
2   Q.  Have you read any of those
3   during the course of your engagement in these
4   cases?
5   A.  Yes, I have.
6   Q.  Where did you do that?
7   A.  I did that during my general
8   background reading.
9   Q.  Who gave them to you?
10  A.  I took it off the internet.
11  Q.  Off the Basel website?
12  A.  I can't recall.  I really can't
13  recall.  It's not just -- I can't recall.
14  Q.  Did you retain copies of any of
15  these standards in your files?
16  A.  No.
17  Q.  You read them on the internet,
18  you didn't print them out?
19  A.  No.
20  Q.  But as you sit here, you can't
21  identify specifically any of the Basel,
22  Wolfsberg or FATF standards you are referring
23  to?
24  A.  In terms of FATF I have a
25  better knowledge because it's closer to the
```

Page 100

```
1      WALTERS
2   work that I was doing than Basel or
3   Wolfsberg.
4   Q.  What specifically by title what
5   are the FATF standards that you are referring
6   to here, can you tell me?
7   A.  The 40 plus 9 recommendations.
8   Q.  Anything else?
9   A.  They have accompanying guidance
10  notes.
11  Q.  You read the 40 plus 9 in
12  connection with your work on these matters?
13  A.  I read all of those on a number
14  of occasions before.
15  Q.  Did you read them in connection
16  with your work on these matters?
17  A.  I refreshed my memory about
18  them.
19  Q.  Did you read them?
20  A.  Yes.
21  Q.  The guidance notes, did you
22  read those in connection with your work on
23  these matters?
24  A.  Some.  I can't recall all.
25  Q.  You read them on the internet,
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 105

    WALTERS
1
2  Q.  When you read Ms. McLeod's
3  report, do you remember disagreeing with
4  anything that was in there?
5  A.  I can't recall having any major
6  issues that upset me.
7  Q.  I'm sorry if this strikes you
8  as a silly question, but the portions of Ms.
9  McLeod's report that you used for your
10  report, I take it you agreed with those
11  portions otherwise you would not have used
12  them, correct?
13  A.  Yes.
14  Q.  When you read Ms. McLeod's
15  testimony, do you recall disagreeing with
16  anything she testified to?
17  A.  I can't recall.
18  Q.  Do you recall that you did
19  disagree with anything she said?
20  A.  I can't recall.
21  Q.  You can't recall one way or the
22  other or you can't recall that you did
23  disagree?
24  A.  Sorry, you have to say that
25  again.

Page 106

1      WALTERS
2  Q.  This comes up in what we do for
3  a living all the time.  I suspect it came up
4  in your police work all the time. When you
5  say you don't recall, are you saying you
6  don't recall you had a disagreement with
7  anything she said or are you saying you don't
8  recall whether or not you had a disagreement?
9  A.  I don't recall having a
10  disagreement.
11  Q.  Look at paragraph 145 of your
12  rebuttal report.  In that paragraph you refer
13  to "the global banking standards".  Are you
14  referring to the same standards, the same
15  global banking standards that you refer to in
16  paragraph 192?
17  A.  Just take a moment to have a
18  look at this. I've summed up all of the
19  different banking standards that have been
20  introduced with a degree of consistency
21  around the world with the intention of
22  reducing money laundering and terrorist
23  financing opportunities so it's a generic
24  expression.  It takes in -- certainly for me
25  it also takes in the standards that

Page 107

1      WALTERS
2  individual institutions would set themselves
3  and countries set so it's all of the
4  standards that become in effect and as I
5  experience the common practice and the common
6  language that's used.  It's not the detail of
7  the legislation, it's the common practice and
8  common language of institutions and bodies
9  that I dealt with.
10  Q.  This is knowledge that you
11  gained during the course of your career with
12  the Metropolitan Police Service?
13  A.  Yes.
14  Q.  What financial institutions,
15  what individual institutions are you
16  referring to in your penultimate answer?  You
17  said you were referring to the standards that
18  individual institutions would set for
19  themselves.  What institutions are you
20  referring to?
21  A.  Banks.
22  Q.  What banks?
23  A.  Regulated businesses and
24  entities.
25  Q.  What banks are you referring

Page 108

1      WALTERS
2  to?
3  A.  Well, all of the banks that I
4  dealt with.  It was common language and
5  practice that they would be talking about
6  global standards to prevent and detect money
7  laundering and counter terror financing.
8  Q.  Have you ever read a bank's
9  policies and procedures for dealing with
10  money laundering?
11  A.  I've read several.
12  Q.  Which ones?
13  A.  That would be confidential.
14  Q.  Have you ever read a bank's
15  internal policies and procedures relating to
16  terror financing?
17  A.  Often they are in the same
18  document in my experience, but I've read
19  several.
20  Q.  Which banks?
21  A.  That would be confidential.
22  Q.  Again, that's reading you did
23  in the course of your career in the MPS?
24  A.  Yes.
25  Q.  You also said you were

Page 113

WALTERS

1   Q.   Cases that you worked on during
2   your career?
3   A.   Yes.
4   Q.   With the MPS?
5   A.   Yes, where I would meet people
6   from regulated businesses and we would
7   discuss issues.
8   Q.   Did any of your cases involve
9   charities other than the Baluchi case?
10  A.   Over the years there's a number
11  of cases that involved charities in different
12  ways and that doesn't just include my time on
13  economic and specialist crime.   This is
14  charities get exploited or abused in
15  different ways by different people.
16  Q.   Did you ever have a case
17  involving a charity and suspicions of terror
18  financing?
19  A.   No, I didn't.
20  Q.   Look at paragraph 193 of your
21  rebuttal report.  You refer here to arbitrage
22  between legal jurisdictions.  What do you
23  mean by that?
24  A.   This was a subject that came up

Page 114

WALTERS

1   in various times in discussions with banks
2   and other regulated entities and people
3   within the regulators.  It was including when
4   working with government, other government
5   departments and legislators where what I mean
6   is with increased globalization there is a
7   threat that corporations or people can decide
8   where they are going to base themselves where
9   they are subject to less strict scrutiny and
10  regulation which will allow them to operate
11  less transparently than else where so easier
12  regulation to manage and so what I mean is
13  the global standards and practices everybody
14  that I dealt with consistently agreed needed
15  to be enforced in such a way that
16  institutions could not just decide they
17  wanted to go else where and develop a
18  financial center for instance somewhere that
19  had no regulation.
20  Q.   To your knowledge Nat West has
21  always been based in the U.K., correct?
22  A.   To my knowledge, yes.
23  Q.   Is it your understanding that
24  banks have to apply the counter terrorist

Page 115

WALTERS

1   designations of every country in the world
2   regardless of where the banks are located and
3   what countries a transaction might involve?
4   MR. BONNER: Objection to form.
5   A.   My experience in speaking with
6   financial institutions and regulators was
7   that it wasn't just about the legal
8   requirements, it was also the spirit of the
9   legislation and standards that had been
10  bought in and the discussions taking place to
11  try and deal with the globalization issue and
12  to have the standards so consistent.
13  Consistent agreement I found in discussions
14  was that people would work to implement the
15  highest standards that they operated in and
16  in doing that and operating with different
17  standards in different places and the
18  legislation that applied, sometimes it could
19  create tensions in terms of legally they
20  would have problems, but they would work to
21  the spirit of operating across the globe in a
22  way that satisfied all of the requirements in
23  areas that they operated.
24  Q.   To your understanding

Page 116

WALTERS

1   considering the legal requirements, is a
2   British bank in its provision of services to
3   a British customer required to follow the
4   United States counter terrorist designations?
5   A.   I'm not a lawyer and I don't
6   opine on the legal issues.
7   Q.   To your understanding given the
8   spirit of the legislation that you refer to,
9   must a British bank serving a British
10  customer in Britain abide by the counter
11  terrorist designations made by the United
12  States?
13  MR. BONNER: Objection to form.
14  You can answer.
15  A.   My experience in this --
16  Q.   I'm asking for your
17  understanding.
18  A.   My understanding is that
19  British institutions would take due note of
20  the standards being applied and the
21  legislation that's applied anywhere they were
22  doing business that could effect them in some
23  way.
24  Q.   My question was different.  My

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 149

1     WALTERS
2   any law enforcement agency ever complained to
3   Nat West about the extent or quality of the
4   information it was provided?
5   A.  From my experience in dealing
6    with these --
7   Q.  I asked you if you have seen
8    any evidence of that?
9   A.  I haven't seen any evidence of
10   that.
11   Q.  Go to paragraph 12 of your
12   report.  Could you read that to yourself.
13     MR. FRIEDMAN: Sorry, should we
14   break for lunch now given the time?
15     MR. BONNER: If you are moving
16   on to something different.
17     MR. FRIEDMAN: Let me just ask
18   about paragraph 12.
19   Q.  You write here that the
20   Palestinian territories Jordan and Lebanon
21   were to use your phrase "high risk
22   jurisdictions", correct?
23   A.  Yes.
24   Q.  What do you mean by the term
25   high risk jurisdictions?

Page 150

1     WALTERS
2   A.  The amount of terrorism going
3   on in those regions and as I would understand
4   from my general knowledge that those issues
5   would make those high risk jurisdictions.
6   Q.  That's your subjective
7   definition?
8   A.  That's my subjective
9   definition.
10   Q.  You're aware that FATF from
11   time to time has published a list of high
12   risk jurisdictions, correct?
13   A.  Yes.
14   Q.  Palestine and Jordan have never
15   appeared on that list, correct?
16   A.  I'm not aware of who's been on,
17   who's been off and when they've changed it.
18   It changes over time.
19   Q.  You're using your own term, you
20   are not using the FATF term high risk
21   jurisdiction?
22   A.  Yes.
23     MR. FRIEDMAN: Why don't we
24   break for lunch.
25     THE VIDEOGRAPHER: We are now

Page 151

1     WALTERS
2   off the record.  The time is 1:06 p.m.
3   June 8, 2011.
4     (Luncheon recess taken at
5    1:06 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1     WALTERS
2   A F T E R N O O N   S E S S I O N
3    (Time Noted: 2:04 p.m.)
4
5   G A R Y  W A L T E R S, resumed and testified
6   as follows:
7
8   CONTINUED EXAMINATION
9   BY MR. FRIEDMAN:
10     THE VIDEOGRAPHER: This is tape
11   four of the deposition of Mr. Gary
12   Walters.  We are now back on the
13   record.  The time is 2:04 p.m.  Today
14   is June 8, 2011.
15   Q.  Mr. Walters, please look at
16   paragraph 13 of your rebuttal report.  You
17   state here that the fact that Interpal was a
18   charity made it a high customer risk,
19   correct?
20   A.  That's right, that's correct,
21   yes.
22   Q.  Based on your review of the
23   record, U.K. law enforcement knew that
24   Interpal was a charity, correct?
25   A.  Yes, that's correct.

Page 153

1      WALTERS
2  Q.   What's your basis for stating
3   that all charities are high risk customers?
4  A.   From my experience from the
5   various standards that get published that
6   we've spoken about, the dealings I had with
7   banks and regulators there is -- charities
8   are recognized as presenting a high risk.
9  Q.   You're familiar with a charity
10   in England known as Guide Dogs for the Blind?
11  A.   Yes.
12  Q.   Do you consider that a high
13   risk customer because it's a charity?
14  A.   Every charity would need to be
15   assessed separately.  In my work I looked at
16   a number of other high risk -- recognized
17   high risk entities and the risk exists so it
18   requires some examination to assess what's
19   the level of risk for each individual
20   circumstance.
21  Q.   My question is the following.
22   Is Guide Dogs for the Blind a high risk
23   customer for a U.K. bank, yes or no?
24  A.   I think as a charity it still
25   exists as a high risk entity, but an

Page 154

1      WALTERS
2   examination of it and its dealings because I
3   think you can't look at any one particular
4   risk element in isolation.
5  Q.   Is Guide Dogs for the Blind a
6   high risk customer?
7  A.   I have not assessed Guide Dogs
8   for the Blind.
9  Q.   You said all charities are high
10   risk customers. You said Guide Dogs for the
11   Blind is a charity, am I right, therefore
12   according to your analysis Guide Dogs for the
13   Blind is a high risk customer?
14      MR. BONNER: Objection to form.
15  A.   As I explained I think per se
16   all charities are recognized as being
17   vulnerable to money laundering and counter
18   terror financing in the same way as all
19   casinos are seen as a high risk entity. That
20   doesn't mean that all casinos are engaged in
21   money laundering or terror financing.  It
22   doesn't mean that all politically exposed
23   persons are high risk people.  It doesn't
24   mean that they are engaged in money
25   laundering, terror financing or corruption.

Page 155

1      WALTERS
2  Q.   Therefore as you use the term
3   Guide Dogs for the Blind is a high risk
4   customer?
5  A.   In a simple assessment -- I
6   think I have to stick with my explanation
7   that per se all charities carry a risk of
8   money laundering and counter terror
9   financing.
10  Q.   You say in your report that
11   charities present a high customer risk,
12   correct?
13  A.   Yes.
14  Q.   Your report is truthful,
15   correct?
16  A.   Yes.
17  Q.   Guide Dogs for the Blind is a
18   charity, correct?
19  A.   Yes.
20  Q.   Therefore Guide Dogs for the
21   Blind presents a high customer risk to a
22   bank, correct?
23  A.   As I said in my previous
24   answers, all charities are recognized as
25   presenting a high risk.

Page 156

1      WALTERS
2  Q.   Including Guide Dogs for the
3   Blind?
4  A.   Including all charities so
5   Guide Dogs for the Blind being a charity
6   would present a risk.
7  Q.   A high customer risk?
8  A.   Would present a high customer
9   risk.
10  Q.   Are you familiar with a charity
11   known as the Royal National Life Boat
12   Institution?
13  A.   Yes, I am.
14  Q.   It's a charity devoted to
15   funding rescues at sea, correct?
16  A.   Yes, it is.
17  Q.   That's a charity?
18  A.   It is.
19  Q.   So therefore in your estimation
20   the Royal National Life Boat Institution as a
21   bank customer is a high risk customer,
22   correct?
23  A.   I'll answer the same way as I
24   answered before that when you have a charity,
25   there is a high risk of it being vulnerable

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 177

1      WALTERS
2  2003."  Nat West explicitly disclosed that
3  fact to NCIS, correct?
4  A.  Yes, they did, yes.
5  Q.  I'm showing you what's been
6  marked as Exhibit 18 which bears the Nat West
7  production numbers 52122 through 123.  You
8  recognize that as Nat West's August 28, 2003
9  disclosure to NCIS in which Nat West
10  ██████████████████████████████████
11  ██████████████████████████████
12  A.  Yes.
13  Q.  This disclosure also references
14  ████████████████████████████████████
15  ████████████████████████
16  A.  Yes.
17  Q.  This also discloses that Nat
18  West ████████████████████████████████
19  ████████████████████████████
20  ██████████████████████████
21  ████████████████████
22  A.  Could you repeat that?
23  Q.  This also discloses that Nat
24  West ████████████████████████████████
25  ██████████████████████████████

---

Page 178

1      WALTERS
2  A.  It does.
3  Q.  It also discloses that ████████
4  ████████████████████████████████
5  ████████████████████████
6  A.  Yes.
7  Q.  And it also asks that this
8  ████████████████████████████████
9  ████████████████████████████████
10  ██████████████████████████
11  A.  That's correct.
12  Q.  It also says, ████████████
13  ████████████████████████████████
14  ████████████████████  do you see that?
15  A.  Yes.
16  Q.  The special branch that's
17  referred to here you understand to be the
18  special branch that was in charge of
19  terrorist financing investigations, correct?
20  A.  Yes, I do.
21  Q.  And what do the letters DS
22  mean?
23  A.  Detective sergeant.
24  Q.  You do not know Neil Bennett?
25  A.  No.

---

Page 179

1      WALTERS
2  Q.  You never worked with him?
3  A.  Not that I'm aware of.  I may
4  well do, but maybe I'm wrong in that.  I may
5  know him.
6  Q.  The NTFIU that's referred to
7  here is the same one that you referred to in
8  your reports as being the focal point for
9  terror financing investigations, correct?
10  A.  Yes, that's correct.
11  Q.  So your eighth red flag was
12  explicitly disclosed to Scotland Yard by Nat
13  West, correct?
14  A.  Yes.
15  Q.  Let's look at your red flag
16  number nine.  I have a specific question for
17  you about this red flag.  What's your basis
18  for saying that it's a red flag if a customer
19  sends money to a name that is similar to the
20  name of a designated entity if in fact the
21  beneficiary is not the same entity as the one
22  that's designated?
23  A.  Within the guidelines and
24  standards that are applied to this field of
25  work, it is recognized and acknowledged that

---

Page 180

1      WALTERS
2  people use different variations of names and
3  false identities, the very nature of the work
4  says and including in most bank policies they
5  recognize this as an issue to require further
6  examination if it looks the same.  Red flags
7  don't mean that there is crime in the broader
8  sense going on.  What it does is it draws
9  attention and raises concern that needs
10  addressing and in doing that when you've got
11  similar names to one that's on a designated
12  list, then for me that is a flag a bit like
13  -- that is a red flag that says here's a
14  concern, we need to examine it and we need to
15  make sure that that's not the same
16  organization who swapped a letter.  Also
17  applicable when different languages are used
18  to come into the equation where when it's
19  translated into English perhaps it's twisted
20  or hyphens are put in where they are not and
21  variations on a name.
22  Q.  It's your understanding that
23  the Al Aqsa Foundation is on the OFAC SDN
24  list?
25  A.  Yes.

---

---

Page 181

```
 1     WALTERS
 2  Q.  It's your understanding that
 3  the El Wafa Charitable Society is on the OFAC
 4  SDN list?
 5  A.  It is.
 6  Q.  What's the basis for that
 7  understanding?
 8  A.  I think later I quote the
 9  Treasury websites, U.S. Treasury websites.
10  Q.  Stating that the El Wafa
11  Charitable Society is an SDN?
12  A.  I'm not sure what it states.
13  Q.  To your understanding that it's
14  designated?
15  A.  It's my understanding that it's
16  designated.
17  Q.  Let's look at your red flag
18  number ten.  "Beneficiaries in locations not
19  in direct relation to Interpal's stated
20  purpose (transfers to ███████████████ "
21  What transfers do you understand Interpal
22  made to the ███?
23  A.  I'm afraid I can't recall.
24  Q.  Nat West disclosed to law
25  enforcement that there was at least one
```

---

Page 182

```
 1     WALTERS
 2  transfer to ███, correct?
 3  A.  I haven't got that disclosure
 4  here in front of me.  Do you have a copy?
 5  Q.  Are you aware that there was
 6  ever a transfer to ███?
 7  A.  I believe there was a transfer
 8  to ███
 9  Q.  Let me show you what's been
10  marked as Exhibit 20 which bears Nat West
11  production numbers 52089 through 91.  Do you
12  recognize this as the NCIS disclosure that
13  Nat West made on June 17, 2002?  Do you
14  recognize this?
15  A.  Yes.
16  Q.  This discloses a transfer to
17  Interpal's accounts from ██████ correct?
18  A.  From ███ yes.
19  Q.  As you sit here, do you believe
20  that there is evidence of a transfer having
21  been made to ███?
22  A.  I would need to go back and
23  check.
24  Q.  You agree that anyone who read
25  the NCIS disclosure would know that there was
```

---

Page 183

```
 1     WALTERS
 2  transfer to Interpal from ███ correct?
 3  A.  Yes.
 4  Q.  Why don't you just put that one
 5  in a separate pile Exhibit 20 because we will
 6  come back to it.  Look at your red flag
 7  number 11.  "Beneficiaries were themselves
 8  charities which constitute significant
 9  customer risk", do you see that?
10  A.  Yes.
11  Q.  Anyone who read the October 15,
12  2001 NCIS disclosure that we looked at
13  together would know that fact, correct?
14  A.  They would.
15  Q.  Look at your red flag number 12
16  which is, "Beneficiaries were sometimes also
17  benefactors like ███ for example."  What
18  makes that a red flag?
19  A.  If someone is sending money in
20  one direction and then it comes back in the
21  other direction, that should raise a concern
22  that what is the motivation behind that
23  transfer unless there were clear reasons
24  within the customer profile that have already
25  documented why that will be happening.
```

---

Page 184

```
 1     WALTERS
 2  Q.  You know that ███ is
 3  ostensibly at least a charity, correct?
 4  A.  I understand that to be the
 5  case.
 6  Q.  Interpal is a charity?
 7  A.  Yes.
 8  Q.  So monies going between
 9  Interpal and ███ would be monies going
10  between two charities, correct?
11  A.  Yes.
12  Q.  Look at red flag number 13.
13  A.  Can I just qualify my last
14  answer that when that red flag is raised as
15  with other red flags it's a reason to examine
16  the threat and then mitigate any risk and
17  make decisions based on knowledge of customer
18  and knowledge of customer, knowledge of
19  business as to is there a reason for it and
20  then explore what that may be.
21  Q.  When you say that you are
22  applying red flags that you learned of when
23  you were with the Metropolitan Police
24  Service, you would expect that law
25  enforcement authorities who learned of these
```

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 193

```
 1      WALTERS
 2  information.
 3  Q.  Mr. Walters, you really need to
 4  answer my question.  Did you consider --
 5      MR. BONNER: Just because Larry
 6  insinuates that you are not answering
 7  the question doesn't mean you are not
 8  answering his question.
 9  Q.  My question is the following.
10  Did you ever consider -- did you Gary Walters
11  ever consider the fact that this person was
12  the recipient of an educational grant from
13  Interpal, yes or no?
14  A.  My experience and training and
15  background leads me to retain a very open
16  mind about what things are and what the
17  reasons are.  In this particular case we are
18  dealing with a very unusual payment by wire
19  transfer to a country that has no apparent
20  link, no obvious link because they don't make
21  these payments on a regular basis to an
22  individual and they have in their report said
23  student grant, but it would require further
24  examination to find out whether that was in
25  the very nature of money laundering. It's
```

Page 194

```
 1      WALTERS
 2  made to look clean with reasonable
 3  explanation.
 4  Q.  You think this is a red flag of
 5  money laundering?
 6  A.  For money laundering red money
 7  laundering or counter terror financing.  My
 8  experience is it doesn't tend to be flagged
 9  out as this is either criminal money or
10  terrorist money being sent.  They will find a
11  cover that says this is going to a student.
12  I don't know who that person is.
13  Q.  I want to make sure that I
14  understand you carefully because you are
15  under oath.
16  A.  I am.
17  Q.  Before I asked you today you
18  remember seeing that this document indicated
19  that the money was being paid to ████████
20  ████████████ for a student grant?
21  A.  Yes, I do.
22  Q.  You don't refer to that in the
23  paragraph in which you discuss this payment,
24  do you?
25  A.  Well, when I was examining all
```

Page 195

```
 1      WALTERS
 2  the material, I was looking at what did Nat
 3  West do about it, not what would Gary Walters
 4  do about it.  I took a view that they sent
 5  money off to an individual in an obscure --
 6  ████████ is not an obscure location, but in a
 7  location they would not normally transfer
 8  money to.  The reason for the transfer is a
 9  student grant, that's what's been put down.
10  Whether that is or is not what it's about is
11  a different matter. I don't draw judgment on
12  that because I'm not investigating that.  I'm
13  not asking the questions that I feel from all
14  my experience that when this red flag comes
15  up it should be questioned. When the red flag
16  appears it should be dealt with and analyzed
17  and assessed and evaluated and an
18  investigation of some kind conducted in order
19  that a decision could be reached is this
20  suspicious or not suspicious.
21  Q.  Mr. Walters, in your report in
22  paragraph 34 you describe these transactions
23  as having "no apparent explanation", correct?
24      MR. BONNER: No apparent
25  relationship.
```

Page 196

```
 1      WALTERS
 2  A.  Bearing no apparent
 3  relationship to Interpal's stated purposes or
 4  geographic area of focus.
 5  Q.  Read on, sir.  They are your
 6  words. Should have been seen minimally as
 7  unusual transactions with no apparent
 8  explanation so my question stands you
 9  described these transactions as having "no
10  apparent explanation", correct?
11  A.  Yes, I did.
12  Q.  The documents that you just
13  testified under oath you saw before do reveal
14  an apparent explanation namely a student
15  grant, correct, yes or no?
16  A.  That is an apparent explanation
17  so yes.
18  Q.  Therefore your statement in
19  your report that these transactions had no
20  apparent explanation was a mistake, correct?
21  A.  I'd accept that I made a
22  mistake there. I apologize.
23  Q.  Look at your report paragraph
24  67 and 68.  Read those to yourself.  Have you
25  read those?
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 197

```
 1      WALTERS
 2  A.  Yes.
 3  Q.  As reflected in your quotation
 4  from Nat West's SAR about ▮▮▮▮▮▮
 5  contributions Nat West expressly disclosed
 6  this to law enforcement, correct?
 7  A.  They did make a disclosure,
 8  yes.
 9  Q.  So if this were as you indicate
10  in paragraph 68 another red flag against the
11  Interpal account Nat West explicitly
12  disclosed it to law enforcement, correct?
13  A.  My experience of examining
14  suspicious activity reports that are sent to
15  the police if it's not fully set out could
16  make it difficult to identify all of the side
17  issues to one particular report.
18  Q.  Did you learn from anyone at
19  law enforcement that they had any difficulty
20  identifying any side issues concerning
21  Interpal?
22  A.  No.
23  Q.  Let me go back to my prior
24  question.  If this were as you indicate in
25  paragraph 68 another red flag against the
```

Page 198

```
 1      WALTERS
 2  Interpal account, your words, Nat West
 3  explicitly disclosed it to law enforcement,
 4  correct?
 5  A.  They did disclose it to law
 6  enforcement.
 7  Q.  I'd like you to look at
 8  paragraph 30 of your report.  I'd like you to
 9  look at the last two sentences.  Is it
10  accurate that you saw no documentation of
11  communication between Nat West and the
12  Charity Commission in connection with the
13  1996 investigation?
14  A.  I can't recall seeing any.
15  Q.  Let me show you what's been
16  marked as Exhibit 23 which bears the Nat West
17  production number 16498 and ask you did you
18  ever see that document before?
19  A.  I don't recall this document.
20  Q.  This contradicts what you said
21  in your report, right, this is communication
22  between Nat West and the Charity Commission
23  concerning the 1996 investigation, correct?
24  A.  In terms of this I would accept
25  that in order for the bank to have been
```

Page 199

```
 1      WALTERS
 2  informed that they needed to place a stop on
 3  the account as a better expression they would
 4  have received some contact in order to inform
 5  them.
 6  Q.  You're aware that the bank was
 7  also informed that the freeze was lifted when
 8  the Charity Commission concluded its
 9  investigation, correct?
10  A.  And they would have been
11  informed that it's been lifted.
12  Q.  I'd like you to look at
13  paragraph 37 of your report.
14  A.  When I said in paragraph 30 I
15  would have expected to find communication, I
16  was talking about rather more than a stop the
17  account and you can open the account.
18  Q.  Do you know whether Nat West
19  and Charity Commission personnel spoke to one
20  another during the course of the
21  investigation?
22  A.  I haven't got details of who
23  spoke to who.  I would presume that they
24  would have done, but I have not seen any
25  record.
```

Page 200

```
 1      WALTERS
 2  Q.  You have not seen it in
 3  writing?
 4  A.  I have seen a letter that we
 5  referred to earlier where it says there has
 6  been discussions.
 7  Q.  Do you have any reason to
 8  believe that's untrue?
 9  A.  No, but I would have expected
10  to have seen more documentation about
11  discussions during meetings.
12  Q.  Here you say there was no
13  communication, but you just told me that you
14  read -- you said there's no documentation of
15  communication, but you did read that there
16  were discussions between the Charity
17  Commission and Nat West, correct?
18      MR. BONNER: Objection to form.
19  Q.  You did see documentary
20  evidence that there were discussions,
21  correct?
22  A.  If I read my paragraph I say I
23  would have, well, you have to take the whole
24  paragraph I think.  I didn't see any
25  documentation of any due diligence or account
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 201

1    WALTERS
2  monitoring being undertaken at the time the
3  account was frozen and from my experience I
4  would have expected, for example, an
5  assessment as to all the account activity
6  preceding the freezing order. I would have
7  also expected to find documentation of
8  communication between the defendant and
9  Charity Commission and even special branch.
10  The lack of documentation -- I'm not saying
11  there's no documentation, but in any event I
12  haven't seen anything that indicates there
13  was any investigation of its own around that
14  '96 investigation.
15  Q.  When you were the operational
16  head of the MLIT of the Metropolitan Police
17  Service, did you have occasion during the
18  course of your money laundering
19  investigations to speak with bank personnel?
20  A.  Yes, I did.
21  Q.  Often?
22  A.  Often.
23  Q.  Did you write an internal memo
24  every time you spoke to bank personnel?
25  A.  In relation to investigations

---

Page 202

1    WALTERS
2  there was always a record kept of the details
3  of investigation.
4  Q.  Did you always write a record
5  of your communications with banks?
6  A.  In relation to specific
7  investigations, yes.
8  Q.  Otherwise?
9  A.  If I wasn't talking about
10  specific cases, not always.
11  Q.  Did you ask the banks to write
12  a record of every one of your communications
13  with them?
14  A.  My experience was that banks
15  and others would often keep records of
16  communications with me.
17  Q.  It's not my question. My
18  question was did you ask the banks to write
19  records of their communication with you?
20  A.  On specific investigations or
21  general meetings?
22  Q.  When you had a conversation
23  with a banker during the course of one of
24  your money laundering investigations, did you
25  ever tell the banker I want you for your own

---

Page 203

1    WALTERS
2  records to write an internal memo of this
3  communication?
4  A.  I didn't specifically ask them
5  to keep a record.
6  Q.  Let's look at paragraph 37 of
7  your report.
8  A.  Just to clarify that last one
9  to go on, my own experience was that banks
10  would sometimes write to me to confirm the
11  meetings that I had with them.
12  Q.  Look at paragraph 37 of your
13  report. That indicates that you're aware
14  that Nat West reported the cryptome report to
15  NCIS, correct?
16  A.  Yes.
17  Q.  Let me show you what's been
18  marked as Exhibit 24. You recognize this to
19  be Nat West's disclosure to NCIS of the
20  ████████████████ correct?
21  A.  Yes.
22  Q.  That disclosure ████████████
23  ██████████████████████████████
24  ████████████████
25  A.  Yes, it does.

---

Page 204

1    WALTERS
2  Q.  NCIS had computers in September
3  2001, correct?
4  A.  Yes.
5  Q.  NCIS had access to the internet
6  in September 2001, correct?
7  A.  Yes.
8  Q.  Your experience NCIS employees
9  understood how to read URLs, correct?
10  A.  From my experience, yes.
11  Q.  Are you aware of any evidence
12  that NCIS ever asked Nat West for more
13  ██████████████████████████████?
14  A.  Not that I can recall.
15  Q.  Do you agree with me that U.K.
16  law enforcement had the ability to read the
17  cryptome report because Nat West called it to
18  their attention?
19  A.  Yes.
20  Q.  Do you agree with me that U.K.
21  law enforcement had the ability to
22  ██████████████████████████████
23  ██████████████████
24  A.  For ability I would qualify it
25  with a resource issue at that time.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

---

Page 205

WALTERS

1    WALTERS
2  Q.  Assuming they had the resources
3  did you think --
4  A.  That's a big assumption because
5  this is in late September 2001 and there was
6  quite a lot of activity particularly around
7  the terrorism per se and I'm not able to say
8  that they would have had the resources at
9  that time in order to focus them on to this
10  particular matter.
11  Q.  Fair enough.  At that time did
12  U.K. law enforcement have the professional
13  capability, the professional skills to
14  [REDACTED]
15  [REDACTED]
16  A.  They wouldn't necessarily have
17  had access to the information.  They wouldn't
18  have had access to all the information in the
19  RBS without getting court orders in order to
20  obtain it.
21  Q.  They had the ability to get
22  that information from Nat West if they wanted
23  it, correct, by means of a production order?
24  A.  There is a few ifs there, but
25  if they had the resources and decided to do

---

Page 206

1    WALTERS
2  it, they could have obtained the material.
3  Q.  From Nat West?
4  A.  Nat West.
5  Q.  To your knowledge they never
6  did so, correct?
7  A.  Not that I'm aware.
8    MR. FRIEDMAN: Let's take a
9  break.
10    THE VIDEOGRAPHER: We're now
11  off the record.  The time is 3:18
12  p.m., June 8, 2011.
13    (Recess taken.)
14    THE VIDEOGRAPHER: This is tape
15  five of the deposition of Mr. Gary
16  Walters.  We are now back on the
17  record.  The time is 3:27 p.m., June
18  8, 2011.
19  Q.  Mr. Walters, I would like you
20  to look again at paragraph 37 of your report.
21  Specifically your statement as follows.
22  Further, Mr. Hoseason used a letter in this
23  instance referring to Exhibit 24 because he
24  felt the need for urgency to convey the
25  information.  You cite Mr. Hoseason's

---

Page 207

1    WALTERS
2  transcript at pages 202 and 203, do you see
3  that?
4  A.  Yes.
5  Q.  You read Mr. Hoseason's
6  transcript in order to be able to say that,
7  correct?
8  A.  I did, yes.
9  Q.  I'm going to show you what's
10  been marked as Exhibit 25 which is the
11  transcript of Mr. Hoseason and ask you to
12  turn to page 203.  Let me read to you the
13  testimony that I would like you to focus on.
14  Line 8.
15    "Question:  Can you explain why
16  you would have felt that there was
17  some urgency to convey this
18  information to NCIS?
19    "Answer: It was very shortly
20  after the events of 11 September.  We
21  were making a significant number of
22  disclosures to NCIS at the time.  As I
23  think I mentioned before, we were very
24  concerned not to fall short in terms
25  of our reporting obligations.  The

---

Page 208

1    WALTERS
2  reason I suggested that we sent this
3  letter was because with a certain
4  amount of further review to be done,
5  we were not in a position to put
6  together anything more meaningful at
7  the time.  The form itself, the
8  disclosure form, did not really suit
9  putting that kind of information into
10  it so it was more expedient to produce
11  a short letter like this."
12    Do you see that?
13  A.  I do.
14  Q.  Did you read that testimony
15  before you wrote your report?
16  A.  Yes, I did.
17  Q.  You have no reason to doubt
18  that that is a truthful explanation for the
19  urgency that Mr. Hoseason felt, correct?
20  A.  Well, I know from the letter
21  that in the letter itself Mr. Hoseason
22  informs them that as I state in my report he
23  does say [REDACTED]
24  [REDACTED]
25  [REDACTED]

---

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 209

```
 1       WALTERS
 2  ████████████████ so, you know, to
 3  that extent I can understand that he wants
 4  law enforcement to be informed that there is
 5  a significant event related to the account
 6  and as I understand he said himself he wanted
 7  to let law enforcement know as he puts it
 8  that they are on top of the situation.
 9  Q.  He wanted to do it as soon as
10  he could, correct?
11  A.  Well, he says we are ████████████
12  ████████████████████████ so I would
13  imagine that if that's right then they would
14  have been actively doing it there and then.
15  Q.  I'd like you to go back to
16  Exhibit 17 which we looked at this morning,
17  I'm sorry, which we looked at before the
18  break.  Do you have that in front of you?
19  A.  I have.
20  Q.  I would like you to look at
21  paragraph 39 of your report.  In the first
22  sentence of paragraph 39 you say that the
23  cryptome disclosure, Exhibit 24, made no
24  mention of -- I'm sorry, in the first
25  sentence of paragraph 39 you say that Exhibit
```

Page 210

```
 1       WALTERS
 2  17 made no mention of the cryptome report or
 3  the letter sent to NCIS, correct?
 4  A.  I do say that.
 5  Q.  Look at the first sentence of
 6  the disclosure in Exhibit 17.  It begins with
 7  the following. ████████████████████████
 8  ████████████████████████████████████████
 9  ████████████████████████████████████████
10  ████████████████████████████████████████
11  ████████████████████ do you see that?
12  A.  I do.
13  Q.  If I told you that ID 140425 is
14  the NCIS identification number for the
15  ████████████████████ Exhibit 24, then you
16  would agree with me that this disclosure does
17  refer to the cryptome disclosure that was
18  made to NCIS, correct?
19      MR. BONNER: Objection to form.
20  A.  Have I got Exhibit 24?
21  Q.  It's the last exhibit we looked
22  at.  Let me take this in a different
23  direction.  When the bank makes a disclosure
24  to NCIS, NCIS assigns an identification
25  number to the disclosure, correct?
```

Page 211

```
 1       WALTERS
 2  A.  Yes.
 3  Q.  You see that the disclosure in
 4  Exhibit 17 uses the -- identifies the Nat
 5  West previous disclosure with the number
 6  140425, correct?
 7  A.  Yes.
 8  Q.  Do you recognize that to be an
 9  NCIS identification number?
10  A.  Yes.
11  Q.  If that is the NCIS
12  identification number for Exhibit 24, the
13  letter, you recognize that number to be an
14  NCIS identification number, correct?
15  A.  I believe so, yes.
16  Q.  If that is the number that NCIS
17  assigned to Exhibit 17, the first disclosure,
18  then in fact, I'm sorry, if the 140425 number
19  is what NCIS assigned to Exhibit 24, then
20  Exhibit 17 does in fact refer to the prior
21  disclosure, correct?
22      MR. BONNER: Objection to form.
23  Calls for speculation.
24  A.  There is a non specific cross
25  reference.  From my experience I would have
```

Page 212

```
 1       WALTERS
 2  expected having had and these things --
 3  sometimes things happen, I would have
 4  expected that having heard that there was a
 5  -- they were undertaking a thorough review of
 6  the activity through the accounts with a view
 7  to making a full disclosure in due course
 8  with so much information available to the
 9  bank for them to examine based on the
10  cryptome report I would have expected the
11  disclosure to include all of the information
12  they had available rather than a summary that
13  is not set into context.
14  Q.  First of all, you referred to a
15  non specific cross reference. The non
16  specific cross reference is to an NCIS
17  identification number, correct?
18  A.  I apologize, I did not mean it
19  in that way.  Sorry to interrupt.
20  Q.  The non specific cross
21  reference is a cross reference to an NCIS
22  identification number for the prior document,
23  correct?
24  A.  It is.
25  Q.  NCIS knows its own
```

Page 213

```
1      WALTERS
2   identification numbers, correct?
3   A.  Yes.
4   Q.   So the second report uses an
5   NCIS identification number and the first
6   disclosure says that
7
8                          do you see that?
9   A.  Yes.
10  Q.  The second disclosure which has
11  a cross reference to the NCIS ID number that
12  I'm asking you to assume is the NCIS ID
13  number for the first disclosure which in fact
14  it is, says, further to our previous
15  disclosure and there is the ID number a
16  review of all sterling accounts held by our
17  customer shows in the main etc., etc.,
18  correct?
19  A.  Yes.
20  Q.   So Exhibit 17 reports the
21  results of the review that is described in
22  Exhibit 24, correct?
23      MR. BONNER: Objection to form.
24  A.  My experience in dealing with
25  banks and what I would have expected with all
```

Page 214

```
1      WALTERS
2   my experience of having dealt with these
3   would have been that a full review would
4   contain far more information than they have
5   sent.  A full review would have analyzed all
6   of the accounts thoroughly and set it into
7   context and that's what I would have been
8   expecting the bank to do.
9   Q.  I appreciate that, Mr. Walters,
10  and thank you for sharing with me what you
11  would have expected, but my question was
12  different.  My question is as you read them
13  today, Exhibit 17 reports the results of the
14  review that's described in Exhibit 24,
15  correct?
16      MR. BONNER: Objection to form.
17  Go ahead, you can answer.
18  A.  Yes, it does.
19  Q.  It does so using NCIS' own
20  identification number for the prior
21  disclosure, correct?
22  A.  That relates to the letter
23  saying we're doing a full --
24  Q.  Yes.
25  A.  -- report, yes.
```

Page 215

```
1      WALTERS
2   Q.  Have you seen any evidence that
3   Nat West failed to answer any follow up
4   questions posed by NCIS?
5   A.  Not that I recall, no.
6   Q.  Have you seen any communication
7   from NCIS saying we would have expected that
8   you would have told us something more and put
9   it in context? Did you see anything that said
10  that?
11  A.  No, I haven't seen anything
12  that says that.
13  Q.  In fact, you're aware of
14  subsequent communications from NCIS and NTFIU
15  that say to Nat West thank you for your
16  disclosures, but we don't need any more,
17  correct?
18      MR. BONNER: Objection to form.
19  A.  I think we need to go and refer
20  to where that is in my report or the
21  documents.  I would like to see the
22  documents.
23  Q.  You're aware, we will look at
24  the documents, but you're aware that on a
25  couple of occasions after Exhibit 17 Nat West
```

Page 216

```
1      WALTERS
2   recorded having spoken with Mark Ashtown and
3   others about making further disclosures and
4   Nat West was told by law enforcement that no
5   further disclosure was needed, correct?
6      MR. BONNER: Objection to form.
7   A.  From recollection those
8   communications were not related to these
9   disclosures.  These are other matters.
10  Q.  They are related to Interpal,
11  correct?
12  A.  They are related to Interpal,
13  but not this particular instance.
14  Q.  You haven't seen anything where
15  anyone from law enforcement said to Nat West
16  in substance we need more disclosure about
17  the                    have you?
18  A.  I think to set it into context
19  the activity drivers for want of a better
20  term for law enforcement is that judgments
21  would be made, there would be a trust with
22  the banks, it consistently happened a trust
23  with the banks that this is all the
24  information that's available so that's my
25  experience and then you make a judgment on
```

---

Page 241

```
 1      WALTERS
 2  it down in a memo, you think it would be
 3  speculative despite your experience with
 4  bankers to say that that memo would not have
 5  been shown to anybody?
 6      MR. BONNER: Objection to form.
 7  A.  Would not have what?
 8  Q.  Would have been shown to
 9  somebody?
10      MR. BONNER: Objection.
11  A.  Within this case there are a
12  couple of other instances where people said
13  they would do things and then nothing
14  happened for a long time.
15  Q.  Look at paragraph --
16  A.  I would have expected bankers
17  to have done what they said they would do.
18  Q.  Look at paragraph 57 of your
19  rebuttal report.  Why don't you read that to
20  yourself.
21  A.  Yes.
22  Q.  You see that there was no
23  guidance given to Ms. Lane with respect to
24  balancing the risk of tipping off with the
25  need for further information, correct?
```

---

Page 242

```
 1      WALTERS
 2  A.  I haven't seen it or I don't
 3  recall seeing it.
 4  Q.  Did you read her deposition
 5  testimony?
 6  A.  I did.
 7  Q.  Do you remember that she
 8  testified about her training on tipping off?
 9  A.  I don't recall that particular
10  thing.  Perhaps I could read it.
11  Q.  Let me show you what's been
12  marked as Exhibit 31 which is the deposition
13  transcript of Belinda Lane and ask you to
14  look at page 234, line 6 through 21.  I'll
15  ask you to read that to yourself.  Did you
16  read that testimony before you signed your
17  report?
18  A.  I'm still reading.
19  Q.  Sorry.
20  A.  Just trying to get it into
21  context here.
22  Q.  Did you read that before you
23  signed your report?
24  A.  Yes, I did.
25  Q.  You could put that aside.
```

---

Page 243

```
 1      WALTERS
 2  A.  In a case like this that's a
 3  one off case, just to finish my answer from
 4  the last one, I read that, but in this one
 5  it's a specific very special account and I
 6  would have anticipated that she would have
 7  received some bespoke guidance on what to ask
 8  and what to not to ask.
 9      MR. FRIEDMAN: I move to strike
10  everything after yes, I did.
11  Q.  Look at paragraph 64 of your
12  rebuttal report.
13      MR. BONNER: Paragraph 64,
14  right?
15  Q.  Your reference to the first SAR
16  is to the SAR providing the URL for the
17  cryptome report, correct?
18  A.  I believe so, yes.  Yes.
19  Q.  Look at paragraph 161 of your
20  report.  You write, "Suspicions of links to
21  terrorist financing was raised again by
22  payment of ███████████████
23  ████████████████████████████████
24  ████████████  which led to an SAR being
25  filed submitted internally stating possible
```

---

Page 244

```
 1      WALTERS
 2  umbrella for funding terrorism in the Middle
 3  East (NW 00834 to 380)", do you see that?
 4  A.  I do.
 5  Q.  Did you look at that document
 6  before you signed your report containing that
 7  paragraph?
 8  A.  Yes.
 9  Q.  Let's mark as Exhibit 32 the
10  document you cite and let's mark as Exhibit
11  33 a goalkeeper report dated three days
12  later.  Putting those in front of you.  Do
13  you recognize Exhibit 32 to be the document
14  you reference in paragraph 161?  Question is
15  do you recognize Exhibit 32 as the document
16  you reference in paragraph 161?
17  A.  Obviously there is a page been
18  taken out.
19  Q.  It's because it's a blank page,
20  but in paragraph 161 you refer to a document
21  bearing the production numbers 8374 to 380
22  and Exhibit 2 has the same production
23  numbers, correct?
24  A.  Yes.
25  Q.  You recognize Exhibit 33 as a
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 261

```
 1      WALTERS
 2   Where did you get the name ██████████
 3   from?
 4   A.  I shortened it to that.
 5   Q.  You also don't see ████████
 6   name on either the OFAC designation list or
 7   the Bank of England designation list,
 8   correct?
 9   A.  That's correct.
10   Q.  Look at paragraph 108 of your
11   report.  You say there that at this time in
12   2003 ██████ was a high risk jurisdiction, do
13   you see that?
14   A.  Yes.
15   Q.  What's your basis for referring
16   to Yemen there as a high risk jurisdiction?
17   A.  I believe in 2003 there were
18   various difficulties in the Middle East.
19   Q.  Is it your subjective
20   determination that it was a high risk
21   jurisdiction?
22   A.  Subjective is an interesting
23   word.  I draw on my experience and knowledge
24   to assess these documents.
25   Q.  Nat West -- FATF publishes
```

Page 262

```
 1      WALTERS
 2   lists of high risk jurisdictions, right?
 3   A.  They do.
 4   Q.  Has ██████ ever been listed?
 5   A.  I'm not aware.
 6   Q.  Do you know of any other entity
 7   that publishes lists of high risk
 8   jurisdictions other than FATF?
 9   A.  As I sit here now I'm not
10   aware.
11   Q.  Look at paragraph 165 of your
12   report.  Read that to yourself.
13   A.  Yes.
14   Q.  This relates to the telephone
15   call that Mr. O'Hear made to Mr. Ashtown that
16   we read about in Exhibit 44, correct?
17   A.  Yes, it does.
18   Q.  Also in Exhibit 34?
19   A.  Yes.
20   Q.  You say, "This additional
21   information was passed to law enforcement,
22   but not officially disclosed."  By that you
23   mean it was disclosed in a telephone call?
24   A.  Yes, I do and not through the
25   normal suspicious activity reporting regime.
```

Page 263

```
 1      WALTERS
 2   Q.  In that telephone call
 3   according to what you see before you, Mr.
 4   Ashtown told Mr. O'Hear that ██████████
 5   ████████████████████████████████████
 6   ████████████████████████████████████
 7   correct?
 8   A.  I'm not sure without going back
 9   the exact wording, he ████████████████
10   ████████████████████████████████
11   Q.  Have you ever seen that NTFIU
12   special branch ever subsequently told Nat
13   West that it should make additional
14   disclosure on this subject?
15   A.  My experience would be that
16   this is just in relation to this verification
17   of the information that they had and not an
18   on going expansion into you don't need to
19   bother with anything else.
20   Q.  My question was a little bit
21   different.  In fact a lot different.  Have
22   you seen any evidence that following this
23   conversation between Mr. Ashtown and Mr.
24   O'Hear anyone in law enforcement asked Nat
25   West to make a written disclosure on this
```

Page 264

```
 1      WALTERS
 2   subject?
 3   A.  On this particular bit?
 4   Q.  Yes.
 5   A.  Not on this particular
 6   transaction.
 7   Q.  As you understand the record,
 8   Nat West called special branch, called the
 9   NTFIU special branch and disclosed this
10   information and Mr. Ashtown told Nat West
11   ████████████████████████████████████
12   ████████████████████████████████████
13   ████████████████████ correct?
14   A.  Yes.
15   Q.  He also said that
16   investigations are on going here and that he
17   will be back in touch, correct?
18   A.  Yes.
19   Q.  He also said that ████████████
20   ████████████████████████████████
21   ████████████████ correct?
22   A.  Yes.
23   Q.  You're criticizing Nat West for
24   not submitting an updated disclosure on this,
25   correct?
```

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 281

WALTERS

1       WALTERS
2   A.  Yes.
3   Q.  In paragraph 91 you say, "In my
4   review of the defendant's documents I have
5   not identified any documentation of any
6   significant KYC or due diligence being
7   undertaken by the defendant after the OFAC
8   designation of Interpal", correct?
9   A.  Which paragraph is that, sir?
10  Q.  91.
11  A.  That's correct.
12  Q.  Let me show you Exhibits 38, 39
13  and 40.  38 bears the Nat West production
14  numbers 16767 through 16774, 39 bears the Nat
15  West production numbers 66721 through 23 and
16  40 bears the production numbers Nat West 667
17  to 740.  Please take a look at these three
18  exhibits.  Have you seen these before?
19  A.  Yes.
20  Q.  These documents reflect reviews
21  of all payments made from Interpal's accounts
22  at Nat West by Guy Cole after the OFAC
23  designation, correct?
24  A.  Let me have a moment to read
25  it, please.

Page 282

1       WALTERS
2   Q.  These documents reflect the
3   fact that after OFAC's designation of
4   Interpal Nat West conducted on an on-going
5   basis semi-annual reviews of all payments in
6   Interpal's accounts, correct?
7       MR. BONNER: Objection to form.
8   A.  There is a record here of a
9   semi-annual report.
10  Q.  It also shows that Nat West
11  also made a retrospective analysis of all
12  payments in Interpal's accounts as well,
13  correct?
14  A.  There is some analysis done.
15  Q.  Had you read these documents
16  before you signed your report containing
17  paragraphs 86 and 91?
18  A.  I had.
19  Q.  Now look at paragraph 127.
20  A.  I was just pausing to frame the
21  rest of that answer.
22  Q.  I asked if you looked at it and
23  you said you had?
24  A.  I had.  My opinion as I voiced
25  it in the report is that I would have

Page 283

1       WALTERS
2   expected that this would have taken place a
3   lot sooner than it did.
4   Q.  Okay.
5   A.  My experience would be when
6   there's a matter like this is that the sort
7   of research and review and due diligence
8   would take place immediately.
9   Q.  These documents show that Nat
10  West conducted semi-annual reviews of
11  Interpal's accounts into 2005, correct?
12  A.  There's one semi-annual review
13  that's recorded here.
14  Q.  In 2005?
15  A.  In 2005.
16  Q.  That's Exhibit 40?
17  A.  On 40, yes.
18  Q.  I'll represent to you just so
19  you are not unclear about this issue that
20  that is because of the agreement between the
21  parties on the cut off date for document
22  productions it did not extend into 2006.  I
23  didn't want you to be uncertain about why
24  there's nothing for 2006.
25  A.  Thank you very much.

Page 284

1       WALTERS
2   Q.  Look at paragraph 127 of your
3   report.  In paragraph 127 you say among other
4   things that as of April 21, 2004 no
5   additional due diligence had been completed,
6   correct?
7   A.  It refers in my report to a
8   previous chain of e-mails.  I don't want to
9   take things out of context.  Maybe I should
10  remind myself what the previous chain of
11  e-mails were.
12  Q.  Look at Exhibit 38.
13  A.  Yeah.
14  Q.  That contains a report of due
15  diligence conducted by Mr. Cole dated May 20,
16  2004, correct, as well as May 17, 2004?
17  A.  38 is some research done by Guy
18  Cole.
19  Q.  In May of 2004?
20  A.  In May 2004.
21  Q.  In May 2004, correct?
22  A.  May 2004.
23  Q.  Look at paragraph 87 of your
24  report, Mr. Walters.  I would like you to
25  read the second sentence and let me read it

Page 285

          WALTERS
1      WALTERS
2   aloud.  Mr. Roger, Irvin Roger as head of the
3   money laundering prevention unit within the
4   corporate banking financial markets division
5   which included Interpal within its customer
6   responsibility should have understood that
7   the designation of Interpal by OFAC meant
8   that the U.S. Government was making clear its
9   belief that Interpal was involved in funding
10  terrorism.  Do you see that?
11  A.  Yes.
12  Q.  Is it your understanding that
13  Mr. Roger did not understand that the
14  designation of Interpal by OFAC meant that
15  the U.S. Government was making clear its
16  belief that Interpal was involved in funding
17  terrorism?
18  A.  I understood that he would
19  understand it.
20  Q.  You based on your reading of
21  his deposition testimony know that he
22  testified that he did understand that,
23  correct?
24  A.  Yes.
25  Q.  Look at paragraph 109 of your

Page 286

1      WALTERS
2   report.  Read that to yourself.
3   A.  Yes.
4   Q.  You state here among other
5   things that you have seen no responses to
6   Damien Connors' August 26, 2003 e-mail,
7   correct?
8   A.  Yes.
9   Q.  Let me show you what's been
10  marked as Exhibit 42 which contains a number
11  of documents.  Aren't those all responses to
12  Damien Connors' August 26, 2003 e-mail?
13      MR. BONNER: I think to be
14  clear, Larry, it says I've not
15  identified a response to that e-mail
16  from CBFM.
17      MR. FRIEDMAN: Can you read the
18  rest of the sentence, Jim?
19      MR. BONNER: Sure.  I can read
20  the whole thing I guess.  I have not
21  identified a response to that e-mail
22  from CBFM nor from the rest of the
23  defendant's organization.
24      MR. FRIEDMAN: By the word
25  defendant, you understand he's

Page 287

1      WALTERS
2   referring to Nat West?
3      MR. BONNER: Correct.
4      MR. FRIEDMAN: Okay.
5   Q.  Look at Exhibit 42.  Doesn't
6   that contain multiple responses to Mr.
7   Connors' August 26, 2003 e-mail?
8   A.  My reading of them is there are
9   nine responses.
10      MR. FRIEDMAN: Let's take a
11  short break and then we will finish
12  up.
13      THE VIDEOGRAPHER: We are now
14  off the record.  The time is 5:52
15  p.m., June 8, 2011.
16      (Recess taken.)
17      THE VIDEOGRAPHER: This is tape
18  seven of the deposition of Mr. Gary
19  Walters.  We are now back on the
20  record.  The time is 6:01 p.m., June
21  8, 2011.
22  Q.  Mr. Walters, did you speak with
23  plaintiff's counsel about your testimony
24  during that break, yes or no?
25  A.  Yes.

Page 288

1      WALTERS
2   Q.  Look at paragraph 171 of your
3   report.  Mr. Walters, did you speak with
4   plaintiff's counsel about your testimony
5   during that break, yes or no?
6   A.  Yes.
7   Q.  Look at paragraph 171 of your
8   report.  What's your basis for stating there
9   that Nat West had clear suspicion of money
10  laundering activity in regard to Interpal's
11  account?  Let me put the question again.
12  Look at paragraph 171 of your rebuttal
13  report.  What's your basis for stating that
14  there is in your view a clear suspicion of
15  money laundering activity in Interpal's
16  accounts?
17  A.  Because of all the red flags
18  that appear and that raises -- each one
19  raises separate suspicion.
20  Q.  In your opinion, did Nat West
21  have a suspicion of money laundering?
22  A.  Yes.
23  Q.  Have you seen any evidence that
24  Nat West had a suspicion of money laundering?
25  A.  In that it is money laundering

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 289

1      WALTERS
2  with a -- money laundering in the broader
3  term.
4  Q.   Meaning what?
5  A.   Suspicious activity.
6  Q.   Nat West disclosed suspicions
7  of involvement in terror financing, correct?
8  A.   Yes.
9  Q.   Have you seen any internal or
10 external communications in which Nat West
11 stated that it suspected Interpal of engaging
12 in money laundering?
13 A.   Not that I can recall.
14 Q.   Look at paragraph 174 of your
15 second report.  Read that to yourself.  Is it
16 your opinion that Nat West should not have
17 closed Interpal's U.S. dollar accounts?
18 A.   I think they should have
19 engaged in more communication when they were
20 considering doing that.
21 Q.   Do you believe that Nat West
22 should not have closed Interpal's U.S. dollar
23 account?
24 A.   I believe they should have
25 engaged in far more communication before

Page 290

1      WALTERS
2  doing so.
3  Q.   We can do this all day and my
4  question is do you believe they should not
5  have closed the accounts?
6  A.   I believe that they should have
7  communicated far better with law enforcement
8  before they chose to do that.
9  Q.   But do you believe they should
10 have closed the accounts?
11 A.   I believe they should have
12 communicated before doing so.
13 Q.   Do you think that Nat West
14 acted inconsistent with your perception of
15 banking practice when it closed the accounts?
16 A.   When it closed the --
17 Q.   Accounts, the U.S. dollar
18 accounts?
19 A.   I think it was -- I do think it
20 was unusual to close them in the way that
21 they closed them.
22 Q.   Do you think it was unusual to
23 close them full stop regardless of whether
24 they communicated about that fact with law
25 enforcement?

Page 291

1      WALTERS
2  A.   Closing accounts is something
3  that banks do on a regular basis.
4  Q.   Here your understanding is that
5  Nat West closed the accounts to avoid
6  inadvertently having a violation of the OFAC
7  regulations, correct?
8  A.   The OFAC designation was
9  clearly causing difficulty and issue as I
10 found documented in the communication that I
11 reviewed.
12 Q.   Is it your understanding that
13 the purpose of an OFAC designation is to
14 create opportunities for freezing funds?
15 A.   An OFAC designation is to
16 inform people of the belief that these are
17 engaged in terrorism and it would involve
18 restricting movement of funds and removing
19 the money from terrorism.
20 Q.   The purpose of an OFAC
21 designation is to prevent the movement of
22 funds from occurring, not to create
23 opportunities for freezing those funds if the
24 movements do occur, correct?
25 A.   Well, the OFAC listing is part

Page 292

1      WALTERS
2  of the overall anti-terrorism strategy.
3  Q.   OFAC wishes by its regulations
4  to your understanding to prevent movements of
5  funds from occurring involving designated
6  entities when those movements are within the
7  jurisdiction of the OFAC regulations,
8  correct?
9  A.   I believe that's a reasonable
10 summary of my understanding.
11 Q.   A reasonable summary of what?
12 A.   My understanding of it.
13 Q.   Look at paragraph 190 of your
14 report.  You write here among other things
15 that Nat West closed the dollar accounts
16 quote in order to overcome in internal quotes
17 potential issues with the U.S., correct?
18 A.   That was my understanding of
19 it, yes.
20 Q.   Another way of putting it is
21 that Nat West did this to avoid violating the
22 OFAC regulations, correct?
23 A.   The OFAC listing was causing
24 Nat West difficulties in a number of
25 different ways.  By taking the OFAC issue out

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

GARY WALTERS
June 8, 2011

Page 297

1     WALTERS
2  without a payment filtering system. That's in
3  May 2004, quite some time after they
4  reassured that the group intends to monitor.
5  Q.  Thereafter Mr. Cole did a
6  review, correct?
7  A.  Mr. Cole did some inquiries,
8  but the group risk handbook of Nat West has
9  got in it a list of -- their own policy is
10  that, for instance, account activity for the
11  previous two years would be reviewed and I
12  think that kind of review would have been
13  beneficial to the decision making and he
14  suggests the semi-annual review so when they
15  couldn't comply with their own policy which
16  was linked to the OFAC listing and difficult
17  it is really to their client if the money
18  wasn't moved, they sought to remove that
19  difficulty which will be not standard
20  operation of the process that they -- it's
21  manipulating the process they documented they
22  should be doing.
23  Q.  Did you read the handbook to
24  which you just referred?
25  A.  I did.

Page 298

1     WALTERS
2  Q.  The whole thing?
3  A.  I did.
4  Q.  You believe you understood it?
5  A.  It was divided up in a way that
6  made some of it quite difficult because it
7  appears to have some bits repeated.  There
8  were bits where different bits were put in at
9  different dates, but I feel I understood it
10  and I quote it in my report.
11  Q.  Look at paragraph 221 of your
12  report.
13  A.  Yes.
14  Q.  What's your basis for stating
15  that Nat West relied on the BBC report?
16  A.  I would need to review the
17  source document.
18  Q.  Let me show you what's been
19  marked as Exhibit 43 which bears the Nat West
20  production number 12942.  Have you seen that
21  before?
22  A.  Yes, I believe I have.
23  Q.  That's a letter from the
24  Charity Commission to Nat West, actually to
25  Royal Bank of Scotland, Nat West's parent,

Page 299

1     WALTERS
2  informing the bank that the Charity
3  Commission's 2003 investigation had ended,
4  correct?
5  A.  Yes.
6  Q.  It informs Nat West through its
7  parent Royal Bank of Scotland that the
8  Charity Commission had unfrozen Interpal's
9  accounts, correct?
10  A.  Yes.
11  Q.  It informed the bank that the
12  trustees of Interpal were now free to operate
13  the bank's accounts with, I think it should
14  be without, but it says with, any further
15  recourse to the commission, correct?
16  A.  Yes.
17  Q.  It reports to the bank where it
18  can find the commission's findings on the
19  commission's website, correct?
20  A.  Yes.
21  Q.  It thanks Mr. Burfoot of the
22  bank and his colleagues for their assistance
23  in dealing with the Interpal investigation,
24  correct?
25  A.  Yes.

Page 300

1     WALTERS
2     MR. FRIEDMAN: I have nothing
3  further at this time.  As I said
4  before, we will be requesting some
5  documents.
6     MR. BONNER: I just have a few
7  questions for Mr. Walters.  I think
8  probably the best thing to do is to
9  keep looking straight ahead even
10  though I'm speaking to you.
11  EXAMINATION BY
12     MR. BONNER:
13  Q.  You recall that during Mr.
14  Friedman's examination, Mr. Walters, there
15  was some discussion of the methodology that
16  you employed in reaching the conclusions that
17  you express in your reports?
18  A.  Yes.
19  Q.  Did you employ a consistent
20  methodology in reaching those conclusions?
21  A.  Yes, I did.
22  Q.  Could you just tell me in
23  general terms what the methodology was that
24  you employed in reaching the conclusions
25  expressed in your report?

**EXHIBIT 146 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 129 of 328 PageID #: 9833

Login | Contact Us | Site Map



Services   Industries   Technology

Services > Compliance and Risk Management

### Services

Forensic Accounting
E-Discovery
Litigation Consulting
Data Collection and Forensic IT
Collective and Class Action
Compliance and Risk Management
Bankruptcy Filing - Creditor Liaison

## Compliance and Risk Management

Companies that wish to maintain health and longevity insure their reputations through proper compliance and by managing financial risk. Our consultants assist clients with developing internal audits, undertaking due diligence procedures, and mitigating risk. Our experts have the skills and experience to determine whether you're meeting requirements and if existing structures are effective.

We provide analysis by reconstructing data and analyzing transactions to determine whether there is any actual fraud or suspicious activity.

Rules and procedures can become more complex and change drastically when one border ends and another begins. The global marketplace has created an environment that raises many questions about local/international jurisdictions and issues regarding data protection. Our analysts and IT specialists determine whether your systems are compliant and determine inefficiencies, productivity loss, and potential regulatory breaches.

Areas of experience include:

**FCPA** – Investigations and audits into claims of bribery extending across numerous jurisdictions. Records evaluation - including data services such as reconstruction and forensic analysis. Provide structural analysis in order to determine whether your current policies are compliant with existing regulations. We also offer assistance in the fulfillment of reporting requirements.

**Anti Trust/Mergers and Acquisitions** – conduct investigation and analysis to determine market monopoly and service comparisons including pricing, penetration, and customer options. Develop presentations for regulatory agencies.

**Analytics** Analysis and Transactional Data Reconstruction. Presentation to governmental bodies (SEC, DOJ)

**Process Advisory** – Develop standardized procedures, strategies, and IT operations that guarantee compliance with regulatory laws.

**IT advisory** – Evaluate client systems and determine efficiency and conformity with data protection rules and regulations.

**Money Laundering** – examine cross border financial transactions and determine if they meet regulatory requirements. Perform due diligence investigations and customer review.

### Contact

**Frances McLeod**
Partner
fmcleod@forensicrisk.com
+1 (401) 519-1438

**Toby Duthie**
Partner
tduthie@forensicrisk.com
+44 (0) 207 269 7837

Download PDF

FCPA Overview

---

About FRA    Our People    Office and Data Center Locations    Careers

**Anti-Corruption Blog:**

The FCPA and other anti-corruption legislation from a European perspective

**New Releases:**

EDReviewer™ 6.0
Our hosted e-discovery solution that provides a time critical, flexible and cost effective platform for the review of litigation data and documents.

**Global Insight**

News and Information on Global Forensic Risk Issues
Facilitation payments and the UK's new Bribery Act

Privacy Policy | Legal Notice

© 2011 Forensic Risk Alliance. All rights reserved.

**EXHIBIT 147 to Declaration of Joel Israel**

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 1

```
1  UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF NEW YORK
   ----------------------------------x
3  MOSES STRAUSS, et al.,
4                      Plaintiffs,
5       -against-
6  CREDIT LYONNAIS, S.A.,
7                      Defendants.
   ----------------------------------x
8  BERNICE WOLF, et al.,
9                      Plaintiffs,
10      -against-
11 CREDIT LYONNAIS, S.A.,
12                     Defendants.
   ----------------------------------x
13
14                    One Liberty Plaza
                      New York, New York
15
                      December 2, 2010
16                    9:45 a.m.
17
18         Videotaped Deposition of Expert
19 Witness, EVAN KOHLMANN, before Shari Cohen,
20 a Notary Public of the State of New York.
21
22
23     ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24          New York, New York 10022
                 212-750-6434
25                REF: 95216
```

Page 3

1     A P P E A R A N C E S (Cont'd):

2

3  KOHN, SWIFT & GRAF, P.C.

4  Attorneys for Plaintiffs

5  One South Broad Street

6  Philadelphia, Pennsylvania  19107

7     BY: STEVEN M. STEINGARD, ESQ.

8  PHONE  215-238-1700

9  FAX   215-238-1968

10 EMAIL  ssteingard@kohnswift.com

11

12

13 CLEARY GOTTLIEB STEEN & HAMILTON LLP

14 Attorneys for Defendants

15 One Liberty Plaza

16 New York, New York  10006

17    BY: AVRAM E. LUFT, ESQ.

18 BRENDAN H. GIBBON, ESQ.

19 JAMIE RIETEMA, ESQ.

20 DAVID LEVY, ESQ.

21 PHONE  212-225-2432

22 FAX   212-225-3999

23 EMAIL  aluft@cgsh.com

24

25    ALSO PRESENT: NATHANIEL ARMSTRONG, Videographer

Page 2

```
1  A P P E A R A N C E S:
2
3  OSEN, LLC
4  Attorneys for Plaintiffs
5       345 Seventh Avenue
6       New York, New York  10001
7  BY:   JOSHUA D. GLATTER, ESQ.
8        PHONE  646-380-0480
9        FAX    646-380-0471
10       EMAIL  jdg@osen.us
11
12
13 OSEN LLC
14 Attorneys for Plaintiffs
15       700 Kinderkamack Road
16       Oradell, New Jersey  07649
17 BY:   ARI UNGAR, ESQ.
18       NAOMI WEINBERG, ESQ.
19       PHONE  201-265-6400
20       FAX    201-265-0303
21       EMAIL  au@osen.us
22
23
24
25
```

Page 4

```
1  ------------------ I N D E X ------------------
2  WITNESS            EXAMINATION BY        PAGE
3  EVAN KOHLMAN       MR. LUFT                 7
4
5
6  -------------- DOCUMENT REQUESTS --------------
7  PAGE   20  Engagement Agreement
8         34  Engagement Agreement
9         58  Copy of database
10
11
12 --------------- E X H I B I T S ---------------
13 KOHLMAN         DESCRIPTION            FOR I.D.
14 Exhibit 1       Invoice                     14
15 Exhibit 2       Invoice                     14
16 Exhibit 3       Expert Report               55
17 Exhibit 4       Letter                      69
18 Exhibit 5       Transcript                 149
19 Exhibit 6       Article                    231
20 Exhibit 7       Document                   253
21 Exhibit 8       Order                      264
22 Exhibit 9       Transcript                 265
23 Exhibit 10      Transcript                 290
24
25           (EXHIBITS TO BE PRODUCED)
```

Page 73

1      KOHLMANN
2  A.  I hope they are, yes.
3  Q.  I hope so too.  I have been
4  referring to 15 attacks and in fact 18 are
5  listed in your report, correct?
6  A.  Let's see, 18.
7  Q.  The reason I've been referring
8  to 15 is the first three attacks mentioned,
9  March 28, 2001 attack, the August 9, 2001
10  attack and the December 1, 2001 attack, is it
11  your understanding that those are no longer
12  at issue in this litigation?
13      MR. GLATTER: Objection to
14  form.
15  A.  I have no idea.
16  Q.  I'm only interested in the ones
17  starting on March 27, 2002 until September
18  24, 2002 which I'll represent to you are the
19  attacks that are at issue currently in this
20  litigation?
21      MR. GLATTER: Objection to
22  form.
23  A.  Okay.
24  Q.  It's September 24, 2004 was the
25  last attack.

Page 74

1      KOHLMANN
2  A.  Just to clarify, March 27, 2002
3  until September 24, 2004?
4  Q.  Correct, those are the 15
5  attacks I'm referring to.  Mr. Kohlmann, yes
6  or no, are you offering an opinion that the
7  March 27, 2002 Park Hotel bombing in Natanya
8  was an attack perpetrated by Hamas?
9      MR. GLATTER: Objection to
10  form.  You can answer.
11  A.  I'm offering an opinion that
12  it's more likely than not based on the
13  evidence proffered by Hamas that Hamas played
14  a culpable role in that attack.
15  Q.  Are you offering an opinion
16  that Hamas perpetrated that attack?
17      MR. GLATTER: Objection to
18  form.
19  A.  Again, I would give you the
20  same answer which is that my opinion would be
21  that it was more likely than not that Hamas
22  -- that there is evidence that Hamas carried
23  out that attack.
24  Q.  So I'm clear I'm not asking you
25  if you believe that there's evidence of it,

Page 75

1      KOHLMANN
2  I'm asking you if you can just give me a yes
3  or no answer if you are offering an opinion
4  that the March 27, 2002 Park Hotel bombing in
5  Natanya was an attack perpetrated by Hamas?
6      MR. GLATTER: Objection to
7  form.
8  A.  Unfortunately it's not a yes or
9  no answer.  More likely than not is the
10  answer.  Not that just there is evidence, but
11  the evidence indicates more likely than not
12  that Hamas was culpable in some way for that
13  attack.
14  Q.  When you say the evidence,
15  that's not all the evidence that exists, it's
16  just the evidence that you found on Hamas
17  websites on the internet, correct?
18  A.  Hamas websites and other on
19  line Hamas materials, correct, yes.
20  Q.  Again, given that you only
21  looked at -- I understand you only looked at
22  Hamas materials on the website, what I'm
23  asking you is a broader question.  Are you
24  offering an opinion that the March 27, 2002
25  Park Hotel bombing in Natanya was an attack

Page 76

1      KOHLMANN
2  perpetrated by Hamas, yes or no, is that an
3  opinion you are offering to the court?
4      MR. GLATTER: Objection to
5  form.
6  A.  The response to that question
7  is once again the same which is based upon
8  the evidence reviewed in my analysis, it's
9  more likely than not that the attack in some
10  way -- Hamas was in some way more than likely
11  or not more than likely, excuse me, more
12  likely than not involved or culpable in this
13  attack.
14  Q.  Again, I'm not asking you based
15  on the evidence you reviewed which admittedly
16  is not a complete set, correct?
17  A.  Correct.
18  Q.  I'm not asking you based on the
19  evidence you reviewed what's your opinion of
20  that evidence, I'm asking if you are offering
21  an opinion to this court that that attack was
22  perpetrated by Hamas?
23      MR. GLATTER: Objection to
24  form, object to the extent the
25  question has been asked and answered

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

KOHLMANN

1  KOHLMANN
2  and object to the extent that the
3  question is beyond the scope of Mr.
4  Kohlmann's expert report.  You may
5  answer.
6      MR. LUFT: I'm trying to
7  determine the scope.  I'm asking if
8  he's offering this opinion.
9      MR. GLATTER: My objection
10 stands.  You may answer.
11 A.  Unfortunately my answer is
12 going to be the same which is that I was not
13 asked to conduct a wide ranging analysis of
14 all sources, but based upon the sources that
15 I specifically was asked to look at, the
16 evidence that I gathered I believe indicates
17 that it's more likely than not that Hamas was
18 culpable in some way for the 15 attacks that
19 are listed or at least the 15 attacks that
20 you are concerned with here.
21 Q.  So am I correct that you are
22 not opining that Hamas was responsible for
23 the March 27, 2002 Park Hotel bombing attack
24 in Natanya?
25     MR. GLATTER: Objection to

1  KOHLMANN
2  form, misstates testimony. You may
3  answer.
4  A.  I don't believe that accurately
5  states what I just said.  I will repeat
6  again.  My conclusion on this is that the
7  evidence that I reviewed for this analysis
8  that being Hamas' on line presence indicates
9  that more likely than not Hamas is culpable
10 in some way for the 15 attacks that are
11 listed here.
12 Q.  Mr. Kohlmann, I don't want to
13 belabor this, but I understand what you want
14 to offer as your opinion and what it is.
15 What I'm asking is I have another question on
16 whether you are offering this other opinion
17 and that's what I'm asking you to tell me yes
18 or no if you are offering it or not and so
19 that's what I want you to tell me either yes
20 you are offering the opinion or no, you are
21 not offering the opinion that Hamas
22 perpetrated the March 27, 2002 Park Hotel
23 bombing in Natanya?
24     MR. GLATTER: Objection to
25 form, vague. You can answer.

1  KOHLMANN
2  A.  Again, with regard to the March
3  27, 2002 Park Hotel bombing what you are
4  suggesting is that I'm not saying they are --
5  I'm saying they were not culpable or saying
6  were culpable.  I'm saying in this case the
7  evidence that I reviewed indicates that more
8  likely than not they were culpable based upon
9  the evidence in this review. I'm not saying
10 based upon all evidence over there, I'm saying
11 based on the evidence in my reviews.
12 Q.  I understand that and what I'm
13 saying is you are not opining to this court
14 that the March 27, 2002 Park Hotel bombing in
15 Natanya was perpetrated by Hamas with no more
16 qualifications, just that's not an opinion
17 you are offering, correct?
18     MR. GLATTER: Objection to
19 form, asked and answered, but you can
20 answer.
21 A.  I am answering that in as much
22 that I'm answering that the evidence that I
23 reviewed indicates that they more likely than
24 not were culpable in some way for these
25 attacks.  It's not a yes or no.  There's no

1  KOHLMANN
2  yes or no because it's half yes, half no.
3  Q.  I believe this is a simple yes
4  or no question of whether this is an opinion
5  you are offering so if what I'm saying to you
6  is not an opinion you are offering, you will
7  tell me no, I'm not offering that opinion and
8  if it is an opinion you are offering, you
9  will tell me yes I am offering that opinion
10 regardless of what any other opinions you may
11 be offering, that's what I'm trying to get at
12 so I'll ask one more time. Are you offering
13 an opinion that the March 27, 2002 Park Hotel
14 bombing in Natanya was an attack perpetrated
15 by Hamas?
16     MR. GLATTER: Objection to
17 form.  May I clarify my objection?
18     MR. LUFT: No.
19     MR. GLATTER: Vague.
20 A.  I cannot answer this any other
21 way than I've already answered it in as much
22 that the evidence that I reviewed indicates
23 that more likely than not Hamas was culpable
24 in some way for these operations.  Beyond
25 that I'm not offering any assessment as to

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 157

1    KOHLMANN
2  agencies at the U.S. government in terms of
3  investigating Hamas financing, Hamas
4  recruitment. I have gone and listened to
5  speeches by individuals who have been accused
6  of Hamas financing, Hamas fundraising and
7  Hamas propagandizing. I have -- what else
8  would qualify as field work. Generally in
9  that vein.
10  Q. Anything else?
11  A. That's all I can recall at the
12  moment.
13  Q. Mr. Bakri is not a member of
14  Hamas though, correct?
15  A. Not as far as I know, no.
16  Q. The speeches that you heard,
17  where did you hear them?
18  A. They were given in the United
19  States, United Kingdom, elsewhere. Primarily
20  the U.S. and the U.K.
21  Q. Any in -- you told me you have
22  never been to Israel?
23  A. No, I have never been to Israel
24  and the occupied territories.
25  Q. So none of them were there?

Page 158

1    KOHLMANN
2  A. No.
3  Q. How about Syria?
4  A. I don't think I'm allowed to go
5  to Syria.
6    MR. GLATTER: I think you mean
7  Saudi Arabia.
8    MR. LUFT: I'm pretty sure I
9  meant Syria.
10    MR. GLATTER: Okay.
11    MR. LUFT: I think Mr. Kohlmann
12  knows why I would ask.
13  A. I have not been to Syria, no.
14  Q. Lebanon?
15  A. No, not to Lebanon, no.
16  Q. Egypt?
17  A. Not to Egypt, no.
18  Q. Who in the U.S. government have
19  you worked with with regard to investigating
20  Hamas recruitment?
21  A. I have worked with the United
22  States Treasury Department, I've worked with
23  the U.S. Justice Department, I've worked with
24  the FBI and I've worked with the National
25  Security Counsel.

Page 159

1    KOHLMANN
2  Q. When you say you have worked
3  with them, what have you done for them?
4  A. I don't believe I can discuss
5  that. I don't believe based upon the fact
6  the work is confidential I don't believe I
7  can discuss that.
8  Q. Do you have --
9  A. I can give you a general
10  description.
11  Q. Why don't we start with that?
12  A. I have assisted them in
13  identifying financing networks. I have
14  assisted them with the identification of
15  websites. I have assisted them with the
16  identification of propaganda videos. I think
17  that's about as specific as I can get.
18  Q. The propaganda videos were on
19  the internet?
20  A. No, the propaganda videos,
21  well, they were once on the internet. They
22  were propaganda videos that were created for
23  the distribution on the internet.
24  Q. I don't want to impinge our
25  country's security in any way so I'll try to

Page 160

1    KOHLMANN
2  ask these carefully. Other than helping with
3  the identification of financing networks,
4  websites and propaganda videos, is there
5  anything else?
6  A. That's the lion share of what I
7  have done.
8  Q. Have you ever been a member of
9  law enforcement?
10  A. No.
11  Q. Have you ever been attended a
12  police academy?
13  A. No.
14  Q. The FBI academy?
15  A. I have attended training
16  courses at the FBI academy, however, I have
17  not graduated from any course of study at the
18  FBI academy.
19  Q. Have you ever trained to be an
20  intelligence agent for a government
21  intelligence agency?
22  A. No.
23  Q. Have you ever been part of the
24  military?
25  A. No.

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 193

1       KOHLMANN
2   A.   Again, I believe that because
3   of my experience in studying Hamas propaganda
4   and their claims of responsibility from the
5   web that are issued through their internet
6   website, my experience is that a single
7   claim, a single credible claim alone is
8   enough to believe that it's more likely than
9   not that Hamas was engaged in some level of
10  culpability in a particular attack, however,
11  the more times they say that from the more
12  branches of the organization or the more
13  individual leaders, that then tends to go up
14  from there.  As regards to did I note that in
15  my report, yes.  In each attack I
16  specifically identified whether or not a
17  communica was posted on either the
18  Palestinian information center or a website
19  operated by the Izzeden al-Qassam Brigades
20  and I was I believe it's pretty specific for
21  each attack.
22  Q.   I'm trying to understand you
23  say it goes up from there, either Hamas was
24  culpable or they were not culpable, right,
25  there's no going up so I'm asking in terms of

Page 194

1       KOHLMANN
2   doing your methodology in assessing the
3   reliability of that information, did it
4   matter to you the fact that there was not
5   these in certain cases additional posts on
6   other websites, did you take that into
7   consideration when doing your analysis?
8       MR. GLATTER: Objection to
9   form.
10  A.   Again, I did take it into
11  consideration, but my sense is that a single
12  claim of responsibility on a credible Hamas
13  site was sufficient detail. That by default
14  means that it's more likely than not that
15  Hamas in some way was culpable for a
16  particular attack.  What I'm saying is that
17  the more times they claim responsibility, the
18  more places that those claims of
19  responsibility come out on line in authorized
20  authentic venues, that means that it goes up
21  from there.  It means it becomes increasingly
22  likely that they were indeed culpable in some
23  way for a given attack, but what I'm saying,
24  yes, I did take into consideration because
25  obviously identified in my report when

Page 195

1       KOHLMANN
2   communicas were either issued by the
3   Palestinian information center i.e. the
4   website of the political wing verses the
5   websites run by the military wing, the
6   Izzeden al-Qassam Brigades.
7   Q.   What I can't tell from your
8   report is where in your methodology you
9   discounted a claim of responsibility where
10  there were not multiple claims?
11      MR. GLATTER: Objection to
12  form.
13  A.   I would have discounted
14  responsibility had there been no claims.  In
15  this case there were claims of responsibility
16  for all 15 and they were claims of
17  responsibility which I deemed to have been
18  posted on credible authentic Hamas websites,
19  either the political, the military wing or
20  both so what I'm saying is is that at a
21  minimum for those 15 attacks at a minimum
22  there was at least one credible claim of
23  responsibility which would indicate to us
24  that more likely than not Hamas had in some
25  way been culpable for these attacks.

Page 196

1       KOHLMANN
2   Q.   Let me understand, you only
3   looked at materials Hamas posted on the web?
4   A.   Correct.
5   Q.   And you're saying that if Hamas
6   had never claimed responsibility, then you
7   would have discounted that in your analysis
8   that Hamas did it, effectively if they never
9   said they did it you would have discounted
10  the possibility that they did it?
11      MR. GLATTER: Objection,
12  misstates the testimony.
13  A.   If Hamas never had issued a
14  communica, credible communica via one of its
15  on line information sources, it never issued
16  a video recording and it never cited the
17  attack in the Glory Record, it had never
18  talked about the attack in one of its
19  magazines, it never produced any evidence
20  that it even knew the attacker, then yes, the
21  attack would not have shown up in this list.
22  Q.   If Hamas did any of those
23  things, then they would qualify under your
24  list of providing more likely than not that
25  Hamas was culpable in the attack?

MOSES STRAUSS VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 2, 2010

Page 301

1    KOHLMANN
2    that were coming from the headline.
3    Q.   Advanced criminal law course,
4    what was that?
5    A.   That was a lot of different
6    things.  That was more procedural than
7    substantive.
8    Q.   For your cyber crime seminar I
9    know you mentioned the paper that you wrote.
10   What was being taught in the class, was the
11   focus of that terrorism and counter
12   terrorism?
13   A.   The focus of that was largely
14   to do with terrorism and counter terrorism.
15   The class was taught by a former assistant
16   U.S. attorney and was taught -- individual
17   classes were taught by FBI agents and others.
18   A large part of it had to do with terrorism.
19   Q.   I assume Afghanistan and
20   Islamism related to terrorism, is that fair?
21       MR. GLATTER: Asked and
22   answered.
23       MR. LUFT: I didn't ask that
24   one.
25       MR. GLATTER: I think you did,

Page 302

1    KOHLMANN
2    but you can answer again.
3        MR. LUFT: Actually I didn't.
4    A.   I don't know if it's related to
5    terrorism per se, but it's relating to my
6    course of study, my understanding of
7    terrorism.
8    Q.   But the topic was not actually
9    terrorism?
10   A.   The topic was modern
11   contemporary Afghan history and the role of
12   Islamism which obviously is directly relevant
13   to terrorism, but I don't think we were
14   studying it from the perspective of terrorism
15   or counter terrorism, we were studying the
16   substantive aspects of this, but obviously
17   it's relating to terrorism.
18   Q.   How about free speech, was the
19   focus of that terrorism and counter
20   terrorism?
21   A.   I can't recall what I did in
22   free speech.  I can't recall what work we did
23   in free speech.
24   Q.   Trial advocacy?
25   A.   I believe trial advocacy was

Page 303

1    KOHLMANN
2    straight trail ad.
3    Q.   First Amendment?
4    A.   I don't recall.
5    Q.   What was your independent
6    study?
7    A.   I don't recall.
8    Q.   Fair to say --
9    A.   I do know what my independent
10   study was.  My independent study was doing
11   work on behalf of the Investigative Project.
12   Q.   Fair to say that the majority
13   of the courses you took in law school the
14   focus was not on terrorism and counter
15   terrorism?
16       MR. GLATTER: Objection to
17   form, vague.
18   A.   I would say that there were at
19   least five to six classes where terrorism was
20   a major focus of study, at least three of
21   which where terrorism was the dominant
22   subject of study.  I don't know if that's the
23   majority, but that's more than two.
24       MR. LUFT: Okay, why don't we
25   wrap up for tonight.

Page 304

1    KOHLMANN
2        MR. GLATTER: We'll see you
3    tomorrow.
4        THE VIDEOGRAPHER: This
5    concludes the deposition of Evan
6    Kohlmann for tonight December 2,
7    2010.  Time is 6:22 p.m.  We are
8    reconvening tomorrow at 9:30.
9        (Time noted: 6:22 p.m.)

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 137 of 328 PageID #: 9841

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 308

```
1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK
    ---------------------------------------x
3   MOSES STRAUSS, et al.,

4                    Plaintiffs,

5      -against-

6   CREDIT LYONNAIS, S.A.,

7                    Defendants.
    ---------------------------------------x
8   BERNICE WOLF, et al.,

9                    Plaintiffs,

10     -against-

11  CREDIT LYONNAIS, S.A.,

12                   Defendants.
    ---------------------------------------x
13

14                 One Liberty Plaza
                   New York, New York
15
                   December 3, 2010
16                 9:45 a.m.

17

18          Continued Videotaped Deposition

19  of Expert Witness, EVAN KOHLMANN, before

20  Shari Cohen, a Notary Public of the State of

21  New York.

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24               New York, New York 10022
                      212-750-6434
25                    REF: 95217
```

Page 309

```
1   A P P E A R A N C E S:

2

3   OSEN, LLC

4   Attorneys for Plaintiffs

5          345 Seventh Avenue

6          New York, New York  10001

7   BY:    JOSHUA D. GLATTER, ESQ.

8          PHONE  646-380-0480
           FAX    646-380-0471
9          EMAIL  jdg@osen.us

10

11

12  OSEN LLC

13  Attorneys for Plaintiffs

14         700 Kinderkamack Road

15         Oradell, New Jersey  07649

16  BY:    ARI UNGAR, ESQ.

17         NAOMI WEINBERG, ESQ.

18         PHONE  201-265-6400
           FAX    201-265-0303
19         EMAIL  au@osen.us

20

21

22

23

24

25
```

Page 310

```
1   A P P E A R A N C E S: (Cont'd)

2

3   KOHN, SWIFT & GRAF, P.C.

4   Attorneys for Plaintiffs

5          One South Broad Street

6          Philadelphia, Pennsylvania  19107

7   BY:    STEVEN M. STEINGARD, ESQ.

8          PHONE  215-238-1700
           FAX    215-238-1968
9          EMAIL  ssteingard@kohnswift.com

10

11

12  CLEARY GOTTLIEB STEEN & HAMILTON LLP

13  Attorneys for Defendants

14         One Liberty Plaza

15         New York, New York  10006

16  BY:    AVRAM E. LUFT, ESQ.

17         BRENDAN H. GIBBON, ESQ.

18         JAMIE RIETEMA, ESQ.

19         DAVID LEVY, ESQ.

20         PHONE  212-225-2432
           FAX    212-225-3999
21         EMAIL  aluft@cgsh.com

22

23  ALSO PRESENT:

24  NATHANIEL ARMSTRONG - Videographer

25
```

Page 311

```
1   ----------------- I N D E X -------------------

2   WITNESS               EXAMINATION BY        PAGE

3   EVAN KOHLMAN          MR. LUFT              314

4

5

6   --------------- E X H I B I T S ----------------

7   KOHLMANN         DESCRIPTION          FOR I.D.

8   Exhibit 11       Trial Transcript        315

9   Exhibit 12       Daubert Hearing         316

10  Exhibit 13       Trial Transcript        318

11  Exhibit 14       Trial Transcript        320

12  Exhibit 15       Article                 361

13  Exhibit 16-17    Documents               392

14  Exhibit 18-19    Documents               410

15  Exhibit 20-21    Documents               413

16  Exhibit 22-23    Documents               442

17

18

19          (EXHIBITS TO BE PRODUCED)

20

21

22

23

24

25
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 488

1 KOHLMANN
2 purchased ISYS and I was to export my own
3 data files i.e. the data files -- the index
4 data files on my computer, I don't believe
5 those would be readable by ISYS on a separate
6 computer. If you ran ISYS, an indexing
7 process through my entire database which I
8 should warn you takes about two weeks you
9 would eventually get a searchable index,
10 should be the identical same one that I had.
11 The process of creating an automated index
12 like that with software A, is very onerous
13 and B, takes quite a bit of time and C,
14 again, is not exportable. It's not like I
15 could give you my data files. You have to
16 re-index the whole thing yourself on your own
17 end.
18 Q. Mr. Kohlmann, I want to ask you
19 just again I'm trying to get a sense of how
20 all this fits together, you said in your
21 Affidavit that your database consists of raw
22 data files and that the materials are sorted
23 chronologically by year and gave examples
24 from 2008?
25 A. Yes.

Page 489

1 KOHLMANN
2 Q. When did you start sorting your
3 materials chronologically by year?
4 A. As soon as I had more than one
5 year worth of materials.
6 Q. As I have seen in the sub
7 database I see there's a folder from '98 to
8 2006 I believe, but I don't see any files
9 chronologically by year within that time
10 period?
11 A. I'll have to double check upon
12 that, but the reason why there's one folder
13 for all those years is because of the fact
14 that I only start separating them out year by
15 year if there's so much data that it starts
16 over loading individual folders. If I saved
17 so many files by hand individually, if you
18 save over 2,000 files by hand individually in
19 one folder, what happens is that Windows can
20 no longer read the folder and any attempt to
21 browse the folder will crash your computer.
22 The idea is as soon as I reach the point I
23 had more than 2,000 hand saved files in one
24 folder which is now in some cases every month
25 with particular groups I would have to then

Page 490

1 KOHLMANN
2 do that. Luckily for the most part between
3 those years aside from the archived copies,
4 the pulled copies of the websites that we
5 had, the materials were specifically related
6 to specific tasks that we were engaged in
7 with regards to these websites so it was a
8 significant amount of material, but it was
9 not more than 2,000 hand saved files.
10 Q. When you say that they were --
11 those materials were related to specific
12 tasks?
13 A. For instance, we were engaged
14 in studying Hamas financing so if Hamas would
15 come out and Hamas did do this, if Hamas came
16 out with something on their website talking
17 about would you like to contribute, here's
18 instruction how you can contribute, those
19 kind of files we would save individually.
20 Q. Not a general collection with
21 regard to Hamas during that time period? You
22 were not trying to capture everything Hamas
23 was putting on the web?
24 A. The idea of addressing that
25 need was to try to archive as much as

Page 491

1 KOHLMANN
2 possible the complete copies of the sites,
3 but we only saved targeted files when we
4 believed that individual files are
5 specifically relevant and necessary to save
6 individually for particular things that we're
7 working on. Certain groups we saved more
8 things by hand, however, that's often because
9 of the fact that those groups don't have the
10 fixed websites so in other words there's no
11 way of creating an automated archive of the
12 website in question. Hamas depending how you
13 appreciate it or not Hamas has a fixed
14 website which means that you could go ahead
15 and download everything off their website in
16 one fell swoop whereas with alot of these
17 other groups they were disseminating
18 communicas via message forums, individually,
19 they would disappear one day, they would come
20 back another day, there was no way of
21 grabbing everything all at once.
22 Q. Mr. Kohlmann, for the period of
23 1998 to 2006 in that folder, those materials
24 are not sorted chronologically other than
25 they fall within that six year, eight year

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 492

KOHLMANN

1  time frame, correct?
2  MR. GLATTER: Folder on the sub
3  database or the database?
4  Q.  Sub database?
5  A.  I would have to review that to
6  be certain.  I believe there are some
7  materials in there sorted chronological, but
8  I would have to go back and look
9  individually.  The other factor to take into
10  mind is that when you save files in a Windows
11  or for that matter any file system, the file
12  system creates records of when the file was
13  created, last modified, etc., etc.  Are you
14  familiar with what I'm discussing?
15  Q.  Yes.
16  A.  So in some cases what I would
17  also do is use the actual computer registry
18  of when I had actually saved files to
19  determine when they were from.
20  Q.  I apologize I have been telling
21  you '98 to 2006.  I have been told it's --
22  A.  2005.
23  Q.  2005, correct.  Mr. Kohlmann,
24  let me ask you this.  I note that in your
25

Page 493

KOHLMANN

1  report you mention that in addition to
2  looking in your own archive there were
3  multiple instances where you used a web based
4  archive to find information that I assume was
5  not included in your database?
6  A.  Yeah, starting in 1998 we have
7  regularly used the internet archive and
8  material stored on the archive i.e.
9  archive.org, www.archive.org to supplement
10  what we have in our own database because of
11  the fact like I said we simply have not had
12  the good fortune to save every single last
13  file so we've used -- it's pretty consistent
14  use of the internet archive to supplement
15  also because of the fact that in many cases
16  it's easier to reproduce materials from the
17  internet archive than it is from our database
18  simply because the internet archive very
19  clearly is time date stamped, it's publicly
20  available, it can be exported and sent to
21  other people and it could be independently
22  verified so for our purposes in a number of
23  ways in which we were using this data using
24  copies distributed by the internet archive
25

Page 494

KOHLMANN

1  provided us benefit.
2  Q.  Mr. Kohlmann, if I want to look
3  at the sub database, how can I determine what
4  materials on the sub database came from your
5  proprietary database and which materials you
6  gathered from the web archive for purposes of
7  this litigation?
8  A.  Everything in our database is
9  part of our database regardless of whether it
10  comes from the archive or it comes directly
11  from the Hamas site.  It's my belief upon
12  studying the way the internet archive works
13  their copies of Hamas websites are equally as
14  authoritative and accurate and credible as
15  the ones that we have saved directly so I
16  personally don't necessarily distinguish
17  between the credibility of al-Qassam.ps as we
18  downloaded it verses al-Qassam.ps which is
19  archived on the archive, however, if you were
20  interested in determining whether or not an
21  individual file has been saved from the
22  internet archive verses has been saved
23  directly from Palestineinfo, al-Qassam.ps
24  there is actually a very simple way of
25

Page 495

KOHLMANN

1  determining that.
2  Q.  Great.
3  A.  Which is that files for the
4  most part that are on the internet archive
5  are saved in web HTML format.  Every single
6  file which is available for download from the
7  internet archive which is in HTML format
8  regardless of whatever site it's in embedded
9  within the HTML, not visible to the naked
10  eye, but if you look in the source file at
11  the top it very clearly states downloaded
12  from the internet archive along with the
13  original URL from which it was downloaded.
14  Q.  There is a folder in your sub
15  database that says appendix and has a whole
16  bunch of PDF's in it.  Do you know what I'm
17  referring to?
18  A.  That's relating to this case.
19  Q.  That's what I want to know.
20  A.  Yeah.
21  Q.  Is that something that existed
22  in your database prior to working on this
23  case or is that material that you assembled
24  for this case?
25

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 496

KOHLMANN

2 A.   This is an issue of confusion I
3 think.  I was producing in addition to my
4 sub database, I also produced to you a folder
5 marked appendix with all of my materials, but
6 those materials are relating to this case,
7 they are not materials that we necessarily
8 downloaded ahead of time into a file marked
9 appendix and it happened to coincide, no,
10 that's just an issue of confusion.
11 Q.   To the extent that the
12 materials listed in the appendix are not
13 materials that I find elsewhere in your sub
14 database, is it fair for me to assume that
15 they were not materials from your database,
16 but materials that you searched on the
17 internet archive to get for purposes of this
18 litigation?
19     MR. GLATTER: Objection to
20 form. I think that misstates the
21 testimony.
22     MR. LUFT: I don't think I
23 asked it to him. I don't think he
24 said anything. I'm trying to
25 understand it, Josh, please.

Page 497

KOHLMANN

2     MR. GLATTER: I understand.
3 I'm just preserving the record.  You
4 can answer the question.
5 A.   I don't think it's 100 percent
6 thing.  I don't know what you are doing to
7 search for those things in there.  It's
8 certainly possible that there are materials
9 from the internet archive which we obtained
10 in relation for this case which we may not
11 have had copies of initially on the actual
12 site and that's one of the reasons why we
13 rely on the internet archive to make sure
14 that anything -- we believe our database is
15 fairly comprehensive, but there's always the
16 possibility it might be missing something so
17 that's one of the reasons we rely on the
18 internet archive it's an independent
19 objective copy of that data and it allows us
20 to look through from the position again of
21 being ignorant of what's in our database what
22 else might be there that we might have
23 missed.
24 Q.   I'm trying to figure out, Mr.
25 Kohlmann, as an easy way to do that check

Page 498

KOHLMANN

2 that I want to know which is what's in your
3 database verses that you are relying on
4 verses what came from the internet archive.
5 If I look what's in the appendix and if I
6 don't find it in the rest of sub database, is
7 it a safe assumption that that means that if
8 I can't find it from your sub database is it
9 a safe assumption that it came from outside
10 your database?
11     MR. GLATTER: Objection to
12 form.
13 A.   I don't know because I don't
14 know what you are doing to look for those
15 files.
16 Q.   Presuming I'm not in error in
17 what I'm doing.
18     MR. GLATTER: Objection to
19 form.
20 A.   It's possible.  I don't know.
21 I don't know.  I'd have to see.  If you have
22 an individual attack, we can try looking and
23 seeing whether or not it's in there or
24 whether or not the only copy we have is from
25 the internet archive, it's possible, but I

Page 499

KOHLMANN

2 think the only thing to say about this is
3 that we often use the internet archive to
4 supplement our off line copies of these
5 websites.  It's something we do on a very
6 frequent basis, not just with regard to
7 Hamas, but with regard to a wide range of
8 different groups.
9 Q.   If something is included in
10 your appendix and does not otherwise exist in
11 the sub database -- strike that
12     Mr. Kohlmann, when you were
13 looking with regard to an individual attack
14 for what materials existed, walk me through
15 your process in terms of when you looked at
16 your database verses when you looked at the
17 web archive?
18 A.   You mean chronologically
19 speaking?
20 Q.   What process did you use when
21 you were faced with a specific attack, how
22 did you assemble information to determine
23 whether you needed to look beyond your own
24 database?
25 A.   We did in every single case.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 500

KOHLMANN
1
2 Q.  Do you recall what number of
3 the 15 cases you looked -- you found material
4 on the web archive that was not included in
5 your database?
6 A.  I don't know only because we
7 did not organize it like that, we simply
8 looked for relevant material and gathered it
9 all together in folders and in several cases
10 I believe even when material was present in
11 our database we used copies that were on the
12 internet archive simply because of the fact
13 it was easier to reproduce them, it was
14 easier to present them, it was easier for us
15 to then authenticate them to defense counsel.
16 Q.  Sitting here today you don't
17 remember which attacks you had information in
18 your database and which ones you looked on
19 the web archive for?
20     MR. GLATTER: Objection to
21 form.
22 A.  Like I said, our presumption
23 initially is there might be some information
24 out there which is not in our database, we
25 have to presume that there might be something

Page 501

KOHLMANN
1
2 not there so immediately we look to current
3 iterations of Hamas websites, we looked to
4 archived iterations of Hamas websites and
5 then we looked to our own database.  This is
6 particularly applicable to Hamas because
7 Hamas has multiple fixed websites which are
8 archived by the internet archive so in this
9 case we wanted to go directly to the horse's
10 mouth so if we had stuff on our database that
11 was great, but we often times tried to
12 present the form that was available in the
13 internet archive so that it was easily
14 accessible to defense counsel, it was easily
15 authenticated, there was no question about
16 where it came from or about what methods we
17 used to save it or whether it was preserved
18 properly or any of that other material.
19 Q.  Mr. Kohlmann, in your
20 declaration you told us that not every item
21 cited in my report is encompassed in my
22 database or the sub database.  This is
23 because many of the materials were at the
24 time I completed the Kohlmann report
25 available directly on line from either the

Page 502

KOHLMANN
1
2 Hamas' current websites or from the internet
3 archive site, do you recall that?
4 A.  Yes, I do.
5     MR. GLATTER: You reading from
6 the report or declaration?
7     MR. LUFT: The declaration.
8     MR. GLATTER: I don't think we
9 introduced that.
10     MR. LUFT: I'm asking to
11 refresh his recollection.
12 Q.  You remember saying that,
13 right?
14 A.  Yes.
15 Q.  When you say not every item in
16 my report is encompassed in my database or my
17 sub database, that means that there's certain
18 things that you have cited to in your report
19 that don't exist in your database which is
20 what we've been talking about, right?
21     MR. GLATTER: Objection to
22 form.
23 A.  Correct, those materials would
24 have been on the internet archive, exactly.
25 Q.  You say the reason that they

Page 503

KOHLMANN
1
2 are not included in your database or your sub
3 database is because many of the materials
4 were available directly on line from either
5 Hamas' current internet websites or from the
6 internet archive, correct?
7 A.  Correct.
8 Q.  What I'm trying to understand
9 is for something to be included at the
10 database from 2003, you would have needed to
11 make a decision in 2003 or some relevant time
12 interval shortly thereafter about whether to
13 save it or not.  You would not know in the
14 future something would continue to be on the
15 web archive or continue to be or continue
16 post on the current version of the website,
17 correct?
18     MR. GLATTER: Objection to
19 form.
20 A.  This goes back to what I was
21 saying before that Hamas is different from
22 other groups.  Al-Qaeda communicas don't last
23 on the internet very long, they get wiped out
24 pretty quickly, so you have to save
25 individual files.  With Hamas, part of what

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

---

Page 504

KOHLMANN

1  KOHLMANN
2  we understood was that Hamas had a continuing
3  presence on the internet and that the Hamas
4  websites which were fixed dot com websites
5  were being regularly indexed by the internet
6  archive.  Given the fact that when we started
7  doing this back in 2003 we had somewhat
8  limited resources as well as limited
9  technology, we did as much as possible to
10  save what we could, but with the
11  understanding that because of the fact that
12  all of this stuff is being repeatedly posted
13  on each iteration of the Hamas website and
14  because there are detailed archive available
15  on the internet archive of those stored
16  sites, it made sense for us to focus in on
17  particular areas of significance if there
18  were particular communicas or particular
19  operations or something in particular off
20  that site that became relevant later
21  obviously we would look in our database to
22  see whether we had a copy, but it was also in
23  the understanding that these materials would
24  likely also alternatively be available via
25  the internet archive or if not the internet

---

Page 505

1  KOHLMANN
2  archive, then from the current iteration of
3  the al-Qassam website or the Palestinian
4  information center website.
5  Q.  In 2002 you knew what would be
6  available on the al-Qassam website today?
7  A.  I knew that the archive was
8  creating archives of the websites so I knew
9  that in 2002 I had a strong degree of
10  confidence that in two years if I wanted to
11  go back and look what was on
12  Kataeb-ezzeldeen.com in large part that
13  material would still be available.
14  The internet archive does not
15  archive every single last file, but neither
16  can we, not by hand anyway, so the idea being
17  is that we understood that there was a back
18  up there where if we needed to go back and
19  make sure that there were individual files
20  which we may or may not have actually had a
21  chance to archive because of the fact that
22  al-Qassam.ps and Palestine info are fixed dot
23  com websites we had a strong degree of
24  confidence that that material would in large
25  part be archived on the internet archive and

---

Page 506

1  KOHLMANN
2  available for us to use.
3  MR. LUFT: Let's take a short
4  break.
5  THE VIDEOGRAPHER: We are now
6  off the record at 1:59 p.m., December
7  3, 2010.
8  (Recess taken.)
9  THE VIDEOGRAPHER: The time is
10  2:18 p.m. on December 3, 2010. We're
11  are now back on the record.  You may
12  proceed.
13  A.  Just to offer a clarification,
14  I want to be very clear how the internet
15  archive is used in my database.  We regularly
16  use the internet archive to access websites
17  which we may or may not already have copies
18  of to save archive material thus my sub
19  database regardless of anything to do with
20  this matter presently at hand, my sub
21  database includes both materials that have
22  been downloaded directly from the Hamas
23  websites as well as material that we may have
24  gotten from the Hamas websites, but via the
25  channel of the archive.  That may or may not

---

Page 507

1  KOHLMANN
2  have any relation to this case.  The point is
3  we use the internet archive frequently and
4  there is no distinction in our database
5  between files that are saved from the
6  internet archive verses the ones that are
7  saved directly from the sites because it's
8  our understanding that the copies maintained
9  on the internet archive are accurate and
10  complete to the extent they proffer
11  themselves to be.
12  Q.  Mr. Kohlmann, do you know if
13  any of the materials relating to the 15
14  attacks in this case that are in your sub
15  database, but not in the file labeled
16  appendix came from the web archive?
17  A.  Repeat the question.
18  (Record read.)
19  A.  It's possible, yeah, but they
20  should all be within -- all that material
21  should be within the -- you're asking me --
22  let me clarify.  You are asking me if there
23  is material in the appendix which is not in
24  my -- repeat the question.
25  (Record read.)

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

EVAN KOHLMANN
December 3, 2010

Page 508

1   KOHLMANN
2   A.   It's possible, but I'm not
3   aware of anything specifically that was used
4   in my report that's not in the appendix with
5   regard to the 15 attacks, the actual 15
6   attacks.
7   Q.   I'm sorry, I think you are
8   missing the question.  Let me try to ask it
9   again in a way -- you have a file in your sub
10   database labeled appendix?
11   A.   A folder, right.
12   Q.   That's material that you put
13   together for this case?
14   A.   Right, that's not actually in
15   my sub database though, that's only in the
16   files that were given to you.
17   MR. GLATTER: By sub database
18   Mr. Luft is referring to the DVD that
19   we produced.
20   Q.   What you gave me as the sub
21   database?
22   MR. STEINGARD: The question
23   has nothing to do with what's in the
24   folder called appendix.
25   Q.   What I want to know is about

Page 509

1   KOHLMANN
2   what you would call your sub database meaning
3   the material that comes from your database
4   exclusive of the folder labeled appendix,
5   okay?
6   A.   Yeah.
7   Q.   My question is do you know if
8   any of the materials in that sub database
9   meaning the stuff not including stuff in your
10   appendix that relates to the 15 attacks in
11   question that you cite in this report came
12   from the web archive?
13   A.   It's possible.  I don't know.
14   I'd have to look to see.  We don't
15   distinguish between material that's taken
16   from our own off line archives verses the
17   internet archive because we don't necessarily
18   distinguish -- we don't think that there is
19   anything indicating a lack of credibility or
20   authenticity because of the internet archive
21   so I don't know.
22   Q.   When you first began work on
23   this matter, when you started to look for
24   materials with regard to the 15 attacks, did
25   you first look at the internet web archive

Page 510

1   KOHLMANN
2   and the current website or did you first
3   search your proprietary database?
4   A.   We ran searches concurrently.
5   We did not do one or the other.  It was not
6   in a specific order.  We ran searches through
7   every resource that was available to us and
8   we also looked obviously on the current site
9   as well.
10   Q.   It was not a process where
11   using one to supplement the other, it was
12   rather you did both at the exact same time
13   and whatever you got, that was the body of
14   information you looked at?
15   MR. GLATTER: Objection to
16   form.
17   A.   Yeah, again, we don't
18   distinguish between material taken from the
19   archive verses material taken from our
20   archive.  Any material which is from a
21   relevant credible authentic Hamas source or
22   from an archive, a credible authentic archive
23   of that site for our purposes it doesn't make
24   a difference.  We did do a search in both
25   locations, but I don't think there was an

Page 511

1   KOHLMANN
2   order to it, no.
3   Q.   In doing your search of your
4   proprietary database, what search terms did
5   you use to find material with regard to the
6   15 attacks?
7   A.   We ran through a multitude of
8   search terms.  First of all, we ran through
9   the names of the individuals who were deemed
10   responsible for the attacks if there were
11   names of individuals in Arabic, we searched
12   for dates i.e. if something took place on
13   September 1, 1999 we searched various dating
14   formats of September 1, 1999 to see whether
15   or not that popped up.
16   We looked -- targeted --
17   actually looked into the communicas section
18   and looked chronologically, they have their
19   communicas organized chronologically so
20   knowing when a particular attack took place
21   we looked to see whether or not there was a
22   communica posted referring to that.
23   We looked to see obviously the
24   Glory Record over time as stored both on the
25   archive and in our own local database.  The

**EXHIBIT 148 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

MOSES STRAUSS, et al.,                      :

             Plaintiffs,          :         Case No. 06-cv-702 (DGT)(MDG)

         -against-                         :

CRÉDIT LYONNAIS, S.A.                       :

           Defendant.          :
------------------------------------------------------x

BERNICE WOLF, et al.,                       :

             Plaintiffs,          :         Case No. 07-cv-914 (DGT)(MDG)

         -against-                         :

CRÉDIT LYONNAIS, S.A.                       :

           Defendant.          :
------------------------------------------------------x

TZVI WEISS, et al.,                         :

             Plaintiffs,          :         Case No. 05-cv-4622 (DGT)(MDG)

         -against-                         :

NATIONAL WESTMINSTER BANK PLC,              :

           Defendant.          :
------------------------------------------------------x

NATAN APPLEBAUM, et al.,                    :

             Plaintiffs,          :         Case No. 07-cv-916 (DGT)(MDG)

         -against-                         :

NATIONAL WESTMINSTER BANK PLC,              :

           Defendant.          :
------------------------------------------------------x

1

1.      My name is Evan F. Kohlmann, and I have been retained as a testifying  expert by plaintiffs in the above-captioned matters. On September 8, 2009, I issued a written report (the "Kohlmann Report") pursuant to Fed. R. Civ. P. 26(a)(2)(B) setting forth my opinions concerning Hamas's  Internet presence and history, and further offering my opinions on whether or not certain materials, in my expert opinion, constitute claims of responsibility by  Hamas for specific acts of violence that caused physical injury to Plaintiffs and/or their relatives.

2.      I am submitting this declaration in order to explain why I am unable to provide the Defendants with an index of materials contained either in my general database, or several DVDs of materials produced on March 3, 2010, constituting an agreed upon sub-database of materials on Hamas extracted from my general database (the "Sub-Database").

3.      I note as an initial matter that the Kohlmann Report identifies all materials that I have considered, reviewed, and relied upon in arriving at my opinions, and cited the specific internet addresses (URLs) that can be accessed.  I further note that the Kohlmann Report included an  appendix of certain Arabic language materials I cited and relied upon in support of the opinions.  The materials in the appendix constitute hard copies of certain materials previously available on-line, which I downloaded and archived in my proprietary database (described further below) but, which, to the best of my knowledge, are no longer accessible either through the website or open-source archiving sites.  The Kohlmann Report's appendix identifies which of these materials relate to a particular attack at issue.

4.      Following the service of the Kohlmann Report upon Defendants, I was advised that Defendants had requested that I make my entire professional database available for their review.  I told Plaintiffs' counsel that because my database contains approximately 2 terabytes of data, its sheer size makes the request to produce it in its entirety extremely difficult.  Further, I

2

relied on only a small portion of the materials contained in the database (and Sub-Database) to generate my opinions in this case.  Large portions of the data concern topics irrelevant to this case, and my report transparently identifies which materials I am relying upon in connection with my opinions.  Finally, my general database contains a variety of highly confidential materials governed by confidentiality agreements with, among others, the United States Department of Justice and Department of Defense.

5.      Thereafter, following what I understand were a series of conversations among counsel for the parties, the parties agreed, as a negotiated compromise, that I would provide the Sub-Database, which I did on March 3, 2010.  I agreed to do this, although many of the materials in the Sub-Database are not materials that I have considered, reviewed or relied upon in connection with the Kohlmann Report's opinions.  The Sub-Database was packaged on several DVD discs, sorted by year, which were served upon the Defendants.

6.      As noted above, the Sub-Database comprises nearly all of the materials on Hamas in my general database, and includes all materials cited in the report that are within my database.  Not every item cited in my report is encompassed in my database or the Sub-Database.  This is because many of the materials were (at the time I completed the Kohlmann Report) available directly on-line from either Hamas's current Internet websites, or from the Internet Archive site.

7.      As explained below, the Sub-Database captures materials in "native format."  The Sub-Database reflects my best, good-faith effort, to provide an extraction from my general database that contains nearly all the Hamas materials in my collection, and shows the manner in which I archive such materials

8.      Subsequent to the Sub-Database's production, I was advised that Defendants' counsel claimed to have difficulty comprehending the nature of the materials produced and

3

requested that I provide an index of the Sub-Database.  My understanding is that Defendants'

counsel is under the impression that I maintain an index of my general database, and can

extrapolate from it an index of the materials on the Sub-Database.  Alternatively, Defendants'

counsel requested that requested that I create an index of the materials contained on the DVDs

comprising the Sub-Database.

9.      For the reasons set forth below, I am unable to accommodate Defendants'

counsel's request.  I do not maintain an existing index of my database, and it would be grossly

burdensome and an immense hardship for me to generate "from scratch" an index of the

materials contained on the DVDs constituting the Sub-Database.  Although I will be happy to

discuss this further at any scheduled deposition, the explanation set forth below explains the

manner in which my database is maintained.

10.     My database consists of raw data files – Microsoft Word documents, HTML web

pages, JPG/TIF images, MPG/AVI videos, and so forth.  Those materials are sorted

chronologically by year -- *i.e.*, if I am searching for a file relating to Hamas that was published or

I recovered in 2008, I would look in the "ARCHIVE (2008)" subfolder under the main "Hamas"

folder.  Within that "ARCHIVE (2008)" subfolder, there are other sub-directories relating to

specific individuals, events, or websites.

11.     Some of the files contained in my database have been recovered and saved

individually by hand.  Those files are generally assigned names based on an in-house archival

methodology:"*[Year]-[Month]-[Day].[Source].[Short Summary of Content] – [Thread Number*

*(if exists)] – [Language].[File extension]*."[1]

---

[1]      By thread number, I refer to the unique numeric identification number given to each registered post on
certain Internet discussion forums.

4

12.     For example, an Arabic-language MPEG video of a Hamas training camp saved from the website www.alqassam.ps on January 1, 2009 would have the filename: "*2009-01-01.alqassam.ps.Hamas training camp video – Arabic.mpg.*"

13.     Other files in my database have been saved as part of an automated process by web indexing software, particularly the popular software package known as "HTTrack." On its own website, HTTrack states that it

> allows you to download a World Wide Web site from the Internet to a local directory, building recursively all directories, getting HTML, images, and other files from the server to your computer. HTTrack arranges the original site's relative link-structure. Simply open a page of the 'mirrored' website in your browser, and you can browse the site from link to link, as if you were viewing it online.[2]

In order to create an historical record of my archives, as frequently as possible, I document the web-spidering processes by saving the log files that HTTrack automatically creates. I save these log files in the root directory of the folder containing each web mirror. These log files can be identified by the generic filename "hts-log.txt", and they indicate when and where the automatically spidered web pages were downloaded, and where they are stored locally. A number of such log files are present on the produced DVDs.

14.     In order to search through the materials in my general database, I rely on two software tools:

1.)     ISYS Desktop 8 – A proprietary archival software package allowing fast, full-Boolean searches through filenames and file content spanning a range of materials, including Word Documents, Adobe PDF files, HTML pages, and much more.

2.)     Mac OSX Spotlight Server – The database runs on a storage module connected to an Apple Mac Snow Leopard Server. Snow Leopard contains a built-in search feature known as "Spotlight" allowing instantaneous, live searches through filenames and content with limited Boolean language options.

---

[2]     http://www.httrack.com/ visited April 15, 2010.

Neither of these software packages independently or in conjunction with the other creates a single, divisible "index" file which is comprehensible to humans.

15.     As noted above, as a good-faith compromise with Defendants' request, I provided the Sub-Database which included all of the materials I relied upon in generating my opinion in these cases, in addition to many other materials that I did not rely upon in any way whatsoever in these cases.[3]

16.     In generating and thereafter producing the Sub-Database to Defendants, I utilized WinZip software to compress the files and permit the fewest number of DVD discs to store the entire Sub-Database.

17.     In addition, the compressed ZIP archive has a short, standard filename, which facilitates the storage of my folders and subfolders which, in their non-compressed form, contain special characters and/or exceed the 128 characters accepted by the standard ISO 9660 file system of contemporary DVD disks.

18.     If I had not used WinZip to compress the Sub-Database, it would have been virtually impossible to store the entire contents of the Hamas-related materials in my general database on to any quantity of discs using an ISO 9660 format.

19.     In order to extract files from the compressed Sub-Database, Defendants need merely to open the files stored on the DVDs provided to them with WinZip software and click "Extract."  This is a relatively standard, commonplace practice for data storage and retrieval.

---

[3]     I removed approximately 20 HTML files containing proprietary login information for Al-Qaida online message forums that are highly sensitive and irrelevant to this case.

6

20.     When the DVD contents are extracted properly, one is able to see the contents exactly as I stored and organized them.  The folders are demarcated as I have described above in paragraphs 11 and 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____29____ day of April, 2010 by     _____.

                                                              Evan F. Kohlmann

7

**EXHIBIT 149 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 153 of 328 PageID #: 9857

MOSES STRAUSS, et al. VS.                                            RONNI SHAKED
CREDIT LYONNAIS, S.A.                                          November 4, 2010

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    ----------------------------------x
 3  MOSES STRAUSS, et al.,
 4                    Plaintiffs,
 5       -against-
 6  CREDIT LYONNAIS, S.A.,
 7                    Defendants.
    ----------------------------------x
 8  BERNICE WOLF, et al.,
 9                    Plaintiffs,
10       -against-
11  CREDIT LYONNAIS, S.A.,
12                    Defendants.
    ----------------------------------x
13
14                 One Liberty Plaza
                   New York, New York
15
                   November 4, 2010
16                 9:38 a.m.
17
18          Videotaped Deposition of Expert
19  Witness, RONNI SHAKED, before Shari Cohen,
20  a Notary Public of the State of New York.
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
         126 East 56th Street, Fifth Floor
24          New York, New York 10022
               212-750-6434
25               REF: 94816
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  OSEN LLC
 4  Attorneys for Plaintiffs
 5       345 Seventh Avenue
 6       New York, New York 10001
 7  BY:   JOSHUA GLATTER, ESQ.
 8        PATRICIA RONAN, ESQ.
 9        ARI UNGAR, ESQ.
10        PHONE  646-380-0480
11        FAX    646-380-0471
12        EMAIL  jdg@osen.us
13
14
15  CLEARY GOTTLIEB STEEN & HAMILTON LLP
16  Attorneys for Defendants
17       One Liberty Plaza
18       New York, New York  10006
19  BY:   LARRY FRIEDMAN, ESQ.
20        EMILY PICCONE ECKSTUT, ESQ.
21        BRENDAN GIBBON, ESQ.
22        DAVID LEVY, ESQ.
23        PHONE  212-225-2432
24        FAX    212-225-3999
25        EMAIL  lfriedman@cgsh.com
```

Page 3

```
 1     A P P E A R A N C E S : (Cont'd)
 2
 3     ALSO PRESENT:
 4  DAN MACOM, Videographer
 5  RUTH COHEN, Interpreter
 6  CLARA BEYLER
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1  ------------------ I N D E X --------------------
 2  WITNESS               EXAMINATION BY        PAGE
 3  RONNI SHAKED          MR. FRIEDMAN             8
 4
 5
 6  ---------------- E X H I B I T S ----------------
 7  SHAKED               DESCRIPTION         FOR I.D.
 8  Exhs. 1-6            Documents                 8
 9  Exhibit 7           Invoices                 35
10  Exhibit 8           Articles                 62
11  Exhs. 9A-9B          Documents                89
12  Exhibit 10          Publication              99
13  Exhibit 11          Article                 101
14  Exhibit 12          Article                 106
15  Exhibit 13          Report                  107
16  Exhibit 14          Article                 109
17  Exhibit 15          Article                 113
18  Exhibit 16          Document                163
19  Exhs. 17A-17B        Documents               186
20  Exhs. 18A-18B        Documents               190
21  Exhs. 19A-19B        Documents               193
22  Exhs. 20A-20B        Documents               195
23  Exhibit 21          Document                199
24  Exhs. 22A-22B        Article                 202
25  Exhs. 23A-23B        Documents               212
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 5

```
 1   ---------- E X H I B I T S (Cont'd) -----------
 2   SHAKED          DESCRIPTION           FOR I.D.
 3   Exhs. 24A-24B    Documents               241
 4   Exhs. 25A-25B    Documents               243
 5   Exhs. 26A-26B    Documents               244
 6   Exhs. 27A-27B    Documents               246
 7   Exhibit 28       Document                247
 8   Exhibit 29       Rebuttal Report         247
 9   Exhs. 30A-30B    Article                 251
10   Exhs. 31A-31B    Documents               254
11   Exhs. 32A-32B    Article                 256
12   Exhs. 33A-33B    Documents               267
13
14
15            (EXHIBITS TO BE PRODUCED)
16
17
18
19
20
21
22
23
24
25
```

Page 7

1    P R O C E E D I N G S
2      THE VIDEOGRAPHER: This is tape
3  one.  We are now on the record.  The
4  time is 9:38 a.m.  Today is Thursday,
5  November 4, 2010.  This is the opening
6  of the deposition of Mr. Ronni Shaked
7  in the matter of Moses Strauss, et al.
8  verses Credit Lyonnais S.A. and also
9  in the matter of Wolf, et al. verses
10 Credit Lyonnais S.A.
11     This deposition is being held
12 at the offices of Cleary Gottlieb
13 Steen & Hamilton which is located at
14 One Liberty Plaza in New York, New
15 York.
16     Our court reporter today is
17 Ms. Shari Cohen with Ellen Grauer
18 Court Reporting.  I'm the legal
19 videographer Dan Macom also with Ellen
20 Grauer Court Reporting.
21     Will counsels please introduce
22 themselves.
23     MR. GLATTER: Good morning,
24 Joshua Glatter, Osen LLC on behalf of
25 the plaintiffs. I'm joined by Ari

Page 6

1   S T I P U L A T I O N S
2
3  IT IS HEREBY STIPULATED AND AGREED by
4  and between the attorneys for the respective
5  parties herein, that the filing, and sealing
6  of the within deposition be waived.
7  IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the form of
9  the question, shall be reserved to the time
10 of the trial.
11 IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be sworn to
13 and signed before any officer authorized to
14 administer an oath with the same force and
15 effect as if signed and sworn to before the
16 Court.
17
18
19    -oOo-
20
21
22
23
24
25

Page 8

1  Ungar, Patricia Ronan and Clara Beylar
2  as our own language assistant.
3     MR. FRIEDMAN: Lawrence
4  Friedman, Cleary Gottlieb Steen &
5  Hamilton LLP on behalf of Credit
6  Lyonnais. With me are my colleagues
7  Brendan Gibbon, Emily Piccone Eckstut
8  and David Levy.
9     THE VIDEOGRAPHER: Will the
10 court reporter please swear in the
11 witness.
12 R U T H  C O H E N, an interpreter,
13 having been duly sworn by the Notary
14 Public, translated as follows:
15 R O N N I  S H A K E D, called as a witness,
16 having been duly sworn by the Notary
17 Public, was examined and testified as
18 follows:
19
20 EXAMINATION BY
21    MR. FRIEDMAN:
22    (Shaked Exhibits 1-6,
23 Documents, marked for Identification.)
24 Q.  Good morning, Mr. Shaked.
25 A.  Good morning.

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 21

1   SHAKED
2   includes my work as a journalist covering
3   terrorist activity in the West Bank and Gaza.
4   Q.  ISA investigations do not focus
5   on an attempt to prove that a certain
6   terrorist attack was committed by Hamas or
7   another terrorist organization, correct?
8       MR. GLATTER: Objection to
9   form.
10  A.  No.
11  Q.  They don't focus on that?
12  A.  They focus on that, yes, excuse
13  me, they focus on that.
14  Q.  Look at Exhibit 2.  Look at
15  your supplemental report, look at page 12.
16  In the second full paragraph you wrote the
17  following.  "The investigations which were
18  performed by the ISA" --
19  A.  Wait a minute, I have to find
20  it.  The second paragraph?
21  Q.  The second paragraph that
22  begins with the words in accordance on page
23  12.  Let's look at Exhibit 4, Let's look at
24  the red line.  Go to page 12.  We will use
25  Exhibit 4 throughout because it will be

---

Page 22

1   SHAKED
2   easier.  Page 12.  Do you see the paragraph
3   under the heading official investigations, do
4   you see that?
5   A.  Yes.
6   Q.  You wrote the following.  "The
7   investigations which were performed by the
8   ISA" --
9   A.  In accordance with?
10  Q.  Yes, in the second sentence you
11  wrote, "This being the case, the
12  investigations which were performed by the
13  ISA did not focus on an attempt to prove that
14  a certain terrorist attack was committed by
15  Hamas or by another terrorist organization,
16  but rather on the identification and arrest
17  of the members of the terrorist cell that
18  perpetrated the attack with the objective of
19  stopping the activity of the terrorist
20  network", is that a true statement?
21  A.  That's true.
22  Q.  You said -- and was that true
23  when you were in the ISA?
24  A.  Yes.
25  Q.  Have you ever before these

---

Page 23

1   SHAKED
2   cases served as an expert in offering
3   conclusions on the subject of which terrorist
4   organization was responsible for an attack,
5   have you ever been hired to do that before?
6   A.  No.
7   Q.  Do you have any professional
8   training in determining which terrorist
9   organization is responsible for committing an
10  attack?
11      MR. GLATTER: Objection to
12  form.
13  A.  No, I don't have.
14  Q.  There are governmental agencies
15  in Israel and in the occupied territories
16  that are responsible for making assessments
17  as to who is responsible for committing a
18  terrorist attack, correct?
19      MR. GLATTER: Objection to
20  form.
21  A.  Possibly it's not right.
22  Q.  The Israel police have official
23  responsibility for determining who's
24  responsible for committing an attack; is that
25  correct?

---

Page 24

1   SHAKED
2   A.  Who's committing attack, not
3   the organization.
4   Q.  Have you ever been a member of
5   the Israel police?
6   A.  No.
7   Q.  The police have tools,
8   investigative tools that help them in
9   fulfilling this responsibility, correct?
10      MR. GLATTER: Objection to
11  form.
12  A.  Not always.
13  Q.  But the police have the ability
14  to detain and interrogate suspects for
15  example, correct?
16  A.  That's correct.
17  Q.  They have the ability to
18  perform searches and seizures, correct?
19  A.  Yes.
20  Q.  And the police communicate with
21  the ISA and the IDF in the course of
22  performing investigations, correct?
23  A.  Connected with the police, not
24  police with the ISA.
25  Q.  Have you ever received any

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 25

```
 1        SHAKED
 2    police training from the Israel police?
 3        MR. GLATTER: Objection to
 4    form.
 5    A.  I think in my career, yes, I
 6    was working sometimes with the police and
 7    they have some kind of training with the
 8    police, but it was many years ago.
 9    Q.  When you were with the ISA?
10    A.  When I was with the ISA, yes.
11    Q.  In the occupied territories the
12    investigative role that is performed by the
13    Israel police within the green line in the
14    occupied territories that role, that
15    investigative role is fulfilled by the IDF,
16    correct?
17        MR. GLATTER: Objection to
18    form.
19    A.  Repeat the question, please.
20    Q.  In the occupied territories,
21    the investigative role that we just discussed
22    that the Israel police perform within the
23    green line, that investigative role in the
24    occupied territories is performed by the IDF,
25    correct?
```

Page 26

```
 1        SHAKED
 2        MR. GLATTER: Objection to
 3    form.
 4    A.  No.
 5    Q.  By whom is it performed?
 6    A.  It's performed by the police.
 7    Q.  By the same Israel police?
 8    A.  By the Israel police acting
 9    also in the occupied territories.
10    Q.  In Israel prosecutors decide
11    whether to bring charges for committing a
12    terrorist attack based on the evidence
13    provided to them by the police, correct?
14        MR. GLATTER: Objection to
15    form.
16    A.  Yes.
17    Q.  In the occupied territories
18    there are military prosecutors who do the
19    same thing, they decide whether to bring
20    charges for committing a terrorist attack
21    based on the information provided to them by
22    the investigators, correct?
23        MR. GLATTER: Objection to
24    form.
25    A.  Investigation of whom?
```

Page 27

```
 1        SHAKED
 2    Q.  Of the suspects that the
 3    prosecutors are considering bringing charges
 4    against?
 5    A.  From where they got it?
 6    Q.  From the police?
 7    A.  From the police, yes.
 8    Q.  The role that's filled by
 9    prosecutors in deciding to bring charges in
10    Israel is performed by military prosecutors
11    in the occupied territories, correct?
12    A.  Correct.
13    Q.  You have never been a
14    prosecutor, correct?
15    A.  Never.
16    Q.  You have no legal training?
17    A.  No.
18    Q.  You are not a lawyer?
19    A.  I'm not a lawyer.
20    Q.  You have never been trained as
21    a prosecutor?
22    A.  Never.
23    Q.  In Israel judges determine
24    whether someone is guilty for having
25    committed a terrorist attack, correct?
```

Page 28

```
 1        SHAKED
 2        MR. GLATTER: Objection to
 3    form.
 4    A.  Right.
 5    Q.  In the occupied territories
 6    that role is fulfilled by military judges of
 7    the military courts, correct?
 8        MR. GLATTER: Objection to
 9    form.
10    A.  Correct.
11    Q.  In Israel judges are selected
12    for their positions based on experience --
13    their experience and merit, correct?
14        MR. GLATTER: Objection to
15    form, object to the extent beyond the
16    scope of Mr. Shaked's opinion.  You
17    may answer.
18    A.  I don't know.  I'm not there.
19    I just can imagine, that's all. I don't know.
20    Q.  You don't know on what basis
21    judges are selected in Israel?
22    A.  I can imagine like according to
23    their experience, education, other things,
24    but it's not my -- I'm not interested in this
25    field.
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

Page 37

SHAKED

1      SHAKED
2   transcripts of other depositions in these
3   cases?
4   A.  No.
5   Q.  You know Mr. Spitzen?
6   A.  Yes, I do know Mr. Spitzen,
7   Ariel Spitzen.
8   Q.  You worked Mr. Spitzen?
9   A.  I'm not working with him.
10      MR. GLATTER: Let Mr. Friedman
11   finish his question before you answer.
12   That's what he wants you to do.
13   That's what we all want you to do.
14   Q.  In the past you have worked
15   with Mr. Spitzen, correct?
16   A.  No, it was not work.
17   Q.  What was it?
18   A.  Mr. Spitzen was a specialist
19   and he was the advisor of Palestinian affairs
20   to the defense ministry.  From time to time
21   as a journalist I got permission to talk with
22   him three or four times, not more than that,
23   in a year that's what they gave me and it was
24   just exchange of views because I think and
25   sometimes we were just sitting and talking

Page 38

1      SHAKED
2   about what's happened in the territories.  I
3   be frank with you perhaps Spitzen came to my
4   home two months ago just to give condolences.
5   Q.  I'm sorry for your loss.  Have
6   you had any communication with him concerning
7   your work or his work on these cases?
8   A.  No.
9   Q.  What about Evan Kohlmann, have
10   you ever met him?
11   A.  Never.
12   Q.  Matthew Levitt?
13   A.  Matthew Levitt I just heard
14   about him because of the Hebrew University
15   and because as a journalist I heard about
16   him.  I don't know who is. I didn't met him
17   until today.  I'll be happy to meet him one
18   day.
19   Q.  What about Shaul Naim, have you
20   ever had any contact with him?
21   A.  I don't know who is Shaul Naim.
22   Q.  You read Mr. Azoulay's rebuttal
23   report?
24   A.  Yes, I do.
25   Q.  Had you ever heard of Mr.

Page 39

1      SHAKED
2   Azoulay before you read his report?
3   A.  No.
4   Q.  Did you read Brian Jenkins'
5   rebuttal report?
6   A.  Yes, I read.
7   Q.  Had you ever heard of Mr.
8   Jenkins before you read his report?
9   A.  As far as I recall, no.
10   Q.  Mr. Shaked, have you ever
11   expressed an opinion that is inconsistent
12   with any of the opinions you express in your
13   reports?
14      MR. GLATTER: Objection to
15   form.
16   A.  Maybe, but as far as I can
17   recall, no.
18   Q.  Do you maintain a resume or
19   curriculum vitae?  Do you have a piece of
20   paper on which you have a listing of your
21   prior experience?
22   A.  Yes, I do.
23   Q.  Where do you keep that?
24   A.  In Jerusalem.
25   Q.  In your office?

Page 40

1      SHAKED
2   A.  In my office.
3   Q.  Do you have multiple versions
4   of your CV or just the current version?
5   A.  No, when I finish I just edit
6   or when I did something else I edit.
7   Q.  In your office you have a copy
8   of your current CV?
9   A.  Yes, I do.
10   Q.  You have a master's degree in
11   middle eastern studies from Hebrew University
12   of Jerusalem?
13   A.  Yes, I'm happy to say, yes.
14   Q.  When did you receive that?
15   A.  I received it in 2006.
16   Q.  2006?
17   A.  2006.
18   Q.  What is middle eastern studies?
19   A.  Middle eastern studies it's
20   study about the history, culture, tradition,
21   language, everything that belong to the
22   Middle East.
23   Q.  In pursuing your master's
24   program, did you have any particular focus in
25   middle eastern studies?

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 41

```
1        SHAKED
2   A.  Yes, I did.
3   Q.  What was that?
4   A.  Suicide bombing.
5   Q.  Did you take courses on suicide
6   bombings?
7   A.  Yes, I did.
8   Q.  How many courses?
9   A.  I took two courses in the
10  Hebrew University of Jerusalem.
11  Q.  What were the names of those
12  courses?
13  A.  Wow, suicide -- I don't
14  remember.  I can bring it to you.  Professor
15  Gidon Aren and Professor Avraham Sela.
16  Q.  Could you spell both of their
17  names?
18  A.  G-I-D-O-N, A-R-E-N, specialist
19  for suicide bombers and Avraham like Abraham,
20  S-E-L-A, Professor Abraham Sela.
21  Q.  What was the name as best you
22  recall of Mr. Aren's course, Professor Aren's
23  course?
24  A.  Culture of suicide bombers or
25  something like this and influence on society
```

Page 42

```
1        SHAKED
2   or something like this.  If it's necessary I
3   can bring it to you.
4   Q.  Just so we know, where do you
5   have that title listed that you could get it
6   for us?
7        MR. GLATTER: Objection to
8   form, but you can answer.
9   A.  You can get it from every book
10  of the Hebrew University of Jerusalem, it's
11  not a problem.
12  Q.  And what department does
13  Professor Aren teach?
14  A.  Sociology.
15  Q.  What was the name of Professor
16  Sela's course you took?
17  A.  Hamas and it was terrorism and
18  beliefs or -- wow, Hamas and -- Hamas as a
19  culture or something like this and then Hamas
20  terrorism, ideology and culture.
21  Q.  In what department does
22  Professor Sela teach?
23  A.  He's teaching in international
24  relations, political science.
25  Q.  Did you take any other courses
```

Page 43

```
1        SHAKED
2   that related to terrorism?
3   A.  Not directly to terrorism.
4   Q.  Did you write a thesis or paper
5   as part of getting your master's degree?
6   A.  Of course.
7   Q.  What was the title of your
8   paper?
9   A.  On their dead bodies.
10  Q.  What was the subject of your
11  paper?
12  A.  The suicide bombers to -- I
13  explain the phenomena in the Palestinian
14  society.
15  Q.  From a sociological
16  perspective?
17  A.  From sociological and from my
18  experience not just but especially from the
19  sociology point of view.
20  Q.  Especially from the
21  sociological point of view?
22  A.  Yes.
23  Q.  Did you have a faculty advisor
24  in connection with that paper?
25  A.  Of course.
```

Page 44

```
1        SHAKED
2   Q.  Who was that?
3   A.  Dr. Anat Lapidoth.
4   Q.  Could you spell that?
5   A.  Anat, A-N-A-T, Lapidoth,
6   L-A-P-I-D-O-T-H.
7   Q.  What department is Dr. Lapidoth
8   in?
9   A.  Middle eastern -- current
10  middle eastern studies.
11  Q.  What is her specialty?
12  A.  She specialist with
13  Palestinians, myth, culture and social
14  affairs.
15  Q.  Do you have a bachelor's
16  degree?
17  A.  Of course I have.
18  Q.  From where?
19  A.  Hebrew University of Jerusalem.
20  Q.  In what year?
21  A.  It was in 1969.
22  Q.  In what field?
23  A.  Middle East studies and Arabic.
24  Q.  What did you do before you
25  joined the ISA in 1969 between school and
```

RONNI SHAKED
November 4, 2010

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

---

Page 45

SHAKED

1    SHAKED
2    joining the ISA or did you go right to the
3    ISA from school?
4    A.   I was a student.  My teacher
5    took me there.
6    Q.   You graduated from Hebrew
7    University in 1969?
8    A.   While I was working in the ISA.
9    Q.   You went right into the ISA?
10   A.   Yes.
11   Q.   Take a look at page 1 of
12   Exhibit 4 in the second paragraph, second
13   sentence?
14   A.   Starting with?
15   Q.   Starting with the words I held
16   a number of positions, do you see that?
17   A.   Not yet.
18   Q.   You say that you devoted a year
19   of your service with the ISA to the study of
20   terrorism and the development of theories
21   aimed at the defeating of terrorism, what
22   year was that?
23   A.   1974, 1975.
24   Q.   That was before Hamas was
25   founded, correct?

---

Page 46

SHAKED

1    SHAKED
2    A.   Before Hamas.
3    Q.   Hamas was founded in 1987?
4    A.   Yes, you're right.
5    Q.   What did you do during your
6    other years with the ISA?
7    A.   I was a handler and -- most of
8    the years I was a handler.
9    Q.   For informants?
10   A.   Of agent, of Palestinian agent
11   that we send them or recruit them from cell
12   of terrorism.
13   Q.   When you left the ISA in 1982,
14   you joined Yediot Aharonot?
15   A.   Yes, I did.
16   Q.   Why did you leave the ISA?
17   A.   After the war in Lebanon I
18   decided to leave it.
19   Q.   Why?
20   A.   Ask my wife.
21   Q.   She's not here.
22   A.   Okay, you can imagine.
23   Q.   You were unhappy?
24   A.   She was not happy, okay.  The
25   children.  I didn't know even my children.

---

Page 47

SHAKED

1    SHAKED
2    Q.   Have you held any government
3    posts since you left the ISA?
4    A.   No thanks.
5    Q.   You have been a commentator and
6    analyst for Yediot since 1982?
7    A.   Yes, I do.
8    Q.   That's been your sole
9    employment since 1982?
10   A.   Yes, that's my sole employment.
11   Q.   May I call it Yediot?
12   A.   Yediot is okay.  That's what
13   everybody in Israel also say Yediot.
14   Q.   In your self introduction in
15   your report you say that you are also a
16   researcher at the Hebrew University of
17   Jerusalem?
18   A.   Yes.
19   Q.   Can you tell me what that is,
20   who you research for, what you do?
21   A.   I'm a research member in the
22   Israeli -- in the Jerusalem Institute for
23   Israel Studies.  It's part of the Hebrew
24   University of Jerusalem.
25   Q.   What's the Jerusalem Institute

---

Page 48

SHAKED

1    SHAKED
2    for Israel Studies?
3    A.   It's an academic institute that
4    belongs to the Hebrew University of Jerusalem
5    that's focused on Jerusalem and peace --
6    focus on peace and focus on Palestinians and
7    other problems that related to the -- let's
8    say to the relationship between Jews and
9    Arabs.
10   Q.   For whom do you perform
11   research?
12   A.   To the university and the
13   research will be part of publishing, part of
14   it for newsletter, for things like this.
15   Q.   For how long have you done
16   this?
17   A.   I've done it just that's a
18   year-and-a-half.  A year.  A year let's say.
19   Q.   A year and how many hours a
20   week on average do you devote to this?
21   A.   At least a day-and-a-half, two
22   days a week.  Two days.
23   Q.   Are you paid for this work?
24   A.   No, not yet.
25   Q.   Are there particular persons to

---

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 49

1      SHAKED
2   whom you are assigned to perform research?
3   A.  Of course.
4   Q.  Who are they?
5   A.  Professor Yakov Bar Simen Tov.
6   Q.  Can you spell that?
7   A.  Jacob, Bar, B-A-R, Simen,
8   S-I-M-E-N, Tov, T-O-V.
9   Q.  What is his field?
10  A.  Resolution of conflicts.
11  Q.  Is he with a particular
12  department at the Hebrew University?
13  A.  He's the head of the department
14  of resolution -- of conflict resolution.
15  Q.  What is his specialty?
16  A.  Theories of conflict
17  resolution, not of conflict.
18  Q.  Theories of conflict
19  resolution?
20  A.  Conflict resolution.
21  Q.  And your research at the Hebrew
22  University is devoted to supporting writings
23  of Professor Simen Tov?
24      MR. GLATTER: Objection to
25  form.

Page 50

1      SHAKED
2   A.  Part of my studies, yes, just
3   part of it.
4   Q.  Is there another part?
5   A.  Yeah.
6   Q.  What's that?
7   A.  Another part I'm making my
8   Ph.D. studies. I'm student of Ph.D.
9   Q.  You are a year into that?
10  A.  Yeah.
11  Q.  In what field are you pursuing
12  a Ph.D.?
13  A.  Again, I'm searching the ethos
14  of conflict of the Palestinian society. I'm
15  taking tools from psychology, social
16  psychology and use them as tools of research
17  of the Palestinian society.
18  Q.  Briefly what do you mean by
19  tools from social psychiatry?
20  A.  Nobody made research on the
21  Palestinian side of the Israeli society
22  about the psychology effect on the conflict.
23  My Professor Daniel Bar Tal did a research on
24  the Israeli side and what I'm doing now I'm
25  taking the Palestinian side in order to

Page 51

1      SHAKED
2   understand the behavior of society in a
3   conflict.
4   Q.  Who is the professor?
5   A.  Professor Daniel Bar Tal.  Very
6   known professor. He's now at Yale University
7   -- Brandice University.
8   Q.  Can you spell his name?
9   A.  Daniel Bar Tal T-A-L. I have
10  three professor helping me.
11  Q.  Who are the other two?
12  A.  The other one is Eli Podeh.
13  Q.  Can you spell that for me?
14  A.  Eli E-L-I, Podeh, P-O-D-E-H.
15  He's from the Hebrew University of Jerusalem
16  department of Middle East studies and Dr.
17  Meir Hatina, specialist on Islamist or
18  fundamentalistic Islam ideology.
19  Q.  What department is he in?
20  A.  Middle East studies.
21  Q.  What is Professor Podeh's
22  specialty?
23  A.  Podeh is the head of the Middle
24  East studies in Hebrew University of
25  Jerusalem.

Page 52

1      SHAKED
2   Q.  What is his specialty?
3   A.  The Israeli Arab conflict and
4   especially Egypt.
5   Q.  Professor Bar Tal?
6   A.  He's a social psychologist.
7   The head of the department in Tel Aviv
8   University.
9   Q.  Is it fair to say your work as
10  a researcher is in the context of your being
11  a Ph.D. student?
12      MR. GLATTER: Objection to
13  form.
14  A.  Yes.
15  Q.  You write in your report that
16  you have worked as a consultant for the FBI.
17  Can you tell me what that is?
18      MR. GLATTER: Where are you
19  looking at?
20      MR. FRIEDMAN: On page 2.
21  A.  There were several cases in the
22  U.S. of Palestinian terrorism that they ask
23  me advice.  I don't want to talk about it in
24  a loud voice because I was asked not to tell
25  about the cases.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 53

SHAKED
1      SHAKED
2  Q.  Were you compensated?
3  A.  No.
4  Q.  The FBI asked you for your
5  advice?
6  A.  Asked me for it.
7  Q.  When was this?
8  A.  It was first in 1996 and then
9  in 2002 and then in 2004.  I don't remember
10  exactly the years.
11  Q.  Did you meet with FBI agents or
12  did you speak with them on the phone?
13  A.  I met with them.
14  Q.  Where did you meet with them?
15  A.  In Chicago, in Florida.
16  Q.  How many times did you meet
17  with the FBI agents?
18  A.  Please.
19  Q.  Could you give me a number?
20  A.  I was several times here.
21  Q.  And you were not paid for this
22  work?
23      MR. GLATTER: Asked and
24  answered.  You can answer again.
25  A.  No.

Page 54

SHAKED
1      SHAKED
2  Q.  You say that you served once as
3  a consultant for the U.S. Department of
4  Justice, what does that refer to?
5  A.  The U.S. Department of Justice
6  made the investigation about several cases
7  especially the case of Arian if you remember
8  in Tampa, Florida and in other cases that I
9  don't -- it was not published yet that I can
10  not talk and I met with people that came to
11  Israel several times.
12  Q.  Were you compensated?
13  A.  No.
14  Q.  They asked for your advice?
15  A.  Yes.
16  Q.  You also write that you have
17  served as a consultant to the Anti-Defamation
18  League?
19  A.  Yes.
20  Q.  What is that about?
21  A.  The Anti-Defamation League as
22  far as you know it's a Jewish or big
23  organization and when terrorism started to be
24  a big problem, not just here, but also in the
25  Middle East, not just here, we decided to

Page 55

1      SHAKED
2  open what called terrorism desk.
3  Q.  At the newspaper at Yediot?
4  A.  No, at ADL.
5  Q.  I'm sorry.
6  A.  And we had the newsletter, the
7  ADL had the newsletter about terrorism and I
8  wrote it or I collect information in part and
9  I wrote part of it because it was a global
10  terrorism, not just in the Middle East.
11  Q.  To make sure I'm clear, Mr.
12  Shaked, you are referring here to work you
13  did to gather information and write articles
14  for the ADL newsletter on global terrorism?
15  A.  Yes.
16  Q.  Were you compensated for that?
17  A.  No.
18  Q.  When did you do that?
19  A.  It started in 1996 after the
20  big problem of terrorism in Jerusalem and
21  until 2000 when they stopped to publish the
22  newsletter.
23  Q.  You say that you also worked as
24  a consultant to CBS News, what is that?
25  A.  CBS News in Jerusalem they have

Page 56

1      SHAKED
2  a big branch and since the first intifada and
3  especially in the second intifada I had to
4  give them just to explain them what happened
5  in order to facilitate the way that the
6  reporter who came from the United States will
7  understand and knows how to deliver the stuff
8  from the West Bank to you to the American
9  people.
10  Q.  Were you compensated for this?
11  A.  Yes, sometimes.  I didn't work
12  on a daily or monthly, but on cases.
13  Q.  You provided advice to CBS News
14  as to how it could gather and report news
15  from Israel?
16  A.  No, I gave them explanation
17  about the situation of the Palestinians.
18  Q.  When did you do this, what
19  years?
20  A.  I did it till the last year I
21  think.
22  Q.  On a compensated basis?
23  A.  Hum?
24  Q.  On a compensated basis?
25  A.  Yes.

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

RONNI SHAKED
November 4, 2010

Page 89

```
 1       SHAKED
 2   Section 1 of Mr. Shaked's 1994 book.
 3       (Shaked Exhibit 9A-9B,
 4   Documents, marked for Identification.)
 5   Q.  Do you recognize Exhibit 9A as
 6   a copy of Section 1 of your 1994 book?
 7   A.  Yes, I recognize.
 8       MR. GLATTER: Just for the
 9   record with respect to Exhibit 9B we
10   just reserve our rights as to the
11   accuracy and correctness of the
12   certified translation.
13   Q.  Are you aware of any factual
14   statements in this Section 1 that are false?
15       MR. GLATTER: Objection to
16   form. Withdrawn.
17   A.  Yeah.
18   Q.  Are you aware of anything in
19   this section that is mistaken?
20       MR. GLATTER: Objection to
21   form.
22   Q.  Let me put it this way.  Mr.
23   Shaked, since you published this in 1994, has
24   it ever come to your attention that something
25   here is inaccurate?
```

Page 90

```
 1       SHAKED
 2       MR. GLATTER: Objection to
 3   form, vague.
 4   A.  I don't think it's not
 5   accurate.
 6   Q.  At the beginning of this
 7   section you describe the abduction of an IDF
 8   sergeant major in December 1992, correct?
 9   A.  Correct.
10   Q.  And as you describe here the
11   men who abducted him delivered a letter in
12   which they identified themselves as members
13   of the al-Qassam military arm of Hamas and
14   offered to exchange him for Sheik Yasin,
15   correct?
16   A.  Correct.
17   Q.  The letter was signed by the
18   special unit of the El Aladin as-Qassam
19   battalion Hamas military arm, correct?
20   A.  Correct.
21   Q.  You note here that no one in
22   Hamas' command knew anything about this,
23   correct?
24   A.  Correct.
25   Q.  And you state that the four men
```

Page 91

```
 1       SHAKED
 2   who committed this kidnapping joined
 3   al-Qassam only after this incident, correct?
 4   A.  Correct.
 5   Q.  You note that two of Hamas'
 6   leaders made statements to the press
 7   indicating that Hamas was responsible for
 8   this abduction, correct?
 9   A.  Correct.
10   Q.  You note that the Hamas
11   representative in Jordan said that Hamas was
12   prepared to release Sergeant Major Toledano
13   in exchange for Sheik Yasin, correct?
14   A.  Correct.
15   Q.  You also note that Sheik Yasin
16   requested that negotiations be carried out
17   for his release and Hamas agreed, correct?
18   A.  Correct.
19   Q.  And you describe here a flyer
20   that was distributed in Hebron that was
21   signed "Hamas Office of Public Relations",
22   correct?
23   A.  Let me see where it is.  I
24   don't remember Hebron leaflet.
25   Q.  I think it's on page 8.
```

Page 92

```
 1       SHAKED
 2       MR. GLATTER: You are referring
 3   to 9B, Larry, when you --
 4       MR. FRIEDMAN: Josh, please
 5   stop interrupting me.
 6       MR. GLATTER: No, I have to
 7   know if you are pointing to something
 8   and saying page 8, I don't know if
 9   it's in the English or Hebrew. You
10   provided us with a certified --
11       MR. FRIEDMAN: I think our
12   translators matched the pages.
13       MR. GLATTER: Okay, it's the
14   first time I'm seeing this
15   translation.
16   Q.  You describe here a flyer that
17   was distributed in Hebron that was signed
18   "Hamas Office of Public Relations", correct?
19   A.  Where is it, please?
20   Q.  If you look at page 8, there is
21   a paragraph that in my English translation
22   begins with the words "On that same day a
23   flyer was distributed in Hebron signed by
24   'Hamas Office of Public Relations'", do you
25   see that?
```

**EXHIBIT 150 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____ :
                            :
COURTNEY LINDE, et al.,     :
                            :
        Plaintiffs,         :
                            :
-against-                   : Case No.:
                            : CV 04 2799(NG)(VVP)
ARAB BANK, PLC,             :
                            :
        Defendant.          :
_____ :
                            :
PHILIP LITLE, et al.,       :
                            :
        Plaintiffs,         :
                            :
-against-                   : Case No.:
                            : CV 04 5449(NG)(VVP)
ARAB BANK, PLC,             :
                            :
        Defendant.          :
_____ :
                            :
ORAN ALMOG, et al.,         :
                            :
        Plaintiffs,         :
                            :
-against-                   : Case No.:
                            : CV 04 5564(NG)(VVP)
ARAB BANK, PLC,             :
                            :
        Defendant.          :
_____ :


VIDEOTAPED DEPOSITION OF RONNI SHAKED
(VOLUME I)
Tel Aviv, Israel
August 2, 2011

Reported by:  BRENDA MATZOV, CA CSR 9243

RONNI   SHAKED – 8/2/2011

Page 2

```
 1    ROBERT L. COULTER, SR., FOR    :
      THE ESTATE OF JANIS RUTH
 2    COULTER, et al.,              :

 3            Plaintiffs,           :

 4    -against-                     : Case No.:
                                      CV 05 365(NG)(VVP)
 5    ARAB BANK, PLC,               :

 6            Defendant.            :
      _____
 7                                  :
      GILA AFRIAT-KURTZER, et al.,  :
 8
              Plaintiffs,           :
 9
      -against-                     : Case No.:
10    ARAB BANK, PLC,               : CV 05 388(NG)(VVP)
11
              Defendant.            :
12    _____
13    MICHAEL BENNETT, et al.,      :

14            Plaintiffs,           :

15    -against-                     : Case No.:
                                      CV 05 3183(NG)(VVP)
16    ARAB BANK, PLC,               :

17            Defendant.            :
      _____
18                                  :
      ARNOLD ROTH, et al.,          :
19
              Plaintiffs,           :
20
      -against-                     : Case No.:
21    ARAB BANK, PLC,               : CV 05 3738(NG)(VVP)
22
              Defendant.            :
23    _____
24
25
```

Page 3

```
 1    STEWART WEISS, et al.,        :

 2            Plaintiffs,           :

 3    -against-                     : Case No.:
                                      CV 06 1623(NG)(VVP)
 4    ARAB BANK, PLC,               :

 5            Defendant.            :
      _____
 6                                  :
      JOSEPH JESNER, et al.,        :
 7
              Plaintiffs,           :
 8
      -against-                     : Case No.:
 9    ARAB BANK, PLC,               : CV 06 3869(NG)(VVP)
10
              Defendant.            :
11    _____
12    YAFFA LEV, et al.,            :

13            Plaintiffs,           :

14    -against-                     : Case No.:
                                      CV 08 03251(NG)(VVP)
15    ARAB BANK, PLC,               :

16            Defendant.            :
      _____
17                                  :
      VIKTORIA AGURENKO, et al.,    :
18
              Plaintiffs,           :
19
      -against-                     : Case No.:
20    ARAB BANK, PLC,               : CV 10 00626(NG)(VVP)
21
              Defendant.            :
22    _____
23
24
25
```

Page 4

```
 1           Videotaped deposition of RONNI SHAKED
 2    (VOLUME I), taken in the above-entitled cause pending
 3    in the United States District Court, Eastern District
 4    of New York, pursuant to notice, before BRENDA MATZOV,
 5    CA CSR 9243, at the David Intercontinental Hotel,
 6    12 Kaufman Street, Conference Room 1123, Tel Aviv,
 7    Israel, on Tuesday, the 2nd day of August, 2011,
 8    at 10:02 a.m.
 9
10
11
12    APPEARANCE OF COUNSEL:
13    FOR PLAINTIFFS:
14         OSEN, LLC
           By:  GARY M. OSEN, ESQ.
15              ARI UNGAR, ESQ.
                CINDY T. SCHLANGER, ESQ.
16         700 Kinderkamack Road
           Oradell, New Jersey 07649
17         (201) 265-6400 / Fax (201) 265-0303
           gmo@osen.us
18         au@osen.us
           cts@osen.us
19
20    FOR DEFENDANT:
21         DEWEY & LeBOEUF, LLP
           By:  ALAN SALPETER, ESQ.
22         Two Prudential Plaza
           180 North Stetson Avenue
23         Suite 3700
           Chicago, Illinois 60601
24         (312) 794-8000 / Fax (312) 794-8100
           asalpeter@dl.com
25
```

Page 5

```
 1    APPEARANCE OF COUNSEL (Continued):
 2    FOR DEFENDANT:
 3         DEWEY & LeBOEUF, LLP
           By:  ALAN B. HOWARD, ESQ.
 4              GASSAN A. BALOUL, ESQ.
           1301 Avenue of the Americas
 5         New York, New York 10019-6092
           (212) 259-8000 / Fax (212) 259-6333
 6         ahoward@dl.com
           gbaloul@dl.com
 7
 8    ISRAELI COUNSEL TO DEWEY & LeBOEUF:
 9         EPSTEIN, CHOMSKY, OSNAT & CO.
           By:  KIYAN BLAL, ADVOCATE
10         Rubinstein House
           20 Lincoln Street
11         Tel Aviv, Israel 67134
           +972 (3) 561-4777 / Fax +972 (3) 561-4776
12         kiyanb@ecglaw.com
13
14    ALSO PRESENT:
15         DORON MATZOV, Videographer
16         VARDA YA'ARI, Hebrew Interpreter
17         MICHAL MARIN, Hebrew Interpreter
18         ASSAF BRESSLER, MM Law
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Page 6

                    I N D E X
WITNESS
Ronni Shaked (Volume I)

EXAMINATION                                    PAGE
By Mr. Salpeter                                   9

                  E X H I B I T S
NUMBER          DESCRIPTION                     PAGE
Exhibit 1       Document Entitled "Expert Report
                of Ronni Shaked, Linde v. Arab
                Bank, PLC, 04 CV 2799  (NG)(VVP)
                and Related Cases"
                (No Bates Number)                12
Exhibit 2       Arabic Document
                (No Bates Number)               116

Exhibit 3       Internet Archive Website Printout,
                Entitled "Terms of Use," Dated
                March 10, 2001
                (No Bates Number)               134
Exhibit 4       Jerusalem Post Website Printout,
                Entitled "Bomb Horror Hits Tel Aviv
                Disco," Dated June 4 (no year)
                (No Bates Number)               166

Exhibit 5       Israel Ministry of Foreign
                Affairs Internet Printout,
                Entitled "Tel Aviv Suicide Bombing
                at the Dolphin Disco - 1 June 2001,"
                Dated June 2, 2001
                (No Bates Number)               170

Page 7

            I N D E X (Continued)


    Q U E S T I O N S   I N S T R U C T E D

            N O T   T O   A N S W E R

                PAGE      LINE

                 82        13

Page 8

                  P R O C E E D I N G S

          THE VIDEOGRAPHER:  This is the video operator
speaking, Doron Matzov of Merrill Legal Solutions,
225 Varick Street, New York, New York 10014.
          Today is August 2nd, 2011, and the time is
10:02 a.m.  We are at the David Intercontinental Hotel,
Tel Aviv, Israel, to take the videotape deposition of
Mr. Ronni Shaked, in the matter of Linde, et al., versus
Arab Bank, PLC, case No. 04 279 [sic] and related cases
in the United States District Court, Eastern District
of New York.
          Will counsel please introduce themselves for
the record.
          MR. UNGAR:  Ari Ungar, Osen, LLC, Oradell,
New Jersey, on behalf of the Linde and Coulter
plaintiffs.  I'm joined by my colleagues, Gary Osen
and Cindy Schlanger.
          MR. BRESSLER:  Assaf Bressler, on behalf of
MM Law.
          MR. SALPETER:  Alan Salpeter, from Dewey &
LeBoeuf, representing Arab Bank.
          MR. BALOUL:  Gassan Baloul, from Dewey &
LeBoeuf.  I represent Arab Bank.
          MR. BLAL:  Kiyan Blal, from the Epstein,

Page 9

Chomsky, Osnat law firm, for Arab Bank.
          MR. HOWARD:  Alan Howard, of Dewey & LeBoeuf,
for Arab Bank.
          THE VIDEOGRAPHER:  Will the court reporter,
Brenda Matzov of Merrill Legal Solutions, please swear
in the witness and the interpreters.


          VARDA YA'ARI -and- MICHAL MARIN,
          the interpreters, were duly affirmed to
          translate from English to Hebrew and from
          Hebrew to English.


                    RONNI SHAKED,
          called as a witness, being first duly
          affirmed, was examined and testified
          as hereinafter set forth:


          (The following proceedings were conducted
          through the Hebrew interpreters, unless otherwise
          indicated.)


                    EXAMINATION
BY MR. SALPETER:
     Q.  Good morning, sir.
          Again, my name is Alan Salpeter.  I'm one of

                                    3 (Pages 6 to 9)

RONNI   SHAKED – 8/2/2011

## Page 18

1    MR. UNGAR:  Objection to form and foundation.
2         THE WITNESS:  Indeed, I am.
3    Q.   BY MR. SALPETER:  Are you aware of the
4  rule that says that substantive mistakes, omissions,
5  or inaccuracies in a publication of facts must be
6  corrected speedily, fairly, and with the appropriate
7  emphasis relative to the original publication?
8         MR. UNGAR:  Same objections.
9         THE WITNESS:  I am familiar with it, indeed.
10   Q.   BY MR. SALPETER:  Have you followed all of
11  these rules of professional ethics for journalists in
12  issuing your expert report in this case?
13        MR. UNGAR:  Objection to form.
14        THE WITNESS:  Yes.  But this report was not
15  submitted as a journalist report.
16   Q.   BY MR. SALPETER:  Have you followed the rules
17  that I just referred to in issuing this report?
18        MR. UNGAR:  Objection to form.  Asked and
19  answered.
20        THE WITNESS:  To the best of my recollection
21  and to the best of my understanding, yes.
22   Q.   BY MR. SALPETER:  Are there any of these rules
23  that you do not follow?
24        MR. UNGAR:  Objection to form.  Asked and
25  answered.

## Page 19

1         THE WITNESS:  To the best of my recollection,
2  no.
3    Q.   BY MR. SALPETER:  Has it come to your
4  attention that there are any mistakes or omissions
5  in your report, Exhibit 1?
6    A.   Indeed, in my second reading of the report,
7  I came across two mistakes that I will be happy to
8  rectify.
9    Q.   Do you know what they are now?  Can you point
10  to them now?
11   A.   I'd be happy to.
12   Q.   Please do so.
13   A.   (Examining.)  (In English.)  Yes, the first
14  one is on page 254.
15   Q.   (Not translated.)  Yes, sir.
16   A.   I'm sorry.  The first mistake is on page 254.
17  It relates to the terror attack on bus line 19.
18   Q.   Can you just say where on the page?
19   A.   (In English.)  (Reading.)
20     "It seems that Hamas was...dominant entity."
21     (Translated.)  It says:  It seems like Hamas
22  was a dominant entity --
23   Q.   Okay.
24   A.   (Translated.)  -- in the last part of the
25  operation.

## Page 20

1         (In English.)  That's what it says.
2         (Translated.)  That's what it says here.
3    And I would like to correct and say that Hamas was
4    an important part of the action or the operation, but
5    not doing its execution.
6    Q.   Is that the correction?
7    A.   Yes.  Okay.  That Hamas had an important part,
8  but not at the very last part.
9    Q.   Does that complete your correction of that
10  item?
11   A.   With respect to this particular point, yes.
12   Q.   What is the other correction?
13        Well, I'm sorry.  Go back, please, to the one
14  you just referred to at page 254.
15        Are you saying that Hamas was not part of
16  executing that attack?
17        MR. UNGAR:  Objection to the extent it
18  mischaracterizes --
19        (Brief comment in Hebrew by the witness.)
20        MR. UNGAR:  Mr. Shaked, please.  I know it's
21  an unusual setting today.  But give me a chance to make
22  objections.  Okay?
23        Objection to the extent it mischaracterizes
24  testimony.
25        THE WITNESS:  (Translated.)  Maybe I wasn't

## Page 21

1  understood correctly.  Perhaps I wasn't translate --
2         (Brief comment in Hebrew by the witness.)
3         THE INTERPRETER:  I said:  "Perhaps I wasn't
4  understood correctly."
5         THE WITNESS:  Perhaps I wasn't translated
6  correctly.  But -- or the words I said were not
7  translated correctly.
8         But Hamas -- what I said is that the Hamas
9  had a major part in these terror attacks -- in this
10  attack, but it did not have a central part in the time
11  of the execution of the attack or during the last part
12  of the attack --
13        (In English.)  "Stage."
14        (Translated.)  -- the last stage of the
15  attack.
16   Q.   BY MR. SALPETER:  Okay.  What is the other
17  correction?
18   A.   With your permission, I'll find it.
19   Q.   (Not translated.)  Sure.  Please.
20   A.   (Examining.)  (Translated.)  I just need to
21  go over --
22        (In English.)  Yeah.  The second mistake --
23  I found it, I'm sorry it took me a lot of time --
24  started on -- even also on page 252.  And it said but
25  even with -- that Hamas publicly assumed responsibility

6  (Pages 18 to 21)

**EXHIBIT 151 to Declaration of Joel Israel**

*TZVI WEISS, et al. VS.*
*NATIONAL WESTMINSTER BANK, PLC*

---

*MATTHEW LEVITT*
*June 2, 2011*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 170 of 328 PageID #: 9874

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

MATTHEW LEVITT
June 2, 2011

**Page 1**

1 UNITED STATES DISTRICT COURT

2 EASTERN DISTRICT OF NEW YORK

---------------------------------x

3 TZVI WEISS, et al.,

4                     Plaintiffs,

5      -against-

6 NATIONAL WESTMINSTER BANK, PLC,

7                     Defendants.

---------------------------------x

8 NATAN APPLEBAUM, et al.,

9                     Plaintiffs,

10     -against-

11 NATIONAL WESTMINSTER BANK, PLC,

12                    Defendants.

---------------------------------x

13

14                   One Liberty Plaza

15                   New York, New York

16                   June 2, 2011
                     9:35 a.m.

17

18          Videotaped Deposition of

19 MATTHEW LEVITT, before Shari Cohen, a Notary

20 Public of the State of New York.

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor

24        New York, New York 10022
               212-750-6434

25             REF: 96667

**Page 2**

1 A P P E A R A N C E S :

2

3 STONE BONNER & ROCCO LLP

4 Attorneys for Plaintiffs

5       260 Madison Avenue

6       New York, New York  10016

7 BY:   JAMES P. BONNER, ESQ.

8       PHONE  212-239-4340

9       FAX    212-239-4310

10      EMAIL  jbonner@lawssb.com

11

12

13 CLEARY GOTTLIEB STEEN & HAMILTON LLP

14 Attorneys for Defendants

15      One Liberty Plaza

16      New York, New York  10006

17 BY:   AVRAM LUFT, ESQ.

18      BRENDAN GIBBON, ESQ.

19      JAMIE RIETEMA, ESQ.

20      PHONE  212-225-2432

21      FAX    212-225-3999

22      EMAIL  lfriedman@cgsh.com

23

24

25

**Page 3**

1    A P P E A R A N C E S (CONT'D):

2

3    ALSO PRESENT:

4 DAN MACOM, Videographer

5 MAXWELL KARDON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1 ------------------ I N D E X -------------------

2 WITNESS              EXAMINATION BY        PAGE

3 MATTHEW LEVITT       MR. LUFT                 7

4

5

6 ---------------- E X H I B I T S ----------------

7 LEVITT       DESCRIPTION            FOR I.D.

8 Exhibit 1    Expert Report             10

9 Exhibit 2    Document, Bates labeled   12

10             Levitt 003167

11 Exhibit 3    Supplemental Expert Reort  17

12 Exhibit 4    Document                  24

13 Exhibit 5    Document                  34

14 Exhibit 6    Report                    63

15 Exhibit 7    Report                    73

16 Exhibit 8    Report                    76

17 Exhibit 9    Document                  80

18 Exhibit 10   Document                 116

19 Exhibit 11   Document                 129

20 Exhibit 12   Expert Report of Brian   141

21             Jenkins

22

23

24          (EXHIBITS TO BE PRODUCED)

25

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 171 of 328 PageID #: 9875

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

MATTHEW LEVITT
June 2, 2011

Page 5

1    S T I P U L A T I O N S
2
3 IT IS HEREBY STIPULATED AND AGREED by
4 and between the attorneys for the respective
5 parties herein, that the filing, and sealing
6 of the within deposition be waived.
7 IT IS FURTHER STIPULATED AND AGREED
8 that all objections, except as to the form of
9 the question, shall be reserved to the time
10 of the trial.
11 IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be sworn to
13 and signed before any officer authorized to
14 administer an oath with the same force and
15 effect as if signed and sworn to before the
16 Court.
17
18
19    -oOo-
20
21
22
23
24
25

Page 6

1    P R O C E E D I N G S
2    THE VIDEOGRAPHER: This is tape
3 one.  We are now on the record.  The
4 time is 9:34 a.m.  Today is Thursday,
5 June 2, 2011.  This is the opening of
6 the deposition of Mr. Matthew Levitt
7 in the matter of Tzvi Weiss, et al.
8 verses National Westminster Bank, PLC
9 and also in the matter of Natan
10 Applebaum, et al. verses National
11 Westminster Bank, PLC.
12    This deposition is being held
13 at the offices of Cleary Gottlieb
14 Steen & Hamilton located at 1 Liberty
15 Plaza in New York, New York.
16    Our court reporter today is
17 Shari Cohen with Ellen Grauer Court
18 Reporting.  I'm the legal videographer
19 Dan Macom also with Ellen Grauer Court
20 Reporting.
21    Will counsels please introduce
22 themselves.
23    MR. LUFT: Avram Luft of Cleary
24 Gottlieb Steen & Hamilton LLP on
25 behalf of National Westminster Bank.

Page 7

1 With me are my colleagues Brendan
2 Gibbon, Jamie Rietema and our legal
3 clerk Maxwell Kardon.
4    MR. BONNER: Jim Bonner with
5 Stone Bonner & Rocco for the
6 plaintiffs.
7    THE VIDEOGRAPHER: Will the
8 court reporter please swear in the
9 witness.
10 M A T T H E W   L E V I T T, called as a
11 witness, having been duly sworn by the
12 Notary Public, was examined and
13 testified as follows:
14
15 EXAMINATION BY
16    MR. LUFT:
17 Q.  How are you, Dr. Levitt?
18 A.  I'm well.  Good morning.  How
19   are you?
20 Q.  Good.  We've met before,
21   correct?
22 A.  Correct.
23 Q.  I took your deposition in the
24   Credit Lyonnais matter?
25 A.  It was a pleasure.

Page 8

1    LEVITT
2 Q.  I'm glad you enjoyed it.  I did
3 too. The same ground rules that applied at
4 that deposition apply at this and in the
5 interest of time I won't bore you with them
6 all over again unless you have any questions,
7 but there are a couple of things I did want
8 to highlight.
9    By agreement between the
10 plaintiffs and the defendant the parties have
11 agreed that your prior deposition in the
12 Credit Lyonnais matter will serve as also
13 your testimony here today in the interest of
14 not having to make you do it all over again.
15 Do you understand that?
16 A.  I do.
17    MR. LUFT: Let's go off the
18 record.
19    THE VIDEOGRAPHER: We are now
20 off the record.  The time is 9:36
21 a.m., June 2, 2011.
22    (Recess taken.)
23    THE VIDEOGRAPHER: We are now
24 back on the record. The time is 9:37
25 a.m., June 2, 2011.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

MATTHEW LEVITT
June 2, 2011

Page 41

1     LEVITT
2  Q.   The money comes from let's take
3  Holy Land Foundation, they send it to
4  Interpal and now when you talk about
5  commingling, are you saying that at that
6  point Interpal takes money that was donated
7  for charity and sends some off to do the
8  charity that -- it sends some monies off to
9  charities, correct, and you are saying some
10  of the money goes for other things?
11  A.   I don't know if that's the
12  case, but what I do know is that what
13  Interpal has been accused of is commingling
14  funds from multiple donors which may have
15  been raising funds, you might have been
16  raising funds for education and you might
17  have been raising funds for social welfare
18  and you for a hospital and the money gets
19  brought into Interpal and then Interpal will
20  then send it on and then when it eventually
21  reaches the ground in the West Bank there are
22  multiple additional levels through which the
23  money is disbursed.
24       Ultimately some of the money
25  may go to education or social welfare.  Some

Page 42

1     LEVITT
2  will go to this social welfare, some will go
3  to that social welfare and some may go
4  towards either directly or indirectly
5  supporting militant activity.
6       Without question the monies
7  across those things whether it's social
8  welfare or military or political which are
9  the three kind of mega baskets that you would
10  put Hamas activity into, the money that comes
11  in supports the organization's overall
12  ability to build grassroot support and pay
13  for people's salaries and create the kind of
14  society and culture and indebtedness and
15  belonging that makes Hamas so effective and
16  in fact so lethal in terms of its ability to
17  have longevity as an organization.
18  Q.   So going back to my example the
19  money now comes into Interpal, comes from
20  let's say Holy Land and two other sources and
21  Interpal makes a transfer to a charity in the
22  West Bank.  This is money that's given to the
23  charity.  At the charity, that money -- so
24  now you have the charity.  Does this get to
25  the point where I said when the money is at

Page 43

1     LEVITT
2  the charity you said it was less likely that
3  money that goes to a charity that's supposed
4  to be for charity and given to a charity is
5  taken away from the charity and used for
6  military activity?
7  A.   It's less common because the
8  beauty of the system is the ability to hide
9  or mask the transfer of funds to from what
10  would be a legitimate purpose, helping people
11  to an illegitimate purpose.  In that sense
12  it's a classic money laundering scheme.
13  There are instances where monies that were
14  raised for purportedly charitable purposes
15  are then used or law enforcement believes
16  they were used in a particular attack, but
17  those are more rare.
18  Q.   Thanks.  Let's go back to what
19  we were talking about, but I appreciate the
20  clarification.  Going back to Human Appeal
21  International?
22  A.   This was 55.
23  Q.   This is page 55 of your report.
24  You wrote a 1996 CIA report identifies HAI
25  Human Appeal International as having to act

Page 44

1     LEVITT
2  as a fundraiser for Hamas, right?
3  A.   Yes.
4  Q.   We noted the support for that
5  is in footnote 31 which includes a
6  declassified CIA document and a U.S. News and
7  World Reports article?
8       MR. BONNER: 311, not 31.
9       MR. LUFT: Correct, thank you,
10  Jim.
11  A.   Yes.
12  Q.   We had Exhibit 5 is it which
13  you told me was the declassified CIA report
14  and we were looking at the third page of it
15  which confusingly has a page 4 at the top?
16  A.   Correct.  It appears it was
17  faxed at some point.
18  Q.   We are all on the same page,
19  right, the third page of the document?
20  A.   Starts a/k/a the charitable
21  establishment of the two holy mosques?
22  Q.   Correct.  Halfway down the
23  page it says Human Appeal International, HAI,
24  right?
25  A.   Yes.

TZVI WEISS, et al. VS.
NATIONAL WESTMINSTER BANK, PLC

MATTHEW LEVITT
June 2, 2011

Page 153

1     LEVITT
2     again, but I do think that it is missing the
3     point to argue that because, for example,
4     some of these organizations predate the
5     official founding of the terrorist wing or
6     the group itself under the name Hamas or the
7     terrorist wing under the name Qassan Brigade
8     misses the point.  Again, we had a long
9     discussion last time about the fact that the
10    same people running the same organizations
11    were engaged in the very similar types of
12    activities including military or terrorist
13    operations before Hamas was founded as such
14    under that name.
15       The senior Hamas officials have
16    said this themselves Khalid Mishal, the
17    current chief of Hamas based out of Syria at
18    least for now has said this many times
19    openly. We call ourselves many things and
20    ultimately we chose Hamas.
21       I would argue that this
22    organization existed prior to its renaming
23    itself Hamas.  You could rename your law firm
24    after this meeting and you could continue
25    with every same client and everything, you

Page 154

1     LEVITT
2     are basically the same entity and so I think
3     that's just kind of a point of disagreement.
4  Q.   That's a point where Mr.
5     Berman disagrees with you as well?
6  A.   Yes.
7  Q.   Let me just ask you one
8     question with regard to that.  The fact that
9     you disagreed with Mr. Berman's criticisms of
10    your work, did that cause you in any way to
11    question any other of Mr. Berman's
12    conclusions?
13 A.   Welcome to social science.
14    Actually he doesn't criticize my work so much
15    as debates a point with me and to be fair
16    this is a point that is debated.  The vast
17    majority of people come out on the side that
18    I happen to come out on which is that there
19    are groups that serve as fronts for Hamas,
20    some of which have predated the founding of
21    Hamas under the name and some of which were
22    founded later.
23       By the way, you know a group
24    like the Mujama that we discuss in this
25    report could have been founded and operating

1     LEVITT
2     with these guys under whatever name one day
3     and then Hamas was founded under that name
4     and it continued operating as Hamas the next
5     day and theoretically though I don't think
6     this is the case, but just for the theory
7     perhaps then it was not engaging as a front
8     and then subsequently did begin to engage as
9     a front so the fact that it predated the
10    founding of Hamas, it's another way that it
11    misses the point, but the nature of social
12    science is that you won't necessarily agree
13    with 100 percent of what anybody says. That
14    doesn't mean that some of the stuff that they
15    -- some of the research that they do, some of
16    the arguments they make are not compelling
17    and I think that there are parts of the
18    argument that are compelling and I'm not so
19    proud an ego as to wash that under the table
20    just because there are other areas where I
21    disagree.
22       Look at me and Brian.  There
23    are a vast majority of things I think we
24    agree on and a lot of work we are doing
25    together right now we agree on. There are

Page 156

1     LEVITT
2     issues where we disagree and that's okay.
3  Q.   Are there any other issues that
4     you want to raise with regard to areas of
5     Brian's report that you disagreed with?
6  A.   No, I'm done.
7       MR. LUFT: Then I am.  Hold on.
8     I am done as well.  Thank you, Dr.
9     Levitt for your time.
10      THE WITNESS: Thank you.  I
11    apologize for that one outburst.
12      MR. BONNER: We will read and
13    sign, but we don't have any questions.
14    Thank you.
15      THE VIDEOGRAPHER: This
16    concludes today's deposition. We are
17    now off the record. The time is 1:25
18    p.m. Today is June 2, 2011.
19       (Time noted: 1:25 p.m.)
20
21
22
23
24
25

**EXHIBIT 152 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 175 of 328 PageID #: 9879

MOSES STRAUSS, et al. VS.                                          MATTHEW LEVITT
CREDIT LYONNAIS, S.A.                                              September 1, 2010

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    ----------------------------------x
 3  MOSES STRAUSS, et al.,
 4                    Plaintiffs,
 5      -against-
 6  CREDIT LYONNAIS, S.A.,
 7                    Defendants.
    ----------------------------------x
 8  BERNICE WOLF, et al.,
 9                    Plaintiffs,
10      -against-
11  CREDIT LYONNAIS, S.A.,
12                    Defendants.
    ----------------------------------x
13
14                    One Liberty Plaza
                      New York, New York
15
                      September 1, 2010
16                    9:27 a.m.
17
18          Videotaped Deposition of Expert
19  Witness, MATTHEW LEVITT, before Shari Cohen,
20  a Notary Public of the State of New York.
21
22
23          ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                 REF: 93800
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  OSEN, LLC
 4  Attorneys for Plaintiffs
 5          345 Seventh Avenue
 6          New York, New York  10001
 7  BY:    JOSHUA D. GLATTER, ESQ.
 8          PHONE  646-380-0480
 9          FAX    646-380-0471
10          EMAIL  jdg@osen.us
11
12
13  OSEN LLC
14  Attorneys for Plaintiffs
15          700 Kinderkamack Road
16          Oradell, New Jersey  07649
17  BY:    ARI UNGAR, ESQ.
18          PHONE  201-265-6400
19          FAX    201-265-0303
20          EMAIL  au@osen.us
21
22
23
24
25
```

Page 3

```
 1     A P P E A R A N C E S (CONT'D):
 2
 3  KOHN, SWIFT & GRAF, P.C.
 4  Attorneys for Plaintiffs
 5  One South Broad Street
 6  Philadelphia, Pennsylvania  19107
 7     BY: STEVEN M. STEINGARD, ESQ.
 8  PHONE  215-238-1700
 9  FAX    215-238-1968
10  EMAIL  ssteingard@kohnswift.com
11
12  CLEARY GOTTLIEB STEEN & HAMILTON LLP
13  Attorneys for Defendants
14  One Liberty Plaza
15  New York, New York  10006
16     BY: AVRAM E. LUFT, ESQ.
17  BRENDAN H. GIBBON, ESQ.
18  JAMIE RIETEMA, ESQ.
19  EMILY PICONE, ESQ.
20  PHONE  212-225-2432
21  FAX    212-225-3999
22  EMAIL  aluft@cgsh.com
23
24     ALSO PRESENT:
25  DAN MACOM, Videographer
```

Page 4

```
 1  ----------------- I N D E X ------------------
 2  WITNESS               EXAMINATION BY        PAGE
 3  MATTHEW LEVITT        MR. LUFT                 7
 4
 5  -------------- DOCUMENT REQUESTS --------------
 6  PAGE   16   Retainer Agreement
 7
 8  --------------- E X H I B I T S ---------------
 9  LEVITT          DESCRIPTION          FOR I.D.
10  Exhibit 1       Invoice                    15
11  Exhibit 2       Supplemental Expert Report 36
12                  of Dr. Matthew Levitt
13  Exhibit 3       Transcript                 87
14  Exhibit 4       Memorandum                144
15  Exhibit 5       Document                  146
16  Exhibit 6       Article                   153
17  Exhibit 7       Article                   169
18  Exhibit 8       Document                  249
19  Exhibit 9       Expert Report of Brian    265
20                  Michael Jenkins
21  Exhibit 10      Article                   307
22  Exhibit 11      Document                  339
23
24
25          (EXHIBITS TO BE PRODUCED)
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

MATTHEW LEVITT
September 1, 2010

LEVITT

1    LEVITT
2  report?
3       MR. LUFT: No, I'm just asking
4  about his general methodology.
5       MR. GLATTER: Objection to
6  form.
7  A.  Can you ask one more time?
8  Q.  In considering in analyzing
9  evidence, how significant do you find one
10  piece of anecdotal evidence with regard to
11  trying to form a larger opinion?
12       MR. GLATTER: Objection as to
13  form.
14  A.  I guess there's two ways to
15  understand that question.  One is one piece
16  of anecdotal evidence in the absence of any
17  other.  The other is one piece of anecdotal
18  evidence in the context of other pieces of
19  evidence.  To which are you referring?
20  Q.  Let's start with the former?
21  A.  In the absence?
22  Q.  Correct.
23  A.  If you have one piece of
24  anecdotal evidence in the absence of any
25  other information or evidence, then it might

1    LEVITT
2  A.  No.
3  Q.  Have you ever tried to?
4  A.  No.
5  Q.  Have you ever spoken with any
6  Hamas members who are not in jail?
7  A.  I make it a point not to for
8  very, you laugh, but for a very specific
9  reason and that is I'm a former government
10  official.
11  Q.  I didn't laugh.
12  A.  For the record it was not you.
13  There is a tendency and it's not just Hamas,
14  but it includes Hamas to meet with former
15  government officials who are when they meet
16  in an academic or a private or a non-profit
17  capacity and then say that they are having
18  some type of back channel to government and I
19  don't want to create that type of mistaken
20  impression.
21  Q.  Are there other charitable
22  entities other than the 12 in the territories
23  that you have met with?
24  A.  I have met with some, not many.
25  One in particular, one of the refugee camps

1    LEVITT
2  make for a telling snippet. If you are
3  writing a book that is, you know, to be
4  published for trade and makes for story line,
5  doesn't mean you cannot use it, you would not
6  want to make it out to be more than it is,
7  right, but in and of itself one discrete
8  piece of evidence and if that's all you have
9  is just that.  The reality is there is a very
10  large spectrum of course and the vast
11  majority of time you are dealing neither with
12  the sole piece of anecdotal evidence that is
13  in a vacuum or with the abundance of
14  completely verifiable data on the other and
15  therefore it's a question of putting together
16  pieces of evidence, patterns, seeing if
17  individual pieces of anecdotal evidence make
18  a pattern, putting them in the context of
19  larger findings, etc. and that enables you to
20  draw conclusions.
21  Q.  How many of the 12 entities
22  have you visited with?
23  A.  I have not visited these 12.
24  Q.  Have you ever spoken to any
25  members of the 12 entities?

1    LEVITT
2  near Bethlehem and the name is escaping me,
3  but for the purpose of this type of analysis
4  where you are trying to figure out if illicit
5  activity is in fact happening when you
6  already have information suggesting that it
7  is, it's kind of like asking if a person
8  who's researching organized crime asks Al
9  Capone are you a crime boss. I'm not
10  expecting him to say yes.  I'm not expecting
11  him to tell me about his illicit activity and
12  therefore it's often I find much more
13  productive to meet with government officials,
14  investigators, with regulators, with other
15  experts and those are the people who are
16  looking into this in ways that I can't so I
17  spend a lot of time with the Palestinian
18  ministries that oversee charity in the
19  Palestinian territories, I visit with the
20  Israelis of course, I talk to Americans and
21  European officials about these things.
22  Q.  The reason you would not ask Al
23  Capone is because you assume he would be
24  bias, he would give an answer that's self
25  serving, right?

Page 241

```
 1     LEVITT
 2  public?
 3  A.  No.
 4  Q.  Do you know who would have been
 5  in a position to review it before it was made
 6  public?
 7  A.  Review it for what, for
 8  release?
 9  Q.  For any purpose who would have
10  had a chance to read this before it became
11  public?
12  A.  Based on my experience in
13  government and in the FBI in particular I
14  know that government reports specifically,
15  well, government reports period, certainly
16  reports that go up to a senior level even
17  within the building, certainly those that
18  leave the building and certainly those that
19  leave the building and go to another agency
20  as this one does gets significant review.  A
21  lot of good and a lot of bad could be said
22  about government bureaucracy, but I recall
23  lots of frustrated jokes that people had
24  about the difficulty of getting a memo
25  released because it had so many layers of
```

Page 242

```
 1     LEVITT
 2  review by the lawyers, by the substantive
 3  analysts, by management, etc.
 4  Q.  This is all FBI internal when
 5  you talk about the review?
 6  A.  Correct.  Something like this I
 7  would be shocked if it did not also get other
 8  review by other parts of DOJ.  FBI is part of
 9  Department of Justice.  It would have
10  received very, very significant internal to
11  the FBI and internal to government review.
12  Q.  Were you involved in the
13  preparation of the Watson memorandum?
14  A.  As mentioned earlier I'm not
15  allowed to say what I was or was not involved
16  in when I was working for the intelligence
17  community which is what I was doing when I
18  was at the FBI.  I can tell you I was
19  involved in focusing on middle eastern
20  terrorist groups and their presence in the
21  United States.
22  Q.  When you first received the
23  Watson memo, was there any information within
24  it that you eschewed as unreliable?
25     MR. GLATTER: Objection to
```

Page 243

```
 1     LEVITT
 2  form.
 3  A.  Unreliable, no, not at the
 4  time.  Though we discussed earlier there's
 5  different types of information in there,
 6  different types of -- which deserve different
 7  types of recognition or acceptance.
 8  Q.  Since you first received it,
 9  have you come to be of the opinion that any
10  information within the memo is unreliable?
11  A.  Yes.
12  Q.  What information is that?
13  A.  There are several press
14  articles like a New York Times or whatever
15  quoted in the report and sometimes people
16  myself included will give some credence to a
17  press report beyond just the fact that it's a
18  press report if it's cited in a government
19  report meaning the working assumption is that
20  if the government didn't believe that to be
21  true, it wouldn't be in there.  In the Watson
22  memo, there is one, I think it's one, USA
23  Today report one of the committees in Hebron
24  that's quoted.
25     Subsequently it turned out that
```

Page 244

```
 1     LEVITT
 2  this particular reporter was exposed for
 3  lying and claiming to be in a place
 4  observing something and was on the other side
 5  of the world and made it up, maybe spoke to
 6  people on the phone, maybe it's not all made
 7  up, but completely discredited so obviously I
 8  don't cite to that.
 9     I believe that early on I had
10  written things that did include that article
11  or pieces from it. Of course once you find
12  out it's discredited, you don't.
13  Q.  What have you done to
14  corroborate the rest of the information in
15  the report so that it does not fall prey to
16  the same type of inaccuracies?
17     MR. GLATTER: Objection as to
18  form and foundation.
19  A.  Thankfully that type of
20  circumstance is extremely rare and I say
21  fortunately because in most cases an outsider
22  is not in a position to be able to
23  independently verify that a source said that
24  or whatever.  I don't particularly feel the
25  need as an academic to verify if an article
```

**EXHIBIT 153 to Declaration of Joel Israel**

<u>חוות דעת עד מומחה – כישורים ונסיון בתחום עליו נתבקשתי להעיד</u>

1. שמי אריה דן שפיצן.

2. שימשתי עד ה-1 ינואר 2009 כראש המחלקה לעניני פלסטינים וכיועץ לעניני פלסטינים של מתאם הפעולות בשטחים בתקן ובמעמד של אלוף משנה – כיום עוסק ביעוץ בתחום המזרח התיכון בדגש על הזירה הפלסטינית לגופים ממסדיים, למכוני מחקר, לרבות למכונים אקדמאיים, ולגופים פרטיים[1]

3. בוגר החוגים להיסטוריה של ארצות האסלאם ולהיסטוריה של עם ישראל בהצטיינות באוניברסיטה העברית בירושלים 1976.

4. **בשנת 1976** הקמתי את מדור המחקר של היועץ לעניני ערבים בממשל הצבאי בגדה המערבית, לימים המנהל האזרחי ושימשתי כראש מדור המחקר במשך שנתיים. נבחרתי לתפקיד זה ע"י הפרופסור אמנון כהן וע"י פרופסור מנחם מילסון (שניהם שימשו בתפקיד היועץ לעניני ערבים בגדה המערבית בזה אחר זה באותה תקופה). על בסיס הישגיי בלימודיי במסגרת החוגים להיסטוריה של ארצות האסלאם ולהיסטוריה של עם ישראל סיימתי אותם בהצטיינות. שימשתי כראש מדור המחקר עד 1978.

**בין השנים 1978 - 1981** שמשתי כאסיסטנט של הפרופ' מנחם מילסון מהחוג לשפה וספרות ערבית והעסקתי כחוקר – אסיסטנט במכון ואן ליר בירושלים שם עסקתי בסוגיות הנוגעות לשילוב האוכלוסיה הערבית בישראל ובממסד המדעי הישראלי. במקביל עסקתי בכתיבת עבודת מחקר מדעית (על בסיס מסמכי מקור בתורכית ובערבית המצויים בארכיון בית המשפטי השרעי של ירושלים) אודות כלכלת ירושלים במאה ה-18. (כתוצר לוואי של מחקר זה פרסמתי מאמר מדעי בכתב העת קתדרה היוצא מטעם מכון בן צבי והעוסק בהקדשים יהודים בירושלים של סוף המאה ה-19)[2]

**בין השנים 1981 - 1993** שמשתי כראש מדור המחקר של היועץ לעניני ערבים וכסגן היועץ (בפועל) בגדה המערבית בעניני עסקקית במחקר חברתי כלכלי ופוליטי של הפלסטינים תוך התמצאות בזרמים הפוליטיים והחברתיים השונים ובהלכי הרוח באוכלוסיה. במסגרת תפקידי זה כתבתי בעצמי והנחתי את הכפופים לי בכתיבת מאות עבודות מחקר, ניירות מטה, מאמרים, לקטים וסקירות ייסוד בנושאים האזרחיים אשר שמשו את מערכת קבלת ההחלטות במשרד הביטחון, בתיאום הפעולות בשטחים ובדרגי 'מקבלי ההחלטות' ברמת השטח בפיקוד המרכז. עבודות מתקופה זו כמו גם מאות עבודות שנכתבו מאוחר יותר, רובן ככולן הינן בעלון סיווג בטחוני ועל כן הופצו בתפוצות פנימיות לדרג מקבלי ההחלטות ולדרגים מקצועיים אך לא ניתן לפרסמן ברבים.

**בשנים 1993 – 1996** צורפתי לצוות המשא ומתן על הסכמי אוסלו ושמשתי חבר בצוותים שנשאו ונתנו על העברת הסמכויות האזרחיות מהמנהל האזרחי לרשות הפלסטינית.

**בשנים 1996 – 1998** שמשתי כמרכז פעילות התאום והקישור האזרחית בגדה המערבית מול הרשות הפלסטינית – המשרד הפלסטיני לעניינים אזרחיים ומשרדים אזרחיים נוספים.

**בשנים 2000-1998** מוניתי ע"י הרמטכ"ל דאז, שאול מופז, ושר הביטחון, יצחק מרדכי, לראש המחלקה לעניינים פלסטינים בגדה המערבית במעמד ובתקן של אלוף משנה. כבכיר היועצים במערך הייעוץ

---

[1] מצ"ב מכתבים מטעם: א. מרכז המידע למודיעין ולטרור; ב. מרכז תמי שטינמץ למחקרי שלום אוניברסיטת ת"א, מכון ממר"י ירושלים המראים על היזדקקות גופים אלו לייעוצי המקצועי.

[2] שפיצן אריה, "האישיות המשפטית" והקדשים יהודים בירושלים של סוף המאה התשע עשרה, קתדרה – חוב' 19, ניסן תשמ"א – ע"מ 73 -82

שמשתי כל אותה תקופה כיועץ לענייני ערבים של מתאם הפעולות עצמו, אלוף (מיל") יעקב אור והייתי כפוף לו בפועל.

**בשנים 2009 - 2001** מוניתי לראש המחלקה לעניינים פלסטיניים של מתאם הפעולות בשטחים, כיועץ לעניני פלסטינים של המתאם ובראש מערך הייעוץ לעניני פלסטיניים בגדה המערבית ובעזה ובתוקף תפקיד זה הייתי למנחה מקצועי ולאוטוריטה עליונה בכל הנוגע לתמונת המצב האזרחית חברתית כלכלית בזירה הפלסטינית בגדמ"ע ובעזה.

כראש המערך שהינו מערך מידע הייתי אחראי בשנים אלה לכתיבת מאות סקירות ועבודות מחקר אודות תמונת המצב האזרחית, הזרמים הפוליטיים השונים ודרכי פעולתם, הזרמים החברתיים, הלכי הרוח המצב הכלכלי והשפעותו ועוד נושאים אזרחיים מגוונים הנוגעים לתחומים הפלסטיני האזרחי ומשיקים כמובן גם לפעילות הצבאית לרבות פעילות אירגוני הטרור (חמא"ס, ג'האד אסלאמי, חזית עממית, ג'האד עולמי ועוד) – בין היתר הייתי אחראי מדי שנה לכתיבה ולעדכון סקירת יסוד הנוגעת לתשתית האזרחית של החמא"ס – הדעוה.

### תקשורת

בתוקף הידע היחודי והיותי אוטוריטה בתחום הפלסטיני נתתי עשרות שיחות רקע לבכירי העיתונאים הישראליים העוסקים בתחום הפלסטיני ובתחום הצבאי (לפחות שיחה עד שתיים בשבוע במהלך עשר השנים האחרונות).וכן ראיונות פרשנות רבים לתקשורת הישראלית[3] אשר ראאה בי כתובת ברת סמכא בכל הנוגע לתחום הפלסטיני. בנוסף, ראיינתי פעמים רבות בתחנות טלויזיה בערבית והענקתי שיחות רקע ושיחות עומק גם לכתבים זרים של העיתונות העולמית בארץ.

### ייעוץ בתחום האקדמי

ציון לעיל הייעוץ השוטף הינתי למספר מכוני מחקר פרטיים ואקדמיים בארץ לאורך השנים ועד היום. כמו כן שותפתי כמרצה וחבר בפנלים בלא מעט סימפוזיונים, כנסים, ימי עיון ומפגשים מדעיים שנערכו מטעם אוניברסיטאות ומכוני מחקר בארץ[4]

### הופעה כעד מומחה בבתי משפט בישראל

הופעתי עשרות פעמים בבתי משפט בישראל (צבאיים ואזרחיים) לרבות הופעות ו/או מתן תצהירים לבית המשפט העליון במגוון נושאים הנוגעים לתחום הפלסטיני. ראיה לציון עד מומחה מרכזי בתיק "התנועה האסלאמית" בישראל לפני בית המשפט המחוזי בחיפה בה נתתי חוות דעת מקיפה אודות העברות כספים לתשתיות אזרחיות ואגודות צדקה של החמא"ס מטעם קרמת קיצוניות בחו"ל, קרן אלאקצא, אינטרפאל וקואליציית הצדקה[5] עדות אשר הביאה לפי הערכת פרקליטות מחוז צפון להודאת הנאשמים באשמות.

---

[3] מקצת הראיונות לקול ישראל, לגלי צה"ל ולטלוויזיה הישראלית רצופים בנספח.

[4] מצב לדוגמא הזמנה מטעם אוניברסיטת תל-אביב ליום עיון בסוגיית "ילדים, מלחמה וטלוויזיה" בו הרצתי בסוגיית "ניצול ילדים במלחמה – היבטים תקשורתיים".

[5] ראה מכתב פרקליטות צפון בנושא וכן מכתב ר' מרחב צפון שב"כ

2

<u>**ייעוץ לגופים מוסדיים**</u>

בתוקף תפקידי בעת שרותי וכיום כאזרח פרטי ייעצתי ועודני נותן ייעוץ בכל הקשור לתמונת המצב האזרחית-פוליטית-חברתית-כלכלית בשטחי הרש"פ ובזירה הפלסטינית למגוון גורמים כגון: תאום פעולות בשטחים, חטיבת מחקר של אגף המודיעין, המועצה לביטחון לאומי, שירות הביטחון הכללי, המוסד ועוד.[6]

<u>**סיכום**</u>

בתוקף נסיוני הרב הידע שצברתי במהלך שלושים שנות עיסוקי בנושא יכולות הניתוח, הכתיבה והמומחיות רבת השנים, שהפכה אותי לאוטוריטה בתחום הפלסטיני, אני מצוי היטב בנעשה בשטחי הרשות הפלסטינית ובקרב הפלסטינים  בשטחים מהבחינה החברתית כלכלית ופוליטית ובין היתר מכיר היטב את דרכי פעילותו של ארגון החמא"ס ובמיוחד את דרכי פעולתה של התשתית האזרחית של תנועה זו אשר נחקרה על ידי לאורך השנים.

---

[6] רצ"ב מכתבו של ראש האגף המדיני בטחוני במשרד הביטחון האלוף (מיל') גלעד בכל הנוגע למעורבות בייעוץ המוסדי.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

## Expert Witness Opinion – Qualifications and Experience in the Field in Which I Have Been Asked to Testify

1.  My name is Arieh Dan Spitzen.

2.  Up until January 1, 2009, I served as head of the Palestinian Affairs Department and as Advisor on Palestinian Affairs to the Coordinator of Israeli Government Activities in the Territories, with the position and status of a Colonel. I currently provide consultancy services on the subject of the Middle East, with emphasis on the Palestinian arena, to institutional bodies, research institutes, including academic institutes, and private organizations[1].

3.  I graduated, with distinction, from the departments of History of the Islamic Lands and History of the Jewish People at the Hebrew University of Jerusalem in 1976.

4.  **In 1976,** I established the Research Section of the Advisor for Arab Affairs in the Military Government in the West Bank, later the Civil Administration, and served as head of the Research Section for two years. I was chosen for this task by Professor Amnon Cohen and by Professor Menahem Milson (both of whom served, consecutively, in the position of Advisor for Arab Affairs in the West Bank at that time). My selection was on the basis of my achievements in my studies in the departments of History of the Islamic Lands and History of the Jewish People, which I completed with distinction. I served as head of the Research Section till 1978.

    **In the years 1978-1981**, I served as an assistant to Professor Menahem Milson in the Department of Arabic Language and Literature. I was also employed as a research assistant at the Van Leer Institute in Jerusalem, where I was involved in issues dealing with the integration of the Arab population in Israeli society and in the Israeli establishment. In parallel, I was involved in writing an academic research paper (based on source documents in Turkish and Arabic found in the archives of the Jerusalem Sharia Court) with respect to the economy of Jerusalem in the 18th century. (As a side effect of this research, I published an academic paper in Cathedra, a journal published by the Ben-Zvi Institute; the paper discussed Jewish charitable trusts – *hekdeshim* – in Jerusalem in the late 19th century).[2]

---

[1] Attached are letters from: a. Intelligence and Terrorism Information Center; b. Tami Steinmetz Center for Peace Research, Tel Aviv University; c. Middle East Media Research Institute (MEMRI), Jerusalem – indicating the use made by these organizations of my professional consultancy services.

[2] Spitzen, Arieh, 'Jewish Charitable Trusts in Late Nineteenth Century Jerusalem: Legal Considerations,' Cathedra 19, Nissan 5741 [=April 1981], pp. 73-82.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

**From 1981 to 1993**, I served as head of the Research Section of the Advisor for Arab Affairs, and as acting Deputy Advisor in the West Bank. I dealt with social, economic and political research into the Palestinians, focusing on various political and social streams and trends within the population. In this position I wrote, or directed those under me in the writing of, hundreds of research papers, background papers, articles, compilations and basic overviews on civilian issues, which served in the decision making process in the Defense Ministry, the office of the Coordinator of Israeli Government Activities in the Territories, and at the "decision making" levels in the field in Central Command. The work carried out during this period, like hundreds of papers written later, are almost all classified, and so were distributed internally at the decision making and professional levels, but cannot be widely published.

**In 1993-1996** I was attached to the Oslo Accords negotiating team, and served as a member of the teams negotiating the transfer of civilian powers from the Civil Administration to the Palestinian Authority.

**In the years 1996-1998**, I served as coordinator of Civilian Coordination and Liaison in the West Bank, working with the Palestinian Authority – Palestinian Ministry for Civilian Affairs and other civilian departments.

**In the period 1998-2000**, I was appointed by the then Chief of Staff, Shaul Mofaz, and Defense Minister, Yitzchak Mordechai, as head of the Palestinian Affairs Department in the West Bank, with the status and position of a Colonel. As the senior advisor in the advisory framework, I served throughout that period as personal Advisor on Arab Affairs to the Coordinator of Activities, Major General (Res.) Yaakov Or, and was in fact subordinate to him.

**In 2001-2009**, I was appointed as head of Palestinian Affairs Department of the Coordinator of Israeli Government Activities in the Territories, as Advisor on Palestinian Affairs to the Coordinator, and as head of the advisory unit on Palestinian affairs in the West Bank and Gaza. By virtue of this position, I was the professional mentor and supreme authority with respect to anything connected with the civilian, social and economic situation in the Palestinian arena in the West Bank and Gaza.

As head of this unit, which was an information framework, I was responsible in those years for the writing of hundreds of surveys and research papers with respect to the civilian situation, the various political streams and their modes of operation, the social streams, the mood in the area, the economic situation and its influence, and various other topics related to the civilian Palestinian sphere, but which also touched on military activity, including the activities of terror organizations (Hamas, Islamic Jihad, Popular Front, World Jihad, and

2

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

others) – *inter alia*, I was responsible each year for writing and updating the basic overview relating to the civilian infrastructure of the Hamas – the *da'wa*.

## Media

By virtue of my special knowledge and my being an authority on the Palestinian sphere, I have given dozens of background talks to senior Israeli journalists dealing with Palestinian and military affairs (at least one or two such talks per week over the past ten years), as well as many commentary interviews to the Israeli media,[3] which saw me as the authoritative point of reference with respect to all aspects of the Palestinian sphere. In addition, I have been interviewed numerous times on Arabic-language television stations, and have also given background and in-depth talks to foreign journalists representing the world press in Israel.

## Academic Consultation

I have mentioned above the ongoing consultation provided over the years, up to the present time, to a number of private and academic research institutes in Israel. In addition, I have taken part as a lecturer and panelist in numerous symposia, conferences, seminars and academic meetings arranged by universities and research institutes in Israel.[4]

## Appearance as an Expert Witness in Israeli Courts

I have appeared dozens of times in Israeli courts (military and civilian), including appearances and/or the provision of affidavits to the Supreme Court, on a range of topics touching on the Palestinian sphere. Of particular note is my appearance as a key expert witness in the Islamic Movement case in Israel, before the District Court in Haifa, in which I provided a comprehensive opinion with respect to the transfer of funds to the civilian infrastructure and charitable societies of Hamas on behalf of radical foundations abroad – the Al Aqsa Foundation, Interpal and the Union of Good[5] – testimony which, in the view of the State Attorney's Office, Northern District, led to the accused pleading guilty.

---

[3] Some of the interviews for Kol Yisrael, Galei Zahal and Israel Television are attached in the Appendix.
[4] Attached, for example, is an invitation from Tel Aviv University to a one-day seminar on the topic of "Children, War and Television," at which I lectured on the subject "Exploitation of Children in War – Media Aspects."
[5] See the letter from the State Attorney's Office, Northern District, on the topic, and the letter from the head of the Northern District, Israel Security Agency.

*Translated from the Hebrew*
*Rina Ne'eman Hebrew Language Services, Inc.*

## Consultation to Institutional Organizations

By virtue of my position during my governmental service, and today as a private citizen, I provided, and still provide, consultation in relation to the civil, political, social, and economic picture in the Palestinian Authority territories and the Palestinian arena, to a variety of organizations, such as: the Coordinator of Israeli Government Activities in the Territories, the Research Division of Intelligence Branch of the Israel Defense Forces, the National Security Council, the Israel Security Agency, the Mossad and others.[6]

## Summary

By virtue of my extensive experience, the knowledge that I have acquired over the course of thirty years of dealing with the topic, the analytical and writing abilities and expertise of many years, which have made me the authority in the Palestinian sphere, I am well informed on what is taking place in the territories of the Palestinian Authority and among the Palestinians in the Territories, from the social, economic and political point of view. Inter alia, I am very familiar with the methods of operation of the Hamas organization, and particularly the methods of operation of the movement's civilian infrastructure, which I have investigated over the years.

---

[6] Attached is a letter from the Director of Policy and Political-Military Affairs in the Defense Ministry, Major-General (Res.) Gilad, in regard to involvement in institutional consultations.

4

**EXHIBIT 154 to Declaration of Joel Israel**

*MOSES STRAUSS, et al. VS.*

*CREDIT LYONNAIS, S.A.*

---

*ARIEH SPITZEN*

*August 11, 2010*

---



126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434   FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 93798.TXT*

*Min-U-Script® with Word Index*

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

ARIEH SPITZEN
August 11, 2010

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    ----------------------------------------X
 3  MOSES STRAUSS, et al.,
 4                        Plaintiffs,
 5       - against -
    CREDIT LYONNAIS, S.A.,
 6                        Defendants.
 7
    CASE NO.: 06-702(DGT)(MDG)
 8  ----------------------------------------X
    BERNICE WOLF, et al.,
 9                        Plaintiffs,
10       - against -
11  CREDIT LYONNAIS, S.A.,
12                        Defendants.
13  CASE NO.: 07-914(DGT)(MDG)
    ----------------------------------------X
14
15                   One Liberty Plaza
16                   New York, New York
17                   August 11, 2010
                     10:09 a.m.
18
19             VIDEOTAPED DEPOSITION of Expert
20  Witness, ARIEH SPITZEN, before Melissa Gilmore,
21  a Notary Public of the State of New York.
22
23         ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                 REF: 93798
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  OSEN LLC
 4  Attorneys for Plaintiffs
 5       345 Seventh Avenue, 21st Floor
 6       New York, New York 10001
 7  BY:  JOSHUA D. GLATTER, ESQ.
 8       PATRICIA E. RONAN, ESQ.
 9       PHONE 646-380-0480
10       FAX 646-380-0471
11       E-MAIL jdg@osen.us
12
13
14  OSEN LLC
15  Attorneys for Plaintiffs
16       700 Kinderkamack Road
17       Oradell, New Jersey 07649
18  BY:  ARI UNGAR, ESQ.
19       PHONE 201-265-6400
20       FAX 201-265-0303
21       E-MAIL au@osen.us
22
23
24
25
```

Page 3

```
 1     A P P E A R A N C E S : (Cont'd)
 2
 3  CLEARY GOTTLIEB STEEN & HAMILTON LLP
 4  Attorneys for Defendant
 5  One Liberty Plaza
 6  New York, New York 10006-1470
 7     BY: AVRAM E. LUFT, ESQ.
 8  BRENDAN H. GIBBON, ESQ.
 9  JAMIE RIETEMA, ESQ.
10  PHONE 212-225-2432
11  FAX 212-225-3999
12  E-MAIL aluft@cgsh.com
13
14
15     ALSO PRESENT:
16  RUTH KOHN, Official Hebrew Interpreter
17  MEIR TURNER, Check Interpreter
18  CLARA M. BEYLER, Check Interpreter
19  DAN MACOM, Videographer
20
21
22
23
24
25
```

Page 4

```
 1  ------------------ I N D E X -----------------
 2  WITNESS              EXAMINATION BY      PAGE
 3  ARIEH SPITZEN        MR. LUFT              8
 4
 5  DIRECTIONS:  PAGES 17, 44, 48
 6
 7  MOTIONS:   PAGE 161
 8
 9  -------- INFORMATION/DOCUMENT REQUESTED -------
10  PAGE   41   Bills submitted since April 2010
11
12
13  --------------- E X H I B I T S ---------------
14  SPITZEN     DESCRIPTION            FOR I.D.
15  Exhibit 1   Hebrew Version of Expert     21
16              Report
17  Exhibit 2   English Version of Expert    22
18              Report
19
20
21          (EXHIBITS TO BE PRODUCED)
22
23
24
25
```

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

ARIEH SPITZEN
August 11, 2010

Page 5

1  FEDERAL STIPULATIONS
2
3  IT IS STIPULATED AND AGREED by
4  and between the attorneys for the respective
5  parties herein, that the filing, sealing,
6  and certification of the within deposition
7  be waived.
8  IT IS FURTHER STIPULATED AND
9  AGREED that all objections, except as to the
10 form of the question, shall be reserved to
11 the time of the trial.
12 IT IS FURTHER STIPULATED AND
13 AGREED that the within deposition may be
14 sworn to and signed before any officer
15 authorized to administer an oath, with the
16 same force and effect as if signed to before
17 the Court.
18
19
20   - oOo -
21
22
23
24
25

Page 6

1  P R O C E E D I N G S
2  * * * *
3  THE VIDEOGRAPHER: This is tape one.
4  We are now on the record. The time is
5  10:09 a.m. Today is Wednesday, August 11,
6  2010. This is the opening of the
7  deposition of Mr. Arieh Spitzen in the
8  matters of Moses Strauss, et al. versus
9  Credit Lyonnais, S.A. and also Wolf, et
10 al. versus Credit Lyonnais, S.A.
11 This deposition is being held at the
12 offices of Cleary Gottlieb Steen &
13 Hamilton, located at One Liberty Plaza,
14 New York, New York. Our court reporter
15 today is Ms. Melissa Gilmore with Ellen
16 Grauer Court Reporting. I'm the legal
17 videographer, Dan Macom, also with Ellen
18 Grauer Court Reporting.
19 Will counsels please introduce
20 themselves.
21 MR. GLATTER: Joshua Glatter, Osen
22 LLC, on behalf of the Strauss plaintiffs.
23 MS. BEYLER: Clara Beyler, special
24 translator on behalf of the plaintiffs.
25 MR. UNGAR: Ari Ungar, Osen LLC, on

Page 7

1  behalf of the Strauss plaintiffs.
2  MS. RONAN: Patricia E. Ronan, Osen
3  LLC, on behalf of the Strauss plaintiffs.
4  MS. RIETEMA: Jamie Rietema, Cleary
5  Gottlieb, on behalf of Credit Lyonnais.
6  MR. TURNER: Meir Turner,
7  interpreter.
8  MR. GIBBON: Brendan Gibbon, on
9  behalf of Credit Lyonnais, with Cleary
10 Gottlieb.
11 MR. LUFT: Avram Luft, of Cleary
12 Gottlieb Steen & Hamilton LLP, on behalf
13 of Credit Lyonnais.
14 THE INTERPRETER: Ruth Kohn, Hebrew
15 interpreter.
16 THE VIDEOGRAPHER: Will our court
17 reporter please swear in the witness?
18 R U T H   K O H N,      called as the
19 official interpreter in this action, was
20 duly sworn to faithfully translate the
21 questions to the witness from English to
22 Hebrew, and the answers from Hebrew to
23 English.
24 A R I E H   S P I T Z E N,   called as a
25 witness, having been duly affirmed by a

Page 8

1  SPITZEN
2  Notary Public, was examined and testified
3  as follows:
4  EXAMINATION BY
5  MR. LUFT:
6  Q. Mr. Spitzen, good morning.
7  A. Good morning.
8  Q. My name is Avi Luft. I represent
9  Credit Lyonnais in this matter.
10 Are you represented here today?
11 A. No, I'm not represented here.
12 MR. LUFT: Is that right,
13 Mr. Glatter?
14 MR. GLATTER: That's correct. The
15 witness is here as an expert witness. The
16 witness is not my client.
17 MR. LUFT: So you are not
18 representing him.
19 MR. GLATTER: I will be defending
20 his deposition today.
21 MR. LUFT: Okay.
22 Q. Mr. Spitzen, have you ever been
23 deposed before?
24 A. Not this way.
25 Q. Have you been deposed in another

MOSES STRAUSS, et al. VS.
CREDIT LYONNAIS, S.A.

ARIEH SPITZEN
August 11, 2010

Page 69

SPITZEN

1    SPITZEN
2  a serious problem with his son --
3     MR. TURNER: Personal.
4     THE WITNESS: -- personal problem
5  with his son, a health problem.  And,
6  therefore, I called him once or twice to
7  find out how his son was and how I could
8  help.  Okay?  That's it.
9     The third matter -- no, I'm sorry
10  the fourth matter, I would like to refer
11  you to page 81, I think it's also page 81
12  in the English version, and that's
13  regarding Mr. Luft's question whether I
14  would like to correct anything in my
15  expert opinion.  On page 81 under the
16  heading -- under the heading identifying
17  with the Hamas --
18     MR. TURNER: Identification.
19 A.  -- "Identification with Hamas" --
20     MR. LUFT: That starts on page 80 of
21  Exhibit 2, which is the English.
22     THE WITNESS: Okay.  I'm sorry.  (In
23  English.)
24     MR. LUFT: It's fine.  I just want
25  the record to be clear.

Page 70

1    SPITZEN
2     MR. GLATTER: Yes, yes, in the
3  English, it's agreed.
4     THE WITNESS: Under the heading,
5  "Identification with Hamas," I indicate
6  overwhelming evidence regarding the
7  relationships, and you can read it from
8  the English.
9     In searches carried out by the IDF
10  troops, these findings were uncovered.
11  That's in section E.  The letter I'm
12  referring to is not in this -- is not
13  found or is not located in this
14  association.  It's a finding from the Holy
15  Land Foundation litigation.  It found its
16  way here by mistake.  It also identifies
17  with the Hamas, but it's not found on the
18  premises of this association.
19     BY MR. LUFT:
20 Q.  Is that it?
21 A.  Yes.
22 Q.  Let me just first clarify the last
23  point while we still have all the pages in
24  front of us.
25     I believe paragraph E that you are

Page 71

1    SPITZEN
2  referring to says, "The symbolic nature of the
3  relationship between ICSH and Hamas was
4  unequivocally expressed in a letter dated 1991
5  which was addressed to the CEO of the Holy Land
6  Foundation, Shukri Abu Baker, and was seized by
7  the FBI and presented as evidence in the
8  criminal trial."
9     So you are saying the correction you
10  would like to make is not that this was a
11  letter that was found by IDF troops?
12 A.  Right.
13 Q.  Rather, you say, it was a finding
14  from the Holy Land Foundation litigation?
15 A.  Correct.
16 Q.  Now, when you say it was a finding,
17  what do you mean by that?
18 A.  An exhibit, a court exhibit.
19 Q.  So it was not something that the
20  court found as a matter of law, correct?
21     MR. GLATTER: Objection, form?  I
22  guess you are asking the definition of
23  finding.
24     MR. LUFT: Well, he said it was a
25  finding.  Now, he is saying it's an

Page 72

1    SPITZEN
2  exhibit at the Holy Land Foundation.  I'm
3  just trying to understand.
4 A.  Yes, there is a reference, if you
5  look at the 455, the footnote number 455, it
6  shows you exactly where it was taken from.
7 Q.  But do you know if this is a finding
8  of fact that the court made or, rather, you are
9  just saying that what you were referring to
10  when you wrote this paragraph was that there
11  was some exhibit in the Holy Land Foundation?
12     MR. GLATTER: Objection to form.
13  Please translate.
14 A.  This was an exhibit shown to the
15  court.  I don't know what was the court's
16  ruling in this case.
17 Q.  So let me now go back to some of the
18  other things, just so I understand the
19  clarifications.
20     You said you have been alerted that
21  you may be called to testify in the Arab Bank
22  litigation?
23 A.  Yes.
24 Q.  The plaintiffs have alerted you to
25  this fact?

**EXHIBIT 155 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

—————————————————————— :

COURTNEY LINDE, et al.,          :
                                 :
        Plaintiffs,              :
                                 :
-against-                        : Case No.:
                                 : CV 04 2799(NG)(VVP)
ARAB BANK, PLC,                  :
                                 :
        Defendant.               :
—————————————————————— :
                                 :
PHILIP LITLE, et al.,            :
                                 :
        Plaintiffs,              :
                                 :
-against-                        : Case No.:
                                 : CV 04 5449(NG)(VVP)
ARAB BANK, PLC,                  :
                                 :
        Defendant.               :
—————————————————————— :
                                 :
ORAN ALMOG, et al.,              :
                                 :
        Plaintiffs,              :
                                 :
-against-                        : Case No.:
                                 : CV 04 5564(NG)(VVP)
ARAB BANK, PLC,                  :
                                 :
        Defendant.               :
—————————————————————— :

VIDEOTAPED DEPOSITION OF ARIEH DAN SPITZEN
(VOLUME I)
Tel Aviv, Israel
July 20, 2011

Reported by:  BRENDA MATZOV, CA CSR 9243

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

Page 2

```
 1    ROBERT L. COULTER, SR., FOR    :
      THE ESTATE OF JANIS RUTH       :
 2    COULTER, et al.,               :
                                     :
 3            Plaintiffs,            :
                                     :
 4    -against-                      : Case No.:
                                     : CV 05 365(NG)(VVP)
 5    ARAB BANK, PLC,                :
                                     :
 6            Defendant.            :
      _____:
 7                                   :
      GILA AFRIAT-KURTZER, et al.,   :
 8                                   :
              Plaintiffs,            :
 9                                   :
      -against-                      : Case No.:
10                                   : CV 05 388(NG)(VVP)
      ARAB BANK, PLC,                :
11                                   :
              Defendant.            :
12    _____:
                                     :
13    MICHAEL BENNETT, et al.,       :
                                     :
14            Plaintiffs,            :
                                     :
15    -against-                      : Case No.:
                                     : CV 05 3183(NG)(VVP)
16    ARAB BANK, PLC,                :
                                     :
17            Defendant.            :
      _____:
18                                   :
      ARNOLD ROTH, et al.,           :
19                                   :
              Plaintiffs,            :
20                                   :
      -against-                      : Case No.:
21                                   : CV 05 3738(NG)(VVP)
      ARAB BANK, PLC,                :
22                                   :
              Defendant.            :
23    _____:
24
25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

```
 1    STEWART WEISS, et al.,              :
                                          :
 2             Plaintiffs,                :
                                          :
 3    -against-                           : Case No.:
                                          : CV 06 1623(NG)(VVP)
 4    ARAB BANK, PLC,                     :
                                          :
 5             Defendant.                 :
      _____:
 6
      JOSEPH JESNER, et al.,              :
 7                                        :
               Plaintiffs,                :
 8                                        :
      -against-                           : Case No.:
 9                                        : CV 06 3869(NG)(VVP)
      ARAB BANK, PLC,                     :
10                                        :
               Defendant.                 :
11    _____:

12    YAFFA LEV, et al.,                  :
                                          :
13             Plaintiffs,                :
                                          :
14    -against-                           : Case No.:
                                          : CV 08 03251(NG)(VVP)
15    ARAB BANK, PLC,                     :
                                          :
16             Defendant.                 :
      _____:
17
      VIKTORIA AGURENKO, et al.,         :
18                                        :
               Plaintiffs,                :
19                                        :
      -against-                           : Case No.:
20                                        : CV 10 00626(NG)(VVP)
      ARAB BANK, PLC,                     :
21                                        :
               Defendant.                 :
22    _____:

23

24

25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

Page 4

```
 1              Videotaped deposition of ARIEH DAN SPITZEN

 2     (VOLUME I), taken in the above-entitled cause pending

 3     in the United States District Court, Eastern District

 4     of New York, pursuant to notice, before BRENDA MATZOV,

 5     CA CSR 9243, at the David Intercontinental Hotel,

 6     12 Kaufman Street, Conference Room 1123, Tel Aviv,

 7     Israel, on Wednesday, the 20th day of July, 2011,

 8     at 10:04 a.m.

 9

10

11     APPEARANCE OF COUNSEL:

12     FOR PLAINTIFFS:

13              OSEN, LLC
                By:  ARI UNGAR, ESQ.
14                   GARY M. OSEN, ESQ.
                     CINDY T. SCHLANGER, ESQ.
15              700 Kinderkamack Road
                Oradell, New Jersey 07649
16              (201)) 265-6400 / Fax (201) 265-0303
                au@osen.us
17              gmo@osen.us
                cts@osen.us
18

19     FOR PLAINTIFFS:

20              MOTLEY RICE, LLC
                By:  JOHN M. EUBANKS, ESQ.
21              28 Bridgeside Boulevard
                P.O. Box 1792
22              Mount Pleasant, South Carolina 29465
                (843) 216-9000 / Fax (843) 216-9450
23              jeubanks@motleyrice.com

24

25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

| | | |
|---|---|---|
| 1 | Hamas.  Perhaps just the Hamas started to take control | 10:56:24 |
| 2 | over them.  So in a case like this, it's very important | 10:56:27 |
| 3 | to state exactly what extent of control the Hamas had | 10:56:33 |
| 4 | over them back then. | 10:56:38 |
| 5 | Q.   BY MR. HOWARD:  Mr. Spitzen, you referred | 10:56:43 |
| 6 | to your 18 criteria methodology, which we will review | 10:56:46 |
| 7 | during this deposition. | 10:56:51 |
| 8 | Did that methodology, applying it to entities | 10:56:54 |
| 9 | to determine if they were controlled by Hamas, did you | 10:56:58 |
| 10 | ever consider, for applying that methodology, that you | 10:57:05 |
| 11 | should take a random control group to research or to | 10:57:08 |
| 12 | do something -- a statistical sampling of Palestinian | 10:57:13 |
| 13 | civil entities to eliminate bias from -- from your | 10:57:18 |
| 14 | methodology? | 10:57:22 |
| 15 | Did you ever consider that? | 10:57:23 |
| 16 | MR. UNGAR:  Objection to form and foundation. | 10:58:03 |
| 17 | THE WITNESS:  (Translated.)  The 18 criteria | 10:58:36 |
| 18 | which appear here -- I divided it to 18 -- actually | 11:01:10 |
| 19 | appeared in many works by researchers, enforcement | 11:01:16 |
| 20 | entities, in different forms.  All in all, this division | 11:01:21 |
| 21 | into 18 is done in order to make things clearer, to make | 11:01:25 |
| 22 | it easier. | 11:01:29 |
| 23 | I don't think I know any -- I mean, I don't -- | 11:01:32 |
| 24 | I wouldn't say that I don't know any researcher.  But | 11:01:34 |
| 25 | most researchers use these in expert opinions.  And also | 11:01:37 |

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

Page 31

| | | |
|---|---|---|
| 1 | it is used by different entities such as enforcement | 11:01:44 |
| 2 | entities, the director -- directorate of intelligence | 11:01:48 |
| 3 | of the IDF, by the Israel security, the ISA.  And all | 11:01:51 |
| 4 | them -- all of them use these criteria.  And the | 11:01:59 |
| 5 | criteria, for example, uses leadership, history, the | 11:02:03 |
| 6 | source of the money.  But if we're going to get into | 11:02:07 |
| 7 | it later, I'm not going to specify all the criteria now. | 11:02:12 |
| 8 | But all in all, these criteria are the | 11:02:16 |
| 9 | acceptable criteria in research, in enforcement.  And, | 11:02:18 |
| 10 | also, you can -- in some places, I saw these referred to | 11:02:25 |
| 11 | as guidelines.  I'm not sure exactly what the difference | 11:02:28 |
| 12 | is.  Therefore, I didn't try to check it in comparison | 11:02:33 |
| 13 | to some kind of another entity.  I did not make up this | 11:02:36 |
| 14 | methodology just for the purpose of checking these | 11:02:42 |
| 15 | specific Hamas entities.  These are acceptable, regular | 11:02:45 |
| 16 | criteria.  People have used them.  People still use | 11:02:51 |
| 17 | them.  I've used them in courts, both in civil [sic] | 11:02:54 |
| 18 | courts and in civilian courts.  The State authorities -- | 11:02:57 |
| 19 | (In English.)  "Military courts and civilian | 11:03:04 |
| 20 | courts." | 11:03:06 |
| 21 | THE INTERPRETER:  Sorry. | 11:03:08 |
| 22 | THE WITNESS:  Military courts and civilian | 11:03:08 |
| 23 | courts.  The State authorities use them in the claims | 11:03:08 |
| 24 | against the HLF and also in the claim regarding the | 11:03:12 |
| 25 | Al-Aqsa Foundation in Germany.  And, therefore, it's | 11:03:15 |

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

Page 32

```
 1    not something new that I just invented for this      11:03:20

 2    research.  So I just --                              11:03:25

 3              THE VIDEOGRAPHER:  We're out of tape.       11:03:35

 4              MR. HOWARD:  We -- that's fine.  We'll get  11:03:35

 5    this on the record without the tape.                 11:03:35

 6              Go ahead.  Please finish.                   11:03:35

 7              THE VIDEOGRAPHER:  This marks the end of    11:03:37

 8    tape --                                              11:03:38

 9              MR. HOWARD:  No, no, no.  I need -- oh, okay. 11:03:38

10              THE VIDEOGRAPHER:  This marks the end of Tape 11:03:38

11    No. 1 in the deposition of Arieh Spitzen.  Going off the 11:03:38

12    record.  The time is 11:03.                          11:03:43

13              MR. HOWARD:  I just want to finish the      11:03:47

14    translation of the answer that was given.            11:03:49

15              THE INTERPRETER:  Okay.                     11:03:50

16              THE WITNESS:  So it wasn't just something used 11:03:55

17    for this specific expert opinion.  So I didn't see any 11:03:57

18    need to check this through comparing with a different 11:04:02

19    group.                                               11:04:05

20              (Recess from 11:03 a.m. to 11:20 a.m.)      11:04:07

21              THE VIDEOGRAPHER:  Back on the record.  Here 11:20:14

22    marks the beginning of Tape No. 2 in the deposition of 11:20:14

23    Arieh Spitzen.  The time is 11:20.                    11:20:20

24        Q.   BY MR. HOWARD:  Mr. Spitzen, just before the 11:20:26

25    break, you mentioned that the 18 criteria methodology 11:20:28
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

Page 146

| | | |
|---|---|---|
| 1 | Palestinian civil entities; correct? | 18:45:02 |
| 2 | A.   That belong to Hamas or Islamic Jihad. | 18:45:15 |
| 3 | Q.   So it wasn't just entities identified with | 18:45:18 |
| 4 | Hamas.  They were ones identified with organizations | 18:45:20 |
| 5 | other than Hamas; correct? | 18:45:25 |
| 6 | A.   These were organizations that we suspected | 18:45:47 |
| 7 | were organizations of either the Hamas or the Islamic | 18:45:50 |
| 8 | Jihad.  These were Islamic organizations. | 18:45:53 |
| 9 | Q.   Now, this book was not publicly available; | 18:46:01 |
| 10 | correct? | 18:46:05 |
| 11 | MR. UNGAR:  Objection to form. | 18:46:08 |
| 12 | THE WITNESS:  No.  I believe it was | 18:46:13 |
| 13 | classified. | 18:46:14 |
| 14 | Q.   BY MR. HOWARD:  And these entities -- Islamic | 18:46:18 |
| 15 | entities that were listed in the da'wa book maintained | 18:46:26 |
| 16 | by the PAD, you didn't try to differentiate the level of | 18:46:33 |
| 17 | affiliation with Hamas or PIJ with any of those entities | 18:46:37 |
| 18 | did you? | 18:46:43 |
| 19 | MR. UNGAR:  Objection to form.  Compound. | 18:47:00 |
| 20 | THE WITNESS:  Obviously, this book changes | 18:48:45 |
| 21 | from one year to another.  It always depends on the | 18:48:46 |
| 22 | kind -- on the year. | 18:48:50 |
| 23 | But after the trial of Raed Salah, already | 18:48:51 |
| 24 | in the book of 2004, we tried to introduce criteria, | 18:48:55 |
| 25 | the very same criteria that were used in the trial, | 18:49:00 |

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

Page 147

```
 1    to examine different associations according to these        18:49:03
 2    criteria.                                                   18:49:07
 3              I don't quite remember at the moment the exact    18:49:08
 4    wording of these criteria.  But in each one of them, to     18:49:11
 5    the best of my recollection, there was a certain chapter    18:49:15
 6    that dealt with the particular institute and its link to    18:49:19
 7    terror, whether it was from the perspective of financing    18:49:23
 8    or activity or certain findings that were found in          18:49:26
 9    this institute and, obviously, a description of the         18:49:31
10    leadership, who it belonged to.  But this is just a         18:49:34
11    very general memory.  I don't remember the details.         18:49:37
12         Q.   BY MR. HOWARD:  Did the da'wa book contain        18:49:41
13    the names of Islamic entities that identified with          18:49:43
14    Hamas but were not part of Hamas, such as the Tubas         18:49:50
15    Zakat Committee that you identified earlier today?          18:49:54
16              MR. UNGAR:  Objection to form.  Time frame,       18:50:11
17    version of the book.                                        18:50:15
18              THE WITNESS:  The da'wa book, as I said,          18:50:56
19    included various Islamic entities.  I don't remember        18:50:58
20    the exact part or the chapter of Jenin at the moment.       18:51:02
21    But it's very -- it makes sense that the Zakat              18:51:06
22    committee -- the Tubas Zakat Committee was mentioned        18:51:10
23    there and who controlled it.  But I cannot swear about      18:51:14
24    it because it's not before me now.                          18:51:18
25         Q.   BY MR. HOWARD:  So is it fair to say the da'wa    18:51:21
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 343

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COURTNEY LINDE, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : Case No.: |
| | : CV 04 2799(NG)(VVP) |
| ARAB BANK, PLC, | : |
| | : |
| Defendant. | : |
| | : |
| PHILIP LITLE, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : Case No.: |
| | : CV 04 5449(NG)(VVP) |
| ARAB BANK, PLC, | : |
| | : |
| Defendant. | : |
| | : |
| ORAN ALMOG, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : Case No.: |
| | : CV 04 5564(NG)(VVP) |
| ARAB BANK, PLC, | : |
| | : |
| Defendant. | : |

VIDEOTAPED DEPOSITION OF ARIEH DAN SPITZEN
(VOLUME III)
Tel Aviv, Israel
July 24, 2011

Reported by:  BRENDA MATZOV, CA CSR 9243

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 344

```
 1    ROBERT L. COULTER, SR., FOR    :
      THE ESTATE OF JANIS RUTH       :
 2    COULTER, et al.,               :
                                     :
 3            Plaintiffs,            :
                                     :
 4    -against-                      : Case No.:
                                     : CV 05 365(NG)(VVP)
 5    ARAB BANK, PLC,                :
                                     :
 6            Defendant.            :
      _____:
 7                                   :
      GILA AFRIAT-KURTZER, et al.,   :
 8                                   :
              Plaintiffs,            :
 9                                   :
      -against-                      : Case No.:
10                                   : CV 05 388(NG)(VVP)
      ARAB BANK, PLC,                :
11                                   :
              Defendant.            :
12    _____:
                                     :
13    MICHAEL BENNETT, et al.,       :
                                     :
14            Plaintiffs,            :
                                     :
15    -against-                      : Case No.:
                                     : CV 05 3183(NG)(VVP)
16    ARAB BANK, PLC,                :
                                     :
17            Defendant.            :
      _____:
18                                   :
      ARNOLD ROTH, et al.,           :
19                                   :
              Plaintiffs,            :
20                                   :
      -against-                      : Case No.:
21                                   : CV 05 3738(NG)(VVP)
      ARAB BANK, PLC,                :
22                                   :
              Defendant.            :
23    _____:
24
25
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

```
 1    STEWART WEISS, et al.,          :
                                      :
 2            Plaintiffs,             :
                                      :
 3    -against-                       : Case No.:
                                      : CV 06 1623(NG)(VVP)
 4    ARAB BANK, PLC,                 :
                                      :
 5            Defendant.              :
      _____:
 6                                    :
      JOSEPH JESNER, et al.,          :
 7                                    :
              Plaintiffs,             :
 8                                    :
      -against-                       : Case No.:
 9                                    : CV 06 3869(NG)(VVP)
      ARAB BANK, PLC,                 :
10                                    :
              Defendant.              :
11    _____:
                                      :
12    YAFFA LEV, et al.,              :
                                      :
13            Plaintiffs,             :
                                      :
14    -against-                       : Case No.:
                                      : CV 08 03251(NG)(VVP)
15    ARAB BANK, PLC,                 :
                                      :
16            Defendant.              :
      _____:
17                                    :
      VIKTORIA AGURENKO, et al.,      :
18                                    :
              Plaintiffs,             :
19                                    :
      -against-                       : Case No.:
20                                    : CV 10 00626(NG)(VVP)
      ARAB BANK, PLC,                 :
21                                    :
              Defendant.              :
22    _____:
23
24
25
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

```
 1          Videotaped deposition of ARIEH DAN SPITZEN

 2     (VOLUME III), taken in the above-entitled cause pending

 3     in the United States District Court, Eastern District

 4     of New York, pursuant to notice, before BRENDA MATZOV,

 5     CA CSR 9243, at the David Intercontinental Hotel,

 6     12 Kaufman Street, Conference Room 1123, Tel Aviv,

 7     Israel, on Sunday, the 24th day of July, 2011,

 8     at 10:07 a.m.

 9

10

11     APPEARANCE OF COUNSEL:

12     FOR PLAINTIFFS:

13              OSEN, LLC
                By:  ARI UNGAR, ESQ.
14                   GARY M. OSEN, ESQ.
                700 Kinderkamack Road
15              Oradell, New Jersey 07649
                (201)) 265-6400 / Fax (201) 265-0303
16              au@osen.us
                gmo@osen.us
17

18     FOR PLAINTIFFS:

19              MOTLEY RICE, LLC
                By:  JOHN M. EUBANKS, ESQ.
20              28 Bridgeside Boulevard
                P.O. Box 1792
21              Mount Pleasant, South Carolina 29465
                (843) 216-9000 / Fax (843) 216-9450
22              jeubanks@motleyrice.com

23

24

25
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 427

| | | |
|---|---|---|
| 1 | A.   Okay. | 15:06:06 |
| 2 | Q.   I'm looking at the page Bates numbered | 15:06:44 |
| 3 | MR-AB00053295. | 15:06:47 |
| 4 | A.   Okay. | 15:07:01 |
| 5 | Q.   And paragraph No. 22. | 15:07:03 |
| 6 | A.   Okay. | 15:07:11 |
| 7 | Q.   It says here that: | 15:07:12 |
| 8 | "Since the Hamas organization does not | 15:07:14 |
| 9 | go public with its relation to the Islamic civilian | 15:07:16 |
| 10 | assistance system, the following institutions have | 15:07:21 |
| 11 | been judged according to several standards which | 15:07:25 |
| 12 | denote their relations to the Hamas." | 15:07:28 |
| 13 | Do you see that? | 15:07:31 |
| 14 | A.   Yes. | 15:07:39 |
| 15 | Q.   And there you list seven criteria for making | 15:07:39 |
| 16 | that determination; correct? | 15:07:42 |
| 17 | A.   That's correct. | 15:07:50 |
| 18 | Q.   When was the first time that you ever used | 15:07:51 |
| 19 | an 18-criteria formula for answering or addressing the | 15:07:55 |
| 20 | question of whether an entity was related to Hamas? | 15:08:02 |
| 21 | MR. UNGAR:  Objection to form. | 15:08:21 |
| 22 | THE WITNESS:  I think I already spoke about | 15:09:41 |
| 23 | this in my testimony.  I think it was at the beginning | 15:09:43 |
| 24 | of the testimony. | 15:09:46 |
| 25 | But when it comes to the criteria themselves, | 15:09:47 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN – 7/24/2011

Page 428

| | | |
|---|---|---|
| 1 | not the list of them, then we use them for a very long | 15:09:49 |
| 2 | time, especially after the Raed Salah trial. And we | 15:09:55 |
| 3 | even improved them.  We did not break them down to | 15:10:00 |
| 4 | 18 criteria. | 15:10:03 |
| 5 | A criterion might -- might be written here, | 15:10:06 |
| 6 | but then it can be broken down to more than one | 15:10:08 |
| 7 | criterion.  So I, as well as many others, have used | 15:10:12 |
| 8 | those criteria extensively.  I prepared the list of | 15:10:16 |
| 9 | 18 criteria in order to make it easy for all those | 15:10:18 |
| 10 | who would read the report. | 15:10:23 |
| 11 | Q.  BY MR. HOWARD:  (Not translated.)  Isn't it | 15:10:24 |
| 12 | true, Mr. Spitzen, that there are criteria among -- | 15:10:25 |
| 13 | THE INTERPRETER:  I'm sorry.  There was a | 15:10:29 |
| 14 | continuation. | 15:10:30 |
| 15 | THE WITNESS:  I simply broke it down.  It | 15:10:31 |
| 16 | doesn't meant -- mean that they didn't exist earlier or | 15:10:33 |
| 17 | that I did not take them into consideration in various | 15:10:36 |
| 18 | circumstances. | 15:10:40 |
| 19 | THE INTERPRETER:  Sorry. | 15:10:41 |
| 20 | Q.  BY MR. HOWARD:  Am I correct, though, that | 15:10:41 |
| 21 | there are criteria that you include among the 18 that | 15:10:43 |
| 22 | you were using in this case and against -- in the cases | 15:10:46 |
| 23 | against Credit Lyonnais and NatWest that were not in | 15:10:49 |
| 24 | any way part of your criteria in the Raed Salah case? | 15:10:53 |
| 25 | A.  Yes.  There are such criteria. | 15:11:22 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 429

| | | |
|---|---|---|
| 1 | Q.   And when was the first time that you used | 15:11:25 |
| 2 | those additional criteria?  Was that in these lawsuits | 15:11:27 |
| 3 | against the banks? | 15:11:31 |
| 4 | MR. UNGAR:  Just for the record, just for the | 15:11:45 |
| 5 | clarity, NatWest, Credit Lyonnais, and Arab Bank? | 15:11:46 |
| 6 | MR. HOWARD:  Yes. | 15:11:53 |
| 7 | THE WITNESS:  Not these criteria -- well, at | 15:12:16 |
| 8 | least not as a part of an expert witness.  I didn't have | 15:12:19 |
| 9 | the occasion to do that as an expert witness.  But in | 15:12:23 |
| 10 | papers that I wrote, definitely.  And in reviews that | 15:12:28 |
| 11 | I wrote, definitely. | 15:12:30 |
| 12 | Q.   BY MR. HOWARD:  So the first time you used | 15:12:33 |
| 13 | this complete list of 18 criteria as a methodology for | 15:12:35 |
| 14 | assessing a relationship between any entity and Hamas | 15:12:42 |
| 15 | was for purposes of being an expert witness in these | 15:12:46 |
| 16 | three cases against banks pending in the United States; | 15:12:50 |
| 17 | correct? | 15:12:54 |
| 18 | There might be something missing from my | 15:13:11 |
| 19 | question. | 15:13:16 |
| 20 | The first time, as an expert witness, that | 15:13:16 |
| 21 | you used this 18-criteria methodology was as an expert | 15:13:18 |
| 22 | witness in these three cases against banks; correct? | 15:13:23 |
| 23 | A.   When it's formulated that way, then yes. | 15:13:40 |
| 24 | Q.   And you've stated several times that there | 15:13:45 |
| 25 | are others who use this methodology. | 15:13:49 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN — 7/24/2011

Page 430

| | | |
|---|---|---|
| 1 | Who are the principal researchers in the | 15:13:53 |
| 2 | field who you look to -- well, let me strike that | 15:13:56 |
| 3 | and ask you:  First of all, what is it -- what is the | 15:14:04 |
| 4 | field of expertise from which you have derived this | 15:14:09 |
| 5 | 18-criteria methodology?  How would you define it? | 15:14:13 |
| 6 | A.   I don't understand the question so much. | 15:14:46 |
| 7 | Q.   Well, you've talked about other researchers | 15:14:48 |
| 8 | in the field that use this 18-criteria methodology. | 15:14:51 |
| 9 | I want to know how you define the "field of expertise." | 15:14:53 |
| 10 | What is it that you and these other | 15:14:58 |
| 11 | researchers who use this methodology are an expert in? | 15:15:00 |
| 12 | A.   So it goes like this.  When I said -- or | 15:17:06 |
| 13 | refer to those who are using these criteria and other | 15:17:09 |
| 14 | criteria, similar ones, those who had mentioned them and | 15:17:12 |
| 15 | are mentioning them, I meant researchers that come from | 15:17:17 |
| 16 | the enforcement entities, whether it's the intelligence | 15:17:21 |
| 17 | directorate or the ISA.  And they bring them up in their | 15:17:24 |
| 18 | reports, even on the Internet. | 15:17:29 |
| 19 | The intelligence directorate with respect to | 15:17:31 |
| 20 | the HLF, on behalf of the head of the research division, | 15:17:34 |
| 21 | or in the ISA, the testimony of the witness Avi, again, | 15:17:39 |
| 22 | in the HLF case.  They're using them as guidelines, as | 15:17:45 |
| 23 | criteria.  And they mention some of them as criteria, | 15:17:49 |
| 24 | these research divisions or branches in the enforcement | 15:17:52 |
| 25 | organizations as well as Middle East experts who study | 15:17:59 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 431

1      the field.                                          15:18:05

2            And this is how they identify institutes.     15:18:06

3      They relate to these criteria one way or another.  Not    15:18:08

4      always do they relate to all 18, sometimes only to some   15:18:12

5      of them.  And they use the criteria that I'm actually      15:18:16

6      using here.                                         15:18:19

7         Q.   Can you identify anyone else who uses the same    15:18:20

8      18 criteria that you do?  Or is this something unique      15:18:24

9      that you are bringing to the exercise?              15:18:29

10           MR. UNGAR:  Can I ask a point of clarification  15:18:30

11     I think will make it clearer?  You specifically     15:18:44

12     delineated 18 criteria?  That's the question?  Not  15:18:49

13     just --                                             15:18:52

14           MR. HOWARD:  Correct.                          15:18:52

15           MR. UNGAR:  -- the substance?  Okay.           15:18:53

16           THE WITNESS:  These 18 criteria, as they       15:19:22

17     appear in a list of one criterion coming after another,   15:19:25

18     the way I wrote this, then it's only me -- or it's me     15:19:29

19     that is using them.  But with respect to the criteria     15:19:32

20     in general, all of them or some of them, they are used    15:19:35

21     extensively.                                        15:19:41

22        Q.   BY MR. HOWARD:  Well, can you name any other  15:19:42

23     researcher who has used every one of the criteria that    15:19:44

24     you have used to make an assessment of whether an entity   15:19:47

25     is connected to Hamas or not?                       15:19:52

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN − 7/24/2011

Page 432

| | | |
|---|---|---|
| 1 | MR. UNGAR:  Objection to form. | 15:20:05 |
| 2 | (Brief exchange in Hebrew between the | 15:20:05 |
| 3 | interpreter and the witness.) | 15:20:05 |
| 4 | THE WITNESS:  Do you mean all of them | 15:20:22 |
| 5 | together? | 15:20:25 |
| 6 | Q.   BY MR. HOWARD:  Correct. | 15:20:26 |
| 7 | A.   I did not check this.  But I can tell you | 15:20:36 |
| 8 | that I remember someone now who used all 18 of them. | 15:20:38 |
| 9 | Q.   As you stated them in your report? | 15:20:42 |
| 10 | (Brief exchange in Hebrew between the | 15:20:44 |
| 11 | interpreter and the witness.) | 15:20:44 |
| 12 | THE INTERPRETER:  The witness thought that | 15:21:03 |
| 13 | I misinterpreted him.  So I re-read what I interpreted, | 15:21:05 |
| 14 | and he agreed that that is what he said. | 15:21:09 |
| 15 | THE WITNESS:  (In English.)  And now I want | 15:21:14 |
| 16 | the question. | 15:21:15 |
| 17 | THE INTERPRETER:  And now the question again | 15:21:16 |
| 18 | because -- yeah. | 15:21:16 |
| 19 | Q.   BY MR. HOWARD:  Did that other person who you | 15:21:17 |
| 20 | can't remember use all 18 criteria as you have defined | 15:21:19 |
| 21 | them?  Or did you interpret what that person was doing? | 15:21:23 |
| 22 | THE INTERPRETER:  The -- what the witness said | 15:21:31 |
| 23 | is that he doesn't know of anyone who used the 18 -- all | 15:21:33 |
| 24 | 18 criteria.  Maybe I did not interpret it in the way | 15:21:37 |
| 25 | that that was clear. | 15:21:39 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN — 7/24/2011

Page 433

| | | |
|---|---|---|
| 1 | THE WITNESS:  (In English.)  Because of that, | 15:21:42 |
| 2 | I interfered in the interpretation. | 15:21:43 |
| 3 | THE INTERPRETER:  Okay.  Okay. | 15:21:44 |
| 4 | Q.   BY MR. HOWARD:  So is it fair to say you've | 15:21:52 |
| 5 | never -- have you seen the 18 criteria, as you've stated | 15:21:53 |
| 6 | them, published anywhere in any treatise? | 15:21:57 |
| 7 | A.   In this form, no. | 15:22:05 |
| 8 | Q.   What are the treatises that you recognize as | 15:22:15 |
| 9 | being authorities in the field? | 15:22:21 |
| 10 | And by "field," I mean the field of, as | 15:22:27 |
| 11 | you describe it, connecting or assessing the relation | 15:22:31 |
| 12 | between civil entities and Hamas. | 15:22:34 |
| 13 | MR. UNGAR:  Objection to form and foundation. | 15:22:46 |
| 14 | THE WITNESS:  I'd like to understand the | 15:23:10 |
| 15 | question.  Are you talking about some kind of a | 15:23:11 |
| 16 | specific work, some kind of a specific research that | 15:23:14 |
| 17 | I would rely on as identify these -- identifying these | 15:23:17 |
| 18 | specific associations? | 15:23:22 |
| 19 | Q.   BY MR. HOWARD:  Not quite.  I'm asking about | 15:23:25 |
| 20 | specific works of specific researchers with regard to | 15:23:27 |
| 21 | the process as to how to identify an entity as being | 15:23:33 |
| 22 | related to Hamas, not with respect to a specific entity. | 15:23:37 |
| 23 | MR. UNGAR:  Objection.  Foundation. | 15:23:57 |
| 24 | THE WITNESS:  I hope I understand what you're | 15:24:05 |
| 25 | asking.  I'm not sure. | 15:24:07 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 434

```
 1        Q.   BY MR. HOWARD:  I'm asking you whether --          15:24:10
 2    strike that.                                                15:24:11
 3           You said you've read other researchers,             15:24:14
 4    other works in coming up with your 18 criteria.  And      15:24:16
 5    I'm asking you:  What are the published treatises or       15:24:20
 6    authorities that you rely on as being expert in the --     15:24:24
 7    in determining what criteria to use for establishing       15:24:28
 8    a relationship between an entity and Hamas?                 15:24:35
 9           MR. UNGAR:  Same objection.                          15:25:02
10           THE WITNESS:  If you're talking about                15:25:55
11    methodological documents, documents that pertain           15:25:57
12    to determining the identification or affiliation           15:26:01
13    and documents that are only methodological, then           15:26:06
14    I did not find any such documents.                         15:26:10
15           What I did find is documents that are               15:26:12
16    mainly from enforcement entities, but also from            15:26:16
17    researchers, that do use these criteria -- maybe          15:26:19
18    some of them, maybe just a few of them -- when they        15:26:24
19    come to determine whether a certain entity is or          15:26:27
20    isn't affiliated with the Hamas, especially if it --      15:26:31
21    to determine if it is affiliated.                          15:26:34
22        Q.   BY MR. HOWARD:  So when you sat down and wrote    15:26:38
23    out your 18 criteria to use in these lawsuits against     15:26:41
24    these banks, you did not have any published treatise       15:26:45
25    that you were relying upon?                                15:26:50
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 435

| | | |
|---|---|---|
| 1 | A.   Do you mean a published treaty [sic] regarding | 15:26:53 |
| 2 | the criteria, how to determine the criteria, how to use | 15:27:17 |
| 3 | the criteria? | 15:27:21 |
| 4 | Q.   Correct. | 15:27:22 |
| 5 | A.   No.  What I did have to my disposal -- several | 15:28:50 |
| 6 | things I had, actually -- was the use that was done in | 15:28:54 |
| 7 | courts in Israel, in the U.S., and also in Germany when | 15:28:57 |
| 8 | they came to prove the identity of this association or | 15:29:02 |
| 9 | that association.  This is as far as the legal material | 15:29:06 |
| 10 | goes.  And I mean all those documents of the prosecution | 15:29:11 |
| 11 | in the HLF and also against the Al-Aqsa Foundation. | 15:29:15 |
| 12 | And also there's a very interesting report | 15:29:21 |
| 13 | in the IRFAN -- IRFAN.  That's the outlawing of the | 15:29:24 |
| 14 | Canadian foundation.  Actually, there it's called | 15:29:29 |
| 15 | different.  It has a different name.  It's not called | 15:29:33 |
| 16 | being outlawed.  But it is nonrecognition of a certain | 15:29:36 |
| 17 | entity for it to be recognized for tax exemption | 15:29:41 |
| 18 | purposes. | 15:29:46 |
| 19 | THE INTERPRETER:  And I cut him off here. | 15:29:50 |
| 20 | THE WITNESS:  That's one thing. | 15:31:30 |
| 21 | (Long narrative in Hebrew by the witness.) | 15:31:34 |
| 22 | MR. HOWARD:  You know, can I hear what he's | 15:31:44 |
| 23 | said so far?  Because my question was about treatises. | 15:31:59 |
| 24 | He said "no" to treatises.  And everything thereafter | 15:32:01 |
| 25 | has been nonresponsive to my question.  I'll listen to | 15:32:03 |

| | | |
|---|---|---|
| 1 | what he has to say.  If he wants to keep going, it will | 15:32:08 |
| 2 | be nonresponsive.  But I want to hear what he's saying | 15:32:12 |
| 3 | about my question. | 15:32:15 |
| 4 | THE WITNESS:  So that's one thing.  And then | 15:32:15 |
| 5 | I had at my disposal all the reports that are public. | 15:32:17 |
| 6 | I mean, I couldn't reach the ones that were not open | 15:32:21 |
| 7 | to the public of the ISA.  There's a very detailed | 15:32:24 |
| 8 | report regarding there the da'wa.  They also have a | 15:32:27 |
| 9 | report about the Union of Good.  That's on the Internet. | 15:32:30 |
| 10 | And then there's many books written by researchers. | 15:32:33 |
| 11 | And all of these are mentioned throughout my footnotes | 15:32:38 |
| 12 | that appear in the report. | 15:32:43 |
| 13 | I also used quite a lot the book of Milstein, | 15:32:45 |
| 14 | "The Green Revolution," and also other researchers of | 15:32:49 |
| 15 | these institutions, specially those who research members | 15:32:53 |
| 16 | or affiliates or associations that related to the Hamas | 15:33:00 |
| 17 | and -- and how and why it is determined that certain | 15:33:04 |
| 18 | civil entities are related to the Hamas.  I also used | 15:33:11 |
| 19 | the Hamas lexicon and even the books by Salah and | 15:33:14 |
| 20 | Mishal, "The Hamas Times" -- | 15:33:18 |
| 21 | THE INTERPRETER:  That's the loose interpreted | 15:33:22 |
| 22 | translation. | 15:33:23 |
| 23 | THE WITNESS:  -- and also Ronni Shaked's book. | 15:33:24 |
| 24 | All of them are required to identify whether certain | 15:33:27 |
| 25 | insti -- civil institutions of the Hamas are in -- | 15:33:30 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN - 7/24/2011

Page 437

| | | |
|---|---|---|
| 1 | are, indeed, affiliated to the Hamas.  And they all | 15:33:32 |
| 2 | use various criteria which appear here. | 15:33:38 |
| 3 |         MR. HOWARD:  Objection.  Nonresponsive. | 15:33:41 |
| 4 |     Q.   BY MR. HOWARD:  Can you answer me "yes" or | 15:33:45 |
| 5 | "no"?  Did you have any scholarly treatises that you | 15:33:46 |
| 6 | relied on that outlined the 18-criteria methodology | 15:33:51 |
| 7 | and how to apply them as you have done here? | 15:33:55 |
| 8 |     A.   I think I've answered this.  I didn't have | 15:34:21 |
| 9 | any methodological paper in front of me. | 15:34:24 |
| 10 |     Q.   And you yourself have not published any | 15:34:27 |
| 11 | methodological paper outlining your eight -- 18 criteria | 15:34:32 |
| 12 | and how to apply them -- correct? | 15:34:35 |
| 13 |         I mean, other than your expert reports in the | 15:34:44 |
| 14 | Credit Lyonnais, NatWest, and Arab Bank cases? | 15:34:46 |
| 15 |     A.   No. | 15:34:57 |
| 16 |     Q.   I take it your 18-criteria methodology and how | 15:35:05 |
| 17 | you've applied it has not been peer-reviewed by anybody | 15:35:08 |
| 18 | else; correct? | 15:35:14 |
| 19 |     A.   Do you mean by some kind of a research | 15:35:32 |
| 20 | institute?  I'd like to understand exactly what you | 15:35:36 |
| 21 | mean by that. | 15:35:38 |
| 22 |     Q.   Are you familiar with the peer-review process | 15:35:38 |
| 23 | by which, if you're going to publish a learned paper, | 15:35:41 |
| 24 | peers in your field have to review it for the -- and | 15:35:46 |
| 25 | comment on it? | 15:35:50 |

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN — 7/24/2011

Page 440

```
 1    differently, someone from a different discipline, yes,      15:50:46
 2    he could definitely say, "This criteria, I don't agree      15:50:49
 3    with it."  That is possible.                                15:50:52
 4         Q.   BY MR. HOWARD:  And do you know whether           15:50:56
 5    the ISA applied all of these 18 criteria in making a        15:50:58
 6    determination as to whether any entity had a relation       15:51:05
 7    with Hamas?                                                 15:51:09
 8              MR. UNGAR:  Objection.  Foundation.               15:51:20
 9              THE WITNESS:  It's a general question.  I         15:52:28
10    don't know whether the Shabak had used all 18.  But         15:52:30
11    I did tell you earlier, in the answer which you didn't      15:52:34
12    accept, that I did use works done by the Shabak.  They      15:52:38
13    used or mention some of the criteria.                       15:52:44
14              Actually, there's the criteria from the          15:52:48
15    Raed Salah case.  And if you divide them up, there's       15:52:51
16    actually much more than seven, if you compare them to       15:52:57
17    these.  And these were definitely examined by the ISA,      15:53:00
18    by the advocacy [sic] general, by the directorate of       15:53:02
19    the intelligence.  And they did accept that.  It was        15:53:06
20    confirmed by all of them.                                   15:53:09
21         Q.   BY MR. HOWARD:  What way was it confirmed?        15:53:15
22         A.   My expert report regarding Raed Salah was done    15:54:40
23    in close collaboration with both the general advocacy       15:54:45
24    and the Attorney General to the ISA.  Both of them,         15:54:50
25    before it was submitted to court, made any comments, if     15:54:54
```

HIGHLY CONFIDENTIAL
ARIEH DAN  SPITZEN − 7/24/2011

Page 441

| | | |
|---|---|---|
| 1 | they had.  And they definitely approved of the criteria | 15:54:59 |
| 2 | that's written in my expert opinion. | 15:55:04 |
| 3 | In order to be more modest, I could say that, | 15:55:07 |
| 4 | indeed, the criteria were issued or submitted by me and | 15:55:10 |
| 5 | also by Ms. Meridor, who worked with me closely also | 15:55:16 |
| 6 | on that expert opinion.  But they did pass through the | 15:55:21 |
| 7 | review and editions by both the Attorney General and | 15:55:25 |
| 8 | the ISA. | 15:55:31 |
| 9 | Q.   Was your expert report that you submitted in | 15:55:31 |
| 10 | this case against Arab Bank or in either of the other | 15:55:45 |
| 11 | bank cases cleared through the ISA? | 15:55:49 |
| 12 | MR. UNGAR:  Objection to form. | 15:56:02 |
| 13 | THE WITNESS:  No. | 15:56:05 |
| 14 | Q.   BY MR. HOWARD:  Was it cleared through the -- | 15:56:05 |
| 15 | did you say the Attorney General to the ISA? | 15:56:08 |
| 16 | MR. UNGAR:  Objection to form. | 15:56:20 |
| 17 | THE WITNESS:  Hold on.  I don't know what | 15:56:37 |
| 18 | you're talking about.  I'm confused.  Are you talking | 15:56:38 |
| 19 | about the Raed Salah report or the report at hand? | 15:56:41 |
| 20 | I'm simply lost. | 15:56:44 |
| 21 | Q.   BY MR. HOWARD:  The report at hand, the | 15:56:46 |
| 22 | report that is Exhibit 1 that you submitted in this | 15:56:47 |
| 23 | case against Arab Bank, did anyone at the ISA, including | 15:56:50 |
| 24 | the Attorney General to the ISA, approve this report? | 15:56:55 |
| 25 | MR. UNGAR:  Objection to form. | 15:57:12 |

**EXHIBIT 156 to Declaration of Joel Israel**

Page 1

1
2            UNITED STATES DISTRICT COURT
3            EASTERN DISTRICT OF NEW YORK
4
   TZVI WEISS, et al.,
5
                  Plaintiffs,
6
            vs.                    Case No.
7                          05-CV-4622(DLI)(MDG)
   NATIONAL WESTMINSTER
8  BANK, PLC,
9            Defendant.
   ----------------------)
10 NATAN APPLEBAUM, et al.,
11                Plaintiffs,
12           vs.                    Case No.
                           07-CV-916(DLI)(MDG)
13 NATIONAL WESTMINSTER
   BANK, PLC,
14
                  Respondent.
15 ----------------------)
16                       Friday, June 10, 2011
17                       9:40 a.m.
18
19            Deposition of BRIAN MICHAEL
20 JENKINS, held at the offices of Osen LLC, 345
21 Seventh Avenue, New York, New York, pursuant
22 to Notice, before Shauna Stoltz-Laurie, a
23 Registered Professional Reporter, Certified
24 Realtime Reporter and Notary Public of the
25 State of New York.

Page 2

1

2   A P P E A R A N C E S:

3

4        OSEN LLC

5        Attorneys for the Weiss Plaintiffs

6              700 Kinderkamack Road

7              Oradell, New Jersey 07649

8        BY:   GARY M. OSEN, ESQ.

9              ARI UNGAR, ESQ.

10             au@osen.us

11             CLARA M. BEYLER, ESQ.

12

13       CLEARY GOTTLIEB STEEN & HAMILTON LLP

14       Attorneys for Defendant

15             One Liberty Plaza

16             New York, New York 10006-1470

17       BY:   AVRAM E. LUFT, ESQ.

18             aluft@cgsh.com

19             BRENDAN GIBBON, ESQ.

20             bgibbon@cgsh.com

21

22   ALSO PRESENT:

23       MARK GRUBE (Cleary Gottlieb law clerk)

24       ANDRA PRUTU (Cleary Gottlieb law clerk)

25

1

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED,

6      by and between the attorneys for the

7      respective parties herein, that filing

8      and sealing be and the same are hereby

9      waived.

10          IT IS FURTHER STIPULATED AND AGREED

11     that all objections, except as to the

12     form of the question, shall be reserved

13     to the time of the trial.

14          IT IS FURTHER STIPULATED AND AGREED

15     that the within deposition may be sworn

16     to and signed before any officer

17     authorized to administer an oath, with

18     the same force and effect as if signed

19     and sworn to before the Court.

20

21

22

23

24

25

Page 18

1                    Jenkins

2    interrupt you, but can we go off the record      09:57:59

3    for about 20 seconds?                            09:58:01

4            THE VIDEOGRAPHER:  We're going off       09:58:02

5        the record.  The time is 9:57.               09:58:03

6        (Recess taken.)                              09:58:07

7            THE VIDEOGRAPHER:  We are back on        09:59:51

8        the record.  The time is 9:59.               09:59:57

9        Q.   Mr. Jenkins, I moment ago I asked       09:59:59

10   you whether one needed to have some degree of    10:00:02

11   specialized knowledge about Hamas or other       10:00:09

12   Palestinian terrorist groups to conduct this     10:00:10

13   kind of technical review, and your response      10:00:16

14   was that you think that you need to have         10:00:18

15   familiarity with the -- the way the Live Note    10:00:21

16   reads, it sort of goes on from there, but you    10:00:28

17   used the term "familiarity" rather than          10:00:30

18   "specialized knowledge." And I guess my          10:00:33

19   question to you is what degree of familiarity    10:00:35

20   do you believe you need to have in order to      10:00:37

21   perform the technical review you did.            10:00:40

22           MR. LUFT:  Objection.  Misstates         10:00:42

23       his prior testimony.                         10:00:44

24       A.   I'm -- I'm not sure, in terms of        10:00:45

25   familiarity, what a numerical scale or a         10:00:48

                                                    Page 19

  1                    Jenkins

  2    quantifiable answer would -- would -- would    10:00:51

  3    be on that.  I mean if we were talking about   10:00:53

  4    nuclear physics or brain surgery, those are    10:00:57

  5    highly technical subjects, and -- and -- and   10:01:01

  6    I would say that, you know, that's a           10:01:03

  7    different criteria.  But often I'm called      10:01:06

  8    upon to -- to review or other people are       10:01:10

  9    called upon to review research products in     10:01:15

 10    which they do not have a -- a degree of        10:01:21

 11    specialized knowledge and are not intended to  10:01:29

 12    replicate the knowledge of the person or       10:01:33

 13    replicate the research done by the person who  10:01:36

 14    is the author of -- of the report.             10:01:39

 15            So I mean are we saying familiarity    10:01:41

 16    is -- is more than an informed layman's        10:01:44

 17    knowledge?  Certainly.                         10:01:48

 18            Is it -- is it coupled with other      10:01:49

 19    experience; is it beyond that?  I would        10:01:53

 20    suggest that it is.                            10:01:56

 21            Has Hamas been a feature of a focus    10:01:58

 22    of my own writings specifically, the answer   10:02:04

 23    is -- is no.                                   10:02:08

 24        Q.   In conducting the technical review   10:02:13

 25    in the reports of NatWest, did you assign a   10:02:17

Page 141

1                    Jenkins

2           MR. OSEN:  No.                    12:59:25

3           MR. LUFT:  If you're talking about  12:59:25

4      it, let me know.                       12:59:25

5           MR. OSEN:  Oh, my God.            12:59:27

6           THE VIDEOGRAPHER:  We are off the  12:59:28

7      record.  The time is 12:59.           12:59:29

8           (Recess taken.)                  13:00:26

9           THE VIDEOGRAPHER:  We are back and  13:18:15

10      the record.  The time is 1:18.        13:18:21

11      Q.    Mr. Jenkins, I'd ask you to turn  13:18:24

12      back to page 12 of your report, Exhibit  13:18:28

13      number 1.                            13:18:33

14      A.    (Perusing document) Page 12, yes,  13:18:39

15      sir.                                  13:18:45

16      Q.    Yes.  The 2ne sentence on the page  13:18:45

17      reads "The PRC was founded by an ex-member of  13:18:48

18      Fatah, and, according to the government of  13:18:51

19      Israel, was instigated and funded by  13:18:53

20      Hezbollah."  Do you see that?         13:18:57

21      A.    Yes.                            13:18:59

22      Q.    Can you tell me who the ex-member  13:18:59

23      of Fatah is who founded the PRC?      13:19:02

24      A.    Not without going back into my  13:19:05

25      footnotes, I would not be able to recall  13:19:08

Page 142

Jenkins

| | | |
|---|---|---|
| 2 | that. | 13:19:10 |
| 3 | Q. You mean into the document you | 13:19:11 |
| 4 | cited in the footnote. | 13:19:15 |
| 5 | A. Um-hm, yes, I'd have to go back | 13:19:16 |
| 6 | into my files to see, because I can't recall | 13:19:18 |
| 7 | at this moment. I mean it's footnoted here, | 13:19:25 |
| 8 | and I see the source is the Israeli Ministry | 13:19:29 |
| 9 | of Foreign Affairs, and there is a website | 13:19:33 |
| 10 | connection to it. | 13:19:36 |
| 11 | Q. Do you know where the PRC is | 13:19:38 |
| 12 | headquartered? | 13:19:40 |
| 13 | MR. LUFT: Objection, relevance. | 13:19:41 |
| 14 | A. No, I don't. | 13:19:46 |
| 15 | Q. Do you know -- can you name a | 13:19:46 |
| 16 | single attack committed by the PRC against | 13:19:50 |
| 17 | Israeli targets in Israel? | 13:19:55 |
| 18 | A. I can't at -- at this moment, but I | 13:19:58 |
| 19 | believe I do recall I have some recollection | 13:20:11 |
| 20 | of PRC being identified as responsible for | 13:20:11 |
| 21 | attacks in Israel, but that is a | 13:20:16 |
| 22 | recollection. As I said, I've have to go | 13:20:19 |
| 23 | back into my -- into my footnotes here. That | 13:20:21 |
| 24 | was not one of the -- one of the key groups | 13:20:25 |
| 25 | that I was -- that I was looking at. | 13:20:26 |

Page 143

Jenkins

1

2     Q.   Well, let's turn then to the          13:20:28

3     "PFLP" --                                   13:20:30

4     A.   Yes.                                   13:20:31

5     Q.   -- if we can for a moment.             13:20:32

6          Do you see in the 2ne sentence         13:20:35

7     under "PFLP, Under the banner of the" Ab -- 13:20:36

8     "Abu Ali Mustafa Brigades, the PFLP is      13:20:40

9     believed to be responsible for the          13:20:44

10    assassination of Israel's Minister of       13:20:45

11    Tourism"?                                    13:20:49

12    A.   Yes.                                   13:20:50

13    Q.   Do you know who or what the Abu Ali    13:20:51

14    Mustafa Brigades are named for?            13:20:58

15    A.   No, in this case I -- I don't          13:21:01

16    recall what -- what -- what they -- what it's 13:21:03

17    named after.  I don't.                      13:21:06

18    Q.   Can you name the current head of       13:21:07

19    the Popular Front for the Liberation of     13:21:10

20    Palestine?                                  13:21:13

21    A.   I believe it's still George Habash.    13:21:13

22    Q.   Let's turn to page 13 with the         13:21:18

23    heading "Al-Aqsa Martyrs Brigade."          13:21:22

24    A.   Yes.                                   13:21:26

25    Q.   Do you see it says that "The           13:21:26

Page 144

1              Jenkins

2    Al-Aqsa Martyrs  Brigade first appeared in"        13:21:26

3    two thousand (inaudible) --                        13:21:29

4            (Discussion off the record.)               13:21:29

5        Q.    The first sentence reads "The            13:21:33

6    Al-Aqsa Martyrs Brigade first appeared in          13:21:34

7    2002."                                             13:21:37

8        A.    I believe that is the first             13:21:38

9    citation for -- for -- for an attack by            13:21:40

10   Al-Aqsa, right.                                    13:21:43

11       Q.    And when it first appeared do you        13:21:44

12   know who its leader was?                           13:21:47

13       A.    I -- I -- no, I don't know.  I           13:21:48

14   don't recall.  I just recall that it was           13:21:52

15   believed to be a -- a creation of Fatah.           13:21:54

16       Q.    Can you turn, please, to page 15?        13:21:57

17       A.    Yes.                                     13:22:05

18       Q.    The first paragraph, that begins         13:22:06

19   "There are several reported examples," do you      13:22:10

20   see that?                                          13:22:13

21       A.    Yes.                                     13:22:13

22       Q.    And the 2ne sentence reads "The          13:22:14

23   August 19th, 2003 bombing of a No. 2 bus that      13:22:17

24   undermined an Israeli-Palestinian ceasefire        13:22:22

25   was reportedly committed by a self-proclaimed      13:22:26

**EXHIBIT 157 to Declaration of Joel Israel**

1

1    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

2     - - - - - - - - - - - - - - - - - - -x

     MOSES STRAUSS, et al.,

3                        Plaintiffs,

4          -against-

5    CREDIT LYONNAIS, S.A.,

                           Defendant.

6

     Civil Action No. 06-CV-702 (DGT)(MDG)

7     - - - - - - - - - - - - - - - - - - -x

     BERNICE WOLF, et al.,

8                        Plaintiffs

9          -against-

10   CREDIT LYONNAIS, S.A.,

                           Defendant.

11

     Civil Action No. 07-CV-914 (DGT)(MDG)

12    - - - - - - - - - - - - - - - - - - -x

13                    1540 Broadway

                      New York, New York

14

                      December 16, 2010

15                    9:42 a.m.

16

17       DEPOSITION of BRIAN MICHAEL JENKINS,

18   an Expert Witness in the above-entitled

19   action, held at the above time and place,

20   taken before Dawn Matera, a Shorthand

21   Reporter and Notary Public of the State

22   of New York, pursuant to the Federal

23   Rules of Civil Procedure.

24

25

**2**

```
1   APPEARANCES:
2
3
4        OSEN LLC
         Attorneys for Plaintiffs
         345 Seventh Avenue, 21st Floor
5        New York, New York 10001
         (646) 380-0470
6   BY:  JOSHUA DAVID GLATTER, ESQ.
         jdg@osen.us
7
8        - and -
9        OSEN LLC
         700 Kinderkamack Road
         Oradell, New Jersey 07649
10  BY:  ARI UNGAR, ESQ.
         au@osen.us
11  BY:  NAOMI B. WEINBERG, ESQ.
         nbw@osen.us
12
13
         KOHN SWIFT & GRAF, P.C.
14       Attorneys for Plaintiffs
         One South Broad Street
15       Philadelphia, Pennsylvania 19107
    BY:  STEVEN M. STEINGARD, ESQ.
16       ssteingard@kohnswift.com
17
18       CLEARY GOTTLIEB STEEN & HAMILTON LLP
         Attorney for Defendant
19       One Liberty Plaza
         New York, New York 10006
20  BY:  AVRAM E. LUFT, ESQ.
         aluft@cgsh.com
21  BY:  BRENDAN H. GIBBON, ESQ.
         bgibbon@cgsh.com
22  BY:  MARK GRUBE, ESQ.
23
         Also Present:
24
         Bob Rudis, Videographer
25
```

**3**

```
1              STIPULATIONS
2        IT IS HEREBY STIPULATED AND AGREED, by
3   and among counsel for the respective
4   parties hereto, that the filing, sealing
5   and certification of the within
6   deposition shall be and the same are
7   hereby waived;
8        IT IS FURTHER STIPULATED AND AGREED
9   that all objections, except as to form of
10  the question, shall be reserved to the
11  time of the trial;
12       IT IS FURTHER STIPULATED AND AGREED
13  that the within deposition may be signed
14  before any Notary Public with the same
15  force and effect as if signed and sworn
16  to before the Court.
17              *    *    *
18
19
20
21
22
23
24
25
```

**4**

```
1              PROCEEDINGS
2        THE VIDEOGRAPHER:  My name is      09:38:34
3   Robert Rudis, of Veritext.  The date     09:38:34
4   today is December 16th, 2010, and the    09:38:37
5   time is approximately 9:42 a.m.          09:38:40
6        This deposition is being held in    09:38:44
7   the office of Zuckerman Spaeder LLP,     09:38:46
8   1540 Broadway, New York, New York.       09:38:51
9        The caption of this case is         09:38:54
10  Moses Strauss, et al., against Credit    09:38:56
11  Lyonnais, S.A., Civil Action Number      09:39:00
12  06-CV-702 (DGT)(MDG).                    09:39:05
13       Also Bernice Wolf, et al.,          09:39:13
14  against Credit Lyonnais, Civil Action    09:39:15
15  Number 07-CV-914(DGT)(MDG), to be        09:43:25
16  heard in the United States District      09:43:33
17  Court, Eastern District of New York.     09:43:35
18       The name of the witness is Brian    09:43:36
19  Michael Jenkins.                         09:43:37
20       At this time, will the attorneys    09:43:39
21  please identify themselves and the       09:43:41
22  parties they represent, after which      09:43:42
23  our court reporter, Dawn Matera, also    09:43:44
24  of Veritext, will swear in the witness   09:43:46
25  and we can proceed.                      09:43:48
```

**5**

```
1              PROCEEDINGS
2        MR. GLATTER:  Joshua Glatter,       09:43:49
3   Osen LLC, on behalf of the Plaintiffs.   09:43:50
4        MR. UNGAR:  Ari Ungar, Osen LLC,    09:43:55
5   on behalf of the Strauss Plaintiffs.     09:43:58
6        MR. STEINGARD:  Steven              09:44:00
7   Steingard, Kohn Swift & Graf, on
8   behalf of the Plaintiffs.               09:44:03
9        MS. WEINBERG:  Naomi Weinberg,      09:44:03
10  Osen LLC, also on behalf of the          09:44:04
11  Strauss Plaintiffs.                      09:44:06
12       MR. LUFT:  Avram Luft of Credit     09:44:07
13  Lyonnais -- excuse me, of Cleary         09:44:14
14  Gottlieb Steen & Hamilton, on behalf     09:44:14
15  of Credit Lyonnais.                      09:44:16
16       MR. GIBBON:  Brendan Gibbon with    09:44:24
17  Cleary Gottlieb Steen & Hamilton, on     09:44:26
18  behalf of Credit Lyonnais.               09:44:26
19       MR. GRUBE:  Mark Grube with
20  Cleary Gottlieb Steen & Hamilton, on
21  behalf of Credit Lyonnais.
22
23
24
25
```

2 (Pages 2 to 5)

VERITEXT REPORTING COMPANY

212-267-6868                                        516-608-2400

138

BRIAN MICHAEL JENKINS

1  which is my field, and I would say I have     12:34:21
2  treated many others in the past with your     12:34:23
3  affliction.                                   12:34:30
4      And the patient said, my                  12:34:31
5  name is Anderson.  How many Andersons         12:34:33
6  have you treated.                             12:34:36
7      And I would say, I don't know             12:34:37
8  how many Andersons I treated, perhaps         12:34:38
9  none, but the affliction you're              12:34:41
10  describing is something that I have dealt    12:34:45
11  with.                                        12:34:48
12      Turn the page to the issue at            12:34:49
13  hand.  Hamas is not an extraterrestrial      12:34:51
14  organization.  Hamas is a terrorist          12:34:55
15  organization.  It is a Palestinian           12:34:58
16  organization.  And this is what I have       12:35:00
17  spent my entire professional life with,      12:35:01
18  dealing with terrorist organizations.        12:35:07
19  And also the very difficult issue of         12:35:09
20  attributing culpability, responsibility,     12:35:11
21  for terrorist actions because this is        12:35:15
22  often a key element, an analysis, because    12:35:18
23  often this is the basis for policy.  This    12:35:24
24  is the basis for military action.  This      12:35:28

139

BRIAN MICHAEL JENKINS

1  is the basis for sanctions.                   12:35:29
2      And so this is an area of which           12:35:32
3  I am often called upon to deal with.          12:35:35
4      Now, it's not as if somebody              12:35:37
5  said have you ever heard of Hamas.  And I     12:35:40
6  would say, Hamas, who are they.               12:35:43
7      I know about Hamas.  I know               12:35:46
8  about the ideology of Hamas.  Pretty fair     12:35:49
9  understanding of the terrorist campaign       12:35:54
10  of Hamas.                                    12:35:55
11      And do you know about                    12:35:58
12  terrorists making claims?  Well, at the      12:36:00
13  risk of immodesty, I know a hell of a lot    12:36:07
14  about terrorist claims.                      12:36:12
15      Q.  How much of your professional        12:36:13
16  life, if you can estimate by a               12:36:18
17  percentage, has been devoted specifically    12:36:20
18  to assessing Hamas?  I'm not asking about    12:36:21
19  terrorist organizations in general.  I am    12:36:29
20  talking about Hamas specifically.            12:36:31
21      MR. LUFT:  You know his                   12:36:32
22  professional life precedes Hamas, so         12:36:35
23  the question is inherently misleading.       12:36:37
24      MR. GLATTER:  Let me take a step         12:36:39

140

BRIAN MICHAEL JENKINS

1  back.                                         12:36:41
2      Q.  How much of your professional         12:36:41
3  life -- do you know when Hamas came into      12:36:43
4  existence?                                    12:36:45
5      A.  Yes.                                  12:36:45
6      Q.  When?                                 12:36:46
7      A.  In the 1980s.                         12:36:47
8      Q.  Do you know what year?                12:36:48
9      A.  Roughly 1984.                         12:36:49
10      Q.  1984, okay.  And since 1984,         12:36:50
11  how much of your professional life has       12:36:57
12  been devoted to specifically studying        12:36:59
13  Hamas?                                       12:37:03
14      A.  I wouldn't be able to offer a        12:37:04
15  specific percentage, but it would be a       12:37:08
16  small percentage.                            12:37:10
17      Q.  You ever publish anything            12:37:11
18  specific about Hamas?                        12:37:12
19      A.  I have not.                          12:37:13
20      Q.  Have you ever lectured,              12:37:14
21  specifically, about Hamas?                   12:37:16
22      A.  Not specifically about Hamas,        12:37:20
23  no.                                          12:37:22
24      Q.  Ever done a study of, any kind       12:37:22

141

BRIAN MICHAEL JENKINS

1  of study, empirical or otherwise, as to       12:37:25
2  whether or not when Hamas claims              12:37:28
3  responsibility for something, in fact,        12:37:29
4  Hamas is considered to, in fact, be           12:37:32
5  responsible for that act?  You understand     12:37:35
6  what I mean.  As opposed to simply the        12:37:39
7  fact that they said it, the fact that in      12:37:41
8  the eyes of the relevant community they       12:37:43
9  did it; you ever --                           12:37:45
10      A.  Specifically and exclusively on      12:37:47
11  Hamas, no.                                   12:37:49
12      Q.  Specifically or exclusively          12:37:49
13  done it for any particular terrorist         12:37:52
14  organization?                                12:37:54
15      A.  Good question.  Have I done it       12:37:54
16  specifically for terrorist -- on specific    12:38:04
17  events, specific events.                     12:38:10
18      Q.  But again, if I understand --        12:38:14
19      MR. LUFT:  Were you done                  12:38:15
20  answering?                                   12:38:16
21      A.  Specific events.  There are          12:38:16
22  numerous cases in which the attribution      12:38:21
23  of an event, claimed or unclaimed,           12:38:24
24  becomes a critical component.                12:38:28

36  (Pages 138 to 141)

154

```
 1         BRIAN MICHAEL JENKINS
 2      Hamas emerged from the Muslim      12:52:05
 3   brothers and represented a current of   12:52:13
 4   thought that was like the Islamist      12:52:16
 5   brothers, more Islamist in its          12:52:20
 6   perspective, but was going to take a more   12:52:27
 7   -- going to launch a more aggressive --   12:52:31
 8   follow a more aggressive policy than the   12:52:36
 9   traditional Muslim Brotherhood.          12:52:38
10      Q.   Are there any specific          12:52:41
11   organizations in the PACT, the           12:52:44
12   Palestinian -- the West Bank or Gaza     12:52:48
13   Strip, that, to your knowledge, were     12:52:52
14   predecessor institutions to Hamas?       12:52:53
15      A.   Predecessor?                    12:52:55
16      Q.   Or founding institutions.  Do   12:52:57
17   you know of any?                         12:52:59
18      A.   Again, I would go back to -- I  12:53:00
19   would go back to the Muslim Brotherhood.  12:53:04
20   Are we -- predecessors.  Hamas actually  12:53:09
21   began, as it launched its campaign, to   12:53:13
22   draw in people, including people who had  12:53:19
23   been members of other Palestinian         12:53:22
24   organizations.  It also initially formed  12:53:26
25   alliances with other Palestinian          12:53:31
```

155

```
 1         BRIAN MICHAEL JENKINS
 2   organizations, although it did not -- it  12:53:35
 3   remained aloof from the Palestinian       12:53:39
 4   authority while it was led by Arafat.     12:53:44
 5      Q.   Can you tell me what al-jamia     12:53:49
 6   al-islamia is?                            12:53:54
 7      A.   Al-jamia al-islamia, actually    12:53:54
 8   JI, refers to a group, either -- there    12:53:58
 9   are several that use that term.  That's a  12:54:02
10   common term.  There is a group in Egypt   12:54:06
11   that use the term.  And there is a group  12:54:09
12   in Indonesia that uses the term.          12:54:11
13      Q.   Are you familiar with any        12:54:14
14   organization by that name in the          12:54:15
15   Palestinian territories today?            12:54:17
16      A.   The name has appeared in         12:54:19
17   Palestinian territory, as well.  As I     12:54:21
18   say, it is a common construction.  It     12:54:23
19   appears in several countries.             12:54:25
20      Q.   Do you know if it has any        12:54:26
21   connection to Hamas?                      12:54:28
22      A.   It may have.                     12:54:30
23      Q.   But you don't know?             12:54:30
24      A.   Don't know.                     12:54:31
25         MR. GLATTER:  Mark this as         12:55:01
```

156

```
 1         BRIAN MICHAEL JENKINS
 2   Exhibit 6, please.                       12:55:02
 3         [The photograph was hereby
 4   marked as Jenkins Exhibit 6 for
 5   identification, as of this date.]        12:55:25
 6      Q.   Mr. Jenkins, I put a photograph  12:55:25
 7   in front of you that we marked as Jenkins  12:55:27
 8   Exhibit 6.                               12:55:29
 9      Do you recognize the individual       12:55:30
10   in that photograph?                       12:55:31
11      A.   Another gentleman with a beard.  12:55:36
12      MR. LUFT:  Objection.                 12:55:38
13   Foundation.  Beyond the scope of his     12:55:39
14   report.                                  12:55:40
15      A.   I don't.                         12:55:46
16      Mr. Jenkins, I will write it         12:55:47
17   out.  Do you know what or who Marj al     12:55:53
18   Zahur is?  M-A-R-J, A-L, Z-A-H-U-R.      12:55:58
19      A.   I cannot recall.                 12:56:03
20      Q.   Can you turn to Page 13 of your  12:56:14
21   report.  Are you at that page?            12:56:29
22      A.   I am at that page.               12:56:40
23      Q.   I am looking at the third line   12:56:41
24   of the first paragraph which discusses    12:56:42
25   the August 19th, 2003 bombing of a number  12:56:44
```

157

```
 1         BRIAN MICHAEL JENKINS
 2   2 bus.  Do you see that sentence?        12:56:47
 3      A.   Yes, I do.                       12:56:49
 4      Q.   And you write two lines down    12:56:50
 5   "The bomber was said to have been         12:56:54
 6   retaliating for the assassination of a    12:56:58
 7   personal friend, but was disowned and     12:57:00
 8   denounced by the official leadership that  12:57:02
 9   proclaimed its commitment to the truce."   12:57:04
10      Do you see that?                      12:57:07
11      A.   I see that print, yes.          12:57:08
12      Q.   I may have some other questions  12:57:10
13   for you about the August 19th bombing    12:57:12
14   later, but for now, my question is:  Do   12:57:14
15   you know who the personal friend is       12:57:16
16   reported to be?                           12:57:17
17      A.   I understand, as my             12:57:18
18   recollection is that the personal friend  12:57:20
19   may also have been another Hamas          12:57:22
20   operative or a Hamas official.            12:57:25
21      Q.   Do you know what his name is?    12:57:29
22      A.   I don't recall.                  12:57:30
23      Q.   Do you know anything else about  12:57:31
24   him, other than the fact that he was      12:57:32
25   another Hamas operative or official?      12:57:34
```

40  (Pages 154 to 157)

**158**

BRIAN MICHAEL JENKINS

1
2    A.   May have been, excuse me.          12:57:36
3    Q.   May have been?          12:57:43
4    A.   May have been.          12:57:44
5    Q.   Do you know who Yaya Ayyash is?          12:57:46
6    I am going to spell it, as follows,          12:57:53
7    reserving the rights because of the          12:57:54
8    Arabic:  Y-A-Y-A, that's the first name.          12:57:56
9    A-Y-Y-A-S-H.  It might also sometimes,          12:58:03
10   sound likes Yaya Ayyash.          12:58:10
11   A.   Yes, I heard that name, but at          12:58:15
12   this moment, I can't recall.          12:58:17
13   Q.   Is there anything you know          12:58:21
14   about him?          12:58:22
15   A.   I am not recalling anything at          12:58:23
16   this moment.          12:58:25
17   Q.   Okay.  Do you know who Hamas's          12:58:25
18   chief spokesperson is reported to be in          12:58:31
19   Lebanon?          12:58:33
20         MR. LUFT:  When, today?          12:58:33
21   Q.   During the Second Intifada?          12:58:35
22   A.   Talking about the spokesperson,          12:58:38
23   we're talking Mashaal?          12:58:41
24   Q.   I am just asking --          12:58:43
25   A.   The one that I know of that          12:58:44

**159**

BRIAN MICHAEL JENKINS

1
2    speaks frequently on their behalf is          12:58:46
3    Mashaal.          12:58:48
4    Q.   Do you know what the al Majd          12:58:49
5    is?  A-L, M-A-J-D.          12:58:51
6    A.   Well, the al Majd can -- again,          12:58:55
7    it's a common term that appears          12:58:58
8    regularly.  There are al Majds and al          12:59:00
9    Majds and al Majds.          12:59:04
10   Q.   Sure.  Let me withdraw the          12:59:06
11   question and put another one to you.          12:59:07
12         Does the name or phrase al Majd          12:59:08
13   have any particular significance to you          12:59:11
14   in connection with Hamas?          12:59:13
15   A.   I don't speak Arabic, but there          12:59:15
16   is a, I have certainly seen the term, but          12:59:21
17   there is one of these terms that occurs          12:59:27
18   regularly like shura or ruling council or          12:59:32
19   al-maji.  I am not going to pronounce          12:59:35
20   these correctly, forgive me.          12:59:36
21   Q.   You said you do not speak          12:59:38
22   Arabic?          12:59:40
23   A.   I do not.          12:59:40
24   Q.   Let me just detour for one          12:59:41
25   second.  Do you have occasions to review          12:59:42

**160**

BRIAN MICHAEL JENKINS

1
2    translations of documents from Arabic?          12:59:45
3    A.   I do.          12:59:47
4    Q.   Is there anybody who assists          12:59:47
5    you -- do you have anyone -- strike that.          12:59:51
6         What translations do you read,          12:59:55
7    or are they ones that are specifically          12:59:56
8    created for you or ones created by MEMRI?          12:59:59
9    A.   There would be a variety of          13:00:02
10   sources.  In some cases they are the ones          13:00:04
11   that are conveniently available through          13:00:07
12   MEMRI.  The U.S. Government has a, an          13:00:10
13   internal service that translates          13:00:16
14   documents pertaining to terrorism, that I          13:00:23
15   will look at those.          13:00:30
16         In some cases, in some cases,          13:00:31
17   and this refers not to Hamas, but in some          13:00:34
18   cases statements by Osama bin Laden, or          13:00:37
19   Zawahiri or some of the other leaders, I          13:00:42
20   will ask for a specific translation,          13:00:46
21   because there may be nuances that are not          13:00:48
22   always carried in the actual -- in the          13:00:56
23   normal translation I may really want to          13:01:04
24   understand, what -- there may be some          13:01:06
25   color phrase or something -- what does          13:01:11

**161**

BRIAN MICHAEL JENKINS

1
2    that really mean, what does that really          13:01:14
3    say, what does that conjure up.          13:01:15
4         So in some cases, I will          13:01:17
5    request through RAND's research library,          13:01:19
6    can you get me a really more textual,          13:01:22
7    more detailed translation of this.          13:01:27
8    Q.   Okay.          13:01:31
9    A.   So variety.          13:01:32
10   Q.   In connection with your work at          13:01:33
11   MTI, the Mineta Transportation Institute,          13:01:34
12   do they provide translation?          13:01:38
13   A.   The work at MTI, we have not          13:01:43
14   used material, we have not needed to use          13:01:45
15   material from Arabic.          13:01:50
16   Q.   I think I probably know the          13:01:51
17   answer to this, but do you speak or read          13:01:53
18   Hebrew?          13:01:55
19   A.   No, I do not.          13:01:55
20   Q.   In drafting and finalizing your          13:01:57
21   report, did you review the materials in          13:02:00
22   any of the appendices to Plaintiffs'          13:02:06
23   experts' reports?          13:02:10
24   A.   I looked at some of it, yes.          13:02:10
25   Q.   Do you remember which ones you          13:02:12

**41 (Pages 158 to 161)**

166

BRIAN MICHAEL JENKINS

1
2    Q.   Can you name for me any major    13:07:42
3    Qassam Brigades cells that operated in    13:07:46
4    Israel of the Palestinian territories    13:07:49
5    during the Second Intifada?    13:07:52
6         MR. LUFT:  Objection.  Vague.    13:07:54
7    A.   There were various cells.  The    13:07:58
8    way it was structured is there were    13:07:59
9    regional commands in Hebron, for example.    13:08:05
10   And I don't know how many regional    13:08:13
11   commands there were.  I think there were    13:08:15
12   probably somewhere between four and six.    13:08:17
13   There were regional commands.  And then    13:08:19
14   within that there were cells that would    13:08:21
15   operate -- the cells would operate, or    13:08:28
16   they would receive broad instructions    13:08:33
17   from the command.  The cells operated    13:08:36
18   independently to carry out specific,    13:08:39
19   specific attacks.    13:08:44
20   Q.   Do you know the names of any of    13:08:45
21   those cells?    13:08:47
22   A.   I mean, I've heard of them    13:08:47
23   referred to as Hebron, Hebron cell, as an    13:08:50
24   example.  Do I know the names of all of    13:08:54
25   the cells?  No, I don't.    13:08:55

167

BRIAN MICHAEL JENKINS

1
2         13:08:57
3         THE WITNESS:  Can I --    13:08:58
4         MR. GLATTER:  Yes.  Anytime you    13:08:59
5    need a break.    13:09:00
6         MR. LUFT:  Let me just pour some    13:09:01
7    water for him.    13:09:03
8         THE WITNESS:  I don't need a    13:09:06
9    break.  It's just voice.    13:09:06
10   BY MR. GLATTER:    13:09:15
11   Q.   Do you know who Raed or Raed    13:09:15
12   Salah is, R-A-E-D, S-A-L-A-H?  To    13:09:25
13   clarify, does that have any significance    13:09:26
14   for you in connection with regard to    13:09:30
15   Hamas?    13:09:32
16   A.   The answer is no.  And I am    13:09:33
17   admittedly, I am admittedly terrible on    13:09:34
18   Arab names.  I mean, I look at, I look at    13:09:40
19   these things all the time and, I don't    13:09:47
20   mean this as any sort of an insult to the    13:09:50
21   Arab population, but I see hundreds and    13:09:53
22   hundreds of Arab names, and Abuls, and    13:10:00
23   Abduls and Ahmad, and quite frankly, in    13:10:06
24   many cases, in my own research in looking    13:10:14
25   at this, to the extent that a specific    13:10:17

168

BRIAN MICHAEL JENKINS

1
2    name is, of an individual is relevant,    13:10:19
3    and often it's not, but it has to be in a    13:10:22
4    specific context of that.  But will I    13:10:27
5    necessarily remember the name of this    13:10:29
6    particular person and that particular    13:10:32
7    person, often not.    13:10:34
8    Q.   Okay.  Do you know who the    13:10:35
9    Palestinian prime minister, the Hamas's    13:10:38
10   prime minister is?    13:10:44
11        MR. LUFT:  Today?    13:10:44
12        MR. GLATTER:  Today, yes.    13:10:52
13   Q.   Again, either it is -- the    13:10:52
14   prime minister, I thought the prime    13:10:57
15   minister and spokesman is Mashaal or    13:10:58
16   Marzouk, but I am not certain, no.    13:11:12
17        MR. GLATTER:  Mark this as 7.    13:11:31
18        [The photograph was hereby
19   marked as Jenkins Exhibit 7 for
20   identification, as of this date.]    13:11:57
21        MR. LUFT:  Out of curiosity,    13:11:57
22   just for housekeeping, these pictures    13:11:58
23   that you've shown, five, six or seven,    13:12:00
24   are they Bates stamped or do they come    13:12:02
25   to any appendices of the report?    13:12:04

169

BRIAN MICHAEL JENKINS

1
2         MR. GLATTER:  Not to my    13:12:07
3    knowledge.    13:12:07
4         MR. LUFT:  These aren't from the    13:12:07
5    report?    13:12:08
6         MR. GLATTER:  No, I don't think    13:12:09
7    so.  I assume if they had been, they    13:12:10
8    would probably have a -- I don't    13:12:12
9    remember what the numbering was for    13:12:16
10   the appendices, but I have to be    13:12:17
11   honest, I can't tell you, sitting here    13:12:19
12   today.    13:12:21
13        MR. LUFT:  That's what I was    13:12:22
14   trying to figure out, okay.    13:12:23
15   BY MR. GLATTER:    13:12:23
16   Q.   Before I ask you about Exhibit    13:12:23
17   7, Mr. Jenkins, you testified a couple of    13:12:25
18   moments ago about your recollections of    13:12:31
19   the structure of the Qassam Brigades?    13:12:35
20   A.   Yes.    13:12:40
21   Q.   All I want to ask you is:  Do    13:12:40
22   you recall whether or not one of    13:12:44
23   Plaintiffs' experts described the command    13:12:45
24   structure of the Qassam Brigades?    13:12:48
25   A.   I think they did in general    13:12:50

43 (Pages 166 to 169)

**EXHIBIT 158 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML   Document 272-7   Filed 03/22/12   Page 236 of 328 PageID #: 9940



Search RAND

| About RAND | Research Areas | Reports & Bookstore | RAND Divisions | Graduate School | News & Events |

RAND > NSRD > RAND Database of Worldwide Terrorism Incidents



**RDWTI Home**

**About RDWTI**

   Database Scope

   Research Coverage

   Contact Us

**Search RDWTI**

   Search Instructions

**Research Publications**

**Related Resources**

• RAND Voices of Jihad Database



EMAIL

## Terrorism Incidents Database Search

### Incident Detail

Jan 29, 2004
Jerusalem, Israel
Hamas (Islamic Resistance Movement)

Weapon type: Explosives
Injuries: 50
Fatalities: 11

A suicide bomber blew up a bus near the prime minister's residence, killing ten bystanders and wounding at least fifty. Prime Minister Sharon was not home at the time of the bombing. The al-Aqsa Martyrs Brigades claimed responsibility for the attack. Hamas has also claimed responsibility for the bombing and denounced al-Aqsa. Hamas has also sent a picture of the suicide bomber to the media to verify their claim.

> Return to search results

> New Search

NSRD Home | National Defense Research Institute | International Research | U.S. National Security Research Area | NSRD Contact Information | Site Feedback

Back to Top

RAND Home | About RAND | Research Areas | Reports & Bookstore | RAND Divisions | News & Events | Employment | Site Index

RAND® is a registered trademark. Copyright © 1994-2011 RAND Corporation. Last Modified: December 14, 2010 Site Feedback »

**EXHIBIT 159 to Declaration of Joel Israel**

*TZVI WEISS VS.*
*NATIONAL WESTMINSTER BANK, PLC*

---

*CLIVE WALKER*
*June 14, 2011*

---



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 96688.TXT*
**Min-U-Script® with Word Index**

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  EASTERN DISTRICT OF NEW YORK
    ----------------------------------x
 3  TZVI WEISS, et al.,
 4                    Plaintiffs,
 5       -against-
 6  NATIONAL WESTMINSTER BANK, PLC,
 7                    Defendants.
    ----------------------------------x
 8  NATAN APPLEBAUM, et al.,
 9                    Plaintiffs,
10       -against-
11  NATIONAL WESTMINSTER BANK, PLC,
12                    Defendants.
    ----------------------------------x
13
14                  One Liberty Plaza
                    New York, New York
15
                    June 14, 2011
16                  9:29 a.m.
17
18       Videotaped Deposition of CLIVE WALKER,
19  pursuant to Notice, before Sophie Nolan, a
20  Notary Public of the State of New York.
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
           126 East 56th Street, Fifth Floor
24            New York, New York 10022
                    212-750-6434
25                  Ref: 96688
```

Page 2

```
 1  A P P E A R A N C E S :
 2
 3  SAYLES WERBNER
 4  Attorneys for Plaintiff
 5       4400 Renaissance Tower
 6       1201 Elm Street
 7       Dallas, Texas  75270
 8  BY:  JOEL L. ISRAEL, ESQ.
 9       PHONE    214-939-8700
10       FAX      214-939-8787
11       E-MAIL   jisrael@swtriallaw.com
12
13
14  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
15  Attorneys for Defendants
16       One Liberty Plaza
17       New York, New York  10006
18  BY:  LAWRENCE FRIEDMAN, ESQ.
19       PHONE    212-225-2266
20       FAX      212-225-3999
21       E-MAIL   lfriedman@cgsh.com
22
23  ALSO PRESENT:
24       DANIEL MACOM, Legal Videographer
25
```

Page 3

```
 1  ------------------ I N D E X -------------------
 2  WITNESS            EXAMINATION BY        PAGE
 3  CLIVE WALKER       MR. FRIEDMAN            7
 4
 5
 6  ---------------- E X H I B I T S ---------------
 7  WALKER        DESCRIPTION            FOR I.D.
 8  Exhibit 1     Expert report of Clive       8
 9                Walker
10  Exhibit 2     Expert Declaration of Clive  22
11                Walker
12  Exhibit 3     Document Bates stamped       23
13                Walker 000001 through
14                Walker 000002
15  Exhibit 4     Document Bates stamped       26
16                Walker 000003 through
17                Walker 000004
18  Exhibit 5     Document Bates stamped       27
19                Walker 000005 through
20                Walker 000005
21  Exhibit 6     Copy of book entitled        49
22                Terrorism and the Law
23  Exhibit 7     William & Mary Law Review    58
24                article
25
```

Page 4

```
 1  ----------- E X H I B I T S (Cont'd) -----------
 2  WALKER        DESCRIPTION            FOR I.D.
 3  Exhibit 8     Book entitled Blackstone's   68
 4                Guide to the Antiterrorism
 5                Legislation
 6  Exhibit 9     Expert Report of Gary        70
 7                Walters
 8  Exhibit 10    Rebuttal Report of Gary      70
 9                Walters
10  Exhibit 11    Expert Report of Jon Holland 71
11  Exhibit 12    Second Expert Report of Jon  72
12                Holland
13  Exhibit 13    Expert Report of Jonathan    73
14                Burchfield
15  Exhibit 14    Second Expert Report of      73
16                Jonathan Burchfield
17  Exhibit 15    Document entitled "Charities 98
18                Back on Track 2007 to 2008"
19  Exhibit 16    Document entitled           104
20                "Counter-terrorism Strategy
21                July 2008"
22  Exhibit 17    Document entitled, "Charity 107
23                Commission Operational
24                Guidance on Charities and
25                Terrorism"
```

Page 5

```
 1  ------------ E X H I B I T S (Cont'd) -----------
 2  WALKER          DESCRIPTION            FOR I.D.
 3  Exhibit 19      May 12, 2009 Hansard House    111
 4                  of Commons debate
 5  Exhibit 20      Hansard Commons debates      112
 6                  print from July 6, 2009
 7  Exhibit 21      Hansard Commons debate       111
 8  Exhibit 22      Letter dated 9/5/03          126
 9  Exhibit 23      Letter dated 10/3/03         126
10  Exhibit 24      Pages from the Metropolitan   88
11                  Police Service website
12  Exhibit 25      Section 21G of the Terrorism  119
13                  Act of 2000
14  Exhibit 26      Print from the Police        127
15                  National Legal Database
16                  website
17  Exhibit 27      Prints from the website of   129
18                  the Association of Chief
19                  Police Officers
20
21
22              (EXHIBITS TO BE PRODUCED)
23
24
25
```

Page 6

```
 1      P R O C E E D I N G S
 2  THE VIDEOGRAPHER: This is tape
 3  one. We're now on the record. The time
 4  is 9:29 a.m. Today is Tuesday, June 14,
 5  2011. This is the opening of the
 6  deposition of Mr. Clive Walker in the
 7  matter of Tzvi Weiss et al versus
 8  National Westminster Bank PLC and also
 9  Natan Applebaum, et al versus National
10  Westminster Bank PH C.
11  This deposition is being held at
12  the offices of Cleary, Gottlieb, Steen &
13  Hamilton, which is located at One Liberty
14  Plaza in New York, New York.
15  Our court reporter today is
16  Ms. Sophie Nolan with Ellen Grauer Court
17  Reporting. I'm the legal videographer,
18  Dan Macom, also with Ellen Grauer Court
19  Reporting.
20  Would counsels please introduce
21  themselves.
22  MR. ISRAEL: Joel Israel with
23  Sayles Werbner here on behalf of the
24  plaintiffs.
25  MR. FRIEDMAN: Lawrence Friedman,
```

Page 7

```
 1  of Cleary Gottlieb Steen & Hamilton on
 2  behalf of Nat West. With me are my
 3  colleagues, Valerie Schuster and David
 4  Levy and Andra Prutu, a summer associate.
 5  THE VIDEOGRAPHER: Will the court
 6  reporter please swear in the witness.
 7  C L I V E   W A L K E R, called as a witness,
 8  having been first duly sworn, was
 9  examined and testified as follows:
10
11  EXAMINATION BY
12  MR. FRIEDMAN:
13  Q.  Good morning, Professor Walker.
14  A.  Good morning.
15  Q.  Have you ever had your deposition
16  taken before?
17  A.  No.
18  Q.  I will be asking you a series of
19  questions today and I will do my best to make
20  my questions as clear and understandable as I
21  can.
22      If at any time you wish for me to
23  repeat or rephrase one of my questions or to
24  explain to you what I mean by a question,
25  please let me know and I'll do my best to
```

Page 8

```
 1      WALKER
 2  oblige.
 3      Otherwise, the record will reflect
 4  that you understood my question and that you
 5  are answering it accordingly. Is that
 6  acceptable?
 7  A.  Yes, that's fine.
 8  Q.  Let me show you what the reporter
 9  has marked as Exhibit 1 and I'll ask you to
10  identify that as your report in these cases.
11  A.  Thank you.
12      (Exhibit 1, expert report of Clive
13      Walker, marked for Identification.)
14  A.  Yes, it looks fine. It looks like
15  the report I submitted.
16  Q.  And your signature appears on page
17  23?
18  A.  Yes, that's correct.
19  Q.  Is there anything in this report
20  that you now believe to be incorrect?
21  A.  I think the only thing I'd say is
22  that I have continued to research into this
23  matter and there is further information which I
24  now have which I didn't have at the time when I
25  wrote the report.
```

Page 33

```
 1      WALKER
 2 Q.  You've looked at secondary sources
 3 concerning the relationship between Nat West
 4 and Interpal?
 5 A.  Yeah, concerning the litigation and
 6 this type of litigation.
 7 Q.  Well, let's focus first on this
 8 litigation.  What secondary sources have you
 9 looked at?
10 A.  I've looked at academic articles,
11 web pages.
12 Q.  Okay.  What academic articles?
13 A.  I've looked at academic articles
14 which relate to the financing of charities and
15 books which -- sorry the financing of
16 terrorism --
17 Q.  Sorry, we're at cross-purposes
18 again.
19 A.  Okay.
20 Q.  What academic articles have you
21 read concerning the facts of these cases, if
22 any?
23 A.  I would have to -- I would have to
24 check.  I can't say that there is an academic
25 article which has as its title this litigation.
```

Page 35

```
 1      WALKER
 2 A.  Yeah.
 3 Q.  Have you learned anything from any
 4 web pages concerning the facts of this case,
 5 these cases?
 6 A.  I can't say that I've learned
 7 anything new.  I've --
 8 Q.  What court --
 9 A.  I've learned probably more people's
10 opinions than facts about the case.
11 Q.  What court papers did plaintiffs
12 give you?  Did they give you the complaint?
13 A.  I think so.  My hesitation is
14 because this goes back to 2006 and I haven't
15 closely reviewed the papers since that time.  I
16 had a number of court papers, probably the
17 complaint and the -- some of the pleadings at
18 that time in 2006.
19 Q.  Have you received any court papers
20 from plaintiffs counsel since 2006?
21 A.  The papers I've received are the
22 reports by Mr. Holland, Mr. Burchfield and the
23 deposition.  Are they not court papers?
24 Q.  Professor Walker, the deposition
25 will go a lot faster if you just try to focus
```

Page 34

```
 1      WALKER
 2 What I would say is there have been a number of
 3 academic articles which have mentioned this
 4 litigation, as I say, alongside other
 5 litigation against other banks of a similar
 6 nature to this litigation.
 7 Q.  Now, you said you looked at web
 8 pages.
 9 A.  Yeah.
10 Q.  Have you looked at any web pages
11 that have educated you on the facts of the
12 relationship between Nat West and Interpal?
13 A.  I'm not sure what you mean by
14 "educated."  I mean, everything one reads one
15 sees a point of view, but I would say, if this
16 helps you, that reading the details of the
17 court documentation plus the details of the
18 Charity Commission reports I would say is my
19 prime source of information.
20 Q.  Okay.  But you referred earlier to
21 web pages and that, in fact, was the subject of
22 my question.
23 A.  Yeah, sure.
24 Q.  If you could just stick with my
25 question.
```

Page 36

```
 1      WALKER
 2 on my question.
 3 A.  I am trying to focus on your
 4 question.  If you could explain your question
 5 it would help.
 6 Q.  Have you received any court papers
 7 from plaintiff's counsel since 2006?  I'm not
 8 talking about the reports.  I'm not talking
 9 about the deposition.
10      Have you received any papers that
11 you understood were filed with the court since
12 2006?
13 A.  Well, I would count the depositions
14 as court papers.  I would count the expert
15 report as court papers, but aside from them the
16 answer is no.
17 Q.  Okay.  Now, I'd like you to look at
18 your CV that is attached to Exhibit 1 of your
19 report.
20 A.  Sure.
21 Q.  There's no indication here that you
22 purport to be an expert on the Charity
23 Commission; correct?
24      MR. ISRAEL: Objection to form.
25 Q.  Is there any indication here that
```

Page 37

```
1      WALKER
2   you purport to be an expert on the Charity
3   Commission?
4   A.   Sorry, I heard an objection.
5      MR. ISRAEL: You can answer.
6   A.   Okay.  Am I an expert on the
7   Charity Commission --
8   Q.   That's not what I asked you.
9   Please, Professor, I asked you --
10  A.   Any indication.
11  Q.   -- is there any indication in your
12  CV that you purported to be an expert on the
13  Charity Commission?
14     MR. ISRAEL: Objection to form.
15  A.   There is evidence in the sense that
16  I purport to be an expert on the subject of
17  terrorism and the law and, as I indicated
18  earlier, this subjective terrorism and the law
19  is an expanding agenda.  And after 9/11 it
20  became part of that agenda that charities may
21  be involved in terrorism and, therefore,
22  since -- particularly since 9/11, I have taken
23  an interest in the activities of the Charity
24  Commission and in my -- certainly in my most
25  recent books have mentioned this -- this issue.
```

Page 38

```
1      WALKER
2   Q.   Do you hold yourself to be an
3   expert on the Charity Commission?
4      MR. ISRAEL: Objection to form.
5   A.   I would, again, repeat that if you
6   talk about the Charity Commission and its
7   dealings with suspected involvement in
8   terrorism finance, I think the answer is yes.
9   Q.   Have you ever practiced as a lawyer
10  before the Charity Commission?
11  A.   No.
12  Q.   You were a clerk and a solicitor at
13  the law firm Emsley Collins & Co. from 1976 to
14  1978; correct?
15  A.   Yes.
16  Q.   And as a clerk, you were what we
17  would refer to as a trainee?
18  A.   Yes.
19  Q.   And as a solicitor, you were a
20  lawyer at that firm?
21  A.   Briefly.
22  Q.   What was the nature of the legal
23  work you did at that firm?
24  A.   It was fairly varied.  I was a new
25  boy, as it were, on the block and so I did lots
```

Page 39

```
1   of different work.  I think the bulk of the
2   work that I ended up doing was in the field of
3   either civil litigation or what in Britain we
4   would call private client work, such as house
5   conveyance or wills, that kind of thing.
6   Q.   Did you have any professional
7   experience with the Charity Commission while
8   you were at that firm?
9   A.   No, no.
10  Q.   Why did you leave that firm?
11  A.   Sorry?
12  Q.   Why did you leave that firm?
13  A.   I had a strong inclination towards
14  academic work.  This was with me whilst I was
15  at university and might be reflected in the
16  fact, though I say it myself, that I received a
17  first-class degree, which is just a degree of
18  impulsion to study.
19     I did consider at the end of my
20  degree going into post-graduate study doing a
21  Ph.D. and it was a kind of a flip of the coin
22  which I did first or which I preferred.  I was
23  interested equally in doing some practice
24  because that is the, as it were -- the life of
```

Page 40

```
1      WALKER
2   the law is practicing.  That was potentially
3   interesting.
4      But having done two or three years
5   of practice, the -- as it were, the academic
6   side called me back and I began looking for
7   jobs in academic life to fulfill my greater
8   priority to satisfy my academic curiosity than
9   my practitioner curiosity.
10  Q.   You practiced law for two to three
11  years?
12  A.   Yes.
13  Q.   You never practiced charity law?
14  A.   Correct.
15  Q.   You've never worked for the Charity
16  Commission?
17  A.   Correct.
18  Q.   And you've never appeared before
19  the Charity Commission as a lawyer?
20  A.   Correct.
21  Q.   Have you ever taught a course on
22  charity law?
23  A.   I've taught the subject of equity
24  and trust, which I guess has much the same
25  meaning here as it does in the U.K.  And as
```

Page 41

1  WALKER
2  part of that course -- part of that course is
3  about charities law.
4  Q.   When did you last teach that class?
5  A.   I taught it some 20 years ago, I
6  think, would be the last time I taught that
7  class.
8  Q.   Do you have a copy in your files of
9  the syllabus for that course?
10 A.   No.
11 Q.   Have you ever worked for a British
12 law enforcement agency?
13 A.   Yes, I think you could say I have.
14 Q.   What's that?
15 A.   I do work on an episodic basis for
16 an organization called the Police National
17 Legal Database.
18 Q.   What is the Police National Legal
19 Database?
20 A.   The Police National Legal Database
21 is an organization which seeks to compile a
22 database of essentially legal material which is
23 seen as relevant to operational police
24 officers.  And what they do is they try and
25 provide explanations -- short explanations to

Page 42

1  WALKER
2  operational police officers of issues such as
3  the meaning of offenses, what recent cases
4  might mean and the idea is that this is readily
5  available online in police stations.
6  Q.   Is this a private, not-for-profit
7  organization?
8  A.   No, it's a public organization.  It
9  is part of the -- I think it is now under the
10 heading of the Association of Chief Police
11 Officers, which is a national organization in
12 England, Wales, which is publicly funded by the
13 government.
14 Q.   And you've been employed by this
15 national legal database?
16 A.   I've been engaged is --
17 Q.   Engaged for what?
18 A.   On the basis that I audit the
19 accuracy of their legal statements.
20 Q.   Have you been paid for that work?
21 A.   Yeah -- well, again, it's a similar
22 arrangement to what I'm doing now.  The
23 university has been paid.  I haven't.
24 Q.   And during what years have you done
25 that?

Page 43

1  WALKER
2  A.   Oh, it goes back a long time.  I
3  think it goes back to -- I don't know whether I
4  mentioned this anywhere in my CV.  It goes back
5  to around about the mid-1990s I think is when
6  it started and is kind of an open contract.
7  They give me work as they feel the need for
8  something to be audited.
9  Q.   And you mentioned the Police
10 National Legal Database.
11 A.   Yes.
12 Q.   You mentioned another organization,
13 the Association of National Police Chiefs.
14 What is that called?
15 A.   The Association of Chief Police
16 Officers.  What I said was that -- that is now,
17 I believe, the umbrella organization for the
18 Police National Legal Database.  I don't have
19 any contact directly with the Association of
20 Chief Police Officers.
21 Q.   Have you ever heard of a -- an
22 agency within British law enforcement known as
23 NCIS?
24 A.   Yes, I have, yes.
25 Q.   What does that acronym stand for?

Page 44

1  WALKER
2  A.   The National Criminal Intelligence
3  Service.
4  Q.   And what about the NTFIU, have you
5  ever heard of that?
6  A.   Yes, I have.
7  Q.   What does that acronym stand for?
8  A.   That's the National Terrorism
9  Finance Investigation Unit.
10 Q.   Have you ever worked for NCIS?
11 A.   No.
12 Q.   SOCA?
13 A.   No.
14 Q.   NTFIU?
15 A.   No.
16 Q.   The FSA?
17 A.   No.
18 Q.   Special Branch?
19 A.   No.
20 Q.   The Anti-terrorist Squad?
21 A.   No.
22 Q.   Bank of England?
23 A.   No.
24 Q.   Her Majesty's Treasury?
25 A.   No.

Page 45

1 　　WALKER
2 Q.  Have you ever held a position at a
3 commercial or a retail bank?
4 A.  No.
5 Q.  Have you ever taught any courses on
6 banking law?
7 A.  Not -- again it's rather like the
8 question you asked about teaching about
9 charity.  Not directly, not a standalone
10 course, but as part of my teaching on terrorism
11 laws, I do teach about how bankers have to deal
12 with antiterrorism laws and regulations.
13 Q.  Have you ever -- so, if I asked you
14 if you've ever taught a course on banking
15 regulation, you'd give me the same answer?
16 A.  Correct.
17 Q.  Okay.  What course are you
18 referring to?
19 A.  For example, I currently teach a
20 course, two courses, both in undergraduate and
21 post-graduate level, on -- which is entitled
22 Terrorism and the Law.
23 Q.  So you currently teach that in an
24 undergraduate version?
25 A.  Yes.

Page 46

1 　　WALKER
2 Q.  And in a graduate version?
3 A.  Correct.
4 Q.  And do you have any course outlines
5 or course syllabi for those courses?
6 A.  I do.  Not with me, but I can
7 certainly find them.
8 Q.  Just so we can be sure what --
9 we're talking about the same document, how
10 would you refer to those documents for those
11 two classes?
12 A.  In terms of what I teach, I guess
13 the title would be module outline -- module
14 outline is the document which gives an idea of
15 what -- what is taught.
16 Q.  And you have a module outline for
17 each class, the undergraduate class and the
18 graduate class?
19 A.  Yes, yes.
20 Q.  And when did you start teaching the
21 undergraduate class?
22 A.  I think about five years ago, six
23 years ago.  I can't recall.
24 Q.  And the graduate class?
25 A.  They both started together.

Page 47

1 　　WALKER
2 Q.  Is there a different module outline
3 for each class for each year or is there --
4 A.  It does vary over years.  You know,
5 sometimes an event occurs and you get
6 interested in a particular subject sometimes.
7 There's no great interest in that area that
8 particular year.  So it does vary year to year
9 what is the precise outline, of course?
10 Q.  Do you have any professional
11 training in banking regulation?
12 A.  Other than the training which goes
13 back to when I became a solicitor, and for that
14 purpose I had to undertake a number of courses
15 at what was then called the Law Society's final
16 exams which included a whole range of
17 commercial experience, and also required me to
18 take what were then called solicitor's accounts
19 exams, where I had to learn how to keep proper
20 accounts of my clients' transactions.
21 Q.  Other than that, you have no
22 professional training in banking regulation;
23 correct?
24 A.  Well, other than that, I would say
25 I have training in terms of what I've learned

Page 48

1 　　WALKER
2 as an academic which I would view as quite
3 professional in the way that I approach any
4 subject and learn about it.  It's the same as
5 what I've learned about terrorism.
6 Q.  Okay.  I'd like you to look at the
7 section of your CV beginning on page 25
8 entitled "Principal Publications on Terrorism
9 and Security," do you see that?
10 A.  Yes.
11 Q.  Which of these -- do any of these
12 publications refer to the Charity Commission?
13 　　MR. ISRAEL: Objection to form.
14 A.  I would believe that the,
15 particularly the books regarding terrorism at
16 the top of the list and especially the most
17 recent two books, namely the Antiterrorism
18 Legislation of 2009 and the Terrorism, the Law
19 Book of 2011.
20 　　I'm pretty sure certainly the
21 latter, which as you can imagine I've just
22 completed and, therefore, have better
23 recollection of its content, although it is
24 300,000 words, so I can't remember every last
25 word of it, does refer to the Charity

Page 53

WALKER

2 Q.   Now, again, your reliance upon this
3 publication by the home office and HM Treasury
4 indicates that you consider that to be a
5 reliable authority; correct?
6 A.   Yes.  I would more, I think,
7 consider it to be an authoritative source
8 rather than necessarily reliable.  They don't
9 give details as to their views.  They are more
10 in terms of statements of policy rather than
11 evidence-based statements.
12 Q.   So you consider -- you prefer to
13 say that you consider it to be an authoritative
14 source?
15 A.   Yes, yes.
16 Q.   Now, look at paragraph 3.2.11 of
17 your report on page 21 --
18     MR. ISRAEL: 22?
19 Q.   I'm sorry, 22.
20 A.   Right.
21 Q.   You record here the same quotation
22 to this authoritative source that you also have
23 in your book; correct?
24 A.   Yes, yes.
25 Q.   And you believe it is accurate

Page 54

WALKER

2 that, as stated here, "The channeling of funds
3 by charities to terrorists is extremely rare";
4 correct?
5 A.   I think you should see that in the
6 context of the fact that there are, I think,
7 around 160,000 charities and relatively few
8 cases or even allegations compared to the
9 figure of 160 so I think extremely rare --
10 160,000 and the number of allegations compared
11 to 160,000 is, therefore, I think, fairly
12 described as extremely rare.
13 Q.   So you believe that the channeling
14 of funds by charities to terrorists is
15 extremely rare?
16     MR. ISRAEL: Objection to form,
17     asked and answered.
18 A.   In the context that I've already
19 stated that there are around 160,000 charities,
20 but of course we should also understand that as
21 indeed the document -- the document in question
22 emphasizes, that one should see that in a risk
23 analysis, if you like, that there are clearly
24 some charities which are far more at risk than
25 others.

Page 55

WALKER

2 Q.   Now, if you look at paragraph 9.96
3 of your book on page 410 you wrote as follows,
4 "The Charity Commission has responded by
5 publishing a counter-terrorism strategy which
6 applies zero tolerance to any connections to
7 prescribed organizations, support for terrorist
8 activity or the fostering of criminal
9 extremists.  The Commission has put in place a
10 proactive monitoring unit and a
11 counter-terrorism team which forms part of the
12 intensive case work unit in compliance and
13 support, as well as issuing operational
14 guidance."
15     Do you see that?
16 A.   Yes.
17 Q.   And these sentences are almost
18 exactly the same as what you have in paragraph
19 3.1.9 -- 3.1.9 of your report on pages eight
20 and nine; correct?
21 A.   Those particular sentences, yes,
22 although that may not be the full point of
23 3.1.9.
24 Q.   And you believe this to be
25 accurate; correct?

Page 56

WALKER

2 A.   It is accurate that the Charity
3 Commission has done these things; correct.
4 Q.   Correct.  I'd like you to look at
5 paragraph 9.9 further on in 9.96 --
6 A.   Yeah.
7 Q.   -- of your book.  After you state
8 what the Charity Commission has done, you go on
9 to state, "Nevertheless a strong and vibrant
10 sector should be encouraged," referring to the
11 charity sector, "and this understanding stance
12 is welcome since 'a wholesale blight on the
13 provision of financial support for humanitarian
14 aid could fuel the destabilization of
15 struggling people abroad and enhance the appeal
16 of terrorist groups to these people.'"
17     That's what you have in paragraph
18 9.96 of your book; correct?
19 A.   Correct.
20 Q.   And that's almost exactly the same
21 as what you wrote in paragraph 3.1.10 on page
22 nine of your report; correct?
23 A.   Correct.
24 Q.   And in this sentence you quote from
25 a William & Mary Law Review article which you

Page 85

WALKER

1      WALKER
2  answer in terms of has there been an article
3  that mentions these terms, I can't say for
4  sure, but I'm not aware of any.
5       However, if I could just -- if you
6  can just give me a minute, one of the -- I may
7  not have mentioned this article in the paper,
8  another academic author on the subject of
9  charities, he writes a great deal on the
10 subject, is a fellow called Peter Edge who's at
11 another U.K. university, and I do recollect him
12 using the terms "hard law" and "soft law" which
13 I think have some affinity with the type of
14 concept that I'm putting forward here.
15      He, as I say, would be viewed as a
16 leading academic author on charities law and
17 hard law/soft law could equate, to some extent,
18 to green light/red light.
19 Q.  You think it's fair to characterize
20 what the Charity Commission does as soft law?
21 A.  Yes, yes.
22 Q.  And what is the publication by
23 Peter Edge to which you're referring?
24 A.  I'm sorry, it's not referred to in
25 this paper, but I --

Page 86

1      WALKER
2  Q.  But what is it?
3  A.  Yeah, I can't remember the
4  reference.  I can find you the reference very
5  easily if you need it.  It is an academic paper
6  of recent origin.  I would say the last five
7  years.
8  Q.  Do you possess a copy of it?
9  A.  I don't have a copy.  I can easily
10 get one.  I have recently read the paper, but I
11 can't remember the precise reference.
12 Q.  And is he a reliable authority?
13 A.  Sorry?
14 Q.  Is he a reliable authority?
15      MR. ISRAEL: Objection to form.
16 A.  He is a well-established academic
17 author.  And so to that extent he is, as it
18 were, on an ad homonym basis he is a reliable
19 person.  I can't vouch for every statement that
20 he makes.
21 Q.  Well, you're testifying under oath
22 today.
23 A.  Sure.
24 Q.  And you just adopted a construct --
25 A.  Yes.

Page 87

1      WALKER
2  Q.  -- of hard law versus soft law --
3  A.  Sure.
4  Q.  -- of which you say he is the
5  author.
6  A.  Yes.
7  Q.  Do you view him as a reliable
8  authority?  I assume so because you testified
9  to what he said today.
10      MR. ISRAEL: Same objection.
11 A.  Sure.  On the basis of his
12 analytical construct of hard law/soft law as
13 applied to the Charity Commission, I found his
14 arguments persuasive.
15 Q.  Okay.  Look at paragraph 3.1.7 of
16 your report.  You state that, "The Charity
17 Commission's default stance seems to be --
18 seems to that of charity ally and not charity
19 policeman."
20      What is your basis for that?  What
21 is your factual basis for that statement?
22 A.  Sorry, there is a word missing I
23 see there.  "Seems to be" it should say "that
24 of charity ally and not charity policeman."
25      The factual basis is -- of course

Page 88

1      WALKER
2  it says "in short" and so it's referring to the
3  description given in -- particularly in the
4  previous paragraph 316 of some cases that are
5  mentioned at that point.
6  Q.  You're familiar with an entity
7  known as the Metropolitan Police Service;
8  correct?
9  A.  Yes.
10 Q.  That's the police force in London;
11 correct?
12 A.  Correct.
13      (Exhibit 24, pages from the
14 Metropolitan Police Service website,
15 marked for Identification.)
16 Q.  I'm going to show you what's been
17 marked as Exhibit 24, which I'll represent to
18 you are pages from the Metropolitan Police
19 Service website.
20 A.  Yup.
21 Q.  Do you have any reason to doubt
22 that this is from the Metropolitan Police
23 Service website?
24      MR. ISRAEL: Objection.
25 A.  I would say that I've not seen

Page 97

```
 1      WALKER
 2  enemy?
 3      MR. ISRAEL: Same objection.
 4  A.  "Public as a whole" meaning --
 5  Q.  The public as a whole.
 6  A.  Including drug dealers?
 7  Q.  Including the public as a whole.
 8  A.  Including drug dealers, bank
 9  robbers?
10  Q.  Every person who walks the fair
11  land of Great Britain, I want you in your mind
12  to think of everyone who walks the land of
13  Great Britain, do you think the Metropolitan
14  Police Service regards that group as its enemy?
15      MR. ISRAEL: Objection to form.
16      Calls for speculation.
17  A.  Well, I think that in terms of the
18  law abiding public, it certainly doesn't view
19  itself as the enemy of the law abiding public,
20  but in terms of the people who are being
21  targeted such as drug dealers or indeed, you
22  might say, terrorists, whilst Britain has not
23  used the phraseology of War on Terror, I think
24  it would not be unfair to characterize the
25  Metropolitan Police as seeing drug dealers,
```

Page 98

```
 1      WALKER
 2  terrorists as their enemy, but I would say that
 3  without relying upon the verbiage of the War on
 4  Terror which I know has American connotations.
 5  Q.  You're associated with the Police
 6  National Legal Database?
 7  A.  Yes.
 8  Q.  Does the Police National Legal
 9  Database regard the British public as an enemy?
10      MR. ISRAEL: Objection to form.
11  A.  I don't think it's expressed any
12  views about -- it's primarily a database
13  speaking to operational officers so it doesn't
14  really have any direct contact with the British
15  public.
16  Q.  It's there to serve the public,
17  correct, through the police officers that it
18  serves?
19  A.  Through the police, yes.
20      (Exhibit 15, document entitled
21  "Charities Back on Track 2007 to 2008,"
22  marked for Identification.)
23  Q.  I'd like to show you what's been
24  marked as Exhibit 15, which is a report issued
25  by the Charity Commission entitled "Charities
```

Page 99

```
 1      WALKER
 2  Back on Track 2007 to 2008."
 3  A.  Right.
 4  Q.  Did you ever see this before?
 5  A.  I've seen this series, but I can't
 6  swear that I've seen this particular document.
 7  Q.  I'll ask my question again.
 8  A.  Sure.
 9  Q.  Have you seen this document before?
10      MR. ISRAEL: Objection, asked and
11  answered.
12  A.  The series I'm familiar with.  What
13  I'm saying there is it possible that I have
14  seen this document because I have consulted
15  this series of documents which appears each
16  year called Back on Track and I've done -- part
17  of my research has encompassed this series of
18  documents called Back on Track.  So it's
19  possible that I've seen this before, but only
20  as part of a wider piece of research.  I'm not
21  familiar with the details of it.
22  Q.  As you sit here today, do you
23  recall seeing this document before?
24      MR. ISRAEL: Same objection.
25  A.  I recall seeing documents called
```

Page 100

```
 1      WALKER
 2  Back on Track.  I'm not sure whether 2007 or
 3  '08 I recall or not.
 4  Q.  So, as you sit here today, you do
 5  not recall seeing this?
 6  A.  As I sit here today, I'm not sure
 7  because, as I say, there is recognition that I
 8  have accessed a series of documents called Back
 9  on Track.  So it's not quite the black and
10  white situation in that the document title is
11  familiar to me.  It's just a question of
12  whether the particular date I've seen or not.
13  I may have done, I may not have done.
14  Q.  This report includes, among other
15  things, a summary of the Charity Commission's
16  compliance work from April 2007 to March 2008;
17  correct?
18  A.  Sorry, are you referring to a
19  particular page here?
20  Q.  I'm referring to my question.
21      MR. ISRAEL: Review the document.
22  Q.  This report summarizes, among other
23  things, the Charity Commission's compliance
24  work from April 2007 to March 2008; correct?
25  I'll invite you to read the introduction to
```

Page 101

WALKER

2 yourself which is on page two.

3 A. Sorry?

4 Q. I'll invite you to read the
5 introduction in that document.

6 A. This document?

7 Q. That document, on page two.

8 A. Right.

9 Q. It has a picture of the three
10 people at the bottom. Do you see it?

11 A. Yeah, sure.

12 Q. Do you want to read that
13 introduction to yourself?

14 A. (Reviewing.)

15 Okay. Well, if I simply read this
16 one sentence without having read the whole
17 document, it would appear that they wish to set
18 out in this document the "key themes and wider
19 issues for charity arising from the
20 Commission's compliance work from 2007 to
21 2008." That's what the statement says.

22 Q. Look at page 27.

23 A. Okay.

24 Q. You'll agree with me that according
25 to this annex during this period of time there

Page 102

WALKER

2 were 490 occasions when the Charity Commission
3 used its compliance powers, including extensive
4 use of information gathering powers; correct?

5 A. Sorry, 490 the final figure on the
6 table, yes?

7 Q. Yes.

8 A. Yes, yes.

9 Q. And if you look at page 28, annex
10 two, you'll see that across the horizontal axis
11 of this chart in the second segment it lists
12 the statutory powers exercised by the
13 Commission during this period; correct?

14 A. Correct.

15 Q. And that includes issuing orders,
16 directions -- and transactions for information
17 for evidence; correct?

18 A. Correct?

19 Q. And that includes suspending
20 trustees?

21 A. Correct.

22 Q. That includes removing trustees?

23 A. Correct.

24 Q. It includes freezing bank accounts?

25 A. Yes.

Page 103

1 WALKER

2 Q. It includes appointing interim
3 managers?

4 A. Yes.

5 Q. And it includes other orders and
6 schemes; correct?

7 A. Yes.

8 Q. And it includes other instances in
9 which the Commission used no powers; correct?

10 A. Correct.

11 Q. I'd like you to look at 3.1.19 of
12 your report. I'm sorry, 3.1.9 of your report.
13 It's on page eight.

14 A. Yes.

15 Q. There in the second sentence you
16 state that, "The Charity Commission has
17 announced that threats to national security,
18 including terrorism, amount to one of the most
19 serious risks for charities," correct?

20 A. Yes.

21 Q. And then you go on to say, "As
22 reflected in its published counter-terrorism
23 strategy, these are issues where the Charity
24 Commission applies zero tolerance to any
25 connections to prescribed organizations,

Page 104

1 WALKER

2 support for terrorist activity or the fostering
3 of criminal extremism. The Commission has also
4 put in place a proactive monitoring unit and a
5 counter-terrorism team which forms part of the
6 intensive case work unit in compliance and
7 support as well as issuing operational
8 guidance, OG 96 charities and terrorism."

9 Do you see that?

10 A. Correct, yes.

11 Q. And that is all accurate, correct,
12 what you wrote here?

13 A. Yes, yes.

14 (Exhibit 16, document entitled
15 "Counter-terrorism Strategy July 2008,"
16 marked for Identification.)

17 Q. Now, let me show you what we marked
18 as Exhibit 16, a publication of the Charity
19 Commission entitled "counter-terrorism Strategy
20 July 2008." This is the document that you
21 refer to in paragraph 3.1.9 of your report;
22 correct?

23 A. Yes.

24 Q. And this document, to your
25 knowledge, accurately states the Charity

Page 113

1      WALKER
2  A.  Yes.
3  Q.  So during a period in May and July
4  and September of 2009, six years after the U.S.
5  designated or sanctioned Interpal, members of
6  Parliament were asking members of Her Majesty's
7  government about discussions between the
8  British authorities and the U.S. authorities
9  concerning the sanctioning of Interpal;
10  correct?
11  A.  Yes.
12      MR. ISRAEL: I don't mean to
13  interrupt, Larry.  I think I got the
14  wrong one.  I have a Daily Telegraph
15  article.
16      MR. FRIEDMAN: Sorry, you got the
17  wrong one.  We'll give it to you when we
18  break.
19  A.  Sorry, I was interrupted.  Could
20  you repeat your question?
21  Q.  So this shows that during a period
22  spanning from May to July to September of 2009,
23  six years after the U.S. sanctioned Interpal,
24  members of Parliament were still asking British
25  authorities about their discussions with U.S.

Page 114

1      WALKER
2  authorities concerning Interpal; correct?
3  A.  Yes.
4  Q.  And as you sit here today, to your
5  understanding, Interpal has never been
6  sanctioned by the British government; correct?
7  A.  Correct.
8  Q.  Go back to your report.  Look at
9  paragraph 3.1.25 on page 13.  Could you read
10  that to yourself, please.
11  A.  (Reviewing.)
12      Yes.
13  Q.  Now, looking at the text of your
14  paragraph 3.1.25 on page 13 of your report, you
15  state that in paragraph D-3 of Mr. Burchfield's
16  report he concedes that the 2009 report of the
17  Charity Commission is arguably the most
18  thorough and comprehensive of all such
19  inquiries.  Do you see that?
20  A.  In my report?
21  Q.  In your report.
22  A.  Yes, yes.
23  Q.  Let's look at paragraph D-3 of
24  Mr. Burchfield's report to which you refer
25  here.  It's Exhibit 13.  And it's on page 13 of

Page 115

1      WALKER
2  Mr. Burchfield's report.
3  A.  Right, yes.
4  Q.  And tell me where it is in this
5  paragraph that Mr. Burchfield concedes that the
6  2009 Charity Commission report is arguably the
7  most thorough and comprehensive?
8  A.  I took that to be inherent in the
9  first sentence in paragraph D-3 to the effect
10  that it is a much more long-lasting inquiry
11  into the affairs of the charity.  And by
12  "long-lasting" I would treat that, if I could
13  use the word synonym rather than antonym, as a
14  synonym for more thorough.
15  Q.  And comprehensive?
16  A.  And comprehensive indeed.
17  Q.  So in your terminology, the term
18  "long-lasting" has the same meaning as the term
19  "the most thorough and comprehensive"?
20  A.  I think in the -- I believed in the
21  context in which it was used in paragraph D03,
22  that that was a fair interpretation of the use
23  of that word.  I wouldn't say it's necessarily
24  a fair interpretation in all contexts.
25  Q.  Now, are you aware that Interpal's

Page 116

1      WALKER
2  accounts at Nat West were closed in March 2007?
3  A.  I'm aware that they were closed.  I
4  wasn't aware of the precise date.
5  Q.  I'll represent to you, and I don't
6  think Joel will disagree --
7  A.  Okay.
8  Q.  -- that the accounts were closed in
9  March of 2007.
10  A.  Okay.
11  Q.  Taking that as a fact, you will
12  agree with me that Nat West did not have access
13  to the Charity Commission's 2009 report at any
14  time when Interpal had accounts at Nat West;
15  correct?
16  A.  Correct.
17  Q.  You'll agree with me that 2009 was
18  two years after 2007?
19  A.  Indeed.
20  Q.  Because Nat West closed the
21  accounts in 2007, it did not have an
22  opportunity to know what the Charity Commission
23  was going to say two years later in connection
24  with Nat West's management of the accounts;
25  correct?

**EXHIBIT 160 to Declaration of Joel Israel**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Case No. 05-CV-4622(DLI)(MDG)
-----------------------------------x
TZVI WEISS, et al.,

                        Plaintiffs,

         -against-


NATIONAL WESTMINSTER BANK, PLC,

                        Defendant.
-----------------------------------x
Case No. 07-CV-916(DLI)(MDG)

NATHAN APPLEBAUM, et al.,

                        Plaintiffs,

         -against-

NATIONAL WESTMINSTER BANK, PLC,

                        Defendant.
-----------------------------------x

                        260 Madison Avenue
                        New York, New York

                        May 20, 2011
                        9:00 a.m.


        VIDEOTAPED DEPOSITION of JONATHAN R.

BURCHFIELD, taken by the Plaintiffs, held at

the aforementioned time and place, before

Sherri Flagg, a Registered Professional

Reporter, Certified LiveNote Reporter, and

Notary Public.

964a2009-4f39-43ef-83c7-300a4a0460b5

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
      Attorneys on Behalf of Plaintiffs:
 4
      SAYLES WERBNER P.C.
 5           4400 Renaissance Tower
             1201 Elm Street
 6           Dallas, Texas 75270
             (214) 939-8711
 7
      BY:    MARK S. WERBNER, ESQ.
 8           mwerbner@swtriallaw.com
 9
10    Attorneys on Behalf of Defendant
      National Westminster Bank, and the Witness:
11
      CLEARY GOTTLIEB STEEN & HAMILTON LLP
12           City Place House
             55 Basinghall Street
13           London, EC2V 5EH
             (020) 7614-2245
14
      BY:    JONATHAN I. BLACKMAN, ESQ.
15           jblackman@cgsh.com
16               -and-
17           2000 Pennsylvania Avenue, NW
             Washington, D.C. 20006-1801
18           (202) 974-1887
19    BY:    VALERIE SCHUSTER, ESQ.
             vschuster@cgsh.com
20
21
      A L S O   P R E S E N T:
22
             David Levy, Cleary Gottlieb
23           Deverell Write, Videographer
24
25
```

964a2009-4f39-43ef-83c7-300a4a0460b5

1                    - J. BURCHFIELD -

2                      *      *      *

3           (Exhibit 1: Expert Report of

4     Jonathan Burchfield, was marked for

5     identification.)

6           (Exhibit 2: Second Expert Report of

7     Jonathan Burchfield, was marked for

8     identification.)

9           (Exhibit 3: Stone King Terms of

10    Engagement 9/10/10 (#NW 217432-434), was

11    marked for identification.)

12          (Exhibit 4: Website bio of Vicki

13    Bowles (#NW 217555), was marked for

14    identification.)

15          (Exhibit 5: A non-exhaustive list of

16    publications authored by J. Burchfield

17    (#NW 217435), was marked for

18    identification.)

19          (Exhibit 6: Interpal Report of an

20    investigation under S 8 of Charities Act

21    1993 (#W_S081305-329), was marked for

22    identification.)

23          (Exhibit 7: Charity Commission

24    Palestinians Relief and Development Fund,

25    was marked for identification.)

Page 4

1          - J. BURCHFIELD -

2          (Exhibit 8: Inquiry Report

3      (Interpal), was marked for

4      identification.)

5                *      *      *

6          VIDEO TECHNICIAN:  We're on the          08:59:55

7      record.  Today's date is May 20th, 2011.    08:59:56

8      The time on the video monitor is 8:59 a.m.  08:59:59

9          This is the beginning of Tape No. 1      09:00:03

10     in the videotape deposition of Jonathan      09:00:06

11     Burchfield in the case of Weiss, et al.      09:00:09

12     versus National Westminster Bank, Plc;       09:00:15

13     Case No. 05-CV-4622.                         09:00:18

14         This case is filed in the U.S.           09:00:21

15     District Court for the Eastern District of   09:00:23

16     New York.                                    09:00:25

17         My name is Deverell Write and I          09:00:25

18     represent Veritext Reporting.  At this       09:00:27

19     time will counsel please state their         09:00:29

20     appearances.                                 09:00:31

21         MR. WERBNER:  My name is Mark            09:00:31

22     Werbner from Dallas, Texas.  I represent     09:00:33

23     those Plaintiffs in the matter that I've     09:00:36

24     filed a notice of appearance.                09:00:38

25         MR. BLACKMAN:  Jonathan Blackman and     09:00:39

964a2009-4f39-43ef-83c7-300a4a0460b5

Page 5

1                    - J. BURCHFIELD -

2          Valerie Schuster and David Levy from      09:00:42

3          Cleary Gottlieb representing the Defendant 09:00:47

4          NatWest and the witness.                  09:00:51

5              VIDEO TECHNICIAN:  Will the reporter  09:00:54

6          please swear in the witness.              09:00:55

7      *      *      *

8      J O N A T H A N   R.   B U R C H F I E L D,

9      first duly sworn/affirmed, was examined

10     and testified as follows:

11     EXAMINATION BY

12     MR. WERBNER:

13         Q.    Would you tell us your full name,    09:01:10

14     sir, and your current residential address.    09:01:12

15         A.    My name is Jonathan Robert           09:01:14

16     Burchfield.  My residential address is 15 The  09:01:16

17     Court, Bury Fields, Guildford in Surrey in the 09:01:20

18     United Kingdom.                                09:01:23

19         Q.    Have you been hired as an expert     09:01:24

20     witness on behalf of the NatWest Bank in this  09:01:28

21     lawsuit?                                       09:01:31

22         A.    Yes, I have.                         09:01:32

23         Q.    What work have you done in that      09:01:32

24     capacity?                                      09:01:35

25         A.    I have prepared two expert reports   09:01:36

964a2009-4f39-43ef-83c7-300a4a0460b5

Page 39

1                  - J. BURCHFIELD -
2    do.                                         09:41:49
3         Q.    What do you do?                   09:41:49
4         A.    I'm a practicing lawyer.  I don't 09:41:51
5    write a lot of articles.                     09:41:53
6         Q.    When you looked in your in-boxes, 09:41:55
7    did you find any additional publications?    09:41:58
8         A.    No, that's -- I prepared this having 09:42:02
9    reviewed my in-boxes.                        09:42:05
10        Q.    This Exhibit 5 entitled "A        09:42:07
11   non-exhaustive list of publications authored by 09:42:16
12   Jonathan Burchfield in the last 10 years,"   09:42:21
13   contains a reference to 14 different         09:42:25
14   publications?                                09:42:27
15        A.    Yes.                              09:42:28
16        Q.    And you have the title and the date. 09:42:28
17   Do any of those publications that you've     09:42:32
18   written deal with terror financing in the    09:42:37
19   charitable organization context?             09:42:43
20        A.    No, they don't.                   09:42:47
21        Q.    Have you read Exhibits 6, 7 and 8? 09:42:49
22        A.    Yes, I have.                      09:43:00
23        Q.    And that was before you prepared  09:43:01
24   your first report, Exhibit 1?                09:43:07
25        A.    Yes.                              09:43:09

**EXHIBIT 161 to Declaration of Joel Israel**



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO. 3:04-CR-240-P |
| | § | |
| HOLY LAND FOUNDATION FOR | § | |
| RELIEF AND DEVELOPMENT (1) | § | |
|    also known as the "HLF" | § | Supersedes Indictment Returned On |
| SHUKRI ABU BAKER (2) | § | July 26, 2004 |
| MOHAMMAD EL-MEZAIN (3) | § | |
| GHASSAN ELASHI (4) | § | |
| HAITHAM MAGHAWRI (5) | § | |
| AKRAM MISHAL (6) | § | |
| MUFID ABDULQADER (7) | § | |
| ABDULRAHMAN ODEH (8) | § | |

### INDICTMENT

The Grand Jury Charges:

### INTRODUCTION

At all times material herein:

1. The Harakat al-Muqawamah al-Islamiyya is Arabic for "The Islamic Resistance

Movement" and is known by the acronym HAMAS. HAMAS, which is sometimes

referred to by its followers as "The Movement," is a terrorist organization based in the

West Bank and Gaza Strip (Gaza). HAMAS was founded in 1987 by Sheikh Ahmed

Yassin as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The

Muslim Brotherhood is an international Islamic organization founded in Egypt in 1928

**Superseding Indictment - Page 1**

and is committed to the globalization of Islam through social engineering and violent
*jihad* (holy war). HAMAS' published charter states that HAMAS' purpose is to create an
Islamic Palestinian state throughout Israel by eliminating the State of Israel through
violent *jihad*.

2. HAMAS achieves its goals through a military wing, known as the Izz el-Din al-
Qassam Brigades, and a social wing, known as *Dawa* ("preaching" or "calling").
Although these two components have separate responsibilities, the organization operates
seamlessly, with each component working to achieve the overall objectives of the terrorist
group.

3. HAMAS' military wing is responsible for carrying out suicide bombings and
other terrorist attacks within Israel, the West Bank and Gaza. These attacks have targeted
civilians and have resulted in the death and injury of hundreds of individuals, including
American citizens. HAMAS' social wing operates as a social welfare agency, providing
food, medical care and education to Palestinians in order to generate loyalty and support
for the organization and its overall goals. HAMAS supports religious and academic
institutions that facilitate the teachings of HAMAS and introduce its radical and violent
ideology at the earliest stages of spiritual and educational development. This social
engineering is critical to winning the hearts and minds of the Palestinian people and to
creating a military and operational recruitment pool for HAMAS. Additionally, HAMAS

**Superseding Indictment - Page 2**

rewards past terrorist acts, and provides incentive for future acts, by financially subsidizing family members of HAMAS operatives who are killed, injured or imprisoned, and ensuring that the families are revered in the community.

4. HAMAS' social services are, in large part, administered by local HAMAS affiliated zakat committees and other ostensibly charitable organizations. "Zakat," or "alms giving," is one of the pillars of Islam and is an act incumbent on all practicing Muslims. The membership of these committees and organizations consists of HAMAS members, operatives and activists. HAMAS' social infrastructure is supported by numerous financial sources located around the world, including individuals and entities in the United States. Additionally, due to HAMAS' substantial expenditures and the fungible nature of money, some of the money collected externally under humanitarian banners is routed to military and operational use, in addition to freeing up other funds for specific terrorist acts. Such uses include the provision of weapons, explosives, transportation services, safehouses, and job salaries for operatives.

5. HAMAS' Political Bureau sits above the social and military wings and serves as the highest ranking leadership body in the HAMAS organization. The Political Bureau is responsible for setting policies and guidelines regarding HAMAS' activities, including directing and coordinating terrorist acts. By design, several high-ranking members of the political bureau, such as Khalid Mishal and Mousa Abu Marzook, have resided outside the West Bank and Gaza, and lived in such places as Jordan, Syria and the United States.

**Superseding Indictment - Page 3**

6. The International Emergency Economic Powers Act (IEEPA) confers upon the President the authority to deal with threats to the national security or foreign policy of the United States. On January 23, 1995, pursuant to this authority, the President issued Executive Order 12947, which declared a national emergency resulting from the grave acts of violence committed by foreign terrorists designed to disrupt the Middle East Peace Process. The Executive Order prohibits transactions, including financial transactions, with organizations and individuals named in the Annex to the Order or organizations and individuals declared to be Specially Designated Terrorists by the United States Department of Treasury pursuant to the criteria articulated in the Order. The Executive Order authorizes the Department of Treasury to block all property subject to United States jurisdiction in which there is any interest held by any organization or individual declared to be a Specially Designated Terrorist. Any United States person or entity who possesses any funds in which any interest is held by a Specially Designated Terrorist, must report such interest to the proper United States authorities. Any dealings in those funds after the designation date, or any attempt to avoid acknowledgment of the funds, is unlawful.

7. To implement Executive Order 12947, the United States Department of Treasury, through the Office of Foreign Assets Control, promulgated the Terrorism Sanctions Regulations, which are detailed at Title 31, Code of Federal Regulations, Section 595. Executive Order 12947 and the Terrorism Sanctions Regulations prohibit, among other things: (a) transferring, paying, exporting, withdrawing or otherwise dealing

Superseding Indictment - Page 4

in property or interests in property of a Specially Designated Terrorist that are in the United States, come within the United States, or come within the possession of or control of United States persons; (b) providing funds, goods or services to a Specially Designated Terrorist; (c) any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of the Terrorism Sanctions Regulations; (d) any conspiracy formed for the purpose of engaging in a prohibited transaction. A willful violation of any of these provisions is a criminal offense.

8. On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist by the President in the Annex to Executive Order 12947. On August 29, 1995, former HAMAS Political Bureau Chief and current Deputy Chief Mousa Abu Marzook was designated as a Specially Designated Terrorist. On August 22, 2003, current HAMAS Political Bureau Chief Khalid Mishal was designated as a Specially Designated Global Terrorist pursuant to Executive Order 13224. Executive Order 13224 was issued on September 23, 2001, pursuant to IEEPA, and prohibits transactions with organizations and individuals who, inter alia, commit, threaten to commit, or support certain acts of terrorism.

9. On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (INA), as added by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pursuant to the AEDPA, the

**Superseding Indictment - Page 5**

Secretary of State may designate a group as a Foreign Terrorist Organization if the group is (1) a foreign organization; (2) the organization engages in terrorist activity as defined by the INA; and, (3) the terrorist activity of the group threatens the national security of the United States. The AEDPA, and specifically 18 U.S.C. § 2339B, reflects Congress' recognition of the danger and design of terrorist movements such as HAMAS and, as a result, it is unlawful to provide material support and resources, to include currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of HAMAS.

10. The Muslim Brotherhood (HAMAS' parent organization) has maintained a presence in the United States since at least the early 1980s. During the times relevant to this Indictment, the Muslim Brotherhood in the United States had approximately ten to fifteen working committees, including a Palestinian Committee whose designed purpose was to support HAMAS. The Palestinian Committee had authority over several organizations, each with a specific purpose in its mandate to support HAMAS, such as propaganda, community relations and fundraising.

11. In or around 1988, shortly after the founding of HAMAS, **The Holy Land Foundation For Relief and Development** ("**HLF**") was created by the defendants **Shukri Abu-Baker, Mohammad El-Mezain** and **Ghassan Elashi,** to fulfill the fundraising component of the Palestinian Committee. From 1989 until 1992, the **HLF** was located in California and, until 1991, was known as the Occupied Land Fund

**Superseding Indictment - Page 6**

Case 1:05-cv-04622-DLI-RML  Document 272-7  Filed 03/22/12  Page 264 of 328 PageID #:
Case 3:04-cr-00240-P  Document 9368  Filed 11/12/2008  Page 7 of 40
9868

(hereinafter all references to the Occupied Land Fund will be as the **HLF**). In 1992, the HLF relocated to Richardson, Texas and became incorporated in Texas. The **HLF** represented itself to be a non-profit, tax exempt, charitable organization designed primarily to assist needy individuals in the West Bank and Gaza. In addition to the main office in Richardson, Texas, the **HLF** maintained offices in New Jersey, California, Illinois, Jerusalem, the West Bank and Gaza, and maintained a presence in other locations, such as Lebanon and Jordan.

12. The Islamic Association for Palestine (IAP) was the propaganda organization of the Palestinian Committee. It had offices in several cities throughout the United States, including Dallas and Chicago.

13. The defendant **Shukri Abu Baker** was the President, Secretary and Chief Executive Officer of the **HLF**. The defendant **Shukri Abu Baker**'s brother is Jamal Abu Baker, a.k.a Jamal Issa, the former HAMAS leader in the Sudan and the current HAMAS leader in Yemen.

14. The defendant **Mohammad El-Mezain** was the original Chairman of the Board until in or about 1999, when he became Director of Endowments for the **HLF**. The defendant **Mohammad El-Mezain** is a cousin of HAMAS Deputy Political Chief and Specially Designated Terrorist Mousa Abu Marzook.

15. The defendant **Ghassan Elashi** was the original Treasurer, and became the Chairman of the Board of the **HLF** in 1999. He was also an incorporator of the IAP. The

**Superseding Indictment - Page 7**

defendant **Ghassan Elashi** is related by marriage to HAMAS Deputy Political Bureau
Chief and Specially Designated Terrorist Mousa Abu Marzook.

16.  The defendant **Haitham Maghawri** was the Executive Director of the **HLF**.

17.  The defendant **Akram Mishal** was the Project and Grants Director for the
**HLF**. The defendant **Akram Mishal** is a cousin of HAMAS Political Bureau Chief and
Specially Designated Global Terrorist Khalid Mishal.

18.  The defendant **Mufid Abdulqader** was a top fundraiser for the **HLF**. The
defendant **Mufid Abdulqader** is the half-brother of HAMAS Political Bureau Chief and
Specially Designated Global Terrorist Khalid Mishal.

19.  The defendant **Abdulrahman Odeh** was the New Jersey representative of the
**HLF**.

The HLF's Relationship with HAMAS

20.  During HAMAS' and the **HLF**'s beginnings, and in furtherance of their
designed objective, the **HLF** provided significant financial resources to HAMAS leaders
and key strategists. In April 1988, prior to its incorporation, the **HLF** sent approximately
$100,000 to HAMAS' future Political Bureau Chief Mousa Abu Marzook and his
associates. Additionally, from 1988 through 1989, the **HLF** wire transferred
approximately $670,000 to an account held by the Islamic Center of Gaza, located in
Gaza. The Islamic Center of Gaza was established by HAMAS spiritual leader and
founder Sheik Ahmed Yassin, and was used by him to coordinate and conduct HAMAS

**Superseding Indictment - Page 8**

activities. During the time that the funds were being transferred to the Islamic Center of Gaza from the **HLF**, Sheik Yassin was arrested and convicted in Israeli court for the kidnapping and murder of an Israeli soldier.

21. As previously described, the **HLF** was deeply involved with a network of Muslim Brotherhood organizations dedicated to furthering the radical violent agenda espoused by HAMAS. These organizations served in different capacities, such as propaganda development and distribution, banking, and creating fundraising forums through which the **HLF** raised money. The **HLF** sponsored conventions, seminars, rallies and teleconferences in support of radical Islamic causes, including HAMAS. At these conventions, seminars, rallies and teleconferences, pro-HAMAS sheiks, Muslim Brotherhood members and HAMAS officials from overseas were employed to inflame the audience and enhance fundraising. The HLF paid for the travel to the United States of several of these speakers and HAMAS officials, including current HAMAS leader Mahmoud Zahar and former HAMAS spokesperson Jamil Hammami. At these events, participants, including the defendant **Mufid Abdulqader**, praised HAMAS through speeches, songs and violent dramatic skits depicting the killing of Jewish people.

22. In October 1993, in response to a United States sponsored Middle East peace initiative between the Israeli government and the Palestinian Liberation Organization, known as the Oslo Accords, and other significant events, the principals of the **HLF** met with other members of the United States based Palestinian Committee in Philadelphia,

**Superseding Indictment - Page 9**

Pennsylvania. The purpose of the meeting was to determine their course of action in support of HAMAS' opposition to the peace plan and to decide how to conceal their activities from the scrutiny of the United States Government. As noted in prior paragraphs, HAMAS is opposed to any peaceful solution to the Palestinian territorial conflict, as such a proposition is at odds with HAMAS' goal of annihilating the State of Israel and establishing an Islamic state in all of historic Palestine. During the meeting, the defendants **Shukri Abu Baker, Ghassan Elashi** and **Haitham Maghawri,** and others known and unknown to the Grand Jury, expressed their support for "The Movement," (as previously stated, a term known to refer to HAMAS, whose full name is the Islamic Resistance Movement) and affirmed that the United States should be used as a fundraising platform to further "The Movement's" goals. The attendees acknowledged the need to avoid scrutiny by law enforcement officials in the United States by masquerading their operations under the cloak of charitable exercise. To that end, the attendees discussed the need to conceal their true motives and objectives by giving nominal amounts to other non-Palestinian charities. The defendant **Shukri Abu Baker** reflected this understanding when he stated, "In the past we gave the Islamists $100,000 and we gave the others $5,000." The attendees noted the danger of attracting the terrorist perception, which would undoubtedly compromise their efforts in supporting the violent *jihad.*

Superseding Indictment - Page 10

23. In 1994, a dispute arose between the **HLF** and another HAMAS fundraising entity in the United States. Then HAMAS Political Chief Mousa Abu Marzook resolved the dispute and determined that the **HLF** would be the primary fund-raising organization for HAMAS in the United States.

24. The **HLF** supported HAMAS by subsidizing HAMAS' vital recruitment and reward efforts in the West Bank and Gaza. Although this financial initiative was spread broadly across the Palestinian population in order to promote HAMAS' appeal throughout the entire Palestinian community, those directly involved in furthering HAMAS' agenda were treated more favorably. In 1992, the Government of Israel deported over 400 members of HAMAS and other Islamic terrorist organizations to southern Lebanon in response to a surge in violence by HAMAS militants against Israeli soldiers, police and civilians. The **HLF** provided financial assistance to the deportees, and publically lauded itself for its response to the deportation. Deceased HAMAS leader Sheik Abdel Rantisi was one of the deportees whose family received financial assistance from the **HLF**.

25. In furtherance of HAMAS' goal of garnering the support of the Palestinian people, the **HLF** sponsored orphans and needy families in the West Bank and Gaza. While the program was mantled with a benevolent appearance, the **HLF** specifically sought orphans and families whose relatives had died or were jailed as a result of furthering HAMAS' violent campaign, including suicide bombings. This type of support

**Superseding Indictment - Page 11**

was critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and

to create an infrastructure solidifying HAMAS' presence.

## COUNT ONE

Conspiracy to Provide Material Support to a Foreign Terrorist Organization -
(18 U.S.C. § 2339B(a)(1))

1. Paragraphs one (1) through twenty-five (25) of the Introduction to this
Indictment are hereby re-alleged and incorporated by reference as though fully set forth
herein.

2. Beginning from on or about October 8, 1997, and continuing until the date of
the Indictment, in the Dallas Division of the Northern District of Texas and elsewhere,
the defendants **Holy Land Foundation for Relief and Development (HLF), Shukri
Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram
Mishal, Mufid Abdulqader** and **Abdulrahman Odeh**, and others known and unknown
to the Grand Jury, knowingly conspired to provide material support and resources, as
those terms are defined in Title 18, United States Code, Section 2339A(b), to wit,
currency and monetary instruments, to HAMAS, a designated Foreign Terrorist
Organization, in violation of Title 18, United States Code, Section 2339B(a)(1).

## MANNER AND MEANS OF THE CONSPIRACY

3. The defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan
Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman
Odeh** provided material support and resources to the designated Foreign Terrorist
Organization HAMAS by raising funds in the United States and sending those funds to
organizations and programs in the West Bank and Gaza which operated on behalf of, or

**Superseding Indictment - Page 13**

under the control of, HAMAS.

4. In furtherance of the conspiracy, the defendants **HLF, Shukri Abu Baker,
Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid
Abdulqader** and **Abdulrahman Odeh**, participated in fundraising events at various
forums, including conventions, services at mosques, seminars and other programs. The
**HLF** sponsored speakers at these events whose mission was to raise funds for the **HLF**.
Prior to the designation of HAMAS as a Foreign Terrorist Organization, the speakers
sponsored by the **HLF** often praised the efforts of HAMAS and its violent activities
against Israel, and encouraged financial support for those efforts. After HAMAS'
designation, upon instruction by the **HLF**, the speakers changed tactics by using
inflammatory language which was designed to support HAMAS and its violent activities
without openly mentioning HAMAS. Some of the speakers sponsored by the **HLF**
included founding HAMAS leaders, prominent HAMAS spokesmen and other speakers
belonging to the Muslim Brotherhood. Furthermore, at some of the fund-raising events,
the speakers, including the defendant **Mufid Abdulqader**, performed skits and songs
which advocated the destruction of the State of Israel and glorified the killing of Jewish
people.

5. In furtherance of the conspiracy, the defendants **HLF, Shukri Abu Baker,
Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid
Abdulqader** and **Abdulrahman Odeh** provided financial support to the families of

**Superseding Indictment - Page 14**

HAMAS "martyrs," detainees and activists knowing and intending that such assistance would support HAMAS' terrorist infrastructure. In screening potential aid recipients and in providing funds, the defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** distinguished between needy Palestinian families generally, and those Palestinian families who had a relative "martyred" or jailed as a result of terrorist activities. In some cases, the defendants specifically targeted families for financial aid who were related to known HAMAS terrorists who had been killed or jailed by the Israelis. In this manner, the defendants effectively rewarded past, and encouraged future, suicide bombings and terrorist activities on behalf of HAMAS.

6. In furtherance of the conspiracy, and in order to conceal the existence of the conspiracy, the defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh,** took several steps which were inconsistent with the activities of a legitimate charity. The defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** in following counter-surveillance measures outlined in a manual they possessed entitled "The Foundation's Policies and Procedures," did the following: retained the services of a security company to search the premises of the **HLF** for listening devices; directed the defendant **Haitham Maghawri** to take training on

Superseding Indictment - Page 15

advanced methods in the detection of wiretaps; shredded documents; maintained incriminating documents at off-site locations, including on the premises of Infocom, a related entity of which the defendant **Ghassan Elashi** was an officer and HAMAS leader Mousa Abu Marzook was a major investor; the defendants **Shukri Abu Baker** and **Akram Mishal** traveled overseas while falsely posing as Infocom employees; and in conversations between themselves and others, the defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** often spoke in code in order to conceal the true nature of their conversation.

7. In order to provide the **HLF** with a cloak of legitimacy and to conceal its relationship to HAMAS, the defendant **Shukri Abu Baker** discussed with the defendant **Ghassan Elashi** the need to provide minimal support to legitimate charitable causes. In furtherance of the conspiracy, and in order to conceal the existence of the conspiracy, the defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** carried out this plan, while providing a substantial amount of their financial assistance to organizations and programs, which operated on behalf of, or under the control of, HAMAS, and to families of HAMAS "martyrs" and detainees.

8. In furtherance of the conspiracy, the defendants **HLF, Shukri Abu Baker, Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid**

Superseding Indictment - Page 16

Abdulqader and **Abdulrahman Odeh** maintained information on the arrest and

prosecution of HAMAS activists in Israel, the West Bank and Gaza, including individuals

who were members of the zakat committees to which the **HLF** sent money.

9. In furtherance of the conspiracy, the defendants **HLF, Shukri Abu Baker,**

**Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid**

**Abdulqader** and **Abdulrahman Odeh** wire transferred and caused to be wire transferred

money from the **HLF** bank accounts in the Northern District of Texas, to zakat

committees located in the West Bank and Gaza which were acting on behalf of, or under

the control of, HAMAS.

10. In furtherance of the conspiracy, the defendants **HLF, Shukri Abu Baker,**

**Mohammad El-Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid**

**Abdulqader** and **Abdulrahman Odeh** wire transferred money from the **HLF** bank

accounts in the Northern District of Texas, to the **HLF** offices in the West Bank and Gaza

for further distribution to zakat committees located in the West Bank and Gaza which

were acting on behalf of, or under the control of, HAMAS, as well as for direct payment

to individuals whom the **HLF** supported on behalf of HAMAS, including the family

members of "martyrs" and prisoners.

<u>OVERT ACTS (1) - (8)</u>

11. In furtherance of the conspiracy and to accomplish its purposes, on or about

the dates listed below, the defendants **HLF, Shukri Abu Baker, Mohammad El-**

**Superseding Indictment - Page 17**

Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader

and Abdulrahman Odeh committed the following overt acts by issuing and causing to be

issued wire transfers in the amounts indicated to be sent from the **HLF** bank accounts in

the Northern District of Texas to the following organizations, which operated on behalf

of, or under the control of, HAMAS:

| Overt Act | Date | Amount | Organization |
|-----------|------|--------|--------------|
| (1) | 11/7/97 | $9,691 | Qalqilia Zakat Committee |
| (2) | 1/26/98 | $95,000 | Islamic Charity Society of Hebron |
| (3) | 3/27/98 | $7,218 | Tolkarem Zakat Committee |
| (4) | 3/27/98 | $11,773 | Nablus Zakat Committee |
| (5) | 1/12/99 | $50,000 | Islamic Charity Society of Hebron |
| (6) | 7/8/99 | $5,306 | Tolkarem Zakat Committee |
| (7) | 4/11/00 | $12,604 | Ramallah Zakat Committee |
| (8) | 6/14/01 | $40,586 | Jenin Zakat Committee |

## OVERT ACTS (9) - (14)

12. In furtherance of the conspiracy and to accomplish its purposes, on or about

the dates listed below, the defendants **HLF, Shukri Abu Baker, Mohammad El-**

**Mezain, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader**

and **Abdulrahman Odeh** committed the following overt acts by issuing and causing to be

issued wire transfers in the amounts indicated to be sent from the **HLF** bank accounts in

**Superseding Indictment - Page 18**

the Northern District of Texas to the **HLF** offices in the West Bank and Gaza, which were then further distributed to zakat committees and to family members of individuals who were either "martyred" or jailed for terrorist related activities:

| Overt Act | Date | Amount |
|-----------|----------|-----------|
| (9) | 11/24/98 | $47,376 |
| (10) | 12/21/99 | $117,506 |
| (11) | 11/20/00 | $200,000 |
| (12) | 12/7/00 | $220,660 |
| (13) | 3/8/01 | $374,755 |
| (14) | 6/11/01 | $192,403 |

In violation of Title 18, United States Code, Section 2339B(a)(1).

**Superseding Indictment - Page 19**      -19-



## COUNTS TWO THROUGH TEN

Providing Material Support to a Foreign Terrorist Organization -
(18 U.S.C. § 2339B(a)(1))

    1.  Paragraphs one (1) through twenty-five (25) of the Introduction to this Indictment and paragraphs three (3) through ten (10) of Count One are hereby re-alleged and incorporated by reference as though fully set forth herein.

    2.  On or about the dates set forth below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri** and **Akram Mishal** aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly provide and attempt to provide material support and resources, as those terms are defined in Title 18, United States Code, Section 2339A(b), to wit, currency and monetary instruments, to HAMAS, a designated Foreign Terrorist Organization, by issuing and causing to be issued wire transfers in the amounts indicated, from the defendant **HLF** bank accounts in the Northern District of Texas, to the following organizations, which operated on behalf of, or under the control of, HAMAS:

| Count | Date | Amount | Organization |
|---|---|---|---|
| 2 | 8/18/98 | $11,962 | Ramallah Zakat Committee |
| 3 | 8/21/98 | $24,211 | Islamic Charity Society of Hebron |
| 4 | 12/31/98 | $8,389 | Jenin Zakat Committee |
| 5 | 5/21/99 | $12,115 | Ramallah Zakat Committee |

**Superseding Indictment - Page 20**

| 6 | 10/13/99 | $25,000 | Islamic Charity Society of Hebron |
| 7 | 12/10/99 | $10,152 | Jenin Zakat Committee |
| 8 | 4/11/00 | $10,711 | Nablus Zakat Committee |
| 9 | 4/11/00 | $7,417 | Qalqilia Zakat Committee |
| 10 | 1/17/01 | $16,674 | Nablus Zakat Committee |

In violation of Title 18, United States Code, Sections 2339B(a)(1) and 2.

## COUNT ELEVEN

Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist -
(50 U.S.C. §§ 1701-1706)

1. Paragraphs one (1) through twenty-five (25) of the Introduction to this
Indictment and three (3) through ten (10) of Count One are hereby re-alleged and
incorporated by reference as though fully set forth herein.

2. Beginning from on or about January 25, 1995, and continuing until the date of
the Indictment, in the Dallas Division of the Northern District of Texas and elsewhere,
the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri,
Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh,** and others known and
unknown to the Grand Jury, knowingly and willfully conspired, confederated and agreed
to violate Executive Order 12947, by contributing funds, goods and services to, and for
the benefit of, a Specially Designated Terrorist, namely HAMAS, in violation of Title 50,
United States Code, Sections 1701 through 1706, and Title 31, Code of Federal
Regulations, Section 595.201 *et. seq*.

## MANNER AND MEANS OF THE CONSPIRACY

3. In furtherance of the conspiracy, on or about January 25, 1995, and continuing
until the date of this Indictment, the defendants **HLF, Shukri Abu Baker, Ghassan
Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman
Odeh** made regular monetary payments to zakat committees and individuals located in
the West Bank and Gaza who were acting on behalf of, or under the control of, a

**Superseding Indictment - Page 22**

 Specially Designated Terrorist, namely HAMAS.

## OVERT ACTS

4. In furtherance of the conspiracy, and in order to accomplish its purposes, on or about the dates listed below, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** committed the following overt acts by contributing funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, to wit, by issuing and causing to be issued wire transfers in the amounts indicated from the **HLF** bank accounts in the Northern District of Texas, to the following organizations, which operated on behalf of, or under the control of, HAMAS:

| Overt Act | Date | Amount | Organization |
|-----------|----------|-----------|-----------------------------------|
| (1) | 4/3/95 | $30,000 | Islamic Charity Society of Hebron |
| (2) | 4/22/96 | $9,758 | Islamic Science & Culture Com. |
| (3) | 11/20/96 | $8,434 | Islamic Charity Society of Hebron |
| (4) | 8/5/97 | $34,563 | Ramallah Zakat Committee |
| (5) | 11/7/97 | $10,690 | Nablus Zakat Committee |
| (6) | 3/27/98 | $12,179 | Qalqilia Zakat Committee |
| (7) | 4/3/98 | $24,173 | Jenin Zakat Committee |
| (8) | 6/26/98 | $75,000 | Islamic Charity Society of Hebron |
| (9) | 1/20/99 | $10,100 | Ramallah Zakat Committee |

**Superseding Indictment - Page 23**

| (10) | 2/16/99 | $20,000 | Islamic Charity Society of Hebron |
| (11) | 3/3/99 | $38,385 | Islamic Charity Society of Hebron |
| (12) | 12/14/99 | $17,996 | Ramallah Zakat Committee |
| (13) | 6/3/99 | $8,406 | Jenin Zakat Committee |
| (14) | 1/17/01 | $11,450 | Tolkarem Zakat Committee |

In violation of Title 50, United States Code, Sections 1701 through 1706 and Title 31, Code of Federal Regulations, Section 595.201 *et. seq.*

## COUNTS TWELVE THROUGH TWENTY-ONE

Providing Funds, Goods and Services to a Specially Designated Terrorist -
(50 U.S.C. §§ 1701-1706)

1. Paragraphs one (1) through twenty-five (25) of the Introduction to this Indictment; paragraphs three (3) through ten (10) of Count One; and paragraph three (3) of Count Eleven are hereby re-alleged and incorporated by reference as though fully set forth herein.

2. On or about the dates listed below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri and Akram Mishal,** aided and abetted by each other and others known and unknown to the Grand Jury, willfully contributed funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, by issuing and causing to be issued wire transfers in the amounts indicated, from the **HLF** bank accounts in the Northern District of Texas, to the following organizations, which operated on behalf of, or under the control of, HAMAS:

| Count | Date | Amount | Organization |
|-------|------|--------|--------------|
| 12 | 10/20/98 | $12,342 | Ramallah Zakat Committee |
| 13 | 12/31/98 | $50,000 | Islamic Charity Society of Hebron |
| 14 | 12/31/98 | $11,138 | Nablus Zakat Committee |
| 15 | 6/3/99 | $8,408 | Jenin Zakat Committee |
| 16 | 9/23/99 | $12,308 | Ramallah Zakat Committee |

**Superseding Indictment - Page 25**

| 17 | 9/23/99 | $36,066 | Islamic Charity Society of Hebron |
| 18 | 12/13/99 | $8,049 | Tolkarem Zakat Committee |
| 19 | 12/14/99 | $12,570 | Nablus Zakat Committee |
| 20 | 1/17/01 | $10,494 | Qalqilia Zakat Committee |
| 21 | 6/11/01 | $6,225 | Qalqilia Zakat Committee |

In violation of Title 50, United States Code, Sections 1701 through 1706; Title 31, Code of Federal Regulations, Section 595.201 et. seq.; and Title 18, United States Code, Section 2.

**Superseding Indictment - Page 26**



## COUNT TWENTY-TWO

Conspiracy to Commit Money Laundering -
(18 U.S.C. § 1956(h))

1. The allegations of paragraphs one (1) through twenty-five (25) of the Introduction to this Indictment; paragraphs three (3) through ten (10) of Count One; and paragraph three (3) of Count Eleven are hereby re-alleged and incorporated by reference as though fully set forth herein.

2. Beginning from on or about January 25, 1995, and continuing until the date of the Indictment, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** and others known and unknown to the Grand Jury, in offenses involving interstate and foreign commerce, transmitted and transferred, and attempted to transmit and transfer, funds from a place within the United States, namely the Northern District of Texas, to places outside the United States, including the West Bank and Gaza, with the intent to promote the carrying on of a specified unlawful activity, to wit, by contributing funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, in violation of Title 50, United States Code, Sections 1701 through 1706 (IEEPA), and punishable under Section 206 of IEEPA (also known as Title 50, United States Code, Section 1705(b)).

3. In furtherance of the conspiracy, between January 25, 1995, through December 4, 2001, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham**

**Superseding Indictment - Page 27**

Maghawri, **Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** transmitted and caused to be transmitted and transferred at least $12,400,000 to various organizations and programs, which operated on behalf of, or under the control of, HAMAS.

## OVERT ACTS

4. In furtherance of the conspiracy, and in order to accomplish its purposes, on or about the dates listed below, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** committed the following overt acts by contributing funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, by issuing and causing to be issued wire transfers in the amounts indicated from the **HLF** bank accounts in the Northern District of Texas, to the following organizations located within the West Bank and Gaza, which operated on behalf of, or under the control of, HAMAS:

| Overt Act | Date | Amount | Organization |
|-----------|------|--------|--------------|
| (1) | 4/3/95 | $30,000 | Islamic Charity Society of Hebron |
| (2) | 4/22/96 | $9,758 | Islamic Science & Culture Com. |
| (3) | 11/20/96 | $8,434 | Islamic Charity Society of Hebron |
| (4) | 8/5/97 | $34,563 | Ramallah Zakat Committee |
| (5) | 11/7/97 | $10,690 | Nablus Zakat Committee |
| (6) | 3/27/98 | $12,179 | Qalqilia Zakat Committee |
| (7) | 4/3/98 | $24,173 | Jenin Zakat Committee |

**Superseding Indictment - Page 28**

| (8) | 6/26/98 | $75,000 | Islamic Charity Society of Hebron |
| (9) | 1/20/99 | $10,100 | Ramallah Zakat Committee |
| (10) | 3/3/99 | $38,385 | Islamic Charity Society of Hebron |
| (11) | 12/14/99 | $17,996 | Ramallah Zakat Committee |
| (12) | 4/11/00 | $8,409 | Jenin Zakat Committee |
| (13) | 1/17/01 | $11,450 | Tolkarem Zakat Committee |

In violation of Title 18, United States Code, Section1956(h).



## COUNTS TWENTY-THREE THROUGH THIRTY-TWO

Money Laundering -
(18 U.S.C. § 1956(a)(2)(A))

1. The allegations of paragraphs one (1) through twenty-five (25) of the Introduction to this Indictment; paragraphs three (3) through ten (10) of Count One; and paragraph three (3) of Count Eleven are hereby re-alleged and incorporated by reference as though fully set forth herein.

2. On or about each of the dates set forth below, for each count below, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri** and **Akram Mishal,** aided and abetted by each other and others known and unknown to the Grand Jury, in offenses involving interstate and foreign commerce, transmitted and transferred, and attempted to transmit and transfer, funds in the amounts indicated, from a place within the United States, namely the Northern District of Texas, to places outside the United States, including the West Bank and Gaza, with the intent to promote the carrying on of a specified unlawful activity, to wit, by willfully contributing funds, goods and services to, or for the benefit of, a Specially Designated Terrorist, namely HAMAS, in violation of Title 50, United States Code, Sections 1701 through 1706 (IEEPA), and punishable under Section 206 of IEEPA (also known as Title 50, United States Code, Section 1705(b)):

Superseding Indictment - Page 30

| Count | Date | Amount | Organization |
|-------|------|--------|--------------|
| 23 | 10/20/98 | $12,342 | Ramallah Zakat Committee |
| 24 | 12/31/98 | $50,000 | Islamic Charity Society of Hebron |
| 25 | 12/31/98 | $11,138 | Nablus Zakat Committee |
| 26 | 6/3/99 | $8,408 | Jenin Zakat Committee |
| 27 | 9/23/99 | $12,308 | Ramallah Zakat Committee |
| 28 | 9/23/99 | $36,066 | Islamic Charity Society of Hebron |
| 29 | 12/13/99 | $8,049 | Tolkarem Zakat Committee |
| 30 | 12/14/99 | $12,570 | Nablus Zakat Committee |
| 31 | 1/17/01 | $10,494 | Qalqilia Zakat Committee |
| 32 | 6/11/01 | $6,225 | Qalqilia Zakat Committee |

In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.



## COUNT THIRTY-THREE

Conspiracy to Impede and Impair the Internal Revenue Service and
to File False Return of Organization Exempt from Income Tax -
(18 U.S.C. § 371)

1. The allegations of paragraphs one (1) through twenty-five (25) of the
Introduction to this Indictment; paragraphs three (3) through ten (10) of Count One; and
paragraph three (3) of Count Eleven are hereby re-alleged and incorporated by reference
as though fully set forth herein.

2. Section 501(c)(3) of the Internal Revenue Code grants authorized charitable
organizations tax exempt status, which exempts them from having to pay any income tax
on the donations they receive. The organizations are required to file an annual
informational return, Form 990, entitled "Return of Organization Exempt from Income
Tax," with the Internal Revenue Service. In that form, the organization must report the
amount of their donations and how those donations are distributed. The return is signed
under the penalty of perjury.

3. In September 1989, the defendant **Ghassan Elashi** filed an application with the
Internal Revenue Service to obtain tax exempt status for the **HLF** pursuant to Section
501(c)(3) of the Internal Revenue Code. Tax exempt status was conferred on the **HLF** in
January 1990.

4. In or around and between January 1990 and continuing until the date of the
Indictment, in the Dallas Division of the Northern District of Texas and elsewhere, the
defendants **Shukri Abu Baker** and **Ghassan Elashi**, and others known and unknown to
the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree
together with themselves and others

> a. to defraud the United States of America and the Internal Revenue Service
>
> ("IRS"), an agency thereof, by impeding, impairing, defeating and obstructing the
>
> lawful governmental functions of the IRS in the ascertainment, evaluation,
>
> assessment and collection of corporate income taxes, in violation of Title 18,
>
> United States Code, Section 371; and
>
> b. to willfully make and subscribe, and aid and assist in the preparation and
>
> presentation of, United States Returns of Organization Exempt from Income Tax,
>
> Form 990, which were verified by written declarations that they were made under
>
> the penalties of perjury and were filed with the IRS, which returns they did not
>
> believe to be true and correct as to every material matter in that the returns
>
> reported payments to Program Services when in fact the payments were going to
>
> HAMAS, in violation of Title 26, United States Code, Section 7206(1).

## MANNERS AND MEANS OF THE CONSPIRACY

5. In furtherance of the conspiracy, between 1992 and 2001, the HLF received
over $57,000,000 in contributions, gifts and grants.

**Superseding Indictment - Page 33**

6. In furtherance of the conspiracy, between 1992 and 2001, the defendants **Shukri Abu Baker** and **Ghassan Elashi** reported approximately $36,230,891 on Line 13 of the HLF's "Returns of Organization Exempt from Income Tax"(Form 990), as payments to Program Services, which the HLF ostensibly distributed as grants to various legitimate projects, including assistance to non-profit medical/dental clinics, orphanages, schools, refugee camps and community centers overseas, when in fact the donations were distributed to individuals and programs associated with, and organizations operating on behalf of, or under the control of, HAMAS, a terrorist organization.

OVERT ACTS

7. In furtherance of the conspiracy, and in order to accomplish its purposes, on or about the dates listed below, the defendants **Shukri Abu Baker** and **Ghassan Elashi** committed the following overt acts by signing and filing the following false Returns of Organization Exempt from Income Tax, Form 990, with the Internal Revenue Service:

| Overt Act | Year | Date Filed |
|-----------|------|------------|
| (1) | 1995 | 8/19/96 |
| (2) | 1996 | 8/18/97 |
| (3) | 1997 | 4/13/98 |
| (4) | 1998 | 3/11/99 |

**Superseding Indictment - Page 34**



(5)        1999        5/8/00

(6)        2000        8/7/01

In violation of Title 18, United States Code, Section 371.

**Superseding Indictment - Page 35**



## COUNTS THIRTY-FOUR THROUGH THIRTY-SIX

Filing False Returns of Organization Exempt from Income Tax -
(26 U.S.C. § 7206(1))

1. The allegations of paragraphs one (1) through twenty-five (25) of the
Introduction to this Indictment; paragraphs three (3) through ten (10) of Count One;
paragraph three (3) of Count Eleven; and paragraphs two (2), three (3), five (5) and six
(6) of Count Thirty-Three are hereby re-alleged and incorporated by reference as though
fully set forth herein.

2. On or about the dates specified below, in the Dallas Division of the Northern
District of Texas and elsewhere, the defendants as listed below, did knowingly and
willfully make and subscribe United States Returns of Organizations Exempt from
Income Tax, Form 990, for the **HLF**, for the years listed below, which were verified by
written declarations that they were made under the penalties of perjury and were filed
with the Internal Revenue Service, which informational tax returns each defendant did not
believe to be true and correct as to every material matter in that the returns reported
payments to Program Services on Line 13 of said returns, whereas each defendant then
and there well knew and believed the payments were not used for program services as
required by their 501(c)(3) status:

| Count | Year | Date filed | Defendant |
|-------|------|-----------|-----------|
| 34 | 1998 | 3/11/99 | **Shukri Abu Baker** |
| 35 | 1999 | 5/8/00 | **Ghassan Elashi** |

**Superseding Indictment - Page 36**



36          2000          8/7/01          **Ghassan Elashi**

In violation of Title 26, United States Code, Section 7206(1).

## FORFEITURE

As a result of committing one or more of the money laundering or monetary

transaction offenses in violation of Title 18, United States Code, Section 1956, alleged in

Counts Twenty-Two through Thirty-Two of this Indictment, the defendants, as listed

below, shall forfeit to the United States of America, all property, real and personal,

involved in the money laundering or monetary transaction offenses, and all property

traceable to such property, including but not limited to the following:

Defendants **HLF, Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri,**

**Akram Mishal, Mufid Abdulqader** and **Abdulrahman Odeh** shall forfeit at least

$12,400,000 in United States currency. That sum represents a portion of the sum of

monies sent from a place within the United States, namely the Northern District of Texas,

to places outside the United States, including the West Bank and Gaza and other places,

as well as monies that were destined for places outside the United States, with the intent

to promote the carrying on of a specified unlawful activity, to wit, willfully contributing

funds, goods and services to, or for the benefit of, a Specially Designated Terrorist,

namely HAMAS, as set forth in Counts Eleven though Twenty-One, for which the

defendants are jointly and severally liable.

By virtue of the commission of one or more of the felony offenses charged in

Counts Twenty-Two through Thirty-Two of this Indictment by the defendants **HLF,**

**Shukri Abu Baker, Ghassan Elashi, Haitham Maghawri, Akram Mishal, Mufid**

**Superseding Indictment - Page 38**

**Abdulqader** and **Abdulrahman Odeh,** any and all interests which the defendants have in the above described sums are vested in the United States and are hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

In the event that any property, real or personal, involved in the offenses and described in Counts Twenty-Six through Thirty-Eight of this Indictment, or any property traceable to such property, as a result of any act or omission of the defendants:

(1)     cannot be located upon exercise of due diligence;

(2)     has been transferred or sold to, or deposited with a third party;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been co-mingled with other property which cannot be divided without difficulty;

**Superseding Indictment - Page 39**

it is the intent of the United States, pursuant to Title 18, United States Code, Section

982(b)(1) to seek forfeiture of any other property of said defendants up to the value of the

above property.

_Sharon Chariton_

FOREPERSON

RICHARD B. ROPER
United States Attorney

_James T. Jacks_

JAMES T. JACKS
First Assistant United States Attorney
1100 Commerce St., Third Floor
Dallas, Texas 75242
214.659.8600
214.767.2846 (Facsimile)
Texas State Bar No. 10449500

NATHAN F. GARRETT
Special Assistant United States Attorney
1100 Commerce St., Third Floor
Dallas, Texas 75242
214.659.8600
214.767.2846 (Facsimile)
Missouri State Bar No. 46500

_Barry Jonas_

BARRY JONAS
Trial Attorney
Department of Justice,
Counter-terrorism Section
950 Pennsylvania Ave.
Washington, D.C. 20530
214.659.8600
214.767.2846 (Facsimile)
New York State Bar No. 2307734

ELIZABETH J. SHAPIRO
Trial Attorney
Department of Justice
20 Massachusetts Ave.
Washington, D.C. 20530
214.659.8600
214.767.2846 (Facsimile)
Washington, DC Bar. No. 418925

Superseding Indictment - Page 40

**EXHIBIT 162 to Declaration of Joel Israel**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STANLEY BOIM, Individually and as Administrator of    )
the Estate of David Boim, Deceased, and JOYCE BOIM,    )
                                      )
              Plaintiffs,    )
                                        )    Civil No. 00 C 2905
v.    )
                                        )    Magistrate Judge Arlander Keys
QURANIC LITERACY INSTITUTE, *et al.*,    )
                                        )
              Defendants.    )

## EXPERT REPORT OF REUVEN PAZ

I.    SCOPE OF ENGAGEMENT

      I have been asked by counsel for plaintiffs to provide certain opinions with respect to the

financing of The Islamic Resistance Movement -- Hamas -- through front organizations and

institutions. It is my understanding that the *Boim* case is brought under 18 USC §2333 which

provides civil remedies for United States nationals who are injured "by reason of an act of

international terrorism. . . ." I also understand that the Court has interpreted this statutory

provision to include those organizations and individuals who "aid and abet" acts of terrorism by

knowingly providing financial assistance to those groups that carry out acts of terrorism.

      Specifically, plaintiffs have asked me to:

      1.    Explain the history of Hamas, whether Hamas is engaged in international

terrorism, how Hamas finances its terrorist operations, and the history of the Hamas terrorist

wing as part of Hamas generally;

      2.    Evaluate whether the "charitable" elements of Hamas are separate from its

terrorist activities;

3.    Examine a variety of publications and statements of the defendants and their principal activists and others to determine whether they reflect notice to the defendants of Hamas involvement in terror operations;

4.    Determine whether the actions of defendants the Holy Land Foundation for Relief and Development ("HLF") and Islamic Association for Palestine (including its various affiliates, collectively referred to herein as "IAP") provided support to organizations and individuals who were connected to Hamas;

5.    Explain what role the defendant organizations have played in support of Hamas and its goals;

6.    Determine whether Hamas, Amjad Hinawi and Khalil Ibrahim Tawfiq Al-Sharif were responsible for the murder of David Boim; and

7.    Translate, or confirm translations of, various documents, video tapes and video tape segments from Arabic to English.

II.    SUMMARY OF OPINIONS

As a result of my examination of exhibits in this case and based upon my knowledge of the history and organization of Hamas and other extreme Islamic organizations developed through my years of research and analysis, it is my opinion that:

1.    Hamas was founded in Gaza in December 1987 as an extension of the Muslim Brotherhood, an extreme Islamic organization. Hamas was established as a comprehensive movement embracing social, political, welfare, educational, religious and cultural elements. Upon its founding, Hamas established the Izz Al-Din Al-Qassam Brigades, a terrorist wing. Hamas has been engaged in terrorism from its very inception in 1988. In August 1988, Hamas published its "Charter." The Charter takes an uncompromising position against any form of

2

reconciliation between Israel and the Palestinians. It seeks the restoration to Islamic control of all lands that have ever been held by Muslims. The Hamas Charter calls for the murder of Jews in Israel and the West Bank and Gaza (the "Territories") and repeats many of the anti-Semitic canards expressed in Europe over the past centuries.

2.     Hamas finances its operations from a number of sources including fund raising by organizations based in the United States, including HLF and IAP. Hamas supports its terrorist wing with funds received by its social welfare organization. Hamas makes no distinction, politically, ideologically or financially, between its social and terrorist elements. The social and terrorist wings of Hamas are elements of a single movement.

3.     The publications and statements of defendants IAP, (including its related organizations including the American Muslim Society and American Middle Eastern League for Palestine), and HLF, and others demonstrate that the defendants had notice of Hamas' terrorist activities. In fact, Hamas has always publicized and taken pride in its terrorist activities.

4.     The actions of IAP and HLF provided support for Hamas and its Jihadist ideology that promotes terrorism.

5.     HLF has provided direct support to Hamas affiliated institutions and organizations in Israel and the Territories. IAP has acted with HLF in providing that direct support. HLF and IAP have participated in meetings with members of Hamas to defeat the Oslo Accords and promote the Hamas agenda of terrorism by supporting organizations in Gaza, the West Bank, and elsewhere in the Middle East that are controlled by Hamas. HLF provided direct support to the Hamas terrorists who were expelled by Israel to Lebanon in December 1992.

6.     Hamas was responsible for David Boim's murder. The individuals who conducted the terrorist operation that resulted in David Boim's murder, Amjad Hinawi and

3

Khalil Ibrahim Tawfiq Al-Sharif were members of Hamas at the time that they perpetrated David's murder. Hamas has accepted responsibility for the murder of David Boim.

      7.      I have attached as Exhibits true and correct translations of relevant documents.

## III.   BACKGROUND

As noted in detail in my *curriculum vitae*, which is attached hereto as Exhibit U, I have particular expertise that allows me to render these opinions. I am an expert on Terrorism and Counter-Terrorism, Islamic movements in the Arab and Islamic world, Palestinian Islamic groups and Palestinian society and politics. I have researched these issues during the past 25 years, both in official and academic fields in Israel. In recent years, I took part in several international academic conferences on various issues related to Islamic and Islamist activity, fund-raising, and terrorism.

From 1971-94, I served in the Israeli security community, culminating as Director of the Research Division of the Israel General Security Service ("Shin Bet"), one of Israel's most significant intelligence agencies, equivalent to the Federal Bureau of Investigation. In this capacity, I was responsible for gathering and analyzing intelligence about terrorist organizations, including Hamas, its operations, leaders and structure for the Israeli government. I have also performed extensive research of Hamas through publicly available sources, such as Hamas communiqués, publications, websites and interviews. During my period of service in the intelligence community, I was the first person to analyze and translate the Hamas Charter when it was published in August 1988.

From 1989-98 I was a lecturer in the department of Middle Eastern Studies at Haifa University. From 1997 to date I have been affiliated with the International Policy Institute for Counter-Terrorism ("ICT") in the Interdisciplinary Center, Herzliya, Israel, serving as academic

director (1997-2000) and Senior Research Fellow (2001-03). Currently, I am Founder and Director of the Project for the Research of Islamist Movements (PRISM) at the Global Research in International Affairs (GLORIA) Center of the Interdisciplinary Center in Herzliya. In each of these capacities, I have and continue to closely monitor publications and various writings, including web sites, of Islamic organizations, including Hamas.

At the present time I have also been acting as a consultant to the United States Department of Justice and the Federal Bureau of Investigation on terrorism issues. I have testified on behalf of the United States government as an expert on Hamas and Islamist movements, most recently in the *Sami Al-Hussayen* case pending in federal district court in Idaho.

I am fluent in spoken and written Arabic and understand the cultural nuances that are often expressed in Islamic speech and writings.

## IV.    MY INVESTIGATION

In order to prepare myself to reach my opinions, I examined the following materials:

1.    The First Amended Complaint in *Boim v. Quranic Literacy Institute, et. al*

2.    The Watson Report and portions of the Administrative Record

3.    HLF's Responses to Requests for Admission

4.    Relevant portions of the following deposition transcripts:

> ### *Deponent*
> Shukri Abu Baker - 30(b)(6)
> Omar Ahmad
> Nihad Awad
> Muhammad El Mezzain
> Rafeeq Jaber (04/09/03)
> Rafeeq Jaber (08/06/03)

5.     Exhibits introduced during depositions:

    a.     Omar Ahmad Deposition Exhibit Nos. 7, 8, 10, 11 and 12

    b.     Shukri Abu-Baker Deposition Exhibit Nos. 13, 15, 16, 18, 20, 22, 23, 24, 28 and 30

    c.     Bassman Elashi Deposition Exhibit No. 31

    d.     Mohammad Salah Deposition Exhibit No. 4, 5 and 18

    e.     Rafeeq Jaber Deposition Exhibit Nos. 20, 21, 22, 24, 25, 26, 32, 33, 34, 35, 52, 54, 56, 57 and 58

6.     Video Tapes:

    a.     New Jersey, IAP 1993 (BO 002666)

    b.     IAP Convention 1992 (BO 002667)

    c.     IAP Conference (BO 002668)

    d.     IAP Palestine . . . Come to Jihad (BO 002669)

    e.     Jihad in America (BO 002670)

    f.     Nihad Awad Intro, Barry University 3/22/94 (BO 002671)

    g.     Nihad Awad, Barry University, Florida, March 22, 1994 (BO 002672)

    h.     The Camp of Returnees (Deportees) (BO 002673) Aqsa Vision

    i.     60 Minutes, "Terrorist Hunter," 05/04/03 (BO 002674)

    j.     1994 HLF (BO 002675) Zakat Ramallah

    k.     Speech by a Veiled Terrorist of Hamas, IAP Conference Kansas City, Missouri, December 27-30, 1989 (BO 002676)

    l.     Joint Maya – IAP Conference 1988 (BO 002677)

m.   Hamas Training & Recruitment, Izz Al-Din Al-Qassam Brigades, Gaza, Palestine, September 1992 (BO 002678)

n.   1989 Convention IAP Kansas City, MO Second Version (BO 002679)

7.   Transcript of Nihad Awad at Barry University

8.   Affidavit of Shukri Abu Baker

9.   Affidavit of Rashid Khalidi

10.   Interview with Khaled Mishal in Al-Hayat (Arabic) and English translation of the interview

11.   Muhammad Salah indictment and conviction

12.   Hamas Charter (Arabic) (1988). English translation available at http://www.palestinecenter.org/cpap/documents/charter.html.

13.   Statement by Hamas from Yemen website of Hamas affiliated organizations (http://www.aqsaorg.com/profile/cmt.php).

14.   State Department Report on Hinawi Trial (March 3, 1998).

15.   Official Sentencing of Hinawi (Palestinian Authority Security Court), (Arabic original with Hebrew and English translations).

16.   Palestinian Authority Publication Identifying Martyrs, http://www.pnic.gov.ps/arabic/quds/arabic/viol/quds_viol33.html .

17.   Islamic block of Hamas at Al-Najah University, Nablus Tribute to Al-Sharif http://www.khayma.com/Islamic_block/index/j5.htm (as of January 21, 2004).

18.   Israel Ministry of Foreign Affairs Request for Handover of Suspects (September 22, 1997) http://www.israel.org/mfa/go.asp?MFAH0bx50.

7

19.     Israel Foreign Affairs Background Paper Seeking Extradition of Suspects Wanted by Israel for Terrorism and Other Crimes (October 22, 1998) http://www.israel-mfa.gov.il/mfa/go.asp?MFAH07o00.

20.     Hamas Tribute to Mahmoud Abu Hanoud, http://www.palestine-info.info/arabic/hamas/shuhda/abohanod/life.htm.

21.     "Record of Honor" to Mahmoud Abu Hanoud, http://www.alwelayah.net/shuhda/sierah/polistain/14.htm

22.     Website of the Izz al-Din al-Qassam Brigades, http://www.ezzedeen.net/english/hamas.htm (as of May 4, 2004).

23.     "Who was Abdullah Azzam?" in Abdullah Azzam, *Join the Caravan,* Azzam Publications, 2001.

24.     "Women may be suicide bombers, Muslim scholar rules," Jerusalem Post, 5/25/03.

25.     December 1988/January 1989 *Ila Filistin.*

26.     Anonymous (Rita Katz), "Terrorist Hunter," (2003).

27.     Muhammad and Azita Salah bank statements for 12/92-2/93 and wire transfer receipts.

28.     In the Matter of the Extradition of Marzook, 924 F. Supp. 565, 592 (S.D.N.Y. 1996).

29.     Arabic document, Bates No. BO 5180.

30.     Report of May 13, 1996 Terrorist Attack and Murder compiled by Israel Police, Benjamin Region.

31.     "3rd Ben Yeyuda Bomber Identified," Jerusalem Post, October 30, 1997.

32.    Materials detailed in Section V(E) below.

## V.    DETAILED OPINIONS

### A.    Hamas and Its Supporters.

The Islamic Resistance Movement -- "Hamas" -- is an extension of the Palestinian Muslim Brotherhood and was established on December 14th 1987, following the events of the popular uprising in the Territories in Gaza and later on in the West Bank.  (December 15, 2003 Khaled Mishal interview (Part 2 of 7))  Upon its formation, Hamas created a terrorist wing of the movement, which has operated alongside its traditional activities in the social, political, welfare, educational, religious, and cultural fields.  Hamas combined these various activities into a single financial system.

Based upon my years of researching Hamas and its operations, I have determined that, during the first intifada, which began in December 1987, there were two important developments regarding Hamas' financing of its operations:

1.    Beginning in the early 1980s, the movement established many front organizations, research institutes, newspapers, and cultural associations in various countries in Europe and the United States, in order to recruit political support, raise funds and launder money.  Among them was IAP.

2.    Following the PLO and the Palestinian national leadership's support for Iraq in the Gulf war in 1990-91, Saudi Arabia and the Gulf Emirates stopped their large scale financial support for the PLO and its supporters in the Palestinian Territories, and started transferring the money to the Palestinian Islamic groups and social organizations and projects run by these Islamic groups, principally Hamas, the largest of them.   This financing was done mainly through front organizations and institutions in Europe and the United States.

These developments, in addition to a change in the policy of the PLO and Palestinian national groups to stop the terrorist fight against Israel and turn to a political struggle and negotiations, put Hamas in the position of being the main Palestinian terrorist element against the Israeli rule in the Territories and against Israeli civilians.  These developments also increased the

9

importance of the pro-Hamas infrastructure of institutions in Europe and the United States in the political and financial support for the Islamic movement.

From my years of research, I can confirm that Hamas, as part of the ideological school of the Muslim Brotherhood, treats the combination of various fields of activity, including terrorism, as part of one struggle of Jihad and a religious duty. Hamas' combination of social and cultural activity with its terrorist activities has been an integral part of Hamas policy, particularly since Hamas became the principal Palestinian opposition group to the PLO, and later to the newly established Palestinian Authority. Thus, providing funds and support to Hamas-related Islamic organizations and institutions provides support to Hamas terrorist activities.

Islamic movements in the Middle East, including Hamas, developed in the past decade an approach that gave a growing importance to the support of the Muslim communities, mainly in Europe and North America, as a kind of backbone to the Middle Eastern groups. This approach was in accord with the policy and theories of the globalization of the Islamic struggle. Hamas attempted to establish Islamic institutions in Western countries, including those mentioned in the *Boim* litigation, in order to use them for the recruitment of support of various kinds, including large-scale fund-raising and money-laundering. The financial support was generally supplied through the transfer of money to the social infrastructure of Hamas in the Palestinian territories without any supervision by the donors as to how the financial support was used. Based on the knowledge I have developed from my years of research, I have determined that part of the money raised or laundered through these organizations, including the defendants, was diverted to the logistics of the terrorist activity of the military wing of Hamas -- the Brigades of Izz al-Din al-Qassam -- who were responsible for the murder of the late David Boim. (*See* discussion at V. D. below).

The "Brigades of Izz al-Din al-Qassam" were formed at the beginning of 1988 and became engaged immediately in well-publicized terrorist activities. (*See, e.g.*, Mishal interview (Part 2 of 7); Exhibit B hereto)  The Izz al-Din al-Qassam Brigades were modeled after similar terrorist groups that were always part of the Muslim Brotherhood.  As one who carefully follows the pronouncements of Hamas leaders, I have never heard the claim from them that the military wing of Hamas is independent from or separate from the rest of Hamas.  Indeed, even today, Hamas and the Izz al-Din al-Qassam Brigades make it clear that they are a single organization. On its current website, Izz al-Din al-Qassam states:

> Hamas Islamic Resistance Movement helps in establishing many institutions such as mosques, clinics, hospitals, schools, and social programs, however, it is best known in the west for its military wing that has carried out numerous heroic resistance attacks against the Zionist occupiers of Palestine, Hamas also organizes extensive charitable and educational programs, and has built great schools for boys and schools for girls and they are separated.  Also they built hospitals throughout Gaza strip and West Bank

http://www.ezzedeen.net/english/hamas.htm (as of May 4, 2004).

Part of the money supplied by United States based pro-Hamas front organizations was raised for so-called humanitarian and relief projects, which were often used to assist families of Hamas "*shuhada*" or "martyrs;" terrorists who were killed, wounded or arrested following terrorist operations, including suicide-bombing.  Those who are killed in such operations are generally referred to as a "*shaheed*" or "martyr" by Hamas spokesmen and propagandists. Support of martyrs is an important element used by Hamas to encourage support for its terrorist activity.  Those contemplating acts of terrorism, where they are likely to perish, need assurance that their families will be taken care of or even rewarded because of their acts of "sacrifice" and "martyrdom."  This is a particularly powerful motive given the poor economic conditions present in Gaza and the West Bank.  Furthermore, the movement's activists who recruit members to the

11

Brigades of Izz al-Din al-Qassam have used the various social, educational, religious and relief projects of Hamas in the Palestinian territories as a source for new recruits.

Since the financial infrastructure of Hamas is clandestine, it is very difficult to say with certainty what percentage of the funds raised for Hamas out of the Middle East were diverted to terrorist activity *per se.* But, it should be noted again that in the view of Hamas and its front organizations, the terrorist activity was and is an integral part of the movement's activity as the religious duty of Jihad, and for the consolidation of an Islamic society on the way to the liberation of all of Palestine, and the creation of an Islamic state by the elimination of the Jewish state of Israel. Therefore, the financial support for Hamas is designed to support the movement as a whole, with no distinction between the different fields of activity.

### B.  Islamic Association for Palestine.

There is clear evidence that the Islamic Association for Palestine is a Hamas front organization deeply involved in supporting Hamas terrorism. Khaled Mishal, one of the founders of Hamas, identifies IAP as a "first pillar" in the establishment of the Muslim Brotherhood outside of the region. (Mishal interview (Part 2 of 7)) This is corroborated by IAP's own logo (shown on the videotape of the 1989 IAP convention), which, until today, makes reference to a Quranic saying that is identified with the Muslim Brotherhood. As explained above, it is well established that Hamas was created by Sheikh Ahmed Yassin and others as an outgrowth of the Muslim Brotherhood in Gaza in 1987 at the time of the first intifada.

I have reviewed in detail a number of videotapes of IAP conventions held in the United States. These tapes demonstrate beyond any doubt that IAP was promoting Hamas with particular emphasis on its terrorist culture and activities. The tape of the 1988 convention makes this very clear. The main speaker on that tape is Abdullah Azzam. Azzam was the leading ideologue of the mujahidin warriors in Afghanistan. In his speech Azzam pays particular tribute

12

to Hamas founder Sheikh Yassin and extols the Hamas agenda of jihad. (*See*, Exhibit A hereto) The role of Azzam in the creation of the call to jihad, martyrdom and terrorism cannot be overemphasized. Osama Bin Laden publicly refers to Abdullah Azzam as his mentor and teacher. According to Bin Laden: "Sheikh Abdullah Azzam was not an individual, but an entire nation by himself. Muslim women have proven themselves incapable of giving birth to a man like him after he was killed." ("Who was Abdullah Azzam?" in Abdullah Azzam, *Join the Caravan*, Azzam Publications, 2001 p. 7.)

The 1989 IAP convention is notable in its unabashed support for Hamas and Hamas terrorism. Dedicated to the memory of Abdullah Azzam, who had been killed in Afghanistan in November 1989, the convention hall was bedecked with Hamas banners and slogans. Included was a large map of Israel with the saying "Islamic Palestine From the River to the Sea" in Arabic. (*See*, Exhibit B) This is a well-known Hamas saying calling for the eradication of Israel and its replacement with an Islamic regime. Another banner states in Arabic "Islamic Resistance Movement. [Hamas] - The Pioneer of Jihad in Palestine." (*Id.*)

The speakers at the 1989 meeting made clear their support for Hamas terrorism. One of the speakers, who was presented as a representative of Hamas in the Territories, had his identity shrouded with a mask. Carrying the Hamas flag, he thanked the Islamic Association for Palestine and the Occupied Land Fund (HLF's original name) for their support before launching into a detailed description of specific terrorist acts carried out by Hamas. (*See*, Exhibit B) Another speaker led the audience in a song whose refrain was "O Hamas." (*See*, Exhibit D)

The 1989 Convention is also notable due to the presence of Sheikh Yusef Qaradawi who also addressed the audience and told them: "the Hour of Judgment will not come until you fight the Jews. And the Muslims will kill them . . . ." (*See*, Exhibit C) Sheikh Qaradawi was and

13

remains a major religious figure who proclaims extremist views. Sheikh Qaradawi has endorsed suicide bombings, and provided Hamas with the Islamic legitimacy for its suicide operations. Most recently he issued a fatwa, a statement of Islamic law, permitting Muslim women to dress secularly in order to engage in terrorist attacks. ("Women may be suicide bombers, Muslim scholar rules," Jerusalem Post, 5/25/03) At his deposition in this case, Omar Ahmad, who in 1989 was the president of AMELP doing business as IAP, described Qaradawi as "the number-one scholar in the Muslim world today" (Ahmad Dep., p. 190-91), and said that he had wished that he had been responsible for inviting him to the event. (Id., 191)

I have viewed the video of the 1989 Convention in its entirety. Based upon my detailed knowledge of the nuances of Arabic language, including its use of scriptural and cultural references, it is clear to me that the message delivered by the video and, hence the convention, is one of unwavering support for Hamas and its program of violent jihad seeking the destruction of Israel and the use of terrorism to achieve that goal. There can be no mistake that the message of jihad in the form of terrorism and calling for the elimination of Israel was a major theme of the event.

In addition to the conventions, IAP supported other efforts to promote Hamas terrorism. It has published Hamas communiqués extolling Hamas terrorism. (Abu Baker Dep., Exs. 13, 15, 16) It has made appeals to support military Jihad with "Jihad by money," calling for contributions to its sister organization the Holy Land Foundation, formerly the Occupied Land Fund ("OLF"). (See, e.g., Exhibit G; Abu Baker Dep., Exs. 13, 15-18)

In 1992, Aqsa Vision (an affiliate of IAP) distributed a video entitled "Izz al-Din al-Qassem Brigades," subtitled "Gaza, September 1992." The video includes footage of Hamas terrorists carrying automatic weapons and jumping out of trees. It includes interviews of Hamas

terrorists who are preparing to engage in "martyrdom" operations. At the end of the video the screen shows the name Aqsa Vision and its phone number. The phone number (214/669-9595) is identical to that of IAP's Richardson, Texas office. (*See, e.g.,* BO 005180)

In 1994, at a conference held at Barry University in Florida, Nihad Awad, who was identified as the Director of Public Relations of IAP, publicly stated that he was "in support of [sic] Hamas movement" while acknowledging that it was "destructive and involved in violence." (Awad dep., p. 58, 2-9 and Exhibit 3 thereto)

From the time of Hamas' inception, IAP published leaflets and communiqués issued by Hamas detailing its operations in its newspaper, *Ila Filistin*. These materials frequently solicited donations to OLF. For example, the December 1988/January 1989 issue of *Ila Filistin* contains multiple Hamas communiqués wherein Hamas affirms its rejection of any political solution to the Israeli-Palestinian conflict. (*See,* Exhibit I) One of these communiqués includes an advertisement asking readers to: "Send your tax-deductible donations to the Occupied Land Fund, P.O. Box 38, Plainfield, IN 46168." (*See,* December 1988/January 1989 *Ila Filistin*)

In the November/December 1989 issue of *Ila Filistin*, a statement posted and signed by IAP extolled the virtues of Hamas and solicited support for the Occupied Land Fund:

> The only way to liberate Palestine, all of Palestine, is the path of jihad...Jihad for the sake of God to liberate the land is every Muslim's individual duty...The Islamic resistance movement, Hamas, is the conscience of Palestinian mujahid people. It is the firebrand of hope that lights up from within the pile of weakness and conspiracy declared by defeatists and conspirators against the Palestinian cause... [W]e invite you to perform jihad for the sake of God with your money—donate as much as you can for the intifada in Palestine. You can send your donation to: Occupied Land Fund, P.O. Box 928, L.A. CA. (Exhibit G)

On December 10, 1988, IAP published a "Message from the Islamic Resistance Movement (Hamas) To The Eminent Islamic Jurisprudence Association For its Fifth Convention in Kuwait." (AR 1499-1500). The message implored the audience to follow these directives:

> "First: Confirm the legal claim of the Muslims to the entirety of Palestine undiminished from the sea to the river. Second: Call for Jihad for the sake of God considering that it is the only way to liberate Palestine and all of the stolen lands. Third: Stand against the attempts to hand over the land of Palestine and recognize the Jewish enemy and his alleged existence via what is called the peace process. Clarify Islam's position on these theses. . . . "

(AR 1529). The document requests that the reader "Send your tax deductible donations TO: Occupied Land Fund." (AR 1511). The mailing address given is Plainfield, Indiana, where Shukri Abu Baker worked prior to moving to California. (*Id.*; Abu Baker Dep., p. 110-11)

On December 1, 1989, the IAP issued a communiqué on behalf of Hamas. (AR 1500). It stated that the intifada is "under the leadership of the Islamic Resistance Movement, "HAMAS." * * * 'HAMAS' is the conscience of the Palestinian Mujahid people  * * * [W]e invite you to perform jihad for the sake of God with your money and donate as much as you can to support the Intifada in Palestine. You can send your donation to: Occupied Land Fund. P.O. Box 928. L.A., CA 90232-0928." (AR 1500, 1531-35).

IAP assistance to HLF in its efforts to raise funds for Hamas is purposeful. For example, IAP and HLF have entered into a contract under which IAP committed to assisting HLF in raising funds. (Abu Baker Dep., Ex. 19) HLF has also used IAP conferences and conventions as forums for raising funds. (Abu Baker Dep., pp. 76-77, 199-200) IAP also published the Hamas Charter in 1988, shortly after it was written. (Awad Dep., Exs. 4, 5) The Hamas Charter clearly calls for the use of violence to achieve its goal of the elimination of Israel as well as the recapture of all lands that were ever under Islamic control. To this very day, IAP has an active and widely circulated web site and news service, which parrots the Hamas line. (*See, e.g.,* Jaber

16

Dep., Exs. 56-58)  To my knowledge, the IAP news has never criticized an act of terrorism, including suicide bombings against civilians.

Beyond the activities mentioned above, which are only highlights of IAP activities, its societal function needs to be emphasized.  IAP is engaged in supporting a Jihadist culture in the United States' Arab and Muslim population.  The presence of school age children in the convention videos singing Hamas oriented songs, the presence of leading extremist Islamic religious figures at these meetings and the call for the support of Jihad tells me that this is an effort to replicate the ideology that is present in Hamas circles in Gaza and the West Bank.  This approach is an important underpinning to the ability to recruit suicide bombers.

IAP also provided an audience for individuals who are identified with Jihadist causes.  Prominent in that list is Sami Al Arian, who has been charged with acting as the leader of the Palestinian Islamic Jihad, a notorious terrorist organization.  The current president of IAP, Rafeeq Jaber, posted bail in 2004 for Abdelhaleem Hasan Al-Ashqar, who, as described in detail below, is a close associate of Hamas leader Mousa Abu Marzook.  The IAP also led a campaign in favor of defendant Muhammed Salah, the admitted head of the Hamas military structure prior to 1993.  In fact, after he was released from an Israeli prison after being convicted for terrorist activities on behalf of Hamas, Salah was allowed to raise funds at an IAP convention.  (Anonymous (Rita Katz), "Terrorist Hunter," p. 140 (2003))

## C.    Holy Land Foundation for Relief and Development.

There is also very clear evidence that the Holy Land Foundation for Relief and Development is a well-organized and prominent supporter of Hamas, and that its funding of Hamas "charities" was a critical element of support for Hamas terrorism.

As explained above, the Muslim Brotherhood and later, Hamas, had at their core, the organization of a social infrastructure.  That social infrastructure has included educational

17

institutions ranging from kindergartens to universities, health care facilities, sports clubs and soup kitchens. The social infrastructure is directed by the same leadership as the political branch, which also commands the terrorist wing of Hamas. (Mishal interview (Part 3 of 7)) The actual financing of the social infrastructure of Hamas is often channeled through *Zakats*, or alms societies, that are present in numerous towns and villages in Gaza and the West Bank. (*See,* AR 1341, 1344, 1346)

The charities supported by HLF are almost uniformly controlled by Hamas. At a September 1993 meeting of U.S.-based Hamas leaders in Philadelphia (discussed further below), Muin Kamel Mohammed Shabib, an admitted Hamas leader, specified the following as "our institutions:"

1. Islamic Charity Association (a/k/a Islamic Charitable Society in Hebron);

2. Charity Committee in Ramallah;

3. Jenin Zakat Committee;

4. Nablus Zakat Committee;

5. Tulkarm Zakat Committee;

6. Orphan Care Association, Bethlehem;

7. Qalqiliyah Zakat Committee;

8. Halhul Zakat Committee; and

9. Hebron Zakat Committee. (AR 1435-36)

HLF President Shukri Abu Baker attended the Philadelphia meetings. (Abu Baker Dep., p. 8) Mr. Abu Baker admitted that HLF subsequently provided funds to each of these entities. (*Id.*, pp. 169-179) This is confirmed by HLF's public disclosure of the organizations that it supports with its "charitable giving." (*See,* Abu Baker Dep., Ex. 24) I have also examined

records of HLF's expenditures found in the Administrative Record that is the basis of the Watson Report. These records further confirm that HLF provided financial support to the very same organizations that Shabib had identified in 1993 as being Hamas institutions.

These institutions continue to be controlled by Hamas to this day. A Hamas website published in Yemen lists each of these organizations as part of Hamas. *(See* List of Hamas Institutions from Yemen Website (http://www.aqsaorg.com/profile/cmt.php as of January 9, 2004) The role of HLF in funding "Jihad with money" is made explicit in the appeals for funds published by IAP as described above.

HLF's role in supporting the families of "Martyrs" is also a critical element in supporting terrorism.[1] One of the *quid-pro-quos* for performing a suicide bombing or otherwise taking the risk of becoming active in Hamas' terrorist structure is the promise that Hamas will take care of your family. Sheikh Ahmad Yassin, the founder of Hamas, has stated that Hamas "distributes $2 million to 3 million in monthly handouts to the relatives of Palestinian suicide bombers; 'martyrs' who have been killed by Israelis; and prisoners in Israeli Jails." (AR 725-28) The participants at the 1993 Philadelphia meeting stressed the necessity of spending funds on the injured, the martyrs and the prisoners' families. (AR 1462)

HLF provides annuities and support for the families of Hamas activists who died carrying out attacks on Israelis, or who were imprisoned or deported for their Hamas activities. In 1992 OLF/HLF created sponsorship forms for "needy families." A space on the form for social worker comments indicates in nearly every case that the applicant's provider was either jailed for reasons of "security" or martyred. (AR 1536-1790) A letter dated August 13, 1992, from HLF Executive Director Haitham Maghawri to "Brother Majed" states: "Dear brother, please

---

[1] In Palestinian and Islamic culture, a "martyr" (*shaheed*) is anyone who dies in battle for Allah. In the Palestinian case, the term took on a wider use during the intifada to include everyone killed in any form of struggle.

nominate a few names of the Martyr's children with a summary on each child's [sic] situation, and how cooperative they are." (Abu Baker Dep. Ex. 23; Exhibit M)  An undated letter on HLF stationary from HLF employee Ibrahim Khalil states: "We asked you for 40 applications forms for needy families from several regions to be sent ASAP, families of the martyrs, if possible would be good." (Exhibit P)

An HLF binder entitled "Orphans Sponsorship Program, Gaza in July 1999" shows photographs of sponsored orphans and the cause of the father's death, specifically distinguishing between "killing," "martyr," "sickness," and other causes of death.  (Abu Baker Dep., Ex. 30) One of the orphans sponsored through this program was the son of Yahya Ayyash, a Hamas bomb-maker known as "the Engineer." (*See,* Exhibit K; Mishal Interview (Part 4 of 7))

HLF's connection with the Hamas terrorist wing can be shown in other ways as well. HLF paid for trips to the United States by Hamas founder Sheikh Jamil Hamami and Hamas leader Dr. Mohammed Siyam.  Both of these men have major roles in the political leadership of Hamas including the terrorist wing.  (Mishal interview (Part 3 of 7); AR 635-38; Abu Baker Dep., p. 204)  HLF also received substantial funding from Mousa Abu Marzook, a founder of Hamas who remains one of its leaders today.  Marzook made these contributions at the same time that he was funding Muhammed Salah's distributions to terrorist operatives in the West Bank and Gaza in 1992-93.  (AR 684-85, 700, 1926-27; Salah Bank Statements for 12/92-2/93) Mousa Abu Marzook gave the instruction in 1994 that HLF was to be the Hamas fundraising arm in the United States rather than the Al-Aqsa Educational Fund operated by Abdelhaleem Hasan Al-Ashqar.  (AR 1478-79, 1482-86)  As a person knowledgeable in the operations of Hamas, it is inconceivable to me, that Marzook was giving money to HLF for charitable purposes.

It is also clear that HLF leadership operated at a high level within Hamas. In September 1993, Israel and the Palestine Liberation Organization ("PLO") entered into an unprecedented agreement known as the Oslo Peace Accords, which were seen as an attempt to end the dispute between Israel and the Palestinians. The Oslo Accords caused great shock and consternation to Hamas, which was openly against any form of Palestinian reconciliation with Israel. A conference of Hamas activists was held in Philadelphia in October 1993 to develop a plan to promote Hamas and work against the Oslo Peace Accords. Among the participants were Hamas leaders from Gaza and the West Bank, including Muin Kamel Mohammed Shabib. HLF President Shukri Abu Baker was an active participant in the conference, as was Ismail Elbarasse, a close associate and financial secretary of Mousa Abu Marzook. (AR 225-65, 1400-11; In the Matter of the Extradition of Marzook, 924 F. Supp. 565, 592 (S.D.N.Y. 1996)) IAP leaders such as Omar Ahmad and Ghassan Dahduli were also in attendance, as was Abdelhaleem Hasan Al-Ashqar, head of the Al Aqsa Educational Foundation. (AR 251-65; 1400-11)

The meeting was under FBI wiretap surveillance and transcripts are in the Administrative Record. (AR 1397-1475) The tapes make clear the very close ties that exist between the political and social infrastructure elements of Hamas. (Id.) They also demonstrate that support of the social infrastructure was deemed critical to the overall success of Hamas in defeating the Oslo Accords. (AR 1420-25) Significantly, the fact that this meeting was held in the United States, and included the presence of a large number of U.S. based Hamas activists demonstrated that the true center of Hamas' leadership was in the United States at that time.

Perhaps one of the most blatant examples of HLF's support for Hamas terrorism took place in the winter of 1992-93. In December 1992, after a series of Hamas terrorist attacks, Israel deported approximately 400 Hamas activists to South Lebanon. The Hamas website calls

21

these deportees, "activists of our people." (AR 1798)  Among the deportees was Hamas co-founder, and later leader, Abdul Azzis Rantisi.  Senior Hamas leaders Hamami, Siyam and Al-Ashqar confirmed during their 1994 Oxford, Mississippi meeting that "the movement" supported the deportees.  (AR 1981-83)  HLF spent at least $277,000 from December 1992 to May 1993 to aid the deportees and their families directly.  (AR 1796-1800)

The Lebanon deportees were the core group of Hamas leaders prior to their deportation. Their displacement from Gaza and the West Bank brought about Marzook's enlistment of Salah to travel to the area to distribute funds to renew and sustain the organization.  HLF's support of the deportees was a clear affirmation of support for Hamas at a time that the organization was in disarray

### D.  David Boim's Murderers, Hinawi and Al-Sharif, Were Members of Hamas; Hamas Takes Credit for the Murder.

According to an official detailed police report, the attack on David Boim and his classmates on May 13, 1996, was carried out by shooting from a stolen Mitsubishi car at a bus stop opposite the entrance to Beit El.  The attackers first shot at a bus traveling south on the road from Nablus to Ramallah.  They then proceeded north on the road to the bus stop and shot at students standing there, including David Boim, who was fatally wounded.  The Mitsubishi continued to travel north but crashed off the side of the road.  Shell casings found in the car matched the weapon used in the murder of David Boim.  (Report of May 13, 1996 Terrorist Attack and Murder Compiled by Israel Police, Benjamin Region)

Amjad Hinawi was tried by the Palestinian Authority for the murder of David Boim.  Mr. Abdelnour Zaibeck, a U.S. foreign service officer assigned to the consulate in Jerusalem, attended Amjad Hinawi's trial in Jericho during February 1998.  On March 3, 1998, Mr. Zaibeck produced a "summary of the trial proceedings."  The report concluded that 1) the proceedings

22

were held openly in the Security Court of the Palestinian Authority; 2) Hinawi was afforded counsel; and, 3) Hinawi was accused of two crimes, participating in a terrorist act and acting as an accomplice in the killing of David Boim. Hinawi did not deny that he participated in the murder. Hinawi claimed at trial that his friend Khalil was the gunman who exploited their friendship in asking Hinawi to drive the car. Hinawi was convicted of both counts, including the murder of David Boim, and was sentenced to 10 years at hard labor. (State Department Report on Hinawi Trial) On February 14, 1998, the Palestinian Authority National Security Court sitting in Jericho handed down the ten-year sentence on Amjad Hinawi. (Official Sentencing of Hinawi) The sentence is as described by the United States Counsel General.

Amjad Hinawi's whereabouts are currently unknown. On September 22, 1997, pursuant to the Oslo II interim agreement, Israel asked the Palestinian Authority to transfer to it a number of individuals who were known to have been involved in terrorist activities. Among them was Hinawi. The requests states:

> Amjad Muhammad Hinawi – member of Hamas who took part in the murder of 16-year old David Boim, an American-Israeli citizen, in Beit El in May 1996. The PA detained Hinawi but subsequently released him in February 1997 on holiday leave for the Id al-Fitr festival.

(Israel Ministry of Foreign Affairs Request for Handover of Suspects)

On October 22, 1998, Israel's Ministry of Foreign Affairs issued a Background Paper identifying "Palestinian suspects wanted by Israel for terrorism and other crimes." The Paper states:

> "Amjad Muhammad Hinawi – member of Hamas who took part in the murder of 16-year old David Boim, an American-Israeli citizen, in Beit El in May 13, 1996. The PA detained Hinawi but subsequently released him in February 1997 on holiday leave for the Id al-Fitr festival."

(Israel Foreign Affairs Background Paper)

Khalil Ibrahim Tawfiq Al-Sharif was never captured by the Palestinian Authority. After murdering David Boim, Al-Sharif undertook additional terrorist activities. Ultimately, he blew himself up as a suicide bomber in Jerusalem in September 1997, taking with him five civilians and injuring over 100 others. (See, e.g., Exhibit 19; "3rd Ben-Yeyuda Bomber Identified," Jerusalem Post, October 30, 1997) There is evidence from numerous sources beyond Hinawi's statement in court, that Al-Sharif murdered David Boim and that he was a member of Hamas. The Palestinian Authority has published on its website an official list of Hamas and Palestinian Islamic Jihad members whose bodies Israel refuses to return to their families. Khalil Al-Sharif's name appears on that list and he is identified as a member of Hamas. The statement as translated from Arabic states:

> "19. the martyr Khalil Ibrahim Al-Sharif from Nablus. Killed in a martyrdom operation in Ben Yehuda Street on September 4, 1997 (Hamas)."

(Palestinian Authority Publication)

The website of the Islamic group at Al-Najah University publishes biographies of "martyrs." Included in that list is Khalil Al-Sharif. Al-Sharif is identified as the murderer of David Boim and a member of Hamas:

> "He (Sharif) took part in several Jihad operations: Beit El in May, 1996; one person was killed and others were wounded."

Al-Sharif is also given credit for four additional terrorist operations including his final activity as the suicide bomber in Ben Yehuda Street in Jerusalem in July 1997. Al-Sharif is identified as having "turned into the Islamic doctrines" -- a description of Hamas affiliation -- "after 1994."

(Islamic block of Hamas at Al-Najah University, Nablus)

Hamas has made it very clear that it takes credit for the attack on David Boim. (Hamas Tribute to Mahmoud Abu Hanoud)   On November 23, 2001, Israeli security forces killed

24

Mahmoud Abu Hanoud in an operation near Nablus.  At the time of his death, Hanoud was the senior commander of the Hamas Izz Al-Din Al-Qassam Brigades.  *(See,* Exhibit I; Statement by Israel Ministry of Foreign Affairs, 24 November 2001)  Hamas websites paid tribute to Hanoud.  Two current websites list terrorist operations in which Hanoud had a role, including the murder of David Boim:

1.    The first website states under the heading "Record of Honor," "In May 1996 (Hanoud) led a group that shot at a convoy of settlers near Bet El, [which] resulted in the killing of one Zionist and injuring three others." This is undoubtedly a reference to the operation that killed David Boim.

2.    The second website states: "Among the operation[s], whose responsibility is related to the squad of Abu Hanoud. . . . May 1996: shooting at a convoy of settlers near Bet El settlement, [which] resulted in killing one settler and injuring 3 others."

Again, this is clearly a reference the May 13, 1996 Hamas operation in Beit El that resulted in the murder of David Boim.

From this evidence, I have concluded that Amjad Hinawi and Khalil Ibrahim Tawfiq Al-Sharif murdered David Boim as part of a Hamas terrorist operation.

E.    **Translations of Arabic Documents, Video Tapes and Video Tape Segments.**

Based upon my knowledge of written and spoken Arabic, I have translated or reviewed translations of the following Arabic documents, video tapes and video tape segments:

1.    Attached as Exhibit A is a true and correct translation of portions of a speech made by Abdullah Azzam, a radical Muslim cleric, at a joint IAP/MAYA conference in Oklahoma City in 1988.  (BO 002677)

2.    Attached as Exhibit B is a true and correct translation of relevant portions of the 1989 IAP convention (Program No. 4) in Kansas City.  (BO 002676)

3.    Attached as Exhibit C is a true and correct translation of portions of a speech made by Yusef Qaradawi, a radical Muslim cleric, at the 1989 IAP convention (Program No. 4).

25

4.      Attached as Exhibit D is a true and correct translation of portions of a chant led by Sheikh Muharram Al-Aarifi at the 1989 IAP convention (Program No. 2).  (BO 002679)

5.      Attached as Exhibit E is a true and correct translation of the final three parts of an interview of Hamas leader Khalid Mishal by *Al Hayat*, an Arabic publication.

6.      Attached as Exhibit F is a true and correct translation of Muhammad Salah's handwritten confession to Israeli authorities.  (Salah Dep. Ex. 18)

7.      Attached as Exhibit G is a true and correct translation of a Hamas communiqué, published by IAP in *Ila Filistin* in December 1989.  (AR 1531)

8.      Attached as Exhibit H is a true and correct translation of a Hamas communiqué, distributed by IAP in May 1989.  (AR 1504-05)

9.      Attached as Exhibit I is a true and correct translation of two Hamas documents published by *Ila Filistin* in December 1988/January 1989.  (AR 1506-11)

10.     Attached as Exhibit J is a true and correct translation of a letter to the editor of *Ila Filistin*, from Hamas, published in *Ila Filistin* in February 1989.

11.     Attached as Exhibit K is a copy of an HLF form used to solicit donations for orphans, including orphans of martyrs.  This particular form solicits donations for Bara Yahya Abdallatif Ayash, the son of Hamas bomb maker Yahya Ayash.  (BO 001655)

12.     Attached as Exhibit L is a copy of a Muslim Youth Society/Hebron form indicating the recipients of money received from HLF.  All recipients are identified as being the families of *shuhada* (martyrs).  The Muslim Youth Society/Hebron is renowned for having developed numerous suicide bombers for Hamas.  (Abu Baker Dep., Ex. 22)

13.    Attached as Exhibit M is a true and correct translation of a letter from HLF Executive Director Haitham Magawri asking for the names of children of *shuhada* (martyrs) to serve as HLF donees. (Abu Baker Dep., Ex. 23)

14.    Attached as Exhibit N is a true and correct translation of a list of entities to which HLF admitted providing funds in its "Programs & Objectives" booklet.   (Abu Baker Dep., Ex. 24)  The list includes several entities affiliated with Hamas.

15.    Attached as Exhibit O is a true and correct translation of an excerpt from the February 1990 edition of *Ila Filistin*, p. 71, which discusses activities organized by IAP in connection with the second anniversary of the intifada, including raising funds for the Occupied Land Fund.  (BO 005003)

16.    Attached as Exhibit P is a true and correct translation of a handwritten letter from Ibrahim Khalil of HLF requesting application forms for families of martyrs.  (AR 1792)

17.    Attached as Exhibit Q is a true and correct translation of a statement by Hamas from a Yemen-based website of Hamas affiliated organizations http://www.aqsaorg.com/ profile/cmt.php.

18.    Attached as Exhibit R is a true and correct translation of a portion of a statement from a website of the Islamic block of Hamas at Al-Najah University entitled "Nablus Tribute to Al-Sharif" http://www.khayma.com/-Islamicblock/index/j5.htm.

19.    Attached as Exhibit S is a true and correct translation of a portion of a statement entitled "Hamas Tribute to Mahmoud Abu Hanoud," http://www.palestine-inf.info/arabic/ hamas/shuhda/abohanod/life.htm.

20.     Attached as Exhibit T is a true and correct translation of a portion of a statement entitled "Record of Honor" to Mahmoud Abu Hanoud,  http://www.alwelayah.net/shuhda/sierah/polistain/14.htm.

_R. Paz_

**Reuven Paz**
6 Herzog St., Herzliya 46492, Israel
Tel. 972-9-9507317
Email: reupaz@netvision.net.il

28

**EXHIBIT 163 to Declaration of Joel Israel**

SECRET//X1

# Selected Recipients of HLFRD Funds: Jan. 1997 - Sept. 2000

| Organization | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|
| HLFRD, Hebron | 0 | 0 | 141,291 | 100 |
| Sanabil Association for Relief and Development | 125,744 | 232,110 | 649,386 | 456, |
| Human Appeal International | 31,475 | 105,388 | 281,608 | |
| HLFRD, Gaza | 231,434 | 76,697 | 217,495 | 65, |
| Dar el Salam Hospital | 164,600 | 128,860 | 137,222 | 5 |
| Islamic Charity Society (ICS) | 138,302 | 690,297 | 275,313 | |
| Hebron Zakat Committee | 20,090 | 18,790 | 21,279 | |
| Orphan Care Association (Bethlehem) | 0 | 0 | 38,435 | |
| Ramallah Zakat Committee | 89,429 | 74,652 | 58,62 | |
| Jenin Zakat Committee | 42,849 | 89,779 | 40,394 | |
| Qalqilia Zakat Committee | 65,577 | 51,827 | 40,441 | |
| Nablus Zakat Committee | 43,951 | 31,008 | 46,482 | |
| Tolkarem Zakat Committee | 23,820 | 13,844 | 30,079 | |
| Halhul Zakat Committee | 31,652 | 22,173 | 29,643 | |

Funds transferred from January 2000 - September 2000
This column represents funds transferred from January 1997 - April 1999, but exact dates unread

0732

DECLASSIFIED BY SPTC
ON 10/19/07

SECRET//X1