**EXHIBIT 164 to Declaration of Joel Israel**

## HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
## INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

I.   Introduction

II.  HAMAS Is A Terrorist Organization

III. History And Organizational Structure Of HLFRD

IV.  HLFRD Acts For Or On Behalf Of HAMAS

   1. FBI Surveillance Of HAMAS Meetings
      1993 Philadelphia Meeting
      1994 Oxford, Mississippi Meeting

   2. Early Funding From HAMAS

   3. Recipients Of HLFRD Funds Overseas
      A. HLFRD offices overseas
         1995 HLFRD Jerusalem Search
         1997 HLFRD Closure
         HLFRD HEBRON office
         HLFRD GAZA office
      B. Zakat Committees In The West Bank And Gaza
         Islamic Charity Association In Hebron
         Ramallah Zakat Committee
         Jenin Zakat Committee & Al Razi Hospital
         Nablus Zakat Committee
         Tolkarem Zakat Committee
         Orphan Care Association (Bethlehem)
         Qalqilia Zakat Committee
         Halhul Zakat Committee
         Hebron Zakat Committee
         Dar El Salam Hospital
         Islamic Aid Committee
      C. Organizations Funneling Money to HAMAS
         Sanabil Association For Relief And Development
         Human Appeal International

   4. HLFRD And Its Leadership Identified As HAMAS
      Domestic assets
      Jamil Sarsour Confession

   5. HLFRD Bank Accounts

   Summary

**0059**

BY LIAISON

Date:       November 5, 2001

To:         Mr. R. Richard Newcomb, Director
            Office of Foreign Assets Control
            Department of Treasury

From:       Mr. Dale L. Watson
            Assistant Director
            Counterterrorism Division

Subject:    HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT
            INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

            ACTION MEMORANDUM


I.  INTRODUCTION

        Pursuant to the provisions of the International Emergency
Economic Powers Act (IEEPA), 50 U.S.C. §1701 *et seq.*, the
President of the United States may invoke the provisions of
the Act to deal with any "unusual and extraordinary threat,
which has its source in whole or substantial part outside the
United States, to the national security, foreign policy, or
economy of the United States, if the President declares a
national emergency with respect to such threat." [IEEPA Sec.
202(a)].  Accordingly, on January 23, 1995, the President
issued Executive Order (E.O.) 12947 declaring a national

emergency regarding the "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security." (Exhibit 1).

On January 25, 1995, the Department of the Treasury, ("Treasury"), Office of Foreign Assets Control (OFAC) issued a list of persons and groups designated by the President as "Specially Designated Terrorists" (SDTs) threatening the Middle East peace process (MEPP) or found to be owned or controlled by, or to be acting for or on behalf of, these terrorist organizations.  The Islamic Resistance Movement, also known as (a.k.a.) HAMAS, was designated a SDT, in that it is considered a foreign terrorist organization which threatens to disrupt the MEPP. (Exhibit 1).  Pursuant to provisions of E.O. 12947, the President has delegated to the Secretary of the Treasury, authority vested in him by the IEEPA, including the authority to accept additional SDTs.

In E.O. 12947, the President specifically determined that the making of donations of the type specified in section 203(b)(2)(A) of IEEPA[1] by United States persons to persons and/or organizations designated pursuant to the E.O. would seriously impair his ability to deal with the national emergency declared by that order and specifically prohibited such donations.  The President transmits, annually, notices of the continuation of this national emergency to the Congress and the Federal Register.

On January 19, 2001, in accordance with section 202(d)2 of the National Emergencies Act (50 U.S.C. § 1622(d)), the President determined that, because terrorist activities continue to threaten the MEPP vital interests of the United States in the Middle East, the national emergency declared on January 23, 1995 (E.O. 12947), and the measures made effective on January 24, 1995, to deal with that emergency must continue in effect.

-----

[1] Section 203(b)(2)(A) of IEEPA (50 U.S.C. 1702(b)(2)(A)) references "donations. . . of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering. . ."  By finding such donations would seriously impair his ability to deal with the national emergency declared, the President, through E.O. 12947, prohibited donations of this nature to HAMAS.

In furtherance of this authority, E.O. 12947 directs all federal agencies, including the Federal Bureau of Investigation (FBI), to take all appropriate measures within their authority to carry out the provisions of the Order. [E.O. 12947, Section 4(a)]. Further, any investigation emanating from a possible violation of the Order shall be coordinated with the FBI. [E.O. 12947, Section 4(b)].

Accordingly, the FBI is providing the following information to Treasury regarding the Holy Land Foundation for Relief and Development (HLFRD), located at 525 International Parkway, Suite 509, Richardson, Texas. The FBI has obtained information which indicates that the HLFRD acts for or on behalf of HAMAS. In compliance with its obligations under the Order, the FBI submits this memorandum for OFAC's consideration in ordering the SDT designation of the HLFRD.

## II.   HAMAS IS A TERRORIST ORGANIZATION

HAMAS is one of the SDTs listed in the Annex to E.O. 12947 as a foreign terrorist group engaged in grave acts of violence that disrupt the MEPP and constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. (Exhibit 1).

HAMAS is a terrorist organization that espouses an extremist Islamic fundamentalist ideology. HAMAS was founded in 1988 in the Gaza Strip and is dedicated to the establishment of an Islamic Palestinian State that encompasses Israel, the West Bank and Gaza. HAMAS is a militant Palestinian offshoot of the Muslim Brotherhood which was founded in 1928 to replace secular rulers with an Islamic society.

In late 1987, activist members of the Muslim Brotherhood, opted to play a more direct role in the popular uprising, known as the Intifada, than the Muslim Brotherhood leadership would allow. As a result, Sheikh Ahmad Yassin, then head of the Muslim Brotherhood in the Gaza Strip, formed HAMAS. In May 1989, Yassin was arrested and in October 1991, he was tried and sentenced to life imprisonment by an Israeli court for HAMAS terrorist activities. (Exhibit 2).

3

In October 1997, following a failed Israeli attempt to assassinate Khalid Mishal, another HAMAS leader in Amman, Jordan, Yassin was released to the Jordanians and subsequently returned to Gaza.  On October 29, 1998, Yassin was placed under house arrest by the Palestinian Authority (PA) following an unsuccessful HAMAS suicide attack to blow up a bus full of school children in Kfar Darom, which resulted in the death of an Israeli soldier.  Yassin was released from house arrest two months later, in December 1998. (Exhibit 2).

HAMAS is primarily based in the West Bank and Gaza.  When HAMAS was declared an illegal organization by the Government of Israel (GOI) in 1989, HAMAS leaders moved its support structures outside Israel.

HAMAS has publicly rejected Yasir Arafat and the PA as the representatives of the Palestinian people.  HAMAS also announced that it opposes the Palestine National Council's 1988 decision to establish an independent Palestinian state in the West Bank.  Since the group's inception, HAMAS has forged significant inroads into acceptance by mainstream Palestinians.

The ideology of HAMAS is codified in the HAMAS covenant. (Exhibit 3).  This covenant establishes HAMAS' primary goal as the creation of an Islamic State in all of Palestine through "Jihad" (Holy War).  HAMAS' covenant emphasizes Jihad as the immediate and sole solution to Palestinian problems and regards participation in the armed struggle as the duty of every Muslim.  HAMAS rejects absolutely any political solution entailing the concession of any part of historic "Palestine."

The primary tenets of HAMAS philosophy are opposition to compromise with Israel over creation of a Palestinian State and replacement of the PA as the sole representative of the Palestinian people.  To these ends, HAMAS pursues a combined program of violence and terror on one hand, and educational, charitable, and social functions on the other.  The principal purpose of its armed attacks is to intimidate and coerce the GOI and its civilian population.  Its benevolent programs are used to enhance its image and earn goodwill in the Palestinian community.

4

**0063**

A recent interview with a senior HAMAS spokesman identifies the influence the political wing of HAMAS has over the military wing. In a July 31, 2001, Reuters article, Abdel-Aziz al-Rantissi, a senior HAMAS official and spokesman stated, "The (HAMAS) political leadership has freed the hand of the brigades to do whatever they want against the brothers of monkeys and pigs." The term "brigades" refers to the group's military wing, Izz el-Din al-Qassam brigades. Rantissi further stated, "I urge all the brigades to chase and target the Israeli political leaders and members of parliament, the killer (Prime Minister Ariel) Sharon and the criminal (Foreign Minister) Shimon Peres." This was believed to be the first public call by HAMAS to target Israeli leaders. According to the article, "Hamas's political wing determines overall policy for the movement . . ." (Exhibit 4).

Even after the September 11, 2001 terrorist attacks against the World Trade Center and Pentagon, HAMAS' public statements urge support for continued violence against Israel and the United States. In a September 2001 public statement published by Reuters, Rantissi echoed calls by Taliban clerics in Afghanistan, urging "Muslims on Friday to unite against any U.S. retaliation for the terror attacks in New York and Washington." He went on to say, "It is impossible for Muslims to stand handcuffed and blindfolded while other Muslims, their brothers, are being attacked. The Muslim world should stand up against the American threats which are fed by the Jews, . . . " (Exhibit 5).

Through its acts of violence, HAMAS has established itself as one of the primary Palestinian terrorist organizations continuing the "armed struggle" against Israel. These terrorist attacks target not only military targets, but civilian ones as well. HAMAS terrorist attacks have resulted in scores of deaths and hundreds of injuries in Israel, including the killing of several U.S. citizens.

From October 1, 2000 to September 10, 2001, HAMAS has claimed responsibility for at least 20 bombings; two shootings; one kidnaping; and one mortar attack. Another six bombings have been averted through the failure or discovery of explosive devises. At least 77 persons, including three American citizens, have been killed in these attacks and at

least 547 injured, including four American citizens.  The use of suicide bombers has become a HAMAS trademark.  A few examples of those bombings are described below:

On August 9, 2001, HAMAS claimed responsibility for a suicide bombing in Jerusalem, that killed 15 civilians and injured more than 130 others.  The attack occurred at one of Jerusalem's most prominent street corners.  Two American citizens, including a 31 year old pregnant elementary school teacher died and four other American citizens, including a three year old boy were wounded when a Palestinian walked into a Sbarro pizzeria at the height of the lunch hour and detonated an explosive device filled with nails.  At the funeral for five members of a family from the West Bank settlement of Talmon, an 11 year old, on a hospital bed with plastic breathing tubes in her nose, was wheeled into the cemetery, where her father, mother and three siblings, ages two, four, and 14 were to be buried. (Exhibit 6).

On June 1, 2001, HAMAS claimed responsibility for a suicide bombing in Tel Aviv, Israel, that killed 21 Israeli youths and injured nearly 100, as they stood outside a popular disco.  Most of the youths killed or injured were girls, between the ages of 14 and 18, celebrating their high school graduation.  According to eyewitnesses, two HAMAS operatives drove the suicide bomber to the disco, a popular club often packed with Russian immigrant teenagers.  They said the bomber slipped unnoticed into line and positioned himself among several girls, including a 14-year-old who had survived a previous bombing in Netanya.  Then, while flirting with one of the girls, he triggered the explosives.  The blast was so intense that it tore limbs from the victims' bodies, scattered their flesh up to six blocks away and vaporized the bomber and the girl next to him. (Exhibit 7).

On May 25, 2001, HAMAS took credit for carrying out a truck bombing to mark the anniversary of Israel's withdrawal from Lebanon.  According to a May 25, 2001, Associated Press article, Islamic militants said they were trying to undermine Israel's morale with the bombings.  The article stated that there have been more than a dozen explosions in the past eight months of Israeli-Palestinian fighting.  On that date, Sheikh

6

0065

Yassin, the spiritual leader of HAMAS, was quoted as saying, "We want to plant terror in the heads of the enemies." (Exhibit 8).

On February 25, 1996, HAMAS conducted suicide bombings in both Jerusalem and Ashkelon, claiming the lives of 26 people and wounding at least 79 others. Those blasts occurred at two of the country's busiest intersections at the height of rush hour. The Jerusalem blast occurred at 6:48 a.m. on a local bus that was stopped at a red light just a block away from the central bus station. The suicide bomber killed 24 people and wounded 50 others. Two Americans, Matthew Eisenfeld, 25, and his girlfriend, Sarah Duker, 23, were among the dead. The second attack took place 50 minutes later at a hitchhiking stop for soldiers, near Ashkelon. That suicide bomber killed two people and wounded 29. HAMAS took credit for both attacks. (Exhibit 9).

## III.   HISTORY AND ORGANIZATIONAL STRUCTURE OF HLFRD

Background: The HLFRD was established in 1989 as a non-profit, non-political, charitable, and tax-exempt organization which solicits donations to help Palestinian people in the West Bank and Gaza. As noted above, the HLFRD is listed as a tax-exempt charity, not a religious organization.

The HLFRD was originally known as the Occupied Land Fund, and incorporated in California on January 11, 1989, with a mailing address of P.O. Box 1448, Los Angeles, California 90053. The Occupied Land Fund's physical address at the time was located at 5855 Green Valley Circle, Suite 207, Culver City, California 90230. On July 27, 1992, the Occupied Land Fund relocated to Texas, and had a forwarding address of P.O. Box 832390, Richardson, Texas 75083.

The Occupied Land Fund was registered with the Texas Secretary of State on November 18, 1992, under the name, "HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT." (Exhibit 10). The HLFRD is listed as a non-profit corporation with a registered office of 850 N. Dorothy Drive, Suite 516, Richardson, Texas. In August 1994, the HLFRD relocated from 1710 Firman Drive, Suite 100, Richardson, Texas 75081 to its current address located at 525 International Parkway, Suite 509, Richardson, Texas 75081.

7

The Texas Secretary of State records further reveal that the HLFRD proposed to pursue, in conducting its affairs in Texas, "charitable-relief for refugees and the indigent needy, fund raising furthering the corporation's exempt purposes, and to sponsor charitable activities benefiting (sic) and to make contributions or distributions to other 501(c)(3) organizations or the corresponding section of any future federal tax code." (Exhibit 10).

Organizational structure: The HLFRD is currently headquartered in Richardson, Texas, with branch offices and representatives scattered throughout the United States, West Bank and Gaza.  Key leaders at the HLFRD include: Shukri Abu Baker, President, Secretary, and Chief Executive Officer (CEO); Haitham Maghawri, Executive Director; Mohammed El Mezain, Director of Endowments; and Ghassan Elashi, Chairman of the Board. (Exhibit 11).

According to public records, the HLFRD raised 13.0 million in 2000; $6.3 million in 1999; and $5.2 million in 1998. (Exhibit 12).

## IV. THE HLFRD ACTS FOR OR ON BEHALF OF HAMAS

As will be described in detail below, the HLFRD acts for or on behalf of HAMAS based on the following analysis:

1. Intercepted Discussions Of HAMAS Leaders:  In 1993 and 1994, the FBI monitored meetings of identified HAMAS leaders and senior representatives from the HLFRD.  During these meetings, discussions were held regarding the need for HAMAS fund-raising in the United States, as well as the primary role of the HLFRD to serve this function.

2. HAMAS Financing:  FBI investigation has determined that in the early 1990s, HAMAS, through Mousa Abu Marzook, provided substantial funds to the HLFRD.

3. Fund Recipients:  FBI investigation has determined that a majority of the funds collected by the HLFRD are used to support HAMAS activities in the Middle East.

4. HLFRD Leadership: Key decision-makers within the HLFRD have been identified as active members of HAMAS.

8

# 1. FBI SURVEILLANCE OF HAMAS MEETINGS

1993 Philadelphia meeting:  A recently declassified electronic surveillance of Abdelhaleem Hasan Ashqar disclosed that he organized a meeting that took place in Philadelphia, Pennsylvania, on October 1 to October 3, 1993.  FBI physical surveillance and subsequent investigation corroborate that this meeting took place.  The electronic intercepts disclosed that participants in the meeting included Ashqar, Akram Kharroubi, Mohammad Al-Hanooti, Ismail Elbarasse, Muin Kamel Mohammed Shabib, three officials from the HLFRD:  Shukri Abu Baker, Ghassan Elashi and Haitham Maghawri; and representatives from the Islamic Association for Palestine (IAP).[2]

The FBI deems this meeting significant since it represented a meeting in the United States among senior leaders of HAMAS, the HLFRD and the IAP.  A brief review of key attendees include:

1. **Abdelhaleem Hasan Ashqar:**  In November 1992, the GOI advised that Ashqar was a U.S.-based HAMAS activist who was involved in transferring funds from the United States to HAMAS in the West Bank and Gaza. (Exhibit 15).

Interviews conducted by the Israeli Police (IP) of self-admitted HAMAS member Sufian Abu Samara provided evidence of Ashqar's membership in HAMAS.  In Samara's January 7, 1991 and January 14, 1991 interviews, he stated that he was recruited and appointed the head of HAMAS in the Southern Gaza Strip by Mousa Abu Marzook in 1989 and also headed the HAMAS Security Apparatus in 1990.  Samara described several instances where Ashqar transferred hundreds of thousands of dollars on behalf of HAMAS, at Samara's direction. (Exhibit 16).

---

[2] Review of American Express records determined that the above-mentioned individuals traveled to Philadelphia on October 1-3, 1993, and stayed at the Courtyard by Marriott Hotel, 8900 Bartram Avenue, Philadelphia, Pennsylvania. (Exhibit 13).  Among the individuals physically observed by the FBI to be at the Courtyard by Marriott on October 1-3, 1993, were:  Ashqar, Maghawri, Shabib, Elbarasse, Baker, and Elashi. (Exhibit 14).

9

During the February 21, 1993, IP interview of self-admitted HAMAS member Mahmud Rumahi, he stated that he was recruited to HAMAS in December 1990, by his brother-in-law, Mahmud Qazim.  Qazim gave Ashqar's phone and fax numbers to Rumahi, so that he would be able to get money and pamphlets. In April 1991, Ashqar sent a representative from the United States to Israel to obtain detailed reports on HAMAS activities in Rumahi's region. (Exhibit 17).

Additionally, Rumahi stated that in July 1991, he traveled to the United States to meet with Ashqar, who arranged for him to fly to Tennessee and meet with Abu Omar Mussa (a.k.a. Mousa Marzook), one of the HAMAS leaders in America.  Rumahi gave a full report to Mussa on his group's HAMAS activities.  After Rumahi returned, he gave Ashqar a detailed report of that conversation. (Exhibit 17).

2. **Akram Kharroubi**:  During the early 1990s, Akram Kharroubi (a.k.a. Haroubi, Harroubi) was head of the Washington, D.C. Muslim Arab Students Association.  He was in contact with HAMAS leaders, including Mousa Abu Marzook.  He reportedly distributed HAMAS statements when they were issued.

He returned to the West Bank and Gaza in 1994.  In early 1999, the GOI detained him for questioning.  During his interview by the IP, he admitted that from 1994 to 1999, he was a money courier between HAMAS members in Jordan and the West Bank.

Kharroubi further stated that in approximately 1997, the HAMAS headquarters in Jordan gave instructions to found a united headquarters of HAMAS in the West Bank, which was to include representatives of all the regions.  Due to the objection of all the regional headquarters to the establishment of a united headquarters for the West Bank, it was decided to establish an Inter-Regional Coordinating Committee where Kharroubi served as the Ramallah region representative. (Exhibit 18).

3. **Mohammad Al-Hanooti**: In April 1992, HLFRD-1, an FBI source, who has been found to be reliable in the past stated that Al-Hanooti was a big supporter of HAMAS.  The source further stated that it was well known in the Palestinian

10

0069

community in the northern New Jersey area that Al-Hanooti was an active HAMAS supporter, purportedly holding fund-raising activities, as well as supporting visitors to the United States from Israel and Jordan, to speak on behalf of HAMAS.

HLFRD-2, an FBI source, who has been found to be reliable in the past stated in 1993, that Al-Hanooti collected over six million U.S. dollars for support of HAMAS in Israel.

4. **Ismail Elbarasse**: During questioning by Israeli authorities, SDT Mohammad Salah stated that he was directed by Marzook to receive funds from Elbarasse to be used for funding HAMAS military operations. (Exhibit 20). Salah's financial records document that Elbarasse wire-transferred a total of $735,000.00 to Salah from December 1992 to January 1993. (Exhibit 21). A review of financial records reflect that in the 1990s, Elbarasse had a joint bank account with Marzook.

5. **Muin Kamel Mohammed Shabib**: Shabib was interviewed by the FBI on March 16, 1994, at which time Shabib admitted supporting HAMAS financially and politically. (Exhibit 22). During IP interviews of arrested HAMAS operative Salah Arouri, Shabib was identified by Arouri as being involved in the HAMAS terrorist apparatus. (Exhibit 23). The GOI has reported that Shabib is a senior HAMAS activist and was formerly in charge of HAMAS' Central Sector (Ramallah-Jerusalem) in the West Bank. According to the GOI, in 1990, Shabib recruited Salah Arouri, to the ranks of HAMAS, and assigned him with the founding of an infrastructure for the military apparatus in Hebron; recruiting young men, preparing squads and procuring weapons and equipment. (Exhibit 24).

6. **Shukri Abu Baker** (HLFRD's CEO): In the published edition of the <u>Dallas Observer</u>, dated March 4 - March 10, 1993, Baker admitted to wiring $60,000.00 a month to the Occupied Territories. Baker stated that he sent Haitham Maghawri, the Social Services Coordinator for the HLFRD, to Lebanon with funds for the 396 expelled Palestinians that the GOI claimed to be HAMAS activists. (Exhibit 25). As discussed below, numerous FBI sources have identified Baker as being a member of HAMAS.

11

7. **Haitham Maghawri** (HLFRD's Executive Director): According to the U.S. Immigration and Naturalization Service (INS) records, on November 4, 1990, Maghawri filed a request for asylum in the United States. In his asylum request he stated his reasons for seeking asylum were that he was being persecuted for his religion by the Amal Movement (Shia terrorist group in Lebanon, a rival to Hizballah). During an interview, Maghawri told INS officials the following information about his past: 1) He had been arrested for placing a car bomb, however, the INS interviewer made no further notes regarding this incident; 2) he was arrested in Lebanon in June, 1988, and was held for three weeks, the reasons not recorded; 3) in May, 1987, he was again arrested in Lebanon and held for five days. (Exhibit 26).

Maghawri's asylum request was denied. On December 19, 1991, he married a U. S. citizen, Fadia Tariq Akilah. As a result of his marriage, Maghawri received permanent residency status on September 15, 1992.

**Ghassan Elashi** (HLFRD's Chairman of the Board): Elashi and his brothers are the founders of InfoCom, Inc., a computer hardware business and Internet service provider located across the street from the HLFRD in Richardson, Texas. Elashi is currently the Vice-President of marketing. In September 2001, OFAC blocked the assets of InfoCom, based upon evidence that InfoCom received $250,000 from Marzook, during the same time frame as Marzook was providing funds to the HLFRD and others associated with HAMAS (detailed below).

**Results of the 1993 Philadelphia Meeting**: The electronic surveillance revealed the following:

The overall goal of the meeting was to develop a strategy to defeat the Israeli/Palestinian peace accord, and to continue and improve their fund-raising and political activities in the United States. During the meeting the participants went to great length and spent much effort hiding their association with the Islamic Resistance Movement, a.k.a. HAMAS. Instead, they referred to HAMAS as "SAMAH", which is HAMAS spelled backwards. Most of the time, the participants referred to HAMAS as "The Movement."

12

The participants decided that for fund-raising purposes, the United States theater was very valuable to them. They stated they could not afford to lose it. In the United States, they could raise funds, propagate their political goals, affect public opinion and influence decision-making of the U.S. Government. In addition, they hoped that sometime in the future they would be viable enough and strong enough to represent an alternative to the Palestinian Liberation Organization.

It was mentioned that the United States provided them with a secure, legal base from which to operate. The democratic environment in the United States allowed them to perform activities that are extremely important to their cause. In discussing financial matters the participants stated a belief that continuation of the Holy War was inevitable.

It was decided that most or almost all of the funds collected in the future should be directed to enhance the Islamic Resistance Movement and to weaken the self-rule government. Holy War efforts should be supported by increasing spending on the injured, the prisoners and their families, and the martyrs and their families. (Exhibit 28).

<u>1994 Oxford, Mississippi Meeting</u>: Declassified electronic surveillance of Ashqar and Muin Shabib disclosed that in early 1994, Ashqar's Al-Aqsa Educational Fund (AAEFI) and the HLFRD were in conflict over fund-raising issues. The electronic surveillance further disclosed that HAMAS Political Bureau head Mousa Abu Marzook designated the HLFRD as the primary fund-raising entity in the United States and ordered the AAEFI to curtail fund-raising operations. Ultimately, Marzook traveled to the United States and chaired a meeting in Dallas, Texas, regarding this issue. (Exhibit 29). Two senior HAMAS activists, Jamal Hamami, one of the founders of HAMAS, and Sheikh Mohammad Siyam (a.k.a. Siam), a self-admitted HAMAS official (Exhibit 30), met with Ashqar in Oxford, Mississippi, on March 13, 1994, to explain Marzook's decision.[1]

---

[1] On March 13, 1994, the FBI observed Ashqar's travel to Memphis International Airport where he picked-up Sheik Jamal Hamami and Sheik Mohammad Siyam. Ashqar drove Hamami and Siyam to his residence where the three remained until March 14, 1994. (Ex. 31).

13

**0072**

It should further be noted that FBI investigation has determined that the HLFRD has used both Hamami and Siyam as guest speakers at HLFRD fund-raising events. American Express records reveal that from September 20, 1990, to November 29, 1991, the HLFRD paid for at least six trips taken by Hamami to the United States. The HLFRD also paid for at least five trips taken by Siyam, a.k.a. M. Siam, M. Seyam, from April 20, 1992 to March 9, 1994. These trips were charged on either the Occupied Land Fund/Baker Corporate American Express Account # 3783-647335-91006 or the HLFRD/Baker Corporate American Express Account # 3783-647335-92004 or 93002. (Exhibit 32).

## 2. EARLY FUNDING FROM HAMAS:

According to the documents filed on October 4, 1995, in the Southern District of New York by the State of Israel's Ministry of Justice, Marzook was identified as the head of the Political Bureau of HAMAS. The document reads:

> The (political) bureau operates as the highest ranking leadership body in the HAMAS organization, setting policies and guidelines respecting HAMAS' activities. In addition to its other functions, this bureau has responsibility for directing and coordinating terrorist acts by HAMAS against soldiers and civilians in Israel and the territories. In his role as head of the political bureau, Marzook financed certain activities of HAMAS, including terrorist activities. In addition, he played an important role in organizing and structuring HAMAS and in supervising the activities of the wing of HAMAS responsible for the terrorist acts and in appointing individuals to important leadership roles in the military wing . . . Even by the time that Marzook became a leader in HAMAS in 1989, he was already clearly aware of the nature of the terror attacks committed by HAMAS. (Exhibit 33).

Investigation corroborates the GOI's statement that Marzook was a significant member of HAMAS. According to the July 25, 1995, FBI interview of Marzook, he described himself only as a "mid-level political activist" within the political arm of HAMAS since 1990. (Exhibit 34). However, as of August 15, 2001, the HAMAS website, www.palestine-

14

0073

info.com/hamas, identified "HAMAS symbols and leaders." The website stated that Marzook was "Elected as Chairman of Hamas Political Bureau in 1991." (Exhibit 35). Based on Marzook's well-established affiliation with HAMAS, Marzook was subsequently designated by the U.S. Government on August 25, 1995, as a SDT. (Exhibit 36).

FBI investigation has revealed that during March, 1992 and August, 1992, Marzook deposited a $100,000.00 check from the Central Fidelity Bank Account # 7920439173 and a $100,000.00 check from a First Virginia Bank Account #68168179 to the HLFRD account at Bank of America, California Account #0941402284. Ismail Elbarrase's name was printed on the check along with Marzook's. The 1993 HLFRD tax form 990 further reflects the receipt of $210,000.00 from Marzook. (Exhibit 37).

During an FBI interview of Nasser Alkhatib on March 15, 1994, he advised that he worked for Marzook and conducted various bank transactions for Marzook. (Exhibit 38). FBI investigation has determined that on August 31, 1992, Nasser Alkhatib deposited a check for $22,000.00 into the HLFRD Bank One Account #1070001258. This check was dated August 24, 1992, and written to "Holy Land Foundation" from First Virginia Bank Account # 5065 0599, listing Nasser and Narman Alkhatib, 6166 Leesburg Pike, Falls Church, on the check. (Exhibit 37).

Marzook Simultaneously Funds the HLFRD & HAMAS Terrorist Operations:

As described, in 1992, Marzook, Elbarasse and Alkhatib were providing funds to the HLFRD. During 1992 to January 1993, these same HAMAS activists were also providing funds to Mohamad Salah, designated by U.S. Government as a SDT in February 1995. Salah was arrested January 25, 1993 in Israel for supporting HAMAS terrorist activities. At the time of his arrest, he had $97,000.00 in cash in his possession, after having admitted to already disbursing approximately $140,000.00 to individuals identified by the GOI as members of HAMAS. (Exhibit 39).

Records verified that Marzook deposited a total of $23,410.00 into Salah's U.S. bank account during the time period of May 20, 1990 to November 29, 1992. Records also

15

0074

verified that Elbarasse deposited a total of $740,000.00 in Salah's account during the time period of August 8, 1992 to January 25, 1993; and Nasser Alkhatib deposited a total of $251,000.00 into Salah's account during the time period of August 21, 1992 to January 22, 1993. (Exhibit 21).

Business records further indicate that during the same period that Marzook is funding the HLFRD and Salah, he is providing large sums of money to IAP. March 1990 Texas State business records list IAP as a d.b.a. for American Middle Eastern League for Palestine (AMEL). Ahmad Agha (who has served as the HLFRD's treasurer, Exhibit 11) and Ismael Elbarasse are listed as Directors of AMEL. In addition, financial records reveal that Elbarasse and Marzook opened a bank account in the name of IAP on January 12, 1990, at the Central Fidelity Bank, Arlington, VA. Elbarasse was the signatory on that account. Bank records show deposits of seven checks totaling $125,000 to this IAP account in 1990 and 1991.

## 3. RECIPIENTS OF HLFRD FUNDS OVERSEAS

The following interview is provided as evidence of how the HLFRD's "charitable" fund-raising activity furthers the HAMAS terrorist organization's agenda. The interview, published in the London Filastin Al-Muslimah, with Dr. Ibrahim Al-Yazuri, one of the founders of HAMAS, described the HAMAS philosophy concerning charitable giving. He stated:

Everyone knows that the Islamic Resistance Movement, HAMAS, is a Palestinian Jihad movement that strives for the liberation of all Palestine, from the (Mediterranean) sea to the river (Jordan), from the north to the south, from the tyrannical Israeli occupation, and this is the main part of its concern. Social work is carried out in support of this aim, and it is considered to be part of the HAMAS movement's strategy . . . The HAMAS movement is concerned about its individuals and its elements, especially those who engage in the blessed jihad against the hateful Israeli occupation, since they are subjected to detention or martyrdom. **The movement takes care of their families and their children and provides them with as much material and moral support as it can.** This is one of the fundamental truths of Islamic work and thus

16

represents the duties of the Islamic state . . . The HAMAS movement provides financial assistance, material aid of food packages in the blessed month of Ramadan, and gifts, clothes, and sacrifice meats for the 'ID AL-ADHA to poor and needy Palestinian families without discrimination.  It also provides poor and needy students and sons of martyrs in the first year of study with school bags containing paper and other study essentials and supports orphans in the Gaza Strip.  **The movement provides this aid through the support and assistance it gives to the zakat (Islamic alms-giving) committees and the Islamic associations and institutions in the Gaza Strip.** (Exhibit 40). (Emphasis added)

In a <u>Washington Post</u> article, dated August 11, 2001, Sheikh Yassin described the purpose of HAMAS' charitable giving in the West Bank and Gaza.  The article states,

On the streets of Gaza, and to a somewhat lesser extent in the West Bank, Hamas's status has been underpinned by a network of medical clinics, schools and welfare institutions that distribute free and subsidized food to the needy.  According to Yassin, the group distributes $2 million to $3 million in monthly handouts to the relatives of Palestinian suicide bombers; "martyrs" who have been killed by Israelis; and prisoners in Israeli jails.  When pressed, he was vague about the provenance of the money, which, according to the State Department, comes mainly from Palestinians overseas, Iran and private benefactors in Saudi Arabia and other moderate Arab states. (Exhibit 41).

Ronni Shaked, a journalist and former official in the GOI, commented on HAMAS fund-raising in a book he wrote based on his interviews with operatives while they were imprisoned:

The major channel for fund-raising for the HAMAS organization in the United States is the Occupied Land Fund that was established in Los Angeles, California.  In 1992, the organization changed its name to the Holy Land Foundation and moved to Richardson, Texas.  The President of this organization is Shukri Abu Baker.[4]

---

[4] Shaked, Ronni and Aviva Shabi, <u>Hamas: M'Emunah B'Alluh L'Derech Ha-Terror</u> (Hamas: From Belief in Allah to the Road of

As will be described below, it has been documented that the HLFRD provided charitable aid to the very individuals and institutions described by HAMAS as its recipients.

As to the individuals receiving support from the HLFRD, evidence strongly suggests that the HLFRD has provided crucial financial support for families of HAMAS suicide bombers, as well as the Palestinians who adhere to the HAMAS movement. It is believed that by providing these annuities to families of HAMAS members, the HLFRD assists HAMAS by providing a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace. According to HLFRD-4, an FBI asset who has provided reliable information in the past, in the words of Shukri Abu Baker, HLFRD's mission is to support the families of the martyrs.

FBI investigation has determined the HLFRD transfers funds to HAMAS overseas utilizing at least three methods:

1) Direct fund transfers from the HLFRD Richardson, Texas office to the HLFRD offices in the West Bank and Gaza;

2) Transfers of funds from the HLFRD Richardson, Texas office to zakat (Islamic charity) committees located in the West Bank and Gaza, controlled by HAMAS;

3) Transfers of funds from the HLFRD Richardson, Texas office to other "charitable" organizations in the Middle East, not controlled by HAMAS, but believed to be supporting HAMAS.

FBI analysis has seen what appears to be the more common use of the HLFRD offices in the West Bank and Gaza as a preferred means of distributing funds to zakat committees. While zakat committees formerly received larger sums directly from the HLFRD Richardson, Texas office, since 2000 the FBI has observed a decrease or elimination of funds sent directly to the zakat committees. This coincides with the increase in funds to the HLFRD offices in the West Bank and Gaza, located in the same region as those zakat committees. (Exhibit 43).

---

Terror, Keter Publishing House, Jerusalem, 1994, p. 171.

18

0077

The largest HLFRD recipients outside of the West Bank and Gaza are Sanabil Association for Relief and Development in Lebanon and Human Appeal International in Jordan.  As will be discussed, these organizations have been linked to HAMAS.

## 3A. HLFRD OFFICES OVERSEAS

Significant information has been provided through the GOI's search of the HLFRD Jerusalem on May 7, 1995 and the closure of all HLFRD offices in Israel on May 6, 1997.

### Search of the HLFRD Office in Jerusalem:

The GOI have provided numerous documents that were seized during the May 7, 1995 search of the HLFRD office in Beit Hanina (an arab village outside of Jerusalem), which was operated by Muhammad Anati.  It is the FBI's analysis that the documents seized and statement by the head of that office demonstrate the control the HLFRD headquarters in Richardson, Texas, had over the HLFRD Jerusalem office.

Documents retrieved in the search show that the two HLFRD offices were in frequent contact.  Numerous documents seized from the office were facsimiles that bore the HLFRD letterhead and included the "sender's" fax number from the HLFRD office in Richardson, Texas.  The following are the main findings:

1. Records reflecting funds transferred from the HLFRD to the Islamic Aid Committee, a.k.a. Islamic Relief Agency (IRA) and lists of people supported by those funds.  Those lists bear the HLFRD name and Richardson office telephone number on the top of the pages, indicating the lists of recipients were reviewed in the HLFRD's Richardson office and then faxed from Texas to Jerusalem.  Further, according to GOI analysis, the names of people who are not known to be affiliated with HAMAS received relatively low monthly payments.

The lists contained dozens of names of recipients who received more significant sums.  Most of those individuals have been identified by the GOI as having ties to HAMAS activists. (Exhibit 45).  The GOI has provided over 50 names of individuals listed by the HLFRD as recipients, having HAMAS connections.  As an example, a paper with a request for 18 fund transfers for families of HAMAS deportees included as follows:

19

16 transfers of between $100.00 and $200.00 each to families of deportees - without the names of the deportees listed.[5] (Exhibit 45). The payment was for February 28, 1993. Each of these transfers bears the registration: family of a deportee, with the date (usually January 15 or February 15, 1993), and the sum to be paid. It is also noted that these families did not receive any previous payments;

Two transfers of $400.00 each for the following:

(a) Ansharah Mahmoud Shukri, Ramallah; date of payment, January 15, 1992; last payment, October 31, 1992; $400.00.

According to the GOI, Ansharah Ali Shukri is the mother of Ahmed Hussein Mahmoud Shukri, who is in jail for the murder of a Jew at a Tel Aviv building site in September 1989, as well as an attempt to cause a bus (line 405) to go off the road. He was arrested in September 1989 and sentenced to life imprisonment. While in prison, Shukri murdered a warden. (Exhibit 45).

(b) Fawzi Salman Abd Al-A'al, Gaza; date of payment, January 15, 1992; last payment, October 31, 1992; $400.00.

According to GOI, Fawzi Salman Mahmoud Abd Al-A'al, Gaza, born in 1946, was a former detainee in 1989. He was fired from his job at the civilian administration (he was a male nurse) following his arrest. Al-A'al's sons, Mazzen and Muhammad, are former detainees and HAMAS activists. (Exhibit 45).

The search produced other examples of individuals receiving money from the HLFRD (Exhibit 45), including:

---

In December 1992, the GOI deported approximately 400 HAMAS and Palestine Islamic Jihad (PIJ) members to Lebanon. The deportees were not admitted to Lebanon, and were forced to live in makeshift tent cities for several months on the Lebanese border. As previously mentioned, during this time, the HLFRD sent funds to these deportees. (Exhibit 46)

20

0079

The father of Muhammad Shawan, a wanted member of the Izz-Al-Din Al-Qassem who was killed in a clash with an IDF force in March 1994, and who participated in several attacks, including the murder of two grocers in the Khan Younes area in May 1993;

The widow of Abd Al-Rahman Aruri, a former deportee, and a senior member of Izz Al-Din Al-Qassam, who was killed in a clash with the Israeli Defense Forces (IDF) in December 1993;

The family of Suleyman Idan, killed during a car-bomb attack in Beit-El in October 1993;

The mother of Ashraf Ba'aluji, serving a life sentence for the murder of three Jews in Jaffa, in December 1992;

The wife of Jamil Al-Baz, a HAMAS activist serving a life sentence for running over a soldier at Nitzanim crossing on July 19, 1991;

The wife of Majdi Hamad, a senior Izz Al-Din Qassam activist in Jabaliyah, who killed local residents and is serving a life sentence;

The family of Yasser Hajaj, a HAMAS activist serving a life sentence for placing an explosive charge on a Tel Aviv beach on July 28, 1990, killing a Jewish tourist from Canada;

The brother of Raid Zakarana, a HAMAS terrorist who committed suicide in Afula in April 1994;

2. An agreement between HLFRD Richardson, Texas and HLFRD Jerusalem: This agreement was dated June 3, 1994, and signed by Shukri Abu Baker, as Executive Director of the HLFRD, and Mohamed Anati, Executive Director, HLFRD Jerusalem office. (Exhibit 47). That agreement states that the HLFRD recognized the HLFRD Jerusalem as its sole agency in the West Bank and Israel and authorized it to oversee fund disbursement for programs.

The key points of Anati's 1995 interview (Exhibit 45) are as follows: Anati's office performed the functions of the fund in liaison, mediation and supervision on behalf of the fund in the United States and did not conduct money transfers;

21

The budget of the Jerusalem office was between $80,000.00 and $120,000.00 per year. This money was earmarked for regular operation of the office and was directly deposited in the HLFRD's account at the Mercantile Discount Bank in East Jerusalem;

The Jerusalem office's task was to draw up lists of needy from the West Bank and to provide those lists to the HLFRD office in Richardson, TX. After the HLFRD sent monies to the zakat committees, the Jerusalem office was then tasked with confirming that the individuals identified by the HLFRD received the allocations from the zakat committees in the West Bank;

The aid (money) was transferred directly from the United States to the zakat committees' bank accounts abroad.

The HLFRD in the United States had two branches in Israel, one in Beit Hanina, which was operated by Anati, and the second in the Gaza Strip, which was under the direction of Zuhair Baghadi. Both branches were directly subordinate to the HLFRD's management in the United States;

The annual budget of the fund in the West Bank was assessed at about one million dollars (valid to 1993-1994);

The center of the fund was in the United States where the contributions are collected. The fund was headed by Shukri Abu Baker, who operated from the main office in Texas. There was another office in New Jersey, headed by Muhammad El-Mezain.

Anati's statement and the above described lists seized from the HLFRD Jerusalem office, which designate the recipients of HLFRD funds, clearly indicate that Shukri Abu Baker played a controlling role in deciding who would receive support by the HLFRD. Many of these recipients have been identified by the GOI as being supporters of HAMAS.

<u>1997 HLFRD Closure</u>:

On May 6, 1997, the Israeli Minister of Defense named five Islamic associations as "non-permissible" and on that basis declared that funds reaching individuals and organizations in the West Bank and Gaza through those associations could be confiscated. (Exhibit 49). The HLFRD

22

0081

was the only U.S. organization listed in this group.[6]  At the time, the HLFRD operated two offices in Israel, one in Gaza and the other in the West Bank town of Beit Hanina.  The HLFRD offices in Israel were closed, based on the determination that the HLFRD raised funds that supported the HAMAS terrorist apparatus.  On December 10, 1997, the head of the HLFRD's Jerusalem office, Mohammad Anati, was arrested and detained on charges of aiding and abetting a terrorist organization.

During his interview by the GOI (Exhibit 50), Anati stated that he was enlisted by HAMAS in 1990 and participated in writing HAMAS slogans and throwing stones.

In early 1993, he met Shukri Abu Baker, who personally hired him to run the HLFRD Jerusalem office.  Anati ran the HLFRD Jerusalem office from early 1993 until its closure.  That office was responsible for HLFRD activities throughout the West Bank.  Anati stated the following about the HLFRD:

1. On March 17, 1996, the army and police came to the HLFRD office in Jerusalem and on authority of a decree by the Minister of Defense, shut down the office for one year.  A year later, Anati re-opened the office, since he had not received an extension of the closure decree.  According to the Anati, despite the closing down of the office, all the branches received their money regularly, directly to their bank accounts.  In 1997, when he re-opened the office, he received the money for the entire year.

2. Anati stated the HLFRD provided aid to the needy, but some of the aid was channeled to HAMAS;

3. Anati enabled every branch to allocate the money freely, and since some of the heads of the branches were connected with or supporters of HAMAS, some of the money served HAMAS.

_____

[6] The GOI orders stated, that despite its declared goals, the HLFRD "deals in the practice of transferring monies to the families of HAMAS activists, who carried out deadly attacks, or who were jailed in the wake of these attacks" and "benefits from funding sources which are identified, according to security assessments, with the overall financial network of HAMAS."

23

**0082**

4. While working for the HLFRD, Anati also secretly promoted HAMAS interests. For example, when he helped build an Islamic clinic in a certain area, everyone around knew that it was the HAMAS organization behind the clinic. When food was distributed during holidays, the population knew that HAMAS was behind this.

5. Approximately six months prior to this interview, Shukri Abu Baker told Anati to establish an advisory committee to the HLFRD, in order to advise which projects to fund. Baker proposed that Anati turn to Dr. Akram Harubi, a.k.a. Kharroubi, as one of the committee members. As previously stated, Kharroubi has admitted to being the Ramallah regional representative on HAMAS' Inter-Regional Coordinating Committee, which coordinated HAMAS activity in the West Bank.

Anati stated he turned to Fuaz Hamad Kamil, a.k.a. Fawaz Hamdan, who studied economics and operated in the Welfare Committee of the Al Razi Hospital in Jenin, for assistance in establishing the HLFRD advisory committee. As discussed later, Hamdan has been imprisoned for his activities in connection with HAMAS, which included aiding fugitives and funding weapons purchases. (The HLFRD has provided support to the Jenin Zakat Committee and Al Razi Hospital.) Hamdan established the committee, which included himself, Anati, Kharroubi and one other.

6. Anati described the HLFRD's headquarters in Richardson, Texas, and Shukri Abu Baker as being in charge.

7. Funds were transferred from the United States to Israel. The HLFRD office in Dallas sent the funds directly to the bank accounts of the different organizations in the West Bank, as well as the bank accounts of the various projects. The money did not pass through his office, except for funds intended for the Jerusalem area, which Anati personally allocated.

8. According to Anati, the HLFRD is connected with HAMAS. When he visited the United States in 1994, he understood that they were pro-HAMAS and engaged in helping the needy. He also stated that he was told by HLFRD members visiting Israel that during parties and conventions held by the HLFRD abroad, it was mentioned that they were pro-HAMAS and they sang HAMAS songs.

24

**0083**

According to the 1999 interview of Kharroubi, after Anati was arrested he was contacted by Hoda Abadin, a resident of Jerusalem, known to Kharroubi as being involved with the handling of orphans at the HLFRD Jerusalem office. Abadin began to coordinate all contacts with the charity committees in the West Bank, which provided lists of candidates for support. She then sent these lists to the HLFRD in Richardson, Texas for approval. Later, she received a list of approved candidates and the sum approved for distribution to each recipient. Simultaneously, the HLFRD sent the approved sum to the relevant charity committee.

Abadin told Kharroubi that following Anati's arrest, HLFRD's lawyer, Mudhi Rishak, indicated that the HLFRD was transferring its activity from the office in A·Ram/Qalandiya outside Jerusalem to her home, since the offices could be shut down on decree. The HLFRD's lawyer, Rishak recommended to stop the HLFRD's activities from its offices until Anati's trial was over. (Exhibit 18). It is the FBI's analysis that the continued operation of the HLFRD subsequent to it's ban demonstrates its continued efforts to provide support to what had been identified as HAMAS recipients. In addition, this activity demonstrates the HLFRD's control over the allocation of funds from the Richardson, Texas headquarters.

HLFRD HEBRON OFFICE

According to FBI analysis of the HLFRD's Richardson office bank records, the HLFRD Hebron office has only been receiving funds from the HFLRD Richardson since October 1998. Hebron received the following:

1999: $442,491.00; Jan.-Sept. 2000: $1,001,492.00

The former head of the HLFRD Hebron office was Kamal al Tamimi. Tamimi has been identified by the GOI as a HAMAS activist. (Exhibit 18). In 1992 he was one of the HAMAS activist deported to Lebanon.

HLFRD GAZA OFFICE

The FBI has little current knowledge as to the leadership of the HLFRD Gaza office. The HLFRD Richardson office sends significantly less money to its Gaza office, as compared to the West Bank. FBI analysis indicates that the HLFRD Gaza received the following:

25

0084

1997: $231,434.00; 1998: $76,697.00; 1999: $217,495.00; Jan.-Sept. 2000: $65,458.00

According to GOI and public source reporting, on September 25, 1997, as a result of HAMAS terrorist attacks, the PA closed what they identified as 16 HAMAS institutions and associations as part of it's efforts to degrade the terrorist infrastructure. The HLFRD's Gaza office was one of those 16 offices that the PA closed. (Exhibits 51, 53). According to the interview of Anati, subsequent to his December 10, 1997, arrest, the HLFRD Gaza office was headed by Muhammad Shawa and was shut down by the PA on the charge that it had ties with HAMAS. (Exhibit 50).

According to HLFRD-4, an FBI source, who has provided reliable information in the past, Shukri Abu Baker, at the September 30, 1997, HLFRD fund-raiser in Buena Park, California, commented on the closing of the HLFRD Gaza office. Baker discussed the HLFRD mission to support the families of the martyrs. He further talked about Yassar Arafat closing a number of charitable organizations' offices in Gaza, including the HLFRD office. Baker stated that Arafat would be sorry that he did this and that the goal of HAMAS to form an Islamic State could not be thwarted. This office has now been re-opened.

The GOI has further reported that Zuhari Barghati was the former Director of the HLFRD Gaza office. The GOI identified Barghati as a HAMAS activist and the nephew of Ismail Barghati, who had a joint account with Marzook while Marzook served as the head of the Political Bureau of HAMAS. (Exhibit 52).

One of the projects this office oversees is the Dar el Salam Hospital discussed below.

## 3B. ZAKAT COMMITTEES IN THE WEST BANK AND GAZA

[FBI COMMENT: Individual names which appear in bold print in this section have been identified by the GOI as being zakat committee leaders. Individual names appearing under these zakat committee leaders are HAMAS activists who have corroborated the HAMAS leadership role of those individuals who immediately appear in bold.]

26

**0085**

FBI analysis has determined that HAMAS uses the zakat committees to provide needed social services for the Palestinian population, thereby gaining support for their movement. (Exhibit 53).  These charity committees receive funds from such organizations as the HLFRD and manage social services, such as hospitals and schools, and distribute food and clothing.

An August 13, 2001 <u>USA Today</u> article describes how HAMAS' social infrastructure, in this case HAMAS-run schools, serve HAMAS' ends:

In HAMAS-run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds (holy martyrs) of tomorrow."  The classroom signs at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs."  At an Islamic school in Gaza City run by HAMAS, 11-year-old Palestinian student Ahmed states, "I will make my body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . I will tear their bodies into little pieces and cause them more pain than they will ever know."  "Allah Akbar," his classmates shout in response: "God is great."  "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise.  Even the principal smiles and nods his approval.  "You don't start educating a shaheed at age 22," says Roni Shaked, a terrorism expert and former officer in Israel's Shin Bet secret service.  "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life." (Exhibit 7).

Zakat committees are located in most communities throughout the West Bank. (Exhibit 53).  Financial analysis of the HLFRD Richardson, Texas office records reveal that it has provided funds to the zakat committees representing the major communities in the West Bank, including:  Hebron, Ramallah, Jenin and Nablus.

It is the FBI's analysis that the zakat committees receiving HLFRD financial support are controlled by HAMAS.  GOI analysis has also determined that HAMAS activists have been elected or appointed to senior leadership positions on these zakat committees.  GOI analysis, as well as open source reporting, has identified that the civilian population is

0086

aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS. (Exhibit 53-54). The HLFRD's funding of the Islamic Charity Association (ICA) is one example of the role that zakat committees play in the overall goal of building HAMAS grassroots support through charitable projects.

## Islamic Charity Association
## a.k.a. Islamic Charitable Society in Hebron

A March 2, 2001, Associated Press article (Exhibit 54) described a large unfinished building in Hebron, West Bank, where Palestinian men and teen-age boys worked on a makeshift assembly line, packing food items into boxes. Inspirational music extolling HAMAS played in the background, "The holy war is calling," a singer intoned on a tape. "We will continue the resistance, the HAMAS revolution."

The article went on to explain that the warehouse is run by the Islamic Charity Organization in Hebron, which distributed 50,000 food packages to destitute Palestinian families in the West Bank ahead of the Muslim holiday of Eid al Adha. The article stated that across the Palestinian areas Islamic charities are filling a growing need created by skyrocketing unemployment and poverty. In so doing, they are winning hearts and minds for HAMAS' unyielding doctrines at the expense of the PA. "People realize more than before who is honest and who is not. In the long run, it will pay off in increased political popularity," said Khaled Amayreh, a Palestinian journalist close to the Islamic movement."

The article describes that, along Shuhada Street in Hebron, 56 families have received monthly donations of food from Islamic charities. Anaya Bader of Shuhada Street said that she desperately needed the donations to make ends meet. With 10 children to feed, she said her Islamic brothers have not only her thanks, but also her support. "All we know is they are the ones who bring us food," she said.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that the ICA received the following from the HLFRD:

1997: $138,302.00; 1998: $690,297.00; 1999: $275,313.00; Jan. Sept. 2000: no funds.

**0087**

Additionally, from January 1997 to April 1999, approximately $52,474.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

It is reasoned that the decrease in funding by the HLFRD is due to the fact that a library building project in Hebron, for which the HLFRD has collected large donations, was completed. The HLFRD Hebron may have taken over the maintenance of the library as well.

According to information from the GOI, the ICA has been identified as a HAMAS entity. (Exhibit 55).

In addition, the GOI reports that the ICA is in charge of such institutions as the Islamic Associations in Dura, Bani Na'im, Yata, and Beit Ola. (Exhibit 56). The GOI identifies the following individuals as leaders of ICA:

**Muhammad Ayad Muhammad Missaq**, a.k.a. Muhammad Eid Muhammad Missak, ICA director/manager; Administrative detention from April to August 1989[7] and from December 1992 to April 1993; identified by the GOI as a senior HAMAS activist in Hebron. (Exhibits 56-57).

Abdallah Najar, a HAMAS activist, was interviewed by the GOI in January 1997. Najar stated that when he worked in the Hebron Orphanage, owned by the ICA, Missaq was one of the HAMAS activists with whom he worked. (Exhibit 58).

Ibrahim Abd Al-Fatah Shubaka, a HAMAS activist, was interviewed by the GOI. Shubaka stated that Missaq was a member of the ICA, which maintains two orphanages and financially supports the town's orphans. He stated that the schools instill the pupils with HAMAS values, and their graduates include operational HAMAS activists. (Exhibit 59).

---

[7] According to GOI, an administrative detention is based on terrorism-based information obtained by Israeli authorities, and reviewed by the region's military commander or a judge. The detention can last for three to six months and can be extended.

0088

**Hashem abd al-Nabi Natshe**, Directorate Co-Chairman and Chairman of the Trade Bureau (Chamber of Commerce.)  In August 1990, Natshe was arrested by the GOI, but released due to a health condition.  The GOI identifies Natshe as a senior HAMAS activist. (Exhibit 56-57).

Abdallah Najar, the HAMAS activist mentioned above, was interviewed in January 1997.  Najar stated that he worked in the Hebron Orphanage, which is affiliated with the ICA.  One of the HAMAS activists he identified working with was Natshe. (Exhibit 56).

**Adnan abd al-Hafez Musbah Maswada**, Directorate Co-Chairman.  Detained June to July 1989 and April to October 1994 for HAMAS activity.  Maswada was a 1992 deportee to Lebanon.  According to the GOI, Maswada is a member of HAMAS headquarters in Hebron and is connected to HAMAS terrorist activities against settlers. (Exhibit 57).

When HAMAS founder Sheikh Ahmad Yassin was interviewed by the GOI, he said that in the period of April to May 1989, he received a message from HAMAS activists in Jordan stating that operational HAMAS representatives should be appointed in Gaza, Hebron and Nablus.  Yassin asked his aide to forward the message to Maswada in Hebron, so that he could assist and advise them whom to appoint. (Exhibits 60).

Yahya Arshad, a HAMAS activist, was interviewed by the GOI.  He stated that in early 1996, HAMAS/Muslim Brotherhood established the Hebron Majles Al-Shura to be responsible for advising and deciding on the political platform of both organizations.  Arshad stated he attended both meetings of this forum and Maswada had also attended. (Exhibits 61).

Mun Wazuz, a Hebron HAMAS activist was interviewed by the GOI.  He stated that Maswada was a senior HAMAS activist. (Exhibits 62).

Assad Heimuni, a Hebron Democratic Front for Liberation of Palestine (DFLP) activist, was interviewed by the GOI. He stated that he knew Maswada to be a HAMAS activist. (Exhibits 63).

30

0089

**Izzam Naaman abd al-Rahman Salhab**, Head of Orphans' Branch. He was a 1992 deportee to Lebanon, returning in December 1993. Salhab was placed under administrative arrest from May to December 1989 and March to June 1990. He was also in prison from December 1990 to December 1991 and October to December 1992. The GOI identified him as a member of the HAMAS leadership in Hebron. (Exhibits 56-57). During an interview in December 1990, Salhab admitted being recruited by HAMAS and being a member of the HAMAS headquarters and in charge of the prison committee. (Exhibit 57, 64).

During the GOI interview of Kutla (student organization of HAMAS) activists Adel Badrin and Fuad Tabish, it was determined that they attended meetings between the Kutla leadership and HAMAS. The last meeting was in April/May 1999. Both Badrin and Tabish separately identified Salhab as being one of the HAMAS representatives present. (Exhibit 65-66).

Akram Kharroubi, a HAMAS activist, was detained and interviewed by the GOI in 1999. Kharroubi stated that Salhab was the Hebron representative to the united headquarters of HAMAS in the West Bank, called the "al Lajna al-Marjiyah," which was to include representatives of all the regional Headquarters. (Exhibit 18). The role of these representatives was to maintain contact with HAMAS activists in his area on various issues including political-organizational activity. HAMAS emissaries came from abroad, and members of the committee were sent abroad, to consult on specific issues. (Exhibits 18, 67).

**Hathem Mahmud Hassan Shahada**, Secretary. Identified by the GOI as a HAMAS activist. (Exhibit 57).

**Taher abd al-Aziz Dandis**, ICA member. Dandis was a 1992 deportee to Lebanon and was imprisoned from June to September 1994. GOI reporting states he is a HAMAS leader in Hebron, with strong ties to other HAMAS leaders. (Exhibit 56).

**Hebron Library Project**: During the 1999 GOI interview of Kharroubi, he stated he was involved in the "founding of a library in Hebron," presumed to be the Al Anwar al Ibrahimi Library. His involvement was at the request of Hitham (Haitham Maghawri, HLFRD Executive Director). (Exhibit 18).

**0090**

According to the 1999 HLFRD Annual Report, the HLFRD undertook the financing of a library, called the Al Anwar Ibrahimi Youth Education Center.   (Exhibit 11).   That library was under the oversight of the HLFRD Jerusalem.

## Charity Committee in Ramallah a.k.a. Ramallah Zakat Committee

According to the GOI, the Ramallah Zakat Committee is a HAMAS entity and provides relief and assistance to the needy in Ramallah and Jerusalem.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $89,229.00; 1998: $72,652.00; 1999: $58,522.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, approximately $24,304.00 was transferred to this zakat committee from the HLFRD Richardson office, exact dates unknown.

The following HAMAS activists have been identified by the GOI as being associated with the Ramallah Zakat Committee (Exhibit 56):

**Aqel Suliman Muhammad Rabia** a.k.a. Aqal Sulayman Muhammad Rabiyah, Director/Manager; incarcerated from December 1990 to March 1992, due to his involvement in HAMAS. (Exhibit 56).

Ahmad Sati, an identified HAMAS activist, was interviewed by the GOI.  He stated that Rabia was Hebron's representative to HAMAS' national propaganda apparatus. He described this apparatus as being guided directly by the regional HAMAS headquarters and indirectly by the national headquarters. (Exhibit 68).

Omar Quasma, a HAMAS activist, was interviewed by the GOI.  He stated that in 1990, he received HAMAS written materials from Rabia to distribute in the Hebron Mosques. (Exhibit 69).

Mahammed Anati, an admitted HAMAS activist and former head of the HLFRD Jerusalem office, was interviewed by the GOI   He stated that after the HLFRD was outlawed by

32

0091

the GOI, Rabia gave him a room at the Ramallah Zakat Committee premises from which he ran HLFRD affairs. (Exhibits 45, 56).

**Amar Muhammad Ahmed Hamadan**, Committee member and former head of the Committee and Treasurer. He was reportedly involved in transferring HAMAS funds to the families of detainees. (Exhibit 56).

**Ibrahim Said Hassan Abu Salem**, is an "unofficial member." He was subject to several administrative arrests from December 1992 to September 1993; currently under administrative detention and serving as a HAMAS leader in prison. A religious lecturer, he served as one of the HAMAS leaders in the West Bank, in contact with HAMAS leaders in Israel and abroad. While deported to Lebanon in 1992, he met other HAMAS leaders there and received assignments to be carried out on his return to the West Bank. (Exhibit 56).

**Fadel Muhammad Salah Hamadan**, Committee member. Hamadan was placed under administrative arrest four times from 1988 to 1992. He was one of the HAMAS members deported to Lebanon in December 1992. He is an Imam and senior HAMAS activist who serves as one of the HAMAS headquarters leaders in Ramallah. He also heads the Majlis al Shura (advisory council) with six members and guides their activities. Reportedly, he is directly connected with the planning of suicide attacks and the spiritual preparation of those about to commit suicide attacks, including the Mahane Yehuda attack in July 1997. (Exhibit 56).

**Mahmud Ahmed Abd Al-Rahman Ramhi**, Committee member. Ramhi was imprisoned from December 1992 to April 1995 for recruitment to HAMAS and having been in charge of the center area of Ramallah on behalf of HAMAS. (Exhibit 57).

**Nabil Abd Al-Hadi Mustafa Mansur**, Committee Secretary. Mansur was arrested three times: October 1985, October to December 1990, and 1994. (Exhibit 56).

33

## Jenin Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $42,849.00; 1998: $89,779.00; 1999: $40,394.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers were made totaling approximately $21,437.00, exact dates unknown.

The GOI reported that the individuals who run this zakat committee are HAMAS members. (Exhibits 56-57).

**Ahmed Salim Ahmed Saltana**, head of the Committee. Saltana was imprisoned from May 1993 to June 1996. Saltana admitted that in 1992, he participated in transferring materials for the preparation of explosive charges. In 1993, he participated in the planning of a car bombing. (Exhibits 71, 57).

Nazia Abu Aoun, a senior HAMAS activist was interviewed by the GOI. He was incarcerated with Sultana from 1993 to 1997. Aoun stated that when Sultana was in prison, he was a senior HAMAS activist. (Exhibit 72).

Iyyad Braham, the HAMAS chief in the Village of Siris, was interviewed by the GOI. He stated that in 1992, he had been appointed to this post by the HAMAS chief in Jebba, Ahmad Sultana. (Exhibit 73).

Fathi Katit, a HAMAS activist in Siris was interviewed by the GOI. He stated that Sultana had given him two manuals for the preparation of explosive charges. (Exhibit 74).

Muhammad Radwan, a HAMAS activist, was interviewed by the GOI. He stated that in 1991 or 1992, Sultana, with whom he worked in the Charity Committee, approached him with an offer to recruit him into HAMAS. Radwan agreed and later, under Sultana's guidance, distributed HAMAS leaflets in Jenin's Mosques. It is the FBI's analysis that this is a typical method of HAMAS using the Dawa (i.e. social infrastructure) to recruit members. (Exhibit 75).

0093

Ibrahim Hassan Ali Jaber, Committee member.  Jaber was placed under administrative arrest four times for being a senior HAMAS member who, among other activities, led riots during the Intifada (1987-1993).  He was also under GOI arrest from January 1995 to January 1996. (Exhibits 56-57).

During the GOI interview, Jaber admitted to having been in charge of HAMAS in Jenin's refugee camp, where he recruited activists and distributed leaflets.  He was also detained by the PA's General Intelligence from February to August 1996, in the PA's attempt to contain HAMAS' support structure, following a wave of suicide attacks. (Exhibit 76).

Nur Al-Din Kamal Asad Tahaina is in charge of the Zakat Committee computer.  Tahaina was imprisoned from July 1994 to December 1994, for "aiding" one of the suicide bombers in the 1994 terrorist attack against an Israeli bus in Afula.  He also was imprisoned by the GOI from January 1995 to January 1996 for conducting HAMAS activities. (Exhibits 56-57).

Naser Khaled Ibrahim Jarar, Committee member.  Jarar was detained in April 1994, for three months for recruiting young men to the HAMAS terrorist wing; and again in January 1998, for his connection to one of the suicide bombers in the 1994 terrorist attack against an Israeli bus in Afula, as well as his assistance to other HAMAS operatives.  Jarar was imprisoned during the 1980s for other terrorist activity, including throwing firebombs at a border guard vehicle and a bus, rioting, and distribution of leaflets. (Exhibits 56-57).

Abd al-Jaber Muhammad Ahmed Jarar, Committee member.  Jarar was arrested in May 1993, for transferring weapons to HAMAS recruits who subsequently conducted terrorist attacks.  Jarar was released from prison in November 1994, and placed under administrative arrest on account of his desire to continue his terrorist activities.  He was released in December 1997. (Exhibits 56-57).

Fawaz Hamdan, Committee member.  Hamdan was imprisoned for his activities in connection with HAMAS, which included aiding fugitives and funding weapons purchases.  After being released in 1996, Hamdan was again arrested in 1997 for his activities in connection with the Jenin Zakat Committee.  He

35

0094

was released in February 1998 and is currently active with the Jenin Zakat Committee and the Al Razi Hospital. (Exhibit 56).

Professor Khalid Said "Abu Hammam," former Committee President. Khalid was detained for more than one year in 1991 for heading the HAMAS administrative office in Jenin since 1988 and being a member of the HAMAS administrative office for the Northern West Bank region. (Exhibit 56).

Al Razi Hospital: The Al Razi Hospital is administered by the Jenin Zakat Committee. Therefore, funds are not normally directly transferred there. However, the hospital, which is supported, in part, by the HLFRD (Exhibit 78), received two transfers: One occurred in April 1998, in the amount of approximately $40,000.00; and one in the amount of approximately $12,000.00, occurred sometime between January 1998 to April 1999, exact dates unknown.

As previously described, Fawaz Hamdan was identified as a Committee member and Administrative Director of the Al Razi Hospital, described above.[8]

<u>Nablus Zakat Committee</u>

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $43,951.00; 1998: $31,008.00; 1999: $46,482.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 to April 1999, transfers of approximately $25,707.00 were made, exact dates unknown.

Abd Al-Rahim Taha Hanbali, head of the Committee. (Exhibit 57).

Mohammed Anati, HAMAS activist and former head of the HLFRD Jerusalem was interviewed by the GOI in 1997. Anati stated that, the Nablus Charity Committee, a.k.a.

---

[8] The "State of Palestine/Ministry of Health" website confirmed that Fawaz Hamad a.k.a. Hamdan was an employee at the Al Razi Hospital, which is managed by the Jenin Zakat Committee and indicated that his title is Administrative and Financial Manager.

36

**0095**

Nablus Zakat, was headed by Dr. Abd Al Rahim Hanbali, a HAMAS activist. He further identified individuals who worked with the orphans as Haj Marzook and Siham Al-Masri, also both reportedly HAMAS activists. (Exhibit 48).

Issa Abu Al-Az, HAMAS activist in the Ayn Beit Alma Refugee Camp, was interviewed by the GOI. He identified Hanbali as a HAMAS activist. (Exhibit 56).

**Hamid Sulayman Jaber Bitawi**, senior Committee member. Bitawi was administratively detained from December 1990 to October 1991. He was expelled to Lebanon in December 1992 and returned to the West Bank in December 1993. (Exhibit 56).

Abd Al-Rahman 'Ashur, a self-admitted HAMAS activist, was interviewed by the GOI. He stated that he had been recruited to HAMAS in 1993 and assisted in disturbances. In early 1995, he decided to become an operative for which he applied to three persons he knew as senior Nablus HAMAS activists, one of which was Bitawi. 'Ashur asked to be recruited to operational activity in Nablus, but the three refused, adding that if they were to change their minds, they would know where to find him. (Exhibit 82).

Musbah Daher, a HAMAS activist from Aksaka, was interviewed by the GOI. He stated that Bitawi was in charge of rallies on behalf of HAMAS. (Exhibit 83).

## Tolkarem a.k.a. Tulkarm Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $23,820.00; 1998: $18,314.00; 1999: $30,079.00; Jan.-Sept. 2000: no funds.

From January 1997 to April 1999, the amount of approximately $15,344.00 was transferred, exact dates unknown.

37

0096

The GOI indicates that the Tolkarem Zakat Committee exists to support HAMAS activities.  The following Tolkarem Zakat Committee members were identified by the GOI as HAMAS members, in some cases senior members in the Tolkarem area. (Exhibit 57):

**Hammad Muhammed Hamed Qa'adan**, head of the Committee, identified by the GOI as a HAMAS activist who belongs to the HAMAS headquarters in Tolkarem and is in contact with the HAMAS leadership in Samaria.

**Ibrahim Muhammad Salim Salim Nir Al Shams**, member of the HAMAS Financial Committee in Tolkarem, and as an Imam of the Mosque.  Salim also reportedly belonged to the Supreme HAMAS Leadership in Nur Al-Shams.  He was imprisoned from October to December 1990 for rioting.

**Riad Abd Al-Latif Abd Al-Karim Al Ras** is a HAMAS activist assigned to the HAMAS Headquarters in Tolkarem.  He is also in contact with the HAMAS leadership in Samaria and he is also a member of the Majlis Al Shura in Tulkarm.

**Husni Hassan Hussein Hawaja** head of the Committee and a HAMAS activist.

**Bilal Hamis Yussef Abu Safira**, Committee member.  Safira is the head of the waqf (Islamic Trust) in Tulkarm and a senior HAMAS member.

## Orphan Care Association (Bethlehem)

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997-1998: no funds; 1999: $38,435.00; Jan.-Sept. 2000: no funds.

According to the GOI, this association is run by prominent HAMAS activists, identified below.  It is located on the ground floor of the Salah al Din Mosque in Bethlehem. (Exhibit 57):

38

0097

**Nasri Musa Issa Abada**, founder.  Abada is one of the HAMAS leaders in Bethlehem and is connected with senior HAMAS operatives in and out of Bethlehem, and is one of six members of the Supreme Majles Shoura in Bethlehem.

**Ghassan Muhammad Harmas**, Chairman; administratively detained from December 15, 1990 to February 23, 1991 and December 1992 to January 1994.  Harmas was a HAMAS deportee to Lebanon.

**Khalil Ali Rashad Dar Rashad**, Association member.  According to the GOI, Rashad is a HAMAS member who has been known to provide assistance to HAMAS fugitives.  He provided assistance to HAMAS bomb-maker Muhi A-Din Sharif and HAMAS Operations Planner Hassan Salameh while the two hid in Bethlehem.

As previously stated, this organization was used during 1998 as a conduit for the HLFRD to send funds to HLFRD Jerusalem staff member Hoda Abdeen after the HLFRD office was closed in December 1997. (Exhibits 18, 50)

### Qalqilia, a.k.a. Qalqiliyah Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $35,577.00; 1998: $29,827.00; 1999: $40,441.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, there were transfers of approximately $17,471.00, exact dates unknown.

GOI reporting indicates that this zakat committee exists to support HAMAS activity.  All four identified members of this committee have been identified by the GOI as HAMAS members. (Exhibit 57):

Bilal Abd Al-Rahim Muhammad Hanoun, Imam of the local Mosque, as well as a HAMAS activist.

Riad Rashid Hamed Walwil, member of the leadership in the Qalqilia and, currently believed to be under PA arrest.  He also served prison time from December 1990 to February 1991

39

**0098**

for rioting and December 1992 to January 1993.  He was detained by the GOI in August 1995 for interview and admitted membership in the HAMAS.  He was held under administrative arrest until July 1996, due to his HAMAS activities.

**Ibrahim Zahran,** Committee member and HAMAS activist.

**Walid Abd Al-Latif Suliman Abu Labadah,** Committee member and a HAMAS activist.

### Halhul Zakat Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $31,652.00; 1998: $22,173.00; 1999: $29,643.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, transfers totaling approximately $17,273.00 were made, exact date unknown.

GOI information indicates that the Halhul Zakat Committee is controlled by HAMAS.  Their information is based at least partly on the fact that the following three Committee members are HAMAS members and they actively direct the Committee. (Exhibit 57):

**Tawfiq Muhammad Ali Atrash,** Committee member.  He also serves as headmaster of an affiliated school, and is a HAMAS member.  Atrash was under administrative arrest from March 1996 to September 1996.

**Ahmed abd al-Rahman Abdallah Jahshan,** Committee member; the headmaster of a school in Halhul; and a known HAMAS member.  In late 1992 he visited Ahmed Salah, a senior HAMAS member in the United States.

**Ahmed Rashid Ahmed Abu Aroush,** Committee member; secretary at the local secondary school; and a known HAMAS member.  He also visited Ahmed Salah in the U.S. in late 1992.

**0099**

## Hebron Zakat Committee a.k.a.
## Hebron Tithing And Alms Committee

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this zakat committee received the following:

1997: $20,090.00; 1998: $12,799.00; 1999: $24,279.00; Jan.-Sept. 2000: no funds.

Additionally, from January 1997 until April 1999, transfers totaling approximately $12,992.00 were made, exact date unknown.

GOI information indicates that this zakat committee is connected to the HAMAS terrorist wing, specifically that HAMAS members run the organization.

According to GOI reporting, the following individuals are leaders of the Hebron Zakat Committee (Exhibit 52):

**Majed Musbah abd al-Fatah Naser al-Din**, is reportedly a HAMAS member and the head of the Committee.  He is known to go abroad on assignment of the Committee to raise funds.

**Muhammad Najab Kamal Sadeq Jabari**, is Chairman of the Committee, head of the Hebron Religious Sages Council in Hebron, and reportedly a HAMAS member.

## Dar El Salam Hospital

Financial analysis of HLFRD bank records (Exhibit 43) indicate that this hospital received the following:

1997: $104,600.00; 1998: $128,850.00; 1999: $37,222.00; Jan.-Sept. 2000: $31,050.00.

Additionally, from January 1997 to April 1999, transfers totaling $15,500.00 were sent from the HLFRD to the Dar El Salam Hospital, exact dates unknown.  It is possible that the reduction in funds was due to the fact that HLFRD was channeling funds through the HLFRD Gaza which oversees the hospital.

41

0100

According to the GOI, the Dar el Salam Hospital was founded in 1995 with HAMAS funds and protection. The building is located on the land of a HAMAS-associated family by the name of Al Bata from Khan Yunis. Members of the family work at the hospital. (Exhibit 57).

FBI investigation indicates that since 1995, Dar el Salam has received over $400,000.00 from the HLFRD. The GOI provided the following information regarding the employees of the Dar el Salam Hospital (Exhibit 57):

**Mufid Muhammad Mahmud Mukhalilati**, Hospital Director. Mukhalilati also heads the health center near the Shifa Hospital in Gaza. The GOI has identified Mukhalilati as a HAMAS activist.

**Naji Muhammad Said Bata**, operates the family pharmacy and has been identified as a HAMAS activist. Beta was imprisoned from December 1992 to January 1993 for participating in riots.

**Salah Muhammad Said Bata**, sales agent and works at the Dar el Salam hospital pharmacy. The GOI has identified him as a HAMAS activist.

### Islamic Aid Committee a.k.a. Islamic Relief Agency (IRA)

According to the GOI, the IRA was an association based mainly in Nazareth, Israel. Its declared purposes were, "Charity, collection of contributions, aid to the needy and charity." The HLFRD provided funding to the IRA. The GOI searched the offices of the IRA and ultimately closed the association, at the same time as it closed the HLFRD. While this organization was closed by the GOI on March 17, 1996, it illustrates the role of the HLFRD in funding HAMAS.

Based upon the search of the IRA offices on July 27, 1995, and November 8, 1995, the GOI determined that the IRA transferred funds to, among others, the families of HAMAS activists who carried out several terrorist attacks, including kidnaping and murder of civilians, policemen and soldiers. The beneficiaries of the funds also included families of prisoners, deportees and HAMAS activists killed

0101

during attacks.  The IRA also transferred funds to families whose homes were demolished according to an administrative decree.

According to the records found, the money transfers to the families of HAMAS activists were separated from the lists of other beneficiaries.   The IRA paid salaries to some ten HAMAS activists in the West Bank who have been imprisoned and/or deported in the past and are acting as the "representatives" of the IRA in their area of residence.   The GOI found forms requesting aid for the families of "The Fallen", filled in by the "representative."  The form included the name of "The Fallen," a detailed description of the attack during which he was killed; his former nationalistic activities in HAMAS; and a description of the special circumstances of the family of "The Fallen." (Exhibit 84).

The court decision to close the IRA stated:

The appellant is engaged in provision of massive aid to the families of HAMAS activists, who perpetrated or planned to perpetrate severe terrorist attacks and who were imprisoned, killed or deported, and that the main source of funds of the appellant is contributions by organizations abroad, all of which constitute part of the funding system of the HAMAS organization. (Exhibit 85).

Many of the lists of HAMAS beneficiaries, previously described in the May 7, 1995, search of the HLFRD Jerusalem offices were funded through the HLFRD providing money and guidance to the IRA.

## 3C. ORGANIZATIONS FUNNELING MONEY TO HAMAS

### Sanabil Association For Relief And Development (Sanabil)

Sanabil is a Lebanese-based organization.  Financial analysis of HLFRD bank records (Exhibit 43) indicate that this organization received the following:

1997: $125,744.00; 1998: $232,110.00; 1999: $649,386.00; Jan.-Sept. 2000: $456,105.00.

0102

Additionally, from January 1997 to April 1999, transfers totaling $161,145.00 were sent from the HLFRD to Sanabil, exact dates unknown.

FBI analysis suggests that the HLFRD has devoted large amounts of money to gain favor and/or facilitate projects with the Lebanese government. For example, on March 10, 2000, Shukri Abu Baker, CEO, and Haitham Maghawri, Executive Director, flew to Lebanon to present a $100,000.00 check to the President and Prime Minister of Lebanon for the reconstruction of power plants destroyed by the Israeli air force on February 8, 2000. (Exhibit 87). The Israeli attack on the power plants was retaliation for Hizballah guerrilla attacks in which five Israeli soldiers were killed since January 25, 2000. (Exhibit 88).

Sanabil also has ties to The Palestine Relief Fund (a.k.a. Interpal), a United Kingdom based organization, which the GOI has identified as belonging to the HAMAS organization. (Exhibit 49). FBI analysis has linked Sanabil, Interpal and the HLFRD:

1. According to its website, www.interpal.org, Interpal describes itself as "The Palestinians' Relief and Development Fund, a non-political, non-profitable, independent charitable organization. The Charity is principally concerned with providing much needed support to the poor and needy Palestinian people in the primary areas of operation in Palestine - West Bank, the Gaza Strip and the refugee camps in Jordan and Lebanon." (Exhibit 89).

2. According to the August 24, 2001 Interpal website, most of the donations received by Interpal are zakat payments which places the charity under a religious duty to distribute funds according to Islamic Law. (Exhibit 89).

3. Interpal's August 15, 2001 website states that it "works closely with Sanabil." (Exhibit 89).

4. Interpal further identifies other organizations, if one wishes to make "International Donations." The only organization listed for the United States is the HLFRD. (Exhibit 89).

0103

5. Finally, a review of the HLFRD's financial records shows that on April 11, 2000, the HLFRD wired Interpal $66,000.00 (Exhibit 89).

## Human Appeal International-Jordan (HAI)

While there is no evidence that HAI is a HAMAS organization, FBI investigation has revealed a close relationship among the HLFRD, HAMAS and HAI.  FBI investigation has determined that the HLFRD provides significant funding to HAI, which benefits the HAMAS agenda.

Financial analysis of HLFRD bank records (Exhibit 43) indicate that HAI received the following:

1997: $31,475.00; 1998: $105,236.00; 1999: $281,608.00; Jan.-Sept. 2000: $233,377.00.

Additionally, during the time period of January 1997 to April 1999, transfers totaling approximately $34,745.00 were made, exact dates unknown.

FBI investigation has determined that Bassam Fares was the HLFRD's Projects and Grants Director, from February 1997 until his voluntary removal from the United States in 2000. Fares held a senior HLFRD position.  From April 1990 through May 1993, Fares was the Deputy Regional Manager for HAI in Jordan. (Exhibit 90).

In February 1996, an HLFRD-5, an FBI source, who has provided reliable information in the past, reported on a meeting at which Bassam Fares, a.k.a. Bassam Farris and others discussed how HAMAS meetings should be structured.

According to the source, FARES, a Jordanian, indicated that he had been affiliated with the Islamic Association for Palestine (IAP) for approximately ten years, and that organization donates to the Palestinian area approximately $3 million per year.  These donations were reportedly sent to the Holy Land Foundation in Palestine, and the money goes to HAMAS.

As previously stated, the IAP also received funds from Mousa Marzook in the early 1990s, during the same time frame as Marzook, acting on behalf of HAMAS, was providing funds to the HLFRD and InfoCom.

45

0104

FBI analysis suggests that unlike some of the other recipients of HLFRD funds, this organization is not controlled by HAMAS, but is a well-funded Gulf organization. It currently appears that HAI-Jordan could be serving as a conduit through which the HLFRD sends funds to its HLFRD representative in Amman.  The HLFRD is not licensed to operate in Jordan, and thus cannot legally have an office or bank account in Amman, Jordan.  It is likely that this close relationship with the HAI allows the HLFRD to circumvent this restriction on its activities.

## 4. HLFRD And Its Leadership Identified As HAMAS

### 4A. FBI asset reporting:

HLFRD-1, an FBI source who has provided reliable information in the past reported that during a speech at the Islamic Center of Passaic County (ICPC) in November, 1994, Mohammad El-Mezain, the HLFRD's current Director of Endowments and former Chairman of the HLFRD Board, admitted that some of the money collected by the ICPC and the HLFRD goes to HAMAS or HAMAS activities in Israel.  El-Mezain also defended HAMAS and the activities carried out by HAMAS.

HLFRD-4, an FBI source, who has provided reliable information in the past, reported that on November 5, 1994, the IAP held a conference at the Culver City Memorial Building in Culver City, California.  The HLFRD's CEO, Shukri Abu Baker was identified to the audience as the Director of the HLFRD in Dallas, Texas, and the Senior Vice-President in HAMAS (second only to Mohammed El Mezain).  The source reported that at this conference, El Mezain and Baker stated that the monies raised by the HLFRD were strictly for HAMAS terrorists.

HLFRD-4 further reported that HAMAS leaders Shukri Abu Baker and Mohamed El-Mezain attended a Muslim Arab Youth Association (MAYA) Conference, December 30, 1994 to January 2, 1995, at the Hyatt Regency in Los Angeles, wherein Sheikh Muhammed Siyam was the keynote speaker.  Siyam was introduced as "Head of operations of Al Jihad Al Islamia in Gaza, the HAMAS military wing."

Siyam stated, "I've been told to restrict or restrain what I say . . . . I hope no one is recording me or taking any pictures, as none are allowed . . . because I'm going to

46

**0105**

speak the truth to you. It's simple.  Finish off the Israeli's.  Kill them all! Exterminate them!  No peace ever! Do not bother to talk politics."

Following Siyam's speech, El-Mezain exhorted the crowd to contribute money.  It was subsequently announced that $207,000 was raised for "the cause."

At that conference, El-Mezain reportedly stated that during 1994 he (El-Mezain) raised $1,800,000 inside the United States for HAMAS.  El-Mezain and Abu Baker stated that funds raised by the HLFRD were strictly dollars for HAMAS. (Exhibit 96).

In December 1994, HLFRD-3, an FBI asset who has provided both reliable and unreliable information in the past, reported that Baker described the HLFRD as follows, "We raise funds for Islam, money goes to projects."  In describing the projects the HLFRD funds, Baker said, "Some money goes to HAMAS, but we build hospitals, schools, etc."

On September 30, 1997, an HLFRD-4, reported on the HLFRD fund-raiser at the Sequoia Convention Center, Buena Park, California.  At that fund-raiser, Shukri Abu Baker stated that the individuals present owed the money to the HLFRD and the people fighting for the Islamic state in the West Bank and Gaza.  He also talked about the HLFRD mission to support the families of the martyrs.  He stated that the goal of HAMAS to form an Islamic State could not be thwarted.  Abu Baker indicated that in the end HAMAS would throw out Arafat and an Islamic State would be established.  -

In March 1998, HLFRD-6, an FBI source, who has provided reliable information in the past advised that Ammar Hussein Imreish, who source identified as the local leader for the HLFRD, specifically talked about HAMAS and its ties to HLFRD. Imreish stated that HAMAS leadership wants to hit only military individuals and targets, not civilians. Additionally, according to the source, the HAMAS leadership says that HLFRD is their voice.  Imreish surmised that in the future, HAMAS will be recognized as a legitimate representative of the Palestinian people and then the HLFRD's ties to HAMAS will then be known.

0106

HLFRD-3 further reported that the HLFRD raises funds for HAMAS and Shukri Abu Baker is a U.S.-based leader of HAMAS.

HLFRD-7, an FBI source, who has provided reliable information in the past reported that El-Mezain travels throughout the United States conducting fund-raising events on behalf of HAMAS and toured different Arab Gulf countries in 1994, giving speeches about HAMAS and collecting donations.

HLFRD-8, an FBI source, who has provided reliable information in the past reported that on Friday, April 6, 2001, an HLFRD representative spoke to a crowd of approximately 500 to 600 at the mosque in Cleveland. He spoke about the plight of Muslims overseas. This individual, introduced an official representative of the HLFRD and stated that it was the duty of Muslims in Cleveland to help the Muslims overseas through the HLFRD.

This same source reported that on Friday, April 13, 2001, this individual again spoke about the HLFRD. The speaker introduced the HLFRD representative and encouraged people to support Muslims overseas through the HLFRD. During this talk, the speaker repeatedly made the statement that the HLFRD is accused of being HAMAS. He then stated, "if we are HAMAS, so what, we are helping our people."

Jamil Sarsour Confession: On October 23, 1998, Sarsour was arrested by the GOI for his involvement with the HAMAS terrorist organization, specifically, for providing financial and other assistance to HAMAS fugitive and military activist, Adel Awadallah. At the time of his arrest, Sarsour was carrying $66,530.00, a personal telephone book and two American passports. Sarsour was interviewed and provided information concerning his and his brother, Salah's activities in support of HAMAS over the last several years.

During the course of his interview, Sarsour described his brother Salah Sarsour's involvement with HAMAS and fund-raising activities by the HLFRD, in Richardson, Texas on behalf of HAMAS. Sarsour stated that some of the members of the Islamic Center in Milwaukee, Wisconsin, and his brothers Salah and Imad are involved in raising money in the name of the HLFRD that is actually for HAMAS. (Exhibit 102).

48

0107

**5. HLFRD Bank Account:**

FBI investigation has revealed that the HLFRD in Richardson, Texas funded the above described zakat committees, HLFRD offices and organizations by means of wire transfers from its Bank One accounts in Texas. Shukri Abu Baker and Ghassan Elashi are the primary signatories of record on these accounts. (Exhibit 103).

## IV. SUMMARY

FBI investigations of HAMAS activities in the United States have revealed that the HLFRD is the primary fund-raising entity for HAMAS and that a significant portion of the funds raised by the HLFRD are clearly being used by the HAMAS organization. The information provided in this document confirms that the HLFRD is acting for or on behalf of HAMAS. Further, senior members of HLFRD support HAMAS ideology and activities. These HAMAS activities interfere with the Middle East peace process and pose a threat to the national security, foreign policy, or economy of the United States. As such, HLFRD should be considered by OFAC for SDT designation as a HAMAS entity, subject to the prohibitions of the IEEPA statute.

49

**0108**

**EXHIBIT 165 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES OWENS, et al.,                    .
                                        .
          Plaintiffs,         .     CA Nos.  01-2244, 04-1536,
                              .     08-1377, 08-1361, 08-1349
     v.                       .     08-1380
                              .
REPUBLIC OF SUDAN, et al.,    .     Washington, D.C.
                              .     Thursday, October 28, 2010
          Defendants.         .     9:40 a.m.
                              .
. . . . . . . . . . . . . . . .         Pages 212 through 376

DAY 3
EVIDENTIARY HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
                              THOMAS FORTUNE FAY, ESQ.
01-2244                       RONALD KARP, ESQ.

04-1536                       JANE NORMAN, ESQ.

08-1361                       STEVEN PERLES, ESQ.
                              EDWARD MACALLISTER, ESQ.
                              ANDERS FERRINGTON, ESQ.
                              BILL WHEELER, ESQ.


08-1349, 08-1380              MICHAEL MILLER, ESQ.
                              GAVRIEL MAIRONE, ESQ.
                              DAVID DICKENS, ESQ.



Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              Official Court Reporter
                              U.S. Courthouse, Room 6714
                              333 Constitution Avenue, NW
                              Washington, D.C. 20001
                              202-354-3186



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

1

2          THE DEPUTY CLERK:  Your Honor, we have civil action

3     01-2244, 04-1536, 08-1377, 08-1361, 08-1349, and civil action

4     08-1380, James Owens et al. versus the Republic of Sudan.  All

5     counsel are present, to include Mr. Pete Miller, who is now

6     sitting at counsel table.

7          THE COURT:  Good morning.  All right.  We have a

8     couple of witnesses.  Where are we going to start?

9          MR. FAY:  I defer to Mr. MacAllister.  It's his show

10    today.

11         THE COURT:  All right.  Mr. MacAllister.

12         MR. MACALLISTER:  Good morning, Your Honor.  We call

13    to the stand Evan Kohlman.

14     **EVAN F. KOHLMANN, WITNESS FOR THE PLAINTIFFS, SWORN**

15         THE COURT:  Good morning, Mr. Kohlmann.

16         THE WITNESS:  Good morning, Your Honor.

17         THE COURT:  Mr. MacAllister.

18                    DIRECT EXAMINATION

19    BY MR. MACALLISTER:

20    Q.   Good morning.  Please state your name for the Court.

21    A.   My name is Evan F. Kohlmann.  E-V-A-N, F., K-O-H-L-M-A-N-N.

22    Q.   Could you state the state that you live in but not your

23    full address?

24    A.   Yes.  I live in the State of New York.

25    Q.   What is your occupation?

1    BY MR. MACALLISTER:

2    Q.   Mr. Kohlmann, please identify what I've just handed to you.

3    A.   This is a copy of my CV.

4    Q.   Is that a fair and accurate copy?

5    A.   It is the most updated copy, that's correct.

6              MR. MACALLISTER:  Your Honor, at this time plaintiffs

7    would move into evidence what has been marked as Plaintiffs'

8    Exhibit M, the Kohlmann CV.

9              THE COURT:  Plaintiffs' Exhibit M is admitted.

10                              (Plaintiff Exhibit M

11                               received into evidence.)

12   BY MR. MACALLISTER:

13   Q.   Is this the kind of information that experts, law

14   enforcement officials, and academics routinely rely upon in

15   their research of terrorist organizations?

16   A.   Yes.  I mean, yeah, it's what I'm paid to do.

17   Q.   Is this the kind of information you relied upon in your 15

18   federal trials?

19   A.   Yes.

20   Q.   What is al-Qaeda?

21   A.   Al-Qaeda is an --

22             THE COURT:  Have we asked to admit him as an expert

23   yet in a particular subject?

24             MR. MACALLISTER:  That's a very good question,

25   Your Honor.

```
 1              THE COURT:  And the answer is?

 2              MR. MACALLISTER:  The answer is no.  The plaintiffs

 3    would proffer Mr. Kohlmann as an expert in the history of

 4    al-Qaeda, including state sponsorship, al-Qaeda leadership, the

 5    infrastructure of al-Qaeda, and al-Qaeda operations and modus

 6    operandi.

 7              THE COURT:  All right.  Mr. Kohlmann is admitted as an

 8    expert to provide expert testimony on that or those subjects.

 9    Please proceed.

10              MR. MACALLISTER:  Thank you, Your Honor.

11    BY MR. MACALLISTER:

12    Q.    What is al-Qaeda, Mr. Kohlmann?

13    A.    Al-Qaeda, which means the solid foundation or solid base,

14    was a terrorist organization founded in September of 1988.  It

15    was founded as the heir apparent to a previous group known as

16    Makhtab al-Khidamat.  Makhtab al-Khidamat, known as the Office

17    of Mujahideen Services, was founded in the late 1980s by Osama

18    bin Laden and his spiritual mentor, a guy named Abdullah Azzam.

19         The reason that this organization had initially been

20    founded was that there were groups of foreign fighters arriving

21    on the Afghan-Pakistani border who had sought to participate in

22    the Afghan jihad, fighting against the Soviets in the Afghan

23    Communist army.  However, when they arrived there, they were

24    poorly equipped, they were poorly organized, they didn't have

25    money, they didn't have a place to stay.
```

**EXHIBIT 166 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML    Document 272-8    Filed 03/22/12    Page 58 of 259 PageID #: 10090

About    Subscriber services    What's new    Contact us    Help

Subscribe now    Already a subscriber or in a subscribing organization? Login

Dictionary    Other language resources

Type a word or phrase to search dictionary    GO

US English    World English

Dictionary    Better writing    World of words    Puzzles and games    For children and schools    For learners of English

Email    Cite

**ING DIRECT Investing** No Account or Investment Minimums. $50 Account Bonus. Learn More! www.sharebuilder.com/ingdirect

**Online English Classes** Take Online English Classes Anytime, Anywhere. Search Now, Free www.servicemountain.com

**Learn Arabic in 10 Days** World-famous Pimsleur Method. As seen on PBS - $9.95 w/ Free S&H. PimsleurApproach.com/Learn-Arab

AdChoices ▷

**Search results in the dictionary**

Islamic Jihad (also Jehad)

More results »

**Nearby Words**

jig
jigaboo
jigger [1]
jigger [2]
jiggered
jiggery-pokery
jiggle
jiggy
jigsaw
**jihad**
jihadi
jilbab
Jilin
jillaroo
jilleroo
jillion
jilt
Jim Crow
jim-dandy

## jihad

Pronunciation:  /dʒɪˈhɑːd/

(also **jehad**)

*noun*

(among Muslims) a war or struggle against unbelievers:

> he declared a jihad against the infidels

*[mass noun]*:

> the importance of jihad as a uniting force

> (also **greater jihad**) *Islam* the spiritual struggle within oneself against sin.

Origin:

from Arabic *jihād*, literally 'effort', expressing, in Muslim thought, struggle on behalf of God and Islam

**Mortgage Rates  --  Select A Loan Program**

40 Year Fixed    7 Year ARM    30 Year Interest Only
30 Year Fixed    5 Year ARM    5 Year Interest Only
15 Year Fixed    3 Year ARM    3 Year Interest Only
10 Year Fixed    1 Year ARM    1 Year Interest Only
Home Equity Line    Second Mortgage

AmeriSave

www.Amerisave.com    Ads by Google

Copyright © 2011 Oxford University Press. All rights reserved.    Privacy policy and legal notice    Credits    Browse Dictionary

**EXHIBIT 167 to Declaration of Joel Israel**



# Financial Action Task Force on Money Laundering

Groupe d'action financière
sur le blanchiment de capitaux

# Guidance for Financial Institutions in Detecting Terrorist Financing

24 April 2002

All rights reserved.
This document may be reproduced for non-commercial purposes.
Requests for permission to reproduce all or part
of this publication for commercial purposes should be directed to:

FATF Secretariat
2, rue André-Pascal
75775 Paris Cedex 16
France

Contact@fatf-gafi.org

# Table of Contents

**Introduction** ........................................................................................................... 1

**Terrorist financing and risks to financial institutions** ....................................... 1

**Reinforcing existing requirements** ....................................................................... 2

**Determining when increased scrutiny is necessary** ........................................... 2

**Characteristics of terrorist financing** ................................................................... 3

    Sources of terrorist funds ...................................................................................... 4

    Laundering of terrorist related funds..................................................................... 5

**Annex 1: Characteristics of financial transactions that may be a cause for increased scrutiny** ........ 7

    A.   Accounts ........................................................................................................ 7

    B.   Deposits and withdrawals............................................................................ 8

    C.   Wire transfers................................................................................................ 8

    D.   Characteristics of the customer or his/her business activity...................... 9

    E.   Transactions linked to locations of concern ............................................... 9

**Annex 2: Sources of Information**.......................................................................... 11

    A.   United Nations lists ...................................................................................... 11

    B.   Other lists...................................................................................................... 11

    C.   Standards ...................................................................................................... 11

# Guidance for Financial Institutions
# in Detecting Terrorist Financing Activities

## Introduction

1.      At its extraordinary Plenary meeting on 29-30 October 2001, the Financial Action Task Force on Money Laundering (FATF) agreed to develop special guidance for financial institutions to help them detect the techniques and mechanisms used in the financing of terrorism.  The FATF subsequently brought together experts from its member countries to gather information on and study the issue of terrorist financing as part of its annual exercise on money laundering methods and trends. One goal of this exercise was to begin establishing such guidance for financial institutions that could be issued along with the annual FATF Report on Money Laundering Methods and Trends. Material derived from the exercise, along with contributions from the Egmont Group and other international bodies, was used in developing the present document.  The information contained in it represents a first attempt to provide necessary guidance for financial institutions in this area.

2.      The goal in providing this guidance is to ensure that financial institutions do not unwittingly hide or move terrorist funds.  Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity.  To help build awareness of how terrorists, their associates or those who support terrorism may use the financial system, this document describes the general characteristics of terrorist financing.  The accompanying case studies illustrate the manner in which competent law enforcement authorities or financial intelligence units (FIUs) are able to establish a terrorist financing link based on information reported by financial institutions.  Annex 1 contains a series of characteristics of financial transactions that have been linked to terrorist activity in the past. When one or several of these potentially suspicious or unusual factors is present in regard to a specific financial transaction – especially when the individual or entity may appear on one of the lists of suspected terrorists, terrorist organisations or associated individuals and entities (see Annex 2: Sources of Information) – then a financial institution would have cause to increase its scrutiny of the transaction and any associated individuals or entities.  In certain instances, this scrutiny could result in reporting the transaction to authorities under applicable suspicious or unusual transaction reporting systems.

## Terrorist financing and risks to financial institutions

3.      A financial institution that carries out a transaction, knowing that the funds or property involved are owned or controlled by terrorists or terrorist organisations, or that the transaction is linked to, or likely to be used in, terrorist activity, may be committing a criminal offence under the laws of many jurisdictions.  Such an offence may exist regardless of whether the assets involved in the transaction were the proceeds of criminal activity or were derived from lawful activity but intended for use in support of terrorism.

4.      Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk.  This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or wilful blindness of a particular institution and thus was to carry out terrorist acts.

## Reinforcing existing requirements

5.      Consideration of the factors contained in this guidance is intended to clarify, complement and / or reinforce already existing due diligence requirements, along with current policies and procedures imposed by national anti-money laundering programmes.  It should be stressed, however, that this guidance does not constitute an additional rule or regulation.  Rather it represents advice from the operational experts of FATF members as to factors associated with financial transactions that should trigger further questions on the part of the financial institution.  The FATF encourages all financial institutions to consider these factors along with policies, practices and procedures already in place for ensuring compliance with appropriate laws and regulations and for minimising reputational risks. It should be noted as well that, while the characteristics indicated in this document may apply specifically to terrorist financing, most of them may also apply in identifying suspicious transactions generally.  Financial institutions in many jurisdictions may already be aware of these characteristics through existing guidance notes or other sources.

6.      In providing this guidance, the FATF intends it to be consistent with applicable criminal and civil laws, as well as relevant regulations, to which financial institutions may be subject in their particular jurisdiction.  It should be noted however that this guidance does not replace or supersede any obligations under the current national laws or regulations.  In particular, implementing the measures proposed by this guidance should not be construed as necessarily protecting a financial institution from any action that a jurisdiction might choose to take against it.  Furthermore, this guidance does not supersede or modify requirements imposed by national or regional authorities, which call for the freezing of assets of individuals and entities suspected of being terrorists or terrorist related, as part of implementing relevant United Nations Security Council Resolutions (see Annex 2: Sources of Information).

## Determining when increased scrutiny is necessary

7.      Financial institutions are encouraged to develop practices and procedures that will help to detect and deter those transactions that may involve funds used in terrorist financing.  The increased scrutiny that may be warranted for some transactions should be seen as a further application of the institution's due diligence and anti-money laundering policies and procedures and should lead, when appropriate, to reporting of such financial activity as suspicious or unusual under applicable transaction reporting regimes for a particular jurisdiction.  To ensure that the practical steps are taken to increase scrutiny of certain transactions when necessary, it may be useful for a financial institution to review its practices in this area as part of its general internal and external audit processes.

---

*Example 1: Front for individual with suspected terrorist links revealed by suspicious transaction report*

The financial intelligence unit (FIU) in Country D received a suspicious transaction report from a domestic financial institution regarding an account held by an individual residing in a neighbouring country.  The individual managed European-based companies and had filed two loan applications on their behalf with the reporting institution.  These loan applications amounted to several million US dollars and were ostensibly intended for the purchase of luxury hotels in Country D.  The bank did not grant any of the loans.

The analysis by the FIU revealed that the funds for the purchase of the hotels were to be channelled through the accounts of the companies represented by the individual.  One of the companies making the purchase of these hotels would then have been taken over by an individual from another country.  This second person represented a group of companies whose activities focused on hotel and leisure sectors, and he appeared to be the ultimate buyer of the real estate.  On the basis of the analysis within the FIU, it appeared that the subject of the suspicious transaction report was acting as a front for the second person.  The latter as well as his family are suspected of being linked to terrorism.

---

8.      The manner in which a financial institution may choose to apply this Guidance will vary depending on the extent of the risk determined to exist by each institution as a general matter, given its normal business operations.  It will also vary according to the individual factors of each case as it

occurs.  Financial institutions should exercise reasonable judgement in modifying and implementing policies and procedures in this area.  This Guidance should not be interpreted as discouraging or prohibiting financial institutions from doing business with any legitimate customer.  Indeed, it has been designed solely as a means of assisting financial institutions in determining whether a transaction merits additional scrutiny so that the institution is thus better able to identify, report (when appropriate) and ultimately avoid transactions involving the funds supporting or associated with the financing of terrorism.

---

**Example 2: Individual's account activity and inclusion on UN list show possible link to terrorist activity**

An individual resided in a neighbouring country but had a demand deposit account and a savings account in Country N.  The bank that maintained the accounts noticed the gradual withdrawal of funds from the accounts from the end of April 2001 onwards and decided to monitor the accounts more closely.  The suspicions of the bank were subsequently reinforced when a name very similar to the account holder's appeared in the consolidated list of persons and/of entities issued by the United Nations Security Council Committee on Afghanistan (UN Security Council Resolution 1333/2000).  The bank immediately made a report to the financial intelligence unit (FIU).

The FIU analysed the financial movements relating to the individual's accounts using records requested from the bank.  It appeared that both of the accounts had been opened by the individual in 1990 and had been fed mostly by cash deposits.  In March 2000 the individual made a sizeable transfer from his savings account to his checking account.  These funds were used to pay for a single premium life insurance policy and to purchase certificates of deposit.

From the middle of April 2001 the individual made several large transfers from his savings account to his demand deposit account.  These funds were transferred abroad to persons and companies located in neighbouring countries and in other regions.

In May and June 2001, the individual sold the certificates of deposit he had purchased, and he then transferred the profits to the accounts of companies based in Asia and to that of a company established in his country of origin.  The individual also cashed in his life insurance policy before the maturity date and transferred its value to an account at a bank in his country of origin.  The last transaction was carried out on 30 August 2001, that is, shortly before the September 11th attacks in the United States.

Finally, the anti-money laundering unit in the individual's county of origin communicated information related to suspicious operations carried out by him and by the companies that received the transfers.  Many of these names also appeared in the files of the FIU.  This case is currently under investigation.

---

9.     It should be acknowledged as well that financial institutions will probably be unable to detect terrorist financing as such.  Indeed, the only time that financial institutions might clearly identify terrorist financing as distinct from other criminal misuse of the financial system is when a known terrorist or terrorist organisation has opened an account.  Financial institutions are, however, in a position to detect suspicious transactions that, if reported, may later prove to be related to terrorist financing.  It is the competent enforcement authority or the financial intelligence unit (FIU) then that is in a position to determine whether the transaction relates to a particular type of criminal or terrorist activity and decide on a course of action.  For this reason, financial institutions do not necessarily need to determine the legality of the source or destination of the funds.  Instead, they should ascertain whether transactions are unusual, suspicious or otherwise indicative of criminal or terrorist activity.

## Characteristics of terrorist financing

10.     The primary objective of terrorism according to one definition is "to intimidate a population, or to compel a Government of an international organisation to do or abstain from doing any act".[1]  In contrast, financial gain is generally the objective of other types of criminal activities.  While the difference in ultimate goals between each of these activities may be true to some extent, terrorist organisations still require financial support in order to achieve their aims.  A successful terrorist group, like any criminal organisation, is therefore necessarily one that is able to build and maintain an effective financial infrastructure.  For this it must develop sources of funding, a means of laundering

---

[1] Article 2, *International Convention for the Suppression of the Financing of Terrorism*, 9 December 1999.

those funds and then finally a way to ensure that the funds can be used to obtain material and other logistical items needed to commit terrorist acts.

*Sources of terrorist funds*

11.     Experts generally believe that terrorist financing comes from two primary sources.  The first source is the financial support provided by States or organisations with large enough infrastructures to collect and then make funds available to the terrorist organisation. This so-called State-sponsored terrorism has declined in recent years, according to some experts, and is increasingly replaced by

---

**Example 3: Diamond trading company possibly linked to terrorist funding operation**

The financial intelligence unit (FIU) in Country C received several suspicious transaction reports from different banks concerning two persons and a diamond trading company.  The individuals and the company in question were account holders at the various banks. In the space of a few months, a large number of fund transfers to and from overseas were made from the accounts of the two individuals.  Moreover, soon after the account was opened, one of the individuals received several USD cheques for large amounts.

According to information obtained by the FIU, one of the accounts held by the company appeared to have received large US dollar deposit originating from companies active in the diamond industry.  One of the directors of the company, a citizen of Country C but residing in Africa, maintained an account at another bank in Country C.  Several transfers had been carried out to and from overseas using this account.  The transfers from foreign countries were mainly in US dollars.  They were converted into the local currency and were then transferred to foreign countries and to accounts in the Country C belonging to one of the two subjects of the suspicious transaction report.

Police information obtained by the FIU revealed that an investigation had already been initiated relating to these individuals and the trafficking of diamonds originating from Africa.  The large funds transfers by the diamond trading company were mainly sent to the same person residing in another region.  Police sources revealed that this person and the individual that had cashed the cheques were suspected of buying diamonds from the rebel army of an African country and then smuggling them into Country C on behalf of a terrorist organisation.  Further research by the FIU also revealed links between the subjects of the suspicious transaction report and individuals and companies already tied to the laundering of funds for organised crime.  This case is currently under investigation.

---

other types of backing.  An individual with sufficient financial means may also provide substantial funding to terrorist groups.  Osama bin Laden, for example, is thought to have contributed significant amounts of his personal fortune to the establishment and support of the Al-Qaeda terrorist network.

12.     The second major source of funds for terrorist organisations is income derived directly from various "revenue-generating" activities.  As with criminal organisations, a terrorist group's income may be derived from crime or other unlawful activities.  A terrorist group in a particular region may support itself through kidnapping and extortion.  In this scenario, ransoms paid to retrieve hostages, along with a special "revolutionary tax" (in reality a euphemism for protection money) demanded of businesses, provide needed financial resources but also play a secondary role as one other means of intimidating the target population.  Besides kidnapping and extortion, terrorist groups may engage in large-scale smuggling, various types of fraud (for example, through credit cards or charities), thefts and robbery, and narcotics trafficking.

13.     Funding for terrorist groups, unlike for criminal organisations however, may also include income derived from legitimate sources or from a combination of lawful and unlawful sources. Indeed, this funding from legal sources is a key difference between terrorist groups and traditional criminal organisations.  How much of a role that legal money plays in the support of terrorism varies according to the terrorist group and whether the source of funds is in the same geographic location as the terrorist acts the group commits.

14.     Community solicitation and fundraising appeals are one very effective means of raising funds to support terrorism.  Often such fundraising is carried out in the name of organisations having the status of a charitable or relief organisation, and it may be targeted at a particular community.  Some members of the community are led to believe that they are giving for a good cause.  In many cases, the charities to which donations are given are in fact legitimate in that they do engage in some of the

work they purport to carry out.  Most of the members of the organisation, however, have no knowledge that a portion of the funds raised by the charity is being diverted to terrorist causes.  For example, the supporters of a terrorist movement from one country may carry out ostensibly legal activities in another country to obtain financial resources.  The movement's supporters raise these funds by infiltrating and taking control of institutions within the immigrant community of the second country.  Some of the specific fundraising methods might include: collection of membership dues and / or subscriptions; sale of publications; speaking tours, cultural and social events; door-to-door solicitation within the community; appeals to wealthy members of the community; and donations of a portion of their personal earnings.

*Laundering of terrorist related funds*

15.     From a technical perspective, the methods used by terrorists and their associates to generate funds from illegal sources differ little from those used by traditional criminal organisations.  Although it would seem logical that funding from legitimate sources would not need to be laundered, there is nevertheless often a need for the terrorist group to obscure or disguise links between it and its legitimate funding sources.  It follows then that terrorist groups must similarly find ways to launder these funds in order to be able to use them without drawing the attention of authorities.  In examining terrorist related financial activity, FATF experts have concluded that terrorists and their support organisations generally use the same methods as criminal groups to launder funds.  Some of the particular methods detected with respect to various terrorist groups include: cash smuggling (both by couriers or bulk cash shipments), structured deposits to or withdrawals from bank accounts, purchases of various types of monetary instruments (travellers' cheques, bank cheques, money orders), use of

---

**Example 4: Cash deposits to accounts of non-profit organisation allegedly finance terrorist group**

The financial intelligence unit (FIU) in Country L received a suspicious transaction report from a bank regarding an account held by an offshore investment company.  The bank's suspicions arose after the company's manager made several large cash deposits in different foreign currencies.  According to the customer, these funds were intended to finance companies in the media sector.  The FIU requested information from several financial institutions.  Through these enquiries, it learned that the managers of the offshore investment company were residing in Country L and a bordering country.  They had opened accounts at various banks in Country L under the names of media companies and a non-profit organisation involved in the promotion of cultural activities.

According to the analysis by the FIU, the managers of the offshore investment company and several other clients had made cash deposits to the accounts.  These funds were ostensibly intended for the financing of media based projects.  The analysis further revealed that the account held by the non-profit organisation was receiving almost daily deposits in small amounts by third parties.  The manager of this organisation stated that the money deposited in this account was coming from its members for the funding of cultural activities.

Police information obtained by the FIU revealed that the managers of offshore investment company were known to have been involved in money laundering and that an investigation was already underway into their activities.  The managers appeared to be members of a terrorist group, which was financed by extortion and narcotics trafficking.  Funds were collected through the non-profit organisation from the different suspects involved in this case.  This case is currently under investigation.

---

credit or debit cards, and wire transfers.  There have been indications that some forms of underground banking (particularly the *hawala* system[2]) have had a role in moving terrorist related funds.

16.     The difference between legally and illegally obtained proceeds raises an important legal problem as far as applying anti-money laundering measures to terrorist financing.  Money laundering has generally been defined as a process whereby funds obtained through or generated by criminal activity are moved or concealed in order to obscure the link between the crime and generated funds.  The terrorist's ultimate aim on the other hand is not to generate profit from his fundraising

---

[2] For more information on the *hawala* system of alternate remittance / underground banking, see the 1999-2000 *FATF Report on Money Laundering Typologies*, 3 February 2001 (pp. 4-8).

mechanisms but to obtain resources to support his operations.  In a number of countries, terrorist financing thus may not yet be included as a predicate offence for money laundering, and it may be impossible therefore to apply preventive and repressive measures specifically targeting this terrorist activity.

17.    When terrorists or terrorist organisations obtain their financial support from legal sources (donations, sales of publications, etc.), there are certain factors that make detecting and tracing these funds more difficult.  For example, charities or non-profit organisations and other legal entities have been cited as playing an important role in the financing of some terrorist groups.  The apparent legal

---

**Example 5: High account turnover indicates fraud allegedly used to finance terrorist organisation**

An investigation in Country B arose as a consequence of a suspicious transaction report.  A financial institution reported that an individual who allegedly earned a salary of just over USD 17,000 per annum had a turnover in his account of nearly USD 356,000.  Investigators subsequently learned that this individual did not exist and that the account had been fraudulently obtained.  Further investigation revealed that the account was linked to a foreign charity and was used to facilitate funds collection for a terrorist organisation through a fraud scheme.  In Country B, the government provides matching funds to charities in an amount equivalent to 42 percent of donations received.  Donations to this charity were being paid into to the account under investigation, and the government matching funds were being claimed by the charity.  The original donations were then returned to the donors so that effectively no donation had been given to the charity.  The charity retained the matching funds.  This fraud resulted in over USD 1.14 million being fraudulently obtained.  This case is currently under investigation.

---

source of this funding may mean that there are few, if any, indicators that would make an individual financial transaction or series of transactions stand out as linked to terrorist activities.

18.    Other important aspects of terrorist financing that make its detection more difficult are the size and nature of the transactions involved.  Several FATF experts have mentioned that the funding needed to mount a terrorist attack does not always call for large sums of money, and the associated transactions are usually not complex.  For example, an examination of the financial connections among the September 11th hijackers showed that most of the individual transactions were small sums, that is, below the usual cash transaction reporting thresholds, and in most cases the operations consisted of only wire transfers.  The individuals were ostensibly foreign students who appeared to be

---

**Example 6: Lack of clear business relationship appears to point terrorist connection**

The manager of a chocolate factory (CHOCCo) introduced the manager of his bank accounts to two individuals, both company managers, who were interested in opening commercial bank accounts.  The two companies were established within a few days of each other, however in different countries.  The first company (TEXTCo) was involved in the textile trade while the second one was a real estate (REALCo) non-trading company.  The companies had different managers and their activities were not connected.

The bank manager opened the accounts for the two companies, which thereafter remained dormant.  After several years, the manager of the chocolate factory announced the arrival of a credit transfer issued by the REALCo to the account of the TEXTCo.  This transfer was ostensibly an advance on an order of tablecloths.  No invoice was shown.  However, once the account of TEXTCo received the funds, its manager asked for them to be made available in cash at a bank branch near the border.  There, accompanied by the manager of CHOCCo, the TEXTCo manager withdrew the cash.

The bank reported this information to the financial intelligence unit (FIU).  The FIU's research showed that the two men crossed the border with the money after making the cash withdrawal.  The border region is one in which terrorist activity occurs, and further information from the intelligence services indicated links between the managers of TEXTCo and REALCo and terrorist organisations active in that region.

---

receiving money from their parents or in the form of grants for their studies, thus the transactions would not have been identified as needing additional scrutiny by the financial institutions involved.

6

## Annex 1: Characteristics of financial transactions that may be a cause for increased scrutiny

As a normal part of carrying out their work, financial institutions should be aware of elements of individual transactions that could indicate funds involved in terrorist financing. The following list of potentially suspicious or unusual activities is meant to show types of transactions that could be a cause for additional scrutiny. This list is not exhaustive, nor does it take the place of any legal obligations related to the reporting suspicious or unusual transactions that may be imposed by individual national authorities.

This list of characteristics should be taken into account by financial institutions along with other available information (including any lists of suspected terrorists, terrorist groups, and associated individuals and entities issued by the United Nations[3] or appropriate national authorities – see Annex 2 : Sources of Information), the nature of the transaction itself, and the parties involved in the transaction, as well as any other guidance that may be provided by national anti-money laundering authorities. The existence of one or more of the factors described in this list may warrant some form of increased scrutiny of the transaction. However, the existence of one of these factors by itself does not necessarily mean that a transaction is suspicious or unusual. For examples of terrorist financing cases developed from the enhanced scrutiny/reporting by financial institutions, please also see the various case examples provided in the body of the main document.

Financial institutions should pay particular attention to:

## A. *Accounts*

(1) Accounts that receive relevant periodical deposits and are dormant at other periods. These accounts are then used in creating a legitimate appearing financial background through which additional fraudulent activities may be carried out.

(2) A dormant account containing a minimal sum suddenly receives a deposit or series of deposits followed by daily cash withdrawals that continue until the transferred sum has been removed.

(3) When opening an account, the customer refuses to provide information required by the financial institution, attempts to reduce the level of information provided to the minimum or provides information that is misleading or difficult to verify.

(4) An account for which several persons have signature authority, yet these persons appear to have no relation among each other (either family ties or business relationship).

(5) An account opened by a legal entity or an organisation that has the same address as other legal entities or organisations but for which the same person or persons have signature authority, when there is no apparent economic or legal reason for such an arrangement (for example, individuals serving as company directors for multiple companies headquartered at the same location, etc.).

(6) An account opened in the name of a recently formed legal entity and in which a higher than expected level of deposits are made in comparison with the income of the founders of the entity.

---

[3] This guidance does not supersede or modify requirements imposed by national or regional authorities, which call for the freezing of assets of individuals and entities suspected of being terrorists or terrorist related, as part of implementing relevant United Nations Security Council Resolutions.

(7)   The opening by the same person of multiple accounts into which numerous small deposits are made that in aggregate are not commensurate with the expected income of the customer.

(8)   An account opened in the name of a legal entity that is involved in the activities of an association or foundation whose aims are related to the claims or demands of a terrorist organisation.

(9)   An account opened in the name of a legal entity, a foundation or an association, which may be linked to a terrorist organisation and that shows movements of funds above the expected level of income.

B.   *Deposits and withdrawals*

(1)   Deposits for a business entity in combinations of monetary instruments that are atypical of the activity normally associated with such a business (for example, deposits that include a mix of business, payroll and social security cheques).

(2)   Large cash withdrawals made from a business account not normally associated with cash transactions.

(3)   Large cash deposits made to the account of an individual or legal entity when the apparent business activity of the individual or entity would normally be conducted in cheques or other payment instruments.

(4)   Mixing of cash deposits and monetary instruments in an account in which such transactions do not appear to have any relation to the normal use of the account.

(5)   Multiple transactions carried out on the same day at the same branch of a financial institution but with an apparent attempt to use different tellers.

(6)   The structuring of deposits through multiple branches of the same financial institution or by groups of individuals who enter a single branch at the same time.

(7)   The deposit or withdrawal of cash in amounts which fall consistently just below identification or reporting thresholds.

(8)   The presentation of uncounted funds for a transaction.  Upon counting, the transaction is reduced to an amount just below that which would trigger reporting or identification requirements.

(9)   The deposit or withdrawal of multiple monetary instruments at amounts which fall consistently just below identification or reporting thresholds, particularly if the instruments are sequentially numbered.

C.   *Wire transfers*

(1)   Wire transfers ordered in small amounts in an apparent effort to avoid triggering identification or reporting requirements.

(2)   Wire transfers to or for an individual where information on the originator, or the person on whose behalf the transaction is conducted, is not provided with the wire transfer, when the inclusion of such information would be expected.

(3) Use of multiple personal and business accounts or the accounts of non-profit organisations or charities to collect and then funnel funds immediately or after a short time to a small number of foreign beneficiaries.

(4) Foreign exchange transactions that are performed on behalf of a customer by a third party followed by wire transfers of the funds to locations having no apparent business connection with the customer or to countries of specific concern.

D.   *Characteristics of the customer or his/her business activity*

(1) Funds generated by a business owned by individuals of the same origin or involvement of multiple individuals of the same origin from countries of specific concern acting on behalf of similar business types.

(2) Shared address for individuals involved in cash transactions, particularly when the address is also a business location and/or does not seem to correspond to the stated occupation (for example student, unemployed, self-employed, etc.).

(3) Stated occupation of the transactor is not commensurate with the level or type of activity (for example, a student or an unemployed individual who receives or sends large numbers of wire transfers, or who makes daily maximum cash withdrawals at multiple locations over a wide geographic area).

(4) Regarding non-profit or charitable organisations, financial transactions for which there appears to be no logical economic purpose or in which there appears to be no link between the stated activity of the organisation and the other parties in the transaction.

(5) A safe deposit box is opened on behalf of a commercial entity when the business activity of the customer is unknown or such activity does not appear to justify the use of a safe deposit box.

(6) Unexplained inconsistencies arising from the process of identifying or verifying the customer (for example, regarding previous or current country of residence, country of issue of the passport, countries visited according to the passport, and documents furnished to confirm name, address and date of birth).

E.   *Transactions linked to locations of concern*

(1) Transactions involving foreign currency exchanges that are followed within a short time by wire transfers to locations of specific concern (for example, countries designated by national authorities, FATF non-cooperative countries and territories, etc.).

(2) Deposits are followed within a short time by wire transfers of funds, particularly to or through a location of specific concern (for example, countries designated by national authorities, FATF non-cooperative countries and territories, etc.).

(3) A business account through which a large number of incoming or outgoing wire transfers take place and for which there appears to be no logical business or other economic purpose, particularly when this activity is to, through or from locations of specific concern.

(4) The use of multiple accounts to collect and then funnel funds to a small number of foreign beneficiaries, both individuals and businesses, particularly when these are in locations of specific concern.

(5)   A customer obtains a credit instrument or engages in commercial financial transactions involving movement of funds to or from locations of specific concern when there appears to be no logical business reasons for dealing with those locations.

(6)   The opening of accounts of financial institutions from locations of specific concern.

(7)   Sending or receiving funds by international transfers from and/or to locations of specific concern.

## Annex 2: Sources of Information

Several sources of information exist that may help financial institutions in determining whether a potentially suspicious or unusual transaction could indicate funds involved in the financing of terrorism and thus be subject to reporting obligations under national anti-money laundering or anti-terrorism laws and regulations.

### A.   United Nations lists

Committee on S/RES/1267 (1999) website: http://www.un.org/Docs/sc/committees/AfghanTemplate.htm

### B.   Other lists

**(1)   Financial Action Task Force**

*FATF Identification of Non-Cooperative Countries and Territories*

FATF website: http://www.fatf-gafi.org/NCCT_en.htm

**(2)   United States**

*Executive Order 13224, 23 September 2001 (with updates)*

US Department of the Treasury website: http://www.ustreas.gov/terrorism.html

**(3)   Council of the European Union**

*Council Regulation (EC) Nº 467/2001 of 6 March 2001 [on freezing Taliban funds]*

*Council Decision (EC) Nº 927/2001 of 27 December 2001* [list of terrorist and terrorist organisations whose assets should be frozen in accordance with Council Regulation (EC) Nº 2580/2001]

*Council Common Position of 27 December 2001 on application of specific measures to combat terrorism* [list of persons, groups and entities involved in terrorist acts]

EUR-lex website: http://europa.eu.int/eur-lex/en/index.html

### C.   Standards

**(1)   Financial Action Task Force**

*FATF Special Recommendations on Terrorist Financing*

FATF website: http://www.fatf-gafi.org/TerFinance_en.htm

*FATF Forty Recommendations on Money Laundering*

FATF website: http://www.fatf-gafi.org/40Recs_en.htm

**(2)   UN Conventions and Resolutions**

*International Convention on the Suppression of Terrorist Financing*

Website: http://untreaty.un.org/English/Terrorism.asp

*UN Security Council Resolutions on Terrorism*

Website:  http://www.un.org/terrorism/sc.htm

(3)     **Council of the European Union**

*Council Regulation (EC) Nº 2580/2001 of 27 December 2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism*

EUR-lex website: http://europa.eu.int/eur-lex/en/index.html

**EXHIBIT 168 to Declaration of Joel Israel**



# Financial Action Task Force
## Groupe d'action financière

## GUIDANCE ON THE RISK–BASED APPROACH TO COMBATING MONEY LAUNDERING AND TERRORIST FINANCING

### *High Level Principles and Procedures*

JUNE 2007

© 2007 FATF/OECD

All rights reserved. No reproduction or translation of this
publication may be made without prior written permission.
Applications for such permission should be made to:
FATF Secretariat, 2 rue André-Pascal, 75775 Paris Cedex 16, France
Fax: +33 1 44 30 61 37 or Contact@fatf-gafi.org

# FATF Guidance on the Risk-Based Approach to Combating Money Laundering and Terrorist Financing

## *High Level Principles and Procedures*

This Guidance was developed by the FATF in close consultation with representatives of the international banking and securities sectors. This public-private sector partnership was integrally involved in the development and finalisation of the Guidance. A list of members of that group is attached at Annex 5. The Guidance Paper was adopted by the FATF at its June 2007 Plenary.

## TABLE OF CONTENTS

**SECTION ONE: USING THE GUIDANCE/PURPOSE OF THE RISK−BASED APPROACH** ................................................................................. 1

Chapter One: Background and Context.................................................................1

Chapter Two: The Risk-Based Approach – *purpose, benefits and challenges*...............................................................................................2

Chapter Three: FATF and the Risk−Based Approach ...............................5

**SECTION TWO: GUIDANCE FOR PUBLIC AUTHORITIES** ........................................... 11

Chapter One: High−level principles for creating a risk−based approach.....................11

Chapter Two:  Implementation of the Risk−Based Approach............................................14

**SECTION THREE: GUIDANCE FOR FINANCIAL INSTITUTIONS ON IMPLEMENTING A RISK−BASED APPROACH** ........................................................... 22

Chapter One:  Risk Categories ............................................................................ 22

Chapter Two: Application of a Risk−Based Approach ...........................................26

Chapter Three:  Internal Controls...................................................................28

**ANNEXES** ........................................................................................................ 30

Annex 1        Sources of Further Information ........................................................ 30

Annex 2        Basel Committee on Banking Supervision – Working Group on Cross Border Banking – Risk Matrix ................................... 36

Annex 3        Basel Committee on Banking Supervision – Working Group on Cross Border Banking – Risk Assessment Links to the AML Management Programme ............................... 38

Annex 4        Glossary of Terminology: ................................................................. 39

Annex 5        Membership of the Electronic Advisory Group.................................. 42

**SECTION ONE:     USING THE GUIDANCE &
PURPOSE OF THE RISK-BASED APPROACH**

## Chapter One:    Background and Context

1.1     Following a meeting in December 2005 between the FATF and representatives of the banking and securities sectors, FATF agreed to establish an Electronic Advisory Group (EAG) on the risk-based approach as part of its outreach to the private sector. The EAG, which is a sub-group of the FATF Working Group on Evaluations and Implementation (WGEI) was set up in March 2006, and was chaired by Mr. Philip Robinson (Financial Services Authority, United Kingdom) and Mr. Rick Small (GE Money, United States). Membership of the Group has consisted of FATF members and observers, as well as representatives from the banking and securities sectors that volunteered to work on the issue of the risk-based approach to combating money laundering and terrorist financing (referred to throughout this paper as "the risk-based approach" (RBA)). A list of members is attached at Appendix 5.

1.2     The work of the EAG followed a number of steps: responses to a questionnaire on risk-based approach were obtained, then the high level elements of a risk-based approach were identified and an outline of the EAG report was agreed. There then followed extensive consultation with both public and private sector members of the EAG, and a final report of the EAG to WGEI setting out draft guidance on the implementation of a risk based approach was provided in April 2007. After further international consultation with both public and private sectors, this Guidance Paper was adopted by the FATF at its June 2007 Plenary. This is the first occasion that the FATF has developed guidance using a public-private sector partnership approach.

Purpose of the Guidance:

1.3     The purpose of this Guidance is to:

- Support the development of a common understanding of what the risk-based approach involves.
- Outline the high-level principles involved in applying the risk-based approach. And
- Indicate good public and private sector practice in the design and implementation of an effective risk-based approach.

Target Audience, Status and Content of the Guidance:

1.4     The Guidance is primarily addressed to public authorities and financial institutions. However, many of the high level principles contained in this document will be equally applicable to designated non-financial businesses and professions. The overall document is structured into three interdependent sections. Section one sets out the key elements of the risk-based approach and provides the basis for which to interpret section two (Guidance for Public Authorities) and section three (Guidance for Financial Institutions). There is also Annex 1, which contains descriptions of additional sources of information.

1.5     The Guidance aims to set out the key elements of an effective risk-based approach and identifies the types of issues that both public authorities and financial institutions may wish to consider when applying a risk-based approach.

1.6     The Guidance recognises that each country and its national authorities, in partnership with its financial institutions, will need to identify the most appropriate regime, tailored to address individual country risks. Therefore, the Guidance does not attempt to provide a single model for the risk-based approach, but seeks to provide guidance for a broad framework based on high level principles and procedures that countries may wish to consider when applying the

risk-based approach with the understanding that this guidance does not override the purview of national authorities.

## Chapter Two:   The Risk-Based Approach – *purpose, benefits and challenges*

<u>The purpose of the Risk-Based Approach</u>

1.7     The FATF Recommendations contain language that permits countries to some degree to adopt a risk-based approach to combating money laundering and terrorist financing. That language also authorise countries to permit financial institutions to use a risk-based approach to discharging certain of their anti-money laundering (AML) and counter-terrorist financing (CFT) obligations. By adopting a risk-based approach, competent authorities and financial institutions are able to ensure that measures to prevent or mitigate money laundering and terrorist financing are commensurate with the risks identified. This will allow resources to be allocated in the most efficient ways. The principle is that resources should be directed in accordance with priorities so that the greatest risks receive the highest attention. The alternative approaches are that resources are either applied evenly, so that all financial institutions, customers, products, etc. receive equal attention, or that resources are targeted, but on the basis of factors other than the risk assessed. This can inadvertently lead to a 'tick box' approach with the focus on meeting regulatory needs rather than combating money laundering or terrorist financing.

1.8     Adopting a risk-based approach implies the adoption of a risk management process for dealing with money laundering and terrorist financing. This process encompasses recognising the existence of the risk(s), undertaking an assessment of the risk(s) and developing strategies to manage and mitigate the identified risks.

1.9     A risk analysis must be performed to determine where the money laundering and terrorist financing risks are the greatest. Countries will need to identify the main vulnerabilities and address them accordingly. Institutions will need to identify higher risk customers, products and services, including delivery channels, and geographical locations. These are not static assessments. They will change over time, depending on how circumstances develop, and how threats evolve.

1.10    The strategies to manage and mitigate the identified money laundering and terrorist financing risks in financial institutions are typically aimed at preventing the activity from occurring through a mixture of deterrence (*e.g.* appropriate CDD measures), detection (*e.g.* monitoring and suspicious transaction reporting), and record-keeping so as to facilitate investigations.

1.11    Proportionate procedures should be designed based on assessed risk. Higher risk areas should be subject to enhanced procedures: for the financial services sector, this would include measures such as enhanced customer due diligence checks and enhanced transaction monitoring. It also follows that in instances where risks are low, simplified or reduced controls may be applied.

1.12    There are no universally accepted methodologies that prescribe the nature and extent of a risk-based approach. However, an effective risk-based approach does involve identifying and categorizing money laundering risks and establishing reasonable controls based on risks identified. An effective risk-based approach will allow financial institutions to exercise reasonable business judgement with respect to their customers. Application of a reasoned and well-articulated risk-based approach will justify the determinations of financial institutions with regard to managing potential money laundering and terrorist financing risks and allow financial institutions to exercise reasonable business judgement with respect to their customers. A risk-based approach should not be designed to prohibit financial institutions

2

from engaging in transactions with customers or establishing relationships with potential customers, but rather it should assist financial institutions to effectively manage potential money laundering and terrorist financing risks.

1.13    Regardless of the strength and effectiveness of AML/CFT controls established by financial institutions, criminals will continue to attempt to move illicit funds through the financial sector undetected and will, from time to time, succeed. A reasonably designed and effectively implemented risk-based approach will provide an appropriate and effective control structure to manage identifiable money laundering and terrorist financing risks. However, it must be recognized that any reasonably applied controls, including controls implemented as a result of a reasonably implemented risk-based approach will not identify and detect all instances of money laundering or terrorist financing. Therefore, regulators, law enforcement and judicial authorities must take into account and give due consideration to a financial institution's well-reasoned risk-based approach. When financial institutions do not effectively mitigate the risks due to a failure to implement an adequate risk-based approach or failure of a risk-based programme that was not adequate in its design, regulators, law enforcement or judicial authorities should take necessary action, including imposing penalties, or other appropriate enforcement/regulatory remedies.

<u>Potential Benefits and Challenges of the Risk-Based Approach</u>

Benefits:

1.14    The adoption of a risk-based approach to combating money laundering and terrorist financing can yield benefits for all parties including the public. Applied effectively, the approach should allow financial institutions and supervisory authorities to be more efficient and effective in their use of resources and minimise burdens on customers. Focusing on higher risk threats should mean that beneficial outcomes can be achieved more effectively.

1.15    Efforts to combat money laundering and terrorist financing should also be flexible in order to adapt as risks evolve. As such, financial institutions will use their judgment, knowledge and expertise to develop an appropriate risk-based approach for their particular organisation, structure and business activities.

1.16    Money laundering and terrorist financing risks can be more effectively managed through a risk-based process that assesses all potential risks, and which is built on a true cooperative arrangement between competent authorities and financial institutions. Without cooperation and understanding between these parties, there can be no effective risk-based process.

1.17    Money launderers and terrorist organisations have considerable knowledge of the financial sector and take extreme measures to hide their financial activities and make them indistinguishable from legitimate transactions. A risk-based approach is designed to make it more difficult for these criminal elements to make use of financial institutions due to the increased focus on the identified higher risk activities that are being undertaken by these criminal elements. In addition, a risk-based approach allows financial institutions to more efficiently and effectively adjust and adapt as new money laundering and terrorist financing methods are identified.

Challenges:

1.18    A risk-based approach is not necessarily an easy option, and there may be barriers to overcome when implementing the necessary measures. Some challenges may be inherent to the use of the risk-based approach. Others may stem from the difficulties in making the transition to a risk-based system. A number of challenges, however, can also be seen as offering opportunities to implement a more effective system. The challenge of implementing

a risk-based approach with respect to terrorist financing is discussed in more detail at paragraphs 1.34 to 1.38 below.

1.19    The risk-based approach is challenging to both public and private sector entities. Such an approach requires resources and expertise to gather and interpret information on risks, both at the country and institutional levels, to develop procedures and systems and to train personnel. It further requires that sound and well-trained judgment be exercised in the implementation within the institution and its subcomponents of such procedures, and systems. It will certainly lead to a greater diversity in practice which should lead to innovations and improved compliance. However, it may also cause uncertainty regarding expectations, difficulty in applying uniform regulatory treatment, and lack of understanding by customers regarding information required to open or maintain an account.

1.20    Implementing a risk-based approach requires that financial institutions have a good understanding of the risks and are able to exercise sound judgment. This requires the building of expertise within financial institutions, including for example, through training, recruitment, taking professional advice and 'learning by doing'. The process will always benefit from information sharing by competent authorities. The provision of good practice guidance is also valuable. Attempting to pursue a risk-based approach without sufficient expertise may lead to financial institutions making flawed judgments. Firms may over-estimate risk, which could lead to wasteful use of resources, or they may under-estimate risk, thereby creating vulnerabilities.

1.21    Financial institutions may find that some staff members are uncomfortable making risk-based judgments. This may lead to overly cautious decisions, or disproportionate time spent documenting the rationale behind a decision. This may also be true at various levels of management. However, in situations where management fails to recognize or underestimates the risks, a culture may develop within the financial institution that allows for inadequate resources to be devoted to compliance leading to potentially significant compliance failures. Supervisors should place greater emphasis on whether the financial institution has an effective decision-making process. However, sample testing should be used or individual decisions reviewed as a means to test the effectiveness of the institution's overall risk management (see paragraph 2.47). Supervisors should appreciate that even though the financial institution has established appropriate risk management structures and procedures that are regularly updated, and has followed the relevant policies, procedures, and processes, the financial institution may still make decisions that were incorrect in light of additional information not reasonably available at the time.

1.22    In implementing the risk-based approach financial institutions should be given the opportunity to make reasonable judgments. This will mean that no two financial institutions are likely to adopt the exact same detailed practices. Such potential diversity of practice will require that regulators make greater effort to identify and disseminate guidelines on sound practice, and may pose challenges to supervisory staff working to monitor compliance. The existence of good practice guidance, supervisory training, industry studies and other available information and materials will assist supervisors in determining whether a financial institution has made sound risk-based judgments.

> *The potential benefits and potential challenges can be summarised as follows:*
>
> Potential Benefits:
>
> - Better management of risks and cost-benefits.
> - Financial institution focus on real and identified threats.
> - Flexibility to adapt to risks that change over time.
>
> Potential Challenges:
>
> - Identifying appropriate information to conduct a sound risk analysis.
> - Addressing short term transitional costs.
> - Greater need for more expert staff capable of making sound judgments;
> - Regulatory response to potential diversity of practice.

## Chapter Three: FATF and the Risk-Based Approach

1.23   The varying degrees of risk of money laundering or terrorist financing for particular types of financial institutions or for particular types of customers, products or transactions is an important consideration underlying the FATF Recommendations. According to the Recommendations countries may take risk into account in two ways: (a) there is a general risk principle that applies to financial institutions (only), and which allows countries in some cases to choose not to apply certain Recommendations either partially or fully, provided certain conditions are met; and (b) there are specific Recommendations where the degree of risk is an issue that a country either must take into account (if there is higher risk), or may take into account (if there is lower risk).

General Risk Principle

1.24   A country could decide that it will apply the full range of AML/CFT measures set out in Recommendations 5-11, 13-15, 18 and 21-22, to all types of financial institutions[1]. However, that country may also decide to take risk into account, and may decide to limit the application of certain Recommendations provided that either of the conditions set out below are met. Where there are limitations or exemptions, this should be done on a strictly limited and justified basis:

- When a financial activity is carried out by a person or entity on an occasional or very limited basis (having regard to quantitative and absolute criteria) such that there is little risk of money laundering or terrorist financing[2] activity occurring, a country may decide that the application of AML measures is not necessary, either fully or partially.

- In strictly limited and justified circumstances, and based on a proven low risk of money laundering or terrorist financing, a country may decide not to apply some or all of the Forty Recommendations to some of the financial activities.

Specific Risk References

1.25   In addition to the general risk principle referred to above, the risk-based approach is either incorporated into the Recommendations (and the Methodology) in specific and limited ways in a number of Recommendations, or it is inherently part of or linked to those

---

[1]      See FATF Recommendations Glossary, definition of "financial institution".

[2]      The reference to terrorist financing in these two statements was added in the FATF Methodology paragraph 20(a) and (b).

Recommendations. For institutions, businesses and professions covered by the FATF Recommendations, risk is addressed in four principal areas: (a) Customer Due Diligence measures (R.5-9); (b) institutions' internal control systems (R.15 & 22); (c) the approach to regulation and oversight by competent authorities (R.23); and (d) provision for countries to allow Designated Non-Financial Businesses and Professions (DNFBPs) to take the risk of money laundering or terrorist financing into account in a similar way to financial institutions (R.12, 16 & 24).

*Customer Due Diligence (R.5-9)*

1.26    Risk is referred to in several forms:

a.  Higher risk – Under Recommendation 5, a country must require its financial institutions to perform enhanced due diligence for higher-risk customers, business relationships or transactions. Recommendations 6 (Political exposed persons) and 7 (Correspondent banking) are examples of this principle and are considered to be higher risk scenarios requiring enhanced CDD.

b.  Lower risk – a country may also permit its financial institutions to take lower risk into account in deciding the extent of the CDD measures they will take (see Methodology criteria 5.9). Financial institutions may thus reduce or simplify (but not avoid completely) the required measures. Two possible examples of where there may be lower money laundering/terrorist financing risks include financial institutions that are subject to the requirements consistent with the FATF Recommendations and supervised for compliance with those requirements, and listed public companies that are subject to regulatory disclosure requirements.

c.  Risk arising from innovation – under Recommendation 8, a country must require its financial institutions to give special attention to the risks arising from new or developing technologies that might favour anonymity.

d.  Risk assessment mechanism – the FATF standards expect that there will be an adequate mechanism by which competent authorities assess or review the procedures adopted by financial institutions to determine the degree of risk and how they manage that risk, as well as to review the determinations made by institutions. This expectation applies to all areas where the risk-based approach applies. In addition, where the competent authorities have issued guidelines to financial institutions on a suitable approach to risk-based procedures, it will be important to establish that the financial institutions have indeed followed such guidelines. The Recommendations also recognise that country risk is a necessary component of any risk assessment mechanism (R.5 & 9).

*Institutions' internal control systems (R.15 & 22)*

1.27    Under Recommendation 15, the development of "appropriate" internal policies, training and audit systems will need to include a specific, and ongoing, consideration of the potential money laundering and terrorist financing risks associated with customers, products and services, geographic areas of operation and so forth. The Interpretative Note to Recommendation 15 makes it clear that a country may allow institutions to have regards to the money laundering and terrorist financing risks, and to the size of the business, when determining the type and extent of measures required. Similarly, country risk (and the implementation of the FATF Recommendations) must be taken into account when assessing the measures being undertaken by foreign branches and subsidiaries (R.22).

6

*Regulation and oversight by competent authorities (R.23)*

1.28    Under Recommendation 23 (for financial institutions other than those subject to the Core Principles or persons providing money or value transfer services), a country may have regard to the risk of money laundering or terrorist financing in a particular financial sector when determining the extent of measures to license or register and appropriately regulate, and to supervise or oversee those institutions for AML/CFT purposes. If there is a proven low risk of money laundering and terrorist financing then lesser measures may be taken. The extent of the measures for persons providing money or value transfer services and money/currency changing services are subject to stated minimum standards.

1.29    Recommendation 23 also recognises that financial institutions subject to Core Principles should also apply elements of the Core Principles that are relevant to AML/CFT (and which are not expressly covered by the FATF Recommendations) for the purpose of combating money laundering and terrorist financing *e.g.* licensing of institutions. Moreover, the Core Principles set out sound principles relating to the procedures for assessing and managing risk, and consideration could be given as to how those already well-defined concepts could apply to AML/CFT.

*Designated Non-Financial Businesses and Professions (R.12, 16, 24)*

1.30    In implementing AML/CFT measures for DNFBPs under Recommendations 12 and 16, a country may permit DNFBP's to take money laundering and terrorist financing risk into account when determining the extent of CDD, internal controls etc, in a way similar to that permitted for financial institutions.[3]

1.31    As regards regulation and monitoring (R.24), a country may have regard to the risk of money laundering or terrorist financing in a particular DNFBP sector (except for casinos which have been determined to be higher risk) when determining the extent of measures required to monitor or ensure compliance for anti-money laundering and counter terrorist financing purposes. If there is a proven low risk of money laundering and terrorist financing then lesser monitoring measures may be taken.[4]

<u>Other Recommendations</u>

1.32    As regards the FATF Nine Special Recommendations on Terrorist Financing, SR VIII dealing with non-profit organisations also recognises that the risk of terrorist financing should be taken into account,[5] and that a targeted approach in dealing with the terrorist threat to the non-profit organisation (NPO) sector is essential given the diversity within individual national sectors and the differing degrees to which parts of each sector may be vulnerable to misuse by terrorists. Likewise the best practices document supporting SR IX encourages countries to base their efforts on assessed risk and threat assessments. Risk is also featured in the methodology supporting SR VII, where beneficiary financial institutions should be required to adopt effective risk-based procedures for identifying and handling wire transfers that are not accompanied by complete originator information.

1.33    Recommendation 25 requires adequate feedback to be provided to the financial sector and DNFBPs. Such feedback helps institutions and businesses to more accurately assess the money laundering and terrorist financing risks and to adjust their risk programmes accordingly. This in turn makes it more likely that better quality suspicious transaction reports

---

[3]        Handbook paragraph 42(e) (i).

[4]        See Methodology R.24.

[5]        Handbook  paragraph 42 (f).

will be filed. As well as being an essential input to any assessment of country or sector wide risks, the promptness and content of such feedback is relevant to implementing an effective risk-based approach.

<u>Applicability of the risk-based approach to terrorist financing</u>

1.34   The application of a risk-based approach to terrorist financing has both similarities and differences compared to money laundering. They both require a process for identifying and assessing risk. However, the characteristics of terrorist financing mean that the risks may be difficult to assess and the implementation strategies may be challenging due to considerations such as the relatively low value of transactions involved in terrorist financing, or the fact that funds can come from legal sources.

1.35   Funds that are used to finance terrorist activities may be derived either from criminal activity or may be from legal sources, and the nature of the funding sources may vary according to the type of terrorist organisation. Where funds are derived from criminal activity, then traditional monitoring mechanisms that are used to identify money laundering may also be appropriate for terrorist financing, though the activity, which may be indicative of suspicion, may not be identified as or connected to terrorist financing. It should be noted that transactions associated with the financing of terrorists may be conducted in very small amounts, which in applying a risk-based approach could be the very transactions that are frequently considered to be of minimal risk with regard to money laundering. Where funds are from legal sources then it is even more difficult to determine that they could be used for terrorist purposes. In addition, the actions of terrorists may be overt and outwardly innocent in appearance, such as the purchase of materials and services (*i.e.* commonly held chemicals, a motor vehicle, etc.) to further their goals, with the only covert fact being the intended use of such materials and services purchased. Therefore, both for terrorist funds derived from criminal activity and for legitimately sourced funds, transactions related to terrorist financing may not exhibit the same traits as conventional money laundering. However in all cases, it is not the responsibility of the financial institution to determine the type of underlying criminal activity, or intended terrorist purpose, rather the institution's role is to report the suspicious activity. The FIU and law enforcement authorities will then examine the matter further and determine if there is a link to terrorist financing.

1.36   Therefore, the ability of financial institutions to detect and identify potential terrorist financing transactions without guidance on terrorist financing typologies or without acting on specific intelligence provided by the authorities is significantly more challenging than is the case for potential money laundering and other suspicious activity. Detection efforts, absent specific national guidance and typologies, are likely to be based around monitoring that focuses on transactions with countries or geographic areas where terrorists are known to operate or on the other limited typologies available (many of which are indicative of the same techniques as are used for money laundering).

1.37   Where particular individuals, organisations or countries are the subject of terrorist finance sanctions, the obligations on institutions to comply and the listing of those individuals, organisations or countries as a result of such actions are determined exclusively by countries and are not a function of risk. Violations of such sanctions may result in a criminal offence or sanctions if funds or financial services are made available to a target or its agent.

1.38   For these reasons, this Guidance has not comprehensively addressed the application of a risk-based process to terrorist financing. It is clearly preferable that a risk-based approach be applied where reasonably practicable, but further consultation with key stakeholders is required to identify a more comprehensive set of indicators of the methods and techniques used for terrorist financing, which can then be factored into strategies to assess terrorist financing risks and devise measures to mitigate them. Financial institutions would then have

an additional basis upon which to more fully develop and implement a risk-based process for terrorist financing.

Limitations to the risk-based approach

1.39    There are circumstances in which the application of a risk-based approach will not apply, or may be limited There are also circumstances in which the application of a risk-based approach may not apply to the initial stages of a requirement or process, but then will apply to subsequent stages.  The limitations to the risk-based approach are usually the result of legal or regulatory requirements that mandate certain actions to be taken.

1.40    Requirements to freeze assets of identified individuals or entities, in jurisdictions where such requirements exist, are independent of any risk assessment. The requirement to freeze is absolute and cannot be impacted by a risk-based process. Similarly, while the identification of potential suspicious transactions can be advanced by a risk-based approach, the reporting of suspicious transactions, once identified, is not risk-based.

1.41    There are a number of components to customer due diligence – identification and verification of identity of customers and beneficial owners, obtaining information on  the purposes and intended nature of the business relationships and conducting ongoing due diligence. Of these components, the identification and verification of identity of customers are requirements which must be completed regardless of the risk-based approach. However, in relation to all the CDD components, a reasonably implemented risk-based approach may allow for a determination of the extent and quantity of information required, and the mechanisms to be used to meet these minimum standards. Once this determination is made, the obligation to keep records and documents that have been obtained for due diligence purposes, as well as transaction records, is not dependent on risk levels.

1.42    Countries may allow financial institutions to apply reduced or simplified measures where the risk of money laundering or terrorist financing is lower. However, these reduced or simplified measures do not necessarily apply to all aspects of customer due diligence. Moreover, where these exemptions are subject to certain conditions being met, it is necessary to verify that these conditions apply, and where the exemption applies under a certain threshold, measures should be in place to prevent transactions from being split artificially to avoid the threshold. In addition, information beyond customer identity, such as customer location and account purpose, may be needed to adequately assess risk. This will be an iterative process: the preliminary information obtained about a customer should be sufficient to determine whether to go further, and in many cases customer monitoring will provide additional information.

1.43    Some form of monitoring, whether it is automated, manual, a review of exception reports or a combination of acceptable options, depending on the risks presented, is required in order to detect unusual and hence possibly suspicious transactions. Even in the case of lower risk customers, monitoring is needed to verify that transactions match the initial low risk profile and if not, trigger a process for appropriately revising the customer's risk rating. Equally, risks for some customers may only become evident once the customer has begun transacting either through an account or otherwise in the relationship with the financial institution. This makes appropriate and reasonable monitoring of customer transactions an essential component of a properly designed risk-based approach, however within this context it should be understood that not all transactions, accounts or customers will be monitored in exactly the same way. Moreover, where there is an actual suspicion of money laundering or terrorist financing, this could be regarded as a higher risk scenario, and enhanced due diligence should be applied regardless of any threshold or exemption.

<u>Distinguishing Risk-Based Supervision and Risk-Based Policies and Processes</u>

1.44    Risk-based policies and processes in financial institutions should be distinguished from risk-based supervision. As illustrated through the 2006 revision of the Basel Core Principles there is a general recognition within supervisory practice of allocating resources taking into account the risks posed by individual financial institutions.[6] The methodology adopted by regulatory authorities to determine allocation of supervisory resources should cover the business focus, the risk profile and the internal control environment, and should permit relevant comparisons between financial institutions. The methodology used for determining the allocation of resources will need updating on an ongoing basis so as to reflect the nature, importance and scope of the risks to which individual financial institutions are exposed. Consequently, this prioritisation would lead supervisors to demonstrate increased regulatory attention to financial institutions that engage in activities assessed to be of higher money laundering risks.

1.45    However, it should also be noted that the risk factors taken into account to prioritise the supervisors' work will depend not only on the intrinsic risk associated with the activity undertaken, but also on the quality and effectiveness of the risk management systems put in place to address such risks.

1.46    Since prudential regulators should have already assessed the quality of risk management controls throughout the financial institutions, it is reasonable that their assessments of these controls be used, at least in part, to inform money laundering and terrorist financing risk assessments (see also paragraph 1.26 above). *Annex 2, provides an example of an assessment that regulators may wish to consider when prioritising supervisory work.*

---

**Summary box:**

**A risk-based approach to countering money laundering and terrorist financing at the national level: key elements for success**

- Financial institutions and regulators should have access to reliable and actionable information about the threats.

- There must be emphasis on cooperative arrangements among the policy makers, law enforcement, regulators, and the private sector.

- Authorities should publicly recognize that the risk-based approach will not eradicate all elements of risk.

- Authorities have a responsibility to establish an atmosphere in which financial institutions need not be afraid of regulatory sanctions where they have acted responsibly and implemented adequate internal systems and controls.

- Regulators' supervisory staff must be well-trained in the risk-based approach, both as applied by supervisors and by financial institutions.

- Requirements and supervisory oversight at the national level should be consistent among similar industries.

---

[6]    See for example *Core Principles Methodology* 2006, Principle 1(1), footnote 6 to AC.

## SECTION TWO:    GUIDANCE FOR PUBLIC AUTHORITIES

## Chapter One:   High-level principles for creating a risk-based approach

2.1     The creation of a risk-based approach to countering money laundering and the financing of terrorism will allow competent authorities and the financial institutions to use their resources most effectively. This chapter sets out five high-level principles that should be considered by countries when designing a risk-based approach. They could be considered as setting out a broad framework of good practice.

2.2     The five principles set out in this paper are intended to assist countries in their efforts to improve their AML/CFT regimes. They are not intended to be prescriptive, and should be applied in a manner that is well-considered and is appropriate to the particular circumstances of the country in question. For example, discussion in this paper assumes that the financial services industry is part of the private sector, although in many countries at least some financial institutions are state-owned.

**Principle One: Understanding and responding to the threats and vulnerabilities: a national risk assessment**

2.3     Successful implementation of a risk-based approach to combating money-laundering and terrorist financing depends on a sound understanding of the threats and vulnerabilities. Where a country is seeking to introduce a risk-based approach at a national level, this will be greatly aided if there is a national understanding of the risks facing the country. This understanding can flow from a national risk assessment.

2.4     National risk assessments should be tailored to the circumstances of each country. For a variety of reasons, including the structure of competent authorities and the nature of the financial  services sector, each country's judgements about the risks will be unique, as will their decisions about how to implement a national assessment in practice. A national assessment need not be a single formal document. It should be considered as a process that is designed to achieve a specific outcome. The desired outcome is that decisions about allocating responsibilities and resources at the national level are based on a comprehensive and up-to-date understanding of the risks. Competent authorities, in consultation with the private sector, should consider how best to achieve this while also taking into account any risk associated with providing information on vulnerabilities in their financial systems to money launderers, terrorist financiers, and other criminals.

**Principle Two: A legal/regulatory framework that supports the application of a risk-based approach**

2.5     Countries should consider whether their legislative and regulatory frameworks are conducive to the application of the risk-based approach. Where appropriate the obligations imposed on financial institutions should be informed by the outcomes of the national risk assessment.

2.6     The risk-based approach does not mean the absence of a clear statement of what is required from financial institutions. However under a risk-based approach, financial institutions should have a degree of flexibility to implement policies and procedures which respond appropriately to their own risk assessment. In effect, the standards implemented may be tailored and/or amended by additional measures as appropriate to the risks of a particular financial institution/business. The fact that policies and procedures, in accordance to the risk levels, may be applied flexibly to different products, services, customers and locations does not mean that policies and procedures need not be clearly defined.

2.7     Basic minimum AML requirements can coexist with a risk-based approach. Indeed, sensible minimum standards, coupled with scope for these to be enhanced when the risk justifies it, should be at the core of risk-based AML/CFT requirements. These standards should, however, be focused on the outcome (combating through deterrence, detection, and reporting of money laundering and terrorist financing), rather than applying legal and regulatory requirements in a purely mechanistic manner to every customer.

**Principle Three: Design of a supervisory framework to support the application of the risk-based approach**

2.8     Where competent authorities have been assigned responsibility for overseeing financial institutions' AML/CFT controls, countries may wish to consider whether such authorities are given the necessary authority to implement a risk-based approach to supervision. Barriers to this may include inappropriate reliance on detailed and prescriptive requirements in the regulator's rules. These requirements may, in turn, stem from the laws under which the regulator gained its powers.

2.9     Where appropriate, regulators should seek to adopt a risk-based approach to the supervision of financial institutions' controls to combat money laundering and terrorist financing. This should be based on a thorough and comprehensive understanding of the types of financial activity, the financial and other institutions that undertake such activity and the money laundering and terrorist financing risks to which these are exposed. Regulators will probably need to prioritise resources based on their overall assessment of where the risks are, which institutions are most exposed to them, and other factors.

2.10    Regulators with responsibilities other than those related to AML/CFT will need to consider these risks alongside other risk assessments arising from the regulator's wider duties.

2.11    Such risk assessments should help the regulator choose where to apply resources in its supervisory programme, with a view to using limited resources to achieve the greatest effect. A risk assessment may also identify that the regulator does not have adequate resources to deal with the risks[7]. In such circumstances the regulator may need to obtain additional resources or adopt other strategies to manage or mitigate any unacceptable residual risks.

2.12    The application of a risk-based approach to supervision requires that regulators' staff be able to make principle-based decisions in a similar fashion as would be expected from staff of a financial institution that has adopted a risk-based approach. These decisions will cover the adequacy of financial institutions' arrangements to combat money laundering and terrorist financing. As such, a regulator may wish to consider how best to train its staff in the practical application of a risk-based approach to supervision. Supervisory staff will need to be well-briefed as to the general principles of a risk-based approach, its possible methods of application, and what a risk-based approach looks like when successfully applied by a financial institution.

**Principle Four: Identifying the main actors and ensuring consistency**

2.13    Countries should consider who the main stakeholders are when adopting a risk-based approach to combating money laundering and terrorist financing. These will differ between countries. Thought should be given as to the most effective way to share responsibility between these parties, and how information may be shared to best effect. For example, which body or bodies are best placed to provide guidance to the financial services industry about

---

[7]     See FATF Recommendation 30.

how to implement a risk-based approach to anti money laundering and counter- terrorist financing.

2.14   A list of potential stakeholders may be considered to include the following:

- Government – this may include legislature, executive, and judiciary.
- Law enforcement agencies - this might include the police, customs etc
- The financial intelligence unit (FIU), security services, other similar agencies etc.
- Financial services regulators.
- The private sector – this might include financial services firms, professional services firms (such as accountants and lawyers), trade bodies, etc.
- The public – arrangements designed to counter money laundering and terrorist financing are ultimately designed to protect the law-abiding public. However these arrangements may also act to place burdens on customers of financial services firms.
- Others – those who are in a position to contribute to the conceptual basis underpinning the risk-based approach, such stakeholders may include academia and the media.

2.15   Clearly a government will be able to exert influence more effectively over some of these stakeholders than others. However, a government will be in a position to assess how all stakeholders can be encouraged to support efforts to combat money laundering and terrorist financing.

2.16   A further element is the role that governments have in seeking to gain recognition of the relevance of a risk-based approach from competent authorities. This may be assisted by relevant authorities making clear and consistent statements about the risk-based approach on the following:

- Financial institutions can be expected to have flexibility to adjust their internal systems and controls taking into consideration lower and high risks, so long as such systems and controls are reasonable. However, there are also minimum legal and regulatory requirements and elements that apply irrespective of the risk level, for example suspicious transaction reporting and minimum standards of customer due diligence.

- Acknowledging that a financial institution's ability to detect and deter money laundering and terrorist financing can sometimes be necessarily limited and that information on risk factors is not always robust or freely available. There should therefore be reasonable policy and supervisory expectations about what a financial institution with good controls aimed at preventing money laundering and the finance of terrorism is able to achieve. A financial institution may have acted in good faith to take reasonable and considered steps to prevent money laundering, and documented the rationale for its decisions, and yet still be abused by a criminal.

- Acknowledging that not all high risk situations will be identical and as a result will not always require precisely the same type of enhanced due diligence.

**Principle Five: Information exchange between the public and private sector**

2.17   Effective information exchange between the public and private sector will form an integral part of a country's strategy for combating money laundering and terrorist financing. In many cases, it will allow the private sector to provide competent authorities with information they identify as a result of previously provided government intelligence.

2.18   Public authorities, whether law enforcement agencies, regulators or other bodies, have privileged access to information that may assist financial institutions to reach informed

judgments when pursuing a risk-based approach to counter money laundering and terrorist financing. Likewise, financial institutions routinely transact with a great number of customers on a daily basis, and are able to understand their clients' businesses reasonably well. It is desirable that public and private bodies work collaboratively to identify what information is valuable to help combat money laundering and terrorist financing, and to develop means by which this information might be shared in a timely and effective manner.

2.19    To be productive, information exchange between the public and private sector should be accompanied by appropriate exchanges among public authorities. FIUs, supervisors and law enforcement agencies should be able to share information and feedback on results and identified vulnerabilities, so that consistent and meaningful inputs can be provided to the private sector. All parties should of course, consider what safeguards are needed to adequately protect sensitive information held by public bodies from being disseminated too widely.

2.20    Relevant stakeholders should seek to maintain a dialogue so that it is well understood what information has proved useful in combating money laundering and terrorist financing.[8] For example the types of information that might be usefully shared between the public and private sector would include, if available:

- Assessments of country risk.
- Typologies or assessments of how money launderers and terrorists have abused the financial system.
- Feedback on suspicious transaction reports and other relevant reports.
- Targeted unclassified intelligence. In specific circumstances, and subject to appropriate safeguards, it may also be appropriate for authorities to share targeted confidential information with financial institutions.
- Countries, persons or organisations whose assets or transactions should be frozen.

2.21    When choosing what information can be properly and profitably shared, public authorities may wish to emphasize to the financial services industry that information from public bodies should inform, but not be a substitute for institutions' own judgments. For example, countries may decide to not create what are perceived to be definitive country-approved lists of low risk customer types. Instead public authorities may prefer to share information on the basis that this will be one input into financial institutions' decision making processes, along with any other relevant information that is available to the financial institutions.

## Chapter Two:   Implementation of the Risk-Based Approach

*Assessment of Risk to Inform National Priorities:*

2.22    A risk-based approach should be built on sound foundations: effort must first be made to ensure that the risks are well understood. As such, a risk-based approach should be based on an assessment of the threats. This is true whenever a risk-based approach is applied, at any scale, whether by countries or individual financial institutions. A country's approach should be informed by its efforts to develop an understanding of the risks in that country. This can be considered as a 'national risk assessment'.

2.23    A national risk assessment should be regarded as a description of fundamental background information to assist supervisors, law enforcement authorities, the FIU and financial institutions to ensure that decisions about allocating responsibilities and resources at the

---

[8]       Examples of such dialogue are included in section four of these guidelines.

national level are based on a practical, comprehensive and up-to-date understanding of the risks.

2.24    A national risk assessment should be tailored to the circumstances of the individual country, both in how it is executed, and its conclusions. Factors that may influence the risk of money laundering and terrorist financing in a country could include the following:

- Political environment.
- Legal environment.
- A country's economic structure.
- Cultural factors, and the nature of civil society.
- Sources, location and concentration of criminal activity.
- Size of the financial services industry.
- Composition of the financial services industry.
- Ownership structure of financial institutions.
- Corporate governance arrangements in financial institutions and the wider economy.
- The nature of payment systems and the prevalence of cash-based transactions.
- Geographical spread of financial industry's operations and customers.
- Types of products and services offered by the financial services industry.
- Types of customers serviced by the financial services industry.
- Types of predicate offences.
- Amounts of illicit money generated domestically.
- Amounts of illicit money generated abroad and laundered domestically.
- Main channels or instruments used for laundering or financing terrorism.
- Sectors of the legal economy affected.
- Underground areas in the economy.

2.25    Countries should also consider how an understanding of the risks of money laundering and terrorist financing can be best achieved at the national level. Which body or bodies will be responsible for contributing to this assessment? How formal should an assessment be? Should the competent authority's view be made public? These are all questions for the competent authority to consider.

2.26    The desired outcome is that decisions about allocating responsibilities and resources at the national level are based on a comprehensive and up-to-date understanding of the risks. To achieve the desired outcome, competent authorities should develop and implement measures to mitigate the identified risks.

2.27    Developing and operating a risk-based approach involves forming judgements. It is important that these judgements are well informed. It follows that, to be effective, the risk-based approach should be information-based and include intelligence where appropriate. Effort should be made to ensure that risk assessments are based on fresh and accurate information. Countries, in partnership with law enforcement bodies, FIUs, regulators and financial institutions, are well placed to bring their knowledge and expertise to bear in developing a risk-based approach that is appropriate for their particular country. Their assessments will not be static: they will change over time, depending on how circumstances develop and how the threats evolve. As such, countries should facilitate the flow of information between different bodies, so that there are no institutional impediments to information dissemination.

2.28    Whatever form they take, a national assessment of the risks, along with measures to mitigate those risks, can inform how resources are applied to combat money laundering and terrorist financing, taking into account other relevant country policy goals. It can also inform how these resources are most effectively assigned to different public bodies, and how those bodies make use of their resources in an effective manner.

2.29    As well as assisting competent authorities to decide how to allocate public funds to combat money laundering and terrorist financing, a national risk assessment can also inform decision-makers about the relationship between the supervisory/regulatory regime and the identified risks. An over-zealous effort to counter the risks could be damaging and counter-productive, placing unreasonable burdens on industry, and act against the interests of the public by limiting access to financial services for some segments of the population. Alternatively, efforts may not be sufficient to provide protection to societies from the threats posed by criminals and terrorists. A sound understanding of the risks at the national level could help obviate these dangers.

**Regulatory Supervision – General Principles**

<u>Defining the acceptable level of risk</u>

2.30    The level of AML/CFT risk will generally be affected by both internal and external risk factors. For example, risk levels may be increased by internal risk factors such as weak compliance resources, inadequate risk controls and insufficient senior management involvement. External level risks may rise due to factors such as the action of third parties and/or political and public factors.

2.31    As described in Section One, all financial activity involves an element of risk. Competent authorities should not prohibit financial institutions from conducting business with high risk customers as long as appropriate policies, procedures and processes to manage the attendant risks are in place. Only in specific cases, for example when justified by the fight against terrorism, crime or the implementation of international obligations, are designated individuals, legal entities, organisations or countries denied categorically access to financial services.

2.32    However, this does not exclude the need to implement basic minimum requirements. For instance FATF Recommendation 5 states that *"Where the financial institution is unable to comply with (CDD requirements), it should not open the account, commence business relations or perform the transaction; or should terminate the business relationship; and should consider making a suspicious transaction report in relation to the customer."* So the level of risk should strike an appropriate balance between the extremes of not accepting customers, and conducting business with unacceptable or unmitigated risk.

2.33    Competent authorities expect financial institutions to put in place effective policies, programmes, procedures and systems to mitigate the risk and acknowledge that even with effective systems not every suspect transaction will necessarily be detected. They should also ensure that those policies, programmes, procedures and systems are applied effectively to prevent financial institutions from becoming conduits for illegal proceeds and ensure that they keep records and make reports that are of use to national authorities in combating money laundering and terrorist financing. Efficient policies and procedures will reduce the level of risks, but are unlikely to eliminate them completely. Assessing money laundering and terrorist financing risks requires judgement and is not an exact science. Monitoring aims at detecting unusual or suspicious transactions among an extremely large number of legitimate transactions, furthermore the demarcation of what is unusual may not always be straightforward since what is "customary" may vary depending on the customers' business. This is why developing an accurate customer profile is important in managing a risk-based

system. Moreover, procedures and controls are frequently based on previous typologies cases, but criminals will adapt their techniques.

2.34     Additionally, not all high risk situations are identical, and therefore will not always require precisely the same level of enhanced due diligence. As a result, supervisors will expect financial institutions to identify individual high risk categories and apply specific and appropriate mitigation measures. For example, some categories could be:

- Non-resident customers (to understand why they want to open an account in a different country).
- Politically exposed persons (to apply a specific policy); And
- Companies with bearer shares (to exert particular vigilance on the identification and verification of the beneficial owner).

Further information on the identification of specific risk categories is provided in Section Three, 'Guidance for the Private Sector'.

<u>Proportionate Supervisory Actions to support the Risk-Based Approach</u>

2.35     Supervisors should seek to identify weaknesses through an effective programme of both on-site and off-site supervision,[9] and through analysis of internal and other available information.

2.36     In the course of their examinations, supervisors should review a financial institution's AML/CFT risk assessments, as well as its policies, procedures and control systems to arrive at an overall assessment of the risk profile of the financial institution and the adequacy of its mitigation measures. Where available, assessments carried out by or for the institutions may be a useful source of information. The assessment should include sample transaction testing of customer accounts to validate the assessment. The supervisor's assessment of management's ability and willingness to take necessary corrective action is also a critical determining factor. Supervisors should use proportionate actions to ensure proper and timely correction of deficiencies, taking into account that identified weaknesses can have wider consequences. Generally, systemic breakdowns or inadequate controls will result in the most severe supervisory response.

2.37     Nevertheless, it may happen that the lack of detection of an isolated high risk transaction, or of transactions of an isolated high risk customer, will in itself be significant, for instance where the amounts are significant, or where the money laundering and terrorist financing typology is well known, or where a scheme has remained undetected for a long time. Such a case might indicate an accumulation of weak risk management practices or regulatory breaches regarding the identification of high risks, transaction monitoring, staff training and internal controls, and therefore, might alone justify supervisory action.

2.38     Supervisors should be in a position to compare risk factors and procedures used by peer financial institutions. This will, among other objectives, assist the supervisors in better understanding how financial institutions are developing and implementing a risk-based approach, as well as in identifying potential deficiencies. Similarly, supervisors can and should use their knowledge of the risks associated with products, services, customers and geographic locations to help them evaluate the financial institution's money laundering and terrorist financing risk assessment, with the understanding, however, that they may possess information that has not been made available to financial institutions and, therefore, financial institutions would not have been able to take such information into account when developing and implementing a risk-based approach. Supervisors (and other relevant stakeholders) are

---

[9]     See Basel Core Principle 20 on Supervisory techniques.

encouraged to use that knowledge to issue guidelines to assist financial institutions in managing their risks. Where financial institutions are permitted to determine the extent of the CDD measures on a risk sensitive basis, this should be consistent with guidelines issued by the competent authorities.[10]. An assessment of the risk-based approach will, for instance, help identify cases where institutions use excessively narrow risk categories that do not capture all existing risks, or adopt criteria that lead to the identification of a large number of higher risk relationships, but without providing for adequate additional due diligence measures.

2.39    In the context of the risk-based approach, the primary focus for supervisors should be to determine whether or not the financial institution's AML/CFT compliance and risk management programme is adequate to: (a) meet the minimum regulatory requirements, and (b) appropriately and effectively mitigate the risks. The supervisory goal is not to prohibit high risk activity, but rather to be confident that financial institutions have adequately and effectively implemented appropriate risk mitigation strategies.

2.40    Under FATF Recommendation 29, supervisors should impose adequate sanctions for failure to comply with statutory and regulatory requirements to combat money laundering and terrorist financing, and effective AML/CFT supervision requires that "the supervisor has available an appropriate range of supervisory tools for use when, in the supervisor's judgement, a bank is not complying with laws, regulations or supervisory decision […]. These tools include the ability to require a bank to take prompt remedial action and to impose penalties. In practice, the range of tools is applied in accordance with the gravity of a situation".[11]

2.41    Fines and/or penalties are not appropriate in all regulatory actions to correct or remedy AML/CFT deficiencies. However, supervisors must have the authority and willingness to apply fines and/or penalties in cases where substantial deficiencies exist.  More often than not, action should take the form of a remedial program through the normal supervisory processes.

2.42    A number of generic aspects of proportionate supervisory actions have been set out in the Basel Core Principles Methodology (as revised October 2006). Although not directly related to anti-money laundering, they nonetheless offer helpful insights into the supervisory oversight of associated risk management process. The key concepts drawn from these principles are outlined in Appendix One.

2.43    In considering the above factors it is clear that proportionate regulation will be supported by two central features:

    a)      *Regulatory Transparency*

2.44    In the implementation of proportionate actions, regulatory transparency will be of paramount importance. Supervisors are aware that financial institutions, while looking for operational freedom to make their own risk judgments, will also seek guidance on regulatory obligations. As such, the regulator with AML/CFT supervisory responsibilities should seek to be transparent in setting out what it expects from regulated institutions, and will need to consider appropriate mechanisms of communicating these messages. For instance, this may be in the form of high-level requirements, based on desired outcomes, rather than detailed process.

2.45    No matter what individual procedure is adopted, the guiding principle will be that financial institutions are aware of their legal responsibilities and regulatory expectations. In the absence of this transparency there is the danger that supervisory actions may be perceived as either

---

[10]        FATF Recommendations 5 & 25, Methodology Essential Criteria 25.1 and 5.12.

[11]        Basel *Core Principles Methodology* 2006, Principle 23, EC 3.

disproportionate or unpredictable which may undermine even the most effective application of the risk-based approach by financial institutions.

b)      *Staff Training of Supervisors and Enforcement Staff*

2.46    In the context of the risk-based approach, it is not possible to specify precisely what a financial institution has to do, in all cases, to meet its regulatory obligations. Thus, a prevailing consideration will be how best to ensure the consistent implementation of predictable and proportionate supervisory actions. The effectiveness of supervisory training will therefore be important to the successful delivery of proportionate supervisory actions.

2.47    Training should aim to allow supervisory staff to form sound comparative judgements about financial institutions AML/CFT systems and controls. It is important in conducting assessments that supervisors have the ability to make judgements regarding management controls in light of the risks assumed by institutions and considering available industry practices. Supervisors might also find it useful to undertake comparative assessments so as to form judgements as to the relative strengths and weaknesses of different institutions' arrangements.

2.48    The training should include instructing supervisors about how to evaluate whether senior management have implemented adequate risk management measures, and that the necessary procedures and controls are in place. The training should also include reference to specific guidance, where available. It should be noted that "the supervisory process should include not only a review of policies and procedures, but also a review of customer files and the sampling of some accounts".[12] The supervisor has equally to assess whether or not the processes are adequate, and if it "determines that the risk management processes are inadequate, it has the power to require a bank or banking group to strengthen them".[13] Supervisors also should be satisfied that sufficient resources are in place to ensure the implementation of effective risk management.

2.49    To fulfil these responsibilities, training should enable supervisory staff to adequately assess:

i.      The quality of internal procedures, including ongoing employee training programmes and internal audit, compliance and risk management functions.

ii.     Whether or not the risk management policies and processes are appropriate in light of the financial institution's risk profile, and are periodically adjusted in light of changing risk profiles.

iii.    The participation of senior management to confirm that they have undertaken adequate risk management, and that the necessary procedures and controls are in place.

---

[12]    See R.29 and *Customer due diligence for banks*, § 61.

[13]    Basel Core Principle Methodology, Core Principle 7, EC1.

Whilst by no means an exhaustive list, onsite examination topics may include the following:

- The application of a group-wide policy
- Assessment of the risk associated with each business line
- The extent that assessments have been formally documented and segmented by products, delivery channels, types of customer and geographic location of customers
- Extent of CDD procedures including identification of new customers, customer profiling and collection of 'Know Your Customer' information
- Additional due diligence is undertaken in relation to high risk customers and businesses, e.g. 'high net worth' individuals, Politically Exposed Persons, and correspondent banking
- Transaction monitoring procedures in place and how alerts are reviewed
- Policies determining how and on what basis existing customer files may be updated
- Quality of internal systems and controls, including processes for identifying and reporting large cash and suspicious transactions
- Policies on record keeping and ease of retrieving identification evidence or transaction records
- Scope, frequency and audience of AML/CFT training and evaluation of effectiveness
- Appropriate sample testing

**There is no set of 'right answers' to these topics. The key considerations are that (a) the financial institution is meeting any minimum regulatory requirements (b) the financial institution has identified its money laundering and terrorist financing risks, worked out how best to manage those risks, and devoted adequate resources to the task; and (c) senior management is properly accountable for AML/CFT controls.**

**Appendix One: Key aspects of risk management as described in the Basel Core *Principles Methodology* (as revised in October 2006):**

Excerpts on risk management processes:

"Individual banks and banking groups are required to have in place comprehensive risk management policies and processes to identify, evaluate, monitor and control or mitigate material risks. The supervisor determines that these processes are adequate for the size and nature of the activities of the bank and banking group and are periodically adjusted in the light of the changing risk profile of the bank or banking group and external market developments. If the supervisor determines that the risk management processes are inadequate, it has the power to require a bank or banking group to strengthen them." (Principle 7, Essential Criteria 1).

"The supervisor confirms that banks and banking groups have appropriate risk management strategies that have been approved by the Board. The supervisor also confirms that the Board ensures that policies and processes for risk-taking are developed, appropriate limits are established, and senior management takes the steps necessary to monitor and control all material risks consistent with the approved strategies." (CP7, EC2);

"The supervisor determines that risk management strategies, policies, processes and limits are properly documented, reviewed and updated, communicated within the bank and banking group, and adhered to in practice. The supervisor determines that exceptions to established policies, processes and limits receive the prompt attention of and authorisation by the appropriate level of management and the Board where necessary." (CP7, EC3).

"The supervisor determines that senior management and the Board understand the nature and level of risk being taken by the bank […]. The supervisor also determines that senior management ensures that the risk management policies and processes are appropriate in the light of the bank's risk profile and business plan and that they are implemented effectively. This includes a requirement that senior management regularly reviews and understands the implications (and limitations) of the risk management information that it receives. The same requirement applies to the Board in relation to risk management information presented to it in a format suitable for Board oversight." (CP7, EC4).

"Where banks and banking groups use models to measure components of risk, the supervisor determines that banks perform periodic and independent validation and testing of the models and systems." (CP7, EC6).

"The supervisor determines that banks and banking groups have risk evaluation, monitoring, and control or mitigation functions with duties clearly segregated from risk-taking functions in the bank […]" (CP7, EC9).

**SECTION THREE: GUIDANCE FOR FINANCIAL INSTITUTIONS ON IMPLEMENTING A
RISK-BASED APPROACH**

Preamble

3.1     The specifics of a financial institution's particular risk-based process should be determined
based on the operations of the financial institution. Where appropriate and feasible, these
policies, procedures and controls setting out how an institution will manage and mitigate its
money laundering and terrorist financing risks should be articulated on a group-wide basis.
However, it is noted that the characteristics of terrorist financing present differently from
money laundering and, therefore, the associated risk may be difficult to assess without a more
comprehensive set of indicators of the methods and techniques used for terrorist financing.
(see paragraphs 1.34 through 1.38). A reasonably designed risk-based approach provides the
means by which a financial institution identifies the criteria to assess potential money
laundering risks. A reasonably implemented risk-based process also provides a framework for
identifying the degree of potential money laundering risks associated with customers and
transactions and allows for an institution to focus on those customers and transactions that
potentially pose the greatest risk of money laundering.

## Chapter One:   Risk Categories

3.2     In order to implement a reasonable risk-based approach, financial institutions should identify
the criteria to assess potential money laundering risks. Identification of the money laundering
and terrorist financing risks, to the extent that such terrorist financing risk can be identified, of
customers or categories of customers, and transactions will allow financial institutions to
determine and implement proportionate measures and controls to mitigate these risks. While a
risk assessment should always be performed at the inception of a customer relationship, for
some customers, a comprehensive risk profile may only become evident once the customer
has begun transacting through an account, making monitoring of customer transactions and
on-going reviews a fundamental component of a reasonably designed risk-based approach. A
financial institution may also have to adjust its risk assessment of a particular customer based
upon information received from a competent authority.

3.3     Money laundering and terrorist financing risks may be measured using various categories.
Application of risk categories provides a strategy for managing potential risks by enabling
financial institutions to subject customers to proportionate controls and oversight. The most
commonly used risk criteria are: country or geographic risk; customer risk; and
product/services risk. The weight given to these risk categories (individually or in
combination) in assessing the overall risk of potential money laundering may vary from one
institution to another, depending on their respective circumstances. Consequently, financial
institutions will have to make their own determination as to the risk weights. Parameters set
by law or regulation may limit a financial institution's discretion.

3.4     While there is no agreed upon set of risk categories, the examples provided herein are the
most commonly identified risk categories. There is no one single methodology to apply to
these risk categories, and the application of these risk categories is intended to provide a
strategy for managing the potential risks.

<u>Country/Geographic Risk</u>

3.5     There is no universally agreed definition by either competent authorities or financial institutions that prescribes whether a particular country or geographic area (including the country within which the financial institution operates) represents a higher risk. Country risk, in conjunction with other risk factors, provides useful information as to potential money laundering and terrorist financing risks.  Factors that may result in a determination that a country poses a higher risk include:

- Countries subject to sanctions, embargoes or similar measures issued by, for example, the United Nations ("UN"). In addition, in some circumstances, countries subject to sanctions or measures similar to those issued by bodies such as the UN, but which may not be universally recognized, may be given credence by a financial institution because of the standing of the issuer and the nature of the measures.

- Countries identified by credible sources[14] as lacking appropriate AML/CFT laws, regulations and other measures.

- Countries identified by credible sources as providing funding or support for terrorist activities that have designated terrorist organisations operating within them.

- Countries identified by credible sources as having significant levels of corruption, or other criminal activity.

<u>Customer Risk</u>

3.6     Determining the potential money laundering or terrorist financing risks, to the extent that such terrorist financing risk can be identified, posed by a customer, or category of customers, is critical to the development of an overall risk framework. Based on its own criteria, a financial institution will determine whether a particular customer poses a higher risk and the potential impact of any mitigating factors on that assessment. Application of risk variables may mitigate or exacerbate the risk assessment. Categories of customers whose activities may indicate a higher risk include:

- Customers conducting their business relationship or transactions in unusual circumstances, such as:

  o  Significant and unexplained geographic distance between the institution and the location of the customer.
  o  Frequent and unexplained movement of accounts to different institutions. And
  o  Frequent and unexplained movement of funds between institutions in various geographic locations.

- Customers where the structure or nature of the entity or relationship makes it difficult to identify the true owner or controlling interests.

- Cash (and cash equivalent) intensive businesses including:

---

[14]     "Credible sources" refers to information that is produced by well-known bodies that generally are regarded as reputable and that make such information publicly and widely available. In addition to the Financial Action Task Force and FATF-style regional bodies, such sources may include, but are not limited to, supra-national or international bodies such as the International Monetary Fund, the World Bank and the Egmont Group of Financial Intelligence Units, as well as relevant national government bodies and non-governmental organisations. The information provided by these credible sources does not have the effect of law or regulation and should not be viewed as an automatic determination that something is of higher risk.

o   Money services businesses (e.g. remittance houses, currency exchange houses, casas de cambio, bureaux de change, money transfer agents and bank note traders or other businesses offering money transfer facilities).

o   Casinos, betting and other gambling related activities. And

o   Businesses that while not normally cash intensive, generate substantial amounts of cash for certain transactions.

- Charities and other "not for profit" organisations which are not subject to monitoring or supervision (especially those operating on a "cross-border" basis)[15].

- "Gatekeepers" such as accountants, lawyers, or other professionals holding accounts at a financial institution, acting on behalf of their clients, and where the financial institution places unreasonable reliance on the gatekeeper.

- Use of intermediaries within the relationship who are not subject to adequate AML/CFT laws and measures and who are not adequately supervised.

- Customers that are Politically Exposed Persons (PEPs).

Product/Service Risk

3.7   An overall risk assessment should also include determining the potential risks presented by products and services offered by a financial institution. Financial institutions should be mindful of the risk associated with new or innovative products or services not specifically being offered by financial institutions, but that make use of the institution's services to deliver the product. Determining the risks of products and services should include a consideration of such factors as:

- Services identified by competent authorities or other credible sources as being potentially higher risk, including, for example:

   o   International correspondent banking services involving transactions such as commercial payments for non-customers (for example, acting as an intermediary bank) and pouch activities. And

   o   International private banking services.

- Services involving banknote and precious metal trading and delivery.

- Services that inherently have provided more anonymity or can readily cross international borders, such as online banking, stored value cards, international wire transfers, private investment companies and trusts.

Variables That May Impact Risk

3.8   A financial institution's risk-based approach methodology may take into account risk variables specific to a particular customer or transaction. These variables may increase or decrease the perceived risk posed by a particular customer or transaction and may include:

---

[15]   See Special Recommendation VIII.

- The purpose of an account or relationship may influence the assessed risk. Accounts opened primarily to facilitate traditional, low denominated consumer transactions may pose a lower risk than an account opened to facilitate large cash transactions from a previously unknown commercial entity.

- The level of assets to be deposited by a particular customer or the size of transactions undertaken. Unusually high levels of assets or unusually large transactions compared to what might reasonably be expected of customers with a similar profile may indicate that a customer not otherwise seen as higher risk should be treated as such. Conversely, low levels of assets or low value transactions involving a customer that would otherwise appear to be higher risk might allow for a financial institution to treat the customer as lower risk.

- The level of regulation or other oversight or governance regime to which a customer is subject. A customer that is a financial institution regulated in a country with a satisfactory AML regime poses less risk from a money laundering perspective than a customer that is unregulated or subject only to minimal AML regulation. Additionally, companies and their wholly owned subsidiaries that are publicly owned and traded on a recognized exchange generally pose minimal money laundering risks. These companies are usually from countries with an adequate, recognised regulatory scheme, and, therefore, generally pose less risk due to the type of business they conduct and the wider governance regime to which they are subject. Similarly, these entities may not be subject to as stringent account opening due diligence or transaction monitoring during the course of the relationship.

- The regularity or duration of the relationship. Long standing relationships involving frequent customer contact throughout the relationship may present less risk from a money laundering perspective.

- The familiarity with a country, including knowledge of local laws, regulations and rules, as well as the structure and extent of regulatory oversight, as the result of a financial institution's own operations within the country.

- The use of intermediate corporate vehicles or other structures that have no apparent commercial or other rationale or that unnecessarily increase the complexity or otherwise result in a lack of transparency. The use of such vehicles or structures, without an acceptable explanation, increases the risk.

<u>Controls for Higher Risk Situations</u>

3.9   Financial institutions should implement appropriate measures and controls to mitigate the potential money laundering risks of those customers that are determined to be higher risk as the result of the institution's risk-based approach. These measures and controls may include:

- Increased awareness by the financial institution of higher risk customers and transactions within business lines across the institution.

- Increased levels of know your customer (KYC) or enhanced due diligence.

- Escalation for approval of the establishment of an account or relationship.

- Increased monitoring of transactions.

- Increased levels of ongoing controls and frequency of reviews of relationships.

- The same measures and controls may often address more than one of the risk criteria identified, and it is not necessarily expected that a financial institution establish specific controls targeting each and every risk criteria.

## Chapter Two:   Application of a Risk-Based Approach

Customer Due Diligence/Know Your Customer

3.10   Customer Due Diligence/Know Your Customer is intended to enable a financial institution to form a reasonable belief that it knows the true identity of each customer and, with an appropriate degree of confidence, knows the types of business and transactions the customer is likely to undertake.  The financial institution's procedures should include procedures to:

(a) Identify and verify the identity of each customer on a timely basis.

(b) Take reasonable risk based measures to identify and verify the identity of any beneficial owner. And

(c) Obtain appropriate additional information to understand the customer's circumstances and business, including the expected nature and level of transactions.

3.11   The starting point is for a financial institution to assess the risks that the customer may pose taking into consideration any appropriate risk variables before making a final determination. Financial institutions will determine the due diligence requirements appropriate to each customer. This may include:

- A standard level of due diligence, to be applied to all customers.

- The standard level being reduced in recognized lower risk scenarios, such as:
  o Publicly listed companies subject to regulatory disclosure requirements.
  o Other financial institutions (domestic or foreign) subject to an AML/CFT regime consistent with the FATF Recommendations.
  o Individuals whose main source of funds is derived from salary, pension, social benefits from an identified and appropriate source and where transactions are commensurate with the funds.
  o Transactions involving de minimis amounts for particular types of transactions (*e.g.* small insurance premiums).

- An increased level of due diligence in respect of those customers that are determined to be of higher risk. This may be the result of the customer's business activity, ownership structure, anticipated or actual volume or types of transactions, including those transactions involving higher risk countries or defined by applicable law or regulation as posing higher risk, such as:

  o Correspondent banking relationships; and
  o PEPs.

Monitoring of Customers and Transactions

3.12   The degree and nature of monitoring by a financial institution will depend on the size of the financial institution, the AML/CFT risks that the institution has, the monitoring method being utilised (manual, automated or some combination), and the type of activity under scrutiny. In applying a risk-based approach to monitoring, financial institutions and their regulatory supervisors must recognize that not all transactions, accounts or customers will be monitored in the same way. The degree of monitoring will be based on the perceived risks associated

with the customer, the products or services being used by the customer and the location of the customer and the transactions. Monitoring methodologies and processes also need to take into account the resources of the financial institution.

3.13   The principal aim of monitoring in a risk-based system is to respond to enterprise-wide issues based on each financial institution's analysis of its major risks. Regulatory authorities should, therefore, be mindful of and give due weight to the determinations made by financial institutions, provided that these determinations are consistent with any legislative or regulatory requirements, and are reasonable and adequately documented.

3.14   Monitoring under a risk-based approach allows a financial institution to create monetary or other thresholds below which an activity will not be reviewed. Defined situations or thresholds used for this purpose should be reviewed on a regular basis to determine adequacy for the risk levels established. Financial institutions should also assess the adequacy of any systems and processes on a periodic basis. The results of the monitoring should always be documented.

<u>Suspicious Transaction Reporting</u>

3.15   The reporting of suspicious transactions or activity is critical to a country's ability to utilize financial information to combat money laundering, terrorist financing and other financial crimes. Countries' reporting regimes are laid down in national law, requiring institutions to file reports when the threshold of suspicion is reached.

3.16   Where a legal or regulatory requirement mandates the reporting of suspicious activity once a suspicion has been formed, a report must be made and, therefore, a risk-based approach for the reporting of suspicious activity under these circumstances is not applicable.

3.17   A risk-based approach is, however, appropriate for the purpose of identifying suspicious activity, for example, by directing additional resources at those areas a financial institution has identified as higher risk. As part of a risk-based approach, it is also likely that a financial institution will utilize information provided by competent authorities to inform its approach for identifying suspicious activity. A financial institution should also periodically assess the adequacy of its system for identifying and reporting suspicious transactions.

<u>Training and Awareness</u>

3.18   Recommendation 15 requires that financial institutions provide their employees with AML/CFT training, and it is important that financial institution employees receive appropriate and proportional training with regard to money laundering and terrorist financing. A financial institution's commitment to having successful controls relies on both training and awareness. This requires an enterprise-wide effort to provide all relevant employees with at least general information on AML/CFT laws, regulations and internal policies.

3.19   Applying a risk-based approach to the various methods available for training, however, gives each financial institution additional flexibility regarding the frequency, delivery mechanisms and focus of such training. A financial institution should review its own workforce and available resources and implement training programmes that provide appropriate AML/CFT information that is:

- Tailored to the appropriate staff responsibility (*e.g.* customer contact or operations).

- At the appropriate level of detail (*e.g.* front-line personnel, complicated products or customer-managed products).

- At a frequency related to the risk level of the business line involved.

- Testing to assess knowledge commensurate with the detail of information provided.

## Chapter Three: Internal Controls

3.20    In order for financial institutions to have effective risk-based approaches, the risk-based process must be imbedded within the internal controls of the institutions. Senior management is ultimately responsible for ensuring that a financial institution maintains an effective internal control structure, including suspicious activity monitoring and reporting. Strong senior management leadership and engagement in AML is an important aspect of the application of the risk-based approach. Senior management must create a culture of compliance, ensuring that staff adheres to the financial institution's policies, procedures and processes designed to limit and control risks.

3.21    In addition to other compliance internal controls, the nature and extent of AML/CFT controls will depend upon a number of factors, including:

- The nature, scale and complexity of a financial institution's business.

- The diversity of a financial institution's operations, including geographical diversity.

- The financial institution's customer, product and activity profile.

- The distribution channels used.

- The volume and size of the transactions.

- The degree of risk associated with each area of the financial institution's operation.

- The extent to which the financial institution is dealing directly with the customer or is dealing through intermediaries, third parties, correspondents, or non face to face access.

3.22    The framework of internal controls should:

- Provide increased focus on a financial institution's operations (products, services, customers and geographic locations) that are more vulnerable to abuse by money launderers and other criminals.

- Provide for regular review of the risk assessment and management processes, taking into account the environment within which the financial institution operates and the activity in its market place.

- Designate an individual or individuals at management level responsible for managing AML/CFT compliance.

- Provide for an AML/CFT compliance function and review programme.

- Ensure that adequate controls are in place before new products are offered.

- Inform senior management of compliance initiatives, identified compliance deficiencies, corrective action taken, and suspicious activity reports filed.

28

- Provide for programme continuity despite changes in management or employee composition or structure.

- Focus on meeting all regulatory record keeping and reporting requirements, recommendations for AML/CFT compliance and provide for timely updates in response to changes in regulations.

- Implement risk-based customer due diligence policies, procedures and processes.

- Provide for adequate controls for higher risk customers, transactions and products, as necessary, such as transaction limits or management approvals.

- Enable the timely identification of reportable transactions and ensure accurate filing of required reports.

- Provide for adequate supervision of employees that handle currency transactions, complete reports, grant exemptions, monitor for suspicious activity, or engage in any other activity that forms part of the institution's AML/CFT programme.

- Incorporate AML/CFT compliance into job descriptions and performance evaluations of appropriate personnel.

- Provide for appropriate training to be given to all relevant staff.

- For groups, to the extent possible, there should be a common control framework.

3.23   Senior management will need to have a means of independently validating the development and operation of the risk assessment and management processes and related internal controls, and obtaining appropriate comfort that the adopted risk-based methodology reflects the risk profile of the financial institution.   This independent testing and reporting should be conducted by, for example, the internal audit department, external auditors, specialist consultants or other qualified parties who are not involved in the implementation or operation of the financial institution's AML/CFT compliance programme.   The testing should be risk-based (focusing attention on higher-risk customers, products and services); should evaluate the adequacy of the financial institution's overall AML/CFT programme; and the quality of risk management for the financial institution's operations, departments and subsidiaries; include comprehensive procedures and testing; and cover all activities.

## ANNEXES

## Annex 1

**Sources of Further Information**

4.1    Various sources of information exist that may help both countries and financial institutions in their development of a risk-based approach. Although not an exhaustive list, this section highlights a number of useful web-links that countries and financial institutions may wish to draw upon. They provide additional sources of information, and further assistance might also be obtained from other information sources such as AML/CFT assessments. .

## A. Financial Action Task Force Documents

The Financial Action Task Force (FATF) is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. Key resources include the 40 Recommendations on Money Laundering and 9 Special Recommendations on Terrorist Financing, the Methodology for Assessing Compliance with the FATF Recommendations, the Handbook for Countries and Assessors, methods and trends (typologies) reports and mutual evaluation reports.

**http://www.fatf-gafi.org**

## B. International Bodies/Organisations

Basel Committee

The Basel Committee on Banking Supervision provides a forum for regular cooperation on banking supervisory matters. Its objective is to enhance understanding of key supervisory issues and improve the quality of banking supervision worldwide. It seeks to do so by exchanging information on national supervisory issues, approaches and techniques, with a view to promoting common understanding. At times, the Committee uses this common understanding to develop guidelines and supervisory standards in areas where they are considered desirable. In this regard, the Committee is best known for its international standards on capital adequacy (Basel I and Basel II); the Core Principles for Effective Banking Supervision; the Concordat on cross-border banking supervision and other relevant documents related to risk management and AML/CFT.

**http://www.bis.org/bcbs/**

IOSCO

The International Organisation of Securities Commissions consists of capital market regulators, their aim is to promote high standards of regulation in order to maintain just, efficient and sound markets; to exchange information on their respective experiences in order to promote the development of domestic markets; to unite their efforts to establish standards and an effective surveillance of international securities transactions; and to provide mutual assistance to promote the integrity of the markets by a rigorous application of the standards and by effective enforcement against offences. IOSCO is known for Resolution on money laundering (1992) and AML Guidance for collective investment schemes (2005) which also address low-risk situations.

**http://www.iosco.org/**

IAIS

International Association of Insurance Supervisors represents some 180 insurance regulators and supervisors of more than 130 countries. Its objectives are to cooperate and contribute to improved supervision of the insurance industry on a domestic and international level in order to maintain efficient, fair, safe and stable insurance markets for the benefit and protection of policyholders; to promote the development of well-regarded insurance markets; and to contribute to global financial stability. IAIS has published principles (*e.g.* Insurance Core Principles and Methodology), standards (*e.g.* Supervisory standard on fit and proper requirements and assessment for insurers) and guidance papers (*e.g.* Guidance paper on AML/CFT; Guidance paper on combating the misuse of insurers; Guidance paper on preventing, detecting and remedying fraud in insurance).

**http://www.iaisweb.org/**

Transparency International

Transparency International, the global civil society organisation leading the fight against corruption, brings people together in a powerful worldwide coalition to end the devastating impact of corruption on men, women and children around the world. TI's mission is to create change towards a world free of corruption.

**http://www.transparency.org/**

## C. Legislation/Guidance on the Risk-Based Approach

### Australia

The *Anti-Money Laundering and Counter-Terrorism Financing Act 2006* (administered by the Australian Government Attorney-General's Department):
**http://www.comlaw.gov.au/comlaw/management.nsf/lookupindexpagesbyid/IP200627290?Open Document**

The Anti-Money Laundering and Counter-Terrorism Financing Rules (administered by the Australian Transaction Reports and Analysis Centre):
**http://www.austrac.gov.au/aml_ctf_rules.html**

### Belgium

Belgium circular of the Banking, Finance and Insurance Commission on the obligations of Customer Due Diligence and Preventing the use of the financial systems for money laundering and the financing of terrorism:
 **http://www.cbfa.be/eng/bo/circ/pdf/ppb_2004_8_d_250.pdf**

Belgium regulation of the Banking, Finance and Insurance Commission Preventing money laundering and the financing of terrorism:
**http://www.cbfa.be/eng/vt/vz/circ/pdf/regulations_27-07-2004.pdf**

**Canada**

Canada, Office of the Superintendent of Financial Institutions – Guidelines on Deterring and Detecting Money Laundering and Terrorist Financing: Sound Business and Financial Practices
http://www.osfi-bsif.gc.ca/app/DocRepository/1/eng/guidelines/sound/guidelines/B8_e.pdf

**Germany**

Federal Financial Supervisory Authority of Germany – BaFin. Internal implementation of appropriate risk management systems for the prevention of money laundering, the financing of terrorism and fraud at the expense of institutions pursuant to sec. 25a (1), sentence 3, No. 6, and (1a) of the Banking Act and sec. 14 (2), No. 2, of the Money Laundering Act
http://www.bafin.de/rundschreiben/89_2005/050324_en.htm

Anti-money laundering safeguards at credit institutions acting as correspondent banks
http://www.bafin.de/verlautbarungen/gw_001106_en.htm

**Italy**

Parts One and Two of the Bank of Italy's Guidance on Suspicious Activity Reports for all financial intermediaries operating in Italy.
http://www.bancaditalia.it/vigilanza_tutela/vig_ban/norma/provv;internal&action=lastLevel.action&Parameter=vigilanza_tutela

**Japan**

Japanese Financial Services Agency – legislation and guidance
http://www.fsa.go.jp/en/refer/legislation/index.html

**Jersey**

Financial Services Commission – Guidance note on anti money laundering:
http://www.jerseyfsc.org/the_commission/anti-money_laundering/guidance_notes/index.asp

**South Africa**

FIU – General Guidance Note Concerning the Identification of Clients
http://www.fic.gov.za/info/Guidance%20concerning%20identification%20of%20clients.pdf

**Singapore**

Singapore notice to banks on the prevention of money laundering and counter terrorist financing
http://www.mas.gov.sg/resource/legislation_guidelines/aml/626%20_amdd%20280207.pdf

**Switzerland**

Ordinance of the Swiss Federal Banking Commission Concerning the Prevention of Anti- Money Laundering:

http://www.ebk.admin.ch/e/archiv/2003/pdf/m032703-03e.pdf


**United Kingdom, Joint Money Laundering Steering Group (JMLSG) Guidance**

UK Industry guidance on anti-money laundering and counter terrorist financing covering good practice application of the law, regulatory requirements and anti-money laundering controls, considered an integral element of the UK AML risk-based approach framework.
http://www.jmlsg.org.uk


**United States**

FFIEC Bank Secrecy Act Anti-Money Laundering Examination Manual
http://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf


**Wolfsberg Group**

The Wolfsberg Group is an association of 12 global banks, which aims to develop financial services industry standards, and related products, for Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing policies. In 2006 the Wolfsberg Group produced guidance on a risk-based approach for managing money laundering risks.
http://www.wolfsberg-principles.com/index.html


## D. Information sharing/outreach arrangements between the public and private sector

Section 314 of the USA PATRIOT Act of 2001:  Regulations implemented pursuant to section 314 established procedures for information sharing to deter money laundering and terrorist activity. These regulations increase information sharing in two respects: *i)* establishes a mechanism by which federal law enforcement agencies can solicit from financial institutions information related to suspected terrorist activity or money laundering; and, *ii)* encourages financial institutions to share information among themselves in order to identify and report activities that may involve terrorism or money laundering.
http://www.fincen.gov/po1044.htm

The United States Bank Secrecy Act Advisory Group: Established by the U.S. Congress in 1992, the Advisory Group is chaired by the Director of FinCEN (the US FIU) and serves as the principal forum in which issues related to the administration of the Bank Secrecy Act (BSA) are discussed amongst industry, regulators and law enforcement agencies. The Advisory Group provides advice to the Secretary of the Treasury on ways to enhance the utility of BSA data to law enforcement agencies while minimizing the impact of compliance obligations on affected financial institutions.
http://uscode.house.gov/download/pls/31C53.txt

Private Sector Dialogue Programmes: The U.S. has initiated AML/CFT dialogues linking U.S. regulators and financial institutions with their counterparts from the Middle East/North Africa (MENA) and Latin America.  This series of outreach events aims to raise awareness of domestic and regional money laundering and terrorist financing risks, international AML/CFT standards and regional developments, and U.S. government policies and private sector measures to combat terrorist financing and money laundering:
http://www.treas.gov/press/releases/js4346.htm
http://www.usmenapsd.org/index2.html

33

*E.      Other Sources of Information to help assist national and financial institution risk assessment of countries and cross border activities*

4.2     In determining the levels of risks associated with particular country or cross border activity financial institutions and governments may draw on a range of publicly available information sources, these may include reports that detail observance of international standards and codes, specific risk ratings associated with illicit activity, corruption surveys and levels of international cooperation. Although not an exhaustive list the following are commonly utilised:

- IMF and World Bank Reports on observance of international standards and codes (Financial Sector Assessment Programme)

  - World Bank reports: **http://www1.worldbank.org/finance/html/cntrynew2.html,**
  - International Monetary Fund: **http://www.imf.org/external/np/rosc/rosc.asp?sort=topic#RR**
  - Offshore Financial Centres (OFCs) IMF staff assessments **www.imf.org/external/np/ofca/ofca.asp**.

- Mutual evaluation reports issued by FATF Style Regional Bodies:

  1. Asia/Pacific Group on Money Laundering (APG)
  **http://www.apgml.org/documents/default.aspx?DocumentCategoryID=8**

  2. Caribbean Financial Action Task Force (CFATF)
  **http://www.cfatf.org/profiles/profiles.asp**

  3. The Committee of Experts on the Evaluation of Anti-Money Laundering Measures (MONEYVAL)
  **http://www.coe.int/t/e/legal_affairs/legal_co-operation/combating_economic_crime/5_money_laundering/Evaluations/Reports_summaries3.asp#TopOfPage**

  4. Eurasian Group (EAG)
  **http://www.eurasiangroup.org/index-7.htm**

  5. GAFISUD
  **http://www.gafisud.org/miembros.htm**

  6. Middle East and North Africa FATF (MENAFATF)
  **http://www.menafatf.org/TopicList.asp?cType=train**

- OECD Sub Group of Country Risk Classification (a list of country of risk classifications published after each meeting)
  **http://www.oecd.org/document/49/0,2340,en_2649_34171_1901105_1_1_1_1,00.html**

- International Narcotics Control Strategy Report (published annually by the US State Department)
  **http://www.state.gov/p/inl/rls/nrcrpt/**

- Egmont Group membership - Coalition of FIU's that participate in regular information exchange and the sharing of good practice, acceptance as a member of the Egmont Group is based a formal procedure that countries must go through in order to be acknowledged as meeting the Egmont definition of an FIU.
  **http://www.egmontgroup.org/**

- Signatory to the United Nations Convention against Transnational Organized Crime
  **http://www.unodc.org/unodc/crime_cicp_signatures_convention.html**

- The Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury economic and trade,  Sanctions Programmes
  **http://www.ustreas.gov/offices/enforcement/ofac/programs/index.shtml**

- Consolidated list of persons, groups and entities subject to EU Financial Sanctions
  **http://ec.europa.eu/comm/external_relations/cfsp/sanctions/list/consol-list.htm**

- UN Security Council Sanctions Committee - Country Status:
  **http://www.un.org/sc/committees/**

**Annex 2**

**Basel Committee on Banking Supervision – Working Group on Cross Border Banking - Risk Matrix**

Analysis of specific risk categories that financial institutions and supervisory authorities may use in assessing AML risks:

| Low | Moderate | High |
|---|---|---|
| Stable, known customer base. | Customer base increasing due to branching, merger, or acquisition. | A large and growing customer base in a wide and diverse geographic area. |
| No electronic banking (e-banking) or the web site is informational or non-transactional. | The bank is beginning e-banking and offers limited products and services. | The bank offers a wide array of e-banking products and services (i.e., account transfers, e-bill payment, or accounts opened via the Internet). |
| There are a few high-risk customers and businesses. | There are a moderate number of high-risk customers and businesses. These may include check cashers, convenience stores, money transmitters, casas de cambio, import or export companies, offshore corporations, politically exposed persons (PEPs), and foreign individuals. | There are a large number of high-risk customers and businesses. These may include check cashers, convenience stores, money transmitters, casas de cambio, import or export companies, offshore corporations, PEPs and foreign individuals. |
| No foreign correspondent financial institution accounts. The bank does not engage in pouch activities, offer special-use accounts, or offer payable through accounts (PTAs). | The bank has a few foreign correspondent financial institution accounts, but typically with financial institutions with adequate AML policies and procedures from low-risk countries, and minimal pouch activities, special-use accounts, or PTAs. | The bank maintains a large number of foreign correspondent financial institution accounts with financial institutions with inadequate AML policies and procedures, particularly those located in high-risk countries, or offers substantial pouch activities, special-use accounts, or PTAs. |
| The bank offers limited or no private banking services or trust and asset management products or services. | The bank offers limited domestic private banking services or trust and asset management products or services over which the bank has investment discretion. Strategic plan may be to increase trust business. | The bank offers significant domestic and international private banking or trust and asset management products or services. Private banking or trust and asset management services are growing. Products offered include investment management services, and trust accounts are predominantly nondiscretionary versus where the bank has full investment discretion. |

| Low | Moderate | High |
|---|---|---|
| Few international accounts or very low volume of currency activity in the accounts. | Moderate level of international accounts with unexplained currency activity. | Large number of international accounts with unexplained currency activity. |
| A limited number of funds transfers for customers, non customers, limited third-party transactions, and no foreign funds transfers. | A moderate number of funds transfers. A few international funds transfers from personal or business accounts with typically low-risk countries. | A large number of non-customer funds transfer transactions and payable upon proper identification (PUPID) transactions. Frequent funds from personal or business accounts to or from high-risk countries, and financial secrecy havens or countries. |
| No transactions with high-risk geographic locations. | Minimal transactions with high-risk geographic locations. | Significant volume of transactions with high-risk geographic locations. |
| Low turnover of key personnel or frontline personnel (i.e., customer service representatives, tellers, or other branch personnel). | Low turnover of key personnel, but frontline personnel in branches may have changed. | High turnover, especially in key personnel positions. |

**Annex 3**

**Basel Committee on Banking Supervision – Working Group on Cross Border Banking - Risk Assessment Links to the AML Management Programme**



**Annex 4**

**Glossary of Terminology:**

**Beneficial Owner**

The natural person(s) who ultimately owns or controls a customer and/or the person on whose behalf a transaction is being conducted. It also incorporates those persons who exercise ultimate effective control over a legal person or arrangement

**Competent authorities**

*Competent authorities* refers to all administrative and law enforcement authorities concerned with combating money laundering and terrorist financing, including the FIU and supervisors.

**Core Principles**

The Core Principles for Effective Banking Supervision issued by the Basel Committee on Banking Supervision, the Objectives and Principles for Securities Regulation issued by the International Organisation of Securities Commissions, and the Insurance Core Principles issued by the International Association of Insurance Supervisors.

**Designated Non-Financial Businesses and Professions**

a. Casinos (which also includes internet casinos).
b. Real estate agents.
c. Dealers in precious metals.
d. Dealers in precious stones.
e. Lawyers, notaries, other independent legal professionals and accountants – this refers to sole practitioners, partners or employed professionals within professional firms. It is not meant to refer to 'internal' professionals that are employees of other types of businesses, nor to professionals working for government agencies, who may already be subject to measures that would combat money laundering.
f. Trust and Company Service Providers refers to all persons or businesses that are not covered elsewhere under these Recommendations, and which as a business, provide any of the following services to third parties:
 - acting as a formation agent of legal persons;
 - acting as (or arranging for another person to act as) a director or secretary of a company, a partner of a partnership, or a similar position in relation to other legal persons;
 - providing a registered office; business address or accommodation, correspondence or administrative address for a company, a partnership or any other legal person or arrangement;
 - acting as (or arranging for another person to act as) a trustee of an express trust;
 - acting as (or arranging for another person to act as) a nominee shareholder for another person.

**Designated Threshold**

The amount set out in the Interpretative Notes to the FATF Recommendations.

**FATF Recommendations**

Refers to the FATF Forty Recommendations and the FATF Nine Special Recommendations on Terrorist Financing.

**Financial Institutions**

Any person or entity who conducts as a business one or more of the following activities or operations for or on behalf of a customer:

1. Acceptance of deposits and other repayable funds from the public.[5]
2. Lending.[6]
3. Financial leasing.[7]
4. The transfer of money or value.[8]
5. Issuing and managing means of payment (e.g. credit and debit cards, cheques, traveller's cheques, money orders and bankers' drafts, electronic money).
6. Financial guarantees and commitments.
7. Trading in:
   - money market instruments (cheques, bills, CDs, derivatives etc.);
   - foreign exchange;
   - exchange, interest rate and index instruments;
   - transferable securities;
   - commodity futures trading.
8. Participation in securities issues and the provision of financial services related to such issues.
9. Individual and collective portfolio management.
10. Safekeeping and administration of cash or liquid securities on behalf of other persons.
11. Otherwise investing, administering or managing funds or money on behalf of other persons.
12. Underwriting and placement of life insurance and other investment related insurance.[9]
13. Money and currency changing

When a financial activity is carried out by a person or entity on an occasional or very limited basis (having regard to quantitative and absolute criteria) such that there is little risk of money laundering activity occurring, a country may decide that the application of anti-money laundering measures is not necessary, either fully or partially.

In strictly limited and justified circumstances, and based on a proven low risk of money laundering, a country may decide not to apply some or all of the Forty Recommendations to some of the financial activities stated above.

**Footnotes:**

[5] This also captures private banking.
[6] This includes inter alia: consumer credit; mortgage credit; factoring, with or without recourse; and finance of commercial transactions (including forfaiting).
[7] This does not extend to financial leasing arrangements in relation to consumer products.
[8] This applies to financial activity in both the formal or informal sector e.g. alternative remittance activity. See the Interpretative Note to Special Recommendation VI. It does not apply to any natural or legal person that provides financial institutions solely with message or other support systems for transmitting funds. See the Interpretative Note to Special Recommendation VII.
[9] This applies both to insurance undertakings and to insurance intermediaries (agents and brokers).

**Legal Arrangements**

*Legal arrangements* refers to express trusts or other similar legal arrangements. Examples of other similar arrangements (for AML/CFT purposes) include fiducie, treuhand and fideicomiso.

**Legal Persons**

Bodies corporate, foundations, anstalt, partnerships, or associations, or any similar bodies that can establish a permanent customer relationship with a financial institution or otherwise own property.

**Politically Exposed Persons (PEPS)**

Individuals who are or have been entrusted with prominent public functions in a foreign country, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials. Business relationships with family members or close associates of PEPs involve reputational risks similar to those with PEPs themselves. The definition is not intended to cover middle ranking or more junior individuals in the foregoing categories.

**Shell Bank**

Bank incorporated in a jurisdiction/country in which it has no physical presence and which is unaffiliated with a regulated financial group.

**Supervisors/Regulators**

The designated competent authorities who have responsibility for ensuring compliance by financial institutions with requirements to combat money laundering and terrorist financing.

**Annex 5**

**Membership of the Electronic Advisory Group**

**FATF Members & Observers**

Australia, Austria , Canada , European Commission, France, Germany, Italy, Japan, Mexico, Netherlands, South Africa, Sweden, Switzerland, UK, USA, IMF, IOSCO, OGBS, World Bank, BCBS

**Banking industry**

BNP Paribas, Banking Association of South Africa, Banks Association of Turkey, Fortis Ban, German Banking Association, Banque et Caisse d'Epargne de l'Etat (Luxembourg), WestLB AG, Crédit Agricole, Felaban/ Mexican Banking Association, Bank of America, Macquarie Bank, CIBC, Japanese Bankers Association, UBS, HSBC, IBFed, European Association of Co-operative Banks, Association of Banks in Singapore, European Association of Public Banks, Wolfsberg Group, European Banking Federation.

**Securities industry**

Investment Dealers Association of Canada, Australian Financial Markets Association, UBS, London Investment Banking Association, JPMorgan Chase & Co., Securities Industry Association, NYSE, ICSA.

**EXHIBIT 169 to Declaration of Joel Israel**



# Financial Action Task Force

## Groupe d'action financière

## RBA GUIDANCE FOR LEGAL PROFESSIONALS

23 October 2008

**© FATF/OECD 2008**

**All rights reserved. No reproduction, copy, transmission or translation of this publication may be made without written permission.**

**Applications for permission to reproduce all or part of this publication should be made to: FATF Secretariat, OECD, 2 rue André Pascal 75775 Paris Cedex 16, France**

**TABLE OF CONTENTS**

SECTION ONE: USING THE GUIDANCE  PURPOSE OF THE RISK-BASED APPROACH ....................................................................................................................4
  Chapter One: Background and Context ............................................................4
  Chapter Two: The Risk-Based Approach – Purpose, Benefits and Challenges ..................8
  Chapter Three: FATF and the Risk-Based Approach..........................................11
SECTION TWO: GUIDANCE FOR PUBLIC AUTHORITIES ...........................................15
  Chapter One: High-level principles for creating a risk-based approach............................15
  Chapter Two: Implementation of the Risk-Based Approach................................19
SECTION THREE: GUIDANCE FOR LEGAL PROFESSIONALS   ON IMPLEMENTING A RISK-BASED APPROACH.................................................................................25
  Chapter One: Risk Categories...............................................................25
  Chapter Two: Application of a Risk-Based Approach ......................................31
  Chapter Three: Internal Controls ........................................................34
ANNEXES ..................................................................................36
ANNEX 1...................................................................................36
  A.    Financial Action Task Force Documents ................................................36
  B.    Legislation/and Court Decisions ......................................................36
  C.    Links to Information on the Supervisory Program in Certain Countries .................36
  D.    Guidance on the Risk-based Approach ................................................37
  E.    Other sources of information to help assist countries' and legal professionals' risk assessment of countries and cross-border activities.............................................37
ANNEX 2....................................................................................39
ANNEX 3....................................................................................41

**SECTION ONE: USING THE GUIDANCE**

**PURPOSE OF THE RISK-BASED APPROACH**

**Chapter One: Background and Context**

1. In June 2007, the FATF adopted Guidance on the Risk-Based Approach to Combating Money Laundering and Terrorist Financing: High Level Principles and Procedures, which includes guidance for public authorities and guidance for financial institutions. This was the culmination of extensive consultation between private and public sector members of an Electronic Advisory Group (EAG) established by the FATF.

2. In addition to financial institutions, the FATF Recommendations also cover a number of designated non-financial businesses and professions (DNFBPs). At its June 2007 meeting, the FATF's Working Group on Evaluation and Implementation (WGEI) endorsed a proposal to convene a meeting of the representatives from the DNFBPs to assess the possibility of developing Guidance on the risk-based approach for their sectors, using the same structure and style as the completed Guidance for financial institutions.

3. This meeting was held in September 2007 and was attended by members of organisations which represent lawyers, notaries, trust and company service providers (TCSPs), accountants, casinos, real estate agents and dealers in precious metals and dealers in precious stones. This private sector group expressed an interest in contributing to FATF Guidance on implementing a risk-based approach for their sectors. The Guidance for the DNFBPs would follow the principles of the risk-based approach already established by FATF, and would highlight risk factors specific to the DNFBPs, as well as suggest mitigation strategies that fit with the particular activities and businesses of the DNFBPs. The FATF established another EAG to facilitate the work.

4. The private sector group met again in December 2007 and was joined by a number of specialist public sector members. Separate working groups comprising public and private sectors members were established, and private sector chairs were appointed.

5. The EAG continued work until this Guidance for legal professionals was presented to the WGEI. After further international consultation with both public and private sectors, the FATF adopted this Guidance at its October 2008 Plenary. Guidance for each of the other DNFBP sectors is being published separately.

Purpose of the Guidance

6. The purpose of this Guidance is to:

- Support the development of a common understanding of what the risk-based approach involves.

- Outline the high-level principles involved in applying the risk-based approach.

- Indicate good practice in the design and implementation of an effective risk-based approach.

4

7.     However, it should be noted that applying a risk-based approach is not mandatory. A properly applied risk-based approach does not necessarily mean a reduced burden, although it should result in a more cost effective use of resources. For some countries, applying a rules-based system might be more appropriate. Countries[1] will need to make their own determinations on whether to apply a risk-based approach, based on their specific money laundering/terrorist financing risks, size and nature of the DNFBP activities, and other relevant information. The issue of timing is also relevant for countries that may have applied anti-money laundering/counter-terrorist financing (AML/CFT) measures to DNFBPs, but where it is uncertain whether the DNFBPs have sufficient experience to implement and apply an effective risk-based approach.

<u>Target Audience, Status and Content of the Guidance</u>

8.     This Guidance has been prepared for, and in relation to, legal professionals.[2] The legal professionals sector includes various professions, including lawyers and notaries, and in some countries there are also different categories of lawyers *e.g.* barristers and solicitors. Many legal professionals are required to comply with specific legislation and regulation and rules and regulations enacted or adopted by professional associations or other self regulatory organisations (SROs). The activities of legal professionals are very diverse, as are the legal and professional obligations with which they are required to comply. The specifics of an individual legal professional's and/or a firm or other collection of legal professionals' particular risk-based processes should accordingly be determined based on the activities undertaken by the legal professional, the ethical and existing supervisory structure for legal professionals and the susceptibility of a legal professional's activities (both generally and particularly) to money laundering and terrorist financing.

9.     Legal professionals provide a range of services and activities that differ vastly, such as in their methods of delivery and in the depth and duration of the relationships formed with clients. This Guidance is written at a high level to take into account the differing practices of legal professionals in different countries, and the different levels and forms of supervision or monitoring that may apply. It is not intended as a template for national legislation imposing obligations on legal professionals or SROs. Each country and its national authorities should aim to establish an active dialogue with its legal professionals and other DNFBP sectors that will be mutually beneficial in establishing effective systems to combat money laundering and terrorist financing.

10.     The following general observations about legal professionals should help inform the approach. Consideration should also be given to the particular activities performed by legal professionals on a national, provincial, or local basis. Because legal professionals typically refer to those benefiting from their services as "clients" rather than "customers", that term is thus generally used throughout this paper, except where specific terms of art such as "customer due diligence" and "know your customer" are used (in such cases a customer can be equated to a client).

11.     For purposes of this Guidance, legal professionals include both lawyers and notaries.

- Lawyers are members of a regulated profession and are bound by their specific professional rules and regulations. Their work is fundamental to promoting adherence to the rule of law in the countries in which they practice. Lawyers hold a unique position in society by providing

---

[1]     All references in the FATF Recommendations and in this document to country or countries apply equally to territories or jurisdictions.

[2]     This refers to sole legal practitioners and partners or employed legal professionals within professional firms. It is not meant to refer to "internal" (*i.e.* in-house) professionals that are employees of other types of businesses, nor to legal professionals working for government agencies, who may already be subject to separate measures that would combat money laundering and terrorist financing. See FATF 40 Recommendations Glossary, definition of "Designated Non-Financial Businesses and Professions" (e).

access to law and justice for individuals and entities, assisting members of society to understand their increasingly complex legal rights and obligations, and assisting clients to comply with the law. Lawyers have their own professional and ethical codes of conduct by which they are regulated. Breaches of the obligations imposed upon them can result in a variety of sanctions, including disciplinary and criminal penalties. The provisions contained in this Guidance, when applied by each country, are subject to professional secrecy and legal professional privilege. As is recognised by the interpretative note to the FATF Recommendation 16, the matters that would fall under legal professional privilege or professional secrecy and that may affect any obligations with regard to money laundering and terrorist financing are determined by each country. Likewise, ethical rules that impose obligations, duties, and responsibilities on legal professionals vary by country. The legal professionals' counseling and advisory role, especially in an increasing regional and global marketplace, does not generally involve a cash handling function.

- Both civil and common law countries have notaries, but the roles of civil and common law notaries differ. Common law mainly differs from civil law in that precedents can be drawn from case law, while in civil systems codified rules are applied by judges to the cases before them. In some common law countries, the common law notary public is a qualified, experienced practitioner, trained in the drafting and execution of legal documents. In other common law countries, the notary public is a public servant appointed by a governmental body to witness the signing of important documents (such as deeds and mortgages) and administer oaths. Known only in civil law jurisdictions, civil law notaries are both members of an autonomous legal profession – although regulated by the law – and qualified public officials, as they are appointed by the State through a selective public contest among law graduates. Civil law notaries, who are bound by an obligation of impartiality with respect to both parties, must be regarded, in matters of real property (conveyancing), family law, inheritance and corporate legal services as practising non-contentious activities**.** They act as gatekeepers by drafting, ensuring the legality and certainty of the instruments and the authenticity of signatures presented to them; providing as well a public fiduciary function by performing the role of a trusted third party . Civil law notaries are obliged by law not to detach themselves from the core of the relationship, therefore making them responsible for all aspects of the deed. For this reason, civil law notaries are assigned functions of a public nature as part of their legal assignments. In civil law jurisdictions, notarial written documents are particular means of evidence, unlike in the common law systems, which are based on the free evidence of witnesses in court: special supreme State powers are devolved to civil law notaries and they can therefore assign "public authority" to each deed they perform. Thereby the civil law notary's deed has a special effectiveness in a trial, whereby it is a means of peremptory binding evidence; furthermore, it is as judicially enforceable as a judgement; if it complies with the law, it can be registered on a public registry. Owing to these characteristics, civil law notaries play a different role in comparison to the services provided by other legal professionals. This Guidance does not cover those common law notaries who perform merely administrative acts such as witnessing or authenticating documents, as these acts are not specified activities.

12.    Recommendation 12 mandates that the requirements for customer due diligence requirements (CDD), record-keeping, and paying attention to all complex, unusual large transactions set out in Recommendations 5, 6, and 8 to 11 apply to DNFBPs in certain circumstances. Recommendation 12 applies to legal professionals when they prepare for and carry out certain specified activities:

- Buying and selling of real estate.

- Managing of client money, securities or other assets.

- Management of bank, savings or securities accounts.

6

- Organisation of contributions for the creation, operation or management of companies.

- Creation, operation or management of legal persons or arrangements, and buying and selling of business entities.

This Guidance has been prepared to assist legal professionals in those situations. Unless legal advice and representation consists of preparing for or carrying out transactions relating to these specified activities, it is not subject to the FATF Recommendations. The Recommendations would thus not cover, for example, an initial meeting before any preparatory work is carried out, or the usual level of advice given at legal aid or other "walk up" clinics.

13.     It is possible that more than one legal professional will be preparing for or carrying out a transaction, in which case they will all need to observe the applicable CDD and record-keeping obligations. However, several legal professionals may be involved in a transaction for a specified activity but not all are preparing for or carrying out the overall transaction. In that situation, those legal professionals providing advice or services (*e.g.* a local law validity opinion) peripheral to the overall transaction who are not preparing for or carrying out the transaction may not be required to observe the applicable CDD and record-keeping obligations.

14.     Recommendation 16 requires that FATF Recommendations 13 to 15 regarding reporting of suspicious transactions and AMLCFT controls, and Recommendation 21 regarding measures to be taken with respect to countries that do not or insufficiently comply with the FATF Recommendations, apply to DNFBPs subject to the certain qualifications. Specifically, Recommendation 16 applies to legal professionals when they engage in a financial transaction on behalf of a client, in relation to the activities referred to in Recommendation 12. Recommendation 16, however, provides that legal professionals are not required to report their suspicions if the relevant information was obtained in circumstances where they are subject to professional secrecy or legal professional privilege.  The lawyer-client relationship is protected by law, regulations, and rules, and codes of conduct (such as legal professional privilege) in many countries, including in some countries by constitutional provisions. This is recognised by the Interpretative Note to Recommendation 16.

15.     The wider audience for this Guidance includes countries, regulators, and self-regulatory organisations (SROs), which are considering how to apply AML/CFT measures to legal professionals. Countries need to identify the most appropriate regime, tailored to address individual country risks, which takes into consideration the activities and professional and ethical codes of conduct of legal professionals in their countries. This regime should recognise the differences between the DNFBP sectors, as well as the differences between the DNFBPs (particularly legal professionals) and financial institutions. However, this Guidance does not override the purview of national authorities. The manner in which legal professionals, SROs, or other supervisory bodies approach their responsibilities under a risk-based CDD system must necessarily be informed by and conform with the existing legal and oversight framework within each country's jurisdiction.

- To the extent a country has adopted a risk-based approach regime, the legal professionals practising in that country should refer to that country's guidance for that regime.

- This Guidance does not supplant specific professional guidance issued by designated competent authorities or SROs in a particular country, and does not constitute a legal interpretation of AML or CFT obligations of legal professionals, and should not be relied on by legal professionals or the judiciary in determining whether a legal professional has complied with his or her AML or CFT obligations.

16.     The provisions in this Guidance are subject to applicable professional secrecy, legal professional privilege or rules of professional conduct, which are determined by each country.

**Chapter Two: The Risk-Based Approach – Purpose, Benefits and Challenges**

The purpose of the Risk-Based Approach

17.     The FATF Recommendations contain language that permits countries to some degree to adopt a risk-based approach to combating money laundering and terrorist financing. That language also authorises countries to permit DNFBPs to use a risk-based approach in applying certain of their AML and CFT obligations.

18.     By adopting a risk-based approach, it is possible to ensure that measures to prevent or mitigate money laundering and terrorist financing are commensurate with the risks identified. This will allow resources to be allocated in the most efficient ways. The principle is that resources should be directed in accordance with priorities so that the greatest risks receive the highest attention. The alternative approaches are that resources are either applied evenly, or that resources are targeted, but on the basis of factors other than risk. This can inadvertently lead to a 'tick box' approach with the focus on meeting regulatory requirements rather than on combating money laundering or terrorist financing efficiently and effectively.

19.     A number of the DNFBP sectors, including legal professionals, are already subject to regulatory or professional requirements (including as promulgated by SROs) that complement AML/CFT measures. For example, by virtue of their professional codes of conduct, many lawyers are already subject to an obligation to identify their clients (*e.g.* to check for conflict of interest) and the substance of the matter submitted to them by such clients, in order to appreciate the consequences that their advice may have. If a lawyer provides legal advice to a client that helps the client commit an offence, that lawyer may, depending on the lawyer's state of knowledge, become an accomplice to the offence. This Guidance must be considered in the context of these professional and ethical codes of conduct. Where possible, it will be beneficial for legal professionals (and relevant authorities and SROs) to devise their AML/CFT policies and procedures in a way that harmonises with other regulatory or professional requirements.  A risk-based AML/CFT regime should not impede free access to the services provided by legal professionals for legitimate purposes, but should create barriers to those who seek to misuse these services.

20.     A risk analysis must be performed to determine where the money laundering and terrorist financing risks are the greatest. Countries will need to identify the main vulnerabilities and address them accordingly. Legal professionals will need this assistance and information to help them to identify higher risk clients and services, including delivery channels, and geographical locations. These are not static assessments. They will change over time, depending on how circumstances develop, and how threats evolve.

21.     The strategies to manage and mitigate money laundering and terrorist financing are typically aimed at preventing the activity from occurring through a mixture of deterrence (*e.g.* appropriate CDD measures), detection (*e.g.* monitoring and suspicious transaction reporting), and record-keeping so as to facilitate investigations.

22.     Proportionate procedures should be designed based on assessed risk. Higher risk areas should be subject to enhanced procedures; this would include measures such as enhanced CDD checks and enhanced transaction monitoring. It also follows that in instances where risks are low, simplified, modified or reduced controls may be applied.

23.     There are no universally accepted methodologies that prescribe the nature and extent of a risk-based approach. However, an effective risk-based approach does involve identifying and categorising money laundering and terrorist financing risks and establishing reasonable controls based on risks identified.

8

24.     An effective risk-based approach will allow legal professionals to exercise reasonable business and professional judgement with respect to clients. Application of a reasoned and well-articulated risk-based approach will justify the judgements made with regard to managing potential money laundering and terrorist financing risks. A risk-based approach should not be designed to prohibit or impede legal professionals from continuing with legitimate practice – especially given their role in society and the proper functioning of the justice system - or from finding innovative ways to diversify or expand their practices.

25.     Regardless of the strength and effectiveness of AML/CFT controls, criminals will continue to attempt to move illicit funds undetected and will, from time to time, succeed. Criminals are more likely to target the DNFBP sectors, including legal professionals, if other routes become more difficult. For this reason, DNFBPs may be more or less vulnerable depending on the effectiveness of the AML/CFT procedures applied in other sectors. A risk-based approach allows DNFBPs, including legal professionals, to more efficiently and effectively adjust and adapt as new money laundering and terrorist financing methods are identified.

26.     A reasonably designed and effectively implemented risk-based approach can provide an appropriate and effective control structure to manage identifiable money laundering and terrorist financing risks. However, it must be recognised that any reasonably applied controls, including controls implemented as a result of a reasonably designed and effectively implemented risk-based approach, will not identify and detect all instances of money laundering or terrorist financing. Therefore, designated competent authorities, SROs, law enforcement, and judicial authorities must take into account and give due consideration to a well reasoned risk-based approach. When there is a failure to implement an adequately designed risk-based approach or failure of a risk-based programme that was not adequate in its design, designated competent authorities, SROs, law enforcement or judicial authorities should take action as necessary and appropriate.

<u>Potential Benefits and Challenges of the Risk-Based Approach</u>

*Benefits*

27.     The adoption of a risk-based approach to combating money laundering and terrorist financing can yield benefits for all parties, including the public. Applied effectively, the approach should allow a more efficient and effective use of resources and minimise burdens on clients. Focusing on higher risk threats should mean that beneficial outcomes can be achieved more effectively.

28.     For legal professionals, the risk-based approach allows the flexibility to approach AML/CFT obligations using specialist skills and responsibilities. This requires legal professionals to take a wide and objective view of their activities and clients.

29.     Efforts to combat money laundering and terrorist financing should also be flexible in order to adapt as risks evolve. As such, legal professionals should use their judgement, knowledge and expertise to develop an appropriate risk-based approach for their particular organisation, structure and practice activities.

*Challenges*

30.     The risk-based approach is not necessarily an easy option and is challenging to both public and private sector entities. Some challenges may be inherent to the use of the risk-based approach. Others may stem from the difficulties in making the transition to a risk-based system. A risk-based approach requires resources and expertise to gather and interpret information on risks, both at the country and institutional levels, to develop procedures and systems, and to train personnel. It further requires that sound and well-trained judgement be exercised in the design and implementation of procedures, and systems. It will certainly lead to a greater diversity in practice that should lead to innovations and improved compliance. However, it may also cause uncertainty regarding

9

expectations, difficulty in applying uniform regulatory treatment, and lack of understanding by clients regarding information required.

31.     Implementing a risk-based approach requires that legal professionals have a sound understanding of the risks and are able to exercise sound judgement. This requires the building of expertise including for example, through training, recruitment, taking professional advice and 'learning by doing'. The process will always benefit from information sharing by designated competent authorities and SROs. The provision of good practice guidance is also valuable. Attempting to pursue a risk-based approach without sufficient expertise may lead to flawed judgements. Legal professionals may over-estimate risk, which could lead to wasteful use of resources, or they may under-estimate risk, thereby creating vulnerabilities. They, and (if applicable) their staff members, may be uncomfortable making risk-based judgements. This may lead to overly cautious decisions, or disproportionate time spent documenting the rationale behind a decision. This may also be true at various levels of management. However, in situations where management fails to recognise or underestimate the risks, a culture may develop that allows for inadequate resources to be devoted to compliance, leading to potentially significant compliance failures.

32.     Designated competent authorities and SROs should place greater emphasis on whether legal professionals have an effective decision-making process with respect to risk management. Sample testing may be used or individual decisions reviewed as a means to test the effectiveness of a legal professional's overall risk management. Designated competent authorities and SROs should recognise that even though appropriate risk management structures and procedures are regularly updated, and the relevant policies, procedures, and processes are followed, decisions may still be made that are incorrect in light of additional information that was not reasonably available at the time.

33.     In implementing the risk-based approach, legal professionals should be given the opportunity to make reasonable judgements for their particular services and activities. This may mean that no two legal professionals and no two firms are likely to adopt the same detailed practices. Such potential diversity of practice will require that designated competent authorities and SROs make greater effort to identify and disseminate guidelines on sound practice, and may pose challenges for staff working to monitor compliance. The existence of good practice guidance, continuing legal education, and supervisory training, industry studies and other materials will assist the designated competent authority or an SRO in determining whether a legal professional has made sound risk-based judgements.

34.     Recommendation 25 requires adequate feedback to be provided to the financial sector and DNFBPs. Such feedback helps institutions, firms and businesses to more accurately assess the money laundering and terrorist financing risks and to adjust their risk programmes accordingly. This in turn makes the detection of suspicious activity more likely and improves the quality of any required suspicious transaction reports. As well as being an essential input to any assessment of country or sector wide risks, the promptness and content of such feedback is relevant to implementing an effective risk-based approach.

---

*The potential benefits and potential challenges can be summarised as follows*:

Potential Benefits:
- Better management of risks and cost-benefits
- Focus on real and identified threats
- Flexibility to adapt to risks that change over time

Potential Challenges:
- Identifying appropriate information to conduct a sound risk analysis
- Addressing short term transitional costs
- Greater need for more expert staff capable of making sound judgements. Regulatory response to potential diversity of practice.

---

10

**Chapter Three: FATF and the Risk-Based Approach**

35.     The varying degrees of risk of money laundering or terrorist financing for particular types of DNFBPs, including legal professionals, or for particular types of clients, or transactions is an important consideration underlying the FATF Recommendations. According to the Recommendations, with regard to DNFBPs there are specific Recommendations where the degree of risk is an issue that a country either must take into account (if there is higher risk), or may take into account (if there is lower risk).

36.     The risk-based approach is either incorporated into the Recommendations (and the Methodology) in specific and limited ways in a number of Recommendations, or it is inherently part of or linked to those Recommendations. For instance, for DNFBPs, including legal professionals risk is addressed in three principal areas (a) Customer/client Due Diligence (*R.5, 6, 8 and 9*); (b) legal professionals and/or firms' internal control systems (*R.15*); and (c) the approach of oversight/monitoring of DNFBPs, including legal professionals (*R.24*).

*Client Due Diligence (R. 5, 6, 8 and 9)*

37.     Risk is referred to in several forms:

        a)     Higher risk – Under Recommendation 5, a country must require its DNFBPs, including legal professionals, to perform enhanced due diligence for higher-risk clients, business relationships or transactions. Recommendation 6 (politically exposed persons) is an example of this principle and is considered to be a higher risk scenario requiring enhanced due diligence.

        b)     Lower risk – A country may also permit legal professionals to take lower risk into account in deciding the extent of the CDD measures they will take (see Methodology criteria 5.9). Legal professionals may thus reduce or simplify (but not avoid completely) the required measures.

        c)     Risk arising from innovation – Under Recommendation 8, a country must require legal professionals to give special attention to the risks arising from new or developing technologies that might favour anonymity.

        d)     Risk assessment mechanism – The FATF standards require that there be an adequate mechanism by which designated competent authorities or SROs assess or review the procedures adopted by legal professionals to determine the degree of risk and how they manage that risk, as well as to review the actual determinations themselves. This expectation applies to all areas where the risk-based approach applies. In addition, where the designated competent authorities or SROs have issued guidelines on a suitable approach to risk-based procedures, it will be important to establish that these have been followed. The Recommendations also recognise that country risk is a necessary component of any risk assessment mechanism (R.5 & R.9).

*Internal control systems (R.15)*

38.     Under Recommendation 15, the development of "appropriate" internal policies, training and audit systems will need to include a specific, and ongoing, consideration of the potential money laundering and terrorist financing risks associated with clients, products and services, geographic areas of operation and so forth. The Interpretative Note to Recommendation 15 makes it clear that a country may allow legal professionals to have regards to the money laundering and terrorist financing risks, and to the size of the business, when determining the type and extent of measures required.

11

*Regulation and oversight by designated competent authorities or SROs (R.24)*

39.     Countries should ensure that legal professionals are subject to effective systems for monitoring and ensuring compliance with AML/CFT requirements. In determining whether the system for monitoring and ensuring compliance is appropriate, regard may be had to the risk of money laundering or terrorist financing in a given business, *i.e.* if there is a low risk then reduced monitoring measures may be taken.

<u>Applicability of the risk-based approach to terrorist financing</u>

40.     There are both similarities and differences in the application of a risk-based approach to terrorist financing and money laundering. They both require a process for identifying and assessing risk. However, the characteristics of terrorist financing make its detection difficult and the implementation of mitigation strategies may be challenging due to considerations such as the relatively low value of transactions involved in terrorist financing, or the fact that funds can be derived from legitimate as well as illicit sources.

41.     Funds that are used to finance terrorist activities may be derived either from criminal activity or may be from legal sources, and the nature of the funding sources may vary according to the type of terrorist organisation. Where funds are derived from criminal activity, then traditional monitoring mechanisms that are used to identify money laundering may also be appropriate for terrorist financing, though the activity, which may be indicative of suspicion, may not be identified as or connected to terrorist financing.  It should be noted that transactions associated with the financing of terrorism may be conducted in very small amounts, which in applying a risk-based approach could be the very transactions that are frequently considered to be of minimal risk with regard to money laundering. Where funds are from legal sources then it is even more difficult to determine if they could be used for terrorist purposes. In addition, the actions of terrorists may be overt and outwardly innocent in appearance, such as the purchase of materials and services to further their goals, with the only covert fact being the intended use of such materials and services purchased. Therefore, while terrorist funds may be derived from criminal activity as well as from legitimate sources, transactions related to terrorist financing may not exhibit the same traits as conventional money laundering. In all cases, however, legal professionals are not responsible for determining the type of underlying criminal activity or intended terrorist purpose.

42.     The ability of legal professionals to detect and identify potential terrorist financing transactions without guidance on terrorist financing typologies or unless acting on specific intelligence provided by the authorities is significantly more challenging than is the case for potential money laundering and other suspicious activity. Detection efforts, absent specific national guidance and typologies, are likely to be based on monitoring that focuses on transactions with countries or geographic areas where terrorists are known to operate or on the other limited typologies available (many of which are indicative of the same techniques as are used for money laundering).

43.     Specific individuals, organisations or countries may be the subject of terrorist financing sanctions, in a particular country. In such cases a listing of individuals, organisations or countries to which such sanctions apply and the obligations on legal professionals to comply with those sanctions are decided by individual countries and are not a function of risk. Legal professionals may commit a criminal offence if they undertake business with a listed individual, organisation or country, or its agent, in contravention of applicable sanctions.

44.     For these reasons, this Guidance has not comprehensively addressed the application of a risk-based process to terrorist financing. It is clearly preferable that a risk-based approach be applied where reasonably practicable, but further consultation with key stakeholders is required to identify a more comprehensive set of indicators of the methods and techniques used for terrorist financing, which can then be factored into strategies to assess terrorist financing risks and devise measures to mitigate them. DNFBPs, including legal professionals, would then have an additional basis upon

40-44 and such subsequent consultations when they occur.

Limitations to the risk-based approach

45.     There are circumstances in which the application of a risk-based approach will not apply, or may be limited. There are also circumstances in which the application of a risk-based approach may not apply to the initial stages of a requirement or process, but then will apply to subsequent stages. The limitations to the risk-based approach are usually the result of legal or regulatory requirements that mandate certain actions to be taken.

46.     Requirements to freeze assets of identified individuals or entities, in countries where such requirements exist, are independent of any risk assessment. The requirement to freeze is absolute and cannot be impacted by a risk-based process. Similarly, while the identification of potential suspicious transactions can be advanced by a risk-based approach, in countries where such obligations exist, the reporting of such suspicious transactions, once identified, is not risk-based. (See paragraph 119.)

47.     CDD comprises several components – Identification and verification of the identity of clients and of beneficial owners, obtaining information on the purposes and intended nature of the business relationships and conducting ongoing due diligence. Of these components, the identification and verification of identity of clients are requirements that must be completed regardless of the risk-based approach. However, in relation to all other CDD components, a reasonably implemented risk-based approach may allow for a determination of the extent and quantity of information required, and the mechanisms to be used to meet these minimum standards. Once this determination is made, the obligation to keep records and documents that have been obtained for due diligence purposes, as well as transaction records, is not dependent on risk levels.

48.     Countries may allow legal professionals to apply reduced or simplified measures where the risk of money laundering or terrorist financing is lower. However, these reduced or simplified measures do not necessarily apply to all aspects of CDD. Where these exemptions are subject to certain conditions being met, it is necessary to verify that these conditions apply, and where the exemption applies under a certain threshold, measures should be in place to prevent transactions from being split artificially to avoid the threshold. Information beyond client identity, such as client location, may be needed to adequately assess risk. This will be an iterative process: the preliminary information obtained about a client should be sufficient to determine whether to go further, and in many cases client monitoring will provide additional information.

49.     Some form of monitoring is required in order to detect unusual and hence possibly suspicious transactions. Even in the case of lower risk clients, monitoring is needed to verify that transactions match the initial low risk profile and if not, trigger a process for appropriately revising the client's risk rating. Equally, risks for some clients may only become evident once a relationship with a client has begun. This makes appropriate and reasonable monitoring of client transactions an essential component of a properly designed risk-based approach; however, within this context it should be understood that not all transactions or clients will be monitored in exactly the same way. Moreover, where there is an actual suspicion of money laundering or terrorist financing, this could be regarded as a higher risk scenario, and enhanced due diligence should be applied regardless of any threshold or exemption. Given the relationship between a legal professional and his/her client, the most effective form of ongoing monitoring will often be continued observance and awareness of a client's activities by the legal professional. This requires legal professionals to be alert to this basis of monitoring and for training of legal professionals to take this feature into account.

Distinguishing Risk-Based Monitoring and Risk-Based Policies and Processes

50.     Risk-based policies and processes should be distinguished from risk-based monitoring by designated competent authorities or SROs. There is a general recognition within monitoring practice that resources should be allocated taking into account the risks posed by individual practices. The methodology adopted by the designated competent authorities or SROs to determine allocation of monitoring resources should cover the practice focus, the risk profile and the internal control environment, and should permit relevant comparisons between practices. Most fundamentally, such methodology needs to recognize that the relationship between the legal professional and the client is often an on-going one. The methodology used for determining the allocation of resources will need updating on an ongoing basis so as to reflect the nature, importance and scope of the risks to which individual practices are exposed. Consequently, this prioritisation should lead designated competent authorities or SROs to focus increased regulatory attention to legal professionals who engage in activities assessed to be of higher risk of money laundering or terrorist financing.

51.     However, it should also be noted that the risk factors taken into account to prioritise the designated competent authorities or SROs' work will depend not only on the intrinsic risk associated with the activity undertaken, but also on the quality and effectiveness of the risk management systems put in place to address such risks.

52.     Since designated competent authorities or SROs should have already assessed the quality of risk management controls applied by legal professionals, it is reasonable that their assessments of these controls be used, at least in part, to inform money laundering and terrorist financing risk assessments conducted by individual firms or businesses.

---

**Summary box: A risk-based approach to countering money laundering and terrorist financing at the national level: key elements for success**

- Legal professionals, designated competent authorities and/or SROs should have access to reliable and actionable information about the threats.

- There must be emphasis on cooperative arrangements among the policy makers, law enforcement, regulators, and the private sector.

- Authorities should publicly recognise that the risk-based approach will not eradicate all elements of risk.

- Authorities have a responsibility to establish an atmosphere in which legal professionals need not be afraid of regulatory sanctions where they have acted responsibly and implemented adequate internal systems and controls.

- Designated competent authorities' and/or SROs' supervisory staff must be well-trained in the risk-based approach, both as applied by designated competent authorities/SROs and by legal professionals.

**SECTION TWO: GUIDANCE FOR PUBLIC AUTHORITIES**

**Chapter One: High-level principles for creating a risk-based approach**

53.     The application of a risk-based approach to countering money laundering and the financing of terrorism will allow designated competent authorities or SROs and legal professionals to use their resources most effectively. This chapter sets out five high-level principles that should be considered by countries when designing a risk-based approach applicable to legal professionals. They could be considered as setting out a broad framework of good practice.

54.     The five principles set out in this Guidance are intended to assist countries in their efforts to improve their AML/CFT regimes. They are not intended to be prescriptive, and should be applied in a manner that is well-considered, is appropriate to the particular circumstances of the country in question and takes into account the way in which legal professionals are regulated in that country and the obligations they are required to observe.

**Principle One: Understanding and responding to the threats and vulnerabilities: a national risk assessment**

55.     Successful implementation of a risk-based approach to combating money-laundering and terrorist financing depends on a sound understanding of the threats and vulnerabilities. Where a country is seeking to introduce a risk-based approach at a national level, this will be greatly aided if there is a national understanding of the risks facing the country. This understanding can flow from a national risk assessment that can assist in identifying the risks.

56.     National risk assessments should be tailored to the circumstances of each country. For a variety of reasons, including the structure of designated competent authorities or SROs and the nature of DNFBPs, including legal professionals, each country's judgements about the risks will be unique, as will their decisions about how to implement a national assessment in practice. A national assessment need not be a single formal process or document. The desired outcome is that decisions about allocating responsibilities and resources at the national level are based on a comprehensive and current understanding of the risks. Designated competent authorities and SROs, in consultation with the private sector, should consider how best to achieve this while also taking into account any jurisdictional limitations of applying the risk-based approach to legal professionals, as well as any risk associated with providing information on money laundering and terrorist vulnerabilities.

**Principle Two: A legal/regulatory framework that supports the application of a risk-based approach**

57.     Countries should consider whether their legislative and regulatory frameworks are conducive to the application of the risk-based approach. Where appropriate the obligations imposed should be informed by the outcomes of the national risk assessment.

58.     The risk-based approach does not mean the absence of a clear statement of what is required from the DNFBPs, including from legal professionals. However, under a risk-based approach, legal professionals should have a degree of flexibility to implement policies and procedures which respond appropriately to their own risk assessment. In effect, the standards implemented may be tailored

15

and/or amended by additional measures as appropriate to the risks of an individual legal professional and/or practice. The fact that policies and procedures, in accordance to the risk levels, may be applied to different services, clients and locations does not mean that policies and procedures need not be clearly defined.

59.     Basic minimum AML/CFT requirements can co-exist with a risk-based approach. Indeed, sensible minimum standards, coupled with scope for these to be enhanced when the risk justifies it, should be at the core of risk-based AML/CFT requirements. These standards should, however, be focused on the outcome (combating through deterrence, detection, and, when there is a requirement in a particular country, reporting of money laundering and terrorist financing), rather than applying legal and regulatory requirements in a purely mechanistic manner to every client.  SROs may assist in the development of such standards for legal professionals.

**Principle Three: Design of a monitoring framework to support the application of the risk-based approach**

60.     In certain countries, SROs play a critical role in the regulation of legal professionals, which may be based on fundamental constitutional principles. Some SROs have the ability to audit or investigate their own members, although in some countries these powers may be limited to reviewing policies and procedures as opposed to specific clients and matters. Depending on the powers of and responsibilities accepted by SROs, SROs may be able to facilitate or ensure compliance by legal professionals with the relevant legislation and/or develop guidance relating to money laundering. In some countries, the SROs may provide a greater level of scrutiny than that which can be afforded by a government or regulatory AML program. SROs should be encouraged to work closely with domestic AML/CFT regulators. Countries should ensure that SROs have appropriate resources to discharge their AML/CFT responsibilities. In some cases, legal professionals may conduct activities falling within the scope of Recommendation 12 that under national law may also require supervision from appropriate authorities.

61.     Where appropriate, designated competent authorities and SROs should seek to adopt a risk-based approach to the monitoring of controls to combat money laundering and terrorist financing. This should be based on a thorough and comprehensive understanding of the types of activity carried out by legal professionals, and the money laundering and terrorist financing risks to which these are exposed. Designated competent authorities and SROs will probably need to prioritise resources based on their overall assessment of where the risks are in the legal professionals' practices.

62.     Designated competent authorities and SROs with responsibilities other than those related to AML/CFT will need to consider these risks alongside other risk assessments arising from the designated competent authority's or SRO's wider duties.

63.     Such risk assessments should help the designated competent authority or SRO choose where to apply resources in its monitoring programme, with a view to using limited resources to achieve the greatest effect. A risk assessment may also indicate that the designated competent authority or SRO does not have adequate resources to deal with the risks. In such circumstances, the designated competent authority or SRO may need to obtain, where possible, additional resources or adopt other strategies to manage or mitigate any unacceptable residual risks.

64.     The application of a risk-based approach to monitoring requires that designated competent authorities' and SROs' staff be able to make principle-based decisions in a fashion similar to what would be expected from the staff of a legal professional's practice. These decisions will cover the adequacy of the arrangements to combat money laundering and terrorist financing. As such, a designated competent authority or SRO may wish to consider how best to train its staff in the practical application of a risk-based approach to monitoring. This staff will need to be well-briefed as to the general principles of a risk-based approach, the possible methods of application, and what a risk-based approach looks like when successfully applied within the context of a national risk assessment.

**Principle Four: Identifying the main actors and ensuring consistency**

65.    Countries should consider who the main stakeholders are when adopting a risk-based approach to combating money laundering and terrorist financing. These will differ from country to country. Thought should be given as to the most effective way to share responsibility between these parties, and how information may be shared to best effect. For example, consideration may be given to which body or bodies are best placed to provide guidance to legal professionals about how to implement a risk-based approach to AML/CFT.

66.    A list of potential stakeholders may include the following:

- Government – This may include legislature, executive, and judiciary.

- Law enforcement agencies – This might include the police, customs and similar agencies.

- The financial intelligence unit (FIU), security services, and other similar agencies.

- Designated competent authorities/SROs (particularly bar associations and law societies).

- The private sector – This might include legal professionals and law firms and legal professional organisations and associations such as national, state, local, and specialty professional societies and bar associations.

- The public – Arrangements designed to counter money laundering and terrorist financing are ultimately designed to protect the law-abiding public.  However, these arrangements may also act to place burdens on clients of legal professionals.

- Others – Those who are in a position to contribute to the conceptual basis underpinning the risk-based approach, such stakeholders may include academia and the media.

67.    Clearly a government will be able to exert influence more effectively over some of these stakeholders than others. However, regardless of its capacity to influence, a government will be in a position to assess how all stakeholders can be encouraged to support efforts to combat money laundering and terrorist financing.

68.    A further element is the role that governments have in seeking to gain recognition of the relevance of a risk-based approach from designated competent authorities. This may be assisted by relevant authorities making clear and consistent statements on the following issues:

- Legal professionals can be expected to have the flexibility to adjust their internal systems and controls taking into consideration lower and high risks, so long as such systems and controls are reasonable. However, there are also minimum legal and regulatory requirements and elements that apply irrespective of the risk level, such as minimum standards of CDD.

- Acknowledging that a legal professional's ability to detect and deter money laundering and terrorist financing may sometimes be necessarily limited and that information on risk factors is not always robust or freely available. There can therefore be reasonable policy and monitoring expectations about what a legal professional with good controls aimed at preventing money laundering and the financing of terrorism is able to achieve. A legal professional may have acted in good faith to take reasonable and considered steps to prevent money laundering, and documented the rationale for his/her decisions, and yet still be abused by a criminal.

17

- Acknowledging that not all high-risk situations are identical and as a result will not always require the application of precisely the same type of enhanced due diligence.

**Principle Five: Information exchange between the public and private sector**

69.     Effective information exchange between the public and private sector will form an integral part of a country's strategy for combating money laundering and terrorist financing. In some cases, it will allow the private sector to provide designated competent authorities and SROs with information they identify as a result of previously provided government intelligence. In countries where SROs regulate and monitor legal professionals for AML compliance, such SROs may well acquire information that would be relevant to a country's strategy for combating money laundering and terrorist financing. To the extent that such information may be released in accordance with applicable laws, regulations, and rules, the results may be made available to the designated competent authorities.

70.     Public authorities, whether law enforcement agencies, designated competent authorities or other bodies, have privileged access to information that may assist legal professionals to reach informed judgements when pursuing a risk-based approach to counter money laundering and terrorist financing. Likewise, legal professionals are able to understand their clients' legal needs reasonably well. It is desirable that public and private bodies work collaboratively to identify what information is valuable to help combat money laundering and terrorist financing, and to develop means by which this information might be shared in a timely and effective manner.

71.     To be productive, information exchange between the public and private sector should be accompanied by appropriate exchanges among public authorities. FIUs, designated competent authorities and law enforcement agencies should be able to share information and feedback on results and identified vulnerabilities, so that consistent and meaningful inputs can be provided to the private sector. All parties should of course, consider what safeguards are needed to adequately protect sensitive information held by public bodies from being disseminated in contravention of applicable laws and regulations.

72.     Relevant stakeholders should seek to maintain a dialogue so that it is well understood what information has proved useful in combating money laundering and terrorist financing. For example, the types of information that might be usefully shared between the public and private sector would include, if available:

- Assessments of country risk.

- Typologies or assessments of how money launderers and terrorists have abused DNFBPs, especially legal professionals.

- Feedback on suspicious transaction reports and other relevant reports.

- Targeted unclassified intelligence. In specific circumstances, and subject to appropriate safeguards and a country's legal and regulatory framework, it may also be appropriate for authorities to share targeted confidential information with legal professionals.

- Countries, persons or organisations whose assets or transactions should be frozen.

73.     When choosing what information can be properly and profitably shared, public authorities may wish to emphasise to legal professionals that information from public bodies should inform, but not be a substitute for legal professionals' own judgements. For example, countries may decide not to create what are perceived to be definitive country-approved lists of low risk client types. Instead,

public authorities may prefer to share information on the basis that this will be one input into legal professionals' decision making processes, along with any other relevant information that is available to legal professionals.

**Chapter Two: Implementation of the Risk-Based Approach**

*Assessment of Risk to Inform National Priorities:*

74.     A risk-based approach should be built on sound foundations: effort must first be made to ensure that the risks are well understood. As such, a risk-based approach should be based on an assessment of the threats. This is true whenever a risk-based approach is applied, at any level, whether by countries or individual legal professionals and/or firms. A country's approach should be informed by its efforts to develop an understanding of the risks in that country. This can be considered as a "national risk assessment".

75.     A national risk assessment should be regarded as a description of fundamental background information to assist designated competent authorities, law enforcement authorities, the FIU, financial institutions and DNFBPs to ensure that decisions about allocating responsibilities and resources at the national level are based on a practical, comprehensive and up-to-date understanding of the risks.

76.     A national risk assessment should be tailored to the circumstances of the individual country, both in how it is executed, and its conclusions, though countries should be mindful that money laundering and terrorist financing can often have an international dimension, and that such information may also add value to the national risk assessment. Factors that may influence the risk of money laundering and terrorist financing in a country could include the following:

- Political environment.

- Legal environment.

- A country's economic structure.

- Cultural factors, and the nature of civil society.

- Sources, location and concentration of criminal activity.

- Size and composition of the financial services industry.

- Ownership structure of financial institutions and DNFBPs businesses.

- Size and nature of the activity carried out by DNFBPs, including legal professionals.

- Corporate governance arrangements in relation to financial institutions and DNFBPs and the wider economy.

- The nature of payment systems and the prevalence of cash-based transactions.

- Geographical spread of the financial industry's and DNFBPs' operations and clients.

- Types of products and services offered by the financial services industry and DNFBPs.

- Types of customers/clients serviced by financial institutions and DNFBPs.

- Types of predicate offences.

- Amounts of illicit money generated domestically.

- Amounts of illicit money generated abroad and laundered domestically.

- Main channels or instruments used for laundering or financing terrorism.

- Sectors of the legal economy affected.

- Underground/informal areas in the economy.

77.     Countries should also consider how an understanding of the risks of money laundering and terrorist financing can be best achieved at the national level. Relevant questions could include: Which body or bodies will be responsible for contributing to this assessment? How formal should an assessment be? Should the designated competent authority's or SRO's view be made public? These are all questions for the designated competent authority or SRO to consider.

78.     The desired outcome is that decisions about allocating responsibilities and resources at the national level are based on a comprehensive and up-to-date understanding of the risks. To achieve the desired outcome, designated competent authorities and SROs should ensure that they identify and provide DNFBPs (including legal professionals) with the information needed to develop this understanding and to design and implement measures to mitigate the identified risks.

79.     Developing and operating a risk-based approach involves forming judgements. It is important that these judgements are well informed. It follows that, to be effective, the risk-based approach should be information-based and include intelligence where appropriate. Effort should be made to ensure that risk assessments are based on fresh and accurate information. Governments utilising partnerships with law enforcement bodies, FIUs, designated competent authorities/SROs and legal professionals themselves, are well placed to bring their knowledge and expertise to bear in developing a risk-based approach that is appropriate for their particular country. Their assessments will not be static and will change over time, depending on how circumstances develop and how the threats evolve. As such, countries should facilitate the flow of information between different bodies, so that there are no institutional impediments to information dissemination.

80.     Whatever form they take, a national assessment of the risks, along with measures to mitigate those risks, can inform how resources are applied to combat money laundering and terrorist financing, taking into account other relevant country policy goals. It can also inform how these resources are most effectively assigned to different public bodies and SROs, and how those bodies make use of those resources in an effective manner.

81.     As well as assisting designated competent authorities and SROs to decide how to allocate funds to combat money laundering and terrorist financing, a national risk assessment can also inform decision-makers on the best strategies for implementing a regulatory regime to address the risks identified. An over-zealous effort to counter the risks could be damaging and counter-productive, placing unreasonable burdens on legal professionals. Alternatively, less aggressive efforts may not be sufficient to protect society from the threats posed by criminals and terrorists. A sound understanding of the risks at the national level could help obviate these dangers.

**Effective systems for monitoring and ensuring compliance with AML/CFT requirements – General Principles**

82.     FATF Recommendation 24 requires that legal professionals should be subject to effective systems for monitoring and ensuring compliance with AML/CFT requirements. In determining whether there is an effective system, regard may be had to the risk of money laundering or terrorist financing in the sector. There should be a designated competent authority or SRO responsible for

monitoring and ensuring compliance by legal professionals; and the authority or SRO should have adequate powers and resources to perform its functions, including powers to monitor and sanction.

<u>Defining the acceptable level of risk</u>

83.     The level of AML/CFT risk will generally be affected by both internal and external risk factors. For example, risk levels may be increased by internal risk factors such as weak compliance resources, inadequate risk controls and insufficient senior management involvement. External level risks may rise due to factors such as the action of third parties and/or political and public developments.

84.     As described in Section One, all activity involves an element of risk. Designated competent authorities and SROs should not prohibit legal professionals from conducting business with high risk clients. However, legal professionals would be prudent to identify, with assistance from this or other Guidance, the risks associated with acting for high risk clients. When applicable law prohibits legal professionals from acting for a client, the risk-based approach does not apply.

85.     However, this does not exclude the need to implement basic minimum requirements. For instance, FATF Recommendation 5 (that applies to legal professionals through the incorporation of R.5 into R.12) states that "where [the legal professional] is unable to comply with [CDD requirements], it should not open the account, commence business relations or perform the transaction; or should terminate the business relationship; and should consider making a suspicious transaction report in relation to the customer." So the level of risk should strike an appropriate balance between the extremes of not accepting clients, and conducting business with unacceptable or unmitigated risk. As is recognised by the interpretative note to FATF Recommendation 16, however, in those countries where a reporting requirement has been adopted the matters that would fall under legal professional privilege or professional secrecy are determined by each country. [3]

86.     Where legal professionals implement a risk-based approach, designated competent authorities and SROs must expect legal professionals to put in place effective policies, programmes, procedures and systems to mitigate the risk and acknowledge that even with effective systems not every suspect transaction will necessarily be detected. They should also ensure that those policies, programmes, procedures and systems are applied effectively to prevent legal professionals from becoming conduits for illegal proceeds and ensure that they keep records and make reports (where obligated) that are of use to national authorities in combating money laundering and terrorist financing. Efficient policies and procedures will reduce the level of risks, but are unlikely to eliminate them completely. Assessing money laundering and terrorist financing risks requires judgement and is not an exact science. Monitoring aims at detecting unusual or suspicious transactions among an extremely large number of legitimate transactions; furthermore, the demarcation of what is unusual may not always be straightforward since what is "customary" may vary depending on the clients' business. This is why developing an accurate client profile is important in managing a risk-based system. Moreover, although procedures and controls are frequently based on previous typologies, criminals will adapt their techniques, which may quickly limit the utility of such typologies.

87.     Additionally, not all high risk situations are identical, and therefore will not always require precisely the same level of enhanced due diligence. As a result, designated competent authorities/SROs will expect legal professionals to identify individual high risk categories and apply specific and appropriate mitigation measures. Further information on the identification of specific risk categories is provided in Section Three, "Guidance for Legal Professionals on Implementing a Risk-Based Approach."

---

[3]     See Annex 1 for a summary of decisions by judicial authorities on these issues.

Proportionate Supervisory/Monitoring Actions to support the Risk-Based Approach

88.     Designated competent authorities and SROs should seek to identify weaknesses through an effective programme of both on-site and off-site supervision, and through analysis of internal and other available information.

89.     In the course of their examinations, designated competent authorities and SROs should review a legal professional's AML/CFT risk assessments, as well as its policies, procedures and control systems to arrive at an overall assessment of the risk profile of legal professionals' practices and the adequacy of their mitigation measures. Where available, assessments carried out by or for legal professionals may be a useful source of information. The designated competent authority/SRO assessment of management's ability and willingness to take necessary corrective action is also a critical determining factor. Designated competent authorities and SROs should use proportionate actions to ensure proper and timely correction of deficiencies, taking into account that identified weaknesses can have wider consequences. Generally, systemic breakdowns or inadequate controls will result in the most severe response.

90.     Nevertheless, it may happen that the lack of detection of an isolated high risk transaction, or of transactions of an isolated high risk client, will in itself be significant, for instance where the amounts are significant, or where the money laundering and terrorist financing typology is well known, or where a scheme has remained undetected for a long time. Such a case might indicate an accumulation of weak risk management practices or regulatory breaches regarding the identification of high risks, monitoring, staff training and internal controls, and therefore, might alone justify action to ensure compliance with the AML/CFT requirements.

91.     Designated competent authorities and SROs can and should use their knowledge of the risks associated with services, clients and geographic locations to help them evaluate legal professionals' money laundering and terrorist financing risk assessments, with the understanding, however, that they may possess information that has not been made available to legal professionals and, therefore, legal professionals would not have been able to take such information into account when developing and implementing a risk-based approach. Designated competent authorities and SROs (and other relevant stakeholders) are encouraged to use that knowledge to issue guidelines to assist legal professionals in managing their risks. Where legal professionals are permitted to determine the extent of the CDD measures on a risk sensitive basis, this should be consistent with guidelines issued by their designated competent authorities and SROs[4]. Guidance specifically designed for legal professionals is likely to be the most effective. An assessment of the risk-based approach will, for instance, help identify cases where legal professionals use excessively narrow risk categories that do not capture all existing risks, or adopt criteria that lead to the identification of a large number of higher risk relationships, but without providing for adequate additional CDD measures.

92.     In the context of the risk-based approach, the primary focus for designated competent authorities and SROs should be to determine whether or not the legal professional's AML/CFT compliance and risk management programme is adequate to: (a) meet the minimum regulatory requirements, and (b) appropriately and effectively mitigate the risks. The monitoring goal is not to prohibit high risk activity, but rather to be confident that legal professionals have adequately and effectively implemented appropriate risk mitigation strategies. Appropriate authorities should, when considering taking action (including applying penalties and sanctions), take into account and give due consideration to the reasoned judgements of legal professionals who are implementing and/or operating an appropriate risk-based approach, which judgements, in hindsight, may ultimately be determined to have been incorrect. In some countries and situations, judicial authorities alone will determine whether the legal professional has complied with the obligation to exercise reasonable judgement.

---

[4]     FATF Recommendations 5 and 25, Methodology Essential Criteria 25.1 and 5.12.

93.     Under FATF Recommendation 24, designated competent authorities and SROs should have adequate powers to perform their monitoring functions, including the power to impose adequate sanctions for failure to comply with statutory and regulatory requirements to combat money laundering and terrorist financing. Fines and/or penalties are not appropriate in all regulatory actions, nor will they be permissible in all jurisdictions, to correct or remedy AML/CFT deficiencies. However, subject to the requirements of this paragraph, competent authorities, judicial authorities and SROs must have the authority and willingness to apply appropriate sanctions in cases where substantial deficiencies exist. Often, action will take the form of a remedial programme through the normal monitoring processes.

94.     In considering the above factors it is clear that proportionate monitoring will be supported by two central features:

*a) Regulatory Transparency*

95.     In the implementation of proportionate actions, regulatory transparency will be of paramount importance. Designated competent authorities and SROs are aware that legal professionals, while looking for professional freedom to make their own risk judgements, will also seek guidance on regulatory obligations. As such, the designated competent authority/SRO with AML/CFT supervisory/monitoring responsibilities should seek to be transparent in setting out what it expects, and will need to consider appropriate mechanisms of communicating these messages. For instance, this may be in the form of high-level requirements, based on desired outcomes, rather than detailed processes. If SROs responsible for the regulation of the relevant legal professionals (including regulation of AML risks) carry out regular AML compliance reviews of their members or otherwise take measures to supervise compliance, the form of an SRO monitoring programme should be determined by each SRO's rules and regulations.

96.     No matter what individual procedure is adopted, the guiding principle will be that there is an awareness of legal responsibilities and regulatory expectations. In the absence of this transparency there is the danger that monitoring actions may be perceived as either disproportionate or unpredictable, which may undermine even the most effective application of the risk-based approach by legal professionals.

*b) General Education, Staff Training of Designated Competent Authorities, SROs, and Enforcement Staff*

97.     SROs or other bodies that have a supervisory or educational role for legal professionals and legal professional organisations all have a stake in an effective risk-based system. This includes making available to legal professionals educational materials, further guidance and increasing awareness of money laundering concerns and risks. Central to the ability of legal professionals to seek to train and guard against money laundering effectively in a risk-based approach, is the provision of realistic typologies, particularly those where there is unwitting involvement.

98.     In the context of the risk-based approach, it is not possible to specify precisely what a legal professional has to do, in all cases, to meet its regulatory obligations. Thus, a prevailing consideration will be how best to ensure the consistent implementation of predictable and proportionate monitoring actions. The effectiveness of monitoring training will therefore be important to the successful delivery of proportionate supervisory/monitoring actions.

99.     Training should aim to allow designated competent authorities/SRO staff to form sound comparative judgements about AML/CFT systems and controls. It is important in conducting assessments that designated competent authorities and SROs have the ability to make judgements regarding management controls in light of the risks assumed by firms and considering available industry practices. Designated competent authorities and SROs might also find it useful to undertake

23

comparative assessments so as to form judgements as to the relative strengths and weaknesses of different legal professional organisations' arrangements.

100.    The training should include instructing designated competent authorities and SROs about how to evaluate whether senior management has implemented adequate risk management measures, and determine if the necessary procedures and controls are in place. The training should also include reference to specific guidance, where available. Designated competent authorities and SROs also should be satisfied that sufficient resources are in place to ensure the implementation of effective risk management.

101.    To fulfil these responsibilities, training should enable designated competent authorities and SROs monitoring staff to adequately assess:

> i. The quality of internal procedures, including ongoing employee training programmes and internal audit, compliance and risk management functions.

> ii. Whether or not the risk management policies and processes are appropriate in light of legal professionals' risk profile, and are periodically adjusted in light of changing risk profiles.

> iii. The participation of senior management to confirm that they have undertaken adequate risk management, and that the necessary procedures and controls are in place.

102.    Educating legal professionals on AML/CFT issues and the risk-based approach is a key element of an effective risk-based approach.  Designated competent authorities should thus consider, in discussion with SROs and legal professionals and other appropriate organisations, ways of encouraging educational bodies (such as universities and law schools) to include within the education and training of legal professionals at all levels appropriate references to AML/CFT laws and the appropriate role that legal professionals can play in combating money laundering and terrorist financing.

**SECTION THREE: GUIDANCE FOR LEGAL PROFESSIONALS**

**ON IMPLEMENTING A RISK-BASED APPROACH**

## Chapter One: Risk Categories

103.     Potential money laundering and terrorist financing risks faced by legal professionals will vary according to many factors including the activities undertaken by the legal professional, the type and identity of client, and the nature of the client relationship and its origin. Legal professionals should identify the criteria that enable them to best assess the potential money laundering and where feasible terrorist financing risks their practices give rise to and should then implement a reasonable risk based approach based on those criteria. These criteria are not exhaustive and are not intended to be prescriptive, and should be applied in a manner that is well-considered, is appropriate to the particular circumstances of the country and takes into account the way in which legal professionals are regulated in that country and the obligations they are required to observe.

104.     Identification of the money laundering risks and terrorist financing risks associated with certain clients or categories of clients, and certain types of work will allow legal professionals to determine and implement reasonable and proportionate measures and controls to mitigate these risks. Although a risk assessment should normally be performed at the inception of a client relationship, for a legal professional, the ongoing nature of the advice and services the legal professional often provides means that automated transaction monitoring systems of the type used by financial institutions will be inappropriate for many legal professionals. The individual legal professionals working with the client are better positioned to identify and detect changes in the type of work or the nature of the client's activities, this is because the lawyer's knowledge of the client and its business will develop throughout the duration of what is expected to be a longer term relationship. Legal professionals will need to pay attention to the nature of the risks presented by isolated, small and short-term client relationships that, depending upon the circumstances, may be low risk (*e.g.* advice provided to walk-ups in a legal aid clinic).

105.     The amount and degree of monitoring will depend on the nature and frequency of the relationship. A legal professional may also have to adjust his or her risk assessment of a particular client based upon information received from a designated competent authority, SRO, or other credible sources.

106.     Money laundering and terrorist financing risks may be measured using various categories. Application of risk categories provides a strategy for managing potential risks by enabling legal professionals, where required, to subject each client to reasonable and proportionate risk assessment. The most commonly used risk criteria are: country or geographic risk; client risk; and risk associated with the particular service offered. The weight given to these risk categories (individually or in combination) in assessing the overall risk of potential money laundering or terrorist financing may vary from one legal professional and/or firm to another, particularly given the size, sophistication, nature and scope of services offered by the legal professional and/or firm. These criteria, however, should not be considered in isolation. Legal professionals, in light of their individual practices and based on their reasonable judgements, will need to assess independently the weight to be given to each risk factor.

107.    Although there is no universally accepted set of risk categories, the examples provided in this Guidance are the most commonly identified risk categories. There is no single methodology to apply these risk categories, and the application of these risk categories is merely intended to provide a suggested framework for approaching the management of potential risks.

Country/Geographic Risk

108.    There is no universally agreed definition by either designated competent authorities, SROs, or legal professionals that prescribes whether a particular country or geographic area (including the country within which the legal professional practices) represents a higher risk. Country risk, in conjunction with other risk factors, provides useful information as to potential money laundering and terrorist financing risks. Money laundering and terrorist financing risks have the potential to arise from almost any source, such as the domicile of the client, the location of the transaction and the source of the funding. Countries that pose a higher risk include:

- Countries subject to sanctions, embargoes or similar measures issued by, for example, the United Nations (UN). In addition, in some circumstances, countries subject to sanctions or measures similar to those issued by bodies such as the UN, but that may not be universally recognised, may be taken into account by a legal professional because of the standing of the issuer of the sanctions and the nature of the measures.

- Countries identified by credible sources[5] as generally lacking appropriate AML/CFT laws, regulations and other measures.

- Countries identified by credible sources as being a location from which funds or support are provided to terrorist organizations.

- Countries identified by credible sources as having significant levels of corruption or other criminal activity.

Client Risk

109.    Determining the potential money laundering or terrorist financing risks posed by a client, or category of clients, is critical to the development and implementation of an overall risk-based framework. Based on its own criteria, a legal professional should seek to determine whether a particular client poses a higher risk and the potential impact of any mitigating factors on that assessment. Application of risk variables may mitigate or exacerbate the risk assessment. Categories of clients whose activities may indicate a higher risk include:

- PEPs are considered as higher risk clients – If a legal professional is advising a client that is a PEP, or where a PEP is the beneficial owner of the client, with respect to the activities specified in Recommendation 12, then a legal professional will need to carry out appropriate enhanced CDD, as required by Recommendation 6. Relevant factors that will influence the extent and nature of CDD include the particular circumstances of a PEP, the PEP's home country, the type of work the PEP is instructing the legal professional to perform or carry out, and the scrutiny to which the PEP is under in the PEP's home country.

---

[5]    "Credible sources" refers to information that is produced by well-known bodies that generally are regarded as reputable and that make such information publicly and widely available. In addition to the FATF and FATF-style regional bodies, such sources may include, but are not limited to, supra-national or international bodies such as the International Monetary Fund, the World Bank, and the Egmont Group of Financial Intelligence Units, as well as relevant national government bodies and non-governmental organisations. The information provided by these credible sources does not have the effect of law or regulation and should not be viewed as an automatic determination that something is of higher risk.

- If a PEP is otherwise involved in a client (other than in the circumstances of Recommendation 6), then the nature of the risk should be considered in light of all relevant circumstances, such as:

  o The nature of the relationship between the client and the PEP. Even if the PEP does not have a controlling interest or a dominant position on the board or in management and therefore does not qualify as a beneficial owner, the PEP may nonetheless affect the risk assessment.

  o The nature of the client (*e.g.* is it a public listed company).

  o The nature of the services sought. For example, lower risks may exist where a PEP is not the client but a director of a client that is a public listed company and the client is purchasing real property for adequate consideration.

- Clients conducting their business relationship or requesting services in unusual or unconventional circumstances (as evaluated in all the circumstances of the representation).

- Clients where the structure or nature of the entity or relationship makes it difficult to identify in a timely fashion the true beneficial owner or controlling interests, such as the unexplained use of legal persons or legal arrangements, nominee shares or bearer shares.

- Clients that are cash (and cash equivalent) intensive businesses including:

  o Money services businesses (*e.g.* remittance houses, currency exchange houses, casas de cambio, centros cambiarios, remisores de fondos, bureaux de change, money transfer agents and bank note traders or other businesses offering money transfer facilities).

  o Casinos, betting and other gambling related activities.

  o Businesses that while not normally cash intensive, generate substantial amounts of cash.

- Where clients that are cash intensive businesses are themselves subject to and regulated for a full range of AML/CFT requirements consistent with the FATF Recommendations this may mitigate the risks.

- Charities and other "not for profit" organisations (NPOs) that are not subject to monitoring or supervision (especially those operating on a "cross-border" basis) by designated competent authorities[6] or SROs.

- Clients using financial intermediaries, financial institutions or legal professionals that are not subject to adequate AML/CFT laws and measures and that are not adequately supervised by competent authorities or SROs.

- Clients having convictions for proceeds generating crimes who instruct the legal professional (who has actual knowledge of such convictions) to undertake specified activities on their behalf.

- Clients who have no address, or multiple addresses without legitimate reasons.

- Clients who change their settlement or execution instructions without appropriate explanation.

---

[6]   See Special Recommendation VIII.

27

- The use of legal persons and arrangements without any apparent legal or legitimate tax, business, economic or other reason.

Service Risk

110.    An overall risk assessment should also include determining the potential risks presented by the services offered by a legal professional, noting that the various legal professionals provide a broad and diverse range of services. The context of the services being offered or delivered is always fundamental to a risk-based approach. Any one of the factors discussed in this Guidance alone may not itself constitute a high risk circumstance. High risk circumstances can be determined only by the careful evaluation of a range of factors that cumulatively and after taking into account any mitigating circumstances would warrant increased risk assessment. When determining the risks associated with provision of services related to specified activities, consideration should be given to such factors as:

- Services where legal professionals, acting as financial intermediaries, actually handle the receipt and transmission of funds through accounts they actually control in the act of closing a business transaction.

- Services to conceal improperly beneficial ownership from competent authorities.

- Services requested by the client for which the legal professional does not have expertise excepting where the legal professional is referring the request to an appropriately trained professional for advice.

- Transfer of real estate between parties in a time period that is unusually short for similar transactions with no apparent legal, tax, business, economic or other legitimate reason.[7]

- Payments received from un-associated or unknown third parties and payments for fees in cash where this would not be a typical method of payment.

- Transactions where it is readily apparent to the legal professional that there is inadequate consideration, such as when the client does not identify legitimate reasons for the amount of the consideration.

- Administrative arrangements concerning estates where the deceased was known to the legal professional as being a person who had been convicted of proceeds generating crimes.

- Clients who offer to pay extraordinary fees for services which would not ordinarily warrant such a premium. However, bona fide and appropriate contingency fee arrangements, where a legal professional may receive a significant premium for a successful representation, should not be considered a risk factor.

- The source of funds and the source of wealth – The source of funds is the activity that generates the funds for a client, while the source of wealth describes the activities that have generated the total net worth of a client.

- Unusually high levels of assets or unusually large transactions compared to what might reasonably be expected of clients with a similar profile may indicate that a client not otherwise seen as higher risk should be treated as such. Conversely, low levels of assets or low value transactions involving a client that would otherwise appear to be higher risk might allow for a legal professional to treat the client as lower risk.

---

[7]    See the FATF Typologies report *Money Laundering and Terrorist Financing through the Real Estate Sector* at http://www.fatf-gafi.org/dataoecd/45/31/40705101.pdf.

- Shell companies, companies with ownership through nominee shareholding and control through nominee and corporate directors[8].

- Situations where it is difficult to identify the beneficiaries of trusts; this might include a discretionary trust that gives the trustee discretionary power to name the beneficiary within a class of beneficiaries and distribute accordingly the assets held in trust, and when a trust is set up for the purpose of managing shares in a company that can make it more difficult to determine the beneficiaries of assets managed by the trust[9];

- Services that deliberately have provided or purposely depend upon more anonymity in the client identity or participants than is normal under the circumstances and experience of the legal professional.

- Legal persons that, as a separate business, offer TCSP services should have regard to the TCSP Guidance, even if such legal persons are owned or operated by legal professionals. Legal professionals, however, who offer TCSP services should have regard to this Guidance, and should consider customer or service risks related to TCSPs such as the following:

    o Unexplained use of express trusts.

    o Unexplained delegation of authority by the client through the use of powers of attorney, mixed boards and representative offices.

    o In the case of express trusts, an unexplained relationship between a settlor and beneficiaries with a vested right, other beneficiaries and persons who are the object of a power.

    o In the case of an express trust, an unexplained (where explanation is warranted) nature of classes of beneficiaries and classes within an expression of wishes.


Variables that May Impact Risk

111.    Due regard must be accorded to the vast and profound differences in practices, size, scale and expertise, amongst legal professionals. As a result, consideration must be given to these factors when creating a reasonable risk-based approach and the resources that can be reasonably allocated to implement and manage it. For example, a sole practitioner would not be expected to devote an equivalent level of resources as a large law firm; rather, the sole practitioner would be expected to develop appropriate systems and controls and a risk-based approach proportionate to the scope and nature of the practitioner's practice.

112.    A significant factor to consider is whether the client and proposed work would be unusual, risky or suspicious for the particular legal professional. This factor must always be considered in the context of the legal professional's practice. A legal professional's risk-based approach methodology may thus take into account risk variables specific to a particular client or type of work. Consistent with the risk-based approach and the concept of proportionality, the presence of one or more of these variables may cause a legal professional to conclude that either enhanced due diligence and monitoring is warranted, or conversely that normal CDD and monitoring can be reduced, modified or simplified. These variables may increase or decrease the perceived risk posed by a particular client or type of work and may include:

---

[8]    See also the FATF typologies report ''The Misuse of Corporate Vehicles, including Trust and Company Service Providers'' published 13 October 2006.

[9]    See also the FATF typologies report "The Misuse of Corporate Vehicles, including Trust and Company Service Providers" Annex 2 on trusts, for a more detailed description of "potential for misuse" of trusts.

- The nature of the client relationship and the client's need for the legal professional to provide specified activities.

- The level of regulation or other oversight or governance regime to which a client is subject. For example, a client that is a financial institution or legal professional regulated in a country with a satisfactory AML/CFT regime poses less risk of money laundering than a client in an industry that has money laundering risks and yet is unregulated for money laundering purposes.

- The reputation and publicly available information about a client. Legal persons that are transparent and well known in the public domain and have operated for a number of years without being convicted of proceeds generating crimes may have low susceptibility to money laundering.

- The regularity or duration of the relationship.

- The familiarity of the legal professional with a country, including knowledge of local laws, regulations and rules, as well as the structure and extent of regulatory oversight, as the result of a legal professional's own activities within the country.

- The proportionality between the magnitude or volume and longevity of the client's business and its legal requirements, including the nature of professional services sought.

- Subject to other factors (including the nature of the services and the source and nature of the client relationship), providing limited legal services in the capacity of a local or special counsel may be considered a low risk factor. This may also, in any event, mean that the legal professional is not "preparing for" or "carrying out" a transaction for a regulated activity specified in Recommendation 12.

- Significant and unexplained geographic distance between the legal professional organisation and the location of the client where there is no nexus to the type of work being undertaken.

- Where a prospective client has instructed the legal professional to undertake a single transaction-based service (as opposed to an ongoing advisory relationship) and one or more other risk factors are present.

- Risks that may arise from the use of new or developing technologies that permit non-face to face relationships and could favour anonymity.  However, due to the prevalence of electronic communication between legal professionals and clients in the delivery of legal services, non-face to face interaction between legal professionals and clients should not, standing alone, be considered a high risk factor.  For example, non-face to face, cross-border work for an existing client is not necessarily high risk work for certain organisations (such as regional, national or international law firms or other firms regardless of size that practice in that type of work) nor would customary services rendered by a sole practitioner on a local basis to a client in the local community who does not otherwise present increased risks.

- The nature of the referral or origination of the client. A prospective client may contact a legal professional in an unsolicited manner or without common or customary methods of introduction or referrals, which may increase risk. By contrast, where a prospective client has been referred from another trusted source subject to an AML/CFT regime that is in line with the FATF standards, the referral may be considered a mitigating risk factor.

- The structure of a client or transaction. Structures with no apparent legal, tax, business, economic or other legitimate reason may increase risk. Legal professionals often design

30

structures (even if complex) for legitimate legal, tax, business, economic or other legitimate reasons, in which case the risk of money laundering could be reduced.

- Trusts that are pensions may be considered lower risk.

<u>Controls for Higher Risk Situations</u>

113.    Legal professionals should implement appropriate measures and controls to mitigate the potential money laundering and terrorist financing risks with respect to those clients that, as the result of the legal professional or firm risk-based approach, are determined to be higher risk. Paramount among these measures is the requirement to train legal professionals and appropriate staff to identify and detect changes in activity by reference to risk-based criteria. These measures and controls may include:

- General training on money laundering methods and risks relevant to legal professionals.

- Targeted training for increased awareness by the legal professionals providing specified activities to higher risk clients or to legal professionals undertaking higher risk work.

- Increased levels of CDD or enhanced due diligence for higher risk situations.

- Escalation or additional review and/or consultation by the legal professional or within a firm at the establishment of a relationship.

- Periodic review of the services offered by the legal professional and/or firm to determine whether the risk of money laundering and terrorist financing occurring has increased.

- Reviewing client relationships from time to time to determine whether the risk of money laundering and terrorist financing occurring has increased.

- The same measures and controls may often address more than one of the risk criteria identified, and it is not necessarily expected that a legal professional establish specific controls targeting each risk criterion.

## Chapter Two: Application of a Risk-Based Approach

<u>Customer Due Diligence/Know Your Customer</u>

114.    Client Due Diligence/Know Your Client is intended to enable a legal professional to form a reasonable belief that it has appropriate awareness of the true identity of each client. The legal professional's procedures should apply in circumstances where a legal and professional is preparing for or carrying out[10] the activities listed in Recommendation 12 and include procedures to:

a) Identify and appropriately verify the identity of each client on a timely basis.

b) Identify the beneficial owner, and take reasonable measures to verify the identity of the beneficial owner such that the legal professional is reasonably satisfied that it knows who the beneficial owner is. The general rule is that clients should be subject to the full range of CDD measures, including the requirement to identify the beneficial owner in accordance with this paragraph. The purpose of identifying beneficial ownership is to ascertain those natural persons who exercise effective control over a client, whether by means of ownership, voting

---

[10]    See paragraphs 12-13 regarding when a legal professional would or would not be engaged in "preparing for" or "carrying out" transactions for clients, and hence the requirements of Recommendation 12 would apply.

rights or otherwise. Legal professionals should have regard to this purpose when identifying the beneficial owner. They may use a risk-based approach when determining the extent to which they are required to identify the beneficial owner, depending on the type of client, business relationship and transaction and other appropriate factors in accordance with Recommendation 5 and its Interpretative Note, § 9-12[11].

c) Obtain appropriate information to understand the client's circumstances and business depending on the nature, scope and timing of the services to be provided. This information may be obtained from clients during the normal course of their instructions to legal professionals.

115.    The starting point is for a legal professional to assess the risks that the client may pose taking into consideration any appropriate risk variables (and any mitigating factors) before making a final determination. The legal professional's assessment of risk will then inform the overall approach to CDD requirements and appropriate verification. Legal professionals will reasonably determine the CDD requirements appropriate to each client given the legal professional's familiarity with the client, which may include:

- A standard level of CDD, generally to be applied to all clients.

- The standard level being reduced after consideration of appropriate risk variables, and in recognised lower risk scenarios, such as:

    o   Publicly listed companies (and their majority owned subsidiaries).

    o   Financial institutions (domestic or foreign) subject to an AML/CFT regime consistent with the FATF Recommendations.

    o   Government authorities and state run enterprises (other than those from sanctioned countries).

- An increased level of CDD in respect of those clients that are reasonably determined by the legal professional to be of higher risk. This may be the result of the client's business activity, ownership structure, particular service offered including work involving higher risk countries or defined by applicable law or regulation as posing higher risk, such as the risks outlined in paragraphs 108-109.

Monitoring of Clients and Specified Activities

116.    The degree and nature of monitoring by a legal professional will depend on the type of legal professional, and if it is a firm, the size and geographic 'footprint' of the firm, the AML/CFT risks that the firm has identified and the nature of the regulated activity provided. Given the nature of the advisory relationship legal professionals have with their clients and that an element of that advisory relationship will usually involve frequent client contact, monitoring is typically best achieved by trained individuals having contact with the client (either face to face or by other means of communication). For purposes of paragraphs 116 to 118 (and related paragraphs), "monitoring" does not oblige the legal professional to function as, or assume the role of, a law enforcement or investigative authority vis-a-vis his or her client. It rather refers to maintaining awareness throughout

---

[11]    Legal professionals should have regard to the Interpretative Notes to Recommendation 5 and the AML/CFT 2004 Methodology Essential Criteria 5.5 and 5.8-5.12, which, among other things, provide more details on the measures that need to be taken to identify beneficial owners, and the impact of higher or lower risk on the required measures.

the course of work for a client to money laundering or terrorist financing activity and/or changing risk factors.

117.    Monitoring of these advisory relationships cannot be achieved solely by reliance on automated systems and whether any such systems would be appropriate will depend in part on the nature of a legal professional's practice and resources reasonably available to the legal professional. For example, a sole practitioner would not be expected to devote an equivalent level of resources as a large law firm; rather, the sole practitioner would be expected to develop appropriate monitoring systems and a risk-based approach proportionate to the scope and nature of the practitioner's practice. A legal professional's advisory relationships are best monitored by the individuals having direct client contact being appropriately trained to identify and detect changes in the risk profile of a client. Where appropriate this should be supported by systems, controls and records within a framework of support by the firm (*e.g.* tailored training programs appropriate to the level of staff responsibility).

118.    Legal professionals should also assess the adequacy of any systems, controls and processes on a periodic basis. Monitoring programs can fall within the system and control framework developed to manage the risk of the firm. The results of the monitoring may also be documented.

119.    The civil law notary does not represent parties to a contract and therefore must maintain a fair position with regard to any duty to both parties.

Suspicious Transaction Reporting

120.    This Guidance does not address FATF Recommendations relating to suspicious transaction reporting (STR) and the proscription against "tipping off" those who are the subject of such reports. Different countries have undertaken different approaches to these Recommendations of the FATF. Where a legal or regulatory requirement mandates the reporting of suspicious activity once a suspicion has been formed, a report must be made and, therefore, a risk-based approach for the reporting of the suspicious activity under these circumstances is not applicable. STRs are not part of risk assessment, but rather reflect a response mechanism – typically to an SRO or government enforcement authority – once a suspicion of money laundering has been identified. For those reasons, this Guidance does not address those elements of the FATF Recommendations.

Education, Training and Awareness

121.    Recommendation 15 requires that legal professionals provide their staff with AML/CFT training, and it is important that legal professional staff receive appropriate and proportional training with regard to money laundering. For legal professionals, and those in smaller firms in particular, such training may assist with monitoring obligations. A legal professional's commitment to having appropriate controls relies fundamentally on both training and awareness. This requires a firm-wide effort to provide all relevant legal professionals with at least general information on AML/CFT laws, regulations and internal policies. To satisfy a risk-based approach, particular attention should be given to risk factors or circumstances occurring in the legal professional's own practice. In addition, governments, SROs and other representative bodies for both common and civil law notaries and bar associations should work with educational institutions to see that both legal professionals, and students taking courses to train for or become legal professionals, are educated on money laundering and terrorist financing risks. For example, bar societies and associations should be encouraged to produce continuing legal education programs on AML/CFT and the risk-based approach.

122.    Applying a risk-based approach to the various methods available for training, however, gives each legal professional flexibility regarding the frequency, delivery mechanisms and focus of such training. Legal professionals should review their own staff and available resources and implement training programs that provide appropriate AML/CFT information that is:

- Tailored to the relevant staff responsibility (*e.g.* client contact or administration).

33

- At the appropriate level of detail (*e.g.* considering the nature of services provided by the legal professional).

- At a frequency suitable to the risk level of the type of work undertaken by the legal professional.

- Used to test to assess staff knowledge of the information provided.

## Chapter Three: Internal Controls

123.    Many DNFBPs differ significantly from financial institutions in terms of size. By contrast to most financial institutions, a significant number of DNFBPs have only a few staff. This limits the resources that small businesses and professions can dedicate to the fight against money laundering and terrorist financing. For a number of DNFBPs, a single person may be responsible for the functions of front office, back office, money laundering reporting, and senior management. This particularity of DNFBPs, including legal professionals, should be taken into account in designing a risk-based framework for internal controls systems. The Interpretative Note to Recommendation 15, dealing with internal controls, specifies that the type and extent of measures to be taken for each of its requirements should be appropriate having regard to the size of the business.

124.    To enable legal professionals to have effective risk-based approaches, the risk-based process must be a part of the internal controls of the legal professional or firm. Legal professionals operate within a wide range of differing business structures, from sole practitioners to large partnerships. These structures often mean that legal professionals' businesses have a flat management structure and that most or all of the principals (or partners) of the firm hold ultimate management responsibility. In other organisations, legal professionals employ corporate style organisational structures with tiered management responsibility. In both cases the principals or the managers are ultimately responsible for ensuring that the organisation maintains an effective internal control structure. Engagement by the principals and managers in AML/CFT is an important aspect of the application of the risk-based approach since such engagement reinforces a culture of compliance, ensuring that staff adheres to the legal professional's policies, procedures and processes designed to limit and control money laundering risks.

125.    The nature and extent of the AML/CFT controls, as well as meeting national requirements, need to be proportionate to the risk involved in the services being offered. In addition to other compliance internal controls, the nature and extent of AML/CFT controls will depend upon a number of factors, such as:

- The nature, scale and complexity of a legal professional's business.

- The diversity of a legal professional's operations, including geographical diversity.

- The legal professional's client, service and activity profile.

- The degree of risk associated with each area of the legal professional's operations.

- The services being offered and the frequency of client contact (either in person or by other means of communication).

126.    Subject to the size and scope of the legal professional's organisation, the framework of risk-based internal controls should:

- Have appropriate risk management systems to determine whether a client, potential client, or beneficial owner is a PEP.

- Provide increased focus on a legal professional's operations (*e.g.* services, clients and geographic locations) that are more vulnerable to abuse by money launderers.

- Provide for periodic review of the risk assessment and management processes, taking into account the environment within which the legal professional operates and the activity in its marketplace.

- Designate personnel at an appropriate level who are responsible for managing AML/CFT compliance.

- Provide for an AML/CFT compliance function and review programme if appropriate given the scale of the organisation and the nature of the legal professional's practice.

- Inform the principals of compliance initiatives, identified compliance deficiencies and corrective action taken.

- Provide for programme continuity despite changes in management or employee composition or structure.

- Focus on meeting all regulatory record keeping or other requirements, as well as promulgated measures for AML/CFT compliance and provide for timely updates in response to changes in regulations.

- Implement risk-based CDD policies, procedures and processes.

- Provide for adequate controls for higher risk clients and services as necessary, such as review with or approvals from others.

- Provide for adequate supervision and support for staff activity that forms part of the organisation's AML/CFT programme.

- Incorporate AML/CFT compliance into job descriptions and performance evaluations of relevant personnel.

- Provide for appropriate training to be given to all relevant staff.

- For groups, to the extent possible, provide a common control framework.

# ANNEXES

# ANNEX 1

# SOURCES OF FURTHER INFORMATION

Various sources of information exist that may help governments and legal professionals in their development of a risk-based approach. Although not an exhaustive list, this Annex 1 highlights a number of useful web-links that governments and legal professionals may wish to draw upon. They provide additional sources of information, and further assistance might also be obtained from other information sources such AML/CFT assessments.

## A.    Financial Action Task Force Documents

The Financial Action Task Force (FATF) is an inter-governmental body whose purpose is the development and promotion of national and international policies to combat money laundering and terrorist financing. Key resources include the 40 Recommendations on Money Laundering and 9 Special Recommendations on Terrorist Financing, the Methodology for Assessing Compliance with the FATF Recommendations, the Handbook for Countries and Assessors, methods and trends (typologies) reports and mutual evaluation reports.

www.fatf-gafi.org

## B.    Legislation/and Court Decisions

The rulings by the ECJ of June 26th 2007 by the Belgium Constitution Court of January 23rd 2008 and the French Conseil d'État of April 10th, 2008 have confirmed that anti-money laundering regulation cannot require or permit the breach the lawyer's duty of professional secrecy when performing the essential activities of the profession. In addition, the Court of First Instance in the Joined Cases T-125/03 &T-253/03 Akzo Nobel Chemicals Ltd and Akcros Chemicals Ltd v Commission of the European Communities has recently restated the ruling in the *AM&S* case that professional secrecy "meets the need to ensure that every person must be able, without constraint, to consult a lawyer whose profession entails the giving of independent legal advice to all those in need of it (*AM&S*, paragraph 18). That principle is thus closely linked to the concept of the lawyer's role as collaborating in the administration of justice by the courts (*AM&S*, paragraph 24).

## C.    Links to Information on the Supervisory Program in Certain Countries

Switzerland

1.    See articles 18 to 21 of the lawyers and notaries' SRO regulations (SRO SAV/SNV): www.sro-sav-snv.ch/fr/02_beitritt/01_regelwerke.htm/02_Reglement.pdf

2.      See articles 38 and 45 to 47 of the lawyers and notaries' SRO statutes (SRO SAV/SNV): www.oad-fsa-fsn.ch/fr/02_beitritt/01_regelwerke.htm/01_Statuten.pdf

**D.      Guidance on the Risk-based Approach**

1.      Law Society of Ireland: www.lawsociety.ie.

2.      Law Society of England and Wales: www.lawsociety.org.uk

3.      Law Society of Hong Kong: www.hklawsoc.org.hk

4.      Organisme d'autoréglementation de la fédération suisse des avocats et de la fédération suisse des notaires (SRO SAV/SNV): home page: www.sro-sav-snv.ch/ www.sro-sav-snv.ch/fr/02_beitritt/01_regelwerke.htm/02_Reglement.pdf (art. 41 to 46)

5.      The Netherlands Bar Association: www.advocatenorde.nl

6.      The Royal Dutch Notarial Society: www.notaris.nl

**E.      Other sources of information to help assist countries' and legal professionals' risk assessment of countries and cross-border activities**

In determining the levels of risks associated with particular country or cross border activity, legal professionals and governments may draw on a range of publicly available information sources, these may include reports that detail observance of international standards and codes, specific risk ratings associated with illicit activity, corruption surveys and levels of international cooperation. Although not an exhaustive list the following are commonly utilised:

- IMF and World Bank Reports on observance of international standards and codes (Financial Sector Assessment Programme)

   o   World Bank reports: www1.worldbank.org/finance/html/cntrynew2.html
   o   International Monetary Fund: www.imf.org/external/np/rosc/rosc.asp?sort=topic#RR
   o   Offshore Financial Centres (OFCs) IMF staff assessments www.imf.org/external/np/ofca/ofca.asp

- Mutual evaluation reports issued by FATF Style Regional Bodies:

   1. Asia/Pacific Group on Money Laundering (APG)
   www.apgml.org/documents/default.aspx?DocumentCategoryID=8

   2. Caribbean Financial Action Task Force (CFATF)
   www.cfatf.org/profiles/profiles.asp

   3. The Committee of Experts on the Evaluation of Anti-Money Laundering Measures (MONEYVAL)

   www.coe.int/t/e/legal_affairs/legal_co-operation/combating_economic_crime/5_money_laundering/Evaluations/Reports_summaries3.asp#TopOfPage

   4. Eurasian Group (EAG)

www.eurasiangroup.org/index-7.htm
5. GAFISUD
www.gafisud.org/miembros.htm

6. Middle East and North Africa FATF (MENAFATF)
www.menafatf.org/TopicList.asp?cType=train

7. The Eastern and South African Anti Money Laundering Group (ESAAMLG)
www.esaamlg.org/

8. Groupe Inter-gouvernemental d'Action contre le Blanchiment d'Argent (GIABA)
www.giabasn.org/?lang=en&sid

- OECD Sub Group of Country Risk Classification (a list of country of risk classifications published after each meeting)
  www.oecd.org/document/49/0,2340,en_2649_34171_1901105_1_1_1_1,00.html

- International Narcotics Control Strategy Report (published annually by the US State Department)
  www.state.gov/p/inl/rls/nrcrpt/

- Egmont Group membership - Coalition of financial intelligence units that participate in regular information exchange and the sharing of good practice, acceptance as a member of the Egmont Group is based a formal procedure that countries must go through in order to be acknowledged as meeting the Egmont definition of an FIU.
  www.egmontgroup.org/

- Signatory to the United Nations Convention against Transnational Organized Crime
  www.unodc.org/unodc/crime_cicp_signatures_convention.html

- The Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury economic and trade,  Sanctions Programmes
  www.ustreas.gov/offices/enforcement/ofac/programs/index.shtml

- Consolidated list of persons, groups and entities subject to EU Financial Sanctions
  http://ec.europa.eu/comm/external_relations/cfsp/sanctions/list/consol-list.htm

- UN Security Council Sanctions Committee - Country Status:
  www.un.org/sc/committees/

# ANNEX 2

# GLOSSARY OF TERMINOLOGY

**Beneficial Owner**

*Beneficial owner* refers to the natural person(s) who ultimately owns or controls a client and/or the person on whose behalf a transaction is being conducted. It also incorporates those persons who exercise ultimate effective control over a legal person or arrangement.

**Competent authorities**

*Competent authorities* refers to all administrative and law enforcement authorities concerned with combating money laundering and terrorist financing, including the FIU and supervisors.

**Designated Non-Financial Businesses and Professions (DNFBPs)**

a. Casinos (which also includes internet casinos).
b. Real estate agents.
c. Dealers in precious metals.
d. Dealers in precious stones.
e. Lawyers, notaries, other independent legal professionals and accountants – this refers to sole practitioners, partners or employed professionals within professional firms. It is not meant to refer to 'internal' professionals that are employees of other types of businesses, nor to professionals working for government agencies, who may already be subject to measures that would combat money laundering.
f. Trust and Company Service Providers refers to all persons or businesses that are not covered elsewhere under the Recommendations, and which as a business, provide any of the following services to third parties:

- Acting as a formation agent of legal persons.
- Acting as (or arranging for another person to act as) a director or secretary of a company, a partner of a partnership, or a similar position in relation to other legal persons.
- Providing a registered office; business address or accommodation, correspondence or administrative address for a company, a partnership or any other legal person or arrangement.
- Acting as (or arranging for another person to act as) a trustee of an express trust.
- Acting as (or arranging for another person to act as) a nominee shareholder for another person.

**Express Trust**

*Express trust* refers to a trust clearly created by the settlor, usually in the form of a document *e.g.* a written deed of trust. They are to be contrasted with trusts which come into being through the operation of the law and which do not result from the clear intent or decision of a settlor to create a trust or similar legal arrangements (*e.g.* constructive trust).

**FATF Recommendations**

Refers to the FATF Forty Recommendations and the FATF Nine Special Recommendations on Terrorist Financing.

**Legal Person**

*Legal person* refers to bodies corporate, foundations, anstalt, partnerships, or associations, or any similar bodies that can establish a permanent client relationship with a legal professional or otherwise own property.

**Legal Professional**

In this Guidance, the term *"Legal professional"* refers to lawyers, civil law notaries, common law notaries, and other independent legal professionals.

**Politically Exposed Persons (PEPs)**

Individuals who are or have been entrusted with prominent public functions in a foreign country, for example Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, important political party officials. Business relationships with family members or close associates of PEPs involve reputational risks similar to those with PEPs themselves. The definition is not intended to cover middle ranking or more junior individuals in the foregoing categories.

**Self-regulatory organisation (SRO)**

A body that represents a profession (*e.g.* lawyers, notaries, other independent legal professionals or accountants), and which is made up of member professionals or a majority thereof, has a role (either exclusive or in conjunction with other entities) in regulating the persons that are qualified to enter and who practise in the profession, and also performs certain supervisory or monitoring type functions. For example, it would be normal for this body to enforce rules to ensure that high ethical and moral standards are maintained by those practising the profession.

## ANNEX 3

## MEMBERS OF THE ELECTRONIC ADVISORY GROUP

**FATF and FSRB members and observers**
Argentina; Asia Pacific Group (APG); Australia; Belgium; Azerbaijan; Canada; Chinese Taipei, China; European Commission (EC); Nigeria; France; Hong Kong, China; Italy; Japan; Luxembourg; MONEYVAL; Netherlands; New Zealand; Offshore Group of Banking Supervisors (OGBS); Portugal; Romania; Spain; South Africa; Switzerland; United Kingdom; United States.

**Dealers in precious metals and dealers in precious stones industries**
Antwerp World Diamond Centre, International Precious Metals Institute, World Jewellery Confederation, Royal Canadian Mint, Jewellers Vigilance Committee, World Federation of Diamond Bourses, Canadian Jewellers Association.

**Real estate industry**
International Consortium of Real Estate Agents, National Association of Estate Agents (UK), the Association of Swedish Real Estate Agents.

**Trust and company service providers industry**
The Society of Trust and Estate Practitioners (STEP), the Law Debenture Trust Corporation.

**Accountants**
American Institute of Certified Public Accountants, Canadian Institute of Chartered Accountants, European Federation of Accountants, German Institute of Auditors, Hong Kong Institute of Public Accountants, Institute of Chartered Accountants of England & Wales.

**Casino industry**
European Casino Association (ECA), Gibraltar Regulatory Authority, Kyte Consultants (Malta), MGM Grand Hotel & Casino, Unibet, William Hill plc.

**Lawyers and notaries**
Allens Arther Robinson, American Bar Association (ABA), American College of Trust and Estate Council, Consejo General del Notariado (Spain), Council of the Notariats of the European Union, Council of Bars and Law Societies of Europe (CCBE), International Bar Association (IBA), Law Society of England & Wales, Law Society of Upper Canada.

**EXHIBIT 170 to Declaration of Joel Israel**



IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV-05-4622 (DGT)
CV-07-0916 (DGT)

TZVI WEISS and others
NATAN APPLEBAUM and others
Plaintiffs

-against-

NATIONAL WESTMINSTER BANK PLC
Defendant

Expert witness report of Gary Walters

17 December 2010

Subject:         Money Laundering and Terrorist Financing
On behalf of:    Plaintiffs

----------------------------------------------------------------------------------------------------------------------------

TZVI WEISS and others
NATAN APPLEBAUM and others
-against-
NATIONAL WESTMINSTER BANK PLC

Contents

| | | |
|---|---|---|
| 1. | **Introduction** | **3** |
| | The author | 4 |
| | My instructions | 4 |
| | Independence | 5 |
| | Material reviewed | 5 |
| | Methodologies | 5 |
| 2. | **Banking Terminology and Practices** | **6** |
| | Money Laundering | 6 |
| | Terrorist Financing | 6 |
| | Suspicious Activity Reports - SARs | 6 |
| 3. | **Bank Management** | **7** |
| | The Risk Management Function at Banks | 7 |
| | Risk-Based Approach | 8 |
| | CDD and KYC | 8 |
| | Monitoring of Accounts and Transactions | 9 |
| 4. | **Law Enforcement in the United Kingdom** | **10** |
| | Law Enforcement and Regulators in the UK | 10 |
| | Financial Investigation | 14 |
| | Financial Investigation Process | 16 |
| 5. | **The Operation of the Risk Management Function at NatWest (and RBS)** | **19** |
| | Key Individuals at the Defendant Bank | 19 |

Appendices

1. Expert Witness Information - Biography of Gary Walters
2. List of Depositions

--------------------------------------------------------------------------------

# 1.   Introduction

1.   This matter is a civil claim for damages against National Westminster Bank PLC ("NatWest" or "Defendant") brought by the survivors, estates and heirs of terrorist attacks in Israel.  Plaintiffs allege that the Defendant bank knowingly provided support to a Foreign Terrorist Organization, and/or provided or collected funds with the knowledge that they would be used for terrorist purposes.

2.   The Defendant is an international bank, with its principal place of business in the United Kingdom.  NatWest was created in 1968 by the merger of three long-standing UK banks. Through subsequent expansion it grew to become the UK's largest commercial bank.  In 2000, The Royal Bank of Scotland Group completed the acquisition of NatWest in a £21 billion transaction.[1]   NatWest is now part of one of the world's largest financial services groups, although it still maintains its own identity and separately branded branch network.

3.   Plaintiffs allege in their Complaints that the Islamic Resistance Movement, commonly referred to as HAMAS, was responsible for committing the attacks that killed or injured the Plaintiffs. HAMAS has been designated a terrorist organization by Israel, the US and the EU.

4.   HAMAS was established in 1987-88, and is primarily based in the West Bank, Gaza and Syria.  In 1995, President Clinton designated HAMAS a Specially Designated Terrorist (SDT) and ordered that all of its property be frozen.  In 1997, it was designated a Foreign Terrorist Organization (FTO) by the US State Department and was designated a Specially Designated Global Terrorist (SDGT) by the US Treasury in 2001.  The EU designated HAMAS as terrorists in 2003.[2]

5.   From at least 1992 until 2007, the Defendant maintained accounts for an organization known first as Palestine and Lebanon Relief Fund, then by other names, including Interpal.[3]  Interpal is the working name for a British charity also known as the Palestinian Relief and Development Fund.  Its stated aim is humanitarian - to provide relief and development aid to Palestinians, mainly in the West Bank, Gaza Strip and camps in Lebanon and Jordan.

6.   According to the US government, HAMAS receives much of its financing through a global network of charities known as the Union of Good operated by the Muslim Brotherhood.  The Union of Good, known in Arabic as I'Tilafun Al-Khayr, was established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation, commonly known as the "Second Intifada."  Its primary purpose is said to be to provide financial support for HAMAS and its agents in the Palestinian territories. According to Plaintiffs, the Union of Good is comprised of more than fifty Islamic charitable foundations worldwide, including Interpal and the Al-Aqsa Charitable Foundation (Al-Aqsa). Plaintiffs allege that the Union of Good utilizes Interpal to collect and distribute "charitable" funds throughout Europe and the Middle East.

7.   In 1996, newspapers in the UK reported that the Charity Commission (the UK organization that regulates charities) had frozen Interpal's accounts because of possible connections to HAMAS.

--------------------------------------------------------------------------------

[1] All references in this Report to "NatWest" (with the exception of documents created or events that occurred before RBS' 2000 acquisition of NatWest) encompass RBS and its risk management at the parent level.
[2] http://www.america.gov/st/washfile-english/2003/September/20030906173844ynnedd0.1619074.html
[3] From its founding in the mid-1980's through 1994, the charity was called Palestine and Lebanon Relief Fund.  In 1994, the name changed to Interpal.

--------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------

The Charity Commission was reported to have carried out a subsequent review of the operations of Interpal, following which the accounts were unfrozen.

8.     On 21 August 2003, the US Treasury Department's Office of Foreign Assets Control (OFAC) added Interpal to its embargo list, and the following day President Bush announced in a Treasury Department press release that he had designated Interpal a "Specially Designated Global Terrorist" and ordered all of its property frozen because Interpal was part of HAMAS's fundraising structure.[4]

9.     When the US Department of Treasury designated the 'Union of Good' an SDGT in 2008, one of the factors contributing to that designation was the Union of Good's connection with Interpal. The Department of Treasury's press release regarding the designation identified Interpal as one of "several organizations designated pursuant to Executive Order 13224 for providing support to HAMAS and other terrorist groups."[5]

## The author

10.    This report was prepared by the undersigned, Gary Walters, on behalf of Forensic Risk Alliance (FRA), a consulting practice that was established in 1999, with offices in the US, UK, France and Switzerland.

11.    I am being compensated (through FRA) according to my hourly billing rate of $550.  The hourly rates for other professionals who assisted me in gathering materials for this report range from $200 to $400.  No element of compensation in any way is based on the size or nature of this report or the outcome of the underlying litigation.

12.    Prior to joining FRA, I spent thirty years as a police officer in the Metropolitan Police, London. The majority of my service was as a Detective investigating serious and organized crime.  I was first trained as a financial investigator in 1990 whilst working in a specialist intelligence unit of New Scotland Yard.  In 2003, I joined the Economic and Specialist Crime Department to lead teams investigating financial crime.  I developed an expertise in Money Laundering investigation and have advised Government Departments, Law Enforcement Agencies, and Regulated Businesses – domestically and internationally.  My biography is attached as Appendix 1.

## My instructions

13.    I have been instructed by the Plaintiffs' attorneys to review the Defendant's document production in this case and to review the testimony of certain defense witnesses.  In addition, Plaintiffs' attorneys requested that I provide expert opinions and explanations concerning:

   •     The meaning of certain banking terms and processes, with a particular emphasis on explaining bank's compliance and risk management functions;

   •     To broadly outline the "architecture" of regulatory and law enforcement oversight in the United Kingdom as it pertains to financial crimes during the relevant time period;

   •     To outline broadly how UK regulators and law enforcement work with banks and other financial institutions to collect, track, report, and monitor information germane to financial crimes, including terrorism, terrorism financing and material support for terrorism; and

----

[4]  http://www.ustreas.gov/offices/enforcement/ofac/actions/2003cumb.shtml; http://www.ustreas.gov/press/releases/js672.htm
[5]  http://www.treas.gov/press/releases/hp1267.htm

- To summarize the operation and organization of the risk management/compliance functions within the Defendant's organization.

Sections 2 through 5 of the report thus detail my opinions as to the above issues.

## Independence

14.    Insofar as this report is addressed to a Court, I acknowledge my duty as an independent expert in this litigation and will continue to comply with that duty.

15.    I confirm that neither I nor FRA as a whole has any previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude me or FRA from giving impartial evidence.

## Material reviewed

16.    The data or other information relied upon or considered by us to form the basis of this report include:

- The Complaints and Court Order on Defendant's Motion to Dismiss the case

- NatWest documents supplied to us by Plaintiffs' counsel

- Deposition transcripts supplied to us by Plaintiffs' counsel.  *See* list of all depositions attached as Appendix 2

17.    The opinions expressed in this Report are preliminary in nature and I reserve the right to revise or supplement those opinions in the event that further evidence or testimony comes to light.

## Methodologies

18.    I was asked to address the issues and questions set out in paragraph 13 of this report.  To the extent the questions were not specific to the Defendant, but addressed certain banking terms generally, or the roles of various regulatory and law enforcement agencies in the United Kingdom in combating financial crimes during the relevant time period, I drew upon my own professional experience as a Manager, Economic and Specialist Crime at the New Scotland Yard, my prior professional experience with the Metropolitan Police Service, as well as research and reference to third party sources that I cite in this report.

## 2.    Banking Terminology and Practices

### Money Laundering

19.    Money Laundering is the process by which funds connected to criminal activity are disguised and manipulated to hide the underlying criminal activity by giving the funds a legitimate appearance and allowing them to move through the financial system.  It encompasses the concealment or disguise of the true nature, source, location, destination, disposition, movement, rights with respect to, or ownership of property, where the funds are derived from or being used for a criminal purpose or criminal enterprise.

20.    Originally, for example under the terms of the Vienna Convention (one of the first UN resolutions targeting international Money Laundering, enacted in 1988 - the Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances), Money Laundering was a concept applied to the movement of the proceeds of drug trafficking.  Over time, this definition has been widely expanded to cover a large variety of criminal activities, including the financing of terrorism.

### Terrorist Financing

21.    Terrorist Financing is the financial support, in any form, of terrorism or of those who encourage, plan, or engage in terrorism.  It may involve funds raised from legitimate sources, such as personal donations and profits from businesses and charitable organizations, as well as from criminal sources, such as the drug trade, the smuggling of weapons and other goods, fraud, kidnapping and extortion.   Terrorists may use Money Laundering techniques to evade authorities' attention and to protect their financial networks, and in some cases the identity of their sponsors and the ultimate beneficiaries.

### Suspicious Activity Reports - SARs

22.    A suspicious activity report (SAR) is a report submitted in relation to known or suspected Money Laundering or known or suspected Terrorist Financing offences. In the United Kingdom, Money Laundering and SARs were made to the National Criminal Intelligence Service (NCIS), until April 2006, when NCIS was merged into the newly created Serious Organized Crime Agency (SOCA).  From that date, SARs were made to SOCA.

23.    SARs are often filed after a transaction has occurred, but where a financial institution in the UK has particular concerns about a prospective transaction or arrangement, it has the ability to seek prior consent before becoming involved in the transaction or an arrangement.[6]

24.    SARs sometimes incorporate an application for consent to proceed with a particular transaction.  If granted, such consent will protect the reporting party from possible prosecution for a Money Laundering or terrorist property offence in connection with the activity for which consent is granted.[7]

---

[6] http://www.soca.gov.uk/about-soca/the-uk-financial-intelligence-unit/legal-basis-for-reporting
[7] http://www.homeoffice.gov.uk/about-us/home-office-circulars/circulars-2008/029-2008/

---------------------------------------------------------------------------------------------------------------------

# 3.     Bank Management

25.     Banks are responsible for creating and maintaining certain records relating to potential Money Laundering and Terrorist Financing activity that they must share with bank regulators, such as the Federal Reserve Board in the US and the Bank of England and the Financial Services Authority (FSA) in the UK.[8]  Those record-keeping requirements assist bank regulators and law enforcement officials in determining whether banks are pro-active in adopting and adhering to global policies and procedures designed to carry out effective compliance and whether banks devote sufficient resources (personnel, time, systems, etc.) to carry out effective compliance.

26.     During my law enforcement career, I learned that account managers and relationship managers typically perform front office functions and play an important role in preventing Money Laundering and Terrorist Financing.  Among other things, they are generally responsible for liaising with customers to collect the information required to open an account, including all the necessary documents to comply with requirements concerning Customer Due Diligence (CDD), sometimes referred to as Know Your Customer (KYC) procedures.  When the account opening file is completed, it usually has to be approved according to the bank's internal delegation of authority, for example, by the branch director or manager, and then it will be maintained on file, typically by the account manager.

**The Risk Management Function at Banks**

27.     Banks in the UK are required to protect themselves from being used for unlawful purposes. This aspect of bank risk management protects customers, the bank, and the banking system, and provides necessary safeguards for the public at large.[9]  Banks manage these risks by establishing policies and procedures for customer acceptance, and for ongoing monitoring of customers, accounts and transactions.

28.     Many countries, including those with major banking centers such as the US and the UK, have required banks as part of their risk-management function to employ procedures to detect and prevent Money Laundering, and to report suspected criminal activity that is in any way connected to their institution.

29.     By 1990, banks based or operating in major financial centers had adopted substantial Money Laundering detection and prevention policies and procedures, known as Anti-Money Laundering, or "AML."[10]  These policies and procedures were adopted in response to the growing enactment of Money Laundering laws and regulations in various countries, and as a result of international treaties and the work of certain intergovernmental and banking industry organizations that published general operating standards.  These AML laws, regulations and standards were first adopted in response to drug trafficking and financial crimes.

---

[8] The Bank of England was formerly responsible for the regulation and supervision of the banking industry.  That responsibility was transferred to the FSA in June 1998.

[9] "[S]ound KYC procedures have particular relevance to the safety and soundness of banks, in that: they help to protect banks' reputation and the integrity of banking systems by reducing the likelihood of banks becoming a vehicle for or a victim of financial crime and suffering consequential reputational damage…."  Basel Committee on Banking Supervision Report, "Customer due diligence for banks," October 2001, p.3.  See: http://www.bis.org/publ/bcbs85.pdf

[10] For the purposes of this report, AML compliance comprises those internal policies and procedures, international law, industry standards, red flags and typologies, relevant software, and reporting obligations followed by financial institutions to manage the risk associated with Money Laundering, including Terrorist Financing.

---------------------------------------------------------------------------------------------------------------------

--------------------------------------------------------------------------------

## Risk-Based Approach

30.     To prevent Money Laundering and Terrorist Financing, financial institutions generally follow a risk-based approach that involves both customer specific due diligence, and systems-wide transaction monitoring.   The level of due diligence applied to a customer is based on the customer's risk profile.  In evaluating the level of risk presented by a customer, banks do not look to any single indicator.   Rather, risk assessment evaluates customers, accounts and transactions against a variety of criteria that banks, regulators and law enforcement officials have identified as consistent with illicit conduct.  Because banks are unable to check every transaction manually, they develop risk-profiles, applying relatively greater scrutiny to those customers and transactions that pose the greatest risk of unlawful activity.

31.     The most commonly used risk criteria are country risk, customer risk, and service risk.

32.     Country risk is measured by the connection a customer or transaction may have with high-risk jurisdictions.  Relevant connections include whether: funds are coming from or going to such a country; a customer (or its officers and directors) is from such country; the customer has offices or operations in a high-risk jurisdiction; or the customer does business with persons or entities in such country.

33.     Customer risk involves an assessment of, among other things, who the customer is and what business the customer is engaged.   High-risk customers include, but are not limited to: armament manufacturers, dealers and intermediaries; charities and other not-for-profit organizations; and politically exposed persons (PEPs).

34.     Services risk concerns the kinds of banking services the customer anticipates or actually uses.  For example, and of particular relevance in this case, wire transfers are considered a higher risk service, because they are a principal means used by criminal enterprises to move funds between and among persons, institutions and countries.  While the occasional utilization of wire transfers alone may not give rise to suspicion, the number, frequency, origin and destination of wire transfers are risk factors that banks take into account as part of their ongoing evaluation of persons and entities with whom they conduct business.

35.     Banks typically have a department or division responsible for preventing the use of the bank's services for criminal activity.  Such groups, discussed in more detail below, are usually referred to as Compliance groups, Financial Security groups, or AML groups.

36.     Risk-based AML compliance standards place the onus on banks to manage customer risk, largely by engaging in customer due diligence.  This allows banks to be fairly relaxed with respect to low-risk customers, while requiring more diligent scrutiny with respect to relationships with high-risk customers.  As described below, customer due diligence has several components.

## CDD and KYC

37.     Customer Due Diligence (CDD) and Know Your Customer (KYC) are well-established risk-management standards that obligate banks at all times to have a clear and concise understanding of its customers and their business.  KYC is an integral part of both opening and maintaining bank accounts and customer relationships and, as such, is an ongoing process. By being familiar with their customers, and the kinds of services and account activity each customer might reasonably engage in, banks are able to act as the watchdog for potential, actual or suspected unlawful activity.

--------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------

38.     Standard practice dictates that a bank begins to apply KYC measures when it first establishes a new customer relationship, typically when that new customer seeks to open an account. Standard account opening procedures include obtaining proper documentation of the customer's legal status (e.g., sole proprietorship, corporation, or charitable association); verifying the customer's name, address and other information; obtaining identification documentation for the customer's officers and directors, at least with respect to those who may be authorized to engage in banking transactions; gathering information on the customer's business, including its sources of funds, the kinds of services the customer will be using the bank for, and where the customer's funds will be going; and other information necessary to formulate a risk-profile for that customer.

39.     In formulating a customer's risk profile, banks pay particular attention to the country risk posed by a customer or its officers and directors; i.e., the connections they may have with high-risk jurisdictions.  While not necessarily determinative of whether a bank should enter into or maintain a relationship with a customer, such connections mandate closer scrutiny of the customer during the entire course of the business relationship.

## Monitoring of Accounts and Transactions

40.     In my professional experience investigating financial crimes and reviewing SARs filed by financial institutions, a bank's risk management function plays a key role in whether it properly evaluates actual account activity against reasonably expected transactional activity for its customers, i.e. whether it successfully detect anomalies inconsistent with a customer's profile.

41.     The purpose of monitoring customer accounts is to identify the following transactions, all of which appear in the Interpal accounts that the Defendant maintained:

- Transactions which by their very nature are inherently suspect;[11]

- Unusual transactions, i.e., transactions that do not have an obvious financial or legitimate purpose;[12] and

- Suspicious transactions, i.e., transactions that may be considered inconsistent with the known and legitimate business of the customer or with the usual turnover of the account in question.[13]

---

[11] For example, suspect transaction activity would include a series of cash transactions conducted on the same day or over the course of multiple days that were structured so that each transaction fell below the reporting requirement.
[12] For example, the unnecessary use of intermediaries.
[13] For example, transactions involving countries where the company has no business.

-------------------------------------------------------------------------------------------------------

Weiss v NatWest
Applebaum v. NatWest
-------------------------------------------------------------------------------------------------------------------

# 4.    Law Enforcement in the United Kingdom

## Law Enforcement and Regulators in the UK

42.    Within the UK, the term "law enforcement" applies to very few agencies. It is usually only used to refer to:

- Police

- HM Revenue and Customs (formerly HM Custom and Excise)

- UK Border Agency

- SOCA (formerly NCIS)

- Serious Fraud Office (SFO)

- National Crime Squad

43.    There are a number of other entities, Regulators or government departments who have some powers to allow them to regulate and investigate within narrow mandates, such as:

- The Financial Services Authority

- The Charity Commission

- The Bank of England

44.    From my experience, Regulators take a very supportive approach to the entities they regulate. Whenever possible they work with the entities to improve systems and processes through negotiation and provision of assistance.

## National Criminal Intelligence Service (NCIS)

45.    Most of the intelligence work against cross-border criminals was conducted by different Police Forces and other Law Enforcement Agencies working independently of each other.  To address the resulting intelligence gap, the NCIS was formed in 1992.  Its role was to centralize the gathering and distribution of intelligence on serious and organized crime.  This established a law enforcement agency with National responsibility and it included other law enforcement agencies; most notably Her Majesty's Customs and Excise.

46.    NCIS took on a number of national roles including that of the Financial Intelligence Unit (FIU) responsible for the receipt and dissemination of suspicious activity reports from banks.

47.    During the late 1990's, the increase in reporting of suspicions led the UK to develop the FIU within NCIS.  The FIU became the single point of contact for reporting SARs from where they would be distributed to the most apt agency for investigation.  The FIU received reports, analyzed them and distributed them to the most apt law enforcement agency for action.  It also forwarded such consent applications to the relevant law enforcement agency.

48.    Consent applications are instances where the disclosing entity has suspicions raised in advance of a transaction being conducted.  An example is where an account holder might inform their branch that they are expecting an unusually large wire transfer from a high-risk jurisdiction into their account and they wish to withdraw the transferred funds (in cash) the moment it is credited to their account.  If the bank identified red flags and they became suspicious of the

-------------------------------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------------------

intended transaction, they would be obliged to report the intended transaction to law enforcement and seek consent for it to occur.

49.    In 2006, NCIS was subsumed into the Serious and Organised Crime Agency (SOCA).  The FIU remained within SOCA as the UK's central point for SAR disclosures.

**Metropolitan Police Service and Special Branch**

50.    Due to the increased terrorist activity, the UK has, like many other governments, developed complex structures and processes to deal with the threat.  The principal police response has been the responsibility of the Metropolitan Police Service (MPS).

51.    It is a criminal offence in the UK to finance or to facilitate the financing of terrorism.[14]   While many countries, including the UK, enacted counter-terrorist measures in the wake of 9/11, the UK had anti-terrorist legislation prior to that time as a result of the conflict in Northern Ireland.

52.    Indeed, over the past forty years Great Britain suffered a number of terrorist incidents.  Until the late 1990s, the majority of the terrorist incidents were bombings related to Northern Ireland and the campaign by Irish Republicans to have a single Ireland.  Irish terrorism was not a new phenomenon and, in 1883, it had been the motivation for founding the Special Irish Branch.  Later, this Branch broadened its responsibilities to include other security issues and the name was shortened to Special Branch.

53.    The UK has historically been policed on a local and geographic basis.  This has resulted in there being more than forty police forces in England and Wales working under the auspices of the Home Office, but independent of any political control.  The largest of these police forces is the MPS, the headquarters of which is New Scotland Yard, London.  Even if its jurisdiction is the London area, the MPS has a number of specialist teams whose remit extends beyond London.  Special Branch is an example of this.

54.    The MPS is divided into units that police on a geographic basis, currently by Borough.  There are thirty-two Boroughs in London, administered by Local Authorities.  The MPS also has specialist departments for work that cannot easily be dealt with by Borough Units.  Examples of such specialist departments are Firearms, Public Order, Serious Crime, and Traffic.

55.    Crime is most usually dealt with by the Criminal Investigation Department (CID), which is an integral part of the Police Service.  The CID mainly comprises of officers with specialist training in the investigation of crime.  Detectives within the CID are spread across geographically based units and within specialist departments; with development training in accordance with the roles being performed.  Most detectives move units every two to four years although this time can be extended in some circumstances.

56.    As mentioned before, the Special Irish Branch was formed in 1883 in response to the Irish terrorist activity in London.  The word "Irish" was dropped from the title in 1888 due to its expanding role in relation to other major threats to security, including taking responsibility for the protection of Royalty.   Special Branch, even though it was a part of the MPS, had a nationwide responsibility.

57.    Most of the terrorist incidents investigated by Special Branch were bombings in London, but as terrorist activity intensified the incidents spread throughout the UK and a wider range of

-------------------------------------------------------------------------------------------------------------------

[14] http://www.soca.gov.uk/about-soca/the-uk-financial-intelligence-unit/legal-basis-for-reporting

-------------------------------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------

terrorist threats emerged, from domestic extremists such as animal rights campaigners to international terrorist groups.

58.    Special Branch was effectively kept separate from the rest of the CID and received special funding in recognition of its role being beyond London, including monitoring movements through ports.  Its role became one focused on intelligence and it aligned itself closely with the UK's security services, MI5 and MI6, utilizing powers of search and arrest not available to the security services.  I will discuss what I mean by "intelligence" later in this report.

59.    Special Branch realized the value of financial intelligence to efforts to combat Money Laundering and Terrorist Financing.  As a result, Special Branch employed a number of financially trained officers within its unit to investigate suspicious money flows.  During the early 1990's, this was a specialist role and officers would work closely with contacts in banks to share intelligence.

60.    During the 1960's, there were some bombings in London that led to the creation of the Bomb Squad, later to be called the Anti-Terrorist Squad, to conduct the investigations.  This placed a divide between the investigations being conducted by the CID and intelligence gathering being done by Special Branch.[15]  In response to the increasing threats from international terrorism, in 2002 the Anti-Terrorist Squad was almost doubled in size.

61.    The Anti –Terrorist Squad was, during one of the reorganizations of the Metropolitan Police in the late 1980s, designated Special Operations 13 (SO13) and at the same time Special Branch became Special Operations 12 (SO12).  In 2006, the SO12 and SO13 were merged to become the Counter Terrorism Command (SO15).[16]

62.    The National Terrorist Financing Investigation Unit (NTFIU) was developed within Special Branch and the Anti-Terrorist Squad, to bring particular focus onto the investigation of terrorist funding within the UK.

63.    Throughout the changes including currently, the term Special Branch has stayed in common usage within and outside the Metropolitan Police.  The name is sometimes used by officers within anti-terrorism work to simplify matters rather than trying to explain the complexities of the different police units within that field of work.

**Financial Services Authority (FSA)**

64.    The Defendant is regulated by the United Kingdom's Financial Services Authority (FSA) under the Financial Services and Markets Act 2000.[17]   The FSA is the principal regulator of the UK's financial services industry and has four statutory objectives under the Act:

- Maintaining market confidence;
- Promoting public understanding of the financial system;
- Protection of consumers; and
- Fighting financial crime.

65.    The FSA monitors the Defendant and undertakes periodic supervisory visits to the Defendant, as well as all the major firms that the FSA regulates.

-------------------------------------------------------------------------------------------

[15] www.met.police.uk/foi/pdfs/other_information/archive/2004/so12_introduction.pdf
[16] http://www.met.police.uk/so/counter_terrorism.htm
[17] http://www.legislation.gov.uk/ukpga/2000/8/contents/enacted

-------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------------------------

### Bank of England

66.    The Bank of England is the central bank of the United Kingdom.  The Bank of England was founded in 1694, nationalized on 1 March 1946, and gained independence in 1997.  Standing at the centre of the UK's financial system, the Bank of England's two core roles are maintaining monetary and financial stability.

67.    The role of the Bank of England has evolved during its history.  In relation to regulation, the Bank of England was the regulator of UK banks, which means it supervised the banks to ensure compliance with legislation and standards, until the responsibility was passed to the FSA in 1997.  The Bank of England was also the administrator for Financial Sanctions in the UK until that responsibility passed to the HM Treasury in October 2007.[18]

### Charity Commission

68.    The Charity Commission is a non-Ministerial Government Department.  It is part of the UK Government's Civil Service, but independent of Ministerial influence.  Government Departments in the UK fall within the responsibility and direct control of Government Ministers.  Non-Ministerial Departments operate with independence from such direct control, primarily to mitigate the risk of political interference in its operation.  The Charity Commission reports annually to Parliament on its performance.  It has some quasi-judicial functions allowing it to use some powers similar to Court powers.[19]

69.    According to its published Mission Statement:

> *The Charity Commission is the independent regulator for charitable activity; ensuring legal compliance, enhancing accountability, encouraging effectiveness and impact, and promoting the public interest in charity to promote the public's trust and confidence.*[20]

70.    It is important to note that the Charity Commission is not a law enforcement agency and, in my experience, its investigations focus on whether charities under its jurisdiction keep adequate records and devote their resources towards the stated purposes of the organization.  The inquiries and investigations by the Charity Commission are normally conducted with the assistance of the charities being investigated.  Whereas the Charity Commission may identify misuse of funds on a criminal level, they could refer that matter to law enforcement for a criminal investigation.

71.    Having worked with the Charity Commission on several occasions, I know that it has limited investigation capacities that prevent it from exploring issues beyond the internal operations of the charities under its review.  My understanding, gleaned from my contact with them, is that they would look at the allegation being made to them, audit the accounts to test the veracity of the allegation, but they would not have the resources to fully investigate overseas expenditure.

72.    Their action is driven on a case-by-case basis.  Where a referral is made to law enforcement, the reaction of law enforcement will also be made on a case-by-case basis.

73.    For example, during 2003 and 2004, one of my investigations related to an individual who had abused the processes established by the Charity Commission in order to establish a charity and

---

[18] http://www.bankofengland.co.uk/
[19] www.charity-commission.gov.uk/about_us
[20] http://www.charity-commission.gov.uk/About_us/About_the_Commission/govframe.aspx

---

obtain money from other charities and organizations. I worked closely with the Charity Commission on this case. The individual concerned was sentenced to serve ten years imprisonment for a wide range of offences. Rv. Baluchi (2005).

74.     I found the Charity Commission was very supportive of my criminal investigations and they explained to me that they had limited capacity to investigate criminal activity and their role was to ensure compliance with regulations.

## Financial Investigation

75.     I worked with various agencies throughout my career, which allowed me to get a thorough understanding of the organizations of the UK law enforcement system.

### Special Branch and Anti-Terrorist Squad

76.     I have worked closely with Special Branch or the Anti-Terrorist Squad on a number of occasions. The cases I worked on included the provision of local knowledge and assistance to facilitate terrorism investigations, which, for example, consisted of using my network of contacts to develop intelligence leads or provide surveillance facilities.

77.     I have worked closely and trained with many officers who have, previously and subsequently, worked in Special Branch and the Anti-Terrorist Squad. This peer group has enabled me to have a good understanding of their work and I have been used on occasions to assist them.

### National Terrorist Financial Investigation Unit (NTFIU)

78.     Since 2005, I worked closely with officers from the NTFIU in discussing Money Laundering cases where the origins of the money under investigation was unknown and there was suspicion that it may be linked to terrorist funding. An example was my work on the Tamil case, which is described in Appendix 1.

79.     I have also attended a number of conferences and industry seminars where officers from the NTFIU and I were speaking or acting as panelists. This happened at least three or four times and we would meet in advance to understand each other's work to avoid duplication in our presentations and present consistent key messages on Anti-Money Laundering strategies.

### Financial Services Authority (FSA)

80.     I had regular meetings with the FSA at both tactical and strategic levels. For the most part, since 2005, I would meet with FSA staff on individual cases wherein I had concerns regarding Regulated entities. These concerns would range from individuals licensed by the FSA to corporations whose systems and controls appeared to be lacking to some degree.

81.     I would also attend conferences, seminars and meetings regarding more strategic issues such as consultation on new Money Laundering Regulations or other related legislation.

### National Criminal Intelligence Service (NCIS) and Serious Organized Crime Agency (SOCA)

82.     I have worked very closely with NCIS and SOCA on various matters, related to both operational and policy issues. Immediately prior to the formation of NCIS, I had worked in the

---

-------------------------------------------------------------------------------------------------------

Special Intelligence Section of the Criminal Intelligence Branch of New Scotland Yard.   A number of my colleagues were secunded to NCIS on its formation.

83.     Since 2004, I have worked very closely with SOCA assisting them on developing intelligence and typologies regarding Corruption and Money Laundering in the UK and internationally.

84.     Since 2007, I had monthly meetings with the FIU in relation to Money Laundering by or on behalf of PEPs, who are people in positions of authority who may be vulnerable to corruption. This meeting was also attended by the FSA and the Serious Fraud Office.

**Suspicious Activity Reports (SAR) Examination**

85.     The MPS Economic and Specialist Crime Department, of which I was part, had within it the central point of contact for SARs sent by the FIU to the MPS.  This unit would refer matters to me on a daily basis for my assessment regarding potential police intervention and investigation.

86.     I would read the SARs as submitted by regulated entities and any other related intelligence material.   I considered between six and ten cases every day for about four years, which represents more than 8,000 SARs.

87.     The SARs I reviewed were of very varying standards. The good SARs would have a full explanation of the reason for suspicion, analysis of account activity set against full information from the KYC data. On the other hand, a poor SAR would simply say there was suspicion.  For example, an international payment not in keeping with the account.  This information would not provide the context necessary to fully understand the implications of the report.

88.     Decisions on need for law enforcement intervention were based on the likely outcome of any intervention.  This would take into account the resources available balanced with the activity that would be needed in order to prosecute offenders and recover illicit assets.  Therefore, the content of the SARs was key to the early assessment of the case.  Where the SAR was poor, there was a real likelihood that law enforcement intervention opportunities would be missed.

89.     Where the case merited law enforcement intervention, I would allocate the SARs to my operational teams for investigation.  In other cases, I would have the intelligence unit conduct more research before making a decision.  In many cases, I would accept that opportunities for law enforcement intervention were missed due to poor reporting.  I dealt with numerous cases where SARs were uncovered some time after the initial reporting, where intervention opportunities had been missed because of the lack of information in the SAR that was available to the reporting entity.

90.     In most cases that were taken on for further development, contact would be made with the disclosing entity at the earliest stage to try and establish timely and effective communication. This regularly led to my meeting with banking staff and discussing internal systems and processes.

91.     It was not unusual for these cases to have identified suspicious activity, but no certainty regarding the predicate offences.  A predicate offence is the crime that generated the proceeds of a crime, which would subsequently be laundered.  In such cases, I sometimes discussed and assessed the probability of the underlying crimes with the disclosing institutions.  Underlying crimes would include predicate offences, but would also include terrorism or other crimes not yet committed.

-------------------------------------------------------------------------------------------------------

92.     In a number of the cases I worked on between 2005 and 2009, I referred potential Terrorist Financing cases to my colleagues on the NTFIU and Special Branch for their information and to have their input to our investigations where appropriate.  I had discussions with them in regard to cases linked to Algeria, Lebanon, South America, Sri Lanka and Nigeria.

## Financial Investigation Process

93.     Investigations by the police have usually been conducted following crimes or incidents.  Such investigations are usually termed 'reactive investigations'.  Most police detective resources are allocated to reactive investigations; most usually where there are clearly defined and actual victims of the crime.

94.     The alternative to a reactive investigation is a 'proactive investigation'.  This is where there may not be an identified victim, but a person or group is suspected of committing a number of crimes or is going to commit crime and therefore the investigation will be conducted before the actual offence is committed.

95.     Money Laundering legislation was originally introduced into the UK to address the laundering of cash from the illicit drugs trade, in part to prevent criminals convicted of drug dealing from being released from prison and enjoying the benefit of their crimes.

96.     Most of the financial investigations conducted were reactive in that a criminal would have been caught and a subsequent investigation would seek to identify any assets for forfeiture by the Courts.

97.     In the late 1980's, officers began to be trained as financial investigators to give them the skills to make use of the financial information within the banking system.  Most of the work entailed using this skill and information as an additional investigative tool within reactive investigations and as a post-conviction tool to confiscate illicit assets.  The early legislation required the identification of specified predicate offences and direct proof that the money was a result of those crimes.

98.     There was very little use of financial intelligence (SARs) to identify suspects in a proactive manner.  Rather, the financial intelligence held by the FIU would be identified as part of a reactive investigation to trace assets where the predicate offence was already known. The SARs, if not actively investigated, still remained a very valuable source of intelligence to law enforcement albeit used retrospectively.

99.     It was the implementation of the Proceeds of Crime Act 2002 (enacted in 2003) that provided the powers for law enforcement to proactively investigate Money Laundering as a stand-alone offence where the predicate offence cannot be proved.  However, I should clarify and point out that prior to 2003, SARs played a crucial part of law enforcement investigations and efforts to combat crime, including terrorism.

### Life of a SAR within law enforcement

100.    The FIU is the central point for the disclosure of SARs.  On receipt of the SAR, the FIU will add it to the database and review it.  The review includes an assessment regarding which law enforcement agency, and sometimes which department within the agency, is best placed to deal with the information.  For example, a SAR that clearly indicates there is a suspicion of tax evasion would be allocated to HM Revenue and Customs.  In this way, a SAR regarding

---------------------------------------------------------------------------------------------------------------------

suspicion of terrorist financing would be referred to the NTFIU, a multi agency unit within Special Branch.

101.   The agency receiving the SAR would make its own decision on what action it would take, developing the information as it saw fit.

102.   The FIU would keep the record of the SAR and action taken in terms of referrals. This allows an agency dealing with a SAR to search the database to identify other linked SARs and identify other agencies that may have an interest.

**Intelligence**

103.   Intelligence is information that has been processed to provide a product that can be used to drive action.

104.   There are a number of different models for the process, but I will set out a simple model that is widely used and understood within law enforcement, in and beyond the UK.

**Collation and Evaluation**

105.   Information is collected from a variety of sources.

106.   The source of the information is evaluated. This evaluation will take into account the background and nature of the source. For example, information on a piece of paper found in the street may be considered to have less credibility that information published by a reputable organization.

107.   Obviously, this can result in a degree of subjectivity, but this can be balanced by evaluating the source against information previously gleaned from that source and how reliable the source has proved in the past.

108.   An evaluation should also be made as to how the source came to know the information. This evaluation recognizes that very reliable sources would themselves have received the information. An example would be where a very reliable source found the piece of paper in the street with information thereon and passed on the information. The fact that the reliable and trusted source passed on the information does not make the information reliable and trusted.

**Analysis**

109.   Once the information has been evaluated it can be analyzed against other information; this analysis should take into account the evaluation of the information in order to validate any conclusions.

**Action**

110.   Having been analyzed, taking into account the evaluation, there are a number of intelligence products that could result depending on the aims of the exercise. For example, the analysis could result in a risk assessment or give options for action.

---------------------------------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------------------------

**Review**

111. During each of the abovementioned stages, there is an opportunity to return to any of the other stages of the process.  It is very common that the analysis stage will identify intelligence gaps that will need to be addressed by collating more information.

112. Intelligence that results in action will normally produce more information for collation and previous sources and material can be re-evaluated.

**Intelligence Confidentiality**

113. Within law enforcement in the UK, intelligence was, to a great extent, kept very separate to operational activity; creating what is sometimes termed a "sterile corridor" to protect the confidentiality of methodology and sources of information.

114. To a great extent, there is now a greater interaction between the development of intelligence and operational activity with other safeguards to protect methodology and sources of information.  In relation to Money Laundering, my role spanned across intelligence and investigation.

-------------------------------------------------------------------------------------------------------------------------

## 5.    The Operation of the Risk Management Function at NatWest (and RBS)

115.    The Defendant is an International bank, considered as one of the largest retail and commercial banks in the UK and operates worldwide.

116.    In March 2000, the Royal Bank of Scotland Group acquired NatWest for £21 billion[21], which was the largest take-over in UK banking history.  Following the acquisition, NatWest became part of one of the world's largest financial services groups.

117.    From my experience dealing with major banks, the work of the financial crime and AML departments closely reflects the intelligence and investigation practice of law enforcement.  In part, this is due to such departments employing former law enforcement officers within these departments and the close working relationship usually fostered with law enforcement.

**Key Individuals at the Defendant Bank**

118.    My review of the produced documentation and testimony indicates that during the relevant time period the Defendant's risk management function went through several reorganizations, with even certain Defendant's witnesses unable to recall with absolute precision the structure of that organization at certain points of time.  In addition, I have not seen any organization charts for the Defendant (and I understand that the Defendant was unable to produce or provide them).  Thus, my description below reflects my present understanding based on documents and testimony, and remains subject to revision.

119.    After RBS's acquisition of the Defendant in 2000, the compliance function was handled by the Compliance Department, which was part of the Legal Department of what had become the RBS Group. Sonia Gayle was Head of Policy for Group Compliance (since 2001), and as such covered conduct of business, data privacy and financial crime from a policy perspective. (Gayle, pg 35)  Ian Wickens was her direct report.  Mr. Wickens provided interpretation on policy for financial crime matters and acted as a gateway link between Group Compliance and Group Investigation & Fraud (GI&F).  (Gayle, pgs 56-57)

120.    From 1999 to 2002, Tom Sludden, a NatWest employee, assisted the Money Laundering Prevention Officer, Neil Munroe, within Group Compliance.  Both of them reported to Brian Pitcairn, Senior Compliance Officer, who report to David Cranston, the Head of the Compliance Department.  Cranston was replaced in 2001 by David Swanney.  Overseeing the introduction of controls and procedures by the different business units, such as Corporate Banking Financial Markets (CBFM), relating to the reporting of suspicious transactions was the joint responsibility of Group Compliance Department and Group Investigations and Fraud. (Sludden, pg 48)

121.    In 2002, the Compliance function was reorganized.  Group Compliance was transferred from Group Legal to Group Risk, and was renamed Group Regulatory Risk. Ms. Gayle kept her function as Head of Policy until 2003, when she left the bank.  After 2002, however, she was no longer in charge of financial crime.  (Gayle, pg 35)   The financial crime function was separated from the rest and became part of Group Enterprise Risk, which was managed by Amanda Holt

-------------------------------------------------------------------------------------------------------------------------

[21] http://www.natwest.com/global/about-us.ashx

from 2002 to 2006. Within this department, Stephen Foster had responsibility for AML and financial crime, as Head of Group Financial Crime. (Holt, pgs 30-31)

122.   Within GI&F (about 30 people), was the Money Laundering Team (six or seven people), which was managed by Mike Hoseason from 1999 to 2004.  He was replaced by Tony O'Hear in 2004.  The Money Laundering Team was also called "Suspicious Reporting Team." Doug Hartley, Charlotte McComas and Fleur Baugh were members of that team.  (Hartley, pgs 23-24) GI&F was working in collaboration with Group Enterprise Risk.

123.   Mr. Foster testified that there were

*…Three distinct areas of the bank. Group functions, which would for example cover HR, Human Resources, Group Communications, Group Risk, which is what I was in. Secondly, you would have the business divisions which were facing off to customers, as I said, Retail, Corporate, Investment Banking and then Manufacturing, which ran all the support operations for the group, and it just so happened, so this is probably where you are confused, is that Group Security & Fraud was within Manufacturing, not as a Group function.*

*It was a historical fact that the Fraud function was built up within the Manufacturing Division, as opposed to being a Group function, and that was principally because most of the fraud we had to deal with came out of payments and operational aspects of the business, and therefore it was considered appropriate to put it in that division. (Foster, pgs 13-14)*

124.   Therefore, it seems that GI&F was not a part of Group Risk.  Nevertheless, there was a close working relationship between GI&F and Group Risk because Mr. Hoseason reported both to Neil Trantum (Head of GI&F) and Mr. Wickens (Head of Policy, who reported to Mr. Foster). (Hoseason, pg 54)

125.   In 2002, the Money Laundering Action Group was formed to provide a monthly or quarterly opportunity for Mr. Hoseason's team and Mr. Foster's team to come together.  They generally discussed terror financing, but not specific accounts or transactions. (Foster, pgs 77-78)

126.   At the division level, which was below Group and included a separate division for each type of business that RBS operated, Irvine Rodger was Head of MLPU for the Corporate Banking Financial Markets (CBFM) division of RBS and his responsibilities also encompassed measures to combat terror financing. (Rodger, pgs 14-15)  As of 2002, each division had different arrangements and CBFM created a centralized team within its division in charge of Money Laundering prevention.  (Rodger, pgs 15-16)  Mr. Rodger reported to the Head of CBFM Legal and Compliance, namely Helen Cockcroft.  From 2003 to 2008, Mr. Rodger reported to Kevin Love, who was the Head of CBFM Enterprise Risk. (Rodger, pg 22)  Mr. Rodger also had a dotted reporting line to Ms. Holt. (Rodger, pg 21)  As of 2004, Guy Cole joined this team and handled the more high-risk businesses, including corresponding banking businesses. (Rodger, pgs 18-19)  Mr. Cole's contacts with Group Enterprise Risk were Ben Norrie and his boss, Mr. Foster.

127.   At the Business level, Belinda Lane was Interpal's relationship manager from late 1999 through February 2002, and late March 2002 through 2006.  Ms. Lane's predecessor was Gerald Matthews.  One of her assistants was Terry Woodley.

Weiss v NatWest
Applebaum v. NatWest
---------------------------------------------------------------------------------------------------------------------------

128.    Before 2002, the Defendant's compliance function can be summarized as follows:



Weiss v NatWest
Applebaum v. NatWest
--------------------------------------------------------------------------------------------------------------------------------------------

129.    After 2002, the structure of the compliance function can be summarized as follows:



Weiss v NatWest
Applebaum v. NatWest
-------------------------------------------------------------------------------------------------------------------------

This report was written by me, and the staff working under my supervision, and it reflects my opinions and conclusions. I personally reviewed and approved the entirety of its contents.

_signature_                                              DATE: 17ᵗʰ December 2010

Gary Walters
Forensic Risk Alliance
Audrey House
16-20 Ely Place
London EC1N 6SN
+44 (0)20 7 831 9110

-------------------------------------------------------------------------------------------------------------------------

FRA

# Appendix 1

-------------------------------------------------------------------------------------------------------------------------

## Appendix 1: Expert Witness Information

### <u>Testifying Witness</u>

- <u>Introduction</u>

  **Forensic Risk Alliance (FRA)** was established in 1999 and has offices and data centers in the US, UK, France and Switzerland.  FRA analyzes the financial implications of complex liabilities in legal disputes and provides reports, advice and expert testimony. FRA is comprised of forensic accountants, former investment bankers, IT programmers, financial analysts and legal project managers.   FRA's principals have been involved in some of the most complex, large-scale litigations, investigations, settlements of the past decade, to include:

  - US$ 20 billion BCCI liquidation and associated litigation
  - £170 million Codelco futures trading fraud
  - Eurobank Cayman Islands money-laundering recovery actions
  - US$ 1.25 billion Swiss Banks litigation
  - US$ 31 billion Oil-for-Food UN, Congressional and Swiss investigations
  - FCPA investigation re: Azeri Privatization related fraud and bribery
  - €1.8 billion European bank sponsored investment scheme investigation

- <u>Qualifications of testifying expert witness</u>

### Gary Walters

Gary Walters, a consultant of FRA, spent thirty years as a police officer with the Metropolitan Police, London.  The majority of his service was as a Detective investigating serious and organized crime.  In 1990, he first trained as a financial investigator whilst working in a specialist intelligence unit of New Scotland Yard.  In 2002, he joined the Economic and Specialist Crime Department to lead teams investigating financial crime.  He developed an expertise in money laundering investigation and has advised Government Departments, Law Enforcement Agencies, and Regulated Businesses – domestically and internationally.

Gary Walters joined the Metropolitan Police Service ("MPS") in 1979 and had a variety of roles and responsibilities, principally in the investigation of serious crime.  Mr. Walters left the Police in 2009 and joined FRA as a consultant in 2010.  Summaries of his roles while in the police service are set out in the next section.

### <u>Qualifications</u>

### Manager, Economic and Specialist Crime, New Scotland Yard, 2003 - 2009

Mr. Walters was a Detective Inspector within the Economic and Specialist Crime Command and led investigation teams dealing with financial crime in London.   His responsibilities included the investigation of major frauds, corruption and money laundering.
From 2003 until the start of 2005, Mr. Walters led the Public Sector Fraud and Corruption Team that focused on fraud and corruption where public money was at risk.  In his work he was involved in many high profile cases and worked with many enforcement agencies.

### <u>*Serious and Organised Crime Agency ("SOCA") and the Serious Fraud Office ("SFO")*</u>

He also had responsibility for the investigation of Overseas Corruption in regard to which he worked closely with the SOCA and SFO.

-------------------------------------------------------------------------------------------------------------------------

Weiss v NatWest
Applebaum v. NatWest
--------------------------------------------------------------------------------------------------------------------------------------

*Charity Commission*

During 2003 and 2004, one of his investigations related to an individual who had abused the processes established by the Charity Commissioners that need to be followed in order to legally establish a charity and obtain money from other charities and organisations.  He worked closely with the Charity Commissioners on this case.  The individual concerned was sentenced to serve ten years imprisonment for a wide range of offences. Rv. Baluchi (2005).

*The Money Laundering Investigation Team ("MLIT") and National Terrorist Financing Intelligence Unit*

From 2005, Mr. Walters was Operational Head of the MLIT, developing its role and responsibility and extending its sphere of operation into organised and serious crime. Some of MLIT's investigations overlapped with terrorism cases and the financing of terrorism.  As such, he regularly interacted with the National Terrorist Financing Intelligence Unit.

During his time with MLIT, there was a change in strategy within the UK Government with regard to tackling financial crime.  Further to this, Mr. Walters was made responsible for advancing the proactive use of the Proceeds of Crime Act 2002 to tackle a wide variety of crime types and Organised Criminal Networks.  Between 2005 and 2006, Mr. Walters' team grew from fifteen investigators to about sixty staff.  The team would have about twenty-five proactive investigations and carry a case load of about one hundred cases awaiting trial but still being investigated.

*Nalborough Money Laundering Case*

An example of the cases Mr. Walters' worked on was R.v. Brian Nalborough (2009). Nalborough was, for all intents and purposes, operating a 'private bank' from an office in Mayfair, London.  The funds moving through his bank accounts were all proved to be from crime or the source could not be established and amounted to millions of pounds.  Funds were laundered through a variety of means including sending funds to the Lebanon where they were withdrawn and withdrawing large quantities of cash from money service businesses in London.  Nalborough was convicted of money laundering and sentenced to four years imprisonment.  The confiscation case relating to his assets is still ongoing.

Nalborough used so-called 'clean' accounts with financial institutions that had been used by his 'financial services' business for around forty years. His 'credibility' and networking resulted in suspicious money movements within his bank accounts not being disclosed to the UK authorities.  It was only when an analysis of his total account activity was undertaken along with additional intelligence in the hands of law enforcement that it exposed the extent of his crimes.

*Co-operation with the National Terrorist Financing Investigation Unit*

Some of the anti-money laundering operations conducted resulted in seizing large amounts of cash where the origins of the money were unknown or suspicious.  In one such case, intelligence identified a number of very small money service businesses that were aggregating their small amounts of cash into substantial sums.  The cash was then being deposited into a large money service business for onward transfer abroad.

During the investigation, it transpired that the small amounts of money were from the Sri Lankan community sending funds home. It was argued that the aggregation of funds was the most economic way to transfer the funds through the banking system.  In this case, the money was being sent to a small money service business in Singapore from where it would be broken up and collected by 'unknown' recipients in cash. Apparently these recipients would then move the funds to the end recipient by trading goods into Sri Lanka.

--------------------------------------------------------------------------------------------------------------------------------------
FRA

-----------------------------------------------------------------------------------------------------------------------

There was intelligence to indicate that some of these funds were donations to support the Tamil Tigers, a separatist militia in Sri Lanka. There was further intelligence to indicate that funds that were being passed to families of the remitters were being channelled through the Tamil separatists' movement as part of a 'hearts and minds' strategy. In this case, Mr. Walters met with his counterparts on the National Terrorist Financing Investigation Unit to discuss areas of mutual interest.

This particular case resulted in no criminal convictions but the money was forfeited under the cash seizure provisions of the Proceeds of Crime Act 2002. It also exemplifies the issues of investigating suspicious activity where the origins and destination of funds may never become clear, but the circumstances allow an inference to be drawn and a judgement made.

_SAR Assessment_

Another team within Economic and Specialist Crime was the Financial Intelligence Development Unit (FIDU). This team monitored and researched SARs impacting on London and was the main point of contact on SAR activity for the SOCA FIU. As Operational Head for anti Money-Laundering, Mr. Walters met with the FIDU on a daily basis to discuss SARs and potential investigations or further research that was needed, these SARs included consent issues. Mr. Walters would consider five to ten cases each day.

_Shah and another v. HSBC Private Bank (UK) Ltd_

In some cases, Mr. Walters would meet with the disclosing institution to obtain further information in order to inform his decision making. The result of Mr. Walters' decision would then be formally channelled back through the FDU to the FIU at SOCA. For example:

Shah and another v. HSBC Private Bank (UK) Ltd (2010) EWCA Civ 31; (2010) WLR (D) 27. This case evolved from suspicious international money movements through the accounts of a businessman with links to the Zimbabwe government that were disclosed to law enforcement. For a number of reasons no criminal case was pursued, but the account holder challenged the actions of the bank through a High Court action and subsequently appealed that Court's decision to the Appeal Court.
In summary, the Shah case supported the bank's identification and disclosure of suspicious activity but has highlighted the need to both rationalise and 'evidence' the reasons for the suspicion should it prove necessary to justify the decision in a court hearing.

**Manager, Westminster Borough, 2001 – 2003**

As Detective Inspector on Westminster Borough, Central London, Mr. Walters was responsible for the management of all crime matters within one of five Divisions including the investigation of all major crimes and critical incidents. Critical incidents were all incidents where the confidence of the public was at issue.

During this period, Mr. Walters also sat on various working groups and undertook project work on behalf of Chief Police Officers.

**Manager, Crime Policy Unit, New Scotland Yard, 1999 - 2001**

Developing policy into crime investigation on behalf of the Metropolitan Police and the Association of Chief Police Officers. This work involved co-ordinating activity across the organisation and with outside agencies.

-----------------------------------------------------------------------------------------------------------------------

------------------------------------------------------------------------------------------------

**Manager, Major Investigation Team, 1997 - 1999**

As a Detective Sergeant and latterly as Detective Inspector, Mr. Walters was employed in the investigation of murders, series rapes and other such major crimes.

**Manager, Central London Intelligence Unit, 1994 - 1997**

Mr. Walters managed a variety of intelligence functions for the Central London area.  Supervising the development of cases and disseminating action plans to operational teams.

**Detective, Special Intelligence Section, New Scotland Yard 1988 - 1990**

Intelligence based focused investigations into organised crime impacting London.  This included developing financial intelligence and liaising with financial institutions in relation to money laundering, terrorist financing, corruption investigations with domestic and international aspects.

**Detective, Battersea Borough, 1984 -1988**

Mr. Walters was engaged as a Detective Constable investigating major crime.

**Constable, Richmond Borough, 1980 -1984**

Mr. Walters was engaged as a Constable on ordinary police duty followed by a time as a trainee Detective.

**<u>Policy Work and Associations</u>**

Mr. Walters formed and led the Proceeds of Corruption Unit investigating Grand Corruption and Kleptocracy, working closely with the UK on Politically Exposed Person issues.   He played a major role in developing the UK's Anti-Corruption Action Plan working on a cross-Whitehall Committee and was one of the UK representatives for the OECD Bribery Review of the UK.

In the UK, Mr. Walters has worked very closely with other Units within the MPS, such as Special Branch on terrorist related matters, other police forces, there are 43 in the UK with geographic responsibility, and other law enforcement agencies, such as HM Revenue and Customs, SOCA.  He provided advice on strategic and tactical issues regarding the use of the Proceeds of Crime Act to tackle a wide range of crimes and provided briefings and training to officers of all ranks.

He also worked with UK Regulators and Government Departments on the development of policy and legislation and its application, from an operational perspective.  To this end, he sat on various committees and working parties such as the UK Anti Corruption Meeting (cross Whitehall Cabinet Office) and the Criminal Justice Meeting (Justice Ministry).  He has also submitted reports and briefings to Government Departments.

Mr. Walters had regular meetings with the Financial Services Authority with regard to ongoing investigations and emerging intelligence.  The meetings related both to tactical and strategic issues relevant to the regulatory and criminal environment.

During his police career, Mr. Walters gave evidence as a witness in numerous court cases across a wide spectrum of criminal cases.

In relation to his international work, Mr. Walters has advised foreign Governments and their agencies and been a contributor to Expert Groups for the UN and the World Bank in regard to stolen asset recovery, investigations and regulation.   He has also worked closely with the International Centre for Asset Recovery (ICAR) in Basel in providing support and advice in multi-

------------------------------------------------------------------------------------------------

-------------------------------------------------------------------------------------------------------------------------

jurisdictional cases.  By way of example, he worked on some complex, sensitive cases in various jurisdictions including Nigeria, Bangladesh, Algeria and the U.S.

## Educational Background

- In 2006, Mr. Walters obtained a Diploma in Anti-Money Laundering from the Cass Business School in order to develop his knowledge and understanding of the broader compliance issues and Regulation.
- Crime Investigation, series of three development courses up to senior investigating officer course
- Crime Analysis Course, intelligence analysis
- Financial Investigation Course, requirement to be authorised to deal with financial disclosure cases
- Scene Management and Examination Course, specialist forensic examination, exhibit handling and scene management
- Senior Investigating Officer Development Course, investigation of most serious crimes and major incidents
- Strategic Management of Critical Incidents Training, high level management of critical incidents
- Source Management, dealing with high risk intelligence sources
- Intelligence Managers Course, high level intelligence processes
- Financial Awareness Training, basic accountancy
- Money Laundering Investigation Managers Course

## Publications and Speaking Engagements

Mr. Walters has been a frequent speaker and panellist at numerous industry conferences such as the Institute of Money Laundering Professionals, the Compliance Institute and the Association of Professional Compliance Consultants.  He has hosted seminars at New Scotland Yard for Regulated Businesses and Regulators to advise on emerging issues and typologies and the resulting impact on business.

In respect of the UNODC and World Bank Stolen Asset Recovery Initiative, Mr. Walters' work is acknowledged in a book published for the UN Convention Against Corruption Conference 2009, "Toward a Global Architecture for Asset Recovery".

-------------------------------------------------------------------------------------------------------------------------

FRA

5

# Appendix 2

-------------------------------------------------------------------------------------------------------------------------------------

**Appendix 2: List of Depositions**

- Stephen Foster: 16 July 2010
- Sonia Gayle: 27 October 2010
- Doug Hartley: 12 July 2010
- Amanda Holt: 23 July 2010
- Michael Hoseason: 14 July 2010
- Irvine Rodger: 22 July 2010
- Tom Sludden: 10 June 2010

**EXHIBIT 171 to Declaration of Joel Israel**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

——————————————————— :

COURTNEY LINDE, et al.,           :
                                  :
        Plaintiffs,               :
                                  :
-against-                         : Case No.:
                                  : CV 04 2799(NG)(VVP)
ARAB BANK, PLC,                   :
                                  :
        Defendant.                :
——————————————————— :
                                  :
PHILIP LITLE, et al.,             :
                                  :
        Plaintiffs,               :
                                  :
-against-                         : Case No.:
                                  : CV 04 5449(NG)(VVP)
ARAB BANK, PLC,                   :
                                  :
        Defendant.                :
——————————————————— :
                                  :
ORAN ALMOG, et al.,               :
                                  :
        Plaintiffs,               :
                                  :
-against-                         : Case No.:
                                  : CV 04 5564(NG)(VVP)
ARAB BANK, PLC,                   :
                                  :
        Defendant.                :
——————————————————— :


VIDEOTAPED DEPOSITION OF ARIEH DAN SPITZEN
(VOLUME I)
Tel Aviv, Israel
July 20, 2011


Reported by:  BRENDA MATZOV, CA CSR 9243

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

```
 1   ROBERT L. COULTER, SR., FOR    :
     THE ESTATE OF JANIS RUTH       :
 2   COULTER, et al.,               :
                                    :
 3              Plaintiffs,         :
                                    :
 4   -against-                      : Case No.:
                                    : CV 05 365(NG)(VVP)
 5   ARAB BANK, PLC,                :
                                    :
 6              Defendant.          :
     _____:
 7                                  :
     GILA AFRIAT-KURTZER, et al.,   :
 8                                  :
                Plaintiffs,         :
 9                                  :
     -against-                      : Case No.:
10                                  : CV 05 388(NG)(VVP)
     ARAB BANK, PLC,                :
11                                  :
                Defendant.          :
12   _____:
                                    :
13   MICHAEL BENNETT, et al.,       :
                                    :
14              Plaintiffs,         :
                                    :
15   -against-                      : Case No.:
                                    : CV 05 3183(NG)(VVP)
16   ARAB BANK, PLC,                :
                                    :
17              Defendant.          :
     _____:
18                                  :
     ARNOLD ROTH, et al.,           :
19                                  :
                Plaintiffs,         :
20                                  :
     -against-                      : Case No.:
21                                  : CV 05 3738(NG)(VVP)
     ARAB BANK, PLC,                :
22                                  :
                Defendant.          :
23   _____:
24
25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

```
 1    STEWART WEISS, et al.,              :
                                          :
 2           Plaintiffs,                  :
                                          :
 3    -against-                           : Case No.:
                                          : CV 06 1623(NG)(VVP)
 4    ARAB BANK, PLC,                     :
                                          :
 5           Defendant.                   :
      _____     :
 6                                        :
      JOSEPH JESNER, et al.,              :
 7                                        :
             Plaintiffs,                  :
 8                                        :
      -against-                           : Case No.:
 9                                        : CV 06 3869(NG)(VVP)
      ARAB BANK, PLC,                     :
10                                        :
             Defendant.                   :
11    _____     :
                                          :
12    YAFFA LEV, et al.,                  :
                                          :
13           Plaintiffs,                  :
                                          :
14    -against-                           : Case No.:
                                          : CV 08 03251(NG)(VVP)
15    ARAB BANK, PLC,                     :
                                          :
16           Defendant.                   :
      _____     :
17                                        :
      VIKTORIA AGURENKO, et al.,          :
18                                        :
             Plaintiffs,                  :
19                                        :
      -against-                           : Case No.:
20                                        : CV 10 00626(NG)(VVP)
      ARAB BANK, PLC,                     :
21                                        :
             Defendant.                   :
22    _____     :
23
24
25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN – 7/20/2011

```
 1            Videotaped deposition of ARIEH DAN SPITZEN

 2    (VOLUME I), taken in the above-entitled cause pending

 3    in the United States District Court, Eastern District

 4    of New York, pursuant to notice, before BRENDA MATZOV,

 5    CA CSR 9243, at the David Intercontinental Hotel,

 6    12 Kaufman Street, Conference Room 1123, Tel Aviv,

 7    Israel, on Wednesday, the 20th day of July, 2011,

 8    at 10:04 a.m.

 9

10

11    APPEARANCE OF COUNSEL:

12    FOR PLAINTIFFS:

13            OSEN, LLC
              By:  ARI UNGAR, ESQ.
14                 GARY M. OSEN, ESQ.
                   CINDY T. SCHLANGER, ESQ.
15            700 Kinderkamack Road
              Oradell, New Jersey 07649
16            (201)) 265-6400 / Fax (201) 265-0303
              au@osen.us
17            gmo@osen.us
              cts@osen.us
18

19    FOR PLAINTIFFS:

20            MOTLEY RICE, LLC
              By:  JOHN M. EUBANKS, ESQ.
21            28 Bridgeside Boulevard
              P.O. Box 1792
22            Mount Pleasant, South Carolina 29465
              (843) 216-9000 / Fax (843) 216-9450
23            jeubanks@motleyrice.com

24

25
```

HIGHLY CONFIDENTIAL
ARIEH DAN SPITZEN - 7/20/2011

Page 96

| | | |
|---|---|---|
| 1 | many board members on any Palestinian Zakat or civilian | 15:28:22 |
| 2 | entity were members of Hamas? | 15:28:27 |
| 3 | A.   No. | 15:28:40 |
| 4 | Q.   As a matter of fact, isn't it true, | 15:28:44 |
| 5 | Mr. Spitzen, that Hamas didn't publicize its | 15:28:46 |
| 6 | association with Palestinian humanitarian entities | 15:28:50 |
| 7 | at all? | 15:28:53 |
| 8 | MR. UNGAR:  Objection to form. | 15:29:02 |
| 9 | THE WITNESS:  Of course, that's true. | 15:29:09 |
| 10 | Otherwise, they would have been shut down the next day. | 15:29:10 |
| 11 | Q.   BY MR. HOWARD:  So Hamas had an incentive to | 15:29:13 |
| 12 | keep their role in these civilian entities secret? | 15:29:16 |
| 13 | MR. UNGAR:  Objection.  Foundation. | 15:29:27 |
| 14 | THE WITNESS:  That's also not precise.  See, | 15:30:23 |
| 15 | it's not a black-and-white game.  The Hamas is very | 15:30:24 |
| 16 | much interested to make sure that their people, that | 15:30:28 |
| 17 | the population know exactly who is controlled by Hamas, | 15:30:31 |
| 18 | who receives money from the Hamas.  But on the other | 15:30:35 |
| 19 | hand, it also tries to avoid -- and it makes sense | 15:30:40 |
| 20 | because, otherwise, it would be suicide on their side | 15:30:43 |
| 21 | to -- not to publish which organizations or associations | 15:30:46 |
| 22 | belong to the Hamas.  Otherwise, they would be shut | 15:30:52 |
| 23 | down. | 15:30:54 |
| 24 | Somebody called this in the HLF -- it was | 15:30:55 |
| 25 | the representative of the ISA.  He said that this is | 15:30:59 |

**EXHIBIT 172 to Declaration of Joel Israel**

Case 1:05-cv-04622-DLI-RML  Document 272-8  Filed 03/22/12  Page 205 of 259 PageID #: 10237

# The Telegraph

# Commission takes a charitable view of terrorism

**A school funded by Green Crescent in Bangladesh hid guns and explosives, writes Alasdair Palmer.**

Alasdair Palmer

4:59PM GMT 28 Mar 2009



[18 Comments (http://www.telegraph.co.uk/comment/personal-view/5066750/Commission-takes-a-charitable-view-of-terrorism.html#disqus_thread)](http://www.telegraph.co.uk/comment/personal-view/5066750/Commission-takes-a-charitable-view-of-terrorism.html#disqus_thread)

Faisal Mostafa has twice been acquitted in Britain of conspiracy to cause explosions. In one of those trials, his co-defendant was found guilty and received 20 years. Mr Mostafa himself has been given a suspended sentence for boarding a plane with a pistol in his luggage. Last week, he was arrested by the security forces in Bangladesh for suspected involvement in terrorism.

The Charity Commission, the body which regulates UK charities, nevertheless thought he was a fit and proper person to be a trustee of the Green Crescent, an Islamic charity based in the UK. The commission may change its mind about Mr Mostafa now that one of the schools that Green Crescent funds in Bangladesh has been searched and found to contain guns, 3,000 bullets, and enough explosive to make more than 200 grenades.

Or it may not. The commission can be surprisingly lax when it comes to evidence that charities may not provide the "public benefit" which it insists is essential to charitable status, but instead have links to groups which may be involved in advocating, or promoting, terrorism.

For instance, it is eight years since evidence first came to light that Interpal, a UK-based charity which aims to provide humanitarian relief in Palestine, is connected to the Union of the Good, an organisation which the US Treasury has designated as a terrorist entity on the grounds that it "facilitates the transfer of tens of millions of dollars a year to Hamas-managed associations in the West Bank and Gaza strip."

But it was only last month that the commission released its report into the matter. That report was a response to a programme made by the journalist John Ware for the BBC two years previously. While the commission failed to investigate many of the BBC's most serious charges against Interpal, it did at least conclude that the organisation should sever its ties with the Union of the Good. Those ties include the fact that Interpal has, as one of its trustees, a man who is also general secretary of the Union of the Good, and who may also have served on Hamas's executive committee.

How will the commission check that Interpal has acted upon its demands? It is surprisingly coy about answering that question. It says it has received an assurance from Interpal that the link has been broken – but admits it has yet to

Case 1:05-cv-04622-DLI-RML   Document 272-8   Filed 03/22/12   Page 206 of 259 PageID #: 10238

check whether this is actually true. Suppose that, when the commission gets round to doing some checking of its own, it finds that Interpal still has ties to the Union of the Good. Then what will it do?

It could deprive the organisation of charitable status. That's what it did to Odstock, a not-for-profit organisation which charged patients fees for medical treatment. The commission would like to do the same to private schools which charge fees without providing what it deems to be adequate "public benefit".

So will the same sanction be applied to an organisation which the commission itself has ruled has links to a group that promotes terrorism? The answer to that question should surely be "Yes". Because to most people, a connection to or involvement with a group advocating terrorism is a much more serious violation of the rules governing charitable activity than, say, charging patients.

No one, however, thinks that the Charity Commission is going to remove Interpal's charitable status, or even the charitable status of the Green Crescent. You can be sure that some convenient form of words will be found to enable the commission to say that it has discharged its duty of ensuring that organisations it permits to be charities are not involved with groups linked to terrorism. Regulators in America, Germany and Australia take a more robust approach and prosecute charities they think have connections with terrorist groups. But we don't – and if you ask why the commission why, you won't receive an adequate answer.

The Charity Commission is not the only government regulator that fails to do its job effectively. Ofsted is another. Just as it took media reports to bring Interpal and the Green Crescent to the commission's attention, so it has taken a report by the think tank Civitas to make Ofsted realise that a number of Islamic schools are unacceptably bad: not only do they fail to teach their pupils essential parts of the curriculum, but they also teach them that democracy is evil, that secular law must be replaced by sharia law, that women are inferior to men, and that homosexuals should be killed.

Ofsted, which was supposed to be inspecting the schools, hadn't noticed any of that – or if it had, hadn't thought it worth doing anything about it. It has now begun its own investigation, which I hope will be rather more thorough and effective than the Charity Commission's investigation into Interpal. I also hope it will have some serious consequences, such as the closing down of schools which attempt to poison the minds of the young.

But I'm not optimistic. The Financial Services Authority, the organisation responsible for failing to regulate the banks, was not a uniquely incompetent or ineffective regulator. They're all like that. And it means we're all in trouble.

© Copyright of Telegraph Media Group Limited 2012

**EXHIBIT 173 to Declaration of Joel Israel**

COMPLIANCE

# Inquiry Report
## Palestinians Relief and Development Fund (Interpal)

Registered Charity Number 1040094

CHARITY COMMISSION

# Contents

**Introduction**    2

**The Charity**    3

**Previous Inquiries**    4

**Source of new concerns**    6

**Commission Inquiry and issues**    7

**Timescale and conduct of the Inquiry**    8

**Findings**    11

Issue 1: Whether particular local partners funded by the Charity were promoting the ideology or the activities of terrorist organisation(s) and therefore would be inappropriate partners for the Charity    11

Issue 2: Whether the Charity's membership of the Union for Good was appropriate    14

Issue 3: Whether one of the trustees, Dr Essam Mustafa, had any links to terrorist organisations or undertook activities which might make him unsuitable to be a trustee of the Charity    20

Issue 4: Whether the trustees were fulfilling their legal duties and responsibilities, in particular by ensuring that the Charity and its assets were protected from any association with terrorist or inappropriate political activities    23

**Summary of conclusions**    31

**Regulatory action taken and actions required of the trustees**    34

**Impact of Commission intervention**    35

**Resources applied**    36

**Issues for the wider sector**    36

**Annex 1:**    **The impact of terrorism legislation**    43

**Annex 2:**    **Summary of the Inquiry regarding the Charity published in the 1996 Annual Report of the Charity Commission for England and Wales**    46

**Annex 3:**    **Statement of the Results of an Inquiry under section 8 of the Charities Act 1993 conducted in 2003**    47

**Annex 4:**    **Public statements made by the Union for Good and its representatives (see paragraph 79)**    49

## Introduction

1. There are a number of charities providing aid internationally in high risk situations including conflict and post-conflict environments, natural disasters and other complex emergencies. Charities often can reach places and communities and accomplish tasks that governments and government agencies cannot, delivering essential relief and rehabilitation assistance in spite of extreme and adverse conditions. These charities make a vital contribution to these communities and their work supports people in desperate need. The value of their work cannot be overstated.

2. Conditions such as those described above present complex risks and difficult challenges for charities providing humanitarian aid. Great humanitarian need often exists in the very regions where there is armed or civil conflict and political unrest and where criminal and terrorist groups[1] or those connected with them may operate. Maintaining humanitarian guiding principles, such as impartiality and independence in the implementation of their work, becomes even more important for charities operating in these environments. The risks and challenges require difficult, and often finely balanced judgements by charity trustees as well as greater effort and stringency in the development, implementation and monitoring of humanitarian programmes of work.

3. Charity trustees take on a significant responsibility to deliver the charity's work while protecting it from abuse. Charity trustees are under a legal obligation to discharge their duty of care, to act in the best interests of the charity and to act prudently as part of their general legal duties. Charity trustees must use charitable funds and assets only in furtherance of the charity's purposes, and avoid undertaking activities that might place the charity's funds, assets or reputation at undue risk. This includes acting with due diligence in the receipt and expenditure of funds and in the selection, use and monitoring of a charity's partners, donors and beneficiaries.

4. Any links between a charity and terrorist activity are totally unacceptable and corrosive of public confidence in charities[2]. This includes fundraising, financial support or provision of facilities, but also includes formal or informal links to organisations proscribed under UK law[3]. Charities are subject to the provisions of UK anti-terrorist legislation. Allegations of criminality are primarily a matter for the law enforcement agencies. The Commission's concerns relate to the lawful exercise by trustees of their duties and responsibilities and ensuring that charitable relief reaches those in need. In addition to the obligations that flow from UK anti-terrorist legislation, charity trustees must discharge their duties and responsibilities and be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. They should take all necessary steps to ensure that their activities could not reasonably be misinterpreted. Charity trustees are accountable for ensuring that proper controls and measures are in place to ensure that terrorist organisations cannot take advantage of a charity's status, reputation, facilities or assets.

5. Where appropriate, the Commission exercises its regulatory powers of investigation and remedy. The Commission exercises these statutory powers only where allegations prompt serious regulatory concern, where risk to charity property and reputation is greatest and where there is a clear public interest for justifying this approach.

---

[1]   Throughout this report we refer to the risks and harm for any charity being associated either with terrorism, terrorist activities or those supporting the ideology or activities of terrorist organisations. For the purpose of this report, when we refer to terrorism and associated expressions we are using the definition given in the Terrorism Act 2000, which is given in full in Annex 1.

[2]   See further the Commission's publications: *OG 96 Charities and Terrorism*, the Commission's *Counter Terrorism Strategy* and the *Risk and Proportionality Framework* for the Commission's compliance work.

[3]   See further Annex 1.

6.  The purpose of a statutory inquiry is to investigate and establish the facts underlying regulatory concerns and so ascertain the extent of any misconduct or mismanagement, assess the risks to the charity, its work, assets, beneficiaries and reputation and decide what action needs to be taken to resolve the concerns. In assessing the extent to which charity trustees have complied with their duties and responsibilities as trustees, the Commission's consideration extends to whether the trustees have complied with the criminal or civil law to the standard which is applicable in the United Kingdom, not the laws in the foreign jurisdiction where the funds may be applied. Although there are limitations on the Commission's ability to do so outside England and Wales, the evidential weight and provenance of the material and evidence are examined. If the allegations are not substantiated, the inquiry will say so. In such circumstances an inquiry can act for the protection of the charity and to enhance the reputation of the wider charitable sector.

## The Charity

7.  The Palestinians Relief and Development Fund, also known as Interpal ("the Charity") is a registered charity delivering aid and other charitable relief to Palestinians, mainly in the Occupied Palestinian Territories[4], Jordan and Lebanon.

8.  The Charity was established in July 1994 and registered as a charity on 11 August 1994. It is governed by a Declaration of Trust dated 29 July 1994.

9.  The Charity's objects, as set out in its Declaration of Trust, are:

    a.  The provision of aid and assistance, support, guidance and comfort to poor needy sick children and widows and those suffering or distressed as a consequence of civil or military action or national disasters within its area of benefit, including setting up and maintenance of medical and health centres.

    b.  To relieve the need hardship and distress of persons whose relatives or friends died or who are missing or detained as a consequence of civil or military action and to provide protection and promote good health, both mental and physical, the relief of poverty and sickness, the advancement of education in matters relating to the nature of grieving and bereavement of connected persons.

    c.  The provision in the interests of social welfare of facilities for the recreation and other leisure time occupation of those of refugee status or connected persons who may have need of such facilities by reason of their youth or age or infirmity or disablement or social and economic circumstances.

10. The Charity raises funds in the UK by way of donations, and directs those funds to its work, which is primarily in the Occupied Palestinian Territories as well as Jordan and Lebanon. In 2007, the Charity collected donations of £5,064,280 and applied £2,201,365 towards its charitable purposes. Of that, £1,564,057 was spent on providing aid in the Occupied Palestinian Territories, with £167,725 and £119,711 spent on aid for Palestinians in Jordan and Lebanon respectively. The remainder went towards other charitable purposes[5].

---

[4]   The Occupied Palestinian Territories comprise the West Bank and the Gaza Strip.
[5]   The Charity's accounts for the year ending 31 December 2007 are available from the Register of Charities on the Commission's website.

11. The Charity's main areas of work are the provision of humanitarian aid, education, community development and health. Much of its aid is delivered through local partners in the Occupied Palestinian Territories, which are responsible for implementing the projects that the Charity supports. Many of these partners are registered locally as charities, some of which are known as "zakat committees"[6].

12. The Charity is a member of a number of umbrella organisations which bring charities together to share experience, information and best practice about providing international aid[7].

13. The Commission recognises the historical and deep-seated nature of the dispute which exists connected with the Occupied Palestinian Territories. It makes no judgments about this and acknowledges that there are the strongly held views within the region. It also acknowledges that since the Charity was established in 1994, the political, economic and social circumstances within the Occupied Palestinian Territories have undergone change. Many of those changes have complicated the work of charities in the region[8].

## Previous Inquiries

14. The Commission has previously conducted two inquiries into the Charity following allegations that it has links to Hamas. The UK Government's view is that there are two wings to Hamas: the political wing and the military wing. Since 2001 the military wing, the Hamas Izz al-Din al-Qassem Brigades, has been proscribed as a terrorist organisation in the UK under the Terrorism Act 2000. Since 2003 Hamas in its entirety has been designated as a terrorist entity in the UK following a European Union regulation[9].

15. The Commission treats allegations of links to terrorism as a zero tolerance issue warranting immediate attention due to the risks such links could pose to the public, the Charity's beneficiaries, and the reputation and integrity of charity[10].

16. The first inquiry into the Charity, in 1996, concerned allegations that the Charity funded Hamas and had connections to a number of former Hamas militants. The inquiry scrutinized the Charity's financial controls and records and ran test checks on particular payments made by the Charity. It found no evidence of any donations that could not be accounted for or that were given for political reasons. As it was not the Commission's usual procedure at the time, no report was published, although reference was made to the inquiry as a high profile case in the Charity Commission's 1996 Annual Report[11].

---

[6]  Zakat, the third pillar of Islam, is the giving of a set proportion of one's wealth to worthy recipients. Zakat committees, which are a type of Islamic charity, provide social welfare (such as aid, education and health services) to Muslim communities in many countries. They exist worldwide in different forms; in the Occupied Palestinian Territories they have a local or regional committee structure. Their size can vary, with some having an annual expenditure of over $1m while others are much smaller. Zakat committees may be registered with the Palestinian Authority or other local regulators as charities. As with all overseas charities that are not within the regulatory jurisdiction of the Commission, they are not nor would expect to be registered as charities in England and Wales.

[7]  These umbrella organisations include British Overseas NGOs for Development (BOND) and the International Bureau of Humanitarian Organisations.

[8]  For an overview of the history and current political position in the Occupied Palestinian Territories please see its Country Profile on the Foreign Office website at www.fco.gov.uk

[9]  Annex 1 explains the meaning of being proscribed under the Terrorism Act 2000 in more detail and sets out the position of the Charity and Hamas under UK terrorism legislation. It also explains the meaning of being designated as a terrorist individual and entity.

[10]  For further information on the Commission's response to allegations of links to terrorism please see the *Commission's Counter-Terrorism Strategy, CC47 Complaints about Charities and its Risk and Proportionality* Framework for its compliance work, all of which are available on the Commission's website.

[11]  Annex 2 contains the 1996 summary of the inquiry included in the Charity Commission's Annual Report.

17. A second inquiry was opened in August 2003 following a decision by the Government of the United States of America to designate the Charity as a *'Specially Designated Global Terrorist'* for allegedly supporting Hamas' political or violent militant activities. The Commission had already been engaged with the Charity since early 2003 as the allegations of it being connected to Hamas had been repeated. As part of its inquiry the Commission formally requested the US Authorities to provide evidence to support the allegations made against the Charity. The US Authorities did not respond with evidence as requested and the Commission concluded that in the absence of any clear evidence showing the Charity had links to Hamas' political or violent militant activities, the inquiry should be closed. It was closed in September 2003, following which the Commission published a statement of the results of the inquiry. This statement is attached in Annex 3.

18. One particular outcome of the 2003 inquiry was that it was made clear at that time that:

*'Where a charity's activities may give, or appear to give, support or succour to any terrorist activity, the Commission expects the charity's trustees to take immediate steps to disassociate the charity from the activity. We expect trustees to be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. Examples include the use of a charity's premises for fundraising or meetings.*

*Charities should take all necessary steps to ensure their activities could not be misinterpreted. The Commission expects trustees and charities to ensure their activities are open and transparent, for example, when transferring assets abroad. We hold trustees accountable for ensuring that procedures are put in place to ensure that terrorist organisations cannot take advantage of a charity's status, reputation, facilities or assets.'*[12]

19. At the conclusion of the 2003 inquiry, the Commission acknowledged that the Charity had made improvements to its procedures and record keeping since the previous inquiry. However, the Commission wrote to the trustees immediately following the closure of the inquiry to make it clear that:

*'whilst the Commission accepts... that on the whole Interpal is a well managed charity and is committed to acting strictly in furtherance of its stated objects and within legal boundaries, we would advise the trustees to implement procedures that allow for independent verification of the projects supported by Interpal. This may well include the use of other charities and NGOs operating in the region to provide independent verification of the contents of the reports received by Interpal. Whilst the trustees may not be able to do this in every instance, the procedures should nonetheless be in place....[In addition,] it would be prudent for the trustees to seek clarification from the local charities on their procedures for selecting beneficiaries, given the recent allegations that Interpal's funds had been used to support Hamas' political/militant activities.'*

---

[12] See paragraphs 14 and 15 of the 2003 Report, in Annex 3.

20. In the same letter, the Commission also confirmed that if at any time in the future, the Commission received *'evidence clearly showing Interpal's funds had been used to support Hamas' political/ militant activities, then [the Commission] would consider opening a fresh inquiry'*. The reasons why the Commission opened the current Inquiry are set out in paragraphs 28-31 of this report.

21. In November 2003 the Charity confirmed to the Commission its then methods of verifying the legitimacy of its partners and the projects it supported in the Occupied Palestinian Territories, and proposed sending questionnaires to its partners to clarify their processes for selecting beneficiaries[13].

## Source of new concerns

### The Panorama Programme *Faith, Hate and Charity*

22. In July 2006 the BBC broadcast a Panorama programme called *Faith, Hate and Charity*. This programme reported allegations that the majority of the Charity's funding was sent to Islamic charities[14] in the Occupied Palestinian Territories, and that a number of these promoted the ideology of Hamas[15]. It appeared to the Commission that the key points reported in the programme were:

   a. allegations that many of these Islamic charities are an integral part of Hamas, and are crucial to its support amongst the Palestinian people. It further alleged that many are committed to a particular concept of dawah[16]; in essence forming a *'dawah wing'* of Hamas[17]. The programme claimed: *'for a political movement like Hamas, dawah is militant preaching, often aimed at impressionable minds'*;

   b. allegations that the Charity's funds are sent to local partners which promote a *'jihadi ethos'*. The programme claimed that militant material had been found at several of these committees' premises during raids by the Israeli Defence Force, and that key figures in the management of certain local partners were members of Hamas;

   c. allegations that a trustee of the Charity had links with Hamas by virtue of meetings with senior Hamas figures and making public expressions of support for the Second Intifada[18]. It further alleged that links were created by that trustee's senior role in the Union for Good[19], a coalition of charities operating in the Occupied Palestinian Territories which directed its funding at *'missionary dawah'*; and

   d. claims that the Charity was a key member of the Union for Good, whose President appeared to have publicly supported suicide bombings directed at Israeli civilians.

23. The allegations reported in the Panorama programme raised issues that were broader than the Commission's regulatory remit. However, in the Commission's view if the allegations in respect of the way in which the Charity may be operating in the Occupied Palestinian Territories were true, these would raise serious implications that the Commission needed to examine further.

---

[13]  See paragraphs 123-126 for further details.

[14]  These are described as local partners in this report (see also footnote 6 above).

[15]  A transcript of the Panorama programme *Faith, Hate and Charity* is available from the BBC website.

[16]  Dawah is generally considered to be an obligation to promote the Islamic faith or call others into it.

[17]  Some countries take the view that there is no distinction between the political and military wings of Hamas, and that Hamas also has a 'dawah wing' which is an integral part of its structure. This is not the view of the UK Government (see paragraph 14).

[18]  The Second Intifada refers to the Palestinian uprising which began in September 2000.

[19]  See paragraph 71 for further information about the Union for Good.

**The Commission's regulatory response**

24. In order to ascertain the basis of these allegations, the Commission immediately contacted the BBC to request the material underpinning the claims made in the Panorama programme ("the Panorama material"). The BBC explained there would be a delay due to the unavailability of the staff who had gathered the material. Over the next two months the Commission repeated its request and liaised with the BBC to obtain the material. Following a meeting with the BBC in October 2006 it was finally provided to the Commission.

25. The Commission sought a meeting with the trustees of the Charity. On 11 August 2006 that meeting took place, attended by the Chair of the trustees, the Charity's Executive Manager, two other trustees and their legal advisers. The Commission explained that it intended to analyse the Panorama material, when received, to ascertain if it raised regulatory concerns about the Charity.

26. The Commission did not rely on the conclusions drawn by the programme but instead, as an independent, evidence-based regulator, it conducted its own analysis of the Panorama material to assess whether it raised regulatory concerns. It established that there was evidence in the material raising concerns that required further investigation to ascertain whether the Charity's trustees were properly fulfilling their legal duties and responsibilities.

27. On 7 December 2006 the Commission met again with the Charity, specifically its Chair, another trustee and its legal representatives following its initial analysis of the Panorama material and put the Commission's preliminary concerns to them.

## Commission Inquiry and issues

28. Following that meeting and due to the serious nature of the issues raised by the Commission's analysis of the Panorama material, the consequent risk to the Charity's assets and reputation, and the Commission's responsibility to safeguard public trust and confidence in the charitable sector, on 13 December 2006 the Commission decided to open an Inquiry under section 8 of the Charities Act 1993 ("the Act").

29. The issues of concern in this Inquiry were different from those of the 1996 inquiry, which were concerned with scrutinising the Charity's financial controls and records, testing individual payments and donations and looking at, in particular, whether the Charity's funds and support reached its intended destination. This was explained to the Charity at the start of the Inquiry. There has been nothing brought to this Inquiry's attention that suggests that the Charity's funding has been siphoned off for inappropriate or non-charitable purposes.

30. The focus of this Inquiry was a new and different allegation that the Charity may be indirectly supporting the ideology or activities of terrorist organisations by using partners which may or appear to support such activities. The regulatory issues were whether the trustees were acting appropriately and with due regard to their legal duties and responsibilities as trustees if they supported the charitable activities of an organisation whose wider activities or associations may include the promotion of the ideology or activities of terrorist organisations.

31. The Commission established, after its examination of the Panorama material that the Inquiry would look at the following issues:

   a. **Issue 1: Whether particular local partners funded by the Charity were promoting the ideology or the activities of terrorist organisation(s) and therefore would be inappropriate partners for the Charity.**

   b. **Issue 2: Whether the Charity's membership of the Union for Good was appropriate.**

   c. **Issue 3: Whether one of the trustees, Dr Essam Mustafa, had any links to terrorist organisations or undertook activities which might make him unsuitable to be a trustee of the Charity.**

   d. **Issue 4: Whether the trustees were fulfilling their legal duties and responsibilities, in particular by ensuring that the Charity and its assets were protected from any association with terrorist or inappropriate political activities.**

## Timescale and conduct of the Inquiry

32. The Inquiry was opened on 13 December 2006 and closed on 26 February 2009.

33. In January 2007 the Inquiry put detailed questions in writing to the trustees of the Charity to explore the issues it had set out. For the next eight months the Inquiry engaged with the trustees to obtain complete responses to these questions and to clarify the information that was provided. This included a visit to the Charity's premises in May 2007, during which the trustees offered to provide the Inquiry with substantial information about the local partners the Charity worked with. The Inquiry assessed the list of material that was provided, and then requested and obtained the relevant documents.

34. In December 2007 the Inquiry interviewed two trustees (the Chair, Ibrahim Hewitt, and the Managing Trustee, Dr Essam Mustafa[20]) and one Charity employee (the Executive Manager, Jihad Qundil). Key points and documents from the Panorama material, as well as issues arising from the Inquiry's engagement with the Charity thus far, were discussed. Following these interviews it was necessary for the Inquiry to put additional points to the trustees to ensure that it fully understood their views and evidence.

35. The trustees regularly reassured the Inquiry that they were prepared to cooperate fully with the process. In practice there were, on occasions, delays in obtaining information from the Charity, and twice, the Charity missed extended deadlines for specific requests[21]. The length of the Inquiry was also affected by the considerable documentary material received from the trustees that required in-depth analysis and verification. The Inquiry also found, on further investigation, that some information provided by the trustees early on in the Inquiry was incomplete or required further explanations and clarification. The Inquiry appreciated that the trustees were volunteers, some of whom travelled overseas regularly; however, the Inquiry expected the trustees and their advisors to meet reasonable deadlines and comply with the Inquiry's requests.

36. When forming its findings and conclusions about the Union for Good, the Inquiry contacted that organisation for its comments.

---

[20] Dr Mustafa has been named by the Charity as its "Managing Trustee". This has no effect on his legal status as one of the trustees of the Charity since all trustees are collectively responsible but recognises certain additional functions that the Charity has given him. He is not an employee of the Charity.

[21] See paragraph 165.

37. Unprompted by the Inquiry, in January 2007 the Israeli Government provided the Inquiry with an outline of its concerns about the Charity and a number of its local partners in the Occupied Palestinian Territories[22]. It also raised concerns about the activities of the Union for Good. The Inquiry subsequently requested and received material relating to the evidential basis for the Israeli Government's concerns.

38. This Inquiry repeated the request made in 2003 to the US Authorities to provide the evidence supporting their decision to designate the Charity[23]. The US Authorities did not provide a response to this request. As a result, the Inquiry could not take account of the reasons underlying the US decision[24].

39. The Inquiry used the Commission's knowledge and experience gained through its general engagement with the charities it regulates, in particular those working internationally and in this region. It did this to set the Charity's activities in context and assist the Inquiry in assuring itself that its assessments about what was possible and realistic in practice were reasonable in the circumstances. The Inquiry looked into the steps taken by other international aid agencies working in the Occupied Palestinian Territories to control and monitor how their funds are used. It also looked at the framework of relevant terrorism legislation in different countries and their impact on the work of the Charity[25]. The Inquiry also gained an appreciation of the significant challenges faced by aid agencies working in the region, including the complexities of the political and security situations[26], and looked at the types of controls and protections put in place by aid agencies generally. The Inquiry looked at the role of local partners in delivering aid in the Occupied Palestinian Territories, and the extent to which aid agencies worked with them[27]. The Inquiry took these factors fully into account.

40. In addition, the Inquiry drew on the expertise of the Commission's International Programme. The International Programme aims to create a healthy, accountable and independent NGO[28] sector by supporting the development of effective local regulation internationally, regionally and nationally through sharing experience and ideas. As part of its work, the International Programme has visited the Occupied Palestinian Territories to explore NGO regulation in the region.

41. Evidential material collected during the course of an inquiry is assessed objectively and fairly without bias, taking into consideration the fact that material provided to an inquiry may arise from sources that have a particular view point or perspective. The Commission's published procedures[29] explain that a charity is entitled to know the nature of allegations being made against it and the nature of the evidence upon which a complaint about them is based. The inquiry will make its findings and conclusions on the basis of the evidence objectively viewed.

---

[22]  In 1998 the Charity was declared a "terrorist organisation" by the Israeli Government under the Terror Preventing Command 1948. It is also an "unlawful association" in Israel under the Defence Regulations (State of Emergency) 1945. Israeli law has no legal standing in the Occupied Palestinian Territories. The Charity is not illegal under Palestinian law.

[23]  See paragraph 17.

[24]  See the Statement of Results of the 2003 Inquiry relating to the Charity, in Annex 3.

[25]  See further "Relevant legislation, orders and other declarations made by other states" in Annex 1.

[26]  The Inquiry understands that Hamas' presence is not confined to its military and political wings. There is a social welfare presence in Palestinian Society which delivers social, cultural and welfare activities.

[27]  As part of this process the Inquiry looked at published research on the role of zakat committees in the Occupied Palestinian Territories. Several of these publications were also identified by the trustees as valuable research material on the subject which informed their decision-making processes.

[28]  Non-Governmental Organisation.

[29]  See further CC47 Complaints about Charities.

42.  The Inquiry involved an examination of the organisation, activities, records, management and decision-making procedures of the Charity in respect of the four issues investigated by the Inquiry. It required an in-depth analysis of a significant volume of documents, electronic records and videos, and engagement with the trustees and their representatives. This included assessing and testing information, and obtaining translations of certain documents.

43.  The Inquiry assessed what material was relevant to the points under consideration with the Charity. It set out in writing to the trustees the nature of the concerns and the allegations made against the Charity which the Inquiry was investigating. This was done through summaries and descriptions of documents in letters, exchanges at meetings and interviews, copies of particular documents, and references to material they already had. This included relevant material given to the Inquiry by third parties.

44.  In addition, the trustees' responses about how they discharged their duties and responsibilities, together with details of the Charity's policies and procedures, and copies of completed forms they provided to the Inquiry, formed an essential part of the evidence that the Inquiry relied on.

45.  Through the Inquiry process, the Charity was provided with the evidence on which the Inquiry came to its findings and conclusions. During the course of the Inquiry's engagement with the trustees and their advisers, they were given a full opportunity to respond to these findings and conclusions. As a consequence, the Commission is satisfied that the Charity has had sight of the relevant material and evidence to support the regulatory concerns which were the focus of this Inquiry.

46.  The volume and complexity of all the material, along with the time needed for the Inquiry to complete its analysis and to receive information from other parties, contributed to the length of this Inquiry.

47.  As a civil regulator, the Commission must apply the civil standard of proof[30] in English law when evaluating evidence upon which it takes regulatory action. This means that an inquiry will apply the principle that the more serious the allegation or consequences of the allegation, the stronger the evidence must be, before the inquiry could conclude whether the allegations concerned were proved and regulatory action should be taken.

48.  In January and February 2009, the Inquiry met with the trustees and their legal representatives to discuss the Inquiry's findings and to give the trustees the opportunity to comment on factual accuracy. During those meetings and related communications, on some issues differing accounts were given on some of the evidence received by the Inquiry. This and the trustees' comments on factual accuracy have been taken into account.

---

[30]   Reference to this standard of proof was made in, for example, the case of Dr Adu Aezick Seray-Wurie v Charity Commission and Her Majesty's Attorney General [2008] EWHC 1091 (Ch) at paragraphs 31 and 32: *'There is only one civil standard in English law, the balance of probabilities. However, it is well established that, the more serious the allegation or the consequences of the allegation, the stronger must be the evidence before a court will conclude that the allegations concerned are proved on the balance of probabilities.'*

## Findings

**Issue 1: Whether particular local partners funded by the Charity were promoting the ideology or the activities of terrorist organisation(s) and therefore would be inappropriate partners for the Charity**

**General context and regulatory principles**

49. Trustees of charities regulated under the law of England and Wales are responsible for the proper management and administration of their charity. Deciding to carry out, or knowingly supporting activities that would be criminal, illegal, or otherwise improper for a charity to carry out would amount to misconduct on the part of the trustees of the charity.

50. The Commission's experience as regulator indicates that the number of cases in which there is evidence to prove that charities have been involved directly, indirectly, deliberately or unwittingly in supporting terrorist activity is very small. However, any such abuse is completely unacceptable in view of the potentially significant impact on public trust and confidence in that charity and the charitable sector in general[31].

51. The Commission's view is that a charity must not provide funding or support[32] to a partner organisation that exposes beneficiaries to activities which directly, or indirectly, promote terrorism. This is so even if the charity's funding or support were used for legitimate humanitarian aid or other charitable activities. Aside from the risks of committing criminal offences under UK legislation, this is likely to amount to misconduct on the part of the trustees in managing and administering the work of the charity.

52. As regulator the Commission can and will look into evidence that trustees have breached charity law by participating in willful wrong-doing or criminal activities, or by acting in such a way that they place their charity at risk of abuse by others. Evidence that indicates criminal offences may have taken place under terrorism or any other legislation will be referred to law enforcement agencies. It is a criminal offence to provide funding or other support to a proscribed organisation[33].

**Regulatory concerns relating to the Charity**

53. Serious allegations were raised in the material examined by the Inquiry about links between some of the Charity's partners in the Occupied Palestinian Territories and the Hamas Izz al-Qassem Brigades[34]. The material included claims that a number of the local partners were promoting the ideology of Hamas to the children they looked after, and/or were promoting the use of terrorist attacks.

54. If these claims were true, there was a risk that the Charity's funds could be used indirectly to promote terrorism or, even if the Charity's funds were not used for such activities, that the Charity was associating itself with terrorist ideologies or activities by funding these local partners. Either of these circumstances would be completely unacceptable for a charity regulated under the law of England and Wales.

---

[31]  Further information on the Commission's general approach to terrorist abuse is set out in its *Counter-Terrorism Strategy*.

[32]  For example, the use of facilities, the provision of volunteers or capacity building activities.

[33]  Section 12 of the Terrorism Act 2000.

[34]  The militant wing of Hamas, which is proscribed as a terrorist organisation under the Terrorism Act 2000.

55. The trustees were and remain under a continuing duty to satisfy themselves about the integrity of their partners. When such serious concerns are raised about those partners, the trustees must take sufficiently rigorous steps to assess the extent and veracity of those concerns. Such an assessment must go beyond a financial audit demonstrating that the Charity's funds reach the intended recipient partners. It must extend to whether or not those recipient partners are appropriate to receive those funds.

## The Charity's partners in the Occupied Palestinian Territories

56. The Inquiry identified four local partners[35] funded by the Charity about which there were sufficient concerns about support for the Hamas Izz al-Din al-Qassem Brigades to require further investigation[36]. The Inquiry requested the Charity respond to these allegations and explain the steps they took to determine whether the allegations were unfounded.

### Material relating to the local partners

57. The Inquiry considered whether the material it examined provided persuasive evidence that any of the local partners with which the Charity worked were promoting the ideology or activities of terrorist organisations, or were otherwise inappropriate to receive Charity funds.

58. Some of this material[37] claimed in particular that:

   a. material relating to the Hamas Izz al-Din al-Qassem Brigades had been found at premises belonging to the Charity's local partners. This material included posters glorifying suicide bombers, videos of children performing songs promoting violence, and videos of ceremonies involving children carrying replica guns and missile launchers, and acting out suicide bombings or assassinations[38];

   b. members of the management committees of some of the local partners operating in the Occupied Palestinian Territories and funded by the Charity had been convicted in Israel of criminal offences relating to militant activity; and

   c. a number of the local partners supported by the Charity had been banned as terrorist organisations under Israeli law[39].

### Findings related to the material

59. Some of the material examined by the Inquiry had been claimed to show a link between each item (be it video, photograph or document) and a particular zakat committee, and the Inquiry established that the Charity did fund some of those local partners.

60. The material provided seemed to indicate that certain local partners funded by the Charity promoted terrorist ideology or activities amongst their beneficiaries. However, the Inquiry could not verify to its satisfaction each of these item's provenance or accuracy. In order for the Inquiry to draw firm conclusions from the material, it would need proof that the material was found at particular identifiable local partners, and/or showed activities which could be proved to have been carried out at a particular identifiable partner, during a particular period of time.

---

[35] The Jenin Charity Committee, the Hebron Charity Committee, the Al Islah Charitable Society in Ramallah and the Al Tadhuman Charity Committee. All four have different variants of their names but these are used for clarity. The Charity works with over 100 zakat committee partners at any time, some of which vary from year to year. A significant number of their other partners in the Occupied Palestinian Territories were also considered although in less detail.

[36] Some of the material considered included videos reported to have been seized by the Israeli Defence Force.

[37] This material was provided by the Israeli Government.

[38] The charity has informed the Inquiry that such material can be found *in any and all Palestinian schools'*.

[39] Israeli law does not have legal standing in the Occupied Palestinian Territories (or the UK) but does have an impact on the practical situation on the ground, which the trustees need to consider. For further guidance see paragraphs 208-209 and Annex 1.

61. The Inquiry found that, given the seriousness of the allegations being made, the material did not reach the standard of proof required under UK civil law for the Inquiry to consider taking regulatory action on this issue[40].

**The Charity's response to concerns**

62. The Charity advised the Inquiry that it: *'had no evidence to suggest that anyone... linked to the organisations supported by Interpal has done anything illegal or misused charitable funds.'* It stated that the local partners highlighted by the Inquiry were: *'entirely lawful'* and it was *'confident that such NGO partners are not engaged in any unlawful activity'.* The Charity explained that these views were based on its *'strict scrutiny procedures'* for monitoring how the local partners used its funds[41]. The trustees also said that they relied on their knowledge and experience of working in the field[42], together with the fact that the committees had not been shut down by the local regulatory authorities, and that *'no concrete evidence'* of wrongdoing had been given to them.

63. The Inquiry also sought details of how the trustees had responded to the specific allegations that were within the Commission's regulatory responsibilities made in the Panorama programme. The trustees told the Inquiry that: *'on the day after the broadcast of Panorama, we opened our own month-long inquiry into the charities in question.'* The Inquiry established that the trustees had obtained statements from these partners that insisted the concerns were unfounded. The trustees stated that they evaluated the responses to these questionnaires, consulted with experts on zakat committees, and relied upon academic research on the benefits of distributing aid through the zakat committee structure. In support of this, the Inquiry was provided with copies of four completed questionnaires, and two examples of publicly available reports on the role of zakat committees.

**Findings related to the trustees' actions**

64. The Inquiry took into account the limitations on the trustees arising from the operational challenges of the Occupied Palestinian Territories. Nevertheless, the Inquiry found that the trustees had accepted the responses from the local partners without adequate further investigation.

65. Given the serious nature of the allegations, the Inquiry would have expected the trustees to have engaged actively with their partners in a manner consistent with the seriousness of the allegations being raised. The Inquiry noted that Funding Agreements were in place with the local partners[43] which set out how the Charity's funds could be used, and the conduct expected of the local partners. The Inquiry was told that the Charity sent questionnaires to four local partners asking them about the truth of the allegations made against the committees. However, the information provided in the four completed questionnaires received by the Charity from four local partners and shown to the Inquiry was, in the Inquiry's view, inadequate; for example in response to the question: *'Does your charity urge hatred and violence? Or do your employees do so?'* one zakat committee replied: *'The society goals don't encourage incitement on hatred or violence. Employees of the society don't practice any activity in this regard.'* A different zakat committee replied to the same question with: *'We don't support hatred or violence, and none of our staff use this method. Our goal is to help Palestinian women and children.'*

---

[40] See paragraph 47.
[41] See Issue 4 below.
[42] See footnote 27.
[43] For further details on these Funding Agreements, see paragraph 133.

13

66. This example is indicative of the quality of the questions and responses in these questionnaires. The steps taken by the trustees to check the validity or otherwise of specific claims of inappropriate activity at particular local partners were not sufficient in the circumstances.

67. The trustees should have entered into more meaningful engagement with the local partners in question. For example, they could have insisted on receiving detailed documentation showing how the requirements of the Funding Agreements were enforced on the ground in each zakat committee. Furthermore, given the seriousness of the allegations, the Charity should have independently verified the local partners' activities on the ground. The greater the risks and more serious the allegations, the more efforts are expected of the trustees.

68. The Inquiry noted that the trustees strongly disagreed with its finding, as they considered their enquiries, along with their knowledge and expertise of the region, amounted to a thorough investigation. They told the Inquiry that they had investigated the allegations *'to the best of [their] ability as a small charity with limited resources'*.

## Conclusion

The Inquiry could not verify the material suggesting that certain local partners funded by the Charity may be promoting terrorist ideology or activities, so the material was of insufficient evidential value to support these allegations.

While accepting the difficulties the trustees faced, and acknowledging the action they did take, the Inquiry concluded, in the circumstances, that they did not take sufficiently rigorous steps to investigate the allegations about their local partners. The trustees should have acted with greater diligence to satisfy themselves that the local partners concerned were not directly or indirectly supporting the promotion of terrorist ideology or activities.

## Issue 2: Whether the Charity's membership of the Union for Good was appropriate

### General context and regulatory principles

69. The Commission encourages charities to look regularly at what they can achieve for their beneficiaries through working with other organisations. When the conditions are right, and the trustees can see the clear advantages to their charity, working together can bring real benefits of shared costs and extra reach[44]. The ability to work through partners is particularly important for charities that work internationally.

70. In any collaborative working arrangement, trustees must continue to fulfill their duties of care and prudence towards their charity. The benefits of the collaboration should be clearly established at the outset and reviewed regularly, and trustees must be satisfied that their charity's assets and reputation are safeguarded in the arrangements. If they cannot be satisfied on these points, then the collaborative working may not be in their charity's interests and accordingly would not be appropriate for the charity.

---

[44] Further information is available in the Commission's guidance on *Collaborative Working and Mergers*.

## Regulatory concerns relating to the Charity

71.  The Charity is a founding member[45] of the Union for Good (also known as the "Charity Coalition", "Coalition for Good" or "I'tilaf Al-Kahyr"), which comprises a number of UK and foreign organisations working with Palestinians and in the Occupied Palestinian Territories.

72.  The Union for Good was created as the continuation of a campaign called the "101 Days Campaign" which was established in 2001 during the Second Intifada[46]. Its President is Sheikh Yusef al-Qaradawi[47], and Dr Mustafa (the Charity's "Managing Trustee"[48]) is its General Secretary. The Union for Good is not a registered charity in the UK[49] and was not the subject of this Inquiry. However, the Charity was, and remains, closely linked to the Union for Good. Dr Mustafa told the Inquiry that he was the originator of the 101 Days Campaign. The trustees described this campaign as a project run by the Charity, and that the Charity was a founding member of it and its successor, the Union for Good. It is the Charity's relationship with the Union for Good and the trustees' management and supervision of this, which was an issue for the Inquiry.

73.  The material examined by the Inquiry included claims that the Union for Good channelled funds from its members, including the Charity, to local partners in the Occupied Palestinian Territories that supported Hamas. However, the Inquiry could not establish the provenance and accuracy of this material[50].

74.  Nonetheless, the Inquiry did consider whether the Charity's membership of the Union for Good was appropriate. It looked at:

   a.  the structure, activities and wider membership of the Union for Good; and

   b.  the relationship between the Charity and the Union for Good.

## The structure, activities and membership of the Union for Good

75.  The Inquiry asked the Charity to describe the Union for Good. They explained it is:

   a.  *'a very loose (albeit well-organised) relationship'* of member organisations and individuals;

   b.  *'an initiative to encourage and facilitate cooperation between those charities associated with it;'* and

   c.  *'a tool used by its associated charities for cooperation and coordinating efforts in their raising funds campaigns.'*

76.  The Charity also informed the Inquiry that: *'the aims, activities, governance and administrative structure of the Union for Good are all of a charitable nature and for a charitable purpose.'*

---

[45]  The Charity has been variously described by the trustees as *'a founding member', 'one of the leading founders'* and *'the founder'* of the Union for Good.

[46]  See footnote 18.

[47]  Sheikh al-Qaradawi is a prominent Muslim scholar. In February 2008 Sheikh al-Qaradawi was refused a visa to enter the UK due to concerns raised about statements he made that appeared to justify acts of terrorism. He had, on a previous occasion in 2004, been granted a visa to enter the UK.

[48]  See footnote 20.

[49]  Annex 1 summarises the relevant legal status of the Union for Good.

[50]  See paragraphs 59-61.

77. The Union for Good told the Inquiry that it was originally set up as *'an ongoing cooperative forum to run as long as the humanitarian situation among Palestinians is continuing.'* Its purposes now are *'charitable objectives, purposes and means that cannot be understood or interpreted otherwise by anyone. Moreover, these have never and will never include political objectives or purposes.'*[51]

78. The Inquiry analysed Union for Good publications, copies of interviews given by its President, and its website to determine how it expressed its purposes and activities. It noted the following material:

   a. According to documents supplied by the Charity, the 101 Days Campaign: *'was launched on 15 May 2001, the anniversary of the Nakbah, the Day of Catastrophe marking the illegal occupation of Palestine.'*

   b. In an interview on Al Jazeera, Sheikh al-Qaradawi said: *'They have even called it... "The Coalition for Good 101 Day Campaign". This means that if Sharon[52] says that he will put down the Intifada in 100 days, we say that in 101 days we will rebuild what he has destroyed, will continue with our resistance and will not stop.'*

79. In particular, the Inquiry's attention was drawn to certain statements made by the Union for Good's then and current President, Sheikh al-Qaradawi, in a programme on Al Jazeera in 2001 (during the Second Intifada and shortly after the Union for Good was formed) which caused particular concern. He appeared to describe the 101 Days Campaign as one form of resistance to the Israeli occupation of the Occupied Palestinian Territories, whilst simultaneously encouraging violent action against Israeli forces as another form of resistance. The relevant extracts and further material identified by the Inquiry is given in Annex 4.

80. In response to the Inquiry's request, the trustees provided a statement given to them in 2002 when the trustees asked Sheikh al-Qaradawi to explain what he, as President of the Union for Good, understood its aims and objectives to be. Sheikh al-Qaradawi supplied a written response, which included the following statement: *'I became more preoccupied and interested in [the Palestinian issue] when I became mature and more aware of life, and that is for many reasons. Because the issue is concerned with a part of the Islamic lands and we have been taught in [school] that when any part of the Islamic land is invaded by any invader, it will be an individual duty on all its people to resist the invader, each as far as he could, male or female, and that all Muslims across the world have to aid them with all that is needed, be it weapons, money or men.'* He then stated: *'For all this, our brothers in Palestine are most in need of aid... Henceforth extending relief and aid to these poor, oppressed, distressed and besieged people is a duty on any one who is able to extend something to them or assist them.'* The Union for Good explained that Sheikh al-Qaradawi's role was honorary and that he was not speaking on their behalf in the 2001 Al Jazeera programme. However, the trustees later indicated that *'it is incorrect to say that the trustees did not recognise the political dimension of Union for Good's work'.*

---

[51]  According to the Union for Good, its objectives are: *'redrawing the priorities of the charitable and relief work of the Palestinians, as well as the formation of its philosophy, strategies and its administrative rules according to the scientific concepts based on the requirements of reality; the coordination between the charity, relief and voluntary institutions that offer their services to the Palestinians; contributing to show the size of the humanitarian suffering of the Palestinian people and informing the international community about this suffering; contributing to the alleviation of the suffering of the Palestinian community in general and that of the most needy in particular; contributing to the building and developing of the capacities of the Palestinian people, as well as the rehabilitation of its local environment and infrastructure; and securing the appropriate environment for the relief and development work to the Palestinian people through the provision of technical support and expertise for Arabic, Islamic and international humanitarian relief organisations wishing to carry out its activities for its benefits and to form partnerships with it.'*

[52]  Ariel Sharon, the former Prime Minister of Israel.

16

**Wider membership and work of the Union for Good**

81. The Inquiry noted that, according to the Union for Good, its work includes conducting field surveys to determine the needs of the Palestinian people, researching and prioritising projects, seeking partnerships with institutions to implement projects, monitoring the financing of projects and working with supporting parties, the implementation, monitoring and running of projects in the Occupied Palestinian Territories. This work is carried out by the Union for Good centrally.

82. In addition, the Union for Good described itself as having members, of which the Charity was one. The material supplied by the Union for Good to the Inquiry disclosed that membership duties included: *'being ready to provide support for E'tilef El Khair (the Union for Good) on matters which coincide with the organisation's objectives, policies and financial and administrative capacities; willingness to contribute towards the expenses of the administration of [the Union for Good].'* Beyond this, how the membership was constituted and its organisational structure lacked clarity.

83. During the Inquiry the Charity supplied an undated list of members of the Union for Good. At least five (out of 24) organisations which appeared on the list have been, since 2003, designated in the UK[53]. Although the Charity advised the Inquiry that these designated entities were no longer members, in December 2008 the Union for Good supplied its list of members, which included at least four of the same designated entities[54].

84. In addition, the Union for Good also supplied details of the contributors to particular projects filtered through its application process. A majority of the projects which listed the Charity as a contributor were also given financial support by one or more designated entity.

85. One member of the Union for Good's Committee (on which Dr Mustafa sat as the General Secretary of the Union for Good) is a designated terrorist person: Sheikh Abd al-Majid al Zindani. The trustees advised the Inquiry that: *'if he [al-Zindani] is an Al Qaida member, we would assume that he would not be a free man today[55]... As regards to Interpal, he has had no contact whatsoever, and is unknown to most of the Interpal trustees.'*

**Findings related to the structure, activities and wider membership of the Union for Good**

86. The Inquiry noted that the Union for Good described itself as having humanitarian purposes. However, the Inquiry found that its President had, on more than one occasion, publicly supported the use of violence to achieve the same purposes as those of the Union for Good.

87. Towards the end of the Inquiry the trustees stated that they had asked Sheikh al-Qaradawi (at an unspecified date) about the Union for Good's purposes and he replied that its goal was *'humanitarian aspects alone'[56].*

---

[53]   These were the Al Aqsa Foundation Belgium, the Al Aqsa Foundation Germany, the Al Aqsa Foundation Holland, the Al Aqsa Islamic Charitable Society Yemen and Sanibil Al Aqsa Sweden. Most were designated in 2003 and they remain designated as at the date of this report. The Al Aqsa Foundation of South Africa was also listed as a member: see paragraphs 136-142 for further details in respect of this organisation. For details of all designated individuals and entities see the Treasury website at www.hm-treasury.gov.uk.

[54]   See footnote 53.

[55]   Being designated does not carry with it an automatic criminal conviction or custodial sentence.

[56]   See paragraph 77.

88. The trustees stated that: *'Dr Qaradawi's views on such matters as suicide bombings are irrelevant to their [the trustees'] relationship with the Union for Good. These views, necessarily, form no part of the implementation of [the trustees'] duties as trustees.'* However, the trustees, to fulfil their duties of care and prudence, had to satisfy themselves that the Union for Good was an appropriate organisation for the Charity to associate with. Sheikh al-Qaradawi's comments were therefore relevant to the discharge of the trustees' duties when working with the Union for Good.

89. The Union for Good's acceptance of designated individuals and entities as members potentially risked harm to the Charity's assets and reputation given its own involvement as a member. By engaging with designated entities through the central activities of the Union for Good, and by regularly contributing to projects also financially supported by designated entities, the Charity risked breaching international financial sanctions upon designated entities[57]. The links with designated entities through membership of the Union for Good risked jeopardising public confidence in the Charity. These risks were heightened, as the Charity could not properly manage this association given the way the Union for Good operated.

90. The Inquiry found no evidence that the trustees had properly assessed the potential risks of membership of the Union for Good, in order to come to a reasonable decision about whether these were outweighed by the benefits. In particular, there was no evidence such a risk assessment had been conducted in 2003 when the Charity knew that a number of the Union for Good's members were named as designated entities.

**The relationship between the Charity and the Union for Good**

91. The trustees explained that the Union for Good runs media and fundraising campaigns for its members, who pay for and receive the funds from them. It has a Central Working Committee but no bank account or, as far as the Inquiry could establish, resources of its own. The Charity provided the UK branch of the Union for Good with substantial administrative support when it was first set up, including hosting its website, organising and providing administrative support to the first meetings between members, and undertaking the task of coordinating the Union for Good's UK and Europe-based members.

92. The Inquiry established that the Union for Good carried out some activities independent from its members. For example, according to the Charity it draws up lists of applications from local partners, which are: *'put into categories according to need and meeting the funding criteria for sponsorship.'* The applications are then sent to members to consider. It also now has its own website[58] and has organised conferences in the UK.

93. The Inquiry asked the Charity to explain its relationship with the Union for Good. The Charity's responses included the following:

   a. A trustee told the Commission during a meeting in December 2006 that the Charity both did and did not provide administrative support to the Union for Good. The trustees later clarified that the Charity made its staff, premises and office facilities available to the Union for Good. The Inquiry established that the Charity produced letters and minutes on behalf of the Union for Good when it was first set up. The Charity's documentary records did not demonstrate to the Inquiry's satisfaction the nature and extent of subsequent support given to the Union for Good.

---

[57]   See Annex 1.

[58]   www.etelaf.org – the website is available in Arabic only.

18

b. The Charity stated that it made grants to applicants co-ordinated through the Union for Good of around 3% of its annual distributions. The grants went direct from the Charity to the recipient zakat committee in the Occupied Palestinian Territories without passing through the Union for Good, and no other direct funding was given to the Union for Good.

c. The trustees advised the Inquiry that they received regular briefings on the activities of the Union for Good, including reports made to trustee meetings. Dr Mustafa stated that he gave periodic reports to the trustees, along with verbal briefings at trustee meetings. According to the minutes of trustee meetings between October 2003 and March 2007, given to the Inquiry by the trustees, the Union for Good was mentioned at four out of the 14 trustee meetings held. In two of those four meetings the mention was in a report to the trustees, and no discussion was held about it. Towards the end of the Inquiry, the trustees provided a list referring to three other occasions during this period where updates to the Board had been given, and stated that: *'there had been very little to report or discuss about [the Charity's] involvement with the Union for Good'.*

94. The Charity advised the Inquiry that its membership of the Union for Good: *'has provided a distinct benefit for Interpal. This can be measured in increased donation levels, extra publicity across a wider potential donor base (internationally and in the UK), administratively and [in] relations with other charities and NGOs.'* These benefits were never quantified to the Inquiry, although the trustees told the Inquiry that they attributed the increase in the Charity's income between 2000 and 2007 to the benefits of its membership of the Union for Good.

95. The Inquiry asked the trustees to explain how its relationship with the Union for Good worked in theory and in practice. It was told that there was no contractual or other written agreement in place between the two organisations, which the Inquiry would have expected of a collaborative relationship of this nature[59].

**Findings related to the relationship between the Charity and the Union for Good**

96. There was a lack of clarity in the information provided to the Inquiry about the nature of the Charity's relationship with the Union for Good. For instance, it was clear that the Charity's resources (such as office facilities) had been expended on the Union for Good, but the trustees were unable to clarify the manner or extent of the resources used.

97. The Charity had played a central role in the establishment and subsequent operation of the Union for Good in the UK, but there was no contract or other written agreement between the two to formalise the relationship.

98. After these findings were put to them, the trustees told the Inquiry that *'we accept that there are areas for improvement in our policies and procedures... for example, the importance and benefit of a written agreement with the Union for Good.'*

---

[59] Further information on collaborative working is available in the Commission's publication *Collaborative Working and Mergers*.

## Conclusions

Given the very close association between the Charity and the Union for Good, the Inquiry concluded that the Charity's continued membership of the Union for Good is not appropriate, for the following reasons:

- Designated entities have been amongst the Union for Good's membership. There is a lack of certainty as to whether this is still the case.

- The involvement of at least one designated entity in many of the projects coordinated through the Union for Good and supported by the Charity allowed a link to be made between the Charity and those designated entities.

- The risks to the Charity's reputation arising through statements made by the President of the Union for Good at the time of its formation, which promoted violence as a legitimate form of resistance in support of the Palestinian cause.

- The trustees did not adequately manage the Charity's relationship with the Union for Good, including the absence of any formal written agreements or any other formal arrangements between them.

- In future, given the lack of clarity surrounding the constitution, organisational structure and membership of the Union for Good, the trustees would not be able to satisfy themselves that they have discharged their legal duties and responsibilities to the Charity.

Therefore, the Charity must dissociate itself from membership of the Union for Good.

### Issue 3: Whether one of the trustees, Dr Essam Mustafa, had any links to terrorist organisations or undertook activities which might make him unsuitable to be a trustee of the Charity

**General context and regulatory principles**

99. Individual trustees are entitled to exercise their own judgment over whom they wish to associate with when acting in their personal capacity. However, a charity is entitled to have the independent and objective judgment of its trustees, acting in the best interests of their charity. Trustees must therefore ensure they do not permit any personal associations to interfere with their judgment as charity trustees.

100. Trustees of charities are publicly accountable. Trustees have a duty of loyalty to their charity. Trustees should ensure that their personal interests or interests which they owe to another body or general conduct do not place them in a position where a conflict with their charity's interests may arise[60]. Even the appearance of a conflict of interest can damage the charity's reputation, so conflicts need to be managed carefully. Where conflicts of interests unavoidably arise, they need to be properly and effectively managed. In practice, many trustees deal with managing conflicts of interest on a regular basis.

---

[60] Further information is set out in the Commission's *Guide to Conflicts of Interest for Charity Trustees*.

101. Holding or expressing strongly controversial or partisan views on a particular issue which is of detriment to and compromises the charity's integrity, purposes or activities may make an individual unsuitable to act as a trustee of that charity. This is regardless of whether those views are held or expressed in a personal capacity. Those views may be irreconcilable with that individual exercising their objective judgement in the interests of their charity. If publicly contentious, such views may also irreparably interfere with that person's ability to properly manage the potential harm to public confidence in their charity, and create risks to the charity's operations. In particular it may undermine the charity's ability to deliver to its beneficiaries.

102. Furthermore, trustees must also ensure that their conduct in their personal capacity does not impact negatively upon their charity's reputation. To do so may breach their duty as trustees to safeguard their charity from undue risk[61]. Any personal associations between a trustee and serious criminal activity such as terrorism would have a significant negative effect on public confidence in their ability to discharge their responsibilities as a charity trustees.

**Regulatory concerns relating to the Charity**

103. The material examined by the Inquiry included allegations that Dr Mustafa was associated with Hamas, by virtue of his meetings with senior Hamas figures and making public expressions of support for the Second Intifada, and through his work for the Union for Good. Although these meetings and his work for the Union for Good were not carried out in Dr Mustafa's capacity as a trustee of the Charity, the Inquiry looked at whether his conduct was in breach of his duties as a trustee or otherwise put the Charity's assets or reputation at risk.

**Dr Mustafa acting in his personal capacity**

**Meetings with alleged Hamas figures**

104. Whilst visiting Yemen in 2002 Dr Mustafa met with Sheikh Mohammed Moyad and Dr Mohammed Siam. The Panorama material described these two individuals as: *'senior members of Hamas'* but did not identify whether they were allegedly members of its political or military wing.

105. Dr Mustafa told the Inquiry that at the time of meeting them, Dr Siam *'was not a member of the Hamas organisation'* and Sheikh Moyad was not *'suspected at that time of involvement in illegal activity or terrorist crimes either in his own country or abroad.'* Dr Mustafa also informed the Inquiry that neither of the men, nor the organisations they represented, nor Hamas, was designated as a terrorist organisation at the time. The Inquiry noted that whilst Hamas in its entirety was not designated as a terrorist entity until 15 September 2003, the Hamas Izz al-Din al-Qassem Brigades were in fact proscribed as a terrorist organisation in 2001.

106. The trustees stated that they were *'confident that Dr Mustafa has at all times kept them aware of its activities[62] and work on behalf of Interpal. If he has met any individuals at meetings or conferences with relevance to the work of Interpal, then he will on occasion mention them.'*

---

[61]    Further information is available in the Commission's publication *The Essential Trustee: what you need to know.*

[62]    The Inquiry considers *'its activities'* refers to the activities of Dr Mustafa.

### Finding related to meetings with alleged Hamas figures

107. The Inquiry found no evidence to suggest that Dr Mustafa's meetings with Sheikh Moyad and Dr Siam had impacted on his conduct as a trustee of the Charity.

## Reference to *'Sheikh of the Mujahideen'*

108. During a broadcast on Al Jazeera in 2001 Dr Mustafa called Sheikh al-Qaradawi[63] the *'Sheikh of the Mujahideen'*. Dr Mustafa told the Inquiry that he was speaking in his personal capacity at the time. The word *'Mujahideen'* has been given different interpretations. It can mean someone who is engaging in a spiritual or social struggle. However, in modern times it has also been given a different interpretation by its association with Afghan fighters in conflict with the Soviet Union in the 1980s. More recently, it has been adopted by some political commentators as a word associated with the Taliban and with militant Islamists[64]. The Inquiry acknowledged that this definition was one of a range of potential interpretations of Dr Mustafa's words.

### Finding related to reference to *'Sheikh of the Mujahideen'*

109. The incident took place a number of years ago and was the only such example brought to the Inquiry's attention. Although trustees should exercise caution when using terms that are open to controversial political interpretations, the Inquiry makes no findings on this allegation.

## Dr Mustafa acting as General Secretary of the Union for Good

110. Prior to his role as General Secretary, Dr Mustafa was the Executive Director of the Union for Good. One of the responsibilities he held in that role was for: *'the effective implementation of projects and to ensure that they were in line with international regulatory specifications.'* Dr Mustafa described his main responsibility when he became General Secretary of the Union for Good as: *'to nurture and develop relationships within the coalition.'*

111. The Inquiry questioned whether Dr Mustafa's roles as Managing Trustee of the Charity and General Secretary of the Union for Good compromised his ability to act solely in the interests of the Charity and created a conflict of interest[65] which a trustee should avoid. It noted that within the Charity Dr Mustafa was described as the Compliance Officer, with responsibility for ensuring the Charity complied with its legal requirements and due diligence in the distribution of funds. Both Dr Mustafa and the other trustees replied that cooperating with other organisations working in the same field is within the Charity's purposes. Dr Mustafa also explained that he did not think his two roles caused any conflict of interest, but were in fact: *'mutually beneficial.'*

112. Towards the end of the Inquiry, the trustees acknowledged that Dr Mustafa's two roles did create the possibility of a conflict of interest, and that as a result Dr Mustafa ceased being the Charity's representative to the Union for Good when he became its General Secretary. The trustees did not, however, give any indication that they managed the possible conflict of interest prior to this, when he was its Executive Director. The trustees also did not acknowledge that any possible conflict of interest remained when he continued to be both a trustee of the Charity and the General Secretary of the Union for Good.

---

[63] The President of the Union for Good.

[64] As an example of the different interpretations that can be given to the word *'Mujahideen'*, the Inquiry noted that in the same Al Jazeera broadcast, Sheikh al-Qaradawi described the Mujahideen as: *'burning with longing for Jihad.'*

[65] Further information on conflicts of interest is available in the Commission's guidance *A Guide to Conflicts of Interest for Charity Trustees.*

22

**Finding related to Dr Mustafa's role in the Union for Good**

113. Given the conclusion in issue 2 above[66], particularly the presence of designated entities amongst the Union for Good's membership, Dr Mustafa's senior role in both organisations meant he could not act solely in the interests of the Charity in relation to arrangements with the Union for Good. His dual role was problematic because it increased the risk to the Charity in being associated with an organisation that had designated entities amongst its members.

114. The trustees' view was that they are able to manage the conflict of interest that arises from Dr Mustafa's dual roles. However, the Inquiry disagrees.

## Conclusion

Concerns about Dr Mustafa's suitability to act in the capacity of trustee of the Charity were not substantiated as the evidence before the Inquiry did not indicate links between Dr Mustafa and terrorist activities.

Given the conclusions drawn by the Inquiry regarding the Union for Good, Dr Mustafa cannot properly discharge his responsibilities to the Charity whilst he remains both a trustee of the Charity and the General Secretary of the Union for Good.

### Issue 4: Whether the trustees were fulfilling their legal duties and responsibilities, in particular by ensuring that the Charity and its assets were protected from any association with terrorist or inappropriate political activities

#### General context and regulatory principles

115. When they take up their role, trustees accept ultimate responsibility for the general control and management of the administration of their charity. All charities must operate within the law, including international humanitarian law which emphasises the duty of governments and the international community to provide assistance and protect civilian populations in times of armed conflict and other natural or man-made disaster situations. The alleviation of suffering, with aid provided on the basis of need and without discrimination of any kind, is the foundation of humanitarian assistance.

116. Trustees accept a range of duties and responsibilities under charity law, including the duty to ensure that their charity does not breach any of the requirements set out in its governing document, to use charitable assets reasonably and only in furtherance of their charity's objects, and to avoid undertaking activities that might place their charity's assets or reputation at undue risk[67].

117. When operating overseas, charities may work through appropriate intermediaries: providing grants to local partners to fund projects or for them to be distributed on the ground can be an effective way of distributing funds, particularly in regions where access and movement is restricted[68].

---

[66] See paragaph 20.

[67] Further information is available in the Commission's publication *The Essential Trustee: what you need to know.*

[68] Further information is set out in the Commission's guidance *Charities Working Internationally.*

118. When choosing intermediaries to work with, trustees must conduct adequate due diligence checks on prospective partners[69], in order to discharge their legal duties and responsibilities, put in place an agreement setting out the proper use of the charity's funds, and implement proper ongoing monitoring of how they use these funds. These procedures must satisfy trustees that:

   a. the activities they intend to carry out through their partners are in furtherance of their charity's purposes;

   b. their partners are and continue to be appropriate for their charity to work with; and

   c. they have put in place adequate monitoring procedures to ensure their charity's funds are being properly applied. This includes:

      i. ensuring that their partners can and will apply their funds for proper charitable purposes, such as by selecting their beneficiaries solely on the basis of charitable need; and

      ii. having an audit trail to demonstrate that the funds reached their partner and the end beneficiaries.

119. All elements of these procedures must be based on an assessment of the risks arising in the charity's area of work. For example, terrorist organisations are known to operate in the Occupied Palestinian Territories, and it is a politicised and unstable region. Trustees of charities working there must take steps to mitigate the risks resulting from these factors, and demonstrate a greater duty of care than in more stable regions. This must be an ongoing assessment as the risks in an area may change[70].

## Regulatory concerns relating to the Charity

120. As a result of the work of the Inquiry, the question arose as to whether the trustees were fulfilling their legal duties and responsibilities when managing the Charity; in particular whether the trustees were exercising adequate due diligence in the selection of local partners, and the monitoring and control exercised over the use of their funds, in order to be satisfied that each local partner was an appropriate recipient of the Charity's funds. As explained above[71], whether the partner concerned received the Charity's funds was not at issue: the Inquiry confirmed that the Charity maintained comprehensive financial audit trails, including a personal acknowledgement from each orphan supported by the Charity. The Inquiry noted this as a good example of practical due diligence steps.

121. When reviewing whether the trustees had been fulfilling their legal duties and responsibilities, the Inquiry took into account the Charity's methods of operating through local partners, and the difficult local conditions it faced. In particular, the trustees told the Inquiry that they were unable to open field offices in the region because the Charity had been banned by the Israeli Government.

122. In particular, the Inquiry looked at:

   a. advice given to the Charity by the Commission in 2003;

   b. the selection and monitoring processes used by the Charity; and

   c. the potential for bias in the distribution of aid.

---

[69]   A partner would be any individual or organisation with whom a charity is associated for the purposes of carrying out an activity.

[70]   Further guidance is available in *Charities Working Internationally* and *Charities and Risk Management*, available on our website.

[71]   See paragraph 30.

**Advice given to the Charity by the Commission in 2003**

123. Despite the specific focus of the 2003 inquiry[72], regulatory advice[73] was given to the Charity about its activities in the Occupied Palestinian Territories, including advice that it should/must:

   a. implement procedures that would allow for independent verification of the work done by the Charity's zakat committee partners; and

   b. seek clarification from these local partners on their procedures for selecting beneficiaries.

124. In response, in November 2003 the Charity confirmed that it:

   a. sent delegations to visit the Charity's partners and projects to check on their implementation and report back to the Charity;

   b. used international NGOs to verify the distribution of the Charity's funds and the implementation of their projects; and

   c. proposed a new process, which involved sending a questionnaire to all its local partners seeking clarification on their procedures for selecting beneficiaries. This Inquiry established that this was not taken forward in 2003, and the first such questionnaires were actually sent in 2006/07 after the start of this Inquiry.

125. During the Inquiry, the Charity stated that three delegations had been sent to their projects in the Occupied Palestinian Territories between November 2003 and March 2007. According to the minutes of trustee meetings from the time, these delegations were part of a programme called 'Bearing Witness', the aims of which did not include monitoring the use of the Charity's funds. A report covering two of the delegations did not provide any detail or analysis of how the Charity's funds had been used by its local partners. Its focus was on raising awareness of humanitarian need in the Occupied Palestinian Territories which was legitimate work for the Charity, but served a different purpose from monitoring or reporting on the use of the Charity's funds. The Inquiry later established that the Charity had organised other delegations comprising members of its staff and trustees.

126. The Charity gave the Inquiry the names of three organisations with which it worked to monitor its zakat partners, which included the Union for Good and one of its members.

**Findings related to the 2003 advice**

127. Although the Inquiry took into account the significant challenges of working in the Occupied Palestinian Territories, the Inquiry found that the procedures put forward by the Charity in 2003 as methods of obtaining independent verification of the work done by its zakat committee partners were not fully implemented and did not achieve this aim.

128. The Charity did not implement its plan to send questionnaires to all its partners to seek clarification on their procedures for selecting beneficiaries until this Inquiry commenced.

129. The delegations were not an effective monitoring method. Those sent as part of the Bearing Witness programme served a different, albeit beneficial purpose, while the details supplied regarding the internal delegations did not demonstrate that they provided adequate detailed monitoring of the Charity's partners and projects.

---

[72] See paragraph 17.

[73] See paragraph 19.

130. The Charity was working with other NGOs to verify the distribution of its funds, but close links between the Charity and the Union for Good meant this could not be considered independent verification of the work done by the Charity's partners.

131. The trustees disagreed with this finding, stating that they always looked for improvements in the Charity's procedures, and sought to implement the Commission's guidance now and in the future. They disagreed that they were under any expectation to implement the advice as the Commission had in their view only suggested they could improve their procedures in these ways. However, the Inquiry noted that the trustees had, in November 2003, confirmed the steps they said they either did or would take and therefore had a reasonable expectation that these would be done.

## Conclusions

The Inquiry concluded that the trustees did not give sufficient consideration to the 2003 advice. As a result, the trustees continued without adequate independent verification of the work done by the Charity's partners, and insufficient clarification regarding how those partners ensured they applied the Charity's funds solely on the basis of charitable need.

The Charity's failure to deliver on the new processes in a timely manner that they had confirmed to the Commission as regulator in 2003 is a matter of concern and, given the region in which the Charity works and the media and other concerns that have been raised about the Charity, has contributed significantly to the difficulties it currently faces.

## The selection and monitoring processes used by the Charity

132. In order to assess whether the trustees had established and implemented adequate procedures, the Inquiry sought details of how the Charity selected and monitored its local partners.

133. The Charity outlined its procedures as follows:

   a. The Charity's prospective partners were required to complete and submit a Partner Profile giving information about their management, finances and activities. The profile also requested *'details as to how the organisation ensures that the end use of the funds are for charitable purposes only'*. However, the trustees could give no explanation, either generally or through specific examples, of how they decided whether the responses given by a prospective partner were sufficient.

   b. The Charity's partners were required to sign and adhere to a Funding Agreement committing them to use the Charity's funds for charitable purposes only and setting out the sanctions that may apply should they not do so. The trustees could give no indication of how they monitored whether partners complied with the Funding Agreement, or any examples of when they would consider it necessary to take steps to check compliance. It appeared to be a paper exercise.

   c. Ongoing projects funded by the Charity supplied regular feedback reports, following which the Charity completed Project Evaluation Forms. However, these forms were not completed properly. In particular, a section requesting the justification for approving continued funding by the Charity was frequently left blank or inadequately filled in. When this was put to the Charity, it told the Inquiry that the form was being reviewed[74].

---

[74] In addition to these three forms, the Charity also provided copies of its Project Proposal Summary, Project Feedback Report and Partnership Protocol.

d. All partners were required to certify that they were registered with the relevant local regulatory authority, although the Charity did maintain the discretion to work with non-registered organisations.

e. The Inquiry was told that prospective partners were checked against the UK's consolidated list of designated persons, entities and groups. Further details are given in paragraphs 136-142.

f. The Charity relied heavily upon the oversight of the local regulatory regime and of local law enforcement bodies to be satisfied that their zakat committee partners were not misapplying the Charity's funds.

  i. The trustees explained that none of the Charity's partners had action taken against them by either the Palestinian National Authority or the Israeli Government. However, the Inquiry noted that the trustees' assertion was incorrect: a significant number of the Charity's partners had in fact been declared "terrorist organisations" by the Israeli Government. The trustees later clarified for the Inquiry that what they meant was that *'despite being declared illegal by Israel, it left them to operate.'*

  ii. In March 2007 the trustees explained that the Charity's partners operated under the *'very strict regulations'* of the Palestinian National Authority, which were: *'in place to ensure that any person or persons involved in illegal activity will be prevented from becoming an official or leading member of a charitable organisation. To the best of the trustees' knowledge, the establishment of a branch of such a charity in order... to cover up the transfer of funds to Hamas... would not be possible under PNA legislation.'* However, the regulations supplied by the trustees to support this claim specified no measures that could be taken to prevent charitable organisations from supporting or promoting any terrorist or political organisations. Furthermore, during the interviews conducted by the Inquiry in December 2007[75], the two trustees confirmed that they were not aware of the extent of monitoring or regulation carried out in the Occupied Palestinian Territories. Later in the Inquiry, the trustees confirmed that they did know *'very well the conditions and facts that are present in the areas of its operation.'*

g. The Charity relied upon published research into the general benefits of the zakat committee structure in delivering social welfare[76]. This may have been significant to the Charity's assessment of the best way to deliver aid in the Occupied Palestinian Territories, but the published research was not suitable to be used as a selection and monitoring tool to assess whether a specific zakat committee was an appropriate partner for the Charity and complied with its Funding Agreement.

134. In addition to the procedures described to the Inquiry, the Charity's accounts for the financial year ending 31 December 2005 stated that the Charity had *'initiated new processes of validation, appraisal and assessment in close liaison with regional regulatory bodies such as the British Consul in Jerusalem and UNDP [United Nations Development Programme]'*.

---

[75]  See paragraph 34.

[76]  The trustees brought two reports to the Inquiry's attention:
- The International Crisis Group Middle East Report No. 12 (2 April 2003) *Islamic Social Welfarism in the Occupied Palestinian Territories*
- Benthall, J (2008) *The Palestinian Zakat Committees 1993-2007 and their Contested Interpretations*

135. In March 2007 the Inquiry requested details of these new processes and was advised by the Charity that they had not yet been initiated. The trustees supplied copies of email correspondence with UNDP from December 2004 which ended with UNDP stating that they would proceed in co-operation with the Charity and left the matter with them. According to the trustees, UNDP then withdrew their offer of co-operation.

**Particular monitoring issues related to designated individuals and entities**

136. As explained above[77], the Inquiry was told that prospective partners were checked against the UK's consolidated list of designated persons, entities and groups.

137. In order to fulfill their legal duty to act in their charity's interests, trustees working with designated individuals and entities must be satisfied that the potential serious harm to public confidence and other risks caused by associating with them are properly assessed and managed. This must include a rigorous assessment of whether it is in the interests of the charity to have any dealings with them at all. In addition, trustees must also put in place robust procedures to ensure they do not inadvertently commit a criminal offence under the legislation relating to designation[78].

138. In March 2007, the Charity told the Inquiry that they had ceased relations with at least 11 organisations because: *'these organisations were either forced to close down or they were designated as "terrorist organisations."'*

139. However, information given to the Inquiry by the trustees showed the Charity continued to work with an organisation called the 'Al Aqsa Foundation of South Africa'. The Charity signed a partnership agreement with this organisation on 17 May 2003. The Inquiry noted that an entity known as the 'Al Aqsa Foundation' was designated in the UK as a terrorist entity on 29 May 2003[79]. It had branches in a number of countries, including South Africa. The addresses of the Charity's partner and the designated entity were identical, including operating from the same PO Box.

140. The Inquiry requested details of how the trustees had addressed the risk that their partner was in fact the designated entity. In response, the trustees confirmed that they had not considered this issue at the time. However, they could make the following points:

a. The designated entity was known as the 'Al Aqsa International Foundation', not the 'Al Aqsa Foundation of South Africa'.

b. The Charity's partner was not a branch of an international organisation, but the designated entity was.

c. The 'Al Aqsa International Foundation' had dissolved. The Charity supplied a copy of a 'Resolution of the board of trustees of one Al-Aqsa International Foundation' to that effect.

d. The trustees had personal knowledge of both the 'Al Aqsa International Foundation' and the 'Al Aqsa Foundation of South Africa'.

e. The Charity's due diligence processes had demonstrated that the two organisations had different trustees, employees and bank accounts.

---

[77]  See paragraph 133(e).

[78]  See Annex 1.

[79]  For further information please see the Financial Sanctions section on the Treasury website at www.hm-treasury.gov.uk.

141. After reviewing the trustees' statements and supporting evidence, the Inquiry noted the following:

    a. The Bank of England Notice of 29 May 2003 confirming the designation gave the entity's name as the 'Al Aqsa Foundation AKA the Al Aqsa International Foundation[80]'.

    b. The trustees offered no explanation of how they knew that their partner was not a branch of an international organisation, or any evidence to support this assertion.

    c. The trustees gave no details of their personal knowledge of the Al Aqsa International Foundation or the Al Aqsa Foundation of South Africa, where this knowledge came from or how it impacted on their decision to enter into a partnership with the Al Aqsa Foundation of South Africa.

    d. When asked to produce an explanation or supporting documentation to demonstrate how the Charity's due diligence processes had clarified there were two organisations, the Charity said they were unable to do so.

142. Finally, the Inquiry noted the trustees' statement that *'there are no specific further minutes of meetings or "risk assessments"'* from 2003 to demonstrate whether and how the trustees ensured that their partner was not the designated entity.

**Findings related to selection and monitoring processes, including relationships with designated individuals and entities**

143. The Inquiry found that the trustees could not explain, either generally or with specific examples, how the information they gathered about their partners was used to determine whether it was appropriate for the Charity to support an organisation or continue funding it.

144. The Charity could not demonstrate that it took sufficient steps to ensure that its partners complied with the Funding Agreement, or that procedures they used to monitor the work of their partners had any practical worth to the Charity as a means of protecting against the misuse of its funds. Examples given of methods of monitoring the use of the Charity's funds (such as published research and awareness-raising delegations) were not directed to that purpose. The Inquiry found that it would be reasonable to expect the trustees to apply the same care in relation to the selection and monitoring of their partners as shown in their financial audit procedures.

145. The Inquiry agreed that it was useful and appropriate to place a degree of reliance on the Palestinian National Authority and local law enforcement bodies to inform and assist the trustees' decision-making. However, during the course of the Inquiry the trustees, when questioned on the topic, stated that they did not know the details of how these regulatory regimes operated. After the trustees had sight of the Inquiry's draft findings, the trustees submitted their explanation of the regulatory regime.

146. The Inquiry found that in 2003 the trustees had failed to identify the potential for one of their partners to be a designated entity. The trustees asserted their partner was not designated without any further supporting or documentary evidence.

147. The Inquiry found there was an ongoing risk that the Al Aqsa Foundation of South Africa may be a designated entity.

---

[80]  A number of other aliases were also given.

## Conclusion

The Occupied Palestinian Territories is a region where designated entities and proscribed terrorist organisations are known to operate. While recognising the challenges for the trustees posed by this environment, the Charity's procedures should have been sufficiently robust to manage the risks involved.

The Inquiry concluded that the trustees had not adequately fulfilled their duties and responsibilities in respect of their due diligence and monitoring procedures for their partners. The procedures the trustees put in place went some way towards mitigating the risks but they were not, in the circumstances, sufficient. Where procedures were in place, for instance those in relation to Funding Agreements and designated entities, they were not fully implemented.

**The potential for bias in the distribution of aid**

148. The material examined by the Inquiry included claims that the distribution of aid by the local partners funded by the Charity was not on the basis of charitable need, but was instead targeted at the families of suicide bombers. This aid was allegedly aimed at providing financial security and social support to the families of those willing to engage in terrorist activity.

149. It is legitimate for charities to provide aid to people in need of humanitarian relief who happen to include children or others whose families have been involved in terrorist activity. However, it is not acceptable for any charity to limit its class of beneficiaries using such a criterion, or deliberately to select and support families who have engaged in terrorist activity. This may indicate that the charity has pre-selected its beneficiaries rather than conducting an assessment of their needs, or that the underlying purpose of the charity is indirectly to support the terrorist activities of the child's family.

150. Within the material it examined, the Inquiry identified a document said to be created by the Al-Tadhuman Charitable Society (a zakat committee partner of the Charity) giving a list of children it supported. Each child was described as coming from the family of a 'martyr' and details were given of the event which led to the death, wounding or imprisonment of their parent(s). The Inquiry noted that the term 'martyr' is used in the Occupied Palestinian Territories to describe an individual harmed, killed or imprisoned as a result of the conflict. In addition, that term is also used to describe suicide bombers. The Charity should take care to establish the basis upon which the Charity's partners in the region are selecting beneficiaries, especially if they use such a term in their selection criteria.

151. However, the Inquiry could not verify to its satisfaction the provenance or accuracy of this document.

**Findings related to the potential for bias in the distribution of aid**

152. The claim that there was a bias in the distribution of aid using the Charity's funds towards the families of martyrs was unfounded, on the basis of the material examined by the Inquiry.

## Conclusions

The Inquiry concluded that:

- The allegations of bias in the distribution of aid were unfounded on the basis of the material examined by the Inquiry.

- However, they added to the risks the Charity had to manage when working in the Occupied Palestinian Territories. To mitigate these risks in the future, the Charity should publish guidelines setting out the criteria it applies in selecting charitable beneficiaries. The Charity should also ensure that their local partners can demonstrate to them that they only use the Charity's funds to support people who fall within those criteria.

## Summary of conclusions

**Issue 1: Whether particular local partners funded by the Charity were promoting the ideology or the activities of terrorist organisation(s) and therefore would be inappropriate partners for the Charity (paragraphs 49-68)**

153. The Inquiry could not verify the material suggesting that certain local partners funded by the Charity may be promoting terrorist ideology or activities, so the material was of insufficient evidential value to support these allegations.

154. While accepting the difficulties the trustees faced, and acknowledging the action they did take, the Inquiry concluded, in the circumstances, that they did not take sufficiently rigorous steps to investigate the allegations about their local partners. The trustees should have acted with greater diligence to satisfy themselves that the local partners concerned were not directly or indirectly supporting the promotion of terrorist ideology or activities.

**Issue 2: Whether the Charity's membership of the Union for Good was appropriate (paragraphs 69-98)**

155. Given the very close association between the Charity and the Union for Good, the Inquiry concluded that the Charity's continued membership of the Union for Good is not appropriate, for the following reasons:

- Designated entities have been amongst the Union for Good's membership. There is a lack of certainty as to whether this is still the case.

- The involvement of at least one designated entity in many of the projects coordinated through the Union for Good and supported by the Charity allowed a link to be made between the Charity and those designated entities.

- The risks to the Charity's reputation arising through statements made by the President of the Union for Good at the time of its formation, which promoted violence as a legitimate form of resistance in support of the Palestinian cause.

- The trustees did not adequately manage the Charity's relationship with the Union for Good, including the absence of any formal written agreements or any other formal arrangements between them.

- In future, given the lack of clarity surrounding the constitution, organisational structure and membership of the Union for Good, the trustees would not be able to satisfy themselves that they have discharged their legal duties and responsibilities to the Charity.

156. Therefore, the Charity must dissociate itself from membership of the Union for Good.

**Issue 3: Whether one of the trustees, Dr Essam Mustafa, had any links to terrorist organisations or undertook activities which might make him unsuitable to be a trustee of the Charity (paragraphs 99-114)**

157. Concerns about Dr Mustafa's suitability to act in the capacity of trustee of the Charity were not substantiated as the evidence before the Inquiry did not indicate links between Dr Mustafa and terrorist activities.

158. Given the conclusions drawn by the Inquiry regarding the Union for Good, Dr Mustafa cannot properly discharge his responsibilities to the Charity whilst he remains both a trustee of the Charity and the General Secretary of the Union for Good.

**Issue 4: Whether the trustees were fulfilling their legal duties and responsibilities, in particular by ensuring that the Charity and its assets were protected from any association with terrorist or inappropriate political activities (paragraphs 115-152)**

159. The Inquiry concluded that the trustees did not give sufficient consideration to the 2003 advice. As a result, the trustees continued without adequate independent verification of the work done by the Charity's partners, and insufficient clarification regarding how those partners ensured they applied the Charity's funds solely on the basis of charitable need.

160. The Charity's failure to deliver on the new processes in a timely manner that they had confirmed to the Commission as regulator in 2003 is a matter of concern and, given the region in which the Charity works and the media and other concerns that have been raised about the Charity, has contributed significantly to the difficulties it currently faces.

161. The Occupied Palestinian Territories is a region where designated entities and proscribed terrorist organisations are known to operate. While recognising the challenges for the trustees posed by this environment, the Charity's procedures should have been sufficiently robust to manage the risks involved.

162. The Inquiry concluded that the trustees had not adequately fulfilled their duties and responsibilities in respect of their due diligence and monitoring procedures for their partners. The procedures the trustees put in place went some way towards mitigating the risks but they were not, in the circumstances, sufficient. Where procedures were in place, for instance those in relation to Funding Agreements and designated entities, they were not fully implemented.

163. The Inquiry concluded that:

- The allegations of bias in the distribution of aid were unfounded on the basis of the material examined by the Inquiry.

- However, they added to the risks the Charity had to manage when working in the Occupied Palestinian Territories. To mitigate these risks in the future, the Charity should publish guidelines setting out the criteria it applies in selecting beneficiaries. The Charity should also ensure that their local partners can demonstrate to them that they only use the Charity's funds to support people who fall within those criteria.

## Overall conclusion

Charities providing humanitarian aid in high-risk situations, such as conflict and other complex emergencies, make a vital contribution to these communities and their work supports people in desperate need. Working in areas facing such situations brings with it difficult risks and challenges and the need for finely balanced judgements by trustees.

Interpal works in the Occupied Palestinian Territories, where there is considerable instability and organisations proscribed and designated by the UK government operate. As a result the trustees face particular challenges and should operate robust procedures commensurate with the risks and practical difficulties involved.

In summary, the Commission noted that the Inquiry had confirmed that the Charity had maintained clear financial audit trails in their delivery of aid for humanitarian purposes.

However:

- The trustees had not taken sufficiently rigorous steps to investigate the allegations about some of their local partners and did not put in place adequate due diligence and monitoring procedures to be satisfied that these partners were not promoting terrorist ideologies or activities (Paragraphs 49-68).

- The Charity's close association with the Union for Good cannot continue given the potential for linkage to be made between the Charity and designated entities through membership of, and association with, the Union for Good (Paragraphs 69-98).

- Given the position with the Union for Good, Dr. Mustafa cannot continue both as trustee of the Charity and General Secretary of the Union for Good (Paragraphs 99-114).

- The due diligence and monitoring procedures the trustees put in place went some way to mitigating risks faced by the Charity. However, in the circumstances, these were not sufficient nor fully implemented. (Paragraphs 115-147).

- In order to deal with any allegations of bias relating to the distribution of aid to the Charity's beneficiaries, the Charity should produce and publish guidelines setting out criteria which their local partners must apply in selecting beneficiaries and ensure that these are complied with. (Paragraphs 148-152).

Steps now required to be taken by the Charity's trustees are set out below.

## Regulatory action taken and actions required of the trustees

164. On 22 January 2007 the Commission ordered, under section 9 of the Act, the Charity's banks to provide copies of the Charity's bank statements. Further orders were made in February 2008 asking for additional statements.

165. On 23 February 2007 and 20 May 2008 the Commission directed the Charity and its representatives to respond to its questions, using its powers under section 8 of the Act. This was necessary because the Charity missed extended deadlines for specific requests for information as outlined in paragraph 35.

166. The Commission referred its findings in relation to the Al Aqsa Foundation of South Africa (see paragraph 147 of this report) to the Asset Freezing Unit at HM Treasury.

167. On 26 February 2009 the Commission provided the Charity with its conclusions from its Inquiry.

168. On 26 February 2009 the Commission made an Order under section 19A of the Act directing the trustees to:

   a. Carry out a review of the trustees' due diligence and monitoring procedures.

   b. End the Charity's membership of, and in all other respects dissociate from, the Union for Good, including ceasing to provide it with any facilities or other resources.

   c. Ensure that no trustee of the Charity holds any office or has any role whatsoever within the Union for Good.

169. The Order included a timetable for completing these actions.

## Impact of Commission intervention

170. The Inquiry has set out its findings and conclusions about the issues being examined, based on the evidence before it. As a result, it has had the following impact.

171. The Charity will conduct, as a result of the Commission's direction, proper due diligence on its partners to be satisfied, and to satisfy donors, the Commission as regulator and the general public, that the Charity is using appropriate local partners and that its funds, assets and reputation are safeguarded. In particular:

   a. where concerns are raised about the Charity's local partners in the Occupied Palestinian Territories or elsewhere, the trustees are aware of their duties and responsibilities to the Charity. Where allegations of a serious nature are made, particularly relating to links to violence or terrorism, the trustees will take thorough and rigorous steps to ensure that their partners are appropriate for the Charity to use; and

   b. the Charity's due diligence procedures will be sufficiently robust for dealing with the challenges of working in the Occupied Palestinian Territories, and will be fully implemented. The risks of charitable funds not being properly applied, or of public confidence in the Charity being harmed, will therefore be reduced.

172. The Inquiry has examined the Charity's relationship with the Union for Good. As a result, the Charity will no longer be a member of this organisation. The risks to the Charity arising from membership will therefore be mitigated.

173. The Charity has faced concerns being raised about its activities since it was first established. An important defence against concerns is to be able to demonstrate that the trustees have adequate safeguards in place to protect the Charity's interests, and to deal properly with these concerns. In doing so, they will be helping to maintain public trust and confidence in charity. As a result of acting on this Inquiry, the trustees will be better able to demonstrate that they are:

   a. fully implementing their due diligence procedures, including those commitments made to the Commission as regulator; and

   b. satisfied that the Charity's funds, assets and reputation are not at undue risk.

174. This Inquiry recognised and highlighted the challenges faced by charities operating in the Occupied Palestinian Territories. It has re-emphasised that charities working in the Occupied Palestinian Territories must be transparent and accountable for their activities and for funds sent to the region, and must rigorously monitor the use of their funds commensurate with the risks and practical difficulties involved. The issues for the wider sector arising from this Inquiry are set out below.

## Resources applied

175. The Commission adopted a multi-disciplinary team working approach to this case both before and during the Inquiry. The team consisted of investigators and lawyers. The Commission, as a non-prosecuting body, does not record the full costs of each inquiry. However, due to the scope and complexity of the case the resources applied were significantly greater than average. In addition, the Commission paid £4,983 to obtain translations of documents written in Arabic.

## Issues for the wider sector

176. The purpose of this section is to highlight the broader issues arising from the Inquiry that have relevance for other charities operating in the Occupied Palestinian Territories or in similarly challenging contexts. The issues raised below are not intended as further comment on the Charity in addition to the findings and conclusions set out the earlier sections of this report, but because of their wider applicability and interest to the charity sector.

177. Charities frequently undertake work around the world in complex and often chronic emergency situations, whether caused by natural disasters or as a result of political and social unrest or armed conflict. There may be a collapse of infrastructure, and/or a breakdown of trust within and between political authorities and civilian populations. A charity's staff and volunteers may often work where there is real danger and a risk of physical harm as they attempt to deliver vital assistance to alleviate human suffering and distress. Charities make a vital contribution to supporting communities in desperate need and the value and impact of their work cannot be overstated.

178. The Commission fully recognises that charities operating in the Occupied Palestinian Territories are likely to come into proximity with political or militant organisations. In Gaza, the political and administrative activity of those organisations is so pervasive and deeply ingrained in daily life that it is inevitable that most individuals and organisations will have some degree of contact and interface with them. This means that trustees need to be even more vigilant in assessing the risks when working there. Trustees cannot base their decisions on an automatic acceptance that all organisations, and those they work with, have an association with Hamas or other political or militant entities. It is the trustees' responsibility, and theirs alone, to properly assess and manage risks to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. They should take all necessary steps to ensure that their activities could not reasonably be misinterpreted.

179. The long-running complex conflict in the Occupied Palestinian Territories presents an extremely challenging operating environment for charities. The volatile and insecure situation requires charities to be highly adaptive and quick to respond to the changing and often acute humanitarian needs of communities and families, while also working to protect, develop and strengthen the provision of education, health and welfare and other services, and support longer-term poverty reduction efforts, often in partnership with other organisations.

180. The risks of working in such a context are likely to fluctuate continually. In times of intense humanitarian crisis, where needs are acute, the requirement to provide immediate and effective emergency assistance will be paramount. This will necessarily mean that the extent of due diligence assessment needs to be proportionate to the urgency of delivering rapid relief. However, in the aftermath of an acute emergency phase when the need to provide relief diminishes, trustees should reassess the risks and undertake thorough due diligence work to manage those risks properly.

181. In such long-running complex emergencies, many charities put in place their own emergency preparedness plans, often drawn up and practiced with established partner organisations on the ground, to help respond as rapidly and effectively as possible to quick-onset humanitarian crises. This allows for adequate and thorough due diligence work to be carried out and operating agreements to be formed between partners, clarifying their respective roles and responsibilities, in advance of the occurrence of crisis situations.

182. Trustees should take appropriate steps to ensure:

   a. the activities they intend to carry out are in furtherance of their charity's purposes;

   b. their partners are, and continue to be, appropriate for the charity to work with;

   c. their partners can and will apply their funds for proper charitable purposes; and

   d. their charity's funds reach the partners and the intended beneficiaries.

183. Humanitarian assistance cannot be denied to people because they support, actively or otherwise, or are sympathetic towards the work or aims of a political body such as Hamas. However, assistance cannot be given solely on the basis of a person's support or sympathy for Hamas.

**Allegations of terrorist abuse within charities**

184. Proven instances of terrorist involvement[81] in and abuse of charities are extremely rare but are completely unacceptable. It is the responsibility of charity trustees to safeguard their charity from the risk of abuse, including terrorist abuse. The Commission will support them to do this, and will also support charities carrying out legitimate and vital humanitarian and other work, within the law.

185. The Commission expects trustees to be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. It also expects trustees to take all necessary steps to minimise the risk that their charity's activities could be misinterpreted as promoting or supporting terrorism by ensuring that they are transparent about the work they do and the rationale behind the trustees' decisions. The Commission holds trustees accountable for ensuring that proper and adequate procedures are put in place and properly implemented to prevent terrorist organisations taking advantage of a charity's status, reputation, facilities or assets.

186. It is particularly important to ensure that the charity is not used to commit any criminal offences under terrorism legislation.

187. In the context of a charity whose purposes are the relief of need, a charity's procedures must ensure that its funds are distributed to its beneficiaries on the basis of charitable need. It may be possible to further limit those benefitting by some other criteria; this will depend on the charity's purposes and policies.

---

[81]   See Annex 1 and footnote 1.

188. In certain circumstances, such as the delivery of food or other aid to a refugee camp, it may be legitimate for a charity to provide aid to all individuals within a group in need that happens to include the children or families of terrorists or those responsible for terrorist activity. In doing so, its trustees must be satisfied that:

a. the aid furthers the charity's purposes;

b. the aid is, in practice, capable of alleviating the need that has been identified;

c. the criteria used – by the charity or its partners – when selecting beneficiaries are consistently applied; and

d. the charity is not breaking charity, terrorism or other applicable law in providing the aid.

189. Trustees must also ensure that they fulfill any obligations under UK or international law regarding the reporting of suspicions of terrorist or criminal activity.

190. It is not acceptable for a charity to select and support individuals because they are the children or families of terrorists or those responsible for terrorist activity. Such a criterion is not based on charitable need.

191. Targeting funds on the basis of affiliations or connections to a terrorist group, irrespective of whether those in that group are in need, would raise the question of whether the purpose of that support was to indirectly support terrorist activity. It could create an unacceptable association to terrorism, and would breach the trustees' duty to ensure the charity's funds were properly applied.

**Acting as a trustee**

192. A prospective trustee should consider the general duties and responsibilities of being a trustee. In addition, the needs of individual charities may vary, and the judgements required of a charity trustee can be challenging and finely balanced, with difficult implications to consider. Before making a decision to become a trustee, individuals should ensure they understand what is required of a trustee for that particular charity, and ensure they are prepared to give the commitment and time to fully discharge their duties, even on challenging matters.

193. Trustees are publicly accountable. A charity is entitled to the independent and objective judgment of its trustees, acting solely as trustees. Trustees must ensure that they do not permit any personal associations to interfere inappropriately with their judgement as charity trustees. They should also ensure that their personal interests or conduct do not place them in a position of conflict with their charity's interests.

194. Holding or expressing strongly controversial or partisan views on a particular issue which is relevant to a charity's purposes and activities may make an individual unsuitable to act as a trustee of that charity. This is regardless of whether these views are held and expressed in a personal capacity. Those views may be irreconcilable with that individual exercising their independent judgment in the interests of their charity. The publicly contentious nature of such views may also irreparably damage public confidence in their ability to carry out a public office and in their charity.

**Managing risk**

195. Charity trustees have a duty of care towards their charity, along with a duty to protect the charity's assets, to use those assets only in furtherance of their charity's purposes and a duty to account for the proper application of their charity's funds. Charity trustees can take risks, however, in order to fulfill their duties, trustees must implement realistic and reasonable risk management strategies to identify and mitigate potential risks to the proper use of their funds.

196. The risks trustees should consider can take a number of forms, including operational, financial, reputational and external risks, and compliance with the law and regulations in the UK or overseas.

**Working with partners**

197. Charities working overseas must ensure their risk assessment takes account of any relevant circumstances arising in their particular country or region of operation. Specific risks could arise from, for example, any internal conflict or other military action in the country or region, any known terrorist or criminal activity in the area, or working in a remote or sparsely populated area or one with limited infrastructure. There is often a need for humanitarian aid in such regions so when working there charities should consider appropriate risk management strategies, such as minimising the charity's exposure to the risk, implementing new procedures for controlling the distribution of funds, or sharing the risk with others through joint working. At the extreme, where the risks are particularly high, the appropriate decision may be to stop working in that region, either temporarily or permanently.

198. When working overseas, charities often operate through local partners rather than establishing their own delivery infrastructure in their country or region of operation. Working through or with a local partner can be an effective way of delivering significant benefits direct to a local community. It does not, however, alleviate or shift responsibility for ensuring the proper application of the charity's funds by the local partner. That responsibility always remains with the charity trustees, forming part of their duties and responsibilities under charity law. The need to implement risk management strategies therefore remains critical.

199. As part of their due diligence processes, trustees should conduct checks on prospective (and existing) partners to satisfy themselves that their partnership with this organisation would not expose the charity's assets or reputation to undue risk. These processes, which can be described as 'know your partner', may also apply in relevant circumstances to a charity's donors or beneficiaries.

200. Charities should establish their own benchmarks for the extent and quality of the information they require about their local partners to be satisfied that their trustees are acting in accordance with their duty to safeguard their charity's funds. The degree of detail needed by trustees to satisfy themselves on these points should be proportionate to the risks present in the area their charity operates. It may be that different partners require differing levels of oversight and monitoring depending on the length of the charity's relationship with them and the strength of their infrastructure.

201. When charities work in or send funds to regions where terrorist groups are known to operate they must still consider their duty to safeguard the proper application of the charity's funds. The presence of terrorist groups creates a significant risk that trustees must manage. For example, trustees must take adequate steps to ensure that they do not put their charity, its funds or its reputation at risk by failing to take basic steps to check that they do not inadvertently commit a criminal offence in the UK or overseas by working with proscribed or designated organisations.

   a. Prospective partners can be checked against the list of organisations proscribed under the Terrorism Act 2000, which is available on the Home Office website here http://security. homeoffice.gov.uk/legislation/current-legislation/terrorism-act-2000/proscribed-terrorist-groups. It is a criminal offence for funds to be made available to proscribed organisations.

   b. Trustees can also consult the consolidated list which includes individuals and entities designated under the Terrorism (United Nations Measures) Order 2006 or the Al Qaida and Taliban (United Nations Measures) Order 2006. It is a criminal offence to make funds or other economic resources available to designated individuals and entities and working with them risks associating a charity with terrorism. The consolidated list is published on the Treasury website here http://www.hm-treasury.gov.uk/fin_sanctions_index.htm.

   c. Charities should also be aware of the risk of committing criminal offences under local laws when working overseas, as many counties have their own list of designated or banned terrorist individuals or organisations. Charities should, where applicable, check those lists to inform their decision about with whom to work.

202. If trustees fail to take these basic steps to check their partners they may fail to properly discharge their duty to safeguard their charity. This, in turn, could be evidence of misconduct or mismanagement by the trustees.

203. The following are examples of the type of due diligence processes trustees may want to apply in order to be satisfied that they are properly safeguarding their charity, and that their charity's funds will be used for charitable purposes:

   a. Develop and apply consistent criteria for selecting their local partners, ensuring that they have sufficient knowledge about each prospective partner to make an informed choice. For example, they may look at a partner's track record for delivering projects, consult with other charities that have worked with them, and ensure that they comply with any regulatory requirements in their own country.

   b. Check their prospective partners against any lists of proscribed and designated organisations which apply in the UK or any other relevant country, particularly the prospective partner's own country.

   c. Satisfy themselves that their prospective partners are capable of delivering the proper charitable application of their funds. They should take, and require their partner to take, reasonable and adequate steps to mitigate any risks to the proper application of their funds. They should require their partners to demonstrate that their funds are applied on the basis of charitable need, for example by requesting sight of the criteria applied to select beneficiaries.

   d. Put agreements between their charity and its partners in writing, and specify the funds being made available, the timeframe for delivery of the project and measures of success. The agreement should set out clear requirements for reporting to the charity on progress and financial expenditure. The requirements set out in the agreement should address any risks specific to the region the local partner works in. For example, if normal banking facilities are not

40

in operation then charities should set out how they will transfer funds.

e. Conduct risk assessments of potential pitfalls to their project, and draw up contingency plans if appropriate. Such plans might cover, for example, what would happen if a partner proved unreliable and the funding agreement was terminated.

f. Draw up robust monitoring processes, write them down and implement them to be satisfied that its funds are adequately protected from abuse, misuse or other loss. These processes should be workable, and all those involved (for example, the trustees, field agents, other NGOs, or other regulators) should be given their role and responsibilities in writing.

g. Ensure its partner understands that sanctions may be taken if agreements are not kept, and be prepared to use those sanctions if needed.

h. Communicate with any other NGOs or umbrella bodies with relevant experience or knowledge that may be of assistance.

204. Local regulation of charities may complement the monitoring work undertaken by trustees; it cannot replace it. Charities can be subject to different legal frameworks and levels of regulation in different parts of the world. Charity regulation may differ in its scope, nature and efficacy, and may or may not overlap with law enforcement agencies. Charity trustees should familiarise themselves with the local regulatory regime, as well as with any legal framework applicable to their charity.

**Collaborative working**

205. Collaborative working can cover a wide range of activities. It can include networking, sharing of information and membership of associations, groups or federations, or more formal arrangements involving contracts or memoranda of understanding between charities.

206. When entering into collaborative working arrangements, trustees must act prudently in the interests of their charity. In practice this means that the benefits of collaborative working should be clearly established at the outset. As good practice trustees are recommended to satisfy themselves that there will be adequate benefits to their charity and beneficiaries. It is also important that an agreement for terminating the arrangements is drawn up from the beginning in case circumstances change and the arrangement is no longer viable.

207. Trustees must also properly exercise their duty of care. Whatever the size and complexity of the proposed arrangement, trustees should thoroughly consider the possible risks involved to ensure that these have been sufficiently addressed. In particular, when considering using charity property or assets in a collaboration, trustees should properly assess the likely risks as well as the potential benefits.

**Working in the Occupied Palestinian Territories**

208. The Occupied Palestinian Territories present a particularly challenging landscape to charities working there. The political situation has altered significantly over the last 18 months, and the acute humanitarian crisis in Gaza brought on by the Israeli military action against Hamas, which began in December 2008, further complicates an already challenging operating environment for charities. The Commission's advice is that charities working in the Occupied Palestinian Territories should keep themselves regularly updated with relevant information concerning the security situation and the operating environment, and actively take this into account when reviewing their risk management strategies and programme delivery plans. The examples given in paragraph 203 above may assist in this.

209. Currently, most local charitable organisations operating in the West Bank come under the regulation of the Palestinian Authority's Ministry of Interior. The Commission advises charities working in the area to make contact with the Ministry of Interior to ensure that they comply with any registration or reporting requirements covering their work in the region. In Gaza it is less clear whether local charities and foreign aid agencies come under the jurisdiction of the Hamas-led Government in the Gaza Strip or the Ministry of Interior in the West Bank. Any charities working there should be aware of the need to adjust their risk management and monitoring strategies accordingly, and potentially to maintain relations with more than one regulatory body. Charities should also consider the accepted standard practices regarding relationships with regulatory bodies adopted by other charities, UN bodies and other assistance actors.

## Sources of further and future guidance

210. Related information and guidance available from the Commission includes:

    a.  OG96 Charities and Terrorism

    b.  The Commission's Counter-Terrorism Strategy

    c.  Charities Working Internationally

    d.  Charities and Risk Management

211. The Commission's Counter-Terrorism Strategy sets out its aim to develop a 'toolkit', in partnership with the sector, to assist charity trustees and their advisors in undertaking risk assessments to better identify and minimise the risk of terrorist abuse. It also sets out the Commission's aim to provide updated advice and guidance regarding charities and terrorism, charities working internationally, charities' legal obligations under terrorism legislation including guidance on proscribed and designated lists, and guidance on the transmission of funds overseas and verifying the end use of funds. This will include defining 'know your' principles for due diligence and the minimum standards we expect charities to reach in applying them.

212. During 2008, the Commission ran a number of events throughout England and Wales, giving many charities the opportunity to discuss the proposed toolkit and provide feedback which the Commission will use along with charities' experience and good practice to inform and shape its development. Work on the toolkit is progressing in collaboration with the sector and the first elements will be available for consultation during 2009.

# Annex 1: The impact of terrorism legislation

**Relevant terrorism legislation in the UK**

**Definition of Terrorism Under UK Legislation**

1. The Terrorism Act 2000 defines terrorism, in s1 of that Act, as follows:

   "1   Terrorism: interpretation

   1. In this Act "terrorism" means the use or threat of action where-

      a. the action falls within subsection (2),

      b. the use or threat is designed to influence the government or to intimidate the public or a section of the public, and

      c. the use or threat is made for the purpose of advancing a political, religious or ideological cause.

   2. Action falls within this subsection if it-

      a. involves serious violence against a person,

      b. involves serious damage to property,

      c. endangers a person's life, other than that of the person committing the action,

      d. creates a serious risk to the health or safety of the public or a section of the public, or

      e. is designed seriously to interfere with or seriously to disrupt an electronic system.

   3. The use or threat of action falling within subsection (2) which involves the use of firearms or explosives is terrorism whether or not subsection (1)(b) is satisfied.

   4. In this section-

      a. "action" includes action outside the United Kingdom,

      b. a reference to any person or to property is a reference to any person, or to property, wherever situated,

      c. a reference to the public includes a reference to the public of a country other than the United Kingdom, and

      d. "the government" means the government of the United Kingdom, of a Part of the United Kingdom or of a country other than the United Kingdom.

   5. In this Act a reference to action taken for the purposes of terrorism includes a reference to action taken for the benefit of a proscribed organisation."

**Proscribed organisations**

2. The Terrorism Act 2000 also provides that certain organisations are "proscribed" (proscribed organsiations are listed in Schedule 2 to this Act, and the Home Secretary may add organisations to Schedule 2 by Order.)[82]. The Act provides that it is an offence to be a member of or support such organisations, in a number of specified ways[83].

**Designated individuals and entities**

3. Under legislation made by the United Nations, the European Union and the UK Government, individuals and entities can be also be "designated". Individuals and entities can be "designated" in the UK under the Terrorism (United Nations Measures) Order 2006 (SI 2006/2657), or under the Al Qaida and Taliban (United Nations Measures) Order 2002 (SI 2002/11) or the Al Qaida and Taliban (United Nations Measures) Order 2006 (SI 2006/2952). These Orders impose financial controls on persons or entities specified by UN Resolutions, European Union Regulations, and the UK Treasury which are all effective in the UK.

4. Under the Orders, it can be an offence for a person (including the designated individual) to deal with funds or economic resources belonging to, owned or held by a designated individual or entity, or to make funds, economic resources or (under the Terrorism (United Nations Measures) Order 2006) financial services, available directly or indirectly, to or for the benefit of a designated individual or entity[84].

**Relevant legislation, orders, and other declarations made by other states** [85]

5. The Government of the United States of America declares certain individuals and entities "Specially Designated Global Terrorists" (SDGTs), under Executive Order 13224, the effect of which is to freeze any assets of those individuals or entities in the U.S. and to prohibit transactions between them and U.S. nationals.[86]

6. The Government of Israel declares certain entities 'unlawful organisations' under the Defense Regulations (State of Emergency) 1945, and 'terror organisations' under the Terror Preventing Command 1948.[87] Under Israeli law, the membership, funding and support of such organisations can amount to criminal offences.

---

[82]   At the date this Inquiry report was published, 45 organisations are "proscribed" criminalising a number of acts and activities, if carried out in relation to such a proscribed organisation. Of these proscribed organisations, two are proscribed under powers introduced in the Terrorism Act 2006, as glorifying terrorism. 14 additional organisations connected to the affairs of Northern Ireland are also proscribed (having already been proscribed under previous legislation).

[83]   Including, for example, holding assets or raising funds and wearing uniform indicating membership or support. The full text of the Terrorism Act 2000 is available on the Office of Public Sector Information website at [www.opsi.gov.uk.]

[84]   The full text of these Orders is available from the Office of Public Sector Information.

[85]   Many other countries have terrorism legislation in place under which persons, entities and organisations can be "designated". Whilst these designations will not be enforceable under UK law, they may affect charities which operate in those countries which are subject to the Commission's regulation,.

[86]   For further information please see the US Department of Treasury on www.ustreas.gov.

[87]   For further information please see the Israeli Ministry of Defense on www.mod.gov.il.

### Effects on the Charity and other organisations

#### The Charity

7. The Charity is not proscribed or designated in the UK.

8. On 22 August 2003 the Charity was designated as an SDGT by the United States Government under Executive Order 13224.

9. The Israeli Government declared the Charity an 'unlawful organisation' on 6 May 1997, and declared it a 'terror organisation' for its affiliation with Hamas on 27 January 1998.

#### Hamas

10. Since 2001, the Hamas Izz al-Din al-Qassem Brigades have been proscribed under the Terrorism Act 2000. Other parts of Hamas (including its political wing) are not currently proscribed.

11. On 12 September 2003 Hamas as a whole (including its political wing) was designated by a European Union regulation. Prior to this date only the Hamas Izz al-Din al-Qassem Brigades were designated. On 22 September 2003 Hamas as a whole was designated by the UK Government.

12. Hamas as a whole (including its political wing) was designated as an SDGT by the United States Government under Executive Order 13224 on 2 November 2001.

13. Hamas as a whole (including its political wing) was designated by the Government of Israel as an 'unlawful association' on 15 September 1989 and a 'terror organization' on 22 June 1989.

14. In the Occupied Palestinian Territories, Hamas is a legitimate political party, although in June 2007, President Abbas issued a decree outlawing the "Executive Force and Militias of the Hamas Movement" within the Occupied Palestinian Territories. The Inquiry understands that this is regarded as impacting on the Hamas Izz al-Din al-Qassem Brigades, not the political wing[88].

#### The Union for Good

15. On 7 July 2008 Israel declared that 36 funds based around the world, which it considered to be members of the Union for Good, were banned associations.

16. On 12 November 2008, the US Department of the Treasury designated the Union of Good under Executive Order 13224.

---

[88] This decree was issued after Hamas took effective power in Gaza

## Annex 2: Summary of the Inquiry regarding the Charity published in the 1996 Annual Report of the Charity Commission for England and Wales

1. Interpal was registered in 1994 with the principal aim of providing aid to the poor and needy, including sick children and widows of those who are missing or detained, and to those detained themselves, as a consequence of civil or military action or national disasters. The charity confines its activities to Palestine and Palestinian refugees. Our investigation into the activities of Interpal was prompted by allegations in the press that there was a connection between the charity Interpal and the alleged terrorist wing of the group Hamas. It was suggested that the charity part funded that group.

2. Where a charity's beneficiaries are overseas our powers of investigation in the locations where funds are distributed are often limited. Our primary concern was to ensure that the trustees had taken all reasonable steps to ensure that funds were being used within the objects of the charity and within the law. We anticipated that Hamas would have supporters in the areas where Interpal distributes aid. Relief cannot be denied to them because of that support but at the same time we needed to ensure, to the best of our abilities, that funds were not being given solely because of a person's support for Hamas. Poverty and need should be the only criteria used when deciding how the charity's funds should be distributed.

3. We scrutinised in detail the charity's controls and records. They were well organised and we found no evidence of any donations that could not be accounted for or that had been given for political reasons. All of the evidence that we obtained suggests that Interpal is independent and non-profit making. Scrutiny of the charity's publicity and documentation provided no evidence of any pro-terrorist propaganda and interviews with the trustees and staff suggested that they were motivated by faith and altruism rather than fanaticism.

46

## Annex 3: Statement of the Results of an Inquiry under section 8 of the Charities Act 1993 conducted in 2003

**PALESTINIANS RELIEF AND DEVELOPMENT FUND (INTERPAL)**

**Introduction**

1.  This report is the statement of the results of the Charity Commission's Inquiry under Section 8 of the Charities Act 1993 ("1993 Act") into the affairs of the Palestinians Relief and Development Fund, known as Interpal.

2.  Interpal was registered as a charity in August 1994. Interpal provides aid to, assists, guides and comforts poor and needy Palestinians in the West Bank and Gaza strip, Jordan and Lebanon. It aims to relieve the hardship and suffering of these distressed persons by cooperating or working with other charitable organisations in the region. Interpal is based in London. Its income for the year ended 31 December 2001 was in excess of £4 million.

**Background and Issues**

3.  Interpal had been subject to a Charity Commission inquiry in 1996 into allegations that some of its funds had been misappropriated for the political or violent militant activities of Hamas in Palestine. This inquiry found no evidence of inappropriate activity, and the information available indicated that Interpal was a well-run organisation. A small number of suggestions were made on how the charity could further improve its procedures.

4.  In April 2003 the Commission contacted Interpal's trustees because similar allegations had been made. The Commission's aim was to determine how Interpal's working practises had changed, if at all, since 1996, especially in light of the increased tensions during recent years in the region. Detailed examination of Interpal's practises and record keeping found that it had improved its procedures and record keeping since the Commission's previous Inquiry, although these procedures could be further enhanced by introducing a greater degree of independent verification of the work done by Interpal's partners in the region on its behalf.

5.  During the course of this correspondence the Commission learned that Interpal had received funds from the Al-Aqsa Foundation in the Netherlands. The Al-Aqsa Foundations in the Netherlands and various other countries had their assets frozen under United Nations sanctions in May 2003 for allegedly supporting terrorist activities. Closer inspection of the records relating to Interpal's relationship with the Al-Aqsa Foundation in the Netherlands revealed that the funds received were in respect of humanitarian work already carried out by Interpal and then invoiced to the Al-Aqsa Foundation.

6.  On 21 August 2003, in a Presidential decree, the Government of the United States of America (US Authorities) designated Interpal as a "Specially Designated Global Terrorist" organisation for allegedly supporting Hamas' political or violent militant activities. The Commission concluded that these were serious allegations and in line with its well-publicised policy opened an Inquiry into Interpal under section 8 of the Charities Act 1993 on 26 August. The principal aim of the Inquiry was to investigate these allegations with a view to determining what, if any, remedial action was necessary to address the issues.

**Actions Taken**

7.  The Commission used its powers to act in the interests of charities and their beneficiaries under Section 18 of the 1993 Act by freezing Interpal's bank accounts as a temporary and protective

measure on 26 August whilst it investigated the allegations. This 'freezing' order allowed Interpal to apply to the Commission for release of funds to fulfil its charitable purposes. In the course of the inquiry, Interpal applied for release of small amounts of funds. The Commission agreed to these releases.

8.  Also, as part of its investigation, the Commission formally requested the US Authorities to provide evidence to support the allegations made against Interpal. The Commission is mindful of the possible consequences for Interpal's beneficiaries of the Commission's actions, and therefore requested the US Authorities to provide evidence to support their allegations within a reasonably short period of time.

**Findings and Outcomes**

9.  The US Authorities were unable to provide evidence to support allegations made against Interpal within the agreed timescale.

10. The Commission concluded that in the absence of any clear evidence showing Interpal had links to Hamas' political or violent militant activities, Interpal's bank accounts should be unfrozen and the Inquiry closed. The bank accounts were 'unfrozen' and the Inquiry was closed on 24 September 2003.

**Wider Issues**

11. The Charity Commission is alert to the possibilities of charities being used to further or support terrorist activities. It will deal with any allegation of potential links between a charity and terrorist activity as an immediate priority. Where such allegations are made we will liaise closely with relevant intelligence, security and law enforcement agencies to facilitate a thorough investigation. As an independent statutory regulator, the Commission will make its own decisions on the law and facts of the case.

12. The Commission's own work reveals that connections or links between registered charities in England and Wales and terrorist organisations are very rare. However, any links between charities and terrorist activity are totally unacceptable and corrosive of public confidence in charities. 'Links' in this case might include fundraising or provision of facilities, but also include formal or informal links to organisations 'proscribed' under the Terrorism Act 2000, and any subsequent secondary legislation.

13. Active collaboration between charities and terrorist organisations is a police matter that may lead to serious criminal charges. Where allegations are made to the Commission or suspicions arise as a result of the Commission's work, the Commission will inform the relevant law enforcement agencies immediately and co-operate fully with the criminal investigation.

14. Where a charity's activities may give, or appear to give, support or succour to any terrorist activity, the Commission expects the charity's trustees to take immediate steps to disassociate the charity from the activity. We expect trustees to be vigilant to ensure that a charity's premises, assets, volunteers or other goods cannot be used for activities that may, or appear to, support or condone terrorist activities. Examples include the use of a charity's premises for fundraising or meetings.

15. Charities should take all necessary steps to ensure their activities could not be misinterpreted. The Commission expects trustees and charities to ensure their activities are open and transparent, for example, when transferring assets abroad. We hold trustees accountable for ensuring that procedures are put in place to ensure that terrorist organisations cannot take advantage of a charity's status, reputation, facilities or assets.

# Annex 4: Public statements made by the Union for Good and its representatives (see paragraph 79)

## Statements made by Sheikh al-Qaradawi

1.  During 2001, on the programme *Shariah and Life* broadcast on Al Jazeera, Sheikh al-Qaradawi was asked what could be done to show the Palestinian people that there were people standing by them. He replied: *'No doubt there are steps that need to be taken at the official and popular level... There is another thing: Financial Jihad. Our brethren are struggling for money. They are sacrificing themselves. They are giving martyrs every day. Thank God this means that the Umma is giving martyrs. Women cry for joy at the death of the martyrs... We should give aid to our brethren to reinforce their steadfastness, to try and overcome the blockade enforced on them.'* Immediately after he spoke, Dr Mustafa was introduced and confirmed that the Sheikh was referring to the 101 Days Campaign.

2.  Later in the interview, Sheikh al-Qaradawi answered further questions about the duties of Muslims regarding the conflict with Israel, and he said: *'We should resist and resist with what we have. We do not have nuclear weapons... I am surprised at any Muslim who calls these acts "suicide acts." These are martyrdom, commando and heroic acts. We should hail those who carry out these acts and bless them and call on God to take them to live in Paradise. They are there, God willing, because of their intentions, works, efforts and Jihad.'*

3.  During another 2001 Al Jazeera interview, Sheikh al-Qaradawi responded to a question from a viewer concerning suicide bombing. He said: *'It is the religious duty of the Umma to fight its enemies and remove them from its dwelling. Anyone who frustrates the Umma from carrying out its religious duty is a traitor to the Umma and a traitor to his religion.'* He went on to say: *'We should resist and resist with what we have. We do not have nuclear weapons. What should we do? This ["suicide operations"] is what we are capable of. I am surprised of any Muslim who calls these acts "suicide acts". These are martyrdom, commando and heroic acts. We should hail those who carry out these acts and bless them and call on God to take them to live in Paradise. They are there, God willing, because of their intentions, works, efforts and Jihad.'*

4.  In the same Al Jazeera interview, Sheikh al-Qaradawi is asked: *'Why don't we focus with arms, because I am one of those who haven't got the money to buy arms to take part in Jihad?'* In response Sheikh al-Qaradawi said: *'I do focus, but I know that the doors are closed.'*

## Statements made by the Union for Good

5.  The "Final Statement of the First Meeting of the Trustees" of the Union for Good in Kuwait, began with the following statement: *'The Zionist enmity to this Umma is manifest in the Zionist barbaric attacks which target the destruction of the constituent elements of a Palestinian society, at various levels, to create a humanitarian catastrophe amongst the Palestinian people, in pursuit of breaking the pride of the people and their steadfastness, in the face of an attempt to cancel the identity of this Holy Land of its Islamist nature, and its ownership by all the Muslims in this world. But the Palestinian response has always been contrary to these attempts and the Palestinian people have insisted on the holiness and Islamist nature of Palestine....'*

6.  The "First Statement of the Coalition [the Union for Good]" gave a list of the campaign's aims which included (amongst humanitarian aims) *'Thwart the Zionist plan to break the strength of the Palestinian people.'*

You can obtain large-print versions of this publication from the Charity Commission on 0845 300 0218

Charity Commission
Telephone:  0845 300 0218
Typetalk:   0845 300 0219
By post:    Charity Commission Direct
            PO Box 1227
            Liverpool
            L69 3UG
Website:    www.charitycommission.gov.uk