# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TZVI WEISS, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 05-cv-4622 (DLI) (MDG) |
| | : | |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| NATAN APPLEBAUM, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 07-cv-916 (DLI) (MDG) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFFS' RESPONSE TO DEFENDANT NATIONAL WESTIMINSTER BANK'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1

SAYLES WERBNER P.C.
1201 Elm Street
Suite 4400
Dallas, TX 75270

Attorneys for *Applebaum Plaintiffs*

- and -

ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036

Attorneys for *Weiss Plaintiffs*

**January 30, 2012**

# TABLE OF CONTENTS

I.     UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR
       COULD FIND THAT PLAINTIFFS HAVE PROVEN THE SCIENTER ELEMENT OF THEIR
       CLAIMS ............................................................................................................................. 2

       A.     Background Facts ........................................................................................................ 2

       B.     The Roles Of United Kingdom Law Enforcement Agencies And Regulators ..................... 6

              (1)    NCIS ............................................................................................................. 6
              (2)    The Bank of England's Financial Sanctions Unit ............................................... 8
              (3)    The National Terrorist Financial Investigation Unit ("NTFIU") of Special Branch 8
              (4)    The Charity Commission .................................................................................. 9

       C.     NatWest's Account-Opening And On-Going "Know Your Customer" Procedures For
              Interpal ................................................................................................................... 12

       D.     The Charity Commission's 1996 Investigation Of Interpal ............................................. 13

       E.     NatWest's 2001 NCIS Disclosures .............................................................................. 14

       F.     Nat West's 2001-2002 Due Diligence On Interpal's Accounts ........................................ 18

       G.     NatWest's 2002 NCIS Disclosure Regarding Interpal ................................................... 22

       H.     NatWest's May 2003 NCIS Disclosure Regarding Its Customer ████████ ................ 28

       I.     Metropolitan Police Special Branch's 2003 Production Order Regarding Interpal ............ 28

       J.     The Charity Commission's 2003 Investigation Of Interpal And NatWest's 2003 NCIS
              Disclosure Regarding Interpal ................................................................................... 29

       K.     Nat West's 2003 Correspondence With The Bank Of England Financial Sanctions Unit
              Regarding Interpal .................................................................................................... 33

       L.     NatWest's Semi-Annual Reviews Of Interpal's Accounts .............................................. 36

       M.     Subjective Impressions Of Interpal's Activity By NatWest Employees ............................ 41

       N.     OFAC's SDGT Designation Of Interpal ...................................................................... 46

       O.     Interpal Has Never Been Listed On Any United Kingdom Or European Terrorist
              Sanctions List ........................................................................................................... 50

       P.     The United Kingdom Parliamentary Proceedings Regarding Interpal .............................. 52

       Q.     The Inapplicability Of Israeli Government Sanctions To NatWest's Conduct In Serving A
              United Kingdom Customer In The United Kingdom ...................................................... 55

       R.     The Proposed Expert Testimony Of Gary Walters ........................................................ 60

              (1)    Walters's qualifications ................................................................................. 60
              (2)    Relevance of Walters's proposed testimony .................................................... 63
              (3)    Walters's methodology ................................................................................. 67
              (4)    Walters's report contains unsubstantiated statements, mistakes and incorrect factual
                     assertions ..................................................................................................... 73
                     a.     Unsubstantiated statements ................................................................ 73
                     b.     Mistakes and incorrect factual assertions ............................................ 80

       S.     The Proposed Expert Testimony Of Clive Walker ........................................................ 86

              (1)    Walker's qualifications as an expert on the Charity Commission, UK law

enforcement and internal bank policies and procedures ......................................... 86

(2)    Walker's methodology............................................................................ 90

T.    The Qualifications Of Jon Holland, An Expert Retained By Nat West............................... 92

U.    The Qualifications Of Jonathan Burchfield, An Expert Retained By NatWest.................. 94

V.    The Qualifications Of Michael Hyland, An Expert Retained By NatWest ........................ 95

W.    The Qualifications Of Yaron Lipshes, An Expert Retained By NatWest............................ 97

II.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING ELEMENTS OF THEIR CLAIMS................................................... 101

A.    Background Facts .......................................................................................................... 101

B.    Plaintiffs' Admissions That They Are Not Purporting To Prove A Direct Causal Link Between The Identified Interpal Transfers And The 15 Attacks (Or Any Other Attacks) 101

C.    Plaintiffs' Fungibility Theory ........................................................................................ 108

D.    Plaintiffs Rely Upon The Proposed Testimony Of Levitt And Spitzen To Prove ............ 109

E.    The Absence Of Evidence That The 13 Charities Were The Alter Egos Of And/Or ........ 111

F.    Levitt's and Spitzen's Opinions Are Inadmissible ........................................................ 131

(1)    Levitt and Spitzen aggregate hearsay ................................................. 131
(2)    Levitt's and Spitzen's methodologies ................................................. 135
(a)    Levitt.............................................................................. 135
(b)    Spitzen ........................................................................... 155

III.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS................................................................................. 169

A.    Background Facts .......................................................................................................... 169

B.    The Relevant OFAC Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas......................................................................................................................... 170

C.    The Relevant Israeli Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas......................................................................................................................... 172

D.    Dr. Levitt Does Not Attribute Responsibility For The 15 Attacks To Hamas.................. 173

E.    Arieh Spitzen Does Not Attribute Responsibility For The 15 Attacks To Hamas ........... 173

F.    Wayne Geisser Does Not Attribute Responsibility For The 15 Attacks To Hamas ......... 174

G.    Ronni Shaked Purports To Attribute Responsibility For The 15 Attacks To Hamas, But His Proposed Testimony Is Inadmissible............................................................................ 174

(1)    Shaked is not qualified to offer opinions as to who perpetrated a terrorist attack 175
(2)    Shaked's proposed testimony attempts to prove responsibility for criminal acts through expert testimony, summarizes hearsay evidence intended to offer a conclusion and opines on the credibility of the evidence upon which he relies ... 179
(3)    Shaked's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Shaked had not applied his methods reliably to the facts of these cases................................................... 181
(a)    Shaked's reliance upon Hamas claims of responsibility......................... 181

(b) Shaked's "very high degree of probability" opinion .............................. 183

(c) Shaked's opinion that Hamas committed the Bus 19 attack.................. 184

(d) Shaked's opinion that Hamas committed the March 7, 2003 Kiryat Arba attack.................................................................................................... 201

(e) Shaked's failure to analyze the significance of the absence of evidence concerning responsibility for an attack.................................................... 205

(f) Shaked's failure to consider the timing of claims of responsibility in relation to when attacks occurred ........................................................... 208

(g) Shaked relies upon information that is not publicly available, and therefore not verifiable.......................................................................... 207

(4) The documents upon which Shaked relies are inadmissible hearsay under Israeli evidence law ........................................................................................................ 208

(a) The Israeli civilian court convictions, sentences and related court and police records upon which Shaked relies are inadmissible hearsay under Israeli evidence law ................................................................................. 208

(b) The convictions rendered by military courts in the Palestinian Territories upon which Shaked relies are inadmissible hearsay under Israeli evidence law and were not rendered in accordance with due process ..... 214

(c) The statements attributed to the ISA and other Israeli government agencies upon which Shaked relies are inadmissible hearsay under Israeli evidence law ....................................................................................... 226

(d) The statements attributed to newspaper and magazine articles and website pages upon which Shaked relies are inadmissible hearsay under Israeli evidence law ........................................................................... 227

(e) The statements attributed to books upon which Shaked relies are inadmissible hearsay under Israeli evidence law ..................................... 228

(f) The recordings posted on the internet upon which Shaked relies are inadmissible hearsay under Israeli evidence law ..................................... 229

(g) The other video recordings upon which Shaked relies are inadmissible hearsay under Israeli evidence law ........................................................ 231

H. Evan Kohlmann Purports To Attribute Responsibility For The 15 attacks To Hamas, But His Proposed Testimony Is Inadmissible........................................................................... 232

(1) Kohlmann's proposed testimony attempts to prove responsibility for criminal acts through expert testimony and summarizes hearsay evidence ............................... 232

(2) Kohlmann opines on the credibility of the evidence upon which he relies .......... 236

(3) Kohlmann is not qualified to determine culpability for an attack........................ 237

(4) Kohlmann is not an expert on Hamas .................................................................. 242

(5) Kohlmann's experience collecting materials from Internet websites does not qualify him as an expert .................................................................................... 247

(6) Kohlmann cannot authenticate the contents of any of the websites upon which he relies.................................................................................................................. 250

(7) Kohlmann's opinions and testimony are based upon insufficient and unreliable sources and are not the product of reliable principles and methods, and Kohlmann has not applied his methods reliably to the facts of these cases .......................... 251

(8) Kohlmann's methodology fails to satisfy expert standards and his own usual standards ............................................................................................................ 257

(9) Kohlmann's conclusions concerning responsibility for the Bus 19 attack .......... 259

(10) The documents upon which Kohlmann relies are inadmissible under Israeli evidence law ...................................................................................................... 265

I. The Qualifications Of Brian Jenkins, An Expert Retained By NatWest .......................... 268

J. Shaul Naim Purports To Authenticate Documents Upon Which Shaked Relies, But His Proposed Testimony Is Inadmissible .................................................................. 278

 (1) Naim is not qualified to authenticate the documents he purports to authenticate. 279
  (a) Generally................................................................................................ 283
  (b) Naim is not qualified to authenticate the documents at issue under the Federal Rules of Evidence .................................................................... 281
  (c) Naim is not qualified to authenticate the documents at issue under Israeli evidence law....................................................................................................... 284
 (2) Naim's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Naim has not applied his methods reliably to the facts of these cases ......................................................... 288
 (3) Naim's invention of the term "attack file"......................................................... 290
 (4) Naim's extensive revisions to his initial report……………………………… 296
K. The Qualifications Of Moshe Azoulay, An Expert Retained By NatWest....................... 293

iv

**PLAINTIFFS' RESPONSE TO DEFENDANT NATIONAL WESTMINSTER BANK'S**
**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE**
<u>**ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1**</u>

Plaintiffs submit this document pursuant to Local Rule 56.1(b) in response to Defendant National Westminster Bank's Statement of Material Facts ("Statement").

NatWest's Statement violates both the Local Rule and this Court's explicit admonition when it struck companion bank Credit Lyonnais, S.A.'s initial Statement of Facts, instructing CL that it file a Statement that includes only "'material facts as to which [CL] contends there is no genuine issue to be tried,' *not any argumentative statements*." *See* September 19, 2011 Order (emphasis added). NatWest has filed a Statement that is virtually identical to CL's original Statement as to more than 80% of the paragraphs. The Statement thus contains the same factual and legal argument that Plaintiffs objected to in the 857 numbered paragraphs in CL's Statement of Facts.

As with CL, Plaintiffs object to NatWest's insistence on evading the Court's page limitations for summary judgment briefing. The Court instructed defense counsel to incorporate Defendant's challenges to Plaintiffs' expert evidence into its Motion for Summary Judgment, not in its Rule 56.1 Statement, which is not an appropriate place for factual or legal argument. Counsel for CL and NatWest unsuccessfully attempted to obtain additional pages beyond the 50 allocated, which presumably would have been included in full or in part in that pleading. However, the banks' inability to persuade the Court to accede to their preferred briefing arrangement, or to grant more than 50 pages for a Memo of Law, does not give NatWest the right to unilaterally arrogate these pages for itself by violating the dictates of Local Rule 56.1, which requires that a statement be short, concise and factual. NatWest's Statement, which at 897 numbered paragraphs is actually *longer* than CL's Statement, is none of these things, and Plaintiffs move the Court to strike the Statement in its entirety for that reason.

1

In the alternative, Plaintiffs include in their responsive paragraphs objections to NatWest's more egregiously argumentative paragraphs.  Plaintiffs have also included objections to certain of NatWest's more overtly argumentative headings. In general, after objecting to NatWest's argument, Plaintiffs have attempted to respond substantively to NatWest's improper argument. However, with regard to certain of NatWest's paragraphs that contain legal argument having to do with irrelevant foreign law (*e.g.*, the intricacies of Article 42A of Israel's Evidence Ordinance), Plaintiffs have simply objected and reserved the right to file an opposition under Fed. R. Civ. P. 44.1 in the unlikely event that the Court determines that foreign law governs the admissibility of evidence in the Eastern District of New York.

**I.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE SCIENTER ELEMENT OF THEIR CLAIMS**

**A.    <u>Background Facts</u>**

1.    NatWest is a financial institution incorporated and headquartered in the United Kingdom.

**RESPONSE**: Admit.

2.    Interpal a/k/a Palestine Relief & Development Fund a/k/a Palestinians Relief & Development Fund ("Interpal") is a non-profit organization registered in the United Kingdom with the Charity Commission for England & Wales ("Charity Commission"). Interpal was founded in 1994 and currently is headquartered in London.  Interpal states in its Declaration of Trust, which it provided to NatWest, as well as publicly, that it collects funds for humanitarian aid that it transfers to various charitable organizations throughout England and Wales, Jordan, Lebanon and the Palestinian Territories.  Schuster Dec. Ex. 3 (NW008300-55 at NW008320-31); Ex. 4 (http://www.interpal.org.uk/en/about-us).

**RESPONSE**: Dispute as to Interpal's founding and geographical scope.  Interpal's Know Your Customer form described the nature of its business as focused geographically on the "Westbank, Gaza, Lebanon" and its Declaration of Trust and website provide that its funds go to the West Bank, Gaza Strip, and refugee camps in Jordan and Lebanon to overcome "suffering and occupation."  Interpal's predecessor, the Palestine & Lebanon Relief Fund, was founded well before 1994, and opened accounts with NatWest in June 1987.  *See* Schuster Dec. Ex. 3 (NW008301, NW008327); Ex. 4 (http://www.interpal.org.uk/en/about-us); Ex. 176 (31 C.F.R. Ch. V, App'x A); Israel Dec. Ex. 6 (NW013636); Ex. 8 (NW191801-6 at NW191804).

3.       Interpal opened its first account with NatWest in September 1994. Schuster Dec. Ex. 5 (NW068714-16).

**RESPONSE**: Disputed.  Interpal's relationship with NatWest began in June 1987, when Interpal's predecessor, the Palestine & Lebanon Relief Fund, which NatWest later referred to as a "connected charity" and used as an alias to describe Interpal in a 2001 Goalkeeper Report, and which the U.S. Government also described as another name for Interpal, opened accounts with NatWest.  Israel Dec. Ex. 6 (NW013636); Ex. 7 (NW052067-73); Ex. 8 (NW191801-6 at NW191804); Schuster Dec. Ex. 176 (31 C.F.R. Ch. V, App'x A).  In addition, the Palestine Lebanon & Relief Fund's directors were the same directors as those for Interpal.  NW191801-805. In fact, a Goalkeeper report generated in connection with the Palestine & Lebanon Relief Fund also included a copy of a 1996 article discussing allegations against Interpal. *Id*.

4.       NatWest closed the last of Interpal's accounts in March 2007. Schuster Dec. Ex. 6 (Hyland Rep. ¶ 8).

**RESPONSE**: Objection.  NatWest relies on its expert's "understanding" that NatWest closed Interpal's accounts on March 16, 2007, which is inadmissible.  Subject to this objection,

Plaintiffs agree that Defendant announced in March 2007 that it had ended its relationship with Interpal.

5.     From 1996 through 2005, NatWest's Fraud Office, which became known as "Group Investigations and Fraud" and subsequently "Group Security and Fraud" was responsible for, among other activities, reviewing internal Suspicious Activity Reports ("SARs") regarding activity in accounts at NatWest, including Interpal's accounts, and submitting disclosures regarding suspicions of terror financing, as required by United Kingdom law, to the UK National Criminal Intelligence Service ("NCIS"). Schuster Dec. Ex. 7 (O'Hear Tr. at 15:20-16:5); Ex. 8 (Hartley Tr. at 26:7-22); Ex. 9 (Cole Tr. at 33:10-17).

**RESPONSE**: Admit.

6.     NatWest maintained records of its SARs and NCIS disclosures about Interpal, among other customers, on a database named "Goalkeeper." NatWest implemented the Goalkeeper system in 1998, replacing a previous system named "Fox." NatWest developed three versions of the Goalkeeper system between 1998 and 2005. Schuster Dec. Ex. 10 (Hoseason 7/14/2010 Tr. at 10:4-13); Ex. 11 (Baugh Tr. at 19:21-20:2, 23:18-24: 10; 25:24-26:3; 57:23-58:2); Ex. 7 (O'Hear Tr. at 52:3-9).

**RESPONSE**: Admit.

7.     Each time a NatWest employee created an internal SAR, the Fraud Office created a new report in Goalkeeper. Schuster Dec. Ex. 7 (O'Hear Tr. at 18:6-10, 52:1-16).

**RESPONSE**: Admit, except Tony O'Hear started in the Group Investigations & Fraud Department in 2002, and thus NatWest has not provided any evidence that prior to 2002, the same procedure described by Mr. O'Hear was, in fact, followed.  Schuster Dec. Ex. 7 (O'Hear Tr.) at 15:20-16:5.

8.     From 2002 through 2005, the Money Laundering Prevention Unit of the Corporate Banking Financial Markets Division ("CBFM MLPU") of NatWest had responsibility for ensuring compliance with anti-money laundering and anti-terror financing sanctions for the accounts held within the Corporate Banking Financial Markets Division, which included Interpal's accounts. Schuster Dec. Ex. 12 (Rodger Tr. at 14:19-15:9; 79:20-22).

**RESPONSE**: Admit that CBFM MLPU shared responsibility, though Rodger testified that the Group Compliance unit, and not CBFM, had the ultimate responsibility for deciding whether to close an account, and others testified, at times contradictingly, that the Bank's centralized Group Investigations & Fraud and Group Risk Management units also had responsibility for ensuring compliance and closing accounts on suspicion of money laundering or terror financing.  Israel Dec. Ex. 29 (Rodger Tr. at 125:12-126:5); Ex. 30 (Wiltshear Tr. at 12:21 – 13:14); Ex. 10 (Hoseason Tr. at 25:22-26:19; 67:13-19; 371:15-372:5; 372:20-373:1); Ex. 28 (Hartley Tr. at 71:19-22); Ex. 77 (NW000149-64 at NW000156).

9.     CBFM MLPU's responsibilities included, among other activities, distributing names of individuals and entities designated on United Kingdom, European Union and international sanctions lists for bank employees to search against the customer databases and reviewing customer accounts whose names appeared similar to those names on the sanctions lists. Id. (Rodger Tr. at 39:1-40:25).

**RESPONSE**: Admit that Rodger testified that CBFM MLPU received designated names and individuals from the Bank's Group level, and was responsible for searching those names and reporting back to the Group level.  Id.

10.     Responsibility for the oversight of anti-money laundering compliance and terror financing sanctions resided with Group Compliance, headed by David Swanney, until 2002, and

thereafter with Group Enterprise Risk, headed by Amanda Holt. Schuster Dec. Ex. 13 (Holt Tr. at 26:6-19, 28:25-30:17).

**RESPONSE**: Admit.

11.     During all periods relevant to these cases, it was a crime in the United Kingdom knowingly or intentionally to support or finance terrorism. Schuster Dec. Ex. 14 (Holland Rep. ¶¶ 3.2-3.50).

**RESPONSE**: Object to introduction of legal argument in a Rule 56.1 Statement, including irrelevant foreign legal argument. Subject to such objection, admit, except that for a period between the enactment of the Terrorism Act 2000 and the Anti-terrorism, Crime and Security Act 2001, it was not an offense under U.K. law for a financial institution to fail to disclose information about terrorism.  Moreover, until September 22, 2003, it was legal in the U.K. to finance HAMAS, and was only illegal to finance HAMAS's "military" apparatus, the Izz al-Din al-Qassam brigades; and until December 27, 2001, it was legal in the UK to finance Izz al-Din al Qassam as well.  Schuster Dec. Ex. 15 (Walker Rep.) at 3.2.2; Israel Dec. Ex. 144 (NW013815); Ex. 5 (NW 214931).

**B.**     **The Roles Of United Kingdom Law Enforcement Agencies And Regulators**

(1)     NCIS

12.     NCIS was established in 1992 to address serious and organized crime in the United Kingdom. Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.55).

**RESPONSE**: Admit.

13.     NCIS's role, among other activities, was to receive disclosures concerning suspected terror financing offenses and disseminate them, along with any other relevant intelligence held by NCIS, to the appropriate law enforcement agencies. Id.

**RESPONSE**: Admit.

14.    As of 1994, banks in the United Kingdom were required by law to report knowledge or suspicion of terror financing to the authorities. Id. (Holland Rep. ¶¶ 3.8, 3.28, 3.33-34). The relevant laws provided for a penalty of imprisonment, fines or both for failure to report a suspicion of terror financing. Id. (Holland Rep.  ¶¶ 3.12, 3.27, 3.36). English courts have defined "suspicion" as a subjective standard. Id. (Holland Rep. ¶¶ 3.40-42). The threshold for reporting a suspicion of terror financing to NCIS was not high, and prudent banks reported all suspicions unless there was a compelling reason not to do so. Id. (Holland Rep. ¶ 5.20).

**RESPONSE**: Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal arguments.  Subject to such objection, admit, except that for a period between the enactment of the Terrorism Act 2000 and the Anti-terrorism, Crime and Security Act 2001, it was not an offense for a financial institution to fail to disclose information about terrorism.  Moreover, the U.K. undertook just one prosecution for breach of the reporting requirements through 2005, thus limiting the applicability of the penalty provisions.  Schuster Dec. Ex. 15 (Walker Rep. at 3.2.2, 3.2.8-3.2.9, 3.2.12).  Dispute that "prudent" banks reported "all suspicions unless there was a compelling reason not to do so" to the extent this implies that prudence required the reporting of unfounded or speculative suspicions.

15.    Banks did not have a duty under United Kingdom law from 1996 through 2005 to investigate whether the suspicions that formed the basis of their NCIS disclosures was well-founded. Rather, the purpose of the disclosure obligations was to provide intelligence to British law enforcement agencies, which had the responsibility under United Kingdom law to assess the intelligence provided by NCIS disclosures. Id. (Holland Rep. ¶¶ 3.29-3.30); Ex. 15 (Walker Rep. ¶ 3.2.6); Ex. 16 (Walker Tr. at 122:15-123:8).

7

**RESPONSE**: Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument.  Subject to such objection, dispute.  The duty of financial institutions as a matter of U.K. law was to provide maximum disclosure of intelligence, but this did not provide the financial institution with a safe harbor if they illegally provided support for terrorism or terrorist organizations, nor did it provide them a grant of immunity.  Schuster Dec. Ex. 15 (Walker Rep. at 3.2.6).  Dispute that the mere act of making a disclosure to NCIS satisfied British banks' obligations with regard to suspicions that gave rise to the NCIS report in question.

      (2)      <u>The Bank of England's Financial Sanctions Unit</u>

16.      The Bank of England was responsible for administering financial sanctions in the United Kingdom during the relevant period. Schuster Dec. Ex. 14 (Holland Rep. ¶ 18.1).

**RESPONSE**: Admit.

17.      The Financial Sanctions Unit was responsible until October 2007 for advising the United Kingdom government on whether to designate persons or entities for involvement in terrorism and/or terror financing. <u>Id</u>. (Holland Rep. ¶ 8.19).

**RESPONSE**: Dispute.  NatWest's expert Mr. Holland states that in fact he was unable to accurately determine the Financial Sanctions Unit's specific role and responsibilities, but "believes" that its responsibilities included advising the U.K. government on whether to designate domestic, U.K.-based, terrorists, which would have excluded HAMAS and its agents. *Id*.

      (3)      <u>The National Terrorist Financial Investigation Unit ("NTFIU") of Special Branch</u>

18.      The NTFIU of Special Branch in the Metropolitan Police in London was responsible for investigating suspicions of terror financing in the United Kingdom (apart from Northern Ireland). <u>Id.</u> (Holland Rep. ¶ 3.55).

**RESPONSE**: Admit that Mr. Holland opined that NTFIU was, at some point in time, the governmental "agency" responsible for investigating.  Id.

     (4)    <u>The Charity Commission</u>

     19.    The Charity Commission is a non-Ministerial Government Department in the United Kingdom responsible for registering and regulating charities, including by instituting inquiries and deregistering charities it concludes were not established for and/or are not being operated for charitable purposes. Schuster Dec. Ex. 17 (Burchfield Rep. ¶¶ B. 1-9); Schuster Dec. Ex. 14 (Holland Rep. ¶¶ 9.2-9.7).

**RESPONSE**: Dispute.  The Charity Commission is a regulatory agency, predominantly focused on promoting charitable activities and institutions fostering them, and is thus a "green-light" regulator better described as a charity ally (rather than policeman) that is focused on enabling and promoting charities.  The Charity Commission has investigated just 17 charities since 1993, and removed a small number of trustees without de-registering any of the charities.  Schuster Dec. Ex. 15 (Walker Rep. at 3.1.1 – 3.1.7).

     20.    The Charity Commission collects and makes publicly available information about each registered charity, including the charity's constitutional documents, details regarding each charity's income and expenditures and the charity's key aims, activities and achievements. In addition, charities earning an annual income over £1 million, such as Interpal, must file an annual return, which provides annually updated details on the charity's contact and trustee information, income, expenditure and other financial information, a summary of the charity's key aims, activities and achievements and confirmation that there are no serious incidents the trustees should report to the Charity Commission and the Trustees' Annual Report. Schuster Dec. Ex. 17 (Burchfield Rep. ¶¶ B.9-12).

**RESPONSE**: Admit.

21.     As NatWest knew, registration of a charity with the Charity Commission establishes as a matter of United Kingdom law a conclusive, statutory presumption that the charity has been established and is being operated for charitable purposes. Id. (Burchfield Rep. ¶¶ B.15-17); Ex. 16 (Walker Tr. at 77:7-17); Ex. 1 (Cole Dec. ¶ 4).

**RESPONSE**: Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument.  Subject to such objection, dispute.  Registration with the Charity Commission and/or the absence of proceedings by the Charity Commission against an organization does not mean that organization was not financing terrorism.  At most, the absence of action by the Commission was one piece of data for a bank to consider as part of its continued risk assessment pertaining to a customer, and duties were placed on financial institutions independent of any regulatory duty of the Charity Commission.  As mentioned, the Charity Commission's predominant mission was to encourage and foster charities, and this ran counter to guarding against terror financing and diminished any sort of comfort that banks could derive from the Commission's failure to take action against a particular registered charity.  Schuster Dec. Ex. 15 (Walker Rep. at 3.1.8-3.1.15, 3.1.26-3.1.27).

22.     A charity that finances terrorist acts would not, under English law, be considered a charity established and/or being operated for charitable purposes. Schuster Dec. Ex. 17 (Burchfield Rep. ¶B. 18).

**RESPONSE**: Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument.  Subject to such objection, dispute.  Under English law, a charity such as Interpal that finances terrorism is considered a charity unless the Charity Commission de-registers it,

something that the Commission has never done over the last two decades.  Schuster Dec. Ex. 15 (Walker Rep. at 3.1.6).

23.    Interpal has at all times since it was first registered in 1994 remained a charity registered with the Charity Commission. Id. (Burchfield Rep. ¶ B. 16).

**RESPONSE**: Admit that in spite of acknowledging that Interpal may provide funds to HAMAS, including to families of terrorists, the Charity Commission has never de-registered Interpal.

24.    The Charity Commission has significant investigative powers under English law, including the ability to require witnesses to give evidence, order the production of documents, remove trustees and employees of a charity, freeze a charity's funds and de-register a charity. Id. (Burchfield Rep. ¶¶ B.7-8); Ex. 14 (Holland Rep. ¶¶ 9.6-9.7).

**RESPONSE**: Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument.  Subject to such objection, admit that the Charity Commission has certain powers, however *see* responses to ¶¶ 19, 21, 22.

25.    The Charity Commission has a Compliance Assessment and Intelligence Unit, which is responsible for addressing allegations of a charity's links to terrorism. The Charity Commission states that the Compliance Assessment and Intelligence Unit "liaise[s] closely with the relevant law enforcement agencies to ensure a proper investigation of the allegations or suspicions." Schuster Dec. Ex. 17 (Burchfield Rep. ¶ C.3); Ex. 18 (Burchfield Reb. Rep. Ex. A at 6).

**RESPONSE**: Admit that the Charity Commission has such a Unit, however *see* responses to ¶¶ 19, 21, 22.

26.    The Charity Commission states that it "treat[s] allegations or suspicions of terrorist activities within charities, or involving individuals associated with charities, as a zero

tolerance issue." Schuster Dec. Ex. 18 (Burchfield Reb. Rep. ¶ B.3); Ex. 15 (Walker Rep. ¶ 3.1.9).

**RESPONSE**: Admit that the Charity Commission made such a statement, in response to widespread criticism about the Commission's tolerance of support for terrorism among certain registered charities, including Interpal.  *See also,* responses to ¶¶ 19, 21, 22.

### C.   NatWest's Account-Opening And On-Going "Know Your Customer" Procedures For Interpal

27.    Abdel Rahman Daya and Essam Yousef Mustafa signed account opening documents for Interpal on September 30, 1994, in which they provided their full names, addresses and telephone numbers. Schuster Dec. Ex. 5 (NW068714-16).

**RESPONSE**: Admit.

28.    In March 1998, Gerald Matthews, a NatWest employee and Interpal's Relationship Manager at the time, met with Jihad Qundil and Essam Mustafa, two of Interpal' s trustees, and wrote in a letter that was maintained in NatWest' s relationship file for Interpal that he became "more fully informed of the funds [sic] activities." Matthews informed Qundil that NatWest required positive identification such as a driver's license or passport along with evidence of the addresses for any new signatories for Interpal's accounts. Schuster Dec. Ex. 19 (NW068887).

**RESPONSE**: Admit.

29.    On September 16, 1998, Jihad Qundil, Ibrahim Brian Hewitt, Mahfuzh Safiee and Essam Mustafa, several of Interpal's trustees at the time, submitted Interpal's "Clubs, Societies and Associations Mandate" form to Matthews at NatWest. Schuster Dec. Ex. 20 (NW053453-56).

**RESPONSE**: Admit.

30.     In May 1999, Qundil sent to NatWest a list of Interpal's past and present trustees, their dates of appointment and, where applicable, their resignation dates. Schuster Dec. Ex. 21 (NW068708-09).

**RESPONSE**: Admit.

**D.      The Charity Commission's 1996 Investigation Of Interpal**

31.     On March 6, 1996, <u>The Times</u> of London published an article stating that officers with the United Kingdom Security Service (MI5) were "studying police intelligence on alleged links between Hamas militants" and Interpal. <u>See</u> Schuster Dec. Ex. 22 ("MI5 study 'charity cash link to Hamas,'" <u>The Times</u>, March 6, 1996); Ex. 17 (Burchfield Rep. ¶ D.1La).

**RESPONSE**: Admit.

32.     The Charity Commission subsequently reported that the March 6 article prompted it to open an investigation of Interpal, during which the Charity Commission temporarily froze Interpal's bank accounts, scrutinized Interpal's controls and records and carried out checks of payments from Interpal's bank statements. Schuster Dec. Ex. 23 (NW014516); Ex. 17 (Burchfield Rep. ¶¶ D.1.a-b); Ex. 25 (W_S081305-29).

**RESPONSE**: Admit that this paragraph accurately, though only partially, sets forth what the Commission stated.

33.     The Charity Commission published its conclusions in the Charity Commission's 1996 Annual Report, which was publicly available. The conclusions stated that Interpal was a "well run and committed organization which carried out important work in a part of the world where there is great hardship and suffering" and that allegations that Interpal funded terrorist activities were not substantiated. Schuster Dec. Ex. 17 (Burchfield Rep.  ¶ D.1.g); Ex. 24 (Burchfield Tr. at 64:4-15).

**RESPONSE**: Dispute.  In its full 1996 report setting forth the results of its investigation of Interpal, which there is no evidence Defendant read, the Charity Commission found Interpal to be a "well run" charity, but also made it clear that it was not concerned with allegations that Interpal funds were going to supporters of HAMAS and the families of suicide bombers "so long as the funds were being applied within the objects of the charity.  In the area of benefit we anticipate that a large number of people will support Hamas."  Schuster Dec. Ex. 25 (W_S 081305-29).  Plaintiffs admit that the Commission included a two-page summary of the investigation in its Annual Report in 1996, and published that summary as an annex to its 2009 report concerning its third investigation of Interpal.  However, no evidence exists that anyone from Defendant read the Commission's 1996 Annual Report, including its summary of its investigation of Interpal.  Further note that in its summary of its 1996 investigation, the Commission stated that its investigation was prompted by allegations that Interpal was connected to the "terrorist wing" of HAMAS, stated as a caveat that "where a charity's beneficiaries are overseas our powers of investigation where funds are distributed are often limited," and further represented that the Commission's "primary concern was to ensure that the trustees had taken all reasonable steps to ensure that funds were being used within the objects of the charity and within the law."  *Id*.

**E.     NatWest's 2001 NCIS Disclosures**

34.     Michael Hoseason, head of NatWest's Fraud Office, testified that in 2001, immediately following the September 11 attacks in the United States, "anything and everything that was vaguely associated with or linked to anything that could possibly be connected to extremism of any description was being reported [to NCIS]" by NatWest. Schuster Dec. Ex. 10 (Hoseason 7/14/20 10 Tr. at 102:24-103:3).

14

**RESPONSE**: Dispute. NatWest misstates its employees' testimony.  Hoseason did not testify that "anything and everything" was being reported by <u>NatWest</u>, but simply that anything and everything was being reported.

35.    Hoseason also testified that the Fraud Office's role was to disclose suspicions to the authorities, not to act as a police officer or law enforcement agency and investigate its suspicions. Schuster Dec. Ex. 26 (Hoseason 7/15/2010 Tr. at 275:10-15).

**RESPONSE**: Dispute, NatWest mischaracterizes and distorts its employee's testimony.  In response to a question of what type of evidence would demonstrate terror financing, after Hoseason earlier had testified that he would need "absolute certainty" such as a criminal conviction in order to close an account, Hoseason attempted to rehabilitate his testimony by stating that: "I am not a police officer or a prosecutor of any kind.  So our role was to establish whether there are reasonable grounds to suspect, and where we feel that there are then we are required to make a disclosure to the authorities.  We are not there to investigate to the nth degree.  That is a job for law enforcement."  *Id*.; *see also* Israel Dec. Ex. 10 (Hoseason Tr. at 24:9-14; 24:25-25:11; 32:3-19; 34:3-9).

36.    On September 27, 2001, Hoseason submitted NCIS disclosure 140425, disclosing



Schuster Dec. Ex. 27 (NW212124); Ex. 10 (Hoseason 7/14/20 10 Tr. at 207:2-207:7).  Douglas Hartley, an employee in NatWest's Fraud Office, entered an undated note into Goalkeeper report 617044 regarding NCIS disclosure 140425, which stated that "Special Branch are investigating." Schuster Dec. Ex. 29 (NW052056-66 at NW052059).

**RESPONSE**: Dispute, for the following reasons: (a) Hoseason's September 27, 2001 letter was not labeled as "NCIS disclosure 140425."  NatWest has characterized the letter as disclosure 140425 for purposes of this lawsuit.  Schuster Dec. Ex. 27 (NW212124); (b) the Cryptome Report states that the document it was publishing was prepared by the Minister of Intelligence from the South African National Intelligence Agency.  Israel Dec. Ex. 11 (South African National Intelligence Agency Report at 1); (c) the Report provides that among its sources were the CIA head in Pretoria, South Africa and Israel's Central Institute for Intelligence and Special Duties.  *Id*. at 3; and (d) there is no evidence that NatWest undertook the ███████████ that it promised NCIS.

37.     By its own admission, Cryptome.org makes no effort to verify the authenticity of the documents it publishes or the identity of the sources that submit them. Cryptome.org's founder, John Young, has publicly stated that "this kind of authentication thing is a long-running scam. People should make up their own minds. Just give them the material, they will make up

16

their own minds [about whether the documents hosted on Cryptome.org are authentic]." Schuster Dec. Ex. 30 (Excerpt from "Reporters' Roundtable: Can You Trust WikiLeaks?" CNET, Oct. 29, 2010, http://www.cnet.con/8301-30976_1-20021253-10348864.html, at 10:10-11:47). Britain's Foreign Office has publicly commented that information on Cryptome.org is "often 'highly inaccurate.'" Schuster Dec. Ex. 31 ("Report: Top international administrator in Bosnia was a British secret service agent," AP Worldstream, September 1, 2005).

**RESPONSE**: Object to NatWest's attempt to cast doubt on the authenticity of documents posted on Cryptome by improperly quoting anonymous comments to the Associated Press purportedly made by a British Foreign Office "spokesman," which were apparently made to try to cast doubt on a story revealing the identity of a British foreign intelligence source. Subject to such objection, dispute. The referenced purported interview with Cryptome's founder, John Young, included Young's statement that his website took military, security and intelligence data and put it on a public forum. Moreover, NatWest stipulated in this case that the Cryptome Report is an authentic copy of ██████████████████ Israel Dec. Ex. 11 (August 25, 2010 Stipulation). In addition, no contemporaneous evidence exists suggesting that, at the time NatWest believed the Report to have been a forgery, altered, or manipulated, nor did NatWest express any such concerns, caveats, or reservations when it transmitted the Report to U.K. law enforcement.

38. Hoseason made a further disclosure to NCIS on October 15, 2001, with reference number 142909, which stated that, ██████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

 The disclosure listed ███████████

████████████████████████ Schuster Dec. Ex. 29 (NW052056-66 at NW052062-66).

**RESPONSE**: Admit, except while the disclosure lists █████████████

███████████████, the disclosure suggests ███████████████

█████████████ whereas in fact NatWest made a multitude of transfers on behalf of Interpal to those beneficiaries over the years.  Israel Dec. Ex. 36 (Geisser Rep. at Ex. C).

39.     NatWest received no responses from any United Kingdom law enforcement agencies or regulators, nor any requests for further information, in response to disclosures 140425 and 142909. Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.59).

**RESPONSE**: Object to NatWest's improper attempt to rely on the report of its banking litigation expert, Mr. Holland, who has no admissible firsthand knowledge, for this purported fact.

**F.    Nat West's 2001-2002 Due Diligence On Interpal's Accounts**

40.     On November 15, 2001, Olha Leeming, a NatWest employee, sent an internal SAR to NatWest's Fraud Office based on a suspicion of terror funding due to what she perceived to be two large overseas credits received into Interpal's accounts. Schuster Dec. Ex. 32 (NW052067-73 at NW052072-73).

**RESPONSE**: Admit.

41.     Leeming testified that her anti-terror finance training instructed her that large credits into a customer's account could be suspicious. Schuster Dec. Ex. 33 (Leeming Tr. at 20:14-21:24).

**RESPONSE**: Admit, except Leeming did not explicitly testify that her belief about large credits came from training.

42.     Goalkeeper report 647655 was created on November 19, 2001, which attached Leeming's internal SAR. Schuster Dec. Ex. 32 (NW052067-73).

**RESPONSE**: Admit.

43.     On December 21, 2001, Douglas Hartley, an employee in NatWest's Fraud Office, noted in Goalkeeper report 647655 that there was a "need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions." Hartley noted that he had not yet submitted an NCIS disclosure concerning these activities because he hoped to gain additional information before doing so. Id. (NW052067-73 at NW052069).

**RESPONSE**: Admit.

44.     On January 17, 2002, Martin Wiltshear, an employee in NatWest's Fraud Office, followed up on Hartley's December 21 note and sent an email to Belinda Lane, Interpal's Relationship Manager, requesting "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account." Schuster Dec. Ex. 34 (NW013335).

**RESPONSE**: Admit, except Wiltshear did not state that he was following up on Hartley's note, and instead states that "[u]nsurprisingly", Group Investigations & Fraud had received a suspicion report with the "obvious" concern of terrorist funding. *Id.*

45.     Lane responded to Wiltshear's email by providing information on Interpal and stating that she had scheduled a January 21, 2002 meeting with Jihad Qundil, Interpal's Secretary, at Interpal's premises, at which she would discuss with Qundil Interpal's use of its U.S. dollar account. Schuster Dec. Ex. 35 (NW012954).

**RESPONSE**: Dispute; NatWest misstates the evidence, and only partially (and misleadingly) quotes it. Lane did not explicitly state that she had scheduled the meeting, that it would be at Interpal, or that she would discuss Interpal's use of the U.S. dollar account. In addition to asking

Wiltshear for further guidance, of which there is no record of any being provided, Lane stated that "[n]ext meeting is Monday 21 January with Mr Qundil at the business premises when I will discuss present operations and use of the $ acc." *Id.*

46.     Hartley entered a note into Goalkeeper report 647655 on February 5, 2002 stating that, because NatWest had made a recent disclosure to NCIS on October 15, 2001, there was "[p]robably no merit in disclosing again at this time ...." Schuster Dec. Ex. 32 (NW052067-73 at NW052069).

**RESPONSE**: Dispute.  NatWest misstates the evidence and only partially (and misleadingly) quotes it.  Hartley did <u>not</u> make any reference to the October 15, 2001 NCIS disclosure, including providing it as a basis for not disclosing again.  NatWest also provides a shortened version of Hartley's statement, which in full is "[p]robably no merit in disclosing again at this time but it won't do any harm for the RM to follow through our recent request as the [Know Your Customer/Due Diligence] info appears deficient."  A further note in report 647655 states that "[f]rom the information available at the date of this record, it is considered that there are insufficient grounds to make a financial disclosure."  NatWest elected not to make a disclosure despite internally acknowledging that, "as the sources of funds cannot be verified, there may be a vulnerability for terrorist funding."  *Id.* at NW052069-71.

47.     Lane met with Qundil at Interpal's premises on March 20, 2002. (Lane testified that the meeting scheduled for January 21, 2002 likely was deferred until March 20.) Qundil told Lane that Interpal received donations from the Muslim community mainly around the festivals of Ramadan, just before Christmas and the Haj in March, and disbursed funds to various charities mainly in the West Bank, Gaza and Lebanon. Qundil also told Lane that Interpal had been investigated fully and cleared of accusations of wrongdoing by the Charity Commission in 1996.

Qundil stated that he would forward the identification information for each of the signatories to Interpal's accounts at NatWest, along with their addresses. Schuster Dec. Ex. 36 (NW068905-06); Ex. 37 (Lane 6/24/2008 Tr. at 144:12-145:9); Ex. 38 (Lane 6/25/2008 Tr. at 340:23 - 341:10).

**RESPONSE**: Admit.

48.    On March 29, 2002, Lane completed further "know your customer"' documentation for Interpal's accounts, which included information concerning the driver's licenses, passports and addresses of Qundil and Mahfuzh Safiee, two of Interpal's signatories. Lane's documentation also included notes on the nature of Interpal's business, which she listed to be the "collection of donations and distribution of funds to charities in Westbank, Gaza, and Lebanon." Lane testified that she was never led to believe that Interpal's business was otherwise. The documentation attached Interpal's Trust Deed, several account statements and information about Interpal from the Charity Commission's Central Registry of Charities. Lane noted in the documentation that she had placed Interpal's 2000 Annual Report in the bank's files and that turnover through Interpal's accounts was consistent with the activity reported in Interpal's audited accounts. Schuster Dec. Ex. 3 (NW008300-55); Ex. 38 (Lane 6/25/2008 Tr. at 341:13-342:5).

**RESPONSE**: Dispute; NatWest misstates and distorts the evidence, and only partially (and misleadingly) quotes or paraphrases it.  Lane testified that she did nothing to verify the statements that Qundil and Interpal provided, as her sole responsibility was to obtain information from the customer.  For example, shortly after the terrorist attacks of September 11, 2001, Qundil told Lane that Interpal was getting more money and revenue specifically because of the attacks and related media coverage.  Qundil also told Lane that donations to Interpal were

increasing "because of terrorism", an explanation that Lane deemed "logical."  Lane never asked Interpal for a further explanation as to why 9/11 and terrorism led a purported Palestinian relief charity to receive more donations.  Israel Dec. Ex. 38 (Lane Tr. at 90:2-12; 90:21 – 92:13; 153:23 – 154:22).

**G.     NatWest's 2002 NCIS Disclosure Regarding Interpal**

49.     On June 7, 2002, N. Morrison, a NatWest employee, sent an internal SAR to NatWest's Fraud Office based on suspicion of terror financing due to a credit of ███████ received from ██████ into Interpal's accounts. Morrison's suspicion was based on his perception of a possible connection between this payment and Al Qaeda and the fact that the word "Jihad" appeared on the documents, which Morrison assumed referred to "holy war," when in fact it was a reference to Jihad Qundil, an Interpal officer.   Schuster Dec. Ex. 39 (NW052074-91 at NW052087-88).

**RESPONSE**: Dispute; NatWest misstates and distorts the evidence, and only partially (and misleadingly) quotes or paraphrases it, as: (1) Morrison stated that there was a "connection between ██████ Al Qaeda and present Middle East," and the rest of the sentence describing to what in the Middle East Morrison was referencing is cut off; (2) Morrison did not state that he "assumed" Jihad referred to holy war, but instead simply stated as fact "a cheque was accepted with payee as Jihad (= Holy War)"; and (3) less significantly, the credit amount stated on the internal SAR was ████████  *Id*.

50.     "Jihad" is an Arabic word with several translations, including "spiritual struggle within oneself against sin." See Schuster Dec. Ex. 40 ("jihad," Oxford Dictionaries Pro. (Oxford University Press April 2010), http://oxforddictionaries.com/definition/jihad?region=us). Jihad is also a recognized Muslim male name. See, e.g., Schuster Dec. Ex. 41 (Excerpt from Maneka

Gandhi & Ozair Husain, <u>The Complete Book of Muslim and Parsi Names</u> (1994) at 207). One of plaintiffs' own proffered experts, Timur Kuran, testified that that he knew someone with the Turkish form of the name Jihad, Cihat. Schuster Dec. Ex. 42 (Kuran CL Tr. at 143:22-144:12).

**RESPONSE**: Admit that the excerpt from Oxford Dictionaries Online reflected in Schuster Dec. Ex. 40 lists "spiritual struggle within oneself against sin" as a definition of "jihad," but notes that this definition is known as "greater jihad." *Id.* Also note that the first definition listed in that excerpt is "a war or struggle against unbelievers." *Id.* Moreover, Schuster Dec. Ex. 40 reflects the definition of "jihad" in the <u>U.S.</u> English version of Oxford Dictionaries Online. The "World English" definition, which more accurately reflects the usage amongst non-U.S. English-speakers, including those in the U.K., lists the following example for "jihad": *he declared a jihad against the infidels.*" Israel Dec. Ex. 166 (emphasis in original). Admit that in "The Complete Book of Muslim and Parsi Names," Jihad is defined as "1. war; effort; zeal. 2. war for the sake of God." Schuster Dec. Ex. 41 at 207.

51.     In response to this internal SAR, on June 17, 2002, Charlotte McComas, an employee in NatWest's Fraud Office, created Goalkeeper report 666814 and entered a note referring to the October 15, 2001 NCIS disclosure numbered 142909, regarding Interpal. McComas wrote that the ███████ payment would be reported to NCIS and that she had "ordered ledgers on sterling accounts and transactions are of the same vein so will not add value to disclosure to include them again." Schuster Dec. Ex. 39 (NW052074-91 at NW052077); Ex. 43 (McComas Tr. at 49:7-49:12).

**RESPONSE**: Admit that NatWest correctly quotes the document, but there is no indication in either the document or McComas's testimony that she wrote the two notes NatWest cites, or on what date they were written.

23

52.      On June 17, 2002, Douglas Hartley submitted NCIS disclosure 207993, which



Schuster Dec. Ex. 39 (NW052074-91 at NW052089-91). On August 5, 2002, a note was entered into Goalkeeper report 666814 stating that NatWest ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from NCIS of disclosure 207993, and that NCIS ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Id. (NW052074-91 at NW052077).

**RESPONSE**: Admit that the documents say as stated, and that NatWest chose to review Interpal's sterling account rather than the U.S. dollar account that had received the reported credit.  Dispute that the reported payment was not in keeping with the size of payment seen previously.  Interpal received over ▮▮▮▮ from Sadoon in ▮▮ separate transfers on ▮▮▮▮ and ▮▮▮ – within a week of the ▮▮▮ transfer that was reported – and received transfers of a combined ▮▮▮▮ on ▮▮▮▮ and ▮▮▮ Israel Dec. Ex. 37 (Geisser Rep. at Ex. D). Interpal also received from the Al Aqsa Foundation almost ▮▮▮▮ total in ▮ separate transfers prior to the disclosure, and almost ▮▮▮▮ after the disclosure. *Id*.  None of the other transfers were disclosed to NCIS.

53.      On July 4, 2002, Hartley entered notes into Goalkeeper report 666814 stating that NatWest needed to seek a "detailed report" from the Relationship Manager regarding her knowledge of Interpal. Id.

**RESPONSE**: Admit.

54.     On July 9, 2002, Charlotte McComas sent a memorandum to the Relationship Manager, Belinda Lane, attaching Goalkeeper report 666814 and informing her that a decision had been made to report the ▓▓▓▓▓ deposit to law enforcement authorities. The memorandum requested that Lane forward a detailed report on her knowledge of Interpal. Id. (NW052074-91 at NW052080).

RESPONSE: Admit, and note that the referenced memorandum also advised Lane not to advise Interpal of: (1) her report; (2) the disclosure to law enforcement; or (3) that any investigation was being undertaken.

55.     McComas testified that she completed such memoranda requesting further information from Relationship Managers as part of the ordinary course of her work in the Fraud Office. Schuster Dec. Ex. 43 (McComas Tr. at 33:10-24).

RESPONSE: Admit, but McComas did not testify how frequently she completed such memoranda, only that the specific document was created in the ordinary course of business.

56.     In response to McComas' s request for information on Interpal, Lane sent McComas a memorandum on July 15, 2002 containing information on Interpal and attaching some of Interpal's "Know Your Customer" information and Lane's notes from her March 20, 2002 meeting with Qundil. Lane's July 15 memorandum also noted that Qundil and Safiee, two Interpal trustees, recently had been re-identified themselves in accordance with "Know Your Customer" procedures, including by providing their respective driver's licenses, passports and addresses to her. Schuster Dec. Ex. 44 (NW0 12952); Ex. 20 (NW053453-56); Ex. 36 (NW068905-06).

RESPONSE: Admit that on July 15, Lane responded to McComas by providing her with almost identical information to the general report that Lane had provided Martin Wiltshear back in

January 2002.  *See* ¶ 45.  Dispute that Lane's memorandum stated that Qundil's and Safiee's driver's licenses, passports, and addresses had been provided, nor is there any evidence that Lane actually attached anything to her memorandum.

57.    On August 1, 2002, McComas wrote a letter to Lane requesting further information on the ██████ payment to Interpal. Schuster Dec. Ex. 39 (NW052074-91 at NW052082). Lane responded on August 9, 2002, forwarding information she had received from E. Mustafa, a trustee of Interpal, regarding the payment, including the explanation that the ████████ credit was a donation from "████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ .... ". Mustafa provided several pages of supporting documentation, which explained in further detail the purpose of the donation. Id. (NW052074-91 at NW052081, NW052082-86); Ex. 45 (NW068227-34).

**RESPONSE**: Admit, except the precise dollar amount was not ████████ nor was it referenced as such in the cited documents.

58.    Thereafter, on September 10, 2002, Douglas Hartley entered a note into Goalkeeper report 666814 stating that Interpal had informed NatWest, supported by back-up documentation, that the ██████ payment to Interpal was a donation for ██████████████ ████████████████ . Hartley wrote that in looking at Interpal's U.S. dollar account, there were "a number of subsequent payments to ████████ for example, which would tend to substantiate the comments." Schuster Dec. Ex. 39 (NW052074-91 at NW052077).

**RESPONSE**: Dispute; NatWest misstates the evidence and only partially (and misleadingly) quotes it. Hartley did not state that Interpal's information was "supported by backup

documentation", and he said only that the money was "said to be" for health, medical and education projects. *Id.*

59.    Tony O'Hear, head of NatWest's Fraud Office at the time, entered a note into Goalkeeper report 666814 on September 17, 2003, that the donor of the ███████ payment, the ████████████████████████████████████████████, while not designated by the Bank of England on its terror financing sanctions list at the time of the June 2002 payment, had been so designated by the Bank of England on May 29, 2003, almost one year later. O'Hear noted that he had spoken to Mark Ashtown at the NTFIU Special Branch, New Scotland Yard, regarding the



Id.

(NW052074-91 at NW052077); Ex. 7 (O'Hear Tr. at 81:23-83:20; 85:21-86:22).

**RESPONSE**: Dispute; NatWest misstates the evidence.  O'Hear made no reference to the Bank of England's sanctions list, but only referenced the fact that the ████████████████ "now appears on a list of named/suspected terrorists." *Id.*  In fact, on the same day the U.K. designated ██████ the U.S. Treasury Department also designated it as a SDGT (specifically naming the ████████████████████████████████ as an "AKA" entity), accusing the organization of funneling funds, including money donated for charitable purposes, to HAMAS. Israel Dec. Ex. 64 (U.S. Department of Treasury Office of Public Affairs May 29, 2003 Release).

60.    That same day, September 17, 2003, O'Hear wrote to Dedrei Nell, a NatWest employee who worked in Group Risk Management, about his conversation with Ashtown, further noting that Ashtown ███████████████████████████████████

█████████████████████████   Schuster Dec. Ex. 46 (NW013699). NatWest never received a further request for information from the NTFIU Special Branch concerning this disclosure.

**RESPONSE**: Admit, but note that NatWest has provided no evidence from its current or former employees as to any communications, or lack thereof, with NTFIU Special Branch, related to Interpal after September 17, 2003.  Note also that NatWest did not inform NCIS, NTFIU or any other part of British law enforcement that Interpal had previously responded to the Bank's terrorism concerns by characterizing the ████████████████, later designated a terrorist organization by the Bank of England, as █████████████████████████ ████████████"  Nor is there any indication that this mischaracterization by Interpal caused the Bank to be less credulous about other representations made by its customer.

61.    Lane met again with Interpal on January 27, 2003, at Interpal's premises.  Lane's interview notes referred to her interview notes dated March 20, 2002, and stated that the details of Interpal's operations remained more or less the same as in 2002. Schuster Dec. Ex. 47 (NW068903).

**RESPONSE**: Admit, except the location of the meeting is provided only as "Cricklewood", where NatWest had a branch.

**H.     NatWest's May 2003 NCIS Disclosure Regarding Its Customer** █████████████

62.    On May 2, 2003, Douglas Hartley submitted NCIS disclosure 276926 regarding a customer named ███████████████████████████████████████ ████████████████████████████████████████████████████ █████████████    See Schuster Dec. Ex. 48 (NW083859-62).

**RESPONSE**: Admit.

**I.      Metropolitan Police Special Branch's 2003 Production Order Regarding Interpal**

63.     Kevin Shiels, a NatWest employee in the Fraud Office, faxed to Tim Kennelly, a NatWest employee on the Fraud Team at the Enfield Customer Service Center, a production order served on NatWest by the Metropolitan Police Special Branch, dated July 7, 2003. Shiels requested that Kennelly provide the Fraud Office with the account statements for seven separate Interpal accounts, in order to comply with the production order. Shiels created Goalkeeper report 704079 on July 7 and appended the production order. Schuster Dec. Ex. 49 (NW052105-13).

**RESPONSE**: Admit, except the Production Order is dated August 5, 2003.

64.     On July 18, 2003, Shiels entered a note into Goalkeeper report 704079 that NatWest had provided to Special Branch the documents covered by the production order. Id.

**RESPONSE**: Dispute.  Shiels note states only that he had telephoned "Tim", ███████████ ████████████████████████████████████████████ " Id. at NW052107.  There is no evidence that NatWest actually provided documents to Special Branch.

**J.      The Charity Commission's 2003 Investigation Of Interpal And NatWest's 2003 NCIS Disclosure Regarding Interpal**

65.     NatWest received an order from the Charity Commission freezing Interpal's accounts on August 26, 2003. Schuster Dec. Ex. 50 (NW013660-61).

**RESPONSE**: Admit.

66.     A. E. Chittock, Senior Litigation Officer at NatWest, responded to the Charity Commission on August 27, 2003 ████████████████████████████████████ ███████████████████████████████. Schuster Dec. Ex. 51 (NW013659).

**RESPONSE**: Dispute; NatWest mischaracterizes and distorts the evidence, and only partially, and misleadingly, quotes it.  Chittock emphasized that the Charity Commission should █

████████████████████████████████ *Id.*  In other words, Chittock's emphasis was on when NatWest could again provide Interpal with banking services.

67.    The Charity Commission contacted Terry Woodley, Assistant Relationship Manager for Interpal's accounts, on August 27, 2003, instructing him to ███████████████ ████████████████████████████████████████████████████████ ██████" Schuster Dec. Ex. 52 (NW013033-35).

**RESPONSE**: Dispute.  Chittock, not the Charity Commission, contacted Woodley on August 27 and provided the above-cited instruction.  *Id.*

68.    Tony O'Hear submitted NCIS disclosure 315666 on August 28, 2003, which stated ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ NCIS disclosure 315666 was appended to Goalkeeper report 710368. Schuster Dec. Ex. 53 (NW052114-23 at NW052122-23).

**RESPONSE**: Admit, except O'Hear did not request that NCIS ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.  *Id.*

69.     On August 28, 2003, O'Hear entered a note into Goalkeeper report 710368 reporting that he had received a phone call from Detective Sergeant Bennett of the NTFIU at Special Branch. O'Hear wrote that Bennett ' ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Id. (NW052114-23 at NW052117).

**RESPONSE**: Admit.

70.     On August 29, 2003, O'Hear entered a note into Goalkeeper report 710368 that he had spoken to Terry Woodley about ensuring that no items would be paid from Interpal's accounts that ███████████████████████ O'Hear noted that he would ██████ ████████████████████████████████████ Id.

**RESPONSE**: Admit.

71.     While the Charity Commission's freezing order was in effect, O'Hear coordinated with Interpal's Relationship Manager, Belinda Lane, and Assistant Relationship Manager, Terry Woodley, to ███████████████████████████████████████████ ██████ Woodley regularly emailed the Charity Commission ██████████████ See Schuster Dec. Ex. 54 (NW013052); Ex. 55 (NW013707); Ex. 56 (NW013708); Ex. 57 (NW052574); Ex. 58 (NW067972-74); Ex. 59 (NW068036-38); Ex. 60 (NW068053); Ex. 61 (NW068056); Ex. 7 (O'Hear Tr. at 61:10-21).

**RESPONSE**: Admit that NatWest emailed the Charity Commission several times ████████ ██████████████████ but dispute that NatWest in fact ████████████████████. There is no evidence that ' ██████████ was referred to the Commission ████████████

72.     O'Hear wrote to Woodley on September 17, 2003, stating that an NCIS disclosure had been submitted in June 2002 concerning the  following Interpal's receipt of a payment (the payment referred to in paragraphs 51-60, above) and asking Woodley to check if funds had been received by Interpal from the during the prior 12 months. Schuster Dec. Ex. 62 (NW012976).

**RESPONSE**:   Admit, although O'Hear informed Woodley that a "Money Laundering Disclosure" had been submitted, and did not specify that it was an NCIS disclosure.

73.     On September 19, 2003, Woodley faxed to Jane Edwards at NatWest's International Banking Center and Noreen Bullock at NatWest's Enfield Customer Service Team a request to obtain Interpal's account statements for the prior 12 months so that the debits could be reviewed in connection with the Charity Commission's investigation. Woodley does not recall whether he received the account statements, but believes he would have followed up on his request if he had not received them. Schuster Dec. Ex. 63 (Woodley Dep. Ex. 46); Ex. 64 (Woodley Dep. Ex. 47); Ex. 65 (Woodley Tr. at 147:13-22, 184:12-185:21).

**RESPONSE**: Dispute.  Both faxes are dated July 19, 2003, though upon being improperly coached by counsel for NatWest, Woodley speculated that July 19 was a mistake.  Further, Woodley did not testify that he did not recall <u>whether</u> he received the account statements. Instead, Woodley testified that he simply did not recall receiving them and does not know if he or anyone else reviewed any provided materials.  *Id*.

74.     O'Hear testified that he played a "key touch point role" between NatWest and the Charity Commission during the time of the Charity Commission's 2003 investigation by

referring to the Charity Commission on a daily basis ██████████████████████████

███████ Schuster Dec. Ex. 7 (O'Hear Tr. at 182:18-21).

**RESPONSE**: Dispute; NatWest misstates and distorts the testimony.  While O'Hear testified

that he played a "key touch point role" between the Bank and Charity Commission, he did not

state that this role included "referring to the Charity Commission on a daily basis ███████████

███████████████████████████ "  In fact, other than testifying that he supposedly had a "key

touch point role", he testified that "[o]ther than that, I couldn't comment." *Id.*

75.     The Charity Commission completed its investigation of Interpal and published its

inquiry report on September 24, 2003. The Charity Commission explained in its inquiry report

that it had completed a detailed examination of Interpal's practices and record-keeping, and that

it had found no clear evidence that Interpal had links to Hamas' political or violent militant

activities and that, accordingly, the Charity Commission was lifting the freeze on Interpal' s

accounts. The Charity Commission also reported that it had investigated Interpal's relationship

with the Al-Aqsa Foundation and concluded that funds Interpal had received from the Al-Aqsa

Foundation were for humanitarian work already carried out by Interpal and invoiced to the Al-

Aqsa Foundation. Schuster Dec. Ex. 66 (Report of the Charity Commission's 2003 Inquiry on

Interpal); Ex. 67 (NW012942); Ex. 68 (NW012943-45); Ex. 69 (NW013641-44); Ex. 70

(NW013701); Ex. 71 (NW013702); Ex. 72 (NW013703); Ex. 73 (NW013944-45); Ex. 74 (NW

13946-47); Ex. 17 (Burchfield Report ¶¶ D.2a-d).

**RESPONSE**: Admit that NatWest correctly quotes selected language in the Commission's 2003

report.  Further state that the Commission's 2003 Report provides neither mention nor analysis

of the allegation that Interpal supported HAMAS by providing support for social services

activities provided by that Foreign Terrorist Organization.  Finally, there is no evidence that any

NatWest employee even read the 2003 Report, despite the fact that it was only two pages long.

76.     The Charity Commission informed NatWest on September 24, 2003 that it █

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. Schuster Dec.

Ex. 67 (NW012942).

**RESPONSE**: Admit that is what the letter states.

**K.     Nat West's 2003 Correspondence With The Bank Of England Financial Sanctions
Unit Regarding Interpal**

77.     On September 5, 2003, Richard Gossage, Director of Group Risk Management of

RBS, wrote to Tom Dawlings of the Financial Sanctions Unit of the Bank of England to disclose

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████ Schuster Dec. Ex. 75 (NW013674-77).

**RESPONSE**: Admit that NatWest correctly summarizes Mr. Gossage's letter.

78.    On October 3, 2003, Dawlings responded to Gossage, noting that the ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████. Schuster Dec. Ex. 76 (NW014505).

**RESPONSE**: Dispute; NatWest misstates the evidence and only partially (and misleadingly)

quotes, summarizes, or paraphrases it.  Dawlings expressed only his ███████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ Further, with regards to ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

79.    On October 28, 2003, Gossage responded to Dawlings that ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Schuster Dec. Ex. 77

(NW014506).

**RESPONSE**: Admit that NatWest correctly summarizes or paraphrases Gossage's Oct. 28, 2003

response to Dawlings, but dispute that NatWest accurately or fairly characterizes the evidence.

Gossage's reply did not include any information on prior payments that had been made by Interpal ████████████████████████████, nor does the record contain any evidence of the '███████ ███████████" completed.  In fact, in the 24 hours leading up to Gossage's reply, Stephen Foster proposed telling the Bank of England that "we have carried out further checks on the accounts we hold for Interpal and we have confirmed that payments are not being made to Hamas from those accounts."  Leah Rowland, however, noted that she was not sure that these representations were factually accurate, and they were specifically excluded from the reply letter to Dawlings, which instead used the vaguer, but still misleadingly reassuring, language NatWest selectively quotes above.  Israel Dec. Ex. 89 (NW013695-7).  Though contrary to Foster's dialogue with Rowland and others, NatWest now concedes that when Gossage assured the Bank of England that a ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████  Ex. 18 (Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 16, at 6-7); Ex. 19 (Second Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 16, at 3-4).  Further, there is no evidence that Gossage read the Charity Commission's two-page report containing the Commission's investigation "findings" in 2003.

## L.     NatWest's Semi-Annual Reviews Of Interpal's Accounts

80.     After learning about OFAC's designation of Interpal, Amanda Holt, Head of Group Enterprise Risk, contacted Irvine Rodger, Head of the CBFM MLPU, to confirm that Rodger knew that Interpal was a customer of CBFM and that there were concerns relating to Interpal, and to discuss a course of action in light of that information. Schuster Dec. Ex. 13 (Holt

Tr. at 78:14-79:6). The OFAC designation prompted Holt to ask the CBFM MLPU to complete a detailed review of Interpal "to get additional information to a greater level of depth." Id. (Holt Tr. at 82:8-83:2).

**RESPONSE**:  Dispute: NatWest distorts and mischaracterizes the evidence and only partially (and misleadingly) sets forth Ms. Holt's testimony.  Holt did request Rodger to complete a review of Interpal, however Holt cannot recall visiting the OFAC website, or taking any other steps, to see why Interpal was designated. She also testified that in light of Defendant's expanding U.S. operations, her concerns pertained to ensuring the Bank would not suffer "reputational damage."  Israel Dec. Ex. 33 (Holt Tr. at 83:6-84:1; 120:17-24).

81.    On May 20, 2004, Guy Cole, an employee in the CBFM MLPU, completed a thorough review of the beneficiaries of Interpal's foreign payments for the prior six months. His review did not reveal any evidence that Interpal had made payments to any terrorist groups during that period. Schuster Dec. Ex. 78 (NW016767-74).

**RESPONSE**: Dispute that Cole (or any NatWest employee) completed a "thorough" review of Interpal's foreign transfers, and further dispute that (notwithstanding the fact that Cole's review was not thorough), Cole's "trawls for information" failed to reveal meaningful, material, and important evidence that suggested to Defendant that Interpal had indeed made payments to terrorist groups.  In fact, Cole himself acknowledges in the cited email that Interpal had transacted with entities deemed by Israel to be part of terrorist groups, but dismisses this as "the perspective taken by Israel," which he accuses of characterizing charities as terrorist organizations merely because terrorists know that, if they die, their dependents will be aided by these charities.  Moreover, in the two weeks prior to the cited email, Cole acknowledged that in spite of promising the Bank of England in October 2003 that Defendant ███████████

███  *"[t]o date we have not put anything in place (my fault, this one slipped my attention). From the below it looks like this might not be straightforward."*  Israel Dec. Ex. 97 (NW017179-90 at NW017186).  He also acknowledged the Bank's inability to track payments because he believed there was "very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM."  Ex. 98 (NW018476-83 at NW018477).  Cole indicated that he had performed Google searches of Interpal beneficiaries, and had even turned up Israeli intelligence information which he discounted but which could have confirmed that such Palestinian entities as Al-Mujama Al-Islami, Al-Jam'iya Al-Islami, Islamic Charitable Society – Hebron, Ramallah Zakat Committee, Tulkarem Zakat Committee, Al-Tadamun Charitable Society, Jenin Zakat Committee, and ████████████████████████ were declared terrorist organizations by Israel in February 2002.  His research *had* confirmed, for example, that Al-Islah Charitable Association had been outlawed by Israel in 2002, but Cole dismissed the findings as "opinion" and "background information."  Cole regarded any conclusion by the Israeli Government about Interpal's links to HAMAS and terrorism as unreliable because he believed that Israel is biased against Palestinian organizations.  Ex. 97 (NW017179-90 at NW 017181); Ex. 98 (NW018476-83).

82.    Cole completed reviews of Interpal's beneficiaries after May 2004 on a semi-annual basis. On each occasion, Cole checked each of Interpal's beneficiaries against available information in the Worldcheck and KYC Check databases, as well as information available through Google. Id. Worldcheck and KYC Check are industry databases that collect and summarize information available in news articles and other public sources, as well as information from government bodies, regulators and enforcement agencies, about entities and

individuals, including whether those entities and individuals are on sanctions lists. Schuster Dec. Ex. 79 (NW066721-23); Ex. 80 (NW066740-42); Ex. 9 (Cole Tr. at 81:8-82:1; 86:7-22); Ex. 12 (Rodger Tr. at 136:1-7).

**RESPONSE**: Admit that evidence demonstrates Cole conducted two additional reviews of Interpal's beneficiaries in December 2004 and July 2005, but dispute that Defendant's selective and misleading references accurately or fairly describe the evidence.  Instead, they set forth an entirely distorted picture of Cole's review.  Defendant omits the material fact that Cole went out of his way to discount any reports tying Interpal to HAMAS or terrorism, including those he reviewed in the databases described above.  Schuster Ex. 78 at NW016767.  Defendant also fails to note that although Cole testified that he reviewed information from other governments, the record also demonstrates that Cole inexplicably dismissed multiple findings of the U.S. and Israel connecting Interpal to terrorism.  Specifically, Cole's subsequent reviews of Interpal's accounts, as the materials cited by NatWest above show, continued to demonstrate that Cole identified (yet chose to dismiss) intelligence linking Interpal and its beneficiaries to HAMAS, including discounting detailed Israeli intelligence reports about Interpal's support of HAMAS as "quite emotive."  Schuster Dec. Ex. 79 at NW 066722; Ex. 80 at NW 066742.

83.     Stephen Foster, Head of Anti-Money Laundering in Group Risk Management, testified about the semi-annual reviews of Interpal's accounts, as follows: "Under the specific circumstances of Interpal, where we had had Charities [Commission] investigations, we had had an internal review to decide whether we would hold the account, and we had had some Suspicious Activity Reports, so we had done a lot of work to assess the risk to the organization of holding this account, we decided, even though we had been given permission to continue holding the account from the Bank of England, that we would monitor the activity of the

account. We thought it was the prudent thing to do." Schuster Dec. Ex. 81 (Foster Tr. at 201:18-202:2).

**RESPONSE**: Admit.

84.     In December 2004, Holt, Foster, Graeme Wyles, Director of Risk for Commercial Banking, Kevin Love, Global Head of Enterprise Risk for Corporate Banking and Financial Markets, Alan Dickinson, Managing Director of Corporate Banking and Head of Core Corporate Bank, Irvine Rodger, Head of CBFM MLPU, and John Cameron, Chief Executive of Corporate Banking and Financial Markets, discussed the bank's relationship with Interpal, including the rationale for maintaining the relationship, the steps being taken to monitor Interpal's accounts and the bank's regulatory position in light of OFAC's designation of Interpal. See Schuster Dec. Ex. 82 (NW066667-71); Ex. 83 (NW066672-76); Ex. 84 (NW066677-81); Ex. 85 (NW066691-95); Ex. 86 (NW066807-13); Ex. 87 (NW066820-21); Ex. 88 (NW066844-46); Ex. 89 (NW066847-52).

**RESPONSE**: Admit that all of the listed individuals were included in email chains discussing the referenced subjects.

85.     Cole completed his second semi-annual review of Interpal's payments on December 16, 2004. Cole reviewed Interpal's payments for the prior six months and checked Interpal's beneficiaries against the United Kingdom and U.S. financial sanctions and terror financing lists, the Complicheck and Worldcheck databases and information available on Google and found that none of Interpal's payments had been made to an entity or individual designated by the United Kingdom or the U.S.   Schuster Dec. Ex. 90 (NW066696-700); Ex. 79 (NW066721-23); Ex. 91 (NW066788-94); Ex. 86 (NW066807-13); Ex. 87 (NW066820-21).

**RESPONSE**: Dispute. While Interpal was designated a terrorist by the U.S., as Cole noted, many of its beneficiaries also "were cited as Hamas organizations in the indictment of the US Islamic charity The Holy Land Foundation, which was prosecuted in the US for funding terrorism." Yet Defendant referred to the Justice Department's findings and official designations by the United States Government as mere "claims." Schuster Dec. Ex. 79 at NW 066722; Ex. 91 at NW 066789-93. *See also* response to ¶¶81-82.

86.    NatWest determined that there was no evidence showing that Interpal had funded any terrorist groups, and decided to maintain the customer relationship. Schuster Dec. Ex. 79 (NW066721-23); Ex. 87 (NW066820-21).

**RESPONSE**: Dispute. *See* responses to ¶¶ 81-82, 85. NatWest acknowledged that there was substantial evidence (including official government designations, and evidence demonstrating that Interpal had sent funds to the Al-Aqsa Foundation ███████████████████████████████ ███████████) that Interpal was funding terrorist groups. As such NatWest's statement that it "determined there was no evidence showing that Interpal had funded any terrorist groups" is false. Instead, NatWest chose to dismiss, discount, and rationalize each piece of evidence it reviewed or had access to which demonstrated that Interpal was connected to terrorist organizations. For example, Guy Cole testified that the OFAC list serves U.S. "political interests" and "government interests" and admitted that an OFAC designation was insufficient for him to conclude that an organization such as Interpal was a terrorist organization. Rodger referred to the evidence as "mainly unsubstantiated commentary." Ben Norrie stated in December 2004 that "some evidence is presented of the alleged Interpal links to Hamas but this does not seem to be substantiated" and offered his unsupported "view that the US action against

Interpal is as much about Foreign Policy as Terrorism." Israel Dec. Ex. 67 (Cole Tr. at 88:2-16; 141:4 – 142:4); Ex. 126 (NW066721-3); Ex. 120 (NW066822-5 at NW066822).

87.    Cole completed his third semi-annual review of Interpal's payments on its accounts for the prior six months on July 6, 2005. Cole once again found no evidence that Interpal had made payments or transfers to designated terrorist groups. He noted that Interpal had made a payment to an entity that subsequently had been designated by the Bank of England, and therefore that he would review Interpal's account activity going forward on a quarterly, rather than semi-annual basis, but recommended that the bank's relationship with Interpal be maintained, given that he did not "believe there ha[d] been an increase in the risk of INTERPAL funding terrorism." Schuster Dec. Ex. 92 (NW066701-04); Ex. 93 (NW066705-11); Ex. 94 (NW066712-16); Ex. 80 (NW066740-42).

**RESPONSE**: Dispute. *See* responses to ¶¶ 81-82, 85-86. NatWest acknowledged that there was substantial evidence that Interpal was funding terrorist groups, but dismissed, discounted, editorialized about, or rationalized each piece of evidence, including determinations of the U.S. Department of Justice and Israeli intelligence agencies. For example, one of the reasons that Cole cites in his July 6, 2005, memorandum for maintaining Interpal's accounts at NatWest is his opinion that "OFAC's designation of INTERPAL as a supporter of terrorism has actually reduced the risk of INTERPAL being used to fund terrorism."

**M.    Subjective Impressions Of Interpal's Activity By NatWest Employees**

88.    Amanda Holt, head of Group Enterprise Risk, testified that she and Group Enterprise Risk as a whole had "no tolerance whatsoever" for funding terrorism. "If there was any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway." Schuster

Dec. Ex. 13 (Holt. Tr. at 79:24-80:22). She was never aware of any evidence that Interpal was funding Hamas. At no point during her tenure at the bank did she suspect that Interpal was funding Hamas. Id. (Holt Tr. at 214:5-216:11, 227:21-228:15, 230:4-230:8)

**RESPONSE**: Dispute.  While Holt testified that she was aware of no evidence and likes to see things for herself, she also testified that she cannot recall ever taking any steps to learn why Interpal had been designated by OFAC, and her concerns pertained to ensuring the Bank would not suffer "reputational damage."  She also wrote on December 10, 2004 that "we were aware that we had accounts for people connected to Hamas, but not Hamas itself."  She added that it was not "Group's policy" to retain customers who are on the Group's sanctions and terrorist lists, including the U.S. list, but noted her "understanding is that it is not a cut and dry case either due to the different stance towards the Palestinian issue between the US and UK."  Instead, Holt needed supposedly "cast-iron fact" before determining that an entity was funding terrorism. Israel Dec. Ex. 33 (Holt Tr. at 83:6-84:1; 120:17-24; 214:24-215:17); Ex. 122 (NW066847-52 at NW066848, 066850).

89.    Holt testified as follows: "[I] spent an inordinate effort making sure that we had no ostriches with their heads in the sand. Ignorance is not bliss. So you had to have as far as possible the full information in front of you to make the decision. Looking the other way was just not an option, whatever grounds, reputational, commercial or whatever grounds." Id. (Holt Tr. at 228:21-229:3).

**RESPONSE**: Dispute.  *See* response to ¶ 88.

90.    Michael Hoseason, head of NatWest's Fraud Office, testified that if NatWest knew Interpal was engaged in any kind of illegal activity, the bank would have closed its accounts. Schuster Dec. Ex. 10 (Hoseason 7/14/2010 Tr. at 24:12-25:8).

**RESPONSE**: Dispute.  Hoseason testified that NatWest would close an account when it "knew with absolute certainty" that the customer was engaged in illegal activity.  The Bank would not close an account "purely on the basis that we had suspicions they may have engaged in any form of unlawful activity."  Hoseason testified that he defined "absolute certainty" as knowing for a fact that a customer had been engaged in unlawful activity, though Hoseason recalls no examples of this happening with any NatWest customer.  He further testified that the clear evidence of wrongdoing that would be necessary to exit the relationship would be if a customer was "convicted in a court of law."  Short of a criminal conviction, Hoseason testified that he was and is not aware of any other circumstances that would have caused him to recommend the Bank stop providing financial services to a customer suspected of terror financing.  Israel Dec. Ex. 10 (Hoseason Tr. at 24:9-14; 24:25-25:11; 32:3-19; 34:3-9).  Hoseason agrees, however, that Osama Bin Laden was not criminally convicted, but when presented with this fact, testified that he viewed Bin Laden as "a slightly different kettle of fish," and that in spite of the lack of a conviction, a Bin Laden account would have been frozen because Bin Laden all but acknowledged his guilt.  Hoseason thereafter backtracked on his prior testimony, claiming that he would take each case on its individual merits and further testified he does not know what would convince him of a customer facilitating terrorism, though an OFAC designation by the United States is not enough to convince him.  *Id*. at 381:22-382:5; 382:17-383:9; 383:23-384:9. As to the type of proof that would evidence the purpose of a transfer, Hoseason testified: "If I had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets as you put it, then that would be clearly evidence."  Short of that, to Hoseason there was nothing else that could be considered proof of the nefarious purposes of a transfer.  *Id*. at 278:17-279:3.

91.     Belinda Lane never had any concerns or suspicions about Interpal. Schuster Dec. Ex. 37 (Lane 6/24/2008 Tr. at 170:23-171:14); Ex. 38 (Lane 6/25/2008 Tr. at 397:23-398:6). To the best of her knowledge, the charities to which Interpal was disbursing funds were providing relief to refugees in Israel, the West Bank, Gaza and Lebanon. Schuster Dec. Ex. 38 (Lane 6/25/2008 Tr. at 341:13-342:5, 344: 10-14).

**RESPONSE**: Dispute; NatWest distorts, and only partially (and misleadingly) quotes, summarizes, or characterizes Lane's testimony and the record.  Lane testified that she "never" had the "teeny weeniest bit of suspicion about Interpal" in all of her years dealing with Interpal.  However, in the above excerpt of deposition testimony NatWest only partially quotes, Lane expressly testified that her knowledge of Interpal's beneficiaries was "[b]ecause Jihad Qundil[1] told me that" and "[i]t wasn't my responsibility to check that.  My responsibility is to ascertain from the customers what their business is."  *Id*.  Lane further testified that shortly after the terrorist attacks of September 11, 2001, Qundil also told Lane that Interpal was getting more money and revenue specifically because of the attacks.  According to Lane, Qundil told her that donations to Interpal were increasing "because of terrorism", an explanation that Lane deemed "logical."  She never asked Interpal for a further explanation as to why 9/11 and terrorism led a purported Palestinian relief charity to receive more donations.  Israel Dec. Ex. 38 (Lane Tr. at 90:2-12; 90:21 – 92:13; 100:6-9; 153:23 – 154:22).

92.     Guy Cole, a member of the CBFM MLPU, who conducted semi-annual reviews of Interpal' s accounts beginning in May 2004, testified that he "never saw any activity that made [him] believe [Interpal] w[as] a terrorist organization." Schuster Dec. Ex. 9 (Cole Tr. at 141:4-141:8).

---

[1] Qundil was an Interpal employee who frequently interfaced with Lane.

**RESPONSE**: Dispute.  *See* responses to ¶¶ 81-82, 85-87.  Though the above testimony is accurately recited, Cole also acknowledged that there was substantial evidence that Interpal was funding terrorist groups, but was dismissive of each piece of evidence, including determinations of the U.S. Department of Justice and Israeli intelligence agencies.

93.     Irvine Rodger, head of the CBFM MLPU, testified that if the bank knew that Interpal was funding terrorism, it would have closed Interpal's accounts. Schuster Dec. Ex. 12 (Rodger Tr. at 129:2-4).

**RESPONSE**: Disputed; NatWest only references part of Rodger's testimony, and its characterization and summary is distorted and misleading. Although Rodger did claim in his testimony that if NatWest knew that Interpal was funding terrorism, it would have closed Interpal's accounts, he also testified in response to a question as to whether there could be any circumstance for closing a suspected terrorist's account unless it was officially designated a terrorist by the Bank of England: "I don't know."  Moreover, Rodger also stated in 2004 that CBFM concluded "that the OFAC sanctions were politically inspired," although when asked about this claim at deposition Rodger could offer no support for this conclusion. He also boasted that "CBFM has deliberately maintained its relationship with Interpal (Charity to relieve the suffering of Palestinians) despite US and Israeli sanctions."  Israel Dec. Ex. 29 (Rodger Tr. at 130:11-131:1); Ex. 141 (NW066764-9); Ex. 143 (NW 069060-2).

94.     NatWest understood that it had made disclosures about Interpal to NCIS on numerous occasions, that the Charity Commission had investigated and cleared Interpal in 1996 and 2003 of charges that Interpal funded Hamas and that the United Kingdom had declined to designate Interpal as an entity that funded terrorism. Schuster Dec. Ex. 26 (Hoseason 7/15/2010 Tr. at 375:4-12); Ex. 81 (Foster Tr. at 120:7-25, 131:3-16).

46

**RESPONSE**: Admit that Michael Hoseason testified that the Bank made several disclosures to U.K. law enforcement, and that Stephen Foster testified that the Charity Commission concluded that Interpal's funds "were not being used to finance terrorism." *Id*. However, dispute that NatWest understood that the Commission had cleared Interpal of charges that it "funded Hamas." In fact the Commission made clear in its 1996 report that it was not concerned with allegations that Interpal funds were going to supporters of HAMAS and the families of suicide bombers "so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas." Schuster Dec. Ex. 25 (W_S 081305-29). In its 2009 Report, the Commission advised that its prior inquiries had been narrow in focus, centering on the specific issue of whether Interpal sent funds to entitles that delivered social and humanitarian services, or whether Interpal was connected to HAMAS's military and/or political activities. Israel Dec. Ex. 173 (2009 Inquiry Report at 6).

**N.    OFAC's SDGT Designation Of Interpal**

95.    OFAC listed Interpal as a Specially Designated Global Terrorist ("SDGT") for purposes of OFAC's asset freezing regulations on August 21, 2003. Schuster Dec. Ex. 95 (http://www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf at 6-7).

**RESPONSE:** Admit that OFAC designated Interpal as a SDGT on August 21, 2003.

96.    OFAC's press release announcing Interpal's designation stated that "[t]he United States government has credible evidence" that Interpal was raising funds on behalf of Hamas. Schuster Dec. Ex. 96 (Hoseason Dep. Ex. 25 at 5-6).

**RESPONSE:** Admit that the Department of Treasury's release included the above statement, as well as its definitive conclusion that Interpal was "a principal charity utilized to hide the flow of money to HAMAS." *Id*.

97.     The United States did not designate any of the transferees of funds from Interpal's accounts as SDGTs before August 21, 2003. Schuster Dec. Ex. 95 (http://www.treasury.gov/resource-center/sanctions/Programs/Documents/teror.pdf at 2-7).

**RESPONSE:** Dispute. The U.S. designated the Al-Aqsa Foundation (including its a.k.a. the Islamic Charitable Society for al-Aqsa) on May 29, 2003. *Id*. at 6. Further note that the United States designated HAMAS as a Specially Designated Terrorist in 1995 and as a Foreign Terrorist Organization in 1997.

98.     As a matter of United Kingdom law, OFAC's regulations cannot be applied in the United Kingdom and did not give rise "to any direct UK legal duty." Schuster Dec. Ex. 14 (Holland Rep. ¶ 110.1); Ex. 15 (Walker Rep. ¶ 13.2.12); Ex. 16 (Walker Tr. at 125:4-11).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument. Subject to such objection, dispute. Holland and Walker did not opine that OFAC's regulations cannot be applied in the U.K., and Holland opined only that U.K. law did not independently obligate NatWest to comply with OFAC. As Judge Sifton held in denying NatWest's motion to dismiss, "[a]lthough British Law does not require that NatWest cease to provide banking services to Interpal or that it cease transactions with HLF, Al-Aqsa, the Jenin Committee and the Tulkarem Committee, it also does not mandate that NatWest continue providing such services. Accordingly, NatWest is free, and, indeed, obligated, to follow the more stringent American law." *Weiss v. Nat'l Westminster Bank*, 453 F.Supp.2d 609, 633 (E.D.N.Y. 2006).

99.     Accordingly, as a matter of United Kingdom law, NatWest was under no obligation to take into account Interpal's entry on the OFAC SDGT list. Schuster Dec. Ex. 14 (Holland Rep. ¶ 10.1).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement, including irrelevant foreign legal argument. Subject to such objection, admit that U.K. law did not independently *obligate* NatWest to comply with the OFAC list. Dispute that U.K. law required, compelled, or in any way obligated NatWest to ignore OFAC designations or provide banking services to OFAC-listed persons or entities.

100.    NatWest did not apply U.S. OFAC regulations, or any other national sanctions regimes other than those of the United Kingdom and the European Union, to its provision of banking services in the United Kingdom on behalf of United Kingdom customers. NatWest understood that OFAC regulations applied only to "U.S. persons." Schuster Dec. Ex. 13 (Holt Tr. at 118:1-119:15); Ex. 81 (Foster Tr. at 41:16-42:21, 43:14-44:1, 44:15-45:14, 172:7-173:4, 174:10-19); Ex. 12 (Rodger Tr. at 28:1-12).

**RESPONSE:** Dispute. NatWest did apply U.S. designations in certain of its business lines. For example, Ian Wickens, one of NatWest's corporate designees pursuant to Fed. R. Civ. P. 30(b)(6), testified that since 1997, NatWest screened all of its financial markets and capital markets activity against the OFAC list even outside the United States, but Wickens further admitted in his testimony that NatWest did not choose to do so for retail banking transactions outside the United States. Israel Dec. Ex. 25 (Wickens Tr. at 101:3-13). Wickens testified that the distinction rested upon "prudential" considerations germane to securities clearing transactions. *Id*. at 99:17-100:10. In the case of NatWest, the record indicates that NatWest chose to keep Interpal's accounts open in spite of knowing that Interpal had been officially designated as a terrorist by the United States. Amanda Holt testified only that an OFAC designation did not "automatically" lead NatWest to terminate a customer. Irvine Rodger's testimony was only in the context of defining his understanding of U.S. person, but he did not

testify that OFAC regulations only applied to U.S. persons.  Stephen Foster testified that he was not a lawyer, and that NatWest "took account" of the OFAC list, but that the Bank was "technically" allowed to hold an account for Interpal.  *Id*.  In addition to the above-cited testimony, NatWest compliance employees stated their views, both in contemporaneous emails and depositions, reflecting disregard and even disdain toward U.S. terrorist designations.  *See* Plaintiffs Separate Statement of Material Facts ¶¶ 185 – 203.  Finally, to the extent NatWest is suggesting its understanding of U.K. law was mistaken, NatWest specifically resisted the production of communications with its in-house counsel by stating that "the aspect of NatWest's state of mind that <u>is</u> relevant and 'at issue' is not its understanding of <u>the law</u>, but rather whether it knew <u>as a matter of fact</u> that Interpal was financing HAMAS terrorism."  NatWest Sept. 4, 2008 Response to Plaintiff Motion to Compel; Weiss Docket Entry No. 158. Indeed, that representation underscored Magistrate Judge Go's denial of Plaintiffs' motion to compel on December 8, 2008 (*Weiss* Docket No. 187) and therefore Plaintiffs object to NatWest's effort to wield U.K. law in light of its prior refusal to produce documents or testimony illuminating what NatWest's contemporaneous understanding of British law actually was at the time, or what advice it requested or received from any lawyer.

101.    NatWest understood that designations pursuant to the OFAC regulations, and any other sanctions regimes besides those of the United Kingdom, European Union and the United Nations, did not apply to the banking services NatWest provided to Interpal in the United Kingdom. Schuster Dec. Ex. 81 (Foster Tr. at 172:7-173:4, 233:11-15); Ex. 12 (Rodger Tr. at 80:23-81:5, 85:15-22); Ex. 97 (Trantum Tr. at 92:10-25); Ex. 13 (Holt Tr. at 118:1-119:15).

**RESPONSE:** Dispute.  *See* Response to ¶ 100.

102.    Accordingly, NatWest did not believe that OFAC's designation of a customer to which NatWest provided banking services in the United Kingdom caused NatWest to "know" that OFAC's grounds for designating Interpal. were correct. See Schuster Dec. Ex. 13 (Holt Tr. at 229:14-230:8); Ex. 12 (Rodger Tr. at 114:17-116:7).

**RESPONSE:** Dispute. *See* Response to ¶ 100. Further, there is no evidence that NatWest had any belief, or even considered the issue, of whether the OFAC designation of Interpal constituted knowledge under the ATA. Plaintiffs dispute that NatWest's improper contention as to the applicability of U.S. designations was in any way connected to its purported belief as to the accuracy of the Interpal designation, and the provided testimony does not support NatWest's proposition. NatWest's compliance employees' views of the OFAC designation reflected not an objective assessment of the designation, but instead disregard and disdain. *See* Plaintiffs Separate Statement of Material Facts ¶¶ 185 – 203.

## O.    Interpal Has Never Been Listed On Any United Kingdom Or European Terrorist Sanctions List

103.    At all times during the relevant period, NatWest applied to its provision of banking services to customers in the United Kingdom the laws relating to the freezing of assets and financial resources of certain persons and entities designated by the United Kingdom, the European Union and the United Nations. See Schuster Dec. Ex. 98 (NW000084-111); Ex. 99 (NW000112-43); Ex. 100 (NW 196319-58); Ex. 101 (NW212047-73); Ex. 102 (Wickens Tr. at 95:15-22); Ex. 97 (Trantum Tr. at 92:17-25); Ex. 81 (Foster Tr. at 41:16-42:1, 43:14-44:1, 44:15-45:14); Ex. 13 (Holt Tr. at 118:1-119:15); Ex. 14 (Holland Rep. ¶¶ 10.1-10.2); Ex. 103 (Barker Rep. ¶¶ 13, 16-22).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement and NatWest's reliance on Messrs. Holland and Barker as to improper (and, in the case of the U.K., irrelevant) issues of

U.K. and U.S. law.  Subject to such objections, Plaintiffs admit that NatWest's above-referenced policies so state, and while the policies also referenced U.S. designations, NatWest simply chose not to obligate itself with the designations.

104.    The United Kingdom government and the U.S. government had discussions about the imposition of terror financing sanctions against Interpal. Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.23); Ex. 16 (Walker Tr. at 109:11-110:3).

**RESPONSE:** Admit that the two governments had discussions regarding Interpal.

105.    The British newspaper <u>The Daily Telegraph</u> published an article on September 25, 2003 stating that United Kingdom officials met with U.S. officials to discuss Interpal "but the Americans produced only press cuttings to support their claim that it was a terrorist organization." Schuster Dec. Ex. 104 ("Britain rejects Bush's charges against charity," The Daily Telegraph, September 25, 2003 at 1).

**RESPONSE:** Object to use of inadmissible evidence.  Subject to such objection, admit that the article so states <u>without</u> attribution.

106.    During the relevant period, neither the United Kingdom nor the European Union included Interpal on their respective lists of persons subject to the freezing of assets or supervision of their financial transactions. Schuster Dec. Ex. 14 (Holland Rep. ¶ 8.25); Ex. 16 (Walker Tr. at 64:2-7).

**RESPONSE:** Admit.

107.    The Charity Commission conducted a third investigation of Interpal after the relevant period, in 2009. Schuster Dec. Ex. 17 (Burchfield Rep. ¶ D.3).

**RESPONSE:** Admit that the Charity Commission issued a 2009 Inquiry Report regarding Interpal.

108.   To date, neither the United Kingdom nor the European Union has ever accused Interpal of funding Hamas or of any involvement in terror financing, or included Interpal on any of its sanctions lists. Schuster Dec. Ex. 14 (Holland Rep. ¶ 8.25).

**RESPONSE:** Dispute.   Mr. Holland's report states only that Interpal was not, and is not, a designated person under the U.K. financial sanctions.

109.   Plaintiffs do not contend NatWest had access to more information than United Kingdom law enforcement agencies and regulators, including NCIS, the Charity Commission, Special Branch and the Bank of England, concerning Interpal. Schuster Dec. Ex. 105 (Plaintiffs' Second Supp'l Resp. to Cont. Interrog. no. 18).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. Subject to such objection, and the objections set forth in the response and amended response to Defendant's Cont. Interrog. No. 18, dispute NatWest's misleading characterization of Plaintiffs' Interrogatory response.   As stated in Plaintiffs' Interrogatory response, neither Plaintiffs nor Defendant can know the entirety of information to which U.K. law enforcement agencies and regulators had actual or potential access concerning Interpal, nor has either party presented any evidence as to what information the U.K. government had actual or potential access other than the few documents NatWest provided. As set forth in Plaintiffs' interrogatory response, it was on that basis that Plaintiffs did not contend that the U.K. government had access to more or less information than NatWest. Plaintiffs only are aware of the information to which NatWest had access, yet failed to provide the U.K. government.

**P.**     **The United Kingdom Parliamentary Proceedings Regarding Interpal**

110.   On October 6, 2003, a member of the United Kingdom Parliament asked a member of the government about Interpal's status in the United Kingdom. The government

representative responded that the Charity Commission had "recently concluded a formal inquiry into Interpal which established that there was no evidence to substantiate allegations that it has links to Hamas's political and militant activities. The commission removed restrictions on Interpal's accounts and... published a report on its inquiry which is publicly available." Schuster Dec. Ex. 106 (Lord Chalfont -Interpal: Charitable Status, HL Deb, 6 Oct. 2003, vol 653, col18 at 3).

**RESPONSE:** Admit that the Baroness Scotland of Asthal provided her understanding of the Commission's investigation, implicitly acknowledging that HAMAS's social da'wa activities were not investigated.

111.    On November 19, 2003, the British charity Oxfam submitted a statement to the United Kingdom Parliament regarding its concerns about the accusations made by the U.S. government against Interpal. Oxfam stated its concern "about the unsubstantiated accusations by the US government that the British Muslim charity Interpal is a terrorist organization" and noted that "Interpal were eventually cleared when no evidence was forthcoming .... ". Schuster Dec. Ex. 107 (Supplementary memorandum submitted by Oxfam to the House of Commons Select Committee on International Development, 19 Nov. 2003 at 1).

**RESPONSE:** Admit that NatWest accurately (though only partially) quotes Oxfam's November 19, 2003 statement to Parliament.

112.    On January 16 and February 6, 2006, members of the United Kingdom Parliament asked the Secretary of State for Foreign and Commonwealth Affairs for the United Kingdom for an assessment of the links between Hamas and Interpal. The Secretary of State responded that the Charity Commission had investigated Interpal on several occasions regarding their links with Hamas and found insufficient evidence to support taking action against Interpal.  Schuster Dec.

Ex. 108 (Hamas/Interpal, HC Deb, 16 Jan. 2006, vol 441, co1976W at 2); Schuster Dec. Ex. 109 (Interpal, HC Deb, 6 Feb. 2006, vol 442, co1772W at 2).

**RESPONSE:** Admit that NatWest correctly summarizes Dr. Howell's statement.

113.   On March 2, 2009, a member of the United Kingdom Parliament asked the Financial Services Secretary to the Treasury whether the government would ask the U.S. to remove its restrictions on Interpal. The Financial Services Secretary responded that the Treasury shared concerns about "any interruption to humanitarian aid" and while "commercial decisions on providing accounts and clearing services are for the banks themselves," the government was "discussing with relevant parties how best to ensure that charities can retain access to the banking system." Schuster Dec. Ex. 110 (Banking: Interpal, 708 H.L. 2 Mar. 2009, col. WA115 at 2).

**RESPONSE:** Admit.

114.   On May 12, 2009, a member of the United Kingdom Parliament asked the Chancellor of the Exchequer about discussions with the U.S. regarding the basis for OFAC's designation of Interpal. The Chancellor of the Exchequer responded that Treasury officials were "in ongoing discussions with their US counterparts about how best we can work together to facilitate legitimate charitable work, while protecting against the abuse of charities by those involved in terrorist finance. He stated that the Treasury had "asked the US authorities to consider if any further information c[ould] be made available about the basis for Interpal's designation." Schuster Dec. Ex. 16 (Walker Tr. at 111:15-113:11); Ex. 111 (Walker Dep. Ex. 19 at 2).

**RESPONSE:** Admit.

115.    On July 6, July 15 and September 9, 2009, members of the United Kingdom Parliament asked the Chancellor of the Exchequer and the Secretary of State for Foreign and Commonwealth Affairs whether they had received evidence from the U.S. government regarding the basis for OFAC's designation of Interpal, and what recent representations the government had made to the U.S. The Chancellor of the Exchequer and the Secretary of State responded that Treasury officials were "in discussions with their US counterparts about how to facilitate legitimate charitable work, while protecting against the abuse of charities by those involved in terrorist finance," and that they continued to discuss Interpal with the U.S. authorities. Schuster Dec. Ex. 112 (Walker Dep. Ex. 20 at 3); Ex. 16 (Walker Tr. at 111:15-113:11); Ex. 113 (Interpal, HC Deb, 15 July 2009, vol 496, col48lIW at 4); Ex. 114 (Walker Dep. Ex. 21 at 3).

**RESPONSE:** Admit that three near-identical written answers were provided in 2009.

116.    On March 29, 2010, the Charity Commission represented to members of the United Kingdom Parliament that it continued to monitor Interpal's compliance with the requirements of the Charity Commission. Schuster Dec. Ex. 115 (Union of Good, HC Deb, 6 Apr 2010, vol 508, coll224W at 5).

**RESPONSE:** Admit.

## Q.    The Inapplicability Of Israeli Government Sanctions To NatWest's Conduct In Serving A United Kingdom Customer In The United Kingdom

117.    The Israeli government designated Interpal as an "unlawful organization" in 1997 and a "terrorist organization" in 1998. Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. no. 14).

**RESPONSE:** Admit.

118.    During all periods relevant to these lawsuits, NatWest had no branches or subsidiaries operating in Israel, and therefore understood that Israeli sanctions did not apply to NatWest's activities. Schuster Dec. Ex. 1 (Cole Dec. 3).

**RESPONSE:** Object to argument. Admit that NatWest had no branches or subsidiaries in Israel. Dispute as to any claim or evidence of NatWest's understanding.

119.    As a matter of Israeli law, NatWest could be prosecuted in Israel under the Prevention of Terrorism Ordinance for hosting Interpal's accounts in the United Kingdom or facilitating a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but designated by Israel as a "terrorist organization" only upon proof beyond a reasonable doubt that NatWest acted with the requisite intent, in particular that: (a) NatWest was aware that Interpal was, or was associated in some way with, a "terrorist organization"; (b) NatWest was aware that its actions had the ability to aid Interpal in the commission of an offense; and (c) NatWest intended to assist Interpal to complete that offense. Schuster Dec. Ex. 117 (Lipshes Rep. at 4-5).

**RESPONSE:** Object to the inclusion of <u>legal arguments</u> regarding conclusions regarding Israeli law in NatWest's Rule 56.1 statement. To the extent that the Court concludes over Plaintiffs' objection that it must make a determination of Israeli law pursuant to Fed. R. Civ. P. 44.1, and directs the parties to provide submissions in that regard, Plaintiffs will of course comply with any such Order, including referencing the legal arguments and analysis set forth in the rebuttal expert witness reports, and deposition testimony, of Professor Alex Stein and/or Professor Emanuel Gross.

120.    NatWest could be prosecuted in Israel under the Defense (Emergency) Regulations for hosting Interpal's accounts in the United Kingdom or facilitating a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but designated by Israel as

an "unlawful association" only upon proof beyond a reasonable doubt that: (a) NatWest knew that it hosted an account that was owned by, or transferred funds to an entity that is, or is associated in some way with, an "unlawful association"; (b) NatWest was aware that its actions had the ability to aid its customer in the commission of an offense under the Defense (Emergency) Regulations; and (c) and the bank intended to assist its customer to complete that offense. Id. (Lipshes Rep. at 7-8).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. *See* Response to ¶ 119.

121.    NatWest's hosting of Interpal's accounts in the United Kingdom or its facilitation of a transfer of funds from Interpal in the United Kingdom to an entity outside Israel but designated by Israel under the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations could be prosecuted only as a "foreign offense," to the extent that the transfers did not pass through correspondent banks in Israel and were not made to transferees' accounts at bank branches located in Israel, because none of these acts was committed in whole or in part in the territory of Israel, and because there is no evidence that NatWest was involved in the preparation for, or an attempt or conspiracy to commit, an offense in Israel. Id. (Lipshes Rep. at 12-16).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. *See* Response to ¶ 119.

122.    NatWest could be held liable for a "foreign offense" under the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations only upon proof beyond a reasonable doubt that, in addition to the elements of the underlying violation of the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations, NatWest's actions constituted an "Offence against the State or the Jewish Nation" under Article 13 of the Israeli Penal Law, which would require proof beyond a reasonable doubt that NatWest' s intention and objective was to

58

damage the security or sovereignty of Israel or some of its citizens, residents or co-nationals of the state. Id. (Lipshes Rep. at 16-19).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. *See* Response to ¶ 119.

123. Alternatively, NatWest could be held liable for a "foreign offense" under the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations only upon proof beyond a reasonable doubt under Article 14 of the Israeli Penal Law that, in addition to the elements of the underlying violation of the Prevention of Terrorism Ordinance or the Defense (Emergency) Regulations:

- hosting Interpal's accounts or transferring funds pursuant to Interpal's instructions harmed, or was capable of harming, the life, body, health or liberty of an Israeli citizen or resident;

- the penalty set for the offense at issue under Israeli law is at least one year;

- in the countries where the offense was committed - under the circumstances here, either the United Kingdom as the place where the accounts were maintained and the place from which the transfers were initiated, and/or Jordan, Lebanon and/or the Palestinian Territories as the places to which the transfers from Interpal's accounts were made - the bank's conduct constitutes an offense as well, and there is no safeguard from criminal liability for the bank in those jurisdictions;

- the bank was not acquitted of this offense abroad and, if convicted, it has not yet borne the penalty; and

- if the bank were convicted in Israel, the penalty imposed on it may not exceed the maximum penalty that it would have been possible to impose on it for these offenses in the country where the offence was committed.

Id. (Lipshes Rep. at 20-21).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. *See* Response to ¶ 119.

124. Moreover, for those transfers that NatWest made to bank accounts in the Palestinian Territories pursuant to the instructions of Interpal, an Israeli prosecutor could not, in order to satisfy the requirements of Article 14 of the Penal Law, rely upon the Israeli Ministry of Defence's declaration that Interpal is an "unlawful association" or upon the Israeli government's

declaration that Interpal. is a "terrorist organization," or that certain of Interpal's transferees are "unlawful associations" or "terrorist organizations," to support a finding that NatWest's completion of the transfers requested by Interpal to these transferees constituted criminal offenses at the point of destination of these transfers, because the Palestinian Territories were and are not considered part of Israel, and these Israeli government declarations had and have no effect there. The relevant declarations regarding these transferees are issued by the Israel Defense Forces Governor with jurisdiction over the place where the relevant account was maintained. Id. (Lipshes Rep. at 21).

**RESPONSE:** Object to legal argument in Rule 56.1 Statement. *See* Response to ¶ 119.

### R.       **The Proposed Expert Testimony Of Gary Walters**

(1)       Walters's qualifications

125.      Walters describes himself as a former police officer and part-time consultant with "Forensic Risk Alliance" ("FRA"), a firm that advertises itself as specializing in forensic accounting, electronic discovery, financial investigation, litigation support and electronic discovery. Schuster Dec. Ex. 119 (Walters Tr. at 21:7-22:6; 23:20-23); Ex. 118 (Walters Dep. Ex. 11).

**RESPONSE:** Dispute. Though Paragraph 125 accurately describes portions of Mr. Walters' testimony, it neglects additional information pertaining to FRA's advertised services and expertise. FRA's website specifically advertises FRA's expertise in compliance and risk management, including without limitation Foreign Corrupt Practices Act ("FCPA") investigations and audits, OFAC, process advisory, and money laundering analysis. *See* Schuster Dec. Ex. 118 (Walters Dep. Ex.11) and Israel Dec. Ex. 146 (http://www.forensicrisk.com/Services.aspx?MID=12&PID=2&Cat=Services&CatSubType=Co

mpliance and Risk Management).

126.    Walters purports to opine on NatWest's "management of the Interpal account," but he has no education or professional training concerning the internal policies and procedures of United Kingdom banks. Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5); Ex. 119 (Walters Tr. at 85:13-86:23).

**RESPONSE:**  Dispute.  Walters does opine on NatWest's management of the Interpal account, but with an eye towards identifying deviations from standard banking practice pertinent to a terrorist financing investigation.  Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5).  Admit that Walters has no formal education concerning the internal policies and procedures of United Kingdom banks, but he spent thirty years in the Metropolitan Police Service, and many of those years with the Economic and Specialist Crime Command, during which he worked on investigations involving terrorism financing, and issues regarding the regulation of banks. Schuster Dec. Ex. 119 (Walters Tr. at 59:2-22, 64:5-70:18.)

127.    Walters has no professional experience investigating a bank's conduct in relation to terror financing. Rather, he worked in a section of the Metropolitan Police responsible for money laundering investigations. Schuster Dec. Ex. 119 (Walters Tr. at 60:19-65:10, 70:19-23, 76:12-77:23, 78:16-79:2).

**RESPONSE:**  Dispute.  Walters had experience with terrorist financing cases, and with issues regarding the regulation of banks.  Israel Dec. Ex. 145 (Walters Tr. at 65:19-70:18).

128.    Walters has no professional experience investigating a charity accused of terror financing. Id. (Walters Tr. at 113:17-20).

**RESPONSE:**   Dispute. While Walters never had a case involving a charity and narrow suspicions of terror financing, he had cases involving money laundering by charities, and many

other cases involving financial malfeasance by charities, which Walters stated included the determination of which crime, including terrorism, was at issue.  Israel Dec. Ex. 145 (Walters Tr. at 77:24-78:4; 84:15-85:7; 113:9-16).

129.    Walters has no professional experience reviewing suspicious activity reports relating to terror financing and never reviewed any of the reports that NatWest filed with respect to Interpal during his police career. Id. (Walters Tr. at 74:20-75:4, 75:24-76:9).

**RESPONSE:**  Admit that Walters never reviewed (at the time) any of the reports that NatWest filed with respect to Interpal and is thus not a fact witness in the case, but dispute that he has no professional experience reviewing suspicious activity reports relating to terror financing.  In fact, during his time as Operational Head for Anti Money Laundering, Mr. Walters met regularly with the Financial Intelligence Development Unit ("FIDU"), the unit which received SARS in the first instance, to discuss SARs and potential investigations.  Israel Dec. Ex. 170 (Walters Rep. at Appdx. 1).

130.    Walters achieved only the third highest rank of eleven possible ranks in the Metropolitan Police rank structure. Id. (Walters Tr. at 82:21-84:9); Ex. 120 (Walters Dep. Ex. 10).

**RESPONSE:**  Admit that Walters was a detective inspector, and served as acting chief inspector at times.

131.    Walters has never published anything, on any topic. Schuster Dec. Ex. 119 (Walters Tr. at 90:25-91:6).

**RESPONSE:**  Admit that Walters has never published an article or book.

132.   Walters copied portions of his reports from the reports that Frances McLeod submitted in <u>Strauss v. Crédit Lyonnais. S.A.</u>, 06-cv-702 (DLI) (MDG) and <u>Wolf v. Crédit Lyonnais. S.A.</u>, 07-cv-914 (DLI) (MDG). <u>Id.</u> (Walters Tr. at 36:17-37:11).

**RESPONSE:**  Admit that a small portion of Walters' report was carried over from the *Credit Lyonnais* cases, and remains accurate.

133.   None of Walters' FRA colleagues, who researched and wrote portions of his reports, has any relevant experience. Walters is not aware of any experience his co-authors (Cassie Searles, Toby Duthie and Lucile Mourey) have with relevant U.S. or United Kingdom banking regulations outside of FRA's work for plaintiffs in these and the <u>Strauss</u> and <u>Wolf</u> lawsuits. <u>Id.</u> (Walters Tr. at 46:21-24 [Searles]; 49:2-5 [Mourey]; 51:2-5 [Duthie]). Nor do they have any experience with the internal policies and procedures of United Kingdom or U.S. banks, <u>id.</u> (Walters Tr. at 47:13-48:4 [Searles]; 49:10-13 [Mourey]), or any education or professional training in U.S. or United Kingdom banking regulations or policies and procedures. <u>Id.</u> (Walters Tr. at 46:25-47:4;48:5-8 [Searles]; 49:6-9 [Mourey]; 51:6-52:2 [Duthie]). Nor do they have prior experience, education or professional training in United Kingdom or U.S. anti-money laundering or anti-terrorism finance laws or regulations. <u>Id.</u> (Walters Tr. at 47:5-12; 48:9-17 [Searles]; 49:25-50:15 [Mourey]; 52:3-11 [Duthie]).

**RESPONSE:**  Dispute.  All that the cited transcript portions show at most is that Mr. Walters was not able to recall from memory at deposition the answers to certain questions about the resumes of his colleagues.  Object that this is improper argument as to what Defendant considers to be "relevant experience", and this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  A description of the highly relevant experience of Forensic Risk Alliance, which

employs both Mr. Walters and his colleagues, is at Appendix 1 to Mr. Walters December 17, 2010 expert report (Israel Dec. Ex. 170).

134.    The only formal higher education Walters has received was a three or four month part-time program for which he attended class one night every two or three weeks to receive a diploma in fighting money laundering. Id. (Walters Tr. at 57:16-58:16).

**RESPONSE:**  Admit that Walters received a diploma in anti-money laundering from the Cass Business School.

135.    Walters began working as a part-time consultant for FRA after being asked to do so by a social friend in mid-2010. Id. (Walters Tr. at 15: 14-17:21).

**RESPONSE:**  Admit that Walters was asked by Toby Duthie, a partner at FRA, to work with the company.

136.    The only work that Walters has done as part of a client matter for FRA is his work on behalf of plaintiffs in these lawsuits. Id. (Walters Tr. at 18:25-19:23).

**RESPONSE:**  Dispute.  While Walters has had no major pieces of work for FRA besides his work in this lawsuit, as he testified, he has attended a number of meetings on matters involving money laundering, corruption, and bribery.  Israel Dec. Ex. 145 (Walters Tr. at 19:4-20:6).

137.    Walters is employed full-time in his family farming business. Id. (Walters Tr. at 2 1:7-22:6).

**RESPONSE:**  Though entirely irrelevant, admit that Walters testified that since he left the police, in 2010 and 2011, he spent the equivalent of full-time hours in his family company, but his schedule is very flexible and he was able to devote considerable time as needed to his consultancy work for FRA.  Israel Dec. Ex. 145 (Walters Tr. at 21:7-22:10; 25:18-24).

(2)    Relevance of Walters's proposed testimony

138.    Walters is not opining that NatWest knew or believed that Interpal was financing terrorism or Hamas. Id. (Walters Tr. at 93:21-94:13).

**RESPONSE:**  Admit.

139.    Walters is not a lawyer and is not opining as to the requirements of United Kingdom law. Id. (Walters Tr. at 94:14-95:11).

**RESPONSE:**  Admit that Walters is not a lawyer and is not opining as to the requirements of U.K. law.  Plaintiffs note the objection to the form of the prior question at Walters Tr. 95:9, to which Walters correctly responded "I'm not offering a legal opinion."  Israel Dec. Ex. 145 (Walters Tr. at 95:10-11.)  What Walters is offering is the opinion that NatWest's management of the Interpal account failed to comply with even minimum banking standards for identifying and dealing with highly suspicious accounts that were the accepted norm in banking at that time. Schuster Dec. Ex. 121 (Walters Reb. Rep. at 2.)

140.    Walters analyzed NatWest's conduct against the "global banking standards published by Basel, Wolfsberg and FATF." He also analyzed NatWest's conduct against "international banking standards and international AML and CTF standards," and "minimum banking standards," which include publications by the Basel Committee on Banking Supervision, the Wolfsberg Group and the Financial Action Task Force ("FATF"), as well as unspecified "U.N. related material" that he found on the internet. Id. (Walters Tr. at 97:3-99:19, 130:8-133:11); Ex. 121 (Walters Reb. Rep. ¶¶ 11 8, 145, 192, 200).

**RESPONSE:**  Admit that Walters used global banking standards to analyze NatWest's conduct, but he also relied on his thirty years of experience as an investigator with the Metropolitan Police Department.  Israel Dec. Ex. 145 (Walters Tr. at 106:11-107:13).

141.    FATF is an international body which publishes recommendations for consideration by member states. FATF publications are not directed at the private sector and do not give rise to legal obligations or liabilities as a matter of English law. Schuster Dec. Ex. 14 (Holland Rep. ¶ 6.2); Ex. 119 (Walker Tr. at 127:10-15).

**RESPONSE:**  Dispute. FATF publications in fact often explicitly direct their recommendations to the private sector. *See, e.g.*, Israel Dec. Ex. 167 (*Guidance for Financial Institutions in Detecting Terror Financing*, April 24, 2002, available at http://www.fatf-gafi.org/dataoecd/39/21/34033955.pdf); Ex. 168 (G*uidance On The Risk Based Approach To Combating Money Laundering and Terrorist Financing*", at 1 (June 2007, available at http://www.fatf-gafi.org/dataoecd/43/46/38960576.pdf) ("Following a meeting in December 2005 between the FATF and representatives of the banking and securities sectors, FATF agreed to establish an Electronic Advisory Group (EAG) on the risk-based approach as part of its outreach to the private sector.")); Ex. 169 (*RBA Guidance for Legal Professionals*" October 23, 2008, available at http://www.fatf-gafi.org/dataoecd/5/58/41584211.pdf)).

142.    Wolfsberg Group guidelines and recommendations issued by the Basel Committee on Banking Supervision have no legal effect in the United Kingdom. Schuster Dec. Ex. 14 (Holland Rep. ¶ 6.15).

**RESPONSE:**  Object to improper argument in a Rule 56.1 Statement as to the legal effect of the Wolfsberg Group guidelines and recommendations in the U.K., and the referenced report of Jonathan Holland, a London lawyer, is simply a legal brief raising Rule 44.1 issues.

143.    Walters purports to analyze NatWest's conduct against that of a "standard Terrorist Financing investigation," Schuster Dec. Ex. 121 (Walters Reb.  ¶ Rep. 5), which he defined as a "standard Terrorist Financing investigation" conducted by the police, not by a bank,

based on his experience conducting money laundering, not terror financing, investigations. Schuster Dec. Ex. 119 (Walters Tr. at 136:13-137:6).

**RESPONSE:** Dispute.  NatWest distorts Walters' experience, which includes investigations of terror suspicions in the context of determining which financial crimes were committed, and thus purposely distorts the background on which Walters' standard was based.  This is a disguised *Daubert* challenge and wholly improper use of Rule 56.1. *See also* Response to ¶ 128.

144.    Walters identified six factors that purportedly made the Cryptome Report credible, which he claims NatWest could have verified: "[(1)] the account numbers were accurate; [(2)] the report lists six of the key figures within Interpal by name; [(3)] the report was correct about the relationship between Interpal and Al-Aqsa ... ; [(4)] additional transfers from ███████████████ identified in a Goalkeeper Report as representing █████████ . .; [(5)] the report was correct about the connection between Interpal and ██████ ... [and (6)] a thorough review would have shown outflows from Interpal's accounts to organizations such as [Al-Mujama Al-Islami, ██████, Al-Islah Charitable Society, Islamic Society Al-Khalil, Al-Salah Charitable Society, ██████ Al-Aqsa Foundation, El Wafa Charitable Society, and the Jenin Zakat Committee]." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 49-50).

**RESPONSE:** Admit.

145.    Walters admitted that NCIS could have verified the first two factors: Interpal's account numbers at NatWest and the names of six of the key figures within Interpal. Schuster Dec. Ex. 119 (Walters Tr. at 224:22-227:2 1).

**RESPONSE:** Admit.

146.    Walters admitted that as to the third and fourth factors, Al-Aqsa Foundation was not designated by either the U.S. or the United Kingdom as a terrorist entity until May 2003, one and a half years after NatWest received the Cryptome Report. Id. (Walters Tr. at 227:22-228:12).

**RESPONSE:**  Admit.

147.    Walters admitted that as to the fifth factor, ███████ has never been designated by either the United Kingdom or the United States as a terrorist entity. Id. (Walters Tr. at 229:8-11).

**RESPONSE:**  Admit.

148.    Walters admitted that as to the sixth factor, seven of the entities have never been designated as terrorist entities in the United States or United Kingdom, and the other entities were not designated until 2003. Id. (Walters Tr. at 228:4-7, 229:8-11, 229:17-230:8).

**RESPONSE:**  Admit.

(3)    Walters's methodology

149.    Walters purports to apply the "global banking standards published by Basel, Wolfsberg and FATF," but he could not identify which specific Basel, Wolfsberg and FATF standards he was referring to, and does not know whether he has read all of the standards. He did not maintain copies of those standards he read, but rather viewed them on the internet. Id (Walters Tr. at 97:3-99:19); Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 145, 192).

**RESPONSE:**  Dispute.  Admit that Walters applied Basel, Wolfsberg and FATF principles in conducting his analysis, and that he could not quote from them from memory at his deposition. Mr. Walters has read all three, and he read them recently during the course of his engagement in this case.  Israel Dec. Ex. 145 (Walters Tr. at 98:15; 99:2-5).  Admit that he read them on the internet rather than physically printing them out.

150.    Walters's report describes how he purportedly "identi[fied] those facts and materials pertinent to a standard Terrorist Financing investigation" and then "identified specific deviations to make an assessment of whether they amounted to major deviations, and delineated the significant deviations." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 5).

**RESPONSE:**  Admit.

151.    Walters admitted that he had never previously used the term "standard Terrorist Financing investigation" prior to his work on behalf of plaintiffs in these lawsuits. Schuster Dec. Ex. 119 (Walters Tr. at 135:18-22).

**RESPONSE:**  Dispute.  Walters testified that he "didn't believe" that he had ever used the term before, but defined what he meant by a standard Terrorist Financing investigation within the context of his work investigating financial crimes.

152.    Walters cannot identify any authority that used or defined the term "standard Terrorist Financing investigation" before he included that term in his report in these lawsuits. Id. (Walters Tr. at 135:23-136:12).

**RESPONSE:**  Admit.  *See* Response to ¶ 151.

153.    Walters admitted that the terms "deviation," "significant deviation" and "major deviation," as he used them in his report, are subjective to him. He defined the terms based on his experience investigating money laundering, not terror financing. He cannot identify any authority that defines the terms "deviation" and "major deviation," or that differentiates a "deviation" from a "significant deviation" and a "major deviation." He cannot recall what the difference is between a "significant deviation" and a "major deviation," as he used the terms in his report. Id. (Walters Tr. at 138: 19-139:2, 141:12-20, 142:15-143:25).

**RESPONSE:** Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1. Subject to the objection, admit that Walters used the terms "deviation" "significant deviation" and "major deviation" based upon his thirty years of experience as an investigator for the Metropolitan Police Force, which included the investigation of financial crimes such as terror financing.

154. Walters identified four "risk factors" that purportedly made Interpal a high-risk customer: "[(1) Interpal presented high country risk because its activity was connected to a high-risk jurisdiction: the Palestinian Territories. In addition, its stated purpose was to remit funds to high-risk jurisdictions: the Palestinian Territories, Jordan and Lebanon[; (2)] Interpal also presented high customer risk. It is a charity, and undertakes transactions with other charities ... [; (3)] In terms of service risk, Interpal "engaged in the high-risk practice of using its NatWest accounts to aggregate small deposits and send wire transfers of larger amounts to entities abroad, including many in the Palestinian Territories[; and (4)] Interpal sometimes even received funds from organizations to which it sent funds .. .. Schuster Dec. Ex. 121 (Walters Reb. Rep. 12-15).

**RESPONSE:** Admit that these were among the risk factors identified by Walters, except as to risk number (1). Interpal also presented high country risk, because it received and sent funds to other high-risk jurisdictions, such as ███████████████████, on a regular basis. *Id*. at ¶ 12.

155. Walters could not identify any publication that formed the basis for his opinion that each of the four "risk factors" indicates that a bank should treat a customer as "high risk." Walters admitted that he applied his own subjective definition of the first "risk factor," "high risk jurisdictions." He does not know whether the Palestinian Territories and Jordan had ever appeared on FATF's list of high risk jurisdictions. Schuster Dec. Ex. 119 (Walters Tr. at 149:24-

150:22). He testified that the basis for his analysis of the "risk factors" was his "experience" with the Basel, FATF and Wolfsberg standards and his "dealings" with banks and regulators, whom he has declined to identify purportedly on the basis of confidentiality. Id. (Walters Tr. at 153:2-8, 161:10-16, 166:18-20).

**RESPONSE:**  Dispute.  Walters was not asked whether he could identify any publication that formed the basis for his opinion that each of the four "risk factors" indicates that a bank should treat a customer as "high risk", and NatWest has cited no evidence to the contrary.  Admit that Walters determined what he considered to be a "high risk jurisdiction", based upon the "amount of terrorism going on in those regions."  Israel Dec. Ex. 145 (Walters Tr. at 149:24-150:5).

156.    Walters cannot identify any objective basis for stating that ███████ in 2003 was a "high-risk" jurisdiction. Id. (Walters Tr. at 261:10-262: 10).

**RESPONSE:**  Dispute.  Walters testified that he considered ██████ a high risk jurisdiction in 2003 because of "various difficulties in the Middle East", and counsel for NatWest never followed up on that testimony for clarification.  Israel Dec. Ex. 145 (Walters Tr. at 261:15-18).

157.    Walters states that Interpal presented "high customer" risk because it is a charity, but admits that according to his criteria, charities such as Guide Dogs for the Blind, the Royal National Life Boat Institution, the Prince's Trust and the Police Benevolent Fund also present a "high customer" risk. Id. (Walters Tr. at 153:9-160:7).

**RESPONSE:**  Dispute.  Walters stated that charities are high-risk customers generally, that it is a risk factor that needs to be considered, but that "[e]ach charity would need to be assessed separately" because "you can't look at any one particular risk element in isolation."  Israel Dec. Ex. 145 (Walters Tr. at 153:14-15; 153:24-154:4).

158.    According to Walters, the purported "red flags" on which he bases his opinions are "[(1)] Use of a charitable association's account to aggregate relatively small donations and then funnel funds by way of relatively large wire transfers to a small number of foreign beneficiaries, both individuals and businesses, located in a high-risk jurisdiction with a massive and well-known terrorism problem[; (2)] Involvement of multiple nationals of countries associated with terrorist activity[; (3)] Charity/relief organizations linked to the transactions on both sides[; (4)] Mix of cash deposits and monetary instruments[; (5)] Non-specific beneficiaries in a location experiencing major incidents of terrorism[; (6)] Wire transfers as the principal service utilized by the Defendant's customer[l; (7)] Media coverage associating the customer with terrorism that was public knowledge in the UK[I; (8)] Interpal was designated a Specially Designated Global Terrorist (SDGT) by OFAC in 2003[; (9)] Interpal sent funds to and received funds from various organizations on the OFAC SDN list ███████ , or with a name similar to a SDGT on the OFAC SDN list (Al-Aqsa Foundation, El-Wafa Charitable Society), listed by the Bank of England as suspected terrorism funders (███████), and outlawed by Israel (Jenin Zakat Committee, ███████)[; (10)] Beneficiaries in locations not in direct relation to Interpal's stated purpose (transfers to ███████████)[I; (11)] Beneficiaries were themselves charities, which constitutes significant customer risk[; (12)] Beneficiaries were sometimes also benefactors, like ███████ for example[; (13)] Different NatWest employees, at different times, in different departments identified Interpal as engaging in activity indicative of Terrorist Financing, thereby providing objective evidence of the suspicious nature of Interpal' s conduct[; (14)] Interpal was investigated by the Charity Commission in 1996 and in 2003, and each time the accounts were frozen[; and (15)] Interpal payments were of ongoing interest to Special

Branch[.]" Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 18); Ex. 119 (Walters Tr. at 165:16-166:7).

**RESPONSE:**  Admit, though there is no evidence that U.K. law enforcement was aware that NatWest chose not to disclose volumes of information pertaining to Interpal's banking conduct, or that law enforcement otherwise had such information.

159.    Walters believes that his 15 purported "red flags" are "understood and published," but he is unable to identify where those "red flags" have been published. Schuster Dec. Ex. 119 (Walters Tr. at 165:16-166:7). He testified that he had identified those 15 purported published red flags based on: (1) his experience as a police officer; (2) FATF standards; and (3) documents he received from conferences. Id. (Walters Tr. at 165:16-166:20).   However, he is unsure whether the "red flags" he had identified based on his experience in the police had been published. Id (Walters Tr. at 167:20-168:8). Similarly, he could not identify which FATF standards are sources of published red flags. When asked whether he read the FATF standards that he identified as being a source of published "red flags" when writing his report, he responded that he "possibly read them at different times. ...on the internet" but did not remember specifically which publications he had read. Id. (Walters Tr. at 166:21-167:19). Finally, he admitted that he did not consult any of the purportedly published documents from conferences while writing his report. Id. (Walters Tr. at 166:8-17).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1. Subject to the objection, admit that <u>at deposition</u>, Mr. Walters was unable to cite from memory to the specific sources of the standards he used in analyzing NatWest's conduct in its handling of the Interpal accounts.

160.    Walters conceded that 13 of his 15 purported "red flags" were either known to UK law enforcement authorities from the information NatWest provided in its NCIS disclosures or were public knowledge, and that law enforcement authorities would have been aware generally of the "red flags" of terrorism. Id. (Walters Tr. at (1) 168:9-17 1:21, (2) 17 1:22-172:25, (3) 173:2-8, (4) 173:9-12, (5) 173:13-25, (6) 174:6-11, (7) 174:17-176:22, (8) 176:23-179:4, (9) 181:17-183:3, (10) 183:6-14, (11) 185:20-186: 14, (12) 186:18-23 and (13) 185:8-19, 187:8-15).

**RESPONSE:**  Admit, though there is no evidence that U.K. law enforcement was aware that NatWest chose not to disclose volumes of information pertaining to Interpal's banking conduct, or that law enforcement otherwise had such information.

161.    As to the ninth red flag, Walters could not identify the basis for stating that sending funds to and receiving funds from organizations that have a name similar to a sanctioned entity is a "red flag," other than generally referring to "the guidelines and standards that are applied to this field of work." Id. (Walters Tr. at 179:15-180:21).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Subject to the objection, admit that Walters referred to "guidelines and standards that are applied in this field of work . . .", *i.e.*, the standards police use when conducting money laundering/terror finance investigations.  However, he followed this testimony with a clear precise explication of his meaning.  *Id*. at 179:23-180:21.

162.    As to the twelfth "red flag," Walters could not identify the basis for stating that two charities sending money to one another is a "red flag." Id. (Walters Tr. at 183:15-184:20).

**RESPONSE:**  Dispute and object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Walters stated the basis quite clearly:  "If someone is sending money in one

direction and then it comes back in another direction, that should raise a concern that what is the motivation behind that transfer unless there were clear reasons within the customer profile that have already documented why that will be happening." *Id*. at 183:19-25.

163.    Walters admitted that he has no education in applying his purported methodology. Id. (Walters Tr. at 144:6-9).

**RESPONSE:**  Dispute.  Walters stated that he has no <u>professional</u> education in applying this type of methodology.  (emphasis added)

164.    Walters admitted that he has never seen his methodology applied anywhere other than in the report FRA submitted by plaintiffs in the Strauss and Wolf actions. Id. (Walters Tr. at 144:10-13).

**RESPONSE:**  Admit.

    (4)    <u>Walters's report contains unsubstantiated statements, mistakes and incorrect factual assertions</u>

        a.    <u>Unsubstantiated statements</u>

**RESPONSE:**  Object to the inclusion of argument, disguised as a header, in a Rule 56.1 Statement.

165.    Walters opines, without identified support, that NatWest's "lack of full and frank reporting and its failure to undertake other conventional steps designed to uncover and report potential Terrorist Financing activity directly and negatively affected the assessment of the account risk and decisions that law enforcement or other regulators were making with regard to their response in terms of investigation or other action." Schuster Dec. Ex. 121 (Walters Reb. Rep. 1 10).

**RESPONSE:**  Dispute, and object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  This quote is from the summary of opinions in the front of the report,

and the substantiation for these summary opinions follows in the body of the report.  Minimally, the following paragraphs in Walters' report demonstrate the "lack of full and frank reporting and its failure to undertake other conventional steps designed to uncover and report potential Terrorist Financing activity": ¶¶ 25, 26, 30, 33, 41, 54 (Schuster Dec. Ex. 121).

166.    Walters never spoke with any law enforcement agencies about Interpal, nor did he have access to any law enforcement files regarding Interpal in relation to his work on these cases. When asked whether he had any actual knowledge as to whether NatWest's actions or lack of actions negatively affected law enforcement's assessments of Interpal, he responded, "I can't speculate on matters I don't know." Schuster Dec. Ex. 119 (Walters Tr. at 125:4-20, 144:14-146:20).

**RESPONSE:**  Admit that Walters never spoke to any law enforcement agencies about Interpal, and admit that Walters has no actual first-hand knowledge as to whether NatWest's actions or lack of actions negatively affected law enforcement's assessments of Interpal.  He is testifying as an expert, not a fact witness.

167.    Walters never saw any evidence that NCIS expected more from NatWest's disclosures, nor that NatWest failed to answer any follow-up questions posed by NCIS, nor any evidence that any law enforcement agency ever complained to NatWest about the extent or quality of the information it had provided concerning Interpal. Id. (Walters Tr. at 148:25-149: 10, 215:1-12, 217:18-23, 219:19-22).

**RESPONSE:**  Admit, though there is no evidence that NCIS was aware that NatWest chose not to disclose volumes of information, or that NCIS otherwise had such information.

168.     Walters is not aware of any disciplinary action that has ever been taken against NatWest for failing to fulfill its obligations with respect to Interpal by any United Kingdom authority. Id. (Walters Tr. at 217:24-218:5).

**RESPONSE:**  Admit.

169.     Walters states, without identified support, that NatWest's receipt of the Cryptome Report, which alleged links between Interpal and Hamas, was a "red flag." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 35, 37). Walters admits that NCIS had access to the Cryptome Report, was not aware of any evidence that NCIS or any law enforcement agency ever asked NatWest for more information relating to the Cryptome Report, and that United Kingdom law enforcement agencies had the ability to obtain from NatWest any additional information they needed in order to investigate the allegations contained in the Cryptome Report. Schuster Dec. Ex. 119 (Waiters Tr. at 203:17-206:7, 217:7-11).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Subject to the objection, admit that NCIS had access to the Cryptome Report and that there is no evidence that NCIS ever asked NatWest for more information about the Cryptome Report, however dispute as to two key points: 1) as Mr. Walters pointed out, in this period, immediately following the events in the United States of September 11, 2001, law enforcement agencies were extremely taxed for resources and may not have deemed the existence of the Cryptome Report as worthy of investigation, without more; and 2) NCIS "wouldn't have had access to all the information in the RBS without getting Court orders in order to obtain it."  Israel Dec. Ex. 145 (Walters Tr. at 204:20-205:20).  Walters' obvious point is that Defendant failed to divulge vital information to NCIS, even though it promised NCIS that it would undertake a ████████████ of Interpal's accounts, and that one cannot conclude or speculate that NCIS in fact had such

information, independently could have obtained it, could have obtained it as timely as Defendant, or did not expect Defendant to provide it with the information. *See* ¶ 44, *supra*.

170.   Walters states, without identified support, that "[i]n the full circumstances of this case, there is, in my view, clear suspicion of Money Laundering activity." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 171). At his deposition, Walters conceded that he does not recall seeing any internal or external communications in which NatWest stated that it suspected Interpal of engaging in money laundering. Schuster Dec. Ex. 119 (Walters Tr. at 289:9-13).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Moreover, this argument is duplicitous.  Walters makes clear that he is using the term "money laundering" in the broader sense, meaning "suspicious activity."  Israel Dec. Ex. 145 (Walters Tr. at 288:25-289:5).  Counsel for NatWest, however, kept forcing him back to the literal, isolated terror financing as something analytically distinct from money laundering, which it only partially is.  Thus Walters "admits" that in that literal sense, he saw no evidence indicating that NatWest suspected money laundering.

171.   Walters states, without identified support, that NatWest granted a 2003 BBC news report, which reported that the Charity Commission had dropped its investigation of Interpal, "unquestioned credibility and weight while discounting more credible sources of adverse information concerning Interpal, including the OFAC list." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 221). He could not identify his basis for stating that NatWest relied on the BBC report. Schuster Dec. Ex. 119 (Walters Tr. at 298:14-17). He conceded that NatWest had received a letter from the Charity Commission informing NatWest ███████████████████████

██████████████████████████████████████████████████████

78

█████████████████████████████████████████████████████████████████████

███████. Id. (Walters Tr. at 298:18-299:25); Ex. 122 (Walters Dep. Ex. 43).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Subject to the objection, admit that Walters stated that he believed that he had previously seen the letter from the Charity Commission informing NatWest that ██████████████ ████████████████████████████, however dispute that Walters "could not identify his basis" for making that statement.  Israel Dec. Ex. 145 (Walters Tr. at 298:11-17).

172.   Walters states, without identified support, that "NatWest's effort to dismiss the importance of OFAC listings deviates materially from standard banking practice ....   Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 200). When shown the Bank of England's instructions to NatWest in October 2003 that ████████████████████████████████████ ████████████████████████████ he conceded that the Bank of England was not instructing NatWest to engage in a major deviation from international banking standards. Schuster Dec. Ex. 119 (Walters Tr. at 294:10-25).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Subject to the objection, admit that Walters stated that "the Bank of England was not instructing NatWest to engage in a major deviation from international banking standards," however dispute that Walters' statement that "NatWest's effort to dismiss the importance of OFAC listings deviates materially from standard banking practice ...." is without identified support.  *See, e.g.,* Schuster Dec. Ex. 121 (Walters Reb. Rep. at ¶¶ 87-89, 173-174).

173.   Walters opines that he "cannot understand why a further disclosure was not submitted to law enforcement in the standard manner [in September 2003, regarding the payment of █████████ to Interpal]." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 165-167). Walters admits

the NTFIU informed NatWest that ███████████████████████████████

████████████████████████████████████████████ When asked

whether he believes NatWest should have made a further disclosure, despite being told by

NTFIU ████████████████ Walters responded, "I would have thought they would

have having confirmed the information and I haven't had a chance to look at - I can't find the

date there, but I would have in normal course events I would have expected that when they got

the feedback from their own staff that this payment came from this particular organization that

they would have submitted a SAR with that information. Having decided not to do that and then

telephone [sic] and spoken, I can understand why they then didn't submit one." Schuster Dec.

Ex. 119 (Walters Tr. at 263:21-264:6, 265:22-267:15).

**Response:**  Admit.

> b.  Mistakes and incorrect factual assertions

174.  Walters admits he made a mistake in writing that a ████ transfer from Interpal to

an individual in ████ had "no apparent explanation," when the wire transfer documentation

reveals that the apparent purpose of the wire transfer was a ███████████ Id. (Walters Tr. at

188:18-196:22).

**RESPONSE:**  Object that this is a disguised *Daubert* challenge and wholly improper use of Rule

56.1.  Subject to the objection, Walters admitted that he made a mistake when he said that the

transfer to ████ had "no apparent explanation", when in fact the document was labeled

███████████ however it is abundantly clear from his testimony that what he was talking about

in his report was that there was no apparent explanation why Interpal, a charity whose stated

purpose was to provide relief to people in the Palestinian territories, would be sending a wire

transfer to ████ To call it a ███████████ would be a typical way in his experience to make

the payment look clean, when it was really money laundering or terror finance.  Israel Dec. Ex. 145 (Walters Tr. at 193:14-194:12).

175.    Walters opines in his report that he has seen no evidence of communication between NatWest and the Charity Commission during the Charity Commission's 1996 investigation of Interpal. <u>Id.</u> (Walters Tr. at 198:7-14); Ex. 121 (Walters Reb. Rep. ¶ 30). Walters testified that he reviewed all of the documents produced by NatWest in this action, but when shown evidence of a telephone call between NatWest and the Charity Commission in March 1996, he testified, "I don't recall this document." Schuster Dec. Ex. 119 (Walters Tr. at 12:24-13:3, 198:15-201:14); Ex. 123 (Walters Dep. Ex. 23).

**RESPONSE:**    Dispute, and object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Defendant clips short Walters' testimony at page 198, which should have extended to line 17, where he clarified that he was talking about more than merely a letter saying "Stop the account" or "Open the account."  What he meant in his report is further clarified when he says:

> If I read my paragraph I say I would have, well, you have to take the whole paragraph I think.  I don't see any documentation of any due diligence or account monitoring being undertaken at the time the account was frozen and from my experience, I would have expected, for example, an assessment as to all the account activity preceding the freezing order.  I would have also expected to find documentation of communication between the defendant and Charity Commission and even Special Branch.  The lack of documentation, -- I'm not saying there's no documentation, but in any event I haven't seen anything that indicates there was any investigation of its own around that '96 investigation.

Israel Dec. Ex. 145 (Walters Tr. 200:22-201-14).

176.    Walters states in his report that he has seen no evidence of any action or due diligence being taken between November 2001 and July 2002 about gaining a "'clear understanding of the activities and full details behind some of [Interpal's] sizeable transactions."'

Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ in 55, 63); Ex. 119 (Walters. Tr. at 233:19-235:3). However, when shown Belinda Lane's due diligence notes dated between November 2001 and July 2002, he conceded that he had seen those documents. Schuster Dec. Ex. 119 (Walters Tr. at 235:4-236:13, 238:15-239:25); Exs. 124-25 (Walters Dep. Exs. 29-30).

**RESPONSE:**  Dispute.  In Walters' Rebuttal Report at ¶ 55, Walters cites a comment by NatWest employee Doug Hartley in a Goalkeeper report concerning two large overseas credits to Interpal's account, after which Mr. Hartley investigated and wrote, "I think we need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions."  It is in response to this call to action that Walters expected to see documentation for a significant investigation, something much more than having the relationship manager pay Interpal a visit and ask its officer a few questions.

177.    Walters states in his report that he has seen no evidence of "significant KYC or due diligence" by NatWest after the date of OFAC's designation of Interpal. Schuster Dec. Ex. 121 (Walter Reb. Rep. ¶¶ 86, 9 1). However, when shown Guy Cole's May 2004, December 2004 and July 2005 semi-annual reviews of Interpal's accounts, he conceded that he had seen those documents and that they analyze Interpal' s accounts after the date of OFAC' s designation. Schuster Dec. Ex. 119 (Walters Tr. at 280:19-282:18); Exs. 126-28 (Walters Dep. Exs. 38-40).

**RESPONSE:**  Dispute.  Walters' opinion on this point is clarified as follows:  "My opinion as I voiced it in the report is that I would have expected that this would have taken place a lot sooner than it did . . . My experience would be when there's a matter like this is that the sort of research and review and due diligence would take place immediately."  Israel Dec. Ex. 145 (Walters Tr. at 282:24-283:8).

178.    Walters states in his report that he has seen no evidence of guidance on "balanc[ing] the risk of tipping off with the need for further information" being provided to the Relationship Manager, Belinda Lane. Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 57). However, when shown Belinda Lane's testimony that she had been trained annually in anti-tipping off policy, he conceded that he had read that testimony. Schuster Dec. Ex. 119 (Walters Tr. at 241:22-242:24); Ex. 129 (Walters Dep. Ex. 31 at 234:6-21).

**RESPONSE:**    Dispute, and object that this is a disguised *Daubert* challenge and wholly improper use of Rule 56.1.  Plainly, what Walters was discussing is clarified by his immediately subsequent testimony stating that he expected specific guidance as to Interpal, which counsel for NatWest didn't like, so he followed it up by improperly moving to strike, falsely claiming that the testimony was non-responsive, and thus omitted that testimony here.  Israel Dec. Ex. 145 (Walters Tr. at 243:2-10.)

179.    Walters states in his report that he has seen no responses to Damien Connor's August 26, 2003 email that circulated the Sanctions and Terrorist Financing Search request. Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 109). However, when shown the responses to Damien Connor's August 26, 2003 email at his deposition, he conceded that there were nine responses to that email. Schuster Dec. Ex. 119 (Walters Tr. at 286:9-287:9); Ex. 130 (Walters Dep. Ex. 42).

**RESPONSE:**  Admit.

180.    Walters states in his report that NatWest's October 15, 2001 NCIS disclosure "made no mention of the Cryptome [R]eport or the letter sent to NCIS [disclosing the Cryptome Report]." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 39). The October 15, 2001 NCIS disclosure begins, '█████████████████████████ .... ". Schuster Dec. Ex. 131

(Walters Dep. Ex. 17).  Walters conceded that the reference to ████████ was to ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.  Schuster Dec. Ex. 119 (Walters Tr. at 209:20-213:9, 2 14:9-25).

**RESPONSE:**  Dispute.  Walters addressed counsel's improper and ambiguous questions and clarified that NatWest's cross reference was non specific, and that he expected NatWest would have provided complete information of its supposed Interpal review rather than the small, hand-selected information NatWest did later disclose, which suggests NatWest did not undertake its promised full review that would have included thoroughly analyzing all accounts.  The inadequacy of the review was, of course, unavailable to a police officer such as Walters until after the fact, since law enforcement could not have known at the time that NatWest was only providing a fraction of the information about Interpal's accounts available to it.  Israel Dec. Ex. 145 (Walters Tr. at 211:24-212:13; 213:24-214:8).

181.    Walters states in his report that Michael Hoseason acted as NatWest's Money Laundering Reporting Officer ("MLRO").  Schuster Dec. Ex. 121 (Walters Reb. ¶ Rep. 43).  Walters admitted during his deposition that Michael Hoseason was not NatWest's designated MLRO.  He could not recall who was the designated MLRO.  Schuster Dec. Ex. 119 (Walters Tr. at 220:15-24, 224: 10-15).

**RESPONSE:**  Admit.

182.    Walters states in his report that NatWest undertook a review in July 2002 of Interpal "eight months after the first SAR was submitted, which constitutes a very significant deviation from the Bank's general obligation to take action in a timely manner."  Schuster Dec.

Ex. 121 (Walters Reb. Rep. ¶ 64). He conceded at his deposition that NatWest conducted its July 2002 review of Interpal's accounts in response to a payment Interpal had received only ███ ███████████████████████ Schuster Dec. Ex. 119 (Walters Tr. at 245:5-16); Exs. 132-33 (Walters Dep. Exs. 32-33).

**RESPONSE:** Dispute. The review Walters is plainly talking about is a review of the extant KYC/due diligence. Walters expresses the view that the KYC/due diligence undertaking should have taken place following the filing of the first SAR in the fall of 2001, rather than almost a year later, in the late summer of 2002. Schuster Dec. Ex. 121 (Walters Reb. Rep. at ¶ 63).

183. Walters states in his report that NatWest made the decision not to disclose a payment of ██████ from ████████████████████████████████████████████ ██████ Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 16 1-162). Walters conceded during his deposition that NatWest did disclose this payment to NCIS on June 17, 2002. Schuster Dec. Ex. 119 (Walters Tr. at 248:22-249:5).

**RESPONSE:** Dispute. The Goalkeeper Report cited in Walters' report in fact stated that no disclosure to NCIS was made and included a note by Michael Hoseason agreeing that no disclosure was necessary. Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶¶ 161-162). At deposition, NatWest showed Walters a different Goalkeeper report, which included an NCIS disclosure pertaining to the referenced payment.

184. Walters states in his report that Interpal received a ██████ transfer from ██████ on ██████████ Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 105). He conceded that the transfer was from an entity named ██████████████████████ ██████████████ not an entity named ██████████████ " Schuster Dec. Ex. 119 (Walters Tr. at 257:4-258:2); Ex. 134 (Walters Dep. Ex. 35 at NW012142). He conceded that the entity



" is not listed as an alias for ████████████ on either the OFAC or Bank of England sanctions lists. Schuster Dec. Ex. 119 (Walters Tr. at 258:3-260:19); Exs. 135-36 (Walters Dep. Exs. 27-28). When asked the basis for referring to ██████████████████████████████ as ████████████ he responded, "I shortened it to that." Schuster Dec. Ex. 119 (Walters Tr. at 260:20-261:4).

**RESPONSE:** Admit that Walters shortened the name to its English equivalent.

185. Walters states in his report that NatWest also received a transfer from "an individual who appears to be linked to ██████████████████ " Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 105). Walters admitted during his deposition that ████████████ name is not listed as an alias for ████████████ on either the OFAC or Bank of England sanctions lists. Schuster Dec. Ex. 119 (Walters Tr. at 261:5-9).

**RESPONSE:** Dispute. Admit that Walters stated that the name ████████████ is not listed on either the OFAC or Bank of England lists. However, the name ██████████████ his link to the ██████████████████████, and the risk of facilitating terrorism associated with them both is disclosed in NatWest's <u>own</u> documents. Israel Dec. Ex. 43 (NW052074-91).

186. Walters states in his report that NatWest "specifically failed to take notice of the ongoing Police interest in the account." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 84). In the same paragraph of his report, Walters states that NatWest "was clearly aware of the ongoing Police inquiry and interest in the account." <u>Id.</u> He admitted that NatWest informed NCIS in 2003 ██████████████████████████████ Schuster Dec. Ex. 119 (Walters Tr. at 277:23-278:8).

**RESPONSE:**  Admit.

187.    Walters opines in his report that NatWest "had several clear opportunities to discuss its potential options with law enforcement and to obtain clear guidance; NatWest failed, however, to take action on such opportunities." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 86). Upon being shown NatWest's correspondence with the Bank of England in September 2003, in which NatWest ████████████████████████████████████████████ ██████ Walters conceded that NatWest did take action on such an opportunity. Schuster Dec. Ex. 119 (Walters Tr. at 122:25-125:3, 126:8-20, 129:23-130:7, 278:9-280: 18); Ex. 137 (Walters Dep. Ex. 37).

**RESPONSE:**   Admit that NatWest followed up on perhaps one opportunity, even though it failed to follow law enforcement's advice in that instance (*see* Response to ¶ 79), and in that instance Walters made clear that in regards to NatWest's interactions with the Bank of England, what the Bank of England had was "not the full information" in the hands of NatWest.  Schuster Dec. Ex. 119 (Walters Tr. at 126:22-25).   Furthermore, as NatWest lacks any further evidence for its statement, dispute that Walters' conclusion that NatWest failed to take actions on "several clear opportunities" was incorrect.

188.    Walters states in his report that Irvine Rodger, "as head of the Money Laundering Prevention Unit within the Corporate Banking Financial Markets' division, which included Interpal within its customer responsibility, should have understood that the designation of Interpal by OFAC meant that the U.S. Government was making clear its belief that Interpal was involved in funding terrorism." Schuster Dec. Ex. 121 (Walters Reb. Rep. ¶ 87). Walters conceded at his deposition that Irvine Rodger testified that he did understand that the OFAC

designation meant that the U.S. government was making clear its belief that Interpal was involved in funding terrorism. Schuster Dec. Ex. 119 (Walters Tr. at 284:23-285:24).

**RESPONSE:**  Admit.

**S.      The Proposed Expert Testimony Of Clive Walker**

(1)     Walker's qualifications as an expert on the Charity Commission, UK law enforcement and internal bank policies and procedures

189.     Walker has never spoken with anyone employed by the Charity Commission, and has never written to such a person other than by emailing the Charity Commission requests for the disclosure of inquiry reports under the Freedom of Inquiry Act and engaging in a short email exchange that occurred after he submitted his report. Schuster Dec. Ex. 16 (Walker Tr. at 13:18-20, 15:3-16:22).

**RESPONSE:** Admit.

190.     Walker has no professional experience working with the Charity Commission. Id. (Walker Tr. at 38:9-11, 40:15-20).

**RESPONSE:** Dispute.  Walker testified that, during the brief period of time that he practiced law before becoming a legal academic, he did not practice before the Charity Commission. Israel Dec. Ex. 159 (Walker Tr. at 40:10-20).  However, as a law professor, Walker has taught courses that included U.K. charity law, *id*. at 40:23-41:3, and has written and taught extensively on the intersection of terror-financing and charities.  *Id*. at 37:15-38:8.

191.     Walker has never taught a course on charity law, other than a course he last taught 20 years ago on equity and trust, which he testified had a section about charities and law and for which he did not retain a copy of the syllabus. Id. (Walker Tr. at 40:23-41: 10). Rather, Walker is a professor of criminal justice studies. Schuster Dec. Ex. 15 (Walker Rep. 1.1.).

**RESPONSE:** Dispute.  See Response to ¶ 190.

192.     Walker has never authored any publications focused on the Charity Commission. He has only published texts on terrorism and the law that contain brief mentions of the Charity Commission. Schuster Dec. Ex. 16 (Walker Tr. at 48:6-49:2).

**RESPONSE:** Dispute.  See Response to ¶ 190.

193.     Walker has never worked for a British law enforcement agency. Id. (Walker Tr. at 41:11-42:19, 44:10-25, 129:9-130:13); Ex. 13 8 (Walker Dep. Ex. 27).

**RESPONSE:** Dispute.  As Walker testified, he has been retained by British law enforcement agencies, such as the Police National Legal Database and the Association of Chief Police Officers.  Israel Dec. Ex. 159 (Walker Tr. at 41:11-43:23).

194.     Walker has never worked for any commercial or retail bank. Schuster Dec. Ex. 16 (Walker Tr. at 45:2-4).

**RESPONSE:** Admit.

195.     Walker has never taught any courses on banking law. He testified that his course named "Terrorism and the Law" includes a section on "how bankers have to deal with antiterrorism laws and regulations," but his outlines for that course do not contain any reference to banking laws or regulations. Id. (Walker Tr. at 45:5-47:9); Ex. 139 (Walker000007-ll); Ex. 140 (Walker0000l2-15).

**RESPONSE:**  Dispute. Walker's terrorism courses (and publications) have included sections about banking law and terrorism.  Israel Dec. Ex. 159 (Walker Tr. at 45:7-12).

196.     Walker has no professional training in banking regulation other than the training that qualified him to practice as a solicitor and what he has learned as an academic. Schuster Dec. Ex. 16 (Walker Tr. at 47:10-48:5).

**RESPONSE:** Admit.

(2)  Walker's methodology

197.  Walker had never applied the terms "red light regulator" and "green light regulator" to the Charity Commission before he used those terms in his report in these lawsuits. Id. (Walker Tr. at 84:4-6).

**RESPONSE:** Admit.

198.  Walker could not identify any authority who had ever applied the terms "red light regulator" or "green light regulator" to the Charity Commission. Id. (Walker Tr. at 84:4-85:4).

**RESPONSE:** Admit.

199.  Walker testified that the academic Peter Edge, a leading author on charities law, applied the terms "soft law" and "hard law" to the Charity Commission. Walker testified that "soft law" equates somewhat to "green light regulator." Id. (Walker Tr. at 85:5-87:14).

**RESPONSE:** Dispute.  Walker testified that he recalled reading an article by Peter Edge which used the terms "hard law" and "soft law," which Walker believes have "some affinity with the type of concept that I'm putting forward here."  Israel Dec. Ex. 159 (Walker Tr. at 85:11-14). Walker further testified that, while he found Edge's "analytical construct" of "hard law/soft law" persuasive as applied to the Charity Commission, *id*. at 87:11-14, he was explicitly *not* endorsing all of the opinions expressed by Edge in that article.  *Id*. at 86:19-20.

200.  Peter Edge's article does not characterize the Charity Commission as applying "soft law," rather than "hard law." Instead, Edge's article describes the Charity Commission's "extensive powers," including suspending and removing a charity's trustees, officers, agents or employees, appointing additional trustees, and freezing the assets of the charity. Edge states that the Charity Commission "works closely with the police, and reports any criminal offense it uncovers during its work to the police. ..." Schuster Dec. Ex. 141 (Peter Edge, "Hard Law and

Soft Power: Counter-Terrorism, the Power of Sacred Places, and the Establishment of an Anglican Islam," 12 Rutgers J.L. & Relig. 358 (2010) at Walker000023).

**RESPONSE:** Dispute.  Edge's article draws a distinction between the "hard law proposals" advanced by the British Government after the Islamist terrorist attacks of July 7, 2005, and the British Government's previous approach, epitomized by reliance on the Charity Commission's oversight.  *Id*. at Walker000026.  Edge's article also contrasts the "hard law proposals," which the British Government abandoned after vociferous opposition was expressed by various groups, including the Islamic Human Rights Commission, *id*. at Walker 000030, with the "soft power" approach ultimately adopted to deal with the problem of radicalized British Islamists, which relies on "seeking to modify the way in which communities choose to act rather than seeking to curb their actions."  *Id*. at Walker000034.

201.    Walker states in his report that the Charity Commission does not give equivalent weight to its enforcement or prosecutorial activities and to its activities facilitating, enabling and promoting charity. Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.5).

**RESPONSE:** Admit.

202.    But Walker conceded in his deposition testimony that the Charity Commission listed 490 occasions between 2007 and 2008 when it exercised its compliance powers, including by issuing orders and directions for information and evidence, suspending trustees, removing trustees, freezing bank accounts and appointing interim managers. Schuster Dec. Ex. 16 (Walker Tr. at 101:24-103:7); Ex. 142 (Walker Dep. Ex. 15).

**RESPONSE:** Admit that counsel for NatWest showed Walker a Charity Commission publication entitled "Charities Back on Track 2007-2008" that contained the claim that the

Charity Commission used its compliance powers on 490 occasions between 2007 and 2008. Israel Dec. Ex. 159 (Walker Tr. at 99:12-102:8).

203.    Walker also conceded that the Charity Commission states that it applies "zero tolerance" to issues of connections between charities and terrorist activity. Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.9); Ex. 16 (Walker Tr. at 103:15-104:13).

**RESPONSE:** Admit that Walker's report includes this claim by the Charity Commission in 2008.

204.    Walker further conceded that the Charity Commission "has also put in place a Proactive Monitoring Unit and a Counter Terrorism Team which forms part of the Intensive Casework Unit in Compliance and Support .. .. ". Schuster Dec. Ex. 15 (Walker Rep. 3.1.9); Ex. 16 (Walker Tr. at 104:3-104:13).

**RESPONSE:** Admit that Walker's report also includes this claim, made by the Charity Commission in 2007.

205.    Walker also conceded that the Charity Commission's stated policy is that is has "always been vigilant about the risk of potential links between charities and terrorist organisations and people connected to them." Schuster Dec. Ex. 16 (Walker Tr. at 105:5-107:12); Ex. 143 (Walker Dep. Ex. 16). When asked for basis for his opinion that the Charity Commission's actions do not reflect its stated policies, he stated, "[T]he factual basis that I would have would be drawn from the - essentially drawn from the three reports that the Charity Commission has issued about Interpal. That would be, I think, my core reason for doubt. But also, of course, I referred earlier to other sources of information about Interpal; for example, the [BBC's] Panorama program on the subject." Schuster Dec. Ex. 16 (Walker Tr. at 105:5-107:12).

**RESPONSE:** Admit.

206.    Walker agrees that the "channeling of funds by charities to terrorists is extremely rare." Id. (Walker Tr. at 53:25-54:12); Ex. 15 (Walker Rep. ¶ 3.2.11).

**RESPONSE:** Dispute.  Walker's report quotes a report by Her Majesty's Treasury which noted that, while the overall percentage of charities who provide funds to terrorists is small, the Charity Commission should "reinforce its awareness of risk factors."  Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.2.11).  At deposition, Walker stated that, considering the large number of registered charities (over 160,000) in the UK, "the number of allegations [of raising funds for terrorists] compared to 160,000 is, therefore, I think fairly described as extremely rare."  Israel Dec. Ex. 159 (Walker Tr. at 54:10-12).  However, Walker testified that, as emphasized by the British Treasury, "there are clearly some charities which are far more at risk [for financing terrorism] than others."  *Id*. at 54:23-25.

207.    Walker did not review any documents produced by NatWest. Schuster Dec. Ex. 16 (Walker Tr. at 18:13-19:17, 31:23-35:18, 109:4-9).  Walker's knowledge of the facts underlying these lawsuits comes from his reading of plaintiffs' complaints, his discussions with plaintiffs' counsel, academic articles that mention these cases and unspecified web pages that contain "people's opinions" about these cases. Id. (Walker Tr. at 18:19-24, 31:23-35:18). Walker testified about the web pages he had read, "I've learned probably more people's opinions than facts about the case." Id. (Walker Tr. at 35:3-10).

**RESPONSE:**  Dispute.  Walker testified that he'd also reviewed other "court papers" in the lawsuit, including the reports of NatWest's experts and a deposition transcript.  Israel Dec. Ex. 159 (Walker Tr. at 35:19-23).

208.    Walker opines in his report that Jonathan Burchfield "fails to properly consider the relevancy and significance of the Commission's 2009 Inquiry Report." Schuster Dec. Ex. 15

(Walker Rep. ¶ 3.1.25). Walker conceded that he was not aware when he wrote his report that NatWest closed Interpal's accounts in 2007, two years before the Charity Commission published its 2009 report on Interpal. Schuster Dec. Ex. 16 (Walker Tr. at 115:25-116:19, 117:16-118:4).

**RESPONSE:** Dispute.  Walker testified that he <u>was</u> aware that the accounts were closed; he merely "wasn't aware of the precise date."  Israel Dec. Ex. 159 (Walker Tr. at 116:3-4).  Walker never testified that he didn't know that the closure of the accounts preceded the issuance of the Commission's 2009 report.

209.    Walker states in his report that Jonathan Burchfield "conceded" that the Charity Commission's 2009 Inquiry Report on Interpal is "arguably the most thorough and comprehensive of all such inquiries ... ." Schuster Dec. Ex. 15 (Walker Rep. ¶ 3.1.25). He admitted that Burchfield did not opine that the Charity Commission's 2009 report was the "most thorough and comprehensive," but rather that he interpreted Burchfield's use of the term "long-lasting" to mean "the most thorough and comprehensive." Schuster Dec. Ex. 16 (Walker Tr. at 114: 13-115:14).

**RESPONSE:** Dispute.  Walker testified that this conclusion was inherent in Burchfield's description of the later investigation as a "'much more long lasting inquiry into the affairs of the Charity'" than the previous investigations.  Israel Dec. Ex. 159 (Walker Tr. at 115:8-14).

**T.**    **The Qualifications Of Jon Holland, An Expert Retained By Nat West**

210.    Jon Holland is a solicitor and partner in the law firm Hogan Lovells, where he is co-head of the financial services litigation team. Schuster Dec. Ex. 14 (Holland Rep. ¶ 11.1).

**RESPONSE:** Admit.

211.    Holland is a member of the Banking Technique and Practice Committee of ICC UK and the City of London Solicitors' Company. <u>Id.</u> (Holland Rep. ¶ 1.3).

**RESPONSE:** Admit.

212.    Holland has authored numerous publications on the subjects of anti-terror financing, anti-money laundering and financial sanctions. Id. (Holland Rep. ¶ 1.5).

**RESPONSE:** Dispute.  Although Holland claimed, in his report, to have authored articles related to anti-terror financing, when asked at deposition which of his publications he believed related to this subject, he could not identify any.  Israel Dec. Ex. 76 (Holland Tr. at 18:23-19:14).

213.    Holland has particular expertise in the fields of anti-terror financing and anti-money laundering, on which he has advised clients since 1983. Id. (Holland Rep. ¶ 1.4).

**RESPONSE:** Dispute.   At deposition, Holland conceded that he is "principally a banking litigator," Israel Dec. Ex. 76 (Holland Tr. at 11:4-5); knows of no directories in which he is listed as an expert on sanctions or terror financing, *id*. at 12:23-13:11; has never received any training in terror-financing law, *id*. at 19:15-20:9; and could not identify anything he'd written that related to terror-financing or even talked about "anti-terrorist financing in any way."  *Id*. at 19:12-14.

214.    Holland is regarded by the key directories in the United Kingdom and internationally as a leading lawyer in the area of banking litigation and contentious regulatory work. Id. (Holland Rep. ¶ 1.6).

**RESPONSE:** Admit that Holland is mentioned in three directories, Chambers, Chambers Global and Legal 500.  Dispute that these are recognized as "the key directories in the United Kingdom and internationally."  Also, Holland testified that his recognition for contentious regulatory work was actually only "in one of them, I'm not sure which, and I'm not sure how Chambers Global is divided up, so it may just have a commercial litigation or a banking litigation slot, I can't remember which."  Israel Dec. Ex. 76 (Holland Tr. at 12:13-22).

215.    Holland is regularly invited to speak at conferences on issues relating to anti-terror financing, anti-money laundering and financial sanctions. Id.

**RESPONSE:** Dispute.   At deposition, Holland claimed to have spoken at "[m]aybe two or three" conferences in which antiterrorist financing law was "the subject or part of the subject" of his presentation.   Israel Dec. Ex. 76 (Holland Tr. at 14:19-24).   Holland subsequently admitted that the subject matter about which he spoke at these conferences was sanctions law, and that he could not recall ever speaking about the "separate anti terrorist financing obligations the financial institutions are tasked with." *Id*. at 15:24-18:8.

**U.**    **The Qualifications Of Jonathan Burchfield, An Expert Retained By NatWest**

216.    Jonathan Burchfield is a solicitor and partner in the law firm Stone King LLP, which specializes in working with charities and non-profit organizations and has been recognized as one of the top three charity law firms in the United Kingdom. Schuster Dec. Ex. 17 (Burchfield Rep. Ex. A).

**RESPONSE:** Admit.

217.    From 1995 through 2006, Burchfield was Head of the Charity Group of the law firm Nabarro Nathanson. Id.

**RESPONSE:** Admit.

218.    From 1984 through 1995, Burchfield was a partner in the law firm Turner Kenneth Brown, where he established that firm's Charity Group. Id.

**RESPONSE:** Admit.

219.    As a charity lawyer, Burchfield has had on a daily basis either contact with the Charity Commission or consideration of the provisions of the laws affecting charities in the United Kingdom. Id.

**RESPONSE:** Admit.

220.    Burchfield has been involved in registering many new charities with the Charity Commission every year. Id.

**RESPONSE:** Admit.

221.    Burchfield has been involved in numerous statutory inquiries initiated by the Charity Commission. Id.

**RESPONSE:** Admit.

222.    Burchfield served for 12 years on the Executive Committee of the Charity Law Association, for which he also acted as Deputy Chairman for several years. Burchfield has significant experience working as a trustee of charities regulated by the Charity Commission, including for The Tubney Charitable Trust, a significant grant-making charity in the United Kingdom, Creativity Culture and Education, a charity established by Arts Council England and St. Edward's School, Oxford, one of the United Kingdom's leading independent schools. Id.

**RESPONSE:** Admit.

223.    Burchfield has written numerous articles for publication in professional journals relevant to charity lawyers. Id.

**RESPONSE:** Admit that Burchfield has written a number of articles related to charities but dispute NatWest's characterization of such articles as "relevant" in the context of this lawsuit. Burchfield conceded at his deposition that none of the articles he has written for publication have dealt with the issue of terror-financing in the charitable organization context.  Israel Dec. Ex. 160 (Burchfield Tr. at 39:16-20).

**V.**     **The Qualifications Of Michael Hyland, An Expert Retained By NatWest**

224.     Michael Hyland is Executive Chairman and Director of MHA Compliance and Training Ltd, where he specializes in the counter-terrorist and anti-money laundering obligations placed on financial institutions. Schuster Dec. Ex. 6 (Hyland Rep. ¶ 1).

**RESPONSE:** Admit.

225.     Prior to MHA, Hyland was Head of Audit and Inspection Services within the United Kingdom operations of the Midland Bank Group plc. Id.

**RESPONSE:** Admit.

226.     Hyland was a founding member of the United Kingdom's Joint Money Laundering Steering Group in 1989, of which he remained a member at the explicit request of the Bank of England until 1997. Id.

**RESPONSE:** Admit.

227.     Hyland is a Fellow of the Chartered Institute of Certified Accountants and a Fellow of the Chartered Institute of Internal Auditors. Id.

**RESPONSE:** Admit.

228.     Hyland has served on numerous anti-money laundering committees in the United Kingdom, including with the British Bankers' Association and the European Banking Federation Money Laundering Committee. Id.

**RESPONSE:** Admit that Hyland states that he has served on several committees, specifically those listed above.

229.     Hyland has chaired and lectured at numerous counter-terror financing and anti-money laundering workshops and courses. Id.

**RESPONSE:** Admit that Hyland so states, although he did not define or quantify "numerous."

230.    Hyland's co-author, Sue Thornhill, is the Professional Services Director of MHA, and previously worked as Assistant Company Secretary of Rothschild Intercontinental Bank, Senior Assistant Secretary of the Committee of London and Scottish Bankers and as a Financial Crime Director of the British Bankers' Association. Id. (Hyland Rep. ¶ 2).

**RESPONSE:** Admit.

231.    Thornhill was a founding member and Secretary of the Joint Money Laundering Steering Group and author of the Joint Money Laundering Steering Group Guidance Notes for the Financial Sector from 1990 to 2005. Id.

**RESPONSE:** Admit.

232.    Hyland and Thornhill have authored a number of reference guides on counter-terror financing and anti-money laundering. Id. (Hyland Rep. Annex 2).

**RESPONSE:** Admit that Annex 2 states that Hyland was a contributing author and Thornhill was a principal author of the BBA/MHA reporting officer's and fraud manager's reference guides.

**W.    The Qualifications Of Yaron Lipshes, An Expert Retained By NatWest**

233.    Yaron Lipshes is an Israeli lawyer specializing in white collar crime at the law firm Caspi & Co. Advocates & Notaries in Tel Aviv, Israel. Schuster Dec. Ex. 117 (Lipshes Rep. Ex. A at 1).

**RESPONSE:** Admit.

234.    Lipshes joined Caspi & Co. in 2007. Id.

**RESPONSE:** Admit.

235.    Lipshes received his law degree *magna cum laude* from the Tel Aviv University. Id.

**RESPONSE:** Admit.

236.    While at Caspi & Co., Lipshes has worked on several high-profile criminal cases in Israel, including the defense of Israel's former Prime Minister in a bribe and corruption investigation, and other various cases involving charges of embezzlement, theft, money laundering, bribe and breach of trust, securities fraud and taxation. Id.

**RESPONSE:** Admit pursuant to Mr. Lipshes' CV, however the CV does not contain the words "high profile."

237.    Also while at Caspi & Co., Lipshes has prepared legal opinions concerning the extraterritorial applicability of Israeli securities law, insider trading and the duties of banks to report to government enforcement agencies. Id.

**RESPONSE:** Admit.

238.    From 2005 to 2007, Lipshes served as a legal advisor to the Investigations Department of the Israel Securities Authority. In that capacity, Lipshes supervised all legal work of the investigations department, and represented the department in litigation. Id.

**RESPONSE:** Admit.

239.    From 1999 to 2004, Lipshes served as an Assistant District Attorney in the Securities Department of the Tel Aviv District Attorney's Office. In that capacity, Lipshes participated in a number of high-profile fraud, theft and corruption cases. Id.

**RESPONSE:** Admit pursuant to Mr. Lipshes' CV, however the CV does not contain the words "high profile."

240.    Lipshes completed compulsory service in the intelligence branch of the Israel Defense Forces ("IDF") and performs reserve service as a defense attorney in the IDF attorney's office. Id.

**RESPONSE:** Admit.

II.   **UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION AND ARTICLE III STANDING ELEMENTS OF THEIR CLAIMS**

A.   **Background Facts**

241.   Plaintiffs' claims arise from 15 attacks between March 27, 2002 and September 24, 2004 that plaintiffs allege were perpetrated by Hamas.

**RESPONSE:** Admit.

242.   Plaintiffs' claims against NatWest are based upon their allegation that NatWest provided material support to Hamas, a Foreign Terrorist Organization. Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. nos. 9-11).

**RESPONSE:** Object to improper argument in a Rule 56.1 statement. Plaintiffs admit that NatWest's provision of material support to HAMAS describes the basis for Plaintiffs' claims.

243.   Plaintiffs' allegation that NatWest provided material support to Hamas is based upon certain funds transfers (the "Identified Interpal Transfers") from Interpal's NatWest accounts to certain charitable organizations in the Palestinian Territories that plaintiffs claim are alter egos of and/or controlled by Hamas (the "13 Charities"), which are described in the expert reports of Dr. Matthew Levitt and Arieh Spitzen. Id. (Plaintiffs' Resp. to Cont. Interrog. nos. 9, 11).

**RESPONSE:** Object to improper argument in a Rule 56.1 statement. Plaintiffs admit that NatWest's provision of material support to HAMAS based upon certain funds transfers from Interpal's NatWest accounts to certain charitable organizations in the Palestinian Territories describes a primary basis for Plaintiffs' claims.

244.   The Identified Interpal Transfers are listed in the November 19, 2009 expert report of Wayne Geisser (the "Geisser 2009 Report" or "Geisser 2009 Rep."). Schuster Dec. Exs.

144, 145, 146 (Geisser 2009 Rep. at 4 and Exs. C-D).

**RESPONSE:** Admit to the extent Defendant uses the term "Identified Interpal Transfers" to refer to transfers made by Interpal from its NatWest accounts to certain organizations in the Palestinian Territories.  Plaintiffs do note that Mr. Geisser did issue a Supplemental Report in December 2010 that details additional transfers made by Interpal from its NatWest accounts to additional entities including ███████████████████  an entity designated as an SDGT on August 22, 2003, the same day Interpal was designated an SDGT.

245.    In addition to the Identified Interpal Transfers, the Geisser 2009 Report also lists transfers to █████████████  Id. Plaintiffs do not allege that ████████████  is an alter ego of and/or controlled by Hamas. Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. nos. 9, 11).

**RESPONSE:** Admit that the Geisser 2009 report lists transfers to ███████████████  With respect to whether ████████████  is an alter ego of and/or controlled by HAMAS, Plaintiffs object to improper argument in a Rule 56.1 statement.  Plaintiffs contend that ████████ ████████  is the son of a HAMAS leader.

246.    Although Geisser also issued a December 2010 report (the "Geisser 2010 Rep.") that lists transfers between Interpal and entities other than the 13 Charities that were made into or out of Interpal's Nat West accounts, plaintiffs do not claim that any of those entities are alter egos of and/or controlled by Hamas. Id. (Plaintiffs' Resp. to Cont. Interrog. no. 11); Ex. 147 (Geisser 2010 Rep.).

**RESPONSE:** Dispute to the extent noted in the Expert Report of Arieh Spitzen, "the *al-Aqsa* Foundation in Germany is a key element in the Hamas infrastructure for the support of terror." Schuster Dec. Ex. 153 (Spitzen Rep. at 20 n. 71). Additionally, as described in detail in the

Expert Report of Dr. Matthew Levitt, the Al Aqsa Foundation was "a critical part of Hamas's terrorist support infrastructure." Ex. 152 (Levitt Rep. at 45). *See also id.* at 44-55 for an in-depth discussion of the Al Aqsa Foundation and its various branches.

247.    The Identified Interpal Transfers made to the 13 Charities were made between ████████████ and ████████████ (the "Relevant Transfer Period"). Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

**RESPONSE:** Admit.

**B.    Plaintiffs' Admissions That They Are Not Purporting To Prove A Direct Causal Link Between The Identified Interpal Transfers And The 15 Attacks (Or Any Other Attacks)**

248.    Plaintiffs admit they "do not contend that any of the funds Interpal transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones." Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. no. 12).

**RESPONSE:** Admit.

249.    Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were used to finance any other terrorist attacks.

**RESPONSE:** Object to improper argument in Rule 56.1 Statement. Dispute to the extent NatWest misapprehends the legal standard for "financing" a terrorist attack. *See Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2725-26 (2010):

> "Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups-legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds-all of which facilitate more terrorist attacks. "Terrorist organizations do not maintain *organizational* 'firewalls' that would prevent or deter ... sharing and commingling of support and benefits." McKune Affidavit, App. 135, ¶ 11. "[I]nvestigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts." M.

Levitt, HAMAS: Politics, Charity, and Terrorism in the Service of Jihad 2-3 (2006). "Indeed, some designated foreign terrorist organizations use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." McKune Affidavit, App. 135, ¶ 11; Levitt, *supra,* at 2 ("Muddying the waters between its political activism, good works, and terrorist attacks, HAMAS is able to use its overt political and charitable organizations as a financial and logistical support network for its terrorist operations").

Money is fungible, and "[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put." McKune Affidavit, App. 134, ¶ 9. But "there is reason to believe that foreign terrorist organizations do not maintain legitimate *financial* firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Id.,* at 135, ¶ 12.

250.     Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were provided to Hamas's military wing.

**RESPONSE:** Object to improper argument in Rule 56.1 Statement. Dispute. *See* Plaintiffs' response to ¶ 249.

251.     Plaintiffs rely upon the expert reports of Levitt and Spitzen to prove the existence of a proximate causal relationship between the Identified Interpal Transfers and the 15 attacks and plaintiffs' Article III standing in these lawsuits. Id. (Plaintiffs' Resp. to Cont. Interrog. nos. 9-11).

**RESPONSE:** Object to improper argument in Rule 56.1 Statement. Dispute. This statement misstates Plaintiffs' responses to NatWest's contention interrogatories by inaccurately suggesting that Plaintiffs are relying solely on expert opinion to prove the existence of proximate cause.

252.     Levitt's expert report in plaintiffs' pending companion lawsuits against Credit Lyonnais, S.A. ("CL") addresses the same 12 charities (the "12 Charities") that his expert report in these lawsuits addresses. Schuster Dec. Ex. 148 (Levitt NW Tr. at 19:12-17).

**RESPONSE:** Admit.

253.    Levitt offers no evidence that any funds transferred by Interpal through its NatWest accounts was used to perpetrate the 15 attacks.

**RESPONSE:** Admit.

254.    Levitt does not opine that any of the 12 Charities participated in any of the 15 attacks. Schuster Dec. Ex. 149 (Levitt CL Tr. at 62:14-63:10).

**RESPONSE:** Admit. Dr. Levitt offers no opinion as to which individuals or entities planned and executed the attacks at issue.

255.    Levitt does not opine that any of the 12 Charities planned the 15 attacks. Id. (Levitt CL Tr. at 63:19-64:3).

**RESPONSE:** Admit. *See* Response to ¶ 254.

256.    Levitt does not opine that any of the 12 Charities trained the perpetrators of the 15 attacks. Id. (Levitt CL Tr. at 64:4-16).

**RESPONSE:** Admit. *See* Response to ¶ 254.

257.    Levitt does not opine that any of the 12 Charities provided logistical support for the 15 attacks. Id. (Levitt CL Tr. at 65:15-25).

**RESPONSE:** Admit. *See* Response to ¶ 254.

258.    Levitt does not opine that any of the 12 Charities requested that someone carry out any of the 15 attacks. Id. (Levitt CL Tr. at 66:2-17).

**RESPONSE:** Admit. *See* Response to ¶ 254.

259.    Levitt does not opine that any of the 12 Charities was the cause of any of the 15 attacks. Id. (Levitt CL Tr. at 70:12-71:12).

**RESPONSE:** Admit. *See* Response to ¶ 254.

260.    Levitt does not opine that any of the 12 Charities recruited the perpetrators of the

15 attacks. Id. (Levitt CL Tr. at 71:13-72:11).

**RESPONSE:** Admit. *See* Response to ¶ 254.

261.    Levitt does not opine that any of the perpetrators of the 15 attacks were recruited from any of the 12 Charities. Id. (Levitt CL Tr. at 72:12-73:6).

**RESPONSE:** Admit. *See* Response to ¶ 254.

262.    Levitt testified that, with regard to what he refers to as the Hamas da'wa network of social welfare institutions, in which he includes the 12 Charities, it was "possible though it's less common" that "money could be raised by a charity where the pitch is [to] give to educational needs and then the money actually is diverted to purchase bullets or what have you." Schuster Dec. Ex. 148 (Levitt NW Tr. at 37:2-11).

**RESPONSE:** Dispute. While the excerpts quoted by NatWest are accurate, Dr. Levitt was not testifying with respect to the 12 Charities but rather was asked to clarify a statement contained on page 13 of his NatWest Expert Report. In response to the question regarding what he meant when he stated in his NatWest report that "Hamas deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks," Dr. Levitt testified as follows:

> It's not just or solely that money could be raised by a charity where the pitch is give to educational needs and then the money actually is diverted to purchase bullets or what have you. That is possible though it's less common. What happens more often is that money is raised for a variety of different things and the money is commingled and some of the funds will go towards education, some of the funds will go towards military, explicitly military purchases, some of the money will go towards other things that provide and facilitate for such attacks such as paying the salaries of operatives, bribing officials, procuring materials that could be used for an attack whether it's actual weapons or otherwise so it need not be the case necessarily though it can be that monies are raised for reason A and then diverted for reason B, reason B being militant or violent activity. It could also just be as is the case with HAMAS and other groups like it that the monies being fungible could be used in a variety of ways, A. B, more generally still money is fungible so if you raise $10 for one of the programs that you run, you may very well free up ten or maybe eight or four or some monies for something else.

Schuster Dec. Ex. 148 (Levitt NW Tr. at 37:6-38:10)

263.    Levitt testified that it was "less common" for money that was transferred from Interpal to a charity in the West Bank to be used for military activity. Id. (Levitt NW Tr. at 42:18-43:12).

**RESPONSE:** Dispute. *See* Response to ¶ 262.  *See also* Israel Dec. Ex. 151 (Levitt Tr. at 43:7-10) (testifying that "the beauty of the system is the ability to hide or mask the transfer of funds from what would be a legitimate purpose.").  Moreover, this testimony was with respect to a hypothetical posed by defense counsel in which the transferring party was Interpal and was not specific to the 12 organizations on which Dr. Levitt opined. *See Id*. at 42:18-43:17.

264.    Levitt testified with regard to transfers from Interpal to charities in the West Bank that "[t]here are instances where monies that were raised for purportedly charitable purposes are then used or law enforcement believes they were used in a particular attack, but those are more rare." Id. (Levitt NW Tr. at 43:13-17).

**RESPONSE:** Admit that the cited testimony is an accurate, albeit selective and misleading excerpt from Dr. Levitt's deposition testimony. Although Dr. Levitt testified at his NatWest deposition that "[t]here are instances where monies that were raised for purportedly charitable purposes are then used or law enforcement believes they were used in a particular attack, but those are more rare," the full context of the testimony can be seen *infra* in response to ¶ 262. Moreover, this testimony was with respect to a hypothetical posed by defense counsel in which the transferring party was Interpal and was not specific to the 12 organizations on which Dr. Levitt opined. *See* Israel Dec. Ex. 151 (Levitt Tr. at 42:18-43:17).

265.    Spitzen's expert report in the pending companion lawsuits against CL addresses the same 13 charities (the "13 Charities") that his expert report in these lawsuits addresses.

Schuster Dec. Ex. 150 (Spitzen NW Tr. at 36:5-9).

**RESPONSE:** Admit

266.    Spitzen does not opine that any of the 13 Charities planned any of the 15 attacks. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 98:18-25).

**RESPONSE:** Admit. Mr. Spitzen offers no opinion as to which individuals or entities planned and executed the attacks at issue.

267.    Spitzen does not opine that any of the 13 Charities participated in any of the 15 attacks. Id. (Spitzen CL Tr. at 98:8-17); Ex. 150 (Spitzen NW Tr. at 81:12-23).

**RESPONSE:** Admit. *See* Response to ¶ 266.

268.    Spitzen does not opine that any funds transferred by Interpal through its NatWest accounts were used to perpetrate the 15 attacks. Id. (Spitzen NW Tr. at 79:4-12).

**RESPONSE:** Admit. *See* Response to ¶ 266.

269.    Spitzen does not opine that any of the 13 Charities were the cause of any of the 15 attacks. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 102:7-16).

**RESPONSE:** Admit that Spitzen did not offer any legal conclusions as to causation. He does conclude that NatWest transferred funds to HAMAS on behalf of Interpal. *See, e.g.,* Schuster Dec. Ex. 153 (Spitzen NatWest Report at 32-33). Whether such material support to HAMAS constitutes legal causation is beyond the scope of Spitzen's expert report.

270.    Spitzen does not opine that any of the 13 Charities transferred funds to the perpetrators of the 15 attacks. Id. (Spitzen CL Tr. at 96:16-24).

**RESPONSE:** Admit. Spitzen does contend that the 13 entities he discussed are part of, or controlled by HAMAS, but he offers no opinions as to whether HAMAS perpetrated the attacks.

271.    Spitzen does not opine that any of the 13 Charities trained the perpetrators of the

15 attacks. Id. (Spitzen CL Tr. at 99:2-10).

**RESPONSE:** Admit.

272.    Spitzen does not opine that any of the 13 Charities requested that someone carry out any of the 15 attacks. Id. (Spitzen CL Tr. at 99:11-19).

**RESPONSE:** Admit.

273.    Spitzen does not opine that any of the 13 Charities recruited the perpetrators of the 15 attacks. Id. (Spitzen CL Tr. at 112:8-16).

**RESPONSE:** Dispute. This paragraph is vague and ambiguous (and the question was objected to at deposition, Schuster Dec. Ex. 151 (Spitzen CL Tr. at 112:13)) particularly its reference to "perpetrator." For example, Falah Nada, a senior employee of the *Al-Islah* Charitable Society – Ramallah & al-Bireh, was instrumental in working with and serving as a intermediary on behalf of Muhamad Arman, a HAMAS explosives specialist involved in the May 7, 2002 Sheffield Club bombing and the July 31, 2002 Hebrew University bombing. *See* Schuster Dec. Ex. 153 (Spitzen NatWest Rep. at 139). Although Mr. Spitzen does not specifically opine that the *al-Islah* Charitable Society or any of the other entities he opines about directly planned or perpetrated any of the 15 attacks at issue, both he and Dr. Levitt note that Jamal al-Tawil, the founder of the *Al-Islah* Charitable Society – Ramallah & al-Bireh, and Jamal al-Hija, a member of the Jenin Zakat Committee who supervised the Committee's Quran study centers, were senior members of the Izz al-Din al-Qassam Brigades. *See Id.* (Spitzen NatWest Rep. at 94, 136-137); Schuster Dec. Ex. 152 (Levitt Rep. Rep. 87-90). Mr. Spitzen also notes that some of the 13 entities employed members of the Izz al-Din al-Qassam Brigades. *See* Schuster Dec. Ex. 153 (Spitzen Rep. at 27-29).

274.    Spitzen offers no evidence that any of the funds Interpal transferred through its

NatWest accounts to the 13 Charities were transferred to Hamas's military wing.

**RESPONSE:** Dispute. Spitzen does not opine that HAMAS differentiates between funds held by its military wing and any other funds it may possess. As such, Spitzen opines that funds transferred by NatWest on behalf of Interpal were transferred to HAMAS, not to any "wing" of HAMAS.

**C.**     **Plaintiffs' Fungibility Theory**

275.     Plaintiffs contend that, in order to prove their Article III standing in these lawsuits, they will prove that "NatWest provided material support to HAMAS, a Foreign Terrorist Organization." Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Cont. Interrog. no. 9).

**RESPONSE:** Object to legal argument in Rule 56.1 statement. Dispute. Although this paragraph accurately quotes from Plaintiff's interrogatory response, Plaintiffs' dispute Defendant's characterization of their response as an articulation of Article III standing in this case. The proper standards for Article III standing are set forth in Section IV.A of the Argument in Plaintiffs' Memorandum in Opposition to Defendant's motion for summary judgment and do not belong in a purportedly factual Rule 56.1 Statement.

276.     Plaintiffs contend that in order to prove proximate causation in these lawsuits under 18 U.S.C. § 2333(a), they will prove that "their injuries were caused by reason of acts of international terrorism perpetrated by HAMAS,... and that because NatWest provided material support to HAMAS, their injuries were caused 'by reason of' acts or omissions by NatWest which, because they are violative of 18 U.S.C. §§2339B and 2339C, are themselves acts of international terrorism." Id. (Plaintiffs' Resp. to Cont. Interrog. no. 10).

**RESPONSE:** Object to legal argument in Rule 56.1 statement. Dispute. Plaintiffs do not dispute that the referenced interrogatory response stated that Plaintiffs "contend that their injuries were

caused by reason of acts of international terrorism perpetrated by HAMAS, *see Linde*, 384 F. Supp. 2d. at 581, and because NatWest provided material support to HAMAS, their injuries were caused 'by reason of' acts or omissions by NatWest which, because they are violative of 18 U.S.C. §§2339B and 2339C, are themselves acts of international terrorism." However, the proper standards for proximate causation are set forth in Plaintiffs' legal memoranda in opposition to Defendant's motion for summary judgment.

277.     Plaintiffs contend they have no burden to prove that any of the funds Interpal transferred from its NatWest accounts were used to specifically finance the 15 attacks because money is fungible, and therefore plaintiffs need only show that these funds were provided to Hamas. Id. (Plaintiffs' Resp. to Cont. Interrog. no. 12).

**RESPONSE:** Object to legal argument in Rule 56.1 statement. Dispute. Plaintiffs do not dispute that their written contention interrogatory response states "that they do not contend that any of the funds Interpal transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones. Plaintiffs state further that they have no burden to so prove." Paragraph 277 constitutes an improper discussion of legal arguments regarding the appropriate standards for causation, which do not belong in an ostensibly factual Rule 56.1 Statement. The proper standards for causation are set forth in Plaintiffs' Memorandum in Opposition to Defendant's motion for summary judgment, at Section IV of the Argument.

**D.     Plaintiffs Rely Upon The Proposed Testimony Of Levitt And Spitzen To Prove That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas**

278.     Plaintiffs contend that the following 13 Charities were during the Relevant Transfer Period "alter egos of and/or controlled by Hamas": Al-Mujama al-Islami-Gaza (the Islamic Center-Gaza); Al- Jam'iya al-Islamiya-Gaza (the Islamic Society-Gaza); Al-Salah

Islamic Association-Gaza (Jam'iyat al-Salah al-Islamiya-Gaza); Al-Wafa Charitable Society-Gaza (Jam'iyat al-Wafa al-Khiriya-Gaza); Islamic Charitable Society-Hebron (Al-Jam'iya al-Khiriya al-Islamiya al-Khalil); Jenin Zakat Committee (Lajnat al-Zakaa Jenin); Nablus Zakat Committee (Lajnat al-Zakaa Nablus); Al-Tadamun Charitable Society-Nablus (Jam'iyat Al-Tadamun al-Khiriya al-Islamiya Nablus); Tulkarem Zakat Committee (Lajnat al-Zakaa Tulkarem); Ramallah-al Bireh Zakat Committee (Lajnat al-Zakaa Ramallah wal-Bireh); Al-Islah Charitable Society-Ramallah & Al-Bireh (Jam'iyat al-Islah al-Khiriya al-Ajithamiya Ramallah al-Bireh); Beit Fajar Zakat Committee (Lajnat al-Zakaa Beit Fajar); and Jerusalem Central Zakat Committee (Lajnat al-Zakaa al-Markaziya al-Quds). Id. (Plaintiffs' Resp. to Cont. Interrog. no. 11).

**RESPONSE:** Admit.

279.    Plaintiffs rely upon the expert reports and proposed testimony of Levitt and Spitzen to prove that the 13 Charities were "alter egos of and/or controlled by Hamas." Id.

**RESPONSE:** Admit that Plaintiffs rely in part on Dr. Levitt's and Mr. Spitzen's opinion. *See* Schuster Dec. Ex. 116 (Plaintiffs' Resp. to Contention Interrog. no. 11).

280.    Plaintiffs cite no other evidence other than the expert reports, documents cited in those expert reports and proposed testimony of Levitt and Spitzen in support of plaintiffs' contention that the 13 Charities were "alter egos of and/or controlled by Hamas." Id.

**RESPONSE:** Dispute.  Although Plaintiffs' response to Interrogatory No. 11 lists the reports of Dr. Matthew Levitt and Mr. Arieh Spitzen and all the documents on which they rely, Plaintiffs objected to Interrogatory No. 11 because it constituted a demand for a recitation of all facts and information that have already been shared with Defendant during the course of discovery.  As

such, Plaintiffs' response to Interrogatory No. 11 did not identify every factor or document that may constitute evidence in this case.

281.    According to Levitt's December 30, 2010 expert report, plaintiffs asked him to provide expert testimony about, among other things, whether all of the 13 Charities except the Jerusalem Central Zakat Committee "were, in fact, controlled by, or alter-egos of, Hamas at the time [NatWest] transferred funds to them." Schuster Dec. Ex. 152 (Levitt NW Rep. at 1); Ex. 148 (Levitt NW Tr. at 11:8-19) (correcting sentence).

**RESPONSE:** Admit.

282.    According to Spitzen's November 30, 2010 expert report, plaintiffs asked him to provide expert testimony with respect to, among other things, whether the 13 Charities "were, in fact, under the control of Hamas or identified with Hamas at the time that National Westminster Bank transferred funds to them." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 1).

**RESPONSE:** Admit.

283.    Plaintiffs do not rely upon the November 2009, August 2010 or December 2010 expert reports of Wayne Geisser (the "Geisser Reports"), which summarize the Identified Interpal Transfers based upon NatWest's banking records, as expert opinion evidence that the 13 Charities were "alter egos and/or controlled by Hamas." See Schuster Dec. Ex. 154 (CL 56.1 Response ¶ 288).

**RESPONSE:** Admit, though the August 2010 Supplemental Expert Report of Wayne Geisser does not summarize the Identified Interpal Transfers, but instead summarizes transfers conducted by CBSP through its accounts at Credit Lyonnais.

284.    Geisser testified that his firm used the same process and methodology to create the portions of the Geisser Reports as to NatWest transactions as it used to create the portions of the Geisser Reports as to CL transactions. See Schuster Dec. Ex. 155 (Geisser Tr. 51:4-21).

**RESPONSE:** Admit.

**E.      The Absence Of Evidence That The 13 Charities Were The Alter Egos Of And/Or Controlled By Hamas**

285.    Hamas was founded in 1987. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶ 442); Ex. 157 (Applebaum Cmpl. ¶ 290).

**RESPONSE:** Admit.

286.    Hamas was designated a Specially Designated Terrorist ("SDT") on January 23, 1995. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶¶ 449-50); Ex. 157 (Applebaum Cmpl. ¶¶ 297-98).

**RESPONSE:** Admit.

287.    The U.S. Secretary of State designated Hamas as a Foreign Terrorist Organization ("FTO") on October 8, 1997. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶ 452); Ex. 157 (Applebaum Cmpl. ¶ 300).

**RESPONSE:** Admit.

288.    Hamas was designated a Specially Designated Global Terrorist ("SDGT") after September 11, 2001. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl. ¶¶ 453-54); Ex. 157 (Applebaum Cmpl. ¶¶ 301-02).

**RESPONSE:** Admit that HAMAS was designated as a Specially Designated Global Terrorist after September 11, 2001 inasmuch as Executive Order 13224 was not signed by President George W. Bush until September 23, 2001.

289.    None of the 13 Charities has ever been designated as an SDT or an FTO by the

United States government.

**RESPONSE:** Admit.

290.    None of the 13 Charities was designated as an SDGT by the United States government during the Relevant Transfer Period.

**RESPONSE:** Admit.

291.    Only one of the 13 Charities, the Al-Salah Society, has ever been designated as an SDGT by the United States government, and it was so designated on August 7, 2007. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 65).

**RESPONSE:** Admit.

292.    The U.S. government's designation of the Al-Salah Society was made nearly two years after the last of the Identified Interpal Transfers occurred. Id. (Spitzen NW Rep. at 65); Ex. 146 (Geisser 2009 Rep., Ex. D).

**RESPONSE:** Admit.

293.    The 12 Charities were licensed by the Israeli Military Authority prior to the establishment of the Palestinian Authority in 1993. Schuster Dec. Ex. 149 (Levitt CL Tr. at 202:9-17).

**RESPONSE:** Admit that Dr. Levitt so testified but deny that this statement is factually accurate. The Al-Islah Charitable Society - Ramallah & Al-Bireh was not established until after the year 2000.

294.    Ten of the 13 Charities predated Hamas's founding in 1987. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 39 (Al-Mujama al-Islami founded in 1973), 52 (Al-Jam'iya al-Islamiya in 1976), 65 (Al-Salah Islamic Society in 1978), 74 (El Wafa Charitable Society in 1980), 78 (Islamic Charitable Society-Hebron in 1962), 91 (Jenin Zakat Committee in 1985), 102 (Nablus

Zakat Committee in 1977), 110 (Al-Tadamun Charitable Society in 1956), 119 (Tulkarem Zakat Committee in 1981), 127 (Ramallah-al Bireh Zakat Committee in 1977)); Ex. 152 (Levitt NW Rep. at 59 (Al-Mujama Al-Islami in 1978), 61 (Al-Jam'iya Al-Islamiya in 1976), 67 (El Wafa Charitable Society in 1980), 81 (Ramallah-Al Bireh Zakat Committee in 1978)); Ex. 149 (Levitt CL Tr. at 56:21-57:5,123:21-124:5).

**RESPONSE:** Admit.

294. During the Relevant Transfer Period, the 12 Charities were required to be registered with the Palestinian Authority. Schuster Dec. Ex. 149 (Levitt CL Tr. at 203:3-203:8).

**RESPONSE:** Dispute. Dr. Levitt testified that the 12 organizations presumably were required to be registered with the Palestinian Authority during the Relevant Transfer Period. Dr. Levitt did not unequivocally testify that the 12 organizations were required to register with the Palestinian Authority. *See Id*. Moreover, whether the 12 organizations were in fact required to register with the Palestinian Authority is a legal question on which Dr. Levitt did not opine.

296. During the Relevant Transfer Period, the 12 Charities were formally subordinate to ministries within the Palestinian Authority government. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 158:2-159:15).

**RESPONSE:** Dispute. Mr. Spitzen testified that during the years 2000 to 2002, the 12 organizations were either subordinate to the WAQF or the PA Ministry of the Interior. Mr. Spitzen did not testify whether the 12 organizations were subordinate to ministries within the Palestinian Authority government prior to 2000. *Id*. The phrase "subordinate" in this context refers to regulatory oversight, not organizational structure and Plaintiffs objected to this question at deposition. *Id*. at 159:8-10.

297. During the Relevant Transfer Period, the 12 Charities each had a board of

directors. Schuster Dec. Ex. 149 (Levitt CL Tr. at 212:4-213:17).

**RESPONSE:** Dispute. Dr. Levitt testified that each of the 12 organizations had a board of trustees, not a board of directors. *See Id*.

298.    During the Relevant Transfer Period, the Palestinian Authority had to approve the elections of the members of the board of directors of the 12 Charities. Id. (Levitt CL Tr. at 204:17-205:14).

**RESPONSE:** Admit that Dr. Levitt so testified.

299.    During the Relevant Transfer Period, the books and records of the 12 Charities were overseen by Palestinian Authority ministries. Id. (Levitt CL Tr. at 206:4-21).

**RESPONSE:** Dispute. Dr. Levitt testified that oversight of charitable organizations in the Palestinian Territories was overseen by two Palestinian ministries. Dr. Levitt also testified that he did not know whether any of the 12 organizations were required under Palestinian law to have audited books and records. *See Id*. at 205:15-206:21.

300.    During the Relevant Transfer Period, the 13 Charities each had a board of directors. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 160:4-8).

**RESPONSE:** Admit.

301.    The boards of some of the 13 Charities included non-Hamas members, as well as Hamas members. Id. (See Spitzen CL Tr. at 166:14-170:8).

**RESPONSE:** Admit.

302.    Levitt does not know whether all of the members of the boards of the 12 Charities were Hamas members, but stated that it "varies" as to what percentages of the boards tend to be Hamas members. Schuster Dec. Ex. 149 (Levitt CL Tr. at 213:18-214:18).

**RESPONSE:** Admit that Dr. Levitt testified that he did not know whether all of the members of the boards of the 12 organizations were HAMAS members. Dr. Levitt testified that it "varies" as to what percentage of the boards tend to be HAMAS members. *See Id.*

303.    Neither Spitzen's nor Levitt's report identifies all of the board members of the 13 Charities during the Relevant Transfer Period.

**RESPONSE:** Admit.

304.    The only board members identified in Spitzen's report are either Hamas members or those he considers to be aligned with Hamas.

**RESPONSE:** Dispute to the extent the statement is tautological since all trustees of a HAMAS-controlled entity are in some measure "aligned with HAMAS."  Mr. Spitzen primarily identifies prominent HAMAS operatives serving in the governing boards but also notes at least 2 who are not clearly HAMAS operatives but who sympathize with and are aligned with HAMAS.  *See* Schuster Dec. Ex. 153 (Spitzen Rep. 80, 150-151).

305.    Spitzen's report does not analyze whether there were members of the boards of the 13 Charities who were not members of Hamas.

**RESPONSE:** Dispute. Mr. Spitzen's report discusses Hashem al-Natshe of the Islamic Charitable Society – Hebron. *See* Schuster Dec. Ex. 153 (Spitzen Rep. at 80). Further, Mr. Spitzen also identifies members of the Jerusalem Zakat Committee who were aligned with, but not necessarily members of, HAMAS. *Id.* (Spitzen Rep. at 150-152).

306.    Levitt's report does not analyze whether there were members of the boards of the 13 Charities who were not members of Hamas.

**RESPONSE:** Admit.

307.    Neither Spitzen's nor Levitt's report analyzes whether any of the board members

of the 13 Charities who were associated with Hamas actually controlled the charity for the purpose of serving Hamas.

**RESPONSE:** Dispute. Mr. Spitzen's and Dr. Levitt's reports make clear that the board members that they identified were key HAMAS leaders, that those individuals exercised control over the entities and that the 13 entities were an integral part of the HAMAS structure.

308.     Neither Levitt nor Spitzen have offered any evidence of "commingling" of funds between the 13 Charities and Hamas.

**RESPONSE:** Objection to legal argument in Rule 56.1 statement. Dispute. This paragraph draws a false dichotomy between HAMAS and the entities discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how Interpal's counterparties form HAMAS's social network and are part of HAMAS. *See, e.g.*, Schuster Dec. Ex. 152 (Levitt Rep. at 12-24); Schuster Dec. Ex. 153 (Spitzen NW Rep. at 21-38).

309.     Each of the 13 Charities maintained its own bank accounts. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:23-234:4); Ex. 149 (Levitt CL Tr. at 168:5-13).

**RESPONSE:** Admit.

310.     The bank accounts of the 13 Charities were maintained in their own names or the names of the treasurer or the head of the entity. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:23-234:4).

**RESPONSE:** Admit.

311.     According to the Geisser Reports, none of the bank account numbers associated with the 13 Charities to which Interpal transferred funds from its NatWest accounts was shared among any of the 13 Charities. Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

**RESPONSE:** Dispute. The Geisser Reports do not opine on whether any of the 13 organizations

that received funds from Interpal shared bank accounts. Rather, the Geisser Reports identify the names of the beneficiaries and the account number to which Interpal transferred money.

312.    Spitzen does not know how much money was required for the daily operations of the 13 Charities. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 233:14-22).

**RESPONSE:** Admit.

313.    Levitt testified that there is no central Hamas treasury from which Hamas funds social programs. Schuster Dec. Ex. 149 (Levitt CL Tr. at 170:24-171:11).

**RESPONSE:** Admit.

314.    With regard to the reference in his report that "Hamas deems legitimate the mingling of these funds" for social welfare and terrorist activities, Schuster Dec. Ex. 152 (Levitt NW Rep. at 13), Levitt testified that it was "possible though it's less common" that "money could be raised by a charity where the pitch is to give to educational needs and then the money actually is diverted to purchase bullets or what have you." Schuster Dec. Ex. 148 (Levitt NW Tr. at 37:2-11).

**RESPONSE:** Dispute. Dr. Levitt's report states "HAMAS deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks." *See* Schuster Dec. Ex. 152 (Levitt Rep. at 13). Additionally, with respect to this sentence from his report, Dr. Levitt testified: "It's not just or solely that money could be raised by a charity where the pitch is to give to educational needs and then the money actually is diverted to purchase bullets or what have you. That is possible though it's less common. What happens more often is that money is raised for a variety of different things and the money is commingled and some of the funds will go towards education, some of the funds will go towards military, explicitly military purchases, some of the money will go towards other things that

120

provide and facilitate for such attacks such as paying the salaries of operatives, bribing officials, procuring materials that could be used for an attack whether it's actual weapons or otherwise so it need not be the case necessarily though it can be that monies are raised for reason A and then diverted for reason B, reason B being militant or violent activity. It could also just be as is the case with HAMAS and other groups like it that the monies being fungible could be used in a variety of ways, A. B, more generally still money is fungible so if you raise $10 for one of the programs that you run, you may very well free up ten or maybe eight or four or some monies for something else." *See* Schuster Dec. Ex. 148 (Levitt Tr. at 37:6-38:10).

315.    Levitt testified that it was "less common" for money that Interpal transferred to a charity in the West Bank that was intended for charitable uses to be used for military activity. Id. (Levitt NW Tr. at 42:18-43:12).

**RESPONSE:** Dispute. Dr. Levitt testified that it was less common for money that goes to an organization that's supposed to be for charity is taken away from the charity and used for military activity. *See* Schuster Dec. Ex. 148 (Levitt Tr. at 42:18-43:17).   Moreover, this testimony was with respect to a hypothetical posed by defense counsel in which the entity transferring the money was Interpal but was not specific to Interpal.

316.    When asked about whether funds sent to a charity in the West Bank by Interpal would have been diverted from the charity and used for military activity, Levitt stated that "[t]here are instances where monies that were raised for purportedly charitable purposes are then used or law enforcement believes they were used in a particular attack, but those are more rare." Id. (Levitt NW Tr. at 42:18-43:17).

**RESPONSE:** Admit.

317.    Neither Levitt nor Spitzen has provided any evidence that any of the 13 Charities

disregarded corporate formalities or shared any offices or property.

**RESPONSE:** Objection to legal argument in Rule 56.1 statement. Dispute. As described in detail in both Dr. Levitt's and Mr. Spitzen's reports, the 12 or 13 organizations form part of HAMAS's Da'wa and are controlled by HAMAS, and NatWest's framing of the functions of a terrorist organization in terms of "corporate formalities" is irrelevant and misplaced.

318.    Neither Spitzen nor Levitt has analyzed whether any of the 13 Charities engaged in any activities on behalf of Hamas, instead of in furtherance of their own charitable goals.

**RESPONSE:** Objection to legal argument in Rule 56.1 statement. Dispute. Defendant draws a false dichotomy between HAMAS and the organizations discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations they reviewed form part of HAMAS's social network and are part of HAMAS. Further, the reference to "charitable goals" is vague, ambiguous, and misleading.

319.    Spitzen admitted that he did not try to determine which decisions and actions taken by the 13 Charities were taken and made by individuals because of their roles at the 13 Charities and what decisions were made by them as members of Hamas. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 204:14-205:16).

**RESPONSE:** Dispute. Spitzen testified that he did not try to determine which decisions and actions taken by the 13 entities were taken and made by individuals because of their roles at the 13 entities (*e.g.*, what time to set for a lunch break) and what decisions were made "as members of HAMAS." This would be akin to attempting to determine which decisions an organized crime leader makes as "President" of a plumbing company and which ones are made in his capacity as a crime boss. Spitzen testified that the basic premise of the question being asked, *i.e.*, that the

associations and HAMAS are separate, was false because in Mr. Spitzen's opinion "these entities are part of the infrastructure of HAMAS." *Id.* at 205:10-16.

320.    Spitzen is unaware of any written instruction from Hamas directing any of the 13 Charities to take a specific action. Id. (Spitzen CL Tr. at 170:25-171:21).

**RESPONSE:** Dispute. While Mr. Spitzen testified that he was unaware of any specific written instructions from HAMAS directing any of the 13 organizations to take a specific action, he further testified "that the al-Mujama leadership and the al-Jam'iya leadership is the HAMAS leadership. Therefore, every decision by Sheik Yassin about what Mujama was going to do, and he made the decisions, and also a decision by Rantissi, and others like them, like Yazuri – and others like them, such as Yazuri and others. That's a decision made by the HAMAS leadership." *Id.* at 171:23-172:7.

321.    Neither Levitt's nor Spitzen's report identifies evidence of any written instruction from Hamas directing any of the 13 Charities to take a specific action.

**RESPONSE:** Dispute. Defendant attempts to draw a false dichotomy between HAMAS and the organizations discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations form a part of HAMAS's social network and are part of HAMAS. Additionally, as discussed in Mr. Spitzen's report, the Union of Good coordinates activities among many of the 13 organizations. For example, Mr. Spitzen lists the *al-Tadamun* Charitable Society in Nablus, *Al-Islah* Charitable Society – Ramallah & al-Bireh, and the Islamic Charitable Society – Hebron as being used by the Union of Good to channel funds to other societies. *See* Schuster Dec. Ex. 153 (Spitzen Rep. at 34-35). He also notes that the *Al-Islah* Charitable Society – Ramallah & al-Bireh was established by HAMAS. *See Id.* (Spitzen Rep. at 15). Mr. Spitzen also cites to and appended the interrogation protocol of Jamal al-Tawil where

the latter confirmed coordinating the establishment of *Al-Islah* Charitable Society – Ramallah & al-Bireh with HAMAS's office in Lebanon. He also stated that upon his arrest by the Palestinian Authority, Falah Nada took over responsibility for distributing the fund received from Lebanon on behalf of *Al-Islah* Charitable Society – Ramallah & al-Bireh.

322.    Neither Spitzen's nor Levitt's report identifies any evidence of any oral directions by Hamas to the 13 Charities.

**RESPONSE:** Dispute. *See* Response to ¶ 321.

323.    Neither Spitzen's nor Levitt's report identifies any actual transactions between Hamas and the 13 Charities.

**RESPONSE:** Dispute. Both Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations form a part of HAMAS's social network and are part of HAMAS. Moreover, since there are transfers between these organizations, any transfers that occurred are transfers between HAMAS entities. Additionally, Spitzen's Report cites examples of the charities in question transferring money to HAMAS operatives. *See, e.g.*, Schuster Dec. Ex. 153 (Spitzen Rep. at 85-86, 94, 115). Mr. Spitzen's report also identifies Al-Tadamun Charitable Society as having transferred funds to other organizations, including the Jenin Zakat Committee. *See Id*. (Spitzen Rep. at 117). Spitzen's report further notes that the *Al-Islah* Charitable Society – Ramallah & al-Bireh "transfers the funds that it receives from the Union of Good to other organizations," thereby assisting those organizations in expanding their da'wa activities. *See Id*. (Spitzen Rep. at 130). As noted in the response to ¶ 321, *Al-Islah* Charitable Society – Ramallah & al-Bireh received direct funding from HAMAS's offices in Lebanon.

324.    Neither Spitzen's nor Levitt's report shows that any transactions between the 13 Charities and Hamas were not at arms' length.

**RESPONSE:**  Dispute. *See* Response to ¶ 323.

325.    Neither Spitzen's nor Levitt's report identifies any transfers from the 13 Charities to Hamas.

**RESPONSE:**    Dispute.    Defendant draws a false dichotomy between HAMAS and the organizations discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations they reviewed form part of HAMAS's social network and are part of HAMAS. *See also* Response to ¶¶ 321, 323.

326.    Neither Spitzen's nor Levitt's report identifies any transfers from Hamas to the 13 Charities.

**RESPONSE:** Dispute. *See* Response to ¶ 321.

327.    The only examples that plaintiffs have cited as evidence in Spitzen's report that the 13 Charities "transferr[ed] money to HAMAS operatives" are (a) Spitzen's statements that certain Hamas terrorists studied at or were active in schools run by the Islamic Charitable Society-Hebron; (b) Spitzen's statement that the "second in importance in the organizational hierarchy" of the Jenin Zakat Committee was convicted for transfers to family members of Hamas operatives; and (c) Spitzen's statement that a book-keeper of the al-Tadamun Charitable Society was convicted for transferring funds to a senior Hamas operative, when Spitzen also notes that the same book-keeper was fired by the Palestinian Authority from his job with al-Tadamun and forced to sign a document stating that he would never take part in al-Tadamun due to his ties with Hamas. See Schuster Dec. Ex. 154 (CL 56.1 Response ¶ 337) (citing Spitzen CL Rep. at 79, 87, 106); Schuster Dec. Ex. 153 (Spitzen NW Rep. at 85-86, 93, and 115) (corresponding to Spitzen CL Rep. at 79, 87, and 106).

**RESPONSE:** Dispute. Spitzen's Report identifies the Tulkarem Zakat Committee as transferring funds to the families of terror operatives. *See* Schuster Dec. Ex. 153 (Spitzen NW Report at 123). It also identifies Jamal al-Tawil, the head of the al-Islah Charitable Society – Ramallah & al-Bireh as having been "sentenced to three years imprisonment for transferring funds (through *al-Islah*) to terrorist elements, the families of 'martyrs' (*shuhada*), Hamas prisoners, and members of the *Izz al-Din al-Qassam* Brigades." *Id*. at 136. The Report further identifies "[r]eceipt vouchers found at the *al-Islah* Society, attesting to the transfer of funds to Hamas terror operatives and their families." *Id*. at 141.

328. Neither Spitzen nor Levitt's report shows that Hamas loaned money to or guaranteed the loans of any of the 13 Charities.

**RESPONSE:** Dispute. Defendant attempts to draw a false dichotomy between HAMAS and the organizations discussed by Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the organizations form a part of HAMAS's social network and are part of HAMAS.

329. Levitt is unaware of any instances in which Hamas loaned money to, or guaranteed the loans of, any of the 12 Charities. Schuster Dec. Ex. 149 (Levitt CL Tr. at 224:21-226:6).

**RESPONSE:** Dispute. While Dr. Levitt testified that he was unaware of HAMAS loaning money to, or guaranteeing the loans of, any of the 12 organizations, he testified that HAMAS's headquarters transferred funds to these organizations and that he would not say that it is impossible that HAMAS loaned money to, or guaranteed the loans of, any of its 12 sub-organizations. *Id*. at 225:2-22.

330. Spitzen testified that Hamas does not publicize its association with any charitable

126

entities operating in the Palestinian Territories. Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. at 96:4-10).

**RESPONSE:**   Dispute.   While Mr. Spitzen testified that HAMAS does not publicize its association with its Palestinian sub-organizations, he further testified that "[t]he HAMAS is very much interested to make sure that their people, that the population know exactly who is controlled by HAMAS, who receives money from the HAMAS. But on the other hand, it also tries to avoid – and it makes sense because, otherwise, it would be suicide on their side to – not to publish which organizations or associations belong to the HAMAS. Otherwise, they would be shut down." *See* Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. at 96:15-23). Moreover, Mr. Spitzen's report on page 61 discusses an interview given by Isma'il Abu Shanab, one of the senior leaders of HAMAS, during which he stated that three of the organizations under review, *al-Salah, al-Mujama al-Islami* and *al-Jam'iya al-Islamiya*, were integral parts of HAMAS's social infrastructure.  Schuster Dec. Ex. 153 (Spitzen Rep. at 61).

331.    Levitt's report states that NatWest "transmitted funds at the behest of [Interpal] to entities and individuals in the Palestinian Territories or abroad who are controlled by, affiliated with, fundraise for, serve as alter egos or departments of, or otherwise support Hamas." Schuster Dec. Ex. 152 (Levitt NW Rep. at 3).

**RESPONSE:** Admit.

332.    Levitt testified that his phrase "entities and individuals" refers to the 12 Charities or an individual at one of the 12 Charities. Schuster Dec. Ex. 149 (Levitt CL Tr. at 133:13-134:7).

**RESPONSE:** Admit.

333.    Levitt testified that he did not determine which of the 12 Charities fit into which

127

of the categories identified in paragraph 331 above - "controlled by," "affiliated with," "fundraise for," "alter ego," "department of and "otherwise supports." Id. (Levitt CL Tr. at 141:4-142:20).

**RESPONSE:**  Dispute. Dr. Levitt testified that most of the 12 organizations fall within more than one of these classification. He further testified that the terms "controlled by," "affiliated with," "fundraise for," "alter ego," "department of and "otherwise supports" were "meant to show the spectrum of variation" as opposed to showing that this organization fit into this category as opposed to another category. He went on to testify that he did not categorize which organizations fit into which categories. *Id*. at 140:11-142:12.

334.    Levitt testified that the categories identified in paragraph 331 were "meant to show the spectrum of variation" as opposed to showing that an organization fits into one category as opposed to another. Id. (Levitt CL Tr. at 141:14-142:20).

**RESPONSE:** Dispute. *See* Response to ¶ 333.

335.    When asked what he meant when he referred to each of the categories along his "spectrum," Levitt defined each category as follows:

(a)     "controlled by": "[S]ome persons, well, some entities that are affiliated with Hamas are a little more independent and they may have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think we cite one in the report that the other end of the extreme and of course there's plenty in the middle are actually founded by Hamas for the express purpose of raising and/or serving as a means of transferring funds you could have either of those extremes or of course pretty much anyone in the middle." Id. (Levitt CL Tr. at 138:10-24).

(b)     "affiliated with": "I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be legally independent entities. Like I said, you don't have the shingle hanging out the front door, but they do in fact have affiliations with Hamas and as we get into the report as I'm sure you are well aware there's all kinds of affiliations we get into. You know, Hamas operatives working

for the charity or the charity being led by Hamas operatives, etc. so this is meant to capture those types of affiliations." Id. (Levitt CL Tr. at 134:24-135:17).

(c)    "fundraise for": "Fundraise for means raises money for." Id. (Levitt CL Tr. at 135:18-22).

(d)    "alter ego": "Some of these the way Hamas uses entities like this is to further the overall - some overall mission or objective of Hamas and therefore they can serve as an alter ego of the organization even if they are never listed on the organizational chart as such, but could be fulfilling a mission for the core entity and therefore is serving as an alter ego for it." Id. (Levitt CL Tr. 136:3-21). When asked to expound upon this, Levitt clarified that "you can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for." Id. (Levitt CL Tr. at 137:5-17).

(e)    "department of": "There are in fact entities that you could describe as departments, actual departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as part of the activities of those committees." Id. (Levitt CL Tr. at 137:18-138:9).

(f)    "otherwise supports": "[I]n some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support beyond the strict provision of monies are also very important of course." Id. (Levitt CL Tr. at 138:25-139:14).

**RESPONSE:** Admit.

336.    Spitzen testified that from 2001 to 2009 he served as Commander of the Palestinian Affairs Department ("PAD") within the Israeli Ministry of Defense. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 123:3-13).

**RESPONSE:** Admit.

337.    Spitzen bases his qualifications as an expert on his experience at the PAD. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 2).

**RESPONSE:**  Dispute. Mr. Spitzen's qualifications as an expert include his experience at the PAD, but are not based solely on his experience at the PAD as implied by this paragraph. Mr. Spitzen's qualifications as an expert are set forth in his Curriculum Vitae, which is included in Appendix 1 to his Expert Report. *See* Israel Dec. Ex. 153.

338.    Spitzen testified that Israel declares an organization to be illegal only after "a very long procedure that goes through a very detailed judicial examination" of the evidence to determine whether the organization meets "all the criteria" for being outlawed. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 132:3-24).

**RESPONSE:** Dispute. In response to a question from Credit Lyonnais about why it took the Government of Israel so long to outlaw a particular entity, Mr. Spitzen testified "I know that it's a very long procedure that goes through a very detailed judicial examination regarding each and every organization. And the purpose of this examination, in my opinion, and, again, I'm not a jurist, the purpose is to find out that this particular organization, according to all the criteria, that this organization, if it meets all the criteria for being outlawed by the highest court of Israel. Supreme Court." *Id.* at 132:14-24.

339.    Spitzen's 18-step methodology for determining whether a charity is an <u>alter ego</u> or under the control of Hamas is different from that used by Israel to declare an organization illegal based upon its involvement with Hamas. <u>Id.</u> (Spitzen CL Tr. at 131:4-132:24).

**RESPONSE:**  Dispute.  Mr. Spitzen has not testified as to the methodology (if any) used by Israel to declare an organization illegal based upon its involvement with HAMAS.

340.    Levitt testified that the 12 Charities, and Spitzen testified that the 13 Charities, all perform charitable work in the Palestinian Territories. Schuster Dec. Ex. 149 (Levitt CL Tr. at 340:24-341:12); Ex. 151 (Spitzen CL Tr. at 281:18-282:7).

**RESPONSE:** Admit.

341.    Spitzen's report lists multiple examples of the 13 Charities performing charitable work in the Palestinian Territories. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 48-49 (Al-Mujama al-Islami), 60-61 (Al-Jam'iya al-Islamiya), 70-71 (Al-Salah Islamic Society), 75-76 (El Wafa Charitable Society), 85 (Islamic Charitable Society-Hebron), 96-97 (Jenin Zakat Committee), 106-07 (Nablus Zakat Committee), 116 (Al-Tadamun Charitable Society), 123 (Tulkarem Zakat Committee), 132 (Ramallah-al Bireh Zakat Committee), 140 (Al-Islah Charitable Society), 146 (Beit Fajar Zakat Committee), 152 (Jerusalem Central Zakat Committee)).

**RESPONSE:** Admit.

342.    Spitzen testified that the 13 Charities provided the social services they said they were providing. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 281:18-282:7).

**RESPONSE:** Admit that Mr. Spitzen testified that the 13 organizations were "generally" providing the social services they said they were providing, but as noted in his report, those "social services" include incitement, indoctrination, and transfer of money to orphans, widows and other relatives of suicide terrorists and movement prisoners. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep. at 19).

343.    USAID, an agency of the U.S. government, approved several of the 13 Charities to receive USAID funding in December 2002. Schuster Dec. Ex. 159 (Matthew Levitt, "Better Late Than Never: Keeping USAID Funds out of Terrorist Hands," Washington Institute for Near East Policy, Policy Watch # 1277 (August 24, 2007) (noting that USAID cleared main charity committees in Jenin, Hebron, Tulkarem, Nablus, and Al-Tadhoman to receive funding)).

**RESPONSE:** Admit that Dr. Levitt stated that USAID "cleared" several charity committees to

receive such funding in December 2002.

344.   USAID, foreign government agencies and U.S. and foreign NGOs and corporations have funded certain of the 13 Charities, or institutions that Spitzen and Levitt claim were controlled by certain of the 13 Charities, both during and after the Relevant Transfer Period. Schuster Dec. Ex. 160 (Matthew Levitt, "How Not to Fund HAMAS: Scrutinize Those Who Receive U.S. Aid," New York Daily News. February 4, 2009 (stating that USAID provided more than $140,000 to the "HAMAS-controlled" Islamic University of Gaza)); Ex. 153 (Spitzen NW Rep. at 39 n.146 (claiming *Al-Mujama al-Islami* took over Islamic University of Gaza in 1983 and transformed it into its "main power base, and later that of HAMAS")); Ex. 161 ("Enter HAMAS: The Challenges of Political Integration," International Crisis Group Middle East Report No. 49, January 18, 2006, at 23 n.190 (noting that the Salah Association received funds from USAID in 2004), 24 ("The British Council, the cultural arm of the UK government, was one of several donors implementing projects at the Islamic University in Gaza"), 24 n.197 (noting that Islamic University of Gaza received $ 1 million in funding from Intel and ANERA, a U.S. NGO, for computers)); Ex. 162 (Emanuel Schäublin, Role and Governance of Islamic Charitable Institutions: The West Bank Zakat Committees (1977-2009) in the Local Context, Centre on Conflict, Development, and Peacebuilding Working Paper (2009), at 25 (noting that Al Razi hospital in Jenin received funding from the governments of Italy and Canada), 31 (noting that French, Italian and Canadian governments have helped medical institutions, such as clinics and hospitals, of zakat committees to build specialized sections), 31 (noting that UNDP and ANERA cooperated with zakat committees to distribute food and medication until 2006)); Ex. 153 (Spitzen NW Rep. at 96 (claiming that Al Razi hospital was founded by and is currently operated by the Jenin Zakat Committee)); Ex. 163 (Jeroen Gunning, "Terrorism, charities and

diasporas: Contrasting the fundraising practices of HAMAS and al Qaeda among Muslims in Europe," in Countering the Financing of Terrorism (Thomas J. Biersteker & Sue E. Eckert eds. 2008), at 100 ("Save the Children, USAID, Médecins Sans Frontiéres, and Medical Aid for Palestine are among the international, non-Islamic charities that have contributed at one time or another to charities affiliated with Hamas, precisely because they have observed that contributions reach their intended destination.")).

**RESPONSE:** Dispute that Schuster Dec. Ex. 160 and 161 indicate that the funding in question occurred "both during and after the Relevant Transfer Period." Dispute that specific citations in ¶ 344 correspond to the 13 HAMAS organizations at issue, but otherwise admit.

**F.   Levitt's and Spitzen's Opinions Are Inadmissible**

    (1)   Levitt and Spitzen aggregate hearsay

**RESPONSE:** Object to the inclusion of arguments, masquerading as headings, in a Rule 56.1 Statement.

    345.   Levitt's report repeatedly cites to the "Watson Memorandum" as support for assertions Levitt makes about certain of the 12 Charities and their members. Schuster Dec. Ex. 152 (Levitt NW Rep. at 15 n.88; 21 n.122; 23 n.133; 37 n.209; 68 nn.424-25; 70 nn.437-39, 442-43, 445-50; 71 nn.451; 453-54; 73 nn.466-70; 84 nn.567-72, 85 nn. 574-78, 582-84).

**RESPONSE:** Admit that Dr. Levitt cites the Watson Memorandum.

    346.   Spitzen's report repeatedly cites to the "Watson Memorandum" as support for the assertions he makes about certain of the 13 Charities and their members. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 84 n.446; 85 n.449; 95 nn.508, 512; 120nn. 678, 685; 129 nn.744, 747; 130 n.756).

**RESPONSE:** Admit.

    347.   The "Watson Memorandum" is dated November 5, 2001 and purportedly was

prepared by Dale Watson, Assistant Director, Counterterrorism Division of the U.S. Federal Bureau of Investigation. Schuster Dec. Ex. 149 (Levitt CL Tr. at 144:7-144:19, 247:13-248:13).

**RESPONSE:** Admit that the Watson Memorandum was issued by Dale Watson, Assistant Director, Counterterrorism Division, Federal Bureau of Investigation, on November 5, 2001.

348.    The "Watson Memorandum" repeatedly cites, paraphrases or quotes statements that it attributes to representatives of the government of Israel ("GOI") in its discussion of the particular entities it addresses, which includes some of the 13 Charities. Schuster Dec. Ex. 164 (Levitt CL Dep. Ex. 4 at 29, 32, 34, 38).

**RESPONSE:** Admit.

349.    Levitt's report repeatedly cites the testimony of an anonymous witness who testified at the U.S. government's retrial of the Holy Land Foundation, who was identified at that retrial under the pseudonym "Avi." Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 75 n.484, 487; 76 nn.489; 77 nn.495, 498, 501, 506; 78 nn.510-12; 81 n.543; 83 nn.554-55).

**RESPONSE:** Dispute the description of "Avi" as an "anonymous witness." While his full name was not provided to defendants or the jury, he was identified by the court as a senior representative of the Israel Security Agency ("ISA"), Israel's internal security service and defense counsel were permitted to probe his professional background at trial. *See U.S. v. El-Mezain*, 2011 WL 6058592 at *10 (5th Cir. December 7, 2011).

350.    According to Levitt, he cannot reveal the true identity of "Avi." Schuster Dec. Ex. 149 (Levitt CL Tr. at 228:4-13).

**RESPONSE:** Admit.

351.    "Avi" testified as an expert witness at the Holy Land Foundation retrial concerning findings purportedly made by the Israel Defense Forces concerning certain of the 12

Charities. Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 78 nn.510-12).

**RESPONSE:** Dispute that "Avi" testified about findings purportedly made by the Israel Defense Forces concerning certain of the 12 organizations, or that included all 12 HAMAS organizations discussed by Dr. Levitt.

352.    Levitt testified that he never discussed with "Avi" his testimony at the Holy Land Foundation trial. Schuster Dec. Ex. 149 (Levitt CL Tr. at 227:7-11).

**RESPONSE:** Admit.

353.    Levitt's report repeats or summarizes information from the testimony of "Avi" as to what Israel Defense Forces personnel purportedly found on the premises of certain of the 12 Charities. Schuster Dec. Ex. 152 (Levitt NW Rep. at 71 n.452; 78 nn.510-12 (asserting that propaganda materials were found at the Nablus Zakat Committee based only on "Avi's" testimony that this occurred)).

**RESPONSE:** Admit that Dr. Levitt's report cites such materials as one of the bases for Dr. Levitt's conclusion about materials that Israeli Defense Forces personnel found on the premises of certain of the 12 organizations.

354.    Levitt's report paraphrases or quotes directly from the testimony of "Avi" as support for assertions he makes about certain of the 12 Charities. Id. (Levitt NW Rep. at 76 n.489; 77 n.506).

**RESPONSE:** Admit.

355.    Spitzen's report repeatedly cites to exhibits introduced into evidence at the Holy Land Foundation retrial. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 62 nn.315, 317; 83 nn.436, 438; p. 84 nn.439-443; 88 nn.467-68, 470; 98 nn. 533; 99 nn.536, 538, 539; 100 nn.540-42, 544; 101 n.545; 107 nn.590-92; 108 n.595; 127 nn.727-29; 130 nn.755, 757; 133 nn. 775-77; 134

n.782; 152 nn.886, 889).

**RESPONSE:** Admit.

356.   Spitzen's report cites to exhibits introduced into evidence at the Holy Land Foundation retrial as support for assertions he makes about certain of the 13 Charities and their members. Id. (Spitzen NW Rep. at 62 nn.315, 317; 83 nn.436, 438; p. 84 nn.439, 443; 88 nn.467-68, 470; 98 nn.533; 99 nn.536, 538, 539; 100 nn.540-42, 544; 101 n.545; 107 nn. 590-92; 108 n.595; 127 nn.727-29; 130 nn.755, 757; 133 nn. 775-77; 134 n.782; 152 nn.886, 889).

**RESPONSE:** Admit.

357.   Spitzen testified that he did not visit any of the 13 Charities between 2000 and 2004. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 160:13-15).

**RESPONSE:** Admit.

358.   Spitzen cites to exhibits introduced into evidence at the Holy Land Foundation retrial for assertions as to what Israel Defense Forces found on the premises of certain of the 13 Charities. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 88 nn. 467-68, 470; 98 n.533; 99 n.536; 107 nn.590-92; 108 n.595).

**RESPONSE:** Admit that Mr. Spitzen cites these materials as one of the bases for his understanding that the documents were found at certain offices. Note that Mr. Spitzen articulated other bases as well, including personal knowledge of the facts based on his experience as the head of the Palestinian Affairs Department ("PAD") with the office of the Coordinator of Government Activities in the Territories ("COGAT"). Also, with respect to p. 88, n.470 of his report, that is something Mr. Spitzen later clarified was not in fact found at the ICSH. *See* Israel Dec. Ex. 154 (Spitzen Tr. at 70:11-16).

359.   Levitt repeatedly quotes directly from a November 28, 2002 German Intelligence

Service (BND) letter as support for assertions he makes about the 12 Charities and their purported connections to Hamas. Schuster Dec. Ex. 152 (Levitt NW Rep. at 64-65, 67, 72, 75, 80-81, 83, 90 and 91); Ex. 165 (Levitt CL Dep. Ex. 8).

**RESPONSE:** Admit.

360. Levitt's report repeatedly cites reports published by the Center for Special Studies/Intelligence and Terrorism Information Center ("C.S.S."), an Israeli NGO, as support for assertions he makes about the 12 Charities and their purported connections to Hamas. Schuster Dec. Ex. 152 (Levitt NW Rep. at 78-80 nn.516, 519, 521-25, 528-31).

**RESPONSE:** Admit that Dr. Levitt's report occasionally cites CSS reports to support assertions he makes about the 12 organizations and their purported connections to HAMAS, however Dr. Levitt's report also cites primary source documents referenced in those CSS reports.

361. Spitzen repeatedly cites to information reported by C.S.S. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 63 n.320; 78 n.394; 95 nn.505, 507; 111 nn.607-10; 116 nn.659-60; 117 nn.661, 664; 124 nn.718, 720, 722; 141 nn.824-25).

**RESPONSE:** Dispute. Mr. Spitzen cites primary source documents cited by CSS.

    (2)    <u>Levitt's and Spitzen's methodologies</u>

        (a)    <u>Levitt</u>

362. When asked to explain his research methods, Levitt confirmed that he previously testified that he tells analysts to "exploit all sources, looking at books, talking to other scholars, journals, keeping on top of information and ... the most important thing is conducting primary field research - going out and interviewing people, meeting people, spending time in the region." Schuster Dec. Ex. 149 (Levitt CL Tr. at 87:14 -88:4).

**RESPONSE:** Admit.

363. Levitt testified that he has never visited any of the 12 Charities. <u>Id.</u> (Levitt CL Tr.

at 110:21-23).

**RESPONSE:** Admit.

364.    Levitt testified that he did not review any of the audited books and records of any of the 12 Charities. Id. (Levitt CL Tr. at 206:4-7).

**RESPONSE:** Admit.

365.    Levitt testified that he has never spoken with any members of the 12 Charities. Id. (Levitt CL Tr. at 110:24-111:4).

**RESPONSE:** Admit.

366.    Levitt testified that he has not spoken with any Hamas members who are not incarcerated. Id. (Levitt Tr. at 111:5-10).

**RESPONSE:** Admit that Dr. Levitt only interviewed HAMAS operatives while they were in prison.

367.    With respect to one of the reasons why he did not meet with the 12 Charities, Levitt testified that "for the purpose of this type of analysis where you are trying to figure out if illicit activity is in fact happening when you already have information suggesting that it is, it's kind of like a person who's researching organized crime asks Al Capone are you a crime boss." Id. (Levitt CL Tr. at 111:21-112:21).

**RESPONSE:** Admit that the excerpt cited is an accurate, albeit selective, quotation from Dr. Levitt's testimony.  Dr. Levitt testified that he did meet with charitable entities in the Palestinian Territories, *id*. at 111:21-24, though he did not meet with the 12 organizations discussed in his report. Dr. Levitt further testified that he has not met with non-imprisoned HAMAS operatives, because as a former U.S. government official, he did not want to create the mistaken impression that any such meeting constituted a "back channel" for those HAMAS operatives to the U.S.

government. *Id*. at 111:5-20.

368.    The following sources cite field research on some of the same 12 Charities on which Levitt opines, including primary source interviews. Schuster Dec. Ex. 163 (Jeroen Gunning, "Terrorism, charities and diasporas: Contrasting the fundraising practices of Hamas and al Qaeda among Muslims in Europe," in Countering the Financing of Terrorism (Thomas J. Biersteker & Sue E. Eckert eds. 2008), at 99 (noting that charities considered to be affiliated with Hamas are organizationally independent from the political and resistance wings)); Ex. 166 ("Islamic Social Welfare Activism In The Occupied Palestinian Territories: A Legitimate Target?" International Crisis Group Middle East Report No. 13 (April 2, 2003) at 11 (noting that funding for charities considered to be affiliated "is anything but centralised" and questioning what "affiliation" of charities means in political context in Palestinian territories)); Ex. 167 (Jonathan Benthall, The Palestinian Zakat Committees 1993-2007 and Their Contested Interpretations, Program for the Study of International Organization(s) Occasional Paper 1/2008, Geneva: Graduate Institute of International and Development Studies, at 8-9 (criticizing the idea that charitable organizations affiliated with Hamas "are in effect its subsidiaries")); Ex. 162 (Emanuel Schäublin, Role and Governance of Islamic Charitable Institutions: The West Bank Zakat Committees (1977-2009) in the Local Context, The Centre on Conflict, Development, and Peacebuilding Working Paper (2009), at 11-14 (citing several scholars for the proposition that charities considered to be affiliated with Hamas are largely autonomous entities)).

**RESPONSE:** Object to NatWest's inclusion of the terms "field research" and "primary source interviews" without defining these terms, which are vague and ambiguous. Object to NatWest's citation to articles not disclosed during expert discovery. If NatWest wanted to designate additional experts to rebut Dr. Levitt and Mr. Spitzen, it should have done so in the course of

expert discovery and afforded Plaintiffs the opportunity to probe the bases of these opinions at deposition. Dispute insofar as NatWest repeatedly mischaracterizes the conclusions of the sources it purports to cite. For example, the 2003 ICG Report explicitly found that "[i]n many cases, such as the extensive network of institutions in Khan Yunis in the Gaza Strip known as the Islamic Association (*al Mujamma' al-Islami*) or that of the Islamic University in Gaza City, the affiliation of a particular social welfare organization with HAMAS is *readily apparent* and all but official. In others it can be inferred from a combination of factors such as the identity of the founders, composition of governing bodies, funding and staffing. While there is nothing scientific or rigorous to this process, Palestinians interviewed by ICG stated that the HAMAS affiliation of a particular relief organization, pre-school education centre, *zakat* committee or mosque is generally a matter of common knowledge so that people can state with some assurance that 'this mosque is HAMAS' and that one is not." Schuster Dec. Ex. 166 (ICG Report at 11) (emphasis added). Defendant also fails to note that the ICG Report states, "The Al-Salah Islamic Association, considered one of the largest HAMAS-affiliated organizations in the Gaza Strip, obtains support from a variety of local and foreign organizations on the basis of project proposals it submits." *Id*. Moreover, although Defendant describes the four sources herein as being "based upon field research," it supplies no definition of the term "field research" and while some of these sources utilize genuine "field research" as commonly understood in the social sciences, some or all of them may have conducted anecdotal interviews of people "in the field" and do not involve the use of raw data that is understood in much of academia to be the hallmark of "field research." Furthermore, Messrs. Benthall and Schaublin did not conduct *any* interviews in the Gaza Strip for their paper and did not analyze specific committees and discuss whether they are controlled by HAMAS.

369.    Levitt's report states that Hamas's social welfare activities help provide "logistical and operational support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire." Schuster Dec. Ex. 152 (Levitt NW Rep. at 2).

**RESPONSE:** Admit.

370.    Levitt's report does not cite any authority for this claim. Id.

**RESPONSE:** Admit that the language quoted at p. 2 does not have a citation. Dispute that Dr. Levitt's report does not elsewhere cite authority for this proposition. *See, e.g.*, Schuster Dec. Ex. 152 (Levitt NW Rep. at 13-20 and citations therein).

371.    The portions of Levitt's report that plaintiffs have identified as authority to support this claim do not identify a specific instance in which one of the 12 Charities provided "logistical and operational support for weapons smuggling, reconnaissance, and acts of terror from suicide bombings to rocket fire," or in which a leader of one of the 12 Charities used the charity for any such purposes. See Schuster Dec. Ex. 154 (CL 56.1 Response ¶ 386 (identifying Levitt CL Rep. at 13-20)); Ex. 152 (Levitt NW Rep. at 13-20 (corresponding to Levitt CL Rep. at 13-20)).

**RESPONSE:** Admit to the extent that ¶ 371 refers to the physical situs of the 12 organizations. Dr. Levitt does not opine that the premises of any of the 12 organizations were used to store weapons or otherwise plan acts of terrorism. However, Dr. Levitt does note that these 12 organizations provide salaries to numerous individuals involved in the commission of acts of terrorism on behalf of HAMAS. Moreover, Dr. Levitt specifically notes that employees of the Jenin Zakat Committee were recruited into HAMAS while working at the organization. *See* Schuster Dec. Ex. 152 (Levitt NW Rep. at 15-16).

372.    Levitt's report states that "Hamas prizes its hospitals because it can use them to

build grassroots support, procure chemicals necessary to making explosives and facilitate terrorist attacks." Id. (Levitt Rep. at 83).

**RESPONSE:** Admit.

373.   Levitt's report does not cite any authority for this claim. Id.

**RESPONSE:** Admit, however when questioned at his CL deposition, Dr. Levitt stated that "there were multiple cases" of this dynamic, and CL's counsel did not probe further. Schuster Dec. Ex. 149 (Levitt CL Tr. at 201:20).

374.   Levitt's report does not identify any specific instances in which a hospital built grassroots support or procured chemicals necessary to making explosives and facilitating terrorist attacks.

**RESPONSE:** Admit.

375.   Levitt is not aware that any of the 12 Charities "procur[ed] chemicals to make explosives for terrorist attacks." Schuster Dec. Ex. 149 (Levitt CL Tr. at 201:10-13).

**RESPONSE:** Admit, though Dr. Levitt said that "there are multiple cases" of the phenomenon in question. *See* Schuster Dec. Ex. 149 (Levitt CL Tr. at 201:20-21).

376.   Levitt testified that his report does not provide a citation for this statement, adding it is "a general statement." Id. (Levitt CL Tr. at 201:14-21)

**RESPONSE:** Admit, though Dr. Levitt said that "there are multiple cases" of the phenomenon in question. *See* Schuster Dec. Ex. 149 (Levitt CL Tr. at 201:20-21).

377.   Levitt's report states that "Hamas aid does in fact buy the support of those who benefit from its largesse" via social welfare activities, and also states, "For example recipients are unlikely to turn down requests to participate in the *da'wa*'s logistical support activities by allowing their homes to serve as safe houses for Hamas fugitives moving from place to place to

avoid capture." Schuster Dec. Ex. 152 (Levitt NW Rep. at 20-21).

**RESPONSE:** Admit.

378.    Levitt's report does not cite any authority for these claims. Id.

**RESPONSE:** Dispute. Footnote 119, for example, supports Dr. Levitt's contention that HAMAS's provision of aid garners it support among the Palestinians.  Schuster Dec. Ex. 152 (Levitt NW Rep. at 20).  *See also Id*. at 21-22, footnotes 123 and 124.

379.    Levitt's report does not connect these assertions to any of the 12 Charities. Id.

**RESPONSE:** Dispute. This paragraph draws a false dichotomy between the 12 organizations and the HAMAS da'wa generally**.**

380.    Levitt states in his report that "Hamas deems legitimate the mingling of these funds, as it considers the social services it provides a jihadist extension of its terrorist attacks." Id. (Levitt NW Rep. at 13).

**RESPONSE:** Admit.

381.    Levitt's report does not cite any authority for this claim. Id.

**RESPONSE:** Admit that the quoted language of p. 13 of Dr. Levitt's report does not have a citation, but dispute that Dr. Levitt's report does not elsewhere cite authority for this proposition. *See*, *e.g.*, Schuster Dec. Ex. 152 (Levitt NW Rep. at 7, 13, 21-24 and citations therein).

382.    The portions of Levitt's report that plaintiffs have identified as authority to support Levitt's claim that "Hamas deems legitimate the mingling of funds" do not identify specific instances of mingling of funds between the 12 Charities and Hamas, except for one instance in which it is stated that the head of one of the charities, the Al-Islah Charitable Association, confessed to laundering funds through the charity for suicide bombings. Schuster Dec. Ex. 154 (CL 56.1 Response ¶¶ 390, 397 (identifying Levitt's CL Report at 7, 13, 21-24, and

87)); Ex. 152 (Levitt NW Rep. at 7, 13, 21-25, and 89-90 (corresponding to CL Report at 7, 13, 21-24, and 87)).

**RESPONSE:** Dispute. This paragraph draws a false dichotomy between the 12 organizations and the HAMAS da'wa generally.

383.    Levitt testified that each of the 12 Charities had its own bank accounts. Schuster Dec. Ex. 149 (Levitt CL Tr. at 168:5-13).

**RESPONSE:** Admit.

384.    When asked for a specific example of an instance in which any of the 12 Charities used money that was given to them to buy weapons, Levitt could not do so. Id. (Levitt CL Tr. at 168:14-21).

**RESPONSE:** Admit.

385.    Levitt testified that there is no central Hamas treasury or repository for funds for military, political and social programs. Id. (Levitt CL Tr. at 170:24-171:11).

**RESPONSE:** Admit.

386.    The example Levitt uses in his CL report to support the assertion that Hamas "deems legitimate the mingling of these funds" was, according to Levitt's CL report, a webpage of the Muslim Brotherhood, described in an article Levitt cited from the International Institute for Counter-Terrorism. Schuster Dec. Ex. 168 (Levitt CL Rep. at 13).

**RESPONSE:** Admit.

387.    The source Levitt cited in his CL report for this example did not contain anything about alleged legitimization of the mingling of military and social service funds. Schuster Dec. Ex. 169 (Levitt CL Dep. Ex. 7).

**RESPONSE:** Admit, though Dr. Levitt's report elsewhere cites authority for this proposition.

*See e.g.*, Schuster Dec. Ex. 152 (Levitt NW Rep. at 7-8, 12-13, 20-24).

388.    Levitt subsequently identified another source for this assertion in his report in these lawsuits. Schuster Dec. Ex. 152 (Levitt NW Rep. at 13 n.80).

**RESPONSE:** Admit.

389.    The new source is a web page of the Israel Defense Forces, which does not refer to any "mingling" of funds. Schuster Dec. Ex. 170 (Levitt NW Dep. Ex. 4).

**RESPONSE:** Admit, except Dr. Levitt's Report contains numerous examples of the mingling he describes. *See, e.g.*, Schuster Dec. Ex. 152 (Levitt NW Rep. at 89-90) (describing flow of money between the HAMAS political leadership, Al Islah Charitable Association and HAMAS cells perpetrating suicide bombing attacks.)

390.    Levitt states in his report: "As the following excerpt from the Charity Commission's report indicates, the Commission's analysis was not predicated upon the question of whether Interpal funded Hamas, but instead addressed the narrower question of whether the funds were directed toward 'charitable' activities rather than other activities (including violent operations) Hamas involved itself with: 'The allegation that funds were going to Hamas and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the object of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but we needed to ensure, to the best of our abilities, that funds were not being given because of a person's support of Hamas.'" Schuster Dec. Ex. 152 (Levitt NW Rep. at 40-41) (emphasis added).

**RESPONSE:** Admit, though the word "because" was emphasized in Levitt's report and the 1996 Charity Commission report.

391.    Levitt's report cites as support for this claim the 1996 Charity Commission report. Id. (Levitt NW Rep. at 40-41 n.230); Ex. 148 (Levitt NW Tr. at 75:4-18) (correcting footnote).

**RESPONSE:** Admit.

392.    The 1996 Charity commission Report actually states as follows: "The allegation that funds were going to supporters of Hamas and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but we needed to ensure, to the best of our abilities, that funds were not being given *because* of a person's support of Hamas." Schuster Dec. Ex. 171 (Levitt NW Dep. Ex. 8 at WS 081307) (emphasis added).

**RESPONSE:** Admit that the quoted text is cited correctly (adding the words "supporters of" HAMAS). As Dr. Levitt and Mr. Spitzen established in their reports, some of the zakat committees listed in the 1996 Charity Commission report as beneficiaries of Interpal, including the Nablus Zakat Committee, the Islamic Charitable Society – Hebron, the Jenin Zakat Committee, the al-Salah Islamic Association and the Islamic Society – Gaza (al-Jam'iya al-Islamiya), are in fact part of HAMAS.

393.    Levitt admitted at his deposition that his purported quotation from the 1996 Charity Commission Report in his report in these lawsuits was mistaken, and that the phrase "supporters of Hamas" should have appeared in place of the word "Hamas" in the first sentence of the purported quotation. Schuster Dec. Ex. 148 (Levitt NW Tr. at 76:10-77:13).

**RESPONSE:** Admit that Dr. Levitt stated at his deposition that the above-mentioned excerpt from the 1996 Charity Commission Report contained the words "supporters of Hamas" and not HAMAS. Dispute any intimation that "supporters of Hamas" cannot encompass organizations

that support "Hamas." As Dr. Levitt stated, "Someone who's a supporter of Hamas has an affiliation with Hamas under U.S. law. For example, a person could be subject to a Hamas related designation." *Id*. at 77:22-78:1.

394.    Levitt testified that his CL Report served as a template for his NatWest report. Id. (Levitt NW Tr. at 20:20-23).

**RESPONSE:** Admit.

395.    Levitt testified that he prepared his NatWest report after his deposition in the lawsuits against CL. Id. (Levitt NW Tr. at 21:13-16).

**RESPONSE:** Admit.

396.    Levitt testified that when preparing his NatWest report he had an opportunity to make any changes to his CL report that he considered appropriate, and that he did make changes for his NatWest report. Id. (Levitt NW Tr. at 20:24-21:8).

**RESPONSE:** Admit.

397.    Levitt testified that to the best of his knowledge he corrected all the items in his CL Report he was aware of and that he believed needed correction. Id. (Levitt NW Tr. at 21:9-12, 22:9-17).

**RESPONSE:** Admit.

398.    Levitt testified that when preparing his NatWest report he had the opportunity to add any additional points to his CL Report that he thought were relevant to his NatWest report, including any additional support for any of his opinions. Id. (Levitt NW Tr. at 22:18-23:3).

**RESPONSE:** Admit.

399.    Levitt testified that when preparing his NatWest report he had the opportunity to remove any statement or source from his CL Report that he no longer thought was appropriate to

include. Id. (Levitt NW Tr. at 23:4-9).

**RESPONSE:** Admit.

400.    Levitt testified that it is important to consider different perspectives as part of his general methodology. Schuster Dec. Ex. 149 (Levitt CL Tr. at 90:17-20).

**RESPONSE:** Admit, though Dr. Levitt also testified about the futility of seeking certain perspectives, insofar as doing so would almost inevitably lead to self-serving responses: "but for the purpose of this type of analysis where you are trying to figure out if illicit activity is in fact happening when you already have information suggesting that it is, it's kind of like asking if a person who's researching organized crime asks Al Capone are you a crime boss. I'm not expecting him to say yes.  I'm not expecting him to tell me about his illicit activity and therefore it's often I find much more productive to meet with government officials, investigators, with regulators, with other experts and those are the people who are looking into this in ways that I can't." Israel Dec. Ex. 152 (Levitt Tr. at 112:3-16).

401.    Levitt testified that governments have information that he, as a private citizen, is unaware of, because they have an ability to collect information beyond what he can collect and because of their "sources and methods and their interest in focusing on groups that are engaged in terrorism." Id. (Levitt CL Tr. at 99:15-101:3).

**RESPONSE:** Admit that Dr. Levitt testified that governments have access to documents that he does not, but dispute that governments necessarily have more or less information than Dr. Levitt possesses. *Id.*

402.    Levitt testified that the Charity Commission conducted three reviews of Interpal, in 1996, 2003 and 2009. Schuster Dec. Ex. 148 (Levitt Tr. at 50:23-51:10).

**RESPONSE:** Admit.

403.    Levitt testified that Interpal is currently, and was throughout the time period covered in his report, a registered charity in England. Id. (Levitt NW Tr. at 49:18-50:3).

**RESPONSE:** Dr. Levitt testified that he "believe[d]" Interpal is currently a registered charity in England. Object to the extent that this question seeks a legal conclusion.

404.    Levitt cites the fact that Interpal was designated by OFAC as an SDGT on August 22, 2003 as evidence that Interpal is "the principal and most important fundraising organization for Hamas in the United Kingdom." Schuster Dec. Ex. 152 (Levitt NW Rep. at 35-40).

**RESPONSE:** Admit that Dr. Levitt cites the fact that Interpal was designated by the U.S. government as an SDGT on August 22, 2003 as one piece of evidence that Interpal is "the principal and most important fundraising organization for Hamas in the United Kingdom."  Dr. Levitt's aforementioned conclusion is multidetermined, and is also based on, *inter alia*, Israeli actions taken against Interpal as well as the Charity Commission investigations of Interpal.

405.    Levitt's report does not mention that 11 of the 12 Charities have never been designated as an SDGT.

**RESPONSE:** Admit that Dr. Levitt's report identified 1 of the 12 organizations discussed as an SDGT.

406.    The only one of the 12 Charities to be designated an SDGT, the Al-Salah Society, was so designated on August 7, 2007. Id. (Levitt NW Rep. at 65).

**RESPONSE:** Admit.

407.    The U.S. government's designation of the Al-Salah Society was made nearly two years after the last of the Identified Interpal Transfers occurred. Schuster Dec. Ex. 146 (Geisser 2009 Rep., Ex. D).

**RESPONSE:** Admit.

408.    Levitt repeatedly cites in his report Ziad Abu Amr, a Palestinian "academic" and "government minister." Schuster Dec. Ex. 152 (Levitt NW Rep. at 5 n.14; 6 n.21; 7 n.26; 8 n.33; 9 nn.41-42, 44-46; 11 n.68; 12 n.69; 59 nn.344, 352; 60 n.358).

**RESPONSE:** Admit.

409.    Levitt testified that Ziad Abu Amr "wrote one of the earlier and better books on Islamic movements in the Palestinian territories including on HAMAS." Schuster Dec. Ex. 149 (Levitt CL Tr. 338:5-14).

**RESPONSE:** Admit.

410.    Levitt does not mention in his report, but conceded at his deposition he previously knew, that Abu Amr, unlike Levitt, had examined the books of one of the 12 Charities (the Al-Islah Society) and there was nothing amiss. Id. (Levitt CL Tr. at 339:3-340:4).

**RESPONSE:** Admit that this is an accurate, albeit selective, quote of Dr. Levitt's testimony about Abu Amr. In fact, Dr. Levitt testified that he previously knew that Abu Amr had examined the books of one of the 12 organizations (the Al-Islah society) and concluded that nothing was amiss, but Dr. Levitt also testified that, "having spoken to the people who do the charity oversight in the Palestinian authority, it's not clear to me or to them what he based this on and from my interviews with the people who do charitable oversight it's not correct. Palestinian Society is complicated. Within any given family there's HAMAS guys, Fatah guys, it's patch work. Ziad Amr also had an interest in minimizing concerns about HAMAS. He was a strong proponent of reconciliation between HAMAS and Fatah. He was a minister in the – he was a Fatah minister in the HAMAS run government at one point so he also had some issues there." *Id.* at 340:9-23.

411.    Levitt testified that, as part of his method of research, it is important to seek

information from different perspectives. Id.. (Levitt CL Tr. at 90:17-20).

**RESPONSE:** Admit, but see answer to ¶ 400.

412.    Levitt testified that, as part of his research methodology, it was important for him to vet the information he was considering. Id. (Levitt CL Tr. at 92:25-93:12).

**RESPONSE:** Admit.

413.    Levitt has not corroborated the information contained in the "Watson Memorandum." Id. (Levitt CL Tr. at 244:13-245:14).

**RESPONSE:** Dispute. NatWest mischaracterizes Dr. Levitt's testimony regarding the Watson Memorandum. In the excerpt cited, Dr. Levitt testified that there were different types of information contained in the Watson Memorandum, much of which it was unnecessary to verify in order to arrive at his conclusions.

414.    When asked if he knew what the authors of the "Watson Memorandum" did to verify the information that they received from the Government of Israel, Levitt testified: "Specifically, no." Id. (Levitt CL Tr. at 245:15-246:2).

**RESPONSE:** Admit that Dr. Levitt did not testify to what the authors of the Watson Memorandum did to verify the information that they cite from the Government of Israel. However, Dr. Levitt's testimony necessarily excluded information that he had derived from his work at the FBI, and when defense counsel asked Dr. Levitt if he personally was involved in drafting the Watson Memorandum, Dr. Levitt testified that he was not permitted to disclose what he did when working in the U.S. intelligence community, but that he could reveal that, at the time, he was "involved on focusing on middle eastern terrorist groups and their presence in the United States." *Id*. (Levitt Tr. at 242:16-21).

415.    Levitt testified that after the "Watson Memorandum" was published, he learned

that one of the sources that it cited was found to be fabricated and was completely discredited. Id. (Levitt CL Tr. at 243:8-244:12).

**RESPONSE:** Admit, though once Dr. Levitt learned that the article cited in the Watson Memorandum was discredited he did not cite to it. *Id*. at 243:21-244:12.

416.    Levitt never asked "Avi" to identify the sources for the statements he made in his testimony at the Holy Land Foundation retrial, and upon which Levitt relied. Id. (Levitt CL Tr. at 231:9-14).

**RESPONSE:** Admit, but the cited testimony lacks context. The U.S. government produced to the defense more than 20 volumes of material that "Avi" used to formulate his expert opinion about HAMAS financing. *U.S. v. El-Mezain, supra*, 2011 WL 6058592 at *10.

417.    Levitt never asked "Avi" what evidence he considered but chose not to rely upon in offering his testimony. Id. (Levitt CL Tr. at 231:15-18).

**RESPONSE:** Admit, *but see* response to ¶ 416.

418.    Levitt had never seen the German BND Report he cites until he obtained a copy through plaintiffs' counsel. Id. (Levitt CL Tr. at 234:24-235:6).

**RESPONSE:** Admit.

419.    Levitt did not conduct an academic review of the BND Report to determine if the information it contains is reliable. Id. (Levitt CL Tr. at 235:18-236:22).

**RESPONSE:** Dispute. The reference to "academic review" is vague and ambiguous. Dr. Levitt testified that, for this type of report, "you don't do a book review which is kind of what it sounds like you are asking about." *Id*. at 236:2-4.

420.    Levitt describes the C.S.S. as an Israeli "think tank" that is "not wholly independent" and "very public about the fact that it is tied to the Israeli military." Id. (Levitt CL

152

Tr. at 248:19-249:11).

**RESPONSE:** Admit.

421. Levitt testified that he rarely cited C.S.S. analyses due to concerns he has about their quality. Id. (Levitt CL Tr. at 249:12-16). However, Levitt does cite C.S.S. analysis in his expert report in these lawsuits, and not merely documents made available by C.S.S. Schuster Dec. Ex. 152 (Levitt NW Rep. at 30-31 n.179; 79 n.519; 88 n.605).

**RESPONSE:** Dispute. This mischaracterizes Dr. Levitt's testimony. He did testify that he rarely cites to CSS's analyses and that "some of their analysis I found better than others." Admit that Dr. Levitt does cite CSS analysis in his expert report in these lawsuits, and not merely documents made available by CSS.

422. Levitt's NatWest report includes a paragraph that does not appear in his CL Report, stating that "[n]ot only does Hamas' da'wa network allow it to capture broad popular support in the Palestinian Territories, but research also indicates that it has the effect of making Hamas attacks more deadly. There appears to be a robust relationship between Hamas's decision to provide comprehensive social services, and its concomitant lethality as an organization when compared to other terrorist organizations lacking anything comparable to Hamas's *da'wa* network." Id. (Levitt NW Rep. at 22).

**RESPONSE:** Admit.

423. Levitt's report cites Radical, Religious and Violent: The New Economics of Terrorism by Eli Berman as support for this opinion. Id. (Levitt NW Rep. at 22 n.126).

**RESPONSE:** Admit.

424. Berman's analysis of this issue is an economic analysis. Schuster Dec. Ex. 148 (Levitt NW Tr. at 135:11-13).

**RESPONSE:** Object that the term "economic analysis" is not defined and is vague and ambiguous. Dispute. Dr. Berman's analysis is more accurately described as socio-political analysis or "rational choice analysis" predicated on economic models.

425.   Levitt is not an economist and did not conduct his own independent economic analysis of the issues Berman analyzes. Id. (Levitt NW Tr. at 135:14-18).

**RESPONSE:** Admit that Dr. Levitt is not an economist and did not perform economic analysis of the issues Dr. Berman analyzes.

426.   Levitt did not conduct any economic or quantitative tests to test and verify Berman's analysis, and testified that doing so would not have been possible because Levitt did not have Berman's data set. Id. (Levitt NW Tr. 135:19-136:8).

**RESPONSE:** Admit that the excerpt cited is an accurate, albeit selective, quotation from Dr. Levitt's testimony. Dr. Levitt also testified, "Again, it's not necessary to re-test every finding especially when a finding is published in like a peer reviewed journal or a university press peer reviewed book. It doesn't mean you will be in complete agreement, most social scientists aren't in complete agreement with each other on anything, right, but this is a serious study and it's worthy of considering his points." *Id*. at 135:24-136:8.

427.   Levitt did not take any steps to check whether the data Berman relied upon was accurate or reliable because he did not have access to Berman's data set and because he could give Berman's analysis "more credence" since it was "a peer reviewed study published in a university press." Id. (Levitt NW Tr. at 138:20-139:11).

**RESPONSE:** Admit that Dr. Levitt testified that he could give more credence to Dr. Berman's study insofar as it was a peer reviewed study published in a university press than information contained in a blog, however Dr. Levitt also testified that Dr. Berman's study could be given

credence because "his findings fit into the context of what we know about Hamas for a very long time in terms of its ability to invest in society and build grass root support and the way that grass root support then translates into success as a terrorist organization." *Id*. at 139:6-11.

428.    When told that Berman states that between 2002 and 2007 the Al Aqsa Martyrs Brigade was only responsible for six attacks and three deaths, and asked whether this statement seemed accurate, Levitt testified that it did not. Id. (Levitt NW Tr. at 139:12-22).

**RESPONSE:** Dispute. When told that Dr. Berman states in his book that between 2002 and 2007 the Al Aqsa Martyrs Brigade was only responsible for three deaths, and asked if that sounded accurate, Dr. Levitt testified, "In a nutshell, no. Measuring Al Aqsa is hard because many attacks were carried out by Al Aqsa and someone else, sometimes Hamas. Often in the press and in reports some of these attacks were described as being carried out by Fatah. Al Aqsa was the militant wing of Fatah. There were some others, the tanzime, [Tanzim] etc. so sometimes attributing an attack to Al Aqsa is difficult so it depends in part on how he went about doing that." *Id*. at 139:22-140:8.

429.    The March 4, 2011 expert report of Brian Michael Jenkins (the "Jenkins Report" or "Jenkins NW Rep.") notes that Levitt's report contains no analysis of any other factors that may contribute to a terrorist organization's "lethality." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 65).

**RESPONSE:** Dispute. Jenkins appears to argue that Dr. Levitt does not analyze the specific factors that Jenkins delineates on p. 65 of the Jenkins Report, as opposed to not analyzing any other factors generally that may contribute to a terrorist organization's lethality.

430.    The Jenkins Report notes that Levitt's report contains no evaluation of whether there is any empirical basis for Berman's assertion that "organizations such as Hamas produce

operatives with a much higher 'defection constraint.'" Id. (Jenkins NW Rep. at 65-66); Ex. 152 (Levitt NW Rep. at 22).

**RESPONSE:** Admit that the Jenkins Report does so state.

431. Berman's book states that "Hamas is *not* a terrorist organization using social service provision as a front to disguise its other activities, as is sometimes claimed." Schuster Dec. Ex. 173 (Eli Berman, Radical, Religious, and Violent: The New Economics of Terrorism, (Cambridge, MA: MIT Press, 2009) at 131-32) (emphasis in original).

**RESPONSE:** Admit that the excerpt cited is an accurate, albeit selective, quotation from Dr. Berman's book. Note that the words preceding the cited text are "[i]n this sense," and that the preceding paragraph to which the cited text is linked discusses, *inter alia*, distinctions between Al Qaeda and HAMAS.

432. Berman cites Levitt as stating that certain social service organizations are a front for Hamas, and opines that Levitt "ignores the fact that the religious and social service provision networks predate the terrorist wing." Id. (Eli Berman, Radical, Religious, and Violent: The New Economics of Terrorism, (Cambridge, MA: MIT Press, 2009) at 264 n.17).

**RESPONSE:** Admit that the excerpt cited is an accurate, albeit selective, quotation from Dr. Berman. Note that Dr. Berman also cites Dr. Levitt's quotation of then Israeli Prime Minister Shimon Peres in 1996 that "Hamas has established charitable organizations in order to camouflage its true nature," and that Dr. Berman states that "Levitt is correct in emphasizing that the violent and benign 'wings' of Hamas have a single leadership, share personnel, and complement each other…" *Id.*

433. Levitt's report in these lawsuits does not mention Berman's criticism of Levitt's views.

**RESPONSE:** Admit, however during his deposition, Dr. Levitt addressed this point, stating "[a]ctually he doesn't criticize my work so much as debates a point with me and to be fair this is a point that is debated. The vast majority of people come out on the side that I happen to come out on which is that there are groups that serve as fronts for Hamas, some of which have predated the founding of Hamas under the name and some of which were founded later. By the way, you know a group like the Mujama that we discuss in this report could have been founded and operating with these guys under whatever name one day and then Hamas was founded under that name and it continued operating as Hamas the next day and theoretically though I don't think this is the case, but just for the theory perhaps then it was not engaging as a front and then subsequently did begin to engage as a front so the fact that it predated the founding of Hamas, it's another way that it misses the point, but the nature of social science is that you won't necessarily agree with 100 percent of what anybody says." Israel Dec. Ex. 151 (Levitt Tr. at 154:13-155:13).

        (b)    <u>Spitzen</u>

434. Spitzen's report states that his methodology for "evaluating the level of Hamas's control of a specific organization" was to examine 18 factors:

    (1)   The organization's history.

    (2)   The organization's leadership (the personal identity of key figures).

    (3)   Ideology and platform (based on interviews with the leadership, the organization's web sites, charters and declarations of [sic] intention).

    (4)   Those employed by or members of the organization in key positions who have ties with Hamas.

    (5)   Ties with other organizations in the Palestinian Territories.

    (6)   Ties with other organizations throughout the world, particularly organizations considered affiliated with the Muslim Brotherhood.

(7)   The identification of the organization as HAMAS-related by Hamas itself.

(8)   Israeli actions against the organization based on its HAMAS/terrorist identity.

(9)   Actions of the Palestinian Authority against the organizations based on its Hamas/terrorist identity.

(10)   American action against the organization based on its Hamas/terrorist identity.

(11)   External sources of funding associated with Hamas.

(12)   Academic or other analyses of the organization.

(13)   Involvement of the organization or its leadership in the Hamas election campaign in 2006.

(14)   The cessation of the flow of funds to the organization as a result of replacement of its board in 2007 by the Palestinian Authority.

(15)   News stories or other media reports identifying the organization with Hamas.

(16)   Findings from searches of the organization's offices that attest to the organization's connections with Hamas and its identification with Hamas's ideology, including support for terror.

(17)   Identification of the organization with Hamas by the population among whom it operates.

(18)   The nature of the organization's activities in supporting the families of suicide terrorists and Hamas prisoners and its being part of the civilian cover framework supporting terror.

Schuster Dec. Ex. 153 (Spitzen NW Rep. at 4-5).

**RESPONSE:** Admit.

435.   Spitzen has conceded that he has used his 18 factor test as he presents it here only in these lawsuits and the other pending lawsuits against CL and Arab Bank. Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. at 429:20-23, 437:22-438:9).

**RESPONSE:** Admit, except Spitzen testified that he used the core criteria manifested in the 18 factor test in a seven factor test when he served as the Israeli government's expert in the trial of

Raed Salah in 2003. Israel Dec. Ex. 155 (Spitzen Tr. at 427:18-428:18).

436.    Spitzen has conceded that his 18 factor test as he presents it here has been used only by him. Id. (Spitzen Arab Bank Tr. at 431:7-21).

**RESPONSE:** Admit that, as delineated, the 18-factor test has only been used by Spitzen (to his knowledge). However, in its condensed form, the 18 factor test was carefully scrutinized and approved by the ISA and utilized by other academics in the field, such as Guy Aviad. Moreover, the testimony of "Avi" in the Holy Land Foundation trial and retrial, which was approved by the ISA, reflects the same methodology used by Mr. Spitzen. *See* Israel Dec. Ex. 155 (Spitzen Tr. at 146:23-147:11; 440:9-441:8; 430:1-433:7).

437.    Spitzen concedes that his 18 factor test has never been published in any treatise and he did not rely on any treatise when he developed his test. Id. (Spitzen Arab Bank Tr. at 433:4-7, 434:22-435:5).

**RESPONSE:** Admit, though Mr. Spitzen testified that this test comports with analysis of the kind performed by other experts in the field.  Israel Dec. Ex. 155 (Spitzen Tr. at 430:1-437:3).

438.    Spitzen concedes that his 18 factor test has never been peer reviewed. Id. (Spitzen Arab Bank Tr. 437:22-438:9).

**RESPONSE:** Admit that, as delineated, the 18-factor test has not been subject to formal "peer review." However, in its condensed form, the 18-factor-test was carefully scrutinized by the ISA, utilized by academics in the field and utilized in the Holy Land Foundation litigation. *See* Israel Dec. Ex. 155 (Spitzen Tr. at 30:17-32:2).

439.    Spitzen testified that he selected his 18 factors based on the materials he had available to him while working on his engagement in these lawsuits, which excluded classified information. Schuster Dec. Ex. 151 (Spitzen CL Tr. at 270:21 -271:11).

**RESPONSE:** Admit that Mr. Spitzen explicitly declined to rely upon classified materials of which he is aware but could not access for his report. *Id*.

440.    Spitzen states in his report that for some of the 13 Charities "all of the criteria [of his 18 factor test] exist and the identification with Hamas is clear," but for others "only some of the criteria existed" and "those were tested against other possibilities (options) and a decision about the identity of the organization as Hamas was achieved after weighing all of the information." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 7).

**RESPONSE:** Admit.

441.    Spitzen's report does not state for which of the 13 Charities all of the criteria existed, and for which only some criteria existed.

**RESPONSE:** Admit, although Spitzen's report describes how he evaluated the presence and absence of his criteria. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep. at 5-7).

442.    Spitzen's report concludes that Hamas controls 11 of the 13 Charities. Id. (Spitzen NW Rep. at 51, 64, 73, 90, 101, 109, 118, 126, 134, 142, 149).

**RESPONSE:** Dispute. Mr. Spitzen concluded that 11 of the 13 organizations were "controlled" by HAMAS, that *Al Wafa* Charitable Society "was part of Hamas's da'wa infrastructure," and that the Jerusalem Central Zakat committee "was apparently identified with Hamas and constituted a part of the movement's da'wa infrastructure."

443.    Spitzen testified that "the conclusions regarding some of the entities are more cut and dry" but "[s]ome other entities, they are more careful – cautious." Schuster Dec. Ex. 151 (Spitzen CL Tr. at 235:13-23).

**RESPONSE:** Admit.

444.    Spitzen's report does not state which of his conclusions regarding the 13 Charities

were "more cut and dry" and which "were more careful."

**RESPONSE:** Dispute. With respect to, *inter alia*, al-Mujama al-Islami, al Jam'iya al Islamiya and al Salah, Mr. Spitzen's descriptions underscore that his determination that these committees are HAMAS-controlled is "cut and dry." With respect to al Mujama, Mr. Spitzen opined, "On the basis of all of the above, we see a clear connection, almost a oneness, between *al-Mujama al-Islami* and Hamas, a fact that was publicly known and stated in both the local and the Western media." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 49). Mr. Spitzen also states, "On the basis of the essential role played by the senior leaders of *al-Mujama al-Islami* in the da'wa activities of Hamas (including the fact that many of its founders are also the founders of Hamas); on the basis of the blatant adoption of Hamas's positions and the call for Hamas terrorist attacks and, in fact, its ideology of carrying out terror activity; on the basis of the organization's sources of funding and its ties to other entities controlled by Hamas, I conclude that, during all the relevant periods, *al-Mujama al-Islami* was controlled by Hamas and it remains a central element in Hamas's da'wa infrastructure." *Id.* (Spitzen NW Rep. at 51). With respect to al Jam'iya, Mr. Spitzen opined, "This was one of the most prominent and central Hamas-identified institutions in the Gaza Strip." *Id.* (Spitzen NW Rep. at 52). Mr. Spitzen also states, "On the basis of the central role played by the senior leadership of *al-Jam'iya al-Islamiya* in Hamas's da'wa activities (including the fact that many of its founders were also among the founders of Hamas), the blatant adoption of Hamas's ideology and terrorist attacks, the Society's sources of funding, and its ties with other organizations controlled by Hamas, I conclude that, in all the relevant periods, *al-Jam'iya al-Islamiya* was controlled by Hamas and it still constitutes a key element in Hamas's infrastructure." *Id.* (Spitzen NW Rep. at 63-4). With respect to al Salah, Mr. Spitzen notes that it was designated a Specially Designated Global Terrorist ("SDGT") by the U.S. because of its

161

relationship with HAMAS. *Id.* (Spitzen NW Rep. at 65-6). Mr. Spitzen also opined, "On the basis of: the important role played by senior Hamas personnel such as Ahmad al-Kurd; *al-Salah*'s network of summer camps and educational institutions (which openly supported violence); the Society's sources of funding; the distribution of funds to terrorists and their families; and the fact that Israel, the United States, and the Palestinian Authority see *al-Salah* as an association identified with Hamas; and its public identification by Hamas and other elements as part of Hamas's civilian infrastructure – the da'wa; from all these I conclude that, at all the relevant times, *al-Salah* was controlled by Hamas and constituted a part of its da'wa infrastructure." *Id.* (Spitzen NW Rep. at 73).

445. Spitzen testified that his analysis does not give equal weight to the absence of a particular factor as to one charity in comparison to the presence of that same factor as to a different charity. Id. (Spitzen CL Tr. at 263:25-264:24).

**RESPONSE:** Admit that the analysis performed by Mr. Spitzen cannot be performed by mechanically calculating the number of factors satisfied. Instead, as he testified, Mr. Spitzen had to assess the factors qualitatively in the context of which materials are publicly available. Thus, the mere absence of available data would not be given equal weight as the existence of available data. Mr. Spitzen repeatedly stressed the need to consider the data sets "holistically." *See* Schuster Dec. Ex. 158 (Spitzen Tr. at 449:2-452:24); *see also* Ex. 153 (Spitzen NW Rep. at 5-7).

446. Spitzen testified that he did not need to find that a minimum number of the 18 factors exists with respect to a particular entity in order for him to conclude that the entity was controlled by Hamas because "it's not a question of quantity, but rather a question of quality." Id. (Spitzen CL Tr. at 265:13-266:2).

**RESPONSE:** Admit.

447.    Spitzen testified that "[s]ometimes two criteria may be sufficient to determine that an organization is a Hamas organization." Id. (Spitzen CL Tr. at 265:13-22).

**RESPONSE:** Admit, but Mr. Spitzen testified that these two criteria must be the history and leadership of the organization, which are the most important of the 18 factors in Spitzen's test, not, as implied by NatWest's statement, any two criteria. *See* Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr. 449:2-452:24).

448.    Spitzen testified that "not every factor has equal weight." Id. (Spitzen CL Tr. at 257:19-258:2).

**RESPONSE:** Admit.

449.    Spitzen testified that before examining the evidence concerning one or more of the 13 Charities, he did not determine the weight each of the 18 factors should be given compared to other factors. Id. (Spitzen CL Tr. at 269:15-25).

**RESPONSE:** Dispute. Mr. Spitzen discusses the relative weight of certain factors in his analysis. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep. at 5-7).

450.    Spitzen testified that he is only able to identify to which factors he attributed the greatest weight "in the context of each and every organization." Id. (Spitzen CL Tr. at 258:13-259:7).

**RESPONSE:** Admit that the selective citation is correct, but dispute the inference Defendant suggests. In conducting analysis of terrorist organizations, identical data sets are not always available for a variety of reasons. Therefore, a researcher has to evaluate the available materials and assess whether the absence of certain evidence is of significance to the analysis or merely reflects circumstantial unavailability of certain materials. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep. at 5).

451.    Spitzen testified that "[t]he material that [he] found regarding each one of the organizations, that was what gave the weight or ascribed the weight to the [factor]." Id. (Spitzen CL Tr. at 259:15-259:23).

**RESPONSE:** Admit the accuracy of the quote, but dispute that Mr. Spitzen only paid attention to the presence of proof of HAMAS affiliation and simply ignored evidence of lack of affiliation. Mr. Spitzen considered whatever evidence was available to him, but noted in his testimony that in conducting analysis of terrorist organizations, identical data sets are not always available for a variety of reasons. Therefore, a researcher has to evaluate the available materials and assess whether the absence of certain evidence is of significance to the analysis or merely reflects circumstantial unavailability of certain materials. *See* Schuster Dec. Ex. 158 (Spitzen Tr. at 465:32-466:21).

452.    The factors "Involvement of the organization or its leadership in the Hamas election campaign in 2006" and "The cessation of flow of funds to the organization as a result of replacement of its administrative board boards in 2007 by the Palestinian Authority" concern information about events that occurred after the Relevant Transfer Period. Schuster Dec. Ex. 153 (Spitzen NW Rep. at 5).

**RESPONSE:** Admit.

453.    Spitzen testified that it would be possible to conclude that an entity was under the control of Hamas if the only one of the 18 factors that was satisfied was that "all the entire leadership of the organization is Hamas – are Hamas people and they are members of the parliament." Schuster Dec. Ex. 151 (Spitzen CL Tr. at 266:3-18).

**RESPONSE:** Dispute. Mr. Spitzen testified that if the leadership criterion was satisfied, that would be enough to demonstrate that the entity was HAMAS-controlled, but that it would be

impossible for "all the entire leadership of the organization" to be HAMAS and not find several other factors also present.  Schuster Dec. Ex. 151 (Spitzen CL Tr. at 266:12-18).

454.    When asked what he meant when he stated that an organization was controlled by Hamas, Spitzen testified that an entity is under the control of Hamas if it is an inseparable part of Hamas and identifies with it. Id. (Spitzen CL Tr. at 146:16-19).

**RESPONSE:**  Admit that Mr. Spitzen testified that this would be one manifestation of HAMAS's control over the organization.

455.    When asked if he meant anything else when he stated that an organization was controlled by Hamas, other than an organization being an inseparable part of Hamas and identified with Hamas, Spitzen stated "I could also maybe add the fact that there are organizations in which the leadership or official leadership of the organization and the board of trustees are almost identical [with Hamas]." Id. (Spitzen CL Tr. at 147:24-148:23).

**RESPONSE:**  Admit that Mr. Spitzen testified that this would be one manifestation of HAMAS's control over an organization.

456.    Spitzen testified that "the moment that one of the . . . 13 organizations is headed by a senior Hamas member, Hamas is the one that's running the day-to-day operations. Hamas is the one who's giving the instructions." Id. (Spitzen CL Tr. at 180:24-181:15). Spitzen testified that an entity is headed by a senior Hamas member when it has a Hamas member in a "key position." Id. (Spitzen CL Tr. at 181:23-182:18).

**RESPONSE:** Admit.

457.    Spitzen testified that he defines a person with a "key position" as anyone who has "the right to sign checks or any documents" who decides "what this association is going to do and how" and who runs the entity's day-to-day operations. Id. (Spitzen CL Tr. at 183:11-184:5).

**RESPONSE:** Admit.

458.   Spitzen testified that he did not visit any of the 13 Charities between 2000 and 2004. Id. (Spitzen CL Tr. at 160:13-15).

**RESPONSE:** Admit.

459.   With respect to Spitzen's factor "Those employed by or members of the organization (in key positions) who have ties with Hamas," Schuster Dec. Ex. 153 (Spitzen NW Rep. at 4), all of the board members identified in Spitzen's report are either Hamas members or those he considers to be aligned with Hamas.

**RESPONSE:** Admit. Note that Mr. Spitzen references a previous member of the Islamic Charitable Society – Hebron's Executive Management, Hashem al Natshe, on p. 85 of his report: "I cannot determine whether Hashem al Natshe is a Hamas operative." Schuster Dec. Ex. 153 (Spitzen Rep. at 85).

460.   With respect to the factors "Ties with other organizations throughout the world, particularly organizations considered affiliated with the Muslim Brotherhood" and "External sources of funding associated with Hamas," Spitzen relies upon the fact that Interpal provides funding to one of the 13 Charities as evidence that the charity is controlled by Hamas. Id. (Spitzen NW Rep. at 50, 62, 72, 76, 88, 99, 108, 118, 125, 133, 141, 147, 153). Spitzen also relies upon this conclusion that the charities are controlled by Hamas as evidence that Interpal is providing funding to Hamas. Id. (Spitzen NW Rep. at 32-33).

**RESPONSE:** Admit that among the HAMAS-affiliated organizations whose relationships with each charity are considered by Mr. Spitzen in evaluating this factor are one or more of the other 13 organizations. As noted repeatedly by the U.S. (*see* designations of HLF, Interpal, CBSP, ASP, Al Aqsa Foundation, the Union of Good, PVOE, etc.), U.K. (HLF, Al Aqsa Foundation),

German (Al Aqsa Foundation), Canadian (HLF, Interpal, Al Aqsa Foundation) and Israeli (HLF, Interpal, CBSP, ASP, Al Aqsa Foundation, the Union of Good, PVOE, etc.) governments, HAMAS operates a global fundraising network. Common sense, not tautology, suggests that transactions between designated entities evince a connection between them. Mr. Spitzen's analysis appropriately considers the trail of funds from HAMAS's external donors to its local distribution points in the Palestinian Territories.

461.     Spitzen relies upon the factor "The nature of the organization's activities (for example in supporting the families of suicide terrorists and Hamas prisoners, etc…) and its being part of the civilian cover framework supporting terror" as grounds to conclude that a particular charity is part of the Hamas civilian "cover," or da'wa. The statement "being part of the civilian cover framework supporting terror" is his conclusion, not evidence. Id. (Spitzen NW Rep. at 5).

**RESPONSE:** Admit that Mr. Spitzen considers an organization's mission of raising money for the families of suicide bombers and HAMAS prisoners as a factor in analyzing whether that organization is part of the HAMAS Da'wa. Dispute that the statement "being part of the civilian cover framework supporting terror" is his conclusion; an organization focused on raising money for HAMAS terrorists and their families is indisputably more likely to be part of the HAMAS Da'wa than charities focused on other "causes."

462.     Spitzen testified that in performing his analysis for his NatWest report, he did not change his methodology from the methodology he used to reach his conclusions in his CL report. Schuster Dec. Ex. 150 (Spitzen NW Tr. at 46:18-23).

**RESPONSE:** Admit.

463.     According to Spitzen's report, plaintiffs also asked him to provide expert testimony with respect to "whether Osama A.H. El-Kurd, who according to the Nihill & Riedley

report I reviewed, received several transfers from Interpal via NatWest on several occasions is a blood relative of Ahmed Harb Ahmad al-Kurd, the long time head of Al-Salah Islamic Society in Gaza." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 2).

**RESPONSE:** Admit.

464.   Spitzen's report states that Interpal made  bank transfers totaling ███ to the ████████████ between ███ and ███ and that these transfers were made as a ██████████ and received by the beneficiary in ████████████ Id. (Spitzen NW Rep. at 68).

**RESPONSE:**  Admit, except Spitzen's report states that based on the Nihill & Riedley Report, the transfers were made between ███ and ███

465.   Spitzen's report states that "[a]fter analyzing the name of the beneficiary, ████ ████ as it appears in the money transfers, it seems that he was probably the son of Ahmad Harb Ahmad al-Kurd." Id.

**RESPONSE:** Admit.

466.   Spitzen was not asked to opine as to who directed the transfer of funds from Interpal to ██████████ Schuster Dec. Ex. 150 (Spitzen NW Tr. at 57:23-58:3).

**RESPONSE:** Admit.

467.   Spitzen has no knowledge of whether Ahmad al-Kurd, the Al-Salah Society or Hamas had anything to do with the transfers from Interpal to ██████████. I1d. (Spitzen NW Tr. at 61:3-21).

**RESPONSE:**  Dispute as phrased.  Interpal is an SDGT so designated because of its integral role in financing HAMAS.  To the extent (if any) that Interpal and/or al-Salah are distinct from

HAMAS, it is accurate to state that Mr. Spitzen offers no opinion as to whether Ahmad al-Kurd or al-Salah was involved in the transfers.

468.    Spitzen is not opining concerning the use of the funds that were allegedly transferred to ██████████    Id. (Spitzen NW Tr. at 58:4-9).

**RESPONSE:** Admit.

469.    Spitzen has no knowledge that the transfers from Interpal to Osama al-Kurd were used for terrorism. Id (Spitzen NW Tr. at 61:22-62:2).

**RESPONSE:** Admit.

470.    Spitzen has no information that ████████████ is in any way connected to terrorism. Id. (Spitzen NW Tr. at 76:17-21).

**RESPONSE:** Admit to the extent "terrorism" as used in ¶ 470 connotes violent acts.

471.    Spitzen's report states that "[a]pparently, the full name of ██████████ contains two more names, indicated by the letters ██ and ██ It is highly probable that these letters represent the names ██████ and ██████ respectively. Put together, we get the full name: ██████████████████ " Schuster Dec. Ex. 153 (Spitzen NW Rep. at 69).

**RESPONSE:** Admit.

472.    Spitzen's report does not cite any authority or provide any basis for these statements.

**RESPONSE:**  Object that this paragraph is vague and ambiguous.  Dispute.  Spitzen's report states "Ahmad al-Kurd's honorific name is 'Abu Osama.'  In Arab countries, including the Palestinian Authority, it is customary to refer to a person by the name of his first born son. Therefore, it seems that Ahmad al-Kurd is the father of ██████ " Schuster Dec. Ex. 153 (Spitzen NW Report at 69).  Additionally, with respect to the letters ██ and ██ contained in ██████████

Kurd's name, Mr. Spitzen states that "[v]arious websites … mention two other sons of Ahmad al-Kurd, using their full names, which include their father's name: Hamza Ahmad Harb al-Kurd and Suhaib Ahmad al-Kurd (the name of the grandfather does not appear)." *Id.*

473.    Spitzen has never studied genealogy as a profession and has never been hired as a genealogist. Schuster Dec. Ex. 150 (Spitzen NW Tr. at 58:16-20).

**RESPONSE:** Admit.

474.    Spitzen testified that it is possible that the ▮▮▮ in ▮▮▮▮▮▮▮▮▮▮ could stand for ▮▮▮▮▮ and the ▮▮▮ could stand for ▮▮▮▮▮ Id. (Spitzen NW Tr. at 75:18-76:9).

**RESPONSE:** Admit.

475.    Spitzen testified that there was a passport number associated with the wire transfer, but because he did not have access to the Palestinian census, he "couldn't check that it was, indeed, the same person." Id. (Spitzen NW Tr. 66:9-13).

**RESPONSE:** Admit.

476.    Spitzen testified that he does not know for a certainty that the ▮▮▮▮▮▮▮ who received the transfers from Interpal is related to Ahmad al-Kurd of the Al-Salah Society. Id. (Spitzen NW Tr. at 70:8-11).

**RESPONSE:** Admit.

477.    Spitzen's report states that in Arab and Muslim countries, the name ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ "would mean that ▮▮▮ is son of ▮▮▮ and grandson of ▮▮ (Ahmad al-Kurd's father), and is a member of the ▮▮▮ family." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 69).

**RESPONSE:** Admit.

478.    Spitzen's report cites as support for this claim various websites that "mention two other sons of Ahmad al-Kurd, using their full names, which include their father's name: Hamza Ahmad Harb al-Kurd and Suhaib Ahmad al-Kurd (the name of the grandfather does not appear)." Id. (Spitzen NW Rep. at 69 n.350).

**RESPONSE:** Admit.

479.    Spitzen could not recall seeing any specific references in his research to Ahmad al-Kurd having a son named ███████ or having sons other than the two sons he references in footnote 350 of his report, neither of whom is named ███████ Schuster Dec. Ex. 150 (Spitzen NW Tr. at 74:15-75:9).

**RESPONSE:**   Admit that Mr. Spitzen could not recall during his deposition as to whether Ahmad al-Kurd had any other sons other than the two sons referenced in footnote 350 of his report.  However, in Footnote 340 to Mr. Spitzen's report, he states that biographical information concerning Ahmed al-Kurd can be seen in Appendix 1 to his report at pages 256-257.  According to the biographical information contained on pages 256-257 in Appendix 1, Ahmed al-Kurd had seven sons and four daughters.

## III.    UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS

### A.    Background Facts

480.    Because plaintiffs allege that Interpal was financing Hamas, and that NatWest's purported knowledge of (or willful blindness to) that financing proximately caused the 15 attacks at issue, an indispensable element of plaintiffs' proof is that Hamas in fact perpetrated each of those 15 attacks. See Schuster Dec. Ex. 156 (Weiss Fifth Am. Cmpl.); Ex. 157 (Applebaum Cmpl.); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 585 (E.D.N.Y 2005) ("As to plaintiffs' claims premised on their second factual theory -i.e., that the Bank's provision of financial

services constitutes material support to, or financing of, foreign terrorist organizations - plaintiffs acknowledge that they will have to prove that the Bank provided these services to the <u>particular group responsible for the attacks giving rise to their injuries</u>") (emphasis added).

**RESPONSE:** Object to argument in Rule 56.1 Statement. Admit that Plaintiffs carry the burden of proof in demonstrating attribution as to HAMAS'S perpetration of the 15 attacks.

481.    Plaintiffs rely for this element of their claims on the proposed expert testimony of Ronni Shaked, Evan Kohlmann, Shaul Naim, Levitt, Spitzen and Geisser and certain of the documents upon which these individuals rely or, in the case of Naim, purport to authenticate. Schuster Dec. Ex. 174 (Plaintiffs' Resp. to CL Cont. Interrog. no. 13); Ex. 175 (Plaintiffs' Supp. Resp. to CL Cont. Interrog. no. 13).

**RESPONSE:** Dispute. Plaintiffs rely on both expert testimony and a variety of independently admissible evidence in support of this element of their claims, including documents cited in the expert reports of Shaked, Kohlmann and Naim. *Id*. at No. 13 (as to both sets of responses listed above).

**B.**    **The Relevant OFAC Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas**

482.    None of the OFAC designations of Interpal or any of the 13 charities attributes responsibility for any particular terrorist attack to Hamas. Schuster Dec. Ex. 176 (31 C.F.R. Ch. V, App'x A at 603, 690 (2010)).

**RESPONSE:** Dispute. Although the OFAC designation *lists* cited by NatWest contain only the names of those designated entities and individuals, as noted above, certain *designations themselves* include government statements of attribution, including for example, the U.S. Treasury Department's August 22, 2003 designation of Interpal, which included a fact sheet regarding HAMAS perpetration of, among other attacks, the Park Hotel bombing. Israel Dec. Ex.

1 (U.S. Department of Treasury Office of Public Affairs August 22, 2003 Release).

483.    The August 22, 2003 U.S. Department of the Treasury press release accompanying OFAC's designation of CBSP, Interpal, the Association de Secours Palestinien and the Sanabil Association for Relief and Development states the following with respect to four of the 15 attacks:

- "By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people, President Bush stated."

- "During 2002, more than 370 persons -including 10 US citizens -were killed in Israel, the West Bank and the Gaza Strip by acts of terrorism. Hamas was responsible for carrying out more than 50 of these attacks, including shootings, suicide bombings, and standoff mortar-and-rocket attacks against civilian and military targets. The group was responsible for the most deadly Palestinian terrorist attack of the year -the suicide bombings of a Passover gathering at a Netanya hotel that killed 29 Israelis, including one dual US-Israeli citizen. HAMAS's bombing of a cafeteria on the Hebrew University campus, which killed nine, including five US citizens, demonstrated its willingness to stage operations in areas frequented by students and tourists, including US citizens."

- "On June 8 and June 11I HAMAS took credit for attacks against Israelis. The organization also took credit for four suicide bombings in a 24-hour period during the weekend preceding May 20th."

- "On August 19th, a suicide bomber detonated his bomb in the back of a double-length city bus near the border between east and west Jerusalem. According to a CNN report, HAMAS said that it was committed to the cease-fire, but also claimed responsibility, stating that the man was a member of its military wing, the Izzedine al-Qassam Brigades, and the attack came in revenge for the killing of two of its members."

Schuster Dec. Ex. 96 (Hoseason Dep. Ex. 25).

**RESPONSE:** Admit.

484.    The August 2003 press release does not attribute responsibility for the August 19, 2003 or May or June 2003 attacks to Hamas, and instead states only that Hamas claimed credit for these attacks.

**RESPONSE:** Dispute. The August 2003 press release sets forth, in part, the reasons underpinning the U.S. Government's decision to designate certain entities and persons affiliated with HAMAS – including Interpal. Among the U.S. Government's stated reasons was HAMAS's pattern of committing terrorist attacks for which the organization claimed responsibility.

485.    OFAC designates an entity based upon its conclusion that the evidence supporting that designation is sufficient to satisfy an "arbitrary and capricious" standard in a U.S. court. Schuster Dec. Ex. 177 (Aufhauser Testimony at 23).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement.  Dispute inasmuch as the legal conclusion articulated by NatWest, based on a selective excerpt from a statement by an individual official, taken out of context, is incorrect. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.,* authorizes the President to declare a national emergency when an extraordinary threat to the United States arises that originates in substantial part in a foreign state. Such a declaration clothes the President with extensive authority set out in 50 U.S.C. § 1702. Under that section he may investigate, regulate, or prohibit transactions in foreign exchange, banking transfers, and importation or exportation of currency or securities by persons or with respect to property, subject to the jurisdiction of the United States. § 1702(a)(1)(A). The actions of the Treasury Department in designating a person or entity as an SDGT are governed by the judicial review provisions of the APA, 5 U.S.C. § 706(2)(A). In short, OFAC's designation actions must not be arbitrary and capricious and must be based on substantial evidence. *See Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003).

486.    David D. Aufhauser, former General Counsel of U.S. Department of the Treasury, testified before the U.S. Senate on September 25, 2003 that OFAC has "a lesser standard for proceeding under IEPA and under the powers given to OFAC, which basically is an 'arbitrary

and capricious' standard. That is a standard that is alien in many parts of the world. For that reason, you frequently have to try to share and develop more evidence than otherwise you think is required. A lot of the dialogue officially is to convince them that this is enough for them to act." Id.

**RESPONSE:** Object and Dispute. *See* response to ¶ 485.

## C.  The Relevant Israeli Designations Do Not Attribute Responsibility For The 15 Attacks To Hamas

**RESPONSE:** Object to insertion of argument, disguised as a header, into Rule 56.1 Statement.

487.  Interpal and certain of the entities to which Interpal transferred funds from Interpal's accounts at NatWest were designated by the Israeli government as "unlawful associations" and/or "terrorist organizations." Schuster Dec. Ex. 178 (Rashumot Publications).

**RESPONSE:** Admit that Interpal and many of its beneficiaries were designated as unlawful associations and/or terrorist organizations by the Israeli government.

488.  None of the Israeli designations of Interpal or any of the 13 charities attributes responsibility for any terrorist attack to Hamas. Id.

**RESPONSE:** Admit that the designations by the Government of Israel of these organizations as HAMAS affiliates and terrorist organizations do not purport to attribute responsibility for particular terrorist attacks to HAMAS or any other group.

## D.  Dr. Levitt Does Not Attribute Responsibility For The 15 Attacks To Hamas

489.  Plaintiffs proffer Dr. Matthew Levitt as an expert witness whom they have requested to offer opinions regarding whether certain entities that received transfers of funds from Interpal's accounts at NatWest were "controlled by, or alter-egos of, Hamas" at the time NatWest transferred funds to them. Schuster Dec. Ex. 152 (Levitt NW Rep. at 1); Ex. 148 (Levitt NW Tr. at 11: 8-19) (correcting sentence).

175

**RESPONSE:** Admit that this is one of the subjects of Dr. Levitt's expert opinion.

490.    Levitt does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases. Schuster Dec. Ex. 152 (Levitt NW Rep. at 1).

**RESPONSE:** Admit.

**E.    Arieh Spitzen Does Not Attribute Responsibility For The 15 Attacks To Hamas**

491.    Plaintiffs proffer Arieh Spitzen as an expert witness whom they have requested to offer opinions regarding whether certain entities that received transfers of funds from Interpal's accounts at NatWest were "under the control of Hamas or identified with Hamas at the time that National Westminster Bank transferred funds to them." Schuster Dec. Ex. 153 (Spitzen NW Rep. at 1).

**RESPONSE:** Admit that this is one of the subjects of Spitzen's expert opinion.

492.    Spitzen does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases. Id.

**RESPONSE:** Admit.

**F.    Wayne Geisser Does Not Attribute Responsibility For The 15 Attacks To Hamas**

493.    Plaintiffs proffer certified public accountant Wayne Geisser as an expert witness who has purported to review and summarize certain categories of transactions that NatWest processed on behalf of Interpal. Schuster Dec. Ex. 147 (Geisser 2010 Rep. at 1-5).

**RESPONSE:** Admit.

494.    Geisser does not purport to offer any opinions in his report regarding Hamas's responsibility for any of the attacks at issue in these cases. Id.

**RESPONSE:** Admit.

**G.      Ronni Shaked Purports To Attribute Responsibility For The 15 Attacks To Hamas, But His Proposed Testimony Is Inadmissible**

**RESPONSE:** Objection to the insertion of argument, disguised as a heading, into Rule 56.1 Statement.

495.    Plaintiffs proffer Ronni Shaked as an expert witness who purports to opine that Hamas perpetrated the 15 attacks at issue in these cases. Schuster Dec. Ex. 179 (Shaked NW Rep. at 2-3).

**RESPONSE:** Admit that this is one of the subjects of Shaked's expert opinion.

(1)     Shaked is not qualified to offer opinions as to who perpetrated a terrorist attack

496.    Shaked has worked as a reporter for Israel's *Yediot Ahronot* daily newspaper since 1982, id. (Shaked NW Rep. at 1), and in that capacity has written news articles about certain of the 15 attacks.

**RESPONSE:** Admit that this is one of the things that Shaked has done during his employment at *Yediot Ahronot*. He has also interviewed countless HAMAS members, including a number implicated in the attacks at issue here, during this period. Schuster Dec. Ex. 179 (Shaked NW Rep. at 4, 15, 37, 48-9, 51).

497.    Shaked does not have any professional training in determining which terrorist organization is responsible for perpetrating an attack, and he has never before served as an expert in any capacity on that subject. Schuster Dec. Ex. 180 (Shaked CL Tr. at 22:6-23:13).

**RESPONSE:** Dispute. Between 1969 and 1982, Mr. Shaked worked for the ISA, the primary law enforcement agency that investigates which members of a terrorist cell perpetrated an attack in Israel, and while there also received training from the Israel police. Israel Dec. Ex. 149 (Shaked Tr. at 22:6-26:9). The Shaked testimony cited by NatWest simply says that the Israeli law enforcement personnel involved in investigating terrorist attacks, whether they are members

of the ISA or the Israeli Police, focus on the identification and arrest of the individual members of the terrorist cell that committed the attack, rather than concentrating on trying to prove organizational responsibility for the attack. *Id*. Shaked previously has provided expert testimony on attribution for a terrorist attack in Israel.  *Id*. (Shaked Tr. at 90:23-91:16).

498.    Shaked has none of the training, skills and tools for determining which terrorist organization is responsible for perpetrating an attack, which reside with Israeli police, prosecutors and judges, none of whom Shaked has ever been a member. Id. (Shaked CL Tr. at 23:7-29:3).

**RESPONSE:** Object to argument in Rule 56.1 Statement. Dispute. NatWest mischaracterizes Shaked's testimony on the subject, as Shaked neither stated nor implied that the training, skills and tools for making a determination of responsibility solely reside with Israeli police, prosecutors and judges. Indeed, Mr. Shaked testified that the ISA, where he worked between 1969 and 1982, is the <u>primary</u> law enforcement agency that investigates which members of a terrorist cell perpetrated an attack, and also stated that when he worked for the ISA, he received training from the Israel police. Israel Dec. Ex. 149 (Shaked Tr. at 22:6-26:9). Moreover, Mr. Shaked, through both his tenure with the ISA and his intensive and protracted involvement with researching Palestinian terrorism since, aided by his proficiency in Arabic and extensive research, is as qualified as anyone to make these determinations.

499.    Shaked has no academic training in determining responsibility for a terrorist attack. Id. (Shaked CL Tr. at 40:10-44:23, 47:14-52:14).

**RESPONSE:** Dispute. In the testimony cited by NatWest, Mr. Shaked explicitly testified as to various courses that he completed at Hebrew University, taught by the foremost experts on the subjects, on HAMAS, terrorism and suicide bombings, as well as the master's thesis he wrote

explaining the phenomena of suicide bombers in Palestinian society. Obviously, these subjects intrinsically involve analysis and assessment of responsibility by various actors for terrorist attacks.

500.    Shaked's academic studies have focused on the sociological aspects of the Israeli-Palestinian conflict, in particular by pursuing courses in the sociology and political science departments, writing a thesis from a sociological point of view to obtain his master's degree and pursuing a Ph.D. in the field of "searching the ethos of conflict of the Palestinian society," using "tools from psychology [and] social psychology." Id.

**RESPONSE:** Dispute. The excerpt quoted by NatWest is from an answer describing only the topic of Shaked's Ph.D. studies, which he has pursued for one year. As noted in response to ¶ 499 above, Mr. Shaked explicitly testified as to his courses and research on suicide bombings, HAMAS and terrorism. Israel Dec. Ex. 149 (Shaked Tr. at 40:10-44:23; 45:18-23).

501.    Shaked worked for the Israel Security Agency ("ISA") between 1969 and 1982. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1).

**RESPONSE:** Admit.

502.    During the time Shaked worked at the ISA, Hamas did not exist. Schuster Dec. Ex. 180 (Shaked CL Tr. at 45:18-46:4).

**RESPONSE:** Admit that HAMAS did not exist as a formal entity until 1987, but predecessor entities such as al-Mujama al-Islami and al Jam'iya al Islamiya did. *See* Schuster Dec. Ex. 179 (Shaked NW Rep. at 63, n. 245).

503.    Shaked's responsibilities at the ISA did not include determining responsibility for terrorist attacks. Schuster Dec. Ex. 179 (Shaked NW Rep. at 12-13); Ex. 180 (Shaked CL Tr. at 22:10-24).

**RESPONSE:** Dispute. The excerpts of testimony cited by NatWest do not stand for the proposition for which they are cited. The first excerpt concerns Mr. Shaked's statement in his report that the priority of the ISA itself (not Mr. Shaked personally) was to focus on the identification and arrest of the individual members of the terrorist cell that committed the attack, rather than attribution of organizational responsibility. *See also* Response to ¶ 497. The second excerpt concerns Mr. Shaked's role as a handler of Palestinian informants or agents recruited from terrorist cells. ¶ 503 falsely attempts to create the impression that there were investigative positions in the ISA involved in "determining responsibility for terrorist attacks," and that Shaked was involved in some other, unrelated, role.

504.    Shaked has published one book about Hamas and he is working on another. Schuster Dec. Ex. 179 (Shaked NW Rep. at 1); Ex. 180 (Shaked CL Tr. at 57:2-58:2).

**RESPONSE:** Admit that Mr. Shaked has published a book about HAMAS. Dispute NatWest's characterization that Shaked "reports he is working on another" when NatWest itself requested, and was provided with, a manuscript of this second book as part of expert discovery in this case. Schuster Dec. Ex. 180 (Shaked Tr. at 57:8-58:2); Ex. 182 (Shaked NW Dep. Exs. 11 and 11A)**.**

505.    Nothing in any of the books Shaked has published relates to determining how it has been determined that Hamas has perpetrated a particular terrorist attack, except for his statement in his published book that Hamas did not commit the 1992 kidnapping of an Israeli military officer for which it had claimed credit. Schuster Dec. Ex. 180 (Shaked CL Tr. at 58:6-59:24, 60:6-25, 62:5-15, 88:23-95:2); Ex. 181 (Shaked CL Dep. Exs. 9A and 9B).

**RESPONSE:** Dispute. Shaked's first book "talk[s] about responsibility of HAMAS to a lot of attacks during the nineties." Schuster Dec. Ex. 180 (Shaked CL Tr. at 60:22-24). Also, HAMAS did not claim credit for the 1992 kidnapping (and murder) of the Israeli officer. Rather, Mr.

Shaked's investigation led to the conclusion that the kidnappers were a group of HAMAS sympathizers in Hebron who only officially joined HAMAS <u>after</u> the kidnapping and had falsely identified themselves as members of Izz al-Din al-Qassam at the time of the kidnapping. *Id*. (90:10-15). Finally, Mr. Shaked's forthcoming book, the manuscript of which was provided to NatWest, does include attribution of various terrorist attacks to HAMAS. *Id*. at 58:9-24.

  (2) Shaked's proposed testimony attempts to prove responsibility for criminal acts through expert testimony, summarizes hearsay evidence intended to offer a <u>conclusion and opines on the credibility of the evidence upon which he relies</u>

  506. Shaked relies on Hamas claims of responsibility to prove that Hamas committed the attacks at issue in these lawsuits. Schuster Dec. Ex. 180 (Shaked CL Tr. at 203:19-204:3, 217:17-22, 223:2-7); Ex. 179 (Shaked NW Rep. at 28, 42-43, 52-53, 59, 66-67, 72-73, 78-79, 85, 91, 98, 102-04, 110-11, 121-122, 124-26, 128-29).

**RESPONSE:** Dispute. NatWest cites just one portion of Mr. Shaked's reliance materials.  To support his conclusions that HAMAS was responsible for the 15 attacks, Mr. Shaked relies upon a wide variety of evidence, including the following: videotaped "wills" of seven suicide bombers involved in the relevant attacks, at least 900 pages of court records (which include numerous confessions and at least 350 pages of criminal convictions and sentencing of HAMAS operatives who participated in the planning and/or execution of 11 of the attacks); and approximately 700 pages of police reports on 10 of the attacks.  Mr. Shaked also relies on official documents of the Israeli government such as ISA reports, official statements of the Prime Minister's office, and personal (videotaped) interviews with HAMAS operatives who participated in the planning and/or execution of the attacks, as well as photographs of the bombers and/or their handlers dressed in HAMAS regalia, posing in front of HAMAS flags or posters of previous HAMAS "martyrs" and other HAMAS martyrology memorabilia. Schuster Dec. Ex. 179 (Shaked NW Rep. at, *e.g.*, 27-41; evidence for each attack is included chronologically throughout Mr.

Shaked's report).

507.     Shaked quotes or summarizes the contents of Hamas websites and publications or interviews in which Hamas operatives purportedly claimed responsibility for the attacks at issue and concludes, for 13 of the 15 Attacks, that those claims of responsibility "suffice to lead to the conclusion that Hamas carried out the terrorist attack." Schuster Dec. Ex. 179 (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 89-90, 97, 101, 108-09, 120, 127).

**RESPONSE:** Dispute. As discussed in response to No. 506 above, Mr. Shaked relies on a number of different types of evidence before concluding HAMAS responsibility for each attack.

508.     Shaked states that Hamas's declarations of responsibility, statements from other sources about the attacks and records from Israeli civilian and military courts "leav[e] no doubt" that Hamas perpetrated 14 of the 15 Attacks. Id. (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 90, 97, 101, 109, 120, 127, 139); Ex. 180 (Shaked CL Tr. at 75:4-12).

**RESPONSE:** Object that "statements from other sources about the attacks" is vague and ambiguous, and renders ¶ 491 unclear. Admit that based on the evidence cited in his report, Mr. Shaked concludes that he has no doubt that HAMAS perpetrated 14 of the 15 attacks.

509.     For the September 24, 2004 attack in Neve Dekalim, Shaked concludes that Hamas was "apparently involved in the planning and perpetration" of the attack, and that there is only a "high degree of probability" that Hamas was responsible for the terrorist attack, but that he "cannot definitively state" that the attack was carried out by Hamas. Schuster Dec. Ex. 179 (Shaked NW Rep. at 16, 122).

**RESPONSE:** Admit.

510.     Shaked has not personally investigated any of the attacks at issue in these lawsuits or examined any forensic evidence in connection with these attacks. See Schuster Dec. Ex. 180 (Shaked CL Tr. at 23:7-25:10, 216:18-217:4).

**RESPONSE:**  Dispute.  In the testimony on which NatWest relies, Mr. Shaked discussed certain training issues, as well as forensic reports, pertaining solely to the Kiryat Arba attack. Throughout his report, Mr. Shaked references interviews he personally conducted with HAMAS terrorists, including those involved in certain of the 15 attacks. Schuster Dec. Ex. 179 (Shaked NW Rep. at 4, 15, 37, 48-9, 51), and on several occasions, Mr. Shaked personally observed the crime scenes shortly after the attacks occurred. *Id*. at 138-39. Finally, he indisputably investigated each attack in connection with his expert report.

(3)     Shaked's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Shaked had not applied his methods reliably to the facts of these cases

**RESPONSE:** Object to the inclusion of argument, disguised as a header, in Rule 56.1 Statement.

(a)     Shaked's reliance upon Hamas claims of responsibility

511.     Shaked agrees that terrorist groups have multiple motivations for claiming responsibility, and they claim responsibility even when they are not involved in the final perpetration of an attack and deny responsibility for attacks they committed. Id. (Shaked CL Tr. at 80:5-83:12, 83:19-84:12, 111:14-25).

**RESPONSE:** Dispute. NatWest mischaracterizes Mr. Shaked's testimony. Mr. Shaked testified that "in the first hours" following an attack some Palestinian terrorist groups have claimed responsibility for attacks in which they were not involved, but in most cases, within a day or two following an attack the actual responsible group is known. He also testifies that Palestinian terrorist groups have "at times" denied responsibility for attacks they committed. *Id*. (Shaked CL Tr. at 83:19-84:12; 111:14-25).

512.    Shaked wrote in a 2010 manuscript of a book he is seeking to have published that terrorist groups are rivals, and compete to be the first to assume responsibility for attacks against Israel, among other reasons to gain support. Schuster Dec. Ex. 182 (Shaked NW Dep. Exs. 11 and 11A).

**RESPONSE:** Admit that Shaked wrote a manuscript of a second book about HAMAS, which NatWest earlier characterizes as something that Shaked "is working on." ¶ 504. Dispute NatWest's characterization of the conclusion in Shaked's book. In the cited sections, he writes that "there is rivalry between the organizations" but says nothing about terrorist groups claiming responsibility "to gain support." Instead, NatWest attempts to conflate two separate paragraphs in Schuster Dec. Ex. 182 (Shaked NW Dep. Exs. 11 and 11A).  In addition to the above discussion of terrorist rivalry, Shaked <u>separately</u> writes that broadcasting a terrorist's will, among other things, "reinforc[es] in the public the support on the dispatching organization." <u>Id</u>.

513.    The example of the rivalry among terrorist groups Shaked cites in his 2010 manuscript is the January 29, 2004 attack on Bus 19 at issue in this case. He wrote that both Hamas and the Al Aqsa Martyrs' Brigades of Fatah each claimed responsibility for this attack. <u>Id.</u> (Shaked NW Dep. Exs. 11 and 11A); Schuster Dec. Ex. 183 (Shaked NW Tr. at 42:24-46:8).

**RESPONSE:** Admit.

514.    In his published book about Hamas, Shaked wrote that Hamas did not commit the 1992 kidnapping of an Israeli military officer for which it had claimed credit, thereby contradicting his statement in his report that Hamas has "not taken responsibility for a terrorist attack that it did not commit." Schuster Dec. Ex. 179 (Shaked NW Rep. at 5); Ex. 180 (Shaked CL Tr. at 88:6-95:2); Ex. 181 (Shaked CL Dep. Exs. 9A and 9B).

**RESPONSE:** Dispute.   NatWest mischaracterizes Mr. Shaked's book and testimony. As set

forth in Plaintiffs' response to ¶ 505, HAMAS itself did not claim credit for the kidnapping (and murder) of the Israeli officer. Rather, the cell of HAMAS sympathizers that perpetrated the attack falsely claimed to be current members of Izz al-Din al-Qassam, when in fact they officially joined only after the attack. In his deposition, Mr. Shaked agreed that HAMAS's leadership was not aware of the attack, and in his book, he wrote only that two HAMAS spokesmen stated that the attack was "smartly planned and executed" and that one of the spokesmen would mediate an exchange of the Israeli solider for HAMAS leader Sheikh Yassin. Schuster Dec. Ex. 180 (Shaked Tr. at 88:6-95:2); Ex. 181 (Shaked Dep: Exs. 9A and 9B, at p. 7). Thus, Mr. Shaked's statement that HAMAS has not taken "official responsibility" for an attack it did not commit is accurate. Ex. 180 (Shaked Tr. at 120:20-121:4).

515.   Shaked testified that Hamas makes a "[f]alse declaration to deny something when they need it." Schuster Dec. Ex. 180 (Shaked CL Tr. at 120:9-13).

**RESPONSE:** Admit, but NatWest omits Mr. Shaked's next answer, in which he confirms that HAMAS does not falsely take responsibility for attacks it did not commit. *Id*. at 120:14-17.

(b)   Shaked's "very high degree of probability" opinion

516.   Shaked concludes "with a very high degree of probability" that Hamas was "involved in the recruiting, planning and perpetration" of 14 of the 15 attacks at issue in these cases. Schuster Dec. Ex. 183 (Shaked NW Tr. at 50:13-52:8); Ex. 179 (Shaked NW Rep. at 16).

**RESPONSE:** Admit.

517.   Shaked could not provide a particular source for the "very high degree of probability" standard he uses. Schuster Dec. Ex. 183 (Shaked NW Tr. at 52:9-57:19).

**RESPONSE:** Dispute. In the excerpt cited by NatWest, Mr. Shaked testified that he has heard and seen this formulation used a number of times after attacks in the print and broadcast media,

including Al-Jazeera, as well as in his professional experience.

518.    Shaked could not explain the "very high degree of probability" standard in terms of simple percentages. Id. (Shaked NW Tr. at 57:20-58:19).

**RESPONSE:** Object to NatWest's use of "simple percentages," which is both vague and suggests that a precise numerical percentage is possible, let alone required. Admit that Mr. Shaked did not put a particular numerical percentage on the term "very high degree of probability," although he noted his standard requires a very high percentage, and that in terms of the suicide bombings at issue, he had no doubt at all.

519.    When asked what he meant by "very high degree of probability," Shaked responded that "[w]hen we examine the Hamas attacks especially suicide attacks, we can establish with a very high degree of certainty based on a methodology who perpetrated the attack because in such cases the Hamas itself does not hide the facts and they praise and they brag and they glorify their operation." Id. (Shaked NW Tr. at 51:14-52:3).

**RESPONSE:** Admit accuracy of quoted excerpt, except NatWest omits Mr. Shaked's further delineation of the standard used, as set forth in response to ¶ 518.  Dispute that the quoted excerpt is a "tautology."

(c)      Shaked's opinion that Hamas committed the Bus 19 attack

520.    Shaked asserts that "[t]he many detailed declarations which were issued by Hamas with regard to the terrorist attacks on the No. 19 bus, the boasting about the suicide bomber within the organization, and the repeated public declarations in which Hamas expressed its pride in the performance of the terrorist attack on the No. 19 bus and other attacks - all of these confirm that Hamas carried out the terrorist attack" and that "[e]ven if the preparations

were shared, it seems that Hamas was the dominant entity in the last stages of the operation." Schuster Dec. Ex. 179 (Shaked NW Rep. at 139).

**RESPONSE:** Admit that Mr. Shaked makes this statement, but modified his conclusion in subsequent testimony, stating that "HAMAS was an important part of the action or the operation, but not during its execution." Israel Dec. Ex. 150 (Shaked Tr. at 20:2-5).

521.    Shaked relies on the "many detailed declarations" of Hamas's responsibility for the Bus 19 attack, as well as the purported "evidence" Hamas submitted in support of those claims, such as the photographs of the suicide bomber Ali Muneer Ja'ara with Hamas paraphernalia and references to Ja'ara in Hamas's so-called "Book of Martyrs." Id. (Shaked NW Rep. at 128-39).

**RESPONSE:** Admit.

522.    Shaked concludes that "it seems that Hamas was the dominant entity in the last stages of the operation," but offers no factual basis for this statement. Id. (Shaked NW Rep. at 139).

**RESPONSE:** Object to argument in Rule 56.1 Statement. Admit that Mr. Shaked makes this statement, but modified his conclusion in subsequent testimony, stating that "HAMAS was an important part of the action or the operation, but not during its execution."  Israel Dec. Ex. 150 (Shaked Tr. at 20:2-5).

523.    Shaked testified that the suicide bomber Ali Muneer Ja'ara wished to commit a suicide bombing and initially contacted members of Hamas, who photographed him wearing Hamas paraphernalia and videotaped him reading a last will and testament. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:11-24); Ex. 179 (Shaked NW Rep. at 128-132).

**RESPONSE:** Admit, except Shaked also described this conduct in his first Report. Schuster

Dec. Ex. 202 (Shaked Rep. at 132).

524.    Shaked agrees that Ja'ara's collaboration with Hamas members resulted in a failed attempt at a suicide bombing two weeks prior to the attack on Bus 19. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 179 (Shaked NW Rep. at 135, 138); Ex. 185 (Azoulay NW Reb. Rep. at 136, 139); Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208).

**RESPONSE:** Dispute. The record shows that Ja'ara spoke with Nofal Adawin prior to the bombing and informed him that he had obtained a new explosive device from the Al Aqsa Martyrs Brigades.  Schuster Dec. Ex. 179 (Shaked Supp. Rep. at 135, 138).

525.    Shaked also agrees that after the failed attempt two weeks prior to the Bus 19 attack, Ja'ara contacted members of another terrorist group, Hamas' s rival the Al Aqsa Martyrs Brigades (the "AAMB"), which equipped Ja'ara with a new bomb and drove him to the location where he successfully perpetrated the attack on Bus 19. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 179 (Shaked NW Rep. at 137); Ex. 185 (Azoulay NW Reb. Rep. at 136-137).

**RESPONSE:** Admit, and Shaked sets out these facts in his initial Report as well.  Schuster Dec. Ex. 202 (Shaked Rep. at 133-34).

526.    Shaked admitted in his deposition testimony that Hamas's rival the AAMB and not Hamas helped Ja'ara perpetrate the attack on Bus 19, and Hamas was involved only with the prior failed attempted attack in which Ja'ara participated. Schuster Dec. Ex. 180 (Shaked CL Tr. at 77:2-10, 182:25-183:16).

**RESPONSE:** Dispute.  Mr. Shaked did not "admit" that "HAMAS's rival the AAMB and not HAMAS helped Ja'ara perpetrate the attack on Bus 19." He set forth plainly the involvement and responsibility of both terrorist organizations. Schuster Dec. Ex. 179 (Shaked Supp. Rep. at 138-

39).  The question in the first deposition excerpt cited above shows that his deposition testimony was consistent with his report ("Q. As you express later in your report Hamas in your review recruited Mr. Ja'ara for an attack which he did not commit, but then he committed the bus 19 attack with members of the al-Aqsa Martyrs Brigade, correct?").

527.    Shaked stated in his report that the AAMB published a press release initially claiming responsibility for the Bus 19 attack, but that the Fatah group of which the AAMB is a part subsequently denied any responsibility for this attack and that the AAMB has "never repeated" this claim of responsibility on its website. Shaked testified that his only sources for these observations were statements by Hamas about what Hamas claims Fatah said, not any Fatah sources. Id. (Shaked CL Tr. at 156:3-158:17); Ex. 179 (Shaked NW Rep. at 128 n. 420).

**RESPONSE:** Admit.

528.    Shaked did not mention in his report the fact that the AAMB specifically claimed responsibility for the Bus 19 attack on its website one year after the attack, directly contradicting what Shaked states in his report. Schuster Dec. Ex. 183 (Shaked NW Tr. at 86:21 -89:17); Ex. 185 (Azoulay NW Reb. Rep. at 124, 138); Ex. 186 (Azoulay NW Reb. Rep., Annexes B5 and B6); Ex. 187 (Kohlmann CL Tr. at 392:19-394:13).

**RESPONSE:** Admit.

529.    After being presented with this claim, Shaked admitted that the AAMB repeated its claim of responsibility for the Bus 19 attack on its website one year after the attack was committed. Schuster Dec. Ex. 183 (Shaked NW Tr. at 89:12-17).

**RESPONSE:** Admit.

530.    Shaked includes in his report a picture that purports to be of Ja'ara with his written "will," which is the same document that Kohlmann attached to the appendix of his report. Schuster Dec. Ex. 179 (Shaked NW Rep. at 132); Ex. 188 (Kohlmann App'x p. 336).

**RESPONSE:** Admit.

531.    Ja'ara's name appears in this will in a different color ink in comparison to the balance of the text, and appears to be written in different handwriting. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 122).

**RESPONSE:** Admit.

532.    There is no indication in Shaked's report that Shaked considered that this "will" might have been a forgery.

**RESPONSE:** Admit.

533.    Shaked does not cite a third will executed by the suicide bomber Ja'ara in the name of the AAMB, which is posted on the internet at http://palissue.com/saqer/ mp66/Ghad-Garahlimages/ali.jpg.

**RESPONSE:** Admit that Shaked does not mention a third will.

534.    The URL for this third will is no longer accessible. However, a copy of the webpage and an English translation are attached as Annexes B3 and B4 to the Rebuttal Report of Moshe Azoulay. Schuster Dec. Ex. 189 (Azoulay NW Reb. Rep., Annexes B3 and B4).

**RESPONSE:** Admit, *but see* Response to ¶ 533.

535.    According to this will, Ja'ara committed the attack on behalf of the AAMB, Martyr Ayman Jouda Unit. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 123-4); Ex. 189 (Azoulay NW Reb. Rep., Annexes B3 and B4).

**RESPONSE:** Admit, *but see* Response to ¶ 533.

536.    One of the Hamas claims of responsibility for the Bus 19 attack that Shaked cites states that Hamas carried out the attack in revenge for the Israel Defense Forces operation at a location named Al-Zeytoun. Schuster Dec. Ex. 179 (Shaked NW Rep. at 129).

**RESPONSE:** Dispute. One of the HAMAS claims of responsibility that Mr. Shaked cites states that HAMAS carried out the attack for a number of reasons, including an Israel Defense Forces attack on the Zeitun suburb of Gaza City, and that claim of responsibility also states that HAMAS carried out the attack as a "natural response" to the "crimes" generally of the "Zionist enemy" against the Palestinian people, cities, and refugees, as well as a gift to Palestinian prisoners. Mr. Shaked also cites to a separate claim of responsibility that makes no mention of the Zeitun attack. Schuster Dec. Ex. 179 (Shaked Supp. Rep. at 129-30).

537.    According to the court sentence of Kaid El Nashash upon which Shaked relies, Ja'ara's failed attempt to commit the attack allegedly orchestrated by Hamas occurred two weeks before the Bus 19 attack, on or about January 15. Schuster Dec. Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208).

**RESPONSE:** Admit that Shaked cites to this document, which places the first attempt two weeks before the Bus 19 attack.

538.    The Al-Zaytoun operation was a battle between the Israel Defense Forces and Islamic Jihad activists that occurred on January 28, 2004 in the Al-Zeytoun neighborhood of Gaza. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 123); Ex. 190 (Azoulay NW Reb. Rep., Annex B2).

**RESPONSE:** Admit that there was a battle as described.

539.    The actual Bus 19 attack then took place on January 29, 2004, only one day <u>after</u> the Al-Zaytoun operation. Schuster Dec. Ex. 179 (Shaked NW Rep. at 128).

**RESPONSE:** Admit that the Bus 19 attack took place on January 29, 2004.

540.    The Al-Zaytoun operation, which Hamas claimed to be Ja'ara's motivation to commit the Bus 19 attack, occurred <u>after</u> the date of Ja'ara's failed attempt to commit the attack allegedly orchestrated by Hamas. Schuster Dec. Ex. 180 (Shaked CL Tr. at 172:2-173:18); Ex. 185 (Azoulay NW Reb. Rep. at 123).

**RESPONSE:** Dispute. *See* Response to ¶ 536.

541.    Shaked did not reveal in his report that his conclusion that Hamas perpetrated the Bus 19 attack is contradicted by a newspaper article Shaked wrote one day after the Bus 19 attack, in which he identified the bomber as a member of the AAMB and asserted that Hezbollah, not Hamas, was responsible for this attack. Schuster Dec. Ex. 180 (Shaked CL Tr. at 202:18-203:18); Ex. 191 (Shaked CL Dep. Exs. 22A and 22B).

**RESPONSE:** Dispute that the article "asserted that Hezbollah, not HAMAS, was responsible for this attack." Instead, the article describes the growing influence in Palestinian society of Hezbollah, which "encourages" and "pressures" Palestinians to commit terrorist attacks against Israel. The article also mentions the rising power of HAMAS.

542.    Shaked states in his report that "it appears that Ja'ara was not really a member of the Al-Aqsa Martyrs' Brigades." Schuster Dec. Ex. 178 (Shaked NW Rep. at 133). This statement contradicts an announcement from the Israeli Prime Minister's Office that Shaked also cites, which states that "[t]he suicide bomber who committed the attack, Ali Munir Jaara, 23 years old, a resident of the Al Aida refugee camp near Bethlehem, was a member of the AI-Aqsa Martyrs' Brigades, the military wing of the Fatah." Schuster Dec. Ex. 192 (copy of http://www.pmo.gov.il/PMO/ Communication/IsraelUnderAttack/Jerusalem2/Jerusalem.htm).

**RESPONSE:** Admit, though Mr. Shaked explicitly acknowledges the Israeli Prime Minister's

Office's statement in his report, before disagreeing with it based on his conclusion that Ja'ara wanted to carry out the attack, and agreed to do so on behalf of first HAMAS, and then Fatah, and that "as far as he was concerned, the most important thing was to carry out the attack." Schuster Dec. Ex. 179 (Shaked Supp. Rep. at 140).

543.    Shaked states in his report that "[a]fter the terrorist attack, [Nufal] Adawin informed Hamas headquarters of the role which he had played in recruiting and training Ja'ara. It is possible that Adawin even inflated his role, in an attempt to receive additional, and perhaps even greater, funding for future terrorist attacks on behalf of Hamas." Schuster Dec. Ex. 179 (Shaked NW Rep. at 137). Shaked's statement is contradicted by Adawin's and Mahmoud Azia's interrogation statements, upon which Shaked also relies, which indicate that Adawin did not inform Hamas headquarters of anything, but rather merely told Azia that he was responsible for the attack, a statement which Adawin later admitted was false. Schuster Dec. Ex. 193 (Shaked NW Rep., App'x 1076-91 at 1079); Ex. 194 (Shaked NW Rep., App'x 1019-22 at 1021).

**RESPONSE:** Objection to argument in Rule 56.1 Statement. Dispute that the sources on which NatWest relies provide any "indication" of whether Adawin did or did not inform HAMAS headquarters of anything, much less "contradict" Mr. Shaked's suggestion as to Adawin's possible actions, but instead simply relate Adawin's conversation with Azia.

544.    In Adawin's statement to the police, upon which Shaked also relies, he admitted that "the truth is that the Tanzim Fatah carried out this suicide bombing and not I," referring to the AAMB. Schuster Dec. Ex. 195 (Shaked CL Dep. Exs. 19A and 19B).

**RESPONSE:** Dispute. The actual translation provided by NatWest makes no reference to the AAMB.

545.     There is no evidence in any of the documents that Shaked reviewed that Hamas ever funded Adawin in his attempt to perpetrate the Bus 19 bombing. To the contrary, according to Adawin' s testimony and Kaid el Nashash' s sentence, the attempted attack was self-financed by selling private property belonging to Nashash. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 138); Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208); Ex. 195 (Shaked CL Dep. Exs. 19A and 19B).

**RESPONSE:** Objection to argument in Rule 56.1 Statement. Paragraph 530 is an argumentative excerpt lifted from the expert report of NatWest expert Moshe Azoulay. Schuster Dec. Ex. 185 (Azoulay Supp. Rebuttal Rep. at 138, ¶ 6.7.4). Admit Adawin testified that Nashash bought explosives with proceeds of gold that he sold.

546.     Shaked also states in his report that "Adawin took Ja'ara by car toward the intended location for the terrorist attack; however, as they approached the Tunnel Road (south of Jerusalem), they encountered a Palestinian security forces roadblock." Schuster Dec. Ex. 179 (Shaked NW Rep. at 135). This statement contradicts the interrogation statement of Adawin from August 30, 2004, which Shaked omitted from the version of this statement attached to his report as Supplemental Appendix No. 1 pages 1076-91, and which indicates that Adawin and Ja'ara traveled to Jerusalem by foot and not by car as stated by Shaked. Schuster Dec. Ex. 196 (Azoulay NW Reb. Rep., Annex B8).

**RESPONSE:** Object to argument in Rule 56.1 Statement. Shaked's narrative accurately reflects that Adawin and Ja'ara were unable to reach their intended target during that first attempt. The fact that one interrogation statement provided a slightly different *version* of an irrelevant detail indicates only a disputed immaterial fact, not a material statement of undisputed fact.  The 27th Count of Mr. Adawin's indictment states that: "After the Accused and his accomplice had

covered a considerable part of the journey, and had reached a point close to the tunnels road, they noticed a road barrier of the Palestinian security forces, and retraced their steps." Schuster Dec. Ex. 196 (Azoulay Supp. Rebuttal Rep., Annex B8).

547.    Shaked did not refer to other documents that attribute responsibility for the Bus 19 attack to the AAMB, including an Intelligence and Terrorism Information Center (ITIC) bulletin dated January 1, 2006; a report of the Homeland Security Department of the RAND organization; and a 2010 Counterterrorism Calendar posted on the website of the U.S. National Counterterrorism Center. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 140-42); Exs. 197-99 (Azoulay NW Reb. Rep., Annexes B9-B 11); Ex. 183 (Shaked NW Tr. at 89:18-91:2, 92:18-94:16, 97:9-98:10, 102:7-21).

**RESPONSE:**  Object to argument in Rule 56.1 Statement. As noted in both of his reports and all of his depositions, Mr. Shaked has consistently described AAMB's role in the attack. Dispute that the documents cited by NatWest demonstrate that HAMAS did not play a role in the Bus 19 attack.  None of them address how to assign responsibility for a terrorist attack or analyze or discuss any evidence concerning the genesis, planning, perpetration, or prosecutions in connection with the Bus 19 attack.  Note further that other materials published by the RAND Corporation acknowledge that HAMAS has claimed responsibility for the Bus 19 Attack.  *See* Israel Dec. Ex. 158 (RAND Database of Worldwide Terrorism Incidents, Results regarding Bus 19 Attack available at http://smapp.rand.org/rwtid/incident_detail.php?id=17934).

548.    Shaked states in his report that he reviewed documents from the investigation of the Bus 19 attack. Schuster Dec. Ex. 179 (Shaked NW Rep. at 137).

**RESPONSE:** Objection, vague as to "documents from the investigation."  In CL's 56.1 Statement ¶ 534, Plaintiffs admitted that Mr. Shaked states in the referenced page of his report

that he reviewed the documents from the Israel Police investigation; Mr. Shaked does not refer to a specific "investigation file."

549.    Shaked states in his report that these documents indicate Hamas members were "convicted of involvement in the terrorist attack" on Bus No. 19. Id. (Shaked NW Rep. at 133-34).

**RESPONSE:** Admit that Shaked's report states that Adawin, Azia, Maqdad, Radab, and Nashash were convicted for involvement in the terrorist attack. Dispute that Shaked described reviewing any specific investigation file.

550.    Shaked also states in his report that "judiciary proceedings in Israel have imposed partial responsibility on Hamas . ..." (Shaked NW Rep. at 136).

**RESPONSE:** The full sentence from which NatWest excerpts a portion states: "In spite of the fact that Hamas proudly assumed responsibility for this terrorist attack, and in spite of the fact that judicial proceedings in Israel have imposed partial responsibility on Hamas, a brief discussion of the situation in which Hamas found itself in 2004 will be useful in clarifying the context in which the terrorist attack was carried out and clearing up any initial confusion as to the terrorist attack and its relationship to Hamas." *Id*.

551.    Shaked reviews in his report the sentences issued against Nufal Adawin and Muhamed Azia, who he states were involved in perpetrating the Bus 19 attack on behalf of Hamas. Shaked also reviews the sentences of Abed AlRahman Yusef Mukadad, Ahmed Abu Radab and Halmi Abed AlKarim Muhammad Hamash, the members of the AAMB who he concludes were convicted of "involvement" in the attack, while Mukadad was also convicted of preparing the bomb used in the attack. Id. (Shaked NW Rep. at 133-35); Ex. 185 (Azoulay NW Reb. Rep. at 135).

**RESPONSE:** Admit.

552.    Both Adawin's and Nashash's sentences indicate that they were not convicted for perpetrating the Bus 19 attack. Further, in connection with the Bus 19 attack, Adawin was charged with the failure to prevent an offense, not perpetrating an offense. Schuster Dec. Ex. 184 (Shaked CL Dep. Exs. 17A and 17B at 208); Ex. 204 (Shaked CL Dep. Exs. 18A and 18B at 212-13); Ex. 180(Shaked CL Tr. at 186:15-193:8).

**RESPONSE:** Dispute. Adawin was convicted of conspiring to commit the Bus 19 attack, and the sentence states that "even though the Accused was not ascribed with direct legal responsibility for these matters, it should be kept in mind that as a result of the preparations made by the Accused, a suicide bombing attack was finally executed and took the lives of 11 people while injuring many more." Schuster Dec. Ex. 204 (Shaked Dep. Exs. 18A and 18B). Nashash's role in the attack on behalf of HAMAS is also noted in his conviction.

553.    Shaked does not mention a third sentence contained in the police investigation file for this attack that NatWest's expert Moshe Azoulay was permitted to review, of Abu Karandal. Schuster Dec. Ex. 179 (Shaked NW Rep. at 133-35); Ex. 185 (Azoulay NW Reb. Rep. at 135).

**RESPONSE:** Admit that Mr. Shaked does not describe this sentence, as described by Mr. Azoulay.  Because neither NatWest nor Azoulay provided this document to Plaintiffs, Plaintiffs are unable to dispute or admit Azoulay's description of this sentence.

554.    According to the court sentences NatWest's expert Moshe Azoulay was permitted to review in the Israel Police investigation file for the Bus 19 attack, the role of the AAMB in this attack was not one of merely, as Shaked states, being "involved" in the attack, but rather of taking the initiative to perpetrate this attack, procuring explosives for it, preparing the bomb for

it and mobilizing the carrier, Ja'ara, and transporting him to the area of the attack. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 135-36).

**RESPONSE:** *See* Response to ¶ 553.

555.    Contrary to Shaked's statement that "even were the preparations made jointly, it seems that Hamas was the dominant organization in the final stages of the operation," the sentences of the AAMB members that Azoulay was permitted to review in the Israel Police file for the Bus 19 attack indicate that it was they, and not members of Hamas, who were dominant in and responsible for all stages of carrying out the attack. Id. (Azoulay NW Reb. Rep. at 135-37).

**RESPONSE:** Object. *See* Response to ¶ 553. *See also* Response to ¶ 520 (explaining Shaked's clarification that "HAMAS was an important part of the action or the operation, but not during its execution.").

556.    Azoulay's review of the Israel Police file indicates that the Bus 19 attack was not carried out in stages. According to the contents of the Israel Police investigation file that Azoulay was permitted to review, there were two different and separate events. The first event in which the file indicates Hamas members (Adawin and Azia) were involved was the attempted attack that failed. Id. (Azoulay NW Reb. Rep. at 136-37).

**RESPONSE:** Object to reference to purported file never produced to Plaintiffs, and to NatWest's summary of the purported file ("[T]here were two different and separate events."). Dispute that the fact, admitted by Mr. Shaked from the outset, that the first attempt was two weeks before the bombing itself demonstrates that the two events were unrelated, since the suicide bomber initially recruited by HAMAS ultimately executed the suicide bombing in question.

557.     In reference to the failed event in which Hamas members Adawin and Azia were involved, Adawin declared in his statement to the police that "I wanted to send Ali Ja'ara to commit a suicide attack in Jerusalem but it didn't happen." Schuster Dec. Ex. 193 (Shaked NW Rep., App'x 1076-91 at 1076).

**RESPONSE:** Admit.

558.     The second event was the January 29, 2004 attack on Bus 19, which succeeded. The contents of the Israel Police investigation file that Azoulay was permitted to review indicate that this attack was carried out in whole, starting with the planning stage through to completion of the operation, by members of the AAMB, together with unorganized military activists. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 136-37).

**RESPONSE:** Object and Dispute. *See* Response to ¶ 553.

559.     There is no indication in the Israel Police investigation file for the Bus 19 attack that Azoulay was permitted to review that anyone involved in the attack was a member of Hamas. Id.. (Azoulay NW Reb. Rep. at 136-37).

**RESPONSE:** Object. *See* Response to ¶ 553.

560.     Adawin was convicted and sentenced only with respect to the attempted attack, and not the actual Bus 19 attack. Id. (Azoulay NW Reb. Rep. at 137); Ex. 204 (Shaked CL Dep. Exs. 18A and 18B at 212-13); Ex. 180 (Shaked CL Tr. at 189:18-193:8).

**RESPONSE:** Object to "*id*" citation to the purported "Israel Police investigation file" ostensibly shown to Azoulay. *See* Response to ¶ 553. Dispute that Adawin was convicted "only" with respect to the attempted attack, and not the "actual Bus 19 attack." Adawin was convicted conspiring to commit the Bus 19 attack, and the sentence states that "Even though the Accused was not ascribed with direct legal responsibility for these matters, it should be kept in mind that

<u>as a result of the preparations made by the Accused</u>, a suicide bombing attack was finally executed and took the lives of 11 people while injuring many more." Schuster Dec. Ex. 204 (Shaked Dep. Exs. 18A and 18B) (emphasis added).

561.    Had the court believed that the Bus 19 attack involved a single ongoing offense, it would have convicted Adawin of intentionally causing the deaths of the victims of the Bus 19 attack and sentenced him to life imprisonment for each of these deaths, as it did with respect to those who were convicted of the actual perpetration of the Bus 19 attack. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 137).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Note that Adawin's sentence itself specifically states that the Bus 19 attack occurred "as a result of preparations made by" Adawin. Schuster Dec. Ex. 204 (Shaked Dep. Exs. 18A and 18B).

562.    The sentences copied from the Israel Police investigation file that Azoulay was permitted to review indicate that there is no substantiation for the conclusion that the January 29, 2004 Bus 19 attack was perpetrated by Hamas. <u>Id.</u> (Azoulay NW Reb. Rep. at 135-36).

**RESPONSE:** Object to reliance on a document purportedly viewed by NatWest's experts but not produced to Plaintiffs. Object to argument in a Rule 56.1 Statement. Dispute that there is no evidence that HAMAS bears partial responsibility for Bus 19 attack, as set forth in responses to ¶¶ 520-561 above.

563.    The contents of the file Azoulay was permitted to review demonstrate that Shaked relies upon documents that are not in the Israel Police investigation file, and does not credit documents that are found in that file. <u>Id.</u>

**RESPONSE:** Object to reliance on a document purportedly viewed by NatWest's experts but not produced to Plaintiffs. Object to argument in a Rule 56.1 Statement.

564. The military indictment that accuses Abdel Rahman Mukadad of responsibility for preparing the bomb for the Bus 19 attack, attached to the Naim Report, does not accuse Mukadad of being a member of Hamas. Id. (Azoulay NW Reb. Rep. at 120).

**RESPONSE:** Admit.

565. Further, according to Shaked, Mukadad was a member of the AAMB. Schuster Dec. Ex. 179 (Shaked NW Rep. at 135).

**RESPONSE:** Admit.

566. Likewise, the military indictment that accuses Ahmad Salah of being the person responsible, together with Mukadad, for preparing the bomb that was used in the Bus 19 attack and for recruiting the suicide bomber, attached to the Naim Report as Exhibit A for the Bus 19 attack, accuses Salah not of being a member of Hamas, but rather of being a member of the AAMB. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 120, 136).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Subject to the objection, admit.

567. The military indictment that accuses Muhamad Ma'ali of leading the suicide bomber to Jerusalem to perpetrate the Bus 19 attack, attached to the Naim Report as Exhibit D for the Bus 19 attack, does not accuse Ma'ali of being a member of Hamas. Id. (Azoulay NW Reb. Rep. at 120-21).

**RESPONSE:** Admit.

568. According to Shaked, Ma'ali was also a member of the AAMB and not Hamas. Schuster Dec. Ex. 179 (Shaked NW Rep. at 138). 569. Likewise, the military indictment that accuses Ali Muhamad Abu Halail of being the person responsible for initiating and planning the Bus 19 attack, attached to the Naim Report as Exhibit B for the Bus 19 attack, does not accuse Halail of being a member of Hamas. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 121).

**RESPONSE:** Admit.

569. Likewise, the military indictment that accuses Ali Muhamad Abu Halail of being the person responsible for initiating and planning the Bus 19 attack, attached to the Naim Report as Exhibit B for the Bus 19 attack, does not accuse Halail of being a member of HAMAS. Schuster Dec. Ex. 185 (Azoulay NW Reb. Report at 121).

**RESPONSE:** Admit.

570. According to Shaked, Abu Halail was a member of the AAMB and not a member of Hamas. Schuster Dec. Ex. 179 (Shaked NW Rep. at 138).

**RESPONSE:** Admit

571. The military indictment cited in footnote 450 of Shaked' s report accuses Hilmi Abd al-Karim Muhammad Hamash of being a member of the AAMB, and of being the person who directly recruited the suicide bomber, Ja'ara, who committed the Bus 19 attack and for causing the death of all the victims of the attack. Schuster Dec. Ex. 200 (Shaked NW Rep., App'x 1066-75).

**RESPONSE:** Admit, except the indictment accuses Hamash of "contacting," not "recruiting" Ja'ara and of being a party to the intentional causing of death, not "causing the death of all the victims of the attack."

572. According to Shaked, Hamash was convicted for perpetrating the Bus 19 attack as a member of the AAMB. Schuster Dec. Ex. 179 (Shaked NW Rep. at 135).

**RESPONSE:** Dispute. Mr. Shaked's report states that Hamash was convicted of "fulfilling his role in the terrorist attack and membership in" AAMB.

573. Shaked later admitted in his deposition testimony that none of the Hamas members he identified was convicted of actually perpetrating the Bus 19 attack, and that each of

the AAMB members Shaked identified were all convicted of intentionally causing the death of those killed in the Bus 19 attack. Schuster Dec. Ex. 180 (Shaked CL Tr. at 186:15-202:3).

**RESPONSE:** Admit, although as noted above, HAMAS members <u>were</u> convicted of conspiracy to commit the Bus 19 attack. *See* Response to ¶ 552 above.

574.    These findings also indicate that Hamas's claim of responsibility for the Bus 19 attack is inconsistent with the findings of the military court concerning this attack. <u>See</u> Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 131, 142-144)

**RESPONSE:**  Objection to argument in a Rule 56.1 Statement. Dispute that AAMB's role in the bombing absolves HAMAS for its role.

575.    Several of the sources cited by Shaked contradict both his and plaintiffs' expert Evan Kohlmann's claim that Hamas's claim of responsibility for the Bus 19 attack is credible.

**RESPONSE:** Object to vague and ambiguous reference to "sources."  Dispute. NatWest does not rely on any evidence for this claim, and Plaintiffs are unable to determine on which "sources" NatWest relies.

576.    Certain Israel Security Agency reports and conclusions cited by Shaked in his expert report state that the AAMB and not Hamas claimed responsibility for the Bus 19 attack. Schuster Dec. Ex. 179 (Shaked NW Rep. at 132-33, 139); Ex. 185 (Azoulay NW Reb. Rep. at 119).

**RESPONSE:** Admit that certain initial reports did indicate that the AAMB, or the AAMB jointly with HAMAS, claimed responsibility for the Bus 19 attack. Object to vague and ambiguous reference to "certain ISA reports and conclusions cited by Shaked."

577.    The Israeli Foreign Ministry website publication cited by Shaked states that both Fatah and Hamas claimed responsibility for the Bus 19 attack. Schuster Dec. Ex. 201 (copy of

http://www.mfa.gov.i1/MFA/MFAArchive/2000_2009/2004/l1/Suicide+bombing+

of+Egged+bus+no+ 19+in+Jerusalem+-.htm).

**RESPONSE:** Admit.

> (d)   Shaked's opinion that Hamas committed the March 7, 2003 Kiryat Arba attack

578.    Shaked initially opined in his report submitted in the companion lawsuits against CL that two Hamas terrorists, Fadi Ziad al-Fakhuri and Safian al-Haraz, were among the perpetrators of the attack in Kiryat Arba in March 7, 2003. Schuster Dec. Ex. 202 (Shaked CL Rep. at 71-75).

**RESPONSE:** Dispute. Mr. Shaked opined that al-Fakhuri and al-Haraz were among the perpetrators of the attack, in addition to Abdallah Ahmad Abu Seif and Basel Qawasmeh. Schuster Dec. Ex. 202 (Shaked Rep. at 71-75).

579.    In his initial CL report, Shaked relied upon Hamas claims of responsibility, photographs and the wills of the attackers, along with the indictment and conviction of a purported co-conspirator. Id.

**RESPONSE:** Admit that this was among the evidence relied upon by Mr. Shaked.

580.    In his initial CL report, Shaked stated that Fadi Ziad al-Fakhuri and Safian al-Haraz were responsible for this attack because that is what he read on websites he attributes to Hamas and in an indictment of an alleged co-conspirator. Id.

**RESPONSE:** Admit that Mr. Shaked relies upon these sources in his report, as well as others, including HAMAS claims of responsibility, official Israeli announcements, Israeli judicial processes, and media reports. Id. at 71-75, n. 265-285. Mr. Shaked was also at the crime scene on the night of the murders.

581.    Subsequently, Shaked offered a different analysis in his supplemental report as to which individuals were responsible, based upon his conclusion that both the indictment and the Hamas statements he had originally relied upon were inaccurate. Schuster Dec. Ex. 203 (Shaked CL 3/7/03 Attack Rep. at 1-3).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute that above-referenced portion of Shaked's supplemental report reflects "a different analysis." Rather it reflects confusion between two HAMAS attacks perpetrated at the same time by the same cell, confusion which appeared to impact the Abu Saif indictment and Fakhuri statement, however neither changed Mr. Shaked's conclusion that HAMAS perpetrated the attack.

582.    In his supplemental CL report, Shaked stated that the attack was "probably not" committed by the individuals he originally identified, but it "most likely" was committed by two others. Id. (Shaked CL 3/7/03 Attack Rep. at 1, 4).

**RESPONSE:** Admit that Shaked's detection of an inconsistency in the Abu Saif indictment led to his re-evaluation of the evidence and to ultimately conclude that two other HAMAS members had committed the attack, but Shaked confirmed that the attack was committed by the same HAMAS cell as he had originally concluded. *Id.*

583.    Shaked explained in his deposition testimony that he changed his opinion because, upon "reading the documents again," he discovered facts that he could not reconcile with his original theory that al-Fakhuri and al-Haraz had committed the attacks. Id. (Shaked CL 3/7/03 Attack Rep. at 1-3); Ex. 180 (Shaked CL Tr. at 205:13-206:5).

**RESPONSE:** Admit that Shaked re-evaluated his opinion based on discrepancies in the Abu Saif indictment. Dispute NatWest's characterization that Shaked "could not reconcile" these inconsistencies "with his original theory."

584.     Shaked testified that there were several inaccuracies in the indictment, the Hamas websites and the Hamas "Book of Martyrs" he initially relied upon. Schuster Dec. Ex. 180 (Shaked CL Tr. at 209:23-216:17).

**RESPONSE:** Admit.

585.     Shaked also stated that his revision of his opinion concerning this attack was based in part upon his "talking with people." Id. (Shaked CL Tr. at 207:7-208:12).

**RESPONSE:** Dispute. Mr. Shaked stated in the above excerpt that his revision, in part, was based on speaking with people, including a HAMAS member.

586.     Shaked admitted that the only persons he spoke to regarding the Kiryat Arba attack were a "sports businessman" friend, a stone merchant friend and a Hamas member serving in the Palestinian Authority's legislative council. Schuster Dec. Ex. 183 (Shaked NW Tr. at 113:21-118:12).

**RESPONSE:** Dispute. Mr. Shaked stated in the above excerpt that he spoke with Sayid Jabari, a public figure in Hebron, Abu Kamel Zaru, Fakhuri's neighbor, and Nizar Ramadam, a member of HAMAS serving in the PA legislative council from Hebron. That defense counsel asked, and obtained, these men's day jobs does not make them less knowledgeable about the attacks or HAMAS.

587.     Shaked stated in his supplemental CL report that "the only definitive way" to confirm the identities of the perpetrators "would be to obtain the forensic reports for the dead terrorists," which he has not done. Schuster Dec. Ex. 203 (Shaked CL 3/7/03 Attack Rep. at 3); Ex. 180 (Shaked CL Tr. 216:18-217:4).

**RESPONSE:** Admit.

588.    Shaked further testified that "even today Hamas[,] even today[,] have misunderstanding who did that operation." Id. (Shaked CL Tr. at 19:3-15).

**RESPONSE:** Admit.

589.    Shaked further testified that "[w]e are dealing with terrorism. We are dealing with things that are not always clear at the time that it happened. We are dealing with [an] organization that even themselves they don't know exactly what happen[ed] and how it's happened[,] therefore sometimes there is []new evidence coming." Id. (Shaked CL Tr. at 18:7-19).

**RESPONSE:** Admit that the quotation is accurate, however NatWest omits the rest of Mr. Shaked's answer that, "as a researcher, as a man who is following at least day by day on this subject I found that something was not really correct, possibly not correct so I went to check again with my sources, with other sources that I found and therefore I needed to correct it." *Id*. (Shaked CL Tr. at 18:14-19). Mr. Shaked illustrated what he meant when he said that "[an] organization that even themselves they don't know exactly what happened" in the case of the Kiryat Arba attack where he noted, "[b]ecause the four Hamas Hebron Cell members carried out their missions at approximately the same time and none of them survived the two attacks, Hamas's media outlets (including the Al-Qassam Fakhuri Statement) may have been uncertain, or incorrectly jumbled certain details regarding the two attacks." Schuster Dec. Ex. 203 (Shaked Supp. Rep. With Respect to the March 7, 2003 Attack Shaked at 3).

       (e)    Shaked's failure to analyze the significance of the absence of evidence concerning responsibility for an attack

590.    For 14 of the 15 attacks, Shaked proposes to testify that he has "no doubt" that Hamas committed the attacks, regardless of whether he has relied upon multiple different types of "evidence" (such as videotaped wills, photographs of the attackers in Hamas clothing, or

convictions of Hamas members who aided the attacker) or just one type of "evidence" (a Hamas claim of responsibility and nothing else). Schuster Ex. 179 (Shaked NW Rep. at 41, 51, 57, 65, 71, 77, 83, 88-90, 97, 101, 108-09, 120, 127, 139).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute. As to each attack, as demonstrated by the referenced pages above, Mr. Shaked relies on a number of different types of evidence.

    (f)    Shaked's failure to consider the timing of claims of responsibility in relation to <u>when attacks occurred</u>

591.    Hamas's purported "official announcement" claiming responsibility for the May 7, 2002 attack was published in June 2008, more than six years after the attack took place. <u>Id.</u> (Shaked NW Rep. at 42).

**RESPONSE:** Dispute. As the above-referenced portion of Mr. Shaked's report indicates, HAMAS's initial announcement of responsibility occurred soon after the attack, and its official announcement occurred in June 2008.

592.    Shaked opines that Hamas withheld the suicide bomber's name to protect his family. <u>Id.</u> (Shaked NW Rep. at 43); Ex. 180 (Shaked CL Tr. at 217:17-222:25).

**RESPONSE:** Dispute that Shaked's testimony, in response to counsel's question about why HAMAS waited to officially claim responsibility, was speculative as opposed to an appropriate inference based on his knowledge and expertise.

593.    Hamas also purportedly issued a late "official announcement" claiming responsibility for the April 30, 2003 attack at Mike's Place, when that announcement was first published on March 8, 2004. Schuster Dec. Ex. 179 (Shaked NW Rep. at 78-79).

**RESPONSE:** Dispute. As the referenced excerpt of Mr. Shaked's report states, HAMAS assumed responsibility at the time of the attack, and published an official announcement on

March 8, 2004.

594.    Hamas also purportedly issued late claims of responsibility for the January 29, 2003 roadside shooting on Road 60 in 2004 and on February 15, 2006. Id. (Shaked NW Rep. at 59).

**RESPONSE:** Dispute. As the referenced excerpt of Mr. Shaked's report states, HAMAS wrote a report about the attack in 2004, and published a report on February 15, 2006.

595.    According to Jenkins, late claims of responsibility must be discounted in an analysis of responsibility, absent a compelling explanation for the delay. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 49-50). Indeed, in June 2008, according to one scholar Hamas's military wing claimed responsibility for a number of previously unclaimed attacks "in an apparent effort by ... senior leaders to undermine a ceasefire with Israel." Id. (Jenkins NW Rep. at 49) (citing Beverly Milton-Edwards and Stephen Farrell, Hamas: The Islamic Resistance Movement, Cambridge, UK: Polity Press (2010), pp. 129-130).

**RESPONSE:** Objection to argument in a Rule 56.1 Statement. Object to reliance on thinly disguised speculation (characterizing Izz al-Din al-Qassam claim as "apparent effort" to undermine ceasefire) for assertion in purported Statement of Undisputed Facts. Jenkins, who was unable to even name the Prime Minister of HAMAS when asked at deposition, is wholly unqualified to opine on HAMAS.

         (g)    Shaked relies upon information that is not publicly available, and therefore not verifiable

**RESPONSE:** Object to the inclusion of argument, disguised as a heading, in a Rule 56.1 Statement.

596.    Shaked relies upon confidential police records he claims to have received from a "special connection" in the Israeli police that are not available to the public. Schuster Dec. Ex. 180 (Shaked CL Tr. at 132:23-134:9).

**RESPONSE:** Admit that Shaked received records from the Israeli police. Object to description as "confidential" to the extent this implies that NatWest was not provided with copies of all documents relied upon by Shaked.

597.    Shaked relies upon confidential court files he claims to have received from Hamas defense lawyers that are not available to the public. Id. (Shaked CL Tr. at 135:14-137:19).

**RESPONSE:** Admit that Shaked received certain court records from defense lawyers for HAMAS defendants. Note that the testimony cited does not indicate that these were unavailable to the public and that NatWest was provided with copies of all documents relied upon by Shaked.

598.    Shaked relies upon confidential documents he claims to have received from a friend at a Tel Aviv court that are not available to the public. Id. (Shaked CL Tr. at 140:10-141:23).

**RESPONSE:** Dispute. The testimony cited does not refer to a "friend" or a "Tel Aviv court," and makes clear that "if somebody cares to get [the records in question] he has all the right to go to the court and get it." *Id*. (Shaked CL Tr. at 140:7-9). Admit that Shaked later testified that he received certain confidential documents regarding the Park Hotel bombing from a friend who worked at a court in Tel Aviv. *Id*. at 141:20-23. However, Shaked further testified that "because most of the cases were in 2002, 2003, 2004 and it's not anymore confidential." *Id*. at 142:2-4.

      (4)     The documents upon which Shaked relies are inadmissible hearsay under Israeli evidence law

          (a)     The Israeli civilian court convictions, sentences and related court and police records upon which Shaked relies are inadmissible hearsay under Israeli evidence law

**RESPONSE:** Object to legal arguments posing as headings in Rule 56.1 Statement.

599.    Shaked relies upon convictions issued by Israeli civilian courts in relation to the following attacks: May 7, 2002; March 5, 2003; and September 9, 2003. Schuster Dec. Ex. 179 (Shaked NW Rep. at 46-47, 68-70, 116).

**RESPONSE:** Admit that among the evidence that Mr. Shaked considered for the above attacks are convictions.

600.    Shaked also relies upon Israeli civilian court indictments, testimony and other court and police records throughout his report.

**RESPONSE:** Admit that these are also among the documents on which Mr. Shaked relies.

601.    Under Israeli law, (a) verdicts and sentences issued by Israeli courts, (b) verdicts and sentences issued by military courts in the Palestinian Territories, (c) indictments submitted to courts in Israel or to military courts, (d) testimony of accused persons and others given to the Israel Police, (e) evidence collected by the police or the ISA for filing in a criminal procedure, (f) reports of the Israeli Police and the Institute of Forensic Pathology in Israel and (g) press announcements issued by different government offices in Israel and military inquiries, would all be inadmissible as hearsay in a civil lawsuit in an Israeli court seeking damages from a defendant that was not a party to the investigations or prosecutions from which these documents originate, and seeking relief on the ground that the defendant had some responsibility for the attacks that are the subjects of these documents. Thus, they could not be received in evidence as proof of the matters asserted in those documents, unless and to the extent any of these documents qualified

211

under an exception to the rule of Israeli law that generally excludes such hearsay evidence. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 14-16); Ex. 185 (Azoulay NW Reb. Rep. at 16-17, 65-67).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.[2]

602.    A basic premise of Israeli evidence law is that a judgment that was rendered in one trial cannot serve as evidence in another trial, unless there is a specific provision of law that explicitly permits it. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 18-20).

**RESPONSE:** Object. *See* Response to ¶ 601.

603.    Article 42A of the Israeli Evidence Ordinance permits a civil defendant to submit a criminal judgment as evidence in a subsequent civil trial so long as the following requirements are met: (a) the judgment is final and convicting; (b) the judgment was issued by an Israeli court; (c) the only admissible section of the judgment is the verdict; and (d) the defendants in the civil case are legally responsible for the actions of the person convicted in the criminal judgment according to one of four categories of legal responsibility established by law. Id. (Azoulay NW Rep. at 21-24, 41-43).

**RESPONSE:** Object. *See* Response to ¶ 601.

604.    The third condition for the admissibility of a criminal judgment as evidence in a civil lawsuit requires either that the convicted person is a party in the civil lawsuit, or the

---

[2] Because issues in this litigation, including the admissibility of evidence, will be governed by American law, Plaintiffs will move at the appropriate time to exclude this foreign law opinion. Plaintiffs have not so moved to this point because the Court can decide the parties' summary judgment motions without reaching this issue, but Plaintiffs explicitly reserve the right to move to exclude the opinions of all of NatWest's foreign law experts at the appropriate time. Plaintiffs also reserve the right to make an appropriate submission in the unlikely event that the Court deems issues of foreign law relevant and prepares to resolve such issues. Obviously, even if relevant, a Rule 56.1 Statement is not the proper place to set forth these legal arguments.

judgment is offered against a party that was not a party to the criminal proceeding but is a
"proxy" or someone whose liability for the alleged damages in the civil lawsuit arises from the
liability of the convicted person, including whoever is obligated to pay the judgment debt of the
convicted person. Id. (Azoulay NW Rep. at 41).

**RESPONSE:** Object. *See* Response to ¶ 601.

605.   The term "proxy" refers to a legal link, or a link of closeness between the
convicted person and the proxy such as the link between a benefactor and a beneficiary. Id.
(Azoulay NW Rep. at 42).

**RESPONSE:** Object. *See* Response to ¶ 601.

606.   The second alternative - someone whose liability for the alleged damages in the
civil lawsuit arises from the liability of the convicted person - refers to a situation in which a
third party is liable (or exempt from liability) for the action of the convicted person, including
whoever is obligated to pay his judgment debt. Thus, for instance, in certain cases, where there is
an employee-employer relationship, an employer is liable for the criminal actions of his or her
employee. Similarly, in the case of a relationship between an insurer and a policy holder, the
insurer must pay for the actions of the policy holder. Id. (Azoulay NW Rep. at 42).

**RESPONSE:** Object. *See* Response to ¶ 601.

607.   The Israeli civilian court judgments Shaked relies upon would be admissible
against NatWest in an Israeli court under Article 42A of the Evidence Ordinance as affirmative
proof that the attacks to which they pertain were perpetrated by Hamas despite the fact that
NatWest was not one of the parties that was convicted only if it were shown that NatWest was
the proxy of the convicted person, was an entity whose liability arises from the liability of the

213

convicted person or was an entity that is obligated to pay the judgment of the convicted person. Id. (Azoulay NW Rep. at 48-49).

**RESPONSE:** Object. *See* Response to ¶ 601.

608.    There is no evidence that NatWest knew any of the persons who are the subject of the Israeli civilian court judgments Shaked relies upon in his report, or that there were personal, legal, commercial or any other relations between NatWest and any of these persons.

**RESPONSE:** Admit.

609.    There is no evidence that NatWest was obligated to pay any debt of the convicted persons.

**RESPONSE:** Object. *See* Response to ¶ 601.

610.    There is no evidence that NatWest knew that there was an association between the entities to which funds were transferred from Interpal's accounts with NatWest and the convicted persons.

**RESPONSE:** Admit that there is no evidence that NatWest knew the identities of the individual members of HAMAS whose indictments, convictions and sentences are set forth in these documents. Dispute that there is no evidence that NatWest knew that the millions of dollars it sent from Interpal to HAMAS over the years was going to affiliates of the terrorist organization. *See* Plaintiffs' discussion of NatWest's scienter, Plaintiffs Mem. at 22-34.

611.    There is no evidence that NatWest knew and foresaw that the entities to which funds were transferred from Interpal's accounts with NatWest would use the funds they received to support Hamas, and that these funds would be used to finance terror.

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute. *See* Plaintiffs' evidence of NatWest's scienter, Plaintiffs Mem. at 22-34.

612.    There is no evidence that any of the convicted persons actually received funds or other support from any of the entities to which funds were transferred from Interpal's accounts with NatWest.

**RESPONSE:** Admit.

613.    Accordingly, there is no evidence that NatWest is the legal proxy of the convicted persons, because there is no evidence that they acted on behalf of NatWest and/or with its consent and/or support. There is no evidence that NatWest is among those obligated to pay the judgment debt of the convicted persons because there is no evidence of any connection and/or legal association between the parties, which could result in such an obligation. Furthermore, there is no evidence of any outstanding judgment debt of the convicted persons under which NatWest is obligated. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 49-50).

**RESPONSE:** Object. *See* Response to ¶ 601.

614.    There is no legal or any other link, direct or indirect, between the convicted persons and NatWest. Id. (Azoulay NW Rep. at 54); Ex. 185 (Azoulay NW Reb. Rep. at 65-68).

**RESPONSE:** Object. *See* Response to ¶ 601.

615.    If NatWest were sued in a civil lawsuit in an Israeli court on the ground that it had some responsibility for the attacks that are the subject of the criminal convictions Shaked relies upon, under Article 42A of the Evidence Ordinance none of these convictions, nor any of the other documents related to the convictions that Shaked cites in his report, would be admissible in evidence against NatWest for the truth of the matters asserted in those documents. They would all be excluded as inadmissible hearsay. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 54); Ex. 185 (Azoulay NW Reb. Rep. at 65-71).

**RESPONSE:** Object. *See* Response to ¶ 601.

616.    The Israeli civilian court convictions and related documents cited by Shaked also do not satisfy the criteria of any other exceptions to the rule excluding hearsay evidence under the Evidence Ordinance or caselaw, and therefore would not be admissible evidence against NatWest for the truth of the matters asserted in those documents. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 55-63).

**RESPONSE:** Object. *See* Response to ¶ 601.

617.    These documents do not qualify under the Evidence Ordinance as "institutional records," "public certificates, "military certificates," "powers of attorney" or other "private documents." Id. (Azoulay NW Rep. at 55-63).

**RESPONSE:** Object. *See* Response to ¶ 601.

618.    These documents do not qualify under Article 20 of the Evidence Ordinance as "expert opinions," with the potential exception of certain documents that Shaked cites as "police ballistic reports" in connection with the Route 60 shooting attacks. Id. (Azoulay NW Rep. at 60-61); Ex. 179 (Shaked NW Rep. at 63 n. 247). These expert opinions could be admissible only if the expert who prepared them presents himself to the court as an expert witness and is subject to cross-examination with respect to the contents of the report. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 60-61).

**RESPONSE:** Object. *See* Response to ¶ 601.

> (b)    The convictions rendered by military courts in the Palestinian Territories upon which Shaked relies are inadmissible hearsay under Israeli evidence <u>law and were not rendered in accordance with due process</u>

619.    Shaked relies upon convictions issued by military courts in the Palestinian Territories in relation to the following attacks: March 27, 2002; May 7, 2002; January 29, 2003; March 5, 2003; March 7, 2003; June 11, 2003; June 20, 2003; August 19, 2003; September 9,

2003; October 22, 2003; and January 29, 2004. Schuster Dec. Ex. 179 (Shaked NW Rep. at 36-37, 46-47, 61-63, 68-70, 76, 95-96, 100, 106-07, 116, 127, 133-35).

**RESPONSE:** Admit that this is among the evidence on which Mr. Shaked relies.

620.    As described above, one of the requirements under Article 42A of the Israeli Evidence Ordinance that a civil defendant must satisfy to introduce into evidence a criminal conviction as evidence in a civil trial is that the judgment was issued by an Israeli court. Schuster Dec. Ex. 205 (Azoulay NW Rep. at 21-24).

**RESPONSE:** Object. *See* Response to ¶ 601.

621.    A court located outside of the borders of the State of Israel and governed by another law, including the military courts in the Palestinian Territories, is not within the scope of Article 42A, and criminal convictions rendered by these courts cannot be submitted as evidence in a civil lawsuit under Article 42A of the Evidence Ordinance because: (a) a military court in the Palestinian Territories is not considered a court upon which a judicial authority is conferred in Israel under Israel's Basic Law: The Judiciary; (b) Israel's Law of Military Jurisdiction does not apply to the military courts in the Palestinian Territories; (c) the military courts in the Palestinian Territories do not derive their authority from Israeli law, and instead were established by virtue of a decree issued by the military commander-in-chief in those territories; (d) consistent with the Supreme Court's prior caselaw, Article 42A must be interpreted narrowly in order to avoid creating an exception that weakens the defendant's defense in a civil proceeding; and (e) accepting a criminal judgment of a court that has no jurisdiction in Israel as evidence in a civil lawsuit in an Israeli court would severely harm constitutional rights and is not consonant with the basic principles of the Israeli legal system that the laws of the State of Israel apply only in areas under the jurisdiction of the State. Id. (Azoulay NW Rep. at 24-40).

**RESPONSE:** Object. *See* Response to ¶ 587.

622.   At the request of the Israeli Supreme Court, the Attorney General of the State of Israel submitted an opinion to the Court that addresses the issue of whether the provisions of Article 42A of the Evidence Ordinance should be applied to a criminal judgment rendered by a military court in the Palestinian Territories. Id. (Azoulay NW Rep. at 40).

**RESPONSE:** Admit.

623.   The Attorney General concluded that, for the reasons described above, the provisions of Article 42A of the Evidence Ordinance should not be applied to a criminal judgment rendered by a military court in the Palestinian Territories. Id.

**RESPONSE:** Object. *See* Response to ¶ 587.

624.   Plaintiffs present Professor Emanuel Gross as an expert who purports to opine that the findings and conclusions contained in a conviction by a military court in the Palestinian Territories may be admissible under Article 42A of the Evidence Ordinance in a civil lawsuit in an Israeli court seeking damages from a defendant that, although not a party to the criminal proceedings before the military court, is alleged to bear liability for plaintiffs' alleged damages. Schuster Dec. Ex. 206 (Gross NW Rep. at 25).

**RESPONSE:** Admit that Plaintiffs proffered Professor Gross as a rebuttal expert in the unlikely event the Court, at an appropriate date, determines that Moshe Azoulay's foreign law opinion is not irrelevant, and should not be excluded on those grounds.

625.   Gross reaches this conclusion in part because he claims in his report that proceedings before military courts in the Palestinian Territories closely resemble the proceedings before Israeli courts. Id. (Gross NW Rep. at 14-16).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Although Plaintiffs proffered

Professor Gross as a rebuttal expert to Azoulay's irrelevant opinion of foreign law, this is not a discrete statement of material fact in accordance with Rule 56.1. It is thus wholly improper and should be stricken, as issues of law are not permitted in this context.

626.   Gross further opines that the admission in civil cases in Israel of convictions issued by military courts in the Palestinian Territories does not severely harm constitutional rights or jeopardize basic principles of the Israeli legal system. Id. (Gross NW Rep. at 18-21).

**RESPONSE:** Object. *See* Response to ¶ 625.

627.   Gross further opines that criminal proceedings before military courts in the Palestinian Territories are consistent with American notions of fairness, most notably, the guarantee of "due process." Id. (Gross NW Rep. at 21-24).

**RESPONSE:** Object. *See* Response to ¶ 625.

628.   Gross's opinion with respect to the practices of military courts in the Palestinian Territories is based solely upon his experience in these courts through 1980, which is decades before the military court convictions upon which Shaked relies. Gross does not offer opinions about the potential gap between the procedures and practices of military courts in 2004 through 2006. Schuster Dec. Ex. 207 (Gross CL Tr. at 28:18-31:2).

**RESPONSE:** Object. *See* Response to ¶ 625. Dispute.  Professor Gross merely testified that he is not opining on any potential gap between the procedures and practices of military courts from 2004-2006. *Id*.

629.   A 2004 amendment to the Israeli Order Regarding Security Provisions (the "2004 Amendment") altered the composition of the committee that selects judges in military courts in the Palestinian Territories and the qualifications required for individuals to be appointed judges. Id (Gross CL Tr. at 31:8-35:18, 96:21-97:11); Ex. 208 (Gross CL Dep. Exs. 2A and 2B).

**RESPONSE:** Object. *See* Response to ¶ 625.

630.    Gross testified that, both before and after the 2004 Amendment, the military courts in the Palestinian Territories are run by military personnel. Schuster Dec. Ex. 207 (Gross CL Tr. at 18:21-19:11).

**RESPONSE:** Dispute. Professor Gross testified in the above-referenced excerpt that IDF courts "belong to the personnel of the IDF, but they are independent."

631.    Gross testified that, both before and after the 2004 Amendment, judges and prosecutors in military courts in the Palestinian Territories are subordinate to, and dependent for advancement on, military commanders. Id. (Gross CL Tr. at 81:16-82:2, 99:20-100:5).

**RESPONSE:** Admit, except Professor Gross's testimony did not specify the time frame as stated by NatWest ("both before and after the 2004 Amendment").

632.    Gross testified that, both before and after the 2004 Amendment, there is no requirement that individuals serving as judges in military courts in the Palestinian Territories have prior experience or training as judges, or experience in criminal law or procedure. Id. (Gross CL Tr. at 34:5-35:18, 74:11-75:8).

**RESPONSE:** Admit, although Professor Gross testified in the above-referenced excerpt that he is not aware of any judges who were not previously practicing criminal law or military law.

633.    Gross testified that five of the seven members of the committee that appoints judges in military courts in the Palestinian Territories are military officers. Id. (Gross CL Tr. at 42:17-19). Because the selection committee is entitled to act with a quorum of five, a selection could be made by a group consisting entirely of military officers. Id. (Gross CL Tr. at 42:20-43:3). The sixth member of the committee is chosen by a military officer. Id. (Gross CL Tr. at 43:14-21); Ex. 208 (Gross CL Dep. Exs. 2A and 2B).

**RESPONSE:** Admit, but the sixth member of the committee is chosen specifically by the President of the Military Appeals Tribunal. *Id.*

634.    Gross testified that more than 80 percent of convictions in military courts are based upon confessions. Schuster Dec. Ex. 207 (Gross CL Tr. at 57:11-58:13).

**RESPONSE:** Admit, although Professor Gross clarified that this included pleas or plea agreements. *Id.*

635.    Gross testified that military courts in the Palestinian Territories are not required to implement Israeli criminal law. Id. (Gross CL Tr. at 51:2-6, 52:16-53:6).

**RESPONSE:** Dispute. Professor Gross testified that military courts are required to follow the Israeli rules of evidence, and that as a practice they implement substantive Israeli criminal law. *Id.*

636.    Gross testified that the military commander of the territory where the military court trial is held had the authority to intervene in a military court verdict by acquitting the accused or canceling the verdict and scheduling a new trial. Id. (Gross CL Tr. at 78:5-79:5). The military has never had the ability to cancel an acquittal and require a new trial in Israeli civilian courts. Id. (Gross CL Tr. at 80:8-11).

**RESPONSE:** Admit, though Professor Gross testified that he is not certain as to the time period during which the military commander could so intervene. *Id.* (Gross CL Tr. at 78:5-79:5).

637.    Gross previously wrote in a book he published in 2004, entitled The Struggling of Democracy Against Terrorism: Legal and Moral Dimensions that "many see the judicial proceedings that the state of Israel conducts in the occupied territories as a general effort and attempt to negate the well known adage that 'military justice is to justice as military music is to

music."' Gross testified that this statement was "sort of a folklore" when he wrote it. Id. (Gross CL Tr. at 69:12-70:4, 82:3-83:24); Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464).

**RESPONSE:** Admit that Professor Gross wrote this excerpt.  Dispute NatWest's misleading and distorted characterization of Professor Gross's deposition testimony. Professor Gross testified: "Q. What do you mean it was a general view? A. It was more sort of a folklore.  It's not something which really happens in  reality which -- something folkloristic which means that I do remember when I entered the service as a young person many years ago I do remember that there was, you know, in the earth something which just says, you know, it's only military court, it's not a civil court and therefore you cannot expect from a military court, you know, the standard, the same standard, but I say it's folklore because since then I pursue many things and based on my own experience that's exactly what I tried to explain here in the book there was -- the state of Israel tried to narrow the gap." *Id*. (Gross CL Tr. at 83:7-24).

638.    Gross also wrote that "the state of Israel chose to preserve the legislative guarantees of the accused standing trial and to constrict as much as possible the influence of the judicial forum upon the procedural rights of the accused." Id. (Gross CL Dep. Exs. 3A and 3B at 464). Gross testified that this statement refers to attempts to prevent trying a person within Israel, where he might receive more constitutional protections than if he were tried in a military court in the Palestinian Territories. Gross testified that this statement was accurate at the time he wrote it. Schuster Dec. Ex. 207 (Gross CL Tr. at 69:12-70:4, 84:9-21).

**RESPONSE:** Dispute. NatWest inserts words into Professor Gross's testimony, which says nothing about "attempts to prevent trying a person within Israel." *Id*. (Gross CL Tr. at 84:9-21).

639.    Gross also wrote that "[t]he question is why did the state of Israel work to reduce the influence of the judicial forum and not to neutralize this influence absolutely, why is there

still a gap? It cannot be ignored that this influence still exists because the judges are not professional judges -- the composition is a mix of a professional judge and army officers with no judicial training." Gross testified that this statement was accurate at the time he wrote it. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464); Ex. 207 (Gross CL Tr. at 84:22-86:7).

**RESPONSE:** Admit.

640. Gross also wrote that, "the right of the detainee according to the Decree [establishing military courts in the Palestinian Territories] to be brought before a judge is different from the right of an Israeli citizen in the areas of the State of Israel to be brought before a judge. While in Israel the detainee must be brought before a judge within 24 hours of the arrest, the fact is that according to the Decree, in the military system it is possible to arrest a person and only to obtain the warrant of arrest after 96 hours. The more serious harm is that a police officer is authorized to issue an arrest warrant within 7 days. There is nothing similar in the laws that apply in Israel - there an arrest warrant is only issued by a judge." Gross testified that this statement was accurate at the time he wrote it, and that the periods for detention were not changed with the 2004 amendment. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 464); Ex. 207 (Gross CL Tr. at 86:8-87:20).

**RESPONSE:** Admit.

641. Gross also wrote that "[a]nother gap exists between the procedures of law that apply in the courts in Israel and the Decree regarding Security Provisions about the right of a detainee to meet with a lawyer: the law that applies in the courts in Israel allows postponement of the meeting between the detainee suspected of security violations and his lawyer up to 10 days with the authorization of the officer in charge and up to 21 days with the authorization of the

president of the district court subject to a right of appeal to the Supreme Court. On the other hand according to the Decree about Security Provisions the person in charge of investigations is permitted to postpone the meeting between the detainee and his lawyer up to 15 days on grounds of the security needs in the region or for the needs of the investigation and the authority is entitled to extend this period by another 15 days. Therefore, it is possible that the meeting can be delayed up to 30 days!" Gross testified that this statement was accurate at the time he wrote it, and that it continued to be accurate until at least 2006. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 87:21-89:3).

**RESPONSE:** Admit.

642.    Gross also wrote that "[t]hese discrepancies and their ramifications as we will see immediately, certainly emphasize the existence of a departure from the balance between security needs and the rights of a accused to a fair trial and to the protection of constitutional safeguards that guarantee a fair trial: the organization B'Tselem presented in 1989 a report that was based on observations made by lawyers for the organization concerning trials in the military courts. The report's findings reflect the dangers discussed here: 'The serious situation, in which a majority of hearings are delayed by about a month because of the failure to bring accused detainees or due to the failure of witnesses for the prosecution to appear violates the basic right of a person not to be punished by prolonged detention prior to his guilt being established in a fair judicial proceeding. The punishment therefore precedes the conviction and the court seems to only determine the date of the end of the punishment, and does not act as the decision-maker on the question of guilt or innocence."' Gross testified that this statement was accurate at the time he wrote it, and that a departure from that balance continued through at least 2006. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 89:8-91:8).

**RESPONSE:** Admit the accuracy of the excerpt from Professor Gross's book. Dispute that Professor Gross testified that observations contained in the B'Tselem report were accurate at the time, as he testified that he does not know if those observations were accurate in 2004-06, just at the time of the report in 1989. Schuster Dec. Ex. 207 (Gross CL Tr. at 89:8-91:8).

643.    Gross also wrote that, "[t]he words of the reserve duty military judge Aryeh Cox emphasizes even more the danger within the military judicial system: 'It's clear that this court is not a natural and regular court, but some kind of solution that the military government found for the purpose of enforcing the government of occupation. The work that is done there is not purely judicial: in practice, the entire situation in the military courts in Gaza seems like something that is not from this world. Hundreds of family members outside, dozens of prisoners inside, most of them very young, and the impression is that they have lost faith in the system and do not even try to defend themselves. They confess to everything. Their defense attorneys, who in many cases are pathetic figures, also resign themselves to the situation and in fact do the work of middlemen for purposes of punishment. I found a complete symbiosis between the prosecution, the judges and the lawyers. With the accused on the sidelines, everything is handled with stoic resignation. We found accused, we also found suitable offenses for them, and what's left to do now is to find even more suitable punishments for them."' Gross testified that this statement was accurate at the time he wrote it, and that his statement regarding the "danger within the military judicial system" existed both before and after the 2004 Amendment. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465); Ex. 207 (Gross CL Tr. at 91:9-95:14).

**RESPONSE:** Dispute. Professor Gross testified that he does not necessarily agree with Aryeh Cox's statement, and that the "danger within the military judicial system" existed less after the 2004 Amendment. Schuster Dec. Ex. 207 (Gross CL Tr. at 91:9-95:14).

644.    Gross also wrote that, "[t]here is no more doubt that evidence in the field has shown that the primary influence exerted by the character of the judicial forum on the rights of the accused is a result of its composition -in the military court, where the judges in it are appointed by a military officer, it follows that the judges and the prosecutors who serve in the Military Advocate's Unit are subordinate to one commander and are dependent on one authority for their advancement, and likewise, the whole system of the separation of powers between the judges and the prosecutors that exists in regular civil courts disappears when it comes to a military court: 'In military courts, for example, the ties between the judge and the prosecutor are close, sometimes only a thin wall separates between the prosecutors room and the judge's room. They are really enmeshed. Because the separation of powers is a basic principle of every judicial system, its absence constitutes one of the main reasons for the fact that the element of adjudication in the territories is not pure."' Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 465-66, quoting Dr. Shay Leibowitz, "No Just Trial in the Territories, Word of a Judge" Hadashot Supplement (11 Oct. 1991)). Gross testified that this statement was accurate at the time he wrote it. Schuster Dec. Ex. 207 (Gross CL Tr. at 95:16-96:15, 101:23-103:6).

**RESPONSE:** Admit.

645.    Gross also wrote, "[f]rom observations that the organization B'Tselem conducted during the same time period it appears that the majority of the trials are not based on witness testimony while convictions are based on confessions by the accused. This finding casts great doubt on the conclusion that proceedings before military courts indeed lead to a just trial, notwithstanding the provisions we have already discussed that apply the rules of procedures and evidence prevailing in Israeli law to the military courts. 'Contrary to the civil court system, the ability of a military judge in the territories to check whether he indeed carries out a just trial and

whether the accused committed all the violations that were carried out, is nil, because generally there is a total and wholesale confession for each violation. This deprives the judge of the ability to examine whether the person standing in front of him committed the violations, in whole or in part, or whether he is innocent. That is, the judge cannot actually unearth the truth and conduct a just trial. In this area of violations there is another factor, fundamental and no less complex from those that follow it. The investigators discover most of the violations using 'informers.' People confess everything, and from confession to confession they incriminate other people. This is very dangerous and uncertain to decide the fate of a person on the basis of an 'informer.' And indictments are presented on the basis of these informers. This is a chain reaction: informer, indictment, confession, punishment. And if we mention punishment, the level of punishment too does not give rise to equal justice. When a Jew kills an Arab he can receive a year in prison. When an Arab throws a stone and no damage is caused, he receives a similar penalty. This is not a just trial."' Gross testified that this statement was accurate at the time he wrote it and that it remained true after the 2004 Amendment, except that "three qualified judgments should now be more able to certify the veracity, the truth than only one professional judge." Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 110:14-21, 111:18-113:7).

**RESPONSE:** Admit, although Professor Gross adds that this did not mean that judges "were not able to make a fact finding process or to follow that kind of process that will enable them, you know, to get to a just result." Schuster Dec. Ex. 207 (Gross CL Tr. at 111:18-113:7).

646.    Gross also wrote, "[t]his is the practical result of a military trial that is different in composition from a regular civil trial, even when it purports to apply procedures that are similar to the procedures that apply in the regular civil courts - the outcome is deep erosion in the basic

right of every defendant to a fair trial. Such an outcome contradicts the tenets of a democratic state." Gross testified that this statement was accurate at the time he wrote it, and that the only change in that observation with respect to 2005 and 2006 would be as a result of the 2004 Amendment regarding the qualification and appointment of judges. See Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 113:21-114:16).

**RESPONSE:** Admit.

647.   Gross also wrote that "[w]hat will be the result in a case where not only is the component that is judged (terrorists) different from the component that sits in the regular civil system, but also where the law allows application of different judgment and evidence arrangements that work for the good of only one side - the prosecution - as the president of the USA teaches? This result will not be able to stand against the basic rules of a genuine democratic government that seeks justice and truth, and the result will be known in advance and the chasm between it and something that's close to the truth is deep." Gross testified that this statement was accurate at the time he wrote it, and that the only change in that observation with respect to 2005 and 2006 would be as a result of the 2004 Amendment regarding the qualification and appointment of judges. Schuster Dec. Ex. 209 (Gross CL Dep. Exs. 3A and 3B at 466); Ex. 207 (Gross CL Tr. at 114:21-1 16:10).

**RESPONSE:** Admit.

648.   One of the assumptions upon which Gross's opinions are based, which was provided to him by plaintiffs' counsel, is that NatWest "knew or consciously or recklessly ignored information regarding Interpal's and Interpal's counterparties' connections to HAMAS, or, at the very least, was aware of the public information connecting Interpal and Interpal

counterparties to Hamas." Schuster Dec. Ex. 206 (Gross NW Rep. at 4); Ex. 207 (Gross CL Tr. at 126:25-128:23).

**RESPONSE:** Admit.

649.   Gross testified at his deposition in the parallel proceedings against CL that without this assumption, and if the evidence showed that the bank had no knowledge about "the identity of the founder who stands behind the front," his opinion regarding the admissibility of convictions of military courts in the Palestinian Territories may change. Schuster Dec. Ex. 207 (Gross CL Tr. at 127:18-128: 17, 197:2-18).

**RESPONSE:** Dispute that in the above-referenced testimony, Professor Gross states which aspect of his opinion would change if the assumption was incorrect. *Id.*

> (c)   The statements attributed to the ISA and other Israeli government agencies upon which Shaked relies are inadmissible hearsay under Israeli evidence law

**RESPONSE:** Object to legal argument, disguised as a heading, in Rule 56.1 Statement.

650.   Shaked cites in his report statements in various documents he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign Affairs and other government agencies in support of his opinion that Hamas is responsible for the attacks at issue in these cases. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 1-16).

**RESPONSE:** Admit that among the documents cited by Shaked are documents from the governmental ministries specified.

651.   None of these documents that he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign Affairs and other government agencies contain factual data received by Shaked himself, using his own senses. All of these documents rely upon factual data and/or assessments of third parties. Id. (Azoulay NW Reb. Rep. at 17).

**RESPONSE:** Dispute. Mr. Shaked discusses in his report interviewing a number of terrorists

and "using his own senses," as NatWest characterizes it. Schuster Dec. Ex. 179 (Shaked NW Rep. at, *e.g.*, 4). *See also,* Response to ¶ 510. Note that ¶ 651 does not specifically reference any examples from Mr. Shaked's report, instead relying on the opinion of its own expert, Moshe Azoulay.

652.    All of the statements in these documents upon which Shaked relies are hearsay evidence that would be inadmissible under the Evidence Ordinance of Israel as proof of their contents in a civil lawsuit in an Israeli court seeking damages from a defendant concerning the matters these documents purport to describe, and do not satisfy the criteria for any of the exceptions to the rule that renders this hearsay evidence inadmissible, as set forth in the Evidence Ordinance or by case law. Id. (Azoulay NW Reb. Rep. at 17-40).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

> (d)    The statements attributed to newspaper and magazine articles and website pages upon which Shaked relies are inadmissible hearsay under Israeli evidence law

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

653.    Shaked cites in his report statements in various newspaper and magazine articles and website pages as support for his opinion that Hamas is responsible for the attacks at issue in these cases. Id (Azoulay NW Reb. Rep. at 40-57).

**RESPONSE:** Admit that these are among the types of documents cited in Shaked's reports.

654.    These statements are inadmissible hearsay under the Israeli Evidence Ordinance and may be received in evidence only to prove the actual publication of the articles and not their contents. Id. (Azoulay NW Reb. Rep. at 58).

**RESPONSE:** Object. *See* Response to ¶ 652.

655.    Information obtained from websites is also inadmissible under the Israeli Evidence Ordinance as evidence of the truth of their contents. Id. (Azoulay NW Reb. Rep. at 58).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

656.    None of the newspaper and magazine articles or website pages Shaked cites satisfies the criteria for any of the exceptions to the rule that renders this hearsay evidence inadmissible, including the exception for institutional records, as set forth by the Evidence Ordinance or by case law. Id (Azoulay NW Reb. Rep. at 57-65).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

(e)    The statements attributed to books upon which Shaked relies are inadmissible hearsay under Israeli evidence law

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

657.    Shaked cites in his report statements in various books as support for his opinion that Hamas was responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 71-77).

**RESPONSE:** Admit that for certain attacks, books are among the types of sources cited by Shaked.

658.    These statements are inadmissible hearsay evidence under the Israeli Evidence Ordinance as proof of their contents. Id. (Azoulay NW Reb. Rep. at 77-78).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest

has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

      (f)     The recordings posted on the internet upon which Shaked relies are <u>inadmissible hearsay under Israeli evidence law</u>

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

659.    Shaked cites in his report the contents of various audio and video recordings as support for his opinion that Hamas is responsible for the attacks at issue in these cases. <u>Id.</u> (Azoulay NW Reb. Rep. at 78).

**RESPONSE:** Admit that among the types of evidence that Shaked cites for certain of the attacks at issue are audio and video recordings. Note that NatWest does not specify which particular recording it refers to in this and subsequent paragraphs.

660.    Under the Israeli Evidence Ordinance, a recording can be received in evidence if it satisfies three tests:

      a.     the technical test - regarding the credibility and authenticity of the medium itself;

      b.     the substantiality test - whether the terms for admissibility of the contents of the recording have been met; and

      c.     the formality test - whether the recording meets the conditions stipulated in the Secret Taping Law.

<u>Id.</u> (Azoulay NW Reb. Rep. at 78-79).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

661.    The audio and video recordings cited by Shaked do not satisfy the technical test because Shaked has not presented the original version of the recorded event. Instead, he has presented only what he purports to be a copy of an original recording that was posted on internet websites by unidentified persons. Shaked has offered no information concerning whether the

posted copy is an accurate, complete or true copy of the original recording. Id. (Azoulay NW Reb. Rep. at 80).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law.

662.    Further, Shaked has presented no testimony from the makers of these recordings, who could verify that whatever is heard or seen in the recordings was indeed said by the speaker who was recorded. Id. (Azoulay NW Reb. Rep. at 80).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law. Further object to NatWest's failure to specify which particular recording or recordings ¶ 662 references.

663.    Further, there is no evidence that the voice heard in the video recordings is the voice of whoever is shown to be speaking, and the manner in which these videos were recorded and edited raises doubts as to the identity of the speaker who is heard and whether the words he is speaking are indeed his own. Id. Viewing these recordings demonstrates they have undergone editing and processing after they were recorded. Id. (Azoulay NW Reb. Rep. at 81).

**RESPONSE:** Object to legal argument in a Rule 56.1 Statement. Moreover, this argumentative statement is one regarding irrelevant, foreign law proffered by one of the experts that NatWest has designated under Fed. R. Civ. P. 44.1 for the determination of a foreign law. Further object to NatWest's failure to specify which particular recording or recordings this paragraph references.

664.    Further, Shaked has not offered any evidence as to the identity of the person who made, edited or posted these recordings. Nor has he offered any evidence as to when they were recorded and/or edited. Id. (Azoulay NW Reb. Rep. at 81).

**RESPONSE:** Object. *See* Response to ¶ 663.

665.    The audio and video recordings cited by Shaked also do not meet the criteria for permitting the admission of a "computer output." Id. (Azoulay NW Reb. Rep. at 82).

**RESPONSE:** Object. *See* Response to ¶ 663.

666.    Second, under the substantiality test, because the contents of the recordings are hearsay, the party seeking to submit them as proof of their contents must demonstrate that they qualify under one of the exceptions to the rule disqualifying hearsay testimony, according to the Evidence Ordinance and/or the caselaw. The recordings cited by Shaked do not satisfy any of the relevant exceptions to the rule that renders hearsay testimony inadmissible. Id (Azoulay NW Reb. Rep. at 83-87).

**RESPONSE:** Object. *See* Response to ¶ 663.

(g)    The other video recordings upon which Shaked relies are inadmissible hearsay under Israeli evidence law

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

667.    Shaked also relies upon other video recordings, including of interviews he conducted or in which he otherwise participated and a British documentary broadcast on Israeli television, as support for his opinion that Hamas is responsible for the attacks at issue in these cases. Id. (Azoulay NW Reb. Rep. at 87-88).

**RESPONSE:** Admit that among the materials Shaked relied upon for certain attacks were the types of recordings described. Note, however, that NatWest's ¶ 653 does not specify to which recording or recordings it refers.

668.    The contents of these recordings are inadmissible hearsay under Israeli law unless they qualify under one of the exceptions to the rule that renders hearsay testimony inadmissible under the Evidence Ordinance and/or caselaw. I. (Azoulay NW Reb. Rep. at 88).

**RESPONSE:** Object. *See* Response to ¶ 663.

669.    These video recordings do not satisfy any of the relevant exceptions to the rule disqualifying hearsay testimony. Id. (Azoulay NW Reb. Rep. at 89-90).

**RESPONSE:** Object. *See* Response to ¶ 663.

## H.    Evan Kohlmann Purports To Attribute Responsibility For The 15 attacks To Hamas, But His Proposed Testimony Is Inadmissible

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

670.    Plaintiffs present Evan Kohlmann as an expert witness who purports to opine that Hamas has claimed responsibility through websites that he attributes to Hamas and other media for the 15 attacks at issue in these cases. Schuster Dec. Ex. 210 (Kohlmann Rep. at 9).

**RESPONSE:** Admit that this partially describes the subject of Mr. Kohlmann's expert opinions but dispute that this description fairly describes the topics for which Mr. Kohlmann has been proffered. Mr. Kohlmann also provides expert opinions constituting an extensive analysis of the development and maintenance of the HAMAS presence on the internet via the use of a number of websites utilized by its sub-branches and wings. Mr. Kohlmann examines, among other things, the provenance of these websites, their development, the type of information they utilize, and how the websites are recognized by intelligence agencies, counter-terrorism agencies and news organizations as the voice of HAMAS or its sub-branches.

(1)    Kohlmann's proposed testimony attempts to prove responsibility for criminal acts through expert testimony and summarizes hearsay evidence

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

671.    Kohlmann relies upon what he contends are "authentic claims of responsibility" that Hamas has purportedly distributed through websites and internet newsletters and forums he attributes to Hamas, which he contends "demonstrate [Hamas's] culpability" in the execution of each of the 15 attacks. Id. (Kohlmann Rep. at 45).

**RESPONSE:** Dispute. Mr. Kohlmann does not offer any opinions concerning HAMAS's culpability for any attack, but only opines that, in his opinion, the communiqués he has identified are credible. Also, NatWest only partially describes the material distributed and the means of distribution which Mr. Kohlmann concluded demonstrate this credibility. Schuster Dec. Ex. 210 (Kohlmann Rep. at 8-9; 44-45).

672.    For each of the attacks in question, Kohlmann collects statements and other materials from websites or interne newsletters and forums he attributes to Hamas and reproduces <u>verbatim</u> or paraphrases or summarizes those statements. <u>Id</u>. (Kohlmann Rep. at 31- 45); Ex. 187 (Kohlmann CL Tr. at 106:7-16).

**RESPONSE:** Dispute. Mr. Kohlmann begins his report with an extensive analysis of the development and maintenance of the HAMAS presence on the internet via the use of a number of websites utilized by its sub-branches and wings. Mr. Kohlmann examines, among other things, the provenance of these websites, their development, the type of information they utilize, and how the websites are recognized by intelligence agencies, counter-terrorism agencies and news organizations as the voice of HAMAS or its sub-branches. It is this analysis coupled with his evaluation of the statements and other materials on these websites and elsewhere with respect to the specified attacks, which underlies his conclusion that HAMAS's claims of responsibility for these attacks are authentic; he does not simply "accept[] them as true." Schuster Dec. Ex. 210 (Kohlmann Rep. at 6-45).

673.   For each of the 15 attacks, Kohlmann quotes or summarizes the claims of responsibility he found on websites or internet newsletters and forums he attributes to Hamas and concludes that these claims of responsibility "demonstrate [Hamas's] culpability in the execution of" these attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 31-45).

**RESPONSE:** Dispute. *See* Response to ¶ 672. Further, although Mr. Kohlmann's report states that these particular claims of responsibility demonstrate culpability, Mr. Kohlmann is not offering any opinion on whether HAMAS is, in fact, responsible for an attack, but is instead simply explaining why, in his opinion, these specific types of communiqués indicate that it is more likely than not that HAMAS bears some responsibility for a given attack.

674.   Kohlmann testified that if he saw a single claim of responsibility for an attack on a Hamas website, that alone was sufficient to demonstrate that it was "more likely than not" that Hamas was culpable in the attack's execution. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 215:16-216:12, 340:7-341:12).

**RESPONSE:** Admitted in part, however NatWest does not fully set forth Mr. Kohlmann's testimony in the excerpts cited. Mr. Kohlmann testified that: "if you have a single document on an official credible HAMAS website which has been issued by HAMAS in order to claim credit for a particular operation either in the form of a communi[que], in the form of the Glory Record or in the form of an official magazine put out by the al-Qassam Brigades, that alone is sufficient that more likely than not there is a degree of culpability on the part of HAMAS, but that the more you have piled on from there, then it goes up from more likely than not increasingly up the scale." He noted that "confidence goes higher and higher depending on the degree of detail there is about the individual who committed the operation, photographs of the individual, video of the individual, a copy of his martyrdom Will or other equally telling information that HAMAS often

packages in with the kind of material that I just described." He also testified "Once you determined you that you have a source that's officially HAMAS and the material is officially credible HAMAS material, you look to see whether or not HAMAS has ever issued a claim of responsibility . . . once HAMAS issues an open claim, a public claim of responsibility on their website based upon my study of their material that in the majority of cases at least large parts of what's in the communi[que] is indeed accurate." *Id.* (Kohlmann CL Tr. at 215:23-216:12; 217:3-24; 341:22-342:8).

675.    Other than what Kohlmann learned regarding the "Mike's Place" attack while working on another project independent of his work on these lawsuits, Kohlmann testified he is not aware of what Hamas's role actually was in perpetrating any of the other 14 attacks. With regard to these attacks, he testified he knows "what Hamas claims to have done." Id. (Kohlmann CL Tr. at 405:7-406:23).

**RESPONSE:** Admit except that Mr. Kohlmann also testified he had an idea of what HAMAS's involvement was in some of the other attacks. With still other attacks, his understanding is based on his analysis of particular categories of HAMAS communiqués setting forth claims of responsibility for attacks. *Id.* (Kohlmann CL Tr. at 405:7-13, 406:17-23).

676.    Kohlmann testified that he did not consider any evidence other than the materials that appear on websites that he attributes to Hamas. Id. (Kohlmann CL Tr. at 106:7-16).

**RESPONSE:** Admit that for the purposes of the opinions Mr. Kohlmann offers in this case, his review was limited to HAMAS materials on the internet and he did not look for any other evidence. *Id.*

677.    Kohlmann testified that "based upon the sources that I specifically was asked to look at, the evidence that I gathered I believe indicates that it's more likely than not that Hamas

was culpable in some way for the 15 attacks" at issue. Id. (Kohlmann CL Tr. at 77:11- 20).

**RESPONSE:** Admit.

    (2)    <u>Kohlmann opines on the credibility of the evidence upon which he relies</u>

678.    Kohlmann opines that what he purports to be Hamas claims of responsibility appearing on websites he attributes to Hamas "demonstrate its culpability in the execution of particular terrorist attacks" including the 15 attacks at issue, and that Hamas has never "issued any rejection or credible denial of its culpability" for the 15 attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 45).

**RESPONSE:** Admit that NatWest accurately, albeit selectively, quotes Kohlmann's testimony on the issue.

679.    Kohlmann testified that "generally speaking Hamas has a very good record in terms of its credibility in terms of claiming credit for these operations." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 101:20-102:18).

**RESPONSE:** Admit.

680.    Kohlmann testified that "even a single claim of responsibility on its own on an official credible website, forum, electronic venue, that itself is credible and authentic" provided a sufficient basis for him to conclude that Hamas was culpable for a terrorist attack. Id. (Kohlmann CL Tr. at 191:19-192:13).

**RESPONSE:** Admit that NatWest accurately, albeit selectively, quotes from Mr. Kohlmann's testimony. Mr. Kohlmann also testified "It's just that when it comes from multiple different sources, the confidence rises significantly higher." Further, he testified "my sense is that a single claim of responsibility on a credible HAMAS website was sufficient detail. That by default means that it's more likely than not that HAMAS in some way was culpable for a particular

attack." *Id*. (Kohlmann CL Tr. at 192:11-13; 194:11-16).

681.    Kohlmann testified that he is opining, based upon his opinions as to the credibility of claims of responsibility that he attributes to Hamas, that Hamas "more likely than not" participated in the commission of the 15 attacks at issue. Id. (Kohlmann CL Tr. at 86:4-6, 193:2-14, 194:10-16, 195:13-25).

**RESPONSE:** Admit, except Mr. Kohlmann in fact testified that HAMAS "more likely than not" "played a culpable role" or "had in some way been culpable" for the attacks in question. *Id*. (Kohlmann CL Tr. at 86:4-7; 195:13-25).

(3)     Kohlmann is not qualified to determine culpability for an attack

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

682.    Kohlmann has never before been proffered as an expert in determining whether Hamas was responsible for committing a terrorist attack. Id. (Kohlmann CL Tr. at 245:2-5).

**RESPONSE:** Admit, except CL's counsel asked Mr. Kohlmann whether he had been previously proffered as an expert in determining whether HAMAS was "responsible" for an attack, not whether HAMAS had "committed" an attack. *Id*. (Kohlmann CL Tr. at 245:3).

683.    Kohlmann has no advanced degree other than a law degree. Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1).

**RESPONSE:** Admit.

684.    Kohlmann has no advanced degree in the study of terrorism. Id.

**RESPONSE:** Admit, except Mr. Kohlmann testified that his law school coursework included advanced coursework concerning terrorism and the law. Israel Dec. Ex. 147 (Kohlmann Tr. at 303:18-23).

685.    Kohlmann has no advanced degree in the study of Hamas. Id.

**RESPONSE:** Admit.

686.    Kohlmann has never been a member of a law enforcement agency and has never graduated from a law enforcement academy. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 160:8-18).

**RESPONSE:** Dispute. Mr. Kohlmann testified that he has taken training courses at the FBI Academy.  *Id*. (Kohlmann CL Tr. at 160:14-18).

687.    Kohlmann has never been trained as an intelligence agent, been part of the military or received any training from the military. Id. (Kohlmann CL Tr. at 160:19-161:6).

**RESPONSE:** Admit.

688.    Kohlmann has never been a prosecutor or a judge. Id. (Kohlmann CL Tr. at 162:3-14).

**RESPONSE:** Admit.

689.    Other than coursework in college that included the "elements of forensic evidence in a social studies context," Kohlmann has never received any formal training in forensic science through a formal academic process. Id. (Kohlmann CL Tr. at 168:15-170:5).

**RESPONSE:** Admitted to the extent stated, however Mr. Kohlmann has received forensic training from law enforcement in the use of computer software to study the preserved content of hard drives, in order to review contents of the drives and assess the significance of the contents. *Id*. (Kohlmann CL Tr. at 168:15-25; 169:2-11).

690.    Kohlmann has never received any formal training in examining photographs for tampering and doctoring outside of being trained in how to use Adobe Photoshop. Id. (Kohlmann CL Tr. at 168:15-17, 171:12-172:9).

**RESPONSE:** Admit that Mr. Kohlmann has not enrolled in academic courses concerning

examining photographs for tampering and doctoring, but object that the reference to "formal training" is vague and ambiguous. Mr. Kohlmann also testified that he had received informal training in the field. *Id.* (Kohlmann CL Tr. at 172:10-18).

691.    None of Kohlmann's "major papers," as listed in his *curriculum vitae,* has as its principal subject how to determine who perpetrated a terrorist attack. Id. (Kohlmann CL Tr. at 232:3-15); Ex. 211 (Kohlmann Rep. Ex. 1).

**RESPONSE:** Admit.

692.    Kohlmann testified that his "expertise with Hamas communiq[ues] and Hamas propaganda" is from the material that has been released through Hamas websites and that he is not "immediately familiar with the vast body that exists beyond the electronic world." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 334:9-335:21).

**RESPONSE:** Admit.

693.    Kohlmann proposed to offer expert testimony regarding the Al Qaeda terrorist group in the United States v. Ahmed Omar Abu Ali (E.D. Va. 2005) case, but the court excluded his testimony. Schuster Dec. Ex. 212 (Kohlmann CL Dep. Ex. 9 at 24:6-29:10).

**RESPONSE:** Admit.

694.    Kohlmann testified that his understanding of the reason the court excluded his proposed testimony in the Abu Ali case is that the government submitted "paperwork" late, not because the court concluded he lacked the necessary credentials. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 261:25-287:12).

**RESPONSE:** Admit.

695.    The transcript of the Daubert hearing in the Abu Ali case indicates that the court rejected Kohlmann's proposed testimony on the ground that he lacked the necessary

qualifications to provide that testimony. Schuster Dec. Ex. 212 (Kohlmann CL Dep. Ex. 9 at 9:13-19, 13:1-9, 28:1-10, 28:16-20).

**RESPONSE:** Admit.

696.    In reference to the expert testimony Kohlmann proposed to offer in the <u>Abu Ali</u> case, the court stated that simply reading about Al Qaeda on the Internet "doesn't make him an expert on Al Qaeda" Id. (Kohlmann CL Dep. Ex. 9 at 9:13-19).

**RESPONSE:** Admit.

697.    The court in <u>Abu Ali</u> also stated that "I have difficulty with the idea that someone who has never done any real law enforcement or intelligence work where he has infiltrated terrorist cells or worked with terrorists or had contact with them is going to come in here and tell the jury that based upon what he's read on the Internet and his — his own writings that he thinks that this al-Fak'asi cell and Qahtani cell belong to al-Qaeda, if that's all you have, it's not going to happen in this courtroom." Id. (Kohlmann CL Dep. Ex. 9 at 13:1-9).

**RESPONSE:** Admit.

698.    Even after reading the order excluding his proposed testimony in the <u>Abu Ali</u> case and the <u>Abu Ali</u> transcript, Kohlmann stated that if asked in the future to testify as to the reasons why he was excluded, he would again testify that his understanding was that the government submitted his paperwork late. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 271:3- 273:21, 278:23-282:17).

**RESPONSE:** Dispute. This mischaracterizes the testimony cited. In truth, Mr. Kohlmann testified that he had not previously seen the order and full transcript and was unclear about what record of his qualifications had been presented to the court in that case, which never examined him on this subject.  In response to a series of improper and incomplete hypothetical questions,

Mr. Kohlmann reiterated that the United States Attorney's Office had advised him that late paperwork was a reason for his exclusion and he therefore could not rule out mentioning that if asked in the future about his understandings concerning the reasons for the exclusion of his testimony in that case. *Id*. (Kohlmann CL Tr. at 268:22-270:11).

699.    Kohlmann repeatedly claimed that he is not trained in reading legal documents, and therefore could not state whether the reasons stated in the <u>Abu Ali</u> transcript about his qualifications were the reasons why he was excluded in that case. <u>Id</u>. (Kohlmann CL Tr. at 273:3-275:3, 275:25-276:8, 283:8-287:12).

**RESPONSE:** Admit that Mr. Kohlmann explained that, based solely on the exhibits Defendant's counsel provided, he was unable to state one way or the other whether the reasons set forth in the transcript constituted the sole basis for the Court's decision to exclude his testimony in the absence of a *Daubert* hearing, particularly when he had been informed otherwise by the U.S. Attorney's Office that proffered him as an expert in that case.

700.    Although Kohlmann claimed at his deposition that the <u>Abu Ali</u> transcript was a legal document that he is not trained to understand, in his report Kohlmann specifically cites and quotes from three separate legal opinions in lawsuits in which he was accepted as an expert, and those quotes all relate to Kohlmann's purported qualifications as an expert, precisely the same topic addressed in the transcript of the <u>Abu Ali</u> case in which Kohlmann was excluded. Schuster Dec. Ex. 210 (Kohlmann Rep. at 4); Ex. 187 (Kohlmann CL Tr. at 275:7-276:15).

**RESPONSE:** Admit that Mr. Kohlmann's report cites to three cases where he was qualified as an expert following his testimony in *Daubert* hearings. Schuster Dec. Ex. 210 (Kohlmann Rep. at 4). Dispute NatWest's implication that these citations are inconsistent with his deposition testimony that he could not confirm, based solely on the excerpt of oral argument shown to him

by CL's counsel, that counsel was correct that the court in <u>Abu Ali</u> excluded his testimony based only on the reasons set forth in the transcript.

701.     Kohlmann graduated from the University of Pennsylvania Law School with a *Juris Doctorate* degree in 2004. Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1).

**RESPONSE:** Admit.

702.     When asked to confirm whether he read case law in law school, Kohlmann stated that "I may have read case law in law school, but honestly law school was six years ago. I don't recall most of what happened there." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 287:13- 15, 288:25-289:7).

**RESPONSE:** Dispute. Mr. Kohlmann testified that he was "sure" he read cases in law school "as part of a legal education." *Id*. (Kohlmann CL Tr. at 287:13-18).

  (4)     <u>Kohlmann is not an expert on Hamas</u>

703.     The principal focus of Kohlmann's research has been Al Qaeda. <u>Id</u>. (Kohlmann CL Tr. at 125:14-19, 126:6-21, 150:10-21); Ex. 213 (Kohlmann CL Dep. Ex. 5 at 86:24-87:3).

**RESPONSE:** Admit.

704.     According to Kohlmann, his work with respect to Al Qaeda involves more than just reviewing materials on the internet — he has, instead, interviewed individuals associated with Al Qaeda; spoken at "great length" with other experts who study Al Qaeda; presented "training courses" on Al Qaeda; published papers in "scholarly and other" journals about Al Qaeda; traveled abroad "frequently" to discuss the issue of Al Qaeda with foreign governments; spoken "regularly" about Al Qaeda in "various different public arenas"; and worked with a United Nations team involved in combating Al Qaeda and its financing. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 130:2-131:20).

**RESPONSE:** Admit.

705.    Kohlmann has been qualified as an expert in U.S. courts to testify in cases involving alleged support to Al Qaeda. Id. (Kohlmann CL Tr. at 237:23-239:8).

**RESPONSE:** Admit.

706.    Kohlmann believes that Hamas and Al Qaeda are "vastly different from each other." Id. (Kohlmann CL Tr. at 127:24-129:22).

**RESPONSE:** Admit.

707.    Kohlmann initially testified that he had been proffered as an expert on Hamas in several U.S. cases, including U.S. v. Ali Asad Chandia, U.S. v. Hassan Abu Jihaad, U.S. v. Mohamed Shnewer et al. and U.S. v. Oussama Kassir (as listed on his CV). Id. (Kohlmann CL Tr. at 240:18-242:6). Kohlmann testified that he was "100% positive" that he was proffered as an expert in Hamas in Shnewer, and "sure" that he was proffered as such in Oussama Kassir. Id. After being presented with the government's proffers of his testimony in those cases at his deposition, Kohlmann conceded that he was not proffered as an expert in Hamas in any of them. Id. (Kohlmann CL Tr. at 314:22-322:25); Ex. 214 (Kohlmann CL Dep. Ex. 11 at 995:14-17); Ex. 215 (Kohlmann CL Dep. Ex. 12 at 47:3-49:12); Ex. 216 (Kohlmann CL Dep. Ex. 13 at 5829:1-4); Ex. 217 (Kohlmann CL Dep. Ex. 14 at 704:6-11).

**RESPONSE:** Dispute. Mr. Kohlmann testified that there were "a number of cases I was proffered as an expert on HAMAS as well as Al-Qaeda and I'm not sure if I remember all of them exactly." He testified that he "believe[d]" he was proffered as an expert on HAMAS in the *Chandia* and *Abu Jihaad* case, that "I know I was in the *Mohammed Amawi* case" in 2008; was "100 percent positive" on *Schnewer* and "sure" on *Kasir*, and that he remembered testifying about HAMAS in the *Syed Hashmi* and *Atif Saddique* cases.  Schuster Dec. Ex. 187 (Kohlmann

CL Tr. at 240:20-241:25). Mr. Kohlmann did not testify that he was proffered as an expert on HAMAS alone in any of these cases. After being shown excerpts of transcripts from several, but not all, of these cases, including the *Schnewer* and *Kasir* trials, Kohlmann conceded that he was not explicitly tendered as a HAMAS expert in these cases, but that his reports in these cases did include material about HAMAS, and in, for example the *Schnewer* case, the government proffered Mr. Kohlmann "in the field of Islamic terrorism" generally, of which HAMAS is obviously a part, instead of focusing on Al Qaeda alone. *Id*. (318:7-322:25).

708.    Kohlmann claims to have devoted a small portion of his time to researching Hamas. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 151:4-153:2).

**RESPONSE:** Dispute. Mr. Kohlmann testified that 20% of his time was devoted to researching HAMAS, Hezbollah and the PIJ. *Id*. (Kohlmann CL Tr. at 153:17-25).

709.    Kohlmann has never visited Israel or the Palestinian Territories. Id. (Kohlmann CL Tr. at 139:19-23).

**RESPONSE:** Admit.

710.    Kohlmann has never interviewed any members of Hamas, except for one instance in which he participated in a telephone interview with a Hamas member conducted by a colleague of his at the Investigative Project in Washington, D.C., where Kohlmann worked during school. Id. (Kohlmann CL Tr. at 138:13-139:23); Ex. 211 (Kohlmann Rep. Ex. 1).

**RESPONSE:** Admit.

711.    Kohlmann has never published a book about Hamas. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 222:23-25).

**RESPONSE:** Admit.

712.    Kohlmann has never worked with the United Nations specifically regarding

Hamas. <u>Id</u>. (Kohlmann CL Tr. at 139:24-140:11).

**RESPONSE:** Admit.

713.    Kohlmann has never traveled abroad to speak with foreign governments where the primary focus of those governments' inquiries was Hamas. <u>Id</u>. (Kohlmann CL Tr. at 140:17-141:14).

**RESPONSE:** Admit.

714.    Kohlmann could not recall any instance of being asked by a foreign government to give presentations to academics and government officials specifically regarding Hamas. <u>Id</u>. (Kohlmann CL Tr. at 142:9-15).

**RESPONSE:** Dispute. With respect to presentations and training, Mr. Kohlmann has traveled internationally to speak with prosecutors and agents in the United Kingdom and Australia about a series of inquiries in which HAMAS was a part, and as part of this work was asked to analyze HAMAS materials contained on computer hard drives. He presented a training seminar to the Royal Canadian Mounted Police on terror financing that included a discussion of HAMAS. He has made presentations on the subject of online recruitment by terrorist groups that included materials from a HAMAS website and HAMAS chat forum.  *Id*. (Kohlmann CL Tr. at 140:17-143:24).

715.    Kohlmann's *curriculum vitae* does not identify a "major paper" that he published that focused on Hamas. Schuster Dec. Ex. 211 (Kohlmann Rep. Ex. 1); Ex. 187 (Kohlmann CL Tr. at 223:2-224:15, 229:7-232:2).

**RESPONSE:** Admit.

716.    Kohlmann testified that the "principal subject" of three of his "major papers" was Hamas. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 223:5-224:15). With regard to the first

paper, although Kohlmann initially claimed that a "significant part of it" contained a discussion of Hamas, when confronted with the actual document, he testified that it did not refer to Hamas at all. The other two papers were summaries of Congressional testimony in which Kohlmann included references to Hamas as part of discussions about Al Qaeda financing. Id. (Kohlmann CL Tr. at 223:5-224:15, 229:7-232:2).

**RESPONSE:** Admit, except dispute Defendant's suggested inference that Kohlmann's testimony at 223-224 represented or was intended to indicate that these papers were anything other than Congressional testimony that included a discussion about HAMAS financing, as Kohlmann explicitly described them as such when he first described them at deposition. *Id.* (Kohlmann CL Tr. at 223:5-224:15).

717.    Kohlmann represented to a court in Denmark that he had given evidence about Hamas in a case in New York. Kohlmann testified that he "believe[d] [he] was referring to the Rafiqsabir case." Kohlmann conceded in his deposition testimony in these lawsuits that the transcript of his testimony in the case to which he was referring in his representation to the Danish court does not mention Hamas at all. Id. (Kohlmann CL Tr. at 252:15-254:8).

**RESPONSE:** Admit in part. Although Mr. Kohlmann initially indicated he thought he was referring to the *Rafiqsabir* case, he subsequently testified that he was unable to recall which case he was referring to in his testimony in Denmark, but that he believed it was in the Southern District of New York. He also indicated that he may have been referring to the work he performed in the case of *U.S. v al-Ishtari*, which settled prior to trial and for which he prepared a report that covered HAMAS. *Id.* (Kohlmann CL Tr. at 256:3-22).

718.    Kohlmann has never before been proffered as an expert in "how likely it is that the underlying statements [on Hamas websites] are truthful." Id. (Kohlmann CL Tr. at 244:13-

25).

**RESPONSE:** Admit.

> (5)  Kohlmann's experience collecting materials from Internet websites does not qualify him as an expert

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

719.  Kohlmann claims that his relevant "expertise" includes "the use of the internet by Hamas and other terrorist organizations in the Palestinian territories." Id. (Kohlmann CL Tr. at 324:9-325:20, 334:9-335:21).

**RESPONSE:** Admit.

720.  Kohlmann claims to have amassed "one of the largest digital collections of terrorist multimedia and propaganda in the world"; that he "compare[s] and contrast[s] particular sources in question with other analogous sources contained in my digital archive"; and that in preparing his report, he reviewed his own collection, certain Internet archives and the current versions of certain websites he contends are affiliated with Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 3, 5, 7).

**RESPONSE:** Admit.

721.  Kohlmann testified that with the exception of work he did at the Investigative Project until late 2003, which was saved on its database, his Hamas sub-database is a fairly accurate record of the Hamas websites he reviewed and that there were no sites that he "was reading [and] didn't save information off of or. . . didn't create copies of" because "every Hamas website that [he] was familiar with, every Hamas websites that was available to [him] — [he] would regularly save material" from. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 471:21- 474:4, 480:24-481:14)

**RESPONSE:** Dispute. NatWest selectively mischaracterizes Mr. Kohlmann's testimony. Mr. Kohlmann testified extensively that, in addition to reviewing his own collection of internet-based terrorist claims of responsibility, he accessed and reviewed (but did not separately save) materials that were easily available on the internet at archive.org. (the "wayback machine"), which reliably preserved many of the older websites Mr. Kohlmann accessed both contemporaneously and for the purpose of compiling his report.  Israel Dec. Ex. 147 (Kohlmann Tr. at 491:22-509:21); Schuster Dec. Ex. 210 (Kohlmann Rep. at 7); Ex. 148 (Kohlmann Dec., April 29, 2010 at ¶ 6). Furthermore, Mr. Kohlmann's Report discloses that his database of HAMAS materials includes materials he had archived up until the then-present time. Schuster Dec. Ex. 210 (Kohlmann Rep. at 7).

722.    Kohlmann opined about the "credibility" of Hamas claims of responsibility, testifying that "a single credible claim alone is enough to believe that it's more likely than not that Hamas was engaged in some level of culpability in a particular attack." Id. (Kohlmann CL Tr. at 193:2-21).

**RESPONSE:** Admitted in part. See Responses to ¶ 680 and ¶ 723.

723.    Kohlmann testified that he was qualified to opine about whether a claim was credible because "[i]f you study the Hamas websites, if you collect the Hamas websites, if you study them for a period of, I don't know, seven, eight, nine years, you start to learn about lessons how the websites operate [ ], the credibility or truthfulness of the statements offered there and about whether or not Hamas regards posting false information as something that should be avoided." Id. (Kohlmann CL Tr. at 198:2-11).

**RESPONSE:**  Admitted in part.  *See* Response to ¶ 680.  Mr. Kohlmann also testified about his experience "as an analyst and as an expert in this field from having studied over time the process

251

by which [HAMAS] release[s] information, how they release information, when they release information and what they say about the information they are releasing." *Id.* (Kohlmann CL Tr. at 186:19-24)

724.   Kohlmann also testified that it was "because of [his] experience in studying Hamas propaganda and their claims of responsibility from the web that are issued through their internet website" that he was able to conclude that a single "credible" claim alone was enough for him to conclude that it was "more likely than not that Hamas was engaged in some level of culpability in a particular attack." Id. (Kohlmann CL Tr. at 192:14-193:21).

**RESPONSE:**  Admitted in part.  *See* Responses to ¶ 680 and ¶ 723.

725.   An independent forensic analysis of Kohlmann's collection of website postings relating to Hamas establishes that Kohlmann did not collect contemporaneously with their publication the claims of responsibility on which he relies in these lawsuits. Rather, an independent forensic analysis of Kohlmann's collection of purportedly Hamas websites confirms that he saved more than <u>94 percent</u> of these websites in 2005 or thereafter — long after all of the 15 attacks at issue took place — and he saved more than <u>68 percent</u> of these websites after plaintiffs hired him to testify in these lawsuits. This forensic analysis also confirms that although his report cites 53 unique URLs pertaining to the relevant attacks, 38 of these URLs were not found in the collection, and 14 of the 15 remaining URLs were preserved by Kohlmann after he was hired by plaintiffs in these lawsuits. Schuster Dec. Ex. 2 (Novak NW Dec. ¶¶ 10-12, 15-17, 21, 24-30).

**RESPONSE:** Object and Dispute. First, NatWest mischaracterizes Mr. Kohlmann's testimony, as he did not testify that he "collected contemporaneously with their publication" the claims of responsibility at issue.  Second, object to reliance on the expert report of Mr. Novak, which

constitutes an improper and untimely expert rebuttal report that NatWest seeks to use well after the deadline for the submission of such reports and should be stricken. The Novak Declaration ignores Mr. Kohlmann's extensive testimony on his contemporaneous review of certain websites and does not give proper weight to his reliance on www.archive.org as a recognized and reliable method to access accurate versions of these websites as of the date they were captured and preserved on www.archive.org, without the need to save such documents to his personal database. Indeed, the Novak declaration does recognize that almost 70% of the challenged postings were obtained from www.archive.org. Schuster Dec. Ex. 2 (Novak NW Dec. ¶ 28). Further, the Novak declaration makes no representations regarding when the Internet Archive collected these materials, or opines as to whether each document or file obtained from the wayback machine is authentic or genuine.  Similarly, as he testified, Mr. Kohlmann's ability to access the URLs cited in his report via www.archive.org did not necessitate preserving many of them in his database.  Israel Dec. Ex. 147 (Kohlmann Tr. at 491:22-509:21); Schuster Dec. Ex. 210 (Kohlmann Rep. at 7); Israel Dec. Ex. 148 (Kohlmann Dec. at ¶ 6); *See also* Response to ¶ 721.

> (6)     Kohlmann cannot authenticate the contents of any of the websites upon which he relies

726.    Kohlmann asserts that his analysis is based upon the presence on the internet of what he considers to be an authentic Hamas claim of responsibility on websites he attributes to Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 45); Ex. 187 (Kohlmann CL Tr. at 51:23-52:9, 191:24-192:13, 194:10-195:25, 197:4-17, 203:20-204:21, 217:3-24, 340:7-341:12, 404:10-405:6, 428:25-429:9).

**RESPONSE:** Admit.

727.    For each of the 15 attacks, Kohlmann does not know who posted any of the

claims of responsibility on websites he attributes to Hamas or whether the individuals who posted the claims had first-hand knowledge of the information they were posting. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 381:24-387:16).

**RESPONSE:** Admit.

728.    Kohlmann did not download most of the statements that he attributes to Hamas until after he was retained by plaintiffs. Schuster Dec. Ex. 2 (Novak NW Dec. ¶¶16-17, 21, 28-30).

**RESPONSE:** Dispute. *See* Response to ¶ 725.

729.    Any statements that Kohlmann downloaded after they were originally published may not truly depict the web page as it appeared when it was first published. Id. (Novak NW Dec. ¶ 31).

**RESPONSE:** Dispute. *See* Response to ¶ 725.

(7)    Kohlmann's opinions and testimony are based upon insufficient and unreliable sources and are not the product of reliable principles and methods, and Kohlmann has not applied his methods reliably to the facts of these cases

**RESPONSE:** Object to argument, disguised as a heading, in a Rule 56.1 Statement.

730.    Kohlmann has not personally investigated any of the 15 attacks at issue or examined any forensic evidence concerning them. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 434:2-23).

**RESPONSE:** Admit.

731.    For each of the 15 attacks, Kohlmann quotes or summarizes the claims of responsibility he found on websites or internet newsletters and forums he attributes to Hamas and concludes in his report that such claims of responsibility "demonstrate [Hamas's] culpability in the execution of" these attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 31-45).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute. Mr. Kohlmann begins his report with an extensive analysis of the development and maintenance of HAMAS's presence on the internet via the use of a number of websites utilized by its sub-branches and wings. Mr. Kohlmann examines, among other things, the provenance of these websites, their development, the type of information they utilize, and how the websites are recognized by intelligence agencies, counter-terrorism agencies and news organizations as the voice of HAMAS or its sub-branches. It is this analysis coupled with his evaluation of the statements and other materials on these websites and elsewhere with respect to the specified attacks, that underlies his conclusion that HAMAS's claims of responsibility for these attacks are authentic and demonstrate culpability in the execution of the attacks. Schuster Dec. Ex. 210 (Kohlmann Rep. at 6-45). Furthermore, and as noted in Plaintiffs' Responses to Paragraphs 674 and 681, Mr. Kohlmann's testimony, *passim*, makes clear that his Report's reference to "demonstrates culpability" is limited to opining that it is more likely than not that these particular categories of communiqués suggest that the attestations of responsibility issued by HAMAS are both authentic and credible.

732.  Kohlmann testified that if "you have a single document on an official credible Hamas website which has been issued by Hamas in order to claim credit for a particular operation[,] either in the form of a communi[qué], in the form of the Glory Record or in the form of an official magazine put out by the al-Qassam Brigades, that alone is sufficient to indicate that more likely than not there is a degree of culpability on the part of Hamas." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 215:16-216:12).

**RESPONSE:** Admit testimony is as quoted, but NatWest does not include the balance of the sentence: "right, but that the more you have piled on from there, then it goes up from more likely than not increasingly up the scale." *Id.*

733. Kohlmann testified that he did not examine whether the facts stated on websites he attributes to Hamas were trustworthy and accurate because "[m]y expert report was judging on the basis that my experience with Hamas websites indicates that in the majority of case[s] that the Hamas communi[qués,] while maybe not entirely accurate word for word[,] have strong indications of culpability, more likely than not they were involved, that means that in these cases when there's a claim of responsibility by default on a Hamas site and it's a credible Hamas site and authentic Hamas site by default that means it's more likely than not that Hamas played some role in carrying out the attack." Id. (Kohlmann CL Tr. at 340:7-341:12).

**RESPONSE:** Dispute as stated. NatWest does not mention Mr. Kohlmann's statement immediately prior to the quote that "[t]hat was not the basis for my expert report." He then goes on to state immediately following the portion quoted by NatWest "but I'm not speaking to individual details because I was not asked to verify whether or not the Hamas communi[ques] matched up to other sources or other -- I was just asked to look for material on Hamas websites and Hamas electronic venues that were relevant and had indicia of culpability with regard to these attacks." *Id.* (Kohlmann CL Tr. at 340:7-341:12).

734. Other than what Kohlmann learned regarding the "Mike's Place" attack while working on another project independent of his work on these lawsuits, Kohlmann testified he is not aware of what Hamas's role actually was in perpetrating any of the other 14 attacks. With regard to these attacks, he testified he knows "what Hamas claims to have done." Id. (Kohlmann CL Tr. at 405:7-406:23).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute. NatWest mischaracterizes Mr. Kohlmann's testimony. Mr. Kohlmann testified that he had an idea of what HAMAS's involvement was in some of the other attacks. With other attacks, his understanding is based on

his review of particular categories of HAMAS communiqués claiming responsibility for an attack. *Id*. (Kohlmann CL Tr. at 405:7-13, 406:17-23).

735. Kohlmann testified that terrorist groups may issue a claim of credit for propaganda purposes. Id. (Kohlmann CL Tr. at 323:2-7).

**RESPONSE:** Admit.

736. Kohlmann testified that terrorist groups have various motivations for making claims of credit for attacks, including helping them with recruitment, financing, to inspire others to join them and inspiring others to take action similar to the group's actions. Id. (Kohlmann CL Tr. at 323:8-324:4).

**RESPONSE:** Admit.

737. Kohlmann testified that additional motivations for a group claiming credit include earning public support and achieving glory or praise for the group. Id. (Kohlmann CL Tr. at 325:21-326:4).

**RESPONSE:** Admit.

738. Kohlmann testified that in doing his work on his report in this case, he only accounted for these motivations "generally, but not specifically" and that he "did not assess claim by claim, because that's not what I was tasked to do." Id. (Kohlmann CL Tr. at 326:5-20).

**RESPONSE:** Admit.

739. Kohlmann testified that some terrorist groups falsely deny responsibility for attacks they committed and that he was "aware [Hamas] denied culpability in certain instances." Id. (Kohlmann CL Tr. at 343:24-344:20).

**RESPONSE:** Admit.

740. Kohlmann testified he was aware that there are certain attacks for which more

than one group made a claim of responsibility, and that there have been attacks for which Hamas has claimed credit and other groups also claimed credit. Id. (Kohlmann CL Tr. at 345:13-346:4).

**RESPONSE:** Admit.

741.   Prior to signing his report, Kohlmann did not determine whether anyone else claimed credit for an attack for which he opined Hamas had claimed credit. Id. (Kohlmann CL Tr. at 346:5-24).

**RESPONSE:** Admit that Defendant accurately, but selectively, quotes Mr. Kohlmann's testimony.  Mr. Kohlmann also testified that "that was not part of my initial tasking." *Id*. (Kohlmann CL Tr. at 346:5-24).

742.   Kohlmann testified that his "observation based upon studying ... the process by which Hamas releases information through its internet website" is that "the more times that Hamas states something, the more confident its leadership [is] that it was actually behind that attack." Id. (Kohlmann CL Tr. at 187:3-188:21).

**RESPONSE:** Admit.

743.   With respect to the "evidence" submitted in support of claims he attributes to Hamas, Kohlmann testified that he "did not engage in a technical analysis" to determine that the photos he relied upon were not doctored. Id. (Kohlmann CL Tr. at 367:19-370:14).

**RESPONSE:** Admit that NatWest accurately, but selectively, quotes Mr. Kohlmann's testimony. Object that NatWest's selective quotation distorts the import of Mr. Kohlmann's testimony.  Mr. Kohlmann also testified that "[n]one of the images that I reviewed in this report immediately evinced signs of having been doctored, but I did not engage in a technical analysis. There were not any immediate signs of them being manipulated or doctored."  He further testified that "immediate signs" would be "[d]octored images, there are problems with them. If

you look at them closely, you could immediately see that there are errors in the way the shadows are, you could see that the resolution often times show up differently for the pieces that have been edited. In a number of cases I've identified images that have been doctored.  It's a sight kind of thing. You could see there are problems with perspective. There are all sorts of photographic issues that show up, but generally speaking those kind of edits are apparent if you know what you are looking for. In this case I did not engage in technical analysis, but again I did not see any obvious signs of them being doctored." *Id*. (Kohlmann CL Tr. at 368:4-369:3).

744.    Kohlmann did not engage "in a specific technical analysis" to verify that a will posted in connection with a particular attack was in fact the actual will of the person who committed the attack. Although he noted that he saw a photograph in which the individual depicted was holding a handwritten copy of his will, and that he saw videos related to two attacks in which the individuals depicted purported to read their wills, Kohlmann "didn't do anything specific" to determine if the person holding up the will was actually the person alleged to be the attacker. Id. (Kohlmann CL Tr. at 370:18-374:8).

**RESPONSE:** Admit

745.    Kohlmann could not say whether the wills he cited were written for a specific attack, because he was not sure whether they indicated a target or when an attack would take place. Id. (Kohlmann CL Tr. at 374:9-375:19).

**RESPONSE:** Dispute. NatWest mischaracterizes Mr. Kohlmann's testimony.  Mr. Kohlmann said he could not be sure without further review of the wills since he could not recall. *Id*. (Kohlmann CL Tr. at 374:9-375:19).

746.    Kohlmann cited the attackers' "biographies" which contained information gathered posthumously, including from the families of the deceased. However, in determining

the reliability of these biographies, Kohlmann did not consider that statements of family members may not be accurate, even though Hamas provided payments to the families of suicide bombers, because he does not "think it has any impact on the reliability whether or not Hamas pays." Id. (Kohlmann CL Tr. at 375:20-378:23).

**RESPONSE:** Dispute and object to argument in a Rule 56.1 Statement. As Mr. Kohlmann noted, if the family members of a suicide bomber are willing to "discuss the life of that individual with HAMAS for the purposes of broadcasting on their website, that . . . indicate[s] a degree of confidence that" the deceased was in fact a member of HAMAS. *Id.* (Kohlmann CL Tr. at 376:18-377:6).

747.    Jenkins emphasizes that these are all relevant considerations in assessing the evidence, because photos may be doctored, biographical material may be assembled after an attack and families of suicide terrorists may obtain social and economic rewards if they cooperate with a terrorist group and provide them with the information they seek. Schuster Dec. Ex. 172 (Jenkins NW Rep. 31-33).

**RESPONSE** Object to argument in a Rule 56.1 Statement.  *See* Responses at ¶¶ 743, 745 and 746.

(8)    Kohlmann's methodology fails to satisfy expert standards and his own usual standards

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

748.    Kohlmann states in his report that "to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as 'comparative analysis," which requires him "to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes." Schuster Dec. Ex. 210 (Kohlmann Rep. at 5).

**RESPONSE:** Admit.

749. Kohlmann testified that in his work for plaintiffs in these cases, "I did not do a comparative analysis of different sources and I didn't do an analysis of the individual facts in the communi[qués] to see whether or not they comported with exactly what Israeli police or Israeli government or other sources might have determined." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 342:16-343:23).

**RESPONSE:** Admit

750. Kohlmann testified that he did not look to what other sources apart from Hamas have said with regard to who carried out these attacks because he "was not asked to do that as part of this project." Id. (Kohlmann CL Tr. at 202:14-203:19).

**RESPONSE:** Dispute. In the excerpt cited, Kohlmann testified that he did not examine whether there were other claims of responsibility as part of the work that he was asked to do in this case, but that for some of the attacks in question he "ha[s] engaged in that analysis." *Id*. (Kohlmann CL Tr. at 202:22-203:4).

751. For the purposes of writing his report, once Kohlmann determined that Hamas claimed responsibility on a website that he attributed to Hamas, he did not check whether any other group also claimed credit for the attack because "What was not part of my initial tasking." Kohlmann did not examine the purported websites of other terrorist organizations to look for other claims of responsibility until after he reviewed the rebuttal report of Brian Jenkins. Id. (Kohlmann CL Tr. at 56:8-14, 77:11-20, 346:5-24, 366:4-21).

**RESPONSE:** Admit

752. As part of his usual "methodology" for determining whether a claim on a website Kohlmann attributes to Hamas is in fact true, Kohlmann would perform an additional check

beyond the claim itself. Kohlmann testified that he did not do any such additional check for purposes of his report in these cases, nor did he perform any research beyond examining purported Hamas claims of responsibility concerning the 15 attacks at issue, apart from the research he had done concerning two of the attacks that he had performed on a prior project. Instead, he did not assess the veracity of the claims upon which he relies based upon what plaintiffs asked him to do. Id. (Kohlmann CL Tr. at 200:24-202:7, 203:5-19, 206:13-23).

**RESPONSE:** Dispute. Mr. Kohlmann offers no opinions on whether a particular claim of responsibility by HAMAS is "true."   Mr. Kohlmann's opinions are limited to whether the communiqués are authentic, credible and whether, in his opinion, it is more likely than not that such communiqué indicates that HAMAS is responsible in some fashion for an attack. Mr. Kohlmann explained that, although a "veracity check" was not relevant to the specific task at hand concerning his limited expert opinions for these cases, *id*. (Kohlmann CL Tr. at 203:13-19), he recalled doing research on two of the attacks in the past, and that he simply could not "recall off the top of [his] head" whether he had engaged in similar analysis for other attacks. *Id*. at 205:24-25.

(9)     Kohlmann's conclusions concerning responsibility for the Bus 19 attack

753.    Kohlmann's analysis of the January 29, 2004 Jerusalem bombing of Bus 19 on pages 43-44 of his report consists of his quoting and summarizing materials he found on websites he attributes to Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 43-44).

**RESPONSE:** Dispute. Mr. Kohlmann begins his report with an extensive analysis of the development and maintenance of HAMAS's presence on the internet via the use of a number of websites utilized by its sub-branches and wings.  Mr. Kohlmann examines, among other things, the provenance of these websites, their development, the type of information they utilize, and

how the websites are recognized by intelligence agencies, counter-terrorism agencies and news organizations as the voice of HAMAS or its sub-branches and this underlies his analysis of specific attacks and the materials relating to those attacks, including the Bus 19 attack. Schuster Dec. Ex. 210 (Kohlmann Rep. at 6-28, 43-44)

754.    Based upon the materials Kohlmann analyzed in connection with the Bus 19 attack, Kohlmann concludes in his report that Hamas distributed "authentic" claims of responsibility for the attack which "demonstrate its culpability in the execution" of this attack. Id. (Kohlmann Rep. at 45).

**RESPONSE:** Dispute.  *See* Response to ¶ 753.  It is this analysis, coupled with Mr. Kohlmann's evaluation of the statements and other materials on these websites and elsewhere with respect to the specified attacks, which underlies his conclusion that HAMAS's claims of responsibility for this attack are authentic and demonstrate culpability in the execution of the attacks.

755.    Outside of any analysis as to whether the claims were made on Hamas websites, Kohlmann does not analyze in his report the quality of any of the evidence regarding the Bus 19 attack on these websites. Id. (Kohlmann Rep. at 43).

**RESPONSE:** Object to argument in a Rule 56.1 Statement.  Dispute.  Mr. Kohlmann devotes substantial discussion to the provenance and reliability of the two websites which contained the information on the Bus 19 attack (websites regarding Bus 19 Attack at http://www.palestine-info.net and http://www.alqassam.ps). Schuster Dec. Ex. 210 (Kohlmann Rep. at 10-16, 25-27, 43-44).  *See* Responses to ¶¶ 752 and 753.

756.    Kohlmann did not seek to determine what role Hamas actually played in perpetrating this attack because that was "not part of what I was tasked to do" by plaintiffs and, consequently, he does not know what Hamas did or did not actually do. Schuster Dec. Ex. 187

(Kohlmann CL Tr. at 402:10-403:11).

**RESPONSE:** Admit.

757.    Kohlmann also describes in his report how one of the websites he attributes to Hamas criticized a rival claim of responsibility for this attack made by Hamas's rival, the Al Aqsa Martyrs Brigades (the "AAMB"), and how those websites also stated that the AAMB subsequently rejected any ties to the attack. Schuster Dec. Ex. 210 (Kohlmann Rep. at 43-44).

**RESPONSE:** Admit.

758.    Kohlmann's report includes no other information as to what the AAMB sources said, outside of the information that Kohlmann claims appears on a website he attributes to Hamas. Id.

**RESPONSE:** Admit.

759.    Kohlmann did not search the internet for a rival AAMB claim of responsibility for the Bus 19 attack before he submitted his report. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 346:5-24).

**RESPONSE:** Admit.

760.    Kohlmann did not analyze whether the AAMB perpetrated the Bus 19 attack. Id. (Kohlmann CL Tr. at 64:18-65:12); Ex. 210 (Kohlmann Rep. at 43-44).

**RESPONSE:** Admit.

761.    Kohlmann testified that he was unaware that the AAMB claimed responsibility for the Bus 19 attack on its website one year after the attack occurred. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 388:11-395:15); Ex. 185 (Azoulay NW Reb. Rep. at 124); Ex. 186 (Azoulay NW Reb. Rep., Annexes B5 and B6).

**RESPONSE:** Admit

762.    The Israel Police investigation file for the Bus 19 attack that NatWest's expert Moshe Azoulay was permitted to review shows that members of the AAMB were found guilty of perpetrating the attack. See supra ¶¶ 553-54, 558.

**RESPONSE:** Admit that Mr. Azoulay's report indicates that that the Israel Police Investigation file he reviewed shows that members of the AAMB were found guilty of perpetrating the attack. Plaintiffs however note that a review of the 81 pages that Mr. Azoulay claims he was allowed to copy and which were attached to his rebuttal report as Annex B do not indicate that any of the perpetrators of the Bus 19 Attack were convicted of being members of the AAMB. Object to reliance on documents purportedly reviewed by NatWest's expert and not produced to Plaintiffs. As stated in Part E Paragraph 2.10 and 2.12, Mr. Azoulay was only allowed to copy 81 pages contained in the investigative filed maintained by the Jerusalem Police.  Mr. Azoulay further states that there were documents that he was not allowed to copy and Plaintiffs therefore have no way of corroborating Mr. Azoulay's statements since all the documents that Mr. Azoulay reviewed have not been produced.

763.    According to Kohlmann's report, Hamas claimed responsibility for the Bus 19 attack by posting communiqués on websites that Kohlmann attributes to Hamas. Schuster Dec. Ex. 210 (Kohlmann Rep. at 43).

**RESPONSE:** Admit.

764.    According to Kohlmann's report, Hamas also published the last will and testament and an "in-depth biography" and pictures of the attacker on websites that Kohlmann attributes to Hamas. Id.

**RESPONSE:** Admit.

765.    There is no indication in the Israel Police investigation file for the Bus 19 attack

that NatWest's expert Moshe Azoulay was permitted to review that anyone involved in the attack was a member of Hamas. <u>See</u> <u>supra</u> ¶¶ 555, 559, 562.

**RESPONSE:** Admit that Mr. Azoulay's report indicates that that the Israel Police Investigation file he reviewed does not indicate that anyone involved in the attack was a member of HAMAS. Object to reliance on documents purportedly reviewed by NatWest's expert and not produced to Plaintiffs. As stated in Part E Paragraph 2.10 and 2.12, Mr. Azoulay claims he was only allowed to copy 81 pages contained in the investigative filed maintained by the Jerusalem Police. Mr. Azoulay further states that there were documents that he was not allowed to copy and Plaintiffs therefore have no way of corroborating Mr. Azoulay's statements since all the documents that Mr. Azoulay reviewed have not been produced.

766. Kohlmann attaches as an appendix to his report a document that purports to be Ja'ara's last will and testament, consisting of a photo of the alleged handwritten will of Ja'ara posted on a website that Kohlmann attributes to Hamas. Schuster Dec. Ex. 188 (Kohlmann Rep. App'x p. 336); Ex. 185 (Azoulay NW Reb. Rep. at 122).

**RESPONSE:** Admit that Kohlmann's appendix includes a document that HAMAS stated was Mr. Ja'ara's will and testament.

767. At his deposition, Kohlmann agreed that in the alleged handwritten will Ja'arah's name was written in different ink from the rest of the document, but he testified that he did not consider that in his analysis for his report. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 414:21-415:17).

**RESPONSE:** Admit.

768. Kohlmann testified that when reviewing the alleged handwritten will he noticed that there were portions that were crossed out, but he could not recall whether he "attempted to

determine the substantive nature of what was in the text." Id. (Kohlmann CL Tr. at 416:18-418:24).

**RESPONSE:** Admit.

769.   Kohlmann also cites a different, "typed" version of Ja'ara's will posted on a website that Kohlmann attributes to Hamas. Schuster Dec. Ex. 218 (Kohlmann CL Dep. Exs. 18 and 19); Ex. 210 (Kohlmann Rep. at 43 n. 166.); Ex. 187 (Kohlmann CL Tr. at 412:12-16, 414:4-13); Ex. 185 (Azoulay NW Reb. Rep. at 122).

**RESPONSE:** Admit that Mr. Kohlmann's Report cited another copy of a will that HAMAS has attributed to Mr. Ja'ara.

770.   Kohlmann did not compare either will to any other sources. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 122).

**RESPONSE:** Dispute. Mr. Kohlmann's report identifies both HAMAS websites that posted a will attested to Mr. Ja'ara. It is unclear what "other sources" NatWest is referring to for possible comparison.

771.   Kohlmann's report also quotes from another claim of responsibility posted on a website Kohlmann attributes to Hamas that reports the Bus 19 attack was perpetrated to avenge the Al-Zaytoun operation. Id. (Azoulay NW Reb. Rep. at 123); Ex. 210 (Kohlmann Rep. at 43).

**RESPONSE:** Admit.

772.   The claim of responsibility issued by Hamas that states that Hamas committed the Bus 19 attack in retaliation for the Al-Zaytoun operation is inconsistent with Nashash's court sentence that indicates that Ja'ara's involvement with Hamas ended before the Al-Zaytoun operation took place. See supra ¶¶ 536-540.

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute. *See* Responses to ¶¶ 536-

540.

773.    Kohlmann does not cite the third will executed by the suicide bomber Ja'ara in the name of the AAMB, as described above. See supra ¶¶ 533-35.

**RESPONSE:** Admit that Mr. Kohlmann's report does not cite to any purported third will.

774.    Kohlmann also does not cite a U.S. National Counterterrorism Center report that attributes the Bus 19 attack to the Al Aqsa Martyrs' Brigades. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 124-25); Ex. 219 (Azoulay NW Reb. Rep., Annex B7).

**RESPONSE:** Admit.

(10)    The documents upon which Kohlmann relies are inadmissible under Israeli evidence law

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

775.    The claims contained in the websites upon which Kohlmann relies would be deemed inadmissible as hearsay in a civil lawsuit in an Israeli court seeking damages from a defendant on the ground that it had some responsibility for the attacks that are the subjects of these claims under the Israeli Evidence Ordinance. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 115-16).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

776.    Under the Israeli Computers Law, printed web pages are classified as "computer output." Id. (Azoulay NW Reb. Rep. at 115).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

777.    Under Section 36 of the Israeli Evidence Ordinance, computer output may be regarded as an "institutional record," which would be admissible only upon proof that:

a.      in the course of its regular conduct, the institution entered a record of an event "proximate to its occurrence" (Section 36 (a) (1) of the Ordinance); and

b.      "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a)(2) of the Ordinance).

Id. (Azoulay NW Reb. Rep. at 116).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

778.    When the record is a computer output, the following must also be proven:

a.      the method of generating the record attests to its credibility (Section 36(a)(3)(a) of the Ordinance); and

b.      The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation. (Section 36(a)(3)(b) of the Ordinance).

Id.

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

779.    The above are aggregate conditions that require proof by an expert in computerized security systems and by a person that may attest to the actual entry of the record. Id.

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

780.    The computer outputs on which Kohlmann bases his opinions do not fulfill any of the requirements under Section 36 of the Israeli Evidence Ordinance. Id.

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

781.    Kohlmann describes how over time the websites he cites were "attacked" and became unavailable, and how they were repeatedly recreated, in each instance under a new name and a new URL. Id. (Azoulay NW Reb. Rep. at 117).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

782.    Kohlmann's statements above regarding the websites he cites suffice to indicate these websites have experienced an insufficient level of security to allow their contents to be received in evidence under the Israeli Evidence Ordinance. Id.

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

783.    Status as an "institutional record" is normally granted to more reliable sources of information, such as bank, university and other institutional websites, and even then, the party that wishes to submit those records must satisfy the aggregate conditions required by the Israeli Evidence Ordinance. Id.

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

784.    The Israeli Evidence Ordinance also requires proof by means of testimony from an expert in the field of computerized systems security that the "institution" maintains computerized information security at such a level as to justify trusting its contents. Id. (Azoulay NW Reb. Rep. at 117-18).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

785.    Plaintiffs have presented no such testimony, and Kohlmann cannot serve as such a

witness because he has no personal acquaintance with these systems and their procedures. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 382:8-387:16).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

786.    The spokesman announcements and other publications on the Israeli Foreign Ministry's and Prime Minister's office websites that Kohlmann cites would also be deemed inadmissible as hearsay under Israeli law because:

a.    they do not satisfy the requirements of the Evidence Ordinance and of caselaw to be recognized as institutional records; and

b.    they cannot be submitted without supporting testimony from a witness on behalf of the entity that published these materials concerning the manner in which these documents were compiled and the means of website security.

Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 119).

**RESPONSE:** Object to argument, including argument regarding irrelevant foreign law, in a Rule 56.1 Statement.

**I.    The Qualifications Of Brian Jenkins, An Expert Retained By NatWest**

787.    Jenkins currently serves as Senior Advisor to the President of the RAND Corporation. Schuster Dec. Ex. 220 (Jenkins NW Rep. Ex. A).

**RESPONSE:** Admit.

788.    RAND is a non-profit federally-contracted research center devoted to research on issues of national interest. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 2 n. 1).

**RESPONSE:** Admit.

789.    Jenkins initiated the RAND Corporation's research program on international terrorism in 1972. Schuster Dec. Ex. 220 (Jenkins NW Rep. Ex. A).

**RESPONSE:** Admit.

790.    From 1972 to 1989, Jenkins directed RAND's research on political violence. Id.

**RESPONSE:** Admit.

791.    From 1986 to 1989, Jenkins was also Chairman of RAND's Political Science Department. Id.

**RESPONSE:** Admit.

792.    From 1989 to 1998, Jenkins was the Deputy Chairman of Kroll Associates, an international investigative and consulting firm. Id.

**RESPONSE:** Admit.

793.    In 1983, Jenkins served as an advisor to the Long Commission, which was convened to examine the circumstances and response to the bombing of the U.S. marine barracks in Lebanon. Id.

**RESPONSE:** Admit.

794.    In 1984, Jenkins assisted the Inman Panel in reviewing the security of American diplomatic facilities abroad and in 1985-86, he served as a member of the Committee of the Embassy of the Future, which established new guidelines for the construction of U.S. diplomatic posts. Id.

**RESPONSE:** Admit.

795.    In 1989, Jenkins served as an advisor to the national commission established to review terrorist threats following the bombing of PanAm 103. Id.

**RESPONSE:** Admit.

796.    In 1993, Jenkins served as a member of the team engaged by the New Jersey-New York Port Authority to review threats and develop new security measures for the World Trade Center. Id.

**RESPONSE:** Admit.

797.    In 1996, President Clinton appointed Jenkins to the White House Commission on Aviation Safety and Security. Id.

**RESPONSE:** Admit.

798.    Jenkins also is the Director of the National Transportation Security Center at the Mineta Transportation Institute, and since 1997 has directed the institute's continuing research on protecting surface transportation against terrorist attacks. Id.

**RESPONSE:** Admit.

799.    Jenkins has served as a consultant to or carried out assignments for several government agencies, including the U.S. Departments of State, Defense and Homeland Security and the U.S. Nuclear Regulatory Commission. Id.

**RESPONSE:** Admit.

800.    As part of its international project to create a global strategy to combat terrorism, the Club of Madrid appointed Jenkins in 2004 to lead the international working group on the role of intelligence. Id.

**RESPONSE:** Admit.

801.    Jenkins has written extensively about intelligence collection, and methods of intelligence analysis. Id.

**RESPONSE:** Dispute.   The portion of Mr. Jenkins' CV from which NatWest copies this irrelevant and immaterial statement indicates only that Mr. Jenkins "has written" about

intelligence collection and "methods of analysis," but not that he has done so "extensively."

802.    Jenkins is the author of *International Terrorism: A New Mode of Conflict*, the editor and co-author of *Terrorism and Personal Protection*, co-editor and co-author of Aviation Terrorism and Security, and a co-author of *The Fall of South Vietnam*. His book *Unconquerable Nation: Knowing Our Enemy, Strengthening Ourselves* was published in 2006. His latest book, *Will Terrorists Go Nuclear?* was published in September 2008. Schuster Dec. Exs. 220-21 (Jenkins NW Rep.,\ Exs. A-B).

**RESPONSE:** Admit.

803.    Jenkins is also the author of over 200 articles, book chapters and published research reports on conflict and crime. Schuster Dec. Ex. 221 (Jenkins NW Rep. Ex. B).

**RESPONSE:** Admit.

804.    According to Jenkins, to be accepted, academic research requires critical peer review. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 7).

**RESPONSE:** Object. Vague and ambiguous as to whom Mr. Jenkins is suggesting will be "accepting" the academic research, and to what type of academic research he is referencing with his opinion.

805.    According to Jenkins, the role of a peer review is to make a reasoned judgment about the content and conclusions of the document under review and to make sure the underlying analysis is methodologically sound. Id. (Jenkins NW Rep. at 8).

**RESPONSE:** Admit.

806.    According to Jenkins, the criteria for that judgment include the validity of its arguments, its factual accuracy, the appropriateness of its methods, its objectivity, its thoroughness and the soundness of its logic. According to Jenkins, a reviewer may not always

agree with the authors on issues, but should insist that alternative arguments be discussed, or at least acknowledged. Id.

**RESPONSE:** Admit.

807.    Shaked and Jenkins agree that a terrorist group's claim of responsibility for an attack is a form of propaganda. Id. (Jenkins NW Rep. at 17); Ex. 187 (Shaked CL Tr. at 79:17-80:8).

**RESPONSE:** Object. Vague and ambiguous as to which "terrorist group" Mr. Jenkins is referring, given the existence of many terrorist groups around the world, all of which Mr. Jenkins presumably is not suggesting act in like manner.  Subject to this objection, dispute NatWest's misleading characterization of Mr. Shaked's testimony. Mr. Shaked's testimony (which appears in Exhibit 180, rather than Exhibit 187) is limited to his agreement that propaganda purposes are only but one non-exclusive motivation for claiming responsibility for an attack.

808.    Shaked, Jenkins and Kohlmann agree that there are multiple motivations for a group to claim responsibility for an attack. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 17); see supra ¶¶ 511, 736-37.

**RESPONSE:**  Admit.

809.    Taking these considerations into account, Jenkins explained that, a terrorist group's claim of responsibility proves "only that someone has made the claim." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 17).

**RESPONSE:** Object. This is not a proper Rule 56.1 statement of fact, but instead a sentence lifted verbatim from Mr. Jenkins' report that clearly reflects Mr. Jenkins' opinion, as opposed to a fact.  Further, it is vague and ambiguous as to which "terrorist group" Mr. Jenkins is referring, given the existence of many terrorist groups around the world, all of which Mr. Jenkins

presumably is not suggesting act in like manner.

810. The Popular Resistance Committees (PRC), the Popular Front for the Liberation of Palestine (PFLP), the Al-Aqsa Martyrs' Brigades (AAMB), the Palestinian Islamic Jihad (PIJ) and the Izz ad-Din al-Qassam Brigades (the military wing of Hamas) are among the major terrorist groups that claimed responsibility for terrorist attacks during the Second Intifada. Id. (Jenkins NW Rep. at 11I-16).

**RESPONSE:** Admit, however Mr. Jenkins and NatWest appear to be attempting to a draw an artificial distinction between the Izz al-Din al-Qassam Brigades, the military wing of HAMAS, and HAMAS as an organization. The U.S. for instance, has considered all of HAMAS a Foreign Terrorist Organization since October 1997. Israel Dec. Ex. 2 (October 8, 1997 Notice from the Department of State, Office of the Coordinator for Counterterrorism).

811. There were numerous unclaimed terrorist attacks during the Second Intifada. Id. (Jenkins NW Rep. at 16).

**RESPONSE:** Admit that there were unclaimed attacks.

812. There are multiple motivations for terrorist groups such as Hamas to make claims of responsibility, including competition with other groups, recruiting new members, obtaining funding and gaining public support. Id. (Jenkins NW Rep. at 17-18); Ex. 187 (Kohlmann CL Tr. at 323:2-324:5, 325:21-326:4); Ex. 180 (Shaked CL Tr. at 80:5-83:12).

**RESPONSE:** Admit.

813. Jenkins and Shaked agree that terrorist groups at times take credit for attacks they did not commit, deny or fail to take credit for attacks they did commit and issue competing claims of responsibility. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 20-26); Ex. 180 (Shaked CL Tr. at 111:14-25, 121:20-122:8).

**RESPONSE:** Dispute. NatWest simply regurgitates the opinion of its expert that terrorist claims of responsibility are not reliable, and Mr. Jenkins' mere opinion is disputed by, among others, Mr. Kohlmann. Schuster Dec. Ex. 210 (Kohlmann Rep. at, *e.g.*, 8-9). Moreover, as discussed in Response to No. 511, NatWest mischaracterizes Mr. Shaked's testimony. Mr. Shaked testified that "in the first hours" following an attack some Palestinian terrorist groups have claimed responsibility for attacks in which they were not involved, but in most cases, within a day or two following an attack the actual responsible group is known. He also testified that Palestinian terrorist groups have "at times" denied responsibility for attacks they committed, but does not testify that denial of responsibility is something Palestinian terrorist groups routinely do or that specific Palestinian groups have denied responsibility for attacks they committed. Schuster Dec. Ex. 180 (Shaked CL Tr. at 83:19-84:12; 111:14-25).

814.    Kohlmann agrees that there is "literature that speaks to" the phenomenon of terrorists making false claims of credit for attacks they did not commit, and agrees that terrorist groups at times falsely deny responsibility for attacks, and that for some attacks more than one group has made a claim of responsibility. Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 332:14-333:7, 343:24-344:20, 345:13-22).

**RESPONSE:** Admit that Kohlmann testified that he is "generally" aware of such literature, however he also testified that he is not aware of any individual HAMAS communiqués that ended up being proven completely false. *Id.* at 334:9-335:21.

815.    Hamas has made claims of responsibility that have been proven false. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 21-22); Ex. 180 (Shaked CL Tr. at 88:18-95:2).

**RESPONSE:** Dispute. Mr. Shaked testified in the above-referenced testimony that he does not believe HAMAS has ever taken official responsibility for an attack that it did not commit.

816. Kohlmann testified that he is "aware [Hamas has] issued claims of responsibility which have [been] brought into question." Schuster Dec. Ex. 187 (Kohlmann CL Tr. at 334:9-335:7).

**RESPONSE:** Admit, though Kohlmann testified that he is not aware of any individual HAMAS communiqués that ended up being proven completely false. *Id*.

817. Hamas has denied responsibility for attacks when other groups claimed that Hamas committed those attacks. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 22-24); Ex. 180 (Shaked CL Tr. at 112:8-115:3); Ex. 187 (Kohlmann CL Tr. at 343:24-344:20).

**RESPONSE:** Admit.

818. According to Jenkins, a responsible analyst cannot take claims of responsibility at face value, but instead must undertake a rigorous analysis of the claims in conjunction with all other available evidence. Schuster Dec. Ex. 172 (Jenkins NW Rep. at 28-34).

**RESPONSE:** Object and Dispute. This "statement of fact" is merely a statement of opinion of NatWest's expert Mr. Jenkins. Mr. Jenkins relies on no facts in this excerpt of his report, and simply offers his opinion about the purportedly "responsible" analyst. It is a wholly improper use of a Rule 56.1 Statement.

819. According to Jenkins, Hamas, like other Palestinian groups, had a powerful incentive to make claims of responsibility for terrorist attacks during the Second Intifada. It considered itself under strong popular pressure, and had to hold the allegiance of its constituents. Although various Palestinian factions cooperated at times, Hamas was in competition with other Palestinian factions. Hamas wanted to attract other action-prone militants, Hamas had to signal continued strength and operational capability in the face of determined Israeli efforts to destroy it. Id. (Jenkins NW Rep. at 34).

**RESPONSE:** Object and Dispute. This is not a proper Rule 56.1 statement of fact, but instead a sentence lifted from Mr. Jenkins' report that merely reflects Mr. Jenkins' opinion. Regardless of the speculative motives Mr. Jenkins ascribes, Palestinian terrorist organizations did not make false claims of responsibility in the name of another terrorist group during the Second Intifada and HAMAS did not make false declarations of responsibility for terrorist attacks. Schuster Dec. Ex. 180 (Shaked CL Tr. at 120:14-17; 121:5-122:8).

820.    According to Jenkins, Shaked's own narrative of the Bus 19 attack - in which he concedes that Hamas's rival the AAMB and not Hamas helped Ja'ara perpetrate this attack, and Hamas was involved only with a prior failed attempted attack -demonstrates that Hamas's claims of responsibility are unreliable and that even the "evidence" a group submits in support of their claims (such as photographs of the bombers or videotaped wills) can be misleading. Id. (Jenkins NW Rep. at 41).

**RESPONSE:** Object and Dispute. This is not a proper Rule 56.1 statement of fact, but instead a sentence lifted from Mr. Jenkins' report that merely reflects Mr. Jenkins' opinion, as opposed to a fact. In fact, the Bus 19 attack does not "demonstrate" anything as to the reliability of HAMAS claims of responsibility, a speculative claim of Mr. Jenkins' disputed by, among others, Mr. Kohlmann. Schuster Dec. Ex. 210 (Kohlmann Rep. at, *e.g.*, 8-9, 43-44). Plaintiffs' Responses to ¶¶ 520-561 discuss why Mr. Shaked attributes responsibility to HAMAS and disagrees with Mr. Jenkins' opinion.

821.    Hamas published several claims of responsibility for certain of the attacks at issue in these cases months or years after the attack took place. For example, the official Hamas announcement claiming responsibility for the May 7, 2002 attack was published by Hamas in

June 2008. Id. (Jenkins NW Rep. at 49-5 1); Ex. 179 (Shaked NW Rep. at 42); Ex. 210 (Kohlmann Rep. at 33).

**RESPONSE:** Admit.

822.    Shaked's only explanation as to why Hamas waited so long to publish its claim of responsibility for the May 7, 2002 attack is that Hamas withheld a suicide bomber's name to protect his family, but no one from Hamas told him that this is true. Schuster Dec. Ex. 179 (Shaked NW Rep. at 43); Ex. 180 (Shaked CL Tr. at 217:17-222:15).

**RESPONSE:** Dispute.   Mr. Shaked explained in the above-cited testimony that among the reasons HAMAS waited to publish its claim of responsibility was concerns pertaining to HAMAS's relations with Jordan.

823.    According to Jenkins, late claims of responsibility "must be discounted in an analysis of responsibility, absent a compelling explanation for the delay." Indeed, in June 2008, according to one scholar Hamas's military wing claimed responsibility for a number of previously unclaimed attacks "in an apparent effort by ... senior leaders to undermine a ceasefire with Israel." See supra ¶ 595.

**RESPONSE:** Object and Dispute. This "statement of fact" is a disguised statement of opinion of NatWest's expert Mr. Jenkins. Mr. Jenkins relies on no facts in this excerpt of his report, and simply speculates as to the discounting of subsequent claims of responsibility. It is a wholly improper use of a Rule 56.1 Statement.

824.    Kohlmann engages in no analysis of the delayed claim of responsibility for the May 7, 2002 attack except to repeat the Hamas statement on the website he attributes to Hamas that the delay in the claim was to "preserve the integrity of the muhjahideen." Schuster Dec. Ex. 210 (Kohlmann Rep. at 33-34).

**RESPONSE:** Object and Dispute. This "statement of fact" simply channels the opinion of NatWest's expert Mr. Jenkins. Mr. Jenkins relies on no facts in this excerpt of his report, and simply speculates by recklessly trying to attribute the HAMAS statement as coming from "the website [Mr. Kohlmann] attributes to HAMAS" when Mr. Jenkins cannot seriously dispute the HAMAS website. Schuster Dec. Ex. 210 (Kohlmann Rep. at 25-27). Either way, it is a disguised *Daubert* challenge and wholly improper use of a Rule 56.1 Statement.

825.    Kohlmann posits that it is a "reasonable assumption" that the "more occasions Hamas claims responsibility for an individual operation" the more likely it is that its claim is legitimate. Id. (Kohlmann Rep. at 8).

**RESPONSE:** Admit.

826.    According to Jenkins, "there is no accepted methodological basis for this position" because "repetition is not confirmation." Schuster Dec. Ex. 172 (Jenkins NW Rep. at 43).

**RESPONSE:** Object and Dispute. This "statement of fact" is a disguised statement of opinion of NatWest's expert Mr. Jenkins. Mr. Jenkins relies on no facts in this excerpt of his report, and this is a disguised *Daubert* challenge and wholly improper use of a Rule 56.1 Statement.

827.    According to Jenkins, "[n]o accepted methodology for analyzing culpability for a terrorist attack would credit a claim of responsibility by itself as reliable proof of responsibility." Id. (Jenkins NW Rep. at 43).

**RESPONSE:** Object and Dispute. This "statement of fact" is a disguised statement of opinion of NatWest's expert Mr. Jenkins. Mr. Jenkins relies on no facts in this excerpt of his report, and this is a disguised *Daubert* challenge and wholly improper use of a Rule 56.1 Statement. NatWest mischaracterizes Kohlmann's testimony, which was that a demonstrably <u>reliable</u> claim of

responsibility for a terrorist attack, like the HAMAS claims he examined in connection with the attacks here at issue, indicates that it is <u>more likely than not</u> that the group claiming responsibility is responsible for the attack. Israel Dec. Ex. 147 (Kohlmann Tr. at 75:2-19; 76:18-78:11; 195:7-25).

## J.   Shaul Naim Purports To Authenticate Documents Upon Which Shaked Relies, But His Proposed Testimony Is Inadmissible

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

828.   Naim stated in his report that the collection of documents for each attack he included in his report "are authentic records of Israeli law enforcement (including judicial agencies and offices)." Schuster Dec. Ex. 222 (Naim NW Rep. at 7).

**RESPONSE:** Admit.

829.   Naim stated in his report that the collection of documents for each attack he included in his report "appear, in my professional opinion, to be authentic records maintained by Israeli Law Enforcement, (including police officers, prosecutors, courts, or military officials), depending on where the relevant document(s) were maintained." <u>Id.</u> (Naim NW Rep. at 6, n. 1).

**RESPONSE:** Admit.

830.   Naim testified that "[w]hen I say it's authentic, I express what I thought was what the document looked like when I saw them.... [T]hey appeared - on the face they appeared to be authentic." Schuster Dec. Ex. 223 (Naim CL Tr. at 13:2-11).

**RESPONSE:** Dispute. Though Mr. Naim otherwise testified as stated, NatWest combines Mr. Naim's testimony and omits certain portions, thereby omitting necessary context.

831.   Naim stated in his report that "[i]n making this determination, I relied on my three decades of experience in working in the police investigation field with these types of documents

on a daily basis to ensure that the documents were authentic, official records." Schuster Dec. Ex. 222 (Naim NW Rep. at 7).

**RESPONSE:** Admit.

832.   Naim testified that "you can know when you read material if you read authentic material or not[,] otherwise it's as if the 30 years [of police work] did not exist." Schuster Dec. Ex. 223 (Naim CL Tr. at 82:21-24).

**RESPONSE:** Admit.

(1)   <u>Naim is not qualified to authenticate the documents he purports to authenticate</u>

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

(a)   <u>Generally</u>

833.   Naim served as a lawyer in the Jerusalem police district's litigation and investigations branches until 2006. Schuster Dec. Ex. 222 (Naim NW Rep. at 3-4).

**RESPONSE:** Dispute. Though it is unclear from NatWest's statement which time period it intends to include within this statement, Mr. Naim describes at the referenced pages his 30-year career in the police as a prosecutor, Chief Superintendent, Commander, and other positions.

834.   Of the 14 relevant attacks Naim addresses in his report, only six are identified as occurring in the Jerusalem police district. <u>Id.</u>(Naim NW Rep. at 6).

**RESPONSE:** Dispute. Mr. Naim identifies 15 attacks, six of which he investigated at the time during his service in Jerusalem with the Israeli police. Schuster Dec. Ex. 222 (Naim Rep. at 5-6).

835.   Accordingly, most of the police records Naim purports to authenticate were not created by the police office in Jerusalem in which Naim previously worked or by the courts in that district. The remainder of the attacks occurred outside of the Jerusalem district and the judicial and law enforcement records pertaining to those attacks were created in entirely different districts. <u>Id.</u>

**RESPONSE:** Object and Dispute.  NatWest's argumentative statement appears to be an attempt to imply that because the documents originate from "different jurisdictions," somehow the records for each attack are different and that Naim cannot opine on them. This disguised argument lacks any basis, as NatWest cites only to Mr. Naim's report.  Moreover, the different police districts in Israel do not create "different jurisdictions," as the Israeli Police is a national law enforcement body.

836.    Naim had worked in his own private law practice for four years when he signed his report. Schuster Dec. Ex. 223 (Naim CL Tr. at 83:3-20, 192:6-9); Ex. 222 (Naim NW Rep. at 4).

**RESPONSE:** Admit.

837.    Most of Naim's private law practice involves litigating traffic and minor criminal cases. Schuster Dec. Ex. 223 (Naim CL Tr. at 138:21-139:13); Ex. 222 (Naim NW Rep. at 4).

**RESPONSE:** Admit. Mr. Naim explained that in light of the 30 years he spent dealing with terrorists and other murderers in the police, it is difficult for him to defend such accused criminals. Schuster Dec. Ex. 223 (Naim Tr. at 139:3-13).

838.    Naim has never prosecuted cases in military courts in Israel or the Palestinian Territories, and his sole experience practicing in a military court in the Palestinian Territories was his representation of one client only last year. Schuster Dec. Ex. 223 (Naim CL Tr. at 139:14-142:24).

**RESPONSE:** Dispute. Mr. Naim explained in the cited excerpt that he had regular professional involvement with the military courts between 1998 and 2006 while with the Israeli police. Schuster Dec. Ex. 223 (Naim Tr. at 141:16 – 142:18).

(b)     Naim is not qualified to authenticate the documents at issue under the <u>Federal Rules of Evidence</u>

**RESPONSE:** Object to the inclusion of argument, disguised as a heading, in a Rule 56.1 Statement.

839.    Naim has no personal knowledge of any of the documents he purports to authenticate. <u>Id.</u> (Naim CL Tr. at 13:12-17, 18:11-19:3, 46:14-47:15, 52:23-53:8).

**RESPONSE:** Admit that Mr. Naim did not create any of the documents or personally maintain them in his own police files.

840.    Naim indicates in his report that he participated in the investigation of six of the attacks at issue in these cases. Schuster Dec. Ex. 222 (Naim NW Rep. at 6).

**RESPONSE:** Admit.

841.    Naim does not indicate whether he examined as part of his involvement in the investigations of these six attacks any of the documents he purports to authenticate. <u>Id.</u> (Naim NW Rep. at 6).

**RESPONSE:** Admit.

842.    Naim's name does not appear on any of the documents attached to his report related to these five attacks or any of the nine other attacks he purports to address. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 108).

**RESPONSE:** Admit.

843.    Naim did not have any official responsibility for maintaining, and did not maintain any of the documents he purports to authenticate. Schuster Dec. Ex. 223 (Naim CL Tr. at 13:12-17, 18:11-19:3, 46:14-47:15, 52:23-53:8, 80:13-81:21).

**RESPONSE:** Admit.

844.    Most of the documents Naim purports to authenticate were first given to him by plaintiffs' counsel, not by any officials who are responsible for maintaining those documents. Id. (Naim CL Tr. at 13:12-17, 52:23-53:8).

**RESPONSE:** Dispute. Mr. Naim did not testify, in the above-cited excerpts or otherwise, that he received "most" of the documents from Plaintiffs' counsel.

845.    When he signed his report, Naim had made no effort to verify that the documents plaintiffs gave to him were authentic, for example by comparing them against true originals. Id. (Naim CL Tr. at 53:18-54:7).

**RESPONSE:** Dispute. Mr. Naim testified only that he did not go to the police or courts. In his report, he discusses why the records appear authentic. Schuster Dec. Ex. 222 (Naim NW Rep. at 7-13).

846.    Naim compared certain of the military court documents that plaintiffs' counsel gave to him against what he saw in military court files to which he obtained access from court personnel, but only after signing his initial report in which he purported to opine that these documents are authentic. Id. (Naim CL Tr. at 68:13 20).

**RESPONSE:** Admit.

847.    Plaintiffs refused to allow Naim to answer any questions concerning the origins of the documents that plaintiffs' counsel provided to him. Id. (Naim CL Tr. at 90:14-21).

**RESPONSE:** Object and Dispute. NatWest's argumentative statement is not a statement of fact in accordance with Rule 56.1, but instead both improper argument and an inappropriate attempt by NatWest to wield a stipulation between the parties, which Plaintiffs properly enforced, to its advantage. The parties stipulated that all communications with their respective experts are confidential.  Nevertheless, in the excerpted "testimony," counsel for NatWest attempted to ask a

question specifically regarding conversations between Mr. Naim and Plaintiffs' counsel, to which Plaintiffs properly objected.  Further, Plaintiffs did not refuse "to allow Naim to answer any questions concerning the origins of the documents that plaintiffs' counsel provided to him" but instead merely one direct question which would have breached the stipulation – NatWest could have obtained information about the origins of the documents by simply asking Mr. Naim for his factual knowledge.

848.    Naim obtained the documents from plaintiffs' counsel for all but three attacks: the October 22, 2003 attacks at Tel Romeida, the March 7, 2003 attack at Kiryat Arba and the April 30, 2003 attack at Mike's Place. Id. (Naim CL Tr. at 26:8-27:5).

**RESPONSE:** Dispute.  In the cited testimony, Mr. Naim testified that he personally obtained indictments for other attacks as well.

849.    For at least one of the three attacks for which Naim did not obtain the documents from plaintiffs' counsel, he received the documents from his personal contacts with the Israeli police. Id. (Naim CL Tr. at 18:11-19:3). They are not publicly available. See infra ¶ 867.

**RESPONSE:** Dispute. In the testimony on which NatWest relies, Mr. Naim stated only in response to a question about one attack (Kiryat Arba) that he spoke directly with the investigating officers to obtain a copy of the file. Mr. Naim did not testify that the files are not publicly available.

850.    Naim did not personally copy the documents he received from his police contacts. Schuster Dec. Ex. 223 (Naim CL Tr. at 46:14-47:15).

**RESPONSE:** Admit, however a personal representative of Mr. Naim's physically made the copies.

851.    Naim has not made any showing with respect to the "appearance, contents, substance, internal patterns, or other distinctive characteristics" of the documents he purports to authenticate.

**RESPONSE:** Object. This "statement of fact" is a disguised legal argument. NatWest relies on no facts in this statement, which is a disguised *Daubert* challenge and wholly improper use of a Rule 56.1 Statement.

> (c)    Naim is not qualified to authenticate the documents at issue under Israeli evidence law

**RESPONSE:**  Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

852.    Naim's experience as a police officer and a lawyer does not qualify him under Israeli law to authenticate the documents that he purports to authenticate here. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 98, 106-07).

**RESPONSE:** Object. This is a statement of irrelevant foreign law proffered by one of NatWest's experts, Moshe Azoulay, and not a discrete statement of material fact in accordance with Rule 56.1. *See* Response to ¶ 601.

853.    Naim is not competent to authenticate any judgments under Paragraph 11 of the Israeli Execution Regulations because he has not presented an original judgment or a true copy certified and signed by the secretariat of the court that issued the judgment. Id. (Azoulay NW Reb. Rep. at 98-99); Ex. 223 (Naim CL Tr. at 13:12-17, 52:23-53:8).

**RESPONSE:** Object. *See* Response to ¶ 852.

854.    Section 23 of the Israeli Evidence Ordinance permits a court to accept as evidence a certificate about a record in an official document that is signed by the civil servant who made the record or the recorded act or received the information about the record or by the person in

charge of the unit where that civil servant worked. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 99-100).

**RESPONSE:** Object. *See* Response to ¶ 852.

855.   Naim is not competent to authenticate any record under Section 23 of the Israeli Evidence Ordinance because he is not a civil servant who is currently an employee of the state. Id. (Azoulay NW Reb. Rep. at 99-100); Ex 223 (Naim CL Tr. at 83:3-20).

**RESPONSE:** Object. *See* Response to ¶ 852.

856.   Section 32 of the Israeli Evidence Ordinance provides that the authenticity of a public certificate may be proven by submitting:

(1)   The original;

(2)   Its verified copy;

(3)   Its copy printed by the official printer;

(4)   Its copy certified with the official seal or with the signature of the officer that possesses the official custody;

(5)   Its copy certified with the official seal of the institution that possesses the official custody;

(6)   Its certified copy with the seal or the signature of a minister or of another functionary of equal status, or of a functionary that holds a rank and position that satisfies the court, concerning the document's credibility; or

(7)   The copy certified with the institution's official seal, if the credibility of the certificate satisfies the court, considering the nature of the document and of the certifying institution.

Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 100-01).

**RESPONSE:** Object. *See* Response to ¶ 852.

857.   Naim has not authenticated any public certificates in compliance with Section 32 of the Israeli Evidence Ordinance because the documents listed in and attached to his reports do

not satisfy any of the above conditions or other stated conditions regarding the verification of a public certificate. Id.

**RESPONSE:** Object. *See* Response to ¶ 852.

858. Naim cannot authenticate any documents pursuant to Section 32 of the Israeli Evidence Ordinance because he did not copy the documents from originals himself and did not verify that the copies are true copies of the originals. Schuster Dec. Ex. 223 (Naim CL Tr. at 46:14-47:11, 53:18-22); Ex. 185 (Azoulay NW Reb. Rep. at 100-01).

**RESPONSE:** Object. *See* Response to ¶ 852.

859. Section 41 of the Israeli Evidence Ordinance provides that a copy of a document that satisfies the terms of Section 36 of the Israeli Evidence Ordinance as an institutional record may be proven to be authentic with a certificate that proves that the copy was made from the original and that it is a true copy. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 101-02).

**RESPONSE:** Object. *See* Response to ¶ 852.

860. Naim cannot authenticate copies of documents under Sections 36 and 41 of the Evidence Ordinance or provide proof of an institutional record by its copy, because he has not proven that these documents are institutional records, and because he has not fulfilled the requirement of certifying that the copies are true copies. Id. (Azoulay NW Reb. Rep. at 102-04).

**RESPONSE:** Object. *See* Response to ¶ 852.

861. Regulation 5(a) of the Regulations of the Hague Convention states that the following individuals are entitled to authenticate documents for the purposes of the convention: "(a) Ministry of Foreign Affairs, registrar in the Magistrate's Court or civil servant appointed by the Minister of Justice according to Article 45 in Notary Law -1976, will be -each of them -the

competent authority to issue in Israel certificates according to the Convention." Id. (Azoulay NW Reb. Rep. at 100-04).

**RESPONSE:** Object. *See* Response to ¶ 852.

862.    Naim has not authenticated any documents in accordance with Regulation 5(a) of the Regulations of the Hague Convention because he has not provided any of the types of official certificates those regulations require. Id. (Azoulay NW Reb. Rep. at 104).

**RESPONSE:** Object. *See* Response to ¶ 852.

863.    Articles 7 and 12 of the Israeli Notary Law permit a notary to certify the authenticity of a copy of a document, if the original document has been submitted to the notary and he has compared the two documents and found them to be identical. Id. (Azoulay NW Reb. Rep. at 104-05).

**RESPONSE:** Object. *See* Response to ¶ 852.

864.    Naim cannot authenticate documents under Article 7 of the Israeli Notary Law because he is not a notary. Id. (Azoulay NW Reb. Rep. at 104-06); Ex. 223 (Naim CL Tr. at 191:25-192:2).

**RESPONSE:** Object. *See* Response to ¶ 852.

865.    Naim cannot authenticate documents under Article 12 of the Israeli Notary Law because there is no evidence that he has compared the copies he has provided with the original versions and found them to be identical. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 105-06).

**RESPONSE:** Object. *See* Response to ¶ 852.

(2)    Naim's proposed testimony is based upon insufficient and unreliable sources and is not the product of reliable principles and methods, and Naim has not applied his methods reliably to the facts of these cases

**RESPONSE:** Object to legal argument, disguised as a heading, in a Rule 56.1 Statement.

866.     With respect to the January 29, 2004 attack on Bus 19, Naim includes documents in his report that expert witness Moshe Azoulay did not find in the police file for this attack that the Jerusalem police provided to him for his review; conversely, Naim does not include certain documents that Azoulay did find in the police file he reviewed. Id. (Azoulay NW Reb. Rep. at 128-34); Ex. 222 (Naim NW Rep. at 24).

**RESPONSE:** Admit that Azoulay stated as much.  Note that Naim states in his report that the documents included in his Appendix were not intended to be a complete file of documents that an Israeli court, prosecutor, law enforcement agency, or military official has for each attack. Schuster Dec. Ex. 222 (Naim NW Rep. at 13).

867.     Contrary to Naim's statements that all of the files he is authenticating are publicly available, Schuster Dec. Ex. 223 (Naim CL Tr. at 41:6-42:18, 44:12-25, 60:7-12, 170:17-172: 17, 176:21-177:2), when Azoulay attempted to search for and retrieve several of the court and police investigation files for different attacks referenced in Naim's report, only certain files with respect to two attacks (the Bus 19 attack and the Café Hillel attack) were made available to him, and those files were different from the files Naim reports he was given. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 128-34); Ex. 224 (Azoulay Supp. Reb. Rep. at 2-5).

**RESPONSE:** Object to argument in a Rule 56.1 Statement. Dispute that the fact that the procedure followed by NatWest's expert apparently led to different results somehow renders Mr. Naim's statement inaccurate.

868.     Naim submitted several written requests to the Israel Police for access to review police files related to the attacks at issue in these cases. Schuster Dec. Ex. 225 (Naim NW Dep. Exs. 7 and 7A); Ex. 226 (Naim NW Tr. at 75:21-76:15).

**RESPONSE:** Admit.

869.    In these requests, Naim offered "reasons" for claiming to be entitled to access these documents that are indisputably false. For example, Naim stated to the Israel Police that plaintiffs are pursuing claims against Hamas, that the claims are also against a number of banks in the U.S. that are holding money deposited by Hamas, and that plaintiffs seek to "remove this money from the banks and transfer it to the families of the dead and injured Americans and Israelis who were the victims of attacks that took place in Israel between 2000 and 2005." Schuster Dec. Ex. 225 (Naim NW Dep. Exs. 7 and 7A); Ex. 226 (Naim NW Tr. at 75:21-76:15).

**RESPONSE:** Dispute. Naim obtained many of these documents for purposes in addition to this litigation. Although protective orders in place in other cases preclude Plaintiffs from responding in detail, the letters referenced are not false.

870.    Plaintiffs are pursuing their claims against NatWest, a British bank, not against Hamas and not against a bank in the U.S.

**RESPONSE:** Admit as to whom Plaintiffs are pursuing their claims against in this litigation, however Mr. Naim's letters to which this statement refers include claims beyond this litigation.

871.    Moreover, plaintiffs are seeking damages from NatWest, not funds that were allegedly deposited by Hamas into a NatWest account.

**RESPONSE:** Admit as to Plaintiffs seeking damages from NatWest in this litigation, however Mr. Naim's letters to which this statement refers include claims beyond this litigation.

(3)    Naim's invention of the term "attack file"

872.    Throughout his initial report in the CL cases, Naim used the term "Attack File" to refer to "police and court files, and their contents, concerning certain attacks." Schuster Dec. Ex. 227 (Naim CL Rep. at 5-12).

**RESPONSE:** Admit.

873.    In his supplemental report in the CL cases and in his report in the NatWest cases, Naim admitted that the term "Attack File" is one he created himself, as an "internal reference for the collection of documents of each attack in the Report for which I am opining that such documents appear, in my professional opinion, to be authentic records...." Schuster Dec. Ex. 228 (Naim CL Supp. Rep. at 2); Schuster Dec. Ex. 222 (Naim NW Rep. at 6 n.1).

**RESPONSE:** Admit that NatWest accurately, albeit selectively, quotes Naim. Dispute that this statement in any way qualifies as an "admission" rather than a clarification to avoid confusion.

874.    Naim applied the term "Attack File" to describe all of the Israeli law enforcement and court materials that were collected for each relevant attack. Schuster Dec. Ex. 222 (Naim NW Rep. at 6 n.1).

**RESPONSE:** Dispute. Mr. Naim specifically stated that the term "Attack File" "was and is not intended to suggest that documents listed in the Appendix for each individual attack constitute an Israeli court, prosecutor, law enforcement agency, or military official's complete file of documents that such entity has generated, collected, archived and/or catalogued for a given attack." Schuster Dec. Ex. 228 (Naim Supp. Rep. at 2).

875.    Naim applied the term "Attack File" to all of these documents, regardless of whether Naim obtained them from plaintiffs' counsel or third parties. Id.

**RESPONSE:** Dispute. *See* Response to ¶ 874.

876.    Naim applied the term "Attack File" to many different types of documents from many different sources, including police investigation files, court files, Israel Security Agency memoranda and indictments. Id. (Naim NW Rep. at 6 n.1, 14-24); Ex. 185 (Azoulay NW Reb. Rep. at 9 1-92).

**RESPONSE:** Admit.

877.    Naim stated in his report that after an investigation has been completed, the entire original "Attack File" is sent to prosecutors for evaluation in order to determine whether there is sufficient evidence for filing an indictment, yet Naim then contradicts that statement by including in the "Attack Files" he purports to describe numerous court records, including sentences and verdicts which, by their nature, could not have existed at the time the investigative file was sent to prosecutors. Schuster Dec. Ex. 222 (Naim NW Rep. at 12, 14-24).

**RESPONSE:** Object to argument in a Rule 56.1 Statement.   Dispute. Mr. Naim's Report explicitly states that the attack file maintained by the court may well be more complete than the one maintained by police, since the police "do not always obtain all of the records generated during the prosecution and court proceedings."  Schuster Dec. Ex. 222 (Naim Rep. at 12).

878.    Naim includes documents in his "Attack Files," such as Israeli Security Agency memoranda, that Naim states are not included in "Attack Files." Id. (Naim NW Rep. at 10 n. 6).

**RESPONSE:** Dispute. *See* Response to ¶ 874, including Mr. Naim's clarification that law enforcement materials may be included in the attack files.

879.    There is no legal or formal term or concept of an "Attack File" in Israel. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 91).

**RESPONSE:** Admit. Mr. Naim stated that this term was his internal reference for the collection of documents of each attack. Schuster Dec. Ex. 228 (Naim Supp. Rep. at 2).

880.    Records relating to specific attacks are generated by various law enforcement agencies in different geographic areas, under different legal systems, at different points in time and for very different reasons. These records are unique to each of these entities, and do not all contain the same documents. Id. (Azoulay NW Reb. Rep. 91-92).

**RESPONSE:** Admit.

881.    It is inaccurate to assert that the entire police investigation file is always included in the court file. Id. (Azoulay NW Reb. Rep. 94-95).

**RESPONSE:** Object and Dispute. Mr. Azoulay does not provide any support for his argument, nor does Mr. Naim assert this position.

882.    No law enforcement file, regardless of the authority, is guaranteed to be a complete file that contains all of the documents generated with respect to a specific attack. Id.; Schuster Dec. Ex. 226 (Naim NW Tr. at 46:16-47:12).

**RESPONSE:** Dispute that the cited testimony stands for this proposition.  Rather, Naim simply clarifies in the excerpted testimony that there are circumstances in which the prosecutor does not have to submit all of the documents that he has to the court.

(4)    Naim's extensive revisions to his initial report

883.    After signing his first report in the CL cases on December 10, 2009, Naim submitted a supplemental report in those cases in which he conceded that, when he signed his initial report, purporting to attest to the authenticity of almost 2,000 pages of documents, he included on that list documents that were not even in his possession at that time, and many of which were never subsequently provided in these lawsuits. Schuster Dec. Ex. 228 (Naim CL Supp. Rep. at 2).

**RESPONSE:** Dispute that Naim included many documents not in his possession, when, as set forth in Naim's supplemental report, he inadvertently included some documents that were duplicates as well as certain ones that were inadvertently included prior to his review.  Schuster Dec. Ex. 228 (Naim Supp. Rep. at 2).

884. In addition to purporting to authenticate documents as an expert witness in these lawsuits, Naim also performed consulting work for plaintiffs' counsel. Schuster Dec. Ex. 223 (Naim CL Tr. at 96:12-98: 16); Ex. 226 (Naim NW Tr. at 17: 14-21:10).

**RESPONSE:** Admit.

**K.      The Qualifications Of Moshe Azoulay, An Expert Retained By NatWest**

885. Moshe Azoulay received an LL.B. in Law and Philosophy from Tel Aviv University in 1993. Schuster Dec. Ex. 229 (Azoulay NW Rep., Annex A).

**RESPONSE:** Admit.

886. Azoulay was admitted to the Bar of Israel in 1995. Id.

**RESPONSE:** Admit.

887. From 1972 to 1978, Azoulay served as a Major in the Armored and Infantry Forces of the Israel Defense Forces. Id.

**RESPONSE:** Admit.

888. From 1979 to 1988, Azoulay served in Special Operations at the Israeli Security Agency, where he was responsible for, among other things, counter terrorism operations. Id.

**RESPONSE:** Dispute. Mr. Azoulay's CV, on which NatWest relies, does not state that he was responsible for counter terrorism operations.

889. From 1979 to 1984, Azoulay served in the Reserve Service of the Israel Defense Forces. From 1989 to 2009, he served in the Reserve Service of the Mossad and the Israel Security Agency. Id.

**RESPONSE:** Admit.

890. On March 11, 2010, Moshe Azoulay submitted written requests to the attorney in charge of Freedom of Information at the Israel Police to review and copy all of the documents

297

contained in the investigation files of four attacks at issue in these lawsuits: the January 29, 2004 attack on Bus 19; the April 30, 2003 attack at Mike's Place restaurant; the October 22, 2003 attack at Tel Rumeida; and the September 24, 2004 attack at Neve Dekalim. Schuster Dec. Ex. 185 (Azoulay NW Reb. Rep. at 127-28).

**RESPONSE:** Admit, although the report cited states only that Azoulay "asked" the attorney in charge "to peruse and copy" the files, and does not describe any written request submitted by Azoulay.

891.    On May 10, 2010, the Jerusalem police granted Azoulay's request to review the investigation file for the January 29, 2004 Bus 19 attack. Id. (Azoulay NW Reb. Rep. at 129).

**RESPONSE:** Admit.

892.    On June 6, 2010, Azoulay reviewed and copied the entire investigation file for the January 29, 2004 Bus 19 attack at the Jerusalem police office, with the exception of certain forensic documents, medical records, pictures of the attack, internal police memos and the investigation log book, all of which the police prohibited Azoulay from copying. Id. (Azoulay NW Reb. Rep. at 129-31).

**RESPONSE:** Admit that Azoulay states as much.

893.    None of the documents that the police permitted Azoulay to copy was included among the documents produced by plaintiffs. Id. (Azoulay NW Reb. Rep. at 132-33).

**RESPONSE:** Admit.

894.    None of the documents that the police permitted Azoulay to copy was cited in or attached to the Naim, Shaked or Kohlmann reports. Id. (Azoulay NW Reb. Rep. at 133).

**RESPONSE:** Admit.

895.    None of the persons whose court sentences for perpetrating the Bus 19 attack that Azoulay was permitted to copy was accused or found to be a member of Hamas. Id.

**RESPONSE:** Admit.

896.    Contrary to what Naim contends in his reports, the police investigation files to which he refers are not freely available to the public. Review of these files is subject to the consent of investigation officers and such consents are not routinely given and/or are not given at all. Id.

**RESPONSE:** Dispute. Mr. Azoulay states only that it "appears" the files are not freely available, based on an apparently unsuccessful attempt he made to obtain certain files. NatWest cites no support for the proposition that consent to view these files is not "routinely given and/or is not given at all."

897.    Further, the permission Azoulay received to review the investigation file for the Bus 19 attack was only limited and did not allow Azoulay to fully read and/or copy all of the material contained in the file which in turn did not contain a single document previously produced by plaintiffs or Naim. Id. (Azoulay NW Reb. Rep. at 128-31).

**RESPONSE:** Admit that Azoulay was not permitted to copy certain documents in the file. It is not clear from Azoulay's report whether there were also documents in the file that he was not permitted to read.

Dated:  January 30, 2012

Respectfully Submitted,

SAYLES WERBNER

By: _Mark S Werbner_

Mark S. Werbner
Joel Israel
4400 Renaissance Tower

299

1201 Elm Street
Dallas, TX 75270
(214) 939-8700

HEIDEMAN NUDELMAN & KALIK, P.C.
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 463-1818

STONE BONNER & ROCCO LLP
James P. Bonner
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

Attorneys for *Applebaum* Plaintiffs


ZUCKERMAN SPAEDER LLC


By: _____
Aitan D. Goelman
Andrew Caridas
1800 M Street NW, Suite 1000
Washington, DC 20036
(202) 778-1800

OSEN LLC
Gary M. Osen
Joshua D. Glatter
Aaron Schlanger
Ari Ungar
2 University Plaza, Suite 201
Hackensack, NJ 07601-6211
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer

300

One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue
Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for *Weiss* Plaintiffs