UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TZVI WEISS, et al.,                              :
                                                 :
                          Plaintiffs,            :        Case No. 05-cv-4622 (DLI) (MDG)
                                                 :
              - against –                        :
                                                 :
NATIONAL WESTMINSTER BANK PLC,                   :
                                                 :
                          Defendant.             :
                                                 :
---------------------------------------------------------------X
NATAN APPLEBAUM, et al.,                          :
                                                 :
                          Plaintiffs,            :
                                                 :
              - against –                        :
                                                 :        Case No. 07-cv-916 (DLI) (MDG)
NATIONAL WESTMINSTER BANK PLC,                   :
                                                 :
                                                 :        **Oral Argument Requested**
                          Defendant.             :
                                                 :
                                                 :
---------------------------------------------------------------X

### REPLY MEMORANDUM OF LAW OF DEFENDANT NATIONAL WESTMINSTER BANK PLC IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

Attorneys for Defendant National Westminster Bank Plc

February 29, 2012

HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT .................................................................... 1

I.    PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE
OF <u>SCIENTER</u> ........................................................................... 4

    A.    Plaintiffs Cannot Rely On Allegations That Are
Blatantly Contradicted By The Record Or Based
On Conjecture And Speculation ..................................................... 5

    B.    A Showing Of "Recklessness" Cannot Satisfy The ATA's
<u>Scienter</u> Requirements And, Applying The Actual Standard,
No Reasonable Juror Could Find NatWest Was Reckless.............. 11

        1.    A showing of mere "recklessness" cannot suffice ............. 11

        2.    Plaintiffs misstate the recklessness standard, and, applying
the actual standard, no reasonable juror could find that
NatWest was reckless ..................................................... 12

            a.    There is no triable case that NatWest was
subjectively aware of a substantial and
unjustifiable risk........................................................ 12

            b.    There is no triable case that NatWest ignored
or consciously disregarded a risk ........................... 14

II.    PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE
OF PROXIMATE CAUSATION OR STANDING................................... 16

    A.    Plaintiffs Have Not Presented Evidence Sufficient To Show
As A Matter Of Law That The 13 Charities Were The <u>Alter
Egos</u> Or Under The Control Of Hamas............................................ 17

    B.    The Mere Transfer Of Funds To The 13 Charities
Cannot Constitute "By Reason Of" Proximate Causation
Under the ATA ................................................................................ 18

III.    PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE
CONCERNING HAMAS'S RESPONSIBILITY FOR THE ATTACKS
AT ISSUE ....................................................................................... 19

CONCLUSION.......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

18 U.S.C. § 2333(a) .......................................................................................... 18

MPC § 2.02 (2)(c) ............................................................................................ 12

**Cases**

A.T. v. Home Depot U.S.A., Inc.,
2012 WL 194958 (E.D.N.Y. Jan. 23, 2012) ........................................................ 4

Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.,
1997 WL 906427 (S.D.N.Y. Sept. 12, 1997) ...................................................... 19

Apeldyn Corp. v. Au Optronics Corp.,
-- F. Supp. 2d --, 2011 WL 5552520 (D. Del. Nov. 15, 2011) ............................. 3

Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135,
2011 WL 4529668 (E.D.N.Y Sept. 27, 2011) ..................................................... 4

Bank Brussels Lambert v. Crédit Lyonnais (Suisse) S.A.,
2001 WL 99506 (S.D.N.Y. Feb. 6, 2001) ........................................................... 19

Boim v. Holy Land Found. for Relief and Dev.,
549 F.3d 685 (7th Cir. 2008) (en banc) .......................................................... 11-12

Brown v. Henderson,
257 F.3d 246 (2d Cir. 2001) ............................................................................. 5

Dennis v. Delta Air Lines, Inc.,
2011 WL 4543487 (E.D.N.Y Sept. 29, 2011) ..................................................... 4

Desia v. GE Life & Annuity Assur. Co.,
350 Fed. App'x 542 (2d Cir. 2009) .................................................................... 4

Estate of Klieman v. Palestinian Auth.,
424 F. Supp. 2d 153 (D.D.C. 2006) ................................................................... 5

Freier v. Westinghouse Elec. Corp.,
303 F.3d 176 (2d Cir. 2002) ............................................................................. 6

Friedman v. Meyers,
482 F.2d 435 (2d Cir. 1973) ............................................................................. 5

**Page(s)**

Gale v. Napolitano,
2011 WL 809499 (E.D.N.Y. Mar. 2, 2011) ................................................. 5

Georgitsi Realty, LLC v. Penn-Star Ins. Co.,
2011 WL 4889251 (E.D.N.Y. Sept. 30, 2011) ............................................ 4

Global-Tech Appliances, Inc. v. SEB S.A.,
131 S. Ct. 2060 (2011) ................................................................................ 2

In re Agape Litig.,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ....................................................... 6

In re DDAVP Direct Purchaser Antitrust Litig.,
585 F.3d 677 (2d Cir. 2009) ....................................................................... 5

In re Dreier LLP,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ....................................................... 3

In re IKON Office Solutions, Inc. Sec. Litig.,
131 F. Supp. 2d 680 (E.D. Pa. 2001) ......................................................... 15

In re Mut. Funds Inv. Litig.,
767 F. Supp. 2d 531 (D. Md. 2010) ............................................................ 15

In re Symbol Tech. Class Action Litig.,
950 F. Supp. 1237 (E.D.N.Y. 1997) ........................................................... 5

Island Software & Computer Serv. Inc. v. Microsoft Corp.,
413 F.3d 257 (2d Cir. 2005) ....................................................................... 4

Linde v. Arab Bank,
384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................................ 12

Morrison v. Nat'l Bank of Aust., Ltd.,
130 S. Ct. 2869 (2010) ................................................................................ 7

MSLMK Invs. Co. v. J.P. Morgan Chase & Co.,
737 F. Supp. 2d 137,145 (S.D.N.Y. 2010) ................................................. 12

Okocha v. Trans Union LLC,
2011 WL 2837594 (E.D.N.Y. Mar. 31, 2011) ........................................... 4-5

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
652 F. Supp. 2d 495 (S.D.N.Y. 2009) ........................................................ 5

Presser v. Key Food Stores Co-op, Inc.,
316 Fed App'x 9 (2d Cir. 2009) ................................................................. 4

**Page(s)**

Rodriguez v. City of New York,
72 F.3d 1051 (2d Cir. 1995)..................................................................................... 5

Rothstein v. UBS AG,
772 F. Supp. 2d 511 (S.D.N.Y. 2011)..................................................................... 19

Scott v. Harris,
550 U.S. 372 (2007).................................................................................................. 4

SEC v. Kelly,
765 F. Supp. 2d 301 (S.D.N.Y. 2011)....................................................................... 5

SEC v. Lowy,
396 F. Supp. 2d 225 (E.D.N.Y. 2003) .................................................................... 15

Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distrib., Inc.),
446 B.R. 32 (Bankr. E.D.N.Y. 2011)......................................................................... 5

St. Jean v. United Parcel Serv. Gen. Serv. Co.,
2012 WL 71843 (E.D.N.Y. Jan. 10, 2012) .............................................................. 4

Steed Fin. LDC v. Nomura Sec. Int'l. Inc.,
148 Fed. App'x 66 (2d Cir. 2005).............................................................................. 5

Tabaa v. Chertoff,
509 F.3d 89 (2d Cir. 2007)......................................................................................... 4

Tropic Pollo I Corp. v. Nat'l Specialty Ins. Co.,
-- F. Supp. 2d --, 2011 WL 2712941 (E.D.N.Y July 8, 2011) ................................. 4

United States v. El-Mezain,
664 F.3d 467 (5th Cir. 2011) .................................................................................. 18

United States v. Ferguson,
-- F.3d --, 2011 WL 6351862 (2d Cir. Dec. 19, 2011)............................................ 3

United States v. Escobar,
2012 WL 492839 (2d Cir. Feb. 16, 2012)............................................................... 20

United States v. Vasquez,
-- F.3d--, 2012 WL 105002 (5th Cir. Jan. 13, 2012)............................................... 3

Weiss v. National Westminster Bank PLC,
453 F. Supp. 2d 609 (E.D.N.Y. 2009) .................................................................... 19

Woodman v. WWOR-TV, Inc.,
411 F.3d 69 (2d Cir. 2005)......................................................................................... 5

                                                                        **Page(s)**

**Other Authorities**

Memorandum Order, <u>Picard v. Kohn, et al.,</u> No. 11-cv-1181 (JSR)
(S.D.N.Y. Feb. 2, 2012), Dkt. No. 69 ................................................................... 18

v

## PRELIMINARY STATEMENT[1]

The Court should grant NatWest summary judgment because there is no admissible evidence on which a reasonable juror could find that plaintiffs have satisfied any one of three indispensable elements of their claims. The ATA does not, as plaintiffs' counsel propose, trump Rule 56 or the Federal Rules of Evidence, and it is empty rhetoric for plaintiffs' counsel to assert that applying these rules, as the Court must do, will render the ATA a "dead letter." Pl. Br. 1. The fault is not in the law, but in the absence of admissible evidence to satisfy what the law requires.

1. <u>Lack of scienter</u>. Plaintiffs' inherently implausible contention that one of the UK's principal international financial institutions, itself the victim of terror attacks,[2] knowingly aided the murder and maiming of innocent civilians without any motive to do so, is conclusively refuted by the undisputed evidence that (a) NatWest repeatedly reported its suspicions about Interpal to the relevant UK law enforcement authorities and regulators, precisely the opposite of what it would do if it were seeking to help Interpal to foster Hamas terrorism, and (b) those authorities and regulators repeatedly assured NatWest that ███████████████████████████ ████████████████████████████████████████████████████ ████ UK Law Enforcement and Regulators thereby addressed and allayed NatWest's suspicions by informing it that Interpal was <u>not</u> known to be funding Hamas. This undisputed fact alone precludes a reasonable juror from finding that NatWest's <u>suspicions</u> of wrongdoing – which is all that, in fact, plaintiffs rely on – are tantamount to NatWest's <u>knowledge</u> of that wrongdoing.

---

[1] Capitalized terms in this brief have the same meaning as in NatWest's initial brief, which is cited as "NatWest Br." Plaintiffs' opposition brief is cited as "Pl. Br." Exhibits referenced in this brief are attachments to the December 7, 2011 Declaration of Valerie Schuster ("Schuster Dec."), the February 29, 2012 Reply Declaration of Stephanie D. Sado ("Sado Reply Dec.") or the January 30, 2012 Declaration of Joel Israel ("Israel Dec.").

[2] NatWest's offices in London were bombed in 1992 and 1993 by Irish Republican Army terrorists. Sado Reply Dec. Ex. 1.

Likewise, it is undisputed NatWest also knew that the Charity Commission, Interpal's regulator, conducted two investigations of allegations that Interpal was funding Hamas, and found no basis for that charge. It is also undisputed NatWest knew that Interpal was registered at all times with the Charity Commission, which, as NatWest knew, established a conclusive statutory presumption under UK law that Interpal was being operated for charitable purposes, as it could not be if it were funding Hamas.

That OFAC separately concluded there was credible evidence that Interpal was funding Hamas for purposes of OFAC's own regulations – which plaintiffs admit did not apply to NatWest's provision of banking services to Interpal in the UK – cannot supply the missing element of <u>scienter</u>. It is undisputed that the bank followed the regulations that <u>did</u> apply to it, as administered by its own UK regulators, who are hardly backward in the fight against global terrorism, and who told NatWest they were well aware of OFAC's conclusions but disagreed with them.[3]

The point is not whether UK Law Enforcement and Regulators or OFAC were correct in their assessments of Interpal. Rather, the point is what NatWest <u>knew</u>. And it is undisputed NatWest <u>knew</u> (a) it had repeatedly reported its suspicions about Interpal, (b) its suspicions were addressed and allayed by the relevant authorities and regulators and (c) among other things, those authorities and regulators assured NatWest ▮▮▮▮▮▮▮▮▮▮▮. On these facts, no reasonable juror could find that NatWest knew or was willfully blind to Interpal's purported financing of Hamas terrorism.[4]

---

[3] The UK Government's strong views on the fight against terrorism, and its robust mechanisms for waging that fight, are set forth in the Statement of Interest of Her Majesty's Treasury, dated December 5, 2011, attached to the letter from Stephen Cromie, served on December 7, 2011. Not surprisingly, plaintiffs do not respond to that Statement.

[4] In <u>Global-Tech Appliances, Inc. v. SEB S.A.</u>, 131 S. Ct. 2060, 2069-71 (2011), the Supreme Court defined "willful blindness" – a doctrine of general application – and then applied it to the induced patent infringement statute before the Court. Plaintiffs offer no basis to conclude that the Supreme Court limited its definition of "willful blindness"

In their brief, plaintiffs retreat to arguing they can prove <u>scienter</u> by proving NatWest acted recklessly. But it is well-settled that mere recklessness does not satisfy the ATA's <u>scienter</u> element. Even if recklessness were sufficient, no reasonable juror could find, based on the undisputed facts, that NatWest acted recklessly. Plaintiffs can argue otherwise only by mischaracterizing the record and the legal principles on which they rely.

2. <u>Lack of proximate causation.</u> Plaintiffs seek to avoid their failure to create a triable issue of proximate causation that links NatWest's provision of routine banking services to Interpal and the attacks at issue by contending that the charities to which Interpal transferred funds were <u>alter egos</u> of or controlled by Hamas. But plaintiffs have not even tried to satisfy the legal tests for this theory, nor have they attempted to prove that any funds Interpal sent to these charities were used for <u>any</u> terrorist attacks, let alone those at issue here. The ATA's specialized and strict "by reason of" proximate causation requirement requires plaintiffs to prove that NatWest's conduct was a "substantial factor" in the causal chain that led directly and foreseeably to the attacks at issue, a test plaintiffs concede they have not met.

3. <u>Lack of admissible evidence that Hamas perpetrated the attacks.</u> Recognizing they rely for this element entirely on inadmissible hearsay, plaintiffs' counsel ask the Court to suspend the Federal Rules of Evidence, claiming that otherwise "no terrorist attack could ever form the basis of an ATA suit." Pl. Br. 43. But there is no ATA exception to these Rules that would allow plaintiffs to prove this element of their claims through the incompetent testimony of an Israeli newspaper reporter and a compiler of website postings who purport to offer "expert"

---

only to patent infringement statutes, <u>see</u> Pl. Br. 25 n. 15, and the precedent they cite for that claim does no such thing. <u>See</u> <u>Apeldyn Corp. v. Au Optronics Corp.</u>, -- F. Supp. 2d --, 2011 WL 5552520, at *10 (D. Del. Nov. 15, 2011). Both this Circuit and the Fifth Circuit have since confirmed that <u>Global-Tech</u> applies outside the patent context. <u>See</u> <u>United States v. Ferguson</u>, -- F.3d --, 2011 WL 6351862, at *10, 24 n. 16 (2d Cir. Dec. 19, 2011); <u>In re Dreier LLP</u>, 452 B.R. 391, 450-51 n. 54 (Bankr. S.D.N.Y. 2011); <u>United States v. Vasquez</u>, -- F.3d --, 2012 WL 105002, at *5 (5th Cir. Jan. 13, 2012).

opinions of Hamas culpability, and through the hearsay documents on which these "experts" rely.  As other ATA lawsuits have demonstrated, a plaintiff <u>can</u> prove this element with proper evidence.  Plaintiffs have failed to do so here.[5]

## I.    <u>PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE OF SCIENTER</u>

Plaintiffs cannot defeat summary judgment by offering empty rhetoric and unreasonable characterizations of the record evidence.  Rather, a court <u>must</u> grant summary judgment where no reasonable juror could find for the non-movant because its version of the facts is unsupported by evidence, "blatantly contradicted by the record" and/or "so utterly discredited by the record that no reasonable jury could have believed him."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).[6] As this Court's recent opinions citing <u>Scott</u> make clear, purported factual disputes must be "genuine" to defeat summary judgment, and that relief is appropriate where, as here, a claimant offers, not evidence, but only its own unsupported theories and an expert's conclusory statements.[7]  Likewise, plaintiffs cannot rely on mere speculation or conjecture concerning possible conclusions or inferences, or argue that NatWest's evidence is not credible without identifying specific contradictory facts in the record, which they have failed to do.[8]

---

[5] Plaintiffs purport to move to strike NatWest's Rule 56.1 Statement in the introduction to their Rule 56.1 response, which is dominated by improper objections, argument and non-responsive assertions.  <u>See</u> Plaintiffs' Response to Defendant National Westminster Bank's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("56.1 Resp.") at 1.  NatWest will brief that subject separately, if the Court wishes that it do so.

[6] The Second Circuit has reaffirmed this principle many times following <u>Scott</u>.  <u>See</u> <u>Presser v. Key Food Stores Co-op, Inc.</u>, 316 Fed App'x 9, 12 (2d Cir. 2009); <u>Tabaa v. Chertoff</u>, 509 F.3d 89, 93 n. 1 (2d Cir. 2007).

[7] <u>See</u> <u>A.T. v. Home Depot U.S.A., Inc.</u>, 2012 WL 194958, at *8, 10 (E.D.N.Y. Jan. 23, 2012); <u>see also</u> <u>Georgitsi Realty, LLC v. Penn-Star Ins. Co.</u>, 2011 WL 4889251, at *1 (E.D.N.Y. Sept. 30, 2011) ("'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'") (quoting <u>Scott</u>); <u>Dennis v. Delta Air Lines, Inc.</u>, 2011 WL 4543487, at *1 (E.D.N.Y Sept. 29, 2011) (same); <u>St. Jean v. United Parcel Serv. Gen. Serv. Co.</u>, 2012 WL 71843, at *6 (E.D.N.Y. Jan. 10, 2012) (same).

[8] <u>Desia v. GE Life & Annuity Assur. Co.</u>, 350 Fed. App'x 542, 544 (2d Cir. 2009) (a non-movant cannot rely upon arguments that would require a jury to speculate); <u>Island Software & Computer Serv. Inc. v. Microsoft Corp.</u>, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact.") (citation omitted); <u>Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135</u>, 2011 WL 4529668, at *7 (E.D.N.Y Sept. 27, 2011) ("The nonmoving party . . . may not rely on '[c]onclusory allegations, conjecture, and speculation,' . . . .") (citation omitted); <u>Tropic Pollo I Corp. v. Nat'l Specialty Ins. Co.</u>, -- F. Supp. 2d -- , 2011 WL 2712941, at *2 (E.D.N.Y. July 8, 2011) (same); <u>Okocha v.</u>

Plaintiffs' further argument that "state of mind is rarely an issue appropriate for disposition at summary judgment" and that the Second Circuit has been lenient in allowing scienter claims to survive is baseless.  Pl. Br. 23-24.  The precedents they cite make the non-controversial point that a "genuine" issue concerning scienter, supported by significant probative evidence of actual knowledge, will preclude summary judgment.[9]  Where, as here, no such evidence exists, the precedents granting summary judgment are legion.[10]

A.      Plaintiffs Cannot Rely On Allegations That Are Blatantly Contradicted By The Record Or Based On Conjecture And Speculation

Plaintiffs' opposition relies entirely on unsupported contentions that are blatantly contradicted by the record or based on conjecture, speculation and unsupported attacks on NatWest's credibility.  None can save their claims from summary judgment.

1.  Plaintiffs' contention that NatWest personnel harbored anything more than mere suspicions that Interpal was funding Hamas, Pl. Br. 23, is both contradicted by the record and based on conjecture and speculation:[11]

---

Trans Union LLC, 2011 WL 2837594, at *4 (E.D.N.Y. Mar. 31, 2011) (same).

[9] Brown v. Henderson, 257 F.3d 246, 251-52, 256 (2d Cir. 2001) (affirming summary judgment because there was no genuine issue of material fact); Friedman v. Meyers, 482 F.2d 435, 439 (2d Cir. 1973); SEC v. Kelly, 765 F. Supp. 2d 301, 318 (S.D.N.Y. 2011); Rodriguez v. City of New York, 72 F.3d 1051, 1064 (2d Cir. 1995); Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distrib., Inc.), 446 B.R. 32, 49-50 (Bankr. E.D.N.Y. 2011).  Plaintiffs also rely on the irrelevant In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir. 2009), which concerned a dismissal motion, not summary judgment.

[10] See, e.g., Steed Fin. LDC v. Nomura Sec. Int'l Inc., 148 Fed. App'x 66, 69 (2d Cir. 2005); In re Symbol Tech. Class Action Litig., 950 F. Supp. 1237, 1245-46 (E.D.N.Y. 1997); Gale v. Napolitano, 2011 WL 809499, at *8, 10 (E.D.N.Y. Mar. 2, 2011) ("'The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'") (citations omitted). Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495 (S.D.N.Y. 2009), which plaintiffs cite for the holding that "lack of an admission of knowledge does not entitle a defendant to summary judgment," Pl. Br. 24 n. 11, in truth holds that where other evidence "would permit a reasonable jury to infer that [the defendant] had actual knowledge of the underlying fraud," the lack of admissions of knowledge did not entitle the defendant to summary judgment."  Id. at 503-04.  Further, Estate of Klieman v. Palestinian Auth., 424 F. Supp. 2d 153, 167 (D.D.C. 2006), which plaintiffs describe as holding that "issues of fact precluded summary judgment on issue of whether defendants' acts satisfied § 2331(1)'s statutory definition of international terrorism," Pl. Br. 24 n. 11, concerned a dismissal motion, not a summary judgment motion.  Woodman v. WWOR-TV, Inc., 411 F.3d 69, 85, 90 (2d Cir. 2005), which plaintiffs cite for the general proposition that scienter may be proven by circumstantial evidence, in fact granted the defendant summary judgment because "[t]he law is 'well-established that conclusory statements, conjecture, or speculation' are inadequate to defeat" such a motion.  (citations omitted).

[11] Plaintiffs' attempts to dismiss the caselaw showing that mere suspicion is insufficient to prove knowledge are

- NatWest reported its suspicions in the context of a regulatory regime under which bank personnel were instructed to report even the slightest concern, so that it could be addressed by law enforcement and regulators, who, unlike the bankers, are the professionals in the field and must conduct the relevant investigations to determine if the concern is well-founded.  Schuster Dec. Ex. 14 (Holland Rep. ¶¶ 3.8, 3.28-30, 3.33-34, 3.40-42, 3.55, 5.20); Ex. 15 (Walker Rep. ¶ 3.2.6); Ex. 16 (Walker Tr. at 122:15-123:8).  As demonstrated in Appendix A to this brief, NatWest made no fewer than five disclosures of its suspicions to NCIS.  In response, UK Law Enforcement and Regulators told NatWest ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  See Appendix A; NatWest Br. 4-5.

- To the contrary, as plaintiffs ignore, the Bank of England, which administered the UK's anti-terrorism sanctions, expressly assured NatWest ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  NatWest Br. 9-10.  This was a clear statement that UK Law Enforcement and Regulators had not concluded that Interpal was funding Hamas (and to this day, they still have not done so).[12]

- Guy Cole conducted semi-annual reviews of the recipients of Interpal's foreign payments and uncovered no evidence that Interpal was funding Hamas.  Schuster Dec. Exs. 78-80.

- Plaintiffs' claim that Amanda Holt "conceded" in an email that she was aware NatWest had accounts "for people connected to Hamas," Pl. Br. 13, is blatantly contradicted by her testimony that "it was very clear . . . that the meaning was allegedly connected, not actually connected.  If we had any accounts connected to Hamas we would have already reported and exited them."  Sado Reply Dec. Ex. 2 (Holt 7/23/10 Tr. at 92:1-4).

- Finally, at all relevant times, and still to this day, Interpal was a lawfully registered charity in the UK, which NatWest knew to create a statutory presumption that Interpal was being operated for charitable purposes.  NatWest Br. 5.

---

unavailing.  Contrary to plaintiffs' assertions, the court in Freier v. Westinghouse Elec. Corp., 303 F.3d 176 (2d Cir. 2002), addressed whether the plaintiff "knew (or reasonably should have known)" about a risk.  Id. at 205.  Moreover, if mere suspicion is not sufficient to prove that a party should have known about a risk, a fortiori mere suspicion is not sufficient to show that a party actually knew about a risk, which is what the ATA's scienter standard requires.  Plaintiffs do not address the holding in In re Agape Litig., 773 F. Supp. 2d 298 (E.D.N.Y. 2011), that awareness of suspicious activity in a bank account did not constitute actual knowledge by the bank of a fraud.

[12] A newspaper article published on September 25, 2003 stated that UK officials met with U.S. officials in the wake of OFAC's sanctioning of Interpal "but the Americans produced only press cuttings to support their claim that it was a terrorist organization."  56.1 Resp. ¶ 105.

2. Plaintiffs' contention that NatWest acted improperly "despite its awareness that Interpal and its counter-parties were officially designated as terrorist organizations by the U.S. and Israel," Pl. Br. 23, is also blatantly contradicted by the record:

- Plaintiffs ignore the indisputable fact that, as NatWest knew, the UK Government disagreed with those designations. 56.1 St. ¶¶ 105-06, 108; NatWest Br. 13. There is no evidence that NatWest knew anything more than the UK government about Interpal's alleged connection to Hamas. 56.1 St. ¶ 109.

- Plaintiffs also ignore the indisputable facts that, as NatWest knew, those designations (a) were made solely for the purposes of the U.S. and Israeli asset freezing regulations pursuant to which they were issued, and (b) did not then, and do not today apply to a UK bank's provision of banking services to a UK customer in the UK. NatWest Br. 11-14.[13]

- Accordingly, to conclude that those designations vested NatWest with knowledge that those designations were accurate and that NatWest was obligated to act in accordance with them, especially when the UK publicly disagreed with them, would afford those designations extraterritorial effect in a manner that would be contrary to the ATA, OFAC's own regulations and chartering Executive Order and the Supreme Court's decision in Morrison v. Nat'l Bank of Aust., Ltd., 130 S. Ct. 2869, 2877 (2010). See Memorandum of Law of Defendant Crédit Lyonnais, S.A. in Opposition to the Café Hillel Plaintiffs' Motion for Summary Judgment ("CL Opp. Br.") Dec. 2, 2011, 6-12.[14]

3. Plaintiffs' contention that there is no evidence NatWest was aware of the Charity Commission's findings in 1996 and 2003 that there was no basis for the allegation that Interpal was funding Hamas, Pl. Br. 27, is also blatantly contradicted by the record:

- There is ample evidence that NatWest employees were well aware of the Charity Commission's investigations and conclusions. Schuster Dec. Ex. 81 (Foster 7/16/10 Tr. at 120:14-17).

---

[13] Plaintiffs also attempt to concoct a material disputed fact by claiming that NatWest "made the policy decision to close the accounts of any non-U.S. customers designated by OFAC. . . ." Pl. Br. at 18. That is blatantly contradicted by the record. NatWest did not implement a policy of closing accounts of OFAC-listed entities until after the period relevant to these lawsuits. Sado Reply Dec. Ex. 3 (Foster 7/16/10 Tr. at 237:23-239:24); Schuster Dec. Ex. 13 (Holt 7/23/10 Tr. at 119:11-15).

[14] The ATA renders an FTO designation binding on an ATA defendant for scienter purposes, but not an SDGT designation, which is procedurally and substantively different from an FTO designation. See CL Opp. Br. 9-13. Interpal has only been designated as an SDGT. Plaintiffs' Statement of Material Facts Pursuant to Local Civil Rule 56.1(b) ("Pl. 56.1 St.") ¶ 151.

- Similarly, Belinda Lane's notes state that Interpal was "fully investigated by the Charities Commission in 1996 and found to be clear." Schuster Dec. Ex. 36.

- After the 2003 investigation, NatWest employees circulated emails announcing that fact and providing a link to the Charity Commission website's posting of its 2003 inquiry report, as well as a summary of the Charity Commission's conclusions. Schuster Dec. Exs. 70-74.[15]

4.   Plaintiffs' mischaracterizations of the so-called South African "Cryptome Report" rest

on pure conjecture and are also blatantly contradicted by the record:

- Plaintiffs cite no support for their fanciful claim that NatWest should have recognized the report's disclosure of "Interpal's account numbers with NatWest, its executives, funds transfers, and other information that NatWest already had in its own possession" as "terrorist financing details." Pl. 56.1 St. ¶ 54.

- Plaintiffs' claim that Michael Hoseason was "sufficiently alarmed" by the Cryptome Report ███████████████ ██ ███, Pl. Br. 5, is blatantly contradicted by his testimony that, after the September 11 attacks, "anything and everything that was vaguely associated with or linked to anything that could possibly be connected to extremism of any description was being reported."[16]  Schuster Dec. Ex. 10 (Hoseason 7/14/10 Tr. at 102:24-103:3).

- Plaintiffs' claim that NatWest's next NCIS disclosure "made no mention of" the Cryptome Report is also blatantly contradicted by the record.  That disclosure ████████████████████████████. Schuster Dec. Ex. 29 (NW052056-66 at NW052062).

5.   Plaintiffs' claim that NatWest went "out of its way to discount the bona fides of"

evidence that Interpal was funding Hamas is also blatantly contradicted by the record:

- Plaintiffs cite no support for their claim that Guy Cole dismissed the Israeli government's findings as "opinion" and "unreliable." Pl. Br. 15. Cole merely wrote in the summary of his May 2004 review of Interpal's accounts that the one website he had found regarding one charity was an "unofficial opinion," and he

---

[15] Plaintiffs mischaracterize the Commission's 1996 findings as being limited to whether "'the funds were being applied within the objects of the charity.'" Pl. Br. 10. The finding that they were being so applied is a finding that they were not being used to finance Hamas terrorism, because supporting terrorism is not a legitimate object of charity in the UK. Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.18).

[16] Plaintiffs attempt to mislead the Court that Hoseason was not referring to what was being reported by NatWest, 56.1 Resp. ¶ 34, but the next question and answer prove otherwise: "Q. So NatWest intensified in a significant way its scrutiny of suspicious terror financing as a result of September 11, 2001, is that correct? A. I would say we intensified the level of reporting." Schuster Dec. Ex. 10 (Hoseason 7/14/10 Tr. at 102:24-103:8) (emphasis added).

diligently recorded Israeli government findings in emails and submitted his reviews to his superiors. See Schuster Dec. Exs. 78-80.

6. Plaintiffs' ludicrous claim that NatWest was motivated to maintain Interpal's accounts and to knowingly support the murder of innocent civilians because Interpal was one of relationship manager Belinda Lane's and NatWest's "most profitable customers," thereby purportedly creating a "special relationship," Pl. Br. 15-16, 33-34, is, unsurprisingly, blatantly contradicted by the record:

- Plaintiffs "extrapolat[e]" from a 2003 email in which Lane referred to "earning" £9000 per month from Interpal (because as a Muslim charity it accepted no interest on its balances) that NatWest could have earned "millions of dollars in profit" over the course of its relationship with Interpal. Even if that were so (and it is not), NatWest's consolidated total income in 2003 was over £7 *billion*. See Sado Reply Dec. Ex. 4 (Excerpts from NatWest Annual Report and Accounts 2003 at 10). If one speculatively "extrapolated" that NatWest's 2003 income from Interpal's accounts were £108,000, it is inconceivable that this tiny amount from a small charity customer – at best .00154 percent of the bank's income – would have induced the bank to knowingly finance murder.

- Moreover, Lane testified that Interpal was a top fee generator for her, not for the bank, Sado Reply Dec. Ex. 5 (Lane 6/24/08 Tr. at 296:3-9), and that because Interpal was not a "growing customer" she did not want to keep it in her portfolio when she moved offices. Id. (Lane 6/24/08 Tr. at 47:3-22, 72:1-73:2).

- In any event, the notion that NatWest would have knowingly financed terrorism in order to appease Lane is equally unsupported and implausible. Lane was only one of five or six business managers at one of NatWest's more than 100 business centers, Sado Reply Dec. Ex. 5 (Lane 6/24/08 Tr. at 28:18-20), and she played no role in NatWest's decision-making concerning disclosures or continuing to serve Interpal, thereby making her personal motives irrelevant.[17]

---

[17] Likewise, Plaintiffs' "straw man" claim that Hoseason testified that NatWest would have exited the relationship only with proof that funds had been used "to buy bullets," Pl. Br. 33, is also blatantly contradicted by the record. Far from giving "chilling" testimony as to the circumstances under which he would have recommended exiting the customer relationship with Interpal, Pl. Br. 33, Hoseason objected that plaintiffs' counsel's questions were "difficult . . . to answer without confusing the issue" and "hypothetical." He emphasized that "[e]ach case would be looked at on its individual merits." Sado Reply Dec. Ex. 6 (Hoseason 7/14/10 Tr. at 33:17-18, 34:1-2). When pressed to answer argumentative questions regarding what evidence he would have considered to be "proof" of the purpose of a transfer of ███ from Interpal to ███████, Hoseason answered, "So if I had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets, as you put it, then that would be clearer evidence." Sado Reply Dec. Ex. 7 (Hoseason 7/15/10 Tr. at 278:17-23) (emphasis added).

7. Plaintiffs' claim that NatWest "falsely promised a 12-month review of Interpal's ledgers" and lacked the ability to monitor Interpal's payments, Pl. Br. 12, 14, is also blatantly contradicted by the record:

- Plaintiffs' claim that NatWest's Richard Gossage promised in his September 5, 2003 letter to the Bank of England "to undertake a 12-month review of Interpal's ledgers, including a review of payments received from the Islamic Charitable Society for the Support of Al-Aqsa," Pl. 56.1 St. ¶ 168; Pl. Br. 12, is false. His letter contains no such promise. See Schuster Dec. Ex. 75.

- Plaintiffs misquote Guy Cole's email that "the Bank had 'no ability to filter or efficiently monitor payments . . . ,'" Pl. Br. 14, when in fact Cole wrote that the relationship manager had no ability to filter or effectively monitor payments. Israel Dec. Ex. 97 (NW017179-90 at NW017186). Further, Cole testified that he was referring to the bank's "preventive technology," not the bank's general ability to conduct "enhanced due diligence" after transfers were completed, which Cole did conduct. Sado Reply Dec. Ex. 8 (Cole 6/8/10 Tr. at 46:19-25, 49:21-50:10).

- Irvine Rodger did not testify, as plaintiffs claim, that the bank could not monitor customer payments, Pl. 56.1 St. ¶¶ 118, 209-10, but rather that NatWest did not have the technology in 2003 to filter payments in real-time. Sado Reply Dec. Ex. 9 (Rodger 7/22/10 Tr. at 104:19-105:23). But that would not have impeded NatWest's monitoring of Interpal's accounts, which it accomplished through Cole's semi-annual reviews of Interpal's payments. NatWest Br. 10.

8. Plaintiffs' claim that NatWest exhibited a "dismissive and disdainful attitude toward U.S. law," Pl. Br. 13, is also blatantly contradicted by the record:

- NatWest complied fully with its obligations to report its suspicions thoroughly and repeatedly to UK Law Enforcement and Regulators, and followed their instructions and acted in conformity with their assurances. NatWest Br. 14-15; Appendix A. Rather than dismissing or disdaining even inapplicable U.S. law, when NatWest learned of OFAC's sanctioning of Interpal in the U.S., it promptly asked the Bank of England, the UK's anti-terror financing regulator ███████████ ██████████████ and was told ██████████. See Schuster Dec. Exs. 75-76.

Accordingly, no reasonable juror could conclude from this evidence that NatWest knew or was "willfully blind" to whether Interpal was funding Hamas, and therefore violated the ATA.

Because the OFAC regulations did <u>not</u> apply to NatWest, the <u>only</u> relevant provisions of U.S. law are the ATA's criminal provisions that penalize material support and provision of financial services to a person who the defendant knows to be a terrorist, in 18 U.S.C. §§ 2339B and 2339C, and the derivative civil liability provided in 18 U.S.C. § 2333. The United States obviously has not prosecuted NatWest for violating these provisions, and plaintiffs have not provided any admissible evidence of such a violation. Finally, the fact that, to this very day, UK Law Enforcement and Regulators have not concluded that Interpal is providing funds to or for the benefit of Hamas indicates that, to sustain plaintiffs' contentions, the Court would need to conclude that either (a) NatWest knew <u>more</u> about Interpal than UK Law Enforcement and Regulators did (which is absurd) or (b) that UK Law Enforcement and Regulators knew that Interpal was funding Hamas but did nothing about it (which is equally absurd). And tellingly, plaintiffs have failed to identify anything more NatWest should have done – other than to close Interpal's accounts, which NatWest had no basis for doing – absent its concluding that Interpal was funding Hamas. But there is no evidence that NatWest so concluded.

B.   A Showing Of "Recklessness" Cannot Satisfy The ATA's <u>Scienter</u> Requirements And, <u>Applying The Actual Standard, No Reasonable Juror Could Find NatWest Was Reckless</u>

Plaintiffs retreat to attempting to base <u>scienter</u> on the notion that NatWest was "reckless." That argument is irreparably flawed. First, a finding of recklessness would not satisfy the ATA's <u>scienter</u> requirement. Second, under the <u>actual</u> "recklessness" standard – not plaintiffs' mischaracterization of it – no reasonable juror could find that NatWest acted recklessly.

1. <u>A showing of mere "recklessness" cannot suffice</u>. The precedents plaintiffs cite for their contention that mere "recklessness" will satisfy the ATA's <u>scienter</u> requirements show instead that the courts have defined "recklessness" in this context as requiring the same proof as is required to prove "willful blindness." <u>See</u> NatWest Br. 3-4. <u>Boim v. Holy Land Foundation</u>

11

for Relief and Develop., 549 F.3d 685 (7th Cir. 2008) (en banc) ("Boim III"), Pl. Br. 24-25, so confirms, as it defines "recklessness" to require that the defendant has "disregard[ed] a risk of harm of which he is aware." 549 F.3d at 694 (citation omitted). The same is true of plaintiffs' other ATA citations. Pl. Br. 25. And Judge Gershon in Linde v. Arab Bank, 384 F. Supp. 2d 571, 585 n. 8 (E.D.N.Y. 2005), expressly ruled, against the same plaintiffs here, that mere recklessness does not satisfy the ATA's scienter requirement.[18]

2. Plaintiffs misstate the recklessness standard and, applying the actual standard, no reasonable juror could find that NatWest was reckless. Plaintiffs paraphrase the Model Penal Code to suggest that, under its section 2.02(c), "persons act 'recklessly' when they are aware of the risk of harm but make a conscious decision to act anyway." Pl. Br. 26. The Model Penal Code has nothing to do with the ATA's scienter standard, but also plaintiffs ignore that the Code requires proof of two distinct elements: (a) that a person is subjectively aware of a substantial and unjustifiable risk and (b) that he deliberately ignores or consciously disregards that risk before deciding to act despite that risk.[19] The Boim III court likewise emphasized that one must "ignore" a risk before deciding to act, when describing the standard for what it termed "recklessness." See Boim, 549 F.3d at 693. Plaintiffs can satisfy neither element.

a. There is no triable case that NatWest was subjectively aware of a substantial and unjustifiable risk. Applying these standards here, it is axiomatic that a party cannot be subjectively aware of a risk where it is told that none exists, ███ ████████████ ██████████████████. Plaintiffs utterly disregard the impact on NatWest of UK

_____

[18] Likewise, plaintiffs' retreat to precedents involving a defendant's disregard for "red flags" evidence is unavailing. Pl. Br. 29. In MSLMK Invs. Co. v. J.P. Morgan Chase & Co., 737 F. Supp. 2d 137, 145 (S.D.N.Y. 2010), involving the Madoff Ponzi scheme, the court confirmed that "red flags" evidence, without more, does not suffice to prove scienter, noting that "while it might have been possible for Defendants to determine that Madoff was committing fraud from the 'red flags' that Plaintiff points out, Plaintiff alleges no facts to demonstrate that Defendants actually did make such a discovery." (emphasis added). The same is true here.

[19] See MPC § 2.02(2)(c).

12

Law Enforcement and Regulators' <u>responses</u> to NatWest's disclosures.  They repeatedly assured

NatWest ██████████████████████████████████████████████████████

██████████████, a conclusion that UK Law Enforcement and Regulators themselves

had not reached despite having more information than NatWest, and have not reached to this

day.  <u>See</u> Appendix A.  <u>Plaintiffs ignore this point, because they have no response to it.</u>

Plaintiffs cannot have it both ways, relying on NatWest's disclosures of its suspicions to UK

Law Enforcement and Regulators as purported evidence of recklessness (although in fact it is the

antithesis of that), and at the same time ignoring what the authorities and regulators said in

response to NatWest's disclosures, which is an essential part of NatWest's state of mind and

knowledge, and defeats any claim of recklessness.[20]

  To conclude otherwise, the Court would need to endorse the counter-intuitive result that

the greater a bank's disclosures, and the greater the assurances the bank receives from the

authorities that respond to the disclosures, the greater the bank's liability.  That would foster a

perverse incentive for banks <u>not</u> to report their suspicions, contrary to what terror financing

sanctions and regulations seek to achieve.  And conspicuously, plaintiffs cannot identify

---

[20] In an attempt to devalue the repeated findings by UK Law Enforcement and Regulators that Interpal was a legitimate charity and NatWest could continue to maintain its accounts, plaintiffs insinuate that those agencies established a "wall" between Hamas's charitable activities and its violent activities, alleging that prior to 2003 it was lawful in the UK to contribute to Hamas's charitable wing, and that those agencies and therefore NatWest knew Interpal was at least supporting Hamas's "non-violent" activities.  <u>See, e.g.</u>, Pl. Br. 32-33.  This supposed bifurcation between support for the "charitable Hamas" and the "violent Hamas" is a red herring.  As plaintiffs point out, in September 2003, the EU and UK made it unlawful to support Hamas at all -- <u>including</u> any charitable activities.  Pl. Br. 2; Pl. 56.1 St. ¶ 5.  Yet even after 2003, and to this day, the EU and UK have not alleged that Interpal funds Hamas at all, and Interpal remains a validly registered charity.  <u>See</u> NatWest Br. 5-7.  Moreover, there is no evidence that the UK Government "divided" Hamas into charitable and military wings.  To the contrary, the 2009 Charity Commission report explains that the "UK Government's view is that there are two wings to Hamas:  the political wing and the military wing" and that, contrary to the views of some countries, Hamas does <u>not</u> have a social or "'dawah wing.'"  Israel Dec. Ex. 173 at 4, 6 n. 17.  Nothing in the record supports the assertion that that the EU or UK recognized a third, "charitable wing" and condoned funding that "wing."

anything NatWest failed to do other than close Interpal's accounts – something NatWest had no basis to do in the absence of "knowing" that Interpal was funding Hamas.[21]

Plaintiffs rely for the contrary conclusion on NatWest's awareness of Israel's and OFAC's sanctioning of Interpal, Pl. Br. 30-31, but these sanctions indisputably did not apply to a UK bank's provision of banking services to a UK customer in the UK, see 56.1 St. ¶¶ 98, 118, NatWest Br. 11-14, and plaintiffs cannot use them as a shortcut to the requisite scienter, be it knowledge or subjective awareness. See CL Opp. Br. 4-12. Plaintiffs contend they are not improperly seeking to apply OFAC's designation of Interpal as an SDGT extraterritorially, but in the same breath they attempt to do just that, asking the Court to substitute NatWest's knowledge of the OFAC designation for any evidence of NatWest's actual knowledge or subjective awareness that Interpal was funding Hamas. Pl. Br. 31 n. 20. At most, NatWest's knowledge that OFAC – a U.S. regulator whose reach does not extend extraterritorially to a UK bank's conduct in the UK – had concluded it had "credible evidence" to designate Interpal as an SDGT for the purpose of its asset freezing regulations provided NatWest with a suspicion about Interpal, which NatWest ███████████████████████████. See Appendix A; Schuster Dec. Ex. 75. In response, the Bank of England explicitly informed NatWest that ███████████ ███████████████████████████ Schuster Dec. Ex. 76. Hearing this from its own regulator, NatWest cannot be deemed to have been aware, based on the inapplicable OFAC designation, of a high probability that Interpal was providing funds to Hamas.

    b. There is no triable case that NatWest ignored or consciously disregarded a risk.

Plaintiffs' argument completely overlooks this second part of the recklessness standard. See Pl. Br. 26-28. But obviously, a party cannot be found to have ignored or consciously disregarded a

---

[21] Thus, NatWest does not come close to Judge Posner's recklessness "archetype" in his Boim III decision. See Pl. Br. 27. NatWest hardly could have known that Interpal was "likely connected to a terrorist organization," when the bank's own government told it otherwise.

risk where it repeatedly took steps to assess the risk, including by reporting the possibility of a

risk to the proper authorities, as the undisputed evidence shows NatWest consistently did.[22]  The

undisputed evidence shows that NatWest identified a potential risk, investigated it, repeatedly

disclosed it to the proper authorities, received instructions from the authorities on how to proceed

and then followed that advice.  That is the antithesis of ignoring and disregarding a known risk.[23]

Plaintiffs' assertion that NatWest acted recklessly because it merely filed "a few

selective, minimalist disclosures with British law enforcement," Pl. Br. 26, is blatantly

contradicted by the record.  In number and content, NatWest's disclosures cannot reasonably be

so described.  See Appendix A; 56.1 St. ¶¶ 34-79; see also NatWest Br. 7-10.  Tellingly,

plaintiffs have failed to identify anything material about Interpal that NatWest learned but did

not disclose and was not a matter of public record.  Plaintiffs' own purported expert, Gary

Walters, conceded this point, admitting that of the 15 "red flags" of Interpal's involvement in

terror financing he purported to identify, NatWest brought 13 to law enforcement's attention in

its disclosures or were public knowledge.  Further, he could not identify a legitimate basis for

deeming the remaining two as "red flags."  56.1 Resp. ¶¶ 158-62.  In any event, even a "failure

to act as aggressively as [one] could have, or should have, does not establish intentionality or

recklessness."  In re Mut. Funds Inv. Litig., 767 F. Supp. 2d at 535 (citations omitted).

Finally, plaintiffs' assertion that NatWest is seeking to immunize its alleged misconduct

on the basis that UK Law Enforcement and Regulators did not criminalize or otherwise take

---

[22] See SEC v. Lowy, 396 F. Supp. 2d 225, 243 (E.D.N.Y. 2003) (finding defendant was not reckless because he "responded reasonably to and investigated each of the supposed 'red flags,' [ ] he did not 'ignore obvious signs of fraud' and [ ] the SEC has not shown that his conduct amounted to 'an extreme departure from the standards of ordinary care.'").

[23] See In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 684, 694-96 (E.D. Pa. 2001) (granting summary judgment to defendant where defendant considered and responded to red flags and received assurances from persons of authority that there was no substantial risk); In re Mut. Funds Inv. Litig., 767 F. Supp. 2d 531, 534, 542 (D. Md. 2010) (granting summary judgment to defendant where defendant monitored and studied risk and elevated information to senior management).

15

action against Interpal deliberately misses the point. See Pl. Br. 23, 31. This is not a case of a conflict between U.S. law and UK law, because the OFAC regulations do not by their own terms purport to apply to NatWest. Rather, the point is that before a reasonable juror could find NatWest liable under the ATA, he or she must find that NatWest as a fact "knew," or was "willfully blind" to whether Interpal was funding Hamas or Hamas terrorism. A reasonable juror could not find that NatWest had this necessary scienter in light of the undisputed evidence of (a) NatWest's repeated and consistent disclosures of its suspicions of such funding, (b) the authorities' responses to NatWest's disclosures and (c) the authorities' assurances that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This undisputed evidence negates the scienter requirement that the bank knew, was blind to or ignored that alleged "fact."

## II. PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE OF PROXIMATE CAUSATION OR STANDING

In response to NatWest's showing that (a) no reasonable juror could find that the 13 Charities to which NatWest transferred funds were the alter egos of or controlled by Hamas, and (b) in any event, the mere transferring of funds to the 13 Charities is insufficient to prove the "by reason of" proximate causal link between NatWest and the attacks at issue that the ATA requires, plaintiffs adopt the same meritless arguments they raised in the companion Strauss and Wolf lawsuits. Pl. Br. 37. Crédit Lyonnais ("CL") in its summary judgment reply brief ("CL Reply") (Strauss Dkt. No. 301), and NatWest in its opening brief, thoroughly discredited those arguments.[24] Accordingly, NatWest need only address several key points.

---

[24] The 13 Charities to which NatWest transferred funds on behalf of Interpal, the only basis on which Plaintiffs can allege support to Hamas, see NatWest Br. 23 n. 19, are the same 13 Charities to which CL transferred funds on behalf of its customer CBSP.

A.  Plaintiffs Have Not Presented Evidence Sufficient To Show As A Matter Of Law That
The 13 Charities Were The Alter Egos Or Under The Control Of Hamas

NatWest has demonstrated that:

- Plaintiffs have failed to proffer evidence sufficient to satisfy the tests set forth in
the opinions of Judge Sifton and then-Circuit Judge Roberts for demonstrating
that the 13 Charities are alter egos of or controlled by Hamas, NatWest Br. 23-25;
and

- Plaintiffs' experts Matthew Levitt and Arieh Spitzen, the only sources of
plaintiffs' "evidence" on this subject, have conceded that the 13 Charities did not
satisfy many of these tests' factors and are silent as to the rest, id. 25-27.[25]

Plaintiffs' response that "[b]ecause NatWest transferred millions of dollars to HAMAS,
and HAMAS is responsible for each of the attacks at issue, a reasonable jury . . . can easily find
that NatWest's actions caused Plaintiffs' injuries," Pl. Br. 38, glosses over the critical failing in
plaintiffs' evidence – they offer no proof that NatWest transferred any funds to Hamas.  To do
that, they must satisfy the tests for proving that the 13 Charities were alter egos of or controlled
by Hamas.  Instead, plaintiffs argue that alter ego or control status is governed by the single
factor of shared leadership, and seek to ignore Judge Sifton's and then-Circuit Judge Roberts's
tests because they cited precedent from "outside the terrorism context." Pl. Br. 42 and n. 37.
But shared leadership is never sufficient to establish control, see CL Reply 12 and n. 17, and
Judges Sifton and Roberts applied the appropriate factors inside "the terrorism context." See id.
11-12; see also NatWest Br. 25 n. 21.[26]

---

[25] Plaintiffs' argument that NatWest "cites no affirmative evidence that any of the 13 organizations is independent of
Hamas" and "instead rel[ies] on unfounded attacks on Plaintiffs' experts," Pl. Br. 40, is wrong.  Even if Levitt's and
Spitzen's proposed testimony were admissible under Daubert and FRE 703, as it is not, neither has established that
there was an alter ego or control relationship between the 13 Charities and Hamas under the governing legal tests.
See NatWest Br. 23-27.  And while NatWest has no burden to disprove what is plaintiffs' burden to prove, NatWest
has cited "affirmative evidence" in its Rule 56.1 Statement, including numerous concessions by Levitt and Spitzen
themselves, underscoring that no reasonable juror could find that the 13 Charities were alter egos of or controlled by
Hamas.  See id.

[26] Moreover, plaintiffs offer no authority to escape the prohibition on having experts offer legal conclusions on
issues that are for the trier of fact to resolve based on the admissible evidence, such as Levitt and Spitzen attempt to
do here.  See NatWest Br. 27-28; CL Reply 15 n. 22.  Plaintiffs simply contend these precedents have "no merit," Pl.
Br. 43, but they are wrong.  Plaintiffs also fail to refute NatWest's (and CL's) showing of the methodological flaws

B.    The Mere Transfer Of Funds To The 13 Charities Cannot Constitute "By Reason Of"
      Proximate Causation Under the ATA

As NatWest, and CL before it have shown:

- Plaintiffs must show that their injuries occurred "<u>by reason of</u> an act of
  international terrorism" committed by the defendant under 18 U.S.C. § 2333(a)
  (emphasis added), which is a strict and narrow proximate causation requirement;
  and

- The mere transferring of funds to the 13 Charities – which is all plaintiffs purport
  to show – cannot prove those transfers "led <u>directly</u> to the plaintiff's injuries" or
  were a "<u>substantial factor</u> in the sequence of responsible causation," as the "by
  reason of" test requires.[27]

In response, plaintiffs offer nothing new, and rely instead on the straw-man argument that

NatWest demands "but for" causation or proof that "particular dollar[s]" were used for the

particular terrorist attacks. Pl. Br. 38-39 and n. 32. NatWest demands neither. Rather,

---

in Levitt's and Spitzen's opinions. NatWest Br. 32-36; CL Reply 15.

Plaintiffs' only supplement to what they argued in opposition to CL's motion is their utterly false statement that the
Fifth Circuit recently upheld the convictions of officials of a U.S. charity, the Holy Land Foundation ("HLF"), on
"largely identical expert testimony and documentary evidence." Pl. Br. 38. But the verdict in that <u>criminal</u> case, in
which proximate causation was <u>not</u> at issue, does not necessarily reflect a finding that Hamas controlled any charity,
because the jury was instructed it could convict the HLF defendants for <u>attempted</u> provision of material support to
Hamas, for which Hamas control over any charity was not an essential element. The government presented
substantial evidence – irrelevant to NatWest and to the charities' relationship to Hamas – that the defendants
<u>intended</u> to fund Hamas and took substantial steps toward that goal. <u>See, e.g.</u>, <u>United States v. El-Mezain</u>, 664 F.3d
467, 527-31 (5th Cir. 2011). Moreover, the government's evidence and expert testimony were hardly "largely
identical" to the testimony plaintiffs rely on here. Levitt's testimony in the HLF trial did not address the level of
influence exerted by Hamas over specific charities, nor did he purport to opine that any specific charity was the <u>alter
ego</u> of Hamas. Rather, he merely provided <u>background</u> information concerning Hamas. Further, unlike plaintiffs
here, who attempt to prove their case <u>only</u> through experts, the government presented admissible evidence
concerning the particular charities at issue, including the defendants' own statements and documents seized from
HLF and certain charities that were authenticated by the Israeli official responsible for seizing them. Finally,
contrary to what plaintiffs state, Pl. Br. 38 n. 30, the Fifth Circuit did not "resoundingly approve[]" the admission of
Levitt's testimony, holding instead that it was not "reversible error" to have admitted the only aspect of Levitt's
testimony that was challenged on appeal, which addressed the public accessibility of Hamas leaders and has nothing
to do with the opinions Levitt offers here. <u>United States v. El-Mezain</u>, 664 F.3d at 515.

[27] <u>See</u> NatWest Br. 21-22, 28-32; CL Reply 13-14. As noted, the "by reason of" requirement in the ATA also
appears in the civil liability provisions of RICO. Just last week, Judge Rakoff reiterated that this standard requires
direct causation when he dismissed civil RICO claims by the Madoff Trustee against certain bank defendants who
allegedly facilitated and prolonged the Madoff Ponzi scheme, because at most these defendants only "furthered,
facilitated, permitted or concealed an injury which happened or could have happened independently of the act[s]"
and did not "directly cause that injury, and thus d[id] not proximately cause it." Memorandum Order, <u>Picard v.
Kohn, et al.</u>, No. 11-cv-1181 (JSR) (S.D.N.Y. Feb. 21, 2012) (Dkt. No. 69) at 6-7. Applying that same reasoning
here, plaintiffs have not alleged, much less proven a direct causal relationship between NatWest's processing of
Interpal's transfers to the 13 Charities and any terrorist attacks, let alone the 15 attacks at issue, that could satisfy the
same, narrow "by reason of" causation standard in the ATA.

consistent with governing caselaw, it has shown that plaintiffs cannot satisfy their burden of proving proximate causation and standing under the ATA's "by reason of" standard without the evidence plaintiffs admit they do not have – that the 13 Charities to which Interpal transferred funds in turn provided funds to Hamas for any purpose, let alone for any terrorist attacks and much less the 15 attacks at issue.[28]

### III.   PLAINTIFFS HAVE NOT PRESENTED A TRIABLE ISSUE CONCERNING HAMAS'S RESPONSIBILITY FOR THE ATTACKS AT ISSUE

Plaintiffs rely for their response to NatWest's showing that no reasonable juror could conclude that Hamas perpetrated the 15 attacks, NatWest Br. 37-50, on their thoroughly discredited opposition to CL's summary judgment motion. Pl. Br. 37. Thus, NatWest incorporates CL's reply in full, which sets forth why plaintiffs must present admissible evidence, rather than two incompetent "expert" witnesses and the rank hearsay they purport to summarize. See CL Reply 15-20.[29]  Only one point warrants further emphasis.

---

[28] Plaintiffs continue to condemn Judge Rakoff's decision in Rothstein v. UBS AG, 772 F. Supp. 2d 511 (S.D.N.Y. 2011) ("Rothstein II"), as a "lonely outlier," Pl. Br. 39, despite CL's refutation of that argument in its reply brief. See CL Reply 14 n. 20. Moreover, NatWest demonstrated in its opening brief that, because the evidence confirms that the only alleged support to Hamas in this case was indirect, from NatWest's customer Interpal through the 13 Charities, the analysis in Rothstein II applies here. See NatWest Br. 28-30. Plaintiffs' claim that these cases involve a "terrorist front customer[]" in addition to the 13 Charities, Pl. Br. 39 n. 34, is unavailing because plaintiffs do not allege that Interpal itself was controlled by Hamas. See Weiss v. National Westminster Bank PLC, 453 F. Supp. 2d 609, 623 (E.D.N.Y. 2009) (plaintiffs cannot rely on allegations of provision of material support to Interpal and other organizations that plaintiffs did not allege were controlled by or operated on behalf of Hamas).

[29] Plaintiffs offer no new support for their discredited argument that the materials their two "experts" summarize are otherwise admissible. Compare CL Reply 18-20 with Pl. Br. 49. Notably, plaintiffs fail to show that the Israeli convictions their experts rely on are admissible under FRE 803(22). Both CL and NatWest have shown that these foreign convictions are inadmissible as against the banks. See NatWest Br. 47-48; CL Reply 19-20. The Café Hillel plaintiffs made another attempt in their reply on their cross-motion for summary judgment in the CL cases, arguing that "a party can use a conviction . . . against a third party," Reply Brief of Café Hillel Plaintiffs in Support of Their Motion for Summary Judgment, Dec. 16, 2011, 19, and citing American International Specialty Lines Ins. Co. v. Towers Financial Corp., 1997 WL 906427 (S.D.N.Y. Sept. 12, 1997) and Bank Brussels Lambert v. Crédit Lyonnais (Suisse) S.A., 2001 WL 99506 (S.D.N.Y. Feb. 6, 2001). But both of these precedents are inapposite. The first concerns the admissibility of a domestic guilty plea allocution against a civil defendant who had a pre-existing legal relationship with the criminal defendant. The second concerns the admissibility of a domestic conviction of a third party that was not admitted in a subsequent civil case. Here the convictions at issue are foreign and involve criminal defendants who had no prior legal relationship with either NatWest or CL. No U.S. court appears to have ever permitted what plaintiffs seek here – the receipt in evidence over a hearsay objection of a foreign felony conviction of a third party (here, alleged Hamas terrorists) in a later civil lawsuit against a defendant that was not a party to the prior criminal case.

Plaintiffs cannot avoid the fact that Shaked's and Kohlmann's proposed testimony is inadmissible under the <u>Mejia</u> and <u>Paracha</u> opinions. <u>See</u> NatWest Br. 38-40, 43-44. Their statement that the <u>Paracha</u> court permitted Kohlmann "to give exactly the sort of testimony at issue here," Pl. Br. 48, is false. Plaintiffs offer Kohlmann here to "attribut[e] responsibility for committing a terrorist attack." Pl. Br. 46. He was <u>never</u> permitted to so testify in <u>Paracha</u>. <u>See</u> CL Reply 17 n. 24. Plaintiffs' claim that these two rulings turn on Confrontation Clause concerns, Pl. Br. 45, is also false, as the Second Circuit confirmed earlier this month. <u>See</u> CL Reply 16-17; <u>United States v. Escobar</u>, 2012 WL 492839, at *2 (2d Cir. Feb. 16, 2012) (summary order) (court excluded expert testimony in <u>Mejia</u> because it was within the jury's ken, violated the Confrontation Clause <u>and</u> repeated hearsay without applying any expertise).[30]

## CONCLUSION

The Court should grant NatWest summary judgment.

Dated:  New York, New York
        February 29, 2012

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
     Lawrence B. Friedman, A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

---

[30] Plaintiffs imply NatWest has conceded that Hamas committed 10 of the 15 attacks, Pl. Br. 43 and n. 38, but NatWest's interrogatory response that plaintiffs mischaracterize contends that the admissible evidence is not sufficient to support the conclusion that <u>any</u> of the 15 attacks was perpetrated by Hamas, and adds merely that plaintiffs' own inadmissible evidence indicates that an entity other than Hamas may have been responsible for five of the attacks. <u>See</u> Israel Dec. Ex. 9. (No. 2 at 5-7).

# APPENDIX A

| DATE | DISCLOSURE OF SUSPICION TO UK LAW ENFORCEMENT AND REGULATORS | RESPONSE FROM UK LAW ENFORCEMENT AND REGULATORS | INTERPAL REGISTERED WITH CHARITY COMMISSION? |
|---|---|---|---|
| Early 1996 | **Charity Commission Investigation.** NatWest complied with a request from the Charity Commission to freeze Interpal's accounts while the Charity Commission scrutinized Interpal's controls and records and carried out checks of payments from Interpal's bank statements.[1] | The Charity Commission completed its investigation of Interpal and published its conclusion that allegations that Interpal funded terrorist activities were not substantiated.[2] | Yes.[3] |
| September 27, 2001 | **NCIS disclosure 140425.** | NatWest received no response to this disclosure.[5] | Yes.[6] |
| October 15, 2001 | **NCIS disclosure 142909.** | NatWest received no response to this disclosure.[8] | Yes.[9] |

---

[1] Schuster Dec. Exs. 23 (NW014516); 17 (Burchfield Rep. ¶¶ D.1.a-b); 25 (W_S081305-29).
[2] Schuster Dec. Exs. 17 (Burchfield Rep. ¶ D.1.g); 24; (Burchfield Tr. at 64:4-15).
[3] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).
[4] Schuster Dec. Exs. 27 (NW212124); 28 (Hoseason Dep. Ex. 11 at 1).
[5] Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.59).
[6] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).
[7] Schuster Dec. Ex. 29 (NW052056-66 at NW052062-66).
[8] Schuster Dec. Ex. 14 (Holland Rep. ¶ 3.59).
[9] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).

| DATE | DISCLOSURE OF SUSPICION TO UK LAW ENFORCEMENT AND REGULATORS | RESPONSE FROM UK LAW ENFORCEMENT AND REGULATORS | INTERPAL REGISTERED WITH CHARITY COMMISSION? |
|---|---|---|---|
| June 17, 2002 | **NCIS disclosure 207993.** NatWest referenced disclosure | | Yes.[12] |
| May 2, 2003 | **NCIS disclosure 276926.** | NatWest received no response to this disclosure. | Yes.[14] |
| August 26 & 27, 2003 | **Charity Commission Investigation.** In response to an order from the Charity Commission freezing Interpal's accounts, NatWest informed the Commission that it | On September 24, 2003, the Charity Commission completed its investigation of Interpal, published its inquiry report online and informed NatWest that it | Yes.[17] |

---

[10] Schuster Dec. Ex. 39 (NW052074-91 at NW052089-91).
[11] Schuster Dec. Exs. 39 (NW052074-91 at NW052077); 14 (Holland Rep. ¶ 3.55).
[12] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).
[13] Schuster Dec. Ex. 48 (NW083859-62).
[14] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).
[15] Schuster Dec. Exs. 50 (NW013660-61); 51 (NW013659).
[16] Schuster Dec. Exs. 66 (Report of the Charity Commission's 2003 Inquiry on Interpal); 67 (NW012942); 68 (NW012943-45); 69 (NW013641-44); 70 (NW013701); 71 (NW013702); 72 (NW013703); 73 (NW013944-45); 74 (NW013946-47); 17 (Burchfield Rep. ¶¶ D.2a-d).
[17] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).

| DATE | DISCLOSURE OF SUSPICION TO UK LAW ENFORCEMENT AND REGULATORS | RESPONSE FROM UK LAW ENFORCEMENT AND REGULATORS | INTERPAL REGISTERED WITH CHARITY COMMISSION? |
|---|---|---|---|
| August 28, 2003 | **NCIS disclosure 315666.** ▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓▓▓ | Yes.[20] |
| September 5, 2003 | **Correspondence with Bank of England.** NatWest corresponded with the Financial Sanctions Unit of the Bank of England and stated that ▓▓▓▓▓▓ | On October 3, 2003, NatWest received a response stating that the ▓▓▓▓▓▓ | Yes.[23] |



---

[18] Schuster Dec. Ex. 53 (NW052114-23 at NW052122-23).
[19] Schuster Dec. Ex. 53 (NW052114-23 at NW052117).
[20] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).
[21] Schuster Dec. Ex. 75 (NW013674-77).
[22] Schuster Dec. Ex. 76 (NW014505).
[23] Schuster Dec. Ex. 17 (Burchfield Rep. ¶ B.16).