**EXHIBIT 1 TO DECLARATION OF STEPHANIE D. SADO**



1 of 1 DOCUMENT

Copyright 1993 Associated Newspapers Ltd.
Evening Standard (London)

April 26, 1993, Monday

**SECTION:** Pg. 33

**LENGTH:** 1067 words

**HEADLINE:** Business as usual for defiant City

**BYLINE:** Patrick Donovan,Andrew Cornelius

**BODY:**

NATIONAL Westminster and HSBC Holdings, two of the biggest banks in the City of London, today put in place contingency plans to ensure that it was business as usual for their customers despite Saturday's huge bomb blast.

Derek Wanless, NatWest's chief executive, said that although the 52-storey NatWest Tower had suffered extensive damage, with up to a third of its windows shattered by the explosion, 'all our businesses are up and running'.

As the clear-up began, a bank spokesman said that the building was fully insured, but it was not yet possible to assesses the cost of the damage.

NatWest said that key members of the 1300 staff who work at the tower, headquarters for the bank's UK retail business, have been moved to other bank offices in the capital.

Other staff will be contacted within the next 48 hours. There is a staff helpline number: 0800 400 490.

The spokesman said that NatWest's computers and other records were not affected by the blast. Tomorrow's annual shareholders' meeting has been switched from the Tower to Chiswell Street Brewery, at 11am.

HSBC, which includes the Hongkong Bank and the Midland Bank, said that its main computer records are safe following the blast which wrecked its Bishopsgate building housing the bank's trade finance division.

The bank lost 'current working files' going back some months.

'"

"

The Stock Exchange said all systems appeared to be working but staff had difficulty arriving at work because only

Business as usual for defiant City Evening Standard (London) April 26, 1993, Monday

one of the doors was open.

_-"

'"

Insurers 'escape' bomb

THE insurance industry will escape relatively unscathed from the weekend City bombings with the Government expected to pick up at least 90% of the estimated £300 million bill.

Leading composites will stand to pay out 'a handful of millions', with Sun Alliance probably the most heavily exposed with expected losses of between £4 and £6 million.

As the market dismissed weekend suggestions that the total bill could rise as high as £1 billion, General Accident shares firmed 1p to 572p. Royal Insurance was up 1p at 327p. Commercial Union eased 1p to 615p. Sun Alliance was 1p lighter at 329p.

It is expected that the large majority of businesses suffering damage will be provided with terrorism cover.

According to the Association of British Insurers: 'While it is much too early to give a reliable figure for the explosion, it seems likely to be of the same order of magnitude as last year's City bomb.

'The businesses affected are likely to have carefully worked out contingency plans which should minimise the disruption and keep down business interruption claims.

'There remain a great deal of empty office accommodation in the City which is being made immediately available to the businesses needing to relocate.'

The ABI adds: 'All insurers pass the premiums for terrorism cover in their entirety to a mutual reinsurance company, Pool Re, which meets the cost of claims.

'If the funds of Pool Re are not sufficient to meet all the claims, insurers will themselves pay Pool Re a further 10% of the premiums they collected for Pool Re.'

**LOAD-DATE:** November 4, 1993

Case 1:05-cv-04622-DLI-RML    Document 277-1    Filed 03/22/12    Page 5 of 40 PageID #: 10727

**The New York Times**

# World

## 1 Dead, 40 Hurt As a Blast Rips Central London

By WILLIAM E. SCHMIDT
Published: April 25, 1993

A huge bomb hidden in a parked construction truck shattered the heart of London's financial district this morning, killing one man, wounding more than 40 people and raising a cloud of smoke that was visible across much of the capital.

Detectives at Scotland Yard immediately blamed the Irish Republican Army, which set off a similar bomb in nearly the same neighborhood just over a year ago, killing three people and causing $1.25 billion in damage.

The body of the dead man was discovered nearly six hours after the explosion by police searching buildings on Bishopsgate, the busy city thoroughfare on which the truck believed to contain the bomb was parked.

Because it was a weekend morning, only a handful of office workers and building security personnel were in the City of London, as the financial district is officially known. The City is also well-traveled by tourists and tour buses, drawn by its narrow streets and many old churches.

Late tonight, two car bombs exploded in the city, damaging buildings but causing no casualties, officials said.

Witnesses said the force of this morning's explosion, which came after several telephone warnings, sent people crying and screaming through the streets as glass from the windows of banks and skyscrapers rained down over an area of several square blocks. Streets were carpeted with broken shards, and the interiors of some buildings resembled stage sets, the furniture inside exposed to the open.

Most of the windows on the eastern side of the 52-story National Westminister Tower were gone, and window blinds fluttered in the spring wind. The explosion gouged a 15-foot wide crater in the street near the Hong Kong and Shanghai Banking Corporation building and blew in the building's lobby.

"It's just damage everywhere," said Nigel Tree, working in the bank. "All the doors of the lift shafts have been blown in. There's very little standing apart from the core wall."

One insurance executive said today's damage might exceed losses from the April 10 explosion of last year. Nicholas Balcombe, the chief executive of a London insurance broker, estimated that damage from this bombing would exceed $1.5 billion. Government to Meet Costs

After last year's explosion, many insurance companies refused to cover any further losses resulting from terrorist attacks in the City of London, and the Government moved to create a special fund to help underwrite such losses. While the measure has not yet been passed into law by Parliament, the Government said today that it would help meet costs.

Police this morning cordoned off nearly a square mile of the City of London, while they searched through damaged buildings. Most of those wounded were treated for shock or cuts received as a result of flying glass.

Among the wounded was a policeman who was helping to evacuate the area at the time the bomb detonated, about 10:25 A.M. The first telephoned warning, which carried a prearranged I.R.A. code word to indicate it is not a crank call, was received by the police about an hour earlier.

As a result, the police evacuated worshipers at the city's oldest synagogue, where the blast later blew out three windows, and telephoned building security guards in the area to get them to herd occupants away from windows.

But many had no warning. In the Moorgate Underground station, not far from the blast site, the concussion from the blast caused panic and commotion among passengers on a train that had just arrived in the station. For others, the warnings came too late.

Raymond Fayer, a security guard at the Hong Kong and Shanghai Bank, was knocked unconscious by the blast, not long after taking a telephone call warning about the bomb. "It all went black and then the next thing I looking up and seeing the ceiling down on me," he said from a London hospital.

Home | Times topics | Member Center

Copyright 2012   The New York Times Company   Privacy Policy   Help   Contact Us   Work for Us   Site Map   Index by Keyword



1 of 1 DOCUMENT

Copyright 1992 Independent Print Ltd
The Independent (London)

April 13, 1992, Monday

**SECTION:** TITLE PAGE; Page 1

**LENGTH:** 589 words

**HEADLINE:** City hopes for 'business as usual' after IRA bomb

**BYLINE:** By DEAN NELSON and ROBERT COLE

**BODY:**

THE CITY of London worked throughout last night to avert chaos for its 300,000 office staff this morning. Worst hit will be those with the 35 to 50 companies forced to move premises by the IRA bomb blast on Friday evening in which three people died.

At Staples Corner, in north-west London, the busy traffic junction which was a bomb target later that night, surveyors completed preliminary investigations but the Department of Transport said no decison had been taken on whether the A5 flyover would have to be rebuilt. Traffic was diverted yesterday, causing major disruption, and even if the flyover survives delays will last for a year.

In the City, British Telecom engineers, building contractors and window replacement companies have been working throughout the weekend to get the area ready for its workforce today.

Telecom engineers have repaired cables and redirected switchboard calls to affected companies to their new premises.

The worst damaged among the City's buildings were the Baltic Exchange and the Chamber of Shipping premises, which Ted Harthill, the City of London's surveyor, said last night would probably have to be completely rebuilt.

Baltic Exchange employees have been told they will be based at the Lloyd's building near by.

The Lord Mayor, Sir Brian Jenkins, said the Corporation of London had established helplines for affected businesses to assist them in finding alternative office accommodation. That would not be a problem because of the large number of offices left vacant by the recession, he said.

He added that although British Telecom had arranged for most calls to be redirected, others would be handled by Guildhall which would also act as a clearing house for stranded employees.

Sir Brian attempted to play down the extent to which the City would be affected, saying every attempt had been

City hopes for 'business as usual' after IRA bomb The Independent (London) April 13, 1992, Monday

made to make it "business as usual".

He added that British Rail had offered poster space at stations to relay information to displaced staff.

"The City of London will be ready for work on Monday as usual. That has been our objective since Friday evening. We are confident that all will work well and effectively in the morning.

"There has been a splendid effort by all concerned in the City of London to provide facilities for those businesses affected by this horrific incident," he added.

Among the worst affected companies in the City are Commercial Union, James Capel, Hongkong & Shanghai Bank and the National Westminster Bank. But the Stock Exchange, the Lloyd's of London insurance market and the foreign exchange markets are all hoping to operate as normal.

Ray Morley, marketing services director of Commercial Union, said that 650 of his staff would be affected and about half would not be found office accommodation for some time. He added that about half would be moved to Croydon as a temporary measure, while the rest will remain in offices in the City.

Damage suffered by the company ran into millions of pounds, he said. It was insured against bomb damage, but bore some of the risk. A police cordon between Leadenhall Street, St Mary Axe and Bevis Marks was lifted at midnight last night, but access to St Mary Axe - where the 100lb bomb went off at 9.21 on Friday evening - remains restricted.

Owen Kelly, Commissioner of the City of London Police, yesterday rejected criticism that police took too long to find the body of the third person killed by the explosion.

He said buildings were too dangerous to search.

**EXHIBIT 2 TO DECLARATION OF STEPHANIE D. SADO**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
                    Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.

- - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
                    Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
                    Defendant.


VIDEOTAPED DEPOSITION OF AMANDA HOLT
         Friday 23 July 2010
              At: 10:00 am
              Taken at:
   Cleary, Gottlieb, Steen & Hamilton LLP
      55 Basinghall Street, London
              United Kingdom


HIGHLY CONFIDENTIAL              2

---

Page 3

1   VIDEOGRAPHER: FLOYD HUMPHREY
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 2

1         A P P E A R A N C E S
2   For Plaintiff Tzvi Weiss:
3         ARI UNGAR
4         Osen LLC
5         700 Kinderkamack Road
6         Oradell, NJ 07649
7         Tel: 201 265 6400
8
9   For Plaintiff Tzvi Weiss:
10        AITAN GOELMAN
11        Zuckerman Spaeder LLP
12        1800 M Street, NW, Suite 1000
13        Washington, DC 20036-5807
14        Tel: 202 778 1996
15  For the Plaintiffs:
16        STEPHEN LOBEL
17        Finers, Stephens & Innocent LLP
18  For Defendant National Westminster Bank, PLC:
19
20        AVRAM E. LUFT and VALERIE SCHUSTER
21        Cleary, Gottlieb, Steen & Hamilton LLP
22        One Liberty Plaza
23        New York, NY 10006-1470
24        Tel: 212 225 2432
25
26  Also Present:
27        COURT EXAMINER - ADRIAN HUGHES
28
29        COURT REPORTER:
30        AILSA WILLIAMS
31        European Deposition Services
32        59 Chesson Rd
33        London, W14 9QS
34
35        Telephone: 44 (020) 7385 0077
36        HIGHLY CONFIDENTIAL       3

---

Page 4

1              I N D E X
2   AMANDA HOLT ... ... ... ... ... ... ... ... ..8
3   DIRECT EXAMINATION BY MR. .. ... ... ... ... ..8
4        GOELMAN:
5
6   CROSS-EXAMINATION BY MR. LUFT: ... ... ... ... 222
7
8   RE-DIRECT EXAMINATION BY MR. .. ... ... ... ... 229
9        GOELMAN:
10           INDEX OF EXHIBITS
11  Holt 1 NW012925-38 ... ... ... ... ... ... ...60
12  Holt 2 NW185976 ... ... ... ... ... ... ...66
13  Holt 3 NW014038-48 ... ... ... ... ... ... ...67
14  Holt 4 Press Release ... ... ... ... ... ... .83
15  Holt 5 NW066682-686 ... ... ... ... ... ... ...88
16  Holt 6 NW066667-70 ... ... ... ... ... ... ... 107
17  Holt 7 NW066672-76 ... ... ... ... ... ... ... 140
18  Holt 8 NW066820 ... ... ... ... ... ... ... 147
19  Holt 9 NW066721-23 ... ... ... ... ... ... ... 150
20  Holt 10 NW018476 ... ... ... ... ... ... ... 159
21  Holt 11 NW066687-90 ... ... ... ... ... ... ... 163
22  Holt 12 NW067948 ... ... ... ... ... ... ... 169
23  Holt 13 NW187287 ... ... ... ... ... ... ... 172
24  Holt 14 NW196319-20 ... ... ... ... ... ... ... 179
25  Holt 15 NW181060-63 ... ... ... ... ... ... ... 188
26  Holt 16 NW180811-15 ... ... ... ... ... ... ... 194
27  Holt 17 NW180828-29 ... ... ... ... ... ... ... 200
28  Holt 18 NW180854 ... ... ... ... ... ... ... 202

Page 89

1    Q.  Who is Mr. Outhwaite?
2    A.  I couldn't put a face to him but the Head
3  of Retail Media Relations means that he was responsible
4  for dealing with the media on behalf of the Retail Bank.
5  So if there had been any -- one of his responsibilities
6  was to look at what was out there in the newspapers and
7  see how it would have impacted on the bank, primarily
8  from a reputational perspective, so reputation.  He had
9  no regulatory background.  It was press relations.
10    Q.  Who was Graham Hardy?
11    A.  I don't know, or I don't recall.
12    Q.  What do you recall about getting this
13  e-mail from Mr. Outhwaite on December 10, 2004?
14    A.  As the e-mail dated December 10 at 11:14
15  am would imply, I was aware, just for clarity, I was
16  aware that the bank had accounts for people -- I should
17  put in here it was sloppy typing on my part -- allegedly
18  connected to Hamas but not Hamas itself, so we were
19  already aware of the allegations.
20    Q.  So Mr. Outhwaite sent this e-mail to you
21  at 10:19 am.  Is that right?
22    A.  Yes.
23    Q.  Would you have read the article that he
24  attached?
25    A.  My e-mail back to him says: "I can't see

Page 90

1  the article", but if he sent it back to me at 6:23 on
2  the front, I would have.  I did read the article.
3    Q.  He sent his initial e-mail to you at 10:19
4  am on Friday December 10.
5    A.  Yes.
6    Q.  Do you know how he could have sent the
7  follow up e-mail with the article at 6:23 am?
8    A.  I have absolutely no idea, I am sorry.  I
9  have no idea.
10    Q.  You sent an e-mail responding to his
11  initial e-mail at 11:14 am, correct?
12    A.  That is correct.
13    Q.  And you copied Mr. Foster?
14    A.  Yes.
15    Q.  And Sharon Wilson?
16    A.  Yes.
17    Q.  And Sue Smith?
18    A.  Yes.
19    Q.  And who is Sue Smith?
20    A.  I don't remember a Sue Smith but she
21  was -- I don't remember a Sue Smith.  I am just looking
22  at the titles.  It says here she is Operational Risk
23  Manager, so she was in the Retail side of the business.
24    Q.  You commented earlier on the portion of the
25  e-mail, you say: "However, we were aware that we had

Page 91

1  accounts of people connected to Hamas."
2    A.  Allegedly connected to Hamas.
3    Q.  You are saying "allegedly"?
4    A.  Yes.
5    Q.  But the e-mail says "for people connected
6  to Hamas", true.
7    A.  That is what the e-mail said, but I have
8  mistyped that e-mail.
9    Q.  I understand that is your testimony.  I am
10  asking you about this particular e-mail though.
11    A.  Sure.
12    Q.  The e-mail states:
13    "We were aware that we had accounts for people
14  connected to Hamas but not Hamas itself."  Correct?
15    MR. LUFT:  Documents speaks for itself.
16    A.  That is what the e-mail says, yes.
17    Q.  And you sent that to four people, correct?
18    A.  Two or three people, copied to Sharon,
19  yes, one other.
20    Q.  And did any of those people ever correct
21  you about awareness of accounts for people connected to
22  Hamas?
23    A.  The person who would have corrected me
24  would have been Stephen, but as to whether or not he
25  actually felt the need to correct me, I don't recall,

Page 92

1  because it was very clear between Stephen and I that the
2  meaning was allegedly connected, not actually connected.
3  If we had any accounts connected to Hamas we would have
4  already reported and exited them.
5    Q.  So is it your testimony that you don't
6  recall anybody correcting that purported error?
7    A.  My testimony is there would be no need for
8  anybody to correct because their understanding was that
9  "allegedly" should have been in there.
10    Q.  Regardless of whether or not there was
11  a need to correct, you don't sitting here today recall
12  anybody correcting you?
13    MR. LUFT:  Objection, asked and answered.
14    MR. GOELMAN :  Asked and answered.
15    MR. LUFT:  I am not going to argue with you,
16  Mr. Goelman.  I just make my objection.
17    A.  What I said was I don't recall Stephen
18  coming in and correcting me, no.  That is not to say
19  that he didn't.  I don't recall because there would have
20  been no need.
21    Q.  Later this e-mail was forwarded to other
22  people as well, including people in the CBFM, true?
23    A.  I have no idea who it was forwarded on to.
24    Q.  Do you recall at any point anybody,
25  Stephen Foster, Irvine Rodger, anybody correcting what

**EXHIBIT 3 TO DECLARATION OF STEPHANIE D. SADO**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)
- - - - - - - - - - - - - - - - - - - - -
TZVI WEISS, et al,
                        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                        Defendant.
- - - - - - - - - - - - - - - - - - - - -
NATAN APPLEBAUM, et al.,
                        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                        Defendant.

VIDEOTAPED DEPOSITION OF STEPHEN FOSTER

Friday 16 July 2010
At: 10:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom

HIGHLY CONFIDENTIAL                    2

Page 2

```
 1        A P P E A R A N C E S
 2  For Plaintiff Tzvi Weiss:
 3        STEPHEN SCHWARTZ, ESQ.
 4        Kohn, Swift & Graf PC
 5        One South Broad Street, Suite 2100
 6        Philadelphia, Pennsylvania 19107-3304
 7        Tel: 419 246 0528
 8  For Plaintiff Natan Applebaum:
 9        MARK WERBNER
10        Sayles & Werbner
11        4400 Renaissance Tower
12        1201 Elm St.
13        Dallas, Texas 75270
14        Tel: 214 939 8763
15
16  For Plaintiff Tzvi Weiss:
17        AITAN GOELMAN
18        Zuckerman Spaeder LLP
19        1800 M Street, NW, Suite 1000
20        Washington, DC 20036-5807
21        Tel: 202 778 1996
22  For Defendant National Westminster Bank, PLC:
23
24        JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25        Cleary, Gottlieb, Steen & Hamilton LLP
26        One Liberty Plaza
27        New York, NY 10006-1470
28            Tel: 212 225 2000
29
30  Also Present:
31
32  COURT REPORTER:
33
34        AILSA WILLIAMS
35        European Deposition Services
36        59 Chesson Rd
37        London, W14 9QS
38        Telephone:  44 (020) 7385 0077
39            HIGHLY CONFIDENTIAL        3
```

Page 3

```
 1                VIDEOGRAPHER: DAVID ROSS
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2                I N D E X
 3  STEPHEN FOSTER  ... ... ... ... ... ... ... ...6
 4  DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..6
 5        WERBNER:
 6
 7  CROSS-EXAMINATION BY MR. ... ... ... ... ... ... 162
 8        SCHWARTZ:
 9  CROSS-EXAMINATION BY MR. ... ... ... ... ... ... 237
10        BLACKMAN:
11
12        INDEX OF EXHIBITS
13  Foster 1 NW012925-33 ... ... ... ... ... ... .79
14  Foster 2 NW014025-36 ... ... ... ... ... ... 103
15  Foster 3 NW013700 ... ... ... ... ... ... ... 107
16  Foster 4 NW013695-97 ... ... ... ... ... ... 112
17  Foster 5 NW212124 ... ... ... ... ... ... ... 121
18  Foster 6 NW180808-10 ... ... ... ... ... ... 138
19  Foster 7 NW013939-41 ... ... ... ... ... ... 142
20  Foster 8 NW066667-71 ... ... ... ... ... ... 148
21  Foster 9 NW067948-49 ... ... ... ... ... ... 156
22  Foster 10 NW180827-29 ... ... ... ... ... ... 159
23  Foster 11 NW088194-97 ... ... ... ... ... ... 187
24  Foster 12 NW017151-54 ... ... ... ... ... ... 202
25  Foster 13 "Press Room, US Dpt of ... ... ... ... 220
26        the Treasury, (No Bates Nos.)
27
28  Foster 14 NW066829-32 ... ... ... ... ... ... 226
29
30
```

Page 237

1  most probably.  It would have been a standard letter to
2  the Bank of England in relation -- asking them if in
3  their view we could continue to operate the account.  It
4  would be no different from any other account, any other
5  letter we sent to them in relation to Sanctions
6  Compliance.  It wouldn't have been a special letter in
7  relation to Interpal, as far as I recall.
8       MR. SCHWARTZ:  Okay.
9       CROSS-EXAMINATION BY MR. BLACKMAN:
10      MR. BLACKMAN:  Very few questions for you,
11  Mr. Foster.  First of all, could you put before you
12  Exhibit 11 and Exhibit 1.
13      A.  Okay, I have them in front of me.
14      Q.  You were questioned about Exhibit 1 this
15  morning and about Exhibit 11 this afternoon.  Is the
16  substance of the two exhibits the same, with the
17  difference being that they would be different names
18  listed on the two exhibits as sanctions lists were
19  revised?
20      A.  Yes, they are aiming to do the same thing,
21  which is to get divisions to search their databases for
22  potential matches to those lists.
23      Q.  Next question, I think last question.  You
24  talked this morning and again this afternoon about OFAC
25  policies.  When I say "OFAC policies", I mean the policy

Page 238

1  that you were developing in the bank to deal with how to
2  respond to OFAC sanctions.
3       A.  Right, yes.
4       Q.  Was there such a policy
5  in August/September 2003, when you had to deal with the
6  response to the OFAC freezing of the Interpal account?
7       MR. SCHWARTZ:  Objection to form.  What do you
8  mean by "such a policy"?
9       MR. BLACKMAN:  Was there an OFAC policy, as
10  I just defined it?
11      MR. SCHWARTZ:  A policy for dealing with OFAC
12  listing at the bank at that time?
13      MR. BLACKMAN:  Yes.
14      A.  There was not a policy at that time.
15      Q.  I think you have testified, correct me if
16  I am wrong -- I don't want mean to lead you, I just want
17  to move this, given the hour -- that you were developing
18  such a policy I think you said in the period of 05/06?
19      A.  Correct.
20      Q.  Did there come a time when that policy
21  would have led the bank to simply automatically require
22  closure of an account of someone who had been listed by
23  OFAC?
24      A.  Yes, the policy developed over a number of
25  years.  As you described,  05/06, we had a policy

Page 239

1  approved by Group Risk Committee, specifically in
2  relation to compliance with OFAC obligations.  Our
3  policy has moved on now to the extent that globally we
4  have a policy which prohibits relationships with anybody
5  on the OFAC list.
6       Q.  When did that particular aspect of the
7  policy go into effect, if I may call it that?
8       A.  Under my recent leadership of the team,
9  which started from April 09 again, a new policy was
10  introduced in June 09 specifically confirming that.  I
11  have to say, I didn't look before then, because I was
12  not working there, but it may well have been in place
13  before then, but certainly from June 09 we have had
14  a policy globally that we will do no relationships with
15  anybody on the OFAC list.
16      Q.  In fact, is it the case that in terms of
17  closures of accounts of people that were on the OFAC
18  list, whether pursuant to the policy or otherwise, the
19  only entities you can recall are Interpal and this
20  Northern Ireland charity?
21      MR. SCHWARTZ:  Objection, leading.
22      MR. BLACKMAN:  You may answer.
23      A.  Yes, they are in that period, yes, they
24  are the only ones I can recall.
25      MR. BLACKMAN:  I have no further questions.

Page 240

1       MR. SCHWARTZ:  Just one question.  These more
2  stringent policies of which you were just speaking with
3  Mr. Blackman --
4       A.  Yes.
5       Q.  -- were they a response to increased
6  operations in the United States?
7       A.  No, I think they are more a desire to --
8  we just wanted to do it because it is a toughening of
9  our approach.
10      Q.  What do you mean by "a toughening of your
11  approach"?
12      A.  It means that nowhere in the world will we
13  allow our business, any of our businesses to do business
14  with an OFAC listed entity, but of course it is possible
15  for any institution in Singapore, for example, to do
16  business with an OFAC listed entity, if they want to.
17  We don't allow that.
18      Q.  Do these reflect a sentiment by the bank
19  that prior policies about OFAC were insufficiently
20  stringent?
21      A.  I am not sure it is that.  It is a change
22  in risk appetite.
23      MR. SCHWARTZ:  I have no further questions.
24      MR. BLACKMAN:  I have one more.  I realize you
25  are not a lawyer, but you adopted -- did you adopt these

**EXHIBIT 4 TO DECLARATION OF STEPHANIE D. SADO**



Annual Report and Accounts 2003



# Consolidated profit and loss account

for the year ended 31 December 2003

| | Note | 2003 £m | 2002 £m |
|---|---|---|---|
| Interest receivable | | | |
| – interest receivable and similar income arising from debt securities | | 54 | 101 |
| – other interest receivable and similar income | | 5,925 | 6,404 |
| Interest payable | | (1,947) | (2,371) |
| **Net interest income** | | 4,032 | 4,134 |
| Dividend income | | 61 | 13 |
| Fees and commissions receivable | | 3,014 | 2,908 |
| Fees and commissions payable | | (796) | (715) |
| Dealing profits | 1 | 797 | 735 |
| Other operating income | | 147 | 619 |
| **Non-interest income** | | 3,223 | 3,560 |
| **Total income** | | 7,255 | 7,694 |
| Administrative expenses | | | |
| – staff costs* | 2 | 1,243 | 1,755 |
| – premises and equipment* | | 207 | 285 |
| – other* | | 2,001 | 2,084 |
| Depreciation and amortisation | | | |
| – tangible fixed assets* | 18 | 95 | 444 |
| – goodwill | 17 | 18 | 26 |
| **Operating expenses** | | 3,564 | 4,594 |
| **Profit before provisions for bad and doubtful debts** | | 3,691 | 3,100 |
| Provisions for bad and doubtful debts | 12 | 549 | 508 |
| Amounts written off fixed asset investments | | 1 | 8 |
| **Profit on ordinary activities before tax** | 4 | 3,141 | 2,584 |
| Tax on profit on ordinary activities | 5 | 947 | 713 |
| **Profit on ordinary activities after tax** | | 2,194 | 1,871 |
| Minority interests – equity | | (1) | 5 |
| **Profit for the financial year** | | 2,195 | 1,866 |
| Preference dividends – non-equity | 6 | 39 | 41 |
| **Profit attributable to ordinary shareholders** | | 2,156 | 1,825 |
| Ordinary dividends | 7 | 2,257 | 695 |
| **Retained (loss)/profit** | 30 | (101) | 1,130 |

* includes restructuring costs (see Note 4)

All items dealt with in arriving at profit on ordinary activities before tax relate to continuing operations.

Profit on ordinary activities before tax and the retained loss for the year on a historical cost basis were not materially different from reported amounts.

10

Consolidated profit and loss account

# Consolidated balance sheet
at 31 December 2003

|  | Note | 2003 £m | 2002 £m |
|---|---|---|---|
| **Assets** | | | |
| Cash and balances at central banks | | 1,112 | 1,251 |
| Items in the course of collection from other banks | | 2,255 | 2,085 |
| Treasury bills and other eligible bills | 9 | 541 | 1,724 |
| Loans and advances to banks | 10 | 35,412 | 23,664 |
| Loans and advances to customers | 11 | 102,572 | 112,122 |
| Debt securities | 13 | 21,727 | 16,846 |
| Equity shares | 14 | 1,072 | 1,067 |
| Interests in associated undertakings | 15 | 19 | 33 |
| Intangible fixed assets | 17 | 273 | 331 |
| Tangible fixed assets | 18 | 1,523 | 3,795 |
| Settlement balances | | 2,136 | 2,500 |
| Other assets | 19 | 3,184 | 5,274 |
| Prepayments and accrued income | | 1,047 | 1,195 |
| **Total assets** | | 172,873 | 171,887 |
| | | | |
| **Liabilities** | | | |
| Deposits by banks | 20 | 17,558 | 17,718 |
| Items in the course of transmission to other banks | | 943 | 1,214 |
| Customer accounts | 21 | 116,569 | 111,477 |
| Debt securities in issue | 22 | 2,112 | 208 |
| Settlement balances and short positions | 23 | 14,464 | 15,180 |
| Other liabilities | 24 | 4,368 | 6,323 |
| Accruals and deferred income | | 1,739 | 3,147 |
| Provisions for liabilities and charges | | | |
| – deferred taxation | 25 | 94 | 1,213 |
| – other provisions | 26 | 152 | 224 |
| Subordinated liabilities | | | |
| – dated loan capital | 27 | 3,272 | 3,341 |
| – undated loan capital including convertible debt | 28 | 2,471 | 2,592 |
| Minority interests | | | |
| – equity | | 3 | 44 |
| – non-equity | | — | 3 |
| Called up share capital | 29 | 2,126 | 2,159 |
| Share premium account | 30 | 1,286 | 1,286 |
| Other reserves | 30 | 298 | 301 |
| Revaluation reserve | 30 | 119 | 99 |
| Profit and loss account | 30 | 5,299 | 5,358 |
| Shareholders' funds | | | |
| – equity | | 8,680 | 8,722 |
| – non-equity | | 448 | 481 |
| **Total liabilities** | | 172,873 | 171,887 |
| | | | |
| **Memorandum items** | | | |
| Contingent liabilities | 37 | 5,853 | 6,500 |
| | | | |
| Commitments (standby facilities, credit lines and other) | 37 | 60,027 | 59,965 |

The accounts were approved by the Board of directors on 18 February 2004 and signed on its behalf by:

| Sir George Mathewson | Fred Goodwin | Fred Watt |
|---|---|---|
| *Chairman* | *Group Chief Executive* | *Group Finance Director* |

**EXHIBIT 5 TO DECLARATION OF STEPHANIE D. SADO**

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
TZVI WEISS, et al.,
              Plaintiffs,
       -against-
NATIONAL WESTMINSTER BANK, PLC,
              Defendant.
-----------------------------------------------x
NATAN APPLEBAUM, et al.,
              Plaintiffs,
       -against-
NATIONAL WESTMINSTER BANK, PLC,
              Defendant.
-----------------------------------------------x

       * HIGHLY CONFIDENTIAL *

       VIDEOTAPED DEPOSITION of BELINDA LANE,

taken before Cheryll Kerr, a Notary Public

and a Shorthand Reporter, held at the offices

of Cleary, Gottlieb, Steen & Hamilton, LLP,

located at 55 Basinghall Street, London,

England on Tuesday, the 24th day of June,

2008, at 9:38 a.m.

## Page 2

APPEARANCES:
KOHN, SWIFT & GRAF, P.C.
       Attorneys for Plaintiff Tzvi Weiss
       One South Broad Street, Suite 2100
       Philadelphia, Pennsylvania  19107-3304

BY:  STEPHEN H. SCHWARTZ, ESQ.

SAYLES WERBNER, P.C.
       Attorneys for Plaintiff NATAN APPLEBAUM
       4400 Renaissance Tower
       1201 Elm Street
       Dallas, Texas  75270
BY:  MARK S. WERBNER, ESQ.

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
       Attorneys for Defendant National
       Westminster Bank, PLC
       One Liberty Plaza
       New York, New York  10006-1470

BY:  LAWRENCE B. FRIEDMAN, ESQ.
     PATRICK SHELDON, ESQ.

GLANCY BINKOW & GOLDBERG, LLP
       Attorneys for Plaintiff Tzvi Weiss
       1430 Broadway, Suite 1603
       New York, New York  10018
BY:  ANDREW FRIEDMAN, ESQ. (OF COUNSEL)

Also Present:  Jackie Sheftali, NatWest; Simon
Rutson, Videographer

       *****  *****  *****

## Page 3

EXAMINATION BY:                    PAGE
Mr. Werbner              7

              EXHIBITS
LANE
FOR ID       DESCRIPTION          PAGE

Exhibit 1  Letter dated January 20      6
       2000, Bates No. NW 13431
Exhibit 2  Credit assessment, Bates      6
       Nos. NW 13316 - NW 13317

Exhibit 3  Meeting synopsis, March 20,      6
       2002, Bates No. NW 13637
Exhibit 4  Transmission note, Bates      6
       No. 13197

Exhibit 5  Memorandum dated July 9,      6
       2002, Bates No. NW 13333
Exhibit 6  Memorandum dated July 15,      6
       2002. Bates No. NW 13332

Exhibit 7  Memorandum dated August 1,      6
       2002. Bates No. NW 13347
Exhibit 8  Fax dated August 6, 2002,      6
       Bates Nos. NW 13347- 13355

Exhibit 9  Document bearing Bates      6
       No. 13346
Exhibit 10  Memorandum bearing fax      6
       date October 10, 2005,
       Bates No. NW 13636
Exhibit 11  Meeting synopsis, January 27,      6
       2003, Bates No. NW 13639

(Continued)

## Page 4

              EXHIBITS (Cont'd)
LANE
FOR ID       DESCRIPTION          PAGE

Exhibit 12  Document bearing Bates      6
       No. NW 13357
Exhibit 13  Document bearing Bates      6
       Nos. NW 12965-12966

Exhibit 14  Letter dated September 24,      6
       2003, Bates No. NW 17132
Exhibit 15  (No document was marked)      6
Exhibit 16  Letter dated June 20, 2001,      6
       Bates No. NW 13415

Exhibit 17  Document bearing Bates      6
       No. NW 10642

       REQUESTS FOR PRODUCTION

DESCRIPTION                    PAGE

Bank Line Payment Manager          143
applications

Page 25

1   deposits or just how -- what?
2       A.   Their annual turnover.
3       Q.   So the business' annual turnover?
4       A.   Yes.
5       Q.   Is there a segment of -- of the real
6   estate people that -- that handle above 25 million?
7       A.   Yes.  That's our corporate offices would
8   deal with that.  We would introduce an account to
9   corporate.
10      Q.   Are there any further breakdowns above
11  that, or is it just above 25 million annual pound
12  turnover that goes into corporate?
13      A.   I am not certain.  It goes into
14  corporate, whether there's anything above corporate,
15  I'm not sure.
16      Q.   And when you say "It goes into
17  corporate," again, is that just in the real estate
18  area?
19           You don't mean -- or -- or at the corporate
20  level, is that a mixture of real estate and other
21  commercial businesses?
22      A.   Yes.
23      Q.   Okay.  So once they have an annual
24  turnover in excess of 25 million pounds, whether
25  they are in the real estate business or something

Page 26

1   else, they go into a different part of the bank?
2       A.   Yes.
3       Q.   So altogether, how long were you in the
4   retail part of the bank as opposed to the
5   commercial?
6       A.   That would be up until I left Islington,
7   which was 2002.
8       Q.   What were the circumstances that gave
9   rise to your leaving Islington in 2002 and going
10  into commercial?
11      A.   The commercial office was very close to
12  home, and also, I wanted to expand my lending
13  knowledge.
14      Q.   What do you mean by that?
15      A.   Well, I was looking after accounts with
16  turnover up to a million, and I wanted to develop
17  myself and look after accounts that went up to
18  25 million.
19      Q.   So how did you go about pursuing that
20  desire?
21      A.   Well, I saw the job advertised, applied
22  for it, had an interview, and got the job.
23      Q.   Who did you interview with?
24      A.   Martin How and Ray Pask.  No.  Sorry, not
25  Martin How.  Paul Croucher and Ray Pask.

Page 27

1       Q.   When you got the job and went into the
2   commercial area, who was your supervisor?
3       A.   Paul Croucher.
4       Q.   Who was your supervisor while you were at
5   Islington in the retail area?
6       A.   When I left, David Roe.
7       Q.   David Roe?
8       A.   (Nodding).
9       Q.   What was his title?
10      A.   Area manager.  Area business manager.
11      Q.   Who was your supervisor when you first
12  started at Islington in 1999?
13      A.   Chris Cook.
14      Q.   Was there anyone after Mr. Cook, before
15  David Roe?
16      A.   I don't think so.
17      Q.   When you were at Laughton, for the few
18  years before Islington -- do I have that right?
19      A.   Uh-huh.
20      Q.   Who did you work for, and what were you
21  doing at Laughton?
22      A.   I was business manager.  My title might
23  have been senior business manager, and I worked for
24  Allison Lucas when I left.
25      Q.   What were the nature of your customers at

Page 28

1   Laughton?
2       A.   A mix of different trading businesses.
3       Q.   But all with annual turnover less than
4   one million pounds?
5       A.   Yes.
6       Q.   And how was your mix of customers
7   different, if it was, when you moved to Islington?
8       A.   I did have a number of property
9   customers, and some of the customers at Islington,
10  just by the nature of where they are located, did
11  have turnover slightly over a million.
12      Q.   How many customers did you have while you
13  were working at Islington?
14      A.   Approximately 300.
15      Q.   And how did that compare to the number
16  you had at Laughton?
17      A.   It was about the same.
18      Q.   And how many other business managers were
19  there at Islington during your period?
20      A.   Five or six.
21      Q.   What were their names?
22      A.   Nick Howard, Surinder Rehal, Peter
23  Dennis, Tyran Sulaman.  I think that's it.
24      Q.   During your work at Islington, did you
25  have an assistant?

Page 45

1   if any, on Friday?
2        MR. L. FRIEDMAN:  I direct you not to
3   answer the question.
4        All the document she looked at are
5   documents that we produced to you.
6        Anything further you're not entitled
7   to.
8        MR. WERBNER:  Do you refuse to answer
9   my last question?
10       MR. L. FRIEDMAN:  I instruct the
11  witness not to answer.
12       MR. WERBNER:  Are you refusing based
13  on what Mr. Friedman said to answer?
14       THE WITNESS:  Yes.
15  BY MR. WERBNER:
16  Q.   Did you talk to anybody, other than who
17  you've described, about this deposition?
18  A.   No.
19  Q.   Did you look at any records to refresh
20  your memory or to prepare for the deposition other
21  than what the lawyers showed you?
22  A.   No.
23       MR. SCHWARTZ:  May I interrupt for
24  one second, please.
25       Mr. Friedman's comments about the

Page 46

1   request for documents --
2        (Informal discussion held off the
3   record.)
4        THE WITNESS:  Could I take a quick
5   break, please.
6        MR. WERBNER:  Absolutely, and any
7   time you need one as we go throughout the
8   days ahead, absolutely, so just take off
9   your microphone and we will go off the
10  record.
11       THE VIDEOGRAPHER:  Going off the
12  record at 10:28.
13       (Recess taken at 10:28 a.m.)
14       (Resumed at 10:40 a.m.)
15       THE VIDEOGRAPHER:  Back on the record
16  at 10:40.
17       MR. L. FRIEDMAN:  Ms. Lane has a name
18  to add that she did not remember before.
19       Do you want to tell him that name?
20       THE WITNESS:  Yes.  When I told you
21  that I passed the accounts in Islington
22  over to a gentleman, one was Surinder
23  Rehal.  The other was Paul Barnsley.
24  BY MR. WERBNER:
25  Q.   All right.  Anything else that you want

Page 47

1   to add or change from what you've already testified?
2   A.   Nope.
3   Q.   Now, after you left Islington's business
4   center, for some reason or another, you continued to
5   act as a relationship manager for Interpal, right?
6   A.   Not initially, no.
7   Q.   At any point?
8   A.   The account was left at Islington
9   business center.  I didn't initially take it with me
10  when I moved to Romford.  When I got to Romford, I
11  was asked to provide my director with a list of my
12  highest income-earning accounts, of which Interpal
13  was one.  He then instructed me several weeks later
14  to transfer that account to Romford with me,
15  although I didn't want to.
16  Q.   Who told you to do it?
17  A.   Paul Croucher.
18  Q.   What was his title?
19  A.   Director, commercial banking.
20  Q.   Why didn't you want to?
21  A.   Because I didn't feel that it qualified
22  as a commercial relationship.
23  Q.   When you initially left Islington
24  business center, did you take any customer accounts
25  with you?

Page 48

1   A.   Yes, I took six or seven.
2   Q.   Why?
3   A.   They were all property customers.
4   Q.   And did you take all the property
5   customers with you that had been in your portfolio?
6   A.   No.
7   Q.   How did you choose those six or seven?
8   A.   The -- the six or seven were either the
9   highest turnover or the highest income-producing
10  accounts.
11  Q.   And so did you take all at a certain
12  criteria that were in the real estate field?
13  A.   Yes.
14  Q.   And what was that criteria?
15  A.   Either the turnover was higher than all
16  the other accounts or the income that was produced
17  for the bank was higher than the others, so it was
18  really what I considered to be my top accounts.
19  Q.   What was the amount of income produced to
20  the bank that you considered among your top
21  accounts?
22  A.   A couple of the them were in the region
23  of 80,000 pounds a year.
24  Q.   And that's determined how?  I mean, how
25  is -- how are you calculating --

Page 69

1    BY MR. WERBNER:
2        Q.   And were -- whether you were meeting
3    these income targets, was that something reviewed
4    with you on some kind of quarterly or annual basis?
5        A.   Yes, an annual basis, and generally, we
6    would have several meetings during the year as well
7    to discuss whether you were on target or not.
8        Q.   Who did you have those meetings with?
9        A.   Chris Cook and David Roe.
10       Q.   Would there be written materials about
11   that from time to time?
12           MR. L. FRIEDMAN:  Object to the form.
13           THE WITNESS:  Only annually.
14   BY MR. WERBNER:
15       Q.   What kind annually was there?
16       A.   We had an annual appraisal.
17       Q.   What did you call that?
18       A.   A and D.
19       Q.   A and D?
20       A.   Appraisal and development.
21       Q.   Appraisal and development.  Thank you.
22   How were you doing?
23           MR. L. FRIEDMAN:  Object to the form.
24           THE WITNESS:  Good.
25   BY MR. WERBNER:

Page 70

1        Q.   That's why you got promoted, right?
2        A.   One of the reasons.
3        Q.   Were you meeting all your income targets?
4        A.   I was at Islington three years.  I think
5    the last two years I certainly exceeded my income
6    target.
7        Q.   Which are the years you have in mind, by
8    virtue of your last answer?
9        A.   2000 through and 2001.
10       Q.   How did you do in '02 and '03?
11       A.   I was a new relationship manager in
12   commercial with a brand-new portfolio.  2002, I -- I
13   can't recall specifically.  I can't recall.  I think
14   I was thereabouts in 2002, and 2003 I can't
15   remember.
16       Q.   But these A and Ds -- annual appraisal
17   and developments -- should reflect that?
18       A.   Yes.
19       Q.   And who maintains custody of those?
20       A.   Either the area managers or -- I don't
21   know if they are sent to another department or not
22   now.
23       Q.   How was, in general, these income targets
24   measured and calculated?
25       A.   (No response.)

Page 71

1        Q.   Let me tell you what I think, and only
2    because I am just trying to -- to get to it.
3        It sounded to me like you got monthly reports
4    that listed your customers and would show the income
5    for each customer that was being generated for the
6    bank, and then maybe those were automatically or
7    able to be summed up.
8        I mean, is that right or not?
9        A.   Yes.
10       Q.   Okay, so put it into your own words and
11   how you would therefore keep these monthly reports
12   and then track them to monitor your progress.
13       Put that in your own words.
14       A.   Each month we received a statement
15   detailing the income for each customer, and a total,
16   and that you -- compare that against mine, my annual
17   target.
18       Q.   And Interpal was among the top of your
19   customers through the time that you were in
20   Islington, at least, right?
21       A.   What do you mean by "top in my
22   customers"?
23       Q.   Income earning towards your goal.
24       A.   It had one of the highest incomes out of
25   all of my customers, yes.

Page 72

1        Q.   So out of 300 or so customers, is it true
2    that Interpal was one of the very top income earners
3    towards your goal?
4            MR. L. FRIEDMAN:  Object to the form.
5            THE WITNESS:  Yes --
6    BY MR. WERBNER:
7        Q.   And --
8        A.   -- and no.  Can I expand a little?
9        Their income was pretty much the same for
10   several years, so although it was a top income-
11   earning customer, I have to expand and grow my
12   customers, and whilst --
13       Whilst it -- it was one of the higher income-
14   earning customers, it wasn't really contributing
15   towards my target, because it wasn't growing,
16   because each year, I have to increase the income
17   that each customer produces.
18       Q.   I mean, is that real clear in your mind,
19   thinking back four or five years, without having the
20   documents in front of you?  Are you that certain of
21   that?
22       A.   It is clear, because I chose not to take
23   Interpal with me, and my director instructed me to
24   bring it, because he could see that it was a high
25   income-earning customer, but because I felt there

Page 73

1  was no potential for me to grow that customer, I
2  didn't want to bring it with me.
3      Q.   Did you -- did you say that to anyone?
4      A.   Yes, I did.
5      Q.   Who did you say that to?
6      A.   Paul.
7      Q.   Paul who?
8      A.   Paul -- Paul Croucher --
9      Q.   And what did he say?
10     A.   -- my director.
11     Q.   And what did he say?
12     A.   He instructed me to transfer the account
13  with me.
14     Q.   And what did you say?
15     A.   I had to do as I was instructed.
16     Q.   Were there any emails or memos concerning
17  that?
18     A.   There may have been.  I had to produce a
19  list for him of the top income earning customers.  I
20  don't recall whether I sent that by email or hand
21  wrote it.  I -- I can't clearly remember.
22     Q.   While you were at the Islington business
23  center, did you have an email on the NatWest system?
24     A.   No, I don't believe I did then.
25     Q.   How did you send email, then?

Page 74

1      A.   Well, it was when I was at Romford I then
2  had email, so I am saying I may have sent one to
3  Paul Croucher.  I can't recall.  We may have just
4  had a discussion about it.
5      Q.   But how could you have sent an email at
6  Islington?
7      A.   I didn't say I sent an email at
8  Islington.
9      Q.   I am not saying that you said you did,
10  but did you have the ability --
11     A.   No.
12     Q.   -- to send email?
13     So you didn't send any emails while you were at
14  Islington?
15     A.   No.
16     Q.   Because you didn't have email?
17     A.   No.
18     Q.   That's right?
19     A.   Yes.
20     Q.   Did you have occasion to deliver typed
21  memoranda, or was everything that you presented
22  handwritten while you were at the Islington business
23  center?
24     A.   Oh, no.  I had access to Word and Excel.
25     Q.   And did you create documents during that

Page 75

1  period of your work?
2      A.   Yes.
3      Q.   Did you do so on a routine basis?
4      A.   Yes.
5          MR. L. FRIEDMAN:  Object to the form.
6  BY MR. WERBNER:
7      Q.   What kind of documents did you create on
8  a routine basis that would deal, say, with your
9  customers?
10     A.   Interview notes.
11     Q.   Anything else?
12     A.   Advances reports.
13     Q.   What is that?
14     A.   When we have to prepare an application
15  for credit facilities to our credit office.
16     Q.   Okay.  What --
17     A.   Letters.
18     Q.   Letters?  What else?
19     A.   Any table I might want to construct for
20  my -- for myself or spreadsheets, because we had
21  Excel.
22     Q.   Why was Interpal generating one of the
23  top income amounts of your portfolio of
24  300 customers?
25     A.   It was purely from credit balances.

Page 76

1      Q.   And why was that so profitable for the
2  bank?
3          MR. L. FRIEDMAN:  Object to the form.
4          THE WITNESS:  They -- they -- because
5      of the volume of credit balances they
6      held.
7  BY MR. WERBNER:
8      Q.   Isn't it also because they did not, like
9  other customers, take interest on those large
10  deposits?
11     A.   Who is -- who is "they"?
12     Q.   Interpal.
13     A.   And who are "customers"?  Their
14  customers?
15     Q.   No, your other customers.
16     A.   Sorry.  Could you repeat the question?
17     Q.   Yeah.
18     Did Interpal, with those large balances at
19  NatWest -- were they paid interest?
20     A.   No.
21     Q.   Were most of the customers among your 300
22  that had large balances paid interest?
23     A.   Yes.
24     Q.   So this was a very special benefit to
25  NatWest as far as that Interpal accounts, right?

Page 293

1    Q.   Thank you.
2        Let's turn to Lane Deposition Exhibit 12, which
3    is with the Bates number NW 13357.  Can you identify
4    that for us, please?
5    A.   (No response).
6    Q.   Do you remember anything about this
7    incident?
8    A.   Only in that I was shown this on Friday
9    (indicating).
10   Q.   All right, but did you know of it before
11   seeing it Friday?
12   A.   It -- it -- it reminded me, but I -- I
13   can't recall it clearly.
14   Q.   Seeing it Friday refreshed your
15   recollection, but it wasn't the first time only last
16   Friday that -- that you heard of some sort of
17   complaint letter?
18   A.   I -- I remember when -- when I saw it on
19   Friday, I -- I did remember the incident, yes.
20   Q.   All right, and tell me what you remember.
21   A.   I -- I would prefer to see the other
22   document, but -- is that possible?
23   Q.   I wish I did, and it may be the very next
24   pages.  This fax thing says there's five pages
25   (indicating).  I just don't have them handy, I'm

Page 294

1    sorry.
2    A.   Okay.  I think I recall it was -- it
3    was -- just give me a moment, please.
4    Q.   Sure.
5    A.   It was to do with the treatment of one of
6    the members of staff of Interpal by Cricklewood
7    branch.
8    Q.   What was your understanding of how they
9    were treating them?
10   A.   I -- I believe they were sort of rude
11   and -- you know.
12   Q.   Now, Mr. Terry Woodley, your assistant
13   manager, writes to David Humphreys of IBC.
14       What -- what is the reason that he was
15   addressed with this concern?  I mean, what about --
16   A.   Oh, wait a minute.  This --
17       MR. L. FRIEDMAN:  I object to the
18       form.
19       THE WITNESS:  I think I might be
20       getting confused here.  I think I might
21       need to see the complaint letter.
22   BY MR. WERBNER:
23   Q.   Okay.  What about noticing David
24   Humphreys of IBC has caught your attention.  Who is
25   that and what do they do?

Page 295

1    A.   I can only assume IBC is international
2    banking center.
3    Q.   In any case, Mr. Woodley mentions in Lane
4    Exhibit 12 in reference to the subject Interpal that
5    he wants urgent attention, as the customer is "our
6    top five fee earners for the bank."  Do you see
7    that.
8        MR. L. FRIEDMAN:  Excuse me.  Can you
9        read back what you transcribed on that.
10       (Whereupon, the record was read back
11       by the reporter.)
12       MR. L. FRIEDMAN:  I object to the
13       form of the question.
14       (Informal discussion held off the
15       record.)
16       MR. L. FRIEDMAN:  No.  He misread the
17       document but that's okay as far as you are
18       concerned.
19       THE WITNESS:  Could you repeat.
20       MR. WERBNER:  Let me rephrase.  I
21       don't know if we are stalling for time or
22       not.
23       THE WITNESS:  No, I forgot what I was
24       actually supposed to --
25       MR. WERBNER:  No problem.

Page 296

1        MR. L. FRIEDMAN:  I object to that.
2    BY MR. WERBNER:
3    Q.   Around the middle of May 2003, was
4    Interpal in the top five fee earners for the bank?
5    A.   No, I think Terry made a mistake there
6    and he should have said for Belinda's portfolio, not
7    the bank.
8    Q.   Are you sure?
9    A.   I am certain.
10   Q.   Why do you know that?
11   A.   Because he wouldn't know whether it was
12   in the top five for the bank.
13   Q.   But was Interpal among the top five fee
14   earners among your 300 customers?
15   A.   I would imagine it probably was at that
16   time.
17   Q.   Well, do you have any reason to doubt his
18   statement (indicating), insofar --
19       (Informal discussion held off the
20       record.)
21       MR. WERBNER:  Let me finish.  Can I
22   finish?
23       THE WITNESS:  Sorry.
24   BY MR. WERBNER:
25   Q.   Do you have any reason to doubt his

**EXHIBIT 6 TO DECLARATION OF STEPHANIE D. SADO**

---

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
        Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
        Defendant.

- - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
        Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,
        Defendant.


VIDEOTAPED DEPOSITION OF MIKE HOSEASON VOLUME 1
Wednesday 14 July 2010
At:  10:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom


HIGHLY CONFIDENTIAL       2

---

Page 2

```
 1          A P P E A R A N C E S
 2   For Plaintiff Tzvi Weiss:
 3       STEPHEN SCHWARTZ, ESQ.
 4       Kohn, Swift & Graf PC
 5       One South Broad Street, Suite 2100
 6       Philadelphia, Pennsylvania 19107-3304
 7       Tel: 419 246 0528
 8   For Plaintiff Natan Applebaum:
 9       MARK WERBNER
10       Sayles & Werbner
11       4400 Renaissance Tower
12       1201 Elm St.
13       Dallas, Texas 75270
14       Tel: 214 939 8763
15
16   For Plaintiff Tzvi Weiss:
17       AITAN GOELMAN
18       Zuckerman Spaeder LLP
19       1800 M Street, NW, Suite 1000
20       Washington, DC 20036-5807
21       Tel: 202 778 1996
22   For Defendant National Westminster Bank, PLC:
23
24       JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25       Cleary, Gottlieb, Steen & Hamilton LLP
26       One Liberty Plaza
27       New York, NY 10006-1470
28          Tel: 212 225 2000
29
30   Also Present:
31
32   COURT REPORTER:
33
34   AILSA WILLIAMS
35   European Deposition Services
36   59 Chesson Rd
37   London, W14 9QS
38   Telephone:  44 (020) 7385 0077
39          HIGHLY CONFIDENTIAL        3
```

---

Page 3

```
 1        VIDEOGRAPHER: DAVID ROSS
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1             I N D E X
 2   MIKE HOSEASON . ... ... ... ... ... ... ... ...6
 3   DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..6
 4       WERBNER:
 5
 6   CROSS-EXAMINATION BY MR. GOELMAN: . ... ... ... ... 155
 7
 8          INDEX OF EXHIBITS
 9   Hoseason 1 NW000149-164 ... ... ... ... ... ... .47
10   Hoseason 2 NW000233-261 ... ... ... ... ... ... .74
11   Hoseason 3 NW052140-176 ... ... ... ... ... ... .80
12   Hoseason 4 NW196915-932 ... ... ... ... ... ... 100
13   Hoseason 5 NW212124 ... ... ... ... ... ... ... 101
14   Hoseason 6 NW052016-17 ... ... ... ... ... ... 120
15   Hoseason 7 NW008356-366 ... ... ... ... ... ... 124
16   Hoseason 8 NW052067-073 ... ... ... ... ... ... 140
17   Hoseason 9 NW052074-91  ... ... ... ... ... ... 151
18   Hoseason 10 NW000285-293 ... ... ... ... ... ... 157
19   Hoseason 11 37 Page Website ... ... ... ... ... 207
20       Download "From Anonymous" (No
21       Bates No.)
22
23
24
25
26
27
28
```

Page 33

1    MR. BLACKMAN: That is so argumentative and it
2  is just sort of piling argument upon argument, leaving
3  out prior things that were testified and we are not,
4  you know, Mr. Werbner, we are not in front of a jury
5  here. This is supposed to be a discovery deposition,
6  you are supposed to be getting facts, not making
7  speeches. So if the witness wants to hear the question
8  again and answer it, he certainly can do so, but the
9  question, as you well know, is completely out of bounds.
10    Q. I will ask the court reporter to please
11  read the question so that we can hear the witness'
12  answer, beginning with "So unless a customer..."
13    MR. BLACKMAN: Also misstates the prior
14  testimony because he didn't in fact say any of those
15  things, but go ahead.
16    (Read back)
17    A. It is a difficult question to answer
18  without confusing the issue. If a customer had been
19  convicted in a court of law of any kind of unlawful
20  activity, then that would be grounds on which we would
21  ask them to make alternative banking arrangements.
22    Q. Was there any circumstances, less than
23  a criminal conviction, by which NatWest would stop
24  rendering financial services to a customer that the bank
25  had serious concerns was engaged in terror financing?

Page 34

1    A. It was a hypothetical question. Each case
2  would be looked at on its individual merits.
3    Q. From the position that you played were
4  there circumstances that you in your role as the leader
5  of the Money Laundering Team, less than a criminal
6  conviction, that would cause you to recommend the bank
7  stop providing financial services to a customer
8  suspected of terror financing?
9    A. None that I am aware of.
10    Q. Isn't it true that the bank continued to
11  provide financial services to Interpal even when it had
12  red flagged its account and stated in internal bank
13  records that it was suspected of terror financing
14  because of the bank's concern of "reputational risk"?
15    MR. BLACKMAN: Object to the form of the
16  question, lacks foundation. We don't know what records
17  you are talking about. Also, to the extent that it is
18  based on Interpal having the account red flagged, it has
19  been asked and answered, I think close to ten times. We
20  can spend time reasking questions and making speeches
21  but I have got to tell you this. We agreed to two days
22  for this thing because in an excess of caution that you
23  might need it, but you have spent most of the first hour
24  making speeches, and we may just cut this off at some
25  point if we don't move on to something other than

Page 35

1  reasking argumentative questions. You can answer the
2  question one more time if you can.
3    MR. WERBNER: I would ask the court reporter
4  to please read the question pending to the witness.
5    (Read back)
6    A. I think I have already said, without
7  looking at the record, I can't under oath say whether we
8  had a red flag against the Interpal record on
9  Goalkeeper. It was not a red flag against the account.
10  We did continue to provide financial services. We had
11  made a report to the authorities. It didn't mean that
12  we had -- I think your words were "serious grounds", it
13  meant that we had discharged our regulatory legal
14  obligations to make that report.
15    Q. From your work on the Money Laundering
16  Team, in the period 1999 to 2003, do you ever remember
17  a Money Laundering Suspicion Report being submitted to
18  the regulatory authorities when the risk was color coded
19  less than red?
20    A. I couldn't say without examining all the
21  records that were submitted to the authorities between
22  those dates.
23    Q. From your work on the Money Laundering
24  committee during the period 1999 to 2003, do you recall
25  or can you say that every customer's account that was

Page 36

1  red flagged for terror financing was disclosed and
2  submitted to the regulatory authorities?
3    MR. BLACKMAN: Objection to the form of the
4  question. Red flagging accounts is not something that I
5  think has been identified as a concept, much less
6  testified about. There is no Money Laundering
7  Committee. His testimony was that he was part of an
8  Anti-money Laundering Unit. Maybe this is just you just
9  don't even care what the testimony has been, but
10  I object to the form of the question. It lacks
11  foundation. You can answer.
12    MR. WERBNER: Would you please read the
13  question to the witness.
14    (Read back)
15    A. It was a Money Laundering Suspicion
16  Reporting Team. It was not a committee of any sort.
17  Again, without reviewing every single record I could not
18  under oath tell you whether every single account that
19  was red flagged was reported.
20    Q. Are you aware that around August 2003 the
21  United States Government declared Interpal, the bank
22  NatWest's customer, to be an organization engaged in
23  terror financing?
24    MR. BLACKMAN: Object to the form of the
25  question. Actually there was a specific designation

**EXHIBIT 7 TO DECLARATION OF STEPHANIE SADO**

**FILED UNDER SEAL**

Page 232

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,

          Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,

          Plaintiffs,

against

NATIONAL WESTMINSTER BANK, PLC.,

          Defendant.

VIDEOTAPED DEPOSITION OF MIKE HOSEASON, VOLUME 2

Thursday 15 July 2010

At: 9:30 am

Taken at:

Cleary, Gottlieb, Steen & Hamilton LLP

55 Basinghall Street, London

United Kingdom

HIGHLY CONFIDENTIAL                233

---

Page 234

1   VIDEOGRAPHER: DAVID ROSS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 233

1   A P P E A R A N C E S
2   For Plaintiff Tzvi Weiss:
3       STEPHEN SCHWARTZ, ESQ.
4       Kohn, Swift & Graf PC
5       One South Broad Street, Suite 2100
6       Philadelphia, Pennsylvania 19107-3304
7       Tel: 419 246 0528
8   For Plaintiff Natan Applebaum:
9       MARK WERBNER
10      Sayles & Werbner
11      4400 Renaissance Tower
12      1201 Elm St.
13      Dallas, Texas 75270
14      Tel: 214 939 8763
15
16  For Plaintiff Tzvi Weiss:
17      AITAN GOELMAN
18      Zuckerman Spaeder LLP
19      1800 M Street, NW, Suite 1000
20      Washington, DC 20036-5807
21      Tel: 202 778 1996
22  For Defendant National Westminster Bank, PLC:
23
24      JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25      Cleary, Gottlieb, Steen & Hamilton LLP
26      One Liberty Plaza
27      New York, NY 10006-1470
28          Tel: 212 225 2000
29
30  Also Present:
31
32  COURT REPORTER:
33
34  AILSA WILLIAMS
35  European Deposition Services
36  59 Chesson Rd
37  London, W14 9QS
38  Telephone: 44 (020) 7385 0077
39          HIGHLY CONFIDENTIAL          234

---

Page 235

1                I N D E X
2   MIKE HOSEASON (Cont.) ... ... ... ... ... ... 237
3   CROSS-EXAMINATION BY MR. GOELMAN ... ... ... ... 237
4       (Cont.)
5
6   CROSS-EXAMINATION BY MR. ... ... ... ... ... ... 430
7       BLACKMAN:
8   FURTHER CROSS-EXAMINATION BY MR. ... ... ... ... 439
9       GOELMAN:
10
11          INDEX OF EXHIBITS
12  Hoseason 12 NW013279 ... ... ... ... ... ... 253
13  Hoseason 13 NW009755-757 ... ... ... ... ... ... 264
14  Hoseason 14 NW012772 ... ... ... ... ... ... 270
15  Hoseason 15 NW191801-806 ... ... ... ... ... 279
16  Hoseason 16 NW052874-86 ... ... ... ... ... ... 317
17  Hoseason 17 NW012954 ... ... ... ... ... ... 322
18  Hoseason 18 NW008374-380 ... ... ... ... ... ... 327
19  Hoseason 19 Bank of England News ... ... ... ... 342
20      Release (No Bates No.)
21
22  Hoseason 20 NW009934-42 ... ... ... ... ... ... 347
23
24  Hoseason 21 NW012129-152 ... ... ... ... ... ... 354
25
26  Hoseason 22 NW012108-128 ... ... ... ... ... ... 357
27
28  Hoseason 23 NW051994-997 ... ... ... ... ... ... 361
29
30  Hoseason 24 NW012925-38 ... ... ... ... ... ... 365
31
32  Hoseason 25 "Press Room, US ... ... ... ... ... 376
33      Department of the Treasury",
34      (No Bates Nos.)
35
36  Hoseason 26 NW088194-197 ... ... ... ... ... ... 384
37

Page 276

1      Q. There is no evidence in Hoseason 11 to support
2  that these funds were being used to support terrorist
3  activity?
4      A. No.
5      MR. BLACKMAN: I am going to object. Let's not
6  argue with the witness about a document that we don't know
7  what it is, and now you are arguing whether he thinks the
8  document does or does not support -- do what you want. My
9  objection is noted.
10     MR. GOELMAN: I am just trying to understand his
11 answer. You believe that there is no evidence in Hoseason
12 11, the report, that these funds were being used to support
13 terrorist activity?
14     MR. BLACKMAN: Which funds?
15     MR. GOELMAN: Yes, which funds?
16     MR. BLACKMAN: The last question was about
17 transfer to ████████████
18     A. You were talking about transactions between
19 these parties.
20     Q. The Al-Aqsa parties you mean?
21     A. Yes.
22     Q. Interpal and the Al-Aqsa foundations?
23     A. Yes, that is what you were talking about.
24     Q. Right. And your position is that there is no
25 evidence in Hoseason 11 that transactions between Al-Aqsa

Page 277

1  and Interpal were used to fund terrorism?
2      A. Yes. You are asking me to state whether there
3  is anything in here that corroborates the validity of the
4  allegations that are made in this document, and I am saying
5  I don't believe there are. We were suspicious, we made
6  a report to the authorities. That is all we are required to
7  do so.
8      Q. That was not my question. My question was, in
9  one of your answers you talked about evidence of the purpose
10 of these transfers. I am asking you what you meant is that,
11 what type of evidence do you have in mind that would show
12 the purpose of transfer of ██████ to ████████
13 ████████
14     A. Evidence, proof that it was being used, that
15 those monies were being used for illegal purposes.
16     Q. Okay. But what type of evidence are you
17 talking about?
18     A. As I said, I am not a police officer, I am not
19 a prosecutor.
20     Q. I understand what your job title was at the
21 time but I am trying to follow-up on a statement that you
22 made in an answer to a question, where you talked about
23 proof of the purpose of these transfers. I can't get from
24 you an answer as to what you have in mind when you say you
25 have proof of the purpose of the transaction. I mean,

Page 278

1  financial transactions don't generally say: "This is going
2  for a house, this is going for a bullet", right, do they?
3      MR. BLACKMAN: I am going to object to the
4  question as being argumentative, and I would have to point
5  out that the reason we have gone down this road is that you
6  started asking him to read a document that there is no proof
7  he ever saw, there is no evidence that any of the contents
8  of it are true, that is authored by someone called
9  "Anonymous", and reach conclusions about whether anything in
10 it corroborates some proposition that you want to make. He
11 was trying to answer your question. Now you don't like the
12 road you have gone down. I agree it is a very unprofitable
13 road, but that is why we are there. Please answer the
14 question. Maybe we can move on to something that is
15 remotely admissible evidence.
16     A. Can I ask you to repeat the question?
17     Q. Yes. When you say "proof of the purpose of
18 the transfers", what type of proof do you have in mind that
19 would provide proof of the purpose of the transfer?
20     A. So if I had been supplied with clear evidence
21 that demonstrated that those funds were subsequently
22 utilized to buy bullets, as you put it, then that would be
23 clearer evidence.
24     Q. Okay. Short of that, short of evidence that
25 the funds were used to buy bullets or explosives, is there

Page 279

1  anything else that you would consider to be proof of the
2  nefarious purposes of the transfers?
3      A. No.
4      MR. BLACKMAN: Objection to the form of the
5  question.
6      Q. Your answer is "no"?
7      A. No.
8      Q. Can you turn to page 28 of 37, please, kind of
9  midway, middle top of the page, the paragraph starting with:
10     The AIF expect Mounir Jarada @ Abu Ahmed
11 El-Raghman (the head of Hamas military operations in Sudan)
12 after Ramhadaan (February 97) to assist in military training
13 in South Africa".
14     Do you have before you -- Mark, did you mark 4124
15 yesterday?
16     MR. WERBNER: I don't recall.
17     MR. GOELMAN: I don't want to remark exhibits. I
18 am handing a document to the court reporter and ask that it
19 be marked Hoseason 15.
20     (Exhibit Hoseason 15 marked for identification)
21     Please take your time in reviewing Hoseason 15,
22 for the record Bates stamp NW191801 through 191806.
23     A. Okay.
24     Q. Can you tell me if you recognize Hoseason
25 Exhibit 15, just in terms of the type of document it is?

**EXHIBIT 8 TO DECLARATION OF STEPHANIE D. SADO**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(CPS)(MDG)
- - - - - - - - - - - - - - - - - - - - -
TZVI WEISS, et al,
                        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                        Defendant.
- - - - - - - - - - - - - - - - - - - - -
NATAN APPLEBAUM, et al.,
                        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
                        Defendant.

VIDEOTAPED DEPOSITION OF GUY COLE
Tuesday 8 June 2010
At:  9:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom

HIGHLY CONFIDENTIAL                    2

---

Page 2

1        A P P E A R A N C E S
2   For Plaintiff Tzvi Weiss:
3        STEPHEN SCHWARTZ, ESQ.
4        Kohn, Swift & Graf PC
5        One South Broad Street, Suite 2100
6        Philadelphia, Pennsylvania 19107-3304
7        Tel: 419 246 0528
8   For Plaintiff Natan Applebaum:
9        JOEL L. ISRAEL
10       Sayles & Werbner
11       4400 Renaissance Tower
12       1201 Elm St.
13       Dallas, Texas 75270
14       Tel: 214 939 8763
15
16  For Defendant National Westminster Bank, PLC:
17
18       JONATHAN I. BLACKMAN ESQ.
19       Cleary, Gottlieb, Steen & Hamilton LLP
20       One Liberty Plaza
21       New York, NY 10006-1470
22             Tel: 302 351 9415
23
24  Also Present:
25
26  COURT REPORTER:
27
28  AILSA WILLIAMS
29  European Deposition Services
30  59 Chesson Rd
31  London, W14 9QS
32  Telephone:  44 (020) 7385 0077
33  VIDEOGRAPHER: SIMON ADDINSELL
34
35
36
37       HIGHLY CONFIDENTIAL           3

---

Page 3

1                    I N D E X
2   GUY COLE ... ... ... ... ... ... ... ...5
3   CROSS-EXAMINATION BY MR. ISRAEL: ... ... ... ... 138
4   CROSS-EXAMINATION BY MR. .. ... ... ... ... ... 147
5      BLACKMAN:
6
7           INDEX OF EXHIBITS
8   Cole 1 E-mails NW013939-41 ... ... ... ... ... .38
9   Cole 2 E-mails NW066732-39  ... ... ... ... ... .44
10  Cole 3 Case Summary NW008356-66 ... ... ... ... .55
11  Cole 4 Case Summary NW008367-73 ... ... ... ... .65
12  Cole 5 GI&F Letter dated 27 ... ... ... ... ... .66
13       September, 2001
14
15  Cole 6 "Anonymous" from Internet .. ... ... ... .67
16
17  Cole 7 New York Times Extract . ... ... ... ... .82
18
19  Cole 8 E-mails NW050050-55  ... ... ... ... ... .95
20
21  Cole 9 E-mails NW155832 ... ... ... ... ... ... 108
22
23  Cole 10 E-mails NW066807-813 ... ... ... ... ... 111
24
25  Cole 11 E-mails NW066800-806 ... ... ... ... ... 115
26
27  Cole 12 E-mails NW066701-704 ... ... ... ... ... 122
28
29  Cole 13 E-mails NW066705-11 ... ... ... ... ... 126
30
31  Cole 14 E-mails NW181094-97 ... ... ... ... ... 131
32
33  Cole 15 E-mails NW066740-42 ... ... ... ... ... 136
34
35
36
37

---

Page 4

1        THE VIDEOGRAPHER:  This is the beginning of
2   tape one in volume one of the deposition of Guy Cole,
3   in the matter of Tzvi Weiss et al, plaintiffs, against
4   National Westminster Bank plc, defendants.  This is
5   case number 1:05-cv-04622 (DTG) (MDG) and also Natan
6   Applebaum et al, Plaintiffs, against National
7   Westminster Bank plc, this case number being
8   1:07cv00916 (DTG)(MDG).  This matter is before the
9   United States District Court, Eastern District of New
10  York.
11       Today's date is 8 June, 2010 the time is
12  9:10 am.  This deposition is taking place at the
13  offices of Cleary Gottlieb in London.  The court
14  reporter is Ailsa Williams, the videographer is Simon
15  Addinsell, both from European Deposition Services.
16       Could counsel please introduce themselves
17  for the record, stating what company they are with and
18  who they represent in this matter, please.
19       MR. SCHWARTZ:  My name is Stephen Schwartz
20  with the law firm of Kohn, Swift & Graf, Philadelphia,
21  Pennsylvania, United States of America, representing
22  the Weiss plaintiffs.
23       MR. ISRAEL:  Joel Israel, Sayles Werbner,
24  here on before of Applebaum plaintiffs.
25       MR. BLACKMAN:  Jonathan Blackman, Cleary

Page 45

1  they Doc1.doc?
2       A.  I believe they would be, yes.
3       Q.  So then created these last 4 pages,
4  is that correct?
5       A.  Yes.
6       Q.  You remember doing that?
7       A.  Yes.
8       Q.  Okay.  Let's take a look, please, at
9  66735.  Mr. Norrie -- you said you know Mr. Norrie, is
10 that correct?
11      A.  Yes.
12      Q.  And he is at Mr. Foster's group, is that
13 correct?
14      A.  In his team, yes.
15      Q.  He says to you:
16      "You may remember the matches we have previously
17 reported to the Bank of England against Interpal and its
18 various AKA's."
19      At the time you received this, April 2004, did you
20 in fact remember the matches that had been reported, as
21 Mr. Norrie expected apparently?
22      A.  No.
23      Q.  You had no knowledge of the Interpal
24 account at that time?
25      A.  I don't believe I did, no.

Page 46

1       Q.  Further down Mr. Norrie says:
2       "Can I ask you to investigate whether any enhanced
3  due diligence has been put in place over these accounts (not
4  sure the above was communicated, therefore suspect not) and
5  if not take steps to ensure that measures are put in place."
6       Did you investigate whether any enhanced due
7  diligence had been put in place over the Interpal accounts?
8       A.  I wouldn't be able to recall without
9  looking at this document.
10      Q.  Sorry?
11      A.  I would not be able to recall this event
12 without -- today, so the only thing I have got to go
13 on is this document.
14      Q.  Okay.
15      A.  I wouldn't remember that precise e-mail.
16      Q.  Can you tell from this document whether
17 enhanced due diligence had been put in place?
18      A.  Well, it depends what you define as
19 "enhanced due diligence".  By the end of this document
20 I had done enhanced due diligence because I had done
21 a review, so by the end of this e-mail chain there has
22 been enhanced due diligence.
23      Q.  So by May 2004 what you did producing
24 Doc1.doc, that was enhanced due diligence?
25      A.  Yes.

Page 47

1       Q.  In the act of producing Doc1.doc, did
2  you look to see whether work like that had been done
3  previously?
4       A.  I expect I would have looked in
5  goalkeeper.
6       Q.  But you don't remember, is that correct?
7       A.  Yes, I don't remember.
8       Q.  So to the best of your knowledge you
9  don't know whether any enhanced due diligence had been
10 put in place prior to what you did?
11      A.  At that time, well, yes, I wouldn't
12 know.  Sorry, could you repeat that question?  I was
13 reading.
14      Q.  You said you are not sure what I mean by
15 enhanced due diligence and I don't mean anything other
16 than what Mr. Norrie means, Mr. Norrie asked you?
17      MR. BLACKMAN:  He is not Mr. Norrie.
18      Q.  I understand, but Mr. Norrie asked you
19 the question whether enhanced -- so apparently
20 Mr. Norrie expected you to understand what he was
21 talking about.  Maybe you did not?
22      A.  No.
23      Q.  Did you understand what he was asking:
24 "Can you investigate whether any enhanced due
25 diligence has been put in place."  Did you understand

Page 48

1  what he was asking you to look for?
2       A.  I presume he would have said: "Can you
3  look around to see what extra work has been done on
4  this case, this client."
5       Q.  So you presume that is what he meant?
6       A.  Yes.
7       Q.  Do you remember whether you called him
8  to ask him what he meant?
9       A.  I can't recall that.  I would presume
10 I would have done but I can't recall.
11      Q.  But when you received this e-mail asking
12 you to investigate, to investigate whether any
13 enhanced due diligence has been put in place, did you
14 understand what he asked?
15      MR. BLACKMAN:  That question was just asked
16 and answered.  You can answer it again.
17      A.  Yes, I did.  I can presume what -- he
18 wanted to see what extra due diligence had been put in
19 place, so that is the question.
20      Q.  And do you remember what extra due
21 diligence had been put in place, if any?
22      A.  I don't remember.
23      Q.  If you turn to 66734, in the middle of
24 the page there is what appears to be an e-mail from
25 you to Ben Norrie, dated May 6, 2004, starting with

1  "The relationship manager is aware".  Do you see that?
2       A.  Yes.
3       Q.  Is that a response to Mr. Norrie's two
4  previous e-mails?
5       A.  It appears to be, yes.
6       Q.  You say:
7       "The relationship manager is aware of the
8  potential terrorism connections with this account and
9  liaised with Derek Brand during the account freeze."
10      How did you know that?
11      A.  I wouldn't be able to tell you today how
12 I knew that.
13      Q.  Did you speak to the relationship
14 manager?
15      A.  I would expect so but I can't recall
16 that.
17      Q.  You say: "The RM has no ability to
18 filter or efficiently monitor payments."
19      MR. BLACKMAN:  Actually you left out part of
20 that.
21      Q.  "Although diligent in their interaction
22 with the customer, the RM has no ability to filter or
23 efficiently monitor payments.  I understand this could
24 be done in the core data management team in
25 manufacturing, who control payment blocking and

1  restrictions".
2       I believe you said that manufacturing was the back
3  office functions?
4       A.  Yes.
5       Q.  Is it the case that at this time CBFM
6  had no capacity within itself to monitor, to control
7  payment blocking and restrictions?
8       A.  Yes, as a technology, preventive
9  technology, CBFM would not know or be in a position to
10 do that.
11      Q.  So would the core data team in
12 manufacturing be responsible for payment blocking and
13 restrictions for the entire group?
14      A.  I can only say what is here.  So
15 I understood this could be done.  I don't know if it
16 would be for the entire group or not.  Either way, as
17 I have said, I understand in that sentence, I would
18 presume I was taking in advice from somebody else.
19      Q.  Was it common practice for CBFM to
20 request that the core data management team in
21 manufacturing filter payments for CBFM customers?
22      A.  Not to my knowledge.
23      Q.  It was not common practice?
24      A.  At that time, reading this, it is not
25 even clear whether they could definitely do it either,

1  is it, so it is saying "I understand", so I am not
2  aware of them doing that.
3       Q.  Was the filtering of transactions by
4  anyone common practice within CBFM?
5       A.  The filtering of transactions, as in
6  stopping transactions, if there is a name -- is that
7  what you define filtering as?
8       Q.  I define filtering as part of enhanced
9  due diligence.  You may define it differently.  I want
10 to find out what you know.
11      A.  If "filtering" you mean the modern sort
12 of definition of filtering, i.e. stopping payments
13 because there is someone on a watch list, and the
14 payment will be stopped at the end of the track, it
15 was not common practice in the UK, let alone the
16 division or the group.
17      Q.  Did your group have the capacity to do
18 this at this time?
19      A.  No.
20      Q.  At some point did your unit obtain the
21 capacity to filter transactions?
22      A.  Between 2003 and 2005?
23      Q.  Yes.
24      A.  No.  As I said, it was not industry
25 practice or the bank's practice.

1       Q.  Throughout that time period?
2       A.  Yes.
3       Q.  A little further up the page, 66734,
4  there is what appears to be an e-mail from Ben Norrie
5  responding to the e-mail we just looked at.  The last
6  sentence, Mr. Norrie asks:
7       "Are the CBFM MLPU happy with the potential
8  risks in continuing this relationship?"
9       Do you see that?
10      A.  Yes.
11      Q.  Do you know what Mr. Norrie meant by
12 "potential risks"?
13      A.  Not with precision, but we work in money
14 laundering prevention, so I presume risks relevant to
15 our jobs.
16      Q.  Did you find out whether -- did you
17 speak to Mr. Rodger about whether your unit was happy
18 with the potential risks in continuing this
19 relationship?
20      A.  I expect I would have done, yes.
21      Q.  You don't remember doing so?
22      A.  I don't remember doing so.
23      Q.  You expect that you would have, as part
24 of your job, consulted with Mr. Rodger on this?
25      A.  Most definitely.

**EXHIBIT 9 TO DECLARATION OF STEPHANIE SADO**

**FILED UNDER SEAL**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No: 05cv4622(DGT)(MDG)

- - - - - - - - - - - - - - - - - - - -

TZVI WEISS, et al,
        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
        Defendant.

- - - - - - - - - - - - - - - - - - - -

NATAN APPLEBAUM, et al.,
        Plaintiffs,
against
NATIONAL WESTMINSTER BANK, PLC.,
        Defendant.


VIDEOTAPED DEPOSITION OF IRVINE RODGER
Thursday 22 July 2010
At:  10:00 am
Taken at:
Cleary, Gottlieb, Steen & Hamilton LLP
55 Basinghall Street, London
United Kingdom


HIGHLY CONFIDENTIAL      2

Page 2

1     A P P E A R A N C E S
2  For Plaintiff Tzvi Weiss:
3     ARI UNGAR
4     Osen LLC
5     700 Kinderkamack Road
6     Oradell, NJ 07649
7     Tel: 201 265 6400
8
9  For Plaintiff Tzvi Weiss:
10    AITAN GOELMAN
11    Zuckerman Spaeder LLP
12    1800 M Street, NW, Suite 1000
13    Washington, DC 20036-5807
14    Tel: 202 778 1996
15  For Defendant National Westminster Bank, PLC:
16
17    AVRAM E. LUFT and VALERIE SCHUSTER
18    Cleary, Gottlieb, Steen & Hamilton LLP
19    One Liberty Plaza
20    New York, NY 10006-1470
21      Tel: 212 225 2432
22
23  Also Present:
24
25    COURT REPORTER:
26
27    AILSA WILLIAMS
28    European Deposition Services
29    59 Chesson Rd
30    London, W14 9QS
31    Telephone:  44 (020) 7385 0077
32    VIDEOGRAPHER: FLOYD HUMPHREY
33
34
35
36    HIGHLY CONFIDENTIAL    3

Page 3

1          I N D E X
2  IRVINE RODGER . ... ... ... ... ... ... ... ..6
3  DIRECT EXAMINATION BY MR. .. ... ... ... ... ..6
4    GOELMAN:
5
6       INDEX OF EXHIBITS
7  Rodger 1 NW014458-59 ... ... ... ... ... ... .30
8  Rodger 2 NW088194-97 ... ... ... ... ... ... .38
9  Rodger 3 NW051168-69 ... ... ... ... ... ... .47
10  Rodger 4 NW051994-97 ... ... ... ... ... ... .65
11  Rodger 5 NW012925-38 ... ... ... ... ... ... .68
12  Rodger 6 NW000130-143 ... ... ... ... ... ... .74
13  Rodger 7 Press Release  ... ... ... ... ... ... .83
14  Rodger 8 NW013052 ... ... ... ... ... ... ... .89
15  Rodger 9 NW185976 .. ... ... ... ... ... ... .91
16  Rodger 10 NW014038-48 . ... ... ... ... ... .91
17  Rodger 11 NW014013 .. ... ... ... ... ... ... .94
18  Rodger 12 NW013701 ... ... ... ... ... ... .95
19  Rodger 13 NW013939-41 ... ... ... ... ... .. 100
20  Rodger 14 NW017151-54 ... ... ... ... ... .. 107
21  Rodger 15 NW018476-83 ... ... ... ... ... .. 149
22  Rodger 16 NW017191-95 ... ... ... ... ... .. 159
23  Rodger 17 NW066847-52 ... ... ... ... ... .. 175
24  Rodger 18 NW067946-47 ... ... ... ... ... .. 189
25  Rodger 19 NW066844-46 ... ... ... ... ... .. 196
26  Rodger 20 NW066807-13 ... ... ... ... ... .. 202

Page 4

1   Rodger 21 NW066721-23 ... ... ... ... ... .. 213
2   Rodger 22 NW066795-96 ... ... ... ... ... .. 220
3   Rodger 23 NW181032-35 ... ... ... ... ... .. 225
4   Rodger 24 NW066777-79 ... ... ... ... ... .. 233
5   Rodger 25 NW069060-62 ... ... ... ... ... .. 241
6   Rodger 26 NW066764-69 ... ... ... ... ... .. 243
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 101

1      Q. Page 13940, the first e-mail
2  chronologically, which is the last e-mail on this
3  exhibit.
4      A. Yes.
5      Q. Referring to the Bank of England,
6  Mr. Foster writes:
7      "They have reminded us that █████████
8  ████████████████████████████████
9      Do you see that?
10     A. Yes.
11     Q. Did you have an understanding as to
12  whether payments to Hamas were permitted before the BoE
13  notice of late September 2003?
14     A. No.
15     Q. Do you remember hearing about the BoE
16  notice of late September 2003?
17     A. No. Which notice is this?
18     Q. There is a notice referenced by
19  Mr. Foster, the BoE notice of late September, that
20  prohibited payments to Hamas?
21     A. I don't recall.
22     Q. Can you go to the e-mail from Derek Brand,
23  right above the e-mail from Mr. Foster. Do you know who
24  Mr. Brand is?
25     A. No.

Page 102

1      Q. You don't recognize the name?
2      A. I recognize the name but I have got no
3  idea who he is.
4      Q. Do you recall receiving this e-mail chain?
5      A. No. I got 200 e-mails a day so ...
6      Q. Can you turn to the first page of the
7  exhibit, please. There is an e-mail from Mr. Foster to
8  Tony O'Hear and Ben Norrie. Do you see that?
9      A. Yes.
10     Q. Do you know who Mr. Norrie is?
11     A. I think, from what I recall, he works for
12  Stephen Foster.
13     Q. Mr. Foster writes:
14     "Thanks for this. I think the main concern
15  now is to ensure that no future payment is made to
16  Hamas. With the restrictions lifted, is there any
17  formal (or even informal) monitoring of the traffic?
18  What scope is there to use the filtering technology we
19  have in GBS or Payment Ops to monitor?"
20     Do you have an understanding as to what
21  Mr. Foster was referring to when he talked about the
22  "filtering technology we have in GBS or Payment Ops"?
23     A. It implies that he was referring to
24  payment filtering technologies that are used to identify
25  payments going out of the bank.

Page 103

1      Q. And was that filtering technology that the
2  bank had in place in the fall of 2003?
3      A. No.
4      Q. When did that filtering technology come on
5  line?
6      MR. LUFT: Objection, foundation.
7      Q. If you know?
8      A. I can't recall. 2008, 09.
9      Q. Not until 2008 or 09?
10     A. The current incarnation, 2008 or 09.
11     Q. In Mr. Foster referring to filtering
12  technology "we have in GBS or Payment Ops", was there
13  some type of filtering technology that as early as 2003
14  was available in GBS or Payment Ops?
15     MR. LUFT: Objection, foundation.
16     Q. If you know?
17     A. I don't know.
18     Q. Fiona Miller writes an e-mail in the
19  middle of this first page of this exhibit to Mr. O'Hear,
20  and she writes:
21     "In similar cases in the past the customer
22  only Compliance function has been responsible for
23  monitoring. In this case CBFM Compliance - Irvine
24  Rodger/Guy Cole should be able to assist."
25     So is it fair to say that this e-mail was

Page 104

1  forwarded to you by Mr. O'Hear to see if you could
2  assist in monitoring Interpal payments going forward?
3      A. I don't know.
4      Q. Mr. O'Hear writes:
5      "Guy/Irvine, is the monitoring of payment traffic,
6  as outlined by Stephen, possible here?"
7      I understand you don't recall getting this e-mail
8  from Mr. O'Hear. Do you remember the issue of whether or
9  not it was possible to monitor Interpal's payment traffic
10  being brought up?
11     A. I am trying to read between the lines of
12  the e-mail and my conclusion is I just do not know.
13     Q. Whether or not you recall the specific
14  episode, do you know whether it was possible to monitor
15  payment traffic of --
16     A. What we did within CBFM was --
17     MR. LUFT: Did you finish the question?
18     MR. GOELMAN: Effectively. Go ahead.
19     A. What we did within CBFM was payments to
20  Interpal were reviewed six months after they were made
21  by Guy Cole, which is akin to what is being referred to
22  here, but obviously that was not realtime, but that was
23  the best that we could do in the circumstances.
24     Q. So was it your -- withdrawn. So
25  Mr. Foster's suggestion about using filtering technology

Page 105

1  to monitor and when Mr. O'Hear says "Is that possible?"
2  here, the answer in October 2003 was "no"?
3      A.  Yes -- no, the answer was no, it was not
4  possible.
5      Q.  Were you involved in any discussions in
6  the bank in 2002/03 about acquiring the technical
7  capability to implement realtime monitoring of payments?
8      A.  No.
9      Q.  So if in 2002 someone, one of RBS's
10  customers had tried to send money to Osama Bin Laden,
11  there was no technical way for the bank to intercept
12  that payment.  Is that true?
13      MR. LUFT:  Objection, foundation, calls for
14  speculation, incomplete hypothetical.
15      A.  I don't know.
16      Q.  You don't know of any filtering technology
17  that could have stopped payments before they actually
18  went?
19      A.  There was no --
20      MR. LUFT:  Objection, foundation, calls for
21  speculation, incomplete hypothetical.
22      A.  No knowledge which I have which would
23  answer that.
24      Q.  As part of your efforts to stay current in
25  the Anti-money Laundering field, is it fair to say that

Page 106

1  there were banks who in 2003 had the technical
2  capability to filter transactions in realtime?
3      MR. LUFT:  Objection, foundation.
4      Q.  If you know.
5      A.  I don't know.
6      MR. GOELMAN:  This is a good stopping place to
7  take a break for lunch.
8      THE VIDEOGRAPHER:  Going off the record at
9  1:22 pm.
10      (Break for Lunch.)
11      THE VIDEOGRAPHER:  We are back on the record
12  at 2:16 pm.
13      MR. GOELMAN:  Good afternoon, Mr. Rodger.
14      A.  Afternoon.
15      Q.  Did you have a chance to get some tea?
16      A.  Yes.
17      Q.  Before we broke, you testified that "What
18  we did within CBFM was payments to Interpal were
19  reviewed six months after they were made, by Guy Cole".
20  Do you recall when that practice was implemented?
21      A.  I don't recall but I imagine it was
22  subsequent to the Charities Commission investigation
23  having been concluded.  That was the kind of undertaking
24  the Group gave to the Charities Commission, that that
25  work could be done.

Page 107

1      Q.  Do you remember what precipitated the
2  initiation of that practice?
3      A.  The Charities Commission investigation, I
4  think Group was keen, because of the seriousness of the
5  allegations, Group was very keen to review all payments
6  coming out of Interpal, just to ensure that none of
7  these payments went to undesirables.
8      Q.  When you talk about the seriousness of the
9  allegations, you are talking about the seriousness --
10      A.  The OFAC allegations.
11      Q.  That Interpal was funding a terrorist
12  group?
13      A.  Yes.
14      Q.  I am going to hand the court reporter
15  a document I will ask be marked as Rodger Exhibit 14,
16  please.
17      (Exhibit Rodger 14 marked for identification.)
18      For the record the Bates stamps are somewhat cut
19  off at the bottom but it is NW17151 through NW17054.
20      MR. LUFT:  From the looks of the document and
21  from the stamping it looks like this is one chain,
22  correct, even though there is a staple and then a page
23  is attached at the end?
24      MR. GOELMAN:  Yes.  The reason the page is not
25  part of the staple is it was stapled upside down so I

Page 108

1  took it off and paper clipped it to the pages that were
2  right side up.
3      MR. LUFT:  So we can just look at this as one
4  document.
5      Q.  Let me know when you have had a chance to
6  review this e-mail chain, Mr. Rodger.
7      A.  Okay.
8      Q.  Do you recognize Rodger Exhibit 14 as an
9  e-mail chain that precipitated the practice of 6-month
10  reviews of Interpal transfers that you previously
11  described?
12      A.  I don't recall the specific e-mail but
13  I do know that Guy Cole started doing 6-monthly reviews.
14      Q.  Does this reflect what caused Mr. Cole to
15  begin doing those reviews?
16      MR. LUFT:  Objection, foundation.
17      A.  I don't know whether this triggered it but
18  Guy did 6-monthly reviews thereafter, or not thereafter
19  but afterwards, after the designation.
20      Q.  And these e-mails are dated from April 21,
21  2004 through May 20, 2004, true?
22      A.  Yes.
23      Q.  Does that reflect that these reviews that
24  Mr. Cole performed did not begin until approximately --
25  the first one was not until approximately nine months