

1800 M STREET, NW   SUITE 1000
WASHINGTON, DC  20036-5802
202.778.1800   202.822.8106 fax   www.zuckerman.com

Aitan D. Goelman
Partner
202-778-1996
agoelman@zuckerman.com

November 30, 2012

BY ECF

Honorable Dora L. Irizarry
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    *Strauss, et al. v. Crédit Lyonnais, S.A.*, 06-cv-702 (DLI)(MDG)
            *Wolf, et al. v. Crédit Lyonnais, S.A.*, 07-cv-914 (DLI)(MDG)

            *Weiss, et al. v. National Westminster Bank, Plc*, 05-cv-4622 (DLI)(MDG)
            *Applebaum, et al. v. National Westminster Bank, Plc*, 07-cv-916 (DLI)(MDG)

Dear Judge Irizarry:

    We submit this letter on behalf of all Plaintiffs in the above-referenced cases in order to respond to certain specific, material inaccuracies set forth in the letter filed on November 28, 2012, (the "November 28 Letter") by Defendants Crédit Lyonnais, S.A. ("CL") and National Westminster Bank, Plc, ("NatWest") (collectively, "the Banks").

### 1. **Proximate Cause**

    As set forth in Plaintiffs' November 21 letter, at 6, the proximate cause discussion in *Gill v. Arab Bank, plc*, 2012 WL 5395746 (E.D.N.Y. Nov. 6, 102) ("*Gill III*"), contains just one vague reference to the issue of the alter ego status of the Palestinian "charities" at issue. Even if this phrase can be interpreted as a finding by Judge Weinstein that Plaintiffs' experts' opinions are insufficient to allow a reasonable juror to find the Palestinian organizations at issue are Hamas alter egos, given that Judge Weinstein previously admitted Plaintiffs' experts Arieh Spitzen and Dr. Matthew Levitt's opinions on that precise subject under Fed. R. Evid. 702, such a finding would be both incorrect and legally incoherent. The Banks' November 28 Letter glosses over this contradiction, surmising that Judge Weinstein ruled that these opinions "are admissible but also of low probative value." November 28 Letter at 2. This supposition, however, accentuates rather than eliminates the incoherence of any such reading. *Gill III*



Honorable Dora L. Irizarry
November 30, 2012
Page 2

contains *no* discussion regarding either Mr. Spitzen's or Dr. Levitt's analysis of the relevant charitable and social service organizations (either individually or collectively).[1] Moreover, as the Second Circuit has conclusively held,[2] and as Judge Weinstein explicitly recognized, *Gill* Nov. 2, 2012 Tr. at 58:15-18, once a judge holds that expert opinion is admissible, the "probative value" to be assigned to those opinions is a matter for the jury, and not the judge.

### 2. Scienter

In their November 13 letters, at 4 n.5, the Banks falsely claimed that, in *Gill*, Arab Bank did not "pursue" and Judge Weinstein therefore did not "address" the alleged insufficiency of recklessness to satisfy the ATA's *scienter* requirement. Faced with incontrovertible proof to the contrary, the Banks continue to try to blur the distinction between willful blindness and recklessness. To do so, the Banks invent a new category of intent, "mere recklessness," which they equate with "negligence or even gross negligence." November 28 Letter at 3. But each of these *mens rea* standards – negligence, gross negligence, recklessness and willful blindness – are different mental states, and each has its own meaning. The definition of "recklessness" is not a mystery, or even subject to serious dispute. *Boim III* holds that "[w]hen the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk. That is recklessness," 549 F.3d at 693 (citation omitted), and *that* is the *mens rea* standard that both Judge Weinstein and Judge Sifton have expressly adopted. *See Gill I*, 2012 WL 4960358, at * 31; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 428 (E.D.N.Y. 2009).

As was the case in their prior November 13 letters, the Banks' continued efforts to argue that recklessness fails to satisfy the relevant mental state reflects their implicit acknowledgement that each Defendant was "on notice of a risk" of terror financing but marched forward anyway. Once again, the Banks' November 28 Letter falsely characterizes as "indisputable" the representation that CL "only" suspected that its customer CBSP "was engaged in money laundering," not terror financing because it reported its suspicions to the French agency TRACFIN, rather than the French police. November 28 Letter at 4. But CL still cannot

---

[1] Although the charitable and social services organizations at issue in *Gill* overlap with those at issue in these cases, they are not perfectly identical, as Judge Weinstein did not have before him specific charities, such as the Al-Wafa Charitable Society – Gaza, the Beit Fajar Zakat Committee or the Jerusalem Central Zakat Committee, that Plaintiffs' experts have analyzed for *these* cases.

[2] *See In re Joint Eastern & Southern Dist. Asbestos Litigation*, 52 F.3d 1124, 1126, 1133 (2d Cir. 1995) (reversing grant of summary judgment where district court "inappropriately usurped the role of the jury" by discounting admissible expert opinion; whether expert evidence is sufficient to defeat summary judgment "should be guided by the well-established standards governing judgment as a matter of law—whether, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses *or otherwise considering the weight of the evidence*, there can be but one conclusion as the verdict that reasonable jurors could have reached." (internal quotations omitted) (emphasis added).



Honorable Dora L. Irizarry
November 30, 2012
Page 3

overcome the fact that, as set forth in Plaintiffs' Memo of Law in Opposition to CL's Motion for Summary Judgment ("CL Opp."), at 6-7, TRACFIN was not only the French agency with jurisdiction over terror-financing declarations, it publicized the fact that it gave *priority* to these declarations, and French banks, including CL, were specifically instructed by their primary regulator to file TRACFIN declarations where they suspected terror financing. *See also* CL Opp. at 4, 9-10 (explaining that former Bank employee Robert Audren himself received instructions to file TRACFIN declarations in cases of suspected terrorism financing, and also explaining that the content of the declarations themselves could lead a reasonable juror to conclude that Audren was focused on risk of terrorism financing).[3]

The November 28 Letter (at 5) also unsuccessfully attempts to distinguish the Banks' post-designation payouts to their SDGT customers from Arab Bank's post-designation payout to Osama Hamdan. The Banks claim that "unlike Hamdan," the Palestinian charities at issue were not designated at the time of the payouts. *Id.* But the issue in *Gill* was not which persons or entities Hamdan transferred funds to, but rather Arab Bank's awareness that Hamdan was designated an SDGT when it remitted him the balance in his account. Not only is that precisely the same scenario with respect to both Interpal and CBSP, the two Banks' respective *customers,* but ironically, Hamdan was designated on the *same day* as Interpal and CBSP. In fact, the U.S Treasury Department's accompanying press release detailed the basis for the designation of all three (and a number of other) Hamas-affiliated terrorists, *including* an explanation of how Interpal's and CBSP's funding of Hamas improved Hamas's ability to carry out violent terrorist attacks like the suicide bombing, three days earlier, of a civilian bus in Jerusalem on August 19, 2003, which injured Plaintiff Chana Nathansen and killed her 3-year old daughter. See Plaintiffs' Rule 56.1 Statement in Opposition to NatWest's Motion for Summary Judgment ¶¶ 202-204. Compliance officials in both Banks received notice of the U.S. designation but nonetheless continued to provide funds to these SDGTs, creating proof of *scienter* every bit as powerful as that which Judge Weinstein remarked would have been sufficient in *Gill III. See* November 21 letter at 9.

---

[3] Far from being "indisputable," there is *no contemporaneous* evidence that CL suspected "only" generic money laundering by CBSP, or that, at the time, the Bank regarded terror financing to be distinct from, rather than a subset of, money laundering. The record instead indicates that this "rationale" was only developed *after* Plaintiffs sued CL, and reflects little more than Bank witnesses' willingness to parrot CL's carefully developed post-litigation narrative. This narrative, however, is wholly inconsistent with the extrinsic evidence generated during the relevant time period. This pattern and strategy is evident in the Banks' continued effort to walk back from statements contemporaneously set forth in the TRACFIN declarations and the signed, sworn, contemporaneous statement to French police made by Audren. November 28 Letter at 4. At deposition, Audren tried to rewrite those portions of his previous written statements that contradict the Bank's cover story, but unfortunately for CL, these documents say what they say, and the Court can refer to the documents themselves, rather than either party's characterization of them.


The Banks also accuses Plaintiffs of "grossly misrepresent[ing]" the evidence by describing how NatWest "'consulted with Interpal on how to best evade the U.S. sanctions against it,'" November 28 Letter at 5, and point out that there is no evidence that NatWest actually acceded to Interpal's post-designation request that NatWest effectuate U.S. dollar transfers on Interpal's behalf under a false name. *Id.*, at 5 n.7. But the issue is not whether NatWest agreed to Interpal's request, but the fact that NatWest never reported this blatantly criminal request to the British authorities. Moreover, there *is* evidence that NatWest conspired with Interpal to minimize the chances that the U.S. could seize Interpal's U.S. dollar denominated assets, including advising Interpal official Jihad Qundil to consider withdrawing the entire balance of Interpal's U.S. dollar account in cash, with the explicit goal of frustrating any attempt by U.S. law enforcement to seize these assets. Plaintiff's Memorandum of Law in Opposition to NatWest's Motion for Summary Judgment ("NatWest Opp."), at 17.

Finally, the Banks again mischaracterize both Plaintiffs' and NatWest's own arguments about the British Government's view of the Hamas *da'wa*. The November 28 Letter, at 5, states that "[t]he UK government simply does not consider the 13 Charities to be part of Hamas," but as NatWest itself previously noted, the British Government's official position is that the Hamas da'wa *itself* does not exist. NatWest Reply Brief at 13 n.20. This not only contradicts reality and U.S. law, it renders the British refusal to designate any *particular* Palestinian charity meaningless.

### 3. <u>Attribution</u>

The November 28 Letter's efforts to artificially distinguish the expert opinions on attribution offered in these cases and the ones that Judge Weinstein accepted in *Gill II* only underscores their similarity. The Banks' attacks on Ronni Shaked and Evan Kohlmann as unqualified aggregators of hearsay whose opinions lack any *Daubert*-appropriate methodology echo in all significant respects Arab Bank's unsuccessful arguments in *Gill*. As explained in Plaintiffs November 21 letter, at 13-14, the most salient distinction between the *Gill* experts and those offered in these cases is that, unlike the *Gill* experts, Kohlmann and Shaked have been repeatedly qualified as expert witnesses by other courts.

Most troubling, in their November 28 Letter, the Banks double down on their false contention that Judge Weinstein expressed skepticism about Shaked and Kohlmann in particular, accusing *Plaintiffs* of dishonesty by claiming "in their November 21 letter that Judge Weinstein never expressed skepticism concerning Shaked or Kohlmann." November 28 Letter at 7 n.9. That representation remains simply and demonstrably false. *At no point* in the *Gill* proceedings did the Court express *any* degree of skepticism about those two expert witnesses. The transcript cited by the Banks in purported support of their false contention contains no such sentiment, nor does any other part of the *Gill* transcripts or opinions. Judge Weinstein *did* express skepticism that Hamas's claim of responsibility could be admitted against Arab Bank and ultimately


**ZUCKERMAN SPAEDER LLP**

Honorable Dora L. Irizarry
November 30, 2012
Page 5

erroneously excluded that evidence,[4] but he never objected to the reliance, by experts in the field, on such claims of responsibility. On the contrary, he explicitly noted that "the difficulty of obtaining direct evidence of Hamas' participation in the attack" militated in favor of admitting expert opinion on attribution. *Gill II*, at *5.

Accordingly, for the reasons set forth above, and in Plaintiffs' prior memoranda and letters, the Banks' motions for summary judgment should be denied.

Respectfully submitted,

Aitan D. Goelman

cc: All Counsel (by email)

---

[4] The Banks' argument that Judge Weinstein was correct when he found that Hamas's claim of responsibility in *Gill* was not independently admissible, November 28 Letter at 8 n.10, is wholly unpersuasive. The Banks characterize the three cases cited by Plaintiffs showing the admissibility of boasts of criminal responsibility as "inapposite and unhelpful to plaintiffs," an odd argument considering that Judge Weinstein explicitly cited this precedent as contrary authority in *Gill III*, at *23. Judge Weinstein simply elected, without explanation, to depart from this line of cases.