

1800 M STREET, NW   SUITE 1000
WASHINGTON, DC 20036-5802
202.778.1800   202.822.8106 fax   www.zuckerman.com

Aitan D. Goelman
Partner
202-778-1996
agoelman@zuckerman.com

November 21, 2012

**FILED UNDER SEAL**
VIA HAND DELIVERY

Honorable Dora L. Irizarry
United States District Judge
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    *Strauss, et al. v. Crédit Lyonnais, S.A.*, 06-cv-702 (DLI)(MDG)
              *Wolf, et al. v. Crédit Lyonnais, S.A.*, 07-cv-914 (DLI)(MDG)

              *Weiss, et al. v. National Westminster Bank, Plc*, 05-cv-4622 (DLI)(MDG)
              *Applebaum, et al. v. National Westminster Bank, Plc*, 07-cv-916 (DLI)(MDG)

Dear Judge Irizarry:

    We submit this letter on behalf of all plaintiffs in the above-referenced cases in response to two letters filed on November 13, 2012, by counsel to the Defendants in these actions.[1] Because the letters submitted on behalf of Defendants Crédit Lyonnais, S.A. ("CL") and National Westminster Bank, Plc, ("NatWest") (collectively, "the Banks") are largely duplicative, Plaintiffs are submitting one letter in response to both. To the extent that particular portions of this letter are relevant to the cases against one of the Banks, but not the other, that is noted herein.

    As explained below, this Court should reject the Banks' suggestion that Judge

---

[1] We are filing this letter under seal because it contains information defined as "Protected Information" in the Supplemental Protective Orders issued by Magistrate Judge Go in these cases. *Strauss* ECF No. 284; *Weiss v. NatWest* ECF No. 260. Pursuant to Judge Go's Orders, counsel for Plaintiffs will file a public, redacted version of this letter after providing counsel for the Banks with an opportunity to review and object to Plaintiffs' proposed redactions and propose any additional redactions that they believe are warranted.



Honorable Dora L. Irizarry
November 21, 2012
Page 2

Weinstein's opinion in *Gill v. Arab Bank, plc*, 2012 WL 5395746 (E.D.N.Y. Nov. 6, 2012) ("*Gill III*") granting Arab Bank summary judgment establishes that CL and NatWest deserve similar Rule 56 relief in these cases. *Gill III* does not warrant awarding *Arab Bank* summary judgment in other lawsuits it faces in this District,[2] let alone serve as a basis to award these Banks summary judgment in these actions. *Gill III* granted Arab Bank's summary judgment on the issues of scienter and proximate cause largely based on the Bank's withholding of all documents for the period 2005 to 2008 and Judge Weinstein's conclusion that the several-year gap between the available evidence of Arab Bank's provision of material support to Hamas and the attack that injured Mr. Gill rendered such earlier support too temporally attenuated from the attack to hold Arab Bank liable. Although we disagree with Judge Weinstein's analysis and application of the facts to the law in *Gill*, the four-year gap in the evidentiary record from the end of the Second Intifada in 2004 to the attack that injured Mr. Gill in 2008 is non-existent in *these* cases. All of the attacks at issue in these cases occurred between 2002 and 2004, during the Second Intifada, contemporaneously with the Banks' provision of material support to Hamas. Moreover, on the ground that the *Gill* case most resembles this litigation, proof of Hamas's responsibility for the attacks in question, Judge Weinstein *denied* Arab Bank's summary judgment motion. Finally, Judge Weinstein squarely rejected the Arab Bank's *Daubert* objections to each of the twelve expert witnesses proffered by Mr. Gill, objections that echoed, at times word for word, the *Daubert* challenges that occupy so much of the Banks' summary judgment motions.

Unsurprisingly, the Banks conveniently ignore *Gill III*'s statement that "[v]iewed most favorably to plaintiff, a reasonable jury might conclude that the Bank violated one of the material support of terrorism statutes *in 2005 or before*." *Gill III* at *17 (emphasis in original). Judge Weinstein simply disagreed that material support provided several years before an attack permitted a reasonable juror to infer that the Bank "knew that earlier provision of financial services to Hamas would probably be used to injure an American *in or after 2008*." *Id.* (Emphasis in original.) Plaintiffs strongly disagree with Judge Weinstein's analysis and conclusion, including the standard he delineates for temporal proximity, which materially

---

[2] *Linde, et al. v. Arab Bank Plc*, 04-CV-2799 (E.D.N.Y. 2004) (NG)(VVP); *Litle, et al. v. Arab Bank, Plc*, No. CV-04-5449 (E.D.N.Y. 2004) (NG)(VVP); *Almog, et al. v. Arab Bank, Plc*, No. CV-04-5564 (E.D.N.Y. 2004) (NG)(VVP); *Coulter, et al. v. Arab Bank, Plc*, No. CV-05-365 (E.D.N.Y. 2005) (NG)(VVP); *Afriat-Kurtzer, et al. v. Arab Bank, Plc*, No. CV-05-388 (E.D.N.Y. 2005) (NG)(VVP); *Bennett, et al. v. Arab Bank, Plc*, No. CV-05-3183 (E.D.N.Y. 2005) (NG)(VVP); *Roth, et al. v. Arab Bank, Plc*, No. CV-05-3738 (E.D.N.Y. 2005) (NG)(VVP); *Weiss, et al. v. Arab Bank, Plc*, No. CV-06-1623 (E.D.N.Y. 2006) (NG)(VVP); *Jesner, et al. v. Arab Bank, Plc*, No. CV-06-3869 (E.D.N.Y.) (NG)(VVP); *Lev, et al. v. Arab Bank, Plc*, No. CV-08-3251 (E.D.N.Y. 2008) (NG)(VVP); and *Agurenko, et al. v. Arab Bank, Plc*, No. CV-10-626 (E.D.N.Y. 2010) (NG)(VVP). To the extent Your Honor observes that statements and holdings in *Gill III* materially conflict with prior holdings and decisions Judge Gershon issued in the *Linde* cases, that arises from the fact that, while Judge Weinstein imported the entire discovery record from *Linde* into *Gill*, he nevertheless *sua sponte* asserted he was not bound by any rulings issued in *Linde*, including rulings arising out of *Linde*'s very discovery record. *See* Gill Oct. 3, 2012 Tr. at 151:4-7.

2



Honorable Dora L. Irizarry
November 21, 2012
Page 3

conflicts with other ATA precedent, including precedent from courts in this Circuit[3] and in any event offers no assistance to CL or NatWest. On the contrary, *Gill III supports* the Plaintiffs' position.

### 1. Judge Weinstein's Proximate Cause Holding Does Not Help the Banks

Contrary to the implication in the Banks' letters, neither Mr. Gill nor the Plaintiffs in these cases claim that the ATA eliminates a causation requirement. Instead, Plaintiffs have resisted the Banks' efforts to effectively impose on them a non-existent burden of tracing money to a specific attack. In establishing that no such tracing is required, *Gill* is consistent with both Plaintiffs' position and the opinions Judge Posner set forth for the *en banc* majority in *Boim v. Holy Land Foundation for Relief & Develop.* 549 F. 3d 685 (7th Cir. 2008) (*Boim III*). Judge Weinstein rejected the causation framework suggested by the Banks when he largely denied Arab Bank's motion to dismiss:

---

[3] As Judge Daniels observed in *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010), denying a bank's motion to dismiss:

> *Thus, it has been recognized that, in actions arising from a terrorist attack, the proximate cause element is relaxed. See, Boim v. Holy Land Foundation for Relief and Dev.*, 549 F.3d 685, 697-98 (7th Cir.2008) (finding that, for claims under the Anti-Terrorism Act, a showing that defendant gave material support to terrorist organization through the making of charitable donations, with awareness or deliberate indifference to the facts, is sufficient to establish the requisite causal connection to injuries sustained in terrorist attack.).
>
> Al Qaeda's ability to accomplish the coordinated large-scale terrorist attacks of September 11th is dependent on the cumulative efforts and contributions of untold thousands over an extended period of time. *The commingling of funds and services, and the fungible nature of money itself, essentially renders it impossible to identify the specific material support, (much less the original source thereof), that enabled al Qaeda to commit a particular terrorist attack. Individually, the financial or other material support provided by a particular person or entity may be of insignificant value. Yet, it is the collective contributions of all such sponsors that gives birth to a repository of seemingly endless financial, military, and logistical resources, from which the terrorist organization draws upon with impunity to carry out its violent attacks against innocent civilians. Such a reality bears directly on the issues of temporal and causal proximity.*

*Id.* at 492-93 (emphasis added). *Accord Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 115 (D.D.C. 2006) (scope of risk associated with providing material support to terrorist groups includes risk that such support may facilitate future terrorist attacks years later); *Boim v. Holy Land Foundation for Relief & Develop.*, 549 F. 3d 685, 699 (7th Cir. 2008) ("To the objection that the logic of our analysis would allow the imposition of liability on someone who with the requisite state of mind contributed to a terrorist organization in 1995 that killed an American abroad in 2045 . . . .the imposition of liability in the hypothetical case would not be as outlandish, given the character of terrorism, as one might think. . . . Terrorism campaigns often last for many decades. Think of Ireland, Sri Lanka, the Philippines, Colombia, Kashmir-and Palestine, where Arab terrorism has been more or less continuous since 1920. Seed money for terrorism can sprout acts of violence long after the investment.").

3



Honorable Dora L. Irizarry
November 21, 2012
Page 4

> [T]he point made by Judge Posner for the en banc majority in *Boim* has merit. The money used need not be shown to have been used to purchase the bullet that struck the plaintiff. A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets. The problem can be solved by considering relative amounts of contributions and intentions. Thus, a major recent contribution with a malign state of mind would – and should – be enough, as the *Boim* en banc majority contended. But a small contribution made long before the event – even if recklessly made – would not be. The concept of proximate cause is central in imposing a balance.

*Gill v. Arab Bank plc*, ___ F. Supp. 2d. ___, 2012 WL 4960358, at *32-33 (E.D.N.Y. Oct. 17, 2012 at *32 ("*Gill I*").

In *Gill III*, at * 26, Judge Weinstein found that the available evidence of transfers by Arab Bank to Hamas was limited to transactions that occurred several years before the attack in question and therefore the proximate cause requirement was not satisfied. In both his comments at oral argument and written decision, Judge Weinstein focused intently on his conclusion that all of the available transactional records predated 2004 and many of the most significant ones cited by Mr. Gill occurred before 2002, and that Mr. Gill had been unable to proffer evidence of *any* transfers to Hamas during the three years preceding the attack that injured him in April 2008 (albeit due to Arab Bank's withholding of such records). *See Gill* Nov. 2, 2012 Tr. at 25:15-28:15; *Gill III* at * 26 ("[F]unds transferred to [Hamas member] in 2002, at the height of the Second Intifada, cannot be found to have proximately caused injury to an American in 2008.").

The contrast with the cases against the Banks could not be starker. All of the attacks at issue in these cases took place *during* the Second Intifada, when the Defendants' flow of money to Hamas was at its zenith. The many millions of dollars transferred by CL and NatWest to Hamas shortly before the terrorist attacks that injured Plaintiffs and murdered or maimed their family members easily satisfy the temporal and magnitude requirements under Judge Weinstein's proximate cause analysis ("a major recent contribution"),[4] and, as set forth below, the Plaintiffs' evidence of scienter easily meets the applicable recklessness threshold.

---

[4] For example, the Café Hillel Plaintiffs moved for summary judgment against CL due to the Bank's knowing transfer to CBSP of close to ▮▮▮▮▮▮ just a few weeks before Hamas perpetrated the September 19, 2003 Café Hillel suicide bombing, and just a few weeks after the U.S. terrorist designation of CBSP explicitly notified CL that its customer's support for Hamas was assisting Hamas in perpetrating such bombings against American and Israeli civilians.



Honorable Dora L. Irizarry
November 21, 2012
Page 5

 

The Banks also should derive no comfort from Judge Weinstein's approach to the question of whether the "charities" at issue can be considered Hamas's "alter egos." The Banks' argument on this issue is premised on the exclusion of the opinions of Plaintiffs' Hamas experts, Dr. Matthew Levitt and Arieh Spitzen, both of whom opine that the charities in question were alter egos of, or controlled by, Hamas during the relevant time period. The Banks attack Dr. Levitt and Mr. Spitzen as mere aggregators of hearsay, without any *Daubert*-compliant methodology, who ignore contradictory evidence to reach predetermined conclusions. NatWest Motion for Summary Judgment ("NatWest MSJ") at 32-26; CL Motion for Summary Judgment ("CL MSJ") at 30-34. Arab Bank made the very same arguments in its nearly-identical attempt to exclude Dr. Levitt and Mr. Spitzen. Judge Weinstein, however, <u>rejected</u> these arguments and, like every other court to consider their admissibility under Rule 702, qualified both experts. In the process, Judge Weinstein explicitly endorsed Mr. Spitzen's 18-point alter-ego test.[5]

To circumvent this problem, the Banks misrepresent Judge Weinstein's discussion of the Palestinian charities, citing in their *proximate cause* section statements in *Gill III* addressing *scienter*, where Judge Weinstein erroneously concluded that the Second Intifada-era "notice events" proffered by Mr. Gill to show Arab Bank's awareness of its customers' affiliation with Hamas were insufficient to prove Arab Bank's scienter in 2008. *See* Letters at 2-3. The only

---

[5]  With respect to Mr. Spitzen, Judge Weinstein held:

> *Plaintiff proffers Mr. Spitzen to opine on four subjects: (1) charitable committees, known as zakat committees, which plaintiff alleges to be alter egos of, or front organizations for, Hamas*; (2) transfers made from the Bank to several of Hamas's senior leaders in the Gaza Strip and West Bank; (3) the Saudi Committee for the Support of the Intifada (the "Saudi Committee"), which plaintiff alleges distributed money to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks; and (4) the Bank's alleged transfer of funds to Hezbollah that were allegedly funneled to the families of Palestinian "martyrs."
>
> *Defendant chiefly attacks Mr. Spitzen's opinion on the first subject—i.e., the relationship between certain zakat committees and Hamas. Mr. Spitzen identifies eighteen categories of information he considered in order to determine whether a particular entity is an alter ego of Hamas.* Defendant contends this methodology is unreliable and cause for excluding Mr. Spitzen's report and testimony under Rule 702. Mr. Spitzen's eighteen-factor analysis encompasses categories of information generally considered by experts who analyze entities believed to act for terrorist entities. *His methodology passes muster under Daubert and Rule 702. His report and testimony will aid the jury in understanding issues related to the Bank's conduct and state of mind.*

*Gill v. Arab Bank*, ___ F. Supp. 2d., ___, 2012 WL 5177592 (E.D.N.Y. Oct. 19, 2012) ("*Gill II*") at *6 (emphasis added). *See also id.* (admitting Dr. Levitt's testimony and observing that "Dr. Levitt opines as to the organizational structure of Hamas, focusing on the leadership network of international charities and funders known as *da'wa* and international donors that maintained accounts with the Bank or processed fund transfers to Hamas through the Bank").



Honorable Dora L. Irizarry
November 21, 2012
Page 6

reference to the charities in *Gill III*'s proximate cause section, however, appeared as part of the Court's criticism of Mr. Gill's purported failure to show specific evidence regarding the transfers themselves. *Gill III*, at *27. Thus it is unclear whether *Gill III*'s reference to the supposed insufficiency of the "alter ego" evidence also applies to the timing issue. In any case, even if the Banks' interpretation of this clause in Judge Weinstein's opinion were correct, a holding that the Spitzen and Levitt expert reports were insufficient to show the charities' alter ego status would not simply be error – it would be legally incoherent, given that the *Gill* court had *already* accepted these opinions in their entirety and reaffirmed that, once expert opinion passes the *Daubert* hurdle, the weight to be attributed to it is entirely a matter for the jury, and not the Court. *Gill* Nov. 2, 2012 Tr. at 58:15-18. The Banks' proximate cause arguments focus intently on attacking the admissibility of the Spitzen and Levitt reports for a reason – they recognize that, once admitted, the reports themselves are more than sufficient to create a material issue of fact with regard to the charities' alter ego status.[6]

### 2. Judge Weinstein's Approach to the ATA's Scienter Requirement Militates <u>Against</u> the Banks' State of Mind Arguments

The Banks' begin their <u>scienter</u> argument with a transparent straw man, arguing that Judge Weinstein's opinion refutes the Plaintiffs' purported "contention that <u>scienter</u> should not be addressed on summary judgment." Letters at 4. Plaintiffs, of course, have made no such contention. Rather, they have cited well-established Second Circuit precedent for the unremarkable, and usually uncontroversial, proposition that <u>scienter</u>, as an issue often dependent on "'the inferences which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions,'" is generally not well suited for summary disposition. *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973), quoted at Plaintiffs' Opposition to CL's Motion for Summary Judgment ("CL Opp."), at 14. *See, also, Life Product Clearing LLC v. Angel*, 530 F.Supp. 2d 646, 652 (S.D.N.Y. 2010) ("[C]ases that hinge on an issue relating to state of mind should generally not be disposed of summarily.") (collecting cases), cited at CL Opp. at 14 n.12. As this Court itself noted at the pre-motion conference, both scienter and proximate cause are "generally issues for the trier of fact." Pre-Motion Conference Tr. at 11-12, June 23, 2011.

---

[6] Contrary to the Banks' argument, Letters at 2 n. 3, *Gill III* does not aid their effort to misappropriate New York law on corporate veil-piercing into the analysis of "alter ego" status. Notably, Judge Weinstein's analysis entirely omits any consideration of the 10-factor alter ego test used by the court in *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001). Although the Banks insists that Plaintiffs "must" address this standard, CL MSJ at 22, NatWest MSJ at 25, this faux requirement is entirely of the Banks' own creation, as neither Judge Weinstein nor any other court has used it in its analysis of the alter ego question under the ATA.



Honorable Dora L. Irizarry
November 21, 2012
Page 7

The most significant feature of Judge Weinstein's approach to the ATA's <u>scienter</u> element is that he agreed with Mr. Gill, with Plaintiffs, and with the vast majority of courts to consider the issue, that proof of a defendant's recklessness suffices to satisfy the ATA's <u>scienter</u> requirement. Judge Weinstein made this determination at the Motion to Dismiss stage in *Gill*, *Gill I*, at *31 ("The Court is persuaded by [the *Boim III* majority's conclusion that recklessness is sufficient] for substantially the reasons stated in its opinion."), and reaffirmed it at summary judgment. *Gill III*, at *10. This provides yet additional refutation of NatWest's false contention that it is "well-settled that mere recklessness does not satisfy the ATA's <u>scienter</u> element." NatWest Reply Brief at 3.

The Banks' attempt to avoid the impact of Judge Weinstein's endorsement of the recklessness standard takes two forms, both of which are futile. First, they argue, falsely, that "Arab Bank did not pursue [the purported insufficiency of recklessness] in *Gill*, and accordingly Judge Weinstein did not address it." Letters at 4 n.5. In fact, Arab Bank *repeatedly* argued that recklessness was insufficient under the ATA, and used the same inapposite and unpersuasive precedent as the Banks to do so. See Arab Bank Motion to Dismiss (*Gill* ECF No. 21), at 39-40, Reply Brief in Support of Motion to Dismiss (*Gill* ECF No. 32), at 33-34. Judge Weinstein explicitly rejected Arab Bank's arguments, instead joining Judge Sifton (which in any case remains law of these cases), the *Boim III* majority and so many other courts in holding that recklessness satisfies the ATA's scienter requirement. *Gill I*, at *31. The only difference between the scienter arguments of Arab Bank and the instant Banks is that Arab Bank, having lost the battle over the appropriate level of scienter at the Motion to Dismiss stage, chose not to endlessly relitigate the issue, while the Banks in these cases have elected to do just that.

In addition to falsely arguing that Judge Weinstein simply "did not address" the sufficiency of recklessness, the Banks attempt to denude the *Gill* holding on the applicable scienter standard under the ATA of meaning by simply redefining recklessness so that it is synonymous with willful blindness. To that end, the Banks argue that "[a]pplying Judge Weinstein's articulation of the requirements of the recklessness standards," the Banks cannot be "deemed to have been reckless absent proof" that they were "aware of the risk of harm" from their customers' actions and "demonstrated deliberate indifference to that risk, rising to the level of willful blindness." Letters at 4. But *Gill I* and *Gill III* hold that evidence of recklessness, *standing alone*, satisfies the ATA's scienter requirement. In fact, Judge Weinstein doesn't even mention willful blindness – the second prong of the Banks' preferred standard is, again, entirely of the Banks' own creation.

It is not hard to understand why the Banks are so resistant to the conclusion that recklessness is a sufficient state of mind under the ATA, as Plaintiffs have produced more than enough evidence from which a reasonable juror could conclude that CL and NatWest were each,



Honorable Dora L. Irizarry
November 21, 2012
Page 8

at the very least, reckless in their dealings with their institutional Hamas customers.[7] CL admits that its suspicions about CBSP dated from the mid-1990s, and that its concerns grew with the jump in transfers by CBSP to the Palestinian Territories coinciding with the outbreak of the Second Intifada, although CL insists that it suspected "only" a never-defined, curiously generic form of money-laundering. Even indulging CL's repeatedly-asserted false assumption of a hermetic distinction between money laundering and terror financing, there is substantial evidence that CL's concerns with regard to CBSP were *specifically* focused on terror financing in Israel. This includes the sworn statement of Robert Audren, the CL compliance official in charge of the CBSP investigation, that he took note of CBSP ▌ CL Opp., at 3.

Unlike CL, NatWest did not destroy the records of the contemporaneous internal communications of its AML unit and therefore was confronted in this litigation with numerous records in which its compliance officials explicitly noted that their concerns with Interpal involved Interpal's apparent connections to Palestinian terrorism. For this reason, NatWest could not claim that its concerns were unrelated to terrorism. Nevertheless, NatWest argues that its suspicions about Interpal's involvement with Palestinian terrorism did not rise to the level of "knowledge" required by the ATA.

The evidence recounted in the Plaintiffs' summary judgment pleadings proves otherwise, in that both banks were, minimally, reckless in continuing to transfer money on behalf of, and ultimately provide funds to, their terrorist customers. The Banks' attempt to distort Judge Weinstein's consideration of the burden of avoiding the risk of reckless action, Letters at 4, does not change the conclusion at all, as here, "the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the [defendant's] failure to adopt the precaution a demonstration of the [defendant's] indifference to the risk." *Id.*, quoting *Gill III* at *12. Where the burdens involved could have been borne by refraining from executing international wire transfers to Islamist institutions in a country in the midst of a campaign of suicide bombings, truly minimal inconveniences relative to the risk of the murder of innocent civilians existed.

Significantly, when Judge Weinstein considered conduct of Arab Bank that is objectively analogous to the Banks' conduct in these cases, he observed that had the *Gill* attack occurred in closer proximity to the documented transactions at issue, summary judgment would *not* be warranted. Specifically, Judge Weinstein evaluated evidence of Arab Bank's scienter when it returned the balance of funds – approximately $8,500 – to Osama Hamdan in March 2005 after

---

[7] As set forth in their Memoranda opposing the Banks' Motions for Summary Judgment, Plaintiffs' evidence also suffices to meet the threshold for willful blindness and actual knowledge, but its sufficiency in demonstrating recklessness is virtually incontestable.

8



Honorable Dora L. Irizarry
November 21, 2012
Page 9

closing his account with Arab Bank. On August 22, 2003, after a particularly vicious Hamas suicide bombing in Jerusalem, the United States had designated Hamdan, a senior Hamas leader in Lebanon, as an SDGT. This designation was part of the same executive action in which the U.S. designated the Banks' customers CBSP and Interpal as SDGTs, and the U.S Treasury Department press release accompanying these designations detailed the role played by Hamdan, CBSP and Interpal in Hamas's terrorist activity. *Gill III* at *16; CL Opp. at 11; Plaintiffs' Opposition to NatWest's Motion for Summary Judgment ("NatWest Opp.") at 11. In 2004, Arab Bank informed its banking regulators of the existence of the Hamdan account. The Lebanese banking authorities took no action, and Arab Bank issued Hamdan a check for approximately $8,500, representing the proceeds of his account. *Gill III*, at *17.

Like the Banks here, Arab Bank argued that U.S. designations had no legal effect in the country where the account was held, and like CL, argued that its decision to provide its SDGT customer with the balance of funds in his account was compelled by the law of the relevant jurisdiction – in that case Lebanon.[8] Like CBSP in France and Interpal in the UK, Hamdan continued operating openly and "lawfully" in Lebanon even after the U.S. designated him an SDGT. Nevertheless, Judge Weinstein correctly found that, based on the Hamdan payout, "a reasonable jury might conclude that [Arab Bank] violated one of the material support of terrorism statutes *in 2005 or before*." *Id.* (Emphasis in original.)

CL's and NatWest's post-designation actions are, if anything, more egregious than the Hamdan payout. CL transmitted about thirty times as much to CBSP after its designation as Arab Bank paid Hamdan. CL Opp. at 11. NatWest, for its part, continued servicing Interpal for *years* after its designation, transferring *millions* of dollars on its behalf to Hamas-controlled organizations in the Palestinian Territories. NatWest Opp. at 12-13. NatWest even consulted with Interpal on how best to evade the U.S. sanctions against it. NatWest Opp. at 16-17. And NatWest is no more immunized for its violation of the ATA by the failure of the UK Charity Commission to act against Interpal than Arab Bank is by the failure of the Government of Lebanon to act against Hamdan. As NatWest's employees explicitly and repeatedly recognized at the time, authorities in the UK and U.S. had profoundly different approaches to terrorism, particularly Palestinian terrorism.[9] This difference is brought into stark relief by the Charity

---

[8] As set forth in Plaintiffs' Opposition to CL's Motion for Summary Judgment, even CL's own expert on French banking law conceded at deposition that, contrary to CL's contention, French law did *not* require it to send CBSP the balance in its accounts after CBSP's designation by the U.S. CL Opp. at 20 n.23.

[9] *See Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609, 630-31 (E.D.N.Y. 2006)

> Plaintiffs respond that because the British government and the Charity Commission's definition of a terrorist organization differs materially from the American definition of a terrorist organization a finding by the Charity Commission does not establish that Interpal was something other than a terrorist organization under American law. The British distinguish in the case of an organization



Honorable Dora L. Irizarry
November 21, 2012
Page 10

Commission's "investigations" of Interpal, as it was explicitly unconcerned with non-military aid that benefited Hamas and, as the bank knew, discounted allegations of Interpal's support for terrorism as coming from a "Jewish" source. NatWest Opp. at 11.

In fact, NatWest *relies* on the different approaches between the U.S. and UK, acknowledging that the British Government's official position is that "contrary to the view of some countries, Hamas does not have a social, or 'dawah wing.'" NatWest Reply Brief in Further Support of Motion for Summary Judgment ("NatWest Reply") at 13 n.20. Obviously, if a country's official policy is to define Hamas's social organizations as not being part of Hamas, that government's failure to outlaw these organizations cannot be used as evidence of their lack of affiliation to that terrorist organization. Nor is it simply the "view" of "some countries" that Hamas has a social wing. The United States is one of those countries, and fatally for NatWest, it is not merely the American "view" that the Hamas *da'wa* exists, it is American *law* that donations to Hamas *da'wa* institutions are legally indistinguishable under the ATA from donations to Hamas's terrorist wing.[10]

Although the Banks' letters repeatedly purport to cite to portions of the record in *Gill*, very often these citations simply do not say what counsel for the Banks represents that they do. For example, NatWest claims that at oral argument in *Gill* counsel for Mr. Gill "conceded" that "to the extent that a bank performs an investigation (as NatWest did here) and then concludes that it is reasonable to proceed with a particular customer (as NatWest concluded, based upon all of the authorities and evidence noted in NatWest's motion for summary judgment), that bank cannot be found to be reckless." Letters at 5. As purported proof of this "concession" by Mr.

---

able to establish a wall between a terrorist wing of an organization and a charitable wing. In contrast, the American government has refused to make such a distinction because "even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive." *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000). This different approach is highlighted by the fact that in 2003 the United Stated Government designated Interpal an SDGT, but even after examining the evidence against Interpal provided to it by the United States government, the Charity Commission again found that Interpal was not a terrorist organization. Thus, the Charity Commission's report does not establish as a matter of law and beyond dispute that Interpal was not a terrorist organization.

[10] *See Holder v. Humanitarian Law Project*, __ U.S. __, 130 S. Ct. 2705, 2725-726 (2010) ("Money is fungible, and '[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put.' .... But 'there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations.' ... Thus, '[f]unds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives.'") (citations omitted).



Honorable Dora L. Irizarry
November 21, 2012
Page 11

Gill's counsel (who, the bank takes pains to point out, is "the same counsel who represents the Weiss plaintiffs here") NatWest cites to a page from the transcript of the summary judgment oral argument. NatWest Letter at 5 n.7. Perhaps unsurprisingly, a review of this portion of the transcript reveals that counsel made no such concession. Instead, counsel stated (on the page following that cited by NatWest) that once Arab Bank was aware that one of its customers had been designated as a terrorist, it could "in theory do an investigation, hire Kroll or some other firm, do full due diligence and conclude that the Israeli government was wrong about al Mujama, or that the U.S. government is wrong about Osama Hamdan, he's actually a Quaker leader and not the Hamas leader in Lebanon." Nov. 2, 2012, Hr'g Tr., *Gill v. Arab Bank, plc*, 11-cv-3706 (JBW) at 44:19-24.

NatWest's suggestion that it conducted such an investigation and concluded that *any* designation, by the U.S., Israel or any other country, was wrong is laughable. NatWest never "investigated" or "disproved" the conclusions of South African intelligence, in a report in the possession of the chief of NatWest's AML unit, that identified specific Interpal transfers from its NatWest accounts to ▮, ▮. NatWest Opp. at 3. NatWest never investigated or disproved the conclusions of the United States Government, set forth in the OFAC press release that accompanied Interpal's SDGT designation, that Interpal was Hamas's fundraising "coordinator" in Europe. NatWest Opp. at 11. In fact, ▮, NatWest never truly investigated Interpal at all. The only "investigation" performed by NatWest was Guy Cole's semi-annual, post-Intifada, retrospective reviews of Interpal's transfers, which constituted nothing more than Cole's uninformed and reflexive discounting of U.S. and Israeli conclusions about Interpal's counterparties.[11]

Furthermore, the Banks attempt to use *Gill III*'s comparison, at *6, of the impact, at summary judgment, of an adverse inference issued against a party that withholds discovery and inferences to be drawn from witnesses whom the trier of fact believes lied. The Banks contend that *Gill III*'s citation of caselaw for the proposition that a nonmoving party at summary judgment must have more evidence than solely an inference that opposing witnesses are lying militates in favor of granting the Banks Rule 56 relief. But as both *Gill III* and the cases cited therein make clear, this means only that the party with the burden of proof at trial cannot rely *solely* and exclusively on an inference from the falsity of opposing witnesses' testimony. These cases, and the authority set forth in Plaintiffs' Oppositions to Summary Judgment in CL, at 23-24, are equally clear that false witness testimony and an implausible cover story have independent probative force on the question of scienter. And as set forth in Plaintiffs' briefs in opposition to summary judgment, there is *significant* independent, affirmative evidence of both

---

[11] *See, e.g.*, NatWest Opp. at 15 (describing Cole's dismissal of Israel's designation of ▮ ▮, to which NatWest transferred millions of dollars on Interpal's behalf, as "speculation" and "unsubstantiated commentary.").



Banks' scienter, in addition to the overwhelming evidence of the falseness of CL's cover story and the incredible testimony of numerous witnesses for both Banks.

Finally, the Banks have essentially gotten it backward: many of the false statements made by their witnesses contradict independent, affirmative, contemporaneous evidence of the Banks' scienter. ███████████████████████████████████████████████████████████████████████████████████████████████████. CL Opp. at 18 n.19. When Amanda Holt, a high-ranking AML official at NatWest, was shown, at deposition, an email that she'd written that stated clearly, with regard to the Interpal accounts, that "we were aware that we had accounts for people connected with Hamas," she argued that she meant to write that NatWest was aware only that it maintained accounts for people "allegedly" connected to Hamas. NatWest Reply at 6. Plaintiffs maintain that this testimony, given by witnesses who had spent days preparing for their testimony with counsel for the Banks and who were represented at deposition by counsel for the Banks, was not credible, and that a reasonable finder of fact would so find after considering the context, plausibility, contrary evidence and the witnesses' demeanor during testimony. This credibility evaluation will ultimately be made by a jury, not either party. But the Banks argue that at summary judgment, the Court must accept this testimony, and numerous other examples of questionable or provably false testimony, as completely true. In the process, the Banks improperly demand that this Court *ignore* the affirmative, written evidence of scienter that their witnesses' incredible testimony purports to contradict. This extraordinary request would necessarily require the Court to make a credibility determination and credit the witnesses' testimony over the contrary evidence, an act manifestly outside the role of a court at summary judgment.

### 3. The *Gill* Court Admitted Expert Testimony on Hamas Responsibility and Denied Summary Judgment on That Ground

Although the Banks do not seriously contend that Hamas is innocent of the terrorist attacks that injured Plaintiffs and killed and maimed their family members, they maintain that Plaintiffs are incapable of offering admissible evidence from which a reasonable juror could find, by a preponderance of the evidence, that Hamas was responsible for *any* of the fifteen attacks in question. The Banks have decried Plaintiffs' proffer of expert testimony on Hamas's responsibility for the attacks as a "cynical and impermissible shortcut," *see, e.g.*, CL MSJ at 35, and have repeatedly characterized the use of an expert to opine on Hamas' responsibility as an attempt to aggregate inadmissible hearsay through a "hearsay delivery vehicle" posing as an expert. *Id.* at 38, 39, 43. Now, however, faced with the fact that *Gill II* resulted in the admission of experts proffered by Mr. Gill on the question of Hamas attribution, the Banks wanly claim that



Honorable Dora L. Irizarry
November 21, 2012
Page 13

their objections were only to the *specific* experts offered by the Plaintiffs in these cases, rather than to the use of expert testimony generally to prove attribution. CL Letter at 5 n.7; NatWest Letter at 6 n.8.

The Banks' efforts to distinguish the experts admitted in *Gill* from Ronni Shaked and Evan Kohlmann, who are offered in these cases, is sheer sophistry and fails. *Gill II* considered, and rejected, the very same arguments against admissibility of expert testimony on attribution, citing the very same (inapposite) precedent, as those made by the Banks.[12] In *Gill II*, Judge Weinstein unsurprisingly and resoundingly dismissed these arguments, noting that the materials relied upon by Gill's attribution experts met the standard of Fed. R. Evid. 703, as "the analysis of internet-based material is rooted in the methodology employed by other experts in [the terrorism] field." *Gill II*, at *5. In doing so, Judge Weinstein joined the large and growing ranks of federal judges to acknowledge that terrorism experts routinely and legitimately rely on precisely the types of materials considered by Messrs. Kohlmann and Mr. Shaked in these cases.[13] Judge Weinstein therefore recognized that adopting the standards for attribution evidence, and expertise, espoused by Arab Bank (and NatWest, and CL), would make it impossible for any plaintiff under the ATA to prove what terrorist group was responsible for the attack that injured him or her, noting when admitting one of Gill's attribution experts over objection that "the difficulty of obtaining direct evidence of Hamas' participation in the attack will force plaintiff to rely on circumstantial evidence." *Id.*

Second, the Banks' description of the purported difference in the Gill attribution experts' qualifications, methodology and sources with those of Kohlmann and Shaked is either entirely uninformed or entirely disingenuous. Kohlmann and Eli Alshech, one of the attribution experts admitted by Judge Weinstein in *Gill II*, have both studied the jihadi presence on, and use of, the internet for years. The only difference is that, while Kohlmann has been qualified as an expert in this area by dozens of court in the U.S. and abroad, this was Alshech's first service as an expert. NatWest Opp. at 46. If anything, Mr. Shaked is *more* qualified to testify as an expert than his two counterparts in *Gill*, as unlike Shaked, who personally interviewed many of the terrorists involved in the attacks at issue and who has previously been qualified as an expert on Hamas, neither is true of the witnesses accepted in *Gill II. See, e.g.*, CL Opp. at 43.

The materials relied upon by Kohlmann and Shaked are clearly more robust than those

---

[12] *See*, e.g., Arab Bank's Mem. of Law in support motion to exclude Plaintiff's expert Gill Erez at 10-12 (*Gill* ECF No. 79).

[13] *See U.S. v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (affirming admission of opinions of terrorism expert over defendant's objections that opinions were based on hearsay, where district court noted that it "'could think of few other materials that experts in the field of terrorism would rely on.'"). *Accord Boim III*, at 704 ("Biologists do not study animal behavior by placing animals under oath, and students of terrorism do not arrive at their assessments solely or even primarily by studying the records of judicial proceedings.").



Honorable Dora L. Irizarry
November 21, 2012
Page 14

considered by the *Gill* experts. In *Gill*, the shooting was committed by a masked, anonymous, gunman, and no one was ever charged, much less convicted, of the crime. Moreover, there was no video will or martyrdom video in *Gill*, and no visual evidence of the perpetrator's affiliation with Hamas. This is in stark contrast with most of the attacks in the instant cases, where the suicide bomber often pretaped a "martyrdom video" in which he is depicted dressed in Hamas regalia, standing before Hamas banners, and where Hamas made broad propaganda use of these materials. CL Opp. at 40-42; NatWest Opp. at 43-45.

The Banks attempt to distinguish the accepted expert opinion in *Gill* by focusing on the topographical analysis of the area of the attack in *Gill* that was performed by Gil Erez, one of the attribution experts offered by Mr. Gill.. CL Letter at 5 n. 7, NatWest Letter at 6 n.8. Mr. Erez's topographical analysis, however, was for the purpose of authenticating the videotape of the shooting as a depiction of the attack against Mr. Gill, and not as direct evidence of Hamas's responsibility. *Gill II* at \*5. Moreover, Judge Weinstein repeatedly dismissed the probative value of the evidence that the Banks point at to distinguish *Gill*, concluding that the video had virtually no impact in proving attribution, and that the fact that the video showed a gun that was also used by the likely shooter (which was admittedly broadly available to militants in Gaza) was similarly unpersuasive. *Gill II*, at \*5; *Gill III*, at \*21-23. Therefore, it is clear that Judge Weinstein's decision to admit the attribution experts in *Gill* was not based on any feature different from the attribution experts offered in these cases.

The Banks also falsely suggest that Judge Weinstein expressed skepticism on Messrs. Kohlmann's and Shaked's admissibility as expert witnesses, implying that counsel for Mr. Gill decided to replace them with experts that counsel believed were more likely to be permitted to testify. *See* CL Letter at 5 n.7, NatWest Letter at 6 n. 8. ("After Judge Weinstein expressed skepticism that [Kohlmann's and Shaked's] opinions would be admissible – we infer for the same reasons [the Banks have] demonstrated they are not admissible – Mr. Gill's counsel did not present their opinions at all in support of Mr. Gill's claims.") In fact, Judge Weinstein *never* expressed any skepticism of either Kohlmann or Shaked. *Gill* counsel's decision to submit different attribution experts was a result of Shaked's and Kohlmann's unavailability during the extremely compressed schedule imposed by Judge Weinstein for discovery in *Gill*.

### 4. Plaintiff's Ample Independently-Admissible Evidence Remains Sufficient to Deny Summary Judgment on Hamas Responsibility

Finally, the Banks' effort to use Judge Weinstein's dicta concerning the independent admissibility of elements of *Gill*'s attribution evidence fails. *Gill III* errs in stating that because "[u]nder the perverse assumptions of terrorists, an armed attack on civilians reflects glory," *Gill III* at \*23, terrorist organizations' claims of responsibility do not qualify as admissions against interest under Fed. R. Evid. 804(b)(3). *Gill III* cites no authority for this proposition, and, even more oddly acknowledges (but neither analyzes nor distinguishes) precedent *to the contrary*

14


**ZUCKERMAN SPAEDER** LLP

Honorable Dora L. Irizarry
November 21, 2012
Page 15

holding that, where defendants make incriminating statements in order to self-aggrandize or boast among their criminal associates, these statements are nevertheless admissible under Rule 804(b)(3).[14]

Even if not independently admissible, the data and information relied upon by Plaintiffs' experts still comes into evidence under Fed R. Evid. 703, as long as it is the type of evidence relied upon by experts in the field and is not more unfairly prejudicial than probative. Although Judge Weinstein never reached that particular issue, having admitted the entirety of Mr. Gill's attribution experts' opinions, and having explicitly found that the materials relied upon therein were the type routinely relied upon by experts in the relevant fields, Judge Weinstein very likely would have admitted the claims themselves under Rule 703.

In addition, much of the attribution evidence that Plaintiffs in these cases will offer at trial is independently admissible for reasons that did not exist in *Gill*. For example, Plaintiffs will offer convictions of Hamas members for participation in some of the attacks at issue (admissible under Fed. R. Evid. 803(22)); martyrdom videos made by soon-to-be suicide bombers with the expectation of death (admissible under Fed. R. Evid 803(3)); and visual evidence of the perpetrators' affiliation with Hamas, including photographs and videos of them dressed in Hamas regalia, which are not statements at all for hearsay purposes.

Moreover, the Banks' contention that Judge Weinstein found that "confessions by accused terrorists" and Israel Security Agency (ISA) reports were inadmissible, CL Letter at 6, NatWest Letter at 7, is inaccurate. Rather, Judge Weinstein excluded a statement contained within a post-arrest statement made by Ayoub Ahmed Abu Karim who, while a Palestinian terrorist, was not involved in the attack against Mr. Gill. Judge Weinstein also excluded portions of a report by the ISA that relied on this statement. *Gill III* at *24-25. But even assuming without conceding that Judge Weinstein's conclusions on the admissibility of the particular statements contained in the ISA reports is correct, *Gill III* does not stand for the proposition that ISA reports and terrorists' confessions are *per se* inadmissible. *Gill III* merely found that a *particular* statement was "hearsay within hearsay and inadmissible unless it qualifies under its own exception to the hearsay rules." *Gill III*, at *25. In contrast, the confessions at issue in these cases are frequently statements made by the perpetrators themselves.

Finally, while the Banks quote Judge Weinstein's statement that evidence of Hamas's reaction to the death of the putative gunman in *Gill* "has no bearing on the Bank's conduct and is not probative of Hamas's responsibility," CL Letter at 7, NatWest Letter at 6, they omit the rest of this paragraph, which explains why Judge Weinstein reached this conclusion: the shooting

---

[14]   *Id.* (citing *United States v. Mills*, 704 F.2d 1553, 1562 (11th Cir. 1983); *United States v. Mussare, III*, 405 F.3d 161, 168 (3d Cir. 2005); and *United States v. Berrios*, 676 F.3d 118, 120 (3d Cir. 2012)).



Honorable Dora L. Irizarry
November 21, 2012
Page 16

took place in 2008, and "Hamas's reaction to Za'anin's death only speaks to his affiliation with Hamas in June 2012." *Gill III*, at *25. Like so much else about *Gill III*, this conclusion stemmed from Judge Weinstein's concern with the perceived lack of temporal proximity between the attack that injured Gill and other evidence. Here, in contrast, there is no such gap.

More fundamentally, Judge Weinstein *denied* Arab Bank summary judgment on the Hamas responsibility element of proof, after Arab Bank made arguments substantially identical to those made by the Banks in this case. Thus, even after summary judgment in *Gill*, the Banks can cite to *no* ATA case where a court either excluded expert opinion on attribution or granted summary judgment because of the inability of a plaintiff to prove attribution. This Court should not be the first.

## CONCLUSION

For the reason set forth above, in Plaintiffs' opposition to the Banks' summary judgment motions, and the Café Hillel Plaintiffs' motion for summary judgment, the Banks' motions for summary judgment should be denied and the Court should promptly convene a pre-trial status conference.

Respectfully submitted,

Aitan D. Goelman

cc:   All Counsel (by email)

16