11-0211-cv
Rothstein v. UBS AG

1        UNITED STATES COURT OF APPEALS

2            FOR THE SECOND CIRCUIT

3                  - - - - - -

4               August Term, 2011

5    (Argued: March 1, 2012          Decided: February 14, 2013)

6              Docket No. 11-0211-cv

7    _____

8    RACHEL ROTHSTEIN, FRED ROTHSTEIN, NORA ROTHSTEIN, JENNY
9    RUBIN, DEBORAH RUBIN, DANIEL MILLER, ABRAHAM MENDELSON,
10   STUART ELLIOT HERSH, RENAY E. FRYM, NOAM ROZENMAN, ELENA
11   ROZENMAN, TZVI ROZENMAN, SHAUL STERN, individually and as
12   personal representative of the Estate of Leah Stern, JOSEPH STERN, SHIMSON
13   STERN, YOCHEVED KUSHNER, JULIA KATZ, ALICE FEINSTEIN,
14   CHARLES FEINSTEIN, EMILE FEINSTEIN, ALEXANDER FEINSTEIN,
15   CHAIM KAPLAN, individually and as natural guardian of plaintiffs Mushka
16   Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan,
17   RIVKA KAPLAN, individually and as natural guardian of plaintiffs Mushka
18   Kaplan, Arye Leib Kaplan, Menachem Kaplan, Chana Kaplan, Efraim Kaplan,
19   MUSHKA KAPLAN, minor, ARYE LEIB KAPLAN, minor, MENACHEM
20   KAPLAN, minor, CHANA KAPLAN, minor, EFRAIM KAPLAN, minor,
21   AVISHAI REUVANE, ELISHEVA ARON, CHAYIM KUMER, NECHAMA
22   KUMER, NETANEL HERSKOVITZ, MARTIN HERSKOVITZ and PEARL
23   HERSKOVITZ, BENNETT and PAULA FINER, individually and as legal
24   guardians for plaintiff Chana Nachenberg, CHANA NACHENBERG, DAVID
25   NACHENBERG, SARA NACHENBERG, minor, ZEV FINER, SHOSHANA
26   FINER OHANA, HOWARD M. GREEN, and MINA DORA GREEN,

27                              Plaintiffs-Appellants,

28                  - v. -
29   UBS AG,
30                              Defendant-Appellee.[*]
31   _____

_____

[*]      The Clerk of the Court is directed to amend the official caption to
conform with the above.

1    Before:  KEARSE, LOHIER, and DRONEY, Circuit Judges.

2               Appeal from a judgment of the United States District Court for the Southern District

3    of New York, Jed S. Rakoff, Judge, dismissing, for lack of standing and failure to state an Anti-

4    Terrorism Act claim, see 18 U.S.C. § 2331 et seq., against bank for facilitating terrorism by

5    transferring U.S. currency to Iran.  See 647 F.Supp.2d 292 (2009); 772 F.Supp.2d 511 (2011).

6               Affirmed.

7               NATHANIEL A. TARNOR, Washington, D.C. (Robert J.
8               Tolchin, Jaroslawicz & Jaros, New York, New York, on the
9               brief), for Plaintiffs-Appellants.

10              JONATHAN ROSENBERG, New York, New York (Daniel L.
11              Cantor, Jacqueline V. Roeder, O'Melveny & Myers, New York,
12              New York; Jonathan D. Hacker, Anton Metlitsky, O'Melveny
13              & Myers, Washington, D.C.; Andrew J. Pincus, Marc R.
14              Cohen, Alex C. Lakatos, Paul W. Hughes, Mayer Brown,
15              Washington, D.C., on the brief), for Defendant-Appellee.

16              PILLSBURY WINTHROP SHAW PITTMAN, New York,
17              New York (Frederick A. Brodie, of counsel), filed a brief for
18              Amicus Curiae Government of Switzerland, in support of
19              Appellee.

20              DECHERT, New York, New York (Linda C. Goldstein, of
21              counsel; Brian D. Ginsberg, Covington & Burling, New York,
22              New York, of counsel), filed a brief for Amici Curiae Institute
23              of International Bankers, Association of German Banks,
24              economiesuisse, European Banking Federation, Federation of
25              German Industries, French Banking Federation, Mouvement
26              des Entreprises de France, and Swiss Bankers Association, in
27              support of Appellee.

28   KEARSE, Circuit Judge:

29              Plaintiffs Rachel Rothstein et al. appeal from a judgment of the United States District

30   Court for the Southern District of New York, Jed S. Rakoff, Judge, dismissing their action brought

2

1    under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 et seq., against defendant UBS AG

2    ("UBS"), alleging that plaintiffs were direct or indirect victims of terrorist attacks in Israel facilitated

3    by UBS's furnishing United States currency to Iran, which the United States Department of State has

4    listed as a state sponsor of terrorism.  The district court granted UBS's motion to dismiss plaintiffs'

5    First Amended Complaint ("FAC" or "Complaint"), concluding principally that, because the

6    Complaint did not plausibly allege that plaintiffs' injuries were proximately caused by UBS's conduct,

7    plaintiffs lacked standing and the Complaint failed to state a claim on which relief can be granted.

8    On appeal, plaintiffs contend principally that the Complaint alleged a chain of causation between

9    transfers of funds to Iran by UBS and plaintiffs' injuries at the hands of various terrorist groups

10   sponsored by Iran, sufficient to establish traceability for purposes both of standing and of stating a

11   claim under the ATA.  For the reasons that follow, we conclude that plaintiffs had standing to assert

12   their ATA claims but

13   that the Complaint failed to state a claim on which relief can be granted.

14                                    I.  BACKGROUND

15         The Complaint, whose factual allegations we take as true, as we must in reviewing a

16   dismissal for failure to state a claim or a lack-of-standing dismissal on the basis of the pleadings, see,

17   e.g., Selevan v. New York Thruway Authority, 584 F.3d 82, 88 (2d Cir. 2009), alleged principally as

18   follows.   Plaintiffs are United States citizens who either were themselves physically or

19   psychologically injured in terrorist attacks in Israel, or are survivors of victims of such attacks and

3

1    have thus suffered emotional injuries.  UBS is a financial institution incorporated and headquartered

2    in Switzerland, with offices in the United States.

3    A.  <u>The Events Alleged in the Complaint</u>

4    1.  <u>Iran and Terrorism</u>

5    The Complaint alleged that Iran has, continuously since 1979, pursued an official

6    policy designed to cause the murder and/or expulsion of the Jewish residents of Israel, bring about

7    the eradication of the State of Israel, and cause Israel's replacement with an Islamic state.  (See FAC

8    ¶ 48.)  In furtherance of these goals, "it has been the continuous and official policy of Iran" since 1979

9    "to use terrorism."  (<u>Id</u>. ¶ 50.)  Accordingly, since the early 1980s, "Iran has provided the Hamas

10    terrorist organization with extensive material support, including hundreds of millions of dollars in

11    funds, specifically to enable, encourage and cause Hamas to carry out terrorist attacks against Jewish

12    civilians in Israel, the West Bank and the Gaza Strip."  (<u>Id</u>. ¶ 50(b).)

13             Iran has consistently conditioned its provision of material support and
14             resources to Hamas on Hamas' agreement to utilize the support and resources
15             to carry out terrorist attacks against Jewish civilians in Israel, the West Bank
16             and Gaza. . . .  Under that agreement, Hamas undertook to carry out acts of
17             terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran
18             undertook to provide Hamas with financial support to carry out such attacks.
19             The purpose of this agreement was to terrorize the Jewish civilian population
20             in Israel.  All terrorist attacks carried out by Hamas are carried out further to
21             the aforementioned agreement with Iran.

22    (<u>Id</u>.; <u>see also</u> <u>id</u>. ¶ 50(c) (identical allegations of Iran agreement with, and support of, the Palestine

23    Islamic Jihad terrorist organization ("PIJ")).)

4

1            In addition, in 1982 Iran "established the Hizbollah terrorist organization."  (<u>Id</u>.

2    ¶ 50(a).)  Since that time Iran has "controlled, funded and operated" Hizbollah and used that

3    organization "to carry out thousands of terrorist attacks against Israeli civilian and military targets in

4    Israel, the West Bank and the Gaza Strip, in which hundreds of innocent[] victims have been

5    murdered and thousands more maimed."  (<u>Id</u>.)

6            The support provided by Iran to Hizbollah, Hamas, and PIJ "for the specific purpose

7    of facilitating and causing terrorist attacks against innocent civilians" (FAC ¶ 52) included money in

8    the form of "hundreds of millions of dollars" (<u>id</u>. ¶¶ 50(b) and (c))--"tens of millions of dollars in cash

9    annually" (<u>id</u>. ¶ 52)--"both directly and via . . . 'Iranian Government Organs,'" including the Central

10   Bank of Iran and other Iranian government-owned banks (<u>id</u>. ¶ 53).  The terrorist organizations needed

11   support in the form of cash because they "were unable to freely use banking services (e.g. wire

12   transfers, checks) to pay for those activities due to counterterrorism sanctions and restrictions imposed

13   by the U.S. government" (<u>id</u>. ¶ 55; <u>see also</u> <u>id</u>. ¶ 56), and "cash dollars are a universally accepted

14   currency and means of payment" (<u>id</u>. ¶ 55).

15           If Hizbollah[ and] Hamas . . . had not received cash dollars from Iran,
16           their ability to carry out terrorist attacks and (a) to build and maintain their
17           respective operational infrastructures for the planning and execution of
18           terrorist attacks; (b) to purchase and store weapons, explosives and other
19           materiel used by them to carry out terrorist attacks; (c) to pay, train, transport
20           and shelter their terrorist operatives; and (d) to carry out specific terrorist
21           attacks, would have been severely crippled and limited.

22   (FAC ¶ 59.)

23           Since 1984, the United States Department of State ("State Department") has

24   continuously, under § 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j),

25   designated Iran a state sponsor of terrorism.  (<u>See</u> <u>id</u>. ¶ 51.)  In 1996, a State Department report found

1    that Iran had continued "to encourage Hizballah [sic], HAMAS, [and] the PIJ" to engage in "violence

2    and terrorism," and that Iran was "the premier state sponsor of international terrorism." (Id. (internal

3    quotation marks omitted).)  And in 2006, the Secretary of State described Iran as "the central banker

4    for terrorism around the world." (Id. ¶ 102 (internal quotation marks omitted).

5

6         2.  UBS as a Custodian of U.S. Currency

7              In 1996, the United States Federal Reserve System ("Federal Reserve" or "Fed")

8    established an Extended Custodial Inventory ("ECI") Program "to facilitate the international

9    distribution of U.S. banknotes and to protect against sudden spikes in the international demand for

10   U.S. currency." (FAC ¶ 62.)  Under the ECI Program, the United States government designates

11   private commercial banks to function as "overseas cash depots that hold currency on behalf of the

12   Federal Reserve on a custodial basis." (Id.)  Each ECI facility maintains an account with the Federal

13   Reserve; when a customer withdraws U.S. dollars from, or deposits U.S. dollars in, the facility, the

14   facility's ECI account with the Fed is debited, or credited, accordingly. (Id.)  The ECI facility is

15   obligated "to provide monthly reports of its transactions and to comply with all regulations issued by

16   the Office of Foreign Asset[s] Control ('OFAC') of the U.S. Treasury." (Id. ¶ 64.)

17            OFAC regulations provide, in part, that "no United States person, on or after [August

18   22, 1996], knowing or having reasonable cause to know that a country is designated under section 6(j)

19   of the Export Administration Act . . . as a country supporting international terrorism, shall engage in

20   a financial transaction with the government of that country." 31 C.F.R. § 596.201(a). (See generally

21   FAC ¶ 100.) The criminal code section implemented by that regulation defines "United States person"

22   to include "any person in the United States." 18 U.S.C. § 2332d(b)(2)(D).  Financial transactions, as

6

1    defined in 18 U.S.C. § 1956(c)(4)--which § 2332d(b)(1) incorporates by reference--include

2    transactions (affecting interstate or foreign commerce) "involving the movement of funds" by any

3    means or "involving one or more monetary instruments," 18 U.S.C. §§ 1956(c)(4)(A)(i) and (ii);

4    "monetary instruments," as used in § 1956(c)(4), include "currency of the United States," 18 U.S.C.

5    § 1956(c)(5).  (See generally FAC ¶¶ 93-100.)

6            UBS, which has numerous offices in the United States and thus is a "'United States

7    person' within the meaning of § 2332d" (id. ¶ 96), entered into an ECI agreement with the Federal

8    Reserve in 1996 to operate an ECI facility in Zurich, Switzerland (see id. ¶ 64).   In the ECI

9    Agreement, UBS took on the obligation not to engage in financial transactions with the government

10   of any country designated a state sponsor of terrorism.  (See id. ¶¶ 64-65, 100.)  UBS also agreed to

11   provide monthly reports of its U.S. currency transactions.  (See id. ¶ 64.)


12        3.  UBS and Iran

13           In 2003, after American soldiers discovered, concealed on property of Saddam Hussein

14   in Iraq, approximately $650 million in U.S. currency in Federal Reserve wrappers, an investigation

15   was launched into which of four likely ECI facilities, one of which was UBS, was the source of that

16   currency.  (See FAC ¶¶ 66-68.)  Documents eventually produced by UBS revealed, to the extent

17   pertinent here, "that UBS had transferred U.S. currency to Iran and to Iranian Government Organs."

18   (Id. ¶ 71.)  These transfers were forbidden by OFAC regulations (see id. ¶ 100), and had not been

19   reported to OFAC or the Federal Reserve by UBS (id. ¶ 72).

20           In light of discoveries that UBS had engaged in forbidden U.S. currency transactions

21   with Iran, as well as with Cuba, Libya, and the former Yugoslavia, at times when such transactions

7

1   were prohibited (see FAC ¶ 86 ("[f]rom the time UBS began working with the Fed in 1996 until

2   sometime [in 2003] . . . UBS used the Federal Reserve to conduct" with those countries "billions of

3   dollars worth of transactions" (internal quotation marks omitted))), the Federal Reserve terminated

4   UBS's ECI Agreement in 2003.  (See id. ¶¶ 78-88.)  In 2004, pursuant to an "Order of Assessment of

5   a Civil Money Penalty Issued Upon Consent" (id. ¶ 82), the Federal Reserve fined UBS $100 million

6   (id. ¶ 83).


7              4. Plaintiffs' Injuries

8              The Complaint alleged that plaintiffs were injured, and/or had family members who

9   were injured or killed, in five bombings and several rocket attacks in Israel, conducted by Hamas or

10  Hizbollah between July 30, 1997, and July 22, 2006.  (See FAC ¶¶ 4-43.)  It alleged that the ability

11  of Hizbollah and Hamas to, inter alia, purchase weapons and other materiel, train their terrorist

12  operatives, and carry out those attacks was substantially increased by those organizations' receipt of

13  cash dollars from Iran.  (See id. ¶¶ 59-60.)

14             The fact that Iran was subject to United States government sanctions made it difficult

15  for Iran to obtain the large sums of cash dollars needed for the Hizbollah and Hamas operations.  (Id.

16  ¶ 61.) The Complaint alleged that "UBS solved this problem for Iran by illegally providing Iran with

17  hundreds of millions of dollars in cash between 1996 and 2004 . . . ."  (Id.)


18  B.  Proceedings in the District Court

19             In 2008, plaintiffs commenced the present action under the civil liability provision of

20  the ATA, which provides that

8

> 1        [a]ny national of the United States <u>injured</u> in his or her person, property, or
> 2        business <u>by reason of an act of international terrorism</u>, or his or her estate,
> 3        survivors, or heirs, <u>may sue therefor</u> in any appropriate district court of the
> 4        United States and shall recover threefold the damages he or she sustains and
> 5        the cost of the suit, including attorney's fees,

6 18 U.S.C. § 2333(a) (emphases added).  To the extent not later withdrawn by plaintiffs, the FAC

7 alleged that UBS was liable for aiding and abetting international terrorism in violation of the ATA

8 (Count One) and aiding and abetting violations of customary international law, as made part of federal

9 common law (Count Two).  UBS moved to dismiss the Complaint for failure to state a cause of action

10 and for lack of standing.

11        In an opinion reported at 647 F.Supp.2d 292 (2009) ("<u>Rothstein I</u>"), the district court

12 granted the motion to dismiss.  Noting that the Complaint did not allege that UBS had any direct

13 relationship with terrorist organizations or involvement in any of the attacks that caused plaintiffs'

14 injuries, the court concluded that the "extended chain of inferences" asserted by plaintiffs was

> 15        far too attenuated to provide plaintiffs with sufficient standing to bring this
> 16        action under federal law.  <u>See</u> <u>Allen v. Wright</u>, 468 U.S. 737, 750, 104 S.Ct.
> 17        3315, 82 L.Ed.2d 556 (1984) (<u>standing requires that the injury be "fairly</u>
> 18        <u>traceable" to the alleged actions of the defendant</u>); <u>Simon v. E. Ky. Welfare</u>
> 19        <u>Rights Org.</u>, 426 U.S. 26, 42-43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)
> 20        (standing is not established where injury results from "the independent action
> 21        of some third party not before the court"); <u>see also</u> <u>Bell Atlantic Corp. v.</u>
> 22        <u>Twombly</u>, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (from
> 23        a pleading perspective, "[f]actual allegations must be enough to raise a right
> 24        to relief above the speculative level"); <u>Ashcroft v. Iqbal</u>, -- U.S. --, 129 S.Ct.
> 25        1937, 1949-50, 173 L.Ed.2d 868 (2009) (affirming <u>Twombly</u>).

> 26        Specifically, <u>plaintiffs, to establish standing here, must at a minimum</u>
> 27        <u>allege facts that show a proximate causal relationship between UBS's transfers</u>
> 28        <u>of funds to Iran and Hamas' and Hezbollah's</u> [sic] <u>commission of the terrorist</u>
> 29        <u>acts that caused plaintiffs' injuries</u>.  This they have entirely failed to do.

30 <u>Rothstein I</u>, 647 F.Supp.2d at 294 (emphases ours).  The court continued:

1     Among many other deficiencies in the causal chain, <u>the First Amended</u>
2    <u>Complaint</u> ("Am. Compl.") <u>does not allege that UBS is a primary or even</u>
3    <u>relatively significant source of U.S. banknotes for the Iranian government</u>.
4    Moreover, cash dollars have multiple legitimate uses besides funding
5    terrorism, and, as the amended complaint itself states, "[U.S.] cash dollars are
6    a universally accepted currency and means of payment."  Am. Compl. ¶ 55.
7    Further still, there are no specific allegations showing that the terrorist groups
8    here in question raise their funds from monies transferred from Iran.  Without
9    multiplying examples, the point is that <u>plaintiffs' allegations here are far too</u>
10    <u>speculative to provide the plausible indication of proximate causation</u>
11    <u>necessary to establish plaintiffs' standing in this case</u>.

12 <u>Id</u>. (emphases added).

13    For essentially the same reason, the district court also concluded that the Complaint

14 failed to state a claim on which relief can be granted under the ATA.  The court stated that the

15 language of § 2333(a), granting a private right of action to a United States national injured "by reason

16 of" an act of international terrorism, is essentially a requirement that a plaintiff show that his injury

17 was proximately caused by the defendant.  <u>See</u> <u>Rothstein I</u>, 647 F.Supp.2d at 295 (noting that the "by

18 reason of" language in the private-right-of-action provisions of the Racketeer Influenced and Corrupt

19 Organizations Act ("RICO"), 18 U.S.C. § 1961 <u>et seq</u>., and the Clayton Antitrust Act, 15 U.S.C.

20 §§ 12-27, "has typically been construed to be synonymous with 'proximate cause'").  The court

21 concluded that "[i]f the allegations here are so speculative and attenuated as to deprive plaintiffs of

22 standing, it follows <u>a fortiori</u> that they fail to adequately plead causation."  <u>Rothstein I</u>, 647 F.Supp.2d

23 at 295.

24    The court further concluded that Count One of the Complaint was insufficient to state

25 a claim on a theory of aiding and abetting.

26    [S]uch a theory would here require adequate allegations that the defendant not
27    only knew that its funds would be used to sponsor terrorist acts by Hamas and
28    Hezbollah [<u>sic</u>], but also intended to do so. . . .

1                  No such allegations are remotely made here.  In fact, the Court cannot
2                  discern any substantive allegation in the amended complaint that adequately
3                  alleges intent in any form.

4  Id.

5          Finally, the court concluded that plaintiffs' claims against UBS in Count Two for aiding

6  and abetting violations of customary international law, as incorporated in federal common law, were

7  preempted by the ATA.  See id. at 296.  The Complaint was dismissed in its entirety.

8          Plaintiffs appealed to this Court.  While their appeal was pending, the United States

9  Supreme Court decided Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010) ("Humanitarian

10  Law Project" or "HLP"), addressing the constitutionality of 18 U.S.C. § 2339B(a)(1), which makes

11  it a federal crime knowingly to provide material support or resources to a foreign terrorist

12  organization.  In an order dated August 26, 2010, we stated that the district court had dismissed the

13  complaint for lack of standing under Article III of the Constitution and for failure to state a claim; and

14  while noting that this case and HLP were in "different posture[s] and addressed . . . different [ATA]

15  provision[s]," Rothstein v. UBS AG, No. 09-4108 (2d Cir. Aug. 26, 2010) ("Rothstein II"), we

16  concluded that it would be beneficial to have the district court consider the relevance of HLP in the

17  first instance.  We thus dismissed plaintiffs' appeal without prejudice and remanded to the district

18  court for further consideration in light of HLP.

19          On remand, the district court received supplemental briefing from the parties, and, in

20  an opinion reported at 772 F.Supp.2d 511 (2011) ("Rothstein III"), concluded that HLP did not

21  warrant a different outcome.

22                  As the Second Circuit suggested, there are several obvious and
23                  potentially dispositive differences between Humanitarian Law Project and
24                  Rothstein.  To begin with, Humanitarian Law Project does not address Article

11

III standing, a central component of the Court's <u>Rothstein</u> decision.  This is especially important as Article III "requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).  Indeed, no statute could cure plaintiffs' standing deficiencies, as Congress cannot "abrogate the Art. III minima." <u>Gladstone, Realtors v. Vill. of Bellwood</u>, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).  Thus, neither 18 U.S.C. § 2339(B)(a)(1) nor the Supreme Court's interpretation thereof alters in any way plaintiffs' obligation to satisfy the "fairly traceable" prong of the standing inquiry, which requires them to plausibly plead that a defendant's alleged actions "materially increase[d] the probability of injury." <u>Huddy v. F.C.C.</u>, 236 F.3d 720, 722 (D.C.Cir.2001).

<u>Rothstein III</u>, 772 F.Supp.2d at 515.

The district court pointed out that <u>HLP</u> also did not address § 2333(a)'s proximate causation requirement and that it involved different conduct, <u>i.e.</u>, attempts by the <u>HLP</u> plaintiffs to donate funds directly to terrorist organizations.  <u>See</u> <u>Rothstein III</u>, 772 F.Supp.2d at 516.  The district court noted the Supreme Court's comment in <u>HLP</u> that "'[m]oney is fungible,' and . . . that even money given to terrorist groups for purportedly legitimate purposes can be 'redirected to funding the group's violent activities,'" <u>Rothstein III</u>, 772 F.Supp.2d at 517 (quoting <u>HLP</u>, 130 S. Ct. at 2729).  But the district court concluded that that comment did not justify a conclusion that "the most remote and tenuous connections to organizations with some undefined relationship to undefined terrorist groups could subject potential defendants to ATA liability," <u>Rothstein III</u>, 772 F.Supp.2d at 518.

This renewed appeal followed.

12

1                                    II.  DISCUSSION

2              On appeal, plaintiffs contend that the district court erred in concluding that they lack

3      standing to pursue their Count One claims against UBS under the ATA.  They advance no argument

4      that the district court erred in dismissing their Count Two claims under international law as

5      incorporated into federal common law; accordingly, any challenge to the dismissal of Count Two is

6      waived.  Plaintiffs also contend that, once the court concluded that they lacked standing, it exceeded

7      its authority in addressing the sufficiency of the complaint, and that, in any event, the court erred in

8      concluding that Count One was insufficient to state a claim on which relief can be granted.

9              "We review de novo a district court's dismissal of a complaint for lack of standing, see

10     Fed.R.Civ.P. 12(b)(1), and for failure to state a claim, see Fed. R. Civ. P. 12(b)(6). . . .  In conducting

11     this review, we . . . construe plaintiffs' complaint liberally, accepting all factual allegations in the

12     complaint as true, and drawing all reasonable inferences in plaintiffs' favor."  Selevan v. New York

13     Thruway Authority, 584 F.3d at 88 (internal quotation marks omitted); see, e.g., Lerner v. Fleet Bank,

14     N.A., 318 F.3d 113, 117 (2d Cir.) ("Lerner"), cert. denied, 540 U.S. 1012 (2003).  Under this standard,

15     we conclude, for the reasons that follow, that the Complaint was sufficient to show Article III standing

16     but insufficient to state a claim on which relief can be granted.


17     A.  Standing

18          1.  Article III Standing; Jurisdiction

19              No principle is more fundamental to the judiciary's proper role in our
20              system of government than the constitutional limitation of federal-court
21              jurisdiction to actual cases or controversies. . . .  The concept of standing is

13

1       part of this limitation.

2   Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 37 (1976); see, e.g., Lujan v.

3   Defenders of Wildlife, 504 U.S. 555, 559-60 (1992) ("Lujan"); Allen v. Wright, 468 U.S. 737, 750-51

4   (1984); Warth v. Seldin, 422 U.S. 490, 498-99 (1975).

5           [T]he irreducible constitutional minimum of standing contains three elements.
6           First, the plaintiff must have suffered an "injury in fact"--an invasion of a
7           legally protected interest which is (a) concrete and particularized . . . and (b)
8           actual or imminent, not conjectural or hypothetical . . . .  Second, there must
9           be a causal connection between the injury and the conduct complained of--the
10          injury has to be fairly . . . trace[able] to the challenged action of the defendant,
11          and not . . . th[e] result [of] the independent action of some third party not
12          before the court. . . .  Third, it must be likely, as opposed to merely speculative,
13          that the injury will be redressed by a favorable decision.

14   Lujan, 504 U.S. at 560-61 (other internal quotation marks omitted) (emphases ours).  If any of these

15   three elements is missing, the federal court lacks jurisdiction to entertain the action.  See, e.g., id.

16   at 561; Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102-04 (1998).  Only the second

17   element--traceability--is at issue in the present case.

18           For the reasons that follow, we conclude that the court erred in ruling that, because the

19   Complaint was insufficient to allege proximate cause, plaintiffs failed to show Article III standing,

20   i.e., failed to show that their injuries were fairly traceable to UBS's acts.


21       2.  "Fairly Traceable" vs. "Proximate Cause"

22           The traceability requirement for Article III standing means that the plaintiff must

23   "demonstrate a causal nexus between the defendant's conduct and the injury."  Heldman v. Sobol, 962

24   F.2d 148, 156 (2d Cir. 1992); see, e.g., Allen, 468 U.S. at 756-59.  Such a nexus is most easily shown

25   if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at

14

1    issue.  However, while the "indirectness" of an injury "'may make it substantially more difficult'" to

2    show the "fairly traceable" element of Article III standing, i.e., "'to establish that, in fact, the asserted

3    injury was the consequence of the defendants' actions," indirectness is "not necessarily fatal to

4    standing," Simon, 426 U.S. at 44-45 (quoting Warth, 422 U.S. at 505), because the "fairly traceable"

5    standard is lower than that of proximate cause, see, e.g., Bennett v. Spear, 520 U.S. 154, 168-71

6    (1997); Connecticut v. American Electric Power Co., 582 F.3d 309, 346 (2d Cir. 2009) ("American

7    Electric Power"), rev'd on other grounds 131 S. Ct. 2527 (2011); Lerner, 318 F.3d at 122 n.8; Focus

8    on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1273 (11th Cir. 2003) ("Focus").

9              Central to the notion of proximate cause is the idea that a person is not liable
10             to all those who may have been injured by his conduct, but only to those with
11             respect to whom his acts were a substantial factor in the sequence of
12             responsible causation and whose injury was reasonably foreseeable or
13             anticipated as a natural consequence.

14    Lerner, 318 F.3d at 123 (internal quotation marks omitted) (emphasis ours); see, e.g., Anza v. Ideal

15    Steel Supply Corp., 547 U.S. 451, 461 (2006) (with respect to "proximate causation, the central

16    question . . . is whether the alleged violation led directly to the plaintiff's injuries").

17          The requirement that a complaint "allege[] an injury" that is "'fairly traceable' to

18    defendants' conduct . . . for [purposes of] constitutional standing" is a "lesser burden" than the

19    requirement that it show proximate cause.  Lerner, 318 F.3d at 122 n.8.  Thus, the fact that there is an

20    intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not

21    necessarily a basis for finding that the injury is not "fairly traceable" to the acts of the defendant.  See,

22    e.g., id. at 122 & n.8 (concluding that the plaintiffs' allegations that defendant banks' failure to report

23    an attorney's malfeasance, which would have resulted in his suspension or disbarment and in plaintiffs'

24    ceasing to invest with the attorney, was "sufficiently tenuous to fail to demonstrate proximate

1    causation"; but concluding that "we cannot say" that those assertions "do not allege an injury fairly

2    traceable to defendants' conduct").

3           Accordingly, we, like other courts, have noted that, "particularly at the pleading stage,

4    the 'fairly traceable' standard is not equivalent to a requirement of tort causation" and that "for

5    purposes of satisfying Article III's causation requirement, we are concerned with something less than

6    the concept of proximate cause." American Electric Power, 582 F.3d at 346 (other internal quotation

7    marks omitted) (emphasis ours); see, e.g., Barbour v. Haley, 471 F.3d 1222, 1226 (11th Cir. 2006)

8    ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to

9    that action for standing purposes." (other internal quotation marks omitted)), cert. denied, 551 U.S.

10    1134 (2007); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,

11    913 F.2d 64, 72 (3d Cir. 1990) ("The 'fairly traceable' requirement . . . is not equivalent to a

12    requirement of tort causation."), cert. denied, 498 U.S. 1109 (1991); Natural Resources Defense

13    Council, Inc. v. Watkins, 954 F.2d 974, 980 n.7 (4th Cir. 1992) (same); Focus, 344 F.3d at 1273 ("no

14    authority even remotely suggests that proximate causation applies to the doctrine of [Article III]

15    standing" (internal quotation marks omitted)).  As stated the Supreme Court stated in Bennett, it is

16    "wrong[]" to "equate[] injury 'fairly traceable' to the defendant with injury as to which the defendant's

17    actions are the very last step in the chain of causation." 520 U.S. at 168-69 (emphasis added).  Rather,

18    "at [the pleading] stage of the litigation," the plaintiffs' "burden . . . of alleging that their injury is

19    'fairly traceable' to" the challenged act "is relatively modest."  Id. at 171.

20           In sum, the test for whether a complaint shows the "fairly traceable" element of

21    Article III standing imposes a standard lower than proximate cause.

1          3. <u>The Allegations of the FAC</u>

2          The factual allegations in the Complaint in the present case (<u>see</u> Part I.A. above), taken

3 in the light most favorable to plaintiffs, with all reasonable inferences drawn in their favor, asserted

4 that at all pertinent times, Iran had a policy of promoting terrorism to injure and intimidate the Jewish

5 residents of Israel and to cause the eradication of the State of Israel; that Hizbollah and Hamas are

6 terrorist organizations; that Iran provided Hamas and Hizbollah with hundreds of millions of dollars

7 to fund terrorist attacks; that Iran conditioned that funding on agreement by those organizations to

8 conduct terrorist attacks on Israel and its residents; and that the bombings and rocket attacks between

9 July 1997 and July 2006, in which plaintiffs and/or their family members were injured, were

10 conducted by Hizbollah or Hamas.  The plausibility of these allegations is supported by the facts that

11 the State Department in 1984 listed Iran as a state sponsor of terrorism, in 1996 found that Iran

12 continued to encourage Hizbollah and Hamas to engage in violence and terrorism and was the premier

13 state sponsor of international terrorism, and in 2006 described Iran as the central banker for terrorism

14 around the world.

15          The Complaint also alleged that Hizbollah and Hamas needed large sums of money to

16 fund their operations; that those organizations, by reason of their nature and the existence of

17 counterterrorism sanctions, could not freely use normal banking services such as checks or wire

18 transfers; and that U.S. currency is a universally accepted form of payment.  (<u>See</u>, <u>e.g.</u>, FAC ¶ 56

19 (citing Congressional testimony of the United States Under Secretary of the Treasury for Terrorism

20 and Financial Intelligence that, "[a]s the formal and informal financial sectors [have] become

21 increasingly inhospitable to financiers of terrorism, . . . . [t]he movement of money via cash couriers

22 is now one of the princip[al] methods that terrorists use to move funds" (internal quotation marks

17

1    omitted)).)  The Complaint alleged that between 1996 and 2004, in violation of United States laws,

2    UBS provided Iran with hundreds of millions of dollars in cash--transactions that UBS has publicly

3    acknowledged.

4           UBS argues that the dollars provided by Iran to Hizbollah and Hamas cannot fairly be

5    traced to the U.S. currency transfers to Iran from UBS because during the period when UBS was

6    sending U.S. currency to Iran, Iran held billions of U.S. dollars in its reserves.  (See UBS brief on

7    appeal at 27; see also Exhibit 14 to Declaration of Daniel L. Cantor dated September 4, 2008, in

8    support of UBS Motion To Dismiss FAC (March 27, 2007 news report of Iran's estimate that it had

9    between $10 billion and $20 billion of its foreign reserves in dollars).)  Plaintiffs argue that the fact

10    that Iran was obtaining U.S. currency from multiple sources should not affect plaintiffs' standing to

11    sue.  We agree.  Although the size of Iran's well-publicized reserve affects the issue of proximate

12    cause, we cannot conclude that it prevents the Complaint from meeting the lower standard of fair

13    traceability.   Cf. Massachusetts v. EPA, 549 U.S. 497, 524 (2007) (rejecting the defendant's

14    "erroneous assumption that a small incremental step, because it is incremental, can never be attacked

15    in a federal judicial forum").

16           It is reasonable to infer that Iran's ability to amass U.S. currency was increased by

17    UBS's transfers.  Iran thus had available more U.S. currency than it would have had without UBS's

18    transfers; the more U.S. currency Iran possessed, the greater its ability to fund Hizbollah and Hamas

19    for the conduct of terrorism; and the greater the financial support Hizbollah and Hamas received, the

20    more frequent and more violent the terrorist attacks they could conduct.  The fact that plaintiffs did

21    not more specifically describe the scale of UBS's financial transactions with Iran as a "primary" or

22    "significant" source of Iran's cash supply is irrelevant.  In sum, we cannot conclude that the Complaint

1    failed to allege sufficiently that plaintiffs' injuries in bombings and rocket attacks conducted by

2    Hizbollah and Hamas were fairly traceable to UBS's provision of U.S. currency to Iran.  Accordingly,

3    plaintiffs have Article III standing to pursue their claims under the ATA.

4    B.  The Sufficiency of the Complaint

5            Although we conclude that the Complaint should not have been dismissed for lack of

6    Article III standing, we may affirm the judgment of the district court on any ground that finds a basis

7    in the record, see, e.g., Bennett, 520 U.S. at 166-67, and we affirm because the Complaint failed to

8    allege proximate cause sufficiently to state a claim on which relief can be granted, see, e.g., Lerner,

9    318 F.3d at 130 ("affirm[ing] the district court's dismissal of plaintiffs' RICO claims for lack of

10   standing, but . . . do[ing] so under Rule 12(b)(6) for failure to state a claim").  Plaintiffs invite us to

11   remand to the district court for analysis of the Complaint's sufficiency--arguing that that court lacked

12   jurisdiction to proceed to the sufficiency question once it determined that plaintiffs lacked standing.

13   We decline that invitation, both because we have determined that the district court did have

14   jurisdiction and because the sufficiency of a complaint to state a claim is a matter of law and is

15   particularly suitable for determination by a court of appeals, whether or not the sufficiency question

16   has been addressed by the district court.  See, e.g., McCall v. Pataki, 232 F.3d 321, 322-23 (2d Cir.

17   2000).

18           The private-civil-action section of the ATA, quoted in full in Part I.B. above, allows

19   a United States national to bring an action in federal court for treble damages if he or she is "injured

20   in his or her person . . . by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  In order

21   to state a claim on which relief can be granted, the "[f]actual allegations" of a complaint "must be

19

1   enough to raise a right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S.

2   544, 555 (2007) ("Twombly"), and make the claim at least "plausible on its face," id. at 570.  "A claim

3   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

4   reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556

5   U.S. 662, 678 (2009).  In addressing the sufficiency of a complaint we accept as true all factual

6   allegations and draw from them all reasonable inferences; but we are not required to credit conclusory

7   allegations or legal conclusions couched as factual allegations.  See, e.g., Twombly, 550 U.S. at 555,

8   557.

9          In the present case, Count One of the Complaint asserted that UBS was civilly liable

10   for its cash transfers to Iran on an aiding-and-abetting theory (see, e.g., FAC ¶ 138 ("[b]y its course

11   of conduct described herein, defendant UBS aided and abetted acts of international terrorism, within

12   the meaning of 18 U.S.C. §§ 2331 and 2333, carried out by Iran"); see also Introductory Paragraph

13   to FAC ¶¶ 128-41 ("FIRST COUNT ON BEHALF OF ALL PLAINTIFFS[:]   AIDING AND

14   ABETTING INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)")).  On appeal,

15   plaintiffs seek a ruling that Count One states a claim on the basis that UBS may be held liable either

16   as an aider and abettor or as a principal.

17          With respect to the causation element of § 2333, while plaintiffs purported to concede,

18   both in their brief (see Plaintiffs' brief on appeal at 30) and at oral argument, that that section requires

19   a showing of proximate cause, they argue that a showing of less than proximate cause, as that term

20   is ordinarily used, suffices (see id. at 30-32).  They also contend that the FAC sufficiently pleaded

21   proximate cause by alleging that UBS committed "a per se violation of a statute . . . meant to protect

22   a certain class of persons [including plaintiffs] from harm" (id. at 33) and that they were harmed; they

20

1    argue that in such circumstances "causation may be presumed" (id. at 36-37 (internal quotation marks

2    omitted)), with the burden shifted to UBS "to prove that its wrongful conduct was not the cause of

3    plaintiffs' harm" (id. at 33).  We are not persuaded that Congress intended to permit recovery under

4    § 2333 on a showing of less than proximate cause or that the Complaint contains plausible allegations

5    that UBS's transfers of U.S. currency to Iran proximately caused plaintiffs' injuries.

6              First, we do not agree with plaintiffs' contention that the "by reason of" language

7    chosen by Congress in creating a civil right of action under the ATA was intended to permit recovery

8    on a showing of less than proximate cause, as the term is ordinarily used.  The "by reason of" language

9    had a well-understood meaning, as Congress had used it in creating private rights of action under

10   RICO and the antitrust laws, and it had historically been interpreted as requiring proof of proximate

11   cause.  As described in Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), Congress

12   in 1890 provided a private right of action in § 7 of the Sherman Act for injuries to business or property

13   "by reason of" a violation of the Sherman Act; "lower federal courts . . . read § 7 to incorporate

14   common-law principles of proximate causation."  Holmes, 503 U.S. at 267 & n.13.  In 1914, Congress

15   provided a private right of action in § 4 of the Clayton Act, using the "by reason of" language

16   "borrowed from § 7 of the Sherman Act"; in 1983, the Supreme Court held, "as many lower federal

17   courts had done before" it, "that a plaintiff's right to sue under § 4 required a showing that the

18   defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."

19   Holmes, 503 U.S. at 267-68.  When Congress enacted RICO in 1970 and provided a private right of

20   action in 18 U.S.C. § 1964(c), "Congress modeled § 1964(c) on the civil-action provision . . . [in] § 4

21   of the Clayton Act," again using the "by reason of" language, Holmes, 503 U.S. at 267; and with

22   respect to that language in RICO, "[t]he Courts of Appeals . . . overwhelmingly held that not mere

1    factual, but proximate, causation is required," id. at 266 n.11.  In Holmes, interpreting the RICO

2    provision, the Court held that the "by reason of" language required a showing of proximate cause,

3    saying "[w]e may fairly credit the 91st Congress, which enacted RICO, with knowing the

4    interpretation federal courts had given the words earlier Congresses had used first in § 7 of the

5    Sherman Act, and later in the Clayton Act's § 4. . . .  It used the same words, and we can only assume

6    it intended them to have the same meaning that courts had already given them."  503 U.S. at 268.

7         We reach the same conclusion here with respect to the ATA--finally enacted in 1992,

8    see Report of the Senate Committee on the Judiciary, 102-342, at 22 (1992) (noting that § 2333 was

9    initially enacted in error in 1990 and was repealed in 1991, to be reenacted in 1992).  Although the

10   legislative history of the ATA indicates that Congress intended to create impediments to terrorism by

11   "the imposition of liability at any point along the causal chain of terrorism," id., and plaintiffs rely on

12   that language to argue that use of a standard lower than proximate cause in § 2333 is needed to

13   implement that intent, we note that even without such a lower standard Congress did in fact impose

14   liability--either civil or criminal--at each such point.  And if, in creating civil liability through § 2333,

15   Congress had intended to allow recovery upon a showing lower than proximate cause, we think it

16   either would have so stated expressly or would at least have chosen language that had not commonly

17   been interpreted to require proximate cause for the prior 100 years.

18         Nor are we persuaded by plaintiffs' contention that "because both federal and state

19   antiterrorism laws were enacted to protect against the threat of international terrorism and because

20   Plaintiffs' injuries occurred after UBS violated these laws, [proximate] causation should be presumed"

21   (Plaintiffs' brief on appeal at 36).  Plaintiffs argue, citing Liriano v. Hobart Corp., 170 F.3d 264, 271

22   (2d Cir. 1999) ("Liriano"), that "[a] basic principle of traditional tort law is that when a defendant

1    commits a per se violation of a statute or regulation meant to protect a certain class of persons from

2    harm, and a person in this class is thereafter harmed, the burden shifts to the defendant to prove that

3    its wrongful conduct was not the cause of plaintiffs' harm."  (Plaintiffs' brief on appeal at 33; see id.

4    n.9 (advocating "per se liability").)  First, plaintiffs' reliance on Liriano is misplaced because, as is

5    revealed by their quotation from that case, Liriano was discussing not proximate cause but "'cause-in-

6    fact'" and "'but-for cause'" (Plaintiffs' brief on appeal at 33 n.9 (quoting Liriano, 170 F.3d at 271)).

7    Second, plaintiffs' contention that proximate cause is established because they were injured after UBS

8    violated federal law is a post hoc, ergo propter hoc proposition that would mean that any provider of

9    U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused

10   by a terrorist organization associated with that state.  If Congress had intended to impose strict

11   liability, we have no doubt that it would have found words more susceptible to that interpretation,

12   rather than repeating the language it had used in other statutes to require a showing of proximate

13   cause.

14          Further, the statutory scheme does not suggest that Congress intended a presumption

15   of proximate causation to be read into § 2333(a) with respect to a defendant who had not been found

16   guilty of a terrorism offense in a criminal proceeding.  In subsections (b) and (c) of § 2333, Congress

17   did in effect create some presumptions--indeed, irrebuttable presumptions--that could be applied in

18   an action under § 2333(a).  Thus, as against a defendant convicted of certain federal crimes involving

19   homicides, kidnaping, hostage taking, and aircraft hijacking, subsection (b) of § 2333 in effect creates

20   an irrebuttable presumption against the defendant with respect to each element of the offense of

21   conviction.  See 18 U.S.C. § 2333(b) ("A final judgment or decree rendered in favor of the United

22   States in any criminal proceeding under [the listed sections] shall estop the defendant from denying

23

1   the essential allegations of the criminal offense in any subsequent civil proceeding under this section."

2   (emphasis added)); see also id. § 2333(c) (same with respect to a criminal conviction under foreign

3   law).  There is no allegation in the Complaint that UBS has been convicted of such a crime; the fine

4   imposed on UBS by the Federal Reserve was a "Civil Money Penalty" (FAC ¶ 82 (emphasis added)).

5   As Congress, by its express provisions, created irrebuttable presumptions in subsections (b) and (c)

6   usable against a defendant who had been convicted in a criminal proceeding, we cannot conclude that

7   an intent to create any kind of presumption or burden-shifting mechanism with respect to a defendant

8   who has not been so convicted is inferable from Congress's silence.

9       As discussed in Parts II.A.2. and 3. above, the burden of showing that plaintiffs'

10   injuries were proximately caused by UBS's transfers of U.S. currency to Iran is higher than the burden

11   of showing that plaintiffs' injuries were fairly traceable to those transfers.  Although we agree with

12   plaintiffs' contention that, despite the fact that Iran had billions of dollars in its reserves from multiple

13   sources, plaintiffs' injuries are fairly traceable to those transfers in the Article III sense (because the

14   transfers increased Iran's ability--and perhaps its readiness--to provide funding to Hizbollah and

15   Hamas), we cannot agree that the Complaint sufficiently alleges proximate cause.  The Complaint

16   does not allege that UBS was a participant in the terrorist attacks that injured plaintiffs.  It does not

17   allege that UBS provided money to Hizbollah or Hamas.  It does not allege that U.S. currency UBS

18   transferred to Iran was given to Hizbollah or Hamas.  And it does not allege that if UBS had not

19   transferred U.S. currency to Iran, Iran, with its billions of dollars in reserve, would not have funded

20   the attacks in which plaintiffs were injured.

21       And while the Complaint alleges that "UBS knew full well that the cash dollars it was

22   providing to a state-sponsor of terrorism such as Iran would be used to cause and facilitate terrorist

24

1    attacks by Iranian-sponsored terrorist organizations such as Hamas, Hizbollah and PIJ" (id. ¶ 108

2    (emphases added)), these are conclusory allegations that do not meet Twombly's plausibility standard

3    with respect to the need for a proximate causal relationship between the cash transferred by UBS to

4    Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs.  The fact that the transfers

5    were made to a state sponsor of terrorism of course made it more likely that the moneys would be used

6    for terrorism than if the transfers were to a state that did not sponsor terrorism.  But the fact remains

7    that Iran is a government, and as such it has many legitimate agencies, operations, and programs to

8    fund.  We see no nonconclusory allegation in the Complaint that plausibly shows that the moneys

9    UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable

10   to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.

11           Finally, we are not persuaded that the district court erred in concluding that plaintiffs

12   had not stated a claim on which relief could be granted against UBS on an aiding-and-abetting theory,

13   because it does not appear to us that Congress intended § 2333(a) to permit recovery on such a theory.

14   In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), which dealt with

15   an action under § 10(b) of the Securities Exchange Act, the Supreme Court noted that

16           Congress has not enacted a general civil aiding and abetting statute . . . . Thus,
17           when Congress enacts a statute under which a person may sue and recover
18           damages from a private defendant for the defendant's violation of some
19           statutory norm, there is no general presumption that the plaintiff may also sue
20           aiders and abettors.

21   Id. at 182.  The Court concluded that "an implicit congressional intent to impose . . . aiding and

22   abetting liability"  could not plausibly be inferred from "statutory silence."  Id. at 185.

23           In the ATA, § 2333 is silent as to the permissibility of aiding and abetting liability.

24   Further counseling against a judicial interpretation of that section as authorizing such liability is the

25

1    fact that there are sections of the ATA's criminal provisions--providing jurisdiction over, inter alia,

2    United States nationals and habitual residents--that do refer to aiding and abetting liability.  For

3    example, § 2339B, which prohibits "knowingly provid[ing] material support or resources to a foreign

4    terrorist organization," 18 U.S.C. § 2339B(a)(1), provides that there is jurisdiction over an offense

5    under subsection (a) if, inter alia, "an offender aids or abets any person over whom jurisdiction exists

6    under this paragraph in committing an offense under subsection (a)," id. § 2339B(d)(1)(F); see also

7    id. § 2332g(b)(5) (same with respect to "aid[ing] or abet[ting]" the production and possession of

8    antiaircraft missile systems); id. § 2332h(b)(5) (same with respect to "aid[ing] or abet[ting]" the

9    production and possession of radiological dispersal devices); id. § 2339D(b)(6) (same with respect

10   to "aid[ing] or abet[ting]" the receipt of military training from a foreign terrorist organization).  We

11   doubt that Congress, having included in the ATA several express provisions with respect to aiding and

12   abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil

13   liability for aiding and abetting through its silence.  Accord Boim v. Holy Land Foundation for Relief

14   and Development, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) ("statutory silence on the subject of

15   secondary liability means there is none; and section 2333(a) . . . does not mention aiders and abettors

16   or other secondary actors"), cert. denied, 130 S. Ct. 458 (2009).  It of course remains within the

17   prerogative of Congress to create civil liability on an aiding-and-abetting basis and to specify the

18   elements, such as mens rea, of such a cause of action.

1                                    CONCLUSION

2              We have considered all of plaintiffs' contentions on this appeal and, except to the extent

3      discussed above, have found them to be without merit.  We affirm the district court's dismissal of the

4      First Amended Complaint for failure to state a claim on which relief can be granted.

5              No costs.