UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
TZIV WEISS, et al.,                                   :
                                                      :
                              Plaintiffs,             :
                                                      :          **OPINION AND ORDER**
                                                      :          05-CV-4622 (DLI) (MDG)
                 -against-                            :
                                                      :
                                                      :
NATIONAL WESTMINSTER BANK PLC,                        :
                                                      :
                              Defendant.              :
                                                      :
-------------------------------------------------------- x
NATAN APPLEBAUM, et al.,                              :
                                                      :
                              Plaintiffs,             :
                                                      :          07-cv-916 (DLI) (MDG)
                                                      :
                 -against-                            :
                                                      :
                                                      :
NATIONAL WESTMINSTER BANK PLC,                        :
                                                      :
                              Defendant.              :
                                                      :
-------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**

     Approximately 200 individuals and estates of deceased persons (collectively,

"Plaintiffs"), brought this consolidated action against defendant National Westminster Bank Plc

("NatWest" or "Defendant"), seeking to recover damages from fifteen terrorist attacks in Israel

and the Palestine Territories pursuant to the civil liability provision of the Antiterrorism Act of

1992 ("ATA"), 18 U.S.C. § 2333(a) ("Section 2333(a)").  Defendant moved for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Weiss Dkt. Entry No.

264),[1] which Plaintiffs opposed (Weiss Dkt. Entry No. 271).  For the reasons set forth below, the

---

[1]     Citations to the "Weiss Docket" are to docket 05-CV-4622.  Citations to the "Applebaum Docket" are to

Court finds that Plaintiffs have failed to establish the scienter requirements under the ATA. Accordingly, Defendant's motion is granted and the case is dismissed.

## BACKGROUND[2]

### I.    The Parties

Plaintiffs' claims arise from fifteen attacks in Israel and the Palestine Territories that occurred between March 27, 2002 and September 24, 2004 (the "relevant period"), which Plaintiffs allege were perpetrated by the Palestinian organization, Hamas.  (Def.'s Statement of Material Facts, Weiss Dkt. Entry No. 266 ("NW's 56.1") ¶ 241; Pls.' Response to Def.'s Statement of Material Facts, Weiss Dkt. Entry No. 273 ("Pls.' 56.1 Resp.") ¶ 241.)  Plaintiffs comprise approximately 200 United States citizens who were injured in the terrorist attacks, the estates of those killed in the terrorist attacks and/or are family members of people killed or injured in the terrorist attacks.  (*See* 5th Am. Compl., Weiss Dkt. Entry No. 141 ("Weiss 5th Am. Compl."), ¶¶ 8-438; Compl., Applebaum Dkt. Entry No. 1 ("Applebaum Compl."), ¶¶ 5-287.)

NatWest is a financial institution incorporated and headquartered in the United Kingdom. (NW's 56.1 ¶ 1; Pls.' 56.1 Resp. ¶ 1.)   While Plaintiffs allege that Defendant had several "agents" in New York and Connecticut, and opened an office in Texas (Fifth Am. Compl. ¶¶ 440-41), NatWest denies these allegations, stating only that it was registered to conduct business in Texas and closed the associated office in 2003 (Ans. to 5 Am. Compl. ¶¶ 440-41.)[3]  Currently, there are no known offices in the United States.  NatWest is a member of the Royal Bank of Scotland Group.  (Statement of Interest of Her Majesty's Treasury ("Stmt. of Interest"), Dkt.

---

docket 07-CV-916.  Where documents have been filed on both dockets, the Court cites to the Weiss Docket only, as the lead case.

[2]        Except where otherwise stated, the Background is taken from facts that are not genuinely in dispute.

[3]        The Court does not understand the Plaintiffs to argue that NatWest was obligated to adhere to designations by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") by nature of its alleged business in the United States.

Entry No. 268 at n.2.)   Furthermore, ███████████████████████████

███████████████████████████████████████████████████████████████████████

        During the relevant period, NatWest employed numerous individuals to assist in its compliance with British and international banking regulations.  NatWest's Group Security and Fraud Office ("Fraud Office")[4] was responsible for, among other activities, reviewing internal Suspicious Activity Reports ("SARs") regarding activity in accounts at NatWest and submitting disclosures regarding suspicions of terror financing, as required by United Kingdom law, to the UK National Criminal Intelligence Service ("NCIS").   (NW's 56.1 ¶ 5; Pls.' 56.1 Resp. ¶ 5.) The Money Laundering Prevention Unit of the Corporate Banking Financial Markets Division ("CBFM MLPU") had responsibility for ensuring compliance with anti-money laundering and anti-terror financing sanctions for the accounts held within the Corporate Banking Financial Markets Division.   (NW's 56.1 ¶ 8; Pls.' 56.1 Resp. ¶ 8.)   In particular, CMFM MLPU distributed names of individuals and entities designated as linked to terrorism on United Kingdom, European Union and international sanctions lists for bank employees to search against the customer databases and to review customer accounts whose names appeared similar to those names on the sanctions lists.   (NW's 56.1 ¶ 9; Pls.' 56.1 Resp. ¶ 9.)   Ultimate responsibility for the oversight of anti-money laundering compliance and terror financing sanctions resided with Group Compliance until 2002, and with Group Enterprise Risk thereafter.   (NW's 56.1 ¶ 10; Pls.' 56.1 Resp. ¶ 10.)

---

[4]        This NatWest department has had different names at different times.  (NW's 56.1 ¶ 5.)  The Court will refer to it and all of its iterations as the Fraud Office, unless specification is necessary and noted.

NatWest maintained records of its SARs and NCIS disclosures about its customers on a database named "Goalkeeper."[5]  (NW's 56.1 ¶ 6; Pls.' 56.1 Resp. ¶ 6.)  Each time a NatWest employee created an internal SAR, the Fraud Office created a new report in Goalkeeper.  (NW's 56.1 ¶ 7; Pls.' 56.1 Resp. ¶ 7.)

## II.    Interpal

Interpal, a/k/a the Palestine Relief & Development Fund, a/k/a Palestinians Relief & Development Fund ("Interpal"), is a non-profit entity registered in the United Kingdom with the Charity Commission for England & Wales ("Charity Commission").  (NW's 56.1 ¶ 2; Pls.' 56.1 Resp. ¶ 2.)  Interpal, which is headquartered in London, states in its Declaration of Trust, that it collects funds for humanitarian aid that it transfers to various charitable organizations throughout Jordan, Lebanon, and the Palestinian Territories.[6]  (NW's 56.1 ¶ 2; Pls.' 56.1 Resp. ¶ 2.)  Interpal opened its first account with NatWest in September 1994 and opened additional accounts thereafter.  (NW's 56.1 ¶ 3; Pls.' 56.1 Resp. ¶ 3)  NatWest closed the last of Interpal's accounts in March 2007.  (NW's 56.1 ¶ 4; Pls.' 56.1 Resp. ¶ 4.)

## III.    British Regulatory Bodies

British banks engage with numerous law enforcement and regulatory agencies when they suspect a customer of engaging in terror financing, including the NCIS, the Bank of England, the Metropolitan Police, and the Charity Commission.  NCIS was established in 1992 to address serious and organized crime in the United Kingdom.  (NW's 56.1 ¶ 12; Pls.' 56.1 Resp. ¶ 12.)  During the relevant period, banks in the United Kingdom were required to report knowledge or suspicion of terror financing to the authorities.  (NW's 56.1 ¶ 14; Pls.' 56.1 Resp. ¶ 14.)  Among

---

[5]     The Goalkeeper software was updated several times during the relevant period, and replaced an earlier software program called "Fox."  (NW's 56.1 ¶ 6.)  The Court will refer to all versions of the record-keeping software systems as Goalkeeper.

[6]     The parties dispute whether Interpal was founded in 1994 or earlier; however, that dispute is immaterial to resolution of the issues of this case.

other activities, NCIS received such disclosures from banks and disseminated them to the appropriate law enforcement agency.  (NW's 56.1 ¶ 13; Pls.' 56.1 Resp. ¶ 13.)

During the relevant period, the Bank of England was responsible for administering financial sanctions against financial institutions in the United Kingdom.  (NW's 56.1 ¶ 16; Pls.' 56.1 Resp. ¶ 16.)  NatWest contends that the Bank of England's Financial Sanctions Unit was responsible for advising the British government about whether to designate and sanction persons or entities for their involvement in terrorism and/or terror financing (NW's 56.1 ¶ 17), which Plaintiffs dispute (Pls.' 56.1 Resp. ¶ 17); however, there is no evidence that any other British department had such responsibility.

The National Terrorist Financial Investigation Unit ("NTFIU") of the Special Branch in the Metropolitan Police in London was responsible for investigating suspicions of terror financing in the United Kingdom.  (NW's 56.1 ¶ 18; Pls.' 56.1 Resp. ¶ 18.)

The Charity Commission is a department in the British government for which there is no United States equivalent.  All charities operating in the United Kingdom must register with the Charity Commission.  (NW's 56.1 ¶ 19; Pls.' 56.1 Resp. ¶ 19.)  The Charity Commission collects and makes publicly available information about each registered charity, including the charity's constitutional documents, income, expenditures, goals, activities, and achievements. Charities with annual income over £1 million, such as Interpal, must file an annual return, which lists, among other things, the charity's contact and trustee information, income, and expenditures.  (NW's 56.1 ¶ 20; Pls.' 56.1 Resp. ¶ 20.)  The Charity Commission has the authority to institute inquiries and to deregister charities it concludes were not established for and/or are not being operated for charitable purposes.  (NW 56.1 ¶ 19.)  The Charity Commission's Compliance Assessment and Intelligence Unit is responsible for addressing

5

allegations of a charity's links to terrorism and as such, "liaise[s] closely with the relevant law enforcement agencies to ensure a proper investigation of the allegations or suspicions."[7]  (NW's 56.1 ¶ 25; Pls.' 56.1 ¶ 25.)

## IV.   Timeline of Relevant Events

The pivotal issue in this case is whether NatWest, as the bank that held Interpal's accounts, knowingly facilitated Interpal's provision of money to charities based in Palestine that allegedly supported Hamas, such that NatWest can be held accountable for terror financing under the ATA.  A chronological presentation of the facts is informative.

### A.   1996 Charity Commission Investigation and Report

On March 6, 1996, *The Times* of London published an article indicating that the United Kingdom Security Service (MI5) was "studying police intelligence on alleged links between Hamas militants" and Interpal.  (NW's 56.1 ¶ 31; Pls.' 56.1 Resp. ¶ 31.)  This article prompted the Charity Commission to open an investigation on Interpal, during which the Charity Commission temporarily froze Interpal's bank accounts, scrutinized Interpal's controls and records, and scrutinized payments from Interpal's bank statements.  (NW's 56.1 ¶ 32; Pls.' 56.1 Resp. ¶ 32.)  On July 3, 1996, NatWest updated its records on Interpal, indicating that ███

████████████████████████████████████████████████████████████

███████████████████████████████████████ (Declaration of Valerie Schuster ("Schuster Decl."), Dkt. Entry No. 267, Ex. 23.)  In the words of the Charity Commission, the nature and scope of the investigation was as follows:

> Where a charity has an area of benefit outside of the UK it is difficult for the Charity Commission to make checks ourselves in the locations where funds are distributed.  In this case

---

[7]   Plaintiffs characterize the Charity Commission as a "green-light" regulator that focuses on "promoting charitable activities and institutions" rather than regulating (or "policing") registered charities.  (Pls.' 56.1 ¶ 19.)  However, the fact it can "deregister" charities and has investigatory duties appears to give it policing authority.

circumstances in area of benefit precluded any such visit. We therefore had to satisfy ourselves that the trustees of the charity were doing all that was reasonable to satisfy themselves that the funds raised were being applied towards charitable purposes. To this end we decided to concentrate on scrutiny of the charity's controls and records, and test checks of individual payments chosen from copies of the charity's bank statements which were obtained from their bankers.

The allegation that funds were going to supporters of Hamas and in particular the families of suicide bombers was not of direct concern so long as the funds were being applied within the objects of the charity. In the area of benefit we anticipate that a large number of people will support Hamas. Relief cannot be denied to them because of that support but at the same time we needed to ensure, to the best of our abilities, that funds were not being given *because* of a person's support of Hamas. In other words poverty and need should be the only criteria used when deciding how the charity's funds should be distributed.

We organised our scrutiny of the charity's activities under three main headings, child sponsorship, project sponsorship and fund-raising.

(Schuster Decl. Ex. 25.) The Charity Commission explained that "[o]n our first visit to the charity we were accompanied by one of our accountants and accountancy support has been available throughout our investigation." (*Id.*)

Ultimately, the investigation concluded that Interpal was an entity fulfilling charitable purposes. In particular, the Charity Commission stated that:

Scrutiny of the charity's publicity and documentation provided no evidence of any pro-terrorist or anti-Israeli propaganda and interviews with the trustees and staff suggested that they were motivated by faith and altruism rather than fanaticism.

We carried out a range of financial checks . . . . Test checks of payments from the charity's bank accounts all provided evidence of an appropriate end use for its funds.

Although press coverage spoke about evidence being made available to the Government which showed that the charity was funding terrorist activities this has not been substantiated. All of

the evidence that we were able to uncover pointed to a well run and committed organisation which carried out important work in a part of the world where there is great hardship and suffering.  It would be impossible and inappropriate, for the charity to ensure that its funds only go to supporters of the Israelis in this volatile area of conflict.    The unfounded allegation that by aiding Palestinian children the charity is in effect nurturing terrorism remains just that . . . .  What they do need to do is to take whatever steps they can to ensure that their donations only go to charitable purposes within their objects.  We are satisfied that they do this to the best of their abilities.

(*Id*.)

**B.    NatWest's Disclosures Following the Terror Attacks of September 11, 2001**

According to NatWest, in the immediate aftermath of the terror attacks of September 11, 2001, banks in the United Kingdom scrutinized their accounts and "anything and everything that was vaguely associated with or linked to anything that could possibly be connected to extremism of any description" for disclosure to the appropriate authorities.  (Schuster Decl. Ex. 10.)

**1.    Cryptome Report**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████    The Cryptome Report was written by an individual identified only as "Anonymous" and purports to link a "briefing document . . . prepared for the South African President, Thabo Mbeki" that asserts Interpal provides funding to Hamas.  (Schuster Decl. Ex. 28.)  Neither party has submitted any evidence as to the authenticity of this document.  Notably, the founder of the Cryptome website has explained that, "[t]he whole notion of verification, authentication and responsibility is just snake oil . . . .  So this kind of authentication thing is a long-running scam.  People should make up their own minds.  Just give them the material, they will make up their minds."  (Schuster Decl. Ex. 30.)



(*Id.*)  Douglas Hartley, an employee in NatWest's Fraud Office, entered an undated note into Goalkeeper regarding the disclosure, indicating that "Special Branch are investigating."  (NW's 56.1 ¶ 36; Pls.' 56.1 Resp. ¶ 36.)  There is no evidence that NatWest received any responses, directives, or requests for further information from any United Kingdom law enforcement agencies or regulators in response to this disclosure of an unsubstantiated allegation.

### 2.   Charity Funding Generally

On October 15, 2001, Hoseason made a second disclosure to NCIS, summarizing his review of Interpal's accounts as follows:



(NW's 56.1 ¶ 38; Pls.' 56.1 Resp. ¶ 38.)  There is no evidence that NatWest received any responses, directives, or requests for further information from any United Kingdom law enforcement agencies or regulators in response to this disclosure.

3.   ██████████████████████

On November 15, 2001, Olha Leeming, a NatWest employee, sent an internal SAR to NatWest's Fraud Office based on a suspicion of terror financing due to what she perceived to be ████████████████████ received into Interpal's accounts.  (NW's 56.1 ¶ 40; Pls.' 56.1 Resp. ¶ 40.)  As a result, NatWest created a Goalkeeper report.  (NW's 56.1 ¶ 42; Pls.' 56.1 Resp. ¶ 42.) NatWest investigated, and Belinda Lane, the NatWest relationship manager assigned to the Interpal accounts, set up a meeting at Interpal's office with its officers.[8]  (NW's 56.1 ¶¶ 42-45; Pls.' 56.1 Resp. ¶¶ 42-45.)  Jihad Qundil, Interpal's Secretary, explained that Interpal received its largest donations and highest volume of donations around the festivals of Ramadan and the Hajj and that Interpal's purpose is to collect such donations for redistribution to charities in Lebanon and the Palestinian territories.[9]  He further explained that the Charity Commission investigated Interpal in 1996 and cleared it of any wrongdoing.  (NW's 56.1 ¶ 47; Pls.' 56.1 Resp. ¶ 47.)

According to Lane, Qundil said that Interpal's donations increased "following [the attacks of] 9/11, because there was a lot more sympathy for the people, and people felt more obliged to make donations to help people."  (Deposition of Belinda Lane taken on June 24, 2008 ("Lane 06/24/08 Depo. Tr."), attached as Ex. 38 to the Declaration of Joel Israel ("Israel Decl."), Dkt. Entry No. 272, 91:1-5.)  When pressed by Plaintiffs' counsel as to why, specifically, donations increased, Lane stated that she "didn't have a very detailed conversation about it," and that Qundil "literally just told me that, you know, following that situation, the - - the deposits that they were receiving had just increased, and I didn't find it unusual.  They are a charity."  (*Id*. at 91:22-92:5.)

---

[8]    Lane initially scheduled this meeting for January 21, 2002; however, it was rescheduled to March 20, 2002. (NW's 56.1 ¶¶ 45-47; Pls.' 56.1 Resp. ¶¶ 45-47.)
[9]    None of the parties have disputed the correlation of dates of the festivals of Ramadan and the Hajj in 2001 with the increased donations, as suggested by Qundil.

After this meeting, Lane prepared a "know your customer" report on Interpal, updating NatWest's files on Interpal with updated officer information, Interpal's annual report for 2000, and other documents.  (NW's 56.1 ¶ 48; Pls.' 56.1 Resp. ¶ 48.)

### C.      NatWest's Disclosures in 2002 and Early 2003

On June 7, 2002, N. Morrison, a NatWest employee, prepared a SAR for terror financing based on Interpal's receipt of a credit of ███████ from ███████ noting ███████ as the payee, which Morrison perceived to imply that the funds were designated ██████████████ ████████████████.  (NW's 56.1 ¶ 49; Pls.' 56.1 Resp. ¶ 49.)  On June 17, 2002, NatWest created a Goalkeeper report to track the investigation of the transaction and disclosed the transaction to NCIS.  (NW's 56.1 ¶¶ 51-52; Pls.' 56.1 Resp. ¶¶ 51-52.)  On August 5, 2002, a note was entered into Goalkeeper stating that NatWest had received an acknowledgment from NCIS that ████████████████████████████████████████████████████████████ ██████.  (NW's 56.1 ¶ 52; Pls.' 56.1 Resp. ¶ 52.)  NatWest conducted an internal investigation, during which employees of NatWest's Fraud Office contacted Lane to obtain more information about Interpal.  (NW's 56.1 ¶ 54; Pls.' 56.1 Resp. ¶ 54.)  Lane provided the Fraud Office with "know your customer" paperwork for Interpal and its officers.  Lane also indicated that, with respect to the specific transaction at issue, Interpal stated that it was a donation from ██████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (NW's 56.1 ¶ 57; Pls.' 56.1 Resp. ¶ 57.)

The investigations of this transaction found no wrong doing on Interpal's part.  Indeed, uunbeknownst to N. Morrison, ████████████████████████████████████████ ██████  (NW's 56.1 ¶ 49; Pls.' 56.1 Resp. ¶ 49.)  Thus, one of the reasons that this credit

appeared to be suspicious—that the purpose for the payment was ██████████████ had a harmless explanation.  The Goalkeeper records of the investigation indicate that, at the time that Interpal received the ██████████ the ██████ donor organization was not listed as having links to terrorism.  However, on September 17, 2003, Tony O'Hear, the head of the Fraud Office, updated the Goalkeeper report, noting that on May 29, 2003, nearly one year after Interpal's receipt of the payment, the Bank of England had designated ████████████ ██████████████.  (NW's 56.1 ¶ 59; Pls.' 56.1 Resp. ¶ 59.)  O'Hear noted that he contacted the NTFIU regarding the subsequent designation of this entity and any potential implications of the designation for Interpal.  The NTFIU advised him that ██████████ ████████████████████████████████████████████████████ ██████████████.  (*Id.*)  NatWest did not receive any further requests from NTFIU.

NatWest's disclosure of "anything and everything" continued.  On May 2, 2003, NatWest submitted an NCIS disclosure related to a customer who had made several payments to Muslim organizations, including Interpal.  (NW's 56.1 ¶ 62; Pls.' 56.1 Resp. ¶ 62.)  On July 18, 2003, NatWest updated its Goalkeeper report to indicate that it had produced documents to the Special Branch, pursuant to a Production Order NatWest received from Special Branch.  (NW's 56.1 ¶¶ 63-64; Pls.' 56.1 Resp. ¶¶ 63-64.)

### D.    United States Names Interpal as a Specially Designated Global Terrorist

On August 21, 2003, the United States Treasury Department Office of Foreign Assets Control ("OFAC") listed Interpal as a Specially Designated Global Terrorist ("SGDT") for purposes of OFAC's asset freezing regulations.  (NW's 56.1 ¶ 95; Pls.' 56.1 Resp. ¶ 95.)  The U.S. press release stated that:

> Interpal . . . has been a principal charity utilized to hide the flow of money to HAMAS.  Reporting indicates it is the conduit through which money flows to HAMAS from other charities . . . and oversees the activities of other charities. . . .  Reporting indicates that Interpal is the fundraising coordinator of HAMAS.  This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy.

(Schuster Decl. Ex. 96.)  The U.S. and U.K. governments discussed the imposition of terror financing sanctions against Interpal, as set forth more fully below.  (NW's 56.1 ¶ 104; Pls.' 56.1 Resp. ¶ 104.)

### E.    2003 Charity Commission Investigation and Report

On August 26, 2003, subsequent to OFAC's SDGT designation of Interpal, the Charity Commission issued an order freezing Interpal's accounts.  (NW's 56.1 ¶ 65; Pls.' 56.1 Resp. ¶ 65.)  On August 27, 2003, NatWest responded via letter as follows:



(Schuster Decl. Ex. 51.)  On that same day, the Fraud Office asked Terry Woodley, the assistant relationship manager for Interpal, to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Schuster Decl. Ex. 52.)

On August 28, 2003, NatWest submitted a disclosure to NCIS indicating that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (NW's 56.1 ¶ 68; Pls.' 56.1 Resp. ¶ 68.)  The disclosure referred to NatWest's two prior NCIS disclosures and the Charity Commission's pending investigation.  (*Id*.)  In particular,

the disclosure requested that 

(Schuster Decl. Ex. 53.)  On August 29, 2003, O'Hear entered a note into Goalkeeper summarizing a telephone call from NTFIU.  O'Hear indicated that NTFIU

(NW's 56.1 ¶ 69; Pls.' 56.1 Resp. ¶ 69.)  O'Hear conveyed this request to Woodley the next day.  (NW's 56.1 ¶ 70; Pls.' 56.1 Resp. ¶ 70.)

While the Charity Commission's freezing order was in effect,

(NW's 56.1 ¶ 71; Pls.' 56.1 Resp. ¶ 71.)  NatWest also reviewed Interpal's payments for the past 12 months.  (NW's 56.1 ¶¶ 72-73; Pls.' 56.1 Resp. ¶¶ 72-73.)

On September 24, 2003, the Charity Commission published its report, announcing that it had completed its investigation of Interpal and had cleared Interpal of allegations of terror financing.  (Schuster Decl. Ex. 66.)  The report indicated that Interpal had received funds from The Al-Aqsa Foundation in the Netherlands (which was sanctioned by the United Nations in May 2003 for terror financing), but that Interpal received those funds for work already carried out by Interpal prior to The Al-Aqsa Foundation's designation.  (*Id.*)  The report made reference to the OFAC designation and indicated that the Charity Commission had contacted the United States government to obtain the information supporting its designation.  (*Id.*)  The report indicated that "[t]he US Authorities were unable to provide evidence to support allegations made against INTERPAL within the agreed timescale."  (*Id.*)  The Commission concluded that, "in the

absence of any clear evidence showing INTERPAL had links to Hamas' political or violent

military activities, INTERPAL's bank accounts should be unfrozen and the Inquiry closed.  The

bank accounts were 'unfrozen' and the Inquiry was closed on 24 September 2003." (*Id.*) ████

████████████████████████████████████████████████████████████████████

(NW's 56.1 ¶ 76; Pls.' 56.1 Resp. ¶ 76.)

In addition to disclosing ███████████████████████ and █████████

███████████████████ NatWest disclosed █████████ to the Bank of

England.  On September 5, 2003, Richard Gossage, Director of Group Risk Management, wrote

to Tom Dawlings of the Financial Sanctions Unit of the Bank of England informing him of the

ongoing investigations and seeking guidance as follows:



(Schuster Decl. Ex. 75.)

On October 3, 2003, after the Charity Commission had issued its report clearing Interpal

of allegations of terror financing, Dawlings responded by letter that:





(Schuster Decl. Ex. 76.)

On October 28, 2003, Gossage replied in a letter stating that:



(Schuster Decl. Ex. 77.)

### F.    Semi-annual Review of Interpal's Accounts

Immediately upon learning about OFAC's designation of Interpal, NatWest conducted its own internal investigation of Interpal's accounts "to get additional information to a greater level of depth."  (Deposition of Amanda Holt taken on July 23, 2010 ("Holt Depo. Tr."), attached as Ex. 13 to Schuster Decl. 78:14-79:6, 82:8-83:2.)  NatWest initiated its own review of Interpal's accounts, rather than simply wait for the results of the law enforcement investigations.  (*Id.* 82:17-83:2.)  NatWest's periodic reviews found no links to Hamas or any other terrorist organizations.

16

The first such review occurred in May 2004.  Guy Cole, an employee in the CBFM MLPU reviewed the payments made from Interpal's accounts to various charities abroad for the past six months.  (Schuster Decl. Ex. 78.)  He compared the names of the recipient organizations (as well as any abbreviations or other similarly named organizations) to a database that collected information from British and other government sources, as well as news sources, and other public sources of information.  (NW's 56.1 ¶ 82.)  He determined that one recipient organization was designated as linked to terrorism by nature of "an unofficial opinion from an Israeli website," but that there were "no other reports or recognition of this charity having links to terrorism . . . on any other websites."  (Schuster Decl. Ex. 78.)  Ultimately, he concluded that none of the donors or recipients was a designated terrorist organization.  (*Id*.)  At the time of Cole's internal investigation, NatWest lacked the tools to review payments made from Interpal's accounts to organizations abroad simply by name recognition of the recipient organization in real time.  Thus, he suggested semi-annual retroactive review of the accounts.  (*Id*.)

Cole conducted two additional reviews of Interpal's accounts.  These reviews occurred after the relevant period.  They are included in this narrative as they demonstrate NatWest's continued efforts to detect transactions made in aid of any terrorist organizations or acts.  For example, in December 2004, Cole researched Interpal's payments for the prior six months to over sixty organizations abroad.  (Schuster Decl. Ex. 79.)  None of them were designated terrorist organizations by the Bank of England or OFAC.  He explained that, "[a]s one might expect with charities operating in this region, speculation exists around some of the [organizations] being connected with terrorism, in particular Hamas."  (*Id*.)  He also noted that six of the organizations were listed as linked to Hamas in the indictment in the United States

prosecution of The Holy Land Fund.[10]   Cole's supervisor recommended "that we keep the account open and continue performing similar thorough reviews of account behavior.  One strike and they are out?!"  (*Id.*)  NatWest decided to keep Interpal's accounts open.

Later, in May 2005, Cole conducted another retroactive review.  (Schuster Decl. Ex. 80.)  Cole determined that, at the time the payments were made to the various organizations abroad, none of them were designated terrorist organizations by the Bank of England or OFAC.  However, a recipient who received a payment from Interpal in January 2005, was designated by the Bank of England five months later, in June 2005.  NatWest decided to keep Interpal's accounts open, but to conduct quarterly reviews of the accounts.

### G.    Interpal's Status

Currently, Interpal remains on OFAC's list of SDGTs.  Neither the British government nor European Union has designated Interpal as linked to terrorism or terror financing.  (NW's 56.1 ¶ 108.)  However, in addition to British law enforcement agencies, the British government's political branch was aware of the OFAC designation when it was made in 2003 and sought information about the designation from the United States government.  On October 6, 2003, a member of the United Kingdom's  Parliament inquired as to the status of Interpal, given that it had been listed as a SDGT by OFAC.  (NW's 56.1 ¶ 110; Pls.' 56.1 Resp. ¶ 110.)  It is clear that the U.K. and U.S. governments held discussions regarding Interpal, as Interpal's status under OFAC was raised several times at Parliament.  (NW's 56.1 ¶¶ 112-16; Pls.' 56.1 Resp. ¶¶ 112-16.)  Nonetheless, neither the Bank of England nor any other United Kingdom agency ever designated Interpal as an organization that supports terrorism.

---

[10]    *United States v. Holy Land Foundation for Relief & Dev., et al.*, 04-CR-240-G (N.D. Tex.).

## VI.    This Action

Pursuant to Section 2333(a) of the ATA, two groups of Plaintiffs brought separate actions in this District against Defendant, captioned *Weiss, e al. v. National Westminster Bank Plc*, 05-CV-4622(DLI)(MDG), and *Applebaum, et al. v. National Westminster Bank Plc*, 07-CV-916(DLI)(MDG).   (*See generally* Compl., Weiss Dkt. Entry No. 1 ("Weiss Compl."); Applebaum Compl.)  Plaintiffs seek damages arising out of terrorist attacks allegedly carried out by Hamas in Israel and the Palestinian Territories from March 27, 2002 to September 24, 2004, and alleged that Defendant aided and abetted the murder or attempted murder of United States citizens, committed acts of international terrorism, and collected and transmitted funds on behalf of a terrorist organization.  (Weiss Am. Compl. ("Weiss Am. Compl."), Weiss Dkt. Entry No. 28 ¶¶ 419-37; Applebaum Compl. ¶¶ 426-44.)  Specifically, Plaintiffs allege that Defendant aided Hamas because it maintained bank accounts for Interpal and sent money to Hamas front organizations on behalf of Interpal, even though it knew that Interpal supported Hamas.  (Weiss Am. Compl. ¶¶ 350-418; Applebaum Compl. ¶¶ 351-425.)

NatWest moved to dismiss the Weiss amended complaint in its entirety.  (*See* Def.'s Mot. to Dismiss, Dkt. Entry No. 38.)  The Honorable Charles B. Sifton, Senior United States District Judge, who was presiding over the action at the time,[11] granted the motion with respect to Plaintiffs' claim that Defendant aided and abetted the murder or attempted murder of United State citizens, but denied the motion to dismiss with respect to Plaintiffs' claims that Defendant committed acts of international terrorism and collected and transmitted funds on behalf of foreign terrorists.  *See Weiss v. National Westminster Bank Plc*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006).  In light of Judge Sifton's rulings in *Weiss*, the parties in *Applebaum* agreed to dismissal of their aiding and abetting claim.  (Applebaum Dkt. Entry Nos. 26, 28.)  By order dated

---

[11]        These cases ultimately were reassigned to this Court on January 28, 2011.

December 27, 2007, *Weiss* and *Applebaum* were formally consolidated for pretrial proceedings. Subsequently, Plaintiffs amended the complaint (*see* 5th Am. Compl., Dkt. Entry No. 141) and the parties conducted extensive discovery.

Defendant moves for summary judgment, asserting that no reasonable juror could find that: (1) Defendant acted with the requisite scienter, (2) Plaintiffs have proven proximate causation and Article III standing; or (3) Hamas was responsible for the terrorist attacks at issue. (*See* Def.'s Mem. of Law in Supp. of its Mot. for Summ. J., Weiss Dkt. Entry No. 265 ("Def.'s Mem.").) Defendant also contends that the proposed testimony of the experts Plaintiffs put forth to establish scienter, causation, and Hamas' responsibility for the attacks is inadmissible, and, therefore, cannot be relied upon by the Court in deciding the motion for summary judgment. (*See id.* at 15-20, 32-34, 37-49.) Plaintiffs oppose Defendant's motion for summary judgment. (*See* Pls.' Mem. Of Law in Opp'n to Def.'s Mot. for Summ. J., Weiss Dkt. Entry No. 281 (Pls.' Opp'n").)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.,* 156 F. 3d 396, 400 (2d Cir. 1998). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F. 3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Grp., Inc.*, 859 F. 2d 1108, 1114 (2d Cir. 1988)).

## DISCUSSION

### I.    Statutory Background

Plaintiffs' claims arise under Section 2333(a) of the ATA, which provides a civil remedy for United States citizens who are injured by a terrorist attack. The statute provides that: "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a). Plaintiffs contend that Defendant committed an act of international terrorism because it violated 18 U.S.C. § 2339B ("Section 2339B") and 18 U.S.C. § 2339C ("Section 2339C"). Violations of Sections 2339B and 2339C are considered to be acts of "international terrorism" under Section 2333(a). *See Strauss v. Crédit Lyonnais*, 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006) ("Violations of 18 U.S.C. § 2339B and § 2339C are recognized as international terrorism under 18 U.S.C. 2333(a)"); *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F. 3d 1000, 1015 (7th Cir. 2002) ("*Boim I*") ("If the plaintiffs could show that [Defendants] violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331.").

Section 2339B imposes criminal penalties on anybody who:

knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so. . . .  To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism.

18 U.S.C. § 2339B(a)(1).

Section 2339C imposes criminal penalties on anybody who:

by any means, directly or indirectly, unlawfully and willfully provides or collects funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out . . . any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

18 U.S.C. § 2339C(a)(1).

## II.     Scienter

### A.      Legal Standards

Defendant asserts that no reasonable juror could find that it acted with the scienter required by Sections 2333(a), 2339B or 2339C because there is no evidence that it knowingly provided support to terrorists.  (*See* Def.'s Memorandum of Law in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem."), Dkt. Entry No. 265, 1-20.)  Plaintiffs contend that there is ample evidence upon which a reasonable juror can conclude that Defendant had the requisite state of mind.  (*See* Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n"), Dkt. Entry No. 271, 22-34.)

Courts have held that a party must engage in knowing misconduct to be liable under Section 2333(a).  *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F. 3d 685, 694 (7th Cir. 2008) (en banc) ("*Boim III*").  A party also must "knowingly" provide material support to a terrorist organization to run afoul of Section 2339B, which means that it must "have knowledge

22

that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism." 18 U.S.C. § 2339B(a)(1). Section 2339C similarly requires that the party act "with the *knowledge* that such funds are to be used" to carry out terrorist attacks. 18 U.S.C. § 233C(a)(1) (emphasis added); *see also Strauss*, 2006 WL 2862704, at *17.

The Plaintiffs and Defendant in this case, much like the Plaintiffs and Defendant in a similar case before this Court, *Strauss, et al. v. Credit Lyonnais*, 06-CV-702(DLI)(MDG), 07-CV-914(DLI)(MDG), debate the standard for "knowledge" and "knowingly" used in these statutes. In *Strauss, et al. v. Credit Lyonnais*, ___ F. Supp. 2d ___, 2013 WL 751283 (E.D.N.Y. Feb. 28, 2013), this Court analyzed precedent from this Circuit and elsewhere that discussed these terms and held that, under the ATA, to satisfy the scienter element, a plaintiff must show that a defendant: (i) had actual knowledge of links to terrorism, or (ii) exhibited deliberate indifference to links of terrorism. *See id.* at *8-10 ("Plaintiffs must show that Defendant knew or was deliberately indifferent to the fact that CBSP was financially supporting terrorist organizations, meaning that Defendant knew there was a substantial probability that Defendant was supporting terrorists by hosting the CBSP accounts and sending money at the behest of CBSP to the 13 Charities." (citing *Boim III*, 549 F. 3d at 693-94)). There have been no intervening cases addressing this issue; thus, the Court finds no reason to revisit the standards set forth in *Strauss*.

### B. Analysis

To survive summary judgment, the evidence, in the light most favorable to the nonmoving Plaintiffs, must establish that NatWest either: (i) had actual knowledge of Interpal's funding of Hamas, or (ii) exhibited deliberate indifference, meaning, that NatWest knew there

was a substantial probability that NatWest was supporting terrorism by retaining the Interpal accounts and sending money at the behest of Interpal to the alleged Hamas-related charities abroad.   Upon careful consideration of the facts and circumstances of this case, summary judgment is granted in Defendant's favor as the undisputed evidence demonstrates that Defendant did not have the requisite scienter.

### 1.   NatWest's Diligence

First, none of the payments that NatWest processed for Interpal went to United States or British designated terrorist organizations.[12]   (Schuster Decl. Ex. 87.)   On one occasion, after the relevant period, in January 2005, Interpal made a payment to an entity that was not designated by the Bank of England until five months later.   (Schuster Decl. Ex. 80.)   NatWest learned of this payment during the course of a periodic internal review of Interpal's accounts, immediately submitted a SAR, sought written confirmation from Interpal that they would cease contact with that entity, and increased the frequency of its review of Interpal's accounts.   (*Id.*)   This level of inquiry demonstrates Defendant's continuous exercise of due diligence.   Most notably, this transaction occurred after the relevant period.

Second, NatWest investigated OFAC's designation of Interpal as an SDGT in 2003, seeking immediate, ██████████ guidance from the Charity Commission, Special Branch, and the Bank of England.   Each of these government departments investigated Interpal and cleared Interpal of allegations of terror financing, expressly giving NatWest permission to maintain Interpal's accounts.   (Schuster Decl. Exs. 66, 67 70, 71, 76, 77.)   Notably, the British government did not designate Interpal even though the British government had discussed Interpal's SDGT designation with the United States government (NW's 56.1 ¶¶ 104-05, 114-15;

---

[12]        Six recipients were listed as linked to Hamas on the *indictment* of the United States prosecution of the Holy Land Foundation.  (Schuster Decl. Ex. 79.)

Pls.' 56.1 Resp. ¶¶ 104-05, 114-15), and the British government had the authority to designate and sanction Interpal under its own laws (Stmt. of Interest ¶¶ 3, 8.)  In a submission to this Court in connection with this litigation, Her Majesty's Treasury wrote that:



(Stmt. of Interest ¶¶ 13-14.)  In addition to discussing the OFAC designation and the evidence in support thereof with U.S. officials, and the investigations conducted by British government agencies described above, several discussions occurred in the British Parliament as to whether there was sufficient evidence linking Interpal to Hamas.   (Schuster Decl. Exs. 106-15.) Ultimately, the British government declined to designate Interpal.

Third, none of the NatWest employees involved with Interpal *actually* suspected Interpal of supporting terrorism.   (Holt Depo. Tr. 79:24-80:22, 214:5-216:11, 227:21-228:15, 230:4-230:8; Deposition of Guy Cole taken on June 8, 2010, attached as Ex. 9 to Schuster Decl. ("Cole Depo. Tr.") 141:4-8; Deposition of Irvine Rodger taken on July 22, 2010, attached as Ex. 12 to Schuster Decl. ("Rodger Depo. Tr.") 129:2-4; 06/24/08 Lane Depo. Tr. 170:23-171:14)   The filing of a SAR does not equate to knowledge or even legitimate suspicion of terror financing because employees were trained to file SARs any time a transaction or information obtained

raised red flags, regardless of their subjective beliefs.[13]  It is undisputed that none of the SARs

and resulting investigations led to any credible evidence of terror financing.  In some instances,

the suspicion underlying the SAR was completely mistaken, such as the concern that ███████

████████████████████████████████████████████████████████████████

██████████████   Other suspicions were understood to be unsubstantiated at the time

NatWest disclosed them, such as ███████████████████████   NatWest

disclosed ████████████ nonetheless as employees were trained to disclose "anything and

everything."  The fact that NatWest's monitoring of accounts captured even the most minor of

incidents and that NatWest disclosed those incidents to authorities demonstrates diligence and

not deliberate indifference.  Furthermore, "[m]ere suspicion, whatever its reasonableness, cannot

be equated with knowledge."  *Frier v. Westinghouse Elec. Corp.*, 303 F. 3d 176, 205-06 (2d Cir.

2002).

Fourth, there is no evidence of a corporate culture of deliberate indifference with respect

to regulatory obligations.  Notably, with respect to efforts to prevent terror financing, Holt

testified that she:

> [S]pent an inordinate effort making sure that we had no ostriches
> with their heads in the sand.  Ignorance is not bliss.  So you had to
> have as far as possible the full information in front of you to make
> the decision.  Looking the other way was just not an option,
> whatever grounds, reputational, commercial or whatever grounds.

(Holt. Depo. Tr. 228:21-229:3; *see also* Schuster Decl. Ex. 51.)  She further clarified that, "If we

had any accounts connected to Hamas we would have already reported and exited."  (Holt. Depo.

Tr. 92:3-4.)  Indeed, the NatWest employees involved with internal investigations of Interpal

testified that NatWest had a zero tolerance policy for terror financing.  (Holt Depo. Tr. 79:24-

---

[13]      For example, Olha Leeming submitted a SAR based on ██████████████ received into Interpal's accounts, not because she suspected Interpal of funding Hamas, but rather because she was trained that ████ ████ could be suspicious.  (NW's 56.1 ¶¶ 40-41.)

80:22; Deposition of Michael Hoseason taken on July 14, 2010, attached to Schuster Decl. as Ex. 10 ("Hoseason Depo. Tr. 7/14/10"), 24:12-25:8; Rodger Depo. Tr. 129:2-4.)  This vigilance towards terrorism is, undoubtedly, a function of regulatory obligations; but, terrorism is likely a very personal issue for NatWest's employees, as NatWest itself sustained damage from bombing attacks in 1992 and 1993.  (Reply Declaration of Stephanie B. Sado in support of Def.'s Mot. for Summ. J. ("Sado Reply Decl.") Ex. 1.)

The resolution of this motion would be different if the evidence indicated that NatWest failed to monitor the various international terrorist sanctions lists to ensure its compliance, or, that upon learning of OFAC's designation of Interpal, did nothing.  The undisputed evidence shows that NatWest did not ignore OFAC's listing of its customer; rather, NatWest thoroughly pursued its investigation of Interpal, internally and with every appropriate British law enforcement and regulatory agency.

### 2. Plaintiffs' Evidence of Scienter

Plaintiffs portray NatWest employees as ill-motivated and reckless with respect to anti-terror finance compliance.  Plaintiffs' assertions are unsupported by the record.

#### a. Lane's Purported Desire for Profits

Plaintiffs suggest that NatWest's retention of the interest earned on Interpal's deposits due to Interpal's refusal to accept interest, on religious grounds, is evidence of NatWest's desire to place profits above compliance.  (Pls.' Opp'n. 15-18.)  This contention is frivolous at best.  First, the purported lucrative nature of the Interpal accounts for one particular relationship manager, Lane, was discussed among Lane and other branch employees in the context of a complaint from Interpal as to the poor service it received at the branch office, and, importantly, not in the context of a broader discussion at NatWest as to whether NatWest should retain

Interpal as a client.  (Israel Decl. Exs. 103, 104, 105, 110.)  Second, it is absurd to suggest that the interest earned on the bank accounts of a non-profit entity, which constituted a miniscule portion of NatWest's annual revenue, would induce NatWest to ignore and thereby facilitate terrorism.  (Sado Reply Decl. Ex. 4; Lane 6/24/08 Depo. Tr. 72:13-17.)  Notably, Lane was just one of six relationship managers at one of NatWest's more than 100 business centers.  (Lane 6/24/08 Depo. Tr. 28:18-20.)  Third, Lane's request for an adjustment to her annual income target, should NatWest terminate Interpal as a client, should be viewed as nothing more than a prudent business solution.  (Schuster Ex. 85.)  Fourth, the Interpal account was not nearly as lucrative for Lane as Plaintiffs suggest.  When Lane transferred to a different division within NatWest, she did not retain Interpal's accounts in her portfolio because Interpal, as a non-profit, was not "growing" and its stagnant revenue presented "no potential for [Lane] to grow with the customer."  (Lane 6/24/08 Depo. Tr. 47:8-15, 72:9-73:2.)  Finally, there is no evidence that NatWest engaged in any sort of crude comparative analysis—weighing profits garnered from Interpal's accounts on one side, against the risks associated with assisting an alleged terrorist organization on the other side, thereby choosing profits over liability for noncompliance with anti-terrorism laws and regulations.

### b.      Foreign Law and Foreign Jurisdictions

Plaintiffs' suggestion that evidence of NatWest's "dismissive" attitude towards United States law and Israeli designations of terrorist entities demonstrates that NatWest acted with the requisite scienter is unsupported by the record.  As set forth in greater detail above, it is undisputed that, as soon as OFAC designated Interpal as an SDGT, NatWest reported the designation to the appropriate British authorities and began an extensive dialogue with those authorities regarding OFAC's SDGT designation of Interpal.  Rather than dismissing the United

28

States' designation, this diligence demonstrates a concern with determining whether the designation impacted NatWest's ability to maintain the Interpal accounts.  Furthermore, NatWest knew that the British government disagreed with OFAC's SDGT designation of Interpal.

It appears that Plaintiffs' support for this contention arises out of a nuanced discussion held by NatWest's top management and compliance officers as to whether to retain Interpal—a customer at times accused of terror financing, for whom neither NatWest nor the British government had uncovered credible links to terrorism despite their thorough investigation. Among other considerations, officers at NatWest discussed:  (i) the reputation risks associated with keeping an OFAC SDGT designated customer, (ii) the reputation risks associated with terminating a British customer accused of terrorism that the British government found has no links to terrorism, (iii) the risks, reputational or otherwise, to plans to expand business to the United States, (iv) the "different stance towards the Palestinian issue between the US and UK," (v) the increased costs of diligently monitoring and administering Interpal's accounts, and (vi) the overtly biased nature of some of the accusations against Interpal.  (Schuster Ex. 85, 89.)  It bears repeating that NatWest conducted this conversation about a customer that NatWest employees had no subjective suspicions of terrorism links or objective evidence from either NatWest's internal investigations or investigations conducted by the British government.  There is no evidence to suggest that, had NatWest known or actually suspected Interpal of terror financing, it would have done anything other than closed its accounts.

Notably, Guy Cole's summary of his May 2004 investigation discusses an issue which is at the heart of this case—namely, the different views of different countries as to the Israeli-Palestinian conflict.  (Schuster Decl. Ex. 78.)  For example, regarding Israel and the United Kingdom, Cole writes:

> It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities.   [Interpal] is the predominant UK charity providing relief in this region, it hosted and funded a visit by British MPs to the region in 1998.

(*Id.*)  This difference of opinion did not trouble Cole or others at NatWest because NatWest had no branch offices or subsidiaries operating in Israel.  (NW's 56.1 ¶ 119; Pls.' 56.1 Resp. ¶ 119.) The evidence in this case indicates that NatWest employees viewed the different treatment of Interpal by the United States and British governments as a reflection of the two governments' different policies as to the Israeli-Palestinian conflict, rather than, a reflection of the two governments' different definitions of terrorism.   (Schuster Decl. Ex. 86, 89; Deposition of Stephen Foster taken on July 16, 2010, attached as Ex. 81 to Schuster Decl. ("Foster Depo. Tr."), 233:3-15; Israel Decl. Ex. 120.)

Ultimately, NatWest decided to retain Interpal as a customer and to undertake enhanced monitoring of its accounts.   (Schuster Decl. Ex. 89, Foster Depo. Tr. 201:18-202:2.)   Stray comments in email correspondences recognizing the United Kingdom's purported different view of the Israeli-Palestinian conflict from the United States or Israel does not in any way diminish the diligence that NatWest undertook in investigating, disclosing, and monitoring Interpal's accounts.  These stray comments do not support a finding of deliberate indifference because they were made in the context of routine due diligence investigations of Interpal's accounts.

### c.   OFAC Designation as Scienter

In sum, this case involves a bank that reported any and all suspicions regarding its non-profit customer, no matter how small or credible, to its government, cooperated with its government, and maintained a customer's account because neither the bank nor its government

found credible evidence of the non-profit's terrorist activities.  It is apparent that the U.S. government, by nature of OFAC's designation of Interpal as a SDGT, felt otherwise.  There is no authority for the proposition that knowledge of an OFAC designation equates to knowledge of terrorist activities under the ATA for purposes of civil liability.  Otherwise the scienter requirement of the ATA would be meaningless.  Banks would be strictly liable for maintaining such accounts, and the scope of ATA liability would be radically enlarged.  Furthermore, as Her Majesty's Treasury wrote, ██████████████████████████████████████████ ████████████████████████ (Stmt. of Interest ¶¶ 15-20.)

NatWest makes a compelling argument that, if the scienter element of the ATA is satisfied simply by knowledge of an OFAC SDGT designation, that the Court would be sanctioning an extraterritorial application of United States law.  (Def. Mem. at 12-14.)  The Court is inclined to agree with NatWest.  OFAC's authority to designate entities as SDGTs derives from Executive Order 13224, which applies only to "U.S. persons" and "U.S. financial institutions."  Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001).  Section 1 of that Order applies only to "all property and interests in property . . . that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons."  Similarly, Section 2 applies only to "any transaction or dealing by United States persons or within the United States."  Because OFAC is unable to block transactions conducted by non-U.S. financial institutions for non-U.S. persons, it is unlikely that Congress intended for private ATA plaintiffs to rely on a foreign bank's knowledge of a foreign customer's SDGT designation to establish scienter under the ATA.  However, this finding is not essential to the outcome of this case.  Moreover, clarification of this issue is better suited for the political branches of government.

Moreover, penalizing NatWest with civil liability under the circumstances here could stifle the incentive of the banks to report suspected terror activity to enforcement agencies and render the decisions of enforcement agencies meaningless.  The logical extension of Plaintiffs' theory is that the financial institutions would be strictly liable regardless of the investigative conclusions reached by government bodies or whether the financial institutions reported their suspicions at all.  It is unreasonable to assume the ATA intended to achieve such a result.

### 3.     *Weiss* is Distinguishable from *Strauss*

Throughout their briefs, Plaintiffs and Defendant refer to the consolidated *Strauss* action, which is also before this Court.  The overarching storyline in *Strauss* is quite similar to this action.  The *Strauss* plaintiffs are United States citizens who were harmed in terror attacks in Israel and the Palestinian Territories, allegedly conducted by Hamas.  *Strauss*, 2013 WL 751283, at *1.  The *Strauss* plaintiffs seek damages from a French bank, Crédit Lyonnais, S.A. ("Crédit Lyonnais"), which administered accounts for a French Muslim charity, Comite de Bienfaissance et de Secours aux Palestiniens ("CBSP").  *Id.*  CBSP solicited donations, which it then transferred to non-profit organizations located in the Palestinian Territories.  *Id.* at *1-2.  The *Strauss* plaintiffs assert that these charities operated as the alter egos of Hamas, funneling money to Hamas to execute its terror attacks.  *Id.* at *2.  On August 21, 2003, OFAC designated CBSP as a SDGT, whereas, neither the French government nor the EU had designated or sanctioned CBSP for terror financing.  *Id.* at *1.  However, the general similarities between these two cases do not extend to the specific facts underlying the Court's analysis of scienter.  The manner in which NatWest managed Interpal's accounts varies so significantly from Crédit Lyonnais' handling of CBSP's accounts that the Court must arrive at different results with respect to the defendants' motions for summary judgment.

First, the diligent, thorough, and urgent manner in which NatWest investigated, reported, and monitored Interpal is absent from the facts of the *Strauss* case. On two occasions, Crédit Lyonnais suspected CBSP of terrorism and reported its suspicions to the French government. *Id.* at *2-5. On December 6, 2001, at the time Crédit Lyonnais filed its second report with French authorities, it had decided to close CBSP's account. *Id.* at *5. Yet, on August 21, 2003, when OFAC designated CBSP as a SDGT, the accounts were still open. *Id.* at *6. The evidence demonstrates that Crédit Lyonnais's compliance officers were not aware that the accounts had remained open years after the bank decided to close them.[14]  *Id.* Crédit Lyonnais closed the accounts on August 29, 2003, at the urging of its compliance officers. *Id.* Remarkably, CBSP continued to receive donations as late as September 2003, and Crédit Lyonnais mailed CBSP checks for those deposits. *Id.* In *Strauss*, there is a genuine material issue of fact as to whether Crédit Lyonnais acted with deliberate indifference such that summary judgment on scienter would have been improper.

Second, the activity in CBSP's accounts underlying the two reports to the French authorities is of a different caliber than that reported to the British government by NatWest. NatWest's policy of reporting "anything and everything" resulted in the filing of reports, based on evidence understood by NatWest employees at the time of reporting as unsubstantiated. In *Strauss*, however, Crédit Lyonnais' suspicion arose from observing abnormal account activity for which they had no explanation. *Id.* at *2-5. Initially, Crédit Lyonnais suspected CBSP of money laundering; however, by the time Crédit Lyonnais filed its second report, Crédit Lyonnais suspected links to terrorism. *Id.* at 4-5. In support of its decision to report CBSP to French authorities, Crédit Lyonnais noted an increase in donations and difficulty in determining the

---

[14]     This oversight by Crédit Lyonnais' compliance department stands in stark contrast to the continuous monitoring of Interpal conducted by NatWest's compliance officers.

donors, as CBSP received its funds from an intermediary French bank and no longer directly from the donors.  *Id*.  Crédit Lyonnais feared CBSP's potential association with "a radical form of Islam" during a major escalation of violence in Israel.  *Id*. at *4.  At the time of reporting its suspicions of terrorism, Crédit Lyonnais informed the French authorities that it was closing CBSP's bank accounts.  *Id*.

Third, there is no evidence that the employees at NatWest actually suspected Interpal of terror financing.   In *Strauss*, there is a genuine dispute as to whether the Crédit Lyonnais employees did, subjectively, suspect CBSP of terror financing, such that granting summary judgment on scienter would have been improper.

Fourth, there is no evidence in *Strauss* of the inter-government dialogue that transpired between the British and United States governments in this action.  Both the regulatory agencies and political branches of the British and United States governments discussed Interpal's designation.

**CONCLUSION**

Summary judgment is granted in NatWest's favor on each claim as to scienter. Accordingly, the Court need not address the parties' contentions regarding the admissibility of expert reports, proximate cause, whether NatWest provided funds to an FTO, and whether Hamas was responsible for the terror attacks at issue in this action.  This action is thus dismissed in its entirety.

SO ORDERED.

Dated:  Brooklyn, New York
         March 28, 2013

_____/s/_____
          DORA L. IRIZARRY
       United States District Judge