UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

TZVI WEISS, et al.,                      :

                        :

                Plaintiffs,      :     Case No. 05-cv-4622 (DLI) (MDG)

                        :

              - against –         :

                        :

NATIONAL WESTMINSTER BANK PLC,     :

                        :

              Defendant.      :

                        :

-------------------------------------------------------------X

NATAN APPLEBAUM, et al.,             :

                        :

                Plaintiffs,      :

                        :

             - against –         :

                        :     Case No. 07-cv-916 (DLI) (MDG)

NATIONAL WESTMINSTER BANK PLC,     :

                        :     **Oral Argument Requested**

              Defendant.      :

                        :

                        :

-------------------------------------------------------------X

## MEMORANDUM OF LAW OF DEFENDANT NATIONAL WESTMINSTER BANK PLC IN SUPPORT OF ITS MOTION FOR AN ORDER DISMISSING <u>PLAINTIFFS' CLAIMS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT</u>

 

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

November 12, 2014

# TABLE OF CONTENTS

**Page**

I. NATWEST IS NOT SUBJECT TO GENERAL PERSONAL JURISDICTION UNDER THE NEW *DAIMLER v. BAUMAN* STANDARD ........................................... 1

II. NATWEST IS NOT SUBJECT TO SPECIFIC PERSONAL JURISDICTION............. 5

    A. Plaintiffs Bear The Burden Of Proving That The Court Has Specific Jurisdiction Over NatWest.................................................................................... 6

    B. The Court Can Assert Specific Jurisdiction Over NatWest Only To The Extent That Plaintiffs' Claims "Arise From" NatWest's Forum Contacts, And Thus Plaintiffs Can Pursue Their Claims Only To The Extent They Are Based On The New York Transfers................................................................. 7

    C. The Court Cannot Assert Specific Jurisdiction Over NatWest With Respect To Claims Based On The New York Transfers Because Plaintiffs Do Not And Cannot Plausibly Allege That Those Transfers Caused Their Injuries, And Thus That Their Claims "Arise From" Those Transfers .............. 14

        1. Without Evidence That The New York Transfers Were Forwarded To The Palestinian Territories, Plaintiffs Cannot Establish The Factual Or Proximate Causation Elements Of Their Claims.................................. 15

        2. Even If There Were Evidence That One Or More Of The New York Transfers Reached The Palestinian Territories, Plaintiffs Cannot Plausibly Allege Those Transfers Were A But-For Cause Of Plaintiffs' Injuries, Or That Plaintiffs' Injuries Were A Foreseeable Consequence Of Those Transfers ............................................................................ 16

    D. NatWest Did Not Waive Its Right To Challenge Specific Personal Jurisdiction Any More Than It Waived Its Right To Challenge General Personal Jurisdiction ........................................................................................... 18

III. IN THE ALTERNATIVE, THE COURT SHOULD GRANT NATWEST SUMMARY JUDGMENT BECAUSE NO REASONABLE JUROR COULD FIND FOR PLAINTIFFS ON THE SCIENTER AND CAUSATION ELEMENTS OF THEIR CLAIMS THAT "ARISE FROM" THE NEW YORK TRANSFERS .......................................................................................................... 18

    A. It Is Law Of The Case That No Reasonable Juror Could Find That NatWest Had The Requisite Scienter As Of The Last New York Transfer On August 15, 2003...................................................................................................... 19

1.  The Events That The Second Circuit Found To Create A Triable Issue Of Fact Concerning NatWest's Scienter All Relate to NatWest's State of Mind After August 15, 2003, And Thus After The Last New York Transfer ............................................................................................... 20

2.  This Court's Ruling That No Reasonable Juror Could Find That NatWest Had The Requisite Scienter On Or Before August 15, 2003 Is Law Of The Case ............................................................................................... 23

CONCLUSION .................................................................................................... 24

## TABLE OF AUTHORITIES

**Rules and Statutes** Page(s)

18 U.S.C. § 2333(a) ........................................................................................... 10, 14-15

CPLR § 302(a)(1) ................................................................................................. 1, 7

CPLR § 302(a)(2) ................................................................................................. 8

CPLR § 302(a)(3) ................................................................................................. 8

Fed. R. Civ. P. 12(g)(2) ....................................................................................... 4, 18

Fed. R. Civ. P. 4(k)(1) .......................................................................................... 1, 5, 8

**Cases**

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
171 F.3d 779 (2d Cir. 1999) .............................................................................. 6-7

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985) ........................................................................................... 7

Burrage v. United States,
134 S. Ct. 881 (2014) ......................................................................................... 14-15

Credit Lyonnais Sec. (USA), Inc. v. Alcantara,
183 F.3d 151 (2d Cir. 1999) .............................................................................. 7, 16

CutCo Indus., Inc. v. Naughton,
806 F.2d 361 (2d Cir. 1986) .............................................................................. 6-7, 16

Daimler AG v. Bauman,
134 S. Ct. 746 (2014) ......................................................................................... passim

DiStefano v. Carozzi N. Am., Inc.,
286 F.3d 81 (2d Cir. 2001) ................................................................................ 8

Fontanetta v. American Bd. of Internal Medicine,
421 F.2d 355 (2d Cir. 1970) .............................................................................. 12-14

Goodyear Dunlop Tires Operations, S.A. v. Brown,
131 S. Ct. 2846 (2011) ....................................................................................... 5

Gucci America, Inc. v. Bank of China,
768 F.3d 122 (2d Cir. 2014), .............................................................................. passim

Helicopteros Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408 (1984)................................................................................................... 9

Herendeen v. Champion Int'l Corp.,
    525 F.2d 130 (2d Cir. 1975)................................................................................. 10-11

Holzsager v. Valley Hosp.,
    646 F.2d 792 (2d Cir. 1981)..................................................................................... 4

In re Terrorist Attacks on Sept. 11, 2001,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)...................................................................... 8

Johnson v. Ward,
    4 N.Y.3d 516 (2005) ............................................................................................... 7-8

Licci v. Am. Express Bank Ltd.,
    704 F. Supp. 2d 403 (S.D.N.Y. 2010)..................................................................... 16

Licci v. Lebanese Canadian Bank, SAL,
    673 F.3d 50 (2d Cir. 2012)................................................................................... 9, 16

Licci v. Lebanese Canadian Bank, SAL,
    732 F.3d 161 (2d Cir. 2013)................................................................................ 9, 11

Liona Corp. v. PCH Assocs. (In re PCH Assocs.),
    949 F.2d 585 (2d Cir. 1991)................................................................................... 23

O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001),
    714 F.3d 118 (2d Cir. 2013)................................................................................... 15

PDK Labs, Inc. v. Friedlander,
    103 F.3d 1105 (2d Cir. 1997).................................................................................. 8

Perkins v. Benguet Consol. Mining Co.,
    342 U.S. 437 (1952)............................................................................................... 3-4

Porcello v. Brackett,
    446 N.Y.S.2d 780 (N.Y. App. Div. 1981) .............................................................. 8

Rothstein v. UBS AG,
    708 F.3d 82 (2d Cir. 2013)................................................................................. 14-15

SEC v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996).................................................................................. 10

Seiferth v. Helicopteros Atuneros, Inc.,
    472 F.3d 266 (5th Cir. 2006) .................................................................................. 8

Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,
   450 F.3d 100 (2d Cir. 2006)............................................................................................ 7

State v. Samaritan Asset Mgmt. Servs., Inc.,
   874 N.Y.S.2d 698 (Sup. Ct. N.Y. Co. 2008) ...................................................... 12

Strauss v. Credit Lyonnais, S.A.,
   925 F. Supp. 2d 414 (E.D.N.Y.. 2013) .............................................................. 14, 17

Sunward Elecs., Inc. v. McDonald,
   362 F.3d 17 (2d Cir. 2004)............................................................................................ 8

Vaichunas v. Tonyes,
   877 N.Y.S.2d 204 (N.Y. App. Div. 2009) ........................................................... 8

Walden v. Fiore,
   134 S. Ct. 1115 (2014)................................................................................................. 8

Weinfeld v. Minor,
   No. 12-CV-6395 (DLI), 2014 WL 4954630 (E.D.N.Y. Sept. 30, 2014) ............................ 7

Weiss v. Nat'l Westminster Bank Plc,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................................................................ 20

Weiss v. Nat'l Westminster Bank Plc,
   936 F. Supp. 2d 100 (E.D.N.Y. 2013) ........................................................ 1, 19, 21, 23

Weiss v. Nat'l Westminster Bank Plc,
   No. 13-1618-cv, slip op. (2d Cir. Sept. 22, 2014)................................................. 19

Pursuant to the Court's Order dated November 4, 2014, defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in support of its motion for an order dismissing plaintiffs' claims for lack of personal jurisdiction or, alternatively, for summary judgment. As shown in Part I below, NatWest is not subject to general personal jurisdiction under the Supreme Court's new Daimler AG v. Bauman standard, because NatWest neither is incorporated nor has its principal place of business in New York. As shown in Part II, NatWest is not subject to specific personal jurisdiction in these actions under CPLR § 302(a)(1) or Federal Rule of Civil Procedure 4(k)(1), and thus the Court should dismiss these lawsuits because it cannot assert personal jurisdiction over NatWest at all. In the alternative, as shown in Part III, the Court should grant NatWest summary judgment, because the only claims as to which the Court could potentially exercise personal jurisdiction over NatWest arise from NatWest's conduct before August 15, 2003, as of which date no reasonable juror could find for plaintiffs on the scienter or causation elements of their claims.[1]

## I.  NATWEST IS NOT SUBJECT TO GENERAL PERSONAL JURISDICTION UNDER THE NEW *DAIMLER V. BAUMAN* STANDARD

Plaintiffs allege that the Court has general jurisdiction over NatWest because "it continuously and systematically does business in the United States." Weiss Fifth Am. Compl. ¶ 4; Applebaum Compl. ¶ 4. The Supreme Court recently rejected this basis for general jurisdiction in Daimler AG v. Bauman, 134 S. Ct. 746 (2014). The Court announced a new – and significantly narrower – standard for general jurisdiction over a corporate defendant under the Due Process Clause, holding that a corporate defendant is subject to general jurisdiction only in its "place of incorporation and principal place of business," absent "exceptional"

---

[1] Capitalized terms in this brief have the same meaning as in NatWest's initial and reply briefs in support its prior summary judgment motion, dated December 7, 2011 (Weiss ECF No. 265) and February 29, 2012 (Weiss ECF No. 276), and the Court's ruling on that motion, Weiss v. Nat'l Westminster Bank Plc, 936 F. Supp. 2d 100 (E.D.N.Y. 2013).

circumstances. 134 S. Ct. at 760-62 & n.19. Under <u>Daimler</u>, which overruled prior "controlling precedent in this Circuit," <u>Gucci America, Inc. v. Bank of China</u>, 768 F.3d 122, 136 (2d Cir. 2014), the Court cannot exercise general jurisdiction over NatWest because it is incorporated and has its principal place of business in the United Kingdom. Thus, absent proof of specific jurisdiction over NatWest, the Court must dismiss these lawsuits.

In <u>Daimler</u>, plaintiffs sued DaimlerChrysler AG ("Daimler") in California, alleging that Daimler's Argentine subsidiary had collaborated with Argentine security forces to kidnap, detain, torture and kill plaintiffs and their relatives between 1976 and 1983. 134 S. Ct. at 751. Plaintiffs asserted that the court possessed general jurisdiction based on the substantial contacts Daimler's indirect U.S. subsidiary ("MBUSA") had with California. <u>Id.</u> Assuming for purposes of its jurisdictional analysis that all of MBUSA's California contacts were "imputable to Daimler," the Supreme Court held that these contacts nonetheless could not render Daimler "at home" in California or subject it to jurisdiction there. <u>Daimler</u> explains that, for corporate defendants, "the place of incorporation and principal place of business are 'paradigm bases for general jurisdiction,'" and are the <u>only</u> bases that courts should consider in all but exceptional cases because they "afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." <u>Id.</u> at 760 (citation omitted). The Court specifically held that allegations of "continuous and systematic" in-state operations, like those made by plaintiffs there and here, were "unacceptably grasping" and insufficient to support the assertion of general jurisdiction. <u>Id.</u> at 761. The Court noted that this more restrictive rule is particularly appropriate for transnational litigation – such as the present lawsuits – because of "the risks to international comity [that a more] . . . expansive view of general jurisdiction pose[s]." <u>Id.</u> at 763.

2

As Justice Sotomayor observed in her concurrence, Daimler's "new rule" is a departure from the prior test for general jurisdiction on which plaintiffs rely here, which turned on whether a defendant had "'continuous corporate operations within a state' that are 'so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" Id. at 767 (quoting International Shoe Co. v. Washington, 66 S. Ct. 154 (1945) (emphasis omitted)).  The Second Circuit recently confirmed that Daimler "expressly cast[s] doubt on previous Supreme Court and New York Court of Appeals cases that permitted general jurisdiction on the basis that a foreign corporation was doing business through a local branch office in the forum." Gucci America, 768 F.3d at 135. Applying Daimler's new rule in Gucci America, the Second Circuit therefore held that the district court lacked general jurisdiction over Bank of China ("BOC") because it was incorporated and headquartered abroad, and because its limited forum activities – more extensive than those of NatWest during the relevant period – "plainly do not approach" the required level of contacts to justify the exercise of general jurisdiction. Id. at 134-38.[2]

Given this change in the law, plaintiffs cannot continue to invoke the Court's general jurisdiction, because NatWest neither is incorporated nor has its principal place of business in New York, and thus New York cannot be an "all-purpose forum" in which NatWest "may be sued on any and all claims" under the new Daimler standard. Daimler, 134 S. Ct. at 760.[3]

---

[2] BOC, a nonparty, appealed from orders directing it to comply with an asset-freeze injunction and a document subpoena. See id. at 126-27. The Second Circuit noted that "a district court can enforce an injunction against a nonparty such as BOC only if it has personal jurisdiction over that nonparty," id. at 134 (citation omitted), and that "BOC's nonparty status does not alter the applicability" of the Supreme Court's decisions addressing general personal jurisdiction over parties, including Daimler, see id. at 134 n.13. The Second Circuit therefore vacated the district court's orders and remanded for a determination as to whether BOC is subject to specific personal jurisdiction. See id. at 145.

[3] Nor do these cases present exceptional circumstances akin to those in Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952), which is the only precedent identified in Daimler where "a corporation's operations in a forum

Finally, as the Second Circuit recently confirmed in <u>Gucci America</u>, involving comparable circumstances, NatWest has not waived a personal jurisdiction defense based on <u>Daimler</u> under Rule 12, which provides that a party waives the defense of lack of personal jurisdiction if that defense "was available to the party but omitted from its earlier motion [under this rule]." Fed. R. Civ. P. 12(g)(2). The Second Circuit has repeatedly "held that a defendant does not waive a personal jurisdiction argument . . . if the 'argument that the court lacked jurisdiction over [the] defendant would have been directly contrary to controlling precedent in this Circuit." <u>Gucci America</u>, 768 F.3d at 135-36 (quoting <u>Hawknet, Ltd. v. Overseas Shipping Agencies</u>, 590 F.3d 87, 92 (2d Cir. 2009)); <u>see also</u> <u>Holzsager v. Valley Hosp.</u>, 646 F.2d 792, 796 (2d Cir. 1981) (no waiver of a personal jurisdiction defense based on a recent Supreme Court ruling). In its recent <u>Gucci America</u> decision, the Second Circuit explicitly ruled that "[p]rior to <u>Daimler</u>, controlling precedent in this Circuit made it clear that a foreign bank with a branch in New York <u>was</u> properly subject to general personal jurisdiction here." <u>Gucci America</u>, 768 F.3d at 136 (emphasis in original). <u>Gucci America</u> holds that, because <u>Daimler</u> overruled that "controlling precedent," BOC timely raised its personal jurisdiction defense by asserting it promptly after <u>Daimler</u> was issued. <u>Id.</u> The same is even more true of NatWest's <u>Daimler</u>-based personal jurisdiction defense, which NatWest promptly asserted at its first opportunity before

---

other than its formal place of incorporation or principal place of business [were] so substantial and of such a nature as to render the corporation at home in that State." 134 S. Ct. at 761 n.19. The defendant mining corporation in <u>Perkins</u> was incorporated in the Philippines, where it operated gold and silver mines until the Japanese occupation of the Philippines in World War II compelled the company to suspend its mining operations and its president to move to Ohio. <u>Id.</u> at 756. The Supreme Court held that, under those exceptional "wartime circumstances," general jurisdiction could be asserted over the company in Ohio, where its president maintained an office from which he directed all of the company's activities, because "Ohio was the corporation's principal, if temporary, place of business." <u>Id.</u> (internal quotation marks omitted). These facts are worlds away from those of the present cases, as they were from those of <u>Daimler</u> itself and would be for virtually all cases where general jurisdiction previously would have existed.

4

this Court post-<u>Daimler</u>. <u>Gucci America</u> thus forecloses any argument that NatWest waived its objection to personal jurisdiction by not asserting it before <u>Daimler</u>.[4]

Accordingly, the Court should dismiss plaintiffs' claims to the extent they are based on the Court's general personal jurisdiction.

## II.   NATWEST IS NOT SUBJECT TO SPECIFIC PERSONAL JURISDICTION

Because NatWest is not subject to the Court's general personal jurisdiction, plaintiffs may maintain their claims only if they can establish specific personal jurisdiction over NatWest for those claims. But as shown below, NatWest's relevant contacts with New York in particular, and the United States as a whole, are insufficient to support personal jurisdiction with respect to plaintiffs' claims under either New York's long-arm statute, CPLR § 302(a), or Federal Rule of Civil Procedure 4(k)(1).

NatWest's only relevant forum contacts are certain U.S. dollar-denominated wire transfers NatWest processed on behalf of its customer, Interpal, to the 13 Charities between November 8, 1996 and August 15, 2003.[5] Because Interpal asked for these transfers to be denominated in U.S. dollars, NatWest in the U.K. directed them through its U.S. dollar correspondent bank accounts in New York,[6] from which the funds were then transferred to the specified New York correspondents of the banks in the Palestinian Territories at which the 13

---

[4]  <u>Gucci America</u> also forecloses any argument by plaintiffs akin to the one they have raised in opposition to the pending <u>Daimler</u>-based motion by Crédit Lyonnais in plaintiffs' parallel lawsuit against it, that the change in law that supports NatWest's personal jurisdiction defense occurred in 2011 in <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 131 S. Ct. 2846 (2011), and that NatWest therefore needed to raise its objection promptly post-<u>Goodyear</u>. BOC did not assert its personal jurisdiction defense after <u>Goodyear</u> in either the District Court or the Court of Appeals; rather, it raised that defense only after <u>Daimler</u> was decided, and following oral argument on BOC's appeal. The Second Circuit held that BOC did not waive its defense by raising it after <u>Daimler</u> because the defense was not available before <u>Daimler</u>. <u>Gucci America</u>, 768 F.3d at 135-36. The same is true of NatWest here.

[5]  Based on the analysis of NatWest's account records conducted by plaintiffs' expert Wayne Geisser, <u>see</u> Schuster Decl. Ex. 146 (<u>Weiss</u> ECF No. 267), NatWest has identified 185 U.S. dollar-denominated wire transfers that it made on Interpal's behalf through correspondent bank accounts in New York to the New York correspondents of the banks in the Palestinian Territories at which the 13 Charities held accounts.

[6]  <u>See</u> Schuster Decl. Ex. 97 (<u>Weiss</u> ECF No. 267) (Trantum Deposition), at 90:4-5 (explaining that "from an RBS/NatWest view, dollar payments cleared through the US").

Charities held accounts. It is undisputed that the remaining transfers on which plaintiffs base their claims against NatWest, including all such transfers after August 15, 2003, had no contact with the United States.

The New York transfers are not sufficient to permit the Court to exercise specific jurisdiction over NatWest. Specific jurisdiction is far narrower than general jurisdiction, and a court may exercise specific jurisdiction over a defendant with respect to a plaintiff's claims only to the extent they "arise from" the defendant's forum contacts. Thus, the Court may not assert specific jurisdiction over NatWest as to claims that arise from transfers after the last New York transfer, which was made on August 15, 2003. Moreover, plaintiffs cannot show that their claims "arise from" NatWest's New York transfers, all of which were made before August 15, 2003, and are the only ones as to which the Court could assert specific jurisdiction over NatWest. In particular, plaintiffs do not and cannot plausibly allege that NatWest's pre-August 15, 2003 transfers factually or proximately caused the attacks by which plaintiffs allegedly were injured, because plaintiffs cannot show that these transfers even reached their intended beneficiaries in the Palestinian Territories, an essential step in the causal chain on which plaintiffs rely.[7]

A. **Plaintiffs Bear The Burden Of Proving That The Court Has Specific Jurisdiction Over NatWest**

When responding to a motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). When a jurisdictional motion is made before discovery, a plaintiff need only make a prima facie showing that jurisdiction is proper, CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.

---

[7] Even if plaintiffs could assert specific jurisdiction over claims based on the pre-August 15, 2003 New York wire transfers, NatWest would be entitled to summary judgment dismissing all such claims for lack of scienter and causation. See infra Part III.

6

1986), and "the court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction," Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2d Cir. 1999).  But here, because years of exhaustive discovery have already been completed, plaintiffs must discharge the greater burden of alleging specific facts that establish jurisdiction over NatWest.  See Bank Brussels, 171 F.3d at 784; Credit Lyonnais, 183 F.3d at 154.[8]  As shown below, they cannot do so.

**B.     The Court Can Assert Specific Jurisdiction Over NatWest Only To The Extent That Plaintiffs' Claims "Arise From" NatWest's Forum Contacts, And Thus Plaintiffs Can Pursue Their Claims Only To The Extent They Are Based On The New York Transfers**

The Court can assert specific jurisdiction over NatWest consistently with constitutional due process only to the extent that NatWest "has 'purposefully directed' [its] activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (internal citations omitted) (emphasis added).  See also Weinfeld v. Minor, No. 12-CV-6395 (DLI), 2014 WL 4954630, at *6 (E.D.N.Y. Sept. 30, 2014) (Irizarry, J.) (specific jurisdiction is limited to claims "arising out of particular acts purposefully targeted towards New York").  Likewise, the subsection of New York's long-arm statute that provides specific jurisdiction over non-domiciliaries who "transact[] business within the state," CPLR § 302(a)(1), requires that "the claim asserted must arise from that business activity."  Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 103 (2d Cir. 2006) (emphasis added); Johnson v. Ward, 4

---

[8]  Given the extensive discovery already undertaken in this case, there is no need for any additional jurisdictional discovery.  The purpose of such discovery would be to provide access to jurisdictional facts that might not otherwise be available before the full merits discovery plaintiffs have already taken in these cases.  Nor would jurisdictional discovery serve any purpose here because there are no factual disputes regarding plaintiffs' jurisdictional allegations.  Those allegations, even if taken as true, do not confer jurisdiction.  As shown above, because NatWest is a U.K. corporation with its principal place of business in the U.K., Daimler establishes that there can be no general jurisdiction over NatWest in a U.S. court.  And as shown below, NatWest's only relevant contacts with the United States were the New York transfers, for which plaintiffs received complete documentation long ago.

N.Y.3d 516, 519 (2005).[9] Federal Rule of Civil Procedure 4(k)(1), on which plaintiffs rely in their complaints as a source of specific jurisdiction, similarly requires them to prove that their claims arise from NatWest's contacts with the forum. See In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 806 (S.D.N.Y. 2005).

It is fundamental that plaintiffs' claims can be deemed to "arise out of" NatWest's New York transactions only if they bear a "'substantial relationship'" to those transactions. PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1109 (2d Cir. 1997) (quoting Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988)). Moreover, "plaintiff[s] must establish the court's jurisdiction with respect to each claim asserted." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original). "This result flows logically from the distinction between general and specific jurisdiction . . . . If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts." Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006).[10]

---

[9] The other relevant subsections of the New York long-arm statute – CPLR §§ 302(a)(2) and (3) – do not provide an alternative basis for specific personal jurisdiction over NatWest. First, NatWest's routing of wire transfers to correspondent banks in New York does not constitute "a tortious act within the state" under Section 302(a)(2). Similarly, plaintiffs cannot show an "injury to person or property within the state" under Section 302(a)(3) because all of the relevant injuries occurred in Israel or the Palestinian Territories. In determining whether an in-state injury occurred, courts look to "the original event which caused the injury." DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84-85 (2d Cir. 2001). Moreover, New York courts have consistently held that the situs of the injury in a wrongful death action is where the death occurred, see, e.g., Porcello v. Brackett, 446 N.Y.S.2d 780, 782 (N.Y. App. Div. 1981), and that Section 302(a)(3) does not reach claims based on a plaintiff's subsequent emotional or physical damages in New York resulting from an injury that occurred outside New York. See Vaichunas v. Tonyes, 877 N.Y.S.2d 204, 205 (N.Y. App. Div. 2009).

[10] For the same reason, plaintiffs may not rely on the Court's specific jurisdiction with respect to claims arising from the relevant forum contacts to bootstrap jurisdiction over separate claims based on other transfers that did not involve forum contacts. Otherwise, the distinction between general personal jurisdiction, "which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit," and specific personal jurisdiction, which "'depends on an affiliation between the forum and the underlying controversy,'" would collapse. Walden v. Fiore, 134 S. Ct. 1115, 1121 n.6 (2014) (citation omitted).

Applying these principles here, the "arise from" requirement determines both whether this Court may assert personal jurisdiction over NatWest and the scope of that jurisdiction.  Further, it limits the Court's assertion of personal jurisdiction over NatWest to, at most, those of plaintiffs' claims that are "premised on" NatWest's New York transfers on behalf of Interpal that were intended for one of the 13 Charities.  See Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 171-74 (2d Cir. 2013) (holding that where a foreign bank purposefully avails itself of the benefits of the New York forum by using "a correspondent account in New York to accomplish its dollar-denominated wire transfers," New York courts may exercise specific jurisdiction over that bank on "claims[] which are premised on [the foreign bank's] use of a correspondent account to support a terrorist organization").[11]  By contrast, plaintiffs' claims that are based on transfers made after August 15, 2003, and none of which touched New York, do not arise from any forum contacts.  Accordingly, the Court may not exercise specific jurisdiction over NatWest with respect to such claims.[12]

Plaintiffs cannot avoid this conclusion by positing that all of their separate injuries that were caused by different attacks that allegedly were funded by distinct wire transfers that occurred at different times somehow constitute a single unitary claim.  Plaintiffs' complaints assert claims by more than 200 persons injured by 15 different attacks that purportedly were caused by NatWest's processing of hundreds of wire transfers to 13 different charities over the

---

[11]  In Licci, all of the transfers alleged by the plaintiffs to have constituted material support for a foreign terrorist organization passed through New York accounts, and so the plaintiffs' claims arose entirely from those transactions and there was no need for the court to parse the extent to which the plaintiffs' claims arose from those transactions as opposed to others.  See Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 56-57 (2d Cir. 2012).  Here, the majority of the transfers that plaintiffs allege went to Hamas alter egos, and all such transfers after August 15, 2003, did not pass through New York.

[12]  Although NatWest had other contacts with New York and the United States during the relevant time period, plaintiffs' claims do not "arise from" those contacts and thus they are not material to the Court's specific personal jurisdiction over NatWest for these claims.  See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984) (holding that a forum contact can establish specific jurisdiction only if the asserted claims "arise out of or relate to" that contact).

course of many years. These are not one claim, but rather <u>multiple</u> claims. Each plaintiff has asserted a claim for relief under 18 U.S.C. § 2333(a), arising from that plaintiff's injury; no plaintiff's claim for relief is the same as, or could be <u>res judicata</u> with respect to, any other plaintiff's claim for relief.

Moreover, those of plaintiffs' claims that are premised on dollar-denominated transfers made through New York – all of which occurred on or before August 15, 2003 – are distinct from, and could not be <u>res judicata</u> with respect to, the claims premised on later transfers that did not touch New York. <u>See SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1464 (2d Cir. 1996) ("The claim that First Jersey defrauded customers in the sale, purchase, and repurchase of certain securities in 1975-1979 is not the same as the claim that First Jersey defrauded customers in the sale, purchase, and repurchase of other securities in 1982-1985."). The claims here each arise out of separate financial transactions sent at separate times to distinct transferees and made with separate knowledge and intent. Any argument by plaintiffs that these two categories of claims should be treated as one claim fails the fundamental test for determining "whether causes of action are the same for purposes of res judicata." <u>Herendeen v. Champion Int'l Corp.</u>, 525 F.2d 130, 133 (2d Cir. 1975).

First, the "essential facts and issues" in the two sets of claims are not the same. <u>See id.</u> at 133-34. Most obviously, OFAC did not designate Interpal as an SDGT – a fact on which plaintiffs heavily rely for their contention that NatWest knew, or was willfully blind to whether, Interpal was funding Hamas – until August 21, 2003, <u>after</u> the last New York transfer. Thus, the question whether that designation and subsequent events caused NatWest to have the requisite <u>scienter</u>, which the Second Circuit found to be material to claims arising from transfers

10

after that date, see infra Part II.C, is not relevant to claims arising from the earlier New York transfers.

Second, "evidence which would have tended to support or deny the allegations" concerning plaintiffs' claims based on transfers on or before August 15, 2003 "would not be required to meet the issues presented" in claims based on transfers after the August 21, 2003 OFAC designation, and vice versa. See Herendeen, 525 F.2d at 135. As shown below, the limited evidence that the Second Circuit identified as creating a triable issue of scienter relates exclusively to claims based on NatWest's transfers after the August 21, 2003 OFAC designation, and is irrelevant to claims based on the New York transfers, the last of which occurred on August 15, 2003.

Third, even if a reasonable jury could find that NatWest possessed the requisite scienter when it made transfers outside New York after August 21, 2003, that finding would not "impair or destroy rights or interests established by" a different judgment that NatWest was not liable for the New York transfers on or before August 15, 2003 because it lacked scienter at the time of those transfers. See id. at 133.

The distinct claims based on post-August 15, 2003 wire transfers processed by NatWest in the U.K. on behalf of its U.K. customer, Interpal, to the 13 Charities in the Palestinian Territories, without ever passing through the United States do not "stem[]" from the use of a New York correspondent account or any other forum activity and are not "sufficiently related to [NatWest's] New York business activity." Cf. Licci, 732 F.3d at 169 ("Because the defendant's allegedly culpable conduct stems from th[e] use of the New York correspondent account, . . . the plaintiffs' claims are sufficiently related to [the defendant's] New York business activity." (citing Licci v. Lebanese Canadian Bank, 984 N.E.2d 893, 901 (2012)). Nor would it

11

be foreseeable to a foreign bank that it would be subject to the burden of defending against claims alleging its banking activities constituted wrongdoing in a forum in which none of those activities occurred. Cf. id. at 171-72 ("It should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use."). It follows that the pre-August 15, 2003 wire transfers cannot support jurisdiction for those post-August 15, 2003 claims.

This conclusion is further supported by State v. Samaritan Asset Management Services, Inc., 874 N.Y.S.2d 698 (Sup. Ct. N.Y. Co. 2008), which holds that where a plaintiff premises its claims on separate, independent transactions by a defendant both within and outside New York, the court's jurisdiction is limited solely to those claims that are based on the defendant's transactions in New York. In Samaritan, the court found that although "the [out-of-state] defendant's use of New York brokers to effectuate their trades [wa]s sufficient to subject them to New York [specific personal] jurisdiction as to those transactions," with respect to "transactions wherein the defendants used . . . an out-of-state company[] to conduct their trades, there are insufficient contacts with the State of New York to . . . maintain [specific personal] jurisdiction over the defendants . . . ." Id. at 704. The court reached this conclusion notwithstanding that, like plaintiffs here, the plaintiff in that case (the New York Attorney General) did not bring a separate claim for each transaction, but rather alleged that the series of independent but related transactions in the aggregate were unlawful.[13]

The Second Circuit's ruling in Fontanetta v. American Board of Internal Medicine, 421 F.2d 355 (2d Cir. 1970), also supports this conclusion. In Fontanetta, the Second Circuit held that the plaintiff could not base specific jurisdiction in New York on a New York

---

[13] Compare Am. Compl. ¶¶ 108-12, State v. Samaritan Asset Mgmt. Servs., Inc., No. 404969/06, 2007 WL 7070699 (Sup. Ct. N.Y. Co. Apr. 23, 2007), with Weiss Fifth Am. Compl. ¶¶ 579-97 & Applebaum Compl. ¶¶ 426-44.

transaction that did not itself give rise to the plaintiff's claim, despite the intertwined relationship between that New York transaction and one in Pennsylvania from which plaintiff's claim arose. The plaintiff, a New York doctor seeking board certification, had passed the required written test conducted in New York, but failed the related and required oral examination conducted in Pennsylvania. Id. at 356. He sued in New York to compel the board to explain why it had failed him on the oral examination, and argued that the court had specific jurisdiction over his claim based on the written examination he took in New York. Id. The Second Circuit rejected that argument. It ruled that the plaintiff's claim "arose from" the oral examination in Pennsylvania and not the written examination in New York, and thus there was no specific jurisdiction in New York, despite the fact that the two examinations were related, and indeed the "plaintiff could not take the oral examination until he had passed the written one." Id. at 358. In particular, the court rejected the plaintiff's attempt to combine two discrete transactions, "separated not only by geography, but by time," and ruled that, because his claim did not arise from the written examination in New York, but rather the later out-of-state oral examination, the written examination was jurisdictionally irrelevant. Id. at 358-359.

So too here. This Court cannot treat NatWest's prior wire transfers that touched New York as providing a basis for asserting personal jurisdiction over NatWest in New York for claims based on subsequent transfers that never touched the United States. Indeed, there is even less reason here to assert jurisdiction than in Fontanetta. There, at least the transaction from which the plaintiff's claim arose could not have occurred but for the prior New York transaction. See id. at 358. Here, by contrast, the post-August 15, 2003 transfers that took place entirely outside the United States did not depend in any way on the transfers that NatWest directed through New York.

**C.     The Court Cannot Assert Specific Jurisdiction Over NatWest With Respect
To Claims Based On The New York Transfers Because Plaintiffs Do Not And
Cannot Plausibly Allege That Those Transfers Caused Their Injuries, And
Thus That Their Claims "Arise From" Those Transfers**

The Court cannot assert specific jurisdiction over NatWest with respect to

plaintiffs' claims arising from the New York transfers because plaintiffs cannot plausibly allege

that those transfers factually or proximately caused the attacks by which plaintiffs claim to have

been injured.  This is a necessary corollary of <u>Fontanetta</u>:  because plaintiffs cannot plausibly

allege the causation element of their claims based on the New York transfers, the New York

transfers cannot provide a basis for exercising specific jurisdiction over NatWest.  <u>Id.</u> at 358-

59.[14]

As this Court ruled in <u>Strauss v. Credit Lyonnais, S.A.</u>, "the Second Circuit [has]

held that the phrase 'by reason of' [in Section 2333(a) of the ATA] requires that Plaintiffs show

that their damages were proximately caused by Defendant."  925 F. Supp. 2d 414, 432 (E.D.N.Y.

2013) (citing <u>Rothstein v. UBS AG</u>, 708 F.3d 82, 95 (2d Cir. 2013)).  Accordingly, plaintiffs

must show (1) that NatWest's actions were a "substantial factor in the sequence of responsible

causation," and (2) that their injuries were "reasonably foreseeable or anticipated as a natural

consequence" of those actions.  <u>Id.</u> (quoting <u>Lerner v. Fleet Bank, N.A.</u>, 318 F.3d 113, 123 (2d

Cir. 2003)).

Further, since <u>Strauss</u> was decided, the Supreme Court and Second Circuit have

made clear that these statutory requirements are <u>in addition to</u>, and <u>not in lieu of</u>, the requirement

that plaintiffs show factual causation – <u>i.e.</u>, that NatWest's conduct was a but-for cause of their

injuries.  <u>See</u> <u>Burrage v. United States</u>, 134 S. Ct. 881, 889 (2014) (noting that "it is one of the

---

[14] And even if plaintiffs could plausibly allege that their claims that arise from the New York transfers, NatWest
would nonetheless be entitled to summary judgment on those claims because no reasonable juror could find that
plaintiffs had carried their burden of proving the <u>scienter</u> and causation elements of those claims, as shown below.
<u>See</u> <u>infra</u> Part III.

traditional background principles against which Congress legislate[s]," that "the phrase, 'by reason of,' requires at least a showing of 'but for' causation" (citations and internal quotation marks omitted)); O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001), 714 F.3d 118, 123 (2d Cir. 2013) (noting the phrase "by reason of" had a "well understood meaning" when Congress enacted Section 2333(a), which "require[s] a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well" (quoting Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 266-68 (1992))).

As shown above, after Daimler, plaintiffs can proceed with their claims, at most, based solely on NatWest's New York transfers. See supra Part II.B. But those claims must be dismissed because plaintiffs do not and cannot plausibly allege that those transfers, the last of which occurred on August 15, 2003, factually or proximately caused their injuries.

### 1.   Without Evidence That The New York Transfers Were Forwarded To The Palestinian Territories, Plaintiffs Cannot Establish The Factual Or Proximate Causation Elements Of Their Claims

At the threshold, to prove that the New York transfers factually or proximately caused their injuries, plaintiffs must show that the funds NatWest transferred to other correspondent banks in New York subsequently reached the 13 Charities in the Palestinian Territories that plaintiffs contend are alter egos of Hamas and part of the causal chain plaintiffs have posited.[15] If these funds did not leave New York or went somewhere else, those transfers could not have factually or proximately caused plaintiffs' injuries. See Rothstein, 708 F.3d at 97 (2d Cir. 2013) (affirming dismissal for failure to adequately allege proximate causation where

---

[15] See, e.g., Weiss Fifth Am. Compl. ¶ 551 & Applebaum Compl. ¶ 399 ("NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions."); Weiss Fifth Am. Compl. ¶ 558 & Applebaum Compl. ¶ 406 ("Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest transferred to HAMAS since 1996 and that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even after the U.S. Government designation of Interpal.").

the court saw "no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas"). But none of the transaction records identified by plaintiffs' expert Wayne Geisser satisfies plaintiffs' burden of proof in this regard. That is because neither the transaction records nor any other evidence shows the disposition of the funds after NatWest transferred them to the beneficiary banks' correspondent banks in New York.

Thus, plaintiffs have failed to establish that the New York transfers confer specific jurisdiction over NatWest, because plaintiffs cannot plausibly allege that their claims even arise from those transfers.[16]

> ### 2. Even If There Were Evidence That One Or More Of The New York Transfers Reached The Palestinian Territories, Plaintiffs Cannot Plausibly Allege Those Transfers Were A But-For Cause Of Plaintiffs' Injuries, Or That Plaintiffs' Injuries Were A Foreseeable Consequence Of Those Transfers

Even if plaintiffs could point to evidence that one or more of the New York transfers was subsequently forwarded to the accounts of one or more of the 13 Charities in the Palestinian Territories, and assuming arguendo that those charities were alter egos of Hamas (although there is no competent evidence that they were), plaintiffs still cannot allege specific facts showing that such transfers were a but-for cause of their injuries. Plaintiffs concede that they cannot show any direct link between the funds Interpal transferred through its NatWest

---

[16] This conclusion is consistent with Licci, which was decided on review of a decision granting a dismissal motion that was filed before the plaintiffs had the benefit of discovery. See Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 57 (2d Cir. 2012). As such, the plaintiffs were only required to make a prima facie showing of personal jurisdiction, and the court was required to accept the plaintiffs' allegations as true. Licci v. Am. Express Bank Ltd., 704 F. Supp. 2d 403, 406 (S.D.N.Y. 2010) ("Where, as here, no evidentiary hearing has been held, nor have the parties engaged in jurisdictional discovery, plaintiffs need only make a prima facie showing that jurisdiction exists. Such a showing may be demonstrated on the basis of legally sufficient allegations of jurisdiction alone." (internal citations omitted)); see also Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 152 (2d Cir. 1999); CutCo, Indus., Inv. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986). Thus, the plaintiffs in Licci bore the burden only of alleging that the wire transfers at issue were destined for Hizbollah. Here, after years of exhaustive discovery, plaintiffs' burden is to allege specific facts showing that the funds at issue were received by the charities they allege are alter egos of Hamas.

accounts to any specific attack. See 56.1 St. ¶ 248 (citing Pls.' Resp. to Cont. Interrog. no. 12).

Nor is there any evidence that Hamas would have been unable to fund, or would not have

funded, the attacks in which plaintiffs were injured in the absence of such transfers. See

Schuster Decl. Ex. 152 (Levitt Report) at 25 (concession by plaintiffs' expert that prior to 2006

Hamas obtained "tens of millions of dollars" annually from "U.S.-designated State Sponsors of

Terrorism such as Iran as well as a network of mainly Saudi and other Gulf State individuals"

among other sources).

Nor is there record evidence that the New York transfers proximately caused

plaintiffs' injuries. Plaintiffs cannot show, as they must, that as of the relevant times – when the

transfers through New York were processed by NatWest – it was "reasonably foreseeable or

anticipated as a natural consequence" that such transfers would result in injuries to U.S. citizens

in terror attacks committed by Hamas. Strauss, 925 F. Supp. 2d at 432 (quoting Lerner, 318 F.3d

at 123); see also Gill v. Arab Bank PLC, 893 F. Supp. 2d 542, 572 (E.D.N.Y. 2012) (defendant's

"provision of financial services must be shown to have been [made] . . . with a malign state of

mind" (internal quotations omitted)). To the contrary, as shown below, it is law of the case that

there is no evidence before August 15, 2003, the date of the last New York transfer, that could

possibly raise a triable issue as to NatWest's scienter. See infra Part III. Hence, there is no

evidence that, as of the date of the last New York transfer, NatWest had acted "with the malign

state of mind" necessary to establish proximate causation.

Accordingly, plaintiffs cannot plausibly allege that the relevant New York wire

transfers factually or proximately caused plaintiffs' injuries. The Court should therefore find that

those transfers do not provide a basis for asserting specific jurisdiction over NatWest, and should

dismiss plaintiffs' claims on that ground.

17

**D.   NatWest Did Not Waive Its Right To Challenge Specific Personal Jurisdiction Any More Than It Waived Its Right To Challenge General Personal Jurisdiction**

Finally, NatWest did not waive its personal jurisdictional defense under Rule 12(g)(2). As shown above, a party can only waive a defense that it possesses at the time. See supra Part I. NatWest did not possess a defense under Rule 12(b)(2) of "lack of personal jurisdiction" before Daimler overruled the "prior controlling precedent of this Circuit." Gucci America, 768 F.3d at 136. NatWest therefore could not have knowingly waived that defense. Thus, in Gucci America, the Second Circuit held that BOC "did not waive its personal jurisdiction objection" – either general or specific – by not asserting it before Daimler, id., and remanded the case precisely so that the district court to "give the [specific jurisdiction] issue due consideration," id. at 137-38. Now that plaintiffs can no longer invoke the Court's general jurisdiction in these cases, it is similarly appropriate for this Court to consider NatWest's specific jurisdiction defense, which it has promptly asserted post-Daimler.

In light of the foregoing, the Court should dismiss plaintiffs' claims for lack of specific jurisdiction.

**III.   IN THE ALTERNATIVE, THE COURT SHOULD GRANT NATWEST SUMMARY JUDGMENT BECAUSE NO REASONABLE JUROR COULD FIND FOR PLAINTIFFS ON THE *SCIENTER* AND CAUSATION ELEMENTS OF THEIR CLAIMS THAT "ARISE FROM" THE NEW YORK TRANSFERS**

Even if there were a basis for the Court to exercise specific jurisdiction over NatWest – and there is not – the scope of that jurisdiction after Daimler is limited to those of plaintiffs' claims that arise from the New York transfers. See supra Part II.B. Plaintiffs must therefore prove that NatWest effected those transfers, the last of which occurred on August 15, 2003, with the requisite scienter and that those transfers factually and proximately caused plaintiffs' injuries. For the reasons detailed above, plaintiffs cannot plausibly allege, much less

18

prove, the causation elements of their claims based on the New York transfers. Moreover, as shown below, in light of the Second Circuit's recent ruling concerning the limited scope of the matters on the basis of which a reasonable juror could find that NatWest transferred funds to Interpal with the requisite <u>scienter</u>, plaintiffs also cannot prove the <u>scienter</u> element of their claims as of August 15, 2003. Thus, even if the Court finds that the New York transfers provide a sufficient basis for asserting specific jurisdiction over NatWest, the Court should grant NatWest summary judgment on plaintiffs' claims that arise from those transfers.[17]

### A. It Is Law Of The Case That No Reasonable Juror Could Find That NatWest Had The Requisite <u>Scienter</u> As Of The Last New York Transfer On August 15, 2003

When the Second Circuit reversed this Court's grant of summary judgment to NatWest, which this Court based on its conclusion that no reasonable juror could find for plaintiffs on the <u>scienter</u> element of their claims, the Second Circuit ruled that, in order for plaintiffs to satisfy the <u>scienter</u> element of their claims, they must prove "that NatWest provided material support to Interpal <u>while</u> having knowledge that, or exhibiting deliberate indifference to whether, Interpal solicited funds or other things of value for Hamas." <u>Weiss v. Nat'l Westminster Bank PLC</u>, No. 13-1618-cv, slip op. at 11 (2d Cir. Sept. 22, 2014) (internal quotations omitted) (emphasis added). Post-<u>Daimler</u>, and because plaintiffs are now limited to invoking this Court's specific jurisdiction over NatWest, plaintiffs must prove that NatWest had that culpable state of mind <u>at the time</u> it made the jurisdictionally relevant New York transfers,

---

[17] This Court did not rule on NatWest's initial motion for summary judgment on the proximate causation and Hamas responsibility elements of all of plaintiffs' claims, including those arising from transfers outside New York. <u>See Weiss</u>, 936 F. Supp. 2d at 120. Accordingly, pursuant to the Second Circuit's order that, on remand, this Court should "consider NatWest's other arguments in support of summary judgment," <u>Weiss v. Nat'l Westminster Bank PLC</u>, No. 13-1618-cv, slip op. at 4 (2d Cir. Sept. 22, 2014), NatWest respectfully reserves the right to renew its initial summary judgment motion on those grounds if the Court denies this motion. Here, NatWest argues only that no reasonable juror could find that plaintiffs have established the <u>scienter</u> and causation element of those claims that arise out of the New York transfers, even if there were specific jurisdiction over such claims.

and thus no later than August 15, 2003.  As Judge Sifton previously ruled in these cases, plaintiffs cannot rely on evidence of a bank's scienter after its relevant transfers to show that the bank acted with scienter at the time it made those transfers.  See Weiss v. Nat'l Westminster Bank Plc, 453 F. Supp. 2d 609, 626 n.12 (E.D.N.Y. 2006) ("Because defendant is correct that designations of organizations as terrorist groups which occurred after the relevant bank transfers cannot demonstrate that NatWest had knowledge of the group's terrorist identity when it provided material support to an FTO, those designations are not discussed here.").  Thus, although pre-Daimler plaintiffs could rely on evidence of NatWest's scienter as of August 2005, the date of the last Sterling-denominated transfer identified by plaintiffs' expert, because they were invoking the Court's pre-Daimler general jurisdiction, plaintiffs now must prove that NatWest acted with the requisite scienter as of the last jurisdictionally relevant transfer on August 15, 2003.

As shown below, while the Second Circuit reversed this Court's decision that no reasonable juror could find that NatWest acted with the requisite scienter, it rejected plaintiffs' argument that pre-August 15, 2003 facts supported scienter.  Rather, the Second Circuit based its decision entirely on facts that relate to NatWest's state of mind after the August 21, 2003 OFAC designation.  The Second Circuit left intact this Court's holding – which is thus law of the case – that there is no evidence that creates a triable issue of scienter as of the last New York transfer, on August 15, 2003.

**1.  The Events That The Second Circuit Found To Create A Triable Issue Of Fact Concerning NatWest's Scienter All Relate to NatWest's State of Mind After August 15, 2003, And Thus After The Last New York Transfer**

As shown above, the only claims as to which the Court could possibly exercise specific jurisdiction are those which arise from the New York transfers that occurred on and

before August 15, 2003.  Yet all of the evidence identified by the Second Circuit as creating a triable issue of <u>scienter</u> relates to NatWest's state of mind <u>after</u> that date, and is thus now immaterial.

After considering the entire record, this Court previously concluded there was no evidence that created a triable issue of <u>scienter</u> and granted summary judgment to NatWest. <u>Weiss v. Nat'l Westminster Bank Plc</u>, 936 F. Supp. 2d 100, 113-120 (E.D.N.Y. 2013).  The Second Circuit's narrow reversal of that ruling rested on only four facts and left intact the remainder of this Court's analysis of the factual record.  <u>See, e.g., Weiss</u>, slip op. at 12-15.  And each of these four facts necessarily relates to NatWest's state of mind <u>on or after</u> August 21, 2003, the date of the OFAC designation, and is thus irrelevant to whether NatWest had the requisite <u>scienter</u> on or before August 15, 2003, the date of the last New York transfer.  These four facts include the following:

(1) the OFAC designation itself[18] and the accompanying OFAC press release on August 22, 2003, <u>id.</u> at 15;

(2) a December 2004 email from NatWest employee Amanda Holt, stating that "[w]e were aware that we had accounts for people connected to Hamas, but not Hamas itself," <u>id.</u> at 16, which merely demonstrates Holt's knowledge of post-August 15, 2003 facts, such as the OFAC designation of Interpal, related press coverage, and NatWest's September 2003 investigation of Interpal's accounts, <u>see</u> Israel Decl. Ex. 122 (the December 2004 emails relied upon by the Second Circuit, in which, following Holt's statement cited above, NatWest employees discuss their knowledge of these post-August 15, 2003 facts relating to Interpal);[19]

---

[18] The Second Circuit cautioned that the OFAC designation was not, by itself, sufficient "to create a triable issue of fact regarding a foreign defendant's scienter." <u>Weiss</u>, slip op. at 15 n.9.

[19] There is no evidence that this statement referred to pre-August 15, 2003 facts, but in any event, as discussed below, it is law of the case that any such facts are inadequate to permit a reasonable juror to find <u>scienter</u>.

21

(3) NatWest's biannual review of Interpal's accounts in December 2004 and its knowledge of Interpal's payments to organizations "which the United States alleged were 'operated on behalf of, or under the control of, Hamas'" in the 2004 Holy Land Foundation indictment, Weiss, slip op. at 16-17;[20] and

(4) A subsequent biannual review of accounts that NatWest conducted in 2005, id. at 17.[21]

The only other evidence that the Second Circuit identified is the deposition testimony of Michael Hoseason concerning the standard NatWest would apply in determining whether to close an account potentially connected to terror financing. Id. at 16. But this testimony does not establish anything standing alone – one cannot apply too strict a standard in evaluating evidence unless there is first evidence to evaluate. The Second Circuit thus identified this testimony as being potentially relevant only in connection with the evidence discussed above, which could have put NatWest on notice after the OFAC designation on August 21, 2003. In short, none of the evidence on which the Second Circuit relied is relevant to NatWest's scienter with respect to the only claims over which this Court can exercise specific jurisdiction over NatWest post-Daimler.

---

[20]  In addition to having been published long after the last jurisdictionally relevant transfer, the Holy Land Foundation indictment is clearly inadmissible. Nor is there any evidence that NatWest had any means of knowing the contents of the Holy Land Foundation indictment before it was filed.

[21]  The Second Circuit wrote that "in May 2005, NatWest discovered that Interpal made a payment to an organization which in June 2005 was designated by the Bank of England as 'an organisation suspected of supporting terrorism." Weiss, slip op. at 17. In fact, the report was written in July 2005 and contained an analysis of account activity for May 2005 and the preceding five months. In any event, all of the contents of this report fall far outside the jurisdictionally relevant timeframe.

**2. This Court's Ruling That No Reasonable Juror Could Find That NatWest Had The Requisite <u>Scienter</u> On Or Before August 15, 2003 Is Law Of The Case**

Although plaintiffs argued before this Court and on appeal that numerous additional putative facts establish NatWest's <u>scienter</u> before the OFAC designation, this Court rejected those arguments, as did the Second Circuit when it identified only the post-August 15, 2003 facts listed above as creating a triable issue of <u>scienter</u>. <u>Weiss</u>, slip op. at 15-17. The Second Circuit let stand this Court's ruling that nothing in the record creates a triable issue of fact regarding NatWest's <u>scienter</u> as of August 15, 2003, the date of the last New York transfer. That ruling is now law of the case and thus "binding precedent to be followed in subsequent stages of [this] litigation." <u>Liona Corp. v. PCH Assocs. (In re PCH Assocs.)</u>, 949 F.2d 585, 592-93 (2d Cir. 1991) (prior district court ruling is law of the case where it "was not disapproved by the appellate court") (quoting 1B Moore's Federal Practice ¶ 0.404[4.—3], at 131); <u>see also</u> <u>Burrell v. United States</u>, 467 F.3d 160, 165 (2d Cir. 2006) ("[W]here issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court."). Thus, plaintiffs cannot rely on evidence previously rejected by this Court in support of the notion that NatWest acted with the requisite <u>scienter</u> as of August 15, 2003.

In particular, both before this Court and on appeal, plaintiffs relied primarily on one pre-August 15, 2003 fact to support a finding of <u>scienter</u>: NatWest's review of the Cryptome Report. But this Court ruled that the Cryptome Report is merely an unauthenticated, "unsubstantiated allegation" that, even together with all other pre-August 15, 2003 evidence, does not give rise to a triable issue of fact. <u>Weiss</u>, 936 F. Supp. 2d at 107. And despite plaintiffs having devoted a significant portion of their appellate briefing to this issue, including a section in their opening brief headed "NatWest's Knowledge of the SA Intelligence Report Creates a Genuine Dispute," Pls.' Appellate Br. at 56, the Second Circuit did not even mention the

23

Cryptome Report in its opinion.  Nor did the Second Circuit disturb this Court's ruling that suspicious activity reports filed by NatWest before August 15, 2003 concerning Interpal do not suffice to show <u>scienter</u> because the "filing of a SAR does not equate to knowledge or even legitimate suspicion of terror financing because employees were trained to file SARs any time a transaction or information obtained raised red flags, regardless of their subjective beliefs." <u>Weiss</u>, 936 F. Supp. 2d at 115.

   In short, the Second Circuit rejected plaintiffs' argument that the Cryptome Report – or any other evidence relied on by plaintiffs – creates a triable issue as to NatWest's <u>scienter</u> before August 15, 2003.  Accordingly, this Court "is barred from reconsidering or modifying" its prior ruling that no reasonable juror could conclude that NatWest knew or was willfully blind to whether Interpal solicited funds for Hamas as of August 15, 2003, the date of the last New York transfer.  <u>Burrell</u>, 467 F.3d at 165.  Thus, even if this Court exercises specific jurisdiction over any of plaintiffs' claims, it should grant summary judgment to NatWest dismissing these lawsuits.

## <u>CONCLUSION</u>

   For the foregoing reasons, the Court should dismiss plaintiffs' claims for lack of personal jurisdiction, or alternatively the Court should grant NatWest summary judgment.

Dated:  November 12, 2014

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

Lawrence B. Friedman, A Member of the Firm
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

25