UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| TZVI WEISS, LEIB WEISS, MALKE WEISS, | : |
| YITZCHAK WEISS, YERUCHAIM WEISS, | : |
| ESTHER DEUTSCH, MOSES STRAUSS, | : |
| PHILIP STRAUSS, BLUMA STRAUSS, | : |
| AHRON STRAUSS, ROISIE ENGELMAN, | : |
| JOSEPH STRAUSS, MATANYA NATHANSEN, | : |
| CHANA NATHANSEN, MATANYA AND | : |
| CHANA NATHANSEN FOR THE ESTATE OF | : |
| TEHILLA NATHANSEN, YEHUDIT | : |
| NATHANSEN, S.N., a minor, HEZEKIEL | : |
| TOPOROWITCH, PEARL B. TOPOROWITCH, | : |
| YEHUDA TOPOROWITCH, DAVID | : |
| TOPOROWITCH, SHAINA CHAVA NADEL, | : |
| BLUMA ROM, RIVKA POLLACK, EUGENE | : |
| GOLDSTEIN, LORRAINE GOLDSTEIN, | : |
| BARBARA GOLDSTEIN INGARDIA, RICHARD | : |
| GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA | : |
| FREEDMAN, MICHAL HONICKMAN FOR THE | : |
| ESTATE OF HOWARD GOLDSTEIN, MICHAL | : |
| HONICKMAN, DAVID GOLDSTEIN, | : |
| HARRY LEONARD BEER AS EXECUTOR OF | : |
| THE ESTATE OF ALAN BEER, HARRY | : |
| LEONARD BEER, ANNA BEER, PHYLLIS | : |
| MAISEL, ESTELLE CARROLL, SARRI ANNE | : |
| SINGER, JUDITH SINGER, ERIC M. SINGER, | : |
| ROBERT SINGER, JULIE AVERBACH FOR | : |
| THE ESTATE OF STEVEN AVERBACH, JULIE | : |
| AVERBACH, TAMIR AVERBACH, DEVIR | : |
| AVERBACH, SEAN AVERBACH, A.A., a minor, | : |
| MAIDA AVERBACH FOR THE ESTATE OF | : |
| DAVID AVERBACH, MAIDA AVERBACH, | : |
| MICHAEL AVERBACH, EILEEN SAPADIN, | : |
| DANIEL ROZENSTEIN, JULIA ROZENSTEIN | : |
| SCHON, ALEXANDER ROZENSTEIN, ESTHER | : |
| ROZENSTEIN, JACOB STEINMETZ, | : |
| DEBORAH STEINMETZ, JACOB STEINMETZ | : |
| AND DEBORAH STEINMETZ FOR THE | : |
| ESTATE OF AMICHAI STEINMETZ, NAVA | : |
| STEINMETZ, ORIT MAYERSON, NATANEL | : |
| STEINMETZ, ROBERT L. COULTER, SR. FOR | : |
| THE ESTATE OF JANIS RUTH COULTER, | : |
| DIANNE COULTER MILLER, ROBERT L. | : |
| COULTER, SR., ROBERT L. COULTER, JR., | : |

**SIXTH AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**05-CV-4622 (DLI)(MDG)**

LARRY CARTER FOR THE ESTATE OF DIANE :
LESLIE CARTER, LARRY CARTER, SHAUN       :
CHOFFEL, RICHARD BLUTSTEIN AND           :
KATHERINE BAKER FOR THE ESTATE OF        :
BENJAMIN BLUTSTEIN, RICHARD              :
BLUTSTEIN, KATHERINE BAKER, REBEKAH :
BLUTSTEIN, NEVENKA GRITZ FOR THE         :
ESTATE OF DAVID GRITZ, NEVENKA GRITZ, :
NEVENKA GRITZ FOR THE ESTATE OF          :
NORMAN GRITZ, JACQUELINE CHAMBERS :
AS THE ADMINISTRATOR OF THE ESTATE       :
OF ESTHER BABLAR, JACQUELINE             :
CHAMBERS, LEVANA COHEN, ELI COHEN,       :
SARAH ELYAKIM, YEHUDA AGABABA,           :
MENACHE AGABABA, YEHEZKEL                 :
AGABABA, GRETA GELER, ILANA EROPA        :
DORFMAN, REFAEL KITSIS AND TOVA          :
GUTTMAN AS THE ADMINISTRATOR OF          :
THE ESTATE OF HANNAH ROGEN, AKIVA        :
ANACHOVICH, JOSHUA FAUDEM, ZOHAR         :
FATER, BRUCE MAZER, ORLY ROM,            :
RICHARD COFFEY, GAL GANZMAN, JUDITH :
BUCHMAN-ZIV, ORA COHEN, MIRAV            :
COHEN, DANIEL COHEN, O.C., a minor, S.C., :
a minor, E.N.C., a minor, FAIGA ZVIA     :
LIEBERMAN, EINAT NOKED FOR THE           :
ESTATE OF EYAL NOKED, EINAT NOKED,       :
A.N., a minor, AVISHAG NOKED, BARUCH     :
ZURI NOKED, BINYAMIN ELKANA NOKED,       :
NETA NECHAMA COHEN, T.N., a minor,       :
KAREN GOLDBERG, CHANA WEISS, ESTHER :
GOLDBERG, YITZHAK GOLDBERG,              :
SHOSHANA GOLDBERG, ELIEZER               :
GOLDBERG, Y.M.G., a minor, T.Y.G., a minor, :
NILLY CHOMAN, TEMIMA SPETNER, JASON :
KIRSCHENBAUM, ISABELLE                   :
KIRSCHENBAUM, ISABELLE                   :
KIRSCHENBAUM FOR THE ESTATE OF           :
MARTIN KIRSCHENBAUM, JOSHUA              :
KIRSCHENBAUM, SHOSHANA BURGETT,          :
DAVID KIRSCHENBAUM, DANIELLE             :
TEITELBAUM, NETANEL MILLER, CHAYA        :
MILLER, ARIE MILLER, ALTEA STEINHERZ,    :
JONATHAN STEINHERZ, BARUCH YEHUDA :
ZIV BRILL, CHAYA BEILI, and GILA ALUF    :
                                         :

2

```
                    Plaintiffs,              :
                                             :
         -against-                           :
                                             :
                                             :
NATIONAL WESTMINSTER BANK, PLC,              :
                                             :
                    Defendant.               :
---------------------------------------------------------------x
```

Plaintiffs Tzvi Weiss, Leib Weiss, Malke Weiss, Yitzchak Weiss, Yeruchaim Weiss, Esther Deutsch, Moses Strauss, Philip Strauss, Bluma Strauss, Ahron Strauss, Roisie Engelman, Joseph Strauss, Matanya Nathansen, Chana Nathansen, Matanya and Chana Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, S.N., a minor, Hezekiel Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Pollack, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard Goldstein, Michael Goldstein, Chana Freedman, Michal Honickman for the Estate of Howard Goldstein, Michal Honickman, David Goldstein, Harry Leonard Beer as Executor of the Estate of Alan Beer, Harry Leonard Beer, Anna Beer, Phyllis Maisel, Estelle Carroll, Sarri Anne Singer, Judith Singer, Eric M. Singer, Robert Singer, Julie Averbach for the Estate of Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, A.A., a minor, Maida Averbach for the Estate of David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Daniel Rozenstein, Julia Rozenstein Schon, Alexander Rozenstein, Esther Rozenstein, Jacob Steinmetz, Deborah Steinmetz, Jacob Steinmetz and Deborah Steinmetz for the Estate of Amichai Steinmetz, Nava Steinmetz, Orit Mayerson, Natanel Steinmetz, Robert L. Coulter, Sr. for the Estate of Janis Ruth Coulter, Dianne Coulter Miller, Robert L. Coulter, Sr., Robert L. Coulter, Jr., Larry Carter for the Estate of Diane Leslie Carter, Larry Carter, Shaun Choffel, Richard Blutstein and Katherine Baker for the Estate of Benjamin Blutstein, Richard Blutstein, Katherine Baker, Rebekah Blutstein, Nevenka Gritz for the Estate of David Gritz, Nevenka Gritz, Nevenka Gritz for the Estate of Norman Gritz, Jacqueline Chambers as the Administrator for the Estate of Esther Bablar, Jacqueline Chambers, Levana Cohen, Eli Cohen, Sarah Elyakim, Yehuda Agababa, Menache Agababa, Yehezkel Agababa, Greta Geler, Ilana Eropa Dorfman, Refael Kitsis and Tova Guttman as the Administrators for the Estate of Hannah Rogen, Akiva Anachovich, Joshua Faudem, Zohar Fater, Bruce Mazer, Orly Rom, Richard Coffey, Gal Ganzman, Judith Buchman-Ziv, Ora Cohen, Mirav Cohen, Daniel Cohen, O.C., a minor, S.C., a minor, E.N.C., a minor, Faiga Zvia Lieberman, Einat Noked for the Estate of Eyal Noked, Einat Noked, A.N., Avishag Noked, Baruch Zuri Noked, Binyamin Elkana Noked, Neta Nechama Cohen, T.N., Karen Goldberg, Chana Weiss, Esther Goldberg, Yitzhak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Y.M.G., a minor, T.Y.G., a minor, Nilly Choman, Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum, Isabelle Kirschenbaum for the Estate of Martin Kirschenbaum, Joshua Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle Teitelbaum, Netanel Miller, Chaya Miller, Arie Miller, Altea Steinherz, Jonathan Steinherz, Baruch Yehuda Ziv Brill, Chaya Beili, and Gila Aluf by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the conduct of defendant National Westminster Bank, Plc (hereinafter: "NatWest").   Defendant is a financial institution headquartered in the United Kingdom that has knowingly collected, provided, and transmitted money and financial services to HAMAS[1], a Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).   NatWest has thereby substantially aided and abetted the commission of acts of international terrorism, as defined by 18 U.S.C. § 2331, including the terrorist attacks that injured the plaintiffs, and has violated the prohibitions on providing material support for acts of international terrorism (18 U.S.C. § 2339B) and on financing acts of international terrorism (18 U.S.C. § 2339C), set forth in the Antiterrorism Act ("ATA") as amended by the AEDPA. Defendant is therefore civilly liable under § 2333(a) of the ATA to the plaintiffs, who have been injured in their person by reason of acts of international terrorism.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States, who have been killed or injured by reason of acts of international terrorism, and/or their estates, survivors, and heirs.   This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

---

[1]      HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya" also known as the "the Islamic Resistance Movement."

4.      NatWest is subject to personal jurisdiction in the United States pursuant to Fed. R. Civ. P. 4(k) because, among other things, it continuously and systematically does business in the United States.  The defendant is also subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2339B(d)(1)(D) because it has committed tortious acts within the United States by transferring funds through the United States for the benefit of HAMAS, and has purposefully availed itself of United States jurisdiction in the course of committing the wrongful acts alleged herein.

## THE PARTIES

### A.      The Plaintiffs

### JERUSALEM BUS BOMBING – AUGUST 19, 2003

5.      On August 19, 2003, Raed Abdul Hamid Misk, a suicide bomber, detonated explosives on Egged bus No. 2.

6.      The Islamic Resistance Movement (hereinafter known as "HAMAS") claimed responsibility for the attack.

7.      On January 23, 1995, President Clinton issued Executive Order No. 12947 identifying HAMAS as a terrorist organization whose terrorist attacks "constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

### The Weiss Family

8.      Plaintiff Tzvi Weiss, age 31, is a citizen of the United States and a resident of the State of New York.

9.      Tzvi was in Israel studying at a rabbinical college in 2003 and was planning to return to the United States on August 21, 2003.

10.      On the evening of August 19, 2003, he boarded Egged bus No. 2 in Jerusalem

after having visited the Kotel (Wailing Wall), Judaism's holiest site, to pray. He was on his way to a friend's wedding.

11.     As the bus arrived at Shmuel Hanavi Street he heard a terrible explosion. Everything went black, and he could not hear anything but a deafening ringing in his ears.

12.     In the panicked aftermath of the explosion, Tzvi jumped out of a window of the bus and began to run, stumbling over dead bodies and body parts as he fled the scene.

13.     Tzvi was covered with blood and his hand had been cut. His body was shaking from the shock of the experience, and he had a constant terrible ringing in his ears.[2]

14.     Once he got his bearings, Tzvi telephoned his brother, plaintiff Yitzchk Weiss, and waited for his brother to arrive to accompany him to the hospital.

15.     An ambulance transported Tzvi to Bikur Cholim Hospital where he underwent tests. He later learned that both of his eardrums had been shattered and torn as a result of the explosion.

16.     His left eardrum had been completely torn, and his hearing was severely impaired. He continued to experience severe pain in his hand and was unable to bend his fingers.

17.     Tzvi decided to return home to the United States to be near his family while he began recovering from the injuries and the effects of having been a victim of a terrorist attack. He returned to the United States the following day and visited an ear specialist within hours of his arrival. He underwent tests and was advised to have surgery on his left ear to attempt to regain some of his hearing loss in that ear. Tzvi obtained a second opinion from another doctor who agreed with the diagnosis.

18.     After a number of examinations by the initial physician, and after treatment with antibiotics, Tzvi underwent surgery on his left ear. After the surgery, the incessant ringing in his

ears became louder and worse than before.

19.     Tzvi also visited another physician for treatment of the severe pain in his hand. He was told the injuries might require surgery.

20.     Tzvi continued to visit doctors on numerous occasions to assess his ears, and underwent many tests, but the agonizing ringing continued. Eventually, it was determined that the surgery on Tzvi's left ear had not been successful. Tzvi suffered numerous panic attacks because of his injuries and the symptoms that continued to affect him.

21.     As a result of the injuries that he sustained in the attack, combined with the memories of the attack itself, Tzvi's mental health deteriorated. The suffering that Tzvi has endured as a result of the injuries he sustained in the attack is ongoing and relentless. It has negatively impacted every aspect of his life.

22.     Tzvi enrolled in rabbinical college upon his return to the United States, but the injuries and their symptoms prevented him from concentrating on his schoolwork, and he could no longer achieve the academic success that he had achieved prior to the attack.

23.     As a result of the attack, plaintiff Tzvi Weiss has suffered severe physical and mental anguish and extreme emotional distress.

24.     Plaintiffs Leib and Malke[3] Weiss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Tzvi Weiss.

25.     Plaintiff Yitzchak Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

26.     Plaintiff Yeruchaim Weiss is a citizen of the United States and a resident of the State of Israel. He is a brother of plaintiff Tzvi Weiss.

---

[2]     The medical term for the condition is tinnitus.

27.     Plaintiff Esther Deutsch is a citizen of the United States and a resident of the State of New York. She is the sister of plaintiff Tzvi Weiss.

28.     The parents and siblings of Tzvi Weiss experienced great anxiety after learning of the attack that injured Tzvi and observing the suffering that Tzvi has endured as a result of his injuries.

29.     As a result of the attack, plaintiffs Leib Weiss, Malke Weiss, Yitzchak Weiss, Yeruchaim Weiss and Esther Deutsch have suffered severe mental anguish and extreme emotional distress.

**The Strauss Family**

30.     Plaintiff Moses Strauss, age 34, is a citizen of the United States and a resident of the State of New Jersey.

31.     Mr. Strauss was studying in Israel in 2003, and was planning to return to the United States in April 2004.

32.     At around 9:00 pm on August 19, 2003, he boarded Egged bus #2 in Jerusalem after praying at the Kotel (also known as the "Western Wall" or "Wailing Wall").

33.     Approximately 15 minutes into the bus ride, Mr. Strauss heard a deafening boom when Misk had detonated the explosives on the bus.

34.     Mr. Strauss fell forward as a result of the explosion. His eye glasses, jacket, hat and cell phone flew off his body.

35.     As Mr. Strauss regained his bearings and realized what had occurred, he witnessed people screaming and crying and he saw blood and body parts all around him.

---

[3]     Although spelled "Malka" in the Amended Complaint, Mrs. Weiss's name as it appears on her U.S. passport is actually spelled "Malke".

36.     Mr. Strauss's clothes were covered with blood and his hearing was severely impaired.

37.     To exit the bus, Mr. Strauss stepped over bodies and in a state of shock made his way towards his apartment. As he reached the corner near his apartment, he saw a friend, and they went into his friend's apartment and telephoned Mr. Strauss's father, plaintiff Philip Strauss to tell him he had been in an attack, but was alive. After making the telephone call, the friend drove Moses to Hadassah Hospital.

38.     As a result of the explosion, Mr. Strauss's body ached, especially his right ear and hand. After arriving at the hospital Mr. Strauss underwent numerous tests, and doctors removed the shrapnel from his ear and hand.

39.     Days after the attack, Mr. Strauss still experienced agonizing pain in his ear, and his hearing loss did not improve.

40.     After the attack, Mr. Strauss returned to the United States without completing his studies in Israel.

41.     Mr. Strauss has been examined by medical specialists in both Israel and the United States. Both physicians confirmed that Mr. Strauss would require surgery on his ear.

42.     In the winter of 2004, Mr. Strauss underwent ear surgery in the United States. His ear is still not completely healed, and he has been told that his condition will never improve. An ear specialist continues to monitor his condition.

43.     Mr. Strauss continues to relive the attack, the images of the attack replaying in his mind daily.

44.     As a result of the attack, plaintiff Moses Strauss has suffered severe physical and mental anguish and extreme emotional distress.

45.     Plaintiffs Philip Strauss and Bluma Strauss are citizens of the United States and residents of the State of New York. They are the parents of plaintiff Moses Strauss.

46.     After hearing of the attack, Bluma Strauss attempted unsuccessfully to reach her son on his cell phone. When she tried to reach him at his apartment, someone else answered the telephone and said that her son was not there. Bluma Strauss grew increasingly concerned.

47.     Upon learning that her son was injured in the bombing, Bluma Strauss's distress grew.

48.     As a result of the attack, plaintiffs Philip Strauss and Bluma Strauss have suffered severe mental anguish and extreme emotional distress.

49.     Plaintiff Ahron Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

50.     Plaintiff Roisie Engelman is a citizen of the United States and a resident of the State of New Jersey. She is the sister of plaintiff Moses Strauss.

51.     Roisie Engelman was on vacation when she received a telephone call advising her that there had been a bombing in Israel. Roisie attempted to contact her brother on his cellular telephone, but was unable to reach him. She also telephoned her other brother, Aaron, attempting to locate Moses or her parents.

52.     When Roisie finally received the news that her brother had been injured in the bus bombing, she was very concerned and extremely anxious.

53.     Plaintiff Joseph Strauss is a citizen of the United States and a resident of the State of New Jersey. He is a brother of plaintiff Moses Strauss.

54.     Joseph learned of the attack while watching the news on an airplane. He was aware that the bombing had occurred near the neighborhood where his brother lived. Upon

arriving in California, Joseph spoke to his parents and learned of Moses's condition. During the hours of the plane flight, Joseph experienced great anxiety because he was uncertain at that time if his brother had been present at the bombing.

55.     Roisie Engelman, Joseph Strauss and Ahron Strauss experienced great anxiety after learning of the attack that caused the injuries that their brother sustained.

56.     As a result of the attack, plaintiffs Roisie Engelman, Joseph Strauss and Ahron Strauss have suffered severe mental anguish and extreme emotional distress.

**The Nathansen Family**

57.     Tehilla Nathansen was a citizen of the United States and a citizen of the State of Israel.  She was three (3) years old and sitting on her mother's lap when she was murdered in the suicide bomb attack.

58.     The Nathansen family had boarded the bus at the Kotel in Jerusalem, where they had just completed their prayers.

59.     Chana Nathansen, Tehilla's mother, is a citizen of the United States and a citizen and resident of the State of Israel.

60.     Plaintiff Matanya Nathansen, Tehilla's father, is a citizen and resident of the State of Israel.

61.     Plaintiffs Matanya and Chana Nathansen bring this action both individually and on behalf of their three (3) year old daughter's estate.

62.     Chana Nathansen was severely injured in the explosion that killed her daughter and is partially crippled as a result of her injuries. Chana Nathansen had seven (7) ball bearings removed from her body that left bullet holes in her chest, leg and arm. She is also now hearing impaired in one ear.

63.     Plaintiff Chana Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old daughter, and witnessing the severe injuries sustained by her daughters, plaintiff S.N., a minor, and plaintiff Yehudit Nathansen, in addition to the injuries she herself sustained.

64.     Matanya Nathansen was injured by the explosion. He suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger. He is now hearing impaired and can no longer walk properly.

65.     In addition to the injuries he sustained as a result of the explosion, plaintiff Matanya Nathansen has sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his three year old daughter, as well as the severe injuries sustained by his wife and young daughters.

66.     Plaintiff Yehudit Nathansen is a citizen of the United States and a citizen and resident of the State of Israel.  She is the 19 year old sister of Tehilla Nathansen and the daughter of Matanya and Chana Nathansen. At the time of the explosion, Yehudit was sitting with her aunt, a few seats away from her parents.

67.     Yehudit sustained physical injuries from the explosion and was treated at Bikur Cholim Hospital in Jerusalem.

68.     Plaintiff Yehudit Nathansen has suffered physical and severe mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old sister, as well as the severe injuries sustained by her mother and baby sister, and the injuries to her father.

69.     Plaintiff S.N., a minor, is a citizen of the United States and a citizen and resident of the State of Israel.

70.     She is the 13 year old sister of Tehilla Nathansen.

71.     S.N. was sitting on her mother's lap at the time of the explosion. S.N. was five (5) months old at that time. As a result of the explosion, S.N. suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars, and scars on her face and legs. She also sustained severe physical injuries requiring the removal of numerous ball bearings from her legs. The full effect of her injuries, including her ability to walk, will not be fully known until she is older.

72.     As a result of the terrorist attack, plaintiff S.N. has suffered severe physical and mental anguish and extreme emotional distress.

73.     Plaintiff Hezekial Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel. He is the father of Plaintiff Chana Nathansen and the grandfather of the three Nathansen girls.

74.     Plaintiff Pearl B. Toporowitch is a citizen of the United States and a resident of the State of Israel. She is the mother of plaintiff Chana Nathansen and the grandmother of the three Nathansen girls.

75.     In the middle of the night, Hezekial and Pearl were notified by telephone of the bombing that had killed their granddaughter, Tehilla Nathansen, and crippled their daughter, Chana Nathansen. That night they traveled to Jerusalem. Pearl attempted to obtain further details about the condition of her son-in-law and her granddaughters.

76.     In the aftermath of the bombing, Chana, her husband, and her children were transferred to different hospitals thereby complicating the family's efforts to locate them.

77.     Hezekial was supposed to travel to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to do so. He was initially told to

identify the bodies of <u>two</u> granddaughters since S.N. had not yet been identified at the hospital and was thought to be deceased.

78.     As a result of the terrorist attack, plaintiff Hezekial Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old granddaughter, as well as the severe injuries sustained by his daughter, and injuries sustained by his granddaughters and son-in-law.

79.     As a result of the terrorist attack, plaintiff Pearl B. Toporowitch, has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old granddaughter, as well as the severe injuries sustained by her daughter and other granddaughter and injuries to her son-in-law.

80.     Plaintiff Yehuda Toporowitch is a citizen of the United States and a resident of the State of New Jersey.

81.     Yehuda Toporowitch is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls.

82.     In the middle of the night he was notified by telephone of the bombing that had killed his niece and crippled his sister.

83.     He had been working at a resort when he received the telephone call, and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

84.     Yehuda rushed home and traveled with his parents to the Tel Aviv area and stopped at the home of one of his sisters. He then took a taxicab to the central morgue and attempted to identify his niece's remains, but a positive identification was not possible because of the nature and extent of Tehilla's injuries.

85.     Yehuda then made arrangements for the necessary DNA testing that ultimately confirmed his niece's identity.

86.     As a result of the terrorist attack, plaintiff Yehuda Toporowitch has suffered severe mental anguish and extreme emotional distress from the death of his three year old niece and the attempt to identify her remains. He has also suffered severe mental anguish and extreme emotional distress as a result of the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

87.     Plaintiff David Toporowitch is a citizen of the United States and a citizen and resident of the State of Israel.

88.     He is a brother of plaintiff Chana Nathansen and an uncle of the three Nathansen girls. He was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister. Instead, he had to piece together the events by himself after his family had already left for Jerusalem.

89.     Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

90.     As a result of the terrorist attack, plaintiff David Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old niece, as well as the severe injuries sustained by his sister and other niece.

91.     Plaintiff Shaina Chava Nadel is a citizen of the United States and a citizen and resident of the State of Israel.

92.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

93.     Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

94.     As a result of the terrorist attack, plaintiff Shaina Chava Nadel has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

95.     Plaintiff Bluma Rom is a citizen of the United States and a citizen and resident of the State of Israel.

96.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls. Like the rest of her immediate family, Bluma visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her younger sister.

97.     As a result of the terrorist attack, plaintiff Bluma Rom has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

98.     Plaintiff Rivka (Toporowitch) Pollack is a citizen of the United States and a citizen and resident of the State of Israel.

99.     She is a sister of plaintiff Chana Nathansen and an aunt of the three Nathansen girls.

100.    Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister and injuries to her brother-in-law.

101.    She stayed with her baby niece S.N., caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital. Having to change the dressings on her niece's wounds, care for her various injuries, and take her to doctors, has deeply emotionally affected her.

102.    As a result of the terrorist attack, plaintiff Rivka (Toporowitch) Pollack has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries incurred by her sister, other niece and brother-in-law.

**The Cohen Family**

103.    Plaintiff Ora Cohen, age 54, is a citizen of the United States and a citizen of the State of Israel.

104.    Mrs. Cohen and her husband had decided to celebrate their ninth wedding anniversary on August 19, 2003 by visiting the Western Wall with their five children.

105.    At around 9:00 p.m., after praying at the Western Wall, the Cohen family boarded Egged bus #2 to return home.

106.    As the bus made its way down Shmuel Hanavi Street, Raed Misk detonated his explosive charge.  Just prior to the explosion, Mrs. Cohen had seen the bomber, who was seated behind her.

107.    As a result of the explosion, Mrs. Cohen sustained shrapnel wounds, burns to her

body, and a broken jaw. She also suffered nasal trauma, and severe hearing loss.

108.     Mrs. Cohen was taken to the hospital and remained hospitalized until August 29, 2003.

109.     Mrs. Cohen was subsequently hospitalized for follow-up treatment from November 6, 2005 to November 10, 2005.

110.     Mrs. Cohen continues to suffer from ongoing jaw pain, and her hearing problems have continued to worsen.

111.     Mrs. Cohen has been treated by numerous medical providers and her treatment is ongoing.

112.     Plaintiff E.N.C., age 12, is a citizen of the United States and a citizen of the State of Israel. He is the son of plaintiff Ora Cohen.

113.     As the Cohen family rode the bus, Mrs. Cohen had been holding her infant son, E.N.C., on her lap.  When the blast went off, E.N.C. was thrown from her arms and presumed dead.  He was found alive several hours after the attack, buried beneath a pile of corpses.

114.     After the explosion, the entire Cohen family was separated in the chaos.  Mrs. Cohen spent several hours unaware if her children were alive or dead.

115.     Due to the trauma she experienced as a passenger seated close to the bomber, witnessing the horrible aftermath of the attack, and being separated from her family following the attack, Mrs. Cohen suffered and continues to suffer severe emotional repercussions including depression, insomnia and nightmares.  She experiences crippling fears for herself and her family.

116.     Mrs. Cohen has received and continues to receive psychiatric treatment to help cope with the negative emotional effects she continues to experience as a result of the attack.

117.     Mrs. Cohen also struggles with the day-to-day care of her large family, including

the ongoing medical and emotional treatment of her five young children, all of whom were present at and injured in the terrorist attack.

118.    As a result of the terrorist attack, plaintiff Ora Cohen has suffered severe physical and mental anguish and extreme emotional distress.

119.    Plaintiff E.N.C. was separated from the rest of his family following the attack. He sustained a broken hip and damage to his lung. He has also experienced hearing problems and an eye infection. He was treated inpatient at Hadassah Ein Kerem Hospital in Jerusalem from August 19 through August 29, 2003.

120.    As he has gotten older, E.N.C. has experienced fear and anxiety as a result of understanding the type of traumatic event he had gone through. He has significant fears related to personal security. Furthermore, his hearing issues have persisted due to bilateral ruptures in his eardrums.

121.    As a result of the attack, plaintiff E.N.C. has suffered severe physical and mental anguish and extreme emotional distress.

122.    Plaintiff Mirav Cohen, age 20, is a citizen of the United States and a citizen of the State of Israel. She is the daughter of plaintiff Ora Cohen.

123.    Mirav Cohen had visited the Western Wall with her parents and siblings on August 19, 2003.  She also boarded Egged bus #2 with her family.

124.    As a result of the terrorist's blast, Mirav Cohen sustained facial burns and lacerations, lung damage, hearing loss in both ears, and shrapnel wounds.  She also witnessed the chaos and carnage after the attack.

125.    Mirav Cohen was taken to the hospital and remained hospitalized until August 28, 2003.  She was separated from her family at the site of the attack and was not reunited with the

rest of her family for hours.

126.    Mirav Cohen's hearing has continued to worsen, and now requires that she wear a hearing aid.

127.    Mirav Cohen has been treated by numerous medical providers and her treatment is ongoing.

128.    Mirav Cohen has experienced depression, has had numerous nightmares, and has had bed wetting incidents as a result of the attack.  She has received and continues to receive psychiatric treatment to help cope with the negative emotional effects she continues to experience since the attack.

129.    As a result of the terrorist attack, plaintiff Mirav Cohen has suffered severe physical and mental anguish and extreme emotional distress.

130.    Plaintiff Daniel Cohen, age 19, is a citizen of the United States and a citizen of the State of Israel. He is the son of plaintiff Ora Cohen.

131.    Daniel Cohen had visited the Western Wall with his parents and siblings on August 19, 2003.  He also boarded Egged bus #2 with his family.

132.    He witnessed the chaos after the attack and was separated from his family for several hours.

133.    Daniel Cohen was taken to the hospital and remained hospitalized until August 28, 2003.

134.    As a result of the explosion, Daniel Cohen sustained facial lacerations, lung damage, hearing loss in both ears, and shrapnel wounds to his feet.

135.    Daniel Cohen's hearing has continued to worsen.  Daniel Cohen has been treated by numerous medical providers, and his treatment is ongoing.

136.    Daniel Cohen has had many nightmares since the terrorist attack. He has suffered and continues to suffer severe emotional distress including anger and severe aggression as a result of what he experienced during and subsequent to the terrorist attack.

137.    Daniel Cohen has received and continues to receive psychiatric treatment to help alleviate the negative emotional effects he continues to experience since the attack.

138.    As a result of the attack, plaintiff Daniel Cohen has suffered severe physical and mental anguish and extreme emotional distress.

139.    Plaintiff O.C., age 17, is a citizen of the United States and a citizen of the State of Israel.  She is the daughter of plaintiff Ora Cohen.

140.    O.C. had visited the Western Wall with her parents and siblings on August 19, 2003.  She also boarded Egged bus #2 with her family.

141.    She witnessed the chaos after the attack and was separated from her family for several hours.

142.    As a result of the explosion, O.C. sustained hearing loss, eye infections, and shrapnel wounds to her spine and feet.

143.    O.C. was taken to the hospital and remained hospitalized until August 28, 2003.

144.    O.C. has been treated by numerous medical providers, and her treatment is ongoing.  She continues to hear white noise in her ears and suffers from back pain. She will require additional procedures to remove the shrapnel that remains in her body.

145.    O.C. suffered and continues to suffer severe emotional distress including depression and obsessive recollections of the attack and her resulting suffering.

146.    O.C. has received and continues to receive psychiatric treatment to help address and alleviate the negative emotional effects she continues to experience since the attack.

147.     As a result of the attack, plaintiff O.C. has suffered severe physical and mental anguish and extreme emotional distress.

148.     Plaintiff S.C., age 14, is a citizen of the United States and a citizen of the State of Israel.

149.     S.C. had visited the Western Wall with her parents and siblings on August 19, 2003.  She was being held by her father on Egged bus #2 at the time of the blast.

150.     After the explosion, S.C. had to be forcibly removed from the arms of her father, who had been rendered unconscious.  S.C. was also separated from her parents and siblings in the chaos.

151.     S.C. sustained severe physical injuries including nerve damage and permanent damage to her left eye. She had additional shrapnel wounds, hearing loss, and lost many teeth as a result of the attack.

152.     S.C. was taken to the hospital and remained hospitalized until September 19, 2003.  Over one hundred pieces of glass were extracted from her eyes and face.  She underwent three surgeries to her right eye, which doctors were able to save.  The damage to her left eye was rendered essentially useless.

153.     S.C. has been treated by numerous medical providers, and her treatment is ongoing.  Since the month she spent in the hospital immediately after the attack, S.C. has been hospitalized on four subsequent occasions for additional medical procedures relating to the attack.

154.     S.C. has difficulty coping with her perceived "ugliness" caused by her injuries. She also continues to hear white noise in her ears, and will continue to require surgeries and medical procedures and treatment for the wounds to her eye, ears, and face.

155.   S.C. suffered and continues to suffer severe emotional effects including nightmares and an obsessive fixation on the attack.   She also has an obsessive fixation concerning her useless eye and own self-perceived ugliness.

156.   S.C. has received and continues to receive psychiatric treatment to help address the negative emotional effects she continues to experience after the attack.

157.   As a result of the attack, plaintiff S.C. has suffered severe physical and mental anguish and extreme emotional distress.

**The Lieberman Family**

158.   Semuel Walner was killed when Raed Misk detonated the bomb onboard Bus 2 in Jerusalem.

159.   Plaintiff Faiga Zvia Lieberman is a citizen of the United States and a resident of the State of New York. She is the sister of Semuel Walner.

160.   Faiga Zvia Lieberman learned of her brother's death while she was on vacation in the Catskill Mountains. She verified her brother's death by speaking with her brother-in-law in Israel. She went home and boarded a flight, arriving the day after the funeral. She remained with her family to sit shiva (seven days of mourning) before returning home.

161.   Because she was a widow with small children at the time, Plaintiff Faiga Zvia Lieberman tried to remain outwardly strong in the midst of her grief; as a result, she suffered extensively with sleeping problems because the only time she could address her loss was in the evening after her children had gone to bed.

162.   As a result of the terrorist attack, plaintiff Faiga Zvia Lieberman has experienced emotional pain and suffering and the loss of her brother's companionship, advice and counsel.

## SHOOTING ATTACK ON ROUTE 60 – JUNE 20, 2003

**The Goldstein Family**

163.    Howard Goldstein was a citizen of the United States and a citizen of the State of Israel.

164.    He was murdered on June 20, 2003, while driving his car with his parents on Route 60 in Israel.

165.    Howard was driving his parents and his wife from Eli to Jerusalem where they had stayed the previous night following the wedding of Howard's son, David Goldstein. Howard and his wife and parents were traveling for a weekend in Jerusalem to further celebrate David's wedding (which had taken place the previous night).

166.    While Howard was driving, Howard's father, Eugene Goldstein, was seated in the front passenger seat and his mother, Lorraine Goldstein, was seated behind her husband. Howard's wife, Michal Goldstein was seated in the rear seat of the car, on the driver's side, behind Howard.

167.    At some point, as Howard was driving, Eugene noticed two individuals on the side of the road near the Yabroud underpass. As the Goldsteins' car approached, the men turned and began rapidly firing their guns at the Goldsteins' vehicle.

168.    Howard was struck by at least one bullet and ultimately succumbed to his injuries while driving and slumped over the steering wheel.

169.    HAMAS claimed responsibility for the attack.

170.    Plaintiffs Eugene and Lorraine Goldstein are citizens of the United States and are residents of the State of Florida. They are the parents of Howard Goldstein.

171.    Eugene was shot in the back, head and shoulder.

172.     The top of the bullet that struck Eugene grazed his head. The remainder exploded in one of his lungs, leaving behind shrapnel in his lung, liver and kidneys. The bullet lodged between his heart and his lungs.

173.     At some point in time, while Howard was slumped over the steering wheel, Eugene grabbed the steering wheel and maintained control of the car until it crashed and rolled over, approximately eight miles south of Ofra.

174.     As a result of the terrorist attack, Eugene still has several bullet fragments lodged in his chest. He must undergo an x-ray every three (3) months to monitor the condition of the bullet fragments encapsulated in his chest.

175.     He has since returned to his job where he missed three (3) months of work as a result of his injuries.

176.     Lorraine was also shot and severely injured.

177.     She was struck by a bullet which entered her body through her back, grazed her carotid artery and lodged in her jaw bone. She has three bullet holes in her back.

178.     Shrapnel also lodged throughout her body, especially in her back. She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

179.     Eugene and Lorraine Goldstein remained in Jerusalem at Hadassah Hospital for approximately ten (10) days and were unable to return home when they were discharged from the hospital because the airline did not give Eugene permission to fly due to the poor condition of his lungs.

180.     Lorraine required physical therapy because the scar tissue in her jaw prevented her from opening it fully. She still suffers from pain and headaches.

181.     She has had 11 teeth pulled and undergone extensive periodontal and dental work.

She must also deal with the harmful effects of shrapnel lodged throughout her body.

182.    As a result of the terrorist attack, plaintiffs Eugene Goldstein and Lorraine Goldstein have suffered severe physical and mental anguish and extreme emotional distress.

183.    The Goldstein family in New York received notice of the attack from two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

184.    The Goldstein family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred. The video broadcast showed Howard, Eugene, and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

185.    Lorraine's face and hair were covered with blood.

186.    Plaintiff Richard Goldstein is a citizen of the United States and a resident of the State of New York.  He is a son of plaintiffs Eugene and Lorraine Goldstein and a brother of Howard Goldstein.

187.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, Barbara Goldstein Ingardia, at work and asked her to return home immediately. When she arrived, her extended family was present. They shared the tragic news that their parents and brother had been attacked. Barbara then made plans to fly to Israel to care for her parents.

188.    As a result of the terrorist attack, plaintiff Richard Goldstein has suffered mental anguish and extreme emotional distress caused by the death of his brother and the life-threatening injuries to both of his parents.

189.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a resident of the State of New York. She is the daughter of plaintiffs Eugene and Lorraine Goldstein and

the sister of Howard Goldstein.

190.     Barbara left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

191.     In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

192.     At one point during her hospital stay, Lorraine was placed on life support.

193.     Barbara blames herself for encouraging her parents to attend the wedding. As a result of the terrorist attack, plaintiff Barbara Goldstein Ingardia has suffered severe mental anguish and extreme emotional distress.

194.     Plaintiff Michael Goldstein is a citizen of the United States and a resident of the State of Florida. He is a brother of Howard Goldstein and a son of plaintiffs Eugene and Lorraine Goldstein.

195.     As a result of the terrorist attack, plaintiff Michael Goldstein has suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his parents.

196.     Plaintiff Chana Freedman is a citizen of the United States and a resident of the State of New York.

197.     She is the daughter of Howard and Michal Goldstein.

198.     Chana and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been involved in what they believed to be an automobile accident.

199.     Chana's husband received a telephone call from his father informing the couple to

go directly to Hadassah Hospital.

200.     When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

201.     Chana informed her brother Daniel and his wife, who had just been married, of the attack when they arrived at the hospital.

202.     As a result of her father's death, plaintiff Chana Freedman has suffered severe mental anguish and extreme emotional distress.

203.     Plaintiff Michal Honickman, formerly known as Mindy Goldstein, is a citizen of the United States and the State of Israel.

204.     Michal is the widow of Howard Goldstein, and brings this action both individually, and as the legal representative of Howard Goldstein's estate.

205.     Michal is the mother of Plaintiffs Chana Freedman and David Goldstein. Howard Goldstein was the father of Plaintiffs Chana Freedman and David Goldstein.

206.     On Friday, June 20, 2003, their 27th wedding anniversary, Michal and Howard were driving with Eugene and Lorraine Goldstein on Route 60, just north of Ofra, heading to Jerusalem.

207.     Michal was injured when glass fragments from the car vehicle's windows struck her body, including her left eye. She also sustained hairline fractures of her ribs, bruising, and physical trauma when the vehicle eventually crashed and rolled over.

208.     Michal has suffered severe mental anguish and extreme emotional distress having been present during the attack, witnessed the death of her husband, whom she had to bury and mourn with her children, in addition to having witnessed her in-laws getting shot and

hospitalized, all in the context of what had been, prior to that point, a joyous family occasion celebrating her son, David's wedding.

209.   Michal has suffered trauma as a result of surviving the attack.

210.   As a result of the attack and the loss of her husband of twenty-seven years, Plaintiff Michal Honickman has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

211.   Plaintiff David Goldstein is a citizen of the United States and the State of Israel.

212.   At the time of the attack, David was at a Jerusalem hotel awaiting his family's arrival for weekend wedding celebrations when he was notified that something had happened to his parents and his grandparents, and that they had been taken to Hadassah Hospital.

213.   Upon arrival at the hospital, David learned that his father had been killed in the attack, and that his mother and grandparents had been injured.

214.   Prior to the attack, David frequently spoke to his father, including on the morning of his father's death.

215.   As a result of his father death, Plaintiff David Goldstein has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

## THE JAFFA ROAD BUS #14A BOMBING: JUNE 11, 2003

216.   At approximately 5:30 p.m. on June 11, 2003, Abdel Madi Shabneh, a HAMAS operative dressed as an ultra-Orthodox Jew, boarded Egged bus #14A at the Mahane Yehuda market.

217.   A short while after Shabneh boarded the bus, as the bus drove down Jaffa Road

near the Davidka Square, Shabneh detonated his bomb, wrecking the bus and killing sixteen (16) of its passengers. Over 100 people were wounded, including dozens of bystanders.

218.   Shabneh, an 18-year old high school student from Hebron, was initially recruited by HAMAS while playing on a local Jihad Mosque soccer team.

**The Beer Family**

219.   Alan Beer, a citizen of the United States, was on the bus returning from a condolence call to his friend's family when the bomber detonated his explosives and killed him.

220.   Alan's friend, to whom he had paid the condolence call, learned of the bus bombing and telephoned plaintiff Harry Leonard Beer, Alan's brother, in Cleveland, Ohio. Harry Leonard quickly telephoned his sister, plaintiff Phyllis Maisel, whose son happened to be on the scene of the bombing earlier. Harry Leonard then telephoned his other sister, plaintiff Estelle Carroll and informed her of the terrorist attack.

221.   After speaking with her brother, Phyllis asked her son to return to the crime scene and identify Alan's body.   Thereafter, plaintiffs Anna Beer, Harry Leonard Beer and Estelle Carroll flew to Israel to attend Alan's funeral.

222.   Plaintiff Harry Leonard Beer is a citizen of the United States and a resident of the State of Ohio.

223.   Plaintiff Harry Leonard Beer brings this action both in his individual capacity and as the executor of the Estate of Alan Beer.

224.   Plaintiff Harry Leonard Beer has experienced emotional pain and suffering and the loss of his brother's companionship, advice and counsel.

225.   As a result of the terrorist attack, plaintiff Harry Leonard Beer has suffered severe mental anguish and extreme emotional distress as well as the loss of his brother's

companionship, advice and counsel.

226.    Plaintiff Estelle Carroll is a citizen of the United States and a resident of the State of Virginia.

227.    Plaintiff Phyllis Maisel is a citizen of the United States and a resident of the State of Israel.

228.    Plaintiffs Estelle Carroll and Phyllis Maisel have experienced emotional pain and suffering and the loss of their brother's companionship, advice and counsel.

229.    As a result of the terrorist attack, plaintiffs Estelle Carroll and Phyllis Maisel have suffered severe mental anguish and extreme emotional distress.

230.    Plaintiff Anna Beer is a citizen of the United States and a resident of the State of Ohio. She is the mother of Alan Beer.

231.    Anna has experienced emotional pain and suffering, the loss of her youngest child's companionship, advice and counsel.

232.    As a result of the terrorist attack, plaintiff Anna Beer has experienced the loss of her youngest son's society, companionship, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Singer Family**

233.    Plaintiff Sarri Anne Singer is a citizen of the United States and a resident of the State of New Jersey.

234.    On June 11, 2003, Sarri Anne Singer boarded bus #14A in Jerusalem to meet a friend for dinner. Soon thereafter, the suicide bomber detonated his bomb only two to three seats away from where Sarri was seated.  When the explosives were detonated, Sarri felt a shockwave across her face.  The roof of the bus had fallen in and the man in front of her was not moving.

Everyone sitting and standing near plaintiff Sarri Singer had been killed.

235.    Sarri was struck with shrapnel from the explosion, which entered her shoulder and broke her clavicle. After the blast she was unable to open her left eye, and her right eye was extremely restricted. She was unable to hear because of a loud ringing in her ears, and her ruptured eardrums. Barely walking, she was taken to an ambulance.

236.    She sustained injuries to her face and legs resulting in scarring. She has undergone physical therapy and procedures. Shrapnel had lodged in her gums, moving her teeth. She has undergone extensive dental work.

237.    As a result of the attack, plaintiff Sarri Anne Singer has suffered severe physical and mental anguish and extreme emotional distress.

238.    Plaintiff Judith Singer is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Sarri Anne Singer.

239.    Judith learned of the attack when her son telephoned her at work.

240.    As a result of the attack plaintiff Judith Singer has suffered severe mental anguish and extreme emotional distress.

241.    Plaintiff Eric M. Singer is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Sarri Anne Singer.

242.    Eric first learned of the attack when he received an emergency phone call from his father while having lunch in a restaurant. After speaking with his mother and notifying his office, Eric and his father flew that night to Israel to be with Sarri.

243.    As a result of the attack, plaintiff Eric Singer has suffered severe mental anguish and extreme emotional distress.

244.    Plaintiff Robert Singer is a citizen of the United States and a resident of the State

of New Jersey. He is the father of plaintiff Sarri Anne Singer.

245.    After learning of the attack, Robert travelled to Israel to be with his daughter.

246.    As a result of the attack, plaintiff Robert Singer has suffered severe mental anguish and extreme emotional distress.

<u>**COMMUTER BUS BOMBING – MAY 18, 2003**</u>

<u>**The Averbach Family**</u>

247.    On May 18, 2003, Steven Averbach was a citizen of the United States and a citizen and resident of the State of Israel.

248.    Steve Averbach passed away on June 3, 2010 as a result of injuries sustained during a suicide bombing that occurred on May 18, 2003. He was 44 years old.

249.    At the time of the attack Steve resided near Tel Aviv, Israel. He was a married father of four sons ranging in age from 2 to 13. Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 20) and A.A. (age 15).

250.    Steve's older sons, Tamir (age 26) and Devir (age 23), are from a prior marriage.

251.    On May 18, 2003, Steve was seated on a commuter bus heading for Jerusalem when he noticed an Arab dressed as a religious Jew board the bus. Steve became immediately suspicious.

252.    As Steve approached him, the bomber detonated his explosives.

253.    HAMAS claimed responsibility for the bombing.

254.    The bomber was later identified by his family as Bassem Jamil Tarkrouri.

255.    Seven (7) people were killed by the explosion, ranging in age from 35 to 68. Steve was one of twenty (20) people injured.

256.    Steve absorbed a substantial amount of the impact of the explosion and multiple

pieces of shrapnel.

257.    Steve sustained a critical wound when a ball bearing originally packed together with the bomber's explosives penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae. The ball bearing lodged in his spinal canal causing severe compression damage to his spinal cord. The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

258.    Following surgery, Steve was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs. He underwent numerous operations to his back, groin and gastric intestines. He also underwent a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

259.    Steve returned to the Intensive Care Unit several times with complications.

260.    Steve was paralyzed from his neck down.

261.    On more than one occasion, Steve pleaded with his doctors and family members to take him off of life support.

262.    From the time of the attack until he died in 2010, Steve did not have the use of his arms or legs, and could not brush his own teeth or scratch his own nose.

263.    He was completely dependent on the 24-hour care provided to him and had no foreseeable hope of recovery.

264.    He lived in constant pain and battled depression.

265.    As a result of the attack, Steve Averbach suffered severe physical and mental anguish and extreme emotional distress from May 18, 2003 until his death.

266.    Plaintiff Julie Averbach is a citizen and resident of the State of Israel. She was the

wife of Steve Averbach and the mother of Sean Averbach and A.A., a minor. Julie brings this action individually, as the legal representative of the Estate of Steven Averbach, and on behalf of A.A., a minor.

267.    As the result of the injuries sustained by Steve, Julie had to relocate her family to be closer to the rehabilitation center where Steve resided for nearly a year. Steve moved home from the rehabilitation center in July 2004, but required continuous 24-hour care. Following the attack, Julie was, in most respects, a single parent and could not enjoy the normal companionship, day-to-day assistance and mutual support that she had previously received from her husband.

268.    As a result of the suffering that Steve experienced following the attack and his death that resulted from the injuries sustained in the attack, plaintiff Julie Averbach has experienced emotional pain and suffering, loss of her husband's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

269.    Plaintiff Tamir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the 26 year old son of Steve Averbach and Steve's first wife.

270.    Plaintiff Tamir Averbach has experienced severe mental anguish and extreme emotional distress from witnessing his father's relentless and painful suffering, his repeated surgeries and brushes with death, his permanent physical condition, and the loss of his father's society, companionship, comfort, advice and counsel.

271.    Plaintiff Devir Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the 23 year old son of Steve Averbach and Steve's first wife.

272.    Devir and his elder brother, Tamir, remember what it was like when their father

was an able-bodied man.

273.    As a result of the attack, plaintiff Devir Averbach has suffered severe mental anguish and extreme emotional distress as a result of his father's relentless and painful suffering, repeated surgeries and brushes with death, his permanent physical condition, and the loss of his father's society, companionship, comfort, advice and counsel.

274.    Plaintiff Sean Averbach is a citizen of the United States and a citizen and resident of the State of Israel. He is the 20 year old son of plaintiffs Steve and Julie Averbach.

275.    As a result of the brutal attack on his father, he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father.  Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life.

276.    As a result of the attack, plaintiff Sean Averbach has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

277.    Plaintiff A.A., a minor, is a citizen of the United States and a citizen and resident of the State of Israel. He is the 15 year old son of Steve and Julie Averbach.

278.    As a result of the brutal attack on his father he has been emotionally traumatized and will in all likelihood never possess memory of a time when his father was capable of using his arms and legs. Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, driving in a car with, or playing sports with his father have been denied to him and will in all likelihood be denied to him for the remainder of his father's life.

279.    As a result of the attack, plaintiff A.A. has experienced emotional pain and

suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

280.    Dr. David Averbach was a United States citizen and resident of the State of New Jersey. He was the father of Steve Averbach. Dr. David Averbach passed away on August 16, 2013.

281.    Plaintiff Maida Averbach is a citizen of the United States and a resident of the State of New Jersey. She is the mother of Steven Averbach.

282.    Plaintiff Maida Averbach brings this action both individually, and as the legal representative of the Estate of David Averbach.

283.    Maida and David Averbach had returned home late on May 17, 2003, from a dinner honoring David. Soon thereafter, Maida switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Maida recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

284.    After a sleepless night, Maida received a telephone call on Sunday morning at 5:50 a.m. from her daughter-in-law and a social worker from Hadassah Hospital. They explained that Steve had been grievously wounded by the explosion and had a ball bearing lodged between his C3 and C4 vertebrae.

285.    As a respected surgeon with many years of experience, David immediately understood the severity of his son's injuries.

286.    At the time of the attack, David and Maida Averbach had partially retired from their jobs so that they could spend more time with Steve and his children.

287.    Following the attack, Steve's constant inability to use his hands and legs, his

inevitable battle with depression and the emotional effect it has had on Steve's four children were a constant source of continued anguish to both of his parents.

288.    Prior to his own death, David Averbach experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and suffered severe mental anguish and extreme emotional distress.

289.    Plaintiff Maida Averbach experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack from the moment she saw her son's hand on television in the early morning hours of May 18, 2003.

290.     As a result of Steve's death, plaintiff Maida Averbach has experienced emotional pain and suffering, loss of her son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

291.    Plaintiff Michael Averbach is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Steve Averbach.

292.    Michael Averbach has always looked up to his brother and admired him. The injuries that his brother has sustained have been a severe emotional blow to Michael.

293.    Since the date of the attack Michael had flown to Israel repeatedly, often at his brother's request, simply to sit by Steve's bedside and talk.

294.    As a result of the terrorist attack, plaintiff Michael Averbach has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

295.    Plaintiff Eileen Sapadin is a citizen of the United States and a resident of the State of New Jersey. She is the sister of Steve Averbach.

296.    Eileen was staying at her parents' home with her husband and three of her four

children on the morning her mother received notification of the attack.

297. Eileen has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack.

298. She suffers from anxiety and depression, has trouble sleeping and cries every day.

299. In the past year, she has lost more than thirty pounds and has suffered physical exacerbations of a colitis condition that was in remission prior to the attack that severely injured her brother.

300. As a result of the terrorist attack, plaintiff Eileen Sapadin has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, advice and counsel and has suffered severe physical and mental anguish and extreme emotional distress.

## THE MIKE'S PLACE BOMBING - TEL AVIV, APRIL 30, 2003

### The Rozenstein Family

301. On April 30, 2003, a suicide bomber, Asif Muhammad Hanif, entered Mike's Place, a popular bar situated on the seashore a few hundred meters from the American Embassy in Tel Aviv, and detonated his explosives.[4]

302. The attack was perpetrated by Asif Muhammad Hanif, 22, a British citizen who entered Israel through Jordan. He was sent by HAMAS.

303. Plaintiff Daniel Rozenstein is a citizen of the United States and a resident of the State of Florida.

304. Daniel was seated inside the bar and decided to step outside when he crossed paths with the suicide bomber in the entry way just as he detonated his explosives.

305. As a result of the attack, Daniel suffered third degree burns over his entire body.

Since his back was to the bomber, Daniel's back bore the brunt of the explosion.

306.    After three days in the hospital, Daniel slipped into a coma that lasted eight days. He was placed on a respirator and other life supports for over a week.  He remained in the hospital for one and a half months, followed by eight months of treatment as an outpatient.

307.    Since the bombing he has sustained severe hearing loss. He cannot maintain his balance, is often dizzy, and frequently experiences black outs. Much of his body is covered by scar tissue, including his back and hands. His right hand no longer functions properly because it is covered in scar tissue.

308.    As a result of the attack, plaintiff Daniel Rozenstein has suffered severe physical and mental anguish and extreme emotional distress.

309.    Plaintiff Julia Rozenstein Schon is a citizen of the United States and a resident of the State of Texas. She is the sister of plaintiff Daniel Rozenstein.

310.    On the night of the bombing, Julia received a telephone call from the father of Daniel's girlfriend.  She was told there had been an attack and that no one was certain of Daniel's condition.

311.    When Julia first saw Daniel she did not recognize him because his body was horribly burned and his face and ears were swollen beyond recognition. She spent many days in the hospital, and was there when her brother slipped into a coma.

312.    Julia still suffers nightmares and is traumatized by the attack. Even now, she calls her brother compulsively to be certain that he is not in danger.

313.    As a result of the attack, plaintiff Julia Rozenstein Schon has suffered severe mental anguish and extreme emotional distress.

---

[4]    There were actually two (2) bombers, both British nationals sent by HAMAS, but the explosive belt on one of them failed to detonate.

314.    Plaintiff Alexander Rozenstein is a citizen of the United States and a resident of the State of Florida. He is the father of Daniel Rozenstein.

315.    Plaintiff Esther Rozenstein is a citizen of the United States and a resident of the State of Florida. She is the mother of Daniel Rozenstein.

316.    As a result of the attack, plaintiffs Alexander Rozenstein and Esther Rozenstein have suffered severe mental anguish and extreme emotional distress.

**Joshua Faudem**

317.    Plaintiff Joshua Faudem, age 40, is a citizen of the United States and a citizen of the State of Israel.

318.    Mr. Faudem, a documentary filmmaker, was working in Israel in the spring of 2003, filming what would be produced as "Blues by the Beach," a documentary on everyday life for young Israelis.

319.    On the night of the attack, Mr. Faudem was enjoying an evening of live music at Mike's Place and was filming the crowd and performances there.

320.    At approximately 1:00 in the morning, Asif Hanif detonated his explosives at the entrance to Mike's Place.

321.    Amidst the terror and chaos in the wake of the explosion, Mr. Faudem assisted his then-girlfriend to the bar's back storeroom, away from the carnage.

322.    At some point during the bombing's aftermath, Mr. Faudem realized his video camera was still recording.  He picked up the camera and began filming the scene around him and the people outside of the bar.

323.    When he realized that everyone needed to evacuate the building, Mr. Faudem assisted his girlfriend out of the bar.  They had to wade through spilled blood, body parts, and

pieces flesh to get outside. As they exited, Mr. Faudem saw the dead bodies of his friends and the mangled corpse of the suicide bomber.  Mr. Faudem attempted to shield his girlfriend's eyes from the horrors that surrounded them, but she slipped in a pool of blood, fell on her back, and gazed directly at the bomber's headless torso.

324.    Mr. Faudem and his girlfriend were taken by ambulance to the hospital, where they were released later that morning.

325.    Mr. Faudem remains haunted by the images that fill his mind.  As a filmmaker, he travels the world showing his film "Blues by the Beach" and sharing his story with others. Although this can be somewhat therapeutic, it is also immensely painful for Mr. Faudem to continually relive his experience by sharing his story and movie with audiences.

326.    As a result of the terrorist attack, plaintiff Joshua Faudem has suffered severe mental anguish and extreme emotional distress.

**Zohar Fater**

327.    Plaintiff Zohar Fater, age 40, is a citizen of the United States and a citizen of the State of Israel.

328.    Ms. Fater, a regular attendee of the Mike's Place musical jam sessions, was enjoying an evening of live music the night of the attack.

329.    When Asif Hanif detonated his explosives at the entrance to Mike's Place, the force of the blast threw Ms. Fater several feet through the air where she landed on the pavement between two cars outside of the bar.  She instinctively shut her eyes to prevent herself from witnessing any of the horrible sights she knew surrounded her.

330.    Ms. Fater was rapidly losing blood as a result of a leg wound caused by the explosion.  A friend sat with Ms. Fater and kept her talking in an effort to keep her conscious

until medical personnel arrived.

331.    Ms. Fater was one of the last victims to be loaded into an ambulance and by that time she was having difficulty breathing, was nearly fainting, and could only feel her fingers.

332.    Ms. Fater remained hospitalized for two weeks after the attack, during which time she underwent several surgeries on her knee and leg.

333.    After her release from the hospital, Ms. Fater remained wheelchair-bound for two months.  Thereafter, she had to walk with the assistance of crutches.

334.    To this day Ms. Fater has limited mobility, must wear special shoes, and continues to experience pain in her injured leg.

335.    On account of her restricted mobility, Ms. Fater had serious difficulty maintaining her longstanding job with the Tel Aviv Orchestra.  Although she was also employed as a fashion model, she can no longer reveal her leg due to the scarring and has thus been unable to model anymore.

336.    Due to the traumatic physical experience she underwent coupled with her exposure to the horrible sounds and smells of a bombing site, Ms. Fater has also suffered psychological trauma.

337.    As a result of the attack, plaintiff Zohar Fater has suffered severe physical and mental anguish and extreme emotional distress.

**Bruce Mazer**

338.    Plaintiff Bruce Mazer, age 54, is a citizen of the United States and a citizen of the State of Israel. He is also a resident of the State of Missouri.

339.    Mr. Mazer was living in Tel Aviv in the spring of 2003.  On the night of the terrorist attack, Mr. Mazer was celebrating a friend's birthday and enjoying an evening of live

music at Mike's Place.

340.    Mr. Mazer heard Asif Hanif detonate his explosives, but Mr. Mazer initially believed the noise to be firecrackers.  He spun around and witnessed the havoc the bombing caused.  He saw blood everywhere and slipped in it as he exited the bar.  Once outside, Mr. Mazer reunited with his roommate and they helped each other remove scattered bits of flesh and viscera from their clothes.

341.    That night, Mr. Mazer was examined at the intensive care unit of the hospital. After the examination and an evaluation by a psychiatrist, he was discharged.

342.    Mr. Mazer continues to suffer emotionally as a result of the trauma he experienced.  Loud noises trigger an automatic recollection of the events of April 30, 2003, and generate bouts of depression.

343.    As a result of the attack, plaintiff Bruce Mazer has suffered severe mental anguish and extreme emotional distress.

**Orly Rom**

344.    Plaintiff Orly Rom, age 33, is a citizen of the United States and a citizen of the State of Israel.

345.    Ms. Rom was living in Tel Aviv in the spring of 2003.  On the night of the attack, Ms. Rom was celebrating her boyfriend's birthday and enjoying an evening of live music at Mike's Place when the terrorist detonated his explosives.

346.    Ms. Rom suffered a temporary hearing loss as a result of the explosion's deafening noise.

347.    Although she sustained no serious physical injuries, Ms. Rom witnessed the graphic sight of the bombing's aftermath.

348. That night, Ms. Rom was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Ms. Rom was discharged.

349. Ms. Rom continued to suffer emotionally as a result of the trauma she experienced. She has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

350. As a result of the terrorist attack, plaintiff Orly Rom has suffered severe mental anguish and extreme emotional distress.

**Richard Coffey**

351. Plaintiff Richard Coffey, age 52, is a citizen of the United States and a citizen of the State of Israel.

352. Mr. Coffey was living in Tel Aviv in the spring of 2003 and working as a bartender at Mike's Place. He also performed frequently as a singer at the club. On the night of the attack, Mr. Coffey was celebrating his birthday at Mike's Place and was enjoying an evening of camaraderie and performances of jam sessions.

353. As a result of the bomber's blast, Mr. Coffey sustained minor injuries to his back and head. He has also endured the ongoing emotional trauma of having witnessed the graphic images of the bombing's aftermath, including the sights of deceased and injured friends and colleagues.

354. That night, Mr. Coffey was examined at the intensive care unit at the hospital. After that examination, Mr. Coffey was discharged.

355. Mr. Coffey continued to suffer emotionally as a result of the trauma he experienced. He has suffered from depression and insomnia and has attended group therapy sessions with a social worker.

356.    As a result of the terrorist attack, plaintiff Richard Coffey has suffered severe mental anguish and extreme emotional distress.

**Gal Ganzman**

357.    Plaintiff Gal Ganzman, age 42, is a citizen of the United States and a citizen of the State of Israel.  He is a resident of Manila, Philippines.

358.    Mr. Ganzman was the owner of Mike's Place in the spring of 2003. On the night of the terrorist attack, Mr. Ganzman was bartending and performing his usual duties as bar owner and manager.

359.    When Asif Hanif detonated his explosives, Mr. Ganzman was pouring a beer for a customer.  Mr. Ganzman heard noises similar to fireworks, followed by silence.

360.    Mr. Ganzman suffered temporary hearing loss as a result of the explosion's deafening noise.

361.    Mr. Ganzman witnessed the graphic sights of the bombing's aftermath, including viscera, blood, and the bomber's scattered remains.  His exposure to the images and smells of violent death has left him traumatized.

362.    That night, Mr. Ganzman was examined at the intensive care unit at the hospital. After that examination and a conversation with a psychiatrist, Mr. Ganzman was discharged.

363.    Mr. Ganzman's girlfriend and two friends were present at the attack. Each of them died en route to the hospital.  Mr. Ganzman has been profoundly affected by the loss of these individuals.

364.    Following his experience on the night of April 20, 2003, Mr. Ganzman continued to suffer emotionally for some time as a result of the trauma he survived.  He suffered from Post-Traumatic Stress Disorder and has experienced panic attacks.

365.   As a result of the terrorist attack, plaintiff Gal Ganzman has suffered severe mental anguish and extreme emotional distress.

**Judith Buchman-Ziv**

366.   Plaintiff Judith Buchman-Ziv, age 63, is a citizen of the United States and a citizen of the State of Israel.  She is a resident of the State of New York.

367.   In the spring of 2003 Ms. Buchman-Ziv was living in Tel Aviv, where she worked as a legal assistant. She also performed regularly as a singer and guitarist at Mike's Place.  On the night of the attack, Ms. Buchman-Ziv was performing in the weekly jam sessions at Mike's Place.

368.   As she tried to exit the bar after the explosion, Ms. Buchman-Ziv was exposed to horrible sights of body parts and the bomber's mangled corpse.  She slipped and fell in human blood and remains.  She exited the bar in a state of shock and went home.

369.   Ms. Buchman-Ziv continues to suffer emotionally as a result of the trauma she experienced.  She suffered and continues to suffer from severe Post-Traumatic Stress Disorder, Acute Stress Disorder, Anxiety Disorder, panic attacks, depressive episodes, nightmares, nervousness, and hysteria.  She continues to receive regular counseling in the United States.

370.   As a result of the attack, plaintiff Judith Buchman-Ziv has suffered severe mental anguish and extreme emotional distress.

## SHOOTING ATTACK ON ROAD #60 - JANUARY 29, 2003

**The Steinmetz Family**

371.   Plaintiffs Jacob Steinmetz and Deborah Steinmetz are citizens of the United States and citizens and residents of the State of Israel.

372.   On January 29, 2003, Jacob was driving their car on Road #60. Deborah sat in the

47

front passenger seat of the car. As their car made a turn, two masked men began shooting at the car. The entire driver's side of the car was riddled with bullets.

373.    HAMAS perpetrated this attack.

374.    Two bullets hit Jacob. One shot passed through the car seat and lodged in his leg. The other shot entered his arm and passed through his elbow.

375.    After arriving at the hospital and over the next few days, Jacob underwent a number of operations.

376.    Four metal spikes were surgically inserted into his bone in order to restrain his arm.  The spikes remained there for three months and severely restricted his arm's mobility. Additional plastic surgeries were performed.  Jacob received a skin graft from his leg to cover the opening in his elbow.

377.    In 2003, Jacob underwent a complete elbow replacement that included the placement of a large metal hinge.

378.    Presently, the use of Jacob's arm is greatly limited.

379.    As a result of the attack, plaintiff Jacob Steinmetz has suffered severe physical and mental anguish and extreme emotional distress.

380.    As a result of being in the car that terrorists targeted, plaintiff Deborah experiences great anxiety and has suffered severe mental anguish and extreme emotional distress.

381.    Plaintiffs Nava Steinmetz, Orit (Steinmetz) Mayerson and Natanel Steinmetz are the children of Jacob and Deborah Steinmetz.

382.    Amichai Steinmetz was a citizen of the United States and the son of plaintiffs Jacob and Deborah Steinmetz.

383.    In 2009, Amichai Steinmetz went missing while on a trip to India. In December 2015 an Israeli court declared Amichai Steinmetz dead.

384.    Following the attack and prior to his declaration of death in 2015, Amichai Steinmetz suffered severe mental anguish and extreme emotional distress as a result of the attack.

385.    Plaintiffs Jacob and Deborah Steinmetz bring this action both individually and on behalf of the Estate of Amichai Steinmetz.

386.    As a result of the attack, plaintiffs, Nava Steinmetz, Orit (Steinmetz) Mayerson and Natanel Steinmetz have suffered severe mental anguish and extreme emotional distress.

## THE HEBREW UNIVERSITY CAFETERIA BOMBING - JULY 31, 2002

387.    On the afternoon of July 31, 2002, approximately 100 people were eating lunch in the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem.  A bomb planted inside the cafeteria exploded, killing nine (9) people and injuring as many as eighty-five (85) others. Five Americans were killed in the attack, including Janis Ruth Coulter, Benjamin Blutstein, Diane Carter and David Gritz.

388.    HAMAS claimed responsibility for the attack.

389.    According to published reports, Mohammed Odeh, who worked at Hebrew University as a painter for an Israeli contractor, carried out the attack.

390.     Odeh received the explosives from accomplices in the West Bank town of Ramallah, where the HAMAS cell command was located. On the night before the attack, Odeh had jumped over a fence on the campus and hid the explosives under a bush. The next morning, he walked through the main gate using his employee permit, picked up the bomb and planted it in the cafeteria. He then remote detonated the explosives with a cell phone.

49

391. Familiar with the university, Odeh had chosen the Frank Sinatra Cafeteria as the site for the bombing, knowing that few Arabs frequented the cafeteria and that foreign students frequently dined there.

**The Coulter Family**

392. Janis Ruth Coulter, a 36 year old citizen of the United States, was in the cafeteria when the bomb exploded killing her and injuring her friend who she was eating lunch with.

393. She was the assistant director of the Hebrew University's Rothenberg International School's Office of Academic Affairs in New York.

394. Janis had arrived in Israel just one day before the bombing to accompany a group of nineteen (19) American students who were scheduled to attend classes at the university.

395. Plaintiff Robert L. Coulter, Sr. was watching television news that morning in the United States when he saw a "news flash" about a bombing at Hebrew University. Thinking he saw his daughter's head lying in an unsealed body bag, he called his other daughter, plaintiff Dianne Coulter Miller. Dianne called Janis's boss in New York and both Mr. Coulter and his daughter desperately tried to reach Janis on her cell phone without success.

396. Plaintiff Robert Coulter, Jr. had heard about the bombing on the radio on the way to work, but didn't make the connection with Janis's visit to Israel. His father called him at work about the possibility that Janis was at the cafeteria and he then drove immediately to his father's house.

397. Initially, Janis was identified only through the numbers on her medical alert bracelet. Eventually, the family retrieved Janis's dental records and faxed them to Israel where, later that evening, her death was confirmed.

398. Plaintiff Robert L. Coulter, Sr. is a citizen of the United States and a resident of

the State of Massachusetts. He brings this action both individually and on behalf of the Estate of Janis Ruth Coulter.

399.    Plaintiff Dianne Coulter Miller is a citizen of the United States and a resident of the State of Massachusetts.

400.    Plaintiff Robert L. Coulter, Jr. is a citizen of the United States and a resident of the State of Massachusetts.

401.    As a result of Janis's death, plaintiff Robert L. Coulter, Sr. has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

402.    As a result of Janis's death, plaintiff Dianne Coulter Miller has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

403.    As a result of Janis's death, plaintiff Robert L. Coulter, Jr. has experienced emotional pain and suffering, loss of his sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Carter Family**

404.    Diane Leslie Carter, a 38 year old citizen of the United States and resident of the State of North Carolina, was eating lunch in the cafeteria when the bomb exploded.

405.    Diane Carter was killed by the bomb blast.

406.    In 1990, Diane had moved to Israel, where she worked as a librarian and archivist in the National Library on the Givat Ram campus of Hebrew University in Jerusalem.

407.    Plaintiff Larry Carter is a citizen of the United States and a resident of the State of North Carolina. He is the father of Diane Carter. He brings this action both individually and on

behalf of the Estate of Diane Leslie Carter.

408.    Larry learned of his daughter's death from a journalist who called his home. After conferring with his ex-wife, Diane's mother, Larry was able to confirm that his daughter was, in fact, killed in the bombing.

409.    Diane's sister, plaintiff Shaun Choffel, is a citizen of the United States and a resident of the State of Virginia.

410.    Both Larry and Shaun learned that Diane had been buried in Israel only moments before the funeral was scheduled to begin. Neither of them had the opportunity to say goodbye to Diane.

411.    As a result of Diane Carter's death, plaintiff Larry Carter has experienced emotional pain and suffering, loss of his daughter's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

412.    As a result of Diane Carter's death, plaintiff Shaun Choffel has experienced emotional pain and suffering, loss of her sister's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Blutstein Family**

413.    Benjamin Blutstein, a 25 year old citizen of the United States and resident of the State of Pennsylvania, was killed in the blast.

414.    Benjamin had come to Israel for a two-year study program at the Pardes Institute in Jerusalem to become a teacher.

415.    Benjamin was scheduled to fly home to visit his family in Pennsylvania the day after he was murdered by HAMAS terrorists. Instead, two days after the attack, Benjamin's body was flown home and buried in his parents' home town of Harrisburg, Pennsylvania.

416.    Plaintiffs, Dr. Richard Blutstein and Dr. Katherine Baker, bring this action both individually and on behalf of the Estate of Benjamin Blutstein.

417.    Plaintiff Dr. Richard Blutstein is a citizen of the United States and a resident of the State of Pennsylvania.

418.    Plaintiff Dr. Katherine Baker is a citizen of the United States and a resident of the State of Pennsylvania.

419.    Plaintiff Rebekah Blutstein is a citizen of the United States and a resident of the State of Pennsylvania. She is the sister of Benjamin Blutstein.

420.    Richard first heard about the attack while watching Fox News early in the morning.  He then called Benjamin's cell phone and got a recording. Shortly thereafter he contacted friends in Israel to ascertain if Benjamin had been injured in the attack.  After a friend made a positive identification, Richard received a call confirming Benjamin's death.

421.    Katherine learned that her son had been killed in the attack when she received a call from a representative of the American Embassy. She was too overwhelmed with emotion to call her husband. Richard received the call from a neighbor, who was with Katherine.  Katherine then composed herself enough to inform her daughter, Rebekah.

422.    As a result of Benjamin's death, plaintiff Richard Blutstein has experienced emotional pain and suffering, loss of his son's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

423.    As a result of Benjamin's death, plaintiff Katherine Baker has experienced emotional pain and suffering, loss of Benjamin's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

424.    Although Rebekah's father had informed her about the attack, Rebekah's mother

was the one who told her that her brother had died.

425.    As a result of Benjamin's death, plaintiff Rebekah Blutstein has experienced emotional pain and suffering, loss of her brother's society, companionship, comfort, protection, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

**The Gritz Family**

426.    David Gritz, a 24 year old dual citizen of the United States and France was killed in the explosion. He had come to Israel for the first time with the help of a scholarship from the Hartman Institute to study philosophy and write his doctorate.

427.    He died after being in Israel for only two weeks.

428.    Norman Gritz was a citizen of the United States and France and a resident of France. He was the father of David Gritz. Norman Gritz died on September 5, 2005.

429.    Plaintiff Nevenka Gritz is a citizen and resident of France. She is the mother of David Gritz, who was an only child.

430.    Plaintiff Nevenka Gritz brings this action both individually and on behalf of the Estate of David Gritz and the Estate of Norman Gritz.

431.    Nevenka and her husband, Norman Gritz, were in New York on the day their son was murdered. Friends of theirs informed them that television reports had indicated that a bombing had taken place at Hebrew University. Nevenka and her husband attempted to reach their son by phone, and then called the Israeli consulate in the hopes of getting more information. Eventually, confirmation came from the Israeli consulate that David's body had been identified.

432.    Following the attack and prior to his death Norman Gritz experienced emotional pain and suffering, loss of his only child's society, companionship, comfort, advice and counsel and suffered severe mental anguish and extreme emotional distress.

433.   As a result of David's death, plaintiff Nevenka Gritz has experienced emotional pain and suffering, loss of their only child's society, companionship, comfort, advice and counsel and suffered severe mental anguish and extreme emotional distress.

## THE SHEFFIELD CLUB BOMBING OF MAY 7, 2002

434.   On the night of May 7, 2002, a Palestinian suicide bomber entered the third floor of a building in Rishon Letzion's new industrial area that housed the Sheffield Club, an unlicensed social club and gambling parlor, and detonated a bomb.

435.   HAMAS perpetrated and claimed responsibility for this attack.

436.   Eyewitnesses reported that the bomb blast propelled many of the victims through the club's windows and on to parked cars in the parking lot three floors below.

437.   Fifteen (15) people were killed by the attack including Esther Bablar, an American citizen who had returned to Israel after thirty (30) years to marry her childhood sweetheart, Yitzhak, who was also killed in the attack. Esther died of her injuries the following morning. Esther is survived by three children.

**The Bablar Family**

438.   Plaintiffs Jacqueline Chambers and Levana Cohen are citizens of the United States and residents of the State of Florida. They are the daughters of Esther Bablar.

439.   Plaintiff Jacqueline Chambers brings this action both individually and on behalf of the Estate of Esther Bablar.

440.   Esther had spent the month before the bombing in Florida with her youngest daughter, plaintiff Levana Cohen who had just given birth to Esther's grandchild and had been in New York visiting Jacqueline the day before the attack.

441.   On the day of the attack, a member of the Bablar family in Israel contacted

Esther's sister in New York and told her the bad news. Eventually both of Esther's daughters were notified and they quickly made arrangements to board a flight to Israel with their aunt and uncle.

442.    As a result of the terrorist attack, plaintiffs Jacqueline Chambers and Levana Cohen have experienced emotional pain and suffering, and the loss of their mother's society, companionship, comfort, protection, attention, advice and counsel.

443.    Plaintiff Eli Cohen is a citizen of the United States and a resident of the State of New York. He is the son of Esther Bablar.

444.    As a result of the terrorist attack, plaintiff Eli Cohen has experienced emotional pain and suffering, and the loss of his mother's society, companionship, comfort, protection, attention, advice and counsel.

445.    Plaintiff Sarah Elyakim is a citizen of the United States and a resident of the State of New York. She is the sister of Esther Bablar.

446.    As a result of the terrorist attack, plaintiff Sarah Elyakim has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel.

**The Agababa Family**

447.    Dalya Massa, an Israeli citizen, received penetrating shrapnel wounds to her chest as a result of the bombing at the Sheffield Club. She was transported to Assaf Harofeh Hospital where her chest was opened to remove the shrapnel. She underwent 30 minutes of cardiac massage, but within a few hours, Dalya Massa was pronounced dead.

448.    Plaintiff Yehuda Agababa is a citizen of the United States and a resident of the State of California. He is the brother of Dalya Massa.

449.    Yehuda Agababa learned that his sister, Dalya Massa, was injured in the Sheffield

Club bombing when he received a phone call from his brother Yehezkel in Israel informing him of this fact. After learning a few hours later that his sister had died, he got on the first plane. Yehuda has described his sister's death as one of the most traumatic events of his life, and it resulted in extended depression and isolation from romantic and family relationships.

450.    Plaintiff Menache Agababa is a citizen of the United States and a resident of the State of New Jersey. He is the brother of Dalya Massa.

451.    Menache Agababa learned that his sister, Dalya Massa, had been killed when he received a call from his brother, Ovadia in Israel. He immediately boarded a flight to Israel, but arrived after the funeral.

452.    Following the death of his sister, Menache Agababa sought treatment from a therapist to deal with his emotional injuries as a result of his sister's death.

453.    He has also felt the obligation to return to Israel often to care for both his mother and his niece, whose mother was killed.

454.    Plaintiff Yehezkel Agababa is a citizen of the United States and a resident of the State of Israel. He is the brother of Dalya Massa.

455.    Yehezkel Agababa learned that his sister, Dalya Massa, had been injured when he received a call from his nephew Doron. He rushed to the hospital where his sister had died.

456.    He has preoccupied himself with his niece, who lost her mother in the bombing and had lost her father two years prior to the attack.

457.    Plaintiffs Yehuda Agaba, Menache Agaba and Yehezkel Agababa have experienced emotional pain and suffering and the loss of their sister's companionship, advice and counsel and have suffered severe physical and mental anguish and extreme emotional distress.

## PASSOVER MASSACRE AT THE PARK HOTEL IN NETENAYA: MARCH 27, 2002

### The Rogen Family

458.    On March 27, 2002, a HAMAS suicide bomber blew himself up near the dining area within the Park Hotel in Netanya. It was the night of the Jewish holiday of Passover and the hotel dining room was filled with hundreds of people celebrating the Passover Seder with their families and friends. Thirty (30) people were murdered in the bombing, including Hannah Rogen, who was severely wounded in the attack and died of the wounds six days later on April 2, 2002.

459.    Hannah was a Holocaust survivor who immigrated to the United States after World War II.  She was attending the Passover Seder at the invitation of a childhood friend, Yulia Talmi, who was also killed in the attack.

460.    Hannah was a citizen of the United States at the time of her death.

461.    Greta Geler is the great niece of Hannah Rogen.  She, along with Ilana Eropa Dorfman, Rafael Kitsis, and Tova Guttman bring this action as Administrators of the Estate of Hannah Rogen.

### The Anachovich Family

462.    David Anachovich and Frieda Anachovich, citizens of the State of Israel, were guests at the Passover Seder at the Park Hotel on March 27, 2002 when the suicide bomber detonated the explosives.

463.    David Anachovich was transported to the hospital but died before surgery could be performed.

464.    Frieda Anachovich suffered a blow to the pelvis that necessitated her confinement in a wheelchair for six months, and use of a walker afterward. She also sustained damage to her

hearing in the blast. Frieda Anachovich died in 2015.

465.     Plaintiff Akiva Anachovich is a citizen of the United States and a resident of the State of New Jersey. He is the son of David and Frieda Anachovich.

466.     When Plaintiff Akiva Anachovich was notified of the bombing, he immediately boarded a flight to Israel to attend to his parents. Upon arrival in Israel, he arranged for his father's burial.

467.     From 2002 through 2015, Plaintiff Akiva Anachovich traveled to Israel four times each year to care for his mother. This care included taking her to doctor appointments and providing other support services that she required.

468.     Plaintiff Akiva Anachovich continues to suffer emotionally from the loss of his father and the impact that the bombing had on his mother's life until her death in 2015.

469.     As a result of the attack, plaintiff Akiva Anachovich has experienced emotional pain and suffering and the loss of his father's companionship, advice and counsel.

### THE TEL ROMEDA SHOOTING IN HEBRON - OCTOBER 22, 2003

470.     On October 22, 2003, HAMAS gunman Rafiq Ziyad Qunaybi opened fire from his porch at two (2) passersby in Tel Romeda, Hebron.

471.     Both men were wounded in the shooting.

**The Noked Family**

472.     Plaintiff Eyal Noked was a citizen of the United States and a citizen of the State of Israel. Eyal Noked passed away on June 11, 2011.

473.     In the fall of 2003, Mr. Noked, a foreman for a building company, was living and working in Hebron with his wife and six children.

474.     On October 22, 2003, Mr. Noked was traveling with a friend near the entrance to

Hebron's Admot Yishai neighborhood when Rafiq Qunaybi opened fire, significantly wounding Mr. Noked.

475. Mr. Noked sustained serious physical injuries, including a gunshot wound to the left shoulder, a shattered left arm, and shrapnel wounds to his head and back.

476. Mr. Noked was taken to the hospital for emergency medical treatment and remained hospitalized until October 30, 2003. He underwent surgery to remove the shrapnel from his body and to reaffix his injured left arm. Mr. Noked's left arm remained paralyzed until his death.

477. Mr. Noked was treated by numerous medical providers and participated in a lengthy period of physical rehabilitation.

478. Due to the traumatic physical effects of the attack, Mr. Noked sustained psychological trauma and he suffered from severe emotional effects of the attack. He experienced fear, anxiety, panic attacks, and cold sweats. He also had recurring nightmares and visions of the shooting attack and its aftermath. Mr. Noked participated in counseling sessions with rabbinical councils to help alleviate the emotional effects.

479. Prior to his death, Eyal Noked suffered severe physical and mental anguish and extreme emotional distress as a result of the attack.

480. Plaintiff Einat Noked is an Israeli citizen and was the wife of Eyal Noked. She brings this suit both individually and on behalf of the Estate of Eyal Noked.

481. Plaintiffs A.N., a minor, Avishag Noked, Baruch Zuri Noked, Binyamin Elkana Noked, Neta Nechama Cohen (nee Noked), and T.N., a minor, are the children of Eyal and Einat Noked.

482. Plaintiffs Einat Noked, A.N., Avishag Noked, Baruch Zuri Noked, Binyamin

Elkana Noked, Neta Nechama Cohen (nee Noked), and T.N. have suffered severe mental anguish and extreme emotional distress.

## THE BOMBING OF BUS NUMBER 19: JANUARY 29, 2004

483.    On January 29, 2004 Ali Ju'ara, a Palestinian policeman from the Aida refugee camp on the outskirts of Bethlehem, boarded Bus No. 19 ("Bus 19") in Jerusalem and seated himself at the back of the bus.  The Bus's usual route commences at Hadassah Hospital Ein Kerem, in the Ein Kerem neighborhood of Jerusalem, and thereafter travels through the center of Jerusalem to Hadassah Hospital and Hebrew University on Mount Scopus.  On that day, January 29, shortly before 9 a.m. Israeli time, Bus 19 reached the corner of Gaza and Arlozorov streets in Jerusalem.  At that moment, Ali Ju'ara detonated the bomb he was carrying.  The resulting explosion killed 11 people and wounded 50 others, including Stuart Scott Goldberg.

484.    After the Bus 19 attack, both HAMAS and the Al Aqsa Martyrs Brigades claimed responsibility for the attack.

485.    In 2004, the Israeli Military Court in Judea issued an indictment against Nufal Adawin.  The indictment identifies Adawin as a HAMAS member, and charges Adawin for his role in connection with the January 29, 2004 Bus 19 bombing.

486.    Specifically, count 27 of the Adawin indictment charges that Adawin recruited Ali Ju'ara on HAMAS's behalf for the purpose of arranging for Ju'ara to carry out a suicide bombing.  Adawin planned the attack with Ali Ju'ara and Muhammad Nashash, another member of HAMAS.  Adawin also helped to prepare the bomb for the attack.  Adawin was in the process of transporting Ali Ju'ara to carry out the attack when they had to turn back because of a roadblock.

487.    Thereafter, Adawin advised Ali Ju'ara that he had been in contact with another

Palestinian terrorist group, Tanzim-Fatah, in connection with carrying out the attack they planned.   Adawin informed Ali Ju'ara that he intended to seek Tanzim-Fatah's assistance in order to carry out the attack.

488.   After the attack, Adawin sent pictures and video he had previously taken of Al Ju'ara to a TV station in Bethlehem. Adawin, on HAMAS's behalf, claimed responsibility for the Bus 19 attack.

**The Goldberg Family**

489.   Stuart Scott Goldberg, 41, a Canadian citizen, was killed in the Bus 19 Attack. He is survived by his wife Karen Goldberg, and their seven children Chana (Goldberg) Weiss, Esther Goldberg, Yitzchak Goldberg, Shoshana Goldberg, Eliezer Goldberg, Y.M.G. and T.Y.G. (referred to herein collectively as "the Goldberg Children Plaintiffs").   Mr. Goldberg was a therapist who specialized in helping teens at risk and their families.   He also wrote a column in *The Jewish Press* called Lifeline.

490.   Plaintiff Karen Goldberg is a citizen of the United States and a citizen and resident of the State of Israel.  She was Stuart Scott Goldberg's wife.

491.   As a result of her husband's death she has lost material services, affection, companionship, consortium and the customary amenities of married life.   As a result of the attack, she has suffered severe mental anguish and extreme emotional distress.

492.   The Goldberg Children Plaintiffs are all citizens of the United States and citizens and residents of the State of Israel.

493.   As a result of the Bus 19 Attack and their father's murder, the Goldberg Children Plaintiffs have permanently lost the benefits of his companionship, comfort, protection, attention, advice and counsel for the balance of their lives.  As a result of the attack, they have all suffered

severe mental anguish and extreme emotional distress.

**The Choman Family**

494.    Anat Darom was killed in the Bus 19 attack on January 29, 2004.

495.    Plaintiff Nilly Choman is a citizen of the United States and a resident of the State of Israel. She is the sister of Anat Darom.

496.    On the morning of the attack, Nilly was at home in Tel Aviv, Israel when she heard the news of a suicide bombing in Jerusalem on the radio. Out of habit, given the frequent terror attacks during that time period, she attempted to call her sister Anat, but received no answer to any of the calls she made.

497.    Because her parents were abroad, Nilly and another sister tried to locate Anat. Nilly called the hospitals in and around Jerusalem, but was unable to locate Anat. Around 12:30 p.m., Nilly's workplace called her and told her that she needed to go to the Abu Kabir pathology institute because there was an unidentified body from the bombing. She was also recommended to contact Anat's dentist before going to Abu Kabir.

498.    Because Anat was located so close to the bomber, Anat's body was in a very unidentifiable state. Thus the identification process took a very long time.

499.    Nilly was tasked with informing her family – including her parents – that Anat had been killed.

500.    As a result of her sister's death, Nilly's life has changed completely. A social worker by profession, Nilly experiences life events as more difficult than she previously did and feels grief, sadness and emptiness due to the loss of her sister. She experiences fear and anxiety about her loved ones since her sister's death, and she will not allow herself or her children to travel on public transportation.

501.    The loss of her sister has caused Nilly to be short tempered and has diminished her tolerance for others – contributing to her not working for nearly six years as a social worker because she could not empathize with or tolerate her clients. She has felt a significant decrease in her quality of life since the loss of her sister.

502.    As a result of the terrorist attack, plaintiff Nilly Choman has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel.

## THE BEN YEHUDA STREET BOMBINGS: DECEMBER 1, 2001

503.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing (followed by a coordinated car bombing). A large quantity of nails was packed with each of the bombs. Eleven (11) people were murdered and over one hundred (100) people were injured. Bahr had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society is one of HAMAS's key charitable front organizations in the West Bank.

504.    Subsequent to the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks.  HAMAS also claimed responsibility for this attack.

**Temima Spetner**

505.    Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

506.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and

fell.  Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

507.    As a result of the terrorist attack, the femoral artery of Temima's right leg was severed.  She was transported to the hospital where doctors operated on her to stop the bleeding. The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel. Temima remained in the hospital for ten days.

508.    There is significant scarring on Temima's thigh and the lower part of her abdomen.  She continues to experience numbness in her right leg and is highly sensitive to pain in that leg. Temima has also experienced psychological trauma as a result of the attack.

509.    As a result of the attack, plaintiff Temima Spetner has suffered severe physical and mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

510.    Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

511.    Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

512.    As a result of the first explosion, Jason was thrown to the ground.  As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

513.    When he got up the second time he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off.  When he began running up the street for help, he felt a sharp pain in his leg and back.

514.    Jason was taken to Shaare Tzedek Hospital in Jerusalem where he underwent two

65

operations. Surgeons removed 8 metal bolts from his arm, leg and back.

515. Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

516. As a direct result of the terrorist attack, plaintiff Jason Kirschenbaum has suffered severe physical and mental anguish and extreme emotional distress.

517. Plaintiff Isabelle Kirschenbaum is a United States citizen and a citizen of the State of New York. She is the mother of Jason Kirschenbaum.

518. Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York. Martin Kirschenbaum passed away on April 2, 2008. He was the father of Jason Kirschenbaum.

519. Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

520. Isabelle first learned of the double suicide bombing while watching the Cable News Network (CNN). After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

521. As a result of the attack, plaintiff Isabelle Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

522. Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

523. Following the attack and prior to his death Martin Kirschenbaum suffered severe mental anguish and extreme emotional distress as a result of the attack.

524. Plaintiff Joshua Kirschenbaum is a United States citizen and a citizen of the State

of New York.  He is a brother of Jason Kirschenbaum.

525.    Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle Kirschenbaum telephoned Joshua to advise him that his brother, Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Tzedek Hospital in Jerusalem.

526.    As a result of the terrorist attack, plaintiff Joshua Kirschenbaum has suffered severe mental anguish and extreme emotional distress

527.    Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of Jason Kirschenbaum.

528.    As a result of the attack, plaintiff Shoshana Burgett has suffered severe mental anguish and extreme emotional distress.

529.    Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of Jason Kirschenbaum.

530.    As a result of the attack, plaintiff David Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

531.    Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of Jason Kirschenbaum.

532.    As a result of the attack, plaintiff Danielle Teitelbaum has suffered severe mental anguish and extreme emotional distress.

**The Miller Family**

533.    Plaintiff Netanel Miller, age 33, is a citizen of the United States and a resident of the State of Florida.

534.    Plaintiff Chaya Miller is a citizen of the United States.  Plaintiff Arie Miller is a

citizen of the State of Israel.  They are the parents of plaintiff Netanel Miller and they reside in Israel.

535.    On the evening of December 1, 2001, plaintiff Netanel Miller was with friends enjoying ice cream at the pedestrian mall in Jerusalem.  One of the suicide bombers detonated his explosives a few feet from Netanel and his friends.  Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

536.    A bolt from the bomb lodged in the upper part of Netanel's leg.  Other bolts hit him in the back, resulting in burns.  His hand and knee were also injured.

537.    Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg.  After walking approximately 30 feet, Netanel collapsed on the sidewalk.  Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg.  His attempts to use pressure to stop the bleeding were unsuccessful.

538.    Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, plaintiffs Arie and Chaya Miller.  Netanel spoke to his father, who had been an Army medic.  Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

539.    Ultimately, Netanel was taken to the Shaare Zedek Hospital by ambulance.  Since Netanel had lost a great deal of blood, he was given a blood transfusion.

540.    Arie came to the hospital.  Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

541.    Netanel was admitted to the hospital and remained there for two days.

542.    Netanel endured the pain in his leg for nearly two years.

543.    The pain in Netanel's leg became so severe he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

544.    As a result of the flashbacks and severe pain, Netanel also underwent treatment by a mental health professional.

545.    As a result of the attack, plaintiff Netanel Miller has suffered severe physical and mental anguish and extreme emotional distress.

546.    Upon learning that their son, Netanel, had been injured in the bombing, and knowing he has suffered as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

547.    As a result of the attack, plaintiffs Chaya Miller and Arie Miller have suffered severe mental anguish and extreme emotional distress.

**The Steinherz Family**

548.    Plaintiff Altea Steinherz and plaintiff Jonathan Steinherz are citizens of the United States and residents of the State of Israel. They are husband and wife.

549.    On December 1, 2001, Altea Steinherz was nine months pregnant.  Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby.  A short time later they heard another bomb explode.  Believing the bombing was over, they began to walk home.

550.    While walking in the street they saw a crazed man run past them.  Altea insisted that the couple turn around, away from the direction from which the man had come.  They heard a third explosion from where the man had run.  They later learned that the explosion was the result of a car bomb.

551.     As they began to run, Altea fell twice, and broke her arm as a result of one the falls.

552.     Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

553.     Having personally seen the emergency efforts and fears of individuals at the hospital after the attack, Altea no longer feels she can continue to volunteer at the hospital as she had done previously.  She has become more fearful in general.

554.     As a result of the attack, plaintiff Altea Steinherz suffered severe physical anguish and extreme emotional distress.

555.     As a result of the attack, plaintiff Jonathan Steinherz suffered severe mental anguish and extreme emotional distress.

**The Brill Family**

556.     Plaintiff Baruch Yehuda Ziv Brill is a citizen of the United States and a resident of the State of Israel.

557.     On December 1, 2001, Baruch Brill, then age 17, was spending time after the end of the Sabbath in the pedestrian mall located on Ben Yehuda Street when the two HAMAS suicide bombers, blew themselves up.

558.     Baruch Brill was taken to Hadassah Hospital on Mount Scopus in Jerusalem with severe physical injuries. He had endured multiple shrapnel wounds from the bombing in addition to perforation of his left eardrum. According to X-rays taken in the hospital, he had multiple large pieces of shrapnel in his left arm and chest.

559.     Baruch had two nails lodged in his left wrist that were part of the bomb vest that exploded, two pieces of shrapnel in the lower left side of his back, and a nail in the back part of

his left leg.  He also had cuts and abrasions over his entire body.

560.    He experienced severe pain associated with debridement of his injuries and the open nature of his wounds.

561.    Baruch Brill remained in the hospital until his discharge on December 9, 2001.

562.    Baruch Brill underwent extensive physical therapy as a result of the injuries he sustained in the bombing.

563.    He has also undergone emotional therapy in the form of art therapy and psychological treatment as a result of the Post-Traumatic Stress Disorder that he suffered as a result of the bombing.

564.    In order to complete his high school studies, Baruch Brill was required to attend night classes at his own expense due to the amount of school that he missed while recuperating from his injuries and while he was in the hospital.

565.    As a result of the attack, plaintiff Baruch Brill has suffered severe physical and mental anguish and extreme emotional distress.

566.    Plaintiff Chaya Beili in a citizen of the United States and a resident of the State of Israel. She is the mother of Baruch Yehuda Ziv Brill.

567.    Chaya Beili learned of the Ben Yehuda bombing in which her son was injured when her oldest daughter called her while at home. Chaya immediately started calling her son and could not reach him. After about an hour, a friend of her son called and said Baruch had been placed in an ambulance and was being taken to the hospital.

568.    During her son's hospitalization and subsequent physical and emotional therapy, Baruch resided with Chaya since his parents were divorced. Chaya personally witnessed her son's pain and recovery and has been greatly affected by her son's injuries.

569.    As a result of the attack, plaintiff Chaya Beili has suffered severe mental anguish and extreme emotional distress.

## PATT JUNCTION BUS # 32A BOMBING: JUNE 18, 2002

### Gila Aluf

570.    At approximately 7:50 a.m. on June 18, 2002, a HAMAS terrorist named Mohammad Haza' al-Ghul boarded bus number 32A in the Gilo neighborhood of Jerusalem and almost immediately detonated the large bomb which he carried in a bag stuffed with ball bearings. The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren. 19 people were killed and 74 people were injured.

571.    HAMAS claimed responsibility for the attack and identified the bomber, Mohammad Haza' al-Ghul, as an Islamic law student at An-Najah University. Fahmi Ayd Ramdan Mushahara was later convicted by an Israeli court of helping plan the attack, including identifying the bus line on which to carry out the attack and transporting the suicide bomber to the location where he boarded the bus, and for being a member of Hamas.

572.    Plaintiff Gila Aluf is a citizen of the United States and a citizen and resident of the State of Israel.

573.    Gila's husband, Boaz Aluf, was a citizen of the State of Israel. On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus 32A when Mohammed al-Ghul detonated the bomb. Boaz Aluf was killed in the terrorist attack.

574.    As a result of the terrorist attack that murdered her husband, Boaz Aluf, plaintiff Gila Aluf has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress.

### B.      The Defendant

575.     National Westminster Bank, Plc ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom. It is part of the Royal Bank of Scotland Group.

576.     NatWest conducts business in the United States and in New York, both directly and through its agents, at a number of locations including 101 Park Avenue, New York, New York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its annual report as one of its "principal offices."

577.     NatWest has also been registered to conduct business within the State of Texas since 1999, and state records list its address as 600 Travis Street in Houston, Texas.

## FACTUAL ALLEGATIONS

### I.      THE ISLAMIC RESISTANCE MOVEMENT ("HAMAS")

### A.      The Founding of HAMAS

578.     In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

579.     Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel, the West Bank, and the Gaza Strip, including the attacks that injured the plaintiffs.

### B.      Formal Designations of HAMAS as a Terrorist Organization

580.     In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and*

*Advertisements Gazette*.

581.     Initially, HAMAS specialized in kidnapping and executing people suspected of cooperating with Israel. It quickly evolved and broadened its operations so that by the early 1990s it specialized primarily in murdering civilians in Israel.

582.     For example, on April 6, 1994, a HAMAS suicide bomber blew up a bus in Afula, killing eight (8) people.

583.     On April 13, 1994, a HAMAS suicide bomber blew up a bus in Hadera, killing five (5) people.

584.     On October 19, 1994, a HAMAS suicide bomber blew up a bus in Tel Aviv, killing twenty-two (22) people.

585.     On January 23, 1995, President Clinton issued Executive Order No. 12947. President Clinton found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

586.     Executive Order No. 12947 designated HAMAS as a "Specially Designated Terrorist" (SDT).  Executive Order No. 12947 blocked all property and interests in property of the terrorist organizations and persons designated in the Order, including HAMAS.

587.     On February 25, 1996, a HAMAS suicide bomber blew up a bus in Jerusalem killing twenty-six (26) people, three (3) of whom were U.S. citizens, and injuring eighty (80), three (3) of whom were U.S. citizens.  HAMAS claimed responsibility for the bombing.

588.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of

1996.  The designation of HAMAS as a Foreign Terrorist Organization has been renewed every two years since 1997.

589.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

590.    Executive Order No. 13224 designated HAMAS as a Specially Designated Global Terrorist ("SDGT").  Executive Order No. 13224 blocked all property and interests in property of the SDGTs, including HAMAS.

### C.    HAMAS's Organizational Structure

591.    HAMAS's terrorist operations depend upon its religious and social activities to recruit, educate and train terrorists and to collect material and aid.  Its terrorist operations and social activities operate side-by-side and support each other.

### 1.    The "Dawa"

592.    HAMAS's infrastructure in Palestinian Authority-controlled territory ("the PACT") is comprised of two interwoven components: its terrorist apparatus, and its religious and social infrastructure, which is responsible for recruiting and training terrorists.  This patchwork of charitable and social institutions is commonly referred to by HAMAS as the "Dawa."

593.    For the purpose of raising funds for its operations, HAMAS has established or taken control of "charity" committees across the PACT and abroad, including committees in Ramallah, Jenin, and Tulkarem.  Each of these committees is controlled by HAMAS agents and collects and distributes its funds on behalf of HAMAS.[5]

---

[5]      There are approximately 80 such "charitable" committees in the West Bank and Gaza Strip nominally supervised by the Palestinian Authority's Ministry of Waqf and Religious Affairs.

594.    One of the important roles of these "charities" is their involvement in the channeling of funds to pay expenses for and assist the families of terrorist operatives who are arrested, injured or killed. These entities also assist with the provision of housing subsidies to the families of suicide bombers whose homes are often demolished by the Israeli army after the bomber's identity has been confirmed.

595.    The network of these "charities" and other "charitable" associations not only helps raise funds for HAMAS's terrorist operations, but also helps it to identify and recruit potential terrorists.  The network also assists recruitment, in part, by funneling money to pay benefits to the families of terrorist operatives who are arrested, injured, or killed.

596.    Nonetheless, HAMAS, like other foreign terrorist organizations, collects funds under the guise of political or humanitarian activities, thus ultimately supporting the kind of terrorist activities that injured the plaintiffs herein.

### 2.    Terrorism Financing

597.    Funds raised by or on behalf of HAMAS for "charitable purposes" are used to finance its terrorist activities. As Congress found when passing the AEDPA: "Foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism Act of 1996, Pub. L. No. 104-132, sec. 301(a)(7), 110 Stat. 1247.

598.    HAMAS receives a majority of its financing through donations coordinated by prominent Saudi and Gulf State charities and the global network of charities known as the Union of Good, operated by the Muslim Brotherhood. The Union of Good, in turn, raises funds that are, in part, channeled through an entity known as the Palestine Relief and Development Fund and/or Interpal (Hereinafter: "Interpal"), which maintains several accounts with defendant NatWest.

### a.        The Union of Good

599.    I'Tilafu Al-Khayr a/k/a the Union of Good is an umbrella organization established by the Muslim Brotherhood in October 2000, immediately following the outbreak of the ongoing violent Palestinian-Israeli confrontation commonly termed the "Second Intifada."

600.    The Union of Good is thus a principal fundraising mechanism for HAMAS.

601.    The Union of Good's primary "charitable" purpose is to provide financial support for HAMAS and its agents in the PACT.

602.    The Union of Good is comprised of more than fifty (50) Islamic charitable foundations worldwide.  The U.S. Government has designated several of these foundations, including Interpal and the Al-Aqsa Charitable Foundation, as Specially Designated Global Terrorists ("SDGT").

603.    The U.S. Government designated Interpal an SDGT on August 22, 2003, and designated the Al-Aqsa Charitable Foundation an SDGT on May 29, 2003.

604.    NatWest maintains a U.S. Dollar account for the Union of Good with the account number 140-00-08537933.

605.    The Union of Good uses Interpal as its principal clearing house for funds raised throughout Europe and the Middle East.

606.    For example, in recent months, plaintiffs discovered that the Union of Good's "101 Days Campaign" maintains its own website at www.101days.org.  The campaign solicits funds for HAMAS and directs prospective donors to donate via Interpal's NatWest account numbers 60082295142940 (Sterling) and 60720508524882 (Euros).

607.    **Interpal's own website directly manifests the symbiotic link between the Union of Good and Interpal, soliciting donations for the former, and explicitly stating that:**

Any donation that is made to INTERPAL through this web page is distributed with the knowledge and approval of the other members of the Union for Good directly to the charities in Palestine that are implementing the work creation programs [sic].[6]

608.    The Union of Good is headed by Dr. Yussuf al-Qaradawi, an extremist Sunni Muslim scholar based in Qatar.  NatWest is will aware of al-Qaradawi's connections to terrorism and his connection to Interpal.

609.    To begin with, al-Qaradawi has been on the U.S. Watch List since November 1999 and cannot travel to the United States.

610.    Al-Qaradawi was also a leading shareholder and principal in the Al Taqwa Bank, which was officially designated as a Specially Designated Global Terrorist on November 7, 2001, because of its ties to fundraising and money laundering for al Qaeda and HAMAS.

611.    Nor is al-Qaradawi an obscure or shadowy figure. On the contrary, he has his own weekly television program on *Al Jazeera* and has very publicly issued an Islamic religious edict (*fatwa*) authorizing suicide bombing attacks against Israel.[7]

612.    In fact, on April 14, 2002, al-Qaradawi appeared on *Al Jazeera* extolling "jihad and martyrdom" against Israelis and denouncing the U.S. designation of HAMAS and other terrorist organizations.

613.    Although the Union of Good and other fundraising organizations for HAMAS speak only generally about the Intifada and the families of the 'martyrs,' NatWest has been, and remains, in a unique position to monitor and quantify most of the transactions flowing into the Union of Good and Interpal accounts.  NatWest is also in a position to monitor and determine the

---

[6]        http://www.interpal.org/web/101.htm

[7]        Al-Qaradawi was also the first scholar who authorized women to commit suicide attacks (March 2002) in the context of the second Intifada, as cited in HAMAS's official website: http://www.palestine-info.info/arabic/fatawa/alamaliyat/qaradawi.htm.

identities of the entities to which the Union of Good and Interpal transmit the funds they collect via NatWest accounts.

614.    Thus, while the 101 days website speaks obliquely of supporting "**the families of the injured and the martyred in particular,**" NatWest, at all relevant times has had direct, first-hand knowledge of the organizations to which this 'support' has been transmitted, i.e. dozens of notorious HAMAS front organizations.

615.    As recently as October 29, 2005, in an interview with *The Guardian* newspaper, al-Qaradawi discussed suicide bombing in Israel and is quoted as saying:

> The actor who commits this is a martyr because he gave his life for the noble cause of fighting oppression and defending his community. These operations are best seen as the weapon of the weak against the powerful. It is a kind of divine justice when the poor, who don't have weapons, are given a weapon which the fully equipped and armed-to-the-teeth powerful don't have - the powerful are not willing to give their lives for any cause.

616.    More importantly, al-Qaradawi's views and activities have been a matter of public record for many years.[8]

617.    Through his many public appearances and popular television program, al-Qaradawi has never concealed his views about the moral rectitude of murdering Jews and Israelis.

618.    To take just one example, in the September 1999 edition of the *Palestine Times*, in an article entitled "Sheikh Yousuf al-Qaradawi: Hamas and the Islamic Jihad represent the glorious face of the Islamic Umma- Interview" al-Qaradawi blessed "the martyrdom operations in which a given Moslem fighter turns himself or herself into a human bomb that casts terror in the hearts of the enemy … If we can't carry out acts of Jihad ourselves, we at least should

---

[8]    Al-Qaradawi was the subject of massive publicity in Great Britain when he was invited to London by its mayor in July 2004, but his prominence long predates that event.

support and prop up the Mujahideen financially and morally so that they will be steadfast until God's victory."

619.    NatWest is, and at all relevant times was, aware of al-Qaradawi's views. More importantly, NatWest has specific and detailed knowledge of how al-Qaradawi and his myriad of charitable front organizations channel funds to HAMAS because millions of dollars flow through accounts held at NatWest.

620.    Al-Qaradawi might be considered the "chairman of the board" of HAMAS's global fundraising efforts, but Issam Yusuf a/k/a Essam Yussef a/k/a Issam Yusuf Mustafa is the operational head (Vice Chairman and Managing Trustee) of the Union of Good. He is a HAMAS agent and former vice chairman of Interpal, and he manages HAMAS's day-to-day fundraising efforts.

621.    The board of directors of the Union of Good includes three senior HAMAS figures: Sheikh Hamid al-Bitawi, Dr. Essam Salhoub, and Bassam Jarrar.

622.    In 2001, al-Qaradawi publicly described the activities of the Islamic charitable societies sustaining the Intifada against Israel as a "new type of *jihad*, financial *jihad*, through which financial support is guaranteed to the martyrs' families, Palestinian prisoners and detainees, and every Palestinian whose property is damaged during the conflict."

623.    As of the filing of this Amended Complaint, NatWest collects and transmits funds on behalf of the Union of Good and its largest fundraising arm, Interpal.

### b.    Interpal

624.    Charitable donations to the Union of Good are partially collected and distributed through Interpal.

625.    Interpal was founded in 1981 as the Palestine and Lebanon Relief Fund and was

reincorporated as Interpal in November 1994.

626.    On or before January 1, 1996, Interpal opened one or more accounts with defendant NatWest.

627.    The Charity Commission, established by law as a regulator and registrar for charities in England and Wales, froze Interpal's accounts at NatWest in March 1996 based on evidence that it channelled money to HAMAS.

628.    The allegations of links between Interpal and HAMAS were published in numerous British newspapers at the time, including *The Guardian* and *The Times of London*.[9]

629.    A spokesman for the Charity Commission told *The Guardian* that Interpal's bank accounts had been frozen "as a precautionary measure." Following the widely published reports of Interpal's links to HAMAS, NatWest took no action to terminate its relationship with Interpal.[10]

630.    The Charity Commission ultimately unfroze the accounts ostensibly because the British government distinguished (at the time) between the military and social or charitable wings of HAMAS.  There was no finding by the Charity Commission concerning Interpal's relationship with HAMAS per se, nor did Interpal attempt to deny that it was transferring millions of dollars to HAMAS.

---

[9]    Richard Norton-Taylor and Ian Black, *Palestinian Charity Funds Frozen Over 'Hamas Link,'* THE GUARDIAN, Mar. 9, 1996; Richard Norton-Taylor, *News in Brief: Palestinian Group Cleared*, THE GUARDIAN, Mar. 13, 1996; Julian Borger, *Close Trust, Israel Pleads; Britain is being asked to clamp down on Palestinian fundraisers,* Sept. 7, 1997; Stewart Tendler and Christopher Walker, *MI5 study 'charity cash linked to Hamas,'* THE TIMES, Mar. 6, 1996; Stewart Tendler, *Charity's funds are frozen over alleged Hamas link,* THE TIMES, Mar. 9, 1996; Adrian Lee and Michael Evans, *MI5 traces network of Hamas funding,* THE TIMES, Mar. 11, 1996.

[10]    In an interview reported in THE GUARDIAN on August 7, 1997, Mr. Ibrahim Hewitt, Chairman of Interpal, publicly acknowledged that it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by HAMAS.

631.    The Charity Commission's May 30, 1996 report concerning Interpal stated its

findings as follows:

> Poverty and need must however be the only criteria when deciding how the
> charity's funds are distributed and aid must not be given because of a person's
> support for terrorism. We found no evidence in the charity (Interpal) of any pro-
> terrorist bias, or indeed bias of any kind.

632.    Thus, the Charity Commission finding was that Interpal donated funds [to

HAMAS] without any evident intent to support terrorism per se, or as the Commission put it,

without "any pro-terrorist bias."

633.    U.S. anti-terrorism laws, however, do not distinguish between "biased" and

"unbiased" support provided to designated Foreign Terrorist Organizations.

634.    As Kenneth R. McKune, Associate Coordinator for Counterterrorism at the U.S.

Department of State noted in a sworn declaration on April 21, 1998:

> [T]he Antiterrorism and Effective Death Penalty Act of 1996 prohibits the
> provision of material support or resources to foreign terrorist groups that have
> been formally designated, pursuant to statute, as "foreign terrorist organizations"
> by the Secretary of State.  In prohibiting comprehensively the provision of such
> support and resources, the law does not differentiate between the criminal,
> terrorist activities of these organizations, and the civil, non-violent activities, if
> any, in which they might engage.  In legislating this particular dimension of the
> "material support" ban, the Congress found that "foreign organizations that
> engage in terrorist activity are so tainted by their criminal conduct that any
> contribution to such an organization facilitates that conduct."

635.    NatWest nonetheless provided (and continues to provide) funds for institutions

that belong to HAMAS's financial infrastructure in the PACT, including many entities the

Government of Israel has declared unlawful and the U.S. Department of Justice has identified as

agents of HAMAS.

636.    Following the March 1996 British investigation which first placed NatWest on

notice that it was transferring funds to HAMAS, Interpal was declared an "unlawful

organization" by the Government of Israel in May 1997 because of its fundraising activities on behalf of HAMAS.  Notice of the designation was placed in the official publication, the *Announcements and Advertisements Gazette*.

637.    Despite this designation, NatWest did not cease providing financial services to Interpal.

638.    Interpal was further designated a terrorist organization in January 1998 by the Government of Israel.  Notice of the designation was also placed in the *Announcements and Advertisements Gazette*.

## II.    DEFENDANT'S CONDUCT

### A.    NatWest Transfers to HAMAS Entities

639.    Despite this designation and the knowledge that it was providing financial services to a Foreign Terrorist Organization, NatWest did not cease providing financial services to Interpal.

640.    NatWest provided **and continues to provide** financial services to HAMAS via various HAMAS-controlled institutions including, but not limited to: the Orphan Care Society of Bethlehem, Al-Islah Charitable Society in Ramallah-Al-Bireh, the Ramallah-Al-Bireh Charitable Society, the Jenin Charity Committee, the Hebron Islamic Association, Tulkarem Charity Committee, Al-Mujama al-Islami, the Islamic Society in the Gaza Strip, and the Muslim Youth Association of Hebron.[11]

641.    The Orphan Care Society of Bethlehem was outlawed by the Government of Israel in February 2002.  Most of its chief functionaries, including its director, Dr. Ghassan

---

[11]    The Jenin Charity Committee and Tulkarem Charity Committee (among others) are specifically identified as HAMAS-controlled organizations by the United States Government in the July 2004 criminal indictment of Holy Land Foundation for Relief and Development in the Northern District of Texas.

Harmass, are HAMAS terrorists.  The Orphan Care Society pays subsidies to the children of HAMAS "martyrs" and imprisoned HAMAS members.[12]

642.   The 2001 version of Interpal's website stated that Interpal "works closely with" the Orphan Care Society.

643.   On August 16, 2002, NatWest transferred $1,875.65 ($1,906 minus commission) from Interpal to the Orphan Care Society.

644.   On September 17, 2002, NatWest transferred £6,533.00 (£6,547 minus commission; approximately $10, 069.30) from Interpal to the Orphan Care Society.

645.   On November 15, 2002, NatWest transferred £5,693 (£5,707 minus commission; approximately $8, 989.82) from Interpal to the Orphan Care Society.

646.   The Islamic Society of Gaza is an alter-ego of HAMAS. Its directors and employees are members of HAMAS and the entity serves as a principal headquarters of HAMAS in the Gaza Strip. Since at least 1996, NatWest has transferred funds to the Islamic Society of Gaza on Interpal's behalf.

647.   The Al-Islah Charitable Society in Ramallah-Al-Bireh was founded in 1997.  The Government of Israel declared the Al-Islah Charitable Society an "unlawful organization" in February 2002.  The Al-Islah Charitable Society regularly transfers money for the benefit of the families of HAMAS "martyrs," and subsidizes the renovation of homes that belong to the families of suicide bombers and were destroyed by Israel.  The Al-Islah Charitable Society supports the families of "martyrs," HAMAS prisoners in Israeli jails, and deported HAMAS members.

648.   The Jenin Zakat Committee was declared an "unlawful organization" by the

---

[12]    In an interview published on the 101 days website, Dr. Harmass states that Interpal is one of the Orphan Care Society's largest sources of donations:  http://www.101days.org/arabic/taqareer/yateem.htm

Government of Israel in February, 2002.  This "charity" is run by HAMAS terrorists, and it provides aid to HAMAS terrorists, to the families of "martyrs," and Palestinians wounded or imprisoned as a result of violent confrontations with Israel.

649.    The 2001 version of Interpal's website states that Interpal "works closely with" the Jenin Zakat Committee.

650.    On May 2, 2003, NatWest transferred £15,687 (£15,713 minus commission; approximately $25,285.90) from Interpal to the Jenin Zakat Committee.

651.    On July 11, 2003, NatWest transferred £15,330 (approximately $25,064.50) from Interpal to the Jenin Zakat Committee.  Natwest charged a commission of £11.

652.    The Tulkarem Charity Committee was founded in 1981.  The Government of Israel declared the Tulkarem Charity Committee an "unlawful organization" in February, 2002. The Committee is headed by a HAMAS terrorist.

653.    In 2002 alone, NatWest transferred over $1,500,000.00 to the HAMAS front organizations listed in paragraph 352, which had been previously designated as unlawful organizations by the Government of Israel because of their affiliation with HAMAS.

**B.    Funds Collected by NatWest from Specially Designated Global Terrorists and Convicted Fundraisers for HAMAS**

654.    On at least three separate occasions NatWest accepted deposits on behalf of Interpal from organizations and entities whose terrorist connections are a matter of public record.

655.    In April 2000, NatWest accepted a deposit of $66,000.00 for Interpal from the Holy Land Foundation for Relief and Development ("HLF").[13]

656.    According to a prior version of Interpal's website (dating back to August 2001),

---

[13]    On May 6, 1997, the Government of Israel designated the Holy Land Foundation for Relief and Development ("HLF") as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …"

Interpal directs persons wishing to make "international donations" to donate to HLF.

657.    On December 4, 2001, the U.S. Secretary of Treasury determined that HLF was subject to Executive Order Nos. 12947 and 13224 because HLF "acts for or on behalf of" HAMAS.

658.    Accordingly, HLF was designated an SDT under Executive Order No. 12947 and an SDGT under Executive Order No. 13224.

659.    In December 2001, the Counsel of the European Union designated Holy Land Foundation as a terrorist entity under Article 2(b) and Regulation (EC) No. 2580/2001 on specific restrictive measures directed against certain persons and entities with a view to combating terrorism and repealing Decision 2005/848/EC.

660.    In order to facilitate the application of financial sanctions, the European Banking Federation, the European Savings Banks Group, the European Association of Co-operative Banks and the European Association of Public Banks (the "EU Credit Sector Federations") and the Commission recognized the need for an EU consolidated list of persons, groups and entities subject to CFSP related financial sanctions.   It was therefore agreed that the Credit Sector Federations would set up a database containing the consolidated list for the Commission, which would host and maintain the database and keep it up-to-date.   This database was developed first and foremost to assist the members of the EU Credit Sector Federations in their compliance with financial sanctions.   HAMAS and HLF were so listed in December 2001.

661.    On March 11, 2002, HLF filed suit seeking to enjoin the U.S. Government from continuing to block or freeze its assets.

662.    On August 8, 2002, the United States District Court for the District of Columbia issued a written opinion in *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F.

Supp. 2d 57, 70 (D.D.C. 2002) finding that "between 1992 and 1999, HLF contributed approximately 1.4 million dollars to eight Hamas-controlled "zakat" (or charity) committees…. HLF grant lists also establish that, between 1992 and 2001, HLF gave approximately five million dollars to seven other Hamas-controlled charitable organizations, including a hospital in Gaza."[14]

663.    The publicly available 2002 court decision sets forth with specificity the legal basis for concluding that HLF's conduct – which is nearly identical to that of Interpal – constituted support for terrorism.

664.    Like HLF, the Al-Aqsa Charitable Foundation is a critical part of HAMAS's transnational terrorist support infrastructure. The Al-Aqsa Foundation also maintained branch offices in The Netherlands, Denmark, Belgium, Sweden, Pakistan, South Africa, Yemen and elsewhere.

665.    On March 27, 2003, NatWest deposited at least two payments to Interpal totalling 295,000 Euros from the Dutch branch of the Al-Aqsa Foundation.[15]

666.    Two months later, on May 29, 2003, the U.S. Treasury Department added the Al-Aqsa Foundation to its list of Specially Designated Global Terrorist entities, accusing the organization of  funneling funds -- including money donated for charitable purposes -- to the militant terrorist group HAMAS.

667.    Nonetheless, NatWest took no steps to close its Interpal accounts.

668.    Years earlier, in or about January 2001, NatWest accepted deposits totaling

---

[14]    In fact, in November 2001, the FBI identified eight (8) charitable fronts as agents of HAMAS, at least 6 of whom have been NatWest wire transfer recipients.  See, Memorandum of Dale L. Watson, the Assistant Director of the FBI's Counterterrorism Division, written to R. Richard Newcomb, Director of the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and dated November 5, 2001.

[15]    On July 31, 2002, German authorities closed the Al-Aqsa Foundation in Germany because of its support for HAMAS.  On January 1, 2003, the Danish government charged three Al-Aqsa Foundation officials in Denmark with supporting terrorism.  In April 2003, Dutch authorities blocked Al-Aqsa Foundation assets in The Netherlands based on information that funds were provided to organizations supporting terrorism in the Middle East.

$70,000.00 on behalf of Interpal from the Al-Aqsa organization in Yemen.

669. On January 10, 2003, German authorities arrested Sheik Mohammed Ali Hasan al-Moayad, the head of the Al-Aqsa organization in Yemen, at the request of the U.S. Department of Justice and the Federal Bureau of Investigation. The arrest took place after a year-long investigations of al-Moayad and undercover operations by the FBI's Joint Terrorism Task Force for his knowingly and intentionally conspiring to provide material support and resources for Al-Qaeda and HAMAS.

670. Prior to his arrest in Germany, Sheik al-Moayad had met with an undercover government informant and proffered proof of his prior fundraising on behalf of HAMAS by tendering to the undercover government informant a receipt from Interpal confirming a $70,000.00 donation from the Sheik's Al-Aqsa organization in Yemen.

671. Sheik al-Moayad was subsequently convicted of providing material support to HAMAS in violation of 18 U.S.C. § 2339B and in 2005 was sentenced to 75 years in prison.

**C.     Interpal's Designation by the U.S. Government in 2003 and Defendant's Continuing Conduct**

672. The August 19, 2003 HAMAS suicide bombing of a bus resulted in the death of Tehilla Nathansen, and injuries to members of the Nathansen family and plaintiff Tzvi Weiss.

673. Following this atrocity, President George W. Bush stated:

At my direction, the Treasury Department has moved today to block and freeze the assets of six top HAMAS leaders and five non-governmental organizations that I am advised provide financial support to HAMAS. By claiming responsibility for the despicable act of terror on August 19, HAMAS has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people.

674. Thereafter, Interpal, as one of the five non-governmental organizations, was designated as an SDGT on August 22, 2003.

675.    In an interview reported in *The Guardian* on August 28, 2003, <u>after</u> the U.S. Government designation, Mr. Hewitt, Chairman of Interpal, was publicly quoted as saying: "We deal with people whether they are HAMAS or whether they are Fatah."

676.    Even after Interpal's designation as a Specially Designated Global Terrorist organization and its Chairman's public admission of its relationship to HAMAS, already designated a Foreign Terrorist Organization, NatWest again took no action to cease its relationships with Interpal.

677.    On September 12, 2003, the European Union designated all of HAMAS (including its social "wing") a terrorist organization, but even then, NatWest took no action to close Interpal's accounts.

678.    To this day, notwithstanding all of this publicly available information, NatWest continues to collect and transmit funds for HAMAS.

**D.      Specific Accounts and Transactions**

679.    Interpal is a pivotal part of HAMAS's fundraising infrastructure and a significant source of HAMAS's financing.

680.    For more than nine (9) years, defendant NatWest has knowingly maintained numerous accounts for Interpal and has collected, received, transmitted, and provided **millions of dollars** on behalf of Interpal directly to agents of HAMAS in the PACT.

681.    These accounts include:

U.S. Dollar Account Number – 140-00-04156838

Euro Account Number – 60720508524882

Sterling Account Number – 60082295142940

682.    NatWest thereby provides HAMAS with a highly convenient method to collect and transfer funds in U.S. Dollars as well as Sterling and Euros.

683.     NatWest also provides Interpal with merchant banking services, directly and through another Royal Bank of Scotland subsidiary, thereby making it possible for Interpal to maintain merchant accounts with MasterCard, VISA and other credit card companies.

684.     This allows HAMAS to solicit contributions in dozens of currencies from around the world and allows Interpal to solicit funds for HAMAS via its website at www.interpal.org.

685.     In addition, NatWest, with the help of financial products provided by its sister company, provides further substantial assistance to HAMAS by making it possible for British nationals to make direct contributions to Interpal by way of their employer's payroll department through a program called "Give As You Earn."

686.     Since March 1996, defendant NatWest has known that it has been providing financial services to HAMAS and that Interpal collects money for, and transmits money to, HAMAS, a Foreign Terrorist Organization.

687.     NatWest has transferred funds directly to HAMAS-controlled entities on hundreds (if not thousands) of occasions.

688.     For example, on February 19, 2003, NatWest transferred £21,424 (approximately $34,083.40) to the HAMAS front organization, the Tulkarem Zakat (Charity) Committee Society and charged a commission of £10. See Exhibit A attached. At the time NatWest transferred this amount to HAMAS, both Interpal (the repository of the funds) and the Tulkarem Charitable Society (the HAMAS front that received the funds) had been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

689.     The U.S. Department of Justice has identified the Tulkarem Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

690.    On April 1, 2003, NatWest transferred another £17,974 (£18,000 minus commission; approximately $28,465.4) from Interpal to the Tulkarem Zakat Committee.

691.    Likewise, on July 30, 2003, NatWest transferred £73,757 ($119,809.00 U.S.) to the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.   See Exhibit B attached. This transaction was apparently financed by the World Assembly of Muslim Youth ("WAMY"), the well known Saudi "charity" linked to both HAMAS and Al Qaeda financing.[16] At the time NatWest transferred this amount to HAMAS, WAMY (the source of the funds), Interpal (the repository of the funds) and the Jenin Charitable Society (the HAMAS front that received the funds) had all been designated as unlawful organizations by the Government of Israel due to their support for or control by HAMAS.

692.    One of Interpal's officers/directors, Mahfuzh Safiee is an officer of WAMY, Ltd. (a European branch of WAMY).

693.    The U.S. Department of Justice has identified the Jenin Charitable Society as an "organization, which operated on behalf of, or under the control of, HAMAS."

694.    Nor did NatWest cease providing enormous sums of money to HAMAS even after Interpal was formally designated a Specially Designated Global Terrorist by President Bush on August 22, 2003. On the contrary, the same millions of dollars that NatWest transferred to HAMAS since 1996 and that helped maim and murder U.S. citizens such as the plaintiffs and bankroll the families of terrorists, including suicide bombers, continued to flow unabated even after the U.S. Government designation of Interpal.

695.    For example, on November 5, 2003 (two months **AFTER** the official U.S.

---

[16]    The WAMY Conference in Riyadh in October 2002 was attended by the head of the HAMAS Political Bureau, Khalid Mishal, who was also designated a Specially Designated Global Terrorist on August 22, 2003, pursuant to Executive Order No. 13224.

designation), NatWest transferred £32,329 ($54,322.40 U.S.) to the same well-known HAMAS front organization, the Jenin Charitable Society, debiting Interpal's Account Number 600822-95142940.  See Exhibit C attached.

696.    Transactional documents of the kind attached to this complaint are *themselves* the criminal transactions that Congress tried to interdict by enacting both the criminal provisions of

697.    18 U.S.C. §§ 2339B and 2339C and the civil provision of 18 U.S.C. § 2333(a) as set forth below.

###    E.    NatWest's Regulatory Obligations and Duty of Care

698.    All banks which have international operations or relationships with correspondent banks have a duty, based on international banking norms, to adopt know your customer ("KYC"), anti-money laundering ("ATL"), and anti-terrorist financing ("ATF") standards which are defined and enforced by the Financial Action Task Force ("FATF") and its supportive governments.

699.    The United Kingdom is a participant in the FATF.

700.    This duty devolves upon officials and directors of all such banks and includes a due diligence obligation to monitor publicly accessible information and allegations in relation to "high risk" customers, which would include charities collecting funds from the public.

701.    This duty to monitor and profile charity customers arises independently of any particular transaction.

702.    Beginning with the creation of FATF in 1989 and especially since the collapse of the Bank of Credit and Commerce International and the enactment of the first European Union directive on the subject in 1991, a consensus has evolved in the banking community concerning

know your customer and anti-terrorist financing standards required by international banking institutions.

703.    These standards are encapsulated in written principles issued by FATF and the Basel Group of Bank Supervisors.

704.    In April 2002, the FATF issued a report entitled "Guidance For Financial Institutions in Detecting Terrorist Financing."  The report was issued to all major international financial institutions to provide guidance to "ensure that financial institutions do not unwittingly hide or move terrorist funds.  Financial institutions will thus be better able to protect themselves from being used as a conduit for such activity …"

705.    In addition to its inherent obligation not to violate the criminal statutes of the United States, the FATF report very clearly put NatWest on notice that:

> Regardless of whether the funds in a transaction are related to terrorists for the purposes of national criminal legislation, business relationships with such individuals or other closely associated persons or entities could, under certain circumstances, expose a financial institution to significant reputational, operational, and legal risk.  This risk is even more serious if the person or entity involved is later shown to have benefited from the lack of effective monitoring or willful blindness of a particular institution and thus was to carry out terrorist acts.

706.    There are also standards developed by the Wolfsberg Group of banks that affect the correspondent banks of Wolfsberg Group member financial institutions.

707.    On July 16, 2002, the Royal Bank of Scotland Group (NatWest's parent company) adopted new "Know Your Customer" guidelines and adopted the so-called Wolfsberg Principles for the Suppression of Terror Financing thereby committing NatWest to implement: "procedures for consulting applicable lists and taking reasonable and practicable steps to determine whether a person involved in a prospective or existing business relationship appears on such a list."

708.    At the same time, NatWest's parent company publicly acknowledged that: "Funds used to support terrorism do not derive exclusively from criminal activities and differ from those associated with most existing money laundering offences" and committed itself to "the ongoing monitoring of individual transactions on customer accounts …"

709.    In September 2002, the RBS Group of which NatWest issued a "Statement of Principles for Fighting Crime and the Financing of Terrorism."  The document describes their plan to institute AML controls, particularly on terrorist financing, and to cooperate with U.K. authorities in criminal investigations.

710.    These standards are binding on banks and bankers doing business internationally, due to their commercial relationships with the banks of other countries that are legally obligated to apply these norms.

711.    Accordingly, NatWest had (and has) and affirmative duty to monitor publicly available information and allegations about its customer, Interpal.

712.    NatWest also had (and has) an affirmative duty to monitor publicly available information and allegations about its customer's parent organization – the Union of Good – as well as publicly available information concerning HAMAS controlled entities to which its customer transferred millions of dollars.

713.    It was and remains the standard in the international banking industry for compliance departments at banks like NatWest to access, in detail, public allegations of misconduct by such "charities" or diversions of their funds to terrorist activities.

714.    In many cases, information linking payees of NatWest transactions and HAMAS could readily be obtained by simple Internet searches or by subscribing to a database or press clippings service.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER OR PHYSICAL VIOLENCE TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

715.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

716.    Plaintiffs have been injured in their person by reason of acts committed by HAMAS that involved violence and were dangerous to human life and that violated the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

717.    The acts of HAMAS in killing and attempting to kill U.S. nationals and other persons were and are intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

718.    The acts of terrorism set forth herein were extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within close proximity of the attack, and extreme emotional distress to the family members of those who were killed or injured by reason of the act.

719.    The financial services which defendant knowingly provides to HAMAS  by collecting and transmitting funds on behalf of HAMAS, and making it possible for HAMAS to obtain donations through credit cards like VISA and MasterCard, which are available throughout much of the world, substantially assist HAMAS in its recruiting, rewarding, and providing

incentives to suicide bombers and other terrorists. These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to plaintiffs.

720. Defendant knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

721. Throughout the period in which it has provided financial services for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

722. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

723. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

724. By knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

725. As stated above, the Union of Good and Interpal are major funding sources for

HAMAS.

726.    By providing a wide range of vital financial services to these entities, defendant NatWest substantially assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.

727.    Defendant knows of HAMAS's terrorist activities.

728.    Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

729.    By knowingly providing material support to a designated Foreign Terrorist Organization, defendant is therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

### COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

730.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

731.    Defendant wilfully and unlawfully provides financial services to HAMAS by collecting, receiving, transmitting, and providing funds, through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of Interpal with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint.

732.    The acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by

intimidation or coercion; and (c) affect the conduct of the Government of Israel by mass destruction and murder.

733.    Defendant is therefore liable to the plaintiffs who have suffered injuries to their person and property by reason of such acts under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a)    Enter judgment against the defendant and in favor of each plaintiff for compensatory damages in amounts to be determined at trial;

(b)    Enter judgment against the defendant and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(c)    Enter judgment against the defendant and in favor of each plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(d)    Enter an Order declaring that the defendant has violated, and is continuing to violate, the Antiterrorism Act, 18 U.S.C. § 2331 *et seq*.; and

(e)    Grant such other and further relief as justice requires.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: June 17, 2016
      Hackensack, New Jersey

                                    OSEN LLC

                          By      /s/ Gary M. Osen
                                  Gary M. Osen, Esq.
                                  Ari Ungar, Esq.
                                  Aaron Schlanger, Esq.
                                  Peter Raven-Hansen, Esq., Of Counsel
                                  2 University Plaza, Suite 201
                                  Hackensack, New Jersey 07601
                                  Telephone: (201) 265-6400
                                  Facsimile:  (201) 265-0303

                                  Attorneys for Plaintiffs

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard, Esq.
Stephen Schwartz, Esq.
One South Broad Street
Philadelphia, PA 19107
Telephone:  (215) 238-1700

ZUCKERMAN SPAEDER LLC
Shawn Naunton, Esq.
399 Park Avenue, 14th Floor
New York, NY 10022
Telephone: (646) 746-8655

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue
Suite 100
North Little Rock, AR 72116
Telephone: (501) 791-2277

MOTLEY RICE, LLC
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

# EXHIBIT A

♻ NatWest

## PAYMENT DEBIT ADVICE

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:   IBCCTYO00410266
Your ref   ETR 2003 81
Date:       19th February 2003

We confirm having remitted the following Standard transfer.

Amount debited:   GBP  21,450.00
From account:     600022-95142940
Amount sent:      GBP  21,424.00

Debit date:  19th February 2003

In favour of:
TULKAREM ZAKAT COMMITTEE

Beneficiary bank:
ARAB BANK PLC
(TULKARM BRANCH)
TULKARM
PALESTINIAN TERRITORY (OCCUPIED)

Beneficiary account number:
00705000100500

Payee bank:
ARABGE2LXXX

Payment details:
SPONSORS AN ORPHAN/NEEDY CHILDPROG
RAMADAN PROJECTS QURBANI MEA

Ordered by:
PALESTINIANS DEV FUND INTERPAL

Transactional information:

Requested amount        GBP  21,450.00

Rate:
Currency exchange contract:

NWB commission charges:        0.00

Agent banks charges:           0.00

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

National Westminster Bank plc. Registered in England No 929027. Registered Office: 135 Bishopsgate, London EC2M 3UR
Regulated by The Financial Services Authority
Acting agreement held between members of The Royal Bank of Scotland Group.

NatWest Bank PLC

# EXHIBIT B

**NatWest**

## PAYMENT DEBIT CONFIRMATION

com 96/00 N02

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:   EBANKGO02676119
Your ref: +BTR/03/267-097
Date:     30th July 2003
Delivery ref:   0020030730023602

### We confirm having remitted the following Standard transfer.

Amount debited:   GBP 73,757.00
From account:    600822-95142940
Amount sent:     GBP 73,757.00

Debit date: 30th July 2003

In favour of:
JENIN ZAKAT COMMITTEE
ALAWQAF BUILDING
ALHASBA STREET, JENIN
PALESTINE

Beneficiary bank:
CAIRO-AMMAN BANK
JENIN BRANCH
PALESTINE

Beneficiary account number:
016002364009

Payee bank:
CAIRO AMMAN

Payment details:
WAH 'Y RIYADH/SHARQIAH ORPHANS,
SCHOOL KIT AND NEEDY STUDENTS,
AND TWO FREEZER UNITS

Ordered by:
INTERPAL

Transactional information:

Requested amount:          GBP 73,757.00

Rate:
Currency exchange contract:

NWB commission charges:    GBP 11.00

Agent banks charges:        0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary – the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

Sheet 29 of 31

National Westminster Bank plc. Registered in England No 929027. Registered Office: 135 Bishopsgate, London EC2M 3UR
Regulated by the Financial Services Authority.
Agency agreements exist between members of The Royal Bank of Scotland Group.

NatWest Bank PLC

# EXHIBIT C

♻ **NatWest**

## PAYMENT DEBIT CONFIRMATION

DC0092.000147J

THE SECRETARY
PALESTINIANS RELIEF & DEV FUND
PO BOX NO 3333
LONDON
NW6 1RW

Our ref:   EBANKG003684066
Your ref:  +BTR/03/369-178
Date:    5th November 2003
Delivery ref:  0020031105024512

### We confirm having remitted the following Standard transfer.

Amount debited:   GBP  32,329.00
From account:   · 600822-95142940
Amount sent:    GBP  32,329.00

Debit date: 5th November 2003

In favour of:
JENIN ZAKAT COMMITTEE
ALAWQAF BUILDING
· ALHASBA STREET, JENIN
PALESTINE

Beneficiary bank:
CAIRO-AMMAN BANK
JENIN BRANCH
PALESTINE

Beneficiary account number:
015002364000

Payee bank:
CAIRO AMMAN

Payment details:
REBUILDING OF VILLAGE MOSQUE,
RAMADAN AND SPONSORSHIP PROJECTS

Ordered by:
INTERPAL

Transactional information:

Requested amount:      GBP  32,329.00

Rate:
Currency exchange contract:

NWB commission charges:   GBP  11.00

Agent banks charges:       0.00

Charges debited to account: 600822-95142983

This notification is not confirmation of receipt of the funds by the beneficiary - the Bank does not accept any liability whatsoever for any loss or damage arising in any way from any use of or reliance placed on the information.

Sheet 34 of 59

National Westminster Bank plc. Registered in England No 929027.  Registered Office: 135 Bishopsgate, London EC2M 3UR.
Regulated by the Financial Services Authority.
Agency agreements exist between members of The Royal Bank of Scotland Group.

NatWest Bank PLC