1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
WEISS, ET AL.,                   )
                                 )    05-CV-04622 (DLI)
                Plaintiffs,      )
                                 )
V.                               )    United States Courthouse
                                 )    Brooklyn, New York
                                 )
NATIONAL WESTMINSTER BANK,       )    THURSDAY, SEPTEMBER 15, 2016
                                 )
                Defendant.       )
_____)
```

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE DORA L. IRIZARRY
CHIEF UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

```
FOR THE PLAINTIFFS:   OSEN LLC
                      BY:  GARY OSEN, ESQ.
                           AARON SCHLANGER, ESQ.
                           ARI UNGER, ESQ.
                      2 University Plaza, Suite 201
                      Hackensack, New Jersey 07601


                      TURNER & ASSOCIATES
                      BY:  TAB TURNER, ESQ.
                      4705 Somers Avenue, Suite 100
                      North Little Rock, Arkansas 72116


                      STONE BONNER & ROCCO LLP
                      BY:  SUSAN M. DAVIES, ESQ.
                      145 West 45th Street, Suite 701
                      New York, New York 10036


                      ZUCKERMAN SPADER LLP
                      BY:  SHAWN PATRICK NAUNTON, ESQ.
                      399 Park Avenue, 14th Floor
                      New York, New York 10022
```

NICOLE CANALES, CSR, RPR

2

(APPEARANCES CONTINUED)

FOR THE DEFENDANT:      CLEARY GOTTLIEB STEEN & HAMILTON LLP
                        BY:  LAWRENCE B. FRIEDMAN, ESQ.
                             JONATHAN I. BLACKMAN, ESQ.
                             AVRAM E. LUFT, ESQ.
                             MARK E. MCDONALD, ESQ.
                             MOLLY B. CALKINS, ESQ.
                             MARK S. GRUBE, ESQ.
                        One Liberty Plaza
                        New York, New York 10006

THE COURT REPORTER:     NICOLE CANALES, CSR, RPR
                        225 Cadman Plaza East
                        Brooklyn, New York 11201
                        cnlsnic@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by computer-assisted transcript.

Proceedings                                         3

1          THE CLERK:  Civil Cause for Oral Argument, Docket

2    Numbers 05CV4622, Weiss, et al. versus National Westminster;

3    Docket Number 06CV702, Strauss versus Credit Lyonnais; Docket

4    Number 07CV914, Wolf versus Credit Lyonnais; and Docket Number

5    06CV916, Applebaum versus National Westminster.

6          Please state your appearances.

7          MR. OSEN:  Good morning, your Honor.

8          THE COURT:  Good morning.

9          MR. OSEN:  Gary Osen for the Strauss and Weiss

10   plaintiffs.  With me this morning are Ari Unger and Aaron

11   Schlanger from Osen LLC; as well, my colleague Tab Turner from

12   Turner & Associates; and Shawn Naunton from Zuckerman Spaeder.

13         THE COURT:  Good morning.

14         There is a young lady in the back that was not

15   introduced.  Good morning.

16         MS. DAVIES:  Yes.  Good morning, your Honor.  I'm

17   Susan Davies with Stone Bonner & Rocco, for counsel for the

18   Plaintiff, Wolf and Applebaum cases.

19         THE COURT:  Thank you.  Good morning to all of you.

20         For the defendants.

21         MR. FRIEDMAN:  Good morning, your Honor.  Lawrence

22   Friedman, Cleary Gottlieb Steen & Hamilton, on behalf of the

23   defendants Credit Lyonnaise and National Westminster Bank.

24   And with me are colleagues Jonathan Blackmon, Avram Luft, Mark

25   McDonald, Molly Calkins, and Mark Grube.

NICOLE CANALES, CSR, RPR

Proceedings                                            4

1          THE COURT:  Good morning to all of you.  And some of

2     you I have seen before, the last time that we had a very

3     fascinating oral argument on some of the litigation here.  And

4     I'm going to -- I know it's contrary to what all of you are

5     used to in your practice of standing when you address

6     the Court, but I am going to ask you please to remain seated

7     and speak into the microphones, just because sometimes it's

8     difficult for me and the reporter to hear, and for everybody

9     else in the courtroom to hear one another.  So I apologize in

10    advance if it's contrary to your habit; I prefer a clearer

11    record.

12          So the plaintiffs had made a motion to consolidate

13    all of these cases for trial, and we are finally closer to the

14    road to trial, although there are still additional motions

15    that the defense wishes to make, and I believe that a briefing

16    schedule has already been put in place.  And then I have to

17    say the parties have been working very diligently and very

18    hard throughout the history of these cases.  To the public

19    eye, it may not appear so, because these cases have been

20    around for so long.

21          But there has been a significant amount of discovery

22    and motion practice, and waiting for the Supreme Court and the

23    2nd Circuit to render decisions, and for NatWest to go up to

24    the Circuit on appeal, and there was some wait for that.  It's

25    been just that sort of a protracted road getting us to this

NICOLE CANALES, CSR, RPR

1   point.

2          I thought based on the submissions of the parties

3   that that was sufficient enough for the Court to be able to,

4   at least preliminarily, form an opinion as to a decision on

5   the motion to consolidate, but I did want to give the parties

6   an opportunity for some oral argument, if there was anything

7   that you wanted to add to what was already in the submissions

8   that were made to the Court.  And so this is plaintiffs'

9   motion, so I'm happy to give plaintiffs a few minutes, if

10  there's anything that you would like to say in support of the

11  motions to consolidate.

12          MR. OSEN:  Thank you.  Good morning, Judge.

13          THE COURT:  Good morning again.

14          MR. OSEN:  Let me make sure my microphone is

15  working.  Gary Osen for the Strauss and Weiss plaintiffs.  I'm

16  going to address the basic considerations from our standpoint,

17  and I'm going to also turn the microphone over to my

18  colleague, Mr. Turner, if that's okay with the Court --

19          THE COURT:  Sure.

20          MR. OSEN:  -- to add some additional contacts based

21  on your experience in the Arab Bank trial.

22          THE COURT:  Right.

23          MR. OSEN:  Okay.  So, obviously, your Honor's

24  familiar with the legal standard under Rule 42, so I won't

25  belabor that point.  All of these cases -- and, in that sense,

Proceedings                                                    6

1   I'm referring to the consolidated Weiss, and I believe it's

2   Applebaum, and Strauss, and Wolf cases --

3             THE COURT:  Right.

4             MR. OSEN:  -- they all involve the same application

5   of law.  The claims are based on the ATA violations of Section

6   2339(B) of the material support statute.  They substantially

7   involve the same attacks.  There are 19 attacks in Credit

8   Lyonnais and 17 in NatWest, so there are two additional

9   attacks in the Credit Lyonnais case, but they're all involving

10  HAMAS.  The proof of HAMAS' responsibility for those 17 and 19

11  attacks respectively are identical.  That is to say from -- it

12  doesn't matter who the plaintiff is or what the caption of the

13  case is, the evidence and the experts, the plaintiffs have

14  designated to prove those attacks are the same.

15             The same may be said as well for a substantial

16  portion of the approximate cause element of the claim in all

17  of the cases.  As I mentioned a moment ago, for HAMAS

18  attribution, the plaintiffs' experts are Evan Coleman and

19  Dr. Ronny Shaked (phonetic), and the defendant's experts, both

20  case in chief and rebuttal, are essentially the same on these

21  issues.  So approximate cause, which -- you know, can be

22  described a couple of different ways, but we think of it

23  primarily as the question of whether or not the banks actually

24  transmitted funds to HAMAS or HAMAS-controlled organizations.

25  And there, again, the experts on both sides are exactly the

1   same in Strauss and Weiss cases and between Credit Lyonnais

2   and NatWest.  Typically, we would offer Dr. Levit --

3          THE COURT:  But the offense that transpired in terms

4   of how the banks responded to the various different accounts

5   that are at issue here was vastly different.  The approach by

6   NatWest was vastly different from the approach that was taken

7   by Credit Lyonnais, and there's going to have to be by

8   necessity additional witnesses from the banks themselves and,

9   perhaps, from other persons that were involved in the

10  investigation of these matters.  And so those are going to be

11  substantially different witnesses; there are going to be far

12  more numerous witnesses than the expert testimony concerning

13  the attacks themselves, which is far more limited in nature.

14          In NatWest, for example, there was a significant

15  involvement by the British government.  Her Majesty's Treasury

16  was involved.  The Parliament was involved.  That's not the

17  same case with respect to Credit Lyonnais.  And so it's not

18  necessarily clear to me, that given the difference in not only

19  the quantity of the evidence but the type of evidence that's

20  going to be submitted in connection with the defense of the

21  claims, that it wouldn't cause jury confusion.

22          MR. OSEN:  Let me address that, your Honor.  I agree

23  completely with your characterization as it relates to the

24  issue you're addressing, which is state of mind, which is the

25  third element in the claim.  And so on that issue, which is,

Proceedings                                    8

1  of course --

2          THE COURT:  But it also affects approximate proof as

3  to approximate cause.  Its not just the scienter element, but

4  it's also the approximate cause.  When did NatWest become

5  aware that this was an FTO?  When did Credit Lyonnais become

6  aware that these were FTOs?  Were they in fact FTOs at the

7  time that the accounts were had?  These are different time

8  frames.  These are different -- very different situations

9  and, again, very different reactions to those occurrences.

10         MR. OSEN:  We don't dispute that, your Honor.  As

11  far as how the banks responded to that, the fact scenarios for

12  each one of them is distinct, but we think that makes it

13  easier for a jury to address the culpability of the banks

14  separately within the same trial.  Mr. Turner can address the

15  question in terms of the practical time in our experience that

16  these various components of liability take in the context of

17  the trial.  But what you've described is entirely accurate as

18  to the differentials, if you will, in the evidence and both

19  affirmatively and from the defense standpoint.

20         But, again, because you don't have substantial

21  overlap or interaction between the defendants in their

22  conduct -- there are a handful of transactions which Credit

23  Lyonnais transferred money to Interpal's account and NatWest,

24  but aside from that it's not as if the e-mail traffic or the

25  testimony, one touches upon the other, so they're very

NICOLE CANALES, CSR, RPR

Proceedings                                    9

1   distinct.  And I think from a standpoint of consolidation, if

2   the question is judicial efficiency, or prejudice, or the

3   potential for confusion, the advantage and the efficiency of

4   not litigating 19 attacks, not litigating approximate cause of

5   whether or not these so-called charities were in fact

6   controlled by HAMAS, that's a substantial part of the

7   plaintiffs' case.

8            And that would otherwise have to be repeated with

9   the -- not only the expense and the taxing of limited judicial

10  resources, but it would also cause delay and risk the

11  possibility of different juries hearing the exact same

12  evidence on these issues coming out differently.  So from our

13  standpoint, we don't see the prospect of confusion --

14           THE COURT:  But isn't that the same thing with the

15  other cases, with Arab Bank, and with some of the other banks

16  that have been the subject of this same type of the

17  litigation, both here in this district and in the Southern

18  District?  It's generally the same organizations that are --

19  or similar organizations that are involved.

20           MR. OSEN:  That's true, your Honor.

21           THE COURT:  Because it's not just a question of

22  whether these are in fact terrorist organizations, but there's

23  a real distinct timing element as to when they were declared

24  FTOs, when the banks became aware of the existence of those

25  accounts.  You know, they weren't being -- these accounts

Proceedings                                                    10

1    weren't being booked as accounts for HAMAS; they were being

2    booked as charitable organizations, and in some sense, you

3    know -- and I'm not saying this as I've determined these facts

4    to be so.  These are obviously allegations that have to be

5    proven at trial.

6            But just taking them from the papers, they were in

7    some sense, at least from the plaintiffs' sense, a disguised

8    front, right, for HAMAS, because ultimately those accounts

9    were being used to fund HAMAS activities.  But it was done in

10   a way that, perhaps, from the bank's perspective -- and as

11   defense for the banks, whether it's Credit Lyonnais or

12   NatWest, it posed certain issues with respect to when they

13   became aware, and how promptly they acted, and whether they

14   acted sufficiently and efficiently, or within the confines of

15   their legal obligations, whether it's the Unites States'

16   obligation, or the British obligations, and so on, or French

17   obligations.

18           MR. OSEN:  We agree with that, your Honor.  The

19   state of mind aspect of this, and what did they know about the

20   customer, what did they know about where the money was going

21   is idiosyncratic, if you will, to each defendant, and those

22   circumstances are unique to them.  But, again, I think that

23   speaks to the fact that a jury --

24           THE COURT:  How much time would it take for the

25   experts to testify about the various attacks?  How much time

NICOLE CANALES, CSR, RPR

Proceedings                                    11

1    are we talking about?

2              MR. TURNER:  I can address that, your Honor.

3              THE COURT:  Thank you, Mr. Turner.

4              MR. TURNER:  Based on the unique experience gained

5    from the Linde versus Arab Bank case, if you do a comparative

6    analysis in the Linde case, the Arab Bank case, it involved 24

7    separate attacks, all allegedly carried out by HAMAS, and

8    ultimately found by the jury to have been carried out by

9    HAMAS.  These two cases, Credit Lyonnais involves 19 attacks,

10   and NatWest involves 17 attacks.  In the Arab Bank case, we

11   were able to put on testimony pertaining to the attacks

12   themselves, all 24 attacks, and in what amounted to about 4

13   days of testimony.

14             THE COURT:  Now, these 24 attacks, were those the

15   same attacks that are involved in NatWest and Credit Lyonnais,

16   or were they different attacks?

17             MR. TURNER:  They were the same attacks.

18             THE COURT:  The same attacks.

19             MR. TURNER:  And so as a consequence, we feel pretty

20   comfortable that putting on evidence -- whether you count it

21   as 19 or whether you count it as 36, we're fairly confident

22   that being able to put on the attack part of the case --

23             THE COURT:  It wouldn't be 36, because basically

24   17 -- there's an overlap of 17, so there's no overlap of

25   evidence.  You have two additional.

NICOLE CANALES, CSR, RPR

Proceedings                                    12

1           MR. TURNER:  Sure.  But if you do them twice, in

2    other words, we have two trials, one as to NatWest and one as

3    to Credit Lyonnais, then you're basically putting on 37

4    because you're repeating yourself.

5           THE COURT:  Sorry to interrupt you, but how much

6    time did it take in the Arab Bank case to try the liability

7    issues?

8           MR. TURNER:  By liability, I presume you're

9    referring to --

10          THE COURT:  Approximate cause and the scienter.

11          MR. TURNER:  Roughly speaking -- and the numbers

12   bear this out -- the number of Arab Bank witnesses deposed for

13   purposes of discovery in that case were 24; in Credit

14   Lyonnais, there were 30; and in NatWest, there were 19.  In

15   the Arab Bank case, we used 50 percent of those witnesses at

16   trial that amounted to one-and-a-half days testimony.  So

17   roughly speaking, there was one-and-a-half days of trial

18   devoted to the deposition testimony alone.  Now, that's

19   separate and apart, of course, from the expert witnesses that

20   testified as to both of those issues, both approximate cause

21   and scienter.

22          THE COURT:  And how long was that testimony?

23          MR. TURNER:  That testimony lasted roughly -- five

24   days of testimony, and that included cross-examination.

25          THE COURT:  I was sort of assuming it would take

Proceedings                                    13

1   everything, direct and cross.

2           MR. TURNER:  That is correct.

3           THE COURT:  All right.

4           MR. TURNER:  Now, the fundamental proposition,

5   at least as I understand the arguments made by the banks for

6   desiring to have separate trials, is that it is too confusing

7   and prejudicial to have multiple defendants from the same

8   accident or attacks in the same courtroom and a jury trying to

9   decide those issues, but that's contrary to my experience.  On

10  a routine basis in civil cases, we have multiple-defendant

11  cases, whether it's involving a drug, or whether it's

12  involving legal malpractice, or medical malpractice, or

13  medical malpractice.

14          As a good example, oftentimes we have medical

15  malpractice cases where there's hospitals and three doctors

16  all tried at the same time, for the same events, all involving

17  separate conduct, all involving separate knowledge, all

18  involving separate acts, separate conduct, separate medical

19  records, all tried at the same time.  And the jury is asked to

20  apportion fault on each one of those based upon their own

21  misconduct, or alleged misconduct, rather than the conduct of

22  others.

23          And we see very successfully that juries on a very

24  routine basis handle these kinds of issues quite easily, and

25  apportion fault in some instances, recognizing -- this is not

Proceedings                                          14

1    a comparative false situation; it is separate fault.  But

2    juries all the time not only consider the evidence, but they

3    even go one step further and they compare the fault one among

4    the other, so I think it's a --

5            THE COURT:  But that's the problem here, because you

6    can't -- the jury in fact is prohibited, or would be

7    prohibited, from saying, well, Credit Lyonnais was at fault

8    here; therefore, NatWest should also be at fault.  And, again,

9    both banks took very different approaches.  And as I sit here,

10   I'm the one tasked with giving instructions to the jury, and I

11   have given a lot of thought about the -- one of the other

12   arguments used in support of the motion, that the Court could

13   give some sort of limine instruction.

14           The one thing I always try to avoid as a judge, and

15   tried to avoid as a state judge, as much as I try to avoid as

16   a federal judge is marshalling the evidence for the jury,

17   because you start going down a very slippery slope when you do

18   that.  And it seems to me that that could create some real

19   difficulty here in that regard.

20           MR. TURNER:  And there's no question about that.  If

21   you go back, and you take a look at the case law on this

22   particular issue that we're debating today, most of the case

23   law, as you know, comes out of the criminal context rather

24   than the civil context, because we don't see these kinds of

25   motions very often in civil cases.

1          THE COURT:  Right.

2          MR. TURNER:  We see them most often in criminal

3    cases.

4          THE COURT:  Right.

5          MR. TURNER:  And the key factors that the Court

6    seems to focus on -- the appellate courts at least seem to

7    focus on -- is that in fact consolidation for trial is always

8    a discretionary issue with the judge, and it's a balance

9    between the efficiency and the timing of the system versus the

10   potential prejudice and confusion of the issues to the jury,

11   prejudice to the parties and confusion for the jury.

12         And the key factors that seem to go into an analysis

13   of these issues in the criminal context is whether or not

14   there is antagonistic defenses, and that has been defined

15   under the law as not being different defenses.  That has been

16   one blaming the other.  We don't have that in this situation.

17   We don't have allegations in this case nor testimony in this

18   case with Credit Lyonnais blaming NatWest or NatWest blaming

19   Credit Lyonnais as being the one responsible.

20         So when you begin to take off the factors considered

21   by the Court, antagonistic defenses don't apply.  Well,

22   complexity doesn't really apply here either, because

23   complexity is broken down into -- at least according to the

24   case law, either there's a huge number of defendants, which we

25   don't have here -- we only have two -- or the issues in the

Proceedings                              16

1   witnesses are so disparate and so different among the two

2   defendants -- for instance, in most of the cases where the

3   appellate courts have found that severance should have been

4   granted, you had one defendant who had one witness, very

5   little involvement, and you had another defendant who had 47

6   witnesses and was primarily involved, and there was such a

7   huge difference.

8            Here we have 19 attacks.  We have 17 attacks.  We've

9   got practically the same number of witnesses on both.  And all

10  of the case law that I have taken a look at -- and I have read

11  both briefs, and I have done some independent research, and in

12  addition to that, reading some other cases -- one of the

13  things that the courts always seem to note is the courts, in

14  allowing the district court discretion to do this, gives the

15  district court a variety of tools with which to work with in

16  ensuring that there's no prejudice, and that any confusion is

17  limited, and that includes limine instructions.

18           That includes jury instructions that make it quite

19  clear what the questions are that are being asked of them at

20  the end of the trial; very clear limine instructions during

21  various parts of the testimony in the case, ensuring that the

22  jury understands that the evidence is being restricted to this

23  particular issue or that particular issue or this particular

24  defendant or that particular defendant.  All of those tools

25  are available to the court if the court so desires and finds

Proceedings                                    17

1    that it's reasonable.  But the one thing that makes no sense

2    in the arguments from the banks is that these issues are so

3    complex and so confusing that juries can't comprehend what's

4    going on.

5            Because our civil justice system does this on a

6    daily basis; we ask jurors to try six and seven defendants in

7    civil cases on a routine basis.  They're able to listen to the

8    evidence; they're able to ferret out what's important to an

9    individual defendant.  And the one thing that cuts against all

10   of this is having to try these nineteen or seventeen attacks

11   twice.

12           THE COURT:  I understand.

13           MR. TURNER:  That just makes no sense.

14           THE COURT:  I understand that, but there were two

15   other points -- and then I'm going to give the floor over to

16   defense -- that I'd like to hear.  The defense raised an

17   argument that they may need to forego having defense counsel

18   represent both clients at the trial, which, of course, is --

19   especially at this juncture, in the case, would be a pretty

20   hard burden for any case.  I'm sure that plaintiffs' counsel

21   can imagine how their clients would feel if, at this juncture,

22   you have to tell them I can't go forward with this; we're

23   going to have to get another attorney, putting yourselves in

24   that client's shoes.

25           But, also, even given, Mr. Turner, what you have

Proceedings                                    18

1    said here, sometimes in -- and you're right; there's a lot of

2    analogy to criminal cases, and sometimes in criminal cases

3    the court has to consider where certain defenses by one

4    defendant might have a negative spillover to the codefendant.

5    And sometimes -- even though severance is very rarely granted

6    in the criminal context, especially in federal court,

7    sometimes it is warranted, because there might be a negative

8    spillover effect on the codefendant.

9           I certainly can see the possibility where there

10   might be some undue prejudice to the Credit Lyonnais defendant

11   based on the evidence that I expect will be introduced by

12   NatWest about the lengths to which they went to investigate

13   the accounts and -- just forgive me, because I'm going by my

14   recollection of the facts in the case, but to promptly close

15   accounts, and, in fact, the involvement of the government

16   itself in the investigation of the matter, both by the

17   treasury and by Parliament, to the point where -- at least in

18   this humble district court judge's view -- I thought that a

19   summary judgment was warranted, and I have to tell you it was

20   not a decision that I came to very lightly, under the

21   circumstances here.

22          I never come to that decision lightly in any summary

23   judgment motion case, in any case, because under our system of

24   laws we want people to have their day in court; we want them

25   to be able to have their due process, and so it's something

Proceedings                                              19

1    that we do very carefully.  And the Circuit disagreed, and so

2    we have that case back, and we'll proceed accordingly.  By

3    contrast, I also have a summary judgment motion by the Credit

4    Lyonnais defendant, and I thought that there were material

5    issues of fact that needed to be determined by the jury based

6    on a different set of circumstances there.

7             There were delays in responding.  There was a

8    certain level -- and, again, I don't want to -- I'm not making

9    any sort of judgments about anything, but the opinion said

10   this --

11            MR. TURNER:  Of course.

12            THE COURT:  -- that there was some carelessness, if

13   you will, or lack of attention to the fact that some accounts,

14   while they said should be closed at a certain period of time,

15   were not in fact closed, and deposits continued to be made.

16   There was sort of a more lax approach, if you will, and who's

17   to say that the jury looking at that says, well, wait a

18   minute; NatWest did all of this, so how come this bank

19   couldn't do this?  And why didn't they do this?

20            And in that sense, perhaps, improperly using the

21   evidence that NatWest produces in its defense against the

22   codefendant, as opposed to just purely looking at the evidence

23   that Credit Lyonnais presents against the backdrop of the

24   legal instructions that I'm going to be giving them concerning

25   approximate cause, and scienter, and all of those legal

Proceedings                    20

1    principles that they're going to have to apply, that's

2    bothersome to me, because the consequences are huge here for

3    everybody, for the plaintiffs, and for the defendants.

4            MR. TURNER:  Of course, and that's why you have the

5    job of having the discretion to do exactly what we're doing

6    here today.

7            THE COURT:  And the extra grey hairs.

8            MR. TURNER:  That's exactly right.  We have two

9    issues that you have raised.  One has to do with this

10   allegation of potential conflict of interest and having to get

11   new counsel; and the second, of course, is the spillover, what

12   you refer to the spillover effect.  First, with respect to the

13   conflict of interest, I have not seen thus far articulated any

14   rational reasoning as to what conflict exists.  These cases

15   have been going on now for a decade or more, and they've been

16   consolidated for purposes of discovery.  So there has been no

17   surprise to either one of these banks that these cases were

18   consolidated for purposes at least of discovery, but I'm

19   not --

20           MR. FRIEDMAN:  They were not.

21           MR. OSEN:  I'm sorry, your Honor.  I just want to

22   make clear that the two cases were not -- Weiss -- I'm sorry.

23           THE COURT:  Credit Lyonnais and NatWest were not --

24   it's easier to refer to them as defendants, as plaintiffs.

25           MR. OSEN:  The two plaintiff groups were

Proceedings 21

1    consolidated in each case.

2           THE COURT:  Right.

3           MR. FRIEDMAN:  There's been no consolidation as

4    between the banks.  Eleven years later, it's the first time

5    we're hearing about consolidation.

6           MR. TURNER:  But there's also never been an order

7    entered pertaining to the consolidation of trial order, the

8    issue of --

9           THE COURT:  That was never raised until now.

10          MR. TURNER:  Exactly.  So that's always existed as a

11   possibility for a decade, because we're talking about the same

12   events in both instances.  So I don't think it's a credible

13   argument to argue that we're surprised all of a sudden that

14   any issue of consolidation has arisen after a decade of the

15   litigation.

16          Secondly, with respect to the issue of conflict of

17   interest, I'm in no position to evaluate the two banks'

18   internal issues associated with who their attorney choice is.

19   I can't comment on that issue, but what I can comment is that

20   I looked very carefully for an articulated reason in the

21   briefing as to what that conflict allegedly was and how it was

22   so significant that it would rise to the level recognized

23   under the law as being antagonistic.  And that's the key, at

24   least, according to the case law, is that there has to be an

25   antagonistic aspect of it between the two defendants who are

Proceedings                                    22

1   seeking separate trials.

2          And antagonism has been defined universally in the

3   cases, at least that I read, as blaming each other.  That is

4   considered antagonist.  The fact that they had different

5   defenses has never been considered, at least, according to the

6   case law, as significant enough to demand separate trials.

7   With respect to the second issue, the spillover, the so-called

8   spillover issue, that's true in every case with multiple

9   defendants.  To give one example, I used to do defense work

10  representing the medical industry.  I have defended cases

11  where I represented the hospital, two doctors, and three

12  nurses.  Each had different defenses.  Each had different

13  facts.

14         Each had different levels of involvement in the care

15  and treatment of that particular patient, but I represented

16  each one of them during the course of the trial.  I have had

17  cases as a plaintiffs' attorney, where defendants represented

18  not only the manufacturer of the product but the supplier of

19  the product and also the third party who modified the product.

20  So I don't find it very compelling to argue that all of a

21  sudden these two banks have decided they need to have

22  different attorneys representing them at trial after a decade

23  of this litigation and knowing where the litigation was

24  headed, at least in terms of the attacks and the deposition

25  testimony, the issues that were being raised.

Proceedings                    23

1        So I think the tools that the Court has available in

2   its discretion to use are more than adequate to protect those

3   interests during the course of the trial.

4            THE COURT:  What about the spillover effect?

5            MR. TURNER:  The spillover effect is true with

6   regard to all cases, just like the medical malpractice case I

7   was mentioning.

8            THE COURT:  Not if they're separate.  They're not

9   going to hear about what credit Lyonnais did or they're not

10  going to hear what NatWest did.

11           MR. TURNER:  Well, and I guess that's the point of

12  my use of the medical malpractice case.  There's always a

13  chance that a nurse is going to get convicted in a medical

14  malpractice case because of what the doctor did.  That's

15  always a concern, but in a medical malpractice case we don't

16  have seven different trials of the same facts, trying them all

17  separately because there's a concern of spillover.  The system

18  takes care of that with the tools provided.

19           THE COURT:  But we do have them in some criminal

20  cases where, for example, you have the kingpin being tried

21  with the street-level dealer.

22           MR. TURNER:  Exactly.

23           THE COURT:  And so there have been instances where

24  spillover is a consideration.  But let me give the defense an

25  opportunity to respond.  I know we covered a lot of ground

1     here.

2          MR. FRIEDMAN:  Let me go through that, your Honor.

3     Your Honor already made many of my points, but let me go

4     through this.  But, first of all, I will say before Mr. Turner

5     became actively involved, this case was scheduled for a trial

6     involving Credit Lyonnais.  The plaintiffs have been saying

7     for ten years they want to try their claims against Credit

8     Lyonnais first -- and it was only a couple of months ago that

9     they first raised the question of consolidation -- and that

10    they would try NatWest second.

11         My disagreement with my friend Mr. Turner is that

12    this case was brought 11 years ago, and it's been litigated

13    for 11 years as separate cases against two banks, so we're not

14    talking about severance.  This is the reverse of severance.

15    This is a consolidation that has been sprung on us after

16    11 years.  And there's never been a conflict concern now

17    because I've never had to advocate for both banks at the same,

18    time in front of the same jury, but now they're saying that I

19    will need to, if they have it their way.

20         And your Honor is absolutely correct that the

21    spillover effect would be tremendous, and I will articulate

22    specific examples of the spillover effect -- your Honor has

23    already articulated several of them -- that would result in

24    grotesque prejudice, really grotesque, reversible prejudice to

25    Credit Lyonnais and NatWest, because the facts go both ways.

Proceedings                               25

1   There are some issues as to which the spillover effect will be

2   harmful to Credit Lyonnais and some issues as to which the

3   spillover effect will be harmful to NatWest.  And the problem

4   is --

5                THE COURT:  Such as?

6                MR. FRIEDMAN:  For example, your Honor raised two of

7   the points.  One thing that creates -- and there's no

8   requirement in the case law that the defenses be

9   antagonistic -- I don't know where that comes from -- or that

10  one defendant is blaming another.  It's that there is a

11  tension between the defendants, and there are at least three

12  respects in which there are tensions, and your Honor

13  identified two of them.  One is that Credit Lyonnais closed

14  CBSP's accounts as soon as it learned of the OPAC (phonetic)

15  designation we discussed in our CBSV as an SDGT.

16               THE COURT:  You mean NatWest.

17               MR. FRIEDMAN:  No, Credit Lyonnais.  NatWest

18  continued for years to serve its customer Interpal, after

19  Interpal had been designated by OPAC as an SDGT, because, as

20  your Honor found quite important, the Bank of England

21  sanctioned, in the English equivalent of OPAC; it said that

22  England had no objection.  England was not aware of -- UK was

23  not aware of evidence that precluded NatWest from continuing

24  to serve Interpal.

25               So that's a respect in which Credit Lyonnais would

1   want to emphasize; that as soon as they learned of the OPAC

2   designation, they immediately closed the account.  Of course,

3   no transfers had been done for over a year.  And NatWest will

4   want to justify its continued opening of the account,

5   maintenance of the account, in the face of the OPAC

6   designation for a couple of years, until this litigation made

7   it untenable to continue to serve Interpal.

8          A second example is one your Honor identified.

9   Your Honor found important that NatWest had consulted with the

10  British authorities, and I would expect that -- advocating for

11  NatWest before a jury trying NatWest, I would emphasize the

12  fact that NatWest did all that it could to go to governmental

13  authorities to get guidance.  And, as your Honor pointed out,

14  it could reflect poorly on Credit Lyonnais in front of the

15  same jury that it didn't do that; but the Credit Lyonnais

16  witnesses will explain amply why they didn't do that, and why

17  in the French system that option was not available to them

18  that was available to NatWest, unbeknownst to the other, in

19  the English system.

20         So I would expect, wearing my NatWest hat, to be

21  emphasizing the fact that NatWest went to the authorities,

22  in -- wearing my Credit Lyonnais hat, I would be prejudiced by

23  the jury hearing about what NatWest did, when we're forced --

24  as your Honor has said, the evidence relating to NatWest alone

25  is completely irrelevant to Credit Lyonnais and completely

Proceedings                                27

1   inadmissible as against Credit Lyonnais.

2          So what my friends are doing is trying to present

3   before a single jury 50 percent of -- evidence that is

4   inadmissible as against the other defendant, precisely to

5   achieve that spillover effect and precisely to fill the gaps

6   in their proof.  Let's not kid ourselves; after 11 years it's

7   no accident that plaintiffs have suddenly come up with this

8   idea that they want to try the two banks together.  It's

9   because they recognize that perhaps the sum of trying the two

10  banks together would be greater than the individual parts

11  together.

12          There's a third specific instance I can cite,

13  your Honor, in which the spillover effect would be highly

14  prejudicial to the banks; and that is the fact that the

15  approximate causation evidence -- although the same charities

16  might be involved, the approximate causation evidence with

17  respect to each bank is vastly different because of the timing

18  of when the transfers were made.  So, for example, credit

19  Lyonnais' transfers ended in 2002.  NatWest's transfers to the

20  charities that are alleged to be HAMAS alteregos continued

21  into 2005.

22          The evidence that their experts will present with

23  respect to approximate causation for each scenario is vastly

24  different because the status of the charity transferees

25  changed during the interim period.  So, for example, one of

Proceedings                               28

1    credit Lyonnais' most important defenses is that none of the

2    transferee charities -- the so-called HAMAS alteregos, none,

3    none had been designated, had been sanctioned, by any country

4    in the world as of the date of those transfers, including

5    Israel.  Now, Credit Lyonnais is going to emphasize that; no

6    supervise to the defendants or to the Court.

7            NatWest, on the other hand, can't emphasize that,

8    because NatWest's transfers continued into 2005, at which

9    point, unbeknownst to NatWest.  But still it's a fact some of

10   those transferees were designated by Israel or by the United

11   States.  So those are three concrete examples where the

12   spillover effect of a jury hearing evidence that is completely

13   inadmissible, with respect to one of the two banks, would,

14   nonetheless, instinctively, as your Honor put it, try to draw

15   a comparison, no matter how many instructions your Honor gave.

16           And I sympathize with your Honor's predicament in

17   giving instructions.  Your Honor should not need to give

18   instructions, should not want to give instructions, and, as

19   the 2nd Circuit has said, in the *Malcolm* case and in the

20   *Flintkote* (phonetic) case, where you have such a massive

21   amount of evidence that would be inadmissible, as against one

22   of the defendants, the judge can't be in the business of every

23   ten minutes giving limine instructions.

24           So, your Honor, if we were to go forward with a

25   consolidated trial, my clients would have a real problem, and

Proceedings                                    29

1    I would have a real problem, because I would need to advise

2    them that there are real tensions and real issues with respect

3    to my defending both of them at the same time, in front of the

4    same jury.  And, again -- as Mr. Turner may not know, because

5    he was not actively involved in these cases at the time --

6    this is a total surprise.  It was always understood for

7    at least the last five or six years that plaintiffs would try

8    their claims against Credit Lyonnais first and against NatWest

9    second.

10           But, your Honor, there's an even more important

11   point that I need to make, and that is the following:  To

12   allow the fact that the same evidence would be proffered with

13   respect to HAMAS responsibility for the attacks, to allow that

14   to drive the consolidation train would really be to allow the

15   tail to wag the dog.  And why do I say that?  Because, as my

16   friends conceded, their evidence of HAMAS responsibility,

17   based on their Arab Bank experience, with 50 percent more

18   attacks, took only four days; whereas, here, these cases will

19   go on for weeks, about scienter and about approximate

20   causation.

21           And what Mr. Turner did not tell your Honor -- but

22   we all know is true -- the scienter case and Arab Bank was

23   very short because Arab Bank was precluded from mounting a

24   scienter defense, because of the evidentiary sanctions imposed

25   by Judge Gershon, as a result of Arab Bank's failure to

Proceedings                              30

1   produce documents.  And, as your Honor knows, the 2nd Circuit

2   was asked to mandamus Judge Gershon with respect to those

3   evidentiary sanctions, and it declined to do so.

4          So there is no comparison between the scienter case

5   for NatWest and the scienter case for Credit Lyonnais and the

6   scienter case for Arab Bank.  The scienter case for the

7   plaintiffs and the Arab Bank case was a layout [sic] because

8   the defendant was precluded from presenting scienter evidence.

9   I, on the other hand, am going to present tens of witnesses,

10  all of whom were deposed, both experts and officials, of the

11  banks, whose testimony -- deposition testimony your Honor has

12  already read.

13         In fact, your Honor -- and I have a slide with a bar

14  chart that I can hand up, if your Honor wishes -- there are 53

15  witnesses who were deposed in these cases, both Credit

16  Lyonnais, and each Credit Lyonnais or NatWest, that are

17  completely non-overlapping.  There are 24 non -- I'm sorry.

18  There are 22 non-overlapping Credit Lyonnais fact witnesses, 7

19  non-overlapping Credit Lyonnais expert witnesses, 19

20  non-overlapping NatWest fact witnesses, 5 non-overlapping

21  NatWest expert witnesses, for a total of 53.

22         THE COURT:  How many experts for NatWest?

23         MR. FRIEDMAN:  Five.  So it's twenty-two, seven,

24  nineteen, and five.  How many overlapping fact witnesses are

25  there?  There is zero.  There are zero overlapping fact

NICOLE CANALES, CSR, RPR

Proceedings                                          31

1   witnesses.

2          Now, going back to the point I was making,

3   your Honor, if they can prove the HAMAS-responsibility part of

4   their case in four days, to allow those four days of

5   repetition -- and I'm going to come back to the fact that it's

6   going to be less than four days, because your Honor has

7   already made evidentiary rulings that will limit them to a

8   much greater extent than Judge Cogan did.  Judge Cogan

9   disagreed with your Honor, with respect to the --

10         THE COURT:  We do, on occasion.

11         MR. FRIEDMAN:  I'm sorry?

12         THE COURT:  We do on occasion disagree.

13         MR. FRIEDMAN:  And your Honor to allow those four

14   days of repetition, to drive the consolidation issue, would

15   surely be to allow the tail to wag the dog, because there are

16   going to be 20, 30, 40 days of trial on the scienter, as

17   your Honor pointed out earlier, on the scienter and

18   approximate causation cases.  And the scienter and approximate

19   causation cases for Credit Lyonnais and for NatWest are vastly

20   different, and let me just come back to that briefly.

21         Again, just using the number of witnesses who were

22   deposed as a proxy, they deposed 22 Credit Lyonnais fact

23   witnesses and 7 Credit Lyonnais expert witnesses.  There is no

24   overlap with respect to any of those and NatWest, where they

25   deposed 19 NatWest fact witnesses and 5 NatWest expert

NICOLE CANALES, CSR, RPR

Proceedings                                    32

1    witnesses.

2            I'm going to be bringing most of these people to

3    trial, and the testimony is going to go on for weeks, I'm

4    sorry to say.  But, nonetheless, it will go on for weeks.  And

5    the spillover effect -- as I have already described and won't

6    belabor -- of having the jury hear the NatWest scienter

7    evidence, and the NatWest approximate causation evidence, and

8    have the same jury hear the Credit Lyonnais scienter evidence

9    and the Credit Lyonnais approximate causation evidence, the

10   spillover effect, the prejudice of that, would be tremendous.

11           Because, as your Honor said this morning to

12   plaintiffs' counsel, the jury instinctively would say, well, I

13   heard NatWest did this; why didn't Credit Lyonnais do that?

14   Or I heard Credit Lyonnais did this; why didn't NatWest do

15   that?  Whereas, that would be completely impermissible, and

16   they agree that your Honor would need to instruct the jury not

17   to engage in that type of comparative exercise, because the

18   evidence about Credit Lyonnais is completely inadmissible with

19   respect to NatWest, and the evidence with respect to NatWest

20   is completely inadmissible with respect to Credit Lyonnais.

21           Coming back to the HAMAS responsibility case, the

22   reason why I say that -- my friend's concession that it took

23   them only four days to present that case in Arab Bank, with

24   50 percent more attacks, the reason I say it would take even

25   less time here is that Judge Cogan allowed them to present

NICOLE CANALES, CSR, RPR

Proceedings                              33

1    types of evidence in support of their HAMAS responsibility

2    case that your Honor has already said they can't present.

3            For example, your Honor said that Mr. Shaked

4    (phonetic) and Mr. Coleman cannot present opinions about HAMAS

5    responsibility.  They can't aggregate evidence because it's

6    not something that is appropriate for expert testimony, and

7    your Honor cited 2nd Circuit's Mejia decision in ruling that

8    they could not do that.  Judge Cogan disagrees.  Secondly,

9    your Honor has ruled that HAMAS claims of responsibility for

10   the attacks are inadmissible hearsay because they're not

11   statements against penal interest.  Judge Cogan respectfully

12   disagreed and allowed all of that evidence to come in.

13           Thirdly, Judge Cogan allowed eyewitnesses to the

14   attacks to testify, even though in this case we have deposed

15   all of the eyewitnesses that they proffered, and every one of

16   them swore under oath that they have no idea who committed the

17   attacks; and, therefore, all of that eyewitness testimony is

18   inadmissible, as we plan to establish, if necessary, in an

19   in limine motion.  So, therefore, your Honor, plaintiffs HAMAS

20   responsibility evidence in this case will be much shorter and

21   will be much more document intensive than it was in the Arab

22   Bank case.

23           But even if I allow my friends to rely on their Arab

24   Bank experience as a proxy, to allow those four days to drive

25   the analysis, when we're going to have tens of days on

Proceedings                    34

1   approximate causation and scienter, would really stand reality

2   on its head.  And, again, as I said earlier, they can't use

3   Arab Bank as a proxy with respect to the brevity of the

4   scienter case, because Arab Bank was precluded from mounting a

5   scienter defense.  Let me make just two other points,

6   your Honor.  Actually, it's three other points, your Honor.

7            First of all, a consolidated trial would be far too

8   long.  If, as the parties estimated, each individual trial

9   would be as much as two months, then a consolidated trial

10  would be just shy of four months.  Maybe four months less four

11  days, if you believe what plaintiffs say about the

12  non-repetition of the HAMAS responsibility evidence.  That

13  would make it exceedingly difficult to seat a jury for a

14  consolidated case.  To require people to be here for four

15  months, it just would be far too long.

16           And because most of the evidence is

17  non-duplicative -- none of the evidence, really, is

18  duplicative, except with respect to HAMAS responsibility.  A

19  consolidated trial would not be much shorter than the combined

20  duration of two individual trials, but, of course, with two

21  individual trials, you would have two juries.  Asking a jury

22  to sit through a four-month consolidated trial, for a case

23  that -- cases that have existed for 11 years without

24  consolidation, in particular, is completely inappropriate.

25           Next, your Honor -- I think I've adequately covered

Proceedings                                        35

1   the conflict issue, which we alluded to in our letter to

2   the Court.  Again, I haven't discussed this issue with

3   Mr. Turner, and I appreciate that he's not been privy to my

4   consultations with my clients, but it's a real issue, and I

5   take my ethical responsibilities, as we all do, very, very

6   seriously.

7            And if your Honor were to say -- as I ask your Honor

8   not to say, but if your Honor were to say that both banks have

9   to appear before the same jury, despite the spillover effects,

10  despite the non-duplication of evidence, despite the duration

11  of that trial, then I do think my clients would be quite

12  prudent to decide that they can't have the same counsel

13  advocating their cases before a single jury.  They can't have

14  me -- to use my free examples, they can't have me saying look

15  at Credit Lyonnais; closed the accounts as soon as OPAC

16  designated its customer -- isn't that wonderful -- when

17  NatWest, with reliance on the British government, continued to

18  serve its designated customer for years.

19           They can't have me saying, oh, look at NatWest; they

20  consulted with the English government, what were they to do,

21  when at the same time Credit Lyonnais did not do that.  Credit

22  Lyonnais witnesses have explained and can explain to a jury

23  why they didn't do that.  But it's not fair to have -- and

24  prejudicial, a word that my friends did not use a lot in their

25  presentation, prejudicial, which is the keystone of the

Proceedings                    36

1    analysis.  It would be prejudicial to have a jury compare the

2    two parties in that way.

3              And, finally, your Honor, with respect to damages,

4    in their motion letter, my friends invoked a question of

5    whether there should be consolidated damages trials.  That's

6    an issue for another day.  Perhaps consolidation will be

7    appropriate if both defendants are found liable.  I hope there

8    won't be a need for a damages case, because neither defendant

9    will be found liable.  And if only one of the defendants is

10   found liable in two separate trials, then consolidation will

11   be moot.  There will be just one damages trial.

12             But, again, its a bit of a bootstrap, especially

13   with the plaintiffs having proposed eight years ago, now that

14   liability and damages be bifurcated, for them to say somehow

15   damages issues implements this question.  If your Honor would

16   like, I can hand up the bar chart with those numbers.

17             THE COURT:  Has plaintiffs' counsel seen this bar

18   chart?

19             MR. FRIEDMAN:  They haven't.

20             THE COURT:  Would you show it to them, please.

21             MR. FRIEDMAN:  And I have the individual names for

22   your Honor.

23             Your Honor.  In sum, the analysis is, according to

24   the 2nd Circuit, is you balance the efficiency gain with

25   the -- of consolidation with the prejudice that would be

Proceedings                                      37

1    caused as the result of consolidation.  Here, my friends have

2    conceded the efficiency gain would be, at most, four days of

3    non-repeated HAMAS responsibility evidence.  And I can tell

4    your Honor quite sincerely that these trials would be

5    overwhelmingly about scienter and about approximate causation.

6              And the prejudice that would befall my clients if

7    they had to present their scienter and approximate causation

8    defenses, or if the jury heard the scienter and approximate

9    causation, proof of the plaintiffs, the prejudice would be

10   overwhelming.  And, you know, your Honor, it's a little unfair

11   for me to have said that you balance the efficiency against

12   the prejudice.  First of all, you don't even get in the

13   consolidation door unless you can show substantial efficiency.

14   And, here, I submit that the plaintiffs can't even do that;

15   they can't even show that there would be a substantial

16   efficiency gain as the result of consolidation.

17             But the 2nd Circuit again -- and we cited to

18   your Honor and call to your Honor's attention again the

19   2nd Circuit's rulings in the *Malcolm* case and in the *Flintkote*

20   case, where -- for example, in *Malcolm,* the 2nd Circuit said

21   the benefits of efficiency can never be purchased at the cost

22   of fairness.  And the *Flintkote* court said that consolidation

23   is particularly inappropriate where the introduction of large

24   amounts of evidence that is relevant to one defendant but

25   irrelevant and inadmissible as to others risks confusing the

1   jury.

2         Your Honor already put her finger on it this morning

3   here, the prejudice, the risks of jury confusion.  In fact,

4   from your Honor's perspective, as your Honor said, the need

5   for your Honor to constantly intervene in the presentation of

6   evidence and to say, look, you can't consider this with

7   respect to one bank or the other, and your Honor would have to

8   do that for weeks on end, because these cases will be

9   overwhelmingly about scienter and approximate causation and

10  only minimally about HAMAS responsibility.  Thank you for your

11  patience, your Honor.

12        THE COURT:  Thank you all very much.  I am going

13  to -- I plan on issuing a decision fairly quickly, and I'm

14  hopeful by the first week of October.

15        And, madam reporter, I'd like to get a copy of these

16  proceedings.

17        Yes, sir.

18        MR. OSEN:  If I may, just one additional point.

19        THE COURT:  Briefly.

20        MR. OSEN:  Not about the argument, your Honor, but

21  it's my understanding -- and defense counsel can correct me,

22  and we'll confer afterwards.  When we recheck this docket

23  after 11 years, it appears that there was a bifurcation order

24  entered with respect to discovery but not with respect to the

25  trial.  And just to correct Mr. Friedman, it was the

Proceedings                          39

1    defendants that asked for bifurcation in June of 2008.

2              THE COURT:  Of damages, you mean, not liability.

3              MR. OSEN:  I'm sorry.  Yes.  Between liability and

4    damages.  So liability and damages discovery were bifurcated

5    in the magistrate judge's order on pretrial discovery, but we

6    couldn't find -- and maybe we missed it -- an order relating

7    to bifurcation of damages and liability for either case at

8    trial.

9              MR. FRIEDMAN:  I think it should be a nonissue,

10   because the parties agree that there is such a bifurcation,

11   and --

12             MR. OSEN:  We never agreed, your Honor, except with

13   respect to discovery, as far as we can tell in the record.

14             MR. FRIEDMAN:  Your Honor, I can dig out the

15   correspondence.  And Mr. Osen and I have known each other now

16   for many years.  But it was agreed, and I have it in writing,

17   that damages discovery would take place after a liability

18   trial, so there can be no ambiguity about that, that liability

19   and damages were bifurcated for trial too because we have

20   correspondence.  And I won't bore your Honor with a debate

21   about whose idea it was, although I'm quite confident it was

22   plaintiffs who proposed it, but Mr. Osen has a different

23   recollection.  So be it.  It doesn't matter.

24             The fact that the parties agreed that damages

25   discovery would take place after a liability trial, except

Proceedings                                              40

1   with respect to the so-called designated plaintiffs that you

2   identify, means of necessity that liability and damages were

3   bifurcated for purposes of trial too.

4           MR. OSEN:  Your Honor, I'm not here to argue that

5   issue.  I just wanted to draw your attention to it because we

6   couldn't find an order with respect to trial and bifurcation

7   on the docket.  I may be mistaken.  We're going to go back.  I

8   obviously will confer with Mr. Friedman on it.  It was

9   somewhat surprising to us.

10          THE COURT:  It will be helpful to the Court, since

11  you've raised that opinion, within a week, after both counsel

12  have had an opportunity to review the docket, just a simple

13  joint letter, just to let me know to that effect whether or

14  not there in fact is such an order.  I think that's easy

15  enough.  I would think that it makes sense to have a

16  bifurcation of damages from liability, and to the extent that

17  there is -- I do think that damages discovery was held off

18  during -- there was a substantial amount of discovery that had

19  to be done.  I remember going through the summary judgment

20  motions.  There was a ton of discovery, a ton of exhibits to

21  go through, so it certainly made sense to do that.

22          MR. FRIEDMAN:  Your Honor, I'm not really sure what

23  the issue is.  I think --

24          THE COURT:  To the extent I think that counsel is

25  requesting, and it might be -- I like a clean docket, so --

NICOLE CANALES, CSR, RPR

Proceedings                          41

1          MR. FRIEDMAN:  Maybe we can propose -- I think we

2     agree that trial is bifurcated as to liability and damages,

3     because there hasn't been damages discovery.

4          THE COURT:  Right.

5          MR. FRIEDMAN:  And if we can propose an order that

6     we consent --

7          THE COURT:  Or a stipulation that I can so order.

8          MR. FRIEDMAN:  -- that memorializes that, we can

9     discuss it.

10         MR. OSEN:  The reason I raised it, your Honor, is

11    because to the extent that the issue comes up with respect to

12    the consolidation issue we're here today, the timing and

13    additional waste of money, resources, etcetera that results

14    from having ceriodum (phonetic) damages trial or waiting for a

15    damages trial, while we have --

16         THE COURT:  We can do one trial immediately after

17    the other.  We'll be a bunch of tired litigators and a tired

18    judge, but that's okay.  That's what we're here for.

19         MR. OSEN:  The only thing I would say is that,

20    at least in our experience in Arab Bank following the trial --

21    and I would expect Mr. Friedman would do the same in this

22    case -- is if there was a liability verdict, we would expect a

23    vigorous briefing under Rule 50 and 59.  That basically takes

24    another year before you get a ruling after a full briefing

25    schedule on that, which then affects how the parties proceed

Proceedings                                          42

1   on the next trial.  As a practical matter --

2          THE COURT:  Maybe.  Maybe not.  I don't know why

3   that should necessarily affect the next trial.

4          MR. OSEN:  Well.  Because --

5          THE COURT:  That's assuming.  Again, I'm putting the

6   cart before the horse.  But for argument sake, if we have two

7   separate trials, so we do one liability trial, and then we do

8   the next liability trial, because there may or may not be

9   liability.  You don't know.  I will never bet on what a jury

10  is going to do.  Who does that is a fool.  We're just -- like

11  to make crazy bets.  I don't know.  But I would think that

12  doing that, there could always be an adjustment with the

13  schedule for damages discovery.  And, besides, you're still

14  talking about damages from one different entity versus another

15  entity.

16         MR. OSEN:  Yes, but, at that point, assuming there

17  was liability in both cases, the damages would be what they

18  are irrespective of the defendant.  In other words, the

19  proffer wouldn't depend on the defendant.

20         THE COURT:  So we're talking about waiting another

21  two months until after the second liability trial is done?

22         MR. FRIEDMAN:  Well, we have to do --

23         THE COURT:  And, as you said, there's going to be

24  post-verdict motions, so --

25         MR. FRIEDMAN:  We also have to do damages discovery.

NICOLE CANALES, CSR, RPR

Proceedings                    43

1          THE COURT:  And damages discovery.  So I'm not -- I

2   don't think that in the scheme of things that that's a more

3   worrisome concern.

4          MR. OSEN:  Thank you, your Honor.

5          THE COURT:  But, in any event, if you wanted to make

6   sure that we have a clear docket on that issue, if you want to

7   send me a joint letter, say, by the 22nd, next week, just to

8   let me know that.  And then if you want to do it by way of

9   stipulation, that's fine, but I can so order a proposed order.

10  That's fine.  Whichever way you all agree is most expedient.

11         I want to thank all of you.  As usual, it is always

12  a pleasure to have oral argument in this case, in these cases.

13  It's always a pleasure to have attorneys who really know their

14  case and are so thoroughly prepared.

15         MR. OSEN:  I'm sorry, your Honor.

16         THE COURT:  Yes, Counsel.

17         MR. OSEN:  One last thing, we have a couple of

18  PowerPoint slides which reiterate the numbers that we gave

19  you.

20         THE COURT:  I really don't -- I don't feel that that

21  is going to be necessary for my analysis.

22         MR. OSEN:  That's fine, your Honor.

23         THE COURT:  But I appreciate the offer.

24         MR. FRIEDMAN:  Thank you, your Honor.

25         THE COURT:  Okay.  Thank you.  All very much.

Proceedings                                   44

1                    (Proceedings adjourned.)

2

3                            *  *  *

4

5          I certify that the foregoing is a true and correct
   transcription of the record from proceedings in the
6  above-entitled case.

7      /s/ Nicole Canales          September 22, 2016
          Nicole Canales                 Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25