UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TZVI WEISS, et al.,

                         Plaintiffs,

          - against -

NATIONAL WESTMINSTER BANK PLC,

                   Defendant.

Case No. 05-CV-4622 (DLI) (RML)

------------------------------------------------------------X

NATAN APPLEBAUM, et al.,

                         Plaintiffs,

          - against -

NATIONAL WESTMINSTER BANK PLC,

                   Defendant.

Case No. 07-CV-916 (DLI) (RML)

**Oral Argument Requested**

------------------------------------------------------------X

## MEMORANDUM OF LAW OF DEFENDANT NATIONAL WESTMINSTER BANK PLC IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant
National Westminster Bank Plc

December 21, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....................................................................................ii

I.     NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THE PROXIMATE CAUSATION ELEMENT OF THEIR CLAIMS............................ 1

     A.    *Al Rajhi* Defines The Circumstances In Which A Bank's Routine Transfer Of
Funds To A Charity Does Not Constitute A Direct Transfer To An FTO That Is
Sufficient To Establish Proximate Cause Under The ATA ................................... 3

     B.    Plaintiffs' Evidence Concerning The 13 Charities Fails To Show That They Are
Legally Equivalent To Hamas, And Thus That A Transfer To Them Was A
Direct Transfer To Hamas Under *Al Rajhi* ............................................................ 7

     C.    Plaintiffs Also Fail To Show <u>Indirect</u> Proximate Causation................................. 10

II.    NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THAT HAMAS PERPETRATED THE ATTACKS BY WHICH PLAINTIFFS
ALLEGE THEY WERE INJURED ............................................................................ 12

     A.    Shaked's Proposed Testimony Is Not Admissible.............................................. 12

     B.    Kohlmann's Proposed Testimony Is Not Admissible......................................... 15

     C.    The Other Evidence On Which Shaked And Kohlmann Purport To Rely Is
Inadmissible Hearsay .......................................................................................... 16

     D.    Plaintiffs Have Not Authenticated The Documents On Which Shaked And
Kohlmann Purport To Rely.................................................................................. 22

     E.    Plaintiffs Are Collaterally Estopped From Claiming That Hamas Perpetrated
The January 29, 2004 Attack ............................................................................... 23

III.   PLAINTIFFS CANNOT ASSERT CLAIMS ARISING BEFORE JUNE 25, 2002
UNDER SECTION 2339C OF THE ATA BECAUSE THAT PROVISION CANNOT
BE APPLIED RETROACTIVELY .............................................................................. 25

CONCLUSION....................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Rules and Statutes**

Fed. R. Evid. 702(c)-(d) .................................................................................... 15

Suppression of the Financing of Terrorism Convention Implementation Act of 2001,
Pub. L. No. 107-197, 116 Stat. 721 (2002) ...................................................... 25

**Cases**

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........................................................................................... 2

*Be-Lo Stores v. NLRB*,
126 F.3d 268 (4th Cir. 1997) ............................................................................ 22

*Berkey v. Third Ave. Ry. Co.*,
244 N.Y. 84 (1926) ............................................................................................ 9

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998) ............................................................................. 24

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) ........................................................................... 25

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) ............................................................................. 18

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
274 F. Supp. 2d 86 (D.D.C. 2003) ............................................................... 4, 6, 8

*Burrage v. United States*,
134 S. Ct. 881 (2014) ......................................................................................... 2

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014) ......................................................................................... 1

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ........................................................................................... 9

*Gill v. Arab Bank, PLC,*
893 F. Supp. 2d 542 (E.D.N.Y. 2012) ............................................................ 17

*Gilmore v. Palestinian Interim Self-Gov't,*
No. 14-7129, 2016 WL 7210140 (D.C. Cir. Dec. 13, 2016) ........................ 13, 15, 17

*Hullaby v. State,*
911 S.W.2d 921 (Tex. App. 1995) .................................................................. 21

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,*
No. 03-MD-1529 (JMF), 2014 WL6982140 (S.D.N.Y. Dec. 10, 2014) ............ 19

*In re Sept. 11 Litig.,*
621 F. Supp. 2d 131 (S.D.N.Y. 2009).............................................................. 17

*In re Terrorist Attacks on Sept. 11, 2001,*
349 F. Supp. 2d 765 (S.D.N.Y. 2005).............................................................. 4

*In re WorldCom, Inc. Sec. Litig.,*
No. 02 CIV 3288 DLC, 2005 WL 375315 (S.D.N.Y. Feb. 17, 2005) ................ 19

*Kaplan v. Al Jazeera,*
No. 10 Civ. 5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011)........................ 2

*Lerner v. Fleet Bank, N.A.,*
318 F.3d 113 (2d Cir. 2003)............................................................................ 2

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 273 (2d Cir. 2006)............................................................................ 2

*Linde v. Arab Bank, PLC,*
97 F. Supp. 3d 287 (E.D.N.Y. 2015) .............................................................. 24

*Lloyd v. Am. Exp. Lines, Inc.,*
580 F.2d 1179 (3d Cir. 1978)........................................................................... 17

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,*
268 F.3d 58 (2d Cir. 2001)........................................................................... 8-9

*Nat'l Council of Resistance of Iran v. Dep't of State,*
373 F.3d 152 (D.C. Cir. 2004)........................................................................ 6

*NLRB v. Deena Artware, Inc.,*
361 U.S. 398 (1960)........................................................................................ 9

*O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001),*
714 F.3d 118 (2d Cir. 2013)..................................................................... *passim*

*Rothstein v. UBS AG,*
708 F.3d 82 (2d Cir. 2013)..................................................................... 2, 3, 4, 11

*Strauss v. Crédit Lyonnais, S.A.,*
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..................................................... *passim*

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
200 F.3d 843 (D.C. Cir. 2000)................................................................. 9

*United States v. Gagliardi,*
506 F.3d 140 (2d Cir. 2007)................................................................... 22

*United States v. Mejia,*
545 F.3d 179 (2d Cir. 2008)................................................................... 13, 14, 15

*United States v. Paracha,*
No. 03 CR. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ................................. 14, 15, 16

*United States v. Perlmuter,*
693 F.2d 1290 (9th Cir. 1982) ............................................................... 23

*United States v. Romano,*
706 F.2d 370 (2d Cir. 1983)................................................................... 19

*Weiss v. Nat'l Westminster Bank PLC,*
453 F. Supp. 2d 609 (E.D.N.Y. 2006) .......................................................5-6, 7, 11

*Weiss v. Nat'l Westminster Bank Plc,*
768 F.3d 202 (2d Cir. 2014)................................................................... 1

## Other Authorities

7 John H. Wigmore, *Evidence in Trials at Common Law* § 2158, 772-73 (Chadbourn
rev., Little, Brown & Company 1978).......................................................... 22

Pursuant to the Court's Orders dated August 2 and 12, 2016, Defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law in support of its renewed motion for summary judgment.[1] For the reasons stated below, no reasonable juror could find that plaintiffs have proven the proximate causation or Hamas responsibility elements of their claims. Accordingly, NatWest is entitled to summary judgment.

## I.     NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION ELEMENT OF THEIR CLAIMS

Section 2333(a)'s requirement that plaintiffs prove their injuries were caused "by reason of" an act of international terrorism makes it essential for plaintiffs to demonstrate that

---

[1] On December 7, 2011, NatWest moved for summary judgment on the grounds that no reasonable juror could find that plaintiffs have proven three elements of their claims: (1) that NatWest acted with the requisite scienter; (2) that NatWest's transfers on behalf of its customer Interpal proximately caused the attacks by which plaintiffs allege they were injured; and (3) that Hamas perpetrated those attacks. ECF Nos. 264, 265. (All citations to "ECF" numbers refer to electronic filings on the *Weiss* docket, Case No. 05-CV-4622 (DLI) (RML), unless otherwise specified.) On March 28, 2013, the Court granted NatWest summary judgment, reaching only the scienter element, and ruling that no reasonable juror could find for plaintiffs on that element. ECF No. 310. On September 22, 2014, the Second Circuit reversed the Court's grant of summary judgment to NatWest and remanded the case "for further proceedings, including consideration of NatWest's other asserted grounds for summary judgment." *Weiss v. Nat'l Westminster Bank Plc*, 768 F.3d 202, 212 (2d Cir. 2014). On October 17, 2014, immediately after the Second Circuit issued the mandate, NatWest sought permission, which the Court granted, to move for dismissal for lack of personal jurisdiction based on the Supreme Court's intervening decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). ECF Nos. 316, 317. On January 12, 2015, NatWest filed the fully-briefed *Daimler*-based motion pursuant to the Court's bundle rule. ECF No. 326. On March 31, 2016, the Court issued its Opinion and Order denying NatWest's jurisdictional motion. ECF No. 338. On May 11, 2016, plaintiffs sent a letter, further to an April 7, 2016 teleconference, stating that they intended to (1) amend the *Weiss* and *Applebaum* complaints to add claims arising from two additional attacks, the Ben Yehuda Street Bombings on December 1, 2001 and the Patt Junction Bus #32A Bombing on June 18, 2002 (but plaintiffs also ultimately added claims relating to the March 7, 2002 attack) (collectively, the "SoL Attacks"); and (2) supplement their production of documents in discovery with additional materials relating to Hamas. May 11, 2016 Ltr. From G. Osen to L. Friedman, Declaration of Mark S. Grube dated Dec. 21, 2016 ("Grube Decl."), Ex. 5. On August 2 and 12, 2016, the Court granted NatWest permission to file, and set a schedule for, NatWest's renewed motion for summary judgment with respect to the proximate cause and Hamas responsibility elements that the Court did not reach in its March 28, 2013 opinion, as well as NatWest's motion for summary judgment with respect to plaintiffs' claims based on the SoL Attacks.

All capitalized terms not defined herein have the meaning ascribed to them in NatWest's initial and reply memoranda of law in support of its initial motion for summary judgment, filed on March 22, 2012 pursuant to the Court's bundle rule, ECF Nos. 265 and 276, which are cited in this memorandum as "NW Br. at __" and "NW Reply at __," respectively. NW's Statement of Undisputed Material Facts As to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 (ECF No. 266) is cited as "NW 56.1 St. ¶ __," and plaintiffs' response thereto (ECF No. 273) is cited as "Pls.' 56.1 Resp. ¶ __." Citations to exhibits appended to the Declaration of Valerie Schuster in support of NatWest's motion for summary judgment (ECF No. 267) are designated "Schuster Decl. Ex. __." In addition, NatWest is submitting herewith a Supplemental Statement of Additional Undisputed Material Facts As To Which There Is No Genuine Issue Pursuant To Local Civil Rule 56.1, which is cited as "NW Supp. 56.1 ¶ __," and the Grube Declaration and the exhibits thereto.

NatWest's provision of routine banking services to its customer Interpal proximately caused the terrorist attacks by which plaintiffs were injured. *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013); *O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 118, 123-25 (2d Cir. 2013) ("*Al Rajhi*"). The "by reason of" standard, which appears in several federal statutes in addition to the Anti-Terrorism Act ("ATA"), requires "a more stringent showing of proximate cause than would be required at common law." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 285 n.5 (2d Cir. 2006) (citation omitted). Plaintiffs therefore must prove that NatWest's conduct was "'a substantial factor in the sequence of responsible causation,'" *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) (citation omitted), that it "led directly to [plaintiffs'] injuries," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), and that it was "reasonably foreseeable that [NatWest's] conduct [was] likely to result in violent criminal acts," *Kaplan v. Al Jazeera*, No. 10 Civ. 5298, 2011 WL 2314783, at *7 (S.D.N.Y. June 7, 2011); *see also Burrage v. United States*, 134 S. Ct. 881, 889 (2014) ("[T]he phrase, 'by reason of,' requires at least a showing of 'but for' causation." (citation omitted)).

The Second Circuit's 2013 decision in *Al Rajhi* confirms that, in order for plaintiffs to satisfy these requirements and thus prove the proximate causation element of their ATA claims against NatWest for materially supporting Hamas—the foreign terrorist organization ("FTO") plaintiffs accuse of having perpetrated the attacks by which plaintiffs were injured—plaintiffs must prove either: (1) <u>direct</u> causation, meaning that NatWest provided funds <u>directly</u> to Hamas; <u>or</u> (2) <u>indirect</u> causation, meaning that NatWest transferred funds to a third party, including those closely aligned or affiliated with Hamas, which funds then "actually [were] transferred to [Hamas] <u>and</u> aided in the" attacks by which plaintiffs were injured. *See Al Rajhi*, 714 F.3d at 124 (emphasis added); *Rothstein*, 708 F.3d at 97.

2

Here, plaintiffs concede they cannot satisfy the <u>indirect</u> causation test, because there is no evidence that any of the funds that NatWest transferred at Interpal's request were actually used to perpetrate any of the attacks.  Plaintiffs thus base their claims entirely on attempting to prove that the 13 charities in the Palestinian Territories that received transfers from Interpal's NatWest accounts (the "13 Charities") are <u>legally the same as</u> Hamas, such that the transfers to the 13 Charities were in fact <u>direct</u> transfers to Hamas itself.  But the evidence on which plaintiffs rely to show that the 13 Charities and Hamas are one and the same is inadequate for that purpose <u>as a matter of law</u> under *Al Rajhi*.  The Second Circuit ruled in *Al Rajhi* that strikingly similar allegations regarding transfers to a charity that had been sanctioned as an SDGT for supporting al Qaeda were insufficient to establish a claim of <u>direct</u> causation, and therefore that the plaintiffs' allegations that funds were transferred to that charity were insufficient to support claims under the ATA that the bank that transferred the funds proximately caused the September 11, 2001 attacks.  714 F.3d at 124.  As shown below, *Al Rajhi* requires that the Court reach the same conclusion here with respect to NatWest, and grant it summary judgment.

A.    ***Al Rajhi* Defines The Circumstances In Which A Bank's Routine Transfer Of Funds To A Charity Does <u>Not</u> Constitute A Direct Transfer To An FTO That Is Sufficient To Establish Proximate Cause Under The ATA**

Plaintiffs attempt to establish "a proximate causal relationship between" NatWest's processing of funds transfers on behalf of Interpal and the "terrorist attacks . . . that injured plaintiffs," *Rothstein*, 708 F.3d at 97, by contending that: (1) the 13 Charities were <u>alter egos</u> or under the control of Hamas, such that, as a matter of law, these transfers were made to Hamas itself; and thus, (2) because money is fungible, the transfers were "a substantial factor in the sequence of responsible causation" that "led directly to [plaintiffs'] injuries," and it was "reasonably foreseeable" to NatWest that these transfers would lead to the attacks.  *Id.* at 91-92; NW 56.1 St. ¶ 275-277.  But *Al Rajhi* teaches that evidence of transfers to alleged charitable

"front" groups are not sufficient to establish that NatWest made a direct transfer of funds to Hamas.[2]

The *Al Rajhi* complaint alleged civil ATA claims against several entities and individuals for causing the September 11, 2001 terrorist attacks, including Al Rajhi Bank, which was alleged to have served as "the primary bank for a number of charities that serve as al Qaeda front groups." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) (citation omitted).[3]   Specifically, the plaintiffs alleged that Al Rajhi Bank's client, a charity named Al-Haramain Islamic Foundation, Incorporated ("Al-Haramain"): (1) was a front organization for al Qaeda; (2) provided al Qaeda with "recruits, weapons and money"; (3) employed senior al Qaeda operatives; (4) was a designated terrorist entity (SDGT); and (5) had financed al Qaeda's terrorist activities. *Burnett*, 274 F. Supp. 2d at 104.

In affirming dismissal of the claims against Al Rajhi Bank, the Second Circuit ruled that the plaintiffs' allegations that the bank "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to" an FTO failed to show an <u>indirect</u> proximate causal relationship between the bank's funding and the attacks because there was no

---

[2] This Court considered similar arguments in *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432-34 (E.D.N.Y. 2013) ("*Strauss*"), <u>before</u> the Second Circuit's ruling in *Al Rajhi*. The Court concluded that evidence of transfers to purported "Hamas front organizations" was sufficient to satisfy the proximate causation element of Section 2333(a). In doing so, the Court distinguished *Rothstein*, in which the Second Circuit held that it was insufficient for purposes of proximate cause to allege that the defendant "provid[ed] Iran with hundreds of millions of dollars in cash," 708 F.3d at 87, knowing that (1) Iran "promot[ed] terrorism to injure and intimidate the Jewish residents of Israel"; (2) Iran "provided Hamas and Hizbollah with hundreds of millions of dollars to fund terrorist attacks"; and (3) Iran "conditioned that funding on agreement by those organizations to conduct terrorist attacks on Israel and its residents," *id.* at 92. In its *Strauss* decision, the Court focused on the allegations in *Rothstein* that the defendant provided financial services to a government, not charitable organizations. 925 F. Supp. 2d at 433. But the Second Circuit, in rejecting claims against Al Rajhi Bank, noted that the allegations against the bank were "strikingly similar" to those found "insufficient for the purposes of establishing proximate causation" in *Rothstein*, and clarified that *Rothstein* is <u>not</u> limited to claims based on alleged funds transfers to a state sponsor of terrorism. *Al Rajhi*, 714 F.3d at 124.

[3] The *Burnett* court permitted Al Rajhi Bank to serve plaintiffs with a Rule 12(e) request for a more definite statement and reserve its right to renew its dismissal motion after receiving plaintiffs' response. 274 F. Supp. 2d at 110. The case was later transferred to the Southern District of New York, *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005), and consolidated into *Al Rajhi*, 714 F.3d at 118, where the Second Circuit affirmed the district court's dismissal of the claims against the bank.

evidence that the funds were used to perpetrate the attacks. *Al Rajhi*, 714 F.3d at 124. The court also declined to find a direct proximate causal relationship between the bank and the attacks because, notwithstanding the allegations that Al-Haramain was a mere "front" and designated fundraiser for al Qaeda, there was no allegation that, by providing funds to Al-Haramain, Al Rajhi Bank "provided money directly to al Qaeda." *Id.*

These rulings establish that ATA plaintiffs must meet an exacting standard in order to prove that a bank's transfers of funds to a charity that is alleged to be connected to an FTO proximately caused an attack committed by that FTO. *See id.* ("We also are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda . . . proximately caused the September 11, 2001 attacks or plaintiffs' injuries."). Specifically, a plaintiff must show either that the funds transferred to the affiliated charity were provided to the FTO and then actually used to commit a terrorist act (indirect causation), or that the transfer was a direct transfer to the FTO itself (direct causation). For the latter—the type of causation plaintiffs allege here, *see supra* p. 3—the Second Circuit's rulings also make clear that, to establish that a charity is legally equivalent to an FTO, it is insufficient to show merely that the charity was designated as an SDGT for being a fundraiser for the FTO, that the charity is considered to be a "front" (or similar term) for the FTO, or that it has overlapping leadership and supports the FTO's operations or goals. *See id.* ("These allegations are insufficient for proximate causation purposes for the same reasons the allegations in *Rothstein* fell short."). In fact, in *Al Rajhi* the Second Circuit declined to find that the presence of all four of these factors was sufficient to establish that Al-Haramain was, as a matter of law, the FTO al Qaeda itself. *See id.*

Judge Sifton's ruling ten years ago (on which this Court relied in *Strauss*) that plaintiffs can satisfy the proximate causation element of their claims by showing that the 13 Charities were

controlled by, or are an "alias" of Hamas, *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d

609, 623 (E.D.N.Y. 2006), is no longer controlling after *Al Rajhi*, which was likewise issued

after this Court's *Strauss* ruling.  While Judge Sifton's *Weiss* decision lists several factors to be

considered in determining whether the 13 Charities are controlled by or aliases of Hamas—

"whether the organizations share leadership, whether they commingle finances, publications,

offices, and personnel, and whether one operates as a division of the other," 453 F. Supp. 2d at

623 (citations omitted)—*Al Rajhi* now makes clear that even the combination of certain of these

factors, much less any of them alone, does <u>not</u> suffice to show that a charity is the same as an

FTO for purposes of proving a direct transfer of funds to that FTO.[4]  Specifically, in *Al Rajhi*—

and despite allegations that Al-Haramain was a front organization for al Qaeda, provided al

Qaeda with "recruits, weapons, and money," had senior al Qaeda operatives as employees, was a

designated terrorist entity (SDGT), and financed al Qaeda's terrorist activities, *Burnett*, 274 F.

Supp. 2d at 104—the Second Circuit ruled that the complaint lacked "factual allegations" that Al

Rajhi Bank "provided money directly to al Qaeda."  714 F.3d at 124.  That Al-Haramain's stated

purpose was to raise funds for al Qaeda (and was designated by the U.S. government for that

reason) was not enough to make a transfer to Al-Haramain's bank account a transfer to al Qaeda

itself.[5]

---

[4] While the Secretary of State has at times chosen to designate as FTOs groups that were found to be aliases of organizations already so designated, *see Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 159 (D.C. Cir. 2004), the absence of any terrorist designation of any of the 13 Charities during the relevant time period, and the fact that one of them was specifically designated as an SDGT and <u>not</u> an FTO in 2007, reflects the Executive Branch's conclusion that the 13 Charities are <u>not</u> aliases of Hamas. *See* NW 56.1 St. ¶¶ 289-292.

[5] Specifically, Al-Haramain and the other purported al Qaeda front charities were alleged to have "(1) raised and laundered funds on behalf of al-Qaeda; (2) channeled donated funds to al-Qaeda; (3) provided financial and logistical support and physical assets to al-Qaeda; (4) permitted al-Qaeda members to use ostensible employment with their organizations as a vehicle for covertly traveling in furtherance of al-Qaeda's operations; (5) performed reconnaissance within conflict regions on behalf of al-Qaeda; (6) served as liaisons to localized terrorist organizations on behalf of al-Qaeda, thereby assisting al-Qaeda in expanding its operational base and sphere of influence; (7) funded and facilitated shipments of arms and supplies to al-Qaeda; (8) funded camps used by al-Qaeda to train soldiers and terrorists; (9) actively recruited Muslim youths on behalf of al-Qaeda; (10) served as channels for distributing information and documentation within al-Qaeda, and from al-Qaeda to the media; (11) disseminated

**B.    Plaintiffs' Evidence Concerning The 13 Charities Fails To Show That They Are Legally Equivalent To Hamas, And Thus That A Transfer To Them Was A Direct Transfer To Hamas Under *Al Rajhi***

Under *Al Rajhi*, plaintiffs' claims with regard to each transfer can proceed under plaintiffs' <u>direct</u> causation theory only if the 13 Charities that received the transfers are, as a matter of law, equivalent to transfers to Hamas itself.  But there is no evidence on which a reasonable juror could make such a finding.  Plaintiffs offer neither fact witnesses nor any admissible documents that support such a finding, and instead rely solely on "expert" testimony of Dr. Matthew Levitt and Arieh Spitzen.  NW 56.1 St. ¶¶ 278-283.[6]  Moreover, despite Levitt's and Spitzen's incantation of the terms "<u>alter ego</u>" and "control" to describe the relationship between the 13 Charities and Hamas, these labels are just as inadequate as was labeling Al-Haramain a "front" for al Qaeda in *Al Rajhi*.  Notably, neither Levitt nor Spitzen applied the legal tests for determining <u>alter ego</u> or "control" status, but rather each referred only to his own, far more lenient standards.  NW 56.1 St. ¶¶ 331-335, 434-445.  Indeed, to the extent Levitt and Spitzen rely on facts at all in support of their labels, these facts are precisely the same kinds of facts that were found insufficient in *Al Rajhi*.[7]  For example, Levitt primarily analyzed whether

---

publications designed to advance al-Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad . . . ." Appellants' Consolidated Br. with Respect to Dismissals for Failure to State a Claim and Foreign Sovereign Immunity at 30-31, *Al Rajhi*, No. 11-3294-cv (CON) (2d Cir. Jan. 20, 2012), ECF No. 299 (citing plaintiffs' pleadings and record evidence).

[6] NatWest demonstrated in its original summary judgment motion that the opinions of Levitt and Spitzen are inadmissible. NW Br. at 32-36; NW 56.1 St. ¶¶ 345-479.  NatWest recognizes that the Court reached contrary conclusions in *Strauss*, and notes these further defects in plaintiffs' proof here only to preserve its objections on these grounds. 925 F. Supp. 2d at 437-43. Plaintiffs also rely on the proposed testimony of accountant Wayne Geisser, but solely to summarize the relevant transfers based upon NatWest's banking records. NW 56.1 St. ¶¶ 283-284.

[7] To the extent that plaintiffs have identified transfers between Interpal and other persons or entities other than the 13 Charities through its NatWest account, those transfers cannot be offered to prove liability because plaintiffs do not claim that any persons or entities other than the 13 Charities were <u>alter egos</u> of and/or controlled by Hamas.  NW 56.1 St. ¶¶ 245-246.  *See Weiss*, 453 F. Supp. 2d at 623 (holding that plaintiffs' claims could not rely upon provision of material support to Interpal and other organizations that plaintiffs did not allege were controlled by Hamas or that they are run on behalf of Hamas because "[m]erely providing financial support and supporting the terrorist objective of an FTO does not suffice to show that an organization is so dominated and controlled so as to have lost its independent identity.").

the 13 Charities: (1) have employed Hamas members; (2) were a source for Hamas recruiting; or (3) provided Hamas members the ability to misuse their positions with the charity to benefit Hamas, regardless of whether the charity itself was involved in or facilitated any of these actions, and regardless of whether Hamas had any power to direct the charity's actions. NW 56.1 St. ¶ 335. But in *Al Rajhi* the Second Circuit concluded that allegations that senior al Qaeda operatives worked for Al-Haramain and that Al-Haramain provided al Qaeda with recruits and weapons and financed al Qaeda's terrorist activities, *see Burnett*, 274 F. Supp. 2d at 104, were inadequate to support the plaintiffs' claims against Al-Haramain's banker, Al Rajhi Bank. *Al Rajhi*, 714 F.3d at 124. *Al Rajhi* calls for the same result here, with respect to NatWest.

Similarly, although Spitzen purported to apply his own 18 factor test to conclude that the 13 Charities effectively are Hamas, NW 56.1 St. ¶ 434, he failed to explain how he used those 18 factors (many of which he conceded were not present for most of the 13 Charities) to support his conclusions, NW 56.1 St. ¶¶ 440-441, and testified that one factor alone could suffice to show control—"all the entire leadership of the organization . . . are Hamas people." NW 56.1 St. ¶ 453. That is plainly contrary to *Al Rajhi*'s dismissal of claims against Al Rajhi Bank despite the plaintiffs' allegations of shared leadership between the bank's customer, Al-Haramain, and al Qaeda. *Burnett*, 274 F. Supp. 2d at 104; *Al Rajhi*, 714 F.3d at 124.

More fundamentally, neither Levitt nor Spitzen opines, and plaintiffs have conceded that they have no admissible evidence, that the 13 Charities commingled funds with Hamas, or that Hamas controlled the bank accounts of the 13 Charities to which NatWest directed transfers on behalf of Interpal. NW 56.1 St. ¶¶ 308-311, 385. As in *Al Rajhi*, that creates a gaping hole in plaintiffs' attempt to prove that the 13 Charities are the legal equivalents of Hamas. [8]

---

[8] This is an additional factor identified by Judge Sifton, which is also a factor in the well-established "alter ego" test. *See MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (factors include

Indeed, Levitt confirmed that, contrary to plaintiffs' core contention, he did not even analyze whether the 13 Charities were the legal equivalents of Hamas, but instead considered only whether they fall within a spectrum of support for Hamas. Further, the six characteristics on that spectrum by which he defined such support make clear that his analysis is inadequate to prove that the 13 Charities are legally equivalent to Hamas under *Al Rajhi*. Levitt described his six characteristics as follows:

1. Controlled by: "some entities that are affiliated with Hamas are a little more independent and they may have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think . . . [at] the other end of the extreme and of course there's plenty in the middle . . . ."

2. Affiliated with: "I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be legally independent entities. Like I said you don't have the shingle hanging out the front door, but they do in fact have affiliations with Hamas . . . ." (emphasis added).

3. Fundraise for: "Fundraise for means raises money for."

4. "Could be" alter ego: "[Y]ou can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for [Hamas]."

5. Department of: "[A]ctual departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as part of the activities of those committees."[9]

---

"(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; and (10) intermingling of property between the entities." (citation omitted)). Importantly, the cases cited in Judge Sifton's opinion and other precedents on which Judge Sifton relies are all corporate-veil piercing cases, or cases which specifically rely on corporate veil-piercing law. *See e.g., Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84 (1926); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403 (1960); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 628-30 (1983); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000). NatWest demonstrated in its initial summary judgment motion that plaintiffs fail to meet the requirements of this test, NW Br. at 23-27, and *Al Rajhi*'s analysis further confirms NatWest's showing.

[9] Despite this definition, Levitt conceded in his CL deposition that a source he relied on to state that the charitable network is one of Hamas's three "wings" in fact only indicated that Hamas had two wings: the military (terrorist)

6. <u>Otherwise supports</u>: "[I]n some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support beyond the strict provision of monies."

NW 56.1 St. ¶ 335. All of these characteristics describe entities at least as far removed from Hamas as Al-Haramain was from al Qaeda in *Al Rajhi*; none satisfies the *Al Rajhi* test, or any conventional <u>alter ego</u> standard.

In sum, the evidence on which Levitt and Spitzen relied to opine that each of the 13 Charities is the legal equivalent of Hamas is inadequate under the applicable legal standards read in light of *Al Rajhi*. NW Supp. 56.1 ¶¶ 7-39. Thus, plaintiffs must prove proximate causation under the <u>indirect</u> test set forth in *Al Rajhi*.

### C.   Plaintiffs Also Fail To Show <u>Indirect</u> Proximate Causation

Levitt's and Spitzen's opinions indicate that plaintiffs at most could pursue an <u>indirect</u> causation claim, on the basis that NatWest made transfers to the 13 Charities, which plaintiffs claim support Hamas, similar to Al-Haramain's support of al Qaeda in *Al Rajhi*. But plaintiffs cannot prove such an <u>indirect</u> causal relationship between NatWest's transfers and the attacks by which plaintiffs were injured without proof that the funds that NatWest transferred to the 13 Charities "actually [were] transferred to [Hamas] and aided in the" attacks by which plaintiffs were injured. *Al Rajhi*, 714 F.3d at 124. As noted above, plaintiffs concede they cannot show that any funds that NatWest transferred on behalf of Interpal were transferred to Hamas, much less used for, or in any way facilitated, any of the attacks at issue. NW 56.1 St. ¶¶ 248-274; NW Supp. 56.1 ¶ 5. Further, both Spitzen and Levitt admit they have <u>no</u> evidence that <u>any</u> of the 13 Charities caused, participated in or planned any of the attacks, or trained or recruited or provided logistical support or transferred money to any of the attackers. NW 56.1 St. ¶¶ 253-261, 266-

---

and political wings, and that the charitable network was not a "wing." Levitt CL Tr. 152:9-155:13, Grube Decl. Ex. 3; NW Supp. 56.1 ¶ 16.

274. Absent any evidence that the transferred funds actually aided in the terror attacks by which plaintiffs were injured, plaintiffs' proof of proximate causation is no more supportable than the allegations that were dismissed in *Rothstein* and *Al Rajhi*. *See Al Rajhi*, 714 F.3d at 124; *Rothstein*, 708 F.3d at 97.

Moreover, Levitt and Spitzen conceded that any funds sent to the 13 Charities were most likely used for <u>charitable</u> purposes, which also makes plaintiffs' claims similar to those that were dismissed in *Rothstein* and *Al Rajhi*. *See Rothstein*, 708 F.3d at 97 (holding that the provision of financial services to Iran did not proximately cause terror attacks perpetrated by Iran-supported FTO, noting that Iran has "many legitimate agencies, operations, and programs to fund"); *Al Rajhi*, 714 F.3d at 124 (observing that allegations about funds transfers to charity supporting al Qaeda were "strikingly similar" to the allegations in *Rothstein*). Thus:

- Levitt testified that it is "less common" that funds raised by a charity for education would be used for terrorism, NW 56.1 St. ¶¶ 262-264, 315; and

- Levitt and Spitzen testified that all of the charities perform charitable work and provide social services in the Palestinian Territories, NW 56.1 St. ¶¶ 340-342.

Accordingly, the Court should grant NatWest summary judgment. No reasonable juror could find for plaintiffs on the proximate causation element of their claims. There is no evidence that NatWest transferred funds <u>directly</u> to Hamas, or that any funds were "actually" transferred from the 13 Charities to Hamas and used in the attacks by which plaintiffs were injured. NW 56.1 St. ¶ 248.[10]

---

[10] NatWest likewise is entitled to summary judgment on plaintiffs' claims under Section 2333(a) to the extent they are predicated on a violation of Section 2339B. To succeed on their claim under Section 2339B of the ATA, plaintiffs must prove that NatWest knowingly provided material support or resources to an FTO. Judge Sifton ruled at the pleading stage that plaintiffs' complaints adequately alleged support of an FTO by alleging that the 13 Charities were <u>alter egos</u> of or controlled by Hamas, and therefore were agents of a designated FTO. *Weiss*, 453 F. Supp. 2d at 623 (citing *Nat'l Council*, 373 F.3d at 157-59). But as shown above, there is no admissible evidence from which a reasonable juror could conclude that NatWest's transfers to the 13 Charities were the legal equivalent of a direct transfer to an FTO.

11

## II.  NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THAT HAMAS PERPETRATED THE ATTACKS BY WHICH PLAINTIFFS ALLEGE THEY WERE INJURED

Plaintiffs also have failed to present any admissible evidence from which a reasonable juror could find the final link in the causal chain on which plaintiffs rely—that Hamas perpetrated the attacks at issue.  Plaintiffs attempt to prove that Hamas perpetrated the attacks by presenting: (1) the opinions of two "attribution experts"—Ronni Shaked, an Israeli newspaper reporter, and Evan Kohlmann, a compiler of predominantly al Qaeda-specific information published on the internet—who purport to opine that, based on their review of various hearsay materials, Hamas perpetrated the attacks; and (2) various hearsay documents on which Shaked and Kohlmann rely.[11]  Plaintiffs also offer an "expert" opinion from Shaul Naim, a retired Jerusalem police officer, in an attempt to authenticate those hearsay documents.  But none of this evidence is admissible, and NatWest is therefore entitled to summary judgment.

### A.    Shaked's Proposed Testimony Is Not Admissible

Shaked's proposed testimony is precisely the same as what he proposed to provide in support of plaintiffs' claims against Crédit Lyonnais ("CL") in the *Strauss* and *Wolf* cases.  He simply collects hearsay evidence relating to the attacks—including newspaper articles, claims published on websites Shaked attributes to Hamas, interviews of purported Hamas members, propaganda literature, Israeli government press releases, non-public police reports that Shaked claims to have obtained through police contacts he fostered as a newspaper reporter, unauthenticated Israeli civilian and military court records, and the like—and then paraphrases or reproduces them *verbatim*, accepting them all as true.  The Court has already correctly ruled in *Strauss* that Shaked's attribution opinions are inadmissible to prove that Hamas was responsible

---

[11] Plaintiffs also have offered testimony from certain persons who were present at or shortly after some of the attacks, but each has testified that he or she has no personal knowledge about who perpetrated the attacks.  NW Supp. 56.1 ¶¶ 99-105.  Thus, plaintiffs cannot rely on these witnesses to prove that Hamas perpetrated these attacks.

for the attacks, noting that *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), precludes such attribution testimony. *Strauss*, 925 F. Supp. 2d at 444.[12]

In *Mejia*, the government proffered a police officer to testify that, in his "expert" opinion, the gang to which the defendants allegedly belonged was responsible for between 18 and 23 murders. 545 F.3d at 186-87. The Second Circuit differentiated between permissible expert testimony under Federal Rule of Evidence ("FRE") 702 and impermissible summary fact witness testimony, and held that it was reversible error for the district court to have allowed the police officer to testify to this opinion because it exceeded the scope of permissible testimony under FRE 702. *See id.* at 194-96; *see also id.* at 201-02. The court noted that the fact of the gang's criminal responsibility for murders was "well within the grasp of the average juror" and thus not an appropriate subject of expert testimony. *Id.* at 194-95 (citing FRE 702). The court concluded that it is not permissible "to substitute expert testimony for factual evidence of murder in the first instance," *id.* at 195, and that FRE 702 forbids an expert from being a "chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt." *Id.* at 190.[13]

This Court properly ruled in *Strauss* that *Mejia* precludes Shaked from pronouncing Hamas guilty of the attacks at issue. The Court reasoned that, if the hearsay documents on which Shaked relied "were otherwise admissible, Shaked could use his expertise to explain, for example, that the logo on the letterhead is Hamas', how Hamas typically makes announcements over the internet or that the Izz al-Din al-Qassam Brigades is Hamas' military branch." *Strauss*,

---

[12] The D.C. Circuit Court of Appeals recently reached the same conclusion with respect to a similar purported expert opinion. *See Gilmore v. Palestinian Interim Self-Gov't*, No. 14-7129, 2016 WL 7210140, at *10 (D.C. Cir. Dec. 13, 2016).

[13] The Second Circuit also held that the officer's testimony was an abuse of FRE 703 because he merely transmitted inadmissible hearsay to the jury. *See id.* at 197 (although expert may rely on hearsay if "experts in the field reasonably rely on such evidence in forming their opinions," expert may not "simply transmit that hearsay to the jury" without analysis in order to circumvent the rule against hearsay).

925 F. Supp. 2d at 444-45. The Court correctly concluded, however, that under *Mejia* "attribution testimony cannot be used as an excuse to introduce and summarize straightforward factual evidence that has not been admitted, such as a webpage that says 'Hamas carried out a suicide bombing,'" and thus the Court ruled that Shaked "cannot be used to establish basic facts in the first place," such as Hamas's responsibility for the attacks. *Id.* at 445. The Court therefore granted CL summary judgment on claims arising from the September 24, 2004 attack, for which plaintiffs proffered no evidence of Hamas's responsibility other than Shaked's inadmissible opinion that Hamas perpetrated that attack. *Id.* at 449-50.

Here, and precisely as plaintiffs did in *Strauss*, they are attempting to use Shaked for the same improper "shortcut" that *Mejia* condemns. His report simply aggregates factual, non-technical and inadmissible hearsay evidence, which he quotes or summarizes in his report, including: Hamas's claims of responsibility and photographs and videos, NW 56.1 St. ¶¶ 506-515, 520-521, 578-582, 590-595; Israeli military court convictions, *id.* ¶¶ 619-647; Israeli government press releases repeating Hamas claims of responsibility and a purported government report attributing certain attacks to Hamas (discussed further below), *id.* ¶¶ 650-652; and newspaper articles and books, *id.* ¶¶ 653-658. After cataloguing this non-technical and inadmissible hearsay evidence, Shaked repeatedly declares they "leave no doubt" that Hamas perpetrated the attacks. *Id.* ¶¶ 495, 506-510. Such an *ipse dixit* pronouncement of guilt is precisely what the Court ruled in *Strauss* that Shaked cannot do, and what *Mejia* holds even a qualified expert cannot do. *Mejia*, 545 F.3d at 190-91; *see also United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *18, 21 (S.D.N.Y. Jan. 3, 2006) (permitting an expert to testify only about a terrorist group's origins and structure but not about the "background and alleged activities" of specific alleged co-conspirators, because such testimony "is properly

admitted through fact witnesses, not an expert"), *aff'd*, 313 F. App'x 347 (2d Cir. 2008);

*Gilmore*, 2016 WL 7210140, at *10.[14]

### B.   Kohlmann's Proposed Testimony Is Not Admissible

Plaintiffs' other purported expert, Evan Kohlmann, purports to opine that Hamas

perpetrated the attacks at issue by relying exclusively on claims of responsibility for the attacks

that Kohlmann asserts he has collected from internet websites he attributes to Hamas.  NW 56.1

St. ¶¶ 670-677, 730-734, 753-756; NW Supp. 56.1 ¶¶ 91-94.  Kohlmann's opinions here are

identical to those that the Court excluded in *Strauss* (in fact, plaintiffs rely here on the same

report Kohlmann submitted in *Strauss*), on the ground that an expert cannot simply recite

hearsay—such as Hamas's claims of responsibility that appear on the internet—to the jury.  925

F. Supp. 2d at 446.

Kohlmann's opinions constitute an improper "expert pronounce[ment]" of guilt, *Mejia*,

545 F.3d at 195, contrary to *Mejia* and *Paracha*.  His primary methodology was to review

websites that purport to claim responsibility for attacks on behalf of Hamas, and to conclude

based on those websites that their claims were "credible"[15] and therefore Hamas did indeed

commit those attacks.  NW 56.1 St. ¶¶ 670-681, 730-734, 753-756.  Thus, like Shaked,

Kohlmann is proposing to offer merely his own summary of the inadmissible hearsay appearing

on purported Hamas websites he has elected to credit, which is an abuse of FRE 703.  In *Strauss*,

---

[14] NatWest demonstrated in its original summary judgment motion that Shaked is not qualified to opine about whether Hamas perpetrated the attacks at issue because, by his own admission, his education and experience do not provide him with any distinctive knowledge, education or skill to analyze who has committed any attack, let alone the attacks at issue here.  NW Br. at 40; NW 56.1 St. ¶¶ 496-505.  NatWest also demonstrated that the numerous substantive deficiencies in Shaked's analysis further show that his proposed testimony is not reliable, which provides a separate and independent reason to exclude that testimony.  *See* FRE 702(c)-(d); NW Br. at 40-43; NW 56.1 St. ¶¶ 511-598.  NatWest recognizes, however, that the Court reached a contrary conclusion in *Strauss*, and notes these further defects in Shaked's opinions here only to preserve its objections on these grounds.  925 F. Supp. 2d at 443.

[15] Kohlmann's opinion that the purported Hamas claims of responsibility he cites are "credible," NW 56.1 St. ¶¶ 678-681, is plainly impermissible.  *See Paracha*, 2006 WL 12768, at *18, 23.

the Court ruled that Kohlmann's "recitation of secondary evidence, not all of which is admissible, that Hamas perpetrated" the attacks was itself inadmissible, and therefore plaintiffs could not rely on Kohlmann's attribution opinions, reasoning that Kohlmann made "no attempt to bring his expertise to bear and comes to no conclusion as to the import or accuracy of his summaries other than concluding that Hamas has claimed responsibility for the attacks." 925 F. Supp. 2d at 446; *see also Paracha*, 2006 WL 12768, at *18, 21-24 (permitting Kohlmann to testify only about the origins and structure of al Qaeda—a topic, unlike Hamas, on which his work has focused—but not the "alleged activities" of specific alleged co-conspirators, because that "is properly admitted through fact witnesses, not an expert"). For the same reasons, the Court should exclude Kohlmann's proposed opinions here.[16]

### C.   The Other Evidence On Which Shaked And Kohlmann Purport To Rely Is Inadmissible Hearsay

Further, all of the documents on which Shaked and Kohlmann rely are inadmissible hearsay, and thus plaintiffs cannot rely on these documents to prove that Hamas perpetrated an attack, as the Court has already ruled with respect to most of these materials. *Strauss*, 925 F. Supp. 2d at 444-45, 449-50. In *Strauss*, the Court observed that plaintiffs rely on video "wills," Israeli court documents and government records, Hamas claims of responsibility and a variety of other documents, but ruled that plaintiffs' claims arising from 14 of the 15 Attacks at issue could proceed based solely on "judgments in Israeli courts assigning responsibility to Hamas or its operatives, official Israeli government investigative reports concluding that Hamas or its operatives were responsible for the attack and/or Shaked's own eye-witness accounts." *Id.* at

---

[16] NatWest demonstrated in its original summary judgment motion that Kohlmann is not qualified to opine about whether Hamas perpetrated the terrorist attacks at issue because, by his own admission, his education and experience do not provide him with any distinctive knowledge, education or skill to analyze who has committed any attack, let alone the attacks at issue here. NW Br. at 44-46; NW 56.1 St. ¶¶ 682-752. NatWest also demonstrated that Kohlmann's opinions are not based on a reliable methodology. NW Br. at 46-47; NW 56.1 St. ¶¶ 730-774. NatWest recognizes that the Court reached a contrary conclusion in *Strauss*, and notes this further defect in Kohlmann's opinions here only to preserve its objection on this ground. 925 F. Supp. 2d at 443.

447.  In so ruling, the Court distinguished these three types of evidence from the other types of

evidence on which plaintiffs rely and which the Court found to be inadmissible.  *Id.* at 446-47.

Thus, the Court has already ruled that: (1) claims of responsibility posted on websites

allegedly affiliated with Hamas are inadmissible hearsay, *id.* at 444-45, 449-50; (2) video "wills"

and confessions of purported Hamas suicide bombers are likewise inadmissible under FRE

803(3) because the potential "perverse" incentives to terrorists, recognized by this Court and

others, undermine their probativeness of the declarant's then-existing state of mind, *see Gill v.*

*Arab Bank, PLC*, 893 F. Supp. 2d 542, 571 (E.D.N.Y. 2012); *In re Sept. 11 Litig.*, 621 F. Supp.

2d 131, 160 (S.D.N.Y. 2009); and (3) newspaper reports, press releases and other reports by the

Israeli Ministry of Foreign Affairs and the Prime Minister's Office that simply repeat

inadmissible claims of responsibility are also inadmissible hearsay (or inadmissible hearsay

within hearsay).  *Strauss*, 925 F. Supp. 2d at 449 & n.22.  *See also Gilmore*, 2016 WL 7210140,

at *7.  As shown below, the remaining categories of documents on which plaintiffs rely here are

inadmissible too.

Israeli Military Court Convictions.  Plaintiffs seek to rely on Israeli military court

convictions relating to 13 of the attacks, including two of the SoL Attacks, in order to attribute

these attacks to Hamas.  NW 56.1 St. ¶¶ 619-647; NW Supp. 56.1 ¶¶ 62-63.  The Court ruled in

*Strauss* that Israeli military court convictions are admissible under FRE 803(22), 925 F. Supp. 2d

at 448, but as shown in the pending reconsideration motion by CL concerning that ruling, the

Court should conclude that these convictions are <u>not</u> admissible because plaintiffs have not

established that the Israeli military court proceedings that led to those convictions complied with

due process requirements <u>in practice</u>, as required by *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d

1179, 1189-90 (3d Cir. 1978).  *See Strauss*, No. 06-CV-702 (DLI) (RML), ECF Nos. 422 at 4-

17

16, 425 at 1-4. As CL has shown, Plaintiffs' expert, Professor Emanuel Gross, explicitly conceded in his deposition testimony that his report addresses <u>exclusively</u> how the Israeli military courts were designed to function <u>in theory</u>, not how they functioned <u>in practice</u>, and that <u>in practice</u> during the relevant period, the Israeli military court proceedings that resulted in the convictions on which plaintiffs rely did <u>not</u> comply with due process requirements. NW Supp. 56.1 ¶ 63. Based on Professor Gross's testimony, the circumstances present here are similar to those in *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 137, 142 (2d Cir. 2000), where the Second Circuit declined to enforce a Liberian court judgment because it found that Liberia's judicial system was not impartial or compatible with the requirements of due process. In particular, the Second Circuit concluded that evidence concerning "the <u>design</u> of the Liberian judicial system" (that the "procedural rules of Liberia are modeled on those of New York State courts") was insufficient to establish that the court should enforce the Liberian judgment, because such "design" evidence "says nothing about [the courts'] <u>practice</u> during the period in question," which is the relevant inquiry, and the record contained evidence that the Liberian courts were not compatible with due process in practice. *Id.* (emphasis added). Therefore, Professor Gross's report is irrelevant and insufficient as a matter of law to establish that the military court convictions on which plaintiffs rely are admissible under FRE 803(22).[17]

<u>Israeli Military Court Indictment</u>. Plaintiffs also seek to rely on an Israeli military court indictment as evidence that Hamas committed the March 7, 2003 attack. NW 56.1 St. ¶¶ 579-589. *Strauss* holds that this indictment is admissible, 925 F. Supp. 2d at 448, but that ruling also

---

[17] NatWest demonstrated in its original summary judgment motion that the Israeli civil court convictions of Hamas members that the Court found to provide a sufficient basis for a reasonable juror to find that Hamas perpetrated five of the attacks—the March 27, May 7 and July 31, 2002 bombings and the March 5 and September 9, 2003 bombings—in fact are not admissible under FRE 803(22). NW Br. at 47-48; NW 56.1 St. ¶¶ 599-618 (Israeli evidence law). NatWest recognizes, however, that the Court reached a contrary conclusion in *Strauss*, and notes the inadmissibility of these civil court convictions here only to preserve its objection on this ground. 925 F. Supp. 2d at 443.

is the subject of CL's pending reconsideration motion and contrary to black letter law that "an indictment is not evidence of guilt." *United States v. Romano*, 706 F.2d 370, 374 (2d Cir. 1983) (citing *United States v. Calandra*, 414 U.S. 338, 343 (1974)). *See Strauss*, ECF Nos. 422 at 19-22, 425 at 7-9. We are unaware of any precedent in the Second Circuit allowing an indictment to be received in evidence to establish the indictee's guilt under FRE 803(8), and the *Romano* decision suggests there can be none. To the contrary, courts in this Circuit have repeatedly rejected this notion. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV 3288 DLC, 2005 WL 375315, at *9 (S.D.N.Y. Feb. 17, 2005); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03-MD-1529 (JMF), 2014 WL6982140, at *10 (S.D.N.Y. Dec. 10, 2014).

ISA Reports. Plaintiffs also purport to rely on reports by the Israel Security Agency ("ISA"). NW 56.1 St. ¶¶ 650-52. The Court held in *Strauss* that a portion of an ISA Report addressing the April 30, 2003 attack was admissible and self-authenticating because it was clearly marked on its face as an official, published report of the ISA and it identified reliable facts supporting its conclusion that Hamas committed that attack. 925 F. Supp. 2d at 448-49. In doing so, the Court distinguished an ISA report that Judge Weinstein properly ruled was inadmissible in *Gill* because its "relevant conclusion was supported only by a confession repeating second-hand information of uncertain provenance, and there was 'no evidence independent of the confession that served as a basis of the ISA reports' indication' that the terrorist cell at issue was Hamas' agent." *Id.* at 449 n.22 (quoting *Gill*, 893 F. Supp. 2d at 571).

By contrast, the purported report that Shaked relies on for the SoL Attacks contains no official insignia of the ISA or any other indication that it is an official document of the ISA. NW Supp. 56.1 St. ¶¶ 66-69. Nor does it contain any indication of the quality or reliability of the sources of its conclusions. *Id.* ¶ 70. Moreover, the provenance of this document is

19

questionable—Shaked claims he received this document in his capacity as a journalist "from Avi Shy in the communication department" of the ISA. *Id.* ¶ 67. This document is therefore inadmissible as a public record under FRE 803(8)(A), and also should be excluded because its questionable origins and the lack of any official insignia on the document render it inherently untrustworthy and inadmissible under FRE 803(8)(B).

Further, the findings of the other reports on which plaintiffs rely—annual surveys of terror attacks and not investigative reports of particular attacks—have the same characteristics as the ISA Report in *Gill* that this Court agreed was inadmissible. *Strauss*, 925 F. Supp. 2d at 449 (citing *Gill*, 893 F. Supp. 2d at 571). The chronology of attacks simply recites conclusory statements about the identity and actions of the alleged perpetrators without citing to any investigative steps that were taken or evidence that was gathered regarding those attacks. Likewise, the "uncertain provenance," *id.*, of the reports' statements regarding the relevant attacks also render them inadmissible. NW Supp. 56.1 ¶¶ 64-70.[18]

Shaked's Fact Testimony. In *Strauss*, the Court concluded with respect to the October 22, 2003 shooting attack that Shaked's testimony "that he witnessed firsthand the aftermath of the attack and saw evidence that Hamas was responsible" provides sufficient admissible evidence from which a reasonable jury could conclude that Hamas perpetrated that attack. 925 F. Supp. 2d at 448. This ruling also is the subject of CL's pending reconsideration motion. In fact, Shaked testified only that, upon arriving at the scene of the attack, he observed someone photographing what Shaked evidently believed to be the corpse of the shooter, and saw his "green bandana." NW Supp. 56.1 ¶ 50. Apart from the fact that Shaked has not stated why he

---

[18] NatWest demonstrated in its original summary judgment motion that the ISA report that the Court found to provide a sufficient basis for a reasonable juror to find that Hamas perpetrated the April 30, 2003 bombing is not admissible. NW Br. at 47-48; NW 56.1 St. ¶¶ 650-652 (Israeli law). NatWest recognizes, however, that the Court reached a contrary conclusion in *Strauss*, and notes the inadmissibility of this report here only to preserve its objection on this ground. 925 F. Supp. 2d at 443.

believes the corpse he saw was that of the perpetrator, the fact that the corpse bore a green bandana could be relevant only if Shaked were relying on that fact to indicate that the perpetrator acted on behalf of Hamas.  But as CL has shown in its pending reconsideration motion, that would render the green bandana an inadmissible non-verbal hearsay assertion by the perpetrator, just as if Shaked were purporting to testify that he heard the perpetrator state "I am acting on behalf of Hamas." *See Hullaby v. State*, 911 S.W.2d 921, 931 (Tex. App. 1995) ("If Officer Young's statement was based on non-verbal conduct such as the wearing of gang colors, that conduct would be hearsay.").  In any event, the probative force of the green bandana, if any, is slight, and admission of Shaked's observation would simply invite speculation that the perpetrator was acting on behalf of Hamas.  Shaked's observation is therefore inadmissible.  *See Strauss*, ECF Nos. 422 at 22-25, 425 at 9-10.

The September 24, 2004 and March 7, 2002 Attacks.  At a minimum, none of the evidence on which plaintiffs rely to prove that Hamas perpetrated the September 24, 2004 and March 7, 2002 attacks is admissible.  In *Strauss*, the Court granted summary judgment to CL with respect to claims arising from the September 24, 2004 attack because the only documentary evidence of Hamas's responsibility for that attack that plaintiffs proffered consisted of newspaper reports, Hamas claims of responsibility and a videotape, all of which are inadmissible hearsay.  925 F. Supp. 2d at 449-50.[19]  Similarly, plaintiffs' newly-asserted claims based on the March 7, 2002 attack rely on a video "will" and other Hamas claims of responsibility, NW Supp. 56.1 ¶¶ 79-80, which the Court found to be inadmissible in *Strauss*, 925 F. Supp. 2d at 445.  Thus, the Court should grant NatWest summary judgment with respect to claims arising from the September 24, 2004 and March 7, 2002 attacks.

---

[19] Plaintiffs are also collaterally estopped by the *Strauss* ruling from claiming that Hamas perpetrated the September 24, 2004 attack for the reasons described *infra* at pp. 23-25.

21

### D.   Plaintiffs Have Not Authenticated The Documents On Which Shaked And Kohlmann Purport To Rely

Further, plaintiffs have not met their burden to properly authenticate the documents on which Shaked and Kohlmann purport to rely. Plaintiffs proffer Shaul Naim, a retired Jerusalem police officer now in private law practice, as a purported "expert" to authenticate certain of the purported police and court records on which Shaked relies, but Naim satisfies none of the tests for authenticating these documents, and he is not even qualified to offer an authenticity opinion under FRE 702. Naim cannot authenticate these documents under:

- FRE 901(b)(1), because he did not maintain any of them and he has no personal knowledge of them. *See, e.g.*, *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). Instead, most were given to him by plaintiffs' counsel, and plaintiffs refused to allow Naim to testify concerning the origins of these documents. NW 56.1 St. ¶¶ 844, 847. He acknowledged that he obtained at least some from personal contacts with the Israeli police, but he cannot be sure of their origin, because he did not personally copy them. NW 56.1 St. ¶¶ 848-50.

- FRE 901(b)(3), because plaintiffs have proffered no authenticated specimens for comparison. *See Be-Lo Stores v. NLRB*, 126 F.3d 268, 279-80 (4th Cir. 1997). Naim also admitted that, when he signed his report, he had not compared the documents plaintiffs' counsel gave to him with any true originals. NW 56.1 St. ¶¶ 844-46.

- FRE 901(b)(4), because he has made no showing of any "distinctive characteristics" that would establish their authenticity. Instead, he states only that these documents "appear" to him to be authentic. NW 56.1 St. ¶¶ 828-32, 851.

- FRE 901(b)(7), because he has not shown that any of them are recorded or filed in a public office where items of this nature are kept, he did not retrieve the documents himself and he cannot attest to their chain of custody, and he has not proven that their contents are an accurate transcription of the originals and that the originals are genuine. *See* 7 John H. Wigmore, *Evidence in Trials at Common Law* § 2158, 772-73 (Chadbourn rev., Little, Brown & Company 1978).

- FRE 902(3), because he is not their custodian or an official who is authorized to attest to their authenticity.

- FRCP 44(a)(2), because he was neither their custodian or an official authorized by law to certify or acknowledge their authenticity.

Nor is Naim qualified to offer an authenticity opinion. He has never had any role with the military courts, the Israeli civilian courts or the Israel Police outside the Jerusalem district. NW 56.1 St. ¶¶ 833-38. And his purported authenticity opinions are not the product of an adequate methodology under *Daubert*. Naim testified that "[w]hen I say it's authentic, I express what I thought was what the document looked like when I saw them. . . . [T]hey appeared – on the face . . . to be authentic." NW 56.1 St. ¶ 830. But an expert may not, as Naim does here, rely on an "aura of authenticity" surrounding the documents he is addressing, *United States v. Perlmuter*, 693 F.2d 1290, 1293 (9th Cir. 1982), without reference to any objective factors.[20]

\*         \*         \*

Without the inadmissible proposed testimony of plaintiffs' purported experts or the inadmissible hearsay documents on which they rely, there is no admissible evidence on the basis of which a reasonable juror could find that Hamas committed the 18 attacks at issue. NatWest is entitled to summary judgment on this ground alone.

### E.   Plaintiffs Are Collaterally Estopped From Claiming That Hamas Perpetrated The January 29, 2004 Attack

NatWest has already shown that, even if the military court convictions were otherwise admissible (and they are not), they show only that a Hamas member was convicted of conspiring with the perpetrator of the January 29, 2004 (or "Bus No. 19") attack to commit a prior, unsuccessful attack that was attempted two weeks before the January 29, 2004 attack, and for later failing to prevent that attack. NW Br. at 42; NW 56.1 St. ¶¶ 537, 548-552. Moreover, indictments and statements on which Shaked relies in his report (none of which is admissible in any event) confirm that the perpetrators of the January 29, 2004 attack belonged not to Hamas,

---

[20] Furthermore, Naim confirmed that he obtained access to those documents that were not given to him by plaintiffs' counsel under false pretenses. He falsely told the Israel Police that plaintiffs' claims are being pursued against Hamas and against banks in the U.S. that are holding money deposited by Hamas. NW 56.1 St. ¶¶ 868-871.

but to a rival organization, the Al-Aqsa Martyrs Brigades ("AAMB"), or were simply unaffiliated "military activists." NW 56.1 St. ¶¶ 527-529, 541-577.

For these same reasons, the court in *Linde v. Arab Bank* ruled last year that plaintiffs failed to proffer sufficient evidence of Hamas's responsibility for the Bus No. 19 attack in that case and granted Arab Bank's Rule 50 motion for judgment as a matter of law with respect to that attack. *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 330-31 (E.D.N.Y. 2015) (evidence instead "demonstrated that the AAMB used its resources to carry out the Bus No. 19 attack"). That ruling collaterally estops plaintiffs from claiming here that Hamas committed the Bus No. 19 attack.[21]

"The doctrine of collateral estoppel precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a prior proceeding." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719–20 (2d Cir. 1998). A party is "collaterally estopped from relitigating an issue if . . . (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Id.* (citation omitted). All of these requirements are satisfied here: (1) the identical issue of Hamas's responsibility for the January 29, 2004 attack was raised, and (2) was actually litigated and decided in the *Arab Bank* case. Moreover, (3) plaintiffs here are the same plaintiffs who fully and fairly litigated this identical issue in *Arab Bank*[22] during a five-week liability trial, followed by extensive briefing on Arab Bank's post-trial

---

[21] Plaintiffs have been on notice of this collateral estoppel argument since June 22, 2016, when CL filed a pre-motion letter asserting that the same plaintiffs were collaterally estopped from asserting that Hamas perpetrated this attack. *Strauss*, ECF No. 409 at 2.

[22] *Compare Weiss* Sixth Am. Compl., ECF No. 345 (naming eight Goldberg family plaintiffs claiming injuries sustained in the Bus No. 19 attack) *with* Complaint in *Coulter v. Arab Bank, PLC.*, No. 05-CV-365 (BMC) (PK) (E.D.N.Y. Jan. 21, 2005), ECF No. 1 (naming same plaintiffs and claiming identical injuries).

motions, resulting in the Rule 50 decision.  Finally, (4) resolution of the issue of Hamas's (non)-responsibility for the January 29, 2004 attack was necessary to the court's Rule 50 decision on the merits of Arab Bank's liability to plaintiffs injured in that attack, and the Rule 50 decision was not tentative, but final.  Thus, plaintiffs are now estopped from arguing that Hamas was responsible for the Bus No. 19 attack.

## III.   PLAINTIFFS CANNOT ASSERT CLAIMS ARISING BEFORE JUNE 25, 2002 UNDER SECTION 2339C OF THE ATA BECAUSE THAT PROVISION CANNOT BE APPLIED RETROACTIVELY

Finally, to the extent plaintiffs' claims under Section 2333(a) that arise from attacks occurring before June 25, 2002[23] are predicated on conduct by NatWest that allegedly violated Section 2339C of the ATA, *see Weiss* Sixth Am. Compl., ECF No. 345 (Third Claim for Relief); Am. Compl., *Applebaum v. Nat'l Westminster Bank Plc*, No. 07-CV-916 (DLI) (RML) (E.D.N.Y. June 17, 2016), ECF No. 218 (Third Claim for Relief), the Court should dismiss those claims because that provision was enacted after those attacks, and it cannot be applied retroactively.  *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2001, Pub. L. No. 107-197, 116 Stat. 721 (2002) (codified as amended in 18. U.S.C.); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 691 (7th Cir. 2008) (en banc) (to state a Section 2333 claim predicated on a violation of 2339A, plaintiff must show that defendant provided material support "between the effective date of section 2339A and" plaintiff's injury).

## CONCLUSION

In light of the foregoing, the Court should grant NatWest summary judgment.

---

[23] These include the attacks that occurred on December 1, 2001, March 7, 2002, March 27, 2002, May 7, 2002 and June 18, 2002.

Dated: New York, New York
       December 21, 2016

                    Respectfully submitted,

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP


                    By: _____
                         Lawrence B. Friedman, A Member of the Firm

                    One Liberty Plaza
                    New York, New York 10006
                    (212) 225-2000

                    Attorneys for Defendant
                    National Westminster Bank Plc

26