# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

TZVI WEISS, LEIB WEISS, MALKE WEISS,   :
YITZCHAK WEISS, YERUCHAIM WEISS,   :
ESTHER DEUTSCH, MOSES STRAUSS,   :
PHILIP STRAUSS, BLUMA STRAUSS,   :
AHRON STRAUSS, ROISIE ENGELMAN,   :
JOSEPH STRAUSS, MATANYA NATHANSEN,   :
CHANA NATHANSEN, MATANYA AND   :
CHANA NATHANSEN FOR THE ESTATE OF   :
TEHILLA NATHANSEN, YEHUDIT   :
NATHANSEN, S.N., a minor, HEZEKIEL   :
TOPOROWITCH, PEARL B. TOPOROWITCH,   :
YEHUDA TOPOROWITCH, DAVID   :
TOPOROWITCH, SHAINA CHAVA NADEL,   :
BLUMA ROM, RIVKA POLLACK, EUGENE   :
GOLDSTEIN, LORRAINE GOLDSTEIN,   :
BARBARA GOLDSTEIN INGARDIA, RICHARD:
GOLDSTEIN, MICHAEL GOLDSTEIN, CHANA :
FREEDMAN, MICHAL HONICKMAN FOR THE:
ESTATE OF HOWARD GOLDSTEIN, MICHAL  :
HONICKMAN, DAVID GOLDSTEIN,   :
HARRY LEONARD BEER AS EXECUTOR OF  :
THE ESTATE OF ALAN BEER, HARRY   :
LEONARD BEER, ANNA BEER, PHYLLIS   :
MAISEL, ESTELLE CARROLL, SARRI ANNE :
SINGER, JUDITH SINGER, ERIC M. SINGER, :
ROBERT SINGER, JULIE AVERBACH FOR  :
THE ESTATE OF STEVEN AVERBACH, JULIE :
AVERBACH, TAMIR AVERBACH, DEVIR   :
AVERBACH, SEAN AVERBACH, A.A., a minor, :
MAIDA AVERBACH FOR THE ESTATE OF  :
DAVID AVERBACH, MAIDA AVERBACH,   :
MICHAEL AVERBACH, EILEEN SAPADIN,   :
DANIEL ROZENSTEIN, JULIA ROZENSTEIN :
SCHON, ALEXANDER ROZENSTEIN, ESTHER :
ROZENSTEIN, JACOB STEINMETZ,   :
DEBORAH STEINMETZ, JACOB STEINMETZ :
AND DEBORAH STEINMETZ FOR THE   :
ESTATE OF AMICHAI STEINMETZ, NAVA  :
STEINMETZ, ORIT MAYERSON, NATANEL  :
 STEINMETZ, ROBERT L. COULTER, SR. FOR :
THE ESTATE OF JANIS RUTH COULTER,   :
DIANNE COULTER MILLER, ROBERT L.   :
COULTER, SR., ROBERT L. COULTER, JR.,   :

**SIXTH AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**05-CV-4622 (DLI)(MDG)**

501.    The loss of her sister has caused Nilly to be short tempered and has diminished her tolerance for others – contributing to her not working for nearly six years as a social worker because she could not empathize with or tolerate her clients. She has felt a significant decrease in her quality of life since the loss of her sister.

502.    As a result of the terrorist attack, plaintiff Nilly Choman has experienced emotional pain and suffering and the loss of her sister's companionship, advice and counsel.

## THE BEN YEHUDA STREET BOMBINGS: DECEMBER 1, 2001

503.    In the late evening of December 1, 2001, Nabil Halabiya and Osama Mohammad Id Bahr, two HAMAS suicide bombers, blew themselves up in a pedestrian mall in Jerusalem as part of a coordinated double suicide bombing (followed by a coordinated car bombing). A large quantity of nails was packed with each of the bombs. Eleven (11) people were murdered and over one hundred (100) people were injured. Bahr had been recruited by Jamal al-Tawil, the chairman of the Al-Islah Charitable Society since 2000. The Al-Islah Charitable Society is one of HAMAS's key charitable front organizations in the West Bank.

504.    Subsequent to the two suicide bombings terrorists detonated a car bomb near the site of the first two attacks.  HAMAS also claimed responsibility for this attack.

**Temima Spetner**

505.    Temima Spetner is a citizen of the United States and a resident of the State of Missouri.

506.    On December 1, 2001, Temima was walking down the pedestrian mall in Jerusalem when one of the suicide bombers detonated his explosives approximately 10 yards from where she was standing. Temima was hit by shrapnel on her arms and fingers. While bleeding heavily, and with clothing soaked in blood, Temima began running up the walkway and

fell.  Someone came to her aid and attempted to stop the bleeding until ambulances arrived at the scene.

507.     As a result of the terrorist attack, the femoral artery of Temima's right leg was severed.  She was transported to the hospital where doctors operated on her to stop the bleeding.  The following day it was determined that Temima's intestines had been punctured by shrapnel, and she underwent another operation to repair her intestines and remove most of the shrapnel.  Temima remained in the hospital for ten days.

508.     There is significant scarring on Temima's thigh and the lower part of her abdomen.  She continues to experience numbness in her right leg and is highly sensitive to pain in that leg. Temima has also experienced psychological trauma as a result of the attack.

509.     As a result of the attack, plaintiff Temima Spetner has suffered severe physical and mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

510.     Plaintiff Jason Kirschenbaum is a citizen of the United States and a resident of the State of New York.

511.     Jason Kirschenbaum was on Ben Yehuda Street in Jerusalem on December 1, 2001 when the double suicide bombing took place.

512.     As a result of the first explosion, Jason was thrown to the ground.  As he stood up, the second suicide bomber detonated his explosives and Jason was thrown in another direction.

513.     When he got up the second time he felt numb. Jason saw his left arm dangling back and forth and held it because he thought it might fall off.  When he began running up the street for help, he felt a sharp pain in his leg and back.

514.     Jason was taken to Shaare Tzedek Hospital in Jerusalem where he underwent two

operations.  Surgeons removed 8 metal bolts from his arm, leg and back.

515.    Jason had to undergo several months of physical therapy for the injuries to his arm, leg and back.  He still has scarring where he was branded by the bolts that penetrated his skin.

516.    As a direct result of the terrorist attack, plaintiff Jason Kirschenbaum has suffered severe physical and mental anguish and extreme emotional distress.

517.    Plaintiff Isabelle Kirschenbaum is a United States citizen and a citizen of the State of New York.  She is the mother of Jason Kirschenbaum.

518.    Martin Kirschenbaum was a citizen of the United States and a resident of the State of New York. Martin Kirschenbaum passed away on April 2, 2008. He was the father of Jason Kirschenbaum.

519.    Plaintiff Isabelle Kirschenbaum brings this action both individually and as the representative of the Estate of Martin Kirschenbaum.

520.    Isabelle first learned of the double suicide bombing while watching the Cable News Network (CNN).  After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack.

521.    As a result of the attack, plaintiff Isabelle Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

522.    Martin Kirschenbaum learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

523.    Following the attack and prior to his death Martin Kirschenbaum suffered severe mental anguish and extreme emotional distress as a result of the attack.

524.    Plaintiff Joshua Kirschenbaum is a United States citizen and a citizen of the State

of New York.  He is a brother of Jason Kirschenbaum.

525.    Joshua Kirschenbaum was in Tel Aviv at the time of the attack. Martin and Isabelle Kirschenbaum telephoned Joshua to advise him that his brother, Jason had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Tzedek Hospital in Jerusalem.

526.    As a result of the terrorist attack, plaintiff Joshua Kirschenbaum has suffered severe mental anguish and extreme emotional distress

527.    Plaintiff Shoshana Burgett is a citizen of the United States and a resident of the State of New York. She is a sister of Jason Kirschenbaum.

528.    As a result of the attack, plaintiff Shoshana Burgett has suffered severe mental anguish and extreme emotional distress.

529.    Plaintiff David Kirschenbaum is a citizen of the United States and a resident of the State of New York. He is a brother of Jason Kirschenbaum.

530.    As a result of the attack, plaintiff David Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

531.    Plaintiff Danielle Teitelbaum is a citizen of the United States and a resident of the State of New Jersey. She is a sister of Jason Kirschenbaum.

532.    As a result of the attack, plaintiff Danielle Teitelbaum has suffered severe mental anguish and extreme emotional distress.

**The Miller Family**

533.    Plaintiff Netanel Miller, age 33, is a citizen of the United States and a resident of the State of Florida.

534.    Plaintiff Chaya Miller is a citizen of the United States.  Plaintiff Arie Miller is a

citizen of the State of Israel. They are the parents of plaintiff Netanel Miller and they reside in Israel.

535. On the evening of December 1, 2001, plaintiff Netanel Miller was with friends enjoying ice cream at the pedestrian mall in Jerusalem. One of the suicide bombers detonated his explosives a few feet from Netanel and his friends. Netanel had his back to the bomber, and he was thrown to the ground as a result of the explosion.

536. A bolt from the bomb lodged in the upper part of Netanel's leg. Other bolts hit him in the back, resulting in burns. His hand and knee were also injured.

537. Netanel, in shock and unaware of the severity of his injuries, attempted to walk home, limping on his injured leg. After walking approximately 30 feet, Netanel collapsed on the sidewalk. Only then did Netanel become aware of how much he was bleeding from the wounds he had sustained in his leg. His attempts to use pressure to stop the bleeding were unsuccessful.

538. Some people stopped to help him, and Netanel handed them his cellular phone, asking them to call his parents, plaintiffs Arie and Chaya Miller. Netanel spoke to his father, who had been an Army medic. Arie asked Netanel specific questions about his condition and insisted Netanel seek medical help.

539. Ultimately, Netanel was taken to the Shaare Zedek Hospital by ambulance. Since Netanel had lost a great deal of blood, he was given a blood transfusion.

540. Arie came to the hospital. Chaya arrived an hour or so later after she found someone to stay with her other children at her home.

541. Netanel was admitted to the hospital and remained there for two days.

542. Netanel endured the pain in his leg for nearly two years.

543. The pain in Netanel's leg became so severe he had to undergo surgery, and the bolt that was still lodged in his leg was finally removed.

544. As a result of the flashbacks and severe pain, Netanel also underwent treatment by a mental health professional.

545. As a result of the attack, plaintiff Netanel Miller has suffered severe physical and mental anguish and extreme emotional distress.

546. Upon learning that their son, Netanel, had been injured in the bombing, and knowing he has suffered as a result of those injuries, plaintiffs Chaya Miller and Arie Miller experienced great concern and anxiety.

547. As a result of the attack, plaintiffs Chaya Miller and Arie Miller have suffered severe mental anguish and extreme emotional distress.

**The Steinherz Family**

548. Plaintiff Altea Steinherz and plaintiff Jonathan Steinherz are citizens of the United States and residents of the State of Israel. They are husband and wife.

549. On December 1, 2001, Altea Steinherz was nine months pregnant. Altea and Jonathan were at a restaurant in Jerusalem when they heard a bomb explode nearby. A short time later they heard another bomb explode. Believing the bombing was over, they began to walk home.

550. While walking in the street they saw a crazed man run past them. Altea insisted that the couple turn around, away from the direction from which the man had come. They heard a third explosion from where the man had run. They later learned that the explosion was the result of a car bomb.

551.    As they began to run, Altea fell twice, and broke her arm as a result of one the falls.

552.    Until her son, Yitzhak, was born 11 days later, Altea and Jonathan feared for the condition of their unborn child.

553.    Having personally seen the emergency efforts and fears of individuals at the hospital after the attack, Altea no longer feels she can continue to volunteer at the hospital as she had done previously.  She has become more fearful in general.

554.    As a result of the attack, plaintiff Altea Steinherz suffered severe physical anguish and extreme emotional distress.

555.    As a result of the attack, plaintiff Jonathan Steinherz suffered severe mental anguish and extreme emotional distress.

**The Brill Family**

556.    Plaintiff Baruch Yehuda Ziv Brill is a citizen of the United States and a resident of the State of Israel.

557.    On December 1, 2001, Baruch Brill, then age 17, was spending time after the end of the Sabbath in the pedestrian mall located on Ben Yehuda Street when the two HAMAS suicide bombers, blew themselves up.

558.    Baruch Brill was taken to Hadassah Hospital on Mount Scopus in Jerusalem with severe physical injuries. He had endured multiple shrapnel wounds from the bombing in addition to perforation of his left eardrum. According to X-rays taken in the hospital, he had multiple large pieces of shrapnel in his left arm and chest.

559.    Baruch had two nails lodged in his left wrist that were part of the bomb vest that exploded, two pieces of shrapnel in the lower left side of his back, and a nail in the back part of

his left leg. He also had cuts and abrasions over his entire body.

560. He experienced severe pain associated with debridement of his injuries and the open nature of his wounds.

561. Baruch Brill remained in the hospital until his discharge on December 9, 2001.

562. Baruch Brill underwent extensive physical therapy as a result of the injuries he sustained in the bombing.

563. He has also undergone emotional therapy in the form of art therapy and psychological treatment as a result of the Post-Traumatic Stress Disorder that he suffered as a result of the bombing.

564. In order to complete his high school studies, Baruch Brill was required to attend night classes at his own expense due to the amount of school that he missed while recuperating from his injuries and while he was in the hospital.

565. As a result of the attack, plaintiff Baruch Brill has suffered severe physical and mental anguish and extreme emotional distress.

566. Plaintiff Chaya Beili in a citizen of the United States and a resident of the State of Israel. She is the mother of Baruch Yehuda Ziv Brill.

567. Chaya Beili learned of the Ben Yehuda bombing in which her son was injured when her oldest daughter called her while at home. Chaya immediately started calling her son and could not reach him. After about an hour, a friend of her son called and said Baruch had been placed in an ambulance and was being taken to the hospital.

568. During her son's hospitalization and subsequent physical and emotional therapy, Baruch resided with Chaya since his parents were divorced. Chaya personally witnessed her son's pain and recovery and has been greatly affected by her son's injuries.

569.    As a result of the attack, plaintiff Chaya Beili has suffered severe mental anguish and extreme emotional distress.

## PATT JUNCTION BUS # 32A BOMBING: JUNE 18, 2002

### Gila Aluf

570.    At approximately 7:50 a.m. on June 18, 2002, a HAMAS terrorist named Mohammad Haza' al-Ghul boarded bus number 32A in the Gilo neighborhood of Jerusalem and almost immediately detonated the large bomb which he carried in a bag stuffed with ball bearings.  The blast destroyed the front half of the bus, packed with people on their way to work and a group of schoolchildren.  19 people were killed and 74 people were injured.

571.    HAMAS claimed responsibility for the attack and identified the bomber, Mohammad Haza' al-Ghul, as an Islamic law student at An-Najah University.  Fahmi Ayd Ramdan Mushahara was later convicted by an Israeli court of helping plan the attack, including identifying the bus line on which to carry out the attack and transporting the suicide bomber to the location where he boarded the bus, and for being a member of Hamas.

572.    Plaintiff Gila Aluf is a citizen of the United States and a citizen and resident of the State of Israel.

573.    Gila's husband, Boaz Aluf, was a citizen of the State of Israel. On the morning of June 18, 2002, Boaz was going to work in the computer department of Jerusalem's Bank Tefahot and was on Bus 32A when Mohammed al-Ghul detonated the bomb.  Boaz Aluf was killed in the terrorist attack.

574.    As a result of the terrorist attack that murdered her husband, Boaz Aluf, plaintiff Gila Aluf has lost the material services, affection, companionship, consortium and the customary amenities of married life and has suffered severe mental anguish and extreme emotional distress.

### B.      The Defendant

575.    National Westminster Bank, Plc ("NatWest") is a British financial institution with its principal place of business in London, United Kingdom. It is part of the Royal Bank of Scotland Group.

576.    NatWest conducts business in the United States and in New York, both directly and through its agents, at a number of locations including 101 Park Avenue, New York, New York 10178, and 600 Steamboat Road, Greenwich, Connecticut 06830, which it also lists in its annual report as one of its "principal offices."

577.    NatWest has also been registered to conduct business within the State of Texas since 1999, and state records list its address as 600 Travis Street in Houston, Texas.

## FACTUAL ALLEGATIONS

## I.      THE ISLAMIC RESISTANCE MOVEMENT ("HAMAS")

### A.      The Founding of HAMAS

578.    In December 1987, Sheik Ahmed Yassin formed the Palestinian Islamic Resistance Movement ("HAMAS") as an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

579.    Pursuant to its charter, HAMAS and its operatives plan, assist, and conduct acts of international terrorism in Israel, the West Bank, and the Gaza Strip, including the attacks that injured the plaintiffs.

### B.      Formal Designations of HAMAS as a Terrorist Organization

580.    In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts. Notice of the designation was placed in the official Government of Israel publication, the *Announcements and*

incentives to suicide bombers and other terrorists. These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to plaintiffs.

720.    Defendant knows that it provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

721.    Throughout the period in which it has provided financial services for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

722.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

723.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

724.    By knowingly collecting and transferring funds for the benefit of HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

725.    As stated above, the Union of Good and Interpal are major funding sources for

HAMAS.

726.    By providing a wide range of vital financial services to these entities, defendant NatWest substantially assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.

727.    Defendant knows of HAMAS's terrorist activities.

728.    Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

729.    By knowingly providing material support to a designated Foreign Terrorist Organization, defendant is therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## THIRD CLAIM FOR RELIEF

## COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333(a)

730.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

731.    Defendant wilfully and unlawfully provides financial services to HAMAS by collecting, receiving, transmitting, and providing funds, through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of Interpal with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint.

732.    The acts committed against the plaintiffs were intended to: (a) intimidate or coerce the civilian population of Israel; (b) influence the policy of the Government of Israel by

# Exhibit 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

| | |
|---|---|
| The Estate of David Applebaum, The Estate of Naava Applebaum, Debra Applebaum, The Estate of Jacqueline Applebaum, Natan Applebaum, Shira Applebaum, Yitzchak Applebaum, Shayna Applebaum, Tovi Belle Applebaum, Geela Applebaum Gordon, Chaya Tziporah Cohen, Philip Litle, The Estate of Abigail Litle, Elishua Litle, Hannah Litle, Heidi Litle, Josiah Litle, Noah Litle, Ari Horovitz, Batsheva Horovitz Sadan, David Horovitz, The Estate of Debra Ruth Horovitz, The Estate of Eli Natan Horovitz, The Estate of Leah Horovitz, The Estate Moshe Horovitz, Nechama Horovitz, Shulamite Horovitz, ToviHorovitz, Tvi Horovitz, Uri Horovitz, Bernice Wolf, Bryan Wolf, StanleyWolf, Fran Strauss Baxter, William J. Baxter, Ariela Freirmark Menachem Freirmark, Hadassah Freirmark, Phyllis Pam, Rivka Reena Pam, Shoshana Tita, Ezra Tita, Ephraim Tita, Ephriam Tita for the Estate of Bertin Tita, Rachel Potolski, Ovadia Topporowitch, Yisrael Topporowitch, Yitzchak Topporowitch, Miriam Ehrenfeld, Rose Joseph, Leibel Reinitz, Malvia Reinitz, Margali Reinitz Mendy Reinitz, Miriam Reinitz, Rivka Reinitz, Samuel Reinitz, Shmuel Reinitz, Yakov Reinitz, The Estate of Mordechai Reinitz, The Estate of Yissocher Dov Reinitz, Yitzchok Reinitz, Raizel Shimon Leah Tauber Helen Weider, Avrohom D. Richter, Breina Richter, Miriam Leah Richter Moshe Richter, Nechama Richter, Sara Malka Richter, Shlomo Chaim Richter, Tranne Richter, Yakov Yosef Richter, Yechiel Richter, Yehudis Richter, Yisroel Richter, Yitzchok Richter, Perl Brailofsky, Malky Breuer, Ester Buxbaum, Gittel Cohen, Chaya Freisel Rachel Rosner, Elizabeth Schwartz, Jacob Schwartz, Max Schwartz Michael Schwartz, Phillip Schwartz, Abraham Zarkowsky, Aron Zarkowsky, Bshava Zarkowsky Richter, The Estate of Eli Zarkowsky, Ezriel Zarkowsky, Gittel Zarkowsky,The Estate of Goldie Zarkowsky, Joseph Zarkowsky, Mendel Zarkowsky Miriam Zarkowsky, Shrage Zarkowsky, Trany Zarkowsky, Yehuda Zarkowsky, Erik Schecter, Shlomo Tratner, The Estate of Tiferet Tratner. Averham Grossman, Devorah Chechanow Leifer Joseph Leifer, Bracha Milstein, Shifra Miller, Chaya Rosenberg, Abraham Waxler, Arthur Waxler, Baruch Waxler, Chana Waxler, Dina Waxler Ezekiel Waxler, Gedalia Waxler, Haggi Waxler, Nachum Waxler Obadiah Waxler Yaakov Waxler, Yoel Waxler, Zacharia Waxler Nethaniel Bluth, Moshe Naimi, Faye Chana Benjaminson, The Estate ofMoshe Gottlieb, Seymour Gottlieb, Sheila Gottlieb<br><br><br><br><br><br>Plaintiffs,<br><br>-against- | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> :   NO: 07-CV-916-<br> :   DLI-MDG<br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> :   **AMENDED**<br> :   **COMPLAINT**<br> : <br> : <br> :   Jury Trial<br> :   Demanded<br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

295.    On September 24, 2004, Tiferet Tratner, age 24, was killed in her home as she sat on the couch in Neve Dekalim by a terrorist mortar attack launched from or near the Gaza Strip.  This murder took place the day before Yom Kippur.  HAMAS claimed responsibility for the terror attack and was in fact responsible.

296.    Tiferet was an American citizen and is the daughter of Shlomo Tratner.  Prior to her murder, Tiferet worked with the elderly and with people with disabilities.  Shlomo Tratner has suffered severe emotional anguish, pain, suffering and distress over the murder of his daughter and brings this action individually and on behalf of the Estate of Tiferet Tratner for her wrongful death, all to their damage.

### Ben Yehuda Mall Suicide Bombing – December 1, 2001

### The Grossman Family

297.    On December 1, 2001, at approximately 11:30 p.m., Averham Grossman was in the Ben Yehuda pedestrian mall in Jerusalem, Israel when two suicide bombers detonated explosive devices.  The pedestrian mall was filled with many young people on a Saturday night.  A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people.  HAMAS claimed responsibility for the attack, which was carried out by Nabil Halabia, aka Mahmoud Nabeel Halabey, and Osama Mohammed Id Bahr.  This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

298.    As a result of the attack, Averham Grossman was traumatized and suffered severe mental anguish and pain and suffering, all to his damage.  He injured his back and was struck by the second bomb while helping those wounded from the first bomb.

299.    Averham Grossman is a United States citizen.

### The Leifer Family

300.    Joseph Leifer and Devorah Chechanow Leifer, both US nationals who reside in Brooklyn, New York, were visiting Israel in December 2001 when they injured in a terror attack that took place on the Ben Yehuda pedestrian mall in downtown Jerusalem.

301.    On December 1, 2001, the pedestrian mall was filled with many young people on a Saturday night. At about 11:30 p.m., two suicide bombers detonated explosive devices among the crowd on the mall. A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people. HAMAS claimed responsibility for the attack, which was carried out by Bail Halabia and Osama Mohammed Id Bahr. HAMAS was in fact responsible for this terror attack.

302.    As a result of the attack, Joseph suffered serious life threatening wounds. Devorah Chechanow Leifer, who was present with Joseph, suffered less serious personal injures. Both Joseph Leifer and Devorah Chechanow Leifer suffered severe mental anguish and pain and suffering and join as Plaintiffs in this action.

### The Waxler Family

303.    Obadiah Waxler, a US national who resides in Brooklyn, New York, was visiting Israel in December 2001 when he was critically injured in a terror attack that took place on the Ben Yehuda pedestrian mall in downtown Jerusalem. He joins as a Plaintiff to this action to recover for the injuries he suffered in this terror attack.

304.    On December 1, 2001, the pedestrian mall was filled with many young people on a Saturday night. At about 11:30 p.m., two suicide bombers detonated explosive devised among the crowd on the mall. A car bomb also exploded about 20 minutes after the initial attack, killing and injuring more people. HAMAS claimed responsibility for the attack,

which was carried out by Nabil Halabia and Osama Mohammed Id Bahr. HAMAS was in fact responsible for this terror attack.

305.    As a result of the attack, Obadiah Waxler suffered serious personal injures, mental anguish and pain and suffering. Numerous surgeries were necessary to save Obadiah's life and he required almost 3 years rehabilitating from the life threatening injuries. Durign this time, Obadiah was unable to work. While he was hospitalized in Israel before his transfer to New York, Obadiah's brother, Ezekial Waxler, who lived in Israel, ceased work to care for his seriously inured brother.

306.    At the time of the terror attack, Obadiah Waxler was engaged to be married. He was married on June 10, 2002. His wife Chana Waxler, cared extensively for Obadiah for several years as he recovered from his serious wounds. This necessitated that she take off from work. She was only able to work part time so she could care for her husband.

307.    Obadiah's family in New York also took turns giving him care and support for several years. These family members of Obadiah join as Plaintiffs in this action to recover their loss of consortium and solarium and loss of earnings as a result of the injuries suffered by Obadiah Waxler. They also seek just compensation for their own mental anguish they suffered as proximate cause of the terror attack on Obadiah. These plaintiffs are Obadiah Waxler's parents, Arthur Waxler and Dina Waxler, his wife, Chana Waxler, and brothers and sisters, Ezekial Waxler, Abraham Waxler, Haggi Waxler, Nachum Waxler, Yoel Waxler, Zacharia Waxler, Gedalia Waxler, Baruch Waxler, Yaakov Waxler, Chaya Rosenberg, Bracha Milstein and Shifra Miller. All of these plaintiffs are citizens of the United States of America. All of them currently reside in Brooklyn. New York except for Ezekial Waxler who currently resides in Israel.

**Otzem School Attack – March 7, 2002**

**The Bluth Family**

308.     Nethaniel Bluth is a citizen of the United States who for some time has resided in Israel with his parents, Ephraim and Shoshana.  On March 7, 2002, Nethaniel was a 19 year old student at Otzem, which is located in the community of Atzmona, Israel.  Nethaniel began his studies there in August, 2001.

309.     On March 7, 2002, while Nethaniel was studying with about 80 other students in a lesson being led by one of the Rabbis, a small explosion occurred.  Nethaniel and the other students rushed to the window to see what happened.  A Palestinian terrorist who was in the midst of attacking the students had thrown a grenade into one of the dorm rooms.  It was late at night, around 11:00 p.m., and the students looked in horror as the terrorist opened fire on the students with a burst from an automatic weapon.  The attacker threw additional grenades in an attempt to kill and injure as many of the students as possible.  Nethaniel was struck by shrapnel when a grenade exploded only a few feet from him.  His arms, legs and scalp were injured.  One piece of shrapnel pierced his chest and hit his chest bone. He sues for his pain, suffering, trauma, mental anguish and extreme emotional distress, all to his damage HAMAS claimed responsibility for the attack, which was committed by Mohammed Fathi Farahat aka Mohammed Nadal Farhath.   This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

310.     Nethaniel was rushed to Tel HaShomer Hospital for surgery to save his life.  Five of his classmates were murdered in the attack.   Nethaniel underwent three surgical procedures following the attack.  His chest wound was closed, a gash in his scalp was surgically treated and the various wounds to his arms were stitched.  Nethaniel has scars from

these injuries.  After rehabilitation, Nethaniel regained most of the use of his hands, arms and legs.  He also suffered severe damage to both of his ear drums when the grenade exploded close to him.  His hearing is permanently impaired in his left ear.

### Park Hotel Suicide Bombing - March 27, 2002

### The Naimi Family

311.    Foruk Naimi was a citizen of Israel when she was murdered in Israel on March 27, 2002 while celebrating the Passover Seder.

312.    Foruk was killed when a Palestinian suicide bomber entered the Park Hotel in Netanya, Israel and detonated a bomb in the midst of the Passover holiday Seder.  HAMAS claimed responsibility for this suicide bombing of a religious event which killed 30 people and wounded more than 100. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

313.    The homicide bomber and HAMAS terrorist who committed this atrocity was Abdel Bassat Qassem Odeh.  Odeh was assisted with the planning and execution of the terror attack by others, including, but not limited to, Abbas al-Sayed, from Tulkarem.  In 2005, Abbas al-Sayed was found guilty by a District Court in Tel Aviv, Israel of overseeing the Park Hotel attack.

314.    Plaintiff Moshe Naimi is a citizen of the United States and resides in New Jersey. He is the son of Foruk.  The death of his mother has caused him severe mental anguish, pain and suffering, trauma and extreme emotional distress, all to his damage.


### Suicide Bombing of Egged Bus No. 32A – June 18, 2002

### The Gottlieb Family

315.    Moshe Gottlieb was a United States national who was residing in Israel on June 18, 2002, when he was murdered by a Palestinian terrorist.  HAMAS was responsible for this terror attack, which was carried out by HAMAS terrorist Mohammed Haza'Kaied al-Ghoul.

316.    Dr. Gottlieb was killed on June 18, 2002, when the suicide bomber boarded Egged Bus No. 32A at 7:50 a.m. near Gilo, Israel and detonated a large bomb which was carried in a bag stuffed with ball bearings.  Nineteen people were killed (from age 11 to 72) and 74 were injured in this terror attack.  The attack completely destroyed the crowded bus carrying many young students to school and others to work. This terror attack was within the scope of the scheme and conspiracy described below in which Arab Bank was a knowing and active participant.

317.    Dr. Gottlieb boarded the bus en route to Bnei Brak, located within the State of Israel, where he was due to work with a group of children with Down's Syndrome.  For years, Dr. Gottlieb had been treating these children for free once a week.

318.    Sheila Gottlieb is a citizen of the United States and is the wife of Dr. Gottlieb. The murder of her husband has caused her severe mental anguish, pain and suffering, loss of consortium and extreme emotional distress, all to her damage.

319.    Seymour Gottlieb is a citizen of the United States and is the son of Dr. Gottlieb. The death of his father has caused him severe mental anguish, pain and suffering and extreme emotional distress, all to his damage.

320.    Faye Chana Benjaminson is a citizen of the Untied States and is the daughter of Dr. Gottlieb.  The death of her father has caused her severe mental anguish, pain and suffering and extreme emotional distress, all to her damage.

**B.    The Defendant**

persons within close proximity of the attacks and extreme emotional distress to the family members of those who were killed or injured by reason of the acts.

463.    The financial services that the defendant knowingly provided to HAMAS by collecting and transmitting funds on behalf of HAMAS (with the knowledge that CBSP fundraises for HAMAS) assists HAMAS in its recruiting, rewarding, and providing incentives to suicide bombers and other terrorists.  These financial services facilitate acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

464.    The defendant knows that it has provides material support to HAMAS, a Foreign Terrorist Organization, and it knows that HAMAS commits horrific terrorist attacks of the kind that have maimed and murdered American citizens such as plaintiffs.

465.    Throughout the period in which it has provided financial support for the benefit of HAMAS, defendant was, and to this date remains, aware that HAMAS collects and receives funds transmitted by defendant NatWest at the request of Interpal and the Union of Good and that HAMAS has committed numerous criminal acts, including the suicide bombings and other acts of international terrorism that have injured American citizens, including plaintiffs.

466.    Because it aided and abetted violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person and property, the defendant is liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs  have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### COMMITING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) and 18 U.S.C § 2333(a)

467.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

468.    By knowingly providing financial services to HAMAS, the defendant has provided material support to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

469.    As stated above, the Union of Good and Interpal are major funding sources for HAMAS.

470.    By providing a wide range of vital financial services to these entities, defendant NatWest substantially assist HAMAS in its recruiting, rewarding and providing incentives to suicide bombers and other terrorists.

471.    Defendant knows of HAMAS's terrorist activities.

472.    Defendant knows that HAMAS had been designated a Foreign Terrorist Organization by the Government of the United States.

473.    By knowingly providing material support to a designated Foreign Terrorist Organization, the defendant is civilly liable for damages to the plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

### THIRD CLAIM FOR RELIEF

### COLLECTING AND PROVIDING FUNDS FOR THE FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C and 18 U.S.C § 2333(a)

474.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

475.    Defendant willfully and unlawfully provides financial services to HAMS, by collecting, receiving, transmitting and providing funds through accounts it maintains for Interpal and the Union of Good and through credit card payments it receives on behalf of

# Exhibit 3

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK
    --------------------------------x
3   MOSES STRAUSS, et al.,

4                        Plaintiffs,

5         -against-

6   CREDIT LYONNAIS, S.A.,

7                        Defendants.
    --------------------------------x
8   BERNICE WOLF, et al.,

9                        Plaintiffs,

10        -against-

11  CREDIT LYONNAIS, S.A.,

12                       Defendants.
    --------------------------------x
13

14                      One Liberty Plaza
                        New York, New York
15
                        September 1, 2010
16                      9:27 a.m.

17

18             Videotaped Deposition of Expert

19  Witness, MATTHEW LEVITT, before Shari Cohen,

20  a Notary Public of the State of New York.

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                   REF: 93800

```
 1                    LEVITT

 2   Hamas?

 3        A.    The Palestinian authority has

 4   and is today in a different type of conflict

 5   with Hamas.  It also at times has been hand

 6   and glove with Hamas.  At times cooperating

 7   and participating in violence and at times

 8   politically cooperating, but most of the time

 9   in their history and in recent history, by

10   recent history I mean things beyond the time

11   period involved here, there has been

12   particularly acute conflict with the exchange

13   of ammunition you described between elements

14   of the Fatah led Palestinian authority now

15   dominating the West Bank and Hamas dominating

16   the Gaza Strip.

17        Q.    When speaking to Israeli

18   sources, what do you do to determine that

19   they are not giving you opinions based on

20   their own self interest of saying things

21   which might be disadvantageous to Hamas?

22                 MR. GLATTER: Objection as to

23        form.

24        A.    There really is nothing I can

25   do.  Well, there's very little I can do when
```

                        LEVITT

1

2   telephone, that's all you've got here and not

3   even in the same language so.

4          Q.    Okay, I don't know one way or

5   the other.

6                MR. GLATTER: For the record we

7          reserve our rights and objections as

8          to the translation in the exhibit.

9          Q.    If you could turn to page 12 of

10  your report.  Do you see right under Roman IV

11  the paragraph and in that paragraph the last

12  line of it is Sheikh Yassin himself rejected

13  the idea that Hamas's da'wa, network of

14  charities, its leadership, military

15  (terrorist) and political wings were

16  uncoordinated colon and then it has a quote

17  that says we cannot separate the wing from

18  the body.  If we do so, the body will not be

19  able to fly. Hamas is one body?

20         A.    Yes.

21         Q.    It has a footnote citing to an

22  article in Reuters from May 27, 1998,

23  correct?

24         A.    Right.

25                MR. LUFT: If you will mark

```
 1                    LEVITT
 2          this as Exhibit 6.  I believe you will
 3          tell me that this is a copy of an
 4          article from May 27, 1998 headline
 5          Yassin Sees Israel Eliminated Eithin
 6          25 Years, byline Reuters.
 7                  (Levitt Exhibit 6, Article,
 8          marked for Identification.)
 9          Q.    Is this the article you were
10   citing to?
11          A.    It's a version of it.
12          Q.    Do you see the quote we cannot
13   separate the wing from the body. If we do so
14   the body will not be able to fly. Hamas is
15   one body?
16          A.    I do.
17          Q.    In the sentence that precedes
18   it it says Yassin said there was no
19   separation between the Hamas political wing
20   and the Izzadin Kassam brigades, its military
21   arm. It says nothing about the da'wa,
22   correct?
23          A.    That's right.  I wonder --
24   there are two possibilities here. Either that
25   sentence leading into it made an error which
```

```
 1                    LEVITT
 2   is possible.
 3          Q.    Meaning the sentence in your
 4   report?
 5          A.    My report, right.
 6          Q.    Should not have included the
 7   da'wa?
 8          A.    The other option and I don't
 9   know the answer sitting here, but this has
10   happened many times which you actually have
11   given me is not the copy from the Reuters
12   website, it's from a Lexis Nexis production
13   and it's a version of the Reuters article
14   that ran in the Jerusalem Post.  What often
15   happens is that multiple versions of the
16   Reuters wire article will be run and it will
17   appear slightly differently so you have --
18   and sometimes it will say when you do a Lexis
19   Nexis update whatever so that's also a
20   possibility.  I cannot -- but I have had that
21   experience and I had that understanding.
22          Q.    Do you have a copy of the
23   article that you relied upon?
24          A.    I don't have anything with me
25   here, but I have my files back home.
```

1               LEVITT

2        Q.    By agreement of the parties the

3  way we did the documents you relied upon if

4  there was a citation we would just find the

5  document unless there was something we could

6  not find so this is the version of the

7  article, the only one that I'm aware of, I

8  don't know if there is another, but certainly

9  in this version it says nothing of the da'wa

10 with regard to that quote?

11       A.    Correct, in this version it

12 speaks about the political wing and the

13 military arm.

14       Q.    If there was not another

15 version speaking of the da'wa, then as you

16 said this statement in your report would be

17 incorrect?

18       A.    I would say it mistates.  It

19 would have been more accurate to say the

20 civilian arm or the political arm as opposed

21 to specifically saying the da'wa and it's

22 possible that that was an error.

23       Q.    You make reference to the

24 political wing separately, correct?

25       A.    Correct.

1                          LEVITT

2          A.     For uzis and for kindergartens?

3                  MR. GLATTER: Objection to the

4          form of the question.

5          Q.     Each of the 12 entities had

6    their own bank accounts, correct?

7          A.     Yes, in which money comes in

8    for Hamas the organization, money gets

9    disbursed to other entities.  Those funds,

10   it's not like they have separate accounts for

11   these different things and therefore the

12   mingling, the co-mingling of these funds

13   muddies the water.

14         Q.     Dr. Levitt, could you point me

15   to a specific example where any of these 12

16   entities use money that was given to them to

17   buy uzis?

18         A.     No.

19         Q.     How about any other type of

20   weapon?

21         A.     Not to my knowledge.

22                 MR. LUFT: I'd like to mark as

23          Exhibit 7 a document from February 10,

24          2003 by Jonathan Fighel titled Hamas

25          calls for economic Jihad against the

# Exhibit 4

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------------X
 3   MOSES STRAUSS, et al.,

 4                         Plaintiffs,
          - against -
 5
     CREDIT LYONNAIS, S.A.,
 6
                          Defendants.
 7
     CASE NO.: 06-702(DGT)(MDG)
 8   ----------------------------------------X
     BERNICE WOLF, et al.,
 9
                          Plaintiffs,
10        - against -

11   CREDIT LYONNAIS, S.A.,

12                        Defendants.

13   CASE NO.: 07-914(DGT)(MDG)
     ----------------------------------------X
14

15                      One Liberty Plaza
                        New York, New York
16
                        August 12, 2010
17                      9:45 a.m.

18

19        CONTINUED VIDEOTAPED DEPOSITION of Expert

20   Witness, ARIEH SPITZEN, before Melissa Gilmore,

21   a Notary Public of the State of New York.

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                    REF: 93799
```

Spitzen

1  head of the Hamas and he was at that time also

2  the head of the Mujama, he is the one who makes

3  the decisions or made the decision -- decisions

4  regarding the content, regarding -- regarding

5  the content that those schools and those

6  nursery schools will teach the children and

7  pass over to the children.

8              I cannot be sure whether he will be

9  in charge of their schedule when they will go

10 out for recess and when they will not.

11     Q.   Mr. Spitzen, my question to you is

12 how -- how -- let me strike that.

13             Mr. Spitzen, did you, in doing your

14 analysis, endeavor to try to determine which

15 decisions and actions taken by the 13 entities

16 were taken and made by individuals because of

17 their roles at the 13 entities or because of

18 their alleged roles at Hamas?

19             MR. GLATTER:  Objection as to form

20        and foundation.

21     A.   No, this was not the method or the

22 way of my research.

23     Q.   And Mr. Spitzen, did -- did you, in

24 conducting your analysis to offer these expert

<pre>
 1                    Spitzen
 2  opinions, endeavor to try to determine whether
 3  an individual, who you allege to be a member of
 4  Hamas and to have either been a volunteer or
 5  employee of one of the 13 entities, whether
 6  their actions were done because they were
 7  acting on behalf of Hamas or because they were
 8  acting on behalf of one of the 13 entities?
 9            MR. GLATTER:  Same objection.
10       A.    Again, this is not the way I was
11  working.  Your basic assumption in this
12  question is that these associations are one
13  thing and the Hamas is another thing.  I
14  determine in my expert opinion, and I insist on
15  it, that these entities are part of the
16  infrastructure of Hamas.
17       Q.    Mr. Spitzen, is it your expert
18  opinion that there is no -- no distinguishment
19  between the 13 entities and Hamas?
20            MR. GLATTER:  You can answer.
21       A.    Yes, and I'm also saying it at the
22  end of each of the sections, that these
23  associations are part of the civilian
24  infrastructure of the Hamas.
25            MR. TURNER:  I think it was
</pre>

# Exhibit 5

OSEN LLC

ATTORNEYS AT LAW
WWW.OSENLAW.COM

2 UNIVERSITY PLAZA, SUITE 201, HACKENSACK, NJ 07601       345 SEVENTH AVENUE, 21ST FLOOR, NEW YORK, NY 10001
T. 201.265.6400   F. 201.265.0303                         T. 646.380.0470  F. 646.380.0471

May 11, 2016

**VIA E-MAIL**

Lawrence B. Friedman, Esq.
Cleary Gottlieb Steen & Hamilton LLP
1 Liberty Plaza
New York, New York 10006

Re:   *Strauss, et al. v. Crédit Lyonnais, S.A.*, 06-cv-702 (DLI)(MDG)
      *Wolf, et al. v. Crédit Lyonnais, S.A.*, 07-cv-914 (DLI)(MDG)
      *Weiss, et al. v. National Westminster Bank Plc*, 05-cv-4622 (DLI)(MDG)
      *Applebaum, et al. v. National Westminster Bank Plc*, 07-cv-916 (DLI)(MDG)

Dear Larry:

         We write on behalf of all plaintiffs in advance of the parties' May 17 court conference
before Magistrate Judge Go and further to our April 7 call, during which we discussed the
parties' pre-trial plans following Judge Irizarry's March 31 denial in full of both *CL*'s and
*NatWest*'s motions for dismissal for lack of personal jurisdiction, or in the alternative for
summary judgment. The following reflects plaintiffs' pre-trial intentions:

1.   We plan to amend the *Strauss* and *Weiss* complaints to add new plaintiffs implicated in
     attacks already encompassed in the *CL/NatWest* complaints. We also plan to add new
     capacities, such as estates of already existing plaintiffs in the *Strauss, Wolf, Weiss* and
     *Applebaum* cases, reflecting deaths that have occurred since the *CL/Natwest* cases were
     filed.

2.   We also plan to amend the *Weiss* and *Applebaum* complaints to add two attacks already
     encompassed in the *CL* complaints – the Ben Yehuda Street Bombings, December 1,
     2001 and the Patt Junction Bus #32A Bombing, June 18, 2002. Mr. Kohlmann's Arab
     Bank expert report (which you have) addresses Hamas's responsibility for the June 18,
     2002 attack (his report in the *Credit Lyonnais* and *NatWest* cases already opines on the
     December 1, 2001 attack) and Dr. Shaked's supplemental expert report in *CL* addresses
     both attacks. We are prepared to stand on the contents of those reports and adopt the
     opinions as to those two attacks for the *NatWest* case.

Lawrence B. Friedman, Esq
May 11, 2016
Page 2 of 2

3. We do not plan to add any plaintiffs injured in attacks that are not already encompassed in the *CL* and *NatWest* complaints or in the amendment proposed above.

4. We plan to supplement our discovery production with some limited additional materials relating to Hamas, in light of the long time-lapse since the conclusion of fact discovery. We will send you a separate letter on these supplemental disclosures in the next two weeks. Although we do not anticipate that any of these materials will affect the contents of the motions you have indicated you intend to file, we will, of course, afford you an opportunity to review them before committing to a briefing schedule on your proposed motions, without prejudice to your making any objections you may have to the use of such materials at trial.

5. We plan to file a motion to consolidate the *CL* and *NatWest* cases for bifurcated trial pursuant to Fed. R. Civ. P. 42(a) and will discuss or propose a briefing schedule for that motion.

6. We remain prepared to consider and convey any settlement offers defendants wish to proffer, but we decline your invitation to repeat the process that we engaged in three years ago regarding potential resolution of the *Crédit Lyonnais* case.

If you would like to discuss any of these – or any other – issues before the conference, please let us know.

Sincerely,

Gary M. Osen

cc:     All Counsel

# Exhibit 6

# Second Supplemental Expert Report
Of
# Ronni Shaked

*Strauss v. Crédit Lyonnais, S.A.* 06 CV 702 (DLI)(MDG)
*Wolf v. Crédit Lyonnais, S.A.* 07 CV 914 (DLI)(MDG)

**March 28, 2001 – Suicide Bombing at Neve Yamin**

**a. The terrorist attack**

At 7:25 a.m., a powerful explosion was heard at the Mifgash Hashalom gas station, near the Neve Yamin Junction, not far from the southern entry checkpoint to Qalqilya. A suicide bomber, carrying on his person an improvised bomb, blew himself up. The suicide bombing resulted in six casualties, all of them incurred by young men who had been waiting for the bus to transport them to a yeshiva high school they attended.



Shmulik Friedman, aged 16, recounted: "I stood with my back to my friends, some distance away from them, and suddenly I heard a strong explosion. I turned around but I couldn't see anything, everything was full of smoke. A few seconds later I came to my senses, and I saw my friends lying on the floor. It took me a long time to understand what had happened."

Rina Hochman, a pediatrician, was at the gas station when the explosion occurred. "I ran in the direction of the explosion, and I saw the children lying there," said Hochman. "Two of them were in serious condition. I started performing CPR on them. It was a terrible sight."

The mother of one of the wounded said: "You send your child to school in the morning, and these are the results. How long will this go on?"[1]

---

[1] <u>Yediot Aharonot</u>, March 29, 2001.

**b. Evidence and Legal Attribution**

**1) The assumption of responsibility**

Hamas's official website published an announcement about the suicide bombing at Neve Yamin, in which responsibility was claimed by the *Izz al-Din al-Qassam* Brigades. The official announcement emphasizes the name of the suicide bomber Fadi Atallah Amer as the one who carried out the operation. The announcement stated:

> "He carried a bag filled with explosives, approached the military target at which the operation was directed, and detonated the bomb in the vicinity of three soldiers stationed at the checkpoint. He killed two of them and wounded seven." The announcement is signed in the name of the "Martyr of the *Izz al-Din al-Qassam* Brigades, Palestine, Jerusalem."[2]

The official website of the *Izz al-Din al-Qassam* Brigades also published the announcement claiming responsibility for the suicide bombing. The center of the announcement contains the logo of the *Izz al-Din al-Qassam* Brigades, while on both sides it was written, in English and Arabic: "*Izz al-Din al-Qassam* Brigades, the military wing of Hamas, Information Office." The announcement, signed by the *Izz al-Din al-Qassam* Brigades, claims responsibility for the suicide bombing carried out by Fadi Atallah Amer from Qalqilya.[3]

It should be noted that the announcement claiming responsibility was published by Hamas on or about April 12, 2001, about two weeks after the suicide bombing.  The Hamas announcement claimed that the publication had been delayed due to "security reasons."[4] In my view, Hamas delayed taking responsibility for the attack because of concerns of collective punishment of the residents of Qalqilya due to the large number of terrorist attacks emanating from the town at that time. Hamas claimed responsibility for the terrorist attack only after the suicide bomber had been identified by the Israel Defense Forces and the Israel Security Agency.

**2) Pictures**

Hamas prepared a poster in honor of the suicide bomber. The logo of the *Izz al-Din al-Qassam* Brigades appears in the center of the poster, and this is to emphasize that the attack was carried out by Hamas. Under the picture is written, "The martyr, the hero Fadi Atallah Amer, who carried out the operation on March 8, 2001." On the poster appear other symbols; for example, the picture of a terrorist dressed in white funeral shrouds to symbolize a suicide bomber, two

---

[2] W_S089569.
[3] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=101.
[4] W_S089569; *see also* the forensic report W_S161554-66 and W_S161567-72.

rifles symbolizing the struggle, and a picture of the Dome of the Rock, at the al-Aqsa site, to symbolize the religious context.[5]



Another poster prepared by Hamas connects the suicide bomber and the al-Aqsa mosques in Jerusalem, to emphasize the religious context:[6]



Two additional posters were prepared by Hamas that connect the suicide bomber Fadi Atallah Amer with the Hamas commanders of Qalqilya and with the suicide bombing carried out by Hamas at the Dolphinarium in Tel Aviv. The posters were placed at a school in Qalqilya:[7]

---

[5] W_S089553.
[6] http://www.palestine-info.com/arabic/hamas/shuhda/fadi/fadi.htm.
[7] http://www.terrorism-info.org.il/malam_multimedia/html/final/sp/sib3_04/k_apc.htm.

 

Another poster of Amer, which includes the Hamas emblem:[8]



A poster was prepared in memory of Abd al-Rahman Hamad, the *Izz al-Din al-Qassam* Brigades commander who was responsible for the terrorist attack at Neve Yamin. The poster incorporates Hamas symbols:[9]



---

[8] http://4qalqilia.ps/old/martyres4.htm.
[9] http://4qalqilia.ps/old/martyres4.htm.

4

### 3) Official Hamas reports

a.  Hamas published on its official website a report on ten suicide bombings during 2001. The suicide bomber in Neve Yamin was referred to as the "third messenger." The report also includes pictures of the suicide bomber. The following are the details from the report:

> The third messenger – The martyr, the hero Fadi Atallah Yusuf
>
> Type of operation: Explosive belt
>
> Location of the operation: Military checkpoint separating Qalqilya and Kfar Saba.
>
> Amount of explosive: 10 kilograms
>
> Enemy losses: Two killed and seven wounded, one died subsequently from his wounds.
>
> Place and date of birth: Qalqilya, 1979
>
> Date of his death: March 28, 2001.[10]

b.  <u>The Book of Martyrs</u> of the *Izz al-Din al-Qassam* Brigades published a picture and a report on the suicide bomber Fadi Atallah Amer.[11]

c.  Qassamion, the official monthly journal of the *al-Qassam* Brigades, published a report on the Hamas operation. The operation is listed as the third of ten operations, and was carried out by the suicide bomber Fadi Atallah, "who blew himself up at a military checkpoint between Qalqilya and Kfar Saba, and killed two combat soldiers and wounded seven others."[12]

d.  The official website of the *Izz al-Din al-Qassam* Brigades published a report on Hamas operations, under the title, "Pages of Heroism." The report on the suicide bombing at Neve Yamin states that it was carried out on March 28, 2001, at a military checkpoint separating Qalqilya and Kfar Saba, by Fadi Amer from the town of Qalqilya.[13]

e.  The official website of the *Izz al-Din al-Qassam* Brigades published a list of all the terrorist attacks that it had carried out in the month of March in the years 1989 to 2008.

---

[10] http://www.palestine-info.com/arabic/hamas/glory/kasamten.htm.
[11] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101; *see also* http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.
[12] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.
[13] http://www.xn--mgbx8bo.com/arabic/statistics1.php?id=59.

According to the website, on March 28, 2001, Fadi Atallah Yusuf Amer, from the town of Qalqilya, carried out a "martyrdom operation" when he blew himself up at "a military checkpoint separating Qalqilya and Kfar Saba. The operation caused the deaths of three Zionists and wounding of seven more."[14]

f.    <u>The Book of Martyrs</u> on the official website of the *Izz al-Din al-Qassam* Brigades provides a full report on the operation by the terrorist Fadi Atallah Yusuf Amer, and calls him a "*Qassami* [member of the *Izz al-Din al-Qassam* Brigades] holy warrior." The report includes the suicide bomber's life story, notes that the *al-Qassam* Brigades mourned "their martyr," and provides the official announcement by the *Izz al-Din al-Qassam* Brigades taking responsibility for the attack. The report notes that the operation was carried out using an explosive belt weighing 10 kilograms, and states that Amer was a commander in the *Izz al-Din al-Qassam* Brigades.[15]

g.    Hamas's official website published a special report on the suicide bomber that includes a poster made in his honor. The report provides details on the attack, and glorifies and praises the suicide bomber Fadi Atallah Amer. The report sets forth a checklist of significant details of the operation:

> Details of the operation:
>
> Type of operation: Explosive belt
>
> Location of the operation: A military checkpoint separating Qalqilya and Kfar Saba.
>
> Amount of explosive: 10 kilograms
>
> Enemy losses: Two killed and seven wounded, one of whom died later from his wounds.
>
> Date on which the sacrifice operation was carried out: March 28, 2001.[16]

---

[14] http://www.alqassam.ps/images/userfiles/image/books/information_office/alqassam_history/3.html.
[15] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.
[16] W_S089553-54.

### c. Official Documents of the Israeli Government

### 1. Report of the Israel Security Agency

---

**March 28, 2001**

**Explosion of a Suicide Bomber near the Gas Station at Neve Yamin**

**2 killed and 4 wounded**

---

"**The suicide bomber Fadi Amer**

A resident of <u>Qalqilya</u>, **aged 23**, single, a Hamas operative, a student at the "Open University" in Qalqilya, blew himself up at the gas station on Highway No. 444 south of the Kfar Saba East Junction, near a group of high school students who were waiting at the gas station for their bus to the school in Kedumim. The Hamas infrastructure in Qalqilya was responsible for carrying out the terrorist attack. The suicide bomber was sent by **Jibril Jibril** and **Tarek Barzilai**, Hamas military operatives from Qalqilya. The operatives updated **Abd al-Rahman Hamad** (killed) and **Raed Hutari**, a senior Hamas military operative, with respect to the terrorist attack, so that they could take responsibility. **Ibrahim Dahmas**, a Hamas operations operative from Qalqilya, also admitted during his interrogation to connections with the suicide bomber and that he was aware of the planning for the terrorist attack.[17]

### 2) Police Report

An expert report by the Israel Police's explosives expert determined that the bomb used in the attack was improvised. The explosives expert determined that the bomb was made of an improvised explosive, with an electrical operating system that included a battery and electrical conductors, as well as a pipe that served to house the bomb. All of the aforementioned facts are evidence, according to the expert, of an improvised bomb. The report also presents pictures from the scene of the event, indicating the connection between the explosion and its results.[18]

### 3) Report of the Israeli Ministry of Foreign Affairs

A report by the Israeli Ministry of Foreign Affairs mentions the terrorist attack at the Mifgash Hashalom gas station, near the entrance to Ramallah, in which two Israelis were killed. The report states that Hamas had claimed responsibility for the terrorist attack.[19]

---

[17] W_S089727.
[18] W_S161554-66 and W_S161567-72.
[19] W_S089556.

#### d. Additional Supporting Material

##### 1) Symbolic Funeral

Members of the Islamic Bloc at the branch of the al-Quds Open University held a "symbolic funeral" for Fadi Atallah. (In cases of suicide bombings, Israel does not customarily return the body of the suicide bomber to his family; rather, it is sent for burial in the cemetery for the "enemy fallen," maintained by the Israel Defense Forces.) The symbolic funeral procession ended at the home of the suicide bomber's parents, where members of the *Izz al-Din al-Qassam* Brigades were called on to re-enact the actions of the suicide bomber.[20]

##### 2) Mourners' Tent

Hamas's official website indicated that, as part of the mourning by the *Izz al-Din al-Qassam* Brigades for "their martyr," a mourners' tent was set up, which was adorned with green flags.[21]

##### 3) Memorial Assembly

On the third day following Amer's death, Hamas held a memorial rally in Qalqilya for him, in which most of the town's residents participated. During the rally, a speech by the head of Hamas's Political Bureau, Khalid Mishal, was relayed by telephone.[22]

#### e. Summary of the Suicide Bombing at Neve Yamin

From all the materials surveyed above, I conclude that the principal members of Hamas involved in the terrorist attack are as follows:

1.  **The suicide bomber** – Fadi Atallah Yusuf Amer. Born in 1979, a resident of Qalqilya, a student at the al-Quds Open University branch in his hometown, in the Department of Islamic Studies. He was a member of Hamas and considered by the organization to be one of the leaders of the *Izz al-Din al-Qassam* Brigades.[23] A short time before carrying out the terrorist attack, he submitted an application to the Waqf offices to be accepted for employment as a muezzin at one of the mosques. He was a member of the Muslim Brotherhood movement.[24] He completed his high school studies in Qalqilya, continued

---

[20] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101; *see also* W_S089553-54.
[21] W_S089553-54.
[22] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101; *see also* W_S089553-54.
[23] W_S089553-54.
[24] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.

studying at a religious college in Qalqilya, and then continued his academic studies at a branch of the al-Quds Open University.[25]

2. **Abd al-Rahman Hamad** – Commander in the *Izz al-Din al-Qassam* Brigades, to whom responsibility for dispatching the suicide bomber for the terrorist attack at Neve Yamin is ascribed. Hamad was assassinated by Israel on October 14, 2001. The *Izz al-Din al-Qassam* Brigades considered him one of their military commanders, and the Hamas website published a special report about him. At the top of the page is his picture, above which is written, "The holy warrior of *Qassam* [member of the *al-Qassam* Brigades] Abd al-Rahman Hamad."[26]

A picture of Hamad appears in a Hamas poster. Surrounding his picture are pictures of other Hamas operatives from Qalqilya, including a picture of the suicide bomber Fadi Atallah.[27]

The official Hamas website published a photo of Abd al-Rahman Hamad, above which was written, "The martyr, the hero Abd al-Rahman Sa'id Muhammad Hamad."[28]

On another Hamas website, Abd al-Rahman Hamad is mentioned as "one of the commanders of the Qassam in Qalqilya."[29]

In The Book of Hamas Martyrs, the name of Abd al-Rahman Hamad appears as one of the martyrs of the *Izz al-Din al-Qassam* Brigades, and it is stated that he was a "*Qassami* [member of the *Izz al-Din al-Qassam* Brigades] holy warrior."[30]

3. **Ayman Halawah** – Commander of Hamas in the Nablus area, who had earned the nickname Hamas Engineer No. 3. Halawah was a student in the Department of Electrical Engineering at Bir-Zeit University, and during the 1990s had prepared bombs for suicide bombers. He is considered to be responsible for the suicide bombings at the Dolphinarium and the Sbarro pizzeria. Halawah was assassinated by Israel on October 22, 2001.[31]

---

[25] W_S089553-54; *see also* http://www.palestine-info.com/arabic/hamas/shuhda/fadi/fadi.htm.

[26] W_S089550-52.

[27] http://www.terrorism-info.org.il/malam_multimedia/html/final/sp/sib3_04/k_apc.htm.

[28] http://www.palestine-info.com/arabic/hamas/shuhda/abdalrahman/hamad.htm.

[29] http://www.paldf.net/forum/showthread.php?t=687748.

[30] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=79.

[31] http://www.alqassam.ps/arabic/special1.php?all=all&&&sid=4017; *see also* http://www.alqassam.ps/arabic/special1.php?all=all&&&sid=4020; *see also* Guy Aviad, Lexicon of the Hamas Movement, Tel Aviv, Maarakhot, p. 101.

4.  **Selim Hija** – A resident of the village of Burqa, born in 1972, a student at al-Najah University. Joined Hamas in 1989. At the beginning of the Second Intifada, he was recruited into the *Izz al-Din al-Qassam* Brigades by Ayman Halawah, commander of Hamas's *Izz al-Din al-Qassam* Brigades in Nablus, and appointed as his close assistant. For the suicide bombing at the Dolphinarium, he served as operations officer and liaison between Hamas's military infrastructure in Nablus and Ramallah. He was arrested and sentenced by the military court to 16 life sentences and an additional 30 years.[32]

5.  **Tareq Muhammad Abd al-Latif Abu Mariam** – A resident of Qalqilya, born in 1982. Joined Hamas in 1997. Abu Mariam recruited the suicide bomber for the March 28, 2001 suicide bombing at Neve Yamin. Abu Mariam was arrested in July 2002 and in June 2004 was sentenced to 2 life sentences plus an additional 15 years.[33]

### f. Conclusion

The many documents cited in this report, particularly Hamas documents, show that Hamas is responsible for the terrorist attack at Neve Yamin. The other activities carried out, from the symbolic funeral, to the setting up of a mourner's tent, and also the memorial rally that included the speech by Khalid Mishal, head of Hamas's Political Bureau, that was relayed via telephone, further substantiate this conclusion.

Hamas did not attempt to hide its responsibility for the terrorist attack at Neve Yamin. On the contrary, the suicide bomber and the members of the cell responsible for the attack enjoyed its respect and admiration. Additionally, in Qalqilya in particular and throughout the Palestinian Territories in general, attempts were made to transform the suicide bomber into a role model and a figure for emulation.

Based on my familiarity with Hamas's *modus operandi*, and the evidence deduced from the Hamas documents, mourning ceremonies, symbols and pictures, referenced above, I conclude with a very high degree of probability (and indeed I have no doubt) that Hamas is responsible for the suicide bombing at the gas station in Neve Yamin.

---

[32] Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 97-98.
[33] *See* W_S161576-82 and W_S161583-93.

## August 9, 2001 – Suicide Bombing at Sbarro in Jerusalem

### a. The terrorist attack

On August 9, 2001, at 1:55 p.m., a suicide bomber detonated a bomb at the Sbarro pizzeria on the corner of Jaffa Road and King George Street, a heavily trafficked intersection in Jerusalem.

About five minutes after the blast, I arrived at the location of the incident.  I noted that a strong smell of burning filled the air, and observed many wounded people covered in blood lying on the sidewalk.

The suicide bombing resulted in 15 killed, approximately 130 wounded. Among those killed were five members of a single family, the Schijveschuurder family: the father of the family, his wife, and three of their children. Two of their other children were seriously injured.[34] As CNN reported:

> Thursday's blast rocked the Sbarro restaurant -- at the intersection of King Georges Street and the Jaffa Road, a major artery going into central Jerusalem during the busy lunch hour. … Television pictures after the blast showed a scene of devastation, panic and chaos. A woman covered with blood held a cloth to her face as she stood in front of the restaurant. Other injured people lay bleeding on the street; others were led away screaming as the severely injured were being loaded into the back of ambulances and carried away on stretchers. The inside of the restaurant was littered with broken plaster, fixtures and furniture….

> Thursday's bombing was the worst suicide attack since a June 1 suicide bomber killed 21 people at a Tel Aviv disco[35]

The terrorist operation at Sbarro in Jerusalem was coordinated and arranged by the headquarters of the *Izz al-Din al-Qassam* Brigades in the West Bank: the command in Nablus initiated the attack, and decided on carrying out a mass terrorist attack. The organization's infrastructure in Ramallah was asked to identify a suitable target, to prepare an explosive device, and to send the suicide bomber to Jerusalem. The infrastructure in Jenin was asked to find the terrorist to carry out the suicide bombing.[36]

---

[34] Yediot Aharonot, August 10, 2001.
[35] CNN Jerusalem Bureau Chief Mike Hanna and Correspondent Jerrold Kessel contributed to this report – August 9, 2001.
[36] *See* Guy Aviad, Lexicon of the Hamas Movement,  p. 144.



37

### b. Evidence and Legal Attribution

#### 1) The assumption of responsibility

In the evening following the terrorist attack, an announcement by the *Izz al-Din al-Qassam* Brigades was published in Jenin, in which Hamas claimed responsibility for the terrorist attack at Sbarro.[38] The announcement was received by facsimile at the editorial offices of Yediot Aharonot in Jerusalem.

The following is the content of the announcement:

> Military manifest on behalf of the *Izz al-Din al-Qassam* Brigades. With the help of Allah and his assistance, the Qassami holy warrior, Izz al-Din Suheil Ahmed al-Masri, of the village of Aqabah near Jenin, carried out a martyrdom operation…[39]

> On Thursday afternoon, August 9, 2001, the martyrdom operation was carried out at Sbarro Restaurant, in the heart of occupied Jerusalem, which caused Zionist deaths and injuries, this being in revenge for our children, women, and old people, whose blood was spilled in defense of Jerusalem and Palestine, and as a gift to the spirits of the Martyrs in Jenin, Mahmoud Musa Abu Musaab and Jamal Sif a-Din Abu-Daya, and in revenge for the killing of the holy warriors and commanders, Jamal Mansour and Jamal Selim and Salah Darawza. This blow is the prelude to a chain of blows by the *al-Qassam* Brigades as a lesson to the Jews… [signed] The Martyr Brigade *Izz al-Din al-Qassam*, Jenin District, the military wing of the Islamic Resistance Movement Hamas. Thursday, August 9, 2001.[40]

At the top of the announcement, in the center of the page, is the symbol of the *Izz al-Din al-Qassam* Brigades. To the right of the symbol appears the inscription in Arabic "*Izz al-Din al-Qassam* Brigades, the military wing of the Hamas Movement, Information Office." To the left of

---

[37] http://news.bbc.co.uk/2/hi/middle_east/1483492.stm.
[38] Yediot Aharonot, September 10, 2001.
[39] http://www.alqassam.ps/arabic/byan_poup.php?id=3976.
[40] http://www.alqassam.ps/arabic/byan_poup.php?id=3976; *see also* W_S090067.

the symbol appears the same inscription in English. The official announcement, signed by the "*Izz al-Din al-Qassam* Brigades, the military wing of the Hamas Movement" claimed full responsibility for the terrorist attack, and provides the date and the name of the suicide bomber Izz al-Din al-Masri. The announcement quotes verses from the Quran, as well as slogans from the Hamas repertoire, such as "Jihad is Victory or Sacrifice," "Allah is Great and Victory to Islam."[41]

a.    On August 9, 2001, at 6:00 p.m., the London daily, <u>The Guardian</u>, published initial details about the terrorist attack. The report noted that the (Palestinian) Islamic Jihad in Beirut had claimed responsibility for the terrorist attack, stating that the suicide bomber was Hussein Omar Abu Nasa, aged 23.[42] This report was, of course, wrong. The claim by the Islamic Jihad for the attack apparently resulted from the fact that the Islamic Jihad was making preparations to send a suicide bomber to Jerusalem at that very time, its headquarters had approved the operation, and it seems that the headquarters thought that the bombing at the Sbarro pizzeria had been carried out by their organization on the basis of the approval it had granted. Hours later, when it turned out that Hamas had, in fact, perpetrated the terrorist attack, Islamic Jihad made no further attempts to claim responsibility.

b.    The Israeli Ministry of Foreign Affairs published a report about the terrorist attack at Sbarro pizzeria on August 9 in the afternoon, a few hours following the terrorist attack. The report states that Hamas and the Islamic Jihad had claimed responsibility.[43] In my view, this error arose because the report was published so close in time to the attack, relying on announcements made up to the time of the official announcement by Hamas. As stated, in the evening following the attack, when the official announcement by Hamas was published – no other organization other than Hamas claimed responsibility.

### 2) Pictures

The first picture was given to the <u>Reuters</u> news agency on August 9, 2001, some hours following the execution of the terrorist attack. In the picture the suicide bomber can be seen wearing a bandana on his head, bearing the inscription "*Izz al-Din al-Qassam* Brigades," holding a rifle in one hand, and a Quran in the other. Behind him a poster in the green color of Hamas is visible.

---

[41] W_S090067.

[42] http://www.guardian.co.uk/world/2001/aug/09/israel.

[43] <u>http://mfa.gov.il/MFA/MFA-Archive/2000/Pages/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale.aspx</u>.

The picture was published in all the newspapers the day after the terrorist attack, including Yediot Aharonot.[44]



Three additional pictures of the suicide terrorist appeared on Hamas websites:



45



46

---

[44] Yediot Aharonot, August 10, 2001.
[45] http://www.alqassam.ps/images/userfiles/image/album/shohdaa/ezz_masri/ezz_masri2.jpg.
[46] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=250.



Hamas prepared a poster in which the picture of Izz al-Din al-Masri appears on the background of a picture of the Sbarro pizzeria after the terrorist attack.[48]



Following the terrorist attack, Hamas prepared a poster linking the suicide bomber to the *Izz al-Din al-Qassam* Brigades.[49]



A poster of Ayman Halaweh, the commander of Hamas in Nablus and who approved dispatching the suicide bomber, against the background of the symbol of the *Izz al-Din al-Qassam* Brigades; under the picture is the caption, "The martyr, the Engineer No. 3, Ayman Adnan Halaweh."

---

[47] http://www.aqsaa.com/vb/showthread.php?t=79488.
[48] http://www.alqassam.ps/arabic/operations2.php?id=56.
[49] http://www.aqsaa.com/vb/showthread.php?t=79488.



50

Hamas prepared a poster in memory of Ayman Halaweh:[51]



Pictures of Qeis Adwan, an *al-Qassam* Brigades operative in the Jenin Refugee Camp who recruited Izz al-Din al-Masri to the *Izz al-Din al-Qassam* Brigades, were posted on Hamas's websites:



52

---

50 http://www.palsharing.com/i/00003/ijxi7tl3etkz.jpg.

51 http://www.alqassam.ps/arabic/upload/halawa2.jpg.



53

### 3) Material from Hamas websites

a.   ***Al-Kutla al-Islamiya*** – On the website of the Islamic Bloc (*al-Kutla al-Islamiya*), Hamas's student organization in the universities, there is a complete description of the operation at the Sbarro pizzeria by Hamas, including mention of the name of Izz al-Din al-Masri, who carried out the suicide bombing.[54]

b.   **The official Hamas website** – A photo of Izz al-Din al-Masri appears on the official Hamas website below the caption, "The Qassami [member of the *Izz al-Din al-Qassam* Brigades] Izz al-Din al-Masri (23), hero of the martyrdom operation on Jaffa Road in the heart of Jerusalem, who killed 19 Zionists and wounded more than one hundred, in revenge for the killing of Hamas' political commanders in Nablus, Bethlehem and Qalqilya. [His operation was carried out] on August 9, 2001."[55]

c.   **The official Hamas website** – The official Hamas website published the story of the terrorist Ahlam Tamimi, under the title "Stories of Heroism and Pioneering." The report states that "She was the first woman in the *Izz al-Din al-Qassam* Brigades," and also tells the story of her life, including her part in the suicide bombing at the Sbarro pizzeria.[56]

d.   ***Al-Kutla al-Islamiya*** – The website of *al-Kutla al-Islamiya* published a complete report on Ahlam Tamimi, including her recruitment into Hamas, emphasizing her being the first woman in the ranks of the *Izz al-Din al-Qassam* Brigades. The report describes in detail her role as a member of Hamas in the terrorist attack at Sbarro. A picture of Ahlam Tamimi also appears in the report.[57]

---

[52] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=215.
[53] http://www.palestine-info.com/arabic/spfiles/suhada_2005/sh_jenin/qees.htm.
[54] http://www.alkotla-f.ps/vb/showthread.php?p=124114.
[55] W_S090054.
[56] http://www.palestine-info.com/arabic/feda/2004/tamemee.htm.
[57] http://www.alkutla.org/ib/index.php?showtopic=19232.

e.   **The official Hamas website** – The website devoted three pages to the life story of cell member Muhammad Daghlas, emphasizing his involvement in the terrorist attack at the Sbarro pizzeria.[58]

f.   **The official Hamas website** – The Hamas website devotes two pages to Sayed Sheikh Qassam, Ibrahim Hamed's deputy. The report mentions the Sbarro operation, and also presents the picture of his funeral, with him wrapped in the Hamas flag.[59] Below is a picture of Sayed Sheikh Qassam, which appeared on Hamas's website, on which is the caption, "The Qassami [member of the *al-Qassam* Brigades] martyr."


[60]

g.   ***Al-Qassam* Publication** – After Sayed Abd al-Karim Qassam was killed, Hamas issued an official announcement in which it announced his death, mentioning that he was a "commander." The center of the announcement contains the logo of the *Izz al-Din al-Qassam* Brigades, while on both sides it was written, in English and Arabic: "*Izz al-Din al-Qassam* Brigades, the military wing of Hamas Information Office." The announcement emphasizes the fact that Qassam was a senior commander.[61]

h.   ***Al-Qassam* Publication** – On the *Izz al-Din al-Qassam* Brigades website, an internet page was devoted to Izz al-Din al-Masri, with the title, "Hero of the martyrdom operation in Jaffa Road in the center of occupied Jerusalem." The picture of the suicide bomber is placed at the top of the page; from that page there are three links to a page with his life story, a page with the official announcement accepting responsibility for the terrorist

---

[58] W_S090057 - W_S090059.
[59] http://www.palestine-info.com/arabic/spfiles/suhada_2005/ram_allah/sayeed.htm.
[60] http://www.palestine-info.com/arabic/hamas/shuhda/2003/saied/saied1.jpg.
[61] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=368.

attack at Sbarro and that Izz al-Din al-Masri was the suicide bomber, and a page with pictures of the suicide bomber.[62]

i.  **Al-Qassam** Publication – The official website of the *Izz al-Din al-Qassam* Brigades published, approximately nine years after the Sbarro bombing, a special report entitled, "Al-Masri avenged the blood of the martyrs and killed 20 Zionists." In the report there are pictures of al-Masri, including pictures of him with a weapon in his hand and with Hamas symbols, as well as pictures from the scene of the terrorist attack."[63]

j.  **Al-Qassam** Publication – The official website of the *al-Qassam* Brigades published a page containing details of operations carried out by Ayman Halaweh, Hamas engineer in Nablus, with details of the Sbarro operation and the manner in which it was carried out via Abdullah Barghouti and the suicide terrorist Izz al-Din al-Masri.[64]

### 4) Official Hamas reports

In addition to propaganda aimed at the wider public, Hamas publishes its own "official" reports, in which it takes responsibility for its terrorist attacks.

a.  **Al-Risalah Magazine** – On August 16, 2001, "Al-Risalah" – one of Hamas's official publications – published a mourning notice on the death of Izz al-Din al-Masri. At the top of the announcement, in bold letters, was written, "Announcement of the death of the Qassami [member of the *al-Qassam* Brigades] martyr. The Hamas Movement in the Jenin district announces the death of our martyr, the Qassami Izz al-Din Suheil al-Masri, who carried out the heroic operation in Jerusalem." The announcement is signed by the "Islamic Resistance Movement – Hamas."[65]

b.  **Al-Qassam** Publication – In a special report marking the twenty first anniversary of the founding of Hamas, details are given of Hamas's suicide bombings. The Sbarro bombing earned particular prominence. A picture of Izz al-Din al-Masri appears at the top of the page with the following details below it:

> Type of operation: Martyrdom

---

[62] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=250;
http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=250;
http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=250.
[63] http://www.alqassam.ps/arabic/news1.php?id=17429.
[64] http://www.alqassam.ps/arabic/special1.php?all=all&&sid=4020.
[65] Al-Risalah newspaper, August 16, 2001.

Time: 2 in the afternoon, Thursday, August 9, 2001

Location: Jerusalem, at the junction of King David Street and Jaffa Road, Sbarro Restaurant.

Type of material: Qassam 19

Enemy losses: 19 killed and more than 120 wounded, 13 of them in serious condition.

Qassam losses: the heroic martyr Izz al-Din Suheil al-Masri, aged 24.

This is the third powerful operation carried out by Hamas.[66]

c.   *Al-Qassam* **Publication** – A special report on the *Izz al-Din al-Qassam* website under the title, "Hamas warns against humiliating the prisoner Abdullah Barghouti" provides a special report on Barghouti's activities: his recruitment to Hamas, his training, construction of the bomb for the suicide bombing at the Sbarro pizzeria, and details of the Sbarro bombing.[67]

d.   *Al-Qassam* **Publication** – A special report on the *Izz al-Din al-Qassam* Brigades website, under the title, "The Qassami prisoner, the commander Abdullah Barghouti, reveals in three chapters new details of his activities." The report praises his activities and presents a report on a number of terrorist attacks in which he was involved. A chapter is devoted to the terrorist attack at the Sbarro pizzeria and his key role in carrying out the terrorist attack.[68]

e.   *Al-Qassam* **Publication** – A report of the Qassam movement on Palestinian prisoners presents the story of Ahlam Tamimi, the female terrorist who led the suicide bomber to Jerusalem. The report notes that Ahlam Tamimi was the first female terrorist who was a member of the Hamas organization and a member of its *Izz al-Din al-Qassam* Brigades. The report provides details of her part in the terrorist attack, emphasizing her membership in the organization.[69]

f.   **Qassamion** – In December 2007, Hamas published a special booklet marking 20 years of the organization. In the booklet, a special chapter is devoted to the activities of women in the organization. The booklet provides a long report on Ahlam Tamimi and includes her

---

[66] http://www.alqassam.ps/arabic/operations2.php?id=56.
[67] http://www.alqassam.ps/arabic/news1.php?id=1215.
[68] W_S089575-82.
[69] http://www.qassam.ps/prisoner-96-Ahlam_Mazen_At_Tamimi.html.

photograph. The title is "The Qassami [member of the *al-Qassam* Brigades] prisoner Ahlam Tamimi."[70]

g.   **Qassamion** – In Qassamion, issue No. 15 from November 2009, the name of Izz al-Din al-Masri is given as the one who carried out the operation at the Sbarro pizzeria in Jerusalem and caused the deaths of 19 Israelis.[71]

h.   **Qassamion** – In Qassamion, issue No. 9 from August 2008, there was an extensive article on the Sbarro operation, which was accompanied by a picture of Izz al-Din al-Masri. The title of the report was: "The martyrdom operation at Sbarro." The article, which is a poem of praise to those who carried out the terrorist attack, takes pride in the special ability demonstrated in carrying out the Sbarro bombing.[72]

### 5) Other supporting material

Dr. Abd al-Aziz al-Rantisi, the second ranking member of Hamas during that period, stated: "I call on Sharon, the spiller of blood: Go back to your home in Russia. This is an operation aimed at proving that the Palestinian people has not forgotten its martyrs and is not prepared to give up any piece of its land."[73]

**Hamas official Ashraf Swaftah** stated in a ceremony honoring Izz al-Din al-Masri, who carried out the suicide bombing of the Sbarro pizzeria in central Jerusalem on August 9, 2001: "His relatives distributed sweets and accepted their son as a bridegroom married to 'the black-eyed,' not as someone who had been killed and was being laid in the ground."[74]

### c. Official Documents of the Israeli Government

### 1) Report of the Israel Security Agency, 2005

An ISA report from 2005, entitled "Suicide Bombers in the Five Years of Conflict," provides a full report on the Sbarro operation and on the suicide bomber Izz al-Din al-Masri. The report states:

> The suicide bomber Izz al-Din al-Masri, resident of Aqabah/Jenin, aged 22, single, blew himself up in the Sbarro Restaurant at the corner of King George

---

[70] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.
[71] http://www.alqassam.ps/images/userfiles/image/books/information_office/qassamion_15.pdf.
[72] http://www.alqassam.ps/images/userfiles/image/books/information_office/qassamion_9.pdf.
[73] Yediot Aharonot, August 9, 2001.
[74] http://www.memri.org/report/en/0/0/0/0/0/0/538.htm#_edn16.

Street and Jaffa Road in Jerusalem. The terrorist attack was planned and directed by the Hamas infrastructure in Ramallah. The deadly bomb was produced by Abdullah Jamal, the chief "Engineer" of the Hamas infrastructure in the Judea region, who was involved in the production of explosive devices and the training of Hamas operatives in the production of explosives and the establishment of bomb laboratories.[75]

### 2) Documents and legal proceedings in Israel

On June 1, 2003, Abdullah Barghouti admitted to the counts of the indictment submitted against him.[76] He stated in court: "I admit to that attributed to me in the indictment." On the basis of his confession, he was convicted of a series of crimes, including preparation of the bomb and participation in initiating and planning the terrorist attack at the Sbarro pizzeria.[77] The court sentenced him to 67 cumulative life sentences.[78]

The indictment against Ahlam Tamimi reveals her membership in the *Izz al-Din al-Qassam* Brigades, and her activity in connection with the terrorist attack at the Sbarro pizzeria.[79] The indictment provides details of her recruitment into Hamas's *Izz al-Din al-Qassam* Brigades, including the approval received from the Hamas headquarters in Gaza for her recruitment.[80] The indictment states that she carried out preliminary reconnaissance in Jerusalem, and chose to carry out the terrorist attack at the corner of King George Street and Jaffa Road, where the Sbarro pizzeria was located.[81] The indictment recounts how she led the suicide bomber Izz al-Din al-Masri, with the explosive guitar, to the pizzeria, to the site of the terrorist attack in Jerusalem.[82]

On October 23, 2003, before her sentencing, Ahlam Tamimi admitted to the court her activity in the *Izz al-Din al-Qassam* Brigades and terror activities, including the explosion at the Sbarro pizzeria, emphasizing throughout her statement that she was not sorry, and, that on the contrary, she was "happy" about the activity she had carried out.[83]

---

[75] *See* Israel Security Agency report at: http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc.

[76] *See* indictment ROTH 00436.  *See also* Appendix No. 1, pp. 12-55, where Barghouti discusses using his Arab Bank account to receive payments for carrying out terrorist activities.

[77] ROTH 00397-403.

[78] ROTH 00397-403.

[79] ROTH 00417-26; *see also* ROTH 00404-13, third and fifth count.

[80] ROTH 00417-26, first count.

[81] ROTH 00417-26, fifth count.

[82] ROTH 00417-26, fifth count.

[83] ROTH 00430-32.

On June 22, 2003, Ahlam Tamimi admitted guilt before the court to all the counts of the indictment submitted against her. She admitted guilt to her actions in the presence of her attorney.[84]

The military court sentenced Ahlam Tamimi to 16 life terms for the Sbarro operation.[85]

The indictment against Muhammad Wa'el Daghlas recounts his recruitment into the *Izz al-Din al-Qassam* Brigades and his activity in the organization.[86] This activity included, among other things, renting an "operational apartment" in the Ramallah area, to serve his commanders as a meeting place, and also as a hiding place for the suicide bomber who blew himself up at the Sbarro pizzeria;[87] the recruitment of Ahlam Tamimi into the *Izz al-Din al-Qassam* Brigades;[88] the purchase of the guitar; the dispatch of Ahlam Tamimi to carry out preliminary reconnaissance in Jerusalem to identify a site for a terrorist attack; preparation of Izz al-Din al-Masri for carrying out the terrorist attack, and the dispatch of Ahlam Tamimi to bring the suicide bomber to Jerusalem.[89]

Muhammad Daghlas admitted guilt in court to all the counts of the indictment against him.[90] Based on his confession, the court sentenced him to 15 life terms plus 25 years imprisonment.[91]

On the basis of his confession before the military court,[92] Bilal Barghouti was sentenced to 15 cumulative life terms plus 35 years imprisonment. Prior to the Court handing down his sentence, Bilal Barghouti stated: "I am sorry that I was not able to bring about the deaths of many others."[93]

### d. Other Supporting Material

In 2006, while preparing a documentary film, I interviewed and filmed the members of the Sbarro cell: Abdullah Barghouti, who described to me how he constructed the explosive device in the guitar and described in detail his activities in Hamas; and Bilal Barghouti and Muhammad Daghlas, who described their part in the Sbarro bombing. I also conducted a long interview with

---

[84] ROTH 00428-29.
[85] W_S156479-503.
[86] ROTH 00404-13, first count.
[87] ROTH 00404-13, second count.
[88] ROTH 00404-13, third count.
[89] ROTH 00404-13, fifth count.
[90] *See* verdict W_S157275-76.
[91] W_S157271-73.
[92] W_S156682-83.
[93] W_S156678-80.

Ahlam Tamimi who told proudly and in detail of her part in the Sbarro bombing. During filming, all those interviewed proudly admitted that they were members of the Hamas Movement.[94]

### e. Summary of the Suicide Bombing at the Sbarro Pizzeria

In July, Ayman Halaweh contacted Abdullah Barghouti and informed him that there was a person who was willing to carry out a suicide operation. He asked Abdullah to contact Bilal Barghouti, to find a person to bring the suicide bomber to Jerusalem. Bilal Barghouti recruited Muhammad Wa'el Daghlas for this purpose, who in turn recruited Ahlam Aref Tamimi, a communications student at Bir-Zeit University, for this objective. Abdullah Barghouti reported to Ayman Halaweh that the chain for transfer of the suicide bomber to Jerusalem was ready, and gave him the details of the recruits. Halaweh instructed him to give them a small explosive device, to check whether they were able to carry out the mission. On July 30, Ahlam Tamimi placed the small explosive device in a supermarket on King George Street in Jerusalem. Abdullah Barghouti reported to Ayman Halaweh on the success of the operation, and asked him to send him the large explosive device.[95]

At the beginning of August 2001, a messenger arrived from Nablus and gave Abdullah Barghouti a large explosive device. Bilal Barghouti asked Abdullah Barghouti to prepare the explosive device inside a guitar. Abdullah Barghouti prepared a large bomb inside the guitar, adding screws to it to increase the number of casualties. After completing preparation of the bomb, Abdullah Barghouti reported to Ayman Halaweh that the bomb was ready.[96]

Some days later, the terrorist, Izz al-Din al-Masri, arrived in Ramallah and met with Bilal Barghouti and Muhammad Wa'el Daghlas, who arranged to accommodate him and train him in the operation of the bomb.[97]

On August 8, at the instructions of Muhammad Wa'el Daghlas, Ahlam Tamimi traveled to Jerusalem to locate a site for a terrorist attack. She dressed in a short tank top in order to look like a Jewish woman. On the same day, Bilal Barghouti instructed Izz al-Din al-Masri how to operate the bomb.[98] On August 9, Muhammad Daghlas introduced Ahlam Tamimi to the suicide bomber, after dressing him in clothes typically worn by Jews, and the two set out for Jerusalem to carry out the terrorist attack. Izz al-Din al-Masri carried the guitar on his back. Ahlam Tamimi

---

[94] *See* the documentary film, "For the Sake of Allah."
[95] ROTH 00350-92, indictment count 10; *see also* http://www.alqassam.ps/arabic/news1.php?id=1215.
[96] ROTH 00350-ROTH 00392, indictment count 12.
[97] ROTH 00350-ROTH 00392, indictment count 12.
[98] ROTH 00350-ROTH 00392, indictment count 12; *see also* http://www.alqassam.ps/arabic/news1.php?id=1215.

brought him to the corner of King George Street and Jaffa Road, and instructed him to carry out the terrorist attack at that junction.[99]

1.  **Izz al-Din Suheil al-Masri – the suicide bomber:** Izz al-Din Suheil al-Masri, who was born in 1979 in the village of Aqabah near Jenin, was the suicide bomber who blew himself up in the Sbarro pizzeria in Jerusalem. He worked in his father's restaurant in the center of the town of Jenin. He was a religious person, who devoted many hours to prayer in the mosque and to the study of the Quran.[100] In 1999 he was interrogated by the ISA because he was suspected of being a Hamas operative.[101]

    Izz al-Din al-Masri sought, in the suicide bombing which he carried out, to kill as many Jews as possible, particularly, religious Jews. With respect to his last moments before committing the suicide bombing, *see* the testimony of Ahlam Tamimi in the documentary film, "For the Sake of Allah."[102]

    In December 2007, Hamas published a special booklet marking the organization's twentieth anniversary. The booklet contains an article about Izz al-Din al-Masri and the Sbarro suicide bombing. The article was accompanied by his picture with a Kalashnikov in his hand and a Hamas bandana on his head.[103]

2.  **Qeis Adwan:** Izz al-Din al-Masri was recruited to the *Izz al-Din al-Qassam* Brigades by Qeis Adwan, known as Abu Jabal, a key operative of the *al-Qassam* Brigades in the Jenin Refugee Camp, who served as commander of the *Izz al-Din al-Qassam* Brigades in Jenin in 2001-2002.[104]

    Qeis Adwan belonged to a cell of the Muslim Brotherhood. Upon completing his high school studies in 1995, he enrolled to study architecture at al-Najah University in Nablus, where he joined the *Izz al-Din al-Qassam* Brigades. During his studies at al-Najah, he was active in *al-Kutla al-Islamiya*, and even served as chairman of the student council on behalf of Hamas. Adwan was recruited into Hamas by Jamal Abu al-Hija (a senior Hamas member in Samaria) following their arrest in 1996. In the winter of 2001 he was

---

[99] *See* the documentary film, "For the Sake of Allah," in which Ahlam Tamimi recounts in detail how she transferred the terrorist to Jerusalem, to the site of the terrorist attack; *see also* ROTH 00350-92, indictment count 12.
[100] *See* the documentary film, "For the Sake of Allah."
[101] W_S090041-42.
[102] *See* Appendix 2 to this report.
[103] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.
[104] *See* W_S090041-42 and Guy Aviad, Lexicon of the Hamas Movement, p. 189.

trained to serve as an "Engineer."[105] In 2002, he was considered the unopposed leader of Hamas in the Jenin region, and was a fugitive and central target of the ISA. On April 5, 2002, he was located in a house in the town of Tubas, where he was killed.[106]

Qeis Adwan was described by <u>The New York Times</u> as: "The most wanted Palestinian." <u>The New York Times</u> article attributed to him the responsibility for the terrorist attack at the Sbarro pizzeria.[107]

The operation was executed by a Hamas cell in Ramallah, in which Muhammad Daghlas, Bilal Barghouti and Ahlam Tamimi were members. The three of them took care of the logistics for the operation, were responsible for the transfer of the suicide bomber from Ramallah to Jerusalem, and for pointing out for him the location where he was to carry out the suicide bombing.[108]

3. **Abdullah Ghaleb Abdullah Barghouti – the Engineer:** Born in Kuwait in 1972, he was married and the father of a girl. Barghouti was an electronics technician who completed his academic studies in South Korea. He lived in the village of Beit Rime, near Ramallah. Barghouti owned an electronic devices repair shop in Ramallah.[109]

Abdullah Barghouti earned the nickname "the Engineer" in Hamas because of his "skills" in preparing explosive devices.[110]

Abdullah Barghouti was recruited to Hamas by his cousin, **Bilal Barghouti**, an operative of the *Izz al-Din al-Qassam* Brigades in Ramallah.[111] Within the Hamas leadership, Abdullah Barghouti's skills as an electronics engineer were noted, and it was decided to make him a "bomb engineer." He was taken to Nablus by his cousin, where he was introduced to Ayman Halaweh, a senior member of the Hamas leadership in Nablus and an expert on the production of explosive devices. Halaweh taught Barghouti to prepare triacetone triperoxide-type (TATP) explosive devices,[112] and taught him to prepare poison from potatoes, in order to construct chemical bombs.[113]

---

[105] Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 189-190.
[106] Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 189-190.
[107] http://query.nytimes.com/gst/fullpage.html?res=9F04EFDF1F3FF933A05755C0A9649C8B63.
[108] ROTH 00350-92 and *also* ROTH 00417-26.
[109] *See* the film, "For the Sake of Allah."
[110] ROTH 00350-92.
[111] http://www.alqassam.ps/arabic/news1.php?id=1215.
[112] TAPT-type explosives are often associated with terrorist attacks, and are often favored by Hamas. *See* http://www.nytimes.com/2005/07/17/international/europe/17explosives.html.
[113] ROTH 00350-92, indictment count 3.

Some months later he was introduced to Ibrahim Hamed, commander of Hamas in Ramallah and the West Bank,[114] known as "Salah 1"[115] and he agreed to work as a manufacturer of explosive devices. Hamed was Abdullah Barghouti's direct commander. For his activity in Hamas, Abdullah Barghouti received the sum of $117,000.[116] Barghouti operated a bomb laboratory in Ramallah, where he produced explosive devices for suicide bombers and for other terror operations.[117]

4.   **Ayman Halaweh – Commander of the Hamas in Nablus:** Born in 1974 in Nablus, Halaweh was a senior bomb expert in Hamas who was given the nickname Engineer No. 3. Halaweh studied electrical engineering at al-Najah University in Nablus. In 1997 he joined the *Izz al-Din al-Qassam* Brigades and was involved in the preparation of explosive devices for suicide bombers who blew themselves up in Jerusalem. He was arrested in 1998 and sentenced to two and a half years imprisonment. Upon the outbreak of the Second Intifada, he went underground.[118]

According to a report given by his deputy, Selim Hijja, he was trained for his role as "Engineer" – expert in the construction of explosive devices – by a Hamas emissary who came from outside the Palestinian Territories and trained him.[119]

Halaweh constructed the bombs for the terrorist attack at the Dolphinarium and at the Sbarro pizzeria in Jerusalem. Additionally, he trained the next generation of bomb "engineers," foremost among them Abdullah Barghouti. On October 22, 2001, he was assassinated by Israel.[120] It was Ayman Halaweh who gave approval to Abdullah Barghouti to dispatch the suicide bomber to Jerusalem, after having received a description of the target for the terrorist attack.[121]

**f. Conclusion**

The attack at Sbarro in Jerusalem is an example of activity carried out at the instructions of the senior echelon of Hamas, in coordination with Hamas commands across the West Bank, from

---

[114]  A special booklet of the military wing of Hamas published in December 2007 to mark 20 years since the founding of Hamas, published an article on Ibrahim Hamed, including his picture, describing him as commander of Hamas in the West Bank; *see* http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.
[115]  http://www.alqassam.ps/arabic/news1.php?id=1215.
[116]  ROTH 00350-92, indictment count 2, *see also* http://www.alqassam.ps/arabic/news1.php?id=1215.
[117]  ROTH 00350-92, indictment count 6.
[118]  Guy Aviad, Lexicon of the Hamas Movement, p. 101.
[119]  http://www.paldf.net/forum/showthread.php?t=40272.
[120]  Guy Aviad, Lexicon of the Hamas Movement, p. 101.
[121]  http://www.alqassam.ps/arabic/special1.php?all=all&&&sid=4020.

Jenin in the north to the Jerusalem region. Following the elimination of the heads of Hamas in Nablus on July 31, 2001, the Hamas command decided to carry out a large scale revenge operation which would cause numerous casualties.[122]

It was Ayman Halaweh, "Engineer" and the Hamas commander in Nablus, who planned the attack. At the beginning of August 2001, Ayman Halaweh instructed **Qeis Adwan**, who was commander of the *Izz al-Din al-Qassam* Brigades in the Jenin region, to find a candidate for carrying out a suicide bombing. For this purpose, Qeis Adwan recruited **Izz al-Din al-Masri**, a young man living in the village of Aqabah, near Jenin, who agreed to carry out the suicide bombing.

In order to carry out the attack, Ayman Halaweh contacted Hamas "Engineer" **Abdullah Barghouti**, informed him that there was a suicide bomber ready, and instructed him to prepare a bomb and to identify a potential target for a multi-victim terrorist attack. Barghouti had his recruiter Bilal Abdullah Barghouti begin preparations for the mission. Bilal Barghouti recruited Muhammad Wa'el Daghlas to assist him in the mission.

For the purpose of locating a potential site for carrying out the attack, and to also serve as a guide for bringing the suicide bomber to the location of the attack, Daghlas recruited Ahlam Tamimi, a communications student from Ramallah. Her recruitment as the first woman in the *Izz al-Din al-Qassam* Brigades was approved by the head of Hamas, Sheikh Ahmed Yassin. This fact confirms the assessment that the senior command of Hamas, and the head of Hamas, Sheikh Ahmed Yassin, knew of the intention to carry out the attack and even approved it.

Following her recruitment and as part of her training, Ahlam Tamimi was sent on a preliminary reconnaissance mission in Jerusalem, and following that, for a "trial mission," to place a small bomb in Jerusalem, to test her capability as an *al-Qassam* operative. Ahlam Tamimi placed the bomb in a supermarket at a distance of about 500 meters from the place she had chosen for the suicide bombing. One of the aims of her mission was to also check security arrangements.[123]

Abdullah Barghouti received a report on the intended location and passed the details to Ayman Halaweh, and received his approval for the proposed location.[124]

---

[122] *See* Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 165.
[123] ROTH 00417-26.
[124] ROTH 00350-92.

At the beginning of August, Ayman Halaweh sent Abdullah Barghouti a large explosive device. In order to adapt the bomb to the conditions of West Jerusalem, Abdullah Barghouti installed the bomb inside a guitar.[125]

Bilal Barghouti and Muhammad Wa'el Daghlas rented an apartment on the outskirts of Ramallah, where they accommodated the suicide bomber and where Bilal Barghouti trained him to operate the bomb.[126] The suicide bomber was given a haircut and was dressed in clothes that would make him look Jewish.[127]

On August 9, Muhammad Wa'el Daghlas called Ahlam Tamimi and instructed her to come to the center of Ramallah. In accordance with the prepared plan, Ahlam Tamimi transported the suicide bomber to Jerusalem. She traveled with him to the area of the Old City's Nablus Gate, from where the two walked to the corner of Jaffa Road and King George Street. Ahlam Tamimi disguised herself as a western girl, wearing a tank top and jeans. The suicide bomber walked beside her with the guitar on his back. She led the suicide bomber to near the Sbarro pizzeria, and pointed out the place where he was to carry out the suicide bombing.[128] She parted from him with a religious blessing.[129] Some minutes later, at approximately 1:35 p.m., the suicide bomber entered the Sbarro pizzeria and blew himself up, causing the deaths of 15 people and the wounding of approximately 130 others.[130]

Based on the wealth of documents, pictures, video segments, the documentary film, and the testimonies that I have presented – from Hamas, from legal and Israeli governmental sources, and from other sources – I conclude with a high degree of probability (and, indeed, I have no doubt) that Hamas is responsible for the suicide bombing at Sbarro.

---

[125] ROTH 00350-92.
[126] ROTH 00404-13.
[127] ROTH 00404-13.
[128] ROTH 00417-26.
[129] *See* the documentary film, "For the Sake of Allah."
[130] *See* Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 165.

### December 1, 2001 – Suicide Bombings on Ben Yehuda Street

**a. The terrorist attack**

On December 1, 2001 two suicide bombers blew themselves up on Ben Yehuda Street in Jerusalem, located in a busy section of Jerusalem. The bombers denotated their explosives at a time when the cafés were busy and full of young people. Less than ten minutes later, when the rescue services were still treating the many wounded, a car bomb exploded on Rav Kook Street, some tens of meters from the place where the two terrorists had blown themselves up. 11 people were killed and another 188 wounded.[131] The first two explosions occurred one minute apart, when the two suicide bombers came to the area, close to midnight, and blew themselves up, the first bomber in the middle of the Ben Yehuda pedestrian mall, and the second bomber on Herbert Samuel Street, close to Ben Yehuda Street.[132]

The force of the powerful explosions caused numerous injuries. Next to the cafés stood many young frightened people, some bleeding, while their friends attempted to offer them assistance. While police units, medical teams, and firefighters who arrived on the scene attempted to evacuate the wounded, another explosion took place, on the corner of Rav Kook Street and Jaffa Road. The powerful explosion, which was caused by a car bomb, was clearly heard in the damaged pedestrian mall, and caused hysteria there. Ten people were wounded from the explosion of the car bomb, three of them severely.[133] The car bomb blew up just below the windows of the editorial offices of Yediot Aharonot in Jerusalem. I ran down to the street and had an opportunity to observe the bombing scene.

---

[131] Yediot Aharonot, December 2, 2001, pp. 1-2.
[132] Yediot Aharonot, December 2, 2001, pp. 1-2.
[133] Yediot Aharonot, December 2, 2001.



**b. Evidence and Legal Attribution**

**1) The assumption of responsibility**

a.      An official announcement of the *Izz al-Din al-Qassam* Brigades was distributed following the double terrorist attack.[134] At the top of the page appears the emblem of the *Izz al-Din al-Qassam* Brigades, and on the two sides of the emblem, in Arabic and English, is written, "*Izz al-Din al-Qassam* Brigades, the military wing of Hamas, Information Office." The announcement lists the names of the two suicide bombers, "The holy warrior, member of the *Qassam*, Osama Mahmud Eid Bahar, and the holy warrior, member of the Qassam, Nabil Mahmud Jamil Halabiya." Additionally, the announcement lists that the date of the terrorist attack as December 1, 2001. Finally, the announcement is signed in the name of the *Izz al-Din al-Qassam* Brigades, and bears the date December 1, 2001.[135]

b.      Another version of the claim of responsibility appeared on Hamas's official website. The emblem of Hamas also appears on the announcement, at its center, while on both sides, in Arabic and English, it is written, "The Islamic Resistance Movement Hamas – Palestine." The announcement states the names of the two "holy warrior martyrs" – Nabil Mahmud

---

[134] A short time following the terrorist attack, a telephone call was received at the offices of the BBC. The speaker on the telephone stated that it was the Islamic Jihad that had carried out the terrorist attack, but it very quickly became clear that this was a false announcement (*see*: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=123).
[135] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.

Halabiya and Mahmud Eid Bahar. Here, too, the announcement is signed by the *Izz al-Din al-Qassam* Brigades.[136]

## 2) Pictures

A picture of Nabil Halabiya, one of the two suicide bombers, was published on a page dedicated to him on the official website of the *al-Qassam* Brigades:[137]



Another picture published on the same page depicts the two suicide bombers, and beneath it appears the caption, "The two heroic martyrs Nabil Mahmud Halabiya (right) and Osama Eid (left), who carried out the double operation in Jerusalem":[138]



---

[136] http://web.archive.org/web/20030727123829/http://www.palestine_info.info/arabic/hamas/statements/2001/1_12_01.htm.
[137] W_S089539, *or see*: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=115.
[138] W_S089540, *or see*: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=115.

Another picture of the two, alongside a picture of the fire that broke out at the scene of the attack, was published at the top of a report on the operation that appeared on the official website of the *al-Qassam* Brigades:[139]



### 3) Material from Hamas websites

To mark the 21st anniversary of the founding of Hamas, *al-Kutla al-Islamiya* published a list of the organization's principal terrorist attacks since its founding. The suicide bombing on Ben Yehuda receives particular mention, and pictures of the two suicide bombers are provided.[140]

The official website of the *Izz al-Din al-Qassam* Brigades published an article on the operations of Abdullah Barghouthi, nicknamed there "the Engineer," who constructed the explosive belts for the two suicide bombers in the double suicide bombing on Ben Yehuda Street. The same source notes that the double suicide bombing on Ben Yehuda Street "caused the deaths of 11 Zionists."[141]

In an article on the double suicide bombing on Ben Yehuda Street, pictures from the scene of the attack were included, so as to boast of its results.[142]

Hamas's official website published a picture of Nabil Halabiya below the caption, "The *Qassami* [member of the *Izz al-Din al-Qassam* Brigades] martyr, the hero Nabil Mahmud Halabiya, hero of the martyrdom operation in Jerusalem on December 1, 2001."[143]

Hamas's official website published a picture of Osama Bahar, and at the top of the page on which the picture appears is the caption, "The *Qassami* [member of the *Izz al-Din al-Qassam*

---

[139] http://www.alqassam.ps/arabic/operations2.php?id=58.
[140] W_S168423-24.
[141] W_S089576.
[142] http://www.alqassam.ps/arabic/operations2.php?id=58; http://www.alqassam.ps/arabic/operations_images.php?id=58.
[143] W_S089543.

Brigades] martyr, the hero Osama Mahmud Eid Bahar, hero of the martyrdom operation in Jerusalem on December 1, 2001."[144]

The official website of the *Izz al-Din al-Qassam* Brigades published a special report under the heading, "[*al-Qassam* Brigades] dedicate to the Palestinian people six quality, courageous operations, *al-Qassam* Brigades: [This is] the response to the killing of Hamas commander Mahmud Abu Hunud, [the reaction] coming after a short time and coming only with the permission of Allah." The report enumerates various suicide operations, and includes the double terrorist attack in the area of Ben Yehuda Street, and also mentions the names of the two suicide bombers, Nabil Halabiya and Osama Bahar. The report states, in error, that the terrorist attack was at the Machane Yehuda market instead of Ben Yehuda Street.[145]

On the official website of the *Izz al-Din al-Qassam* Brigades, pictures from the scene of the attack were published. Publication of the pictures was aimed at praising the operation and those behind it. The names of the two terrorists are mentioned at the bottom of the page.[146]

### 4) Official Hamas reports

a.  ***Al-Qassam* publication** – the Information Office of the *al-Qassam* Brigades published a special report on the double suicide bombing on Ben-Yehuda Street in Jerusalem. The report states:[147]

> Type of operation: Double martyrdom operation and a car bomb.

> Location of the operation: Ben Yehuda Street, not far from Zion Square. The second explosion was at a distance of between 50 and 70 meters from the first explosion.

> Date of the operation: December 1, 2001

> Enemy losses: 11 killed and more than 190 wounded, of whom 20 in serious to very serious condition.

> Our losses: The two operatives who sacrificed themselves for Allah [*istishhadiun*] Osama Mahmud Eid Bahar and Nabil Mahmud Jamil Halabiya, both from Abu Dis.

At the top of the report appears a picture of the two terrorists and alongside it a picture from the scene of the attack.

---

[144] W_S089547.
[145] http://www.alqassam.ps/arabic/print_news.php?id=10.
[146] http://www.alqassam.ps/arabic/operations_images.php?id=58.
[147] W_S089534-35.

The report states that the suicide bombing was received with joy on the Palestinian street.[148]

b.   **Journal of events detailing the operations carried out by the *al-Qassam* Brigades** –
In a special report by the *Izz al-Din al-Qassam* Brigades reviewing the operations it carried out in the month of Ramadan since 1988, the following is written about the double terrorist attack on Ben Yehuda Street: "On December 1, 2001: (Martyrdom operation) in an operation by two members of *Izz al-Din al-Qassam* who sacrificed themselves for Allah [*istishhadiun*], Osama Mahmud Eid Bahar and Nabil Mahmud Jamil Halabiya, both from the town of Abu Dis in the Jerusalem district. They carried out a double martyrdom operation in Ben Yehuda Street in occupied Jerusalem; similarly, the two holy warriors also left a bomb in the vehicle in which they arrived [at the site of the terrorist attack], which blew up ten minutes after they had sacrificed themselves for Allah. The operation caused the deaths of 22 Zionists and the wounding of another 190."[149]

Another journal of events publicizing Hamas operations since 1990 contains a similar description to the one appearing in the monthly journal of events, but adds that the two suicide bombers hid, on the night before the attack, in the al-Aqsa Mosque, and that they carried out the terrorist attack on the 17th day of Ramadan.[150]

c.   **The Book of Hamas Martyrs** – Pictures of the two suicide bombers appears in a special section on martyrs on the official website of the *Izz al-Din al-Qassam* Brigades; alongside the picture of each of them appears the date of the operation and the title, "*Qassami* holy warrior," that is, Jihad warrior belonging to the *Izz al-Din al-Qassam* Brigades.[151]

On the official website of the *Izz al-Din al-Qassam* Brigades, in the virtual Book of Martyrs, there is a special page devoted to the suicide bomber Osama Eid Bahar. On that page appears the text of the announcement claiming responsibility for the terrorist attack. The text of the announcement's title is as follows: "Military Manifesto on Behalf of the *Izz al-Din al-Qassam* Brigades." The text claiming responsibility for the attack reads: "*Izz al-Din al-Qassam* Brigades announce that they claim responsibility for the double

---

[148] W_S089534-35.
[149] http://www.alqassam.ps/arabic/special_internal.php?id=112.
[150] http://www.alqassam.ps/images/userfiles/image/books/information_office/alqassam_history/12.html.
[151] http://www.alqassam.ps/arabic/sohdaa3.php?from=96.

operation carried out in Western Jerusalem and which caused the deaths of 10 Israelis and the wounding of 150 others."[152]

On the official website of the *Izz al-Din al-Qassam* Brigades, in the virtual <u>Book of Martyrs</u>, there is a special page devoted to the suicide bomber Nabil Mahmud Halabiya. On that page appears the text of the announcement claiming responsibility for the terrorist attack. The text of the announcement's title reads: "Military Manifesto on Behalf of the *Izz al-Din al-Qassam* Brigades." The text claiming responsibility for the attack reads: "*Izz al-Din al-Qassam* Brigades announce that they claim responsibility for the double operation carried out in Western Jerusalem and which caused the deaths of 10 Israelis and the wounding of 150 others."[153]

d.　**Qassamion** – In its issue No. 15 from November 2009, the official monthly journal of the *al-Qassam* Brigades, Qassamion, provides details about the terrorist attack on Ben Yehuda Street (such as the location of the terrorist attack and the number of those killed), and states the names of the two suicide bombers and the fact that the two belonged to the *Izz al-Din al-Qassam* Brigades.[154]

---

[152] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=123.
[153] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=115.
[154] http://www.alqassam.ps/images/userfiles/image/books/information_office/qassamion_15.pdf, p. 23.

**c. Official Documents of the Israeli Government**

### 1) Report of the Israel Security Agency:[155]

> **December 1, 2001**
>
> **Explosion of 2 Suicide Bombers in the Ben Yehuda Pedestrian Mall**
> **in Jerusalem**
> **11 killed and 170 wounded**

"The suicide bombers

     Osama Bahar         Nabil Abu Halabiya

Osama Bahar, **aged 25**, a member of Hamas in Abu Dis, religious, a member of the prison security committee and investigator of those suspected of cooperation, and Nabil Abu Halabiya, **aged 24**, known as a general intelligence operative in the Palestinian Authority, plasterer by trade, skilled in martial arts, a resident of Abu Dis, blew themselves up on the Ben Yehuda pedestrian mall in Jerusalem. About a quarter of an hour later, a car bomb exploded in Kook Street, near the pedestrian mall. The Hamas organization claimed responsibility for the terrorist attack. Osama had approached **Farid Atrash** (a resident of Abu Dis who was responsible for channel of communication between Hamas military activity in Ramallah and Jerusalem) and asked him to arrange for him to meet **Jamal Tawil**, a senior Hamas operative from Ramallah, so that he could recruit him into the Hamas's military wing. Tawil informed Farid that Osama was to "come to Manara Square two weeks later, on Sunday, dressed in a black jacket and holding a newspaper." Subsequently, Tawil passed Osama's request to **Ibrahim Hamed**, one of the heads of the Hamas command in Ramallah, who apparently recruited him for the terrorist attack. In the interrogation of **Abdullah Jamal [Barghouthi]**, a senior member of the Hamas infrastructure in Ramallah, he stated that he prepared and transferred the belts and bombs for the terrorist attack through **Sayd Sheikh Qasem**, Ibrahim Hamed's operations officer. Nabil Abu Halabiya was a close friend of Osama's, and apparently was recruited for the terrorist attack using the system of "one friend brings another." The car bomb that exploded belonged to Nader Alian, a resident of Abu Dis, an operative of Islamic Jihad, who admitted during his interrogation that the vehicle, a blue 1987 model Opel Kadett, belonged to him, but since he lived in the Palestinian territories, while the vehicle with Israeli license plates, Nader required the assistance of his friend, Murad Abu Ramila, who registered the vehicle under the name of his cousin. Nader sold the vehicle to Nabil and Osama, and handed it over to them the day before the terrorist attack."

---

[155] W_S089715-16.

## 2) Announcement by the Israeli Government

On February 7, 2002, the Prime Minister's office published an announcement with respect to the uncovering of the cell responsible for the Ben Yehuda terrorist attack. The announcement stated that Hamas was behind the attack:[156]

> The Israel Security Agency, with the assistance of the Israel Police, Jerusalem District, and the Border Police, recently uncovered the Hamas military infrastructure that assisted in executing the double suicide bombing in the pedestrian mall in Jerusalem on December 1, 2001.

> Four Hamas operatives, residents of the village of Abu Dis in East Jerusalem, were members of the infrastructure: Farid Salah Naim Atrash, Muhammad Abdullah Hasan Halabiya, Nidal Yasin Muhammad Abu Nab, and Iyad Fahd Yusuf Abu Hilal. The investigation revealed that during September 2001, Nidal and Muhammad Halabiya were recruited into cells of Hamas's military [wing] which the two perpetrators of the double suicide bombing, Osama Bahar and Nabil Mahmud Halabiya, were members of.

> The cell maintained contact with Hamas's military command in Ramallah, as well as with the *Izz al-Din al-Qassam* cell in Bethlehem, which provided explosives and weapons for the two suicide bombers to carry out the suicide bombing in Jerusalem. The investigation discovered that during the preparations for carrying out the terrorist attack, Osama Bahar and Nabil Mahmud Halabiya purchased a vehicle with yellow license plates from a resident of East Jerusalem who has a blue identity card; this vehicle served for preparing the car bomb that was set off during the execution of the suicide bombing. Muhammad Abdullah Halabiya and Nidal Abu Nab admitted in [their] interrogation that as part of their activities in the cell, they planned to carry out a terrorist attack by running soldiers down, seizing their weapons and subsequently firing on the unit with those weapons.

## 3) Documents and legal proceedings in Israel

The preparations for the terrorist attack in Ben Yehuda Street and the manner of preparation and assembly of the three bombs which were used in the terrorist attack are reflected in Count 38 of the indictment of Abdullah Barghouti, the person who prepared the explosive belts for the suicide bombers. From the details in this count, we learn that the order to prepare the bombs came from Ibrahim Hamed, commander of the *Izz al-Din al-Qassam* Brigades in the central region of the West Bank. The order was conveyed to Abdullah Barghouthi through Hamed's deputy, Sayd Sheikh Qasem. After Abdullah Barghouthi finished preparing the bombs, he gave them to Sayd Qasem.[157]

---

[156] W_S089532.
[157] ROTH00363–64.

Before his verdict was handed down, Abdullah Barghouthi told the court: [I] "admit to that attributed to me in the indictment." On the basis of his admission, Barghouthi was convicted by the court of, among other things, preparation of the three bombs used in the terrorist attack on Ben Yehuda Street.[158] On November 30, 2004, the military court sentenced Abdullah Barghouthi to 67 consecutive life terms.[159]

The expert opinion report by the Israel Police's explosives expert details the way in which the bomb was prepared, and the materials used in its preparation.[160]

### d. Summary of the Suicide Bombings on Ben Yehuda Street

#### 1) Commander of the operation, Ibrahim Hamed

Ibrahim Hamed, commander of Hamas in the central West Bank, gave the instruction to Abdullah Barghouthi to prepare the three bombs used in the attack on Ben Yehuda Street. Between 2003 and 2006, Hamed served as commander of the *Izz al-Din al-Qassam* Brigades in the West Bank.[161] The fact that such a high ranking member of Hamas's *Izz al-Din al-Qassam* Brigades was involved in the execution of this attack shows the great importance of the terrorist attack in the eyes of Hamas.

#### 2) Sayd Abd al-Karim Sheikh Qasem

Ibrahim Hamed's deputy, Sayd Abd al-Karim Sheikh Qasem, served as liaison between him and Abdullah Barghouthi. Qasem conveyed Hamed's orders to Barghouthi with respect to the preparation of the three bombs used in the terrorist attack. After Barghouthi finished preparing the bombs, Qasem transferred them to Ibrahim Hamed.[162] Qasem was killed on November 1, 2003, during an exchange of fire with Israel Defense Forces troops who were trying to arrest Ibrahim Hamed.[163]

---

[158] ROTH00436; similarly, *see* ROTH00398.
[159] ROTH00403.
[160] W_S161505-17; W_S161518-27; W_S161528-35; W_S161541; W_S161538-40; W_S161536-37.
[161] Guy Aviad, Lexicon of the Hamas Movement, pp. 95-97.
[162] ROTH00363–64.
[163] http://www.palestine-info.com/arabic/spfiles/suhada_2005/ram_allah/sayeed.htm.

### 3) Nabil Mahmoud Jamil Halabiya and Osama Muhammad Eid Bahar – The Suicide Bombers

Nabil Mahmoud Jamil Halabiya and Osama Muhammad Eid Bahar were both residents of the town of Abu Dis, near Jerusalem. Their names and identities were listed in an announcement distributed by the *Izz al-Din al-Qassam* Brigades a short time following the attack. Their names also appear in all the announcements in which Hamas claimed responsibility for the terrorist attack.[164]

**Nabil Halabiya** had spent five years in an Israeli prison, while **Osama Bahar** had served in the Palestinian Police up until about a week before carrying out the suicide bombing.[165]

### 4) Abdullah Ghaleb Barghouthi – Producer of the Bombs

Barghouthi, or as he was called by Hamas, the "Engineer," was involved in numerous Hamas terrorist attacks and is responsible for the murders of dozens of people. He prepared the three bombs that were used by the two suicide bombers in the double suicide bombing on Ben Yehuda Street.[166] One bomb was concealed in a computer case, a second bomb was an explosive belt, and the third was concealed in the vehicle in which the two suicide bombers arrived at the scene of the attack. Nails and screws were added to suicide bombers' bombs, so as to cause as many casualties as possible. Similarly, a poisonous material called methomyl was put into their bombs, in order to increase their lethality.[167] Barghouthi was convicted of the murders of 66 people and of wounding more than 500 people. On November 30, 2004, the military court in Beit-El sentenced Abdullah Barghouthi to 67 cumulative life sentences.[168]

### e. Conclusion

Ibrahim Hamed, commander of the *Izz al-Din al-Qassam* Brigades in Ramallah, sent his deputy, Sayd Abd al-Karim Sheikh Qasem,[169] to Abdullah Barghouthi to ask him to construct bombs for a suicide bombing. Barghouthi prepared the bombs and gave them to Sayd Sheikh. Together with

---

[164] http://alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.
[165] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=123.
[166] W_S089576.
[167] ROTH00363–64, W_S161536-37.
[168] ROTH00403.
[169] On the role of Sayad Sheikh Qassam in Hamas and his picture, *see*: http://www.palestine-info.com/arabic/hamas/shuhda/2003/saied/syrah.htm; *see also*: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=368.

Ibrahim Hamed, Sayd Sheikh transferred the bombs to Jerusalem for the use of the two suicide bombers.[170]

From the many Hamas documents and Israeli sources cited above, it is clear that from the command level down to the field operatives, Hamas is responsibile for the double suicide bombing on Ben Yehuda Street in Jerusalem. Hamas's various publications describing the double suicide bombing on Ben Yehuda Street indicate that it glorifies the attack as a success of the *Izz al-Din al-Qassam* Brigades.

Based on the numerous documents cited above dealing with the double suicide bombing on Ben Yehuda Street in Jerusalem,  I conclude, with a very high degree of probability (and indeed, I have no doubt) that Hamas was responsibile for this attack.

---

[170] ROTH00363–64.

## March 7, 2002 – Suicide Attack at Atzmona

### a. The terrorist attack

On March 7, 2002, at 11:40 p.m., a terrorist infiltrated the study hall area in the settlement of Atzmona in the Gaza Strip. The terrorist proceeded toward the Caravans in which the students of one of the religious colleges lived, and threw grenades at them. He then proceeded to the study hall, in which 40 students were then studying.

One of the wounded who survived the attack, Uri Diner (19), recounted:

> We were sitting in the lecture room of the pre-Army program, studying. We heard the noise, we were certain that another mortar round had fallen on Atzmona. That was something that was already routine for us. A few seconds later the true picture became clear. Immediately after the boom of the grenade we heard a long burst [of firing]. And then a second burst. He just poured all his ammunition into our classroom. One magazine after another, 260 rounds. The whole story lasted about a quarter of an hour, a very long quarter of an hour.



The killings ended only when the terrorist encountered, on his way toward the living quarters, an Israel Defense Forces officer, Lieutenant Colonel Eyal Tam, who lived in the settlement, and who shot and killed him.

Six grenades and nine magazines used by the terrorist left five students dead.[171] In addition, 23 wounded were evacuated to the hospitals, five of them in serious condition. The *Izz al-Din al-Qassam* Brigades announced that they had carried out the attack.[172]

---

[171] Yediot Aharonot, March 10, 2002.

### b. Evidence and Legal Attribution

#### 1) The assumption of responsibility

The *Izz al-Din al-Qassam* Brigades published an official announcement in which they claimed responsibility for the terrorist attack. At the top of the announcement, in the center of the page, is the symbol of the *Izz al-Din al-Qassam* Brigades. To the right of the symbol appears the inscription in Arabic "*Izz al-Din al-Qassam* Brigades, the military wing of the Hamas Movement, Information Office." To the left of the symbol appears the same inscription in English.  The announcement mentions, in bold, the name Muhammad Farhat as the one who carried out the attack, and is signed by the "*Izz al-Din al-Qassam* Brigades."[173]

#### 2) Pictures

a.    The official Hamas website published, on the second anniversary of the attack, the picture of Muhammad Farhat, dressed in a military uniform, wearing a hat with the symbols of Hamas, and standing in front of a poster with the symbols of Hamas. His mother Maryam Farhat, also a member of Hamas, appears in the second picture as she bids farewell to her dead son. The mother's head is adorned with a bandana bearing Hamas symbols, and she is holding an M-16. Above the pictures is written, "Marking the second anniversary of the martyrdom of Qassam member Muhammad Farhat."[174]

 

b.    The official website of the *Izz al-Din al-Qassam* Brigades published pictures of Muhammad Farhat with a weapon in his hand and with Hamas symbols appearing on his clothing.[175]

---

[172] http://www.ynet.co.il/articles/0,7340,L-1745788,00.html.
[173] http://www.alqassam.ps/arabic/byan_poup.php?id=82.
[174] http://www.palestine-info.com/arabic/feda/2004/fara7at.htm.
[175] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=205.

 



c.      The official website of Hamas published an additional picture of the terrorist.[176]



d.      The official Hamas website stated that prior to leaving for the attack, Muhammad Farhat bade farewell to his mother.[177] The following is the photo taken together with his mother prior to his departure for the terrorist attack in Atzmona.[178]



---

[176] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohamadfarhat/1.jpg.
[177] http://www.palestine-info.com/arabic/feda/2004/fara7at.htm.
[178] http://scr.mzajtv.com/yt-thumbs/llBt76Ab4sk_1.jpg.

44

e.  In a video film prepared in honor of Maryam Farhat, the mother of the terrorist, many pictures of Muhammad Farhat show him wearing Hamas attire or wearing a military uniform, and holding a weapon. There are many pictures of his mother, and posters prepared in honor of the terrorist. In the background, a song prepared in his honor and in honor of his mother, plays, with the repeated chorus, "She dressed him the uniform of battle, and handed him the rifle. She took him out into the night, and took from him his 'testament.'" In addition, the song mentions that Ahmed Yassin, the founder of Hamas, gave his blessing to the attack.[179]

### 3) The "Will"

a.  Muhammad Farhat was filmed on video, reading his "Will." In the "Will," he was standing in front of Hamas symbols while wearing a military uniform, a hat with an *Izz al-Din al-Qassam* Brigades ribbon on it, and holding an M-16 assault rifle. The video can be seen on the official website of the *Izz al-Din al-Qassam* Brigades. The video was published by the central information office of the *Izz al-Din al-Qassam* Brigades.[180]

b.  Muhammad Farhat left a "Will," which was published on the official Hamas website, and based on its content, was written on the day on which he carried out the attack. At the top of the page is the picture of the terrorist, above which is written, "The 'will' of the Qassami [member of the *al-Qassam* Brigades] martyr, the hero, Muhammad Fathi Farhat." In his "Will," the terrorist claimed that he "desired to cut off the heads of the Jews and those who help them." In addition, he addresses the members of Hamas and calls on them to unite and to bear the flag of jihad. The "Will" is also replete with religious figures of speech.[181] The "Will" was also published on the official website of the *Izz al-Din al-Qassam* Brigades.[182]

### 4) Material from Hamas websites

a.  An official announcement by Hamas reported on the attack at Atzmona. At the top of the announcement, in the center of the page, is the symbol of the *Izz al-Din al-Qassam*

---

[179]  http://www.youtube.com/watch?v=DvG68bqkn38;  *see also*  http://www.youtube.com/watch?v=DYT3-jmJXM0&feature=related; *see also*  http://www.youtube.com/watch?v=llBt76Ab4sk&feature=related; *see also* http://www.youtube.com/watch?v=vYm-eW39yTU&feature=related.
[180] http://www.alqassam.ps/arabic/video1.php?cat=3&id=30.
[181] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohamadfarhat/waseyh.htm.
[182] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.

Brigades. To the right of the symbol appears the inscription in Arabic "*Izz al-Din al-Qassam* Brigades, the military wing of the Hamas Movement, Information Office." To the left of the symbol appears the same inscription in English. The announcement emphasizes the name of Muhammad Fathi Farhat as the one who carried out the attack, and states that "The *Izz al-Din al-Qassam* Brigades claims responsibility for this heroic operation."[183]

b.   The official website of the *Izz al-Din al-Qassam* Brigades also published a full report on the attack at Atzmona. At the top of the page is a picture of the terrorist, Muhammad Farhat, above which is written:

   "The operation to storm the settlement of Atzmona."

Following that the website details the terrorist attack:

   Type of operation: Storming of the settlement Atzmona in the southern Gaza Strip

   Date of the operation: Tuesday, March 8, 2002

   Operation carried out by: The implementer of the martyrdom operation, the Qassami [member of the *al-Qassam* Brigades] Muhammad Fathi Farhat.

   Results of the operation: Seven Zionist soldiers were killed and more than ten wounded.

The report offers a description of the attack and complete details about Muhammad Farhat.[184]

c.   Hamas's official website published a full report on Muhammad Farhat and his activity. The page on the website includes his photo, and contains the caption, "The Qassami [member of the *Izz al-Din al-Qassam* Brigades] martyr, the hero, Muhammad Fathi Farhat... who was killed in the martyrdom operation [in carrying out] a military operation whose target was the settlement of Atzmona in the Gaza Strip, on March 8, 2002, during which he killed four Zionist soldiers and wounded tens."[185]

d.   On the second anniversary of Muhammad Farhat's death, Hamas published his biography on its official website, and details of the way in which he carried out the terrorist attack in

---

[183] http://www.alqassam.ps/arabic/byan_poup.php?id=82.
[184] http://www.alqassam.ps/arabic/operations2.php?id=30.
[185] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohamadfarhat/mohamed.htm.

the settlement of Atzmona. The biography glorifies, praises, and expresses Hamas's pride in the attack he carried out.[186]

e.  On the eighth anniversary of Muhammad Farhat's death, Hamas's official website published an article about the terrorist and about the operation he carried out in Atzmona. The article mentions explicitly, "the one who carried out the martyrdom operation, Muhammad Farhat – member of the *Izz al-Din al-Qassam* Brigades…"[187] Publication of this report after eight years demonstrates that Hamas attributed importance to the operation in Atzmona, and no less so to the activities of the terrorist Muhammad Farhat.

f.  The official Hamas website published a report written by Maryam Farhat, the mother of the terrorist Muhammad, that contains blessings and praise for her son being a martyr. At the top of the article is a picture of Maryam Farhat, with a green Hamas bandana on her head, as she bids farewell to her dead son. The article was shaped to disseminate the myth of martyrdom and to glorify him.[188]

g.  Hamas's official website published an article on the family of the terrorist Muhammad Farhat, under the title, "The Family of the Holy Qassami [Member of the *Izz al-Din al-Qassam* Brigades] Warrior, the Martyr Muhammad Fathi Farhat…" The article mentions that Muhammad Farhat was "one of the holy warriors of the martyred *Izz al-Din al-Qassam* Brigades [which is] the military wing of the Islamic Resistance Movement – Hamas."[189]

h.  The "Qassam Diary" published on the official website of the *Izz al-Din al-Qassam* Brigades lists all the operations carried out by the organization including the March 7, 2002 attack on Atzmona. With respect to the attack in Atzmona, it states, "On March 7, 2002, the holy warrior, the Qassami [member of the *Izz al-Din al-Qassam* Brigades], the martyr Muhammad Fathi Farhat, aged 17, from the al-Shajai'ya neighborhood in Gaza, was able to infiltrate the settlement of Atzmona…" Further on, the "Qassam Diary" provides details of the operation and its results.[190]

i.  The official website of the *Izz al-Din al-Qassam* Brigades published the life story of the terrorist, emphasizing that this was an operation carried out by a young man, one of the

---

[186] http://www.palestine-info.com/arabic/feda/2004/fara7at.htm.
[187] http://www.alqassam.ps/arabic/print_news.php?id=14663.
[188] http://www.palestine-info.com/arabic/Hamas/shuhda/2002/omahat/farhat.htm.
[189] http://www.palestine-info.com/arabic/spfiles/insehab/report20.htm.
[190] http://www.alqassam.ps/images/userfiles/image/books/information_office/alqassam_history/3.html.

youngest in Hamas. The website noted that through this operation, the terrorist was able to incite the Palestinian population. In addition, the website reports that the body of the terrorist, dressed in green clothing on which was written, "perpetrator of the martyrdom operation [*istashhadi*] from the Hamas Movement," was accompanied to burial by a funeral procession comprised of 16 masked men from the *Izz al-Din al-Qassam* Brigades. In addition, the founder of Hamas, Sheikh Ahmed Yassin, was present at the funeral, and was joined by the senior leadership of the Movement – Dr. Abd al-Aziz al-Rantisi, Mahmud al-Zahar, Isma'il Abu Shanab, and Isma'il Haniya.[191]

j.   Included in the "Pages of Glory" – an official publication of the Information Office of the *Izz al-Din al-Qassam* Brigades with respect to the organization's operations since its founding – is a report on the Atzmona operation. The passage describing the operation states, "The Qassami [member of the *Izz al-Din al-Qassam* Brigades] implementer of the martyrdom operation stormed the military college and rained grenades and bullets upon it." In the paragraph indicating "Our [Hamas] losses" is written, "The martyr Muhammad Farhat from the al-Shajai'ya neighborhood in Gaza."[192]

k.   Qassamion devoted its ninth issue, in August 2008, to Maryam Farhat. In an interview, she revealed that after it was decided that this would be an operation carried out by a single attacker rather than four as originally planned, she personally asked Salah Shehada, commander of the *Izz al-Din al-Qassam* Brigades, to send her son, Muhammad, to carry out the attack in Atzmona. Shehada's positive response was conveyed through Wa'el Nasar, who was in charge of the operation, and her son was sent alone to carry out the attack.[193]

l.   Qassamion, in its fourth issue, had an article about Wa'el Nasr, the terrorist who sent Muhammad Farhat to the terrorist attack at Atzmona. The article lists the attacks for which Nasar was responsible in his capacity as a commander in Hamas's *Izz al-Din al-Qassam* Brigades. Included in the list is the terrorist attack at Atzmona.[194]

m.   In an article on Wa'el Nasar, published on the *Izz al-Din al-Qassam* English language website, it states that he was responsible for the Atzmona operations. The website contains the following passage:

---

[191] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.
[192] http://www.xn--mgbx8bo.com/arabic/statistics1.php?id=59.
[193] *See* pp. 19-20 in: http://www.alqassam.ps/images/userfiles/image/books/information_office/qassamion_9.pdf.
[194] *See* pp. 9-10 in: http://www.alqassam.ps/arabic/upload/magazine/4/Kassamyoun_Layout_v4.pdf.

The operations commanded by Wa'el included: – Infiltration of the Atzmona settlement by Mohammad Farhat which resulted in killing 7 soldiers and injuring more than a dozen.[195]

### c. Summary of the Suicide Attack

#### 1) The Suicide Terrorist

Muhammad Fathi Farhat, aged 17, a resident of the al-Shajai'ya neighborhood in Gaza, was a member of the "Youth Brigades" of the *Izz al-Din al-Qassam* Brigades. In addition, the terrorist was a member of a family of Hamas operatives: his eldest brother, Nidal, who was a senior *al-Qassam* member responsible for the development of the Qassam missile project, had been killed; two other brothers were arrested by Israel and sentenced to a number of years in jail; and another brother was wounded in clashes with the Israel Defense Forces. The mother of the terrorist was photographed with him during his preparations for the terrorist attack, and she is considered a symbol of Palestinian mothers who encourage their sons to carry out terrorist attacks. The mother, Maryam, also known as Umm Nidal, is a Hamas operative, and was elected in 2006 to serve as a member of the Palestinian Legislative Council on behalf of Hamas. Her position as a representative of Hamas was conferred on her as a mark of honor after her third son, Rawad, was killed by the Israel Defense Forces in 2005.[196]

#### 2) The Commander of the Operation – The Dispatcher

a.    According to an official publication by the *Izz al-Din al-Qassam* Brigades, the one responsible for the Atzmona attack and the person who dispatched Muhammad Farhat was Wa'el Nasar, known as Abu al-Muatsem. Nasar, one of the senior leaders of Hamas's *Izz al-Din al-Qassam* Brigades in the Gaza Strip, was assassinated by Israel on May 30, 2004. In official publications of Hamas, it is emphasized that Wa'el supervised the preparation and equipment of dozens of suicide terrorists, "foremost among them being Muhammad Farhat, who carried out the operation in Atzmona."[197] A picture of

---

[195] http://www.qassam.ps/martyr-20-Wael_Nassar.html.
[196] *See, e.g.,* http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohamadfarhat/mohamed.htm; http://www.palestine-info.com/arabic/spfiles/insehab/report20.htm; http://www.alqassam.ps/images/userfiles/image/books/information_office/alqassam_history/3.html; Guy Aviad, Lexicon of the Hamas Movement, pp. 207-208.
[197] http://www.qassam.ps/martyr-20-Wael_Nassar.html; *see also* http://www.alqassam.ps/arabic/news1.php?id=16172, *and also* http://www.alqassam.ps/arabic/sohdaa5.php?id=1033.

Wa'el Nasar together with Sheikh Ahmed Yassin was published in one of Hamas's official publications.[198]

b.  Wa'el Nasar, one of the veteran members of the *Izz al-Din al-Qassam* Brigades, was born in 1973 in Gaza, studied at the Islamic University of Gaza, was a veteran of Hamas, and was arrested by Israel in 1991 for his activity in Hamas. He was imprisoned for four years by the Palestinian Authority, and was released at the beginning of the Second Intifada. He was also one of Sheikh Ahmed Yassin's bodyguards, and at the same time served as a senior Hamas military commander in the city of Gaza. Nasar was involved in firing mortars at Israeli settlements, and also initiated and commanded numerous terror operations. He was assassinated by Israel on May 30, 2004.[199]

### d. Conclusion

The Atzmona attack was not only praised by Hamas but was also considered one of the events that influenced public opinion in Gaza, due to a number of factors. First, the dead terrorist was relatively young. Second, he came from a family of Hamas operatives (two others of which were later killed in the service of Hamas). Lastly, his mother achieved iconic status for allegedly bidding him farewell before he set out to carry out the attack (thereby endorsing his "self-sacrifice" and encouraging him to go forward with the attack).

The mother of the terrorist is a Hamas operative and serves as a member of the Palestinian Legislative Council on behalf of Hamas. She does not hide her affiliation with Hamas, and takes pride in the death of her sons in attacks carried out in the name of Hamas.[200]

The reports that the operation was commanded by one of the senior commanders in Hamas – Wa'el Nasar – and that the operation was carried out with the approval of the military commander of Hamas – Salah Shehada – reinforce that Hamas was responsible for the terrorist attack.

Based on Hamas documents, its announcements, the memorial days for the terrorist attack, Hamas's boasting about taking responsibility, and the pictures and video films, I conclude, with

---

[198] http://web.archive.org/web/20070710152042/http://palestine-info.info/arabic/hamas/shuhda/2004/wael_nasar/syrah.htm.
[199] Guy Aviad, Lexicon of the Hamas Movement, p. 161.
[200] Muhammad was the only son who died in an attack he carried out. Nidal Farhat was killed in a "work accident" while experimenting with explosives, while Radwan was killed by the IDF.

a very high degree of probability (and, indeed, have no doubt) that Hamas was responsible for the suicide attack in Atzmona.

### June 18, 2002 – Suicide Bombing on Bus No. 32-A, Patt Junction, Jerusalem

#### a. The terrorist attack

On the morning of June 18, 2002 in the Gilo neighborhood in southern Jerusalem. a suicide bomber detonated a bomb on Bus No. 32-A while it traveled on Dov Yosef Street, killing 19 people, 17 of whom were local neighborhood residents. Israeli Prime Minister Ariel Sharon visited the scene of the bombing and, expressing his shock, stated "I haven't seen a horror like this in all the wars."

#### b. Evidence and Legal Attribution

##### 1) The assumption of responsibility

On the day of the bombing, Hamas issued an official announcement, which stated, "Military Announcement on behalf of the *Izz al-Din al-Qassam* Brigades. The war of the buses continues. O Sharon, the Qassami [member of the *al-Qassam* Brigades] martyr, the heroic holy warrior Muhamad Haza al-Ghoul has broken through Sharon's protective wall … Praise to God…" The announcement listed details of the operation and was signed in the name of "The Shahid *Izz al-Din al-Qassam* Brigades. The military wing of the Islamic Resistance Movement. Hamas-Palestine."[201]

The *Izz al-Din al-Qassam* Brigades also published an official announcement on the day of the bombing taking responsibility for the attack. At the top of the announcement, in the center of the page, is the symbol of the *Izz al-Din al-Qassam* Brigades. To the right of the symbol appears the inscription in Arabic "*Izz al-Din al-Qassam* Brigades, the military wing of the Hamas Movement, Information Office." To the left of the symbol appears the same inscription in English. The announcement was signed by "*Izz al-Din al-Qassam* Brigades, the military wing of the Islamic Resistance Movement – Hamas-Palestine" and stated that the person who carried out the attack was the Qassami [member of the *Izz al-Din al-Qassam* Brigades] martyr, the holy warrior and hero Muhamad Haza al-Ghoul, aged 24, a Masters student at al-Najah University. The announcement explicitly mentions the No. 32 bus, and emphasizes a number of times that the *Izz al-Din al-Qassam* Brigades took responsibility for carrying out the attack.[202]

---

[201] http://www.palestine-info.com/arabic/hamas/statements/2002/18_6_02.htm.
[202] http://www.alqassam.ps/arabic/byan_poup.php?id=4503.

In addition, in the al-Faraa Refugee Camp, where the suicide bomber lived, an announcement made via the loudspeaker system of the mosques, which publicized the suicide bomber's name, noted that he was responsible for a suicide bombing in Jerusalem, and took responsibility on behalf of Hamas for the suicide bombing in Jerusalem.[203]

### 2) Pictures

The Hamas website and the *Izz al-Din al-Qassam* Brigades' website published numerous pictures of Muhamad al-Ghoul. In some of the pictures al-Ghoul appears holding an M-16 rifle and wearing a bandana and scarf containing Hamas symbols. The pictures were also published in the *Izz al-Din al-Qassam* Brigades' *Book of Martyrs*.[204] On the Hamas website, on the page on which the suicide terrorist's pictures were published, it was written, "Special pictures of the Qassami martyr, the hero Muhamad Haza al-Ghoul, who carried out the 'martyrdom operation' near the settlement of Gilo, which caused the deaths of 19 Zionists … this high-quality operation was carried out on June 18, 2002."[205]

In addition, on al-Ghoul's "Will" page (*see* below), the official Hamas website published a picture of the terrorist dressed in a military uniform and holding an M-16 rifle. In the picture, al-Ghoul can be seen wearing a Hamas bandana on his forehead, and a scarf around his neck; both contain Hamas's symbols.[206]

---

[203] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/report.htm.
[204] http://www.palestine-info.com/arabic/spfiles/suhada_2005/sh_Nables/gol.htm; http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/algol.htm; http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/waseyah.htm; http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=201; http://web.archive.org/web/20040407084011/http://www.palestine-info.info/arabic/palestoday/intifada_photos/photo226/photo226.htm.
[205] http://web.archive.org/web/20040407084011/http://www.palestine-info.info/arabic/palestoday/intifada_photos/photo226/photo226.htm.
[206] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/waseyah.htm.






The official Hamas website also published the picture of Ali Musa Alan, an *al Qassam* Brigades' commander in the southern West Bank and the individual who sent Muhamad al-Ghoul to carry out the suicide bombing on the No. 32-A bus at Patt Junction in Jerusalem. The picture appeared underneath the caption "Ali Musa Alan, the Qassami commander, who caused Sharon a headache":[207]



---

[207] http://www.palestine-info.com/arabic/spfiles/suhada_2005/bet_lahem/alaan.htm.

The following poster was prepared by Hamas following the death of Muhanad Taher, who had recruited Muhamad al-Ghoul to be a suicide bomber. The poster includes the pictures of suicide bombers whom Taher had dispatched for terrorist operations. On the poster is written, "The martyr, the commander, Engineer No. 4."[208]



### 3) The "Will"

As mentioned above, the suicide terrorist's Will was also published on Hamas's official website.[209] In his "Will" – in which he admitted his intention to carry out the suicide bombing – al-Ghoul recounted that he had twice previously attempted to carry out a suicide bombing, but ultimately did not carry them out. The official Hamas website, which published the Will, also revealed that al-Ghoul had written previous "Wills."[210]

Al-Ghoul's "Will" was also published on the official website of the *Izz al-Din al-Qassam* Brigades, on a page devoted to the suicide bomber. In the "Will" published on this site, al-Ghoul thanked Allah for having made him one of the select sons of the Hamas Movement.[211]

### 4) Material from Hamas websites

a.      The official website of Hamas published Muhamad al-Ghoul's biography, emphasizing the religious side of his personality and his actions for Islam. At the top of the page is his picture in a military uniform holding an M-16 rifle, and on his forehead is a bandana with Hamas symbols.[212]

---

[208] http://www.palestine-info.com/arabic/hamas/shuhda/2002/taher/photo.htm.
[209] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/waseyah.htm.
[210] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/report.htm.
[211] http://www.alqassam.ps/arabic/sohdaa5.php?id=201.
[212] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/serh.htm.

b.    The official website of the *Izz al-Din al-Qassam* Brigades published the biography and Hamas activities of Ali Alan, the terrorist who dispatched Muhamad al-Ghoul to the suicide bombing in Jerusalem.[213]

c.    As stated above, the official Hamas website stated that following the attack, the loudspeaker announcement system in the al-Faraa Refugee Camp reported the name of Muhamad al-Ghoul as the perpetrator of the suicide operation.[214]

d.    The official website of the *Izz al-Din al-Qassam* Brigades published a special page on the suicide bomber, with a poem in praise of him. The poem, which includes incitement against the Jews and compares them to monkeys, was designed to glorify and praise the suicide bombing al-Ghoul carried out. This page also included personal details about Muhamad al-Ghoul, and his "Will."[215]

e.    The official website of the Hamas Movement published Muhamad al-Ghoul's picture, underneath the caption, "The perpetrator of the sacrificial operation, the Qassami [member of the *Izz al-Din al-Qassam* Brigades], the hero Muhamad Haza al-Ghoul (24), who carried out the sacrifice operation in Gilo on June 18, 2002."[216]

f.    In June 2010, eight years after the terrorist attack, the official website of the *Izz al-Din al-Qassam* Brigades published an article marking the terrorist attack, in which the organization also acknowledged responsibility. The article included pictures of the suicide bomber, Muhamad al-Ghoul, and pictures from the scene, including pictures of the bus after the explosion.[217]

g.    Sheikh Ahmed Yassin, the founder of Hamas, stated after the Patt Junction bombing, "The act of sacrifice carried out by one of the organization's operatives on Tuesday, yesterday morning, near Jerusalem, was carried out in the framework of the Palestinian people's right to make use of the path of resistance and of self-defense."[218]

---

[213] http://www.alqassam.ps/arabic/sohdaa5.php?id=283.
[214] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/report.htm.
[215] http://www.alqassam.ps/arabic/sohdaa5.php?id=201.
[216] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/algol.htm.
[217] http://www.alqassam.ps/arabic/news1.php?id=16533.
[218] http://www.alqassam.ps/arabic/operations2.php?id=82.

### 5) Official Hamas reports

a.   The official website of the *Izz al-Din al-Qassam* Brigades published a detailed report on the suicide bombing carried out by Muhamad al-Ghoul. The first part of the report is set up in the form of a checklist of significant details about the attack:

> Type of operation: Martyrdom
>
> Method of executing the operation: Explosion on a Zionist bus
>
> Date of the operation: the morning of Tuesday, June 18, 2002
>
> Location of the operation: In the occupied city of Jerusalem
>
> Enemy losses: 19 Zionists killed, and 74 Zionists wounded.
>
> Organization executing [the operation]: The *Izz al-Din al-Qassam* Martyr Brigades
>
> Executed by: The perpetrator of the sacrificial operation, the Qassami [member of the *Izz al-Din al-Qassam* Brigades], Muhamad Haza al-Ghoul.[219]

b.   Qassamion referenced in its No. 15 issue from November 2009 a survey of Hamas operations in Jerusalem that included the suicide bombing on the No. 32 bus carried out by Muhamad al-Ghoul. The journal mentions that in this operation "20 Zionists were killed."[220]

c.   The official Hamas website published the names of those members of the organization killed in June 2002. The name of the suicide bomber appears at No. 34 of the list, and his address – al-Faraa Refugee Camp – is also given.[221]

### c. Official Documents of the Israeli Government

#### 1. Report of the Israel Security Agency on the Terrorist Attack at Patt Junction

---

[219] http://www.alqassam.ps/arabic/operations2.php?id=82.

[220] *See* page 24 in: http://www.alqassam.ps/images/userfiles/image/books/information_office/qassamion_15.pdf.

[221] http://www.palestine-info.com/arabic/palestoday/shuhada/june_2002.htm.

**"June 18, 2002**

**Explosion of a Suicide Bomber on a Bus in the Gilo Neighborhood in Jerusalem**
**19 killed and 50 wounded**
**The suicide bomber – Muhamad al-Ghoul"**

A resident of Nablus, **aged 22**, a Masters student of Religious Law at al-Najah University, blew himself up on an Egged No. 32 bus on Dov Yosef Street in the Gilo neighborhood in Jerusalem. The suicide bomber was located, recruited, and trained by the Hamas military infrastructure in Samaria. Following two failed attempts to send the suicide bomber for a terrorist attack, and following the interception of Qeis Adwan (one of the leaders of the Hamas infrastructure in Samaria), the suicide bomber was referred by Mazen Fukha to **Muhanad Taher**, who at that time headed the Hamas infrastructure in Samaria (since killed).

Muhanad Taher brought the suicide terrorist to **Khalil Marwan Khalil**, a member of the organization in Samaria (under arrest), who transported him to Azariya in East Jerusalem, where he was supposed to be collected, by prior arrangement, by **Ali Alan**, a Hamas military operative from Bethlehem. Ali was assisted by his colleague **Ramadan Mashahrah**, and his brother, **Fahmi Mashahrah**, both of whom were residents of East Jerusalem and holders of blue identity cards (under arrest), in planning and executing the  attack.

Following the gathering of intelligence carried out by Fahmi, the target for the attack was selected – the Egged No. 32 bus traveling from the direction of the Gilo neighborhood toward the center of Jerusalem. The target was chosen as attractive for carrying out a terrorist attack in light of the fact that it stops at the Beit Zafafa stop, an area with a large Arab population, where a person of Arab appearance would not be deemed suspicious. As part of the preparations for the terrorist attack, Fahmi traveled on the aforementioned bus route a number of times, purchased a multi-ride bus ticket, and even had it punched so that it could be used by the suicide bomber without arousing suspicion.

The suicide bomber was transferred to Bethlehem, where he stayed overnight, and the following morning he was transported to the area of Abu Dis in Jerusalem where Fahmi collected him, and the two continued their journey toward West Jerusalem, with Ramadan Mashahrah traveling ahead of them and warning them of Israeli checkpoints. Upon their arrival at the bus stop near Beit Zafafa, the suicide bomber was dropped off; he got on the bus and blew himself up."[222]

---

[222] W_S089692-93.

### 2) Announcement on behalf of the Israeli Ministry of Foreign Affairs

The Israeli Ministry of Foreign Affairs announcement of the terrorist attack was accompanied by photographs from the attack scene and stated that Hamas had taken responsibility for carrying out the bombing. The announcement also published the name of the terrorist, Muhamad al-Ghoul. The report provided details of the terrorist's route from northern Samaria to Jerusalem.[223]

### 3) Documents and legal proceedings in Israel

a.   **The indictment filed in the military court against Fahmi Eid Ramadan Mashahrah** – Hamas operative from the Jerusalem region, who was responsible for the logistics of the terrorist operation and for dispatching the suicide bomber to the bus stop, accused Mashahrah of membership in the *Izz al-Din al-Qassam* Brigades (first count). Pursuant to instructions from his recruiter, he prepared the vehicle for transporting the suicide bomber Muhamad al-Ghoul, carried out four preliminary reconnaissance runs in Jerusalem to identify a place to carry out the terrorist attack, and finally recommended the Gilo neighborhood as a place to carry out the terrorist attack. The indictment claimed that the defendant himself carried out a preliminary reconnaissance run, during which he traveled on the bus from the Beit Zafafa stop, which is where he recommended that the suicide bomber get on the bus. In addition, Mashahrah was accused of purchasing a multi-ride ticket for the bus in order to give it to the suicide terrorist so that he would not arouse suspicion. He was accused of driving the terrorist in his vehicle to a point 200 meters from the bus stop, handing him the bus ticket and instructing him to carry out the explosion after the bus made three additional stops. The terrorist got on the bus and some seconds later blew himself up.[224]

b.   **The verdict against Fahmi Eid Ramadan Mashahrah** – based on his admission, Mashahrah was convicted by the military court. The court sentenced him to 20 consecutive life terms.[225]

c.   **The indictment against Ramadan Eid Ramadan Mashahrah** – Hamas commander in the Jerusalem region. Mashahrah recruited his brother, Fahmi Mashahrah (see the two previous paragraphs), and initiated the terrorist attack. The indictment accuses Ramadan

---

[223]

http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/6/Suicide%20bombing%20at%20Patt%20junction%20in%20Jerusalem%20-%2018.

[224] W_S156882-30.

[225] W_S156740-41.

Eid Mashahrah of membership in the Hamas Movement and the *Izz al-Din al-Qassam* Brigades (first count); of recruiting his brother Fahmi into the *al-Qassam* Brigades, and using him to pursue the terrorist attack (second count); and of carrying out preparations for the terrorist attack including carrying out preliminary reconnaissance of the location intended for execution of the suicide bombing. Ramadan Mashahrah was also accused of providing money to his recruit to prepare the vehicle for transporting the suicide bomber; of receiving instructions from Ali Alan, the commander of the Hamas in Judea, who instructed him how to make contact with the suicide bomber and where to meet him; and of tracking and maintaining visual contact with the vehicle in which the suicide bomber was traveling, in order to ensure that he reached the target designated for the explosion (third count).[226]

d.     **The verdict against Ramadan Eid Ramadan Mashahrah** – the military court sentenced Ramadan Eid Mashahrah to 20 consecutive life terms.[227]

e.     **Report of the Israel Police crime laboratory** – the report confirms that this was a terrorist bomb, with its various components, including metal ball bearings intended to cause a large number of deaths. The report also includes laboratory proofs that the bomb indeed blew up on the bus.[228]

### d. Summary of the Suicide Bombing on Bus No. 32-A at Patt Junction

From all the materials described above, I conclude that the principal Hamas members involved in the terrorist attack – and the infrastructure that directed the terrorist attack – are as follows:

1.     **The suicide bomber – Muhamad al-Ghoul**: born in 1978, resident of the al-Faraa Refugee Camp in the northern part of the West Bank, and a Masters student in the Department of Islamic Law at al-Najah University in Nablus. Al-Ghoul joined Hamas while still a high school student. He continued his academic studies at al-Najah University and in 1997 joined the "Islamic Bloc" ("*al-Kutla al-Islamiya*") – the student organization of Hamas at the University. Al-Ghoul was a religious radical who knew the Quran by heart and who, during his Masters studies, expressed his willingness to carry out a suicide bombing. The fact that he wrote a "Will" three times proves, in my opinion, the extent of his zealousness and devotion, and the seriousness of his intentions.[229]

---

[226] *See* Appendix 1, pp. 1-9.
[227] *See* Appendix 1, pp. 10-11.
[228] W_S161544, 161573-75; W_S161542-43; W_S161545-53.
[229] http://www.palestine-info.com/arabic/spfiles/suhada_2005/sh_Nables/gol.htm,

Al-Ghoul was recruited to serve as the suicide bomber and was sent to Jerusalem to carry out his mission by **Muhanad Taher**, the commander of the *Izz al-Din al-Qassam* Brigades in the northern West Bank (*see* below for details regarding Taher). Pursuant to instructions received from his operator in Nablus, al-Ghoul traveled to the village of Azariya near Jerusalem – where he was received by the accomplices of **Ali Alan**,[230] commander of Hamas in the southern West Bank. The following day – June 18, 2002 – he was sent to blow himself up on the bus in Jerusalem.[231]

2. **Ali Musa Alan:** born in 1975. Resident of the al-Ayda Refugee Camp near Bethlehem. High school educated, married and the father of a son, he served as commander of the *Izz al-Din al-Qassam* Brigades in the southern West Bank. Alan was first arrested in 1994 for his involvement in terrorist activity for Hamas, and was sentenced to four and half years' imprisonment. At the beginning of the Second Intifada (al-Aqsa Intifada), he joined the *Izz al-Din al-Qassam* Brigades, was trained by bomb expert Ayman Halaweh in the preparation of bombs, and appointed by the Hamas high command as commander of the *Izz al-Din al-Qassam* Brigades in the southern West Bank.

Since 2002, he has become known as a person responsible for suicide operations. He used his connections with Nablus to obtain explosive belts, recruit suicide bombers and dispatched them into the Israel to carry out attacks. Among other things, he sent suicide bomber Muhamad al-Ghoul to carry out the suicide mission on the No. 32-A bus at Patt Junction in Jerusalem. He was killed on March 18, 2003, in a shooting battle with Israel Defense Forces troops. Following his death, the *Izz al-Din al-Qassam* Brigades published his picture and biography on its official website, taking pride in the fact that he "killed over 50 Zionists."[232]

3. **Muhanad Taher**[233]: commander of the *Izz al-Din al-Qassam* Brigades in the northern West Bank. Taher coordinated his activities at al-Najah University, where he was a member of the student council for Hamas. He was arrested by the Palestinian Authority

---

http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohmad_algol/serh.htm.

[230] For information regarding Ali Alan and his ties with Hamas, *see*: http://www.alqassam.ps/arabic/sohdaa5.php?id=283.

[231] Guy Aviad, Lexicon of the Hamas Movement, p. 232.

[232] Guy Aviad, Lexicon of the Hamas Movement, p. 220; *see also*: http://www.alqassam.ps/arabic/sohdaa5.php?id=283; *see also*: http://www.palestine-info.com/arabic/spfiles/suhada_2005/bet_lahem/alaan.htm ; http://www.alqassam.ps/arabic/news1.php?id=16755.

[233] For information regarding Muhanad Taher and his status within Hamas as one of the senior commanders of its military wing, *see, for example,* the detailed reports published about him on the Hamas website and on the *Izz al-Din al-Qassam* website: http://www.palestine-info.com/arabic/spfiles/suhada_2005/sh_Nables/mohanad.htm; http://www.alqassam.ps/arabic/news1.php?id=16755.

and was imprisoned for two years. Upon his release by the Palestinian Authority, at the outbreak of the Second Intifada, he began to operate as part of the *Izz al-Din al-Qassam* Brigades, and became commander of the *al-Qassam* Brigades in the northern West Bank. He was responsible for a series of terrorist attacks, among them the terrorist attack at Sbarro pizzeria in Jerusalem, the terrorist attack at the Dolphinarium, and the terrorist attack at the Park Hotel in Netanya. His expertise in preparing explosive devices earned him the nickname "Hamas' Engineer No. 4." On June 10, 2002, he was killed in a gun battle with Israel Defense Forces troops.[234]

### e. Conclusion

The suicide bombing on bus 32 in the Gilo neighborhood in Jerusalem on June 18, 2002, is a classic example of the *modus operandi* of the *Izz al-Din al-Qassam* Brigades. The terrorist attack was managed by the local command, which scheduled and coordinated the operations of cells in different areas of the West Bank, and succeeded in sending to Jerusalem a suicide bomber who lived in northern Samaria. This cooperation indicates that in the period under review, the regional command had control over Hamas cells in different regions, and these cells operated not randomly, but in line with instructions and guidance they received from the command.

Muhanad Taher and Ali Alan were senior commanders in Hamas. Taher commanded the northern region of the West Bank, while Alan commanded the southern region of the West Bank. The cooperation between them facilitated the suicide bombing.

The suicide terrorist bomber was recruited by Taher. As a religiously fanatical young man, there was no need to convince al-Ghoul to carry out the suicide bombing. He chose to carry out the operation of his own free will.

Al-Ghoul is an example of a member of the Islamic Bloc, the student arm of Hamas, who made a rapid transition from political activity and religious preaching as part of the *Da'wa* to military activity and willingness to carry out a suicide bombing.

As part of the coordination between Taher and Alan, Taher was responsible for recruiting the terrorist and sending him to Jerusalem, while Alan was responsible for arming him with an explosive belt and transferring him to the site for carrying out the attack. For this mission, Ali Alan recruited Ramadan Mashahrah, who in turn recruited his brother, Fahmi Mashahrah, to

---

[234] Guy Aviad, Lexicon of the Hamas Movement, p. 111; *see also*: http://www.alqassam.ps/arabic/news1.php?id=16755.

assist in the operation. The Mashrah brothers were residents of East Jerusalem, and had Jerusalem identity cards. The two carried out a preliminary reconnaissance run and identified the bus stop at Patt Junction as a potential location for a suicide bombing.

Through coordination between Ali Alan and Muhanad Taher, the suicide terrorist was sent to Jerusalem. Ali Alan provided the explosive belt, and the two brothers, by prior arrangement, transported the terrorist Muhamad al-Ghoul to the chosen location. He got on the bus and blew himself up.

Based on the materials cited above, and my experience and familiarity with the *modus operandi* of Hamas, I conclude, with a very high degree of probability (and, indeed, I have no doubt) that Hamas was responsible for the suicide bombing carried out on June 18, 2002, at Patt Junction in Jerusalem.

_____
Ronni Shaked

$$02/12/2013$$
Date

# Exhibit 7

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF NEW YORK
    --------------------------------------------x
3   MOSES STRAUSS, et al.,

4                           Plaintiffs,

5       -against-

6   CREDIT LYONNAIS, S.A.,

7                           Defendants.
    --------------------------------------------x
8   BERNICE WOLF, et al.,

9                           Plaintiffs,

10      -against-

11  CREDIT LYONNAIS, S.A.,

12                          Defendants.
    --------------------------------------------x
13

14                          One Liberty Plaza
                            New York, New York
15
                            February 12, 2014
16                          10:15 a.m.

17

18      Videotaped Deposition of RONNI SHAKED,

19  before Shari Cohen, a Notary Public of the

20  State of New York.

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York 10022
                    212-750-6434
25                  REF:  106037

```
 1                          SHAKED
 2   what you're saying, does this report reflect
 3   all of the opinions you propose to express in
 4   these cases concerning the five attacks and
 5   does it contain all of the facts that you
 6   rely upon in reaching those opinions?
 7              MR. UNGAR: Objection to form
 8         and compound.
 9              MR. FRIEDMAN: Do you want me
10         to break it up and take more time?
11              MR. UNGAR: I just want to put
12         the objection on the record.
13              MR. FRIEDMAN: Do you want me
14         to break it up and take more time?
15              MR. UNGAR: I think it would be
16         clearer to do one at a time because
17         the answer to one of them I don't
18         think is the one you asked the first
19         time.
20              MR. FRIEDMAN: Exactly.
21    Q.    My first question is does this
22   report contain all the opinions that you
23   intend to express concerning the five attacks
24   that you cover?
25    A.    The report contains all the
```

1                          SHAKED

2    opinions and all the facts connected with all

3    the attacks and not everything  -- everything

4    that I was able to find in my research. It's

5    possible that there was a piece of paper or a

6    piece of information that escaped me and I

7    could not put my hand on.

8              Q.    Did anyone help you with your

9    research for this report?

10             A.    No.

11             Q.    The documents that you refer to

12   in the footnotes in your report, did you

13   obtain all of those on your own or were any

14   of them provided to you by someone else?

15             A.    To the best of my recollection

16   and my knowledge all the footnotes in the

17   report were collected by myself except maybe

18   and I would have to check all the footnotes

19   now maybe a remark that I received from the

20   counsel of the plaintiffs and if it exists

21   and I would have to check it I indicated it

22   which I customarily do I indicated that I

23   received it from the plaintiffs.

24             Q.    Are all of the documents you

25   rely on identified in your report?

1          SHAKED

2              MR. UNGAR: Objection to form,

3          vague.

4          A.    I did to the best of my ability

5     to make sure that they would all be

6     identified and if I made a mistake here or

7     there, but I believe that I did the best to

8     the best of my ability to identify.

9          Q.    Are you aware of any documents

10    that you relied on that are not identified in

11    your report?

12         A.    I'll give you an example from

13    the most recent period.  Two new books for

14    example.  One of the terrorists the murderer

15    Abdullah Barghouti and some other material

16    that was written in Gaza after the terrorists

17    were released in the deal that is going on

18    with John Kerry right now.

19         Q.    Are those materials that you

20    relied on in your report that you did not

21    identify in your report?

22         A.    I did not rely on these

23    materials because they are repetition and

24    reinforcement of my positions.

25         Q.    So let me go back to two

```
 1                    SHAKED
 2   questions ago.  Are you aware of anything
 3   that you relied on in writing this report
 4   that is not identified in this report?
 5              MR. UNGAR: Objection to form,
 6        vague.
 7        A.    I repeat my previous answer.  I
 8   did to the best of my ability and to the best
 9   of my professional knowledge to make sure
10   that everything would be contained here.
11   Unless there is something what's called a
12   slip of the pen and that may be a minor
13   mistake.
14        Q.    But as far as you know as you
15   sit here today everything you relied on is
16   identified in your report, correct?
17              MR. UNGAR: Objection, asked
18        and answered.
19        A.    Certainly to the best of my
20   estimation and to the best of my ability,
21   yes, except that occasionally the material
22   that is inside me, my knowledge, my
23   professional knowledge is so vast that I used
24   something from my professional experience.
25        Q.    Mr. Shaked, plaintiffs' lawyers
```

1              SHAKED

2         A.    That's right.  The Magid

3    Institute at the Hebrew University.

4         Q.    You taught that course in 2013?

5         A.    No, in the last month of 2013

6    and in 2014.

7         Q.    Could you please look at the

8    entry for 2014 under employment in your CV.

9    What university does that state the Magid

10   Institute is part of?

11        A.    It's a slip of the pen.  It's

12   not in Arab.  It's the Hebrew University

13   because in Hebrew Arabic and Hebrew it's just

14   the difference of one letter.

15        Q.    I just want to make sure that

16   in your --

17        A.    The letter bet and the letter

18   reish on the keyboard are next to each other.

19        Q.    I just want to make sure that

20   your CV says that you teach at the Arab

21   University in Jerusalem, but in fact you

22   teach at the Hebrew University in Jerusalm?

23        A.    Right.

24        Q.    The course that you are

25   teaching is entitled history of the Israeli

1                       SHAKED

2    Palestinian conflict; is that right?

3            A.    Yes.

4            Q.    This is an undergraduate

5    course?

6            A.    Yes, it's a course within the

7    undergraduate studies, yes.

8            Q.    In that course do you teach

9    anything about any of the attacks at issue in

10   these lawsuits?

11           A.    No because I talk about

12   different topics.

13           Q.    What topics do you talk about?

14           A.    Psychological -- sociological

15   aspects of the conflict like, for example,

16   narratives, collective memory, collective

17   recollection, orientation of collective

18   emotions and I include history inside this

19   topic because the purpose of the course is

20   not to tell about what's happening with

21   terror and such, but to show how the society

22   or community behaves and how a culture of

23   conflict is constructed.

24                 Of course I deal with the

25   aspect, the so-called aspect of violence,

```
 1                       SHAKED
 2    terror and resistance because according to my
 3    research it's part of the culture.
 4            Q.    But you don't cover
 5    specifically any of the attacks that are at
 6    issue in these lawsuits as part of your
 7    teaching, right?
 8                    MR. UNGAR: Objection, asked
 9            and answered.
10            A.    I don't cover that.  I don't
11    focus on them.
12            Q.    You stated that you're a
13    researcher at the Truman Research Institute?
14            A.    That's right.
15            Q.    For how long have you done
16    that?
17            A.    Since 2012.  The school year.
18            Q.    Is that position part of your
19    continuing doctoral studies?
20            A.    This position positions me as
21    part of the Palestinian desk and it enables
22    me to continue my doctoral studies.
23            Q.    What subjects do you research?
24            A.    I research the ethos of the
25    conflict of the Palestinian society.
```

```
1                        SHAKED

2         Q.     The ethos of the conflict of

3    the Palestinian society?

4         A.     Yes.

5         Q.     From a sociological and

6    psychological perspective?

7                   MR. UNGAR: Objection to form.

8         A.     From the perspective of social

9    psychology.

10        Q.     You're continuing your doctoral

11   studies that you told us about in 2011,

12   correct?

13        A.     Actually I'm in the last stages

14   of finishing it.

15        Q.     You will soon submit your

16   dissertation entitled, "The Ethos of Conflict

17   in the Palestinian Society", right?

18        A.     That's right.

19        Q.     Does that dissertation address

20   any of the attacks that are at issue in these

21   lawsuits?

22        A.     No.

23        Q.     Has any of your research at the

24   Truman Research Institute addressed any of

25   the attacks at issue in these lawsuits?
```

1                          SHAKED

2          A.     No.

3          Q.     When you receive your

4   doctorate, Mr. Shaked, and congratulations on

5   your continuing studies, in what field will

6   your doctorate be in?

7          A.     Ph.D. in philosophy.

8          Q.     So you are pursuing a Ph.D.

9   from the philosophy department?

10         A.     No, the name is Ph.D. from the

11  department of -- Middle East department.

12         Q.     The Ph.D. will be in philosophy

13  so you will be a doctor of philosophy?

14         A.     Yes.

15         Q.     The specific area of philosophy

16  you're specializing in in your studies is the

17  ethos of conflict in Palestinian society,

18  right?

19         A.     Correct.

20         Q.     Sincerely congratulations on

21  your studies.

22         A.     I hope in two months.

23         Q.     Your CV also states that in

24  January of 2013 you served as a commentator

25  on Palestinian matters on the Knesset

```
 1                    SHAKED

 2          Shaked, marked for Identification.)

 3          Q.    Mr. Shaked, let me show you

 4   what the reporter marked as Exhibit 36 which

 5   is the supplemental expert report you

 6   submitted in these cases.  If you look at

 7   page 2 under the heading scope of the

 8   required work, you wrote, "In May 2009

 9   counsel for the plaintiffs asked me to

10   provide an expert opinion on the question of

11   whether Hamas was involved in the recruiting,

12   planning and perpetration of the following

13   suicide bombings" and then you listed several

14   bomb, and if you look on to page 3, you

15   wrote, "Counsel for the plaintiffs also asked

16   me to provide an expert opinion with respect

17   to the question of whether Hamas had been

18   involved in the recruiting and perpetration

19   of the following terrorist attacks --

20                MR. UNGAR: Perpetration.

21          Q.    "Perpetration of the following

22   terrorist attacks" and then you listed other

23   attacks.  Do you want to interpret that?  If

24   you look at your most recent report Exhibit

25   34 you just launched on page 1 into
```

1                              SHAKED

2    discussing the first of the five attacks that

3    you address.  With that background my

4    question is the following. Is the scope of

5    the work or is the description of the scope

6    of the work -- of the required work that you

7    put in your last report, would you describe

8    the scope of the required work for your

9    newest report in the same terms merely

10   substituting the five additional attacks for

11   the attacks listed in your prior report?

12                    MR. UNGAR: Objection to form.

13        Q.    Or, in other words, is the

14   scope of the required work for your most

15   recent report about the five attacks the same

16   as it was for the prior attacks except that

17   now you are dealing with five different

18   attacks?

19        A.    I learned about those terrorist

20   attacks and it's the same scope because I

21   wanted to continue with the same line, the

22   same methodology and the same way.

23        Q.    You anticipated my next

24   question, but let me just be clear.  In your

25   prior report you have a section beginning on

1                              SHAKED

2      page 3 that describes your methodology and I

3      think based on your last answer your answer

4      to this question will be yes, but just to

5      confirm, did you follow in your most recent

6      report with respect to the five additional

7      attacks the same methodology that you

8      describe in your prior report?

9              A.     Yes.

10             Q.      Mr. Shaked, at your prior

11     depositions, the Credit Lyonnais deposition

12     and the Nat West deposition, you answered

13     questions that I asked you about your

14     methodology and you describe your methodology

15     further in response to my questions.  I take

16     it that your description of your methodology

17     in your prior testimony applies equally to

18     the methodology that you used for your most

19     recent report, correct?

20                     MR. UNGAR: Objection to form.

21             A.     I can't remember what I

22     answered to the questions that I was asked at

23     the time, it was a long time ago, but I use

24     the same methodology the same ways of

25     supposition, analysis and conclusions as

```
 1                    SHAKED
 2  before.
 3        Q.   When did you last read the
 4  transcripts of the two days of deposition
 5  testimony that you gave in this office?
 6        A.   I think it will be in the
 7  course of the last month.
 8        Q.   Did you see anything in your
 9  prior testimony that you wish to change?
10             MR. UNGAR: Objection to form.
11             MR. FRIEDMAN: What's the form
12        objection?
13             MR. UNGAR: It's a very broad
14        question.  For the record he said he
15        might have seen it within the last
16        month.  Big transcripts.  If he
17        remembers anything that stands out,
18        then point it out.
19        Q.   Mr. Shaked, having read the
20  transcripts more or less in the last month,
21  is there anything you can tell us today that
22  you wish to change in your prior testimony?
23        A.   No, as I said, I also found in
24  new materials that the reliance and the
25  methodology were all right.
```

1                      SHAKED

2     files before you were engaged by the

3     plaintiffs to prepare your expert report; is

4     that correct?

5              A.    To the best of my recollection

6     it is correct.

7              Q.    Where physically do you keep

8     these files?

9              A.    In two places today in my room,

10    in my research room at the university where I

11    have four or five meters of documents there

12    and the rest at home whatever my wife would

13    allow.

14                  MR. FRIEDMAN: I'm going to ask

15           the reporter to mark as Exhibit 37 a

16           Hebrew language document provided to

17           us by plaintiffs.

18                  (Shaked Exhibit 37,

19           Document, marked for Identification.)

20             Q.    I will represent to you, Mr.

21    Shaked, this is a document that you cite in

22    your most recent report.

23             A.    Correct.

24             Q.    From where did you obtain

25    this?

1                          SHAKED

2          A.    I obtained this document

3    directly from the ISA.

4          Q.    Is there a specific person at

5    the ISA from whom you received this document?

6          A.    I received it from Avi Shy in

7    the communication department.

8          Q.    You received it while you were

9    working at Yediot?

10         A.    Correct.

11         Q.    Tell me how do you know looking

12   at this document that you received it from

13   Avi Shy at Shabak?

14              MR. UNGAR: Objection to form.

15         A.    Besides the fact that I

16   received it in my hand, not just me, but also

17   several other journalists as well together my

18   experience from the ISA from the Yediot

19   Aharonot and also from my research taught me

20   that this is the ISA's language.  In

21   addition, this report had been published in

22   the middle of the Intifada and towards 2008

23   and a similar report was issued and it has on

24   it the logo of the ISA because the ISA came

25   out of hiding.

```
1                        SHAKED
2         Q.     This document does not bear the
3    logo of the ISA, correct?
4         A.     Not here.
5         Q.     You can put that to one side.
6    For each of the five attacks you address in
7    your report you refer to claims of
8    responsibility for those attacks that appear
9    on websites that you attribute to Hamas,
10   correct?
11        A.     Yes, but if I may explain
12   something.  In my work trying to find the
13   organization that is behind a certain
14   terrorist attack I can say I work like a
15   physician.  If I come to a doctor and say I
16   have a pain in my elbow, I make several
17   various suppositions of where the pain may be
18   coming from and I try to analyze the entire
19   situation and only then I arrive at the
20   result.
21                I mean in this case that the
22   subject of claiming responsibility or the
23   subject of the ISA or the subject of the
24   police I analyze all the material together
25   and only then I arrive at the result, in
```

1                          SHAKED

2    other words, I try to look at the entire

3    picture and not only at a little segment of a

4    picture and the gathering of all the

5    materials, the supposition and the analysis

6    gives me at the end of the day the result

7    that is not dependent on the several minutes

8    or the hour of the given event, but it gives

9    me a perspective of the several days that

10   thanks to which I can draw the correct

11   conclusions.

12              This is different than my

13   journalistic work because as a journalist I

14   have to come up with an immediate result of

15   the exact moment which I'm analyzing and

16   therefore it happens several times that there

17   were mistakes made and on the other hand in

18   this type of report with a perspective of

19   more time I can arrive at different results

20   by analyzing let's say the totality of data

21   and arriving at a complete picture.

22              MR. FRIEDMAN: I want to state

23          that I may at some point move to

24          strike all of that answer other than

25          the word yes which was responsive to

SHAKED

1

2    infrastructure was directed to locate a

3    target. I'm reading it from English, a

4    suitable target, while the infrastructure in

5    Jenin was asked to locate a candidate.  I

6    think it's more or less word for word as it

7    was cited.

8         Q.    Does Mr. Aviad's book say that

9    the infrastructure in Ramallah was asked to

10   send the suicide bomber to Jerusalem?

11        A.    No.  It only asks to carry out

12   an attack.

13        Q.    You can put that aside.  Let's

14   talk about the December 1, 2001 bombing on

15   Ben Yehuda Street?

16        A.    Yes.

17        Q.    First of all you write the car

18   bomb exploded outside the editorial offices

19   of Yediot Aharonot and therefore when you

20   heard the explosion you went downstairs to

21   the attack scene, correct?

22        A.    That's correct, it was right

23   under my window.

24        Q.    Are the opinions you express in

25   your report premised at all on anything you

1                        SHAKED

2      observed at the attack scene?

3            A.     No.

4            Q.     Look at footnote 134 on page 31

5      of your report.  Read it to yourself, please.

6            A.     I read it.

7            Q.     What's your source for the

8      information you report that such a telephone

9      call was received at the offices of the BBC?

10           A.     I can assume that it was

11     Muhammad Badran from the BBC who called me.

12           Q.     You believe this is based on a

13     telephone call that you received from an

14     employee of the BBC?

15           A.     On the telephone conversation

16     and on the quick news communica that was

17     shown on the BBC later on.

18           Q.     That you witnessed -- that you

19     saw?

20           A.     There is a person who

21     constantly observes the news on the

22     television and he saw it.

23           Q.     At the offices of Yediot?

24           A.     Correct.

25           Q.     What you have in this footnote

1                     SHAKED

2    is your personal recollection of what you

3    were told by an employee of the BBC or what

4    you were told by a fellow employee of Yediot

5    Aharonot that he saw on the BBC television

6    news; is that correct?

7              A.    This announcement was published

8    because just upon listening or hearing and

9    without doing a cross verification I wouldn't

10   have cited it.

11             Q.    Mr. Shaked, my question is not

12   a trick question.  I just want to establish

13   the fact.  Let me finish.  What you wrote in

14   this footnote is based on your personal

15   recollection of what you were told by an

16   employee of the BBC and/or what you were told

17   by a fellow employee of Yediot that he or she

18   had seen on the BBC television news; is that

19   correct?

20             A.    Yes.

21             Q.    Look at page 33 of your report.

22   The photograph on the top of that page is a

23   photograph from what you characterize as the

24   official website of the al-Qassam Brigades;

25   is that right?

1                          **SHAKED**

2    question was whether it was consistent with

3    your understanding of the practices of

4    Israeli authorities at the time that if a

5    terrorist was killed while perpetrating an

6    attack in Atzmona that the authorities would

7    have provided the terrorist's body to his

8    family?

9                    MR. UNGAR: Same objection.

10        A.    To the best of my knowledge

11   that was the reality.

12        Q.    So to the best of your

13   knowledge it was the practice of the Israeli

14   authorities at that time to provide the body

15   of a deceased terrorist in Gaza to his or her

16   family?

17                    MR. UNGAR: Objection to form,

18        asked and answered.

19        A.    To the best of my recollection

20   this was the reality.

21        Q.    Turn to page 44, please.

22        A.    Yes, please.

23        Q.    As to the photograph at the

24   bottom of this page you describe this photo

25   as having been taken prior to Muhammad

1                        SHAKED

2    Farhat's departure for the terrorist attack

3    in Atzmona, correct?

4          A.    Correct.

5          Q.    What's your basis for saying

6    that?

7          A.    I saw several movies on the

8    internet besides the movie by Barbara Victor.

9    I read about it on the Hamas website and in

10   the life story of Maryam Farhat.  From the

11   filmography I had the impression that these

12   were real photos.

13         Q.    Independent of what you saw on

14   websites or in films, you yourself based on

15   your own personal knowledge do not know

16   whether this photo was taken prior to Mr.

17   Farhat's departure for the terrorist attack

18   in Atzmona, correct?

19         A.    The murderer Farhat.  Of course

20   I don't know because I wasn't there.  Based

21   on all my knowledge and everything that's

22   connected with the woman's status and the

23   woman's position and especially mothers of

24   dead people, people who are killed that's

25   taken from the Karan I have the basis to

1                      SHAKED

2    believe that this is a real picture although

3    I wasn't there.

4                MR. FRIEDMAN: I move to strike

5          that.

6          Q.   Look at the top of page 45.

7    Sorry, before you do that, the bottom of page

8    44, what is the source that you cite in

9    footnote 178, can you describe that to me?

10         A.   We are talking about the

11   official website of the Hamas.  I have to see

12   exactly.  It's Palestine info.  It has very

13   extensive description of this operation.

14         Q.   You are talking about footnote

15   177, right?

16         A.   Yes.  You are asking about 178?

17         Q.   Indeed I am.

18         A.   It's a website in Gaza.  I

19   don't remember exactly what it is, but it's a

20   website in Gaza or maybe it's an excerpt from

21   a short film that I took.

22         Q.   You don't know?

23         A.   I don't remember.

24         Q.   An excerpt from a short film

25   that you took?

1                          SHAKED

2          A.     No, God forbid, which I found

3    on one of the websites.

4          Q.     That you attribute to Hamas?

5          A.     It's not important.  To me the

6    photo is important, not who received it or

7    obtained it.

8          Q.     You are of the view that this

9    photo is reliable, correct?

10                MR. UNGAR: Objection to form.

11         A.     To the best of my recollection

12   it was taken in her yard, the yard of her

13   house.

14         Q.     The source that you took it

15   from stated that it was taken before his

16   departure from Atzmona, correct?

17         A.     I can't say it with certainty

18   because I don't remember what was written

19   there.  I would have to check on it.

20         Q.     You don't recall whether the

21   website contains the characterization of the

22   photo that you put in your report?

23                MR. UNGAR: Objection to form.

24         A.     I believe that what I wrote is

25   correct and what I took from the website.

1                        SHAKED

2          Q.    If you would like, Mr. Shaked,

3    I will show you that website and you will see

4    that it merely contains the photo so my

5    question for you is the following.  You wrote

6    in this report which you signed and which you

7    testified is true and accurate in all

8    respects that this photo was taken of Mr.

9    Farhat with his mother prior to his departure

10   for the terrorist attack in Atzmona and my

11   question is what is your basis for saying

12   that?

13                    MR. UNGAR: Objection, asked

14        and answered.

15         A.    From professional knowledge of

16   whoever dealt with films this is not a still

17   photo, it's a photo from a film from a moving

18   film.  I wrote here that this is a photo of

19   him and his mother that was taken before him

20   going to Atzmona without citing the website,

21   just only attributing the photo to it.

22         Q.    So I ask you again what is your

23   basis for saying in your report that this

24   photo was taken prior to his departure for

25   the terrorist attack in Atzmona?

1               SHAKED

2       A.    A, the movies that I saw,

3   especially the movie by Barbara Victor.  B,

4   to the best of my recollection there are

5   other websites which contain the photo of

6   Abdullah Farhat and his mother.  I wanted to

7   show here in this picture the culture that

8   existed in the Palestinian society at that

9   time concerning attacks and suicide attacks,

10   terror attacks and suicide attacks.

11       Q.    So you agree with me that your

12   characterization of this photo is not

13   revealed in the website that you cited for

14   the statement, correct?

15              MR. UNGAR: Objection to form.

16       A.    It's not cited and I don't cite

17   anything either.

18       Q.    So just to make sure the record

19   is clear, your characterization of this photo

20   is based on something that you have not

21   disclosed in your report, correct?

22              MR. UNGAR: Objection to form.

23       A.    I indeed wrote my report from

24   an official Hamas website that Mrs. Farhat

25   parted from or that the son parted from his

1                          SHAKED

2    mother before going out to carry out an

3    operation.

4            Q.    That's not what this sentence

5    in your report says.  Your sentence in the

6    report says as follows, "The following is the

7    photo taken together with his mother prior to

8    his departure for the terrorist attack in

9    Atzmona."  You've agreed with me that the

10   website you cite for -- that you identify for

11   that statement does not contain that

12   information so what is your source for that

13   information?

14               MR. UNGAR: Objection to form.

15           A.    I agree that maybe this exact

16   citation is not on the website, but from my

17   experience, my knowledge and my ability to

18   evaluate it as a professional this is a

19   picture that was taken before his going out

20   to an operation.

21               MR. FRIEDMAN: Hold that

22        thought and we'll sit here and he will

23        change the tape.

24                THE VIDEOGRAPHER: We are now

25        off the record.  The time is 4:28

1                    SHAKED

2           going to finish this line of

3           questioning.

4                MR. UNGAR: I'll give you two

5           minutes.

6                MR. FRIEDMAN: You don't give

7           me anything.  I want to finish this

8           line of questioning.  If you want to

9           walk out walk out, but I'm entitled --

10          if you really had to go, you would let

11          me finish, okay.

12          Q.   Mr. Shaked --

13               MR. UNGAR: You can have two

14          minutes.

15               MR. FRIEDMAN: What?

16               MR. UNGAR: You can have two

17          minutes and then we are going to take

18          a break.

19               MR. FRIEDMAN: Are you going to

20          talk to him during the break?

21               MR. UNGAR: If he's going to

22          the restroom with me.

23               MR. FRIEDMAN: Are you going to

24          talk to him about his testimony during

25          the break?

1                    SHAKED

2              MR. UNGAR: We are taking a

3          break because we've been going for an

4          hour and 15 minutes.

5              MR. FRIEDMAN: Are you going to

6          talk to him about this testimony?

7              MR. UNGAR: No, we will not

8          talk about the testimony at all, but I

9          would still like to take a break in a

10         minute or two.

11         Q.    Mr. Shaked, how long before Mr.

12   Farhat departed for the attack was this photo

13   taken?

14             MR. UNGAR: Objection to form.

15         A.    I don't know because I wasn't

16   there.  I believe to what it says that before

17   he went out this photo was taken.  It might

18   have been a day, two days, an hour, two

19   hours.

20         Q.    You said you believed to what

21   it says that before he went out this photo

22   was taken.  What is it, what says that to

23   you?

24         A.    In one of the Hamas websites

25   and I don't have the website in front of me

1                          SHAKED

2   it says that the son says good-bye to his

3   mother before going out on a mission or

4   operation.

5          Q.    It references this photo in

6   saying that?

7          A.    I can't say with certainty that

8   it references this photo.

9          Q.    What is it about your knowledge

10  of Hamas culture that tells you this was

11  taken prior to his departure for the

12  terrorist attack?  You said a few moments ago

13  that the statement is based on your knowledge

14  of Hamas culture.  What is it about your

15  knowledge of Hamas culture that tells you

16  this particular photo was taken prior to his

17  departure for the terrorist attack in

18  Atzmona?

19               MR. UNGAR: Objection,

20         mischaracterizes the testimony.

21         A.    I'll try to answer you standing

22  on one foot because it's a very long answer.

23  There are mothers of dead people and the

24  mothers are called in Arabic hansa.  If you

25  want to compare it to the Jewish tradition

1                    SHAKED
2      it's Hannah and her seven sons.  According to
3      the Muslim tradition there was a poet by the
4      name of Hantza Bint Amer who was very close
5      to the prophet Mohammad who sent off her sons
6      and they parted from her before going to a
7      battle for the prophet in order to be
8      shahids.
9                    Ever since then and especially
10     during the Intifada and especially within the
11     Hamas this model was adopted and there is
12     several examples both in Gaza and in the West
13     Bank of mothers whose sons became shahids who
14     said good-bye to the mothers before going
15     toward death.
16                    There are researches regarding
17     this phenomenon written by Palestinians.
18     This is a well known phenomenon and the
19     mothers become heroines just as Maryam Farhat
20     became a heroine.
21          Q.     That is the basis on which you
22     say that this photo was taken prior to his
23     departure for the attack?
24               MR. UNGAR: Objection to form.
25          A.     I cited the narrative here, but

1                          SHAKED

2     I hope you are going to see the film by

3     Barbara Victor which contains long segments

4     of the parting.

5                    MR. FRIEDMAN: I have two more

6          questions.

7          Q.    Did you cite Barbara Victor's

8     film in your report?

9          A.    No.

10         Q.    Does this photo appear in her

11    film?

12         A.    I don't remember whether this

13    particular photo appears, but other similar

14    pictures definitely.

15         Q.    You did not take this photo

16    from her film?

17         A.    No, unfortunately I don't have

18    the film.

19                    MR. FRIEDMAN: Let's take a

20         break.

21                    THE VIDEOGRAPHER: We are now

22         off the record.  The time is 4:38

23         p.m., February 12, 2014.

24              (Recess taken.)

25                    THE VIDEOGRAPHER: We are now

1                          SHAKED

2    you quote from on page 58, when was that

3    published?

4         A.    In my opinion it was published

5    a long time afterwards because it took a

6    while before the two brothers were arrested

7    and after their interrogation was completed

8    because according to the information

9    contained in the report it seems to me that

10   it was written after an interrogation.  I

11   won't be surprised if it was taken from the

12   annual report or a report that was written a

13   few months after.

14              MR. FRIEDMAN: Let's take a

15         break.

16              THE VIDEOGRAPHER: We are now

17         off the record.  The time is 5:17

18         p.m., February 12, 2014.

19              (Recess taken.)

20              THE VIDEOGRAPHER: We're now

21         back on the record.  The time is 5:26

22         p.m., February 12, 2014.

23         Q.    Mr. Shaked, if you look at page

24   55 of your report?

25         A.    All right.

1                    **SHAKED**

2          Q.    Your description of al-Ghoul's

3    Will is based on what you saw on websites

4    that you attribute to Hamas, right?

5          A.    Yes.

6          Q.    The next section, section 4,

7    captions material from Hamas websites.

8    Again, that's all based on what you read on

9    websites that you attribute to Hamas,

10   correct?

11         A.    That's right.

12         Q.    On page 57 the section

13   captioned official Hamas reports, that's all

14   material that you saw on websites that you

15   attribute to Hamas, correct?

16         A.    Correct.

17         Q.    Then you go on to cite a report

18   that you attribute to the ISA, correct?

19         A.    Yes.

20         Q.    Mr. Shaked, with respect to all

21   of the ISA reports that you refer to in your

22   report here, am I right that you have not

23   spoken to anyone from the ISA to learn more

24   about what is stated in those reports?

25         A.    I was present at the ISA's

1                          SHAKED

2          A.    Yes, first court, yes.

3          Q.    I don't know what you mean by

4    first court?

5          A.    It's just a word that appears

6    here first court, but these are documents

7    from the court.

8          Q.    From the military court?

9          A.    Yes.

10          Q.    So document 3A that you refer

11   to, the indictment, that's a military court

12   indictment, correct?

13          A.    Of course, terrorists are only

14   tried in military court, terrorists from the

15   West Bank from the territories.

16          Q.    Document 3B, the verdict that

17   you describe, that's also a military court

18   verdict, correct?

19          A.    Yes.

20          Q.    And document C, that's a

21   military court indictment, correct?

22          A.    Yes.

23          Q.    And document D, that's a

24   military court verdict, correct?

25          A.    That's what I wrote.

1                       SHAKED

2          Q.     That's your understanding?

3          A.     Yes.

4          Q.     You describe the first document

5     that you refer to as a military court

6     indictment against Fahmi Eid Ramadan

7     Mashahrah, correct?

8          A.     Yes.

9                 MR. FRIEDMAN: I'm going to ask

10            the reporter to mark as Exhibit 46 the

11            document you refer to as the

12            indictment against Fahmi Eid Ramadan

13            Mashahrah.  This is the document that

14            you cite in your footnote 224.

15                 (Shaked Exhibit 46, Document,

16            marked for Identification.)

17         Q.     This is, Mr. Shaked, an

18    indictment of someone named Fallah Tahar

19    Abdallah Nada, correct?

20         A.     Yes.

21         Q.     So what you refer to in your

22    report as an indictment against Fahmi Eid

23    Ramadan Mashahrah is actually an indictment

24    of Fallah Tahar Abdallah Nada, correct?

25         A.     There is simply a mistake here,

1                          SHAKED

2    maybe a slip of the pen regarding the

3    citation.  We are dealing here with two

4    completely different people and this case

5    deals with the attack on -- just a minute --

6    the double attack on Ben Yehuda.

7          Q.    So the document that you

8    referenced in footnote 224 as the indictment

9    filed in military court against Fahmi Eid

10   Ramadan Mashahrah is not in fact that

11   indictment and in fact does not pertain to

12   the Patt Junction attack at all, right?

13         A.    I think that this is simply a

14   slip of the pen and maybe a mistake in

15   printing or typing on the computer.  This is

16   not an attempt to do anything else.  I have

17   no problem with producing it as soon as

18   possible in order to show that this was

19   really a slip of the pen and nothing else

20   because there are quotations, citations here

21   on this and not something else.

22         Q.    Have you ever spoken to Mr.

23   Aviad?

24         A.    No surprisingly.

25         Q.    Why surprisingly?

# Exhibit 8

**SECOND SUPPLEMENTAL REBUTTAL REPORT OF MOSHE AZOULAY**

I submit this Second Supplemental Rebuttal Report to address certain aspects of the reports submitted by Ronni Shaked, dated December 2, 2013 (the "Shaked Report"), and Dr. Eli Alshech, dated November 29, 2013 (the "Alshech Report"), in the lawsuits captioned <u>Strauss, et al. v. Credit Lyonnais</u> (Case No. 06-cv-702 (DGT)(MDG)) and <u>Wolf, et al. v. Credit Lyonnais</u> (Case No. 07-cv-914 (DGT)(MDG)), which I understand are pending in the U.S. District Court for the Eastern District of New York.  I previously submitted 3 reports in these lawsuits.  The first is dated December 8, 2009, which I will refer to as the "Primary Expert Opinion."  The second is dated July 1, 2010, which I will refer to as the "Rebuttal Report."  The third is dated March 31, 2011, which I will refer to as the "Supplemental Rebuttal Report."

The documents and other information I considered in forming the opinions I state in this report are identified in this Second Supplemental Rebuttal Report and the annexes thereto.

Since I have already conveyed in the framework of the Primary Expert Opinion and of my Rebuttal Report matters that shall be detailed in this Second Supplemental Rebuttal Report, I shall where appropriate refer below to the relevant sections of the Primary Expert Opinion or the Rebuttal Report.

**A.  <u>Shaked Report</u>**

I address below Shaked's characterizations of certain of the documents and other materials he identifies in his report as the basis for his conclusions that Hamas is responsible for the five attacks listed in Annex A to this report, and the admissibility of these documents under the Evidence Ordinance of Israel as proof of their contents under certain circumstances.

1.    <u>Statements attributed to the ISA & other government agencies</u>:

    1.1    <u>Nature and content of the documents:</u>

        I refer below to the documents and other materials identified in the Shaked Report containing statements Shaked attributes to the Israeli Security Agency (ISA) and other government agencies according to the numbers of the footnotes in which Shaked has cited these documents.

1

### 1.1.1    FN 17 – W_S089727

Shaked refers to this document as an ISA document, although it does not bear any symbol of, or reference to, the ISA. The document summarized 4.5 years of struggle, focusing on suicide bombing attacks.

Shaked cited the entire passage regarding the attack at Neve Yamin gas station (attack no. 1 on the list in Annex A).

According to the passage, the Hamas infrastructure in Kalkilya was responsible for the attack at Neve Yamin.

The portion of the passage regarding Tarek Barzilai's role in the attack – specifically, that Barzilai and Jibril Jibril sent the suicide bomber – is not consistent with certain military court files that Shaked cited.  For example, W_S161584 and W_S161576, show that Barzilai testified before the military court that he did not know that Fadi Amer was going to commit a suicide bombing. Barzilai also pleaded that he did not "recruit" Amer for military actions, and that Jibril Jibril met Fadi in a coffee shop that Barzilai owned in Kalkilya.

It should be noted that the military court did not believe Barzilai, and convicted him for assistance to cause death.

The ISA report cited by Shaked does not provide any source that proves Jibril is a Hamas member.

### 1.1.2    FN 19 – W_S089556

The document appears to be printed from the website of the Ministry of Foreign Affairs.  It is titled, "Suicide and Other Bombing Attacks in Israel since the Declaration of Principles (Sept 1993)."

The document contain a list of attacks that occurred in Israel from September 1993 through January 2007. It states that on March 28, 2001 two teenagers were killed in an attack at a gas station near Kefar Sava.

The document states that Hamas claimed responsibility for the attack.  There is no indication of the basis for this statement.

### 1.1.3    FN 43 -- SHAKED001277

http://mfa.gov.il/MFA/MFAArchive/2000/Pages/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale.aspx.

The link leads to an article on the website of the Ministry of Foreign Affairs about the bombing at Sbarro on August 9, 2001 (attack no. 2 on the list in Annex A). The article states that Hamas and Islamic Jihad claimed responsibility for the attack.

There is no indication of the basis for this statement.

### 1.1.4    FN 75 –

http://www.pmo.gov.il/NR/rdonlyres/81819B47-FE6C-47C2-B000-77B9A7EB9A5A/0/%D7%97%D7%95%D7%91%D7%A8%D7%AA%D7%9E%D7%97%D7%91%D7%9C%D7%99%D7%9D%D7%9E%D7%AA%D7%90%D7%91%D7%93%D7%99%D7%9D%D7%91%D7%9C%D7%99%D7%AA%D7%9E%D7%95%D7%A0%D7%95%D7%AA1.doc.

The link is inaccessible. To reach this file, I had to delete the "O" from the "PMO" of the link. The corrected link leads to a word document named: "*suicide bombers notebook without pictures 1*."

This is the same source as in FN 17 above. Shaked refers to this document as an ISA document, although it does not bear any symbol of, or reference to, the ISA.

Shaked cited a small part of the entire passage regarding the bombing at Sbarro on August 9, 2001 (attack no. 2 on the list in Annex A). According to the cited part of the document, the attack was planned and directed by Hamas, and the bomb was produced

3

by Abdalla Jamal, who was the Hamas engineer in the Judea region.

There is no indication of the basis for this statement.

### 1.1.5    FN 155 – W_S089715-16

This is the same source as in FN 17 and FN 75 above. Shaked refers to this document as an ISA document, although it does not bear any symbol of, or reference to, the ISA.

Shaked cited the entire passage regarding the explosion of two suicide bombers in Ben Yehuda Street in Jerusalem on December 1, 2001 (attack no. 3 on the list in Annex A). The article provides a description of the process of recruiting the suicide bomber, the approval of the attack and its execution.

The document states that Hamas claimed responsibility for the attack.

The information provided in this passage purports to be based on interrogations of certain individuals who were allegedly involved in the attack.

### 1.1.6    FN 156 – W_S089532

This is a press release made by the Prime Minister's Office on February 7, 2002.  Shaked provides the complete translation of the announcement.

According to the announcement, the suicide bombers of the December 1, 2001 attack were recruited to a Hamas cell and assisted by Hamas operatives from Ramallah and Bethlehem.

### 1.1.7    FN 222 – W_S089692-3

This is the same source as in FN 17, FN 75 and FN 155 above. Shaked refers to this document as an ISA document, although it does not bear any symbol of, or reference to, the ISA.

Shaked cited the entire passage regarding the explosion of a suicide bomber on a bus in the Gilo neighborhood in Jerusalem on June 18, 2002 (attack no. 5 on the list in Annex A). The document provides a description of the Hamas infrastructure in Samaria's process of locating, recruiting and training the suicide bomber. The process of planning and executing the attack was described as well.

### 1.1.8    FN 223 – SHAKED001702

http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/6/Suicide%20bombing%20at%20Patt%20junction%20in%20Jerusalem%20-%2018.

The link is inaccessible. I was able to access the document at the following link:

http://mfa.gov.il/MFA/MFA-archive/2002/Pages/Suicide%20bombing%20at%20Patt%20junction%20in%20Jerusalem%20-%2018.aspx

This is an article on the Ministry of Foreign Affairs website about the bombing at Patt Junction on June 18, 2002 (attack no. 5 on the list in Annex A).  According to its content, the announcement is based on a "preliminary investigation" and includes the full names, the age, the living cities  and the pictures of the victims. It also refers to publications that were made on June 19, 2002, the day after the attack. The many details contained in the announcement and the statement that it is based on preliminary investigation findings convince me that it  was made or at least updated after the day of the attack.

The article states that Hamas claimed responsibility for the attack, and that Hamas identified the suicide bomber as "**Muhamed al– Ral.**"  (According to Shaked, his name is "Muhamad al-Ghoul.")

The article also includes a description of the suicide bomber's route on the day of the attack.

As noted in the announcement, the information is based on a "preliminary investigation."

1.2      **Analysis of the documents pursuant to the Evidence Ordinance**:

1.2.1    **Prime Minister's Office and MFA press releases / spokesman announcements**

1.2.1.1   Certain of the documents described in paragraph 1.1 above are press releases made on behalf of the Prime Minister's Office or the Press Division of the Prime Minister's Office, or were published on the website of the Ministry of Foreign Affairs as public information. These publications are in most cases issued in real time, soon after and concerning the occurrence of terrorist attacks, and address the number of victims and preliminary investigative conclusions regarding the events.

Some of these documents are based on information received from the findings of investigations undertaken by agencies such as the IDF, the ISA and Israel Police.

1.2.1.2   I have been asked to address the evidentiary status of the documents discussed in paragraphs 1.1.1 – 1.1.8 above, and in particular whether they would be admissible under the Evidence Ordinance of Israel as proof of their contents, in a proceeding arising from a civil claim for damages against a defendant who was not a party to the events these documents describe, and other than as submitted in the nature of providing support for a qualified expert's offer of an opinion on a subject within

his competence based upon his specialized analysis or interpretation of those documents.[1]

1.2.1.3   All of these documents are hearsay evidence. None contains factual data received by Shaked using his own senses.   Further, they all rely on factual data and/or assessments of other third parties (ISA, IDF, Israel Police, etc.).  Because these documents constitute hearsay evidence, according to the general Evidence Laws of the State of Israel they are inadmissible as evidence of their contents, unless it is proven that they are within one or more of the exceptions of the rule that disqualifies hearsay evidence, as set forth by the Evidence Ordinance or by case law.

In the framework of the following analysis, I shall examine whether the documents addressed above, which constitute part of the factual foundation from which Shaked states his conclusions are derived, are included in any of the exceptions to the rule that disqualifies hearsay evidence, and therefore would be admissible as evidence in the type of civil proceedings described above.

1.2.1.4   Among the exceptions to the rule that disqualifies hearsay evidence and renders it inadmissible is one for institutional records. The definition of an institutional record and the requirements for proving that a document constitutes such a record are set forth in Sections 35 to 39 of the Evidence Ordinance.[2]

An institutional record is defined as "a document, including an output, which is executed by an institution during the regular course of activity of that institution."

---

[1]   I do not address this subject because I understand that it will be addressed under U.S. evidence law.  In any event, in my view, under Israeli evidence law, the documents attached to the Shaked Report are inadmissible under Israeli evidence law as proof of their contents, and providing them as exhibits to the Shaked Report does  not change their legal status in a manner that would cause an Israeli court to receive them in evidence as providing support for any expert opinions, because Shaked does not apply any specialized knowledge to analyzing or interpreting these documents, and instead merely cites and/or summarizes their contents.

[2]   The Evidence Ordinance [New Version] 5731-1971.

Section 35 of the Evidence Ordinance defines the term "institution" as including, among others, the "State." It also defines the term "output" by way of referring to its definition in the Computers Law,[3] which in turn defines this term as including "data, symbols, concepts or instructions that are generated, in any given way, by a computer."

1.2.1.5  Section 36 of the Evidence Ordinance states the requirements for proving that a document constitutes an institutional record.

First, the section determines the admissibility of an institutional record as proof of its content in every legal procedure, both criminal and civil, as an exception to the rule that disqualifies hearsay evidence; second, it determines the conditions for admissibility of a record as such. These two basic conditions must be satisfied for any institutional record. Further, when such a record is a computer output, an additional condition must be satisfied in order for the output to be admitted.

The basic conditions for admissibility of an institutional record are as follows:

- The first condition is that, in the course of its regular conduct, the institution enters a record of the event that is the subject of the document "proximate to its occurrence" (Section 36 (a) (1) of the Ordinance).

- The second condition is that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a) (2) of the Ordinance).

When the record is a computer output, the following must also be proven:

---

[3]    The Computers Law, 5755 – 1995.

8

- The method of generating the record attests to its credibility (Section 36 (a) (3) (a) of the Ordinance).

- The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation.

1.2.1.6   A party that wishes to submit the abovementioned documents as institutional records must prove that they fulfill these conditions, and this proof must be provided by sworn testimony by a witness who is competent to provide this proof.[4]

In State of Israel v. Ohana et al.[5] the court ruled as follows:

"The prosecution must prove the statutory conditions of admissibility of the institutional record so that it would be possible to submit it as evidence of the truth of its content, and only if no counter-argument is raised against it and it is consensual, it may indeed be submitted as such, without proving its conditions of admissibility. This is clearly evident from the wording of Section 36 ("if all these are upheld").[6]

"Moreover, in our opinion, the rationale underlying the requirement for proving the terms of admissibility in the previous Section 37 has not changed: the legal arrangement for submitting institutional records – similar to bank records in the past – not by the person conducting them, is an exception to the rules of evidence, and therefore it is understandable that anyone who wishes to use evidence in deviation from the rules of evidence must fulfill the very minimal requirement of proving that the conditions for its account as an institutional record have

---

[4]   Dr. Kedmi, Consolidated and Updated Version, 2009, 2nd Part, p 986.
[5]   Opening Motion 1120.04 Tel Aviv District Court; The State of Israel v. Rafi Ben Kalifa Ohana et al., published in NEVO.
[6]   Pages 5 and 6 of the court ruling.

9

been upheld (as had been required in the previous Section 37)."[7]

The court further specified as follows:

"We also do not accept the position of the prosecution's representatives by which, after they had submitted the documents, the defense is then transferred the burden of proving that it is not an institutional record. As explained hereinabove, this is not the correct order of things as the law prescribes. The institutional record shall be admitted as such, and as admissible to the truth of its content, inasmuch as there is consent to the document's submittal or insofar as the party submitting the document shall prove the existence of the conditions prescribed by the law. By its argument, the prosecution may be pointing to Section 36 (d) of the Evidence Ordinance, which determines that:

'In the event where evidence, by virtue of this clause, has been admitted, the second party shall be entitled to carry out a cross-examination of witnesses it has summoned for testimony, for the purpose of refuting the evidence, inasmuch as these witnesses are associated to the litigant submitting the evidence.'   However, in our opinion, the provisions of this clause do not transfer the burden of refuting the conditions for an institutional record, but rather deal with its own weight, after having already been 'admitted' as evidence and, in any case, this burden, as aforesaid shall not be transferred to a defense that has expressed its objection, but only after the prosecution proves the basic conditions of admissibility pursuant to Section 36 (a) of the Evidence Ordinance."[8]

---

[7]     Page 6 of the court ruling.
[8]     Section 7 of the court ruling on page 11.

10

1.2.1.7    In another case, Dr. Lotan v. The Israel BAR,[9] the court makes an important distinction between proof of the content of an institutional record, and proof of the truth of the content of an institutional record, and states that:

> "'Proof of the content' is proof of the record's authenticity, whereas proof of the truth of the content is as its name implies: proof of correspondence of the record's content to reality…. It is accepted by the two parties that proof of the record's truth of content, i.e. fulfillment of the conditions prescribed in Section 36 to the Evidence Ordinance, requires a testimony or affidavit." The Supreme Court made the same point in criminal appeal 347/88 Demianyuk v. The State of Israel, Padi 47(4) 227.

1.2.1.8    In the case of United Mizrahi Bank v. Plutnik[10] the defendant objected to the submission of a "certificate regarding institutional record of a bank entity" which was signed by two senior officials of the bank because it was not supported by an affidavit and because these officials did not testify in court and the defendant had no chance of cross-examine them. The court agreed with the defendant and declared this certificate inadmissible.

It may be concluded from the provisions of Section 36 of the Evidence Ordinance, from the court rulings addressed above and from the words of the scholar Dr. Kedmi in this matter, that when a party refuses to agree to the receipt in evidence of a document as an "institutional record," the party interested in submitting the document as such must prove by sworn witness testimony the existence of the prerequisites for admissibility of the document pursuant to Section 36 of the Evidence Ordinance. Regarding the basic conditions (Sections 36 (a) (1) and (2)), a witness must testify from his own

---

[9]    Administrative Petition 611/06 (Jerusalem) Dr. Michael Lotan v. the Israel BAR, published in NEVO.

[10]    Civil Case (T.A) 103072/97 United Mizrahi Bank v. Plutnik Uziel, page 4, published in NEVO.

11

personal knowledge that the conditions have been upheld, and regarding Section 36 (a) (3), a person must testify on behalf of the institution that generated the record.

1.2.1.9    Shaked cannot serve as a witness for purposes of proving the fulfillment of the conditions prescribed in Section 36 of the Evidence Ordinance, because he did not draft any of the documents he cites, he is not an employee of the institution that generated these documents, nor is he an expert in the field of computers and information security.

1.2.1.10    Even if the fulfillment of these conditions would have been proven by testimony from competent witnesses as required, it would still be necessary to examine whether they are admissible as evidence of the truth of the documents' contents due to other requirements, such as whether they are expressions of opinion or based on professional knowledge, in which event they could be submitted under Section 20 of the Evidence Ordinance [Physician certificate and Expert report], or whether they are merely information of investigative authorities that is inadmissible pursuant to Section 36 (c) of the Evidence Ordinance,   which renders inadmissible materials generated by investigative authorities in order to submit them in criminal proceedings. The contents of such documents – including reports of confessions, affidavits and the like – must be proven by witnesses with first hand knowledge of these matters.

1.2.1.11    The second relevant exception to the rule that disqualifies hearsay and renders it inadmissible is the exception that applies to "public certificates."    Section 29 of the Evidence Ordinance defines a "public certificate" as "a certificate of one of the bodies prescribed hereunder, which is an act of legislation, judgment or execution, or a record of such act, or part of the formal records of one of the bodies hereunder and, in this context, a certificate that is held as a record, whether held formally or in some other way; and these are the said bodies:

12

(1) The State of Israel or the sovereign authority over land outside of Israel;

(2) Government offices, a local authority, a court of law, any other body with judicial quasi-judicial authority, a notary or any other formal body of Israel or of a land outside of Israel (hereinafter: 'The Institutions'); and

(3) A civil servant, an employee of a sovereign authority over a land outside of Israel or a worker of an institution (hereinafter: 'Clerk')."

This does not entail every document that is generated by a public authority, but rather only a certificate that in itself constitutes an act of legislation, judgment or execution carried out by a public body or a record of such act.

"This definition emphasizes the fact that it involves a 'certificate' or a 'record' that personifies a 'governmental action' by law – contrary to an 'administrative action' – of the governmental bodies prescribed thereof, both Israeli governmental bodies and foreign governmental bodies."[11]

Documents that satisfy the criteria of Section 29 of the Evidence Ordinance are considered public certificates and are admissible in evidence as proof of their contents.

Section 32 of the Evidence Ordinance states that a document can be proven to be a public certificate by presenting the original document, or a verified copy of the original, or a copy certified and sealed by the authority holding the document or a copy certified by a Minister or other senior civil servant that satisfies the judge regarding the reliability of the certification of the

---

[11]    Dr. Kedmi, 2nd part, page 638.

13

document, or a copy of the document is certified and sealed by an Institution.

Case law establishes four additional criteria that a document must satisfy in order to be considered a "public certificate." In the Demianyuk case,[12] the court reaffirmed these criteria, as follows:

(a) The document must be prepared according to a legal duty to prepare it,

(b) It must be a kind of public document,

(c) There must be an intention to preserve it for the future, and

(d) It must be open to the public.

The rule is that when a document satisfies the criteria of Section 29 of the Evidence Ordinance, it is admissible only to prove its existence. When a party seeks to submit such a document in evidence for the truth of its contents, he must prove that the document also satisfies the four other criteria listed above.

1.2.1.12 The first question I shall try to clarify is whether the documents at issue constitute an "act of execution" or a record of an act of execution. In other words, do they meet the definition of an act that personifies "governmental activity" or do they constitute merely an "administrative activity"?

If it is concluded that the document constitutes "governmental activity," we must still verify whether such activity (such as a press release) is performed as an explicit statutory obligation, which is required by the first among the conditions determined by case law.

---

[12]    Criminal appeal 347/88 Demianyuk v. The State of Israel, Padi 47 (4) 227.

1.2.1.13 A document that satisfies the conditions for a public certificate constitutes admissible evidence for the truth of its contents, without the requirement for an attesting witness and without the second party, against which the document is submitted, having the right to cross-examination of the person who created the document, and therefore it is important to examine whether the document fulfills all of the conditions set forth by case law.[13]

1.2.1.14 The press releases and spokesman announcements on which Shaked relies are roughly divided into two types of statements. The first type is a collection of press releases concerning the occurrence of a terrorist attack and the details of the event, to the extent known at the time of publication. The second type is a collection of press releases concerning defensive operations carried out by the various security forces, such as the exposure, apprehension or assassination of terrorist operatives in encounters or initiated operations.

A review of the documents demonstrates that, apart from a factual report of the actual events, they also incorporate reports that are based on investigations carried out by the ISA or the Israel Police, and reports that certain organizations have claimed responsibility for an attack.

1.2.1.15 Thus, the press releases are not tantamount to a "legislative action" or a "judicial action," or a record of them.

The question I shall try to answer is whether these documents constitute "governmental action" or a "record of a governmental action."

I have examined the case law and the characteristics and types of documents that have been admitted by case law as public certificates, by virtue of their classification as a

---

[13]       Dr. Kedmi, 2nd part, p. 644.

governmental action. After examining the documents that have been admitted by the court as public certificates, I am convinced that, beside fulfillment of the conditions set forth in Section 29 of the Evidence Ordinance and the four other conditions prescribed by case law, they all share the following common characteristics that distinguish a document that is a "public certificate" from any other formal document of an administrative nature:

- They are tantamount to a declaration of a status by a legal body or of the status of rights and duties.

- They establish a judicial norm, or a new status, or rights and duties that did not exist before.

- They change a judicial norm, or an existing status, or the status of rights and duties.

1.2.1.16 To illustrate this conclusion, consider the following examples, from case law in Israel, of documents that have been admitted as public certificates, on account of the fact that they constitute a "governmental action":[14]

   a. <u>Birth certificate</u>, <u>marriage certificate</u>, <u>death certificate</u>, <u>travel certificate</u>, <u>passport</u>, <u>identity card</u>, <u>soldier card</u>, <u>records of the population census</u>.

    If issued by the entity authorized by law (both local law and foreign law), these certificates are tantamount to a public certificate that constitutes prima facie evidence of their contents.

    It is evident that the abovementioned documents are characterized by the fact that:

- They declare the status of a person (birth, marriage, divorce, death, citizenship, certificate of registration of a corporation, etc.).

---

[14]    Dr. Kedmi, 2nd part, pp. 652-661 and the court rulings he cites.

- Beside forming or changing a status, these certificates also form or change the rights and duties, e.g.:

  o Marriage certificate – the right to remarry and, on the other hand, the prohibition of bigamy.

  o Divorce certificate – rights for alimony over children and the duty of the parents to bear payments, etc.

  o Death certificate – also establishes a new status of legal heirs.

  o A corporation registration certificate subjects the corporation to rights and duties prescribed by the relevant law (companies, partnerships, associations, etc.).

  o Registration in the population census – by virtue of which a person has the right to elect and be elected, etc.

b. A confiscation order, an execution office report of an execution, property tax records, records at the Real Estate Regularization & Registration Dept., "governmental" aerial photos taken by the government for official purposes, records related to copyrights.

If legally issued by the authorized body, these documents constitute public certificates. These documents also bear the same "identifying marks" of an act of execution, since they establish, declare or modify the status of rights in real estate assets or intellectual property and/or rights of creditors and/or duties of debtors.

1.2.1.17 My conclusion is that the press releases and spokesman announcements concerning the occurrence of acts of terrorism on which Shaked relies do not conform to the

17

criteria required for their classification as a governmental action, because they do not establish any rights and/or duties and/or status. They are mere informative-administrative notices that are made to the public via the media, as part of a general policy - anchored in democratic governance and the informative role of the government - of conveying information to the public, both within the State and for international purposes.

Indeed, one may postulate that the actual notice, on behalf of a government institution, that a certain event was an act of terrorism, establishes rights and duties, such as the right for compensation pursuant to the Compensation to Victims of Hostilities Law.[15] However, a review of the provisions of Section 10 of this Law demonstrates that the authority to determine whether a certain action is a "hostility" that permits compensation pursuant to this Law was given to an "admitting authority," which is appointed by the Minister of Defense, following consultation with the Minister of Labor and Social Services. Therefore, such form of notice is not tantamount to an announcement, by law, of the occurrence of a "hostility" and, moreover, it does not in any way attest to the identity of the person or entity responsible for its execution.

1.2.1.18 In addition, none of these press releases and spokesman announcements concerning the occurrence of acts of terrorism satisfies the first of the four conditions set forth by the ruling in the Demianyuk case because they are not made in accordance with an explicit statutory obligation. Similarly, none of these documents satisfies the third condition, because there is no demonstrated intention to preserve them for future use, contrary to activities which

---

[15] The Compensation to Victims of Hostilities Law 5730 – 1970; see also to the 8th chapter of the Property Tax and Compensation Fund Law, 5721-1961, which refers to the definitions of "hostilities" in the Compensation to Victims of Hostilities Law.

are documents in a diary or other means of preservation of information.

1.2.1.19   Regarding the second type of press release, in which the spokesman of the Prime Minister's Office or the Ministry of Foreign Affairs issues a report concerning operations that are carried out by other bodies, i.e. the IDF, the ISA and the Israel Police, one may postulate that such notice constitutes a record of a "governmental action," because the various security forces execute and carry out their roles in accordance with law.

However, these documents do not fulfill the condition of a statutory obligation for execution of the publication because (a) none involves a record of an institution that carried out a governmental action, but rather constitutes an informative notice, and (b) there is no authority for the proposition that the Prime Minister's Office or the Ministry of Foreign Affairs is obliged by law to release to the press such type of notice. Therefore, even if the report would have been conveyed by the institution that carried out the governmental action (e.g. due to the fact that the ISA is an independent state body that is subordinate to the Prime Minister), these press releases do not fulfill the first of the four conditions set forth by the ruling in the Demjanjuk case, regarding the admissibility of a public certificate as evidence of its content, a condition requiring that a record be made in accordance with an explicit statutory obligation.

Israeli courts have shown some flexibility in applying this statutory obligation requirement.  For example, there is no requirement that a party prove the existence of a specific law or regulation obliging the execution of a governmental action.  An order of a supervisor or a military commander will suffice.  But in my view even if a spokesman or press advisor is operating in accordance with a ministry's or a minister's guidelines, the documents at issue are issued for the purpose of

providing the public with information and not for the purpose of executing a governmental action.

Nor does any of these documents satisfy the third condition, for the reasons stated above with respect to the first type of press release.

1.2.1.20   Finally, as stated above, even if a document qualifies as a public certificate under the criteria described above, as also stated above, Section 32 of the Evidence Ordinance states that a document can be proven to be a public certificate by presenting the original document, or a verified copy of the original, or a copy of the certified and sealed by the authority holding the document or a copy certified by a Minister or other senior civil servant, or a copy of the document is certified and sealed by an Institution.   None of documents at issue has been presented in conformity with these requirements, and therefore none qualifies for the exception to the rule that disqualifies hearsay evidence for public certificates.

### 1.2.2   ISA Report

1.2.2.1   One of the documents on which Shaked bases his opinions is described by him as an ISA report. As I noted above, this document does not bear any symbol of, or reference to the ISA. For the purpose of this analysis I will consider this document as if it were generated by the ISA.

1.2.2.2   The following is stated in the terms of usage of the ISA website:

"**Official Publications of the State of Israel**

In the case of contradiction or inconsistency between the material published on the website and that which appears in written official publications of the State of Israel, only the material appearing in such official publications will be considered accurate."

20

Moreover, as also noted in terms of usage, the website contains photographs from several sources, including 2 private sources: the Spielberg archive and Jupiter images.

According to the disclaimer:

"The service is presented to the public 'as is.'

The State of Israel is not responsible for adaptation of the service to the user's needs. Likewise, the State of Israel disclaims liability for errors in the material presented in the service.

The State of Israel disclaims liability for changes made in the material presented in the service by the user or by any third party."

It is evident from the content of these warnings that the material published on the ISA website does not constitute "an official written publication of the State of Israel," and the presented information (or at least part of it) is generated or copied from other private sources.

1.2.2.3   There is no doubt that this report was not prepared and not written by Shaked himself, and it is not submitted by the ISA, and therefore it constitutes hearsay evidence. Furthermore, Shaked relies upon this document for the truth of its contents, and it constitutes an important aspect of the factual basis from which his conclusions are derived.

Therefore the question that must be asked is whether this document is within one or more of the exceptions to the rule that disqualifies hearsay, and which exceptions therefore qualify it to be admitted as evidence of its contents.

1.2.2.4   An examination into the admissibility of ISA report is, to a great extent, derived both from the nature and essence of the document and from the nature of the organization

itself, its functions and spheres of responsibility. The functions of the ISA in brief, among others, include defense against terrorist activity committed against the State of Israel and its inhabitants and to investigate, expose and arrest the persons involved in such activity, to take operative confessions from them and, from this stage on, to transfer the detainees and their confessions to the Israel Police for further investigation and testimonies, for the purpose of prosecuting the perpetrators and their accomplices. The ISA is an investigative-intelligence body that constitutes part of the executive authority of the State of Israel, and the information generated from its investigations is the initial phase in the chain of information emerging from the investigations of an "investigative authority," and ultimately serves as evidence in criminal proceedings.

1.2.2.5    As detailed in the ISA report itself, the factual findings it contains are a product of investigations and the collection of intelligence from various sources. Consequently, some of the conclusions in this report constitute an intelligence assessment and/or opinion that is based on the cumulative sources of information in the organization regarding the same matter.

1.2.2.6    The report titled "suicide bombers in five years of conflict" is comprised of a statistical collection of data on types of terrorist attacks committed during the period covered by the report, 2000-2005, sorted by various profiles, and a list of all the suicide bombing attacks committed during the period covered by the report, which includes, where available, the identity of the suicide bombers. In addition to the statistical data provided by this report, it also incorporates the assessment of the ISA regarding the suicide bombers' organizational affiliation, according to information derived from investigations of and/or confessions taken from other detainees by ISA investigators, concerning those involved in assisting,

22

commanding and dispatching the suicide bomber to his mission.

1.2.2.7   I conclude that the ISA report does not qualify as an institutional record, and thus is not admissible evidence on this ground.  Even if such a report were proven to be an institutional record, it must be viewed as a concentration of material prepared by an "investigative authority" for the purpose of its filing as evidence in a criminal case, which according to Section 36(c) of the Evidence Ordinance, as detailed above, is inadmissible as an institutional record.

Furthermore, it seems that the ISA report also does not fulfill all of the conditions prescribed by Section 36 of the Evidence Ordinance for its admissibility as an institutional record since, by its very nature, this report is a concentration and processing of periodical data edited by "someone" in the ISA, and it is not a record of an "event" that was prepared proximate to its "occurrence," in accordance with the requirements of Section 36(a)(1) of the Evidence Ordinance:

"(1) The institution, in its regular course of conduct, enters a record of the event subject of the record proximate to its occurrence."

Furthermore, we have no evidence that the ISA report fulfills the second condition set forth in Section 36 of the Evidence Ordinance – that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content."

Moreover, since this ISA report involves a computer "output," we also do not have evidence of the existence of the third condition, which requires that, when the record is a computer output, in addition to proving the existence of the abovementioned basic conditions, the following must <u>also</u> be proven:

23

o The manner in which the record was generated may attest to its credibility.

o The institution regularly employs reasonable security measures to protect from an infiltration to the content of the computer materials and from failures in the computer's operation.

As detailed above, the party interested in filing a document as an institutional record bears the burden of proving that the document fulfills the conditions of admissibility set forth in Section 36 of the Evidence Ordinance.

At a minimum, as stated above, I am convinced that the contents of the document support the conclusion that it does not fulfill the conditions for its admission as an institutional record. In addition, proof of the existence of the first two conditions would be necessary by way of testimony from the person who wrote the report or at least by the person in charge of the team responsible for it.

Moreover, even if the conditions of Section 36 of the Evidence Ordinance were fulfilled, I believe that it is a document of an "investigative authority," since it is no more than a concentration of data from investigations conducted for the purpose of their filing as evidence in a criminal proceeding, and therefore they are subject to the provisions of Section 36 (c) of the Evidence Ordinance, which in turn removes them from the population of institutional records that may be submitted as evidence of their content unless they may be filed as evidence "according to a different law," as prescribed in Section 39(B) of the Evidence Ordinance.

Section 39(B) of the Evidence Ordinance provides that the section of the Law regarding institutional records does not render admissible documents which are

24

inadmissible pursuant to a restriction other than their failure to qualify for an exception to the rule against hearsay evidence, nor does it limit the admissibility of evidence that is authorized by other law, including case law.

In the next section, I will analyze the admissibility of the ISA report according to other exceptions to the rule that disqualifies hearsay evidence.

Thus, the ISA report is not an institutional record, and therefore it is inadmissible as evidence of its content, in the framework of this exception to the rule that disqualifies hearsay evidence.

1.2.2.8   Nor does this document qualify as a "public certificate." The question that must be asked in this context is whether this ISA document enters the definition of an "act of execution" or a record of such an act that personifies a governmental action, and whether the conditions - set forth by case law for the documents' admission as evidence of their contents – exist in it, and particularly whether there is a statutory obligation to publish this report.

In my opinion, this ISA report does not qualify as a public certificate due to the following:

(a)  There is no statutory obligation to publish

- The Israel Security Agency Law 5762-2002,[16] and the regulations thereunder, define the function of the Agency, its authorities and duties. Section 12 of the Law obliges the General Director of the Agency to report its activity to the Ministerial Committee on ISA Matters, which is to be established by virtue of Section 5 of the Law, and is to be headed by the Prime Minister. The Director General of the Agency

---

[16]     The Israel Security Agency Law 5762-2002.

is also obliged to report to the Knesset Committee on ISA Matters, which is the Secondary Committee for Intelligence and Secret Services of the Knesset Foreign Affairs and Defense Committee, and is headed by Chairman of the Foreign Affairs and Defense Committee.

- Beside this duty to report to the Ministerial Committee and the Knesset Committee, the Israel Security Agency Law and/or the regulations thereunder do not include any obligation to publish any of the activities of the ISA.

- Moreover, Section 19 (a) (3) of the Israel Security Agency Law states the following: "The Prime Minister may permit the publication of information whose publication is prohibited under this section, and he may prescribe by regulation provisions regarding the grant of a permit for publication." To the best of my knowledge, to date, no regulations have been issued regarding the permit for publication. Notwithstanding, we must remember that even if the Prime Minister would have determined the abovementioned, this would entail a permit for publication and not a duty for publication.

- Furthermore, a review of the Terms of Usage of the ISA website, the page publishing the "current activity" of the Agency does not state that the Agency does so by virtue of some given statutory duty.

- The rules, the Agency guidelines and procedures are classified and there is no obligation to publish them in any official publication (Section 22 of the Israel Security Agency Law). So that in effect, even if there were some internal guideline of the Agency by way of rules and/or instructions, it is impossible to verify this, without testimony by the ISA representative who is responsible for the publications. Therefore, it is

reasonable to assume under such circumstances that there is no obligation to publish.

- Accordingly, the first among the four conditions prescribed by case law for the admissibility of a public certificate as evidence of its content is not fulfilled.

(b)   The publication is not an "act of execution" or a record of an act of execution

- Seemingly, ISA reports are official documents, as there is no doubt that the ISA is an official body of the State of Israel that operates in accordance with law.

- However, as mentioned above regarding the analysis of this report as an institutional record, the document discussed contains data, some of which are statistical [number of terrorist attacks, their types and the number of casualties sorted by regional profile, etc.]; part are products of interrogations held with suspects and detainees; and part are by definition intelligence assessments or intelligence opinions.

Judging by the nature of the document, in my opinion it must be attributed to one of two groups: investigation findings or opinions.

If belonging to the first group, the document will not be admissible pursuant to Section 36 (c) of the Evidence Ordinance, because it is a document that concentrates on investigation findings that were prepared by an investigative authority for the purpose of their filing as evidence in a criminal proceeding; if belonging to the second group, it must be submitted in the same manner as an expert opinion is submitted, by the expert who created it on behalf of the ISA

according to Sections 20 and 24(a) of the Evidence Ordinance.

In this context, it is noteworthy that in legal proceedings where expert opinions of the ISA were submitted in order to prove a given fact, the expert who furnished the opinion was required to appear as a witness and undergo cross-examination regarding his findings and conclusions.[17]

- Furthermore, according to the analysis I have conducted hereinabove, in the context of publications on behalf of the spokesman of the Prime Minister's Office and the spokesman of the Ministry of Foreign Affairs, I came there to the conclusion that a "governmental action" or a record of such action held by an institution is characterized by several "identifying marks" that may facilitate the distinction between a public certificate and some other action of an official body that is not a "governmental action." An examination of the ISA reports under this test shows that they do not contain any one of the necessary identifying marks, since they do not establish or alter status, rights or duties.

- Accordingly, this document is not tantamount to a "governmental action" or record thereof, and even if there was some doubt regarding this conclusion, there is no doubt that the ISA does not have a statutory obligation to publish this report.  Therefore, my conclusion is that it is inadmissible as evidence of its contents in the framework of the "public certificate" exception to the disqualification of hearsay evidence and, inasmuch as a given party is interested in submitting it, it must do so by way of the expert on

---

[17]   Criminal Appeal 621/88 <u>Eliezer Piler et al v. the State of Israel</u>, Court Rulings, Vol.47, 3rd part, 5753/5754, 1993, in Plea for Criminal appeal 11493/03 <u>Mahmud Mahajna v. The State of Israel</u>, published in NEVO.

matters of intelligence who created it or at least was in charge of the team that created it.[18]

(c)   The ISA report reflects retrospective opinions

- The ISA report on which Shaked relies was published from May 2005 and onwards.

  o   The report titled "Terrorist suicide bombers in five years of conflict" summarizes figures until September 2005, and it is obvious from its content that it was published after this date [footnotes 17, 75, 155 and 222 in the Shaked Report].

1.2.2.9   The report of the ISA on which Shaked relies may be considered "opinion." According to case law in Israel, an expert may rely upon opinions of other "experts," provided that his conclusions may not merely be the adoption of the conclusions of the other experts, but rather must reflect his own conclusions.[19] Here, in addition to the fact that this report is not conducted according to statutory authority, the identity of the expert who prepared it is unknown. Therefore, in my opinion, this report must not be viewed as an opinion of "another expert." If one wishes to rely on this report to prove the truth of its contents, it would be admissible under Israeli evidence law only if it was submitted pursuant to the sworn testimony, on behalf of the ISA, of an attesting witness who prepared it or was in charge of the team that prepared it.

This principle is demonstrated by the decision of the Supreme Court in the matter of Mahmud Mahajna,[20] in which the court states that "had an expert witness in a

---

[18]   Refer to Appeal 80/03 (the Military Court of Appeals) Sergeant Ilan Weissberg v. the Chief Military Attorney; also refer to a guiding ruling in the matter – Criminal Appeal 566/89 Marziano v. The State of Israel, Ruling 46 (d) 539, 601.

[19]   Criminal Appeal 566/89 Martziano v. The State of Israel, page 9 of the decision, published in NEVO.

[20]   In Criminal Petition 11493/03 Mahmud Mahajna v. The State of Israel, page 9 of the decision, published in NEVO.

29

criminal trial testified that, on the basis of the professional information at his disposal, John Doe is a member of Hamas or that X organization is a terrorist organization, though cannot convey any given detail concerning the information on his behalf, and in light of which the defense would be totally prevented from any possibility of conducting a cross-examination, then there could possibly be some truth in the allegations of the defense by which such testimony does not allow to employ an appropriate defense for the defendants."  The court made this statement in the context of rejecting the defense's petition to disqualify the testimony of an ISA member who was among others supported in his testimony by confidential evidence, and the court ruled that this should not disqualify his testimony, which will in turn be examined comprehensively, while also taking into account the non-disclosure of confidential information. Here, Shaked is relying on ISA reports as evidence of the truth of their contents.  However, in contrast to the Mahmud Mahajna case, here no one from the ISA is testifying about these reports, and therefore the defendant is being deprived of an opportunity to cross-examine the party responsible for these reports.

2.    **Statements attributed to newspaper and magazine articles and website pages**:

I refer below to the documents and other materials identified in the Shaked Report containing statements Shaked attributes to newspaper and magazine articles and website pages.  In addition, Shaked cites and refers, in 142 footnotes, to numerous Arabic language websites, including websites said to be official or affiliated with Hamas. I itemize these websites below only to analyze the admissibility of their contents under Israeli evidence law.

2.1    **Nature and content of the documents**:

2.1.1    **FN 1 – Yediot Aharonot, March 29, 2001 - Shaked001096**

This is an article published on March 29, 2001 in the "Yediot Aharonot" daily newspaper, and written by Oren Meiri, Reuven

30

Weiss and Efrat Milner, concerning the suicide bombing attack in Neve Yamin Junction that was executed the day before.

Shaked's description of this attack on page 1 of his report contains information that is not mentioned in th article, even though he cited this article as his sole support for his description.

According to the authors of the article, the explosion occurred "at the gas station near Neve Yamin Junction not far from Qalqilya." Shaked added to this, without support, that the explosion occurred at "the Mifgash Hashalom gas station" and that it was "not far from the southern entry checkpoint to Qalqilya." Shaked also added that the victims "had been waiting for the bus to transport them," although the article states that they "were on their way to the Yeshiva high school."

It is noted in the article that "our journalist Ronni Shaked reported that Hamas claimed responsibility for the attack in Neve Yamin as well as for suicide bomb attack of the day before yesterday in the French Hill in Jerusalem."

### 2.1.2   FN 2, 4 – W_S089569

These pages are printed from a website written in the Arabic language, which I do not read.

The first page bears the date January 21, 2007, which, according to the footer of these pages, is the same date that they were printed. The article contains several passages bearing different dates between April and June 2001. None of the passages was created on the date of the attack in Neve Yamin.

Shaked cited in his report a translation of one of these passages that purports to be a detailed description of the Neve Yamin attack. As I will analyze in Chapter 7 of this report, many details in this announcement are inconsistent with other sources Shaked cites, such as the description of the attack, the bomb used, the place of the attack and the targeted victims.

### 2.1.3   FN 3 –

http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=101 -- **SHAKED001102**

According to Shaked, this is a claim of responsibility by Izz al-Din al-Qassam Brigades for the attack in Neve Yamin. As noted by Shaked, this announcement was published in Arabic on the above website, on April 12, 2001, which is about two weeks after the attack.

As I will analyze in Chapter 7 of this report, the late claim of responsibility could have been because it was a false claim made by Hamas, and not because of the purported "security reasons" Shaked cited.

2.1.4   **FN 7, 27 -**

http://www.terrorism-info.org.il/malam_multimedia/html/final/sp/sib3_04/k_apc.htm   -- **Shaked001106**

The link leads to the homepage of the Meir Amit Intelligence and Terrorism Information Center, and does not produce the information noted by Shaked.

The document "Shaked001106" has been printed on April 5, 2011 from the "Malam" website. The article presents a series of posters that, according to the unidentified authors of this article, were found and photographed by IDF and A.P. photographers at several schools in the West Bank and Gaza during 2003.

The first poster on page 1 of the article includes several pictures. One of them seems to be similar to pictures presented by Shaked as a picture of Fadi Amer.

The text relating to this poster states that it is in memorial of Abdel Rahman Hamed, who was the head of the Hamas infrastructure in Qalqilya and responsible for deadly attacks in Israel, including Neve Yamin on March 28, 2001.

There is no indication of the basis for these statements.

32

2.1.5   **FN 34 – Yediot Aharonot, August 10, 2001 – Shaked 001097**

The source is a page from Yediot Aharonot that was published on August 10, 2001- one day after the August 9 attack at Sbarro. The page contains a few items written by different authors, which all describe the results of the deadly attack at Sbarro. As described by Shaked it is noted that the Schijveschuurder family lost five of its members and two others were injured.

2.1.6   **FN 35 – Shaked001098**

CNN Jerusalem Bureau Chief Mike Hanna and Correspondent Jerrold Kessel contributed to this report – August 9, 2001

This is a journalistic report published by the CNN website on August 10, 2001 [not August 9, as Shaked cited]. The report is mainly about the Israeli retaliation after 14 were killed and dozens injured by a suicide bomber who attacked a busy Jerusalem pizzeria.

The description of the scene of the attack provided in this source, and that Shaked quotes in his report, is based on pictures that according to the report's author were published on television.

2.1.7   **FN 37 --**

http://news.bbc.co.uk/2/hi/middle_east/1483492.stm        – **Shaked001269**

This is a journalistic article printed from the BBC news website that describes the attack in a pizza parlour in Jerusalem on August 9, 2001.

The article includes the map presented in page 12 of the Shaked Report.

2.1.8   **FN 38 –- Yediot Aharonot, September 10, 2001 - Shaked001101**

33

This is a journalistic article from Yediot Aharonot written by Shaked. The article was published on August 10, 2001 [not on September 10, as Shaked noted in his FN 38].

The author states that a Hamas member, Iz a-din Al Masri, is the terrorist that executed the attack the day before at Sbarro. According to the author, the military wing of the Hamas – Iz al-din al Qassam Brigades in Jenin – published a claim of responsibility for the attack.

There is no indication of the basis for this statement.

2.1.9   **FN 42**   http://www.guardian.co.uk/world/2001/aug/09/israel   – **SHAKED001274**

This is identified as a "6 pm update" published on August 9, 2001, on what appears to be the The Guardian's website. According to the authors, Islamic Jihad in Beirut said it carried out the suicide bombing at Sbarro. In a statement, the group said the attack had been carried out by Hussein Omar Abu Naaseh, 23.

There is no indication of the basis for this statement.

2.1.10   **FN 44 - Yediot Aharonot, August 10, 2001 – Shaked001101**

This is the same article as in FN 38 above, which was written by Shaked. The article contains the upper picture presented in page 14 of the Shaked Report. As printed on the picture, its source is the Reuters news agency.

2.1.11   **FN 73 - Yediot Aharonot, August 9, 2001**.

This is the same article as in FN 38 and FN 44 above, which was written by Shaked. The article was published on August 10 and not on August 9. The article contains what is purported to be a statement made by Abdel Aziz Rantissi regarding the reason for the attack.

2.1.12   **FN**                              **74**                              – http://www.memri.org/report/en/0/0/0/0/0/0/0/538.htm#_edn16          -- **SHAKED001378**

34

This is a journalist article on the subject of: "'72 Black Eyed Virgins': A Muslim Debate on the Rewards of Martyrs," by Y. Feldner.

Shaked cited the full passage from the article. According to the author, the source of the information is "Al-Risala (Palestinian Authority), August 16, 2001."

2.1.13 **FN 107**–

http://query.nytimes.com/gst/fullpage.html?res=9F04EFDF1F3FF9 33A05755C0A9649C8B63 – **SHAKED001454**

. This is an article from the N.Y. Times Magazine by Elizabeth Rubin published on June 30, 2002 on the Magazine's website.

The author states that Qeis Adwan was responsible for the attack in Sbarro Pizza in Jerusalem. The source of this information is described as a "Shin Bet" [ISA] officer.

2.1.14 **FN 112** --

http://www.nytimes.com/2005/07/17/international/europe/17explos ives.html – **SHAKED001465**

This is a journalistic article whose subject is: "A Black Market for Bomb Materials Is Said to Flourish in Europe," by Heather Timmons, published on July 17, 2005.

The author states that the information regarding the TATP homemade explosives is according to "official sources."

2.1.15 **FN 131, 132 and 133 – Shaked001267 and Shaked001268**

**Yediot Aharonot, December 2, 2001, pp. 1-2**.

**Yediot Aharonot, December 2, 2001**

This a journalistic report published in Yediot Aharonot on December 2, 2001 by several authors, including Shaked. The article describes the attack and the scene of the attack in Ben Yehuda St, in Jerusalem.

35

The second source is a picture taken on the scene of the attack by "Zoom 77," and the headline of the Yediot Aharonot daily newspaper of December 2, 2001.

Shaked stated on page 30 of his report that "11 people were killed and another 188 wounded." These numbers of casualties do not derive from this article. According to the information in this article, 6 people were killed and 166 wounded.

The authors refer to several sources of information, including the Israel Police, Palestinian sources, eye witnesses and unidentified security sources.

### 2.1.16  FN 171 – <u>Yediot Aharonot</u>, March 10, 2002 – SHAKED001324

This is a journalistic report that was published in Yediot Aharonot on March 10, 2002 by Amir Rappaport, Itsik Saban and Zvi Alush.

The article describes the attack on March 7, 2002 at the settlement of Atzmona. As cited by Shaked, the description is based on the information received from an eye witness that was in the lecture room during the attack.

The story about the killing of the attacker seems to be based on an interview with an IDF officer, L.T. Col. Eyal Tam, in which he explained how he killed the attacker.

There is no indication of the source of information regarding the number of grenades and magazines used by the attacker.

### 2.1.17  FN 172 -

http://www.ynet.co.il/articles/0,7340,L-1745788,00.html            - **Shaked001562**

This is a journalistic article on the Ynet website of Yediot Aharonoth, posted on July 1, 2002, and written by Atilla Shumpelbi and Shimon Ifargan, headlined: "Five Young people were killed in an attack in Atzmona."

According to the authors, "the Iz al-din al-Qassam Brigades, the military wing of the Hamas, announced that they carried out the

attack. According to the announcement the attack carried out by a 19 years old young Palestinian, a resident of Sajai'ya in Gaza."

There is no indication of the source of the information regarding the details of the attack or of the claim of responsibility.

2.1.18 **FN 178 –**

http://scr.mzajtv.com/yt-thumbs/llBt76Ab4sk_1.jpg                -
**Shaked001580**

The link does not produce the picture reproduced by Shaked on page 44 of his report and in SHAKED001580.

The website http://scr.mzajtv.com does not provide any information about the authors or about the sources of information. There is no indication of the source for Shaked's statement that "The following is the photo taken together with his mother prior to his departure for the terrorist attack in Atzmona."

2.1.19 **FN 200** – "Muhammad was the only son who died in an attack he carried out. Nidal Farhat was killed in a "work accident" while experimenting with explosives, while Radwan was killed by the IDF."

Shaked does not cite to any source for this information..

2.1.20 FNs 3, 4a, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 39, 40, 41, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 95b, 98b, 101, 103, 104a, 111, 114, 115, 119, 121, 134, 135, 136, 137, 138, 139, 140, 141, 142a + 142b, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 163, 164, 165, 166, 169a + 169b, 173, 174, 175, 176, 177, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196a-196c, 197a-197c, 198, 201, 202, 203, 204a-204f,   205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 229a-229b, 230, 232b-232d, 233a-233b, 234b,

All the 142 footnotes above, which include 156 sources, are cited by Shaked as Hamas and / or as Iz Al- Din Al - Qassam  Brigades official or affiliate websites.

As noted above, I did not examine each source separately, but will analyze the admissibility of their contents under Israeli evidence law.

2.2 **Analysis of the documents pursuant to the Evidence Ordinance**:[21]

2.2.1 **Publication in a newspaper**

As a rule, a newspaper or magazine article is inadmissible hearsay and may be received in evidence only to prove the actual publication of the article and not its contents. This rule was determined in Tik v. Krinitzi,[22] and was adopted in a later ruling of the court.  It is also stated in Lerner v. Gvirz.[23]  In the ruling of the Court for Family Affairs in Kfar Saba, in the matter of Rodriguez v. Dr. Iris Brown[24] the court prescribes the following:

> "According to the provisions of Section 23 to the Anti-Defamation Law 5725 – 1965, the actual publication in the newspaper may be proven by way of submitting a copy of the newspaper. However, it has been clarified in case law that a quote of the words of a person in a newspaper does not even constitute alleged evidence to the fact that the person said these things or phrased them in the fashion that the newspaper presented them. When attempting to prove the defendant's responsibility for words quoted from him, one must prove that they were indeed said by the defendant, thus the court clarified the following in Tik v. Krinitzi –
>
> The respondent's claim that it was not he who said about the appellant that he is a criminal in terms of Urban Building Laws, obliged the appellant to prove that these things were

---

[21] Again, as stated above, I do not analyze the admissibility of these documents as submitted in the nature of providing support for a qualified expert's opinion.

[22] Civil Appeal 114/64 Tik v. Krinitzi et al., Vol.18 (4) 378, 383, 386-387.

[23] Civil Case [Tel Aviv] 489/96 Lerner v. Gvirz tk-48, 2010(1)1351.

[24] Family Court Case [Kfar Saba] Uri Rodriguez v. Dr. Iris Brown.

indeed published by the respondent (Civil Appeal 114/64 Tik v. Krinitzi et al., Vol.18 (4) 378, 383, 386-387, and also refer to Civil Case (Rishion LeZion) 883/05 – Shmueli Doron et al. v. Limon – Venue Gardens Ltd. et al. Takdin M.C.2007(1), 28201)."

### 2.2.2 Information from websites attributed to Hamas is inadmissible as evidence of the truth of their contents

2.2.2.1   Information obtained from websites attributed to Hamas is not admissible as evidence of the truth of its contents.  The decision of the Magistrate's Court in Tel Aviv from May 19, 2009 discusses the evidentiary validity of this type of document, in the framework of a claim for punitive damages filed by the family of Taher Zaid against the State of Israel,[25] over the killing of Taher Zaid by IDF forces. In the framework of its defense against the claim, the State requested to submit, by way of a civil servant certificate, a web page that was printed from the Hamas website, as evidence of the affiliation of the deceased with the Hamas organization. It was argued that, according to the information from the Hamas website, he belonged to a terrorist organization, and therefore the State is exempt by law[26] from paying compensation, which was expressed in the ruling as follows:

"The applicant is appending to its application a public servant certificate of Mrs. Sophia Mishaniya from the Ministry of Defense, who serves as a translator and detector of publications and notices on Islamic websites, arguing that, in the framework of the investigation and collection of material in this case, she had identified a notice on the website of the Hamas organization by which the deceased was a member of the Hamas movement and that a notice regarding his death was published on the Hamas website.

---

[25]   Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late Taher Muhamed Zaid v. The State of Israel; a decision from 19 May, 2009. An appeal to the Tel Aviv district court [civil appeal  29489-11-09] on this decision was dismissed.

[26]   Civil Wrongs (Liability of the State) Law, 5712-1952.

The translated notice is hereby cited: Today, during the morning hours, the young martyr Taher Atef Mahmud Zaid, age 17, from the Nablus region, died from his wounds. This martyr was considered one of the most active youths in the Yabed mosques and in the Islamic student association of the mosques."

The court had examined whether the document fulfills the requirements of an "official document" that may be filed as evidence by way of a "civil servant certificate," and whether the evidence may be considered an "institutional record." The court rejected the petition of the State to submit this evidence due to several reasons, and determined, among others, the following:

"I am of the same opinion as the plaintiffs in this matter – the translation of information that allegedly appeared on the Hamas movement website is not tantamount to 'something that is recorded in an official document,' and therefore this certificate shall not be deemed a civil servant certificate in its definition in the Evidence Ordinance.

"Furthermore:

"As to submitting the printout itself and its translation – filing evidence from the virtual world is subject, as is any other evidence, to the Evidence Law.

"In order for a document to be considered an institutional record it must fulfill the conditions prescribed in the Evidence Ordinance. In our case, we are dealing with a notice that was published in some given website, which according to the claims of the defendant is the website of the Hamas movement. Since in my opinion this does not involve a record that was created in the ordinary course of conduct of an institution, and since this does not entail data collection and a method of conducting a record that may attest to the truth of its content, the notice shall not be deemed an institutional record.

40

"Since the printout that appears on the website is tantamount to hearsay evidence, it must be submitted by a witness that may confirm its content and be subjected to a cross-examination in its regard. In our case, the correct manner of filing the printout is by a witness that may confirm the content of the notice, i.e.: the person publishing the notice or the editor of the website on which the notice had been published. The actual printout is tantamount to hearsay evidence and is inadmissible as evidence."

2.2.2.2   At the conclusion of the decision, the court ruled as follows:

"In light of the abovementioned and when concluding that the certificate that was submitted by Mrs. Mishaniya is not tantamount to a civil servant certificate, that the printout from the website does not constitute an institutional record and is in itself inadmissible as evidence, it would then not be permitted to submit the evidence."

2.2.2.3   Therefore, according to this ruling, submitting information from an internet source by way of a civil servant certificate according to Section 23 of the Evidence Ordinance is not acceptable, and such information cannot be considered as an institutional record according to Section 36 of the Evidence Ordinance.

2.2.2.4   In his final judgment on October 8, 2009, clauses 39 – 44 of the judgment, the honorable Judge Y. Harel summarized once again his decision from May 19, 2009 and empasized as follows:

"In my decision from 19.05.09 I dismissed the request of the defendant to submit as evidence the civil servant certificate made by Miss. Sofia Mishania, who serves as a translator and a locator of publications and announcements in Islamic websites. To the  civil servant certificate attached a printout of the announcement and its translation to Hebrew by Miss Mishania. The defendant applied in its

41

closing that I consider once again my decision within the final Judgment.

As said, the certificate is based on a printout from the Hamas website. The request was dismissed due to the reason that the certificate that Miss. Mishania edited is not considered as "civil servant certificate" because the publication in the website "…is not considered as 'item which was registered in an official document'…" due to the reason that the printout from the website is not an "institutional record" as its meaning in section 35 of the Evidence Ordinance……

Due to the above said, and as I reached the conclusion that the certificate that was submitted by Miss. Mishania is not considered as "civil servant certificate" and as the printout from the website is not considered as "institutional record" and is inadmissible itself, there is no room allow its submission as evidence.

After I reconsidered my above decision, I did not find a reason to change it."

2.2.2.5 An appeal on the final Judgment was submitted to the Tel Aviv district court in Civil Appeal 29489-11-09. The appeal was dismissed on April 6, 2011.[27]

2.2.3 **Conditions for the admissibility of the contents of websites generally**

2.2.3.1 In a claim filed by Tel Aviv University against a student for a debt of tuition fees, the university petitioned to submit an enrollment document of the student, which was submitted

---

[27] Civil Appeal (Tel Aviv District Court) 29489-11-09 Atef Muhamed Zayed et al V. The State of Israel. Published in NEVO.

42

on-line, as evidence of its contents.[28]   The following was decided in the ruling of this claim:

"In Hebrew year 5760 (2000-2001), the on-line method of enrollment to courses was made available for the first time; a method that is called bidding, by which the student enrolls directly and independently via a personal code which only he knows, and without the intervention of the secretariat.  Most of the arguments in the summations entail attempts to permit the academic records as admissible evidence. It was first argued that the documents requested in this matter were not serviced, and particularly in relation to the enrollment software, in order to examine its reliability and its operation instructions.

"The plaintiff bases its claim on the academic records, by which it is alleged that the defendant enlisted to 29 academic hours in the 5760 school-year.

"Section 36 to the Evidence Ordinance (New Version) determines the existence of aggregate conditions in order for an institutional record to be admissible evidence in proving the truth of its content in a legal proceeding.

"The plaintiff must explicitly prove that all of the statutory aggregate conditions, pursuant to this section, have been fulfilled.

"An institutional record, including a computer output that reflects the records, constitutes an exception to the rule that disqualifies hearsay evidence, as well as an exception to the rule of the best possible evidence. Two basic conditions are required for admitting an institutional record, as well as another aggregate condition for admitting a record in the form of a computer output: the institution regularly documents the event that is the subject of the record, in proximity to its occurrence; the method of collecting the

---

[28]     Civil Case (Magistrate's – Tel-Aviv) 85608.01 Tel-Aviv University v. Shtoyer Yehuda; not published.

data and the record may attest to the truth of the record's content; the mode of generating the computer output may attest to its credibility; and the institution regularly employs reasonable security measures to protect from an infiltration to the content of the computer materials and from failures in the computer's operation. The said conditions, which are aggregate conditions, require proof by an expert on the matter and by any person that may attest to the actual entry of the record.

"A review of the book by author Kozolowsky 'The Computer and the Legal Procedure – Electronic Evidence and Legal Procedures,' chapter 10, reveals that, in order to admit the institutional record as evidence, the litigant must explicitly and specifically demonstrate that all of the aggregate conditions set forth in Section 36 are fulfilled. The proof must be provided explicitly by way of testimony, whether orally or by affidavit, and in the event where the party submitting the record cannot bear such burden, the evidence must be rejected as inadmissible.

"The author further raises the existing fear of unauthorized infiltration into a computer that would bring about modification of the information or damage thereof, given the fact that computer communication is exposed to unauthorized penetration to the data stored thereof.

"In order to fulfill the requirements of the clause and overcome the fear of failure of the computer software, proof of the technical competence of the system and the security and operational measures must be provided by a professional technical officer that is qualified for this function."

2.2.3.2 Another ruling of the Tel Aviv Magistrate's Court, in the matter of Kavei Zahav,[29] addressed the question of the admissibility of web pages as evidence. The court

---

[29] Civil Case (Tel-Aviv) 731916/03 Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili, published in NEVO.

comprehensively analyzed the case law in Israel and even compared it to case law in the United States, and ruled as follows:

"The mere presentation of the records or the computer output is insufficient, as they must be presented by appropriate witnesses that shall confirm by affidavit the fulfillment of the conditions required for their presentation pursuant to the Evidence Ordinance - conditions that have been detailed hereinabove.

"The Computer Law only partially solved the problem of evidence originating from the internet, as aforesaid, by creating an additional category of an 'institutional record.' A web page may be incorporated in an institutional record. A web page may in itself be an institutional record, but it is possible that it shall not constitute an institutional record, as it all depends on the circumstances of documentation, preservation and presentation of the page.

"However, it does not suffice that a certain website and web pages may be determined to be an institutional record; the conditions prescribed in Section 36 of the Evidence Ordinance for determining the admissibility of the institutional evidence must also be fulfilled. We must then ask, are the conditions required for the admissibility of the information in court fulfilled in this case, and this prior to an examination of its credibility and feasibility – an examination that the court carries out in the second stage."

The court further noted as follows:

"The internet is not a narrow and well-defined area, but virtually a 'world on its own merit'; therefore, any reference to information that is located on the internet cannot be uniform by nature. There are numerous types of information on the internet. At times the information is accurate, at times it is partial and at times it is incorrect.

45

"Some of the information is admissible in court and some is inadmissible. Regarding admissible information, its credibility and weight shall also be examined in the second stage.

"One must distinguish between random information that originates from various websites and web pages and information that originates from databases that are secured and protected by a security program, respective of the technology available at that time. This rule is incorporated in the Computers Law."

2.2.3.3    An examination of recent court rulings in Israel indicates the courts are willing to accept evidence originating from institutional websites of government authorities, as well as from the websites of various companies. This regards general information that pertains to the policy of the offices or the companies, the identity of various senior officers and other data that is not specific information to a narrow and defined date or event.  In these cases, the information was admitted even without any support by testimony or affidavit of a person who attested to the truth of the information or had personal knowledge of the information's appearance on the internet.

However**,** the courts did not accept specific information that originates from the internet without clear verification by way of supporting testimony from competent witnesses.[30]

2.2.3.4    Here, on the same grounds that are detailed in the court ruling in the case of Tel Aviv University, the web pages to which Shaked refers and which are said to be printed out from websites do not meet the tests required for their admission as evidence of their contents.  Similar to the

---

[30]    See also a decision in Civil Request 012658/07 in main court file: Income Tax Appeal (Tel Aviv District Court) 1281/03 Asher Hershkovitz v. the Tax Authority. Issued on June 28, 2007. Published in NEVO. The District Court refers to the analysis of the court in the Kavei Zahav case regarding the inadmissibility of internet pages as evidence for specific information where the pages are not supported with supplemental testimonies.

rulings in the Taher Zaid and Tel Aviv University cases, in order for such a computer output to be admitted as an institutional record, a witness that is suitable for proving that the conditions prescribed in the Evidence Ordinance have been satisfied is required. Therefore, in my opinion, these records are not admissible as evidence of their contents without such supporting testimony.

2.2.3.5  It further appears to me that the emphases made by the court in the summation of the hearing in the Kavei Zahav case  and in the Tax authority case [footnote 30 above] also apply here.  Shaked's sources are taken from the websites of various organizations, and are intended by Shaked to prove "information specific to a date or a narrow and defined event" – specifically, the responsibility of Hamas for certain attacks on specific dates – and not general information of an administrative nature of an institution or an authority that publishes them on the internet. The case law in this regard, including the ruling in the Taher Zaid case, which specifically refers to the Hamas website, indicates that a court in Israel would not receive in evidence pages from such websites as evidence of their contents, without supporting testimony from a competent witness, as required by law.

3.   **Statements attributed to court documents, police investigation & explosives expert reports**:

I refer below to the documents and other materials identified in the Shaked Report that are court documents (such as indictments, minutes, verdicts and sentences) and police investigation statements and forensic reports.

3.1   **Military court indictments**

FN 76 – ROTH 00436 Shaked refers to this source as a military court indictment against Abdullah Barghouti. Instead, it is a verdict of the military court against him.  [Marked also as W_S085594.]

47

**FN 79, 80, 81, 82, 123, 128** - ROTH 00417-26 This document is an amended military court indictment against Ahlam Tamimi. [Marked also as W_S085575-84.]

**FN 86, 87, 88, 89, 126, 127** - ROTH 00404-13 This document is an amended military court indictment against Muhamad Daglas. [Marked also as W_S158713-18 and W_S085562-71.]

**FN 95, 96, 97, 98, 99b, 108a, 110, 113, 116a, 117, 124, 125, 157,–** ROTH00350-92 This is a batch of documents from the Beit El military court file against Abdallah Barghouti, including a 109-count indictment [ROTH00350-435], confession and conviction [ROTH00436], and sentence [ROTH00396-403]. [Marked also as NAIM000587-638 and W_S085508-561.]

**FN 162, 167, 170** ROTH00363-364 This document is part of the military court indictment [ROTH00350-392] against Abdallah Barghouti. [Marked also as W_S085508-61.]

**FN 224** - W_S156882-30 Shaked refers to this source as a military court indictment against Fahmi Eid Ramadan Mashahrah. However, these are military court documents against another person, Fallah Taher Abdallah Nada.

**FN 226** - Appendix 1, pp. 1-9 This document is an amended military court indictment against Fahmi Eid Ramadan Mashahrah.

3.2 **Military court verdicts**

**FN 90** – W_S157275-76 This document is a military court verdict against Abdullah Barghouti. The verdict is only in W_S157275. The following page contains pleadings for the punishment.

**FN 92** - W_S156682-83 This document is a verdict of the military court in Beit El in the case of Bilal Yaa'cob Ahmad Barghouthi. Barghouthi was convicted based on his confession to the amended indictment.

**FN 158a -** ROTH00436 This document is the military court verdict based on the confession of Abdallah Barghouthi to the amended indictment. [Marked also as W_S085594.]

48

**FN 225** - W_S156740-41 Shaked cites to this source as a military court verdict against Fahmi Eid Ramadan Mashahrah. Rather, this source contains the sentence and not the verdict. According to the following page, W_S161742, the verdict was handed to the parties in hard copy while the defendant's advocate was absent.

The verdict is in the pages marked as W_S156746-50.

### 3.3   **Military court sentences**

**FN 32** – Guy Aviad, Lexicon of the Hamas Movement, pp. 97-98.

Shaked refers to this source as the basis for the military court sentence against Selim Hija. It is obvious that this source is not a military court sentence.

**FN 33** - W_S161576-82 and W_S161583-93 The first source is a judgment of the military court of appeals in 1648/04, an appeal of the Samaria military court's verdict and sentence of Tareq Muhammad Abd al-Latif Abu in file 5090/03. Only pages W_S161591-593 of the second source contain the sentence.

**FN 77, 78, 159, 168** - ROTH 00397-403  This document is a military court sentence against Abdullah Barghouti. [Marked also as W_S085554-61 and Naim 000631-38.]

**FN 85** - W_S156479-503 Pages 479-81 are a military court sentence against Achlam Tamimi. All other pages are minutes of the military court in her trial.

**FN 91** - W_S157271-73 This document is a military court sentence against Muhamad Daglas.

**FN 93** - W_S156678-80 This document is a military court sentence against Bilal Barghouthi.

**FN 118** - Guy Aviad, Lexicon of the Hamas Movement, p. 101.

Shaked refers to this source as the basis for the military court sentence against Ayman Halaweh. It is obvious that this source is not a military court sentence.

**FN 158b –** ROTH00398 This is the first page of the sentence delivered by the military court against Abdallah Barghouthi. [Marked also as W_S085556.]

**FN 159 –** ROTH00403 This is the last page of the sentence delivered by the military court against Abdallah Barghouthi. He was sentenced to 67 consecutive life terms in prison.  [Marked also as W_S085561.]

**FN 225, 227** - W_S156740-41  This document is a military court sentence against Fahmi Eid Ramadan Mashahrah. [Marked also as Appendix 1, pp. 10-11.]

### 3.4   Other court documents

**FN 83** - ROTH00430-32  This document contains minutes of the military court in Beit El in the trial of Ahlam Tamimi, file No. 42550/01, including her statement to the court before sentencing.  [Marked also as W_S085580-82.]

**FN 84** - ROTH00428-29  This document contains minutes of the military court in Beit El in the trial of Ahlam Tamimi, file No. 42550/01, including a record of the prosecution's amendment of the indictment and Tamimi's confession to its charges.  [Marked also as W_S085586-87.]

### 3.5   Police investigation documents

**FN 18a** - W_S161554-66. This document is a report of a police explosives expert.  According to the findings of the explosives expert, the attacker wore a belt that tightened the bomb to his body. These findings are not consistent with the Hamas announcement claiming responsibility for the Neve Yamin attack, which Shaked cites in footnote 2. According to this announcement, the bomber "carried a bag filled with explosives."

The explosives expert does not make any statement regarding the person or the entity that perpetrated the attack.

**FN 18b** - W_S161567-72. These documents are not part of an expert explosives report. They contain several handwritten police memos

regarding the scene of the attack and collecting and transferring exhibits from the scene and the forensic institute to the explosives laboratory.

**FN 76b** - Appendix No. 1, pp. 12-55. These are statements given by Abdallah Barghouthi to the police interrogator. Barghouthi described how he received the funds for his activity. According to this source, Ibrahim Hamed deposited 40,000NIS into Barghouthi's account at the Ramallah branch of Arab Bank. This amount was not designated for a specific activity.   Barghouthi received all of his other funds from several people in cash.

**FN 160a** – W_S161505-512. This document is a report of a police explosives expert regarding the car bomb detonated at Harav Kouk street in Jerusalem on December 1, 2001.

**FN 160b** – W_S161513–514. This document is a report of a police explosives expert regarding the car bomb detonated at Harav Kouk street in Jerusalem on December 1, 2001. According to the report's findings, there is a low probability that the explosive material was TAFT.

W_S161515-517. This document contains three memos written by explosive laboratory officers regarding the explosion of the car bomb at Harav Kouk street and regarding exhibits found at the scene.

**FN 160c** -   W_S161518-525. This document is a report of a police explosives expert regarding the first bomb exploded by a suicide bomber at Ben Yehuda street in Jerusalem on December 1, 2001. According to the report's findings, there is a low probability that the material used for the bomb is TAFT, and a tiny quantity of Methomyl [commonly known as rat poison] was found on the bomb remains.

W_S161526-527.  This document contains two police memos, which include the list of exhibits found at the scene.

**FN 160d** - W_S161528-35. This document is a report of a police explosives expert regarding the second bomb exploded by a suicide bomber at Ben Yehuda street in Jerusalem on December 1, 2001. The

laboratory tests could not identify the explosive material used in the bomb. According to the report's findings, the bomb was probably hidden in a computer frame. Insect poison was found in the remains of the bomb.

**FN 160e** - W_S161541. This document is a police memo concerning exhibits transferred to the explosives laboratory.

**FN 160f** - W_S161538-40. This document is a police memo, which includes a list of exhibits found at the scene. There are also two sketches of the scenes detailing the three different locations where the explosions occurred.

**FN 160g** - W_S161536-37. This document contains the findings of a laboratory test that analyzed the metal pieces found at the scene of the attacks on December 1, 2001. The test found no explosive materials on the metal pieces and a tiny quantity of the poison Methomyl on part of the metal pieces.

**FN 228a** - W_S161544. This document contains the findings of comparative laboratory tests on two pieces of plastic stickers received by the police laboratory on June 27, 2002. According to the report, they are made of PVC and not from the same roll.

**FN 228b** – W_S161573-75. This document contains the findings of the police laboratory's chemical analysis of a brown material received by the laboratory on June 23, 2002.

**FN 228c** - W_S161542-43. This document contains findings of laboratory tests regarding materials in remains received by the police laboratory on June 19, 2002. The tests revealed  NG [Nitro Glizerin] explosive on the fragmentation. The test revealed no explosives on the other exhibits.

**FN 228d** - W_S161545-53. This is a police explosives expert report regarding an explosion that occurred on bus 32a in Jerusalem on June 18, 2002. According to the report, the bomb was an improvised explosive. The results are consistent with a suicide bombing; the laboratory identified the explosive material as NG.

3.6 **Analysis of the documents pursuant to the Evidence Ordinance**

3.6.1 In the Primary Expert Opinion and in the Rebuttal Report, I provided a comprehensive analysis of the admissibility of the documents listed in Appendix C of the Primary Expert Opinion and of additional documents listed in the Rebuttal Report and its annexes. The police investigation files and court documents that are appended to and/or cited in the Shaked Report as itemized above are the same type and mostly identical to the documents contained in Appendix C of the Primary Expert Opinion and in the Rebuttal Report.

3.6.2 I shall briefly note the crux of my conclusions in the Primary Expert Opinion and Rebuttal Report regarding each of these types of documents:[31]

(a) Documents that are <u>verdicts</u> delivered in criminal proceedings by <u>military courts in the Occupied Territories</u> are <u>inadmissible</u> as evidence of their contents pursuant to Section 42A of the Evidence Ordinance.[32]

(b) Documents that are considered findings and conclusions in <u>sentences</u> that were delivered in a criminal procedure of any given court, be it in Israel or a military court in the Occupied Territories, are <u>inadmissible</u> as evidence of their contents pursuant to Section 42A(b)(2) of the Evidence Ordinance.[33]

(c) Documents that are considered findings and conclusions that are provided as verdicts of courts in Israel, in the criminal proceedings that are the subject of the documents appended to and/or cited

---

[31] See footnote 1 above.
[32] Chapter 3.3 of the Primary Expert Opinion and my findings therein.
[33] Section 42A (b) (2) and my conclusion in Section 3.7 of the Primary Expert Opinion.

in the Shaked Report,[34] would be inadmissible as evidence in a civil proceeding against Crédit Lyonnais in which claims were made similar to the ones I understand are being made in the <u>Strauss</u> and <u>Wolf</u> lawsuits.  The bank [Crédit Lyonnais] is not the "substitute" of the party convicted in the underlying criminal proceedings, the "responsibility" of the bank does not "stem from the responsibility of the convicted party," and the bank was never obliged to be responsible for the "statutory duty" of the convicted; moreover, no such "statutory duty" exists, as detailed at length in the Primary Expert Opinion.[35]

In addition to the case law that I address in the Primary Expert Opinion on this subject, I have considered also the verdict delivered by the District Court–Central Region in Civil Case 5286-08-07 Rosenberg v. Bulus Gad Tourism and Hotels Ltd. et al, which considered the question of whether the responsibility of company directors "stems from the responsibility" of the convicted company, and the court ruled as follows:

"The legislator explains in the law proposal that it is suggested that the findings in the criminal ruling shall also serve against a third party . . . who will not be a litigant in the criminal trial, e.g. a claim filed against the substitute of the convicted or against the employer of an accused due to his bailment responsibility or against his insurer.'

"In his abovementioned book, Kedmi interprets the concept of 'he whose responsibility stems' as follows: 'connected to – he whose responsibility rises – stands or falls – by virtue of the

---

[34]   Shaked does not cite in this report to any verdict of Israeli courts as a basis for his conclusions that Hamas was responsible for the attacks listed in Annex A.
[35]   Section 3.6 of the Primary Expert Opinion.

responsibility of the convicted, e.g. the bailment responsibility of the employer for the actions of his employees' (pp.1360).

"The examples provided by the scholar Kedmi and the explanations of the law proposal in the matter of 'he whose responsibility stems' allegedly indicate that this is directed at he whose responsibility stems solely and exclusively by virtue of the status of another, and it is not a personal responsibility for a wrong. An employer is not responsible for the actions of his employees that are a result of his own wrong, but rather by virtue of the provisions set forth by law (Section 13 of the Civil Wrongs Ordinance), and the same rule applies to a bailor (section 2 of the Bailees Law, 5725-1965) and an insurant (refer to Section 68 of the Insurance Contract Law, 5741 – 1981). Furthermore, it is evident from the abovementioned examples that this entails a party whose responsibility stems exclusively from the obligation of another.

"Is the responsibility of the directors for the actions of the company they had served in such? It seems not to me."[36]

(d)   Minutes of the hearings of courts, both the civil courts in Israel and the military courts in the Occupied Territories, cannot constitute evidence even in a civil case against the convicted or against a convicted accomplice to a felony. In this regard I refer to the decision of the Supreme Court in the matter of Pupik v. Pazgas et al.,[37] where the court ruled as follows:

---

[36]   Civil Case 5286-08-07 Rosenberg v. Bulus Gad Tourism and Hotels Ltd. et al, published in NEVO.

[37]   Permitted Civil Plea 8562/06 Limor Pupik v. Pazgas 1993 Ltd, et al., published in NEVO.

"The minutes the applicant wished to submit do not in themselves constitute admissible evidence and the applicant also admits to this. The rule is that minutes of a criminal court hearing are not in themselves admissible as evidence in a civil procedure. The applicant wishing to submit them must summon the relevant witness to testify in court. In the course of this testimony, it may be possible to file the minutes considering the provisions of the evidence laws pertaining to them (refer to Permitted Civil Appeal 275/96 Aknin v. Gilat – not published). Contrary to the aforesaid, in a different case, the court is entitled to review the indictment, the minutes and any other material filed in a criminal case. This is when the court deems it is necessary in order to clarify the findings and conclusions of a preemptory verdict in a criminal case, which were admitted as evidence pursuant to Section 42a of the Evidence Ordinance (New Version), 5731-1971 (refer also to Section 42b of the Evidence Ordinance).  This is no the matter in the case at hand and, as such, the minutes may be filed – inasmuch as they may be filed – only in the course of the testimonies of the relevant witnesses."[38]

(e)   Written confessions of suspects are tantamount to documents of an investigative authority that are inadmissible as an institutional record pursuant to Section 36 (c) of the Evidence Ordinance; furthermore, we are dealing with an external confession of a convicted party to a criminal procedure, who is not a party to these proceedings

---

[38]   See also Request for Civil Appeal (Jerusalem District Court) 35801-09-10 AIG Insurance Company Ltd. v. Bar Mochay Ariel. Published in NEVO. In Section 7 of the judgment, the court ruled that "the rule is that the minutes of the hearing of the criminal trial is, in itself, inadmissible as evidence in a civil trial. One who is interested to submit it, should summon the relevant witness to testify in court. Within this testimony it might be possible to submit the minutes [as evidence M.A] after considering the orders of the relevant evidences rules."

against Crédit Lyonnais, which cannot be submitted as evidence against a given third party in any form other than by means of testimony by the interrogator and the interrogated party that gave the confession.[39]

(f)   Documents that were prepared by prosecuting and/or investigating authorities, such as indictments, testimony provided to policemen and evidence collected by the police or the ISA for the purpose of their filing as evidence in a criminal procedure, are inadmissible as evidence of their contents.[40]

(g)   Additional documents appended to or cited in the Shaked Report that are police investigation files and forensic reports   are inadmissible pursuant to Section 36 (c) of the Evidence Ordinance, because they are documents that disclose investigation findings that were prepared by an investigative authority for the purpose of their filing as evidence in a criminal proceeding.

Furthermore, a party that wishes to submit these reports against Crédit Lyonnais in a civil case must do so in the same manner as an expert opinion is submitted, by presenting testimony by the expert who created them on behalf of the weapons, explosives, and chemical laboratories units of the Israel Police department.

4.   **Statements attributed to books**:

---

[39]   Section B of the Evidence Ordinance; Sections 10-12 regarding the admissibility of testimony or a confession given outside of court.

[40]   Section 36 (c) of the Evidence Ordinance; Section 10.2 of the Primary Expert Opinion.

4.1     Shaked refers or cites to the book of Guy Aviad, <u>Lexicon of the Hamas Movement</u> as the basis for several factual statements, which are pivotal to his conclusions.

4.1.1   **FN 31, 118, 120** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 101.

These footnotes refers to page 101 of Aviad's book.  According to the source, Ayman Halawah was killed due to an explosion in his car. The source does not support Shaked's claim that Israel assassinated Halawah.

The author notes that during 1997 Halawah assisted with the production of bombs that caused the death of 21 Israelis. Even though, according to the source, Halawah was sentenced to <u>only</u> two-and-a-half years in prison for his assistance with the production of these bombs.

On page 27 of his report, Shaked states that "Halaweh constructed the bombs for the terrorist attack at the Dolphinarium and at the Sbarro pizzeria in Jerusalem." This statement is not consistent with other sources cited by Shaked. On page 165 of the Aviad book, the author states that Abdallah Barghouti constructed the bomb for the Sbarro attack.

There is no indication on page 101 of Aviad's book of the basis for the author's information.

4.1.2   **FN 32 –** Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 97-98

This footnote refers to pages 97-98 in Aviad's book. Here, Aviad describes the terrorist activity of Selim Hija. Aviad does not identify the basis for this information.

In Shaked's summary of the Neve Yamin attack, [page 8 of the Shaked Report] Shaked wrote:

"*From all the materials surveyed above, I conclude that the principal members of Hamas involved in the terrorist attack are as follows*:"

Section 4 of Shaked's summary discusses Selim Hija. According to Shaked, Hija was one of the "principal members of Hamas" involved in the attack in Neve Yamin. Beside the headline of this summary, Shaked did not provide any other basis for his conclusion about Hija's involvement in this attack.

58

Furthermore, even the source referred to by Shaked in this footnote does discuss Hija's involvement in any aspect of this attack.

Therefore the source is not relevant to the attack in Neve Yamin, and it is not clear on what basis Shaked added the name of Hija to his summary for this attack.

4.1.3 **FN 36** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 144.

This footnote refers to page 144 in Aviad's book. The relevant page purports to summarize the biography of Az al din al Masri, who is identified as the suicide bomber in the Sbarro attack in Jerusalem.

The source does not indicate that the infrastructure in Ramallah was asked "to send the suicide bomber to Jerusalem."

The source also conflicts with other sources referred to by Shaked. The military court indictment against Ahlam Tamimi, W_S085578, indicates that  the suicide bomber arrived in Ramallah on August 7, not August 9, and Tamimi instructed him to carry out the attack at the street corner, not atthe Sbarro. [W_S085579]

Aviad's book does not indicate the basis for the information described on page 144.

4.1.4 **FN 104, 105, 106** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 189-90.

This footnote refers to pages 189 and 190 in Aviad's book.  According to Aviad, Qeis Adwan recruited the suicide bomber for the Sbarro attack. Aviad does not name the suicide bomber.

4.1.5 **FN 122, 130** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 165.

This footnote refers to page 165 in Aviad's book. Aviad does not identify the basis for his statement that the Sbarro Pizzeria attack was revenge for the killing of the Hamas leaders in Nablus.

As noted in section 4.1.1 above, and contrary to the statement made by Shaked, Aviad writes that Abdallah Barghuthi constructed the bomb for the Sbarro attack, not Halaweh.

In addition, Aviad writes that 110 people were wounded in the attack, while Shaked writes that 130 were wounded in the attack

4.1.6 **FN 161** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, pp. 95-97.

This footnote refers to pages 95-97 in Aviad's book . This passage discusses Ibrahim Hamed, who Aviad describes as the commander of the military wing of Hamas in the West Bank.

Shaked's statement  that Hamed ordered Barghouti to prepare three bombs for the December 1, 2001 attack is not supported by the pages of the book Shaked refers to in this footnote.

4.1.7 **FN 199** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 161.

This footnote refers to page 161 in Aviad's book . This passage discusses Wa'el Nasser, who Aviad describes as a Hamas senior commander in Gaza until he was assassinated on May 30, 2004.

Aviad does not indicate  the source of his information.

4.1.8 **FN 231** – Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 232.

This footnote refers to page 232 in Aviad's book.  This passage discusses Muhamad Al Ghoul, who Aviad describes as the suicide bomber that carried out the June 18, 2002 attack on Bus 32A in Jerusalem.

Aviad  does not provide any source for his statements.

4.1.9 **FN 232** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 220.

This footnote refers to page 220 in Aviad's book.  The content of this page does not correspond with Shaked statements regarding this footnote.

Shaked refers to this page in Aviad's book as a source of information for his statements regarding Ali Musa Alan [Shaked Report p. 61].

The passage in Aviad's book does not mention Ali Musa Alan and all of it is regarding another person, Akram Ibrahim Mahmud Qawassmeh.

4.1.20 **FN 234** - Guy Aviad, <u>Lexicon of the Hamas Movement</u>, p. 111.

This footnote refers to page 111 in Aviad's book. This passage discusses Muhanad Taher. The statements of Aviad and Shaked regarding the involvement of Taher in the Park Hotel attack conflict with the content of page 165 of the book  [FN 122 and 130 above], which do not mention Taher as involved in the Park Hotel attack.

Contrary to Shaked's statement, Aviad does not mention Taher as one of those responsible for the attack at the Sbarro Pizzeria.

Aviad does not identify his sources for his statements about Taher.

4.2   **Analysis of the documents pursuant to the Evidence Ordinance:**[41]

4.2.1   As a rule and as detailed above, professional literature in itself is hearsay evidence and is inadmissible as proof of its contents. Again, I do not address the admissibility of these items as if they were submitted as providing support for a qualified expert's offer of an opinion on a subject within his competence based upon his specialized analysis or interpretation of them.[42]

4.2.2   I was not able to review the sources of the Aviad statements, as far as they are detailed in the pages referred to by Shaked. As far as the sources include indictments, sentences, confessions, press items, interviews, etc. these types of documents are all inadmissible as evidence of the truth of their contents against Crédit Lyonnais in this civil case. The fact that Aviad cited or relied on them in his book does not make them admissible.

5.   **Audio recordings and video movies:**

5.1 **"Testaments of suicides" on the YouTube website**

5.1.1   Shaked cites several audio and video recordings.  The speakers use literary Arabic, a language I have not mastered.  However, and subject to this restriction, I will examine the admissibility of these recordings according to their nature.

---

[41]   See footnote 1 above.
[42]   See footnote 1 above.

5.1.2   An audio or video recording is deemed an out of court statement which was made in the presence of the person who has listened in and recorded it.  In actuality, this is a sort of record made by the speaker in the recording.

5.1.3   So long as the recording qualifies under the admissibility tests described below, it may be admitted in evidence.

5.1.4   A recording can be received in evidence if it qualifies under three tests,                                   as                                   follows:

- **The technical test** – regarding the credibility and authenticity of the medium itself;

- **The substantiality test** – whether the terms for admissibility of the contents of the recording have been met;

- **The formality test** – whether the recording meets the conditions stipulated in the Secret Taping Law.[43]

The burden of proving these tests are satisfied lies with the party seeking to offer the recording in evidence.

5.2      **The technical admissibility test**

5.2.1   This test is designed to make sure that whatever is said in the recording does indeed reflect what was actually said when the recording was made, because electronic media can be easily altered, edited and counterfeited with hardly leaving any telltale traces.  The case law in Israel has established several "technical" tests a recording must satisfy in order to be admitted in evidence.

---

[43]     Dr Kedmi, part 3, p. 1320. see also criminal appeal 2801/95, Jacob Korkin v. the State of Israel Padi 52 (1), 791, 803-804

Among other considerations, the recording must be true and authentic, having been appropriately guarded, such that there is no doubt about it not having been altered or processed, and that the voices of the speakers are clearly and positively identifiable.[44]

5.2.2   Shaked bases his conclusion that certain attacks have been perpetrated by Hamas on "recorded testaments" of those who claim to be carrying out those attacks.

Within the framework of footnotes numbers 179a – 179d and 180 of his opinion, Shaked refers to several video recordings posted on YouTube and on websites purportedly affiliated with the Iz al Din al Qassam Brigades, which he presents as proof of their contents.

5.2.3   The first question to be addressed is whether these movies, posted on a social network such as YouTube, satisfy the first, technical test.

In my opinion, the answer is they do not.

5.2.3.1   First, Shaked has not presented the original version of the recorded event.  Instead, he has presented only what is said to be a copy of the original recording that was posted by unidentified persons on the YouTube website and on a website that Shaked states is an official Iz al Din al Qassam Brigades website.

Shaked has offered no information concerning whether the copy posted on these websites is an accurate and/or complete and/or true copy of the original recording.

---

[44]   Dr. Kedmi, part 3, pp. 1321-1331.

5.2.3.2   Second, Shaked has presented no testimony from whoever made these recordings, who may verify that whatever is heard or seen in the recordings was indeed said by whoever is seen to be speaking in them.

5.2.3.3   Further, there is no evidence that the voice heard in the recording is indeed the voice of whoever is shown to be speaking.

"Identifying the voices of the speakers in a recording is an essential requisite for the technical admissibility of the recorded medium." And "if the voices identification was not proved beyond a reasonable doubt – the recording is inadmissible" [45]   Further, the manner in which these movies were recorded and edited raises doubts as to the identity of the speaker who is heard in the movie and whether the words he is speaking are indeed his own.  These doubts increase in view of the fact that, in the recording, the person photographed is shown as though reading the texts from documents he holds in his                                                                              hands.

In addition, the text heard in these recordings is in the literary Arabic language that, to the best of my knowledge and experience, is not in daily use among young Palestinians, such as the persons depicted in these recordings.  This indicates the texts are dictated by the initiator and /or creator of the movie and are not the words of whoever is shown as the speaker therein.

5.2.3.4   Moreover, watching these recordings, even with an untrained and non-professional eye, one can very clearly perceive that they have undergone editing and processing after they were recorded.

---

[45]        Dr. Kedmi, part 3, p. 1325.

For example, it is clearly discernible that nationalistic songs were added, as well as scenes from places other than and different from the location at which the "speaker" in the movie was recorded, such as scenes that show unidentified persons holding rifles and other arms. In addition, the YouTube film referred to in footnote 179b contains a scene in which a person is sitting on a wheel chair and dressed with clothes like the clothes that Sheikh Ahmad Yassin wore. It is clear that the compositor of this video intended to convey that the person is indeed Ahmad Yassin, but he does not provide even a profile of him and in fact it could be anyone.

Two of the four videos present another example. The videos present a woman as the mother of Muhamad Farhat, who Shaked describes as the perpetrator of the attack in Atzmona. She is shown beside what appears to be an unidentified dead body.  Comparing the picture produced by Shaked as the picture of Muhamad Farhat to the face of the dead body shows that it is not the same person. Moreover, it is well known that Israel usually refuses to deliver the dead bodies of terrorists back to their families, which is another indication that the dead body does not belong to the perpetrator of the Atzmona attack. The immediate impression of watching these videos is that of propaganda rather than that of a "will."

Moreover, it is not certain that the editing work done on these recordings was not more extensive than can be readily perceived.  Likewise it is not possible to exclude that whoever is actually reading what is heard is not the person shown in the recording, but rather is some other, unknown person.   As a rule, an intentional manipulation of a recording in order to alter it in any way will cause it to be disqualified as evidence.[46]

5.2.3.5   An article written by Alshech and referred to in his report[47] analyzed the type of "will" published by Hamas during the

---

[46]   Dr. Kedmi, part 3, p. 1325.

[47]   E. Alshech / Die Welt des Islams 48 (2008) 23-49.

"Second Intifada," which is the period when the relevant attacks were perpetrated.

In this article, Alshech states as follows:

"It is evident that the documents are edited prior to publication because, for example, portions of the original texts are often deleted and marked with ellipsis."[48]

And,

"While it is impossible to know whether Ḥamas editors formulated these documents or merely edited them, it is clear that the editors had control over the form and content of the documents."[49]

If accurate, these observations confirm these recordings are inadmissible.

5.2.3.6   Nor has Shaked offered any evidence as to the identity of the person who recorded the movies and /or who edited them and /or who posted them on the internet, whether on YouTube or other websites claimed to be affiliated with Hamas.

5.2.3.7   Nor is there any evidence with regard to the points in time at which the movies were recorded and /or edited. It is apparent that they were not recorded in one place or on one date and all of them were edited.

5.2.3.8   Taking into consideration the fact that Shaked attributes the making of these movies to terrorist organizations or terrorism activists, for whom providing deceptive information is often tactical and customary, all of the questions I have noted above become particularly important in assessing the reliability of

---

[48]   Supra page 29 footnote 16.
[49]   Supra page 30.

these recordings and the circumstances under which they were made.

As to the credibility of the contents of these documents, Alshech states as follows:

"There is no reason to doubt that the documents contain some authentic material about the self-immolation attackers and their lives. At the same time, I argue that by systematizing their content, Ḥamas inevitably "reconfigured" some of the true information to conform to its notions of piety and martyrdom and thus to the collective worldview it was hoping to construct. Hence, I do not use the documents to learn about the Ḥamas martyrs' actual lives, beliefs, and deaths, but rather to study the ideology that underlies the texts produced by Ḥamas during the second Intifada."[50]

A party wishing to submit these recordings as evidence of their contents must remove these doubts by means of credible evidence and /or by means of witnesses who can address the questions set forth above, and who can be cross-examined in order to test the reliability of the recordings and of their contents.

5.2.4    In view of the above said, I am of the opinion that the videos presented by Shaked as evidence of their contents do not satisfy the first, technical admissibility test and cannot serve as proof of their contents or the identities of those shown as speakers therein.

5.2.5    Furthermore, in addition to the technical requirements the recordings must meet, as detailed above, the rules of evidence applicable to "computer output" and /or to computer output produced from the internet should also be applied to these recordings posted on websites.  As stated above, there is no evidence that they meet these criteria.

---

[50]    Supra footnote 18.

Furthermore, perusing the details in the webpages of these movies, there is no information about the author, the size of the file, the date of creation, or the date of any editing of these videos.

There is no information with regard to the manner in which these movies reached the website's operators, to whether the editing of these movies was carried out by the original recorders or whether these movies have undergone additional editing by the website's operators who, as mentioned above, are unknown.

5.2.6   My conclusion that these recordings do not satisfy the technical admissibility test should suffice to disqualify them as evidence of the truth of their contents without considering the additional applicable tests.

5.3   **The substantiality test**

5.3.1   The purpose of this test is to determine the admissibility of the contents of a recording that has satisfied the technical admissibility test.

5.2.2   The contents of the recordings are undoubtedly hearsay. Therefore, the party interested in submitting them as proof of their contents must demonstrate that they qualify under one of the exceptions to the rule disqualifying hearsay testimony, according to the Evidence Ordinance and /or the caselaw.

5.3.3   Among the exceptions to the rule disqualifying hearsay testimony, the ones relevant for examining the admissibility of recorded media as proof of their contents are as follows:

- Utterance of a deceased who cannot be brought to court to testify;
- Testimony of an utterance by a witness at the scene of a committed violation according to Section 9 of the Evidence Ordinance;

- ▪ Utterance of a victim of an act of violence according to Section 10 of the Evidence Ordinance;
- ▪ An institutional record according to Section 36 of the Evidence Ordinance.

As stated below, my opinion is that these videos posted on YouTube or on other websites, are not admissible for the truth of their contents under any of the above exceptions to the rule disqualifying                    hearsay                    evidence.

5.3.4     **The exception - Utterance made by a deceased**

5.3.4.1     An utterance by a deceased may, under certain circumstances, be admitted in evidence despite the fact that there is no possibility to "examine the deceased in court about things he said or had written."[51]

5.3.4.2     Among the utterances of a deceased which have been recognized in Israeli caselaw to be admissible in evidence, three are relevant to the case at hand.  One is an utterance by a deceased which at the time it was made was, prima facie, contrary to the deceased's monetary or proprietary interests.  Another is an utterance by a deceased contained in a document which was made during the deceased's "regular course of business," and the third is an utterance of a deceased that was made when he was "on duty."

5.3.4.3     As I have pointed out above, it is not certain that the voice heard in the recorded media is indeed the voice of the person shown, and therefore it is not clear at all whether it concerns an utterance of a "deceased," even if we assume it concerns a person who has died.

---

[51]     Dr. Kedmi, part 2, p. 573.

5.3.4.4    As to the other two exceptions in the context of a deceased, the caselaw states that an utterance of a deceased "office holder" would be admissible in evidence only if it concerns a document he made with regard to an act carried out in the past (as opposed to an act he intended to carry out in the future), and provided that the person can be accorded the status of an "office holder" in an "institution" which he purportedly represents.

Likewise, one cannot say about the deceased that making documents of the kind of such recorded movies was done during his "regular course of business."

### 5.3.5    **The exception - an utterance made by a deceased at the scene of a committed violation – Section 9 of the Evidence Ordinance**

5.3.5.1    Section 9 of the Evidence Ordinance states as follows:  "Testimony to an utterance made when, as claimed, a violation was perpetrated, or directly before or after, and that utterance concerns the matter directly, it will be admissible if the person who uttered it is a witness in the trial."

5.3.5.2    According to the Shaked Report, the speaker in the video referred to in footnote 180 [as far as he is indeed the speaker] is dead, and certainly cannot be a  "witness in the trial."  Furthermore, there is no proof that the utterances of the speaker were made "when . . . a violation was perpetrated, or directly before or after," as required by Section 9 of the Evidence Ordinance.

5.3.5.3    Indeed, the case law has stretched the applicability of this article to cover also the case where the speaker[52] [as far as was proved that he has spoken in his own voice] is dead, but only concerning one of the "Res Gestae" exceptions of the British Common Law, where

---

[52]    Criminal appeal 7293/97, Jafer Amer v. the State of Israel, p. 460, 469 published in NEVO.

70

the utterance is "spontaneous" and was made in the face of an "exciting event."

5.3.5.4   By their substance and character, it is clear that the utterances made by the deceased in these recordings could not be considered as "spontaneous" utterances.  The recordings show clearly that the persons depicted seem to read from a written document, written in advance, and probably not by the deceased himself.  Furthermore, these recordings do not appear to concern any "exciting event."

5.3.5.5   In view of the above, I am of the opinion that these recordings do not meet the criteria of the exception stated in Section 9 of the Evidence Ordinance.

5.3.6   __The exception - Utterance of a victim of an act of violence –__
__Section 10 of the Evidence Ordinance__

5.3.6.1   This article of the Evidence Ordinance allows admitting in evidence, under certain stipulations, an utterance of a victim of an act of violence as the result of which he was injured.

5.3.6.2   Section 10 deals clearly with an utterance by a person on whom it is contended that "an act of violence was perpetrated."[53]

5.3.6.3   According to the Shaked Report, the person shown in those recordings is a suicide bomber who caused death and injuries to many people, including the plaintiffs.  Therefore, it seems to me that it is impossible to attribute to this person the status of someone on whom "an act of violence was perpetrated."  Therefore, in my opinion, this exception is not applicable to these videos.

---

[53]   Section 10 of the Evidence Ordinance,[New Version] 5731–1971

71

5.3.7    **The exception - An institutional record – Section 36 of the Evidence Ordinance**

5.3.7.1    The admissibility of web pages under the exception of institutional records, including web pages that were produced from a Hamas website, has been extensively analyzed in this opinion above. Based on the same reasons stated above, I conclude that these recordings do not qualify for the exception from the exclusion of hearsay for institutional records.

5.3.7.2    I note again that the source of the recorded "will" [Shaked FN 180] is a website that Shaked claims is affiliated with the Iz al Din al Qassam Brigades. Even assuming this to be true, there is no justification to consider such terror group and whoever is behind the posting of this movie on this website to be "an institution," and certainly not to attribute to these recordings the appellation of "institutional record."[54]

As for the other videos posted on YouTube as referred to in footnote 179 to the Shaked Report,  these webpages do not provide any information about the author, the date of creation or alteration of these videos.

5.4    For the reasons listed above, I am of the opinion that these recordings do not satisfy the substantiality test for them to be received in evidence for the truth of their contents.

Because the third formal test deals with recorded media meeting conditions stipulated in the Secret Taping Law,[55] it is not relevant to the case at hand, and therefore I will not analyze it.

---

[54]    See  the analysis in section 2.2.2.2 and footnote 25 above.
[55]    The Secret Taping Law, 5739–1979.

5.5 In sum, I am of the opinion that these recordings do not qualify under the technical test for admissibility with regard to their authenticity, and nor do they qualify under the substantiality test for admissibility in evidence of their contents.  Therefore, they are inadmissible in evidence for the truth of their contents.

6. **Photographed interviews**:

**General**:

6.1 As a factual foundation for his conclusions that Hamas is responsible for perpetrating the terrorist attacks relevant to the claims at hand, Shaked refers to video recordings that include interviews made by him for a British documentary named "For the Sake of Allah."

6.2 This movie includes interviews in English and in spoken Arabic, which I understand to a level sufficient to enable me also to analyze their contents.  The interviews are said to have been held with Palestinian prisoners incarcerated in Israeli jails.

6.4 It should be pointed out that the interviewers were presented to the interviewees as representatives of a Canadian television company.  Whenever the interviewee was able to understand and speak English, the interview was conducted by whoever seemed to be the production manager /director, in English, and whenever the interviewee spoke only Arabic, Shaked was the main interviewer while being directed from time to time by the production manager to ask specific questions.

6.5 **The admissibility of these movies in evidence:**

6.5.1 As I have pointed out in other contexts above, I will not address the evidentiary status of these movies having been submitted as appendices to an expert opinion, but instead to the admissibility of

the documents themselves, while referring to the fact that Shaked is a witness in this case and was present during, and /or took active part in their production.

6.5.2    As a rule, the evidentiary status of these movies is similar to that of the YouTube movies, with the exception fact that, unlike the YouTube movies, Shaked has, as mentioned, taken active part in their production.

6.5.3    The contents of these interviews, and in particular the interviewees' answers, are considered inadmissible hearsay unless they qualify under one of the exceptions to the rule disqualifying hearsay testimony recognized in the Evidence Ordinance and /or the caselaw.

6.5.4    The interviews are equivalent to a written utterance by a "witness" made outside the courtroom.  Therefore, the relevant exceptions according to which their admissibility in evidence should be examined are those stated in the provisions of Sections 9, 10, and 10A of the Evidence Ordinance.

6.5.5    I am of the opinion that the movies do not meet the conditions required by these Sections of the Evidence Ordinance:

6.5.5.1    Section 9 of the Evidence Ordinance deals with utterances made by whoever is a  "witness in court."  To the best of my knowledge, not one of the interviewees falls under the definition of  "witness in court" in the cases at hand, therefore this exception could not be applicable.

Furthermore, even the extension of this exception with regard to "spontaneous" utterances and an  "exciting event" does not apply

74

to these interviews.  The interviews were conducted with the interviewees devoid of any spontaneity and without any exciting event taking place at the scene, and with full knowledge that they were intended for airing on foreign television.

6.5.5.2    According to the Shaked Report, the interviewees were terrorists who initiated and carried out terrorist attacks, some of which are included in the list of terrorist attacks that are the subject of the claim against Crédit Lyonnais.  It seems clear to me that none of the interviewees in these movies may come under the definition of a person on whom an act of violence has been perpetrated, and therefore the exception stated in Section 10 of the Evidence Ordinance does not apply for these interviews.

6.5.5.3    Section 10A of the Evidence Ordinance deals exclusively with criminal proceedings.  As the case at hand involves civil claims, this exception does not apply to either the YouTube movies or the photographed interviews of this documentary.

6.5.5.4    Because the movie was produced with the presence and/or participation of Shaked, and because he is a witness in this case, this movie may be submitted on his behalf only as evidence to its mere existence.  Still, the contents of the movie retain the status of hearsay testimony that is inadmissible in evidence for the truth of its contents.

The contents of these interviews could be proved only by testimony of the interviewed persons in the trial.

7.    **Research concerning relevant attacks**

7.1    **General**

75

7.1.1   For the purpose of this opinion, and in order to evaluate further the opinions of Shaked and Alshech, I have on my own initiative attempted to conduct independent research in connection with the 5 attacks relevant to this report, as follows:

- March 28, 2001 – Suicide Bombing at Neve Yamin.
- August 9, 2001 – Suicide Bombing at Sbarro in Jerusalem.
- December 1, 2001 – Suicide Bombings on Ben Yehuda Street.
- March 7, 2002 – Attack at Atzmona.
- June 18, 2002 – Suicide Bombing on Bus No. 32-A, Jerusalem.

7.1.2   Because the Israel Police collect the relevant evidence and testimony with respect to an attack for submission to prosecutors, who then submit this evidence in court, I have focused on examining the investigation files of the Israel Police with regard to the above listed attacks.

7.1.3   The issues I sought to examine independently are as follows:

- Whether the investigation files of the relevant attacks are open to the public and can be accessed by approaching the investigation officer in charge of the district in which the investigation was carried out;

- Whether the entire investigation file may be read by a member of the public;

- Whether the investigation files contain the complete investigation material relevant to each attack, other than certain material such as minutes of the prosecution and of the court, which are not always given to the police;

- Whether the documents contained in the files for these attacks were referred to in the Shaked Report and/or the Alshech Report;

- Whether the documents referred to in the Shaked Report and the Alshech Report are included in the files; and

- If the contents of the documents contained in the files do not correspond with Shaked's and Alshech's conclusions as to the identity of the perpetrators of  these attacks, what that would indicate with respect to the accuracy of  Shaked's and Alshech's conclusions and methodologies.

### 7.2    My efforts to obtain the relevant files

7.2.1    On October 1, 2013, I sent, by email, a request to Lt. Col. Dror Shwartz, the officer in charge of Freedom of Information at the Israel Police,[56] to peruse and copy all the documents contained in the investigation files for the five attacks listed above.[57]

7.2.2    On November 10, 2013, I received a preliminary answer from the police, dated October 22, 2013, that informed and instructed me to forward the request to the investigations officer in the relevant region, and that the request should not be according to the Freedom of Information Act but according to Instruction No. 14.8 of the Legal Adviser to the Government Instructions,[58] regarding applications of third parties to peruse investigation materials that are in the police file.[59]

7.2.3    According to these instructions, on November 18, 2013, I resent two applications: one to the investigation officer in the central district of the Israel Police regarding the police file of the attack in Neve Yamin,  and the other to the investigations officer in the Jerusalem district regarding the police files for three of the other attacks.[60]

---

[56]    In accordance with the Freedom of Information Law 5758 – 1998, any official entity of the State must appoint a person to be in charge of carrying out the Law.

[57]    A copy of the request is attached as Annex 1.

[58]    The legal adviser to the Government serves also as the general prosecutor of the state.

[59]    A copy of the answer dated October 22, 2013 is attached as Annex 2.

[60]    A copy of the request of November 18, 2013 is attached as Annexes 3 and 4 accordingly.

7.2.4   On November 20, 2013 I received another "formal" answer from Major Y. Shatal, who is the deputy of the investigations officer in the Jerusalem district of the Israel Police. In his answer, he informed me that my request was forwarded to Major Y. Elmaliah who is the commander of the minorities unit in the central unit of the Jerusalem district.[61]

7.2.5   A few days later, I received a telephone call from Major Elmaliah in which he informed me that I am not permitted to peruse the files.  I tried to convince him that he can redact any personal / private information or pictures of the victims or classified information but he still refused to allow me to see the files.

At the end of our conversation, I requested a formal written answer, and he promised to deliver one.

7.2.6   On November 27, 2013, I sent a reminder letter to Major Elmaliah and requested once again a formal written answer.[62]

7.2.7   About two weeks later after a few failed attempts to reach Major Elmaliah by telephone, and due to the fact that I did not receive any written answer, I sent another letter, dated December 8, 2013, to Major Shatal. I informed him about my request and Major Elmaliah's oral refusal and insisted that I receive a formal answer to my request to peruse the police files.[63]

7.2.8   On January 9, 2014, and having received no response to my other applications, I sent another reminder to Major Shatal.[64]

A few hours after delivering this reminder, I received by fax an answer from Major Elmaliah refusing my request.[65] The grounds for refusal were detailed in sections 2 and 3 to this letter:

---

[61]   A copy of the answer dated November 20, 2013 is  attached as Annex 5.
[62]   A copy of the request of November 27, 2013 is attached as Annex 6.
[63]   A copy of the letter dated December 8, 2013 is attached as Annex 7.
[64]   A copy of the reminder letter dated January 9, 2014 is attached as Annex 8.
[65]   A copy of the answer dated January 9, 2014 is attached as Annex 9.

"2. these are sensitive investigation files from investigative and security point of view and the files include privacy aspects.

3. As you are not empowered by one of the involved in the said files, and while there is no court decision that enables copying the files, and due to the sensitivity of the files as noted, your request is not permitted."

7.2.9   While the Jerusalem district did not permit the perusal or the copying of the files, my application to the central district  appears to have been, so far, totally ignored by the investigations officer because I have received no written or oral answer.

On January 9, 2014, I sent a reminder letter to the central district investigations officer with a copy to the officer in charge of freedom of information.[66]

7.2.10  The outcome of all my efforts to peruse and copy the police files pursuant to the procedures available to ordinary Israeli citizens is that I have been unable to review any of the police files regarding the five attacks discussed by Shaked and Alshech. Accordingly, I have been precluded from comparing the contents of these files to the documents appended or cited by Shaked and / or Alshech, for example to determine whether any of Shaked's and Alshech's opinions about the responsibility of Hamas for the attacks at issue in Neve Yamin are flawed or incomplete, in light of what is indicated in the police files.

For example, some of the documents cited by Shaked, such as footnote 17  [W_S089727], identify Jibril Jibril as a key player in the attack. Jibril Jibril is also mentioned in the military court indictment against Tarek Abu Maryam [W_S161576], who is described as the recruiter of the individual Shaked claims to be the suicide bomber in the Neve Yamin attack, Fadi Amer. Shaked does

---

[66]   A copy of the reminder letter to the central district of the police dated January 9, 2014 is attached as Annex 10.

not mention Jibril Jibril as one of the "principal Hamas members" responsible for this attack.

7.2.11 The absence of any reference to Jibril Jibril by Shaked when the sources cited by Shaked indicate he was the initiator and the dispatcher of the suicide bomber in the Neve Yamin attack, leads at least to the inference that Shaked did not provide with his report the entirety of the relevant documents he considered for this attack and/or did not fully consider all of those documents in reaching his conclusions.

### 7.3   **Analysis of the attack in Neve Yamin**

7.3.1   As previously mentioned, on examining the documents cited or appended to the Shaked Report regarding this attack, I noticed that Jibril Jibril, according to Shaked's sources, was the initiator of the attack and the dispatcher of the suicide bomber to his deadly mission.

7.3.2   Among the entire documents that I understand were provided by plaintiffs together with the opinions of Shaked and Alshech, I could not find any statement of Jibril Jibril to the police, or any indictment, any verdict, or any sentence delivered by any court, whether military or Israeli, against him.

7.3.3   Due to the absence of these documents and due to many aspects of Shaked's analysis of this attack that I found to be inconsistent with Shaked's methodology regarding other attacks, I cannot agree with Shaked's conclusion, based on the information he has provided, that Hamas perpetrated this attack.

Rather, according to my analysis, which is based on the same documents relied on in the Shaked Report, I believe that there is  substantial doubt that Hamas was actually responsible for the attack, and instead may not have been responsible for this attack, but retrospectively "adopted" the credit for it.

80

7.3.4   Shaked cited a claim of responsibility, translated from Arabic to English, that was published in what is purported to be a Hamas official website as follows:

"He carried a bag filled with explosives, approached the military target at which the operation was directed, and detonated the bomb in the vicinity of three soldiers stationed at the checkpoint. He killed two of them and wounded seven." [67]

7.3.5   Shaked does not explain how essential details of this claim can be reconciled with the description of the attack in other sources he relies on, as follows:

| Subject | Hamas claim | Other sources | References |
|---|---|---|---|
| Location of the attack | Military checkpoint | Gas station | FN17 - W_S089727 |
| The target | Soldiers | Students | FN17 - W_S089727 |
| The structure and cover of the bomb | A bag filled with explosives | Improvised bomb hidden in an explosive belt | FN 4,18 - W_S161556 |

7.3.6   Shaked admits that Hamas published its claim of responsibility on April 12, 2001, two weeks after the attack. According to Shaked, "the Hamas announcement claimed that the publication had been delayed due to 'security reasons.'"[68]

Even Shaked apparently found this excuse unpersuasive, as he also attempts to give an alternative excuse for the delay.

According to this alternative excuse, "Hamas delayed taking responsibility for the attack because of concerns of collective punishment of the

---

[67]   Shaked report p. 2 and footnote 2.
[68]   Shaked report p. 2 and footnote 4.

residents of Qalqilya due to the large number of terrorist attacks emanating from the town at that time."[69]

Yet even this alternative explanation is not consistent with Shaked's final conclusions about this attack. On page 10 to his report, Shaked stated that: "Hamas did not attempt to hide its responsibility for the terrorist attack at Neve Yamin. On the contrary, the suicide bomber and the members of the cell responsible for the attack enjoyed its respect and admiration."

7.3.7   In my opinion, Shaked does not establish that the real cause for this delay is the "security reasons" purportedly referenced by Hamas, or the concern of collective punishment as also proposed by Shaked.  Indeed, the documents suggest that the Hamas commanders "to whom responsibility for <u>dispatching</u> the suicide bomber for the terrorist attack at Neve Yamin is ascribed,"[70] were not aware of the initiative to carry out the attack, did not know who was behind it, who would carry it out, what the exact target was and what means would be used to carry out the attack.

7.3.8   Support for the alternative conclusion that Hamas was not responsible for this attack, and instead merely claimed credit for it, can be found in the Shaked Report itself and in other sources cited by him as well.

7.3.8.1 The purported ISA report[71] states as follows:

> "...***The operatives updated*** *Abd al-Rahman Hamad (killed) and Raed Hutari, a senior Hamas military operative, with respect to the terrorist attack,* ***so that they could take responsibility****...*" [emphasis not in original.]

7.3.8.2 In the verdict of the military court of Beit El found in file 5090/03, the Military Prosecutor v. Tarek Abu Maryam,[72] the court summarized Nazal's testimony regarding meetings in the cemetery

---

[69]   Shaked report p. 2.
[70]   Shaked Report, p. 9 [item  regarding Abd al-Rahman Hamad].
[71]   Shaked Report, p. 7 and footnote 17- W_S089727.
[72]   See W_S161587.

of Qalqilya between Jibril Jibril, the accused, and the heads of the Hamas in Qalqilya, and states as follows:

"*Nazal describes in his statement that the heads of Hamas in Qalqilya wanted to know who is behind the attack in Neve Yamin.*"

7.3.9    In the sentence of Tarek Abu Maryam,[73] the military court used the term "Military activist" to describe Jibril Jibril, who is described as the initiator and the planner of the attack.[74]

7.3.10  Jibril Jibril was a witness in the military trial of Tarek Abu Maryam. As mentioned above, the court identified Jibril Jibril as a "military activist," and as the planner and initiator of the attack, but **the court never stated or mentioned that Jibril Jibril was a Hamas member.**

7.3.10  According to Shaked and the police explosives expert, the bomb used in the attack was an improvised one, and the explosives were also improvised.[75] The use of improvised explosives and of an improvised bomb suggest  that this attack could have been a private initiative of Jibril Jibril rather than an organized attack by a terrorist group such as Hamas.

7.3.11  All other citations and sources referred to by Shaked as pictures and other publications on the purported Hamas websites are retrospective publications that were done in order to glorify their organization and to enjoy the respect and admiration of the people.

7.3.12  As I noted above, Jibril Jibril is described as the initiator and the planner of the attack and was also an essential witness in the sole military trial cited by Shaked to support his conclusion that Hamas was responsible for this attack.  Nonetheless, Shaked did not provide his statement to the police, or his testimony before the military court.

7.3.13  Instead, Shaked emphasized the role of Selim Hija as one of the principal Hamas members that was responsible for this attack. As I noted in section

---

[73]    See W_S161591 rows 11-12

[74]    See also the verdict against Tarek Abu Maryam where the military court used the terms "attack planner" to describe the role of Jibril Jibril in this attack. [W_S161583 rows 32-33.]

[75]    Shaked Report  pp.1 and 7. See also W_S161554-66 and W_S161567-72. [FN 18 of his report]

4.1.2 regarding the source referred to in FN 32 of the Shaked Report, there is no basis for this statement and there is no indication of any involvement of Selim Hija in this attack.

7.3.14  Shaked also did not cite another claim published on the Fatah movement website, the same day of the attack, naming the name of the suicide bomber without any notice about his organizational affiliation.[76]

7.3.15  Shaked also did not cite what Alshech noted is a message published on the website http://alweehdat.net that attributed the attack to Al Aksa Martyrs Brigades of the Fatah.[77]

7.3.16  Considering the above, and based solely on Shaked's cited sources, leads to the following conclusions:

- Hamas published its claim of responsibility 16 days after the attack occurred.
- Shaked's sources do not establish that Hamas perpetrated the attack.
- Shaked's sources do not establish that Hamas planned the attack.
- Shaked's sources do not establish that Hamas supplied the explosives for the attack.
- Shaked's sources do not establish that Hamas produced the bomb.
- Shaked's sources do not establish that Hamas commanders knew who was behind the attack.
- Shaked's sources do not establish that Hamas knew the location of the attack.
- Shaked's sources do not establish that Hamas knew the exact means used in the attack.
- Shaked's sources do not establish that the supposed initiator and planner of the attack – Jibril Jibril – who the military court identified as a "military activist" without any stable organizational affiliate, had any organizational backup.
- Shaked's sources do not establish that Jibril Jibril was a Hamas member.

---

[76] See Alshech Report page 25 and footnote 70 there.
[77] See Alshech Report page 26 and footnote 79 there.

7.3.17 The many indications noted above suggest that Hamas was not responsible for this attack but retrospectively took the credit for it.

Furthermore, I conclude that Shaked had an insufficient basis to state that Hamas was responsible for this attack, and that if he had followed his own methodology, he should at least note the reasons supporting the conclusion that Hamas did not perpetrate this attack.

7.3.18 To be complete, I note that the person that was convicted for recruiting the suicide bomber - Tarek Abu Maryam - was also convicted for being a Hamas member. Tarek pled in court that he did not recruit the bomber and he did not know that there was a plan for a suicide bombing. Also, Jibril Jibril testified that he met the suicide bomber in a coffee shop owned by Tarek. The military court stated that both lied in their testimony and credited statements they gave to the police. The conviction by the military court was based on the statement of Jibril Jibril, the accused, and the testimony of another witness named Nasser Nazal, who testified about the meeting in a cemetery in which the Hamas commander requested information about the attack.

Considering all of the above, I believe that this decision of the military court may be mistaken. Moreover, the court admitted that Jibril Jibril and the suicide bomber tried to execute an attack but failed to do so, and only "succeeded" in a second try.

The military court of appeals corrected the sentence and decided that the two life terms in prison will not be accumulated.[78]

Even accepting the conclusion of the military court, Shaked's sources do not show that Tarek recruited the suicide bomber in his role as a Hamas member, or pursuant to the order of any Hamas member or commander. Therefore, I believe that even Tarek's conviction by the military court, where it is the sole and only indication of Hamas responsibility, should not lead to the conclusion that Hamas was responsible for this attack.

B. **Alshech Report**

---

[78]     See FN 33 to Shaked Report: W_S161576-582.

8.      I  address below (a) Alshech's characterizations of and reliance upon certain of the documents and other materials he identifies in his report as the basis for his conclusions that Hamas' claims of responsibility for the five attacks he addresses are reliable and credible, and (b) the admissibility under the Evidence Ordinance of Israel of the documents printed or cited by Alshech in his report.[79]

8.1     The second part of the discussion below concerns the admissibility of the documents said to be taken from various websites, mainly from websites Alshech attributes to Hamas or from websites of organizations he describes as claiming to belong or that he characterizes as being controlled by Hamas, or other online publications or military court documents or other Israeli publications  on which Alshech relies.[80]

8.2     In describing Hamas' claims on the internet of responsibility for the five attacks at issue, Alshech elaborately describes websites as a low cost, efficient and relatively secure medium for Hamas to communicate with its targeted audiences, i.e. its members, supporters, volunteers, etc.

Alshech also states that Hamas uses this medium for, among other purposes, dissemination of its ideologies, as an operational platform and for publishing claims of responsibility for its attacks.

8.3     Alshech noted in pages 2-3 to his report that "In this field, we rarely deal in absolutes, but instead, approach the analysis with the aim of reaching conclusions with a reasonable degree of certainty that a claim of responsibility is credible. "  As I discussed above regarding the very same sources cited or referred by Shaked, and as I will further discuss below, the degree of certainty that may be sufficient for academic research is not sufficient as evidence for the truth of the contents of these claims of responsibility for the purposes of a legal proceeding.

---

[79]     Alshech refers in his report to five attacks: on March 28, 2001 in Neve Yamin, on August 9, 2001 in Sbarro Pizzeria in Jerusalem, on December 1, 2001 on Ben Yehuda Street in Jerusalem, on March 7, 2002 in Atzmona and on June 18, 2002 in Egged Bus 32A in Jerusalem.

[80]     Again, I do not address the admissibility of these documents as appendices to an opinion of a qualified expert.

8.4    The methodology used by Alshech in his report is based, among other foundations, on working assumptions about the behavior of terrorist groups and their members.  Some of these working assumptions are incompletely analyzed and not always properly implemented, in a manner and degree that detract from the credibility of Alshech's analysis and conclusions.

8.4.1   As described in footnote 4 to the Alshech Report, the motivation for executing an attack is not merely ideological, but rather for achieving other benefits from the attack, such as glory and higher social status among their people, and financial and other material support for the perpetrators (if they were arrested alive) and /or for their families if they did not survive the attack.

As I will further analyze regarding specific claims of responsibility, these motivations may result in false claims of responsibility by terror organizations, including by Hamas.

8.4.2   In fact, Alshech explicitly admits that claims of responsibility for a terrorist attack may not reliably indicate that the party claiming responsibility actually perpetrated the attack.  In particular, he states that terrorist organizations such as Hamas compete with one another, and claiming responsibility for an attack can "enhance the organizations' prestige and political clout, enable them to attract and identify new recruits, raise funds, and intimidate Israeli citizens as well as competitors."[81]  Thus, Alshech concedes that a claim of responsibility may be attributable to one of these considerations, in which event the making of the claim would not indicate that the claim is true.

8.4.3   Alshech also relies for the credibility of claims on the existence or the absence of competing claims of responsibility by other organizations.

In my opinion, Alshech had to, but failed to consider in his analysis other aspects that are relevant to the absence of competing

---

[81]    See Alshech Report page 40.

claims. As an example, when the initiator or the perpetrator of an attack is not affiliated with any organization, there is no organization that can publish a competent claim of responsibility. If Hamas were to claim responsibility for such a "private" attack, it is obvious that no serious competing claim of responsibility would be expected from any other organization.

8.4.4   Moreover, as I discussed above regarding the Neve Yamin attack, when an attack is an outcome of a "private  initiative," there is a motivation of both the initiator / perpetrator and Hamas to take the credit for the attack.  The initiator may wish to be "adopted" by an organization that will support him and his family if he will be exposed and incarcerated by the Israeli authorities, and there is motivation for the organization's local field commanders to take over and claim the credit for the attack in order to glorify themselves and to enhance their position in the organization.

8.4.5   Alshech further states that because of security or political reasons, Palestinian organizations do not tend to take responsibility for attacks that they did not  commit.[82]

As I discussed in my Rebuttal Report regarding Evan Kohlmann's report, which raised the very same argument, this assumption works both ways, and sometimes the competent organization that perpetrated the attack could not deny or contradict the Hamas claim of responsibility because of political reasons.

Unlike organizations affiliated with the Fatah, which is the most important entity of the Palestinian Authority, Hamas gains its power among Palestinians by claiming and publishing its "heroic" operations against the Zionist regime.

It should be noted that, during the time period of the five attacks, the Hamas military wing was an underground organization and its members were hiding themselves and their activity from both Israeli security forces and the Palestinian Authority security

---

[82]   See Alshech Report page 9.

services.  Every collective punishment against the Palestinian population fell under the responsibility of the P.A.  Moreover, Hamas was not concerned about such retaliations and, to the contrary, it gained more points among the population in its competition against the Fatah and the P.A. and glorified itself as the only organization that could challenge the Israeli forces.  Thus, Hamas had the interest, the incentive and the opportunity to claim responsibility for attacks it did not commit, especially when other organizations who actually perpetrated the attacks could not do so.

Today, Hamas behaves in Gaza exactly as the P.A. behaved in the West Bank during 2000-2005.  Hamas is the de facto governor of the Gaza Strip, and in that capacity, it is more concerned about the retaliation of Israel for the rocket attacks from Gaza to Israel.  Therefore, it does not take responsibility for these attacks and lets extremist organizations do so.

8.4.6   The validity of Alshech's opinions is also questionable because all five of the attacks at issue were committed during the years 2001 and 2002, yet Alshech states that his research is focused mainly on the use of internet by terrorist groups after 2004.[83]

---

[83]   See footnote 161 to the Alshech Report in which he stated as follows: "As I stated in my report in *Gill* at p. 42 n.107, my professional research addressed specifically the terrorists' use of Internet and other media after 2004. In my capacity as director of the Jihad and Terrorism Studies Project, I studied the general use of the Internet by various Jihad organizations including Hamas, PIJ and al-Qaeda, mainly from around the year 2004 and afterward."

9.      **The sources cited or referred by Alshech**

9.1     In the last paragraph of page 4 of his report, Alshech defines the sources
        he relies on as (a) "primary sources," including "material produced by
        terrorists and their sympathizers and published on terrorist organizations'
        own websites, including articles, communiqués, films, chat texts, and
        'semi-religious texts' (such as spiritual wills and biographies of deceased
        terrorists). Web content posted by the administrators of a terrorist website
        is a primary source," and (b) "secondary sources," including "sources
        which discuss the primary sources, such as published studies, news items,
        official government reports, and interviews conducted by known media
        agencies."

9.2     The "primary sources" on which Alshech relies, such as the websites said
        to be controlled or affiliated with Hamas, are the same type of sources
        cited and referred to by Shaked and, in some cases , they are even
        identical.

        Alshech 's "secondary sources" are also of the same type used by Shaked.
        Alshech refers to these as sources that, in his view, corroborate the
        credibility of the primary sources.  Among these sources are military
        indictments, military verdicts and sentences, news items posted in various
        online newspapers, announcements posted in the MFA or PMO websites,
        ISA reports and scholars' articles, including an article written by Alshech
        to which I will refer below.[84]

10.     **Analysis of the documents pursuant to the Evidence Ordinance[85]:**

10.1    I have considered whether the information disseminated by means of these
        websites, such as claims of responsibility for perpetrating certain attacks
        and personal "wills," are credible to such a degree that they may be
        admissible in court proceedings against a third party as evidence of the
        truth of their contents, without investigating or probing into the persons
        who compiled said information and / or who administers these websites
        and / or who collected said information, and what should be the

---

[84]     E. Alshech / Die Welt des Islams 48 (2008) 23-49.
[85]     See footnote 1 above.

framework within which documents and information from said websites may, if at all, be submitted as evidence in court.

10.2    As I noted in section 5.2.3.5 above, Alshech himself argued in his article about martyrdom that the content of the so -called personal recorded wills is manipulated, edited and reconfigured to such a degree that Alshech stated he relies on these documents only for studying the ideology of Hamas and he did not use these documents " to learn about the Ḥamas martyrs' actual lives, beliefs, and deaths."[86]

10.3    All of the "primary sources" and "secondary sources" on which Alshech relies constitute hearsay.  The legal issue in question is whether these sources should be considered as a legal proof of certain facts. In my opinion, based on the Evidence Ordinance and the case law of Israel, the answer is no.

10.4    In accordance with Israeli law, printed web pages are classified as "computer output" as defined in the Computers Law.[87] Therefore my conclusions below relate to all computer outputs on which Alshech relies.

10.5    According to Section 36 of the Evidence Ordinance,[88] computer output may be regarded as an " institutional record," the admissibility of which is conditional on several cumulative criteria stipulated in the Evidence Ordinance.  This I have detailed in my Primary Expert Opinion and in Chapter A of this report above, especially regarding the Shaked Report**.**

For the sake of convenience I am listing here the essence of the admissibility conditions of a computer output as an institutional record, according to the Evidence Ordinance, as follows:

The basic conditions for admissibility of an institutional record are:

(a)    The first condition is that, in the course of its regular conduct, the institution enters a record of the event that is the subject of the document "proximate

---

[86]    E. Alshech / Die Welt des Islams 48 (2008) 31, n.18.
[87]    The Computers Law, 5755 – 1995.
[88]    The Evidence Ordinance [New Version] 5731-1971. Section 36.

to its occurrence" (Section 36 (a) (1) of the Ordinance).

(b) The second condition is that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content" (Section 36 (a) (2) of the Ordinance).

When the record is a computer output, the following must also be proven:

(c) The method of generating the record attests to its credibility (Section 36 (a) (3) (a) of the Ordinance).

(d) The institution regularly employs reasonable security measures to protect against an infiltration to the content of the computer materials and from failures in the computer's operation. (Section 36 (a) (3) (b) of the Ordinance).

A party that wishes to submit the abovementioned documents as institutional records must prove that they fulfill all these conditions, and this proof must be provided by sworn testimony by a witness who is competent to provide this proof.[89]

The said conditions are aggregate conditions that require proof by an expert on the matter of computerized security systems and by a person that may attest to the actual entry of the record.[90]

10.6 The computer outputs on which Alshech founds his opinion, which include web pages  from websites he states belong to entities which are claimed to be part of Hamas and / or organizations affiliated and / or subordinated to and / or controlled by Hamas, do not fulfill the requirements stated above and court judgments with regard to such documents being admissible in court as evidence, and certainly not as proof  to the truth of their contents, against a third party, such as Crédit

---

[89] Dr. Kedmi,  2nd Part, p. 985.
[90] Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late <u>Taher Muhamed Zaid v. The State of Israel</u>; a decision from 19 May, 2009.

Lyonnais, which I understand has no connection to the organization and / or the source of the information of which these documents have been compiled and / or to the contents of these documents.

10.7    Alshech states on page 8 of his report that Hamas operates multiple websites, and it has often changed the location of its ISP providers and of its servers from one country to another, and also that Hamas migrated from certain iterations of its domain names.

Unlike Kohlmann before him, Alshech does not emphasize how, over the years, these websites collapsed and / or were attacked and disappeared offline, and how they were revived and uploaded a considerable number of times and again, every time under another name and another URL.

Instead, he merely states that Hamas took these measures in order to ensure its presence on the internet and to enhance its chances to survive cyber-attacks against its websites by governmental and private agencies.

10.8    Alshech's statements indicate the insufficient level of security that is characteristic of these websites, their level of being prone to infiltration and their exposure to being influenced and / or having their contents be altered by third parties. Furthermore, Alshech admits that Hamas itself used to reconfigure and edit the personal "wills" and used them as a tool for disseminating its propaganda among the Palestinian people and among the Muslims around the world,  in a manner that one cannot rely on their contents, etc.[91]

10.9    The insufficient level of security is aggravated by the fact (which Alshech has also pointed out) that terrorist organizations, including Hamas, make extensive use of various media of communication, including the internet, for multiple purposes, to such an extent that it is not possible to differentiate between the true and the false data provided in those mass communication media.

This issue assumes enhanced significance when such differentiation between true and false information is considered for the purpose of

---

[91]    See E. Alshech / Die Welt des Islams 48 (2008) 28, 30.

qualifying publications quoted from sources said to be managed and controlled by terrorist groups as "institutional records."

It bears emphasis that such status is granted by law and case law to vastly more reliable sources of information, such as banks, universities and other institutional websites for admission as evidence, and even then, the party that wishes to submit such records must satisfy the aggregate conditions required by the Evidence Ordinance.

10.10   As I have addressed above, in order to submit a computer output as an institutional record, it is also necessary to prove through a witness who is expert in the field of computerized systems security that the "institution" (as far as a terrorist organization could be defined for this purpose as an "institution") maintains computerized information security at such a level as to justify trusting its contents.

To the best of my knowledge, no such testimony has been brought forth and Alshech cannot serve as such a witness because, to my knowledge, he has no personal acquaintance with these systems and their procedures.

10.11   Furthermore, the objectives of terrorist organizations, which include dissemination of propaganda via communication-media including websites, do not correspond to, and instead would appear to contradict the second condition stated in Section 36 (a) (1) of the Evidence Ordinance for admission of computer output as institutional records, because in view of the objectives of these organizations one could not show that "the method of collection of data on the subject of the record and the record's editing attest to the truth of its content." As noted above, this assumption is supported by Alshech's own analysis.

10.12   For these reasons, as discussed above, the Tel Aviv Magistrate's Court in the case of Taher Muhamed Zaid against the State of Israel[92] rejected an application by the State of Israel to submit a computer output from a Hamas website as an institutional record by means of a civil servant certificate, stating, among other things, as follows:

---

[92]   Civil Case (Magistrates Tel-Aviv) 45464-04, the inheritance of the late <u>Taher Muhamed Zaid v. The State of Israel</u>; a decision from 19 May, 2009.

"I am of the same opinion as the plaintiffs in this matter – the translation of information that allegedly appeared on the Hamas movement website is not tantamount to 'something that is recorded in an official document,' and therefore this certificate shall not be deemed a civil servant certificate in its definition in the Evidence Ordinance."

And:

"Since the printout that appears on the website is tantamount to hearsay evidence, it must be submitted by a witness that may confirm its content and be subjected to a cross-examination in its regard. In our case, the correct manner of filing the printout is by a witness that may confirm the content of the notice, i.e.: the person publishing the notice or the editor of the website on which the notice had been published. The actual printout is tantamount to hearsay evidence and is inadmissible as evidence."

10.13   My conclusion that these sources of information are inadmissible in evidence for the truth of their content is even stronger regarding any intention of the plaintiffs to use the information published in these computer outputs to prove "information specific to a date or a narrow and defined event" – specifically, the responsibility of Hamas for certain attacks on specific dates and places – and not to prove merely general information of an administrative nature of an institution, or an authority that publishes such information on the internet.

The courts in Israel have made an important differentiation as to the character of the information to be proven by a computer output.   The case law in this regard, such as the case of Kavei Zahav[93], and the ruling in the Taher Zaid case, which specifically refers to a Hamas website, state that the more the information to be proven is specific as to the time and place of an event, the more the party seeking to submit these computer outputs is required to corroborate them with appropriate testimony.   "The mere presentation of the records or the computer output is insufficient, as they must be presented by appropriate witnesses that shall confirm by affidavit the fulfillment of the conditions required for their presentation pursuant to

---

[93]   Civil Case (Tel-Aviv) 731916/03 Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili, published in NEVO.

the Evidence Ordinance - conditions that have been detailed hereinabove."[94]

10.14   In sum, all of the "primary sources" that are pages cited or printed from websites said to be owned, managed, controlled or affiliated with Hamas and on which Alshech relies are "computer outputs" which, according to the Evidence Ordinance , must fulfill the aggregate conditions stated in Section 36 of the Ordinance.  As I conclude above, these documents do not satisfy at least two of the aggregate conditions: there is no competent witness who can testify and be cross - examined on the matter of the security measures and procedures used in these websites against penetration and against manipulation of the content of their database. These conditions are much more relevant when we deal with pages printed or cited from websites that are managed or controlled by terrorist groups such as Hamas, for which the truth is not one of their foundation stones.

10.15   Further, in order to define the credibility and the reliability of the Hamas claims, Alshech referred to "secondary sources" as purportedly providing corroboration for the information he states was placed by Hamas on its websites.  Alshech's comparison between the primary sources and the secondary sources is one of the main indicators presented by Alshech for the conclusion that the Hamas claims for responsibility for these five attacks at issue are credible.

As I have amply analyzed above, all these type of documents that Alshech defines as corroborative are all inadmissible as evidence to the truth of their content:

10.15.1   The IDF spokesman press release [footnote 114,  marked also as ALSHECH001004] and the spokesman announcements and other publications on the Israeli Foreign Ministry's and Prime Minister's websites, particularly the announcements that cite Hamas claims of responsibility for attacks, are considered inadmissible hearsay evidence, on several grounds:

---

[94]     Civil Case (Tel-Aviv) 731916/03 Kavei Zahav Ltd. 012 v. Gez Eliyahu Phili, published in NEVO

a. They do not satisfy the requirements of the Evidence Ordinance and of the case law to be recognized as institutional records.

b. They cannot be submitted without supporting testimony of a witness on behalf of the entity who can testify and be examined about his testimony with regard to the manner in which said documents were compiled and to the means of security maintained at this entity.

10.15.2 The ISA report "Summary of four years of struggle" [footnotes 185 and 207 of Alshech report] contains statistical information regarding many aspects of terrorist attacks in the years 2000-2004. Another ISA report cited by Alshech in footnotes 112 and 113 to his report, is a document that summarized 4.5 years of struggle, focusing on suicide bombing attacks. This source is identical to the source referred by Shaked in footnotes 17, 75, 155 and 222 to his report.

All the details of these documents are results of the ISA investigations and interrogation of suspects for their involvement in the attacks.

I have analyzed these specific documents in my Rebuttal Report and in section 1.2.2 above  and concluded that they are inadmissible in evidence for the truth of their contents.[95]

10.15.3 The military court indictments cited by Alshech[96] are inadmissible because they are a type of document that was prepared by an "investigative authority" for the purpose of its filing as evidence in a criminal case, which according to Section 36(c) of the Evidence Ordinance, as detailed above, is inadmissible as an institutional record.

---

[95] See the detailed analysis in chapter 1.2 of my Rebuttal Report.
[96] The military court indictment V. Abdallah Barghthi – Roth00350-392 [Fn115]; The military court indictment V.  Fahmi Eid Ramadan Mashara - W_S156822-24. [FN 148]

10.15.4 The verdicts cited by Alshech[97] are verdicts delivered in criminal proceedings by military courts in the Occupied Territories and therefore are inadmissible as evidence of their contents pursuant to Section 42A of the Evidence Ordinance.[98]

10.15.5 The sentences cited by Alshech[99] are considered findings and conclusions in sentences that were delivered in a criminal procedure of any given court, be it in Israel or in a military court in the Occupied Territories and therefore are inadmissible as evidence of their contents pursuant to Section 42A of the Evidence Ordinance.[100]

10.16 Therefore, the supposedly corroborative "secondary sources" do not afford the "primary sources" more legal validity and / or credibility, because a citation of a hearsay or other inadmissible source such as indictments, verdicts and sentences delivered by military courts in the Occupied Territories, cannot serve as a proof of the "primary source" hearsay, and certainly not as evidence of the truth of the content of the "primary source" hearsay.

11. **The conclusions of Alshech regarding the Neve Yamin attack**

11.1 In pages 25-26 in his report, Alshech summarized his analysis about the attack of March 28, 2001 in Neve Yamin and concluded that "Hamas's claim of responsibility was both authentic and highly credible."

---

[97]  The military court of appeals verdict in appeal 1648/04 V. Tarek Abu Maryam – W_S161576-82 [FN 76];The Bei El military court verdict in case 3380/03 V. Abdallah Barghuthi - W_S085594 [FN 94, 97, 115] ; The Beit El military court verdict in case 3452/02 V. Bilal Yaacob Ahmad Barghuthi - W_S158608-610[FN 96] ; the Judea military court verdict in case 3807/02 V. Fahmi Eid Ramadan Mashara - W_S156746-50. [FN 145]

[98]  See chapter 3.3 of the Primary Expert Opinion and my findings there.

[99]  The Judea military court sentence in case no. 3580/03 V. Samer abed elSamia Ahmad al Atrash – W_S087793-95 [FN 195]; The Judea military court sentence in case 3807/02 V. Fahmi Eid Ramadan Mashara – W_S156740 [FN 145, 148, 149]; The Judea military court sentence in case 3380/03 V. Abdallah Barghuthi – ROTH00396-403 [FN 94,  97, 115];  The Judea military sentence court in case 4646/03 V. Ibrahim Hamed – W_S163219-22 [FN114]; The Bei El military court sentence in case 3452/02 V. Bilal Yaacob Ahmad Barghuthi - W_S158611-613 [FN 96]; The Beit El military court sentence in case 42575/01 V. Muhamad Waeel Muhamad Daglas – W_S085572-74 [FN 95] and the sentence delivered by the Haifa District court in Criminal case 189/03 regarding Munir Rajbi [marked as ALSHECH001318-324].

[100]  Section 42a (b) (2) and my conclusion in Section 3.7 of the Primary Expert Opinion.

11.2    In my opinion, according to Alshech's methodology and the indicators described in the report, he could not logically and competently reach the above conclusion.

11.3    Alshech argued that "It likewise is important to consider the proximity in time between the attack and the issuance of the claim of responsibility. A claim of responsibility that describes an attack and contains accurate and detailed information about that attack, and which is posted online very soon after an attack occurs, is often seen as more credible than one posted later, after details of the attack have been published by other sources, but there are also delayed claims that may be found credible for other reasons."[101]

11.3.1    The claim of responsibility for this attack, was published by Hamas on April 12, 2001, **sixteen days after the attack**, and not a "few days" as noted by Alshech.[102]   Unlike Shaked, Alshech did not provide or propose any excuse for the delay of publication. According to his methodology, this factor – the delayed publication - underscores the claim's lack of credibility and he does not propose any "other reasons" that make this late claim more credible.

11.3.2    As I noted regarding the Shaked Report, the Hamas claim of responsibility, even though it was delayed more than two weeks, also contained inaccurate information regarding the target, the exact location of the attack, the means used by the bomber, the structure of the bomb and more.

All these indicators should be considered by Alshech according to his methodology, but he disregarded them.

11.3.3    According to Alshech, a website affiliated with the Fatah movement was the first to publish the suicide bomber's name on

---

the same day of the attack, but did not specify his organizational affiliation , if any[103] [Shaked did not mention this source].

The content of this message is consistent with the findings of the military court that no one, including those who are purported to be the Hamas commanders in Qalqilya, knew who was behind the attack.

As I will detail below, Alshech also disregarded the military court documents regarding the conviction of Tarek Abu Maryam and therefore did not consider the facts they contain.

11.4   As a legal corroborative document, Alshech referred to the ruling of the military court of appeals in the Occupied Territories, in the appeal of Tarek Abu Maryam[104] from his conviction and sentence delivered by the Beit El military court[105].

But Alshech disregarded the findings of the Beit El military court regarding the circumstances of the attack. Alshech does not mention at all the person – Jibril Jibril - who according to the corroborative military court documents was the initiator of the attack, the producer of the bomb and the dispatcher of the suicide bomber to his mission. Alshech particularly disregarded the military court finding that Jibril was  a "military activist" and not a member of Hamas.

Furthermore, the ruling of the military court of appeals on which Alshech relied stated regarding the appellant Tarek Abu Maryam as follows:

*"...it could not be any argument that the appellant did not view the attack as 'his offence ' because certainly he was not involved in the planning process, certainly he was not aware of any of the performance details"[106]*

---

[103]   See Alshech Report page 25.
[104]   See Alshech footnote 76  - W_S161576-582.
[105]   W_S161584.
[106]   See W_S161581.

It should be noted that, based on this conclusion, the military court of appeals reduced the sentence against Tarek Abu Maryam and ruled that his two life sentences will be served as concurrent sentences.

These factual findings shows that even Abu Marayam, the only convicted person who was identified by Shaked and Alshech as a Hamas member, did not know the details of the attack and did not play any role in its planning.

11.5   Alshech also disregarded one of the main findings of the Abu Maryam criminal case before the military court, that the Hamas commanders in Qalqilya did not know who was responsible for the attack and they first received the details days after the attack, through the "military activist" initiator, Jibril.

11.6   Instead, Alshech elaborately detailed the number of publications made by Hamas and /or the Iz al-din Al Qassam Brigades on the various websites, including many details about Fadi Amer, the suicide bomber.

It is evident from the text of Alshech's report and its footnotes that all these publications have been prepared long, even years, after the attack, and thus merely show that they were published, but certainly not that their contents are accurate.

11.7   As I noted above, the fact that no competing claim for responsibility has been made by other organizations is not and could not establish the credibility of the claim made by Hamas. When the attack is a result of private initiative – such as in this case – there is no competent organization that could claim responsibility.

11.8   Alshech stated that Palestinian terrorist groups are often eager to quickly disseminate biographical data on those whom they perceive to be heroes and martyrs who have died in the service of their cause.[107]  It is evident that, in this case, Hamas did not behave according to this assumption and instead published its claim more than two weeks later and only after

---

[107]   See Alshech Report page 4.

receiving the details from the real initiator of the attack, who, according to the documents provided by Alshech and Shaked, was not declared or identified as a member of Hamas.

11.9   Alshech did not consider the possibility of private / individual initiative to commit the attack.  Alshech also disregarded the local commanders' motivation to enhance their status and position in the organization by taking responsibility for attacks for which there is no other competent claim, and did not consider the credibility of claims that are made when the real responsible organization is unable to take responsibility or even publish a denial of responsibility because of political reasons.[108]

11.10   Moreover, Alshech did not even accurately apply his own methodology to the factual findings and the circumstances that derive from the documents on which he relied regarding the Neve Yamin attack. As described above, Alshech disregarded the major part of Jibril Jibril in this attack and the fact that there is no evidence that he was a Hamas member.

11.11   Thus, according to the documents provided by Shaked and Alshech, they have not provided a reliable factual basis for concluding that the March 28, 2001 attack was perpetrated by Hamas.

12.   **Summary**

The corroborative sources for Alshech's conclusions, such as the Israeli Foreign Ministry website publications, or the Prime Minister Office website publications or other online newspapers, are merely citing the publications of the "supported" websites.  As I concluded above, one hearsay source cannot serve as a support of another hearsay source, especially not for the objective of proving the truth of the contents published in the "supported" sources.

C.   **Authentication of Legal documents for use outside Israel**

---

[108]   See section 1.14 in page 114 of my Rebuttal Report regarding the claim for responsibility for the January 29, 2004 attack in bus 19 in Jerusalem, where I concluded that the Hamas claim was false and was enabled due to the difficulty of the Al Aksa Martyrs Brigades to make such a claim because of political reasons.

13.     I address below the authentication method that was employed for some of the military court documents cited or referred to by Shaked and Alshech in their reports.

13.1    Authentication of documents is often required for several legal and administrative purposes; the authentication requirements procedures are expressed in legislation as well as in the case law.

13.2    I refer to the analysis on pages 94-104 of my Rebuttal Report regarding the authentication procedures of several types of documents, particularly of public certificates and institutional records.  None of the documents Shaked and Alshech cite in their reports are authenticated by any of the methods discussed in pages 94-104 of my Rebuttal Report.

13.3    I provide the following additional analysis regarding the specific new supposedly "authenticated" documents that were cited or referred to by Shaked and Alshech.

13.4    For the essence of this analysis I prepared a detailed table in which I identify and define the nature of the documents, the entity that delivered them, the accused's name where it is relevant, and the purported authentication method. The table is attached as Annex B to this report.

13.5    The only documents that are purported to be authenticated are some of the military court verdicts and sentences. These documents are marked with different production numbers, and in some instances Shaked and Alshech referred to a version of the document [according to its production number] that does not bear any symbol of authentication.

        I do not discuss the legal effect of referring to a non-authenticated version of a document where there is another version that is purported to be authenticated, and for the purpose of this analysis I considered that the reference is to the supposedly "authenticated" version of the document.

14.     **Authentication of Documents in the West Bank**

The procedure for certifying signatures and documents in the West Bank (the "Zone") is stated in Decree 264 of the military governor. The original, Decree

167, was enacted in 1967 and was amended in 1991 by Decree 264 (amendment 1346).[109]

14.1        Article 1 of Decree 264 defines the special terms mentioned in it:

"Other Zone" – a zone held by the IDF which is not the Zone.

"The Supervisor" – whoever was appointed by me as the supervisor for the purpose of this decree.

"Authentication Action" – authentication of signatures and seals on documents.

"Certification Action" – including the following actions:

1. Certification of correctness of document copies.

2. Certification of correctness of document translations.

3. (items 3 to 5 are not relevant)

"Authentication and Certification Action" – an action of authentication or an action of certification.

14. 2    Article 2 of Decree 264 states as follows:

a.    "The Supervisor may, upon request of an interested party, and after it is proven before him that there is justification for such, execute in the Zone an Authentication Action which is designated to be used outside the Zone.

b.    Without derogating from the statement in section a, anyone that is authorized within his authority and his role according to law or security legislation is entitled to execute an Authentication and Certification Action regarding documents which are designated for use outside the Zone, but this action will be valid only after his signature or his seal was certified by the supervisor."

14.3    Article 3 of Decree 264 (amendment 1346) states as follows:

---

[109]    See Annex 11 to this report.

"An Authentication and Certification Action, executed according to the law of Israel, or executed in the Zone or in an Other Zone by one who is authorized to do it in the established method of execution of Authentication and Certification Actions according to the binding law in Israel, or executed in another Zone according to law or the security legislation of that zone, will be lawful in the same manner as if was done in the Zone by one who was authorized to do it in the Zone."

14.4     Article 7 of Decree 264 states as follows:

   a.   "An action which is executed by the Supervisor according to this decree will not serve as proof that the signature or the seal has been signed or sealed pursuant to the role, and within the scope of authority of the signatory.

   b.   The full meaning of an Authentication Action, executed by the Supervisor, will be only that the signature or the seal that exists on the document, is the signature or the seal of the person or the authority that signed or sealed it.

   c.   The full meaning of a signature certification of the Supervisor will be but one – that the document was brought before the Supervisor and certified by him for the purpose of Article 4."

14.5     Article 8 of Decree 264 states as follows:

   "As a condition to the execution of an action according to this decree, the Supervisor may:

   a.   Demand the payment of a fee in the sum that will be decided from time to time by the Supervisor in an order that will be publically announced according to any procedure that he shall see fit.

   b.   Demand the production of a copy or photocopy of any document that he is requested to authenticate or certify, and a proof that a copy or a photocopy of the said document is in custody of any authority, in accordance with law or security legislation."

14.6     **Interpretation of Decree 264:**

14.6.1 According to Decree 264, any document from the Zone [the West Bank] that is designated for use outside the Zone should be brought before the "Supervisor" in order to authenticate or certify the signature and the seal of the "authorized person" by Law that certified the document.

Shaked and Alshech did not provide any information about the identity and / or the role of the "Supervisor" or of the "authorized person." Further, they did not provide the legal basis of the purported authorization of the persons that put their seals or signatures on the rulings to certify or authenticate them.

My independent attempts to locate such legal sources did not bear any results. Therefore there is no possibility to verify if the seals and / or the signatures that exist on the documents listed in Annex B are seals and signatures of  the "Supervisor" or of the "authorized person."

14.6.2 It might be argued that Article 3 of Decree 264 states an alternative procedure to the procedure stated in Article 2, of authentication and certification of documents that were produced in the West Bank.

According to this interpretation, it is possible to authenticate the rulings rendered by military courts in the West Bank "in the way of authentication and certification according to the binding law in Israel."

As I discuss below, the authentication and certification of judicial rulings that are designated to be used abroad is to be done according to the regulations for the implementation of the Hague Convention.[110]

15.    **Apostil**

The regulations for the implementation of the Hague Convention abolished the necessity to authenticate public documents originating in member countries of the

---

[110]    Regulations for the implementation of the Hague Convention (abolition of authentication of foreign public documents) 5737-1977.

convention through diplomatic or consular authentication, and state as an alternative for authentication of a "document according to the convention" [Apostil], which certifies the authentication of the document, of its signatures, and of the document seal.

Regulation 5 (a) of the Regulations of the Hague Convention determines who is entitled to authenticate documents for the purposes of the convention:

"(a) Ministry of Foreign Affairs, registrar in the Magistrate's Court or civil servant appointed by the Minister of Justice according to Article 45 in Notary Law -1976, will be –each of them– the competent authority to issue in Israel certificates according to the Convention."

As the documents provided bear an Apostil of the Ministry of Foreign Affairs, the analysis below will be concentrated on the procedure of authentication by the Ministry of Foreign Affairs.

16.    **Apostil by the Ministry of Foreign Affairs**

16.1    The binding procedure for authentication[111] of Rulings and Judgments of the Judicial Courts by the MFA, is detailed in the instructions that are published by the MFA on its website.[112]

According to the first paragraph of the instructions: "**The branch is responsible for certifying only Israeli public documents which were issued by government authorities and ministries in the State of Israel.**"

The procedure is described as follows:

"**One must follow the certification procedure as follows**:

 Documents for certification:
   1. Population Registry documents
   2. Marriage or Divorce documents
   3. Academic and Matriculation documents
   4. Medical Doctors Accreditation documents

---

[111]    The MFA uses the term "certification" instead of "authentication." To my best knowledge and according to the context, these terms have the same meaning in Hebrew.

[112]    See: http://mfa.gov.il/MFA/ConsularServices/Pages/PublicDocumentsEng.aspx. Attached also as Annex 12

     5. <u>Certificates of Good Character</u>

     6. <u>Notarized documents</u>

     7. <u>Writs of inheritance</u>

     **8. <u>Court rulings</u>**"

16.2    The procedure for certifying Court rulings is described in Item 8 of the procedure as follows:

"8. **Rulings and Judgments of the Judicial Courts** (but not of Tribunals*):

A.     Photocopy of the ruling or judgment in its entirety.

B.     Authoritative seal of the Judicial Court where the ruling or judgment was rendered.

C.     Signature and Seal of the Chief Secretary or Deputy Chief Secretary of the Judicial Court where the ruling or judgment was rendered.

D.     Signature and Seal of the Registrar of the Supreme Court or the deputy director of the Judicial Courts that certify items B and C above."

16.3    The "authenticated" documents provided by Shaked and Alshech do not meet the substantive conditions stipulated in the MFA authentication procedure and, particularly in sections 8B – 8D of it, for the following reasons:

16.3.1    The rulings were not issued by "**<u>by government authorities and ministries in the State of Israel.</u>**"

As stated in my Primary Expert Report, the military courts in the Occupied Territories are not considered as Israeli authorities, and not a part of the "Israeli Judicial Courts" because their powers and authority derive from a decree of the military commander of the Occupied Territories in his capacity as the Governor, and not from the legislation of the Knesset.

16.3.2    Condition B requires the seal of the Judicial Court **where the ruling was rendered.**

Except for the ruling rendered by the Military Court of Appeals [marked as W_S161576-582] which I will discuss separately, all other rulings do not meet this condition because they bear the seal of the Military Court of Appeals and not of the Judicial Court where the ruling or judgment was rendered.[113]

16.3.3  Condition C requires the **signature and the seal** (which must include the name and position) **of the chief (or the deputy) secretary of the court that rendered the ruling**.

Except for the ruling rendered by the Military Court of Appeals [marked as W_S161576-582] that bears the signature and the seal of the "administrative officer," all other rulings do not bear the seal of the chief (or the deputy) secretary of the court that rendered the ruling.

16.3.4  Condition D requires Signature and Seal of the Registrar of the Supreme Court or the Deputy  Director for the Judicial Courts **certifying conditions B and C**.

None of the produced documents bears such certification.

16.3.5  The "authenticated" documents listed in Annex B are also signed and sealed by an IDF City Officer.  These seals and signatures of IDF City Officers on the documents do not offer any explanation of the reason of sealing or signing the documents.

As the process of authentication of the documents is not presented, I am unable to verify who certified the documents as a "true copy" or who certified the seal or signature of the other seal or signatures.

When the process is properly done, all these details should be presented and detailed on the authenticated document.

Finally, it should be noted that the Apostil only certified the signature and the seal of the IDF City Officer as a formal Israel Defense Forces seal. This method of authentication of rulings and judgments is not according to any procedure that I am familiar

---

[113]   As noted in the table Annex B, the original military courts are the "Beit El" and the "Judea" courts.

with or that I could locate in any legal sources. Certainly it is not according to the procedure of the entity that used that method.

16.4    As described above, the process of authentication is a chain of actions that has its inherent logic, and each of its links is essential to the completeness of the process.

16.4.1 In the first step, the court certifies the copy of a judgment that was rendered by it. This certification should be done by the **signature and the seal** (which must include the name and position) **of the chief (or the deputy) secretary of the court that rendered the ruling**.

16.4.2 The second step is done by the registrar of the Supreme Court by certifying the signature and the seal of the secretary of the court that rendered the ruling.

16.4.3 The third and last step is the Apostil seal. By sealing the document with Apostil, the Ministry of Foreign Affairs certifies the signature and seal of the Supreme Court Registrar.

Obviously, when one or more of the links in this chain is broken – as it has been for the documents listed in Annex B that do not meet all the conditions detailed above - the whole process is impacted and puts doubt on the validity and the credibility of such "authentication."

16.5    **Summary**

Based on the above analysis, I conclude that the "authenticated" documents listed in Annex B  do not meet any of the recognized authentication procedures under Israeli law, nor the procedure stated in Decree 264, or the MFA procedure.

Therefore it is not clear to me on what basis the consular official certified these documents with an Apostil seal, and my conclusion is that they were mistakenly or improperly sealed by the consular official with the Apostil seal.

Obviously, none of the police documents listed in the table Annex B bears any method of authentication, and therefore none of these documents is properly authenticated.

The Judea Military Court file No. 4646/06 marked as W_S162467-544 [which exists also as W_S163208-306] is sealed only by the seal of the Military Court of Appeals without Apostil. Therefore, this file is not considered as "authenticated" according to any procedure for using it for any purpose outside Israel.

The ruling rendered by the Military Court of Appeals [marked as W_S161576-582] is sealed as a true copy by the Military Court of Appeals by the seal and signature of the administrative officer of the court and Apostil by the MFA. The signature of the administrative officer of the court that rendered the ruling is not certified by the registrar of the Supreme Court, and therefore it could not be certified by the MFA.

D.    **Verdicts attributing responsibility for the attacks to Hamas**

In this chapter I shall address whether an Israeli court or a military court in the occupied territories has issued a verdict finding Hamas responsible for committing one or more of the 5 attacks listed in Annex A.

The findings discussed below are based solely on documents produced by plaintiffs regarding the 5 attacks listed in Annex A, or those cited in Shaked's Report or Alshech's Report.

Responsibility for committing the attacks listed in Annex A has been determined by an Israeli court verdict or by a verdict of a military court within the occupied territories as follows:

17.    **Responsibility of Hamas for Committing Attacks According to Verdicts of Israeli Courts**

17.1    Based on the documents reviewed, there were no verdicts were issued by Israeli courts that indicate Hamas was responsible for any of the attacks listed in Annex A.

17.2    **Table 1A – Responsibility of Hamas for Committing Attacks According to Verdicts of Military Courts in the Occupied Territories**

111

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No |
|---|---|---|---|---|---|---|
| 1 | Neve Yamin March 28, 2001 | Samaria Military Court | 5090/03 | Tarek Muhamad Abed el latif Abu Maryam | Guilty verdict - Hamas | W_S161583-590 |
| 2 | Sbarro August 9, 2001 | Beit El Military Court | 42575/01 | Muhamad Waeel Daglas | Confession - Hamas | W_S157275 |
| 3 | Sbarro August 9, 2001 | Beit El Military Court | 3452/02 | Bilal Yaa'cob Ahmad Barghuthi | Confession - Hamas | W_S156682-83 |
| 4 | Sbarro August 9, 2001 | Beit El Military Court | 3380/03 | Abdallah Barghuthi | Confession - Hamas | Roth00436 W_S085594 |
| 5 | Sbarro August 9, 2001 | Beit El Military Court | 42550/01 | Ahlam Tamimi | Confession - Hamas | W_S158762-767 |
| 6 | Ben Yehuda Street December 1, 2001 | Beit El Military Court | 3380/03 | Abdallah Barghuthi | Confession - Hamas | Roth00436 W_S085594 |
| 7 | Ben Yehuda Street December 1, 2001 | Judea Military court | 4646/06 | Ibrahim Hamed | Guilty verdict - Hamas | W_S162408-466 |
| 8[114] | Ben Yehuda Street attack December 1, 2001 | Beit El Military Court | 3042/02 | Muhamad Abdallah Hassan Halabia | Plea bargain - Military activist | W_S158719-722 |

---

[114]   According to this court file, the two suicide bombers in the Ben Yehuda Street attack were members of Halabia's "military cell." The court did not define this cell as a Hamas cell, and Halabia was not convicted for being a Hamas member.  Furthermore, Halabia was sentenced for not preventing the Ben Yehuda Street attack.

| No. | Attack | Court | Legal Procedure | Defendant(s) | Verdict and Responsibility | Ref. No |
|---|---|---|---|---|---|---|
| 9 | Bus 32A June 18, 2002 | Judea Military court | 3807/02 | Fahmi Eid Ramadan Mashahara | Guilty verdict - Hamas | W_S156746-750 |

17.3     As Table 1A indicates, according to the verdicts of military courts in the Occupied Territories, Hamas or Hamas members were responsible for the following four attacks listed in Annex A:

- Attack No. 1: March 28, 2001, Neve Yamin Bombing
- Attack No. 2: August 9, 2001, Sbarro's Bombing
- Attack No. 3: December 1, 2001, Ben Yehuda St. Bombing
- Attack No. 5: June 18, 2002, Patt Junction Bombing

17.4     The admissibility of these documents is covered by my analysis in section 3.6.2. As I concluded there, the verdicts listed in Table 1A are of the types of documents that are inadmissible as evidence of their contents pursuant to Section 42A of the Evidence Ordinance.

17.5     Based on the documents reviewed, there is one attack listed in Annex A for which plaintiffs have not provided a verdict issued by an Israeli court and/or military court in the occupied territories:

- Attack No. 4:  March 7, 2002 – Shooting Attack in Atzmona

Dated:  January 31, 2014

Moshe Azoulay

# Exhibit 9

# תוכן העניינים

הקדמה ........................................ ........................... 1

מחבלים מתאבדים - מאפיינים אישיים ........................................... 2

מחבלים מתאבדים - נתונים גרפיים ........................................... 3

פיגועי התאבדות מתחילת העימות........................................... 5



W_S089661

# הקדמה

מאז ספטמבר 2000 נמצאת מדינת ישראל בעימות אלים ומתמשך עם הפלסטינים, במסגרתו מבוצעים על ידי הצד הפלסטיני על מנגנוניו וארגוניו השונים, פיגועים נגד אזרחים ותושבים ישראלים.

בתקופה זו נרשמו למעלה מ- 24,000 פיגועים כנגד אזרחים ותושבים ישראלים ולמעלה מ- 1000 תושבים ואזרחים ישראלים קיפחו את חייהם בפיגועים אלה. מתוך פיגועים אלה 142 פיגועים הינם פיגועי התאבדות אותם ביצעו 159 מתאבדים ומתאבדות כנגד מטרות ישראליות.

למרות העובדה כי פיגועי ההתאבדות מהווים 0.6% מכלל הפיגועים שבוצעו כנגד ישראל מאז תחילת העימות, הרי **שמספר ההרוגים בפיגועים אלה מגיע לכמחצית מכלל ההרוגים**, ובכך הופך את פיגועי ההתאבדות לקטלניים ביותר. <u>מתחילת העימות ועד אפריל 2005 נמנו</u> <u>510 הרוגים ו- 3290 פצועים מ – 142 פיגועי ההתאבדות.</u>

טרור המתאבדים הפך עם השנים לאמצעי הלחימה המוביל של הפלסטינים, כשבתחילה הוא נשא אופי אידיאולוגי בטענה להתנגדות לגיטימית לכיבוש. עם זאת, במהלך תקופת העימות הסתמנה מגמה לפיה נחלש המניע האידיאולוגי אל מול התחזקות המניע הכלכלי. מפקדות הטרור יזמות ושולטות בפעילות טרור על ידי העברת סכומי כסף גדולים לפעילים בשטח, אשר **מתפרנסים** מאכוונה של פעילות טרור, ולאו דווקא פועלים מתוך מניעים אידיאולוגים טהורים. פעמים רבות המפגעים המגויסים לביצוע פיגועי התאבדות הם פלסטינים אשר להם בעיות כספיות או חברתיות, אשר מסכימים לבצע את הפיגוע בתמורה להבטחה כי ארגון הטרור שבשמו נשלחו, ידאג מבחינה כספית למשפחתם לאחר מותם.

עם הקמת מרחב החיץ, אשר מערים קשיים על ארגוני הטרור בהוצאת פיגועים, גבר השימוש שעושים ארגוני הטרור באוכלוסיות "חלשות" כמו: קטינים, נשים, חולים, אנשים הסובלים מדימומי חברתי שלילי וכיוצא בזה, לשם הוצאה לפועל של פיגועי התאבדות, תוך ניצול מצבם האישי וחזותם התמימה, בניסיון להערים על כוחות הביטחון במערכי הבדוק השונים.

**בחוברת זו מובאת סקירה המפרטת על 159 מבצעי פיגועי ההתאבדות במהלך 4.5 שנות עימות עם הפלסטינים, החל מספטמבר 2000 ועד לחודש מאי 2005.**

W_S089662

## מחבלים מתאבדים - מאפיינים אישיים

לא ניתן לשרטט פרופיל אחד של מחבל מתאבד בסכסוך הישראלי-פלסטיני, זאת משום שמאפייני המתאבדים עברו שינוי מתמיד לאורך השנים.
<u>להלן מספר מאפיינים עיקריים, המדגימים את השינויים שחלו במהלך השנים:</u>

<u>גיל המתאבדים</u> – רובם המכריע של המתאבדים הינם צעירים בני 17-24.
במהלך 2004 חלה ירידה מסוימת בגיל המתאבדים: גברה תופעת המתאבדים הקטינים (בני פחות מ- 17). כמו כן "נעלמה" כמעט לחלוטין תופעת המתאבדים המבוגרים, שהייתה למעשה, מצומצמת גם בשנים הקודמות.

<u>מצב משפחתי</u> – מרביתם המוחלטת של המתאבדים הם רווקים ורק מיעוטם נשואים, עובדה שהיא פועל יוצא מגילם הצעיר של המתאבדים.

<u>השכלה</u> - רוב המתאבדים הם משכילים. בין השנים 2000 – 2003 היו 22% בעלי השכלה גבוהה, 34% בעלי השכלה תיכונית, 9% בעלי השכלה יסודית והשאר – לא ידוע (אם כי בסבירות גבוהה הינם בעלי השכלה יסודית/תיכונית ולא בעלי השכלה גבוהה).
במהלך 2004 חלה ירידה בשיעור בעלי ההשכלה הגבוהה (8%) וההשכלה התיכונית (8%).

<u>מוצא המתאבדים</u> - בין השנים 2000-2003 היו רוב המתאבדים במוצאם מהשומרון (64%) ומיהודה (17%). במהלך 2004 גדל מאוד שיעורם היחסי של מתאבדים תושבי הרצועה (44% לעומת 16% בשנים הקודמות), במקביל חלה ירידה בשיעור המתאבדים מהשומרון (44%)ויהודה (17%).

W_S089663



W_S089664







<div dir="rtl">

<u>פיגועי התאבדות מתחילת העימות</u>

---

**25 פברואר 2005**
**פיצוץ מחבל מתאבד בכניסה למועדון "הסטייג'" בתל אביב**
**5 הרוגים ו- 52 פצועים**

---

**המחבל המתאבד – עבדאללה סעיד בדראן**

תושב <u>דיר אל גוצון/טול כרם</u>, **בן 23**, פוצץ עצמו בסמוך לכניסה למועדון "הסטייג'" בתחילת בתל-אביב, שם המתינו כמה עשרות אנשים. נטילת אחריות פורסמה על ידי ארגון הג'יהאד האיסלאמי ולאחר מכן פורסמה הכחשה. מאחורי הפיגוע עומדות תשתית הג'יהאד האיסלאמי בטול כרם , אשר אוכוונה על ידי מפקדת הג'יהאד האסלאמי בסוריה ותשתית הג'יהאד האיסלמי בג'נין.

---

**18 ינואר 2005**
**פיצוץ מחבל מתאבד בעמדת הבידוק במוצב אורחאן**
**1 הרוג (עובד שב"כ) ו- 8 פצועים**

---

**המחבל המתאבד – עומר טבש**

תושב <u>חן יונס</u>, **בן 21**, פעיל חמא"ס, פוצץ עצמו על כוחות הביטחון במהלך ניסיון מעצר ברחבת הבידוק במוצב האורחאן. המתאבד הגיע לצומת גוש קטיף במכונית סמוך לשעה 16:40, כמעט שעתיים לאחר סגירת הצומת למעבר רכב פלסטיני ובעקבות מידע מודיעיני נעצר ונלקח למתקן הבידוק. מבדיקות חבלה שלאחר הפיגוע עלה כי המתאבד נשא את חגורת הנפץ על ירכיו. חגורת הנפץ הייתה ללא רסס והופעלה באמצעות מנגנון משיכה, ככל הנראה בכדי להערים על אמצעי הבידוק. תנועת החמא"ס נטלה אחריות פומבית לפיגוע וכן פרסמה את צוואתו של המתאבד.

</div>

W_S089666

<div dir="rtl">

---

**1 נוב' 2004**
**פיצוץ מחבל מתאבד בשוק הכרמל בת"א**
**3– הרוגים ו- 32 פצועים**

---

**המחבל המתאבד – עאמר עלי/אלפאר**

תושב <u>מחנה הפליטים עסכר</u>, קטין, **בן 16**, עבד כנגר.  הביע רצונו להתאבד כנקמה על מות דודו בתחילת האינתיפאדה. המתאבד הובל לפיגוע על ידי **באסם חונדקג'י**, סטודנט ללימודי תקשורת באוניברסיטת א-נג'אח , תושב שכם, אשר השתמש בתעודת עיתונאי שהונפקה לו במסגרת לימודיו, על מנת לעבור מחסומים צבאיים באין מפריע. בהסעת המפגע לת"א נעזר חונדקג'י **בבשאר מחמד דאור עבאסי**, נהג מונית ערבי, מזרח ירושלמי, אשר ריצה עונש מאסר תקופה קצרה לפני כן על רקע הסעת פלסטינים לשהייה בלתי חוקית בישראל. המתאבד ירד מהמונית בפתח השוק, נכנס פנימה אל לב השוק ופוצץ עצמו. יש לציין כי מצבה הכלכלי של משפחת המתאבד קשה ביותר ויתכן וזהו המניע של פעילי תשתית החז"ע בשכם, מאכווני הפיגוע, לפנייה אל משפחה זו תוך ניצול מצוקתם.

---

**5 אוק' 2004**
**פיצוץ מחבל מתאבד סמוך לחוליית צה"ל בג'בליה**
**ללא נפגעים**

---

**המחבל המתאבד – לא ידוע**

מחבל מתאבד מטעם החמא"ס, שזהותו לא ידועה, ככל הנראה כבן 50, התפוצץ בסמוך למבנה בו שהה כוח צה"ל בג'בליה, ברצועת עזה. חלקי גופתו של המחבל נמצאו בשטח. לא היו נפגעים לכוחותינו.

---

**22 ספט' 2004**
**פיגוע התאבדות בטרמפיאדה בגבעה הצרפתית בירושלים**
**2 הרוגים (חיילי מג"ב) ו- 17 פצועים**

---

**המחבלת המתאבדת  - זינב אבו-סאלם**

תושבת <u>מחנה הפליטים עסכר/שכם</u>, **כבת 18**, סיימה את לימודי התיכוניים בשנה שעברה ונרשמה לאוניברסיטת נג'אח על מנת להשלים לימודיה. יצאה את ביתה בבוקר הפיגוע לאחר שמסרה לבני משפחתה כי בכוונתה לצאת לאוניברסיטה לצורך הסדרת מסמכים. המתאבדת,

</div>

W_S089667

אשר נשלחה מטעם התארגנות הפת'ח בשכם, פוצצה עצמה סמוך לחיילי מג"ב, בזמן שנבדקה.

<div dir="rtl">

---

**14 ספטמבר 2004**
**פיצוץ מחבל מתאבד רכוב על אופניים סמוך לכוח צה"ל בקלקיליה, 2 חיילים פצועים**

---

### המחבל המתאבד – יוסף טאלב יוסף אגבארי

תושב קלקיליה, חוק בן 24, עבד בעבודות מזדמנות (נגרות, סבלות). ביום הפיגוע הגיע רכוב על אופניים בצבע שחור מכיוון קלקיליה לשער החקלאי הפונה לכוון חבלה. על הסבל האחורי של האופניים היה מונח ארגז ובתוכו שק תפוחי אדמה. החיילים שעמדו במחסום ביקשו ממנו להציג ת"ז ושאלו אותו אם יש ברשותו אישור מעבר, המתאבד השיב בשלילה ונאמר לו לחזור לקלקיליה. המתאבד הסתובב לכיוון קלקיליה ופוצץ עצמו בסמוך לחיילים.

התשתית מאחורי הפיגוע הינה משולבת חמא"ס ותנזים והונהגה על ידי **אברהים עיסא**, (פעיל חמא"ס בעברו ובעל ידע בייצור מטענים) כאחראי הצבאי. עיסא הוא אשר שלח המדון לבצע הפיגוע.

---

**31 אוגוסט 2004**
**פיצוץ 2 מחבלים מתאבדים ב- 2 אוטובוסים סמוכים בבאר שבע**
**16 הרוגים ו- 100 פצועים**

---

### המחבלים המתאבדים

**ניסים ג'עברי**                    **אחמד קואסמה**

נסים ג'עברי, תושב חברון, בן 22 ואחמד קואסמה, תושב חברון, בן 29 פוצצו עצמם כמעט בו זמנית ב- 2 אוטובוסים סמוכים קרוב לבית חולים סורוקה בבאר שבע.

השניים גוייסו על ידי **מצעב השלמון**, ר' חולית החמאס בצפון חברון, אשר היה כלוא בקציעות יחד עם מחמוד קואסמה אחיו של מוראד קואסמה (מפקד הזרוע הצבאית של החמא"ס – – הרוג). עם שחרורם של השניים במסגרת שחתר אסירים הקימו חוליית חמא"ס. אחמד קואסמה נשלח לאסוף מידע בבאר שבע לצורך ביצוע הפיגוע, זאת לאחר שהיה בכוונתם לבצע הפיגוע על אוטובוס המגיע לקריית ארבע אך הגיעו למסקנה כי יהיה קושי לחדור לשם וכי ריכוז האוכלוסייה באזור לא משמעותי לטובת הפיגוע. אחמד יצא מספר פעמים לעבודה

</div>

W_S089668

בבאר שבע עם אחיו וכך למד להכיר את האזור ולבחור את היעד המתאים. הכנת חגורות הנפץ הסתיימה יומיים לפני הפיגוע. ביום שקדם לפיגוע הצטלמו המפגעים עם תפאורת חמא"ס ואמל"ח כשהם מקריאים צוואות מוכנות מראש. השניים לנו בדירה המשמשת זונות בחברון. החגורות הוסוו במסגרת גבס לתמונות על מנת שלא יחשפו במהלך נסיעת המפגעים לבאר שבע. המפגעים, שהונחו ע"י חולית מבוקשים, כיצד לתפעל החגורות, קיבלו 300 ש"ח דמי נסיעה ועלו על הסעת שב"חים לבאר שבע.

---

**28 מאי 2004**
**פיצוץ מחבל מתאבד במכונית תופת ליד מסוף ברפיח**
**2 פצועים**

---

### המחבל המתאבד – אחמד אבו ג'אמוס

תושב <u>חי גנינה/רפיח</u>, **בן 22**, הגיע בשעות הבוקר בג'יפ מכיוון דהניה ונסע לעבר אוטובוס ישראלי שנסע למסוף. הג'יפ נבלם בסוללת עפר, המתאבד ירד מהרכב והחל לבצע ירי לעבר האוטובוס, מספר שניות לאחר מכן התפוצץ הג'יפ. נהג האוטובוס עצר את הרכב דבר שגרם לרכב הליווי להתנגש בו מאחור. כתוצאה מההתנגשות נפצעו קל 2 חיילי צה"ל. הפיגוע בוצע בשת"פ של וועדות ההתנגדות, הג'האד אסלאמי והפת"ח. אחיו של המתאבד, השאם, ביצע בעבר פיגוע חדירה למוצב "מרגנית" באוג' 2001, בו נהרגו 3 חיילים.

---

**22 מאי 2004**
**פיצוץ מחבל מתאבד סמוך למחסום בקעות בעת נוהל מעצר חשוד**
**חייל פצוע ו- 4 פלסטינים פצועים**

---

### המחבל המתאבד – סאמי סלאמה

תושב <u>שכם</u>, **בן 19**, מגוייס ג'האד אסלאמי צבאי שהיה אמור להשתתף בפיגוע הקרבה עצמית, היה מעורב בפיגועי ירי בשכם. ביום הפיגוע הגיע המתאבד משכם למחסום בקעות, לבוש מעיל שחור. המתאבד הוחשד ע"י החיילים במחסום, בוצע לעברו נוהל מעצר חשוד במהלכו פוצץ מטען שנשא על גופו. אחריות לפיגוע ניטלה ע"י החזית העממית, על אף היותו של המתאבד מגוייס ג'יהאד אסלאמי.

## 28 אפריל 2004
## פיצוץ מחבל מתאבד במכונית תופת באזור כפר דרום
## 4 חיילים פצועים

### המחבל המתאבד – טארק חמיד

תושב <u>מחנה הפליטים נצירات</u>, **בן 24**, רווק, פעיל חמא"ס צבאי מוכר. בבוקר יום הפיגוע, סמוך לשעה 06:45 יצא בג'יפ יונדאי כחול, **נושא דגל ישראל**, מכיוון "בית-השלדה" (דרומית לכפר דרום) תוך שהוא גורר את גדר התלתלית שבמקום וחוצה מערבה לכיוון ציר טנצ'ר. לאחר שהג'יפ עלה על הציר הוא החל לנסוע לכיוון דרום, (אזור האורחאן). כוחות צהל שהיו באזור זיהוי את הרכב ופתחו לעבדו באש. הג'יפ הגיע למרחק 50 מ' מכוח צה"ל והתפוצץ. על הפיגוע פורסמה נטילת אחריות של החמא"ס.

## 17 אפריל 2004
## פיצוץ מחבל מתאבד בעמדת צה"ל בא.ת. ארז
## חייל הרוג ו- 3 פצועים

### המחבל המתאבד – פאדי אלעאמודי

תושב <u>מ.פ. גבאליה</u>, **בן 22**, רווק, עבד במפעל "טאטו" באזור התעשייה ארז. ביום הפיגוע הגיע עם כ- 30 פועלים, שנכנסו דרך טרמינל מגן 12 לא.ת. ארז. המתאבד והפועלים נתבקשו להרים החולצה והמכנס ויחד עברו את שערי הבידוק, אשר לא צפצפו ולא התריעו. לאחר כניסת הפועלים נשאר המתאבד אחרון וכאשר עבר את מעבר הפועלים יצא לרחבה החיצונית של הטרמינל ופוצץ עצמו. מבדיקות שבוצעו בשטח עלה כי המתאבד היה לבוש בחגורת נפץ אשר הוסלקה כנראה באזור המפשעה, כמו כן עלה כי מדובר במטען במשקל 2-3 ק"ג, אשר לא הכיל רסס. לא נמצאה מערכת הפעלה וסוללה ומסיבות אלה, ככל הנראה, לא ציפצף המגנומטר.

W_S089670

---

### 14 מרס 2004
### פיצוץ 2 מחבלים מתאבדים בנמל אשדוד
### 10 הרוגים ו- 12 פצועים

---

## המחבלים המתאבדים

נביל מסעוד                    מחמוד סאלם

נביל מסעוד, תושב ג'באליא, בן 17, מפגע מטעם הפת"ח ומחמוד סאלם, תושב בית להיה, בן 18, מפגע מטעם החמא"ס,  הגיעו לנמל אשדוד ביום הפיגוע בשעה 15:50 באמצעות מכולה אשר הייתה אמורה לחזור ריקה מהרצועה לנמל אשדוד דרך מעבר קרני .המתאבדים הוסלקו יחד עם מטעני החבלה, רימונים וציוד אישי בדופן כפולה שהוכנה במכולה עם אפשרויות לפתיחת דלתות מבפנים. השניים התפוצצו בהפרש של מספר דקות ב- 2 זירות סמוכות: האחת בתוך שטח הנמל והשנייה בסמוך לשער הכניסה.

---

### 6 מרס 2004
### פיצוץ 4 מחבלים מתאבדים במחסום ארז
### נהרגו 2 שוטרים פלסטינים

---

## המחבלים המתאבדים

| עמרו סעייד | מחמד אבו דיה | חאתם טאפש | מהתדי מביד |
|---|---|---|---|
| בן 19, שייח רדואן | בן 19, רימאל | בן 18, שאטי | בן 30, שאטי |

בסביבות השעה 10:20 התרחש פיגוע תופת משושלב ומשולב של הג'יהאד האסלאמי, החמא"ס והפת"ח הצבאי באזור התעשייה ארז, שכלל 4 מפגעים שהגיעו על גבי מספר רכבים לאזור הפיגוע.  הפיגוע כלל: פיצוץ מונית תופת פלסטינית סמוך לעמדת כוחות צה"ל, בו נהרג המחבל שברכב. במקביל, הגיע ג'יפ ממנו ירד מחבל לבוש מדים מנומרים שהחל לירות על כוחות צה"ל. המחבל חזר לג'יפ והמשיך בנסיעתו לעבר עמדת כוחות צהל שם הוריד מחבל נוסף מהג'יפ. שני המחבלים נוח ונהרגו על ידי כוחות צה"ל. בנוסף, הגיע ג'יפ נוסף לעמדה הפלסטינית שם התפוצץ ומחבל בתוכו. ההכנות לפיגועו נמשכו מספר חודשים וכללו את הכנת הרכבים, שינועם לג'באליה ואימון המפגעים בחזילה וירי. 2 הג'יפים שנטלו חלק בפיגוע הוסוו כג'יפים מסוג סופ"ג של צה"ל ונשאו לוחות זיהוי ישראליות. במסגרת הכנת הרכבים בוצעו בהם שינויים אשר כללו בין היתר: צביעה בצבע חום, רישום מספר צה"לי, גורה מהבהבת

בצבע כתום וזרקור חיפוש בגג הרכב, אנטנת קשר, רשתות נגד יידוי אבנים, דלתות אחוריות הזהות לדלתות המיגון הקיימות בג'יפ הסופה.

---

## 22 פברואר 2004
## פיצוץ מחבל מתאבד באוטובוס קו 14 בירושלים
## 8 הרוגים ו- 60 פצועים

---

### המחבל המתאבד - מחמד זעול

תושב חוסאן, בן 23, נשוי + ילד קטן, פועל בניין, עבד באזור ירושלים. המתאבד פוצץ מטען אשר נישא בתוך תיק באוטובוס קו 14,ליד גן הפעמון בירושלים. מוקד הפיצוץ אותר במרכז האוטובוס, מול הדלת האחורית.

ככל הנראה ישב המתאבד בעת הפיצוץ על המושב. גדודי חללי אלאקצא של הפת"ח נטלו אחריות לפיגוע. המתאבד לא היה מוכר כפעיל או מעורב בפעילות פוליטית (למעט העובדה כי לפני מספר שנים היה מעורב בפעילות דתית  והתקרב לגורמי "דעוה" אך בעקבות לחץ מצד בני משפחתו הפסיק את פעילותו והתרחק מגורמים אלו). בתחילת האירועים נפצע מירי של חיילים במהלך הפרות סדר שהתחוללו בכפר בעקבות מקרה דריסה של תושב מקומי ע"י כלי רכב ישראלי.

---

## 29 ינואר 2004
## פיצוץ מחבל מתאבד באוטובוס קו 19 בירושלים
## 11 הרוגים ו- 44 פצועים

---

### המחבל המתאבד – עלי ג'עארה

תושב מחנה הפליטים אלעאידה/בית לחם, בן 25, שוטר במשטרת בית לחם, פוצץ עצמו באוטובוס "אגד" (קו 19) במרכז ירושלים. מוקד הפיצוץ היה בחלקו האחורי של האוטובוס. המתאבד נשא עימו המטען במשקל 8-6 ק"ג בתוך תיק.  "גדודי חללי אלאקצא" בבית לחם קיבלו אחריות פומבית על הפיגוע.

המתאבד הותיר אחריו צוואה בכתב ידו בה נאמר כי הוא ביצע את הפעולה כנקמה על החללים שנהרגו בטבח שבוצע בשכונת אליתון. כמו כן נאמר בצוואה כי הפעולה הזו היא חלק מסדרה של פעולות שעתידות להתבצע כנקמה על מותם של חללי שכונת אליתון וכל חללי פלסטין. בצוואתו ביקש המתאבד מאימו כי תסלח לו ולא תזיל עליו דמעות שכן הוא נענה לרצונו של אללה.

W_S089672

---

## 14 ינו' 2004
### פיגוע התאבדות במחסום ארז
### נהרגו 4 חיילים ואזרחים, 10 נפצעו

---

### המחבלת המתאבדת- רים עואד

תושבת עזה, בת למשפחה אמידה, כבת 23, נשואה מזה 5 שנים ואם לשני ילדים קטנים (ילדה בת 3 וילד בן שנה וחצי). גויסה ע"י החמא"ס **והינה האם הפלסטינית הראשונה לביצוע פיגוע התאבדות**. בעלה פעיל חמא"ס. בעבר הביעה כוונות אובדניות, נשמעה כמי שלהוטה לבצע פיגוע התאבדות ואף חיפשה משלחים. קיימה קשר רומנטי עם פעיל חמא"ס צבאי בכיר ויתכן כי הפיגוע נועד גם לנקות את שמה.

---

## 11 ינואר 2004
### פיצוץ מחבל מתאבד סמוך לכוח צה"ל ליד קלקיליה
### ללא נפגעים

---

### המחבל המתאבד – איאד מצרי

תושב שכם, בן 17, התפוצץ בצומת הכפר ג'נספוט עקב "תאונת עבודה" שאירעה לו. המתאבד ובחור נוסף, שהיה מוביל, יצאו משכם לכיוון צומת תפוח כשמטרתם להגיע לאיזור רמאללה. הם הגיעו לאיזור ג'נספוט ושם נתקעו. זמן קצר לאחר שהמוביל הנחה את המתאבד להגיע אליו לחוארה דרך הכפר גמאעין/חוצ'ש, התפוצץ המתאבד באזור הכפר ג'נספוט עקב תאונת עבודה (יתכן וחימש המטען בניגוד להמלצת מובילו). המטען שהונח בתוך תיק צד שחור עם פאוצ' כלל אומים קטנים וכדוריות ברזל, סוללות 1.5 וולט ומפסק תנורים בצבע אדום שהוכנס לפאוצ'. כמו כן נמצאו שרידי פלאפון אותו נשא עמו המתאבד.

---

## 25 דצמבר 2003
### פיצוץ מחבל מתאבד בתחנת אוטובוס בצומת גהה
### 4 הרוגים ו- 20 פצועים

---

### המחבל המתאבד – ת'אאר חנני

תושב בית פוריק, בן 18, איש "החזית העממית", פועל בנין במקצוע, פוצץ עצמו בתחנת אוטובוס בצומת גהה בפתח תקווה. הפיגוע בוצע על ידי תשתית החזית העממית בשכם,

W_S089673

כנקמה על חיסולם של ג'בריל עואד ופאדי חנני. לאחר הפיגוע נעצר **מונזר צנובר**, תושב שטחים, אשר ליווה את המתאבד ליעד הפיגוע. בחקירתו סיפר כי ליווה את המתאבד לצומת גהה וכי השניים נסעו במכונית של נהג ישראלי שזוהה בחקירה **כעופר שוורצבויים**, יליד '65, תושב אורנית, אב לארבעה. בחקירתו סיפר עופר כי במסגרת עיסוקו כנהג מונית נהג להסיע תושבי שטחים רבים, מתוכם גם כאלה שידע כי אין ברשותם אישורי שהייה בישראל.

---

### 3 נובמבר 2003
### פיצוץ מחבל מתאבד סמוך לכוח צה"ל ליד עזון
### 2 חיילים פצועים

---

#### המחבל המתאבד – צביח סעוד

תושב רפידיה/שכם, בן **16**, תלמיד תיכון, יצא לביצוע פיגוע תופת בתוך ישראל על ידי תשתית התנזים הצבאית בשכם. המתאבד הועבר לאזור קלקיליה ע"מ לחדור פנימה באזור כפר קאסם למרכז הארץ באזור בו אין גדר הפרדה. בעקבות מידע מודיעיני נערכו כוחות צה"ל ומשטרת ישראל בפריסה נרחבת בכדי לסכל את חדירתו. במסגרת פעילות צה"ל בכפר עזון באזור קלקיליה החשיד כוח צה"ל מספר מקומיים וסימן להם לעצור, בשלב זה פוצץ עצמו המתאבד על ג'יפ המג"ד. בסיכול הפיגוע נמנע אסון כבד במרכז הארץ.

---

### 9 אוקטובר 2003
### פיצוץ מחבל מתאבד במת"ק טול כרם
### 2 חיילים פצועים

---

#### המחבל המתאבד – אחמד צפאדי

תושב עוריף/שכם, בן **18**, תלמיד תיכון מקצועי (מכונאות רכב) בשכם, הגיע למשרד התיאום והקישור בטול כרם עם תיק גב שחור, המתין בסככת ההמתנה עם פלסטינים נוספים ובשלב מסויים קם, ניגש לחלון קבלת הקהל במתקן ופוצץ עצמו כשגבו והתיק שעליו, מופנים לחלון. המתאבד השאיר אחריו צוואה הכתובה בכתב ידו מה- 8/10/04 בה נכתב: "אני כותב בדמי את דרך החירות וההליכה בדרך הישר למען האסלאם, בכדי לעלות את קרנה של האומה האסלאמית". כמו כן קרא בצוואה למשטרים הערביים הכנועים לנטוש את דרך הפחד והבוגדנות וקרא לעם הפלסטיני להמשיך בדרך ההתנגדות. אחריות על הפיגוע ניטלה ע"י הפת"ח.

W_S089674

---

## 4 אוקטובר 2003
## פיגוע התאבדות במסעדת "מקסים" בחיפה
## 21 הרוגים ו- 48 פצועים

---

### המחבלת המתאבדת – הנאדי ג'רדאת

תושבת ג'נין, רווקה בת **29**, בוגרת לימודי משפטים באוניברסיטת אלקודס הפתוחה. אחיה נהרג לנגד עיניה בעת מבצע ירוטו של אהובה, צאלח ג'רדאת, מי שהיה ראש תשתית הג'יהאד האיסלאמי בג'נין. ביצעה הפיגוע כנקמה על הרג השניים.

המחבלת הוסעה מברטעה לחיפה ע"י גמאל מוסא מחאג'נה, כביכול, במטרה להסדיר עניינים בבית החולים רמב"ם בחיפה עבור אביה החולה. בדרך ביקשה לעצור לאכול במסעדה, שם התפוצצה. המטען היה במשקל של 4 ק"ג וכלל כדוריות מיסב, ברזל בנין חתוך ורדיד נחושת.

---

## 9 ספטמבר 2003
## פיצוץ מחבל מתאבד בכניסה לבית קפה "הלל"
## 7 הרוגים ו- 70 פצועים

---

### המחבל המתאבד – ראמז אבו סלים

תושב רנטיס, בן **22**, פעיל חמא"ס, סטודנט ופעיל ב"כותלה אסלאמיה" באוניברסיטה הפתוחה באל-בירה. היה עצור מינהלית ושוחרר בפברואר 03. בשעה 23:20 פוצץ עצמו בפתח בית הקפה "הלל" ברח' עמק רפאים בירושלים. המתאבד נשלח לפיגוע על ידי חוליה קדמית של תשתית החמא"ס מכפר בית לקיא, חוליה המורכבת ממגויסי חמא"ס מזרח ירושלמים אשר הופעלה על ידי מפקדת החמא"ס ברמאללה. במהלך חודש אוק' 04 נעצר מס' תושבי הכפר עיסאויה בירושלים בידי שרות הביטחון הכללי ומשטרת ירושלים. בחקירתם בשב"כ הודו שניים מהם כי הם שקלטו את המתאבד והובילו אותו ליעד הפיגוע. נחקרים נוספים הודו כי סייעו לשניים ביצירת הקשר עם מפקדת החמא"ס ברמאללה ובהוצאת הפיגוע לפועל.

---

## 9 ספטמבר 2003
## פיצוץ מחבל מתאבד בתחנת אוטובוס בצריפין
## 9 הרוגים ו- 14 פצועים

---

### המחבל המתאבד – אהאב סלים

תושב רנטיס, בן **19**, סטודנט באוניברסיטת רמאללה הפתוחה, מוכר כפעיל חמא"ס וכמי שהסית לנקמה על רקע מותו של פעיל חמא"ס מירי של חיילי צה"ל. לאור קשריו לחמא"ס נעצר המתאבד ב- 21 דצמ' 2002, הועבר למעצר מנהלי למשך שלושה חודשים במתקן

W_S089675

הכליאה בקציעות ושוחרר בתחילת מרץ  2003 . המתאבד  גוייס  כמתאבד על ידי  רמאז, המחבל המתאבד בבית הקפה הלל. פיגוע זה, כמו הפיגוע בבית קפה הלל שבוצע מספר שעות מאוחר יותר, הוכוון על ידי תשתית החמא"ס ברמאללה בראשות **אברהים חאמד.**

---

## 19 אוגוסט 2003
## פיצוץ מחבל מתאבד באוטובוס בירושלים
## 23 הרוגים ו- 115 פצועים

---

### המחבל המתאבד – ראאד מסק

תושב <u>חברון</u>, **בן 29**, נשוי + 2, אימאם במסגד, בוגר אוניברסיטת ג'אאח ללימודי דת, החל לימודי תואר שני. עבד כמורה בבית ספר בחברון, לימד קוראן באוניברסיטת חברון. המתאבד פוצץ עצמו באוטובוס מס' 2 שנסע בדרכו מהכותל דרך שער שכם לכיוון רח' שמואל הנביא בירושלים. ארגון החמא"ס נטל אחריות באופן רשמי על הפיגוע. את הפיגוע הוציאה חוליה ירושלמית אשר הוכוונה על ידי תשתית החמא"ס הצבאי בחברון ואשר תכננה לבצע פיגועי תופת נוספת. בין פעיליה המרכזיים: **נסים זעתרי**, ראש החוליה, **מג'די זעתרי**, גיסו של נסים, **עבדאללה שרבאתי**, פליליונר.  בבוקר הפיגוע הגיע המתאבד לאבו דיס, שם נאסף ע"י מג'די ועבדאללה והועבר למסגד עבאדין בוואדי גוז. במקביל נשלחה חגורת הנפץ מחברון לירושלים באמצעות חברת שליחויות פרטית. המטען הוסלק בקורת גבס ונאסף ע"י נסים מסניף החברה בירושלים. נסים החביא את החגורה בבית הוריו בוואדי גוז. בשעות הערב הובאה החגורה למסגד, מגדי ועבדאללה הלבישו את המתאבד והנחו אותו כיצד להפעיל אותה. משם הסיעוהו לתחנת האוטובוס, מרחק 2 דקות נסיעה מן המסגד.

---

## 12 אוגוסט 2003
## פיצוץ מחבל מתאבד בסופרמרקט בראש העין
## , 1 הרוג ו- 9 פצועים

---

### המחבל המתאבד – אסלאם קטישאת

תושב <u>ראס אלעין/שכם</u>, **בן 18**, פוצץ עצמו בצומת הכניסה לישוב אריאל. ככל הנראה הבחין המתאבד בכוחות הביטחון, נבהל, והפעיל את חגורת הנפץ. ארגון החמא"ס נטל אחריות רשמית על הפיגוע ואף פרסם את פרטי צוואתו. מכלל המודיעין שנאסף לאחר הפיגוע עלה כי תשתית החמא"ס הצבאי בשכם, בראשות **מחמד חנבלי**, היא שביצעה את הפיגוע, כנקמה על ירוטו פאאז צדר וחמיס אבו סאלם, בכירי התשתית, בסוף השבוע האחרון שקדם לפיגוע.

W_S089676

## 12 אוגוסט 2003
## פיצוץ מחבל מתאבד סמוך לתחנת אוטובוס באריאל
## 2 הרוגים ו- 2 פצועים

### המחבל המתאבד – חמיס ג'רואן

תושב מחנה הפליטים עסכר/שכם, בן 17, תלמיד תיכון, פוצץ עצמו בסופרמרקט "חצי קופה" בפארק אפק בראש העין. המטען שנשא היה בתוך תיק שנשא על גבו. אחריות לפיגוע ניטלה ע"י תשתית תנזים שכם באכוונת עות'מאן יונס. את הסעתו של המתאבד לראש העין בצע יוסף שמאלי - ערבי ישראלי תושב גלגוליה , המוכר כמי שמסיע שב'חים.

## 7 יולי 2003
## פיצוץ מחבל מתאבד בבית פרטי בכפר יעבץ
## 1 הרוגה ו- 4 פצועים ,

### המחבל המתאבד – אחמד יחיא

תושב כפר ראעי, בן 21, סטודנט באוניברסיטת ירושלים הפתוחה בג'נין מוכר כפעיל בג'מאעה איסלאמיה,. פוצץ עצמו לצד בית פרטי בכפר יעבץ, אשר בגוש תל מונד. מכלל המידע עלה כי התשתית המשלחת הינה תשתית משולבת של פעילי ג'יהאד איסלאמי מג'נין ומטול כרם. המתאבד גוייס לג'יהאד האיסלאמי באפריל 2003 ובתקופה שלפני הפיגוע החל להתנהג באופן מוזר וחריג, בצורה שלא אפיינה אותו בעבר. במבצע משותף של השב"כ עם משטרת ישראל/ יח' "צבר", ב 11 אוק' 04, נעצר בכפר קאסם מחמד אחמד עא גני חליל, כבן 19, תושב נורא שמס, פעיל ג'יהאד איסלאמי, שהיה מעורב בפיגוע ההתאבדות. ע"פ המודיעין הקיים מחמד חליל הוביל את המתאבד, לתוך שטח ישראל, דרך כפר יעבץ, שם כאמור החליט המתאבד לפוצץ עצמו. יש לציין כי כל מאכווני הפיגוע נעצרו או נהרגו.

## 19 יוני 2003
## פיצוץ מחבל מתאבד בחנות מכולת במושב שדי תרומות
## 1 הרוג

### המחבל המתאבד – אחמד עבאהרה

תושב הכפר יאמון/ג'נין, בן 19 גויס לפיגוע על ידי תשתית הג'יהאד האיסלאמי בג'נין. קצת לאחר השעה 06:00 בבוקר הגיע המתאבד לעבר המכולת בשדה תרומות, כשהוא לבוש בג'ינס, טריקו שחורה ונושא על כתפו תיק מוצלב. המתאבד החל לחטט בחפצים שמחוץ

למכולת, בעל המכולת שאל אותו למעשיהו וקרא לו פנימה על מנת לשוחח עמו, עם היכנסו למכולת ארע פיצוץ עז.

---

## 11 יוני 2003
## פיצוץ מחבל מתאבד באוטובוס קו 14 בירושלים
## 17 הרוגים ו- 104 פצועים ,

---

### המחבל המתאבד – עבד אלמעטי שבאנה

תושב חברון, בן 18, תלמיד בבית ספר תיכון מקצועי בחברון, התפוצץ באוטובוס קו 14 ברח' יפו בירושלים כשהוא לבוש כחרדי. אחריות לפיגוע ניטלה על ידי החמא"ס. בעקבות חקירות לאחר הפיגוע נחשפה חוליה עמה פעל המתאבד וכן נחשפה תשתית של פעילים ירושלמים אשר אחד מהם אף קלט את המתאבד בירושלים טרם צאתו לפיגוע. התארגנות זו הייתה מחוברת למפקדת החמא"ס הצבאי בחברון.

---

## 19 מאי 2003
## פיצוץ מחבלת מתאבדת בקניון העמקים בעפולה
## 3 הרוגים ו- 50 פצועים

---

### המחבלת המתאבדת - הבא דראגמה

תושבת הכפר טובאס, בת 19, רווקה, סטודנטית לאנגלית באוניברסיטת "אלקדס" הפתוחה. המתאבדת הינה אחותו של בכר דראגמה, פעיל פת'/ח/ג'יהאד איסלמי אשר גויס לביצוע פיגוע התאבדות ביוני 2002 אך נעצר לפני כן וכיום הוא כלוא בישראל. הפיגוע כנקמה על מעצרו של האח. המפגעת תוארה כמי שלבשה מכנסי ג'ינס, חולצה צמודה, נעלה נעלי עקב ונשאה תיק נשי שחור שנראה כבד. ככל הנראה המפגעת יצאה לישראל ללא ליווי והגיעה לעפולה בכוחות עצמה.

W_S089678

---

## 19 מאי 2003
## פיצוץ מחבל מתאבד סמוך לג'יפ צה"ל ליד כפר דרום
## 3 חיילים פצועים

### המחבל המתאבד – שאדי נבאהין

תושב מחנה הפליטים בריג/דיר אל בלח/עזה, בן 20, רווק, פעיל חמא"ס, הגיע לכפר דרום כשהוא רכוב על אופניים והתפוצץ במסוך לג'יפ צה"לי שהיה בסיור באזור. המתאבד נשא על גבו תיק גב, בתוכו היה המטען, בכידון האופניים נמצא מנגנון ההפעלה של המטען. פיגוע זה היה חלק מפעילות של התארגנות החמא"ס בדיר אל בלח, אשר ביצעה בשגרה ירי פצמרים/נ"ל"ט לעבר כפר דרום וגלגלה "פיגועי איכות" כל מספר חודשים.

---

## 18 מאי 2003
## פיצוץ מחבל מתאבד ליד מחסום א-ראם/ירושלים
## ללא נפגעים

### המחבל המתאבד – מג'אהד ג'עברי

תושב חברון, בן 19, סטודנט להנדסה בפוליטכניקום, התפוצץ ליד מחסום א-ראם כשהוא לבוש חולצה כחולה וג'ינס חדש, מגולח ועם תספורת קצרה בצידי הראש. המתאבד נשלח לפיגוע על ידי "חוליה קדמית" של החמא"ס, תושבי אזור ירושלים, אשר פעלה   מטעם התשתית הצבאית של חמא"ס בחברון. המתאבד הגיע למחסום באמצעות מונית שירות מחברון לאבו דיס, שם נקלט בידי הפעילים הירושלמים, ומשם הועבר ברגל למחסום. המתאבד התפוצץ טרם הגעתו ליעד עקב החשדתו בידי חיילים.

---

## 18 מאי 2003
## פיצוץ מחבל מתאבד באוטובוס בגבעה הצרפתית בי-ם
## , 7 הרוגים ו- 20 פצועים

### המחבל המתאבד – באסם תכרורי

תושב חברון, בן 19, סטודנט בפוליטכניקום למחשבים שנה א', פוצץ עצמו באוטובוס אגד מס' 6, סמוך לגבעה הצרפתית, כשהוא לבוש כחרדי: מכנסיים שחורים, חולצה לבנה, כיפה וציצית.  המתאבד הולבש בבוקר הפיגוע בעת ששהה בבית אחד המגוייסים  שהופעל בידי

W_S089679

תשתית החמא"ס בחברון, **סאמר אטרש**. בחקירתו הודה סאמר אטרש באיסוף המודיעין לקראת הפיגוע, באיסוף המתאבד מאזור אבו דיס והחדרתו לירושלים, בהלנתו בביתו וכן בהכנתו והובלתו למקום הפיגוע.

---

**17 מאי 2003**
**פיצוץ מחבל מתאבד סמוך לכיכר גרוס בחברון**
**2 הרוגים**

---

### המחבל המתאבד – פואד קואסמה

תושב חברון, בן **22,** פעיל חמא"ס, הגיע לאזור כיכר גרוס בחברון  כשהוא **מחופש ליהודי דתי**, נחשד ע"י חיילים אשר קראו לו לעצור ואז פוצץ עצמו ליד מס' ישראלים. המתאבד היה עצור מנהלי לאחר שנעצר במסגרת הכניסה לעיר חברון במבצע "חומת מגן". המתאבד היה מחובר לקבוצות פעילי חמא"ס ממסגד "גהאד" אשר 4 מהם ביצעו 2 פיגועי התאבדות ב- 7 מרס 03, האחד בקריית ארבע והשני בהיאחזות נגוהות. מחומר חקירות עלה כי יחד עם המתאבד גוייסו לפעולות חמא"ס צבאית עוד 3 מפגעים. כל הארבעה היו מעונינים לבצע פיגוע התאבדות, אולם מתאבד זה נבחר לבצע הפיגוע, על ידי **באסל קואסמה**, מבכירי תשתית החמא"ס בחברון, שהכווינה את הפיגוע .

---

**8 מאי 2003**
**פיצוץ מחבל מתאבד במכונית תופת בצמוד לטנק לטנק ברצ"ע**
**ללא נפגעים**

---

### המחבל המתאבד – מחמוד ענאני

תושב מחנה הפליטים מיראות בדיר אל בלח/עזה, בן **22**, רווק, שוטר ופעיל פת"ח, פוצץ עצמו ברכב תופת בסמוך לטנק, ליד כפר דרום. מספר דקות טרם הפיגוע בוצע ירי הסחה לעבר כוחותינו על ציר טצ'ר. בסריקות לאחר הפיגוע התגלה כי הטנדר הכיל 2 בלוני גז ומטענים בדלתותיו, אולם בעקבות תקלה התפוצץ במהלך הפיגוע  רק בלון גז אחד. "גדודי חללי אלאקצא" נטלו אחריות פומבית לפיגוע.

---

**30 אפריל 2003**
**פיצוץ מחבל מתאבד בכניסה לפאב מייקס פלייס בת"א**
**מתאבד נוסף השליך מטען בסמוך**
**3 הרוגים ו- 62 פצועים**

---

### המחבלים המתאבדים

עמר שריף                     האניף אסיף

האניף אסיף, **בן 22,** <u>אזרח בריטי</u> התפוצץ בכניסה לפאב "מייקס פלייס" בטיילת בתל אביב. עמר שרף, **בן 27,** <u>אזרח בריטי</u> אף הוא, ניסה להתאבד יחד עם האניף אולם בשל תקלה במטען לא הצליח לבצע את זממו ונמלט מהמקום, תוך שהוא נפטר מהמטען שהיה ברשותו. המטען שנשא עמר הורכב מחומר נפץ תקני במשקל של כ- 5 ק"ג, ללא רסס והוטמן בכריכת ספר.  גופתו של עמר נפלטה מהים כשבועיים לאחר הפיגוע. ארגון החמא"ס נטל אחריות לפיגוע ואף פרסם קלטת וידאו בה נואמים שני הבריטים טרם יציאתם לפיגוע. מניתוח ממצאי הדרכונים עולה כי השניים הגיעו לשטח במסלול שהחל ב- 8 לאפריל בסוריה משם לירדן ב- 11 לאפריל וכניסה לשטח ב- 12 לאפריל. מכלל החקירות עלה כי צמד המפגעים הסתייע במספר פעילי שמאל זרים השוהים בשטח לתנועות בישראל, ברצועה ובגדמ'ע.

---

**24 אפריל 2003**
**פיצוץ מחבל מתאבד בכניסה לתחנת הרכבת בכפר סבא**
**1 הרוג ו- 15 פצועים**

---

### המחבל המתאבד – אחמד חטיב

תושב <u>כפר בלאטה/שכם</u>, **בן 18**, תלמיד תיכון, בן להורים גרושים, הגיע בבוקר יום הפיגוע לאזור תחנת הרכבת בכפר סבא, כשהוא לבוש בג'ינס ובמעיל שחור ארוך עם כיתוב באנגלית מאחור, אליו ככל הנראה חוברה חגורת הנפץ. המתאבד עבר שני שוטרים וכשהגיע בסמוך למאבטחי התחנה עצמה, ניגש אליו אחד המאבטחים, שוחח עמו וביקש ממנו להזדהות. המתאבד הכניס יד למכנסיו ופוצץ עצמו. גדודי חללי אלאקצא של 'פתח' וגדודי אבו עלי מצטפא של החזית העממית  נטלו אחריות משותפת לפיגוע.

W_S089681

---

### 15 אפריל 2003
### פיצוץ מחבל מתאבד חמוש בנק"ל רימון וחגורת נפץ במעבר קרני
### 2 הרוגים ו- 3 פצועים

#### המחבל המתאבד – מחמד יונס

תושב <u>מחנה הפליטים ג'באליה/עזה</u>, **בן 18**, תלמיד תיכון, פעיל חמא"ס. בבוקר הפיגוע הגיע אליו **ראמי אבו סחילה**, פעיל חמא"ס צבאי ממ.פ. ג'באליה והכינו לקראת היציאה לפיגוע. בהמשך הבוקר הגיעו סוחר בעל היתר כניסה לאזור המסוף ובנו, אשר הכניסו את המתאבד לארגז מכוניתם והחביאוהו בתוך הסחורה. בבדיקה במסוף לא נבדק הארגז והמתאבד הורד מהמכונית במסוף, כשהוא חמוש בנק"ל, רימונים וחגורת נפץ והחל לירות ולהשליך רימונים לעבר המסוף. המתאבד נורה ונהרג על ידי המאבטחים  וחיילי המילואים במקום.

---

### 30 מרס 2003
### פיצוץ מחבל מתאבד בפתח בית קפה "לונדון" בנתניה
### 54 פצועים

#### המחבל המתאבד – ראמי ע'אנם

תושב הכפר <u>דיר אל גוצון</u> בטול כרם, **בן 20**, רווק, סטודנט לחשבונאות/מנהל עסקים במכללת כדורי בטול כרם, מוכר כפעיל חזית עממית. בשל היותו חשוד בשיתוף פעולה עזב את החזית העממית והצטרף לשורות הג'יהאד האסלאמי מספר ימים לפני הפיגוע. המתאבד פוצע עצמו בכניסה לבית הקפה בנתניה כשהמטען שהורכב מקופסת פח בסדר גודל של 1.5-1 ק"ג, הודק לבטנו באמצעות חגורת עור וסמרטוטים לבנים. אחריות לפיגוע נלקחה ע"י הג'יהאד האסלאמי.

---

### 5 מרס 2003
### פיצוץ מחבל מתאבד באוטובוס בשדרות מוריה בחיפה
### 15 הרוגים ו- 42 פצועים

#### המחבל המתאבד – מחמוד עמראן קואסמה

תושב <u>חברון</u>, **בן 20**, סטודנט למחשבים בפוליטכניקום בחברון, התפוצץ בתוך אוטובוס מס' 37, בכניסה לשכונת כרמליה בחיפה. מאחורי הוצאת הפיגוע עמדה מפקדת החמא"ס הצבאי בחברון, ובמרכזה פעל **עלי רג'בי** כמי שאחראי על התשתית הלוגיסטית ולצדו

המבוקש **עלי עלאן**, האחראי על הכנת חגורת הנפץ. מי ששימש כמובילו של המתאבד לחיפה היה **חאפז רג'בי**, תושב חברון, בעל ת.ז. מזרח ירושלמית אשר אפשרה לו נגישות לישראל.

```
9 פברואר 2003
פיצוץ מכונית תופת ובה 3 מחבלים באורחאן
4 חיילים פצועים
```

### המחבלים המתאבדים

| מחמד אמום | סלימאן מקדאד | סאמי ע"א סאלם |
|---|---|---|

סאמי ע"א סאלם, תושב <u>ברג'/דיר אל בלח</u>, בן **17**, סלימאן מקדאד, תושב <u>נצירארת/עזה</u>, בן **22** ומחמד אמום, תושב <u>בריג'</u>, **בן 18**, נסעו במכונית מסוג פונטיאק בצבע לבן, והגיעו מחלקו הצפוני של האורחאן. שניים מהם ישבו בקדמת הרכב ואחד מאחור, כשהוא מחזיק ברשיות קלאצ'ניקוב. במהלך התקרבותם למחסום, ביצע המפגע שמאחור ירי לעבר כוחותינו, הרכב סטה ימינה, התנגש בבטונאדות של מוצב האורחאן והתפוצץ. אחריות לפיצוע ניטלה על ידי תשתית הג'יהאד האיסלאמי באזור מחנות הפליטים במרכז הרצועה, בראשה עמד (עד להריגתו ב- 17 מרס) **מחמד סעאפין**.

```
17 ינואר 2003
פיצוץ מתאבד ברפסודת תופת מערבית לדוגית
ללא נפגעים
```

### המחבל המתאבד – מחמוד ג'מאסי

תושב <u>רמאל/עזה</u>, **בן 21**, רווק, מוכר כפעיל חמא"ס. המתאבד יצא, ככל הנראה, מאזור שאטי, כשהוא סוחב עמו חצי חבית ובה אמל"ח במשקל 40 ק"ג. המתאבד הגיע לאזור הפיגוע על גבי סירת דיג והורד ממנה כשעליו מצופים במטרה להיסחף עם המים כשרוב גופו שקוע במים. מטרתו הייתה להתקרב לדבור ולהתפוצץ בסמוך לו. דייגים אשר הבחינו בו, חשבו כי הוא נתון במצוקה ושלחו אליו רפסודה, כאשר הגיעה אליו הרפסודה (במקביל להגעת הדבור) פוצץ עצמו במים. הפיגוע אוכזו ע"י פעיל החמא"ס הצבאי הבולט, **ואל נצאר**, ולאחר הפיגוע עלה כי המתאבד התאמן כשנה באזור שאטי בשחייה וצלילה ללא מכשירים.

W_S089683

## 5 ינואר 2003
## פיצוץ 2 מחבלים מתאבדים בתחנה המרכזית הישנה בת"א
## 23 הרוגים ו- 106 פצועים

### המחבלים המתאבדים – בראק חליפה וסאמר נורי

בראק חליפה, **בן 20** וסאמר נורי, **בן 19**, שניהם תושבי <u>שכם</u>, ביצעו פיגוע התאבדות כפול בתחנה המרכזית הישנה בת"א. צמד המתאבדים, שהיו חברים עוד מתקופת ילדותם, פוצצו עצמם בשני מוקדים שונים (במרחק 200 מ') ובהפרש של 50 שניות. השניים הוסעו למקום הפיגוע על ידי ערבי ישראלי. אחריות לפיגוע נלקחה על ידי הזרוע הצבאית של הפת"ח בשכם, בראשותו של **נאאף אבו שרח** (הרוג). אבו שרח אוכון על ידי משמרת המהפכה האיראנים בלבנון, אשר מממנים הפיגועים ומאפשרים להתארגנויות הפת"ח להמשיך ולבצע פיגועים בתחומי ישראל. פיגוע זה הנו אחד הפיגועים הקטלניים ביותר מתחילת העימות, כפי שבא לידי ביטוי בכמות הרבה של הנפגעים ובאיכות המטענים שהכילו חנ"מ במשקל המוערך במעל 10 ק"ג למטען ורסס מתכתי רב במטרה להגדיל את אפקט הפגיעה.

## 28 דצמבר 2002
## פיצוץ מכונית תופת נהוגה בידי מתאבד ליד מגרש הרוסים
## , ללא נפגעים

### המחבל המתאבד – עלאא כרכי

תושב <u>ענאתה החדשה/ירושלים</u>, **בן 20**, רווק, סטודנט למנהל שנה א' במכללת אבארהמיה, ניסה לפוצץ עצמו ברכב תופת שחנה ברח' מונבז בירושלים, בסמיכות לאזור בילויים שוקק חיים. בחקירתו בשירות ביטחון כללי הודה המתאבד כי ביצע הפיגוע במטרה להרוג יהודים ולהיהרג. כמו כן סיפר כי חזר בתשובה לפני כשישה חודשים והחל להתפלל, והחלטתו לבצע פיגוע באה במטרה לכפר על התנהגותו הכופרת לאורך השנים. המתאבד הודה כי הוא זה שיזם הגה וביצע את ניסיון הפיגוע לבדו.

W_S089684

---

**27 נובמבר 2002**
**פיצוץ מכונית תופת נהוגה בידי מתאבד במתחם ה-DCO,**
**ליד מחסום ארז ברצועת עזה, ללא נפגעים**

---

### המחבל המתאבד – מהנד מהדי

תושב שיח' רדואן/עזה, בן 25, נשוי ואב לילד, נסע במכונית על ציר טנצ'ר, התפרץ לעמדת הקישור הפלסטיני והתפוצץ במהלך הנסיעה.

מאחורי ניסיון הפיגוע עומדת תשתית החזית העממית. הפיצוץ היה של מטען ופצמ"ר 82 מ"מ מאולתר.

---

**22 נובמבר 2002**
**פיצוץ סירת תופת נהוגה בידי 2 מתאבדים סמוך לספינת**
**חיל הים מול חופי דוגית, 4 חיילים פצועים**

---

### המחבלים המתאבדים – ג'מאל אסמאעיל ומחמד מצרי

ג'מאל עסמאעיל, תושב בריג'/עזה, בן 22 ומחמד מצרי, תושב בית חנון, בן 19, סטודנט שנה א' באוניברסיטה האיסלאמית, גנבו חסקה של דייגים, העמיסו עליה חומרי נפץ ושייטו באזור האסור לדייג. עקב כך הוקפץ לנקודה דבור חיל הים, צוות הדבור קרא לעברם ומשלא נענה התקרב הדבור לסירת הדייג. בשלב זה פוצצו עצמם שני המתאבדים בתוך הסירה. ארגון הג'יהאד האסלאמי נטל אחריות פומבית לפיגוע. חברי ההתארגנות שביצעה הפיגוע הכירו את שיגרת הפעילות הימית של כוחותינו, שיתפו בפיגוע 2 מפגעים על מנת לדמות את סירת התופת לסירת דייג "רגילה" ובכך לסייע במשיכת הדבור לעבר הסירה.

---

**21 נובמבר 2002**
**פיצוץ מחבל מתאבד באוטובוס קו 20 בירושלים**
**11 הרוגים ו- 50 פצועים**

---

### המחבל המתאבד – נאאל אבו הליל

תושב דורא, אשר עבר מס' חודשים לפני הפיגוע להתגורר בבית לחם, חוק, דתי, נהג לעבוד עם אביו בבסטת ירקות בשוק הישן בבית לחם. המתאבד פוצץ עצמו באוטובוס אגד קו 20 ברח' מכסיקו בירושלים. אחריות לפיגוע ניטלה על ידי החמא"ס. שירות בטחון כללי חשף, במבצע משולב עם צה"ל, את החוליה מבית לחם, אשר הייתה אחראית לפיגוע. במסגרת

המבצע נעצרו 2 יצרני המטענים, 5 פעילים בכירים נוספים שעסקו בהכנת המטענים ובגיוס מתאבדים ו- 6 צעירים אשר גויסו לבצע פיגועי התאבדות. בתאריך 20/11/02 פנה **מחמד שאכר עלאן מעלא** (אחד מיצרני המטען ובן דודו של עלי עלאן, בכיר מבוקשי החמא"ס בבית לחם) **לאיברהים גוגדיה**, פעיל חמא"ס בבית לחם, ובקש ממנו להצטרף אליו לטובת העברת מפגע לירושלים. השניים צעדו בוואדי אחמד' הנמצא סמוך לבית לחם, כאשר מחמד נושא בידו שקית שחורה ובתוכה חליפת התעמלות שחורה ומחברות. לאחר הליכה קצרה פגשו השניים מתאבד והחלו ללכת לכיוון בית ג'אלה. בחלוף 30 דקות, הוציא מחמד את חליפת ההתעמלות משקית הניילון שהביא עמו וקרע את הבטנה הפנימית של החליפה במטרה כי לא תפריע למתאבד להפעיל את חגורת הנפץ. סמוך לכפר שארפאת, הנמצא למרגלות שכונת גילה, הבחין מחמד במערה בה לן המתאבד במשך הלילה. למחרת בבוקר עלה המתאבד על אוטובוס הנוסע לכיוון קרית מנחם בירושלים והתפוצץ.

---

**11 נוב' 2002**
**גילוי גופת מחבל מתאבד שיצא לפיגוע ועליה שרידי חגורת**
**נפץ סמוך למעבר ארז, ללא נפגעים**

---

### המחבל המתאבד – סייד חסנין

תושב <u>מצרים</u>, בן **23**, יצא לבצע פיגוע התאבדות כנגד עמדה צה"לית במעבר פועלים בצפון הרצועה, באכוונת ארגון הג'האד אסלאמי ברצועה. על פי הערכות ניסה המתאבד להגיע לכיוון העמדה האחורית, הסתבר בתיל שבירידה לנחל חנון וכתוצאה מתקלה במטעו או נפילתו של סייד הופעל המטען והרגו במקום. גופתו נמצאה במרחק של כ- 350 מ' דרמית לעמדה אחורית בטרמינל ארז כשעליה שרידי חגורת נפץ ורימון. על ראשו היה סרט שחור עליו כיתוב "פלוגות ירושלים".

---

**4 נוב' 2002**
**פיצוץ מחבל מתאבד בקניון "ערים" בכפר סבא**
**2 הרוגים ו- 37 פצועים**

---

### המחבל המתאבד – ח'אלד צואלחה

תושב <u>כפר בלאטה/שכם</u>, **בן 18**, חוק, פוצץ עצמו בקומה הראשונה של קניון "ערים" בכפ"ס, כנקמה על מות קרוב משפחתו בכניסת הצבא למ.פ. בלאטה. הפיגוע בוצע בידי התארגנות פת"ח משכם. אחריות ניטלה על ידי ארגון "הזרועות השחורות" באכוונתם של צאלח  קיני. צאלח, תושב כפר קליל, פעיל תנזים צבאי, נעצר והודה בחקירתו באיתורו ושילוחו של ח'אלד צואלחה לפיגוע.

---

**27 אוקטובר 2002**
**פיצוץ מחבל בתחנת דלק בכניסה לאריאל**
**3 הרוגים ו- 17 פצועים**

---

**המחבל המתאבד – מחמד בוסטאמי**

תושב <u>שכם</u>, **בן 19**, סטודנט לתכנות מחשבים באוניברסיטת אלנג'אח, הגיע לתחנת הדלק באריאל כשהוא נושא על גופו חגורת נפץ, אזרחים וחיילים שהיו בתחנה החשידו אותו כמחבל. במהלך ניסיונותיהם להשתלט עליו ירה אחד מהם במתאבד  והלה התפוצץ, ככל הנראה הספיק המתאבד  להפעיל את חגורת הנפץ שנשא על גבו. אחריות לפיגוע ניטלה על ידי החמא"ס, הפיגוע בוצע על ידי תשתית החמא"ס בשכם .

---

**21 אוקטובר 2002**
**פיצוץ 2 מחבלים מתאבדים במכונית תופת צמוד לאוטובוס**
**קו 841 ליד צומת כרכור**
**14 הרוגים ו- 48 פצועים ,**

---

**המחבלים המתאבדים – מחמד חסנין ואשרף אסמר**

מחמד חסנין , **בן 19** ואשרף אסמר, **בן 18**, שניהם תושבי <u>ג'נין</u> ופעילי הג'יהאד האסלאמי, נסעו ברכב תופת מכיוון צומת מגידו לחדרה, נצמדו לאוטובוס אגד מס' 841 ופוצצו עצמם. אחריות לפיגוע ניטלה על ידי הג'יהאד האסלאמי. את הפיגוע ביצעה תשתית הג'יהאד האסלאמי בג'נין באכוונתם ותכנונם של **איאד צואלחה** ו**סעיד טובאסי**.

שמות המתאבדים הועברו לטובאסי, אשר העבירם לצואלחה. צואלחה ביקש מטובאסי לארגן רכב ולהעביח ל**אנס ג'ארדאת**, אשר העמיס אותו בחומרי נפץ. לאחר מכן הועבר הרכב עם חומרי הנפץ למחסן בג'נין. טובאסי נפגש עם שני המתאבדים ולקחם לביתם של צואלחה, אשר נתן לשני המתאבדים כסף על מנת שייקנו בגדים לקראת הפיגוע המתוכנן וביקש מטובאסי להביא בצוהרי יום המחרת תיק ריק, נשק, סיסמאות, כתובות בדבר אללה והג'האד אסלאמי וכן סלוטייפ להדבקת הכרחזים והסיסמאות. בצוהרי יום המחרת הסיע המחבל טובאסי את צואלחה

ושני המתאבדים, הלבושים בבגדיהם החדשים, ברכב ירוק עם חלונות כהים לאזור העירייה, שם קיבלו את חומר הנפץ. הפיגוע יצא לדרכו כאשר **מחמד גראדאת**, פעיל ג'יהאד אסלאמי מסילת אל חארתיה, מוביל את המתאבדים ומסייע בפתיחת הדרך.

---

## 11 אוקטובר 2002
## לכידת מחבל מתאבד בעת שניסה לפוצץ חגורת נפץ
## בבית קפה בטיילת בחוף תל אביב, ללא נפגעים

---

### המחבל המתאבד – ראאפת מוקדי

תושב <u>זאויה/קלקיליה</u>, **בן 23**, הגיע בשעות הערב לקפה "הטיילת" בתל-אביב. בעת בדיקה שנערכה ע"י המאבטח בכניסה אותרה חגורת הנפץ על גופו של המתאבד, אשר החל לברוח. לאור צעקות המאבטח רדפו מאבטחי השגרירות האמריקאית אחרי המתאבד ועצרו אותו. ניסיון הפיגוע אוכזן על ידי תשתית החמא"ס ברמאללה, שקלטו ושיגר את המתאבד. הובלתו של המתאבד לתל אביב נעשתה בעזרת נהג ערבי ישראלי, **אשרף זעייר**, תושב כפר עקב, בעל ת.ז. כחולה.

---

## 10 אוקטובר 2002
## פיצוץ מחבל מתאבד ליד תחנת אוטובוס בצומת קוקה קולה
## 1 הרוגה ו- 20 פצועים

---

### המחבל המתאבד – רפיק חמאד

תושב <u>קלקיליה</u>, **בן 31**, נשוי ואב ל- 4, ניסה לעלות לאוטובוס "ח" קרוב למחלף בר-אילן, נפצע במהלך ניסיון העלייה לאוטובוס וטופל במקום ע"י נהג האוטובוס ורופא . כאשר הבחינו כי הוא נושא חגורת נפץ, ניסה המתאבד לברוח, רץ לכיוון תחנת הדלק ופוצץ עצמו. המתאבד גויס לביצוע הפיגוע על רקע חשדות בשת'פ נגדו ונגד משפחתו ועל מנת לנקות את שם המשפחה. המתאבד היה קרוב משפחה של ראש החמא"ס הצבאי לשעבר בקלקיליה, עא-רחמאן חמאד (הרוג). אחריות לפיגוע ניטלה על ידי גדוד עז אלדין אל קסאם. הפיגוע בוצע על ידי תשתית החמא"ס בקלקיליה.

W_S089688

---

## 19 ספטמבר 2002
## פיצוץ מחבל מתאבד באוטובוס קו 4 ברח' אלנבי בתל-אביב
## 6 הרוגים ו- 71 פצועים

---

### המחבל המתאבד – איאד רדאד

תושב רמאללה, ירדני במוצאו, בן 23, הגיע לישראל ביולי 2000, גויס ע"י תשתית החמא"ס הצבאית ברמאללה לצורך ביצוע פיגוע התאבדות. אחראי החוליה והאחראי על גיוס המתאבדים והוצאת הפיגועים לפועל היה מחמוד חמאד מחמוד שריתח, בן 25, תושב יאטה, סטודנט באוניברסיטת ביר זית ופעיל מרכזי בתנועת הסטודנטים מטעם החמא"ס באונ' - הכותלה אסלאמיה. בראש התשתית עמדה מפקדת החמא"ס ברמאללה, שאחראית על ביצוע פיגועי התאבדות נוספים. שריתח נפגש עם המתאבד ברמאללה עפ"י הנחיות שקיבל וגייסו לתשתית. יומיים טרם הפיגוע העבר המתאבד לדירה מבצעית בירושלים ע"י שריתח, צולם וחומש בחגורת הנפץ. מהדירה הסיעו אשרף זעייר, סוחר בגדים בעל ת"ז ירושלמית, אל מקום הפיגוע ברח' אלנבי תוך שהוא מנחה אותו לגבי מתווה הפיגוע אותו בחר (פיצוץ בתוך האוטובוס).

---

## 18 ספטמבר 2002
## פיצוץ מחבל מתאבד ליד ניידת משטרה סמוך לאום אל פחם
## 1 הרוג (שוטר) ו- 2 פצועים

---

### המחבל המתאבד – מרזוק ג'ואדרה

תושב ביר אל בשה/ג'נין, בן 21, רווק, פוצץ עצמו בתחנת אוטובוס בצומת אום אל פחם. המטען הונח בתיק והופעל כנגד שוטרים אשר הגיעו למקום לאחר שקיבלו שיחת טלפון בה נמסר להם על חשוד כמתאבד העומד בצומת. הפיגוע בוצע על ידי התארגנות ג'האד אסלאמי באזור קבאטיה.

W_S089689

```
6 אוגוסט 2002
פיצוץ מחבל מתאבד במכונית של ערבי ישראלי שהסיעו ליד
אום אל פחם, פצוע אחד
```

**המחבל המתאבד** – מחמד אצפר

תושב כפר עסכר/שכם, בן 19, רווק, עבד בחנות בשר, התפוצץ, בתוך רכבו של ערבי ישראלי, תושב נצרת, ליד אום אל פחם.  אחריות לפיגוע נלקחה על ידי גדודי אלנט"יר (חוליה חדשה של תנזים פת'ח), אשר יצאו בהודעה זאת לאחר לחץ כבד שהופעל על ידי משפחתו של המתאבד, לדעת מה עלה בגורלו, לאחר שהלה נעדר מביתו מזה מספר ימים. משלחיו של המתאבד היו עלי עגורי ומראד מרשוד, מראשי תשתית הפת"ח בשכם.

```
4 אוגוסט 2002
פיצוץ מחבל מתאבד באוטובוס בצומת הר מירון
9 הרוגים ו- 52 פצועים
```

**המחבל המתאבד ג'האד/מגאהד חמאדה**

תושב בורקין/שכם, בן 20, ירדני במוצאו, עבד ללא היתר אצל דודו בעבודות חשמל. במסגרת עבודתו הכיר את אבראהים מחמד אבראהים בכרי, אזרח ישראלי תושב הכפר בענה אשר יחד עם חבר הטוב יאסין בכרי היו שותפים להוצאת הפיגוע אל הפועל. המתאבד היה עצור בעבר על רקע שהיה בלתי חוקית בישראל, גורש חזרה לתחומי הרש"פ אך המשיך לעמוד בקשר טלפוני עם אבראהים, במסגרת קשרים אלה סיפר המתאבד לאבראהים כי גויס לחמא"ס וכי ברצונו לבצע פיגוע התאבדות. המתאבד ביקש את סיועו של אבראהים בהעברתו ממקום למקום. בבוקר הפיגוע יצאו אבראהים, יאסין והמתאבד לכיוון כרמיאל, לבחור קו אוטובוס בו נוסעים חיילים רבים, כשאבראהים ברכב קדמי כ"פותח ציר" ויאסין והמתאבד ברכב מאחוריו. במהלך הנסיעה החליף המתאבד בגדים ולבש בגדים האמורים לשוות לו מראה של ישראלי. בשל המצאות כוחות בטחון בכרמיאל נסעו השלושה לכוון אחת מתחנות האיסוף של האוטובוס. המתאבד הורד בצומת שזור, עלה על אוטובוס אגד מס' 361 לצפת, ומשהגיע האוטובוס לצומת מירון  הפעיל את מטען הנפץ שהיה עליו והתפוצץ.

W_S089690

**30 יולי 2002**
**פיצוץ מחבל מתאבד ברח' הנביאים בירושלים**
**5 פצועים**

### המחבל המתאבד חאזם יוסף

תושב <u>בית ג'אלה</u>, בן **17**, תלמיד תיכון, פוצץ מטען בתוך תיק שנשא על גופו, סמוך ל"מרכז הפלאפל" ברח' הנביאים בי-ם. אחריות לפיגוע ניטלה על ידי גדודי חללי אל אקצא. **עלאא עא כרים ומחמד המאש** הודו בחקירותיהם בשירות ביטחון כללי כי הם אלה האחראים להכנת המטען ולשליחתו של המתאבד  לפיגוע, לאחר שהאחרון פנה לעלאא עא כרים וביקש ממנו כי ישלחו לפיגוע התאבדות.

**17 יולי 2002**
**פיצוץ 2 מחבלים מתאבדים במדרחוב נווה שאנן בתל-אביב**
**5 , הרוגים ו – 33 פצועים**

### המחבלים המתאבדים אבראהים נאג'י ומחמד עטאללה

אברהים נאגי, תושב <u>כפר בלאטה/שכם</u>, בן **18** ומחמד עטאללה, תושב כפר עסכר, בן 19 התפוצצו במדרוג בהבדל של כחצי דקה אחד מהשני, בתחילת המדרחוב של נווה שאנן, כשהם עומדים במרחק 30 מ' האחד מהשני. הפיגוע בוצע על ידי התארגנות פת"ח משכם בהובלת **עלי עג'ורי** אשר נטל אחריות לפיגוע בשם "גדודי אל נזיר". המפגעים גויסו והוחדרו לישראל על ידי פעילי הפת"ח. פעילי הג'האד אסלאמי סיפקו את המטענים. המפגעים נעו משכם לאזור ג'נין ושהו באזור אום אל פחם כ- 5 שעות טרם ייצאו לכיוון ת'א. הסעתם לתל אביב בוצעה על ידי **חאלד עאשור**, מסיע שב"חים, תושב יפו, אשר סיפר בחקירתו בשירות ביטחון כללי כי השניים אמרו לו כי בכוונתם לבצע פיגוע התאבדות אולם בשל חשש לחייו הסיעם למקום הפיגוע ולא סיפר על כך לאיש.

W_S089691

.

---

**19 יוני 2002**
**פיצוץ מחבל מתאבד בגבעה הצרפתית בירושלים**
**7 הרוגים ו – 39 פצועים**

---

**המחבל המתאבד סאאד עואדה**

תושב <u>שכם</u>, **בן 17**, פעיל תמים, פוצץ עצמו בתחנת הסעה בצומת הגבעה הצרפתית בי-ם. הפיגוע אוכוון על ידי תשתית הטרור של הפת"ח בשכם.

---

**18 יוני 2002**
**פיצוץ מחבל מתאבד באוטובוס בשכונת גילה בירושלים**
**, 19 הרוגים ו – 50 פצועים**

---

**המחבל המתאבד מחמד אלע'ול**

תושב <u>שכם</u>, **בן 22**, סטודנט לתואר שני בלימודי הלכה באוניברסיטת אלנג'אה, פוצץ עצמו באוטובוס אגד מס' 32 ברחוב דוב יוסף בשכונת גילה בירושלים. המתאבד נאתר, גויס והוכשר על ידי תשתית החמא"ס הצבאית בשומרון. לאחר שני ניסיונות כושלים להוציא את המתאבד לפיגוע ולאחר ייחוטו של קייס עדואן (מראשי תשתית החמ"אס בשומרון) , הופנה המתאבד על ידי מאזן פוקהא **למהנד טאהר**, אשר עמד באותה העת בראש תשתית החמא"ס בשומחן (הרוג). מהנד טאהר הביא את המתאבד **לחליל מרואן חליל**, חבר ההתארגנות בשומחן (עצור), אשר הסיע לעזריה שבמזרח ירושלים שם אמור היה להיאסף על פי תאום מראשו של **עלי עלאן**, פעיל חמא"ס צבאי מבית לחם. עלי נעזר בחברו **רמדאן משאהרה**, ובאחיו, **פהמי משאהרה**, שניהם תושבי מזרח ירושלים בעלי ת.ז. כחולה (עצורים), בביצוע הפיגוע ובתכנונו. לאחר איסוף מודיעין שעשה פהמי נבחר היעד לפיגוע – קו 32 של אגד הנע מכיוון שכונת גילה למרכז ירושלים. היעד נבחר כאטרקטיבי לביצוע פיגוע נוכח העובדה כי הוא עוצר בתחנת בית צפאפא, אזור המחנה באוכלוסייה ערבית, בה לא ייתפס אדם בעל חזות ערבית כחשוד. כחלק מההכנות לקראת הפיגוע, נסע פהמי בקו האוטובוס האמור פעמים מספר, רכש כרטיסיה ואף ניקב אותה על מנת שתוכל לשמש את המתאבד מבלי שתעורר חשד. המתאבד הועבר לבית לחם, הולן בעיר ובבוקר המחרת הוסע לאזור אבו דיס ביחשלים, שם אסף אותו פהמי  והשניים המשיכו בציר הנסיעה לעבר מערב ירושלים כאשר רמדאן משאהרה, נוסע

מלפנים ומתריע מפני מחסומים ישראליים. עם הגעתם לתחנה האוטובוס הסמוכה לבית צפאפא הורד המתאבד, עלה על האוטובוס והתפוצץ.

---

### 17 יוני 2002
### פיצוץ מחבל מתאבד שנחשד ע"י כח מג"ב ליד מרג'ה/הירקון, ללא נפגעים

#### המחבל המתאבד עלא מרשוד

תושב מ.פ. בלאטה/שכם, בן 20, עובד במפעל למוצרי חשמל, פוצץ עצמו במרג'ה, לאחר שהוחשד ע"י כוח מג"ב אשר קרא לו לעצור ולהתפשט. אחריות ניטלה על ידי גדודי אל-נזיר של הפתח. בחקירתו בשירות ביטחון כללי של סאמר חשאש, פעיל תנזים צבאי משכם, עלה כי המתאבד נשלח לפיגוע על ידי עלי עגורי, אשר גם סיפק לו את המטען וכי מגייסו של המתאבד הינו אחיו מוראד.

---

### 11 יוני 2002
### פיצוץ מחבל מתאבד בפתח מסעדה בהרצליה
### 1 הרוגה ו- 12 פצועים

#### המחבל המתאבד עמר זיאדה

תושב שכם, בן 29, נשוי ואב לתינוקת פוצץ עצמו במסעדת מפגש השרון ג'מיל בהרצליה. אחריות לפיגוע ניטלה על ידי גדודי חללי אלאקצא. המתאבד עבד כסוחר ומצבו הכספי היה טוב. בצוואתו ביקש למחוק את חובותיו לאחרים. בעבר השתייך לפת"ח וזמן קצר לפני הפיגוע נעשה דתי.

---

### 5 יוני 2002
### פיצוץ מחבל מתאבד סמוך לאוטובוס ליד צומת מגידו
### 17 הרוגים ו- 42 פצועים

#### המחבל המתאבד חמזה סמודי

תושב ג'נין, בן 18, נסע ברכב תופת, נצמד לחלק האחורי של אוטובוס אגד, קו 830 לטבריה והתפוצץ  בסמוך לו, כ- 500 מטר לפני צומת מגידו. תשתית הג'יהאד האסלאמי מאזור ג'נין בראשות איאד צואלחה (הרוג) היא התשתית האחראית לביצוע הפיגוע. מחקירת סעיד

**טובאסי,** (חבר התשתית ועוזרו הבכיר של איאד (-עצור) )בשב"כ, עלה כי איאד צואלחה ביקש ממנו לארגן מכונית על מנת להכין ממנה מכונית תופת. סעיד הסכים וביקש את עזרתו של **שאדי עמורי** בארגון העניין. שאדי ארגן רכב בצבע לבן, דומה לטנדר, (רנו קנגו) בתמורה העביר לו סעיד 8000 ש"ח. סעיד ושאדי פנו ל**רושדי נורסי** וביקשו ממנו לוחיות רישוי צהובות ללא שהסביר את ייעוד בקשתם. השניים קיבלו את הלוחיות (של רכב סובארו גנוב) ושילמו לו 200 ש"ח. סעיד ושאדי נסעו לביתו של איאד לאחר שהרכיבו את הלוחיות הצהובות וסייעו לו להעמיס מביתו שתי חביות. איאד הסביר להם כי מדובר בחומר נפץ. להערכת סעיד משקל כל חבית היה כ 55 ק"ג. בין היתר, עסק סעיד טובאסי בימים שלפני הפיגוע בנוסף לייצור המטען שהיה ברכב, ובהכנתו של המתאבד לפיגוע.

---

**27 מאי 2002**
**פיצוץ מחבל מתאבד ליד בית קפה בפתח תקוה**
**2 הרוגות ו- 30 פצועים**

---

### המחבל המתאבד ג'האד טיטי

תושב <u>כפר בלטה</u>, **בן 19,** התפוצץ בכניסה לקונדיטוריה "קפה המושבה" בקניון אם המושבות בפ"ת. על פי עדי ראייה, המתאבד ניסה להיכנס למשחקיית ילדים שבקניון אך לאחר שלא הצליח, הגיע לבית הקפה.  הפיגוע בוצע על ידי תשתית התנזים הצבאית בשכם. המתאבד נשלח על ידי **כמאל חטיב,** אחד מחברי התשתית אשר עובד כשוטר בכוחות המיוחדים של משטרת שכם וע"י **נהאד צביח ואברהים עא חי.** פעילים נוספים הסיעו את המתאבד לאזור ראש העין ומשם עלה האחרון על מונית ישראלית עד לאזור הפיגוע.

---

**24 מאי 2002**
**הריגת מחבל מתאבד במכונית תופת בתל אביב**
**7 פצועים**

---

### המחבל המתאבד עמר שכוכאני

תושב <u>אלבירה/רמאללה</u>, **בן 26,** נסע ברכב במהירות לכיוון פתח מועדון ברח' קיבוץ גלויות בתל אביב, נעצר על ידי המאבטחים בכניסה והתפוצץ. לאחר פיצוץ הרכב  מול פתח המועדון, נראה המתאבד כרוצה לצאת מהרכב ונורה שוב מספר פעמים על ידי המאבטח. ברכב הונחו 4 מטעני צינור בחלקו האחורי. גדודי שאהדה אל אקצא נטלו אחריות לפיגוע. בחקירתו בשב"כ של **אמין זיאד,** פעיל תנזים צבאי, אשר היה מעורב בהוצאתו של המתאבד לפיגוע

ההתאבדות, עלה כי מי שתכנן הפיגוע והרכיב את מכונית התופת היה **מחמד אבו חמיד**.(עצור) . ערב הפיגוע צילם אמין את המתאבד במצלמה אשר הביא מבת דודתו.

---

**22 מאי 2002**
**פיצוץ מחבל מתאבד במדרחוב רוטשילד בראשון לציון**
**2 הרוגים ו- 36 פצועים**

---

### המחבל המתאבד עיסא בדיר

תושב דוחא/בית לחם, **בן 17**, התפוצץ במדרחוב רוטשילד בראשון לציון. המתאבד הובל, מבית לחם לראשון לציון, ברכבם של **אברהים סרחאנה**

מדהיישה ואשתו **מרינה פינסקי**, יהודיה ואזרחית ישראלית אשר עלתה מרוסיה לפני 11 שנה. מחקירתם בשב"כ של שני המבילים עלה כי מפגעת נוספת עריך אחמד, בת 20 מבית סאחור (עצורה) הייתה אמורה להשתתף בפיגוע ההתאבדות כאשר על פי התוכנית התכוונה לפוצץ עצמה בשלב בו יגיע כוחות החילוץ וההצלחה לטפל בנפגעי הפיגוע הראשוני. כאשר היו בדרכם לביצוע הפיגוע, התחרטה עריך והוחזרה לבית לחם. ב- 27/5/2002 נעצרו במחנה הפליטים דהיישה כל פעילי תשתית התמים הצבאי אשר עמדה מאחורי שיגור המתאבד לפיגוע. בין היתר נעצר **אחמד יוסף אחמד מערובי**, ראש התשתית ומבוקש בכיר אשר הודה בחקירתו בשב"כ כי הציע לאברהים סרחאנה לסייע לו בביצוע פיגועים וסיפר על מעורבותו בהכוונת הפיגוע והכנת המטענים למתאבדים. יחד עמו נעצר אחיו **עלי מערובי**, בן 16 תושב דהיישה, שהודה בחקירתו כי הונחה על ידי אחיו אחמד לשלם למתאבד ולהשיג רכב גנוב לביצוע הפיגוע. כמו כן הודה עלי כי הכירו את צמד המתאבדים וסיפר כי צילם את המתאבדים לפני יציאתם לביצוע הפיגוע. עוד נעצר **מחמוד סראחנה** פעיל תמים מדהיישה, אשר היה מעורב בהוצאת המתאבדים לשטח. מחמוד סיפר כי הכין את המחבל לפיגוע וצבע את שערותיו. לאחר מכן מסר מחמוד את המתאבדים לידי אברהים ומרינה ואלו הובילו אותם למרכז הארץ.

---

**20 מאי 2002**
**פיצוץ מחבל מתאבד בתחנת אוטובוס ליד ג'יפ מג"ב**
**בצומת תענך, 3 פצועים**

---

### המחבל המתאבד מחמד חמדיה

תושב ג'ניו, **בן 20**, חייט, פוצץ עצמו בתחנת אוטובוס בצומת התענכים בסמוך לג'יפ מג"ב. אחריות לפיגוע ניטלה על ידי הג'יהאד האסלאמי, הפיגוע בוצע על ידי תשתית ג'יהאד אסלאמי

בג'נין, בראשותו של **איאד צואלחה**.(הרוג). **מוחמד אבו טביח**, פעיל ג'האד אסלאמי צבאי (עצור) הודה בחקירתו כי הוא עצמו גייס את המתאבד לפיגוע. מוחמד אבו טביח קישר את המתאבד  לאיאד צואלחה. לאחר הפיגוע פגש אבו טביח את איאד צואלחה אשר הביע אכזבה על כישלון הפיגוע .

---

### 19 מאי 2002
### פיצוץ מחבל מתאבד בשוק בנתניה
### 3 הרוגים ו- 60 פצועים ,

---

### המחבל המתאבד אסאמה בשכאר

תושב <u>מחנה הפליטים עסכר/שכם</u>, **בן 18**, הסתובב באזור השוק בנתניה כשהוא לבוש מדי צה"ל ונושא תיק שחור, בשל חזותו המזרחית הוחשד ומיד לאחר מכן התפוצץ. אחריות לפיגוע ניטלה על ידי ארגון "החזית העממית", הפיגוע בוצע על ידי תשתית "החז"ע" בשכם, במרכזה **עלאם כעבי**. פעילי התשתית העומדים מאחורי פיגוע זה נמצאים בקשר שוטף עם כלואי החז"ע בירחו באמצעות שליחים וכן בקשר טלפוני רציף. במהלך הימים האחרונים עודכנו שאהד עולמה וכלואי החז"ע הנוספים בכוונות לביצוע הפיגוע. בתאריך 23 במאי 2002 נעצר **עאדל עדנאן מחמוד ג'ומעה**, תושב טייבה. בחקירתו בשירות ביטחון כללי הודה כי הסיע את המתאבד ביחד עם בחורה אשר שימשה כמובילת המתאבד. עאדל ציין כי הבין שהסיע מחבל מתאבד רק לאחר שהוריד את המתאבד ושמע את הפיצוץ. לאחר הפיגוע החזיר את מובילת המתאבד לבאקה אל ע'רביה. ב-תאריך 6 יוני 2002 נעצרה **דעאא זיאד גמיל גיוסי**, תושבת טול כרם, סטודנטית באוניברסיטת נג'אח. דעאא ציינה בחקירתה כי התבקשה על ידי פעילי החזית העממית משכם להוביל את המתאבד לתוך נתניה במטרה לשוות לו מראה תמים. דעאא הוסיפה וציינה כי טרם הורדת המתאבד בשוק בנתניה בדקו המפגעים אפשרות לבצע את הפיגוע בקניון בנתניה ובאזור הטיילת.

---

### 8 מאי 2002
### מחבל מתאבד נפצע קשה בתחנת הסעה בצומת מגידו
### 3 פצועים

---

### המחבל המתאבד זידאן זידאן

<u>תושב ג'נין</u>, **בן 19**, נפצע בפיצוץ של מטען חבלה שנשא בתיקו בתחנת הסעה בצומת מגידו. לאחר הפיצוץ  בוצע ירי לעברו של המתאבד על ידי חבלן שהיה במקום. המתאבד נפגע ברגליו וידיו.  בהמשך פוצץ שאר המטען שנשאר בתיק על ידי רובוט משטרתי. בחקירתו

בשירות ביטחון כללי מסר המתאבד כי ביקש **ממחמוד טואלבה** (הרוג),   מראשי הג'האד אסלאמי בג'נין, לצאת לפיגוע. אדם מטעמו של מחמוד מסר למתאבד מטען במשקל של כ- 18 ק"ג. המתאבד נסע במונית לענין ומשם עבר ברגל לאום אל פחם והמשיך בטרמפ לוואדי ערה. אחריות לפיגוע ניטלה על ידי הג'האד האסלאמי.

---

**7 מאי 2002**
**פיצוץ מחבל מתאבד במועדון ביליארד בראשון לציון**
**16 הרוגים ו- 51 פצועים**

---

### המחבל המתאבד מחמד מעמר

תושב <u>קריות/שכם</u>, בן **28**,  במוצאו מירדן, מזוהה חמא"ס, נכנס בסביבות השעה 22:55 למועדון "שפילד" ברחוב סחרוב באיזור התעשייה בראשון לציון, כשבידיו מזוודה, צעד לכיוון מרכז החדר, לעבר התקהלות שסביב מכונות המזל ופוצץ עצמו. נטילת אחריות לפיגוע פורסמה מטעם גדודי עז א-דין אל קסאם וכללה גם איומים לבצע פיגועים נוספים. את הפיגוע ביצעה תשתית החמא"ס ברמאללה בשיתוף עם חולייה ירושלמית, כשמחמוד **עמראן** משמש איש הקשר בין **וואל קאסם** (הרוג), פעיל חמא"ס מראס אל עמוד, מול **אברהים חאמד,** העומד בראש תשתית החמא"ס ברמאללה. בפועל העביר עמראן את ההנחיות לביצוע הפיגועים, העביר את המפגעים המתאבדים ואת מטעני החבלה.

---

**20 אפריל 2002**
**פיצוץ מחבל מתאבד ליד מחסום בקלקיליה,**
**ללא נפגעים**

---

### המחבל המתאבד לא ידוע

מחבל מתאבד התפוצצ סמוך למחסום 108, מערבית לקלקיליה במהלך נוהל מעצר חשוד. אתר החמא"ס ציטט טט דובר בשם גדודי עז אלדין אלקסאם אשר הודיע כי מבצע הפעולה ליד קלקיליה הוא מחמוד מחמד יוסף שולי מהעייריה עצירה אלשמאליה, צפונית לשכם. הדובר אמר בשיחת טלפון כי עד כה לא פורסמה נטילת אחריות רשמית עקב סיבות ביטחוניות. מחמוד שולי עבד בבטחון'ל, בעבר הודיע למשפחתו כי הוא יבצע פיגוע ולאחר מכן נעלם. הפיגוע בוצע בשיתוף פעולה של תשתיות החמא"ס הצבאי בשכם ובקלקיליה.

W_S089697

---

## 19 אפריל 2002
## פיצוץ מחבל מתאבד ברכב תופת ליד עמדת צה"ל
## בצומת גוש קטיף,  2 פצועים

---

### המחבל המתאבד עבדאללה אבו עודה

<u>תושב חאן יונס</u>, **בן 19**, נהג במכונית תופת, מסוג טנדר פיג'ו 504 בצבע לבן עם ארגז פתוח מאחור. המתאבד הגיע עם המכונית לפילבוקס 24 בצומת גוש קטיף כאשר לפניו ובצמוד לו 2 מכוניות נוספות המסתירות את חזית הרכב מפני תצפית צה"ל בפילבוקס. כאשר עברו 2 המכוניות הראשונות את פילבוקס 24 והתרחקו מהצומת, האט המתאבד את מהירות הרכב כשהוא נמצא מטרים ספורים בסמוך לפילבוקס. חייל שהיה בעמדה כוון נשק לעבור נשק במטרה לבצע עליו ירי. המתאבד הסיט את הרכב ממסלול הנסיעה, התקרב לקירות הבטון המקיפות את הפילבוקס ופוצץ את הרכב. אחריות לפיגוע ניטלה על ידי הג'יהאד האסלאמי.

---

## 12 אפריל 2002
## פיצוץ מחבלת מתאבדת בשוק מחנה יהודה בירושלים
## 6 הרוגים ( מתוכם 2 עובדים זרים מסין) ו- 60 פצועים

---

### המחבלת המתאבדת- ענדליב טקאטקה

פעילת תנזים **בת 21 מבית לחם**. הפיגוע הוכוון על ידי <u>מועתז הימוני</u>, פעיל החזית לשחרור פלסטין (חש"פ) מחברון שנעצר במסגרת מבצע 'חומת מגן'. מי שהכין את המטען לפיגוע היה <u>מראון זלום</u>, בכיר התנזים בחברון, שנהרג כתוצאה מפעילות יזומה של כוחות הביטחון. המטען הורכב משלושה צינורות פלסטיק וסוללה והוטמן בתיק נשים שחור לצורך הסוואתו. ביום הפיגוע הוסעה המתאבדת לאבו-דיס ומשם נסעה במונית לתוך העיר ירושלים והגיעה אל שוק מחנה יהודה – שם התפוצצה בסמוך לאוטובוס אגד. מספר ימים לפני ביצוע הפיגוע צולמה המתאבדת  במצלמת וידאו כשהיא לבושה בשחור ואוחזת בידה קוראן.

W_S089698

<div dir="rtl">

**10 אפריל 2002**
**פיצוץ מחבל מתאבד באוטובוס ליד צומת יגור**
**8 הרוגים ו- 17 פצועים**

### המחבל המתאבד ראע'ב ג'רדאת

תושב <u>סילת אלח'ארתיה/ג'נין</u>, בן **18**, התפוצץ בתוך אוטובוס שהיה בדרכו מחיפה לירושלים בין צומת יגור לצומת העמקים. ניטלה אחריות על ידי פעילי הג'יהאד האיסלאמי. התשתית העומדת מאחורי הפיגוע הינה התשתית של **איאד צַאלְחָה**,(הרוג) **ותאלד זכַארנה** . איאד ותאלד הם אלה שהכינו את ראע'ב לפיגוע.

**1 אפריל 2002**
**פיצוץ מחבל מתאבד ליד מחסום משטרתי בירושלים**
**1 הרוג (שוטר)**

### המחבל המתאבד ראמי עיסא

תושב <u>מחנה הפליטים דהיישה/בית לחם</u>, בן **23**, היה חבר בחולית תנזים צבאי אשר ביצעה עשרות פיגועי ירי ומטענים באזור בית לחם וירושלים. (חברי החוליה נעצרו). כחצי שנה לפני הפיגוע, יחד עם צעיר נוסף שדדו ורצחו חלפני כספים. השניים נעצרו, שוחררו ממעצר כמה ימים לפני כניסת צה"ל לעיר וגויסו על ידי גורמי הפת"ח במ.פ. דהיישה. ביום הפיגוע הבחינו שוטרים שעמדו במחסום משטרתי ברח' הנביאים פינת שבטי ישראל בירושלים, ברכב חשוד שעמד על המדרכה על כביש מס' 1. כאשר הגיעו שני השוטרים לבודקו ארע פיצוץ. אחריות לפיגוע נלקחה על ידי גדודי חללי אלאקצא. מעדויות במקום עלה כי נהג אשר הוביל את המתאבד נמלט שניות ספורות לפני הפיצוץ. מוביליו של המתאבד לפיגוע נעצרו על ידי שירות בטחון כללי וצה"ל. העצורים הינם אחים  ממשפחת סראחנה, תושבי מ.פ. דהיישה, אשר הודו בחקירתם בשירות בטחון כללי בהשתתפות בהוצאתו של המתאבד לפיגוע, תוך ניצול ת.ז. כחולות של אשתו ובתו של אחד הפעילים לצורך הובלתו של המתאבד לתוך תחומי ירושלים.

</div>

**31 מרס 2002
פיצוץ מחבל מתאבד ליד מרפאה באפרת
6 פצועים**

### המחבל המתאבד ג'מיל חמיד

תושב בית לחם, קטין בן 16, אשר גויס על ידי הפת"ח, הגיע ברכב מכיוון ואדי ניס עד לשער היישוב אפרת, ירד מהרכב כ- 10 מ' לפני השער, נכנס רגלית לתוך היישוב ופוצץ עצמו בסמוך לתחנת מד"א. אחריות לפיגוע ניטלה על ידי גדודי אלאקצא. את המטען שהיה על גופו הכינו **יחיא דעמאסה ואחמד מוגרבי** מראשי תשתית הפת"ח בבית לחם. **ריאד אל עמור ואברהים עביאת** הינם יוזמי ומאכווני הפיגוע.

**31 מרס 2002
פיצוץ מחבל מתאבד במסעדת "מצה" בחיפה
15 הרוגים ו- 34 פצועים**

### המחבל המתאבד שאדי טובאסי

תושב ג'נין, בן 24, בעל ת.ז. ישראלית, בשל היות אמו אזרחית ישראלית תושבת מוקיבלה, נכנס למסעדת "מצה" בנוה שאנן/חיפה כשעל גופו מטען המוסלק בחגורת נפץ בצבע חאקי צבאי ופוצץ עצמו. הפיגוע בוצע בהכוונת תשתית החמא"ס בג'נין בראשות **קייס עדואן**. המתאבד היה עצור בעבר בגין הפרות סדר וכמו כן נעצר מספר פעמים בישראל על רקע פלילי. על פי חקירת בלאל חזי, נעצר שאדי ברשות הפלסטינית והואשם בשת"פ. המתאבד רצה לנקות את שמו ופנה לחמא"ס וביקש להוכיח כי אינו משת"פ באמצעות פיגוע התאבדות. הגעתו לפיגוע ובחירת המועד לפיגוע נעשו באופן עצמאי, ללא ליווי, תוך ניצול העובדה כי נשא תעודת זהות ישראלית.

W_S089700

---

**30 מרס 2002**
**פיצוץ מחבל מתאבד במכונית והריגת מחבל נוסף**
**במהלך מירוטם בטול כרם**
**1 הרוג (שוטר) ו- 1 פצוע (שוטר)**

---

### המחבל המתאבד  מג'די חנפר

תושב ג'נין, בן 21, פנה לאחמד עלי מחמוד אבו חדר, תושב שכם, פעיל כתאאב שוהדא אל אקצא ויד ימינו של נאצר עויס מפקד התנזים בשכם, וביקש לבצע פיגוע התאבדות. אבו חדר עדכן את נאצר בכך שברשותו מתאבד ונאצר ביקש לפגוש בו למחרת היום. אבו חדר לקח את המתאבד להצטלם בסטודיו בשכם ובהמשך הסיע את המתאבד לביתו של נאצר והשאיר אותו שם. כמו כן נתבקש על ידי נאצר לרכוש מכונית בעלת לוחיות זיהוי ישראליות. ביום הפיגוע יצא המתאבד כשעל גופו חגורת נפץ עם מפגע נוסף, פתחי עמירה, שהיה חמוש ברובה M-16 ומחסניות לבצע פיגוע. השניים הגיעו לאזור באקה אל גרבייה, הופתעו על ידי כוח מג"ב והחלו חילופי ירי כאשר המתאבד פוצץ את חגורת הנפץ שעליו בעוד פתחי יורה על הכוח, עד שנהרג מאש כוח מג"ב.

---

**30 מרס 2002,**
**פיצוץ מחבל מתאבד בבית קפה "ביאליק" בתל אביב**
**1 הרוגה ו- 29 פצועים**

---

### המחבל המתאבד  מהנד צלחאת

תושב שכם, בן 23, נכנס לבית הקפה  כשהוא לבוש בג'ינס ומעיל כחול, נעמד ליד דלפק המשקאות ופוצץ עצמו. אחריות לפיגוע ניטלה על ידי גדודי אלאקצא. המתאבד גויס כשלושה חודשים לפני הפיגוע לגדודי אל אקצא בשכם. ביום הפיגוע יצא בבוקר מכפרו לישראל לאחר שהתגלח והסתפר קצר מאוד. כמו כן סיפר למשפחתו על כוונתו לבצע פיגוע.

W_S089701

<div dir="rtl">

**27 מרס 2002**
**פיצוץ מחבל מתאבד בבית מלון "פארק" בנתניה**
**29 הרוגים ו- 144 פצועים**

### המחבל המתאבד  עבד אלבאסט עודה

תושב <u>טול כרם</u>, **בן 25**, נכנס למלון פארק בנתניה עת ערכו בו עשרות אזרחים את סעודת ליל הסדר ופוצץ עצמו. הפיגוע הוכוון בידי תשתיות החמא"ס הצבאיות בטול כרם ובשכם, בראשות **עבאס אל סייד ומהנד טאהר.** עבאס אל סייד, האחראי לפיגוע מטול כרם (עצור), שימש כראש החמא"ס הצבאי באזור. עבאס הודה בחקירתו כי תכנן להוציא הפיגוע חודשים רבים קודם לכן, אולם תוכניותיו נדחו. עבאס הוא שהורה לפעיל התשתית **מעמר שחרורי** להשיג 2 חגורות נפץ מן התשתית הצבאית בשכם והוא שהציע **לפתחי חציב** להוביל את המתאבד לישראל ולאתר יעד מתאים לפיגוע.  טרם הפיגוע הכינו עבאס ופעילים נוספים מן התשתית את עבד אלבאסט לביצוע הפיגוע – המתאבד  גילח את זקנו, התאפר, לבש מכנסי ג'ינס כחולים נשיים, נעל נעלי נשים, חבש פיאה נוכרית עם שיער חלק, לבש חולצה חומה ומעליה מעיל עור בצבע חום עם צווארון מנומר, כל זאת לשם הטמעות באזורים הומי אדם בישראל. עבאס הלביש את  המתאבד בחגורת הנפץ, שנראתה כמו ווסט בצבע חאקי עם כיסים, בהם הוטמנו חומרי הנפץ, שהיו במשקל 10 ק"ג  והסביר לו כיצד לתפעלה. לאחר שצילם את המתאבד עם רובה M-16 על רקע דגל התנועה ותמונות שהידים, כתב עבאס את צוואתו של המתאבד ובה נאמר כי הוא יוצא לבצע פיגוע בשם גדודי עז אלקדין אלקאסם. בנוסף, צייד עבאס את המתאבד בתעודת זהות של אישה. **מהנד טאהר,** תושב שכם, אשר שימש כראש הזרוע הצבאית של החמא"ס בשומרון   (הרוג) היה אחראי לאספקת חגורת הנפץ מן התשתית בשכם לתשתית בטול כרם. **פתחי חציב,** תושב טול כרם (עצור) הודה בחקירתו כי רכש רכב בישראל ובו הוביל את המתאבד עד לטול כרם, שם עברו השניים לרכב אחר ומשם נסעו נכנסו לישראל.

</div>

W_S089702

---

**29 מרס 2002**
**פיצוץ מחבלת מתאבדת בסופרמרקט בקרית יובל בירושלים.**
**2 הרוגים ו- 22 פצועים**

---

### המחבלת המתאבדת - איאת אלאחרס

נערה **בת 18** ממחנה הפליטים דהיישה שליד בית לחם.

ארגון התנזים של הפת"ח לקח אחריות לפיגוע. המתאבדת נשאה את המטען שהוכן עבורה בתיק נשים שחור.  מי שהוביל את המתאבדת למקום הפיגוע היו אברהים סראחנה ואחיו מוסא סראחנה. השניים, הובילו את המתאבדת בסנדר אדום אל סמוך לסופרמרקט שבשכונת קרית יובל בירושלים. טרם ארע הפיגוע, ניגש מוסא אל שתי קשישות ערביות שמכרו ירק והזהיר אותן מפני הפיגוע שעומד להתרחש. טרם יציאתה לבצע את הפיגוע, צולמה המתאבדת במצלמת וידאו וכתבה צוואה בה נפרדה ממשפחתה.

---

**26 מרס 2002**
**ניסיון ביצוע פיגוע התאבדות במחסום חארס/קלקיליה ללא נפגעים**

---

### המחבל המתאבד  לא ידוע

כוח של משטרת ישראל, שישב ברכב משטרתי זיהה אדם חשוד שעמד בקרבת צומת חארס. הכוח המשטרתי קרא לבלמ"ז להתקרב לצורך ביצוע תחקור, הבלמ"ז התקרב לעבר הרכב המשטרתי, ניסה לפתוח דלת המכונית ובמקביל להפעיל חגורת נפץ אותה נשא על גופו.  עם זיהוי ניסיון ההפעלה התרחק הרכב המשטרתי מהמקום, הבלמ"ז ניצל ההשתהות, הסיר חגורת הנפץ שנשא על גופו ונמלט לתוך כפר חארס. מסך המידע עלה כי התארגנויות חז"ע משכם  ומג'נין הן שעומדות מאחורי ניסיון הפיגוע.

W_S089703

## 22 מרס 2002
## פיצוץ מחבל מתאבד במחסום סאלם/ג'נין
## חייל פצוע

### המחבל המתאבד  ענאד שקיראת

תושב <u>מחנה הפליטים עין בית אלמא/שכם</u>, בן **25**, אשר נשא על גופו חגורת נפץ, נסע במונית פלסטינית, ירד ליד המחסום ופוצץ עצמו. הפיגוע בוצע בשיתוף פעולה בין תשתיות התמים בשכם ובג'נין ובסיוע הג'האד אסלאמי. **זיאד יונס**, מהתנזים בג'נין העביר את המתאבד ואדם נוסף ממ.פ. עין בית אלמא לידי **מחמד נוריסי**, פעיל תנזים ממ.פ. ג'נין שהיה אמור להוציאם לפיגוע. השניים חזרו מסיבה לא ברורה לג'נין ונעצרו בדרך ע"י הצבא. במהלך המעצר פוצץ עצמו המתאבד. מחקירות עצורים בפרשה עלה כי המטען הוכן על ידי **מאגד קיני מתשתית** התנזים בשכם.

## 21 מרס 2002
## פיצוץ מחבל מתאבד בבית קפה ברח' קינג ג'ורג' בירושלים
## 3 הרוגים ו- 80 פצועים

### המחבל המתאבד  מחמד חשאיכה

תושב <u>טלוזה/בקעות</u>, בן **21**, איש המשטרה הפלסטינית מתל/שכם, פוצץ עצמו בפתח בית קפה ברח' קינג ג'ורג' בירושלים. אחריות לפיגוע ניטלה על ידי גדודי אלאקצא, המזוהים עם הפת"ח. בעבר נעצר המתאבד בידי מנגנוני "הרשות", בעקבות מידע מישראל, בשל כוונתו לבצע פיגוע התאבדותו בתחומי "הקו הירוק". בחקירתו אז, הודה מחמד כי התכוון לבצע פיגוע ברעננה וכי בנוסף היה מעורב בהחדרת 2 המתאבדים, שפוצצו עצמם לאחר שנתקלו בכוחות ביטחון ישראליים ליד היישוב מי עמי (8 פברואר). מאוחר יותר הועבר המתאבד, לבקשת הפלסטינים, באישור ובליווי ישראלי, מטול כרם לראמאללה, לצורך מעצרו שם, ואז שוחרר ממעצר או שנמלט תוך העלמת עין של הרשות. מספר ימים לפני הפיגוע נוצר שוב הקשר בין המתאבד ל**נאצר שויש**, אשר ניסה בעבר להוציאו לפיגוע, ועם חידוש הקשר הושלמו ההכנות להוצאתו של מחמד לפיגוע. מאכווניו ומשלחיו של מחמד לפיגוע היו **עא כרים עוויס ונאצר שוויש** מתשתית התנזים בג'נין. הובלתו של מחמד למקום הפיגוע נעשתה בידי 2 בחורות (עצורות).

---

### 20 מרס 2002
### פיצוץ מחבל מתאבד באוטובוס בצומת מוסמוס/ואדי ערה
### 7 הרוגים (מתוכם 4 חיילים) ו- 28 פצועים

---

## המחבל המתאבד  רפאת אבו דיאכ

תושב <u>סילת אלדהאר/ג'נין</u>, **בן 24**, עבד בחנות בגדים בג'נין. המתאבד עלה בצומת אום אל פאחם לאוטובוס אגד 823 מת"א לנצרת עילית ופוצץ עצמו בצומת מוסמוס במרכז האוטובוס בסמוך לדלת האחורית. הג'האד אסלאמי בראשותו של **תאבת מרדאוי** לקחו אחריות על הפיגוע בפני מפקדת הג'האד אסלאמי בסוריה. בחקירתו של תאבת מרדאוי מסר  האחרון כי כשבוע טרם הפיגוע פנה המתאבד אבו דיאכ ל**מחמוד נורסי** ואמר כי בכוונתו לבצע פיגוע התאבדות. תאבת אמר כי היה נוכח בשיחה בין המתאבד ומחמוד נורסי. כמו כן אמר תאבת כי אם המתאבד יוכל להיכנס לבדו לישראל, הם יספקו לו את חגורת הנפץ. בערב טרם יציאתו של ראפת לביצוע הפיגוע מסר לו מחמוד נורסי חגורת נפץ, אותה הכינו תאבת ומחמוד .

---

### 17 מרס 2002
### פיצוץ מחבל מתאבד בצומת הגבעה הצרפתית בירושלים
### 25 פצועים

---

## המחבל המתאבד  אכרם נבתיתי

תושב <u>מ.פ. עאידה</u>, **בן 24**, פעיל ג'יהאד אסלאמי, עבד כחייל, ניסה להיכנס לאוטובוס בצומת הגבעה הצרפתית בירושלים, משלא הצליח לעלות על האוטובוס התפוצץ לידו. הפיגוע בוצע על ידי התשתית הצבאית המובילה של הג'יהאד האיסלאמי בבית לחם בראשותו של **מחמד תעמרי**. בנוסף, השתתפו בהוצאת הפיגוע לפועל **בסאם אבו עקר ואחמד בלבול**, בסאם אף דאג לכתיבת צוואתו של המתאבד.

## 9 מרס 2002
## פיצוץ מחבל מתאבד בבית הקפה "מומנט" בירושלים
## 11 הרוגים ו- 58 פצועים

### המחבל המתאבד  פואד דאר חוראני

תושב <u>מחנה הפליטים אלערוב</u> (יליד בית לחם), בן **22**, סטודנט במכללה למורים ברמאללה,
פעיל חמא"ס דתי, אביו קצין ברש"פ. כשנתיים לפני הפיגוע הוחשד על ידי המודיעין המכל
הפלסטיני כי אמור לבצע פיגוע התאבדות במסגרת החמא"ס. מפקדת החמא"ס ברמאללה
היא האחראית לביצוע פיגוע זה תוך הסתייעות בחוליה מזרח ירושלמית. מחקירות העצורים,
חברי החוליות, בשירות ביטחון כללי  עלה כי **אברהים חאמד**, ראש החמאס הצבאי ברמאללה
אמר ל**מחמד ערמא** כי ברשותו מפגע והורה לו להעביר ל**לאאל קאסם**, מפקד החוליה
המזרח ירושלמית. נקודת האיסוף ליציאה לפיגוע נקבעה במסגד בית חנינא. ערמא והמתאבד
נפגשו במסגד אל ה בירה. מהמסגד לקח חאמד את המתאבד, חימשו לפיגוע וליווה אותו
לתחנת מוניות משם נסע  המתאבד למסגד בית חנינא החדש. ואאל קאסם, הוביל את
המתאבד למקום הפיגוע. בחקירתו מסר כי המתאבד המתין לו ליד מסגד בית חנינא החדש,
משם אסף אותו והורידו בצומת שלפני בית הקפה, הוא הראה למתאבד את היעד לפיגוע ונסע
מהמקום. כמו כן, יחד עם חברי חוליה נוספים עסק ואאל קאסם באיסוף מידע על יעדים
נוספים לפיגועים.

## 7 מרס 2002
## גילוי מחבל מתאבד עם מטען מוסלק בכלוב ציפורים בכרכור
## ללא נפגעים

### המחבל המתאבד  בלאל וליד עלי

תושב <u>סאנור/ג'נין</u>, בן **18**, הסתובב עם כלוב ציפורים באזור הישוב כרכור. אזרח ישראלי אשר
חשד בו קרא לו בעברית לעצור ומשלא נענה פנה אליו בערבית. המתאבד הניח את כלוב
הציפורים על הקרקע ואז הבחין האזרח בצינורות על גופו של המתאבד והניח כי מדובר
בחגורת נפץ. האזרח נסוג לאחור והמתאבד נמלט מהמקום. כלוב הציפורים שהוזנח על ידו
התגלה כממולכד במטען חבלה מאולתר ובמפסק. למחרת נתפס המתאבד והודה בחקירתו
בשירות ביטחון כללי כי הסכים לבצע פיגוע התאבדות לאחר שהסתכסך עם אביו ומאס בחייו.
לדבריו צולם על ידי משלחיו אוחז ברובה ואקדח, הולבש בחגורת נפץ וציוד בכלוב הציפורים
הממולכד. לאחר שקיבל הוראות כיצד להפעיל המטענים הוברח על ידי הפעילים לשטח
ישראל לצורך ביצוע הפיגוע. כמו כן הסגיר המתאבד את חגורת הנפץ, שפוצצה על ידי חבלן.
הפיגוע אוכוון על ידי ארגון הג'האד האסלאמי.

W_S089706

## 7 מרס 2002
## פיצוץ מחבל מתאבד במלון אשל השומרון באריאל
## 9 פצועים

### המחבל המתאבד  שאדי נאצר

תושב <u>מאדמא/בקעות</u>, בן **24**, הגיע רגלית, לבוש מעיל ארוך, מכיוון הכפר כפל חארת לעבר תחנת הדלק בכניסה לאריאל כשהוא נושא ג'ריקן פלסטיק ריק למילוי דלק בצבע צהוב. עם הגעתו לעבר תחנת הדלק פנה לעבר מלון 'אשל השומרון' שממוקם בקרבת התחנה, בפתח המלון הניח בפינה את הג'ריקן הריק.  בשלב זה עורר המתאבד את חשדם של אזרחים ששהו במקום, ואלה הזעיקו שני קציני צה"ל על מנת לעצור אותו. המתאבד הספיק להגיע למלון, עלה לקומה העליונה, ירד ללובי בשנית, שם נתקל בשני הקצינים והפעיל המטען שנשא על גופו. הפיגוע בוצע על ידי תשתית החזית העממית הצבאית בשכם, בראשות **כמיל אבו חניש (עצור)**. בחקירתו של **מחמוד עיסא**, מראשי החז"ע הצבאי בשכם, סיפר האחרון כי כמיל אבו חניש פנה אליו וסיפר לו כי ישנו בחור ממאדמא/בקעות, מגויס של **יאמן פרג'** (הרוג), אשר אמור לבצע פיגוע התאבדות באריאל. כמו כן ביקש כמיל כי עיסא יפנה לפעילי פת"ח על מנת שירכיבו לו מטען. פעיל בשם **מונדר חלף** הסיע את המתאבד ברכב הסעות עד תחנת המוניות ברפידיה שם פגשו ביאמן פרג',  משם המשיכו יאמן והמתאבד  בכיוון מחסום תל, משם הגיע המתאבד לאריאל.

## 7 מרס 2002
## לכידת מחבל מתאבד בבית קפה "קפית" בירושלים
## ללא נפגעים

### המחבל המתאבד  נדאל משעל

תושב <u>מכבר/ירושלים</u>, בן **21**, פעיל חמא"ס, נכנס עם תיק ובו מטען חבלה לבית קפה "קפית" ברחוב עמק רפאים פינת רחוב חנניה בירושלים. מהתיק בלטו חוטים, והמתאבד רעד, מה שעורר את חשדו של אחד העובדים שהשתלט עליו, בסיוע אזרחים נוספים. תשתית החמא"ס מבית לחם היא שעמדה מאחור ניסיון הפיגוע ובמסגרת חשיפתה עלה כי היא התבססה על 6 סטודנטים ממכללת אבו דיס (עצורים), שהיוו מרכיב מרכזי בהכנת לפיגוע, גיוס המתאבד ושילוחו ליחשלים. בחקירתו סיפר המתאבד כי **מחמד חליל שקיראת** גייסו ל"גדודי עז אלדין אלקאסם" ובהמשך שוחחו השניים על רעיון התאבדותו של נדאל בפיגוע. המתאבד רצה למות

W_S089707

בפיגוע מתוך אמונה כי ימות כ"שהיד" , בנוסף שאף לנקום את מותם של השהידים שנהרגו באינתיפאדה.

---

## 5 מרס 2002
## פיצוץ מחבל מתאבד באוטובוס בעפולה
## 1 הרוג ו- 20 פצועים

---

### המחבל המתאבד  עבד אלכרים טחאינה

תושב סילת אלח'ארתיה/ג'נין, בן 23, פוצץ עצמו בתחנה המרכזית בעפולה באוטובוס קו 823 אשר עשה דרכו מנצרת עילית לת'א. מעדותו של נהג האוטובוס עלה כי המתאבד עלה לאוטובוס בתחנה המרכזית בנצרת עלית, כשהוא לבוש בגינס, חולצת גולף בצבע לבן-קרם ומעיל דובון צה"לי, הוא נתן לנהג שטר של 50 ש"ח והתקדם לעבר חלקו האחורי של האוטובוס,  משנקרא על ידי הנהג לקחת עודף, הגיע אל הנהג, לקח העודף וחזר להתיישב בחלק האחורי של האוטובוס. בכניסה לתחנה המרכזית בעפולה הפעיל את חגורת הנפץ שהייתה עליו.  אחריות לפיגוע ניטלה על ידי הגיאהד האסלאמי.

---

## 2 מרס 2002
## פיצוץ מחבל מתאבד ברח' חיים עוזר בירושלים
## 10 הרוגים ו- 46 פצועים

---

### המחבל המתאבד  מחמד דראע'מה

תושב מחנה הפליטים דהיישה/בית לחם, בן 18, פוצץ עצמו ברח' חיים עוזר בשכונת בית ישראל בירושלים, במוצאי שבת, ליד קבוצה של אנשים שיצאה מבית הכנסת. על פי עדות ראייה התחזה המתאבד לחרדי. ניטלה אחריות לפיגוע על ידי "גדודי חללי אל-אלקצא". המתאבד הובל למקום הפיגוע על ידי אשרף חג'אג'רה, בן 20, פלילירון תושב מ.פ. דהיישה אשר נעצר בסמוך לזירת הפיגוע. בחקירתו בשירות ביטחון כללי הודה אשרף לגבי המיוחס לו ולגבי תשתית התמים הצבאי במ.פ. דהיישה/בית לחם אשר ביצעה הפיגוע. ב- 27/5/02 נעצרו בכירי התשתית אחמד מע'רבי ומחמוד סראחנה, אשר הודו בחקירותיהם באחריותם לאכוונת הביצוע והכנת התשתית לקראתו.

---

**27 פברואר 2002**
**פיצוץ מחבלת מתאבדת במחסום מכבים**
**2 פצועים (שוטרים)**

---

### המחבלת המתאבדת - דארין אבו-עישה

**בת 22,** תושבת <u>בית חן שבשומרון</u>. המתאבדת הגיעה למחסום מכבים מכיוון מזרח למערב ברכב עם שני פעילי התנזים, <u>חאפז מקבל ומוסא חסונה</u>. השניים התבקשו להציג תעודות זהות, כשהמתאבדת נתבקשה להזדהות ארע הפיצוץ. המתאבדת נהרגה, שני הגברים שישבו ברכב נורו ונפצעו קשה ושני שוטרים ישראלים נפצעו באורח קל. לפני צאתה לביצוע פיגוע ההתאבדות צולמה המתאבדת על ידי <u>אחמד עאצ'י</u>, עיתונאי מרמאללה כשהיא אוחזת בסכין חדה. ארגון התנזים של הפת"ח נטל אחריות לפיגוע.

---

**22 פברואר 2002**
**פיצוץ מחבל מתאבד בסופרמרקט באפרת**
**3 פצועים**

---

### המחבל המתאבד  מחמד דאר יאסין

תושב <u>דוחא/בית לחם</u>, **בן 26,** עבד כפועל בנין באפרת, ניסה לפוצע את עצמו באמצעות חגורת נפץ בסופרמרקט, הנמצא במרכז המסחרי הדרומי ביישוב. מאחר ולא הצליח לפוצע את חגורת הנפץ, אשר הכילה מטעני צינור ומיכל לחץ ולאחר שזוהה כמחבל נורה למוות ע"י תושב אפרת. הפיגוע אוכוון על ידי תשתית התנזים בבית לחם בראשותו של **יחיא דעמסה,** בשיתוף **ראפאת ג'אברה,** ר' התנזים בדוחא.

---

**19 פברואר 2002**
**פיצוץ מחבל מתאבד ליד אוטובוס בצומת מחולה**
**ללא נפגעים**

---

### המחבל המתאבד  עמר יאסין

תושב <u>ג'נין/שכם</u>, **בן 20,** בצומת מחולה ניסה לעלות על אוטובוס אגד שנסע מירושלים לטבריה. הנהג, אשר חשד במתאבד בשל לבושו (מעיל מנופח) ומראהו, הורה לו לרדת מהאוטובוס לצורך בדיקה. משהחל הנהג בבדיקה ברח המתאבד ולאחר מספר מטרים התפוצץ ונהרג. אחריות לפיגוע ניטלה מטעם הזרועות השחורות/גדודי חללי אל אקצא. על

שילוחו של המתאבד לפיגוע אחראית תשתית התמזים בכפר קליל ברשות **מאג'ד קיני**, אשר הכין את עמר לפיגוע והובילו בחלק מהדרך, עד לואדי בידאן, משם נאסף על ידי פעיל אחר שהובילו לאזור הפיגוע.

---

## 18 פברואר 2002
## פיצוץ מחבל מתאבד במכונית תופת ליד מחסום א-זעים
## שוטר הרוג ו- 2 פצועים

---

### המחבל המתאבד  יאסר עודה

תושב <u>בית צאחור</u>, **בן 34**, נשוי ואב לשלושה, פעיל פת"ח, ירדני במוצאו אשר קיבל תעודת זהות על ידי איחוד משפחות, בשל היות אשתו תושבת בית צאחור. המתאבד חנה ברכב פיג'ו 205 אפור, בצד הכביש בדרך ממעלה אדומים לירושלים. ניידת עם שני שוטרים אשר הבחינה ברכב, החשידה אותו ,ומשהבחינה במתאבד המתרחק מהרכב עיכבה אותו לתקהור. המתאבד טען כי הוא תושב אבו דיס, נשוי + 3 וכי נתקע ללא דלק והוא בדרכו לא-טור להביא דלק. בעת שאחד השוטרים יצא מהניידת לתחקירו, זינק המתאבד לתוך הרכב והפעיל את המטען. הפיגוע בוצע על ידי תשתית התמזים בבית לחם, באכוונתו של **אחמד מערבי**, אשר הודה בחקירתו בשירות ביטחון כללי כי שלח את המתאבד להתפוצץ במכונית התופת כשבוע לפני שביצע את הפיגוע במחסום אך זה לא התפוצץ, כי לא מצא מקום מתאים.

---

## 17 פברואר 2002
## הריגת 2  מחבלים מתאבדים בדרכם לביצוע פיגוע  ליד
## מחנה 80, 2 שוטרים פצועים

---

### המחבלים  המתאבדים  מחמד חמודה ועבד אלג'אבר חאלד

מחמד חמודה, <u>תושב שכם</u>, **בן 18** ועבד אלג'אבר חאלד, תושב ג'יוס/קלקיליה, בן 22 נסעו ברכב מזדה 323 לכוון חדרה. רכב משטרתי שהיה על הכביש החשיד אותם והחליט לעצור את הרכב. תוך כדי נסיעה בוצע ירי מהרכב לעבר ניידת המשטרה. הרכב עצר באזור מחנה 80 וממנו ירד מפגע אחד אשר ככל הנראה השליך מטען או רימון וניסה לבצע ירי לעבר השוטרים. השוטרים השיבו אש והרגו המפגע. המפגע השני המשיך בנסיעה לכיוון תלמי אלעזר כשהרכב המשטרתי ממשיך אחריו במרדף תוך כדי ירי. באזור מצר, תוך כדי ניסיון השוטרים לעקוף את הרכב ארע פיצוץ ברכב המפגע והרכב החל לעלות באש. אחריות לפיגוע ניטלה על ידי גדודי חללי אלאקצא. **איאד מחמוד צאלח נאצר**, פעיל פת"ח צבאי בטול כרם,

סיפר בחקירתו בשירות ביטחון כללי אודות מעורבותו בפיגוע ומעורבותו של **מחמד זיתאוי**, ר' התנזים בטול כרם בהוצאת הפיגוע.

---

## 16 פברואר 2002
## פיצוץ מחבל מתאבד במרכז המסחרי בקרני שומרון
## 3 הרוגים ו- 22 פצועים

---

### המחבל המתאבד  צאדק עבד אלחאפט'

תושב <u>קלקיליה</u>, **בן 19**, תלמיד במכללה המקצועית בקלנדיה, פוצץ עצמו בפיצריה במרכז המסחרי בקרני שומרון. ה"חזית העממית" נטלה אחריות על הפיגוע. את הפיגוע תכננה והוציאה לפועל תשתית החז"ע הצבאית בקלקיליה, באכוונתו של **ראאד מאדי**, בשיתוף עם תשתית החז"ע הצבאית בשכם, בראשות **עאהד עולמה**.

---

## 6 פברואר 2002
## לכידת מחבל מתאבד באוטובוס שנסע מירושלים למעלה אדומים
## ללא נפגעים

---

### המחבל המתאבד  נדאל סוראקג'י

תושב <u>שכם,</u> **בן 23**, עלה לאוטובוס אגד קו 176 בצומת הגבעה הצרפתית והתיישב ליד הנהג. הנהג הבחין בו מזיז את ידיו בתוך כיס המעיל שלבש וחשד בו כשראה חוטי חשמל מבצבצים ממעילו. בצומת א-זעיים העלה הנהג שוטרי מג"ב שריתקו את ידיו של המתאבד והורידו אותו מהאוטובוס. חבלים נטרלו את מערכת ההפעלה של חגורת הנפץ. בחקירתו מסר המתאבד כי הסכים להיות שהיד מאחר והושפע קשות ממותו של קרובו, יוסף סורכג'י, (בכיר חמא"ס) ומהמראות שחווה לאחר מות. גיוסו של הדבון בוצע על ידי **איימן שחשיר**, אותו הכיר מספר שנים קודם לכן בעת יציאתו לטקס ה"עמרה". **מהנד טאהר** העביר למתאבד הנחיות טקטיות לביצוע הפיגוע: הנחיות לצורך היטמעות, הנחיות לנסיעה לכיוון ירושלים, הנחיות הפעלת חגורת הנפץ ותדרוך לגבי היעד. ביום הפיגוע התגלח המתאבד ורכש בגדים חדשים (על מנת לשוות לו מראה ישראלי), בהמשך הבוקר הגיע לביתו של אימן שם לבש את החגורה ומעליה מעיל. באזור מחסום ענתא חבר אליו אדם שליווה אותו לאזור היעד. כאשר הגיע לתחנה עלה לאוטובוס כשיד אחת שלו מונחת בכיס בו נמצא מתג ההפעלה. הוא שילם לנהג אולם לא הצליח להפעיל את המטען, הוא נתקף בפחד ולבסוף נתפס.

W_S089711

.

---

**30 ינואר 2002**
**פיצוץ מחבל מתאבד בדרכו לפגישה עם רכז שב"כ ליד טייבה**
**2 פצועים**

---

### המחבל המתאבד  מראד אבו עסל

תושב <u>ענאבתה/טול כרם</u>, בן **23**, נכנס לרכב איסוף בדרך לפגישה עם רכז שב"כ ופוצץ עצמו. הפיגוע בוצע בתכנון ואכוונה של פעילי הג'האד אסלאמי **איאד צואלחה וטארק עז אלדין** ובעזרת פעילים מאזור טול כרם: **מעצצם מחלוף, ג'אסר רדאר ופאדי בהתי.** המתאבד לן את הלילה שלפני הפיגוע יחד עם מעתצם, אשר חימש אותו בבוקר הפיגוע על פי הוראות מדוייקות שקיבל מאיאד צואלחה ולאחר מכן שלח אותו לפיגוע.

---

**27 ינואר 2002**
**פיצוץ מחבלת מתאבדת ברחוב יפו בירושלים**
**1 הרוג, 90 פצועים**

---

### המתאבלת המתאבדת-_וופאא' אידריס

בת **31**, תושבת <u>מחנה הפליטים אלאמערי ברמאללה</u>, גרושה, ללא ילדים מפאת עקרות, עבדה בארגון ה-'סהר האדום'. המתאבדת, אקדמאית ואחות במקצועה. שלושה מאחיה של המתאבדת נמנים על ארגון הפת"ח והבוגר שביניהם אף היה עצור בידי ישראל באינתיפאדה הראשונה. הפיגוע בוצע בהכוונתו של פעיל תנזים מרמאללה. והמתאבדת נפצעה פעמיים כתוצאה מירי כדורי גומי בעת שהגישה עזרה רפואית לפצועים פלסטינים, עובדה אשר ייתכן ושימשה מניע לביצוע הפיגוע. זהו פיגוע ההתאבדות הראשון שבוצע על-ידי אישה במהלך עימות זה.

---

**25 ינואר 2002**
**פיצוץ מחבל מתאבד ברח' נווה שאנן בתל-אביב**
**23 פצועים**

---

### המחבל המתאבד  צפואת חליל

תושב <u>בית וזן/שכם</u>, בן **18**, פוצץ עצמו ברח' נווה שאנן סמוך לתחנה המרכזית הישנה בתל אביב. בזירת הפיגוע נלכד מחבל נוסף אשר היה אמור לבצע ירי. הפיגוע אוכוון על ידי תשתית הג'יהאד האיסלאמי בג'נין, ובשיתוף פעולה עם פעיל פת"ח, שהיה אמור לבצע הירי. **נאצר**

**שאיש ורביע אבו רוב** מהתשתית בג'נין הם שהחדיח את שני המפגעים לישראל בבוקר דרך טול כרם, בשיתוף סייענים מקרב ערביי ישראל.

---

## 15 דצמבר 2001
## פיצוץ מחבל מתאבד ליד מחסום דרומית לטול כרם
## ללא נפגעים

---

### המחבל המתאבד  מחמד פרג'

תושב נור שמס/טול כרם, בן **28,** רווק, פעיל ג'יהאד אסלאמי, פוצץ את עצמו כ- 30 מ' צפונית מזרחית למחסום 105, דרומית לטול כרם. הפיגוע בוצע בשיתוף פעולה  של ארגוני התמים והג'יהאד האסלאמי בטול כרם. המתאבד  גויס והוכן לפעולה על ידי **ריאד בדיר,** פעיל ג'האד אסלאמי צבאי מטול כרם בתאום עם **אנואר עליאן,** פעיל גא"' צבאי מנור אלשמס וחבר בחוליה צבאית באזור טול כרם (עצור).

---

## 12 דצמבר 2001
## פיצוץ 2 מחבלים מתאבדים ליד גני טל/גוש קטיף
## 3 פצועים

---

### המחבלים המתאבדים

אמג'ד אבו פיאד                עלי עאשור

אמג'ד אבו פיאד, תושב שיח' חמודה/עזה, ועלי עאשור, תושב חאן יונס, שניהם סטודנטים בני **22,** רווקים, פוצצו מטענים שנשאו בתיקים נגד 2 רכבים נוסעים ליד גני טל, טרם התאבדות אחד מהם, פוצץ המפגע מטען קרקעי. הפיגוע בוצע ע"י התארגנות חמא"ס מחן יונס, באכוונותו של **מחמד דיף** . כאיש הקשר של מחמד דיף לשאר הפעילים שימש **איסמעיל חמדאן.** הפעיל הבכיר ביותר בתשתיתו של מחמד דיף באיזור חן יונס היה  **עבדאללה אלפרא,** והוא שעמד ככל הנראה מאחורי הפיגוע.

---

## 9 דצמבר 2001
## פיצוץ מחבל מתאבד בצומת הצ'ק פוסט בחיפה
## 30 פצועים

---

### המחבל המתאבד  נמר אבו סיפין

תושב יאמון/ג'נין, בן **18**, נשא על גופו חגורת נפץ ופוצץ עצמו בתוך קבוצת חיילים בצומת הצ'ק פוסט בחיפה. המטען לא התפוצץ בצורה מלאה, כתוצאה מהפיצוץ נפצע המתאבד קשה ונורה למוות על ידי שוטרים שהיו במקום. על גופתו נמצאה מפה/שרטוט אשר הסביר כיצד להגיע לחיפה, כמו כן נמצאו ספר קוראן ותפילת הדרך בערבית. נטילת האחריות פורסמה על ידי ארגון הג'האד האסלאמי. הפיגוע בוצע על ידי תשתית הג'יהאד האסלאמי בשומרון בסיוע פעילי תנזים.

---

## 4 דצמבר 2001
## פיצוץ מחבל מתאבד ליד מלון הילטון ממילא בירושלים
## 5 פצועים

---

### המחבל המתאבד  דאוד סעיד

תושב ארטאס/בית לחם, בן **46**, נשוי ואב ל- 8, התפוצץ בפינת הרח' דוד המלך - אליהו שמעיה בירושלים מטרים ספורים ממלון הילטון ממילא. ככל הנראה ניסה המתאבד לעלות לאוטובוס אך לא הספיק. על הפיגוע לקחה אחריות הזרוע הצבאית של ארגון הג'האד אסלאמי "פלוגות ירושלים". הפיגוע בוצע על ידי תשתית הג'יהאד האסלאמי בבית לחם אשר עומדת בקשר רציף וישיר עם מפקדת הג'האד אסלאמי בדמשק.  מפקד התשתית אשר עומד מאחורי שילוחו של המתאבד לפיגוע ההתאבדות הוא **עיסא מחמד אסמעיל בטאט** מבית לחם (עצור).

---

## 2 דצמבר 2001
### פיצוץ מחבל מתאבד באוטובוס ברח' יד לבנים בחיפה
### 15 הרוגים ו - 35 פצועים

---

## המחבל המתאבד  מאהר חביש י

תושב <u>שכם</u>, **בן 20,** רווק, פוצץ עצמו בתוך אוטובוס "אגד" בקו 16 ברחוב "יד לבנים", בעיר התחתית בחיפה. מתחקור נהג האוטובוס עלה כי המתאבד עלה לאוטובוס בתחנה אחת לפני הפיצוץ, שילם, שילם והחל להיכנס לתוך האוטובוס. כשהנהג קרא לו על מנת להחזיר לו עודף, הסתובב המתאבד ופוצץ עצמו, ככל הנראה באמצעות חגורת נפץ שלבש, שכן לא נשא עמו תיק. תנועת החמא"ס נטלה אחריות לפיגוע. מאכזון הפיגוע הוא **סלים חג'ה,** מבכירי תשתית החמא"ס הצבאית בשומחן. בחקירתו סיפר כי הוא קיבל לידיו את המתאבד והכין אותו לפיגוע, תוך שהוא בודק באם המתאבד מתכוון למות או לא ואמר לו כי אם אינו מוכן עדיף שלא יצא לפיגוע. חג'ה העביר תדרוך למתאבד לגבי מקום היעד, לאחר שלמד את הנושא והנחה אותו שלא להרבות בדיבור עם נהג האוטובוס.

---

## 1 דצמבר 2001
### פיצוץ 2 מחבלים מתאבדים במדרחוב בן יהודה בירושלים
### 11 הרוגים ו - 170 פצועים

---

## המחבלים המתאבדים

| נביל אבו חלביה | אסאמה בחר |
|---|---|

אסאמה בחר, **בן 25,** חבר החמא"ס באבו דיס, דתי, חבר וועדת הביטחון בכלא וחוקר חשודים בשיתוף פעולה ונביל אבו חלביה, **בן 24,** מוכר כפעיל מזד"ל, טייח במקצועו, בעל ידע במיומנויות לחימה, תושב <u>אבו דיס</u>, פוצצו עצמם במדרחוב בן יהודה בירושלים. לאחר כרבע שעה התפוצצה מכונית תופת ברחוב קוק הסמוך למדרחוב. ארגון החמא"ס נטל אחריות רשמית על הפיגוע. אסאמה פנה **לפריד אטרש** (תושב אבו דיס אשר היווה צינור קשר בין פעילות החמא"ס הצבאי ברמאללה לירושלים) וביקש ממנו להפגישו עם **גמאל טאויל,** פעיל חמא"ס בכיר מרמאללה, על מנת שיגייסו לחמא"ס הצבאי. טאויל מסר לפריד כי על אסאמה "להגיע לכיכר המנארה בעוד שבועיים באיום א' לבוש ג'קט שחור ובידו עיתון". לאחר מכן העביר טאויל את בקשת אסמה **לאבראהים חאמד,** מראשי מפקדת החמא"ס ברמאללה, אשר, ככל הנראה, גייסו לפיגוע. בחקירתו של **עבדאללה גמאל,** בכיר בתשתית חמא"ס רמאללה, מסר כי הכין והעביר את החגורות והמטענים לפיגוע דרך **סייד שיח' קאסם,** הקמב"ץ של אברהים חאמד. נביל אבו חלביה היה חבר הטוב והקרוב של אסאמה וכפי

---

הנראה גייס לפיגוע בשיטת "חבר מביא חבר". מכונית התופת שהתפוצצה הייתה שייכת **לנאדר עליאן**, תושב אבו דיס, פעיל ג'האד אסלאמי, אשר הודה בחקירתו כי הרכב, מסוג אופל קדט כחולה מודל 87, היה שייך לו אולם מאחר והוא מתגורר בשטחים והרכב נשא לוחיות זיהוי ישראליות זיקק נאדר לעזרת חבר, מוראאד אבו רמילה אשר רשם הרכב על שם בן דודו. נאדר מכר הרכב לנביל ואסאמה ונמסר לידיהם יום לפני הפיגוע.

---

### 29 נובמבר 2001
### פיצוץ מחבל מתאבד בתוך אוטובוס ליד מחנה 80
### 3 הרוגים ו - 8 פצועים

---

#### המחבל המתאבד  סאמר אסעד שהוואנה

תושב **סילת אלח'ארתיה/ג'נין**, **בן 20**, רווק, דתי, פוצץ עצמו באוטובוס אגד קו 823. הפיצוץ אירע סמוך למחנה 80. מתחקירו האירוע עלה כי לפני הפיצוע אסף האוטובוס מהתחנה בצומת אום אל פחם נוסע אחד כבן 25 בעל הופעה מסודרת, שפם קטן ושיער שחור מגולח. הנוסע מסר לנהג שני שטרות של 100 ש"ח ואמר "חדרה". הנהג הבחין בשני אנשים נוספים שהיו בתחנה, אחד מהם טפח על שכם הנוסע שעלה לאוטובוס. הנוסע הלך לכיוון החלק האחורי של האוטובוס והתיישב. הנהג הגיע לצומת מחנה 80 שמע מעין פיצוץ קטן, נעצר ואז ארע פיצוץ אדיר. על הפיגוע נטלה אחריות **תנועת הג'האד האסלאמי**. במהלך מבצע 'חומת מגן' (אפריל 02) נעצר **תאבת מרדאווי**, פעיל ג'האד אסלאמי צבאי בכיר מג'נין, אשר מסר בחקירתו מידע אודות הפיגוע, לפיו, **מחמוד טואלבה** (הרוג) נער ע"י הרש"פ. טרם מעצה קבל ממנו מרדאווי  חגורת נפץ מוכנה להפעלה. כמו כן סיפר כי **מחמד יאסין אלעאניני** (הרוג) גייס את המתאבד. מרדאווי  מסר למחמד את חגורת הנפץ שהייתה ברשותו יומיים לפני שהפיגוע התבצע. מחמד הוא זה שצילם בתמונות את המתאבד והוא שהסיע אותו לאזור אום אל פחם,  משם אמר אמור היה המתאבד להגיע לאזור של עיר גדולה. על פי התכנון לא היה אמור המתאבד להתפוצץ באזור מחנה 80 ולכן איחרו בלקיחת האחריות על הפיגוע.

---

### 26 נובמבר 2001
### פיצוץ  מחבל מתאבד במחסום ארז
### 2 שוטרי מג"ב פצועים

---

#### המחבל המתאבד  תיסיר אלעג'רמי

W_S089716

תושב <u>מחנה הפליטים ג'באליה/עזה</u>, בן **25**, נשוי ואב ל- 3, עבד כחודש במתפרה באזור התעשייה בארץ, וככל הנראה אסף מידע לקראת הפיגוע. בשעות הבוקר המוקדמות במהלך הכנסת פועלים למחסום הגיע המתאבד ועמד בתור הכניסה ל"קרחסלה" המוווסתת את כניסת

```
8 נובמבר 2001
פיצוץ  מחבל מתאבד במהלך יירוטו בבאקה אל שרקיה בדרך
לביצוע פיגוע התאבדות,
2 שוטרי מג"ב פצועים
```

הפועלים. כעבור מספר דקות הפעיל מטען שנשא בידיו כשהוא עומד ליד חלון העמדה הצופה על הנכנסים. נטילת אחריות בוצעה על ידי גדודי עז אדין אל קסאם של החמא"ס.

### המחבל המתאבד  מאייד חטיב

תושב <u>טול כרם</u>, בן **25**, סטודנט להנדסת בניין בביר זית ואח"כ באלנג'אח. היה אחראי "ועדת ההטפה" בכותלה. במהלך מבצע לתפיסתו של המתאבד, שביקש לבצע פיגוע התאבדות בשטח ישראל הבחין המתאבד בכוחותינו ופוצץ את עצמו. "גדודי עז אלדין אל קסאם" נטלו אחריות לפיגוע. את הפיגוע ביצעה תשתית החמא"ס בשכם בראשותו של **יוסף סורקג'י (הרוג)**. בהוצאת הפיגוע השתתפו גם **נסים אבו רוס (הרוג)** - "מהנדס ראשי" ואחראי ביצועי **,טאהר נאצר (הרוג)** – משלח, **נצר אדין עציידה (עצור)** - מפעיל קדמי וראש חוליי/ה/יות.

```
17 אוקטובר 2001
פיצוץ  מחבל מתאבד ליד ג'יפ צה"ל, באזור חורשת בארי בנגב
2 חיילים פצועים
```

### המחבל המתאבד  פואד אבו סריה

תושב <u>עזה</u>, בן **25**, רווק, התפוצץ ליד ג'יפ לא ממוגן של צה"ל בו שהו באותה עת שני גששים שערכו סיור. הפיצוץ ארע כ- 400 מ' מזרחית לגדר המערכת בתוך שטח ישראל. מבדיקת השטח לאחר האירוע התברר כי המתאבד חדר לתחומי ישראל, כשהוא לבוש מדי צה"ל, מאזור גדר המערכת בו נמצא גשרון להעברת מים. לאחר חציית הגדר הגיע לחורשה והסתתר בתוכה, ברגע שזיהה את הג'יפ עובר רץ לכיוונו והתפוצץ. "החזית העממית" נטלה אחריות לפיגוע.

W_S089717

---

## 7 אוקטובר 2001
## פיצוץ מחבל מתאבד ליד הכניסה לקיבוץ שלוחות
## 1 הרוג

### המחבל המתאבד אחמד דראגמה

תושב טובאס/ג'נין, בן 17, התפוצץ ליד לרכבו של תושב קיבוץ שלוחות (סמוך לבית שאן) בכניסה לקיבוץ. אחריות ניטלה על ידי ארגון הג'יהאד האסלאמי. את הפיגוע ביצעה תשתית הג'יהאד האסלאמי בטובאס. מחקירת תאבת מרדואי בשירות ביטחון כללי עלה כי **אימן דראגמה** שילח את המחבל ומסר לו מזוודת נפץ במשקל 8-10 ק"ג לפיגוע.

---

## 9 ספטמבר 2001
## פיצוץ מחבל מתאבד בתחנת הרכבת בנהריה
## 3 הרוגים ו- 46 פצועים

### המחבל המתאבד שאכר חבישי

תושב אבו סנאן, בן 48, נשוי ואב ל- 6, פוצץ עצמו על רציף תחנת הרכבת בנהריה. ארגון החמא"ס נטל אחריות על הפיגוע ואף פרסם קלטת וידאו בה צולם המתאבד טרם יציאתו לפיגוע. כ- 10 ימים לפני הפיגוע הוחשד המתאבד כמפגע פוטנציאלי, תמונתו הופצה למשטרה ונעשה ניסיון לעוצרו. הפיגוע בוצע על ידי תשתית החמא"ס הצבאית בשומרון. **קייס עדואן**, מראשי הזרוע הצבאית בשומרון (הרצ) עמד מאחורי פיגוע זה, הוא גייס את המתאבד לפיגוע ההתאבדות ובהמשך סיפק לו מקלט לאחר שהמתאבד נמלט מביתו.

---

## 4 ספטמבר 2001
## פיצוץ מחבל מתאבד ברחוב הנביאים בירושלים
## 13 פצועים

### המחבל המתאבד ראאד ברגותי

תושב רמאללה, בן 26, רווק, מורה, בוגר מכללת השריעה באבו דיס, פעיל חמא"ס מתחילת שנות ה- 90, דתי קיצוני, פוצץ עצמו ברח' הנביאים בירושלים בעת שנעצר על ידי שוטר מג"ב שחשדו בו. גדודי עז אלדין אלקסאם נטלו אחריות לפיגוע. מעדויות ראיה עלה כי המתאבד היה לבוש מכנסיים שחורים, חולצה לבנה וכיפה שחורה ונראה כחרדי, על גבו נשא תרמיל גב

גדול. יחד עמו צעד אדם נוסף, **עאהד נתשה**, אשר נפצע בפיצוץ, ואשר שימש כסייענו של המתאבד. התשתית שהוציאה לפועל את הפיגוע היא תשתית מפקדת החמא"ס ברמאללה, אשר פעלה על בסיס פעילים מרמאללה ומיחשלים. בחקירתו בשירות ביטחון כללי סיפר עאהד נתשה כי שבועיים טרם הפיגוע פגש עאהד את חברי החוליה ואת המתאבד במסגד באל בירה, תוך סיכום כי הפיגוע יצא לפועל תוך מס' ימים. עפ"י התכנון המקורי אמור היה הפיגוע להתבצע באוטובוס אגד מס' 13 בי-ם, ואח"כ שונה לתחנת האוטובוס של קו 13. ביום הפיגוע פגש עאהד את המתאבד בצומת א-ראם ומשם המשיכו לי-ם. בי-ם פגשו ב**חמזה קלותי** שמסר להם את המטען , ועאהד הוביל את המתאבד לאזור בניין כלל. מחקירות הממ"ס עלה כי את המטען לפיגוע הכינו **אחמד אבו טהא וראאד אבו דאהר** (מפקד החוליה) ואילו את ראאד ג'ייס לפיגוע **בלאל ברגותי**.

---

## 12 אוגוסט 2001
## פיצוץ  מחבל מתאבד בקפה "וול סטריט" בקריית מוצקין
## 16 פצועים

### המחבל המתאבד  מחמד נצר

תושב <u>קבאטיה/ג'נין</u>, **בן 28**, חוק, פוצץ עצמו בבית קפה "וול סטריט", הנמצא ברחוב שדרות בן-גוריון בקריית-מוצקין.  עדי ראיה במקום סיפרו כי מחמד לבש מכנסי ג'ינס כחולים וחולצה לבנה מכופתרת ולא נשא עמו תיק. הוא התנהג בעצבנות, סביב גופו הייתה מלופפת מעין תחבושת, מתחת לה בצבצו חוטי חשמל. המתאבד לחץ על חפץ שהחזיק בידו, דמוי מצית ואז ארע הפיצוע. אחריות לפיגוע ניטלה על ידי ארגון הג'יהאד האסלאמי. הפיגוע בוצע על ידי ההתארגנות הצבאית של הג'יהאד האסלאמי בג'נין בראשותו של **מחמוד נורסי**.

---

## 9 אוגוסט 2001
## פיצוץ  מחבל מתאבד במסעדת "סבארו" בירושלים
## 15 הרוגים ו- 110 פצועים

### המחבל המתאבד  עז אלדין אלמצרי

תושב <u>עקאבה/ג'נין</u>, **בן 22**, רווק, פוצץ עצמו במסעדת סבארו בפינת הרחובות קינג ג'ורג' ויפו בירושלים. הפיגוע תוכנן ואוכוון על ידי תשתית החמא"ס ברמאללה. את המטען הקטלני ייצר **עבדאללה גמאל** ה"מהנדס" הראשי של תשתית החמא"ס באזור יהודה אשר עסק בייצור מטעני החבלה  ובהכשרת פעילי חמא"ס בייצור אמצעי חבלה ובהקמת מעבדות חבלה. גמאל הטמין את המטען רב העוצמה בתוך גיטרה, הנתונה בתיק גיטרה וסיפקה הסוואה מושלמת.

W_S089719

את התשתית אשר ביצעה את הפיגוע הכוונ פעיל חמא"ס בכיר בן 27 מבית **בלאל ברגותי,** רימא. המגייס והסייען היה **מחמד דגלס** פעיל חמאס צבאי בן 24 מבורקא, אשר הופעל על ידי ברגותי. דגלס גייס את עז אלדין ואת המובילה **אחלאם תמימי,** בת 20, ירדנית אשר התגוררה ברמאללה, למדה בביר זית ועבדה כעיתונאית. דגלס קנה את הגיטרה בה הוטמן מטען החבלה וכן נרתיק לנשיאת הגיטרה. תמימי עסקה באיסוף מודיעין לקראת הפיגוע. ברגותי נפגש עם המתאבד יום לפני ביצוע הפיגוע, הלין ואירח אותו בדירה באזור רמאללה ויצא עמו לקניית בגדים חדשים. ביום הפיגוע קלט דגלס את המתאבד במסגד באל בירה ובהמשך פגשו את ברגותי, אשר לקח אותם לדירה מבצעית במחנה הפליטים אמערי. בדירה תדרך בלאל את המתאבד כיצד להפעיל את המטען. כמו כן ביום הפיגוע פגש דגלס בתמימי ברמאללה יחד עם המתאבד. תמימי המשיכה עם המתאבד והמטען אשר הוטמן בגיטרה לתחנת מוניות ברמאללה, משם לקחו מונית לירושלים. תמימי נשאה עמה מצלמה ודיברה עם

---

### 8 אוגוסט 2001
### פיצוץ  מכונית תופת נהוגה בידי מחבל מתאבד ליד מחסום בקעות
### 1 חייל פצוע

המתאבד, שנשא תיק גיטרה, באנגלית, על מנת לשוות לעצמה מראה בלתי מחשיד של תיירת.

---

### המחבל המתאבד  אשרף סייד

תושב שכם, בן 23, פעיל חמא"ס, נהרג בהתפוצצות מכונית תופת סמוך למחסום צה"לי ליד בקעות שבבקעת הירדן. מתחקור הכוחות המעורבים במקום עלה כי הרכב הגיע למחסום ונעצר לפני הבטונדות. חייל הורה לנהג להתקרב לצורך בדיקה והאחתנו לחץ על דוושת הגז והתפוצץ בסמוך לחייל. קיימת סבירות כי יעד הפיגוע היה אחר וכי המתאבד היה בדרכו לפיגוע אולם חשש כי בדיקת הרכב עלולה להסגיר ולכן החליט לבצע הפיגוע במקום.

---

### 2 אוגוסט 2001
### לכידת מחבל מתאבד בעת שניסה לעלות לאוטובוס ליד בית שאן
### ללא נפגעים

---

### המחבל המתאבד  מחמד אבו חדר בשראת

תושב טמון/ג'נין, במוצאו משכם, בן 16, תלמיד תיכון, נתפס בעת שניסה לעלות על אוטובוס אגד בתל תאומים ליד בית שאן, לצורך ביצוע פיגוע התאבדות. תיקו של המתאבד  הכיל 3 פצמ"רים ומפסק כסוף מחובר בחוט אדום. מחקירתו עלה כי את ניסיון הפיגוע אכוונה תשתית

הג'יהאד האסלאמי מטובאס שהופעלה על ידי זיד בסיסי (עצור). מחקירתו של בסיסי עלה כי **רמזי בשאראת** הציע למתאבד גיוס לג'האד אסלאמי ולאחר מכן שוחח עמו על ביצוע פיגוע

---

### 22 יולי 2001
### לכידת מחבל מתאבד בעת שניסה להפעיל חגורת נפץ בשוק הפשפשים בחיפה, ללא נפגעים

התאבדות. **עראף בשאראת** (עצור) שידל לביצוע הפיגוע והפגיש את המתאבד עם זיד בסיסי. **פואד בשאראת** הוא שהוביל את המתאבד  למקום הפיגוע.

---

## המחבל המתאבד  מוראד טואלבה (נורסי)

תושב **מחנה הפליטים ג'נין**, בן **18**, נעצר בעת שניסה לבצע פיגוע התאבדות בחיפה. המתאבד הסגיר לידי המשטרה מטענים שהסתיר בבית נטוש בחיפה טרם שנעצר. בחקירתו מסר המתאבד כי היה מעוניין לבצע פיגוע התאבדות וחובר על ידי אחיו מחמוד טואלבה לפעילי ג'האד אסלאמי. בחקירת תאבת מרדאוי הודה כי המתאבד קיבל חגורת נפץ שהוכנה על ידי אחיו **מחמוד טואלבה** והוצאה לישראל על ידי מחמד יאסין**.

---

### 16 יולי 2001
### פיצוץ  מחבל מתאבד בתחנת אוטובוס ליד תחנת הרכבת בבנימינה
### 2 חיילים הרוגים ו- 8 פצועים

---

## מחבל המתאבד  נדאל אבו שדוף

תושב **בורקין/ג'נין**, בן **20**, רווק, פוצץ עצמו בתחנת אוטובוס מול תחנת הרכבת בבנימינה. מאכווני הפיגוע היו **תאבת מרדאוי ומחמוד נורסי**. נורסי סיפק תיק במשרל 20 ק"ג **למחמד יאסין,** שהעביר את המפגע והמטען **לסמיר פאיד**, נהג מונית ממחנה הפליטים בג'נין, אשר הסיע את המתאבד  בדרכו לישראל.

---

### 11 יולי 2001
### לכידת מחבל מתאבד בעפולה, ללא נפגעים

---

## המחבל המתאבד  ג'האד ג'ראר

תושב ג'נין, בן **17**, תלמיד תיכון, יצא בבוקר כשברשותו תיק עם מטען חבלה מוכן מאזור ג'נין לכיוון עפולה בשתי מוניות, כאשר  המונית השניה עקפה את מחסום סאלם. באזור תחנת המשטרה אותר ע"י  קצין משטרה שחשד בו וביצע לו מעצר חשוד. המתאבד ניסה

להפעיל את המטען והכניס יד לכיוון התיק אך נוטרל פיסית ע"י קצין המשטרה. בחקירתו הודה המתאבד כי התכוון לבצע פיגוע התאבדות במקום הומה אדם בעפולה. כן מסר כי הנו פעיל ג'האד אסלאמי, וכי קיבל את המטען ממחמוד **טואלבה (נורסי)** יחד עם הנחיות להפעלתו. עוד מסר המתאבד כי טרם יציאתו לביצוע הפיגוע, כתב צוואה ואף הצטלם בוידאו והביע את כוונתו לבצע פיגוע התאבדות. המתאבד גויס כחודשיים טרם הפיגוע לג'האד אסלאמי והביע כוונה לבצע פיגוע התאבדות.

---

## 9 יולי 2001
## לפיצוץ מחבל מתאבד במכונית תופת באזור גוש קטיף
## חייל פצוע

### המחבל המתאבד נאפד נדר

תושב ג'באליה/עזה, **בן 26,** נשוי ואב ל- 2, פעיל חמא"ס, שעבד באוניברסיטה האסלאמית, פוצץ עצמו במכונית תופת סמוך לכלי רכב של צה"ל באזור גוש קטיף. מחקירת החבלנים עלה כי ברכב הונח מטען בסדר גודל כולל של 40 עד 50 ק"ג חומר נפץ, מתוכם התפוצצו כ- 10 עד 15 ק"ג. הפיגוע בוצע על ידי הזרוע הצבאית של ארגון החמא"ס ברצועת עזה באכוונתו של **צאלח שחאדה.** יד ימינו של שחאדה והמוציא לפועל של הפיגוע, **מחמוד מטלק עיסא,** נעצר ע"י המנגנונים מיד לאחר הפיגוע.

---

## 22 יוני 2001
## פיצוץ מכונית תופת סמוך לסיור צה"ל בחוף השקמה/אלי סיני
## 2 חיילים הרוגים ו- 1 פצוע

### המחבל המתאבד אסמאעיל מעצואבי

תושב מחנה הפליטים שאטי/רצועת עזה, **בן 22,** חוק, פעיל חמא"ס, סטודנט באוניברסיטה האסלאמית, פוצץ רכב תופת סמוך לסיור צה"ל בחוף השקמה/אלי סיני. המתאבד, אשר נהג בג'יפ לבן בעל לוחיות זיהוי צהובות, התחבר בחולות בסמוך למבנה, סיור של צה"ל שעבר במקום הוזעק על ידי המקומיים לעזרה, ומשהתקרבו החיילים לעזור לנהג הג'יפ, פוצץ הג'יפ על ידי המתאבד. ממידע שעלה מאוחר יותר התברר כי המתאבד לא התחפר באזור הפיגוע בכוונה תחילה, אלא כנראה התכוון להגיע לאחת ההתנחלויות באזור או אף להיכנס לתוך

W_S089722

תחומי ישראל. יחד עמו בג'יפ נסע גם מחמוד ע'ול, אשר נמלט מהרכב כ- 10 דקות לפני

הפיצוץ.  הפיגוע בוצע על ידי ארגון החמא"ס.

W_S089723

---

## 17 יוני 2001
## פיצוץ (חלקי) מחבל מתאבד בעגלת תופת רתומה לחמור ליד
## עמדת צה"ל בדהניה/רפיח, ללא נפגעים

### המחבל המתאבד  מראד אבו מעילק

תושב מחנה הפליטים נציראת ברצועת עזה, בן 23, סטודנט באוניברסיטה הפתוחה בעזה, התקרב אל שער הכניסה לישוב דהנייה כשהוא רכוב על חמור ועגלה, עליה מיכל מים גדול. בעת שניסה להפעיל את המטען אירע פיצוץ חלקי שהפילו מהעגלה. כשניסה להימלט נורה ע"י חיילי המחסום ונעצר. בחקירתו סיפר המתאבד כי נביל  שריחי, פעיל ג'האד אסלאמי הפועל בצפון הרצועה, גייס ושילח אותו לפיגוע לאחר שהמתאבד פנה אליו מיוזמתו וביקש לבצע פיגוע התאבדות. המתאבד קיבל משרחי 2,500 ש"ח ובהתאם להוראותיו יצא לרפיח שם נפגש עם אדם בשם סאלח. השניים לנו יחד ולמחרת (יום הפיגוע) נסעו לפרדס סמוך לדהנייה, שם קיבל המתאבד עגלה רתומה לחמור ובה מטען נפץ ומנגנון הפעלה, כמו כן קיבל תדרוך כיצד לבצע את הפיגוע.

---

## 1 יוני 2001
## פיצוץ מחבל מתאבד בפתח מועדון ב"דולפינריום" בתל אביב
## 22 הרוגים ו- 83 פצועים

### המחבל המתאבד  סעיד חותרי

תושב קלקיליה (ירדני במוצאו), בן 22,  פעיל חמא"ס, פוצץ עצמו בקרבת קבוצת צעירים בכניסה למועדון "עולם המים" בדולפינריום בת"א. תשתית החמא"ס הצבאית בקלקיליה היא שביצעה את הפיגוע. התשתית הוקמה על ידי סלים חג'ה, בן 30 משכם, מבכירי ארגון החמא"ס ביהודה ושומרון ומי שהיה אחראי על התשתית הצבאית של הארגון בצפון השומרון. חג'ה העמיד בראש התשתית את ע"א רחמאן חמאד אותו הכיר על רקע שהייה משותפת בכלא איימן. מחמוד נאדי (עצור) היה נהג המונית שהסיע את המתאבד לדולפינריום. בחקירתו בשירות ביטחון כללי סיפר כי אנס עא כרים דאוד, תושב קלקיליה, מזוהה חמא"ס ובעל עבר פלילי הוא שתיאם את הסעתו של המתאבד מקלקיליה לת"א תוך שהיה בקשר טלפוני במהלך הנסיעה עם מחמוד ועם המתאבד.

W_S089724

## 29 מאי 2001
## פיצוץ מחבל מתאבד והריגת מחבל נוסף במחסום "תופח"
## 2 חיילים פצועים

### המחבל המתאבד  עבד אלמעטי עצאר

תושב **חאן יונס, בן 19**, רווק, סטודנט באוניברסיטה האסלאמית, הגיע למחסום "תופח" עם צעיר נוסף, **עסמעיל עאשור**, תושב מחנה הפליטים חן יונס, בן 20, אף הוא סטודנט באוניברסיטה האסלאמית. השניים הגיעו לעמדת המגנומטר ונתבקשו להציג תעודות זהות, מאחר ולא החזיקו ברשותם תעודות זהות נתבקשו על ידי החיילים להתרחק מהעמדה. בשלב זה, התקרב המתאבד  לעבר החיילים ופוצץ עצמו, במקביל נסוג מעט לאחור עסמאעיל עאשור ולאחר הפיצוץ התקרב לעמדת החיילים תוך כדי זריקת רימונים. עסמעיל נורה ונהרג מאש חיילי צה"ל. הפיגוע בוצע על ידי ארגון החמא"ס.

## 25 מאי 2001
## פיצוץ מכונית תופת בידי 2 מתאבדים בתחנה המרכזית בחדרה
## 66 פצועים

### המחבלים המתאבדים  אסאמה אבו אלהיג'א ועלא צבאח

אסאמה אבו אלהיג'א, תושב <u>מחנה הפליטים ג'נין</u>, **בן 22**, רווק, עבד בחברת שטיחים ועלא צבאח, תושב העיר <u>ג'נין</u>,  **בן 22**, רווק, עבד בחנות אופנה. השניים פוצצו מכונית תופת בתחנה המרכזית בחדרה. ארגון הג'יהאד האסלאמי נטל אחריות על הפיגוע. מארגני הפיגוע היו **תאבת מרדאוי ומחמוד נורס,** שהכינו רכב תופת ומזוודת נפץ ויצאו עימם מברטעה לישראל. זהו פיגוע ההתאבדות הראשון (מאז נובמבר 1998 - ירושלים), שהארגון ביצע בשטח ישראל.

W_S089725

## 25 מאי 2001
## פיצוץ מיכלית תופת בידי מחבל מתאבד בצומת נצרים,
## ללא נפגעים

### המחבל המתאבד  חסין אבו נאצר

תושב מחנה הפליטים ג'באליה/עזה, בן 22, רווק, סטודנט באוניברסיטה האסלאמית, פעיל ג'האד אסלאמי בעברו. אבו נאצר נהג מיכלית דלק בסמוך לשיירה צבאית בצומת נצרים. כוח צה"ל במוצב מגן 3 פתח באש לעבר המיכלית. אבו נאצר ירד מהציר, נעצר על תלולית של המוצב, ואז אירעה התפוצצות המיכלית, כאשר המתאבד ישוב בתוכה. בחלקה הקדמי של המשאית היו 3 בלוני גז, ו-48 ק"ג של חומר נפץ מאולתר. אחריות לפיגוע ניטלה על ידי החמא"ס.  הפיגוע אוכוון על ידי צאלח שחאדה, מבכירי הנהגת החמא"ס באזח"ע וממייסדי הזרוע המבצעית שלה.

## 18 מאי 2001
## פיצוץ מחבל מתאבד בכניסה לקניון השרון בנתניה
## 5 הרוגים ו- 86 פצועים

### המחבל המתאבד  מחמוד מרמש

תושב טול כרם, בן 21, רווק, דתי, פעיל חמא"ס פוצץ עצמו בכניסה לקניון השרון בנתניה. ארגון החמא"ס נטל אחריות על הפיגוע ואף פרסם קלטת בה נראה המחבל המתאבד, מחמוד מרמש. הפיגוע בוצע על ידי תשתית החמא"ס באזור טול כרם, האחראית גם ל- 2 הפיגועים הנוספים שהיו בנתניה (4/3,-i 18/5) בהם התאבדו פעילי התשתית המקומיים של המסגד הישן בטול כרם. פואז בדראן (הרוג), פעיל חמא"ס צבאי מטול כרם, גייס את המתאבד לפיגוע. עמאר חדירי, מי ששימש כסייענו של עבאס אל סיד (ראש התשתית, עצור), היה איש השטח והמתווך בין פואז ועבאס. בין היתר, הורה עבאס לעמאר להכין את כל הציוד לצילום המתאבד ולמסור אותו לפואז.

---

## 29 אפריל 2001
## פיצוץ מכונית תופת בידי מחבל מתאבד סמוך לאוטובוס בצומת
## דיר שרף, ללא נפגעים

---

### המחבל המתאבד  ג'מאל נאצר

תושב <u>שכם</u>, **בן 23**, רווק, סטודנט להנדסה באוניברסיטת אל נג'אח בשכם, פעיל ב"אלכתלה אלאסלאמיה", פוצץ מכונית תופת סמוך לאוטובוס שהוביל תלמידים בצומת דיר שרף. מחומר שעלה בחקירת הסתבר כי במהלך הפיגוע התרחשה תקלה. רכב פלסטיני נצמד לאוטובוס דבר שגרם לנאצר להסס ולפוצץ את הרכב שלא בצמוד לאוטובוס כפי שהיה מתוכנן - מה שלמעשה מנע בנס נפגעים רבים. הפיגוע בוצע באכוונת תשתית החמא"ס בשכם. **עבאדה בלאל** שילח את המתאבד לפיגוע וכמו כן ידועה מעורבותם של **חאלד ריאן ומג'די בלאסמה** בגלגול הפיגוע.

---

## 22 אפריל 2001
## פיצוץ מחבל מתאבד בתחנת אוטובוס בכפר סבא
## 1 הרוג ו- 45 פצועים

---

### המחבל המתאבד  עמאד זבידי

תושב <u>שכם</u>, **בן 18**, תלמיד תיכון, פוצץ מטען על גופו בסמוך לאוטובוס אגד, קו 29, שעצר בתחנת אוטובוס ברח' טשרניחובסקי בכפר סבא. אחריות לפיגוע ניטלה על ידי ארגון החמא"ס. את הפיגוע ביצעה התארגנות של פעילי חמא"ס מאזור שכם. אחראי לגיוסו ושיגורו של המתאבד לפיגוע היה **מהנד טאהר**. בחקירתו הודה **עא רחמאן שדיד** במעורבותו בהעברתו של המתאבד לביצוע הפיגוע בכפר סבא. את ארגון מקום הפיגוע והסעתו ביצע **עלי חודירי** ואת ההסעה ביצע **נהאד אבו קשק**, נהג במקצועו, בעל ת.ז. ישראלית.

---

## 28 מרס 2001
## פיצוץ מחבל מתאבד סמוך לתחנת דלק בנוה ימין
## 2 הרוגים ו- 4 פצועים

---

### המחבל המתאבד  פאדי עאמר

תושב <u>קלקיליה</u>, **בן 23**, רווק, פעיל חמא"ס, סטודנט ב"אוניברסיטה הפתוחה" בקלקיליה, פוצץ עצמו בתחנת דלק בכביש 444 דרומית לצומת כפר סבא מזרח, בקרבת קבוצת תלמידי תיכון אשר המתינו בתחנת הדלק להסעה לביה"ס בקדומים. תשתית החמא"ס בקלקיליה היא האחראית לביצוע הפיגוע. המתאבד נשלח על ידי **ג'בריל ג'בריל וטארק ברזילי**, פעילי

---

חמא"ס צבאי צבאיים מקלקיליה. הפעילים עדכנו את **עא רחמאן חמאד** (הרג) ו**ראא'ד חותרי**, פעיל חמאס צבאי בכיר אודות הפיגוע על מנת שיטלו אחריות. גם **אבראהים דחמס**, פעיל חמא"ס מבצעי בקלקיליה, הודה בחקירתו בקשריו עם המתאבד ומודעותו לתכנון הפיגוע.

---

### 27 מרס 2001
### פיצוץ מחבל מתאבד ליד אוטובוס בצומת הגבעה הצרפתית בירושלים
### 13 פצועים

**המחבל המתאבד  דיאא טויל**

תושב <u>אלבירה/רמאללה</u>, **בן 20**, רווק, סטודנט להנדסה באוניברסיטת ביר זית, פעיל חמא"ס, אחיינו של ג'מאל טויל, פעיל חמא"ס בכיר ברמאללאה. המתאבד פוצץ עצמו ליד אוטובוס אגד בקו מס' 6, אשר נסע מכיוון הגבעה הצרפתית לכיוון מזרח. אחריות לפיגוע ניטלה על ידי ארגון החמא"ס. החל מיולי 01 החלה להיחשף תשתית חמא"ס צבאית, שמרכזה בשומרון ולה קצה מבצעי ברמאללה. ב- 9 אוג' 01 נעצרו ע"י ממ"ס רמאללה **עבדאללה גמאל ובלאל ברגותי**, שניהם תושבי בית רימא. בחקירתם בשירות ביטחון כללי הודו  באחריותם להוצאתו של המתאבד לפיגוע. כמו כן הודו בהפעלת מעבדת חבלה ברמאללה. ברגותי הוא שגייס את המתאבד לפיגוע ולאחר מכן שלח אותו לשכם לקבל המטען. המתאבד  נשלח לפיגוע על ידי **אימן חלאוה** (הרג), מראשי תשתית החמא"ס בשומן.

---

### 4 מרס 2001
### פיצוץ מחבל מתאבד ברחוב מרכזי בנתניה
### 3 הרוגים ו- 53  פצועים

**המחבל המתאבד  אחמד עליאן**

תושב <u>מחנה הפליטים נור אלשמס/טול כרם</u>, **בן 23**, רווק, איש דת, מואזין, התקרב לאוטובוס אגד קו 22 שעמד ברמזור בצומת הרחובות הרצל ושוהם, כשהיה במרחק 2-3 מ' מהאוטובוס פוצץ עצמו. כשבוע לפני התאבדותו כתב המתאבד צוואה בה התייחס ראשית לעצם ההתאבדות וניכר כי היה חשוף לשטיפת מוח חמא"סית במסגד בו התפלל. בחלקה השני של הצוואה חילק המתאבד את ירושתו. הפיגוע בוצע על ידי תשתית החמא"ס בטול כרם, בהנהגתו של **פואז בדראן** (הרג), ובמעורבותו של **אחמד ג'יוסי**, פעיל חמאס בן 23, תושב טול כרם (עצור), אשר הודה בחקירתו כי הוביל את המתאבד לפיגוע וכי פתח עבורו ציר בדרך לנתניה.

W_S089728

---

**1 מרס 2001**
**מחבל מתאבד פוצץ מטען במונית, סמוך לצומת מי עמי**
**1 הרוג ו- 10  פצועים**

---

### המחבל המתאבד  זיד כילאני

תושב סיריס/ג'נין, בן **28**, ישב במושב האחורי במונית שירות (בה נהג ישראלי תושב אלעד) בדרכה מתל אביב לטבריה והפעיל מטען (אשר היה בתוך תיק) בעת שנתקלו במחסום משטרתי יזום, סמוך לצומת מי עמי. המתאבד נפצע באורח אנוש בפיגוע. המתאבד ביצע פיגוע דקירה בשוק הכרמל בתל אביב ב- 21 דצמבר 2000 בו דקר ופצע אזרח ישראלי בעת שביצע קניות בשוק. יום קודם לפיגוע במונית ביצע המתאבד פיגוע מטען בתל אביב, כאשר השאיר מטען, אותו לא הצליח להפעיל, בחנות שווארמה בעיר (המטען התגלה ופוצץ על ידי חבלן). באותו יום הניח המתאבד מטען נוסף, סמוך לקבוצת צעירים ששהתה בחוף הדולפינריום בתל אביב. המתאבד ניסה להפעיל את המטען אך המטען לא התפוצץ. בחקירתו סיפר כי היה ברשותו מטען נוסף שלא היה תקין ואשר התכוון לקחתו עמו חזרה לשטחים על מנת להשמישו. מטען זה הופעל על ידו בעת שהרכב בו נסע נעצר לבדיקה. את כל הפיגועים ביצע המתאבד בשליחות ארגון החמא"ס, באכוונתו של **קייס עדואן אבו ג'בל**, תושב ג'נין, ראש הכותלה אסלאמיה בנג'אה. בשלב מאוחר יותר נעצרה חברתו של זיד, **אנג'ליקה יוספוב**, יהודיה, המתגוררת באזור המרכז. אנג'ליקה מסרה בחקירתה כי הייתה מודעת לפיגוע הדקירה שביצע המתאבד. כמו כן ידעה על כך שברשותו שני מטעני חבלה. אנג'ליקה היתה עם המתאבד בעת הטמנת המטען במזנון ברח' אלנבי, הלכה עמו לחוף הדולפינריום תוך שהיא מודעת לכך שברשותו מטען, הייתה עמו בעת הנחת המטען ובעת שניסה להפעילו באמצעות הטלפון הנייד. כמו כן ידעה אנג'ליקה כי ברשות המתאבד מטען בעת שעלה למונית, שם גרם המתאבד, בסופו של דבר, לפיצוץ המטען.

W_S089729

## 1 ינואר 2001
## פיצוץ מכונית תופת בידי מחבל מתאבד ברחוב הרצל בנתניה
## 35 פצועים

### המחבל המתאבד  האמד אבו חג'לה

תושב שכם, בן 23, רווק, סטודנט להנדסת בניין באוניברסיטת אלנג'אח בשכם, דתי, פעיל ב"כותלה אסלאמיה" בנג'אח, פוצץ מכונית תופת ברחוב הרצל בנתניה. אחריות לפיגוע ניטלה על ידי ארגון החמא"ס. את הפיגוע ביצעה תשתית החמא"ס בשכם בראשותו של **עמר ג'בריני. מחמוד מדני** (הרוג), היה אחראי על אתירתו והכנתו של המתאבד לפיגוע. **פיצל סבעאנה**, פעיל חמא"ס צבאי מקבאטיה/ג'נין היה אחראי  על העברתו של המתאבד לתחומי "הקו-הירוק". גם בפיגוע זה התבססה התשתית על סטודנטים חברי "אלכתלה אלאסלאמיה" (תא הסטודנטים של החמא"ס באוניברסיטאות), המשמשים באופן מסורתי מאתר לפעילים צבאים וסייענים ומהווים את אחד הנדבכים המרכזיים בתשתית החמא"ס בשומרן.

## 22 דצמבר 2000
## פיצוץ מחבל מתאבד בפונדק מחולה/בקעת הירדן
## 3 חיילים פצועים

### המחבל המתאבד  האשם נג'אר

תושב חבחן, בן 25, רווק, סטודנט לעיתונות באוניברסיטת אלנג'אח בשכם, ראש ה"כתלה" בפקולטה למדעי החברה, נכנס לקיוסק, לאחר שקנה גרעינים, קולה וסיגריות, יצא למרפסת במקום, התקרב לעבר קבוצת חיילים שהייתה במקום ופוצץ עצמו כשהים מרחק מטרים ספורים מהם. אחריות לפיגוע ניטלה על ידי ארגון החמא"ס. המתאבד גויס לחמא"ס ב- 1994 ומאז פעל בשורות הארגון. ככל הנראה בוצע הפיגוע על ידי תשתית החמא"ס בשכם. **סלים חג'ה (עצור),**  מסר בחקירתו בשירות ביטחון כללי כי הפיגוע בוצע תחת אכוונתו של **אימן חלאוה (הרוג)** ושל סלים עצמו עצמו אשר איתר את המתאבד. כמו כן השתתף **נאדר צוואפטא** (עצור), פעיל חמא"ס מטובאס בהוצאת הפיגוע.

W_S089730

## 15 דצמבר 2000
## מחבל מתאבד ניסה לפוצץ עצמו ליד כוח אבטחה סמוך למחסום ארז ללא נפגעים

### המחבל המתאבד  נור אלדין צאפי

תושב <u>מחנה הפליטים שאטי/עזה</u>, בן 22, רווק, פעיל חמא"ס, בוגר לימודי חשבונאות ב"אוניברסיטה האסלאמית' בעזה, הגיע למגן 12 לאחר כניסת הפועלים הפלסטינים לאזור תעשיה ארז. בעת שעבר במגנומטר נשמע צפצוף. המתאבד ניסה להפעיל חגורת נפץ ומשלא הצליח ניסה לדקור את הסלקטור במקום. בעקבות כך נורה המתאבד על ידי הסלקטורים וחייל שהיו במקום. אין מידע לגבי ההתארגנות העומדת מאחורי הפיגוע.

## 6 נובמבר 2000
## פיצוץ סירה סמוך לספינת "דבור" של חיל הים, ליד רפיח ללא נפגעים

### המחבל המתאבד  חמדי מקדאד

תושב <u>מחנה הפליטים שאטי/עזה</u>, בן 27, רווק. סמוך לחצות התפוצצה סירת חסקה פלסטינית בסמוך לדבור חיל הים אשר ביצע סיור שגרתי ברצועת החוף מול עזה. פיצוץ החסקה היה במרחק של 60-50 מ' מהדבור ובטווח 1,400 מ' מהחוף. חיילי הדבור זיהו חסקה קטנה ובה 2 ארגזים מכוסים בחרטום. החסקה הייתה ממונעת וזוהה עליה אדם אחד אשר עם זיהויו התכופף ואז נשמע פיצוץ. תנועת החמא"ס טענה, בקבלת אחריות פומבית לפיגוע, כי מדובר בפיגוע התאבדות לפיו שהה המתאבד על החסקה בעת שהתפוצצה. יש **לציין כי מדובר בפיגוע ימי ראשון שביצעה תנועת החמא"ס מאז הקמתה.**

W_S089731

---

**26 אוקטובר 2000**
**פיצוץ מחבל מתאבד רכוב על אופניים סמוך לעמדת צה"ל ליד גוש קטיף**
**1 חייל פצוע**

---

**המחבל המתאבד  נביל אלעראעיר**

תושב <u>סג'אעיה ג'דידה/עזה</u>, בן **24**, רווק, סטודנט ב'אוניברסיטה האסלאמית" בעזה, רכב על אופניו על ציר כיסופים ממזרח למערב, חייל צה"ל שהבחין בו הורה לו להתרחק ואז אירע הפיצוץ. ארגון "הג'יהאד האסלאמי" נטל אחריות לפיגוע וזהו למעשה הפיגוע הראשון שמבצע הארגון ברצועה מאז אפריל 1997.הפיגוע בוצע ביום השנה ה- 5 למותו של פתחי שקאקי, מייסד הארגון. הפיגוע באכוונתו של **מחמוד אל הינדי**, אחראי הג'יהאד האסלאמי ברצועה. התארגנות הג'האד אסלאמי הצבאית האחראית לפיגוע הינה ממ.פ. ג'בליה והעומד בראשה, **מקליד חמיד**. (נהרג מאוחר יותר).

W_S089732

# Exhibit 10

תיק מס׳: 3191/03           תאריך : ו׳ אלול, תשס״ג
                               3 ספטמבר, 2003

**בית המשפט הצבאי**
**י ה ו ד ה**
**- פ ר ו ט ו ק ו ל -**

בפני השופט: רס״ן אלי בר-און        דיון בית משפט מיום : 03/09/2003

תובע: סגן ניב סיון
סניגור: עו״ד בטול תאופיק - נוכח
       אבךף סארה ?

נאשם: פלאח טאהר עבדאללה נדא     ת.ז.: 944220425 / שב״ס - נוכח

רשמת: טור׳ חגית אברהם
מתורגמן: רב״ט כרים סלאמה

אב״ד פותח את הישיבה ומזהה את הנאשם

**מהלך דיון**

סניגור : הקראתי למרשי את כתב האישום, הסברתי לו את תוכנו, הוא הבינו וכופר
במיוחס לו בו. אני מבקש לדחות את הדיון בתיק לישיבת הוכחות ולזמן את עדות
התביעה 3,4. ייתכן שבעקבות עדויותיהן ניתן יהיה לקצר את ההליך ולהגיש חומר
אחר בהסכמה.

תובע: אני מצטרף לבקשת הסניגור לזימון העדות.

**ה ח ל ט ה**

המשך הדיון בתיק נדחה לישיבת הוכחות אשר תתקיים בתאריך 20/10/03.

למועד זה תזמן מזכירות ביהמ״ש את עדות התביעה 3,4.

ניתן והודע היום, 03/09/2003, בפומבי ובמעמד הצדדים.

שופט

1



W_S156882

תאריך: כ"ו אב, תשס"יג       תיק מס': 3191/03
24 אוגוסט, 2003

| | |
|---|---|
| בית המשפט הצבאי | 1 |
| י ה ו ד ה | 2 |
| - פ ר ו ט ו ק ו ל - | 3 |
| | 4 |
| | 5 |
| דיון בית משפט מיום: 24/08/2003     בפני אב"ד: רס"ן אלי בר-און | 6 |
| שופט: | 7 |
| שופט: | 8 |
| תובעת: סגן אולגה קווישניק | 9 |
| סניגור: עו"ד אכרם סמרה - נוכח | 10 |
| | 11 |
| נאשם: פלאח טאהר עבדאללה נדא     ת.ז.: 944220425 / שב"ס - נוכח | 12 |
| | 13 |
| רשמת: רב"ט מיכל הירשברג | 14 |
| מתורגמן: רב"ט כרים סלאמה | 15 |
| | 16 |
| | 17 |
| אב"ד פותח את הישיבה ומזהה את הנאשם. | 18 |
| | 19 |
| **מהלך דיון** | 20 |
| | 21 |
| סניגור: אבקש דחיה אחרונה למועד קרוב, על מנת לבדוק את החומר. | 22 |
| | 23 |
| תובעת: אבקש לקיים את החקראה. | 24 |
| | 25 |
| **ה ח ל ט ה** | 26 |
| | 27 |
| הדיון בתיק נדחח לישיבת חקראה אחרונה אשר תתקיים בתאריך 03/09/03. | 28 |
| | 29 |
| ניתן והודע היום, 24/08/2003, בפומבי ובמעמד הצדדים. | 30 |
| | 31 |
| שופט | 32 |
| | 33 |
| | 34 |

1

W_S156883

תיק מס׳: 3191/03

תאריך: כ״ו אייר, תשס״ג
28 מאי, 2003

בית המשפט הצבאי
**ב י ת - א ל**
**- פ ר ו ט ו ק ו ל -**

1
2
3
4
5

| | |
|---|---|
| בפני האב״ד: רס״ן אלי בר-און | דיון בית משפט מיום: 28/05/2003 |
| שופט: | |
| שופט: | |

6
7
8
9

תובע: קמ״ש רוסטיסלב פסק
סניגורים: עו״ד בסול - נוכח
עו״ד סמרה - נוכח

10
11
12
13

נאשם: פלאח טאהר עבדאללה נדא     ת.ז.: 944220425 / שב״ס - נוכח

14
15

רשמת: סמל סיון הראל
מתורגמן: רב״ט כרים סלאמה

16
17
18

אב״ד פותח את הישיבה ומזהה את הנאשם.

19
20
21

**מהלך דיון**

22
23

נאשם: אני מיוצג ע״י עורכי הדין בסול וסמרה.

24
25

עו״ד בסול: דיברתי עם התביעה בנוגע לתיק. אבקש לדחות את ישיבת ההקראה שקבועה להיום על מנת לתת לנו הזדמנות נוספת לשבת עם התביעה כדי לסיים את התיק בהסדר כלשהו. מאחר שרוב עדי התביעה נשפטו אני סבור שניתן יהיה לסיים את התיק בהסדר.

26
27
28
29
30

**ה ח ל ט ה**

31
32

הדיון בתיק נדחה לישיבת הקראה נוספת אשר תתקיים בתאריך 14/07/03.

33
34

**ניתן והודע היום, 28/05/03, בפומבי ובמעמד הצדדים.**

35
36
37
38

שופט

1

תיק מס׳: 3191/03

תאריך: י״ג ניסן, תשס״ג
15 אפריל, 2003

בית המשפט הצבאי
ב י ת - א ל
- פ ר ו ט ו ק ו ל -

1
2
3
4
5

דיון בית משפט מיום: 15/04/2003

בפני אב״ד: רס״ן אלי בר-און
שופט:
שופט:

6
7
8

תובע: סרן ראיד שנאן
סניגור: עו״ד בסול - טוכה

9
10
11

נאשם: פלאח טאהר עבדאללה נדא    ת.ז.: 944220425 / שב״ס - נעדר

12
13

רשמת: טורי ורד אילוז
מתורגמן: רב״ט כרים סלאמה

14
15
16

17

אב״ד פותח את הישיבה.

18
19

**מהלך דיון**

20
21

סניגור: הנאשם לא הובא לדיון. אני פתחתי במשא ומתן עם התביעה ואני מאמין
שניתן לסיים את התיק בהסדר בקרוב. אבקש לקבוע את הדיון בתיק לישיבת
הקראה נוספת.

22
23
24

25

**ה ח ל ט ה**

26

27

לנוכח העובדה כי העצורים משב״ס לא הובאו לדיון היום, אני מורה על דחיית הדיון
בתיק לישיבת הקראה נוספת אשר תתקיים בתאריך 12/05/03.

28
29

30

**ניתן והודע היום, 14/04/03 , בפומבי ובמעמד הצדדים.**

31
32

שופט

33
34

1

W_S156885

| צבא | הגנה | לישראל |
|---|---|---|
| בית המשפט הצבאי | | תיק ביה"מ   03/ 1 **319** |
| בית אל | | תיק תביעה   173/03 |
| בפני הרכב | | תיק פ.א.   567/03 בנימין |
| | | 568/03 בנימין |
| | | 569/03 בנימין |
| | | 570/03 בנימין |
| | | 571/03 בנימין |
| | | 572/03 בנימין |

## במשפט שבין התובע הצבאי - המאשים

### - נ ג ד -

פלאח טאהר עבדאללה נדא (המכונה "אבו טאהר")
ת.ז. 944220425, יליד 02.10.55, תושב אלבירה
עצור מיום 21.01.03



### - ה נ א ש ם -

# כ ת ב - א י ש ו ם

### הנאשם הנ"ל מואשם בזאת בביצוע העבירות הבאות:

### פרט ראשון:

**מהות העבירה:** פגיעה בביטחון האיזור, עבירה לפי סעיף 53(א)(4) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 1994 או בסמוך לכך, עשה מעשה או מחדל שיש בהם פגיעה, היזק, הפרעה או סכנה לביטחון האיזור או לביטחון כוחות צה"ל וחייליו או לפעולתם, שימושם או ביטחונם של כל אחד מאלה: אניה, אוירון. נמל. רציף. מזח, מעגן, שדה תעופה, מסילת ברזל, נתיב מים, דרך, דרך-עפר, קטר, כלי רכב, כלי משא או כל אמצעי אחר של הובלה ציבורית, או תקשורת ציבורית, או כל מפעל , מוסד, או ציוד המשמש או מסוגל לשמש לייצורם, הספקתם, החסנתם, העברתם, מסירתם או הפצתם של מים. דלק. גז או חשמל או כל רכוש של מדינת ישראל או של צה"ל, דהיינו :

הנאשם הנ"ל. במועד האמור, ברמאללה או בסמוך לכך, פנה אל עבדאללה אברהים עבדאללה אל בכרי, אשר עמד לנסוע לירדן הנאשם ביקש מעבדאללה אל בכרי, לאחר שהאחרון יגיע לירדן, להתקשר מירדן אל משפחתו של גיק (יעקוב) נזאל, המבוקש לכוחות הביטחון הישראליים, ולהודיע להם כי בנם נמצא בעקבה בירדן ורוצה לנסוע לארה"ב. עבדאללה אל בכרי ביצע את כל מה שהנאשם ביקש ממנו לעשות.

הנאשם ועבדאללה אל בכרי ידעו היטב כי באותה העת המבוקש גיק נזאל שהה במדינת ישראל ושיחת הטלפון האמורה נועדו להטעות את כוחות הביטחון הישראליים, אשר לדעת הנאשם וחבריו האזינו לטלפונים של משפחת המבוקש גיק נזאל.

W_S156886

**פרט שני:**

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מחודש יוני 2001 ועד ליום מעצרו, היה חבר או פעל כחבר בהתאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל, במהלך התקופה האמורה, היה חבר בארגון "ג'מעיית אלאצלאח", שהוא התאחדות בלתי מותרת.
בתמורה לפעילותו בארגון האמור, הנאשם נהג לקבל משכורת. בעת מעצרו של הנאשם נתפסו אצלו 2,160 ש"ח ו-365 דינר ירדני, אשר אותם הוא קיבל כמשכורת מ"ג'מעיית אלאצלאח".

**פרט שלישי:**

**מהות העבירה:** נשיאת משרה בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ב) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הקודם, ניהל או עזר להנהלת התאחדות בלתי מותרת, או החזיק בכל משרה או עמדה בהתאחדות בלתי מותרת או תחת מרותה, דהיינו:
הנאשם הנ"ל, במהלך התקופה האמורה, שימש כאחראי על העזרה לאסירים ולמשפחות הפצועים בארגון "ג'מעיית אלאצלאח", שהוא התאחדות בלתי מותרת.
במסגרת תפקידו זה הנאשם העביר כספים רבים למשפחות החמאס העצורים בישראל.

**פרט רביעי:**

**מהות העבירה:** חברות בהתאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מסוף שנת 2001 ועד ליום מעצרו, היה חבר או פעל כחבר בהתאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל, במהלך התקופה האמורה, היה חבר או פעל כחבר בארגון החמאס, שהוא התאחדות בלתי מותרת.

**פרט חמישי:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2001 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל, במועד האמור, במסגד "עלי" באלבירה, פנה לאדם בשם מחמד חסן אחמד ערמאן, אשר הגיע להתפלל במסגד האמור, מסר לידיו אגרת סגורה ואמר לו קראו את מה שכתוב באגרת הנ"ל.
מחמד ערמאן פתח את האיגרת הנ"ל. באגרת האמורה מחמד ערמאן נתבקש להגיע ביום מסוים, בשעה שתים-עשרה בצהרים אל בניין העירייה באלבירה על מנת לפגוש אדם פלוני. הוא נתבקש ללבוש לפגישה האמורה ז'קט שחור וכאפיה אדומה וכן להחזיק ביד ג'יתון. באגרת האמורה צוינו גם מילות קוד אשר באמצעותן מחמד ערמאן האמורה שהיו יצטרך לפגוש יזהו אחד את השני.
מחמד ערמאן הגיע לפגישה האמורה בהתאם להוראות שהיו באגרת הנ"ל ונפגש עם אברהים ג'מיל ע'ע'אני אחמד, המכונה "שיח'". במהלך הפגישה האמורה, אבר'חים אחמד גייס את מחמד ערמאן לידודזי עד א-דין אל קסאם", הזרוע הצבאית של ארגון החמאס, שהוא התאחדות בלתי מותרת, וכן הורה לגייס אנשים נוספים כחברים לזרוע הצבאית של הארגון.
בעת גיוסו של מחמד ערמאן לארגון החמאס, אברהים אחמד העניק לאחרון את הכינוי הפח"עי "אבו מעאז".

2

ה.ת 1703/ה

לאחר תקופה קצרה, מחמד ערמאן נפגש שוב עם אבראהים חאמד ברמאללה ומסר כי לא גייס אנשים לפעילות צבאית בארגון החמאס. אבראהים חאמד מסר למחמד ערמאן כי האחרון יפעל עם חוליית חמאס, אשר חבריה הינם בעלי תעודות זהות ישראליות.

אבראהים חאמד הכיר למחמד ערמאן את איש הקשר של האחרון עם חוליית החמאס הנ"ל - ואאל מחמוד מחמד-עלי קאסם, המכונה "אבו סעדי", שהוא תושב שכונת ראס אל עמוד בירושלים. מאז ועד למעצרו על-ידי כוחות הביטחון הישראליים, מחמד ערמאן פעל בארגון החמאס תחת פיקודו של אבראהים חאמד הנ"ל. במסגרת פעילותו בארגון החמאס, מחמד ערמאן הפעיל חוליית של פעילי ארגון החמאס, אשר חבריה התגוררו בירושלים.

**במהלך החודשים מרץ - יולי 2002, במסגרת פעילותו בזרוע הצבאית של ארגון החמאס, אשר אליה גייס בתקופה של הנאשם כאמור לעיל, בהנחיותיו של אבראהים חאמד וביחד עם חברי "החוליה הירושלמית" של ארגון החמאס, גרם מחמד ערמאן במותם למותם של 35 אזרחים ולפציעתם של מעל ל-200 אזרחים נוספים בפיגועים הבאים:**

פיגוע התאבדות בבית-קפה "מומנט" בירושלים ביום 09.03.02, אשר בן נהרגו 11 אזרחים ונפצעו 65 אזרחים נוספים

פיגוע התאבדות במועדון "שפילד-קלאב" בראשון לציון ביום 07.05.02, אשר בו נהרגו 15 אזרחים ונפצעו 59 אזרחים נוספים

פיגוע הנחת מטען חבלה באתר "פי גלילות" ביום 23.05.02.

שני פיגועים של הנחת מטעני חבלה על פסי הרכבת בישראל (אחד בלוד ואחד בסמוך לרחובות)

פיגוע תופת באוניברסיטה העברית בירושלים ביום 31.07.02, אשר בו נהרגו 9 אזרחים ונפצעו 81 אזרחים נוספים

### <u>פרט שישי:</u>

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו בדבר איסור סחר בציוד מלחמתי (יהודה והשומרון) (מס' 243), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2001 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי, ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:

הנאשם הנ"ל, במועד האמור, במסגד "עלי" באלבירה, נפגש עם אבתהאל יוסף דיב ביתהאאלו ועם פטמה אבראהים מחמוד זאיד. הנאשם שתי חברותיו נסעו ביחד ברכב לבנק הערבי באלבירה. שם, על-פי הוראתו של הנאשם, שתי חברותיו ירדו מהרכב והמתינו מספר דקות לנאשם שהמשיך לנסוע עם הרכב. לאחר שהנאשם חזר, שתי חברותיו הנ"ל עלו בחזרה לרכב וחזרו ביחד עם הנאשם למסגד "עלי". במסגרת הנכ"ל הנ"ל הנאשם קיבל והעביר למסגד "עלי" תיק שבתוכו היו בגדים ורובה שחור מפורק לחלקים עם מחסניות.

### <u>פרט שביעי:</u>

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:

הנאשם הנ"ל, פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במסגד "עלי" הנ"ל, באיזור או בסמוך לכך, נפגש עם פטמה אבראהים מחמוד זאיד, אבתהאל יוסף דיב ביתהאאלו ואימאן אבו פארה.

הנאשם ביקש מפטמה זאיד כי תפעל בהעברת האשגרים עבורו מהמסגד "עלי" למסגד "סייד קותוב" ברמאללה ובחזרה למסגד "עלי". הנאשם הסביר לפטמה זאיד על נקודות המשלש במסגדים הנ"ל, אשר בהם יוחבאו האשגרים. פטמה זאיד הסכימה ואף מסרה לנאשם את מספר הטלפון הנייד שלה. לאחר כשבוע פטמה זאיד קיבלה מהנאשם הודעת טקסט בטלפון הסלולרי

תת 03/171

W_S156888

שלה. בהתאם למה שנאמר בהודעת הטקסט הנ"ל, פטמה זאיד הגיעה למסגד "עלי" ומצאה שם נקודות המשלש שלושה אשורים, אשר עליהם היה רשום "דאר סייד". פטמה זאיד העבירה את שלושת האשורים הנ"ל למסגד "סייד כותוב" והסתירה אותם בנקודות המשלש.

**פרט שמיני:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 2002, כשבוע לאחר שביצע את המיוחס לו בפרט האישום הקודם, או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
פטמה אברהים מחמוד זאיד, במועד האמור, ברמאללה או בסמוך לכך, על-פי הוראתו של הנאשם, פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, ביחד עם אימאם אבו פארה, העבירה אשורים מנקודות המשלש במסגד "עלי" לנקודות המשלש במסגד "סייד כותוב".
לאחר מספר ימים, פטמה זאיד קיבלה הודעה נוספת מהנאשם. בהתאם לאמור בהודעה הנ"ל, פטמה זאיד הגיעה אל נקודת המשלש במסגד "סייד כותוב" ואספה שם אשר המיוחד אליה וכן 50 דינר ירדני. פטמה זאיד לקחה את 50 דינר ירדני הנ"ל לעצמה בהתאם לאמור באשור הנ"ל.

**פרט תשיעי:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בשנת 2002, כשבוע לאחר שביצע את המיוחס לו בפרט האישום הקודם, או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
פטמה אברהים מחמוד זאיד, במועד האמור, ברמאללה או בסמוך לכך, על-פי הוראתו של הנאשם, פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, ביחד עם אימאם אבו פארה, חעבירה אשורים מנקודות המשלש במסגד "עלי" לנקודות המשלש במסגד "סייד כותוב".

**פרט עשירי:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל, או בסמוך לכך, נפגש עם אבנתהאל יוסף דיב ביתהאלו. הנאשם מסר לאבנתהאל ביתהאלו אשור סגור. על-פי הוראתו של הנאשם, אבנתהאל ביתהאלו העבירה את האשור הנ"ל למסגד ע/נאצר ברמאללה בסמוך לכך והסתירה אותו בשירותי הנשים במסגד האמור.

4

W_S156889

**פרט אחד-עשר:**

**מהות העבירה:** התחפשות, עבירה לפי סעיף 55 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מתחילת שנת 2002 ועד ליום מעצרו, השתמש בתחפושת בנסיבות שבהן עלול השימוש בתחפושת לפגוע בשלום הציבור, או בביטחון כוחות צה"ל או בהגנתו של האיזור או בקיום הסדר הציבורי, דהיינו:
הנאשם הנ"ל, במהלך התקופה האמורה, ברמאללה, כפר עקב ומקומות נוספים, במספר רב של הזדמנויות שונות, התחפש לאישה על מנת לא להיעצר על-ידי כוחות הביטחון הישראליים. הנאשם נהג להסתובב בבגדי אישה (גלביה, רעלה וכפפות), אשר נקנו עבורו על-ידי פטמה אברהים מחמוד זאיד, וזאת בהתאם להוראתו של הנאשם.

**פרט שניים-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך שנת 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, בחודש אפריל 2002 או בסמוך לכך. בבלכירה או בסמוך לכך. נפגש עם פטמה אברהים מחמוד זאיד, אימאן או פארה ואבתהאל יוסף דיב ביתאאלו, וזאת בהתאם להוראתו של הנאשם, אשר אותה קיבלה פטמה זאיד בטלפון הסלולרי שלה.
הנאשם מסר לידי הנשים הנ"ל אשר בתיהן סגור ובהתאם להוראתו של הנאשם העבירו אותו אל "אבו אנס", בעל חנות בגדים ברמאללה. לאחר מכן, חברותיה הנ"ל של הנאשם החזירו אשר תשובה מ"אבו אנס" אל הנאשם.
חברותיו הנ"ל של הנאשם, במהלך שנת 2002, העבירו **4 אשגרים נוספים** מהנאשם אל "אבו אנס" הנ"ל. לאחר העברת כל אשגר ל"אבו אנס" חברותיו הנ"ל היו מקבלות אשר תשובה ומעבירות אותו לידי הנאשם במסגד "יעלי" בבלכירה.

**פרט שלושה-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש פברואר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במסגד "יעלי" ברמאללה או בסמוך לכך, נפגש עם אבתהאל יוסף דיב ביתאאלו.
הנאשם התעניין אם אבתהאל ביתאאלו יוצאת לבדה לסידורים ברמאללה, ומשנענה בחיוב ביקש ממנה לסייע לו בהעברת אשגרים, כספים ומסמכים לעורכי-דין ברמאללה. הנאשם הסביר לאבתהאל ביתאאלו כי הינו פעיל בארגון החמאס ומבוקש לכוחות הביטחון הישראליים ולכן לא יכול לעשות זאת לבד ולא יכול לשלוח את בני משפחתו למשימות הנ"ל מהחשש כי מקום המסתור הנ"ל במסגד "יעלי" הנ"ל יתגלה.
לאחר שאבתהאל ביתאאלו הסכימה, הנאשם מסר לה מילוין קוד באמצעותו יתאמו את הפגישות דרך הטלפון הסלולרי. כמו כן, הנאשם מסר לאבתהאל ביתאאלו מפתח למסגד "יעלי" על מנת שהיא תוכל להיכנס למסגד ולפגוש אותו מבלי לקבל את המפתח מהשומר.
ביום למחרת, אבתהאל ביתאאלו הגיעה למסגד "יעלי" הנ"ל וקיבלה מהנאשם **ארבעה** אשגרים על-פי הוראתו של הנאשם, אבתהאל ביתאאלו העבירה את האשגרים הנ"ל למשרדי "ג'מעיית אלצלאח" לחברת חסוטה, לחברת הדפוס "שרקי" ולמשרד עו"ד כפאח. האשגר, אשר אותו העבירה אבתהאל ביתאאלו ל"ג'מעיית אלצלאח" הכיל בתוכו שני אשגרים - אחד מהם היא העבירה לג'מאל טוויל, המכונה "אבו עבדאללה", פעיל בכיר בארגון החמאס, ואת האשגר השני

ח"ת 173/03

היא העבירה לעומר חמדאן, המכונה "אבו מחמד" - מנהל "ג'מעיית אלאצלאח". לאחר מכן, אבתהאל ביתהאלו קיבלה בכל אחד מן המקומות הנ"ל אשגרי תשובה והעבירה אותם לנאשם.

**פרט ארבעה-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש פברואר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, במסגד "עלי" באלבירה או בסמוך לכך, נפגש עם אבתהאל יוסף דיב ביתהאלו. הנאשם מסר לאבתהאל ביתהאלו שלושה אשגרים · הראשון עבור עו"ד כפאח (באשגר זה הנאשם הכניס סכום של כ-500 דולר ארה"ב), השני עבור "ג'מעיית אלאצלאח" והשלישי עבור בית הדפוס "ישרקי". בהתאם להוראות הנאשם, אבתהאל ביתהאלו העבירה את שלושת האשגרים הנ"ל למעגנים. לאחר מכן, אבתהאל ביתהאלו קיבלה בכל אחד מן המקומות הנ"ל אשגרי תשובה והעבירה אותם לנאשם.

**פרט חמישה-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש פברואר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, במסגד "עלי" באלבירה או בסמוך לכך, נפגש עם אבתהאל יוסף דיב ביתהאלו. הנאשם מסר לאבתהאל ביתהאלו שלושה אשגרים · הראשון עבור עו"ד כפאח, השני עבור "ג'מעיית אלאצלאח" והשלישי עבור בית הדפוס "ישרקי". בהתאם להוראות הנאשם, אבתהאל ביתהאלו העבירה את שלושת האשגרים הנ"ל למעגנים. לאחר מכן, אבתהאל ביתהאלו קיבלה בכל אחד מן המקומות הנ"ל אשגרי תשובה והעבירה אותם לנאשם.

**פרט שישה-עשר:**

**מהות העבירה:** קשירת קשר לגרימת מוות בכוונה, עבירה לפי סעיף 22 לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968 וסעיף 51(א) לצו בדבר הוראות הביטחון (יהודה והשומרון) (מס' 378), תש"י-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף חודש פברואר 2002 או בסמוך לכך, קשר עם אדם אחר לגרום בכוונה למותו של אחר, דהיינו: הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, נפגש עם עמאד מחמד אבו עוואד. עמאד אבו עוואד סיפר לנאשם כי הוא ואחמד אכרם אחמד סאלמי הצליחו לייצר חומר נפץ וכי בכוונתם לייצר מחומר הנפץ הנ"ל מטעני חבלה ולבצע באמצעותם פיגועים נגד כוחות צה"ל, וזאת בכוונה לגרום למותם של חיילי צה"ל. עמאד אבו עוואד ביקש לקבל מהנאשם סיוע כספי בסך 2,000 - 3,000 ש"ח לצורך ביצוע הפעילות האמורה. הנאשם הסכים להעניק לרשותו של עמאד אבו עוואד וחברו את הסיוע המבוקש בתנאי כי הפעילות האמורה תבוצע בשם ארגון החמאס. עמאד אבו עוואד הסכים לתנאי שהציב הנאשם.

ת.ת 03/ג'-1

W_S156891

**פרט שבעה-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) לתקנות הגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף חודש פברואר - תחילת חודש מרץ 2002 או בסמוך לכך, עשה עבודה כל שהוא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו : הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, נפגש פעם נוספת עם עמאד מחמוד חאמד אבו עוואד. במהלך פגישה זו מסר עמאד אבו עוואד לנאשם כי ביכולתו לייצר חומרי נפץ.

בעקבות האמור לעיל, הנאשם ביקש כי עמאד אבו עוואד ילבש זיקט שחור, ישים על ראשו כאפיה לבנה, ייוצג לפניו "ינטשה" ויפוש שם אדם המכונה "אבו מואאזי", אשר אותו יזהה באמצעות מילות קוד.

בנקביל, אברהים ג'מיל ע/ע/אני חאמד, המכונה "שיחי", פעיל צבאי בכיר בארגון החמאס, האמור לפרט האישום החמישי, הורה למחמד חסן אחמד ערמאן, המכונה "אבו מואאזי", פעיל צבאי בכיר בארגון אף הוא, להגיע לפגישה האמורה עם עמאד אבו עוואד.

עמאד אבו עוואד עשה כפי שהורה לו הנאשם ונפגש עם "אבו מואאזי", שהוא מחמד ערמאן. עמאד אבו עוואד מסר למחמד ערמאן כי הוא וחבריו יכולים להכין חומר נפץ ולייצר ממנו טילים. מחמד ערמאן ביקש כי עמאד אבו עוואד לא יספר על כך לאיש ויפגוש בעוד שבוע במקום מסוים. לאחר שבוע, עמאד אבו עוואד נפגש שוב עם מחמד ערמאן. במהלך הפגישה האמורה מחמד ערמאן מסר לעמאד אבו עוואד רוסי"ר M-16, אותו קיבל למטרה זו מאברהים חאמד הנ"ל, על מנת שעמאד אבו עוואד יתאמן בשימוש ברוסי"ר הנ"ל וכן הורה לעמאד אבו עוואד לייצר 15 טילים, לגייס אנשים נוספים לפעילות צבאית בארגון, וללמד אותם לייצר טילים ולהשתמש ברוסי"ר M-16 הנ"ל.

מחמד ערמאן הבהיר לעמאד אבו עוואד כי לאחר שהאחרון יידע היטב לייצר את הטילים ויסיים את הבגרויות הוא יגויס באופן רשמי לזרוע הצבאית של ארגון החמאס, שהוא התאחדות בלתי מותרת.

כמו כן, מחמד ערמאן חפנה את עמאד אבו עוואד לעבאס פאזי קורעאן, אשר ביקש לקבל מעמאד אבו עוואד מידע אודות ייצור הטילים.

עמאד אבו עוואד הנאמן ביחד עם אחרים בשימוש ברוסי"ר M-16 הנ"ל ואף תכנן לבצע באמצעותו פיגוע ירי נגד כוחות צה"ל.

בהתאם להוראתו של מחמד ערמאן, עמאד אבו עוואד גייס שלושה אנשים נוספים (אוסאמה אחמד מבלח, אחמד עלי קרעאן, עלאא קרעאן) וביחד עימם גם אחמד אכרם אחמד סאלמה, בסוף חודש מרץ 2002, ייצר ברמאללה **20 טילי "קסאמ"**, אשר היו מוכנים לשיגור.

עמאד אבו עוואד וחבריו תכננו לשגר את הטילים הנ"ל לעבר היישובים הישראליים הסמוכים לרמאללה, בכוונה לגרום למוותם של אזרחים ישראליים, אולם תוכניותם לא יצאה אל הפועל עקב פציעתו של אחמד סאלמה ועקב כניסת כוחות צה"ל לרמאללה במסגרת מבצע "חומת מגן" אשר עצרו את עמאד אבו עוואד.

**פרט שמונה-עשר:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(א) לתקנות הגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במחצית השנייה של חודש מרץ 2002 או בסמוך לכך, עשה עבודה כל שהוא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו : הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, ברמאללה או בסמוך לכך, נפגש עם פטמה אברהים מחמוד זאיד ועם אבתהאל יוסף דיב ביתאאלו, וזאת לאחר שהעביר לפטמה זאיר הודעת טקסט אודות הפגישה באמצעות מכשיר הטלפון הסלולרי שלה.

הנאשם אמר לחברותיו הנ"ל כי ברצונו להעביר דברים לביתו של פואד חוראני, המחבל המתאבד, אשר כשבעה לפני כן, ביום 09.03.02, ביצע פיגוע התאבדות בבית-קפה "מומנטו" בירושלים וגרם למוותם של 11 בני אדם ולפציעתם של 65 נוספים.

חברותיו הנ"ל הסכימו לבקשתו של הנאשם ונסעו ביחד עם האחרון לביתו של קרובת משפחה פואד חוראני ברמאללה. בבית הנ"ל, אבתהאל מסרה שקית שחורה וזה קלטת וידאו בה צולם פואד חוראני לפני שיצא לביצוע פיגוע ההתאבדות הנ"ל, אותה קיבלה מהנשים לידי בני המשפחה של פואד חוראני. בעת מסירת השקית הנ"ל, אבתהאל היתה רעולת פנים, וזאת בהתאם להוראת הנאשם.

ת.פ. נ/ס/ד"ג

W_S156892

**פרט תשעה-עשר:**

**מהות העבירה:** מתן מקלט, עבירה לפי סעיף 57 לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"י-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, באמצע שנת 2002 או בסמוך לכך, עזר או נתן מקלט לכל אדם שעבר עבירה על תחיקת הביטחון או עסק או שהיה עוסק בכל פעולה שמטרתה לפגוע בשלום הציבור. שלום כוחות צה"ל וחיילו וקיום הסדר הציבורי או שיש יסוד סביר לחשוד כי עשה כן, בין על-ידי מתן ידיעות, מחסה, מזון, משקה, כסף, בגדים, נשק, תחמושת, אספקה, מספוא, אמצעי תובלה, נפט או דלק מסוג כל שהוא או בין בדרך אחרת, דהיינו: הנאשם הנ"ל, במועד האמור, במשך מספר ימים רצופים, בדירה בבניין אלבכרי ברמאללה או בסמוך לכך, הסתיר את איימן מחמוד עבדאללה עטאיא (רשיד), פעיל בארגון החמאס, אשר היה מבוקש לכוחות הביטחון הישראליים.

**פרט עשרים:**

**מהות העבירה:** החזקת כלי-יריה ללא היתר, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות ביטחון (יהודה והשומרון) (מס' 378), תש"י-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך התקופה האמורה בפרט האישום הקודם, החזיק ברשותו כלי-יריה, תחמושת, פצצה, רימון-יד או חפץ נפיץ או מבעיר, כלי או חפץ או דבר המתוכנן או מסוגל לגרום מוות או חבלה חמורה, ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או מטעמו, דהיינו: הנאשם הנ"ל, במהלך התקופה האמורה, ברמאללה או בסמוך לכך, החזיק באקדח 14, וזאת ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או מטעמו.

**פרט עשרים ואחד:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ז-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במועד האמור בפרט האישום הקודם או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל, במועד האמור, ברמאללה או בסמוך לכך, מסר לידי איימן מחמוד עבדאללה עטאיא (רשיד) אגרת סגורה והורה לאחרון להעבירה אל מאג'ד אבן חדיג'ה, המכונה "אבו אסמאעיל", בעל בית קפה הממוא בכיכר מנאהרה ברמאללה. איימן עטאיא, בתאום להוראת הנאשם, מסר את האיגרת הנ"ל לידי מאג'ד אבו חדיג'ה הנ"ל. מאג'ד אבו חדיג'ה רשם אגרת תשובה סגורה ומסרה לאיימן עטאיא. איימן עטאיא העביר את אגרת התשובה לידי הנאשם.

**פרט עשרים ושניים:**

**מהות העבירה:** כניסה למקומות המיועדים לנשים, עבירה לפי סעיף 307 לחוק הפלילי הירדני מס' 16 לשנת 1960.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במהלך קיץ 2002 או בסמוך לכך, התחזה לאישה ונכנס למקום המיועד לנשים, או שבעת המעשה מותרת בו כניסה לנשים בלבד, דהיינו: הנאשם הנ"ל, אשר במהלך התקופה האמורה היה מבוקש לכוחות הביטחון הישראליים בגין פעילותו בארגון החמאס, ברמאללה או בסמוך לכך, הסתתר במגורי סטודנטיות של אוניברסיטת "ירושלים" באבו-דיס. הנאשם התגורר במעונות הסטודנטיות, שהינם מקום המיועד לנשים, כאשר הוא מחופש לאישה.

ת.ת 03.173

W_S156893

<div dir="rtl">

**פרט עשרים ושלושה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש יולי 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, ברמאללה או בסמוך לכך, מסר לידי פטמה אברהים מחמדי זאיד ואימאן אבו פארה אשר סגור. חברתו הנ"ל של הנאשם העבירה את האשר המצורף, על-פי הוראתו של הנאשם, לידי מחנד, תושב כפר עין, אשר עמו נפגשו בכניסה לספריית "אל אקצא" הנמצאת ליד מסגד "סייד כותובי" ברמאללה.
פטמה זאיד תיאמה את הפגישה עם מחנד הנ"ל לאחר יצרה עמו קשר טלפוני באמצעות מילות קוד שקיבלה מהנאשם.
במהלך הפגישה עם מחנד הנ"ל, פטמה זאיד, אימאן אבו פארה ומחנד סיכמו כי אם הן ירצו להעביר אשרים נוספים מהנאשם, הם ייפגשו ליד הבנק הירדני ברמאללה.

**פרט עשרים וארבעה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש יולי 2002, מספר ימים לאחר שביצע את המיוחס לו בפרט האישום הקודם, או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, מסר לידי פטמה אברהים מחמד זאיד אשר סגור. פטמה זאיד, על-פי הוראתו של הנאשם, העבירה את האשר הנ"ל לידי מחנד, תושב כפר עין, אשר עמו נפגשה ליד הבנק הירדני ברמאללה, וזאת בהתאם לסיכום המתואר בפרט האישום הקודם.
במהלך הפגישה עם מחנד הנ"ל, פטמה זאיד קיבלה מהאחרון אשר והעבירה אותו לידי הנאשם.

**פרט עשרים וחמישה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במחצית השנייה של שנת 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:
הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, במסגד "יעלו" באלבירה, נפש עם אבתהאל יוסף דיב ביתהאלו.
במהלך הפגישה האמורה אבתהאל ביתהאלו סיפרה לנאשם כי שמעה את קולו של מאהר אבו-קריק, המכונה "אבו אנס" בביתה של אחותה - ויסאם. הנאשם מסר לאבתהאל ביתהאלו אשר ובקש למסור אותו לבעלה של אנג'אס כי האשר נועד לאדם הנמצא אצלו. אבתהאל ביתהאלו עשתה כפי שהורה הנאשם, הגיעה לחרבתא בני חארס ומסרה את האשר האמור לעג'והאב אנג'אס וביקשה למסור אותו לי"אדם הנמצא אצלו".
ביום למחרת, אבתהאל ביתהאלו העבירה אשר תשובה מעג'והאב אנג'אס לנאשם.

</div>

ת.ת 173/03

W_S156894

**פרט עשרים ושישה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במועד האמור בפרק האישום הקודם או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו : הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, במסגד "עלי" באלבירה, נפגש עם אבנתהאל יוסף דיב ביתהאלו. הנאשם מסר לאבנתהאל ביתהאלו מעטפה עם כסף. בהתחם להוראות הנאשם, אבנתהאל ביתהאלו העניר את המעטפה הנ"ל לחלפן כספים אבו סאמר אלשריף ברמאללה. לאחר מכן, אבנתהאל ביתהאלו קיבלה מחלפן הכספים הנ"ל מעטפה עם כסף והעביר אותה לנאשם.

**פרט עשרים ושבעה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, במחצית השניה של שנת 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו : הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, במסגד "עלי" באלבירה, נפגש עם אבנתהאל יוסף דיב ביתהאלו. הנאשם מסר לאבנתהאל ביתהאל אשגר. הנאשם הורה לאבנתהאל ביתהאלו להעביר את האשגר הנ"ל אל עוהאב אנג'אס, בעלה של אחותה של אבנתהאל ביתהאלו, ויסאם. האשגר האמור היה עבור מאהר אבו-קוזיק, המכונה "אבו אנס", אשר שהה בבית של עוהאב אנג'אס בחרבתא בני חארס. בהתחם להוראות הנאשם, אבנתהאל ביתהאלו הגיעה עם האשגר האמור אל ביתו של עוהאב אנג'אס, אך אז התברר כי האחרון נעצר על-ידי כוחות הביטחון הישראליים. לאור האמור, אבנתהאל ביתהאלו חזרה הנ"ל הנאשם והחזירה לו את האשגר.

**פרט עשרים ושמונה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף חודש נובמבר - תחילת חודש דצמבר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו : הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, בביתה של אחותו, סמירה, ברמאללה, נפגש עם פטמה אברהים מחמוד זאיד. הנאשם מסר לידי פטמה זאיד שתי קלטות אודיו והורה לה לתמלל אותן בהתאם להוראות הנאשם. פטמה זאיד האזינה לקלטות הנ"ל ותמללה אותן. בקלטות הללו הוקלטה הודאתו של יוסף עראר. כאשר האחרון מודה בשיתוף פעולה עם השב"כ הישראלי ובקשרים עם מספר בחורים מהמסגד ומהמכללה. לאחר שסיימה את מלאכת התמלול, פטמה זאיד החזירה את הקלטות ואת דפי התמלול לרשותה לידי הנאשם.

ת.ת. 05/171

W_S156895

**פרט עשרים ותשעה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו א דבר כללי האחריות לעבירות (יהודה והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מחודש דצמבר 2002 ועד לאמצע חודש ינואר 2003 או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו:

הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במהלך התקופה האמורה, ב-4 הזדמנויות שונות, העבירה אשגרים סגורים לידי פטמה אברהים מחמוד זאיד והורה לה להעבירם אל שריף, המכונה "אבו סאמר", חלקן כספים ברמאללה. פטמה זאיד העבירה את האשגרים הנ"ל בתהאם להורות הנאשם. בכל אחת מן ההזדמנויות האמורות פטמה זאיד קיבלה מ שריף הנ"ל אשגר תשובה והעבירה אותו לידי הנאשם. באחת ההזדמניות פטמה זאיד העבירה לנאשם, ביחד עם אשגר תשובה משריף הנ"ל, גם מעטפה עם כסף בתוכה.

**פרט שלושים:**

**מהות העבירה:** סחר בציוד מלחמתי, עבירה לפי סעיף 2 לצו איסור סחר בציוד מלחמתי (יהודה והשומרון) (מסי 243), תשכ"ח-1968, וסעיף 14(א) לצו א דבר כללי האחריות לעבירות (יהודה והשומרון) (מסי 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף שנת 2002 או בסמוך לכך, סחר או עסק בצורה אחרת בציוד מלחמתי ללא היתר חתום על-ידי מפקד האיזור או מטעמו, דהיינו:

במועד האמור, ברמאללה או בסמוך לכך, אימן מחמוד עבדאללה עטאיא (רשיד), פעיל בארגון החמאס, נפש עם מחמוד אברהים אחמד אבו רחמה, פעיל בארגון החמאס. מחמוד אבו רחמה מסר לאימן עטאיא כי הוא קים ועומד בראשות של חוליה צבאית של ארגון החמאס המונה מספר אנשים. מחמוד אבו רחמה מסר כי ברצונו לבצע פעילות צבאית עם החוליה הנ"ל. מחמוד אבו רחמה מסר כי בסמוך לבלעיון ישנו מקום הנקרא "אבו למונה" אליו מגיעים סיורים של צה"ל, וכי הוא וחברי חוליתו הנ"ל מתכננים לעשות מארב לסיור צה"ל הנ"ל וליירות עליו במטרה לגרום למותם של חיילי צה"ל. אימן עטאיא הסכים לבקשתו של מחמוד אבו רחמה לדאוג לספק לאחרונ מספר רובים ביודעו לצורך ההוצאה לפועל של הפיגוע האמור.

אימן עטאיא החליט לפנות אל הנאשם על מנת לקבל מהאחרונ כלי נשק לצורך ההוצאה לפועל של הפיגוע המתוכנן. ברמאללה או בסמוך לכך, אימן עטאיא פנה אל אשתו של הנאשם - מדאללה נדא, וביקש לפגוש בנאשם. מדאללה נדא מסרה כי הנאשם הינו מבוקש לכוחות הביטחון הישראליים ולכן לא ניתן להיפגש עמו, אך ניתן להעביר לו איגרת במצעותה של מדאללה נדא. אימן עטאיא כתב איגרת בה פירט כי קיימת חוליה צבאית המבקשת כלי נשק לצורך ביצוע פיגועים. אימן עטאיא העביר את האיגרת למדאללה נדא.

לאחר כשבוע, אימן עטאיא הגיע שוב לביתה של הנאשם וקיבל מידי אשתו, מדאללה נדא, איגרת תשובה מהנאשם. לאחר יומיים אימן עטאיא העביר איגרת נוספת לנאשם במצעותה אשתו של האחרונ, מדאללה נדא. באיגרת הנ"ל, אימן עטאיא ביקש כי הנאשם בכל זאת יעביר לידיו נשק, או לפחות יפנה את אימן עטאיא לפעילים צבאיים של ארגון החמאס, אשר יוכלו לספק את הנשק המבקש.

לאחר ארבעה ימים נוספים, מדאללה נדא מסרה לאימן עטאיא איגרת תשובה מהנאשם באיגרת האמורה, הנאשם כתב כי אינו יכול להשיג נשק, אך הוא יכול להעביר כספים על מנת שאימן עטאיא בעצמו יקנה את הנשק. בהתאם להנחיותיו של הנאשם שהיו באיגרת האמורה, אימן עטאיא פתח חשבון בנק ועבירו את פרטיו באינגרת לנאשם במצעותה מדאללה נדא. לאחר כשבוע הנאשם קיבל איגרת מהנאשם, במצעותה אשתו של האחרונ - מדאללה נדא, ובה נכתב כי הנאשם העביר לחשבון הבנק של הנאשם 7,000 דינר ירדני. הנאשם מסר את סכום הכסף הנ"ל לידי פטמה אברהים מחמוד זאיד, אשר הפקידה אותו בחשבון הבנק של אימן עטאיא, וזאת על-פי הוראתו של הנאשם.

בעקבות קבלת הכספים האמורים, אימן עטאיא פנה אל בסאם אשקר וביקש לרכוש ממנו 2 רוס"יר M-16. בסאם אשקר מסר כי מחיר רוס"יר M-16 הינו 3,100 דינר ירדני ליחידה. בסופו של דבר סוכם כי בסאם אשקר ימכור לנאשם רוס"יר M-16 אחד עם תחמושת. מספר ימים לאחר מכן, אימן עטאיא, ביחד עם מחמוד אברהים אבו רחמה, נפגש בכיכר מנארה ברמאללה עם בסאם אשקר וקיבל מידי האחרון כ-500 כדורים.

ת.ת 03-73

לאחר מספר ימים, ביום 25.12.02, בסאם אשקר התקשר אל איימן עטאיא והודיע כי השיג את הנשק המבוקש. הנאשם ובסאם אשקר קבעו להיפגש ביום למחרת, 26.12.02, לצורך ביצוע העסקה. ביום 26.12.02 איימן עטאיא ניגש לבנק ברמאללה ומשך סכום של 4,000 דינר ירדני, שזה חלק מהכסף שהועבר אליו על-ידי הנאשם. לאחר מכן, איימן עטאיא נפגש עם בסאם אשקר בכיכר מנארה ברמאללה. בסאם הספיק להגיד לאיימן עטאיא כי ימסור לידיו את הנשק ביום שבת, 28.12.02. בשלב זה איימן עטאיא נעצר על-ידי כוחות הביטחון הישראליים.

### פרט שלושים ואחד:

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש דצמבר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, ברמאללה או בסמוך לכך, מסר לפטמה אברהים מחמוד זאיד אשגר סגור. פטמה זאיד, בהתאם להוראתו של הנאשם, העבירה את האשגר הנ"ל אל "אבו מחמדי", העובד בבית הדפוס "שרקי" ברמאללה. לאחר שפטמה זאיד מסרה ל"אבו מחמדי" הנ"ל את האשגר האמור, פטמה זאיד קיבלה מ"אבו מחמד" אשגר תשובה והעבירה אותו לידי הנאשם.

### פרט שלושים ושניים:

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בחודש דצמבר 2002 או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, ברמאללה או בסמוך לכך, מסר לפטמה אברהים מחמוד זאיד אשגר סגור. בהתאם להוראת הנאשם, פטמה זאיד העבירה את האשגר הנ"ל אל אדם בשם סאמר, העובד בבית הדפוס "שרקי" ברמאללה.

### פרט שלושים ושלושה:

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירה (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בסוף חודש דצמבר 2002 - תחילת חודש ינואר 2003 או בסמוך לכך, עשה עבודה כל שהיא או ביצוע שירות כל שהוא בשביל התאחדות בלתי מותרת, דהיינו: הנאשם הנ"ל - פעיל בכיר בארגון החמאס, שהוא התאחדות בלתי מותרת, במועד האמור, הורה לפטמה אברהים מחמוד זאיד להיפגש עם אישה פלונית ברמאללה. פטמה זאיד, בהתאם להוראתו של הנאשם, נפגשה ברמאללה, או בסמוך לכך, עם אישה פלונית וקיבלה ממנה מכתב במעטפה סגורה. פטמה זאיד העבירה את המכתב הנ"ל ליד הנאשם.

12

ת.ת 03/643:

**פרט שלושים וארבעה:**

**מהות העבירה:** החזקת כלי-יריה, עבירה לפי סעיף 53(א)(1) לצו בדבר הוראות בטחון (יהודה והשומרון) (מס' 378), תש"ל-1970.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מחודש נובמבר 2002 ועד ליום מעצרו או בסמוך לכך, החזיק ברשותה כלי-יריה, תחמושת, פצצה, רימון יד או חפץ נפיץ או מבעיר, כלי או חפץ או דבר המתוכנן או מסוגל לגרום מוות או חבלה חמורה, ללא תעודת היתר שהוענקה על ידי מפקד צבאי או מטעמו, דהיינו:

הנאשמת הנ"ל, במהלך התקופה האמורה, בדירה בכפר עקב, אשר בה הסתתר על מנת לא להיעצר על-ידי כוחות הביטחון הישראליים, החזיק באקדח, וזאת ללא תעודת היתר שהוענקה על-ידי מפקד צבאי או מטעמו.

**פרט שלושים וחמישה:**

**מהות העבירה:** ביצוע שירות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ג) לתקנות ההגנה (שעת חירום), 1945 וסעיף 14(א) לצו בדבר כללי האחריות לעבירות (יהודה והשומרון) (מס' 225), תשכ"ח-1968.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, החל מחודש נובמבר 2002 ועד ליום מעצרו או בסמוך לכך, עשה עבודה כל שהיא או ביצע שירות כל שהוא בשביל התאחדות בלתי מותרת, במהלך התקופה האמורה, הסתתר בדירתו של פטמה אברהים מחמוד זאיד ושל אימאן אבו פארה ואבתהאל יוסף דיב ביתהאאל בכפר עקב.

**פטמה זאיד**, במהלך התקופה האמורה, על-פי הוראת הנאשם, **בתדירות של פעמיים בשבוע ולעתים בתדירות אף גבוהה יותר**, העבירה אשגרים סגורים מהנאשם לנקודות המשלש במסגרדים "יעלי" באלבירה ו"סייד כותובי" ברמאללה, וכן העבירה אשגרים מנקודות המשלש האמורות לעיל לידי הנאשם.

**כמו כן**, פטמה זאיד, על-פי הוראת הנאשם, העבירה מספר אשגרים ושקית עם מכתבים שונים מהנאשם אל כפאח, המכונה "אום מואעז", שהיא המנהלת של האגודה "אל הודאי".

**פרט שלושים ושישה:**

**מהות העבירה:** קבלת תרומות עבור התאחדות בלתי מותרת, עבירה לפי תקנה 85(1)(ח) לתקנות ההגנה (שעת חירום), 1945.

**פרטי העבירה:** הנאשם הנ"ל, באיזור, בתחילת שנת 2003 או בסמוך לכך, גבה, קיבל, דרש או תבע תרומות או תמיכה להתאחדות בלתי מותרת או מתוך אמתלה שאלה נועדו להתאחדות בלתי מותרת, דהיינו:

הנאשם הנ"ל, במועד האמור, קיבל בסיוע של אשתו, מדאללה נדא, סכום של 1,560 דינר ירדני, אשר העביר מערב הסעודית לחשבונה של אשת הנאשם עבור הארגון "רימעית אלאצלאחי", שהוא התאחדות בלתי מותרת. על-פי הוראתו של הנאשם, מדאללה נדא משכה את הכסף האמור מחשבון הבנק שלה והעבירה אותו במזומן לדירת המסתתר בכפר עקב, אשר בה הסתתר הנאשם. הכסף האמור נתפס בעת מעצרו של הנאשם על-ידי כוחות הביטחון הישראליים.

W_S156898

**עדי התביעה:**

1. רס"ר יצחק יעקובוף ,מ.א. 1008358, לח"ק יהודה. [גובה אמרת הנאשם ביום 16.02.03 ומגיש מסמכים וחפצים שנתפסו במהלך גביית האמרה]

2. רס"ר משה לוי, מ.א. 953117, לח"ק יהודה. [גובה אמרת הנאשם ביום 17.02.03]

3. פטמה אברהים מחמוד זאיד, ת.ז. 904738630. (עצורה) (ת.ת. 125/03)

4. אבתהאל יוסף דיב ביתאאלו, ת.ז. 914120746. (עצורה) (ת.ת. 127/03)

5. ע.ג'אבר מוצטפא ע.ג'אבר פוקהא, ת.ז. 968840173. (עצור)

6. איימן מחמוד עבדאללה עטאיא (רשיד), ת.ז. 988711347. (עצור) [ת ת. 98/03]

7. עמאד מחמוד חמאד אבו עוואד, ת.ז. 941470759. (עצור)

8. אחמד אכרם אחמד סאלמי, ת.ז. 906628045. (עצור)

9. כרם מחמוד חמאד אבו עוואד, ת.ז. 950919100. (עצור)

10. מוצטפא ראבח יוסף קרעאן, ת.ז. 938391133. (עצור)

11. מחמד חסן אחמד ערמאן, ת.ז. 901056259. (עצור) (ת.ת. 888/02)

12. פריד סאלח נעים אטרש, ת.ז. 029877925. (עצור)

13. עבדאללה אברהים עבדאללה אל בכרי, ת ז. 958066979. (פרטים בתביעה)

**רשימת עדים מפורטת בנוגע לפיגועים שבוצעו על-ידי חוליתתו של מחמד ערמאן תועבר ע"י התביעה במהלך המשפט**


מיכאל קוטליק,    סרן
תובע    צבאי


תאריך : 16.03.2003
סימוכין : 173-03

בבית המשפט הצבאי ב _____

## בקשה למתן פקודת מעצר/
## הארכת פקודת מעצר*

\* מחק את המיותר

### חלק א׳- הבקשה

1. אני תובע צבאי/חוקר משטרה*, מבקש בזה פקודת מעצר/הארכת פקודת מעצר* ל- _____ ימים
לצורכי _____ , עד תום ההליכים בתיק בית משפט
2. הועצר נוחזק במ]עצר בתיק זה מיום
3. א] העצור נחשד בביצוע המעשים הבאים, המהווים עבירה על הדין ותחיקת הבטחון

_____

_____

_____

ב הוגש נגד העצור כתב אישום בתיק _____ _____ ובו מיוחסות לו העבירות הבאות:

_____

_____

_____

| פס׳ אישי | שם פרטי ושם משפחה | תפקיד | תאריך | חתימה |
|---|---|---|---|---|
| | | | | |

### חלק ב׳- הדיון בבקשה

בפני כבוד השופט _____
המבקש _____
בא כ ח העצור _____ (בהעדר בא כ ר. ישאל העצור אם הינו מיוצג ומה שם בא כוחו)
שם המתורגמן _____
1 דברי התובע הצבאי/חוקר משטרה*:

_____

_____

2 דברי העצור:בא כוחו*:

_____

_____

### חלק ג׳- ההחלטה

1 לאחר ששמעתי את טיעוני הצדדים ועיינתי בחומר שהוצג בפני הנני מחליט כדלקמן
א לעצור את החשוד למשך _____ ימים, מהיום.
ב לעצור את הנאשם עד לתום ההליכים המשפטיים נגדו
ג לדחות את הבקשה.

י הזכרתה של ה]אשם/עצור* שאיננו מיוצג, תוסבר לו זכותו להגיש בקשה לעיון ]יחדש במיעצרו)
2 נימוקי ההחלטה

_____

_____

| פס׳ אישי | דרגה | שם פרטי ומשפחה | תאריך | רתימה |
|---|---|---|---|---|
| | ק/5030983 רס״ן צבי לקח | | | |
| | ישיא ביהמ״ש הצבאי אדוריייר | | | |

פרטי רשים]-

3605 _____

בית אל

מס' תיק: 3191/03                                    תאריך :י"ב אדר ב', תשס"ג
                                                     16 מרץ, 2003

<div dir="rtl">

1
2          בית   המשפט   הצבאי   בבית   אל
3
4          פרוטקול הדיון בישיבת דן יחיד
5
6          בפני הנשיא: רס"ן צבי לקח
7
8          תובע: סרן מיכאל קוטליק- נוכח
9          סניגור :עו"ד תאופיק בסול-נוכח
10
11         נאשם:פלאח טאהר עבדאללה נדא ת.ז. 944220425 /שב"ס - נוכח
12
13         מתורגמן: סמל עפו אבו-חיה
14         רשמת: סמל ענבל חס
15  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
16         אב"ד פותח את הדיון ומזהה את הנאשם
17
18         **מהלך הדיון**
19
20         תובע: בהסכמת הסניגוריה, התביעה מבקשת לעצור את הנאשם עד תום ההליכים
21         המשפטיים נגדו. כתב האישום מייחס לנאשם פעילות בארגון החמאס, כאשר פרטי
22         האישום החמורים הם החמישי, השבעה עשר והשלושים. הנאשם מכחיש בחקירתו
23         את כל המיוחס לו, אך מופלל ע"י עדי התביעה. לעניין פרט האישום החמישי, אני
24         מפנה לעדותו של מחמד ערמאן, עד תביעה מס' 11. לגבי פרט האישום השבעה עשר,
25         אני מפנה לאמרותיו של עד התביעה מס' 7, עמאד אבו עוואד, אשר מוצאות חיזוק
26         מאמרותיהם של עדי התביעה 8,9,10. ואילו לעניין פרט האישום השלושים אני
27         מפנה לאמרותיהם של עדי התביעה מס' 3,6.
28
29         סניגור : אני הסכמתי לבקשת המעצר לאחר שעיינתי בכתב האישום. אנו מסכימים
30         לדברי התובע. אנו מבקשים לשמור לעצמנו את הזכות להגשת ב"יש כאשר כל חומר
31         החקירה יהיה בידינו.
32
33         **ה ח ל ט ה**
34
35         לאחר שעיינתי בתיק החקירה, מצאתי כי קיים בסיס ראייתי לכאורי להוכחת
36         האשמות המיוחסות לנאשם. המדובר באשמות חמורות המקימות עילת מעצר.
37         לפיכך, ובהסכמת הצדדים, אני מאריך את מעצרו של הנאשם עד לתום ההליכים
38         המשפטיים נגדו.
39         הסניגור רשאי להגיש בקשה לעיון חוזר תנד
40
41         ניתן והודע היום, 16/03/03, בפומבי ובמעמד הצדדים.
42
43
44
45
46
</div>

נשיא

מ.מ איו"ש 2726/05:                                  תאריך: 31 אוקטובר, 2005

הדיון נחלק ל-2 חלקים הגלוי והחסוי. עיינתי במעמד צד אחד בחומר חמודיעיני אשר עמד בבסיס  1
ההחלטה לעצור את העצור. כמו כן, שמעתי את דבריו של העצור והסבריו של נציג המפקד  2
הצבאי.  3
  4
ייאמר מיד, כי שוכנעתי שלא ניתן לחשוף פרט כלשהו מין החומר המודיעיני האמור, זאת לבל  5
יפגע בטחון האזור, אני מחליט על כן להותיר חומר זה חסוי.  6
  7
מצאתי לנכון לזמן נציג מטעם השב"כ שיציג בפני את החומר המודיעיני בנוגע לעציר וכן היום  8
התייצב נציג שב"כ המכונה "עומר ".  9
  10
בדיון הגלוי ביהמ"ש למד מפיו של נציג חשב"כ כי מיוחסת לעציר פעילות עדכנית וענפה במסגרת  11
ארגון החמאס המסכנת את בטחון האזור. מרבית פעילותו מבוצעת באזור, מסיבה זו בלבד  12
הוחלט להוציא נגדו צו מעצר מנהלי לתקופה של שישה חודשים.  13
  14
סנגורו של העציר מסר לביהמ"ש כי העציר נעצר בתאריך 25/9/05, תושב ירושלים וכי מאז  15
שחרורו ממאסר קודם בשנת 99' אינגו מעורב בכל פעילות נגד בטחון האזור. לטענת הסנגור  16
במקרה ספציפי זה לא היה מקום למפקד הצבאי לחתום על צו מעצר מנהלי בהיות העציר תושב  17
ירושלים. כמו כן, טען הסניגור כי לגופו של עניין העציר חדל מלהיות פעיל בארגון החמאס וייתכן  18
ומעצרו נובע מפעילתו בעברית המקומים שהתקיימו לאחרונה. סבר הסניגור כי בנסיבות העניין  19
ניתן היה לשקול חלופות למעצר מנהלי היות ומדובר בתושב ירושלים עם כתובת ידועה שניתן  20
לפקח עליו מבחינה בטחונית.  21
  22
לאחר עיון בחומר החמודיעיני שהוצג בפני בעניינו של העציר, פריד צאלח נעים אטרש ת.ז  23
029877925, מגיע אני למסקנה כי ההחלטה להוציא נגדו צו מעצר מנהלי בדין יסודה ורק שיקולי  24
בטחון החלכיים חייבו הוצאתו הצו.  25
  26
הוצג בפניי ע"י נציג השב"כ חומר מודיעיני עדכני מהימן ואיכותי אשר מצביע על חשש ודאי  27
לביטחון האזור לו ישוחרר העציר, ועל מעורבותו של העציר בפעילות עדכנית ארגונית ורחבה  28
במסגרת ארגון החמאס באזור.  29
  30
באשר לתקופת המעצר, דומני כי תקופה של ארבעה חודשים הינה תקופה מספקת בשלב זה כדי  31
לנטרל את מסוכנתו של העציר. על כן צו המעצר יקובר ויסתיים בתאריך 28/1/06. יודעש כי לא  32
מדובר בקיצור מהותי אלא לצורך בחינת עניינו של העציר במועד מוקדם יותר.  33
  34
השתכנעתי כי מדובר במעצר המבוא לנטרל סכנה עתידית, וכי אין כל אפשרות לנטרל את  35
מסוכנתו של העציר על ידי מעצר בית או חלופת מעצר אחרת.  36
  37
כאמור, מהחומר המודיעיני עולה, כי העציר מעורב בפעילות במסגרת ארגון החמאס באזור ולא  38
מצאתי כל עילה להתערב בעניין סמכותו של המפקד הצבאי להוציא צו המעצר המנהלי שבו  39
עסקינן.  40
  41
בנסיבות אלו מעצרו המנהלי של העציר הינו צעד נדרש ואף מחייב וזאת על מנת להגן על ביטחון  42
האזור וביטחוני הציבור.  43
  44
**על כן הנני מאשר את צו המעצר המנהלי ואת התקופה האמורה.**  45
  46
זכות ערעור כחוק.  47
  48
**ניתן והודע חיום, 31/10/05, בהעדר הצדדים. מזכירות ביהמ"ש תעביר העתק החלטה זו לידי**  49
**הצדדים ולמתקן הכליאה בו שוהה העציר.**  50
  51
  52
  53

שופט

3

מ.מ איי"ש: 2726/05                     תאריך : 31 אוקטובר, 2005

| | |
|---|---|
| ביהמ"ש הצבאי בעופר | 1 |
| | 2 |
| פרוטוקול הדיון בישיבת דן יחיד | 3 |
| | 4 |
| -------------------------------------------------- | 5 |
| בפני כב' השופט: רס"ן אדריאן אגסי | 6 |
| | 7 |
| המבקש : | 8 |
| מפקד כוחות צה"ל באיו"ש | 9 |
| באמצעות התביעה הצבאית: סרן מיכאל ליאלין | 10 |
| | 11 |
| | 12 |
| המשיב: פריד צאלח נעים אטרש ת.ז 029877925/ עיסאוויה- נוכח | 13 |
| מקום מעצר: עופר | 14 |
| סנגור: עו"ד ג'מיל חטיב | 15 |
| | 16 |
| מתורגמן: סמ"ר איבאד נאסרלדין | 17 |
| רשמת: טורי עדי אהרונוב | 18 |
| -------------------------------------------------- | 19 |
| אב"ד פותח את הדיון ומזהה את העצור. | 20 |
| נציג השב"כ המכונה "עומר " מזהר כדין. | 21 |
| מהלך הדיון | 22 |
| | 23 |
| המשך דיון מיום 2/10/05 | 24 |
| תובע : אני מגיש חומר גלוי הכולל את אמרתו של אחיו של העציר פואד, מדצמ' 04 ולפיו העציר | 25 |
| משתייך לאוסרח של האחים המוסלמים. חדבר איננו מהות כל עבירה, מדובר באירגון שלא הוצא | 26 |
| מחוץ לחוק. | 27 |
| ש : איזח פעילות מיוחסת לו? | 28 |
| ת: פעילות במסגרת אוסרח והאחים המוסלמים , ובנוסף פעילות נוספה ונענפה במסגרת החמאס. | 29 |
| ש : איפה מרכז הפעילות. | 30 |
| ת: באיזור הגדה ושומרון. | 31 |
| ש : האם יש לו שותפים לפעילות? | 32 |
| ת: כן. | 33 |
| ש : מה הסטטוס שלהם? | 34 |
| ת: חלקם עצורים. | 35 |
| ש : האם חלקם נחקרו? | 36 |
| ת: חלק קטן. | 37 |
| ש : האם אותו חלק קטן נחקרו לגבי העצור? | 38 |
| ת: כן. | 39 |
| ש : האם אותו פואד נמצא באותו חלק קטן. | 40 |
| ת: הנחקרים שהשתתפו בפעילות יחד עם הנדון נחקרו על כלל הפעילות שלהם, הם לא נשאלו | 41 |
| ספציפית על שמו של העציר. | 42 |
| ש : אני טוען שיש אחד בשם מהאר אשהב שנחקר אודות העציר. מה אתה אומר לגבי זה. | 43 |
| ת: אני לא יודע אישית כי אותו אשהב נשאל על העציר באופן ספציפי. | 44 |
| סינגור : אנו עומדים על טענותינו כי אשהב נשאל אודות העציר בחקירתנו ואנו מבקשים מהשב"כ | 45 |
| לעשות בדיקה נוספת בעניין זה. | 46 |
| לאחר הפסקה: | 47 |
| תובע: קיים חומר גלוי נוסף. עדותו המשטרתית של מהאר אשהב מ-5/9/05 , אשר בו הנחקר מזוהה | 48 |
| את העציר בתמונה כמי שיש במדרגות הכניסה במשרד בביר נבעלה. הנחקר הלך למשרד הזה | 49 |
| בתקופת חברותו למועצת מקומית א-רם. חומר זה לא מהווה חלק מהחומר הרלוונטי למעצר | 50 |
| מנהלי. לא מיוחסת לו שום חשיבות לא לכאן ולא לכאן, ולכן החומר הזה לא הוגש לביהמ"ש ולא | 51 |
| הובג בפני המפקד הצבאי. | 52 |
| ש : האם מעצרו של המשיב קשור לבחירות? | 53 |
| ת: לא. | 54 |
| ש : האם ידוע לך היכן הוא מתגורר כעת? | 55 |

1

W_S156903

מ.מ איי"ש: 2726/05                                    תאריך: 31 אוקטובר, 2005,

1    ת: באעסויה.
2    ש: היכן הוא התגורר לפני כן?
3    ת: אני יודע בדיוק. אני יודע שבעבר הוא התגורר באבו דיס.
4    ש: מתי פעם אחרונה הוא היה בתחקור אצל השב"כ? כי
5    לפני מספר חודשים.
6    ש: אני טוען שזה היה ב21 באוגוסט. אני מבקש את התחקור , זה חומר גלוי.
7
8    לאחר ההפסקה: נציג שב"כ מגיש תוך תחקור של העציר מה21/08/05.
9    ש: האם החומר המודיעיני שמתייחס למרשי התאסף לפני התחקור או אחריו?
10   ת: גם וגם.
11   ש: מתי התקבל החומר המשמעותי שגרם לכם להחליט לעצור אותו?
12   ת: הפעילות שלו התרחבה לאחר התחקור ולכן החלטנו לעצור אותו. בתחקור לא מיוחסת לו
13   פעילות כלשהי.
14   ש: לא מיוחסת לעציר פעילות בתחקור.
15   ת: מחשש כי חשיפת מקורות המידע.
16   ש: האם הפעילות הרחבה היתה במהלך כל התקופה שלאחר התחקור, או במהלך תקופה
17   ספציפית?
18   ת: לא מדובר רק בפעילות אחת ספציפית.
19   ש: האם כל הפעילות היתה באיזור?
20   ת: הפעילות המשמעותית בוצעה באיזור.
21   ש: האם אפשר להתמקד באיזור מסויים?
22   ת: יפורט בחסוי.
23   ש: האם מופיע בחומר כי מרשי שבר את רגלו?
24   ת: מופיע בעדותו של מאחר אשחב כי רגלו של העציר היתה מגובסת.
25   ש: האם מרבית הפעילות היתה באיזור?
26   ת: כמו שאמרתי, הפעילות המשמעותית עליה מבוסס סיכונו של העציר בוצעה באיזור.
27   ש: אם נוציא לו צו הגבלה שמונע את כניסתו לאיזור, האם זה יפטור את הבעיה.
28   ת: לדעתנו לא.
29   חסינגיעור מסכם: לגבי חסמכות, קיימת סמכות מקבילה לפי התקדימים , אבל מדובר בחליך
30   מנהלי שהטענה המרכזית היא שהפעילות האסורה בוצעה באיזור. אנו מדברים על תושב ירושלים,
31   והיה מקום לשקול חלופות עם היועץ המשפטי לפני שמפקד צבאי חתם על הצו. אנו מבקשים
32   שביחמש"י יבדוק את עניין הסמכות ואת החלופות. באשר למעוצרו אנו טוענים כי מדובר באדם
33   שאין לו כל קשר לפעילות אסורה מלבד היותו חבר באוסרה , עניין דתי. מרשי היה בתחקור ב21
34   באוגוסט, ולא נעצר. אנו סבורים כי מעוצרו קשור לבחירות, משום שעל פי האמורה של אשחב, הוא
35   ראה את מרשי על המדרגות של המועצה. אנו מבקשים לבטל את הצו או לקצרו באופן מהותי.
36   החלטה
37
38   לבקשת התובע ומאחר ושוכנעתי שהדבר יועיל לגילוי האמת ולעשיית משפט צדק, אני מורה על
39   קיומו של דיון במעמד צד אחד.
40   
41
42
43   תובע: אני מגיש דו"ח חסוי.
44
45   דו"ח חסוי מתקבל ומסומן ת/1.
46   בשלב זה מתקיים דיון במעמד צד אחד.
47   החלטה
48
49   ביום, 29/9/05, הורה מפקד צבא באיי"ש על מעצרו המנהלי של העציר, פריד צאלח נעים אטרש
50   ת.ז 029877925, כך שייעצר לתקופה של 6 חודשים בגין חיומו מסכן את בטחון האזור.
51
52   עפ"י מצוות הצו בדבר מעצרים מנהליים (הוראת שעה) הובא בפניי העציר לשם קיום ביקורת
53   שיפוטית על צו המעצר האמור.
54

2

הודעתו של: / الاعلان تبع:

משטרת ישראל

הודעה מס' / اعلان رقم: 3 — עמוד מס' / صفحة رقم: 1

| מספר זהות / رقم الهوية | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة | שם באותיות לטיניות / الاسم في حروف انكليزية |
|---|---|---|---|
| 023306924 | מאהר | אלדחיה | |

| שם לידה/נעורים/קודם / الاسم السابق، آخر | מצב משפחתי / الحالة العائلية | מין / الجنس | לאום / القومية |
|---|---|---|---|
| | ☑ נשוי / متزوج ☐ רווק / اعزب ☐ גרוש / مطلق ☐ אלמן / ارمل | ز | מוסלמי |

| תאריך לידה / تاريخ الولادة | ארץ לידה / بلد الولادة | טל' בבית / التلفون في البيت | טל' בעבודה / التلفون بمكان العمل |
|---|---|---|---|
| 30.5.68 | | | |

| כתובת מגורים / عنوان السكن | שם ומען מקום העבודה / مكان العمل وعنوانه |
|---|---|
| ט/ כרם | חיים |

| מס' טלפון נייד / رقم النقال الهاتفي | שם האב / اسم الاب | כתובת ההורים / عنوان الوالدين |
|---|---|---|
| | 20 עבדאללה שאהין | |

| תאריך / التاريخ | שעה / الساعة | מקום גביית העדות / مكان اخذ الافادة | החוקר / المحقق: מס' אישי / الرقم الشخصي | דרגה / الرتبة | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة |
|---|---|---|---|---|---|---|
| 5.9.05 | 11:45 | מירושלים | 99106 | רס"מ | יעקב | ברזני |

הבאתי אותו בפני והובהרת לו כי אינו מעורב [illegible] יעקב 99106
מודיעים כי הנך חשוד בחברות ובפעילות בארגון התנזים אין אתה חייב לומר
דבר אלא אם הנך רוצה לעשות כן ולכל אשר תאמר ירשם ויכול לשמש
שהבנתי תוכן האזהרה [illegible] ברזני יעקב
x ماهر عبد الله شاهين الذ[illegible] 99106
את [illegible] בשנת 80 [illegible] והלכתי לבית הספר [illegible]
של [illegible] ואני [illegible] [illegible]
מאלרם ואני [illegible] בקלאסה [illegible]. בשנת 1987 [illegible] בבית
המודיעין [illegible] הקומוניסטים [illegible] אדהם נבן 55 סמר [illegible]
[illegible] כבן 55 [illegible] [illegible] [illegible]
[illegible] הוא [illegible]. [illegible] [illegible] הקומוניסטים הוא כי [illegible]
[illegible] המודיעין מהגרעון. את [illegible] [illegible]
[illegible] ואני [illegible] בעיר העתיקה בירושלים. [illegible]
[illegible] 1990 [illegible] [illegible] [illegible]
שאלה: מתי [illegible] [illegible] ?
תשובה: [illegible] [illegible] [illegible] 1995 [illegible] [illegible]
[illegible] [illegible] כבן 47 [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible]. [illegible]
[illegible] כבן 30 [illegible] [illegible] כבן 30 [illegible]
[illegible] [illegible] כבן 22 [illegible] מאלרם
[illegible] כבן 30 [illegible] מאלרם. [illegible]
[illegible] כבן 25 [illegible] באלרם, [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible]
[illegible]. [illegible] בשנת 2000 את [illegible] "[illegible] אלרם" [illegible]
[illegible] [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible]
[illegible] כבן 100 [illegible] [illegible] [illegible]
[illegible] [illegible] [illegible] [illegible]

שעת סיום גביית ההודעה

ברזני יעקב
99106

x ماهر الذ[illegible] (signature)

(2.05) 2000×50×2 — ט-3007

מדינת ישראל
משטרת

הודעתו של:
الإعلان عن:

35884454   F.02
31-OCT-2005 13:58   FROM
W_S156906

**הודעתו של:** / الاعلان تبع:

**משטרת ישראל**

הודעה מס' / اعلان رقم: 2 — עמוד מס' / صفحة رقم: 3

| מספר זהות رقم الهوية | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة | שם באותיות לטיניות الاسم في حروف لاتينية |
|---|---|---|---|
| | מאהר | [illegible] | |

| שם קודם/נוסף الاسم السابق, آخر | מצב משפחתי الحالة العائلية: ☐ נשוי متزوج ☐ רווק أعزب ☐ גרוש مطلق ☐ אלמן أرمل | מין الجنس | לאום الوطنية |
|---|---|---|---|
| | | | |

| תאריך לידה تاريخ الولادة | ארץ לידה بلد الولادة | טל' בבית התלונן في البيت | טל' בעבודה التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| כתובת מגורים عنوان السكن | שם ומען מקום העבודה مكان العمل وعنوانه |
|---|---|
| | |

| מס' טלפון נייד رقم النقال الهاتفي | שם האב اسم الاب | כתובת ההורים عنوان الوالدين |
|---|---|---|
| | | |

| תאריך التاريخ | שעה الساعة | מקום גביית העדות مكان اخذ الافادة | החוקר المحقق: מס' אישי الرقم الشخصي | דרגה الرتبة | שם פרטי الاسم الشخصي | שם משפחה اسم العائلة |
|---|---|---|---|---|---|---|
| 5.9.05 | | | | | יצחק | ברצון |

שאלה: מה מסר לך אברהים שאוור ביום 5.9.05?
תשובה: אברהים שאוור שלח לי הרבה קבצים שבהם יש ניתוח לבחירות של דירים [illegible] הוא אחד של הרש"פ. הוא ביקש שאקבל אותם בפקס וכך עשיתי ובאשר עברתי עליהם לקראת הבחירות מסרתי כל הניתוח לאמג'ד שיחזיר אותם אליו. הכרטיסים שאמג'ד אמר לי זה של משגיחים בבחירות (מרכזים סנדיק) [illegible] הכרטיסים יאפשרו לי ובין הבחירות [illegible] של אברהים שאוור
שאלה: לשובך "יובל" מסרת כי [illegible] כרטיסים אלה של משגיחים בבחירות [illegible] לי בדיוק הממונים בדואר [illegible] נכון?
תשובה: כן, לא נכון ומה שאמרתי לו שהכרטיסים האלה הם למשגיחים של בחירות ברש"פ והם משגיחים מודעות מקומיות דרך הרש"פ ולא של ארגון החמאס. כן יש כרטיס של [illegible] בחירות של הבחירות באל-[illegible] האחרונות ובמשרד שלי יש קלטות אסלאמיות וספרי דת אסלאמיים [illegible] חמאס שלו כתוב "אין אלהים אלא אללה" שאותם נתן לי אברהים שאוור וכן יש במחשב תקליטור של [illegible]. כן [illegible] את כמה פעמים [illegible] אברהים שאוור [illegible] ממנו כסף [illegible] בבנק [illegible] בפרט [illegible] וכי יש לי [illegible] משפחה [illegible]
שאלה: מה [illegible]?
תשובה: [illegible] הוא מאמריקה [illegible] בין 55-60 [illegible] בערך 50 והוא [illegible] 95 [illegible] והראה לי [illegible] והוא [illegible] אמר לי [illegible] 100 דולר [illegible] 50 [illegible] ובאלו [illegible] מי [illegible] (חיילת)
שאלה: מה קשרין [illegible] ומתי?
תשובה: ב 2001-2002 [illegible] בסעודיה והתפללנו במכה [illegible] והוא [illegible] והוא [illegible] לי [illegible] כבן 25 והוא [illegible] ברצון להתפלל [illegible] בזמן הבחירות [illegible] נכבדים [illegible]

שעת סיום גביית ההודעה

(2.05) 2000×50×2 — ברצון יצחק — [signature] — ט"ו 3007

W_S156907

משטרה ישראל

הודעתו של:
الإعلان عن:

W_S156908

משטרת ישראל

הודעתו של: / الاعلان تبع:

הודעה מס' / اعلان رقم: 3 — עמוד מס' / صفحة رقم: 2

| מספר זהות / رقم الهوية | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة | שם באותיות לטיניות / الاسم في حروف انكليزية |
|---|---|---|---|
| | מאהר | אשקר | |

| שם קודם/נוסף / الاسم السابق، آخر | מצב משפחתי / الحالة العائلية | מין / الجنس | לאום / الوطنية |
|---|---|---|---|
| | ☐ נשוי / متزوج ☐ רווק / اعزب ☐ גרוש / مطلق ☐ אלמן / ارمل | | |

| תאריך לידה / تاريخ الولادة | ארץ לידה / بلد الولادة | טל' בבית / التلفون في البيت | טל' בעבודה / التلفون بمكان العمل |
|---|---|---|---|
| | | | |

| כתובת מגורים / عنوان السكن | שם ומען מקום העבודה / مكان العمل وعنوانه |
|---|---|
| | |

| מס' טלפון נייד / رقم النقل الهوائي | שם האב / اسم الاب | כתובת ההורים / عنوان الوالدين |
|---|---|---|
| | | |

| תאריך / التاريخ | שעה / الساعة | מקום גביית העדות / مكان اخذ الافادة | החוקר / المحقق: מס' אישי / الرقم الشخصي | דרגה / الرتبة | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة |
|---|---|---|---|---|---|---|
| 5.9.05 | | | | | יעקב | ברעם |

שאלה: מראה לך מספר תמונות מי אתה מזהה מהם ואיפה ראית אותם?
תשובה: במספר 3 בתמונה (3) זה חבר של אברהים שאומר הוא מתנועת ג'האד הוא ואברהים נוסעים הרבה ברכב של אברהים (שמו מאג'ד רג'ב מחמוד ג'עדבה ת.ז 051096190 יעקב) במספר (3) שלו ראיתי את אחד מהם בעיירה שלי. גם במספר (2) יש לי מכיר את אחד במספר (1) זהו חברי אחמד אבו שהאב הוא שלו היה במשרד בבי"ר נבלוס וכל מספרים שנים של וחברי (שמו מחמד מחמוד אבו רביע אבו ... ת.ז 025400046 יעקב) במספר (6) לא מכיר את אחד גם במספר (6) שלו מכיר את סמך במספר (4) לא מכיר את מספר במספר (4) שלו בלייה אותו בתמונה (7) יכול להיות שבוא היה במשרד בבי"ר נבלוס שלו יודע מה שמו. (שמו אבו ... מחמד אשרף ... ת"ז 925352002 יעקב) תמונות המספר שקיבלתי מהמשטרה "יובל" ומתכוונות ברגע יעקב 5.9.05 ג'אר הוצאתי ... בקשתי את מה של מה ... אני אומר שהתמונה עדיין ...

ماهر عدنان شاهين الأشقر

ברעם יעקב
29106

שעת סיום גביית ההודעה

(2.05) 2000×50×2

טר3007

W_S156909



W_S156910

לרשם (פ)

1. אבראהים מחמד אבראהים עליאן ת.ז. 03091049-1

2. פריד צאלח נעים אטרש ת.ז. 029877925

3. מחמד חליל עבדאללה אבו סעלוק ת.ז. 058973348

4. חאלד עא-כרים צאלח סויס ת.ז. 97128148-0

5. חליל עא פתאח סאלם בזאר ת.ז. 85860191-7

6. מחמד אחמד חליל סמארה ת.ז. 974865651

7. חליל חסן סלימאן חגאזי ת.ז. 97932011-6

8. מחמד עומר אחמד חלבי ת.ז. 931080873

W_S156911



W_S156912

1. אסי"ן מחמד לחמד אלדיראמס- ב"ה לחם ת.ז.953695368

2. אבו אלנ"א ר"אג מחמד בגוניה ת.ז.999495161

3. אחמד מצטפא אססאם·טבה אלחלה חמד- םולימ אדינר בחרים,

4. ראגי דמאל ברלי אלצש אמד נ"בן – נ"ג ת.ז.941122202

5. אבמלב דוהר בדער- "שלאר אלראש ת.ז.023498835

6. חאלד דירואש – מלרדא –"שלאר אלראש ת.ז.024767881

7. אגאל, כנ"אר ומאנד מכבם אע א"ר"ינל ת.ז.999835481

8. עבד אלה אבו עבד אלראלק אמלר םנ"א- נ"בן –"ימלא ת.ז.917763104

W_S156913

بسم الله الرحمن الرحيم

انا الموقع ادناه ماهر عرفان شاهين الدرشب

لاجوح مسطلع يعني جاباك

١- سا عدة في عام ١٩٨٠ في حملة انتخابات في الحرام لفتح

٢- حام ١٩٨٧ انضمت الى الحزب الشيوعي مع كلالدرشب

حبعرمل حضر مشاركت في اعرجانات السيد يه ماعمال شرايج

الجاد المعدان

٣- عام ١٩٩٥ انضمت الى ابوصيحم ابوغزاله في طلب دعر

للدعوه

٤- ادرس القرآن في مخيطي ومدارس عندي ناس كثير

مالى نادر النش و عماد القيس ومراد ابوغزاله وغيرهم

وكان في الماضي مدارس عندي القرآن تاي بخور وباعم جهد

٥- مساعد لجنة زكاة الحرام في الرمضان على ايتام وعائلات

يمكونه جوفرامل واعالى بائي من مشرعيم واهلى الخير

يائي مال لتعام من مخضم معنى في امريكا جهه اياد جه ايومر

العالى ١٠١٠ش كل سنه كمالة شهيم مبالى ايضامالى شره

٦- ش في ٢ مه دينار ٢ مه ديكتور في الاردن

لحيه سليم الدرشب كمالى للدرباله مايعمل ودعى العالى

عم طرقيم اعمار باخذه من الاردن اوسه طرقيم الميك سه

امريكا

٧- كان حيسدنا باكم معمر في مراسلة الانترنت على مواقع

نصريه لحداعية مع معالى الدرهم وسمع للعلم العرلاي

٨- دعاى ابراهيم شاعر اى البيانات في الميد الرمضى

بمى سمى الام اربا ط منبك مرشه

٨- جمى ماهر الدرشب وتيل ارمابع كله نياذيكا انا سا ابوصف

وبعد ام نزوجنت اعمع عمى ابو بلال رمال الناس مم نظهرنا سلامهايا

W_S156914

... الحروف في حياتي اليومية الكثير من الناس سلام
... خالدا ابو عرفة ومثلي عبدالرحيم الجبلي ومازنه توضيع البناي
... وعبد المنعم الحماني مترابطي بي م صلة اما ثرابة واما غير
... منهم تعوضهاله لهم جماس .

... هؤشر لا/٥٠٥ احضر ابراهيم شارر عندي ظرف فيه بطاقات
... يراضي الدتقابات وطلب ابه انشيل عندي حتي ياتي وياخذها
... عندي في البيت كتب سلامب وكاسيتاب سلام واعلام
... سلامب تحتوي علي للدلك لادلاله سراي تستطاي عديد

... يتصل بي ابراهيم شارر مه سجم عدر خدة مراب لاطلب مساعده
... عليه مرتضاه اعطاني رقم حساب في بنك للدخل مبه المال مرتضي

... عام ١٩٩ . تقريبا حاد رجل مه امريكا علي مصطفي ومعه لله
... مبه سخطاب وكان علك كبه كبيره مه المال حامه هذا التبرعي
... للفيرقاء ما هناجهم ثم دانفه كثارة كبيره مه المال علي
... جماجم الدعوه والتبليخ في مسب ميحما سبح عدم .

... رأيت مه مع ابراهيم شارر شاب ميم خادي عمره ٢٥ جه يكم
... علي منقة القداس .

... رأيت شاب طمه مدير الاطرابش عمره ٢٥ جه تبلي علي
... خرج الناي الي نظر مكتب لطم انه شابح جماس .

... رأيت شخلي طمه حقوب ابو عصا في اكتب الموجود في بريلا
... رأيت ايضا باب الدسباط لالقدس عده حال وحاد
... اي يني يوم الدتقابات خيام مع حماس كثرد محمد حماه
... سالم مير نام سلاسلم الزير ٤/٤/١. ٥٠ c.

## דוח תחקור הנדון - 21/08/05
## פריד צאלח נעים אסרש /

### עסאווייה

### ת.ז 029877925

<u>1. **מלם אישי:**</u>

1. כבן 30, "אבו מעאד", מתגורר בעסאוויה שוכר את דירתו ממחמד חמדאן   כבן 55, "אבו טאה",, מתגורר מעל בית הנדון, טלפ 025825614.

2. הנדון בעל עסק לממסכר ותיקון מתשבים באבו דיס נמצא ליד מועדון אבו דיס, שם העסק "סיים סאק", שותפו של הנדון סאמר עריקאת   כבן 30, מתגורר באבו דיס, טלפ 0522663069, ללא רכב, דתי.

3. טלפ הנדון 0522411336, ללא מסט ללא רכב.

4. הנדון בוגר תואר ראשון בשריעה באונ' באונ' אל קודס הפתוחה בסוואנה.

5. הנדון סיים דיפלומה במחשבים מחברת מייקרוסופט באונ' ביר זית.

6. הנדון דתי, מתפלל בעיקר במסגד אל אקצא ובמסגד אל אוחוד בעסאוויה.

7. הנדון כלש 4 פעמים, ישב בבתי הכלא הנבוים, מגרש הרוסים, שאטה, דמון, אשקלון, גלמה.

### 2. מלם משפחה:

1. אחי הנדון:

1. מחמד רגב כבן 33, נשוי, "אבו צאלח". מתגורר באדי קדום, מורה בבית הספר ליתומים בעיר העתיקה, טלפ 0522870825, ללא רכב, דתי, כלש חמאס בשנת 95.

2. עאמר כבן 26, רווק, מתגורר באבו דיס, עובד במסעדה בסנטר 1, טלפ 0528717636, ללא רכב, כלש בשנת 95 ער הפס"ד, אינו דתי.

3. פואד   כבן 20, מתגורר באבו דיס, רווק, פועל בנין, טלפ 0522687746. ללא רכב, דתי, כלש ער הפס"ד.

### 3. מהלך השיחה:

1. הגיע לזימונו בזמן.

2. התרעם על כך וטען כי השבכ תמיד אינם עומד בזמן, הסברתי לו כי היה משהו דחוף ועל כן הוא נאלץ להמתין.

3. הנדון התכבד בקופה מסר את פרטיו ואת עברו באוניברסטאות השונות.

4. שחחנו בנושאים דתיים, הנדון ציין כי מטרתו בחיים להקים מדינה פלסטינית דתית אשר לא תשלט עי ממשלה אלא עי הדת.

5. ;טען כי ביום חחמאס מתעסק בהרג אך צריכים לחשוב על העתיד ומה יהיה לאחר סיום המלחמה והוא כבר נמצא שם מכין את הקרקע לכך.

6. סיפר על יוסף חטיב   חברו הטוב שהתחולל ועל כך שהוא כיום קיצוני, הבעתי את דעתי כי מרבית אלו שעוברים מצד לצד עושים את זה בצורה קיצונית יותר מאלו שנמצאים כבר שם.

7. הנדון הביע את רצונו שנהיה חברים אך הותנה זאת בכך שעלי להיות מוסלמי, הסברתי לחון שאיני יכול את רצונו מוסלמי אלא לאחר שאכיר כראוי את הקראן.

8. הנדון הציע שאכרגשא ספר קראן ואתחיל ללמוד אך הסברתי לו כי עלי ללמוד עם מישהו שהוא מומחה בדבר ועל כן הצעתי שהנדון ילמד אותי קראן.

9. הנדון חייך והציע כי אלמד עם יוסף חטיב את הקראן, הוסיף תוך כדי יציאה החוצה כי סאמר סיאם

לא יכול להגיע חיום משום שיש לו תור לקופת חולים עם בנו, נמסר לו תארך חדש לזימון.

10. צולם ושוחרר לביתו.



W_S156917

W_S156918

משטרת ישראל

הודעה של: / إفادة

הודעה מס׳ / إفادة رقم: 2

גליון מס׳ / نسخة رقم: [illegible]

| מספר זהות / رقم الهوية | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة | שם באותיות לטיניות / الاسم في حروف انكليزية |
| --- | --- | --- | --- |
| | [illegible] | [illegible] | |

| שם קודם / الاسم السابق | מצב משפחתי / الحالة الاجتماعية | מין / الجنس | דת / الدين |
| --- | --- | --- | --- |
| | ☐ נשוי / متزوج ☐ רווק / أعزب ☐ גרוש / مطلق ☐ אלמן / ارمل | | |

| תאריך לידה / تاريخ الولادة | מקום לידה / مكان الولادة | טל׳ בבית / التلفون في البيت | טל׳ בעבודה / التلفون بمكان العمل |
| --- | --- | --- | --- |
| | [illegible] | | |

| הכתובת / العنوان | שם ומען מקום העבודה / اسم وعنوان مكان العمل |
| --- | --- |
| | |

| מס׳ טלפון נייד / رقم الهاتف اللاسلكي | שם האב / اسم الاب | כתובת ההורים / العنوان للاب |
| --- | --- | --- |
| | | |

| התאריך / التاريخ | שעה / الساعة | מקום / المكان | החוקר / المحقق: מס׳ אישי / الرقم الشخصي | דרגה / الرتبة | שם פרטי / الاسم الشخصي | שם משפחה / اسم العائلة |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | | |

[illegible] 15.1.04 [illegible]

[illegible]

[illegible] 14

שעת סיום גביית ההודעה

بسم الله الرحمن الرحيم

لنا الحرية لأمانة ... خلال جهاز مخيم الشهداء لمجوعة بغداد قسم ...

تنظيم بغداد الأوائل ... على ... تقوم بعمليات أشهر ... يعطيه ... استنى
أحمد ... ... عمر أبوء ... ... على ... منظمة السلفية مغلقة
... ... نصره كان ... عمليات عمرة للأشهر ... عبد ...
الحديث ... ... وكان ... في (رح) عامر ... أبو عتبة ... عمد ...
... عربية ... السكندرية الجزيرية ... كذلك رباد
عمرة ... ... حكمة في العملية ... جبين جنائم ...
... ... حرص ... عمد ... شنه الاشتباكات ...
... ... تكرت ... الست ... أحد ... قنيفة ... دعوها
... ... الأمر ... ...

... ... ... ... ... ... ... الأرض ...
... ... على ... ما ... ... نشاطها ... ...
... لقاء ... ... و ... ... عراق ... ...
... ... ساعة ... رفض جنس و ... ... علاقات ...
... اشرف ... ... ... كامل ... ... وضعنا عبدالهادي
على ... علاوة ... ... عبد ... ... الغربية و عمرة
... ... جنزوة ... كان أبو ودبت ... كنت ... ... ... تجارة
... ... أبو ... ... ... ... قاد بحر ... الربعة اشر
... رفض ... ... ... ... ... التجميع أحمد بانسيم ...
... قرية ... مجارة ... دقيقها الثنية

غداد جهاز مخيم الشهداء ـ ١٥ / ١٢ / ٢٠٠٤

980895840

מ.מ איו"יש : 2726/05                                             תאריך :כ"ח אלול, תשס"ח
                                                          2 אוקטובר, 2005

1                      ביהמ"ש הצבאי בעופר

2

3                פרוטוקול הדיון בישיבת דן יחיד

4

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6            בפני כב' השופט : רס"ן אדריאן אגסי

7

8                        המבקש :

9               מפקד כוחות צה"ל באיו"ש

10         באמצעות התביעה הצבאית : סרן יוסי מלקו

11

12

13   המשיב : פריד צאלח נעים אטרש, ת"ז 029877925/עיסאווייה – נוכח

14                     מקום מעצר : עופר

15                 סנגור : עו"ד ג'מיל חטיב

16

17         מתורגמן : סמ"ר איבאד נסראלדין

18              רשמת : סמל איה נבעה

19 - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

20             אב"ד פותח את הדיון ומזהה את העצור.

21

22                    מהלך הדיון

23

24   ביהמ"ש מבהיר לעציר כי הוצא נגדו צו מעצר מנהלי מתאריך 29/9/05 עד 28/3/06.

25

26   בית המשפט מבהיר לעציר את מהות ההליך ואת זכויותיו על פי חצו בדבר מעצרים

27   מנהליים (הוראת שעה) (יהודה והשומרון) (מספר 1226), התשמ"ח - 1988.

28

29   תובע : קיים חומר גלוי בעניינו של העצור זימנו אותו, אך הוא טרם נתקבל על כן

30   אבקש דחייה.

31   סניגור : יש לנו טענה טרומית לפיה מדובר בת.ז זהות ישראלית של העציר, הוא גר

32   בעיסאווייה בירושלים ולכן למפקד צבאי לא היה סמכות לחתום על חצו.

33   תובע : מיוחסת לעציר פעילות בתוך האזור נגד בטחון האזור.

34

35                    ה ח ל ט ה

36

37   לאחר עיון ראשוני בחומר המודיעיני, עולה כי מיוחסת לעציר פעילות ענפה נגד

38   בטחון האזור בתוך האזור. מצאתי לנכון לזמן נציג מטעם השב"כ. הדיון יתקיים

39   בתאריך 31/10/05, עד אז יישאר העציר במעצר מנהלי.

40

41   ניתן והודע היום, 2/10/05, בפומבי ובמעמד הצדדים.

42

43

44                    שופט

45

1

2726/05

צבא ההגנה לישראל

צו בדבר מעצרים מנהליים (הוראת שעה) (יהודה והשומרון)
(מס' 1226), התשמ"ח - 1988

**צו מעצר מנהלי**

בתוקף סמכותי לפי סעיף 1 לצו בדבר מעצרים מנהליים (הוראת שעה) (יהודה והשומרון)
(מס' 1226), התשמ"ח - 1988  לאחר שעיינתי בחומר הביטחוני של הרשום מטה, ובהיותי סבור,
כי זה הדבר הכרחי בגלל טעמי בטחון החלטיים , ומכיוון שיש לי יסוד סביר להניח , כי טעמים של
בטחון האזור ובטחון הציבור מחייבים זאת , הנני מצווה על מעצרו של :

**פריד צאלח נעים אטרש**
שם

**1975** | **029877925**
שנת לידה | תעודת זהות

**עיסאוויה**
מען

עד יום **28/03/2006** | מיום **29/09/2005**

**בגין היותו מסכן את בטחון האזור**

התשס"ה _____

2005 _____

ק/4377851
אליים מיקל ארלשטיין
מח"ש בנימין

מפקד | צבאי
לאזור   יהודה  והשומרון

עמ״מ 3126/05

5. **לפיכך הנני דוחה את הערעור**, ומותיר על כנה את החלטת השופט קמא.

ניתנה היום, 4.12.05, בלשכה.

מזכירות ביהמ״ש תעביר העתק החלטה זו לידי הצדדים.



שופט

2

W_S156923

עמ"מ 05/3126

בית המשפט הצבאי לערעורים
באזור   יהודה   והשומרון

בפני השופט: סא"ל שלומי כוכב

**המערער: פריד צאלח נעים אטרש, ת"ז 29877925** (באמצעות ב"כ עו"ד גימיל חטיב)

נגד

**המשיב: תובע הצבאי** (סרן מיכאל ליאלין)

ערער על החלטת ביהמ"ש הצבאי בעופר (כב' השופט רס"ן אדריאן אנסי)
בתיק מס' 05/2726 מיום 31.10.05
(הערער נדחה)

תאריך הישיבה: 4 בדצמבר 2005.

## <u>החלטה</u>

1.   המפקד הצבאי חורה בצו כי העצור הנ"ל יוחזק במעצר במשך שישה חודשים עד תאריך -
28.3.06, בגין היותו מסכן את בטחון האזור. העצור הובא בפני כבוד השופט רס"ן אדריאן
אנסי לצורך ביקורת שיפוטית על הצו. השופט החליט לקצר את המעצר, לא מהותית, עד
לתאריך 28.1.06. על החלטה זו בא הערעור לו הנני נדרש כעת.

2.   ב"כ המערער התנגד למעצר בטענות שונות. ציין כי המערער אינו מסכן את שלום הציבור.
לחילופין ביקש כי תינקט חלופת מעצר, וזאת לאור היותו של המערער תושב ירושלים,
בעל כתובת קבועה שם. מאחר שמיוחסת למערער פעילות באזור, הרי שניתן לבודדו מן
האזור, ולפקח עליו בירושלים.

3.   לאחר הדיון הגלוי עיינתי בחומר החסוי, חומר אשר לא מצאתי כי אוכל לחושפו בפני
המערער או בא-כוח מבלי שיהיה בכך כדי לפגוע בביטחון האזור. המצער הוא בשל
פעילות המערער במסגרת החמאס מן הזמן האחרון. לאור טיב הפעילות, לרבות שימוש
באמצעי תקשורת שונים, ולאור טיב הסכנה הנשקפת מן המערער, נראה כי חלופת מעצר
בביתו של המערער, לא תועיל במקרה זה.

4.   הגעתי למסקנה כי טעמי ביטחון האזור והציבור מחייבים את המעצר, ולא מצאתי כי
נפלה שגגה בהחלטת ביהמ"ש קמא.

W_S156924

עמ"מ 3126/05                                                      תאריך: 4.12.05

|  |  |
|---|---|
| **בית המשפט הצבאי לערעורים** | 1 |
|  | 2 |
| דיון מיום : 4 בדצמבר 2005, ג' בכסלו התשס"ו. | 3 |
|  | 4 |
| בפני השופט: סא"ל שלומי כוכב | 5 |
|  | 6 |
| המערער: פריד סאלח נעים אטרש, ת"ז 29877925 | 7 |
|  | 8 |
| סניגור: עו"ד ג'מיל חטיב | 9 |
|  | 10 |
|  | 11 |
| התובע הצבאי: סרן מיכאל ליאלין | 12 |
| מתורגמן: סמ"ר אמיר נסראלדין | 13 |
| רשמת: טורי אורטל זינגדון | 14 |
| **השופט פותח את הישיבה ומזהה את המערער.** | 15 |
|  | 16 |
| <u>התב"צ</u> : | 17 |
| התקבל מידע מודיעיני חדש אשר מראה כי המערער פעל במסגרת חמא"ס. | 18 |
|  | 19 |
| <u>הסניגור</u> : | 20 |
| אנו מדברים על תושב ירושלים שיש לו תעודת זהות כחולה. בזמנו, אנו טענו כי לבימ"ש קמא אין סמכות | 21 |
| מאחר ואנו מדברים על תושב ישראלי שחיה מקום לחוציא את צו המעצר המנהלי על ידי גורמים אחרים ולא | 22 |
| על ידי המפקד הצבאי. מאחר וביהמ"ש החליט כי יש מקום וסמכות, דבר המחייב את המפקד הצבאי להוציא | 23 |
| צו. | 24 |
| על פי החלטות בימ"ש קמא אנו מתרשמים כי מרבית הפעילות התבצעה באזור. הצעט חלופת מעצר כי יש | 25 |
| למערער כתובת ידועה והוא גר בישראל. אינני מבין מדוע לא להחליט על חלופת מעצר | 26 |
| מאחר וכל הפעילות הייתה באזור, אפשרות של חלופת מעצר לא נבדקה. מדובר בפעילות עדכנית, מסוכנת | 27 |
| במסגרת ארגון החמאס. | 28 |
| ביהמ"ש קיצר בכך שענייינו ייבדק בשלב מוקדם יותר. מדובר באדם שיש לו כתובת ידועה ויש אפשרות לפקח | 29 |
| עליו ולכן יש סיכוי לבדוק בכובד ראש את חלופת המעצר, או לבטל את חצו. | 30 |
| למערער אין כל קשר לפעילות במסגרת ארגון החמאס. | 31 |
|  | 32 |
| <u>התב"צ</u> : | 33 |
| מרבז פעולותיו המסוכנת של המערער נמצא באזור יהודה והשומרון, לכן יש לדון בעניינו לטעמנו על פי הדין | 34 |
| החל באזור. | 35 |
| אנו סבורים כי חלופת מעצר אשר מוצעת על ידי ההגנה, לא תוכל לנטרל את הסכנה הנשקפת מן המערער. | 36 |
| סכנה זו תימנע אך ורק באמצעות כליאתו של המערער מאחורי סורג ובריח וניתוקו מהתשתית והפעילות | 37 |
| מוחי לכותלי הכלא. | 38 |

1

W_S156925

עמ"מ 3126/05                                                          תאריך  4.12.05

1   מערער

2   אני סבור כי המעצר המנהלי, כל בן אדם שנעצר פעם אחת כל פעם מאריכים לו את הצו ונותנים לו עונש על

3   עבירה לפחות 10 פעמים.

4   אני חושב כי מעצרי שהיה בתוך ירושלים יש לאבחן בין תושב ישראלי לבין תושב ישראלי שהוא ערבי

5   לפני מעצרי הייתי בפגישה עם קצין האזור והוא שאל אותי איפה אני מתפלל, מדוע אני מתפלל במסגד, למה

6   אני נותן שיעורי דת. האם זו הסכנה שאני מהווה למדינת ישראל? אני תומך במפלגתו של שרון "קדימה". אני

7   חי במדינה שיש בה חירות וחופש.

8

2

צבא     הגנה     לישראל

28 נובמבר 2005



יבמ"ש   132
בימ"ש למעצורים מנהליים
טל: 02-5884253
פקס 02-5884445

<u>מת"כ עופר- שליש כלואים</u>
התביעה מעופר – ממונה
בימ"ש עופר- תיק שוטף

<u>הנדון: זימון לביהמ"ש הצבאי לעירעורים בעופר</u>

1   הדיון בעניינים של העצורים שברשימה להלן יתקיימו ביום 4/12/05 החל משעה 9.00.

2.   <u>במידה ומי מהעצורים אינו במת"כ עופר יש להודיע על כך מבעוד מועד.</u>

3.   <u>אין להעביר את העצורים למת"כ אחר לפני מועד מתן ההחלטות.</u>

4.   לטיפולכם המסור אודה.

| סנגור | מ"מ | צמ"מ | שם העצור |
|---|---|---|---|
| חטיב גמיל | 2858/05 | 2860/05 | עומר גמיל עדי זאר סלים, 901153544 |
| חטיב גמיר | 2812/05 | 2939/05 | גראא אלדין חליל מוחמד אבו קרע, 926209370 |
| ג'מיל חטיב | 2880/05 | 2943/05 | מיצפא מוחמד סעד אבו ערה, 952526168 |
| ג'מיל חטיב | 2882/05 | 2944/05 | עצאם עבד אלרחמאן יוסף שלבי, 967817750 |
| חטיב גמיל | 2943/05 | 2971/05 | כעדי גבר אבראהים דיאב, 938460854 |
| ג'מיל חטיב | 2938/05 | 3022/05 | זאד מוסא עבד אלמגיד חאמד, 962140869 |
| חטיב גמיל | 2726/05 | 3126/05 | פריד כאלה נעים אטיש, 29877925 |
| ג'מיל חטיב | 2964/05 | 3227/05 | מוחמד אבראהים עלי גלאל, 992538074 |
| חטיב גמיל | 2900/05 | 3228/05 | נ'ניד עבד אלרחים עבדאללה נואל, 989256375 |
| מאדי ראיאסמי | 3032/05 | 3286/05 | אבראהדים כרים אכמאעיל שאווד, 27580158 |
| חטיב גמיל | 2751/05 | 2852/05 | מוחמד אסמאעיל מוחמד חאמד, 941395345 |
| עבד עסלי | 5249/05 | 3369/05 | מוסא כאלם אבניה ג'האלן, 950708891 |

חטמ"י- עצויון

העצור אולי יעבור אליכם!!!!!

בכבוד רב,

אורדית אביגזר   סג"ר
א. ערעורים   מנהליים

אושר עם כלא עופר ביום __ 2/11 בשעה __ 9:45 עם __ __

בכבוד רב,

אורדית אביגזר   סג"י
א. ערעורים   מנהליים

W_S156927

צבא   הגנה   לישראל

28 בנובמבר 2005



י ב מ " ש   132
ביר:מ"ש למעצרים מנהליים
טל   02-5884253
פקס:   02-5884445

לכבוד עו"ד   חטיב ג'מיל

**הנדון: הודעה על מועד דיון**

1.  להלן תיקי מרשך אשר נקבעו עבורך ליום **4/12/05** בשעה: 11:00 בבימ"ש הצבאי לערעורים במשנו **בעופר**.

2.  לידיעתך והיערכותך בהתאם.

| עמ"ס | מ"מ | שם העצור |
|------|------|----------|
| 2860/05 | 2858/05 | ג'ומר ג'מיל עלי דאר סלים, 901153544 |
| 2939/05 | 2812/05 | עלאא אלדין חליל מוחמד אבו קרע, 926209370 |
| 2943/05 | 2880/05 | מוצטפא מוחמד סעיד אבו ערד, 952526168 |
| 2944/05 | 2882/05 | עצאם עבד אלרחמאן יוסף סלבי, 967817750 |
| 2971/05 | 2943/05 | סעדי גבר אבראהים דיאב, 938460854 |
| 3022/05 | 2938/05 | זיאד מנאא עבד אלמג'יד חאמד, 962140869 |
| 3126/05 | 2726/05 | פריד סאלח נעים אטרש, 29877925 |
| 3227/05 | 2964/05 | מוחמד אבראהים עלי גלאל, 992538074 |
| 3228/05 | 2900/05 | נג'ה עבד אלי'חזם עבדאלל'ה נאל, 989256375 |
| 2852/05 | 2751/05 | מ'חמד אסמאעיל מוחמר חאמד, 941395345 |

בכבוד רב,

אודרית אביבוד   סור'
א. שיעורים   מנהליים

נשלח ביום  28|11  בשעה  13:10  אושר ע"י _____



חטיב ג'מיל, של"ד
ביך ת'מלגיר

W_S156928

<div dir="rtl">

בית המשפט הצבאי
במחוז יופר

מ"מ 2726/05

31260035 :סימוכ

בעניין :- פריד צלח אטרש   ת"ז 029877925
ע"י ב"כ עו"ד חטיב גמיל
כפר ערערה 30026, ת.ד 623
טל 046358828
פקס 046352260

**המערער**                                              -נגד-

מפקד כוחות צה"ל באיו"ש

**המשיב**

**ערר**

מוגש בזה ערעור על החלטת כבוד השופט רס"ן  אדריאן אגסי  שניתנה ביום 31\10\05
מ.מ איו"ש 2726\05 אשר על פיה אושר מעצרו המנהלי של המערער ע"י מפקד כוחות צה"ל
באיו"ש מתאריך 29/09/05 ועד  לתאריך 28/01/06

ואלה נימוקי הבקשה :

1. טעה בכבוד בית המשפט קמא שעה שלא נתן הזדמנות למערער לעיין בחומר החסוי אשר
מייחס לו פעילויות עדכניות חמסכנות את ביטחון האזור ומניעה מעיון בחומר החסוי
המודיעיני מנעה מהמערער כל טענה לגבי נכונות ו/או דיוק המדע הנ"ל

2. טעה כבוד בית המשפט קמא שעה שאשר את תקופת המעצר המנהלי ללא כל בסיס חוקי

3. טעה כבוד בית המשפט קמא שעה של של ניתן למערער לחזות חופשי ולא לחגביל את חירותו
במעצר ראו מעצר לפי סעיף 5  לאתן יסוד כבוד תאהם וחירותו ובנוסף טעה בית המשפט
שעה שלא נתב בוחדרות ולא אזן אזן בין האינטרס הפרטי של המערער לחזות חופשי לבין
האינטרס הציבורי

4. טעה כבוד במשפט קמא שעה שלא התייחס ו/או נתן משקל כלשהו לנסיבותיו של
המערער .

5. המערער שומר ורמר על זכותו לחעלות נימוקים נוספים בדיון שיתקיים במעמד הצדדים

6. לאור האמור לעיל, מתבקש בית המשפט הנכבד לבטל את צו חמעצר חמנהלי נגד המערער
ו/או לקצר מתחקופת המעצר



חטיב גמיל, עו"ד
ב"כ המערער

</div>

W_S156929

מס' תיק: 3157/03              תאריך: כ"ד תמוז, תשס"ג
24 יולי, 2003

| | |
|---|---|
| בית המשפט הצבאי בבית אל | 1 |
| | 2 |
| פרוטוקול הדיון בישיבת דן יחיד | 3 |
| | 4 |
| בפני שופט: רס"ן אלי בר-און | 5 |
| | 6 |
| נאשמת: פטמה אבראהים מחמוד זאיד ת.ז. 904738630 / שב"ס | 7 |
| -------------------------------------------------------- | 8 |
| | 9 |
| **ג ז ר - ד י ן** | 10 |
| | 11 |

הנאשמת הורשעה בכך שבסוף שנת 2001 שכרה משרד ביחד עם חברותיה עבור פעיל
בכיר בחמאס בשם פלאח נדא, על מנת שזה יקיים את פגישותיו הסודיות במשרד זה.
במהלך שנת 2002 העבירה הנאשמת אשגרים מנדא למספר אנשים אחרים. בקיץ של
אותה השנה הלינו הנאשמת וחברותיה את נדא במעונות הסטודנטיות באוניברסיטת
אבו דיס. בתקופה זו היה נדא מחופש לאישה והנאשמת וחברתה סיפקו לו בגדי
אישה. בחודש מרץ 2002 העבירה הנאשמת וחברתה קלטת וידאו בה מצולם המתאבד
פואד חוראני לידי משפחתו של המתאבד. הקלטת נמסרה לנאשמת ע"י נדא. החל
מחודש נובמבר 2002 ועד ליום מעצרה הלינו הנאשמת וחברתה את נדא בדירה
שכורה בה התגוררו בכפר עקב. בסוף שנת 2002 תמללה הנאשמת 2 קלטות אודיו
עבור נדא. בקלטות הללו הוקלט אדם שהודה בשיתוף פעולה עם השב"כ הישראלי.
באותה התקופה אף הפקידה הנאשמת כסף שמסר לה נדא בחשבונו של אדם בשם
אימן עטאיא.

הצדדים הציגו בפני הסדר טיעון, אשר מקל עם הנאשמת במידה רבה. יחד עם זאת,
החלטתי שלא לחרוג מן ההסדר לנוכח עברה הנקי של הנאשמת והודאתה באשמה
בהזדמנות הראשונה.

אשר על כן, החלטתי לכבד את הסדר הטיעון ולגזור על הנאשמת את העונשים
הבאים:

1.  26 חודשי מאסר לריצוי בפועל, שמניינם מיום מעצרה של הנאשמת, 21.01.03.

2.  24 חודשי מאסר על תנאי, והתנאי הוא שבמשך 5 שנים מיום שחרורה לא
תעבור הנאשמת עבירה כלשהי לפי תקנה 85 לתקנות ההגנה (שעת חירום),
1945, או סעיף 57 לצו בדבר הוראות ביטחון, תשי"ל-1970 או ניסיון לעבור
אחת מעבירות אלו.

3.  קנס כספי בסך 4,000 ש"ח או 8 חודשי מאסר תמורתו. הקנס ישולם עד למועד
שחרורה של הנאשמת מן המאסר.

ניתן היום, 24/07/03, בפומבי ובמעמד הצדדים.

זכות ערעור תוך 30 יום מהיום.

שופט

# Exhibit 11

# Expert Report
# of Evan F. Kohlmann

## Linde, et al. v. Arab Bank, and all related cases

**Evan F. Kohlmann**
**www.flashpoint-intel.com - evan@flashpoint-intel.com**

**I. Professional Background and Qualifications**......................................................Page 3

**II: Research and Archival Methodology**.............................................................Page 5

**III: Applying Research Methodology to Plaintiffs' Case**....................................Page 6

**IV. Summary of Conclusions**……………………………………………..Page 8

**V: The Role of the Internet for the Islamic Resistance Movement (Hamas)**......Page 9

**VI: The Web Footprint of the Islamic Resistance Movement (Hamas)**.............Page 10

**VII: The Culpability of Hamas and its Operational Sub-Branches in Executing Terrorist Attacks Identified by Plaintiffs**............................................................Page 29

**VIII: Conclusions**...................................................................................................Page 55

## I.) Professional Background and Qualifications

My full name is Evan Francois Kohlmann. I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I currently work as an investigator with the Nine Eleven Finding Answers (NEFA) Foundation and as an on-air analyst for NBC News in the United States. I also run an Internet website Globalterroralert.com that provides information to the general public relating to international terrorism. I am author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford International Press, London, 2004), which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites. I have testified on eleven occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, and Bosnia-Herzegovina. I have testified twice as an expert witness in U.S. civil cases, Gates v. Syrian Arab Republic and Amduso v. Sudan before the U.S. District Court for the District of Columbia, and have provided deposition testimony in Strauss, et al. v. Credit Lyonnais. I have additionally testified as an approved expert witness in United States federal and military courts in sixteen criminal cases:

- United States v. Sabri Benkhala (Eastern District of Virginia, 2004)
- United States v. Ali Timimi (Eastern District of Virginia, 2005)
- United States v. Uzair Paracha (Southern District of New York, 2005)
- United States v. Ali Asad Chandia (Eastern District of Virginia, 2006)
- United States v. Yassin Aref (Northern District of New York, 2006.
- United States v. Sabri Benkhala (Eastern District of Virginia, 2007)
- United States v. Rafiq Sabir (Southern District of New York, 2007)
- United States v. Emaddedine Muntasser (District of Massachusetts, 2007)
- United States v. Hassan Abu Jihaad (District of Connecticut, 2008)
- United States v. Mohammed Amawi et al. (Northern District of Ohio, 2008)
- United States v. Salim Hamdan (Guantanamo Bay Military Commissions, 2008)
- United States v. Ali Hamza al-Bahlul (Guantanamo Bay Military Commissions, 2008)

- United States v. Mohamed Shnewer et al. (District of New Jersey, 2008)
- United States v. Oussama Kassir (Southern District of New York, 2009)
- United States v. Syed Haris Ahmed (Northern District of Georgia, 2009)
- United States v. Pete Seda et al. (District of Oregon, 2010)

In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a *Daubert* hearing on my qualifications as an expert witness and issued a ruling, concluding:

> "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and… Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

Likewise, in United States v. Hassan Abu Jihaad, Federal District Judge Mark Kravitz held a *Daubert* hearing on my qualifications as an expert witness and issued a ruling, concluding:

> "Mr. Kohlmann is certainly qualified to provide expert testimony… Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism… Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda… and the other subjects on which he will offer testimony.  Indeed… it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects… Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded."

Similarly, in United States v. Syed Haris Ahmed, Federal District Judge William S. Duffey Jr. held a *Daubert* hearing on my qualifications as an expert witness, and noted in his published ruling:

> "Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed.  His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors... A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT."

I am being compensated by Plaintiffs in these cases according to an hourly billable rate of US$400.  I confirm that I have no previous professional or personal connection or relationship with any of the parties or witnesses in this case that would preclude my giving impartial evidence.

4

## II.)    Research and Archival Methodology

The methodology employed in formulating this report is derived from techniques taught to me by the late Dr. Joseph Lepgold, a senior faculty member from the Department of Government of the Edmund A. Walsh School of Foreign Service (SFS) at Georgetown University, as part of official coursework towards the completion of my Georgetown University Senior Honors Thesis, "The Legacy of the Arab-Afghans: A Case Study."   Sources of research in the field of terrorism and terrorist organizations can loosely be divided into three sub-categories: primary sources, secondary sources, and tertiary sources.  Primary sources are generally considered to be the most credible and most authentic sources of information for objective analysis.  Examples of primary sources would include a face-to-face interview with the leader of a terrorist organization, an in-person visit to a training camp, or directly witnessing a terrorist attack.  However, because international terrorist organizations are, by their very nature, secretive organizations which operate clandestinely, access to primary sources is rare and inconsistent.  As such, frequently, terrorism analysts must instead turn to secondary sources in order to gain a deeper understanding of these groups.  Examples of secondary sources would include an original video or audio recording of a terrorist leader, published written communiqués, or an official magazine/website created by a terrorist organization. Secondary sources can occasionally be self-authenticating (i.e. a high-resolution video of an unmasked individual speaking) or can require deductive reasoning in order to determine their authenticity.  Beyond primary and secondary sources, there is one further category of research: tertiary sources.  Examples of tertiary sources would include a newspaper article, a television news report, or a book or magazine published by a reputable third party.  However, because the information offered in tertiary sources often comes through a convoluted or unclear chain of custody, I limit my own use of tertiary sources to add additional context to information already confirmed by primary or secondary sources.

In order to determine the provenance of particular secondary or tertiary sources, I engage in a traditional social science method known as "comparative analysis."  This requires me to compare and contrast particular sources in question with other analogous sources contained in my digital archive, searching for common threads and themes.  By drawing from a wide assortment of primary and secondary sources, I establish a single, objective narrative—while simultaneously noting any significant factual discrepancies or conflicting data.  During a May 2009 *Daubert* hearing before Judge William S. Duffey Jr. in the Northern District of Georgia, I explained the process of "comparative analysis" and how I rely upon it when making determinations of fact.  This testimony was subsequently summarized by Judge Duffey in his own published ruling qualifying me as an expert:

> "The basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information, through websites, primary interviews, books, news articles, and journals, and other information.  His testimony essentially synthesizes these concepts, and through the use of the comparative analysis methodology, Kohlmann has developed an understanding of terrorist organization structures, operations, and membership… Kohlmann testified in detail regarding the methodology of comparative analysis, how it is relied upon by experts in social sciences, and how the particular information he gathers

allows him to perform reliable analysis.  He specifically testified to how he gathers and analyzes information from primary, secondary, and tertiary sources, and he explained the difference between the sources and why and how he relies on each differently.  He further explained how comparative analysis is performed, assimilating the relevant information and comparing and contrasting sources against one another to form a cohesive whole.  The sources Kohlmann uses and the methodology he employs to analyze those sources, are identical to those used by other experts in his field.  Kohlmann explained his methodology and how he used the methodology to arrive at his opinions in this case.  The defendants did not offer any evidence at the hearing or subsequent to it to suggest that Kohlmann's methodology is not sound or is not the same methodology typically relied upon by other social scientists…  Mr. Kohlmann's ability to synthesize that information through comparative analysis establishes his qualification as an expert."

## III.)  Applying Research Methodology to Plaintiffs' Case

In October 2010, Plaintiffs' counsel requested that I provide an expert opinion on the use of the Internet and other media by the Islamic Resistance Movement (Hamas, a/k/a "the Martyr Ezzadeen al-Qassam Brigades")[1] in order to disseminate propaganda, claim responsibility for various terrorist attacks, and/or glorify deceased or imprisoned members of its organization.  I have specifically been requested to:

- Identify key websites which, in my expert opinion, are directly controlled by Hamas, set forth their provenance, and summarize their agenda and purpose.
- Describe how Hamas and its co-conspirators use the Internet and other media, including specific websites and Internet discussion forums, to facilitate Hamas' terrorist operations.
- Explain and opine upon the meaning and significance of certain texts, websites, videos, audio files and other media used by Hamas (including Hamas-controlled or related persons, organizations, or entities).
- Offer an expert opinion regarding whether Hamas has claimed responsibility through its websites and other media for the following specific terrorist attacks from 2001-2004 (the "Attacks"), and—if so—to provide an expert opinion on the reliability and credibility of those claims[2]:

  o  March 28, 2001 – Gas Station Bombing near Kfar Saba

---

[1] As used in this report, "Hamas" refers to Harakat al-Muqawama al-Islamiya, a Palestinian Islamist movement that is an outgrowth of the Palestinian branch of the Egypt-based Muslim Brotherhood. The United States designated Hamas a Specially Designated Terrorist (SDT) in 1995, a Foreign Terrorist Organization (FTO) in 1997 and a Specially Designated Global Terrorist (SDGT) in 2001.  The official name of the military wing of Hamas, spelled herein as "the Ezzedeen al-Qassam Brigades", can also be transliterated from Arabic into English in a variety of other spellings, including "the Izzadeen al-Qassam Brigades" and "the Izz al-Din al-Qassam Brigades."

[2] As used in this Report, references to a Hamas claim being "reliable" and "credible" are not intended to express a legal opinion regarding Hamas's sole or shared responsibility for an attack, nor are they intended to suggest that the specific types of Hamas claims of attribution I address in this Report are dispositive of Hamas's responsibility for any attack.  Instead, references to "reliability" and "credibility" signals my view that the evidence I have considered and am relying upon from  Hamas' online websites indicates that it is more likely than not that Hamas played at least some culpable role for each attack.

- June 1, 2001 – Dophinarium Suicide Bombing in Tel Aviv
- August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
- December 1, 2001 – Ben Yehuda Bombings in Jerusalem
- December 12, 2001 – Shooting attack on Bus in Emmanuel
- March 7, 2002 – Atzmona Shooting attack
- March 9, 2002 – Café Moment Suicide Bombing
- March 27, 2002 – Park Hotel Bombing, Netanya.
- May 7, 2002 – Sheffield Club Bombing, Rishon Letzion.
- June 18, 2002 – Jerusalem Bus #32 Bombing
- July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem.
- September 19, 2002 – Tel Aviv Bus #4 Bombing
- January 29, 2003 – Shooting Attack on Route 60
- March 5, 2003 – Haifa Bus #37 Bombing
- March 7, 2003 – Shooting in Kiryat Arba
- April 30, 2003 – Mike's Place Bombing, Tel Aviv
- May 18, 2003 – Jerusalem Bus #6 Bombing
- June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem.
- June 20, 2003 – Shooting Attack on Route 60.
- August 19, 2003 – Jerusalem Bus #2 Bombing.
- September 9, 2003 – Bombing at Café Hillel in Jerusalem
- October 22, 2003 – Tel Romeida Shooting Attack
- January 29, 2004 – Jerusalem Bus # 19 Bombing
- September 24, 2004 – Mortar Strike in Neve Dekalim.

In order to apply my research and analytical methodology to Plaintiffs' cases, I have reviewed my own stored archive of Hamas websites and relevant propaganda materials (accessed from 2001 until the present). Both on a manual basis and simultaneously using automated web spidering software known as "WinHTTrack," I have gradually compiled an open source historical record of now-defunct Hamas-related websites and e-mail lists. Those materials stored on my own information server have been supplemented by other available online archives of those same websites and materials (primarily hosted by the Internet Archive, www.archive.org). To provide further context, I have also thoroughly examined the current iteration of the official Hamas Internet website, Alqassam.ps, and its accompanying web discussion forum Almoltaqa.ps. On a logistical level, in order to address any issues concerning original documents written in the Arabic language, I have been directly assisted in reviewing these documents and formulating the subsequent report by my researcher, a graduate student and native of Jordan who is fluent in modern standard Arabic and has worked in the past as an Arabic-English language tutor.

After identifying the array of official websites used by Hamas over time, I have systematically reviewed copies of communiqués (or "bayans") stored in their online archives, comparing the style, language, and content of those statements to official assessments from the Ministry of Foreign Affairs of the State of Israel, and to other documents published by Hamas—such as the infamous al-Qassam "Glory Record"—video-recorded "martyrdom" wills, photographs, and biographical information about the

alleged perpetrators of attacks.  This review was conducted both to determine whether Hamas had ever issued legitimate claims of credit for particular terrorist attacks, and equally, whether Hamas had specifically denied involvement in other terrorist attacks.  It is a reasonable assumption that the more occasions Hamas claims responsibility for an individual operation, and the more specific detail Hamas can provide about the planning and execution of that operation, the more likely it is that its claims are legitimate.

## IV.)   Summary of Conclusions

Based upon the information, research, and analysis presented in this report, I have reached several key conclusions:

- Since at least 2001, the Palestinian Hamas organization—a designated Foreign Terrorist Organization (FTO) otherwise known as the "Islamic Resistance Movement" and "the Ezzedeen al-Qassam Brigades"—has maintained a regular presence on the Internet through the use of fixed websites, online newsletters, and virtual discussion forums.  The most notable of these entities are the Palestine-info.net website, the Alqassam.ps website (also formerly known as Qassamiyoon.com, Kataeb-ezzeldeen.net, Ezzedeen.net, etc.), and the Almoltaqa.ps social networking forum.  Hamas has employed these venues to disseminate its propaganda, to conduct public interviews with senior Hamas officials, to facilitate communication and coordination among Hamas supporters, and to assist in illicit terrorist financing schemes.  Hamas's web presence is one of its most vital material resources, serving as a massive "force multiplier" for its membership.

- Since 2001, Hamas, together with persons or entities controlled by, or related to Hamas, has utilized certain texts, websites and other media (many of which will be discussed and analyzed *infra*) for the purpose of advertising its involvement and responsibility in various violent "operations," including attacks that are alleged to have injured the Plaintiffs in these actions. In my expert opinion, these texts, websites and media can be attributed to Hamas and have particular significance to Hamas on both a symbolic and operational level, including their use in connection with acknowledging Hamas's involvement and/or contribution to particular violent acts.

- Using the above-mentioned means (namely websites, newsletters, and forums), Hamas has distributed authentic claims of responsibility—accompanied by other evidence in the form of high-resolution photographs, original video recordings, and the personal accounts of eyewitnesses—which demonstrate its culpability in the execution of particular terrorist attacks identified by Plaintiffs that have occurred between 2001 and 2004.  Those attacks include (but are not limited to) the:

  o  March 28, 2001 – Gas Station Bombing near Kfar Saba
  o  June 1, 2001 – Dophinarium Suicide Bombing in Tel Aviv

8

- August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
- December 1, 2001 – Ben Yehuda Bombings in Jerusalem
- December 12, 2001 – Shooting attack on Bus in Emmanuel
- March 7, 2002 – Atzmona Shooting attack
- March 9, 2002 – Café Moment Suicide Bombing
- March 27, 2002 – Park Hotel Bombing, Netanya.
- May 7, 2002 – Sheffield Club Bombing, Rishon Letzion.
- June 18, 2002 – Jerusalem Bus #32 Bombing
- July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem.
- September 19, 2002 – Tel Aviv Bus #4 Bombing
- January 29, 2003 – Shooting Attack on Route 60
- March 5, 2003 – Haifa Bus #37 Bombing
- March 7, 2003 – Shooting in Kiryat Arba
- April 30, 2003 – Mike's Place Bombing, Tel Aviv
- May 18, 2003 – Jerusalem Bus #6 Bombing
- June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem.
- June 20, 2003 – Shooting Attack on Route 60.
- August 19, 2003 – Jerusalem Bus #2 Bombing.
- September 9, 2003 – Bombing at Café Hillel in Jerusalem
- October 22, 2003 – Tel Romeida Shooting Attack
- January 29, 2004 – Jerusalem Bus # 19 Bombing
- September 24, 2004 – Mortar Strike in Neve Dekalim.

With regard to the above-mentioned means (namely websites, newsletters, and forums), neither Hamas nor any of its sub-branches (such as the Ezzedeen al-Qassam Brigades) has ever issued any rejection or credible denial of its culpability in executing the aforementioned series of twenty-four terrorist attacks that occurred between 2001 and 2004.

## V.)   The Role of the Internet for the Islamic Resistance Movement (Hamas)

Prior to the emergence of the Internet and the modern digital frontier, international terrorist organizations such as Hamas faced serious obstacles in matters of communication, coordination, and media access.  A fixed television channel or radio station is an easy target for an organized military force, as the Israeli government has proven with its repeated strikes on the Hezbollah broadcast company known as "Al-Manar" in Lebanon.  Years of effort and hard-earned financing channeled to build the physical infrastructure necessary to support traditional media and communications methods can be obliterated in an instant by a single laser-guided missile dropped from an enemy aircraft.  Even inviting mainstream media to do their own independent interviews and reporting can present some serious risks.  On various occasions, journalists have been secretly employed as spies (or assassins, as in the case of the late Afghan warlord Ahmad Shah Massoud), and terrorist groups like Hamas have little control over the message of the media once journalists leave the conflict zone.  Propaganda videos that take Hamas

9

months to film, edit, and create are boiled down into 30-second cable news segments that present an incomplete picture of what the organization is attempting to achieve.

As such, the advent of the Internet has caused a revolutionary democratization of media, especially among Foreign Terrorist Organizations with limited fixed resources like Hamas. The leaders of Hamas can now speak directly to a broad, globalized audience without worrying about imminent security dangers or the filtering effect of Al-Arabiya, Al-Jazeera, and Western news agencies. Potential recruits and would-be donors can be solicited far from the narrow confines of mosques and Islamic universities in the West Bank and Gaza Strip. Hamas can re-shape its own public image, and present raw information about its ongoing endeavors. It can even use social networking forums in order to facilitate communication between and among Hamas members operating within the borders of Gaza—allowing them to instantly pool their intelligence, resources, and experience. Charging forward on the frontline of information technology, Hamas has also experimented with other innovative strategies such as themed video games and online children's literature in order to expand the potential reach of its recruitment drives.

Thus, to ask what role the Internet plays in the operations of Hamas is perhaps the wrong question. Much like other urbanized populations at large, the Internet and the World Wide Web have pervaded every aspect of the lives of Hamas members, whether on a personal or political level. The Internet has become an integral communications tool and a critical low-cost force multiplier for Hamas. The sudden absence of that tool would be catastrophic, and perhaps the best testament to that fact is how quickly Hamas has resurrected its primary website following various attacks over time by hackers and law enforcement agencies. It is no longer simply a curiosity or a sideshow—rather, the Internet has now evolved into serving as the primary mouthpiece to the world for Hamas.

## VI.) The Web Footprint of the Islamic Resistance Movement (Hamas)

The Islamic Resistance Movement ("Hamas") is divided into several operational sub-branches and wings, each of which maintains its own unique presence on the Internet.

### • The Hamas Political Wing (www.palestine-info.net, et. al)

Like other analogous terrorist groups, Hamas has both a political and military wing. Though there are frequent cross-overs in terms of their leadership and activities, the general purpose of the Hamas political wing is to spread the ideological doctrine of Hamas, to recruit new activists and members, to negotiate relationships with foreign governments and other outside parties, and to help solicit material resources needed to finance the military operations of Hamas. On December 1, 1997, Hamas supporters based in Beirut, Lebanon established a new organization on the Internet, the Palestinian Information Center (PIC). The website of the group—alternatively located at Palestine-info.net, Palestine-info.com, Palestine-info.org, Palestine-info.info, and elsewhere—was

initially published in Arabic only, but later was complemented with an English-language version starting on January 1, 1998.

Though the PIC has never explicitly acknowledged being affiliated with Hamas, it has been identified as such by senior Hamas officials, the U.S. government, and other Western governments.  In an online interview in May 2003, Hamas senior spokesman Ismail Abu Shanab stated, "on the internet there are many websites and pages that represent Hamas activities.  You can find them on www.palestine-info.info."[3]  Likewise, in March 2004, federal prosecutors in Idaho filed a second superseding criminal indictment against Sami Omar al-Hussayen, alleging that an Internet website under his administration was soliciting donations to Hamas: "Participate with money, and this is [via] The Palestinian Information Center (the official mouthpiece of the Islamic Resistance Movement, HAMAS), which opens the door of donations for all Muslims to assist their brothers in their honorable jihad against the dictatorial Zionist Jewish enemy."[4]  The Open Source Center (OSC)—a U.S. government open-source intelligence service, formerly known as the Foreign Broadcast Information Service (FBIS)—refers to Palestine-info.net in its official database as a "HAMAS-affiliated site."  This affiliation has correspondingly been recognized by European law enforcement authorities.  The 2003 annual "Report of the Office for the Protection of the Constitution" from the German Interior Ministry addressed the website under a section titled "Means of agitation and communication," explaining: "The Palestinian Information Centre (PIC) provides daily reports and news from the Palestinian perspective.  The Palestinian Hamas also posts its communiqués and other articles on this site.  It [Hamas] no longer has its own website and now publishes its material exclusively on the PIC's site."[5]  Finally, it should be noted that, at the time of the writing of this report in June 2009, a Google web search for the phrase "hamas website" turned up www.palestine-info.com in Arabic among its top five results.

The Internet domain name "Palestine-info.net" was first registered with Network Solutions Inc. in November 1998 on behalf of the Palestinian Information Center in Beirut by U.S. resident Ziyad Helmi Khaleel.[6]  While living in the United States, Khaleel was a public activist for the Hamas front group Islamic Association for Palestine (IAP) and an associate of Ahmed Abu Marzouq, nephew of the Deputy Chief of the Hamas Political Bureau, Musa Abu Marzouq.  Shortly thereafter, in December 1999, Ziyad Khaleel was arrested by authorities in Jordan as an alleged "procurement agent" for Al-Qaida leader Usama Bin Laden.[7]  Khaleel was later identified in documents exhibited

---

[3] "Interview with Ismail Abu Shanab, Senior Spokesman and Policymaker of the Islamic Resistance Movement (Hamas) on "The Roadmap and the Palestinians' Right of Return."  IslamOnline.  May 28, 2003.  http://www.islamonline.net/livedialogue/english/Browse.asp?hGuestID=BH3h8q.

[4] Second Superseding Indictment.  United States v. Sami Omar al-Hussayen.  No. 03-040 (D. Idaho, 2004).  Page 9.

[5] "Means of agitation and communication."  German Federal Ministry of the Interior.  Annual Report of the Office for Protection of the Constitution: 2003.  Page 224.

[6] Internic domain records.  (http://www.networksolutions.com/cgi-bin/whois/whois/)

[7] Lorch, Donatella and Daniel Klaidman.  "The Plot Thickens."  Newsweek.  February 7, 2000.

during <u>United States v. Usama Bin Laden et al</u>. as having purchased a satellite telephone and accessories for Bin Laden's personal use in Afghanistan.[8]

Visitors to the Palestinian Information Center Internet homepage were immediately offered access to a number of sub-sections, one of which is labeled "Hamas."  The "Hamas" sub-section offered a number of options—including access to profiles and photos of senior Hamas leaders, copies of official Hamas communiqués (in English and Arabic), Hamas propaganda posters, and the Hamas "Glory Record."[9]  The infamous "Glory Record" serves as an annual tally of operations undertaken by the Hamas military wing (the Ezzadeen al-Qassam Brigades).  It includes such entries as the following:



- "Al-Affouleh Operation: It was the first operation in a series of revenge operations for the Al-ibraheemy Holy Shrine massacre on 6 April 1994.  The militant Ra'ed Abdallah Zakarneh, a member of Al Qassam Brigades, drove a booby-trapped vehicle with an Israeli registration plate into Al:affouleh bus station at 12:25 p.m. and detonated it.  Nine Israelis were killed and more than 150 were injured.  A statement revealed that the car was carrying 57 kilograms of explosives."[10]

- "Dezenkov Street Operation: In an immediate reaction to the previous operation, the militant Saleh Abdelraheem Sawy bombed an Israeli bus at Dezenkof Street in downtown Tel Aviv on 19 October 1994. The explosion was rather violent, leaving 22 Israelis dead, 47 injured and seriously damaging many shops. Israelis were confused and shocked by this operation, causing Yitzhak Rabin to shorten his visit to London."[11]

http://www.palestine-info.org/photo/resistance_photo/images_respho/1a.gif

**Sample Image from the Palestine Information Center (PIC)**

---

[8] <u>United States v. Usama Bin Laden et al</u>. (SDNY, 2001).  Trial Transcript, Pages 3028-3038, 3478-3480, 3482, and 3485.

[9] http://web.archive.org/web/19990202113708/http://www.palestine-info.org/hamas/index-h.html and http://web.archive.org/web/19990826043235/http://www.palestine-info.net/hamas/.  As of July 2009, the PIC website appears to have since quietly removed much of its once-flourishing Hamas content.

[10] http://web.archive.org/web/20000109170449/http://www.palestine-info.net/hamas/glory/index.htm. January 2000.

[11] http://web.archive.org/web/20000109170449/http://www.palestine-info.net/hamas/glory/index.htm. January 2000.

The Palestine-info.net website contained substantial information on senior Hamas leaders, including numerous photographs and extensive personal biographies available in both Arabic and English.  In fact, the website dedicated more than one sub-section to profiling Hamas leaders and extolling their resumes.[12]   The following individuals are some of those identified by the Palestinian Information Center website as senior Hamas leaders, along with relevant information from their personal profiles posted on Palestine-info.net:

- Shaykh Ahmed Yassin[13]
  - The late Shaykh Ahmed Yassin heads the list of Hamas leaders and is credited by Palestine-info.net as a "Founder of Hamas."  The website also acknowledges that Yassin was convicted by an Israeli military court in 1991 of involvement in various crimes, "including inciting others to kidnap and murder Zionist soldiers and the establishment of Hamas and its military and security apparatus."

- Khalid Meshaal[14]
  - Syria-based Hamas leader Khalid Meshaal is referred to by Palestine-info.net as the "President" of "the Hamas Political Bureau."  The website also describes him as "one of the founders of the Islamic Resistance Movement (Hamas)," a "Member of [the] Hamas Political Bureau since it was established", and "Chairman of the Bureau" since 1996.

- Musa Abu Marzouq[15]
  - Syria-based Hamas leader Musa Abu Marzouq is identified by Palestine-info.net as a "member of [the] Hamas Political Bureau" who was "elected as Chairman of [the] Hamas Political Bureau in 1991."  The website also acknowledges that Marzouq was "arrested by the U.S. authorities at New York's JFK International Airport" in 1995 based upon evidence that Abu Marzouq was responsible for "issuing commands and transferring money to the military wing of Hamas."

  - The website further notes, "An American federal court ordered to extradite him to the Zionist occupation authorities.  In January 1997, Dr. Abu

---

[12] See: http://web.archive.org/web/19981205033122/http://www.palestine-info.org/hamas/romooz.html, http://web.archive.org/web/20040619112356/http://www.palestine-info.com/arabic/hamas/leaders/leaders.htm, and
http://web.archive.org/web/20000818174847/http://www.palestine-info.net/hamas/leaders/index.htm.
[13] See: http://web.archive.org/web/20001030024835/http://www.palestine-info.org/hamas/leaders/yaseen.htm and http://web.archive.org/web/20040814181502/http://www.palestine-info.com/arabic/hamas/leaders/yaseen.htm.
[14] See: http://web.archive.org/web/19981203071355/http://www.palestine-info.org/hamas/leaders/mashal.html and
http://web.archive.org/web/20040626095003/http://www.palestine-info.com/arabic/hamas/leaders/khalid.htm.
[15] See: http://web.archive.org/web/19981201042041/http://www.palestine-info.org/hamas/leaders/mosa.html and http://web.archive.org/web/20040626095413/http://www.palestine-info.com/arabic/hamas/leaders/abomarzouq.htm.

Marzook decided not to appeal the extradition order against him after having spent 18 months in a solitary confinement cell at a New York federal jail." The Palestine-info.net website includes several photos of Musa Abu Marzouq being held prisoner in the United States while awaiting extradition.

- Ibrahim Ghousheh[16]
  - According to the Palestine-info.net website, Ibrahim Ghousheh is a "Hamas Spokesman" and has served in this role since 1992. The site also indicates that Ghousheh is a "Member of [the] Hamas Political Bureau." Ghousheh, normally based in Jordan, was deported by the Jordanian government for eighteen months in 1999 for his ties to Hamas.

- Abdelaziz al-Rantisi[17]
  - According to the Palestine-info.net website, the late Abdelaziz al-Rantisi is identified as the "Hamas Spokesman in Gaza" who was one of those responsible for "found[ing] the Islamic Resistance Movement, Hamas, in 1987." Al-Rantisi was killed in a targeted Israeli military airstrike on April 17, 2004.

- Mohammed Nazzal[18]
  - Amman-based activist Mohammed Nazzal was one of the founders of the Hamas political office in Jordan. According to the Palestine-info.net website, Nazzal has served as the "Hamas Representative in Jordan" since 1992 and is a "Member of Hamas Political Bureau." In August 1999, the Jordanian government temporarily closed the Hamas office in Amman and issued an arrest warrant (later rescinded) for Nazzal.

- Jamal Mansour[19]
  - According to the Palestine-info.net website, the late Jamal Mansour was "a Hamas leader in the West Bank", "a Hamas spokesman in the West Bank," and a "Spokesman of Hamas delegation to the dialogue with the Palestinian Authority." In 1992, Israel deported Mansour along with more

---

[16] See: http://web.archive.org/web/20001214155000/http://www.palestine-info.org/hamas/leaders/ghoshe.html and
http://web.archive.org/web/20040814181530/http://www.palestine-info.com/arabic/hamas/leaders/ghosheh.htm.
[17] See: http://web.archive.org/web/19981203144807/http://www.palestine-info.org/hamas/leaders/ranteesi.html and
http://web.archive.org/web/20040517064728/http://www.palestine-info.com/arabic/hamas/leaders/rantisi.htm.
[18] See: http://web.archive.org/web/20001207082600/http://palestine-info.org/hamas/leaders/nazzal.html and http://web.archive.org/web/20040626100049/http://www.palestine-info.com/arabic/hamas/leaders/nazzal.htm.
[19] See: http://web.archive.org/web/19981203100225/http://www.palestine-info.org/hamas/leaders/jamalmans.html and
http://web.archive.org/web/20040626095818/http://www.palestine-info.com/arabic/hamas/leaders/jamal.htm.

14

than 400 other Palestinian extremists to refugee camps in southern Lebanon.  Mansour's violent opposition to the Oslo peace accords led to his imprisonment in a Palestinian Authority-run jail for at least two years and more than five years in Israeli jails in total.  Mansour was eventually killed in a targeted Israeli military airstrike in July 2001 for his role in militant activities.

- Imad al-Alamy[20]
  - According to the Palestine-info.net website, Imad al-Alamy is a "Member of Hamas Political Bureau."  After being deported from the Gaza Strip in 1991 and moving his base of operations to Damascus, Syria, al-Alamy has served as a critical link between Hamas, its various state sponsors, and other Islamic militant organizations active in the region.

- Salah Shehadeh[21]
  - According to the Palestine-info.net website, Salah Shehadeh was a "Founder of Hamas' military apparatus."  Shehadeh was killed in a targeted Israeli military airstrike in July 2002 for his role in terrorist activities.  At the time of his death, Shehadeh was the supreme commander of the Hamas military wing, the Ezzedeen al-Qassam Brigades.

- Ismail Haniya[22]
  - Based in the Gaza Strip, Ismail Haniya is the Prime Minister of the Hamas government in Gaza and is a senior political leader of Hamas.  Haniya's recent Hamas speeches and biography are cited on Palestine-info.com.

- Shaykh Khaled al-Haj[23]
  - Operating in the West Bank, Khaled al-Haj has allegedly served as a senior Hamas leader and coordinator between Hamas and other terrorist organizations in and around the town of Jenin.  As a result of his militant activities, Al-Haj has spent nearly three years in Palestinian Authority prisons and additional time as a prisoner in Israeli jails.  According to Palestine-info.net, al-Haj is listed as a "spokesman for the Islamic Resistance Movement, Hamas, in the Jenin district."

---

[20] See: http://web.archive.org/web/20001207034900/http://palestine-info.org/hamas/leaders/emadalmy.html and http://web.archive.org/web/20040626095643/http://www.palestine-info.com/arabic/hamas/leaders/alalami.htm.
[21] See: http://web.archive.org/web/19981202120441/http://www.palestine-info.org/hamas/leaders/salah.html and http://web.archive.org/web/20040814181418/http://www.palestine-info.com/arabic/hamas/leaders/salah.htm.
[22] http://web.archive.org/web/20060213060854/http://www.palestine-info.net/arabic/hamas/leaders/2005/haneya.htm.
[23] See: http://web.archive.org/web/20041102211459/http://www.palestine-info.net/arabic/hamas/leaders/khaled_Haj.htm and http://web.archive.org/web/20040626095847/http://www.palestine-info.com/arabic/hamas/leaders/khalidalhag.htm.

- Rifat Nasif[24]
    - Rifat Nasif is a top Hamas political leader in the town of Tulkarem. He has served jail terms in both Israeli and Palestinian Authority-run prisons for his role in militant activities. According to Palestine-info.net, Nasif "joined the ranks of the Islamic Resistance Movement, Hamas, at the beginning in 1987, and since then has been one of the most prominent Hamas leaders in the city of Tulkarem."

- Osama Hamdan
    - Osama Hamdan is the senior representative of Hamas based in Lebanon and is a member of the movement's politburo.[25] In August 2003, the U.S. Treasury Department blacklisted Osama Hamdan as a "Specially Designated Global Terrorist" (SDGT) due to his leadership position in Hamas. According to an accompanying fact sheet distributed by the U.S. government:

        > "Hamdan, a senior HAMAS official based in Lebanon, maintains contact with representatives with other terrorist organizations with the purpose of strengthening the ties between these organizations in order to strengthen an international Islamic Jihad. He has worked with other HAMAS and Hizballah leaders on initiatives to develop and activate the military network inside the Palestinian territories in support of the current intifada, including the movement of weapons, explosives and personnel to the West Bank and Gaza for HAMAS fighters. Funds transferred from charitable donations to HAMAS for distribution to the families of Palestinian 'martyrs' have been transferred to the bank account of Hamdan and used to support HAMAS military operations in Israel."[26]

    - In June 2003, Palestine-info.net published an "exclusive interview" with Hamdan, which it described as "the Hamas representative in Lebanon."[27] In response to questions about the relationship between Hamas and other Palestinian political movements, Hamdan explained, "internal dialogue between the factions continues in various forms, and it is of a bilateral nature. Speaking for Hamas, we still consider dialogue as a means of understanding among the Palestinian people." Hamdan also addressed rumors that Western efforts to block financial support for Hamas in the Palestinian territories was "having an impact on the practice": "we know that our enemies have gone through major efforts to besiege the forces of resistance, we do our best to overcome them."

---

[24] http://web.archive.org/web/20041102211347/http://www.palestine-info.net/arabic/hamas/leaders/rafat1.htm.

[25] "Hamdan says progress made on talks due to compromise; Hamas urges coexistence under Palestinian rule." Al-Arabiya. May 20, 2009.

[26] "U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities." U.S. Treasury Department Press Release JS-672; Office of Public Affairs. August 22, 2003.

[27] http://web.archive.org/web/20040624124455/http://www.palestine-info.com/arabic/hamas/hewar/hamdan.htm.

o In 2004, Palestine-info.net published the complete transcript of an online public interview on Paltalk chat forums "with the mujahid brother Osama Hamdan, the representative of the Islamic Resistance Movement (Hamas) in Lebanon."[28]   During the course of the open question-and-answer session, Hamdan was asked about the "Hamas accounts that were closed by the U.S. government."  He responded, "Everyone knows that it is not the leaders of Hamas who hold accounts in the United States of America. This is part of a cheap U.S. attempt to blackmail Arab governments and to force the whole world to besiege the Hamas movement, as well as to put pressure on the ministers of European countries to put Hamas on the EU terrorist list of European—and this cause for a moment of pause by our people and our nation."[29]

o In 2005, Palestine-info.net published "an interview with the representative of the Islamic Resistance Movement (Hamas) in Lebanon Osama Hamdan."  Hamdan waved off suggestions by his interviewer that the Lebanese government was showing increasing hostility to Palestinian refugees: "We in Hamas believe that what is required at this stage is to build understanding between the Palestinians and the Lebanese."[30]

o The Palestinian Information Center (PIC) has prominently posted an appeal on its website for donations from supporters:[31]

> "A call for contributions… to support the Al-Aqsa Intifada and the struggle of Palestinian people; to uncover the Zionist massacres against the unarmed Palestinian people; to highlight the dangers posed by the Zionists to our Arab and Islamic nation; in support of the Al-Aqsa Intifada; and to support the mujahideen and the examples of heroism and the heroic resistance; to show the truth that some are trying to cover up or have ignored or distorted.  The Palestinian Information Center, the voice of Palestine to the world… To contribute in honor of the cause of jihad, to support serious and objective Palestinian media, contribute to the Palestinian Information Center online."[32]

The announcement explains that PIC "accepts donations and financial transfers" in a U.S. dollar account (#3-810-622473-0330) at a branch of Arab Bank in Beirut, Lebanon.  It further emphasizes, "please kindly put the account number only, without writing the name of the Centre or any other names." [33]

---

[28] http://web.archive.org/web/20040624125721/http://www.palestine-info.com/arabic/hamas/hewar/hamdan_1.htm.

[29] http://web.archive.org/web/20040624125721/http://www.palestine-info.com/arabic/hamas/hewar/hamdan_1.htm.

[30] http://www.palestine-info.info/arabic/hamas/hewar/2005/7amdan05.htm.  December 2010.

[31] http://www.palestine-info.info/arabic/donation.htm.  January 2011.

[32] http://www.palestine-info.info/arabic/donation.htm

[33] http://www.palestine-info.info/arabic/donation.htm.  January 2011.

o Plaintiffs' counsel have provided me with what appear to be printouts of internal bank records from Arab Bank relating to account (#3-810-622473-0330). The records include copies of an identity card for the registered account holder, "Osama Hamdan Abdel latif Hamdan." Other records show financial transfers sent to several specified beneficiaries at this Arab Bank account, including "Palestinian Information Center", "Osama Hamdan", "Intifada", and "Harakat Al Muqawamah Al Islamiyah HAMAS."[34]



Banner image from Palestine-info.net promoting the cause of Hamas leaders facing expulsion from Jordan

In addition to these individual profiles and biographies, the Palestine-info.net website run by the Palestinian Information Center also regularly carried general news updates, both in Arabic and in English, concerning the recent activities (and legal predicaments) of senior Hamas leaders. For example, in 1999, when the Jordanian government arrested and eventually expelled a number of locally-based Hamas leaders (including Khalid Meshaal, Ibrahim Ghousheh, Ezzat Risheq, and Sami Khater), an entire new Arabic-language sub-section was created at www.palestine-info.net/jordanissue inorder to identify the Hamas leaders affected by the arrests and expulsions, address the underlying issues, and appeal for support from others.[35] Individual Hamas leaders were also identified in official Hamas statements (published in Arabic and in English) on the Palestine-info.net website.[36]

- **The Ezzadeen al-Qassam Brigades**

The "Ezzadeen al-Qassam Brigades" (in Arabic, "Kataeb Ezzedeen al-Qassam") is the military wing of the Hamas movement. According to the April 2003 edition of the U.S. State Department Publication <u>Patterns of Global Terrorism</u>:

"Various HAMAS elements have used both political and violent means, including terrorism, to pursue the goal of establishing an Islamic Palestinian state in place of Israel… HAMAS activists, especially those in the Izz al-Din al-Qassam Brigades, have conducted many attacks—including large-scale suicide bombings—against Israeli civilian and military targets… The group has not targeted US interests—although some US citizens have been killed in HAMAS operations."[37]

---

[34] File: ABPLC 188913-188985.pdf (labeled "Account of Osama Hamdan").

[35] http://web.archive.org/web/20000309021136/http://palestine-info.com/jordanissue/index.html.

[36] For example: http://web.archive.org/web/20001217020600/http://www.palestine-info.net/hamas/communiques/comm_text/1999/24_11_99.htm. November 14, 1999.

[37] Office of the Secretary of State and Office of the Coordinator for Counterterrorism. <u>Patterns of Global Terrorism 2002</u>. U.S. Department of State. Released April 2003. Page 107.

18

○ **Qassamiyoon.com**

In approximately July 2001, the Ezzadeen al-Qassam Brigades established its first Internet website located at the domain http://www.qassamiyoon.com.  The emergence of the Arabic-language website was announced, among other places, on an online discussion forum by the Muslim Brotherhood[38], http://www.ikhwan.net.[39]  In early July, users on the Ikhwan.net forum began posting messages with corresponding links to qassamiyoon.com under the title, "The Kataeb al-Qassam online website will soon appear, God willing."[40]  Once ready for the public, under its main series of sub-sections, the Qassamiyoon.com website listed two initial offerings for first time visitors: "Who Are We?" and "Who Are You?"  Those who selected "Who Are We?" were told, "this is the path – this is the voice of Hamas… the Brothers from the Martyr Ezzadeen al-Qassam Brigades."[41]  With regards to "Who Are You?", the website beseeched:

> "…Are you among those who spend their wealth in the path of Allah?  …Are you among those who sacrifice their lives in the cause of Allah?  …Are you prepared to leave your wife, your parents, your children, and follow the lions on the path of glory and martyrdom?  …Have you decided yet???!!!"[42]

The Qassamiyoon.com website offered another sub-section, labeled "Communiques," which was described as "devoted to the publications of the Martyr Ezzadeen al-Qassam Brigades, which record the glorious history of these steadfast brigades."[43]  Also available for download were lengthy insider biographies of the late Hamas master bomb-maker Yahya Ayyash[44] and a Palestinian Arab-Afghan commander credited with having helped establish Hamas in the late 1980s, Shaykh Abdullah

---

[38] The "Muslim Brotherhood" refers to Jamiat al-Ikhwan al-Muslimeen, a religious and political organization founded by Hassan al-Banna in 1928.  It opposed the movement toward secularism that was occurring in the Muslim world at the time and encouraged a return to Islamic societies predicated on Quranic precepts.

[39] "The Muslim Brotherhood Websites are a group of websites launched by the Muslim Brotherhood of Egypt or any organization around the world claiming to be endorsing the Muslim Brotherhood ideology. These websites are announced by a Muslim Brotherhood entity as an official representative of the organization or one of its branches. They are either run by individuals or groups affiliated with the Muslim Brotherhood… The Muslim Brotherhood began using cyberspace as a new and effective means of communication at a time when most attempts to have a media outlet have failed to find their way into official recognition…  The ikhwan.net website, http://ikhwan.net, was launched on Jan, 21st, 2001. The domain information showed it was registered in the name a person in Al-Rayah street , Jiddah, Kingdom of Saudi Arabia. The ikhwan.net website expanded its network and launched Saraya Al-Ikhwan Al-Muslimeen room on the Middle East domain on the well-known PalTalk program." http://www.ikhwanweb.com/Article.asp?ID=18865&SectionID=0.

[40] http://www.ikhwan.net/archive/showthread.php?t=2648.  July 8, 2001.

[41] http://web.archive.org/web/20011027084734/http://www.qassamiyoon.com/we/index.htm.  December 2001.

[42] http://web.archive.org/web/20011110055154/http://www.qassamiyoon.com/you/index.htm.  November 2001.

[43] http://web.archive.org/web/20011221003349/qassamiyoon.com/byanat/center.htm.  November 2001. (See e.g.: http://web.archive.org/web/20011212023310/qassamiyoon.com/byanat/26-11-2001.htm)

[44] http://web.archive.org/web/20011027195233/http://www.qassamiyoon.com/document/ayash/index.htm. October 2001.

19

Azzam.[45]   Demonstrating the authenticity of its credentials, the Qassamiyoon.com site even carried an "exclusive interview" with Saleh Shehadeh, the chief of the Ezzadeen al-Qassam military wing in Gaza.[46]   During his interview, Shehadeh appealed for website readers to personally render their support to the cause of Hamas:

> "We call upon people to donate their time and money to aid in the smuggling of weapons into Palestine—as here in Palestine, the bullet for a Kalashnikov can cost three dollars and that of an M-16 costs $1.50, perhaps even up to two dollars.  However, with regards to defensive weapons, we have no weapons to counter tanks or jets.  If they ever become available to us, this is a rare occurrence and they fetch unimaginable prices…  So, I tell all the Muslims and Arabs—and I believe in the goodness in them—to be generous with their wealth and weapons, or to facilitate or ease the smuggling of weapons, as we are in the frontline of those who are defending Jerusalem, Al-Aqsa, and the soil of occupied Palestine."[47]

Further material published on the Qassamiyoon.com website contained detailed technical analyses of weapons and tactics used by the Ezzadeen al-Qassam Brigades—information that appeared to come directly from those Brigades.  On November 13, 2001, the site published a report on "remotely-detonated explosive devices… a new tactic that has been developed in the war with the occupation."[48]   A day later, on November 14, Qassamiyoon.com released a second "special report" on "the ingenuity of the mujahideen in developing weaponry to resist the occupation."[49]   According to that report:

> "Over the past few years, the military wing of the Hamas Movement has been able to develop its own weapons and home-grown fighting methods that were previously unattainable, and the mujahideen were able to utilize them during the al-Aqsa Intifada.  The [Hamas] Movement has shown particular advancement in its techniques of preparing and detonating explosive devices.  This is one of the weapons born from the ingenuity of the mujahideen, despite their lack of resources and capabilities, especially by utilizing mobile phones to serve as an electric circuit to detonate the explosive from a distance just by dialing the phone number of the device—in addition to changing the shapes of the devices, which are known as 'smart bombs'…  Sources from the military wing of the Hamas Movement confirm that the engineers of our movement were also able to build hand grenades of unique quality [made] of plastic and iron to make the intensity of explosions more powerful than the Mills and F1-type Grenades.  And that's not all—the mujahideen were also able to develop a launcher for these devices, an idea based on the principle of a teargas launcher, and the scope of the launched device extends at least 150 meters…  It is fair to say that the [Hamas] Movement has been able to setup workshops which have turned into factories for producing light weapons and for the purpose of inventing new weapons suiting its present needs, or to add modifications on weapons

---

[45] http://web.archive.org/web/20011016085158/http://www.qassamiyoon.com/shohadaa/center.htm. October 2001.

[46] http://www.qassamiyoon.com/chat/salah.htm.  October 2001.  See also: http://web.archive.org/web/20020623074026/http://www.qassam.net/chat/salah.htm.

[47] http://www.qassamiyoon.com/chat/salah.htm.  October 2001.  See also: http://web.archive.org/web/20020623074026/http://www.qassam.net/chat/salah.htm.

[48] http://web.archive.org/web/20011212094911/http://qassamiyoon.com/tagrer/index.htm.  November 2001.

[49] http://web.archive.org/web/20011211204612/http://qassamiyoon.com/tagrer/tagrer14_11_01.htm. December 2001.

designed for special missions such as building expanded ammunition clips, and explosive belts."[50]

Underscoring the authenticity of the Qassamiyoon.com website as the online voice for Hamas's al-Qassam Brigades, over the period of its year-long existence, it was frequently cited as such in regional mainstream media and by Palestinian non-governmental organizations.  On December 26, 2001, the <u>Al-Rai</u> newspaper in Amman, Jordan published a list of Internet websites serving as the official mouthpieces for terrorist organizations.  The article identified the official website of the Ezzadeen al-Qassam Brigades as www.qassamiyoon.com.  Likewise, on several instances, the Palestinian Human Rights Monitoring Group (PHRMG) has re-published copies of Arabic-language communiqués from the Ezzadeen al-Qassam Brigades, crediting them to Qassamiyoon.com.[51]

○ **Qassam.org**

In the spring of 2002, the Qassamiyoon.com website suddenly came to a halt for unknown reasons.  Visitors to the site were eventually greeted with a short message in Arabic: "Brothers and sisters ... Dear visitors, we invite you to follow up on our new address, http://www.qassam.org.  You can contact us via email: qassam@qassam.org and webmaster@qassam.org."[52]  Along with the qassam.org web domain, the administrators of the new site also registered a host of other parallel domains—such as qassam.net and qassam.ps—that served as mirror locators to reach the same website.  Every message on the Qassam.org site "welcoming visitors" was signed in Arabic by "the brothers from the Martyr Ezzedeen al-Qassam Brigades, the military wing of the Islamic Resistance Movement, Hamas."[53]  Under its main series of sub-sections, the qassam.org/qassam.net website listed the same two initial offerings for first time visitors as had Qassamiyoon.com: "Who Are We?" and "Who Are You?"  Those who selected "Who Are We?" were told, "this is the path – this is the voice of Hamas… the Brothers from the Martyr Ezzadeen al-Qassam Brigades."[54]

In the same tradition of its Qassamiyoon.com predecessor, the Qassam.org site contained a wide range of original content published by the Ezzadeen al-Qassam Brigades that was either highly unusual or entirely unique.  The website included a main sub-section reserved for the systematic distribution of official Hamas communiqués: "This section is devoted to the publications of the Martyr Izzadeen al-Qassam Brigades, which record the glorious history of these steadfast brigades."[55]  At its zenith, the qassam.net/qassam.org website offered visitors the opportunity to download copies of all Qassam Brigades communiqués issued from March 2001 through the late spring of

---

[50] http://web.archive.org/web/20011211204612/http://qassamiyoon.com/tagrer/tagrer14_11_01.htm. December 2001.

[51] http://www.phrmg.org/PHRMG%20Documents/Suicide%20bombers/kata%27ib%20al-qassam.htm; http://www.phrmg.org/arabic/documents/assassination/Testimonies/mahmoud_abu_hnoud.htm.

[52] http://web.archive.org/web/20020524231122/http://qassamiyoon.com/.  May 2002.

[53] http://web.archive.org/web/20011213134358/http://www.qassam.org/.  December 2001.

[54] http://web.archive.org/web/20020803105011/www.qassam.net/we/index.htm.  August 2002.

[55] http://web.archive.org/web/20020206105419/http://www.qassam.org/byanat/center.htm.  February 2002.

2002.[56]  In May 2002, the Qassam website distributed exclusive "documents from the archives of the Martyr Ezzadeen al-Qassam Brigades in Jenin.  These are identity cards belonging to the well-known [Israeli] soldiers who were killed during the battle in the Jenin refugee camp."[57]   No other website in operation at that time offered anything approximating the quality and range of Hamas-related content available for download on qassam.net and qassam.org.

In April 2002, a new announcement in Arabic was posted on the Qassam website under the "Hamas – Communiqués" sub-section.[58]  According to that document:

> "The great country of terrorism, America…  America has declared that it will provide the Zionist entity with $200 million urgently, from an original sum of $72 billion, to kill more Palestinian, scatter them, and quash their resistance to the occupation.  Meanwhile, the mujahideen in Palestine barely have the money to pay for some bullets and explosives to destroy the Zionist-American project.  The Ezzedeen al-Qassam Brigades give their thanks to everyone who has contributed and who are still contributing supplies in support of the mujahideen in Palestine.  To support the mujahideen in Palestine: contact us on address: support@qassam.org.  An important advertisement to those who would like to donate: to our dear brothers and sisters, we have discovered that several account numbers have been published in the forums, and we—the website of the Ezzedeen al-Qassam Brigades—do not have any knowledge of this, and we declare that they do not have any connection with us… in any way.  Accordingly… whoever would like to donate must directly go through the website and to contact at support@qassam.org.  We ask you to spread this news in all forums."[59]

The Arabic page described above contained a single link to yet another page hosted on the Qassam website.  This second page offered a similarly-themed message in English:

> "The Martyr Ezzadeen el-Qassam Brigades, your own defending brigades, the military wing of Hamas movement in Palestine, is calling upon you to donate with what you can to assist the cause of Jihad and resistance until the occupation is eliminated and every span of the Muslim Palestine is liberated.  While the Martyr Ezzadeen el-Qassam Brigades are calling upon you for donation, we put between your hands some of the difficulties that your mujahideen brothers are facing to get the equipments and logistics.  The price of Kalashnikov bullet is $3 and the price of the Kalashnikov gun itself now is $2,000 and it was $3,500 couple of months ago, and do you know that the the price of R-B-G is $12,000 and the price of T.N.T that's used by your mujahideen brothers is $100 a kilo, also the Martyr Ezzadeen el-Qassam Brigades now manufacture Al-Qassam surface-to-surface missiles in different sizes and also the anti-shields Al-Banna bomber.  The Martyr Ezzadeen el-Qassam Brigades also supervise the development of fighting, defensive and attacking weapons and other much projects mustn't be elaborated for confidentiality purposes.  Martyr Ezzadeen el-Qassam Brigades after getting you

---

[56] http://web.archive.org/web/20020206105419/http://www.qassam.org/byanat/center.htm.  February 2002.
[57] http://www.qassam.org/qassam_story/jeneen/index.htm.  May 2002.  See also:
http://web.archive.org/web/20020619184901/www.qassam.net/qassam_story/jeneen/index.htm.
[58] http://web.archive.org/web/20020425102224/http://www.qassam.org/hamas/bayanat/tabar3.htm.  April 2002.
[59] http://web.archive.org/web/20020425102224/http://www.qassam.org/hamas/bayanat/tabar3.htm.  April 2002.

informed of what Palestine is facing, we call upon all Muslims all over the world to give a hand to their mujahideen brothers in Palestine who sacrifice their bloods and persons for your dignity and guard the front line to defend the Arab and Muslim Ummah…  My Mujahideen brothers all over the world: now you can contribute to building a strong Islamic army.  Thousands and thousands of mujahid youth in Palestine long for carrying any kind of weapons to defend the Ummah's dignity, but no one is giving a hand.  Now you can contribute in providing weapons to the mujahideen whose ammunition run out while facing the Zionists.  Hundreds of men sold the jewelry of their wives and sisters to equip as many fighters as possible to defend your honor and dignity.  My mujahideen brothers ... you'll have no excuse in front of Allah, So contribute with what you can.  The Martyr Ezzadeen el-Qassam Brigades is calling upon the righteous people from the Arab and Muslim Ummah to collect donations in Mosques, and from those who are financially able to donate, then send these donations to the mujahideen in Palestine.  Dear donator brother, send us at the e-mail available at Martyr Ezzadeen el-Qassam Brigades' web site and send us a fake name and the amount that you want to donate and we will secure handing this money to the mujahideen.   You can send any inquiries to (support@qassam.org)."[60]

The decision of the Qassam website to post a copy of its fundraising appeal in English was, no doubt, aimed at broadening the pool of potential donors.  However, it also attracted the attention of mainstream Western journalists and bloggers intent on shutting down the Hamas infrastructure on the Internet.   An article subsequently published in <u>USA Today</u> reported that potential donors who attempted to contact the Qassam website in response were told to wire their funds to "Ahmed Mohammed Ali, Elbatech Bank, account no.: 38926/9/510 Arab Bank -- Gaza branch -- Palestine… Please tell us the field in which you prefer your money to be spent on such as: martyrdom attacks; buying weapons for the mujahadeen; training the youth; or inventing and developing missiles, mortars (and) explosives."  According to <u>USA Today</u>, "the account name and number appear to change every 48 to 72 hours."[61]   Likewise, an American blogger who contacted the Qassam website at the time reported receiving similar instructions: "Dear donor, We assure you that all the money will be given to nobody but to all the Mujahideen in Palestine.  This is the bank account: Name: Ayman ataya Mansoor.  Bank account no.: 38924/2/510 Arab bank- Gaza branch- Palestine."[62]

o **Kataeb-ezzeldeen.com**

During the fall of 2002, the Qassam.net/Qassam.org website began to experience service outages, allegedly due to pressure from U.S. law enforcement agencies and cybervigilantes.  In due course, the site was replaced with a new web domain registered as www.kataeb-ezzeldeen.com.  A note added to the sidebar of the revamped website in October 2002 explained, "the website administrators thank everyone who helped in completing the website with its new look, and those who labor to provide assistance, support, and continuous fruitful work.  They have worked long nights for nothing more

---

[60] http://www.qassam.net/tabaro3.htm.  April 2002.

[61] Kelley, Jack.  "Militants wire Web with links to jihad; Islamic groups using Internet to recruit, solicit money, send terrorism instructions."  <u>USA Today</u>.  July 10, 2002.

[62] http://www.enterstageright.com/archive/articles/0502/0502terrbankacct.htm.

than the grace of Allah…   We also wish to mention the brother from our hosting company who put priceless efforts into keeping the website online for you."[63]   Like its Qassam.org predecessor, the Kataeb-ezzeldeen.com website included sub-sections for sermons by senior Hamas leaders (such as Dr. Abdelaziz al-Rantisi) and a complete database of official Ezzedeen al-Qassam communiqués issued from September 24, 2002 onwards.[64]   Underscoring the official relationship between Kataeb-ezzeldeen.com and Hamas, on November 18, 2002, the website posted a new official communiqué from the Ezzedeen al-Qassam Brigades titled, "Beware of Rogue Publications, and Protect the Unity of our People and our Struggle."[65]   According to that statement, "recently, deceitful forces have attempted to publish false statements and attribute them to our Ezzedeen al-Qassam Brigades… and al-Qassam Brigades would like against this to assure that… the official communiqués which originate from us are published on the Internet website of the al-Qassam Brigades.  Any statements from now on that contradict our policies and are not published on our website are considered illegitimate and inaccurate statements, and we consider this a clear statement of our unchanging position."[66]

Days later, on November 28, 2002, the Kataeb-ezzeldeen.com website posted a new announcement titled, "An Appeal for Contributions from the Martyr Ezzedeen al-Qassam Brigades, the military wing of the Islamic Resistance Movement (Hamas)."[67] Akin to previous appeals posted on the Qassam.org site, the statement called on "you Muslim brothers and Muslim sisters to allocate a part of your money for the mujahideen who are fighting to protect the honor and pride of the Muslim nation.  If you cannot do jihad with us, then the least you can do is to donate from the money Allah trusted you with.  At a time when forces are waging a war against Islam in order to destroy it, we call upon you to support your brothers in Palestine.  For more inquiries contact us at our e-mail address: support@kataeb-ezzeldeen.com."[68]

o **Ezzedeen.net**

In January 2003, the reigning Qassam website hosted at the domain Kataeb-ezzeldeen.com experienced another mysterious fatal meltdown.  Once again, in a matter of only days, the site was resurrected at a new Internet domain, www.ezzedeen.net.  The domain name itself was first registered on January 28, 2003 by "Ahmed Salim" (vip_man999@hotmail.com) with the contact address: "Ezzedeen.net, Gizaa Bomar Cyrcl 59, Cairo, Egypt 41211, 056582895."[69]   A notice in Arabic, posted in the website

---

[63] http://web.archive.org/web/20021017082932/http://www.kataeb-ezzeldeen.com/.  October 2002.

[64] http://web.archive.org/web/20021211191827/http://www.kataeb-ezzeldeen.com/bayanat/index.asp. December 2002.

[65] http://www.kataeb-ezzeldeen.com/bayanat/Bayan.asp?BayanID=158.  December 2002.  See also: http://www.alqassam.ps/arabic/statments.php?id=164.

[66] http://www.kataeb-ezzeldeen.com/bayanat/Bayan.asp?BayanID=158.  December 2002.  See also: http://www.alqassam.ps/arabic/statments.php?id=164.

[67] http://web.archive.org/web/20021201101143/http://www.kataeb-ezzeldeen.com/Ads/Tabar3.asp. November 28, 2002.

[68] http://web.archive.org/web/20021201101143/http://www.kataeb-ezzeldeen.com/Ads/Tabar3.asp. November 28, 2002.

[69] WHOIS search on EZZEDEEN.NET.  March 10, 2004.

sidebar, addressed "our dear brothers, supporters, and frequent visitors to the al-Qassam website":

> "We celebrate with you the news of our return despite the great hardships and tribulations that aimed to shut down this Hamas platform in order to bury the words of truth, power, and freedom.  We vow to Allah never to forgo any effort in order to preserve this shining monument.  It draws the Islamic nation towards jihad, fires up its determination, and pushes it towards victory and power, Allah-willing.  On behalf of your brothers, the administrators of the al-Qassam Website."[70]

Unlike its relatively short-lived predecessor Kataeb-ezzeldeen.com, the Ezzedeen.net website remained active and online from January 2003 until at least May 2004.

As with previous Qassam domains, the Ezzedeen.net website offered users a meticulously-organized library of Hamas propaganda content and even the opportunity to interact directly with Hamas operatives in the field.  On March 25, 2004, the Ezzedeen.net website posted an announcement of the "martyrdom" of Hamas spiritual leader Shaykh Ahmad Yassin "who ascended to the rank of the righteous martyrs after he was bombarded in a Zionist attack shortly after dawn prayers on Monday morning… To participate in the celebration and mourning of the Mujahid Shaykh, please e-mail the following address: news_ezz01@hotmail.com."[71]  As a result of their continuing efforts, the Ezzedeen.net web team received the dubious honor of being recognized by the U.S. Foreign Broadcast Information Service (FBIS)—the open source arm of the Central Intelligence Agency (CIA)—as the official "web site of Izz-al-Din al-Qassam Brigades, HAMAS military wing."[72]

The emergence of the Ezzedeen.net incarnation of the Qassam website also heralded a series of new developments on the site itself—eventually including an English-language section for visitors originating from outside the Arab world.  In fact, the English-language section of the Ezzedeen.net site was prominently labeled, "Copyrights © 2004, Ezzedeen Al-Qassam Brigades Official Website."[73]  According to an "About Us" page on the English section of the website, "we are the grandsons of the former Mujahideen and the Companions of Prophet Mohammed… We carried our weapons to defend the Ummah honour, its bright history, and its holy sites and mosques…  Therefore, the most difficult and painful path was adopted: the path of resisting the well-armed and well-equipped Israeli occupation till we achieve either splendid victory or martyrdom and paradise…  Jihad is our path and martyrdom for the sake of Allah is our best wishes.  We do not mind even if our blood is the price since it is in the cause of Allah, al-Aqsa, Palestine, defending our women, kids and properties."[74]  The English-language version of the Qassam website hosted at Ezzedeen.net also offered visitors content on the topics of "the Hamas Movement", "Jihad & Terrorism", and

---

[70] http://web.archive.org/web/20030204152954/http://www.ezzedeen.net/.  February 2003.

[71] http://web.archive.org/web/20040328112250/ezzedeen.net/.  March 24, 2004.

[72] E.g.: United States Foreign Broadcast Information Service (FBIS) daily update.  August 21, 2003.

[73] http://web.archive.org/web/20040315171106/www.ezzedeen.net/english/aboutus.htm.  March 2004.

[74] http://web.archive.org/web/20040315171106/www.ezzedeen.net/english/aboutus.htm.  March 2004.

"Martyrdom Bombing."[75]   According to the administrators of Ezzedeen.net, "this home page was constructed to renew the energies and to inflame and revive hearts, which were about to be stained with the sickness of loving life and hating death."[76]

Over the length of its existence, the Ezzedeen.net website also saw a dramatic expansion of the online video library available to Hamas supporters.  Broadening their range beyond a scattered handful of low-resolution rocket launches, Ezzedeen.net administrators added their first (exclusive) live recording of a suicide car bomb attack on an Israeli military checkpoint in Gaza by 23-year old Palestinian Tareq Hmeid.[77]   On March 8, 2004, the online video library hosted on the Ezzedeen.net site received yet another new addition: "martyrdom" wills read in English by two British nationals who had executed a suicide bomb attack on April 30, 2003 at "Mike's Place," a waterfront bar in Tel Aviv popular with English-speaking Israelis and Western visitors.[78]   Though one of the bombers failed to detonate, the attack nonetheless killed three people and wounded 55 others.  According to 22-year old Asif Mohamed Hanif's speech in the video, because the "dirty Jews" were eligible for service in Israel's military, they deserved to be murdered: "It's a great honour to kill one of these people… We have problems and we ask Tony Blair and George Bush to help us.  Who is Tony Blair and George Bush?  I wish God either to guide them or for his wrath to come upon these people."  The failed bomber, 27-year old Omar Khan Sharif, laughs at the comments of his British companion and then proceeds to threaten, "We will take revenge and we will get the Jews and the Crusaders out of the land of Islam.  Fellow Muslims, we left Britain to look for martyrdom."[79]   This video is, at least in part, an effort to convince other Muslims from Europe—and particularly the United Kingdom—to travel to conflict zones in the Islamic world and join extremist organizations, with the intention of becoming unlawful combatants and suicide bombers.  At the close of the video of the two British suicide bombers, the official logo of the Ezzedeen al-Qassam Brigades is shown, alongside the URL: "www.ezzedeen.net."[80]

o **Alqassam.com/Alqassam.ps**

The final and current iteration of the Qassam website, alqassam.com (a.k.a. alqassam.net, alqassam.com, alqassam.info, alqassam.ws, qassam.info, qassam.ps) emerged in early June 2004 when the old Ezzedeen.net domain finally was knocked offline by unknown parties.  By particularly registering a .PS (Palestinian Territories) domain, the Ezzedeen al-Qassam Brigades web administrators have established greater insurance against digital hijackings and de-registrations by law enforcement agencies and

---

[75] http://web.archive.org/web/20040315171106/www.ezzedeen.net/english/aboutus.htm.   March 2004.

[76] http://web.archive.org/web/20040315171106/www.ezzedeen.net/english/aboutus.htm.   March 2004.

[77] http://web.archive.org/web/20040511011338/http://www.ezzedeen.net/movies/mpg/tareq.WMV.   April 2004.  See also: http://ezzedeen.net/movies/open.php?cat=1&book=53.

[78] "Bomb Britons appear on Hamas tape."  BBC News.  March 8, 2004.
http://news.bbc.co.uk/2/hi/uk_news/3543269.stm.

[79] http://www.ezzedeen.net/movies/mpg/part2.wmv.   March 2004.  (A copy of this video is attached as an Appendix to this report.)

[80] http://www.ezzedeen.net/movies/mpg/part2.wmv.   March 2004.  (A copy of this video is attached as an Appendix to this report.)

26

cybervigilantes.   Nonetheless, the content of the mirrored "Alqassam" websites are virtually indistinguishable from the former and now defunct Ezzedeen.net domain.  Even the English-language pages created by Ezzedeen.net administrators were simply subtly edited to read instead, "Copyrights © 2004.  Ezzedeen Al-Qassam Brigades Official Website, english@alqassam.ws."[81]   Later, in 2006, the attribution was further appropriately modified to read, "Copyrights © 2006.  Ezzedeen Al-Qassam Brigades Official Website, english@alqassam.ws."  In December of that year, the Alqassam.ws website published an exclusive English-language "interview with one of the Ezzedeen al-Qassam Brigades Field Troops," "Abu al-Mu'tasim"—"a man who is working in the field and on the frontlines."  When asked if he had a message for readers, Abu al-Mu'tasim replied, "First of all, I would like to thank the readers for following up on the Palestinian issue through this web site.  And I hope that each and everyone will be an ambassador for Palestine."[82]

As a result, the current series of Alqassam.ws/.info/.com/.ps domains have been accepted by virtually all parties as, without question, the official Internet frontend of the Ezzedeen al-Qassam Brigades.  In a February 2006 article titled "Hamas Web site says group received Hizbollah money", the Reuters news service described the website Alqassam.ws as "run by the group's armed wing, Izz el-Deen al-Qassam."[83]   Likewise, according to an official report from the Office of the National Coordinator for Counterterrorism (NCTb) in the Netherlands, "the majority of jihadi groups have a presence on the Internet and, of course, they do their very best, in a number of ways, not only to win over souls but also to persuade individuals that they will be ready to participate in the violent jihad.  Thus, the military arm of Hamas has its own site, entitled alqassam.com, aimed at recruitment."[84]   As of the time of the writing of this report, the principle active Hamas web domain is http://www.alqassam.ps, registered on April 11, 2005 to "Ehab Ahmad" in the Gaza Strip.[85]

In April 2009, the Ezzadeen al-Qassam Brigades issued the second edition of its online English-language magazine.  The magazine contained, among other things, a detailed Q&A about the website alqassam.ps:

Q: "Why you decided to have a site?"
A: "As you know, during the last ten years there was a revolution on the internet, we began to notice that international opinion formed by reading news or analyzing texts, etc. the site became an important mean to the propaganda against the Zionist aggression. We want the people in the West to know our cause and to support us…  Our voice didn't reach to the entire world.  Every language in the world takes information from the English sites so the pronounced people became wider.  The number of the people who is using the internet is getting larger and larger…"

---

[81] http://web.archive.org/web/20050718080234/http://www.alqassam.ws/english/aboutus.htm.  July 2005.
[82] http://www.alqassam.ps/english/?action=showinet&inid=1.  June 2009.
[83] Al-Mughrabi, Nidal.  "Hamas Web site says group received Hizbollah money."  Reuters.  February 15, 2006.
[84] "Jihadis and the Internet."  Report issued by the Office National Coordinator for Counterterrorism (NCTb); Ministry of Justice, Netherlands.  January 16, 2007.
[85] WHOIS search on ALQASSAM.PS.  May 2009.

Q: "What is the purpose of your site?"
A: "It is not one purpose; we have many purposes: defending the resistance name from the Zionist media, which described it as 'terrorism'; exposing the Zionist crimes and massacres against the Palestinian civilians; providing researchers with some real facts about the Palestinian resistance; keeping readers in the picture of the ongoing matters in the OPT; make communications with the intellectuals; exposing our suffering in the Zionist jails, torture, and humiliation; and, explaining why we fight the Zionist entity… This Website mainly aims at justifying our resistance against the Zionist occupation forces according to the international laws…"
Q: "Did this site bring you advantages?"
A: "Of course."
Q: "Do you have blocked by the 'Israelis'?"
A: "We succeeded to foil several electronic attacks on our site. They tried but they failed till now. They realize the important of it. So they will keep trying and we will keep defending."
Q: "Last thing; tell me how I can donate."
A: "If you want to donate, send us your details and we will deal with you very well.  You can contact us on: english@alqassam.ps.  For donations: fund@alqassam.ps."[86]

This information is likewise reflected in Arabic on the alqassam.ps website under the "Contact Us" content subsection: "The Brigades of the Martyr Izz el-Deen al-Qassam, the military wing of Islamic Resistance Movement, Hamas, in Palestine—to contact us please e-mail to the following addresses: info@alqassam.ps (management of the site and general correspondence), press@alqassam.ps (for media), design@alqassam.ps (for technical contributions), and fund@alqassam.ps (for providing support and donations)."[87]

   o **Almoltaqa.ps**

The second edition of the al-Qassam Brigades' online English magazine released in April 2009 also included a prominent advertisement, urging readers, "for more information, visit our forum: www.almoltaqa.ps."[88]  Almoltaqa.ps is a multi-lingual discussion and social networking web forum which operates using database-driven commercial software known as "VBulletin."  It is hosted by the same Internet provider in Saudi Arabia, Shabakah.net, as the official Ezzadeen al-Qassam website (qassam.ps); in fact, their Internet Protocol addresses are almost sequential.  The IP address of Qassam.ps is 89.144.96.68, while the IP for Almoltaqa.ps is 89.144.96.37.  Both web domains were leased using the same registrar service in Gaza, "mektab."[89]  Likewise, there are prominent hyperlinks to the almoltaqa.ps discussion forum on the Ezzadeen al-Qassam Brigades main site (http://www.alqassam.ps/arabic).  The front page of the Arabic-language section of the almoltaqa.ps forum is clearly labeled with a footnote in Arabic, "Copyright, the Media Office of the Martyr Ezzadeen al-Qassam Brigades."[90]

---

[86] "Ask Us … about the Palestinian cause, you'll have weekly reports." Ezzadeen Al Qassam Brigades Newsletter.  Issue: April 2007.  http://www.alqassam.ps.
[87] http://www.alqassam.ps/arabic/contact_us.php.  May 2009.
[88] "Ask Us … about the Palestinian cause, you'll have weekly reports." Ezzadeen Al Qassam Brigades Newsletter.  Issue: April 2007.  http://www.alqassam.ps.
[89] WHOIS and DNS searches on Qassam.ps and Almoltaqa.ps.
[90] http://www.almoltaqa.ps.  June 2009.

Conversely, the front page of the English-language section of the almoltaqa.ps forum is labeled with a footnote in English, "Copyright 2000-2009, Jelsoft Enterprises Ltd.  The Media Office of the Izzadeen al-Qassam Brigades."[91]  Users who attempt to register as forum participants in the English-subsection of almoltaqa.ps are asked to first review a series of guidelines and rules for the forum.  According to the first rule in that list, "this is the official forum of the Al-Qassam Brigades; however, the opinions expressed here are entirely personal and do not necessarily express the views of the Brigades of Hamas."[92]

## VII.)  The Culpability of Hamas and its Operational Sub-Branches in Executing Terrorist Attacks Identified by Plaintiffs

- **March 28, 2001 – Gas Station Bombing near Kfar Saba**



On March 28, 2001, a suicide bomber detonated himself at the Mifgash Hashalom gas station, east of Kfar Saba, killing two bystanders.  On April 12, 2001, the Ezzedeen al-Qassam Brigades published an Arabic-language statement claiming responsibility for a series of ten suicide operations, including the March 28 attack near Kfar Saba—a document which has been posted, among other places, on Hamas's alqassam.ps website.  The communiqué identified the bomber as 23-year old Fadi Attallah Yusif Omar (pictured at right), and a photo of Omar was likewise later added to the Alqassam.ps website.[93]

The statement released by the Ezzedeen al-Qassam Brigades directly addressed the unexpected delay in claiming credit for the blast: "at the time, we refrained from mentioning the name of our courageous martyr, the third in the chain of ten martyrs who have delivered good news to the media, for security reasons imposed on us by the nature of the battle in our blessed land.  We have vowed to Allah and to you to avenge the death of our martyr Fadi and the other martyrs before him… and we have shown Sharon and his miserable council of swine that our operations and the actions of our mujahideen will shake their beds until they leave our country defeated and humbled."[94]  A copy of the identical Arabic-language communiqué was also posted on the Hamas website Palestine-info.net.[95]

Alongside the Hamas communiqué and a photo of the bomber, the Alqassam.ps website has also printed a detailed personal biography of Fadi Omar and a summary of his relationship with Hamas.[96]  According to that document, in the wake of his martyrdom, Hamas organized "a symbolic event mourning [him].  People gathered in front of the residence of the family of the martyr Fadi Omar, the comrade from the Ezzedeen al-Qassam Brigades, and the house was draped in green banners.  Also on them

---

[91] http://www.almoltaqa.ps/english.  June 2009.

[92] http://almoltaqa.ps/english/register.php.  June 2009.

[93] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.  June 2009.

[94] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=101.  June 2009.

[95] http://web.archive.org/web/20040810063327/www.palestine-info.info/arabic/hamas/glory/bayant.htm

[96] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=101.  June 2009.

were banners for the Islamic Resistance Movement Hamas, which declared that Hamas mourned its fallen comrade Fadi."  In a public ceremony, the director of the Hamas Political Bureau, Khaled Meshaal, cited the importance of the Kfar Saba bombing: "I send my greetings to our people in Qalqiliya for this Martyr Fadi, whose name carries the highest meanings of courage and sacrifice."[97]

- **June 1, 2001 – Dolphinarium Suicide Bombing in Tel Aviv**



On the evening of June 1, 2001, a suicide bomber detonated himself in a crowd of teenagers standing outside a discotheque on the Tel Aviv seafront promenade, killing 21 and wounding 120 others.[98]  According to the Israeli Ministry of Foreign Affairs, "the explosive charge contained a large number of metal objects—including balls and screws—designed to increase the extent of injuries."[99]  Three days later , on June 4, 2001, the Ezzedeen al-Qassam Brigades published an Arabic-language statement claiming responsibility for the attack in Tel Aviv, a copy of which was later posted on the Alqassam.ps website operated by Hamas.[100]  The statement–which identified the bomber as 20-year old Saeed Hassan Hussein Ali Hotari—described how he had "approached the target calm and composed at 11:30PM, according to the plan, and executed his martyrdom operation deep in the heart of the enemies… This operation was carried out using a high-explosive substance, 'Qassam-19', that has been independently developed by the engineers of the Ezzedeen al-Qassam Brigades."[101]  The Hamas website Alqassam.ps also offers a complete biography of Saeed Hotari, and a matching slideshow of four original photographs of Hotari—including one image of him brandishing an AK-47.[102]

According to his Hamas biography published on Al-Qassam.ps, "the martyr" Hotari was born in Jordan in 1979 and had moved to the northern West Bank town of Qalqilya in 1999 to work as an electrician.[103]  The document further boasted that Hotari's attack "claimed the lives of more than twenty Zionists, and wounded more than one hundred and fifty others—the bloodiest single attack witnessed by the Zionist entity in more than five years by their own admission, bringing back to mind the ability of our

---

[97] http://www.alqassam.ps/a9rabic/sohdaa5.php?sub_action=sera&id=101.  June 2009.

[98] "Tel-Aviv suicide bombing at the Dolphin disco: June 1, 2001."
http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2001/6/Tel-Aviv%20suicide%20bombing%20at%20the%20Dolphin%20disco%20-%201-.

[99] "Tel-Aviv suicide bombing at the Dolphin disco: June 1, 2001."
http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2001/6/Tel-Aviv%20suicide%20bombing%20at%20the%20Dolphin%20disco%20-%201-.

[100] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=128.  May 2010.

[101] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=128.  May 2010.

[102] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=128.  May 2010.

[103] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=128.  May 2010.

people to respond and strike back."[104]  The biography also offered what it described as the martyrdom will of Saeed Hotari, which defiantly promotes suicide operations: "If preparing [for jihad] is considered terrorism, then we are all terrorists, and if defending our honor is considered extremism, then we are all extremists… I will make from my body shrapnel and bombs that will chase the sons of the Zionists and burn their remnants."  Hotari continued on in his will, urging his father to distribute candy in order to celebrate his anticipated "martyrdom."[105]

- **August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem**



In the early afternoon of August 9, 2001, a suicide bomber entered a Sbarro pizzeria at the corner of King George Street and Jaffa Road in downtown Jerusalem, and detonated a guitar case packed with 5-10kg of explosives—killing 15 and wounding at least 130 others.[106]  On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the Sbarro restaurant attack, a copy of which was later posted on the Alqassam.ps website operated by Hamas.  According to that statement, "By the grace of Allah and his support, on the afternoon of Thursday August 9, 2001, this mujahid from al-Qassam executed the martyrdom operation in the middle of the Sbarro Restaurant in the heart of occupied Jerusalem, causing a large number of dead and wounded among the ranks of the Zionists, and this was revenge for the bloodshed of our women, children, and the elderly—and in defense of Jerusalem and Palestine, as a tribute to the souls of our righteous martyrs."[107]  The communiqué further threatened that the Sbarro attack would only be the beginning of "a chain of attacks by al-Qassam that will teach the Jews a lesson they will never forget, as a punishment for their cowardly actions in assassinating mujahideen and members of the Palestinian resistance."[108]

In addition to the Hamas statement itself, the Alqassam.ps website also offered a detailed personal biography of the bomber behind the Sbarro explosion, 22-year old Ezzedeen Shuhail Ahmad al-Masri (pictured above).  According to that biography, Ezzedeen's "jihadi journey" began when he "joined the Martyr Ezzedeen al-Qassam Brigades under the command of the al-Qassam Engineer Qais Adwan Abu Jabal, and began working in total secrecy… The Brigades had begun preparations for a revenge operation… and the martyrs began preparing to rise up to the paradise virgins—and Ezzedeen al-Masri was amongst them."[109]  Alongside the biography, the Hamas website Alqassam.ps also published a high-resolution photo spread showing Ezzedeen al-Masri dressed in what appears to be a suicide bomb vest and carrying an assault rifle, wearing

---

[104] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=128.  May 2010.

[105] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=128.  May 2010.

[106] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2000/10/Suicide%20bombing%20at%20the%20Sbarro%20pizzeria%20in%20Jerusale

[107] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=250.  June 2009.

[108] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=250.  June 2009.

[109] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=250.  June 2009.

the green headband of Hamas and with a similarly-themed Hamas banner hanging on the wall behind him (as depicted in the images below).[110]



- **December 1, 2001 – Ben Yehuda Bombings in Jerusalem**

Late on the evening of Saturday, December 1, 2001, a pair of suicide bombers entered a pedestrian mall on Ben Yehuda Street in central Jerusalem and detonated explosive devices that killed 11 young bystanders and wounded over 188 others. The suicide attack was followed by a nearby car bombing approximately 20 minutes afterwards.[111]  On the same day, an Arabic-language statement was published by the Ezzedeen al-Qassam claiming responsibility for the twin suicide bombings on Ben Yehuda Street. Matching copies of that communiqué, titled "The Blood of Our Martyrs' is Not Water," were distributed online through both the Palestine-info.net and the Alqassam.ps websites.[112]  The document identified the two bombers as Usama Muhammed Eid Bahr and Nabeel Mahmud Jameel Halabiyyah and explained that the two men had "carried out… a courageous, painful attack against one of the enemy's dens in

---

[110] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=250.   June 2009.
[111] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2001/12/Suicide%20bombing%20at%20the%20 Ben-Yehuda%20pedestrian%20mall
[112] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.

occupied west Jerusalem, and this was revenge for the blood of our martyrs."[113]   In the communiqué, Hamas threatened further suicide attacks aimed at "punishing the reckless officials from our enemy's military and government ministries."[114]

Aside from the statement itself regarding the Ben Yehuda bombings, the Alqassam.ps website also offered visitors a series of high-resolution photographs of Usama Bahr and Nabeel Halabiyyah (as seen below) and biographies of the two men issued as part of an "Al-Qassam Special Report."[115]  This "special report" likewise noted that "on the website of the Hamas movement, the al-Qassam Brigades declared their responsibility for the Jerusalem operation" executed by Bahr and Halabiyyah.[116]



Images of Usama Muhammed Eid Bahr and Nabeel Mahmud Jameel Halabiyyah, the Hamas suicide bombers responsible for the December 2001 Ben Yehuda bombings.

- **December 12, 2001 – Shooting attack on Bus in Emmanuel**

On December 12, 2001, three assailants launched a multi-pronged assault on Dan Bus No. 189 transporting Israeli civilians to the West Bank settlement of Emmanuel.  The attack, which involved the use of improvised explosive devices, hand grenades, and automatic weapons fire, killed 10 and wounded at least 30 others.  According to the Israeli Ministry of Foreign Affairs:

"About a kilometer north of the settlement, three terrorists who were lying in wait on a hillside overlooking the road exploded two bombs that had been planted earlier, causing a great deal of damage. Some of the passengers were killed instantly.  The bus continued driving for another few hundred meters, at which point passengers began trying to escape.  At that point, one of the terrorists came down from the hill and began throwing hand grenades and shooting at the fleeing passengers.  The other two terrorists also shot

---

[113] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.
[114] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=115.  June 2009.
[115] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=115.  June 2009.
[116] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=115.  June 2009.

at the passengers, from the hillside. More people were wounded or killed by this shooting, including some of the occupants of three private cars that were traveling near the bus.  The terrorists also shot at the rescuers who were trying to evacuate the wounded."[117]



One of the three assailants, 21-year old Hamas "field commander" Asem Yousef (a.k.a. Abu Rehan), was killed during the operation.[118]  A photograph and biography for Yousef have been since been posted on the Hamas website Alqassam.ps.  According to the biography, Yousef had been a follower of Hamas since his youth, and later joined the armed wing, the Ezzadeen al-Qassam Brigades. On November 12, 2001, Israeli authorities raided his family's West Bank house in a search for militants (one of them being his brother Mohammed, a known Ezzadeen al-Qassam operative), killing his brother Mohammed Yousef:

> "He saw in the eyes of his mother an extreme sadness and deep wound after his brother was killed in front of his parents and brothers and no one was able to offer him any assistance… This savageness planted the seeds of dark anger in the lion's heart, and an unrelenting drive.  On December 12, 2001, or a month following the day that his brother was martyred, he chose to transform one of the centers of exploitation [a settlement] to a fire which will burn the Jews… The operation resulted in a large number of dead and wounded and the destruction of the entire bus and a number of other vehicles."[119]

The Hamas biography even boasted how several victims of the initial attack were subsequently "run over by an ambulance when the driver lost control after being struck by the martyr Asem."[120]  It concluded by printing purported excerpts from the "martyrdom" will of Asem Yousef, wherein he triumphantly declared, "victory has drawn near in the final days of this blessed month, which have given me the chance to sacrifice myself wholly in the cause of Allah in order to defend the soil of beloved Palestine and to avenge the death of my dear brother the Mujahid."[121]

It should be noted that the Hamas website Alqassam.ps has also separately published several other documents detailing the involvement of Hamas operatives in the terrorist attack on Bus No. 189.  It offers, among other things, the biography and photo of Asem's brother Mohammed.  The biography of Mohammed Rihan similarly notes, "the Zionist authorities arrested his father and all of his brothers except the martyr Asem, who—exactly one month later on December 12, 2001—carried out revenge in the name of Allah's religion and the blood of his brother and the martyrs of Palestine when he carried out a courageous martyrdom operation that many books, articles, and various other analyses were written about in light of its complexity and impact known as 'Operation Emmanuel.'  During [this operation], Asem and several members of his al-

---

[117] "Terrorist attack on bus at Emmanuel: December 12, 2001." http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2001/12/Terrorist%20attack%20on%20bus%20at%20Emmanuel%20-%2012-Dec-2001.

[118] http://www.alqassam.ps/arabic/sohdaa5.php?id=1168.

[119] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=1168

[120] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=1168

[121] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=1168.

Qassam [Brigades] cell planted explosive devices in the path of a Zionist bus marked as line number 198[sic] destined for the Emmanuel settlement… When the bus stopped [after the impact of the IED] and the settlers rushed to get out, they were met by a volley of bullets showered upon them from an ambush laid by Asem, killing 11 Zionists and wounding about 40 others."[122]   Months later, in June 2002, when Hamas issued a statement claiming responsibility for "planting several explosive devices at the gate" of the Emmanuel settlement targeting a bus full of settlers in a combined ambush, including "spraying the bus with bullets", the communiqué signed by the Ezzadeen al-Qassam Brigades "confirmed that it was the same unit which carried out the attack in Emmanuel last December and in the same location where 11 Zionists were killed and dozens were wounded."[123]

- **March 7, 2002 – Atzmona Shooting attack**



On March 7, 2002, a heavily-armed Palestinian gunman infiltrated a religious high school in the Jewish settlement of Atmona in Gush Katif.  In the bloody, commando-style assault that ensued, five teenaged students were killed and twenty three others were wounded.[124]  According to one survivor, "He got in one of the buildings and started shooting and throwing grenades, and carried on to the study hall where there were a lot of pupils."[125]   On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the rampage in Atzmona, a copy of which was later posted on the Alqassam.ps website operated by Hamas.[126]  According to that statement, "the Brigades of the Martyr Ezzedeen al-Qassam declare their responsibility for the heroic operation which was carried out by one of the members of its youth movements… the courageous martyr Mohammed Fathi Farhat."[127]  A copy of the Ezzedeen al-Qassam communiqué regarding the Atzmona massacre was likewise posted on the Hamas website Palestine-info.net.[128]

An accompanying biography posted on the Hamas website Alqassam.ps described how 19-year old Mohammed Farhat "was the talk of people here in Gaza, and it seems that his action excited its people, the ordinary people, who came out not in the thousands, but in the tens of thousands, for the funeral of the young hero who… infiltrated the Gush Katif settlement… killing five of the Zionists and wounding dozens."[129]  According to the

---

[122] http://www.alqassam.ps/arabic/sohdaa5.php?id=1581.

[123] http://www.alqassam.ps/arabic/statments.php?id=118.

[124] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/3/Palestinian%20Terrorism-%20Photos%20-%20March%202-21-%202002.

[125] http://www.guardian.co.uk/world/2002/mar/09/israel3.

[126] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=205.

[127] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=205.

[128] http://www.palestine-info.com/arabic/hamas/statements/2002/8_3_02.htm.  October 2002.

[129] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.

biography, Farhat's corpse was publicly paraded during his funeral by a Hamas honor guard: "the body of the martyr was wrapped in a green banner emblazoned with the word 'Tawhid' as dozens of armed members from the military wing of Hamas unleashed a hail of bullets… Dozens of green flags were held aloft during the funeral and the sound of bullets did not stop until the body of the martyr was surrounded by masked al-Qassam gunmen firing enthusiastically in the air in his honor."[130]   Reportedly, Farhat's funeral was attended by a group of senior Hamas leaders, including the late Hamas founder Shaykh Ahmed Yassin, Dr. Abdelaziz al-Rantisi, and Ismail Haniyeh.  According to the website Alqassam.ps, attendees at Farhat's funeral were addressed by a Hamas spokesman through a loudspeaker: "This young lion from Hamas stormed this heavily-armed and defended settlement, breaking the myth regarding the invincible [Israeli] army… Yesterday, we vowed that a response to the crimes of the occupation was inevitable.  Today, Hamas has fulfilled that promise."[131]

The official biography published on Alqassam.ps also included a written "martyr" will allegedly written by Farhat, in which he appealed directly "to my father and mother, [I hope] that you are full of patience and persistence, and I can only congratulate you on my expected martyrdom, God willing."[132]   A second matching copy of Farhat's "martyr" will was published on the Hamas website Palestine-info.net.[133]   Both the websites Alqassam.ps and Palestine-info.net offer visitors a litany of multimedia relating to Mohammed Farhat, including various high-resolution still images and even a final three and a half minute video-recorded version of his will (inked with the watermark of the Ezzedeen al-Qassam Brigades).[134]   In the recorded video, Farhat testifies:

> "I am the martyr—Allah-willing—Mohammed Fathi Farhat; son of the Martyr Ezzedeen al-Qassam Brigades, and I ask Allah, raised and glorified, to accept my deed, to unite me with my martyred brothers, and to reward me with the companionship of the messenger—prayer and peace upon him—in the high heavens.  O' Muslims, I will carry out my deed only to satisfy my Lord and for vengeance against the enemies of humanity, the Jews, the blood-suckers who continue to murder my people each morning and evening.  And I will carry out my modest operation in order to avenge my brothers and sisters in Balata and Jenin and Farah and Gaza, and in vengeance against the Sharon-inspired massacres against our people."[135]

**March 9, 2002 – Café Moment Suicide Bombing**

On March 9, 2002, a suicide bomber detonated an explosive just before midnight at a restaurant, "Café Moment", packed with customers in the Rehavia neighborhood of

---

[130] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.

[131] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.

[132] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=205.

[133] http://www.palestine-info.com/arabic/hamas/shuhda/2002/mohamadfarhat/waseyh.htm.

[134] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=video&id=205.  See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=205.  See also:  http://www.palestine-info.info/arabic/palestoday/intifada_photos/photo184/photo184.htm.

[135] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=video&id=205.



Jerusalem.  The deadly explosion killed eleven people and wounded at least 54 others.[136]  On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the bombing at Café Moment, a copy of which was later posted on the Alqassam.ps website operated by Hamas.[137]  The statement identified "the brother mujahid martyr Ismail Fouad al-Horani from the al-Arroub camp" as the culprit responsible for the "heroic operation in the heart of occupied Jerusalem, after passing through all checkpoints.  [This was] the first response in the al-Qassam's series of revenge [attacks] for the slaughter and massacres that have been committed in the past few days, and our mujahid hero has helped to soothe the pain and distress of our people and our nation, and healing their hearts and bringing the smile back to their lips."[138] Matching copies of the Ezzedeen al-Qassam communiqué regarding the Café Moment suicide attack were posted elsewhere on the Alqassam.ps website[139], and likewise on the Hamas website Palestine-info.net.[140]

Under its exclusive profile of al-Horani and his operation, the website Alqassam.ps offers an official "martyr" biography, including further details on the attack on the Jerusalem café:

> "Despite the presence of Zionist security guards at the entrance to Café Moment… the martyr hero Fouad al-Horani managed to enter the cafe and blew himself up amongst a crowd of Zionists inside a cafe known to be frequented by the elite of the Zionist community.  [The attack] killed eleven settlers and wounded more than 90 others, including seven in critical condition.  It is clear that all the dead were soldiers of the Zionist occupation."[141]

During a rally of hard-line Islamic students celebrating the "martyrdom" of al-Horani, an organizer told the crowd that the Café Moment bomber "was not only a credit to the al-Qassam Brigades and Hamas, but furthermore, is the pride of all the forces of national and Islamic liberation movements in light of the silence from other Arab nations and the international community, and their perceived favoritism towards the Zionists in their war against the Palestinians."[142]  Excerpts from the same biography of Ismail Fouad al-Horani were also published separately on the Hamas website Palestine-info.net.[143]  Photographs

---

[136] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/3/Suicide%20bombing%20at%20Cafe%20Moment%20in%20Jerusalem%20-%209-Ma.

[137] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=169.

[138] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=169.

[139] http://www.alqassam.ps/arabic/statments.php?id=84.

[140] http://www.palestine-info.com/arabic/hamas/statements/2002/9_3_02.htm.  December 2002.

[141] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=169.

[142] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=169.

[143] http://www.palestine-info.info/arabic/hamas/shuhda/2002/alhorane/life.htm.  See also: http://www.palestine-info.info/arabic/hamas/shuhda/2002/alhorane/alhorane.htm.

of al-Horani were subsequently posted on the website Alqassam.ps, including an image of him brandishing an automatic weapon under the label, "The Al-Qassam Martyr Fouad Ismail al-Horani."[144]

- **March 27, 2002 – Park Hotel Bombing, Netanya**

On March 27, 2002, a suicide bombing at the Park Hotel in the city of Netanya killed thirty and wounded at least 140 others in the midst of celebrations for the Passover holiday.  On April 14, 2003, an Israeli court sentenced four alleged Hamas members to 29 life terms and an additional 20 years in prison for helping to plan the attack.[145]  On several occasions in the wake of the bombing, the Ezzadeen al-Qassam Brigades have claimed responsibility for it and have provided personal details about the bomber and his mission.  On the same day as the bombing, the website Palestine-info.net published an official English-language communiqué signed by Hamas and watermarked with its logo describing the Park Hotel bombing as a "modest gift" to Ariel Sharon, timed to occur in the midst of a regional summit of Arab leaders in Beirut, Lebanon.  Furthermore, according to that document:

> "…What the Zionist entity and its ally America call 'innocent civilians' are called in our Brigades and our Palestinian people's lexicon settlers and usurpers of our lands. They will only receive death and displacement and if they wish to save their lives they have to pack up and leave before they regret it.  Our operation… is a clear message to our Arab rulers that our Mujahid people have chosen their road and known how to regain lands and rights in full depending on Allah only.  Our people do not accept other than Jihad and resistance as the main path to regain usurped rights… occupation crimes against our people that are struggling for regaining usurped rights will not pass unpunished and we will spread death in lines of the Zionists everywhere in the streets, buses, hotels, restaurants and discos. They will not find a safe place until they leave our lands, cities and villages."[146]

The statement posted on the Palestine-info.net website was confirmed by a second Arabic-language communiqué—titled "The Zionists Will Not Enjoy Security Until Our People Enjoy it in Practice"—posted separately on the Ezzadeen al-Qassam Brigades' website (which can still be found on the present iteration of the al-Qassam website).[147]  That website identified the bomber as 25-year old Tulkarem resident Abdel Baset Mohammed Qassem Odeh, and offered an in-depth biography of Odeh and exclusive photos of him holding an automatic weapon while standing in front of Hamas propaganda posters and wearing a Hamas headband.[148]  A copy of the Arabic-language communiqué is presented in the appendix to this report, along with a selection of photos of Odeh released on the Ezzadeen al-Qassam website.  In the midst of Odeh's printed biography, Hamas took pains to threaten that "the occupation crimes being committed against our

---

[144] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=169.

[145] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/3/ Passover%20suicide%20bombing%20at%20Park%20Hotel%20in%20Netanya.

[146] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/27mar02.htm.  December 2002.

[147] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=99.  June 2009.

[148] http://www.alqassam.ps/arabic/sohdaa5.php?id=99.  June 2009.

mujahid people… will not pass without punishment, and we will have the Zionists taste death in every street, bus, hotel, restaurant, and dance [club], and they won't find for themselves a secure place away from us."[149]




Images of Abdel Baset Odeh, the Hamas suicide bomber responsible for the Park Hotel bombing in Netanya, March 2002

In February 2008, the Media Office of the Ezzadeen al-Qassam Brigades published a special issue of their Arabic-language online magazine to mark the 20th anniversary of the military wing of Hamas.  It summarizes the twenty-year history of the al-Qassam Brigades, and offers data and many statistics regarding Hamas military operations.[150]  One of the operations covered in the magazine issue was the bombing of the Park Hotel.  According to that document:

> "The Martyr Abdel Baset Odeh was able to break through all the Zionist security cordons and reached the Park Hotel in the city of Netanya, exploding his pure body amongst a crowd of settlers, and his operation resulted in the deaths of 25 Zionists and wounding more than 190 others.  Of them, forty are in critical condition and ten of them are comatosed.  Zionist sources have reported that, at the time of the explosion, there were more than 300 settlers in the hall, that the intensity of the explosion caused the ceiling to collapse, and that there were injuries to those outside the hall.  This operation is

---

[149] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=99
[150] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.

considered one of the most devastating martyrdom operations that has tormented the enemy and [they] still talk about it and its aftermath."[151]

- **May 7, 2002 – Sheffield Club Bombing, Rishon Letzion**



Late in the evening of May 7, 2002, a suicide bomber entered an unlicensed casino in Rishon Letzion known as the "Sheffield Club" and detonated "a suitcase of explosives, spiked with shrapnel and nails to cause maximum injury"— killing 15 and wounding 55 others.[152]   More than six years later, the Ezzedeen al-Qassam Brigades issued a communiqué (dated June 7, 2008) claiming credit for a series of past operations, including the attack on the Sheffield Club.[153]   The statement identified the bomber as Nablus-native, Jordanian-resident Mohammed Jameel Nabil Muammar and added, "in claiming responsibility for these heroic operations years after their execution, the al-Qassam Brigades has demonstrated that—despite purported claims for the operations by others—we chose to remain silent until the appropriate time in order to preserve the integrity of the mujahideen, and this is only the tip of the iceberg of our undeclared operations."[154]

An accompanying biography posted on the Hamas website Alqassam.ps explained how the operation had been carried out: "Our martyr, Mohammed Muammar, set off on Tuesday, May 7, 2002 and infiltrated all the Zionist borders and security checkpoints and entered a gambling club carrying an explosives case, and he detonated it inside the place. The operation resulted in 20 dead Zionists and 60 other Zionists were wounded.  The al-Qassam Brigades were secretive in regards to claiming responsibility for the operation when it occurred in May 2002… for special security reasons."[155]

- **June 18, 2002 – Jerusalem Bus #32 Bombing**

On June 18, 2002, during morning rush hour, a suicide bomber boarded Egged Bus No. 32A in the Beit Safafa neighborhood of Jerusalem and detonated a powerful explosive hidden inside a bag packed with metal ball bearings.  The ensuing blast ripped apart the bus, killing 19 people and wounding at least 74 others.[156]   In fact, the bombing of Bus No. 32A was the deadliest terror attack in Jerusalem since February 25, 1996.  A fifteen year-old survivor recalled the horrific immediate aftermath: "I saw a lot of bodies and body parts lying around. There was a lot of mess. For the first few minutes, there was

---

[151] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.

[152] http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2002/2/Rahamim+Kimhi.htm.

[153] http://www.alqassam.ps/arabic/statments.php?id=3921.  June 2009.

[154] http://www.alqassam.ps/arabic/statments.php?id=3921.  June 2009.

[155] http://www.alqassam.ps/arabic/sohdaa5.php?id=1085

[156] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/6/Suicide%20bombing%20at%20Patt%20junction%20in%20Jerusalem%20-%2018.

a lot of shouting, then silence."[157]  The bomber, 22-year old Mohammed Haza al-Ghoul, a graduate student at An-Najah University in the West Bank town of Nablus, was mourned at his family's home in the Al-Faraa refugee camp.  His father, Haza, told journalists, "He's a martyr. We have only to ask our God to be merciful with him."[158]

On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the bombing of Bus No. 32A, a copy of which was later posted on the Alqassam.ps website operated by Hamas.[159]  According to the statement:



"Despite their defensive shield and protecting wall, the Ezzedeen al-Qassam Brigades hero Mohammed Haza al-Ghoul… was able to explode his pure body amongst the malevolent Zionists, killing and wounding dozens of them, reassuring the hearts of the believers and avenging our martyrs in Nablus, Jenin, Tulkarem, Qalqilya, Ramallah, and all our beloved refugee camps and villages.  On the morning of Tuesday, June 18, 2002, the blessed martyr prayed his morning prayer and, while fasting, headed toward the heart of the Zionists in beloved Jerusalem… It was a date with martyrdom, sending a Zionist bus (Bus Number 32) to hell.  We, the Ezzedeen al-Qassam, declare a holy war against the malevolent Zionists as part of a plan devised by the leadership of the al-Qassam Brigades under the slogan, 'the martyrs are coming from everywhere.'  There are dozens of suicide bombers in waiting, one after the other.  We say to the Zionists to start digging your graves, because the number of your victims will be in the hundreds… Jihad and martyrdom operations will continue so long as the occupation lingers over our holy land."[160]

A copy of the Ezzedeen al-Qassam communiqué regarding the Bus No. 32A bombing was likewise posted on the Hamas website Palestine-info.net.[161]

The Alqassam.ps website also offered Mohammed al-Ghoul's biography, in which Hamas representatives explained that al-Ghoul had intended on carrying out a "martyrdom attack" twice before—and he had even prepared two prior "martyrdom wills"—"but conditions did not allow him to complete this task."  In his biography on Alqassam.ps, the bomber praised Allah "who made me among the sons of the benevolent Hamas movement, and especially for making me among the sons of the Martyr Ezzedeen

---

[157] Weizman, Steve.  "Suicide bomber attacks crowded bus in Jerusalem, at least 20 killed."  Associated Press.  June 18, 2002.
[158] Weizman, Steve.  "Suicide bomber attacks crowded bus in Jerusalem, at least 20 killed."  Associated Press.  June 18, 2002.
[159] http://alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=201.
[160] http://alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=201.
[161] http://www.palestine-info.com/arabic/hamas/statements/2002/18_6_02.htm.  October 2002.

al-Qassam Brigades.  How beautiful is it that I should be the retaliation and that my bones shall be fragments who blow up the enemy."[162]  A matching copy of al-Ghoul's final "martyr" will was likewise posted on the Hamas website Palestine-info.net.[163]

The website Alqassam.ps offers numerous other evidentiary materials and references to the complicity of Hamas and its Ezzedeen al-Qassam Brigades in the bombing of Bus No. 32A.  One Arabic-language document titled "The Qassam Brigades By the Numbers" explains, "[this is] a quick overview of the highlights from the jihadi operations by Hamas… We apologize for not being able to cite all of the many operations and assassinations by the movement."  Under an entry labeled "18/6/2002", the document notes, "the al-Qassam martyr Mohammed Haza al-Ghoul from the al-Faraa refugee camp blew himself up inside a Zionist bus in the Pat junction in Jerusalem near the Gilo settlement, which caused the deaths of 19 Zionists and wounded a hundred others."[164]  In another digest posted on the Alqassam.ps website under the sub-section "Private Files", Hamas boasts of how the "Al-Ghoul family planted terror in the hearts of Zionists."[165]  According to the document, "Mohammed [al-Ghoul] was a man of scholarly pursuits, of faith, a man of arms and on the battlefield, and a son of the al-Qassam Brigades."[166]  Numerous original photographs of al-Ghoul have been posted on various Hamas websites, including Palestine-info.net and Alqassam.ps.[167]

- **July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem**

On July 31, 2002, a bomb exploded without warning in the Frank Sinatra cafeteria at the Mt. Scopus campus of Hebrew University in the middle of a crowded lunch, killing nine people and wounding 85 others, fourteen of them seriously.[168]  Shortly thereafter, the Palestine-info.net website published an official English-language communiqué signed by Hamas and watermarked with its logo claiming responsibility for the attack: "Here we surface again from the ruins and debris to plant terror in hearts of the Zionists… [and] teach Sharon and Ben Eliezer the only lesson that they understand.  The Qassam Brigades declare with the grace and strength of Allah full responsibility for the blast in the cafeteria of the Hebrew University's Law Faculty."[169]  The statement further described the bombing as one of:

> "…a series of Qassam destructive retaliatory strikes to the Gaza massacre and liquidation of general commander Sheikh Salah Shehada…  The Qassam Brigades have decided that avenging the assassination of any leader of our Jihad Movement the Islamic Resistance Movement, Hamas, or any commander of our Brigades the Qassam Brigades would be:

---

[162] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=201.

[163] http://www.palestine-info.info/arabic/hamas/shuhda/2002/mohmad_algol/waseyah.htm.  See also: http://www.palestine-info.info/arabic/hamas/shuhda/2002/mohmad_algol/algol.htm.

[164] http://www.alqassam.ps/arabic/special_files/entelaqa/05/main.htm.

[165] http://ns2.alqassam.ps/arabic/special_internal.php?id=78.

[166] http://ns2.alqassam.ps/arabic/special_internal.php?id=78.

[167] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=201.

[168] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2002/7/ Terrorist%20bombing%20at%20Hebrew%20University%20cafeteria.htm.

[169] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/31jul02.htm.  December 2002.

killing 100 Zionist usurpers at least… Terrorist statements by the American administration, topped by criminal Bush, that backed the Zionist enemy would not terrorize people loving and yearning for martyrdom and not caring less about those who describe our legitimate resistance as terrorism."[170]

The English statement posted on the Palestine-info.net website was confirmed by a second Arabic-language communiqué—titled "The Zionists Will Not Enjoy Security Until Our People Enjoy it in Practice"—posted separately on the Ezzadeen al-Qassam Brigades' website (which can still be found on the present iteration of the al-Qassam website).[171] The latter document identified the bomber as Mohammed Odeh, a former painter at the university, who placed the bomb with the assistance of accomplice Wael Qassim, and who later detonated the bomb remotely with a cell phone-activated detonator.[172] According to the communiqué, "It is not a coincidence that this device was used in this particular cafeteria. This was a device built with careful forethought, gathered intelligence, and precise preparation."[173]

- **September 19, 2002 – Tel Aviv Bus #4 Bombing**

On September 19, 2002, a suicide bomber boarded Dan Bus No. 4 in Tel Aviv and detonated an explosive device on Allenby Street. The ensuing blast killed six people and wounded approximately 70 others.[174] On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for the bombing of Bus No. 4, a copy of which was later posted on the Hamas website Ezzedeen.net. According to the initial statement published on Ezzedeen.net: "The Brigades of the Martyr Ezzedeen al-Qassam announce the martyrdom, at 12:55pm sharp this afternoon, Thursday 12 Rajab 1423 AH (corresponding to 9/19/2002) of one of the martyrs from the Brigades of the Martyr Ezzedeen al-Qassam—who we will refrain from identifying by name at this time—in the bombing of Bus No. 4 carrying Zionist occupiers… This operation is the third in number of our long series of retaliation which the al-Qassam Brigades promised to undertake after the assassination last year of its leader Shaykh Saleh Shehadeh."[175]

Nearly six years later, Hamas issued a second, follow-up communiqué regarding the September 2002 bombing of Bus No. 4 in Tel Aviv, which was ultimately posted on the website Alqassam.ps. The statement, dated June 7, 2008, explained:

"We in the al-Qassam Brigades reveal for the first time after more than five years on the identity of two of our courageous fighters, and they [include]… the al-Qassam Martyr Hero Iyad Naim Subhi Radad, executor of the martyrdom operation on Allenby Street in the city of Tel Aviv on September 19, 2002. The martyr boarded the Zionist bus and then

---

[170] http://www.palestine-info.co.uk/hamas/communiques/comm_text/2002/31jul02.htm. December 2002.

[171] http://www.alqassam.ps/arabic/operations2.php?id=23. June 2009.

[172] http://www.alqassam.ps/arabic/operations2.php?id=23. June 2009.

[173] http://www.alqassam.ps/arabic/operations2.php?id=23. June 2009.

[174] http://www.mfa.gov.il/MFA/Terrorism-%20Obstacle%20to%20Peace/Palestinian%20terror%20since%202000/Suicide%20and%20Other%20Bombing%20Attacks%20in%20Israel%20Since.

[175] http://web.archive.org/web/20040226160257/http://ezzedeen.net/Byanat/2002/09-2002/19_09_2002.htm. April 2003.

blew himself up, leaving 6 Zionists dead and more than 60 others wounded. The operation was executed in response to the assassination of the commander Shaykh Saleh Shehadeh… The al-Qassam Brigades have claimed responsibility for [this] heroic operation years after it was carried out to confirm our involvement in it. Despite the fact that we have claimed credit for other operations, we opted for silence [in this case] at the time in order to preserve the safety of our mujahideen—and this is only the tip of the iceberg of the operations we have carried out that we have not claimed credit for. We assure everyone that our cells in the West Bank are still active and ready to hit the occupiers at the time and place deemed most appropriate as a retaliation for his crimes against our people. This is a jihad, victory or martyrdom."[176]

The justification for the long delay in announcing Radad's name is repeated in the bomber's official biography published on the Hamas website Alqassam.ps. According to the document, "the Qassam Brigades have refrained from offering details on the operation… this is because of special security concerns… The al-Qassam Brigades have held back from claiming credit for many operations for security reasons. As for the operations that have not yet been claimed by the Brigades at the moment, they will be announced in due course."[177]

The website Alqassam.ps offers numerous other evidentiary materials and references to the complicity of Hamas and its Ezzedeen al-Qassam Brigades in the bombing of Bus No. 4. One Arabic-language document titled "The Qassam Brigades By the Numbers" explains, "[this is] a quick overview of the highlights from the jihadi operations by Hamas… We apologize for not being able to cite all of the many operations and assassinations by the movement." Under an entry labeled "19/9/2002", the document notes, "five Zionists and 63 others were wounded in an al-Qassam martyrdom operation on a bus in Tel Aviv as part of a series of retaliations to avenge the assassination of the Commander-General of the al-Qassam Brigades, Saleh Shehadeh."[178] A poster of Iyad Radad alongside Muhammad Jamil Nabil Mu'ammar (the Sheffield Club suicide bomber), has also been posted on the website Alqassam.ps.[179]

- **January 29, 2003 – Shooting Attack on Route 60**

On January 29, 2003, unknown assailants fired automatic weapons at an Israeli vehicle traveling on Route 60 near the town of Ofra and the Palestinian city of Jenin, wounding two Israeli civilians.[180] Approximately 10 months later, in December 2003, the Hamas website Palestine-info.net published a new document titled, "The Zionists admit: The arrested Hamas cells in Ramallah stand out in terms of their great expertise, superior planning, conduct, and complete secrecy."[181] The report released on Palestine-info.net detailed the activities of several Hamas terror cells in the area of Ramallah,

---

[176] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=1086. See also: http://www.alqassam.ps/arabic/statments.php?id=3921.

[177] http://www.alqassam.ps/arabic/sohdaa5.php?id=1086. See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=1086.

[178] http://www.alqassam.ps/arabic/special_files/entelaqa/05/main.htm.

[179] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=1086.

[180] http://www.israelemb.org/articles/2003/December/2003122400.htm

[181] http://www.palestine-info.info/arabic/hamas/glory/ramalah.htm. July 2009.

including one cell in particular based in the town of Silwad comprised of approximately five local Palestinian youths all between the ages of 27-28—most of whom were already known as Hamas operatives.   Among the various attacks attributed to the Silwad terror cell by Palestine-info.net was the January 29, 2003, Route 60 attack near Ofra.[182]

Further specifics about the incident near Ofra were revealed in another separate document later posted on the official Ezzedeen al-Qassam Brigades website Alqassam.ps, titled "Special Reports: The Most Complex Cell in the History of the [Zionist] Entity in Ramallah."[183]   The document labeled the January 2003 Route 60 attack as "the Sinjal Junction Operation" and narrated the events that took place in remarkable detail:

> "The mujahideen Muayad Hamad, Yaser Hamad, Farah Hamad, and Khaled al-Najjar - after observing the Sinjal Junction on Route 60, where settlers used to pass by - went to action and waited for the target, a car carrying four settlers.   When the proper target emerged on the horizon, the cell leader gave instructions to the other Mujahidin to get ready to begin their mission.   When the car reached the appropriate landmark, the Mujahidin began firing their weapons relentlessly on the vehicle at a very close range from a distance of no more than a few meters.   This operation resulted in the injury of one settler, shot in the spine and permanently paralyzed, called Dvir Kinarti, and serious injuries to another settler when his arm was shattered from the elbow down and another was injured and he is Jacob Steinmetz."[184]

- **March 5, 2003 – Haifa Bus #37 Bombing**



On March 5, 2003, a suicide bomber detonated an explosive vest aboard Egged Bus #37 in the Carmel neighborhood of Haifa, en route to Haifa University—killing seven passengers and wounding 53 others.[185]   The Ezzedeen al-Qassam Brigades have issued at least two communiqués (both dated March 7, 2003) claiming responsibility for the bombing, which are still available on the Alqassam.ps website.   While the first statement merely references the Haifa bombing amid a series of other Hamas military operations, the second communiqué offers specific details of the attack and the bomber, identified as 20-year old Mahmoud Imran Salim al-Qawasmi (pictured at right), a resident of the Hebron suburbs.[186]   The latter document threatens follow-up terrorist attacks in "Haifa, Jaffa, Jerusalem": "We emphasize that this response is only the first in a series of strikes by the Al-Qassam [Brigades] which will teach the Jews a lesson they won't forget for their crimes against our defenseless people."[187]   The Ezzedeen al-Qassam Brigades have also published a lengthy biography of "the Martyr" al-Qawasmi, which notes, "After the bombing, occupation authorities found parts of

---

[182] http://www.palestine-info.info/arabic/hamas/glory/ramalah.htm.  July 2009.

[183] http://www.alqassam.ps/arabic/special.php?id=2102.  July 2009.

[184] http://www.alqassam.ps/arabic/special.php?id=2102.  July 2009.

[185] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/Suicide%20bombing%20of%20Egged%20b us%20No%2037%20in%20Haifa%20-%205-Ma.

[186] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=bayan&id=274.  July 2009.  <u>See also</u>: http://www.alqassam.ps/arabic/statments.php?id=245.  July 2009.

[187] http://www.alqassam.ps/arabic/statments.php?id=245.  July 2009.

Martyr Mahmoud's ID card and a piece of paper with his handwriting stating that the al-Qassam Brigades, to which he belongs, was responsible for the attack."[188]

- **March 7, 2003 – Shooting in Kiryat Arba**

On March 7, 2003, two assailants disguised as Jewish Yeshiva students infiltrated Kiryat Arba through an electronic checkpoint and broke into an Israeli household during Shabbat dinner, firing their weapons on the family they found inside.  The attack killed two and wounded five others.[189]   On the same day, March 7, 2003, the Ezzedeen al-Qassam Brigades claimed responsibility for "successfully infiltrating the… Kiryat Arba settlement occupying the former territory of Hebron in retaliation for the spilling of the blood of innocents and the defenseless, safe in their homes in Gaza and the West Bank—and in response to the policies of home demolition and arrests carried out by this cowardly and arrogant enemy."[190]   A copy of the Hamas communiqué was later posted, among other places, on the Alqassam.ps website.[191]

- **April 30, 2003 – Mike's Place Bombing, Tel Aviv**

On April 30, 2003, a suicide bomber blew himself up at the entrance to Mike's Place, a British-themed bar near the waterfront in Tel Aviv, killing three civilians and wounding over 50 others.[192]   In an Arabic-language statement released through the Palestine-info.net website, the Ezzedeen al-Qassam Brigades claimed joint responsibility for the attack in cooperation with the Al-Aqsa Martyrs Brigades.[193]   While the communiqué did not name the bomber himself, Hamas reassured its supporters that "this martyr" was indeed part of the al-Qassam Brigades and further details would be provided in the future.[194]    The same Arabic-language statement claiming credit for the "Mike's 

Place" bombing—titled, "Our Weapons Will Not Go Down Until the Occupation Goes Down"—was also released directly through the website of the al-Qassam Brigades, and can still be found on the present iteration of the official al-Qassam website.[195]   The

---

[188] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=274.  July 2009.
[189] http://www.mfa.gov.il/MFA/Government/Communiques/2003/ Senior+Hamas+terrorists+killed+in+Hebron+-+9-Sep-2.htm.
[190] http://www.alqassam.ps/arabic/statments.php?id=246.  July 2009.
[191] http://www.alqassam.ps/arabic/statments.php?id=246.  July 2009.
[192] http://www.mfa.gov.il/MFA/Government/Communiques/2003/Details+of+April+30- +2003+Tel+Aviv+suicide+bombing.htm.
[193] http://www.palestine-info.net/arabic/hamas/statements/2003/30_4_03.htm.  September 2003.
[194] http://www.palestine-info.net/arabic/hamas/statements/2003/30_4_03.htm.  September 2003.
[195] http://www.alqassam.ps/arabic/statments.php?id=266.  June 2009.

communiqué threatened, "our resistance will continue and escalate, and our weapons will continue to target those who have usurped our lands and stolen our wealth… The popular masses today are ready to respond with full force against anyone who tries to stand in the way of the resistance in order to appease their Zionist and American masters."[196]

Almost a year later, on March 8, 2004, the online video library hosted on the Qassam Brigades website Ezzedeen.net was modified to include a new addition: "martyrdom" wills read in English by two British nationals who had executed the suicide April 2003 bomb attack at "Mike's Place."[197]  According to 22-year old Asif Mohamed Hanif, "It's a great honor to kill one of these people… We have problems and we ask Tony Blair and George Bush to help us.  Who is Tony Blair and George Bush?  I wish God either to guide them or for his wrath to come upon these people."  A second failed bomber, 27-year old Omar Khan Sharif, laughs at the comments of his British companion and then proceeds to threaten, "We will take revenge and we will get the Jews and the Crusaders out of the land of Islam.  Fellow Muslims, we left Britain to look for martyrdom."[198]  This video is, at least in part, an effort to convince other Muslims from Europe—and particularly the United Kingdom—to travel to conflict zones in the Islamic world and join extremist organizations, with the intention of becoming unlawful combatants and suicide bombers.  At the end of the video of the two British suicide bombers, the official logo of the Ezzadeen al-Qassam Brigades is shown, alongside the URL: "www.ezzedeen.net."[199]

- **May 18, 2003 – Jerusalem Bus #6 Bombing**

On May 18, 2003, a suicide bomber boarded Egged Bus No. 6 and detonated an explosive device near French Hill in Jerusalem, killing seven and wounding 20 others.[200]  On the same day, the Ezzedeen Al-Qassam Brigades released an official communiqué claiming responsibility for a series of attacks in Jerusalem on May 18 including the bombing of Bus No. 6, copies of which were later posted on the Hamas websites Ezzedeen.net, Palestine-info.net, and Alqassam.ps.[201]  The statement named three Ezzedeen al-Qassam Brigades "martyrs" from the operations of May 18, including 19-year old



[196] http://www.alqassam.ps/arabic/statments.php?id=266.  June 2009.

[197] "Bomb Britons appear on Hamas tape."  <u>BBC News</u>.  March 8, 2004. http://news.bbc.co.uk/2/hi/uk_news/3543269.stm.

[198] http://www.ezzedeen.net/movies/mpg/part2.wmv.  March 2004.

[199] http://www.ezzedeen.net/movies/mpg/part2.wmv.  March 2004.

[200] http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Palestinian+terror+since+2000/Suicide+and+Other+Bombing+Attacks+in+Israel+Since.htm.

[201] http://www.ezzedeen.net/Byanat/2003/05_2003/18_05_2003_1.htm.  August 2003.  <u>See also</u>: http://www.palestine-info.info/arabic/hamas/statements/2003/18_5_03.htm.  July 2003.  <u>See also</u>: http://www.alqassam.ps/arabic/statments.php?id=284.  <u>See also</u>: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=308.

47

Jamal Takruri.

Takruri's precise role in the bombing of Bus No. 6 was further expounded on in his official biography posted on the Hamas website Alqassam.ps.[202]  According to the document, Takruri "waited at a bus stop in the city until the preferred minibus arrived that the martyr had selected.  It was comprised of two floors, and he sat on the first floor in the front of the bus.  According to various accounts of the operation, he blew himself up only a short distance away from where he had boarded the bus… killing seven Zionists and wounding more than twenty others, including four of them seriously.  The Zionist reports on the operation noted that the bus was completely in flames 'and was blown to pieces.'"[203]  The website Alqassam.ps also offers a slideshow of original photographs of Jamal Takruri, including an image of the 19-year old holding an automatic weapon and standing in front of a banner emblazoned with the official logo of Hamas (see above).[204]

- **June 11, 2003 - Jaffa Road Bus 14A Bombing, Jerusalem.**

On June 11, 2003, a suicide bomber detonated himself aboard Egged Bus #14A on Jaffa Road in central Jerusalem, killing seventeen and wounding over 100 others.[205]  Days later, on June 13, the Ezzedeen al-Qassam Brigades published a statement claiming responsibility for the suicide bombing in Jerusalem, which it labeled a revenge mission for the failed assassination of senior Hamas leader Dr. Abdelaziz al-Rantisi.[206]  According to the communiqué, the bomber responsible for "the Jerusalem operation" was 18-year old Abdel Muti Mohammed Saleh Shabaneh, of Hebron.[207]  It also threatened that "the Jerusalem operation is only the beginning of a new series of attacks which will avenge the Zionist effort to grab all of our country."[208]  On the Hamas website Alqassam.ps, the statement claiming credit for the Jaffa Road bombing is accompanied by several high-resolution images of Abdel Muti Shabaneh (as seen below)[209] and a lengthy personal biography.[210]

Though the website did not offer a copy for download, the biography posted on Alqassam.ps described a "recorded video of the martyr reading his will to his people and to the military leaders and politicians."   It further boasted of "claims by enemy intelligence of prior planning for the operation by the Al-Qassam Brigades, especially since the response came so quickly to the attempted assassination of [Abdelaziz] Rantisi.  This was merely to justify the failure of military intelligence… Abdel Muti, a simple

---

[202] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=308.

[203] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=308.

[204] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=308.

[205] http://www.mfa.gov.il/MFA/Terrorism-%20Obstacle%20to%20Peace/Palestinian%20terror%20since%202000/Suicide%20and%20Other%20Bombing%20Attacks%20in%20Israel%20Since

[206] http://www.alqassam.ps/arabic/statments.php?id=295.  June 2009.

[207] http://www.alqassam.ps/arabic/statments.php?id=295.  June 2009.

[208] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=315. .  June 2009.

[209] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=picture&id=315.  June 2009.

[210] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=315.  June 2009.

student who knew little of the streets in the city of Jerusalem successfully infiltrated through all the military cordons, despite the high state of alert."[211]



Images of Abdel Muti Mohammed Saleh Shabaneh, the Hamas suicide bomber responsible for the June 2003 Jaffa Road bus bombing

- **June 20, 2003 – Shooting Attack on Route 60**

On June 20, 2003, another Israeli vehicle was fired upon by unknown assailants while it was traveling on Route 60 near Ofra.  According to the Israeli government, the same Silwad-based Hamas cell involved in the January 29, 2003 "Sinjal Junction Operation" was also implicated in this remarkably similar follow-up attack.[212]  Though Hamas does not appear to have released a separate and distinct communiqué regarding this attack, it has nonetheless expressed a claim of responsibility.  In the "Glory Record" of the Ezzedeen al-Qassam Brigades—a yearbook recording the group's military achievements—Hamas reported carrying out an attack on June 20, 2003 "targeting a car with settlers, resulting in the death of one settler and wounding others."[213]  The Hamas "Glory Record" also appeared to confirm that the Route 60 attack had indeed been

---

[211] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=315.  June 2009.

[212] http://www.israelemb.org/articles/2003/December/2003122400.htm.

[213] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.  July 2009.

carried out by a Silwad-based cell from the Ezzedeen al-Qassam Brigades, corroborating the account of the Israeli government.[214]

- **August 19, 2003 – Bombing of Bus #2, Jerusalem**

On August 19, 2003, a suicide bomber aboard Egged Bus #2 detonated a 5kg explosive device packed with ball bearings in the Shmuel Hanavi neighborhood of Jerusalem, killing 23 and wounding more than 130 others.[215]  The Ezzedeen al-Qassam Brigades website Alqassam.ps later published a copy of a communiqué from the group claiming responsibility for the bombing, and explaining that the attack had been carried out as revenge for the killing of Hamas leaders by the Israeli military despite calls for a cease-fire:



"In memory of the burning of the blessed al-Aqsa Mosque; in response to the Jewish desecration of the Masra of the beloved [Prophet]; to avenge the soul of the courageous martyr Abdullah Abdul-Qader Qawasmeh (Abu Ayman), and the al-Qassam martyrs in Nablus, for the assassination of the Saraya al-Quds commander martyr Mohammed Ayyub Sadr; and, in light of the continuous Sharon-Israeli violations of the announced truce by the Palestinian resistance factions, with the help and grace of Allah, the martyr-cell of Abdullah al-Qawasmeh carried out this modest reaction in the Islamic city of Jerusalem… With divine power, Quranic determination, and Qassami-steadfastness, the Martyr Ezzedeen al-Qassam Brigades present to the paradise virgins of eternity the Martyr and the one who memorized the book of Allah, the mujahid teacher Raed Abdulhamid Mesk (Abu al-Mumin)."[216]

The statement concluded, "we assure everyone that we are still abiding by the announced truce, and every crime committed by the enemy will result in a painful response, so expect nothing from us other than the language of blood and bullets."[217]  The websites Ezzedeen.net and Alqassam.ps both also published a biography and final will of the bomber, identified as 29-year old schoolteacher Raed Mesk (pictured above and below), a series of intimate photos of Mesk, and a propaganda poster for the Ezzedeen al-Qassam

---

[214] http://www.palestine-info.info/arabic/Hamas/glory/ramalah.htm.  July 2009.
[215] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/8/
Suicide%20bombing%20of%20No%202%20Egged%20bus%20in%20Jerusalem%20-%201.
[216] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750.  June 2009.
[217] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=750.  June 2009.

Brigades featuring Mesk.[218]  In a video recording posted online on Alqassam.ps, Mesk addressed the camera and defiantly declared:

> "Allah has graced us to belong to this faith [sic] and to belong to this faithful group of Ezzedeen al-Qassam. We announce it, in the face of the grudging Zionist enemy, that we are coming—we are coming to get you in the heart of your home, in your bed, amongst your children, and we will make the soldiers of the [al-Qassam] Brigades reach you wherever you may be…  This is what we promise and will forever dream about. It is the wish of our lives; it is our pleasure…with the grace of Allah, we will make the ground burn underneath their feet; we will make their lives a fearsome time bomb, just like that cowardly soldier who was mentioned in global media as having boarded a bus, and worried that there was a terrorist, so he disembarked. Then he boarded another bus, and once again convinced himself that a terrorist had boarded, so again he got off… We will reach you, enemies. We will get you, Sharon, wherever you may be."[219]

In February 2008, the Media Office of the Ezzadeen al-Qassam Brigades published a special issue of their Arabic-language online magazine to mark the 20th anniversary of the military wing of Hamas.  It summarizes the twenty-year history of the al-Qassam Brigades, and offers data and many statistics regarding Hamas military operations.[220]  One of the operations covered in the magazine issue was the August 2003 bombing of Bus #2 in Jerusalem.  According to the magazine, "Hafiz Quran Raed Mesk carried out this martyrdom operation in occupied Jerusalem inside of a double-decker bus, killing 23 and wounding 125 others."[221]



- **September 9, 2003 – Bombing at Café Hillel in Jerusalem**

---

[218] http://www.ezzedeen.net/shohada/2003/raed_mesk/raed_mesk.htm.  December 2003.  See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=750.  June 2009.
[219] http://www.alqassam.ps/images/userfiles/image/vedio/wsaya/raed_misk.rmvb.  February 2010.
[220] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.
[221] http://www.alqassam.ps/arabic/upload/qassamion_5.pdf.  June 2009.  Page 20.

On September 9, 2003, a suicide bomber detonated an explosive just before midnight in a restaurant, the Café Hillel, in the German Colony neighborhood in Jerusalem, killing seven bystanders and wounding over 50 others.[222]   The Ezzedeen al-Qassam Brigades have issued at least two communiqués (dated respectively September 9 and September 10, 2003) claiming responsibility for the bombing, which are still available on the Alqassam.ps website.   While the first statement merely references the bombing in brief along with an accompanying attack in Tel Aviv, the second communiqué offers specific details of the attack and the bomber, identified as 22-year old Ramez Fihmi Ezzedeen Abu Sleem.[223]   According to the latter document, the Café Hillel bombing was only "the beginning of our response to the crimes committed by the enemy on our people, especially the assassination of Engineer Commander Ismail Abu Shanab, and the attempted assassinations on… Shaykh Ahmed Yassin, Mr. Ismail Haniyeh, and dozens of other leaders and field commanders from the Martyr Ezzedeen al-Qassam Brigades."   It continued, "We affirm to all our resistance cells that, from now on, it is permissible to target Israeli homes and residential buildings… in response to the enemy policy of targeting the homes of our people in Khan Younis, Hebron, and Nablus—which have escalated until the latest incident that occurred today, when they targeted the house of Dr. Mahmud al-Zahar."[224]   The Alqassam.ps website also features a detailed biography of Ramez Abu Sleem, which notes, "Hamas succeeded in carrying out twin simultaneous operations (one at five in the afternoon, and the other at half past eleven in the evening), confirming that all of the Zionist procedures and policies designed to prevent martyrdom operations—a weapon of the Intifada and the primary method of greatest impact—have failed to achieve their objectives."[225]



- **October 22, 2003 - Tel Romeida Shooting Attack**

On October 22, 2003, a single assailant launched a shooting attack on two Israeli nationals at the entrance to the Tel Romeida neighborhood of Hebron, moderately wounding both.   Though Hamas has never released an explicit communiqué or statement claiming responsibility for the Tel Romeida attack, it has nonetheless posted the "martyr" biography of the assailant—23-year old Rafiq Mohammed Ziyad Qanibi—multiple times on multiple iterations of the official Hamas website.[226]   The biography includes an original photograph of Qanibi (shown at right) and describes him as



---

[222] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2003/9/Suicide%20Bombings-%20Tzrifin%20and%20Jerusalem%20-%20Septembe.

[223] http://www.alqassam.ps/arabic/statments.php?id=340.  July 2009.  See also: http://www.alqassam.ps/arabic/statments.php?id=336.  July 2009.

[224] http://www.alqassam.ps/arabic/statments.php?id=340.  July 2009.

[225] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=477.  July 2009.

[226] http://www.palestine-info.info/arabic/Hamas/shuhda/2003/rafeeq/syrah.htm.  July 2009.  See also: http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.

both an "al-Qassam mujahid" and "an al-Qassam martyr."[227]   According to the biography posted online by Hamas, Qanibi was carrying a rifle hidden under his jacket while walking near Tel Romeida.  When he reached "Jewish soil," he began firing on a group of soldiers gathered in the settlement until he was cut down in the cross-fire.[228]   The document also noted that Qanibi's bedroom was decorated with images of other "martyrs" from Hamas' Ezzedeen al-Qassam Brigades and he would often "close the door on himself and spend long hours meditating there."[229]

- **January 29, 2004 – Jerusalem Bus # 19 Bombing**



In the morning hours of January 29, 2004, a suicide bomber wearing an explosive vest detonated himself on Egged Bus #19 at the corner of Gaza and Arlozorov streets in Jerusalem, killing 11 and wounding over 50 others.[230]  The Hamas website Palestine-info.net later published an Arabic-language communiqué claiming credit for the Bus #19 bombing titled "He Who Fails to Protect Himself, Fails to Protect Others" and identifying the bomber as 25-year old Bethlehem resident and former Palestinian policeman Ali Muneer Yusif Jaarah (shown above).[231]   The statement posted on Palestine-info.net repeatedly boasted of the "advanced planning and preparation" carried out by "the martyr Jaarah and his al-Qassam Brigades."[232]

A second Arabic-language communiqué published on the Alqassam.ps website likewise claimed credit for the bombing and indicated that the attack was targeted near the personal residence of Israeli Prime Minister Ariel Sharon in order to avenge a massacre of Palestinians at Hayy al-Zaytun.[233]  The statement took pains to address an apparently conflicting claim of responsibility for the same bombing issued by the al-Aqsa Martyrs Brigades, a military wing of the Palestinian Fatah movement: "We condemn the hasty way in which our brothers from the al-Aqsa Martyrs Brigades claimed credit [for this operation], which is why we have delayed our own declaration until the correct brothers responsible could be identified.  Images of the Martyr and his connection to the

---

[227] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[228] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[229] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=362.  July 2009.
[230] http://www.mfa.gov.il/MFA/MFAArchive/2000_2009/2004/1/
Suicide%20bombing%20of%20Egged%20bus%20no%2019%20in%20Jerusalem%20-.
[231] http:// www.palestine-info.info/arabic/hamas/shuhda/2004/ali/syrah.htm.  August 2004.
[232] http:// www.palestine-info.info/arabic/hamas/shuhda/2004/ali/syrah.htm.  August 2004.
[233] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.  June 2009.

al-Qassam Brigades were provided to the media and were… displayed on the website of the al-Qassam Brigades."[234]

The Hamas website Alqassam.ps also features a wealth of material relating to Bus #19 bomber Ali Jaarah, including a special report on the attack, Jaarah's last will and testament, and an in-depth biography.[235]   In that biography published online, Hamas once again addressed the issue of the conflicting claims for the attack from the Al-Aqsa Martyrs Brigades: "On Friday, the spokesman for the Fatah movement appeared on Al-Manar television and apologized for his group claiming credit for the operation and apologized to the al-Qassam Brigades, rejecting any links to the Fatah movement.  This has also been confirmed by a Fatah spokesman in the Gaza Strip."[236]

Aside from content on websites exclusively run by the Hamas Movement and its Ezzedeen al-Qassam Brigades, I am also aware of the existence of a separate Arabic-language communiqué posted on the website KATAEBAQSA.ORG which appears to claim responsibility for the January 29, 2004 bombing of Bus #19 on behalf of the Al-Aqsa Martyrs Brigades (AAMB).  However, even if facts were established confirming the involvement of AAMB resources or operatives in the January 28 Bus #19 bombing, this would not, in and of itself, make Hamas's claim of responsibility inauthentic or lacking in credibility.

- **September 24, 2004 – Mortar Strike in Neve Dekalim**

On September 24, 2004, a surprise mortar bombardment from assailants in Khan Younis targeted the Gush Katif settlement of Neve Dekalim, killing a 24-year old Israeli woman.[237]   The Ezzedeen al-Qassam Brigades have issued at least two communiqués (both dated September 24, 2004) claiming responsibility for the mortar attack, which are still available on the Alqassam.ps website.[238]   The first document simply claims credit for "launching three 100mm mortar shells towards the Neve Dekalim settlement at exactly 10:30 in the morning."[239]   The second document repeats this information and adds that the attack "had the impact of killing an enemy soldier and moderately wounding two others."[240]

---

[234] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=byan&id=378.  June 2009.

[235] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=378.  June 2009.

[236] http://www.alqassam.ps/arabic/sohdaa5.php?sub_action=sera&id=378.  June 2009.

[237] http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2004/Tiferet+Tratner.htm.

[238] http://www.alqassam.ps/arabic/statments.php?id=755.  July 2009.  See also: http://www.alqassam.ps/arabic/statments.php?id=754.  June 2009.

[239] http://www.alqassam.ps/arabic/statments.php?id=754.  June 2009.

[240] http://www.alqassam.ps/arabic/statments.php?id=755.  July 2009.

## VIII.) Conclusions

Based upon the information, research, and analysis presented heretofore in this report, I have reached several key conclusions:

- Since at least 2001, the Palestinian Hamas organization—a designated Foreign Terrorist Organization (FTO) otherwise known as the "Islamic Resistance Movement" and "the Martyr Ezzedeen al-Qassam Brigades"—has maintained a regular presence on the Internet through the use of fixed websites, online newsletters, and virtual discussion forums.  The most notable of these entities are the Palestine-info.net website, the Alqassam.ps website (also formerly known as Qassamiyoon.com, Kataeb-ezzeldeen.net, Ezzeddeen.net, etc.), and the Almoltaqa.ps social networking forum.  Hamas has employed these venues to disseminate its propaganda, to conduct public interviews with senior Hamas officials, to facilitate communication and coordination among Hamas supporters, and to assist in illicit terrorist financing schemes.  Hamas' web presence is one of its most critical material resources, serving as a massive "force multiplier" for its membership.

- Since 2001, the Hamas movement—together with persons or entities controlled by, or related to Hamas—has utilized certain texts, websites and other media (many of which have been discussed and analyzed herein) for the purpose of advertising its involvement and responsibility in various violent "operations," including attacks that are alleged to have injured the Plaintiffs in these actions.  In my expert opinion, these texts, websites, and media can be attributed to Hamas and have particular significance to Hamas on both a symbolic and operational level, including their use in connection with acknowledging Hamas's involvement and/or contribution to particular acts.

- Using the above-mentioned means (namely websites, newsletters, and forums), Hamas has distributed authentic claims of responsibility—accompanied by other evidence in the form of high-resolution photographs, original video recordings, and the personal accounts of eyewitnesses—which represent compelling indicators of culpability in the execution of particular terrorist attacks identified by Plaintiffs that have occurred between 2001 and 2004.  Those attacks include (but are not limited to):

  o March 28, 2001 – Gas Station Bombing near Kfar Saba
  o June 1, 2001 – Dophinarium Suicide Bombing in Tel Aviv
  o August 9, 2001 – Sbarro Pizzeria Bombing, Jerusalem
  o December 1, 2001 – Ben Yehuda Bombings in Jerusalem
  o December 12, 2001 – Shooting attack on Bus in Emmanuel
  o March 7, 2002 – Atzmona Shooting attack
  o March 9, 2002 – Café Moment Suicide Bombing
  o March 27, 2002 – Park Hotel Bombing, Netanya.
  o May 7, 2002 – Sheffield Club Bombing, Rishon Letzion.

- o June 18, 2002 – Jerusalem Bus #32 Bombing
- o July 31, 2002 – Hebrew University Cafeteria Bombing, Jerusalem.
- o September 19, 2002 – Tel Aviv Bus #4 Bombing
- o January 29, 2003 – Shooting Attack on Route 60
- o March 5, 2003 – Haifa Bus #37 Bombing
- o March 7, 2003 – Shooting in Kiryat Arba
- o April 30, 2003 – Mike's Place Bombing, Tel Aviv
- o May 18, 2003 – Jerusalem Bus #6 Bombing
- o June 11, 2003 – Jaffa Road Bus 14A Bombing, Jerusalem.
- o June 20, 2003 – Shooting Attack on Route 60.
- o August 19, 2003 – Jerusalem Bus #2 Bombing.
- o September 9, 2003 – Bombing at Café Hillel in Jerusalem
- o October 22, 2003 – Tel Romeida Shooting Attack
- o January 29, 2004 – Jerusalem Bus # 19 Bombing
- o September 24, 2004 – Mortar Strike in Neve Dekalim.

- With regard to the above-mentioned means (namely websites, newsletters, and forums), neither Hamas nor any of its sub-branches (such as the Ezzedeen al-Qassam Brigades) has ever issued any rejection or credible denial of its culpability in executing the aforementioned series of twenty-four terrorist attacks that occurred between 2001 and 2004.


/s/Evan F. Kohlmann                          February 18, 2011
Evan F. Kohlmann                             Date

56

# Exhibit 12

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF NEW YORK

3

4  MOSES STRAUSS, et al.,       )
                           )
5            Plaintiffs,   )
  vs.                   ) Case No.
6                     ) CV 06-702 (DLI)(MDG)
  CREDIT LYONNAIS, S.A.,     )
7                     )
            Defendant.    )
8  _____)
                     )
9  BERNICE WOLF, et al.,      )
                     )
10           Plaintiffs,   )
  vs.                   ) Case No.
11                     ) CV 07-914 (DLI)(MDG)
  CREDIT LYONNAIS, S.A.,     )
12                     )
            Defendant.    )
13  _____)

14

15

16            VIDEOTAPED DEPOSITION OF

17               SHALOM SABAG

18             TEL AVIV, ISRAEL

19            FEBRUARY 4, 2014

20

21

22

23

24

25  REPORTED BY:  BRENDA MATZOV, CA CSR NO. 9243

| | | |
|---|---|---|
| 13:30:11 | 1 | there are 24 stores in Jerusalem, and we do the |
| 13:30:14 | 2 | maintenance work.  They also have stores in Tel Aviv |
| 13:30:16 | 3 | and Haifa.  But every person works in his area.  So |
| 13:30:21 | 4 | I work in Jerusalem. |
| 13:30:24 | 5 | Q.   Now, is that what you were doing at the |
| 13:30:25 | 6 | time of the attack at Patt Junction on June 18, 2002? |
| 13:30:38 | 7 | A.   Yes.  That's exactly it.  I just left the |
| 13:30:41 | 8 | supermarket in Gilo. |
| 13:30:44 | 9 | Q.   Okay.  Now, Mr. Sabag, I'm sorry to have |
| 13:30:47 | 10 | to take you through these events.  But my opponents |
| 13:30:52 | 11 | have told us that they want you to testify about this |
| 13:30:55 | 12 | subject.  So I need to ask you some questions about |
| 13:30:58 | 13 | your experiences on that terrible day.  So if you will, |
| 13:31:19 | 14 | please tell me everything that you recall about that |
| 13:31:24 | 15 | day. |
| 13:31:24 | 16 | (Narrative in Hebrew by the witness.) |
| 13:31:25 | 17 | MR. FRIEDMAN:  Let's just -- I'm sorry. |
| 13:31:25 | 18 | But let me interrupt you so that the interpreter |
| 13:32:22 | 19 | can interpret what you said thus far.  And we'll |
| 13:32:26 | 20 | break it into segments. |
| 13:32:32 | 21 | So, Madam Interpreter, if you will please |
| 13:32:38 | 22 | interpret what the witness said thus far. |
| 13:32:39 | 23 | THE INTERPRETER:  Yes. |
| 13:32:40 | 24 | THE WITNESS:  The truth is that it's like |
| 13:32:42 | 25 | as if it was now.  I remember that I was working in |

FEBRUARY 4, 2014 - SHALOM SABAG

| | | |
|---|---|---|
| 13:32:45 | 1 | Gilo and I was coming down the slope, going down |
| 13:32:50 | 2 | towards the station.  And there was the bus in the |
| 13:32:53 | 3 | station.  I arrived.  It -- there was a red light. |
| 13:32:55 | 4 | The light was red in the junction.  And I was a little |
| 13:33:02 | 5 | bit after the -- after the stop.  And there was a long |
| 13:33:08 | 6 | line of cars waiting.  And after a few minutes, I heard |
| 13:33:13 | 7 | a very strong blast.  My car trembled.  And then I could |
| 13:33:19 | 8 | see in my mirror that the bus was -- had exploded. |
| 13:33:25 | 9 | When I saw the blast and I knew that at the |
| 13:33:57 | 10 | time there were terroristic attacks occurring to buses |
| 13:34:01 | 11 | and I saw in my rear mirror that everything was flying |
| 13:34:06 | 12 | about, I didn't think twice.  I ran to the bus, and |
| 13:34:09 | 13 | I wanted to save as many lives as possible. |
| 13:34:13 | 14 | Q.   BY MR. FRIEDMAN:  Please describe what |
| 13:34:15 | 15 | happened next. |
| 13:35:17 | 16 | A.   The truth, I was looking for people who |
| 13:35:20 | 17 | were wounded, not those who were very seriously wounded |
| 13:35:25 | 18 | because those you are not supposed to move.  This can |
| 13:35:27 | 19 | be done only by paramedics and the like.  So I was |
| 13:35:30 | 20 | looking for people who were more slightly wounded |
| 13:35:33 | 21 | that could stand on their own feet and that I could |
| 13:35:36 | 22 | help them out.  And I did help to bring a few people |
| 13:35:41 | 23 | down off the bus.  More people came in the meantime |
| 13:35:43 | 24 | and paramedics arrived. |
| 13:35:46 | 25 | And there was this one girl who was lying |

```
13:47:26   1   from Al-Jazeera.  They admitted on their own news.
13:47:30   2   And they had called, and they admitted themselves.
13:47:32   3   It couldn't be anyone else.
13:47:35   4        Q.   So what you know on this subject is what
13:47:37   5   you learned from the news; correct?
13:47:43   6        A.   Yes, certainly.
13:47:44   7        Q.   And -- and as you sit here today, you don't
13:47:49   8   know whether the group that was responsible was Hamas
13:47:53   9   or some other group; is that right?
13:48:29  10        A.   The truth is that I -- I don't know exactly.
13:48:34  11   But they were all partners to this.  In the past,
13:48:38  12   there was also the Fatah, and the Fatah was together
13:48:42  13   with the Hamas.  They were together.  Maybe now they've
13:48:45  14   separated.  But then they were all together.  They were
13:48:48  15   all acting together as one.
13:48:51  16        Q.   And this is based on what you've learned
13:48:53  17   from the news?
13:49:18  18        A.   You also see.  You don't only hear, if it
13:49:21  19   was only radio, but you also see.  You can see, for
13:49:24  20   instance, in Gaza how the Hamas ousted Fatah from Gaza.
13:49:39  21   I do -- I do understand -- I do have an understanding
13:49:42  22   and I do read.  It's not as if they tell me and I just
13:49:47  23   buy it like that.  I'm no -- I'm not a fool.
13:49:50  24        Q.   Now, Mr. Sabag, if you were to come to the
13:49:52  25   trial in this case and the judge were to say to you,
```

# Exhibit 13

CONFIDENTIAL                    1

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK
     --------------------------------------------x
3    MOSES STRAUSS, et al.,

4                          Plaintiffs,
          -against-
5
     CREDIT LYONNAIS, S.A.,
6                          Defendant.

7    Case No. 06-702 (DGT)(MGD)
     --------------------------------------------x
8    BERNICE WOLF, et al.,

9                          Plaintiffs,
          -against-
10
     CREDIT LYONNAIS, S.A.,
11                         Defendant.

12   Case No. 07-914 (DGT)(MGD)
     --------------------------------------------x
13

14     *  *  *  C O N F I D E N T I A L  *  *  *

15
                              One Liberty Plaza
16                            New York, New York

17                            November 7, 2013
                              2:05 p.m.
18

19          Videotaped Deposition of the Plaintiff,
     TEMIMA SPETNER, pursuant to Notice, before
20   Jennifer Fuchs, a Notary Public of the State of
     New York.
21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                 Ref: 105442B

CONFIDENTIAL                                    7

```
 1              SPETNER - CONFIDENTIAL
 2   as clear and understandable as I can.  If at any
 3   time you wish for me to repeat, rephrase or
 4   restate a question, especially if you don't
 5   understand any aspect of my question, please tell
 6   me, and I will do my best to make my question
 7   clearer.
 8        A.    Okay.
 9        Q.    If you don't do that, the record
10   will reflect that you understood the question and
11   are answering it accordingly.
12        A.    Okay.
13        Q.    And if at any time you want to take
14   a break, please let us know, and we'll take a
15   break, so long as a question is not pending.
16              I think we should be done within two
17   hours, so it won't go that long, okay?
18        A.    Okay.
19        Q.    Is there anything about your
20   physical, mental or emotional condition that
21   won't allow you to answer my questions completely
22   and truthfully today?
23        A.    No.
24              MR. FRIEDMAN:  Let me ask the
25        reporter to mark as Spetner Exhibit 1 the
```

**CONFIDENTIAL** 8

```
 1              SPETNER - CONFIDENTIAL
 2         plaintiff profile form that your lawyers
 3         have given to us.
 4              (Spetner Exhibit 1, Plaintiff
 5         profile form, marked for identification.)
 6         Q.    Is that your signature on page 25?
 7         A.    Yes, yes.
 8         Q.    And do you recognize this to be the
 9    plaintiff profile form that you completed for
10    this case?
11         A.    Yes.
12         Q.    Did you personally complete this?
13         A.    Yes.
14         Q.    Is it accurate in all respects?
15         A.    The only thing that is not accurate
16    is I marked down that I didn't receive any
17    compensation, and I did receive from the Israeli
18    government.
19         Q.    What did you receive?
20         A.    I don't remember how much it was.
21         Q.    It was monetary compensation?
22         A.    Monetary compensation.
23              MR. UNGAR:  We just have the
24         standard objection to collateral source, we
25         think it's irrelevant, but you can answer
```

CONFIDENTIAL                              59

```
 1              SPETNER - CONFIDENTIAL
 2         because they were just running around
 3         trying to help as many people as possible,
 4         and he called to them to come help and they
 5         didn't have enough people, so they just
 6         threw him bandages to try to stop the
 7         bleeding himself.  So I was laying there
 8         about a half an hour is what I was told."
 9              And that ends at page 29, line 5.
10         Q.    So my first question to you on that
11    subject is whether there is anything else, as you
12    sit here today, that you recall about that
13    incident?
14         A.    No.
15         Q.    That's a complete rendition of what
16    you remember about the attack by which you were
17    injured?
18         A.    Yes.
19         Q.    I take it you did not see the
20    bomber?
21         A.    No.
22         Q.    Do you have any information about
23    his or her identity?  Do you know who it was, who
24    was the bomber?
25         A.    I don't know.  I might have seen a
```

```
 1              SPETNER - CONFIDENTIAL
 2   news article.
 3        Q.     Other than what you've seen in news
 4   articles, do you have any information as to who
 5   the bomber was?
 6        A.     No.
 7        Q.     In fact, you don't know how many
 8   bombers there were, correct?
 9        A.     I believe I do.
10        Q.     How do you know that?
11        A.     From what I was told after, I was
12   told or read or -- I mean, it was common
13   knowledge at the time that there were two.
14        Q.     Two bombers?
15        A.     Two suicide bombers.
16        Q.     But that's what you heard after the
17   attack.
18        A.     Right.
19        Q.     Who did you hear that from?
20        A.     I don't remember.
21        Q.     Do you have any knowledge as to the
22   identity of any group with which they were
23   affiliated or on behalf of which they were
24   acting?
25        A.     Repeat the question.
```

1              SPETNER - CONFIDENTIAL

2        Q.     Do you have any personal

3   knowledge --

4        A.     I don't.

5        Q.     -- as to the identity of any group

6   with which they were affiliated or on behalf of

7   which they were acting?

8        A.     I don't have any personal knowledge.

9        Q.     Everything you know on that subject

10  is what you read or what someone told you after

11  the attack, correct?

12       A.     Correct.

13       Q.     And you were told after the attack

14  that Hamas had claimed responsibility for the

15  attack, correct?

16       A.     Correct.

17       Q.     You did not do anything to determine

18  whether that was true or false, correct?

19       A.     Correct.

20       Q.     Just to be clear, all that you know

21  or all that you have heard about who is

22  responsible for the attack is what you've heard

23  from other people, correct?

24       A.     Correct.

25       Q.     And who are those people?  You don't

```
 1              SPETNER - CONFIDENTIAL
 2    have to give me names, if you don't remember but.
 3         A.    I don't know.  I would have heard,
 4    family members, friends, news articles.
 5         Q.    Okay.  Did you ever speak with any
 6    law enforcement authorities or any military
 7    authorities concerning the attack?
 8         A.    No.
 9         Q.    Were you ever interviewed by any
10    investigators concerning the attack?
11         A.    No.
12         Q.    Did you ever provide any written
13    statements to any investigators concerning the
14    attack?
15         A.    No.
16         Q.    Who were you with -- you testified
17    that you were with some other people.
18         A.    I was with a friend.
19         Q.    What is your friend's name?
20         A.    Ariella Feinstein.
21         Q.    Is she suing anyone based on the
22    attack?
23         A.    Not to my knowledge.
24         Q.    Was she injured?
25         A.    Yes.
```

CONFIDENTIAL                           63

```
 1                   SPETNER - CONFIDENTIAL
 2          Q.      How was she injured?
 3          A.      She -- she -- if I remember
 4   correctly, she had shrapnel that hit her jaw and
 5   that hit her leg.  She had superficial injuries.
 6          Q.      Is she Israeli or American?
 7          A.      American.  Well, I take that back.
 8   She lives in Israel now.  I don't know if she is
 9   an Israeli citizen.
10          Q.      Do you know if she's a U.S. citizen?
11          A.      Yes, she is a U.S. citizen.
12          Q.      And how do you know that?
13          A.      I was in school with her.  I was
14   friends with her.  She was American.
15          Q.      At Yeshiva?
16          A.      No.  This was in Israel.
17          Q.      In Jerusalem?
18          A.      Yes.
19          Q.      Where is she from in the States?
20          A.      California.
21          Q.      Have you ever spoken to her about
22   your involvement in these lawsuits?
23          A.      No.
24          Q.      Do you know whether she was
25   interviewed or gave any statements to any law
```

CONFIDENTIAL                          64

```
 1                    SPETNER - CONFIDENTIAL
 2    enforcement authorities?
 3          A.     I don't know.  I don't know.
 4          Q.     Did you maintain a friendship with
 5    her after the attack?
 6          A.     No.
 7          Q.     Combining your testimony in the Arab
 8    Bank cases and the additional information you've
 9    given me this afternoon, have you described to me
10    everything you remember about the attack?
11          A.     Yes.
12          Q.     Have you described to me everything
13    you know about the attack?
14          A.     Yes.
15          Q.     Have you described to me everything
16    you know about responsibility for the attack?
17                 MR. UNGAR:  Objection to form.
18          A.     Yes.
19                 MR. UNGAR:  Calls for a legal
20          conclusion.
21          A.     Can I say one thing?
22                 MR. FRIEDMAN:  Yes.
23          A.     I don't think I mentioned that I
24    know there was a car bomb that was after the two
25    suicide bombers.
```

```
 1                  SPETNER - CONFIDENTIAL

 2          Q.      Also in Jerusalem?

 3          A.      Yes.

 4          Q.      And how do you know about that?

 5          A.      I heard afterwards from family

 6    members, friends.

 7          Q.      Did you attend any legal proceedings

 8    relating to the attack in Israel?

 9          A.      No.

10          Q.      Do you know anything about -- did

11    you participate in any of these legal proceedings

12    other than by attendance; did you make any

13    statements, did you make any submissions,

14    anything like that?

15          A.      No.

16          Q.      Have you ever spoken with anyone who

17    you understood was investigating the attack?

18          A.      No.

19          Q.      Do you know anything at all about

20    funding for the attack?

21                  MR. UNGAR:  Objection to form,

22          vague.

23          A.      Other than -- other than what we've

24    discussed and what's being discussed --

25          Q.      In the lawsuit.
```

```
 1                     SPETNER - CONFIDENTIAL
 2          A.       -- in the lawsuits?
 3          Q.       Other than what you've heard from
 4     your lawyers in connection with these lawsuits,
 5     do you have any information about any funding for
 6     the attack?
 7          A.       No.
 8          Q.       Do you know anything about the role
 9     of any charitable organization in funding the
10     attack?
11          A.       No.
12          Q.       Do you know anything about the role
13     of any bank in funding the attack?
14          A.       No.
15          Q.       Had you ever heard of Credit
16     Lyonnais before you sued that bank?
17          A.       No.
18          Q.       Do you know anything about Credit
19     Lyonnais at all other than what your lawyers have
20     told you?
21          A.       No.
22          Q.       Had you ever heard of National
23     Westminster Bank?
24          A.       No.
25          Q.       Do you have any information about
```