UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TZVI WEISS, et al.,

                     Plaintiffs,               Case No. 05-CV-4622 (DLI) (RML)

      - against -

NATIONAL WESTMINSTER BANK PLC,

                    Defendant.

------------------------------------------------------------X

NATAN APPLEBAUM, et al.,

                     Plaintiffs,

      - against -                Case No. 07-CV-916 (DLI) (RML)

NATIONAL WESTMINSTER BANK PLC,

                    Defendant.        **Oral Argument Requested**

------------------------------------------------------------X

## NATIONAL WESTMINSTER BANK PLC'S SUPPLEMENTAL STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

Attorneys for Defendant National Westminster Bank Plc

December 21, 2016

# TABLE OF CONTENTS

**Page**

I. BACKGROUND ...................................................................................................1

II. UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO
REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THE PROXIMATE CAUSATION ELEMENT OF THEIR CLAIMS..............................2

    A. Background Facts.........................................................................................2

    B. Plaintiffs' Evidence In Support Of Their Contention That The 13 Charities
    Were The Alter Egos Of And/Or Controlled By Hamas .........................................3

III. UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO
REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN
THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS BASED ON
THE SoL ATTACKS..............................................................................................8

    A. Background Facts.........................................................................................8

    B. Ronni Shaked Purports To Attribute Responsibility For The SoL Attacks
    To Hamas, But His Proposed Testimony Is Inadmissible .........................................8

        1. Shaked's Opinions That Hamas Perpetrated The Three SoL Attacks
        Are Based On The Same Methodology That Shaked Used For His Prior
        Opinions That Hamas Perpetrated The 15 Attacks He Addressed In His
        Prior Reports ....................................................................................9

        2. Shaked's Attribution Opinions Are Based Exclusively On Inadmissible
        Hearsay ..........................................................................................10

            a. Hamas Claims of Responsibility..................................................11

            b. Israeli Military Court Convictions ...............................................12

            c. Purported Israeli Government Documents....................................12

            d. Newspaper Articles and Books....................................................14

        3. Shaked's Proposed Attribution Testimony Is Unreliable ........................14

            a. December 1, 2001 attack on Ben Yehuda Street ..........................14

            b. March 7, 2002 attack at Atzmona ................................................15

            c. June 18, 2002 attack at Patt Junction...........................................15

        4. Shaked Is Not Qualified To Offer Opinions As To Who Perpetrated A
        Terrorist Attack ...............................................................................16

    C. Evan Kohlmann Purports To Attribute Responsibility For The SoL
    Attacks To Hamas, But His Proposed Testimony Is Inadmissible .......................16

1.      Kohlmann's Testimony Is Substantially Similar To His Previous
        Inadmissible Testimony, And Merely Recites Hearsay Without
        Independent Analysis..............................................................................17

2.      Kohlmann Is Not Qualified To Offer Opinions As To Who Perpetrated
        A Terrorist Attack ..................................................................................18

3.      Kohlmann's Proposed Testimony Is Unreliable ......................................18

D.      None Of The Fact Witnesses Plaintiffs Proffer To Testify Regarding The
        SoL Attacks Has Personal Knowledge As To Who Perpetrated Any Of
        The Attacks ...........................................................................................19

I.      **BACKGROUND**

1.      On March 28, 2013, the Court granted National Westminster Bank Plc

("NatWest") summary judgment, ruling that no reasonable juror could find for plaintiffs on the

scienter element of their claims, and without reaching NatWest's arguments that it was also

entitled to summary judgment on the proximate causation and Hamas responsibility elements of

plaintiffs' claims. *See* Order Granting Motion for Summary Judgment (ECF No. 310).[1]  On

September 22, 2014, the Second Circuit reversed the Court's grant of summary judgment to

NatWest on scienter grounds and remanded the case "for further proceedings, including

consideration of NatWest's other asserted grounds for summary judgment." *Weiss v. Nat'l

Westminster Bank Plc*, 768 F.3d 202, 212 (2d Cir. 2014).  Plaintiffs subsequently amended the

*Weiss* and *Applebaum* complaints to add claims arising from three additional attacks that were

previously time-barred before Congress amended the Anti-Terrorism Act's statute of limitations

in 2013 (collectively, the "SoL Attacks").  On August 2 and 12, 2016, the Court granted NatWest

permission to file, and set a schedule for, NatWest's renewed motion for summary judgment

with respect to the proximate causation and Hamas responsibility issues that the Court did not

reach in its March 28, 2013 opinion, as well as NatWest's motion for summary judgment with

respect to plaintiffs' claims based on the SoL Attacks.

2.      The three SoL Attacks occurred on the following dates:  (a) December 1, 2001

(Ben Yehuda Street), *see* Grube Decl. Ex. 1[2] (*Weiss* Sixth Am. Compl. ("*Weiss* SAC") ¶¶ 503-

---

[1] All citations to "ECF" numbers refer to electronic filings on the *Weiss* docket, Case No. 05-CV-4622 (DLI) (RML), unless otherwise specified.

[2] Citations to "Grube Decl. Ex. __" refer to the exhibits attached to the Declaration of Mark S. Grube In Support Of Renewed Motion Of National Westminster Bank Plc For Summary Judgment, dated December 21, 2016.  National Westminster Bank Plc's Statement of Material Facts As to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 (ECF No. 266) is cited as "NatWest 56.1 St. ¶ __."  Citations to exhibits appended to the Declaration of Valerie Schuster in Support of the Motion for Summary Judgment by National Westminster Bank Plc (ECF No. 267) are designated "Schuster Decl. Ex. __."

1

569), Grube Decl. Ex. 2 (*Applebaum* Am. Compl. ("*Applebaum* AC") ¶¶ 297-307); (b) March 7, 2002 (Atzmona), *see* Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 308-310); (c) June 18, 2002 (Patt Junction), *see* Grube Decl. Ex. 1 (*Weiss* SAC ¶¶ 570-577), Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 315-320).

## II.   UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE PROXIMATE CAUSATION ELEMENT OF THEIR CLAIMS

### A.   Background Facts

3.     Plaintiffs allege that NatWest provided material support to Hamas, a Foreign Terrorist Organization ("FTO"), based on certain funds transfers (the "Identified Interpal Transfers") from Interpal's NatWest accounts to certain charitable organizations in the Palestinian Territories (the "13 Charities") that Plaintiffs contend are alter egos of and/or are controlled by Hamas. *See* NatWest 56.1 St. ¶¶ 241-244.

4.     Plaintiffs do not allege, and there is no evidence in the record, that NatWest or any of the 13 Charities perpetrated the terrorist attacks by which Plaintiffs were injured. *See* NatWest 56.1 St. ¶¶ 253-261, 266-267.

5.     Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were used to finance the terrorist attacks by which Plaintiffs were injured or to provide support to Hamas's military wing. *See* NatWest 56.1 St. ¶¶ 248-249, 253, 268-274.

6.     Plaintiffs allege, based on their alter ego theory, that they can satisfy the proximate causation element of their claims under Section 2333 of the Anti-Terrorism Act because the Identified Interpal Transfers constitute direct material support for Hamas. *See* NatWest 56.1 St. ¶¶ 276-277.

**B.** **Plaintiffs' Evidence In Support Of Their Contention That The 13 Charities Were The <u>Alter Egos</u> Of And/Or Controlled By Hamas**

7.      Plaintiffs rely on the expert reports and proposed testimony of Matthew Levitt and Arieh Spitzen to prove that the 13 Charities were "alter egos of and/or controlled by Hamas." *See* NatWest 56.1 St. ¶¶ 278-283.

8.      None of the 13 Charities has ever been designated as a Specially Designated Terrorist ("SDT") or as an FTO by the United States government. *See* NatWest 56.1 St. ¶ 289.

9.      The only one of the Charities ever designated as a Specially Designated Global Terrorist ("SDGT"), the Al-Salah Society, was designated in 2007, almost two years after the last of the Identified Interpal Transfers occurred. *See* NatWest 56.1 St. ¶¶ 291-292.

10.     Ten of the 13 Charities were created prior to the founding of Hamas. *See* NatWest 56.1 St. ¶ 294.

11.     Levitt testified that the Palestinian Authority and Hamas have been in "conflict" for "most of the time in their history." *See* Grube Decl. Ex. 3 (Levitt CL Tr. at 115:3-16).

12.      During the relevant period, the 12 of the 13 Charities Levitt considered were required to be registered with and overseen by the Palestinian Authority, which approved the elections of the members of the board of directors of the charities. *See* NatWest 56.1 St. ¶¶ 295-299.

13.     Each of the 13 Charities maintained a separate board of directors and dedicated bank accounts during the relevant period. *See* NatWest 56.1 St. ¶¶ 300, 308-310.

14.     There were non-Hamas members on some of the boards of directors of the Charities. *See* NatWest 56.1 St. ¶ 301.

15.     The 13 Charities all performed charitable work in the Palestinian Territories. *See* NatWest 56.1 St. ¶¶ 340-342.

16.     Levitt conceded that a source he relied on to conclude that the charitable network is one of Hamas's three "wings" in fact only indicated that Hamas had two wings—the military (terrorist) and political wings—and made no mention of a "da'wa network of charities." Grube Decl. Ex 3 (Levitt CL Tr. at 152:9-155:22).

17.     There is no evidence of any instructions from Hamas leadership directing any of the 13 Charities to take specific actions. *See* NatWest 56.1 St. ¶¶ 320-322.

18.     There is no central treasury from which Hamas funds its military, political and social programs. *See* NatWest 56.1 St. ¶¶ 313, 385.

19.     There is no evidence of any transfers from the 13 Charities to Hamas leadership, nor of any loans or guarantees of loans from Hamas leadership to the Charities. *See* NatWest 56.1 St. ¶¶ 325-329.

20.     The Israel Defense Forces webpage that Levitt's report identifies to support his assertion that "Hamas deems legitimate the mingling" of military and social service funds does not refer to any mingling of funds. *See* NatWest 56.1 St. ¶¶ 386-389.

21.     There is no evidence that any of the 13 Charities comingled funds with Hamas, apart from one assertion in Levitt's report that the head of one of the charities, the Al-Islah Charitable Association, confessed to laundering funds through the charity for suicide bombings. *See* NatWest 56.1 St. ¶ 382.

22.     Levitt does not opine that the funds purportedly laundered by the head of the Al-Islah Charitable Association were connected to any of the Identified Interpal Transfers or the attacks by which Plaintiffs were injured. *See* Schuster Decl. Ex. 152 (Levitt NW Rep. at 78-90).

23.     Levitt testified that it was "possible though it's less common" and "rare" that money donated to a charity is taken away from that charity and used for Hamas military activity. *See* NatWest 56.1 St. ¶¶ 314-316.

24.     Levitt is not aware of any instances in which any of the 12 of the 13 Charities he considered had used money to buy weapons.  *See* Grube Decl. Ex. 3 (Levitt CL Tr. at 168:14-21).

25.     Levitt is not aware of any instances in which the premises of any of the 12 of the 13 Charities he considered "were used to store weapons or otherwise plan acts of terrorism." *See* Pls' Resp. to Def. Nat'l Westminster Bank's Statement of Material Facts As to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 ¶ 371 (ECF No. 273).

26.     Levitt could not conclude that any of the 12 of the 13 Charities he considered are alter egos or controlled by Hamas.  *See* NatWest 56.1 St. ¶ 333.

27.     Instead, Levitt opined only that he believed each of the 12 of the 13 Charities he considered fell within a "spectrum of variation"  with respect to affiliation with Hamas.  *See* NatWest 56.1 St. ¶¶ 331-335.

28.     Levitt testified that the spectrum included the following categories:  "controlled by," "affiliated with," "fundraise for," "alter ego," "department of" and "otherwise supports." *See* NatWest 56.1 St. ¶¶ 331-335.

29.     Levitt defined the above categories as follows:

   a) Controlled by: "some entities that are affiliated with Hamas are a little more independent and they may have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think . . . [at] the other end of the extreme and of course there's plenty in the middle . . . ."

   b) Affiliated with: "I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be legally independent entities.  Like I said, you don't have the shingle hanging

out the front door, but they do in fact have affiliations with Hamas . . . ." (emphasis added).

c) Fundraise for: "Fundraise for means raises money for."

d) "Could be" alter ego: "[Y]ou can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for [Hamas]."

e) Department of: "[A]ctual departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as part of the activities of those committees."

f) Otherwise supports: "[I]n some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support beyond the strict provision of monies."

See Nat West 56.1 St. ¶ 335.

30. Levitt testified that he did not determine where each of the 12 of the 13 Charities he considered fell on his spectrum. See NatWest 56.1 St. ¶ 333.

31. Spitzen testified that his opinions regarding the 13 Charities' relationship to Hamas were based on an 18 factor test he created to evaluate "the level of Hamas's control of a specific organization." See NatWest 56.1 St. ¶¶ 434-442.

32. Spitzen testified that, for some of the 13 Charities, "all of the [18] criteria exist and the identification with Hamas is clear," but for others "only some of the criteria existed." See NatWest 56.1 St. ¶ 440.

33. Spitzen did not identify any of the 13 Charities for which all of his criteria were satisfied. See NatWest 56.1 St. ¶¶ 440-441.

6

34.     Spitzen testified that "the conclusions regarding some of the entities are more cut and dry" but "[s]ome other entities, they are more careful – cautious." *See* NatWest 56.1 St. ¶ 443.

35.     Spitzen's report  does not state which of his criteria were satisfied for each organization, or which of his conclusions were "cautious." *See* NatWest 56.1 St. ¶¶ 440-444.

36.     Spitzen testified that he did not give each of the 18 criteria equal weight, that each criterion did not have the same weight for each charity, that different criteria held the greatest weight in his analysis for different charities, and that he did not require a minimum number of criteria to be met before he considered a charity to be controlled by Hamas. *See* NatWest 56.1 St. ¶¶ 445-453.

37.     Spitzen testified that it was "not the method or the way of my research" to determine which actions taken by alleged Hamas members at the 13 Charities were taken on behalf of Hamas rather than on behalf of the particular charity.  *See* Grube Decl. Ex. 4 (Spitzen CL Tr. at 204:14-205:16).

38.     Spitzen testified that, when a charity has a senior Hamas member in a "key position," meaning a position given "the right to sign checks or documents," he considered Hamas to be "running the day-to-day operations." *See* NatWest 56.1 St. ¶¶ 456-457.

39.     Spitzen's report  concludes that the Al Wafa Charitable Society and the Jerusalem Central Zakat committee were not "controlled" by Hamas. *See* Schuster Decl. Ex. 153 (Spitzen NW Rep. at 71, 142).

III.   **UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT NO REASONABLE JUROR COULD FIND THAT PLAINTIFFS HAVE PROVEN THE HAMAS RESPONSIBILITY ELEMENT OF THEIR CLAIMS BASED ON THE SoL ATTACKS**

A.   **Background Facts**

40.   Because plaintiffs allege that NatWest's provision of routine banking services to a lawful, registered charity in the United Kingdom known as "Interpal" (a/k/a Palestine Relief & Development Fund a/k/a Palestinians Relief & Development Fund) proximately caused the three SoL Attacks by which certain of plaintiffs were injured, plaintiffs must prove that NatWest provided services directly to the entity that perpetrated the SoL Attacks, which plaintiffs allege was Hamas, and that Hamas in fact perpetrated the attacks.  Grube Decl. Ex. 1 (*Weiss* SAC ¶¶ 723-729); Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 467-473).

41.   In order to prove that Hamas perpetrated the SoL Attacks, plaintiffs rely on the proposed expert testimony of Ronni Shaked and Evan Kohlmann, the proposed testimony of two fact witnesses who were present at or shortly after one of the three SoL Attacks, and the documents cited in the expert reports that Shaked and Kohlmann have submitted concerning the SoL Attacks.  Grube Decl. Ex. 5 (May 11, 2016 Osen Ltr. to Friedman at 1).

B.   **Ronni Shaked Purports To Attribute Responsibility For The SoL Attacks To Hamas, But His Proposed Testimony Is Inadmissible**

42.   Plaintiffs proffer Ronni Shaked as an expert witness who purports to opine that Hamas perpetrated the three SoL Attacks.  Shaked's opinions are contained in his "Second Supplemental Expert Report," dated December 2, 2013.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 1-64).

43.   Plaintiffs previously proffered Shaked as an expert witness, and in that instance he opined that Hamas perpetrated the 15 attacks that were addressed in NatWest's prior summary judgment motion.  *See* NatWest 56.1 St. ¶¶ 495-669.

1.   Shaked's Opinions That Hamas Perpetrated The Three SoL Attacks Are Based On The Same Methodology That Shaked Used For His Prior Opinions That Hamas Perpetrated The 15 Attacks He Addressed In His Prior Reports

44.   The object of Ronni Shaked's analysis concerning the SoL Attacks is the same as the object of his prior analysis, which was to determine whether Hamas was involved in the recruiting, planning and perpetration of terrorist attacks.  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 46:3-47:22).

45.   Shaked used the same methodology to determine whether Hamas perpetrated the three SoL Attacks that he previously used to determine whether Hamas perpetrated the 15 attacks he previously addressed.  *Id.* (Shaked 2/12/14 Tr. at 47:13-49:2).  Shaked testified, "I learned about [the SoL Attacks] and it's the same scope [as my prior report] because I wanted to continue with the same line, the same methodology and the same way." *Id.* (Shaked 2/12/14 Tr. at 47:13-22).

46.   As to the December 1, 2001 (Ben Yehuda) attack, one of the SoL Attacks, Shaked wrote in his Second Supplemental Report that, "[f]rom the many Hamas documents and Israeli sources cited above, it is clear that from the command level down to the field operatives, Hamas is responsible for the double suicide bombing on Ben Yehuda Street in Jerusalem.  Hamas's various publications describing the double suicide bombing on Ben Yehuda Street indicate that it glorifies the attack as a success of the *Izz al-Din al-Qassam* Brigades."  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 41).

47.   As to the March 7, 2002 (Atzmona) attack, one of the SoL Attacks, Shaked wrote in his Second Supplemental Report that, "[b]ased on Hamas documents, its announcements, the memorial days for the terrorist attack, Hamas's boasting about taking responsibility, and the pictures and video films, I conclude, with a very high degree of probability (and, indeed, have no

9

doubt) that Hamas was responsible for the suicide attack in Atzmona." *Id.* (Shaked Second Supp. Rep. at 50-51).

48.     As to the June 18, 2002 (Patt Junction) attack, one of the SoL Attacks, Shaked wrote in his Second Supplemental Report that, "[b]ased on the materials cited above, and my experience and familiarity with the *modus operandi* of Hamas, I conclude, with a very high degree of probability (and, indeed, I have no doubt) that Hamas was responsible for the suicide bombing carried out on June 18, 2002, at Patt Junction in Jerusalem." *See id.* (Shaked Second Supp. Rep. at 63); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 147:10-148:3).

> ### 2.     Shaked's Attribution Opinions Are Based Exclusively On Inadmissible Hearsay

49.     Shaked relies on the same evidence to attribute the September 24, 2004 attack to Hamas that he relied on in the matter of *Strauss v. Crédit Lyonnais, S.A.*, Case No. 06-CV-702 (DLI) (RML). *See* Schuster Decl. Ex. 179 (Shaked NW Rep. at 121-122); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013).

50.     Shaked's Report attributes the October 22, 2003 attack to Hamas based on his observation at the scene of a photograph being taken of a corpse that bore a green bandana, which Shaked presumed to be the perpetrator of the attack. *See* Schuster Decl. Ex. 179 (Shaked NW Rep. at 126).

51.     In his Second Supplemental Report, Shaked claims that he visited the site of one of the three SoL Attacks.  However, Shaked testified that his opinions regarding Hamas's responsibility for the SoL Attacks are not based on his personal knowledge, including his observation of any attack site. *See* Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 31); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 109:4-14).

52.     Instead, Shaked's opinions that Hamas perpetrated the SoL Attacks are based solely on the documents and materials cited in his Second Supplemental Report.  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 19:21-22:24).

53.     Shaked does not cite any Israeli civil court conviction in relation to any of the SoL Attacks.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 1-63).

a.  Hamas Claims of Responsibility

54.     For each of the SoL Attacks, Shaked relies on Hamas claims of responsibility to conclude that Hamas committed the attack.  *Id.* (Shaked Second Supp. Rep. at 31-32, 40-41, 52-53, 62-63); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 61:5-11).

55.     In particular, Shaked quotes from or summarizes the contents of Hamas websites and publications or interviews in which Hamas operatives purportedly claimed responsibility for each attack.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 33-36, 55-57).

56.     Terrorist groups, including Hamas, had strong incentives during the Second Intifada to make claims of responsibility for terrorist attacks, including for purposes of propaganda, competition with rival groups and recruitment.  Accordingly, such claims of responsibility are not reliable.  *See* NatWest 56.1 St. ¶¶ 812-827.

57.     Shaked also reproduces photographs purportedly created and distributed by Hamas.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 32-33, 53-55).

58.     Shaked also cites in his report the contents of various audio and video recordings as support for his opinion that Hamas is responsible for the SoL Attacks.  Other than interviews he conducted or in which he otherwise participated, however, Shaked has offered no information concerning whether the copies of the audio and video recordings are accurate, complete or true copies of the original recordings.  Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 63).

59.     Shaked has presented no testimony from the makers of these recordings, who could verify that whatever is heard or seen in the recordings was indeed said by the speaker who was recorded.  *Id.* (Azoulay Second Supp. Reb. Rep. at 64).

60.     There is no evidence that the voice heard in the video recordings is the voice of whoever is shown to be speaking, and the manner in which these videos were recorded and edited raises doubts as to the identity of the speaker who is heard and whether the words he is speaking are indeed his own.  *Id.*  Viewing these recordings demonstrates they have undergone editing and processing after they were recorded.  *Id.*

61.     Further, Shaked has not offered any evidence as to the identity of the person who made, edited or posted these recordings.  Nor has he offered any evidence as to when they were recorded and/or edited.  *Id.* (Azoulay Second Supp. Reb. Rep. at 66).

b.  Israeli Military Court Convictions

62.     For two of the SoL Attacks, Shaked relies on Israeli military court convictions to support his conclusion that Hamas perpetrated the attack.  In particular, Shaked relies upon convictions issued by Israeli military courts in the Palestinian Territories in relation to the December 1, 2001 and June 18, 2002 attacks.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 38-39, 59-60).

63.     The military court convictions upon which Shaked relies are the product of proceedings that, in practice, did not comply with due process, as plaintiffs' expert, Professor Emanuel Gross, has testified.  *See* NatWest 56.1 St. ¶¶ 628-649.

c.  Purported Israeli Government Documents

64.     In his report concerning the SoL Attacks, Shaked cites statements in various documents he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign

Affairs and other government agencies in support of his opinion that Hamas is responsible for the SoL Attacks. Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 1-6).

65.    For all but one of these documents, on their face they purport to do no more than cite the fact that Hamas claimed responsibility for an attack. *Id.* (Azoulay Second Supp. Reb. Rep. at 2-6).

66.    Shaked references a document that he refers to as an "ISA report from 2005, entitled 'Suicide Bombers in the Five Years of Conflict.'" Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 22 n.75); Grube Decl. Ex. 9 (Shaked Dep. Ex. 37). Shaked repeatedly cites this document throughout his report concerning the SoL Attacks. Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 37, 57-58).

67.    Shaked testified at his deposition that he received this document "from Avi Shy in the communication department" of the ISA while Shaked was working as a newspaper journalist. Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 59:18-60:10).

68.    Shaked admitted that this document does not bear any insignia of the ISA. *Id.* (Shaked 2/12/14 Tr. at 61:2-4).

69.    This document bears no indication on its face that it was produced or published by the ISA, nor does it identify the source of the information it contains concerning responsibility for the SoL Attacks. Grube Decl. Ex. 9 (Shaked Dep. Ex. 37).

70.    This document contains no indication of the source of its conclusions, and therefore does not demonstrate that it contains factual findings from a legally authorized investigation. Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 2-5, 21, 23-24, 27-28).

> d.   Newspaper Articles and Books

71.     Shaked cites in his Second Supplemental Report statements that appear in various newspaper and magazine articles and website pages as support for his opinion that Hamas is responsible for the SoL Attacks.  *Id.* (Azoulay Second Supp. Reb. Rep. at 30-38).

72.     Shaked also cites in his Second Supplemental Report statements that appear in various books as support for his opinion that Hamas was responsible for the SoL Attacks.  *Id.* (Azoulay Second Supp. Reb. Rep. at 57-61).

> 3.     Shaked's Proposed Attribution Testimony Is Unreliable

> a.   December 1, 2001 attack on Ben Yehuda Street

73.     In his Second Supplemental Report, Shaked wrote that, "A short time following the terrorist attack, a telephone call was received at the offices of the BBC.  The speaker on the telephone stated that it was the Islamic Jihad that had carried out the terrorist attack, but it very quickly became clear that this was a false announcement."  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 31 n.134).

74.     Shaked testified that the content of footnote 134 to his Second Supplemental Report is based either on his personal recollection of what he was told by an employee of the BBC and/or what he was told by a fellow employee of the Israeli newspaper *Yediot Aharonot* that this employee had seen on a BBC broadcast.  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 109:13-111:10).

75.     In the portion of Shaked's Second Supplemental Report titled "Summary of the Suicide Bombings on Ben Yehuda Street," he referred to Ibrahim Hamed as the purported commander of the operation.  The only source Shaked cited as support for that summary is a book written by Guy Aviad.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 39).

76.     In the portion of Shaked's Second Supplemental Report titled "Summary of the Suicide Bombings on Ben Yehuda Street," he refers to Sayd Abd-al Karim Sheikh Qasem.  The only sources Shaked cited as support for that reference are the military court indictment of another individual and a website Shaked attributes to Hamas.  *Id.* (Shaked Second Supp. Rep. at 39).

77.     In the portion of Shaked's Second Supplemental Report titled "Summary of the Suicide Bombings on Ben Yehuda Street," he discusses the purported suicide bombers, Nabil Mahmoud Jamil Halabiya and Osama Muhammad Eid Bahar.  The only sources Shaked cited as support for that discussion is a website Shaked attributes to Hamas.  *Id.* (Shaked Second Supp. Rep. at 40).

78.     Shaked ignores the role of Nader Alian, who is described in the purported ISA report from which Shaked quotes as "an operative of Islamic Jihad" and the owner of the car bomb that exploded at Ben Yehuda Street.  *See id.* (Shaked Second Supp. Rep. at 37, 40).

b.  <u>March 7, 2002 attack at Atzmona</u>

79.     Shaked included a photograph in his Second Supplemental Report and wrote that "[t]he following is the photo taken [of the person Shaked identifies as having committed the attack] together with his mother prior to his departure for the terrorist attack in Atzmona."  That statement is not supported by any of the evidence Shaked cites in his report.  *Id.* (Shaked Second Supp. Rep. at 44); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 128:10-134:20; 136:22-140:5).

80.     Shaked does not purport to rely on any Israeli government records with respect to the March 7, 2002 attack.  *See* Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 42-51).

c.  <u>June 18, 2002 attack at Patt Junction</u>

81.     Shaked purports to rely on the military court indictment of Fahmi Eid Ramadan Mashahrah.  *Id.* (Shaked Second Supp. Rep. at 59).

82.     However, the document he cited is actually an indictment of another person, Fallah Taher Abdallah Nada. *See id.* (Shaked Second Supp. Rep. at 59); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 153:10-155:6); Grube Decl. Ex. 10 (Shaked Dep. Ex. 46).

83.     Shaked cited a report of the Israeli Ministry of Foreign Affairs, which states only that Hamas had taken responsibility for the attack.  It does not state that Hamas actually perpetrated the attack.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 59).

### 4.     Shaked Is Not Qualified To Offer Opinions As To Who Perpetrated A Terrorist Attack

84.     Shaked does not have any professional training in determining which terrorist organization is responsible for perpetrating an attack, and he has never before served as an expert in any capacity on that subject. *See* NatWest 56.1 St. ¶¶ 496-505.

85.     Shaked testified that the analysis in his Second Supplemental Report is "different than my journalistic work . . . ."  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 62:12-21).

86.     The course that Shaked taught at Hebrew University, titled "History of the Israeli Palestinian Conflict," was taught from a psychological and sociological perspective. *Id.* (Shaked 2/12/14 Tr. at 30:24-32:11).

87.     Shaked's research at the Truman Research Institute is from the perspective of social psychology. *Id.* (Shaked 2/12/14 Tr. at 32:12-33:9).

88.     Shaked is pursuing a Ph.D. in philosophy.  His doctoral studies do not focus on any of the attacks at issue in these lawsuits. *Id.* (Shaked 2/12/14 Tr. at 33:10-34:19).

### C.     Evan Kohlmann Purports To Attribute Responsibility For The SoL Attacks To Hamas, But His Proposed Testimony Is Inadmissible

89.     Plaintiffs also proffer Evan Kohlmann as an expert witness who purports to opine that Hamas has claimed responsibility for the SoL Attacks through websites that he attributes to Hamas and other media, and that these claims of responsibility are credible.  Schuster Decl. Ex.

210 (Kohlmann Rep. at 6-7, 9); Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 6-7, 9).

Plaintiffs indicated by letter dated May 11, 2016 that they were relying on Kohlmann's analysis

of the June 18, 2002 attack in his report submitted in *Linde v. Arab Bank*. Grube Decl. Ex. 5

(May 11, 2016 Osen Ltr. to Friedman at 1).

90.     Plaintiffs previously proffered Kohlmann as an expert witness, and in that

instance he opined that Hamas perpetrated the 15 attacks that were addressed in NatWest's prior

summary judgment motion. *See* NatWest 56.1 St. ¶¶ 495-669.

1.     Kohlmann's Testimony Is Substantially Similar To His Previous
       Inadmissible Testimony, And Merely Recites Hearsay Without
       Independent Analysis

91.     The object of Kohlmann's analysis concerning the SoL Attacks is the same as the

object of his prior analysis, which was to determine whether Hamas claimed responsibility for

the SoL Attacks and opine on the reliability and credibility of those claims.  Schuster Decl. Ex.

210 (Kohlmann Rep. at 7); Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 6).

92.     Kohlmann used the same methodology to determine whether Hamas perpetrated

the three SoL Attacks that he previously used to determine whether Hamas perpetrated the 15

attacks he previously addressed.  Schuster Decl. Ex. 210 (Kohlmann Rep. at 5-7); Grube Decl.

Ex. 11 (Kohlmann Arab Bank Rep. at 7-8).

93.     Kohlmann relies on the same materials as he did in analyzing whether Hamas

perpetrated the 15 attacks he previously addressed, namely what he contends are "authentic

claims of responsibility" that Hamas has purportedly distributed through websites and internet

newsletters and forums he attributes to Hamas, which he contends "demonstrate [Hamas's]

culpability" in the execution of the SoL Attacks.  *See* NatWest 56.1 St. ¶¶ 671-676, 719-725.

94.     Kohlmann opines that claims of responsibility appearing on websites he attributes

to Hamas "demonstrate its culpability in the execution of particular terrorist attacks" including

the SOL Attacks, and that Hamas has never "issued any rejection or credible denial of its culpability" for the SOL Attacks. *See* NatWest 56.1 St. ¶¶ 678-681; Schuster Decl. Ex. 210 (Kohlmann Rep. at 45), Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 8).

> 2. <u>Kohlmann Is Not Qualified To Offer Opinions As To Who Perpetrated A Terrorist Attack</u>

95. Kohlmann has no advanced degree in the study of terrorism or Hamas or professional experience in law enforcement or intelligence. *See* NatWest 56.1 St. ¶¶ 682-702.

96. The principal focus of Kohlmann's research has been Al Qaeda and he has never before been proffered as an expert in determining whether Hamas was responsible for committing a terrorist attack. *See* NatWest 56.1 St. ¶¶ 703-718.

> 3. <u>Kohlmann's Proposed Testimony Is Unreliable</u>

97. Kohlmann has not personally investigated any of the SoL Attacks or examined any forensic evidence concerning them. Rather, Kohlmann's analysis consists of quoting or summarizing claims of responsibility he found on the internet he attributes to Hamas, without considering whether the statements and photos on the websites he reviewed were trustworthy and accurate. *See* NatWest 56.1 St. ¶¶ 730-747.

98. Kohlmann stated that his usual methodology to determine the reliability of a particular source is to conduct a "comparative analysis" which requires comparing and contrasting the source in question with other analogous sources to try to identify common "threads and themes." Kohlmann stated that for purposes of his report in this case, he did not conduct a comparative analysis and therefore once Kohlmann determined that Hamas claimed responsibility on a website that he attributed to Hamas, he did not check whether any other group also claimed credit for the attack, because he was not asked to do so. *See* NatWest 56.1 St. ¶¶ 748-752.

**D.**   **None Of The Fact Witnesses Plaintiffs Proffer To Testify Regarding The SoL Attacks Has Personal Knowledge As To Who Perpetrated Any Of The Attacks**

99.     Plaintiffs have identified one plaintiff (Temima Spetner-Gould) and one eyewitnesses (Shalom Sabag) who were present at or shortly after one of the SoL Attacks to testify regarding the SoL Attacks.  Neither of these individuals, however, has any personal knowledge as to who is responsible for any of the SoL Attacks.

100.    Shalom Sabag was an eyewitness to the June 18, 2002 attack.  Grube Decl. Ex. 12 (Sabag Tr. at 20:5-21:13).

101.    Sabag testified that the only information he knew about the June 18, 2002 attack was based on what he had learned from news reports.  *Id.* (Sabag Tr. at 26:4-6).

102.    Temima Spetner-Gould is a plaintiff in this case.  Grube Decl. Ex. 13 (Spetner Tr. at 7:24-8:18).

103.    Spetner-Gould testified that she did not see the bombers who perpetrated the December 1, 2001 attack and, other than what she learned from news reports, she does not know anything about the identity of the suicide bombers.  *Id.* (Spetner Tr. at 59:19-62:4).

104.    Spetner-Gould does not know which group, if any, the bombers were affiliated with, nor anything about how the attack was funded.  *Id.* (Spetner Tr. at 60:21-61:8, 66:3-14).

105.    Spetner-Gould testified that she never spoke with law enforcement, military authorities or investigators about the attack, nor did she attend or participate in any legal proceedings related to this attack.  *Id.* (Spetner Tr. at 62:5-66:7).

Dated: December 21, 2016

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
Lawrence B. Friedman, A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc