UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
TZVI WEISS, *et al*.,                          :
                                               :          Case No. 05-CV-4622 (DLI) (RML)
                      Plaintiffs,              :
          - against -                          :
                                               :
NATIONAL WESTMINSTER BANK PLC,                 :
-------------------------------------------------------------------X
NATAN APPLEBAUM, *et al*.,                     :
                                               :          Case No. 07-CV-916 (DLI) (RML)
                      Plaintiffs,              :
          - against -                          :
                                               :
NATIONAL WESTMINSTER BANK PLC,                 :
-------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO NATWEST'S RENEWED MOTION FOR SUMMARY JUDGMENT**

January 25, 2017

Table of Contents

Table of Authorities ........................................................................................................ iii

Preliminary Statement ...................................................................................................... 1

Argument ........................................................................................................................... 1

I.   NATWEST HAS NOT SHOWN AS A MATTER OF LAW THAT ITS KNOWING
     PROVISION OF MATERIAL SUPPORT TO HAMAS VIA ITS SDGT CUSTOMER
     INTERPAL DID NOT PROXIMATELY CAUSE THE CONTEMPORANEOUS
     TERRORIST ATTACKS BY HAMAS. .............................................................................. 1

     A.  *Rothstein* Stated the Governing Standard of Proximate Causation .................... 2

     B.  *Al Rajhi* Did Not Change the *Rothstein* Causation Standard, Require Proof that
         NatWest's Material Support Was "Actually Used To Perpetrate" The Attacks,
         or Immunize Knowing Material Support for Hamas as "Routine Banking" .................... 4

     C.  The Evidence Clearly Establishes that NatWest Transferred Funds to Counter-parties
         Controlled by Hamas. ..................................................................................... 6

     D.  The Newly Adopted ATA §2333(d) Provides an
         Alternative Basis for Rejecting NatWest's Causation Argument ....................... 8

II.  UNCONTRADICTED ADMISSIBLE EVIDENCE DEMONSTRATES
     THAT HAMAS COMMITTED THE RELEVANT TERRORIST ATTACKS ...... 10

     A.  Even Standing Alone, Judgments of Conviction
         Establish that Hamas Committed 14 of the Attacks .......................................... 10

     B.  Even Standing Alone, Reports of Israeli Government Investigations
         Demonstrate Hamas's Responsibility for 13 of the Attacks ............................ 12

     C.  Plaintiffs' Expert Testimony Concerning the March 7, 2002 (Atzmona) and
         September 24, 2004 (Neve Dekalim) Attacks Defeats Summary Judgment ................... 15

         1.  Hamas's Credible Claim of Responsibility for the Atzmona Attack ........................... 15

         2.  Hamas's Credible Claim of Responsibility for the Neve Dekalim Attack ................. 17

3.   There Is No Evidence that Hamas Asserts False Claims of Responsibility ...............17

4.   Hamas's Credible Claims of Responsibility
      For The Atzmona and Neve Dekalim Attacks Are Admissible...................................19

D.   Dr. Shaked's Expert Testimony Raises a Genuine Factual Dispute Regarding
      Hamas's Responsibility for the October 22, 2003 (Tel Romeda) Attack.........................21

E.   Plaintiffs Are Not Estopped from Presenting Evidence
      of  Hamas's Responsibility for the Neve Dekalim and Bus 19 Attacks ..........................23

Conclusion ..........................................................................................................................25

Table of Authorities

**<u>Cases</u>**

*Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*,
    1997 WL 906427 (S.D.N.Y. Sept. 12, 1997)...................................................................... 10

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ............................................................................................................ 3

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) .......................................................................................................... 13

*Bluth v. Islamic Republic of Iran*,
    2016 WL 4491760 (D.D.C. Aug. 25, 2016) ...................................................................... 21

*Boim v. Holy Land Found. for Relief and Dev.*,
    549 F.3d 685 (7th Cir. 2008) .............................................................................................. 8

*Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    805 F.2d 49 (2d Cir. 1986)................................................................................................ 13

*Bridgeway Corp. v. Citibank*,
    201 F.3d 134 (2d Cir. 2000)....................................................................................... 11, 14

*Bridgeway Corp. v. Citibank*,
    45 F. Supp. 2d 276 (S.D.N.Y. 1999)................................................................................ 11

*CA, Inc. v. New Relic, Inc.*,
    2015 WL 1611993 (E.D.N.Y. Apr. 8, 2015) .................................................................... 14

*Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc.*,
    2009 WL 2500546 (E.D. Cal. Aug. 14, 2009)................................................................. 21

*Donnelly v. F.A.A.*,
    411 F.3d 267 (D.C. Cir. 2005)......................................................................................... 11

*Gelb v. Royal Globe Ins. Co.*,
    798 F.2d 38 (2d Cir. 1986)............................................................................................... 24

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................................................... 5

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ............................................................................... 5

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................................ 9, 10

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) .............................................................................................. 3

*Hullaby v. State*,
    911 S.W.2d 921 (Tex. App. 1995) .................................................................. 22, 23

*Huske v. Tyson Foods, Inc.*,
    2013 WL 5832248  (E.D. Tex. Oct. 29, 2013) ..................................................... 21

*In re Ollag Constr. Equip. Corp.*,
    665 F.2d 43 (2d Cir. 1981) .................................................................................. 20

*In Re Terrorist Attacks on September 11,
    2001*, 349 F.Supp. 2d 765, 833 (S.D.N.Y. 2005), *on reconsideration in part,* 392 F.Supp. 2d
    539 (S.D.N.Y. 2005), *aff'd,* 538 F.3d 71 (2d Cir. 2008), *aff'd,* 538 F.3d 71 (2d Cir. 2008), *aff'd,*
    714 F.3d 118 (2d Cir. 2013) ............................................................................ 4, 5

*In Re Terrorist Attacks on September 11,
    2001*, 740 F. Supp. 2d 494 (S.D.N.Y.  2010), *aff'd,* 714 F.3d 118 (2d Cir. 2013) ................... 3

*In re Vitamin C Antitrust Litig.*,
    2013 WL 504257 (E.D.N.Y. Feb. 8, 2013)..................................................... 20, 21

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
    1998 WL 851607 (S.D.N.Y. Dec. 8, 1998) ......................................................... 13

*Inouye v. Kemna*,
    504 F.3d 705 (9th Cir. 2007) .............................................................................. 24

*Lakah v. UBS, AG*,
    996 F. Supp. 2d 250 (S.D.N.Y. 2014)................................................................. 14

*Lakah v. USB AG*,
    2014 WL 5475294 (S.D.N.Y. Oct. 30, 2014) ...................................................... 23

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) .................................................................. 5

*Linde v. Arab Bank, PLC*,
    922 F. Supp. 2d 316 (E.D.N.Y. 2013) .......................................................... 18, 22

*Linde v. Arab Bank, PLC*,
    97 F. Supp. 3d 287 (E.D.N.Y. 2015) ........................................................... passim

*Lloyd v. Am. Exp. Lines, Inc.*,
  580 F.2d 1179 (3d Cir. 1978)................................................................................ 11

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
  828 F. Supp. 114 (S.D.N.Y. 1993)........................................................................ 20

*Pittman v. County of Madison*,
  2015 WL 557248 (S.D. Ill. Feb. 10, 2015)........................................................... 16

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)........................................................................... passim

*Saks Int'l, Inc. v. M/V Export Champion*,
  817 F.2d 1011 (2d Cir. 1987)................................................................................ 20

*Satchell v. Dilworth*,
  745 F.2d 781 (2d Cir. 1984)................................................................................. 23

*Schaghticoke Tribal Nation v. Kempthorne*,
  587 F. Supp. 2d 389 (D. Conn. 2008)................................................................... 14

*Shelden v. Barre Belt Granite Emp'r Union Pension Fund*,
  25 F.3d 74 (2d Cir. 1994) ..................................................................................... 16

*Stansell v. BGP, Inc.*,
  2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ........................................................ 5

*Strauss v. Crédit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) ............................................................ passim

*Strauss v. Crédit Lyonnais S.A.*,
  2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)............................................................ 6

*U.S. v. Gagliardi*,
  506 F.3d 140 (2d Cir. 2007)................................................................................. 14

*U.S. v. Garland*,
  991 F.2d 328 (6th Cir. 1993) ................................................................................ 11

*U.S. v. Mejia*,
  545 F.3d 179 (2d Cir. 2008)................................................................................. 22

*U.S. v. Williams*,
  205 F.3d 23 (2d Cir. 2000)................................................................................... 20

*U.S. v. Best,*
219 F.3d 192 (2d Cir. 2000)................................................................................ 16

*U.S. v. El-Mezain,*
664 F.3d 467 (5th Cir. 2011) ............................................................................... 7

*Weiss v. National Westminster Bank PLC,*
768 F.3d 202 (2d Cir. 2014)............................................................................. 4, 6

*Wultz v. Islamic Republic of Iran,*
755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................... 9, 10

## **Statutes**

1 U.S.C. §1 ............................................................................................................. 8, 24

18 U.S.C. § 2333(d) ............................................................................................. 8, 9, 25

18 U.S.C. § 2333(a) ...................................................................................................... 8

Pub. Law No. 114-222, 130 Stat. 852 (2016) ......................................... 3, 8, 9, 24, 25

## **Rules**

Fed. R. Evid. 803(3)..................................................................................................... 16

Fed. R. Evid. 803(6)................................................................................................. 20, 21

Fed. R. Evid. 803(8)................................................................................................. 13, 14

Fed. R. Evid. 803(22)................................................................................................... 10

Rule 804(b)(2)............................................................................................................... 16

Fed. R. Evid. 804(b)(3)............................................................................................ 16, 17

Fed. R. Evid. 807 ......................................................................................................... 22

Fed. R. Evid. 902(3)........................................................................................... 10, 13, 14

Rule 902(5) ................................................................................................................... 14

## **Other Authorities**

Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* §200 (2d ed. 2016) ...... 2

Plaintiffs respectfully submit this memorandum of law in opposition to defendant National Westminster Bank Plc's ("NatWest") renewed motion for summary judgment.[1]

PRELIMINARY STATEMENT

This motion is yet another fruitless exercise in delay.  NatWest raises only arguments it already presented in its December 2012 summary judgment motion.  Post-2012 case law has only further eroded the ground upon which NatWest's tired arguments rest.  Undeterred, NatWest again garbles the proximate cause standard set forth in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), and disregards the application of that standard (on facts virtually identical to those at issue here) in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) and *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015).  NatWest also repeats its baseless claim that no reasonable factfinder could conclude that Hamas was responsible for the attacks at issue although the *Arab Bank* jury found two years ago that Hamas committed those attacks, and Arab Bank does not even contest that finding on appeal.

ARGUMENT

I.

NATWEST HAS NOT SHOWN AS A MATTER OF LAW
THAT ITS KNOWING PROVISION OF MATERIAL SUPPORT TO HAMAS
VIA ITS SDGT CUSTOMER INTERPAL DID NOT PROXIMATELY CAUSE
THE CONTEMPORANEOUS TERRORIST ATTACKS BY HAMAS

In *Rothstein*, this Circuit adopted a traditional common law proximate causation standard for claims under the Anti-Terrorism Act ("ATA").  In *Strauss*, 925 F. Supp. 2d at 431-43, this Court carefully applied that standard in rejecting Credit Lyonnais' purported proximate causation

---

[1] Plaintiffs employ the following abbreviations: Rule 56.1 Statement in Response to NatWest's Supplemental 56.1 Statement and Supplemental Counter-Statement of Additional Material Facts ("Supp. SOF"); Declaration of Aaron Schlanger ("Schlanger Decl."); Plaintiffs' January 30, 2012 Memorandum of Law in Opposition (*Weiss* ECF 281, *Applebaum* ECF 155) ("Opp. Mem."); Plaintiffs' January 30, 2012 Response to NatWest's Local 56.1 Statement (*Weiss* ECF 283, *Applebaum* ECF 157) ("Resp. to NW SOF"); Plaintiffs' January 30, 2012 56.1(b) Statement of Material Facts as to Which There Is a Genuine Issue to Be Tried (*Weiss* ECF 284, *Applebaum* ECF  158) ("SOF"); NatWest's Memorandum of Law in Support of Renewed Motion for Summary Judgment ("NW Supp. Mem.").

defense on facts that are not meaningfully distinguishable from those before the Court.

Because *Rothstein* requires the same result here, NatWest claims that the standard has changed.  It asserts that *In re Terrorist Attacks on Sept. 11, 2001* ("*Al-Rajhi*"), 714 F.3d 118 (2d Cir. 2013), decided barely two months after *Rothstein*, imposed a new, harsher causation standard.  But *Al Rajhi* did not change the causation standard; it applied *Rothstein* to entirely "conclusory" allegations.  Contrary to NatWest's assertions, *Al Rajhi* did *not* hold that Plaintiffs must show that the funds NatWest transferred were "actually used to perpetrate" the attacks at issue (NW Supp. Mem. at 5), or that *knowingly* providing material support to a foreign terrorist organization can *ever* be "routine banking" (*id.* at 2), immune from ATA liability.

### A.  *Rothstein* Stated the Governing Standard of Proximate Causation

*Rothstein* rejected an "unprecedented" argument that causation should be *presumed* under the ATA, *Rothstein*, 708 F.3d at 96, and instead adopted the traditional standard of causation.

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his *acts were a substantial factor in the sequence of responsible causation* and whose injury was reasonably foreseeable or anticipated as a natural consequence.

*Id.* at 91 (emphasis in original) (internal quotation omitted).  The standard embraces both causation in fact (substantial factor) and causation in law (reasonable foreseeability).[2]

*Rothstein* then applied this traditional standard to the plaintiffs' conclusory allegations to find them wanting under "*Twombly's* plausibility [pleading] standard."  *Id.* at 97.  To illustrate the complaint's deficiencies, *Rothstein* identified some sufficient alternative allegations that the complaint lacked, including "that UBS provided money to [FTOs] Hizbollah or Hamas" or "that U.S. currency UBS transferred to Iran was given to Hizbollah or Hamas."  *Id.*  The question for

---

[2]  *See* Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts* §200 (2d ed. 2016) ("proximate cause" is used both to refer to the two prongs of causation and, more narrowly, to refer just to foreseeability).

the jury, therefore, is whether NatWest's conduct was a substantial factor in the sequence of responsible causation that resulted in Hamas's direct harm to the Plaintiffs.[3]  Conversely, the jury is not required to find that NatWest paid funds directly to "Hamas" *qua* "Hamas," as NatWest appears to contend by misapplying RICO case law.

As Judge Daniels explained in *In Re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494 (S.D.N.Y.  2010), where the defendant allegedly provided knowing support to Al Qaeda:

> [i]t is of no import whether such material support was provided directly or indirectly to the terrorist organization.… The labyrinthine means by which al Qaeda receives material support will not act as a shield to protect the providers of such support from liability.  Plaintiffs must, however, plead sufficient factual allegations to show that a defendant knew, or had reason to believe, that the intermediate entities or persons, would transfer to, or expend the financial or other material support provided by defendant, on behalf of, or at the direction of, al Qaeda.  Intentionally channeling funds or other material support through various intermediaries, with knowledge that the final and intended recipient is the terrorist organization al Qaeda, exposes the initial donor and each of the knowing intermediary actors to potential liability for their own conduct of providing material support to a foreign designated terrorist organization.

*Id.* at 517.

*Al Rajhi* affirmed that opinion.[4]  Judge Daniels' construction of the ATA causation requirement is further vindicated by the recently enacted Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. Law No. 114-222, 130 Stat. 852 (2016), which confirmed that the ATA's purpose it to "provide civil litigants with the broadest possible basis … to seek relief against persons, entities, and foreign countries … that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United

---

[3]  Defendant injects *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) into *Rothstein's* proximate cause standard to suggest a requirement of "directness" that is inapplicable to ATA claims.  *Anza* was a RICO case.  Plaintiffs indirectly harmed through the market by defendant's conduct do not meet RICO's causation requirements.  In *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992), the Supreme Court deemed such indirect injuries too remote because they are contingent on the harm suffered by direct victims, who "can be counted on to vindicate the law." *Id.* at 269-270. Here, of course, the Plaintiffs *are* the direct victims of Hamas's acts of terrorism.

[4]  Three of the defendants dismissed in *Al Rajhi* were parties to the *Al Rajhi* appeal.

States."  JASTA §2(b) (emphasis added).

> **B.** *Al Rajhi* **Did Not Change the** *Rothstein* **Causation Standard, Require Proof that NatWest's Material Support Was "Actually Used To Perpetrate" the Attacks, or Immunize Knowing Material Support for Hamas As "Routine Banking"**

Just two months after declaring the proximate causation standard in *Rothstein*, the Second Circuit applied it in *Al Rajhi*.  *Al Rajhi*, 714 F.3d at 124.  Al Rajhi Bank allegedly provided services to Al-Haramain Islamic Foundation ("Al-Haramain") before its designation as an SDGT for supporting al Qaeda.  The plaintiffs made only conclusory allegations that the funds provided by Al-Haramain to al Qaeda went *through* Al Rajhi Bank.[5]  The Court held that allegations that the defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda" were insufficient.  It noted that plaintiffs had not alleged, for example, that defendants "provided money directly to al Qaeda," or that the funds defendants provided were "actually transferred to al Qaeda and aided in the [attack]."  *Id*.

Embellishing the latter example, NatWest asserts that Plaintiffs must show that funds it furnished to Hamas were "*actually used to perpetrate*" attacks.  NW Supp. Mem. at 5 (emphasis added).  Neither the text nor logic of *Rothstein* or *Al Rajhi* support this invented requirement.

Nothing in *Al Rajhi* suggests that: (a) its listing of illustrative missing causation

---

[5]  Plaintiffs' 12(e) statement did allege transfers of funds to a *different* FTO – Hamas – but made no non-conclusory allegation that *Hamas* participated in the 9/11 attacks.  *See Burnett v. Al Baraka Inv. and Dev. Corp.*, CIV. A. 02-1616 (JR) (D.D.C. Aug. 27, 2003), ECF No. 266, Plaintiffs' Response to Al Rajhi Bank's Rule 12(e) Request to Plaintiffs, ¶66.  *See* 349 F. Supp. 2d 765, 833 (S.D.N.Y. 2005) ("… Plaintiffs have not alleged any relationship between Hamas and al Qaeda or the terrorist attacks of September 11."), *on reconsideration in part,* 392 F. Supp. 2d 539 (S.D.N.Y. 2005), and *aff'd,* 538 F.3d 71 (2d Cir. 2008), and *aff'd,* 538 F.3d 71 (2d Cir. 2008), and *aff'd,* 714 F.3d 118 (2d Cir. 2013).  Nor did plaintiffs make any non-conclusory allegation that Al Rajhi knew that the charities with which it dealt were connected to terrorism.  *See* 349 F. Supp. 2d at 832-33 ("Even with the opportunity to clarify their claims against Al Rajhi Bank, the *Burnett* Plaintiffs do not offer facts to support their conclusions that Al Rajhi Bank had to *know* that [the] Defendant charities … were supporting terrorism.") (emphasis added); *see also id.* ("The *Federal* and *Burnett* complaints do not include any facts to support the inference that Arab Bank *knew or had to know* that it was providing material support to terrorists by providing financial services to the charity Defendants or by processing wire transfers in Spain.") (emphasis added).  Here, of course, Plaintiffs have provided evidence both that Hamas committed the attacks and that there is a triable issue whether NatWest knew it was providing funds for Hamas.  *Weiss v. National Westminster Bank PLC*, 768 F.3d 202, 206, 212 (2d Cir. 2014).

allegations restricted rather than supplemented the types of allegations *Rothstein* identified as sufficient, including that money "UBS transferred to Iran was given to Hizbollah or Hamas"; or (b) plaintiffs had to plead that money that was transferred was "*actually used to perpetrate*" the attacks. The latter phrase is entirely NatWest's invention. Instead, *Al Rajhi* gave the example of money that was actually transferred and "aided in" – not "actually used to perpetrate" – the September 11 attacks. Given the amount and proximity of the funds transferred by NatWest to Hamas-controlled organizations (*see* Supp. SOF ¶¶ 105-120), NatWest cannot establish as a matter of law that the funds did not "aid" in the attacks. *See Strauss*, 925 F. Supp. 2d at 432 ("a reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue"). The supposed "actually used to perpetrate" requirement is just another renewal by NatWest of its failed effort to engraft the "but-for" tracing requirement on the ATA that this Court rejected in *Strauss*, as has *every* court that has reached the issue.[6]

NatWest also uses *Al Rajhi* as a pretext to reargue that "routine banking services" cannot proximately cause terrorist attacks. NW Supp. Mem. at 2. Plaintiffs agree. As the lower court in *Al Rajhi* remarked, "[p]roviding routine banking services, *without having knowledge of the terrorist activities,*" does not subject a bank to liability. 349 F. Supp. 2d at 835 (emphasis added). But providing banking services to Hamas *with knowledge* that the counter-parties receiving the funds are part of an FTO is the antithesis of "routine banking" – it is a felony under the material support statutes. *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005) ("Although the Bank would like this court to find, as did the court in *In re Terrorist*

---

[6]   *Strauss*, 925 F. Supp. 2d at 433; *see, e.g., Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507-08 (E.D.N.Y. 2012); *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *9 n. 5 (M.D. Fla. Mar. 31, 2011) ("Defendants have suggested that the Court adopt a 'but for' causation requirement. However, the Court is unaware of, and Defendants fail to point to, any ATA case in which such strict causation is required. In fact, many courts considering the ATA have definitively held that but for causation is not required."); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009).

*Attacks*, that it is engaged in 'routine banking services,' here, *given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities*, there is nothing 'routine' about the services the Bank is alleged to provide.") (emphasis added); *Strauss v. Crédit Lyonnais S.A.*, 2006 WL 2862704, at *12 (E.D.N.Y. Oct. 5, 2006) (distinguishing the district court opinion in *Al Rajhi* because "[t]he court relied on the routine nature of the banking services to conclude that the defendant bank had no knowledge of the client's terrorist activities, not that the provision of banking services *knowingly* to fund terrorist activities was permissible") (emphasis added).

The problem in *Al Rajhi* was that plaintiffs only made "conclusory allegations" of such knowledge that did "not meet *Twombly's* plausibility standard." *Al Rajhi*, 714 F.3d at 124 (giving as example the allegation that "UBS knew full well that the [funds it was providing] would be used to cause and facilitate terrorist attacks….").  The Second Circuit's finding here that the "evidence was sufficient to create a triable issue of fact as to whether NatWest's knowledge and behavior in response satisfied the statutory scienter requirements" – that is, whether "NatWest had actual knowledge that, or exhibited deliberate indifference to whether, Interpal provided material support to a terrorist organization" – is dispositive of NatWest's "routine banking" argument.  It removes NatWest's actions from the realm of the "routine" and distinguishes *Al Rajhi*'s "conclusory" allegations.  *Weiss*, 768 F.3d at 206, 212.

**C.  The Evidence Clearly Establishes that NatWest Transferred Funds to Counter-parties Controlled by Hamas**

The record creates a triable issue of fact as to whether NatWest's funds transfers on Interpal's behalf provided material support to Hamas.  First, the U.S. Treasury Department designated Interpal an SDGT because "[r]eporting indicates that Interpal is the fundraising coordinator of Hamas" and that "[f]unds are generated by, and flow through, these organizations

on behalf of Hamas."[7]  SOF ¶¶ 151-55; Supp. SOF ¶ 105.  *See Rothstein*, 708 F.3d at 93 (the plausibility of plaintiffs' allegations was supported by the government's designation of Iran).

Second, a jury convicted defendants in the Holy Land Foundation ("HLF") case for providing funds to many of the same Hamas "charities" that Interpal funded through accounts it held at NatWest.  *See U.S. v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011).  Finding that "[t]he evidence of Hamas control of the ... committees was substantial," the Fifth Circuit upheld those convictions.  Yet, NatWest now asks this Court to reject substantially the same evidence as a matter of law.  *Id.* (highlighting Dr. Levitt's testimony "that Hamas controls many of the zakat committees in the West Bank and Gaza").  As Judge Cogan remarked in *Arab Bank*, "If the government can prove Hamas' control of these charities beyond a reasonable doubt in a criminal case and without reference to the alter ego test advocated by defendant, plaintiffs can do the same in this civil case."  *Arab Bank,* 97 F. Supp. 3d at 334.

Third, the expert reports of Dr. Levitt and Mr. Spitzen cite and rely upon substantial evidence that confirms that the NatWest counter-parties to which Interpal sent funds were controlled by Hamas.  That evidence included multiple governments' findings that they were Hamas-controlled.  *See, e.g.,* Schuster Decl. Ex. 153 (Spitzen Report) at 20 (German Ministry of Interior); 40, 53, 65, 74, 78, 91, 102, 110, 119, 127, 135, 143 (Israeli Minister of Defense); 40, 65, 91, 102, 119 (U.S. Department of Treasury).  In addition, a 2001 FBI Memorandum (the "Watson Memorandum") described a significant number of them as "controlled by HAMAS."  Supp. SOF ¶ 120.  NatWest's attempt to draw a false dichotomy between Hamas and the "charitable" organizations discussed by Mr. Spitzen and Dr. Levitt is not supported by the record.  Both of their reports discuss in depth how these organizations form a part of Hamas's

---

[7]  https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx.

social network.  Additionally, as discussed in Mr. Spitzen's report, during the relevant time period, the Union of Good (which also held an account at NatWest through Interpal and was later designated an SDGT as "an organization created by Hamas leadership in late-2000 to transfer funds to the terrorist organization"[8]) coordinated activities among many of the 13 organizations.[9]

In *Arab Bank*, Judge Cogan described the evidence and testimony presented through Dr. Levitt and Mr. Spitzen as "a cornucopia of circumstantial evidence to support a jury finding that defendant knew or was willfully blind to the charities' Hamas affiliations."  97 F. Supp. 3d at 335.  Here Plaintiffs do not need a cornucopia, only enough to show a genuine dispute, which the same evidence indisputably does.

### D.  The Newly Adopted ATA §2333(d) Provides an Alternative Basis for Rejecting NatWest's Causation Argument

In September 2016, Congress enacted JASTA, which provides a cause of action for Americans injured by an act of international terrorism "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization …, as of the date on which such act of international terrorism was committed, planned, or authorized.…"  18 U.S.C. § 2333(d).  Under § 2333(d), "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, … the person who committed such an act …"[10]

---

[8]  https://www.treasury.gov/resource-center/terrorist-illicit-finance/Pages/protecting-union-of-good.aspx.

[9]  For example, Mr. Spitzen states that the Union of Good used the al-Tadamun Charitable Society in Nablus, Al-Islah Charitable Society-Ramallah & al-Bireh, and the Islamic Charitable Society-Hebron to channel funds to other societies.  *See* Schuster Decl. Ex. 153 (Spitzen Rep.) at 34-35.  He also notes that the Al-Islah Charitable Society-Ramallah & al-Bireh was established by Hamas.  *See id*. at 15.  Moreover, he discusses an interview given by Isma'il Abu Shanab, one of the senior leaders of Hamas, during which he stated that three of the charities under review (al-Salah, al-Mujama al-Islami and al-Jam'iya al-Islamiya) were integral parts of Hamas's social infrastructure.  *See* id. at 61.  Mr. Spitzen also cites and appends the interrogation protocol in which Jamal al-Tawil confirmed coordinating the establishment of Al-Islah Charitable Society-Ramallah & al-Bireh with Hamas's office in Lebanon.  *See id*. at 136, 140-41.  Additionally, Mr. Spitzen cites examples of the charities in question transferring money to Hamas operatives. *See, e.g.*, *id*. at 85-86, 93-94, 115.

[10]  JASTA applies to any action pending on the date of its enactment (September 28, 2016) arising out of injuries sustained on or after September 11, 2001.  JASTA § 7. "Person" includes associations and other organizations. §2333(d)(1) (incorporating 1 U.S.C. §1).

Congress enacted § 2333(d) to codify the common law secondary liability that the courts had rejected for § 2333(a) claims in *Rothstein* and *Boim v. Holy Land Found. for Relief and Dev.* (*Boim III*), 549 F.3d 685, 693-694 (7th Cir. 2008) (en banc).  The statute seeks to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  JASTA § 2(b).

Congress also found that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which comprehensively addresses civil aiding and abetting and conspiracy, "provides the proper legal framework for how such liability should function in the context of" the ATA.  JASTA § 2(a)(5). In *Halberstam*, the plaintiff administratrix sued Linda Hamilton for aiding and abetting her boyfriend, who murdered the decedent during a burglary.  Although Hamilton assisted her boyfriend's criminal conduct only by laundering the proceeds of his thefts and performing accounting services, knew only that he committed criminal activity at night, and never intended to assist any killing, the court held her liable for aiding and abetting the murder.  705 F.2d at 488.

In discussing the proof of causation required to sustain an aiding and abetting claim, the *Halberstam* court emphasized "that a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it."  705 F.2d at 484.  Liability does not require "but-for" causation.  *Id*. at 482-85.  Rather, "when [Hamilton] assisted [her boyfriend], it was enough that she knew he was involved in some type of personal property crime at night – whether as a fence, burglar, or armed robber made no difference – *because violence and killing is a foreseeable risk in any of these enterprises*."  *Id*. at 488 (emphasis added).  Of course, violence and killing is an even more foreseeable risk of providing large sums of money to Hamas-controlled organizations while Hamas is engaged in an extended campaign of suicide bombings

9

and other terrorist attacks, as this Court expressly found in *Strauss*. 925 F. Supp. 2d at 432.

Section 2333(d) therefore provides an alternative basis for rejecting NatWest's contention that, as a matter of law, its conduct did not cause Plaintiffs' injuries. *See, e.g., Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 57 (D.D.C. 2010) (where bank knowingly processed millions of dollars of wire transfers to a known FTO, the bank aided and abetted the murder of the plaintiff by the FTO's suicide bomber).[11]

## II.
### UNCONTRADICTED ADMISSIBLE EVIDENCE DEMONSTRATES THAT HAMAS COMMITTED THE RELEVANT TERRORIST ATTACKS

### A. Even Standing Alone, Judgments of Conviction Establish that Hamas Committed 14 of the Attacks

The convictions of Hamas terrorists for their roles in 14 of the 18 terrorist attacks at issue here (*see* Supp. SOF ¶¶ 128-29) suffice to defeat NatWest's motion with respect to those attacks. *See Strauss*, 925 F. Supp. 2d at 447 (holding Israeli judgments of conviction admissible pursuant to Fed. R. Evid. 803(22)); *Arab Bank*, 97 F. Supp. 3d at 349 (admitting "criminal convictions of Hamas operatives in Israeli courts"); Schlanger Decl. Ex. 17 at 5.[12] As foreign public documents, all of the judgments of conviction can be self-authenticated pursuant to Fed. R. Evid. 902(3). *See Strauss*, 925 F.Supp.2d at 448. *See, e.g.*, Schlanger Decl. Exs. 19, 22-23, 25, 28, 44.

In *Strauss*, the Court rejected NatWest's argument that third-party convictions are not admissible against civil defendants. 925 F. Supp. 2d at 447 ("the plain language of Rule 803(22) … does not impose such a limit"). *See also Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, 1997 WL 906427, at *4 n.7 (S.D.N.Y. Sept. 12, 1997) (collecting authorities). As the Court recognized, the limitation upon Rule 803(22) that NatWest cites only applies to

---

[11] By imposing aiding and abetting liability upon a defendant who "knowingly and substantially assist[s] the principal violation," *Halberstam*, 705 F.2d at 488, the governing legal framework also confirms the case law establishing that "routine banking" does not include *knowingly* providing material support to an FTO. *See* Point I.B., *supra*. Whether assistance is substantial depends in part on the amount and timing of the assistance, quintessentially a fact question for the jury. *Halberstam*, 705 F.2d at 478.

[12] Contrary to NatWest's assertion (*see* NW Supp. Mem. 18-19), the record evidence of Hamas's responsibility for the March 7, 2003 (Kiryat Arba) attack includes the conviction of Hamas member Abdallah Ahmad Abu Seif, as well as the indictment upon which that conviction is based. *See* Resp. to NW SOF ¶ 619; Supp. SOF ¶ 128(f).

convictions offered by the prosecution in a criminal case. *See* Fed. R. Evid. 803(22)(D).

*Strauss* also rejected NatWest's argument that to admit a foreign judgment of conviction under Rule 803(22) courts require an affirmative showing that the foreign tribunal complied with due process. *Strauss*, 925 F. Supp. 2d at 447-48.[13]  Thus, even if correct, NatWest's assertion that Israeli military tribunals do not afford defendants American-style due process would only "affect[] the weight of the [convictions as] evidence, not [their] admissibility." *Id.* at 448.[14] Moreover, NatWest does not assert that the Israeli *civilian* tribunals that convicted Hamas operatives for five of the attacks at issue failed to observe procedural due process. *See* Supp. SOF ¶¶ 63, 128(a)-(c), (e) and (k).

In any event, the record establishes that the military tribunals that convicted Hamas operatives for nine of the attacks employed fair proceedings. *See id.* at ¶ 63.  The testimony of Plaintiffs' expert rebuttal witness Professor Gross demonstrates that "many of the basic rights that accused persons have in American courts also are applicable to defendants in the Israeli military courts" such that the convicted Hamas terrorists "were afforded more than a modicum of due process." *Strauss*, 925 F. Supp. 2d at 448 (citing Professor Gross's report in that case, which is substantially identical to Schuster Decl. Ex. 206, *see esp.* at ¶¶ 57-71); *see also* Supp. SOF ¶ 63.[15]  Since this Court's 2013 decision in *Strauss*, the admissibility of Israeli military court convictions has been repeatedly confirmed. *E.g., Linde v. Arab Bank, PLC*, 04-cv-2799 (BMC)(PK) (E.D.N.Y.) ECF 1049 (*see* Schlanger Decl. Ex. 17 at 5); *Sokolow v. Palestine*

---

[13] *Accord, e.g., Donnelly v. F.A.A.*, 411 F.3d 267, 270-71 (D.C. Cir. 2005) ("[P]rinciples of comity suggest that the Japanese judgment [of conviction] should be [admitted into evidence and] given weight as *prima facie* evidence of the facts underlying it and the burden was on [the party contesting those facts] to impeach the judgment."); *U.S. v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993) ("A foreign judgment [of conviction] that shows no sign of being unreliable should be admitted.").

[14] *Accord, e.g., Garland*, 991 F.2d at 335; *Donnelly*, 441 F.3d at 271; *Lloyd v. Am. Exp. Lines, Inc.*, 580 F.2d 1179, 1190 (3d Cir. 1978).

[15] NatWest's misplaces its reliance on *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000) to impeach Professor Gross's testimony. *See* NW Supp. Mem. 18. *Bridgeway* did no concern admissibility of foreign convictions. The court addressed whether a foreign judgment should be given conclusive effect – relief that is limited to judgments rendered by judicial systems that conform their procedures to American notions of due process. 201 F.3d at 141 n.1. Moreover, NatWest's quibbles with Israeli military court procedures pale in comparison to the "powerful and uncontradicted documentary evidence" in *Bridgeway*, which included State Department reports that the Liberian justice system had effectively ceased to exist during a seven-year civil war. 201 F.3d at 141-44; *see also Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278-80, 286-87 (S.D.N.Y. 1999) (affirmed by *Bridgeway*).

*Liberation Org.*, 04-cv-397 (GBD)(RLE) (S.D.N.Y.) ECF 672.  NatWest cites no case in which a court refused to admit a foreign conviction arising from comparable procedures.

NatWest also repackages the previously unsuccessful argument that the convictions cited by Dr. Shaked in his analysis of the January 29, 2004 (Bus 19) attack demonstrate only that a Hamas member was convicted of conspiring to commit a *prior*, unsuccessful attack.  *See* NW Supp. Mem. at 23-24.  As the Court emphasized in *Strauss*, the evidence that another terrorist organization assisted the suicide bomber recruited by Hamas to commit the Bus 19 attack does not entitle NatWest to judgment as a matter of law.  Rather, "[a]t most, [it] raises a triable issue of fact" as to Hamas's responsibility for this attack.  *Strauss*, 925 F. Supp. 2d at 447 n.20.

The record fully supports that holding.  Contrary to NatWest's assertion, Hamas member Nufal Adawin was convicted of conspiring to cause, and failing to prevent, the Bus 19 attack, not a prior, unsuccessful attack.  *See* Supp. SOF ¶ 149; Schlanger Decl. ¶ 34 and Ex. 25.  In sentencing Adawin, the Israeli court found that he had: (a) recruited the suicide bomber and "planned the attack in detail" (Schlanger Decl. Ex. 25 L-C180927); and (b) failed to prevent the attack when informed of the suicide bomber's intention to carry it out with help from another terrorist organization.  *See id*.  In addition, Adawin's co-conspirator and fellow Hamas member, Muhammad al-Nashash, was sentenced to 20 years in prison for his role in recruiting the suicide bomber and planning what ultimately became the Bus 19 attack.  *See* Supp. SOF ¶ 150.[16]

### B.  Even Standing Alone, Reports of Israeli Government Investigations Demonstrate Hamas's Responsibility for 13 of the Attacks

Rule 803(8)(A)(iii) provides a hearsay exception for "a record or statement of a public office … if it sets out … factual findings from a legally authorized investigation."  Official Israeli government records setting forth the results of investigations by the ISA and the Israel Defense Forces ("IDF") demonstrate that Hamas terrorists committed 13 of the 18 attacks.  *See* Supp. SOF ¶¶ 125-27.  Those 13 attacks include the April 30, 2003 suicide bombing of Mike's

---

[16]  In addition to the convictions of Adawin and al-Nashash, Hamas's responsibility for the Bus 19 attack is evidenced by a public announcement by the Israel Security Agency ("ISA") of its finding that Muhammad abu Uda, the head of the Hamas *Izz ad-Din al-Qassam* Brigades in the Bethlehem area, was "in charge" of the Bus 19 attack. *See* Supp. SOF ¶ 140; Schlanger Decl. ¶ 33 and Ex. 24; Point II.B, *infra*.

Place in Tel Aviv, which did not produce a conviction.  *See id.* at ¶ 125(e).

In *Strauss*, the Court held that the ISA report *Summary of the Year 2003* ("2003 ISA Report"), which finds Hamas responsible for the Mike's Place attack,[17] is both admissible under Rule 803(8)(A)(iii) and self-authenticating as a foreign public document under Rule 902(3).  *See* 925 F. Supp. 2d at 448.[18]  NatWest does not contest this ruling, except to "preserve" its irrelevant "objection" that an Israeli court would exclude the 2003 ISA Report as hearsay.  *See id.* at 447-48 (noting that Credit Lyonnais "neither points to any authority (and the court is unaware of any) nor provides any reasoned explanation as to why this court should look to Israeli evidentiary rules and not the Federal Rules of Evidence in making its admissibility rulings").

Hamas's responsibility for nine other attacks is demonstrated by *Suicide Terrorists in the Current Conflict, September 2000-September 2007* ("2007 ISA Report"), another ISA report admitted into evidence at the Arab Bank trial.  *See* Supp. SOF ¶¶ 125(a)-(b), (d), (f), (g)-(i), 127; Schlanger Decl. ¶¶ 4-7 and Exs. 1, 2, 4.  The Israeli government's findings that Hamas was responsible for three other attacks were reported in official public announcements by: the ISA (*see* Supp. SOF ¶¶ 125(j), 148 and Schlanger Decl. Ex. 24 (February 2, 2004 announcement re Bus 19 attack)); the PMO (*see* Supp. SOF at ¶ 125(c) and Schlanger Decl. Ex. 5 (August 21, 2002 announcement re Hebrew University attack)); and the IDF (*see* Supp. SOF at ¶ 126 and Schlanger Decl. Ex. 20 (December 23, 2003 announcement re June 20, 2003 (Route 60) attack)). Like the 2003 ISA Report, these reports set forth "factual findings from a legally authorized investigation."  Fed. R. Evid. 803(8)(A)(iii); Supp. SOF at ¶¶ 122-23, 125-27.  As a result, these government reports independently defeat NatWest's motion with respect to 13 of the attacks.

---

[17]  *See also* Supp. SOF ¶ 125(e); Schlanger Decl. Ex. 6 (June 15, 2003 official announcement of the Office of the Prime Minister of Israel ("PMO") regarding the on-going ISA investigation into the Mike's Place attack and ISA's interim finding that the two suicide bombers "were dispatched to perpetrate the attack by the Hamas military command in the Gaza Strip"); Schlanger Decl. Ex. 4 at 28 (2007 ISA Report describing evidence analyzed by ISA in connection with the Mike' Place attack).

[18]  *Accord, e.g.*, *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988) (affirming admissibility of Navy investigative report into cause of airplane crash); *Bradford Trust Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 805 F.2d 49, 54 (2d Cir. 1986) ("[T]he district court correctly admitted [two] FBI reports as falling within the public records hearsay exception; but it erred in giving them no weight."); *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 1998 WL 851607, at *1 (S.D.N.Y. Dec. 8, 1998) (admitting European Commission's statement of objections setting forth interim factual findings).

NatWest asserts that the ISA reports are "conclusory" and do not detail, for each attack, "investigative steps that were taken or evidence that was gathered."  NW Supp. Mem. 20.  But these quibbles do not satisfy NatWest's burden of showing that these presumptively admissible government records lack trustworthiness.  *See* Fed. R. Evid. 803(8)(B); *Bridgeway*, 201 F.3d at 143 ("The burden to show 'a lack of trustworthiness' [is on] the party opposing admission.").  In combatting terrorism, the ISA and the IDF cannot publicly disclose the nature and sources of all intelligence they gather.  In any event, judgments of conviction confirm the trustworthiness of the Israeli government's findings that Hamas was responsible for:  (a) each of the nine attacks addressed in the 2007 ISA Report (*see* Supp. SOF ¶¶ 128(a)-(b), (e), (g)-(h), (j)-(k), 124); (b) the July 31, 2002 (Hebrew University) attack (*see id.* at ¶ 128(c)); (c) the June 20, 2003 (Route 60) attack (*see id.* at ¶ 128(i)); and (d) the January 29, 2004 (Bus 19) attack.  *See id.* at ¶ 128(l)).

NatWest's efforts to challenge the authenticity of the Israeli government reports fail to recognize that the "bar for authentication of evidence is not particularly high" and that the applicable standard is "one of 'reasonable likelihood' and is 'minimal.'"  *U.S. v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (citations omitted).  Pursuant to Fed. R. Evid. 902(3), Plaintiffs can authenticate these documents through official certification.  *See, e.g., Strauss*, 925 F. Supp. at 448.  Moreover, the ISA and IDF reports are self-authenticating under Rule 901(a)(4) because they bear the official logos of those government agencies.  *See Lakah v. UBS, AG*, 996 F. Supp. 2d 250, 255 (S.D.N.Y. 2014) (logo of Egypt's Capital Markets Authority sufficed to authenticate letters); Schlanger Decl. ¶¶ 4 and Ex. 1; *id.* at Exs. 5, 6, 20, 31, 32, 49.

The reports are also self-authenticating under Rule 902(5) because they were downloaded from the agencies' official websites and, in most cases, are still available on the internet.  *See, e.g., Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397 (D. Conn. 2008) (press release downloaded from congressman's web address was self-authenticating under Rule 902(5)); *CA, Inc. v. New Relic, Inc.*, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (printouts of webpages bearing time-and-date stamp and URL were authenticated by counsel's declaration); Schlanger Decl. ¶¶ 4-5, 13, 14, 15, 41.

**C. Plaintiffs' Expert Testimony Concerning the March 7, 2002 (Atzmona) and September 24, 2004 (Neve Dekalim) Attacks Defeats Summary Judgment[19]**

**1. Hamas's Credible Claim of Responsibility for the Atzmona Attack**

As Plaintiffs' experts opine, Hamas published an immediate claim of responsibility for the March 7, 2002 (Atzmona) attack.  *See* Supp. SOF ¶ 136.  Substantial circumstantial evidence identified by Plaintiffs' experts establishes the trustworthiness of that claim.  For example, Hamas's claim was: (i) made on the day the attack occurred; (ii) published on the websites of Hamas's political wing and military organization (the *Izz al-Din al-Qassam* Brigades); and (iii) asserted in an official Hamas communiqué that bears the official symbol and inscription of the *al-Qassam* Brigades.  *See id.* at ¶ 137(a)-(c).  Perhaps most importantly, Hamas's claim sets forth accurate details regarding the attack that, as of the time of the announcement, would only have been known to those responsible.  Those non-public details included the name, age, and residence of the attacker (17-year-old Muhammed Farhat of Gaza), and the date, time and location of the attack (11:52 p.m. on March 7, 2002 at Atzmona).  *See id.* at ¶ 137(d).[20]

In addition to these characteristics of the claim itself, two videos published on Hamas websites provide further circumstantial guarantees of the claim's trustworthiness.  *See id.* at ¶¶ 137(e), 138-41.  Muhammad Farhat, whom Hamas identified as the perpetrator of the Atzmona attack, recorded a "video will" no more than two days before he died committing the attack.  *See* Supp. SOF ¶¶ 138-41; Schlanger Decl. ¶¶ 47-50 and Exs. 38-41.  The video shows Farhat standing in front of Hamas symbols, wearing a hat with the *al-Qassam* Brigades ribbon,

---

[19]  Hamas published claims of responsibility for all of the attacks at issue in these actions, except the October 22, 2003 (Tel Romeda) attack in which only the Hamas operative was killed.  *See* Supp. SOF ¶¶ 134-35.  For purposes of opposing NatWest's summary judgment motion, it is only necessary for the Court to consider the admissibility of Hamas's claims regarding the Atzmona and Neve Dekalim attacks.

[20]  According to NatWest's proposed terrorism expert, Brian Jenkins, an organization's claim of responsibility is more credible if, among other things, it:  (a) is announced within a short time after the attack, (b) through a reliable route that the organization has used before, (c) contains accurate details of the attack, and (d) contains details that would be known only to the perpetrator.  *See* Schuster Decl. Ex. 172 (Jenkins Report) at 28-29, 49 n.102.

and carrying a gun.  *See* Supp. SOF at ¶ 139; Schlanger Decl. Ex. 38.  Farhat declares that he is a

"son" of the *al-Qassam* Brigades and states his intention to carry out an "operation … in order to

take revenge upon the enemies of humanity – the Jews, the bloodsuckers who kill my people day

and night."  *Id*. at ¶ 140; Schlanger Decl. ¶ 48 and Ex. 39.  Farhat further states that he expects to

die undertaking the "operation."  *See id*.; Schlanger Decl. ¶ 48 and Ex. 39.  The Farhat "video

will" is therefore admissible as: (i) a statement against Farhat's interest, under Fed. R. Evid.

804(b)(3);[21] (ii) a statement of Farhat's "then-existing state of mind (such as motive, intent or

plan)," under Rule 803(3);[22] and (iii) a statement made under the belief of imminent death, under

Rule 804(b)(2).[23]  It can be authenticated by Dr. Shaked, who is able to identify Muhammad

Farhat.  *See* Supp. SOF ¶ 79; *Arab Bank*, 97 F. Supp. 2d at 341 ("[P]laintiffs' expert witnesses,

Messrs. Kohlmann and Shaked, who were both familiar with the likenesses of these terrorists

from their extensive review of other Hamas materials, identified the individuals depicted in the

'video wills' as the same individuals who carried out the attacks in question.").

In the second video published on the Hamas websites, Maryam Farhat, who was an

infamous Hamas operative and Palestinian Legislative council member, is shown advising her

---

[21] Contrary to NatWest's assertion (NW Supp. Mem. 17), *Strauss* did not rule that "video wills" are *per se* inadmissible.  *See Strauss*, 925 F. Supp. 2d at 443, 444, 446 (mentioning video wills, but making no ruling regarding their admissibility).  The Court's rationale for precluding the Hamas organization's post-attack claims of responsibility does not apply to an individual suicide terrorist, who lacks any "propaganda" motive to assert a false claim that he intends to commit a terrorist attack.  *See id.* at 449 (ruling that "Hamas' claims of responsibility were not against its interest *as an organization* such that Hamas only would have made them if it believed them to be true") (emphasis added).  It is clearly against the penal, proprietary and pecuniary interests of a Palestinian to declare his membership in an illegal organization and his intention to commit mass murder.  *See Arab Bank*, 97 F. Supp. 3d at 341-42 (video wills are declarations against interest because "they expose a declarant to significant criminal liability" and risk that "Israel would make great efforts to capture or kill the declarant").

[22] *See, e.g., United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future … may be introduced to prove that the declarant thereafter acted in accordance with the stated intent."); *Shelden v. Barre Belt Granite Emp'r Union Pension Fund*, 25 F.3d 74, 79 (2d Cir. 1994) ("[U]nder a long established exception to the hearsay rule, the existence of the plan or intention [to do a given act] may be proven by evidence of 'the person's own statements as to its existence.'") (citation omitted).

[23] *See, e.g., Pittman v. County of Madison*, 2015 WL 557248, at *3 (S.D. Ill. Feb. 10, 2015) (admitting a note written prior to a plaintiff's suicide attempt in which he stated that "he would rather die than 'snitch'").

son – Atzmona attacker Muhammed Farhat – regarding techniques for killing Jewish settlers and then dispatching him for his suicide mission. *See id*. at ¶¶ 79, 137(e); Schlanger Decl. Ex. 42. This video and the Farhat "video will" provide compelling circumstantial evidence of the trustworthiness of the Hamas communiqué claiming responsibility for the Atzmona attack. *See esp*. Schuster Decl. Ex. 172 (Jenkins Report) at 31-32 (opining that "pre-attack" evidence, such as photos and video statements by a suicide terrorist "is considered more compelling than post-attack evidence" and that "video wills may be important evidence" corroborating a claim of responsibility, particularly if they were made close in time to the attack).

### 2. Hamas's Credible Claim of Responsibility for the Neve Dekalim Attack

As Plaintiffs' experts opine, Hamas published two immediate claims of responsibility for the September 24, 2004 (Neve Dekalim) attack. *See* Supp. SOF ¶ 146. Hamas made the first claim within a half-hour of the attack. *See id*. at ¶ 147(a); Schlanger Decl. Ex. 29. In a second admission made an hour after the first claim, Hamas confirmed the first announcement and reported the casualties acknowledged by "the enemy." *Id*.; Schlanger Decl. Ex. 30. Hamas made both claims in official communiqués that bear the *al-Qassam* Brigades' official symbol and inscription. *See id*. ¶ 147(b); Schlanger Decl. Exs. 29, 30. Importantly, both claims of responsibility also set forth details regarding the attack – including its exact time and location and that it involved the firing of three 100-mm mortar shells – that only those responsible for the attack would have known at that time. *See id*. at 147(c). No admissible evidence suggests that a terrorist organization other than Hamas claimed responsibility for the attack. *See id*. at 147(e).

### 3. There Is No Evidence that Hamas Asserts False Claims of Responsibility

In *Strauss*, the Court found Hamas's post-attack claims of responsibility for certain terrorist attacks (not including the Atzmona attack) inadmissible under Rule 804(b)(3). The Court reasoned that the propaganda interests and motives of Hamas to take "'credit'" for terror

17

attacks are such that its claims of responsibility for an attack are "not against its interests *as an organization* such that Hamas only would have made them if it believed them to be true." *Strauss*, 925 F. Supp. 2d at 449 (emphasis added).  The Court did not address the specific content or circumstances of any particular claim of responsibility.  *See id.*[24]

The record does not support the conclusion that Hamas asserted false claims of responsibility for the Atzmona and Neve Dekalim attacks.  *See* Supp. SOF ¶¶ 56, 131.  Plaintiffs' terrorism expert, Dr. Shaked, testified that, during the Second Intifada, Hamas *never* issued an official claim of responsibility for an attack in which it was not involved.  *See id.* at ¶ 56.  Similarly, Plaintiffs' expert regarding Hamas's internet communications, Evan Kohlmann, testified that he is not aware of any claim of responsibility during the Second Intifada period that was issued through an official Hamas website that has been shown to be false, as opposed to merely exaggerated or inaccurate in some detail.  *See id.*[25]  Indeed, Hamas attempted to "achieve the position of honest broker in the Israeli Palestinian conflict" by only "claim[ing] credit for the stuff they can prove that they have done."  Schuster Decl. Ex. 187 (Kohlmann Dep.) at 187:13-15, 187:17-18 (*quoted in* Supp. SOF ¶ 56).  *See also* Supp. SOF ¶ 131.

NatWest's proposed expert, Brian Jenkins, cites to three purported false claims of responsibility made by Hamas over an almost six-year period (during which over 27,000 terrorist attacks were committed in Israel).  *See* Supp. SOF ¶ 124.  Critically, however, Jenkins cites no

---

[24] *But see Arab Bank*, 97 F. Supp. 3d at 339-40 ("'The fact that Hamas may have other motivations for claiming responsibility for a terrorist attack does not automatically render such claims inadmissible.  After all, it is rare for anyone to say anything purely for the sake of getting himself in trouble…. [T]he question is not whether Hamas' claims of responsibility were undiluted by other motives, but whether Hamas, or rather, its members were aware that they faced severe penal consequences for making these claims…. With the potential penal consequences as severe as they are in this case, Hamas' propaganda motives are insufficient to render its statements inadmissible.").

[25] Contrary to NatWest's arguments, Mr. Kohlmann: (a) qualifies as an expert regarding Hamas's use of propaganda and the internet and the authenticity of official Hamas communiqués and Hamas websites; and (b) has employed a reliable methodology in formulating his opinions.  Indeed, other courts have both certified Kohlmann as an expert regarding these precise issues and found his methodologies sufficiently reliable to justify admitting his opinions.  *See Strauss*, 925 F. Supp. 2d at 446; *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 331-32 (E.D.N.Y. 2013); *Arab Bank*, 97 F. Supp. 3d at 299-300; Opp. Mem. 45-48; Schlanger Decl. ¶ 25 and Ex. 16.

official Hamas websites that evidence false claims.  Instead – conceding that he has "not done any independent investigation" to determine who was responsible for these three attacks – Jenkins relies exclusively on newspapers and other secondary sources.  *See* Schuster Decl. Ex. 172 (Jenkins Report) at 21-22 nn. 36-43; Schlanger Decl. Ex. 13 (Jenkins 6/10/2011 Dep.) at 136:11-15.  In the case of the April 10, 2002 (Yagur Junction) attack, for example, Jenkins cites a source that is at least three-times removed from the purported Hamas claim.  *See* Schuster Decl. Ex. 172 at 21 n.39 (citing Xinhua News Agency article (citing Israeli TV quoting Al-Jazeera TV quoting an unidentified source)); Schlanger Decl. Ex. 14.  In fact, Hamas never claimed responsibility for the Yagur Junction attack or the May 19, 2002 (Netanya Market) attack via an official communiqué published on one of its websites, and a Hamas-controlled website announced that the purported Hamas claim of responsibility for the Yagur Junction attack was not authentic.  *See* Schlanger Decl. at ¶ 22 and Ex. 13.[26]  The ITIC report that Jenkins cites as evidence for his assertion that Hamas's claim of responsibility for the third attack – on December 28, 2007 at Wadi Telem – was false actually states that one of the three perpetrators of that attack was reported to be a member of the *al-Qassam* Brigades.  *See* Schlanger Decl. Ex. ¶ 24 and Ex. 15; *id*. Ex. 13 (Jenkins 6/10/2011 Dep.) at 125:2-7.  In short, NatWest has failed to demonstrate that Hamas asserted a false claim of responsibility for any terror attack, let alone that its claims regarding Atzmona and Neve Dekalim are less than completely credible.

### 4.  Hamas's Credible Claims of Responsibility For The Atzmona and Neve Dekalim Attacks Are Admissible

Although the Court may be skeptical as to whether Hamas's claims of responsibility qualify generally as exceptions to hearsay under Fed. R. Evid. 804(b)(3)(A), each attack and

---

[26]  In its analysis of these two attacks, the 2007 ISA Report does not reference any Hamas claim of responsibility. *See* Schlanger Decl. Ex. 4 at 44, 47

statement requires individual consideration.  In this instance, there is no evidence that Hamas was motivated to assert a false claim of responsibility for the Atzmona and Neve Dekalim attacks.  On the other hand, NatWest cannot dispute that claiming responsibility for these attacks has a "great … tendency … to expose [Hamas] to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  *See Arab Bank*, 97 F. Supp. 3d at 339 ("It is beyond reasonable dispute that Hamas' claim of responsibility for a violent terrorist attack on Israeli civilians could subject the organization and its members to penal consequences, including crackdowns, arrests and even assassination by Israel.").  The Hamas communiqués claiming responsibility for the Atzmona and Neve Dekalim attacks are therefore admissible under Rule 804(b)(3)(A).

They are also admissible under the business records exception, which "'favor[s] the admission of evidence rather than its exclusion if it has any probative value.'"  *U.S. v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (quoting *In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981)).  Any "qualified witness" can lay the foundation Rule 803(6) requires.  Fed. R. Evid. 803(6)).  That witness need "not [be] an employee of the entity that owns and prepared [the records]."  *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).

As Plaintiffs demonstrate above, the contents of the Atzmona and Neve Dekalim claims establish that they were made "at or near the time [of the attacks] by – or from information transmitted by – someone with knowledge."  Rule 803(6)(A).  *See, e.g., Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 114, 119 (S.D.N.Y. 1993) (the court may determine from any "appropriate source—from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things—that the [Rule 803(6)(A)] foundational element has been met.") (internal quotation omitted); Supp. SOF ¶¶ 136, 137(a) & (d), 146, 147(a) & (c).  Kohlmann's expert testimony establishes that Hamas maintains the websites on which the claims were published "in the course of a regularly conducted activity."

20

Fed. R. Evid. 803(6)(B). *See* Supp. SOF ¶¶ 132-33; *In re Vitamin C Antitrust Litig*., 2013 WL 504257 at *5 (E.D.N.Y. Feb. 8, 2013) ("Statements on a website can be considered business records within the scope of Rule 803(6)."); *Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc*., 2009 WL 2500546, at * 9 (E.D. Cal. Aug. 14, 2009) (same).

Kohlmann's testimony also demonstrates that the publication of such claims was "a regular practice of that activity" by Hamas. Rule 803(6)(C). *See* Supp. SOF ¶¶ 132-33; *In re Vitamin C,* 2013 WL 504257 at *5, n.3 ("[T]his Court … sees no reason why an online press release could not constitute a business record."). *Accord Huske v. Tyson Foods, Inc*., 2013 WL 5832248, at *1 (E.D. Tex. Oct. 29, 2013) (admitting defendant's press release and noting that it "could qualify as a business record … if [defendant] regularly maintains these type of records"). Accordingly, Hamas's claims of responsibility for the Atzmona and Neve Dekalim attacks are also admissible pursuant to Rule 803(6).

Rule 807's residual exception also justifies admitting the claims of responsibility. As Rule 807(a)(1)-(3) requires, these statements are: (1) supported by circumstantial guarantees of their trustworthiness (*see supra* at Points II.C.1-3); (2) offered as evidence of material facts in this litigation; and (3) more probative of that fact than any other evidence Plaintiffs can obtain through reasonable effort. In addition, "admitting [Hamas's statements] will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a)(4). As a result, particularly given NatWest's inability to muster any evidence that an organization other than Hamas committed the Atzmona and Neve Dekalim attacks, the Hamas communiqués should be admitted. *Accord Bluth v. Islamic Republic of Iran*, 2016 WL 4491760 at *3-5, 13 (D.D.C. Aug. 25, 2016) (finding Hamas responsible for the Atzmona attack).

**D.  Dr. Shaked's Expert Testimony Raises a Genuine Factual Dispute Regarding Hamas's Responsibility for the October 22, 2003 (Tel Romeda) Attack**

The *Strauss* Court held that Dr. Shaked is qualified as an expert, that his methodology is reliable, and that he may offer expert attribution testimony for which there is a proper evidentiary foundation.  *See Strauss*, 925 F. Supp. 2d at 443-45.  *See also Arab Bank*, 922 F. Supp. 2d at 330-31; *Arab Bank*, 97 F. Supp.3d at 302; Opp. Mem. 45-48; Schlanger Decl. ¶¶ 7, 20 and Ex. 3.

In the preceding sections, Plaintiffs have catalogued the admissible evidence that lays the foundation for Dr. Shaked's attribution opinions regarding 17 of the 18 attacks.  *See, supra*, Points II.A-C.  For the remaining attack – the October 22, 2003 (Tel Romeda) shooting – Dr. Shaked's testimony regarding photographs and video of the scene of the attack provides part of the requisite foundation for his opinion that Hamas committed the attack.  Dr. Shaked will use his expertise to explain how the headband worn by the deceased perpetrator indicates his connection to Hamas.  *See* Schuster Decl. Ex. 179 (Shaked Report) at 8, 126, 127.  As the Court contemplated in *Strauss*, by explaining the connection between Hamas and the headband shown in the photographs, "Shaked [will] put factual evidence in context to help plaintiffs establish that Hamas is responsible for [this] attack."  *Strauss*, 925 F. Supp. 2d at 445 (citing *U.S. v. Mejia*, 545 F.3d 179 (2d Cir. 2008)).  Contrary to NatWest's argument, Dr. Shaked's testimony constitutes sufficient admissible evidence to establish Hamas's responsibility for the Tel Romeda attack.

Plaintiffs have produced records of subsequent convictions of members of the Hamas cell headed by Rafiq Muhammad Ziyad Aqanibi, the perpetrator of the October 22, 2003 attack.  *See* Schlanger Decl. Exs. 22-23.  Dr. Shaked also took into account Aqanibi's prior arrests and convictions for his Hamas membership.[27]  Dr. Shaked cross-referenced this information against

---

[27]  Schuster Decl. Ex. 179 at 127 ("In three cases, before his death, Aqanibi was arrested by Israel and convicted of membership in Hamas.  At the time when he was killed, Aqanibi was wanted by the Israeli security forces on suspicion of being involved in Hamas terrorist operations.").

statements and materials Hamas published about Aqanibi and the October 22, 2003 attack.

NatWest's argument for the exclusion of Dr. Shaked's testimony rests entirely on *Hullaby v. State*, 911 S.W.2d 921, 931 (Tex. App. 1995), a Texas state case concerning the Texas Rules of Criminal Evidence. *See* NW Supp. Mem. at 21. In *Hullaby*, the state offered evidence, through an expert on gangs, regarding which gangs various witnesses identified or "claimed" as their own. 911 S.W.2d at 930-31. Thus, the evidence was affirmatively *presented* as assertive conduct. Finally, the language NatWest quotes was dicta because the court *affirmed* the trial court's decision to admit the testimony. *Id.* at 931.

NatWest cites no case where a court excluded evidence that individuals' attire demonstrated their identity or affiliation. The implications of such a precedent would be profound, as it would presumably lead to the exclusion of evidence such as hoods and robes worn by members of the Ku Klux Klan, or even uniforms worn by law enforcement officers or others.[28] Contrary to NatWest's argument, Dr. Shaked's expert testimony constitutes sufficient admissible evidence to establish Hamas' responsibility for the Tel Romeda attack.

### E. Plaintiffs Are Not Estopped from Presenting Evidence of Hamas's Responsibility for the Neve Dekalim and Bus 19 Attacks

By failing to plead a collateral estoppel defense in its July 1, 2016 Answers, NatWest waived that that affirmative defense regarding Hamas's responsibility for the January 29, 2004 (Bus 19) and September 24, 2004 (Neve Dekalim) attacks. *See, e.g., Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984); *Lakah v. USB AG*, 2014 WL 5475294, at *1, 2 (S.D.N.Y. Oct. 30, 2014). That waiver is not excused by the unsupported assertion that Plaintiffs "received notice" of NatWest's intention to assert collateral estoppel with respect to the Bus 19 attack when Credit Lyonnais belatedly raised that defense in *Strauss*. *See* NW Supp. Mem. at 24 n.21.

---

[28] Shaked's report did not set forth all of the visual evidence Plaintiffs produced in this case because that evidence is extremely graphic. Plaintiffs can provide the Court with both video and photographs that demonstrate that the bandana is far from a generic piece of green cloth. The words on the bandana read: "There is no God except Allah." Shaked describes the bandana in his report as a "Hamas bandana." Schuster Decl. Ex. 179 at 127.

23

The Court should reject NatWest's argument with respect to the Bus 19 attack for two additional reasons. First, there has been no final judgment in the *Arab Bank* case with respect to the claims of the plaintiffs whose injuries arise from the Bus 19 attack. The Rule 54(b) judgment in *Arab Bank* relates only to the claims of plaintiffs whose injuries arose from other attacks. That judgment therefore has no collateral estoppel effect as against the Bus 19 Plaintiffs. *Cf., e.g., Inouye v. Kemna*, 504 F.3d 705, 709 n.3 (9th Cir. 2007) (judgment entered after defendant was dismissed from the case had no preclusion effect as against that defendant).

Judge Cogan's April 8, 2015 decision that there was insufficient evidence of Hamas's responsibility for the Bus 19 attack was also the subject of a motion for reconsideration. *See* Schlanger Decl. ¶ 27 and Ex. 18. As the *Arab Bank* plaintiffs argued in that motion, which the settlement in Arab Bank rendered moot, Judge Cogan's decision was based on a misunderstanding of the conviction of Muhammad al-Nashash. Because of a transcription error, that conviction appeared to show that he was convicted of being a member of Fatah's Al-Aqsa Martyrs Brigades, rather than Hamas's *al-Qassam* Brigades. *See* Schlanger Decl. ¶¶ 35-37 and Exs. 26-28. Given that Judge Cogan did not have the opportunity to consider the *Arab Bank* plaintiffs' reconsideration motion (*see id*. at ¶ 27), his determination does not qualify as final for collateral estoppel purposes. *See, e.g., Gelb v. Royal Globe Ins. Co*., 798 F.2d 38, 44-45 (2d Cir. 1986) (collateral estoppel did not bar re-litigation of issue that appellate court declined to review; doctrine is limited to issues "carefully considered in the first proceeding").

JASTA also provides an alternative basis for rejecting NatWest's collateral estoppel defense because it creates a new cause of action against any person who aids and abets a designated FTO that "committed, planned or authorized" an act of international terrorism giving rise to a plaintiff's injury. *See* JASTA § 4. The statute uses the definition of "person" incorporated into 1 U.S.C. § 1, rather than the one contained in the ATA, in order to include all conceivable forms through which an FTO might act (*e.g*., individuals, associations, corporate forms). Thus, it rejects a tracing requirement like the one NatWest advocates, which would only proscribe support to the individual who actually perpetrated the attack. This is confirmed by

24

Congress's description of the all-encompassing scope of the statute, which was drafted to provide plaintiffs with the "broadest possible" claim against any person or entity that provided "material support, directly or indirectly" to terrorists or those who "pose a significant risk of committing acts of terrorism."  JASTA § 2(b); *id*. at § 2(a)(6); *see* pp. 3-4, *supra*.

Accordingly, § 2333(d) creates a claim against a defendant that aids or abets a designated FTO that "committed, planned or authorized" an attack that injured a plaintiff.  In his April 8, 2015 decision, Judge Cogan considered only whether the evidence of "Hamas's involvement in bringing about the [Bus 19] attack was sufficient for a reasonable jury to find by a preponderance of the evidence that Hamas *committed* the attack." *Arab Bank*, 97 F. Supp. 3d at 330 (emphasis added).  *Arab Bank* did not consider whether Hamas "planned or authorized" the attack, much less whether the plaintiffs satisfied the elements of the new JASTA aiding and abetting claim. On the other hand, the Israeli military tribunals concluded that convicted Hamas operatives Adawin and al-Nashash did "plan" and "authorize" the Bus 19 attack.  *See* p. 12, *supra*. Accordingly, Judge Cogan's April 8, 2015 opinion has no impact on the viability of Plaintiffs' JASTA aiding and abetting claim against NatWest.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' initial memorandum in opposition, the Court should deny NatWest's motion for summary judgment in all respects.

January 25, 2017                    **OSEN LLC**

                                    By: /s/ Gary M. Osen
                                    Aaron Schlanger
                                    Ari Ungar
                                    Peter Raven-Hansen (of counsel)
                                    2 University Plaza, Suite 402
                                    Hackensack, NJ 07601
                                    (201) 265-6400

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**ZUCKERMAN SPAEDER LLC**
Shawn P. Naunton
399 Park Avenue, 14th Floor
New York, NY 10022
(646) 746-8655

**Attorneys for Plaintiffs Weiss,** *et al*.

**SAYLES WERBNER P.C.**

By: /s/ Mark S. Werbner
1201 Elm Street, Suite 4400
Dallas, TX 75270
(214) 939-8700

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

**STONE BONNER & ROCCO LLP**
James P. Bonner
Patrick L. Rocco
Susan M. Davies
145 West 45th Street, Suite 701
New York, NY 10036
(212) 239-4340

26

**PERLES LAW FIRM, P.C.**
Steven R. Perles
Edward Macallister
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive, Suite 260
Woodlands, TX 77380
(281) 296-9090

**Attorneys for Plaintiffs Applebaum,** *et al*.