# Exhibit 3

943

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   COURTNEY LINDE, ET AL.,         )
                                     )   04CV02799 (BMC)
 4                   Plaintiffs,     )   And all related cases:
                                     )   04CV05449 (Litle)
 5                                   )   04CV05564 (Almog)
                                     )   04CV00365 (Coulter)
 6                                   )   05CV00388 (Afrait-Kurtzer)
                                     )   05CV03183 (Bennett)
 7                                   )   05CV03768 (Roth)
         -against-                   )   06CV01623 (Weiss)
 8                                   )
                                     )   United States Courthouse
 9                                   )   Brooklyn, New York
                                     )
10   ARAB BANK, PLC,                 )   MONDAY, AUGUST 25, 2014
                                     )
11                   Defendant.      )
     _____)
12

13            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
14                 UNITED STATES DISTRICT JUDGE

15

     APPEARANCES:
16

17   FOR PLAINTIFFS LINDE     OSEN, LLC
     AND COULTER:             BY:  GARY M. OSEN, ESQ.

18                            TURNER & ASSOCIATES, PLLC
                              BY:  CLYDE T. TURNER, ESQ.
19

20   FOR PLAINTIFFS LITLE,    SAYLES WERBNER
     BENNETT AND ROTH:        BY:  MARK S. WERBNER, ESQ.
21

22

23   FOR PLAINTIFFS ALMOG:    STONE BONNER & ROCCO, LLP
                              BY:  JAMES P. BONNER, ESQ.
24
                              MOTLEY RICE, LLC
                              BY:  MICHAEL E. ELSNER, ESQ.
25                            BY:  JODI FLOWERS, ESQ.
```

944

(APPEARANCES CONT.)

FOR THE DEFENDANT:          DLA PIPER US, LLP
                           BY:  SHAND STEPHENS, ESQ.
                           BY:  ANTHONY PAUL COLES, ESQ.
                           BY:  BRETT INGERMAN, ESQ.
                           BY:  MARGARET CIVETTA, ESQ.


INTERPRETED BY:            VARDA YAARI AND RACHELLE AVITAL


THE COURT REPORTER:        NICOLE CANALES, CSR, RPR
                           225 Cadman Plaza East
                           Brooklyn, New York 11201
                           cnlsnic@aol.com


Proceedings recorded by mechanical stenography, transcript produced by computer-assisted transcript.

981

1          (Plaintiffs' Exhibits 1064, 1065, 1069, 1572, 127,

2   98, 221, 180, 217, 138, 136, 175, 179, 185  were received in

3   evidence.)

4          MR. INGERMAN:  Those are over our prior objections.

5          THE COURT:  Plaintiffs may call their next witness.

6          MR. WERBNER:  Ronnie Shaked, S-h-a-k-e-d.

7   Your Honor, may we also have the translators come up?

8          THE COURT:  Sure.

9          THE CLERK:  May I have the interpreter raise your

10  right hand.  Do you solemnly affirm that you will well and

11  truly interpret the proceedings before this Court in this

12  case?

13         THE INTERPRETER:  I so affirm.

14         THE CLERK:  Please state and spell your name for the

15  reporter.

16         THE INTERPRETER:  Rachelle, R-a-c-h-e-l-l-e; Avital,

17  A-v-i-t-a-l.

18         THE CLERK:  Now, for the witness.

19         THE COURT:  We have two interpreters.

20         THE CLERK:  I'm sorry.

21         THE INTERPRETER:  Varda, V-a-r-d-a; Yaari,

22  Y-a-a-r-i.

23         THE CLERK:  May I have the witness raise his right

24  hand.  Do you solemnly swear or affirm that the testimony you

25  shall give to the Court shall be the truth, the whole truth

982

1    and nothing but the truth?

2              THE WITNESS:  Yes, I so affirm.

3              THE CLERK:  Okay.  May he please spell his name for

4    the reporter.

5              THE WITNESS:  Ronnie Shaked, R-o-n-n-i, S-h-a-k-e-d.

6                         RONNI SHAKED,

7    called as a witness, by and on behalf of the plaintiffs,

8    having been first duly sworn, was examined and testified as

9    follows:

10             THE CLERK:  Thank you.  You may be seated.

11             THE COURT:  Let me ask the interpreters how are you

12   going to work it between the two of you?

13             THE INTERPRETER:  Switch every 20 minutes.

14             THE COURT:  So whoever is talking will talk into the

15   mike.

16             You may proceed.

17             MR. TURNER:  I was going to make one point.  And I

18   presume this is the way the Court proceeds in these kinds of

19   circumstances.  The witness himself does not have a

20   microphone, and I presume that's okay with you.

21             THE COURT:  I think that's okay.

22             MR. TURNER:  Okay.  I'll try to make sure he speaks

23   up, as we move through.

24             THE COURT:  Since we won't understand the words he's

25   saying, I'm not sure we have to hear them well.

Shaked - Direct - Turner                    983

1           MR. TURNER:  I agree.  Secondly, by way of

2    introduction, this is the language of Hebrew.  May I proceed?

3           THE COURT:  You may.

4    DIRECT EXAMINATION

5    BY MR. TURNER:

6    Q    Give us your name, please.

7    A    Ronni Shaked.

8    Q    And where are you from, Dr. Shaked?

9    A    I'm from Jerusalem.  I live in a suburb near Jerusalem.

10   Q    What do you do for a living?

11   A    I'm currently working in a Hebrew University in

12   Jerusalem.  My profession is academic researcher and

13   journalist.

14   Q    Do you speak English?

15   A    Yes, I can speak English.

16   Q    What other languages do you speak?

17   A    I speak Arabic, and English and Hebrew.

18   Q    We're going to be communicating today in Hebrew.  Why is

19   that?

20   A    Because it is easier for me to discuss the professional

21   subjects that will be the subject of this trial and easier for

22   me to express myself in Hebrew.

23   Q    Now, by way of introduction for the remainder of today,

24   and throughout probably most of tomorrow, we're going to be

25   talking about who was responsible for the 24 attacks, terror

Shaked - Direct - Turner                                      984

1   attacks, that are at issue in this lawsuit.  Do you understand

2   that?

3   A     Yes, I understand that.

4   Q     Let's back up for a minute.  Do you have a family?

5   A     Yes, I have a family.

6   Q     Tell us about your family very briefly.

7   A     I have three kids.  Sadly, one of them died four years

8   ago this week.  The two older girls are officers in the prison

9   service, in Israel.  My wife is a nurse.  I have seven

10  grandchildren.  And I live, as I said, in a suburb of

11  Jerusalem.

12  Q     Does all of your family live in Israel?

13  A     Yes.

14  Q     Tell us a little bit about your educational background?

15  A     I went to high school in Jerusalem, a high schooled

16  called, Leyada Hauniversita, L-e-y-a-d-a

17  H-a-u-n-i-v-e-r-s-i-t-a.  After that, I went to Hebrew

18  University and completed my BA.  I took a break for a few

19  years.  In 2004, I returned to the university to complete my

20  MA.  I finished my MA Summa cum laude.  I finished my Ph.D.,

21  finish writing my Ph.D., about four months ago.  In about a

22  month I should get the final approval of my Ph.D., which will

23  be my third degree.

24  Q     Let's back up to after you graduated from high school.

25  Did you go into the military service in Israel?

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                           985

1    A     Yes, I did.  I joined the military.

2    Q     What field did you initially begin in, in the military?

3    A     In the first half of my military service, I served as a

4    paratrooper.  I was a combat soldier.  And in a second half of

5    my service, I served in the Intelligence Unit.

6    Q     Let's focus a little bit on the Intelligence Unit.  Tell

7    us about the Intelligence Unit that you were trained in.  What

8    kind of things did you do?

9    A     I served in the Intelligence Unit in the year 1965, when

10   the city of Jerusalem was still divided.  The purpose of the

11   unit I served in was to check out and assess the intelligence

12   related to the Jordanian Army, which was posted, positioned

13   right opposite us, and to discover intelligence about the

14   beginning of the terrorism that was going on at that time,

15   Palestinian terrorism.

16   Q     What was your specific role when you began in the

17   intelligence community, in the military, in Israel back in the

18   60s?

19   A     My role was to analyze the intelligence that came from

20   the field and, based on that analysis, to determine what

21   needed to be done; either to prevent terror attacks or other

22   activities taken by the military, by the Jordanian military,

23   at that time.

24   Q     Did you receive training in the intelligence community

25   back in the 60s?

Shaked - Direct - Turner                              986

1    A    Yes, I took courses.  I was given courses when I was in

2    the intelligence forces.

3    Q    Tell us a little bit about the period of time that you

4    worked in intelligence.  Did you get promoted?  Did you

5    graduate up to different jobs?

6    A    When I was serving in the military intelligence, I was,

7    indeed, promoted, and I was made responsible for collecting

8    intelligence for a particular part of Jerusalem.  After I

9    completed my military service, I served in other areas of

10   intelligence, after I completed my BA in university.

11   Q    Now, when you were in -- that first period of time that

12   you were working in the intelligence area, did you have the

13   opportunity to communicate with the Palestinian territories,

14   the Palestinian communities that surrounded Jerusalem?

15   A    During the first period, when I served in intelligence,

16   Jerusalem was still divided, and so I had no ability to

17   community with the Arab community.  During the second period,

18   certainly, yes.

19   Q    Let's go to the second period.  At some point in time,

20   did you leave the military?

21   A    Yes, I completed my military service late 1966.

22   Q    What did you do then?

23   A    I went to study in the Hebrew university in Jerusalem.  I

24   studied Middle Eastern Studies.

25   Q    What does that mean, Middle Eastern Studies?

1   A     Middle Eastern Studies involves the study of societies of

2   the Middle East, the culture of the Middle East, the Islamic

3   religion; the various developments in the Middle East relative

4   to other places in the world, and most especially involves

5   understanding the Middle East as it existed at that time.

6   Q     Where was Hebrew University at the time?

7   A     It was in Jerusalem, in what is today known as the

8   western part of the city.

9   Q     At some point, did you reenter government service?

10  A     During the third year of my studies, towards the end, I

11  joined the ISA, the Israeli Security Agency.

12  Q     So the ladies and gentlemen can sort of get an idea, what

13  at that time was the Israeli Security Agency?

14  A     The Israeli Security Agency is an intelligence

15  organization that is aimed at preventing terror attacks from

16  occurring.  It also works to prevent subversive political

17  activity in order to defend the security of the state of

18  Israel.  During those years, the main activity was preventing

19  Palestinian terror attacks perpetrated against Israeli

20  citizens.  And if I may add, it can be compared to the work of

21  the FBI in the United States.

22  Q     Now, when you reentered government service, can you sort

23  of, first of all, describe for us the time period; when did

24  you reenter and how long did you stay?

25  A     In the end of 1968, I returned to my work in the ISA.  I

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                          988

1   worked in the ISA until the end of the Lebanon War in 1982.  I

2   worked a total of about 12 and a half to 13 years in the

3   field.

4   Q    Let's talk about that 12-and-a-half to 13-year period for

5   a moment.  First of all, when you reentered the ISA, the

6   Israeli Security Agency, what was your job within the

7   intelligence community?

8   A    I studied very intensively the Arabic language, and I

9   became a handler of agents.  Just to explain to you what the

10  role means, I can say that that meant recruiting agents from

11  the Palestinian society, aiming at detecting and preventing

12  terrorist acts.  To recruit means to actually win the trust of

13  people and then to handle them as agents, and that is in their

14  society in enemy territory, as my commanders have instructed

15  me and according to the instructions I received.

16  Q    When you say handler, does that mean you were actually

17  working with Palestinians?

18  A    When I say that I worked with them, I meant that I worked

19  with the Palestinians, together with the Palestinians, in the

20  midst of Palestinians.  I maintained a daily and an hourly

21  contact with Palestinians, in their society, with the agents I

22  handled and the interrogees I interrogated.

23  Q    Now, as part of your job as a handler, was it important

24  for you to understand the Palestinian society, the

25  communities, how they operated and how they thought?

1  A     Without understanding the Palestinian society, the

2  various social codes of the society, their language, their

3  symbols, their religion; their culture, their mindset, their

4  political concepts of a particular society, there's no way to

5  understand the society, and this is what I did, I did all I

6  could in order to decipher their codes, to understand their

7  language thoroughly, to study their culture, to study their

8  moral ethics of the Palestinian society, in order to swim like

9  fish in the water of the Palestinian society.

10 Q     Now, during the period of time you were working in the

11 ISA, at some point were you promoted?

12 A     Yes, indeed, I have been promoted.

13 Q     Tell us about that promotion.

14 A     My first role was the commander of the (sic) Jerusalem,

15 and that meant that I was responsible for other handlers and

16 other agents.  I was the one who had to direct various

17 operations, to set the conditions on the ground, in order to

18 prepare for operations of thwarting terrorism by gathering

19 intelligence.  I had to advance my employees, other employees,

20 so they reach full and comprehensive understanding that which

21 would give them better control and more clarity with respect

22 to the field.  For that purpose, I had to maintain ties with

23 other organizations of the Israeli government and other law

24 enforcement or other intelligence agencies.

25            In my second period, I was promoted to be the

Shaked - Direct - Turner                                990

1    commander of the Ramallah agent, where I did the same things

2    like I did in Jerusalem, but, there, the scope of my work was

3    far larger than that of the city.

4    Q    At some point in time, did your geographic area that you

5    were responsible for expand?

6    A    Even very much so.

7    Q    How did it expand?

8    A    When we talk about the area of Jerusalem, you can see

9    that there's a very particular kind of a population.  But in

10   Ramallah, the population is more diverse.  You have city

11   dwellers, you have rural population; I have the Palestinian

12   refugee camps; I have areas where there are people who are

13   wanted, and one has to cope with them in order to apprehend

14   them.  There's also very extensive military activity taking

15   place in the area, unlike the city of Jerusalem that is

16   totally under civilian control.

17   Q    During the period of time that you were working in

18   intelligence, and specifically working with terror, was it

19   important to your job to know and understand where the terror

20   cells were developing, who communicated with whom, and who was

21   in charge?

22             MR. INGERMAN:  Objection.

23             THE COURT:  Sustained.

24   Q    During the period of time that you worked for the ISA,

25   working in the context of terror, was it important for you to

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                               991

1   go into the communities?

2   A    Of course, it was very, very important for me to be in

3   touch with the population, not just to study about them but to

4   also know who from among them could be recruited as agents

5   that would later be serving me for my security ends.  It is

6   very important to get to the community, to get to know it, to

7   know who I was up against, to know exactly who the elite was,

8   what people -- what economic status, to know the academics

9   around them, to know what social influence they had and also

10  to know the rank and file who live their daily lives; I had

11  connections and ties with them too.  And also to know the

12  political segmentation of the population, to understand its

13  structure, to understand the aspiration of the population, to

14  know how it exists, how the Palestinian society exists in the

15  conditions that prevailed back then.

16  Q    At some point in time did you leave the ISA for the

17  public sector?

18  A    Yes, in 1988, in 1982 late 1982, I left the ISA and I

19  became a journalist.

20  Q    Where did you go to work?

21  A    I was very happy, but I immediately joined the largest,

22  the most distributed, newspaper in Israel

23  named "Yedothahronoth," Y-e-d-o-t-h-a-h-r-o-n-o-t-h.

24  Q    Did you have an area within the paper that you

25  specialized in?

Shaked - Direct - Turner                                       992

1   A     Already the beginning of my way there, I became the

2   correspondent for Palestinian affairs, terror affairs, Arab

3   affairs, Palestinian affairs, and those Palestinians residing

4   within the state of Israel; and that had to do with every

5   issue pertaining to Palestinians, which is called the

6   Palestinian desk.  All that was under my responsibility.  In

7   addition to their various political connections, not only to

8   Israel, but also as to other Arabs in the Islamist world.

9   Q     Over the years that you worked in -- let me just strike

10  that and ask this question.  How many years total did you work

11  for the newspaper?

12  A     Thirty years.

13  Q     And during that 30-year period, was your focus pretty

14  much on terrorism?

15  A     This was actually to me the most important topic, as it

16  was to my editor.  It was the topic in the state of Israel.

17  Q     During that 30-year period, did you investigate, and

18  study and analyze terrorism only in Israel, the West Bank and

19  Gaza, or did you do it in other places as well?

20         MR. INGERMAN:  Objection.

21         THE COURT:  Overruled.

22  A     Terrorism is terrorism is terrorism, and there are

23  various influences coming from Israel to the world and from

24  the world to Israel.  This is why I studied terrorism in the

25  entire Middle East and around the world as well.

1  Q    Are you also an author of books on terrorism?

2  A    Yes, I did write two books on terrorism.  In addition to

3  two others that only marginally touch upon terrorism.

4  Q    When did you first become aware of a terror group called

5  "Hamas"?

6  A    Actually, a few days after Hamas was founded, on the 14th

7  of December 1987 --

8             THE INTERPRETER:  December?

9             THE WITNESS:  December.

10  A    1987.  I had already become aware of the existence of

11  Hamas organization.

12  Q    When did you first become aware of someone named Sheikh

13  Yassin?

14  A    Well, I learned about him a long time before Hamas.  I

15  wrote about him already in 1982.  And in 1983, when I covered

16  his trial, he was tried in Israel, in court.

17  Q    Over the years, did you personally have an opportunity to

18  be in the same room with Sheikh Yassin?

19  A    Many, many times I would say, without exaggerating.

20  Q    Did you actually have interviews and communications

21  directly with Sheikh Yassin over the years?

22  A    When Sheikh Yassin was in prison, in 1993, I was writing

23  my book about Hamas, and I sat with him for many long hours,

24  and I interviewed him for the purpose of writing my book.

25  This was the first book that was written about Hamas, and the

Shaked - Direct - Turner                    994

1    help that I received from Sheikh Yassin was very, very

2    welcome.  When he was released in 1997 and returned to the

3    Gaza Strip, I visited him in his home a number of times, and I

4    also visited him in the Islamic center in Gaza.  We also had

5    telephone calls as part of my journalistic work.

6    Q    Now, there's been a statement made during the course of

7    this trial that Hamas was a secretive organization.  How many

8    years have you been both investigating, following and

9    reporting on Hamas?

10               MR. INGERMAN:  Your Honor, before we have the

11   answer, may we approach quickly?

12               THE COURT:  Sure.

13               (Sidebar - Outside the presence of the jury.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR                                                995

1        MR. INGERMAN:  Thank you, your Honor.  I'm somewhat

2   challenged because of the translation, but the question was

3   how many years have you been investigating Hamas?  The answer

4   went on for almost 45, 50 seconds.  It seems to me that the

5   witness is offering more than the answer, more than an answer

6   to the question.

7        THE COURT:  Well, he is an expert, and it cuts off

8   some of the questioning and makes it a faster exchange.  I'm

9   going to allow it.  You can't really object on the ground that

10  the answer is not responsive until you hear the answer.  I

11  would urge you not to make those objections, because he is the

12  expert.

13                    (Sidebar concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct Turner                                    996

1          (In the presence of the jury.)

2          THE COURT:  Go ahead.

3    Q    He may go ahead and finish his answers.

4          THE COURT:  Well, she has to translate the question.

5    I don't think she did that yet.

6          THE WITNESS:  Since Hamas was founded, to this very

7    day, and I emphasize this very day, I have been investigating

8    and researching with Hamas.  If I may add one comment that was

9    said early on, Hamas was a secretive organization but also to

10   the Palestinian society, Israeli society and to the

11   international community.  This was no secret organization.

12   Everyone knew exactly what the Hamas structure was.  Everyone

13   knew who the individuals in Hamas were, everyone, and I

14   mean -- not everyone, but everyone who's engaged with the

15   subject of Hamas knows the Hamas operatives.  And as a

16   journalist, for sure, I have known many of the Hamas members.

17   I knew their telephone numbers that I received from their

18   leadership, because they gave me those numbers for me to be

19   able to contact their operatives, to interview them,

20   especially in those areas where we operated.

21   Q    During the relevant time frame here, between 1999 and

22   2005, on this topic of secrecy, did Hamas have their own

23   websites?

24   A    Yes, it did.

25   Q    Did Hamas have its own TV station?

Shaked - Direct Turner                                    997

1   A    Yes.

2   Q    Did Hamas have its own radio stations?

3   A    Yes, it had radio stations.  It had one central station

4   and a number of regional stations.

5   Q    Did Hamas have its own newspaper, where they published --

6   actually published information for the various communities

7   across the West Bank and Gaza?

8   A    Yes, not just one newspaper.

9   Q    Did they also have public ceremonies, where Hamas would

10  invite the public to come to the Hamas ceremonies?

11  A    Yes, they held many such ceremonies.

12  Q    Now, over your lifetime of experience involving terror

13  and including Hamas, have you from time to time been consulted

14  by the FBI?

15  A    Yes, a number of times during my career I was consulted

16  by the FBI, to discuss various issues related to terror.

17              (Proceedings continued on the next page.)

18

19

20

21

22

23

24

25

Shaked - Direct Turner                                998

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                999

1  Q    And in the context of your consultations with the FBI,

2  did you come to the United States?

3  A    Yes, in USA, too.

4  Q    And did you have an opportunity to collaborate with the

5  FBI, share information, in other words, with the FBI, about

6  terror, including Hamas?

7  A    It wasn't exactly a collaboration.  They wanted to hear

8  my expert opinion about Islamic terror.

9  Q    Now, over the years, have you also participated in the

10  creation of documentaries about terror and Hamas?

11  A    Yes.  I was involved over the years in the production

12  of a number of films about Hamas and especially the main

13  film I was involved in in 2006.

14         MR. TURNER:  Your Honor, at this point, I would

15  like to put something on the screen.  Can we have the

16  screen; is that possible?

17         THE COURT:  I thought we were just asked to raise

18  the screen.  We'll lower it again.  It's fine.

19         MR. INGERMAN:  Your Honor, before it's shown to

20  the jury, can we have some idea what it is?

21         THE COURT:  Yes.  Show it to counsel first.

22         MR. TURNER:  Thank you.

23  BY MR. TURNER:

24  Q    Now, as part of your work in this particular case,

25  Mr. Shaked, have you had an opportunity to help prepare a

SHAKED - DIRECT - TURNER                    1000

1    map of Israel, the West Bank and Gaza that specifically

2    identifies the 24 attacks that we're here to talk about?

3    A    Yes, sir.

4              MR. TURNER:  And can you put it on the screen.

5              THE COURT:  Witness only.  Go ahead.

6    BY MR. TURNER:

7    Q    It should be on your screen at some point in time,

8    Mr. Shaked.

9    A    It's on my screen.

10   Q    Do you recognize that particular map?

11   A    Of course I am familiar with this map.

12   Q    And will that help illustrate what we're about to begin

13   talking about?

14   A    Yes, it will indeed help to illustrate the subject we

15   are about to talk about.

16             MR. TURNER:  May I put it up there now?

17             MR. STEPHENS:  No objection, your Honor.

18             THE COURT:  All right.

19   BY MR. TURNER:

20   Q    Now, we've listed on this particular map all 24 terror

21   attacks that are at issue in this litigation.

22        Do you understand that, sir?

23   A    Yes, I do.

24   Q    Okay.  Just so we can sort of get our coordinates

25   correct, first of all, can you identify the West Bank on

SHAKED - DIRECT - TURNER                    1001

1   this particular map in this segment that we've blown up?

2   A    Yes, I can.

3   Q    All right.  And I believe you can actually draw on that

4   screen.

5        Okay.  Now, can you back out of that, Mr. Miller, if

6   you will, and go down to Gaza for a minute just so we orient

7   ourselves to where these particular locations are.

8        Can you circle the Gaza Strip for us.

9   A    (Indicating.)

10  Q    And you live in Jerusalem; is that correct?  And you

11  circled Jerusalem.

12       All right.  Now, have you had an opportunity to

13  investigate these 24 attacks?

14  A    Yes, I did have such an opportunity.

15  Q    And have you been able to complete an investigation to

16  the point where you feel comfortable concluding who or what

17  terror group was responsible for these 24 attacks?

18  A    Yes, I am able to make that conclusion.

19  Q    And what is your conclusion?

20  A    My conclusion is that for 21 of the terror attacks,

21  there is a very high degree of probability that they were

22  indeed carried out by Hamas.  For the others, there is a

23  high probability that they were carried out by Hamas.

24       I say this because different types of terror attacks

25  were involved.  There is a difference between a terror

SHAKED - DIRECT - TURNER                    1002

1   attack carried out by a suicide bomber, in which case it is

2   easier, almost definite, I say almost certain that we could

3   determine who carried it out, compared to other terror

4   attacks such as shooting, the shooting of mortars, or terror

5   attacks carried out by two organizations collaborating

6   together.

7        Therefore, I say that in 21 of the cases, there is a

8   very high assessment that they were carried out by Hamas and

9   the other three, there is a high probability but slightly

10  less so.

11  Q   Now, during the course of your investigation -- can we

12  have the lights back up.

13       During the course of your investigation, I want to

14  focus on the sources of information that you had available

15  to you in order to reach these conclusions, okay?

16  A   All right.

17  Q   First of all, did you have access to something called

18  official claims of responsibility by Hamas for these

19  attacks?

20            MR. INGERMAN:  Objection.

21            THE COURT:  Overruled.

22  A   Yes.

23  BY MR. TURNER:

24  Q   Did you have access to ISA, Israeli Security Agency,

25  reports for some of these attacks?

SHAKED - DIRECT - TURNER                    1003

1    A    Yes.

2    Q    Did you have access to other forms of government

3    investigation records such as police reports, ballistics

4    reports, forensics reports, photographs, things of that

5    nature?

6    A    Yes, I did, of course.

7    Q    And did you have access in some of these cases to

8    actual court records of arrests, convictions, and

9    confessions by Hamas?

10   A    Yes, I did.

11   Q    And did you have a personal opportunity to actually

12   attend some of these court proceedings where these

13   individuals from Hamas were pleading guilty?

14   A    Yes, I was present in the court.

15   Q    Now, there's also another source of information called

16   wills.

17        Have you had an opportunity in many of these 24 attacks

18   to actually watch video wills that were prepared by Hamas

19   before these suicide bombings were undertaken?

20   A    Yes, I had the opportunity to view those wills.

21   Q    And have you also had an opportunity in some of these

22   24 attacks to review written wills as opposed to video wills

23   that were actually prepared and published by Hamas for these

24   killers?

25              MR. INGERMAN:  Objection.

SHAKED - DIRECT - TURNER                    1004

1      THE COURT:  Overruled.

2   A    Yes, I did read them.

3   BY MR. TURNER:

4   Q    Now, there's another category of evidence called

5   memorializations.  Can you describe to the ladies and

6   gentlemen of the jury what a memorialization of these

7   horrific events means.

8   A    Sadly, Hamas does not view the suicide bombers as

9   criminals who have carried out terrible acts.  On the

10  contrary, they view them as heroes who should be glorified

11  and turned into role models and praised.  And that is why

12  Hamas decides to commemorate these suicide bombers in

13  various ways which I will describe before you.

14      The first stage is a funeral.  It could be a real

15  funeral or a symbolic funeral held in honor, and I say in

16  honor in quotation marks, of the suicide bomber.  This is

17  usually held with participation of many of the people who

18  live in the city or village, and it involves the waving of

19  flags, the chanting of slogans, the singing of songs, in

20  honor of the suicide bomber.

21      Another example involves the establishment of a

22  mourners' tent.  I say mourners in quotes because they

23  actually call this a wedding.  And people come to visit the

24  mother and the father to congratulate the mother and the

25  father on the terror attacks, what we would say murderous

1    terror attacks, that were carried out or terror attack

2    carried out by their son.

3          Another example of this memorialization are posters,

4    large posters, with pictures, portraits of suicide bombers,

5    that are hung throughout the cities and villages.  And

6    another example are graffiti or murals.

7          Further examples involve the naming of streets,

8    schools, and buildings after those suicide bombers.  For

9    example, the central square in the city of Jenin is named

10   after Yahya Ayyash who was the first engineer of Hamas.

11         In addition to this, there are various memorialization

12   acts that are done at the universities in the Palestinian

13   territories.  And in the Palestinian territories there are

14   many universities.  Only in the West Bank alone, there are

15   13 universities.  And this is one of those places where

16   ceremonies are held and gatherings and assemblies in memory

17   of those suicide bombers.  And in the newspapers, mostly the

18   Hamas newspapers, large sections are devoted to them,

19   starting not just with the obituaries but also the story of

20   their lives.  Mostly in *Al-Risala* and *Al-Qassam Yun*, which

21   are the Hamas newspapers.  But not only in those, in other

22   dailies as well.

23         In addition to these, there are special television

24   programs that are devoted to the suicide bomber and these

25   are broadcast not only by the television channels of Hamas,

SHAKED - DIRECT - TURNER                    1006

1    they do have two large television channels, but they are

2    also given by others in memory of those suicide bombers.

3    They are done also by the satellite stations such as Al

4    Jazeera or other countries.

5         And also the television stations of Palestinians.  A

6    well-known program is -- there was a word in Arabic,

7    laajilkum, which means for you or for your sake, in which

8    they actually glorify and praise the life and the deeds of

9    the suicide bomber.

10        With your permission, I'd just give one last example.

11   Poets and authors write books and poems including an author

12   such as Mahmoud Darwish who writes poems of hymns of praise

13   in honor of the suicide bombers.  And he's the Palestinian

14   national poet.  These poems are composed and are sung in the

15   Arab world including by well-known popular singers such as

16   Fayruz.  If I am going to compare her, then I would compare

17   her to Tina Turner.  She is that famous, and she is singing

18   those poems of praise in honor of the suicide bombers.

19   Q    In these 24 attacks or at least many of them, have you

20   had access to actual posters published by Hamas?

21   A    Concerning most of them, I manage to collect most of

22   the posters that actually relate to those suicide bombers.

23   These posters were disseminated by the Palestinian Society

24   mostly by Hamas.  These are large posters in which they

25   actually praise and sanctify the suicide bomber.

SHAKED - DIRECT - TURNER                    1007

1  Q    Have you personally attended some of these funerals or

2  weddings?

3  A    I did attend a number of those funerals, and there were

4  many more cases in which I visited the mourners' tents in

5  order to see those weddings, quote/unquote, of those

6  shahids.

7  Q    Now, in addition to these sources of information, have

8  you also had an opportunity on occasion to personally

9  interview some of the terrorists who committed some of these

10 24 attacks in prison?

11 A    Yes.  I did interview some of those terrorists that are

12 held in prison and those terrorists that carry down the

13 terror attacks about which we are talking here in court.

14 Q    For instance, we're going to be talking today and

15 tomorrow about somebody by the name of Abdullah Barghouti.

16     Who is Abdullah Barghouti in the context of what we're

17 here to talk about?

18 A    Abdullah Barghouti is considered to be the arch

19 terrorist.  He is the engineer, the explosive engineer, that

20 caused the death of more Israelis than any other

21 Palestinian.  We are talking about a terrorist that grew up

22 in Kuwait, studied in South Korea, moved to Ramallah.  In

23 the course of two years built bombs that brought about the

24 death of 67 Jews and the injury of many hundreds.

25     Abdullah Barghouti was a person I met in prison.  He

SHAKED - DIRECT - TURNER                    1008

1   agreed to meet and talk so that I -- and I tried to talk to
2   him in order to understand what actually drove him to that
3   killing.
4   Q    Did you actually have an opportunity to videotape the
5   interview with Barghouti?
6   A    Of course.
7   Q    And during the course of this interview with Barghouti,
8   did you learn precisely how he would go about making these
9   bombs?
10              MR. INGERMAN:  Objection.
11              THE COURT:  Leading?
12              MR. INGERMAN:  Objection.
13              THE COURT:  Leading?  Is the objection that it's
14   leading?
15              MR. INGERMAN:  And 801.
16              THE COURT:  Overruled.
17   A    Barghouti was all too happy to describe to me how he
18   actually built those explosive vests, how he fitted them on
19   the suicide bombers, how he prepared those explosive charges
20   that he dispatched along with the terrorists into Israel
21   including those -- to those 24 terror attacks.
22       He was also delighted to describe to me how he prepared
23   the booby-trap cars that he dispatched to Israel in the aim,
24   as he declared it, and his aim was in his words was to kill
25   as many Israelis as possible.

SHAKED - DIRECT - TURNER                    1009

1   Q    I want to circle back for a minute and talk about more

2   globally all of these various sources of information.

3            THE COURT:  Before you do that, is this a good

4   time to take a break?

5            MR. TURNER:  Sure.

6            THE COURT:  All right.  Let's take our afternoon

7   break, ladies and gentlemen.  We'll be back here at 3:15.

8            Please do not talk about the case amongst

9   yourselves.  See you shortly.

10           (Jurors exit the courtroom.)

11           THE COURT:  All right.  Be seated.  Just so the

12  witness doesn't hear what I have to say to the lawyers, let

13  me have you over at sidebar for a minute.

14           (Sidebar conference.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1010

1           THE COURT:  Just for the record, I overruled the

2    hearsay objection on the ground that I understood this to be

3    one of the bases for the expert's opinion.  And I think it's

4    highly reliable in that context.

5           I do think, Mr. Turner, it would be better if you

6    make it clear that, in fact, various things he testified to

7    which might draw a hearsay objection are part of the

8    information he's relying on in reaching his opinion so that

9    the jury has the proper context under Rule 703.

10           MR. TURNER:  Yes, sir.

11           THE COURT:  All right.  3:15.

12           (End sidebar conference.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1011

1          THE COURT:  Please bring in the jury.

2          (Jurors enter the courtroom.)

3          THE COURT:  All right.  Be seated, please.

4          Mr. Turner, before you begin, ladies and

5    gentlemen, I just wanted to mention to you, you're doing

6    really well focusing on the testimony, but I wanted to

7    caution you that sometimes in the late afternoon after

8    you've had lunch, you get a little sluggish, a little harder

9    to stay awake, so please give it your all and really keep

10   the focus that you've had throughout the trial.

11         Please continue.

12         MR. TURNER:  Thank you.

13   BY MR. TURNER:

14   Q    When we broke, Mr. Shaked, what we were beginning to

15   talk about was taking all of these various sources of

16   information and looking at them more globally.

17         And my question for you is, is there one type of

18   evidence that is more important than another type of

19   evidence?

20   A    No, for me every piece of evidence is important.  This

21   is why I collect all the evidence that I can collect from

22   different sources from different places and only then do I

23   weigh all of it together in order to build the entire

24   picture.  It is not one piece of evidence alone, not at all.

25   Q    Well, let's focus for a minute on claims of

SHAKED - DIRECT - TURNER                    1012

1   responsibility.

2       Is there a difference between an official claim of

3   responsibility and an unoffical or one just simply

4   published in the media, for instance?

5           MR. INGERMAN:  Objection.

6           THE COURT:  Overruled.

7           Hang on one second.  You mean, difference in the

8   weight he gives it?

9           MR. TURNER:  Pardon me?

10          THE COURT:  Do you mean difference in the weight

11  that he gives it?

12          MR. TURNER:  No.  Technically, is there a

13  difference between -- in what he does, between an official

14  claim of responsibility and an unoffical?

15          THE COURT:  And how he views those two kinds of

16  claims?

17          MR. TURNER:  Yes, sir.

18          THE COURT:  All right.  Go ahead.

19          MR. TURNER:  Do you want the translator to make

20  the distinction?

21          THE COURT:  If she can, yes.

22  A    Indeed, there are official claims of responsibility

23  there are actually determined by the leadership of the

24  organization.  And these appeared in the official tools of

25  the organization by the form of a communique.

1        In contrast to this, there are other announcements that

2   are made in an unofficial way.  And these have to be

3   thoroughly examined in order to clarify the veracity before

4   issuing any conclusion, such as radio announcements or

5   anonymous announcements that are made to various news

6   agencies and other publications in unofficial tools that are

7   made in an unofficial way.

8   BY MR. TURNER:

9   Q    In the course of your investigation, have you acquired

10  materials off of something called the Al-Qassam's Web site?

11  A    Yes.

12  Q    Is that Web site or those Web sites something that you

13  use in your profession and have used over the years in order

14  to gain information on whatever subject you were

15  researching, studying or analyzing?

16  A    Yes.

17  Q    And how is it that you can determine what is and what

18  is not an authentic Web site of the Al-Qassam brigade?

19            MR. INGERMAN:  Objection, your Honor.

20            THE COURT:  Overruled.

21            MR. INGERMAN:  May we have a brief sidebar?

22            THE COURT:  Sure.

23            (Sidebar conference.)

24            (Continued on the next page.)

25

SIDEBAR CONFERENCE                    1014

1          MR. INGERMAN:  Your Honor, this witness has

2   testified in his deposition that he is not an Internet

3   expert.  They had Mr. Kohlmann on for this.  And he is not

4   qualified to testify about whether or not a particular Web

5   site is authentic or not authentic.

6          THE COURT:  He has not been asked that yet.  He

7   has been asked do you use information from that Web site in

8   reaching your opinions.  And he's going to say yes.

9          If you want to cross-examine him on the fact that

10  he's not an Internet expert, that's fine.

11         MR. INGERMAN:  That's actually not the pending

12  question, your Honor.  And I can go back and look at the

13  real tone.

14         THE COURT:  Well, let me look.

15         (Brief pause.)

16         THE COURT:  He was asked how is it that you

17  determine what's authentic and what's not on the Web site.

18         Now, the answer to the question is the basis of

19  how he forms his opinion.  It's subject to attack by you,

20  but it's just going into his process of expert evaluation.

21  That's why I overruled it.

22         MR. INGERMAN:  Thank you.

23         (End sidebar conference.)

24         (Continued on the next page.)

25

SHAKED - DIRECT - TURNER                    1015

1          MR. TURNER:  May I proceed?

2          THE COURT:  Yes.

3          MR. TURNER:  Do you want to read him back the

4    question.

5          (Record read as requested.)

6    A    The Al-Qassam Web sites are well known and also the

7    Hamas Web sites are well known.  Indeed, I am not an expert

8    on the Internet, but based on the reading of articles and

9    other materials written by other experts, I know that at

10   least the Web sites that I'm using have a very, very high

11   probability of being authentic Web sites of Hamas.

12   BY MR. TURNER:

13   Q    And do you routinely in your profession rely upon the

14   information that you've gained from those Web sites in order

15   to reach conclusions?

16   A    I am using these Web sites and the materials that are

17   in them, yes.

18   Q    Now, in the context of these 24 attacks, have you had

19   an opportunity to prepare 24 slides that help illustrate

20   what your findings are with respect to each attack?

21   A    Yes.

22   Q    And do these slides have -- in fact, I think all of

23   them do -- photographs of the involved terrorists or at

24   least some of the involved terrorists?

25   A    I made an effort to include the key terrorists that

SHAKED - DIRECT - TURNER                      1016

1    participated in every attack.

2    Q    And did you select the photographs, the images that you

3    placed on these slides, as fair and accurate representations

4    of the person identified on the slide?

5    A    Yes.

6    Q    Did you, in fact, take some of the photographs of the

7    people on the slides?

8    A    Yes, I personally did this, shot some of the pictures.

9    Q    And can you identify as fair and accurate

10   representations all of these photographs we're about to

11   begin to look at as the individuals whose name you put under

12   each photograph.

13   A    I will do that.

14          MR. TURNER:  Okay.  Your Honor, at this point I

15   would like to go ahead and begin going through the

16   individual attacks.  The first slide will be the Neve Yamin.

17          THE COURT:  All right.  You may.

18   BY MR. TURNER:

19   Q    Have you had an opportunity to investigate the March

20   28, 2001, gas station bombing at Never Yamin that resulted

21   in two deaths and four reported injuries?

22   A    Yes.

23   Q    Were you able to identify the suicide bomber?

24   A    Yes.

25   Q    Who was the suicide bomber?

SHAKED - DIRECT - TURNER                    1017

1   A    The suicide bomber was Fadi Amer, resident of Qalqilya,

2   who we see at the bottom part of the slide.

3   Q    Now, based on your investigation, did Fadi Amer carry

4   out this bombing solely and on his own or as part of Hamas?

5   A    Fadi Amer carried out the attack on behalf of Hamas as

6   member of Hamas and for the organization Hamas.

7        (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER                1018

1    DIRECT EXAMINATION (Continued)

2    BY MR. TURNER:

3    Q    Where is Neve Yamin?

4    A    Neve Yamin is a slow gas station, but it is also called

5    the Peace Gas Station.  It is not too far from Qalqilya,

6    which is an Arab town in the center of Israel.

7    Q    What is the significance, if any, of this gas station?

8    A    This gas station was a transportation station for

9    students who come from the center of Israel towards the

10   east, they come in the morning either driven by their

11   parents' cars or in buses; and from there, they are taken by

12   buses to their respective schools.

13   Q    What did your investigation reveal about Fadi Amer's

14   background?

15   A    Fadi Amer was a student in the university branch of

16   Qalqilya.  He studied Islamic sciences and wanted to serve

17   Islam in the mosque of the -- as an Imam in the mosque of

18   the city.

19              He was a veteran Hamas operative.  And judging by

20   testimonies given by Hamas, he was an officer in the

21   organization in Izz ad-Din al-Qassam, which is the military

22   wing of Hamas.

23   Q    How did you identify Ayman Halawah in the upper

24   left-hand corner as the Hamas commander who was in charge of

25   Nablus who built the bomb?

R. SHAKED - DIRECT/MR. TURNER          1019

1   A     Ayman Halawah was known from other sources and other

2   cases and other terror acts, and from the studies that I

3   conducted as a journalist and also in my studies at the

4   university, he was known to be the commander of Hamas in the

5   area of Nablus.  He was the one who built the bomb, and I

6   learned this from testimonies given by Hamas and other legal

7   sources, Israel legal sources and also the ISA records.

8   Q     The terrorist in the middle, Ra'ed Houtari, how were

9   you able to determine that he oversaw the attack and what

10  does that mean?

11  A     Ra'ed Houtari was Hamas operative in Qalqilya.  His

12  name became known after he was arrested.  And that included

13  -- Hamas actually published a description of his deeds.  He

14  was also arrested by the ISA and gave in his testimony

15  details about the terror, the bombing and what happened.

16  And judging by this and also other testimonies given by

17  other operatives who have linked him directly to the bombing

18  and the way by which he oversaw the terror act.

19            MR. INGERMAN:  Your Honor, may I have a continuing

20  objection on the hearsay issue with respect to this witness?

21            THE COURT:  As far as I'm concerned you do, yes.

22            I will advise the jury when the witness talks

23  about the things he relied upon in reaching his opinion,

24  those facts may or may not be before you through other

25  evidence.  For now, he's just telling you how he got to his

R. SHAKED - DIRECT/MR. TURNER                1020

1  opinion so that you can determine how to evaluate his

2  opinion.

3  BY MR. TURNER:

4  Q    The final terrorist shown on this particular slide is

5  Abd al-Rahman Hamdan.  What role did Hamdan play in this

6  terrorist attack?

7  A    Abd al-Rahman Hamdan was the commander of Hamas in

8  Qalqilya.  He was the one who planned the attack, and he

9  dispatched the bomber to Neve Yamin.

10  Q    What source of information or sources of information

11  did you use to acquire that fact?

12  A    The various sources I used were, for example,

13  testimonies given in Israel court by other terrorists about

14  him.  One example is Ra'ed Houtari himself, the

15  memorialization ceremonies held in Qalqilya after he was

16  killed, including large posters carrying pictures of him

17  with descriptions of the various operations that he

18  commanded.  And most especially, I used materials from Hamas

19  itself that describe his various deeds in detail and the

20  various activities he carried out in the organization and

21  his involvement in the terror attack in Neve Yamin.

22          MR. TURNER:  Could you show the witness only 3222?

23  Tell me when he's ready.

24          THE COURT:  When you can see it, he can see it.

25          MR. TURNER:  Mine comes up the same time as his?

R. SHAKED - DIRECT/MR. TURNER                    1021

1            THE COURT:  Yes, it does.

2   Q    Can you identify what 3222 is, Mr. Shaked?

3   A    Yes, I can.

4   Q    And what is 3222?

5   A    This is an official claim of responsibility from Hamas

6   in which it takes responsibility for the terror attack

7   carried out in Neve Yamin gas station.

8   Q    What is the source of 3222?

9   A    The source of the document is the site, the website of

10  the military wing of Hamas, which is called is Izz ad-Din

11  al-Qassam.

12  Q    Is that the same website that you described earlier

13  that you use on a routine basis?

14  A    Yes, indeed.

15  Q    And is this a fair and accurate image of what was drawn

16  from the Al-Qassam's brigade's website?

17  A    Yes.

18            MR. TURNER:  We offer 3222 into evidence.

19            MR. INGERMAN:  Objection.

20            THE COURT:  Can I see counsel at sidebar for a

21  minute.

22            (Continued on the next page for sidebar.)

23

24

25

SIDEBAR CONFERENCE                                    1022

1          (Sidebar conference begins.)

2          THE COURT:  Isn't this the same website that

3  Coleman testified to and got into evidence over objection?

4          MR. OSEN:  Yes.

5          THE COURT:  So it's the same objection you made in

6  Coleman, right?

7          MR. INGERMAN:  It is, with the added testimony

8  from Mr. Shaked that these are not statements against penal

9  interest.  I mean, he spent five or six minutes talking

10  about how this is a glorification and they do this for the

11  owner --

12          THE COURT:  I reject the argument that because

13  it's a glorification and cannot be against penal interest,

14  it can be both.  It frequently is.  People usually have a

15  motive for saying something that is against their penal

16  interest, besides wanting to go to jail.  So they have some

17  other purpose.  If inherently the declaration is against

18  their penal interest, the fact that they have some other

19  motive for making that declaration does not rob it of its

20  probative force.

21          MR. STEPHENS:  I don't think that's right, your

22  Honor.  If I may --

23          THE COURT:  Okay.  We have a disagreement on that.

24  That's my ruling.

25          But in any event, this objection was passed

SIDEBAR CONFERENCE                    1023

1  essentially because I admitted the website.

2          MR. INGERMAN:  I agree with that, I'm trying to

3  develop the record.  If your Honor will give me a continuing

4  objection, I won't jump up --

5          THE COURT:  I'm happy to give you a continuing

6  objection.

7          MR. INGERMAN:  That's fine.

8          (End of sidebar conference.)

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER                    1024

1           THE COURT:  All right.  The document is received
2   over objection.
3           MR. TURNER:  May we display it, please.
4           (Plaintiff Exhibit 3222 was admitted into
5   evidence.)
6   BY MR. TURNER:
7   Q    Okay.  First of all, blow up the upper one-third all
8   the way to the end.
9           Now, first of all, do you recognize the logo,
10  Mr. Shaked?
11  A    Yes, I can identify the logo.
12  Q    And whose logo is that?
13  A    The logo -- is the logo of the Izz ad-Din Al-Qassam
14  Brigade, the military wing of Hamas.
15  Q    Can you identify the person shown in the photograph?
16  A    Yes, I could.
17  Q    Who is it?
18  A    His name is Fadi Amer, he is the suicide bomber who
19  carried out the Neve Yamin suicide bombing.
20  Q    Are there sometimes in some of these attacks what's
21  called competing claims of responsibility by other
22  organizations?
23  A    Yes, indeed there are.
24  Q    And how does someone like you go about evaluating the
25  authenticity of the competing claims of responsibility?

R. SHAKED - DIRECT/MR. TURNER                1025

1  A    First of all, I don't -- I'm not in competition with

2  time, I'm only in competition with authentic material and

3  myself.  I examine the material based on a perspective of

4  time, and especially by comparing, examining, crosschecking

5  the same material with other material.  Because ultimately,

6  what we have here is just one piece out of a whole complex

7  puzzle.  And in order to build a true picture, I have to

8  base myself on various sources of information.

9  Q    Now, during the course of your investigation, were you

10 able to determine whether there were any competing claims

11 for the bombing at Neve Yamin?

12 A    I don't recall if in the case of Neve Yamin there were

13 indeed competing claims of responsibility.  But in the case

14 of Neve Yamin, Hamas only took responsibility two weeks

15 after the bombing, and there were certainly during that

16 period, various anonymous claims of responsibility.

17 Q    Now, as we go through these claims of responsibility in

18 each of these 24 attacks, including in some instances

19 special reports, as you had last, are all the details in

20 these claims of responsibilities always 100 percent

21 accurate?

22 A    Based on my experience, my research and my examination,

23 I have concluded that the official claims are generally

24 true, as well as other unofficial claims, they are also very

25 often true.  The claims received from competing

R. SHAKED - DIRECT/MR. TURNER                1026

1    organizations or from just anyone; ultimately, in most

2    cases, turn out to be false.

3    Q    Now, from a factual standpoint, does -- at least based

4    on your experience, does Hamas operate like a formal

5    military in that they are in constant communication with one

6    another about every detail at every moment?

7              MR. INGERMAN:  Objection your Honor, form.

8              THE COURT:  Sustained.

9    Q    Based on your experience -- you might want to tell him

10   I'm going to does him a question.

11             Based on your experience in dealing with Hamas,

12   does Hamas communicate with one another, at least based on

13   your experience in reporting these attacks, on a

14   moment-by-moment basis?

15             MR. INGERMAN:  Objection, same question.

16             THE COURT:  Sustained.

17   Q    You might want to tell him again.

18             Mr. Shaked, have you had an opportunity to read

19   3222, the claim of responsibility in this particular attack,

20   the Neve Yamin attack?

21   A    Yes, I would have that opportunity.

22   Q    And would you summarize for us what you learned from

23   this claim of responsibility in terms of this particular

24   attack?

25   A    Firstly, I concluded that Hamas made an official

R. SHAKED - DIRECT/MR. TURNER                1027

1   statement in which it claimed responsibility for the attack,

2   and also published the name of the suicide bomber correctly.

3          I also learned from the statement about the way

4   the suicide bombing was carried out, because Hamas gave

5   details in this statement.  I also learned that Hamas spoke

6   about the suicide bomber Fadi Amer as being the third in a

7   series of terror attacks that it sought to carry out, and I

8   learned this after the fact, based on this piece of

9   information.

10  Q    Could you show the witness please only 3811.  Can you

11  identify 3811?

12  A    Yes, I can.

13  Q    What is 3811?

14  A    This is an ISA report in Israel summing up the actions

15  of suicide bombers from September of 2000 to September of

16  2007.

17  Q    And does this ISA report include a section on Neve

18  Yamin, the attack on Neve Yamin?

19  A    Yes.

20  Q    And did you rely upon this particular government record

21  in reaching your findings in this particular attack?

22  A    Yes, I relied on this piece of information as well in

23  addition to other testimonies.

24  Q    Are these the kinds of reports that you've seen in your

25  over 40-year career at the ISA?

R. SHAKED - DIRECT/MR. TURNER                    1028

1    A    Yes.  Indeed, this report, which sums up certain period

2    of time is typical of the types of reports that I have seen.

3    Q    And does 3811, the ISA report confirm your conclusions

4    that Hamas was responsible for this attack in Neve Yamin?

5    A    Yes, it does.

6              MR. TURNER:  We would offer 3811 into evidence.

7              MR. INGERMAN:  Your Honor, we had a prior

8    objection to that, and I think it was sustained in part and

9    ruled in part as to this document.

10             THE COURT:  Oh, which part was sustained?

11             MR. INGERMAN:  Do you want me to say it?

12             MR. TURNER:  It is redacted further.

13             THE COURT:  It's been redacted?

14             MR. TURNER:  It's been redacted.

15             THE COURT:  Okay.  Anything else?

16             MR. INGERMAN:  No.

17             THE COURT:  The document is received.

18             (Plaintiff Exhibit 3811 was admitted into

19   evidence.)

20   Q    Would you put up 3216.

21             Do you recognize 3216, Mr. Shaked?

22   A    Yes, I do.

23   Q    And what is 3216?

24   A    This is a police report by a police explosives expert

25   describing the explosives charge as being a charge that is

R. SHAKED - DIRECT/MR. TURNER                1029

1   usually used by terrorist groups.

2   Q    Sometimes referred to as a ballistics report?

3   A    It may be called a ballistics report or an explosives

4   report, I'm not an expert on police reports, so I can't

5   really answer that question.

6   Q    Is 3216 the type of police report that you've seen over

7   the years emanating from the police forces within Israel?

8   A    Yes, I have indeed reviewed many such reports.

9   Q    And does this particular report relate to the attack at

10  Neve Yamin?

11  A    Yes, the report indeed discusses the attack at Neve

12  Yamin.

13  Q    And is the information contained in 3216 consistent

14  with the other information leading you to the findings you

15  made about who carried out the terrorist attack in Neve

16  Yamin?

17             MR. INGERMAN:  Objection.

18             THE COURT:  Overruled.

19  A    This finding helped me to reach that conclusion.

20             MR. TURNER:  We offer 3216 into evidence in its

21  redacted form.

22             MR. INGERMAN:  Objection, your Honor.

23             THE COURT:  Same one?

24             MR. INGERMAN:  Yes.

25             THE COURT:  I'm not sure we're speaking the same

R. SHAKED - DIRECT/MR. TURNER                    1030

1    language.  It's been redacted?

2            MR. INGERMAN:  I'm sorry, this is on 801.

3            THE COURT:  That's what I'm asking.  Overruled.

4            (Plaintiff Exhibit 3216 was admitted into

5    evidence.)

6    Q    Now, in addition this information, Mr. Shaked, did you

7    also have an opportunity to investigate -- to see whether

8    there are any posters or memorialization type activities

9    that Hamas carried out on behalf of Fadi Amer?

10   A    Yes, a number of things.  I saw the posters in

11   Qalqilya, and that includes the posters that were hung in

12   central places in the city, and also a symbolic funeral that

13   was held in the city attended by the residents of the city,

14   and also a ceremony that was held by students and a

15   memorial, an official memorial ceremony of Hamas, in which

16   Khaled Mashal himself, the head of the political bureau of

17   Hamas, gave a speech on telephone from the mosque of

18   Qalqilya, the city in which the terrorist was born and

19   operated.  And the Khaled Mashal called others to follow his

20   path, the path of Fadi Amer, the suicide bomber.

21   Q    Did you also have an opportunity to investigate the

22   June 1, 2001, suicide bombing at the Dolphinarium in Tel

23   Aviv that resulted in 21 deaths and 100 plus injured?

24   A    Yes.

25   Q    Were you able to determine who the suicide bomber was

R. SHAKED - DIRECT/MR. TURNER                     1031

1   in the Dolphinarium attack?

2   A    Yes.

3   Q    Who was it?

4   A    Sa'id Houtari, also a resident of Qalqilya.

5   Q    Was this young man also the roommate of the previous

6   suicide bomber?

7   A    Indeed, sir.

8   Q    Now, what was the Dolphinarium in June of 2001, so

9   everyone can understand the setting of where this attack

10  took place?

11  A    The Dolphinarium was the center of entertainment in

12  Israel for young men and women.  There were restaurants

13  there and entertainment centers.  There was a very big

14  discotech in which many young people danced, including my

15  own son, who visited the Dolphinarium to dance and have fun.

16  The clubs served mostly young people from high schools and

17  students who would come and attend the club during the

18  weekends.  They would crowd the club and just came there in

19  order to release their tension.

20  Q    Did that particular attack occur during the day or

21  nighttime?

22  A    This attack happened late at night, this was a Friday

23  night and many, many young people were on their way to dance

24  and have fun during the weekend.

25  Q    And you prepared a slide for this particular attack as

R. SHAKED - DIRECT/MR. TURNER                1032

1    well; is that correct?

2    A    Yes, I did pick out a slide.

3    Q    Mr. Shaked, the top three individuals on this

4    particular slide are the same three individuals involved in

5    the Neve Yamin attack, are they not?

6    A    Indeed, it is exactly the same terrorist cell that

7    perpetrated the attack in Neve Yamin.

8    Q    And were you able to review a claim, an official claim

9    of responsibility by Hamas for this particular attack?

10   A    Yes.

11   Q    Could you put 3252 in front of just the witness,

12   please.

13            Can you identify 3252?

14   A    Yes.

15   Q    What is 3252?

16   A    This is an official document.  It is Izz ad-Din

17   al-Qassam Brigade that announces, and I read the third line

18   from the top, the hero Sa'id -- Houtari who carried out the

19   attack at the Dolphinarium, and this is an official

20   statement, an official claim of responsibility.

21   Q    And was this particular exhibit taken directly off the

22   Al-Qassam Brigade's website, much like the previous one?

23   A    Yes.

24            MR. TURNER:  We offer 3252.

25            THE COURT:  All right.  Same objection?

R. SHAKED - DIRECT/MR. TURNER                1033

1          MR. INGERMAN:  Yes, your Honor.

2          THE COURT:  Admitted over objection.

3          (Plaintiff Exhibit 3252 was admitted into

4     evidence.)

5     Q    Let's go to the slide, if you would, Mr. Miller, in the

6     translated version.  If we could blow up the top half so we

7     put some of this into context.

8          First of all, the claim of responsibility, can you

9     identify the photograph on this particular exhibit,

10    Mr. Shaked?

11    A    Yes, I do.

12    Q    And is the date of attack likewise shown?

13    A    Indeed.  We do see the date.

14    Q    And the logo that the red line is pointing to, can you

15    identify that logo?

16    A    Indeed, I can identify the logo of the Izz ad-Din

17    Al-Qassam Brigade, the military wing of Hamas.

18    Q    Now, Mr. Miller, focus on the bottom where it has the

19    attack in the translated version and it reads, "The tenth

20    messenger the hero martyr, Sa'id Hassan Hussein al-Hutari,

21    20 years old, approached the intended target calmly on

22    Blessed Friday 6/1/2001 at 11:30 p.m. according to the plan

23    and carried out his distinguished suicide attack at the

24    heart of the enemy's territory.  He went to Allah's favor

25    and to his paradise to meet the profits, the martyrs, and

R. SHAKED - DIRECT/MR. TURNER                    1034

1    the righteous."

2         Is that consistent, that description consistent

3    with the facts that you were able to put together as part of

4    your investigation?

5    A    Yes.

6    Q    Now, were there any competing claims of responsibility

7    by other -- responsibility by other terror groups for the

8    attack at the Dolphinarium?

9    A    Yes.  Shortly after, there were a few claims of

10   responsibility.  If I'm not mistaken in this case, it was

11   the Palestinian Islamic Jihad, but they said very, very

12   quickly after the Hamas official claim of responsibility was

13   published, which ruled out every other.

14   Q    Now, in addition to that material, did you also have

15   access to an Israel security agency report, again, that

16   included this particular attack?

17   A    I did have the opportunity to peruse the ISA report

18   along with other records, other legal records.

19   Q    We're going to look at 3811, which is already in

20   evidence.  This is the ISA report that we discussed in the

21   context of Neve Yamin.

22   A    Yes, it is the very same report that details many other

23   terror attacks, including the Neve Yamin and the

24   Dolphinarium.

25   Q    And is the Dolphinarium attack specifically discussed

R. SHAKED - DIRECT/MR. TURNER                1035

1   in Exhibit 3811?

2   A     Yes.

3   Q     And are the results consistent with your findings?

4   A     Yes.

5   Q     Now, in addition that, there was a will prepared by

6   Mr. Houtari.

7   A     Indeed, the terrorist Houtari prepared a will before

8   embarking upon his terror attack.

9   Q     Did you have at some point in time access to that will?

10  A     Yes.

11  Q     And where did you see that particular will?

12  A     Yes, I did see this will in the website of Hamas.  And

13  for proper disclosure I can say that even before that, I

14  could see this in newspapers, because Hamas published it.

15  And I also read many other publications, Hamas wished to

16  make this public shortly after the attack.

17  Q     With respect to memorializations, could you put 3226 on

18  the witness' screen only.

19  A     Yes.

20  Q     Do you recognize this particular image?

21  A     Yes, I can see the picture of Houtari.  And it says

22  that he is the one who perpetrated the attack in Tel Aviv on

23  this Blessed Friday, and the date appears as well.

24  Q     What is the source of this particular exhibit?

25  A     This is a part of a series of posters that were

R. SHAKED - DIRECT/MR. TURNER                1036

1   published in Qalqilya in various mosques in the West Bank.

2   In this case the poster was taken from the official website

3   of the Izz ad-Din al-Qassam because of the good quality and

4   the ability to present it here.

5   Q    Is that the same website we've been discussing thus

6   far?

7   A    Indeed, it is the same website the Izz ad-Din al-Qassam

8   Brigade turn we over.

9            MR. INGERMAN:  Same objection.

10           THE COURT:  All right.  It's overruled.

11           MR. TURNER:  Would you please display that?

12           THE COURT:  Mr. Turner, as you know, I have sole

13   control of what gets displayed and not displayed.

14           MR. TURNER:  I'm sorry.  I though it was put into

15   evidence already.  May I display 3226?

16           THE COURT:  Yes, you may.  You may ask me or you

17   may ask Ms. Clarke, but it's got to be one or the two of us.

18           MR. TURNER:  Thank you.

19   Q    Could you blow up the top.

20           There is some writing on this poster, is there

21   not, Mr. Shaked?

22   A    Indeed so.

23   Q    What does that say?

24   A    It says, so in Arabic al-Shaheed al-qassami, which

25   means the shaheed, the martyr, the person who perpetrated

R. SHAKED - DIRECT/MR. TURNER          1037

1   the attack, the person who died is a member of Izz ad-Din

2   al-Qassam.

3   Q    When you say Izz ad-Din al-Qassam, is that the military

4   wing or so-called military wing of Hamas?

5   A    Yes.

6   Q    Okay.  Could you back out of that now.  And could you

7   go to the bottom where the writing is.

8        Could you read that, please sir?

9   A    Yes.  It does say after reading what it in Arabic,

10  "That this is the perpetrator of the terror attack in

11  Tel Aviv on the Blessed Friday, dated June 1st, 2001."

12  Q    Is that the same date as the Dolphinarium?

13  A    It was the same date.

14  Q    Is that consistent with your conclusion Hamas was

15  responsible for this attack?

16  A    Yes.  It helps me in determining the fact that Hamas is

17  responsible for the terror attack.

18  Q    Did you likewise have an opportunity to investigate the

19  August 9, 2001, bombing in Sbarro Pizzeria in Jerusalem that

20  resulted in 15 people being killed and 132 reported injured?

21        MR. INGERMAN:  Your Honor, I'm going to object to

22  the form of the question.

23        THE COURT:  What's wrong with the form?

24        MR. INGERMAN:  I think it's loaded up with facts

25  that are not in evidence.

R. SHAKED - DIRECT/MR. TURNER          1038

1          THE COURT:  Well, why don't you answer whether

2    you've had an opportunity to investigate the Sbarro bombing

3    on August 9, 2001.

4    A    Yes.

5    Q    How many people were killed?

6    A    15 people.

7    Q    And how many people were reported injured?

8    A    About 170 injured people.

9    Q    Were you able to determine who the suicide bomber was?

10   A    Yes, I could determine who the suicide bomber was.

11   Q    And who was the suicide bomber?

12   A    Yes.  The suicide bomber was called Izz ad-Din

13   al-Masri, a resident of the village near Janin who was 20 or

14   21 years old.

15   Q    Were you able to determine whether or not al-Masri

16   acted alone in this attack or whether he was acting on

17   behalf of Hamas?

18   A    Yes.

19   Q    What was your conclusion?

20   A    That al-Masri on operated on behalf of Hamas as a

21   member of Hamas and for Hamas in every stage of this

22   operation.

23          THE COURT:  Mr. Turner, can you finish the Sbarro

24   attack in ten minutes or do you need more?

25          MR. TURNER:  I can't finish it in ten minutes.

PROCEEDINGS                                    1039

1          THE COURT:  All right.  If this is convenient

2    before he goes into the basis of his conclusion, let's break

3    up the day.

4          MR. TURNER:  Yes, sir.

5          THE COURT:  Ladies and gentlemen, again, I need to

6    remind you, do not discuss the case amongst yourself or

7    anyone else, stay away from any media coverage on the case,

8    do not do any research on the case, do not communicate on

9    the internet about the case, no Facebook postings or Google

10   searches of anything like that.  Keep an open mind.  I know

11   this is hard work, but we appreciate the fact that you're

12   doing it.  Get a good night's sleep and we'll see you

13   tomorrow morning at 9:30.

14          (Jury is out of the courtroom at 4:20 p.m.)

15          THE COURT:  All right.  Anything else we need to

16   cover?

17          MR. OSEN:  Two things, your Honor.

18          THE COURT:  All right.  Everyone have a seat.  The

19   witness may step down.

20          THE WITNESS:  Thank you.

21          (Witness leaves the witness stand.)

22          THE COURT:  Mr. Osen, what do you got?  And the

23   interpreters may step down, too.

24          MR. OSEN:  Your Honor, first, we would request

25   that the defendant file with the Court his proposed list of

1049

```
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
 2

 3   COURTNEY LINDE, ET AL.,        )
                                    )   04CV02799 (BMC)
 4              Plaintiffs,         )   And all related cases:
                                    )   04CV05449 (Litle)
 5                                  )   04CV05564 (Almog)
                                    )   04CV00365 (Coulter)
 6                                  )   05CV00388 (Afrait-Kurtzer)
                                    )   05CV03183 (Bennett)
 7      -against-                   )   05CV03768 (Roth)
                                    )   06CV01623 (Weiss)
 8                                  )
                                    )   United States Courthouse
 9                                  )   Brooklyn, New York
                                    )
10   ARAB BANK, PLC,               )   TUESDAY, AUGUST 26, 2014
                                    )
11              Defendant.          )
     ───────────────────────────────)
12

13         TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
             BEFORE THE HONORABLE BRIAN M. COGAN
14                UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16
     FOR PLAINTIFFS LINDE     OSEN, LLC
17   AND COULTER:             BY:  GARY M. OSEN, ESQ.

18                            TURNER & ASSOCIATES, PLLC
                              BY:  CLYDE T. TURNER, ESQ.
19

20   FOR PLAINTIFFS LITLE,    SAYLES WERBNER
     BENNETT AND ROTH:        BY:  MARK S. WERBNER, ESQ.
21

22
     FOR PLAINTIFFS ALMOG:    STONE BONNER & ROCCO, LLP
23                            BY:  JAMES P. BONNER, ESQ.

24                            MOTLEY RICE, LLC
                              BY:  MICHAEL E. ELSNER, ESQ.
25                            BY:  JODI FLOWERS, ESQ.
```

1050

1

2  (APPEARANCES CONT.)

3  FOR THE DEFENDANT:        DLA PIPER US, LLP
                            BY:  SHAND STEPHENS, ESQ.
4                           BY:  ANTHONY PAUL COLES, ESQ.
                            BY:  BRETT INGERMAN, ESQ.
5                           BY:  MARGARET CIVETTA, ESQ.

6

7  INTERPRETED BY:          NERI SEVENIER, MICHAL MARIN
                            RACHELLE AVITAL AND VARDA YAARI
8

9  THE COURT REPORTER:      NICOLE CANALES, CSR, RPR
                            225 Cadman Plaza East
10                          Brooklyn, New York 11201
                            cnlsnic@aol.com
11

12  Proceedings recorded by mechanical stenography, transcript
    produced by computer-assisted transcript.
13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                      1052

1      THE CLERK:  Please state and spell your name for the
2  reporter.

3      THE INTERPRETER 1:  Neri Sevenier, N-e-r-i,
4  S-e-v-e-n-i-e-r.

5      THE INTERPRETER 2:  Michal, Marin, M-i-c-h-a-l,
6  M-a-r-i-n.

7      THE CLERK:  Thank you.  Be seated.

8      THE COURT:  All right.  Mr. Turner, you may inquire.

9      MR. TURNER:  Thank you, your Honor.

10                   RONNI SHAKED,

11  having been previously duly sworn, was examined, and testified

12  further as follows:

13  DIRECT EXAMINATION (CONTINUED)

14  BY MR. TURNER:

15  Q    Where we left off yesterday, we were beginning to talk

16  about the Sbarro Pizzeria bombing, in August of 2001.

17      MR. TURNER:  Is it permissible to put the slide up,

18  your Honor?

19      THE COURT:  Sure.  Do you want the lights dim?

20      MR. TURNER:  No, sir.  We're fine.

21  Q    Mr. Shaked, did you have an opportunity to conclude who

22  was the suicide bomber at the Sbarro Pizzeria in Jerusalem, in

23  August of 2001?

24  A    Yes.

25  Q    What was the suicide bomber's name?

SHAKED - DIRECT - TURNER                    1053

1    A    Az a din Masri.

2    Q    Were you able to determine whether he acted alone or

3    whether he was acting for and on behalf of Hamas?

4    A    On behalf of Hamas.

5    Q    Now, before we talk about the other individuals that you

6    concluded were involved in this particular attack, can you

7    give us not idea of where Sbarro Pizzeria in Jerusalem is?

8    A    This pizzeria is at the center of the city of Jerusalem,

9    the heart of the city, in a junction between two main streets.

10   And if I could compare it on a smaller scale, it might be

11   compared to Times Square in New York.

12   Q    Where is your office -- or where was your office in

13   relation to Sbarro Pizzeria, at the time, in Jerusalem?

14   A    About 200 meters away.

15   Q    Were you at the office at the time of this bombing?

16   A    I was.

17   Q    Did you hear the bombing?

18   A    I heard it.

19   Q    Did you see smoke from the bomb?

20   A    I seen the smoke that came out from that place.

21   Q    Did you feel the bomb?

22   A    I felt the tremor in the building.

23   Q    Did you go to the scene?

24   A    I went there as fast as I could.

25   Q    Approximately how long did it take you to get there after

1   you heard, felt and saw the smoke from the bomb?

2   A    It took a very short time; perhaps two or three minutes.

3   Q    Now, going back to your chart just a moment, again, the

4   third attack in a row, Ayman Halawa was involved in this

5   attack, according to your chart.  What role did Ayman Halawa

6   play?

7   A    Ayman Halawa was the Hamas commander Nablus, and he was

8   the one who authorized the bombing.

9   Q    And on the upper right, you have somebody named Adwan.

10  What role did Adwan play in this particular attack?

11  A    Qeis Adwan was the Hamas commander in the Jenin area, and

12  he was the man who recruited the suicide bomber.

13  Q    And this Abdullah Barghouti is shown in the middle.  Is

14  that the same Barghouti we talked about earlier yesterday?

15  A    It is the same Barghouti.

16  Q    And what was his role in this particular attack?

17  A    Barghouti was a Hamas engineer, and he built the bomb

18  that exploded.

19  Q    Is Abdullah Barghouti the one you interviewed personally

20  in prison?

21  A    Yes, I interviewed him.

22  Q    This particular bomb at Sbarro Pizzeria, were you able to

23  determine how the bomb was delivered to the sight?  In other

24  words, was it a belt?  Was it a vest?  Was it a briefcase?

25  What was it?

SHAKED - DIRECT - TURNER                              1055

1    A    No, it was not a belt.  It was not a suitcase.  One was

2    put inside a guitar to camouflage it.

3    Q    How do you know that?

4    A    I determined this on the basis of different findings,

5    testimonies from Hamas, testimonies of organizations within

6    the state of Israel; findings in the scene, and in particular

7    the personal interview awarded to me by the participants.

8    Q    Were you able to cross-check the various sources of

9    information in order to confirm the delivery system for the

10   bomb?

11   A    Of course, I did.

12   Q    Is cross-checking important when you're doing the type of

13   thing you were doing in this particular instance?

14   A    Cross-referencing is extremely important, to make sure

15   that all the details are known accurately and all the way.

16   Q    Now, on the right-hand side of your slide, there's a lady

17   shown, Ahlan Tamini.  Am I pronouncing that correctly?

18   A    There is a picture of a lady, and her name is Ahlan

19   Tamini.

20   Q    What role did Tamini play in this particular terrorist

21   attack?

22   A    Tamini led the suicide bomber.  She found the place where

23   he was supposed to explode, she accompanied him to that place

24   and pointed it out for him.

25   Q    Now, based upon your investigation, was Tamini's role in

SHAKED - DIRECT - TURNER                1056

1   this particular attack, the fact that a woman was involved,

2   was that significant in your investigation?

3   A    Yes, it was important role.

4   Q    Why?

5   A    Because in order to hide the suicide bomber, and to get

6   into the western part of Jerusalem, it was necessary to create

7   a sort of image of the couple getting strong (phonetic) in

8   Jerusalem.  Tamini did dress in a free way, with a

9   short-sleeved shirt and led the suicide bomber as if he was

10  her spouse.

11  Q    Now, there's an individual in the middle of the slide,

12  Muhammad Daghlas.  What role did Daghlas play?

13  A    Muhammad Daghlas supplied means; for example, renting an

14  apartment and also created the contact with whom Tamini, whom

15  he had recruited.

16  Q    And, finally, Bilal Barghouti.  Was Bilal Barghouti

17  related to Abdullah Barghouti?

18  A    Yes, he is his uncle.

19  Q    And what role did Bilal Barghouti play in this particular

20  attack?

21  A    He -- Bilal is a senior Hamas operative, and he put the

22  bomb inside the guitar and gave it to the suicide bomber.  He

23  adapted the guitar to the suicide bomber.

24       MR. TURNER:  Now, let's take a look -- if you could

25  show the witness only, 3324.

SHAKED - DIRECT - TURNER                    1057

1  Q    We're going to talk for a minute, Mr. Shaked, about the

2  sources of information you had available for this particular

3  attack.  First of all, do you recognize 3324?

4  A    Yes.

5  Q    Is this the official claim of responsibility by Hamas for

6  the attack in Sbarro Pizzeria in Jerusalem?

7  A    Yes, this is the official claim of responsibility by

8  Hamas.

9  Q    What is the source of this official claim of

10 responsibility?

11 A    This is from the official site of ad-Din al-Qassam

12 Brigade, the military arm of Hamas.

13            MR. TURNER:  We offer 3324 into evidence.

14            THE COURT:  Same objection?

15            MR. INGERMAN:  Yes, your Honor.

16            THE COURT:  Received over objection.

17            (Plaintiffs' Exhibit 3324  was received in

18 evidence.)

19            MR. TURNER:  Let's put that up.

20            THE COURT:  Okay.

21            MR. TURNER:  I believe we have a slide.  Mr. Miller,

22 can you focus in on the English translation on the right-hand

23 side, please, and primarily the description.

24 Q    Now, this indicates a military proclamation by the Martyr

25 Izz ad-Din al-Qassam Brigades.  Is that Hamas?

SHAKED - DIRECT - TURNER                    1058

1  A    Indeed, it is Hamas.  It is the military arm of Hamas.

2  Q    There's a sentence that says by the grace of Allah and

3  his assistance, the holy warrior of al-Qassam:  Izz ad-Din

4  Shuhayl Ahmad al-Masri from the village of Aqabah in the

5  al-Qassam Governorate of Jenin has carried out today;

6  Thursday, August 9, 2001, 19th of Jumada al-Ula, 1422 Hijri -

7  at noon, an act of martyrdom in the middle of -- it says

8  Sbarro Restaurant, in the heart of occupied Jerusalem.

9         What does that tell you about whether or not the

10 suicide bomber was acting for and on behalf of Hamas,

11 Mr. Shaked.

12 A    For me, this is an official announcement, a claim of

13 responsibility by Hamas for the Sbarro bombing.

14 Q    Is the picture of al-Masri on the official claim of

15 responsibility the same photograph that you have shown on your

16 slide?

17 A    Yes, indeed, this is a suicide bomber.

18 Q    So the two photographs are the same person?

19 A    Yes.

20 Q    Now, did you have access to an Israeli Security Agency

21 report that summarized this attack as well?

22 A    Yes.

23       MR. TURNER:  Your Honor, this is already in

24 evidence.  May we display 3811?

25       THE COURT:  You are.

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1059

1          MR. TURNER:  Now, this is a particular section out

2   of Exhibit 3811 that pertains to the Sbarro Pizzeria attack.

3   Can you blow that up at all for us?

4   Q    Now, did the ISA, the Israeli Security Agency, identify

5   the same suicide bomber as you?

6   A    Yes.

7   Q    And did the Israeli Security Agency also identify Bilal

8   Barghouti and Muhammad Daghlas as participants in this

9   particular attack?

10  A    Yes, sir.

11  Q    And how about Abdulla Barghouti?

12  A    He was also identified.

13  Q    Now, in this particular attack, did you also have access

14  to actual conviction records in the court system within

15  Israel, where the participants were convicted of these crimes?

16  A    Yes.

17         MR. TURNER:  May we show Mr. Shaked only 3301,

18  please.

19  Q    Can you identify 3301?

20  A    I do identify it.

21  Q    And what is 3301?

22  A    This is actually the verdict regarding Ahlan Tamini and

23  her involvement in the terror attack, in the cafe.

24         MR. TURNER:  We offer 3301 as a possible conviction

25  of Tamini for this particular attack.

SHAKED - DIRECT - TURNER                    1060

1          MR. INGERMAN:  Same objection.

2          THE COURT:  All right.  Overruled.  It is received.

3          (Plaintiffs' Exhibit 3301  was received in

4  evidence.)

5  Q    Would you show Mr. Shaked 3300.  Do you recognize 3300?

6  A    Yes.

7  Q    What is 3300?

8  A    This is a decision regarding Muhammad Daghlas by the

9  court which issued his sentencing.

10          MR. TURNER:  We offer 3300 as conviction of Daghlas

11  for his role in the bombing.

12          THE COURT:  Just so the record is clear, you're

13  objecting to the Apostille documents as well?

14          MR. INGERMAN:  Yes, your Honor.

15          THE COURT:  That's overruled as received.

16          (Plaintiffs' Exhibit 3300  was received in

17  evidence.)

18          MR. TURNER:  Put up 3205, please.

19  Q    Do you recognize 3205?

20  A    Yes.

21  Q    What is 3205?

22  A    This is also the sentencing that was issued by the court

23  to the terrorists who had perpetrated the attack at Sbarro.

24          MR. TURNER:  We offer 3205 as an Apostille

25  conviction of Bilal Barghouti.

SHAKED - DIRECT - TURNER                1061

1      THE COURT:  That's received over objection.

2      (Plaintiffs' Exhibit 3205  was received in

3  evidence.)

4  Q    I would you show the witness 3336, please.  Do you

5  recognize 3336?

6  A    Yes.

7  Q    What is 3336?

8  A    This is the sentencing that was issued to Abdulla

9  Barghouti.

10  Q    This particular document is not Apostille.  Were you in

11  attendance at the trial, Mr. Shaked?

12  A    Yes, I did attend the trial, and I was also there when

13  the sentencing was read out.

14  Q    So you were personally present in the room at the time of

15  the sentencing?

16      MR. INGERMAN:  Objection.

17      THE COURT:  Overruled.

18      THE WITNESS:  Yes.

19  Q    And was Abdulla Barghouti required to allocute or explain

20  his role in the terrorist attack?

21  A    Abdulla Barghouti did speak up, and said what he had to

22  say and gave his excuses for perpetrating this attack before

23  the sentencing was read.

24  Q    After the sentencing, did you obtain a copy of 3336,

25  which you're looking at on the screen?

SHAKED - DIRECT - TURNER                    1062

1   A    Yes, I did receive.

2   Q    And is 3336 a fair and accurate representation of what

3   you heard in the courtroom and also received from the court on

4   the day of Abdulla Barghouti's sentencing?

5   A    Yes.

6             MR. TURNER:  We offer 3336.

7             THE COURT:  Same objection?

8             MR. INGERMAN:  Yes, your Honor.

9             THE COURT:  It's overruled.  The document is

10  received.

11            (Plaintiffs' Exhibit 3336  was received in

12  evidence.)

13  Q    Now, let's move to memorialization.  Did you have an

14  opportunity to examine any evidence indicating that Hamas

15  actually put on the ceremony for this particular suicide

16  bomber, Mr. Shaked?

17  A    Yes.

18            MR. TURNER:  Would you show the witness 3306,

19  please?

20  Q    Do you recognize 3306, Mr. Shaked?

21  A    Yes, I do.

22  Q    What is 3306?

23  A    Yes, this was an ad or some kind of announcement in the

24  newspaper issued by the Hamas which invites --

25            MR. INGERMAN:  Objection, your Honor.

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                1063

1    THE COURT:  Just describe it generically.

2    THE WITNESS:  This is an ad from a newspaper that

3  invites the public to attend a ceremony in memory of the

4  suicide bomber.

5  Q    Did you use this particular piece of information in

6  trying to answer the question of what evidence exists

7  connecting Hamas to the suicide bomber?

8  A    Yes.

9  Q    Is this one of the types of information you used to

10 cross-check your sources in your methodology?

11    MR. INGERMAN:  Objection.  Form.

12    THE COURT:  Overruled.

13    THE WITNESS:  Yes.

14 Q    Is the word "Hamas" in the invitation?

15 A    The word "Hamas," indeed, appears there, as well as the

16 emblem of the Hamas appear on the publication.

17 Q    Does the suicide bomber's name appear on the invitation?

18 A    Yes, the name of the suicide bomber also appears there.

19 Q    And what is the source of the newspaper?

20    MR. TURNER:  We offer 3306.

21    THE WITNESS:  This is a paper, a Palestinian

22 newspaper, an ordinary one, which is circulated regularly

23 within the Palestinian society.  It is called El Ayaam.

24    MR. TURNER:  Excuse me.  I apologize.  We offer

25 3306.

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1064

1          MR. INGERMAN:  Objection.

2          THE COURT:  Let me see counsel at sidebar.

3      (Sidebar held outside the presence of the jury.)

Sidebar                                                          1065

1                        (Sidebar)

2              THE COURT:  I think I'm going to admit the document

3      with a limine instruction that the jury is not to consider it

4      for the truth of what it asserts, but only as one of the

5      sources of information that the expert considered in reaching

6      his opinion so that it can determine how much weight to give

7      to his opinion.  In doing that, I'm not inclined to send it

8      into the jury room with the other exhibits when they

9      deliberate, although I might give it to them if they ask for

10     it during deliberations.  I take it that does not satisfy your

11     objection?

12             MR. INGERMAN:  It does not, your Honor.

13             THE COURT:  That's my ruling.

14                        (Sidebar concluded.)

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1066

1        (In the presence of the jury.)

2        THE COURT:  We have a technical timeout.

3        Ladies and gentlemen, I'm going to receive this

4   exhibit for the limited purpose of helping you evaluate this

5   witness' opinion.  You are not to take the matters stated in

6   this newspaper article as true, but they are something that he

7   relied upon in reaching his opinion, and it's his opinion that

8   you're going to have to evaluate.

9        You may proceed.

10       MR. TURNER:  May we put the translated version on

11  the screen?

12       THE COURT:  You may.

13  Q   Mr. Shaked, take a moment, if you would, and read through

14  that to yourself.  And what I need for you to tell us is why

15  is this significant if you're evaluating the relationship

16  between Hamas and the suicide bomber at the Sbarro Pizzeria,

17  in terms of their relationship?

18       Now, this word has referenced several times in there

19  called ishdishotti (phonetic).  What does that mean,

20  ishdishotti (phonetic)?

21       THE INTERPRETER:  I didn't translate the answer.

22       MR. TURNER:  I'm sorry.

23       THE WITNESS:  The way I read it, this is not just --

24  this is not about the death of a person, but, rather, this is

25  a wedding, and it is also emphasized that the entity which

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1067

1  invites to this wedding is Hamas movement in Jenin, the Qassam

2  brigade, which are the military arm, and this shows us a

3  direct link between the person, Izz ad-Din Masri, and the

4  announcement and the ceremony.

5  Q    Now, going back to the question I asked a moment ago,

6  this word ishdishotti (phonetic), what does this mean?

7  A    In Arabic this means the person who dies for the sake of

8  Allah.  This is somebody that it is no coincidence, his death.

9  He dies during the perpetration of a terror attack for the

10  sanctity of Allah.  In this case, this was a suicide bombing.

11  He's not just -- he doesn't just die, he's actually looking

12  for death.

13  Q    Now, finally, in addition to the other sources of

14  information, is this one of those attacks where you had an

15  opportunity to actually interview some of the people involved

16  in this particular attack?

17  A    Yes, I did have a chance to interview some of the people;

18  Abdulla Barghouti, Bilal Barghouti, Muhammad Daghlas and Ahlan

19  Tamini.

20  Q    Now, in communicating with these individuals, did they

21  openly communicate with you about the details associated with

22  this bombing and their interaction with one other?

23  A    Yes, they spoke very openly, and I would even say that

24  they were happy and willing to discuss it.

25  Q    And in your communications with Abdullah Barghouti, did

SHAKED - DIRECT - TURNER                    1068

1   he provide you with details about the bomb itself that you

2   were able to cross-check through other sources to confirm?

3              MR. INGERMAN:  Objection, your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes, Abdulla did provide details to

6   me.

7   Q    Were you able to also interview the mother of the suicide

8   bomber?

9   A    Yes, I did interview both the mother and the father of

10  the suicide bomber.

11  Q    And did you videotape that particular interview?

12  A    Of course, I did.

13  Q    And that particular video is marked as 3285.  Mr. Shaked,

14  during the course of that interview, did you receive

15  information that helped you cross-check some of the details

16  about the relationship between Hamas and the suicide bomber?

17  A    Yes.

18  Q    And did that information further lead you to conclude

19  that your analysis was correct?

20  A    Yes.

21  Q    Did you also have an opportunity to investigate the

22  bombing at Ben Yehuda in December of 2001, at approximately

23  11:30 at night?

24  A    Yes.

25  Q    How many people were killed in this particular attack?

SHAKED - DIRECT - TURNER                    1069

1     MR. TURNER:  May we put the slide up by the way,
2  your Honor?
3     THE WITNESS:  Eleven people were killed.
4  Q   And how many were reported to be injured in this
5  particular terrorist attack?
6  A   One hundred and fifty-eight people.
7  Q   Were you able to identify during the course of your
8  investigation who the suicide bombers were in this particular
9  attack?
10  A   Yes.
11  Q   And who were the suicide bombers?
12  A   Two suicides bombers were in Nabil Halabiya and Osama
13  Bahar.
14  Q   Were you able to determine whether they were acting alone
15  or whether they were acting for Hamas in this attack?
16  A   Both of them acted on behalf of Hamas, for Hamas and as
17  members of Hamas.
18  Q   First of all, just to sort of place the setting as a
19  background, where's Ben Yehuda in Jerusalem?
20  A   Ben Yehuda is a strip in the center of Jerusalem, a
21  pedestrian street, with coffee houses, with restaurants and a
22  large shopping center.
23  Q   Where in relation to your office is Ben Yehuda?
24  A   Like 50 meters.  A few step.
25  Q   Were you at the office at 11:30 at night, on

SHAKED - DIRECT - TURNER                    1070

1   December 1, 2001, at the time of the Ben Yehuda bombing?

2   A    No, it was towards midnight.  I was not there.

3   Q    How quickly after the attack did you learn of the attack?

4   A    A few minutes after the bombing, I was already on my way

5   there.

6   Q    Can you give us an estimate of approximately how long it

7   took you to get to the scene of the terrorist attack at

8   Ben Yehuda?

9   A    I would say 15 to 20 minutes, at the most.

10  Q    Now, your chart indicates that Abdullah Barghouti again

11  was involved in this particular attack.  Were you able to

12  confirm that in your interview with Barghouti?

13  A    Yes, I could confirm that in an interview.

14  Q    You have a terrorist on here named Jamal Al-Tawil.  What

15  was his role in this particular attack and who was he?

16  A    Jamal Al-Tawil is, in fact, a Hamas leader.  He was

17  responsible for Al-Islah, the charity of Ramallah, of Hamas in

18  Ramallah; and he was the one who connected between the suicide

19  bombers and the senior commander of Hamas, Ibrahim Hamel.

20  Q    So the jury understands sort of understands where

21  Ramallah is in relation to Jerusalem, how far is Jerusalem

22  from Ramallah?

23  A    Ramallah is north of Jerusalem, at a distance of,

24  perhaps, 15 or 20 kilometers, which is 12 or 13 miles.

25  Q    At the time, was Ramallah considered to be part of the

Sidebar                                                  1071

1    West Bank?

2    A    Yes, Ramallah is part of the West Bank.

3    Q    Your slide indicates that Al-Tawil was the chairman of

4    Al-Islah Charitable Society.  What was the Al-Islah Charitable

5    Society at the time of this attack?

6    A    This society was established in order to create dowa

7    (phonetic), which means to help Hamas economically,

8    financially, Hamas, with all its arms and parts.

9              MR. INGERMAN:  Your Honor, may we approach?

10             THE COURT:  Yes.

11          (Sidebar held outside the presence of the jury.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                    1072

1                    (Sidebar)

2           MR. INGERMAN:  Your Honor, I think this is beyond

3     the scope of his opinion and expert report.  Al-Islah is not

4     mentioned anywhere in his expert report.  Now, he's going

5     beyond that, into whether or not sekot (phonetic) is part of

6     Hamas.  And they're trying to bootstrap into his testimony

7     something that's beyond the scope and was not presented, and I

8     would move to strike the testimony.

9           MR. OSEN:  Jamal Tawil is in the report.  He's

10    always been there.  He's been identified both in Mr. Levitt's

11    testimony and in Mr. Shaked's.  I don't think Mr. Turner

12    intends to go beyond the question he offered, but he's

13    entitled to identify who the cutout between the bombers and

14    Mr. Hamed was.

15          THE COURT:  I think it's within his opinion so far.

16    If you were to go where counsel says he doesn't want you to

17    go, then I agree it would exceed the bounds of his opinion,

18    but we're not there yet.  Please be sensitive to that.

19                    (Sidebar concluded.)

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1073

1        (In the presence of the jury.)

2        MR. TURNER:  May I proceed?

3        THE COURT:  You may.

4        MR. TURNER:  Were you through reading back his

5   answer?

6        THE INTERPRETER:  I'm sorry?

7        MR. TURNER:  Were you through reading back his

8   answer?

9        THE INTERPRETER:  Yes.

10   Q    Now, on the opposite side of your slide is terrorist by

11   the name of Sayd Qasem.  What was his role in this particular

12   attack?

13   A    Sayd Qasem is the deputy commander of Hamas in Ramallah,

14   and he was the one who transferred the bomb to the hands of

15   the bombers.

16   Q    At the top of the screen is a person by the name of

17   Ibrahim Hamed.  Who was Ibrahim Hamed?

18   A    At that time, Ibrahim Hamed was the commander of Hamas in

19   Ramallah, the senior commander, and he was the one who planned

20   the attack.

21        MR. TURNER:  Would you put before the witness 3366,

22   please.

23   Q    Can you identify 3366?

24   A    Yes, I can.

25   Q    What is 3366?

SHAKED - DIRECT - TURNER                    1074

1    A    This is an official claim of responsibility by Hamas for

2    the suicide bombing in Ben Yehuda.

3    Q    What is the source of 3366?

4    A    The official site of the military arm of Hamas.

5    Q    By site, are you referring to website, as we referred to

6    earlier?

7    A    Yes.

8              MR. TURNER:  We offer 3366.

9              THE COURT:  Same objection?

10             MR. INGERMAN:  Yes, sir.

11             THE COURT:  Overruled.  It is received.

12             (Plaintiffs' Exhibit 3366  was received in

13   evidence.)

14             MR. TURNER:  May we place it on the screen?

15             THE COURT:  You may.

16             MR. TURNER:  Can you blow up the picture, please?

17   Q    Can you identify that photograph that's in the official

18   claim of responsibility on Hamas' al-Qassam website?

19   A    Yes.

20   Q    Which one of the suicide bombers is that a picture of?

21   A    We see the picture of Ibrahim Hamel in here.

22             MR. TURNER:  If you can back out, please, and go

23   down to the script.  We have a translated version.  Can you go

24   to the English version, please.  And if you could, blow up the

25   description in the bottom.

SHAKED - DIRECT - TURNER                    1075

1  Q    If you can take a moment and read through that,

2  Mr. Shaked, what I would like for you to do is confirm for us

3  the facts that you were able to learn from this official claim

4  of responsibility, with respect to the question of whether

5  Hamas was responsible for this attack.

6  A    Indeed, yes.

7  Q    All right.  If you could --

8        MR. TURNER:  Your Honor, may we display 3811 again?

9  This is the Israeli Security Agency report that's already in

10 evidence.

11        THE COURT:  Yes.

12        MR. TURNER:  And if you can go to the page that

13 makes reference to the Ben Yehuda bombing.  Now, if you could

14 blow up maybe the first half of that.

15 Q    Now, first of all, did the ISA confirm the identity of

16 the two suicide bombers, as you have described?

17 A    Yes, it did.

18 Q    Did the ISA also confirm the involvement of Hamas in this

19 particular attack?

20 A    Yes.

21 Q    Were you able to use this as a method of cross-checking

22 your other sources to confirm that Hamas was, in fact,

23 responsible for this attack?

24 A    Yes.

25 Q    Now, in addition to the ISA report, did you also have

1  access to other government investigatory records related to

2  the Ben Yehuda attack?

3  A    Yes.

4  Q    Now, in this particular attack, Mr. Shaked, was there one

5  bomb, or were there more than one bomb?

6  A    In this particular attack, there were three bombs.

7  Q    And can you explain what you learned during the course of

8  your investigation about how this bombing was planned in this

9  central location?

10 A    The two terrorists came in a car, which they parked near

11 the site of the bombing.  They stepped down.  One of them put

12 on an explosive vest; the other one was carrying a big

13 computer inside, which there was an explosive charge, one of

14 them doing so far first.  Two minutes afterwards, the other

15 one blew himself up.  And 11 minutes later, the booby-trapped

16 car exploded.  The intention was to cause a maximum number of

17 casualties.

18 Q    During the course of your investigation of this

19 particular attack, were you able to determine why the delay in

20 the third bomb going off was planned the way it was?

21 A    Yes, it turned out that Hamas asked them to wait a few

22 minutes, until the first responders arrived, until people

23 gathered in that place, and then the explosion could cause

24 many more casualties.

25              MR. TURNER:  Put in front of the witness 3457,

SHAKED - DIRECT - TURNER                    1077

1    please.

2    Q    Can you identify 3457?

3    A    Yes.

4    Q    What is 3357?

5    A    This is an expert opinion on behalf of the police about

6    explosives.

7    Q    Explosives involved in this particular attack or another

8    attack?

9    A    In the Ben Yehuda explosion, about which we are talking.

10   Q    Is this an official record pertaining to the

11   investigation similar to those you've seen before?

12   A    Yes.

13   Q    And does this particular record help you with regard to

14   what the government investigation was saying and finding with

15   respect to one of the bombs?

16   A    Yes.

17              MR. TURNER:  We offer 3357.

18              MR. INGERMAN:  Your Honor, may we approach briefly?

19              THE COURT:  Sure.

20          (Sidebar held outside the presence of the jury.)

21

22

23

24

25

Sidebar                                                    1078

1              (Sidebar)

2           THE COURT:  Your Honor, this is an Israeli police

3    report, ballistics report, for lack of a better term.  Doesn't

4    mention Hamas.  Doesn't mention anything having to do with

5    attribution.  We think it's irrelevant and unduly prejudicial.

6           THE COURT:  What's prejudicial about it?

7           MR. INGERMAN:  Well, it's got pictures of the bomb,

8    got descriptions of the explosive device.  His testimony is as

9    to attribution.  If it mentioned Hamas, I could understand it,

10   but there's no mention of Hamas anywhere.

11          MR. OSEN:  Your Honor, the witness testified that he

12   discussed the building of the bombs with Mr. Barghouti.  We

13   had originally had video as to Barghouti's actual statements

14   on this, but he's now described them.  He's corroborating that

15   against the ballistics report and the description

16   Mr. Barghouti gave of how he packed the bomb.

17          THE COURT:  I'll overrule the objection in support

18   of his opinion.

19              (Sidebar concluded.)

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                        1079

1          (In presence of the jury.)

2          MR. TURNER:  May we proceed?

3          THE COURT:  Yes.  357 is admitted.

4          (Plaintiffs' Exhibit 357 was received in evidence.)

5          MR. TURNER:  Could you put before the witness 3358,

6   please?

7   Q    Can you identify 3358?

8   A    Yes.

9   Q    Is this an identical report, except for one of the other

10  bombings?

11  A    Indeed so.

12         MR. TURNER:  We offer 3358.

13         THE COURT:  Same objection?

14         MR. INGERMAN:  Yes, your Honor.

15         THE COURT:  Received over objection.

16         (Plaintiffs' Exhibit 3358  was received in

17  evidence.)

18         MR. TURNER:  Could you put before the witness 3359,

19  please.

20  Q    Do you recognize 3359?

21  A    I do recognize.

22  Q    Is this, in fact, the same report, except for the third

23  bombing?

24  A    Yes.

25         MR. TURNER:  We offer 3359.

SHAKED - DIRECT - TURNER                    1080

1          THE COURT:  All right.  Received over objection.

2          (Plaintiffs' Exhibit 3359  was received in

3    evidence.)

4          MR. TURNER:  Now, if you could go to page 8 of 9 on

5    3359, the one with the photographs.

6          May we display this, your Honor?

7          THE COURT:  Well, let's have a sidebar about that.

8        (Sidebar held outside the presence of the jury.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                                        1081

1                        (Sidebar)

2          THE COURT:  Why?

3          MR. TURNER:  This just shows the computer bomb that

4  confirmed his opinion, Barghouti's interview, confirmed by

5  cross-checking various different sources that it was, in fact,

6  a computer bomb.

7          THE COURT:  I don't think you need the picture for

8  that; you've already got the police report forming the basis

9  of his opinion or contributing to his opinion, and I think the

10 picture is really unnecessary to do that.

11         MR. OSEN:  Your Honor, the picture's in the report

12 itself.

13         THE COURT:  I understand, and I'm not saying I won't

14 give it to the jury for their deliberations.  I will cross

15 that bridge when I come to it, but right now I think, under

16 Rule 403, I'm not going to let you show the picture.

17                   (Sidebar concluded.)

18

19

20

21

22

23

24

25

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1082

1           (In the presence of the jury.)

2           MR. TURNER:  May I proceed?

3           THE COURT:  You may.

4           MR. TURNER:  Mr. Miller, if you would show the

5   witness only page 8 of 9 of 3359?

6   Q    Mr. Shaked, were you able to confirm through the

7   photographs and other materials in these exhibits, these

8   police investigation files, that by cross-checking these

9   sources that the information you learned from Mr. Barghouti's

10  interview about the computer bomb was, in fact, accurate?

11  A    Yes.

12          MR. TURNER:  Now, if you could place before the

13  witness only the beginning of 3284.  It should be a video.

14  Q    Do you recognize the person on the first clip of this

15  particular videotape, Mr. Shaked?

16  A    Yes, of course.

17  Q    And who is that individual?

18  A    Abdulla Barghouti.

19  Q    Now, is this particular video clip taken from your own

20  interview of Barghouti about this particular bombing and how

21  he created or made this particular bomb while he was in

22  prison?

23  A    Yes.

24          MR. TURNER:  Your Honor, under 703, may we show this

25  short clip?

SHAKED - DIRECT - TURNER                    1083

1           THE COURT:  No.

2   Q    Did you also have an opportunity to review the sentencing

3   record for Barghouti that we referred to earlier in the prior

4   bombing, wherein he specifically discusses this particular

5   attack at Ben Yehuda?

6   A    Yes, I did have the opportunity to do that.

7           MR. TURNER:  Your Honor, we would like to display

8   page 2 of 2, in the English translation.  We've got a slide

9   prepared.  It has an excerpt.  And this is already in

10  evidence, Plaintiffs' Exhibit 3336.

11          THE COURT:  Can I see it first?

12          MR. TURNER:  Sure.

13          THE COURT:  Any objection?

14          MR. INGERMAN:  No, your Honor.

15          THE COURT:  All right.  You may proceed.

16          MR. TURNER:  Okay.  If you could display this,

17  please.  Can we get the lights down just a tiny bit?  Thank

18  you.

19  Q    Now, this particular excerpt comes from the sentencing of

20  Barghouti; is that correct, Mr. Shaked?

21  A    Yes.

22  Q    Now, it begins in blue.  The defendant is directly

23  responsible for the murder of dozens of innocent human beings

24  and the injury of hundreds more.  We fail to understand how

25  the defendant could put to the use the scientific knowledge he

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1084

1    acquired, which was intended from the outset to improve human

2    life, for so much destruction and carnage.  And then in white,

3    we found a partial answer to this question, in the words of

4    the defendant, within the pleas for sentencing in this case,

5    from which one could sense, with no difficulty whatsoever, the

6    inexhaustible patriot that has consumed all his humanity.

7         The defendant expressed no remorse but was instead

8    proud of having trained dozens of engineers whom he hoped

9    would cause attacks that are more severe than he himself had

10   caused.  The defendant concluded his address by promising that

11   the Hamas organization would cause the destruction of the

12   state of Israel, in accordance with the vision of Ahmed Yasin.

13        Were you present when those words, or similar words,

14   were stated in court, Mr. Shaked?

15   A    Yes, I was indeed present in the court while these words

16   were said.

17        MR. TURNER:  You may turn the lights back up,

18   please.  Thank you.

19   Q    Now, was this piece of information that you learned at

20   sentencing important information in cross-checking the various

21   sources to ensure accuracy in determining that Hamas was

22   responsible for this attack?

23   A    Indeed so.

24   Q    Did you also have an opportunity to investigate the

25   bombing and shooting of bus 189 near Emmanuel on

SHAKED - DIRECT - TURNER                              1085

1   December 12, 2001?

2   A    Yes.

3            MR. TURNER:  May we place the slide up there,

4   your Honor?

5            THE COURT:  Yes.

6   Q    Were you able to determine who the Hamas shooters were in

7   this particular attack?

8   A    Yes, I did manage to determine.

9   Q    And what were the names of the terrorists involved in

10  this particular attack near Emmanuel?

11  A    Names of the terrorists are apparent on the bottom line.

12  These are three names; Muhammad Aziz Haj Ali, Assem Rihan and

13  Anan Kadusi.  In the top part, you can see their commander

14  Nasr al-Din Assida.

15  Q    Were you able to determine whether these people acted

16  alone or whether they were acting for and on behalf of Hamas

17  in caring out these attacks?

18  A    These terrorists did operate on behalf of the Hamas, for

19  the Hamas and as Hamas operatives.

20  Q    So we get sort of a feel for where this place is, tell us

21  the significance of bus 189 and in the Emmanuel community as

22  it is geographically located in Israel.

23  A    Emmanuel is located at the northern and central part of

24  Samaria.  This is a locality where approximately 4,000 people

25  live.  It is a religious community.  Most of the people who

1   live there work in Tel Aviv, so every morning they travel

2   there and then come back home.  Most of them use that bus to

3   come back home, because the general social status in that is

4   people of middle class and beneath.

5   Q    Was this a commercial bus?

6   A    It was a bus from the public transportation system.

7   Q    How many people were killed in this particular terrorist

8   attack?

9   A    Ten people were killed in this bombing.

10  Q    And how many were injured?

11  A    Thirty people were injured.

12  Q    What time of day did this attack occur?

13  A    It occurred during the late afternoon hours.  I think it

14  was approximately at 7:30 -- excuse me.  17:30, which is

15  5:30 p.m., something like that.

16  Q    During the course of your investigation, were you able to

17  determine whether the type of terror attack that occurred at

18  Emmanuel was a new kind of attack, or was this similar to what

19  had transpired before?

20  A    So far, we have not discussed any attack that was similar

21  to this or of this kind, because this attack combined shooting

22  with throwing a bomb, and then once again shooting at the bus

23  and storming it, a bus with people inside.  This was something

24  new compared to previous attacks.

25            MR. TURNER:  Would you show the witness, please,

1   only 3385?

2   Q     Do you recognize 3385?

3   A     Yes, I do.

4   Q     What is 3385?

5   A     This is a claim of responsibility by the Qassam Brigades,

6   the military arm of Hamas for the Emmanuel bombing.

7   Q     And what is the source of 3385?

8         MR. INGERMAN:  Your Honor, may we approach just

9   briefly?

10        THE COURT:  Sure.

11        (Sidebar held outside the presence of the jury.)

12

13

14

15

16

17

18

19

20

21

22

23

24                  (Sidebar)

25        MR. INGERMAN:  Your Honor, this exhibit is not

Sidebar                                            1088

1    mentioned anywhere in Mr. Shaked's report.  We never had an

2    opportunity to ask him about it at his depositions or inquire

3    with him.  They're showing him this document for the first

4    time, and it's unfair.

5              THE COURT:  Was it on the plaintiffs' list?

6              MR. INGERMAN:  It's on the plaintiffs' exhibit list,

7    of course, but this witness never cited it, that he relied on

8    it for purposes of the report, so we were never able to

9    inquire of him at pretrial.

10             MR. OSEN:  I don't know whether that's accurate or

11   not.  I do believe Mr. Shaked is referenced the Qassam

12   Brigade's claim of responsibility.  I don't know whether the

13   question here is whether this particular version of the URL is

14   not cited or whether they're saying he never cited al-Qassam's

15   claim of responsibility.  I don't think that's correct.

16             MR. INGERMAN:  With respect to the Emmanuel, he has

17   a section in his report on each of the attacks, with

18   respect -- on the Emmanuel section, we did not see any

19   reference to this al-Qassam claim of responsibility.

20             THE COURT:  If you had, since it's been on the

21   plaintiffs' list, would you have asked him?

22             MR. INGERMAN:  Well, we could have inquired with him

23   about how he relied on it, why he relied on it, what was in

24   it?  I mean, it's trial by ambush, really.

25             THE COURT:  I would agree with you if I saw any

NICOLE CANALES, CSR, RPR

1    prejudice to the non-listing earlier, but I'm not seeing any.

2    It's just one more document supporting his opinion, and I

3    don't see any great cross-examination you could have done at

4    his deposition that would have impeached this particular

5    document.  It's of the same general, as all the other ones he

6    relied on, so I'm going to overrule the objection.  I do want

7    plaintiffs' attorneys to check this carefully.  Obviously this

8    one is fine, but a bunch of them would not --

9              MR. INGERMAN:  We do have others that we've

10   identified that I think are coming up that we did not find

11   anywhere in his reports, so --

12             MR. OSEN:  They've had the documents.  They've had

13   the report.  You could reach out to us at any point if you

14   have a question about any one.  Some of these are simply an

15   issue, your Honor, of which resolution version of the same WW

16   al-Qassam.  If there's one that isn't, we're happy to discuss

17   it.  But we would prefer to have had that discussion days ago.

18             THE COURT:  Yes, I think it was clear as to which

19   documents this one would be testifying on.  Right?  I mean,

20   this is not a surprise to you now that they pull this document

21   out with this witness, is it?

22             MR. INGERMAN:  No, but we didn't realize until

23   yesterday, when going through the exhibit.  There's hundreds

24   of exhibits to try to figure out in a 200-plus report whether

25   or not a particular exhibit had been cited.

Sidebar                                                    1090

1      THE COURT:  But I've got to have a feel of quantity.

2  Like I say, if it's an isolated instance or one or two others,

3  it's a problem.  If there's 20 of these exhibits, it's a

4  problem.

5      MR. INGERMAN:  I mean, I would say, your Honor, just

6  estimating, we're looking at somewhere in the 10 to 12 range,

7  I would say.  And I'm happy to discuss them with Mr. Osen on

8  the break.  If we're wrong, the objection's no good, but --

9      THE COURT:  Let's take a break now, and you all try

10 to work this out.  And at least if you can't work it out, give

11 a better feel for what these documents are, why they were not

12 identified in the report -- maybe, as Mr. Osen's suggesting,

13 they're simply other versions of documents that were

14 referenced in his report that are not materially different.

15 If that's the case, it's not a problem.  But we'll take our

16 break now so you can try to work it out.

17     MR. OSEN:  Thank you.

18     MR. INGERMAN:  Thank you.

19                    (Sidebar concluded.)

20

21

22

23

24

25

Proceedings                                    1091

1              (In the presence of the jury.)

2              THE COURT:  Ladies and gentlemen, there's a small

3      issue we need to work out, so we'll take a little bit early of

4      a morning break.  We'll come back here at 11:05.  Please do

5      not discuss the case among yourselves.  See you in 15 minutes.

6              (Outside the presence of the jury.)

7              THE COURT:  Let's reconvene a couple minutes after

8      11:00, so you have a chance to talk.

9              (Recess in proceedings.)

10             (Proceedings continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                           1092

1           (Honorable Brian M. Cogan takes the bench.)

2           THE COURT:  All right.  Be seated, please.  Where

3    do we stand on this?

4           MR. SHAND:  Mr. Ingerman will be right back.

5           THE COURT:  I said 11:02.  I just congratulated

6    everyone for being prompt.  Is the exhibit we were talking

7    about before the break 3385?

8           MR. OSEN:  3385.

9           THE COURT:  Are you sure that goes with this

10   attack?

11          MR. OSEN:  As far as I know.  I can confirm it

12   again, your Honor.

13          MR. INGERMAN:  Sorry, your Honor.

14          THE COURT:  Okay.

15          MR. OSEN:  Yes, your Honor.

16          MR. TURNER:  Do you have the translated version?

17          THE COURT:  I'm sorry.  Are we on the December 12,

18   2001, attack?

19          MR. OSEN:  Yes, the Emmanuel bombing.

20          THE COURT:  Right.  And this document takes

21   responsibility for the attack on the 6th of Jumada al-Awwal

22   which is translated as July 16, 2002; hence, my question.

23          MR. OSEN:  Reasonable question, your Honor.

24          MR. TURNER:  It does say "Emmanuel".

25          THE COURT:  Well, I take it aside from this

PROCEEDINGS                                    1093

1   question as to whether it's even the right document, I take

2   it the parties have not reached a resolution on this issue

3   of documents that the witness is using, but are not

4   contained in his report, allegedly, defendant's contention?

5           MR. OSEN:  Right.  Your Honor, I think we have

6   largely resolved it.  There are a couple of documents

7   towards the back end of the presentation which we were just

8   going to work on now.  But I think with respect to the ones

9   that are upcoming before lunch, it shouldn't be an issue,

10  and we're just going to advise Mr. Turner as to which ones

11  we've worked out.

12          THE COURT:  Is that right?

13          MR. INGERMAN:  It is, yes.

14          THE COURT:  So let's get the jury in and proceed.

15          MR. INGERMAN:  So with respect to this exhibit,

16  your Honor, this obviously is not the same attack?

17          THE COURT:  Well, that's what I said; the

18  plaintiffs are not there yet.

19          MR. OSEN:  Your Honor is correct, the actual

20  translation here has a different date, but it does refer to

21  the Emmanuel attack.

22          THE COURT:  All right.  I'm going to leave this to

23  be worked out in the direct and cross-examination process,

24  okay.  However you want to deal with that is fine.

25          (Jury is in the courtroom at 11:10 a.m.)

R. SHAKED - DIRECT/MR. TURNER                    1094

1          THE COURT:  All right.  Be seated, please.

2          Mr. Turner, you may continue.

3          MR. TURNER:  Thank you, your Honor.

4   DIRECT EXAMINATION (Continued)

5   BY MR. TURNER:

6   Q    When we broke, we were talking about the Emmanuel

7   shooting and bombing.  Do you recall that, sir?

8   A    Yes.

9   Q    Now, as one of the sources of information, in addition

10  to what we've already talked about, did you have access to

11  government records from the Ministry of Foreign Affairs?

12  A    Yes.

13         MR. TURNER:  Could you show the witness only,

14  please, 3392.

15         MR. INGERMAN:  Your Honor, I think you've already

16  ruled on 3392.

17         THE COURT:  I don't think I have.  Oh, you're

18  saying in the prior order?

19         MR. INGERMAN:  Yes.

20         THE COURT:  Mr. Turner, I did enter an order on

21  this document.

22         MR. TURNER:  Yes, sir.  It's only being shown to

23  the witness.

24         THE COURT:  Okay, but I entered an order as to --

25         MR. TURNER:  The admissibility.

R. SHAKED - DIRECT/MR. TURNER                    1095

1      THE COURT:  The admissibility and what the witness

2  will be able to say about this.

3      MR. TURNER:  Yes, sir, I understand.  I fully

4  intend to comply with the order.

5      THE COURT:  All right.  Please proceed.

6      MR. TURNER:  May I proceed?

7      THE COURT:  Yes.

8  BY MR. TURNER:

9  Q    Do you recognize 3392?

10  A    Yes, I do.

11  Q    Now, is this one of the pieces of information that you

12  collected from the various sources that assisted you in

13  reaching the conclusion that Hamas was responsible for this

14  particular attack?

15  A    Yes.

16  Q    Now, in addition to this, did you also have access to a

17  video will of, I believe his name is Assem Rihan, that was

18  taken before this particular attack occurred, but talked

19  about this attack that was about to occur?

20  A    Yes, I did see this video.

21      MR. TURNER:  Mr. Miller, can you show the witness

22  only the first of the video marked 3398.

23  Q    Do you recognize this particular video, Mr. Shaked?

24  A    Yes.

25  Q    Can you identify the person in the video?

R. SHAKED - DIRECT/MR. TURNER                    1096

1   A    Yes, this is the picture of Assem Rihan.

2   Q    Is this the same Assem Rihan that carried out the

3   attack on the bus in Emmanuel?

4   A    Yes.

5   Q    What is the source of this will?  Where did it come

6   from?

7   A    The source of this video is a website of Izz ad-Din

8   al-Qassam Brigade, the military wing of the Hamas.

9   Q    The same website we've been talking about?

10  A    Yes.

11  Q    And did this will help you reach your conclusion that

12  Assem Rihan was one of the shooters and bombers involved in

13  this particular attack and responsible for these deaths and

14  injuries?

15  A    Yes, it helped me.

16           MR. TURNER:  We would offer 3398.

17           MR. INGERMAN:  Your Honor, we renew our objections

18  on 403 grounds.

19           THE COURT:  All right.  The objection is overruled

20  and the exhibit is received.

21           (Plaintiff Exhibit 3398 was admitted into

22  evidence.)

23           MR. TURNER:  May we have the lights, your Honor,

24  and play this?

25           THE COURT:  Yes.

R. SHAKED - DIRECT/MR. TURNER                    1097

1          (Video of Assem Rihan being played.)

2          MR. TURNER:  May we have the lights?

3    Q    Mr. Shaked, did that videotape that was taken prior to

4    this attack assist you in concluding that Rihan and these

5    others were associated with Hamas in carrying out this

6    terrorist attack on behalf of Hamas?

7    A    Yes.

8    Q    In addition to these sources of information, did you

9    also have access to a memorialization poster that was

10   created of Rihan and published throughout the areas?

11   A    Yes, I had access to these posters.

12         MR. TURNER:  Can you show the witness only please,

13   1090, and go to page nine.

14   Q    Do you recognize Exhibit 1090, page nine?

15   A    I do.

16   Q    Who is that individual?

17   A    This is a terrorist who participated in the Emmanuel

18   attack and was killed during the attack.

19   Q    Can you read -- I recognize it's in Arabic at the top

20   of your screen, can you read that for us in Arabic?

21         MR. INGERMAN:  Objection, your Honor.

22         THE COURT:  Sustained.  You need it in first.

23         MR. TURNER:  Your Honor, we would offer 1090, page

24   nine.

25         MR. INGERMAN:  We object, in addition to 801 for

R. SHAKED - DIRECT/MR. TURNER                1098

1    reasons we discussed before the break, we're not seeing the

2    picture anywhere.

3            THE COURT:  I thought we had resolved that, at

4    least at this point.

5            MR. OSEN:  I thought so too, your Honor.  If we

6    can do a quick sidebar.

7            (Continued on the next page for sidebar.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                          1099

1          (Sidebar conference begins.)

2          MR. OSEN:  I think we indicated to you that the

3   poster didn't come as mentioned in this report, but not in

4   the form that is on the screen presented, because we took

5   the same one that is used from -- it's the same poster, just

6   a different version of the same poster.

7          THE COURT:  All right.  Here is my feeling about

8   this:  Look, you've got an expert report, you take his

9   deposition, you go through all the things the expert relied

10  on in his report.  At the end of the report, at the end of

11  the examination you say, is there anything else you relied

12  on.  If he says "no" then you've got good cross-examination,

13  okay.  You've got -- you can say to him on cross-examination

14  you didn't tell us about this during your deposition, did

15  you.  I asked you everything you relied on and you didn't

16  mention this, did you.  This wasn't in your report, was it.

17  And that's where I'm going to leave it right now.

18          MR. INGERMAN:  I understand, your Honor, but the

19  prejudicial value of moving this stuff in outweighs the

20  probative value of the cost here.

21          THE COURT:  I think it really has very little

22  prejudicial value.  It is a picture and an assumption of

23  responsibility by a guy who he's got other sources that show

24  that, so I think the prejudicial impact is really quite

25  limited, so I'm going to relegate it to cross-examination on

SIDEBAR CONFERENCE                          1100

1    that.

2              (End of sidebar conference.)

3              (Continued on the next page.)

R. SHAKED - DIRECT/MR. TURNER                    1101

1          THE COURT:  All right.  The document is admitted

2    over objection.

3          (Plaintiff Exhibit 1090 was admitted into

4    evidence.)

5          MR. TURNER:  May we put it up on the screen, your

6    Honor?

7          THE COURT:  You may.

8          MR. TURNER:  Mr. Miller, if you can enlarge the

9    upper half.

10   BY MR. TURNER:

11   Q    First of all, do you recognize the logo?

12   A    Yes, I recognize it.

13   Q    What is the logo?

14   A    This is the logo of Izz ad-Din al-Qassam Brigade.

15   Q    Can you read for us the Arabic that's written on the

16   document above the logo?

17   A    It says that there -- I have read this phrase first in

18   Arabic.  It says the heroic Assem Rihan who acted out the

19   blessed action of Nablus.

20   Q    Nablus is what?

21   A    They mean the Emmanuel attack.  Nablus appears because

22   Nablus is the central city of that area.

23          MR. INGERMAN:  Objection, your Honor, move to

24   strike.

25          THE COURT:  Sustained.  Ladies and gentlemen, the

R. SHAKED - DIRECT/MR. TURNER          1102

1   words in this document are, again, not to be taken as true

2   by you.  The document is only used to help you evaluate

3   whether you should accept this witness' opinion.

4   Q    Mr. Shaked, where is Nablus in relation to Emmanuel?

5   A    Emmanuel is a couple of kilometers, a few miles

6   northwest of Nablus.

7            MR. TURNER:  If you can go out and focus on the

8   bottom.

9   Q    Who is in the photograph?

10  A    This is a picture of Assem Rihan.

11  Q    What does the Arabic say at the bottom?

12  A    This is an Islamic concept which expresses the heroism

13  of a person who gives his live for others.

14  Q    Did you have an opportunity to investigate the shooting

15  attack in Atzmona in March of 2002?

16  A    Yes.

17           MR. TURNER:  May we demonstrate the slide, your

18  Honor?

19           THE COURT:  Sure.

20  Q    Were you able to determine who the shooter was?

21  A    Yes.

22  Q    Who was the terrorist that carried out the shooting?

23  A    The shooter is Muhammad Farhat, a member of the Hamas

24  organization.

25  Q    Were you able to determine or reach a conclusion as to

1  whether or not Muhammad Farhat did this on his own or

2  whether he was acting before and on behalf of Hamas?

3  A    Muhammad Farhat acted on behalf of Hamas with the

4  knowledge of Hamas and his commanding officers.

5  Q    How many people were killed in this particular terror

6  attack in Atzmona?

7  A    Five people were killed in Atzmona.

8  Q    And how many were injured?

9  A    23 were injured.

10 Q    Did your investigation reveal how old Muhammad Farhat

11 was?

12 A    Yes, he was 17 years old.

13 Q    Did your investigation find anything unique about

14 Muhammad Farhat's role in this particular attack in terms of

15 his age?

16 A    Yes.  I will tell you about it briefly.  Muhammad

17 Farhat wanted to do the suicide bombing.  He turned to his

18 mother, Marriam Farhat, who is also an activist of Hamas,

19 and she went directly to the commander, senior commander of

20 al-Qassam Brigade to get his permission.  And he allowed her

21 son to go and do this.  And only after receiving permission

22 did he go and perpetrate the attack.

23 Q    Is Shehada shown as the top photograph?

24 A    Yes, Salah Shehada is the top of the slide.

25 Q    Did Salah Shehada have any special or unique role in

R. SHAKED - DIRECT/MR. TURNER                1104

1  the investigation of the founding of Hamas?

2  A    Yes.  Salah Shehada was one of the founders of the

3  Hamas and the commander of the military wing of Hamas.

4  Q    What was unique about this particular attack that

5  required that this 17 year old's mother go to Shehada, one

6  of the high executive leaders of Hamas, in order to, as you

7  put it, get permission to do this attack?

8              MR. INGERMAN:  Objection.

9              THE COURT:  Sustained as to form.

10 Q    Can you explain to us why Shehada was required to

11 approve this particular attack, at least based on your

12 investigation?

13 A    Farhat was 17 years old.  He was a member of the Hamas

14 youth movement, and Hamas did not want children for these

15 kinds of attacks.  And he was also -- children are also

16 inexperienced.  This is why permission was required from the

17 commander both from an operational perspective and with

18 respect to the age.

19 Q    What did your investigation reveal about Farhat's

20 mother's role in Hamas?

21 A    The mother of Muhammad Farhat, Marriam, escorted him on

22 his way and wished him good luck.  That means this was the a

23 mother who sent a young son to die for the cause for which

24 she felt was important.

25             MR. TURNER:  Would you show the witness only 3429,

R. SHAKED - DIRECT/MR. TURNER                1105

1   please.

2   Q     Do you recognize 3429?

3   A     Yes, I do.

4   Q     And what is 3429?

5   A     Yes, this is the claim of responsibility issued by

6   al-Qassam Brigade of the military wing of Hamas regarding

7   the attack that was carried out in Atzmona by the heroic

8   Muhammad Farhat.

9   Q     What is the source of 3429?

10  A     It is the official website of the Qassam Brigade, the

11  military wing of Hamas.

12              MR. TURNER:  We offer 3429.

13              THE COURT:  Same objection?

14              MR. INGERMAN:  Yes.

15              THE COURT:  Received over objection.

16              (Plaintiff Exhibit 3429 was admitted into

17  evidence.)

18              MR. TURNER:  May we post it on the screen?

19              THE COURT:  Yes.

20              MR. TURNER:  Please use the English version.  If

21  you can blow up the upper half.

22  BY MR. TURNER:

23  Q     Now, did this official claim of responsibility help you

24  confirm that Muhammad Farhat carried out this terrorist

25  attack on behalf of Hamas at Atzmona?

R. SHAKED - DIRECT/MR. TURNER                1106

1   A    Yes, sir.

2   Q    Now, in addition to this official claim of

3   responsibility, were you also able to access a will of the

4   young boy that was posted on the Hamas al-Qassam website?

5   A    Yes, I did have access.

6   Q    Now, you've listed Wa'el Nasar as one of the

7   participants or operatives in this particular terrorist

8   attack.  Who was Wa'el Nasar?

9   A    He was -- Wa'el Nasar was senior commander in the

10  military wing of Hamas.  He was one of the deputies of Salah

11  Shehada, and he was the one who was responsible and

12  confirmed directly this terror attack.  He was the one who

13  dispatched the suicide bomber to carry out this attack.

14  Q    From a memorialization standpoint, was there a funeral

15  or as they described it "a wedding ceremony" by Hamas on

16  behalf of this young boy?

17  A    Yes, indeed there was a large funeral.

18  Q    Was there anything unique in terms of who attended this

19  particular funeral that was significant in terms of

20  connecting Hamas to this particular attack?

21  A    Yes.  Sheikh Yassin himself was present in the funeral.

22  And along with him there were other senior members, senior

23  leaders of Hamas, such Abd al-Aziz al-Rantisi, Isma'il Abu

24  Shanab and Isma'il Haniya.

25  Q    And who were these; you mentioned Rantisi and Haniya,

R. SHAKED - DIRECT/MR. TURNER                1107

1   who were those individuals in terms of leadership of Hamas

2   at the time?

3   A    Rantisi was number two in the Hamas, that meant he was

4   the deputy of Ahmed Yassin.  And Haniya at the time was

5   Sheikh Ahmed Yassin's chief of staff.

6   Q    Did you also have an opportunity as part of your work

7   to investigate the bombing at Cafe Moment in Jerusalem that

8   occurred on March 9, 2002?

9   A    Yes, I did investigate.

10            MR. TURNER:  May we display the slide, your Honor?

11            THE COURT:  Yes.

12  Q    Were you able to determine who the suicide bomber was

13  in the Cafe Moment attack?

14  A    Yes.  At the bottom of the picture of this slide we can

15  see the photo of Fuad Hurani, he was the suicide bomber.

16  Q    And was Abdullah Barghouti the bomb maker we talked

17  about earlier involved in this attack as well?

18  A    Yes.  Barghouti prepared the explosives belt.

19  Q    In order to understand this particular attack, can you

20  describe what, at the time, Cafe Moment was and where it was

21  located within Jerusalem?

22  A    Yes.  Cafe Moment was at the center of this

23  neighborhood and perhaps I could call it this yuppy

24  neighborhood in Jerusalem, a lot of academics live in that

25  area, intellectuals, students.  And these are the people

1   that went to this cafe.  These are the people that live next

2   to this cafe.  If I liken it to something in New York, I

3   would say that neighborhood is a bit similar to the Village.

4   And people would simply love to go to that cafe and hang out

5   and drink their coffee, and mainly people would go there

6   late at night.

7   Q    Where was the cafe in relation to the prime minister of

8   Israel's home?

9   A    I would say it's about 150 to 200 yards, the distance

10  from the prime minister's home.

11  Q    Where is Cafe Moment in relation to your office?

12  A    I'd say no more than about half a mile.

13  Q    Were you at the office at the time of this particular

14  attack?

15  A    No, I wasn't in my office.  It occurred at a late hour

16  at night.

17  Q    Did you go to the scene of this particular attack?

18  A    Yes.

19  Q    Can you give us an estimate approximately how long it

20  took you to get to the scene following the attack?

21  A    I would say it's approximately -- it took me

22  approximately, 20 minutes, half hour tops, not more than

23  that.

24  Q    Let's work on your slide for just a minute and identify

25  some of these individuals that you determined were involved

R. SHAKED - DIRECT/MR. TURNER                1109

1    in this particular terror attack on behalf of Hamas.

2            First of all, was Wisam Abbasi, what role did

3    Abbasi play in this attack?

4    A    He is at the right hand of the picture and he was a

5    member of the simple.  His role was to locate the cafe in

6    Jerusalem where they will carry out the attack.

7    Q    And what was the role of Walid Anjas?

8    A    Walid Anjas.  Yes, he was an operative a Hamas

9    operative from he was the person who dispatched the suicide

10   bomber from Ramallah to Jerusalem.  And he was the person

11   who authorized, who actually attended the decision regarding

12   the location of the attack.

13   Q    And going back over to the right-hand side of the

14   screen, Wa'el Qassam, what was Qassam's role in this

15   particular terrorist attack?

16   A    Wa'el Qassam was a military leader of Hamas in

17   Jerusalem at that time of the Hamas military wing.  He was

18   the person who choose the place where to perpetrate the

19   attack.  He was the person who had dispatched the suicide

20   bomber and even led him very close to the cafe, just a few

21   yards, and then he pointed at the place where he should

22   explode himself.

23   Q    Moving across to the center, Abdullah Barghouti.  In

24   your interview with Barghouti did you have an opportunity to

25   talk face-to-face with him about the terrorist attack at

R. SHAKED - DIRECT/MR. TURNER                    1110

1   Cafe Moment?

2   A     Yes.

3   Q     And during the course of your investigation were you

4   able to determine from the various sources that you

5   cross-referenced what the source of the bomb was; in other

6   words, was it in a guitar, a computer like the other ones or

7   how was it delivered?

8   A     This time the bomb was in explosive belt that was on

9   the body of the suicide bomber.

10  Q     Moving across to the left again, Muhammad Arman.  What

11  role was Muhammad Arman in this particular terrorist attack?

12  A     Muhammad Arman who was an operations officer, a key

13  operative of Hamas in Ramallah.  He was the person who had

14  fitted the explosive belt on the body of the suicide bomber.

15  Q     And finally up at the top, Ibrahim Hamed.  We've seen

16  his picture before.  You told us who he was in general.

17  What role did you find that he played in the Cafe Moment

18  terrorist attack?

19  A     Yes.  In this case he was very much involved in the

20  recruiting of the suicide bomber, not just the recruiting,

21  but he was the one who coordinated this activity between the

22  different cells, and he was the person who provided

23  instruction and direction on how to carry out this attack.

24  Q     On this particular attack did you have access to

25  information from the Israel Security Agency, the ISA report

R. SHAKED - DIRECT/MR. TURNER                    1111

1   describing this attack?

2   A    Yes, I did have access.

3          MR. TURNER:  Your Honor, 3811 is already in

4   evidence.  May we post the page pertaining to this attack?

5          THE COURT:  You may.

6   Q    Did the ISA identify the same suicide bomber that you

7   were able to identify?

8   A    Indeed so.

9   Q    Now, the ISA indicated that this young man that carried

10  out the suicide attack was a resident of a refugee camp born

11  originally in Bethlehem.  Was that consistent with your

12  investigation?

13  A    Yes, this is in line with -- these details are in line

14  with my investigation.

15  Q    And did the ISA likewise identify individuals that you

16  likewise identified as operatives in this particular attack?

17  A    Indeed, yes.

18  Q    Was this piece of information from the government

19  important to you in reaching your conclusion?

20  A    Yes, it is important to me.

21         MR. TURNER:  Can you please show the witness only

22  3511.

23  Q    Do you recognize 3511?

24  A    Yes.

25  Q    Does this come from an agency or branch of the

1   Government?

2   A    Yes, it is from prime minister's office.

3   Q    Is this one of the pieces or sources of information

4   that you were able to use as a crosscheck method to ensure

5   your information was accurate?

6   A    Yes.

7         MR. TURNER:  Can you show the witness 3484,

8   please.

9   Q    Do you recognize this from the Israel Ministry of

10  Foreign Affairs?

11  A    I recognize it.

12  Q    Is this again one of those sources that you used to

13  crosscheck the accuracy of your investigation?

14  A    Yes, this is an additional cross-referencing source.

15        MR. TURNER:  Would you please show the witness

16  3485, please.

17  Q    Do you recognize 3485?

18  A    I do.

19  Q    What is 3485?

20  A    This is an expert opinion by a police expert who

21  checked the findings found in the scene after the attack.

22        MR. INGERMAN:  Objection, your Honor.

23        THE COURT:  Overruled.

24  Q    And is this similar to the police investigation reports

25  carried out in the ordinary course of business that you

R. SHAKED - DIRECT/MR. TURNER          1113

1   referred to earlier?

2   A    Yes, it is like other police reports.

3   Q    And were you able to use the information you found in

4   this police report to crosscheck other information you

5   learned from Barghouti and from the claim of responsibility

6   in the other investigation sources to confirm your

7   conclusions?

8             MR. INGERMAN:  Objection to form.

9             THE COURT:  Overruled.

10  A    Yes.

11            MR. TURNER:  We offer 3485.

12            THE COURT:  Where did you get this document?

13            THE WITNESS:  Within the framework of my

14  journalistic work, I used to receive different documents

15  from the police, from the ISA, from the Ministry of Foreign

16  Affairs, from the prime minister's office, among others.

17  There were also documents from the police that were open

18  sources.

19            THE COURT:  All right.  Same objection?

20            MR. INGERMAN:  Yes, your Honor.

21            THE COURT:  All right.  It's overruled.  The

22  document is received.

23            (Plaintiff Exhibit 3485 was admitted into

24  evidence.)

25  Q    And finally, with respect to the Cafe Moment terrorist

R. SHAKED - DIRECT/MR. TURNER                 1114

1   attack, 3336 is already in evidence.  That is the sentencing

2   record of Abdullah Barghouti.  Were you present in the

3   courtroom that day?

4   A    Yes, I was present at the court during the reading of

5   the sentence.

6   Q    And did the conviction records as well as what you

7   heard in the courtroom that day help you confirm the facts

8   surrounding the bombing attack at Cafe Moment in Jerusalem?

9   A    Yes, they helped me.

10  Q    Did you have an opportunity to investigate the Park

11  Hotel suicide bombing that occurred on March 27, 2002?

12  A    Yes.

13  Q    Were you able to determine who the suicide bomber was

14  responsible for the terrorist attack at the Park Hotel?

15  A    Yes, I did.

16         MR. TURNER:  Can you put the slide up?  Is that

17  okay, your Honor?

18         THE COURT:  Yes.

19  Q    Who was the suicide bomber responsible for the

20  terrorist attack at the Park Hotel in 2002?

21  A    The name of the suicide bomber was Abd al-Baset Oden

22  and he was a resident of Tulkarem.

23  Q    Where is Tulkarem?

24  A    If you remember the map of Israel, Tulkarem is in the

25  center of Israel, about a 11 miles, perhaps a little more,

R. SHAKED - DIRECT/MR. TURNER               1115

1    from the seashore.

2    Q    Where was the Park Hotel located?

3    A    Park Hotel, it is in the center.  The hotel is in the

4    center of the city of Netanya, which is very close to

5    Tulkarem.

6    Q    Now, in order to understand the background of this

7    particular bombing, can you describe the Park Hotel and the

8    events that were going on at the time of the Park Hotel

9    attack?

10   A    As I said, it happened in the resort town called

11   Netanya.  This is a relatively large hotel.  And that

12   evening, many Israelis gathered there to celebrate Passover,

13   which is a festive dinner.  This is one of the most

14   important events in the Jewish calendar in which people

15   gather together to eat and celebrate.

16          At that night, many of the people in the hotel

17   were elderly people Holocaust survivors who did not have

18   families, and they came together to celebrate the Passover

19   with friends or with other people like them.

20          Dinner started at 7:30.  Everybody was of course

21   well-dressed, festive dresses, and the dinner was also

22   festive, the kind of food was also festive.

23          MR. SHAND:  Your Honor, may we approach for a

24   moment?

25          THE COURT:  Yes.

1116

1     (Continued on the next page for sidebar.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SIDEBAR CONFERENCE                    1117

1          MR. STEPHENS:  This testimony is being given as if

2     he has personal knowledge of all of this.

3          THE COURT:  I didn't get an objection to the

4     question.

5          MR. STEPHENS:  I'm actually trying to talk about

6     the whole procedure here where instead of the question being

7     in your opinion or something like that, he is just telling

8     about everybody was well dressed at a hotel he wasn't even

9     at.

10         THE COURT:  Mr. Stephens, I can't really respond

11    to that.  I can sustain or overrule questions to

12    objections -- sustain or overrule objections to questions.

13    I can't operate thematically.  So if there's a problem with

14    a question, let me know.  If an answer is not responsive to

15    a question, let me know.  Other than that, I can't help you.

16         I will say -- no, I won't say.  Let's go and

17    continue with the questioning.

18              (End sidebar conference.)

19              (Continued on the next page.)

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1118

1      MR. TURNER:  May I continue?

2      THE COURT:  You may.  Let's get on to more

3  particulars.

4      MR. TURNER:  Did you finish interpreting the

5  answer?

6      THE INTERPRETER:  I did.

7  BY MR. TURNER:

8  Q    Now, before we go into the sources of information for

9  this particular suicide attack, I want to talk about your

10  slide and some of the people that you were able to identify

11  as part of your investigation that were involved in this

12  terror attack.

13      But before we do that, were you able to determine

14  whether Odeh, the suicide bomber, was acting alone or

15  whether he was acting for Hamas in carrying out this attack?

16  A    Abdel-Basset Odeh acted on behalf of Hamas in the name

17  of Hamas and as a member of Hamas.

18  Q    Now, on the right of your slide, Muhanad Sharim.  What

19  was his role in this particular attack?

20  A    Muhanad Sharim was a Hamas activist in Tulkarem.  And

21  he provided logistic support for this operation.

22  Q    How about Fathi Khasib?

23  A    Fathi Khasib was a Hamas operative, and he was a driver

24  who took the suicide bomber to the site of the attack.

25  Q    And during the course of your investigation, were you

SHAKED - DIRECT - TURNER                1119

1   able to determine how Odeh, the suicide bomber, managed to

2   get into the hotel and in the midst of the crowd that was

3   celebrating the Passover?

4             MR. INGERMAN:  Objection, your Honor.

5             THE COURT:  Sustained.

6   BY MR. TURNER:

7   Q    During the course of your investigation, were you able

8   to determine facts that demonstrated how Odeh was disguised?

9   A    Yes.

10  Q    What did you learn?

11  A    Yes.  Odeh was disguised as a woman.  He wore blue

12  tight jeans, women's jeans, high-heeled shoes, a brown shirt

13  and a brown woman's jacket.  He wore a wig.  He shaved and

14  he made up as a woman.  He had makeup.  And he carried a

15  woman's bag on his shoulder.

16  Q    And were you able to determine as part of your

17  investigation what the delivery method of the bomb was?

18  A    Yes.

19  Q    And what did you learn?

20  A    Odeh was wearing an explosive belt.  It was sort of a

21  vest hidden under the brown jacket he was wearing.

22  Q    Were you able to determine who built the bomb as part

23  of your investigation?

24  A    Yes, I managed to do that.

25  Q    And what was that terrorist's name?

SHAKED - DIRECT - TURNER                    1120

1  A     His name was Muhanad Taher.  He was the commander of

2  Hamas in Nablus.  And he was the one who built the bomb.

3  Q     And were you able to determine who was the terrorist in

4  charge of planning and supervising the attack on Passover at

5  the Park Hotel?

6  A     Yes.

7  Q     And who was that person?

8  A     His name is Abbas Sayed.

9  Q     Were you able as part of your investigation to look

10  into the background of Abbas al-Sayed?

11  A     I did.

12  Q     And what did you learn about Abbas al-Sayed in terms of

13  his relationship to Hamas?

14  A     Yes.  Abbas al-Sayed joined when he was a high school

15  student, the Muslim Brotherhood.  And when he was studying

16  in Jordan, he joined Hamas.  In the beginning, he was in a

17  political role, a spokesperson.  He also used to preach in

18  mosques.  But when the Intifada started, he became the

19  military commander of Hamas in Tulkarem.

20  Q     Based on your investigation, were you able to determine

21  whether Abbas al-Sayed was a secretive operative of Hamas or

22  whether he was a public figure?

23  A     As a spokesperson for Hamas, it couldn't be secretive.

24  In Tulkarem people knew him.  I would say that many of the

25  residents of Tulkarem knew him.  They heard him preaching in

SHAKED - DIRECT - TURNER                    1121

1    mosques.  He appeared in many ceremonies with a green Hamas

2    bandana on his forehead.  So it was absolutely clear that he

3    was from Hamas.

4            MR. TURNER:  Would you show the witness 3544,

5    please.

6    BY MR. TURNER:

7    Q    Can you identify 3544?

8    A    Yes, I do.

9    Q    What is 3544?

10   A    This is an official announcement by Hamas, an official

11   claim of responsibility declaring that that explosion at

12   Park Hotel in Netanya was their act.

13   Q    And what is the source of 3544?

14   A    The source is the Internet Web site of the Hamas

15   Brigade, the military wave of Hamas.

16   Q    Is that the same Web site we've been referencing

17   throughout today?

18   A    Yes, indeed.

19           MR. TURNER:  We offer 3544.

20           THE COURT:  Same objection?

21           MR. STEPHENS:  Yes.

22           THE COURT:  Received over objection.

23           (Plaintiffs' Exhibit 3544 received in evidence.)

24           MR. TURNER:  Would you please put the English

25   translation over the screen.

SHAKED - DIRECT - TURNER                    1122

1          Is that okay, your Honor?

2          THE COURT:  Yes.

3          MR. TURNER:  Can you blow up the picture for us,

4    please.

5    BY MR. TURNER:

6    Q    Do you recognize that individual?

7    A    Yes, I do.

8    Q    Who is that individual?

9    A    This is Abdel-Basset Odeh, the terrorist who exploded

10   himself at the Park Hotel in Netanya.

11   Q    Were you able during the course of your investigation

12   to determine any background information about Odeh?

13   A    Indeed, I found.

14   Q    What did you learn?

15   A    Yes.  What I learned was that as a young man, he was an

16   Hamas operative, perhaps for two years and maybe even a bit

17   more than that before the attack.  He had volunteered to

18   carry out the suicide bombing and he was wanted by the

19   Israeli authorities.  And everything which I learned was

20   that he had worked for a while in hotels in Netanya.

21          MR. TURNER:  Okay.  Could you back out of that,

22   please.

23   BY MR. TURNER:

24   Q    Now, were you able to crosscheck the validity of the

25   official claim of responsibility with the Israeli Security

SHAKED - DIRECT - TURNER                1123

1   Agency investigation report?

2   A    Yes.

3            MR. TURNER:  Your Honor, may we display the

4   portion of 3811 already in evidence?

5            THE COURT:  Yes.

6   BY MR. TURNER:

7   Q    Did the ISA report relating to the investigation and

8   conclusions for the Park Hotel bombing confirm what you

9   found?

10  A    Yes.

11  Q    Now, did it also confirm -- and by "it," I'm referring

12  to the ISA report -- did it also confirm Muhanad Taher's

13  role in this particular attack?

14  A    Yes, indeed the report does mention the name of Muhanad

15  Taher and his role.

16  Q    And does it likewise mention Abbas al-Sayed?

17  A    Yes.  Abbas al-Sayed is also mentioned.

18  Q    I want to focus in on this one sentence for a minute.

19       Do you see where I'm reading?  I can't read it.

20       "The attack was directed by the Hamas military networks

21  in Tulkarem and Nablus, headed by Abbas al-Sayed and Muhanad

22  Taher.  Abbas al-Sayed, responsible for the attack from

23  Tulkarem, served as the Hamas military leader in the area.

24  Abbas al-Sayed admitted in his interrogation that he had

25  planned to execute the attack many months earlier, but his

SHAKED - DIRECT - TURNER                    1124

1    plans were postponed."

2        Was that consistent, Mr. Shaked, with your

3    cross-reference sources of information?

4    A    Yes, indeed, this is a cross-reference for all the

5    other materials I have in which I have reached.

6    Q    Now, in addition to these sources of information

7    confirming Hamas' role in the Park Hotel attack, did you

8    likewise have access to a videotaped interviewed of one

9    Osama Hamden, a spokesperson from Lebanon on behalf of

10   Hamas?

11           MR. STEPHENS:  Objection.

12           THE COURT:  Just answer as to Osama Hamdan.

13   A    Yes, I did have access to watch it.

14           MR. TURNER:  Your Honor, at this point we'd like

15   to dim the lights and watch 3580, which is already in

16   evidence.

17           THE COURT:  Haven't we already seen it?  Do we

18   need to see it again?

19           MR. TURNER:  I'd kind of like to.

20           THE COURT:  I don't think that's a good enough

21   reason.

22           MR. TURNER:  I didn't think it would be, but I

23   thought I would try.

24           Can you show the witness only 3524, please.

25   BY MR. TURNER:

SHAKED - DIRECT - TURNER                    1125

1    Q    Do you recognize 3524, Mr. Shaked?

2    A    Yes, I do.

3    Q    What is 3524, in general?

4    A    This is the admission in which Abbas al-Sayed gave to a

5    police interrogator.  Parts of it are written in Hebrew and

6    other parts are in Arabic.

7    Q    And are you able to read both the Hebrew and the

8    Arabic?

9    A    The Arabic handwriting it would be a bit difficult for

10   me, but with a little bit of effort I will manage to do it.

11   Q    Now, is this one of the sources of information that you

12   had access to from the police files in reaching your

13   conclusions about Abbas al-Sayed in both Hamas and the Park

14   Hotel attack?

15   A    Yes, indeed so.

16        MR. TURNER:  Now, would you please show the

17   witness only 3553.

18   BY MR. TURNER:

19   Q    Can you identify 3553?

20   A    Yes, I do recognize.

21   Q    What is 3553?

22   A    Yes.  This is the ruling regarding four members, four

23   senior members, of the cell who participated in that terror

24   attack in the Park Hotel.

25        MR. TURNER:  Your Honor, we would offer 3553 as

SHAKED - DIRECT - TURNER                1126

1    apostille convictions of these individuals.

2              THE COURT:  That's received over objection.

3              (Plaintiffs' Exhibit 3553 received in evidence.)

4              MR. TURNER:  May I have one moment?

5              THE COURT:  Yes.

6              (Brief pause.)

7              MR. TURNER:  Can we see you for one second?

8              THE COURT:  Yes.

9              (Sidebar conference.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1127

1        MR. OSEN:  Your Honor ruled that the confession of

2   Abbas al-Sayed was admissible.

3        THE COURT:  I can't hear you.

4        MR. OSEN:  Mr. Ingerman may have put it on the

5   list.  We just wanted to make sure we didn't run afoul of

6   anything that he had raised.

7        THE COURT:  I see.

8        MR. OSEN:  So I just wanted to confirm before we

9   actually --

10        THE COURT:  Is this one of the documents you don't

11   think was in the expert report?

12        MR. INGERMAN:  I don't know what exhibit number

13   he's talking about.

14        MR. TURNER:  3511.  No, 3511.  3511 is the ISA

15   report.  3554.

16        MR. INGERMAN:  3554?

17        THE COURT:  Yes.

18        MR. INGERMAN:  That is one that I put on the list.

19        MR. OSEN:  Right.

20        THE COURT:  Okay.  So the objection is that

21   the -- the objection will be that the witness did not refer

22   to this document in his expert reports.  That a document

23   nevertheless has been ruled admissible, and I think it's for

24   cross-examination to say that the witness' only relying on

25   it for the first time today.

SIDEBAR CONFERENCE                    1128

1          So I will overrule that objection when it comes,

2    but I will note it.

3          MR. INGERMAN:  Okay.  We have our other objection

4    to these documents as well.

5          THE COURT:  Yes, of course.

6          MR. INGERMAN:  Thank you.

7          (End sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1129

1          MR. TURNER:  May I proceed?

2          THE COURT:  You may.

3   BY MR. TURNER:

4   Q    Do you recognize 3554 which is before you?

5   A    Yes, I do.

6   Q    And what is 3554?

7   A    This is the sentencing that was issued by the district

8   court in Tel Aviv against Abbas Sayed.

9          MR. TURNER:  Your Honor, we offer 3554.

10         THE COURT:  All right.  That's received over

11  objection.

12         (Plaintiffs' Exhibit 3554 received in evidence.)

13         MR. TURNER:  First of all, may we go to the

14  document on the screen.

15         This particular part --

16         MR. INGERMAN:  Your Honor, objection.  It's not

17  the same exhibit.

18         THE COURT:  Oh.  Let's take it off the screen.

19         MR. TURNER:  Sorry.

20         THE COURT:  Right.  It's not the same exhibit.

21         MR. TURNER:  Do you not have that on the slide?

22  Just go back to the document.

23         THE COURT:  It may be the same exhibit.  Are you

24  sure it's not the same exhibit?

25         MR. INGERMAN:  It's not, your Honor.

SHAKED - DIRECT - TURNER                    1130

1          THE COURT:  It's not just the English translation

2    of the conviction?

3          MR. OSEN:  It's not on the conviction.  It's the

4    interrogation, police report, which Mr. Shaked testified to

5    a few moments ago.

6          THE COURT:  You have to clean this up.  It's

7    confusing.

8          MR. TURNER:  I'll go back and start over.

9    BY MR. TURNER:

10   Q    All right.  Let's go back to 3554, which you should

11   have on your screen.

12         THE COURT:  I think you mean 3524.  That's the

13   confusion.

14         MR. TURNER:  I think we have 3554 on the screen.

15         THE COURT:  I think you do, but I think you want

16   3524.

17         MR. TURNER:  No, sir.  I think going to 3524 was a

18   mistake on the slide.  So I'm going back to start at 3554.

19         THE COURT:  Okay.  Go ahead.

20   BY MR. TURNER:

21   Q    Do you recognize 3554?

22   A    Yes, I do.

23   Q    And what is 3554?

24   A    This is the sentencing given to Abbas Sayed.

25   Q    Now, during the course of the sentencing records, were

SHAKED - DIRECT - TURNER                    1131

1   you able to -- as part of your investigation, were you able

2   to determine whether Abbas al-Sayed confessed as part of the

3   sentencing?

4   A    Abbas Sayed said that he does admit to all the details,

5   but he does not admit his guilt.  And from what I understand

6   from all the documents, indeed Abbas Sayed did plead guilty.

7   Q    Now we want to go back to 3524 -- if you'll put that in

8   front of you -- which is the police interrogation that we

9   looked at a moment ago.

10        Now, did you have an opportunity as part of your

11   investigation to compare al-Sayed's interrogation

12   investigation with the sentencing confession that he made?

13              MR. INGERMAN:  Objection.

14              THE COURT:  Overruled.

15   A    Yes, I did.

16   BY MR. TURNER:

17   Q    And were they consistent with one another?

18   A    Yes, they are consistent with each other.

19   Q    Including insofar as his role with Hamas was concerned?

20   A    Yes.

21   Q    And the Park Hotel?

22   A    Regarding Park Hotel as well.

23   Q    Now, 3524, which is the interrogation document in front

24   of you, have you seen these type government documents

25   before?

SHAKED - DIRECT - TURNER                    1132

1   A    Yes.

2   Q    Approximately, how many years have you been evaluating

3   these kinds of documents in your profession?

4   A    I can only tell you that I've been looking over these

5   kinds of documents since my very first years working in the

6   ISA.  And I still go over such documents today.  That means

7   I'm talking about 40 years and more than that.

8   Q    And do you recognize the government form?

9   A    Of course.

10  Q    Including the names included on 3524?

11  A    Yes.

12  Q    And the reference to the Park Hotel attack?

13  A    Yes.

14           MR. TURNER:  We offer 3524.

15           THE COURT:  That's received over objection.

16           (Plaintiffs' Exhibit 3524 received in evidence.)

17           MR. INGERMAN:  May we have a sidebar?

18           THE COURT:  Are you almost done with Park Hotel?

19           MR. TURNER:  Yes, sir.

20           THE COURT:  After I rule on this at sidebar, how

21  much more do you have on Park Hotel?

22           MR. TURNER:  One postcard.

23           THE COURT:  All right.  Let's have a sidebar.

24           (Sidebar conference.)

25           (Continued on the next page.)

SIDEBAR CONFERENCE                    1133

1     MR. INGERMAN:  Your Honor, this is an unapostilled

2  interrogation report for Mr. al-Sayed.  It doesn't mention

3  the Park Hotel by name.  It mentions some of the players.

4  And Mr. Shaked testified that he actually -- that Mr. Sayed

5  denied his guilt in the confession.

6         And it's hugely prejudicial because they are going

7  to point out in the slides that are coming that he

8  referenced money that he got in an Arab Bank account which

9  is in connection with a different operation other than the

10  Park Hotel.  We think it would be misleading, confusing to

11  the jury, and unfairly prejudicial among the other

12  objections of 801 and 901.

13     THE COURT:  Well, first of all, as to the 801,

14  I've held it's a declaration against interest.  As to the

15  901, I think the witness has testified that this document is

16  typical of the kinds of documents he's reviewed and has been

17  reviewing for over 40 years.

18         If it helps, you should ask him this question,

19  although I'm loathe to require it as we're spending a lot of

20  time on technicalities that are not furthering the search

21  for truth, but go ahead and ask him how do you know this is

22  real.  Ask him that question.  Then if you ask him that

23  question and I get a satisfactory answer, I will overrule

24  the 901 objection.

25         On the 403 objection, I do not think it's unduly

SIDEBAR CONFERENCE                    1134

1    prejudicial.  I think it is highly probative and because of

2    its probative value, I think the prejudicial impact is

3    outweighed.

4              So the objections are overruled.

5              (End sidebar conference.)

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                     1135

1          MR. TURNER:  May I proceed?

2          THE COURT:  You may.

3    BY MR. TURNER:

4    Q    Going back to 3524, Mr. Shaked, looking at this

5    document, how do you know this document is real or

6    authentic?

7    A    It includes all the necessary details starting with the

8    identity card number of the terrorist, Abbas Sayed, the

9    personal details of the officer who took the testimony, the

10   date, the place of the questioning, the format -- I

11   recognize the format of such documents, and of course the

12   reference to activities in which Abbas Sayed is accused.

13         In addition to that, there is a handwriting which you

14   can compare to other handwritten documents written by Abbas

15   Sayed.

16         THE COURT:  You maintain your offer?

17         MR. TURNER:  Yes, sir.

18         THE COURT:  It is admitted over objection.

19         MR. TURNER:  If we can move to the first slide.

20   May we use the presenter?

21         THE COURT:  Yes.

22         MR. TURNER:  This is the translated version.

23   BY MR. TURNER:

24   Q    Were you able to use this portion, Mr. Shaked, to

25   confirm Mr. al-Sayed's history with Hamas?

SHAKED - DIRECT - TURNER                    1136

1   A     Yes.

2   Q     And do you recognize the name Jamal Mansur?

3   A     Yes.

4   Q     And who was Jamal Mansur at the time?

5   A     Jamal Mansur was one of the heads of the Hamas

6   movement, one of its commanders in Nablus, and a member of

7   his senior leadership.

8   Q     And who was Khaled Mashal?

9   A     Khaled Mashal at the time was the head of the Political

10  Bureau of Hamas.  He was, in fact, the leader of the Hamas

11  movement.  And he dwelled in Damascus at the time.

12  Q     And of course Osama Hamdan we referenced earlier about

13  the CNN video, correct?

14  A     True.

15  Q     And the last two, al-Rantisi and Yusuf Ramallah, do you

16  recognize those two names?

17  A     Yes, I recognize the names.

18  Q     And were they involved with Hamas?

19  A     Both of them were top activists, very senior activists,

20  of Hamas.  One of them acted in the Gaza Strip and the other

21  one was in the West Bank.

22  Q     And is this another example of cross-referencing

23  information to confirm that al-Sayed was appointed as

24  representative of Hamas in Tulkarem?

25  A     Yes.

SHAKED - DIRECT - TURNER                    1137

1   Q    Let's go to the next slide, continuing on with this

2   same document, 3524.  There is a quote, "The money that I

3   paid for the weapons was transferred to my private bank

4   account in Arab Bank in Tulkarem.  This money was sent from

5   the USA to my account," end quote.

6        Did I read that correctly?

7   A    Yes.

8   Q    At the time of these events, approximately, what was

9   the population of Tulkarem?

10  A    I would estimate it at 22,000 to 26,000 residents.

11           MR. TURNER:  Now, if we could go to the next

12  slide, same document.  We should have one more slide.

13  That's okay.  All right.

14           Now, finally if you would, put before the witness

15  1090, page 25.

16  BY MR. TURNER:

17  Q    And I want to ask you a second about memorializations

18  and then we're done with the Park Hotel.

19       Do you recognize Exhibit 1090, page 25?

20  A    Yes, I do.

21  Q    Do you recognize the image?  If so, who is it?

22  A    I recognize the picture.  It says shahid al-Qassam,

23  which means the material member of the al-Qassam,

24  Abdel-Basset Odeh.

25           MR. TURNER:  We offer 1090, page 25.

SHAKED - DIRECT - TURNER                    1138

1       MR. INGERMAN:  Same objection with respect to the

2  report, your Honor.

3       THE COURT:  I'm not going to admit the exhibit.  I

4  will allow it to be shown to the jury for demonstrative

5  purposes as part of the expert's opinion.

6       MR. TURNER:  Thank you, your Honor.  May we put it

7  up on the slide?

8       THE COURT:  Yes.

9       MR. TURNER:  This is 1090, page 25, for

10  demonstrative only.

11  BY MR. TURNER:

12  Q    Mr. Shaked, do you recognize the individual in the

13  photograph as the suicide bomber responsible for the Park

14  Hotel attack?

15  A    Yes, I recognize him.

16  Q    And can you interpret the Arabic?

17  A    It says first quoted in Arabic, "The shahid member of

18  al-Qassam, Abdel-Basset Odeh, who did the operation in

19  Netanya, the sacrifice operation of Netanya."

20  Q    And finally, did you also in addition to all of these

21  other sources of information, have an opportunity to

22  personally interview Abbas al-Sayed in prison?

23  A    Yes, did I interview him in jail.

24       MR. TURNER:  This is a good stopping point, your

25  Honor.

SHAKED - DIRECT - TURNER                    1139

1          THE COURT:  All right.  Ladies and gentlemen,

2     we'll take our lunch break.  We'll reconvene at 1:45.  Have

3     a good lunch.  Don't talk about the case.  Stay away from

4     any press coverage.  See you in an hour and five minutes.

5               (Jurors exit the courtroom.)

6          THE COURT:  Okay.  Recess till 1:45.

7               (Luncheon recess taken.)

8               (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                     1140

1    (Outside the presence of the jury.)

2              THE COURT:  Please bring in the jury.

3                   (In the presence of the jury.)

4              THE COURT:  Be seated, please.

5                   Continue, Mr. Turner.

6              MR. TURNER:  Thank you, your Honor.

7    Q    Mr. Shaked, have you also had the opportunity to

8    investigate the suicide bombing at a place called the

9    Sheffield Club in Rishon, on May 7th, 2002?

10   A    Yes.

11             MR. TURNER:  Can we post the slide?

12             THE COURT:  You may.

13   Q    Were you able to identify the suicide bomber?

14   A    Yes.

15   Q    Who was the suicide bomber?

16   A    At the bottom of the picture, there's the picture of the

17   suicide bomber, Muhammad Muammar.

18   Q    Were you able to determine whether Muammar acted alone or

19   whether he was acting for Hamas?

20   A    Muammar acted for the Hamas, as member of Hamas, on

21   behalf of Hamas.

22   Q    Can you briefly tell us where the Sheffield Club was at

23   the time and what it was?

24   A    The Sheffield Club is located in a city called Rishon,

25   south of Tel Aviv, in an industrial zone.  It is a club to

SHAKED - DIRECT - TURNER                    1141

1   which different people come to spend some time in the wee

2   hours of night.  They drink there.  They play cards, different

3   table games.  They also play billiards, for example.  It is a

4   place to come, and have fun and enjoy one's self.

5   Q    Were you able to determine from your investigation how

6   many people were killed and how many reported injuries there

7   were in this suicide attack?

8   A    Yes.  Fifteen people got killed and about fifty injured.

9   Q    And based on your investigation, who built the bomb?

10  A    The bomb was built by the same terrorist we discussed by

11  the name of Abdulla Barghouti.

12  Q    The one you interviewed?

13  A    Yes, I interviewed him.

14  Q    And did you personally talk with him about this terrorist

15  attack as well?

16  A    Yes, I discussed the suicide bombing with him.

17  Q    In this particular attack, based upon your investigation,

18  how was the bomb disguised?

19  A    In this case, it was a relatively large explosive charge.

20  Some of it was hidden in a bag in which there were shampoo

21  bottles that the explosives were inserted into to; the other

22  part was in an explosive built in like other cases of

23  terrorist attacks.

24  Q    In discussions, including your conversation with

25  Barghouti, did you learn information about ball bearings and

1  screws, things of that nature, in these bombs?

2  A    Yes.

3  Q    What did you learn?

4         MR. INGERMAN:  Objection, your Honor.

5         THE COURT:  Overruled.  Well, I'm going to sustain

6  that objection.

7         MR. TURNER:  So you understand that he cannot

8  answer?

9         THE INTERPRETER:  Yes.

10 Q    Mr. Shaked, during the course of your investigation of

11 these 24 attacks, and especially in the multiple attacks that

12 Barghouti, the bomb maker, was involved in, in your

13 interviews, were you able to determine a course, or pattern or

14 practice of Barghouti, including certain items in bombs for

15 maximum effect?

16        MR. INGERMAN:  Objection.

17        THE COURT:  Sustained as to form.

18 Q    Were you able to learn any information during your

19 investigation from Barghouti or any other source information

20 about the contents of bombs?

21        MR. INGERMAN:  Objection.

22        THE COURT:  Sustained.

23 Q    Now, you have two individuals on your chart, both by the

24 name of Abbasi.  Do you see those individuals in the lower

25 right-hand corner?

SHAKED - DIRECT - TURNER                    1143

1   A    Yes, I can see them.

2   Q    What role did each play in the attack in Rishon?

3   A    The first one was Wisam Abbasi.  He is a member in Hamas

4   organization.  He was the one to choose the Sheffield club as

5   the sight for the terror attack, whereas Ala Abbasi, on the

6   right-hand side of the picture, was an active member of Hamas.

7   He collected information about the target, which is the

8   Sheffield Club in Rishon.

9   Q    To the right and left of Abdulla Barghouti, on the right

10  side, there's Wael Qassam and Muhammad Arman.  Are those the

11  same two individuals we've seen previously in some of the

12  attacks?

13  A    Indeed, these are the same two that were involved in

14  previous terrorist attacks.

15  Q    Likewise, have we previously seen Ibrahim Hamed?

16  A    Yes, we did see Ibrahim Hamed was the senior commander of

17  Hamas in Ramallah.

18       MR. TURNER:  If you would only show the witness,

19  please, 3598.

20  Q    Do you recognize 3598?

21  A    Yes, I do.

22  Q    What is 3598?

23  A    This is the official claim of responsibility by Hamas for

24  the perpetration of the terror attack at the Sheffield Club.

25  Q    What is the source of 3598, please?

SHAKED - DIRECT - TURNER                    1144

1   A    The source is the Internet website of Qassam Brigade, the
2   military wing of Hamas.
3             MR. TURNER:  We would offer that into evidence,
4   your Honor.
5             THE COURT:  Same objection?
6             MR. INGERMAN:  Yes, your Honor.
7             THE COURT:  Received over that objection.
8             (Plaintiffs' Exhibit 3598 was received.)
9             MR. TURNER:  Let's go to the slide, if you would,
10  Mr. Miller, with the English version on it.
11            Is that all right, your Honor?
12            THE COURT:  Yes.  We're putting it up.
13  Q    Now, there are a couple of things that I would like to
14  talk to you about very briefly first off.
15            MR. TURNER:  First of all, if you could blow up the
16  lower paragraph, and let's talk about the description of the
17  attack for a moment.
18  Q    Take a moment and read that to yourself, if you would,
19  Mr. Shaked.  My question is, is that consistent with the other
20  information you were able to find during your investigation of
21  this terrorist attack?
22  A    Yes.
23            MR. TURNER:  Now, if you could back out of that,
24  Mr. Miller, and enlarge the first paragraph.  Starts
25  without -- no, go back to the exit right up there.

SHAKED - DIRECT - TURNER                    1145

1   Q    Now, this particular part of the official claim of

2   responsibility indicates that, without revealing their names,

3   in addition, some of their valiant brothers of al-Qassam

4   carried out many operations for which we did not claim

5   responsibility, at the time, due to difficult security

6   conditions.

7        Based on your investigation, can you explain what

8   that means in terms of security in Israel?

9        MR. INGERMAN:  Objection.

10        THE COURT:  The witness can state his understanding

11   of what it means.

12        THE WITNESS:  I understand there are cases in which

13   Hamas would not claim official responsibility as quickly as it

14   does in other cases, and that is for security reasons.  They

15   might not want to harm the family, or other perpetrators or

16   other people who are still alive and related to the case, to

17   this specific terror attack, and have not been arrested yet.

18   And this is why, for security reasons, they would delay the

19   publicity or the publication of this claim of responsibility.

20   Q    Now, the second sentence in this particular excerpt

21   indicates this official claim of responsibility was delayed

22   for five years.  Was that something that you saw from time to

23   time in investigating these 24 attacks, this type of delay?

24   A    Yes, I have seen something like that, but not five years.

25        MR. TURNER:  Now, your Honor, may I display 3811,

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1146

1   which is in evidence, but only the portion that pertains to

2   the Rishon terrorist attack?

3           THE COURT:  Yes.

4   Q    Now, this is the ISA report or at least the portion of

5   the Israeli Security Agency report that provides information

6   about the Rishon terrorist attack; is that correct?

7   A    Yes.

8   Q    And did this information published by the ISA help you

9   cross-check the information you were finding from the other

10  sources, in terms of the identity of not only the suicide

11  bomber but some of the other participants in the attack?

12  A    Yes, it was of help to me.

13          MR. TURNER:  If you could show the witness only

14  3513, please.

15  Q    Do you recognize 3513?

16  A    Yes, I do.

17  Q    And what in general is 3513?

18  A    This is a statement, a document published by the

19  Premier's Office, in which it brings the statement made by the

20  ISA, exposing the terror infrastructure that carried out the

21  terror attacks in Rishon and also another place, and that was

22  on a street in Tel Aviv.

23  Q    Did 3513, likewise, assist you in cross-checking the

24  accuracy of the information you were finding?

25  A    Indeed, it is another source to cross-check reference.

SHAKED - DIRECT - TURNER                          1147

1    Q    Although we've already seen these and will not look at

2    them again, 3356 and 3658 are both already in evidence as

3    Apostille convictions of Barghouti and Muhammad Arman.  Did

4    those, likewise, assist you in your investigation, in trying

5    to determine whether Hamas was responsible for this terrorist

6    attack?

7    A    Indeed, so.

8    Q    Now, in addition to Barghouti, did you also have an

9    opportunity to personally interview Wael Qassam?

10   A    Yes, I interviewed Wael Qassam as well.

11   Q    In interviewing Wael Qassam, was that in prison?

12   A    Yes, I interviewed him when he was in prison.

13   Q    And did that interview, likewise, assist you in

14   confirming your conclusions?

15   A    Yes, it did help me confirm that evidence in the

16   materials that I already had.

17   Q    Now, in terms of memorialization, did you also have an

18   opportunity to review any information indicating that a

19   mourners' tent, a ceremonial mourners' tent, was prepared by

20   Hamas for this particular terrorist suicide bomber?

21   A    Yes, a mourners' tint was put up in memory of the suicide

22   bomber.

23   Q    Did you also have an opportunity to investigate the

24   bombing of Bus 32-A, near a place called Pat Junction, in

25   Jerusalem that occurred in June of 2002?

SHAKED - DIRECT - TURNER                    1148

1    A    Yes, I did.

2    Q    Were you able to determine who the suicide bomber was in

3    the Pat Junction Bus 32-A terrorist attack?

4    A    Yes.

5              MR. TURNER:  May we display the slide?

6              THE COURT:  Yes.

7    Q    Would you tell the ladies and gentlemen who the suicide

8    bomber was of Bus 32-A, near Pat Junction, in Jerusalem?

9    A    The suicide bomber was Muhammad al Ghoul, an MA student

10   at the University in Nablus.

11   Q    Were you able to determine whether al Ghoul was acting on

12   his own or whether he was acting for Hamas in carrying out

13   this terrorist attack?

14   A    Muhammad al Ghoul acted for Hamas, on behalf of Hamas, in

15   the name of Hamas.

16   Q    What role did Fahmi Mashahrah play in this particular

17   attack?

18   A    Fahmi Mashahrah lived in east Jerusalem, was an

19   operative, planned the attack and dispatched the bomber to the

20   bus stop where it was carried out.

21   Q    What role did Ramadan Mashahrah play?

22   A    Ramadan is Fahmi's brother.  They planned this attack

23   together as a family.  They're both members -- were both

24   members of Hamas.  They planned it together.  They decided

25   where it would be carried out.  They dispatched the suicide

SHAKED - DIRECT - TURNER                    1149

1  bomber together to the bus stop.

2  Q    What about Muhamad al-Taher?  What role did al-Taher play

3  in this particular attack?

4  A    Muhamad al-Taher is a senior commander of Hamas in

5  Nablus.  He was the one who recruited the suicide bomber to

6  carry out this attack.

7  Q    And, finally, Ali Anan?

8  A    Ali Anan is the Hamas commander in southern West Bank.

9  He is the person who actually put the explosive belt on the

10 suicide bomber, Muhamad al Ghoul, and coordinated the attack.

11 Q    So we understand where Pat Junction is, can you describe

12 for us very briefly where Pat Junction is within Jerusalem and

13 the significance of Bus 32-A?

14 A    It's -- Pat Junction is located between the center of

15 Jerusalem and a neighborhood called Gilo, which is populated

16 by middle to lower class people who are in need of public

17 transportation in order to go to work and especially students

18 and pupils going to school.

19 Q    During the course of your investigation, were you able to

20 determine anything about the suicide bomber, al Ghoul, in

21 terms of his relationship to Hamas and his prior activity

22 within Hamas?

23 A    Muhamad al Ghoul was an operative in Hamas, in the

24 University in Nablus.  Based on the details I was able to

25 gather, he had tried twice before to carry out the suicide

SHAKED - DIRECT - TURNER                    1150

1    bombing but had been unsuccessful, and he succeeded the third

2    time.

3              MR. TURNER:  Show the witness only, please, 33611.

4    Q    Can you identify 3611?

5    A    Yes, I can.

6    Q    What is 3611, please?

7    A    This is the official claim of responsibility taken by Izz

8    al-Din al-Qassam.  They're taking responsibility for the bus

9    attack at Pat Junction in Jerusalem.

10   Q    What is the source of 3611?

11   A    It is the official Internet site of Izz al-Din al-Qassam,

12   the military wing of Hamas.

13   Q    Did this particular Exhibit, 3611, the official claim of

14   responsibility for this terrorist attack by Hamas, assist you

15   in concluding that Hamas was responsible?

16   A    Yes, it did help me to determine that Hamas is

17   responsible -- was responsible for the attack.

18             MR. TURNER:  We offer 3611.

19             THE COURT:  That's received over objection.

20             (Plaintiffs' Exhibit 3611 was received.)

21   Q    With respect to the ISA, were you able to review the

22   section of the ISA report pertaining to this particular

23   terrorist attack, which is previously been marked as 3811?

24   A    Yes, I reviewed that part of the ISA report regarding the

25   role of the suicide bomber in this attack.

SHAKED - DIRECT - TURNER                              1151

1    Q    Did that assist you in reaching your conclusion?

2    A    Yes, it helped me to draw my conclusions and to

3    cross-check my information.

4    Q    In addition the ISA report, did you also have access to

5    other government records, for instance, the conviction records

6    of the Mashahrah brothers?

7    A    Yes, I read the legal reports, and I followed the trial

8    of these two people.

9              MR. TURNER:  Could you show the witness only,

10   please, 3617?

11   Q    Do you recognize 3617?

12   A    Yes, I do.

13   Q    What is 3617?

14   A    Yes, this is the verdict of the military court that tried

15   Fahmi Mashahrah, one of the brothers.

16             MR. TURNER:  We offer 3617 as Apostille conviction

17   record of Fahmi Mushahrah.

18             THE COURT:  Received over objection.

19             (Plaintiffs' Exhibit 3617  was received in

20   evidence.)

21             MR. TURNER:  Show the witness, please 3647.

22   Q    Can you identify 3647?

23   A    Yes, I can.

24   Q    What is 3647?

25   A    This is a conviction of the other brother, whose name is

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1152

1   Ramadan Mashahrah.

2   Q    And have you had an opportunity to review this conviction

3   record?

4   A    Yes.

5   Q    Were you actually in the courtroom the day of Ramadan

6   Mashahrah sentencing?

7   A    Yes, I was present in the courtroom.

8   Q    And was the terrorist required to allocute or stand up in

9   court and announce what he was guilty of?

10  A    Yes, he was -- the terrorist was asked to allocate and

11  confess to his crimes.

12  Q    Were you present to hear that confession?

13  A    I was present at the confession.

14  Q    And after the sentencing, did you obtain a copy of those

15  conviction records?

16  A    Yes, I got it from the clerk in the court.

17  Q    And was what you heard in the courtroom, what you heard

18  Ramadan Mashahrah say in the courtroom consistent with the

19  record you're now looking at on the screen?

20  A    Yes.

21        MR. TURNER:  We would offer 3647 as a non-Apostille

22  conviction record of Ramadan Mushahrah for this attack.

23        THE COURT:  Received over objection.

24        (Plaintiffs' Exhibit 3647  was received in

25  evidence.)

SHAKED - DIRECT - TURNER                    1153

1    MR. TURNER:  Show the witness, please, only 3645.

2    Q    Can you identify this Israel Ministry of Foreign Affairs

3    document?

4    A    Yes, I can identify it.

5    Q    Does this relate to the terrorist attack at Pat Junction

6    in Jerusalem?

7    A    It is, indeed.

8    Q    And in cross-checking the various sources of information

9    available, did this assist you in confirming that Hamas was,

10   in fact, responsible for this attack?

11   A    It did, indeed.

12             MR. TURNER:  Show the witness only, please, 3625.

13   Q    Can you identify 3625?

14   A    Yes, I can identify it.

15   Q    What is 3625?

16   A    This is the expert opinion of a police explosives' expert

17   who examined the findings at the site of the terror attack,

18   and this is the report on what he found.

19   Q    Is this the type of report that you've seen over the past

20   30 years?

21   A    Yes, this document is very similar to other documents

22   that I have seen.

23   Q    What is the source of this particular document?

24   A    The source is the Israel police.

25   Q    Did this document assist you in cross-referencing the

SHAKED - DIRECT - TURNER                    1154

1   various factual pieces of information you found during the

2   course of your investigation, linking Hamas to this terrorist

3   attack?

4   A    Yes, it did help me.

5   Q    Is this sometimes referred to in Israel as a SAPA

6   (phonetic) report?

7   A    Yes, it is.

8            MR. TURNER:  We offer 3625.

9            THE COURT:  All right.  Received over objection.

10           (Plaintiffs' 3625 was received in evidence.)

11           MR. TURNER:  Show the witness only, please, 3613.

12  Q    In addition to these other sources of information, did

13  you, likewise, in this particular case, have access to a will

14  of the suicide bomber prepared prior to the terrorist attack?

15  A    Yes, I saw and read the will of the suicide bomber.

16  Q    And in the will itself, there is an image.  Were you able

17  to identify the image?

18  A    Yes, I can identify that image.

19  Q    Who is the photograph of?

20  A    It is a picture of the suicide bomber Muhammad al Ghoul.

21  Q    What is the source of the will?  Where did you get it?

22  A    The will was published on the official site of Hamas on

23  the Internet.

24  Q    Did this information assist you in determining that

25  al Ghoul was, in fact, the suicide bomber responsible for the

SHAKED - DIRECT - TURNER                    1155

1   deaths and injury at this particular terrorist attack?

2   A    Yes, it did help me.

3              MR. TURNER:  We offer 3613.

4              MR. INGERMAN:  You've already excluded that,

5   your Honor.

6              THE COURT:  I think I did.

7              MR. TURNER:  Show the witness only, please, 3636.

8   Q    Can you identify 3636 as specifically the person in the

9   image?

10  A    Yes, I can, and I can identify the person who appears in

11  the picture.

12  Q    And does this relate to the Bus 32-A bombing at Pat

13  Junction?

14  A    Yes, it was related to the bus at the Pat Junction.

15  Q    And does this relate in any way to Hamas, and, if so, how

16  do you know that?

17  A    This is a picture of Muhammad al-Taher, the commander of

18  Hamas, in Nablus, whom I'm familiar with.  It says it also on

19  the picture.  Around him are pictures of terrorists for whom

20  he built bombs, and this is in order to glorify his name, as

21  it were.  And there's also a picture of the terrorist who blew

22  up the bus at the Pat Junction.

23  Q    Is this one of the memorialization-type materials or

24  sources of information that assisted you?

25  A    Yes, this is, indeed, a memorialization material related

SHAKED - DIRECT - TURNER                    1156

1   to Hamas.

2   Q    Did you have an opportunity to investigate the bombing

3   that took place at Hebrew University in July of 2002, at

4   something called the Frank Sinatra student cafeteria in

5   Jerusalem?

6   A    Yes, I did investigate the terror attack that was carried

7   out in the Frank Sinatra cafeteria at Hebrew University in

8   Jerusalem.

9   Q    Were you able to determine the responsible party or at

10  least some of the responsible parties involved in this

11  terrorist attack?

12  A    Yes, Hamas was responsible for this terror attack, and

13  based on my finding, there were a number of people who were

14  connected with this terror attack.

15          MR. TURNER:  May we display the side?

16  Q    How many people were killed in this particular terror

17  attack at Hebrew University?

18  A    Nine students and university faculty were killed in this

19  terror attack.

20  Q    And how many were reported to be injured?

21  A    There were about 70 people injured as a result of the

22  explosion.

23  Q    Now, your slide has three individuals at the bottom.

24  First of all, the two Abassi names, what roles did they play

25  in this particular attack?

SHAKED - DIRECT - TURNER                    1157

1  A    If we go from left to right, we have Muhammad Abassi.  He

2  worked in the university, and he was a Hamas operative, and he

3  chose the place where the terror attack would be carried out.

4           THE INTERPRETER:  Excuse me.  I would like to

5  correct.  He chose the place where to place the bomb.

6           THE WITNESS:  In the middle of the picture, we have

7  Allah Abbasi.  He was Hamas operative.  He collected the

8  intelligence on the target for the attack.

9  Q    What about Muhammad Odeh?

10  A    I mentioned Muhammad Odeh earlier.  I think you may be

11  referring to Wisam Abbasi --

12  Q    I'm sorry.

13  A    He was also among those who collected intelligence and

14  various details on the place where to place the bomb,

15  regarding the cafeteria.

16  Q    The three in the middle row we've seen on some of the

17  other attacks; Wael Qassam, Abdulla Barghouti, and Muhammad

18  Arman.  Were you able to determine during the course of your

19  investigation that these individuals were, in fact, involved

20  in this particular attack?

21  A    Yes, I could determine that those three were directly

22  related to the terror attack.

23  Q    Did -- your personal interviews of Barghouti and Qassam,

24  while they were in jail, did those assist you in reaching

25  conclusions about the perpetrators of this particular

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1158

1  terrorist attack and Hamas' role?

2  A    Yes, in the interviews I conducted with them, they told

3  me about it, and that was a great help to me when I came to

4  cross-check it and to reach my conclusions.

5            MR. TURNER:  You might pull that microphone a little

6  bit closer.

7            THE INTERPRETER:  Sorry.

8  Q    Tell us a little bit about Hebrew University and the

9  Frank Sinatra cafeteria.  Where is that located, and why is

10 this particular place significant in terms of attacks like

11 this?

12 A    The cafeteria -- the Frank Sinatra cafeteria is in a very

13 central place at the University of Jerusalem.  It is the

14 central cafeteria where I myself have been dining daily for

15 the past four years.  There are many students who go there not

16 only to eat but also to meet one another and spend time.  It

17 is a relatively large place that is always crowded around

18 lunchtime, which is the time they go and have their lunch, not

19 just students but also teachers and professors.  This is also

20 a central meeting point for students.

21           MR. TURNER:  Would you show the witness only, please

22 3676.

23 Q    Can you identify 3676?

24 A    Yes.

25 Q    What is 3676, please?

NICOLE CANALES, CSR, RPR

SHAKED - DIRECT - TURNER                    1159

1   A    This is the written official claim of responsibility made

2   by Hamas for the terror attack at the Hebrew University in

3   Jerusalem.

4   Q    How do you know this is from Hamas?

5   A    Because it has the insignia of Hamas.  It has the

6   official logo of Hamas.  It has the special language used by

7   Hamas, including slogans of Hamas.  And according to my

8   experience and what I read in other statements and claims of

9   responsibility, Hamas documents I conclude that this is,

10  indeed, Hamas.

11  Q    How did you first personally receive this particular

12  claim of responsibility?

13  A    I think it was three-and-a-half hours after the attack.

14  When I returned from the Hebrew University to my office in the

15  center of town, my secretary handed it over, this document

16  that arrived by fax.

17  Q    And were you able to identify the fax number that it came

18  from?

19  A    No, I couldn't.

20  Q    And did you subsequently learn any additional information

21  confirming Hamas' role in this particular attack?

22  A    Indeed, I did receive many more documents and testimonies

23  that prove that this was an act done by Hamas.

24  Q    One of the sources of information would be conviction

25  records.  Did you have access in this particular case to

NICOLE CANALES, CSR, RPR

Sidebar                                                              1160

1   conviction records relating to the Sil Won (phonetic) cell for

2   this particular attack?

3            MR. INGERMAN:  Your Honor, may we approach?

4            THE COURT:  Sure.

5            THE WITNESS:  Your Honor, may I go to the bathroom

6   for a minute?

7            THE COURT:  The answer is yes.  I guess you can't

8   wait 20 minutes.

9            THE WITNESS:  I'll wait.  Thank you.

10           (Sidebar held outside the presence of the jury.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                    1161

1      MR. INGERMAN:  Your Honor, with respect to 3676, I

2  think they put the cart before the horse there.  I thought he

3  was going to be able to authenticate it in some way.  He

4  couldn't.  The testimony to the jury was that he saw an

5  official claim of Hamas, and I'd ask that that testimony be

6  struck.

7      THE COURT:  Well, they haven't moved the exhibit in.

8      MR. INGERMAN:  I agree with that, which is why it

9  shouldn't have been read in before authentication.

10      THE COURT:  I don't think he read it in.  He

11  described it generically as official claim of responsibility

12  by Hamas.  I don't think he read a part.

13      MR. INGERMAN:  No, but -- the description was

14  official that he provided, left the jury with the

15  understanding that it was an official claim of responsibility

16  by Hamas.

17      THE COURT:  I think the jury understands that he is

18  basing his opinion on something that he considers to be an

19  official statement of responsibility from Hamas, that has not

20  been moved into evidence.  It's been testified to as part of

21  the basis for his opinion, and I think it's okay for an expert

22  to do that, so I'll overrule the objection.

23              (Sidebar concluded.)

24

25

1162

1       (In the presence of the jury.)

2          THE COURT:  All right.  Ladies and gentlemen, we're

3   going to take our afternoon break now.  We will reconvene at

4   five minutes to 3:00.  You know not what to talk about.  So

5   we'll see you in 15 minutes.  Thank you very much.

6          (Outside the presence of the jury.)

7          THE COURT:  Five to 3:00.

8              (Recess in proceedings.)

9        (Proceedings continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. SHAKED - DIRECT/MR. TURNER                1163

1        (Honorable Brian M. Cogan takes the bench.)

2        THE COURT:  Jury please.

3        (Jury is in the courtroom at 2:57 p.m.)

4        THE COURT:  Be seated.  Continue, Mr. Turner.

5        MR. TURNER:  Thank you, your Honor.

6   DIRECT EXAMINATION (Continued)

7   BY MR. TURNER:

8   Q    I believe when we broke, Mr. Shaked, we were talking

9   about Exhibit 3592, which is already in evidence.  It is the

10  conviction records of associated with the Silwad cell which

11  included the Hebrew University bombing.  Are you familiar

12  with that fact?

13  A    Yes.

14  Q    And did those conviction records affirm for you your

15  conclusions that Hamas was responsible for the terrorist

16  attack at Hebrew University in the Frank Sinatra Cafe?

17  A    Yes, they do assist me in making this determination.

18  Q    Did you have an opportunity to investigate the bombing

19  on Bus Number 4 Allenby in Tel Aviv that occurred on

20  September 19, 2002?

21  A    Yes.

22  Q    And were you able to identify the suicide bomber on

23  Bus 4?

24  A    Yes.

25        MR. TURNER:  May we display the slide?

R. SHAKED - DIRECT/MR. TURNER                    1164

1          THE COURT:  Yes.

2    Q    Who was the suicide bomber?

3    A    Hi name is Iyad Raddad.

4    Q    Were you able to determine whether or not Raddad was

5    acting on his own or working for Hamas when he carried out

6    the terrorist attack Bus Number 4 Allenby Street?

7    A    No, he was not on his own, he operated on behalf of

8    Hamas, for Hamas, as a member of Hamas.

9    Q    So that we have an understanding of Allenby Street, can

10   you please describe for us back in 2002 what Allenby Street

11   was in Tel Aviv and the significance of Bus Number 4?

12   A    Allenby Street is the center street in Tel Aviv leading

13   from north to south.  It is an extremely crowded street.  It

14   is a center for shopping, restaurants and entertainment.

15   Right next to where the explosion took place, there is also

16   a synagogue.  The attack took place in the junction of

17   Voltribe (phonetic) Boulevard and Allenby Street.  This is a

18   very, very central junction in Tel Aviv.  I could compare it

19   to the 5th Avenue and 42nd Street of New York, it is the

20   very hub of Tel Aviv.

21   Q    Now, you've got four individuals shown on the slide

22   depicting the terrorists involved in this particular attack.

23   Again, beginning at the top, we already talked about the

24   suicide bomber at the bottom, beginning at the top, Ibrahim

25   Hamed.  Is that the same gentleman that we've seen in a

R. SHAKED - DIRECT/MR. TURNER                    1165

1    number of other attacks?

2    A    Indeed, it is the same Ibrahim Hamed, a senior Hamas

3    commander in the West Bank in Ramallah.

4    Q    And what about Hasnin Rumana, what role did he play in

5    Hamas?

6    A    Hasnin Rumana was a senior Hamas member.  He was the

7    military commander of Hamas.  He was the liaison between

8    Mahmoud Sharitah, the third one that appears in the slide,

9    and he was the one that connected between the higher

10   headquarters of Hamas and had a key role in this terror

11   attack.

12   Q    And what was Sharitah's role in this terror attack?

13   A    He was a senior member of Hamas.  He was a student in

14   the largest university of the West Bank.  He did not reside

15   in Ramallah, which is located south of West Bank.  He was

16   the one who recruited and dispatched the suicide bomber to

17   perpetrate the attack in Tel Aviv.

18            MR. TURNER:  Show the witness only, please, 3694.

19   Q    Can you identify 3694, sir?

20   A    Yes, I do.

21   Q    What is 3694?

22   A    This is the official claim of responsibility by Hamas

23   for the terror attack on Allenby Street in Tel Aviv.

24   Q    What is the source of 3694?

25   A    It is the official internet website of Hamas.

R. SHAKED - DIRECT/MR. TURNER                1166

1          MR. TURNER:  We offer 3694.

2          THE COURT:  All right.  Received over objection.

3          (Plaintiff Exhibits 3694 was admitted into

4     evidence.)

5     Q    In addition to the official claim of responsibility,

6     did you have access to the Israel Security Agency report

7     reporting the details of the investigation surrounding this

8     particular attack in Tel Aviv?

9     A    Yes, I did have access to that.

10         MR. TURNER:  May we display 3811, which is in

11    evidence, but only the portion pertaining to the Allenby

12    Attack?

13         THE COURT:  Yes.

14    Q    The ISA report, Mr. Shaked, indicates that Raddad was,

15    in fact, the suicide bomber.  Is that, in fact, consistent

16    with your findings?

17    A    Yes, this is consistent with my findings.

18    Q    It also indicate that Raddad was originally from Jordan

19    and was the age 23.  Is that consistent with what you found?

20    A    Yes, I did confirm that.

21    Q    The terrorist Sharitah's name is also referenced in

22    this particular report.  Is that consistent with your

23    findings?

24    A    Indeed, sir.

25    Q    Now, let's go to --

R. SHAKED - DIRECT/MR. TURNER          1167

1        MR. TURNER:  Show the witness only, please, 3692.

2  Q    Can you identify 3692?

3  A    Yes, I can.

4  Q    Can you generally describe what 3692 is, please, sir?

5  A    This document is a document issued by the police

6  laboratory, which examined the findings in the scene and

7  brought those findings that actually informed them about the

8  materials used by the terrorist in order to build the bomb.

9  Q    Did 3692 assist you in reaching your conclusions that

10 Hamas was, in fact, responsible for this particular attack?

11 A    Yes, the findings did assist me.

12 Q    And what is the source of 3692, what agency does that

13 come from in the government in Israel?

14 A    The entity examining such cases is the Israel police.

15 It came from the forensic department of the Israel Police.

16        MR. TURNER:  We offer 3692.

17        THE COURT:  All right.  Received over objection.

18        (Plaintiff Exhibit 3692 was admitted into

19 evidence.)

20        MR. TURNER:  Would you show the witness, please,

21 3513.

22 Q    Can you identify 3513?

23 A    Yes, I can.

24 Q    What is 3513?

25 A    This is a report issued by the prime minister's office

R. SHAKED - DIRECT/MR. TURNER                1168

1    which described two terrorist attack after they were

2    uncovered and after the cell that perpetrated them was

3    uncovered.  One of them was the attack on Allenby Street in

4    Tel Aviv.

5    Q    Did this likewise assist you in confirming and

6    crosschecking the information to make sure that it was

7    accurate?

8    A    Yes, it did help me crosscheck the information.

9    Q    Now, in addition to these other sources, did you also

10   have available to you conviction records for people

11   associated with the Allenby attack?

12   A    Yes, I did.

13          MR. TURNER:  Can you please show the witness 3686.

14   Q    Can you identify 3686?

15   A    Yes, I can.

16   Q    What is 3686?

17   A    This is Mahmoud Sharitah.  He is the person who

18   dispatched the suicide bomber to the attack.  I'm sorry,

19   this is the verdict.  Sorry.  This is the verdict of Mahmoud

20   Sharitah, the person who dispatched the suicide bomber to

21   the attack.

22   Q    With Sharitah, did he confess, according to these

23   records, or did he plead guilty, what happened in this court

24   proceeding?

25   A    Sharitah indeed confessed to his action and it was

R. SHAKED - DIRECT/MR. TURNER          1169

1   based on that confession that he was convicted.

2           MR. TURNER:  Your Honor, we offer 3686, which is

3   the Apostilled conviction record of Sharitah.

4           THE COURT:  All right.  It's received over

5   objection.

6           (Plaintiff Exhibit 3686 was admitted into

7   evidence.)

8   Q    Now, in addition to -- let me back up one second.  We

9   were looking at the ISA report and there was a reference to

10  the fact that Raddad was originally from Jordan.  Is that

11  significant in terms of timing of the reporting of this

12  particular attack by Hamas?

13  A    Yes, because the claim of responsibility by Hamas,

14  which included the name of Raddad, was issued five years

15  after the Allenby bombing.

16  Q    Now, in addition to conviction records, did you also

17  have access to conviction records of Ibrahim Hamed at some

18  point in time?

19  A    Yes, I did have access.

20  Q    Did those records likewise assist you in either way,

21  either confirming or rejecting the notion that Hamas was

22  responsible for the Allenby attack?

23  A    Yes, it helped me.

24  Q    Now, did you also have an opportunity to investigate a

25  shooting attack on Route 60 that occurred in January of

R. SHAKED - DIRECT/MR. TURNER                1170

1   2003, that resulted in two people being injured?

2   A    Yes, I did investigate that.

3   Q    And were you able to, through the course of your

4   investigation, identify the terrorist involved in this

5   particular ambush?

6   A    Yes, I was able to identify the two shooters.

7            MR. TURNER:  May we display the slide?

8   Q    During the course of your investigation, Mr. Shaked,

9   who did you identify as the shooters involved in this

10  particular attack?

11  A    At the bottom of the page we can see the pictures and

12  names of Yasser Hamad and Farah Hamad, who were shooters,

13  and they're both members of the Silwad cell.

14  Q    And during the course of this investigation, were you

15  able to determine whether the shooters carried out this

16  ambush or attack on their own or by and for Hamas?

17  A    The attack was carried out for Hamas, by Hamas

18  operatives and directed by Hamas headquarters.

19  Q    Would you describe for us Route 60, where it's located

20  and what route or route that particular road provides access

21  to within the West Bank and Jerusalem area?

22  A    Highway 60 is the main longitudinal artery in the West

23  Bank.  It goes from north to south and branches off in

24  various places in the east and to the west.  It leads to

25  various village, towns and cities.  It is also the road that

R. SHAKED - DIRECT/MR. TURNER                1171

1   the settlers mainly use when travelling from Jerusalem to

2   the north or to the south.

3   Q    Let's go back to your slide for a minute and let's

4   focus on the lower group of photographs and the two people

5   on the end.  We've talked about the shooters.  What role did

6   Hamdan and Omar play in this particular attack?

7   A    We have to bear in mind that a shooting attack is

8   different than a suicide bombing; in such a case, more

9   people are involved, there are the shooters and other people

10  as well.  And so we have here on the right, Muayad Hamad,

11  and he was the get away driver.  He is the one that drove

12  the car away from the site of the attack and Khaled Omar on

13  the right, he was the commander, the planner of the

14  operation as it was carried out.

15  Q    What role did Hisham Hijazi play?

16  A    He was the commander that coordinated between the

17  headquarters and the cell.  He was the one that provided the

18  money and the weapons, and he also helped to plan the

19  operation.

20  Q    And how about Jesser Barghouti?

21  A    He was also senior commander in Ramallah.  He was a

22  field commander.  He obtained, supplied and transferred the

23  money and arms as well, and gave orders on how and what to

24  do.

25  Q    Now, Sayd Qasem and Ibrahim Hamed, who are shown at the

R. SHAKED - DIRECT/MR. TURNER                    1172

1   top two levels, are those individuals that we already

2   discussed?

3   A    Yes, we've already discussed Ibrahim Hamed.  He was the

4   commander of the military wing of Hamas in the Ramallah

5   area.  And Sayd Qasem, who was his deputy, and he was his

6   operational officer as it were and oversaw the attack.

7   Q    And finally, Murad Barghouti.  What role did Murad

8   Barghouti play?

9   A    There were a number of terror cells operating in this

10  area the role of Barghouti, Murad Barghouti was to be the

11  liaison between the various cells, in order to -- in the

12  Ramallah area in order to advance terror.

13              MR. TURNER:  Would you please show the witness

14  3719.

15  Q    Can you identify 3719?

16  A    Yes, I did.

17  Q    What is 3719?

18  A    This is a document that tells the history of the cell

19  in the Ramallah area.  It is taken from the official website

20  of Hamas.

21  Q    And is the source of the document indicated on the

22  document?

23  A    Yes.  As you can see here on the source it says here

24  Izz ad-Din al-Qassam, the source appears in both English and

25  in Arabic.

R. SHAKED - DIRECT/MR. TURNER          1173

1  Q    And did 3719 provide any information about the attack,

2  the shooting attack on Route 60 that occurred in January of

3  2003?

4  A    Yes, it does.

5  Q    Is this sometimes referred to as a special report?

6  A    Yes, this is indeed a special report.  That is,

7  dissimilar, unlike other reports, we're talking about a

8  different type of terror attack.  Unlike the suicide

9  bombers, in this case, the perpetrators were apprehended and

10 were in prison in Israel.  So this -- this is a special

11 report and it is longer than most of the others.

12               MR. TURNER:  We offer 3719.

13               MR. INGERMAN:  You've already excluded it, your

14 Honor.

15               THE COURT:  I did.

16               MR. TURNER:  Can I have the witness look at 3744,

17 please.

18 Q    Can you identify 3744?

19 A    Yes, I do.

20 Q    And what is 3744?

21 A    This is taken from the official website of Hamas.  It

22 is the opening page.  It gives detailed history of the

23 terror cell, but not only this particular cell that did the

24 shooting, but three others as well.

25 Q    Now, we've talked thus far about the al-Qassam website,

R. SHAKED - DIRECT/MR. TURNER                1174

1  which is part of Hamas.  Did Hamas also have a different

2  website?

3  A    Hamas, in fact, had two official websites.  One was the

4  political part of the political bureau, and the other

5  represented the military wing, but they were both official

6  sites.

7  Q    What was the political wing's website called or

8  referred to?

9  A    The political wing's website is called "Palestine Info"

10  and it represents the special information unit of Hamas.

11  Q    And is 3744 from the Palestinian Information Center?

12  A    Yes, it does.

13  Q    Did it assist you in crosschecking the facts

14  surrounding the Route 60 shooting?

15  A    Yes, it did.  As I noted, a lot of details were given

16  in it.

17            MR. TURNER:  We offer 3744 as redacted.

18            THE COURT:  Okay.  Consistent with my earlier

19  ruling, it's admitted over objection.

20            (Plaintiff Exhibit 3744 was admitted into

21  evidence.)

22            MR. TURNER:  Could you also put before the

23  witness, 3893.

24            MR. INGERMAN:  Your Honor, can we have a quick

25  sidebar on this?

1         THE COURT:  Sure.

2         (Continued on the next page for sidebar.)

SIDEBAR CONFERENCE                    1176

1          (Sidebar conference begins.)

2          THE COURT:  What's the problem?  Everything is out

3    except the picture and the end.

4          MR. INGERMAN:  Well, let me just show you, your

5    Honor.

6          THE COURT:  Everything was out below the picture

7    and starting -- picking up here right.

8          MR. INGERMAN:  Above the picture it says, the

9    imprisoned --

10         THE COURT:  I took it out.

11         MR. INGERMAN:  But why?

12         THE COURT:  You want it in?

13         MR. INGERMAN:  Yes.

14         THE COURT:  But you didn't tell me that before.

15         MR. INGERMAN:  Well, you said everything below the

16   picture was going to be redacted.

17         THE COURT:  I see.  I see.  Do you have any

18   objection by the plaintiff in unredacting those two lines?

19         MR. OSEN:  No.  If the jury doesn't have it yet,

20   we'll make it.

21         THE COURT:  We'll give it to the jury.

22         MR. INGERMAN:  Thank you.

23         (End of sidebar conference.)

24         (Continued on the next page.)

25

R. SHAKED - DIRECT/MR. TURNER                1177

 1            THE COURT:  All right.  Let's proceed.

 2            MR. TURNER:  Please show the witness 3893.

 3   Q    Can you identify 3893?

 4   A    Yes.

 5   Q    What is 3893?

 6   A    It is a document of the Izz ad-Din al-Qassam Martyrs

 7   Brigade taken from the official website of Hamas in which it

 8   details the earlier attacks that we are discussing here.

 9   Q    And did 3893 assist you in reaching the conclusions

10   that you did about Hamas' role in the attack on Route 60 in

11   January of 2003?

12   A    Indeed, it is another document that helped me

13   crosscheck the material and to determine my opinion.

14            MR. TURNER:  We offer 3893.

15            THE COURT:  Mr. Turner, how come you're offering

16   documents that I've excluded?

17            MR. TURNER:  My note didn't say that.  I

18   apologize.

19            THE COURT:  All right.  Well, check again tonight,

20   but that's excluded.

21            MR. TURNER:  Show the witness 3741, please.

22   Q    Can you identify 3741?

23   A    Yes, I do.

24   Q    What is 3741?

25   A    It is the verdict that was handed down against Muayad

R. SHAKED - DIRECT/MR. TURNER                1178

1    Hamad, a member of the shooters cell living in Silwad.

2    Q    And what was the result of the conviction?

3    A    He pled guilty and was sentenced to life sentence.

4              MR. TURNER:  We offer 3741 as Apostilled.

5              THE COURT:  All right.  That's received over

6    objection.

7              (Plaintiff Exhibit 3741 was admitted into

8    evidence.)

9    Q    Did you also have an opportunity to investigate the

10   bombing of Bus 37 in Haifa in March of 2003?

11   A    Indeed.

12   Q    Were you able to conclude who was responsible for that

13   particular bombing?

14   A    Yes.

15             MR. TURNER:  May we display the slide?

16             THE COURT:  Yes.

17   Q    Could you please identify who you determined was the

18   suicide bomber involved in this particular attack on Bus 37?

19   A    At the very bottom center of the slide you can see the

20   picture of Mahmoud Qawasmeh who carried out the attack on

21   Bus 37 in Haifa.

22   Q    And what did your investigation reveal about Qawasmeh?

23   A    Qawasmeh was a Hamas operative, a student at the

24   University of Hebron.  He studied computers and was

25   recruited to Hamas.  And on behalf of Hamas, went out and

R. SHAKED - DIRECT/MR. TURNER          1179

1   carried out the attack in Haifa.

2   Q    And were you able to determine whether or not Qawasmeh

3   was acting on his own or was he acting for Hamas in carrying

4   out the suicide attack on Bus 37?

5   A    Qawasmeh carried out the attack on behalf of Hamas, as

6   Hamas, member for Hamas.

7   Q    Back in 2003 where was Haifa and what was Bus 37?

8   A    Haifa is a port city in Israel.  It is located in the

9   northern part of the country.  It is located on the slopes

10  of a mountain.  And in trying to compare it to anything

11  here, then you can envision San Francisco, you can see the

12  mountain and the port.  And Bus 37 was one of the most

13  central bus lines commuting from downtown Haifa all the way

14  up to the University of Haifa, which is a very large

15  university.  So many students would commute by this

16  particular bus line.

17  Q    How many people were killed and injured in this

18  particular attack?

19  A    17 people were murdered in this terror attack and 53

20  were injured.

21  Q    What role did Ali Alan play in this attack?

22  A    Ali Alan was the commander of Hamas organization in the

23  southern area of the West Bank.  He was the one to command

24  that terror attack.  He was the one who built the explosive

25  charge that was assembled on the explosive belt that was

R. SHAKED - DIRECT/MR. TURNER                1180

1    fitted on the suicide bomber.

2         MR. TURNER:  Would you show the witness 3755,

3    please.

4    Q    Can you identify 3755?

5    A    Yes, I can identify it.

6    Q    What is 3755?

7    A    It is the official claim of responsibility by Izz

8    ad-Din al-Qassam brigade -- al-Qassam Martyrs Brigade, the

9    military wing of Hamas, claiming responsibility for the

10   attack carried out in Bus 37 Haifa, including the name of

11   the suicide bomber.

12        MR. TURNER:  We offer 3755.

13        THE COURT:  I'm confused on the number.  Let's

14   have a sidebar.

15        (Continued on the next page for sidebar.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                1181

1      (Sidebar conference begins.)

2      THE COURT:  3775.  I think so.  What's ambiguous

3  is that you asked him about a claim of responsibility, but

4  you showed him the conviction document in Hebrew.  He

5  answered with what you wanted to show him, not what he was

6  looking at.  So you -- I don't know where you are, but what

7  you were showing him was the conviction document, not the

8  claim of responsibility.

9      MR. OSEN:  I think that popped up after the

10  question.

11      THE COURT:  Really?

12      MR. TURNER:  Yeah, there were two.

13      THE COURT:  So he looked at it and then looked

14  away and then another document came in.

15      MR. TURNER:  I had the number wrong, it was 3775.

16      THE COURT:  Yeah, it's 3775.  Okay.  So I think

17  what happened is I think he heard the wrong number and

18  switched it to the wrong document when he heard the wrong

19  number.  Straighten it out.

20      MR. OSEN:  Okay.

21      (End of sidebar conference.)

22      (Continued on the next page.)

23

24

25

R. SHAKED - DIRECT/MR. TURNER               1182

1          MR. TURNER:  Okay let's back up.  May I proceed?

2          THE COURT:  Yes.

3    BY MR. TURNER:

4    Q    Let's back up let's put up 3775.  Can you identify

5    3775?

6    A    Yes, I can.

7    Q    And what is 3775?

8    A    It is the official claim of responsibility by Izz

9    ad-Din al-Qassam Brigade, the military wing of Hamas

10   concerning the terror attack on Haifa Bus 37, which includes

11   the name of the suicide bomber, Mahmoud Qawasmeh.

12         MR. TURNER:  We offer 3775.

13         THE COURT:  That's received over objection.

14         (Plaintiff Exhibit 3775 was admitted into

15   evidence.)

16   Q    Were you also able to access the Israel Security Agency

17   report reporting on the investigation of this particular

18   attack on Bus 37?

19   A    Yes.

20         MR. TURNER:  May we display 3811, which is in

21   evidence, at least the portion related to Bus 37.

22   Q    Was Qawasmeh identified by the Israel Security Agency

23   as the suicide bomber?

24   A    Yes, indeed so.

25   Q    And did this assist you in reaching your conclusions?

R. SHAKED - DIRECT/MR. TURNER                    1183

1  A    Of course it did help me crosscheck the information I

2  had.

3  Q    Now, in addition to those two pieces of information,

4  did you also have access to court records, convictions of

5  some of the individuals involved in this terror attack?

6  A    Yes.

7           MR. TURNER:  Put 3755 up this time, please.

8  Q    Can you identify 3755?  What is 3755?

9  A    This is the verdict against one of the terrorist that

10 was involved in the terror attack on Bus 37, and he was

11 sentenced to 17 life sentences.

12 Q    And what was his name?

13 A    Can you please move it up or down a bit, so I can see.

14 I do not want to be mistaken about the name.  The other

15 side.  As I told you, it was Fadi al-Ja'aba.

16           MR. TURNER:  We offer 3755.

17           THE COURT:  Received over objection.

18           (Plaintiff Exhibit 3755 was admitted into

19 evidence.)

20           MR. TURNER:  Show the witness 3756, please.

21 Q    Can you identify 3756?

22 A    Yes, I can.

23 Q    What is 3756?

24 A    This is the verdict against Munir Rajbi, member of

25 Hamas cell who participated in preparing the terror attack

R. SHAKED - DIRECT/MR. TURNER                1184

1    on Bus 37.

2              MR. TURNER:  We offer 3756.

3              THE COURT:  That's the Apostilled document?

4              MR. TURNER:  Yes, sir.

5              THE COURT:  All right.  That's received over

6    objection.

7              (Plaintiff Exhibit 3756 was admitted into

8    evidence.)

9              MR. TURNER:  And 3754, please.

10   Q    Can you identify 3754?

11   A    Yes.

12   Q    What is 3754?

13   A    This is the verdict against another terrorist whose

14   name is Mu'az Abu Sharakh, who also participated in

15   preparing the terror attack.

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SHAKED - DIRECT - TURNER                    1185

1          MR. TURNER:  We offer 3754

2          THE COURT:  All right.  Received over objection.

3          (Plaintiffs' Exhibit 3754 received in evidence.)

4   BY MR. TURNER:

5   Q    In addition to those sources of information,

6   Mr. Shaked, did you likewise have available to you a will

7   from Qawasmeh that was prepared prior to the attack?

8   A    To the best of my recollection, Mr. Mahmoud Qawasmeh

9   wrote a will, but I did not see it.

10  Q    Did you have access to any memorialization materials

11  created by Hamas memorializing Qawasmeh's act in bombing bus

12  37 in Haifa?

13  A    Yes, indeed.

14  Q    Did you have an opportunity to investigate the shooting

15  attack that occurred in Kiryat Arba in March of 2003?

16  A    Yes.

17  Q    Were you able to determine during the course of your

18  investigation who was involved in that terror attack?

19  A    Yes.  Two members of Hamas were involved in this terror

20  attack, Hazem al-Qawasmeh and Muhsin al-Qawasmeh.

21         MR. TURNER:  May we display the slide.

22  BY MR. TURNER:

23  Q    Where is or was Kiryat Arba at the time of this terror

24  attack?

25  A    Kiryat Arba is a settlement bordering with Hebron.

SHAKED - DIRECT - TURNER                    1186

1   Q    Was this a significant area in terms of the attack

2   geographically?

3   A    Yes.  Because the access from the sea of Hebron to

4   Kiryat Arba, despite the security means used, is very easy.

5   Q    Did your investigation determine how many shooters were

6   involved in this particular attack?

7   A    Yes, I did reach a conclusion.

8   Q    And was there one location -- okay.  Go ahead and give

9   us your conclusion.

10  A    My conclusion was that two Hamas members, whose names I

11  mentioned, carried out the attack in Kiryat Arba.

12  Q    And was there one location for the shooting or two?

13  A    On that very same evening, at the very same time, at

14  the very same hour, in exactly the same timing, Hamas

15  carried out two attacks.  One was in Kiryat Arba east of

16  Hebron and the second one was in a place called Negohot,

17  west of Kiryat Arba.  In other words, two attacks that

18  happened simultaneously by four terrorists.

19  Q    Now, in the context of this particular attack, you have

20  two other individuals listed on here:  Basel al-Qawasmeh and

21  Abdallah abu Seif.

22       What was their roles in this attack?

23  A    Basel al-Qaawasmeh was one of the senior commanders of

24  Hamas from the military wing in Hebron.  He was a senior

25  commander, and he was the one to bring the explosive vest to

SHAKED - DIRECT - TURNER                    1187

1   one of the terrorists in this attack to instruct and guide

2   and issue the instructions for the execution of the attack.

3        Abdallah abu Seif, on the other hand, was another

4   senior member of Hamas in Hebron.  He was the one leading

5   the two terrorists toward their target in Kiryat Arba.

6              MR. TURNER:  Show the witness 3781.

7              THE COURT:  Before you do that, can you go back to

8   the slide for a minute.  I just want to ask the witness.

9              Why is there no picture of Seif?

10             THE WITNESS:  We were unable to obtain a clear

11  picture that wasn't blurred.

12             THE COURT:  Thank you.

13             MR. TURNER:  3781.  Witness only, please.

14  BY MR. TURNER:

15  Q    Can you identify 3781, Mr. Shaked?

16  A    Yes, I can.

17  Q    And what is 3781?

18  A    This is the official claim of responsibility taken by

19  or made by Hamas' Izz al-Din Al-Qassam Martyrs Brigade,

20  which is its military wing for the attack in Kiryat Arba.

21             MR. TURNER:  We offer 3781.

22             THE COURT:  All right.  That's received over

23  objection.

24             (Plaintiffs' Exhibit 3781 received in evidence.)

25  BY MR. TURNER:

SHAKED - DIRECT - TURNER                1188

1   Q    Did 3781 help you conclude who was responsible for this

2   terror attack on behalf of Hamas?

3   A    Yes.  I'd like to note that it did indeed help me.

4            MR. TURNER:  Show the witness 3797, please.

5   BY MR. TURNER:

6   Q    Can you identify 3797?

7   A    Yes, I do.

8   Q    And can you generally describe what 3797 is?

9            THE COURT:  Generally.

10           This didn't sound general.  Let's see.

11  A    This is a document issued by the Prime Minister's

12  office that describes the terror attack that was held in

13  Kiryat Arba.  It describes the attack, how it was carried

14  out, and who was hurt.

15           THE COURT:  Okay.

16  BY MR. TURNER:

17  Q    Did that information assist you in crosschecking what

18  you already knew from the claim of responsibility?

19  A    Yes, it did.

20           MR. TURNER:  Would you show the witness 4777,

21  please.

22  BY MR. TURNER:

23  Q    Can you identify 4777?

24  A    Yes, I do.

25  Q    What is 4777?

SHAKED - DIRECT - TURNER                 1189

1   A    This is the verdict and sentence regarding the deeds of

2   Muhammad Abu Seif.

3   Q    Did this conviction relate to this attack?

4   A    Excuse me.  Abdallah Abu Seif.

5   Q    Does this conviction relate to this attack?

6   A    Yes.  It relates to one of the terrorists involved

7   whose name I just mentioned, Abdallah Abu Seif.

8   Q    Is Abdallah Abu Seif the one that we did not have a

9   photograph for?

10  A    Yes, indeed, that's the man.

11       MR. TURNER:  Show the witness 3789 as well,

12  please.

13  BY MR. TURNER:

14  Q    Do you recognize 3789?

15  A    Yes, I can identify this document.

16  Q    And what is 3789?

17  A    Yes.  This is a page from the Web site of Izz al-Din

18  Al-Qassam Martyrs Brigade, the military wing of the Hamas.

19  And it is devoted to one of the terrorists involved in the

20  terror attack in Kiryat Arba.  It tells his life story and

21  the story of the terror attack as told by Hamas.

22  Q    And in addition to these sources of information, did

23  you likewise have available any memorializations prepared by

24  Hamas glorifying this conduct?

25  A    Yes, I did.  I had a number of posters that were

1  distributed throughout the city of Hebron.

2  Q    Did you have an opportunity to investigate the suicide

3  bombing that occurred at a place called Mike's Place in Tel

4  Aviv in April of 2003?

5  A    Yes, I did.

6  Q    And were you able to identify the suicide bombers

7  involved in this particular attack?

8  A    Yes, I was able.

9        MR. TURNER:  May we display the slide?

10 BY MR. TURNER:

11 Q    Who were the suicide bombers involved in carrying out

12 the attack at Mike's Place that resulted in three deaths and

13 50-plus reported injuries?

14 A    The two suicide bombers were British citizens of

15 Pakistani origin.  One was named Asif Hanif and the other

16 was named Khan Sharif.  And they both arrived in Israel and

17 were sent to carry out the terrorist attack.

18 Q    Tell us a little bit about Mike's Place.  What was

19 Mike's Place back in 2003 in Tel Aviv and where was it

20 located?

21 A    Mike's Place was one of the more popular jazz clubs

22 located in Tel Aviv.  It's located near the main promenade

23 of the Tel Aviv beach just meters away or yards away from

24 the American Embassy in Israel.  It's located in a very busy

25 place, and at night many young people come to the club to

SHAKED - DIRECT - TURNER                1191

1    hear live jazz music being played.

2    Q    Did your investigation give you any background

3    information on how Hanif and Khan, the two terrorists, made

4    it into Israel?

5    A    Yes, they did.

6    Q    What did you learn during the course of your

7    investigation about these two terrorists?

8    A    These were two members of the British mujahideen

9    organization.  They had decided to come to the Middle East

10   to help the Islamic organizations fighting in it, especially

11   Al-Qaeda.  They arrived in Syria and after they were unable

12   to reach Iraq, they made contact with Islamic operatives in

13   Damascus, and they received a new target in the territories.

14        They were equipped with very sophisticated plastic

15   explosives which they hid between the pages of a Koran book.

16   They arrived in Israel via the Allenby Bridge.  They visited

17   in Jerusalem and in Tel Aviv.  They arrived in Gaza where

18   they met with members of Hamas.  And there they received the

19   orders or the authorization from the headquarters to carry

20   out the terror attack.

21        They returned to Tel Aviv and late at night they

22   entered the Mike's Place jazz club.  One of them blew

23   himself up in it.  The other escaped and later his body was

24   retrieved from the ocean.

25   Q    Were you able to determine during the course of your

SHAKED - DIRECT - TURNER                    1192

1  investigation whether both terrorists were equipped with

2  bombs or whether only one of them had a bomb?

3  A    One of the terrorists was equipped with the explosive

4  materials that I described earlier that was hidden within

5  the pages of a Koran book and the other had an explosive

6  belt.

7  Q    And during the course of your investigation, were you

8  able to determine one way or the other whether the bomb that

9  did not detonate failed to detonate by mistake or did the

10 terrorist change his mind and run away?

11              MR. INGERMAN:  Objection, your Honor.

12              THE COURT:  Sustained.

13 BY MR. TURNER:

14 Q    Were you able to determine -- you can't answer that.

15      Were you able to determine during the course of your

16 investigation why the second bomb did not detonate?

17 A    Yes.  In my assessment and based on information I

18 collected, the second bomb did not blow up for technical

19 reasons.  That was the reason it did not blow up.

20 Q    Now, in looking at the photograph, do you recognize

21 this photograph from other sources?

22 A    I've seen this photograph in many places, not only on

23 the Web site of Hamas.

24 Q    Now, there's a reference to a poster of Ibrahim

25 al-Maqadma.  Do you know who Ibrahim al-Maqadma was back in

SHAKED - DIRECT - TURNER                    1193

1    2002, 2003?

2    A    Yes, I know who Ibrahim al-Maqadma is.

3    Q    Who?

4    A    Ibrahim al-Maqadma was one of the founders of Hamas

5    together with Sheikh Yassin.  He was responsible for Hamas'

6    military -- for the connection between the military wing and

7    the political wing of Hamas.  Because of his activities in

8    Hamas, he was eliminated by Israel in 2002.  We see him here

9    in the poster that was issued in his memory by Hamas.

10        I would like to add that in the poster, we can see that

11   the terror attack that these two men are about to carry out

12   is going to be held in honor of the memory of.

13   Ibrahim al-Maqadma.

14   Q    How can you tell that?

15   A    I know this based on a statement issued by Hamas a year

16   after the terror attack carried out by these two men at

17   Mike's Place.

18   Q    And was that statement made on a particular

19   anniversary?

20   A    Yes.

21   Q    And what was the anniversary of?

22   A    It was on the anniversary of Maqadma's death.

23   Q    Now, is there any significance in trying to determine

24   Hamas' role in this particular attack at Mike's Place to the

25   green banner these two gentlemen are standing in front of?

SHAKED - DIRECT - TURNER                    1194

1    A    Of course.  It's the green, the green color of the

2    Hamas flag.  That is the main symbol of Hamas, the color

3    green.  We can see it in the flag.  We can see it in the

4    headband they are wearing on their forehead.  And we can see

5    it also in the background of the picture of Maqadma.

6    Q    And what are these two terrorists holding, in addition

7    to the rifles?

8    A    In addition to the rifle each is holding, they are

9    holding a book of the Koran.

10              MR. TURNER:  Show the witness 3807, please.

11   BY MR. TURNER:

12   Q    Can you identify 3807?

13   A    Yes, I do.

14   Q    What is 3807?

15   A    This is an official claim of responsibility made by

16   Hamas' Izz al-Din Al-Qassam Martyrs Brigade.  It's a

17   military statement from Izz al-Din Al-Qassam regarding the

18   terror attack at Mike's Place.

19              MR. TURNER:  We offer 3807.

20              THE COURT:  In light of the objection, do a better

21   foundation for it.

22   BY MR. TURNER:

23   Q    What is the source of 3807?

24   A    The source is the official Internet Web site of Izz

25   al-Din Al-Qassam Brigade, which is the military wing of

SHAKED - DIRECT - TURNER                    1195

1   Hamas.

2            MR. TURNER:  We offer 3807.

3            THE COURT:  All right.  It's received over

4   objection.

5            (Plaintiffs' Exhibit 3807 received in evidence.)

6   BY MR. TURNER:

7   Q    Did 3807 help you reach the conclusion that Hamas was,

8   in fact, responsible for the bombing at Mike's Place?

9   A    Indeed, it was.

10           MR. TURNER:  Show the witness 3812, please.

11  BY MR. TURNER:

12  Q    Do you recognize 3812?

13  A    If you can blow it up a bit.

14       Yes, I can identify it.

15  Q    What is 3812?

16  A    It is the claim or announcement made by Izz al-Din

17  Al-Qassam Brigade concerning the terror attack in Mike's

18  Place, including the names of the two perpetrators of the

19  attack.

20  Q    Is this the same document that you were referring to

21  earlier that was issued on the anniversary of Maqadma's

22  death?

23  A    If you can put it up a bit.

24       No, it is not the same document.

25  Q    Did this one come -- what was the source of 3812?

SHAKED - DIRECT - TURNER                    1196

1   A    Is this the document that I'm seeing here (indicating)?

2   Q    Yes, I'm sorry.

3   A    The official Web site of Izz al-Din Al-Qassam.  This is

4   the official Web site of Hamas.

5   Q    And did 3812 assist you in crosschecking information

6   that you were provided and made available in determining

7   Hamas' role in this particular attack?

8   A    Yes, it did help me determine the role of Hamas in this

9   terror attack.

10           MR. TURNER:  We offer 3812.

11           MR. INGERMAN:  Same objection.

12           THE COURT:  Well, let's have a sidebar.

13           In fact, it's probably a good breaking time.  So

14   rather than keeping the jury for our sidebar and breaking,

15   let me send them home.

16           Ladies and gentlemen, don't discuss the case

17   amongst yourselves or with anyone else.  Don't do any

18   research.  Don't look on Google or any other site.  Keep it

19   to yourself.  Don't even think about it till you get back

20   here tomorrow morning.  Stay away from any news reports.

21           Have a good night.

22           (Jurors exit the courtroom.)

23           THE COURT:  Okay.  Be seated.

24           I'm not as familiar with this document as I am

25   with the other one so I'm going to look at it overnight.

1204

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2

 3   COURTNEY LINDE, ET AL.,        )
                                    )   04CV02799 (BMC)
 4                  Plaintiffs,     )   And all related cases:
                                    )   04CV05449 (Litle)
 5                                  )   04CV05564 (Almog)
                                    )   04CV00365 (Coulter)
 6                                  )   05CV00388 (Afrait-Kurtzer)
                                    )   05CV03183 (Bennett)
 7      -against-                   )   05CV03768 (Roth)
                                    )   06CV01623 (Weiss)
 8                                  )
                                    )   United States Courthouse
 9                                  )   Brooklyn, New York
                                    )
10   ARAB BANK, PLC,                )   WEDNESDAY, AUGUST 27, 2014
                                    )
11                  Defendant.      )
     _____)

12

13            TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
                BEFORE THE HONORABLE BRIAN M. COGAN
14                 UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16
     FOR PLAINTIFFS LINDE      OSEN, LLC
17   AND COULTER:              BY:  GARY M. OSEN, ESQ.

18                            TURNER & ASSOCIATES, PLLC
                              BY:  CLYDE T. TURNER, ESQ.
19

20   FOR PLAINTIFFS LITLE,    SAYLES WERBNER
     BENNETT AND ROTH:        BY:  MARK S. WERBNER, ESQ.
21

22
     FOR PLAINTIFFS ALMOG:    STONE BONNER & ROCCO, LLP
23                            BY:  JAMES P. BONNER, ESQ.

24                            MOTLEY RICE, LLC
                              BY:  MICHAEL E. ELSNER, ESQ.
25                            BY:  JODI FLOWERS, ESQ.
```

1205

1

2  (APPEARANCES CONT.)

3  FOR THE DEFENDANT:        DLA PIPER US, LLP
                             BY:  SHAND STEPHENS, ESQ.
4                            BY:  ANTHONY PAUL COLES, ESQ.
                             BY:  BRETT INGERMAN, ESQ.
5                            BY:  MARGARET CIVETTA, ESQ.

6

7  INTERPRETED BY:           VARDA YAARI, RACHELLE AVITAL,
                             MICHAL MARIN AND NERI SEVENIER
8

9  THE COURT REPORTER:       NICOLE CANALES, CSR, RPR
                             225 Cadman Plaza East
10                           Brooklyn, New York 11201
                             cnlsnic@aol.com
11

12  Proceedings recorded by mechanical stenography, transcript
    produced by computer-assisted transcript.
13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  We're working on that.

2          Be seated, please.  Good morning, ladies and

3    gentlemen.

4          THE JURORS COLLECTIVELY:  Good morning.

5          THE COURT:  We'll continue with direct examination.

6    I think where we left off was the proffer of Exhibit 3812,

7    which was received over objection.

8          MR. TURNER:  Thank you, your Honor.

9                    RONNI SHAKED,

10   recalled as a witness, by and on behalf of the plaintiffs,

11   having been first duly sworn, was examined, and testified

12   further as follows:

13   DIRECT EXAMINATION (CONTINUED)

14   BY MR. TURNER:

15   Q    And just for purposes of putting it into context, 3812

16   was one of the claims of responsibility by Hamas; is that

17   correct, sir?

18   A    I need to know exactly what terror attack this is.

19   Q    Mike's Place?

20   A    Yes, indeed so.

21   Q    Now, in addition to the claims of responsibility, and I

22   believe yesterday it was established that there were two

23   separate ones; one a short time after the attack, and then

24   another one, I think, over a year later.

25          Were there other claims of responsibilities made by

1  any other terror organizations for the Mike's Place attack?

2  A    Yes, there were other organizations, sir.

3  Q    Who else claimed responsibility for that attack, other

4  than Hamas?

5  A    Because this whole thing was very vague, there were

6  various organizations that try to piggyback.  This particular

7  one, it was the Hamas the, PIJ, and I myself admit that I

8  thought there were even traces of Al-Qaeda there.  There were

9  others who argued it was the Hezbollah.  It was very vague.

10  It wasn't clear.  The various organizations tried to claim

11  responsibility for this one.

12  Q    Over a period of time, did responsibility for the Mike's

13  Place attack clarify itself?

14  A    Yes.

15          MR. TURNER:  Your Honor, may we go back and display

16  the slide, your Honor?

17          THE COURT:  Yes.

18  Q    Now, yesterday -- we won't go back through all this, but

19  yesterday we talked about the banner, Hamas banner; we talked

20  about the Hamas headbands; we talked about the photograph, and

21  the one thing we didn't talk about, which is already in

22  evidence, is did Hamas at some point in time release a video

23  of these two terrorist prior to the attack?

24  A    Indeed, the Hamas released a videotape of these two

25  terrorists who perpetrated the terror attack.

Shaked - Direct - Turner                          1209

1  Q    And, the video, was it made prior to the attack by Hamas?

2  A    Yes.

3  Q    And can you give us a time perspective; when was the

4  video released of these two terrorists after the attack?

5  A    This videotape was released by Hamas a year after the

6  terror attack.

7       MR. TURNER:  May we display 3811, which is already

8  in evidence.  This is the ISA report.  This will be pertaining

9  to a section pertaining to Mike's Place.

10 Q    Did the ISA, the Israeli Security Agency, report that was

11 ultimately issued about the Mike's Place attack, identify the

12 same two suicide bombers as you were able to identify them?

13 A    Yes, they were identified by the ISA report.

14 Q    In addition to the ISA report, were you given access to

15 other government agency reports and announcements that further

16 clarified that Hamas was, in fact, responsible for this

17 attack?

18 A    Yes, there were.

19 Q    As part of the other sources of information, did you at

20 any point in time have access to Hamas-created memorials of

21 this particular attack, glorifying the terrorists?

22 A    Yes, I did have access to the posters or what we've seen

23 here, which was the beginning of a videotape.

24 Q    Did that further help you cross-check your sources of

25 information for accuracy?

Shaked - Direct - Turner                    1210

1   A    Yes, it did.

2   Q    Did you have an opportunity to investigate the Bus 6

3   bombing in Jerusalem, at a place called French Hill that

4   occurred May 18th, 2003?

5   A    Yes, I examined this terror attack, too.

6   Q    Now, the jury has already had an opportunity to see the

7   videotaped deposition of Mr. Averbach, at the first of the

8   trial; and I realize you were not here, but were you able to,

9   as part of your investigation, identify who the suicide bomber

10  was in this particular attack?

11  A    Yes.

12          MR. TURNER:  May we display the slide for Bus 6

13  bombing?

14          THE COURT:  You may.

15  Q    Who was the suicide bomber that blew up Bus 6?

16  A    At the bottom part of the slide, you can see the picture

17  of Basem Takruri, a very young man, perhaps, 19 or 20, or even

18  younger than that.  He blew himself up on Bus 6 on French

19  Hill.

20  Q    Were you able to determine whether he was acting alone or

21  acting for Hamas?

22  A    He acted on behalf of Hamas.  If I may tell you, this

23  young man wore the clothes of a religious Jewish man.  He wore

24  a yamika, a skull cap, and a black coat to camouflage his

25  identity, and he did this because Hamas demanded him and

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1211

1   requested him to do this.  So he did this for Hamas, and he

2   saw himself as a member of Hamas.

3              MR. TURNER:  Show the witness 3830, please.

4   Q    Do you recognize 3838?

5   A    Yes, I do.

6   Q    What is 3838?

7   A    This is an official claim of responsibility for the

8   bombing of Bus 6 in Jerusalem that was published by Hamas.

9              MR. TURNER:  We offer 3838.

10             THE COURT:  Need a little nor foundation, please.

11  Q    What is the source of 3838?

12  A    The source for this document is the official Internet

13  website of the Qassam Brigades, the military wing of Hamas.

14             THE COURT:  All right.  The document is admitted

15  over objection.

16             (Plaintiffs' Exhibit 3838  was received in

17  evidence.)

18  Q    In addition to the official claim of responsibility by

19  Hamas for the bombing of Bus 6, did you have access to the

20  Israeli Security Agency report previously marked as 3811,

21  which confirmed your findings with regard to claim of

22  responsibility?

23  A    Yes, I did have the opportunity to examine official

24  documents.

25             MR. TURNER:  May we briefly display the portion of

Shaked - Direct - Turner                    1212

1    the ISA report pertaining to this attack?

2            THE COURT:  You may.

3    Q    Did the Israeli Security Agency report help you confirm

4    both the identity of the suicide bomber and Hamas' role in

5    this attack?

6    A    Yes, it was with the help of this report that I could

7    cross-check the information that I had.

8    Q    Did you also have access to other government agency

9    information, such as Prime Minister releases of the ISA

10   report, relating to this particular attack?

11   A    Yes, I did.

12           MR. TURNER:  Would you show the witness 3852,

13   please.

14   Q    Can you identify 3852, sir?

15   A    Yes.

16   Q    What is 3852?

17   A    Yes, this is the sentencing that was given against Omar

18   Sharif, member of Hamas, who fitted the belt and dispatched

19   the suicide bomber who perpetrated the attack on busses.

20           MR. TURNER:  Your Honor, we offer 3852 as Apostilled

21   or certified.

22           THE COURT:  It is received over objection.

23           (Plaintiffs' Exhibit 3852  was received in

24   evidence.)

25   Q    Did you -- in addition to these other sources of

Shaked - Direct - Turner                         1213

1   information we've talked about, did you at some point in time

2   come into possession of a will, a video will, of one of the

3   perpetrators of this attack?

4   A    Yes, I did have access to the long will of the suicide

5   bomber.

6   Q    And what was the source of the video will of the suicide

7   bomber?

8   A    The will was published by the Qassam Brigades, the

9   military wing of a Hamas, after the execution of the attack by

10  Basem Takruri.

11  Q    Did this will, and particularly the words of the suicide

12  bomber himself, help assist you in identifying Hamas as the

13  responsible organization for this attack?

14  A    Indeed, these words helped me.  In particular, the

15  personal words uttered by the terrorists who said I, the

16  living, Shaheed, operate on behalf of Hamas organization in

17  the execution of this attack.

18          MR. TURNER:  Your Honor, we would offer 3863 into

19  evidence and ask that we show the video.

20          THE COURT:  All right.  That is received over

21  objection.

22          (Plaintiffs' Exhibit 3863  was received in

23  evidence.)

24          MR. TURNER:  May we have the lights?

25               (Video played for the jury.)

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                      1214

1          THE COURT:  Can you pause it a minute.

2          Do you need more?

3          MR. TURNER:  Pardon?

4          THE COURT:  Do you need more?

5          MR. TURNER:  No, sir.

6          THE COURT:  Please continue.

7          MR. TURNER:  There's not much more of it.  That's

8    fine.  Could we have the lights?

9    Q    And, finally, as sources of information for the Bus 6

10   suicide bombing on French Hill, did you have access to

11   memorializations, glorifying this particular terrorist that

12   were published by Hamas after the attack?

13   A    Yes, I did receive such materials.

14         MR. TURNER:  Your Honor, we would also offer into

15   evidence 3853, which is the conviction record of Basel

16   Qawasmeh, and it's Exhibit 3853.  It's Apostilled.

17         MR. INGERMAN:  Your Honor, this is one of the ones I

18   think Mr. Osen and I spoke about; they were not going to offer

19   it because it was not in the expert's report.

20         MR. TURNER:  We're not offering it through the

21   witness, I'm just offering the Apostille conviction of Basel

22   Qawasmeh into evidence as a certified copy of the conviction

23   record.

24         THE COURT:  Okay.  Let's have a sidebar, please.

25         (Sidebar held outside the presence of the jury.)

Sidebar                                                        1215

1                          (Sidebar.)

2          THE COURT:  Is it not on a particular exhibit list?

3          MR. INGERMAN:  No, it's on the exhibit list, but it

4     wasn't in the expert's report.

5          THE COURT:  What if they finish this expert, and

6     then offered it not through the expert?  It's an Apostille

7     document.

8          MR. INGERMAN:  I think it's got to come in through a

9     witness.

10         THE COURT:  No, it's self-authenticating.  It

11    doesn't.

12         MR. INGERMAN:  We would object to it.

13         THE COURT:  Overrule the objection.

14                     (Sidebar concluded.)

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct - Turner                    1216

1          (In presence of the jury.)

2          THE COURT:  All right.  That document is received.

3          Continue.

4          (Plaintiffs' Exhibit 3853  was received in

5    evidence.)

6    Q    Mr. Shaked, have you also had the opportunity to

7    investigate the Bus 14A bombing, the suicide bombing that

8    occurred in Jerusalem on Jaffa Road, on June 11, 2003?

9    A    Yes.

10   Q    Were you able to identify the suicide bomber in this

11   attack?

12   A    Yes, I did identify him.

13          MR. TURNER:  May we display the slide?

14          THE COURT:  Yes.

15   Q    Who was the suicide bomber that carried out the attack on

16   Bus 14A, resulting in 17 deaths and 100-plus injuries?

17   A    At the bottom of the slide, you see the picture of Abd el

18   Muati Shabana.  He was a Hamas operative.  He committed the

19   bombing at the bus and committed suicide in it.  You can also

20   identify him by the green bandana he's wearing on his head.

21   Q    Were you able to determine whether Shabana acted alone or

22   whether Shabana was acting for Hamas in carrying out this

23   suicide attack?

24   A    Shabana was member of Hamas, a member of Hamas, and he

25   committed this act in the name of Hamas, on behalf of Hamas,

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1217

1    in the name of Hamas.

2              MR. TURNER:  Show the witness 3866, please.

3    Q    Can you identify 3866?

4    A    Yes, I can identify this document.

5    Q    What is 3866?

6    A    This is a document by the al-Qassam Brigades from the

7    website of Hamas, in which they claim responsibility for the

8    line 14 bombing and tell the story of the suicide bomber.

9              MR. TURNER:  We would offer 3866.

10             THE COURT:  All right.  That's received over

11   objection.

12             (Plaintiffs' Exhibit 3866  was received in

13   evidence.)

14             MR. TURNER:  May we display 3866 very briefly?

15             THE COURT:  You may.

16   Q    Mr. Shaked, when the exhibit comes onto the scene, can

17   you identify for us whether or not the suicide bomber

18   photographed in the Hamas official claim of responsibility is

19   the same individual you identified as the suicide bomber of

20   Bus 14A in Jerusalem?

21   A    Yes, indeed, this is the same picture of Abd el Muati

22   Shabana.

23   Q    Did you, likewise, have access to the Israeli Security

24   Agency report from the investigation of this particular

25   attack, which has been previously marked as 3811?

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1218

1    A    Yes, I had access to the accident report.

2         MR. TURNER:  May we briefly display the section of

3    the ISA report relating to the Bus 14A bombing?

4         THE COURT:  Yes.

5    Q    Did the ISA report identify the same suicide bomber?

6    A    Yes, indeed, it identified the same suicide bomber,

7    Abd el-Muati Shabana.

8         MR. TURNER:  Go back to the original slide, if you

9    will, slide of the attack.

10   Q    The center photograph on the slide, once it pops up, will

11   be of Basel al-Qawasmeh.  We previously marked as and

12   introduced 3853, which was the conviction record of Basel

13   al-Qawasmeh.  Is that the same Basel al-Qawasmeh that

14   participated in this attack as well?

15   A    Yes, the Basel al-Qawasmeh that we see -- whose picture

16   we see in the middle of the slide, with the white head (sic)

17   on his head, is the same Basel al-Qawasmeh who committed the

18   attack and commanded it.

19        MR. TURNER:  Show the witness 3881, please.

20   Q    Can you identify 3881?

21        MR. TURNER:  That's not 3881.  Exhibit 3881.

22   Q    Can you identify 3881?

23   A    Yes, I can.

24   Q    What is 3881?

25   A    Yes, this is the sentencing of Omar Mohammed Sharif, the

1    man who fitted the explosive belt on the body of the suicide

2    bomber and dispatched him to bomb Bus Number 14.

3              MR. TURNER:  We offer 3881 as Apostilled version or

4    certified version of the conviction records for Omar Sharif.

5              THE COURT:  That's received over objection.

6              (Plaintiffs' Exhibit 3881  was received in

7    evidence.)

8    Q    In addition to these other sources of information, did

9    you have an opportunity to locate a will for the suicide

10   bomber in your research?

11   A    Yes.

12   Q    And did you, likewise, have access to any memorialization

13   prepared by Hamas glorifying the suicide bomber for this

14   attack?

15   A    Yes, Hamas did several memorializations for the glory of

16   this attack.

17   Q    Did you also have an opportunity to investigate another

18   shooting attack on Route 60 that occurred on June 20, 2003?

19   A    Yes, I did investigate that.

20   Q    Were you able to determine whether or not Hamas was

21   responsible for this second attack on Route 60?

22   A    Yes, I determined that it was a terrorist from Hamas who

23   perpetrated the shooting on Route 60.

24              MR. TURNER:  May we display the side related to this

25   attack?

Shaked - Direct - Turner                                    1220

1          THE COURT:  Yes.

2    Q    Were you able to identify some of the key individuals

3    involved in this attack through your investigation?

4    A    Yes, I did.

5    Q    Now, there's a group of five individuals across the

6    bottom.  Can you very briefly tell us about this particular

7    attack and the role of these five individuals in the attack?

8    A    This is a group, a squad, of shooters.  They had divided

9    roles between them.  In the center of the picture we see two

10   shooters, Back med al Najab (phonetic/Hebrew) and

11   Faha Sual (phonetic/Hebrew).  The driver was Ahmed Mohammed.

12   He's on the right-hand side on the photograph.  And Yasser

13   Hamed, on the right-hand side, was a lookout and recognizance

14   man.  The commander of this attack was Hide Oma

15   (phonetic/Hebrew), on the left-hand side of the picture.

16   Q    And at the very top, Ibrahim Hamed, we've seen him in a

17   number of the attacks in the last day or so.  What role did

18   Ibrahim Hamed play in this particular Hamas attack?

19   A    Ibrahim Hamed was the commander of Hamas, of -- rather

20   the military wing of Hamas in Ramallah, and he had both to

21   authorize this action and also to give the instruction to

22   execute it.

23          MR. TURNER:  Show the witness 3744, please.

24   Q    Can you identify 3744?

25   A    Yes, I can.

Shaked - Direct - Turner                1221

1          MR. TURNER:  I believe this may already be in

2     evidence, your Honor.

3          THE COURT:  It is, but you were going to unredact

4     the top two lines.

5          MR. TURNER:  Say that again.  I apologize.

6          THE COURT:  You have part of it blacked out above

7     the picture, and I thought we had agreed you were going to

8     submit it, as the defense requested, without those lines in

9     it.

10          MR. TURNER:  That's no problem.  We have no

11     objection to doing that.  We're not going to display it.  I'm

12     just showing this as part of the source of the information he

13     relied on.

14          THE COURT:  That's fine.

15     Q    What is 3744, Mr. Shaked, and how did that help you

16     identify Hamas as responsible for this particular shooting

17     attack?

18     A    This was taken from the official website of Hamas, from

19     their public diplomacy department.  It tells the story of the

20     squad, as Hamas tells it, according to the Hamas narrative,

21     and this was published after the members of the squad were

22     arrested.  And this story, this narrative, as it appeared on

23     the website did help me in checking and making -- very fine

24     (sic) who exited the shooting on Route 60.

25          MR. TURNER:  Your Honor, we would offer into

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1222

1   evidence the following conviction records for four of these

2   individuals, relating to the Route 60 attack on June 20, 2003,

3   Exhibit 4007 of the Hijaz, H-i-j-a-z; 4008, the conviction

4   records of Omar, Route 60 attack; 4009, the conviction records

5   of Hamed, and 4010 Khaled.  The conviction records, all

6   Apolstilled, were certified.

7           THE COURT:  They are received over objection.

8           (Plaintiffs' Exhibit 4007, 4008, 4009, 4010  were

9   received in evidence.)

10  Q    Did you, likewise, have an opportunity to investigate the

11  Bus 2 suicide bombing that occurred in Jerusalem on

12  August 19, 2003?

13  A    Yes, I did.

14          MR. TURNER:  May we display the side?

15          THE COURT:  Yes.

16  Q    Were you able to determine the name or identity of the

17  suicide bomber of Bus 2 that resulted in 23 deaths and a

18  hundred thirty-plus injuries?

19  A    Yes.

20  Q    And before we talk about each of these participants and

21  their role in this attack, can you describe for us the

22  significance of bomb -- of Bus 2 and the route of Bus 2 in

23  Jerusalem at the time of this particular attack?

24  A    Bus Line Number 2 is mostly intended to serve the

25  religious population in Jerusalem.  The aim of this particular

Shaked - Direct - Turner                    1223

1   bus line is to transport people from the Wailing Wall.  This

2   is the holy place for the Jewish people that is located right

3   next to the temple, as it is seen, according to the tradition.

4   And, from there, to transport these people to their homes, in

5   a relatively not so well-to-do neighborhood of religious

6   people in Jerusalem.  It is a very large bus, carrying people,

7   men, woman and children, who go back to their homes from the

8   evening prayer at the Wailing Wall.

9   Q    What did your investigation reveal about Raed Misk, the

10  suicide bomber?

11  A    Raed Misk is a very, very special type of suicide bomber.

12  He was extremely educated.  He was at the very last stages of

13  writing his Ph.D. dissertation at the University of Nablus.

14  After finishing graduating his academic studies, he did his

15  BA/MA at the University of Hebron.  He was a married man.  He

16  had young children.  However, he was extremely religious.  You

17  might even call him fundamentalist.  And he was prepared to

18  carry out the attack in a way that is very hard to describe.

19  He did it with great joy, almost elated.  He was so happy to

20  carry out the murder of people.

21  Q    Now, as part of your investigation, did you have access

22  to video will that was prepared as part of Hamas and

23  distributed by Hamas of Raed Misk?

24          MR. INGERMAN:  Objection, your Honor.

25          MR. TURNER:  It's in evidence, your Honor, as 3912.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1224

1    THE COURT:  Well, the objection, I assume, is to the

2  question.  I'm not seeing what's wrong with the question.  Did

3  he have access to it?

4    MR. INGERMAN:  Its leading.

5    THE COURT:  It's preliminary.  Overruled.

6    THE WITNESS:  Yes, I did have access to this will.

7    MR. TURNER:  Your Honor, at this point, we'd like to

8  show a clip of 3912.  Its different than the clip previously

9  seen, and this goes directly to the part that Mr. Shaked was

10  referencing.

11    THE COURT:  All right.  You may proceed.

12    MR. TURNER:  May we have the lights?

13    THE COURT:  Yes.

14    MR. TURNER:  This is clip two of Exhibit 39.

15    (Video played for the jury.)

16    MR. TURNER:  Can you stop the video for a moment and

17  let me ask a question.

18  Q    Does the headband have any significance, Mr. Shaked, for

19  purposes of relating this gentleman, this terrorist, to Hamas?

20  A    Indeed so.  In the Palestinian society, there are signs

21  and there are symbols for every organization.  This is not a

22  monolithic society, so Hamas or the military wing of Hamas

23  would wear on their heads green headband.  If it was the

24  Fatah, that would be a yellow headband.  If it is the PIJ,

25  Palestinian Islamist Jihad, they would be wearing a black

Shaked - Direct - Turner                    1225

1  bandana.  In the Popular Front for the Liberation of

2  Palestine, which is the more Marxist organization, would wear

3  a red headband.  In other words, the headband is the symbol

4  that identifies and links the individual to the organization

5  he belongs to.

6              MR. TURNER:  Okay.  Mr. Miller.

7                  (Video played for the jury.)

8              MR. TURNER:  That's sufficient.  Could we have the

9  lights.

10 Q    Did that video assist you in connecting the relationship

11 between the terrorists and Hamas?

12 A    Yes.

13 Q    Did your investigation reveal how the terrorist was

14 disguised as he climbed aboard Bus 2 in Jerusalem?

15 A    Yes.

16 Q    How was he disguised?

17 A    Yes.  In order to match the appearance of other people

18 who would board this bus, he made himself look like a

19 religious man.  He had black skull cap like the other

20 residents of the neighborhood who mounted that bus.  They

21 would all have such on their heads.  He was wearing a black

22 coat.  And because he was a heavy man, he could conceal

23 underneath his black coat the explosive belt.  When he boarded

24 the bus, everyone thought that that was yet another resident

25 of the neighborhood, another passenger.  It was late at night,

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1226

1   so it was easy for him to disguise himself.

2          MR. TURNER:  Show the witness 3952, please.

3   Q    Do you recognize 3952?

4   A    I do.

5   Q    What is 3952.

6   A    This is an official claim of responsibility by Hamas

7   organization, or the military wing of Hamas organization, for

8   the perpetration of the attack on Bus Number 2 in Jerusalem by

9   the suicide bomber Rael Misk.

10  Q    What is the source of 3952?

11  A    The source is the official website of Hamas, the military

12  wing of Hamas.

13         MR. TURNER:  We offer 3952 into evidence.

14         THE COURT:  I thought this already came in through

15  Coleman.  Am I wrong?

16         MR. TURNER:  Did I do this earlier?

17         THE COURT:  Not you.  I thought it came in through

18  Coleman.

19         MR. TURNER:  My note doesn't show that.  If it's

20  already in evidence, that's fine.

21         THE COURT:  If it's not, I'll admit it over

22  objection, but I think it's already in.

23         (Plaintiffs' Exhibit 3952  was received in

24  evidence.)

25  Q    Now, in addition to the claim of responsibility, the

Shaked - Direct - Turner                    1227

1   official claim of responsibility by Hamas, did you also have

2   access to Exhibit 1248, which is in evidence, which is a

3   United States Government designation of terrorism that

4   specifically references the Bus 2 bombing in Jerusalem.

5   A    Yes, indeed, this designation was published in the

6   Israeli media, in a very prominent way.

7   Q    How did this particular piece of evidence assist you in

8   not only investigating this bombing but identifying Hamas as

9   one of the -- as the terror group responsible for this attack?

10  A    This piece of evidence is but one piece of a whole

11  picture of many details that I collected.  All together they

12  form the picture which led me to the conclusion that, indeed,

13  Hamas was behind this terror attack.

14  Q    Did you also have access to conviction records of four of

15  the individuals on the slide we were previously looking at?

16  A    Yes.

17          MR. TURNER:  Your Honor, we would offer into

18  evidence the Apostille or certified versions of 3947, which is

19  Nisim Zatari; 3944, the conviction of Majdi Zatari; 3946, the

20  conviction records of Abdallah Sharif Barghouti; and 3945,

21  which are the conviction records of Jalil Ynghmur,

22  Y-n-g-h-m-u-r.

23          THE COURT:  Those are received over objection.

24          (Plaintiffs' Exhibit 3947, 3944, 3946, 3945  were

25  received in evidence.)

Shaked - Direct - Turner                    1228

1   Q    Did those conviction records further inform you about

2   Hamas' role in this attack?

3   A    Yes, this piece of information helped me cross-check the

4   information I had.

5   Q    Did you also have the opportunity to investigate the

6   suicide bombing at a place called Cafe Hillel, in Jerusalem,

7   that occurred September 9, 2003?

8   A    Yes, I did investigate this attack.

9        MR. TURNER:  May we display the slide?

10        THE COURT:  Yes.

11   Q    Were you able to determine the identity of the suicide

12   bomber who carried out the attack on Cafe Hillel, in 2003?

13   A    Yes.

14   Q    Were you able to determine whether he acted alone or

15   whether he was acting for and on behalf of Hamas in carrying

16   out this terrorist attack?

17   A    Ramed abu Saleem (phonetic/Hebrew) was the terrorist of

18   Hamas, a member of Hamas who operated on behalf of Hamas, in

19   the framework of the cell of Hamas, and on behalf of Hamas

20   perpetrated this attack.

21   Q    By way of background, can you tell us what was, back in

22   2003, Cafe Hillel in Jerusalem, and where was it generally

23   located?

24   A    Cafe Hillel is located in a southern neighborhood in

25   Jerusalem, in the German colony.  It is some sort of a yuppie

Shaked - Direct - Turner                    1229

1  neighborhood, where many traditional and young academics live.

2  This neighborhood has many cafes, and in the evenings, many

3  young people and many families attend those cafes, like in any

4  other place.  This specific cafe became very popular even

5  before the attack.  It was very popular among academics and

6  very young people.

7  Q    How far was Cafe Hillel from your office in 2003?

8  A    Two or two-and-a half kilometers away.

9  Q    Did you go to the scene of this attack on the night of

10 the attack?

11 A    Yes, I was in my home, and I rushed over there while

12 still in my slippers.

13 Q    Can you give us an idea of approximately how long it took

14 you to get to the scene after the attack occurred?

15 A    Not more than 15 to 20 minutes, I believe.

16 Q    Were you able to determine who prepared the bomb for this

17 attack?

18 A    Yes.

19 Q    Who prepared the bomb?

20 A    This man is called Baheesh Balel (phonetic), Hamas

21 operative, and he was the man who built the bomb.

22 Q    At some point in time, did you actually have the

23 opportunity to sit down and interview the bomb-maker?

24 A    Yes, I did have this opportunity, and I interviewed him.

25 Q    And during the course of that interview, did you have the

Shaked - Direct - Turner                    1230

1   opportunity to talk with him about this particular attack in

2   Cafe Hillel and how he made the bomb?

3   A    Yes, we did talk about the terror attack in Cafe Hillel

4   and the way he built the bomb.

5   Q    Did you videotape the interview?

6   A    Yes, I did.

7        MR. TURNER:  Show the witness 3993, if you would.

8   Q    Can you identify 3993, please?

9   A    Yes, I can identify it.

10  Q    What is 3993?

11  A    Yes, this is a document of the Qassam Brigades, the

12  military wing of Hamas, taking responsibility for the Cafe

13  Hillel bombing.  And in addition to another attack that

14  happened at the same time, but for our matter, Cafe Hillel is

15  what is important.

16  Q    What is the source of 3993?

17  A    The official website of al-Qassam Brigades, the military

18  wing of Hamas.

19       MR. TURNER:  Offer 3993.

20       THE COURT:  That's received over objection.

21  (Plaintiffs' Exhibit 3993 was received in evidence.)

22  Q    Now, as part of following-up and cross-checking your

23  investigation, did you have access to the ISA report,

24  reporting on the investigation findings of the Israeli

25  Security Agency regarding the Cafe Hillel terrorist attack?

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                              1231

1   A    Yes, I did check ISA reports regarding the Cafe Hillel.

2           MR. TURNER:  May we display 3811, which is already

3   in evidence?

4           THE COURT:  Yes.

5   Q    Did the ISA report assist you in identifying the suicide

6   bomber and some of the participants from Hamas in this attack?

7   A    Yes, indeed, it happened.

8   Q    Did you, likewise, have access to other government

9   records, such as the Prime Minister's records, relating to

10  this particular Cafe Hillel attack?

11  A    Yes, I did.

12  Q    Did those, likewise, confirm your conclusions?

13  A    Every piece of such information is part of the general

14  picture, which later generates my conclusions.

15  Q    Did you also have access to conviction records for some

16  of the participants in this attack?

17  A    Yes.

18          MR. TURNER:  We offer into evidence 3742 and 3987,

19  which are conviction records for Salah Musa, both Apostilled.

20        (Plaintiffs' Exhibits 3742 and 3987 were received in

21                          evidence.)

22          THE COURT:  They are received over objection.

23  Q    Did you also have access to a will prepared by the

24  suicide bomber that was shown through Al Jazerra?

25  A    Yes, I did.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                                    1232

1   Q    Did you have access to any memorializations prepared by

2   Hamas, glorifying the suicide bomber and attack on Cafe

3   Hillel?

4   A    Yes, there were many.

5   Q    Did you also have the opportunity to investigate a

6   shooting attack at a place called Tal Romeda, in October of

7   2003, near Hebron?

8   A    Yes, I had this opportunity.

9   Q    Were you able to identify the shooter in this particular

10  attack?

11  A    Yes, I did.

12        MR. TURNER:  May we display the slide for the Tal

13  Romeda?

14        THE COURT:  You may.

15  Q    Who was the shooter?

16  A    The shooter is a resident of Hebron, a member of Hamas,

17  Rifiq Aqanibi.

18  Q    During the course of your investigation, were you able to

19  determine whether Aqanibi acted by himself or whether he was

20  acting for Hamas in carrying out this attack?

21  A    According to my investigation, Rifiq Aqanibi acted on

22  behalf of Hamas, as member of Hamas and for Hamas.

23  Q    Tell us a little bit about the background of Tal Romeda,

24  where that is, and what is Tal Romeda?

25  A    Tal Romeda is a Jewish settlement in the city of Hebron,

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1233

1  not far from an area that is populated by Palestinians.  This

2  is an area very accessible.  It's easy to get to it.  Normally

3  it is secured by the military, and there are several dozens of

4  families that live in it.

5  Q    What did your investigation reveal about Aqanibi?

6  A    My investigation Aqanibi found that he perpetrated the

7  attack as a member of Hamas, and I'm basing this on the data

8  that I collected, Hamas proclamations, other announcements and

9  the no-how that I have in identifying such people.

10            MR. TURNER:  Can you show the witness 4030, please?

11  Q    Mr. Shaked, can you identify 4030?

12  A    Yes, I can.

13  Q    What is 4030?

14  A    Yes, this is an official announcement by al-Qassam

15  Brigades, claiming responsibility for the Tal Romeda attack.

16  In addition, this report includes details about the suicide

17  bomber, including his will and personal details about him.

18  Q    What is the source of 4030?

19  A    This is from the official site, website, of al-Qassam

20  Brigades, the military wing of Hamas.

21            MR. TURNER:  We offer 4030.

22            THE COURT:  I think I ruled it should be redacted.

23            MR. TURNER:  I think there's portions of it

24  redacted.  We're not going to show the document.  We're just

25  offering it now, subject to your redactions.

Shaked - Direct - Turner                        1234

1          THE COURT:  But you will redact it as previously

2    discussed?

3          MR. TURNER:  Yes.

4          THE COURT:  It's admitted over objection.

5          (Plaintiffs' Exhibit 4030  was received in

6    evidence.)

7    Q    Were you at the scene of this particular attack?

8    A    No, I wasn't in this scene.

9    Q    And have you seen video of this scene?

10   A    Yes, I did.

11         MR. TURNER:  Can you show the witness 4017, please,

12   just the very first part of the news clip?

13   Q    Do you recognize this video as a video that you've seen

14   previously?

15   A    Yes.

16   Q    And can you very generally describe for us what this

17   video shows?

18         MR. INGERMAN:  Your Honor, may we approach?

19         THE COURT:  Yes.

20       (Sidebar held outside the presence of the jury.)

21

22

23

24

25

NICOLE CANALES, CSR, RPR

Sidebar                                                           1235

1              (Sidebar.)

2         MR. INGERMAN:  Your Honor, my notes from your

3    overruling our objection to this video indicate that you had

4    admitted it, because there was a proffer from the plaintiffs

5    that Mr. Shaked was there and, therefore, can authenticate the

6    video.

7         THE COURT:  That's my recollection.

8         MR. TURNER:  That's coming.  He said he wasn't there

9    at the night of the attack, he was there subsequently.

10         THE COURT:  Let's let it get developed.

11              (Sidebar concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shaked - Direct - Turner                    1236

1          (In the presence of the jury.)

2          MR. TURNER:  May I proceed?

3          THE COURT:  You may.

4  Q    Do you recognize the video?

5  A    Yes, I can only see the beginning.

6          MR. TURNER:  Can we show him just a little clip of

7  it, him only, with no voice, no noise?

8          THE WITNESS:  Yes, I recognize it.

9  Q    I couldn't hear you.  I'm sorry.

10 A    Yes, I recognize it.

11 Q    Very generally describe for us what this video relates

12 to.  Don't get into details.  Just very generally what are you

13 seeing on this videotape?

14 A    This shows the impact of shooting on a car, and at the

15 end of the video, we also see a terrorist with a green bandana

16 of Hamas on his head and an AKA-40A (sic) rifle.

17 Q    Have you ever been to the scene of this attack?

18 A    Many times.

19 Q    When?  When was the -- let me ask the question this way.

20 Were you at the scene of this attack on the day of the attack?

21 A    No, I wasn't.

22 Q    When were you at the scene of the attack after the

23 attack?

24 A    About a week later and then several more times.

25 Q    Now, from what you see on this video, can you personally

Shaked - Direct - Turner                    1237

1    identify the scene of this attack?

2    A    Yes, I can identify the street or the alley, which is

3    adjacent to Tal Romeda.

4    Q    Can you identify Yashef (phonetic) news for us?

5    A    Yes, I know this news agency.

6    Q    What is that news agency?

7    A    Yes, this is a news agency that belongs to the settlers

8    in Samaria.  It covers security events in the West Bank.

9    Q    Given your investigation of this particular attack,

10   including the fact that you've been to the scene and that you

11   know this particular alleyway, can you identify with accuracy

12   that the person on the videotape is the suicide bomber on --

13   suicide shooter you had previously identified on your slide?

14   A    I was not at the scene, at the time, but I can evaluate

15   through the video that this is the same man who committed the

16   attack.

17            MR. TURNER:  May we show this brief clip?

18            THE COURT:  No.

19   Q    Have you, likewise, seen memorializations by -- published

20   by Hamas, glorifying this suicide shooting?

21   A    Yes, I did.

22   Q    And did that help inform your ultimate conclusions about

23   Hamas' role in this particular attack?

24   A    Yes, it assisted me in reaching this conclusion.

25   Q    Have you likewise had the opportunity to investigate the

Shaked - Direct - Turner                1238

1  Bus 19 suicide bombing that occurred in Jerusalem, in January

2  of 2004.

3  A    Yes, I did.

4         MR. TURNER:  May we display the slide?

5         THE WITNESS:  It was in January 2004.

6         MR. TURNER:  May we display the slide?

7         THE COURT:  Yes.

8  Q    Were you able to identify the suicide bomber in the Bus

9  19 attack?

10  A    Yes, I did identify him.

11  Q    And were you able to determine whether or not the suicide

12  bomber acted alone, or whether the suicide bomber was acting

13  by or on behalf of Hamas?

14  A    This terrorist did not act alone, and, in this case, he

15  was not only acting on behalf of Hamas, but also on behalf of

16  the al-Qassam Brigades that belong to Fatah.

17  Q    On your slide, you've got a division, on the left-hand

18  side with the green, Hamas' role, and on the right-hand side,

19  al-Aqsa Martyrs Brigade (AAMB) role.

20         Can you explain to us when you found about Hamas'

21  role in this particular attack.

22  A    With your permission, I would like to explain something.

23  I will begin with the suicide bomber.  He volunteered to

24  Hamas, asked to be part of Hamas.  He prepared for that

25  bombing within the Hamas organization, including preparing a

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                          1239

1   video will, which he had read, including fitting him with an

2   explosive vest, and then he was transferred to the Israel

3   territory, but he was stopped at the roadblock.  The two

4   people in the left-hand side of the slide are members of

5   Hamas, Nufal Adawin and Muhammad Nashash.  Nashash was the one

6   who prepared the explosive belt, and Adawin prepared the

7   suicide bomber toward this Hamas attack, which, as I

8   explained, was not -- the end was not carried out.  He was

9   stopped at the very last moment, when he was already with the

10  explosive belt on his body.

11  Q    So did the bombing not occur?

12  A    This terror attack, as it was planned by Hamas, was not

13  carried out.

14  Q    So there was no bombing that occurred?

15  A    There was a bombing, but it was carried out by another

16  organization.

17  Q    Is that the al-Aqsa Martyrs Brigade shown on the other

18  slide?

19  A    Yes, it was carried out by al-Aqsa Martyrs Brigade

20  people.

21  Q    Now, explain how these two organizations, given your

22  investigation, how this suicide bombing was carried out?

23  A    I would like to first of all emphasize that this is not a

24  joint venture of those two organizations.  It's only a shared

25  claim of responsibility.  Because after the planning of the

Shaked - Direct - Turner                    1240

1   attack and after the fact that it was intercepted for security

2   reasons that I have mentioned earlier, the Fatah people have

3   located this Jaara and saw him as the potential suicide

4   bomber.  It was very, very easy, therefore, to mobilize him

5   for the mission, because he had already undergone the

6   preparations in Hamas.  Ali Jaara was the ripe fruit in the

7   hands of the al-Aqsa Martyr Brigade; therefore, from the

8   minute he was found, and, therefore, later dispatched, they

9   didn't need too much preparation.  They simply found the right

10  moment, they fitted him with explosive belt, transported him

11  to Jerusalem to carry out the attack.

12          This is why I see here a double responsibility, a

13  shared, a joint responsibility, both Fatah, a joint

14  responsibility for this attack, because without this basic

15  important preparation carried out by Hamas, I doubt whether

16  this terror attack would have been executed.  And it was

17  executed because the suicide bomber was already prepared to

18  carry out the attack.  I cannot determine whether he did this

19  with the fate of Hamas in his heart, because he is no longer

20  here; he is elsewhere.

21          The picture we can see, the bottom of the slide, the

22  way he was dressed in the Hamas clothes; behind him there's a

23  Hamas flag, and in his hand, the way I know the picture and

24  the video, he's holding the book of Quran, and the will was

25  written in his name as a member of Hamas.

Shaked - Direct - Turner                           1241

1   Q    Now, were -- the two Hamas operatives shown on your

2   slide, Adawin and Nashash, were they ultimately convicted?

3   A    Yes, they were both convicted by the Israeli court.

4           MR. TURNER:  Your Honor, we would offer 4044 and

5   4045 as the Apostille or certified copies of convictions of

6   Adawin and Nashash.

7           THE COURT:  Received over objection.

8           (Plaintiffs' Exhibit 4044, 4045  was received in

9   evidence.)

10          MR. TURNER:  Show the witness 4049, please.

11  Q    Can you identify 4049?

12  A    Yes, I do.

13  Q    What is 4049?

14  A    This document is the official claim of responsibility by

15  Hamas organization for the bombing of Bus 19 by the suicide

16  bomber Ali Jaara.

17  Q    And what is the source of 4049?

18  A    The source is the official website of Hamas organization,

19  its military wing Qassam Brigade.

20          MR. TURNER:  We offer 4049.

21          THE COURT:  That's received over objection.

22          (Plaintiffs' Exhibit 4049  was received in

23  evidence.)

24  Q    Did you likewise have access to an ISA report, confirming

25  your assessment Hamas did, in fact, play a role in carrying

1   out this attack?

2   A    Yes.

3   Q    And did you likewise have access to other government

4   agency records, including from the Ministry of Foreign

5   Affairs, and also the Prime Minister's Office that further

6   confirmed Hamas' role in carrying out this terrorist attack?

7   A    Yes, I did have the opportunity to see these documents

8   that confirmed the part Hamas played in this terrorist attack.

9   Q    Did you likewise have access to a will of Ali Jaara

10  prepared by Hamas prior to this attack?

11  A    Yes.

12  Q    And did you likewise have any access to any

13  memorializations glorifying Ali Jaara, prepared by Hamas, as a

14  result of this attack?

15  A    Yes, indeed, Hamas published various memorialization

16  materials in memory of Ali Jaara, being a member of Hamas.

17           MR. TURNER:  Would you like to take a morning break,

18  or would you like me to move into the 24th attack?

19           THE COURT:  And then you'll ender that?

20           MR. TURNER:  Yes, sir.

21           THE COURT:  Let's go ahead.

22  Q    Did you have an opportunity to investigate the mortar

23  attack on September 24, 2004, at a place called Neve Dekalim?

24  A    Yes, I did investigate it.

25  Q    Now, first of all, tell us where Neve Dekalim is and the

Shaked - Direct - Turner                          1243

1    significance of that city.

2    A    Neve Dekalim is a settlement in the Gaza Strip.  It is a

3    relatively medium-sized locality that is at the distance of

4    sometimes dozens or hundreds of meters away from Palestinian

5    homes in the Gaza Strip.  This place no longer exists because

6    it was evacuated, by the way.

7                MR. TURNER:  May we display the slide for this

8    attack?

9                THE COURT:  Yes.

10   Q    First of all, can you describe for us -- in the context

11   of your investigation, were you able to identify specifically

12   who, the persons, in other words, that launched the mortars

13   into Neve Dekalim?

14   A    One must remember that this particular terror attack,

15   that firing of mortars, is very different from all the others

16   that we have discussed so far; from the shooting attacks, from

17   laying bombs, and definitely, most certainly, from attacks

18   carried out by suicide bombers.  Such an attack is carried out

19   from a distance.  They launch the mortars, and in most cases

20   we cannot see who exactly launched that fire.  It is hard to

21   determine who, specifically, the names of those people who

22   carried out the attack.  Such details, if at all, can be

23   obtained not in every case by intel operations.

24   Q    Now, in this particular attack, did you have access to

25   any government records relating to the investigation, for

Shaked - Direct - Turner                    1244

1   instance, the ISA report?

2   A    In this case, I have to mention that I did see another

3   report that was published by the Prime Minister's Office.  It

4   was not attached to my report because I only discovered it

5   after completing writing my report.  In this report, they

6   disclose the killing of a terrorist.

7              MR. INGERMAN:  Objection, your Honor.  Move to

8   strike.

9              MR. TURNER:  That's not in evidence.  Let me -- I

10  have to ask the question first.

11             THE COURT:  For the record, the objection is

12  sustained.

13             MR. TURNER:  Explain to him that he can't answer

14  that question.

15  Q    Now, during the course of your investigation, Mr. Shaked,

16  were you able to conclude that Hamas played a role in this

17  particular mortar attack?

18  A    Yes.

19  Q    And what is your conclusion?

20  A    Hamas published his official claim of responsibility for

21  this terror attack carried out in Neve Dekalim.  The claim of

22  responsibility was on the very same day that the terror attack

23  was conducted.

24             MR. TURNER:  Show the witness 4073, please.

25  Q    Can you identify 4073?

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                          1245

1  A    Yes, I can recognize it.

2  Q    And what is 4073?

3  A    In the upper part of this slide, you can see the official

4  claim of responsibility made by Hamas organization, stating

5  that it carried out the mortar fire attack on 24th September

6  2004 at 10:50 in the morning, and that was the Friday morning.

7           MR. TURNER:  Okay.  If we can offer that into

8  evidence, 4073.

9           THE COURT:  Need a better foundation.

10 Q    What is the source of 4037, sir?

11 A    The official website of Qassam Brigade, the military wing

12 of Hamas.

13          THE COURT:  That is received over objection.

14          (Plaintiffs' Exhibit 4037  was received in

15 evidence.)

16          MR. TURNER:  May we display 473, the translated

17 investigation?

18          THE COURT:  Yes.

19          MR. TURNER:  If you can blow up the description once

20 it gets up on the screen, please.  That's fine for right now.

21 Q    First of all, Mr. Shaked, do you recognize the logo, the

22 emblem?

23 A    I recognize the logo, yes.

24 Q    And of what organization does that logo or emblem belong?

25 A    This logo belongs to Qassam Brigades, military wing of

Shaked - Direct - Turner                    1246

1  Hamas.

2  Q    The date 9/24/2004, is that the date of the mortar attack

3  at Neve Dekalim?

4  A    Indeed so.

5  Q    Now, are the facts that are described in the first

6  sentence -- specifically the Qassam Brigades claims full

7  responsibility for an operation of firing three 100-millimeter

8  mortar shells in the direction of the Neve Dekalim settlement,

9  at exactly 10:30 a.m. today, is that consistent with what your

10 investigation found, in terms of what transpired?

11 A    Yes, it is consistent with my findings.

12 Q    The sentence -- two sentences down from that, the

13 al-Qassam Brigades have already announced the mortar shells

14 were fired at the aforementioned settlement in proclamation

15 number 107/0409, which was issued at exactly 10:50 on Friday

16 morning, 10th of Shabon 1425, Hitiri 92404.  Did you have

17 access to that proclamation?

18 A    Yes, I did have such access.

19 Q    And did that likewise confirm that Hamas played a role in

20 this particular attack?

21 A    Yes.

22        MR. TURNER:  Could you show the witness 4034,

23 please.

24 Q    Can you identify 4074?

25 A    Yes.

NICOLE CANALES, CSR, RPR

Shaked - Direct - Turner                    1247

1   Q    What is 4074?

2   A    This is the claim of responsibility for the terror attack

3   carried out at 10:30 on Friday, on the date of

4   September 24th, 2004.

5   Q    What is the source of 4074?

6   A    The official website of Qassam Brigades, the military of

7   Hamas.

8            MR. TURNER:  We offer 4074.

9            THE COURT:  That is received over objection.

10           (Plaintiffs' Exhibit 4074  was received in

11   evidence.)

12   Q    Now, based upon your investigation, did you have anything

13   in terms of conviction or other government records, other than

14   what you've already mentioned, or memorializations for this

15   particular attack available for you to review?

16   A    No, I didn't have any other terms of Hamas.

17   Q    Now, based upon the information that you did have access

18   to, were you able to conclude what with a reasonable degree of

19   probability whether Hamas played a role in the mortar attack

20   at Neve Dekalim?

21   A    We were talking about standard mortar bombs that were put

22   into use right at that time by Hamas.  Hamas was the

23   organization, the only one that smuggled them into the Gaza

24   Strip, and was the only organization to use such bombs.  So

25   this is yet another indication linking Hamas with the attack,

1  along with the official claim of responsibility it issued.

2  Q    As a result of your work on these 24 attacks -- it's

3  been, what, a day and a half almost two days since we began

4  going through all 24 attacks.  Have you had an opportunity to

5  prepare charts that summarized the sources of information that

6  you had access to for each of the 24 attacks?

7  A    Yes, I have.

8         MR. TURNER:  Could you put the first chart in front

9  of the witness?

10  Q    Can you identify these charts?

11  A    Yes, I recognize what I have on my screen.

12  Q    Were you able to put check marks in each of the

13  categories, running from left to right, across the top?

14         MR. TURNER:  You can go ahead and put the check

15  marks in for him.

16         THE WITNESS:  The sources that I have used, yes.

17  Q    And do -- these sources that you have checked off, do

18  they constitute a summary of all the sources you had available

19  for each of the given attacks?

20  A    I do hope that I have used all the sources that were

21  available to me and that I could reach in the period when I

22  wrote the report.

23  Q    You've done this for each of the 24 attacks?

24  A    For each of the attacks.

25         MR. TURNER:  Your Honor, we would like to offer

Shaked - Direct - Turner                    1249

1   these three charts with the check marks, pursuant to Rule

2   1006, as summary charts.

3          THE COURT:  All right.  It's admitted over objection

4   as a summary.

5          (Plaintiffs' Exhibit 1006  was received in

6   evidence.)

7          MR. TURNER:  And one moment, please.

8                 (Pause in proceedings.)

9          MR. TURNER:  The next in line number is 4790.  And

10  may we display this very quickly?

11         THE COURT:  Yes.

12  Q   Display the first page, if you would, with the check

13  marks.  And we have one of these pages for each attack; is

14  that correct, sir.

15  A   That is correct.

16         MR. TURNER:  Your Honor, with that, I pass the

17  witness -- there is one thing that -- I was given a note a

18  while ago.  We offer into evidence as Exhibit 37-E3, and this

19  is from the Kiryat Arba attack, the conviction records for

20  al-Din Misk, which are Apostille.

21         THE COURT:  Those are received over objection.

22         MR. TURNER:  And with that, I pass the witness.

23         THE COURT:  Ladies and gentlemen, let's take our

24  morning break.  Please don't talk about the case amongst

25  yourselves or anyone else.  We will reconvene at 11:30.  See

Shaked - Direct - Turner                    1250

1   you in just a few minutes.

2              (Outside the presence of the jury.)

3              THE COURT:  The witness may step down, and everyone

4   can sit.

5              One thing I want to raise with the parties, we had

6   talked about sitting on September 9th, and we had agreed that

7   Ms. Clark would approach the jury and see if they had any

8   problems with that.

9              MR. WERBNER:  Was the 5th, wasn't it?

10             THE CLERK:  The 5th.

11             THE COURT:  Friday, I'm sorry.  Juror Number 9 has a

12  problem.  We don't know the nature of the problem.  I'd like

13  the parties' permission to talk to her privately and see if I

14  can persuade her to reschedule whatever she has that day.  Is

15  that okay?

16             MR. WERBNER:  Yes, sir.

17             MR. STEPHENS:  Okay.

18             THE COURT:  Let's see what I can do.

19                  (Recess in proceedings.)

20        (Proceedings continued on the following page.)

21

22

23

24

25