# Exhibit 8

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ----------------------------------x
 3   MOSES STRAUSS, et al.,

 4                  Plaintiffs,

 5       -against-

 6   CREDIT LYONNAIS, S.A.,

 7                  Defendants.
     ----------------------------------x
 8   BERNICE WOLF, et al.,

 9                  Plaintiffs,

10       -against-

11   CREDIT LYONNAIS, S.A.,

12                  Defendants.
     ----------------------------------x
13

14                  One Liberty Plaza
                    New York, New York
15
                    September 1, 2010
16                  9:27 a.m.

17

18           Videotaped Deposition of Expert

19   Witness, MATTHEW LEVITT, before Shari Cohen,

20   a Notary Public of the State of New York.

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                 REF: 93800
```

```
 1  A P P E A R A N C E S:

 2

 3  OSEN, LLC

 4  Attorneys for Plaintiffs

 5       345 Seventh Avenue

 6       New York, New York  10001

 7  BY:  JOSHUA D. GLATTER, ESQ.

 8       PHONE  646-380-0480

 9       FAX    646-380-0471

10       EMAIL  jdg@osen.us

11

12

13  OSEN LLC

14  Attorneys for Plaintiffs

15       700 Kinderkamack Road

16       Oradell, New Jersey  07649

17  BY:  ARI UNGAR, ESQ.

18       PHONE  201-265-6400

19       FAX    201-265-0303

20       EMAIL  au@osen.us

21

22

23

24

25
```

```
 1  A P P E A R A N C E S (CONT'D):

 2

 3  KOHN, SWIFT & GRAF, P.C.

 4  Attorneys for Plaintiffs

 5       One South Broad Street

 6       Philadelphia, Pennsylvania  19107

 7  BY:    STEVEN M. STEINGARD, ESQ.

 8         PHONE  215-238-1700

 9         FAX    215-238-1968

10         EMAIL  ssteingard@kohnswift.com

11

12  CLEARY GOTTLIEB STEEN & HAMILTON LLP

13  Attorneys for Defendants

14       One Liberty Plaza

15       New York, New York  10006

16  BY:    AVRAM E. LUFT, ESQ.

17         BRENDAN H. GIBBON, ESQ.

18         JAMIE RIETEMA, ESQ.

19         EMILY PICONE, ESQ.

20         PHONE  212-225-2432

21         FAX    212-225-3999

22         EMAIL  aluft@cgsh.com

23

24  ALSO PRESENT:

25  DAN MACOM, Videographer
```

```
 1                    LEVITT
 2   technically a state of war.  Hamas is not a
 3   sovereign state, etc., etc., etc., but there
 4   is an on going --
 5         Q.    They shoot bullets at each
 6   other?
 7         A.    Unfortunately Hamas shoots more
 8   than bullets and Israel responds.  There is a
 9   conflict.
10         Q.    Israel shoots --
11               MR. GLATTER: Were you finished
12         with your answer?
13         A.    I don't remember anymore so go
14   ahead and ask your question.
15         Q.    Israel shoots more than bullets
16   also?
17         A.    Sure.
18         Q.    So we'll use -- is conflict
19   okay for describing this mutual exchange of
20   ammunition?
21         A.    Yes and involves more than just
22   Hamas, there's other parties involved too.
23   May it all end speedily in our day.
24         Q.    I hope so, I really do.  The
25   Palestinian authority has conflicts with
```

1                    LEVITT
2    Hamas?
3         A.    The Palestinian authority has
4    and is today in a different type of conflict
5    with Hamas.  It also at times has been hand
6    and glove with Hamas.  At times cooperating
7    and participating in violence and at times
8    politically cooperating, but most of the time
9    in their history and in recent history, by
10   recent history I mean things beyond the time
11   period involved here, there has been
12   particularly acute conflict with the exchange
13   of ammunition you described between elements
14   of the Fatah led Palestinian authority now
15   dominating the West Bank and Hamas dominating
16   the Gaza Strip.
17        Q.    When speaking to Israeli
18   sources, what do you do to determine that
19   they are not giving you opinions based on
20   their own self interest of saying things
21   which might be disadvantageous to Hamas?
22             MR. GLATTER: Objection as to
23        form.
24        A.    There really is nothing I can
25   do.  Well, there's very little I can do when

```
 1                    LEVITT
 2   interviewing anybody whether it's a Hamas guy
 3   or an Israeli to prevent them from saying or
 4   not saying something.  You develop interview
 5   skills, you try to move the interview in a
 6   certain direction, but the other -- the issue
 7   is they will share information with you, some
 8   of it is stuff they want you to hear and to
 9   use, some maybe if you are a good interviewer
10   they were not inclined to share but you got
11   it out of them and then you need to go and
12   engage in the vetting process.
13              You hopefully -- I certainly
14   have collected documents and conducted other
15   interviews and collected a body of
16   information against which you can measure and
17   I have had instances, many, many instances on
18   every conceivable side of this conflict where
19   I have procured information through
20   interviews that I have not used because it
21   was entirely unverifiable including didn't
22   fit into the body of existing knowledge, etc.
23   and sometimes there will be information that
24   you cannot verify this anecdote, you can't,
25   they clearly got it from methods I'll never
```

```
 1                    LEVITT
 2            (Record read.)
 3            MR. GLATTER:  Objection to
 4       form.  I appreciate you're expediting
 5       the deposition, but you were speaking
 6       kind of fast so objection as to form.
 7       You may answer.
 8       A.    Yes.
 9       Q.    When you state in your first
10  sentence what's written there that funds
11  supporting any part of Hamas free up existing
12  monies to support its terrorist activities,
13  could you explain to me what you mean by
14  that?
15       A.    There is this idea that's
16  sometimes described as principal of
17  fungibility of funds so if you provide me $10
18  for whatever, it theoretically frees up $10
19  that I have for something else.  In the case
20  of a group like Hamas that's engaged in
21  social welfare activities and is also engaged
22  in political activities and is also engaged
23  in military and terrorist activities, if you
24  provide sums of money to the overt parts of
25  the organization which is the social welfare
```

```
 1                     LEVITT
 2   or da'wa side and the political side, that
 3   may free up money that the organization can
 4   then spend on its covert illicit activities
 5   such as the terrorism and military activities
 6   and this is something that's -- that's a good
 7   answer.
 8          Q.    When you say funds supporting
 9   any part of Hamas, included within Hamas do
10   you include the entire Hamas da'wa?
11          A.    That's part of Hamas.
12                MR. GLATTER: Objection to
13          form.
14          Q.    As you defined it?
15          A.    That's part of Hamas.
16                MR. GLATTER: Withdraw the
17          objection.  Thank you.
18          Q.    So if an entity that fundraises
19   for Hamas receives a contribution, in your
20   opinion that would free up money for
21   terrorist activities by Hamas's military arm?
22                MR. GLATTER: Objection as to
23          form and to the extent as phrased the
24          question is hypothetical.  It's an
25          incomplete hypothetical.  You may
```

```
 1                    LEVITT
 2        answer.
 3        A.    I just want to clarify because
 4   I think we may be mixing.  When we were
 5   talking a second ago about the da'wa which
 6   generally refers to the charities and social
 7   service organizations within the territories,
 8   the way the last question was phrased it
 9   could be interpreted as referring to some of
10   the charities that support Hamas outside.
11        Q.    Let me clarify, within the
12   territories?
13        A.    Forgive me, repeat or read back
14   the original question.
15        Q.    Sure.  If an entity within the
16   territories that fundraises for Hamas
17   receives a contribution, in your opinion
18   would that necessarily free up money for
19   terrorist activity by Hamas military arms
20   under the theory of fungibility?
21        A.    The theory of fungibility is
22   that it could, it doesn't assert that you
23   necessarily know that it does, A.  B, the way
24   the question is asked it presumes that the
25   entities that are raising money for Hamas are
```

```
 1                     LEVITT
 2   separate and apart from the other elements,
 3   it's as if the fundraising happens here by
 4   some entity that's raising funds for Hamas
 5   over here and in fact with the 12 we're
 6   talking about and others, it's messier than
 7   that.  They will be raising funds, they will
 8   be receiving funds even more often. Some of
 9   these will provide funds that they received
10   then on to other charity committees.
11   Certainly for the 12 we're talking about and
12   generally as a statement as it happened, yes.
13           Q.    If I could ask you to look at
14   page 13.  I unfortunuately have a slightly
15   mixed up version of your original report and
16   supplemental report on the first pages so if
17   the page numbers are wrong let me know?
18           A.    We'll figure it out.
19                 MR. GLATTER: Do you want to
20        use one of our copies of the exhibit?
21                 MR. LUFT: No, I'm using this
22        one because I wrote on it.  I have a
23        clean copy, but thank you.
24                 MR. GLATTER: Understood.
25           Q.    Do you see the sentence Hamas
```

```
 1                     LEVITT
 2   deems legitimate the mingling of these funds,
 3   as it considers the social services it
 4   provides a jihadist extension of its
 5   terrorist attacks?
 6          A.    Yes.
 7          Q.    What do you mean by mingling of
 8   these funds?
 9          A.    The intentional -- it's not
10   like there are separate accounts or separate
11   entities where money is collected for and
12   stored for education or health clinics or uzi
13   submachine guns, etc. By muddying the waters
14   or mingling the funds together Hamas does
15   itself a great benefit or multiple benefits.
16   It's a brilliant strategy and they certainly
17   see it as legitimate to do this to mingle the
18   funds.
19          Q.    You say that not having
20   separate accounts, each of the 12 entities
21   had its own bank accounts, correct?
22          A.    I assume.
23          Q.    Do you know if they had their
24   own bank accounts?
25          A.    I recall from the accounting
```

```
 1                    LEVITT
 2   report, what's his name that we referred to
 3   earlier?
 4              MR. GLATTER: Geisser.
 5        A.    Thank you, that there were
 6   specific accounts, I don't know if it was one
 7   or more, but yes, they each have accounts.
 8        Q.    Those were not Hamas accounts,
 9   those were accounts in the name of each of
10   the 12 entities, correct?
11              MR. GLATTER: Objection as to
12        form.
13        A.    You pitched your voice at the
14   end and added a correct question mark at the
15   end, but I would say it's more of a statement
16   than a question.  Again, none of these 12
17   have a Hamas shingle outside. I don't think
18   that means they are not part of Hamas and I
19   would argue that giving funds to these
20   charities is giving funds to Hamas.
21        Q.    But when you say they don't
22   have separate accounts for uzis verses
23   medical or kindergarten, each of these
24   entities in fact did have a separate bank
25   account for itself, correct?
```