# Exhibit 10

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ------------------------------------x
 3   MOSES STRAUSS, et al.,

 4                        Plaintiffs,

 5        -against-

 6   CREDIT LYONNAIS, S.A.,

 7                        Defendants.
     ------------------------------------x
 8   BERNICE WOLF, et al.,

 9                        Plaintiffs,

10        -against-

11   CREDIT LYONNAIS, S.A.,

12                        Defendants.
     ------------------------------------x
13

14                        One Liberty Plaza
                          New York, New York
15
                          September 28, 2010
16                        9:40 a.m.

17

18           Videotaped Deposition of Expert

19   Witness, EMANUEL GROSS, before Shari Cohen,

20   a Notary Public of the State of New York.

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF: 94668
```

```
 1   A P P E A R A N C E S:

 2


 3   OSEN LLC

 4   Attorneys for Plaintiffs

 5           700 Kinderkamack Road

 6           Oradell, New Jersey   07649

 7   BY:     AARON SCHLANGER, ESQ.

 8           PHONE   201-265-6400

 9           FAX     201-265-0303

10           EMAIL   au@osen.us

11


12


13   SHALOV STONE BONNER & ROCCO LLP

14   Attorneys for Plaintiffs

15           260 Madison Avenue

16           New York, New York 10016

17   BY:     RALPH STONE, ESQ.

18           PHONE   212-239-4340

19           FAX     212-239-4310

20           EMAIL   rstone@lawssb.com

21

22

23

24

25
```

```
 1   A P P E A R A N C E S (CONT'D)

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4   Attorneys for Defendants

 5        One Liberty Plaza

 6        New York, New York  10006

 7   BY:    LARRY FRIEDMAN, ESQ.

 8          EMILY PICONE ECKSTUT, ESQ.

 9          PHONE  212-225-2432

10          FAX    212-225-3999

11          EMAIL  aluft@cgsh.com

12

13

14   ALSO PRESENT:

15   DAN MACOM, Videographer

16

17

18

19

20

21

22

23

24

25
```

```
 1                         GROSS

 2          A.     Okay.

 3          Q.     Let's read the whole paragraph.

 4    "From observations that the organization

 5    B'Tselem conducted during the same period, it

 6    appears that the majority of the trials are

 7    not based on witness testimony while

 8    convictions are based on confessions by the

 9    accused.  This finding casts great doubt on

10    the conclusion that proceedings before

11    military courts indeed lead to a just trial

12    notwithstanding the provisions we have

13    already discussed that apply the rules of

14    procedures and evidence prevailing in Israeli

15    law to the military courts."  You said

16    earlier to your understanding 80 percent of

17    the convictions are based on confessions,

18    correct?

19          A.     On plea.

20          Q.     This statement by you that the

21    prevalence of confessions casts great doubt

22    on the conclusion that the proceedings indeed

23    lead to a just trial, that remains an

24    accurate observation by you not only in 2004,

25    but also 2005 and 2006, correct?
```

1               GROSS

2               MR. STONE: Objection to form.

3          A.     Not quite.  I want to explain.

4   What I was referring to the observation to

5   the report of the B'Tselem is that the

6   differences between the civil judicial system

7   and the military system grow some doubt or

8   the ability of the military court to provide

9   the same standard of justice.

10          Q.     There were no changes that were

11  made with respect to the prevalence of

12  confessions in 2005 or 2006, correct?

13          A.     I don't know, but once again

14  you are using the term confession and I would

15  prefer to use the term of plea bargain or

16  plea, but I also observed before that it's

17  not unique to the military system, by the

18  way, it's the same here in America.

19          Q.     By plea you mean pleas which

20  are based on a confession to the crime to

21  which the defendant pleas?

22          A.     Yes.

23          Q.     You then continue with another

24  quotation from Mr. Cox, correct, beginning

25  with the words contrary to the civil court's

```
 1                        GROSS

 2    court must also find sufficient corroborative

 3    evidence to establish guilt, correct?

 4         A.    Correct.

 5         Q.    That rule was in place at the

 6    time you wrote what you wrote on page 466 of

 7    your book?

 8         A.    Yes.

 9         Q.    Let's go on to the next point

10    that you make here and that is about the use

11    of informers.  You write quote in this area

12    of violations --  actually you quote Mr. Cox

13    saying --

14                MR. STONE: Where are you?

15         Q.    I'm on page 466 continuing in

16    the same paragraph.

17         A.    Just a moment, please.

18         Q.    The first full paragraph on the

19    page you write -- you quote Mr. Cox's

20    statement that "In this area of violations

21    there is another factor fundamental and no

22    less complex from those that follow it. The

23    investigators discover most of the violations

24    using informers. People confess everything

25    and from confession to confession they
```

1                    GROSS

2    incriminate other people. This is very

3    dangerous and uncertain to decide the fate

4    of a person on the basis of an informer and

5    indictments are presented on the basis of

6    these informers. This is a chain reaction;

7    informer indictment confession punishment",

8    do you see that?

9          A.    Yes.

10         Q.    You relied on this observation

11   by Mr. Cox again for your same point about

12   there being great doubt on the conclusion

13   that proceedings before military courts

14   indeed lead to a just trial, correct?

15                MR. STONE: Objection to form.

16         Q.    That's why you offer this

17   quotation?

18         A.    Yes, but I do want to add

19   something here just to clarify my points.  I

20   had my criticism about how to improve the

21   system.  It doesn't mean that at the time I

22   wrote it or afterwards the judges were not

23   able to make a fact finding process or to

24   follow that kind of process that will enable

25   them, you know, to get to a just result, but

```
 1                    GROSS

 2    the same criticism I had also with the civil

 3    judicial system because I was not happy that

 4    according to the English system as different

 5    from the European system the judge is able to

 6    convict a person just based on his confession

 7    alone.

 8          Q.    Now the last part of this

 9    paragraph refers to the differential in

10    punishment and you quote Mr. Cox as saying,

11    "And if we mention punishment, the level of

12    punishment too does not give rise to equal

13    justice.  When a Jew kills an Arab he can

14    receive a year in prison.  When an Arab

15    throws a stone and no damage is caused he

16    receives a similar penalty. This is not a

17    just trial."  You quote Mr. Cox's statement

18    to that effect?

19          A.    And I agree.

20          Q.    And you agree with it.  If we

21    go to the next paragraph you wrote, "This is

22    the practical result of a military trial

23    that's different in composition from a

24    regular civil trial even when it purports to

25    apply procedures that are similar to the
```

1                    GROSS

2    procedures that apply in the regular civil

3    courts.  The outcome is deep erosion in the

4    basic right of every defendant to a fair

5    trial.  Such an outcome contradicts the

6    tenets of a democratic state."  You wrote

7    that in 2004, correct?

8         A.    Yes.

9         Q.    The only change in that

10   observation by you with respect to 2005 and

11   2006 would be as a result of the amendments

12   we discussed as to the qualifications of

13   judges and how they are appointed, correct?

14        A.    Yes, but I do think that there

15   is -- I mean the whole idea, the whole reason

16   for this amendment is what was my criticism.

17        Q.    Okay and if you look at the

18   last paragraph here which begins with the

19   words what will be the result?

20        A.    Yes.

21        Q.    You say, "What will be the

22   result in a case where not only is the

23   component that is judged terrorists different

24   from the component that sits in the regular

25   civil system, but also where the law allows

```
 1                    GROSS

 2          Professor Gross' testimony that all

 3          the opinions he intends to express in

 4          these cases are stated in his report,

 5          I have no further questions. If that

 6          changes, I will object but if that

 7          objection is overruled, I will have

 8          more questions for Professor Gross.

 9          Thank you, Professor Gross.

10                  THE WITNESS: Thank you.

11                   MR. STONE: We have a handful

12          of questions.

13   EXAMINATION BY

14   MR. STONE:

15          Q.    Professor Gross, in your

16   opinion should an Israeli Civil Court

17   recognize a conviction from a military court

18   in the occupied territories from the year

19   2002?

20                   MR. FRIEDMAN: Objection to

21          form.

22          A.    Yes.

23          Q.    How do you reconcile this view

24   with your testimony earlier today concerning

25   the fairness of military courts that you gave
```

1                        GROSS

2     when you were being questioned by Mr.

3     Friedman concerning your book?

4                    MR. FRIEDMAN: Object to the

5          form.

6          A.    As I tried to explain there are

7     various degrees of fairness and even though I

8     had some concerns about the procedures

9     applied by the military courts, it doesn't

10    mean that with all the faults and the facts

11    nonetheless I was satisfied that the whole

12    machinery, the whole operation as such in my

13    humble opinion it still should be considered

14    as comporting with the notion of civilized

15    system of law and what I understand is the

16    minimum requirement of due process of law.

17         Q.    I would like to talk briefly

18    about the element of intent under Israeli

19    penal law.  Is it your testimony that to

20    establish Credit Lyonnais' liability under

21    the Prevention of Terrorism Act that

22    plaintiffs must show that Credit Lyonnais

23    intended to enable acts of terror?

24                    MR. FRIEDMAN: Object to the

25         form.