# Exhibit 35

תאריך: י"ז כסלו, תשס"ה        תיק מס': 3380/03
30 נובמבר, 2004

# בית המשפט הצבאי יהודה

בפני כב' האב"ד: סא"ל נתנאל בנישו
שופט: סא"ל חנן רובינשטיין
שופט: סרן שרון קינן

התביעה הצבאית

נגד

הנאשם: עבדאללה ע'אלב עבדאללה ברגותי   ת.ז. 030300028 / שב"ס - נוכח
(באמצעות ב"כ עו"ד איליה תאודורי - נוכח)

## גזר דין

הנאשם הורשע על פי הודאתו ב-108 אישומים שיוחסו לו בכתב האישום, אשר לא נראה כדוגמתו בבית משפט למוד ניסיון זה. המדובר בסידרה של עבירות חמורות ביותר, בהן חברות בהתאחדויות בלתי מותרת, ניסיון לייצר חפץ נפיץ, שש עבירות של אימונים צבאיים, קשירת קשר, חמש עבירות של סחר בציוד מלחמתי, ארבע עבירות של ייצור חפץ נפיץ ומבעיר, מתן מקלט, שלוש עבירות של ביצוע שירות, 12 עבירות של ניסיון לגרימת מוות בכוונה, שבע עבירות של נזק לרכוש בזדון, החזקת כלי יריה, עבירות ברשיונות ומסמכים, ומעל לכל, 66 עבירות של גרימת מוות בכוונה.

הנאשם, יליד כוויית, שהגיע לאזור בשנת 1999, הצטרף בחודש מאי 2001 לגדודי עז א-דין אלקסאם, הזרוע הצבאית של ארגון החמאס. בחודשים מאי-יוני 2001 נפגש הנאשם במספר הזדמנויות עם פעיל צבאי בכיר בארגון החמאס, אשר לימד את הנאשם כיצד לייצר חומרי נפץ, מטעני חבלה ומנגנוני הפעלה, רימוני יד וחומרי נפץ. הנאשם למד אף כיצד להסוות את אותם מטעני החבלה. הנאשם למד עוד כיצד לייצר רעל אותו ניתן להכניס למטעני החבלה על מנת להפוך אותם למטעניים כימיים.

לאחר מכן הפך הנאשם במהרה לאחראי על ייצור מטעני החבלה בארגונו, ואימן אחרים בייצור מטעניים כאמור. לאור "הצלחתו" בתפקיד זה, זכה הנאשם בכינוי "המהנדס". בתמורה לפעילותו קיבל הנאשם תמורה כספית בסכום של 117,000$ ואף סיוע כספי בסך 500$ מידי מרואן ברגותי, ראש התנזים.

עוד קודם לכן, בחודש דצמבר 2000, קשר הנאשם קשר עם אחר להשתתף בחטיפת חייל צה"ל. על הנאשם הוטל להכין דירה בה יוחזקו החיילים אשר ייחטפו. הנאשם אכן הכין חדר בדירתו לצורך החזקת החיילים כאמור.

בחודש יוני 2001 קיבל הנאשם לידיו 15 ק"ג של חומר נפץ, וכן אקדח ומחסנית עם כדורים.

בהמשך, שכר הנאשם מחסן בכפרו והקים בו מעבדה לייצור חומרי נפץ ומטעני חבלה. הנאשם העביר למעבדה את חומר הנפץ אותו קיבל, 20 ליטר של מי חמצן, וכן מספר מנגנונים על-חוטיים להפעלת מטעני החבלה שהתכוון לייצר. במעבדתו

-1-

HIGHLY CONFIDENTIAL                                                                                                                ROTH 00396

תאריך : י"ז כסלו, תשס"ה                    תיק מס' : 3380/03
30 נובמבר, 2004

1   ייצר הנאשם שני מטעני חבלה המסוווים לאבנים. הנאשם העביר את מטעני החבלה
2   לשני פעילים צבאיים בארגון החמאס, ביניהם בילאל ברגותי.
3
4   החל מהמחצית השנייה של שנת 2001 הקים הנאשם מספר מעבדות נוספות לייצור
5   חומרי נפץ ומטעני חבלה. הנאשם נהג להעביר אל המעבדות הנ"ל חומרים כימיים
6   שונים, אשר נרכשו על ידו או על ידי חברי ארגון החמאס. הנאשם ייצר באמצעות
7   אותם חומרים כימיים עשרות קילוגרמים של חומרי נפץ, מהם הפיק מספר רב של
8   מטעני חבלה מסוגים שונים. הנאשם ייצר את המטענים הנ"ל במטרה שפעילי
9   ארגונו יבצעו באמצעותם פיגועים נגד מטרות ישראליות. הנאשם תדרך את פעילי
10  ארגונו איך להפעיל את המטענים האמורים. הנאשם אף טרח לאמן וללמד אנשים
11  רבים כיצד לייצר חומרי נפץ ומטעני חבלה ואף העביר לידי ראש גדודי עז א-דין
12  אלקסאם ברמאללה מדיה מגנטית ועליה הוראות כיצד לייצר חומרי נפץ ומטעני
13  חבלה.
14
15  בנוסף לאמור לעיל, ניסה הנאשם לייצר רימוני יד ואף קיבל הוראות לייצר טילי
16  קסאם, אולם החליט כי אין ביכולתו לעשות זאת.
17
18  בחודש יולי 2001 נפגש הנאשם עם מפעילו והנ"ל מסר לנאשם כי הוא מכיר אדם
19  המוכן לבצע פיגוע התאבדות בישראל. על פי בקשת מפעילו, פנה הנאשם לבלאל
20  ברגותי וביקש ממנו למצוא אדם שיוביל את המתאבד לתוך ישראל, על מנת שזה
21  יבצע פיגוע בכוונה לגרום למותם של רבים ככל האפשר. במקביל, ביום 27/07/01
22  קיבל הנאשם לידיו מטען חבלה קטן אותו הכניס לתוך פחית בירה והרכיב לו מטען
23  הפעלה. הנאשם מסר את המטען לבילאל ברגותי, על מנת שזה יעבירו לאנשים
24  אותם גייס ואלה יבצעו באמצעותו פיגוע. ביום 30/07/01 המטען נמסר לידי אחלאם
25  תמימי, שהניחה אותו על גבי אחד המדפים של פחיות המשקה בסופרמרקט קו-אופ
26  ברחוב המלך גיורגי בירושלים. לאחר שהפעילה אותו, עזבה אחלאם את החנות.
27  בשעות הצהריים התפוצץ המטען וגרם לנזק רב לרכוש, אך בנס לא לפציעות בנפש.
28
29  ביום 09/08/01 ביקש הנאשם ממפעילו בחמאס כי יעביר אליו מטען חבלה גדול
30  ומחבל מתאבד לצורך הוצאתו לפועל של פיגוע התאבדות. הנאשם קיבל מטען
31  כאמור, והסתיר אותו, על פי בקשת בילאל ברגותי, לתוך גיטרה. הנאשם הכניס
32  לגיטרה אף שתי שקיות ניילון מלאות בחומרי נפץ וברגים. הנאשם חיבר למטען זה
33  מנגנון הפעלה. את הגיטרה הכניס הנאשם לתוך נרתיק שחור, והוציא כפתור הפעלה
34  אל מחוץ לנרתיק באופן שיהיה ניתן להפעיל את המטען בקלות, מבלי לפותחו כלל.
35  הנאשם העביר את המטען לבילאל ברגותי על מנת שזה ימסור אותו למחבל מתאבד,
36  שיבצע באמצעותו פיגוע. במועד האמור, בסמוך לשעה 13:55, נשלח המחבל עז
37  אלדין מצרי כשהוא נושא עימו את הגיטרה הממולכדת אל מרכז ירושלים. אחלאם
38  תמימי הובילה את המחבל עד למרכז ירושלים וזה נכנס עם גיטרת המוות למסעדת
39  סבארו, שם הפעיל את המטען שהורכב על ידי הנאשם. כתוצאה מהתפוצצות המטען
40  נרצחו 15 מסועדי המסעדה ונפצעו למעלה מ-127 נוספים.
41
42  באירוע זה נרצחו :
43  **פרידה מנדלסון ז"ל**, בת 62 במותה;
44  **לאלי שימשיאשוילי-מסנגיסר ז"ל**, בת 33 במותה;
45  בתה, **תמר שימשיאשוילי-מסנגיסר ז"ל**, בת 8 במותה;
46  **תהילה מעוז ז"ל**, בת 20 במותה;
47  **מיכל רזיאל ז"ל**, בת 15 במותה;
48  **מלכה רוט ז"ל**, בת 15 במותה;
49  **יוכבד ששון ז"ל**, בת 10 במותה;

HIGHLY CONFIDENTIAL                                                     ROTH 00397

תיק מס׳: 3380/03                                    תאריך: י״ז כסלו, תשס״ה
                                                    30 נובמבר, 2004

1   **מרדכי רפאל סחיווסחורדר ז״ל**, בן 44 במותו;
2   אישתו, **צירה סחיווסחורדר ז״ל**, בת 41 במותה;
3   וילדיהם, **רעיה סחיווסחורדר ז״ל**, בת 14 במותה;
4   **אברהם יצחק סחיווסחורדר ז״ל**, בן 4 במותו;
5   **חמדה סחיווסחורדר ז״ל**, בת שנתיים במותה;
6   **ג׳ודית ליליאן גרינבוים ז״ל**, בת 31 במותה;
7   **גיורא בלאש ז״ל**, בן 69 במותו;
8   **צבי גולומבק ז״ל**, בן 26 במותו.

10  במהלך חודש נובמבר 2001 ייצר הנאשם במעבדתו שלושה מטעני חבלה נוספים. את
11  המטען הראשון הכניס לתוך מארז מחשב, את השני הכניס לתוך תיק בד,
12  ובאמצעות השלישי הכין הנאשם חגורת נפץ. בנוסף לחומר הנפץ הכניס הנאשם
13  לתוך המטענים מסמרים ואומים, וזאת על מנת שהמטען יפגע בצורה קשה יותר
14  במספר רב ככל הניתן של אנשים. כמו כן, הכניס הנאשם למטענים חומר רעיל.
15  הנאשם מסר את שלושת מטעני החבלה לפעיל חמאס על מנת שפעילי הארגון יבצעו
16  בהם פיגועי תופת.

18  ביום 01/12/01, בסמוך לשעה 23:36, בכניסה מכיכר ציון לרחוב בן יהודה
19  בירושלים, הפעיל מחבל מתאבד את מטען החבלה שהוסתר בתוך מארז של מחשב.
20  באותו מועד, בצומת הרחובות בן יהודה-לונץ, בירושלים, הפעיל מתאבד שני את
21  חגורת הנפץ שיוצרה על ידי הנאשם. דקות ספורות לאחר מכן, הופעל מטען שלישי
22  שהונח בתוך מכונית שהוחנתה ברחוב הרב קוק.

24  כתוצאה מפיצוץ שלושת המטענים שיוצרו על ידי הנאשם נהרגו 10 אנשים ונפצעו
25  191.

27  בפיגוע זה נרצחו:
28  **יוסף אעזרה ז״ל**, בן 18 במותו;
29  **אסף אביטן ז״ל**, בן 15 במותו;
30  **גיא וקנין ז״ל**, בן 19 במותו;
31  **יוני קורגנוב ז״ל**, בן 17 במותו;
32  **יעקב ישראל דנינו ז״ל**, בן 17 במותו;
33  **מיכאל דהאן ז״ל**, בן 20 במותו;
34  **גולן תורג׳מן ז״ל**, בן 15 במותו;
35  **אדם וינשטיין ז״ל**, בן 14 במותו;
36  **משה ידיד-לוי ז״ל**, בן 19 במותו;
37  **ניר חפצדי ז״ל**, בן 19 במותו.

39  למותר לציין כי נגרם נזק כבד ביותר לבניינים ולכלי רכב באזור הפיגוע.

41  בסוף שנת 2001 ייצר הנאשם, על פי בקשתו של מרואן ברגותי, שני מטעני חבלה
42  נוספים אשר יועדו לשימוש נגד כוחות הבטחון כאשר אלה יכנסו לעיר רמאללה.

44  בהמשך ייצר הנאשם שלושה מטעני חבלה מוסווים בקרטונים של מיץ, וארבעה
45  מטענים נוספים שהוסוו כאבנים. גם מטענים אלה הועברו לפעילים בארגון החמאס.

47  בתחילת חודש מרץ 2002 התבקש הנאשם על ידי מפעילו בחמאס לייצר שוב חגורת
48  נפץ עבור מחבל מתאבד. ואכן ייצר הנאשם חגורת נפץ כאמור, והעבירה לפעילים
49  בחמאס. ביום 09/03/02, בסמוך לשעה 22:30, נכנס מחבל מתאבד, שנשא על גופו

-3-

HIGHLY CONFIDENTIAL                                                      ROTH 00398

תאריך : י"ז כסלו, תשס"ה                                    תיק מס' : 3380/03
30 נובמבר, 2004

1  את חגורת הנפץ שהוכנה על ידי הנאשם, לבית הקפה 'מומנטי בירושלים, שהיה
2  באותה שעה הומה אדם. המחבל הפעיל את חגורת הנפץ וגרם למותם של 10 בני
3  אדם, ולפציעתם של 65.
4
5  בפיגוע זה נרצחו :
6  **אברהם רחמים ז"ל**;
7  **ניר בורוכוב ז"ל**;
8  **לימור בן שוהם ז"ל**;
9  **דן אימוני ז"ל**;
10 **דנית דגן ז"ל**;
11 **אורי פליקס ז"ל**;
12 **ברוך לרנר ז"ל**;
13 **טלי אליהו ז"ל**;
14 **לבנת דבש ז"ל**;
15 **אורית אוזרוב ז"ל**;
16 **נתנאל כוכבי ז"ל.**
17
18 אף בפיגוע זה נגרם נזק לרכוש.
19
20 בחודשים מרץ-אפריל 2002 נתבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון
21 החמאס באזור רמאללה לייצר מטעני חבלה ותיק נפץ לצורך ביצוע פיגוע התאבדות.
22 הנאשם הכין חגורת נפץ ומטען חבלה, אותו הכניס לתוך תיק, אליו צורפו גם ברגים.
23 הנאשם מסר את מטעני הנפץ לפעיל אחר בארגונו. ביום 07/05/02 נכנס מחבל
24 מתאבד למועדון 'שפילד קלאב' בראשון לציון כשעליו חגורת הנפץ שהוכנה על ידי
25 הנאשם. המחבל הפעיל את חגורת הנפץ ובכך גרם למותם של 15 בני אדם, לפציעתם
26 של 59 נוספים, ולהרס רב לבניין בו שכן המועדון.
27
28 בפיגוע זה נרצחו :
29 **רחמים קמחי ז"ל**;
30 **רפאל חיים ז"ל**;
31 **ענת טרמפורוש ז"ל**;
32 **אברהם בייז ז"ל**;
33 **אתי בבלאר ז"ל**;
34 **יצחק בבלאר ז"ל**;
35 **ישראל שיקאר ז"ל**;
36 **שושנה מגמרי ז"ל**;
37 **שארוק רסאן ז"ל**;
38 **נואה חינאווי ז"ל**;
39 **ניר לובטין ז"ל**;
40 **רגינה מלכה בוסלן ז"ל**;
41 **דליה מסה ז"ל**;
42 **פנינה הקרי ז"ל**;
43 **עדנה כהן ז"ל**;
44
45 במהלך חודש מאי 2002 נפגש הנאשם עם פעיל צבאי בארגון החמאס, שביקש ממנו
46 לייצר מטען חבלה נוסף, על מנת לבצע באמצעותו פיגוע תופת. הנאשם הסכים
47 לבקשה, וייצר מטען חבלה בהפעלה סולרית, שניתן להצמידו למתכות באמצעות
48 מגנטים. הנאשם מסר את המטען לפעיל החמאס, וזה הצמיד אותו, ביום 23/05/02,
49 לחלקו התחתון של מיכל דלק במיכלית דלק. המיכלית עשתה את דרכה לאתר "פי

-4-

HIGHLY CONFIDENTIAL                                                                ROTH 00399

תאריך : י"ז כסלו, תשס"ה                                    תיק מס׳ : 3380/03
30 נובמבר, 2004

1  גלילות", כשבעקבותיה המפעילים של מטען החבלה. כאשר הגיעה המיכלית ל"פי
2  גלילות", הפעילו הנ"ל את המטען באמצעות טלפון סלולרי. המטען התפוצץ וגרם
3  נזק כבד למיכלית, אך בנס לא לפגיעה בנפש.
4
5  בחודש יוני 2002 נתבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון החמאס
6  באזור רמאללה לייצר מטען חבלה לצורך ביצוע פיגוע תופת נוסף. הנאשם עשה כן,
7  ומסר את המטען, שהונח ביום 30/06/02 בשעות הבוקר על פסי הרכבת באזור לוד.
8  כשהבחינו מניחי המטען ברכבת מתקרבת לאזור, הפעילו אותו. המטען התפוצץ,
9  דבר שגרם לפציעתם של ארבעה בני אדם ולנזק לקטר הרכבת ולמסילת הברזל.
10
11 עוד באותו חודש ייצר הנאשם מטען נוסף שאף הוא הונח על פסי הרכבת בסמוך
12 ליציאה מרחובות. ביום 21/07/02 בשעות הבוקר המוקדמות הופעל המטען.
13 כתוצאה מהפיצוץ נפצע אדם אחד ונגרם נזק לקטר ולמסילת הברזל.
14
15 בחודש יולי 2002 התבקש הנאשם על ידי מפקד הזרוע הצבאית של ארגון החמאס
16 באזור רמאללה, לייצר מטען חבלה המוסתר בתוך תיק, על מנת לבצע פיגוע תופת.
17 הנאשם ייצר מטען כאמור, ואף טרח למלא את התיק באומי ברזל לצורך הגברת
18 עוצמת הפגיעה של המטען. הנאשם אף הכין מנגנון הפעלה אלחוטי למטען ומסר את
19 המטען לאיש חמאס. המטען הונח בתוך קפיטריה הנמצאת בבניין ע"ש פרנק
20 סינטרה בקמפוס האוניברסיטה העברית בהר הצופים בירושלים. ביום 31/07/02
21 בסמוך לשעה 13:00, שעה בה ברגיל קיים ריכוז גדול של בני אדם בקפיטריה, הופעל
22 המטען. כתוצאה מפיצוץ המטען, שהוכן על ידי הנאשם, נרצחו 9 בני אדם ונפצעו 81
23 נוספים. כמו כן, נגרם נזק לבניין הקפיטריה.
24
25 בפיגוע זה נרצחו :
26 **דפנה שפרוך ז"ל**;
27 **מרלה אן בנט ז"ל**;
28 **דינה קרטר ז"ל**;
29 **בנימין תומאס בלוטשטיין ז"ל**;
30 **רויטל בראשי ז"ל**;
31 **דוד (דיאגו) לדובסקי ז"ל**;
32 **לוינא שפירא ז"ל**;
33 **ג'ניס רות קולטר ז"ל**;
34 **דוד גריץ ז"ל**.
35
36 בחודש אוגוסט 2002 נתבקש הנאשם להכין שני מטעני חבלה. הנאשם נענה לבקשה
37 זו והכין שתי חגורות נפץ, אותן מסר לפעיל בארגון החמאס. ביום 19/09/02 עלה
38 מחבל מתאבד, אשר נשא על גופו אחת מחגורות הנפץ שהכין הנאשם, על אוטובוס
39 קו 4 בתל אביב ופוצץ את המטען. כתוצאה מהפיצוץ נהרגו שישה בני אדם ונפצעו 84
40 נוספים. נזק רב נגרם לאוטובוס ולבתי עסק שהיו בקרבתו.
41
42 בפיגוע זה נרצחו :
43 **יוסי ממיסטלוב ז"ל**, בן 39 במותו;
44 **עופר זינגר ז"ל**, בן 29 במותו;
45 **רוזנה סיסו ז"ל**, בת 63 במותה;
46 **יפה שם-טוב ז"ל**, בת 49 במותה;
47 **סלומון הוניג ז"ל**, 79 במותו;
48 **יונתן ג'סנר ז"ל**, בן 19 במותו;
49

-5-

HIGHLY CONFIDENTIAL                                                                        ROTH 00400

תאריך : י"ז כסלו, תשס"ה          תיק מס׳ : 3380/03
30 נובמבר, 2004

1  ביום 11/10/02, בסמוך לשעה 20:15, ניסה מחבל מתאבד נוסף, שגם הוא נשא על
2  גופו חגורת נפץ שהוכנה על ידי הנאשם, להיכנס למסעדת יוטבתה בתל אביב במטרה
3  לפוצץ את עצמו ולגרום למותם של רבים ככל האפשר. המאבטח שהיה במקום חשד
4  באיש ומנע את כניסתו למסעדה. מאוחר יותר נתפס המחבל.

7  מסכת הטרור הרצחנית שהפעיל הנאשם היא מהחמורות שידענו אי פעם
8  בהיסטוריה העקובה מדם לה אנו שותפים מאז הקמת מדינת ישראל.

10 הנאשם פעל ללא לאות, במשך תקופה ארוכה מאוד, בייצור מטעני חבלה קטלניים
11 ככל האפשר, שיועדו לשמש לפיגועי התאבדות ולפיגועי תופת, וזאת לשם מטרה
12 אחת ויחידה, גרימת מותם של רבים ככל האפשר.

14 הנאשם אחראי במישרין לרציחתם של עשרות בני אדם חפים מפשע, ולפציעתם של
15 מאות אחרים. נשגב מבינתנו להבין איך יכל הנאשם לרתום את הידע המדעי אשר
16 רכש, אשר יועד מלכתחילה לשיפור חיי האדם, לשם זריעת הרס וחורבן כה רב.
17 תשובה חלקית לתמיהה זו מצאנו בדברי הנאשם במסגרת הטיעונים לעונש בתיק
18 זה, מהם ניתן היה להתרשם ללא כל קושי מן השנאה התהומית אשר כילתה מתוכו
19 כל אנושיות. הנאשם לא הביע כל חרטה, אלא התגאה בכך שהכשיר עשרות
20 מהנדסים, אשר הוא מקווה כי יגרמו לפיגועים קשים הרבה יותר מאלה שחוללו על
21 ידו.

23 קשה היתה שמיעתם של טיעוניו הנלוזים של הנאשם, שניסה לקשור את מעשיו
24 המפלצתיים עם פעולותיו של צה"ל באזור, לא מבלי שעירב גם את פעולת
25 האמריקאים בכווית, את העלייה מברית המועצות לשעבר, ואת מדיניות הממשלה,
26 כגורמים שהביאו אותו לפעול. הנאשם סיים את דבריו בכך שהבטיח שארגון
27 החמאס יגרום להתפרקות מדינת ישראל, בהתאם לחזונו של אחמד יאסין.

29 נוכח דבריו של הנאשם, יש להניח כי אלמלא נתפס, היה ממשיך בפעילותו הרצחנית.
30 אך גם מבלי לשער השערות, די לנו להתבונן ברשימת שמות קורבנותיו של הנאשם,
31 הארוכה מנשוא, כדי לעמוד על גודל האסון אותו המיט, לא רק על קורבנותיו
32 ומשפחותיהם, אלא על החברה כולה. מטעני החבלה אותם הכין הנאשם היו כזרעי
33 מוות שפוזרו במקומות רבים ברחבי מדינת ישראל, לאורכה ולרוחבה. קור רוחו של
34 הנאשם והשימוש שעשה במדע ובטכניקה לשם הרג מכוון ושיטתי, אינם יכולים
35 אלא להזכיר לנו תקופות מן האפלות ביותר שבהיסטורייה העם היהודי, אשר סברנו
36 לתומנו כי, עם הקמתה של מדינת ישראל, לא יחזרו על עצמן.

38 מה נאמר ומה נדבר לנוכח גדיעת חייהם של הנרצחים, חלקם עולי ימים, ואף
39 תינוקות של ממש. מה נוכל לבשר למשפחות השלמות שברגע מר אחד נקטלו?

41 קול דמי אחינו זועקים אלינו מן האדמה.

43 אין בכוחנו לרפא את הצלקות הפיזיות והנפשיות של אלה שחוו את התופת.
44 הפצועים עצמם, אך לא רק הם, אלא גם קרובי המשפחה והסובבים, אשר ישאו את
45 רושם הסבל שפקד אותם כרעם ביום בהיר עד סוף ימי חייהם.

47 מה יהא עונשו של מי ששיעבד את כל רצונותיו ומעשיו לשם רצח בני מינו? ללא
48 ספק, אין כל מקום להתחשבות בנסיבות אישיות כלשהן במקרה שכזה. לנוכח
49 מעשים נפשעים כגון אלה שבוצעו על ידי הנאשם, אין כל ספק כי הענישה צריכה

-6-

HIGHLY CONFIDENTIAL                                                                                  ROTH 00401

Case 1:05-cv-04622-DLI-RML   Document 363-35   Filed 02/24/17   Page 8 of 18 PageID #: 16326

תאריך: י"ז כסלו, תשס"ה     תיק מס': 3380/03
30 נובמבר, 2004

1  להיות מירבית, הן לנוכח הצורך שבמניעת מסוכנותו של הנאשם, והן לאור הניסיון
2  לגמול לו כרשעתו.

3
4  מערכת משפט הראויה לשמה צריכה להיות בעלת כושר הרתעה כלפי עבריינים
5  לסוגיהם השונים. הטרור הנוגס היום במדינת ישראל הינו אכזרי וחסר רחמים
6  ואינו מבחין כלל בין חייל, אזרח, תינוק, זקן, נכה או תייר, איש או אישה, באשר
7  הם.

8
9  עלינו, על כן, לתרום את תרומתנו למיגור הטרור, עד כמה שהדבר אפשרי. לצורך כך
10 אין כל צל של ספק כי יש להטיל על הנאשם, ועל שכמותו, עונשה אשר לא רק
11 שתגמול להם על מעשיהם הנפשעים והאכזריים ותביע את סלידת כל בן אנוש וכל
12 חברה מתוקנת מהתנהגותם הנפשעת, אלא אף יהא בה מימד של הרתעה.

13
14 מתוך השקפה זו, עלינו לקבוע כי במקרי טרור נוראיים ורבים כגון אלה שהנאשם
15 אחראי להם מכח מילוי חלקו במנגנון טרור משומן, העונש המירבי שקבע המחוקק
16 צריך להיות לא רק נקודת המוצא לענישה, אלא אף לעיתים קרובות נקודת הסיום.

17
18 כאשר מעשי הטרור להם היה שותף הנאשם הינם כה אכזריים, מאסיביים,
19 וממושכים, עד שניתן לומר כי בפנינו "תעשייה" של טרור בעלת תוצאות קשות
20 מנשוא, העונש הראוי והנכון הינו מיתה. וכבר נאמר במקורותינו: **"שופך דם האדם**
21 **באדם דמו ישפך כי בצלם אלוקים עשה את האדם"**.

22
23 אמנם עד כה עונש זה נותר "הלכה ואין מורין כן", ובתי המשפט הסתפקו בהטלת
24 עונש של מאסר עולם. לדעתנו, מנהג זה, אשר היה הנוהג המקובל כאמור, אסור לו
25 להפוך למצוות אנשים מלומדה, ועל ביהמ"ש לבחון כל מקרה לגופו מתוך הענקת
26 הכבוד הראוי לקביעתו המפורשת של המחוקק, לפיה במקרים מתאימים יש להטיל
27 על נאשם, המורשע בעבירת גרימת מוות בכוונה, עונש מוות.

28
29 לנוכח קביעה חד משמעית זו של המחוקק, פטור ביהמ"ש מן הצורך לדון בשאלות
30 הנוגעות למידת ההתאמה של עונש זה הן לעקרונות משפט צדק ומוסר והן
31 למציאות. יחד עם זאת, לנו נראה כי כאשר בפנינו אדם כנאשם, שכאמור קטל ללא
32 הרף, ללא הבחנה וללא רחמים, באופן מחושב וקר רוח, עד כי דרדר את עצמו לשפל
33 המדרגה האנושית וספק אם ראוי הוא להיקרא אדם, מוצדק ומוסרי שלא להותיר
34 את הוראת החוק כאות מתה.

35
36 אף נציין כי גם אם ערים אנו לטענות לפיהן עונש המוות אינו מרתיע ואינו אפקטיבי
37 באזור, הרי שאם הדבר נראה נכון לגבי מפגעים מתאבדים, חשוב לזכור כי אלה
38 אינם פועלים מכוח עצמם ואף לא כיחידים, ואותם אלה, המרכיבים את מערכת
39 הטרור הרחבה המייצרת את פצצות האדם ומשלחתם, נזהרים מלהיפגע בעצמם, כך
40 שגורם ההרתעה שבעונש האמור נשמר.

41
42 לדעתנו, ראוי על כן הנאשם לעונש מוות, ואך בהטלת עונש שכזה ייעשה דין צדק.

43
44 אלא שיש לזכור כי המחוקק סייג את האפשרות בהטלת עונש המוות בשלל סייגים,
45 אשר העיקרי שבהם נוגע לכך ששלושת שופטי ההרכב ישאו דרגת סא"ל [סעיף
46 47(א)(8) לצו בדבר הוראות ביטחון, תשל"ל - 1970].

47
48

HIGHLY CONFIDENTIAL                                            ROTH 00402

תאריך : י"ז כסלו, תשס"ה  
30 נובמבר, 2004

תיק מס' : 3380/03

1. בהתאם לקביעה זו, מנועים אנו מלפעול על פי צו מצפוננו האמור, ואין בסמכותנו
2. לגזור על הנאשם את העונש המגיע לו.
3.
4. בנסיבות אלה, כל שנותר לנו הוא לגזור, על כן, לנאשם עונש מאסר עולם נפרד בגין
5. כל אדם אשר נרצח כתוצאה ממעשיו. אף אנו קובעים כי עונשי המאסר יהיו
6. מצטברים, זאת למען ידעו כי עבורנו, אובדנו של כל אחד ואחד מן הקורבנות מהווה
7. אובדן עולם מלא. בנוסף על כך, אנו מוצאים אף לנכון לתת ביטוי לשורת העבירות
8. הנוספות שבוצעו על ידי הנאשם, אשר חלקן הביאו לפציעתם של מאות בני אדם.
9.
10. אשר על כן, נוכח דברינו דלעיל, אנו גוזרים על הנאשם 67 מאסרי עולם מצטברים.
11.
12.
13. **זכות ערעור תוך 30 יום.**
14.
15. **ניתן והודע היום, 30/11/2004 , בפומבי ובמעמד הצדדים.**
16.
17.
18.
19.
20. שופט       אב"ד       שופט
21.

-8-

HIGHLY CONFIDENTIAL

ROTH 00403



**Targem Translations**

143 RODNEY STREET
BROOKLYN, N.Y. 11211
TEL. (718) 384-8040
FAX: (718) 388-3516

## CERTIFIED TRANSLATION

I, Miriam Braver, Project Manager at Targem Translations, Inc., located at 143 Rodney Street in Brooklyn, New York, a language services firm with a track record of providing expert language services to the legal community of more than 50 years, do hereby certify that our team of translators, editors and proofreaders, are professionally trained and vastly experienced in providing professional legal translations for submission in U.S. courts, from Hebrew into English and vice versa; and they have professionally translated document "**Abdalla Barghuthi's sentencing/ ROTH00396-403**" from Hebrew into English, faithfully, accurately and completely, to the best of their expertise and experience.

Date: July 14, 2014

Miriam Braver



ROCHAL WEISS
Notary Public, State of New York
Registration No.: 01WE6293785
Qualified in Kings County
My Commission expires December 16, 2017

PROFESSIONAL TRANSLATIONS OF FOREIGN LANGUAGES

Date: 17th of Kislev 5765
November 30, 2004

Case No.: 3380/03

|  | **The Military Court in Judea** |
|---|---|
| **Before the President of the Court:** | Lieutenant Colonel Natanel Benishu |
| Judge: | Lieutenant Colonel Hanan Rubinstein |
| Judge: | Captain Sharon Keinan |

**The Military Prosecution**

-v-

**The Defendant: Abdallah Ghaleb Abdallah Barghuthi Identity No.: 030300028 / Israel Prison Service – present**
(By Counsel Adv. Ilya Theodori – present)

**Sentence**

The Defendant has been convicted pursuant to his guilty plea of 108 charges that have been attributed to him in the indictment, the likes of which has not been seen by this experienced court. This is a series of extremely grave offenses, including membership in an illegal organization, attempt to make explosives, six offenses of military training, conspiracy, five offenses of trading in war materiel, four offenses of making an explosive and incendiary object, harboring, three offenses of execution of a service, 12 offenses of attempt to cause intentional death, seven offenses of malicious damage to property, possession of a firearm, offenses involving licenses and documents, and above all, 66 offenses of causing intentional death.

The Defendant, who was born in Kuwait and arrived in the Area in 1999, enlisted in May 2001 into the Izz al-Din al-Qassam Brigades, the military arm of the Hamas Organization. In May-June 2001, the Defendant met on several occasions a senior military operative in the Hamas Organization, who taught the Defendant how to make explosives, explosive devices and activation mechanisms, hand grenades and explosives. The Defendant also learned how to make poison that could be inserted into the explosive devices to transform them into chemical devices.

Thereafter, the Defendant quickly became responsible for manufacturing explosive devices in his organization, and trained others in the making of such devices. In view of his "success" in this role, the Defendant gained the nickname "the Engineer". In exchange for his activity, the Defendant received financial compensation to the amount of $117,000 and also financial aid of $500 from Marwan Barghuthi, the head of the Tanzim.

Before then, in December 2000, the Defendant conspired with another person to participate in the abduction of IDF soldiers. The Defendant was assigned with preparing an apartment in which the abducted soldiers would be held. The Defendant did prepare a room in his home for the purpose of holding such soldiers.

In June 2001, the Defendant received 15 kg of explosives and a pistol and a magazine with cartridges.

Later, the Defendant rented a storeroom in his village and established in it a laboratory for manufacturing explosives and explosive devices. The Defendant transferred to the laboratory the explosives that he received, 20 liters of hydrogen peroxide, and a number of wireless mechanisms for activating the explosive devices that he intended to manufacture.

Date: 17th of Kislev 5765                                         Case No.: 3380/03
November 30, 2004

In his laboratory, the Defendant manufactured two explosive devices that were camouflaged as stones. The Defendant transferred the explosive devices to two military operatives in the Hamas Organization, including Bilal Barghuthi.

From the second half of 2001, the Defendant established a number of additional laboratories for manufacturing explosives and explosive devices. The Defendant used to transfer various chemicals, which had been purchased by him or by the members of the Hamas organization, to these laboratories. The Defendant used those chemicals to manufacture tens of kilograms of explosives, from which he produced a large number of explosive devices of different types. The Defendant made the above mentioned explosive devices for operatives of his organization to use them to carry out attacks against Israeli targets. The Defendant briefed the operatives of his organization on how to activate the said explosive devices. The Defendant also made the effort to train and teach many people how to manufacture explosives and explosive devices and also forwarded to the head of the Izz al-Din al-Qassam Brigades in Ramallah magnetic media containing instructions on how to manufacture explosives and explosive devices.

In addition to the foregoing, the Defendant attempted to manufacture hand grenades and also received instructions on manufacturing Qassam rockets, which he decided that he could not do.

In July 2001, the Defendant met with his handler and the above mentioned individual informed the Defendant that he knows a person who is prepared to carry out a suicide attack in Israel. At the request of his handler, the Defendant approached Bilal Barghuthi and asked him to find a person to bring the suicide bomber into Israel, in order for him to carry out an attack with the aim of causing the deaths of as many people as possible. At the same time, on July 27, 2001, the Defendant received an explosive device that he put into a can of beer and attached an activation device to it. The Defendant delivered the device to Bilal Barghuthi, in order for him to transfer it to people whom he had enlisted and for them to carry out an attack using it. On July 30, 2001, the explosive device was delivered to Ahlam Tamimi, who put it on one of the shelves of the beverage cans in a Co-Op supermarket on King George Street in Jerusalem. After activating it, Ahlam left the store. At noontime the explosive device exploded and caused a large amount of damage to property, but miraculously no injury.

On August 9, 2001, the Defendant asked his handler in Hamas to transfer to him a large explosive device and a suicide bomber for the purpose of executing a suicide bombing. The Defendant received such an explosive device and concealed it, at the request of Bilal Barghuthi, inside a guitar. The Defendant put into the guitar two plastic bags filled with explosives and screws. The Defendant connected an activation mechanism to this explosive device. The Defendant put the guitar into a black case and extracted an activation button from the case so that the device could be activated easily without opening it at all. The Defendant transferred the explosive device to Bilal Barghuthi in order for him to deliver it to a suicide bomber, who would use it to carry out an attack. At the said time, at about 1:55 p.m., the terrorist Izz al-Din al-Masri was dispatched, while carrying the booby trapped guitar, to central Jerusalem. Ahlam Tamimi led the terrorist to the center of Jerusalem and he went into the Sbarro Restaurant with the deadly guitar, where he activated the explosive device that had been assembled by the Defendant. As a result of the explosion of the explosive device, 15 of the diners of the restaurant were murdered and more than 127 more were injured. In this incident, the following people were murdered:

**Frieda Mendelsohn**, of blessed memory, age 62 at the time of her death;
**Lali Shimashvili-Messengisser**, of blessed memory, age 33 at the time of her death;
her daugher, **Tamara Shimashvili-Messengisser**, of blessed memory, age 8 at the time of her death;
**Tehila Maoz**, of blessed memory, age 20 at the time of her death;
**Michal Raziel**, of blessed memory, age 15 at the time of her death;
**Malka Roth**, of blessed memory, age 15 at the time of her death;
**Yocheved Sasson**, of blessed memory, age 10 at the time of her death;

Date: 17th of Kislev 5765  Case No.: 3380/03
November 30, 2004

**Mordechai Raphael Schijveschuurder**, of blessed memory, age 44 at the time of his death;
His wife, **Tzira Schijveschuurder**, of blessed memory, age 41 at the time of her death;
And their children, **Raya Schijveschuurder**, of blessed memory, age 14 at the time of her death;
**Avraham Yitzhak Schijveschuurder**, of blessed memory, age 4 at the time of his death;
**Hemda Schijveschuurder**, of blessed memory, age 2 at the time of her death;
**Judith Lilian Greenbaum**, of blessed memory, age 31 at the time of her death;
**Giora Balash**, of blessed memory, age 69 at the time of his death;
**Zvi Golombek**, of blessed memory, age 26 at the time of his death.

During November 2001, the Defendant manufactured in his laboratory three additional explosive devices. He put the first explosive device into a computer case, the second into a fabric bag and using the third, the Defendant prepared an explosive belt. In addition to the explosives, the Defendant inserted nails and nuts into the devices, in order for the explosive device to more severely injure as many people as possible. In addition, the Defendant laced the explosive devices with toxic material. The Defendant provided the three explosive devices to a Hamas operative in order for the operatives of the organization to carry out bombing attacks using them.

On December 1, 2001, at about 11:36 p.m., at the entrance to Ben Yehuda Street from Zion Square in Jerusalem, a suicide bomber activated the explosive device that had been concealed inside a computer case. At the same time, at the junction of the streets Ben Yehuda and Luntz, in Jerusalem, a second suicide bomber activated the explosive belt that had been manufactured by the Defendant. A few minutes later, a third explosive device that had been placed inside an automobile that had been parked on Harav Kook Street was activated.

As a result of the detonation of the three explosive devices which were made by the defendant, 10 people were killed and 191 were injured.

In this attack, the following people were murdered:
**Yosef El-Ezra,** of blessed memory, age 18 at the time of his death;
**Assaf Avitan,** of blessed memory, age 15 at the time of his death;
**Guy Vaknin,** of blessed memory, age 19 at the time of his death;
**Yoni Korganov,** of blessed memory, age 17 at the time of his death;
**Yaakov Israel Danino,** of blessed memory, age 17 at the time of his death;
**Michael Dahan,** of blessed memory, age 20 at the time of his death;
**Golan Turgeman,** of blessed memory, age 15 at the time of his death;
**Adam Weinstein,** of blessed memory, age 14 at the time of his death;
**Moshe Yedid-Levy,** of blessed memory, age 19 at the time of his death;
**Nir Haftzadi,** of blessed memory, age 19 at the time of his death;

Needless to say, very heavy damage was sustained by buildings and vehicles in the area of the attack.

In late 2001, the Defendant manufactured, at the request of Marwan Barghuthi, two additional explosive devices that were intended for use against the security forces when they would enter the town of Ramallah.

Later, the Defendant manufactured three explosive devices that were concealed inside juice cartons, and four more explosive devices that were camouflaged as stones. These devices were also transferred to operatives in the Hamas organization.

In early March 2002, the Defendant was requested by his handler in Hamas to manufacture an explosive belt again, for a suicide bomber. Indeed, the Defendant manufactured an explosive belt as set forth, and transferred it to operatives in Hamas.

Date: 17th of Kislev 5765  
November 30, 2004

Case No.: 3380/03

On March 9, 2002, at about 10:30 p.m., a suicide bomber, who was carrying on his person the explosive belt that had been prepared by the Defendant, entered the Café 'Moment' in Jerusalem, which was crowded at that time. The terrorist activated the explosive belt and caused the deaths of 10 people and the injury of 65.

In this attack, the following people were murdered:
**Avraham Rachamim;**
**Nir Borochov,** of blessed memory**;**
**Limor Ben Shoham,** of blessed memory**;**
**Dan Aimoni,** of blessed memory**;**
**Danit Dagan,** of blessed memory**;**
**Uri Felix,** of blessed memory**;**
**Baruch Lerner,** of blessed memory**;**
**Tali Eliyahu,** of blessed memory**;**
**Livnat Dvash,** of blessed memory**;**
**Orit Ozerov,** of blessed memory**;**
**Natanel Cochavi,** of blessed memory**.**

Property was damaged in this attack too.

In March-April 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture explosive devices and an explosive bag for the purpose of carrying out a suicide bombing. The Defendant prepared an explosive belt and an explosive device, which he put into a bag, to which screws were also added. The Defendant delivered the explosive devices to another operative in his organization. On May 7, 2002, a suicide bomber entered the "Sheffield Club" in Rishon LeZion while wearing the explosive belt that had been prepared by the Defendant. The terrorist activated the explosive belt, thus causing the deaths of 15 people, the injury of 59 more and great destruction to the building in which the club was located.

In this attack, the following people were murdered:
**Rachamim Kimchi,** of blessed memory**;**
**Rafael Chaim,** of blessed memory**;**
**Anat Teremporush,** of blessed memory**;**
**Avraham Biaz,** of blessed memory**;**
**Eti Bablar,** of blessed memory**;**
**Yitzhak Bablar,** of blessed memory**;**
**Israel Shikar,** of blessed memory**;**
**Shoshana Magmari,** of blessed memory**;**
**Sharuk Rassan,** of blessed memory**;**
**Nava Hinawi,** of blessed memory**;**
**Nir Lobatin,** of blessed memory**;**
**Regina Malka Boslan,** of blessed memory**;**
**Daliah Massah,** of blessed memory**;**
**Pnina Hikri,** of blessed memory**;**
**Edna Cohen,** of blessed memory**.**

During May 2002, the Defendant met with a military operative in the Hamas organization, who asked him to manufacture an additional explosive device, in order to carry out a bombing using it. The Defendant agreed to the request and made an explosive device with cellular activation that could be attached to metals using magnets. The Defendant delivered the explosive device to the Hamas operative, who attached it, on May 23, 2002, to the bottom of a fuel tank in a fuel tanker. The tanker made its way to the "Pi

Date: 17th of Kislev 5765  Case No.: 3380/03
November 30, 2004

Glilot" site, followed by the operators of the explosive device. When the tanker arrived in "Pi Glilot", the above mentioned individuals activated the device by cellular telephone. The device exploded and caused serious damage to the tanker, but miraculously no injury.

In June 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device for the purpose of carrying out an additional bombing. The Defendant did so, and delivered the explosive device, which was placed on June 30, 2002 in the morning hours on the railway track in the Lod area. When those that had placed the explosive device identified a train approaching the area, they activated it. The explosive device exploded, which caused the injury of four people and damage to the locomotive and the railway.

During that same month, the Defendant manufactured an additional explosive device that was also placed on the railway track near the exit from Rehovot. The device was detonated on July 21, 2002, in the early morning hours. As a result of the explosion, one person was injured and damage was caused to the locomotive and to the railway.

In July 2002, the Defendant was requested by the commander of the military arm of the Hamas organization in the Ramallah area to manufacture an explosive device hidden inside a bag, in order to carry out a bombing. The Defendant made such an explosive device, and also made the effort to fill the bag with iron nuts in order to increase the destructive power of the device. The Defendant even prepared a wireless activation mechanism for the device and delivered the device to a Hamas member. The explosive device was laid inside a cafeteria in the Frank Sinatra Building on the campus of the Hebrew University on Mount Scopus in Jerusalem. On July 31, 2002, at about 1:00 p.m., at a time at which there is usually a large concentration of people in the cafeteria, the explosive device was detonated. As a result of the explosion of the explosive device, which had been prepared by the Defendant, 9 people were murdered and 81 more people were injured. In addition, damage was caused to the cafeteria building.

In this attack, the following people were murdered:
**Daphana Spruch,** of blessed memory;
**Marla Anne Bennett,** of blessed memory;
**Dina Carter,** of blessed memory;
**Benjamin Thomas Blutstein,** of blessed memory;
**Revital Barashi,** of blessed memory;
**David (Diego) Ladowski,** of blessed memory;
**Levina Shapira,** of blessed memory;
**Janis Ruth Coulter,** of blessed memory;
**David Gritz,** of blessed memory.

In August 2002, the Defendant was requested to prepare two explosive devices. The Defendant abided by this request and prepared two explosive belts, which he delivered to an operative in the Hamas organization. On September 19, 2002, a suicide bomber, who was carrying on his person one of the explosive belts that the Defendant had prepared, boarded a bus on Line 4 in Tel Aviv and detonated the explosive device. As a result of the explosion, six people were killed and 84 more were injured. Extensive damage was caused to the bus and to businesses that were near it.

In this attack, the following people were murdered;
**Yossi Mamistalov,** of blessed memory, age 39 at the time of his death;
**Ofer Zinger,** of blessed memory, age 29 at the time of his death;
**Rosanna Siso,** of blessed memory, age 63 at the time of her death;
 **Yaffa Shem-Tov,** of blessed memory, age 49 at the time of her death;
**Solomon Hoenig,** of blessed memory, age 79 at the time of his death;
**Yonatan Jessner,** of blessed memory, age 19 at the time of his death;

Date: 17th of Kislev 5765　　　　　　　　　　　　　　　　Case No.: 3380/03
November 30, 2004

On October 11, 2002, at about 8:15 p.m., an additional suicide bomber, who was also carrying on his person an explosive belt that had been prepared by the Defendant, attempted to enter the Yotvata Restaurant in Tel Aviv with the aim of detonating himself and causing the deaths of as many people as possible. The guard, who was at the entrance to the premises, suspected the man and prevented him from entering the restaurant. The terrorist was later apprehended.

The murderous terrorist web operated by the Defendant is one of the worst we have known in the bloody history which we have been part of since the formation of the State of Israel.

The Defendant acted tirelessly, for a very long period, in the manufacturing of explosive devices that were as lethal as possible, which were intended to be used in suicide attacks and bombings, with but a single aim, of causing the deaths of as many people as possible.

The Defendant is directly responsible for the murder of dozens of innocent human beings and the injury of hundreds more. We fail to understand how the Defendant could put to use the scientific knowledge that he had acquired, which was intended from the outset to improve human life, for sowing so much destruction and carnage. We found a partial answer to this question in the words of the Defendant within the pleas for sentencing in this case, from which one could sense with no difficulty whatsoever the inexhaustible hatred that has consumed all his humanity. The Defendant expressed no remorse, but was instead proud of having trained dozens of engineers, whom he hoped would cause attacks that are more severe than those than those that he himself had caused.

It was difficult to hear the lowly pleas of the Defendant, who tried to relate his monstrous acts with the operations of the IDF in the Area, not without also bringing in the American action in Kuwait, the immigration from the Former Soviet Union and the policy of the government as other factors that led him to act. The Defendant concluded his address by promising that the Hamas organization would cause the destruction of the State of Israel, in accordance with the vision of Ahmad Yasin.

In view of the words of the Defendant, it may be assumed that had he not been caught, he would have continued his murderous activity. But without making hypotheses, it is enough for us to look at the unbearably long list of the names of the victims of the Defendant to assert the magnitude of the disaster that he had caused, not only to his victims and their families, but to society as a whole. The explosive devices that the Defendant had prepared were akin to seeds of death that were scattered in many places around the State of Israel, throughout its length and breadth. The composure of the Defendant and the use he made of science and technology for deliberate, systematic killing, can only remind us of some of the darkest periods in the history of the Jewish People, which we thought would not recur after the founding of the State of Israel.

What can be said in view of the taking of the lives of the victims, some of whom were elderly and some of whom were in infanthood? What can we say about whole families that were wiped out in a single bitter moment?

The voice of the blood of our brethren cries up from the earth.

We cannot heal the physical and mental scars of whose who experienced the hellfire. The casualties themselves, and not only them, but also the relatives and bystanders, who will carry the picture of suffering that befell them like lightning out of the blue for the rest of their lives.

What will be the sentence of a person who pledged all of his wishes and actions to the task of murdering members of his own kind? Undoubtedly, there is no room to consider any personal circumstances in such a case. In view of criminal acts of the type that were committed by the Defendant, there is no doubt that the maximum sentence is called for, both due to the need to prevent the danger of the Defendant to others and light of the attempt to pay back for his evil.

Date: 17th of Kislev 5765  Case No.: 3380/03
November 30, 2004

Any legal system worthy of its name should have the ability to deter offenders of all types. The terrorism which is currently chipping away at the State of Israel is cruel and merciless and makes no differentiation between soldiers, civilians, infants, the elderly, disabled persons or tourists, men or women.

We must therefore make our contribution to quell terrorism, as far as this is possible. For this purpose there is not a shadow of doubt that the Defendant and those like him must be sentenced in a manner that will not only pay them back for their cruel, criminal acts and express the revulsion of any human being and any civil society over their criminal behavior, but that will also constitute a degree of deterrence.

Based on this view, we must determine that in terrible and numerous cases of terrorism such as those for which the Defendant is responsible pursuant to fulfilling his role in a well-oiled terrorist machine, the maximum sentence that the legislator has prescribed should be not only a starting point for sentencing, but often the end point too.

When the terrorist acts in which the Defendant participated are so cruel, massive and long lasting to the point that we may call it an "industry" of terrorism with unbearable results, the most appropriate and correct sentence is death. And it has already been said in our scriptures: "**Whoever sheds human blood, by humans shall their blood be shed; for in the image of God has God made mankind**".

While until now this sentence has remained unused, and the Courts have satisfied themselves with handing down life imprisonment sentences, in our opinion, this practice, which has been common, must not be done out of force of habit alone, and the Court must examine each case on its merits and give due respect to the explicit deliberation of the legislator whereby in appropriate cases a defendant who is convicted of the offense of causing intentional death must be sentenced to death.

In view of this unequivocal deliberation of the legislator, the Court is exempt from the need of discussing questions that are related to the degree of appropriateness of this sentence owing to the principles of justice and morality and due to reality. However, it appears to us that when we have before us a person such as the Defendant, who as set forth has killed incessantly, indiscriminately and mercilessly, in a calculated, imperturbable manner, to the point of reducing himself to the lowest level of humanity possible and who doubtfully deserves to be called a human, it would be just and moral not to leave this provision of the law as a dead letter.

We must also state that even if we are aware of the contentions whereby the death sentence is not a deterrent and is ineffective in the Area, if this appears to be correct in the case of suicide terrorist, it is important to remember that they do not operate based on their own resources alone or as individuals, and those persons who established the broad terrorist network which creates and dispatches the human bombs will take care not to be hurt by themselves, meaning that the deterrent factor in such sentencing is upheld.

In our opinion, the Defendant should be sentenced to death and only in inflicting such a sentence law and justice will be done. But it must be remembered that the legislator has limited the possibility of passing the death sentence by a list of qualifications, the main one being that the three judges of the panel must be of Lieutenant Colonel rank [Section 47(A)(8) of the Security Provisions Order, 5730-1970].

Date: 17th of Kislev 5765
November 30, 2004

Case No.: 3380/03

Pursuant to this deliberation, we are prevented from acting according to our consciences and we do not have the authority to hand down the sentence that the Defendant deserves.

In these circumstances, all we have left to do, therefore, is to hand down a separate life imprisonment sentence to the Defendant for each person who was murdered as a result of his actions. We also decree that the life imprisonment terms are to be cumulative, so that it may be learned that for us, our loss of each and every victim represents the loss of a whole world. In addition to this, we also see fit to give expression to the list of additional offenses that were committed by the Defendant, some of which led to the injury of hundreds of persons.

Therefore, in view of our statements above, we sentence the Defendant to 67 cumulative life imprisonment terms.

**A right of appeal within 30 days is conferred.**

**Handed down and announced today, November 30, 2004, in public and in the presence of the parties.**

|  |  |  |
|---|---|---|
| [Signature] | [Signature] | [Signature] |
| **Judge** | **President of the Court** | **Judge** |

-8-