UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

TZVI WEISS, *et al*.,               :

                          :    Case No. 05-CV-4622 (DLI) (RML)

            Plaintiffs,   :

     - against -          :

                          :

NATIONAL WESTMINSTER BANK PLC,   :

                          :

------------------------------------------------------------ X

NATAN APPLEBAUM, *et al*.,      :

                          :    Case No. 07-CV-916 (DLI) (RML)

            Plaintiffs,   :

     - against -          :

                          :

NATIONAL WESTMINSTER BANK PLC,   :

                          :

------------------------------------------------------------ X

## PLAINTIFFS' LOCAL CIVIL RULE 56.1
## (I) RESPONSE TO DEFENDANT'S SUPPLEMENTAL STATEMENT
## OF ADDITIONAL MATERIAL FACTS, AND
## (II) SUPPLEMENTAL COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Civil Rule 56.1(b), Plaintiffs in the above-captioned actions set forth herein their responses to each of the numbered paragraphs set forth in the Supplemental Rule 56.1 Statement of Defendant National Westminster Bank Plc ("NatWest") dated December 21, 2016 submitted in support of NatWest's Renewed Motion for Summary Judgment ("NatWest's Renewed Motion"), and set forth additional material facts as to which Plaintiffs contend there exist genuine issues to be tried.

### PLAINTIFFS' RESPONSES TO NATWEST'S NUMBERED PARAGRAPHS

1.      On March 28, 2013, the Court granted National Westminster Bank Plc ("NatWest") summary judgment, ruling that no reasonable juror could find for plaintiffs on the scienter element of their claims, and without reaching NatWest's arguments that it was also entitled to summary judgment on the proximate causation and Hamas responsibility elements of

plaintiffs' claims.  *See* Order Granting Motion for Summary Judgment (ECF No. 310).[1]  On September 22, 2014, the Second Circuit reversed the Court's grant of summary judgment to NatWest on scienter grounds and remanded the case "for further proceedings, including consideration of NatWest's other asserted grounds for summary judgment."  *Weiss v. Nat'l Westminster Bank Plc*, 768 F.3d 202, 212 (2d Cir. 2014).  Plaintiffs subsequently amended the *Weiss* and *Applebaum* complaints to add claims arising from three additional attacks that were previously time-barred before Congress amended the Anti-Terrorism Act's statute of limitations in 2013 (collectively, the "SoL Attacks").  On August 2 and 12, 2016, the Court granted NatWest permission to file, and set a schedule for, NatWest's renewed motion for summary judgment with respect to the proximate causation and Hamas responsibility issues that the Court did not reach in its March 28, 2013 opinion, as well as NatWest's motion for summary judgment with respect to plaintiffs' claims based on the SoL Attacks.

**RESPONSE TO 1**:  Paragraph 1 does not set forth any facts that are material to the legal

elements of Plaintiffs' claims or NatWest's defenses.  Therefore, no response from Plaintiffs is

required.

       2.     The three SoL Attacks occurred on the following dates:  (a) December 1, 2001 (Ben Yehuda Street), *see* Grube Decl. Ex. 1[2] (*Weiss* Sixth Am. Compl. ("*Weiss* SAC") ¶¶ 503-569), Grube Decl. Ex. 2 (*Applebaum* Am. Compl. ("*Applebaum* AC") ¶¶ 297-307); (b) March 7, 2002 (Atzmona), *see* Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 308-310); (c) June 18, 2002 (Patt Junction), *see* Grube Decl. Ex. 1 (*Weiss* SAC ¶¶ 570-577), Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 315-320).

**RESPONSE TO 2**:  Plaintiffs admit that NatWest's Renewed Motion addresses the attacks

described in Paragraph 2.

       3.     Plaintiffs allege that NatWest provided material support to Hamas, a Foreign Terrorist Organization ("FTO"), based on certain funds transfers (the "Identified Interpal Transfers") from Interpal's NatWest accounts to certain charitable organizations in the Palestinian Territories (the "13 Charities") that Plaintiffs contend are <u>alter egos</u> of and/or are controlled by Hamas.  *See* NatWest 56.1 St. ¶¶ 241-244.

---

[1] All citations to "ECF" numbers refer to electronic filings on the *Weiss* docket, Case No. 05-CV-4622 (DLI) (RML), unless otherwise specified.

[2] Citations to "Grube Decl. Ex. __" refer to the exhibits attached to the Declaration of Mark S. Grube In Support Of Renewed Motion Of National Westminster Bank Plc For Summary Judgment, dated December 21, 2016.  National Westminster Bank Plc's Statement of Material Facts As to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 (ECF No. 266) is cited as "NatWest 56.1 St. ¶ __."  Citations to exhibits appended to the Declaration of Valerie Schuster in Support of the Motion for Summary Judgment by National Westminster Bank Plc (ECF No. 267) are designated "Schuster Decl. Ex. __."

**RESPONSE TO 3**:  Plaintiffs object to improper argument in a Rule 56.1 statement.  Plaintiffs admit that NatWest's provision of material support to Hamas based upon certain funds transfers from Interpal's NatWest accounts to certain Hamas "charitable" organizations in the Palestinian Territories describes a primary basis for Plaintiffs' claims.

4.      Plaintiffs do not allege, and there is no evidence in the record, that NatWest or any of the 13 Charities perpetrated the terrorist attacks by which Plaintiffs were injured.  *See* NatWest 56.1 St. ¶¶ 253-261, 266-267.

**RESPONSE TO 4:**  Plaintiffs admit the assertions in Paragraph 4.

5.      Plaintiffs do not allege, and there is no evidence in the record, that any of the Identified Interpal Transfers were used to finance the terrorist attacks by which Plaintiffs were injured or to provide support to Hamas's military wing.  *See* NatWest 56.1 St. ¶¶ 248-249, 253, 268-274.

**RESPONSE TO 5:**  Plaintiffs dispute the assertions in Paragraph 5.  *See* Plaintiffs' Response to Defendant National Westminster Bank Plc's Local Civil Rule 56.1 Statement dated January 30, 2012 (*Weiss v. NatWest* ECF No. 283, *Applebaum v. NatWest* ECF No. 157) ("Plaintiffs' 56.1 Response") at ¶ 249.

6.      Plaintiffs allege, based on their <u>alter</u> <u>ego</u> theory, that they can satisfy the proximate causation element of their claims under Section 2333 of the Anti-Terrorism Act because the Identified Interpal Transfers constitute direct material support for Hamas.  *See* NatWest 56.1 St. ¶¶ 276-277.

**RESPONSE TO 6:**  Plaintiffs object to improper argument in Rule 56.1 Statement.  Plaintiffs admit that they contend that the counter-parties that NatWest transferred funds to were controlled by Hamas.  The Second Circuit in this case cites to *United States v. El–Mezain*, 664 F.3d 467, 489 (5th Cir. 2011) where the Fifth Circuit noted that "[t]he evidence of Hamas control of the ... committees was substantial."  There is substantial overlap between the committees that were the basis of the criminal prosecution in *El–Mezain* and the counter-parties NatWest provided funding to.  In addition, Judge Cogan described the evidence of Hamas control of largely the same counter-parties as follows:

[T]he traditional corporate veil-piercing factors do not include whether governments or intelligence services have found an organization to be controlled by Hamas, which would be strong evidence of such a link. Therefore, although these factors can serve as a useful guide in determining whether an entity is dominated and controlled by a terrorist group, they are not a rigid checklist.

Indeed, on similar evidence, the defendants in the Holy Land Foundation trial were convicted for providing material support to Hamas in violation of 18 U.S.C. § 2339B for providing funds to many of the very same charities at issue in this case. *See generally United States v. El–Mezain,* 664 F.3d 467 (5th Cir.2011). The jury instructions in that case did not mention any of the corporate veil piercing factors that defendant claims should apply here, and the Fifth Circuit concluded that "[t]he evidence of Hamas control of the zakat committees was substantial." *Id.* at 489. If the government can prove Hamas' control of these charities beyond a reasonable doubt in a criminal case and without reference to the alter ego test advocated by defendant, plaintiffs can do the same in this civil case.

The testimony of plaintiffs' experts, Dr. Levitt and Mr. Spitzen, supplied a substantial record on which the jury could reasonably conclude that these charities were controlled by Hamas.

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 334 (E.D.N.Y. 2015).

7.      Plaintiffs rely on the expert reports and proposed testimony of Matthew Levitt and Arieh Spitzen to prove that the 13 Charities were "alter egos of and/or controlled by Hamas." *See* NatWest 56.1 St. ¶¶ 278-283.

**RESPONSE TO 7:**  Plaintiffs object to Paragraph 7 because the evidence upon which Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit that they rely in part on Dr. Levitt's and Mr. Spitzen's opinions.  *See* PLAINTIFFS' 56.1 RESPONSE at ¶ 279.

8.      None of the 13 Charities has ever been designated as a Specially Designated Terrorist ("SDT") or as an FTO by the United States government.  *See* NatWest 56.1 St. ¶ 289.

**RESPONSE TO 8:**  Plaintiffs admit the assertions in Paragraph 8, but note that this has no material significance since departments or sub-organizations of an FTO are not separately designated as FTOs.  Their legal status is determined by their control by the FTO.  That is why e.g. the defendants in *El-Mezain* were convicted for providing material support to Hamas as a

result of their donations to many of the same "charities" that NatWest transferred funds to.

Those organizations were not separately designated as either as SDTs or as FTOs.

9.      The only one of the Charities ever designated as a Specially Designated Global Terrorist ("SDGT"), the Al-Salah Society, was designated in 2007, almost two years after the last of the Identified Interpal Transfers occurred.  *See* NatWest 56.1 St. ¶¶ 291-292.

**RESPONSE TO 9:**  Plaintiffs admit the assertions in Paragraph 9.

10.      Ten of the 13 Charities were created prior to the founding of Hamas.  *See* NatWest 56.1 St. ¶ 294.

**RESPONSE TO 10:**  Plaintiffs admit the assertion in Paragraph 10, but note that all of the

charities were controlled by Hamas during the time period that NatWest was providing them

with material support.

11.      Levitt testified that the Palestinian Authority and Hamas have been in "conflict" for "most of the time in their history."  *See* Grube Decl. Ex. 3 (Levitt CL Tr. at 115:3-16).

**RESPONSE TO 11:**  Plaintiffs dispute the assertions in paragraph 11 because NatWest has

mischaracterized Dr. Levitt's testimony by taking it entirely out of context.  Dr. Levitt testified

as follows:

> The Palestinian authority has and is today in a different type of conflict with Hamas. It also at times has been hand and glove with Hamas. At times cooperating and participating in violence and at times politically cooperating, but most of the time in their history and in recent history, by recent history I mean things beyond the time period involved here, there has been particularly acute conflict with the exchange of ammunition you described between elements of the Fatah led Palestinian authority now dominating the West Bank and Hamas dominating the Gaza Strip.

*See* Declaration of Aaron Schlanger executed on January 25 2017 ("Schlanger Decl.") Exhibit 8

(Levitt CL 9/1/2010 Tr. at 115:3-16).

12.      During the relevant period, the 12 of the 13 Charities Levitt considered were required to be registered with and overseen by the Palestinian Authority, which approved the elections of the members of the board of directors of the charities.  *See* NatWest 56.1 St. ¶¶ 295-299.

**RESPONSE TO 12:**  Plaintiffs dispute the assertions in Paragraph 12, except admit that

Dr. Levitt has testified that elections of trustees of 12 of the 13 Charities were required to be

registered or certified by the Palestinian Authority.  *See* PLAINTIFFS' 56.1 RESPONSE at ¶¶ 295-

298.

13.     Each of the 13 Charities maintained a separate board of directors and dedicated
bank accounts during the relevant period.  *See* NatWest 56.1 St. ¶¶ 300, 308-310.

**RESPONSE TO 13**:  Plaintiffs admit the assertions in Paragraph 13 except dispute that the

boards of the 13 Charities were "separate" either from Hamas or from the boards of the other 13

Charities.  *See* Schuster Decl. Ex. 149 (Levitt CL Dep.) at 212:4-213:17.

14.     There were non-Hamas members on some of the boards of directors of the
Charities.  *See* NatWest 56.1 St. ¶ 301.

**RESPONSE TO 14**:  Plaintiffs admit the assertion in Paragraph 14.

15.     The 13 Charities all performed charitable work in the Palestinian Territories.  *See*
NatWest 56.1 St. ¶¶ 340-342.

**RESPONSE TO 15**:  Plaintiffs admit the assertion in Paragraph 15.

16.     Levitt conceded that a source he relied on to conclude that the charitable network
is one of Hamas's three "wings" in fact only indicated that Hamas had two wings—the military
(terrorist) and political wings—and made no mention of a "da'wa network of charities."  Grube
Decl. Ex 3 (Levitt CL Tr. at 152:9-155:22).

**RESPONSE TO 16**:  Plaintiffs dispute the assertions in Paragraph 16 because NatWest has

mischaracterized Dr. Levitt's testimony and report by taking it out of context.  The source

referenced mentioned only the military and political wings of Hamas, but did *not* state that

Hamas had only two wings.

17.     There is no evidence of any instructions from Hamas leadership directing any of
the 13 Charities to take specific actions.  *See* NatWest 56.1 St. ¶¶ 320-322.

**RESPONSE TO 17**:  Plaintiffs dispute the assertions in Paragraph 17. Defendant attempts to

draw a false dichotomy between HAMAS and the 13 Charities discussed in the expert reports of

Mr. Spitzen and Dr. Levitt. Mr. Spitzen's and Dr. Levitt's reports discuss in depth how the 13

Charities form a part of HAMAS's social network and are part of HAMAS. Additionally, as

discussed in Mr. Spitzen's report, the Union of Good coordinates activities among many of the

13 Charities. For example, Mr. Spitzen lists the *al-Tadamun* Charitable Society in Nablus, *Al-*

*Islah* Charitable Society - Ramallah & al-Bireh, and the Islamic Charitable Society - Hebron as

being used by the Union of Good to channel funds to other societies. *See* Schuster Dec. Ex. 153

(Spitzen NW Rep. at 34-35). He also notes that the *Al-Islah* Charitable Society - Ramallah & al-

Bireh was established by HAMAS. *See id*. (Spitzen NW Rep. at 15). Mr. Spitzen also cites to

and appended the interrogation protocol of Jamal al-Tawil where the latter confirmed

coordinating the establishment of *Al-Islah* Charitable Society - Ramallah & al-Bireh with

HAMAS's office in Lebanon. He also stated that upon his arrest by the Palestinian Authority,

Falah Nada took over responsibility for distributing the funds received from Lebanon on behalf

of *Al-Islah* Charitable Society - Ramallah & al-Bireh. *See* PLAINTIFFS' 56.1 RESPONSE at ¶ 321.

18.     There is no central treasury from which Hamas funds its military, political and
social programs. *See* NatWest 56.1 St. ¶¶ 313, 385.

**RESPONSE TO 18**:  Plaintiffs admit that Dr. Levitt has so testified.

19.     There is no evidence of any transfers from the 13 Charities to Hamas leadership,
nor of any loans or guarantees of loans from Hamas leadership to the Charities. *See* NatWest
56.1 St. ¶¶ 325-329.

**RESPONSE TO 19**: Plaintiffs dispute the assertions in Paragraph 19. Defendant draws a false

dichotomy between HAMAS and the 13 Charities. Mr. Spitzen's and Dr. Levitt's reports discuss

in depth how the organizations they reviewed form part of HAMAS's social network and are part

of HAMAS. *See also* PLAINTIFFS' 56.1 RESPONSE at ¶¶ 321,323.

20.     The Israel Defense Forces webpage that Levitt's report identifies to support his
assertion that "Hamas deems legitimate the mingling" of military and social service funds does
not refer to any mingling of funds. *See* NatWest 56.1 St. ¶¶ 386-389.

**RESPONSE TO 20**: Plaintiffs admit the assertions in Paragraph 20, except note Dr. Levitt's

Report contains numerous examples of the mingling he describes. *See, e.g.,* Declaration of

Valerie Schuster executed on December 7, 2011 ("Schuster Dec.") Ex. 152 (Levitt NW Rep.) at

89-90 (describing flow of money between the HAMAS political leadership, *Al-Islah* Charitable

Association and HAMAS cells perpetrating suicide bombing attacks.). *See* PLAINTIFFS' 56.1

RESPONSE ¶ 389.

21.     There is no evidence that any of the 13 Charities comingled funds with Hamas,
apart from one assertion in Levitt's report that the head of one of the charities, the Al-Islah
Charitable Association, confessed to laundering funds through the charity for suicide bombings.
*See* NatWest 56.1 St. ¶ 382.

**RESPONSE TO 21**: Plaintiffs dispute the assertions in Paragraph 21. This paragraph draws a

false dichotomy between the 13 Charities and the HAMAS *da'wa* generally. *See* PLAINTIFFS'

56.1 RESPONSE AT ¶ 382.

22.     Levitt does not opine that the funds purportedly laundered by the head of the Al-
Islah Charitable Association were connected to any of the Identified Interpal Transfers or the
attacks by which Plaintiffs were injured.  *See* Schuster Decl. Ex. 152 (Levitt NW Rep. at 78-90).

**RESPONSE TO 22**: Plaintiffs dispute the assertions in Paragraph 22.  Dr. Levitt's expert report

notes that Interpal sent more than $550,000 from its NatWest account to the *Al-Islah* Charitable

Association between 2001 and 2005.  *See* Schuster Decl. Exhibit 152 (Levitt NW Rep.) at 90.

Dr. Levitt further testified that HAMAS's comingling of funds and the fungibility of those funds

means that any money donated to the 13 Charities, including the *Al-Islah* Charitable Association,

"free[s] up existing monies to support terrorist activities."  *Id.* at 13; Schlanger Decl. Exhibit 8

(Levitt CL Tr. at 162:9-167:20).

23.     Levitt testified that it was "possible though it's less common" and "rare" that
money donated to a charity is taken away from that charity and used for Hamas military activity.
*See* NatWest 56.1 St. ¶¶ 314-316.

**RESPONSE TO 23**: Plaintiffs dispute the assertions in paragraph 23.  Dr. Levitt testified that it was "less common" for "money that goes to an organization that's supposed to be for charity and given to a charity is taken away from the charity and used for military activity." *See* Schuster Decl. Exhibit 148 (Levitt 6/2/2011 Tr.) at 42:18-43:17. Moreover, this testimony was with respect to a hypothetical posed by defense counsel in which the entity transferring the money was Interpal but was not specific to Interpal. Dr. Levitt's report states "HAMAS deems legitimate the mingling of these funds [donated to its charities], as it considers the social services it provides a jihadist extension of its terrorist attacks." *See* Schuster Decl. Exhibit 152 (Levitt NW Rep.) at 13. Additionally, regarding the foregoing statement, Dr. Levitt testified:

> It's not just or solely that money could be raised by a charity where the pitch is to give to educational needs and then the money actually is diverted to purchase bullets or what have you. That is possible though it's less common. What happens more often is that money is raised for a variety of different things and the money is commingled and some of the funds will go towards education, some of the funds will go towards military, explicitly military purchases, some of the money will go towards other things that provide and facilitate for such attacks such as paying the salaries of operatives, bribing officials, procuring materials that could be used for an attack whether it's actual weapons or otherwise so it need not be the case necessarily though it can be that monies are raised for reason A and then diverted for reason B, reason B being militant or violent activity. It could also just be as is the case with HAMAS and other groups like it that the monies being fungible could be used in a variety of ways, A. B, more generally still money is fungible so if you raise $10 for one of the programs that you run, you may very well free up ten or maybe eight or four or some monies for something else.

*See* Schuster Dec. Ex. 148 (Levitt 6/2/2011 Tr.) at 37:6-38:10.

24.     Levitt is not aware of any instances in which any of the 12 of the 13 Charities he considered had used money to buy weapons.  *See* Grube Decl. Ex. 3 (Levitt CL Tr. at 168:14-21).

**RESPONSE TO 24**: Plaintiffs admit the assertions in Paragraph 24, except note that Dr. Levitt testified that the funds received by these Charities were co-mingled and HAMAS used funds received by these Charities to purchase, among other things, weapons used in HAMAS terrorist attacks.  *See* Schuster Dec. Ex. 148 (Levitt 6/2/2011 Tr.) at 37:6-38:15.

25.      Levitt is not aware of any instances in which the premises of any of the 12 of the 13 Charities he considered "were used to store weapons or otherwise plan acts of terrorism."  *See* Pls' Resp. to Def. Nat'l Westminster Bank's Statement of Material Facts As to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 ¶ 371 (ECF No. 273).

**RESPONSE TO 25**: Plaintiffs admit the assertions of Paragraph 25 to the extent they refer to

the physical situs of the 12 organizations. Dr. Levitt does not opine that the premises of any of

the 12 organizations were used to store weapons or otherwise plan acts of terrorism.  However,

Dr. Levitt does note that these 12 organizations provided salaries to numerous individuals

involved in the commission of acts of terrorism on behalf of HAMAS. Moreover, Dr. Levitt

specifically notes that employees of the Jenin Zakat Committee were recruited into HAMAS

while working at the organization. *See* Schuster Dec. Ex. 152 (Levitt NW Rep.) at 15-16.


26.      Levitt could not conclude that any of the 12 of the 13 Charities he considered are alter egos or controlled by Hamas.  *See* NatWest 56.1 St. ¶ 333.

**RESPONSE TO 26**: Plaintiffs dispute the assertions in Paragraph 26. Dr. Levitt did conclude

that the 12 of 13 Charities were controlled by HAMAS. *See, e.g.*, Schuster Dec. Ex. 152 (Levitt

NW Rep.) at 38 (identifying the following 11 of the 13 Charities as "Hamas-affiliated or

controlled organizations": Al Mujama al-Islami (Islamic Center, Gaza), Al-Jam'iya al-Islamiya

(Islamic Society or Islamic Association, Gaza), Al Salah in Gaza, Zakat Fund Committee-Jenin,

Ramallah Zakat Committee, Tulkarm Zakat Committee, El-Wafa Rehabilitation & Health Center

(Al Wafa Charitable Society), Islamic Charitable Society - Hebron, Al-Tadamon Charitable

Society, Al-Islah Charitable Society, and Beit Fajar Zakat Committee.); at 75 ("Nablus Zakat

Committee .... is one of several 'Hamas controlled organizations."); 87 ("the Al-Islah Charitable

Association is a multi-branch charitable organization controlled by Hamas.").


27.      Instead, Levitt opined only that he believed each of the 12 of the 13 Charities he considered fell within a "spectrum of variation" with respect to affiliation with Hamas.  *See* NatWest 56.1 St. ¶¶ 331-335.

**RESPONSE TO 27**: Plaintiffs dispute the assertions in Paragraph 27.  Dr. Levitt testified that

most of the 12 organizations fall within more than one of these classifications: "controlled by,

affiliated with, fundraise for, serve as alter egos or departments of, or otherwise support Hamas."

He further testified that the terms "controlled by," "affiliated with," "fundraise for," "alter ego,"

"department of" and "otherwise supports" were "meant to show the spectrum of variation" as

opposed to showing that an organization fit into one category as opposed to another category.

He went on to testify that he did not categorize which organizations fit into which categories. *See*

Grube Decl. Ex. 3 (Levitt 9/1/2010 CL Tr.) at 140:11-142:12.


    28.     Levitt testified that the spectrum included the following categories:  "controlled
by," "affiliated with," "fundraise for," "alter ego," "department of" and "otherwise supports."
*See* NatWest 56.1 St. ¶¶ 331-335.

**RESPONSE TO 28**: Plaintiffs dispute the assertions in  Paragraph 28 to the extent that they

simplify and mischaracterize Levitt's testimony.  See Plaintiffs' Response to Paragraph 27

above.


    29.     Levitt defined the above categories as follows:
- a) <u>Controlled by</u>: "some entities that are affiliated with Hamas are a little more independent and they may have a Hamas guy who worked there and is able to take advantage on behalf of the organization and others I think . . . [at] the other end of the extreme and of course there's plenty in the middle . . . ."

- b) <u>Affiliated with</u>: "I don't know that I had a specific definition other than to be able to demonstrate in some of these cases you have groups that may be <u>legally independent</u> entities.  Like I said, you don't have the shingle hanging out the front door, but they do in fact have affiliations with Hamas . . . ." (emphasis added).

- c) <u>Fundraise for</u>:  "Fundraise for means raises money for."

- d) <u>"Could be" alter ego</u>: "[Y]ou can have a situation where a person or entity who's affiliated with Hamas is doing something on behalf of the organization and that fulfills a need or an objective of the organization and in that sense maybe only in that particular act or maybe on a larger scale could be acting as an alter ego for [Hamas]."

e) <u>Department of</u>:  "[A]ctual departments or branches of Hamas that the Hamas structure does involve various committees including fundraising committee, education committee and some of the charities that are affiliated with Hamas do interact with and do in some cases actually function as part of the activities of those committees."

f) <u>Otherwise supports</u>:  "[I]n some cases Hamas has recruited through these institutions or used these institutions for the benefit of some other logistical support and those other types of support beyond the strict provision of monies."

*See* Nat West 56.1 St. ¶ 335.

**RESPONSE TO 29**: Plaintiffs admit the assertions of Paragraph 29.

30.     Levitt testified that he did not determine where each of the 12 of the 13 Charities he considered fell on his spectrum.  *See* NatWest 56.1 St. ¶ 333.

**RESPONSE TO 30**: Plaintiffs dispute the assertions of Paragraph 30. *See* Plaintiffs' Response

to Paragraph 27 above.

31.     Spitzen testified that his opinions regarding the 13 Charities' relationship to Hamas were based on an 18 factor test he created to evaluate "the level of Hamas's control of a specific organization."   *See* NatWest 56.1 St. ¶¶ 434-442.

**RESPONSE TO 31**: Plaintiffs dispute the assertions in Paragraph 31.  To the contrary, Mr.

Spitzen testified:

> The 18 criteria which appear here -- I divided it to 18 -- actually appeared in many works by researchers, enforcement entities, in different forms. All in all, this division into 18 is done in order to make things clearer, to make it easier. I don't think I know any -- I mean, I don't -- I wouldn't say that I don't know any researcher. But most researchers use these in expert opinions. And also it is used by different entities such as enforcement entities, the director -- directorate of intelligence of the IDF, by the Israel security, the ISA. And all them -- all of them use these criteria. . . . But all in all, these criteria are the acceptable criteria in research, in enforcement.

Schuster Dec. Ex. 158 (Spitzen Arab Bank Tr.) at 30:17-31:4.

32.     Spitzen testified that, for some of the 13 Charities, "all of the [18] criteria exist and the identification with Hamas is clear," but for others "only some of the criteria existed." *See* NatWest 56.1 St. ¶ 440.

**RESPONSE TO 32**: Plaintiffs admit the assertions in Paragraph 32.

33.     Spitzen did not identify any of the 13 Charities for which all of his criteria were satisfied.  *See* NatWest 56.1 St. ¶¶ 440-441.

**RESPONSE TO 33**: Plaintiffs admit the assertions in paragraph 33, although Spitzen's report describes how he evaluated the presence and absence of his criteria. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep.) at 5-7.

34.     Spitzen testified that "the conclusions regarding some of the entities are more cut and dry" but "[s]ome other entities, they are more careful – cautious."  *See* NatWest 56.1 St. ¶ 443.

**RESPONSE TO 34**: Plaintiffs admit the assertions in Paragraph 34.

35.     Spitzen's report does not state which of his criteria were satisfied for each organization, or which of his conclusions were "cautious."  *See* NatWest 56.1 St. ¶¶ 440-444.

**RESPONSE TO 35**: Plaintiffs dispute the assertions in Paragraph 35.  With respect to, *inter alia*, *al-Mujama al-Islami*, *al Jam'iya al Islamiya* and *al Salah*, Mr. Spitzen's descriptions underscore that his determination that these committees are HAMAS-controlled is "cut and dry." With respect to *al Mujama*, Mr. Spitzen opined, "On the basis of all of the above, we see a clear connection, almost a oneness, between *al-Mujama al-Islami* and Hamas, a fact that was publicly known and stated in both the local and the Western media."  Schuster Dec. Exhibit 153 (Spitzen NW Rep.) at 49.  Mr. Spitzen also states, "On the basis of the essential role played by the senior leaders of *al-Mujama al-Islami* in the da'wa activities of Hamas (including the fact that many of its founders are also the founders of Hamas); on the basis of the blatant adoption of Hamas's positions and the call for Hamas terrorist attacks and, in fact, its ideology of carrying out terror activity; on the basis of the organization's sources of funding and its ties to other entities controlled by Hamas, I conclude that, during all the relevant periods, *al-Mujama al-Islami* was

controlled by Hamas and it remains a central element in Hamas's da'wa infrastructure." *Id*. at 51. With respect to *al Jam'iya*, Mr. Spitzen opined, "This was one of the most prominent and central Hamas-identified institutions in the Gaza Strip." *Id*. at 52. Mr. Spitzen also states, "On the basis of the central role played by the senior leadership of *al-Jam'iya al-Islamiya* in Hamas's da'wa activities (including the fact that many of its founders were also among the founders of Hamas), the blatant adoption of Hamas's ideology and terrorist attacks, the Society's sources of funding, and its ties with other organizations controlled by Hamas, I conclude that, in all the relevant periods, *al-Jam'iya al-Islamiya* was controlled by Hamas and it still constitutes a key element in Hamas's infrastructure." *Id*. at 63-4. With respect to *al Salah*, Mr. Spitzen notes that it was designated a Specially Designated Global Terrorist ("SDGT") by the U.S. because of its relationship with HAMAS. *Id*. at 65-6. Mr. Spitzen also opined, "On the basis of: the important role played by senior Hamas personnel such as Ahmad al-Kurd; *al-Salah's* network of summer camps and educational institutions (which openly supported violence); the Society's sources of funding; the distribution of funds to terrorists and their families; and the fact that Israel, the United States, and the Palestinian Authority see *al-Salah* as an association identified with Hamas; and its public identification by Hamas and other elements as part of Hamas's civilian infrastructure - the da'wa; from all these I conclude that, at all the relevant times, *al-Salah* was controlled by Hamas and constituted a part of its da'wa infrastructure." *Id*. at 73.

36.     Spitzen testified that he did not give each of the 18 criteria equal weight, that each criterion did not have the same weight for each charity, that different criteria held the greatest weight in his analysis for different charities, and that he did not require a minimum number of criteria to be met before he considered a charity to be controlled by Hamas. *See* NatWest 56.1 St. ¶¶ 445-453.

**RESPONSE TO 36**: Plaintiffs admit the assertions in Paragraph 36, subject to the following qualifications: the analysis performed by Mr. Spitzen cannot be performed by mechanically calculating the number of factors satisfied. Instead, as he testified, Mr. Spitzen had to assess the

factors qualitatively in the context of which materials are publicly available. Thus, the mere absence of available data would not be given equal weight as the existence of available data. Mr. Spitzen repeatedly stressed the need to consider the data sets "holistically." *See* Schuster Decl. Ex. 158 (Spitzen Arab Bank Tr.) at 449:2-452:24; *see also* Schuster Decl. Ex. 153 (Spitzen NW Rep.) at 5-7. In conducting analysis of terrorist organizations, identical data sets are not always available for a variety of reasons. Therefore, a researcher has to evaluate the available materials and assess whether the absence of certain evidence is of significance to the analysis or merely reflects circumstantial unavailability of certain materials. *See* Schuster Dec. Ex. 153 (Spitzen NW Rep.) at 5.

37.     Spitzen testified that it was "not the method or the way of my research" to determine which actions taken by alleged Hamas members at the 13 Charities were taken on behalf of Hamas rather than on behalf of the particular charity. *See* Grube Decl. Ex. 4 (Spitzen CL Tr. at 204:14-205:16).

**RESPONSE TO 37**: Plaintiffs dispute the assertions in Paragraph 37 because they are taken out of context and based upon a false assumption contradicted by the findings in Mr. Spitzen's report. Mr. Spitzen testified as follows:

> Q. Well, my question is that if a person that you allege to be a member of Hamas works at a nursery school run by one of the entities, when they make a decision, how do you determine if that decision is being made based on their role at one of the 13 entities or if it's being made based on their alleged role at Hamas? . . . . Why can't you answer? . . .

> A. Because the question is formulated in such a way that it sounds as if this entity is an entity separate from the Hamas, not belonging to the Hamas. I didn't say such a thing.

> Q. . . . Mr. Spitzen, did you, in doing your analysis, endeavor to try to determine which decisions and actions taken by the 13 entities were taken and made by individuals because of their roles at the 13 entities or because of their alleged roles at Hamas?

> A. No, this was not the method or the way of my research.

Q.  And Mr. Spitzen, did -- did you, in conducting your analysis to offer these expert opinions, endeavor to try to determine whether an individual, who you allege to be a member of Hamas and to have either been a volunteer or employee of one of the 13 entities, whether their actions were done because they were acting on behalf of Hamas or because they were acting on behalf of one of the 13 entities?

A. Again, this is not the way I was working. Your basic assumption in this question is that these associations are one thing and the Hamas is another thing. I determine in my expert opinion, and I insist on it, that these entities are part of the infrastructure of Hamas.

Schlanger Decl. Exhibit 9 (Spitzen CL 8/12/2010 Tr.) at 200:19-205:16 (objections omitted).

38.     Spitzen testified that, when a charity has a senior Hamas member in a "key position," meaning a position given "the right to sign checks or documents," he considered Hamas to be "running the day-to-day operations."  *See* NatWest 56.1 St. ¶¶ 456-457.

**RESPONSE TO 38**:  Plaintiffs dispute the assertions in Paragraph 38.  Spitzen testified that he defines a person with a "key position" as anyone who has "the right to sign checks or any documents" who decides "what this association is going to do and how" and who runs the entity's day-to-day operations.  *See* Schuster Decl. Ex. 151 (Spitzen 8/11/2010 CL Tr.) at 183:11-184:5.

39.     Spitzen's report concludes that the Al Wafa Charitable Society and the Jerusalem Central Zakat committee were not "controlled" by Hamas.  *See* Schuster Decl. Ex. 153 (Spitzen NW Rep. at 71, 142).

**RESPONSE TO 39**: Plaintiffs dispute the assertions in Paragraph 39.  Mr. Spitzen opined that "Many of al-Wafa's key operatives are publicly known to be members of Hamas," including the "chairman of Al-Wafa's Board of Directors," and that the al-Wafa society was "known as part of Hamas's *da'wa* infrastructure during the relevant period." *See* Schuster Decl. Ex. 153 (Spitzen NW Rep.) at 74.  Further, he concluded that "at all the relevant times, al-Wafa was part of Hamas's *da'wa* infrastructure."  *Id*. at 77.  Mr. Spitzen noted that "The word "*da'wa*," whose basic meaning in Arabic is 'the call to the believers to shelter beneath the faith – return to the faith,' is used in this expert report (and is commonly used among researchers in the field) in the

16

sense of 'the civilian infrastructure of Hamas' or 'the totality of the civilian institutions and projects *operated by Hamas* in the Palestinian Territories,' that is, in the West Bank and Gaza Strip. *Id* at 13, n. 33 (emphasis added).

Regarding the Jerusalem Central Zakat Committee, Mr. Spitzen opined: (a) some members of that Committee "in key positions" are "Hamas terror operatives" (*id*. at 152); (b) Hamas has acknowledged that the Committee "'is all ours'" (*id*. at 153); and (c) the Committee's sources of funding include "Islamic foundations that have been declared unlawful associations in Israel and the United States." *Id*. He further concluded that "Jerusalem Central Zakat Committee was apparently identified with Hamas and constituted a part of the movement's *da'wa* infrastructure in Jerusalem and "the known facts indicate that the Jerusalem Central Zakat Committee is, apparently, connected with Hamas." *Id*.

40.     Because plaintiffs allege that NatWest's provision of routine banking services to a lawful, registered charity in the United Kingdom known as "Interpal" (a/k/a Palestine Relief & Development Fund a/k/a Palestinians Relief & Development Fund) proximately caused the three SoL Attacks by which certain of plaintiffs were injured, plaintiffs must prove that NatWest provided services directly to the entity that perpetrated the SoL Attacks, which plaintiffs allege was Hamas, and that Hamas in fact perpetrated the attacks. Grube Decl. Ex. 1 (*Weiss* SAC ¶¶ 723-729); Grube Decl. Ex. 2 (*Applebaum* AC ¶¶ 467-473).

**RESPONSE TO 40**: Plaintiffs object to the legal arguments set forth in Paragraph 40, as to which no response is required.  Plaintiffs dispute the assertion that NatWest provided "routine banking services" to Interpal during the relevant period.  NatWest suspected Interpal of providing financial support for Hamas since May 1990 but continued to maintain accounts for, and provide banking services to, Interpal until 2007.  *See* Plaintiffs' 56.1(b) Statement of Material Facts As To Which There Is A Genuine Issue To Be Tried dated January 30, 2012 (*Weiss v. NatWest* ECF No. 274, *Applebaum v. NatWest* ECF No. 158) ("PLAINTIFFS' 56.1(B) STATEMENT") at ¶¶ 9-300.  Plaintiffs dispute NatWest's characterization of Interpal as a "lawful" charity.  In May 1997, Interpal was outlawed by Israel because of its affiliation with Hamas.  *See*

*id*. at ¶ 8.  In January 1998, Interpal was declared a "terrorist organization" by Israel.  *See id*.  In

August 2003, Interpal was designated an SDGT by the U.S. Department of Treasury Office of

Foreign Assets Control ("OFAC").  *See id*.  Plaintiffs admit that certain of the plaintiffs allege

injuries suffered as a result of the three terrorist attacks identified in Paragraph 2 above, and that

Plaintiffs allege that the three attacks were committed, planned or authorized by Hamas.

      41.    In order to prove that Hamas perpetrated the SoL Attacks, plaintiffs rely on the
proposed expert testimony of Ronni Shaked and Evan Kohlmann, the proposed testimony of two
fact witnesses who were present at or shortly after one of the three SoL Attacks, and the
documents cited in the expert reports that Shaked and Kohlmann have submitted concerning the
SoL Attacks.  Grube Decl. Ex. 5 (May 11, 2016 Osen Ltr. to Friedman at 1).

**RESPONSE TO 41**:  Plaintiffs object to Paragraph 41 because the evidence upon which

Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or

NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.

Plaintiffs admit that the evidence identified in Paragraph 41 is part of the evidence upon which

Plaintiffs intend to rely to prove Hamas's responsibility for the attacks identified in Paragraph 2

above.

      42.    Plaintiffs proffer Ronni Shaked as an expert witness who purports to opine that
Hamas perpetrated the three SoL Attacks.  Shaked's opinions are contained in his "Second
Supplemental Expert Report," dated December 2, 2013.  Grube Decl. Ex. 6 (Shaked Second
Supp. Rep. at 1-64).

**RESPONSE TO 42**:  Plaintiffs object to Paragraph 42 because the evidence upon which

Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or

NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.

Plaintiffs admit that it is Dr. Shaked's expert opinion that Hamas is responsible for the three

attacks identified in Paragraph 2 above.  In addition to Dr. Shaked's Second Supplemental

Report dated December 2, 2013 ("Second Supplemental Shaked Report" or "SSSR"), Dr.

Shaked's opinions relevant to the three attacks are also contained in his Expert Report dated

December 30, 2010 ("SR").  *See* Schuster Decl. (*Weiss v. NatWest* ECF No. 267, *Applebaum v. NatWest* ECF No. 151) at Exhibit 179 (SR) at 5-15, 17-26.

       43.     Plaintiffs previously proffered Shaked as an expert witness, and in that instance he opined that Hamas perpetrated the 15 attacks that were addressed in NatWest's prior summary judgment motion.  *See* NatWest 56.1 St. ¶¶ 495-669.

**RESPONSE TO 43**:  Plaintiffs object to Paragraph 43 because the evidence upon which

Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or

NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.

Plaintiffs object to NatWest's use of the word "previously" in Paragraph 43 to the extent that it

incorrectly implies that Plaintiffs do not continue to proffer Dr. Shaked as an expert witness with

respect to the 15 attacks addressed in NatWest's motion for summary judgment dated December

7, 2011 (*Weiss v. NatWest* ECF No. 264, *Applebaum v. NatWest* ECF No. 148) ("NatWest's

Initial Motion").  Plaintiffs admit that it is Dr. Shaked's expert opinion that Hamas was involved

in the recruiting for, and the planning and perpetration of 14 of the 15 attacks addressed in

NatWest's Initial Motion.  *See* Schuster Decl. Exhibit 179 (SR) at 16.  *See also* Schlanger Decl.

at ¶ 7 and Exhibit 3 at 1001:12-1002:10 (stating that it is "almost certain" that Hamas carried out

13 of the 15 attacks).  As to the mortar attack on Neve Dekalim on September 24, 2004, although

Dr. Shaked is unable to state definitively that Hamas was responsible for this attack, he has

expressed the opinion that "there is a high degree of probability that Hamas was responsible for

this terrorist attack."  *See* Schuster Decl. Exhibit 179 (SR) at 122.  *See also* Schlanger Decl. at

¶ 7 and Exhibit 3 at 1001:12-1002:10 ("a high probability").

44.     The object of Ronni Shaked's analysis concerning the SoL Attacks is the same as the object of his prior analysis, which was to determine whether Hamas was involved in the recruiting, planning and perpetration of terrorist attacks.  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 46:3-47:22).

**RESPONSE TO 44**:  Plaintiffs object to Paragraph 44 because the "object" of the analysis that

forms the basis for Dr. Shaked's expert opinions concerning the attacks identified in Paragraph 2

above is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs

dispute the assertions in Paragraph 44, which mischaracterize Dr. Shaked's testimony, except

admit that, as Dr. Shaked testified, the scope of the work required for the Second Supplemental

Shaked Report was the "same scope" as that for the Shaked Report.  *See* Grube Decl. Exhibit. 7

(Shaked 2/12/2014 CL Tr.) at 46:21-47:22).

45.     Shaked used the same methodology to determine whether Hamas perpetrated the three SoL Attacks that he previously used to determine whether Hamas perpetrated the 15 attacks he previously addressed.  *Id.* (Shaked 2/12/14 Tr. at 47:13-49:2).  Shaked testified, "I learned about [the SoL Attacks] and it's the same scope [as my prior report] because I wanted to continue with the same line, the same methodology and the same way."  *Id.* (Shaked 2/12/14 Tr. at 47:13-22).

**RESPONSE TO 45**:  Plaintiffs object to Paragraph 45 because the methodology used by Dr.

Shaked in forming his expert opinions concerning the attacks identified in Paragraph 2 above is

not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is,

therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs dispute the

assertions in Paragraph 45, which mischaracterize Dr. Shaked's testimony, except admit that Dr.

Shaked testified: "I learned about the terrorist attacks and it's the same scope because I wanted to

continue with the same line, the same methodology and the same way" (*see* Grube Decl. Exhibit

7 (Shaked 2/12/2014 CL Tr.) at 47:19-22); and, he used the "same methodology the same ways

of supposition, analysis and conclusions as before."  *Id*. at 48:23-49:2.

46.    As to the December 1, 2001 (Ben Yehuda) attack, one of the SoL Attacks, Shaked wrote in his Second Supplemental Report that, "[f]rom the many Hamas documents and Israeli sources cited above, it is clear that from the command level down to the field operatives, Hamas is responsible for the double suicide bombing on Ben Yehuda Street in Jerusalem.  Hamas's various publications describing the double suicide bombing on Ben Yehuda Street indicate that it glorifies the attack as a success of the *Izz al-Din al-Qassam* Brigades."  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 41).

**RESPONSE TO 46**:  Plaintiffs admit that the language quoted in Paragraph 46 appears in the

Second Supplemental Shaked Report, and further state that the "Israeli sources" referenced in the

quoted language include:  (a) an official report of the Israel Security Agency, *Suicide Bombers in*

*the Five Years of Conflict,* May 2005 ("2005 ISA Report") which identifies Hamas member

Osama Bahar and his friend and Hamas recruit Nabil Abu Halabiya as the two suicide bombers

who perpetrated the Ben Yehuda attack, and senior Hamas member Abdullah Jamal [Barghuthi]

as the person who provided the suicide belts the bombers used (*see* Grube Decl. Exhibit 6

(SSSR) at 37; Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 59:18-60:25); (b) a February

7, 2002 official announcement by the Israeli Prime Minister's Office reporting the result of a

joint ISA-police investigation that identified four other Hamas members involved in preparing

for, and carrying out, the Ben Yehuda attack (*see id*. at 38; Schlanger Decl. at ¶ 41 and Exhibits

31 and 32); and (c) the criminal indictment, guilty plea, conviction and sentencing of Abdallah

Jamal Barghuthi for, among other things, his membership in Hamas and his role in the Ben

Yehuda attack.  *Id*. at 38-39; Schlanger Decl. Exhibits 33-35.

47.    As to the March 7, 2002 (Atzmona) attack, one of the SoL Attacks, Shaked wrote in his Second Supplemental Report that, "[b]ased on Hamas documents, its announcements, the memorial days for the terrorist attack, Hamas's boasting about taking responsibility, and the pictures and video films, I conclude, with a very high degree of probability (and, indeed, have no doubt) that Hamas was responsible for the suicide attack in Atzmona."  *Id.* (Shaked Second Supp. Rep. at 50-51).

**RESPONSE TO 47**:  Plaintiffs admit that the language quoted in Paragraph 47 appears in the

Second Supplemental Shaked Report, and further state that "the pictures and video films"

referenced in the quoted language include:  (a) photographs of Muhammad Farhat, the 17 year-

old perpetrator of the Atzmona suicide attack, taken both before and after his death with his

mother Maryam Farhat, the notorious Hamas member known internationally as the "'mother of

martyrs'" and "considered a symbol of Palestinian mothers who encourage their sons to carry out

terrorist attacks" (*see* Grube Decl. Ex. 6 (SSSR) at 43, 44, 47, 49); (b) a video honoring Maryam

Farhat that includes many photographs of Muhammad Farhat and Maryam Farhat wearing

Hamas symbols and holding weapons (*id*. at 45 (citing, *inter alia*,

http://www.youtube.com/watch?v=DvG68bqkn38); Schlanger Decl. at ¶ 51 and Exhibit 42); and

(c) Muhammad Farhat's "video will," which was filmed no earlier than the day prior to the

attack, and in which he identifies himself as a member of the *Izz al-Din al-Qassam* Brigades and

states his intention to carry out a suicide operation.  *See* Grube Decl. Ex. 6 (SSSR) at 45;

Schlanger Decl. Exhibits 38 and 39.

48.     As to the June 18, 2002 (Patt Junction) attack, one of the SoL Attacks, Shaked
wrote in his Second Supplemental Report that, "[b]ased on the materials cited above, and my
experience and familiarity with the *modus operandi* of Hamas, I conclude, with a very high
degree of probability (and, indeed, I have no doubt) that Hamas was responsible for the suicide
bombing carried out on June 18, 2002, at Patt Junction in Jerusalem."  *See id.* (Shaked Second
Supp. Rep. at 63); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 147:10-148:3).

**RESPONSE TO 48**:  Plaintiffs admit that the language quoted in Paragraph 48 appears in the

Second Supplemental Shaked Report, and further state that among "the materials cited above"

referenced in the quoted language are:  (a) the 2005 ISA Report, which includes the findings that

the suicide bombing on Bus 32A at Patt Junction was planned and executed by Hamas operatives

Ali Alian, Ramadan Mashahrah and Fahmi Mashahrah (*see* Grube Decl. Ex. 6 (SSSR) at 58;

Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 59:18-60:25); (b) the criminal indictments,

guilty pleas, convictions and sentencing of Ramadan Mashahrah and Fahmi Mashahrah for their

roles in the Bus 32-A suicide bombing (Grube Decl. Ex. 6 (SSSR) at 59-60; Schlanger Decl.

Exhibits 43-46); and (c) the official communiqué published on the internet by the *Izz al-Din al-Qassam* Brigades on the same day that the suicide bombing occurred which, among other things, correctly identified the suicide bomber as Muhamad Haza al-Ghoul a master's degree student studying Islamic law at al-Najah University.  Grube Decl. Ex. 6 (SSSR) at 52; Schlanger Decl. at ¶ 57 and Exhibit 47.

   49. Shaked relies on the same evidence to attribute the September 24, 2004 attack to Hamas that he relied on in the matter of *Strauss v. Crédit Lyonnais, S.A.*, Case No. 06-CV-702 (DLI) (RML).  *See* Schuster Decl. Ex. 179 (Shaked NW Rep. at 121-122); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 449 (E.D.N.Y. 2013).

**RESPONSE TO 49**:  Plaintiffs object to Paragraph 49 because the data relied upon by Dr. Shaked in forming his expert opinion concerning the September 24, 2004 attack is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  The evidence Dr. Shaked relies upon to attribute the September 24, 2004 attack to Hamas is set forth in the Shaked Report (Schuster Exhibit 179).

   50. Shaked's Report attributes the October 22, 2003 attack to Hamas based on his observation at the scene of a photograph being taken of a corpse that bore a green bandana, which Shaked presumed to be the perpetrator of the attack.  *See* Schuster Decl. Ex. 179 (Shaked NW Rep. at 126).

**RESPONSE TO 50**:  Plaintiffs object to Paragraph 50 because the data relied upon by Dr. Shaked in forming his expert opinion concerning the October 22, 2003 attack is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  The evidence Dr. Shaked relies upon to attribute the October 22, 2003 attack to Hamas is set forth in the Shaked Report (Schuster Exhibit 179).  Plaintiffs admit that one of the pieces of evidence that Dr. Shaked considered in concluding that the October 22, 2003 attack at Tel Romeda was perpetrated by Hamas was his

review of photographs taken at the scene of the attack shortly after it occurred,[3] but Plaintiffs

dispute the assertion that Dr. Shaked "presumed" the corpse depicted in the photographs to be

that of the perpetrator of the attack. To the extent that NatWest insists upon authentication of the

crime scene photographs, Plaintiffs are prepared to proffer the testimony of the photographer, to

the extent the Court deems that necessary. Plaintiffs have also produced records of subsequent

convictions of members of the Hamas cell headed by Rafiq Muhammad Ziyad Aqanibi, the

perpetrator of the October 22, 2003 attack. *See* Schlanger Decl. Exhibits 22-23. Dr. Shaked also

took into account Aqanibi's prior arrests and convictions for his membership in Hamas.[4]

Dr. Shaked cross-referenced this information against statements and materials Hamas published

about Aqanibi and the October 22, 2003 attack. See Schuster Decl. Exhibit 179 (SR) at 124-27.

51.     In his Second Supplemental Report, Shaked claims that he visited the site of one
of the three SoL Attacks. However, Shaked testified that his opinions regarding Hamas's
responsibility for the SoL Attacks are not based on his personal knowledge, including his
observation of any attack site. *See* Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 31); Grube
Decl. Ex. 7 (Shaked 2/12/14 Tr. at 109:4-14).

**RESPONSE TO 51**: Plaintiffs object to Paragraph 51 because the data relied upon by Dr.

Shaked in forming his expert opinions concerning the attacks identified in Paragraph 2 above is

not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is,

therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs dispute the

assertion that Dr. Shaked's expert opinions are not based on his "personal knowledge." Among

other things, Dr. Shaked's expert opinions are based upon his vast personal knowledge obtained

through his professional experience in studying terrorism for many years while a Commander in

[3] Dr. Shaked was not present at the scene of the attack when the photographs at issue were taken. *See* Schlanger Decl. Exhibit 3 (Arab Bank Trial Transcript 8/25/2014 (Shaked-Direct)) at 1234:7-8.

[4] Schuster Decl. Exhibit 179 (SR) at 127 ("In three cases, before his death, Aqanibi was arrested by Israel and convicted of membership in Hamas. At the time when he was killed, Aqanibi was wanted by the Israeli security forces on suspicion of being involved in Hamas terrorist operations.").

the Israel Security Agency, as a consultant for the Federal Bureau of Investigation and as the author of a leading book on Hamas. *See* Schuster Decl. Exhibit 179 (SR) at 1-4; Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 22:2-24. *Accord Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.2d 414, 443 (2013) ("Shaked has established that he has specialized 'knowledge, skill, experience, training or education,' about Hamas. Fed.R.Evid. 702. Among other things, he served for over a decade in the ISA, has worked as a consultant for the FBI, authored a published book about Hamas and covered Palestinian affairs and terrorism for Israel's largest newspaper for over twenty years."). Plaintiffs admit that Dr. Shaked testified that the opinions expressed in the Second Supplemental Shaked Report concerning the Ben Yehuda Street bombings are not "premised at all on anything [he] observed at the attack scene." *See* Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 109:24-110:3.

52.     Instead, Shaked's opinions that Hamas perpetrated the SoL Attacks are based solely on the documents and materials cited in his Second Supplemental Report. Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 19:21-22:24).

**RESPONSE TO 52**: Plaintiffs object to Paragraph 52 because the data relied upon by Dr. Shaked in forming his expert opinions concerning the attacks identified in Paragraph 2 above is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs dispute the assertion in Paragraph 52 which misstates the evidence NatWest cites and, therefore, fails to comply with Rule 56.1(d). Dr. Shaked testified that the opinions in the Second Supplemental Shaked Report are based not only on the documents and materials cited therein but also upon his professional knowledge and experience. *See* Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 22:21-24. *See also* Response to Paragraph 51.

25

53.     Shaked does not cite any Israeli civil court conviction in relation to any of the SoL Attacks.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 1-63).

**RESPONSE TO 53**:  Plaintiffs object to Paragraph 53 because the data relied upon by Dr.

Shaked in forming his expert opinions concerning the attacks identified in Paragraph 2 above is

not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is,

therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit the assertion

in Paragraph 53.

54.     For each of the SoL Attacks, Shaked relies on Hamas claims of responsibility to conclude that Hamas committed the attack.  *Id.* (Shaked Second Supp. Rep. at 31-32, 40-41, 52-53, 62-63); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 61:5-11).

**RESPONSE TO 54**:  Plaintiffs object to Paragraph 54 because the data relied upon by Dr.

Shaked in forming his expert opinions concerning the attacks identified in Paragraph 2 above is

not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is,

therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs dispute the

assertion in Paragraph 54, except admit that Dr. Shaked's attribution of each of the attacks to

Hamas is based in part on Hamas's credible claims of responsibility.  *See* Schuster Decl.

Exhibit 179 (SR) at 3-15, 17-26; Grube Decl. Exhibit 6 (SSSR) at 30-63; Grube Decl. Exhibit 7

(Shaked 2/12/2014 CL Tr.) at 61:6-62:21.  Terrorism experts reasonably rely on terrorist

organizations' credible claims of responsibility in forming an opinion concerning the

responsibility for particular terrorist attacks, as demonstrated by the report of NatWest's

terrorism expert Brian Jenkins.  *See esp*., Schuster Decl. Exhibit 172 (Jenkins Report) at 3, 27-

33.  *See also* Schuster Decl. Exhibit 210 (Kohlmann Report) at 3-6.

55.     In particular, Shaked quotes from or summarizes the contents of Hamas websites and publications or interviews in which Hamas operatives purportedly claimed responsibility for each attack.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 33-36, 55-57).

**RESPONSE TO 55**:  Plaintiffs object to Paragraph 55 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit to the assertion in Paragraph 55, except for the assertion that such quotations and summaries are "[i]n particular."  *See* Grube Decl. Exhibit 6 (SSSR) at 30-63.  Terrorism experts reasonably rely on terrorist organizations' credible claims of responsibility in forming an opinion concerning the responsibility for particular terrorist attacks, as demonstrated by the report of NatWest's terrorism expert Brian Jenkins.  *See esp*., Schuster Decl. Exhibit 172 (Jenkins Report) at 3, 27-33.  *See also* Schuster Decl. Exhibit 210 (Kohlmann Report) at 3-6.

56.    Terrorist groups, including Hamas, had strong incentives during the Second Intifada to make claims of responsibility for terrorist attacks, including for purposes of propaganda, competition with rival groups and recruitment.  Accordingly, such claims of responsibility are not reliable.  *See* NatWest 56.1 St. ¶¶ 812-827.

**RESPONSE TO 56**:  Plaintiffs object that the assertion that Hamas's claims of responsibility for terrorist attacks committed during the Second Intifada are not reliable is not supported by any evidence cited in NatWest 56.1 St. at ¶¶ 812-827 and, therefore, fails to comply with Rule 56.1(d).  Plaintiffs dispute this assertion.  Dr. Shaked has opined that during the Second Intifada Hamas never officially claimed responsibility for any terrorist attack it did not commit.  *See* Schuster Decl. Exhibit 179 (SR) at 5; Schuster Decl. Exhibit 180 (Shaked 11/4/2010 CL Tr.) at 87:21-88:22, 110:6-25, 120:9-122:8.  Mr. Kohlmann has testified that he is not aware of any claim of responsibility issued through an official Hamas website that has been shown to be false, as opposed to exaggerated or inaccurate in some detail.  *See* Schuster Decl. Exhibit 187 (Kohlmann 12/3/2010 CL Tr.) at 334:9-335:21.  Mr. Kohlmann also testified that it is Hamas's policy not to assert false claims of responsibility for terror attacks.  *See id*. at 187:10-18 ("When

Hamas issues a communi[qué] through their website[,] by default because of their philosophy or because of their belief that by telling the truth that they can achieve the position of an honest broker in the Israeli Palestinian conflict, this is their general mode of operation.  Their general preference is to try to claim credit for the stuff they can prove they have done."); *id*. at 188:11-21 ("Because the internet is a public venue and because it's available to anyone it means that Hamas' claims of responsibility can be verified by the general public including its own supporters and by its critics which means it [engages] in a very serious liability if it were to start claiming credit for a large number of a significant number of operations or other activities in which it does not actually play a role.").

To the extent that NatWest relies on the expert opinions of Brian M. Jenkins, this cannot be justified by the record which makes clear that Mr. Jenkins does not even know when Hamas was established and is wholly unqualified to opine on the subject of Hamas, its organizational structure or *modes operandi*.  *See* Schlanger Decl. Exhibit 50 (Jenkins 12/16/2010 Deposition in *Strauss v. Credit Lyonnais, S.A.*, 06-cv-702 and *Wolf v. Credit Lyonnais, S.A.*, 07-cv-914 (E.D.N.Y.).) at 140:3-141:12.  This will be the subject of a future motion *in limine*.

Unsurprisingly, therefore, when Mr. Jenkins cites to three terrorist attacks for which he asserts Hamas has purportedly made false claims of responsibility (*see* Schuster Decl. Exhibit 172 (Expert Report of Brian Michael Jenkins dated March 4, 2011 ("Jenkins Report")) at 21-22), he relies on English language newspaper reports and made no efforts to confirm his source materials.  *Id*. at 21-22 nn. 37-41.  One of the attacks occurred after the period of the Second Intifada (*see id*. at 21 (referencing December 28, 2007 attack at Wadi Telem)), a significant factor which Mr. Jenkins lacks the professional qualifications to understand.  One of the sources Mr. Jenkins cites concerning this attack reports that the affiliation of one of the three perpetrators

was "unclear" and that he was reported to be affiliated with Hamas. *See id.* at 21 n.38 (citing

ITIC Bulletin January 3, 2008); Schlanger Decl. at ¶ 24 and Exhibit 15.  This source therefore

refutes Mr. Jenkin's assertion that any claim by Hamas with respect to the December 28, 2007

(Wadi Telem) attack was false.

In addition, Mr. Jenkins does not appear to have consulted the official ISA Report,

*Suicide Terrorists in the Current Conflict, September 2000-September 2007* ("2007 ISA Report")

which analyzes two of the attacks he identifies (April 10, 2002 attack at Yagur Junction and

May 19, 2002 attack at Netanya Market) but makes no reference to any claims of responsibility

for those attacks having been made by Hamas.  *See* Schlanger Exhibit 4 (2007 ISA Report) at 44,

47.  An official Hamas communiqué stated that the purported Hamas claim for the April 10,

2002 bombing at Yagur Junction was not an official Hamas claim.  *See* Schlanger Decl. at ¶ 22

and Exhibit 13.

Moreover, although Mr. Jenkins lacks professional qualifications to opine on Hamas, his

report does correctly acknowledge that terrorist organizations' claims of responsibility are part of

the data that terrorism experts must consider in determining responsibility for particular terrorist

attacks.  *See, e.g.*, Schuster Decl. Exhibit 172 (Jenkins Report) at 3, 20, 27-34.  Mr. Jenkins

opines that the credibility of a particular claim of responsibility can be determined based on

various factors and indicia enumerated in his report.  *See id.* at 27-34.  For example, in Mr.

Jenkin's opinion, claims of responsibility issued immediately after an attack are more credible,

whereas the credibility of "[a] claim that is made after an extended period following an event

must be discounted, barring a convincing explanation for the delay."  *Id.* at 28.  The Jenkins

Report specifically notes that the credibility of Hamas's claims for seven of the 15 attacks that

were addressed in NatWest's Initial Motion, and the December 1, 2001 (Ben Yehuda) attack, is

enhanced by the fact that these claims were announced within hours or a few days after the

attacks occurred.  *See id*. at 49 n.102 (December 1, 2001 (same day), March 27, 2002 (same

day), March 5, 2003 (within 2 days), March 7, 2003 (same day), May 18, 2003 (same day), June

11, 2003 (2 days), September 9, 2003 (same day), September 24, 2004 (same day)).

57.      Shaked also reproduces photographs purportedly created and distributed by
Hamas.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 32-33, 53-55).

**RESPONSE TO 57**:  Plaintiffs object to Paragraph 57 because the data relied upon by

Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 57.

58.      Shaked also cites in his report the contents of various audio and video recordings
as support for his opinion that Hamas is responsible for the SoL Attacks.  Other than interviews
he conducted or in which he otherwise participated, however, Shaked has offered no information
concerning whether the copies of the audio and video recordings are accurate, complete or true
copies of the original recordings.  Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 63).

**RESPONSE TO 58**:  Plaintiffs object to Paragraph 58 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs further object that the reference in Paragraph 58 to "various audio

and video recordings" is vague and unintelligible to the point that Paragraph 58 cannot be

admitted or controverted.  Plaintiffs further object that Paragraph 58 erroneously assumes that all

of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in

evidence.  *See* Fed.R.Evid. 703.

59.      Shaked has presented no testimony from the makers of these recordings, who
could verify that whatever is heard or seen in the recordings was indeed said by the speaker who
was recorded.  *Id.* (Azoulay Second Supp. Reb. Rep. at 64).

**RESPONSE TO 59**:  Plaintiffs object to Paragraph 59 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs further object that the reference in Paragraph 59 to "these recordings" is vague and unintelligible to the point that Paragraph 59 cannot be admitted or controverted.  Plaintiffs further object that Paragraph 59 erroneously assumes that all of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in evidence.  *See* Fed.R.Evid. 703.

   60.    There is no evidence that the voice heard in the video recordings is the voice of whoever is shown to be speaking, and the manner in which these videos were recorded and edited raises doubts as to the identity of the speaker who is heard and whether the words he is speaking are indeed his own.  *Id.*  Viewing these recordings demonstrates they have undergone editing and processing after they were recorded.  *Id.*

**RESPONSE TO 60:**  Plaintiffs object to Paragraph 60 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs further object that Paragraph 60 is not a "short and concise statement" as required by Rule 56.1(a) and that the reference therein to "the video recordings" is vague and unintelligible to the point that Paragraph 60 cannot be admitted or controverted. Plaintiffs further object that Paragraph 60 erroneously assumes that all of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in evidence.  *See* Fed.R.Evid. 703.

   61.    Further, Shaked has not offered any evidence as to the identity of the person who made, edited or posted these recordings.  Nor has he offered any evidence as to when they were recorded and/or edited.  *Id.* (Azoulay Second Supp. Reb. Rep. at 66).

**RESPONSE TO 61**:  Plaintiffs object to Paragraph 61 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs further object that Paragraph 61 is not a "short and concise statement" as required by Rule 56.1(a) and that the reference therein to "these recordings" is vague and unintelligible to the point that Paragraph 61 cannot be admitted or controverted. Plaintiffs further object that Paragraph 60 erroneously assumes that all of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in evidence.  *See* Fed.R.Evid. 703. Plaintiffs note that, as a general matter, the contents of a recording and the date on which it was posted on the internet provide evidence as to when the recording was made.  To the extent that Paragraph 61 refers to the "video will" of Mohammed Farhat, the terrorist who committed suicide in perpetrating the March 7, 2002 (Atzmona) attack (*see* Grube Decl. Exhibit 6 (SSSR) at 45), the contents of that recording evidences the fact that the recording was made no more than one day prior to the attack.  *See* Schlanger Decl. at ¶¶ 48-50 and Exhibits 39-41.

62.     For two of the SoL Attacks, Shaked relies on Israeli military court convictions to support his conclusion that Hamas perpetrated the attack.  In particular, Shaked relies upon convictions issued by Israeli military courts in the Palestinian Territories in relation to the December 1, 2001 and June 18, 2002 attacks.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 38-39, 59-60).

**RESPONSE TO 62**:  Plaintiffs object to Paragraph 62 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit to the assertions in Paragraph 62, except for the assertion that Dr. Shaked's reliance on the convictions is "[i]n particular."

63.     The military court convictions upon which Shaked relies are the product of proceedings that, in practice, did not comply with due process, as plaintiffs' expert, Professor Emanuel Gross, has testified.  *See* NatWest 56.1 St. ¶¶ 628-649.

**RESPONSE TO 63**:  Plaintiffs object to Paragraph 63 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs further object that Paragraph 63 erroneously assumes that all of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in evidence (*see* Fed.R.Evid. 703), and that the admissibility of a foreign judgment of conviction depends upon proof that the legal proceedings that resulted in the conviction comport with American notions of due process.  *See Strauss*, 925 F. Supp.2d at 448 (holding that "criticisms of the process afforded defendants in Israeli military courts and their ability to come to a reliable verdict…affect[] the weight of the evidence, not [its] admissibility").  *Accord Donnelly v. FAA*, 411 F.3d 267, 270-71 (D.D.C. 2005) ("[P]rinciples of comity suggest that the Japanese judgment [of conviction] should be [admitted into evidence and] given weight as *prima facie* evidence of the facts underlying it and the burden was on [the party contesting those facts] to impeach the judgment."); *U.S. v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993) ("A foreign judgment [of conviction] that shows no sign of being unreliable should be admitted."); *Mike's Train House, Inc. v. Lionel*, LLC, 472 F.3d 398, 411-12 (6th Cir. 2006) (affirming admissibility of Korean judgments of conviction pursuant to Rule 803(22)).

Plaintiffs object to, and dispute, the mischaracterization of Professor Gross's testimony in Paragraph 63.  *See* PLAINTIFFS' 56.1 RESPONSE at ¶¶ 628-638, 642-43, 645.  Professor Gross has testified that "the Israeli military justice system's procedures offer due process guarantees that are similar to those provided by the American criminal justice system."  Schuster Decl. Exhibit 206 (Gross Report) at ¶ 58.  *See also* Schlanger Decl. Exhibit 10 (Gross 9/28/2010 CL Tr.) at 112:19-113:7 ("I had my criticism about how to improve the system.  It doesn't mean that at the time I wrote it [*The Struggling of Democracy Against Terrorism:  Legal and Moral Dimensions* (2004)] or afterwards the judges were not able to make a fact finding process or to follow that kind of process that will enable them, you know, to get to a just result, but the same

criticism I had also with the civil judicial system because I was not happy that according to the English system as different from the European system the judge is able to convict a person just based on his confession alone."); *id*. at 216:6-16 ("As I tried to explain there are various degrees of fairness and even though I had some concerns about the procedures applied by the military courts, it doesn't mean that with all the faults and the facts nonetheless I was satisfied that the whole machinery, the whole operation as such in my humble opinion it still should be considered as comporting with the notion of [a] civilized system of law and what I understand is the minimum requirement of due process of law.").  As in the *Strauss* case, Professor Gross's expert report in this case demonstrates that "many of the basic rights that accused persons have in American courts are applicable to defendants in the Israeli military courts.  For example, Israeli military trials typically are open to the public; defendants are entitled to representation by an attorney; the same rules of evidence as in Israeli civilian courts apply; defendants are entitled to challenge confessions on the grounds of coercion; witnesses are subject to cross-examination; defendants enjoy the privilege against self-incrimination; and if defendants enter a guilty plea, the judge must explain the consequences of the plea to the defendant before accepting the plea." *Strauss*, 925 F. Supp.2d at 448.  *See* Schuster Decl. Exhibit 206 (Gross Report) at ¶¶ 58-71.  In addition, prior to being interrogated, a terrorism suspect is advised that "he or she is not obligated to say anything; that anything he or she says may be used as evidence in court; and that the suspect has the right to remain silent and consult a lawyer."  Schuster Decl. Exhibit 222 (Expert Report of Shaul Naim dated December 29, 2010 ("Naim Report")) at 10.

Plaintiffs further object to the assertion in Paragraph 63 that the Israeli military court proceedings that resulted in the judgments of conviction upon which Dr. Shaked relies did not comply with due process on the ground that it is a legal conclusion, not a statement of material

fact as required by Rule 56.1(a).  Plaintiffs dispute this assertion based, *inter alia*, on the

evidence cited in the prior paragraph.  *See also* Schuster Decl. Exhibit 222 (Naim Report) at 12-

13.  Based on the same evidentiary record concerning the procedures in Israeli military courts,

the *Strauss* court concluded that "many of the basic rights that accused persons have in American

courts also are applicable to defendants in the Israeli military courts" such that the terrorists

convicted by Israeli military courts are "afforded more than a modicum of due process."  *Strauss*,

925 F.Supp.2d at 448.

64.     In his report concerning the SoL Attacks, Shaked cites statements in various
documents he attributes to the Israel Security Agency (ISA), the Israeli Ministry of Foreign
Affairs and other government agencies in support of his opinion that Hamas is responsible for
the SoL Attacks.  Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 1-6).

**RESPONSE TO 64**:  Plaintiffs object to Paragraph 64 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit that the Second Supplemental Shaked Report cites official

Israeli government reports, among other sources.

65.     For all but one of these documents, on their face they purport to do no more than
cite the fact that Hamas claimed responsibility for an attack.  *Id.* (Azoulay Second Supp. Reb.
Rep. at 2-6).

**RESPONSE TO 65**:  Plaintiffs object to Paragraph 65 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs dispute this assertion.  The Second Supplemental Shaked Report

cites numerous official government reports that reflect factual findings from legally authorized

investigations into the December 1, 2001 (Ben Yehuda) and June 18, 2002 (Bus 32A) attacks,

and do not merely "cite the fact that Hamas claimed responsibility for an attack."  With respect

to the December 1, 2001 (Ben Yehuda) attack, the SSSR quotes:  (a) the 2005 ISA Report which

includes the ISA's findings that one of the two suicide bombers was a member of Hamas, that he

was recruited to carry out the attack by the head of the Hamas command in Ramallah, and that

the suicide belts used by the bombers were manufactured by the Hamas "engineer" Abdullah

Barghuthi (*see* Grube Decl. Exhibit 6 (SSSR) at 37; *accord* Schlanger Decl. Exhibit 4 (2007 ISA

Report) at 64); and (b) a February 7, 2002 announcement by the Israeli Prime Minister's Office

that discloses, *inter alia*, that the ISA together with Jerusalem and Border Police had identified

four Hamas operatives resident in the village of Abu Dis in East Jerusalem who had participated

in the double suicide bombing in the pedestrian mall in Jerusalem on December 1, 2001" and

that "the two perpetrators of the double suicide bombing…were members of [Hamas's military

wing]."  *See* Grube Decl. Exhibit 6 (SSSR) at 38.  *See also* Schlanger Decl. Exhibit 31.  With

respect to the June 18, 2002 (Bus 32A) attacks, the SSSR quotes the 2005 ISA Report which

includes the ISA's findings that the suicide bomber was "located, recruited, and trained by the

Hamas military infrastructure in Samaria" and details the roles played by five other Hamas

members in planning and executing the attack.  *See* Grube Decl. Exhibit 6 (SSSR) at 58.  Accord

Schlanger Decl. Exhibit 4 (2007 ISA Report) at 40.

66.     Shaked references a document that he refers to as an "ISA report from 2005, entitled 'Suicide Bombers in the Five Years of Conflict.'"  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 22 n.75); Grube Decl. Ex. 9 (Shaked Dep. Ex. 37).  Shaked repeatedly cites this document throughout his report concerning the SoL Attacks.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 37, 57-58).

**RESPONSE TO 66**:  Plaintiffs object to Paragraph 66 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertions in Paragraph 66.

67.     Shaked testified at his deposition that he received this document "from Avi Shy in the communication department" of the ISA while Shaked was working as a newspaper journalist. Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 59:18-60:10).

**RESPONSE TO 67**:  Plaintiffs object to Paragraph 67 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertions in Paragraph 67.

68.     Shaked admitted that this document does not bear any insignia of the ISA.  *Id.* (Shaked 2/12/14 Tr. at 61:2-4).

**RESPONSE TO 68**:  Plaintiffs object to Paragraph 68 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 68.

69.     This document bears no indication on its face that it was produced or published by the ISA, nor does it identify the source of the information it contains concerning responsibility for the SoL Attacks.  Grube Decl. Ex. 9 (Shaked Dep. Ex. 37).

**RESPONSE TO 69**:  Plaintiffs object to Paragraph 69 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit that the copy of the 2005 ISA Report that was marked at

the February 12, 2014 deposition of Dr. Shaked in the *Strauss* case does not indicate on its face

that it was produced or published by the ISA.  However, the findings in the 2005 ISA Report

concerning the attacks identified in Paragraph 2 above are identical to the findings in the 2007

ISA Report, which does bear the ISA insignia and is currently available on the ISA's website.

*See* Schlanger Decl. at ¶ 1 and Exhibit 1.  Plaintiffs produced the 2007 ISA Report to NatWest in

discovery.  *Id*. at ¶ 6.  Dr. Shaked testified that the 2005 ISA Report "had been published in the

middle of the Intifada and [then] towards 2008 … a similar report was issued and it has on it the logo of the ISA because the ISA came out of hiding." *See* Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 60:20-25. A copy of the 2007 ISA Report along with a certified English translation was admitted into evidence at the trial of *Linde v. Arab Bank, Plc*, No. 04-cv-2799(BMC)(VVP) (E.D.N.Y.) ("Arab Bank Trial"). *See* Schlanger Decl. at ¶ 7 and Exhibit 4. Plaintiffs dispute the assertion that the 2005 ISA Report does not identify the source of the information it contains. The ISA is responsible for investigating terrorist attacks that take place in Israel and the Palestinian territories and, among other things, identifying the parties responsible. *See* Schuster Decl. Exhibit 222 (Naim Report) at 8. It is axiomatic that a report issued by the ISA concerning suicide bombings during the Second Intifada is based upon the ISA's investigation of same.

70.     This document contains no indication of the source of its conclusions, and therefore does not demonstrate that it contains factual findings from a legally authorized investigation. Grube Decl. Ex. 8 (Azoulay Second Supp. Reb. Rep. at 2-5, 21, 23-24, 27-28).

**RESPONSE TO 70**: Plaintiffs object to Paragraph 70 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs further object that Paragraph 70 erroneously assumes that all of the data relied upon by Dr. Shaked in forming his expert opinions must be admissible in evidence. *See* Fed.R.Evid. 703. Plaintiffs dispute the assertions in Paragraph 70. *See* Plaintiffs' Response to Paragraph 69 above.

71.     Shaked cites in his Second Supplemental Report statements that appear in various newspaper and magazine articles and website pages as support for his opinion that Hamas is responsible for the SoL Attacks. *Id.* (Azoulay Second Supp. Reb. Rep. at 30-38).

**RESPONSE TO 71**: Plaintiffs object to Paragraph 71 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs dispute the assertion that Dr. Shaked cites to "magazine articles" as a basis for his opinions concerning the attacks identified in Paragraph 2 above. *See* Grube Decl. Exhibit 6 (SSSR) at 30-63. Plaintiffs admit that newspaper articles and website pages are among the sources of information cited in the Second Supplemental Shaked Report. *See id*. Terrorism experts reasonably rely on newspaper and magazine articles and website pages in forming an opinion concerning the responsibility for particular terrorist attacks, as demonstrated by the citation of such materials in the report of NatWest's terrorism expert Brian Jenkins. *See, e.g*., Schuster Decl. Exhibit 172 (Jenkins Report) at 14 nn.24 and 25, 15 n.27, 16 nn.31 and 32, 21 n.38, 22 nn.42 and 44.

72.     Shaked also cites in his Second Supplemental Report statements that appear in various books as support for his opinion that Hamas was responsible for the SoL Attacks. *Id.* (Azoulay Second Supp. Reb. Rep. at 57-61).

**RESPONSE TO 72**: Plaintiffs object to Paragraph 72 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs admit that books are among the sources of information cited in the Second Supplemental Shaked Report. Terrorism experts reasonably rely on books and journal articles in forming an opinion concerning the responsibility for particular terrorist attacks, as demonstrated by the citation of these materials in the report of NatWest's terrorism expert Brian Jenkins. *See, e.g*., Schuster Decl. Exhibit 172 (Jenkins Report) at 15 n.29, 24 n.47.

73.     In his Second Supplemental Report, Shaked wrote that, "A short time following the terrorist attack, a telephone call was received at the offices of the BBC. The speaker on the telephone stated that it was the Islamic Jihad that had carried out the terrorist attack, but it very quickly became clear that this was a false announcement." Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 31 n.134).

**RESPONSE TO 73**:  Plaintiffs object to Paragraph 73 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit that the language quoted in Paragraph 73 appears in footnote 134 on page 31 of the Second Supplemental Shaked Report.  In this footnote, Dr. Shaked also cites to the credible claim of responsibility for the December 1, 2001 (Ben Yehuda) attack that was published on the official website of the *Izz al-Din al-Qassam* Brigades on the same day the attack occurred.  *See* Grube Decl. Exhibit 6 (SSSR) at 31 and n.31; Schlanger Decl. Exhibit 36.  This promptly-issued official Hamas announcement bears the insignia of the *Izz al-Din al-Qassam* Brigades and correctly identifies the two suicide bombers as Brigades members Osama Bahr and Nabil Halabiya, a fact that could not have been publicly known at that time. *See id*. at 31; Schlanger Decl. at ¶ 45 and Exhibit 36.  According to NatWest's terrorism expert, the following characteristics of this announcement indicate that it is credible and reasonable for a terrorism expert to rely upon:  (a) it was issued on the same day as the attack, (b) via an official Hamas website, (c) it bears the *al-Qassam* Brigade's insignia, (d) it is written in the typical language used by Hamas, and (e) it contains non-public information that would only be known to those responsible for the attack (*i.e.*, the names of the suicide bombers who had killed themselves only hours earlier).  *See* Schlanger Decl. Exhibit 36; Schuster Decl. Exhibit 172 (Jenkins Report) at 28-29, 31, 49 n.102.

74.     Shaked testified that the content of footnote 134 to his Second Supplemental Report is based either on his personal recollection of what he was told by an employee of the BBC and/or what he was told by a fellow employee of the Israeli newspaper *Yediot Aharonot* that this employee had seen on a BBC broadcast.  Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 109:13-111:10).

**RESPONSE TO 74**:  Plaintiffs object to Paragraph 74 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 74.

75.     In the portion of Shaked's Second Supplemental Report titled "Summary of the Suicide Bombings on Ben Yehuda Street," he referred to Ibrahim Hamed as the purported commander of the operation.  The only source Shaked cited as support for that summary is a book written by Guy Aviad.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 39).

**RESPONSE TO 75**:  Plaintiffs object to Paragraph 75 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit that Dr. Shaked identified Ibrahim Hamad, the head of

Hamas in Ramallah, as the commander of the operation that resulted in the December 1, 2001

(Ben Yehuda) attack.  Plaintiffs dispute the assertion that the Second Supplemental Shaked

Report cites only a book by Guy Aviad as support for this fact.  *See* Grube Decl. Exhibit 6

(SSSR) at 37, 39 n.162.  Both the 2005 ISA Report, quoted in the SSSR, and the Israeli military

court indictment of Hamas "engineer" Abdallah Jamal Barghuthi, cited in the SSSR, identify

Ibrahim Hamad as the commander of the December 1, 2001 (Ben Yehuda) attack.  *See id*.  *See*

*also* Schlanger Decl. Exhibit 33 (Barghuthi indictment) at Count 2.

76.     In the portion of Shaked's Second Supplemental Report titled "Summary of the Suicide Bombings on Ben Yehuda Street," he refers to Sayd Abd-al Karim Sheikh Qasem.  The only sources Shaked cited as support for that reference are the military court indictment of another individual and a website Shaked attributes to Hamas.  *Id.* (Shaked Second Supp. Rep. at 39).

**RESPONSE TO 76**:  Plaintiffs object to Paragraph 76 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit that the Second Supplemental Shaked Report identifies

Hamas member Sayd Qasem as having played a role in connection with the December 1, 2001

(Ben Yehuda) attack.  Plaintiffs dispute the assertion that the Second Supplemental Shaked

Report cites only the Barghuthi indictment and a Hamas website as support for this fact.  The

2005 ISA Report quoted in the SSSR also sets forth the role played by Sayd Qasem.  *See* Grube

Decl. Exhibit 6 (SSSR) at 37.

77.     In the portion of Shaked's Second Supplemental Report titled "Summary of the
Suicide Bombings on Ben Yehuda Street," he discusses the purported suicide bombers, Nabil
Mahmoud Jamil Halabiya and Osama Muhammad Eid Bahar.  The only sources Shaked cited as
support for that discussion is a website Shaked attributes to Hamas.  *Id.* (Shaked Second Supp.
Rep. at 40).

**RESPONSE TO 77**:  Plaintiffs object to Paragraph 77 because the data relied upon by Dr.

Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit that the Second Supplemental Shaked Report identifies

Osama Bahar and Nabil Halabiya as the suicide bombers who perpetrated the December 1, 2001

(Ben Yehuda) attack.  Plaintiffs dispute the assertion that the Second Supplemental Shaked

Report cites only a Hamas website as support for this fact.  The 2005 ISA Report quoted in the

SSSR identifies Osama Bahar, a Hamas member, and Nabil Halabiya as the suicide bombers and

provides extensive detail about the roles played by other Hamas members in this attack.  *See*

Grube Decl. Exhibit 6 (SSSR) at 37.  *See also* Schlanger Decl. Exhibit 4 (2007 ISA Report) at

639.  The SSSR also quotes a February 7, 2002 report issued by the Israeli Prime Minister's

Office concerning a joint ISA and police investigation that had identified four Hamas members

resident in the village of Abu Dis in East Jerusalem who had participated in the December 1,

2001 (Ben Yehuda) attack.  *See id*. at 38; Schlanger Decl. Exhibit 31-32.  The Israeli Prime

Minister's Office report identifies the two suicide bombers as Osama Bahar and Nabil Halabiya,

both members of *al-Qassam* Brigades cells.  *See id.* at 38; Schlanger Decl. Exhibit 31-32.

78.     Shaked ignores the role of Nader Alian, who is described in the purported ISA report from which Shaked quotes as "an operative of Islamic Jihad" and the owner of the car bomb that exploded at Ben Yehuda Street.  *See id.* (Shaked Second Supp. Rep. at 37, 40).

**RESPONSE TO 78**:  Plaintiffs object to Paragraph 78 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs dispute the assertion in Paragraph 78 that Nader Alian was "the owner of the car bomb that exploded at Ben Yehuda Street."  This assertion is contradicted by the evidence NatWest cites and, therefore, fails to comply with Rule 56.1(d).  At page 37, the Second Supplemental Shaked Report quotes the 2005 ISA Report which states that the car that Hamas converted into a car bomb (using a bomb manufactured by Hamas "engineer" Abdullah Barghuthi) was sold to the two suicide bombers by Nader Alian prior to the December 1, 2001 (Ben Yehuda) attack:  "Nader sold the vehicle to Nabil and Osama, and handed it over to them the day before the terrorist attack."  *See* Grube Decl. Exhibit 6 (SSSR) at 37.  *See also* Schlanger Decl. Exhibit 4 (2007 ISA Report) at 639; Schlanger Decl. Exhibit 11 (Shaked 2/12/2014 CL Tr.) at 121:7-20.  Plaintiffs dispute the assertion in Paragraph 78 that Dr. Shaked "ignores the role of Nader Alian."  As the Second Supplemental Shaked Report makes clear, Dr. Shaked was aware of the limited role played by Nader Alian (*see* Grube Decl. Exhibit 6 at 37) and ultimately concluded (based on overwhelming evidence) that Hamas was responsible for the December 1, 2001 (Ben Yehuda) attack.  *See id.* at 37-41.

79.     Shaked included a photograph in his Second Supplemental Report and wrote that "[t]he following is the photo taken [of the person Shaked identifies as having committed the attack] together with his mother prior to his departure for the terrorist attack in Atzmona."  That statement is not supported by any of the evidence Shaked cites in his report.  *Id.* (Shaked Second Supp. Rep. at 44); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 128:10-134:20; 136:22-140:5).

**RESPONSE TO 79**:  Plaintiffs object to Paragraph 79 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs dispute the assertion that the Second Supplemental Shaked Report does not cite to any source that supports his assertion that a photograph on page 44 of the SSSR depicts Mohammed Farhat, the perpetrator of the March 7, 2002 (Atzmona) attack "together with his mother [Hamas operative Maryam Farhat] prior to his departure for the terrorist attack in Atzmona."  As Dr. Shaked testified, the image in question is a still image taken from a video.  *See* Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 132:15-18.  The Second Supplemental Shaked Report cites to a portion of this video, including the image in question, on YouTube.  *See* Grube Decl. Exhibit 6 (SSSR) at 45 n.179 (citing

https://www.youtube.com/watch?v=llBt76Ab4sk&feature=related).  *See also* Schlanger Decl. Exhibit 42.  As he testified, Dr. Shaked was familiar with this video based on his professional knowledge and experience.  *See* Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.) at 134:12-20. Indeed, the video is notorious throughout the Middle East.  Shortly after the March 7, 2002 (Atzmona) attack, the video was broadcast "throughout the Middle East on Arabic-language television [and] made [Maryam] Farahat a celebrity."  Daniel Williams, *A Mother's Blessing To Kill and Be Killed; Palestinian Treated As Celebrity For Backing Son's Plan to Raid Israeli Settlement*, THE WASHINGTON POST, June 25, 2002.  *See also, e.g.*, *Suicide Bombers' Mother Elected to Palestinian Parliament*, ABC News, January 26, 2006,

http://abcnews.go.com/WNT/story?id=1536576 ("[Mariam Farahat] is most famous for her presence in a Hamas video, showing her 17-year-old how to attack Israelis and telling him not to return.  Shortly afterward, he killed five students in a Jewish settlement before he was killed himself."); Chris McGreal, *Hamas Makes Gains Against Fatah, But Fails To Win Power*, THE GUARDIAN (U.K.), January 26, 2006 ("Among the more contentious candidates in Gaza was the

44

Mother of Martyrs, who sent three of her sons to be suicide bombers.  Mariam Farhat's campaign video includes footage of her helping her son, Mohammed, 17, to prepare his bomb belt and advising him on techniques that killed five Israelis."); Jonathan Saul, *Israelis Despair Over Hamas Election Victory*, REUTERS NEWS, January 26, 2006 ("Among those expected to win seats in the new Palestinian parliament was Mariam Farhat, also known as Umm Nidal, who in a video tape message urged her sons to carry out attacks—including the one on a Jewish settlement in which [Avi] Zaha's 18-year-old-son [Ariel Zana] was killed [*i.e.*, the March 7, 2002 (Atzmona) attack]."); Nidal al-Mughrabi, *Hamas "Mother of Martyrs" Runs in Palestinian Poll*, REUTERS NEWS, December 8, 2005 ("[Maryam] Farhat, 56, could give an added boost to Hamas as she has strong militant credentials, including an appearance—carrying a gun—in a video in which she advised one of her sons, Mohammed, on tactics before he attacked a Jewish settlement. Mohammed, 17, killed five Israelis before he was gunned down in the 2002 assault in the occupied Gaza Strip."); Ian Fisher, Women, *Secret Hamas Strength, Win Votes at Polls and New Role*, N.Y. TIMES, February 3, 2006 ("Mariam Farhat [is] the mother of three Hamas supporters killed by Israelis.  She bade one son goodbye in a homemade videotape before he stormed an Israeli settlement, killing five people, then being shot dead.  She said later, in a much-publicized quotation, that she wished she had 100 sons to sacrifice that way."); Greg Myre, *Militants Seize, Then Release, U.S. Teacher in West Bank*, N.Y. TIMES, October 12, 2006 ("[Maryam] Farhat, who is a member of the militant faction Hamas, gained notoriety in 2002 when she made a video with her 17-year-old son, Muhammad, and encouraged him to attack Israel.  A short time later, he took part in a shooting that left five Israelis and himself dead.  The video was released after the shooting."); William Yardley, *Mariam Farhat, Known as 'Mother of Martyrs,' Dies at 64*, N.Y. TIMES, March 20, 2013 ("Ms. Farhat was elected to the Palestinian Legislative Council in

2006.  Four years earlier, her 17-year-old son, Mohammad, was shot to death after he stormed an Israeli settlement with an automatic rifle and explosives, killing five students.  Shortly before the attack, Ms. Farhat made a video in which she appeared with Mohammad to show support for what he was about to do.").  Dr. Shaked would also be able to identify Maryam Farhat because she became a prominent public figure in the aftermath of the March 7, 2002 (Atzmona) attack, including serving as a Hamas member of the Palestinian Legislative Counsel.  *See* Grube Decl. Exhibit 6 (SSSR) at 49, 50.

80.    Shaked does not purport to rely on any Israeli government records with respect to the March 7, 2002 attack.  *See* Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 42-51).

**RESPONSE TO 80**:  Plaintiffs object to Paragraph 80 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 80.  As the report of NatWest's terrorism expert, Brian Jenkins, indicates, terrorism experts reasonably rely on numerous sources of information other than government records in determining the responsibility for terrorist attacks.  *See* Schuster Decl. Exhibit 172 (Jenkins Report).

81.    Shaked purports to rely on the military court indictment of Fahmi Eid Ramadan Mashahrah.  *Id.* (Shaked Second Supp. Rep. at 59).

**RESPONSE TO 81**:  Plaintiffs object to Paragraph 81 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit that Dr. Shaked's opinion that Hamas is responsible for the June 18, 2002 (Bus 32A) attack is based in part on the indictment and conviction of Fahmi Mashahrah for his role in planning and executing that attack.

82.     However, the document he cited is actually an indictment of another person, Fallah Taher Abdallah Nada.  *See id.* (Shaked Second Supp. Rep. at 59); Grube Decl. Ex. 7 (Shaked 2/12/14 Tr. at 153:10-155:6); Grube Decl. Ex. 10 (Shaked Dep. Ex. 46).

**RESPONSE TO 82**:  Plaintiffs object to Paragraph 82 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs deny the assertion in Paragraph 82.  As Dr. Shaked testified at his deposition, there is a typographical error in footnote 224 on page 59 of the Second Supplemental Shaked Report.  *See* Grube Decl. Exhibit 7 (Shaked CL 2/12/2014 Tr.) at 155:7-21 ("this was really a slip of the pen and nothing else").  The citation to the non-existent Bates range "W_S156882-30" was intended to refer to W-S156822-30, which is the Bates range of the Israeli military court indictment of Fahmi Mashahrah.  *See* Schlanger Decl. at ¶ 53 and Exhibit 43.

83.     Shaked cited a report of the Israeli Ministry of Foreign Affairs, which states only that Hamas had taken responsibility for the attack.  It does not state that Hamas actually perpetrated the attack.  Grube Decl. Ex. 6 (Shaked Second Supp. Rep. at 59).

**RESPONSE TO 83**:  Plaintiffs object to Paragraph 83 because the data relied upon by Dr. Shaked in forming his expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 83.  The Ministry of Foreign Affairs announcement was made on June 18, 2002, the date on which the Bus 32A attack occurred before the Israeli government had completed its investigation of the attack.  *See* Schlanger Decl. Exhibit 49 (referring to the "preliminary investigation" of the attack).  The announcement reflects that the Israeli government found Hamas's claim of responsibility for the June 18, 2002 (Bus 32A) attack to be credible.  *See id.*

The Second Supplemental Shaked Report also cites to the 2005 ISA Report which sets forth the findings of the ISA's investigation into the June 18, 2002 (Bus 32A) attack, which

findings demonstrate that Hamas was responsible for this attack.  *See* Grube Decl. Exhibit 6

(SSSR) at 57-58.  *See also* Schlanger Decl. Exhibit 4 (2007 ISA Report) at 40.  According to the

ISA, "[t]he suicide bomber was located, recruited, and trained by the Hamas military

infrastructure in Samaria."  *Id*.; Schlanger Decl. Exhibit 4 (2007 ISA Report) at 40.  Five other

Hamas members participated in the planning and execution of the attack, including Fahmi

Mashahrah who selected Bus 32A as the target, purchased and "punched" a multi-ride bus ticket

for the suicide bomber and, together with Ramadan Mashahrah, transported the suicide bomber

to the bus stop where the suicide bomber boarded Bus 32A and blew himself up.  *See id*.

84.    Shaked does not have any professional training in determining which terrorist
organization is responsible for perpetrating an attack, and he has never before served as an expert
in any capacity on that subject.  *See* NatWest 56.1 St. ¶¶ 496-505.

**RESPONSE TO 84**:  Plaintiffs object to Paragraph 84 because Dr. Shaked's qualifications as an

expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs

dispute the assertions in Paragraph 84.  *See* PLAINTIFFS' 56.1 RESPONSE at ¶¶ 496-505.  Between

1969 and 1982, Dr. Shaked worked for the ISA, the primary Israeli law enforcement agency

charged with, among other things, investigating terrorist attacks, identifying the perpetrators, and

thwarting future attacks.  *See* Schuster Decl. Exhibit 179 (SR) at 1-4; Schuster Decl. Exhibit 222

(Naim Report) at 8; Schuster Decl. Exhibit 180 (Shaked 11/4/2010 CL Tr.) at 21:4-22:24.  While

at the ISA, Dr. Shaked also received training from the Israeli police. *See* Schuster Decl.

Exhibit 180 (Shaked 11/4/2010 CL Tr.) at 24:25-25:10.

At the Arab Bank Trial, Dr. Shaked served as an expert witness on the issue of Hamas's

responsibility for all of the terrorist attacks at issue in these actions.  *See* Schlanger Decl. at ¶ 7

and Exhibit 3 (Arab Bank Trial Transcript 8/25/2014 (Shaked-Direct)); *Linde v. Arab Bank, Plc*,

922 F.Supp.2d 316, 330 (E.D.N.Y. 2013) ("Mr. Shaked is qualified to offer his opinions

regarding the attribution of terror attacks to Hamas in this case.").

The court in the *Strauss* case also held that Dr. Shaked is qualified to opine on the issue

of Hamas's responsibility for these terrorist attacks and that the methodology reflected in his

virtually identical reports in that case is reliable.  *Strauss v. Credit Lyonnais, S.A.*, 925 F.Supp.2d

at 443-44 ("Shaked has established that he has specialized 'knowledge, skill, experience,

training, or education,' about Hamas.  Among other things, he served for over a decade in the

ISA, has worked as a consultant for the FBI, authored a published book about Hamas and

covered Palestinian affairs and terrorism for Israel's largest newspaper for over twenty years.

Moreover, Shaked's analysis appears to comport with the 'same level of intellectual rigor that

characterizes' a terrorism expert.  He states that his findings are based upon multiple sources of

information, including interviews and reviews of secondary materials, and he has cross-checked

his findings against other sources of information, which is similar to what other courts have held

is a typical methodology accepted among and used by terrorism experts.") (internal citations

omitted).

85.    The course that Shaked taught at Hebrew University, titled "History of the Israeli
Palestinian Conflict," was taught from a psychological and sociological perspective.  *Id.* (Shaked
2/12/14 Tr. at 30:24-32:11).

**RESPONSE TO 85**:  Plaintiffs object to Paragraph 85 because Dr. Shaked's qualifications as an

expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs

dispute the assertions in Paragraph 85.  Dr. Shaked testified that in the course he teaches

"[p]sychological-social aspects of the conflict" as well as "history" and "violence, terror and

resistance," because "the purpose of the course is …to show how the society or community

behaves and how a culture of conflict is constructed." *See* Grube Decl. Exhibit 7 (Shaked

2/12/2014 CL Tr.) at 31:13-32:3.

86.     Shaked's research at the Truman Research Institute is from the perspective of social psychology. *Id.* (Shaked 2/12/14 Tr. at 32:12-33:9).

**RESPONSE TO 86**:  Plaintiffs object to Paragraph 86 because Dr. Shaked's qualifications as an

expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs

admit the assertion in Paragraph 86.

87.     Shaked is pursuing a Ph.D. in philosophy.  His doctoral studies do not focus on any of the attacks at issue in these lawsuits.  *Id.* (Shaked 2/12/14 Tr. at 33:10-34:19).

**RESPONSE TO 87**:  Plaintiffs object to Paragraph 87 because Dr. Shaked's qualifications as an

expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs

dispute the assertions in Paragraph 87, except admit that Dr. Shaked's doctoral studies did not

focus on any of the attacks at issue in these actions.  Dr. Shaked received his doctorate from the

Middle East Department of The Hebrew University of Jerusalem.  The subject of his research

was "The Ethos of Conflict Within the Palestinian Society." *See* Grube Decl. Exhibit 7 (Shaked

2/12/2014 CL Tr.) at 34:3-19.

88.     Plaintiffs also proffer Evan Kohlmann as an expert witness who purports to opine that Hamas has claimed responsibility for the SoL Attacks through websites that he attributes to Hamas and other media, and that these claims of responsibility are credible.  Schuster Decl. Ex. 210 (Kohlmann Rep. at 6-7, 9); Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 6-7, 9). Plaintiffs indicated by letter dated May 11, 2016 that they were relying on Kohlmann's analysis of the June 18, 2002 attack in his report submitted in *Linde v. Arab Bank*.  Grube Decl. Ex. 5 (May 11, 2016 Osen Ltr. to Friedman at 1).

**RESPONSE TO 88**:  Plaintiffs object to Paragraph 88 because the evidence upon which

Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or

NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.

Plaintiffs admit the assertion in Paragraph 88 that they proffer Evan Kohlmann as an expert

witness regarding the attacks identified in Paragraph 2 above, but dispute NatWest's

characterization of Mr. Kohlmann's opinions.  Mr. Kohlmann provides expert opinions and

analysis concerning:  (a) Hamas's use of the internet and other media to disseminate claims of

responsibility for various terrorist attacks and to glorify deceased or imprisoned members of its

organization; (b) identification of specific websites as websites that are directly controlled by

Hamas; (c) the meaning and significance of particular texts, webpages, photographs, videos,

audio files and other media used by Hamas; (d) the authenticity and credibility of particular

claims of responsibility for the attacks, and of other images and information appearing on Hamas

websites.  *See* Schuster Decl. Exhibit 210 (Kohlmann Report dated September 8, 2009

("Kohlmann Report")) esp. at 6-8; Grube Decl. Exhibit 11 (Kohlmann Report submitted in *Linde*

*v. Arab Bank, Plc*, No. 04-cv-2799(BMC)(VVP) (E.D.N.Y.) dated February 18, 2011

("Kohlmann Arab Bank Report")) esp. at 6-8.  NatWest's terrorism expert Brian Jenkins has

opined that the Kohlmann Report "makes a good case that Hamas communicates through a

number of websites it controls."  *See* Schuster Decl. Exhibit 172 (Jenkins Report) at 42.  The

court in the *Strauss* case held that Mr. Kohlmann's opinions concerning Hamas's "use of

propaganda and its websites … is admissible and an appropriate subject for an expert opinion."

*Strauss,* 925 F.Supp.2d at 446.  *See also* PLAINTIFFS' 56.1 RESPONSE at ¶ 670.  Mr. Kohlmann's

analysis and opinions concerning the March 7, 2002 (Atzmona) and June 18, 2002 (Bus 32A)

attacks are set forth in the Kohlmann Arab Bank Report.  *See* Grube Decl. Exhibit 11 at 35-38,

40-42.

89.     Plaintiffs previously proffered Kohlmann as an expert witness, and in that
instance he opined that Hamas perpetrated the 15 attacks that were addressed in NatWest's prior
summary judgment motion.  *See* NatWest 56.1 St. ¶¶ 495-669.

51

**RESPONSE TO 89**:  Plaintiffs object to Paragraph 89 because the evidence upon which Plaintiffs intend to rely is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement. Plaintiffs object to NatWest's use of the word "previously" in Paragraph 89 to the extent that it incorrectly implies that Plaintiffs do not continue to proffer Mr. Kohlmann as an expert witness with respect to the 15 attacks addressed in NatWest's Initial Motion.  Plaintiffs dispute the assertion in Paragraph 89 that Mr. Kohlmann has opined that Hamas perpetrated the 15 terrorist attacks addressed in NatWest's Initial Motion.  Mr. Kohlmann does not offer any opinion concerning Hamas's responsibility for any terrorist attack.  *See* Plaintiffs' Response to Paragraph 88, above; PLAINTIFFS' 56.1 RESPONSE at ¶ 671.

90.    The object of Kohlmann's analysis concerning the SoL Attacks is the same as the object of his prior analysis, which was to determine whether Hamas claimed responsibility for the SoL Attacks and opine on the reliability and credibility of those claims.  Schuster Decl. Ex. 210 (Kohlmann Rep. at 7); Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 6).

**RESPONSE TO 90**:  Plaintiffs object to Paragraph 90 because the "object" of the analysis that forms the basis for Mr. Kohlmann's expert opinions is not a fact that is material to any legal element of Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's Rule 56.1 statement.  Plaintiffs further object to Paragraph 90 as unintelligible to the extent that it refers to Mr. Kohlmann's "prior analysis."  Plaintiffs admit that Mr. Kohlmann opines as to the authenticity and credibility of particular claims of responsibility for the attacks identified in Paragraph 2 above, but dispute that Paragraph 90 provides a complete description of Mr. Kohlmann's opinions.  *See* Plaintiffs' Response to Paragraph 88 above.

91.    Kohlmann used the same methodology to determine whether Hamas perpetrated the three SoL Attacks that he previously used to determine whether Hamas perpetrated the 15 attacks he previously addressed.  Schuster Decl. Ex. 210 (Kohlmann Rep. at 5-7); Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 7-8).

**RESPONSE TO 91**:  Plaintiffs object to Paragraph 91 because the methodology used by

Mr. Kohlmann in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs object to NatWest's use of the word "previously" (twice) in

Paragraph 91 on the ground that it is unintelligible.  The Kohlmann Report sets forth Mr.

Kohlmann's opinions with respect to the 15 attacks addressed in NatWest's Initial Motion and

the December 1, 2001 (Ben Yehuda) attack.  *See* Schuster Decl. Exhibit 210.  Mr. Kohlmann's

opinions with respect to the March 7, 2002 (Atzmona) and the June 18, 2002 (Bus 32A) attacks

are set forth in the Kohlmann Arab Bank Report.  *See* Grube Decl. Exhibit 11 at 35-36.

Plaintiffs dispute the assertion in Paragraph 91 that Mr. Kohlmann "determine[d] whether Hamas

perpetrated the three SoL attacks."  *See* Plaintiffs' Response to Paragraph 89 above.  Plaintiffs

admit that Mr. Kohlmann used the same methodology to analyze, and formulate his opinions as

to, all 18 attacks.  *See* Schuster Decl. Exhibit 210 (Kohlmann Report) esp. at 6-8; Grube Decl.

Exhibit 11 (Kohlmann Arab Bank Report) esp. at 6-8.

     92.     Kohlmann relies on the same materials as he did in analyzing whether Hamas perpetrated the 15 attacks he previously addressed, namely what he contends are "authentic claims of responsibility" that Hamas has purportedly distributed through websites and internet newsletters and forums he attributes to Hamas, which he contends "demonstrate [Hamas's] culpability" in the execution of the SoL Attacks.  *See* NatWest 56.1 St. ¶¶ 671-676, 719-725.

**RESPONSE TO 92**:  Plaintiffs object to Paragraph 92 because the materials relied upon by

Mr. Kohlmann in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs object to NatWest's use of the word "previously" in Paragraph 92

for the same reason they object to this word in Paragraph 91.  *See* Plaintiffs' Response to

Paragraph 91 above.  Plaintiffs dispute the assertions in Paragraph 92 that Mr. Kohlmann

analyzed whether Hamas perpetrated the 15 attacks addressed in NatWest's Initial Motion and

offers opinions concerning Hamas's culpability for those attacks.  *See* Plaintiffs' Response to

Paragraph 88, above; PLAINTIFFS' 56.1 RESPONSE at ¶ 671.  Plaintiffs dispute the assertion in

Paragraph 92 that Mr. Kohlmann relies on "the same materials" for all 18 attacks.  For example,

for each of the attacks, Mr. Kohlmann cites different announcements on different webpages.

*See, e.g*., Kohlmann Report at 30 n.93 (citing a December 1, 2001 Hamas announcement

published on the Hamas website www.alqassam.ps concerning the December 1, 2001(Ben

Yehuda) attack) and 32 n.99 (citing a March 27, 2002 Hamas announcement published on the

Hamas website www.palestine-info.net concerning the March 27, 2002 (Park Hotel) attack).

Plaintiffs admit that Mr. Kohlmann opines that certain identified claims of responsibility for each

of the SoL attacks are official communiqués of Hamas.  *See* Schuster Decl. Exhibit 210

(Kohlmann Report) at 30 n.93; Grube Decl. Exhibit 11 (Kohlmann Arab Bank Report) at 35

nn.126, 128 and 129, 41 nn. 159 and 161.

93.     Kohlmann opines that claims of responsibility appearing on websites he attributes
to Hamas "demonstrate its culpability in the execution of particular terrorist attacks" including
the SOL Attacks, and that Hamas has never "issued any rejection or credible denial of its
culpability" for the SOL Attacks.  *See* NatWest 56.1 St. ¶¶ 678-681; Schuster Decl. Ex. 210
(Kohlmann Rep. at 45), Grube Decl. Ex. 11 (Kohlmann Arab Bank Rep. at 8).

**RESPONSE TO 93**:  Plaintiffs dispute the assertion in Paragraph 93 that Mr. Kohlmann opines

that Hamas is culpable for the execution of any terrorist attack.  *See* Plaintiffs' Response to

Paragraph 88, above; PLAINTIFFS' 56.1 RESPONSE at ¶ 671.  Plaintiffs admit the assertion in

Paragraph 93 that Mr. Kohlmann opines that Hamas has never issued any rejection or credible

denial of its culpability for the attacks at issue in these actions.

94.     Kohlmann has no advanced degree in the study of terrorism or Hamas or
professional experience in law enforcement or intelligence.  *See* NatWest 56.1 St. ¶¶ 682-702.

**RESPONSE TO 94**:  Plaintiffs object to Paragraph 94 because Mr. Kohlmann's qualifications

as an expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's 56.1 statement.  Plaintiffs admit

the assertions in Paragraph 94, except that Mr. Kohlmann has undertaken advanced coursework

concerning terrorism in connection with his law degree and has taken training courses at the FBI

Academy.  *See* PLAINTIFFS' 56.1 RESPONSE at ¶¶ 684, 686.  Mr. Kohlmann served as an expert

witness at the Arab Bank Trial, where he provided testimony to authenticate www.palestine-

info.com and www.alqassam.ps as Hamas websites and authenticated many of the same official

Hamas communications that he has offered opinions about in this action.  *See Linde,* 922

F.Supp.2d at 331; Schlanger Decl. at ¶ 25 and Ex. 16.  The court in the *Strauss* case also held

that Mr. Kohlmann is qualified as a terrorism expert and that his methodology is reliable.  *See*

*Strauss,* 925 F.Supp.2d at 446 ("Among other things, [Kohlmann] is the author of a textbook on

terrorism that is used in graduate level courses at Harvard University's Kennedy School of

Government and Princeton University, and oversees one of the largest digital collections of

terrorist multimedia and propaganda in the world.  Notably, Kohlmann has testified as an expert

in sixteen cases in federal courts and before the Guantanamo Bay military commissions.

Moreover, his research and archival methodology appear to be consistent with those in the

terrorist field, as other courts have recognized.") (citations omitted).

95.     The principal focus of Kohlmann's research has been Al Qaeda and he has never
before been proffered as an expert in determining whether Hamas was responsible for
committing a terrorist attack.  *See* NatWest 56.1 St. ¶¶ 703-718.

**RESPONSE TO 95**:  Plaintiffs object to Paragraph 95 because Mr. Kohlmann's qualifications

as an expert are not a fact that is material to any legal element of Plaintiffs' claims or NatWest's

defenses and are, therefore, not properly included in NatWest's 56.1 statement.  Plaintiffs object

to Paragraph 95 to the extent that it asserts or implies that Plaintiffs proffer Mr. Kohlmann to

opine as to whether Hamas is responsible for committing the terrorist attacks at issue in this

litigation.  Mr. Kohlmann does not offer any opinion concerning Hamas's responsibility for any

terrorist attack.  *See* Plaintiffs' Response to Paragraph 88, above; PLAINTIFFS' 56.1 RESPONSE at

¶ 671.  Plaintiffs admit the assertion in Paragraph 95 that the principal of Mr. Kohlmann's

research has been Al Qaeda.  Mr. Kohlmann testified about Hamas websites and official

communiqués at the Arab Bank Trial.  *See Linde,* 922 F.Supp.2d at 331; Schlanger Decl. at ¶ 25

and Ex. 16.  299-300.  The court in the *Strauss* case also held that Mr. Kohlmann is qualified to

testify about Hamas, its use of propaganda and its websites.  *See Strauss,* 925 F.Supp.2d at 446.

> 96.     Kohlmann has not personally investigated any of the SoL Attacks or examined
> any forensic evidence concerning them.  Rather, Kohlmann's analysis consists of quoting or
> summarizing claims of responsibility he found on the internet he attributes to Hamas, without
> considering whether the statements and photos on the websites he reviewed were trustworthy and
> accurate.  *See* NatWest 56.1 St. ¶¶ 730-747.

RESPONSE TO 96:  Plaintiffs object to Paragraph 96 because the methodology used by

Mr. Kohlmann in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs dispute the assertion in Paragraph 96 that, in forming his expert

opinions, Mr. Kohlmann did not "consider[] whether the statements and photos on the websites

he reviewed were trustworthy and accurate."  To the contrary, Mr. Kohlmann testified that in

analyzing the trustworthiness and accuracy of Hamas claims of responsibility published on

authentic Hamas websites he considered numerous factors including "the kind of language used

in the [communiqués].  The seniority of [the] Hamas leaders that are cited.  The level of detail

that's given.  There is a lot of different factors that play into this."  Schuster Decl. Exhibit 187

(Kohlmann 12/2/2010 CL Tr.) at 189:23-190:4.  *See also id*. at 199:3-18.  In addition,

Mr. Kohlmann looked for the presence of other "telling information that Hamas often packages

in with" the official communiqués such as "photographs of the individual [who committed the

operation], video of the individual, [or] a copy of his martyrdom Will."  *Id*. at 217:15-24.

Significantly, these are many of the same indicia of reliability enumerated in the report of

NatWest's terrorism expert Brian Jenkins.  *See esp*. Schuster Decl. Exhibit 172 (Jenkins Report) at 29, 31-32.  Mr. Kohlmann also testified that he considered whether claims of responsibility were issued on the websites of both the political bureau of Hamas (*i.e*., www.palestine-info.net) and the *Izz al-Din al-Qassam* Brigades (www.alqassam.ps) "because if both … issue separate statements both indicating Hamas' claim of responsibility for a particular attack, what this indicates is it's not just an issue of one branch or another branch of Hamas or one leader versus another leader, it means that there is confidence throughout the leadership of Hamas."  *See* Schuster Decl. Exhibit 187 (Kohlmann 12/2/2010 CL Tr.) at 189:11216:20-217:24; Schuster Decl. Exhibit 210 (Kohlmann Report) at 10, 25.  Mr. Kohlmann also testified that he is experienced in determining whether photographs have been manipulated or doctored, and that none of the photographs he reviewed for the purposes of his report showed signs of having been doctored.  *See* Schuster Decl. Exhibit 187 (Kohlmann 12/2/2010 CL Tr.) at 171:12-172:18, 367:19-370:14.  Plaintiffs admit the assertions in Paragraph 96 that Mr. Kohlmann has not personally investigated any of the attacks identified in Paragraph 2 above or examined any forensic evidence concerning them.  The court in the *Strauss* case held that Mr. Kohlmann's research and methodology are consistent with those of other experts' in the terrorism field, noting that other courts in the Southern and Eastern Districts of New York have so recognized. *See Strauss,* 925 F.Supp.2d at 446 (citing cases).

97.    Kohlmann stated that his usual methodology to determine the reliability of a particular source is to conduct a "comparative analysis" which requires comparing and contrasting the source in question with other analogous sources to try to identify common "threads and themes."  Kohlmann stated that for purposes of his report in this case, he did not conduct a comparative analysis and therefore once Kohlmann determined that Hamas claimed responsibility on a website that he attributed to Hamas, he did not check whether any other group also claimed credit for the attack, because he was not asked to do so.  *See* NatWest 56.1 St. ¶¶ 748-752.

**RESPONSE TO 97**:  Plaintiffs object to Paragraph 97 because the methodology used by

Mr. Kohlmann in forming his expert opinions is not a fact that is material to any legal element of

Plaintiffs' claims or NatWest's defenses and is, therefore, not properly included in NatWest's

Rule 56.1 statement.  Plaintiffs admit the assertion in Paragraph 97 that, in preparing his report,

Mr. Kohlmann did not research whether any other terrorist group had claimed credit for an

attack.  The court in the *Strauss* case held that Mr. Kohlmann's research and methodology are

consistent with those of other experts' in the terrorism field, noting that other courts in the

Southern and Eastern Districts of New York have so recognized.  *See Strauss,* 925 F.Supp.2d at

446 (citing cases).

98.    Plaintiffs have identified one plaintiff (Temima Spetner-Gould) and one
eyewitnesses (Shalom Sabag) who were present at or shortly after one of the SoL Attacks to
testify regarding the SoL Attacks.  Neither of these individuals, however, has any personal
knowledge as to who is responsible for any of the SoL Attacks.

**RESPONSE TO 98:**  Plaintiffs admit the assertions in Paragraph 98.

99.    Shalom Sabag was an eyewitness to the June 18, 2002 attack.  Grube Decl. Ex. 12
(Sabag Tr. at 20:5-21:13).

**RESPONSE TO 99:**  Plaintiffs admit the assertion in Paragraph 99.

100.    Sabag testified that the only information he knew about the June 18, 2002 attack
was based on what he had learned from news reports.  *Id.* (Sabag Tr. at 26:4-6).

**RESPONSE TO 100:**  Plaintiffs dispute the assertion in Paragraph 100 which directly

contradicts the assertion in Paragraph 99 above.  Mr. Sabag heard the explosion of Bus 32A on

June 18, 2002, and witnessed the immediate aftermath of the attack.  *See* Grube Decl. Exhibit 12

(Sabag CL 2/4/2014 Tr.) at 20:9-21:13.

101.    Temima Spetner-Gould is a plaintiff in this case.  Grube Decl. Ex. 13 (Spetner Tr.
at 7:24-8:18).

**RESPONSE TO 101:**  Plaintiffs admit the assertion in Paragraph 101.

102.    Spetner-Gould testified that she did not see the bombers who perpetrated the December 1, 2001 attack and, other than what she learned from news reports, she does not know anything about the identity of the suicide bombers.  *Id.* (Spetner Tr. at 59:19-62:4).

**RESPONSE TO 102:**  Plaintiffs admit the assertions in Paragraph 102.

103.    Spetner-Gould does not know which group, if any, the bombers were affiliated with, nor anything about how the attack was funded.  *Id.* (Spetner Tr. at 60:21-61:8, 66:3-14).

**RESPONSE TO 103:**  Plaintiffs admit the assertions in Paragraph 103.

104.    Spetner-Gould testified that she never spoke with law enforcement, military authorities or investigators about the attack, nor did she attend or participate in any legal proceedings related to this attack.  *Id.* (Spetner Tr. at 62:5-66:7).

**RESPONSE TO 104:**  Plaintiffs admit the assertions in Paragraph 104.


## PLAINTIFFS' SUPPLEMENTAL COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Civil Rule 56.1(b), and in addition to their Statement of Material Facts filed in opposition to NatWest's Initial Motion, Plaintiffs respectfully submit this counter-statement of additional material facts.

### Interpal's Use of Its NatWest Account To Transfer Millions of Dollars to "Charities" Controlled By Hamas

105.    On August 22, 2003, the U.S. Treasury Department designated Interpal a Specially Designated Global Terrorist ("SDGT") on the finding that "[r]eporting indicates that Interpal is the fundraising coordinator of HAMAS" and that "[f]unds are generated by, and flow through, these organizations on behalf of Hamas."  *See* https://www.treasury.gov/press-center/press-releases/Pages/js672.aspx.

106.    Interpal transferred via NatWest a total of U.S. $ 4,001,792 to Al-Salah in 62 transfers from 1997 – 2005.  *See* Schuster Decl. Exhibit 153 (Spitzen NW Report) at 72, n. 369 (citing the December 28, 2010 Expert Report of Wayne Geisser, CPA ("2010 Geisser Report")

(which is at Exhibit 37 to the Declaration of Joel Israel executed on January 30, 2012 (*Weiss* ECF No. 272, *Applebaum* ECF No. 156 ("Israel Decl.")).

107.    Interpal transferred via NatWest a total of U.S. $ 354,185 to Al-Wafa in 24 transfers from 1996 – 2004.  *Id*. at 76, n. 390.

108.    The transfer of funds from Interpal via NatWest to the ICSH for an amount of USD 3,545,582 in 88 transfers, from 1997-2005.  *Id*. at 88, n. 472.

109.    Interpal transferred via NatWest to the Jenin Zakat Committee a sum of USD 1,307,510 in 51 transfers, from 1997-2005.  *Id*. at 99, n. 538

110.    Interpal transferred via NatWest to the Nablus Zakat Committee the sum of USD 732,601 in 32 transfers from 1998-2005.  *Id*. at 108, n. 597

111.    Interpal transferred via NatWest to *Al-Tadamun* the sum of USD 579,603 in 38 in 1997, 2001-2005.  *Id*. at 118, n. 670.

112.    Interpal transferred via NatWest to the Tulkarem Zakat Committee a sum of USD 577,318 in 29 transfers, from 1997 to 2004.  *Id*. at 125, n. 725.

113.    Interpal transferred via NatWest to the RBZC a sum of USD 419,426 in 34 transfers, from 1997 to 2005.  *Id*. at 133, n. 780.

114.    Interpal transferred via NatWest to the *Al-Islah* Charitable Society the sum of USD 553,103 in 21 transfers, from 2001 to 2005.  *Id*. at 141 n. 826.

115.    Interpal transferred via NatWest to the Beit Fajar Zakat Committee the sum of USD 220,593 in 27 transfers, from 1997 to 2005.  *Id*. at 147, n. 856.

116.    Interpal transferred via NatWest to the *Jerusalem Central Zakat* Committee the sum of USD 91,555 in 12 transfers, from 1997 to 2005.  *Id*. at 153, n. 892.

117.    As discussed in the expert reports of Dr. Shaked, Schuster Decl. Exhibit 179 (SR)

and Grube Decl. Exhibit 6 (SSSR), the 18 attacks at issue in these actions all took place on the

following dates, which occurred during the same time period that Interpal used its NatWest

account to send millions of dollars in funds to "Charities" controlled by Hamas (*see* Paragraphs

106-116 above):

- December 1, 2001 – Suicide Bombings on Ben Yehuda Street (Grube Decl. Ex. 6 at 30-41).
- March 7, 2002 – Suicide Attack at Atzmona (*Id.* at 42-51).
- March 27, 2002 – the suicide bombing at the Park Hotel, Netanya (Schuster Decl. Exhibit 179 at 16).
- May 7, 2002 – terrorist attack at the Sheffield Club, Rishon Le-Zion (*Id.*).
- June 18, 2002 – Suicide Bombing on Bus No. 32-A, Patt Junction, Jerusalem (Grube Decl. Ex. 6 at 52-63).
- July 31, 2002 – terrorist attack on the cafeteria of the Hebrew University, Jerusalem (Schuster Decl. Exhibit 179 at 16).
- January 29, 2003 – shooting attack on Road 60 (*Id.*).
- March 5, 2003 – terrorist attack on the No. 37 bus, Haifa (*Id.*).
- March 7, 2003 – shooting attack in Kiryat Arba (*Id.*).
- April 30, 2003 – terrorist attack at Mike's Place, Tel Aviv (*Id.*).
- May 18, 2003 – terrorist attack on the No. 6 bus, French Hill, Jerusalem (*Id.*).
- June 11, 2003 – terrorist attack on the No. 14A bus, Jaffa Road, Jerusalem (*Id.*).
- June 20, 2003 – shooting attack on Road 60 (*Id.*).
- August 19, 2003 – terrorist attack on the No. 2 bus, Jerusalem (*Id.*).
- September 9, 2003 – terrorist attack at Café Hillel, Jerusalem (*Id.*).
- October 22, 2003 – shooting attack in Tel Rumeida (*Id.*).
- January 29, 2004 – terrorist attack on the No. 19 bus, Jerusalem (*Id.*).
- September 24, 2004 – mortar attack on Neve Dekalim (*Id.*).

118.    During the time of the outbreak of the Second Intifada in 2000, Interpal's

transfers out of its NatWest accounts to 13 Hamas-linked "charities" skyrocketed, from

approximately $640,000 in 1999 to over $1.325 million in 2000 and more than $3.14 million in

2001.  *See* Israel Decl. Exhibit 36 (November 19, 2009 Expert Report of Wayne D. Geisser

("2009 Geisser Report") at Ex. C.  During that same time, the amount Interpal received from the

Hamas-affiliated groups World Assembly of Muslim Youth ("WAMY") and the Al Aqsa

Foundation also rose, from approximately $715,000 in 1999 to over $1.13 million in 2000 to

over $2.4 million in 2001.  *See* Israel Decl. Exhibit 37 (2010 Geisser Report) at Ex. B.

119.     Interpal's transfers to the 13 purported Palestinian charities peaked in 2003, with Interpal transferring more than $3.8 million to those entities from its NatWest accounts.  *See* Israel Decl. Exhibit 36 (2009 Geisser Report ) at Ex. C.  That year, Interpal received more than $2 million into its NatWest accounts from WAMY and the Al Aqsa Foundation, providing a real-time example confirming various countries' intelligence services' (including Israel's, South Africa's and the United States') description of Interpal as HAMAS's paymaster in Europe and of NatWest's own reflections about the possibility that Interpal was an "umbrella for funding Terrorism in the Middle East."  See Israel Decl. Exhibit 57 at NW052138-9.

120.     The expert reports of Dr. Levitt and Mr. Spitzen cite and reply upon substantial evidence that confirms that the NatWest counter-parties to which Interpal sent funds were controlled by Hamas. *See* Schuster Decl. Exhibit 153 (Spitzen Report) at 24-154; Schuster Decl. Exhibit 152 (Levitt NW Report) at 15-32, 35-43, 46-92**.**  That evidence included not only multiple governments' findings that they were Hamas-controlled, but also a 2001 FBI Memorandum (the "Watson Memorandum") describing "a significant number of them" as "controlled by HAMAS".  *See* Schuster Decl. Exhibit 152 (Levitt NW Report) at 19.

**Opinions of Dr. Ronni Shaked**

121.     In the opinion of Dr. Shaked, Hamas was responsible for committing all of the terrorist attacks addressed in NatWest's Original and Renewed Motions.  *See* Schuster Decl. Exhibit 179 (SR); Grube Decl. Exhibit 6 (SSSR).

**Findings of Israeli Government Investigations**

122.     The ISA is the primary Israeli law enforcement agency responsible for investigating terrorist attacks in Israel and the Palestinian territories, and its responsibilities include identifying the perpetrators and thwarting future attacks.  *See* Schuster Decl. Exhibit 179

(SR) at 1-4, 12-13; Schuster Decl. Exhibit 180 (Shaked 11/4/2010 CL Tr.) at 21:4-22:24; Schuster Decl. Exhibit 222 (Naim Report) at 8.  The ISA reports directly to the Office of the Prime Minister of Israel ("PMO").  *See* Schlanger Decl. at ¶ 3.

123.    The ISA, together with the Israeli police, conducts extensive investigations of terror attacks including crime scene analysis, obtaining autopsy reports, interviewing eyewitnesses, victims, family members of victims, family members and associates of suspects, and interrogating suspects.  *See* Schuster Decl. Exhibit 222 (Naim Report) at 8-12.

124.    According to the ISA, between September 2000 and September 2007, there were 27,000 terrorist attacks against Israeli citizens and residents.  See Schlanger Decl. Ex. 4 (2007 ISA Report) at 1.

125.    Based upon its investigations, the ISA concluded that Hamas was responsible for 10 of the 15 terrorist attacks addressed in NatWest's Initial Motion.  Specifically, the ISA found that Hamas was responsible for the following terrorist attacks:

a.    March 27, 2002 (Park Hotel, Netanya) (*see* Schuster Decl. Exhibit 179 (SR) at 35; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 50 (L-C089112));

b.    May 7, 2002 (Sheffield Club, Rishon LeZion) (*see* Schuster Decl. Exhibit 179 (SR) at 45; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 45 (L_C089107));

c.    July 31, 2002 (Hebrew University Cafeteria) (*see* Schuster Decl. Exhibit 179 (SR) at 54; Schlanger Decl. at ¶ 13 and Exhibit 5 (August 21, 2002 PMO announcement));

d.    March 5, 2003 (Bus 37, Haifa) (*see* Schuster Decl. Exhibit 179 (SR) at 68; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 30 (L-C089092));

e.   April 30, 2003 (Mike's Place, Tel Aviv) (*see* Schuster Decl. Exhibit 179 (SR) at 81-83; Schlanger Decl. at ¶¶ 14-15 and Exhibit 6 (June 15, 2003 PMO announcement) and Exhibit 7 (2003 ISA Report) at page 12);

f.   May 18, 2003 (Bus 6, French Hill, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 88-89; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 27 (L_C089089));

g.   June 11, 2003 (Bus 14A, Jaffa Road, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 95; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 25 (L_C089087));

h.   August 19, 2003 (Bus 2, Jerusalem) (*see* Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 23 (L_C089085));

i.   September 9, 2003 (Café Hillel, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 113-114; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 22 (L_C089084); and

j.   January 29, 2004 (Bus 19, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 132-33; Schlanger Decl. at ¶ 33 and Exhibit 24 (February 2, 2004 ISA announcement)).

126.   The Israel Defense Forces concluded that Hamas was responsible for the June 20, 2003 (Route 60) attack.  *See* Schuster Decl. Exhibit 179 (SR) at 100-101; Schlanger Decl. at ¶ 29 and Exhibit 20.

127.   Based upon its investigations, the ISA concluded that Hamas was responsible for two of the three terrorist attacks addressed in NatWest's Renewed Motion.  Specifically, the ISA found Hamas was responsible for the following terrorist attacks:

a.  December 1, 2001 (Ben Yehuda Street, Jerusalem) (*see* Grube Decl. Exhibit 6 (SSSR) at 37-38; Schlanger Decl. Exhibit 4 (ISA 2007 Report) at page 64 (L_C089126); Schlanger Decl. Exhibit 31 (February 7, 2002 Ministry of Foreign Affairs announcement)); and

b.  June 18, 2002 (Bus 32A, Patt Junction, Jerusalem) (*see* Grube Decl. Exhibit 6 (SSSR) at 58; Schlanger Decl. Exhibit 4 (2007 ISA Report) at page 40 (L_C089102)).

**Judgments of Conviction by Israeli Civilian and Military Courts**

128.    Members of Hamas pled guilty and/or were tried and convicted by Israeli civilian or military courts for their membership in Hamas and for their roles in committing 12 of the 15 terrorist attacks addressed in NatWest's Initial Motion.  Specifically, Hamas members were convicted for their roles played in connection with the following attacks:

a.  March 27, 2002 (Park Hotel, Netanya) (*see* Schuster Decl. Exhibit 179 (SR) at 36-37; Schuster Decl. Exhibit 222 (Naim Report) at 7, 14-15; Schuster Decl. Exhibit 205 (Report of Moshe Azoulay dated December 29, 2010 ("Azoulay Report")) at 7-8 (citing convictions by Jerusalem and Tel Aviv District Courts) and 9, 13 (citing military court convictions));

b.  May 7, 2002 (Sheffield Club, Rishon LeZion) (*see* Schuster Decl. Exhibit 179 (SR) at 46-47; Schlanger Decl. at ¶¶ 42-44 and Exhibits 33-35 (Barghuthi military court indictment (Counts 67-83), guilty verdict and sentencing; Schuster Decl. Exhibit 222 (Naim Report) at 7, 15-16; Schuster Decl. Exhibit 205 (Azoulay Report) at 7-8 (citing Jerusalem District Court convictions) and 11, 12, 13 (citing military court convictions));

c.  July 31, 2002 (Hebrew University Cafeteria) (*see* Schuster Decl. Exhibit 179 (SR) at 55-56; Schlanger Decl. at ¶¶ 42-44 and Exhibits 33-35 (Barghuthi indictment (Counts 87-97), guilty verdict and sentencing); Schuster Decl. Exhibit 222 (Naim Report) at 7, 16-17; Schuster Decl. Exhibit 205 (Azoulay Report) at 7-9 (citing Jerusalem District Court convictions) and 12-13 (citing military court conviction));

d.  January 29, 2003 (Route 60) (*see* Schuster Decl. Exhibit 179 (SR) at 61-62; Schuster Decl. Exhibit 222 (Naim Report) at 7, 17-19; Schuster Decl. Exhibit 205 (Azoulay Report) at 10, 13 (citing military court convictions))

e.  March 5, 2003 (Bus 37, Haifa) (*see* Schuster Decl. Exhibit 179 (SR) at 68-70; Schuster Decl. Exhibit 222 (Naim Report) at 7, 20; Schuster Decl. Exhibit 205 (Azoulay Report) at 7-8 (citing Israel Supreme Court conviction) and 10, 12, 13 (citing military court convictions));

f.  March 7, 2003 (Kiryat Arba) (*see* Schuster Decl. Exhibit 179 (SR) at 76; Schuster Decl. Exhibit 227 (Expert Report of Shaul Naim in *Strauss v. Credit Lyonnais, S.A.*, 06-cv-702 and *Wolf v. Credit Lyonnais, S.A.*, 07-cv-914 (E.D.N.Y.) dated December 10, 2009 ("Naim CL Report")) at 16; Schlanger Decl. at ¶ 28 and Exhibit 19 (conviction and sentencing of Abdallah Abu Seif));

g.  May 18, 2003 (Bus 6, French Hill, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 89); Schuster Decl. Exhibit 222 (Naim Report) at 7, 21; Schuster Decl. Exhibit 205 (Azoulay Report) at 10, 13 (citing military court convictions));

h.  June 11, 2003 (Bus 14A, Jaffa Road, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 95-96; Schuster Decl. Exhibit 222 (Naim Report) at 7, 21; Schuster Decl.

Exhibit 205 (Azoulay Report) at 10, 13 (citing military court convictions));

i.  June 20, 2003 (Route 60) (*see* Schuster Decl. Exhibit 179 (SR) at 61-62, 100; Schuster Decl. Exhibit 222 (Naim Report) at 7, 21; Schuster Decl. Exhibit 205 (Azoulay Report) at 10-11, 13 (citing military court convictions));

j.  August 19, 2003 (Bus 2, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 106-107; Schuster Decl. Exhibit 222 (Naim Report) at 7, 22; Schuster Decl. Exhibit 205 (Azoulay Report) at 11, 13 (citing military court conviction));

k.  September 9, 2003 (Café Hillel, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at115-116; Schuster Decl. Exhibit 222 (Naim Report) at 7, 22-23; Schuster Decl. Exhibit 205 (Azoulay Report) at 7-8 (citing Jerusalem District Court convictions) and 12-13 (citing military court convictions)); and

l.  January 29, 2004 (Bus 19, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 133-35; Schlanger Decl. at ¶¶ 34-37 and Exhibits 25-28 (Nufal Adawin military court conviction and sentencing, Muhammad El-Nashash indictment and sentencing); Schuster Decl. Exhibit 222 (Naim Report) at 7, 24).

129.  Members of Hamas pled guilty and/or were tried and convicted by Israeli Military Courts for their membership in Hamas and their roles in committing two of the three terrorist attacks addressed in NatWest's Renewed Motion.  Specifically, the Hamas members were convicted for their roles played in connection with the following attacks:

a.  December 1, 2001 (Ben Yehuda Street, Jerusalem) (*see* Grube Decl. Exhibit 6 (SSSR) at 38-39; Schlanger Decl. at ¶¶ 42-44 and Exhibits 33-35 (Barghuthi indictment, guilty verdict and sentencing); Schuster Decl. Exhibit 228 (Supplemental Expert Report of Shaul Naim in *Strauss v. Credit Lyonnais, S.A.*,

06-cv-702 and *Wolf v. Credit Lyonnais, S.A.*, 07-cv-914 (E.D.N.Y.) dated

January 12, 2010 ("Naim Supplemental CL Report") at 2, 3); and

  b.  June 18, 2002 (Bus 32A, Patt Junction, Jerusalem) (*see* Grube Decl. Exhibit 6

  (SSSR) at 59-60; Schlanger Decl. at ¶¶ 53-56 and Exhibits 433-46 (indictments,

  guilty verdicts and sentences of Fahmi Mashahara and Ramadan Mashahara)).

**<u>Hamas's Claims of Responsibility</u>**

130.    Terrorism experts reasonably rely on terrorist organizations' credible claims of

responsibility in forming an opinion concerning the responsibility for particular terrorist attacks,

as demonstrated by the report of NatWest's terrorism expert Brian Jenkins.  *See* Schuster Decl.

Exhibit 172 (Jenkins Report) at 3, 20, 27-34.  *See also* Plaintiffs' Response to Paragraph 56,

above; Schlanger Decl. Exhibit 13 (Arab Bank Trial transcript – Kohlmann direct, August 18,

2014) at 353:16-354:19.

131.    It is the policy of Hamas not to claim responsibility for terrorist attacks that it did

not commit.  *See* Schuster Decl. Exhibit 179 (SR) at 5; Schuster Decl. Exhibit 180 (Shaked

11/4/2010 CL Tr.) at 87:21-88:22, 110:6-25, 120:9-122:8; Schuster Decl. Exhibit 187

(Kohlmann 12/3/2010 CL Tr.) at 334:9-335:21.  *See also* Plaintiffs' Response to Paragraph 56,

above.

132.    Hamas makes extensive use of the internet for communication, coordination and

media access, and as an information repository.  *See* Schuster Decl. Exhibit 210 (Kohlmann

Report) at 9-10; Schlanger Decl. at ¶ 25 and Exhibit 16 (Arab Bank Trial transcript – Kohlmann

direct, August 18, 2014) at 397:4-11.

133.    At all times relevant to these actions, Hamas controlled the websites

www.alqassam.ps and www.palestine-info.net, among others.  *See* Schuster Decl. Exhibit 210

(Kohlmann Report) at 9-28; Schlanger Decl. Exhibit 16 (Arab Bank Trial transcript – Kohlmann direct, August 18, 2014) at 353:2-15, 354:20-363:15, 399:6-20, 402:3-403:25, 415:17-416:17; Schlanger Decl. Exhibit 12 (Jenkins 6/10/2011 Dep.) at 135:25-136:6; Schuster Decl. Exhibit 172 (Jenkins Report) at 42 ("[Kohlmann correctly points out that the internet has become an important component of terrorist communications, and he makes a good case that Hamas communicates through a number of websites it controls.").

134.    Hamas published claims of responsibility for each of the following attacks addressed in NatWest's Initial Motion on one or more of its websites:

 a. March 27, 2002 (Park Hotel, Netanya) (*see* Schuster Decl. Exhibit 179 (SR) at 28; Schuster Decl. Exhibit 210 (Kohlmann Report) at 31-32;

 b. May 7, 2002 (Sheffield Club, Rishon LeZion) (*see* Schuster Decl. Exhibit 179 (SR) at 42-43; Schuster Decl. Exhibit 210 (Kohlmann Report) at 33-34);

 c. July 31, 2002 (Hebrew University Cafeteria) (*see* Schuster Decl. Exhibit 179 (SR) at 52-53; Schuster Decl. Exhibit 210 (Kohlmann Report) at 34);

 d. January 29, 2003 (Route 60) (*see* Schuster Decl. Exhibit 179 (SR) at 59; Schuster Decl. Exhibit 210 (Kohlmann Report) at 35);

 e. March 5, 2003 (Bus 37, Haifa) (*see* Schuster Decl. Exhibit 179 (SR) at 66-67; Schuster Decl. Exhibit 210 (Kohlmann Report) at 35-36);

 f. March 7, 2003 (Kiryat Arba) (*see* Schuster Decl. Exhibit 179 (SR) at 72-73; Schuster Decl. Exhibit 210 (Kohlmann Report) at 36);

 g. April 30, 2003 (Mike's Place) (see Schuster Decl. Exhibit 179 (SR) at 78-79; Schuster Decl. Exhibit 210 (Kohlmann Report) at 36-37);

 h. May 18, 2003 (Bus 6, French Hill, Jerusalem) (*see* Schuster Decl. Exhibit 179

(SR) at 85; Schuster Decl. Exhibit 210 (Kohlmann Report) at 38);

i.  June 11, 2003 (Bus 14A, Jaffa Road, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 91; Schuster Decl. Exhibit 210 (Kohlmann Report) at 38;

j.  June 20, 2003 (Route 60) (*see* Schuster Decl. Exhibit 179 (SR) at 98-99; Schuster Decl. Exhibit 210 (Kohlmann Report) at 39-40);

k.  August 19, 2003 (Bus 2, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 102-104; Schuster Decl. Exhibit 210 (Kohlmann Report) at 40-41);

l.  September 9, 2003 (Café Hillel, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 110-11; Schuster Decl. Exhibit 210 (Kohlmann Report) at 41-42);

m.  January 29, 2004 (Bus 19, Jerusalem) (*see* Schuster Decl. Exhibit 179 (SR) at 128-29; Schuster Decl. Exhibit 210 (Kohlmann Report) at 43-44; and

n.  September 24, 2004 (Neve Dekalim) (*see* Schuster Decl. Exhibit 179 (SR) at 121-22; Schuster Decl. Exhibit 210 (Kohlmann Report) at 44.

135.   Hamas published claims of responsibility for each of the following attacks addressed in NatWest's Renewed Motion on one or more of its websites:

a.  December 1, 2001 (Ben Yehuda Street, Jerusalem) (*see* Grube Decl. Exhibit 6 (SSSR) at 31-32; Grube Decl. Exhibit 11 (Kohlmann Arab Bank Report) at 32-33);

b.  March 7, 2002 (Atzmona) (*see* Grube Decl. Exhibit 6 (SSSR) at 43; Grube Decl. Exhibit 11 (Kohlmann Arab Bank Report) at 35); and

c.  June 18, 2002 (Bus 32A, Patt Junction, Jerusalem) (*see* Grube Decl. Exhibit 6 (SSSR) at 52-53; Grube Decl. Exhibit 11 (Kohlmann Arab Bank Report) at 40-41).

**March 7, 2002 (Atzmona) Attack**

136.    Hamas claimed responsibility for the March 7, 2002 (Atzmona) attack on the day

of the attack by publishing an official announcement on both its political and *Izz al-Din al-*

*Qassam* Brigades websites.  *See* Grube Decl. Exhibit 6 (SSSR) at 43, 45-46; Schuster Decl.

Exhibit 210 (Kohlmann Report) at 10-28; Grube Decl. Ex. 11 (Kohlmann AB Report) at 35;

Schuster Decl. Exhibit 172 (Jenkins Report) at 49 n.102; Schlanger Decl. at ¶ 46 and Exhibit 37.

137.    The Hamas claim of responsibility for the March 7, 2002 (Atzmona) attack is

highly credible, based on the following indicia of credibility identified by Plaintiffs' and

NatWest's terrorism experts:

   a.  The announcement was made on the day the attack occurred.  *See* Paragraph 136

       above.  *See generally* Schuster Decl. Exhibit 172 (Jenkin Report) at 28 (indicating

       that claims asserted shortly after an attack are more credible), 49 n.102 (Hamas

       claim of responsibility for March 7, 2002 attack issued "same day").

   b.  The announcement was published on both the Hamas political and *Izz al-Din al-*

       *Qassam* Brigades websites, indicating a high level of organizational involvement.

       *See* Schuster Decl. Exhibit 210 (Kohlmann Report) at 8 10-28; Grube Decl.

       Exhibit 11 (Kohlmann AB Report) at 35; Schuster Decl. Exhibit 187 (Kohlmann

       12/2/2010 CL Tr.) at 189:11216:20-217:24.

   c.  The announcement includes the symbol of the *Izz al-Din al-Qassam* Brigades

       along with an inscription in both Arabic and English noting: "*Izz al-Din Al-*

       *Qassam* Brigades, the Military Wing of the Hamas Movement, Information

       Office."  *See* Grube Decl. at Ex. 6 (SSSR) at 43; Grube Decl. Exhibit 11

       (Kohlmann AB Report) at 35 (identifying the claim as an official communiqué of

the al-Qassam Brigades); Schlanger Decl. Exhibit 37.  *See generally* Schuster

Decl. Exhibit 172 (Jenkins Report) at 29.

d.  The announcement contains accurate details about the attack that, at the time of

the announcement, would only have been known to those responsible, including

the name, age and residence of the attacker (17-year-old Mohammed Farhat of

Gaza) and the date, time and location of the attack (11:52 p.m. on March 7, 2002

at Atzmona).  *Compare* Grube Decl. Exhibit 6 (SSSR) at 42 *with* Schlanger Decl.

Exhibit 37.  *See generally* Schuster Decl. Exhibit 172 (Jenkins Report) at 29, 31;

Schuster Decl. Exhibit 210 (Kohlmann Report) at 8.

e.  The Hamas websites also published "pre-attack" evidence confirming the identity

of the attacker, including a video of attacker's mother (the notorious Hamas

member Miryam Farhat) sending him off to his "martyrdom" (*see* Grube Decl.

Exhibit 6 (SSSR) at 44, 45, 49; Grube Decl. Exhibit 7 (Shaked 2/12/2014 CL Tr.)

at 132:15-18[5]; Schlanger Decl. Exhibit 42) and a "video will" recorded by the

_____

[5]  The video of Miryam Farhat – the "mother of martyrs" – sending her son to commit the March 7, 2002 (Atzmona) attack was broadcast "throughout the Middle East on Arabic-language television [and] made [Miryam] Farahat a celebrity."  Daniel Williams, *A Mother's Blessing To Kill and Be Killed; Palestinian Treated As Celebrity For Backing Son's Plan to Raid Israeli Settlement*, THE WASHINGTON POST, June 25, 2002.  *See also, e.g.*, *Suicide Bombers' Mother Elected to Palestinian Parliament*, ABC News, January 26, 2006, http://abcnews.go.com/WNT/story?id=1536576 ("[Mariam Farahat] is most famous for her presence in a Hamas video, showing her 17-year-old how to attack Israelis and telling him not to return.  Shortly afterward, he killed five students in a Jewish settlement before he was killed himself."); Chris McGreal, *Hamas Makes Gains Against Fatah, But Fails To Win Power*, THE GUARDIAN (U.K.), January 26, 2006 ("Among the more contentious candidates in Gaza was the Mother of Martyrs, who sent three of her sons to be suicide bombers.  Mariam Farhat's campaign video includes footage of her helping her son, Mohammed, 17, to prepare his bomb belt and advising him on techniques that killed five Israelis."); Jonathan Saul, *Israelis Despair Over Hamas Election Victory*, REUTERS NEWS, January 26, 2006 ("Among those expected to win seats in the new Palestinian parliament was Mariam Farhat, also known as Umm Nidal, who in a video tape message urged her sons to carry out attacks—including the one on a Jewish settlement in

attacker within a day or two before the attack.  *See* Grube Decl. Exhibit 6 (SSSR) at 45; Grube Decl. Exhibit 11 (Kohlmann AB Report) at 36; Schlanger Decl. at ¶¶ 47-50 and Exhibits 38-41.  *See generally*, Schuster Decl. Exhibit 172 (Jenkins Report) at 31-32 (opining that such pre-attack evidence "is considered more compelling" because more difficult to fabricate than post-attack evidence, and that video wills are "important evidence to be considered" particularly if made "close in time to the attack").

    f.   No other terrorist organization asserted a claim of responsibility for the March 7, 2002 (Atzmona) attack.  *See* Schuster Decl. Exhibit 172 (Jenkins Report).

---

which [Avi] Zaha's 18-year-old-son [Ariel Zana] was killed [*i.e.*, the March 7, 2002 (Atzmona) attack].");  Nidal al-Mughrabi, *Hamas "Mother of Martyrs" Runs in Palestinian Poll*, REUTERS NEWS, December 8, 2005 ("[Maryam] Farhat, 56, could give an added boost to Hamas as she has strong militant credentials, including an appearance—carrying a gun—in a video in which she advised one of her sons, Mohammed, on tactics before he attacked a Jewish settlement.  Mohammed, 17, killed five Israelis before he was gunned down in the 2002 assault in the occupied Gaza Strip.");  Ian Fisher, *Women, Secret Hamas Strength, Win Votes at Polls and New Role*, N.Y. TIMES, February 3, 2006 ("Mariam Farhat [is] the mother of three Hamas supporters killed by Israelis.  She bade one son goodbye in a homemade videotape before he stormed an Israeli settlement, killing five people, then being shot dead.  She said later, in a much-publicized quotation, that she wished she had 100 sons to sacrifice that way.");  Greg Myre, *Militants Seize, Then Release, U.S. Teacher in West Bank*, N.Y. TIMES, October 12, 2006 ("[Maryam] Farhat, who is a member of the militant faction Hamas, gained notoriety in 2002 when she made a video with her 17-year-old son, Muhammad, and encouraged him to attack Israel.  A short time later, he took part in a shooting that left five Israelis and himself dead.  The video was released after the shooting.");  William Yardley, *Mariam Farhat, Known as 'Mother of Martyrs,' Dies at 64*, N.Y. TIMES, March 20, 2013 ("Ms. Farhat was elected to the Palestinian Legislative Council in 2006.  Four years earlier, her 17-year-old son, Mohammad, was shot to death after he stormed an Israeli settlement with an automatic rifle and explosives, killing five students.  Shortly before the attack, Ms. Farhat made a video in which she appeared with Mohammad to show support for what he was about to do.").  Dr. Shaked would also be able to identify Maryam Farhat because she became a prominent public figure in the aftermath of the March 7, 2002 (Atzmona) attack, including serving as a Hamas member of the Palestinian Legislative Counsel.  *See* Grube Decl. Exhibit 6 (SSSR) at 49, 50.

138.    The video will of Mohammed Farhat was published on both the Hamas political and *al-Qassam* Brigades websites. *See* Schuster Decl. Exhibit 210 (Kohlmann Report) at 10-28; Grube Decl. Exhibit 11 (Kohlmann AB Report) at 36 n.134.

139.    The video will of Mohammed Farhat provides compelling evidence of Hamas's responsibility for the March 7, 2002 (Atzmona) attack. It shows Farhat standing in front of a background that contains recognizable Hamas symbols while wearing a hat emblazoned with an "*Izz al-Din Al-Qassam* Brigades ribbon," and carrying a gun. *See* Grube Decl. Exhibit 6 (SSSR) at 45; Schlanger Decl. Exhibit 38.

140.    In the video will, Farhat declares that he is a "son" of the al-Qassam Brigades. *See* Schlanger Decl. Exhibit 36. He states his intention to carry out an "operation … in order to take revenge upon the enemies of humanity—the Jews, the bloodsuckers who kill my people day and night." Schlanger Decl. at ¶ 48 and Exhibit 39. He indicates that he expects to die undertaking the "operation" by praying to Allah "to accept my operation, to unite me with my martyred brothers and grant me the companionship of the Prophet…in the highest levels of Paradise." *Id*.

141.    The Farhat video will was recorded no more than two days before the March 7, 2002 (Atzmona) attack. In the video, Farhat refers to events that took place on March 5, 2007, including an Israeli missile attack reported to have taken place at 7:15 p.m. on March 5, 2007. *See* Schlanger Decl. at ¶¶ 48-50 and Exhibits 39-41. *See generally* Schuster Decl. Exhibit 172 (Jenkins Report) at 32 (opining that video wills "may be important evidence" of responsibility for an attack, particularly if recorded close in time to the attack.)

**April 30, 2003 (Mike's Place) Attack**

142.     The ISA found that:  "In April [2003] the Hamas performed a suicide bombing in Mike's Place restaurant in Tel Aviv, where 3 Israeli civilians were killed and more than 60 were [wounded]."  Schlanger Decl. Exhibit 7 (2003 ISA Report).

143.     On June 15, 2003, the Office of the Prime Minister of Israel issued an announcement concerning the status of the ISA's on-going investigation into the April 30, 2003 (Mike's Place) attack, which included the statement that:  "The two British Muslims who were involved in the bombing at Mikes Place were dispatched to perpetrate the attack by the Hamas military command in the Gaza Strip."  Schlanger Decl. Exhibit 6 (June 15, 2003 PMO announcement).

**October 22, 2003 (Tel Romeda) Attack**

144.     Hamas published a detailed biography of the October 22, 2003 (Tel Romeda) attacker, Rafiq Qanibi, on both its political and *Izz al-Din al-Qassam* Brigades websites which describes his role in perpetrating the attack.  *See* Schuster Decl. Exhibit 179 (SR) at 124; Schuster Decl. Exhibit 210 (Kohlmann Report) at 42; Schlanger Decl. at ¶ 30 and Exhibit 21. Among other things, the biography states that "[o]n 10/22/2003, after the Wednesday Midday Prayer, the martyr [Rafiq Qanibi] concealed his machine-gun under the jacket he was wearing and walked around near the Jews' territory on top of Tel Rumedia."  Schlanger Decl. Exhibit 21 at MR-ARA227179.  It further states that "according to the residents of the occupied Palestinian houses there" before he began shooting Rafiq "put a green headband on his forehead."  *Id*.

145.     Hamas also published Rafiq Qanibi's name in the Hamas Book of Martyrs, the virtual commemorative book in which Hamas publishes the photographs and histories of Hamas members who have been killed, including in suicide operations.  *See* Schuster Decl. Exhibit 179

(SR) at 33 n.102, 124.  Hamas also published his name and photograph on posters celebrating

him as a Hamas martyr.  *See id*. at 124-25.

**September 24, 2004 (Neve Dekalim) Attack**

146.  Hamas claimed responsibility for the September 24, 2004 mortar attack in Neve

Dekalim on the day of the attack by publishing two official announcements on the *Izz al-Din al-*

*Qassam* Brigades website.  *See* Schuster Decl. Exhibit 179 (SR) at 122; Schuster Decl.

Exhibit 210 (Kohlmann Report) at 10-28, 44; Schuster Decl. Exhibit 172 (Jenkins Report) at 49

n.102; Schlanger Decl. at ¶¶ 38-39 and Exhibits 29-30.

147.  The Hamas claim of responsibility for the September 24, 2004 (Neve Dekalim)

attack is highly credible, based on the following indicia of credibility identified by Plaintiffs' and

NatWest's terrorism experts:

      a.  The first of the announcements was made within half an hour of the attack.  *See*

         Schlanger Decl. Exhibit 29.  The second was made an hour later, confirmed the

         first announcement and reported that "the enemy acknowledged that a female

         soldier was killed and two other soldiers moderately wounded."  Schlanger Decl.

         Exhibit 30.  *See generally* Schuster Decl. Exhibit 172 (Jenkin Report) at 28

         (indicating that claims asserted shortly after an attack are more credible), 49 n.102

         (Hamas claim of responsibility for September 24, 2004 attack issued "same day").

      b.  The announcements include the symbol of the *Izz al-Din al-Qassam* Brigades

         along with an inscription in both Arabic and English noting: "*Izz al-Din Al-*

         *Qassam* Brigades, the Military Wing of the Hamas Movement, Information

         Office."  *See* Schuster Decl. Exhibit 179 (SR) at 123; Schuster Decl. Exhibit 210

         (Kohlmann Report) at 44 (identifying the claims as official communiqué of the al-

Qassam Brigades); Schlanger Decl. Exhibits 29, 30.  *See generally* Schuster Decl.

Exhibit 172 (Jenkins Report) at 29.

c.   The announcements contain details about the attack that, at the time of the

announcement, would only have been known to those responsible, including the

exact time of the attack and that it involved the firing of three 100-mm mortar

shells.  *See* Schlanger Decl. Exhibits 29, 30.  *See generally* Schuster Decl.

Exhibit 172 (Jenkins Report) at 29, 31; Schuster Decl. Exhibit 210 (Kohlmann

Report) at 8.

d.   Hamas published "pre-attack" evidence in the form of a video showing three

masked men whose faces are covered with green Hamas bandanas firing mortars

towards Neve Dekalim.  *See* Schuster Decl. Exhibit 179 (SR) at 122.  *See*

*generally*, Schuster Decl. Exhibit 172 (Jenkins Report) at 31-32 (opining that pre-

attack evidence "is considered more compelling").

e.   No other terrorist organization asserted a claim of responsibility for the

September 24, 2004 (Neve Dekalim) attack.  *See* Schuster Decl. Exhibit 172

(Jenkins Report); Israel Decl. Exhibit 9 at pp. 5-7.

**<u>January 29, 2004 (Bus 19) Attack</u>**

148.   On February 2, 2004, in an official announcement concerning the death of Hamas

terrorist Muhammad abu Uda, the ISA stated that:  "Muhammad abu Uda was … the one who,

according to intelligence assessments, was in charge of the deadly terrorist attack in bus line 19

in Jerusalem on Thursday [i.e., January 29, 2004] in which 11 civilians were killed and over 60

wounded."  *See* Schlanger Decl. Exhibit 24; Schuster Decl. Exhibit 179 (SR) at 132-33.

149.    Nufal Jihad Nufal Adawin was convicted by the Military Appeals Court of Judea and Samaria for his role in perpetrating the January 29, 2004 (Bus 19) attack.  *See* Schlanger Decl. Exhibit 25 (Nufal Adawin guilty verdict and sentencing).  Among other crimes, Adawin was convicted of (a) membership in Hamas (an illegal organization) (see Schlanger Exhibit 25 at L_C180923:7-8, L_C180927:20-22) (b) holding a position in Hamas (*see id*. at L_C180923:9-10, L_C180927:21-22), (c) rendering services for Hamas (*see id*. at L_C180923:15-16), (d) conspiring to intentionally cause death by recruiting the suicide bomber who committed the Bus 19 attack, "plan[ing] the attack in detail and prepar[ing] an improvised explosive device for the purpose of carrying out the attack" (*id*. at L_C180923:12-13, L_C180927:34-39); and (e) failing to prevent a crime by doing nothing to prevent the occurrence of the Bus 19 attack when informed by the suicide bomber that he intended to carry out "the attack planned by the defendant [*i.e*., Adawin]" with the help of another terrorist group.  *See id*. at L_C180923:17, L_C180927:40-44.  The sentencing judgment states that after the Bus 19 attack, Adawin delivered the photographs and video recording he had made of the suicide bomber prior to the attack to a television station in Bethlehem for the purpose of claiming responsibility for the attack on behalf of Hamas.  *See id*. at L_C180927:48-L_C180928:5.

150.    Muhammad Kayed Khalil al-Nashash was indicted by an Israeli military prosecutor for, among other crimes, (a) membership in the *Izz al-Din al-Qassam* Brigades of Hamas (an illegal organization) (*see* Schlanger Decl. Exhibit 26 (al-Nashash indictment) at Count 4), and (b) performing services for that illegal organization.  *See id*. at Count 5.  Al-Nashash pled guilty to, among other things, the charge of membership in the *Izz al-Din al-Qassam* Brigades.  *See* Schlanger Decl. Exhibit 27 (al-Nashash indictment as amended to reflect his plea agreement) at Count 4.

151.    In sentencing al-Nashash to a term of 20 years of imprisonment, the Military

Court of Judea made an upward departure from the agreed upon 15-year sentence because of al-

Nashash's role in planning the suicide bombing that was ultimately carried out by the suicide

bomber he recruited as the Bus 19 attack.  *See* Schlanger Decl. Exhibit 28 (al-Nashash

sentencing decision).  The court found that al-Nashash's "'contribution' to the fact that the same

attacker [*i.e.*, the suicide bomber he recruited] was in the end able to carry out his plot should be

credited to [al-Nashash]."  *Id*. at L_C180762:34-36.


Dated:  January 25, 2016                    **OSEN LLC**

                                            By    /s/ Gary M. Osen
                                               Gary M. Osen, Esq.
                                               Ari Ungar, Esq.
                                               Peter Haven-Hansen, Esq., Of Counsel
                                               2 University Plaza, Suite 402
                                               Hackensack, NJ 07601
                                               (201) 265-6400
                                                (201) 265-6400

                                            **ZUCKERMAN SPAEDER LLC**
                                            Shawn Naunton, Esq.
                                            399 Park Avenue, 14th Floor
                                            New York, NY 10022
                                            (646) 746-8655

                                            **KOHN, SWIFT & GRAF, P.C.**
                                            Steven M. Steingard, Esq.
                                            Stephen Schwartz, Esq.
                                            One South Broad Street
                                            Philadelphia, PA 19107
                                            (215) 238-1700

                                            **TURNER & ASSOCIATES, P.A.**
                                            C. Tab Turner, Esq.
                                            4705 Somers Avenue, Suite 100
                                            North Little Rock, AR 72116
                                            (501) 791-2277

                                            **Attorneys for Plaintiffs Weiss *et al*.**

**SAYLES WERBNER P.C.**

By    /s/ Mark S. Werbner
       Mark S. Werbner, Esq.
       1201 Elm Street, Suite 4400
       Dallas, TX 75270
       (214) 939-8700

       **STONE BONNER & ROCCO LLP**
       James P. Bonner, Esq.
       Patrick L. Rocco, Esq.
       Susan M. Davies, Esq.
       145 West 45th Street, Suite 701
       New York, NY 10036
       (212) 239-4340

       **HEIDEMAN NUDELMAN & KALIK, P.C.**
       Richard D. Heideman, Esq.
       Noel J. Nudelman, Esq.
       Tracy Reichman Kalik, Esq.
       1146 19th Street, NW, Fifth Floor
       Washington, DC 20036
       (202) 463-1818

       **PERLES LAW FIRM, P.C.**
       Steven R. Perles, Esq.
       Edward MacAllister, Esq.
       1146 19th Street, NW, 5th Floor
       Washington, DC 20036
       (202) 745-1300

       **THE DAVID LAW FIRM, P.C.**
       Jonathan David, Esq.
       10655 Six Pines Drive, Suite 260
       Woodlands, TX 77380
       (281) 296-9090

       **Attorneys for Plaintiffs Applebaum, *et al*.**