UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                                                :
TZVI WEISS, et al.,                                             :
                                                                :
                                  Plaintiffs,                   :        Case No. 05-CV-4622 (DLI) (RML)
                                                                :
                        - against -                             :
                                                                :
NATIONAL WESTMINSTER BANK PLC,                                  :
                                                                :
                                  Defendant.                    :
----------------------------------------------------------------X
                                                                :
NATAN APPLEBAUM, et al.,                                        :
                                                                :
                                  Plaintiffs,                   :
                                                                :
                        - against -                             :
                                                                :        Case No. 07-CV-916 (DLI) (RML)
NATIONAL WESTMINSTER BANK PLC,                                  :
                                                                :
                                  Defendant.                    :
                                                                :
                                                                :
----------------------------------------------------------------X

## <u>JOINT PRE-TRIAL ORDER</u>

## I.     <u>TRIAL COUNSEL</u>

        *The full names, addresses (including e-mail addresses), and telephone and fax numbers of all trial counsel.*

        **(a)      <u>For Plaintiffs</u>**

        Osen LLC (*Weiss* Trial Counsel)
        Gary M. Osen (gosen@osenlaw.com)
        Ari Ungar (aungar@osenlaw.com)
        2 University Plaza, Suite 402
        Hackensack, New Jersey 07601
        Tel: (201) 265-6400
        Fax: (201) 265-0303

Zuckerman Spaeder LLP (*Weiss* Trial Counsel)
Aitan D. Goelman (agoelman@zuckerman.com)
Shawn P. Naunton (snaunton@zuckerman.com)
Anant Kumar (akumar@zuckerman.com)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (646) 746-8655
Fax: (212) 704-4256

Turner & Associates, P.A. (*Weiss* Trial Counsel)
C. Tab Turner (tab@tturner.com)
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Tel: (501) 791-2277
Fax: (501) 791-1251

Sayles Werbner (*Applebaum* Trial Counsel)
Mark Werbner (mwerbner@swtriallaw.com)
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Tel: (214) 939-8700
Fax: (214) 939-8787

Heideman Nudelman & Kalik, PC (*Applebaum* Trial Counsel)
Richard D. Heideman (rdheideman@hnklaw.com)
1146 19th Street, NW #500
Washington, DC 20036
Tel: (202) 463-1818
Fax: (202) 463-2999

**(b)**      **For Defendant**

Cleary Gottlieb Steen & Hamilton LLP
Jonathan I. Blackman (jblackman@cgsh.com)
Lawrence B. Friedman (lfriedman@cgsh.com)
Rishi Zutshi (rzutshi@cgsh.com)
Avram E. Luft (aluft@cgsh.com)
One Liberty Plaza
New York, New York 10006
Tel:  (212) 225-2000
Fax: (212) 225-3999

## II.      SUBJECT MATTER JURISDICTION

*A brief statement by the plaintiff as to the basis of subject matter jurisdiction, and a brief statement by other parties as to the presence or absence of subject matter jurisdiction. Such*

2

6344872.1

*statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.*

### (a)      Statement by Plaintiffs

This is a civil action brought by citizens of the United States, their estates, survivors, and heirs under 18 U.S.C. § 2333 of the Anti-Terrorism Act (the "ATA"), 18 U.S.C. §§ 2331 *et seq.* The Court has exclusive subject matter jurisdiction over this action pursuant to 18 U.S.C. § 2338, and also has subject matter jurisdiction pursuant to 18 U.S.C. § 2333 and 28 U.S.C. § 1331.

### (b)      Statement by Defendant

NatWest does not contest the Court's subject matter jurisdiction as to plaintiffs who are United States nationals.  *See* 18 U.S.C. § 2333(a).

## III.    SUMMARY OF CLAIMS AND DEFENSES

*A brief summary by each party of the claims and defenses such party has asserted that remain to be tried without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted that are not to be tried.*

### (a)      Plaintiffs' summary of claims

Each Plaintiff's claims arise under § 2333 of the ATA. Each Plaintiff alleges that he or she was injured by reason of acts of international terrorism as that term is defined under 18 U.S.C. § 2331(1), and each Plaintiff's injuries arise from one of the following attacks that occurred in the State of Israel, or in the West Bank or Gaza Strip, each of which is alleged to have been committed by the Foreign Terrorist Organization (FTO) Hamas:

- December 1, 2001 – Suicide Bombings on Ben Yehuda Street, Jerusalem.

- March 7, 2002 – Shooting Attack at Atzmona.

- March 27, 2002 – Suicide Bombing at the Park Hotel, Netanya.

- May 7, 2002 – Suicide Bombing at the Sheffield Club, Rishon Le-Zion.

- June 18, 2002 – Suicide Bombing on Bus No. 32-A, Patt Junction, Jerusalem.

- July 31, 2002 – Bombing of the Frank Sinatra Cafeteria at Hebrew University, Jerusalem.

- January 29, 2003 – Shooting Attack on Road 60.

- March 5, 2003 – Suicide Bombing on Bus No. 37, Haifa.

6344872.1

- March 7, 2003 – Shooting Attack in Kiryat Arba.

- April 30, 2003 – Suicide Bombing at Mike's Place, Tel Aviv.

- May 18, 2003 – Suicide Bombing on Bus No. 6, French Hill, Jerusalem.

- June 11, 2003 – Suicide Bombing on Bus No. 14A, Jaffa Road, Jerusalem.

- June 20, 2003 – Shooting Attack on Road 60.

- August 19, 2003 – Suicide Bombing on Bus No. 2, Jerusalem.

- September 9, 2003 – Suicide Bombing at Café Hillel, Jerusalem.

- October 22, 2003 – Shooting Attack in Tel Rumeida.

Plaintiffs allege that Defendant is liable to each of them under § 2333(a) because Defendant violated § 2339B (prohibiting knowingly providing material support to FTOs) and under § 2333(d) (prohibiting aiding and abetting a person or entity who committed an attack committed, planned or authorized by an FTO). Plaintiffs allege that the Defendant (1) provided material support and substantial assistance to Hamas with a culpable state of mind, (2) that Hamas committed the attacks at issue, and (3) that the Bank's conduct was both a cause-in-fact and a proximate cause of their injuries. Plaintiffs allege that the Bank transmitted material support and substantial assistance to Hamas through and in connection with its customer Interpal over many years, in an amount, at a time, and with a state of mind that rendered its unlawful conduct a substantial factor in causing their injuries and made it reasonably foreseeable that providing such material support would result in injury and/or death to the Plaintiffs. In sum, the material support minimally comprised:

- Maintaining accounts and providing services to Interpal.

- Providing material support to Hamas through its network of "charitable" organizations.

In 2006, Defendant NatWest moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). In a decision reported at *Weiss v. National Westminster Bank PLC*, 453 F. Supp. 2d 609 (E.D.N.Y. 2006), the Court denied Defendant's motion as to Plaintiffs' second and third claims for relief based upon violations of §§ 2339B(a)(1) and 2339C, respectively, but granted the motion as to Plaintiffs' first claim for relief based upon common law aiding and abetting. *Id.* at 621.

In 2011 Defendant moved for summary judgment. The Court granted the motion, finding insufficient evidence to create a triable issue for the jury as to whether Defendant's scienter satisfied the statutory scienter standard. *See* 936 F. Supp. 2d 100 (E.D.N.Y. 2013). Following the decision, Plaintiffs appealed it to U.S. Court of Appeals for the Second Circuit. In 2014, the Court of Appeals reversed the decision, holding the evidence sufficient to create a triable issue of fact as to whether Defendant's knowledge and behavior satisfied the statutory scienter

4

requirements, and remanded for further proceedings, including consideration of Defendant's other grounds for summary judgment. *Weiss v. National Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014).

In 2014, Defendant moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, citing recent authority. The Court denied the motion on March 31, 2016. *See* 176 F. Supp. 3d 264 (E.D.N.Y. 2016).

In 2016, Defendant filed a new motion for summary judgment arguing that there is insufficient admissible evidence that Hamas perpetrated the attacks in which Plaintiffs were injured and again arguing that there is insufficient admissible evidence that Defendant's conduct proximately caused Plaintiffs' injuries. On September 30, 2017, the Court denied Defendant's motion, except as to the September 24, 2004 attack, for which it found insufficient evidence of Hamas's responsibility; the January 29, 2004 attack on Bus No. 19, as to which it held Plaintiffs to be collaterally estopped from arguing that Hamas perpetrated the attack; and Plaintiffs' § 2339C claims relating to the attacks that occurred on December 1, 2001, March 7, 2002, March 27, 2002, and June 18, 2002, because these attacks occurred before the enactment of § 2339C. *See* 2017 WL 4480753 (E.D.N.Y. 2017).

Plaintiffs now withdraw in its entirety their § 2333(a) claim based on violation of § 2339C. The claims that remain for trial are: (1) the Second Claim for Relief, asserting a § 2333(a) claim for violation of § 2339B, and (2) a claim arising under 18 U.S.C. § 2333(d),[1] for all attacks occurring after Sept. 11, 2001, based on the existing allegations of the complaint that (1) Hamas was responsible for the attacks that injured the Plaintiffs;[2] (2) Defendant provided substantial assistance to Hamas for its terrorist activities, including these attacks, by transferring significant sums of money to organizations that it knew (or consciously avoided knowing) were controlled by Hamas and; (3) Defendant's acts were a substantial factor in causing the Plaintiffs' injuries and those injuries were a reasonably foreseeable result of the significant sums of money Defendant sent to Hamas. Although as noted above the Court has previously dismissed the common law aiding and abetting claim, § 2333(d) provides a new and superseding legal basis for statutory aiding and abetting claims, applying *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "the proper legal framework" for such claims and for all claims arising under Title 18 U.S. Code, Part 1, Chapter 113B, including Plaintiffs' Second Claim for Relief. *See* Pub. L. No. 114-222, Justice Against Sponsors of Terrorism Act § 2(a)(5). This was recently confirmed by the Second Circuit in *Linde v. Arab Bank, PLC*, No. 16-2119-cv (L), 2018 WL 797454 (2d Cir. Feb. 9, 2018), holding that "plaintiffs are entitled to the benefits of JASTA's expansion of the ATA liability to aiders and abettors," that the controlling legal framework is supplied by *Halberstam, supra.*, and that "under an aiding and abetting theory of ATA liability, plaintiffs

---

[1] Section 2333(d) was added to the ATA on Sept. 28, 2016, by the Justice Against Sponsors of Terrorism Act (JASTA). JASTA is expressly retroactive, applying to all cases pending on its date of enactment and arising out of injuries occurring on or after Sept. 11, 2001.

[2] Defendant has stipulated that each attack was an act of international terrorism as defined by 18 U.S.C. § 2331.

would *not* have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1)." *Id.* at *11.

**(b)     Defendant's summary of defenses**

Plaintiffs cannot satisfy their burden of proving the four substantive elements of their claims.[3]

First, plaintiffs cannot satisfy their burden of proving that NatWest's conduct "involve[d] violence or endanger[ed] human life" and "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government," as plaintiffs are required to prove under the Second Circuit's recent decision in Linde v. Arab Bank PLC, -- F.3d --, 2018 WL 797454, at *7-9 (2d Cir. 2018), in order to satisfy the "act of international terrorism" element of their claims. See 18 U.S.C. 2333(a), 2331(1). As plaintiffs have conceded, they are attempting to prove that NatWest committed an "act of international terrorism" based solely on evidence that the bank allegedly provided knowing and material support to Hamas in violation of 18 U.S.C. § 2339B by providing financial services to the bank's customer Interpal, a UK charity that plaintiffs accuse of supporting Hamas, including by processing wire transfers on behalf of Interpal to the 13 Charities that allegedly are alter egos of or controlled by Hamas. Op. at 19-20, 24, Strauss, 06-cv-702 (E.D.N.Y. Feb. 28, 2013), Dkt. No. 340 ("2013 Strauss SJ Op."). But the Second Circuit ruled in Linde that such evidence, without more, is insufficient as a matter of law to prove an "act of international terrorism." Linde, 2018 WL 797454, at *9. While on the record in Linde the Second Circuit concluded that the evidence in that case might permit a reasonable juror to find that Arab Bank committed an "act of international terrorism," id., no such evidence exists here with respect to the conduct of NatWest.

Second, plaintiffs cannot satisfy their burden of proving the scienter element of their claims under 18 U.S.C. §§ 2333(a), 2339B or, for the attacks after June 25, 2002, 2339(C), because there is no evidence on the basis of which the jury could conclude that (i) NatWest "knowingly provided material support or resources" to Hamas, which requires that NatWest did so "intentionally, voluntarily, and deliberately," United States v. Ferrarini, 219 F.3d 144, 155 (2d Cir. 2000) (defining "knowingly"), or alternatively that NatWest "exhibited deliberate indifference to whether" it was providing material support to Hamas by processing transactions on behalf of its customer, Interpal, Weiss v. Nat'l Westminster Bank PLC, 768 F.3d 202, 205 (2d Cir. 2014), which requires proof that NatWest subjectively believed that there was a high probability that it was providing material support to Hamas by processing transfers on behalf of Interpal to the charities at issue in these cases (the "13 Charities"), and that NatWest took deliberate actions to avoid learning that it was financing Hamas in this manner, and (ii) NatWest acted with "'malice'" and an "evil motive," Kaplan v. Al Jazeera, 2011 WL 2314783, at *4 (S.D.N.Y. June 7, 2011). At trial, NatWest will show that there is no admissible evidence that

---

[3] The claims to be tried do not include an aiding and abetting claim because Judge Sifton dismissed the only aiding and abetting claim plaintiffs have ever pleaded in these lawsuits long ago. See Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006). In the event plaintiffs seek the Court's permission to assert an aiding and abetting claim, and that request is granted, NatWest will amend its summary of defenses accordingly.

6344872.1

the bank suspected, let alone knew or deliberately disregarded (because suspicion is not enough), that Interpal was funding Hamas through Interpal's accounts at NatWest.

In addition, plaintiffs cannot satisfy their burden of proving the <u>scienter</u> element of their claims under 18 U.S.C. §§ 2333(a) and 2339(C), which requires proof that NatWest "willfully" provided or collected funds with the intention or with the knowledge that those funds would be used to carry out terrorist attacks.  <u>Goldberg v. UBS AG</u>, 660 F. Supp. 2d 410, 427-28 (E.D.N.Y. 2009).

<u>Third</u>, plaintiffs cannot satisfy their burden of proving that their injuries were proximately caused by NatWest's provision of banking services to Interpal, as 18 U.S.C. § 2333(a) requires of all plaintiffs' claims.  There is no admissible evidence on the basis of which the jury could find that the 13 Charities to which Interpal transferred funds from its NatWest accounts were <u>alter egos</u> of or controlled by Hamas at the time when those transfers were being made, which is the only way plaintiffs can prove that those transfers were effectively made directly to Hamas itself.  Nor, as plaintiffs concede, is there any admissible evidence that the funds transferred to the 13 Charities by NatWest on behalf of Interpal "actually [were] transferred to [Hamas] and aided in the . . . attacks" at issue, which is the only means by which plaintiffs can satisfy the proximate causation element of their claims if they cannot prove that the 13 Charities were <u>alter egos</u> of or controlled by Hamas when those transfers were being made.  <u>O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)</u>, 714 F.3d 118, 124 (2d Cir. 2013).

Moreover, even if there were admissible evidence that the 13 Charities were <u>alter egos</u> of or controlled by Hamas, such that the funds transferred by NatWest on behalf of Interpal to those entities effectively were made directly to Hamas, plaintiffs still cannot prove that their injuries were caused "by reason of" an act of international terrorism committed by NatWest because they cannot prove that NatWest's conduct was a but-for cause of those injuries, <u>see</u> <u>Linde</u>, 2018 WL 797454, at *12 (leaving open whether ATA requires plaintiffs to prove but-for causation), and because they cannot prove (a) that NatWest's conduct was a "substantial reason that Hamas was able to perpetrate the terrorist attacks at issue," and (b) that Hamas's "increased ability to carry out deadly attacks was a foreseeable consequence of" that conduct.  2013 <u>Strauss</u> SJ Op., at 26-28.

<u>Fourth</u>, plaintiffs cannot satisfy their burden of proving with admissible evidence that the attacks by which they claim to have been injured were perpetrated by Hamas.  The evidence on which plaintiffs rely to establish that Hamas perpetrated any of the attacks at issue is inadmissible.  To the extent any evidence on which plaintiffs rely is admissible, it is insufficient to establish that Hamas perpetrated the attacks.

## IV.   TRIAL OF THE CASE

*A statement by each party as to whether the case is to be tried with or without a jury and the number of trial days needed.*

### (a)    Plaintiffs' statement

This case will be tried to a jury. Plaintiffs currently estimate that their case-in-chief will require a total of twelve (12) trial days and their rebuttal case will require a total of two (2) trial days.

> **(b)** **Defendant's statement**

NatWest agrees with plaintiffs that this case should be tried before a jury. It believes that the trial will require at least two months.

## V.    CONSENT TO TRIAL BY MAGISTRATE JUDGE

*A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).*

The parties have not so consented.

## VI.    STIPULATIONS

*Stipulations of fact or law. Such stipulations are encouraged.*

1.    National Westminster Bank Plc ("NatWest") is a financial institution incorporated and headquartered in the United Kingdom.

2.    NatWest maintained records of its SARs and NCIS disclosures about Interpal among other customers, on a database named "Goalkeeper." NatWest implemented the Goalkeeper system in 1998, replacing a previous system named "Fox." NatWest developed three versions of the Goalkeeper system between 1998 and 2005.

3.    Abdel Rahman Daya and Essam Yousef Mustafa signed account opening documents for Interpal on September 30, 1994, in which they provided their full names, addresses and telephone numbers.

4.    The United States Department of the Treasury designated Interpal as a Specially Designated Global Terrorist ("SDGT") on August 21, 2003. The U.S. Office of Foreign Assets Control ("OFAC") listed Interpal on its Specially Designated Nationals List ("SDN List") following its designation.

5.    The Islamic Resistance Movement (Hamas) was founded in 1987.[4]

6.    In 1989, the Government of Israel declared the Islamic Resistance Movement (Hamas) a terrorist organization and also declared it an "unlawful organization."

---

[4] For the avoidance of doubt, NatWest stipulates to the facts and/or legal conclusions in Paragraphs 5 through 11, not to its knowledge of such facts or legal conclusions as of the relevant time.

6344872.1

7.      The United States Department of the Treasury designated the Islamic Resistance Movement (Hamas) as a Specially Designated Terrorist ("SDT") on January 23, 1995.

8.      The United States Department of State designated Hamas as a Foreign Terrorist Organization on October 8, 1997, and Hamas has remained so designated to the present date.

9.      Hamas is an organization that, during the period 2000 to 2004, engaged in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act).

10.      Hamas is an organization that, during the period 2000 to 2004, engaged in terrorism.

11.      Each of the attacks at issue constitute "acts of international terrorism" within the meaning of 18 U.S.C. § 2331(1).

## VII.   WITNESSES

*A list of the names and addresses of all witnesses, including possible witnesses who will be called only for impeachment or rebuttal purposes and so designated, together with a brief narrative statement of the expected testimony of each witness. The parties will list and briefly describe the basis for any objections to witnesses offered by any other party. Unless prompt notice is given and good cause shown, only listed witnesses will be permitted to testify.*

### (a)      Plaintiffs' witness list

Case-In-Chief Fact Witnesses

a.   Current and former National Westminster Bank Plc Employees, Officers, and Directors (by deposition designation)[5]

   • Douglas Hartley
     Address: Unknown

---

[5] At the present time, it is not clear whether Defendant will agree that any witness called live may be called live in the opposing party's case-in-chief, without regard to the geographic limitations of trial subpoenas issued pursuant to Fed. R. Civ. P. 45. In addition, the location information for certain of the Defendant's witnesses is currently unknown. Consequently, Plaintiffs reserve the right to amend this initial designation to advise whether a witness will be called live, and, if so, whether that witness's deposition testimony will be introduced solely for impeachment purposes. Plaintiffs also refer the Court to Defendant for the location information for each witness.

6344872.1

Mr. Hartley was a member of NatWest's Money Laundering Unit from 2000 to 2003. He will testify as to various Goalkeeper cases concerning Interpal, including entries he himself made. He will also testify as to the submission of a June 2002 NCIS disclosure. He will also testify as to internal communications reflecting the bank's knowledge of Interpal's designation and links to Hamas.

Defendant's objections:[6]  See note 6, supra.

- Fleur Baugh
  Address: Unknown

Ms. Baugh worked in the operations team of RBS's Group Financial Crime Unit, which oversaw the money laundering reporting unit. She will testify as to the development, policies, procedures, and processes of the bank's Goalkeeper database.

Defendant's objections:  See note 6, supra.

- Guy Cole
  Address: Unknown

Mr. Cole served as surveillance manager in the Corporate Banking and Financial Markets Division's Money Laundering Prevention Unit from 2003 to 2005. He will testify as to the bank's efforts to monitor Interpal's accounts. He will also testify as to internal communications reflecting the bank's knowledge of Interpal's connections to Hamas, and its decision-making as to whether to keep Interpal's accounts open.

Defendant's objections:  See note 6, supra.

- Olha Leeming
  Address: Unknown

Ms. Leeming was a long-term member of the bank's inward payments department, serving in that capacity through 2008. She will testify as to a November 2001 SAR she completed concerning two Interpal payments. She will testify as to how the bank's AML policies were operationalized in the bank's day-to-day functions.

Defendant's objections:  See note 6, supra.

- Belinda Lane

---

[6] In addition to the specific objections noted below, NatWest reserves the right to object to plaintiffs' designations, and to offer counter-designations, of each witness's deposition testimony (if applicable), and to object to particular questions that plaintiffs pose to each witness at trial, to the extent plaintiffs seek to elicit inadmissible evidence from such witness.  NatWest also reserves the right to amend its objections to plaintiffs' witness list and summaries of proposed testimony in the event that plaintiffs seek the Court's permission to assert an aiding and abetting claim, and the Court grants such request.

6344872.1

Address: Unknown

Ms. Lane served as the Relationship Manager for Interpal from late 1999 to 2006. She will testify as to the bank's purported due diligence with respect to Interpal and the history of the relationship between Interpal and the bank. She will also testify as to numerous communications (internal as well as external) concerning the relationship between the bank and Interpal.

> Defendant's objections:  See note 6, supra.

- Gerald Matthews
  Address: Unknown

Mr. Matthews served as the Business Manager at the Islington Business Center from  1994 through 1999, including serving as the Relationship Manager for Interpal prior to the tenure of Belinda Lane. He will testify as to the history of the bank's relationship with Interpal, and communications between the bank and contact persons at Interpal.

> Defendant's objections:  See note 6, supra.

- Amanda Holt
  Address: Unknown

Ms. Holt served as the Head of Enterprise Group Risk from 2002 to 2006. Her role included responsibility for AML/sanctions/terrorist-financing prevention controls for the Group. She will testify as to internal communications confirming the bank's knowledge that Interpal was connected to Hamas. She will also testify as to the bank's position at the time regarding the circumstances under which a relationship with a customer should be severed, including what risks and other factors were considered.

> Defendant's objections:  See note 6, supra.

- Charlotte McComas
  Address: Unknown

Ms. McComas served as Fraud Officer at the Royal Bank of Scotland's Group Investigations and Fraud unit. She will testify as to the bank's processes for investigating SARs, including her investigation of a payment to Interpal involving the Al-Aqsa Foundation of Yemen. She will testify as to internal communications reflecting  the bank's knowledge of Interpal's connections to terrorist financing.

> Defendant's objections:  See note 6, supra.

- Mike Hoseason
  Address: Unknown

6344872.1

Mr. Hoseason served as team leader in the Group Financial Crime – Money Laundering unit from 1999 through 2004. He will testify as to the bank's process for reviewing SARs and making disclosure to NCIS, and various Goalkeeper cases related to Interpal. He will also testify as to the bank's knowledge of Interpal's connection to Hamas, including its receipt in 2001 of a South African intelligence report describing such connections.

> Defendant's objections:  NatWest objects to plaintiffs' reference to an anonymous report hosted on the website www.cryptome.org as a "South African intelligence report" because it is not authenticated (nor is it self-authenticating) as such, but NatWest does not object to testimony of Mr. Hoseason concerning NatWest's review of that report and disclosure of it to the UK government.  See NatWest Motion in Limine ("MIL") Summary No. D.1.  See also note 6, supra.

- Jacqueline Sheftali
  Address: Unknown

Ms. Sheftali served as counsel in the Royal Bank of Scotland Group Litigation department. She will testify as to the bank's processes for collecting and producing documents in this litigation, for purposes of authentication.

> Defendant's objections:  NatWest objects to the above-described testimony of Ms. Sheftali on the grounds that the subject of the bank's collecting and producing documents is irrelevant to the claims and defenses in these lawsuits, and any probative value that testimony may have, including "for purposes of authentication," would be unnecessary (as NatWest does not object to the authenticity of any documents it created) and cumulative, and thus substantially outweighed by the unfair prejudice, jury confusion and waste of time it would cause.  See also note 6, supra.

- Sonia Gayle
  Address:Unknown

Ms. Gayle served as Head of Policy in the bank's Group Compliance unit from 2001 to 2003. She will testify as to the bank's mechanisms relating to regulatory compliance, as well as various compliance policies pertaining to sanctions and terrorist financing. She will also testify as to internal communications reflecting the bank's knowledge of Interpal's connections to Hamas.

> Defendant's objections:  See note 6, supra.

- Thomas Sludden
  Address: Unknown

Mr. Sludden served as a Corporate Governance Manager in Royal Bank of Scotland's Retail Direct Division. He will testify as to the bank's mechanisms relating to regulatory compliance, the organizational structure of the various units that were responsible for compliance, and the allocation of responsibilities to those units.

Defendant's objections:  <u>See</u> note 6, <u>supra</u>.

● Martin Wiltshear
  Address: Unknown

Mr. Wiltshear worked in NatWest's Group Investigations and Fraud – Money Laundering unit from 2001 to 2002. He will testify as to the bank's system for tracking suspicious entities and transactions. He will also testify as to communications with Belinda Lane in 2001 concerning the need for investigation of Interpal.

Defendant's objections:  <u>See</u> note 6, <u>supra</u>.

● Stephen Foster
  Address: Unknown

Mr. Foster served as Head of AML Compliance as part of the bank's Group Risk Management from 2002 through 2006, and he later served in other roles at the bank. He will testify as to the bank's mechanisms and policies for attempting compliance with terror-financing regulations. He will also testify as to the bank's review of its relationship with Interpal in 2003, and to the bank's position on the effect of OFAC designations.

Defendant's objections:  <u>See</u> note 6, <u>supra</u>.

● Tony O'Hear
  Address: Unknown

Mr. O'Hear served as manager for the bank's Group Investigations and Fraud unit from 2002 to 2005. He will testify as to his team's receipt and evaluation of SARs as well as the bank's decision-making process for NCIS disclosures. He will also testify as to the bank's knowledge of Interpal's and other related entities' connection to terrorism financing, as well as the bank's attempt to monitor Interpal payments.

Defendant's objections:  <u>See</u> note 6, <u>supra</u>.

● Neil Trantum
  Address: Unknown

Mr. Trantum was Head of Group Investigations and Fraud at NatWest until 2004. He will testify as to the bank's position on compliance with OFAC designations. He will also testify as to the organization and responsibilities of various bank units charged with regulatory compliance and investigation of suspicious transactions.

Defendant's objections:  <u>See</u> note 6, <u>supra</u>.

● Terry Woodley
  Address: Unknown

6344872.1

Mr. Woodley was an Assistant Relationship Manager at the bank's Romford office from 2001 to 2004. He will testify as to the history and development of the bank's relationship with Interpal. He will also testify as to communications between the bank and contact persons at Interpal.

> Defendant's objections:  See note 6, supra.

- Ian Wickens
  Address: Unknown

Mr. Wickens was a member of and Money Laundering Reporting Officer in the bank's Group Investigations and Fraud unit until 2001; a Manager in Group Compliance from 2001-2002; and a Senior Policy Consultant for AML thereafter. He will testify as to the bank's policies and mechanisms for attempting regulatory compliance, including the functions of the Goalkeeper system. He will testify as to the organizational structure over time of the various compliance and investigation units within the bank.

> Defendant's objections:  See note 6, supra.

- Irvine Rodger
  Address: Unknown

Mr. Rodger served as head of the Corporate Banking and Financial Markets Division's Money Laundering Prevention Unit from 2002 onwards. He will testify as to internal communications among senior compliance personnel that reflect the bank's knowledge of Interpal's ties to terrorist financing; the bank's representations to external regulatory agencies; the bank's purported efforts to investigate Interpal and monitor its payment traffic; and the bank's stated rationale for maintaining Interpal as a customer.

> Defendant's objections:  See note 6, supra.

b.  Fact witnesses regarding the relevant attacks.

- Mr. Steven Averbach (de bene esse video testimony)

Mr. Averbach died on June 3, 2010. His estate and his surviving family members are Plaintiffs. On May 18, 2003, Mr. Averbach was on a bus heading to work when a terrorist dressed as an observant Orthodox Jew boarded the bus. Mr. Averbach believed it likely that the individual was in fact a suicide bomber. When Mr. Averbach reached for his handgun, the terrorist blew himself up, killing seven people and seriously injuring 20, including Mr. Averbach. Plaintiffs will present Mr. Averbach's testimony to corroborate the description of the bomber and his method as set forth in other admissible documents.

> Defendant's objections:  NatWest objects to the above-described testimony on the grounds it would be irrelevant and any probative value it may have would be substantially outweighed by the unfair prejudice and waste of time it would cause. See NatWest MIL Summary No. B.1, infra.  See also note 6, supra.

14

- Joshua Faudem
  Address: Jerusalem, Israel

Mr. Faudem witnessed and was injured in the terror attack at Mike's Place in Tel Aviv on April 30, 2003. Mr. Faudem was at the bar before and during the attack and will testify confirming the identity of the Hamas suicide bomber.

> Defendant's objections: NatWest objects to the above-described testimony on the grounds it would be irrelevant and any probative value it may have would be substantially outweighed by the unfair prejudice and waste of time it would cause. See NatWest MIL Summary No. B.1, infra. See also note 6, supra.

- Mordechai Dzikansky

From January 2003 through September 2007 Det. Dzikansky was posted in Israel as the first NYPD Liaison to the Israel National Police, principally focusing upon intelligence gathering and evaluation, and analyzing and relaying key information back to the NYPD in New York City to enhance the NYPD's ability to recognize, react to, prevent, and recover from terrorist attacks. During his tenure, Det. Dzikansky personally responded to and analyzed at least 21 bombing scenes in Israel. He will testify about the March 5, 2003 bus no. 37 attack, the April 30, 2003 Mike's Place attack, the May 18, 2003 bus no. 6A attack, the June 11, 2003 bus no. 14A attack, the August 19, 2003 bus no. 2 attack and the September 9, 2003 Café Hillel attack

> Defendant's objections: NatWest objects to the above-described testimony on the grounds it would be irrelevant and any probative value it may have would be substantially outweighed by the unfair prejudice and waste of time it would cause. See NatWest MIL Summary No. B.1, infra. See also note 6, supra.

- David "Dudi" Bar
  Address: Kfar Saba, Israel

Mr. Bar is a retired police officer who investigated the April 30, 2003 Mike's Place terror attack. Mr. Bar will testify about facts he knows as an eyewitness to the immediate aftermath of the attack, including a detailed description of the attack scene and personal knowledge he acquired concerning the Hamas terrorists who perpetrated the attack.

> Defendant's objections: NatWest objects to the above-described testimony on the grounds it would be irrelevant and any probative value it may have would be substantially outweighed by the unfair prejudice and waste of time it would cause. If admissible at all, NatWest further objects to the above-described testimony about "knowledge" Mr. Bar "acquired" about the perpetrators of the attack to the extent it is hearsay. See NatWest MIL Summary No. B.1, infra. See also note 6, supra.

Case-in-Chief and Rebuttal Expert Witnesses

- Wayne Geisser

15

6344872.1

Address: Philadelphia, Pennsylvania

Mr. Geisser is a CPA at Marcum LLP. At trial Mr. Geisser will testify regarding the transactions that are reflected in the records produced by NatWest, including the relevant entities Interpal transferred money to/received money from, and the date and amount of such transfers.

> Defendant's objections:  NatWest reserves the right to object to Mr. Geisser's purported expert testimony as unnecessary, cumulative and wasteful of time.  See also note 6, supra.

- Gary Walters
  Address: Kent, United Kingdom

Mr. Walters is a Consultant at Forensic Risk Alliance. Mr. Walters will testify at trial as to the architecture of U.K. bank compliance and risk-management functions in general during the relevant time frame, and the organization and operation of Defendant's compliance and risk-management units in particular.

> Defendant's objections:  NatWest objects to the purported expert testimony of Mr. Walters for the reasons stated in its MIL Summary No. E.1, infra.  See also note 6, supra.

- Alex Stein
  Address: New York, New York

Mr. Stein is a Professor of Law at Brooklyn Law School. Professor Stein will be prepared to offer testimony rebutting the opinions of Defendant's expert Mr. Lipshes, in the event Mr. Lipshes' testimony regarding the bank's exposure to criminal liability in Israel is not stricken in its entirety.

> Defendant's objections:  See note 6, supra.

- Clive Walker
  Address: Leeds, United Kingdom

Mr. Walker is a Professor Emeritus of Criminal Justice Studies at the University of Leeds School of Law. Professor Walker will be prepared to offer testimony rebutting the opinions of Defendant's expert witnesses Jonathan Burchfield and/or Jon Holland, in the event testimony from Messrs. Burchfeld and/or Holland is not ruled to be inadmissible in light of Weiss v. National Westminster Bank, 768 F.3d 202 (2d Cir. 2014) regarding the regulatory function of the Charity Commission, and U.K. legislation and regulation of financial institutions with respect to terrorism financing.

> Defendant's objections:  NatWest objects to the purported expert testimony of Mr. Walker for the reasons stated in its MIL Summary No. E.2, infra.  See also note 6, supra.

16

- Mr. Evan Kohlmann
  Address: New York, New York

Mr. Kohlmann is a private international terrorism consultant who specializes in tracking Al-Qaeda, Hamas, and other terrorist organizations. At trial Mr. Kohlmann will provide expert testimony regarding:

(1)  Hamas's primary websites and internet forums during the relevant period, setting forth their provenance and explaining Hamas's strategy and practice in using them, particularly with respect to claiming credit for terrorist attacks that it committed; and
(2)  Whether Hamas issued official public claims of responsibility for the attacks giving rise to the Plaintiffs' injuries.

> Defendant's objections:  NatWest objects to the purported expert testimony of Mr. Kohlmann for the reasons stated in its MIL Summary No. E.3, infra.  See also note 6, supra.

- Dr. Ronni Shaked
  Address: P.O. Box 85759
  Mevasseret Zion, Israel 90805

Dr. Shaked worked for the Israel Security Agency ("ISA") between 1969 and 1982, rising to the rank of Commander of the Jerusalem Sector and Commander of the Ramallah Sector.

At trial Dr. Shaked will provide expert testimony concerning:

(1)  whether Hamas was responsible for each of the attacks at issue in this trial based on the available evidence;
(2)  the methods and channels Hamas employs to officially claim credit for terrorist attacks, and the reasons Hamas frequently openly acknowledges its involvement in, and/or perpetration of, terrorist attacks;
(3)  the methods the ISA and other Israeli law enforcement agencies and offices utilize to investigate, document, and report upon terrorist attacks, including attribution of attacks to particular terrorist organizations;
(4)  comparative analysis of court records and police files assessed against various other forms of evidence that identify the individual and/or organization responsible for a terrorist attack in Israel;
(5)  Hamas's *Izz al-Din al-Qassam Brigades'* infrastructure and chain of command; and
(6)  the organization and structure of Hamas's *Izz al-Din al-Qassam Brigades.*

> Defendant's objections:  NatWest objects to the purported expert testimony of Dr. Shaked for the reasons stated in its MIL Summary No. E.4, infra.  See also note 6, supra.

- Dr. Matthew Levitt
  Address: 1111 19th Street, NW, Suite 500

6344872.1

Washington, DC 20036

Dr. Levitt previously served as Deputy Assistant Secretary for Intelligence and Analysis at the Treasury Department, and as an Intelligence Research Specialist in the Federal Bureau of Investigation's ("FBI") International Terrorism Intelligence Unit. He is currently a Senior Fellow and Director of the Stein Program on Terrorism, Intelligence and Policy at The Washington Institute for Near East Policy, and Professorial Lecturer in International Relations and Strategic Studies at Johns Hopkins University's School of Advanced International Studies ("SAIS"). At trial Dr. Levitt will offer expert testimony regarding Hamas's creation and organizational structure, including its leadership and network of social institutions known as the *da'wa* with a particular emphasis on the international donor network that funds Hamas's *da'wa*, including Interpal, the Al Aqsa Foundation, CBSP and the Union of Good.

> Defendant's objections: NatWest objects to the purported expert testimony of Dr. Levitt for the reasons stated in its MIL Summary Nos. E.6, E.7 and E.8, infra. See also note 6, supra.

- Mr. Arieh Spitzen
  Address: Jerusalem, Israel

Mr. Spitzen previously served as head of the Palestinian Affairs Department ("PAD") in the Coordinator of Government Activities in the Territories ("COGAT"), part of the Israeli Ministry of Defense. At trial Mr. Spitzen will offer expert testimony which:

(1) identifies and discusses senior Hamas leaders;

(2) explains that specific institutions, including Al-Mujama Al-Islami – Gaza (the Islamic Center – Gaza), Al-Jam'iya Al-Islamiya – Gaza (the Islamic Society – Gaza), and Al-Salah Islamic Society – Gaza were key Hamas institutions in the Gaza Strip;

(3) explains the relationship between Hamas and the Union of Good (the latter an SDGT that constituted a primary Hamas fundraising mechanism via an umbrella of foreign fundraisers); and

(4)  explains that specific institutions, including, but not limited to, al-Tadumun Charitable Society, Nablus Zakat Committee, Jenin Zakat Committee and Islamic Charitable Society Hebron were key Hamas institutions in the West Bank during the relevant time period.

> Defendant's objections: NatWest objects to the purported expert testimony of Mr. Spitzen for the reasons stated in its MIL Summary Nos. E.6, E.7 and E.8, infra. See also note 6, supra.

**(b)    Defendant's witness list[7]**

---

[7] Subject to the Court's ruling on the parties' motions *in limine*. NatWest also reserves the right to amend its witness list and summaries of proposed testimony in the event that plaintiffs seek the Court's permission to assert an aiding and abetting claim, and the Court grants such request.

6344872.1

Fact witnesses (for Defendant's case-in-chief and/or rebuttal)

1. Fleur Baugh

    Address:   c/o Jonathan I. Blackman
               Cleary Gottlieb Steen & Hamilton LLP
               One Liberty Plaza
               New York, New York 10006

    Ms. Baugh was employed by NatWest and/or its affiliates beginning in August 1997,
    and was a fraud analyst in the Security and Risk Department of Financial Markets
    during the relevant period.  She is expected to testify about her professional
    background, qualifications and experience; NatWest's policies and procedures during
    the relevant period for identifying and addressing possible money laundering and
    terror financing activities by NatWest customers, including the filing of Goalkeeper
    reports; the use of other NatWest databases by the Security and Risk Department; and
    other information related to plaintiffs' claims and NatWest's defenses in these
    lawsuits.

            Plaintiffs' objections[8]: See note 8, supra.

2. Douglas Hartley

    Address:   c/o Jonathan I. Blackman
               Cleary Gottlieb Steen & Hamilton LLP
               One Liberty Plaza
               New York, New York 10006

    Mr. Hartley has been employed by NatWest and/or its affiliates since 1978, and
    worked in NatWest's Fraud Office during the relevant period.  He is expected to
    testify about his professional background, qualifications and experience; NatWest's
    history and organization, and its policies and procedures during the relevant period
    for identifying and addressing possible money laundering and terror financing
    activities by NatWest customers, including the filing of Goalkeeper reports and the
    submission of internal Suspicious Activity Reports to NatWest's Fraud Office;
    NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring
    and understanding of certain transactions in Interpal's accounts; the reasons for
    NatWest's suspicions about certain of Interpal's transactions and steps NatWest took

---

[8] In addition to the specific objections noted herein, and Plaintiffs' proposed motions *in limine*
and *Daubert* motions set forth herein, Plaintiffs reserve the right to object to Defendant's
designations, and to offer counter-designations, of each witness's deposition testimony (if
applicable), and to object to particular questions that Defendant poses to each witness at trial, to
the extent Defendant seeks to elicit inadmissible evidence from such witness.

in response to such suspicions; the reasons for and contents of NatWest's communications with UK law enforcement (including disclosures to NCIS) concerning Interpal; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

3. Michael Hoseason

Address:   c/o Jonathan I. Blackman
           Cleary Gottlieb Steen & Hamilton LLP
           One Liberty Plaza
           New York, New York 10006

Mr. Hoseason was the head of the Anti-Money Laundering Team in NatWest's Fraud Office from 2000 until 2004.  He is expected to testify about his professional background, qualifications and experience; NatWest's organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; the reasons for NatWest's suspicions about certain of Interpal's transactions and steps NatWest took in response to such suspicions; the reasons for and contents of NatWest's communications with UK law enforcement (including disclosures to NCIS and NTFIU Special Branch, New Scotland Yard, and the production order by the Metropolitan Police Special Branch) concerning Interpal; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant UN, EU, UK and OFAC regulations and sanctions, communications with the Bank of England's Financial Sanctions Unit regarding Interpal, and the recommendations of various banking advisory groups; his understanding of NCIS's procedures during the relevant period for addressing suspicions of money laundering and terror financing, and the respective roles of NCIS and NatWest in addressing such suspicions; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; the closure of the Friends of Al-Aqsa accounts; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

6344872.1

<u>Plaintiffs' objections</u>:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement, to the extent they are offered for truth or as a legal conclusion.  Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1.  <u>See also</u> note 8, <u>supra</u>.

4.  Olha Leeming

Address:   c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Ms. Leeming was employed by NatWest and/or its affiliates beginning in 1982, and worked on the Inward Payments Team during the relevant period.  She is expected to testify about her professional background, qualifications and experience; NatWest's history and organization, and its policies, training and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; the reasons for NatWest's suspicions about certain of Interpal's transactions and steps NatWest took in response to such suspicions; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

<u>Plaintiffs' objections</u>:  <u>See</u> note 8, <u>supra</u>.

5.  Tony O'Hear

Address:   c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. O'Hear has been employed by RBS and/or its affiliates since 1983, and was a senior-level employee in NatWest's Fraud Office during the relevant period.  He is expected to testify about his professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers (including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office); NatWest's knowledge concerning Interpal and its activities; NatWest's

6344872.1

monitoring and understanding of certain transactions in Interpal's accounts; the reasons for NatWest's suspicions about Interpal's transactions and steps NatWest took in response to such suspicions; the reasons for and contents of NatWest's communications with UK law enforcement and regulators (including disclosures to NCIS and NTFIU Special Branch, New Scotland Yard, and communications with the Charity Commission) concerning Interpal; NatWest's lack of knowledge concerning Israeli sanctions; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions, and the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

6.  Belinda Lane

    Address:  c/o Jonathan I. Blackman
              Cleary Gottlieb Steen & Hamilton LLP
              One Liberty Plaza
              New York, New York 10006

Ms. Lane was NatWest's relationship manager for Interpal from late 1999 until approximately 2006, with the exception of a brief gap in February 2002 when she transferred from NatWest's Islington Business Center to Romford Essex.  She is expected to testify about her professional background, qualifications and experience; NatWest's organization, and its training and procedures for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; NatWest's communications with UK law enforcement concerning Interpal; her understanding during the relevant period of the investigations conducted by and reports made by the Charity Commission; the income generated for NatWest from Interpal's accounts; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law,

6344872.1

Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

7. Guy Cole

   Address:  c/o Jonathan I. Blackman
             Cleary Gottlieb Steen & Hamilton LLP
             One Liberty Plaza
             New York, New York 10006

Mr. Cole was employed by NatWest and/or its affiliates beginning in May 2003, and worked in the Corporate Banking and Financial Markets Money Laundering Prevention Unit during the relevant period.  He is expected to testify about his professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; the subjects Mr. Cole addressed in his declaration in support of NatWest's summary judgment motion dated December 7, 2011, including NatWest's lack of branches or subsidiaries operating in Israel during the relevant period, his understanding during the relevant period of the implications for NatWest's conduct of Israeli sanctions, Interpal's status during the relevant period as a charity registered with the Charity Commission, and his understanding of the statutory presumptions in the UK accompanying registration of a charity with the Charity Commission; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; NatWest's semi-annual reviews of Interpal's accounts; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; NatWest's communications with UK law enforcement (including disclosures to NCIS) concerning Interpal; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant UK and OFAC regulations and sanctions; NatWest's searches of client databases for sanctioned entities; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

   Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a

6344872.1

legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. <u>See also</u> note 8, <u>supra</u>.

8. Stephen Foster

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Foster was Head of Anti-Money Laundering Compliance in Group Risk Management during the relevant period.  He is expected to testify about his professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terrorist financing activities by NatWest customers; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and semi-annual reviews of Interpal's accounts; NatWest's communications with the UK government, including the Bank of England's Financial Sanctions Unit, regarding Interpal; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant UN, EU, UK and OFAC regulations and sanctions, and the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission, and communications with the Bank of England's Financial Sanctions Unit regarding Interpal; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> <u>Plaintiffs' objections</u>:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. <u>See also</u> note 8, <u>supra</u>.

9. Sonia Gayle

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Ms. Gayle was Head of Group Regulatory Policy from September 2001 to 2003.  She is expected to testify about her professional background, qualifications and experience; NatWest's policies and procedures during the relevant period for

6344872.1

identifying and addressing possible money laundering and terror financing activities by NatWest customers; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

<u>See</u> note 8, <u>supra</u>.

10. Amanda Holt

Address:  c/o Jonathan I. Blackman
          Cleary Gottlieb Steen & Hamilton LLP
          One Liberty Plaza
          New York, New York 10006

Ms. Holt was Head of Group Enterprise Risk from January 2002 until April 2006. She is expected to testify about her professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities, NatWest's monitoring and understanding of certain transactions in Interpal's accounts, the reasons for NatWest's suspicions about certain of Interpal's transactions, and steps NatWest took in response to such suspicions, including NatWest's semi-annual reviews of Interpal's accounts; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; NatWest's lack of knowledge concerning Israeli sanctions; her understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions, the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission, and the recommendations of various banking advisory groups; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> <u>Plaintiffs' objections</u>:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. <u>See also</u> note 8, <u>supra</u>.

11. Charlotte McComas

Address:  c/o Jonathan I. Blackman
          Cleary Gottlieb Steen & Hamilton LLP
          One Liberty Plaza

6344872.1

New York, New York 10006

Ms. McComas served as a Fraud Officer in NatWest's Fraud Office from 2002 until 2003. She is expected to testify about her professional background, qualifications and experience; NatWest's policies and procedures for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's account; NatWest's communications with UK law enforcement (including disclosures to NCIS) concerning Interpal; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections: Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; or the contents of reports by UK law enforcement, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

12. Irvine Rodger

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Rodger was employed by RBS and/or its affiliates beginning in July 2001, and headed the Money Laundering Prevention Unit in the Corporate Banking Financial Markets Division from 2002 until 2012. He is expected to testify about his professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; NatWest's semi-annual reviews of Interpal's accounts; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; NatWest's lack of knowledge concerning Israeli sanctions; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions, the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission, and the recommendations of various banking advisory groups; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

26

Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

13. Ian Wickens

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Wickens was employed by NatWest and/or its affiliates from 1970 until his retirement in 2012, including as a Manager in Group Investigations & Fraud and Group Compliance from 1996 through 2001, and a Senior Policy Consultant for Anti-Money Laundering, Group Risk Management from 2002 through 2004.  He is expected to testify about his professional background, qualifications and experience; NatWest's history and organization, and its policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office, and Goalkeeper's color-coded risk rating system; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

Plaintiffs' objections:  Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

14. Martin Wiltshear

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Wiltshear worked in the Anti-Money Laundering Team in NatWest's Fraud Office from 2001 until 2002.  He is expected to testify about his professional background, qualifications and experience; NatWest's policies, training and

procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers, including the filing of Goalkeeper reports and the submission of internal Suspicious Activity Reports to NatWest's Fraud Office; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; the reasons for NatWest's suspicions about certain of Interpal's transactions and steps NatWest took in response to such suspicions; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

Plaintiffs' objections: See note 8, supra.

15. Terry Woodley

    Address:  c/o Jonathan I. Blackman
               Cleary Gottlieb Steen & Hamilton LLP
               One Liberty Plaza
               New York, New York 10006

Mr. Woodley served as NatWest's assistant relationship manager for Interpal from 2002 until at least late 2003. He is expected to testify about his professional background, qualifications and experience; NatWest's knowledge concerning Interpal and its activities; NatWest's monitoring and understanding of certain transactions in Interpal's accounts; NatWest's communications with UK law enforcement and regulators (including the Charity Commission); his understanding during the relevant period of the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

          Plaintiffs' objections: Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

16. Richard Gossage

    Address:  c/o Jonathan I. Blackman
               Cleary Gottlieb Steen & Hamilton LLP
               One Liberty Plaza
               New York, New York 10006

Mr. Gossage was the Director of Group Risk Management during the relevant period. He is expected to testify about his professional background, qualifications and

28

experience; NatWest's policies and procedures during the relevant period for identifying and addressing possible money laundering and terror financing activities by NatWest customers; NatWest's knowledge concerning Interpal and its activities; communications with the UK government, including the Bank of England's Financial Sanctions Unit, regarding Interpal; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions, the investigations conducted by, reports made by, and freezing orders issued by the Charity Commission, and communications with the Bank of England's Financial Sanctions Unit regarding Interpal; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> <u>Plaintiffs' objections</u>:  Plaintiffs object to the proposed testimony of this witness as facially improper, because this witness either was not previously disclosed by Defendant or not produced for deposition during discovery. Plaintiffs will move to exclude this witness, or in the alternative to reopen discovery for the purpose of obtaining all documents and testimony necessary to evaluate the testimony of this witness, without limitation. In the event testimony from this witness is permitted, Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. <u>See also</u> note 8, <u>supra</u>.

17. Kevin Love

Address:  c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Love was the Global Head of Enterprise Risk for Corporate Banking & Financial Markets during the relevant period.  He is expected to testify about his professional background, qualifications and experience; NatWest's policies and procedures for identifying and addressing possible terror financing activities by NatWest customers; NatWest's review and ongoing monitoring of the Interpal accounts; NatWest's considerations and internal discussions regarding whether to maintain the Interpal accounts; NatWest's knowledge concerning Interpal and its activities; his understanding during the relevant period of NatWest's obligations to report suspicious activities and the implications for NatWest's conduct of relevant EU, UK and OFAC regulations and sanctions, and the investigations conducted by, reports

6344872.1

made by, and freezing orders issued by the Charity Commission; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections:  Plaintiffs object to the proposed testimony of this witness as facially improper, because this witness either was not previously disclosed by Defendant or not produced for deposition during discovery. Plaintiffs will move to exclude this witness, or in the alternative to reopen discovery for the purpose of obtaining all documents and testimony necessary to evaluate the testimony of this witness, without limitation. In the event testimony from this witness is permitted, Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, Defendant's understanding of such law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK law enforcement or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

18. Representative of Her Majesty's Treasury[9]

    Address:  c/o Jonathan I. Blackman
                Cleary Gottlieb Steen & Hamilton LLP
                One Liberty Plaza
                New York, New York 10006

[Name, title and background].  He/she is expected to testify about his/her professional background, qualifications and experience; the guidance transmitted to NatWest concerning Interpal by the Bank of England Financial Sanctions Unit on behalf of Her Majesty's Treasury, including the reasons for such guidance; and other information related to plaintiffs' claims and NatWest's defenses in these lawsuits.

> Plaintiffs' objections:  Plaintiffs object to the proposed testimony of this witness as facially improper, because this witness has not been identified, was not previously disclosed by Defendant, and was not produced for deposition during discovery. Plaintiffs will move to exclude this witness, or in the alternative to reopen discovery for the purpose of obtaining all documents and testimony necessary to evaluate the testimony of this witness, without limitation. In the event testimony from this witness is permitted, Plaintiffs object to the extent Defendant will seek to offer testimony from this witness regarding English, EU, or UN law, or the legality of Defendant's actions under such law; the position of any English or EU regulator regarding Interpal; or the contents of reports by UK

---

[9] NatWest is not yet able to provide the name of the witness it may call from Her Majesty's Treasury, but expects to provide such name to plaintiffs well in advance of trial.

6344872.1

regulators, law enforcement, or the Charity Commission, to the extent they are offered for truth or as a legal conclusion. Such testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1. See also note 8, supra.

19. Any fact witness plaintiffs call in their case-in-chief or on rebuttal

Address:  N/A

In addition to the witnesses identified above, NatWest may call any fact witness who is called by plaintiffs, whether in plaintiffs' case-in-chief or on rebuttal, and whether such witness testifies live or by deposition, to testify (either live or by deposition) concerning the matters on which such witness testifies during plaintiffs' examination.

Plaintiffs' objections: See note 8, supra.

Expert witnesses (for Defendant's case-in-chief and/or rebuttal)

1. Jonathan Holland

Address:  c/o Jonathan I. Blackman
             Cleary Gottlieb Steen & Hamilton LLP
             One Liberty Plaza
             New York, New York 10006

Mr. Holland is a practicing solicitor in the United Kingdom and partner in the law firm Latham & Watkins whose experience includes advising banks in the United Kingdom regarding anti-terrorist financing and anti-money laundering legislation and financial sanctions.  He is expected to testify about his professional qualifications and experience; the matters he addressed in his expert reports in these lawsuits dated December 6, 2010 and February 28, 2011; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Holland's experience and expertise.

Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

2. Michael Hyland

Address:  c/o Jonathan I. Blackman
             Cleary Gottlieb Steen & Hamilton LLP
             One Liberty Plaza
             New York, New York 10006

31

Mr. Hyland was, at the time he submitted his expert report in these lawsuits dated March 2, 2011, Executive Chairman and Director of MHA Compliance and Training Ltd, specializing in the subject of how financial institutions in the United Kingdom address their anti-money laundering and counter-terrorist financing obligations.  Mr. Hyland has since retired.   He is expected to testify about his professional qualifications and experience; the matters he addressed in his expert report; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Hyland's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

3.   Jonathan Burchfield

    Address:  c/o Jonathan I. Blackman
           Cleary Gottlieb Steen & Hamilton LLP
           One Liberty Plaza
           New York, New York 10006

Mr. Burchfield is a practicing solicitor in the United Kingdom and partner in the law firm Stone King LLP who has, since the early 1990s, exclusively specialized in the field of UK charity law and practice.  He is expected to testify about his professional qualifications and experience; the matters he addressed in his expert reports in these lawsuits dated December 3, 2010 and March 1, 2011; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Burchfield's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

4.   Moshe Azoulay

    Address:  c/o Jonathan I. Blackman
           Cleary Gottlieb Steen & Hamilton LLP
           One Liberty Plaza
           New York, New York 10006

Mr. Azoulay is an Israeli attorney and previously served in the Israeli Defense Forces, the Israel Security Agency and the Mossad, Israel's international intelligence agency.  He is expected to testify about his professional qualifications and experience; the matters he addressed in his expert reports in these lawsuits dated December 29, 2010, March 3, 2011, April 14, 2011, as well as those he addressed in his expert reports in

6344872.1

the *Strauss* and *Wolf* lawsuits dated December 8, 2009 and January 31, 2014; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Azoulay's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

5.  Brian Michael Jenkins

    Address:  c/o Jonathan I. Blackman
              Cleary Gottlieb Steen & Hamilton LLP
              One Liberty Plaza
              New York, New York 10006

Mr. Jenkins is Senior Advisor to the President of the RAND Corporation, Director of the National Society Center at the Mineta Transportation Institute, Advisor to Commercial Crime Services, the non-profit investigative arm of the International Chamber of Commerce and an advisor to U.S. government agencies and private corporations.  He is expected to testify about his professional qualifications and experience; the matters he addressed in his expert report in these lawsuits dated March 4, 2011; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Jenkins's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

6.  Amy Singer

    Address:  c/o Jonathan I. Blackman
              Cleary Gottlieb Steen & Hamilton LLP
              One Liberty Plaza
              New York, New York 10006

Ms. Singer is a Professor in the Department of Middle Eastern and African History of Tel Aviv University.  She is expected to testify about professional qualifications, experience and expertise; the matters she addressed in her expert report in these lawsuits dated December 29, 2010; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Professor Singer's experience and expertise.

> Plaintiffs' objections: See note 8, supra.

7.  John Barker

6344872.1

Address: c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

John Barker is a member of the Bar of the District of Columbia and a partner of the law firm Arnold & Porter Kaye Scholer LLP. He is expected to testify about his professional qualifications, experience and expertise; the matters he addressed in his expert report in these lawsuits dated March 2, 2011; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Barker's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

8. Yaron Lipshes

Address: c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Mr. Lipshes is an Israeli attorney and partner of the firm Caspi & Co., where he focuses his practice on white collar criminal defense and other types of government enforcement litigation. He is expected to testify about his professional qualifications, experience and expertise; the matters he addressed in his expert report in these lawsuits dated December 27, 2010; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Lipshes's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the purported expert testimony of this witness for the reasons set forth in the summary of Plaintiffs' proposed motions *in limine* and *Daubert* motions, infra. See also note 8, supra.

9. Ashim Kapur

Address: c/o Jonathan I. Blackman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Ashim Kapur is a Director of Digital Forensics at Stroz Friedberg, who is replacing NatWest's previously disclosed expert, Jason Novak, who has since left Stroz

6344872.1

Friedberg and is no longer available to testify in these lawsuits.  Mr. Novak served as a Digital Forensic Examiner with Stroz Friedberg when he issued his declarations in these lawsuits on December 2, 2011.  Mr. Kapur is expected to testify about his professional qualifications, experience and expertise; the matters addressed in his declaration dated January 29, 2018; and in rebuttal to any expert testimony presented by plaintiffs concerning matters within Mr. Kapur's experience and expertise.

> Plaintiffs' objections: Plaintiffs object to the inclusion of Ashim Kapur on Defendant's witness list on the grounds that (i) his proposed testimony is irrelevant and in violation of Fed. R. Evid. 403; and (ii) this witness was not produced for deposition during discovery. Plaintiffs will move to exclude this witness. See also note 8, supra.

## VIII.   EXHIBIT LISTS AND DEPOSITION DESIGNATIONS

*A schedule listing exhibits to be offered in evidence and, if not admitted by stipulation, the party or parties that will be offering them. The schedule will also include possible impeachment documents and/or exhibits, as well as exhibits that will be offered on rebuttal. The parties will list and briefly describe the basis for any objections to the admissibility of any exhibits.  Parties are expected to resolve all issues of authenticity, chain of custody, and related grounds before trial. Meritless objections based on these grounds may result in the imposition of sanctions. Except for good cause shown, only listed exhibits will be received in evidence.*

Attached as Exhibit A hereto is plaintiffs' list of case-in-chief exhibits (and NatWest's objections).[10]   Attached as Exhibit B hereto is NatWest's list of case-in-chief exhibits (and plaintiffs' objections).

In accordance with the Court's guidance during the October 16, 2017 scheduling conference, exhibits that will be used solely as impeachment are not listed on the parties' respective exhibit lists.  *See* Tr. of Civil Cause for Telephone Conference Before the Honorable Robert M. Levy United States Magistrate Judge at 7:2-8 (Oct. 16, 2017).  Furthermore, pursuant to the Court's Pretrial Order dated December 12, 2017, the parties are not including their respective deposition designations at this time, and will do so within "30 days after decision of

---

[10] NatWest is willing to meet and confer with plaintiffs concerning any of its objections. NatWest also notes that many of plaintiffs' descriptions of their exhibits appear to be erroneous and/or internally inconsistent, a problem that was compounded by plaintiffs' refusal to exchange copies of their exhibits at the time the parties exchanged their exhibit lists.  Although NatWest has attempted to note its objections to such exhibits, if any, based on the often erroneous and incomplete information plaintiffs provided, NatWest reserves the right to amend such objections (or to add objections) in the event plaintiffs correct or amend their exhibit list or it becomes apparent that NatWest misapprehended the exhibits plaintiffs intended to include on their list.  In addition, NatWest reserves the right to amend its objections to plaintiffs' exhibit list in the event that plaintiffs seek the Court's permission to assert an aiding and abetting claim, and the Court grants such request.

6344872.1

any motions in limine . . . unless otherwise ordered by the Court."  *See* December 12, 2017 Pretrial Order.

In addition to the objections identified in the attached exhibit lists, each side reserves the right to object to English translations of non-English exhibits proffered by the other side.  The parties will confer in good faith to resolve as many such objections as feasible before trial.

## IX.   PROPOSED MOTIONS

*Proposed motions addressing evidentiary or other issues that should be resolved in limine.*

### (a)   Plaintiffs' proposed motions

1. Motion to exclude any evidence of the contents of the Charity Commission for England & Wales' ("Charity Commission") three reports on Interpal, from 1996, 2003 and 2009, or the position of *any* UK regulator (*e.g.* Special Branch, Bank of England), toward Interpal to the extent this evidence is offered for truth or as a legal conclusion.

   a. Whether Interpal's donations were specifically directed to finance terrorist acts is not relevant to a claim under 18 U.S.C. §2339B claim; rather, the U.S. legal standard  is whether Interpal knowingly financed a U.S. designated terrorist organization. The Charity Commission's "conclusions[] were in response to a different question than is posed by the United States statutes." *Weiss v. National Westminster Bank Plc*, 768 F.3d 202, 204-05, 209-10 (2d Cir. 2014)

   b. The Second Circuit has held that "plaintiffs are entitled to the benefits of JASTA's expansion of the ATA liability to aiders and abettors" and that that the controlling legal framework is supplied by *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  *Linde v. Arab Bank PLC*, 2018 WL 797454, at *11. *Halberstam* requires proof only that an aider and abettor was "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance." *Halberstam*, 705 F.2d at 477. *See also Linde* at *11 ("awareness [does not] require proof that Arab Bank knew of the specific attacks at issue when it provided financial services for Hamas.").

2. Motion to exclude any evidence concerning English, EU, UN, or U.S. law; Defendant's belief in what English, EU, or UN law was; or the legality of Defendant's actions under English, EU, or UN law.

3. Motion to exclude any evidence intended to inform the jury that any award of damages to Plaintiffs will be trebled.

4. Motion to exclude any evidence of collateral source information to support mitigation of damages.

6344872.1

5.  Motion to exclude any evidence concerning how and why individual Plaintiffs joined the lawsuit.

6.  Motion to exclude any evidence supporting defenses of contributory fault or assumption of risk.

7.  Motion to strike Defendant's Second Affirmative Defense – "Plaintiffs' claims are barred, in whole or in part, by the intervening acts, wrongs, omissions and/or negligence of other individuals or entities."

8.  Motion to prevent Defendant from offering any exhibits, testimony, or argument that so-called aid organizations in the United States or elsewhere (including USAID) provided funding to zakat committees and similar Palestinian organizations at issue in this case, or what such aid organizations allegedly believed or suspected concerning zakat committees or other Palestinian social services organizations.

9.  Motion to prevent Defendant from offering exhibits, testimony, or argument that Defendant or any of its employees has an excellent reputation. This evidence is not relevant, is unfairly prejudicial, and constitutes inadmissible character or reputation evidence.

10. Motion to prevent Defendant from offering exhibits, testimony, or argument that Great Britain opposes terrorism generally, or that Great Britain is an important U.S. ally or cooperates with the United States government in terrorism investigations. This evidence is not relevant, is unfairly prejudicial, and constitutes inadmissible character or reputation evidence

11. Motion to exclude any evidence or argument that Palestinian violence against Israeli civilians is justified by Israeli government policies or by purported Israeli "aggression" against, or "oppression" of, Palestinians.

12. Motion to exclude any evidence or argument that a verdict against Defendant in this lawsuit will have adverse impact on the economy.

13. Motion to exclude any evidence or argument that Plaintiffs have brought suits, or refrained from bringing suits, against other financial institutions, including the outcomes of any such suits.

14. Motion to exclude testimony of purported expert John Barker.

    a.  Even Rule 44.1 testimony concerning *foreign* law is improper before the jury; this is especially true of proposed testimony on U.S. law. *See, e.g.*, *GlobalRock Networks, Inc.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) ("Experts should not testify on the meaning of words in a statute or regulation as that decision is one of law which must be made by the court.") (citing *Contini by Conini v. Hyundai Motor Co.*, 876 F. Supp. 540, 542 (S.D.N.Y. 1995)); *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (testimony regarding "meaning and applicability" of regulations "would invade the province of the court to determine the applicable

law and to instruct the jury as to that law"); *Washington v. Kelly Co.*, 105 F. Supp. 3d 293, 329 (S.D.N.Y. 2015) (noting several "examples of courts prohibiting experts from instructing the jury as to the relevant law" such as testimony on "the legal meaning of terms used in [regulations]").

    b.   Mr. Barker is offering opinion testimony on questions of law, which are the sole province of the Court.

    c.   Plaintiffs do not contend that the OFAC regulations are dispositive, but U.S. Treasury Department designations are evidence of whether Interpal provided material support to Hamas and NatWest's scienter.

15. Motion to exclude testimony of purported expert Yaron Lipshes.

    a.   Rule 44.1 testimony is improper before the jury.

    b.   Prosecution standards under Israeli law are irrelevant.

    c.   Mr. Lipshes's report states: "[A]ssuming there is no evidence that the bank knew that Interpal and/or its transferees were financing terrorism . . ." That is the central question at issue, which underscores that the testimony is irrelevant.

16. Motion to exclude testimony of purported expert Moshe Azoulay.

    a.   Rule 44.1 testimony is improper before the jury.

    b.   Legal question of the admissibility of court records under Israeli law is irrelevant.

17. Motion to exclude testimony of purported expert Brian Michael Jenkins.

    a.   Mr. Jenkins is not qualified to opine on Hamas.

    b.   Mr. Jenkins does not employ any discernable methodology.

    c.   Mr. Jenkins does not provide a substantive opinion about any material issue; therefore, his testimony is irrelevant.

18. Motion to exclude testimony of purported expert Jon Holland.

    a.   Rule 44.1 testimony is improper before the jury.

    b.   Mr. Holland's proposed testimony regarding the framework of UK regulations and laws is irrelevant, confusing to the jury, and unfairly prejudicial in light of the Second Circuit's decision finding that British law applies a different legal standard than the ATA. *See Weiss v. National Westminster Bank Plc*, 453 F. Supp. 2d 609, 633 (2d Cir. 2006) ("Although British Law does not require that NatWest cease to provide banking services to Interpal or that it cease transactions with HLF, Al–Aqsa, the Jenin Committee and the Tulkarem Committee, it also does

6344872.1

not mandate that NatWest continue providing such services. Accordingly, NatWest is free, and, indeed, obligated, to follow the more stringent American law. Principles of international comity do not demand otherwise.").

19. Motion to exclude testimony of purported expert Jonathan Burchfeld.

    a. Rule 44.1 testimony is improper before the jury.

    b. Mr. Burchfeld does not employ any discernable methodology regarding his non-legal assertions; he simply read Charity Commission reports and disagrees with the complaint's allegations based on his reading of the reports.

    c. Mr. Burchfeld's proposed testimony is irrelevant, confusing to the jury, and unfairly prejudicial in light of the Second Circuit's decision finding that British law applies a different legal standard than the ATA. *See Weiss v. National Westminster Bank Plc*, 453 F. Supp. 2d 609, 633 (2d Cir. 2006) ("Although British Law does not require that NatWest cease to provide banking services to Interpal or that it cease transactions with HLF, Al–Aqsa, the Jenin Committee and the Tulkarem Committee, it also does not mandate that NatWest continue providing such services. Accordingly, NatWest is free, and, indeed, obligated, to follow the more stringent American law. Principles of international comity do not demand otherwise.").

20. Motion to exclude testimony of purported expert Michael Hyland.

    a. Rule 44.1 testimony is improper before the jury.

    b. Mr. Hyland does not employ any discernable methodology. His report simply summarizes English banking regulations during the "Relevant Period" and describes generally how banks were monitored. Based on this background, he argues for various inferences from the facts that are favorable to NatWest. Such testimony is a blatant usurpation of the function of the jury.

21. Motion to exclude testimony from Defendant's proposed witnesses Kevin Love, Richard Gossage, Ashim Kapur, and an as-yet-unidentified "representative of Her Majesty's Treasury", on the grounds that (i) their proposed testimony is irrelevant and in violation of Fed. R. Evid. 403 and Fed. R. Civ. P. 44.1; and (ii) these witnesses were not produced for deposition during discovery.

    **(b)**   <u>**Defendant's proposed motions**</u>

6344872.1

### A. IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE ABOUT INTERPAL AND THE 13 CHARITIES[11]

#### 1. The Court Should Exclude Evidence Concerning Israeli Government Designations Of Interpal And Certain Of The 13 Charities

The Court should exclude under FRE 402 and 403 evidence regarding the Israeli government's designations of Interpal and certain of the 13 Charities as "terrorist organizations" and/or "unlawful organizations." <u>First</u>, these Israeli government designations are not relevant to NatWest's <u>scienter</u>, because there is no evidence that NatWest was aware of them during the relevant period.

<u>Second</u>, these designations are not relevant to whether NatWest committed an "act of international terrorism," 18 U.S.C. §§ 2333(a), 2331(1); <u>Linde v. Arab Bank</u>, 2018 WL 797454, at *5, 8 (2d Cir. Feb. 9, 2018), including because there is no evidence that they were based on the Israeli government's finding that the 13 Charities themselves engaged in terrorist activities, and the designations do not purport to address NatWest's conduct at all, much less do they purport to be based on a finding that NatWest's processing of funds transfers to the 13 Charities on behalf of Interpal involved violence or endangered human life and appeared to be intended to intimidate or coerce a civilian population or to influence or affect a government.

<u>Third</u>, these designations also are not relevant to the proximate causation element of plaintiffs' claims, including because there is no evidence that the Israeli government's designations of certain of the 13 Charities were based on the government's finding that those charities were controlled by or <u>alter egos</u> of Hamas, as plaintiffs must prove here, rather than some other unspecified level of support for or involvement with Hamas or some other "unlawful" activities.

<u>Fourth</u>, any probative value that these designations may have is substantially outweighed by the dangers of unfair prejudice to NatWest and of confusing the jury and wasting its and the Court's time. In order for the jury to deem these designations relevant, it would need to speculate – based on no evidence – that the Israeli government's designations reflect its findings that certain of the 13 Charities were controlled by or <u>alter egos</u> of Hamas. Moreover, allowing plaintiffs to refer to these designations would lead to a time-consuming sideshow concerning, among other things, the processes, standards and policies pursuant to which Israel makes these designations, and the fact that, under Israeli law, these designations did not apply to NatWest's conduct on behalf of Interpal in the UK, evidence of which NatWest would need to present in order to diminish (but not eliminate) the risk that the jury would impermissibly rely on these designations as a shortcut to finding for plaintiffs on the "act of international terrorism," <u>scienter</u> and/or proximate causation elements of their claims. <u>See United States v. Awadallah</u>, 436 F.3d 125, 133 (2d Cir. 2006) (FRE 403 "requires that evidence be excluded, even if relevant, if the jury will place undue weight on that evidence").

---

[11] Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Joint Pre-Trial Order.

2.      **The Court Should Preclude Plaintiffs From Citing OFAC's SDGT Designation Of Interpal As Evidence Of Interpal's Support For Hamas**

The Court should, under FRE 403 and 802, preclude plaintiffs from citing OFAC's August 21, 2003 designation of Interpal as an SDGT and the Treasury Department's accompanying press release as evidence of Interpal's support for Hamas.  <u>First</u>, OFAC's designation is not relevant to whether NatWest committed an "act of international terrorism," including because there is no evidence that this designation was based on OFAC's finding that Interpal itself engaged in terrorist activities.  Moreover, the designation does not purport to address NatWest's conduct at all, much less does it purport to be based on a finding that NatWest's processing of funds transfers on behalf of Interpal involved violence or endangered human life and appeared to be intended to intimidate or coerce a civilian population or to influence or affect a government.

<u>Second</u>, although NatWest does not dispute that the OFAC designation is relevant to its <u>scienter</u> as of August 21, 2003 and thereafter, neither OFAC's designation of Interpal as an SDGT, nor the accompanying Treasury Department press release asserting that OFAC had "credible evidence" that Interpal was "raising funds on behalf of HAMAS" and "then transfer[ring those funds] to sub-organizations of HAMAS," is admissible for the truth of its contents.  Although "factual findings from a legally authorized investigation" are admissible under the public records exception to the hearsay rule, FRE 803(8)(A)(iii), "[l]egal conclusions are inadmissible because the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires."  <u>Hines v. Bandon Steel Decks, Inc.</u>, 886 F.2d 299, 303 (11th Cir. 1989).  Here, the Court will instruct the jury that it must decide, among other things, whether plaintiffs have proven by a preponderance of the evidence that the 13 Charities that received wire transfers that NatWest processed on behalf of Interpal were controlled by or were <u>alter egos</u> of Hamas, and will instruct the jury on the legal elements of such control or <u>alter ego</u> status.  The jury, however, will have no way of knowing whether OFAC's legal conclusion about Interpal or its transferees was based on the same preponderance standard, or whether OFAC applied the same tests to determine control or <u>alter ego</u> status, as the jury will be instructed to apply, particularly because nothing in the designation itself or in the accompanying press release discloses OFAC's reasoning or the facts on which its legal conclusion was based.  Moreover, the press release strongly indicates that OFAC applied a lesser "credible evidence" standard to an undisclosed test for "sub-organizations" that may materially differ from the test the jury will be required to apply here.  Accordingly, OFAC's legal conclusion is inadmissible.

<u>Third</u>, any probative value that OFAC's designation of Interpal may have as evidence of Interpal's support for Hamas, i.e., as evidence of the truth of its contents, is substantially outweighed by the danger of unfair prejudice to NatWest.  In order for the jury to conclude that this designation is relevant to the proximate causation element of plaintiffs' claims, the jury would need to speculate, without any grounding in the evidence, that:  (1) when OFAC stated that it had received "credible evidence" that Interpal was "raising funds on behalf of Hamas," OFAC was relying on Interpal's funds transfers through its NatWest accounts to the 13 Charities, as opposed to other activities of Interpal, of which NatWest had no knowledge; (2) even if

6344872.1

OFAC were referring to such transfers, OFAC had concluded that the 13 Charities were controlled by or alter egos of Hamas, as opposed to having a more attenuated relationship with Hamas; and (3) finally, OFAC's statement is even properly characterized as a "conclusion" to which any weight should be given, when OFAC merely stated that it had identified "credible evidence" that Interpal provided unspecified support for Hamas.  Because the jury would be required to engage in these multiple levels of speculation before it could conclude that this evidence is relevant, it should be excluded.  See, e.g., United States v. Kaplan, 490 F.3d 110, 122 (2d Cir. 2007) (district court erred by admitting evidence where "jury was required to draw a series of inferences, unsupported by other evidence, to connect [the evidence] . . . [to] the ultimate issue in the case"); Cook v. Hatch Associates, No. 02-CV-0065A, 2007 WL 1267026, at *2 (W.D.N.Y. Apr. 30, 2007) (excluding EEOC determination letter that "contain[ed] only conclusory findings that fail to describe the nature of its investigation or the basis for its conclusions" under FRE 403).

### B.   IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE ABOUT HAMAS

#### 1.   The Court Should Exclude Testimony By "Designated Plaintiffs" And Eyewitnesses To The Attacks

The Court should exclude under FRE 402, 403 and 802 the proposed testimony of two plaintiffs, Steven Averbach and Joshua Faudem, and two other eyewitnesses to some of the attacks by which plaintiffs were injured, Mordechai Dzikansky and David Bar, concerning what they purportedly saw at the scenes of those attacks.  NatWest has offered to and will stipulate to the only facts that these four witnesses could possibly address that could be relevant to NatWest's liability for the attacks:  that the attacks occurred, and that certain plaintiffs and/or their family members were injured as a result of those attacks.  Each of these four witnesses conceded in his or her deposition testimony that he or she cannot testify from personal knowledge:  (1) whether NatWest had the requisite scienter; (2) whether NatWest's conduct proximately caused plaintiffs' injuries; or (3) whether Hamas perpetrated any of the attacks.  Moreover, because each of them testified that he had no personal knowledge about NatWest, none of these witnesses can offer any evidence that NatWest engaged in an "act of international terrorism."  At most, these plaintiffs and eyewitnesses testified that they saw the terrorist who perpetrated the attack but have no firsthand knowledge as to such attacker's affiliation with Hamas, if any, and/or that they read or heard statements in the media or from other second-hand sources purporting to attribute the attacks to Hamas.  The former is not relevant (or, at a minimum, it is of such scant probative value that it should be excluded under FRE 403 for the reasons stated below) and the latter is inadmissible hearsay, as this Court has already ruled, see Memorandum and Order at 5 (Sept. 30, 2017), ECF No. 443 ("2017 SJ Op.").

Relatedly, the Court should exclude, under FRCP 26(a)(2)(C), the proposed testimony of Dzikansky, whom plaintiffs previously disclosed as a non-retained "expert" witness.  Dzikansky is a retired New York Police Department ("NYPD") officer who spent most of his career policing routine crimes in New York City, but served as the NYPD's liaison to the civilian police force of Israel later in his career.  In that position, Dzikansky was responsible for relaying to the NYPD information that he obtained from the Israeli police concerning acts of terrorism in Israel, in order to help prevent and mitigate acts of terrorism in New York City.  Dzikansky had no

6344872.1

responsibility for independently investigating acts of terrorism in Israel. Nonetheless, plaintiffs previously proposed to have him testify to his opinions about who perpetrated several of the attacks at issue in these lawsuits that occurred during his tenure as NYPD liaison to the Israeli police – purportedly based on his personal knowledge – pursuant to FRCP 26(a)(2)(C), which permits parties to offer testimony, in limited circumstances, by non-retained expert witnesses without disclosing a written report of the proffered expert's opinions. By his own admission in his deposition testimony, however, Dzikansky does not, as contemplated by Rule 26(a)(2)(C), propose to offer any _expert_ opinions concerning the attacks, but rather only _fact_ witness testimony. But Dzikansky is not competent to offer any admissible and relevant fact witness testimony because, as he also conceded in his deposition testimony, he has no first-hand knowledge concerning the identity or affiliation of the perpetrators of any of the attacks about which he proposes to testify. Rather, his proposed testimony consists solely of inadmissible hearsay about the attacks that he obtained from the media or the Israeli police. In other words, Dzikansky is situated no differently from the other fact witnesses who have no firsthand knowledge as to whether Hamas committed any attack, and whose testimony should therefore be excluded.

Similarly, although plaintiffs suggest that Bar will testify to the "personal knowledge he acquired concerning the Hamas terrorist who perpetrated" the April 30, 2003 Mike's Place attack, he conceded in his deposition testimony that attributing responsibility for that attack was not one of his duties as an Israeli civilian police officer (or the responsibility of his group), and that the "personal knowledge he acquired" concerning the terrorist's alleged affiliation with Hamas was the result of his review of the investigation file or "intelligence," the substance of which he refused to disclose, other than that it included a video claim of responsibility by Hamas, which the Court has already excluded as inadmissible hearsay. As with Dzikansky, Bar's testimony would thus be inadmissible hearsay.

In any event, the substantial unfair prejudice to NatWest that would result if the Court were to allow testimony from any of these plaintiffs or eyewitnesses would far outweigh its probative value. Indeed, in United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008), the Second Circuit reversed the convictions of two defendants who had been found guilty under the criminal material support provisions of the ATA in large part because the district court improperly permitted a government witness to give eyewitness testimony regarding a suicide bombing in Israel. Id. at 163-64; see also 160-61 ("an eyewitness account of a violent, destructive, and fatal suicide bombing seems quite clearly to 'involve conduct more inflammatory than [a violation of the material support provisions],'" and "given the highly charged and emotional nature of the testimony and its minimal evidentiary value, the court's decision [to permit the testimony] was arbitrary"). That conclusion is even more compelling with respect to the proposed testimony by the witnesses here, because plaintiffs allege that NatWest processed transactions on behalf of Interpal to charities that plaintiffs allege were controlled by or _alter egos_ of Hamas, but do _not_ allege that NatWest planned, carried out or had any involvement whatsoever in any of the attacks. Cf. id. at 161 (noting that because "[t]he defendants were not charged with planning or carrying out the Tel Aviv bombing," and because the witness who testified to the bus bombing "never referred to either defendant or to any aspect of the investigation or charges against them," such witness's testimony should have been excluded).

6344872.1

2.      **The Court Should Exclude Images Of Terrorist Attacks**

The Court should exclude under FRE 402 and 403 any visual images depicting any terrorist attack, or the aftermath or injuries caused by any terrorist attack.  NatWest has offered to and will stipulate to the only facts that such images or videos could be relevant to in the liability trial: that the terrorist attacks at issue occurred and that certain plaintiffs and/or their family members were injured as a result of those attacks.  Plaintiffs have identified no images depicting terrorist attacks that are relevant to:  (1) whether NatWest committed an "act of international terrorism"; (2) whether NatWest had the requisite scienter; (3) whether NatWest's conduct proximately caused plaintiffs' injuries; or (4) whether Hamas perpetrated any of the attacks.  In any event, the substantial unfair prejudice to NatWest that would result if the Court were to permit plaintiffs to introduce images of terrorist attacks would far outweigh their probative value.  See, e.g., In re Sept. 11 Litig., No. 21 MC 97(AKH), 2007 WL 3036439, at *4 (S.D.N.Y. Oct. 17, 2007) (excluding photographs of aftermath of September 11 attack as a "clear example of evidence that should be excluded because of its high likelihood of prejudicing, confusing, and misleading the jury pursuant to Federal Rule of Evidence 403").

3.      **The Court Should Exclude Evidence Of Hamas Claims Of Responsibility For The Attacks**

The Court should exclude under FRE 802 all evidence of Hamas's purported claims of responsibility for any of the attacks at issue – including the video of Muhammad Farhat (the "Farhat video") – and any evidence that merely repeats, summarizes or relies on such claims.  First, the Court has already ruled in the Strauss and Wolf cases that Hamas's claims of responsibility are inadmissible hearsay, and in particular that they are not admissible under the exception for statements against interest.  2013 Strauss SJ Op. at 55; see also Memorandum and Order at 6-7 (Sept. 30, 2017), Strauss v. Crédit Lyonnais, S.A., ECF No. 443 ("2017 Strauss SJ Op.").  This ruling necessarily extends to all explicit statements by which Hamas claimed credit for an attack, such as through communiqués and the Hamas "Glory Record," as well as all implicit statements by which Hamas effectively claimed credit for an attack, such as publication or posts of unauthenticated videotaped "wills," including the Farhat video.  Although the Court has ruled in Strauss that the Farhat video may be admissible if plaintiffs can authenticate it, see 2017 Strauss SJ Op. at 11, in fact plaintiffs have not provided any such authentication.  The sole evidence that plaintiffs proffer concerning the origins of that video is the proposed testimony of their expert Ronni Shaked, but he lacks the requisite "firsthand knowledge of the video's origins."  Soto v. City of New York, No. 13 CV 8474-LTS-JLC, 2017 WL 892338, at *1 (S.D.N.Y. Mar. 6, 2017).  Shaked's mere repetition of the hearsay contents of the video is improper under FRE 702 and is insufficient to authenticate it.

Second, for the same reasons that the Court has excluded Hamas's claims of responsibility, the Court should exclude any derivative evidence that merely repeats, summarizes or relies on such claims of responsibility.  This includes any Israeli government reports that are founded on Hamas claims of responsibility, rather than on independent investigations.  Although the Court has ruled that certain Israeli government documents may fall within the public records exception to the rule against hearsay, that exception does not "automatically render all of [the documents'] contents admissible."  Beechwood Restorative Care Ctr. v. Leeds, 856 F. Supp. 2d 580, 588 (W.D.N.Y. 2012).  Even for documents that may partially qualify as public records,

44

therefore, the Court should exclude those parts that are based on inadmissible claims of responsibility.

4. **The Court Should Exclude Newspaper Articles Concerning Hamas**

The Court should exclude under FRE 402, 403 and 802 the numerous newspaper articles plaintiffs have indicated they will seek to introduce at trial. Among other things, these articles purport to: (1) identify Interpal as a supporter of Hamas; (2) link other Palestinian charities to Hamas; and (3) attribute attacks to Hamas. Each of these articles is plainly inadmissible for the truth of its contents. See 2013 Strauss SJ Op. at 54 ("Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted." (citation omitted)).

Moreover, none of these articles is relevant to the scienter element of plaintiffs' claims. There is no evidence that anyone at NatWest ever saw any of these articles, and thus there is no basis on which the jury could rationally conclude that the articles are relevant to show that NatWest knew or deliberately disregarded their contents. Further, these articles should be excluded under FRE 403 because the danger that the jury will unfairly consider them for their truth substantially outweighs their probative value.

C. **IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE CONCERNING OTHER ATTACKS AND TERRORISM GENERALLY**

1. **The Court Should Exclude References To The September 11, 2001 Attacks Or To The Jury's Supposed Role In Stopping Terrorism**

The Court should, under FRE 402 and 403, preclude plaintiffs' counsel from making any argument or other statement that refers to the September 11, 2001 attacks or to the jury having a role in preventing terrorism. The reason for this request is that, during the trial of plaintiffs' claims against Arab Bank, plaintiffs' counsel made a slew of improper remarks to the jury in a blatant attempt to appeal to its emotions and sympathy, including by invoking images and memories of the September 11, 2001 attacks and suggesting to the jury that it should render a verdict to "stop terrorism." For example, plaintiffs' counsel argued to the jury as follows:

- "You are in a very special situation, a situation that no jury in the history of this country has ever been in. . . . You have more power today to change the way this world operates, the world of banking operates, than anyone else on the face of the earth. That power is not only awesome but it is important. It is important because the greatest force of evil in our society today, the greatest, not one of the greatest, the greatest force of evil in our society today is terrorism. . . . That is the power that you have today. That is the power that you have to tell other banks, don't you dare do what these people did. You do and you will pay. That is how we stop terrorism."

6344872.1

- "It was pretty moving for me to be here on September 11.  I hadn't been here before for September 11.  That was that day that I cross-examined [an Arab Bank witness], and that night, I stood at the hotel down the street, you know, and saw those blue lights and stepped back.  What am I doing here?  What difference will it make?  You know what's going on in the world since then.  It's not any better.  You know what we're facing."

Statements such as these are utterly irrelevant to the "act of international terrorism," scienter, proximate cause and Hamas responsibility issues the jury will be asked to decide.  Instead, they are designed to "improperly distract[] the jury from its sworn duty to hand down a just verdict based on the evidence presented to it" and to "play to the sympathy of [the] jury." Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 539, 541 (2d Cir. 1992).  Accordingly, the Court should preclude plaintiffs' counsel from making them.  See id. (reversing verdict in light of prejudicial comments by counsel, noting "the bounds of counsel's advocacy are circumscribed by considerations of the prejudice it might engender").

## 2.     The Court Should Exclude Evidence Concerning The Politics Of The Palestinian-Israeli Peace Process And The Second Intifada

The Court should exclude under FRE 402 and 403 evidence regarding the politics of the Palestinian-Israeli peace process and the Second Intifada.  Plaintiffs have indicated that they intend to introduce evidence of the history of peace negotiations between Palestinians and Israelis, including the 1993 Oslo Accords and, in particular, Hamas's violent opposition to those agreements between the Palestine Liberation Organization and Israel.  Similarly, plaintiffs apparently intend to introduce evidence linking the outbreak of violence beginning in 2000 (i.e., the Second Intifada) to Hamas's opposition to peace with Israel.  None of this evidence is remotely relevant to any element of any of plaintiffs' claims against NatWest, which require plaintiffs to prove that *NatWest* committed an "act of international terrorism" with the requisite scienter, and proximately caused plaintiffs' injuries.  Moreover, the dangers of unfair prejudice and jury confusion presented by this evidence substantially outweigh its probative value, including because, among other things, it would suggest to the jury that it should decide these cases for political reasons, rather than by applying the law to the facts, as established by admissible evidence.

## 3.     The Court Should Exclude Evidence Concerning Other Terrorist Attacks

The Court should exclude under FRE 402 and 403 evidence of terrorist attacks other than the 16 attacks at issue in these cases (the "Relevant Attacks").  Evidence of terrorist attacks other than the Relevant Attacks is not probative with respect to any element of plaintiffs' claims and therefore is not relevant.  Moreover, the unfair prejudice to NatWest of such evidence would substantially outweigh its probative value, even if it had any.  For example, plaintiffs have argued that "[b]etween the outbreak of the Second Intifada in late 2000 and 2004, Hamas perpetrated 52 suicide bombings, killing 247 Israelis and wounding at least 1,647," and have referred to these terrorist attacks as "the bloodiest attacks" during that period.  See Pls.' Stmt. of Material Facts as to Which There Is A Genuine Issue to be Tried Pursuant to Local Civ. R.

46

56.1(b) ¶ 29 (Jan. 30, 2012), <u>Weiss</u> ECF No. 274.  That evidence is not probative of any element of plaintiffs' claims, and would serve only to inflame the passions of the jury and thus prejudice NatWest.

Similarly, plaintiffs' experts' proposed testimony that certain individuals affiliated with the 13 Charities may have been involved in terrorist attacks other than the Relevant Attacks is not probative of whether Hamas perpetrated the Relevant Attacks, whether the 13 Charities were controlled by or <u>alter egos</u> of Hamas, or whether NatWest's funds transfers to the 13 Charities themselves were violent or dangerous acts that appear to have been intended to coerce a civilian population or government, and, again, would risk inflaming the jury's passions and thus unfairly prejudice NatWest.

4.    **The Court Should Exclude Evidence Concerning Purported Hamas Affiliations Of Entities Or Persons Other Than Interpal Or The 13 Charities, Including The Union Of Good**

The Court should exclude under FRE 402 and 403 evidence concerning the alleged Hamas affiliations of entities or persons other than Interpal and the 13 Charities.  Plaintiffs' witness and exhibit lists suggest plaintiffs intend to introduce voluminous documentary and expert evidence concerning links between Hamas and entities and persons other than Interpal and the 13 Charities, and/or the alleged support that such entities or persons provided to Hamas.  For example, plaintiffs have disclosed their intention to have multiple experts testify that the Union of Good is a "Hamas umbrella organization," of which Interpal, among numerous other "charitable front groups," was a member.  Plaintiffs also have included dozens of documents on their exhibit list that relate solely to the alleged Hamas links of other charities, such as the Al Aqsa Foundation, Holy Land Foundation, Sanabil Association for Relief and the World Assembly of Muslim Youth, and persons including Osama El Kurd.  All of this evidence should be excluded.

<u>First</u>, this evidence does not tend to show that the 13 Charities, and therefore NatWest in processing transfers from Interpal to the 13 Charities, engaged in conduct that "involve[d] violence or endanger[ed] human life" and "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government" such that plaintiffs could rely on it to prove that NatWest's conduct met the definitional requirements of "international terrorism" under § 2331(1).

<u>Second</u>, none of this evidence is relevant to NatWest's <u>scienter</u> because there is no evidence NatWest was aware of any of it during the relevant period.  <u>Third</u>, this evidence also is not relevant to the proximate causation element of plaintiffs' claims, because it has no tendency to show that the 13 Charities were controlled by or <u>alter egos</u> of Hamas, as plaintiffs must prove here.  Rather, this evidence solely relates to separate entities and persons that are not part of the causal chain on which plaintiffs' claims are based.  The same is true of the Union of Good, although plaintiffs claim that Interpal was part of it; even if that were true, any evidence of links between the Union of Good and Hamas would not show that the 13 Charities, which are not alleged to be part of the Union of Good, were controlled by or <u>alter egos</u> of Hamas.  Moreover, even to the extent plaintiffs were somehow permitted at this late stage to amend their claims against NatWest to include claims based on transfers to any of these other organizations (and

47

they should not be), at most plaintiffs would only be able to show that such organizations were supporters of Hamas, not controlled by or <u>alter egos</u> of Hamas. Accordingly, evidence regarding these entities would still be irrelevant to proximate causation under <u>O'Neill v. Al Rajhi Bank (In re Terrorist Attacks on Sept. 11, 2001)</u>, 714 F.3d 118 (2d Cir. 2013).

<u>Finally</u>, any probative value that this evidence may have is substantially outweighed by the dangers of unfair prejudice to NatWest and of confusing the jury and wasting time. If the jury receives this evidence, it is likely to unfairly apply it in evaluating NatWest's <u>scienter</u>, even though there is no evidence NatWest was aware of any of it. The jury also is likely to be confused as to the significance of this evidence and to speculate that, since it was introduced, it must be relevant to plaintiffs' claims. Indeed, as plaintiffs intend, the jury is likely to improperly conflate the purported Hamas affiliations of these entities and persons with those of the 13 Charities, and will thus be improperly influenced by this evidence in reaching a decision as to the "act of international terrorism," <u>scienter</u> and/or proximate causation elements of plaintiffs' claims. <u>See</u> <u>United States v. Awadallah</u>, 436 F.3d 125, 133 (2d Cir. 2006) (FRE 403 "requires that evidence be excluded, even if relevant, if the jury will place undue weight on that evidence").

### D.   IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE CONCERNING NATWEST AND INAPPLICABLE LEGAL STANDARDS

#### 1.   The Court Should Preclude Plaintiffs From Referring To The Anonymous Internet Posting On www.cryptome.org As A "South African Intelligence Report" Or Otherwise Suggesting That The Jury Can Consider It For The Truth Of Its Contents

The Court should, under FRE 802, 901 and 902, preclude plaintiffs from referring to the anonymous internet posting on www.cryptome.org as if it were an official report of the South African intelligence agency, or otherwise suggesting that the jury can consider it for the truth of its contents. Specifically, on September 27, 2001, a NatWest employee submitted a disclosure to the UK National Criminal Intelligence Service ("NCIS") concerning allegations linking Interpal to Hamas that were made in an article hosted on the website www.cryptome.org, which purports to be authored by "Anonymous" and to contain a "briefing document . . . prepared for the South African President, Thabo Mbeki" in 1998 (the "Cryptome Report"). Neither the article nor the Cryptome Report identifies any sources for the allegations they make against various Muslim organizations, other than stating that the information is based on "composite source documents," allegedly from South African intelligence archives. It is undisputed that the UK government never responded to or asked for additional information concerning NatWest's disclosure of the Cryptome Report or the article containing it. NatWest does not dispute that the Cryptome Report and the article containing it are relevant and admissible for the limited purpose of showing that NatWest saw the Cryptome Report and the article containing it and included them in NatWest's disclosure to NCIS. Plaintiffs, however, have indicated that they intend to go beyond that limited and permissible purpose. Despite having no evidence as to the provenance or authenticity of the Cryptome Report or the article containing it, plaintiffs apparently intend to represent at trial that the Cryptome Report is a "South African National Intelligence Agency Report" and to otherwise suggest to the jury that it is an authoritative official report that the jury

6344872.1

can consider for the truth of its contents, purportedly because NatWest did not contemporaneously document any doubts as to the Cryptome Report's authenticity when disclosing it to NCIS.

Plaintiffs' argument turns the Federal Rules of Evidence on their head, and should be rejected. First, as the party claiming the document is an official South African government report, plaintiffs bear the burden under FRE 901 or 902 to authenticate it as such. See, e.g., United States v. Sutherland, 656 F.2d 1181, 1201 (5th Cir. 1981) ("the proponent [of evidence] must meet the minimal burden of authentication before [that evidence] can be admitted. That burden cannot be satisfied (or its failure rendered harmless) merely because the opponent did not challenge its accuracy."). Although there are numerous methods by which a party can authenticate documents, plaintiffs have satisfied none of them with respect to the Cryptome Report, and this document is not a self-authenticating foreign public document under FRE 902(3), including because it purports to be contained in an article authored by "Anonymous" and appeared on a website with no affiliations of any kind with any foreign government. See United States v. Perlmuter, 693 F.2d 1290, 1293 (9th Cir. 1982) (district court abused its discretion in admitting under FRE 902(3) records relating to defendant's criminal history in Israel that were not "executed or attested by a person who is acting in an official capacity and who is authorized by the laws of that country to make the attestation or execution").

Second, because plaintiffs cannot show that the Cryptome Report is anything more than an anonymously authored document posted by unknown persons on an unofficial website, the document meets none of the hearsay exceptions and is inadmissible for the truth of its contents. Obviously, plaintiffs should therefore be precluded from arguing that the jury can consider its contents for their truth; likewise, plaintiffs should also be precluded from hinting that the jury do so by misleadingly referring to the Cryptome Report as a "South African Intelligence Report" or otherwise suggesting it is in fact an official document, or by arguing to the jury that NatWest's failure to contemporaneously note any doubts regarding the document's authenticity opens the door to the jury considering the document for its truth. Besides being an impermissible end-run around the rule against hearsay, any such suggestion or argument would be far more unfairly prejudicial to NatWest than it would be probative of NatWest's liability. See FRE 403.

### 2. The Court Should Exclude Evidence That NatWest Employees Purportedly Were "Dismissive" Or "Disdainful" Of U.S. Law

The Court should exclude under FRE 402 and 403 evidence that NatWest employees purportedly were "dismissive" or "disdainful" of U.S. law. It is undisputed that OFAC's August 21, 2003 designation of Interpal for purposes of OFAC's asset-freezing regulations did not apply in the UK, and thus NatWest was under no obligation to take the OFAC designation into account in dealing with Interpal in the UK. Plaintiffs, however, have indicated that they will argue to the jury that NatWest's decision to keep Interpal's accounts open after the OFAC designation "was due, at least in part, to its dismissive and disdainful attitude towards U.S. law" by pointing to evidence that some NatWest employees made comments that could be interpreted as critical or dismissive of OFAC's sanctions regime. The Court should not permit plaintiffs to do so.

First, this evidence is not relevant to whether NatWest's conduct satisfies the definition of "international terrorism" under § 2331(1) because it does not tend to show that NatWest's

provision of routine financial services to Interpal "involve[d] violence or endanger[ed] human life" and "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government," as plaintiffs must prove under the Second Circuit's decision in <u>Linde v. Arab Bank, PLC</u>, 2018 WL 797454, at *8.  <u>Second</u>, this evidence also is not relevant because, whatever NatWest's view of OFAC sanctions, they did not apply in the UK and thus the OFAC designation of Interpal does not establish that NatWest acted with the requisite <u>scienter</u>, as this Court and Second Circuit have both ruled. <u>See</u> <u>Weiss v. Nat'l Westminster Bank PLC</u>, 936 F. Supp. 2d 100, 118 (E.D.N.Y. 2013) ("There is no authority for the proposition that knowledge of an OFAC designation equates to knowledge of terrorist activities under the ATA for purposes of civil liability.  Otherwise the scienter requirement of the ATA would be meaningless.  Banks would be strictly liable for maintaining such accounts, and the scope of ATA liability would be radically enlarged."), <u>rev'd on other grounds</u>, 768 F.3d 202, 211 n.9 (2d Cir. 2014) ("We do not mean to suggest that the designation of an organization as an SDGT is sufficient, without more, to create a triable issue of fact regarding a foreign defendant's scienter.").  Whatever views NatWest employees may have had of the U.S. designation of Interpal, those views do not show that the bank in fact knew or was willfully blind to the fact that Interpal was funding Hamas or that it knew of any purported links between Interpal and terrorist activities such that NatWest's processing of transfers from Interpal's accounts involved "violence" or "danger to life" and was apparently intended to terrorize a population or government.

<u>Third</u>, NatWest's employees' irrelevant comments, if admitted, would be unfairly prejudicial and would lead to a time-consuming sideshow mini-trial concerning this subject.  Indeed, plaintiffs intend to introduce this evidence precisely for its prejudicial effect, hoping that the jury will find NatWest to be anti-American.  This is exactly the kind of unfair prejudice FRE 403 was designed to prevent.  Moreover, in order to combat (but not eliminate) this unfair prejudice, NatWest would need to present evidence that NatWest employees were correct that U.S. law did not apply in the UK and that they were entitled to rely on the views of regulators in the UK to the extent those views differed from OFAC's views, which would lead to a distracting mini-trial of limited or no probative value.

### 3.   The Court Should Exclude Evidence That The Charity Commission Referred To The Source Of Rejected Allegations Against Interpal As "Jewish"

The Court should exclude under FRE 402 and 403 evidence that, following the completion of the Charity Commission's 1996 investigation of allegations that Interpal was linked to Hamas, which the Charity Commission determined were unfounded, a representative of the Charity Commission told a NatWest employee that the rejected allegations had come from a "Jewish source," which that NatWest employee then repeated in internal NatWest communications.  (The Charity Commission also said the allegations against Interpal were "untrue and possibly malicious," although plaintiffs ignore that.)  Plaintiffs have indicated they will attack NatWest witnesses on the stand with the rhetorical question of why the "religion" of the source of allegations was relevant, thereby suggesting to the jury that the Charity Commission and NatWest by extension were anti-Semitic, and thus further suggesting the result of the Charity Commission's inquiries and all of NatWest's conduct in this case are somehow suspect.

First, this evidence is not relevant to whether NatWest's conduct satisfies the definition of "international terrorism" under § 2331(1) because it does not tend to show whether NatWest's provision of routine financial services to Interpal "involved violence" or "endangered human life" and also exhibited an apparent intent to terrorize the Israeli government or population.

Second, this evidence is not relevant as it has no bearing on what NatWest knew or whether it was willfully blind with respect to Interpal.  Third, even if this evidence had any minimal probative value, it would be vastly outweighed by the danger of unfair prejudice to NatWest.  Plaintiffs have no evidence and are only speculating that a single stray comment by a representative of the Charity Commission from more than 20 years ago reflects anti-Semitism and not, for example, the fact that one side to the Israeli-Palestinian (or Jewish-Arab) conflict may have had an interest in making accusations against the other side.  Moreover, even if this evidence did show anti-Semitism, allowing the jury to receive it would likely inflame the jury, even though this evidence would not make any claims or defenses in these cases more or less probable.  Fourth, even if there were any probative value in inquiring into why the Charity Commission representative noted the religion of the alleged source (which there is not), the only witness qualified to offer any admissible testimony on that topic would be the Charity Commission representative who made the comment, but plaintiffs have not included that person on their witness list.

> ### 4.  The Court Should Exclude Evidence That Post-Dates The Last Relevant Wire Transfer, Which Was On September 25, 2003, Unless It Sheds Light On NatWest's State Of Mind During The Relevant Period

The Court should exclude under FRE 402 and 403 evidence that post-dates the last relevant wire transfer processed by NatWest, which was on September 25, 2003, unless it sheds light on NatWest's state of mind during the relevant period.  The following facts are not subject to genuine dispute:  (1) plaintiffs' claims against NatWest are based upon the transfers of funds that Interpal made from its NatWest accounts to the 13 Charities, which plaintiffs allege were alter egos of and/or controlled by Hamas; (2) the last attack on which plaintiffs base their claims took place on October 22, 2003; and (3) the last transfer by NatWest to any of the 13 Charities prior to the October 22, 2003 attack occurred on September 25, 2003.

First, in light the undisputed facts, evidence of NatWest's conduct or state of mind after the September 25, 2003 transfers is not relevant to either the proximate causation or scienter element of plaintiffs' claims.  Evidence is relevant to the proximate causation element of plaintiffs' claims only if it tends to show that NatWest's conduct was "a substantial factor in the sequence of responsible causation" leading to plaintiffs' injuries, or that plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of NatWest's conduct.  Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (quoting Lerner v. Fleet Bank, N.A., 318 F.3d 113, 123 (2d Cir. 2003)).  Evidence of NatWest's conduct after the last relevant transfer on September 25, 2003 – including transfers processed by NatWest to the 13 Charities after that date – does neither.  Even accepting plaintiffs' theory that "money is fungible," time is not, and it defies common sense to argue that a wire transfer or anything else NatWest did after an attack was "a substantial factor in the sequence of responsible causation" leading to that attack.  It similarly defies logic to argue that it would have been foreseeable to

NatWest when it processed a wire transfer on behalf of Interpal to one of the 13 Charities after the last attack on October 22, 2003 that it would thereby cause "as a natural consequence" attacks that had already occurred. Moreover, evidence is relevant to NatWest's scienter only if it tends to show that NatWest knew or was willfully blind to the fact that Interpal was funding Hamas at the time when NatWest engaged in the conduct that is alleged to have proximately caused plaintiffs' injuries – i.e., when NatWest processed the relevant transfers, ending on September 25, 2003. See Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 626 n.12 (E.D.N.Y. 2006) (dismissing as irrelevant allegations as to what NatWest knew after it had made relevant transfers). Evidence of NatWest's state of mind after that last relevant transfer is thus not relevant to plaintiffs' claims here.

Second, for these same reasons, evidence of NatWest's conduct or state of mind after September 25, 2003 also is not relevant to the "act of international terrorism" element of plaintiffs' claims. Evidence that post-dates the September 25, 2003 transfers does not tend to show that NatWest's conduct in processing the relevant transfers from Interpal's accounts to the 13 Charities "involved violence" or "endangered human life" and also exhibited an apparent intent to terrorize the Israeli government or population, as plaintiffs must prove to establish that NatWest's conduct meets the definition of "international terrorism" under § 2331(1). See 18 U.S.C. § 2333(a) (plaintiffs' injuries must be caused "by reason of" the "act of international terrorism").

Third, the probative value, if any, of evidence of NatWest's conduct or state of mind after the last relevant transfer would be substantially outweighed by the dangers of unfair prejudice and confusion. Most significantly, the jury is likely to use such evidence to engage in impermissible hindsight bias to conclude – irrationally – that NatWest knew or was willfully blind to facts that it only learned later. See Jeffrey J. Rachlinski, A Psychological Theory of Judging in Hindsight, 65 U. Chi. L. Rev. 571, 571-72 (1998) ("In hindsight, people consistently exaggerate what could have been anticipated in foresight. They not only tend to view what has happened as having been inevitable but also to view it as having appeared 'relatively inevitable' before it happened."). Moreover, allowing plaintiffs to introduce this evidence would lead to time-consuming mini-trials concerning irrelevant evidence that post-dates, often by many years, the last relevant transfer on September 25, 2003 and the attacks at issue. The Court need only refer to the considerable portion of the parties' Local Rule 56.1 Statements and summary judgment briefs addressing evidence and events after September 25, 2003 to anticipate how much time would be wasted at trial on these irrelevant issues.

Fourth, although NatWest's conduct and state of mind after September 25, 2003 is irrelevant, evidence post-dating September 25, 2003 could still be relevant to the extent it sheds light on NatWest's state of mind, or apparent intent, during the relevant period. For example, during the relevant period, NatWest represented to the Bank of England that it would continue to monitor Interpal's accounts going forward to ensure that payments were not being made to Hamas. Plaintiffs have alleged that NatWest's representation was false, that it already knew Interpal was funding Hamas and that NatWest had no good faith intention of continuing to monitor Interpal. Accordingly, evidence that, after the relevant period, NatWest in fact continued to diligently monitor Interpal's account is relevant to show that, contrary to plaintiffs' claims, NatWest's representation to the Bank of England during the relevant period was made in good faith and that NatWest really did not know or believe that Interpal was funding Hamas

6344872.1

during the relevant period, and that NatWest did not apparently intend to terrorize any population or government.  Accordingly, such limited post-relevant period evidence should be admitted, while other evidence post-dating September 25, 2003 should be excluded unless it is shown to be relevant to NatWest's state of mind during the relevant period.[12]

> 5.    **The Court Should Exclude Evidence That NatWest Closed, And Subsequently Reopened, The Accounts Of An Unrelated Customer, Friends Of Al-Aqsa**

The Court should exclude under FRE 402 and 403 evidence concerning NatWest's December 2004 closure, and subsequent January 2005 reopening, of the accounts of an unrelated customer, Friends Of Al-Aqsa ("FoAA").  Plaintiffs have argued that a negative inference should be drawn from the fact that, despite purported similarities between the risks posed by the FoAA and Interpal accounts, NatWest decided to close the former and not the latter.  Furthermore, and contradicting their first argument, plaintiffs have also argued that a negative inference should be drawn from NatWest's subsequent decision to reopen the FoAA account because (plaintiffs claim) the risks posed by those accounts had not changed.

First, this evidence is not relevant to plaintiffs' claims in these lawsuits, which are based on wire transfers NatWest processed for Interpal, not FoAA.  The fact that NatWest closed and reopened the accounts of a different customer, or its reasons for doing so, have no bearing on whether NatWest knew or was willfully blind to the fact that Interpal was funding Hamas,whether NatWest proximately caused plaintiffs' injuries by processing transfers on behalf of Interpal or whether NatWest's processing of transfers on Interpal's behalf involved "violence" or "danger to life" or was apparently intended to terrorize the Israeli government or population such that NatWest's conduct meets the definition of an "international terrorism" under § 2331(1).  Second, the probative value of this evidence, if any, is substantially outweighed by the dangers of unfair prejudice, confusion, and wasting time.  In response to plaintiffs' improper argument, the jury is likely to speculate why NatWest did not close the Interpal accounts when it did close the FoAA accounts, even though NatWest's conduct with respect to an unrelated customer has no bearing on what NatWest knew or whether it was willfully blind with respect to Interpal.  In order to avoid that speculation and the resulting unfair prejudice, NatWest will be forced to introduce evidence as to the reasons it closed and then reopened the FoAA accounts, which will be time-consuming and wasteful.

---

[12] Should the Court grant this motion, it need not reach NatWest's proposed motions D.5 through D.9, infra, as the evidence addressed in those proposed motions, which post-dates the relevant period and sheds no light on NatWest's state of mind or conduct during the relevant period, would necessarily be excluded.  Even if the Court denies this motion, however, it would still need to decide those other proposed motions because they address multiple separate reasons why such evidence should be excluded in addition to the reasons addressed by this proposed motion.

6.    **The Court Should Exclude Evidence That NatWest's Transfers To Some Of The 13 Charities On Behalf Of A Customer Other Than Interpal, Human Appeal International, Were Blocked In Israel After The Relevant Period**

The Court should exclude under FRE 402 and 403 evidence that NatWest's transfers to certain of the 13 Charities on behalf of its unrelated customer, Human Appeal International, were blocked in Israel after the relevant period.  <u>First</u>, this evidence is not relevant to NatWest's <u>scienter</u> because it has no bearing on whether NatWest knew or deliberately disregarded that Interpal was funding Hamas during the relevant period, which ended months before the transfers on behalf of Human Appeal International were blocked in Israel in June 2004.  Obviously, NatWest could not have known during the relevant period that transfers it would process on behalf of another customer to some of the 13 Charities nine months later would be blocked because those charities were designated in Israel.  <u>Second</u>, this evidence is not relevant to show whether NatWest's conduct during the relevant period constituted an "act of international terrorism," as defined in § 2331(1).

<u>Third</u>, this evidence should be excluded under FRE 403 because the unfair prejudice, jury confusion and waste of trial time this evidence would engender is substantially outweighed by any minimal probative value this evidence may have.  Although evidence of NatWest's state of mind after the last relevant transfer is not relevant to the <u>scienter</u> or apparent intent elements of plaintiffs' claims, there is a substantial risk that the jury will draw an improper conclusion from this evidence as to NatWest's <u>scienter</u> or apparent intent – not based on rational inferences from the evidence, but based solely on impermissible hindsight bias.  Moreover, it is likely that the jury, if presented with this evidence, will be confused as to its significance and attempt to rely on this evidence in evaluating the <u>scienter</u>, apparent intent and/or proximate cause elements of plaintiffs' claims, even though such evidence is patently irrelevant to all three.  Finally, because NatWest would need to introduce evidence concerning these blocked transfers and the steps it took in response in order to minimize (but not eliminate) the unfair prejudice this evidence would cause, introduction of this evidence would lead to a time-consuming sideshow.

7.    **The Court Should Exclude Evidence Of NatWest's Business Decision In 2005 Or 2006 To Begin Applying The OFAC List To Its Global Operations**

The Court should exclude under FRE 402 and 403 evidence and argument concerning NatWest's business decision in 2005 or 2006 to begin applying the OFAC sanctions list to its global operations.  Although Interpal was designated as an SDGT by OFAC on August 21, 2003, it is undisputed that this designation did not apply to NatWest's banking relationship with Interpal in the UK, and that, in the UK, Interpal remained a lawful registered charity, as it does to this day.  Nonetheless, plaintiffs have indicated that they will introduce evidence of NatWest's subsequent business decision "in 2005 or 2006" to apply the OFAC list to its global operations, and argue that NatWest decided nonetheless to maintain the Interpal accounts following this decision because they were "highly lucrative" and because "the profits that the Bank derived from its relationship with Interpal were never far from [NatWest] employees' minds."

First, this evidence is not relevant to whether NatWest conduct's in providing routine financial services to Interpal satisfies the definition of "international terrorism" under § 2331(1) or to NatWest's scienter, including because the decision to begin applying the OFAC list globally was made well after the time period relevant to these lawsuits.  Nor does NatWest's subsequent business decision somehow change the fact that OFAC's August 21, 2003 designation of Interpal did not apply to NatWest outside of the U.S.  Second, the probative value of this evidence, if any, is substantially outweighed by the dangers of unfair prejudice, confusion and wasting time.  If the jury receives this evidence, it is likely to speculate why NatWest would not have applied the OFAC list to its global operations sooner, and why it would continue to maintain the Interpal accounts after it decided to apply the OFAC list to its global operations, even though both are irrelevant.  To combat this speculation and unfair prejudice, NatWest would need to introduce evidence explaining its business decision years after the relevant period to apply the OFAC list globally, and its separate business decision to nonetheless maintain the Interpal accounts, all of which would be a waste of time.

## 8.   The Court Should Exclude Evidence Regarding NatWest's Closing Of Interpal's Accounts In 2007

The Court should exclude under FRE 402, 403 and 407 evidence and argument concerning NatWest's closing of Interpal's accounts in March 2007.  Plaintiffs apparently intend to argue that "NatWest intentionally made the choice not to exit the relationship with Interpal until 2007" and "closed [Interpal's accounts] only after Judge Sifton denied its motion to dismiss" in these lawsuits.

First, the timing and reasons for NatWest's closure of the Interpal accounts are not relevant because that closure occurred years after the relevant period, and thus has no bearing on NatWest's state of mind at the time of the relevant transfers that plaintiffs allege caused their injuries, is not part of the causal chain on which plaintiffs' claims are based and does not tend to show that NatWest's processing of the relevant transfers meets the definition of "international terrorism" under § 2331(1).  Second, even if this evidence were marginally probative – and it is not – the dangers of unfair prejudice to NatWest far outweigh that minimal probative value, and thus the Court should still exclude it under FRE 403.  Third, to the extent plaintiffs intend to argue that NatWest's closure of the Interpal accounts is a "measure[] . . . that would have made [their] earlier injur[ies] or harm less likely to occur," then evidence of the account closing is inadmissible under FRE 407 to prove NatWest's "culpable conduct."

## 9.   The Court Should Exclude The 2009 Charity Commission Report Concerning Interpal

The Court should exclude under FRE 402 and 403 the 2009 Charity Commission report concerning Interpal.  First, because it was issued six years after the time period relevant to these lawsuits, the 2009 Charity Commission report is plainly irrelevant to the scienter, proximate causation and "act of international terrorism" elements of plaintiffs' claims, which must be assessed as of the relevant time and not six years later.  Plaintiffs have nonetheless argued that the 2009 Charity Commission report is relevant in two ways:  (1) to show that the Charity Commission's earlier investigation into Interpal in 2003, during the relevant time period, was "limited in scope" and somehow elided the issue of whether Interpal was funding Hamas-

controlled charities; and, (2) relatedly, to show that, prior to the Charity Commission's 2009 report, the Charity Commission in fact tolerated Interpal's support for Hamas.  But neither of these propositions is supported by any evidence, and instead they rely entirely on plaintiffs' mischaracterizations, and thus the 2009 Charity Commission report is not relevant.

Second, the probative value, if any, of the misleading inferences plaintiffs wish to present to the jury from the 2009 Charity Commission report are substantially outweighed by the dangers of unfair prejudice to NatWest and of creating a confusing and time-consuming sideshow.  For example, plaintiffs appear to be relying on the hearsay accusations that Interpal indirectly supported the ideology or activities of Hamas that were made in a BBC television program that prompted the Charity Commission's 2009 report, even though, in that report, the Charity Commission rejected those allegations.  Even worse, disclosing the 2009 Charity Commission report to the jury in support of plaintiffs' misrepresentations cited above would cause unfair prejudice to NatWest because of hindsight bias, which would be particularly egregious because the 2009 report discusses evidence that NatWest did not have, including materials provided by the Israeli government.  And the jury may improperly speculate that NatWest should have known about the facts underlying the Charity Commission's irrelevant criticisms of Interpal and its trustees.  In order to combat that speculation, NatWest would need to present contrary evidence, demonstrating that plaintiffs are misrepresenting the 2009 report, which would waste time.

10. **The Court Should Preclude Plaintiffs From Arguing That The Recommendations By The FATF Are Relevant To NatWest's Conduct In Relation To Interpal**

The Court should preclude plaintiffs under FRE 402 and 403 from arguing that the recommendations by the Financial Action Task Force ("FATF") are relevant to NatWest's conduct in relation to Interpal.  FATF is an inter-governmental body whose purpose is to "set standards and promote effective implementation of legal, regulatory and operational measures for combating money laundering, terror financing and other related threats to the integrity of the international financial system."  It makes recommendations to the nations of the world for them to adopt national legislation and regulations to combat money laundering and terror financing. These recommendations are not directed at private banks, and are not legally binding on banks unless and until they are adopted as part of the national laws and regulations by which these banks are governed.  For this reason alone, the FATF recommendations are not relevant to the jury's evaluation of NatWest's conduct in these cases.   Further, even if the FATF recommendations were binding on NatWest (and they are not), any deviation by NatWest from those recommendations would, at most, establish NatWest's negligence, but that is irrelevant because plaintiffs must prove that NatWest acted with scienter and that its conduct involved "violence" or "danger to life" and was apparently intended to terrorize the Israeli government or population.  For the same reason, even if the FATF recommendations had any probative value, that would be substantially outweighed by the danger of unfair prejudice to NatWest due to the risk that the jury would consider plaintiffs' arguments that NatWest deviated from those recommendations in evaluating NatWest's scienter and whether its conduct meets the definitional requirements of § 2331(1), and thereby tend to treat this as a negligence case, rather than one based on actual knowledge or willful blindness and in which plaintiffs also must prove NatWest acted with the apparent intent to coerce a population or government.  Introduction of this evidence would also create a confusing and time-wasting sideshow, as NatWest would then

56

need to introduce evidence to explain the purpose of these recommendations, *i.e.*, that they are directed to national governments and not to banks such as NatWest, and that they were not binding on NatWest to the extent they were not reflected in legislation in the UK during the relevant time.

> 11. **The Court Should Exclude Evidence Concerning The 2002 And 2010 Settlements Between RBS/NatWest And The UK Financial Services Authority, And The 2013 Settlements Between RBS And U.S. Regulators Concerning Violations Of Sanctions Against Sudan, Iran, Burma And Cuba**

The Court should, under FRE 402, 403, 404(b), 408, 410 and 802, preclude plaintiffs from presenting evidence or arguments concerning the 2002 and 2010 settlements between The Royal Bank of Scotland plc ("RBS") or NatWest and the UK Financial Services Authority (the "FSA Settlements"), and the 2013 settlements between NatWest's parent company, RBS, and U.S. regulators (the "U.S. Settlements" and together with the FSA Settlements, the "Settlements"). The FSA Settlements, respectively, resolved allegations that for a short period in 2002 RBS failed to live up to anti-money laundering ("AML") standards and, for a period of time in 2007 and 2008, NatWest failed to properly filter transactions against the UK sanctions list, until NatWest identified this problem and addressed it. The U.S. Settlements resolved accusations that certain transactions processed through the U.S. for the benefit of sanctioned Sudanese, Cuban, Burmese and Iranian entities violated the International Emergency Economic Powers Act, the Trading With the Enemy Act and various state and federal regulations. Each of the Settlements contains a statement of the factual allegations on which it is based. Neither these factual allegations, nor the fact that NatWest or RBS entered into the Settlements, is admissible for any purpose in these lawsuits against NatWest.

First, the Settlements are irrelevant to plaintiffs' claims against NatWest here. The Settlements do not refer to the banking services that NatWest provided to Interpal, and those services were not the subject of any civil or criminal accusations or charges by federal or state authorities, despite the fact that most of the Settlements were entered into years after plaintiffs filed these lawsuits. Moreover, none of the transactions described in the Settlements involved any alleged violations of the ATA or any funding of Hamas or any other FTO, SDGT or other terrorist or terrorist group. Instead, all of the transactions described in the U.S. Settlements were processed for the benefit of entities from or linked to sanctioned countries, including Sudan, Cuba, Burma and Iran. The FSA Settlements concern irrelevant conduct concerning AML obligations and conduct occurring between December 15, 2007 and December 31, 2008, long after the period relevant to these lawsuits.

Second, because NatWest is not a party to the U.S. Settlements, it did not make any statement in those settlements that could qualify as a party admission under FRE 801(d)(2)(A). Nor did RBS – over which NatWest exercises no control – enter into the Settlements as NatWest's agent such that RBS's statements could be considered "vicarious admissions" of NatWest. See FRE 801(d)(2)(D); Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537–38 (2d Cir. 1992) (vicarious admission requires showing of agency relationship); In re Parmalat Sec. Litig., 501 F. Supp. 2d 560, 588 & n. 149 (S.D.N.Y. 2007) (agency relationship requires showing

of control).   Accordingly, when used against NatWest, the U.S. Settlements are inadmissible hearsay.

Third, the U.S. Settlements do not fall within any hearsay exception.   FRE 803(22) provides an exception for "final judgment[s] of conviction," but none of the U.S. Settlements resulted in a conviction.  FRE 803(8) provides an exception for "factual findings from a legally authorized investigation" (emphasis added), but the U.S. Settlements contain only factual allegations that were not even admitted by RBS).

Fourth, even if the Settlements were relevant and were not inadmissible hearsay, they still would be inadmissible under FRE 408 and 410.   Consistent with the policy of promoting settlements, including consent orders and other settlements with government agencies, FRE 408 prohibits the admission of the Settlements "to prove [the] underlying facts of liability." United States v. Gilbert, 668 F.2d 94, 97 (2d Cir. 1981).   Moreover, the Settlements are also the functional equivalent of a plea of nolo contendere, which is inadmissible for any reason under FRE 410.  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893–94 (2d Cir. 1976).

Fifth, the Settlements are inadmissible under FRE 403 because the unfair prejudice, confusion and waste of trial time that would be caused by the introduction of evidence concerning them vastly outweighs any probative value they might have (of which there is none). There is a substantial risk that the jury will conflate the transactions and other conduct that are the subject of the Settlements with the transactions and other conduct that is at issue in these lawsuits, and will thus be improperly influenced by the contents of the Settlements and the conduct underlying them in rendering a verdict in these lawsuits.   Moreover, if the Settlements were received in evidence, NatWest would need to devote substantial additional time at trial to explaining to the jury – through numerous additional witnesses and documents – the transactions underlying the Settlements, the laws and regulations that are the subject of the Settlements and the settlements themselves, in order to refute any contention that these matters have any bearing on plaintiffs' allegations in these lawsuits.   The result would be a separate, time-wasting mini-trial on the facts of irrelevant settlements.

Finally, the Settlements and the transactions underlying them also are inadmissible under Rule 404(b), which bars "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of the person in order to show action in conformity therewith."  Plaintiffs will rely on these matters in an attempt to show that, because NatWest committed irrelevant sanctions violations, it is somehow more likely that NatWest knowingly provided material support to Hamas, as plaintiffs allege here.  FRE 404(b) forbids this sort of "propensity to violate the law" evidence.

## E.    INADMISSIBLE TESTIMONY BY PLAINTIFFS' EXPERTS

### 1.    The Court Should Exclude Testimony By Plaintiffs' Proposed Expert Gary Walters

The Court should exclude the testimony of Gary Walters in its entirety under FRE 702. First, Walters is unqualified to express the opinions he purports to give in these lawsuits. Walters is a retired police officer in the London Metropolitan Police Service who never once investigated suspicions of terror financing, and who has never worked at a bank.   Nevertheless,

plaintiffs have proffered Walters to describe "the architecture of U.K. bank compliance and risk-management functions" during the relevant period and to express his purported expert opinions that NatWest's disclosures to the UK government (and the "operation of [NatWest]'s compliance and risk-management units") in this case were deficient and somehow impeded the UK government's ability investigate whether Interpal was engaged in terror financing.  Walters's complete lack of qualifications to offer these opinions requires that they be excluded.  See, e.g., Restivo v. Hessemann, 846 F.3d 547, 578 (2d Cir. 2017) (upholding exclusion of opinions from "accomplished statistician" regarding forensic science and other areas "clearly outside [his] area of expertise.").

Second, Walters's opinions would be impermissible for even a qualified expert to give. Specifically, Walters purports to opine that NatWest somehow turned a blind eye to purported suspicions about Interpal, for example by stating that "[i]n the face of increasing red flags, I believe that the Defendant began to manipulate the process to maintain the account."  Courts routinely strike such purported expert testimony about a corporation's state of mind because "[t]he question of intent is a classic jury question and not one for experts."  In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).  To the extent Walters does not opine as to NatWest's state of mind, his opinion addresses the entirely irrelevant issue of whether NatWest could have done more to facilitate the UK government's investigation of Interpal.  But this is not a negligence case, and so Walters's subjective and unreliable opinion that NatWest could have done more will not "help the trier of fact understand the evidence or to determine a fact in issue," as required by FRE 702.  Moreover, and particularly because Walters lacks any expertise in the matters he purports to address, his opinions are based on nothing more than his lay interpretation of straightforward materials, such as when he (erroneously) states that he has "not seen" or "not identified" any evidence that NatWest followed up on certain suspicions, which Walters then uses as the basis for his opinions that NatWest "could have done more."  Plaintiffs should not be permitted to have Walters, in the guise of an "expert" witness, "become a vehicle for a factual narrative that simply accumulates and puts together pieces of a factual story."  Travelers Indem. Co. v. Northrop Grumman Corp., No. 12 CIV 3040 KBF, 2014 WL 464769, at *3 (S.D.N.Y. Jan. 28, 2014).

Third, Walters's opinions are both subjective and riddled with errors, and accordingly do not satisfy FRE 702's reliability requirement that is applied in this Circuit, pursuant to the Supreme Court's seminal rulings in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999).  Specifically, the gravamen of Walters's proposed expert testimony is that NatWest, rather than "operate[] the Interpal accounts as expected," committed "major deviations" or "significant deviations" from such expectations. But Walters conceded at his deposition that these terms are based on no objective criteria and thus are purely subjective to him.  See Nimely v. City of N.Y., 414 F.3d 381, 399 (2d Cir. 2005) (finding reversible error in admission of expert testimony rooted in "unverifiable subjectivity"). Moreover, Walters's opinion as to what was "expected" of NatWest derives from standards promulgated by the FATF and similar international bodies that were not binding on UK banks during the relevant period.  Finally, although Walters's opinions rest on his conclusion that NatWest failed to disclose what he describes as 15 "red flags" about Interpal, he conceded in his deposition testimony that 13 were either known to UK law enforcement because of NatWest's disclosures or were matters of public knowledge, and Walters could not explain why the last two were even "red flags" at all.  See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266

(2d Cir. 2002) ("<u>Daubert</u> and Rule 702 mandate the exclusion of [] unreliable opinion testimony.").

2.      **The Court Should Exclude Testimony By Plaintiffs' Proposed Expert Clive Walker**

The Court also should exclude the testimony of Clive Walker in its entirety under FRE 702.  <u>First</u>, much like Walters, Walker is unqualified to express the opinions included in his report in these lawsuits.  Walker is a professor of criminal justice in the UK who focuses his academic work on terrorism.  That, however, is not the subject of the opinions he purports to give here.  In particular, Walker purports to rebut two of the experts presented by NatWest and whose testimony will help the jury understand the legal, regulatory and factual context in which NatWest operated during the relevant time by drawing on their relevant experience and expertise to describe the UK Charity Commission and UK banking laws, respectively.  But unlike the experts presented by NatWest who address these topics, it is undisputed that Walker has <u>zero</u> relevant experience or specialized knowledge concerning either the Charity Commission or UK banking laws.  Walker's purported expert testimony should be excluded for this reason alone.  <u>See, e.g.</u>, <u>Restivo</u>, 846 F.3d at 578.

<u>Second</u>, Walker's purported expert testimony should be excluded for the additional and related reason that he does not draw on any "specialized knowledge" that "will help the trier of fact understand the evidence or to determine a fact in issue," as required by FRE 702.  Indeed, he has no "specialized knowledge" regarding the subjects he purports to address in his report.  Walker's conclusions are instead based on non-expert inferences he purports to draw from reading selected statutes, regulations and other publicly available sources, and after speaking with plaintiffs' counsel, rather than being based on an independent review of the evidence in these lawsuits.  Walker's "opinions" are thus nothing more than, at best, plaintiff's jury arguments, which FRE 702 forbids Walker from making from the witness stand in the guise of a qualified expert, which – in any event – he is not.  <u>See</u> <u>In re Rezulin</u>, 309 F. Supp. 2d at 541 (experts may not "testify about lay matters which a jury is capable of understanding and deciding without the expert's help").

<u>Third</u>, Walker's purported expert analysis does <u>not</u> have any basis other than Walker's <u>ipse dixit</u>, and therefore also does not satisfy FRE 702's reliability requirement.  The crux of his proposed testimony is that there is a distinction between "green light" and "red light" regulators, and that the Charity Commission is in the former category.  But Walker admits that he created this construct of "green light" versus "red light" regulators for these lawsuits, and is unable to identify any authority that has ever applied those terms.  This invented construct is thus wholly subjective and is not derived from any objective criteria that are commonly accepted, peer reviewed or verifiable in any manner.  That alone makes his opinion that the Charity Commission is a supposed "green light" regulator unreliable.  Even worse, Walker's opinion that the Charity Commission is a "green light" regulator is contradicted by the evidence, which confirms that the Charity Commission possesses the characteristics of a "red light" regulator, as even Walker defines that term.  In short, Walker's opinions are based on an entirely idiosyncratic <u>ipse</u> <u>dixit</u> "methodology" that presupposes the conclusion he wishes to reach, and are inadmissible.

60

3.      **The Court Should Exclude Testimony By Plaintiffs' Proposed Expert Evan Kohlmann**

The Court should exclude the testimony of Evan Kohlmann in its entirety under FRE 702.  The Court has already ruled that the second category of Kohlmann's proposed testimony disclosed in plaintiffs' witness list – "whether Hamas issued official public claims of responsibility for the attacks giving rise to the Plaintiffs' injuries" – is inadmissible because Kohlmann is "simply repeating hearsay evidence without applying any expertise whatsoever." 2013 Strauss SJ Op. at 48-50 (citation omitted); see also 2017 SJ Op. at 13-14.  The Court should now rule that the first category of Kohlmann's proposed testimony – concerning "Hamas's primary websites and internet forums during the relevant period, setting forth their provenance and explaining Hamas's strategy and practice in using them, particularly with respect to claiming credit for terrorist attacks the it has committed" – also is inadmissible for the same reason. Based on the disclosures in Kohlmann's expert report, this "background" testimony would only provide: (1) irrelevant information regarding Hamas's historical internet presence; and (2) a recitation of hearsay published online regarding Hamas's hierarchy and operations.  Testimony about neither subject is admissible.

First, the jury has no reason to consider the evolution of any internet sites that may be affiliated with Hamas, as the result of the Court's rulings that the contents of those websites are inadmissible hearsay.  See 2013 Strauss SJ Op. at 55; 2017 SJ Op. at 17.  Because the websites will not be before the jury, Kohlmann's purported opinions as to how Hamas uses those websites would not "help the [jury] to understand the evidence or to determine a fact in issue," FRE 702, as is required for them to be admissible – and, to the contrary, would only serve to confuse the jury and waste time.

Second, Kohlmann's proposed testimony regarding the structure and operations of Hamas should be excluded for the same reason that the Court excluded his opinions on Hamas's internet claims of responsibility for attacks:  Kohlmann merely regurgitates facts he claims to have read online about this subject, without adding any expertise.   Indeed, Kohlmann has admitted that he has performed no field work concerning Hamas, and all of the "opinions" he proposes to offer at trial are based solely on reading various materials on the internet.

4.      **The Court Should Exclude Testimony By Plaintiffs' Proposed Expert Ronni Shaked**

The Court should exclude the testimony of Ronni Shaked in its entirety under FRE 702. The Court has already excluded most of Shaked's proposed testimony, which purports to attribute responsibility for the attacks at issue to Hamas, because it merely summarizes straightforward factual materials, in violation of the rule that expert testimony "cannot be used to establish basic facts in the first place."  2017 SJ Op. at 12-13; 2013 Strauss SJ Op. at 46-48.  Of the six categories of Shaked's proposed testimony disclosed in plaintiffs' witness list, this ruling excludes the first two.  The fourth category, concerning a purported "comparative analysis," is an improper attempt to recast Shaked's already rejected opinions as admissible expert analysis when, as the Court has already correctly ruled, it is not.  First, the Court has already ruled that the majority of the materials that Shaked addresses in his expert reports – video "wills," newspaper reports and Hamas claims of responsibility – are inadmissible hearsay, and thus

6344872.1

Shaked cannot offer any admissible testimony about those materials. <u>Second</u>, the Court should also preclude Shaked from testifying about the materials he cites in his expert reports that the Court has ruled are admissible (<u>e.g.</u>, court convictions). In his reports, Shaked merely summarizes and quotes from these materials, which the jury can read as easily as Shaked can, and Shaked offers no expertise that would help the jury to understand them. <u>See</u> <u>United States v. Mejia</u>, 545 F.3d 179, 194 (2d Cir. 2008) (instructing that "material well within the grasp of the average juror" must be presented via documentary proof and other factual evidence, rather than expert testimony).

The Court also should exclude the remaining three categories of Shaked's proposed testimony. The third category – concerning the methods of Israeli law enforcement in attributing attacks to terrorist organizations – is not disclosed in the reports Shaked submitted in these lawsuits, and thus he may not testify to such opinions at trial. <u>See</u> FRCP 26(a)(2)(B) (expert report must contain "complete statement of all opinions the witness will express and the basis and reasons for them"). To the extent they are disclosed in Shaked's reports, the fifth and sixth categories – concerning the "infrastructure" and "organization" of Hamas – are not relevant.

> **5.      The Court Should Exclude Documents That Plaintiffs Previously Disclosed Would Be Authenticated By Their Purported "Authentication" Expert, Shaul Naim, Who Plaintiffs Have Not Identified As A Trial Witness**

The Court should exclude under FRE 901 and 902 the documents that plaintiffs previously disclosed would be authenticated by Shaul Naim, whom plaintiffs proffered to authenticate various Israeli court and police documents, but whom plaintiffs have not identified as a witness they may call at trial. <u>First</u>, without a witness to testify about these documents, plaintiffs cannot authenticate them under FRE 901. <u>Second</u>, the vast majority of these documents are not self-authenticating under FRE 902. FRE 902(3) states that a "foreign public document" is self-authenticating only when it is: (1) "signed or attested by a person who is authorized by a foreign country's laws to do so" and (2) "accompanied by a final certification that certifies the genuineness of the signature and official position of the signer." Although, in limited circumstances, foreign public documents may be deemed "presumptively authentic" in the absence of a certification (the second requirement noted above), in no circumstances may the Court excuse plaintiffs from meeting the first requirement, that the document be executed or attested to by an authorized official. <u>See</u> <u>United States v. Perlmuter</u>, 693 F.2d 1290, 1293 (9th Cir. 1982) (district court abused its discretion in admitting under FRE 902(3) records relating to defendant's criminal history in Israel that were not "executed or attested by a person who is acting in an official capacity and who is authorized by the laws of that country to make the attestation or execution."). Notwithstanding this rule, the vast majority of purportedly foreign public documents disclosed in plaintiffs' exhibit list do not meet either requirement of this Rule. Moreover, the limited circumstances in which the final certification requirement may be excused – if "all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy," and plaintiffs demonstrate "good cause," FRE 902(3) – do not apply here. An expert presented by NatWest, Moshe Azoulay, an Israeli lawyer, made repeated requests to Israeli courts and police for copies of these documents so that he could attempt to independently verify their authenticity, but his requests were largely ignored, and the documents he did receive differed substantially from the documents plaintiffs produced and those which

6344872.1

Naim has stated he received from plaintiffs' counsel.  Because plaintiffs have not "advance[d] facts explaining [their] inability to obtain certification from one of the officials specified in the rule," they have failed to establish "good cause."  United States v. Yousef, 175 F.R.D. 192, 194 (S.D.N.Y. 1997).  Thus, the documents do not meet FRE 902's requirements for authentication, and the Court therefore should exclude them.

6.      **The Court Should Exclude Inadmissible Hearsay That Is Disclosed In The Expert Reports Of Plaintiffs' Proposed Experts Matthew Levitt And Arieh Spitzen**

The Court should, under FRE 702 and 703, preclude plaintiffs' proposed experts Matthew Levitt and Arieh Spitzen, who purport to offer opinions concerning the relationship between the 13 Charities and Hamas, from improperly summarizing factual evidence that is not in the record or transmitting inadmissible evidence to the jury.  First, as the Court has already ruled with respect to the proposed expert testimony of Shaked and Kohlmann, while FRE 702 permits experts to use their expertise to explain relevant "background" to the jury or to help the jury "put factual evidence in context," expert testimony may not be used as a shortcut to prove basic facts in the first place.  See Mejia, 545 F.3d at 190; 2013 Strauss SJ Op. at 47-50; 2017 SJ Op. at 13.  Despite this well-established rule, however, both Levitt's and Spitzen's expert reports contain lengthy recitations of basic facts that plaintiffs contend show that the 13 Charities are alter egos of or controlled by Hamas.  Because the jury is capable of understanding these facts for itself, if these facts were supported by admissible evidence, FRE 702 does not permit Levitt and Spitzen to testify about them.

Second, although experts may rely on inadmissible hearsay to form their opinions "[i]f experts in the particular field would reasonably rely" on such materials, that does not permit the experts to transmit such hearsay to the jury unless "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  FRE 703.  Here, both Levitt and Spitzen heavily rely on inadmissible hearsay – such as the contents of websites and exhibits and testimony from other litigation – which they quote extensively in their expert reports.  Whatever minimal probative value these materials might have in helping the jury to evaluate Levitt's and Spitzen's opinions, that minimal value is outweighed by the unfair prejudice to NatWest, which will be unable to cross-examine the sources of the out-of-court statements that Levitt and Spitzen summarize, or otherwise fairly impeach the grounds for those statements.

7.      **The Court Should Exclude Levitt's And Spitzen's Conclusions That The 13 Charities Are "Controlled" By Hamas**

The Court should, under FRE 702 and 703, preclude plaintiffs' proposed experts Matthew Levitt and Arieh Spitzen from offering opinions that the 13 Charities are alter egos of or controlled by Hamas, and from using synonymous terminology that suggests Levitt and Spitzen are offering legal conclusions on this subject.  Although the Court has ruled that Levitt and Spitzen may offer opinions concerning the 13 Charities that plaintiffs contend will be sufficient to permit a jury to conclude that the 13 Charities are alter egos of or controlled by Hamas, the Court cannot permit Levitt and Spitzen to state any such conclusion themselves, as they did repeatedly in their respective expert reports.  That is because such a conclusion is not an

6344872.1

appropriate subject for expert testimony, but rather is for the jury to consider by applying Levitt's and Spitzen's expert testimony to the legal instructions that the Court will provide, which will define the legal requirements for proving the existence of an <u>alter</u> <u>ego</u> or control relationship between two entities.  <u>See</u> 2013 <u>Strauss</u> SJ Op. at 42 (noting that expert testimony may not "intrud[e] on the exclusive fact finding province of the jury or the legal determinations of the court.").

Upholding this rule will be particularly important here, for three reasons.  <u>First</u>, both Levitt and Spitzen have confirmed that the definitions of <u>alter</u> <u>ego</u> and "control" they applied in reaching their conclusions are not the same as the legally binding definitions that the Court will provide to the jury.  <u>Second</u>, whether the 13 Charities were indeed Hamas <u>alter</u> <u>egos</u> of or controlled by Hamas, or whether instead they were merely Hamas "supporters" or "affiliates," is a critical legal question in light of the Second Circuit's decision in <u>Al Rajhi</u>, 714 F.3d 118.  As <u>Al Rajhi</u> establishes, plaintiffs cannot prove their direct transfer-based theory of proximate causation unless they can prove that Interpal's transfers effectively were made <u>directly</u> to Hamas itself, based on plaintiffs' claim that the 13 Charities are <u>alter</u> <u>egos</u> of or controlled by Hamas, and were not merely "supporters" or "affiliates" of Hamas.  <u>Third</u>, a jury is likely to give these experts' ultimate conclusions about the 13 Charities undue weight because plaintiffs will present no fact witnesses to address the status of the 13 Charities.  <u>See</u> <u>Nimely v. City of N.Y.</u>, 414 F.3d 381, 397 (2d Cir. 2005) (FRE 403 must play a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations.").

### 8.   The Court Should Exclude Testimony By Levitt and Spitzen About Alleged Support For Hamas Terrorism By Charities, Including The 13 Charities

The Court also should, under FRE 402, 403 and 702, preclude Levitt and Spitzen from offering any opinions or other testimony regarding support for Hamas terrorism that allegedly is provided by Hamas's "da'wa" (or "Hamas charities") generally, or by the 13 Charities specifically, separate and apart from the opinions Levitt and Spitzen propose to offer about characteristics of the 13 Charities on the basis of which plaintiffs will contend that the 13 Charities are <u>alter</u> <u>egos</u> of or controlled by Hamas, in an attempt to establish the proximate causal chain of direct support for Hamas by Interpal on which plaintiffs rely in these lawsuits.

<u>First</u>, the Court should exclude testimony by Levitt and Spitzen about charities other than the 13 Charities, or about "Hamas charities" generally.  Both Levitt and Spitzen make numerous broad statements in their respective reports regarding the support that purported "Hamas charities" in general provide to Hamas's terrorist activities, including many charities that are not among the 13 Charities.  For example, Levitt proposes to opine in these lawsuits that "Hamas charities" generally finance or participate in terrorist attacks, including by supplying chemicals for bombs or providing safe haven for fugitive terrorists.  But this evidence is not relevant, because plaintiffs have conceded they have no evidence that any of the 13 Charities themselves financed or participated in any of the attacks at issue; therefore plaintiffs have undertaken to prove – and must at a minimum prove to prevail – that the 13 Charities are <u>alter</u> <u>egos</u> of or controlled by Hamas in order to satisfy the ATA's proximate causation requirement.  Further, even if testimony by Levitt and Spitzen about <u>other</u> charities' purported support for Hamas had

any probative value (as it does not), that would be substantially outweighed by the danger of unfair prejudice to NatWest, particularly because this evidence is inflammatory and will invite the jury to speculate, without any basis, that the 13 Charities engaged in similar conduct.

Second, the Court also should exclude Levitt's and Spitzen's proposed testimony regarding the 13 Charities' alleged support for Hamas terrorism, including their purported expressions of radical Islamist ideology, anti-Israel sentiment, glorification of "martyrdom" and purported youth "indoctrination."  This testimony is not relevant to plaintiffs' showing that the 13 Charities are alter egos of or controlled by Hamas.  At most, it might be relevant to show that the 13 Charities were supporters of Hamas, but under the Second Circuit's ruling in Al Rajhi, 714 F.3d 118, that would not be sufficient to satisfy plaintiffs' "direct transfer" theory of proximate causation, even if it were true.  In addition, this proposed testimony also is not relevant to the "act of international terrorism" element of plaintiffs' claims because it does not show that the 13 Charities themselves participated in the attacks at issue, which plaintiffs must show, at a minimum, in order to prove that NatWest, by processing transfers from Interpal's accounts to the 13 Charities, itself committed an act of international terrorism by knowingly and intentionally funding the attacks.  See Linde, 2018 WL 797454, at *5, 8.  Moreover, the probative value of this evidence (if any) would be substantially outweighed by the danger that it would offend and enrage the jury, and thus unfairly prejudice NatWest.  Furthermore, due to the highly politicized nature of this evidence, placing it into an appropriate context would require an extensive and confusing sideshow concerning the complexities of the Israeli-Palestinian conflict, which would yield little (if anything) of probative value.  Thus, even if this evidence were relevant (as it is not), it should be excluded under FRE 403.

Third, a separate and independent defect in this proposed testimony by Levitt and Spitzen concerning the 13 Charities' purported support for Hamas terrorism is that both proposed experts rely for this testimony on their own conclusions as to what various persons and entities supposedly thought or believed.  For example, both propose to tell the jury why Hamas as an organization "prized" "its" charities and what motivates suicide bombers and their families.  None of these opinions is a proper subject for expert testimony, as plaintiffs conceded in their lawsuits against Arab Bank, in which the court excluded "opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person," because such evidence "'lies outside the bounds of expert testimony.'"  Linde v. Arab Bank, PLC, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) (quoting Rezulin, 309 F. Supp. 2d at 547).  The Court should exclude these opinions here as well.

Fourth, these opinions by Levitt and Spitzen also are largely unsupported ipse dixit and/or are contradicted by the sources on which Levitt and Spitzen rely.  For example, one of the principal opinions disclosed in Levitt's report is that funds given to purported Hamas social service organizations "free up" money for terrorism because Hamas "mingles" funds for social, political and military activities.  But these claims not only are unsupported by any of the sources on which Levitt purports to rely, but also they are contradicted by Levitt's deposition testimony that Hamas has no central repository from which it funds military, political and social programs. See Amorgianos, 303 F.3d at 266 (stating that FRE 702 "mandate[s] the exclusion" of opinions for which an expert provides no support).  In a belated effort to shore up support for some of his ipse dixit statements at his deposition, Levitt repeatedly referenced his prior work for the U.S. government as a basis for those statements, despite earlier testifying (and writing in his report)

65

that none of his opinions are based on his government experience.  Worse still, when counsel for NatWest asked Levitt follow-up questions in order to test whether his government experience truly provides him with a basis for these opinions, Levitt refused to answer those questions, claiming that the highly confidential nature of his government work prevented him from responding.  Obviously, Levitt (and plaintiffs who have proffered him) cannot have it both ways, relying on information he purportedly learned as a government employee, and then refusing to answer questions concerning that subject.  See Gill v. Arab Bank, 893 F. Supp. 2d 523, 541 (E.D.N.Y. 2012) (excluding experts whose testimony was based on "information . . . likely obtained secretly in [their] official position and would not be subject to effective cross-examination.").

Fifth, none of the facts recited by either Levitt or Spitzen in support of their opinions that the 13 Charities supported Hamas terrorism was known to NatWest at the time it processed transfers to those charities on behalf of Interpal.  For this reason alone, whatever minimal probative value such evidence may have, it is substantially outweighed by the risk of unfair prejudice to NatWest, including the risk that the jury will improperly consider this evidence in evaluating NatWest's scienter and whether NatWest's provision of routine financial services to Interpal constituted "act[s] of international terrorism" as defined in § 2331(1), to which this testimony is unquestionably irrelevant.

6344872.1

Dated: March 8, 2018

Respectfully submitted,

OSEN LLC

By: */s/ Gary M. Osen*

Gary M. Osen
Ari Ungar
2 University Plaza, Suite 402
Hackensack, New Jersey 07601
Tel: (201) 265-6400

- and -

*/s/ Shawn P. Naunton*
ZUCKERMAN SPAEDER LLP
Aitan D. Goelman
Shawn P. Naunton
Anant Kumar
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: (646) 746-8655

- and -

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Tel: (501) 791-2277

- and -

KOHN SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700

*Attorneys for the Weiss Plaintiffs*

6344872.1

SAYLES WERBNER

By:  */s/ Mark Werbner*

Mark Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Tel: (214) 939-8700

- and -

STONE BONNER & ROCCO LLP
James P. Bonner
Stone Bonner & Rocco LLP
1700 Broadway, 41st Floor
New York, NY 10019
Tel: (212) 239-4340

- and -

HEIDEMAN NUDELMAN & KALIK, PC
Richard D. Heideman
Noel J. Nudelman
1146 19th Street, NW #500
Washington, DC 20036
Tel: (202) 463-1818

*Attorneys for the Applebaum Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:  */s/ Lawrence B. Friedman*

Lawrence B. Friedman
Jonathan I. Blackman
Rishi Zutshi
Avram E. Luft
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Defendant National Westminster Bank, plc*

6344872.1