# Exhibit 4

317

```
 1   UNITED STATES DISTRICT COURT
 2   EASTERN DISTRICT OF NEW YORK
     ---------------------------------x
 3   TZVI WEISS, et al.,
 4            Plaintiffs,
 5       -against-
 6   NATIONAL WESTMINSTER BANK, PLS,
 7            Defendant.
     ---------------------------------x
 8   NATAN APPLEBAUM, et al.,
 9            Plaintiffs,
10       -against-
11   NATIONAL WESTMINSTER BANK, PLC.,
12            Defendant.
     ---------------------------------x
13
14
              * HIGHLY CONFIDENTIAL *
15
16
           CONTINUED VIDEOTAPED DEPOSITION of
17
     Belinda Lane, Volume II, taken before Cheryll
18
     Kerr, a Notary Public and a Shorthand
19
     Reporter, at the offices of Cleary, Gottlieb,
20
     55 Basinghall Street, London, England on
21
     the 25th day of June, 2008 at 9:36 a.m.
22
23
24
25
```

```
 1   INDEX
 2   EXAMINATION BY                        PAGE
 3   MR. SCHWARTZ                          318
 4   MR. WERBNER                           404
 5
 6            EXHIBITS
 7   LANE
     FOR ID    DESCRIPTION                 PAGE
 8
     Exhibit 19  Single-page document Bates   337
 9              No. NW 012954
10   Exhibit 20  Multi-page document Bates    346
                Nos. NW 000084
11              through NW 0000111
12   Exhibit 21  Document Bates Nos. NW 008321  365
                through 8446
13
     Exhibit 22  Three-page document bearing   382
14              Bates Nos. NW 009833
                to 9835
15
     Exhibit 23  Document bearing Bates        393
16              Nos. NW 000294 through
17
18
19   REQUESTS FOR INFORMATION
20   DESCRIPTION                          PAGE
21   Legible copy of 8436                 381
22
23
24
25
```

316

```
 1   APPEARANCES:
 2   KOHN, SWIFT & GRAF, P.C.
         Attorneys for Plaintiff Tzvi Weiss
 3       One South Broad Street, Suite 2100
         Philadelphia, Pennsylvania 19107-3304
 4
     BY:  STEPHEN H. SCHWARTZ, ESQ.
 5
 6   SAYLES WERBNER, P.C.
         Attorneys for Plaintiff Natan Applebaum
 7       4400 Renaissance Tower
         1201 Elm Street
 8       Dallas, Texas 75270
 9   BY:  MARK S. WERBNER, ESQ.
10
     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
11       Attorneys for Defendant National
         Westminster Bank, PLC
12       One Liberty Plaza
         New York, New York 10006-1470
13
     BY:  LAWRENCE B. FRIEDMAN, ESQ.
14       PATRICK SHELDON, ESQ.
15
     GLANCY BINKOW & GOLDBERG LLP
16       Attorneys for Plaintiff Tzvi Weiss
         1430 Broadway, Suite 1603
17       New York, New York 10018
18   BY:  ANDREW FRIEDMAN, ESQ. (OF COUNSEL)
19
     Also Present: Jackie Sheftali, NatWest; Simon
20   Rutson, Videographer
21
22           *****  *****  *****
23
24
25
```

318

```
 1           THE VIDEOGRAPHER:  This is the
 2       beginning of Tape 1, Volume 2 and the
 3       continuation in the deposition of Belinda
 4       Lane.
 5           On the record, 9:36 a.m., as
 6       indicated on the video screen.
 7   B E L I N D A  L A N E,
 8   called as a witness, having been previously duly
 9   sworn, was examined and testified
10   as follows:
11       EXAMINATION BY MR. SCHWARTZ:
12   Q.  Good morning, Ms. Lane.  My name is
13   Steven Schwartz.
14   A.  Good morning.
15   Q.  I met you yesterday.  How are you?  Did
16   you get a good night's sleep?
17   A.  I did, thank you.
18   Q.  Wish I did, but I am going to be asking
19   you a few more questions about what you know about
20   the facts which have given rise to this lawsuit.
21       I am going to try very hard not to tread over
22   the same ground we went over yesterday, but I think
23   inevitably I may repeat certain things, and if I do,
24   I hope you'll apologize to me (sic), and I hope your
25   lawyers will not object too strenuously.
```

339

```
1   been sent..."
2      Do you know who would have sent it to
3   Mr. Wiltshire --
4      A.   No.
5      Q.   -- or how the suspicion would have been
6   precipitated?
7      A.   No.
8      Q.   You don't know?
9         (Informal discussion held off the
10       record.)
11  BY MR. SCHWARTZ:
12     Q.   He says in the second paragraph "I would
13  be grateful -- I would be -- therefore be grateful
14  if you would kindly provide me some background info
15  on this connection with details of the most recent
16  due diligence undertaken in respect of the bank's
17  knowledge of dealings in the U.S. dollar account."
18  Do you see that?
19     A.   Yes.
20     Q.   Did you send Mr. Wiltshire the details of
21  the bank's most recent due diligence as he
22  requested?
23     A.   This -- I sent him a return email
24  (indicating).
25     Q.   So your testimony is that this email was
```

340

```
1   your response to that request for the most recent
2   due diligence, is that correct?
3      A.   Yes.
4      I would add that I have stated at the bottom
5   that "My next meeting is Monday, the 21st of
6   January, when I will discuss present operations in
7   use of the dollar account."
8      Whether I then sent something subsequent to
9   that meeting, I don't know.
10     Q.   Do you remember whether you did in fact
11  meet with Mr. Qundil on the 21st of January, 2002?
12     A.   If that was the date on one of the
13  interview notes that I produced -- I can't remember,
14  unless I was shown the note, interview note.  If --
15  if it had that date on there, and I had done an
16  interview note, then yes.
17     Q.   Well, yesterday Mr. Werbner put in two
18  exhibits, if you recall, which were Lane 3, which is
19  the synopsis of customer meeting, and that's dated
20  March 20th, 2002, about two months after this
21  meeting, and Lane 11, which is a synopsis of a
22  customer meeting January 27th, 2003.
23     Now, I am not perfect.  I may have missed it in
24  the database, but to the best of my knowledge, I
25  have never seen a meeting synopsis for that
```

341

```
1   January 21st meeting.  Do you know if you produced
2   one?
3      A.   I am fairly certain that if -- if I had
4   had a meeting, I would have produced it, but I can
5   only conclude, because I very much doubt that I
6   would have seen them in both January and the March,
7   my guess is that that meeting on the 21st of January
8   perhaps got deferred for some reason to the March,
9   because I very much doubt -- I don't recall seeing
10  them two times in such a short space of time.
11     But if I had have seen them, I am fairly
12  certain I would have produced an interview note.
13     Q.   Okay.  Now, in -- in your response to
14  Mr. Wiltshire, you say that "Interpal provides" --
15  excuse me.
16     This is your fourth bullet point -- "provides
17  charitable relief to refugees in Israel, West Bank,
18  and Gaza and Lebanon."
19     How did you know that?
20     A.   Because Jihad Qundil told me that.
21     Q.   Did you personally, yourself, check to
22  see that that was true?
23     A.   No.  It wasn't my responsibility to check
24  that.  My responsibility is to ascertain from the
25  customers what their business is.
```

342

```
1      And if ever there is anything that would lead
2   me to believe that their business was -- was
3   otherwise, then I would be suspicious and would file
4   a suspicious transaction report, but there was never
5   anything that led me to believe they did otherwise.
6      Q.   Do you know whether anyone within the
7   bank would have had responsibility to check the
8   accuracy of that statement (indicating)?
9      A.   I don't know that, no.
10     Q.   Well, I am only asking --
11     A.   Uh-huh.
12     Q.   -- because in my review of the -- we were
13  provided with hundreds of transaction documents for
14  the account.  Most of them were, in fact, sent to
15  other organizations rather than to individuals in
16  relief, if I may characterize it that way.
17     So I am really wondering whether to your
18  knowledge, did anyone within the bank check to see
19  that, in fact, the dollars that were being disbursed
20  from the NatWest Interpal accounts were, in fact,
21  providing charitable relief to refugees in Israel,
22  West Bank, Gaza and Lebanon?
23        MR. L. FRIEDMAN:  Object to the form
24     of the question.
25        THE WITNESS:  I don't know.
```

351

1  in any doubt whatsoever.
2     Q.   Did your training in money laundering
3  prevention teach you to distinguish between funds
4  being received by your client as opposed to funds
5  being disbursed by your client?
6     A.   Well, I know the difference between funds
7  in and funds out, so -- I'm not sure what you mean
8  by "distinguished between."
9     Q.   Let me rephrase the question, then.
10    In your training in money laundering
11 prevention, were you taught that "funds in" were
12 more likely to raise a suspicion than "funds out"?
13    A.   Not necessarily, but you would have had
14 to receive funds in to have funds go out, so I --
15 I --
16    Personally, I don't recall there being a
17 significant difference between the two. Both could
18 raise the same suspicion.
19    Q.   So your best recollection of your
20 training is that an unusual amount of funds in could
21 raise a suspicion of money laundering, is that
22 correct?
23       MR. L. FRIEDMAN: Object to the form.
24       THE WITNESS: If it was outside the
25    normal context of the customer's business

352

1    operations.
2  BY MR. SCHWARTZ:
3     Q.   And is that the same answer for transfers
4  of funds out?
5     A.   Yes.
6     Q.   Did you also receive training in how to
7  help the bank ensure that it was not involved in
8  terrorism funding?
9        MR. L. FRIEDMAN: Object to form.
10       THE WITNESS: I believe it's all part
11    of the same training, yes.
12 BY MR. SCHWARTZ:
13    Q.   So then you did receive training of that
14 nature?
15    A.   Yes.
16    Q.   Can you tell me, please, your
17 understanding of the sort of transactions that might
18 give rise to a suspicion of terrorism funding?
19       MR. L. FRIEDMAN: From her training?
20 BY MR. SCHWARTZ:
21    Q.   From your training.
22    A.   I can't remember specific examples, but
23 again, it -- it would -- it would just be unusual
24 transactions outside the normal context of the
25 customer's business operations.

353

1     Q.   And if you saw such a thing, your job, as
2  it were, would be to file a suspicious activity
3  report with the bank?
4     A.   Yes, it would.
5     Q.   Now, you understand that this case that
6  we are here working on concerns your client
7  Interpal?
8     A.   Yes.
9     Q.   Your former client, excuse me.
10    During the years that you were relationship
11 manager for Interpal, did any transaction of theirs
12 give rise to a suspicion of money laundering, to
13 you?
14    A.   No.
15    Q.   ==Did any of their transactions ever cause==
16 ==you to have a suspicion of terrorism financing?==
17    ==A.   No.==
18    Q.   All right. You've testified that you
19 would be looking for transactions out of the
20 ordinary pattern of the client's business, is that
21 correct?
22    A.   It's not my role to look for those
23 transactions. If -- if one was brought to my
24 attention, but it's not my role to look for those.
25    Q.   Well, who would bring it to your

354

1  attention?
2     A.   Money laundering prevention unit or group
3  investigations and fraud, possibly, or maybe another
4  department that were processing those applications.
5     Q.   But you, yourself, did not monitor
6  Interpal --
7     A.   No.
8     Q.   -- for money laundering or terrorism
9  financing, is that correct?
10    A.   That's correct.
11    Q.   You, yourself, did not look for
12 suspicious transactions from Interpal --
13 transactions that would give rise to a suspicion of
14 money laundering or terrorism financing, correct?
15    A.   I didn't suspect the customer, so I had
16 no reason to look at any individual transactions.
17    Q.   And to the best of your knowledge, that
18 would have been done by the service center, as
19 you've testified earlier?
20       MR. L. FRIEDMAN: What would have
21    been done? I'm sorry.
22       MR. SCHWARTZ: Monitoring
23    transactions for transactions that would
24    give rise to a suspicion of money
25    laundering or terrorism financing.