# Exhibit 10

```
                                    1
 1      UNITED STATES DISTRICT COURT
 2      EASTERN DISTRICT OF NEW YORK
 3            Action No: 05cv4622(DGT)(MDG)
 4      ---------------------
 5   TZVI WEISS, et al,
 6              Plaintiffs,
 7   against
 8   NATIONAL WESTMINSTER BANK, PLC.,
 9              Defendant.
10   ---------------------
11   NATAN APPLEBAUM, et al.,
12              Plaintiffs,
13   against
14   NATIONAL WESTMINSTER BANK, PLC.,
15              Defendant.
16
17
18        VIDEOTAPED DEPOSITION OF AMANDA HOLT
19              Friday 23 July 2010
20              At:  10:00 am
21              Taken at:
22        Cleary, Gottlieb, Steen & Hamilton LLP
23              55 Basinghall Street, London
24              United Kingdom
25
26
27
28
29        HIGHLY CONFIDENTIAL              2
```

```
                                    2
 1            A P P E A R A N C E S
 2   For Plaintiff Tzvi Weiss:
 3        ARI UNGAR
 4        Osen LLC
 5        700 Kinderkamack Road
 6        Oradell, NJ 07649
 7        Tel: 201 265 6400
 8
 9   For Plaintiff Tzvi Weiss:
10        AITAN GOELMAN
11        Zuckerman Spaeder LLP
12        1800 M Street, NW, Suite 1000
13        Washington, DC 20036-5807
14        Tel: 202 778 1996
15   For the Plaintiffs:
16        STEPHEN LOBEL
17        Finers, Stephens & Innocent LLP
18   For Defendant National Westminster Bank, PLC:
19
20        AVRAM E. LUFT and VALERIE SCHUSTER
21        Cleary, Gottlieb, Steen & Hamilton LLP
22        One Liberty Plaza
23        New York, NY 10006-1470
24          Tel: 212 225 2432
25
26   Also Present:
27        COURT EXAMINER - ADRIAN HUGHES
28
29        COURT REPORTER:
30        AILSA WILLIAMS
31        European Deposition Services
32        59 Chesson Rd
33        London, W14 9QS
34
35        Telephone:  44 (020) 7385 0077
36           HIGHLY CONFIDENTIAL           3
```

```
                                    3
 1    VIDEOGRAPHER: FLOYD HUMPHREY
```

```
                                    4
 1              I N D E X
 2   AMANDA HOLT ... ... ... ... ... ... ... ..8
 3   DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..8
 4        GOELMAN:
 5
 6   CROSS-EXAMINATION BY MR. LUFT:  ... ... ... ... 222
 7
 8   RE-DIRECT EXAMINATION BY MR. .. ... ... ... ... 229
 9        GOELMAN:
10           INDEX OF EXHIBITS
11   Holt 1 NW012925-38 ... ... ... ... ... ... .60
12   Holt 2 NW185976 ... ... ... ... ... ... ... ..66
13   Holt 3 NW014038-48 ... ... ... ... ... ... .67
14   Holt 4 Press Release .. ... ... ... ... ... .83
15   Holt 5 NW066682-686 ... ... ... ... ... ... .88
16   Holt 6 NW066667-70 ... ... ... ... ... ... 107
17   Holt 7 NW066672-76 ... ... ... ... ... ... 140
18   Holt 8 NW066820 ... ... ... ... ... ... ... 147
19   Holt 9 NW066721-23 ... ... ... ... ... ... 150
20   Holt 10 NW018476 .. ... ... ... ... ... ... 159
21   Holt 11 NW066687-90 ... ... ... ... ... ... 163
22   Holt 12 NW067948 .. ... ... ... ... ... ... 169
23   Holt 13 NW187287 .. ... ... ... ... ... ... 172
24   Holt 14 NW196319-20 ... ... ... ... ... ... 179
25   Holt 15 NW181060-63 ... ... ... ... ... ... 188
26   Holt 16 NW180811-15 ... ... ... ... ... ... 194
27   Holt 17 NW180828-29 ... ... ... ... ... ... 200
28   Holt 18 NW180854 .. ... ... ... ... ... ... 202
```

69

1  contained in this paragraph?
2     A. As far as I recall, yes.
3     Q. And you indicated that your reaction to
4  Mr. Foster was that you wanted to know more about this
5  case?
6     A. It is, yes.
7     Q. You were familiar with what OFAC's role in
8  administering the American sanctions regime was
9  in September and August 2003, weren't you?
10    A. I was aware of what OFAC was responsible
11 for doing, yes.
12    Q. And is one of the things that you wanted
13 to know more about was why OFAC had decided to list
14 Interpal as a terrorist organization?
15    A. Initially what I wanted to know was which
16 lists that the Group was subject to across the Group
17 globally Interpal was on, because I wanted to know which
18 part of the Group really needed to comply with, so
19 I knew which part of the Group, which team I had to talk
20 to more than anything else, to get more information.
21    Q. Do you recall which part of the bank
22 Interpal was a customer of?
23    A. As far as I recall, it was a part of CBFM,
24 Corporate Bank and Financial Markets.
25    Q. Did you also want to know more about why

70

1  OFAC had listed a customer of the bank as a specially
2  designated global terrorist?
3     A. I am only pausing to try and think back.
4  My main concern was not to try and question OFAC, it was
5  more to understand exactly, as I said, which lists they
6  were on and which team I needed to talk to to get more
7  information from, and so then we could decide how the
8  bank would most appropriately respond to fulfill its
9  obligations.
10    Q. Did you talk to the team at CBFM?
11    A. Yes, I did.
12    Q. Do you recall who you talked to in
13 particular?
14    A. I don't recall who I spoke to when but
15 I do remember speaking to Irvine Rodger.
16    Q. As best as you can recall, can you give me
17 an approximate, if not a date, at least how long after
18 you first learned of OFAC's designation of Interpal it
19 was when you spoke to Mr. Rodger?
20    A. I can't give you any indication of time.
21 I do know that I would have done it as soon as
22 I possibly could.
23    Q. Why is that?
24    A. Mainly because, if there was an issue, we
25 needed to address it quickly. There was absolutely

71

1  no -- there was no tolerance within the bank for not
2  complying with the regulation and legislation.
3     Q. Was there a specific concern for reacting
4  in a timely fashion because this involved potential
5  support of terrorism?
6     A. Right, we would have reacted quickly, yes,
7  yes. I am trying to think of the best way of expressing
8  this. There was an acute awareness that the difference
9  between Anti-money Laundering and the Sanctions and
10 Terrorist Financing processes is that in most cases of
11 Enterprise Risk judgment you could take a risk based
12 judgment over things. So whether or not -- not so much
13 in Know Your Customer, but certainly in terms of whether
14 or not you would, say, authorize a new product. ==But in==
15 ==terms of terrorist financing, there was no risk based==
16 ==judgment. If the name was on the list that you had to==
17 ==comply with, you had to comply, and you had to make sure==
18 ==that you could put in procedures as quickly as possible.==
19 ==So I know I wouldn't have sat on it: "What should we do==
20 ==about this?" I would have reacted very quickly to get==
21 ==the information we as team needed to make sure that the==
22 ==bank acted quickly and appropriately.==
23    Q. You said if the name was on the list that
24 you had to comply with, are you talking about -- what
25 list are you referring to specifically there?

72

1     A. Different lists related to different parts
2  of the Group.
3     Q. So are you specifically limiting that to
4  the list that the bank was legally obliged to follow in
5  that particular jurisdiction?
6     MR. LUFT: Objection, vague, confusing.
7     A. There was a legal minimum that the bank
8  had to comply with, which was very clear. If a name was
9  on the Bank of England lists, it was very clear as to
10 the procedure that the bank had to follow. Now, the
11 bank didn't just operate in the UK. We had Group
12 responsibility, not just UK responsibility, and as
13 a Group function we needed to get the information
14 required to actually make the right decision for the
15 right part of the Group. Okay?
16    Q. If an organization was not on the Bank of
17 England list but there were other indications of
18 possible connections with terror financing, could the
19 bank then take a risk based judgment approach?
20    MR. LUFT: Objection, incomplete hypothetical,
21 calls for speculation.
22    A. As far as I recall, the bank did not
23 discount or it didn't take an easy decision in terms of:
24 "This is a UK customer, it is not on the Bank of England
25 list, we can therefore ignore them." The bank took

77

1  operational losses.  That was what I mean by a risk based
2  decision.
3       Q.  So a risk based decision necessarily
4  encompasses a weighing of the potential advantages to
5  the bank versus the potential risks of taking
6  a particular action.
7       A.  That is correct.
8       Q.  And in a case where the bank was not
9  legally obligated by the presence of a name on the Bank
10 of England sanctions list, but nevertheless had
11 information suggesting that there was a link to
12 terrorism, would such a weighing of potential advantage
13 versus potential risk to the bank be appropriate?
14      MR. LUFT:  Objection, incomplete hypothetical.
15      A.  I can't say across the board, but I can
16 talk through exactly as far as I recall the thought
17 processes that went through with Interpal.
18      Q.  Okay, but you cannot tell me just as
19 a general matter whether a risk based approach would be
20 appropriate in that kind of scenario?
21      A.  I can recall a very clear statement across
22 the board, whether it was a Regulatory Risk policy or an
23 Enterprise Risk policy, that the bank had zero appetite
24 for regulatory breaches, let alone legislative legal
25 breaches.  So, for want of a better phrase, there was

78

1  a zero risk appetite for not complying with regulation
2  and legislation, as far as the Group could see it and
3  understood it, across the board.  Does that answer your
4  question?
5       MR. GOELMAN:  We have to change the tape.
6  Time to take another break.
7       THE VIDEOGRAPHER:  End of tape one, volume one
8  in the video deposition of Ms Amanda Holt.  Going off
9  record at 12:09 pm.
10      (A short break)
11      THE VIDEOGRAPHER:  This is the beginning of
12 tape two, volume one in the video deposition of
13 Ms Amanda Holt.  Back on the record at 12:18 pm.
14      MR. GOELMAN:  Ms Holt, before we broke or
15 several minutes before we broke you were talking about
16 a meeting that you recalled having with Mr. Rodger at
17 some point after Mr. Foster first alerted you to the
18 fact that Interpal had been listed by OFAC.  Do you
19 recall that?
20      A.  I recall saying that I had either talked
21 or met with Irvine, yes.
22      Q.  So either a phone conversation or an in
23 person meeting?
24      A.  Yes, it could even have been an e-mail,
25 but I definitely remember contacting Irvine.

79

1       Q.  And what was the purpose of you contacting
2  Irvine at that point?
3       A.  To confirm that Interpal was a customer of
4  CBFM, that he knew that there were concerns relating to
5  it, and to discuss what needed to be done to actually
6  determine the next course, the course of action.
7       Q.  What do you recall about the content of
8  that communication between yourself and Irvine Rodger?
9       A.  I can't remember the specific details but
10 I do remember that Irvine or a member of his team did
11 some further investigation of the Interpal account in
12 terms of monies in/monies out.
13      Q.  When you say "some further investigation",
14 what did that encompass, if you recall?
15      A.  I don't recall the detail, other than they
16 went to see exactly how the account was being operated
17 and, as I said, as far as they could, determine where
18 monies were coming in from and where payments were being
19 made, to see if there was any cause for suspicion.
20      Q.  Any cause for suspicion that what?
21      A.  That they were funding terrorism.
22      Q.  And specifically Hamas?
23      A.  Yes.
24      Q.  What do you recall?  Do you recall
25 subsequent communications between Mr. Rodger or anyone

80

1  working for him?
2       A.  Again, I don't recall the detail.  I don't
3  know whether now is the right time to say, but the way I
4  approached this, or any other concern that came to me
5  when I was in this role, was just because something
6  wasn't on a Bank of England list wouldn't actually have
7  meant that I just dismissed things.  ==The Group as==
8  ==a whole and me as an individual had absolutely no==
9  ==tolerance whatsoever, no risk based decision whatsoever,==
10 ==funding terrorism.  If there was any thought whatsoever==
11 ==that a customer of the bank was funding terrorism or was==
12 ==getting involved in any type of financial crime, that==
13 ==would have been reported straightaway.  It wouldn't==
14 ==necessarily have mattered that they were not on a Bank==
15 ==of England list.  I took my responsibilities very, very==
16 ==seriously, not just because of the financial penalties==
17 ==that went with sanctions and, you know, the terrorist==
18 ==legislation.  If I was responsible for making sure that==
19 ==the bank put in place procedures to detect terrorist==
20 ==financing, then I would have taken those or I took --==
21 ==not would have, I took those responsibilities very==
22 ==seriously.==
23      Q.  ==When you say "not just because of the==
24 ==financial penalties that went with sanctions", what==
25 ==other reasons?==

81

1    A.  As a matter of personal integrity.  I had
2    a job to do and I do it to the best of my ability, and
3    I felt that is what my team did as well.
4        Q.  And is it fair to say you were also aware
5    of the consequences of being wrong about a customer of
6    the bank facilitating terrorism, in terms of what that
7    would mean to the victims of that terrorism?
8        A.  Of course.
9        MR. LUFT:  Objection, vague.
10       A.  I don't -- as an individual I could never
11   ever condone terrorism.  Okay?  It doesn't matter who is
12   doing it.  That is me as an individual and me as an
13   employee.
14       Q.  You testified that if there was any
15   thought whatsoever that a customer of the bank was
16   funding terrorism that would have been reported
17   straightaway.  Did you consider a listing by the United
18   States Department of Treasury of Interpal as a funder of
19   terrorism to be a thought that a customer was funding
20   terrorism?
21       A.  By that do you mean was the fact that
22   Interpal was on one of the FATF lists, did that cause me
23   to --
24       Q.  OFAC lists?
25       A.  OFAC lists, sorry.

82

1        Q.  You testified that --
2        MR. LUFT:  Did you finish your answer?
3        A.  I was just asking for further
4    clarification, sorry.  By your question, did you mean
5    did I consider the fact that Interpal was on the OFAC
6    list would give me cause to suspect they were funding
7    terrorism?  I didn't understand your question.
8        Q.  Let me rephrase it.  You testified that if
9    there was any thought whatsoever that a customer of the
10   bank was financing terrorism, or was getting involved in
11   any type of financial crime, that would have been
12   reported straightaway.  My question was about the phrase
13   "if there is any thought whatsoever", and whether you
14   considered that a listing by OFAC that a bank customer
15   was funding terrorism was sufficient to be "a thought
16   whatsoever" in your estimation?
17       A.  I can't speak generally but I can speak
18   specifically about OFAC, which was that was what
19   prompted us, prompted me to ask Irvine to do a detailed
20   review of Interpal, or enhanced oversight, however you
21   want to phrase it, of the Interpal account.  I felt that
22   was above and beyond having a suspicion, because
23   a suspicion would have involved talking to or just
24   reporting to the relevant authorities.  Well, they
25   already would have been aware, so we were doing

83

1    additional work ourselves to get additional information
2    to a greater level of depth.
3        Q.  I am going to ask the court reporter to
4    mark this as Exhibit 4, please.
5        (Exhibit Holt 4 marked for identification)
6        For the record, this is a printout from the OFAC
7    Office of Public Affairs website.  Ms Holt, at any point
8    after RBS' customer, Interpal, was designated as a specially
9    designated global terrorist by OFAC, did you take any steps
10   to learn why OFAC believed that Interpal was a supporter of
11   terrorism?
12       A.  I don't recall.  I don't recall.
13       Q.  Were you aware when you were Head of Group
14   Enterprise Risk that OFAC had a website?
15       A.  I don't recall.  I genuinely don't recall.
16       Q.  Did you have access to the Internet from
17   your desktop computer?
18       A.  I did, yes.
19       Q.  Earlier you spoke of your general
20   philosophy of wanting to see things for yourself.  Do
21   you recall that?
22       A.  I do, yes.
23       Q.  Wouldn't a visit to the OFAC website have
24   been consistent with that approach?
25       A.  I can't recall exactly what I did in 2002

84

1    and 2003.
2        Q.  Can you turn to page 5 out of 6 of Holt
3    Exhibit 4, please.  At the bottom it says: "Palestinian
4    Relief and Development Fund- Interpal."  Do you see
5    that?  Bottom of page 5 out of 6, it just says:
6    "Palestinian Relief and Development Fund - Interpal."
7    Do you see that?
8        A.  I do see that.
9        Q.  If you turn over, the first sentence there
10   says:
11       "Interpal, headquartered in the UK, has been
12   a principal charity utilized to hide the flow of money
13   to Hamas."
14       Did you know in 2003 that OFAC had concluded
15   that Interpal was a principal charity utilized to hide
16   the flow of money to Hamas?
17       A.  I did know they had concluded that, yes.
18       Q.  Did you know, in particular, that OFAC had
19   concluded that Interpal was secretly funding Hamas?
20       MR. LUFT:  Objection, assumes facts not in
21   evidence.
22       Q.  I will rephrase that.  When you say that
23   you knew that OFAC had concluded that Interpal was
24   a principal charity used to hide the flow of money to
25   Hamas, is it fair to say you knew that the allegation

89

1  Q. Who is Mr. Outhwaite?
2  A. I couldn't put a face to him but the Head
3  of Retail Media Relations means that he was responsible
4  for dealing with the media on behalf of the Retail Bank.
5  So if there had been any -- one of his responsibilities
6  was to look at what was out there in the newspapers and
7  see how it would have impacted on the bank, primarily
8  from a reputational perspective, so reputation. He had
9  no regulatory background. It was press relations.
10  Q. Who was Graham Hardy?
11  A. I don't know, or I don't recall.
12  Q. What do you recall about getting this
13  e-mail from Mr. Outhwaite on December 10, 2004?
14  A. As the e-mail dated December 10 at 11:14
15  am would imply, I was aware, just for clarity, I was
16  aware that the bank had accounts for people -- I should
17  put in here it was sloppy typing on my part -- allegedly
18  connected to Hamas but not Hamas itself, so we were
19  already aware of the allegations.
20  Q. So Mr. Outhwaite sent this e-mail to you
21  at 10:19 am. Is that right?
22  A. Yes.
23  Q. Would you have read the article that he
24  attached?
25  A. My e-mail back to him says: "I can't see

90

1  the article", but if he sent it back to me at 6:23 on
2  the front, I would have. I did read the article.
3  Q. He sent his initial e-mail to you at 10:19
4  am on Friday December 10.
5  A. Yes.
6  Q. Do you know how he could have sent the
7  follow up e-mail with the article at 6:23 am?
8  A. I have absolutely no idea, I am sorry. I
9  have no idea.
10  Q. You sent an e-mail responding to his
11  initial e-mail at 11:14 am, correct?
12  A. That is correct.
13  Q. And you copied Mr. Foster?
14  A. Yes.
15  Q. And Sharon Wilson?
16  A. Yes.
17  Q. And Sue Smith?
18  A. Yes.
19  Q. And who is Sue Smith?
20  A. I don't remember a Sue Smith but she
21  was -- I don't remember a Sue Smith. I am just looking
22  at the titles. It says here she is Operational Risk
23  Manager, so she was in the Retail side of the business.
24  Q. You commented earlier on the portion of
25  the e-mail, you say: "However, we were aware that we had

91

1  accounts of people connected to Hamas."
2  A. Allegedly connected to Hamas.
3  Q. You are saying "allegedly"?
4  A. Yes.
5  Q. But the e-mail says "for people connected
6  to Hamas", true.
7  A. That is what the e-mail said, but I have
8  mistyped that e-mail.
9  Q. I understand that is your testimony. I am
10  asking you about this particular e-mail though.
11  A. Sure.
12  Q. The e-mail states:
13  "We were aware that we had accounts for people
14  connected to Hamas but not Hamas itself." Correct?
15  MR. LUFT: Documents speaks for itself.
16  A. That is what the e-mail says, yes.
17  Q. And you sent that to four people, correct?
18  A. Two or three people, copied to Sharon,
19  yes, one other.
20  Q. And did any of those people ever correct
21  you about awareness of accounts for people connected to
22  Hamas?
23  A. The person who would have corrected me
24  would have been Stephen, but as to whether or not he
25  actually felt the need to correct me, I don't recall,

92

1  because it was very clear between Stephen and I that the
2  meaning was allegedly connected, not actually connected.
3  If we had any accounts connected to Hamas we would have
4  already reported and exited them.
5  Q. So is it your testimony that you don't
6  recall anybody correcting that purported error?
7  A. My testimony is there would be no need for
8  anybody to correct because their understanding was that
9  "allegedly" should have been in there.
10  Q. Regardless of whether or not there was
11  a need to correct, you don't sitting here today recall
12  anybody correcting you?
13  MR. LUFT: Objection, asked and answered.
14  MR. GOELMAN : Asked and not answered.
15  MR. LUFT: I am not going to argue with you,
16  Mr. Goelman. I just make my objection.
17  A. What I said was I don't recall Stephen
18  coming in and correcting me, no. That is not to say
19  that he didn't. I don't recall because there would have
20  been no need.
21  Q. Later this e-mail was forwarded to other
22  people as well, including people in the CBFM, true?
23  A. I have no idea who it was forwarded on to.
24  Q. Do you recall at any point anybody,
25  Stephen Foster, Irvine Rodger, anybody correcting what

225

1  Q. And Mr. Goelman read you from portions of
2  this paragraph, correct?
3  A. He did.
4  Q. Now, Ms Holt, if Guy Cole determined an
5  allegation regarding Interpal was unreliable, would you
6  have expected that allegation to be passed along to
7  senior management?
8  MR. GOELMAN: Objection to form and leading.
9  A. If I have asked somebody to do an
10  investigation, or to do a piece of work, I don't expect
11  to have a complete rundown of "I did this, I did this,
12  I did this, I then decided this was not relevant". What
13  I am looking for is a summary of the relevant matters,
14  the relevant facts. So if Guy had actually looked at
15  Worldcheck, he had found something that was on
16  Worldcheck but he had found that the Worldcheck results
17  were unreliable, I would not have expected him to have
18  included that in a briefing. In fact, it probably would
19  have been unhelpful to include information that was not
20  only not relevant but was actually misleading.
21  Q. Ms Holt, your position was the Head of
22  Group Enterprise Risk?
23  A. That is correct.
24  Q. As the Head of Group Enterprise Risk, in
25  your experience, if the bank believed Interpal was

226

1  funding terrorism, would the potential of negative media
2  attention from exiting have affected the bank's decision
3  as to whether to close the account?
4  MR. GOELMAN: Objection to the leading.
5  A. I have no evidence to support this but
6  I never saw any evidence of the bank putting
7  reputational considerations above full compliance with
8  legal and regulatory requirements, so no, they would
9  never have actually said: "Well, on balance, we will not
10  comply because of the regulatory damage", and what is
11  more I certainly would not have either, and that was my
12  job as Group Head of Enterprise Risk.
13  Q. Based on your experience at RBS, if
14  NatWest believed that Interpal was funding terrorism,
15  would they have kept NatWest on as a client?
16  MR. GOELMAN: Objection to form and to
17  leading.
18  A. Could you say the question again?
19  Q. Sure. Based on your experience at RBS, if
20  NatWest believed that Interpal was funding terrorism,
21  would they have kept NatWest on as a client?
22  A. Would they have kept --
23  THE EXAMINER: Kept who?
24  MR. GOELMAN: Same objections.
25  A. NatWest was not a client of RBS.

227

1  MR. LUFT: Sure, let me clarify. I am sorry.
2  If the bank, and by the bank I mean NatWest and the
3  entity that owns it, RBS, if the bank believed that
4  Interpal was funding terrorism, would they have kept
5  NatWest -- excuse me -- would they have kept Interpal on
6  as a client?
7  THE EXAMINER: Yes, you were saying NatWest
8  which was causing the confusion.
9  A. No, they wouldn't have. I don't -- well,
10  I have no evidence to prove this but no, I absolutely
11  believe they would not have. This is the last time I am
12  going to say this but, you know, for what its worth,
13  there is absolutely no way that I would let my job turn
14  me into a person that I despised, because I am the one
15  person I cannot escape from so, for what its worth, if I
16  thought they were funding terrorism, it would have been
17  very hard not to exit. I would not have kept quiet.
18  Q. Let me ask you, did you ever believe that
19  Interpal was sending money to Hamas?
20  A. No, I didn't.
21  Q. Were you ever told by people at the bank
22  that someone at the bank believed that Interpal was
23  sending money to Hamas?
24  MR. GOELMAN: Objection to form and to
25  leading.

228

1  A. Nobody at the bank gave me any evidence
2  that Interpal was paying funds, passing funds to Hamas.
3  Nobody actually who was close and who had done the
4  detailed work came to me and said "Look, Amanda, we
5  cannot find the evidence but really, we believe this is
6  what they are doing." In fact, they told me completely
7  the opposite. Also, if somebody had come to me and
8  said: "Look, we cannot prove it but all of the
9  circumstantial evidence makes this really smell, this is
10  not good. We really believe that Interpal is funding
11  Hamas," there would have been a clear recommendation to
12  exit, not from reputational grounds, purely because
13  there was a really strong and clear and inconclusive
14  suspicion that Interpal was funding terrorism, but
15  nobody ever came to me with that.
16  Q. Did you and the people that reported to
17  you ever make a decision not to investigate Interpal so
18  as to avoid gaining knowledge of whether Interpal was
19  sending money to terrorists?
20  MR. GOELMAN: Objection to form, leading.
21  A. As far as I was concerned, my tenure at
22  the bank, I spent an inordinate effort making sure that
23  we had no ostriches with their heads in the sand.
24  Ignorance is not bliss. So you had to have as far as
25  possible the full information in front of you to make