# Exhibit 12

**1**

```
 1             UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF NEW YORK
 3                  Action No: 05cv4622(DGT)(MDG)
 4      ---------------------
 5      TZVI WEISS, et al,
 6                   Plaintiffs,
 7      against
 8      NATIONAL WESTMINSTER BANK, PLC.,
 9                   Defendant.
10      ---------------------
11      NATAN APPLEBAUM, et al.,
12                   Plaintiffs,
13      against
14      NATIONAL WESTMINSTER BANK, PLC.,
15                   Defendant.
16
17
18        VIDEOTAPED DEPOSITION OF STEPHEN FOSTER
19              Friday 16 July 2010
20              At:  10:00 am
21              Taken at:
22         Cleary, Gottlieb, Steen & Hamilton LLP
23            55 Basinghall Street, London
24                 United Kingdom
25
26
27
28
29         HIGHLY CONFIDENTIAL           2
```

**2**

```
 1               A P P E A R A N C E S
 2  For Plaintiff Tzvi Weiss:
 3      STEPHEN SCHWARTZ, ESQ.
 4      Kohn, Swift & Graf PC
 5      One South Broad Street, Suite 2100
 6      Philadelphia, Pennsylvania 19107-3304
 7      Tel: 419 246 0528
 8  For Plaintiff Natan Applebaum:
 9      MARK WERBNER
10      Sayles & Werbner
11      4400 Renaissance Tower
12      1201 Elm St.
13      Dallas, Texas 75270
14      Tel: 214 939 8763
15
16  For Plaintiff Tzvi Weiss:
17      AITAN GOELMAN
18      Zuckerman Spaeder LLP
19      1800 M Street, NW, Suite 1000
20      Washington, DC 20036-5807
21      Tel: 202 778 1996
22  For Defendant National Westminster Bank, PLC:
23
24      JONATHAN I. BLACKMAN ESQ. and SUE. H. RHEE
25      Cleary, Gottlieb, Steen & Hamilton LLP
26      One Liberty Plaza
27      New York, NY 10006-1470
28         Tel: 212 225 2000
29
30  Also Present:
31
32      COURT REPORTER:
33
34      AILSA WILLIAMS
35      European Deposition Services
36      59 Chesson Rd
37      London, W14 9QS
38      Telephone:  44 (020) 7385 0077
39         HIGHLY CONFIDENTIAL           3
```

**3**

```
 1   VIDEOGRAPHER: DAVID ROSS
```

**4**

```
 1
 2                I N D E X
 3   STEPHEN FOSTER ... ... ... ... ... ... ... ..6
 4   DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..6
 5     WERBNER:
 6
 7   CROSS-EXAMINATION BY MR. .. ... ... ... ... ... 162
 8     SCHWARTZ:
 9   CROSS-EXAMINATION BY MR. .. ... ... ... ... ... 237
10     BLACKMAN:
11
12         INDEX OF EXHIBITS
13   Foster 1 NW012925-33 .. ... ... ... ... ... ..79
14   Foster 2 NW014025-36 .. ... ... ... ... ... 103
15   Foster 3 NW013700 . ... ... ... ... ... ... 107
16   Foster 4 NW013695-97 .. ... ... ... ... ... 112
17   Foster 5 NW212124 . ... ... ... ... ... ... 121
18   Foster 6 NW180808-10 .. ... ... ... ... ... 138
19   Foster 7 NW013939-41 .. ... ... ... ... ... 142
20   Foster 8 NW066667-71 .. ... ... ... ... ... 148
21   Foster 9 NW067948-49 .. ... ... ... ... ... 156
22   Foster 10 NW180827-29 . ... ... ... ... ... 159
23   Foster 11 NW088194-97 . ... ... ... ... ... 187
24   Foster 12 NW017151-54 . ... ... ... ... ... 202
25   Foster 13 "Press Room, US Dpt of .. ... ... ... 220
26      the Treasury, (No Bates Nos.)
27
28   Foster 14 NW066829-32 . ... ... ... ... ... 226
29
30
```

209

1  must be carefully made, as closing the account without an
2  identifiable reason will most probably result in adverse
3  media attention. Also, if a terrorism related payment is
4  identified as being made, we again would suffer untoward
5  regulatory media attention."
6      Do you think that is what you were addressing
7  when you were speaking of "reputational issues"?
8      A. Yes, because there are many reasons why we
9  might close an account for a customer. If a customer
10 considers that that is unjustified, it is common
11 practice for them to go to the newspapers and try and
12 make a story out of it. Any bank, not just us. And
13 that is not a nice thing to see in the papers because
14 generally we cannot respond, so the case against us is
15 shown in a bad light. Terrorism, we don't want to be
16 related to terrorism at all.
17     Q. So you are perhaps kind of between a rock
18 and a hard place when you try to close an account like
19 this? That is what you were saying?
20     A. No, because if we had been concerned that
21 it was linked to terrorism we wouldn't have had any
22 hesitation in closing it. The media attention for
23 closing an account related to terrorism wouldn't have
24 worried me.
25     Q. So at least at this time then you were not

210

1  really concerned that the accounts were linked to
2  terrorism?
3      A. We had no evidence to suggest that,
4  because this is after two Charity Commission
5  investigations, a number of contacts with, as we have
6  seen before, Special Branch, which I was not involved
7  in, so our comfort at the time was that we could
8  continue to manage the account.
9      Q. You did have a listing by OFAC?
10     A. Yes, indeed.
11     Q. So it was not no evidence, but you did not
12 consider it to be sufficient?
13     A. That was a listing in the United States.
14 It doesn't necessarily mean it is a terrorist
15 organization, that it is actually financing terrorism.
16     Q. What do you understand it to mean?
17     A. That the US authorities suspect it might
18 be.
19     Q. If you turn over to the first page, the
20 very last full paragraph, not the single sentence, and
21 this now -- let me ask you first, please, this appears
22 to be an e-mail from Guy Cole to you and to Ben Norrie?
23     A. Yes.
24     Q. Cc'd to Messrs Rodger, Davies and Richard
25 Jones, is that correct?

211

1      A. Yes.
2      Q. Who was Mr. Davies?
3      A. Rob Davies worked in my team for a period
4  looking after the administration of our sanctions lists.
5      Q. And Mr. Jones?
6      A. Mr. Jones was one of the members of the
7  MLPU we just discussed, the Money Laundering Prevention
8  Unit in Corporate Banking Division.
9      Q. And Mr. Rodger was the head of that unit,
10 correct?
11     A. Yes, at that time, yes.
12     Q. You say in the second paragraph -- excuse
13 me. Okay, now, this e-mail is, as I have just
14 described -- do you remember receiving it?
15     A. I don't remember specifically receiving
16 it.
17     Q. Do you have any doubt that you received
18 it, May 20, 2004?
19     A. I have no reason to doubt that I received
20 it.
21     Q. Would you have received this in the
22 ordinary course of your business?
23     A. Yes, I would.
24     Q. If you look at the next to last paragraph,
25 or the last full paragraph, Mr. Cole writes:

212

1      "I am content to leave the sterling and Euro
2  accounts operating with the semi-annual review taking place
3  for foreign payments made from the accounts. Consideration
4  will need to be given regarding the operation of the US
5  dollar account, as funds from this account will get frozen
6  if they are transferred via a US domiciled/owned
7  counterparty."
8      Do you understand what Mr. Cole meant when he
9  said: "Consideration will need to be given regarding the
10 operation of the US dollar account."
11     A. I do, yes.
12     Q. Could you explain, please?
13     A. Given that Interpal was listed on OFAC, if
14 we tried to make a payment on behalf of our customer in
15 US dollars, it would need to go through the United
16 States, through a counterparty correspondent bank in the
17 United States, and would likely be frozen by that US
18 based institution, meeting their obligations under OFAC.
19     Q. So is Mr. Cole suggesting here, to your
20 understanding, that you should consider advising the
21 customer to stop making dollar transactions?
22     MR. BLACKMAN: Objection.
23     A. No, we wouldn't do that.
24     Q. So what is he suggesting?
25     A. So he is suggesting that the funds might