# Exhibit 13

## 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF NEW YORK
 3                Action No: 05cv4622(DGT)(MDG)
 4      - - - - - - - - - - - - - - - - - - - -
 5      TZVI WEISS, et al,
 6                   Plaintiffs,
 7      against
 8      NATIONAL WESTMINSTER BANK, PLC.,
 9                   Defendant.
10      - - - - - - - - - - - - - - - - - - - -
11      NATAN APPLEBAUM, et al.,
12                   Plaintiffs,
13      against
14      NATIONAL WESTMINSTER BANK, PLC.,
15                   Defendant.
16
17
18           VIDEOTAPED DEPOSITION OF IRVINE RODGER
19                   Thursday 22 July 2010
20                   At:  10:00 am
21                   Taken at:
22           Cleary, Gottlieb, Steen & Hamilton LLP
23                55 Basinghall Street, London
24                      United Kingdom
25
26
27
28
29          HIGHLY CONFIDENTIAL                    2
```

## 2

```
 1                   A P P E A R A N C E S
 2      For Plaintiff Tzvi Weiss:
 3           ARI UNGAR
 4           Osen LLC
 5           700 Kinderkamack Road
 6           Oradell, NJ 07649
 7           Tel: 201 265 6400
 8
 9      For Plaintiff Tzvi Weiss:
10           AITAN GOELMAN
11           Zuckerman Spaeder LLP
12           1800 M Street, NW, Suite 1000
13           Washington, DC 20036-5807
14           Tel: 202 778 1996
15      For Defendant National Westminster Bank, PLC:
16
17           AVRAM E. LUFT and VALERIE SCHUSTER
18           Cleary, Gottlieb, Steen & Hamilton LLP
19           One Liberty Plaza
20           New York, NY 10006-1470
21              Tel: 212 225 2432
22
23      Also Present:
24
25           COURT REPORTER:
26
27           AILSA WILLIAMS
28           European Deposition Services
29           59 Chesson Rd
30           London, W14 9QS
31           Telephone:  44 (020) 7385 0077
32           VIDEOGRAPHER: FLOYD HUMPHREY
33
34
35
36           HIGHLY CONFIDENTIAL                    3
```

## 3

```
 1                       I N D E X
 2      IRVINE RODGER . ... ... ... ... ... ... ..6
 3      DIRECT EXAMINATION BY MR. . ... ... ... ... ... ..6
 4           GOELMAN:
 5
 6              INDEX OF EXHIBITS
 7      Rodger 1 NW014458-59 .. ... ... ... ... ... ... .30
 8      Rodger 2 NW088194-97 . ... ... ... ... ... .38
 9      Rodger 3 NW051168-69 .. ... ... ... ... ... .47
10      Rodger 4 NW051994-97 .. ... ... ... ... ... .65
11      Rodger 5 NW012925-38 . ... ... ... ... ... .68
12      Rodger 6 NW000130-143 . ... ... ... ... ... .74
13      Rodger 7 Press Release  ... ... ... ... ... .83
14      Rodger 8 NW013052 . ... ... ... ... ... ... .89
15      Rodger 9 NW185976 . ... ... ... ... ... ... .91
16      Rodger 10 NW014038-48 .. ... ... ... ... ... .91
17      Rodger 11 NW014013  ... ... ... ... ... ... .94
18      Rodger 12 NW013701  ... ... ... ... ... ... .95
19      Rodger 13 NW013939-41 . ... ... ... ... ... ... 100
20      Rodger 14 NW017151-54 . ... ... ... ... ... ... 107
21      Rodger 15 NW018476-83 . ... ... ... ... ... ... 149
22      Rodger 16 NW017191-95 . ... ... ... ... ... ... 159
23      Rodger 17 NW066847-52 . ... ... ... ... ... ... 175
24      Rodger 18 NW067946-47 . ... ... ... ... ... ... 189
25      Rodger 19 NW066844-46 . ... ... ... ... ... ... 196
26      Rodger 20 NW066807-13 . ... ... ... ... ... ... 202
```

## 4

```
 1      Rodger 21 NW066721-23 . ... ... ... ... ... ... 213
 2      Rodger 22 NW066795-96 . ... ... ... ... ... ... 220
 3      Rodger 23 NW181032-35 . ... ... ... ... ... ... 225
 4      Rodger 24 NW066777-79 . ... ... ... ... ... ... 233
 5      Rodger 25 NW069060-62 . ... ... ... ... ... ... 241
 6      Rodger 26 NW066764-69 . ... ... ... ... ... ... 243
```

125

1 terrorist organizations?
2     MR. LUFT: Objection, vague and ambiguous and
3 calls for speculation.
4     A. I don't know really.
5     Q. Mr. Cole writes in the next paragraph:
6 "I think any decision to keep/close the account
7 must be carefully made, as closing the account without an
8 identifiable reason will most probably result in adverse
9 media attention. Also, if a terrorism related payment is
10 identified as being made, we again would suffer untoward
11 regulatory/media attention".
12     Did you understand in May 2004 that it was
13 CBFM's decision as to whether or not to allow Interpal
14 to continue to bank with RBS?
15     A. The decision to allow the account to stay
16 open would ultimately have rested with the Group
17 Compliance team. They are the people that have got the
18 power. CBFM, from a business angle, whether they wanted
19 to continue operating the account, the advice my team
20 gave was that we could manage the account.
21     Q. But you are saying that the ultimate
22 decision on whether or not to allow Interpal to continue
23 to bank with RBS was not CBFM's, is that correct?
24     A. Yes.
25     Q. It was Group's?

126

1     A. If Group didn't want the account to remain
2 open, it would be within Group's gift to say "No, close
3 it."
4     Q. And you would have had to comply?
5     A. We would have had to comply.
6     Q. Mr. Cole writes you and others that:
7 "Closing the account without an identifiable
8 reason will most probably result in adverse media
9 attention."
10     Did you have an understanding -- first of all, did
11 you agree with that in May 2004, that closing the account
12 without an identifiable reason would probably result in
13 adverse media attention?
14     MR. LUFT: Objection.
15     A. Yes.
16     Q. And why was that your belief?
17     A. The position of the Muslim minority in
18 this country. They generally feel isolated and
19 sidelined and they would regard a national bank closing
20 down what they would regard as a good Muslim charity as
21 an aggressive act. You have got people like George
22 Galloway who would highlight that to the media. It was
23 unnecessary in my mind because the charity itself was
24 operating, as far as we could tell, were operating well.
25     Q. When you say "an aggressive act", what do

127

1 you mean by that?
2     A. What is the context of me saying that?
3     Q. "The Muslim minority would regard
4 a national bank closing down what they would regard as a
5 good Muslim charity as an aggressive act?
6     A. I think I would say, first of all,
7 elements of the Muslim minority, by no means the whole
8 Muslim minority, they would regard it as another example
9 of a Muslim organization being picked on.
10     Q. Were you concerned about being accused
11 of -- strike that. Were you concerned about the bank
12 being accused of anti-Muslim discrimination, if it
13 ordered the account closed?
14     A. The answer to that is no, if there was
15 grounds for it to close then there would be absolutely
16 no problem at all, but if there were no grounds then
17 potential.
18     Q. There is a potential to be accused of
19 being bigoted against Muslims?
20     A. Yes.
21     Q. And that was something that you were
22 concerned about in May 2004?
23     A. If I just go back, the way the questioning
24 is going is not helpful. A closure of Interpal without
25 reason would not be -- could be perceived to be bigoted

128

1 to Muslims.
2     Q. Was that a concern of yours in May 2004?
3     A. I suspect it was something which I would
4 have believed, yes.
5     Q. You have talked about an identifiable
6 reason to close the account and how the absence of such
7 a reason might result in adverse publicity, correct?
8     MR. LUFT: Objection, misstates his prior
9 testimony.
10     A. Just to make it clear, closing the
11 account, the account would be closed without any
12 hesitation if grounds were there to close it, regardless
13 of any Muslim feeling. There is no way would that
14 account be kept open if the account was -- Interpal was
15 funding Hamas.
16     Q. Earlier you said the answer to that is
17 "No, if there was grounds for it to close there would be
18 absolutely no problem at all, but if there are no
19 grounds then the potential", and something about being
20 accused of being bigoted against Muslims. So is it your
21 belief that if there was an identifiable, as Mr. Cole
22 calls it, an identifiable reason to close the account,
23 then the bank would not be risking that backlash that
24 you described?
25     MR. LUFT: Objection, misstates the prior

129

1  testimony, confusing.
2      A.  The bank would not keep the account open
3  if it was funding terrorism, end of story, absolutely no
4  doubt.
5      Q.  My question was whether you believed
6  in May 2004 that if there was an identifiable reason for
7  the bank to close the account then there wouldn't be the
8  same risk of negative publicity that you talked about
9  for if the bank closed it without an identifiable
10 reason?
11     A.  If there was an identifiable reason to
12 close the account then there would be no concerns
13 regarding the Muslim minority.  It would be irrelevant,
14 because the key thing is the financing of terrorism.
15     Q.  And you did not regard the designation by
16 OFAC of Interpal as an SDGT to be an identifiable reason
17 to close the account.  Is that true?
18     A.  It was Bank of England did not regard then
19 that designation as being a reason to list Interpal.  It
20 was not my decision.  I am not GOFI.  The resources of
21 Bank of England and OFAC can make that judgment, so all
22 you can do is rely on others that do.
23     Q.  Are you saying that the only identifiable
24 reason to close the account would be if Bank of England
25 listed Interpal as a terrorist organization?

130

1      MR. LUFT:  Objection, misstates his prior
2  testimony.
3      A.  If Bank of England decided to list that
4  account there wouldn't be a debate, the account would be
5  closed.  Regardless of any disquiet in the Muslim
6  community, it would be closed, end of story.  Without
7  that Bank of England decision, the UK Government
8  presumably did not regard Interpal as being an account
9  worthy of closure, and I don't know the circumstances,
10 but European Union didn't follow OFAC either.
11     Q.  If the Bank of England or the European
12 Union had listed Interpal as a terrorist organization,
13 the bank would have been compelled to close the account,
14 true?
15     A.  Yes.
16     Q.  It wouldn't have required any use of
17 judgment on the bank's part, right?
18     A.  Yes.
19     Q.  You wouldn't have had any discretion to
20 leave the account open, true?
21     A.  Yes.
22     Q.  My question is, are there identifiable
23 reasons to close the account, even if you are still
24 legally entitled in the UK to operate the account?
25     MR. LUFT:  Objection, vague.

131

1      A.  I don't know.
2      Q.  Can you look at Mr. Foster's e-mail right
3  above the e-mail we were just looking at.  He writes:
4      "Guy, Ben is away all week so I am replying on
5  this.  You are correct that filtering is a group wide issue
6  and that is why we have been working with key stakeholders
7  like Payment Operations to develop the policy and
8  capability.  This continues and we know that it is a very
9  important element of our counter-terrorism efforts".
10     Would you agree that filtering is a very important
11 element of counter-terrorism efforts?
12     A.  Yes.
13     Q.  And nevertheless is it true that
14 in May 2004 RBS didn't have filtering capability?
15     MR. LUFT:  Objection, mischaracterizes the
16 document.
17     A.  RBS Group didn't have filtering
18 technologies back in 2004, not adequate ones.
19     Q.  And that was more than two and a half
20 years after the attacks of 9/11?
21     A.  Yes.
22     Q.  Was that a concern to you, in May 2004?
23     A.  The fact that the bank didn't have
24 filtering arrangements in place at that time was not out
25 of line with the other players in the UK market.

132

1      Q.  Was the bank's lack of that capability of
2  concern to you, in May 2004, as head of the MLPU?
3      A.  I don't recall.
4      Q.  Mr. Foster goes on to write Mr. Cole,
5  last sentence in the second paragraph:
6      "You are right to highlight the reputational
7  issues but if management decide they don't want the
8  relationship, there are ways to exit that might not
9  cause a problem."
10     When you received this e-mail from Mr. Foster
11 in May 2004, did you understand him to agree with
12 Mr. Cole that reputational issues to the bank were
13 important?
14     MR. LUFT:  Objection, misstates the document.
15     A.  I honestly do not recall.
16     Q.  Mr. Foster writes:
17     "There are ways to exit that might not cause
18 a problem."
19     Do you see that?
20     A.  Yes.
21     Q.  Do you know what ways to exit Mr. Foster
22 had in mind?
23     A.  Absolutely no idea.  I would be
24 interested.  I would like to ask that question to
25 Mr. Foster.