UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------------------------ X
TZVI WEISS, et al.,                              :
                                                 :
                         Plaintiffs,             :      Case No. 05-CV-4622 (DLI) (RML)
                                                 :
           - against -                           :
                                                 :
NATIONAL WESTMINSTER BANK PLC,                   :
                                                 :
                         Defendant.              :
                                                 :
------------------------------------------------ X
NATAN APPLEBAUM, et al.,                         :
                                                 :
                         Plaintiffs,             :
                                                 :
           - against -                           :
                                                 :      Case No. 07-CV-916 (DLI) (RML)
NATIONAL WESTMINSTER BANK PLC,                   :
                                                 :
                         Defendant.              :      Oral Argument Requested
                                                 :
------------------------------------------------ X
```

## NATIONAL WESTMINSTER BANK PLC'S SUPPLEMENTAL STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

Attorneys for Defendant National Westminster Bank Plc

April 11, 2018

## TABLE OF CONTENTS

**Page**

I.     UNDISPUTED FACTS SHOWING THAT, TO NATWEST'S KNOWLEDGE, IT WAS FACILITATING FUNDS TRANSFERS FOR INTERPAL TO CHARITIES AND FOR CHARITABLE PURPOSES ........................................................ 1

    A.     Undisputed Facts Concerning NatWest's Knowledge Of Interpal's Stated Charitable Purposes .................................................................................. 1

    B.     Undisputed Facts Concerning NatWest's Knowledge Of The Charitable Purposes For The Wire Transfers It Processed On Behalf Of Interpal To The 13 Charities .................................................................................... 3

    C.     Undisputed Facts Concerning NatWest's Knowledge Of Interpal's Use Of Funds ................................................................................................... 3

II.     UNDISPUTED FACTS SHOWING THAT NATWEST WOULD NOT HAVE KNOWINGLY FACILITATED TERRORISM AND WAS MORALLY AND ETHICALLY OPPOSED TO DOING SO ........................................................ 4

Pursuant to Local Rule 56.1 of the Local Rules of Civil Practice of the U.S. District Court

for the Eastern District of New York, defendant National Westminster Bank Plc ("NatWest")

submits the following supplemental statement of material facts as to which there is no genuine

dispute.  Where indicated, the documents, deposition testimony and other materials cited in this

Rule 56.1 Statement are being submitted with this supplemental Rule 56.1 Statement as exhibits

to the Declaration of Mark E. McDonald, dated April 11, 2018 ("McDonald Declaration").

## I.   UNDISPUTED FACTS SHOWING THAT, TO NATWEST'S KNOWLEDGE, IT WAS FACILITATING FUNDS TRANSFERS FOR INTERPAL TO CHARITIES AND FOR CHARITABLE PURPOSES

### A.   Undisputed Facts Concerning NatWest's Knowledge Of Interpal's Stated Charitable Purposes

1.      On March 11, 1998, Gerald Matthews, a NatWest employee and Relationship

Manager for the accounts of Palestinian Relief & Development Fund (a/k/a Interpal) ("Interpal")

at the time, completed a customer appraisal form for Interpal describing it as an organization that

"[p]rovides charitable relief" in Palestine and Lebanon, usually involving "food or allowances

for children's education."  The form further noted that the "[t]wo major times of the year for

receipts are Ramadan . . . and at Easter time."  McDonald Decl. Ex. 1.

2.      On January 17, 2002, Martin Wiltshear, an employee in NatWest's Fraud Office,

sent an email to Belinda Lane, who was then Relationship Manager for Interpal's accounts,

requesting "details of the most recent due diligence undertaken in respect of the Bank's

knowledge of dealings in [Interpal's] US$ account."  In response, Lane provided details about

Interpal, including that it "[p]rovide[s] charitable relief to refugees in Israel, West Bank & Gaza

and Lebanon" and that its receipt of funds is seasonal, "usually at Ramada[n] and Easter."  Lane

further stated that she had scheduled a January 21, 2002 meeting with Jihad Qundil, Interpal's

Secretary, at Interpal's premises, at which she would discuss with Qundil Interpal's current operations.  McDonald Decl. Ex. 2.

3.      Lane met with Qundil at Interpal's premises on March 20, 2002.  (Lane testified that the meeting scheduled for January 21, 2002 likely was deferred until March 20.)  Qundil told Lane that Interpal was a charity that provided assistance in Palestine and Lebanon, including via food parcels and cash.  Qundil also told Lane that Interpal sponsored a summer campaign for the benefit of Muslim orphans.  McDonald Decl. Ex. 3; Ex. 4 at 340:23-341:10.

4.      An August 2003 record from the Central Register of Charities maintained by the Charity Commission for England & Wales (the "Charity Commission"), which NatWest maintained in its files, listed among Interpal's "Objects" "the provision of aid and assistance, support[,] guidance[,] and comfort to poor[,] needy[,] sick children and widows."  McDonald Decl. Ex. 5.

5.      According to Interpal's Annual Reports and financial statements for years 1999 and 2003, which NatWest maintained in its files, Interpal's stated policy was "to distribute 80% of its income on Direct Charitable Projects, retain 10% as reserve for future distribution, and budget for 10% for Indirect Charitable Expenditure (i.e. 5% for Fundraising and 5% for Administration)."  Interpal stated that it often exceeded this target for direct charitable spending.  For example, Interpal said it spent 87.3 percent of the funds it received directly on charitable projects in 1999, 93 percent in 2000, 94.7 percent in 2001, and 94 percent in 2002.  McDonald Decl. Ex. 6 at NW052943, NW052957, NW052984, NW053017, NW053032, NW053067; Ex. 7 at NW052663.

6.      Interpal represented in its 2000 Annual Report, which NatWest maintained in its files, that "[w]hatever happens in the political arena – upon which we can have little or no

influence – the human tragedy that engulfs generation after generation of Palestinians demands our attention." McDonald Decl. Ex. 6 at NW052982.

**B.      Undisputed Facts Concerning NatWest's Knowledge Of The Charitable Purposes For The Wire Transfers It Processed On Behalf Of Interpal To The 13 Charities**

7.      Between November 8, 1996 and September 25, 2003, at the request of its customer Interpal, NatWest processed 457 wire transfers (the "Relevant Transfers") to the 13 charities that plaintiffs contend are alter egos of or controlled by Hamas (the "13 Charities). The stated purposes for these transfers included "Orphans Programme[s]," "Development of a Women and Maternity Clinic," "School Kit Project[s]," "Student Aid," "Emergency Medical Aid," "Food Parcels," "Winter Clothes Project[s]," "Community Development...Centres," "Mini Bus Project," "Ramadan Projects" and "Small Mosque Project." The bank records reflecting the stated purposes for the Relevant Transfers are accurately summarized in Exhibit 8 to the McDonald Declaration, which identifies those records by the Bates numbers with which they were produced to plaintiffs in discovery. McDonald Decl. Ex. 8 (Transfer Chart).[1]

8.      None of the Relevant Transfers was identified as being for any violent or terroristic purpose.

**C.      Undisputed Facts Concerning NatWest's Knowledge Of Interpal's Use Of Funds**

9.      On December 13, 2004, a description of Interpal from its website was circulated among senior NatWest employees, including Kevin Love, Alan Dickinson, Derek Weir, Jill Lewis, Graeme Wyles, Irvine Rodger and Guy Cole. The description stated that Interpal felt that

---

[1] NatWest prepared Exhibit 8 pursuant to Federal Rule of Evidence 1006 in order to avoid burdening the Court with the voluminous underlying bank records. Pursuant to that Rule, NatWest will provide the Court and plaintiffs with the underlying bank records upon request.

it was "bound by a religious duty and moral obligation to ensure that the funds" it received were "used for charitable purposes as specified." McDonald Decl. Ex. 9.

10.     In line with this duty and its "commitment to Public Accountability and Transparency," Interpal stated that it allowed transfers only to "bona fide organisations" and insisted upon "formal contractual relationships" with all of its partners. Specifically, Interpal said that partners were required to "sign and adhere strictly" to "strict Funding Agreement[s] to ensure the proper charitable use of funds as specified." *Id.*

11.     In addition, Interpal stated that recipients of funds from Interpal were "under a duty to provide progress reports and a final report of the projects they implement[ed] on [Interpal's] behalf . . . supported by relevant documents (e.g. receipts of purchases and distribution of funds) and photographic or video records." *Id.*

12.     In its Annual Reports, including for years 1999-2001, which NatWest maintained in its files, Interpal explained that another control it employed to ensure that the funds it transferred were being used for their stated, charitable purposes was to send delegations to its "areas of operation" to report back on the progress of its projects. Interpal explained that sending these delegations both enabled Interpal to "ensure transparency and accountability of its operations" and also to identify areas of need for future projects. McDonald Decl. Ex. 6 at NW052938, NW052942, NW052980, NW053026; Ex. 7 at NW052648.

## II.     UNDISPUTED FACTS SHOWING THAT NATWEST WOULD NOT HAVE KNOWINGLY FACILITATED TERRORISM AND WAS MORALLY AND ETHICALLY OPPOSED TO DOING SO

13.     Amanda Holt, Head of Group Enterprise Risk, testified that "I could never ever condone terrorism. Okay? It doesn't matter who is doing it. That is me as an individual and me as an employee." McDonald Decl. Ex. 10 at 81:10-13.

14.     Holt further testified that: "The Group as a whole and me as an individual had absolutely no tolerance whatsoever . . . [for] funding terrorism.  If there was any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway. . . .  I took my responsibilities very, very seriously, not just because of the financial penalties that went with sanctions and, you know, the terrorist legislation" but also "[a]s a matter of personal integrity." *Id.* at 80:7-81:3.

15.     Holt further testified that "in terms of terrorist financing, there was no risk based judgment . . . you had to comply . . . as quickly as possible.  So I know I wouldn't have sat on it: 'What should we do about this?'  I would have reacted very quickly to get the information we as team needed to make sure that the bank acted quickly and appropriately."  In addition, when asked, "if the bank believed that Interpal was funding terrorism . . . would they have kept Interpal on as a client?" Holt responded, "I absolutely believe they would not have." *Id.* at 71:14-22, 227:1-11.

16.     On December 10, 2004, in response to an email that she was sent forwarding a link to an article "talking about accounts hel[d] by Hamas with NatWest," Holt wrote "we were aware that we had accounts for people connected to Hamas, but not Hamas itself." In the email in the same chain immediately following Holt's, Stephen Foster, Head of Anti-Money Laundering Compliance in Group Risk Management, wrote "[a]s Amanda says, we were aware of one account with *alleged* links to Hamas – Interpal – but not that we had actual ac[c]ounts for Hamas." (emphasis added).  Holt herself wrote later in the email chain that, "[i]n summary, Interpal are a charity customer of CBFM.  They have *alleged* links with Hamas . . . ." (emphasis added).  In addition, Holt testified that in her original email she was referring to Interpal's

"alleged" links with Hamas, as she subsequently wrote in her later email. *Id.* at 90:24-91:8; Ex. 11.

17.    Foster testified that NatWest did not "want to be related to terrorism at all . . . [and] wouldn't have had any hesitation in closing" an account if the bank were "concerned that it was linked to terrorism." McDonald Decl. Ex. 12 at 209:8-24.

18.    Irvine Rodger, Head of the Corporate Banking and Financial Markets Division's Money Laundering Prevention Unit, testified that "the bank would not keep [an] account open if it was funding terrorism, end of story, absolutely no doubt." McDonald Decl. Ex. 13 at 128:10-129:4.

19.    Neil Trantum, the Head of Group Investigations and Fraud, testified that he "would not want to be involved in [terrorist financing], ethically or reputationally." As a result, if bank employees "thought terrorist finance was going on, [the account] would have just been closed. It would not have been: 'Let's have a think about what the risks are . . . .'" McDonald Decl. Ex. 14 at 142:12-143:2.

20.    Lane testified that Interpal's transactions never caused her to suspect terror financing. McDonald Decl. Ex. 4 at 353:15-17.

21.    Ian Wickens, who occupied multiple anti-money laundering compliance roles throughout his career at the bank, testified that NatWest "would never have wanted to not report something which could have had a terrorist connection." McDonald Decl. Ex. 15 at 78:10-12.

Dated: April 11, 2018
      New York, New York

             Respectfully submitted,

             CLEARY GOTTLIEB STEEN & HAMILTON LLP

             By: _____
                Jonathan I. Blackman
                Lawrence B. Friedman

             One Liberty Plaza
             New York, New York 10006
             (212) 225-2000

             Attorneys for Defendant National Westminster Bank Plc