UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

TZVI WEISS, et al.,

                           Plaintiffs,

        - against -

NATIONAL WESTMINSTER BANK PLC,

                           Defendant.

Case No. 05-CV-4622 (DLI) (RML)

--------------------------------------------------------- X

NATAN APPLEBAUM, et al.,

                           Plaintiffs,

        - against -

NATIONAL WESTMINSTER BANK PLC,

                           Defendant.

Case No. 07-CV-916 (DLI) (RML)

**Oral Argument Requested**

--------------------------------------------------------- X

## MEMORANDUM OF LAW OF DEFENDANT NATIONAL WESTMINSTER BANK PLC IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

April 11, 2018

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ............................................................................................................. 4

I.    NATWEST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
      CLAIMS ........................................................................................................... 4

      A.    After *Linde*, Plaintiffs Must Present A Triable Case That NatWest
            Engaged In Violent Acts Or Acts Dangerous To Human Life With
            Apparent Terroristic Intent ................................................................... 4

      B.    No Reasonable Juror Could Find That Plaintiffs Have Satisfied Either The
            "Violence Or Acts Dangerous To Human Life" Or "Terroristic Intent"
            Prongs Of The "International Terrorism" Element Of Their Claims ................... 9

            1.    There Is No Triable Issue With Respect To The Violence Prong ............ 9

            2.    There Is No Triable Issue With Respect To The Terroristic Intent
                  Prong .......................................................................................... 13

      C.    The Fact That There Was A Jury Question In *Linde* Does Not Support The
            Conclusion That There Is One Here ..................................................... 16

II.   EVEN IF PLAINTIFFS WERE PERMITTED TO REINSTATE OR REPLEAD
      THEIR AIDING AND ABETTING CLAIM, WHICH THEY HAVE NOT
      DONE, NATWEST WOULD BE ENTITLED TO SUMMARY JUDGMENT ON
      THAT CLAIM .................................................................................................. 20

CONCLUSION ......................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

18 U.S.C. § 2331(1) ............................................................................... *passim*

18 U.S.C. § 2333(a) .............................................................................. *passim*

18 U.S.C. § 2339B ................................................................................ *passim*

**Cases**

*Begley v. Ford Motor Co.*,
476 F.2d 1276 (2d Cir. 1973) .............................................................. 17

*Boim v. Holy Land Found. for Relief and Dev.*,
549 F.3d 685 (7th Cir. 2008) ............................................................... 19

*Boim v. Quranic Literacy Inst.*,
340 F. Supp. 2d 885 (N.D. Ill. 2004) .................................................. 20

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................................. 7

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ................................................................ *passim*

*Linde v. Arab Bank, PLC*,
97 F. Supp. 3d 287 (E.D.N.Y. 2015) .................................................. 18, 19

*MacDraw, Inc. v. CIT Grp. Equip. Fin. Inc.*,
157 F.3d 956 (2d Cir. 1998) ................................................................ 21

*Morangelli v. Chemed Corp.*,
922 F. Supp. 2d 278 (E.D.N.Y. 2013) ................................................ 12

*United States v. Haipe*,
769 F.3d 1189 (D.C. Cir. 2014) .......................................................... 9

**Page(s)**

*United States v. Wells,*
163 F.3d 889 (4th Cir. 1998) ............................................................................ 6

*Weiss v. Nat'l Westminster Bank PLC,*
453 F. Supp. 2d 609 (E.D.N.Y. 2006) .............................................................. 21, 23

*Weiss v. Nat'l Westminster Bank PLC,*
768 F.3d 202 (2d Cir. 2014)............................................................................. *passim*

Pursuant to Federal Rule of Civil Procedure 56 and the Court's Orders dated March 14 and March 27, 2018, defendant National Westminster Bank Plc ("NatWest") respectfully submits this memorandum of law, together with its Supplemental Statement of Additional Material Facts as to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 ("Supplemental 56.1 Statement") and the Declaration of Mark E. McDonald ("McDonald Declaration") and the exhibits thereto, in support of NatWest's motion for summary judgment based on the new standards for civil liability under the Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333(a), established by the Second Circuit in *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018).[1]

## PRELIMINARY STATEMENT

Under *Linde*, a civil plaintiff seeking damages under the ATA must show, in addition to violations of a predicate criminal statute by the defendant, that the defendant engaged in violent acts or acts dangerous to human life, and did so with apparent terroristic intent. Plaintiffs here have failed to present any facts on which a reasonable jury could find in plaintiffs' favor with respect to either of these two required elements of civil liability against NatWest.

To the contrary, plaintiffs have no evidence that NatWest provided banking services to Interpal with the intent of terrorizing any civilian population or government. Nor is there any evidence that, by providing such banking services, NatWest participated in any terrorist attacks or funded any terrorists. Rather, discovery has confirmed that NatWest processed routine wire transfers for its customer, Interpal, a lawful UK charity, that were earmarked for express

---

[1] NatWest's Supplemental 56.1 Statement is cited as "NW Supp. 56.1 Stmt. ¶ ___." NatWest's original Statement of Material Facts as to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1, dated December 7 2011, ECF No. 279, is cited as "NW 2011 56.1 Stmt. ¶ ___," and plaintiffs' response thereto, dated January 30, 2012, ECF No. 283, is cited as "Pls.' Resp. to NW 2011 56.1 Stmt. ¶ ___." All exhibits cited herein are attached to the McDonald Declaration. Unless otherwise specified, all citations to "ECF Nos." are to the docket in *Weiss*, Case No. 05-cv-4622 (DLI) (RML).

charitable purposes such as supporting orphans, schools, hospitals and religious institutions. Discovery also has confirmed that NatWest, a leading UK bank, did not remotely share Hamas's terrorist goals and, in fact, opposed them and all other forms of terrorism. On this record, no reasonable juror could conclude that NatWest's conduct bespeaks any intent to terrorize the Israeli population or government. Nor could any reasonable juror conclude that NatWest's conduct involved violence or acts dangerous to human life.

Under *Linde* and on this record, completed after years of discovery, plaintiffs therefore have no triable case against NatWest. Up to now, plaintiffs have pursued these lawsuits on the convoluted theory that, "through a chain of statutory incorporation by reference,"[2] NatWest's provision of routine banking services to Interpal constituted "international terrorism," provided plaintiffs could show that NatWest knew it was giving material support to Hamas-controlled charities in violation of 18 U.S.C. § 2339B. In *Linde*, the Second Circuit has now squarely rejected this theory. Under *Linde*, an ATA plaintiff must prove not only that the defendant's conduct violated a predicate criminal statute such as § 2339B, but *separately* that the defendant's conduct *also* (a) involved "violent acts or acts dangerous to human life" *and* (b) was apparently intended "to intimidate or coerce a civilian population" or "the policy of a government." *Id.* § 2331(1). In their pre-motion letter to the Court and previously in these lawsuits, plaintiffs did not dispute that they have no evidence that would satisfy these separate prongs of the "international terrorism" element of their claims. The Court should therefore grant NatWest summary judgment.

---

[2] Br. for Plaintiffs-Appellants at 33-34, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014) (No. 13 Civ. 1618), ECF No. 40 ("Pls.' Second Circuit Br.").

Plaintiffs also argued in their pre-motion letter that, because the Second Circuit found a jury question on the "violent acts" and "terroristic intent" prongs on the facts of *Linde*, this Court should automatically do the same here. This argument is a makeweight. The availability of summary judgment depends on the facts of each case, and the facts of *Linde* and of the present actions are radically different. In *Linde*, there was evidence that Arab Bank shared Hamas's terrorist goals and that it knowingly and willingly supported suicide bombings by Hamas terrorists in furtherance of those goals. There is nothing even remotely resembling such evidence here, and plaintiffs have never suggested otherwise.

Plaintiffs also referred in their pre-motion letter to a purported aiding and abetting claim, but that effort to rescue their case after *Linde* is also misplaced. Their aiding and abetting claim was dismissed over a decade ago, and they have not sought to replead it. If plaintiffs think they have a new aiding and abetting claim based on the Justice Against Sponsors of Terrorism Act ("JASTA"), they have not sought to allege one, and in any event such a repleading would be futile. *Linde* held that aiding and abetting liability under the ATA is narrowly cabined to a defendant that provides substantial assistance to terrorist *acts* – and not merely to terrorist *organizations* – while knowing that the defendant itself is participating in such terrorist acts. Plaintiffs have presented no evidence to meet that standard because, at most, the evidence shows that NatWest knowingly provided banking services to allegedly Hamas-controlled charities for charitable – *not* violent – activities, which does not suffice to establish the bank's liability. Thus, even if plaintiffs properly asserted an aiding and abetting claim, which they have not, the Court would need to grant NatWest summary judgment on that claim too.

## ARGUMENT

I. **NATWEST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS**

    A.     **After *Linde*, Plaintiffs Must Present A Triable Case That NatWest Engaged In Violent Acts Or Acts Dangerous To Human Life With Apparent Terroristic Intent**

Section 2333(a) of the ATA provides a civil claim for "[a]ny national of the United States" injured "by reason of an act of international terrorism." In turn, "international terrorism" is defined to encompass activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
> (i) to intimidate or coerce a civilian population;
>
> (ii) to influence the policy of a government by intimidation or coercion; or
>
> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).

Plaintiffs have asserted – and this Court ruled, before *Linde* materially changed the legal requirements for plaintiffs' claims – that they can prove NatWest committed an "act of international terrorism" for purposes of the ATA based solely on evidence that NatWest violated the ATA's predicate material support statute, 18 U.S.C. § 2339B, which prohibits the knowing provision of material support to a designated foreign terrorist organization ("FTO"), here by

facilitating Interpal's transfers of funds from its NatWest accounts to 13 charities (the "13 Charities") that plaintiffs contend are *alter egos* of or controlled by Hamas, which is an FTO. *See* Opinion and Order at 6, 21 (Mar. 28, 2013), ECF No. 310, *vacated on other grounds*, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014). In *Linde* the Second Circuit squarely rejected this interpretation of the "act of international terrorism" element of a civil ATA claim. Specifically, *Linde* held that it was error for the district court to have instructed the jury to find the "international terrorism" element is satisfied if the jury found Arab Bank violated § 2339B. 882 F.3d at 325. Instead, "the court was required to charge, and the jury obliged to find proved, the definitional requirements of § 2331(1) to find Arab Bank liable as a principal under § 2333(a)." *Id.* at 326.

Linde thus confirms that § 2331(1) imposes three *separate* requirements, all of which plaintiffs must satisfy.[3] *First*, plaintiffs must prove that NatWest's acts were "a violation of the criminal laws of the United States or of any State." 18 U.S.C. § 2331(1)(A). *Second*, plaintiffs must prove that NatWest's actions "involve[d] violent acts or acts dangerous to human life." *Id.* *Third*, plaintiffs must prove that NatWest's acts "appear to [have been] intended" "to intimidate or coerce a civilian population" *or* "to influence the policy of a government by intimidation or coercion," *or* "to affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id.* § 2331(1)(B). *See Linde*, 882 F.3d at 326.

The first *Linde* prong, by its terms, is satisfied by showing that the defendant provided knowing material support to an FTO in violation of § 2339B, a criminal statute "of the United States."[4] *Linde* held that the remaining two prongs, however, require proof of more than is

---

[3] The fourth required element under § 2331(1) – that the acts "occur primarily outside the territorial jurisdiction of the United States" – is not in dispute.

[4] The Second Circuit previously ruled that there is a triable issue of fact regarding whether NatWest's provision of routine banking services to its customer Interpal constituted the knowing provision of material support to an FTO in

required to show a violation of § 2339B.  *See id.* at 326 (noting a violation of § 2339B "does not invariably equate to an act of international terrorism").

 *(a)  The requirement that the defendant engage in violence or acts dangerous to human life.*  In *Linde*, the Second Circuit began with the obvious point that financial services, unlike suicide bombings, are not inherently violent or dangerous.  *See id.* at 326-27 (contrasting a "suicide bombing," which "is unquestionably a violent act," with "providing financial services to a known terrorist organization," which may "not involve violence or endanger life").  On the specific facts of *Linde*, the Court of Appeals then found there to be a jury question as to whether Arab Bank's provision of financial services to Hamas in connection with Hamas's violent activities – including processing payments specifically for suicide bombings – satisfied the violence prong.  *See id.* at 327.  But as a matter of law, *Linde* makes clear that, in order for financial services to constitute violent or dangerous acts, they must be closely connected to violent or dangerous activities.  *See id.* at 328 (noting bank's "services themselves" must "involve[] violence or danger to life").  Other decisions that have construed the term "international terrorism" (or "terrorism") in § 2331(1) have similarly – and unsurprisingly – concluded that for otherwise lawful acts, like bank transfers, to qualify as acts of terrorism they must have a direct connection to violence.  *See United States v. Wells*, 163 F.3d 889, 899-900 (4th Cir. 1998) (looking to § 2331(1) for guidance on whether an act committed within the United States qualified as terrorism, and finding that the purchase and transport of a Chevrolet Suburban for the purpose of abducting and murdering government officials qualified as terrorism).

---

violation of § 2339B because NatWest allegedly knew or was willfully blind that it was transferring funds for Interpal to the 13 Charities that were allegedly *alter egos* of Hamas, an FTO. *See Weiss*, 768 F.3d at 211.  NatWest respectfully maintains that plaintiffs cannot prove a knowing violation of § 2339B, but will assume *arguendo* for purposes of this motion that they can do so.

By contrast, the provision of financial services, even to a known FTO, that is not directly connected to violent acts does not satisfy the violence prong under *Linde*. In particular, by rejecting the argument by the *Linde* plaintiffs – the same persons who are suing NatWest here – that any violation of § 2339B necessarily satisfies the violence or danger to human life prong, *Linde* also rejected the "fungibility" principle on which plaintiffs have relied from the start of these cases in an attempt to establish that the provision of financial services to an FTO (which they claim occurred here because NatWest sent funds at Interpal's request to charities allegedly controlled by Hamas) is inherently violent or dangerous for purposes of civil liability under § 2333(a). In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court applied the fungibility principle to hold that § 2339B criminalizes *all* material support to an FTO – even for overtly charitable or non-violent purposes – based on Congress's finding that such support *always* "frees up" funds for, or otherwise enables, the FTO to engage in terrorist acts. *Id.* at 29-31. *Linde* clearly held, however, that a violation of § 2339B is *not* enough to satisfy the "international terrorism" element of a civil liability claim under § 2333(a). 882 F.3d at 327. Likewise, *Linde* rejected the related argument that plaintiffs could satisfy the "violence or acts dangerous to human life" prong by showing that their "injuries were reasonably foreseeable or anticipated as a natural consequence of" the provision of financial services to an FTO, regardless of whether that support was provided for the FTO's non-violent activities. *Id.* at 328. Rather, there must be evidence that the defendant provided direct support for violent acts and not merely for the non-violent activities of an FTO.

   *(b) The requirement that the defendant acted with apparent terroristic intent*. The terroristic intent prong "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster*

*Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014). *Linde* makes clear that this "objective

standard" depends on what the defendant knows and does, and asks what a reasonable observer

would conclude the defendant intended given its knowledge and conduct. 882 F.3d at 327

(noting terroristic intent prong turned on whether Arab Bank's provision of financial services to

Hamas was "routine" or whether it was, for example, knowingly funding suicide bombings); *see

also id.* at 330 (noting that "certain communications dating from as early as 2001, *i.e.*, before the

attacks here at issue, could have alerted [Arab Bank] that the transfers being requested therein

were payments for suicide bombings"). Thus, although the terroristic intent prong of § 2331(1)

does not impose a subjective *scienter* requirement, the bank's knowledge about the uses to which

its financial services were put is relevant to this prong because these facts are necessarily critical

to a reasonable observer's determination of the "apparent intentions" of the defendant's actions.

If the defendant did not, at a minimum, know that it was supporting the violent activities of a

terrorist organization, no objective observer could conclude that it had the requisite apparent

terroristic intent. *See id.* at 327.

As with the "violence or acts dangerous to human life" prong, proving merely that the

defendant provided material support to a known FTO in violation of § 2339B is insufficient to

satisfy the terroristic intent prong. *Id.* at 326. Rather, a plaintiff must show not merely that the

defendant knew it was providing material support to a terrorist organization, but also that an

objective observer would conclude, based on the defendant's own conduct and knowledge of

relevant circumstances, that the defendant had the extraordinary intent, in providing such

support, to thereby coerce or intimidate a civilian population or government. This is a high

hurdle: even knowingly participating in violent activities that would satisfy the first prong under

*Linde* does not suffice to satisfy the separate requirement of apparent terroristic intent. *Id.* at 327

(noting § 2331(1)(B) serves to "distinguish terrorist acts from other violent crimes"); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (expressing doubt as to whether kidnapping and ransom committed by a defendant who was "a high official of an organization with a sole purpose of establishing an Islamic government" could satisfy the "apparent intent" prong of § 2331(1) absent additional actions by the defendant that appeared to be intended to intimidate a population or influence a government). Rather, the plaintiff must present evidence of conduct and knowledge that would cause a reasonable observer to conclude that the defendant wished to "coerce," by means of violence and fear, an entire civilian population or government into submission to the defendant's goals. A reasonable observer (or reasonable juror) would, at a minimum, look to whether the defendant actually had a goal to achieve by terrorizing such a population or government before concluding that it apparently intended to do so, and the absence of one would make it impossible to reach such a conclusion.

**B.** **No Reasonable Juror Could Find That Plaintiffs Have Satisfied Either The "Violence Or Acts Dangerous To Human Life" Or "Terroristic Intent" Prongs Of The "International Terrorism" Element Of Their Claims**

1. <u>There Is No Triable Issue With Respect To The Violence Prong</u>

No reasonable juror could find on the record of these cases that NatWest's banking services to its customer Interpal involved violence or acts dangerous to human life. Even if plaintiffs could prove that NatWest was knowingly providing banking services to alleged Hamas-controlled charities, as plaintiffs contend, the evidence shows at most that NatWest was facilitating funds transfers to *charities* for *charitable purposes*. There is no evidence that NatWest provided financial services (much less knowingly) for violent or terrorist activities.

Undisputed evidence from NatWest's contemporaneous records demonstrates that, to NatWest's knowledge, and regardless of Interpal's alleged support for Hamas, Interpal was a *charity* aiming to do good works in a deeply deprived and troubled region. Customer

9

information forms and emails between NatWest employees describe Interpal as an organization that "provides charitable relief" in Palestine and Lebanon, usually involving "food or allowances for children's education," at highest volume close to Muslim holidays. *See* NW Supp. 56.1 Stmt. ¶¶ 1-2; Exs. 1, 2. NatWest's records also include internal meeting minutes describing Interpal's orphan relief projects and emergency humanitarian assistance, NW Supp. 56.1 Stmt. ¶ 3; Ex. 3; a Charity Commission record describing Interpal's purpose as "the provision of aid and assistance, support[,] guidance[,] and comfort to poor[,] needy[,] sick children and widows," NW Supp. 56.1 Stmt. ¶ 4; Ex. 5; and Interpal's annual reports that discuss Interpal's charitable projects and report that eighty percent or more of Interpal's funds are "expended on direct charitable projects" and the rest on "indirect charitable expenditures," such as fundraising, or administrative costs. NW Supp. 56.1 Stmt. ¶ 5; Ex. 6 at NW052943; NW052957, NW052984, NW053017, NW053032, NW053067; Ex. 7 at NW052663. Interpal's 2000 Annual Report, which it provided to NatWest, also expressed its lack of a political agenda in Israel: "Whatever happens in the political arena - upon which we [Interpal] can have little or no influence – the human tragedy that engulfs generation after generation of Palestinians demands our attention." NW Supp. 56.1 Stmt. ¶ 6; Ex. 6 at NW052982.[5]

The record also demonstrates that the vast majority of transfers to the 13 Charities that NatWest processed on behalf of Interpal were expressly earmarked for charitable purposes. *See* NW Supp. 56.1 Stmt. ¶¶ 7-8; Ex. 8 (Transfer Chart).[6] For example, nearly half of the transfer requests processed by NatWest on behalf of Interpal to the 13 Charities had a stated purpose

---

[5] Interpal remains today, more than 15 years after the relevant events, a lawful, registered charity in the UK.

[6] Pursuant to Federal Rule of Evidence 1006, and in order to avoid burdening the Court with the voluminous underlying bank records, NatWest prepared Exhibit 8 as a summary of the relevant records, which were previously produced by NatWest in these lawsuits and are identified in Exhibit 8 by the Bates numbers with which they were produced in discovery. NatWest will provide the Court and plaintiffs with the underlying bank records upon request. *See* NW Supp. 56.1 Stmt. ¶ 7.

indicating they were for the benefit of children and families, such as "Orphans Programme[s]," "Development of a Women and Maternity Clinic," "School Kit Project[s]," and "Student Aid." *Id.* Other transfers were designated as being for emergency food, clothing and humanitarian relief, such as "Emergency Medical Aid," "Food Parcels," and "Winter Clothes Project[s]." *Id.* More still were designated for community development and infrastructure purposes, including "Community Development . . . Centres" and "Mini Bus Project." *Id.* Numerous others were for religious initiatives such as "Ramadan Projects" and "Small Mosque Project." *Id.* There are no transfer requests – *none* – indicating the transfers were for any sort of violent, terroristic purpose. *Id.*

NatWest's records also show – without contradiction – that NatWest understood Interpal to be committed to ensuring that its funds actually went to the charitable purposes described in these transfer request forms.  For example, as far as NatWest knew, Interpal felt "bound by a religious duty and moral obligation to ensure that the funds are used for charitable purposes as specified," NW Supp. 56.1 Stmt. ¶ 9; Ex. 9; that its beneficiaries were all themselves "bona fide organisations" "subject to . . . strict Funding Agreement[s] to ensure the proper end use of funds as specified," NW Supp. 56.1 Stmt. ¶ 10; Ex. 9; and that parties receiving Interpal's funds had a duty to provide reports on the progress of projects implemented with Interpal funds, "supported by relevant documents . . . and photographic or video records."  NW Supp. 56.1 Stmt. ¶ 11; Ex. 9.  NatWest was also aware that Interpal sought to send delegations to the Occupied Territories, to report back on the progress of these Interpal-funded projects.  NW Supp. 56.1 Stmt. ¶ 12; Ex. 6 at NW052938, NW052942, NW052980, NW053026; Ex. 7 at NW052648.

Plaintiffs do not dispute any of this.  To the contrary, they have conceded they have no evidence that any of the transfers processed by NatWest were used for terrorism or anything

other than charity. *See* Pls.' Resp. to NW 2011 56.1 Stmt. ¶ 248 ("Plaintiffs admit they 'do not contend that any of the funds Interpal transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones.'") (quoting Pls.' Resp. to Contention Interrog. no. 12).[7] Moreover, plaintiffs have conceded that the 13 Charities in fact provided the charitable services they claimed to provide, that they were in several instances also funded by the United States government itself, and that none had been designated as terrorist organizations by the United States, the European Union or the United Kingdom when these transfers occurred. *See* Pls.' Resp. to NW 2011 56.1 Stmt. ¶¶ 289-292, 340-344.

Plaintiffs' own experts, Matthew Levitt and Arieh Spitzen, on whom plaintiffs rely to argue that the 13 Charities were front organizations for Hamas, likewise admit that the 13 Charities performed the charitable services they undertook to provide with donations from abroad, that Hamas did not publicize its purported association with any of these charities, and that it was "less common" and "more rare" for any funds donated to such charities to be diverted for the purposes of terrorism. *See* NW 2011 56.1 Stmt. ¶¶ 262-264, 330, 340-342. Plaintiffs also admit that Levitt and Spitzen do *not* opine: (1) "that any funds transferred by Interpal through its NatWest accounts was used to perpetrate the 15 attacks," Pls.' Resp. to NW 2011 56.1 Stmt. ¶¶ 253, 268; (2) "that any of the [13][8] Charities participated in any of the 15 attacks," *id.* ¶¶ 254, 267; (3) "that any of the [13] Charities planned the 15 attacks," *id.* ¶¶ 255, 266; (4) "that any of the [13] Charities trained the perpetrators of the 15 attacks," *id.* ¶¶ 256, 271; (5) "that any of the

---

[7] These concessions are binding on plaintiffs. *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 311 (E.D.N.Y. 2013) (responses to contention interrogatories are "judicial admissions that generally estop the answering party from later seeking to assert positions omitted from, or otherwise at variance with, those responses.") (quoting *Wechsler v. Hunt Health Sys. Ltd.*, No. 94 Civ. 8294, 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999)).

[8] Levitt's report refers to 12 charities.

[13] Charities requested that someone carry out any of the 15 attacks," *id.* ¶¶ 258, 272; or (6) "that any of the [13] Charities was the cause of any of the 15 attacks," *id.* ¶¶ 259, 269.[9]

Unlike the transfers explicitly designated for suicide bombings in *Linde*, none of the transfers processed by NatWest on behalf of Interpal was connected to any violent act. At most, plaintiffs have alleged that providing funds to the 13 Charities *indirectly* contributed to terrorism based on the fungibility principle, *i.e.*, that funding charitable works freed up funds or otherwise enabled Hamas to separately carry out terrorist attacks. *See* Pls.' Resp. to NW 2011 56.1 Stmt. ¶¶ 249-250, 276-277. But that is insufficient as a matter of law to satisfy the violence or acts dangerous to human life prong after *Linde*. In sum, plaintiffs cannot satisfy that prong, and NatWest is entitled to summary judgment for that reason alone.

2.      There Is No Triable Issue With Respect To The Terroristic Intent Prong

In addition, no reasonable juror could find that NatWest's conduct was apparently intended to intimidate or coerce the Israeli civilian population or government. As shown above, *Linde* makes clear that plaintiffs must, at a minimum, identify evidence that the bank knew it was providing banking services for terrorist acts to satisfy this prong. But plaintiffs have never asserted – and in fact they have essentially conceded that they cannot not prove – that NatWest knowingly provided financial services for terrorist activities. *See* Pls.' Resp. to NW 2011 56.1 Stmt. ¶ 249 (disputing statement that "there is no evidence in the record[] that any of the Identified Interpal Transfers were used to finance any other terrorist attacks" only by referring to the U.S. Supreme Court's *Holder* decision articulating the fungibility principle).

---

[9] Plaintiffs further admit that Levitt does not opine "that any of the 12 Charities provided logistical support for the 15 attacks," *id.* ¶ 257; "that any of the 12 Charities recruited the perpetrators of the 15 attacks," *id.* ¶ 260; or "that any of the perpetrators of the 15 attacks were recruited from any of the 12 Charities," *id.* ¶ 261; and that Spitzen does not opine "that any of the 13 Charities transferred funds to the perpetrators of the 15 attacks," *id.* ¶ 270.

In successfully obtaining the reversal of this Court's prior grant of summary judgment to NatWest, plaintiffs themselves expressly told the Second Circuit that NatWest knew *only* that it was providing material support for non-violent purposes:

> [T]he District Court incorrectly disregarded *evidence of NatWest's knowledge that it was providing material support for the "charitable" or "social" activities of Hamas. Plaintiffs do not dispute that none of the payments processed by Interpal for the benefit of Hamas was overtly earmarked for either Hamas's terror cells or violent acts ("bullets" or "explosives")*, but this distinction is irrelevant under the ATA. Thus, the District Court[] . . . erred by overlooking evidence creating a genuine dispute whether NatWest knew of links to Hamas, including Hamas's charitable or social service activities.

Pls.' Second Circuit Br. at 28-29 (emphasis added). After *Linde*, the absence of evidence that any of the transfers NatWest processed were for terrorism is no longer irrelevant, and instead is *crucial* to satisfying the terroristic intent prong of plaintiffs' claims. Indeed, in analyzing why there was a triable issue of violation of § 2339B's criminal material support provision, the Court of Appeals homed in on evidence "that NatWest had knowledge that, or exhibited deliberate indifference to whether, Interpal financed Hamas's *non-political* and *non-violent* activities." *Weiss*, 768 F.3d at 210 (emphasis in original). But under *Linde*, this is not sufficient to show civil liability for an act of "international terrorism" under § 2333(a). To the contrary, on this record, including NatWest's banking records, *see supra* at 9-11, showing its knowledge of transfers to charities and not for violent purposes, the fact that NatWest did not knowingly fund terrorism is beyond dispute.

It is also undisputed that NatWest had no motive to fund terrorism and did not intend to do so. *See* Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 34 n.22 (Jan. 30, 2012), ECF No. 281 (arguing that plaintiffs need not prove motive). NatWest employees testified without contradiction at their depositions that neither they nor the bank would have knowingly

facilitated terrorism because they were morally and ethically opposed to doing so.  Amanda Holt,

the head of Group Enterprise Risk and the author of the isolated statement upon which the Court

of Appeals primarily relied in reversing this Court's earlier summary judgment in this action,

*Weiss*, 768 F.3d at 211,[10] was clear that she condemned terrorism and that NatWest had a zero-

tolerance policy towards it.  She said, "I could never ever condone terrorism.  Okay?  It doesn't

matter who is doing it.  That is me as an individual and me as an employee," NW Supp. 56.1

Stmt. ¶ 13, and "[t]he Group as a whole and me as an individual had absolutely no tolerance

whatsoever . . . [for] funding terrorism.  If there was any thought whatsoever that a customer of

the bank was funding terrorism or was getting involved in any type of financial crime, that would

have been reported straightaway . . . .  I took my responsibilities very, very seriously, not just

because of the financial penalties that went with sanctions and, you know, the terrorist

legislation" but also "[a]s a matter of personal integrity," *id.* ¶ 14.[11]

  Other employees provided similar testimony, explicitly condemning terrorism and

explaining that NatWest had absolutely no tolerance for it.  For example, Stephen Foster, the

head of Anti-Money Laundering Compliance in Group Risk Management, testified that NatWest

did not "want to be related to terrorism at all . . . [and] wouldn't have had any hesitation in

closing" an account if the bank were "concerned that it was linked to terrorism."  *Id.* ¶ 17.  Irvine

---

[10] In December 2004, a NatWest employee received a Google alert with a link to an article "talking about accounts hel[d] by Hamas with NatWest."  NW Supp. 56.1 Stmt. ¶ 16; Ex. 11.  In the course of the ensuing email discussion, Amanda Holt wrote that "we were aware that we had accounts for people connected to Hamas, but not Hamas itself."  *Id.*  The subsequent email correspondence and Holt's deposition testimony make clear that Holt was referring only to *alleged* links to Hamas.  *Id.*  The Second Circuit cited Holt's statement in concluding that plaintiffs had presented sufficient evidence to raise a triable issue of fact as to whether NatWest had the requisite *scienter* under § 2339B.  *Weiss*, 768 F.3d at 211.

[11] In addition, Holt testified that "in terms of terrorist financing, there was no risk based judgment . . . you had to comply . . . as quickly as possible.  So I know I wouldn't have sat on it: 'What should we do about this?'  I would have reacted very quickly to get the information we as team needed to make sure that the bank acted quickly and appropriately," *id.* ¶ 15, and when asked, "if the bank believed that Interpal was funding terrorism . . . would they have kept Interpal on as a client?" Holt responded, "I absolutely believe they would not have."  *Id.*

Rodger, the head of the Corporate Banking and Financial Markets Division's Money Laundering Prevention Unit, testified that "the bank would not keep [an] account open if it was funding terrorism, end of story, absolutely no doubt." *Id.* ¶ 18.  Neil Trantum, the head of Group Investigations and Fraud, testified that he "would not want to be involved in [terrorist financing], ethically or reputationally." *Id.* ¶ 19.  As a result, if bank employees "thought terrorist finance was going on, [the account] would have just been closed.  It would not have been: 'Let's have a think about what the risks are . . . .'" *Id.* ¶ 19.  Belinda Lane, the Interpal relationship manager at NatWest, testified that Interpal's transactions never caused her to suspect terror financing. *Id.* ¶ 20.  And Ian Wickens, who occupied multiple anti-money laundering compliance roles throughout his career at the bank, added that NatWest "would never have wanted to not report something that could have had a terrorist connection." *Id.* ¶ 21.

Plaintiffs have never disputed, and cannot dispute, any of this evidence, which precludes a reasonable juror from concluding that NatWest had an apparent intent to coerce a civilian population or government through terrorist acts.  Nor have plaintiffs ever adduced evidence – or even alleged – that NatWest shared Hamas's stated goals of "coercing" or "intimidating" Israel into ceding territory (or anything else Hamas wants to achieve through its violent acts), much less that NatWest felt so strongly about those goals that it was willing to engage in violent coercion or intimidation itself to achieve them.  To state the argument demonstrates its absurdity.  Plaintiffs cannot show a genuine issue of fact on the terroristic intent prong, and on this additional independent ground NatWest should be granted summary judgment.

### C.  The Fact That There Was A Jury Question In *Linde* Does Not Support The Conclusion That There Is One Here

Plaintiffs' sole pre-motion letter response to NatWest's motion for summary judgment based on *Linde* was to assert, without any attempt to argue that NatWest's actions satisfy the

statutory requirements of § 2331(1), that *Linde* "[held] that the 'act of international terrorism'

issue is a fact question for the jury." Letter from Shawn P. Naunton to Chief Judge Irizarry at 2

(Mar. 2, 2018), ECF No. 389 ("Pls.' Mar. 2, 2018 Letter"); *see also* Joint Letter to Chief Judge

Irizarry at 2 (Mar. 26, 2018), ECF No. 392 (asserting that the only issue before the Court with

respect to primary liability is "whether the evidence presented of Defendants' knowing violations

of 18 U.S.C. 2339B cannot constitute acts of international terrorism under the ATA as a matter

of law"). Plaintiffs' reliance on the fact that the Second Circuit found a jury question in *Linde* is

misplaced.

*First*, contrary to plaintiffs' argument that the Second Circuit held that the violence and

terroristic intent prongs *always* present a fact question for the jury, the Second Circuit in fact

ruled that evidence of Arab Bank's knowing provision of material support to an FTO, without

more, is *insufficient* as a matter of law to satisfy those prongs. After making clear the elements

needed to be shown to prove an "act of international terrorism," the Second Circuit vacated and

remanded the jury's verdict, which found, among other things, that Arab Bank had violated

§ 2339B. If the jury's finding that Arab Bank knowingly provided material support to Hamas in

violation of § 2339B was the "functional equivalent" of a finding that Arab Bank committed an

act of international terrorism, the Second Circuit would have concluded the charging error was

harmless and affirmed the verdict. *Linde*, 882 F.3d at 328 (quoting *Rasanen v. Doe*, 723 F.3d

325, 355 (2d. Cir. 2013)); *cf. Begley v. Ford Motor Co.*, 476 F.2d 1276, 1279 n.3 (2d Cir. 1973)

(affirming jury verdict in tort suit against defendant despite court's error in submitting

negligence claim to jury, because the adverse verdict meant jury necessarily also found for

plaintiff on elements of similar but less demanding breach of warranty claim). It did just the

opposite, because the evidence was not necessarily sufficient to sustain a verdict on the violence

and terroristic intent prongs.  Under *Linde*, plaintiffs' evidence that NatWest violated § 2339B is thus, without more, insufficient *as a matter of law* to prove that NatWest committed an act of international terrorism.  882 F.3d at 327.

*Second*, the evidence that the Second Circuit determined to have raised a question of fact for the jury in *Linde* bears no resemblance to the evidence plaintiffs have adduced here.  Among the evidence in *Linde* on which the Second Circuit concluded a jury could, but need not, find that Arab Bank's conduct satisfied the violence and terroristic intent prongs was that Arab Bank provided banking services to "known Hamas leaders and operatives," and processed wire transfers that "were explicitly identified as payments for suicide bombings."  *Id.* at 321. Specifically, there was evidence that:

- Arab Bank processed "24 payments to the families of suicide bombers from Hamas" including those "who perpetrated four of the terrorist attacks at issue." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 304 (E.D.N.Y. 2015).[12]

- Arab Bank processed nine transfers totaling $123,000 to the person who confessed to perpetrating one of the attacks. *Linde*, 97 F. Supp. 3d at 303.

- Arab Bank received at least two transfers totaling $54,000 on behalf of one of its customers who was the "mastermind" of that attack, and who confessed to using those funds to purchase weapons. *Id.* at 317, 321, 329.

- Multiple Arab Bank employees testified that they knowingly processed "lists of payments to the families of deceased individuals, whose cause of death was noted as . . . 'martyrdom operations.'" *Id.* at 304-05.

- Osama Hamdan, "a spokesman for and leader of Hamas," was "an account holder at Arab Bank in Lebanon," and "[s]everal transfers into his Arab Bank account in Beirut explicitly listed 'Hamas' as the beneficiary party." *Id.* at 300, 311.

- "Sheikh Yassin, an Arab Bank customer, was the most famous founding member and leader of Hamas," and Arab Bank employees knew he was a "terrorist leader of a terrorist group." *Id.* at 305, 333.

---

[12] The Second Circuit in *Linde* referred to the "more detailed discussion of the evidence supporting the jury's liability verdict . . . in the district court's thorough post-trial opinion." *Linde*, 882 F.3d at 321 n.8.

- Sheikh Yassin's Arab Bank account was advertised by a Hamas leader on the internet as the account to which donations to Hamas could be sent. *Id.* at 303.

- Arab Bank wrote a letter stating it "strive[s] for the success" of one of its customers that Arab Bank knew was making payments for "suicide operation[s]." *Id.* at 307.

Unlike the mere provision of "routine" financial services to an FTO, which is all that plaintiffs can show here, this conduct could fairly be said to involve "violence" or "danger to life" and an apparent intent to terrorize the Israeli population or government.

The type of evidence presented in *Linde* does not exist here:

- There is *no* evidence that NatWest processed payments to any individuals or families of individuals whom plaintiffs claim are responsible for attacks.

- There is *no* evidence that NatWest processed any payments for suicide bombings or for *any* other violent activities at all.

- There is *no* evidence that NatWest processed any payments that were used to buy weapons.

- There is *no* evidence that NatWest held accounts for Hamas or Hamas terrorist leaders.

- There is *no* evidence that NatWest accepted or made donations in the name of Hamas.

- There is *no* evidence that NatWest supported or shared the goals of Hamas's terrorist activities.

Likewise, there is nothing here akin to the evidence that was held to support a jury verdict of liability in *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008) ("*Boim III*"), which is discussed (although not expressly approved) in *Linde*.[13] Evidence in *Boim III* included that the defendants "published and distributed an abundance of pro-Hamas documents," including an editorial "that advocated martyrdom operations, meeting

---

[13] The Second Circuit expressly left open whether it "would similarly conclude," as the Seventh Circuit did in *Boim III*, "that a jury could find that direct monetary donations" to Hamas can satisfy § 2331(1). *Linde*, 882 F.3d at 327.

19

death with death, and killing [J]ews," *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, 910-11 (N.D. Ill. 2004); "admit[ted] being a Hamas activist," *id.* at 896; knowingly supported "the admitted U.S.-based leader of the military branch of Hamas," and helped to conceal his "role as Hamas' military commander," *id.* at 924; and participated in a meeting of Hamas members and supporters that was "taped by the FBI," during which they addressed how to "ensure [the] failure" of the Oslo Accord, including through "concentrating our financial resources on those directly connected with Jihad, such as [the] injured, the martyrs, their families and the prisoners," *id.* at 908-09.

There is no evidence even remotely like this regarding NatWest. Plaintiffs have no evidence that NatWest employed Hamas operatives, that NatWest employees made public statements in support of Hamas jihad, that NatWest published and distributed pro-Hamas propaganda that advocated killing Jews, or that NatWest did anything else that could reasonably be viewed as being intended to engage in terrorism. Neither the facts of *Linde* nor those of *Boim III* support plaintiffs here. To the contrary, there is no evidence that NatWest either participated in violent acts or had apparent terroristic intent. The Court should grant NatWest's motion for summary judgment.

## II. EVEN IF PLAINTIFFS WERE PERMITTED TO REINSTATE OR REPLEAD THEIR AIDING AND ABETTING CLAIM, WHICH THEY HAVE NOT DONE, NATWEST WOULD BE ENTITLED TO SUMMARY JUDGMENT ON THAT CLAIM

Implicitly recognizing that their primary liability claim does not survive *Linde*, plaintiffs have indicated that they would seek to pursue an aiding and abetting claim under JASTA at trial in these cases. However, plaintiffs have taken no steps to plead an aiding and abetting claim that would meet the requirements of JASTA, or to reinstate their previous aiding and abetting claim that was dismissed a dozen years ago. Even if plaintiffs had done so, there is no evidence on

which a reasonable juror could find for plaintiffs on the required elements of an aiding and abetting claim under JASTA.

At the threshold, plaintiffs are not entitled to proceed to trial on the aiding and abetting claim they previously pleaded in these cases because Judge Sifton *dismissed* that claim. *See Weiss v. Nat'l Westminster Bank PLC,* 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006). Assuming *arguendo* that JASTA overruled the reasoning underlying Judge Sifton's ruling, plaintiffs have cited no authority for the proposition that they may unilaterally ignore a prior order of this Court, based on their own conclusion that it is no longer "good law," without moving the Court to reconsider that order.

Further, plaintiffs disregard that Judge Sifton dismissed their aiding and abetting claim *not* because at the time there was no aiding and abetting liability available under the ATA, which (to a limited extent) is no longer true after JASTA, but rather because plaintiffs had failed to plead facts showing that NatWest provided "substantial assistance" to Hamas terrorist activity. *See id.* at 621. Far from overruling that reasoning, JASTA reaffirms that substantial assistance is a required element of an aiding and abetting claim under that statute. *Linde*, 882 F.3d at 329. Under these circumstances, Judge Sifton's dismissal ruling is law of the case, and plaintiffs have not shown any reason for the Court to reconsider it.

If plaintiffs were to seek leave to amend their complaints to add an aiding and abetting claim under JASTA, that would be futile because plaintiffs, on the record established in these actions, cannot prove the necessary elements for an aiding and abetting claim under JASTA as a matter of law. *See, e.g., MacDraw, Inc. v. CIT Grp. Equip. Fin. Inc.*, 157 F.3d 956, 962-63 (2d Cir. 1998) (affirming denial of plaintiff's request at trial to reassert previously dismissed claim under Rule 15(b) as "futile").

21

Aiding and abetting liability under JASTA requires proof of three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (3) "the defendant must knowingly and substantially assist the principal violation." *Linde*, 882 F.3d at 329 (citing *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)).

As a matter of law, plaintiffs cannot prove that NatWest had the requisite mental state. As with primary liability claims, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*. [It] requires the secondary actor to be 'aware' that, by assisting the principal, *it is itself assuming a 'role' in terrorist activities*." *Id.* (emphasis added). Plaintiffs have not identified any evidence that creates a triable issue under this standard. Unlike in *Linde*, where the court noted that "some record evidence" could "permit a jury . . . to infer the requisite awareness," namely that "certain communications dating from as early as 2001 . . . could have alerted the bank that the transfers being requested therein were payments for suicide bombings," *id.* at 330, there is no evidence that NatWest knew of Interpal's support for "terrorist activities." *See supra* at 13-14. In any event, as shown above, no reasonable juror could find on this record that NatWest had the requisite awareness that it was playing a role in Hamas's terrorist activities, in contrast to, at most, Hamas's charitable and non-violent activities.

Apparently recognizing that they cannot meet *Linde*'s requirements, plaintiffs argue that it is sufficient to prove that NatWest was "generally aware" that it "played a significant role supporting Hamas or that acts of terrorism would foreseeably result from [its] support." Pls.'

Mar. 2, 2018 Letter at 3.[14] *Linde*, however, explicitly and repeatedly *rejected* that ground as being sufficient for purposes of aiding and abetting liability. *See* 882 F.3d at 329-30 (knowledge required for violation of § 2339B, *i.e.*, "knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities," is *insufficient* for aiding and abetting); *id.* at 329 ("[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*.").

Nor is there any evidence sufficient to satisfy the substantial assistance element, the ground on which Judge Sifton dismissed the only aiding and abetting claim plaintiffs have ever pleaded. *Weiss*, 453 F. Supp. 2d at 621. *Linde* identified six factors from *Halberstam* relevant to determining "how much encouragement or assistance is substantial enough" to satisfy this element: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84). Here, there is no evidence that NatWest "encouraged" an act of terrorism, the first *Halberstam* factor; on the contrary, as noted above, NatWest was opposed to terrorism and Hamas's violent agenda. As to the "amount" of assistance supposedly provided, there is no evidence that NatWest's banking services to Interpal were necessary or even helpful to Hamas in carrying out the attacks at issue. *See* Pls.' Resp. to NW 2011 56.1 Stmt. ¶ 248 ("Plaintiffs admit they 'do not contend that any of the funds Interpal

---

[14] Similarly, plaintiffs argue that *Linde* requires "proof only that an aider and abettor was 'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides assistance.'" Pls.' Mar. 2, 2018 Letter at 2 (citation omitted). However, the "overall illegal or tortious activity" at issue in *Linde* and here is *terrorism*, not just allegedly transferring funds to alleged Hamas charities, which is all plaintiffs claim they can prove NatWest did here.

transferred from the accounts it maintained with NatWest to HAMAS was used specifically to finance any of the terrorist attacks that injured Plaintiffs and/or killed their loved ones.'") (quoting Pls.' Resp. to Contention Interrog. no. 12).  Similarly, NatWest was clearly "absen[t]" at the time of the torts; there is no evidence that it was present at the attacks that caused plaintiffs' injuries.  Further, there is no evidence that NatWest had any relationship with Hamas; at most plaintiffs allege that NatWest knew that Interpal supported Hamas and that NatWest processed wire transfers whose ultimate beneficiaries were charities allegedly controlled by Hamas.  And, as shown above, there is no evidence that NatWest actually knew that the funds that Interpal transferred through its NatWest accounts were being used to finance any acts of terrorism, or that those funds were actually used to finance such acts.

Because plaintiffs could not satisfy either the *scienter* or substantial assistance elements of an aiding and abetting claim under JASTA even if they were to attempt to bring such a claim, NatWest would be entitled to summary judgment on that claim too.

## CONCLUSION

For the foregoing reasons, the Court should grant NatWest summary judgment, and dismiss all claims against it.

Dated: April 11, 2018
       New York, New York

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
       Jonathan I. Blackman
       Lawrence B. Friedman

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant National Westminster Bank Plc

25