# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TZVI WEISS, *et al.*,        : | |
|        : | |
|     Plaintiffs,        : | |
|        : | Case No. 05-cv-4622 (DLI) (MDG) |
|        : | |
|    -against-        : | |
|        : | |
| NATIONAL WESTMINSTER BANK, PLC,    : | |
|        : | |
|     Defendant.        : | |
|        : | |
| NATAN APPLEBAUM, *et al.*,        : | |
|        : | |
|     Plaintiffs,        : | |
|        : | Case No. 07-cv-916 (DLI) (MDG) |
|    -against-        : | |
|        : | |
| NATIONAL WESTMINSTER BANK, PLC,    : | |
|        : | |
|     Defendant.        : | |
|        : | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL CIVIL RULE 56.1(B)

SAYLES WERBNER P.C.
1201 Elm Street
Suite 4400
Dallas, TX 75270

Attorneys for *Applebaum Plaintiffs*

- and -

ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036

Attorneys for *Weiss Plaintiffs*

**January 30, 2012**

# TABLE OF CONTENTS

I.      HAMAS AND ITS TERRORIST DESIGNATION............................................................1

II.     THE START OF INTERPAL'S RELATIONSHIP WITH NATWEST AND NATWEST'S TERROR FINANCING SUSPICIONS IN THE 1990s.............................3

III.    OUTBREAK OF SECOND INTIFADA............................................................9

IV.    LANE TAKES OVER ACCOUNT, AND NATWEST RECEIVES A REPORT FROM THE SOUTH AFRICAN NATIONAL INTELLIGENCE AGENCY.................12

V.      NATWEST'S GOALKEEPER SYSTEM........................................................21

VI.    POST- SOUTH AFRICAN INTELLIGENCE REPORT REPORTING.........................23

VII.   DECISION TO REPORT TO NCIS............................................................37

VIII.  RISK FACTORS............................................................39

IX.    U.S. DESIGNATION............................................................42

X.     NATWEST'S VIEW OF U.S. DESIGNATIONS............................................50

XI.    EARLY 2004 CONTACT WITH INTERPAL AND MONITORING.........................55

XII.   NATWEST'S COZY RELATIONSHIP WITH INTERPAL............................60

XIII.  DECISION TO CONTINUE MAINTAINING INTERPAL'S ACCOUNTS.................67

XIV.   NATWEST ACCOUNT CLOSING PROCESS............................................73

XV.    EXITING FRIENDS OF AL AQSA AND OTHER RELATIONSHIPS.........................79

Pursuant to Local Rule 56.1(b) of the Local Rules of Civil Practice of the U.S. District Court for the Eastern District of New York, Plaintiffs submit the following statement of material facts as to which there is a genuine issue to be tried. Where indicated, the documents, deposition testimony and other materials cited in this Rule 56.1(b) Statement are being submitted as exhibits to the Declaration of Joel Israel, dated January 30, 2011 ("Israel Dec.").

## I.      HAMAS AND ITS TERRORIST DESIGNATION

1.      HAMAS, which is an acronym of the Arabic phrase for "Islamic Resistance Movement," was founded by Sheikh Ahmed Yassin and others in Gaza in 1987.  HAMAS's consistent ideology, formalized in its Charter and other documents, calls for the destruction of the State of Israel and the establishment of an Islamic state in the area that now comprises Israel and the Palestinian Territories.  Declaration of Valerie Schuster in Support of NatWest's Motion for Summary Judgment ("Schuster Dec.") Exhibit 152 (Expert Report of Matthew Levitt at 3-8); Ex. 179 (Expert Report of Ronni Shaked at 17).

2.      In October 1993, HAMAS activists in the United States convened a meeting in Philadelphia, Pennsylvania, to strategize on how to support HAMAS's efforts to undermine the peace process with Israel. In the meeting, which was taped by the FBI under a Foreign Intelligence Surveillance Act ("FISA") warrant, various leaders discussed the need to provide financial support to HAMAS by funding constituent members of the HAMAS Da'wa (social wing), including educational, medical and religious institutions, as well as zakat committees affiliated with HAMAS.  Schuster Dec. Ex. 152 (Levitt Report at 54 n.311, 55-80).

3.      From its founding, HAMAS has always been comprised of an armed wing ("Izz al-Din al-Qassam," or the "al-Qassam Brigades"), as well as social and political wings. The HAMAS social wing, known in Arabic as the "Da'wa," includes various mosques, schools, orphanages,

summer camps, hospitals, medical services and soup kitchens. These institutions are integral to HAMAS's ability to engage in incitement and recruitment, as well as logistical and operational support for the terrorist activities of the armed wing. Schuster Dec. Ex. 152 (Levitt Report at 2). For example, HAMAS terrorists often hold "day jobs" at Da'wa institutions, and HAMAS-affiliated schools are used to spread HAMAS propaganda, with some Da'wa kindergartens even dressing students in suicide bomber costumes. *Id*. at 59; Israel Dec. Ex. 1 (U.S. Department of Treasury Office of Public Affairs August 22, 2003 Release) (stating in part that "[w]hile HAMAS may provide money for legitimate charitable work, this work is a primary recruiting tool for the organization's militant causes").

4.      On January 23, 1995, in response to HAMAS's deadly and highly-publicized campaign of suicide bombings targeting civilians in Israel, the President of the United States issued Executive Order 12947, which designated HAMAS a Specially-Designated Terrorist ("SDT"). On October 8, 1997, the United States designated Hamas a Foreign Terrorist Organization ("FTO").  Israel Dec. Ex. 2 (U.S. Department of State, Federal Register Vol. 62, No. 195, Oct 8, 1997).  No later than December 3, 2001, NatWest maintained a list of OFAC-designated entities that included HAMAS'S FTO designation.  Israel Dec. Ex. 3 (NW 084649-84859).

5.      Neither the U.K. nor the EU placed HAMAS, or any of its subparts, on a sanctions list until after the terrorist attacks of September 11, 2001, and then they only designated HAMAS's armed wing, Izz al-Din al-Qassam. It was not until September 2003, that the EU and U.K. included HAMAS in its entirety in their terrorist sanctions regime. Israel Dec. Ex. 4 (European Council Decision of December 22, 2003); Ex. 5 (NW 214931).

6.      HAMAS raised, and raises, millions of dollars each year through charitable front groups, including groups in Western Europe and the United States. In late 2000, soon after the outbreak

of the Second Intifada, these groups were formally brought together under the umbrella group called the "Union of Good." Interpal was, and remains, a charter member of the Union of Good, but its role as chief HAMAS fundraiser in Europe predates the creation of the Union of Good. Israel Dec. Ex. 1 (U.S. Department of Treasury Office of Public Affairs August 22, 2003 Release); Schuster Dec. Ex. 152 (Levitt Report at 26-32, 35).

7.      On May 11, 1997, Israel outlawed Interpal because of its affiliation with HAMAS, and in January 1998, Israel declared Interpal to be a "terrorist organization." Schuster Dec. Ex. 152 (Levitt Report at 39).

## II.      THE START OF INTERPAL'S RELATIONSHIP WITH NATWEST AND NATWEST'S TERROR FINANCING SUSPICIONS IN THE 1990s

8.      Interpal's relationship with NatWest began in June 1987, when Interpal's predecessor, the Palestine & Lebanon Relief Fund ("PLRF"), which NatWest later referred to as a "connected charity" and at times identified interchangeably with Interpal, opened accounts with NatWest. When OFAC designated Interpal an SDGT in August 2003, it listed the "Palestine & Lebanon Relief Fund" as one of Interpal's recognized aliases.  Israel Dec. Ex. 6 (NW 013636); Ex. 7 (NW 052067-73); Ex. 8 (NW 191801-6 at NW 191804); Schuster Dec. Ex. 176 (31 C.F.R. Ch. V, App'x A).

9.      NatWest first began detailing terrorism concerns pertaining to these accounts in May 1990 when it created a suspicious activity report ("SAR") in its internal database, and in March 1992, NatWest submitted a report to the predecessor to the U.K. National Criminal Intelligence Service ("NCIS") pursuant to the U.K. Money-Laundering-Prevention of Terrorism Act (1989). This disclosure described the suspicious circumstances surrounding Interpal's numerous transfers abroad, including transfers to Israel, the Sudan, and the United States.  Israel Dec. Ex. 8

(NW 191801-6 at NW 191804-5); Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 11, at 16).

10.     This 1992 report, signed by NatWest's Fraud Intelligence Manager, Ian Wickens, documented concerns with "numerous transfers" abroad made in U.S. dollars, and noted the fact that, although Interpal was ostensibly a charity founded to help needy Palestinians, it was sending money to Khartoum, Sudan and Virginia.  The report also noted that "Bob Stevens at Special Branch has an active interest in our customers."  Israel Dec. Ex. 8 (NW191801-6).

11.     Special Branch is the department of the Metropolitan Police (also known as "Scotland Yard") assigned to fighting terrorism.

12.     The 1992 disclosure included the name of Mounir Jarada, an individual whom Wickens disclosed as being a suspicious beneficiary of funds.  Jarada was the head of HAMAS'S "military" wing in Sudan, a fact that NatWest knew at least as early as September 2001.  Israel Dec. Ex. 8 (NW 191801-6 at NW 191804); Ex. 10 (Hoseason Tr. at 279-280; 281:8-23; 282:21-283:1; 283:11-17); Ex. 11 (South African National Intelligence Agency Report ("SA Intelligence Report")).

13.     NatWest did not perform any further diligence on these accounts after submitting the 1992 report.  Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 11, at 16).

14.     NatWest's concerns over Interpal's possible connections to terrorists increased in 1996 when NatWest compliance personnel were alerted to media reports that discussed allegations made by the Government of Israel that Interpal provided financial support for HAMAS, which was at the time engaged in an intensive campaign of suicide bombings targeting civilians in Israel.  In his deposition, Michael Hoseason, the former head of the group within NatWest

responsible for preventing money laundering (including terror financing) characterized this as a "claim" by Israeli military intelligence that Interpal was HAMAS's chief fundraiser.  Israel Dec. Ex. 8 (NW 191801-6 at NW 191806); Ex. 10 Hoseason Tr. at 284:24-285:4).

15.     On March 6, 1996, *The Times of London* reported that "M15 officers are studying police intelligence on alleged links between Hamas militants and a Palestinian fund-raising organization registered in London with the Charity Commissioners.  Police sources believe up to Pounds 1 million a year is being raised by the Palestinians Relief and Development Fund, also known as Interpal."  Schuster Dec. Ex. 22 ("MI5 study 'charity cash link to Hamas,'" The Times, March 6, 1996).  MI5 is the British security service.

16.     On March 7, 1996, the Charity Commission ordered all of Interpal's accounts frozen. The Times article from the previous day specifically was identified by the Charity Commission as the catalyst for its action.  Israel Dec. Ex. 12 (W_S 157762); Ex. 13 (W_S 157765).

17.     On March 9, 1996, the *Guardian* (London) reported that the Charity Commission had frozen Interpal's accounts because of possible connections to HAMAS.  The headline stated: PALESTINIAN CHARITY FUNDS FROZEN OVER 'HAMAS LINK.'  The story stated: "The Charity Commissioners last night froze the assets of a London-based Palestinian fundraising organisation amid suspicions that money is being channeled to supporters of Hamas, the extremist group which has claimed responsibility for suicide bombs in Israel. Bank accounts of the Palestinian Relief and Development Fund, known as Interpal, had been frozen 'as a precautionary measure', a spokesman said last night."  Israel Dec. Ex. 14 (W_S 157766).

18.     On March 13, 1996, the *Financial Times* (London) reported on the Charity Commission investigation of Interpal.  This article was attached in NatWest's electronic "Fox" system to Case No. 4124, which included the 1992 SAR concerning Interpal's predecessor, the Palestine &

Lebanon Relief Fund, submitted to the U.K. authorities.  Israel Dec. Ex. 8 (NW 191801-6 at NW191804-6).

19.     The Fox database was a predecessor to NatWest's electronic Goalkeeper system (see Paras. 72-80) that was used to record all money laundering and terror financing suspicions pertaining to customers.  Even when the Fox database was replaced by Goalkeeper in approximately 1999, Fox reports remained accessible on Goalkeeper and could be located using Goalkeeper's robust search capability.

20.     On March 15, 1996, *The New York Times* issued a special report, "Roots of Terror: A special report; Alms and Arms: Tactics in a Holy War."  This report stated as follows: "Israeli officials say that among the key Hamas fund-raising operations are the Holy Land Foundation of Richardson, Texas and the London-based Palestine and Lebanon Relief Fund, known, for its telex address, as Interpal." Israel Dec. Ex. 15 (W_S 157773-9).

21.     On May 1, 1996, the Charity Commission issued a report concerning Interpal.  It found Interpal to be a "well run" charity, but also made it clear that it was not concerned with allegations that Interpal funds were going to supporters of Hamas and the families of suicide bombers "so long as the funds were being applied within the objects of the charity.  In the area of benefit we anticipate that a large number of people will support Hamas."  Schuster Dec. Ex. 25 (W_S 081305-29).

22.     Shortly after the Charity Commission concluded its "investigation" of Interpal, Gerald Matthews, who was at the time NatWest's business manager for Interpal, spoke to an official of the Charity Commission, whose identity Matthews cannot remember, about its investigation of Interpal.  During that conversation, the Charity Commission official told Matthews that, although the Commission had been informed of allegations that Interpal provided support to Palestinian

terrorist organizations, these allegations had been from a "Jewish" source and had been "untrue and possibly malicious."  Matthews does not recall asking the Charity Commission official why the religion of the source was relevant for a consideration of the substance of the allegations. Instead, when describing the allegations against Interpal in a NatWest Appraisal Form for a line of credit requested by Interpal in 1998, Matthews himself noted that the allegations were from a "Jewish" source.  The Bank subsequently granted Interpal's request for a $300,000 USD line of credit and Matthews does not recall discussing with anyone at the Bank the fact that the official of the Charity Commission had considered the religion of the source of the terrorism allegations against Interpal to be relevant.  Nor does Matthews recall anyone from the Bank questioning him about his inclusion in the Appraisal Form that the source of the allegation against Interpal was Jewish.  Israel Dec. Ex. 16 (NW068291-96); Ex. 17 (Matthews Tr. at 42:11-48:25).

23.     There is no evidence that NatWest ever read the actual 1996 Charity Commission Report. Its only contemporaneous source of information about the investigation and its conclusion was Matthews' conversation with the Charity Commission, and his recollection that the Commission informed him that the source of the allegations against Interpal was Jewish.  *See* ¶ 22.

24.     There is no documentation of any due diligence or account monitoring being undertaken by NatWest at the time of the account being frozen in 1996.  When the Charity Commission unfroze Interpal's accounts, there is no documentation that NatWest took any steps to apply heightened scrutiny to the transactions received by Interpal or transmitted by Interpal, or documentation of communication between NatWest and the Charity Commission or Special Branch.  In its discovery responses, NatWest points only to the Charity Commission's order to temporarily freeze Interpal's accounts and several routine conversations with Interpal as demonstrating the investigation it performed of Interpal's accounts during and after the Charity

Commission's investigation.  Israel Dec. Ex. 18 (Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 12, at 6); Ex. 19 (Second Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 12, at 3); Ex. 20 (NW 014516); Ex. 21 (NW 016495-500).

25.     In an August 7, 1997 article in the *Guardian* on Israeli efforts to lobby Britain to stop Interpal's fundraising activities, the newspaper asked Interpal Chairman Ibrahim Hewitt to respond to Israeli accusations that Interpal raised funds for HAMAS.  The *Guardian* paraphrased Hewitt's response as admitting that "it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by Hamas, but argued that Hamas runs a social welfare and religious network separate from its military wing, Izz el-Deen al-Qassam."  The article quotes Hewitt as saying: "It's like the difference between Sinn Fein and the IRA."  In other words, Interpal's Chairman admitted that the organization raised funds for the HAMAS Da'wa.  Israel Dec. Ex. 22 (W_S 157786-7).

26.     At the time, NatWest officials, like other citizens of the U.K., would have been familiar with the Sinn Fein's role as the political wing of the IRA, which the U.K. regarded as a terrorist organization.

27.     In an August 17, 1997 article captioned "Suicide Bomber Link to London," the *Sunday Telegraph* reported that Interpal as "a registered charity, channels money collected in Saudi Arabia and the Gulf States to assist Hamas prisoners and their families."  Israel Dec. Ex. 23 (W_S 157788).

III.    **OUTBREAK OF SECOND INTIFADA**

28.    In July 2000, President Clinton hosted Israeli and Palestinian leaders at a summit meeting in Camp David in an attempt to reach a final peace agreement based on the vision of Jewish and Palestinian states living side by side in the territory of historic Palestine. In the months following this failure, a violent Palestinian uprising erupted against Israel. This uprising later became known as the Second Intifada, or the "Al Aqsa Intifada," after a Muslim shrine located in Jerusalem.  Schuster Dec. Ex. 179 (Shaked Report at 21).

29.    The Second Intifada included a more sustained and bloodier wave of terrorist attacks against civilians in Israel than at any time in Israel's history. The overwhelming majority of victims were civilians murdered in Israeli population centers in suicide bombings. Although HAMAS was not the only Palestinian terrorist group to commit attacks, including suicide bombings, HAMAS was responsible for the bloodiest attacks.   Between the outbreak of the Second Intifada in late 2000 and 2004, HAMAS perpetrated 52 suicide bombings, killing 247 Israelis and wounding at least 1,647. *Id.*

30.    These attacks were sensational and were designed to, and did, garner widespread media attention throughout the world. They precipitated numerous front page stories in European and American newspapers, and lead stories on news broadcasts in both the U.S. and Europe. Individuals in NatWest, including in key anti-terror financing roles, were aware of these news reports at or near the time that they appeared.  Israel Dec. Ex. 18 (Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 7, at 4-5).

31.    Neil Trantum, who was head of Group Investigations and Fraud following NatWest's merger with Royal Bank of Scotland, has regarded HAMAS as a terrorist organization "over a

period of time" and believes he knew who HAMAS was in 1996.  He recognizes that Islamic religious motivation is part of HAMAS's motivation.  Israel Dec. Ex. 24 (Trantum Tr. at 73:10-20; 74:3-20).

32.     Ian Wickens was aware that there was a considerable amount of terrorism in the Palestinian-Israeli conflict.  Israel Dec. Ex. 25 (Wickens Tr. at 137:2-138:3).  Trantum was Wickens' supervisor after joining NatWest in 1998.  Wickens' team was responsible for reporting money laundering suspicions, including those related to terror financing, on a bank-wide level at that time.  When Wickens left the bank in July 2001, Michael Hoseason replaced Wickens as the bank's Money Laundering Reporting Officer ("MLRO") and team leader of the bank's Money Laundering Group (which later became Group Investigation & Fraud).  From 1987-2001, Wickens was NatWest's MLRO and received internal suspicious activity reports, and supervised a team of people reviewing them.  Ex. 24 (Trantum Tr. at 34:12-24; 35:9-12); Ex. 25 (Wickens Tr. at 48:8-50:12; 50:25-52:20).

33.     Hoseason was involved with the money laundering team from 1999 until 2004, and his title was Money Laundering Suspicion Team Leader.  Israel Dec. Ex. 10 (Hoseason Tr. at 8:10-21).  Hoseason understood HAMAS to be a terror organization in September 2001, and one that engaged in murderous attacks against civilians.  He recalls reading articles after September 11, 2001 talking about the mosques in the Finsbury Park section of London as a connection point for various Islamic terrorists, and was aware of media reports suggesting a certain amount of extremism being "peddled from that mosque."  NatWest's branch in Finsbury Park maintained the Interpal accounts.  Ex. 26 (NW 212124); Ex. 10 (Hoseason 111:24-112:4; 195:20-23; 216:8-15).

34.     Tony O'Hear first heard of HAMAS in 2000 when he read reports in the U.K. press about HAMAS'S involvement in terrorist activities, and when he would see HAMAS'S name, he made the link to terrorism or potential terrorism activities.  Israel Dec. Ex. 27 (O'Hear Tr. at 24:6-25:22).  From 2002-2005, Tony O'Hear reported to Hoseason.  *Id*. at 19:5-18.

35.     Doug Hartley understands HAMAS to be a Palestinian terrorist organization, and was familiar with HAMAS starting in 2000.  He was aware of conflict going on in Israel and the Palestinian Territories from 2000-2003, and aware that it was a volatile region with conflict between the two populations.  Israel Dec. Ex. 28 (Hartley Tr. at 79:13-21; 96:20-97:6).  From 2000-2003, Hoseason was Hartley's immediate line manager.  *Id*. at 11:8-18.

36.     Irvine Rodger was aware of suicide bombings taking place in Israel between 2000 and 2003, and initially thought Palestinians had committed the September 11, 2001 terrorist attacks on the U.S.  He testified that HAMAS was commonly regarded as a terrorist organization during that time.  Israel Dec. Ex. 29 (Rodger Tr. at 51:18-52:22; 53:23-54:9; 54:25-55:8).  In the spring of 2002, Rodger joined the bank in a new function called the Money Laundering Prevention Unit, or MLPU.  Rodger was head of the MLPU for the Corporate Banking Financing Markets ("CBFM") division of RBS through at least 2010, and his responsibilities included measures to combat terrorist financing within the CBFM Division, of which Interpal was a customer beginning in 2002.  From 2003-2008, Rodger reported to Kevin Love, who was the head of CBFM Enterprise Risk.  *Id*. at 9:2-12; 14:19-15:9; 22:10-13.

37.     Martin Wiltshear, another compliance employee, knew that the Middle East always had a volatile climate, including as of January 2002, which led to the risk of terrorist funding.  He learned about this risk of terrorist funding from his line manager, Gary Merrick, and Hoseason

was the head of his department.  Israel Dec. Ex. 30 (Wiltshear Tr. at 22:21-23:6; 34:21 – 36:11); Ex. 31 (NW 012954).

38.     Stephen Foster understands that HAMAS is a Palestinian-based organization with what he refers to as "alleged links to terrorism," and recalls reading about events "linked to HAMAS" in the news.  Israel Dec. Ex. 32 (Foster Tr. at 229:25 – 231:6).  From December 2002-2006, Foster was responsible for policy for Anti-Money Laundering and Sanctions in Terrorist Financing for the bank's Group Risk Management department. *Id*. at 6:16-23; 9:6-10:1.

39.     Amanda Holt was familiar with HAMAS in 2002 and was aware that it was on terrorist lists and that it was a Palestinian Islamic group.  From reading newspapers, she also was aware of the Second Intifada while it was ongoing in Israel and the Palestinian Territories between 2001 and 2004.  Israel Dec. Ex. 33 (Holt Tr. at 51:13-52:17).  Holt joined the bank in January 2002 and was its first Head of Group Enterprise Risk, a position that the U.K. Financial Services Authority ("FSA") recommended that NatWest establish.  In 2002, Holt's Group Enterprise Risk department took over responsibility for Money Laundering Prevention and Sanctions in Terrorist Financing, and Foster was among the employees who reported to her when he joined the bank as Head of Group Anti-Money Laundering. *Id*. at 22:10-12; 23:2-4; 25:2-13; 29:19-31:12.

40.     Sonia Gayle, Head of Policy for the bank's Group Compliance Department beginning in September 2001, was aware HAMAS had been designated but was not aware of HAMAS perpetrating terrorist attacks.  Israel Dec. Ex. 34 (Gayle Tr. at 111:22-112:18; 10:25-11:4).

## IV.     LANE TAKES OVER ACCOUNT, AND NATWEST RECEIVES A REPORT FROM THE SOUTH AFRICAN NATIONAL INTELLIGENCE AGENCY

41.     As the Second Intifada was breaking out in late 2000, with waves of terrorist attacks against Israeli civilians garnering worldwide media coverage, including in the U.K., where they were seen and read by numerous NatWest compliance employees, NatWest saw a sharp increase

in contributions to Interpal's accounts at NatWest, and subsequent large payments (including some over $100,000) by Interpal to Palestinian charities about whom NatWest admittedly knew very little and admittedly suspected were involved in terrorism financing.  Israel Dec. Ex. 35 (NW 052056-66).

42.     During that time Interpal's transfers out of its NatWest accounts to 13 HAMAS-linked "charities" skyrocketed, from approximately $640,000 in 1999 to over $1.325 million in 2000 and more than $3.14 million in 2001.  Israel Dec. Ex. 36 (Geisser Rep. at Ex. C).  During that same time, the amount Interpal received from the HAMAS-affiliated groups World Assembly of Muslim Youth ("WAMY") and the Al Aqsa Foundation also rose, from approximately $715,000 in 1999 to over $1.13 million in 2000 to over $2.4 million in 2001.  Ex. 37 (Geisser Rep. at Ex. B).

43.     Beginning in late 1999, prior to the Second Intifada, and continuing through 2006, Belinda Lane was NatWest's "relationship manager" ("RM") for the five Interpal accounts held by NatWest in U.S. dollars, euros, and British pounds.  Israel Dec. Ex. 38 (Lane Tr. at 167:16-22; 272:4-12).

44.     As Interpal's RM, Lane was Interpal's primary contact at the Bank.  She performed various services for Interpal, which consistently ranked as one of Lane's most profitable clients. The services included approval of the implementation of the Bank Line Payment Manager system for Interpal, which enabled it to make transfers abroad without requiring intervention by NatWest employees.  Lane also set up a Streamline system by which Interpal could get money from donors straight from a credit card.  Israel Dec. Ex. 38 (Lane Tr. at 142:1-10; 284:16 – 285:19).

45.     When she became relationship manager for Interpal, Lane already was familiar with suspicious activity reports and had filed approximately ten (unrelated to Interpal) prior to 1999. While Lane was Interpal's relationship manager, the Bank's central unit in charge of money laundering contacted Lane five to ten times regarding Interpal, an amount she considered "irregular" and more than any other customer she could recall.  Israel Dec. Ex. 38 (Lane Tr. at 83:1 – 85:16).

46.     Lane always had the ability to look at each transaction executed in any of Interpal's accounts.  Israel Dec. Ex. 38 (Lane Tr. at 132:7-17).

47.     Upon taking over the Interpal account, Lane learned that Interpal had previously been under investigation by the U.K. Charity Commission because of allegations of financing terrorism.  Israel Dec. Ex. 38 (Lane Tr. at 238:4-11).

48.     In June 2001, Lane approved Interpal opening a new U.S. dollar account listing Union of Good as one of the account holders, though Lane did not ask any questions or perform any due diligence with regard to the Union of Good, and still does not know who the Union of Good is. Israel Dec. Ex. 38 (Lane Tr. at 127:7-12; 127:13-25; 128:21-23); Ex. 39 (NW 013415).

49.     Shortly after the terrorist attacks of September 11, 2001, Jihad Qundil, Interpal's Secretary, told Lane that Interpal was getting more money and revenue specifically because of the attacks.  Qundil also told Lane that donations to Interpal were increasing "because of terrorism," an explanation that Lane deemed "logical."  She never investigated or asked Interpal for a further explanation as to why 9/11 and terrorism led a purported Palestinian relief charity to receive more donations.  Israel Dec. Ex. 38 (Lane Tr. at 90:2-12; 90:21 – 92:13; 153:23 – 154:22).

50.     Within a few weeks of the September 11 terrorist attacks, NatWest and its Head of Group Investigations & Fraud, Michael Hoseason, came into possession of a South African National Intelligence Agency report ("SA Intelligence Report") that appeared on the website of Cryptome.org.  Israel Dec. Ex. 36 (NW 212124).

51.     Hoseason and the people on his team knew how to search the internet during the 2000-04 time period, and had internet access.  Israel Dec. Ex. 10 (Hoseason Tr. at 166:12-17).

52.     Cryptome.org is an anti-secrecy organization that runs a website that posts various secret documents, including reports from various countries' intelligence services.  In that capacity, it has been described as a precursor to Wikileaks.

53.     The SA Intelligence Report purported to summarize international Islamic militancy and its presence in South Africa, and was created for the then-South African president, Thabo Mbeki, in 1998.   It identified HAMAS'S global fundraising network in which context it talked extensively about Interpal, described therein as "the Hamas fund in Western Europe." Israel Dec. Ex. 11 (SA Intelligence Report at p. 24).

54.     The SA Intelligence Report detailed Interpal's support of HAMAS, and set out numerous terrorist financing details that NatWest could have easily verified by consulting documents already in its possession.  These details included Interpal's account numbers with NatWest, its executives, funds transfers, and other information that NatWest already had in its own possession.  Israel Dec. Ex. 11 (SA Intelligence Report at pp. 23-24).

55.     The following information in NatWest's possession matched the details provided in the SA Intelligence Report:

- **Bank accounts -** The Report noted that Interpal financed HAMAS through accounts Interpal maintained at NatWest and even listed six Interpal bank accounts at NatWest, with accurate account numbers. Israel Dec. Ex. 11 (SA Intelligence Report at p. 23); Ex. 40 (NW013416-8).

- **Executives -** The Report listed six of the key figures within Interpal by name. Ex. 11 (SA Intelligence Report at p. 23). *See* Ex. 41 (NW013279), Interpal Board of Trustees as of June 24, 1999, which contains the same six names (the transliterations from Arabic into English were not identical.); Ex. 10 (Hoseason Tr. at 251:11-25).

- **Al-Aqsa Network -** The Report stated that "Hamas through Interpal operates on an international basis through a global network of AL-AQSA structures (HAMAS=INTERPAL=AL-AQSA)"

  o   NatWest had records of at least 21 transfers from Al-Aqsa entities to Interpal from 1997 to 2003 totaling over $2.08 million. Ex. 37 (Geisser Rep. at Ex. B and D); Ex. 42 (NW009934-42).

  o   NatWest also had additional transfers from Hameed Thabet Sadoon, identified in a 2002 Goalkeeper report as representing Al-Aqsa in Yemen, totaled over $470,000 from 2002 to 2003. Ex. 37 (Geisser Rep. at Ex. B and D); Ex. 43 (NW052074-91 at NW052078).

- **Deposits from Scandinavia -** The Report stated that funds collected in Scandinavia were being directly transferred to Interpal in Britain. NatWest possessed many examples of this type of transfer in its files, including the following transfers from Al-Aqsa Spannmal Stiftelse (HAMAS's fundraiser in Sweden) to Interpal:

  o   10/11/00 - $4,029.12, Ex. 44 (NW008973).

  o   01/15/01 - £21,960, Ex. 45 (NW012764).

  o   05/30/01 - $13,382, Ex. 46 (NW008981); Ex. 47 ( NW052412).

- **WAMY Connection -** The Report stated that in 1997, "Wahdan Ahmed Khunfhur returned from Saudi Arabia to South Africa. During a feedback meeting on 1997-02-06, Khunfhur mentioned that funds for the [Al-Aqsa International Foundation] and other extremist organisations in South Africa would be channeled from INTERPAL in England to the 'World Assembly of Muslim Youth (WAMY)' in Saudi Arabia to South Africa through front companies." Ex. 11 (SA Intelligence Report at p. 28). At the time, NatWest's own records showed receipts by Interpal from WAMY of more than one million dollars (and 378,000 pounds). Receipts by Interpal from WAMY of very large sums continued through 2003. Ex. 37 (Geisser Rep. Ex. B and E); Ex. 49 (NW009755-7); Ex. 50 (NW052416); Ex. 48 (NW008982).

56.     NatWest has no information to dispute any of the factual assertions contained in the SA

Intelligence Report, other than the spelling of one of its branches as "Criclewood" instead of

"Cricklewood."   Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 5, at 10-11).

57.     Certain of the individuals and entities discussed in the SA Intelligence Report, such as the Islamic Relief Agency and Mounir Jarada, had also been identified in NatWest's 1992 suspicious activity report.  The SA Intelligence Report stated that "the AIF expect Mounir Jarada @a Abu Achmed EL-RAGHMAN (the head of HAMAS military operations in Sudan) after Ramhadaan (February 1997) to assist in military training in South Africa."  Ex. 11 (SA Intelligence Report at p. 28). (*see* ¶ 12 above); Ex. 10 (Hoseason Tr. at 279-281:23; 282:21-283:1; 283:11-17). NatWest itself had noted suspicious transfers to Jarada in Khartoum in its 1992 report, and though NatWest's counsel interjected at Hoseason's deposition that the 1992 SAR concerned the Palestine & Lebanon Relief Fund and implied that Jarada thus could not have been rediscovered via the 1992 report, in fact PLRF was an alias for Interpal, and even as late as November 2001, Goalkeeper reports generated by Defendant still referred to Interpal as the Palestine & Lebanon Relief Fund.  Ex. 8 (NW191801-6 at NW191804); Ex. 7 (NW 052067-73); Ex. 10 (Hoseason Tr. at 281:1-20).  Moreover, as explained below, it is undisputed that Hoseason's team was trained to use Goalkeeper's search capabilities to find and review all past reports involving any individual or entity that they were currently investigating.  Therefore, even if an individual employee was unaware of the identity between PLRF and Interpal, a search by name of an individual involved, such as Interpal Secretary Jihad Qundil or HAMAS military leader Mounir Jarada, would have produced the earlier report.

58.     On September 27, 2001, Hoseason wrote NCIS a letter which included the internet address of the SA Intelligence Report, and advised that certain of the accounts mentioned in the Report were held at NatWest's branch in Finsbury Park.  Hoseason's letter also informed NCIS

that "[w]e are currently undertaking a thorough review of the activity through all the accounts held for Palestinians Relief & Development Fund – Interpal with a view to making a full disclosure in due course."  Ex. 26 (NW 212124); Ex. 10 (Hoseason Tr. at 111:24-112:4).

59.     Hoseason testified that he does not recall who alerted him to the SA Intelligence Report on the Cryptome website.  Although Hoseason admitted that he was made aware of allegations that Interpal funded HAMAS, and that this triggered the Bank's responsibility to investigate, he does not know if such investigation actually occurred.  Though Hoseason said that September 11th led the Bank to file numerous disclosures out of caution, he acknowledged that it was uncommon to be communicating with NCIS before making a full disclosure and in fact he does not recall _any_ other occasion where rather than file a suspicious activity report he submitted a letter to NCIS instead.  The reason it was done this way is because he felt it was urgent to convey this information to law enforcement as soon as possible.  Israel Dec. Ex. 10 (Hoseason Tr. at 103:9-104:4; 110:3-20; 111:5-19; 112:5-17; 124:1-13; 202:24-203:7).

60.     Hoseason agrees that the letter to NCIS stating that the Bank would undertake a thorough review of the activities through all of the Interpal accounts so NatWest could make a full disclosure in due course was designed to reassure NCIS that NatWest was on top of the issue. Israel Dec. Ex. 26 (NW 212124); Ex. 10 (Hoseason Tr. at 206:18-22; 207:8-10; 209:13-17)

61.     Nonetheless, Hoseason doesn't know if he took _any_ steps to determine the reliability of the information contained in the SA Intelligence Report, or if he gave anyone instructions to use enhanced due diligence with Interpal.  In fact, Hoseason says after making the disclosure the responsibility for monitoring activity in Interpal's accounts fell outside his team and back to the business unit that had the customer.  Hoseason's team would not give the business unit any

specific instructions in terms of how to handle the customer.  Israel Dec. Ex. 10 (Hoseason Tr. at 289:20-25; 294:17-295:6; 295:23-296:13).

62.     Neither Hoseason nor any other witness recalls a thorough review of activity in Interpal's accounts, and there is no documentary evidence suggesting that the Bank undertook any such review.  Israel Dec. Ex. 10 (Hoseason Tr. at 104:8-16).

63.     Hoseason, the bank's Money Laundering Suspicion Team Leader, does not remember ever speaking to Lane, and does not know her at all.  He, or someone working for him, would sometimes contact relationship managers to ask that additional information be obtained from a customer, but Hoseason himself did not do so for Interpal.  Israel Dec. Ex. 10 (Hoseason Tr. at 121:25-122:7; 165:23-166:5).

64.     Hoseason testified that the promised thorough review of the activity of the Interpal accounts would have entailed "looking at each of the accounts for that particular customer, considering the type of activity passing through it, source of funds, destination of funds, velocity of funds passing through the account."  Thus, such a review would have included an analysis of both inflows and outflows of funds, and NatWest would have looked at the counterparties on the transactions.  Hoseason claimed that he did not know if he would want law enforcement to have the benefit of any information the Bank had about the accuracy of the allegations in the Cryptome article.  Israel Dec. Ex. 10 (Hoseason Tr. at 243:7-22; 248:6-13).

65.     On September 27, 2001, NatWest also opened Goalkeeper Case No. 617044, and on October 15, 2001, Hoseason submitted an NCIS Disclosure stating that a review of all sterling accounts held by Interpal "shows in the main small personal credits of between £5-£100 to the accounts with some large payments of £21k-£75,000."  The disclosure added that "most outward

payments are made from the USD$ account to various charities in Palestine about whom we know very little."  Israel Dec. Ex. 35 (NW 052056-66).

66.     NatWest did not perform any research into the background or identity of these entities, about whom it "knew very little" until at least May 2004.  Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 13, at 28-30).

67.     Hoseason agrees that it was not a coincidence that a Goalkeeper Report was created the same day he wrote the letter to NCIS, and he was the person who designated the Goalkeeper Report as "high profile."  Israel Dec. Ex. 35 (NW 052056-66); Ex. 10 (Hoseason Tr. at 125:12-21; 127:2-9).

68.     Hoseason also agreed that as of September 27, 2001, the Bank had sufficient grounds to suspect that Interpal was involved in terrorist funding to warrant disclosure to the authorities, but that Goalkeeper Report 617044 does not even mention the letter sent to NCIS on that date.  In fact, the SA Intelligence Report also is not referenced in that Goalkeeper Report, despite Hoseason's admission that it would have been useful to include that information.  Israel Dec. Ex. 10 (Hoseason Tr. at 297:20-298:6; 298:25-299:2; 299:9-15); Ex. 35 (NW 052056-66).

69.     Hoseason also acknowledged that Goalkeeper Report 617044 was not an effort to present the authorities with a complete list of all of Interpal's counterparties.  Rather, the decision about which beneficiaries to include admittedly required *the exercise of judgment and discretion*. Hoseason agrees that, while he submitted and would have reviewed that disclosure, it would have been useful to know more about the beneficiaries of the Interpal payments.  He does not remember if he or anyone else researched those entities.  Hoseason claims that if someone on his team had done an internet search on any of the beneficiaries and discovered information with

connections to HAMAS, they "might have been" included in the NCIS disclosure. It depended on the individual's judgment. He further testified that disclosures were made to provide NCIS with "a snapshot" of the account activity and an explanation of why NatWest considered it to be suspicious. Israel Dec. Ex. 10 (Hoseason Tr. at 303:6-13; 304:17-305:17; 309:3-24).

70. There is no documentary evidence indicating that NatWest undertook the "thorough review" of Interpal's accounts that it promised NCIS, or any review whatsoever, other than the three sentences in the October 15, 2001, NCIS Disclosure. Stephen Foster says that if NatWest was suspicious of Interpal being linked to HAMAS and using its bank accounts for terror financing, he would want the bank to conduct a thorough review of the activity through all of its accounts. When asked to confirm whether this happened in response to the SA Intelligence Report, Foster says "it would be a decision for the customer holding divisions but it really is difficult to judge given what you are showing me because I was not [employed by NatWest] at the time." Israel Dec. Ex. 32 (Foster Tr. at 124:8-20; 125:10-18).

71. At the same time that NatWest was inaccurately assuring NCIS that it would conduct a thorough review of Interpal, it *was*, in fact, conducting internet and media research to ensure that it was not financing *certain* terrorism. The searches, however, which manifested in spreadsheets identifying potential links, solely pertained to ensuring that the bank was not providing financial services to any individuals or organizations linked to Osama Bin Laden, and these searches had nothing to do with Interpal or HAMAS. Israel Dec. Ex. 51 (NW 214836-47).

## V.    NATWEST'S GOALKEEPER SYSTEM

72. The Goalkeeper system was NatWest's electronic system used for recording suspicions that its customers were engaged in some kind of criminal activity, including money laundering or terrorist financing. NatWest used Goalkeeper from some time in 1999 until 2000, when

Goalkeeper II began operating.  Goalkeeper III, which was an enhancement and not a major advancement over Goalkeeper II, replaced Goalkeeper II at the end of November 2004.  Israel Dec. Ex. 52 (Baugh Tr. at 22:1-8; 57:23 – 59:22); Ex. 25 (Wickens Tr. at 259:17-262:17).

73.     Relevant documents relating to a Goalkeeper Report were attached to the report in the Goalkeeper system to form part of the Goalkeeper "case" or file.  Tony O'Hear, for example, says that all of his communications regarding Interpal would have been captured in the relevant Goalkeeper cases.  Israel Dec. Ex. 52 (Baugh Tr. at 233:9 – 234:6); Ex. 27 (O'Hear Tr. at 62:25-63:4).

74.     NatWest's corporate representative concerning the Goalkeeper system, Fleur Baugh, testified that colored risk ratings that appeared within Goalkeeper Reports were allocated based on the information entered about the transaction(s) that led to the report, and while it was discretionary on the part of the data inputter what rating to assign, Baugh says there were general guidelines given during trainings she conducted about what constitutes a certain risk rating.  In addition to the manually assigned risk rating, the Goalkeeper system also assigned a risk rating.  Israel Dec. Ex. 52 (Baugh Tr. at 138:6 – 144:3; 146:15 – 148:14).

75.     The procedural manual for Goalkeeper II states that a red risk rating means "Extreme caution is advised" and "The nature of the incident gives serious grounds for concern."  The procedural manual for Goalkeeper III states that a red risk rating means "Firm evidence of wrongdoing."  Israel Dec. Ex. 53 (NW000233-60 at NW000237); Ex. 54 (NW052140-76 at NW052160).

76.     Red risk ratings were assigned to Interpal and its Palestine & Lebanon Relief Fund and Palestinian Relief & Development Fund aliases in most of the Goalkeeper Reports filed about

Interpal.  Israel Dec. Ex. 7 (NW052067-73); Ex. 43 (NW052074-91); Ex. 55 (NW052114-23); Ex. 56 (NW052124-28).

77.    Tony O'Hear disputes that red color ratings were used to assess cases in the Goalkeeper system and testified that he's not aware of their being used in the money laundering environment and in the assessment of terror financing cases.  Israel Dec. Ex. 27 (O'Hear Tr. at 76:24-77:16).

78.    Michael Hoseason says red flags being utilized for a customer appearing on multiple occasions in Goalkeeper "wouldn't necessarily suggest any heightened degree of risk."  Israel Dec. Ex. 10 (Hoseason Tr. at 28:9-12).

79.    Within the Goalkeeper system, employees could search for a name to pull up previous Goalkeeper Reports involving that name.  The colored risk ratings are always visible on the reports.  Israel Dec. Ex. 52 (Baugh Tr. at 176:18 – 177:7; 188:1-21).

80.    When someone in Hoseason's Money Laundering Team received a suspicious activity report from the field, one of the first things they were instructed to do was to check for and retrieve any previous files involving the subject of that report.  They could look for these reports through a number of different fields in Goalkeeper and could search by the name of the account as well as entities, associated individuals, and account numbers.  Thus, a member of Hoseason's team working an Interpal-related SAR should have reviewed all previous Goalkeeper files involving Interpal and its principals, including the 1992 SAR.  Israel Dec. Ex. 10 (Hoseason Tr. at 173:18-174:23).

## VI.    POST- SOUTH AFRICAN INTELLIGENCE REPORT REPORTING

81.    Between November 2001 and June 2002, three *additional* internal SARs about Interpal were sent by NatWest employees in the field to members of Hoseason's unit.  These internal alerts, however, did not result in any written disclosures to U.K. law enforcement, and were not

followed by any ascertainable increased due diligence or account monitoring.  Instead, the suspicions were only disclosed verbally to NCIS – which was not proper at the time, particularly in the post-9/11 context.  Schuster Dec. Ex. 121 (Expert Report of Gary Walters at 10, ¶ 54).

82.     On November 19, 2001, Olha Leeming, an employee in NatWest's back office, filed an internal SAR (GK2-647655) with NatWest's Group Investigation and Fraud unit for assessment and investigation.  The report is about Interpal, and NatWest refers to Interpal by its alias, the Palestine & Lebanon Relief Fund, which first opened its accounts with the bank in 1987.  Leeming filed this report because of "high non cash turnover and suspected terrorist funding" and referred to two credits from overseas, one for $333,322 from WAMY and another for $59,974 from an individual in Yemen identified as Fawzi Hassan Ahmed Dahhan.   After receiving the internal SAR, Group Investigation and Fraud member Doug Hartley wrote on December 21, 2001: "According to ISS records there is an LRS Manager at Islington Business Centre who (hopefully!) looks after this customer.  With $3 million turnover during 2001 I think we need to gain a clear understanding of the activities here and full details behind some of the sizeable transactions."  The report and attachments do not include any indication of what, if anything, was done to gain this clear understanding.  Israel Dec. Ex. 7 (NW 052067-73); Ex. 58 (NW052415); Ex. 59 (NW052416).

83.     Hartley also recorded:

> Existing case for this customer discovered somewhat belatedly.  Probably no merit in disclosing again at this time but it won't do any harm for the RM to follow through our recent request as the KYC/DD info appears deficient.   Israel Dec. Ex. 7 (NW 052067-73 at NW052069).

84.     At deposition, Hartley acknowledged that it is a "fair assumption" that his notes were a request for further action or a recommendation for further action.  He testified that he does not recall why he believed that the KYC due diligence information was deficient, or why he included

the word "hopefully" in the note with regard to the branch manager's monitoring of Interpal. Israel Dec. Ex. 28 (Hartley Tr. at 93:11-20; 94:15-95:6).

85.     A subsequent February 5, 2002, case note in the file by an unidentified NatWest employee stated: "Funds are received into a US Dollar account by international transfer from various locations in the Middle East and at the moment a large balance has accumulated without outward transfer.  Given the current volatile situation in Palestine we are concerned that as the source of funds cannot be verified; there may be vulnerability to terrorist funding." Notwithstanding the previous October 2001 disclosure to NCIS and the above case note, NatWest decided that there were "insufficient grounds to make a financial disclosure" to law enforcement.  Israel Dec. Ex. 7 (NW052067-73 at NW052070-1).

86.     Hartley testified that he does not know if it ever came to his attention that Interpal had been accused of raising money for HAMAS, despite repeated references to these allegations in Goalkeeper Reports on Interpal.  Israel Dec. Ex. 28 (Hartley Tr. at 80:2-8).

87.     Hartley does not have any recollection discussing the Interpal account with Hoseason or anyone else at the Bank.  He does not remember ever taking a position one way or the other about Interpal as far as whether the Bank should have made an additional disclosure to British law enforcement or taken any other action.  Israel Dec. Ex. 28 (Hartley Tr. at 159:22-160:5; 161:6-9).

88.     At the time of the February 2002 Goalkeeper Report, Hoseason said that while he had access to Goalkeeper, had been involved in creating the report on Interpal just a few months earlier, and had communicated about Interpal to NCIS on behalf of the Bank, he does not know if he would have reviewed the February 5 note contained in the second Goalkeeper Report,

testifying "there is no particular reason why I would have."  Israel Dec. Ex. 10 (Hoseason Tr. at 144:18-145:13); Ex. 7 (NW052067-73 at NW052070).

89.     In addition to the decision not to disclose NatWest's renewed concerns about Interpal to NCIS, this Goalkeeper Report made no mention of the hundreds of thousands of dollars in *prior* inbound payments from WAMY and Dahhan, nor was it later amended to reflect the millions of dollars in inbound payments received from these two sources subsequent to the Goalkeeper Report.   Israel Dec. Ex. 60  (WAMY: 03/13/00 - $186,654.85, NW012770; 03/14/00 - $361,827.31, NW012771;  10/02/00 - $93,303.00, NW052436-7;  12/11/00 - $87,627.17, NW012776; 02/28/01 - £239,604.00, NW052275; 08/01/01 - $333,306.59, NW052419; 08/06/01 - £139,189.00, NW052272; 11/21/01 - $333,322.72, NW052408; 02/17/02 - $233,322.28, NW012782-3; 04/18/02 - $160,122.52, NW012786-7; 07/22/02 - $236,533.00, NW012294-316; 07/22/02 - $249,333.00, NW012317-339; 07/01/03 - $279,189.47, NW052409; and 07/01/03 - $243,864.47, NW052423).  Ex. 61 (Dahhan: 10/25/00 - $39,969.12 – NW052384; 10/31/00 - $39,969.07 – NW052380; 11/07/00 - $99,969.20 – NW012774; 11/21/00 -  $99,962.83 – NW012762; 12/08/00 - $199,969.16 – NW012775; 12/19/00 - $124,968.95 – NW052500; 03/20/01 - $54,969.30 – NW052493; 06/20/01 - $30,000.00 – NW052411; 07/24/01 - $99,969.34 – NW052421; 11/13/01 - $59,962.58 – NW052415; 11/22/01 - $19,962.88 – NW052406; 12/18/01 - $59,989.04 – NW052404; 12/27/01 - $39,962.73 – NW052399; 12/27/01 - $39,989.23 – NW052401; 01/02/02 - $19,962.64 – NW052270; 01/15/02 - $80,239.14 – NW012778-79; 04/22/02 - $195,495.00 – NW008996, NW012788; 04/29/02 - $14,389.11 – NW052287; 04/30/02 - $142,341.69 – NW012790-91; 04/30/02 - $105,678.08 – NW012792; 06/17/02 - $69,939.05 – NW012359; 07/3/02 - $101,921.69 – NW012340; and 01/14/03 - $49,988.10 – NW012190).

90.     On January 17, 2002, two months after the internal SAR described above was filed and less than three weeks before the case note concluding that there was a "vulnerability to terrorist funding" through Interpal's accounts at NatWest, Martin Wiltshear of NatWest's Group Investigation and Fraud division wrote to Belinda Lane, stating "[u]nsurprisingly, we have been sent a Money Laundering Suspicion Report on the above connection" [the Palestine Lebanon & Relief Fund] based on large dollar payments going in and out.  He writes further, "[t]he concern is obviously terrorist funding especially given the volatile climate of the area."  He asks her for "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in the US$ account."  Lane responded with basic details and a request for "further guidance," of which there is no record of any being provided.  Israel Dec. Ex. 31 (NW012954).

91.     Wiltshear's reference to the "volatile climate of the area" made weeks before an unnamed NatWest employee wrote about "the current volatile situation in Palestine," was another reference to the ongoing Second Intifada and the wave of suicide bombings that murdered civilians in Israel.  Israel Dec. Ex. 30 (Wiltshear Tr. at 28:15 – 30:11; 34:18-35:20); Ex. 31 (NW012954).

92.     At his deposition, Wiltshear did not recall having seen this exchange before and does not know why he wrote the email to Lane, other than to suggest he may have been asked to do so by his manager, Michael Hoseason.  Israel Dec. Ex. 30 (Wiltshear Tr. at 28:15 – 30:11).

93.     Five months later, on June 7, 2002, NatWest employee N. Morrison filed an additional internal SAR, and two Goalkeeper cases subsequently were opened (on June 14 and June 17) due to a June 6, 2002 $180,950 inbound payment from Hameed Thabit Sadoon of the Islamic Charitable Society for the Support of the Al-Aqsa Al-Shareef in Sana'a, Yemen (a/k/a the Al

Aqsa Foundation – Yemen).  Israel Dec. Ex. 57 (NW052133-9 (Case No. 666593)); Ex. 43 (NW052074-91 (Case No. 666814)).

94.     Hoseason agrees that the same suspicious activity report led to a duplication of two different Goalkeeper Reports within a span of three days, though each report gives different information.  Israel Dec. Ex. 10 (Hoseason Tr. at 334:12-21).

95.     The June 7 SAR stated "Connection between Yemen, Al Qaida, and present Middle East situation cannot be ignored."  Under "Nature of Suspected Offence", the drafter stated "Possible umbrella for funding terrorism in Middle East."  Israel Dec. Ex. 57 (NW052133-9 at NW 052138-9).

96.     The first case, GK2:666593, was created on June 14.  It listed "Reason(s) for suspicion" as "Payments to/from blacklisted or high risk countries" (*i.e.*, Yemen).  Israel Dec. Ex. 57 (NW052133-9 at NW052133).  The second case, GK2:666814, was created on June 17 and listed "High non cash turnover" as the reason for suspicion.  Ex. 43 (NW052074-91 at NW052074).

97.     The second case was followed by a July disclosure to NCIS submitted by Doug Hartley, stating that NatWest was reporting the Sadoon payment because it "is not in keeping with the size of the payment seen previously."  The disclosure also assures NCIS that "a review of the sterling account has shown no significant change in turnover."  Israel Dec. Ex. 43 (NW052074-91 at NW052089-91).

98.     Hartley says that if he had been researching this case he would have looked to see whether other payments had been received from Hameed Thabat Sadoon, the individual who was involved in the $180,000 transaction.  Israel Dec. Ex. 28 (Hartley Tr. at 111:5-10); Ex. 43 (NW052074-91 at NW 052078).

99.     In fact, though the disclosure stated that the payment was unusual in size, Interpal received over $109,000 from Sadoon in two separate transfers on June 5 and June 12 – within a week of the June 6 transfer that was reported – and received transfers of a combined $159,800 on March 21 and April 30.   Israel Dec. Ex. 37 (Geisser Rep. at Ex. D).   Interpal also received approximately $800,000 from various Al Aqsa Foundation entities prior to the disclosure, and over $1 million after the disclosure.   Nonetheless, none of the other transfers was disclosed to NCIS.  *Id.*

100.    On the same day as the NCIS disclosure, Hartley entered a note into Case No. 666814 stating that "Given the background we should be seeking a detailed report from the RM on his knowledge of these customers."   Israel Dec. Ex. 43 (NW052074-91 at NW052077); Ex. 28 (Hartley Tr. at 108:9-110:6).   On July 9, Group Investigation & Fraud employee Charlotte McComas contacted Belinda Lane, notifying her of the July 4 disclosure, asking for a "detailed report on your knowledge of this customer and the activities seen on the accounts" and reminding her that it was "an offence to advise the customer or any other 3rd party of your report to us."  Ex. 43 (NW052074-91 at NW052080).

101.    On July 15, Lane responded by providing McComas with almost identical information to the generalized report that she provided Martin Wiltshear six months earlier.  Israel Dec. Ex. 62 (NW 012952); *see* ¶ 90 above.

102.    Lane was aware in July 2002 that suspicious activity reports regarding Interpal were being made to government criminal authorities, and that the Bank's investigation of Interpal and subsequent reporting to U.K. governmental authorities was a very significant and serious matter. Israel Dec. Ex. 38 (Lane Tr. at 227:4-15; 228:10-229:13; 232:9-14).

103.     On August 1, McComas requested further information about the $180,000 Sadoon incoming transfer, and in spite of her July 9 admonition to Lane not to advise the customer about these inquiries, Lane contacted Interpal about the transfer.   Interpal told Lane that Al-Aqsa – Yemen (referred to by Lane as the "Islamic Charitable Society for the Support of Al-Aqsa Al-Shareef") was an "aid agency in Yemen," a description which Lane credulously and dutifully passed on to McComas. O'Hear agrees that his understanding, which he later passed on to Foster, of Al-Aqsa – Yemen as constituting an aid agency in Yemen, came from Interpal.  Israel Dec. Ex. 43 (NW052074-91 at NW 052081-6); Ex. 27 (O'Hear Tr. at 169:22-171:14); Ex. 63 (NW013939-41 at NW013940).

104.     Lane testified that she was not expected to do, nor did she do, more to investigate Interpal other than accept Interpal's verbal representations.  Lane, for example, never visited Interpal's website to see that it listed NatWest's accounts for donations, and did not learn in August 2003 (or, to her recollection, until after this lawsuit was filed) that Interpal had been designated an SDGT by the U.S. government.  Israel Dec. Ex. 38 (Lane Tr. at 95:8-13; 256:2-6).

105.     NatWest concluded that the information Interpal provided addressed the suspicions it had regarding the transaction.   Israel Dec. Ex. 18 (Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 25, at 7).

106.     Upon learning about this transfer, Lane decided *not* to increase her scrutiny of Interpal's accounts.  Israel Dec. Ex. 38 (Lane Tr. at 245:13 – 246:18).

107.     In January 2003, Lane made a note in her file that "customers" (*i.e.*, donors) of Interpal as well as Interpal employees were bringing in large amounts of cash to deposit into the Interpal account, and Lane was aware that most of the international transfers made by Interpal were to

organizations in the West Bank, Gaza, and Jordan, but she never investigated any of Interpal's beneficiaries. Israel Dec. Ex. 38 (Lane Tr. at 94:20 – 96:7; 290:18 – 291:1; 291:6-20).

108.    After receiving Interpal's characterization of its benefactor Al Aqsa Foundation, NatWest took no further investigative steps for at least one year, even after the Al Aqsa Foundation was designated as a terrorist organization by both British and American authorities in May 2003. Case No. 666593 was closed on August 22, 2003 (the day after Interpal itself was designated a terrorist organization by the U.S.). As to whether the time period (14 months) that this purported investigation of one sizeable credit lasted was extraordinarily long, Hoseason testified that "it certainly is, I can't explain it." Israel Dec. Ex. 10 (Hoseason Tr. at 329:24-330:10); Ex. 75 (NW052133-9 at NW052133).

109.    In 2002 the Bank established a Money Laundering Action Group, of which Mr. Hoseason's team and Mr. Foster's team were members. The Group allowed the teams to come together monthly or quarterly to discuss terror financing issues. Israel Dec. Ex. 32 (Foster Tr. at 77:24-78:3; 78:20-22); Ex. 10 (Hoseason Tr. at 391:20-392:2).

110.    On May 29, 2003, the U.S. Treasury Department designated the Al-Aqsa Foundation as an SDGT (specifically naming the Islamic Charitable Society for the Support of Al-Aqsa as an "AKA" entity), accusing the organization of funneling funds, including money donated for charitable purposes, to HAMAS. On the same date, the Bank of England designated the Al-Aqsa Foundation as a terrorist organization. On May 30, 2003, NatWest prepared a Goalkeeper Report stating that "Chancellor Gordon Brown ordered an immediate freeze on all assets held in UK firms belonging to the Al-Aqsa Foundation." Israel Dec. Ex. 1 (U.S. Department of Treasury Office of Public Affairs May 29, 2003 Release); Ex. 65 (NW051994-97).

111.    On May 29, news of Al-Aqsa's designation was circulated to relevant Bank employees, asking them to "ensure that the necessary due diligence is completed and the result (nil or positive return) is returned to Group Risk Management (fao: Stephen Foster, Head of Anti-Money Laundering Compliance) by 16 June 2003."  Ex. 66 (NW050721-751).  Guy Cole, from CBFM's MLPU, responded on June 16 that CBFM "has had a nil return for the names contained in [the list]." *Id*. at NW050721.  Cole joined the bank in May 2003.  Irvine Rodger was his supervisor.  Ex. 67 (Cole Tr. at 9:21-11:8; 19:6-20:2).

112.    With regard to the fact that, as of May 29, 2003, one of Interpal's regular donators was, according to the British Treasury, an organization that it had reasonable grounds to suspect committed, participated in, facilitated or attempted to facilitate acts of terrorism, Hoseason conceded that "it is certainly not something that we would be enthusiastic about," and agreed that the fact that Interpal falsely told Belinda Lane that a terrorist organization was actually an "aid society" "would certainly heighten our suspicion" since "obviously the honesty of our customer is of interest to us."   Israel Dec. Ex. 10 (Hoseason Tr. at 344:22-345:5; 346:8-347:1). Nevertheless, the Bank took no action in response to this designation.

113.    In fact, even after Al-Aqsa's designation both Al-Aqsa and Hamid Sadoon continued to send funds to Interpal's NatWest account, and NatWest continued to process these transactions. On June 13, for instance, Interpal received a $60,000 transfer from Al-Aqsa Yemen, and a week later received $20,000 from Sadoon.  Israel Dec. Ex. 69 (NW012129-152); Ex. 68 (NW012108-128).  Moreover, just 10 days prior to the designation, Interpal received a £262,000 transfer from the Al Aqsa Foundation of South Africa.  None of these transactions were disclosed to law enforcement.  Ex. 10 (Hoseason Tr. at 348:22-349:2; 351:13-21); Ex. 42 (NW009934-42).

114.    As to the June 13, 2003 transfer, which was received from "AL-GAMEYAH AL-KHEREYAH AL-ISLAMEYAH LENASRAT AL-AQSA AL-SHAREEF.  SANAA - YEMEN" two weeks after the Bank of England had placed the Al Aqsa Foundation on its terrorist list, Hoseason agrees it would make sense for an organization listed on the sanctions list to try and get around that ban by using a name in a different language, omitting its address or doing something else of the sort.  Hoseason also agreed that the $20,000 from Sadoon came three weeks after the Al Aqsa Foundation organization had been designated and after Sadoon had received a red risk rating on the Goalkeeper Report at NW 052075.  Hoseason, when asked if he was alarmed by these transfers, testified "Am I alarmed? Certainly not comfortable with it, no." Israel Dec. Ex. 69 (NW012108-28); Ex. 68 (NW012129-52); Ex. 43 (NW052074-91 at NW052075); Ex. 10 (Hoseason Tr. at 355:12-356:3; 357:23-358:9; 359:1-360:10).

115.    Though Al-Aqsa's designation was noted in case No. 666814, the case was closed without further disclosure on September 17, 2003.  Israel Dec. Ex. 43 (NW052074-91 at NW052074).

116.    Throughout this time period, consistent with earlier years, Interpal continued to transfer millions of dollars from its NatWest accounts to the Palestinian entities about whom Hoseason noted NatWest "knew very little."  For example:

    a.  **August 16, 2002** – Interpal made a $74,911 transfer to Islamic Charitable Society – Al Khalil.  Israel Dec. Ex. 70 (NW010812).

    b.  **September 16, 2002** – Interpal made transfer orders of £34,806 to SANABIL, £16,792 to Al Mujama Al Islami – Gaza (HAMAS'S flagship organization, which was founded by HAMAS spiritual leader Sheikh Ahmed Yassin), £61,957 to Al Salah Islamic Association, £25,250 to Islamic Charitable Society – Al Khalil, £11,025 to Nablus Zakat Committee, £6,545 to Jenin Zakat Committee, £9,050 to Ramallah Zakat Committee, £11,100 to Al Mujama Al Islami – Khan Yunis, among 31 transfer orders placed that day totaling over £350,000.

    c.  **November 14, 2002** – Interpal made 62 transfer orders totaling over £630,000 to such Palestinian entities as Islamic University of Gaza, Islamic Charitable

Society, Tulkarem Zakat Committee, Al Mujama Al Islami, Al-Islah Charitable Society, Al Salah Islamic Association, and Nablus Zakat Committee.

d. **December 12, 2002** – Interpal made a $21,500 transfer order to Jenin Zakat Committee and $10,000 transfer to Al Tadamun Charitable Society – Nablus.

e. **January 15, 2003** – Interpal made £59,962 transfer order to Al Salah Islamic Association and £18,497 transfer to Al-Islah Charitable Society.

f. **January 23, 2003** – Interpal made 57 transfer orders totaling over £665,000 to such Palestinian entities as Qalqilya Zakat Committee, Al Tadamun Charitable Society, Al Islah Charitable Society, Al Mujama Al Islami (£27,877), Al Salah Islamic Association (£82,204), El Wafa Charitable Society, and Al Ihsan Charitable Society.

g. **February 19, 2003** – Interpal made 22 transfer orders totaling approximately £130,000 to such Palestinian entities as Al Mujama Al Islami, Islamic Charitable Society, and Al Salah Islamic Association.

h. **March 27, 2003** – Interpal made transfers of 195,000 euros and 100,000 euros to Stichting Al Aqsa in the Netherlands.  The Al Aqsa Foundation, including in the Netherlands, was of course designated as a HAMAS front by the U.S. and Bank of England two months later on May 29.

i. **June 27, 2003** – Interpal made 36 transfers totaling over £410,000 to such Palestinian entities as Al Salah Islamic Association, Al Mujama Al Islami, Islamic Charitable Society, Jenin Zakat Committee, and Ramallah Zakat Committee.  Israel Dec. Ex. 71 (NW013248).

j. **July 29-30, 2003** – Interpal made 21 transfers totaling over £710,000 to such Palestinian entities as Al Mujama Al Islami, Al Salah Islamic Association (£76,458), Islamic Charitable Society, Nablus Zakat Committee, and Jenin Zakat Committee.

k. **July 30, 2003** – Interpal made 16 transfers from its USD account totaling $556,000 to such Palestinian entities as Al Salah Islamic Association ($70,000), El Wafa Charitable Society ($50,000), Al Ihsan Charity Society ($25,000), and Islamic Charitable Society ($10,000).

Israel Dec. Ex. 36 (Geisser Rep. at Ex. D); Ex. 37 (Geisser Rep. at Exs. D-E).

117.    Interpal's transfers to the 13 purported Palestinian charities peaked in 2003, with Interpal transferring more than $3.8 million to those entities from its NatWest accounts.  Geisser Ex. C. That year, Interpal received more than $2 million into its NatWest accounts from WAMY and the Al Aqsa Foundation, providing a real-time example confirming various countries'

intelligence services' (including Israel's, South Africa's and the United States') description of Interpal as HAMAS's paymaster in Europe and of NatWest's own reflections about the possibility that Interpal was an "umbrella for funding Terrorism in the Middle East." Israel Dec. Ex. 37 (Geisser Rep. at Ex. B); Israel Dec. Ex. 57 (NW052133-9 at NW 052138-9).

118.    During this time, the Bank was uncertain of its ability to discover risky payments. For example, Irvine Rodger does not know if, in 2002, one of the bank's customers tried to send money directly to Osama Bin Laden whether the bank could have detected and intercepted the payment. Israel Dec. Ex. 29 (Rodger Tr. at 105:9-106:5).

119.    On November 19, 2002, the U.K. Financial Service Authority ("FSA") assessed a £750,000 financial penalty against RBS, of whom NatWest had been a part for two years by that time. Based on a review of a sampling of 181 accounts between January and May 2002, the FSA determined that RBS contravened FSA money laundering rules pertaining to obtaining and retaining sufficient KYC information. The FSA found a "high level of breaches" during its investigation due to "a failure adequately to monitor compliance with regulatory requirements," and thus "the size of RBS and the retail banking market in which it operates presents a serious risk to the FSA's statutory objective to reduce financial crime." "The breaches revealed weaknesses in the RBS anti-money laundering control system…. The seriousness of the breaches is exacerbated by the fact that they took place against a background of increased regulatory emphasis on the importance of effective anti-money laundering controls." Israel Dec. Ex. 72 (December 12, 2002 "Final Notice" from the Financial Services Authority to the Royal Bank of Scotland plc).

120.    NatWest still contends that other than the four NCIS disclosures it made between 1996 and 2004, it need not have made any more. Israel Dec. Ex. 9 (Responses and Objections by

Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 15, at 32-33).

121.    On July 7, 2003, Lane prepared a memorandum regarding the Interpal accounts.  In addition to mentioning the accounts' impeccable operations, and the transfer of those accounts coinciding with Lane's transfer from NatWest's Retail Department to CBFM in March 2002, Lane stated that since NatWest reported Interpal to "the authorities" in July 2002, she has had heard nothing further.  Israel Dec. Ex. 6 (NW 013636).

122.    Interpal was also mentioned in other internal SARs.  For example, on May 2, 2003 NatWest opened a Goalkeeper Report regarding Andrew Skinner, a customer who was transferring money to, among others, Interpal and Friends of Al-Aqsa, an accountholder of NatWest's parent company RBS.  The report noted that "The branch has concerns regarding the volume of outgoings to what appears to be Muslim organizations.…  On the basis of the information available to us at the present time, it is considered that the above incident/activity may constitute or involve money laundering and consequently a disclosure has been made to the NCIS and other appropriate authorities....  This information may be of relevance when considering any business approaches or dealings with the above named parties."  Israel Dec. Ex. 73 (NW083850-62 at NW083850-5).

123.    NatWest disclosed Skinner's activity to NCIS on May 7, however it is unclear from the disclosure what information was provided regarding Interpal (such as NatWest's history of suspicions) other than its name.  Israel Dec. Ex. 73 (NW083850-62 at NW 083859-62).

124.    On July 30, 2003, Interpal made a request to Terry Woodley, who assisted Lane, to transfer money from five accounts into its main account "as a matter of urgency."  The transfers were for more than 750,000 pounds.  Israel Dec. Ex. 74 (NW013375).

125.    On August 5, 2003, NatWest received a Production Order pursuant to the Terrorism Act of 2000 from the Metropolitan Police Special Branch to produce records pertaining to Interpal. There is no evidence of what, if any, production NatWest made in response.  Israel Dec. Ex. 75 (NW052105-13 at NW052110).

## VII.    DECISION TO REPORT TO NCIS

126.    Multiple compliance employees at NatWest testified about the decision-making process that went into deciding whether to report a customer and its transactions to NCIS.  Beginning in at least 1987, British law imposed an obligation on bank employees to report any suspicions of criminal activity to law enforcement.   The first legislation directed specifically at terrorist financing was enacted in 1989, and by 2000, it was widely known and understood at NatWest that staff, including relationship managers of business customers, had a duty to report such suspicions.  Internally, suspicions were reported to the designated internal function, namely the bank's group fraud office.  Israel Dec. Ex. 25 (Wickens Tr. at 38:17-40:7).

127.    NatWest understood that financial institutions in the U.K. played, and continue to play, an important role in preventing terror financing, and without the full cooperation of financial institutions, law enforcement will have difficulty in locating and seizing money related to terrorism.  Israel Dec. Ex. 10 (Hoseason Tr. at 92:16-93:3).

128.    Everybody at NatWest was responsible for trying to detect terror financing and money laundering.  Israel Dec. Ex. 10 (Hoseason Tr. at 440:16-441:7).

129.    Between 2000 and 2005, Hoseason had the authority to decide whether a suspicions report was sent to NCIS.  Between 1995 and 2000, Wickens and his assistant manager, Dennis Shepard, had this authority.  Israel Dec. Ex. 25 (Wickens Tr. at 58:8-59:16).

130. In 2001, money laundering and terror financings disclosures to law enforcement came only from Hoseason's group. Before deciding on whether or not to make a disclosure of an internal suspicion report, Hoseason or someone in his unit used their professional judgment as to whether a disclosure should be filed. This was based on their training, professional experience, and attendance at conferences, trade associations, and other guidance. Israel Dec. Ex. 10 (Hoseason Tr. at 162:13-17).

131. Anti-money laundering analysts within the Group Investigation & Fraud unit would make recommendations for reporting suspicions to Hoseason, who would decide whether to send a disclosure to U.K. law enforcement, specifically NCIS. Israel Dec. Ex. 30 (Wiltshear Tr. at 12:21 – 13:14).

132. Initially, Doug Hartley had to show disclosures to Hoseason prior to submitting them to NCIS, but as time went on he submitted them directly himself, and estimates that more than 80% of the internal SARs that Hoseason's and his team received were disclosed to NCIS. Israel Dec. Ex. 28 (Hartley Tr. at 38:12-21; 38:25-39:13).

133. In the context of the 2002 Sadoon/Al Aqsa disclosure, Stephen Foster admits that submitting suspicious activity reports to the authorities was an important part of the Bank's job because "it allows them to use suspicions we sent in to investigate." Foster admits that the Bank itself had the ability to determine whether to allow a customer to continue with the Bank as a customer. Israel Dec. Ex. 32 (Foster Tr. at 109:18-110:4).

134. If NatWest had advance notice of a transaction of which it was suspicious, it was required to seek consent from NCIS before processing that transaction. However, in practice consent rarely was sought even though the purpose was to provide law enforcement a chance to intervene

and get its hands on the money before it went anywhere.  Israel Dec. Ex. 25 (Wickens Tr. at 139:11-141:8).

135.    Other than during the month-long period in 2003 when the U.K. Charity Commission ordered Interpal's accounts frozen after the OFAC designation, NatWest never sought consent authority from the U.K. regarding any of Interpal's transactions between 2000 and 2004.  Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 24, at 47).

136.    As NatWest knew, NCIS had an enormous backlog of disclosures, and an investigation by Her Majesty's Treasury revealed that disclosures, on average, were not reviewed by U.K. law enforcement for at least 10 months.  Israel Dec. Ex. 76 (Holland Tr. at 276:5 – 279:18); Schuster Dec. Ex. 14 (Expert Report of Jon Holland at ¶¶ 3.57-3.58).

137.    As NatWest knew, British banks could increase the chances that a disclosure to NCIS was reviewed in a timely fashion by labeling a disclosure a "fast-track" disclosure.  Israel Dec. Ex. 76 (Holland Tr. at 278:14 – 279:8).

138.    Other than the NCIS disclosure submitted after Interpal's OFAC designation, none of the NatWest disclosures involving Interpal was labeled "fast-track."

## VIII.   <u>RISK FACTORS</u>

139.    In deciding whether to report a transaction to NCIS or seek guidance, NatWest's compliance employees considered many risk factors.

140.    Starting in July 2002, Fleur Baugh and Doug Hartley were the two employees who could say whether express prior consent was needed from NCIS before a transaction could proceed.  If a business unit reported an upcoming transaction that they thought was suspicious, Baugh and Hartley might report the transaction to NCIS and seek its consent to make the transaction, though

such consent was not frequently sought.  Israel Dec. Ex. 52 (Baugh Tr. at 113:2 – 114:18); Ex. 77 (NW000149-164 at NW000162.

141.   A factor considered by Baugh in deciding whether to seek prior consent from NCIS was the intended destination of the funds and whether they would be outside the scope of U.K. law enforcement.  Israel Dec. Ex. 52 (Baugh Tr. at 116:21 – 118:19).

142.   In forming suspicions about which transactions or customers had red flags, Cole's CBFM Money Laundering Prevention Unit relied on the knowledge that the Bank's staff had of its customers to determine whether such actions as large movements of cash were red flags.  Israel Dec. Ex. 67 (Cole Tr. at 27:8-28:10).

143.   Ian Wickens' money laundering group sometimes initiated investigations to try to determine if terror financing was occurring without having first received a suspicion report. Information about customers could come to his group from various sources such as a tipoff from another bank, a law enforcement officer, or a newspaper article that would cause them to start proactively investigating.  Israel Dec. Ex. 25 (Wickens Tr. at 79:23-81:8).

144.   Wickens knew, for example, that the Irish Republican Army would not walk into the Bank to open an account in the name of the IRA.  He considered the IRA adept at covering its tracks, understood that front companies were "part of the machinery" of terrorist groups, and felt that there can be a cumulative nature of suspicion or buildup of factors such as having a lot of money and unusual movements and transmissions that lead to concerns.  Israel Dec. Ex. 25 (Wickens Tr. at 114:14-116:22; 119:9-121:2).

145.   Through newspaper articles, Stephen Foster understood that terror groups often used charities as fronts to conceal their criminal activity.  Israel Dec. Ex. 32 (Foster Tr. at 67:5-11).

146.     Irvine Rodger was familiar with the Financial Action Task Force ("FATF") and testified that the MLPU reviewed FATF advisories and statements.  He had a high level of understanding of FATF's 2001 Special Recommendations against terrorism financing, and as head of the MLPU, Rodger gave regard to these Recommendations, which included the Special Recommendation that cautioned about the use of charities as terrorist fronts.  Israel Dec. Ex. 29 (Rodger Tr. at 50:23-51:8; 56:18-57:2).

147.     Hoseason was and remains familiar with FATF, and as part of his job in 2001, he kept abreast of developments in FATF guidance.  He is aware of FATF's October 2001 issuance of Special Recommendations addressing banks' role in preventing terror financing, and would have read the eight Special Recommendations initially issued, and the ninth added later, at the time that they were issued.  He recalls that, in October 2001, FATF guidance advised banks to be vigilant for the use of charitable organizations as fronts for terrorist organizations.  Israel Dec. Ex. 10 (Hoseason Tr. at 324:325:20).

148.     Hoseason also was aware as of September 2001 and January 2002 of the typology that entities engaged in terror financing often used charities as a front to conceal their criminal activity.  He calls the typology "a recognized means by which monies are moved, and I use the terminology of front, it is a recognized means by which monies can be moved around using the guise of a charity."  Though he does not specifically remember, he would not be surprised if he heard that the September 11 attacks were financed at least partially by money moved through charitable fronts.  Israel Dec. Ex. 10 (Hoseason Tr. at 150:20-151:1; 215:15-24; 323:19-324:1; 324:14-19).

149.     Tony O'Hear agrees that payments over $10,000 for Interpal had to be reported to U.K. law enforcement after Interpal's August 2003 OFAC designation, but acknowledges that

transactions below that amount also could constitute terror financing risks.  Israel Dec. Ex. 27 (O'Hear Tr. at 145:13-20).

## IX.    U.S. DESIGNATION

150.    On August 19, 2003, a HAMAS suicide bomber attacked a civilian bus in downtown Jerusalem, killing 13 people, including five children, and hospitalizing 102 others. Among the injured were six plaintiffs in this case. One of them was Chana Nathansen, whose three-year old daughter, Tehila, was sitting on her lap and was killed during the bombing.  Mordechai Reinitz and his son, Yissocher, also were killed.

151.    On August 22, 2003, the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC") designated Interpal as a Specially Designated Global Terrorist ("SDGT").  Entities with which Interpal previously had transacted millions of dollars through its NatWest accounts, including CBSP, the Palestinian Association in Austria, and the Sanabil Association for Relief and Development, also were designated as SDGTs at that time based on their connections to HAMAS.  Sanabil, for example, was the third-largest recipient of Interpal funds in 2002.  OFAC also designated as SDGTs various HAMAS leaders, including Sheikh Yassin, Abdel Aziz Rantissi and Khalid Mishaal.  Israel Dec. Ex. 1 (U.S. Department of Treasury Office of Public Affairs August 22, 2003 Release); Ex. 78 (NW013444-78 at NW013474).

152.    At the time of the designations, President Bush released the following statement: "By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the Palestinian people," and Secretary of the Treasury John Snow issued a statement that read, in part, "Hamas leaders and those who provide their funding

against have the blood of innocents on their hands."  Israel Dec. Ex. 1 (U.S. Department of Treasury Office of Public Affairs August 22, 2003 Release NW Π 000048).

153.    The announcement of Interpal's designation included discussions of HAMAS'S perpetration of terrorist attacks, including suicide bombings targeting U.S. and Israeli civilians, in the preceding months in Israel.  *Id*. at NWΠ 000049.

154.    In introducing the five designated organizations, including Interpal, the U.S. Government stated that it had "credible evidence" that each was "part of a web of charities raising funds on behalf of HAMAS and using humanitarian purposes as a cover for acts that support HAMAS." According to the U.S. Government, "Funds are generated by, and flow through, these organizations on behalf of HAMAS."  *Id*. at NWΠ 000052.

155.    The designation stated that Interpal "has been a principal charity utilized to hide the flow of money to HAMAS.  Reporting indicates it is the conduit through which money flows to HAMAS from other charities, *e.g.,* the Al Aqsa Foundation (designated under EO 13224 on May 29th) and oversees the activities of other charities.  For example, the Sanabil Association for Relief and Development (designated as part of this tranche), represents Interpal in Lebanon. Reporting indicates that Interpal is the fundraising coordinator of HAMAS.  This role is of the type that includes supervising activities of charities, developing new charities in targeted areas, instructing how funds should be transferred from one charity to another, and even determining public relations policy."  *Id*. at NWΠ 000052

156.    NatWest did not have and still has no information to dispute any of the findings in the U.S. Government's statement designating Interpal as a SDGT.  Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, Nos. 8-9, at 14-15).

157.   Key compliance employees Neil Trantum, Tony O'Hear, Irvine Rodger, and Michael Hoseason do not recall any other customers of the bank being designated on the OFAC list. Israel Dec. Ex. 24 (Trantum Tr. at 134-35); Ex. 27 (O'Hear Tr. at 132:13-18); Ex. 29 (Rodger Tr. at 80:16-22; 152:22-153:19); Ex. 10 (Hoseason Tr. at 371:7-14).

158.   Foster recalls that the Bank had one other customer that was on the OFAC list, a small charity in Northern Ireland that was linked to the Irish Republican Army in 2006. Foster says that the Bank closed that account since by 2006, it was applying OFAC requirements globally. Israel Dec. Ex. 32 (Foster Tr. at 171:16-21; 218:21-219:13).

159.   Rodger understood that the U.S. was making clear its belief that Interpal was involved in terrorism. Israel Dec. Ex. 29 (Rodger Tr. at 81:6-13).

160.   Yet, Rodger does not recall if he knew that Interpal had been subject to previous disclosures. He testified that if he had been aware of such disclosures during that time, he would not have reviewed them personally, but a member of his team might have. As to whether the MLPU would have wanted to inform itself about previous disclosures about a customer that had just been designated a terrorist, Rodger says "I can't recall." *Id*. at 93:12-19; 94:1-7

161.   On August 26, 2003, the U.K. Charity Commission issued a freezing order on Interpal's accounts. Israel Dec. Ex. 79 (NW013660-1).

162.   On September 17, Tony O'Hear emailed Group Risk Management's Dedri Nell, telling her that "I have today spoken to Mark Ashtown of the NTFIU, Special Branch, New Scotland Yard. Mark was fully aware of the payment for $180,939 (given we had disclosed then this is not surprising). I advised that Interpal had confirmed the source of this payment to be the Islamic Charitable Society for the support of Al-Aqsa which he noted with interest!" Israel Dec. Ex. 80 (NW013700).

163.    Interpal RM Lane testified that, until Plaintiffs filed this lawsuit, she did not know that Interpal, one of her top-earning clients, had been designated an SDGT by the U.S. Government. Israel Dec. Ex. 38 (Lane Tr. at 256:11-257:2).

164.    On September 24, the Charity Commission unfroze Interpal's accounts.  In its inquiry report, the Commission concluded that it had no "clear evidence showing Interpal had links to Hamas' political or violent militant activities," but made no mention of the allegation that Interpal supported HAMAS'S social wing.   Israel Dec. Ex. 81 (NW012941); Ex. 82 (NW013649); Ex. 83 (The Charity Commission for England and Wales 2003 Inquiry Report regarding Palestinians Relief and Development Fund).

165.    As with the 1996 Report, there is no evidence that anyone at NatWest actually read the 2003 Charity Commission Report.  In particular, there were no copies in or attached to any of the files produced in this litigation.  And although one employee (Holt) testified that she believed that she *would* have read the report, she has no recollection of actually doing so and was not even involved with the Interpal issue at the time that the Charity Commission Report was released. Israel Dec. Ex. 33 (Holt Tr. at 86:7-88:3).

166.    The day after its accounts were unfrozen, Interpal made nine transfers totaling £228,656 to the following nine institutions in the Palestinian Territories and Lebanon: Al-Islah Charitable Society, Orphan Care Society, Nablus Zakat Committee, Social Reform Society, Gaza Zakat Committee, Jenin Zakat Committee, Islamic Charitable Society, Zakat Fund (Lebanon), and Mercy Association for Children.  Israel Dec. Ex. 36 (Geisser Rep. at Ex. D).

167.    In an October 2 email chain, Group Risk Management's Damien Connor mentioned to Tom Sludden, Ben Norrie (a long-term contract employee working with the Bank's compliance teams, Israel Dec. Ex. 25 (Wickens Tr. at 142:6-14)), and Stephen Foster that "[t]he blocking of

'Interpal' accounts was a direct result of Charities Commission Order, and not an order via the Bank of England. We therefore have not reported this account formally to the Bank of England as part of our reporting process.  Please note that Interpal (and its respective a.k.as) have now been cleared of any wrong doing or links with Hamas by the Charities Commission."  Israel Dec. Ex. 84 (NW016749-50).

168.    On September 5, Richard Gossage, the head of Risk Management at the Bank, wrote to Tom Dawlings of the Bank of England Financial Sanctions Unit inquiring whether further action should be taken with respect to Interpal.  In the letter, Gossage promised to undertake a 12-month review of Interpal's ledgers, including a review of payments received from the Islamic Charitable Society for the Support of Al-Aqsa.  Israel Dec. Ex. 85 (NW014500-4); Ex. 86 (NW012976).

169.    Dawlings responded to Gossage's September 5 letter on October 3, advising that: "The Bank of England issued a Notice under article 4 of the Terrorism (United Nations Measures) Order 2001 in respect of Hamas on 22 September 2003. As a result of this any payment to, *or for the benefit of*, Hamas are prohibited.  If any such payments are being made by Interpal, these will need to be frozen. If you suspect that any such payments might be being made, then this would be a matter to report to the Charity Commission, Special Branch and this Unit."  Israel Dec. Ex. 87 (NW014505) (emphasis added).

170.    Gossage replied on October 28, telling Dawlings: "In response to the comments in your letter, a full investigation was completed of the payments made by Interpal as part of the Charity Commission inquiry. There is no indication that any payments have been made to Hamas from the accounts held by RBS Group. The Group intends to monitor the payments transactions of

Interpal for potential payments to the benefit of Hamas going forward."  Israel Dec. Ex. 88 (NW014551).

171.    Gossage's reply did not include any information on prior payments that had been made by Interpal "for the benefit of" Hamas, nor does the record contain any evidence of the "full investigation" completed.  In fact, in the 24 hours leading up to Gossage's reply, Foster proposed telling the Bank of England that "we have carried out further checks on the accounts we hold for Interpal and we have confirmed that payments are not being made to Hamas from those accounts."  Leah Rowland, Executive Secretary to Holt, however, noted that she was not sure that these representations were factually accurate, and they were specifically excluded from the reply letter to Dawlings, which instead used the vaguer, but still misleadingly reassuring, language set forth above.  Israel Dec. Ex. 89 (NW013695-7).

172.    NatWest now states that, when Gossage assured the Bank of England that a "full investigation" had been carried out, he was referencing the Charity Commission's inquiries.  Israel Dec. Ex. 18 (Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 16, at 6-7); Ex. 19 (Second Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 16, at 3-4).  There is no evidence that Gossage (or anyone else at the bank) read the Charity Commission's two-page report containing the investigation's findings.

173.    On October 13 and 14, O'Hear, Foster, Cole, Irvine Rodger, among others, were on an email chain in which O'Hear asked if the formal or informal monitoring of payment traffic with regards to Interpal was possible.  No response was provided for at least six months, even though on October 9 Norrie had expressed "wider concerns" to Foster about the Bank's ability to screen

potential payments.  Israel Dec. Ex. 63 (NW013939-41); Ex. 90 (NW017173-8 at NW017173); Ex. 91 (NW 213357-8).

174.    O'Hear was aware that the Bank of England had listed the Al Aqsa Foundation, including its Yemen branch, on its list of suspects for terrorist financing, and that Interpal had repeatedly sent and received large transfers to and from the Foundation.  In the above email discussion with other compliance officers, which included reference to the Al Aqsa Foundation, O'Hear did not mention the designation because it is his "guess" that the other individuals, namely Foster and Norrie, already were aware of that fact.  Israel Dec. Ex. 27 (O'Hear Tr. at 171:18-22; 172:19-173:22); Ex. 63 (NW013939-41).

175.    Foster was never asked for an opinion about how to handle Interpal after it was designated.  Instead, he was simply told about the designation by the corporate banking division, and he indicated to them that it was their responsibility to make a decision on the account.  After the designation, Foster, who was responsible for the bank's Anti-Money Laundering and Sanctions in Terrorist Financing policy, did not undertake any follow-up investigation, such as looking at the OFAC website.   He explained this failure by testifying that it was the responsibility of the corporate banking division "and they would have done that."  Israel Dec. Ex. 32 (Foster Tr. at 56:10-21; 58:2-17; 59:5-13; 61:16-23; 63:7-16; 65:5-24; 73:15-18). However, there is no indication that anyone from CBFM actually did do that.

176.    When asked why he doesn't recall anything related to Interpal, Foster says it was a long time ago and "I was a busy person. This would not necessarily have stood out that much."  Foster admits that learning that a NatWest customer had been designated as supporting HAMAS and terrorism "was unusual."   Interpal also is the only NatWest customer who was a charity that Stephen Foster can recall that became suspected of terror financing.  Nonetheless, Foster did not

look at any records related to Interpal even though he could have done so and even though it would have concerned him to learn of links between Interpal and HAMAS. *Id*.

177.    Foster agrees that the Bank had enormous resources to carry out its business. He says it is one of the largest retail corporate banks in the country and, in fact, the world. *Id*. at 141:5-142:1.

178.    With regards to the investigation of Interpal, Foster says that he would have expected Cole and Rodger to have sought out all evidence in their review of the accounts, including Goalkeeper, and they should have looked at the history of payments received and payments made. Foster does not know if any of that was done. *Id*. at 235:5-17.

179.    Cole does not think he responded to Foster's October 14, 2003 email asking Cole and Rodger if monitoring of Interpal's payment traffic was possible. He does not believe he had knowledge of the Interpal accounts as of April 21, 2004. Israel Dec. Ex. 67 (Cole Tr. at 41:6-42:16; 45:8-25); Ex. 63 (NW013939-41); Ex. 92 (NW066732-5 at NW066735).

180.    Rodger was aware that the Charity Commission published a report after it completed its 2003 investigation of Interpal. However, despite being responsible for the decision to recommend continuing to service the Interpal accounts, he did not read the report as "lots of reports come to my attention. I don't read them all." Though Interpal is the only customer Rodger can recall that was designated a terrorist by the United States, Rodger also did not read about the 1996 Charity Commission investigation. With respect to, NW13939-41 (Israel Dec. Ex. 63), an email chain which he received and which discusses the Bank of England's prohibition on payments to HAMAS, Rodger does not remember it and doesn't recall receiving this email chain as "I got 200 emails a day." Ex. 29 (Rodger Tr. at 99:19-25; 102:4-5).

181.    On November 5, 2003, Interpal made 13 transfers totaling £429,817 to such Palestinian entities as the Jenin Zakat Committee and Islamic Charitable Society. NatWest learned no later

than July 13, 2004 that the Jenin Zakat Committee was declared an Unlawful Association in Israel.  Israel Dec. Ex. 93 (NW 155831).  At no time did NatWest disclose these transfers to British authorities.

182.    Amanda Holt wanted CBFM to perform extra monitoring of the Interpal accounts, to go above and beyond the minimum regulatory requirements, and to see what actually was happening in the accounts and who the payees were.  Israel Dec. Ex. 33 (Holt Tr. at 130:15-131:8).

183.    Holt cannot recall if she took any steps to learn why Interpal had been designated by OFAC.  *Id*. at 83:7-12

184.    If NatWest felt that it wanted to take a further look at any particular customer's account to ensure its activity was appropriate, it could do so, and it in fact did so on a number of occasions to ensure that the Bank was not "supporting criminal activity."  These investigations were not performed solely at the request of the U.K. authorities, but sometimes at NatWest's own initiative.  Israel Dec. Ex. 32 (Foster Tr. at 128:3-129:20).

## X.    NATWEST'S VIEW OF U.S. DESIGNATIONS

185.    NatWest compliance employees' views, reflected both in contemporaneous emails and depositions, manifested disregard and even disdain toward U.S. terrorist designations.   At deposition, Cole expressed the belief that the OFAC list serves U.S. "political interests" and "government interests" and admitted that an OFAC designation was insufficient for him to conclude that Interpal was a terrorist organization.  Israel Dec. Ex. 67 (Cole Tr. at 88:2-16; 141:4 – 142:4).

186.    Neil Trantum's understanding of OFAC from the Bank's point of view is that dollar payments cleared through the U.S. needed to comply with the OFAC list, but that it wasn't

necessary for NatWest to refrain from doing business with a person that was on the OFAC list if

they were outside the U.S.  "The OFAC list is for dollar payments, it is a U.S. thing.  In the U.K.

that is not necessarily the be-all and end-all."  Israel Dec. Ex. 24 (Trantum Tr. at 89:16-90:7;

91:10-17).

187.   Trantum testified that "the group complied with UK laws and regulations and required its

offices overseas to comply with the group's UK legislations and local regulations as well.  In

certain parts of the world OFAC has no bearing."  Moreover, "for non-dollar payments OFAC

has no bearing in the UK."  Outside the U.S., the Bank did not comply with U.S. legislation.

Wickens and Foster had the same understanding, and Foster acknowledged that while there also

was no *obligation* for NatWest's U.S. operation to comply with the Bank of England sanctions

list, it did so because it was "the policy" of the bank.  Israel Dec. Ex. 24 (Trantum Tr. at 92:15-

25; 98:20-99:11); Ex. 25 (Wickens Tr. at 95:8-22); Ex. 32 (Foster Tr. at 71:21-72:15; 74:12-24).

188.   Trantum's testimony matches that of Wickens, who testified that since 1997, NatWest did

screen all its financial markets and capital markets activity against the OFAC list even outside

the United States, but admitted that it did not do so for retail transactions, and Interpal's accounts

were retail until being moved to CBFM.  Israel Dec. Ex. 25 (Wickens Tr. at 101:3-13).  Wickens

claims the distinction rests upon "prudential" considerations germane to securities clearing

transactions, because Financial Markets transactions were usually cleared in the United States.

*Id*. at 99:17-100:10

189.   As to whether the Interpal account could be kept open in 2003 after its U.S. designation,

Foster says that because the OFAC list did not apply in the U.K. "we were allowed to hold an

account for Interpal, technically."  At the time of the designation, Foster says the Bank had no

specific policy in relation to OFAC, given it was outside of the U.K.'s jurisdiction.  He doesn't

even know why OFAC information was distributed within the Bank.  Israel Dec. Ex. 32 (Foster Tr. at 172:7-9; 194:14-25).

190.    Foster testified that with regards to Interpal, the Bank had "no evidence" to suggest terrorism links.  As to the OFAC designation, "that was a listing in the United States. It doesn't necessarily mean it is a terrorist organization that is actually financing terrorism." In other words, "the US authorities suspect it might be."  *Id*. at 209:25-210:18.

191.    O'Hear's understanding is that if HAMAS was listed by the Bank of England than it would be illegal to permit any transactions with them; if they were not listed, then any transaction would be legal.  Israel Dec. Ex. 27 (O'Hear Tr. at 150:11-151:13).

192.    Holt testified that the Bank of England sanctions list was not the only factor the Bank would consider with a suspicious customer, and Interpal's U.S. designation necessitated further investigation by CBFM to fully understand the facts and decide the best course of action.  Israel Dec. Ex. 33 (Holt Tr. at 72:16-73:7; 77:3-78:4).

193.    Holt further testified that she likes to see things for herself, but cannot recall visiting the OFAC website to see why Interpal was designated, and though she did not deem the OFAC designation unsubstantiated, she never developed a suspicion that Interpal was funding HAMAS. *Id*. at 83:19-84:17; 229:14-230:8.

194.    Hoseason was aware around the time of Interpal's OFAC designation that Interpal had "appeared on the list of some description.  I don't believe that list specifically related to persons and entities engaged in terrorist financing.  I think it was a list of people and entities that were suspected of doing so."  Israel Dec. Ex. 10 (Hoseason Tr. at 37:5-10; 137:25-138:9).

195.    Rodger was aware that OFAC had a website, but he did not view the website because "I don't regard that as being material to the activities of CBFM. MLPU's business is in the UK…I

didn't regard it as relevant to the UK situation."  As to the reason for the U.S. designation, he imagines that someone on his team would have asked that question, or that he would have asked someone on the team to find out more about it.  He acknowledged that the designation was unusual, as he could recall no other occasion on which a customer of the Bank was designated a terrorist by the U.S. Government, and it was important that he understood the reason why Interpal had been designated.  Israel Dec. Ex. 29 (Rodger Tr. at 84:23-86:10; 87:11-16; 88:15-21).

196.    Rodger referred to the OFAC designation as one view "but the material view was the Bank of England, one being a UK bank."  In other words, he believes the Bank of England's view, not OFAC's, was the salient view.  *Id*. at 115:16-21; 116:5-7.

197.    Rodger did state that designations by the Bank of England, European Union and OFAC of a NatWest customer's *payees* would be a matter for consideration by his money laundering unit.  *Id*. at 236:23-237:24.

198.    Rodger testified that U.K. law enforcement did not have concerns with Interpal, a contention that he based on the fact that the UK Government had not sanctioned Interpal.  However Rodger never spoke with U.K. law enforcement about Interpal and does not know if other compliance employees of the Bank did either.  He stated that the fact that Interpal wasn't listed by the Bank of England "implied that there were no concerns" but acknowledges that he did not have any information about what UK law enforcement actually thought about Interpal. *Id*. at 186:3-21; 187:23-188:13.

199.    Rodger acknowledged that NatWest continued to service Interpal even after banks in Arab countries were refusing to do business with Interpal because of the OFAC designation. Israel Dec. Ex. 94 (NW067946-7); Ex. 29 (Rodger Tr. at 200:3-17).

200.    With regard to Israeli intelligence outlawing an Interpal beneficiary, the Al-Islah Charitable Society, based on its connections to HAMAS, Rodger testified that just because something is on a "website does not necessarily mean that it is true, and the actual treatment of the charity by the Bank of England is material because they would have had the resources to investigate and establish the veracity or otherwise of the comments here."  Though Rodger is and was aware that the Israeli Government maintained a publicly available list in English of organizations it concluded funded terrorism, Rodger says it was not material and the only list that is material, or relevant, or salient for a U.K. bank, was the U.K. list.  Rodger stated that the OFAC list has some relevance because the Bank had operations in the U.S., but all other countries where the Bank doesn't have locations are "irrelevant."  Rodger understood in 2004 that the country most affected by HAMAS attacks was Israel, and acknowledged that if, for example, he wanted to know more about a Basque terrorist group, he would look to see what the Spanish government said.  Though he does not know how the U.K. Government made judgments about potential terrorism links, he has "no doubt" and is "sure" that the U.K. and Israel had close intelligence contacts.  Israel Dec. Ex. 29 (Rodger Tr. at 161:25-162:21; 163:19-164:10; 164:21-165:1; 165:20-167:14).

201.    By 2006, NatWest had decided to apply OFAC requirements globally because of a change in the Bank's "risk appetite."  Israel Dec. Ex. 32 (Foster Tr. at 240:18-22).  Nonetheless, NatWest chose to leave Interpal's accounts open at the time.  According to Foster, the new policy would have mandated the Bank closing Interpal's accounts, "but there may have been other reasons if we didn't close it, then why we maintained it."  *Id.* at 219:23-220:3.

202.    As noted above, Foster recalls that the Bank had one other customer that was on the OFAC list, a small charity in Northern Ireland that was linked to the Irish Republican Army, and

that the Bank had closed that account, since by 2006 it was applying OFAC requirements globally.  *Id*. at 171:16-21; 218:21-219:13.

203.    Sonia Gayle, Head of the Group Compliance Department, claims not to have been aware before she was deposed that Interpal was the Bank's customer, and does not recall hearing about Interpal or any other customer of the Bank being designated by OFAC.  Israel Dec. Ex. 34 (Gayle Tr. at 100:4-101:5; 103:13-16).  Though Gayle and her department spoke with the Bank of England weekly when Gayle joined the Bank in late 2001, she never discussed Interpal, of whom she had not heard until her October 2010 deposition, with the Bank of England.  *Id*. at 128:3-15; 100:4-11.

## XI.    EARLY 2004 CONTACT WITH INTERPAL AND MONITORING

204.    On January 12, 2004, Interpal's Adlin Adnan wrote to Lane and Clive Bray (who took over Terry Woodley's role as assistant relationship manager for Interpal), copying Jihad Qundil, and referenced a September 2003 issue Interpal had with NatWest's Cricklewood Branch. Adnan stated that Interpal had experienced additional problems with Cricklewood over the prior few months.  Lane responded that she was "extremely concerned to learn of the poor service which you have encountered and will be writing to the manager of the branch to seek their comments and apologies."  Israel Dec. Ex. 95 (NW017133-4).

205.    Bray forwarded the complaint to the Cricklewood Branch on January 21 and stated that "because of the value to the Bank of this connection we feel that an appropriately worded letter of apology is required and would appreciate it if you would issue such a letter and copy us in." Israel Dec. Ex. 96 (NW017131).

206.    On April 21, 2004, six months after the chain of emails culminating in O'Hear's question if the monitoring of Interpal payment traffic was possible, Norrie emailed regarding the Interpal

account and the assurances to the Bank of England that NatWest would monitor transactions. Norrie asked whether any monitoring or enhanced due diligence had been done, and Tom Sludden confirmed that the answer was no. Israel Dec. Ex. 90 (NW017173-8).

207. After Cole admitted to Norrie on May 6 that Interpal's relationship manager "has no ability to filter or efficiently monitor payments," Norrie forwarded the response to Foster five minutes later and acknowledged "we undertook with the BoE to monitor Interpal going forward. To date we have not put anything in place (my fault, this one slipped my attention). From the below it looks like this might not be straightforward." Israel Dec. Ex. 97 (NW017179-90 at NW017186).

208. Cole remarked to Norrie, Foster, and Rodger via email on May 17, 2004 that "I realise due to the US terrorist designation of Interpal, that we should be wary of the payments from their accounts with us, but in reality I believe there is very little we can effectively do to prevent payments being made without a payment filtering system, as the customer can initiate payments themselves without needing to contact the RM." Israel Dec. Ex. 98 (NW018476-83 at NW018477).

209. Rodger acknowledged that the shortcomings in the filtering system meant that after 9/11, he does not know if the Bank could have intercepted a payment from one of its customers to Osama Bin Laden. Israel Dec. Ex. 29 (Rodger Tr. at 105:9-106:5).

210. These observations contradict Gossage's representations to the Bank of England that NatWest would be monitoring Interpal's accounts. *See* ¶ 170.

211. Instead, on May 17 Cole stated that he was reviewing payments on Interpal's accounts for the prior six months, and was identifying payments that warranted further investigation. He concluded:

> From my trawls for information on the internet I have not found any information that substantiates beyond opinion that Interpal has made payments to terrorist groups.  It appears the perspective taken by Israel towards Interpal and other charities operating/funding schools/orphanages/hostels in Palestine and Gaza, is that these charities perpetuate terrorism as terrorists know that if they die their dependents will be looked after by the charities.

Cole also indicated that he had performed Google searches of Interpal beneficiaries, and had even turned up Israeli intelligence information about entities that he discounted but which could have confirmed that such Palestinian entities as Al-Mujama Al-Islami, Al-Jam'iya Al-Islami, Islamic Charitable Society – Hebron, Ramallah Zakat Committee, Tulkarem Zakat Committee, Al-Tadamun Charitable Society, Jenin Zakat Committee, and World Assembly of Muslim Youth were declared terrorist organizations by Israel in February 2002.  His research *had* confirmed, for example, that Al-Islah Charitable Association had been outlawed by Israel in 2002, but Cole dismissed the findings as "opinion" and "background information."   Cole regarded any conclusion by the Israeli Government about Interpal's links to HAMAS and terrorism as unreliable because he believed that Israel is biased against Palestinian organizations and regards any organization that provides assistance to the Palestinian population to be a terrorist entity.  Israel Dec. Ex. 99 (Annex D to Azoulay Rep.); Ex. 97 (NW017179-90 at NW017181); Ex. 98 (NW018476-83).

212.    Various Bank documents show that NatWest was aware of, and capable of using for informational purposes, Israeli intelligence websites that listed Israeli governmental designations.  For example, a May 2004 "Significant Case Commentary" issued by the Bank included the designation of the registered U.K. charity Human Appeal International, and a June 2005 "Know Your Customer" document concerning Human Appeal International referred to the same determination by the Government of Israel.  Israel Dec. Ex. 100 (NW180879-83); Ex. 101 (NW196915-32).

213.    Cole assessed the reputational risks of both closing and maintaining the account.  He stated that closure could generate adverse media attention if NatWest closed the account "without an identifiable reason" and that the failure to close the account could generate "untoward regulatory/media attention" if a terrorist related payment was identified.  Israel Dec. Ex. 97 (NW017179-90 at NW017180-1).

214.    Nonetheless, Cole concluded his analysis by saying: "I am content to leave the Sterling and Euro accounts operating with a semi annual review taking place for foreign payments made from the accounts. [...] I assume you are happy with the approach, unless I hear otherwise." Foster responded that he supported Cole's position, though he asked if semi-annual reviews were sufficient.  *Id*. at NW017179-80.

215.    Cole testified that "this is probably the only case where this scenario existed.  I would not -- this is the only client I ever monitored in this regard, so it is not standard procedure." Israel Dec. Ex. 67 (Cole Tr. at 58:9-19).

216.    On May 20, Rob Davies, a member of Foster's team, recognized the awkwardness of continuing to service an OFAC-designated terrorist, warning Foster and Norrie: "Another issue for us to consider with INTERPAL could be payment filtering.  It may look a little inconsistent going forward if we have to block USD payments going to INTERPAL (*i.e.*, INTERPAL is OFAC listed) but are happy to maintain a relationship with them as a customer."  Israel Dec. Ex. 102 (NW017151-4 at NW017151).

217.    When confronted with this email at deposition, Rodger dismissed Davies as a "junior person" about whom "I would wonder to what extent he actually understood it, the issue at hand."  Israel Dec. Ex. 29 (Rodger Tr. at 148:1-7).

218.     Rodger testified that CBFM, namely Cole, reviewed payments to Interpal six months after they had been made, a process that was precipitated by the Charity Commission's 2003 investigation and the seriousness of the allegations, namely the OFAC allegations, that Interpal was funding a terrorist group.   However, Rodger acknowledges that Cole did not begin the review until at least nine months after the OFAC designation. *Id*. at 104:19-105:4; 106:17-107:13; 108:20-109:4.

219.     Rodger admitted that "the major risk" of the Bank's decision to continue its relationship with Interpal "would be that the bank had made a wrong judgment on Interpal and actually it was somehow managing to fund Hamas, and that would have been very, very poor if that was the case." *Id*. at 122:18-123:5.

220.     Rodger says that enhanced due diligence is understanding the nature of the account, the type of transactions which go through the account, the types of expected account activity, and those types of investigative areas.   He does not recall any enhanced due diligence measures that CBFM put in place between August 2003 and April 2004 for Interpal.   *Id*. at 109:22-110:7; 111:21-24.

221.     At deposition, Rodger refused to confirm that he received Cole's six months review of outgoing payments from Interpal in May 2004, even though his name appears on the distribution list.   Rodger testified that he would have had a meeting with Cole where Cole would have told him what was in the report, though he doesn't actually recall a specific meeting with Cole and believes it happened because that is the way things worked in his department.   *Id*. at 150:17-151:11; 152:5-11.

222.     Though Interpal was the only customer of CBFM designated by OFAC, Rodger can't recall if he read the emails and documents pertaining to the designation.   *Id*. at 152:22-153:19.

223.    On June 19, 2004, the Bank was contacted by Bank Hapoalim in Israel after another of NatWest's customers, Human Appeal International (*see* ¶ 212), attempted to remit funds to the Jenin Zakat Committee, who per Bank Hapoalim's notification to NatWest, had been declared an Unlawful Association by the Israeli government.   Between 1997-2006, Interpal and the Jenin Zakat Committee transacted more than $1.3 million through NatWest, however NatWest reported none of these transactions to British authorities.   Israel Dec. Ex. 100 (NW180879-83 at NW180880); Ex. 36 (Geisser Rep. at Ex. C).

## XII.    NATWEST'S COZY RELATIONSHIP WITH INTERPAL

224.    NatWest's relationship with Interpal was highly profitable for the Bank, a fact of which Bank employees dealing with the accounts were acutely aware.   Interpal was consistently one of Belinda Lane's top earning accounts, producing one of the highest incomes for the Bank.   This was so "because of the volume of credit balances they held," and because Interpal's refusal to accept interest [because strict adherents of Islamic law, sharia, interpret sharia as forbidding the earning of interest] allowed NatWest to pocket the interest owed on its large balances, unlike with the rest of her customers.   When Interpal's deposits increased, "the income that [Lane's] portfolio received would increase."   So the larger the deposits, the more money NatWest made, and the increased income was an important factor in her annual reviews.   Israel Dec. Ex. 38 (Lane Tr. at 71:24-25; 76:8-23; 85:17-22; 88:6-8; 89:13-25).

225.    While she was relationship manager for Interpal, Lane received a promotion, which was due in part to the fact that she "certainly exceeded [her] income target" in 2000 and 2001.   *Id*. at 70:4-6.

226.    Wickens, NatWest's Money Laundering Reporting Officer until 2001, disclaims any personal knowledge of how closely NatWest managed the Interpal accounts, or that he had any

involvement in the process.  He purports not to know whether one of the larger and most profitable accounts of a relationship manager would be among those to which the most attention was devoted, but agrees the manager would be quite familiar with those accounts.  Israel Dec. Ex. 35 (Wickens Tr. at 68:16-25; 173:25-175:16).

227.    On May 13, 2003, Interpal's Jihad Qundil sent Lane a letter complaining about several issues Interpal was having receiving funds.  In raising the complaint internally within NatWest's Commercial Banking division two days later, Lane's assistant Terry Woodley stated: "I should be grateful if you would give the matter your urgent attention as the customer is in our Top 5 fee earners for the bank."  Israel Dec. Ex. 103 (NW 068305-11).  This echoed an internal email Lane sent on February 26, 2003, in which she remarked "if Terry didn't tell you these custs are my top income earners - £9kpm!"  Ex. 104 (NW 217191); Ex. 6 (NW013636).

228.    On the same day that the Charity Commission unfroze Interpal's account, Lane wrote the Cricklewood Branch of the Bank, advising that she had received an email from Interpal regarding the unhelpfulness of the branch.  Lane noted: "In view of the fact that this is my largest income earning customer by virtue of the credit balances which they maintain with the Bank, I should be grateful if you would arrange to forward to them an urgent apology and also offer to discuss with them, either in person or by phone, some solutions for you both.  I look forward to receiving your comments and also a copy of your apology letter."  Israel Dec. Ex. 105 (NW017132).

229.    After the OFAC designation, Interpal and NatWest strategized how to deal with the designation's effect on Interpal's U.S. dollar account.  Given Interpal's designation, any attempt by the organization to execute a transaction in U.S. dollars likely would have been frozen. Israel Dec. Ex. 32 (Foster Tr. at 212:13-18).  NatWest well understood this risk and tried to

prevent the U.S. from gaining control over Interpal's funds.  Israel Dec. Ex. 97 (NW017179-90 at NW017180).

230.    Cole suggested that the Bank consider closing Interpal's U.S. dollar account.  He said that there was no point in Interpal sending funds to the U.S. if the Bank knew they were going to get frozen, and by closing the dollar account no U.S. entities would be needed to transact with the Interpal accounts, therefore they were not breaching U.S. law.   Because of this, he recommended that Interpal not transact through the U.S. after its designation.  Rodger, Foster, and Norrie all agreed with Cole's recommendation.   Israel Dec. Ex. 106 (NW066732-9 at NW066732); Ex. 67 (Cole Tr. at 90:25 – 92:17; 92:24 – 93:13; 94:18 – 95:19).

231.    In response to the following question at her deposition – "Q. Am I correct in restating that your answer to that question was yes, that NatWest could transact business for Interpal after the US designation so long as the transaction did not involve US dollars?" – Holt testified as follows  "A. My belief would be NatWest could continue with its relationship with Interpal, and if it transacted in US dollars, which it would be entitled to do of course, it would have then the consequences in the US of transacting in US dollars."  As CBFM was expanding in the U.S., the Bank was mindful of not only being compliant in the U.K. but also avoiding doing anything that would be commercially damaging to U.S. operations.  This did not have anything to do with zero tolerance, in terms of not complying with regulations or legislation, but instead "a wider remit. How could the bank suffer reputational damage?"  Israel Dec. Ex. 33 (Holt Tr. at 120:17-24). Or, as Cole testified, "it would not be wise or conducive to the business to do [any Interpal business] in dollars."  Ex. 67 (Cole Tr. at 142:17-143:4).

232.    In fact, as early as January 25, 2004, Jihad Qundil and Ibrahim Hewitt, Interpal's Chairman, wrote to Lane requesting that Interpal's Main U.S. Dollar Account "be taken off the

system as we are unlikely to use this account for transfers in the near future."  A week later, on February 2, Bray wrote to Qundil confirming Interpal's request that the U.S. Dollar account "no longer" "be reported", and forwarded the request to the Bank's account maintenance department. Israel Dec. Ex. 107 (NW 017109-10); Ex. 108 (NW 017104).

233.    Rodger describes the Bank's subsequent closure of Interpal's U.S. dollar accounts not as trying to get around the U.S. government but "more of a factual thing" since the dollar payments would get blocked.  Rodger testified that the extraterritoriality of U.S. laws is "something that all firms around the world need to address if they want to operate within the US market and then they need to be aware of these restrictions."  He agrees that it would be illegal to help somebody evade OFAC restrictions.  Israel Dec. Ex. 29 (Rodger Tr. at 29:6-30:4; 142:17-143:4).

234.    Foster drew a distinction between advising Interpal not to make transfers through the U.S. in order to avoid exposing its assets to seizure by the American authorities, and the Bank's suggestion that Interpal close its dollar accounts because "it was the sensible thing to do." He says the difference is that he didn't tell the customer to avoid U.S. law by making a transaction in a different currency.  He does acknowledge, in terms of the two having the same affect, "I guess you could, yes, but I am trying to make a different distinction, I guess, because I don't know why we closed the dollar account, but my point and answer to your original question was…we would not tell a customer to do a transaction in a different currency from dollars if they wanted to do it in dollars. We would not tell them to change the currency in order that they would avoid US sanctions." However, Foster conceded that the Bank's treatment of Interpal's dollar account had the effect of allowing Interpal to complete transactions that would otherwise have been frozen because of Interpal's OFAC designation.  Israel Dec. Ex. 32 (Foster Tr. at 213:20-216:15).

235.    In a June 2004 email chain, the bank's Group Risk Management policy department and CBFM's regulatory risk unit raised, among other issues, whether the legal department should examine the extraterritoriality of U.S. law.  However, there is no indication from the documents produced what the results of this consideration were.  In any event, the Bank is not asserting a mistake of law defense in this case.  Israel Dec. Ex. 109 (NW183380-6); NatWest Sept. 4, 2008 Response to Plaintiff Motion to Compel, *Weiss* Docket Entry No. 158.

236.    In the interim, on July 28, 2004, NatWest inadvertently credited Interpal's euro account with over 25,000 euros, and Lane reminded the Bank's Central Investigations Unit that Interpal "is a very valuable connection so let's tread carefully" in contacting Interpal for debit authority. Israel Dec. Ex. 110 (NW053390).  Lane believed that the Bank's relationship with Interpal was "very valuable" because maintaining these accounts had been so profitable for the Bank, and for her in particular.  Ex. 38 (Lane Tr. at 75:22-77:14).

237.    On November 24, 2004, Interpal invited Lane to an anniversary celebration of Interpal's achievements.  Six days prior to that, Jihad Qundil asked Lane to cooperate with Interpal in its efforts to evade U.S. sanctions, as, in Lane's words, "Jihad also queried whether an account could be opened which did not state the Interpal name in order that they can try and get donations through - I have requested further information on the name of the account, signatories etc but feel that we will have to be very careful here and may possibly not be able to assist." Israel Dec. Ex. 111 (NW 068209-10); Ex. 112 (NW068211).  Although there is no evidence that NatWest actually assisted Interpal in smuggling U.S. dollar-denominated transfers past U.S. authorities, the Bank never told Interpal that it would be illegal (or even inappropriate) for NatWest to assist Interpal in this attempt.  Nor did Interpal's request that the Bank assist it in this endeavor precipitate a decision by NatWest to separate from its customer or to disclose to

American or British regulators that Interpal had attempted to enlist the Bank's assistance in evading U.S. sanctions.

238.    On November 24, Lane wrote a letter to Interpal regarding 29 payments Interpal attempted to send to Middle East beneficiaries that were frozen due to its OFAC designation and rejection by another bank's Middle East branch (as well as by Citibank in the U.S.), and NatWest's inability to return the funds to Interpal without first receiving a license from OFAC to do so.  Israel Dec. Ex. 111 (NW 068209-10); Ex. 112 (NW068211).

239.    Interpal responded to NatWest on December 1, stating it expected a refund, and that "as far as we are concerned, our 'quarrel' is with NatWest Bank.  We never instructed NatWest to go via Citibank.  We have nothing to do with Citibank, and would like the money to be returned to us *by NatWest* without delay.  It is then up to NatWest to ask Citibank to return what we consider NatWest funds, not ours.  The error was made by NatWest, and we should not have to suffer for it as who knows when OFAC will grant a licence."  Israel Dec. Ex. 113 (NW068212).

240.    Qundil added in a letter to Lane on December 9 that NatWest had not followed Interpal's prior instructions to route payments through Jordan, rather than the U.S.  As to obtaining the license, Qundil notes that "anyone with interest may apply.  It is surely in NatWest's interest to do so.  An application from NatWest due to the bank's error would in any case stand a better chance of obtaining an OFAC license.  We feel we do not stand a chance if we applied ourselves."  Israel Dec. Ex. 114 (NW068197).

241.    On December 22, Lane, Cole, and Rodger discussed the need to close Interpal's U.S. dollar account, and Lane confirmed that Interpal themselves planned to close the account, to which Rodger stated that it was "good that Interpal is being so cooperative."  Israel Dec. Ex. 115 (NW066797-9).

242.    On December 31, Lane prepared a memorandum documenting a phone call she had with Jihad Qundil.  Qundil had advised Lane that Interpal had located an Indian charity maintaining a U.S. dollar account in London with another bank (Canara Bank). Because NatWest had previously requested that Interpal close its U.S. dollar account, Qundil wanted to send Interpal's NatWest U.S. dollar account funds balance to the Indian charity, but, because of "previous problems" Qundil "required assurance that the money would not be returned nor sent out of this country via America."  Lane's memo indicates that she advised Qundil that Interpal's funds would not leave the U.K., but would instead be moved through internal transfers and would avoid the funds being processed through the U.S.  Israel Dec. Ex. 116 (NW068901).

243.    Lane's memorandum indicates that she advised Qundil that the money would be transferred at Interpal's own risk, and that she could not confirm whether the U.S. would be made aware of a U.S. dollar transfer, however she advised Qundil that the funds could be withdrawn in cash (though she acknowledged that Mr. Qundil might face difficulty paying the cash over the counter into another account) or that Interpal could convert the dollars into pounds sterling.  Israel Dec. Ex. 116 (NW068901).

244.    Despite this, Lane testified that she "never" had the "teeny weeniest bit of suspicion about Interpal" in all of her years dealing with Interpal.  Israel Dec. Ex. 38 (Lane Tr. at 100:6-9). Lane further testified that, until this lawsuit was filed, she did not know that Interpal had been designated as an SDGT by the U.S. Government.  *Id.* at 256:11-257:2

245.    On January 26, 2005, Interpal requested that the Bank route funds to Muslim Aid, a British-based charity organization that is a member of the Union of Good.  Interpal's request explicitly stated: "[w]e have no problem with you effecting the transfer provided you can guarantee that the funds are safely transferred to our partner's USD account in the UK strictly via

the UK only, and does not involve routing through the US." Israel Dec. Ex. 117 (NW068331); Ex. 118 (NW200986-NW201000).

246.    On February 7, NatWest issued to Interpal a U.S. draft balance payable to Muslim Aid. Two days later, and almost a year and a half after the United States designated Interpal an SDGT, Interpal transferred (via a draft) $108,273.86 to Muslim Aid, another member of the OFAC-designated HAMAS umbrella organization the Union of Good, routing the money through Fleet Bank in Boston.   Israel Dec. Ex. 119 (NW068330); Ex. 118 (NW200986-NW201000).

## XIII.   DECISION TO CONTINUE MAINTAINING INTERPAL'S ACCOUNTS

247.    Towards the end of 2004, NatWest compliance employees further discussed their ongoing decision to continue the Bank's relationship with Interpal, including in the context of another customer, Friends of Al-Aqsa, whose accounts the Bank had closed.  On December 3, Norrie emailed Foster and Rob Davies, referencing a May 20, 2004 email from more than six months earlier as "the last correspondence I have on Interpal," and acknowledging that in open-source materials, "some evidence is presented of the alleged Interpal links to Hamas but this does not seem to be substantiated."   Norrie further offered his "view that the US action against Interpal is as much about Foreign Policy as Terrorism" and he was thus "happy with the approach recommended by Guy" Cole six months earlier.   He nonetheless noted that "[m]aintaining the relationship will still put us outside the Group standards - do we need to have this signed off?"  Israel Dec. Ex. 120 (NW066822-5 at NW066822).

248.    A week later, on December 10, NatWest became aware of an online article in Front Page Magazine, titled "How Terrorist Propaganda Kills", and which discussed how

> the most active HAMAS front organization worldwide is the London-based Interpal,
> which publishes anti-American and anti-Israeli propaganda, and which in 2003 alone sent

more than $20 million to different HAMAS organizations in the Palestinian territories. In addition to fundraising in England in Pounds Sterling, Interpal lists on its website four different bank accounts to which contributors can send money. All the accounts are with Nat West Bank, and the international scope of the organization is evident by dedicated dollar and euro accounts. Israel Dec. Ex. 121 (NW066677-81 at NW066677).

249.    This press led to a range of reactions at NatWest.   Upon receipt of the article on December 10, Holt wrote that "we were aware that we had accounts for people connected to Hamas, but not Hamas itself." She also forwarded the article to Foster for the "legal/regulatory view from Group," and Foster then forwarded the information on to Norrie, Davies, Love, and Cole, and expressed his agreement with Holt that "we were aware of one account with alleged links to Hamas – Interpal – but not that we had actual accounts for Hamas.  Is this true?  If so, why have they not been picked up by the searches?"  Israel Dec. Ex. 122 (NW066847-52 at NW066850).

250.    When asked at deposition about her email admitting that the bank was "aware" that it had accounts "for people connected to Hamas, but not Hamas itself," Holt tried to retroactively insert the word "allegedly," and testified that she must have "mistyped" the email.  Israel Dec. Ex. 123 (NW66682-6); Ex. 33 (Holt Tr. at 90:24-91:16; 92:24-93:7).

251.    Foster added later that day: "[e]ven allowing for the differences between UK and US approaches to Israel/Palestine issues and the general push back against the extra territoriality of US laws, I suggest that as a group we should look very carefully at such connections before deciding to continue with them.  This is doubly important in CBFM where we know that fund raising efforts in the US are coming increasingly under the 'OFAC microscope.'"  Israel Dec. Ex. 122 (NW066847-52 at NW066849).

252.    Three days later, Group Risk Management's Holt emailed CBFM's Foster and Love, discussing how it was not "Group's policy" to retain customers who are on the Group's sanctions

and terrorist lists, including the U.S. list, but noting her "understanding is that it is not a cut and dry case either due to the different stance towards the Palestinian issue between the US and UK." She then asked the rationale for not exiting the relationship given the designation, what steps such as extra monitoring were being taken, and what the bank's regulatory position was "given our increased presence in the US and the formation of the new US organization structure."  Israel Dec. Ex. 122 (NW066847-52 at NW066848).

253.    Three hours later, Rodger wrote in an email to his CBFM supervisor, Kevin Love (Global CBFM Head of Enterprise Risk), and Cole: "[t]he rationale for not exiting is that UK law enforcement does not have any concerns with Interpal, the Charity Commission which undertook a thorough review after Interpal was listed by OFAC could find nothing wrong either and the Bank of England has chosen not to follow the US lead.  There is a suspicion that the US is being over-zealous in the Middle East (witness Commercial Bank of Syria)."  Israel Dec. Ex. 122 (NW066847-52 at NW066847-50).[1]

254.    Rodger also reported to Love that day, in an email chain that excludes Holt, on an "irritation" that Lane told him Interpal had in getting payments through to payees in the Palestinian Territories due to Interpal's OFAC designation.  "Consequently, although the account is quite a big income earner [Lane] (£50,000), it is becoming higher maintenance."  Rodger acknowledges that Love was relying on him to give an analysis of whether there were real grounds to Interpal supporting terrorism.  Israel Dec. Ex. 29 (Rodger Tr. at 193:8-16; 198:11-15); Ex. 124 (NW066807-13 at NW066810).

---

[1] On May 11, 2004, the U.S. Treasury Department had designated the Commercial Bank of Syria ("CBS") as a financial institution of primary money laundering concern, and in response NatWest weighed the risks of continuing its relationship with CBS, and discussed the fact that if the bank ceased transacting in U.S. dollars with CBS because it felt that is what the U.S. designation required, its conduct would "have consequences on our relationships with entities such as Interpal (an OFAC SDGT)."  Israel Dec. Ex. 125 (NW197097-197102).

255.    Rodger's email adds that "[t]aking everything into account, Belinda would accept the loss of this customer even though it has done nothing wrong provided her target can be adjusted accordingly.  She did point out that the charity would find it difficult to rebank due to OFAC and the background to RBS kicking it out.   There is consequently a danger of adverse media comment if we were to close a legitimate charitable account."  Israel Dec. Ex. 124 (NW066807-13 at NW066810-1).

256.    Further to Rodger's email, the Bank's Director of Risk, Graeme Wyles, requested on December 14 that the Bank "defer any debate over exit for the time being.  We have more than sufficient 'clear cut' exits underway / in course without adding a potential 'high profile' situation where at this time no 'malpractice' is proven or indeed actually evident."  Israel Dec. Ex. 124 (NW066807-13 at NW 066808).

257.    On December 16, Cole reported the results of his six-month Interpal review to Rodger and noted that there were allegations that some of Interpal's beneficiaries were connected with HAMAS terrorism, allegations which Cole characterized as "speculation."  Cole made particular note of Al-Mujama Al-Islami, who to that point had received more than $1.3 million from Interpal's NatWest accounts since 1996; had been declared a terrorist organization by Israel in 2002; and which, as Cole noted, was founded in 1978 by HAMAS leader Sheikh Ahmed Yassin. Cole also listed a number of additional charities (which had received millions of dollars from Interpal) who had had their funds confiscated by Israeli forces in February 2004.   Rodger forwarded Cole's analysis to CBFM executives, characterizing the allegations of HAMAS ties as "mainly unsubstantiated commentary," while recommending the account remain open with a "one strike and they are out" policy.  Alan Dickinson, a CBFM senior executive and later RBS'

CEO, approved this recommendation.  Israel Dec. Ex. 126 (NW066721-3); Ex. 36 (Geisser Rep. at Ex. C).

258.    Dickinson sent a report a day later to CBFM's chief executive, John Cameron, incorrectly stating that CBFM MLPU's review undertaken by Cole had not contained any adverse information on any of Interpal's beneficiaries, and also incorrectly stating that MLPU had been reviewing Interpal's accounts since the UK authorities' September 2003 investigation of Interpal. Love, Foster, Holt, Rodger, Norrie, and Cole all received copies of Dickinson's report, but did not correct the inaccuracies.  Israel Dec. Ex. 127 (NW067948-9); *see* ¶¶ 206-211.

259.    Upon receipt of the report, Foster reiterated that "with the RBS plans to expand in the US, having relationships like this is going to cause us problems – just look at the recent Structured Finance case where we could not sign the OFAC questionnaire and so may face being excluded in future from such deals."  Israel Dec. Ex. 127 (NW067948-9 at NW067948).

260.    On January 31, 2005, Love asked other members of the CBFM Enterprise Risk team, including Cole and Rodger, to describe any "residual risk" relating to Interpal, and Rodger responded that he had thought of two "Interpal-like cases," Commercial Bank of Syria and Myanmar Foreign Trade Bank, both of which the Bank had decided to exit.  At the time, the Commercial Bank of Syria had not been designated by OFAC.  Israel Dec. Ex. 128 (NW 066758-9).

261.    On June 27, 2005, Al-Ihsan Charitable Organization, an Interpal beneficiary, was placed on the Bank of England list, and Cole informed Belinda Lane of that fact.  Rodger, who previously had announced a "one strike and they are out" policy (*see* ¶ 257), decided it was still "appropriate" to keep Interpal's accounts open and rejected moving to a monthly review of Interpal's accounts, concluding that this would be "over the top."  However, Rodger did agree to

make the review quarterly instead of biannual.   Israel Dec. Ex. 129 (NW066701-4 at NW066701).

262.   On July 6, 2005, Cole completed the first quarterly review of Interpal's accounts and recommended that NatWest continue to allow Interpal to bank with it, and stated as follows:

- "In December 2004, The Israeli Intelligence and Terrorism Information Center issued an information bulletin on INTERPAL. No new insight into INTERPAL was given by the bulletin and the text on a whole is quite emotive. No reference was made to INTERPAL's NatWest accounts or the RBS Group."

- "Although a payment was made to the [Bank of England-designated] Al lhsan Charity, I do not believe that there has been an increase in the risk of INTERPAL funding terrorism or to the Bank's reputation in maintaining this relationship."

- "In January 2005 the US dollar account maintained by INTERPAL was closed at our request, which has reduced the exposure our relationship has to OFAC sanctions against INTERPAL."

- "At a workshop attended in June on 'Managing the Risks of Funding Terror', Nick Ridley the lead intelligence analyst on the financing of terrorism at Europol, advised that a government designation of an organisation as a financer of terrorism (as INTERPAL has been by OFAC), almost certainly means that no financing of terrorism would take place via the entity after the designation.  Therefore, the result of OFAC's designation of INTERPAL as a supporter of terrorism has actually reduced the risk of the INTERPAL being used to fund terrorism."

- "Following the terrorist organisation designation of Elehssan/Al lhsan Charity, we have now requested written confirmation from INTERPAL that they will not make any future payments to organisations suspected of terrorist financing by the Bank of England."

Israel Dec. Ex. 130 (NW 066777-9).

263.   In 2005 or 2006, the Bank *did* change its policy in dealing more toughly with non-U.S. customers that were on the OFAC list, but this was not due to any changes in U.K. law and instead was a result of the Bank's increasing business in the U.S.  "The increasing importance of the U.S. to our business and greater recognition, if we needed it, of the importance of preventing terrorism."  Prior to this time, the Bank says it complied completely in the U.S. with OFAC but

"what I am saying is that outside the US we decided to follow the same practice."  Israel Dec. Ex. 32 (Foster Tr. at 169:14-170:13; 170:22-171:3).

264.    In January 2006, Interpal received a 400,000 euro check from fellow-SDGT CBSP, and NW refused to accept the payment, which it disclosed to NCIS.  In August 2006, Interpal re-presented the check, but NatWest did not accept it and again disclosed the single payment to NCIS.  However, this was not the only business transacted between Interpal and CBSP; between 1996 and 2002 CBSP transferred over $500,000 to Interpal.  Moreover, CBSP was designated as an SDGT on the same day that Interpal had been in 2003, and was announced in the same official U.S. Government press release that advised of Interpal's designation; thus NatWest knew of it.  Yet no evidence exists indicating that NatWest conducted any review or otherwise reported to UK law enforcement the fact that Interpal had received funds from another SDGT so designated for identical reasons.  Moreover, notwithstanding this additional and incomplete reporting to NCIS in 2006, NatWest allowed Interpal's accounts to remain open.  Israel Dec. Ex. 131 (NW 219318-22); Ex. 36 (Geisser Rep. at Ex. A).

## XIV.    NATWEST ACCOUNT CLOSING PROCESS

265.    In addition to their view of the impact (or lack thereof) of an OFAC designation on a NatWest customer, Bank employees also testified about which employees within the Bank had authority to close an account suspected of terror financing and on what basis such accounts were closed.  In this testimony, employees of each section of the Bank pointed the finger at another section, claiming that such authority did not reside in their own part of the Bank.

<u>Who had Authority</u>

266.    Neil Trantum testified that during his time as head of the bank's Group Investigations & Fraud department, his group did not have the authority to terminate a customer, but instead only

could make a recommendation, and it was then for the business division of the Bank within which the customer banked (such as CBFM) to decide whether to terminate the relationship.  He testified further that this was problematic when a customer banked across different businesses. Though the head of the department, Trantum was not consulted when Group Investigations & Fraud made a recommendation because it was below his pay grade.  Israel Dec. Ex. 24 (Trantum Tr. at 111:3-21; 112:7-15).

267.    At his deposition, Trantum was shown NW000149-164 (Israel Dec. Ex. 77), a policy statement which assigns Group Investigations & Fraud responsibility for deciding which accounts to close.  Trantum testified that he had never seen this document before, and that this written policy was inconsistent with his practice and his understanding of the division of responsibility within NatWest.  Ex. 24 (Trantum Tr. at 114:7-115:2); Ex. 77 at NW000161, Item No. 9.

268.    By contrast, Irvine Rodger testified that the ultimate decision whether to close an account was not CBFM's, but instead belonged to the central Group Compliance unit.  If Group did not want the account to remain open, it could so decide and CBFM had to comply.  Israel Dec. Ex. 29 (Rodger Tr. at 125:12-126:5).

269.    Sonia Gayle, Head of Policy for the bank's Group Compliance Department beginning in late 2001, does not believe that the Group Compliance department bore the responsibility to decide to close or freeze an account, and instead believes "that there was not one single department that would make that decision."  Israel Dec. Ex. 34 (Gayle Tr. at 82:23-84:19).

270.    Hoseason says the Group could not close an account, but instead could only make a recommendation if it felt appropriate grounds existed to senior management within the business

unit, such as CBFM, that was responsible for ownership of the account.  Israel Dec. Ex. 10 (Hoseason Tr. at 25:22-26:19).

271.    Hoseason acknowledges that NatWest's written policy instructed his unit that when there was a risk in maintaining a customer, his department was to give instruction to close an account. *Id*. at 67:13-19; Ex. 77 (NW000149-164 at NW000156).

272.    Upon the designation of an entity such as Interpal, Hoseason says that at that point, responsibility on the Group level moved from his department to Group Risk Management, which dealt with sanctions, though Hoseason's unit still could have recommended that the Bank sever a relationship.  Israel Dec. Ex. 10 (Hoseason Tr. at 371:15-372:5; 372:20-373:1).

273.    Amanda Holt, head of the bank's overall Group Enterprise Risk unit, acknowledges that she had the authority to instruct Kevin Love, head of CBFM's Enterprise Risk unit, to take action with respect to accounts in the CBFM division in which Interpal's accounts resided.  Israel Dec. Ex. 33 (Holt Tr. at 109:2-5).

274.    During his time in the bank's money laundering unit, Doug Hartley had the capacity to recommend that an account be closed.  Israel Dec. Ex. 28 (Hartley Tr. at 71:19-22).

Reasons to Close

275.    Hoseason said NatWest would close an account when it "knew with absolute certainty that the customer was engaged in any kind of illegal activity"  They would not close an account "purely on the basis that we had suspicions they may have engaged in any form of unlawful activity."  "Absolute certainty" is knowing for a fact that a customer had been engaged in unlawful activity, though Hoseason recalls no examples of this happening.  The clear evidence of wrongdoing that would be necessary to exit the relationship would be if a customer was "convicted in a court of law."  Short of a criminal conviction, Hoseason is not aware of any other

circumstances that would have caused him to recommend the Bank stop providing financial services to a customer suspected of terror financing.  Israel Dec. Ex. 10 (Hoseason Tr. at 24:9-14; 24:25-25:11; 32:3-19; 34:3-9).

276.   Although Hoseason agrees that Osama Bin Laden was not criminally convicted, he views him as "a slightly different kettle of fish," and says that in spite of the lack of a conviction, a Bin Laden account would have been frozen because Bin Laden all but acknowledged his guilt.  From this perspective, Hoseason backtracked and said he would take each case on its individual merits and he does not know what would convince him of a customer facilitating terrorism; an OFAC designation is not enough to convince him.  *Id*. at 381:22-382:5; 382:17-383:9; 383:23-384:9.

277.   As to the type of proof that would evidence the purpose of a transfer, Hoseason testified: "If I had been supplied with clear evidence that demonstrated that those funds were subsequently utilized to buy bullets as you put it, then that would be clearly evidence."  Otherwise, "short of evidence that the funds were used to buy bullets or explosives", there is nothing else that could be considered proof of the nefarious purposes of a transfer.  *Id*. at 278:17-279:3.

278.   Hoseason acknowledges that between the middle of 2003 and the end of 2004, RBS had closed five accounts with potential links to terrorism.  He does not know why any of those accounts were closed or whether those parties had been convicted in a court of law of terrorist offenses, and does not believe that NCIS had directed that any of these accounts be closed.  He admits that if a customer had actually been convicted in a court of law of supporting terrorism, it is likely something that would have come to his attention.  *Id*. at 421:25-423:3; 439:13-440:12; Ex. 132 (NW180854-7 at NW180856-7).

279.   NatWest could, and did, close accounts after submitting multiple disclosures about a customer to NCIS, even where NCIS did not order that the accounts be closed.  This was done on

a case-by-case basis on the merits of each situation.  Israel Dec. Ex. 52 (Baugh Tr. at 164:3 – 165:14); Ex. 25 (Wickens Tr. at 125:15-126:22).

280.   Neil Trantum testified if there was a high degree of suspicion with regards to terror financing, then the Bank would not want to be involved with the customer, however when the suspicion was "very tenuous", then it was a more difficult decision whether to terminate the relationship.  Israel Dec. Ex. 24 (Trantum Tr. at 143:3-22).

281.   Holt testified that if she had "cast-iron fact" of Interpal financing terrorism, she could have gone to the Bank of England and told them to put Interpal on its sanctions list.  However, she states that "Nobody at the bank gave me any evidence that Interpal was paying funds, passing funds to Hamas.  Nobody actually who was close and who had done the detailed work came to me and said 'Look, Amanda, we cannot find the evidence but really, we believe this is what they are doing.'  In fact, they told me completely the opposite.  Also, if somebody had come to me and said: 'Look, we cannot prove it but all of the circumstantial evidence makes this really smell, this is not good.  We really believe that Interpal is funding Hamas,' there would have been a clear recommendation to exit, not from reputational grounds, purely because there was a really strong and clear and inconclusive suspicion that Interpal was funding terrorism, but nobody ever came to me with that."  Israel Dec. Ex. 33 (Holt Tr. at 214:24-215:17; 228:1-15).

282.   NatWest had discretion to close accounts at any time for almost any reason if it wanted to, and no law in the U.K. obligated the Bank to continue to operate the Interpal accounts after Interpal was designated by the U.S. in 2003.  Instead, NatWest intentionally made the choice not to exit the relationship with Interpal until 2007.  Israel Dec. Ex. 32 (Foster Tr. at 231:15-232:2); Ex. 29 (Rodger 240:11-22).

283.   Rodger testified that proof that a NatWest customer was funding terrorists such as HAMAS would include "that there would be payments going to Hamas linked organizations." This included a one-strike-and-out policy whereby "One single payment of 5 [pence] to a terrorist is enough to say that is to exit the relationship," and proof of payment to a terrorist was sending money to a beneficiary who appeared on the Bank of England list.  Israel Dec. Ex. 29 (Rodger Tr. at 204:1-13; 219:15-220:6).

284.   In addition to the accounts closed and then reopened for Friends of Al Aqsa (see ¶¶ 288-298 below), NatWest apparently closed at least four or five other accounts based on terrorism suspicions during this time, however the Bank claimed that it only was able to locate information as to two of the customers, Abdullah El-Faisal and Rashad Daloub.  Israel Dec. Ex. 133 (Fourth Supplemental Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories (Contention Interrogatories) at p. 2).

285.   On January 13, 2003, NatWest submitted an NCIS Disclosure for El-Faisal, who was allegedly a supporter of Osama Bin Laden.  NatWest informed NCIS that the account "does not see a lot of activity, however there are regular small credits to the account by cash and cheque." Special Branch had expressed an interest in the customer, and in light of NatWest's concerns regarding the source of El-Faisal's funds and the purposes of the transactions, NatWest proposed giving notice to NCIS to close the account, though there is no evidence that El-Faisal had been designated a terrorist by any government.  Israel Dec. Ex. 134 (NW219323-6 at NW219323-5).

286.   On February 24, 2004, NatWest submitted an NCIS disclosure for Daloub, a frozen-food business owner who "previously had unusual activity on his account, including a high level of cash transactions."  Though NTFIU served a production order on Daloub's account, NatWest decided to close the account after confirming with NTFIU that the account closure would not

impact its enquiries. The disclosure with NCIS was filed to confirm NatWest's decision to voluntarily terminate the relationship. Israel Dec. Ex. 134 (NW219323-6 at NW219326).

287.     At no time between 2000 and 2004 did any U.K. governmental authority ever request that NatWest continue to maintain Interpal's accounts. Israel Dec. Ex. 9 (Responses and Objections by Defendant National Westminster Bank PLC to Plaintiffs' Second Set of Interrogatories, No. 10, at 15).

## XV.    EXITING FRIENDS OF AL AQSA AND OTHER RELATIONSHIPS

288.     On December 15, 2004, the Bank submitted a disclosure to NCIS regarding a customer named Friends of Al-Aqsa ("FoAA"). FoAA was a retail customer, and its accounts were held in RBS's "Retail" division (whereas Interpal's accounts with NatWest were held in RBS's CBFM division). FoAA was a pro-Palestinian business that, in 2002, held a joint conference with Interpal collaborator and Bank of England designee the Al-Aqsa Foundation. Based on that association, and its inability to "establish the background" of FoAA's activity, the Bank filed the disclosure and also opened a Goalkeeper Report for suspected terrorist funding. Israel Dec. Ex. 135 (NW191807-14).

289.     Hoseason prepared a Group Financial Crime Briefing Note on December 29 regarding FoAA's accounts. He noted that FoAA first came to his unit's attention as a result of the Skinner Goalkeeper Report (that also identified Interpal), and then further attention arose upon discovering the conference with the Al-Aqsa Foundation. According to Hoseason's Note, the bank's Retail Compliance unit informed FoAA on December 9 that it was closing FoAA's accounts, and media outlets began making inquiries on December 29. Israel Dec. Ex. 136 (NW190202-5 at NW190205).

290.    In his deposition, Hoseason agreed that the documentary evidence suggests that the concern related to FoAA was the Skinner Goalkeeper Report and the link to the Al Aqsa Foundation, which had been designated by the Bank of England, but that the Bank left Interpal's accounts open, despite its numerous previous transactions with the Al Aqsa Foundation, and despite the reference in the Skinner Goalkeeper Report to donations to Interpal.   Israel Dec. Ex. 10 (Hoseason Tr. at 424:4-23).

291.    By January 3, 2005, U.K. media was reporting that RBS had closed FoAA's accounts. That same day, a reporter from the Edinburgh Evening News sent the bank a press release from the Muslim Association of Britain criticizing the Bank for its decision as being a '"tool' for pro-Israeli lobby," announcing planned protests, and stating that U.K. law enforcement confirmed it had not ordered FoAA's closure.  Israel Dec. Ex. 137 (NW180811-5 at NW180813-5); Ex. 138 (NW190918-20 at NW190918).

292.    On January 5, Rodger, Foster, and Cole discussed the closing, and Rodger remarked on the incongruity of the Bank's treatment of FoAA as compared with Interpal, commenting: "This must be a Retail account.  [Group Enterprise Risk] maybe tried to bully them to exit, even though there are no EU/OFAC sanctions.  It does show that the Group is dysfunctional if its Palestinian linkage was the reason for exit and CBFM rightly keeps Interpal going when it could be argued, there are greater grounds."  Israel Dec. Ex. 139 (NW069055-8).

293.    The Bank's Retail Compliance department confirmed that Retail Compliance decided to close the account "based on reputational risk to the business given the background to this case." Israel Dec. Ex. 140 (NW180808-10 at NW180808).

294.    Rodger, from CBFM's money laundering unit, noted that same day that FoAA's accounts were in the Retail Division, and that CBFM had "mounted an investigation into another

Palestinian charity, Interpal, which is subject to OFAC sanctions (though not EU), and decided that the account is operating satisfactorily and that the OFAC sanctions were politically inspired."  Israel Dec. Ex. 141 (NW066764-9).

295.    At deposition, Rodger could not explain the basis of his belief that OFAC's sanctions against Interpal were "politically inspired."  Israel Dec. Ex. 29 (Rodger Tr. at 245:4-247:15).

296.    The Bank completed a threat assessment dealing with the possibility that protests by Muslim groups against the FoAA closure would lead to violence against Bank employees and destruction of Bank property.  Israel Dec. Ex. 142 (NW180827-9).

297.    Facing protests, RBS reversed its decision a day later and decided to reopen FoAA's account, action which it felt "significantly reduced" the threat of protests.  *Id*.; Israel Dec. Ex. 136 (NW190202-5).

298.    A January 7, 2005 Executive Briefing Note regarding FoAA confirmed that over the preceding 18 months, five accounts had been closed due to suspected terrorism links (*see* ¶ 278). As to FoAA, the Note stated that "in view [sic] the reputational risk if the litigation was pursued [against the bank by FoAA] together with the weight of public contacts (over 200 including threats to close accounts), press coverage and intimated demonstrations it was clear that the reputational and financial risk of closure had been underestimated."  The Bank then apologized to FoAA, informed FoAA of its desire to do future community service projects together, and issued letters rescinding the closure on January 6.  FoAA then issued a public notice calling for all action against the Bank, including all planned demonstrations, to be canceled.  Israel Dec. Ex. 132 (NW180854-7).

299.   There is no indication that the Bank's decision to reverse the FoAA closure order had anything to do with the actual risks presented by that account's operation, or that its compliance personnel had experienced a change of heart regarding those risks.

300.   On June 10, 2005, Rodger was informed by a Group Risk Management employee of a complaint the bank had received regarding its closure of three accounts, including "International Colleges of Islamic Science."   Rodger responded that "[i]f this is an anti-Islamic accusation against the Bank, there should be an awareness that CBFM has deliberately maintained its relationship with Interpal (Charity to relieve the suffering of Palestinians) despite US and Israeli sanctions." Israel Dec. Ex. 143 (NW069060-2).

Dated:  January 30, 2012

Respectfully Submitted,

SAYLES WERBNER

By: _Mark S Werbner_

Mark S. Werbner
Joel Israel
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

HEIDEMAN NUDELMAN & KALIK, P.C.
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 463-1818

STONE BONNER & ROCCO LLP
James P. Bonner
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 239-4340

Attorneys for *Applebaum* Plaintiffs

147808v6

ZUCKERMAN SPAEDER LLC

By: _____
Aitan D. Goelman
Andrew Caridas
1800 M Street NW, Suite 1000
Washington, DC 20036
(202) 778-1800

OSEN LLC
Gary M. Osen
Joshua D. Glatter
Aaron Schlanger
Ari Ungar
2 University Plaza, Suite 201
Hackensack, NJ 07601-6211
(201) 265-6400

KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen H. Schwartz
Neil L. Glazer
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue
Suite 100
North Little Rock, AR 72116
(501) 791-2277


Attorneys for *Weiss* Plaintiffs