# Exhibit 2



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

MUL-651983

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control and the Royal Bank of Scotland plc.

### I.   PARTIES

1.   The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

2.   The Royal Bank of Scotland plc ("RBS") is a subsidiary of the Royal Bank of Scotland Group plc and is registered and organized under the laws of England and Wales.

### II.   FACTUAL STATEMENT

3.   In 1997, National Westminster Bank ("NatWest") – which RBS acquired in March 2000 – began acting as a correspondent bank for Bank Melli Iran ("Bank Melli") and its wholly-owned UK subsidiary, Melli Bank Plc ("Melli Plc"). As part of its operations in serving as a correspondent bank, RBS processed U.S. Dollar ("USD") transactions for and on behalf of Bank Melli and Melli Plc and these banks' customers. NatWest (and later RBS) conducted USD payments for the Iranian banks by sending Society for Worldwide Interbank Financial Telecommunication ("SWIFT") MT103 payment messages directly to non-U.S. beneficiary banks, and SWIFT MT202 payment messages (or "cover payments") to U.S. clearing banks. Although the payment messages sent to non-U.S. beneficiary banks included complete payment information, including the names of the Iranian banks and customers, the payment instructions sent to U.S. financial institutions did not include any references to the Iranian parties.

4.   Around the time it acquired the Bank Melli relationships, NatWest sought legal guidance from a U.S. law firm regarding the applicability of the then-existing U-Turn general license for payments RBS was sending on behalf of its Iranian customers. The bank provided the law firm with a series of proposed transactions involving payments originated by Bank Melli or Bank Melli customers that were destined for non-U.S. beneficiary banks, and requested guidance as to whether such payments were permissible. In a legal opinion dated June 30, 1997, the U.S. law firm provided guidance to NatWest that the transactions did not appear to violate U.S. sanctions regulations, particularly because "no U.S. bank would credit or debit an account of an Iranian person or entity." The law firm's description of the payments stated that Bank Melli would be listed as the originator of the transactions, which prompted NatWest to seek an updated opinion as to whether the guidance remained valid if the names of the Iranian parties were not included in the payment instructions sent to the United States. While the law firm

**Royal Bank of Scotland plc**                                                      2
**MUL-651983**

stated in a letter to NatWest that its initial legal guidance remained valid, it appears to have based this assessment on an understanding that the bank processed all USD transfers in the same manner.

5.      In early-to-mid 2002, RBS elected to cease providing settlement clearing for Melli Plc "due to the heavy operational burden" placed on the bank's payments center, as well as various settlement and operational risks, and closed the Iranian bank's accounts. In November 2002, supposedly at the advice of Melli Plc, Bank Melli requested the closure of its accounts with RBS. The closure of the Bank Melli and Melli Plc accounts eliminated RBS' ability to process USD payments on behalf of its clients to Iranian beneficiaries through internal book transfers. The Senior Relationship Manager – Middle East ("SRM – ME"), who managed RBS' correspondent banking relationship for Iran, subsequently sent a message on November 13, 2002, to a Relationship Officer and a Relationship Manager in Global Banking Services ("GBS") (which became part of Global Transaction Services ("GTS")) recommending the bank temporarily effect any future Iranian-related payments in Sterling rather than USD. Within a few weeks, however, several of RBS' customers began to complain about the bank's unwillingness to send USD payments to Iran.

6.      The problem presented by the bank's unwillingness to send USD payments to Iran appears to have been compounded by the introduction of a new payment processing platform, known as ProPay, which was designed to reduce the amount of manual processing within RBS. As part of the system's automated process, after a payment operator entered all of the information required to send a SWIFT MT103 transfer, a SWIFT MT202 cover payment was automatically generated and pre-populated based on the information contained in the SWIFT MT103.

7.      While the SRM – ME acknowledged that the bank could process Iranian-related transactions via cover payments and understood they were valid pursuant to the U-Turn general license, he warned that U.S. financial institutions would reject any transactions referencing Iran "[because] their systems will pick up the name in the message and reject the payment instruction, rather than initiate an enquiry [*sic*] as to whether or not this is a legal OFAC transaction...." In a November 27, 2002, email to a Senior Credit Manager, the then-Head of Asia, Middle East and Africa, and others, the SRE – ME noted: "As we no longer have a Vostro [for Bank Melli], we would need to place cover via the US. This is not possible for us at the moment as our Payments Systems cannot be manipulated to remove all trace of beneficiary bank [*sic*], and will identify the Iranian bank in our MT202, so the payment will simply be bounced back on to our Nostro with [a U.S. financial institution]."

8.      Beginning in late 2002, several employees within RBS responsible for managing and/or overseeing certain global correspondent banking relationships – including the SRM – ME and a Senior Manager – Trade, with copies to the Head of Credit Risk for Correspondent Banking – worked with two Senior Project Analysts in Change Management, Payment Operations who were involved in the implementation of the ProPay system, in order to manipulate outbound payment messages involving Iran. Over the next several months, the group developed a procedure within ProPay that would allow RBS to send USD payments to Iran and/or Iranian banks through a third-country bank that would omit information about the Iranian

**Royal Bank of Scotland plc**                                                             3
**MUL-651983**

nexus in any cover payments sent to U.S. financial institutions. According to this procedure,
RBS payment operators would list the actual name of the Iranian bank – rather than the Iranian
bank's Bank Identifier Code ("BIC") – in the beneficiary bank field of the payment instructions
with a country code of Great Britain rather than Iran. This method allowed the non-U.S. bank to
identify the ultimate Iranian beneficiary bank for the payment from the information contained in
the MT103. The manner in which this information was styled, however, prevented the bank's
payment system from automatically including references to the Iranian bank or Iran in related
cover messages and resulted in the data being omitted from instructions sent to U.S. clearing
banks.

     9.     In order to assist payment operators in effecting USD payments to Iranian banks
through ProPay, the above-mentioned procedures were memorialized into written instructions.
These instructions stated that payments containing a reference to any potential sanctions target in
ProPay would generate a warning or block, and instructed the payment operators, upon
triggering a warning or block, to contact a member of GBS to determine whether the transaction
was permissible. For transactions the payment operators were "advised to process," the
instructions included the following message:

> IMPORTANT: FOR <u>ALL</u> US DOLLAR PAYMENTS TO A COUNTRY SUBJECT TO
> US SANCTIONS, <u>A PAYMENT MESSAGE CANNOT CONTAIN ANY OF THE</u>
> <u>FOLLOWING</u>: 1. The sanctioned country name. 2. Any name designated on the Office
> of Foreign Assets Control (OFAC) restricted list, which can encompass a bank name,
> remitter or beneficiary.

     10.     The procedures contained detailed instructions outlining how payment operators
should enter information in order to process Iranian-related payments without mentioning the
name of the Iranian bank in payment messages sent to the United States. While the precise
deployment date of the ProPay instructions is not clear, they were included in the bank's
Business Support Manual ("BSM") and posted on RBS' intranet in December 2003, and
reportedly distributed to International Banking Center employees on an ad hoc basis during
2003.

     11.     While the written ProPay instructions included a message indicating that the
payment method should only be utilized for certain Iranian banks and did not apply to other
payments implicating U.S. sanctions, RBS employees appear to have utilized these procedures in
order to process USD payments involving other U.S.-sanctioned countries. For example, a
memorandum dated March 14, 2003, from a Senior Relationship Manager to "PA Investigations"
and copying the Head of Risk Management for GBS, discussed nearly identical instructions for
processing USD payments involving Libya. The memorandum indicated GBS, "as a matter of
routine, advises that the name of the Libyan bank and beneficiary is not to be quoted on any
SWIFT messages in order to avoid blocking in the US under OFACs sanctions." In addition, a
process for sending USD payments to several Libyan state-owned banks, including Jamahiriya
Bank, Libyan Arab Foreign Bank, National Commercial Bank, Sahara Bank, Umma Bank, and
Gumhouria Bank, was memorialized in written instructions similar to those for Iranian payments.

12.     Several members of RBS management responsible for managing and/or overseeing operations in the bank's Global Correspondent Banking and Payment Operations units continued to provide, or were aware of, various instructions advising payment operators how to process USD payments involving sanctioned countries. For example, in June 2003, one of the managers issued an e-mail to all Payment Processing Center Heads and stated: "Please take care when making [payments] from free format SWIFT instructions to ensure that there is no wording within the message that could potentially lead to the payment being stopped e.g. reference to a sanctioned country i.e. Sudan, Iraq."

13.     In November 2003, the Group Executive Management Committee revised the RBSG-wide policy statement on Sanctions and Terrorist Financing. The policy included an explicit requirement regarding OFAC and stated, "US regulations require US$ payments cleared through the US to be checked against the lists of suspected persons issued by the OFAC. Group businesses with US relationships and US$ payments must comply with US regulations." Despite the bank's policy, various units within RBS continued to process payments to Iran and other U.S.-sanctioned countries by using non-transparent payment practices, including those described above. Between 2004 and 2007, for example, RBS established a structure within ProPay for one of its customers with a wholly-owned subsidiary in Sudan to automatically populate SWIFT payment messages destined for Sudanese banks. The structure within ProPay allowed RBS to use Field 59 (the beneficiary field) of a SWIFT message to reference the sanctioned country bank, and Field 72 (bank-to-bank information field) in order to provide further routing instructions. This process ensured the name of the Sudanese bank involved in the transaction was not referenced in the MT202 SWIFT cover payment sent to the U.S. financial institution.

14.     Beginning in early 2006, RBS implemented a series of policies and procedures that reduced the bank's USD business with Iran and other U.S.-sanctioned countries. In May 2006, the Group Head of AML recommended RBS' Group Risk Committee approve the addition of an OFAC-specific appendix to the bank's Sanctions and Terrorist Financing policy. The policy, which listed Sudan, Iran, and Cuba as examples of countries subject to U.S. sanctions, stated: "[There] are certain jurisdictions that we cannot make US$ payments to as they would be frozen by the correspondent US institution... It is the responsibility of the Divisional Risk Functions to ensure that all of their relevant business and payment areas are aware of the restrictions." Although Group Risk Committee approved the policy shortly thereafter, it was not fully implemented until 2007 due to delays with the introduction of a new filtering platform. On December 21, 2006, the Chief Executive of Global Banking and Markets sent an email to members of RBS' Money Laundering Prevention Unit stating the Group Chief Executive's Advisory Group had adopted a policy of "no US Dollar business with Iranian counter-parties," although this was later clarified to exclude U-Turn payments.

15.     Despite the bank's policies, RBS continued to process USD payments through the United States in apparent violation of the Burmese Sanctions Regulations, the Cuban Assets Control Regulations, the Iranian Transactions Regulations, and the Sudanese Sanctions Regulations until late 2009. While the bank's investigation did not identify written instructions for countries other than Iran and Libya, the ProPay instructions referenced above were posted on the bank's intranet until October 2008, incorporated into the BSM that was distributed to the RBS' Payment Processing Centers, and distributed to International Banking Center employees

**Royal Bank of Scotland plc**                                                    5
**MUL-651983**

on an ad hoc basis as early as 2003. Similar routing and keying methods to those outlined in the ProPay instructions were used for certain payments involving Sudan, and to a more limited extent involving Myanmar and Cuba.

16.    RBS appears to have processed transactions in violation of the Tom Lantos Block Burmese JADE (Junta's Anti-Democratic Efforts) Act of 2008 (Pub. L. 110-286) ("JADE Act") and/or Executive Orders and/or regulations promulgated pursuant to, *inter alia*, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44.

17.    From on or about July 22, 2005, to on or about July 9, 2009, RBS processed 46 electronic funds transfers in the aggregate amount of $375,946, through financial institutions located in the United States in apparent violation of the prohibitions against (i) the exportation or reexportation of financial services to Burma from the United States, 31 C.F.R. § 537.202; and/or (ii) dealing in property and interests in property that "come within the United States" or that "comes into the possession or control of a United States person" of persons blocked pursuant to 31 C.F.R. § 537.201, Executive Order 13448, and/or the JADE Act.

18.    From on or about September 6, 2005, to on or about November 6, 2009, RBS processed 38 electronic funds transfers in the aggregate amount of $795,345 through financial institutions located in the United States in apparent violation of the prohibitions against the exportation or reexportation of services from the United States to Iran, 31 C.F.R. § 560.204.

19.    From on or about July 1, 2005, to on or about August 12, 2009, RBS processed 326 electronic funds transfers in the aggregate amount of $32,649,380 through financial institutions located in the United States in apparent violation of the prohibitions against (i) the exportation or reexportation of services from the United States to Sudan, 31 C.F.R § 538.205; and/or (ii) dealing in property and interests in property of the Government of Sudan that "come within the United States," 31 C.F.R. § 538.201.

20.    From on or about August 19, 2005, to on or about October 16, 2009, RBS processed 24 electronic funds transfers in which Cuba or a Cuban national had an interest, in the aggregate amount of $290,206, through financial institutions located in the United States in apparent violation of the prohibition on dealing in property in which Cuba or a Cuban national has an interest, 31 C.F.R. § 515.201.

21.    The apparent violations described above were voluntarily self-disclosed to OFAC within the meaning of OFAC's Economic Sanctions Enforcement Guidelines (the "Guidelines"). *See* 31 C.F.R. part 501, App A.

22.    The apparent violations by RBS described above undermined U.S. national security, foreign policy, and other objectives of U.S. sanctions programs.

23.    RBS has taken remedial action by prohibiting USD payments to certain sanctioned countries; engaging in a comprehensive effort to address all sanctions related issues

across its business units; and initiated an effort in 2009 to review its entire customer base to identify relationships that should be terminated based on its policy.

24.     RBS cooperated with OFAC by conducting an historical review and identifying in writing transactions that appeared to violate OFAC sanctions regulations; providing comprehensive, well-organized, and detailed information regarding the apparent violations for OFAC's analysis; signing a tolling agreement with OFAC and subsequently agreeing to extend the agreement on multiple occasions; and by responding promptly to requests for information.

25.     OFAC has not issued a penalty notice or Finding of Violation against RBS in the five years preceding the apparent violations.

## III.     TERMS OF SETTLEMENT

IT IS HEREBY AGREED by OFAC and RBS that:

26.     RBS has terminated the conduct outlined in paragraphs 3 through 15 above and RBS has put in place, and agreed to maintain, policies and procedures that prohibit, and are designed to minimize the risk of the recurrence of, similar conduct in the future.

27.     RBS agrees to provide OFAC with copies of all submissions to the Board of Governors of the Federal Reserve System ("Board of Governors") in the same form provided to the Board of Governors pursuant to the "Order to Cease and Desist Issued upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended," to RBS on December 11, 2013, by the Board of Governors (Docket No. 13-019-B-FB1 and 13-019-B-FB2) relating to the OFAC compliance review.  It is understood that the United Kingdom's Financial Conduct Authority ("FCA"), as RBS' home country supervisor for conduct issues, is assisting the Board of Governors in the supervision of its Order in keeping with the FCA's functions under the United Kingdom's Financial Services and Markets Act 2000.

28.     Without this Agreement constituting an admission or denial by RBS of any allegation made or implied by OFAC in connection with this matter, and solely for the purpose of settling this matter without a final agency finding that a violation has occurred, RBS agrees to a settlement in the amount of $33,122,307 arising out of the apparent violations by RBS of the JADE Act, IEEPA, TWEA, the Executive Orders, and the Regulations described in paragraphs 17-20 of this Agreement.  RBS' obligation to OFAC to pay such settlement amount shall be deemed satisfied by its payment of a greater or equal amount in satisfaction of penalties assessed by the Board of Governors for the same pattern of conduct.

29.     Should OFAC determine, in the reasonable exercise of its discretion, that RBS has willfully and materially breached its obligations under paragraphs 27 or 28 of this Agreement, OFAC shall provide written notice to RBS of the alleged breach and provide RBS with 30 days from the date of RBS's receipt of such notice, or longer as determined by OFAC, to demonstrate that no willful and material breach has occurred or that any breach has been cured.  In the event that OFAC determines that a willful and material breach of this Agreement has occurred, OFAC will provide notice to RBS of its determination, and this Agreement shall be null and void, and

**Royal Bank of Scotland plc**                                              7
**MUL-651983**

the statute of limitations applying to activity occurring on or after July 1, 2005, shall be deemed
tolled until a date 180 days following RBS' receipt of notice of OFAC's determination that a
breach of the Agreement has occurred.

      30.     OFAC agrees that, as of the date that RBS satisfies the obligations set forth in
paragraphs 27 through 28 above, OFAC will release and forever discharge RBS from any and all
civil liability under the legal authorities that OFAC administers, in connection with the apparent
violations described in paragraphs 17-20 of this Agreement.

      31.     RBS waives any claim by or on behalf of RBS, whether asserted or unasserted,
against OFAC, the U.S. Department of the Treasury, and/or its officials and employees arising
out of the facts giving rise to this Agreement, including but not limited to OFAC's investigation
of the apparent violations and any possible legal objection to this Agreement at any future date.

## IV.    MISCELLANEOUS PROVISIONS

      32.     Except for the apparent violations described in paragraphs 17 through 20 above,
the provisions of this Agreement shall not bar, estop, or otherwise prevent OFAC from taking
any other action affecting RBS with respect to any and all matters, including but not limited to,
any violations or apparent violations occurring after the dates of the conduct described herein.
The provisions of this Agreement shall not bar, estop, or otherwise prevent other U.S. federal,
state, or county officials from taking any other action affecting RBS.

      33.     Each provision of this Agreement shall remain effective and enforceable
according to the laws of the United States of America until stayed, modified, terminated, or
suspended by OFAC.

      34.     No amendment to the provisions of this Agreement shall be effective unless
executed in writing by OFAC and by RBS.

      35.     The provisions of this Agreement shall be binding on RBS and its successors and
assigns. To the extent RBS' compliance with this Agreement requires it, RBS agrees to use best
efforts to ensure that all entities within RBS comply with the requirements and obligations set
forth in this Agreement, to the full extent permissible under locally applicable laws and
regulations, and the instructions of local regulatory agencies.

      36.     No representations, either oral or written, except those provisions as set forth
herein, were made to induce any of the parties to agree to the provisions as set forth herein.

      37.     This Agreement consists of 8 pages and expresses the complete understanding of
OFAC and RBS regarding resolution of the apparent violations arising from or related to the
apparent violations described in paragraphs 17 through 20 above. No other agreements, oral or
written, exist between OFAC and RBS regarding resolution of this matter.

      38.     OFAC, in its sole discretion, may post on OFAC's website this entire Agreement
or the facts set forth in paragraphs 3 through 25 of this Agreement, including the identity of any
entity involved, the satisfied settlement amount, and a brief description of the apparent

**Royal Bank of Scotland plc**                                                        **8**
**MUL-651983**

violations. OFAC also may issue a press release including this information, and any other
information it deems appropriate in its sole discretion.

      39.    Use of facsimile signatures shall not delay the approval and implementation of the
terms of this Agreement. In the event any party to this Agreement provides a facsimile
signature, the party shall substitute the facsimile with an original signature. The Agreement may
be signed in multiple counterparts, which together shall constitute the Agreement. The effective
date of the Agreement shall be the latest date of execution.

      40.    All communications regarding this Agreement shall be addressed to:

| | |
|---|---|
| RBS plc | Office of Foreign Assets Control |
| 36 St Andrew Square | U.S. Department of the Treasury |
| Edinburgh, EH2 2YB | Attn. Sanctions Compliance & Evaluation |
| United Kingdom | 1500 Pennsylvania Avenue, N.W., Annex |
| | Washington, DC 20220 |

**AGREED:**

For and on behalf of RBS plc

_Chris Campbell_
Chris Campbell
RBS' Duly Authorized Representative

DATED: _10/12/13_

_Adam J. Szubin_
Adam J. Szubin
Director
Office of Foreign Assets Control

DATED: _12/11/13_