# Exhibit 30

Case 1:05-cv-04622-DLI-RML   Document 400-39   Filed 05/23/18   Page 2 of 7 PageID #: 17931

# U.S. DEPARTMENT OF THE TREASURY

## Press Center

### Testimony of Stuart A. Levey, Under Secretary Terrorism and Financial Intelligence

8/23/2004

FROM THE OFFICE OF PUBLIC AFFAIRS

js-1869

Chairman Oxley, Congressman Frank and Members of the Committee, thank you for inviting me to testify before you today about our efforts to combat terrorist financing.  I am pleased that my first time testifying as Under Secretary for the new Office of Terrorism and Financial Intelligence is on this important subject.

There is little need to underscore the importance of our campaign against terrorist financing, especially before this audience.  This Committee has demonstrated its commitment to fighting the financial war against terror and I think would certainly agree, as I do, with the 9/11 Commission's recommendation that "vigorous efforts to track terrorist financing must remain front and center in U.S. counterterrorism efforts."  As this statement implies, combating terrorist financing is part of a broader counterterrorism mission.  I would therefore first like to describe the U.S. government's overall terrorist financing campaign and how it supports the broader war on terror.  I will then describe the vital contribution that the Treasury Department makes to this campaign and how the creation of the Office of Terrorism and Financial Intelligence (TFI) at the Treasury Department will improve our overall performance.

In the course of my testimony, I will address what I believe are the central issues raised by the 9/11 Commission regarding our efforts to combat terrorist financing. Let me say at the outset that I agree with most of the Commission's report as it relates to terrorist financing, and I commend the Commission and its staff for a truly outstanding job analyzing this issue. Most important, I believe the report will us improve our efforts to combat terrorist financing.

**A. Terrorist Financing:  A Key Front in a Global War on Terror**

As the Commission recognized, our terrorist financing campaign must be viewed as one front in a global war on terror.  Rather than an end in itself, our attack on terrorist financing is but one means of achieving our broader goal.  In the end, the goal is not to stop the money, but to stop the killing.  To achieve this goal, we must bring to bear every power available to all relevant government agencies.

Similarly, in attacking terrorist financing, we need to keep open all of our options and choose the course that is most effective in each case.  For example, if the most effective strategy with respect to a known financier is to observe him covertly so as to identify and possibly capture the next link in the chain, then we must do that.  If the most effective course of action is to designate a financier in order to freeze terrorist-related assets and shut down a source or conduit of terrorist financing, we must pursue that option.  As I will discuss, sometimes the different types of actions are complementary.  Sometimes they are not and, in those cases, a choice must be made.  Our options, however, must be weighed based on the facts of the case.  We have an interagency process in place to do just this, where these different options are coordinated to inflict maximum damage to terrorist capabilities.  Our goal is not to maximize the number of times that we exercise the tools of a particular agency, but to take the action as a government that will do the most to cripple terrorist organizations.

There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it.  They note that terrorist attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.

The 9/11 Commission wisely rejected this point of view.  In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act.  The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out.  As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, travel, plan operations, and bribe corrupt officials, for example.  If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Of course, our attempts to prevent terrorist financing cannot possibly stop all terrorist attacks.  Yet the financial networks of terrorist organizations represent vulnerabilities that we can exploit.  For example, in appropriate cases, we can immediately strike at the finances of terrorists and their supporters through public designation and the corresponding freezing of terrorist-related assets.  We can also quietly

investigate and follow money trails to identify and unravel terrorist financing networks. When successful, this method allows us to trace funds "upstream" - to identify terrorist donors and facilitators - and "downstream" - to target terrorist operatives and cells. In addition to these strategies, we can also simultaneously increase transparency and accountability measures that force terrorists to raise, move and store money in riskier and costlier ways, thereby improving our ability to disrupt them.

**B. The Interagency Character of Our Campaign Against Terrorist**

FinancingOur campaign against terrorist financing is, and must continue to be, an interagency effort, relying on cooperation across the U.S. government. The resources, authorities and expertise of all the relevant agencies cannot and should not be amalgamated in one Department. We need to draw on the full range of weapons in our arsenal - from intelligence activities to diplomatic pressure, from regulatory actions and administrative sanctions to criminal prosecutions - without concern for "turf" or the reputation of a particular agency.

The interagency team that has applied itself to this issue since 9/11 is truly extraordinary. My former home, the Department of Justice (DOJ) and the FBI, for example, have done heroic work to transform themselves to best tackle the terrorist financing problem. Law enforcement is a primary weapon on the domestic front, and the powerful, public effect of successful prosecutions is simply unrivaled. The FBI's financial investigators, coordinated out of the Terrorism Financing Operations Section (TFOS) created by Director Mueller after 9/11 here in Washington, have shown dedication and resourcefulness, marshaling the shared resources of law enforcement through Joint Terrorism Task Forces (JTTF's) across the country, integrating intelligence through unprecedented cooperation with the CIA, and building successful cases that would not have been thought viable a mere four years ago. Bringing these cases to court are talented assistant U.S. attorneys across the country, working under the guidance of a small group of experienced prosecutors at DOJ's Counter-Terrorism Section (CTS) under the leadership of my co-panelist here today, Barry Sabin. Over the past two months, the public has received dramatic reminders of this group's effectiveness, with the indictments of the Holy Land Foundation's leadership echelon and the convictions of Abdulrahman Alamoudi and the Elashi brothers.

The Civil Division of the Department of Justice also plays a key but often unnoticed role in the overall effort. A team of premier lawyers from the Civil Division and the Department of the Treasury has successfully defended every administrative action that Treasury has taken in the terrorist financing campaign against a wide range of constitutional challenges. Congress has given the Treasury Department some very robust powers, such as the ability to block suspected terrorist-related assets, even pending investigation. We have used these powers judiciously, as the courts have affirmed in rejecting legal challenges to these authorities and our use of them. Working together with the Civil Division, the Treasury Department has prevailed in the defense of lawsuits brought by three U.S.-based charities challenging their designation as Specially Designated Global Terrorists pursuant to E.O. 13224. The charities asserted that the Treasury Department, including the Office of Foreign Assets Control (OFAC), had exceeded its authority under the International Emergency Economic Powers Act and violated various constitutional guarantees. In addition, the charities brought an Administrative Procedure Act challenge to the type and quantum of evidence on which Treasury relied in making the designations. Courts of Appeals in the District of Columbia and the Seventh Circuit upheld the legality of Treasury's actions. <u>Holy Land Foundation for Relief & Development v. Ashcroft</u>, No. 02-5307, 2003 WL 21414301 (D.C. June 20, 2003); <u>Global Relief Foundation, Inc. v. O'Neill</u>, 315 F.3d 748 (7th Cir. 2002); <u>Benevolence Intern. Foundation, Inc. v. Ashcroft</u>, 200 F. Supp. 2d 935 (N.D. Ill. 2002).

Other law enforcement agencies, including Treasury's premier financial investigators in the Criminal Investigation Division of the IRS, have contributed to these efforts, untangling intricate money laundering and tax evasion schemes implicated in terrorist financing investigations to build cases for prosecution. U.S. Immigration and Customs Enforcement (ICE) at the Department of Homeland Security also plays a critical role in terrorist financing cases, working in close collaboration with the FBI. In an excellent example of information sharing between federal law enforcement agencies, ICE vets all of its terrorist financing leads through the FBI pursuant to a Memorandum of Agreement between DOJ and DHS. When an ICE investigation has a nexus to terrorism or terrorist financing, the investigating ICE field office is instructed to contact the appropriate FBI field office to arrange for a smooth transition of the investigation to the FBI-led JTTF. ICE special agents enhance many JTTF investigations by providing information and intelligence, language capabilities, and legal and investigative expertise. ICE and the FBI also established a Joint Vetting Unit staffed by senior personnel from each agency to identify investigations with a potential nexus to terrorist financing. Thus, the FBI and DOJ are immediately aware of all ICE cases that relate to terrorist financing. ICE also does important investigative work in such areas as bulk cash smuggling, unlicensed money remitters, and money laundering through insurance and other non-traditional financial mechanisms.

Other departments and agencies bring expertise, authorities and resources to the campaign against terrorist financing. When it comes to diplomatic efforts, the State Department is of course at the forefront. Since 9/11, the State Department has built a worldwide coalition against terrorist financing – a monumental achievement – and endeavors every day to strengthen it. And, in the overseas intelligence arena, the CIA and its intelligence partners have also reconstituted themselves since 9/11 in ways that are critical to the overall effort but which, in many respects, cannot be discussed in this setting. Our greatest accomplishments to date have all been collaborative efforts, and our success in the future will depend on the strength of our interagency communication, cooperation and collaboration.

**C. The Office of Terrorism and Financial Intelligence -- Enhancing Treasury's Contribution**

The Congress and the President have given the Treasury Department the responsibility to safeguard the integrity of the U.S. and international financial systems from abuse by terrorists, rogue states, money launderers, and criminals. Treasury – as the United States' Finance Ministry – is well situated to accomplish this mission given its role in both the domestic and international financial systems.

Treasury has unique relationships in the international community, including with Finance Ministries, Central Banks, financial intelligence units, and international financial institutions, as well as with the private sector.

To safeguard the financial systems both at home and abroad, the Treasury Department draws upon several capabilities:

- <u>Sanctions and Administrative Powers</u>: Treasury wields a broad range of powerful economic sanctions and administrative powers to attack various forms of illicit finance, including E.O. 13224 issued under the International Economic Emergency Powers Act (IEEPA). Treasury's OFAC administers and enforces the various economic sanctions and restrictions imposed under the Secretary's IEEPA authority.
- <u>Financial Regulation and Supervision</u>: Treasury, through the Financial Crimes Enforcement Network (FinCEN), administers the Bank Secrecy Act (BSA) and issues and enforces anti-money laundering /counter-terrorist financing regulations. Treasury further maintains close contact with the federal financial supervisors – including the Treasury Department's Office of the Comptroller of the Currency and Office of Thrift Supervision – with the goal of ensuring that these regulations are being implemented consistently throughout the financial sectors.
- <u>International Initiatives</u>: Treasury is part of and has access to an extensive international network of Finance Ministries and Finance Ministry-related bodies such as the Financial Action Task Force (FATF) and various FATF-Style Regional Bodies, the International Monetary Fund (IMF), the World Bank, the G7, and various regional multilateral development banks. In addition, FinCEN is the critical facilitator for the international relationships among financial intelligence units organized through the Egmont Group.
- <u>Private Sector Outreach</u>: As a result of our traditional role in safeguarding the financial system, Treasury has developed a unique partnership with the private sector. Through such outreach programs as the BSA Advisory Group (BSAAG) and other regulatory and educational seminars and programs, Treasury maintains a close relationship with U.S. financial institutions to ensure a smooth exchange of information related to money laundering and terrorist financing. FinCEN administers Section 314 of the U.S.A. PATRIOT Act (Patriot Act), which mandates enhanced information sharing between the government and the financial sector.
- <u>Law Enforcement and Law Enforcement Support</u>: Treasury combats various forms of financial crime through the direct law enforcement actions of IRS-CI and the law enforcement support provided by FinCEN and Treasury's regulatory authorities.

These assets place the Treasury Department at the epicenter of the forces arrayed against terrorist financing. Since the September 11th attacks, Treasury has diligently applied these assets as part of a comprehensive campaign against terrorist financing. However, until just recently, Treasury's structure did not match its mission in combating terrorist financing as a distinct priority. At the same time that the Commission was preparing the release of its final report, the Treasury Department was preparing a new office structure to improve its ability to combat terrorist financing. The creation of the Office of Terrorism and Financial Intelligence (TFI) at the Treasury Department will enable the Department to bring all of its assets to bear more effectively than it ever has before and to play the leadership role that it should play in battling terrorist financing. The fight against terrorism financing will be a long one, and TFI is structured to manage all of Treasury's resources, authorities and expertise to attack terrorist financing over the long term.

One key function of TFI is to assemble, integrate and analyze intelligence. The war on terror remains a war of information, and TFI's Office of Intelligence and Analysis (OIA) is helping us meet this challenge. OIA will integrate, for the first time, all of the Department's information and intelligence streams, including BSA data at FinCEN, OFAC targeting analysis and sanctions enforcement data, and all intelligence flowing into the Department from the intelligence community. Frankly, this is an area where significant improvement is needed because, prior to the creation of OIA, these data were generally kept in separate "stovepiped" channels. OIA ensures that appropriate security and privacy protections are implemented to safeguard data and that these data streams are reviewed, synthesized, and presented to policymakers for appropriate action.

TFI also includes the Office of Terrorist Financing and Financial Crimes (OTF), which is the policy and enforcement apparatus for the Department on terrorist financing, money laundering, financial crime, and sanctions issues. Building on earlier Treasury efforts, OTF integrates the important functions of OFAC and FinCEN with other components of the Department. OTF represents the United States at international bodies dedicated to fighting terrorist financing and financial crime, such as the FATF, and will increase our other international efforts in this field. Domestically, OTF will continue to develop and implement strategies against money laundering and other financial crimes. For example, OTF is working closely with FinCEN, which has the responsibility to effectively enforce the BSA and related provisions of the Patriot Act. OTF is also increasing our interaction with federal law enforcement and works closely with the criminal investigators at the IRS to deal with emerging domestic and international financial crimes of concern.

Both the intelligence and operational functions are under my direction, and it is my responsibility to ensure that they complement and support each other's missions. I believe that, if I do my job well, TFI will significantly enhance Treasury's contribution to our government's campaign against terrorist financing. I look forward to working with this Committee to achieve that goal.

**D. Our Anti-Money Laundering Regime is Critically Important, but Cannot Alone Stop or Defeat Terrorist Financing**

As I indicated earlier, I agree with the Commission's key recommendation that "[v]igorous efforts to track terrorist financing must remain front and center in U.S. counterterrorism efforts." The simple fact remains that the money trail generally does not lie. As we have developed, analyzed, and shared financial intelligence throughout the government, we have refined the way in which we can use money trails to identify, locate, and arrest or capture terrorists and their networks. Studying money trails can also help us understand how terrorists exploit vulnerabilities in our financial systems and take advantage of regulatory weaknesses. This, in turn, permits us to address these vulnerabilities through improved regulatory guidance and by informing private sector institutions of vulnerabilities in their systems.

In order to track money trails of any kind, you need financial information. Much of this information is obtained overtly, through laws promoting financial transparency like the BSA. The key question before us is whether the systems we have implemented to ensure financial transparency – most of which were aimed at money laundering – are sufficient to provide the federal government with the information it needs to "vigorously track terrorist financing."

Our approach to obtaining the necessary financial information to combat terrorist financing has been forged by nearly twenty years of experience in combating money laundering. But there are important and fundamental differences between the financing of terrorism and

money laundering, and by relying exclusively on the same methods and tools, we may inhibit our ability to succeed. Treasury, through FinCEN, administers the BSA, which is principally aimed at achieving the appropriate level of financial transparency to detect and prevent money laundering. With money laundering, investigators look through a telescope trying to detect the movement of large amounts of cash. With terrorist financing, investigators need a microscope in order to identify and track the movement of relatively small amounts of often "clean" money supporting an evil purpose.

We have begun the effort to study whether we can devise tools or systems aimed more particularly at terrorist financing. I look forward to working together with this Committee on this important issue. As this Committee knows well, one critically important tool against both money laundering and terrorist financing was provided by Section 314 of the Patriot Act, which mandates the sharing of information with and among the financial sector, that is, both vertically (between the government and the industry) and horizontally (providing a safe harbor that allows industry members to share with each other). Treasury has implemented this section by creating a "pointer" system for law enforcement. This system gives law enforcement, in the right case, the ability to work with FinCEN to transmit names of persons of interest to the financial sector to determine whether those institutions have any relevant transaction or account information. The industry reports back only when it has information, and then law enforcement follows up with the institution with appropriate process. The system implemented by FinCEN has been successful, and law enforcement has advised that it has been a valuable tool. But this system is only a first step when it comes to information sharing.

We should endeavor to develop better processes for sharing information with the financial sector. The financial industry is eager to help – indeed, it has been very helpful already. We must figure out ways to effectively and appropriately share relevant information with the financial sector to better equip it to generate financial information that will help us identify terrorist financing. This will not be an easy task. Much of the information relevant to terrorist financing is classified. Moreover, law enforcement is correctly reticent about sharing information that could compromise an investigation. Finally, we need to be sensitive to the privacy and reputational interests of our citizens and ensure that appropriate controls are in place to safeguard information.

It is also important to remember that the movement of money in the 21st century knows no borders. Terrorism – particularly the type of terrorism we are dealing with since 9/11 – has global reach. The United States is leading the global effort to increase financial transparency, and rules guaranteeing a certain level of transparency are absolutely required if we are to be effective at tracking terrorist financing. Section 311 of the Patriot Act allows us to protect our financial systems from illicit funds emanating from jurisdictions that do not have such rules. This provision provides the authority to prevent jurisdictions and foreign financial institutions found to be of "primary money laundering concern" from doing business with the United States. Just this past May, the Treasury Department designated the Commercial Bank of Syria (CBS), based on concerns relating to financial transparency, and problems we observed with that institution, including terrorist financing. Pursuant to this designation, we have issued a proposed rule that, when issued in final form, will oblige U.S. financial institutions to sever all correspondent relations with CBS. The Commercial Bank of Syria will either take effective steps to address our concerns, or we will cut it off from our financial system. Actions of this type will help cause jurisdictions and institutions to adopt real reforms that impose an acceptable degree of financial transparency, and will help protect the integrity of our financial system in the meantime. As Under Secretary of TFI, I will aggressively apply Section 311 when we have reason to believe that our financial system is being threatened by terrorist financing or other criminal networks.

**E. Using Designations More Effectively**

I think I have made clear my view that those of us engaged in the financial war against terrorism should, in every instance, wield whatever tool is best able to advance the overall mission to stop terrorism. Acting in accordance with that principle, however, requires an accurate understanding of the power of each of the relevant tools. In that regard, I would like to discuss the value of the public actions the Treasury Department can take – particularly public designations. The 9/11 Commission states that "public designation of terrorist financiers and organizations is still part of the fight, but it is not the primary weapon. Designations are instead a form of diplomacy, as governments join together to identify named individuals and groups as terrorists. They also prevent open fundraising." While I agree with the first quoted sentence, I think in this particular passage, the 9/11 Commission does not give enough credit to the potential power of public designations. In addition to being a form of diplomacy and stopping open fundraising, if used properly, designations can be valuable by:

1. shutting down the pipeline through which designated parties raise and move money;
2. informing third parties, who may be unwittingly financing terrorist activity, of their association with supporters of terrorism;
3. deterring non-designated parties, who might otherwise be willing to finance terrorist activity; and
4. forcing terrorists to use potentially more costly, less efficient and/or less reliable means of financing.

These benefits of designation cannot be measured by simply totaling the amount of terrorist-related assets frozen. Terrorist-related accounts are not pools of water awaiting discovery as much as they are rivers, with funds constantly flowing in and out. By freezing accounts, we dam that river, thus not only capturing whatever water happens to be in the river at that moment but, more importantly, also ensuring that this individual or organization can never in the future act as a conduit of funds to terrorists. Indeed, if fully implemented, a designation excommunicates supporters of terrorism from the formal financial system, incapacitating them or driving them to more expensive, more cumbersome, and riskier channels.

I say "if fully implemented" because, as the 9/11 Commission recognized, implementation is vital in this context, but not at all assured. The great majority of terrorist financiers and facilitators operate and store their money overseas. For designations to have a maximum impact, we must persuade other nations to take action alongside us. This is not a simple task. In some cases there is a failure of will, and in others there are insufficient means to take administrative action. In either case, we must continue to persuade, cajole, or provide needed

technical assistance to make sure that our designations are more than just words on paper. Over the past three years, the State Department has labored tirelessly in this cause, and its persistent work has yielded results: dozens of countries have joined us in submitting over 285 al Qaeda-linked targets for designation under the United Nations; 87 countries in every region of the world have either adopted new laws and regulations to fight terrorist financing or are in the process of doing so; and 20 different U.S. government offices and agencies have provided technical assistance and training to help front-line states develop counter-terrorist financing and anti-money laundering regimes. TFI is currently assisting foreign states to make designations more effective through the development of: intelligence-driven designation protocols; notification, freezing, seizing and reporting protocols for the private sector; and investigative protocols for following leads stemming from frozen accounts and transactions.

We can also improve the effectiveness of designations by focusing on key financial targets. We cannot afford to expend valuable resources and political capital on designations that have little or no practical effect in interdicting terrorist funding or deterring those who would otherwise support terrorism. In this sense, the number of designations issued, like the amount of terrorist-related assets frozen, is a potentially misleading metric, because that number says nothing about whether a designation has any real impact. Designations are most disruptive and effective when applied against terrorist financiers, facilitators, and donors whose financial support is critical to terrorist operations. Such designations also have the greatest deterrent effect among other potential terrorist supporters.

In assessing the potential value of designations, it is also important to realize that designations are also not necessarily applied at the expense of other actions. The administrative nature of designations and the congressionally-authorized use of classified information to support them allow us to shut down terrorist financing sources and conduits quickly when other options may not be ripe for action. In these instances, we can continue to pursue parallel criminal investigations and prosecutions.

For example, just two months after the President signed Executive Order 13224, the Treasury Department froze the assets of three large Islamic charities associated with terrorist financing activity in the U.S.: the Holy Land Foundation (HLF), the Global Relief Foundation (GRF), and the Benevolence International Foundation (BIF). These actions ensured that no more money would flow from these organizations to al Qaeda or other terrorist groups. The assets of these organizations were instantly locked in place. Thereafter, the Department of Justice successfully prosecuted BIF's chief executive officer, Enaam Aranout. In the case of HLF, the Department of Justice has also indicted the organization and its leadership on terrorist financing-related charges and is now seeking to forfeit the assets that Treasury blocked pursuant to designation. This combination of designation and law enforcement action created an optimal outcome. First, the more nimble administrative standard for designations allowed Treasury to intercede swiftly and shut down terrorist financing that was occurring through HLF accounts, thereby potentially preventing future terrorist acts. Second, the Justice Department was able to continue its criminal investigations of terrorist financing activity and carefully build its cases for criminal prosecution under the more restrictive processes and evidentiary standard that attend our criminal justice system. Third, Treasury's designation prevented the flight of terrorist-related assets out of the United States, securing these assets for constructive use. These effects demonstrate how terrorist financing designations can facilitate and complement other actions by the government.

**F. The Need for International Cooperation and Engagement**

As I have mentioned above, our terrorist financing campaign depends on international cooperation. The terrorist threats that we face and the capital provided to fuel terrorist activity emanate principally from abroad. Attacking, preventing and protecting against these threats require international action. Treasury has worked together with the State Department and others in the interagency community to enlist international support in a global campaign against terrorist financing.

Building on Treasury's relationships with Finance Ministries around the world, we have developed a strategy to globalize this campaign that includes: (i) establishing or improving international standards to address identified vulnerabilities; (ii) ensuring global compliance with these standards; (iii) improving global capabilities to identify, freeze and investigate terrorist-related assets and accounts; (iv) addressing financing mechanisms of particular concern, and (v) facilitating the sharing of information.

Together with our counterparts in the FATF, Treasury has covered tremendous ground since 9/11 in developing international standards to combat terrorist financing, building from the international community's experience in combating money laundering. These standards have mobilized the international community to take action on important terrorist financing issues such as: freezing terrorist-related assets; regulating and monitoring alternative remittance systems; ensuring accurate and meaningful originator information on cross-border wire transfers, and protecting non-profit organizations from terrorist abuse. Treasury is also engaging the FATF to pursue the risk of terrorist financing through cash couriers. The recent decision by the IMF and World Bank to make country compliance with the FATF standards a part of their regular surveillance of global financial sectors is an important step forward in giving real meaning to these standards. These efforts have produced considerable results, but more can and should be done. TFI will continue to engage the international community to target specific issues and jurisdictions of concern, and to encourage effective implementation of standards to combat terrorist financing.

**Conclusion**

In preparing for my new position, I have repeatedly confronted questions about our effectiveness in the campaign against terrorist financing. Put simply, are we making progress? How can we know if we are achieving our objectives? How do we measure success?

These are important questions, and difficult ones. Al Qaeda does not release financial statements, and we will never know precisely how much money is flowing to a terrorist group in a given year or how much money intended for terrorists never reached their hands due to our efforts. We therefore often find ourselves discussing proxies for these ultimate questions: how many donors and facilitators are captured or

behind bars; how much money has been frozen or seized; how many countries are joining us in freezing assets or upgrading their laws to make it harder to move money illegally. Each of these benchmarks points to only one aspect of the problem, though, and imperfectly at that.

More revealing, to my mind, is intelligence that reflects the ease or difficulty with which terrorists are able to raise, move, and store money. If reporting suggests that fewer and fewer donors are willing to risk sending money to terrorist groups – that is a sign of success. If we see that a terrorist group is resorting to riskier and more cumbersome ways of moving money – that is also a sign of success. And if we receive intelligence that terrorist groups like al Qaeda or HAMAS are desperate for money, that is the best indicator we have that we are making a real difference.

The information available to us indicates that there are some encouraging answers to these questions. Not surprisingly, the information also suggests that we still have a lot of work to do. I think it is fair to say that, while we must prepare for a long term campaign against terrorist financing, our policies are beginning to achieve results, and we are headed in the right direction.

I would be happy to answer any questions that you may have.

-30-