UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
TZVI WEISS, *et al.*,                    :
                                         :
                Plaintiffs,    :
                                         :    Case No. 05-cv-4622 (DLI)(RML)
  -against-                             :
                                         :
NATIONAL WESTMINSTER BANK, PLC,          :
                                         :
                Defendant.     :
_____
NATAN APPLEBAUM, *et al.*,               :
                                         :
                Plaintiffs,    :
                                         :    Case No. 07-cv-916 (DLI)(RML)
  -against-                             :
                                         :
NATIONAL WESTMINSTER BANK, PLC,          :
                                         :
                Defendant.     :
_____:

**PLAINTIFFS' RESPONSE TO DEFENDANT NATIONAL WESTIMINSTER BANK'S SUPPLEMENTAL STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Local Civil Rule 56.1(b), Plaintiffs in the above-captioned actions set forth herein their responses to each of the numbered paragraphs set forth in Defendant National Westminster Bank Plc's ("NatWest") Supplemental Statement of Additional Material Facts as to Which There Is No Genuine Issue Pursuant to Local Rule 56.1 ("NatWest's Supplemental Statement") dated April 11, 2018 and submitted in support of NatWest's Motion for Summary Judgment ("NatWest's Motion").

**PLAINTIFFS' RESPONSES TO NATWEST'S NUMBERED PARAGRAPHS**

1. On March 11, 1998, Gerald Matthews, a NatWest employee and Relationship Manager for the accounts of Palestinian Relief & Development Fund (a/k/a Interpal) ("Interpal") at the time, completed a customer appraisal form for Interpal describing it as an organization that "[p]rovides charitable relief" in Palestine and Lebanon, usually involving "food or allowances for children's education." The form further noted that the "[t]wo major times of the year for receipts are Ramadan ... and at Easter time." McDonald Decl. Ex. 1.

**RESPONSE: Admit the quoted statements were made, but note that the Second Circuit has expressly held that:**

> **The requirement to "appear to be intended ..." does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions.** *Cf. Boim v. Holy Land Found. for Relief and Dev.*, **549 F.3d 685, 693–94 (7th Cir.2008) (en banc) (Posner, *J.*) (describing the appearance-of-intention requirement "not [as] a state-of-mind requirement" and stating that "it is a matter of external appearance rather than subjective intent....").**

*Weiss v. Nat'l Westminster Bank PLC*, **768 F.3d 202, 207 (2d Cir. 2014). Therefore, the customer appraisal form for Interpal is irrelevant to the subject of the pending motion. The "external appearance" relevant to 18 U.S.C. §2331 is not the "external appearance" presented by a terrorist group or its funders. If that were the case, Hamas's description of**

**its terror campaign as "legitimate resistance to occupation" would itself nullify the ATA. Instead, the question for the jury is whether the Defendant's conduct presents the "external appearance." That is to be determined by assessing the Bank's culpability in contributing to the acts of terrorism at issue.**

2. On January 17, 2002, Martin Wiltshear, an employee in NatWest's Fraud Office, sent an email to Belinda Lane, who was then Relationship Manager for Interpal's accounts, requesting "details of the most recent due diligence undertaken in respect of the Bank's knowledge of dealings in [Interpal's] US$ account." In response, Lane provided details about Interpal, including that it "[p]rovide[s] charitable relief to refugees in Israel, West Bank & Gaza and Lebanon" and that its receipt of funds is seasonal, "usually at Ramada[n] and Easter." Lane further stated that she had scheduled a January 21, 2002 meeting with Jihad Qundil, Interpal's Secretary, at Interpal's premises, at which she would discuss with Qundil Interpal's current operations. McDonald Decl. Ex. 2.

**RESPONSE: Admit the quoted statements were made, but otherwise incorporate the same response as Response No. 1 above.**

3. Lane met with Qundil at Interpal's premises on March 20, 2002. (Lane testified that the meeting scheduled for January 21, 2002 likely was deferred until March 20.) Qundil told Lane that Interpal was a charity that provided assistance in Palestine and Lebanon, including via food parcels and cash. Qundil also told Lane that Interpal sponsored a summer campaign for the benefit of Muslim orphans. McDonald Decl. Ex. 3; Ex. 4 at 340:23-341:10.

**RESPONSE: Admit the quoted statements were allegedly made, but otherwise incorporate the same response as Response No. 1 above.**

4. An August 2003 record from the Central Register of Charities maintained by the

Charity Commission for England & Wales (the "Charity Commission"), which NatWest maintained in its files, listed among Interpal's "Objects" "the provision of aid and assistance, support[,] guidance[,] and comfort to poor[,] needy[,] sick children and widows." McDonald Decl. Ex. 5.

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

5.    According to Interpal's Annual Reports and financial statements for years 1999 and 2003, which NatWest maintained in its files, Interpal's stated policy was "to distribute 80% of its income on Direct Charitable Projects, retain 10% as reserve for future distribution, and budget for 10% for Indirect Charitable Expenditure (i.e. 5% for Fundraising and 5% for Administration)." Interpal stated that it often exceeded this target for direct charitable spending. For example, Interpal said it spent 87.3 percent of the funds it received directly on charitable projects in 1999, 93 percent in 2000, 94.7 percent in 2001, and 94 percent in 2002. McDonald Decl. Ex. 6 at NW052943, NW052957, NW052984, NW053017, NW053032, NW053067; Ex. 7 at NW052663.

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

6.    Interpal represented in its 2000 Annual Report, which NatWest maintained in its files, that "[w]hatever happens in the political arena - upon which we can have little or no influence - the human tragedy that engulfs generation after generation of Palestinians demands our attention." McDonald Decl. Ex. 6 at NW052982.

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

7.    Between November 8, 1996 and September 25, 2003, at the request of its customer

3

Interpal, NatWest processed 457 wire transfers (the "Relevant Transfers") to the 13 charities that plaintiffs contend are alter egos of or controlled by Hamas (the "13 Charities). The stated purposes for these transfers included "Orphans Programme[s]," "Development of a Women and Maternity Clinic," "School Kit Project[s]," "Student Aid," "Emergency Medical Aid," "Food Parcels," "Winter Clothes Project[s]," "Community Development... Centres," "Mini Bus Project," "Ramadan Projects" and "Small Mosque Project." The bank records reflecting the stated purposes for the Relevant Transfers are accurately summarized in Exhibit 8 to the McDonald Declaration, which identifies those records by the Bates numbers with which they were produced to plaintiffs in discovery. McDonald Decl. Ex. 8 (Transfer Chart).[1]

**RESPONSE: Admit that NatWest processed *at least* 457 wire transfers for Hamas (totaling approximately $12,000,000) and that the quoted statements are contained in the documents cited, but otherwise incorporate the same response as Response No. 1 above.**

8. None of the Relevant Transfers was identified as being for any violent or terroristic purpose.

**RESPONSE: Admit that Interpal did not identify any of the Relevant Transfers as being for any violent or terroristic purpose.**

9. On December 13, 2004, a description of Interpal from its website was circulated among senior NatWest employees, including Kevin Love, Alan Dickinson, Derek Weir, Jill Lewis, Graeme Wyles, Irvine Rodger and Guy Cole. The description stated that Interpal felt that it was "bound by a religious duty and moral obligation to ensure that the funds" it received were "used for charitable purposes as specified." McDonald Decl. Ex. 9.

---

[1] NatWest prepared Exhibit 8 pursuant to Federal Rule of Evidence 1006 in order to avoid burdening the Court with the voluminous underlying bank records. Pursuant to that Rule, NatWest will provide the Court and plaintiffs with the underlying bank records upon request.

4

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

10. In line with this duty and its "commitment to Public Accountability and Transparency," Interpal stated that it allowed transfers only to "bona fide organisations" and insisted upon "formal contractual relationships" with all of its partners. Specifically, Interpal said that partners were required to "sign and adhere strictly" to "strict Funding Agreement[s] to ensure the proper charitable use of funds as specified." *Id.*

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

11. In addition, Interpal stated that recipients of funds from Interpal were "under a duty to provide progress reports and a final report of the projects they implement[ed] on [Interpal's] behalf ... supported by relevant documents (e.g. receipts of purchases and distribution of funds) and photographic or video records." *Id.*

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

12. In its Annual Reports, including for years 1999-2001, which NatWest maintained in its files, Interpal explained that another control it employed to ensure that the funds it transferred were being used for their stated, charitable purposes was to send delegations to its "areas of operation" to report back on the progress of its projects. Interpal explained that sending these delegations both enabled Interpal to "ensure transparency and accountability of its operations" and also to identify areas of need for future projects. McDonald Decl. Ex. 6 at NW052938, NW052942, NW052980, NW053026; Ex. 7 at NW052648.

5

**RESPONSE: Admit the quoted statements are contained in the document cited, but otherwise incorporate the same response as Response No. 1 above.**

13. Amanda Holt, Head of Group Enterprise Risk, testified that "I could never ever condone terrorism. Okay? It doesn't matter who is doing it. That is me as an individual and me as an employee." McDonald Decl. Ex. 10 at 81:10-13.

**RESPONSE: Admit that Ms. Holt so testified, but otherwise incorporate the same response as Response No. 1 above.**

14. Holt further testified that: "The Group as a whole and me as an individual had absolutely no tolerance whatsoever ... [for] funding terrorism. If there was any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway.... I took my responsibilities very, very seriously, not just because of the financial penalties that went with sanctions and, you know, the terrorist legislation" but also "[a]s a matter of personal integrity." *Id.* at 80:7-81:3.

**RESPONSE: Admit that Ms. Holt so testified, but otherwise incorporate the same response as Response No. 1 above.**

15. Holt further testified that "in terms of terrorist financing, there was no risk based judgment ... you had to comply ... as quickly as possible. So I know I wouldn't have sat on it: 'What should we do about this?' I would have reacted very quickly to get the information we as team needed to make sure that the bank acted quickly and appropriately." In addition, when asked, "if the bank believed that Interpal was funding terrorism ... would they have kept Interpal on as a client?" Holt responded, "I absolutely believe they would not have." *Id.* at 71:14-22, 227:1-11.

**RESPONSE: Admit that Ms. Holt so testified, but otherwise incorporate the same response as Response No. 1 above.**

16. On December 10, 2004, in response to an email that she was sent forwarding a link to an article "talking about accounts hel[d] by Hamas with NatWest," Holt wrote "we were aware that we had accounts for people connected to Hamas, but not Hamas itself." In the email in the same chain immediately following Holt's, Stephen Foster, Head of Anti-Money Laundering Compliance in Group Risk Management, wrote "[a]s Amanda says, we were aware of one account with *alleged* links to Hamas – Interpal – but not that we had actual ac[c]aunts for Hamas." (emphasis added). Holt herself wrote later in the email chain that, "[i]n summary, Interpal are a charity customer of CBFM. They have *alleged* links with Hamas …." (emphasis added). In addition, Holt testified that in her original email she was referring to Interpal's "alleged" links with Hamas, as she subsequently wrote in her later email. *Id.* at 90:24-91:8; Ex. 11.

**RESPONSE: Admit that Ms. Holt so testified, but otherwise incorporate the same response as Response No. 1 above.**

17. Foster testified that NatWest did not "want to be related to terrorism at all … [and] wouldn't have had any hesitation in closing" an account if the bank were "concerned that it was linked to terrorism." McDonald Decl. Ex. 12 at 209:8-24.

**RESPONSE: Admit that Mr. Foster so testified, but otherwise incorporate the same response as Response No. 1 above.**

18. Irvine Rodger, Head of the Corporate Banking and Financial Markets Division's Money Laundering Prevention Unit, testified that "the bank would not keep [an] account open if it was funding terrorism, end of story, absolutely no doubt." McDonald Decl. Ex. 13 at 128:10-129:4.

**RESPONSE: Admit that Mr. Rodger so testified, but otherwise incorporate the same response as Response No. 1 above.**

7

19. Neil Trantum, the Head of Group Investigations and Fraud, testified that he "would not want to be involved in [terrorist financing], ethically or reputationally." As a result, if bank employees "thought terrorist finance was going on, [the account] would have just been closed. It would not have been: 'Let's have a think about what the risks are ….'" McDonald Decl. Ex. 14 at 142:12-143:2.

**RESPONSE: Admit that Mr. Trantum so testified, but otherwise incorporate the same response as Response No. 1 above.**

20. Lane testified that Interpal's transactions never caused her to suspect terror financing. McDonald Decl. Ex. 4 at 353:15-17.

**RESPONSE: Admit that Ms. Lane so testified, but otherwise incorporate the same response as Response No. 1 above.**

21. Ian Wickens, who occupied multiple anti-money laundering compliance roles throughout his career at the bank, testified that NatWest "would never have wanted to not report something which could have had a terrorist connection." McDonald Decl. Ex. 15 at 78:10-12.

**RESPONSE: Admit that Mr. Wickens so testified, but otherwise incorporate the same response as Response No. 1 above.**

Dated: May 8, 2018                    **OSEN LLC**

                                          By    /s/ Gary M. Osen
                                                 Gary M. Osen, Esq.
                                                 Ari Ungar, Esq.
                                                 Peter Raven-Hansen, Esq., Of Counsel
                                                 Aaron Schlanger, Esq.
                                                 2 University Plaza, Suite 402
                                                 Hackensack, NJ 07601
                                                 (201) 265-6400
                                                 (201) 265-6400

**ZUCKERMAN SPAEDER LLP**
Shawn Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
(646) 746-8655

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard, Esq.
Stephen Schwartz, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**Attorneys for *Weiss* Plaintiffs**

**SAYLES WERBNER P.C.**

By  /s/ Mark S. Werbner
Mark S. Werbner, Esq.
1201 Elm Street, Suite 4400
Dallas, TX 75270
(214) 939-8700

**STONE BONNER & ROCCO LLP**
James P. Bonner, Esq.
Patrick L. Rocco, Esq.
Susan M. Davies, Esq.
145 West 45th Street, Suite 701
New York, NY 10036
(212) 239-4340

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles, Esq.
Edward MacAllister, Esq.
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David, Esq.
10655 Six Pines Drive, Suite 260
Woodlands, TX 77380
(281) 296-9090

**Attorneys for *Applebaum* Plaintiffs**