UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

TZVI WEISS, *et al.*,                              :
                                                   :
                              Plaintiffs,          :
                                                   :            Case No. 05-cv-4622 (DLI)(RML)
        -against-                                  :
                                                   :
NATIONAL WESTMINSTER BANK, PLC,                    :
                                                   :
                              Defendant.           :
_____

NATAN APPLEBAUM, *et al.*,                         :
                                                   :
                              Plaintiffs,          :
                                                   :            Case No. 07-cv-916 (DLI)(RML)
        -against-                                  :
                                                   :
NATIONAL WESTMINSTER BANK, PLC,                    :
                                                   :
                              Defendant.           :
_____           :


**PLAINITIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A
GENUINE ISSUE TO BE TRIED PURSUANT TO LOCAL CIVIL RULE 56.1(b)**

Pursuant to Local Rule 56.1(b) of the Local Rules of Civil Practice of the U.S. District Court for the Eastern District of New York, Plaintiffs submit the following statement of material facts as to which there is a genuine issue to be tried. Where indicated, the documents, deposition testimony and other materials cited in this Rule 56.1(b) Statement are being submitted as exhibits to the Declaration of Aaron Schlanger, dated May 8, 2018 ("Schlanger Decl."). Plaintiffs do not herein include all statements of material fact relevant to this motion because the law of the case has already established that there is a dispute of material facts regarding National Westminster Bank Plc's ("NatWest") state of mind. However, Plaintiffs include by reference their Statement of Material Facts as to Which There Is a Genuine Issue to Be Tried Pursuant to Local Civil Rule 56.1(b) dated January 30, 2012, which is attached as Exhibit 1 to the Schlanger Declaration for the Court's convenience.

## COUNTERSTATEMENT OF MATERIAL FACTS

1.  In 2013, the U.S. Treasury Department's Office of Foreign Assets Control found that:

> In 1997, National Westminster Bank - which RBS acquired in March 2000 - began acting as a correspondent bank for Bank Melli Iran ("Bank Melli") and its wholly-owned UK subsidiary, Melli Bank Plc ("Melli Plc"). As part of its operations in serving as a correspondent bank, RBS processed U.S. Dollar ("USD") transactions for and on behalf of Bank Melli and Melli Plc and these banks' customers. NatWest (and later RBS) conducted USD payments for the Iranian banks by sending Society for Worldwide Interbank Financial Telecommunication ("SWIFT") MT103 payment messages directly to non-U.S. beneficiary banks, and SWIFT MT202 payment messages (or "cover payments") to U.S. clearing banks. Although the payment messages sent to non-U.S. beneficiary banks included complete payment information, including the names of the Iranian banks and customers, the payment instructions sent to U.S. financial institutions did not include any references to the Iranian parties.

Schlanger Decl. Ex. 2.

2.  The Treasury Department's Office of Foreign Assets Control further found that:

> In November 2003, the Group Executive Management Committee revised the RBSG-wide policy statement on Sanctions and Terrorist Financing. The policy included an explicit requirement regarding OFAC and stated, "US regulations require US$ payments cleared through the US to be checked against the lists of suspected persons issued by the OFAC. Group businesses with US relationships and US$ payments must comply with US regulations." Despite the bank's policy, various units within RBS continued to process payments to Iran and other U.S.-sanctioned countries by using non-transparent payment practices, including those described above.

Schlanger Decl. Ex. 2.

3.    In 2013, NatWest's parent company, Royal Bank of Scotland, entered into a consent order with the New York State Department of Financial Services wherein it admitted that "from at least 2002 to 2011" RBS laundered more than $500,000,000 through the United States on behalf of Sudanese and Iranian customers and beneficiaries and provided employees in payment processing centers in the United Kingdom written instructions containing a step-by-step guide on how to create and route U.S. dollar payment messages involving sanctioned entities through the United States to avoid detection. These instructions stated in relevant part:

> IMPORTANT: FOR ALL US DOLLAR PAYMENTS TO A COUNTRY SUBJECT TO US SANCTIONS, A PAYMENT MESSAGE CANNOT CONTAIN ANY OF THE FOLLOWING: 1. The sanctioned country name. 2. Any name designated on the Office of Foreign Asset Control (OFAC) restricted list, which can encompass a bank name, remitter or beneficiary ...

Schlanger Decl. Ex. 3.

4.    RBS also admitted that "these instructions were included in RBS's Business Support Manual and made available to all relevant employees, posted on RBS's Intranet and periodically disseminated to RBS's International Banking Center payment processors." Schlanger Decl. Ex. 3.

5.    RBS further admitted that "senior RBS employees, including RBS's Group Head of Anti-Money Laundering, as well as the Head of Operational Risk, Global Transaction Services,

and the Head of Global Banking Services for Europe, Middle East and Africa, were fully aware of and in some instances even provided such instructions to employees." Schlanger Decl. Ex. 3.

6.      Amanda Holt joined Royal Bank of Scotland RBS Group in February 2002 as Head of Group Enterprise Risk. This position included the responsibility for the anti-money laundering, sanctions and terrorist financing prevention controls for the Group. Schlanger Decl. Ex. 31.

7.      The U.S. government has found that (as of August 2003) Interpal was "the fundraising coordinator of HAMAS." Schlanger Decl. Ex. 4.

8.      As early as 1996, NatWest was in possession of a *Financial Times* article that noted that "[a] senior [Israeli] military officer said Interpal, also known as the Palestinian Relief and Development Fund, raised money for Hamas institutions and directly provided support to families of Hamas guerillas and suicide bombers. 'Interpal is the main source of funds for Hamas outside the [Palestinian] territories,' he said." Schlanger Decl. Ex. 5. NatWest was therefore aware of the allegations that Interpal was sending funds to "HAMAS institutions."

9.      In 1997, the *Guardian* published an article that paraphrased Ibrahim Brian Hewitt, a trustee and spokesman for Interpal, as saying "it was possible that some of Interpal's beneficiaries in the Palestinian territories had been established by Hamas, but argued that Hamas runs a social welfare and religious network separate from its military wing, Izz el-Deen al-Qassam." The article then quoted Hewitt as saying: "It's like the difference between Sinn Fein and the IRA." Schlanger Decl. Ex. 6.

10.      The identity and nature of many of the institutions NatWest transferred funds to (*i.e.*, Interpal counter-parties and beneficiaries) were published in numerous English-language and Western publications. For example, on September 5, 1993, *The Sunday Times* ran a story stating "In the cool, whitewashed offices of the Islamic Society, Abu Al-Abed warns that Arafat too will

3

face the righteous wrath of Hamas if he fails to govern according to the strictest laws of God in the land where he sometimes claims he was born….” Schlanger Decl. Ex. 7.

11.     On November 27, 1994, *The New York Times* ran a story stating, “Hamas is tireless in its efforts to build its bank of potential martyrs, as I found visiting a summer camp for boys run by its social work wing, the Islamic Society.” Schlanger Decl. Ex. 8.

12.     Interpal’s trustee, Essam Yusef, served as a senior leader of the Union of Good, Hamas’s fundraising organization, and as a senior Hamas leader. Schlanger Decl. Ex. 9.

13.     Interpal was a key member of the Union of Good and NatWest maintained a USD account for the Union of Good that was controlled by Interpal. Schlanger Decl. Ex. 10.

14.     Several Union of Good member organizations were founded by Hamas’s most senior leadership, and the Chairman of the Union of Good, Sheikh Yusuf Qaradawi, was one of the most famous and outspoken Muslim clerics in the world, known for (among other things) issuing a religious ruling – or fatwa – approving suicide bombings against civilians in Israel. Schlanger Decl. Ex. 11.

15.     In 2007, then-head of Hamas, Khalid Mashaal, publicly praised Qaradawi and the Union of Good for its invaluable financial support to Hamas. Schlanger Decl. Ex. 12.

16.     Interpal’s “objects” were to organize massive amounts of funding for Hamas through the network of Union of Good entities, several of which have been separately designated as SDGTs. Schlanger Decl. Ex. 4, 13, 14 and 15.

17.     Interpal also collected funds from the Al Aqsa Foundation, designated by the United States, Israel and the United Kingdom for supporting Hamas. Schlanger Decl. Ex. 14, 16, 17 and 18.

18.     All of the identified Hamas institutions to which NatWest sent funds were

controlled by senior Hamas officials. In some cases, the counterparties were directly controlled by

Hamas founders and most senior leaders. Schlanger Decl. Ex. 11.

19.     Several of the identified Hamas institutions to which NatWest sent funds were

organizations with primary responsibility for collecting information on and facilitating funds

transfers to the families of suicide bombers and other deceased operatives (or "martyrs") as well

as subsidies to the families of terrorists in prison. Schlanger Decl. Ex. 11, 19, 20 and 21.

20.     Interpal's "direct charitable spending" included payments of $553,103 to the al-

Islah Society, founded by Jamal al-Tawil, a high-end Hamas official and recruiter; $1,515,928

to the Islamic Center in Gaza, founded by Sheikh Ahmed Yassin (Hamas's founder and iconic

leader); $2,688,549 to the Islamic Society in Gaza, also founded by Sheikh Yassin; and

$4,001,792 to Al-Salah in Gaza, designated an SDGT for its role in Hamas, including

"employ[ing] a number of Hamas military wing members." Schlanger Decl. Exs. 9, 11 and

22.

21.     Interpal's "direct charitable spending" included support for Hamas institutions

that indoctrinate small children to glorify violence, Schlanger Decl. Ex. 23, Hamas institutions

supervised by prominent Hamas clerics who exhort thousands of Palestinians to engage in

violence, Schlanger Decl. Ex. 24, and Hamas institutions that subsidize terrorists by paying

them and/or their families stipends, Schlanger Decl. Ex. 21.

22.     NatWest received numerous "red flags" on its Goalkeeper system indicating that

Interpal was a high-risk customer. Schlanger Decl. Exs. 25-29.

23.     As then-Treasury Department Under Secretary for Terrorism and Financial

Intelligence Stuart Levey testified on August 23, 2004 before Congress:

> There are some who question the effectiveness of our strategy to prevent
> terrorism by attacking the financing that supports it. They note that terrorist

attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.

The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, travel, plan operations, and bribe corrupt officials, for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Schlanger Decl. Ex. 30.

Dated: May 8, 2018             **OSEN LLC**

            By      /s/ Gary M. Osen
                     Gary M. Osen, Esq.
                     Ari Ungar, Esq.
                     Peter Raven-Hansen, Esq., Of Counsel
                     Aaron Schlanger, Esq.
                     2 University Plaza, Suite 402
                     Hackensack, NJ 07601
                     (201) 265-6400
                     (201) 265-6400

                     **ZUCKERMAN SPAEDER LLP**
                     Shawn Naunton, Esq.
                     485 Madison Avenue, 10th Floor
                     New York, NY 10022
                     (646) 746-8655

                     **KOHN, SWIFT & GRAF, P.C.**
                     Steven M. Steingard, Esq.
                     Stephen Schwartz, Esq.
                     1600 Market Street, Suite 2500
                     Philadelphia, PA 19103
                     (215) 238-1700

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**Attorneys for *Weiss* Plaintiffs**

**SAYLES WERBNER P.C.**

By      /s/ Mark S. Werbner
        Mark S. Werbner, Esq.
        1201 Elm Street, Suite 4400
        Dallas, TX 75270
        (214) 939-8700

**STONE BONNER & ROCCO LLP**
James P. Bonner, Esq.
Patrick L. Rocco, Esq.
Susan M. Davies, Esq.
145 West 45th Street, Suite 701
New York, NY 10036
(212) 239-4340

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles, Esq.
Edward MacAllister, Esq.
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David, Esq.
10655 Six Pines Drive, Suite 260
Woodlands, TX 77380
(281) 296-9090

**Attorneys for *Applebaum* Plaintiffs**

7