UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| TZVI WEISS, *et al*., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 05-cv-4622 (DLI)(RML) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |

_____

| | | |
|---|---|---|
| NATAN APPLEBAUM, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 07-cv-916 (DLI)(RML) |
| -against- | : | |
| | : | |
| NATIONAL WESTMINSTER BANK, PLC, | : | |
| | : | |
| Defendant. | : | |

_____:

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

I.      INTRODUCTION .......................................................................................... 1

II.     WHETHER DEFENDANT'S ACTIVITIES "INVOLVED" VIOLENCE OR
        DANGER TO HUMAN LIFE AND OBJECTIVELY APPEARED TO HAVE
        TERRORIST INTENT RAISES GENUINE ISSUES OF FACT PRECLUDING
        SUMMARY JUDGMENT ON PLAINTIFFS' §2333(a) PRIMARY LIABILITY
        CLAIM ............................................................................................................ 6

        A.      Material Support for Hamas in the Form of Financial Services Can Create
                Civil Liability Under §2333(a) by a Chain of Statutory Incorporations by
                Reference ...................................................................................... 6

        B.      Whether Defendant's Activities Involved Violent Acts or Acts Dangerous to
                Human Life Is a Disputed Issue of Fact for the Jury ....................... 8

        C.      Whether Defendant's Acts Objectively Appeared to Have the Intent
                Required by §2331(1)(B) Is a Disputed Issue of Fact for the Jury ............ 11

                1. Defendant Misstates the Applicable Legal Standard ..................... 11

                2. Defendant's Post-Summary Judgment Admissions of Systematic and
                   Intentional Evasion of U.S. Sanctions Also Undercut the Credibility
                   of Its Claims .................................................................................. 13

III.    WHETHER DEFENDANT WAS GENERALLY AWARE OF ITS ROLE IN
        THE OVERALL ILLEGAL OR TORTIOUS ACTIVITY AND GAVE
        SUBSTANTIAL ASSISTANCE TO HAMAS RAISES GENUINE DISPUTES
        OF FACT PRECLUDING SUMMARY JUDGMENT ON PLAINTIFFS'
        §2333(d) AIDING AND ABETTING CLAIM .............................................. 16

        A.      Plaintiffs Have Timely and Properly Asserted a §2333(d) Claim for
                Aiding and Abetting .................................................................... 16

        B.      Judge Sifton's 2006 Aiding and Abetting Ruling Does Not Apply
                to §2333(d) Claims ...................................................................... 17

        C.      Whether Defendant Provided Substantial Assistance to Hamas Raises a
                Genuine Dispute of Material Fact for the Jury ............................. 18

        D.      Whether Defendant Was Generally Aware of Its Role Raises a Disputed
                Issue of Fact for the Jury ............................................................. 23

IV.     CONCLUSION ............................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*Boim v. Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008) (*en banc*) .................................................................. 6

*Corley v. United States*,
  556 U.S. 303 (2009) .............................................................................................. 8

*Goldberg v. UBS AG*,
  690 F. Supp. 2d 92 (E.D.N.Y. 2010) ................................................................... 25

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ..................................................................... *passim*

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ............................................................................................ 9, 20

*Holy Land Found. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002) ...................................................................... 12

*In re Terrorist Attacks on September 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005) .............................................................. 6, 18

*Islamic American Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ............................................................................. 12

*Jesner v. Arab Bank, PLC*,
  No. 16-499, 2018 WL 1914663 (U.S. Apr. 24, 2018) ............................................ 7

*Linde v. Arab Bank, PLC*,
  882 F.3d 314 (2d Cir. 2018) ......................................................................... *passim*

*Linde v. Arab Bank, PLC*,
  97 F. Supp. 3d 287 (E.D.N.Y. 2015) ................................................................... 11

*Morales v. Truman*,
  535 F.2d 864 (5th Cir. 1976) ............................................................................... 16

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) .................................................................................. 17

*United States v. El Mezain*,
  664 F.3d 467 (5th Cir. 2011) .......................................................................... 11, 12

*United States v. State of Texas*,
  523 F. Supp. 703 (E.D. Tex. 1981) ..................................................................... 16

*Weiss v. Nat'l Westminster Bank PLC*,
    278 F. Supp. 3d 636 (E.D.N.Y. 2017) ................................................................... 7

*Weiss v. Nat'l Westminster Bank PLC*,
    36 F. Supp. 2d 100 (E.D.N.Y. 2013) ............................................................... 1, 13

*Weiss v. Nat'l Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) ................................................................... *passim*

*Weiss v. Nat'l Westminster Bank, PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) ...................................................... 6, 17, 18

**Statutes**

8 U.S.C. §1182 ................................................................................................. 25

18 U.S.C. §2331 ...................................................................................... *passim*

18 U.S.C. §2332 ................................................................................................. 8

18 U.S.C. §2333(a) ............................................................................................ 6

18 U.S.C. §2333(d) .................................................................................. *passim*

18 U.S.C. §2339A ........................................................................................ 8, 24

18 U.S.C. §2339B ...................................................................................... *passim*

Pub. L. 104-132,
    110 Stat. 1214 (1996) ..................................................................................... 9

Pub. L. 104-172,
    110 Stat. 1541 (1996) ................................................................................... 15

Pub. L. 114-222,
    130 Stat. 851 (2016) ....................................................................................... 3

**Other Authorities**

Executive Order No. 13,224,
    66 Fed. Reg. 49079 (Sept. 23, 2001) ........................................................... 15

Hearing on S.2465, Before the S. Comm. on the Judiciary,
    101st Cong. at 79 (1990) ............................................................................. 20

*Moore's Federal Prac. & Proc.* §18.43 ........................................................... 16

Restatement (Second) of Torts §876 (1979) .................................................... 22

S. Rep. No. 102-342 (1992) ........................................................................................... 7

*Webster's New Twentieth Century Dictionary Unabridged* (2d ed. 1983) ..................................... 8

## I.      INTRODUCTION

National Westminster Bank, PLC's ("NatWest") instant motion is its *third* attempt in the last seven years to obtain summary judgment, and its *fifth* attempt to take these cases from the jury by having this Court resolve Plaintiffs' claims as a matter of law.[1] The first time Defendant moved for summary judgment, this Court granted NatWest's motion, noting that the "resolution of [NatWest's summary judgment] motion would be different if the evidence indicated that *NatWest failed to monitor the various international terrorist sanctions lists to ensure its compliance*, or, that upon learning of OFAC's designation of Interpal, did nothing." *Weiss v. Nat'l Westminster Bank PLC*, 936 F. Supp. 2d 100, 116 (E.D.N.Y. 2013) (emphasis added).

Shortly after that decision issued in 2013, Defendant's parent company, Royal Bank of Scotland ("RBS"), publicly admitted in a 2013 Consent Order with the New York Department of Financial Services ("DFS") that it and NatWest actively assisted designated State Sponsors of Terrorism in evading U.S. sanctions during the same time period its compliance department[2] was allowing Interpal and the Union of Good to channel millions of dollars to Hamas.[3] Had Defendant's witnesses testified truthfully in these cases or had its systematic and calculated evasion of U.S. sanctions against State Sponsors of Terrorism been made public prior to the completion of briefing, NatWest and RBS's institutional contempt for U.S. laws would have been significantly illuminated. In any event, the Court of Appeals later found a material fact in dispute regarding NatWest's state of mind and reinstated these actions.

---

[1]      *See* ECF Nos. 38, 264, 326, and 358.

[2]      After RBS acquired NatWest in 2000, RBS assumed responsibility for overseeing NatWest's compliance functions.

[3]      RBS also entered into a Settlement Agreement with the Department of the Treasury's Office of Foreign Assets Control ("OFAC").

This time, Defendant seeks summary judgment on issues addressed by the Second Circuit's recent ruling in *Linde v. Arab Bank, PLC*, wherein the Court of Appeals vacated judgment following a jury verdict for plaintiffs and remanded that case[4] because it concluded that the trial judge was required to instruct the jury that it had to separately determine whether the defendant bank's conduct satisfied all four elements of an act of international terrorism under 18 U.S.C. §2331(1). 882 F.3d 314 (2d Cir. 2018). The District Court in *Linde* had, in accord with other district courts in this Circuit, including this Court,[5] ruled that knowingly violating 18 U.S.C. §2339B(a)(1) constituted an act of international terrorism under 18 U.S.C. §2331(1) *as a matter of law*. But the Second Circuit instead held that whether knowingly providing banking services for a notorious terrorist group "involve[s] violence or endanger[s] human life" and "appear[s] to be intended to intimidate or coerce a civilian population or to influence or affect a government" within the meaning of 18 U.S.C. §2331(1) is a question for the jury. *Linde*, 882 F.3d at 326.

The Court of Appeals also held that the *Linde* plaintiffs were "entitled to the benefits of JASTA's [Justice Against Sponsors of Terrorism Act] expansion of ATA liability to aiders and abettors on this appeal." *Id.* at 328. Congress expressly intended §2333(d) "to provide civil litigants with *the broadest possible basis*" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, Pub. L. 114-222, §2(b), 130 Stat. 851, 853 (2016) (emphasis added). Nevertheless, the court ruled that it could not determine, as a matter of law, whether the jury's findings sufficed to impose liability under 18 U.S.C. §2333(d), the statutory aiding and abetting claim added to the Anti-Terrorism Act ("ATA") by JASTA after the vacated *Linde* judgment was

---

[4]     By operation of a settlement agreement there was not in fact another trial.

[5]     *See Weiss v. Nat'l Westminster Bank Plc,* 453 F. Supp. 2d 609, 613 (E.D.N.Y. 2006).

issued.

Ironically, Defendant now asks this Court to invert *Linde's* holding and decide, *as a matter of law*, the very issues the Court of Appeals expressly reserved for the jury: whether Defendant's conduct satisfies the elements of §2331(1) and §2333(d). Contrary to Defendant's arguments, the Court of Appeals ruled "only" that providing routine financial services to a Foreign Terrorist Organization ("FTO") like Hamas is not so intrinsically dangerous that it "compel[s] a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327. Whether Defendant's knowing violations of §2339B satisfy elements of §2331(1) "raises questions of fact for a jury to decide," not questions for a court to decide as a matter of law. *Id.* at 328.[6]

In Part II, *infra,* Plaintiffs address Defendant's argument that this Court must find as a matter of law that Defendant's supposedly "routine banking" services for its Specially Designated Global Terrorist ("SDGT") customers cannot constitute acts of international terrorism under §2331(1) that would support primary liability. NW2.[7] In fact, the Court of Appeals expressly approved that theory in *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014), and assumed its validity in *Linde*. Moreover, contrary to Defendant's repeated refrain that it merely conducted "routine banking" and "otherwise lawful acts," *Linde* did not create a safe harbor for banking conduct that violates §2339B. Furthermore, Defendant erroneously claims that §2331(1) requires proof that a "defendant *actually* had a goal to achieve by terrorizing … a population or government." NW9 (emphasis added). The Court of Appeals has *twice* stressed that this

---

[6]     *See also id*. at 327 (no §2331(1) finding "as a matter of law"), 328-29 (no aiding and abetting finding "as a matter of law"), 330 (no general awareness finding "as a matter of law"; no substantial assistance finding "as a matter of law"), 331 (no secondary liability finding "as a matter of law"), 332 (no aiding and abetting finding "as a matter of law").

[7]     References to Defendant's brief are indicated by "NW[  ]."

requirement is *objective*, not subjective.

In Part III, *infra*, Plaintiffs show that Defendant's general awareness of its role in facilitating Hamas's financing and Defendant's substantial assistance to Hamas by transferring millions of dollars to this FTO during a prolonged terror campaign preclude summary judgment on the §2333(d) claim. *Linde* held that "[a]fter JASTA, plaintiffs are not limited to proving their ATA claim on a theory of … primary liability," 882 F.3d at 331, but "are entitled to the benefits of JASTA's expansion" by the enactment of statutory aiding and abetting liability under §2333(d), *id*. at 328.

Judge Sifton's dismissals of Plaintiffs' *common law* aiding and abetting claims in 2006 – a decade before §2333(d) was enacted – do not bar their assertion of the different, newly-enacted §2333(d) *statutory* claim, which is indisputably an intervening change of controlling law. Judge Sifton's conclusion that "routine banking" did not constitute "substantial assistance" for an aiding and abetting claim does not support summary judgment, inasmuch as it was based entirely on pre-JASTA New York and Second Circuit case law, rather than on the multi-factor test set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has now expressly found to be the "proper legal framework" for deciding §2333(d) liability. *See Linde*, 882 F.3d at 329. Nor did Judge Sifton have the benefit of the substantial evidence that Plaintiffs developed in discovery regarding the extent and duration of the material support that Defendant provided to Hamas or the extent of its knowledge.

Finally, *Halberstam* held that a defendant need only "be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance . . . ." *Halberstam*, 705 F.2d at 487–88. *Halberstam* then held this standard was satisfied by facts showing that Linda Hamilton, the girlfriend of a burglar who committed an unplanned murder during a burglary, was

4

generally aware that she helped launder the proceeds her boyfriend gained by fencing the items he stole during his unlawful nighttime activities, even though she was neither aware of the murder nor intended that it happen. The *Halberstam* decision described her role as "banker, bookkeeper, recordkeeper, and secretary." *Id.* at 487. The District of Columbia Court of Appeals held that her "general awareness of her role in a continuing criminal enterprise," *not* in the killing, was sufficient to hold her civilly liable under an aiding and abetting theory for the killing, as it was a foreseeable risk of such activity. *Id.* at 488. Similarly, a jury could reasonably find that terrorism is a foreseeable risk of knowingly providing financial services to a terrorist organization.

Defendant claims that it is undisputed that it was not even generally aware of its role in "terrorist acts." But the standard the Court of Appeals enunciated in *Linde* was awareness of "a 'role' in terrorist *activities*." 882 F.3d at 329 (emphasis added). The Second Circuit previously ruled that soliciting funds for Hamas itself constitutes terrorist activity. *Weiss*, 768 F.3d at 209 ("[I]f Interpal [NatWest's customer] solicited funds for Hamas, then *Interpal engaged in terrorist activity* within the meaning of Section 212(a)(3)(B) of the Immigration and Nationality Act.") (emphasis added). Here, the record contains substantial evidence that Defendant was aware that its SDGT customer was collecting and dispersing funds for Hamas, which is, *by definition*, a "terrorist activity." There are, therefore, hotly-disputed issues of material fact as to whether Defendant had the requisite state of mind for §2333(d) aiding and abetting liability, and as in *Linde*, "[t]he possibility of liability on that theory would have to be pursued at [trial]." 882 F.3d at 329.

II.   **WHETHER DEFENDANT'S ACTIVITIES "INVOLVED" VIOLENCE OR DANGER TO HUMAN LIFE AND OBJECTIVELY APPEARED TO HAVE TERRORIST INTENT RAISES GENUINE ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT ON PLAINTIFFS' §2333(a) PRIMARY LIABILITY CLAIM.**

A.   **Material Support for Hamas in the Form of Financial Services Can Create Civil Liability Under §2333(a) by a Chain of Statutory Incorporations by Reference.**

In *Weiss*, the Court of Appeals expressly held that "through [a] complex series of statutory incorporation … a defendant may be liable for civil remedies under §2333(a) for providing material support to an organization that solicits funds for an FTO." 768 F.3d at 209.[8] *Linde* assumed as much, faulting the lower court's jury instructions, rather than the theory of liability plaintiffs espoused, which is indistinguishable from the claim Plaintiffs advance here. *See Linde*, 882 F.3d at 326-27. While Defendant again disparages this supposedly "convoluted theory" (NW2), *Weiss* demonstrates that Defendant's assertions provide no basis for summary judgment.

Nor does Defendant's refrain that its conduct constituted nothing more than "routine banking," NW1, NW2, NW5 n.4, NW19, insulate it from such liability. Although various courts have acknowledged that routine banking activities do not create liability when defendants act *without knowledge* that they are supporting an FTO or an organization that engages in terrorist activities (*see, e.g., In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 832-33 (S.D.N.Y. 2005)), "[w]here 'the Bank knows that the groups to which it provides services are engaged in terrorist activities' even the 'provision of basic banking services may qualify as material support.'" *Weiss v. Nat'l Westminster Bank, PLC*, 453 F. Supp. 2d 609, 625 (E.D.N.Y. 2006) (quoting *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)). This Court

---

[8]   The Seventh Circuit came to the same conclusion. *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690-91 (7th Cir. 2008) (*en banc*).

has also already rejected Defendant's "routine banking" arguments. *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 641-42 (E.D.N.Y. 2017) (citing other cases rejecting claims that knowing support is "routine banking" immune from ATA liability).[9]

The Supreme Court recently confirmed that the ATA and its civil provisions are intended to penalize the provision of banking services involved in terrorism financing:

> The Anti-Terrorism Act … is part of a comprehensive statutory and regulatory regime that prohibits terrorism ***and terrorism financing.*** The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on *when, and how, banks should be held liable for the financing of terrorism.*

*Jesner v. Arab Bank, PLC*, No. 16-499, 2018 WL 1914663, at *18 (U.S. Apr. 24, 2018) (emphasis added); *see also id.* at *14 (noting the same about §2333(a)). Defendant's claim that banking conduct cannot give rise to ATA liability flies in the face of the Supreme Court's truism. Any other conclusion would vitiate the plain meaning of the statute and defeat the congressional purpose to interdict the flow of funds for terrorism by imposing liability up the chain of causation. *See* S. Rep. No. 102-342, at 22 (1992).

Nothing in *Linde* alters this conclusion. The theory of primary liability requires proof that a defendant's activities constituted acts of international terrorism, and therefore proof of each of the four elements of §2331(1). *Linde* did not hold that wire transfers or supposed "routine banking" can *never* constitute acts of international terrorism, only that they do not *always* do so: "We conclude *only* that providing routine financial services to members and associates of terrorist organizations . . . [does not] *compel* a finding that as a matter of law, the services" fulfilled the elements of §2331(1). 882 F.3d at 327 (emphasis added). *Linde* also noted that whether knowingly

---

[9]        Defendant's claim that its bank transfers were "otherwise lawful," NW6, is false because it has admitted for purposes of this motion that the transfers violated §2339B(a)(1), a felony statute. NW5 n.4.

providing banking services to associates of terrorist organizations "should not be viewed as routine" itself "raises questions of fact for a jury to decide," on which the jury must be instructed. *Id.*

> ### B. Whether Defendant's Activities Involved Violent Acts or Acts Dangerous to Human Life Is a Disputed Issue of Fact for the Jury.

Defendant argues that this Court should decide as a matter of law that it was not "engaged in violent acts or acts dangerous to human life," the first element of §2331(1). NW1. But that is *not* what §2331(1) says. The statute defines international terrorism as "activities *that involve* violent acts or acts dangerous to human life," not activities that *are* themselves violent or dangerous to human life. §2331(1)(A) (emphasis added).[10] *See Linde*, 882 F.3d at 319, 326 (correctly quoting this part of the §2331(1) definition). Congress knows how to say "engaged in violence" when that is what it means. *See* 18 U.S.C. §2332(c) (prohibiting "engag[ing] in violence"). The word choice was deliberate because requiring that the material support itself *be* – rather than just *involve* – violent or dangerous acts would exempt from civil liability most of what Congress defined as material support.[11]

Here the legislative history evincing Congress's intent to authorize civil liability to interrupt or imperil the flow of money for terrorism does not alter the plain text of §2331(1); it explains the significance of the word "involves." *See, e.g., Corley v. United States*, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). The same is true of Congress's express finding that "foreign organizations that

---

[10]      "Involve" can mean "include," but it also means "to implicate" or "bring into connection." *Webster's New Twentieth Century Dictionary Unabridged* (2d ed. 1983).

[11]      *See* 18 U.S.C. §2339A(b)(1) (material support includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, … false documentation or identification, communications equipment," etc.).

engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, §301(a)(7), 110 Stat. 1214, 1247 (emphasis added). *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 29-31, 36 (2010) (concluding that the congressional finding was "justified" and entitled to "significant weight" because providing material support to an FTO in any form "further[s] terrorism … in multiple ways"). If financial services provided to an FTO always facilitate terrorist activity, they can certainly "involve" the violence and danger that terrorist activity poses, and a jury is entitled to so find.

*Linde* did not write "involves" out of §2333(1), nor could it. It only decided that providing financial services does not as a matter of law involve violence or danger to human life. The Court of Appeals in *Linde* did not provide even *one* example of a circumstance in which providing financial services does *not* satisfy those requirements. In fact, had *Linde* accepted Defendant's arguments that wire transfers and other supposedly routine banking services cannot involve violence or danger to human life, it would have ordered judgment for the defendant bank on the primary liability claim, instead of ordering a remand.

NatWest attempts to fashion criteria that the Second Circuit did not enunciate regarding when material support involves violence or danger. It claims that its knowing provision of financial services to Hamas was "routine banking" and that it never processed any payments for, *e.g.*, "suicide bombings or for any other violent activities" or to "accounts for Hamas or Hamas terrorist leaders." NW19. But *Linde* never stated that §2331(1) requires proof of those particular facts, or any specific type of material support at all. Rather, the Second Circuit found that a jury must assess whether the entire record – including transferring funds to purported charities controlled by

9

terrorist organizations – supports a finding that a defendant had engaged in activities "that involve violent acts or acts dangerous to human life." *See Linde,* 882 F.3d at 326.

The record contains ample evidence that Defendant's activities satisfied §2331(1)'s requirements. The supposed charities Defendant admittedly held accounts for were designated as SDGTs by the U.S. government because of the roles they played as Hamas's fundraisers. *See* Pls. 56.1 ¶ 7, Schlanger Decl. Ex. 4 (designating NatWest's customer Interpal an SDGT for serving as "the fundraising coordinator of HAMAS").[12] The evidence also shows that NatWest sent millions of dollars to Hamas "sub-organizations"[13] in the Palestinian Territories, including organizations controlled by Hamas founders like Sheikh Ahmed Yassin (designated a Specially Designated Terrorist ("SDT") by the U.S. in 1995) and Ismail Abu Shanab (a co-founder of Hamas), as well as senior Hamas leaders such as the current Hamas leader, Ismail Haniyeh, Ahmed al-Kurd (designated an SDGT in 2007), Jamal al-Tawil and Sheikh Hamed Betawi. Schlanger Decl. Ex. 11. The record further demonstrates that these sub-organizations were instrumental in organizing and distributing payments to families of suicide bombers and other terrorists.[14] Pls. 56.1 ¶ 19, Schlanger Decl. Exs. 11, 19-21.

---

[12]     NatWest also held an account for the Union of Good, another SDGT that the Treasury Department found to be "an organization created by Hamas leadership in late-2000 to transfer funds to the terrorist organization" whose "executive leadership and board of directors includes Hamas leaders, Specially Designated Global Terrorists (SDGTs), and other terrorist supporters." Pls. 56.1 ¶ 12, Schlanger Decl. Ex. 9. The Treasury Department found that the "secretary general of the Union of Good … also acts as the vice-chairman of the United Kingdom-based Interpal," and that "[a]s of mid-2007, this official served on the Hamas executive committee under Hamas leader Khaled Misha'al." *Id.*

[13]     These "sub-organizations" comprised zakat committees and charitable societies that Hamas controlled in the Palestinian Territories. As explicated by Plaintiffs' expert witnesses Arieh Spitzen and Dr. Matthew Levitt, these institutions substantially facilitate all of Hamas's activities. Schlanger Decl. Ex. 11, 21.

[14]     As the District Court in *Linde* noted: "[Plaintiffs' Expert] Mr. Spitzen also testified that many of the charities at issue handed out Hamas propaganda, and often gave funds to terrorists and their family members. Specifically, he testified that he was familiar with 'lists showing martyr payments to families of suicide bombers and other terrorists' from his time working for the Israeli government. Mr. Spitzen explained that these 'martyr files' were similar to social security files in that they described the martyr, the circumstances of his death, his background, and any money

These organizations also recruited Hamas operatives to commit terrorist attacks. *Id.* For example, Jamal al-Tawil, whose al-Islah Society received $553,103 from NatWest, recruited Osama Bahar, one of the suicide bombers who blew himself up in the Ben Yehuda Bombings in Jerusalem on December 1, 2001 that injured Plaintiffs in both the *Weiss* and *Applebaum* cases. Pls. 56.1 ¶¶ 18, 19, 20, Schlanger Decl. Exs. 11, 22. Finally, the evidence shows that these "suborganizations of Hamas" were integral to Hamas's structure and operational capacity. Indeed, the Hamas affiliation of substantially the same organizations was a predicate for criminal convictions under §2339B(a)(1) in *United States v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011), as the Court of Appeals noted in *Weiss* in finding a triable issue of fact concerning NatWest's knowledge. 768 F.3d at 212 & n.10.

### C.   Whether Defendant's Acts Objectively Appeared to Have the Intent Required by §2331(1)(B) Is a Disputed Issue of Fact for the Jury.

#### 1.   Defendant Misstates the Applicable Legal Standard.

NatWest argues that the absence of proof that "defendant *actually* had a goal to achieve by terrorizing … a population or government" precludes any finding that it acted with the apparent intent §2331(1)(B) requires. NW9 (emphasis added). Defendant makes the same error repeatedly. *See* NW16 (arguing the "absurdity" of saying that defendant "shared Hamas's stated goals of 'coercing' or 'intimidating' Israel"). But once again, this is not the §2331(1) standard. It conflates the objective appearance of terrorist intent with a defendant's actual, subjective state of mind.

The Second Circuit has expressly held that "[t]he requirement to 'appear to be intended ...' does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss*, 768 F.3d at 207 n.6. The *Linde* panel agreed. 882 F.3d

---

transferred to him or his family." *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 304 (E.D.N.Y. 2015), *vacated on other grounds*, 882 F.3d 314.

at 327. Contrary to Defendant's assertion, *see* NW8, *Linde* nowhere states that subjective intent is a factor that the jury should consider.[15] It simply holds that a properly instructed jury must consider "all the definitional requirements of §2331(1)." *Id.* at 327.

Notwithstanding *Weiss*'s unambiguous language, Defendant argues that "although the terroristic intent prong of §2331(1) does not impose a subjective *scienter* requirement, the bank's knowledge about the uses to which its financial services were put is relevant to this prong *because these facts are necessarily critical* to a reasonable observer's determination of the 'apparent intentions' of the defendant's actions." NW8 (emphasis added). Even if this were correct, *which it is not*, it would be self-defeating, because the law of the case establishes that whether Defendant knowingly provided material support to Hamas presents a disputed question of fact the jury must resolve. *Weiss*, 768 F.3d at 211.

Moreover, relying on Interpal's self-description of its activities[16] and citing the same documentation and deposition testimony previously advanced in 2011 (*see, e.g.,* NW15, quoting testimony that "if there was any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway") cannot negate Plaintiffs' scienter evidence as a matter of law.

---

[15]    Defendant implies that *Linde*'s reference to certain communications from 2001 alerting the defendant there that payments were for suicide bombings might evidence the required apparent intent. NW8. The quoted language, however, is *not* from the Court's discussion of §2331(1), but a reference to the (subjective) state of mind required for aiding and abetting under §2333(d).

[16]    Donors to terrorist organizations often claim to support only the social services provided by FTOs. *See, e.g., Holy Land Found. v. Ashcroft,* 219 F. Supp. 2d 57, 64 (D.D.C. 2002) (upholding plaintiff's designation as a terrorist organization despite its contention "that it is a §501(c)(3) charitable organization that provides humanitarian aid throughout the world, although its primary focus has been to provide aid to the Palestinian population in the West Bank and Gaza"); *El-Mezain*, 664 F.3d at 527 n.18 ("Because one would not expect a purported charitable organization like HLF or one of the zakat committees to openly acknowledge its ties to a terrorist group, much of the Government's evidence was circumstantial and required the jury to make logical inferences."); *Islamic American Relief Agency v. Gonzales,* 477 F.3d 728, 730 (D.C. Cir. 2007) (upholding the terrorism designation of the Islamic African Relief Agency, an organization that "has engaged in humanitarian activities around the world, often in partnership with similar organizations").

12

2.     **Defendant's Post-Summary Judgment Admissions of Systematic and Intentional Evasion of U.S. Sanctions Also Undercut the Credibility of Its Claims.**

In 2011, as now, Defendant's summary judgment brief relied heavily on bank employees' self-serving statements opposing terrorism, and a supposed "zero tolerance" corporate culture for providing terrorist financing. This Court expressly relied on some of this testimony in initially granting NatWest summary judgment on the question of scienter, *Weiss*, 936 F. Supp. 2d at 110, 115, finding, *inter alia*, that:

> [T]here is no evidence of a corporate culture of deliberate indifference with respect to regulatory obligations…. *The resolution of this motion would be different if the evidence indicated that NatWest failed to monitor the various international terrorist sanctions lists to ensure its compliance*, or, that upon learning of OFAC's designation of Interpal, did nothing.

*Id*. at 115-16 (emphasis added) (internal citations to Holt deposition and record omitted).

However, *after* this Court's last summary judgment ruling in 2013, NatWest's parent corporation, RBS, entered a consent order that detailed those organizations' significant contemporaneous efforts to evade U.S. sanctions against State Sponsors of Terrorism. Pls. 56.1 ¶¶ 1-5, Schlanger Decl. Exs. 2, 3. The same RBS compliance personnel who testified in these cases oversaw NatWest's sanctions policies. Thus, the DFS consent order exposes the falsity of Defendant's "zero tolerance" protestations and undercuts even the Defendant's incorrect gloss on the evidence relevant to objective apparent intent.

DFS found (and RBS admitted) that "from at least 2002 to 2011 [thus overlapping the relevant period in these cases], RBS conducted more than 3,500 transactions valued at approximately $523 million through New York correspondent banks involving Sudanese and Iranian customers and beneficiaries, including a number of entities on the Specially Designated Nationals ('SDN') list of the Office of Foreign Assets Control ('OFAC')…." Pls. 56.1 ¶ 3, Schlanger Decl. Ex. 3 at 1-2. DFS also found that "RBS provided employees in payment

13

processing centers in the United Kingdom written instructions containing a step by step guide on how to create and route U.S. dollar payment messages involving sanctioned entities through the United States to avoid detection," and that "senior RBS employees, including RBS's Group Head of Anti-Money Laundering, as well as the Head of Operational Risk, Global Transaction Services, and the Head of Global Banking Services for Europe, Middle East and Africa, were *fully aware* of and in some instances even provided such instructions to employees." Pls. 56.1 ¶ 3, Schlanger Decl. Ex. 3 at 2-3 (emphasis added).

In a related Settlement Agreement, OFAC found that beginning in 1997, NatWest cleared U.S. dollars ("USD") on behalf of SDGT Bank Melli Iran and its wholly-owned UK subsidiary, Melli Bank Plc, by intentionally deleting the names of Iranian banks and customers from their payment instructions to U.S. banks to evade detection. Pls. 56.1 ¶ 1, Schlanger Decl. Ex. 2 at 2-3. Over time, RBS developed procedures that were memorialized into written instructions to help customers evade U.S. sanctions. Pls. 56.1 ¶ 2, Schlanger Decl. Ex. 2 at 2-3. The instructions included the following message:

> IMPORTANT: FOR ALL US DOLLAR PAYMENTS TO A COUNTRY SUBJECT TO US SANCTIONS, A PAYMENT MESSAGE CANNOT CONTAIN ANY OF THE FOLLOWING: 1. The sanctioned country name. 2. Any name designated on the Office of Foreign Assets Control (OFAC) restricted list, which can encompass a bank name, remitter or beneficiary.

Schlanger Decl. Ex. 2 at 3. OFAC further found that:

> Despite the bank's policies, RBS continued to process USD payments through the United States in apparent violation of the Burmese Sanctions Regulations, the Cuban Assets Control Regulations, the Iranian Transactions Regulations, and the Sudanese Sanctions Regulations until late 2009.

*Id.* at 4.

The Department of the Treasury and DFS's findings demonstrate that, from at least 2002 to 2011, NatWest (and RBS's compliance department that oversaw NatWest's compliance

14

program) systematically assisted State Sponsors of Terrorism to evade U.S. sanctions expressly intended, *inter alia*, to prevent "the proliferation of weapons of mass destruction and acts of international terrorism."[17] Minimally, those facts underscore the conclusion that the self-serving statements on which NatWest almost exclusively relies to support its latest motion concerning its supposed knowledge, corporate culture, and attitude toward U.S. counter-terror financing laws and regulations cannot support summary judgment. Indeed, that evidence strongly suggests the existence of a corporate culture brazenly indifferent to the downstream consequences of terror financing.

Yet notwithstanding the Consent Orders, NatWest actually again relies on the same self-serving statements by Ms. Holt, the head of RBS's Group Enterprise Risk, to argue that its state of mind and apparent intent cannot be disputed:

> I could never ever condone terrorism … [t]he Group as a whole and me as an individual had absolutely no tolerance whatsoever ... [for] funding terrorism. If there was any thought whatsoever that a customer of the bank was funding terrorism or was getting involved in any type of financial crime, that would have been reported straightaway.

NW15, *citing* Supp. 56.1 Stmt. ¶ 13. But Ms. Holt joined RBS as Head of Group Enterprise Risk in early 2002, and was later responsible for anti-money laundering, terror financing prevention, and sanctions compliance during much of the period during which RBS admits it engaged in wide-scale efforts to evade U.S. counter-terrorism laws. Pls. 56.1 ¶ 6, Schlanger Decl. Ex. 31. RBS's admissions reveal that Holt's sworn testimony about NatWest and RBS ("the Group as a whole") was at best incomplete and arguably untruthful, and that this Court's past reliance on it (without the benefit of these later disclosures) was misplaced.

---

[17]     *See, e.g.*, Iran-Libya Sanctions Act, Pub. L. 104-172, §2(2), 110 Stat. 1541 (1996). *See also* Exec. Order 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001).

III.   **WHETHER DEFENDANT WAS GENERALLY AWARE OF ITS ROLE IN THE OVERALL ILLEGAL OR TORTIOUS ACTIVITY AND GAVE SUBSTANTIAL ASSISTANCE TO HAMAS RAISES GENUINE DISPUTES OF FACT PRECLUDING SUMMARY JUDGMENT ON PLAINTIFFS' §2333(d) AIDING AND ABETTING CLAIM.**

   A.   **Plaintiffs Have Timely and Properly Asserted a §2333(d) Claim for Aiding and Abetting.**

*Linde* expressly held that, "[a]fter JASTA, plaintiffs are not limited to proving their ATA claim on a theory of [the defendant's] primary liability." 882 F.3d at 331. The *Linde* court explained:

> [P]laintiffs are entitled to the benefits of JASTA's expansion of ATA liability to aiders and abettors on this appeal. . . . [U]nder an aiding and abetting theory of ATA liability, plaintiffs would not have to prove that the bank's own acts constitute international terrorism satisfying all the definitional requirements of § 2331(1).

*Id.* at 328. That is, the newly-enacted §2333(d) provides a claim for statutory aiding and abetting acts of international terrorism committed by an FTO like Hamas, and that claim does not require that Defendant's activities satisfy any of §2331(1)'s requirements. Accordingly, in the proposed Joint Pre-Trial Order, *NatWest*, ECF No. 391, at 5 (Mar. 8, 2018), Plaintiffs set out their §2333(d) claim.[18]

---

[18]   Fed. R. Civ. P. 16(d) provides that a pretrial order controls the course of the action, and such an order "supersedes the pleadings." *Moore's Federal Prac. & Proc.* §18.43[3]. *See, e.g., Morales v. Truman,* 535 F.2d 864, 867 n.7 (5th Cir. 1976) ("[T]he pretrial order supersedes the pleadings and becomes the governing pattern of the lawsuit."), *rev'd on other grounds,* 430 U.S. 322 (1977); *United States v. State of Tex.*, 523 F. Supp. 703, 720 (E.D. Tex. 1981) ("the pre-trial order . . . serv[es], in effect, as the operative complaint and answer in the case"). Plaintiffs filed the Joint Pre-Trial Order less than one month after *Linde* confirmed their entitlement to prove their case under §2333(d) and provided the first ever appellate analysis of its provisions. As Defendant's counsel told this Court regarding §2333(d)'s requirements, "Neither the parties nor the Court has previously addressed these requirements, or applied them to the evidence, because *Linde* has newly articulated them." Letter from Lawrence B. Friedman to Hon. Dora L. Irizarry dated March 26, 2018, No. 05-cv-04622-DLI-RML, at 3, ECF No. 392. Should the Court prefer that Plaintiffs assert their §2333(d) claims by amending their complaints rather than through the Joint Pre-Trial Order, they will of course do so.

**B.      Judge Sifton's 2006 Aiding and Abetting Ruling Does Not Apply to §2333(d) Claims.**

Defendant argues that, by dismissing Plaintiffs' common law aiding and abetting claims in 2006, Judge Sifton precluded a §2333(d) claim, and that Plaintiffs are trying to "reinstate their previous aiding and abetting claim" or seeking reconsideration because the 2006 decision is no longer good law. NW21. But Plaintiffs' original aiding and abetting claims – which they asserted a decade before §2333(d)'s enactment – arose under common law, not any statute. First Amended Complaint, ECF No. 28. Judge Sifton dismissed those common law claims,[19] not yet-to-be-enacted statutory claims.

In *Linde*, Judge Gershon also dismissed common law aiding and abetting claims in a bench ruling, once it was clear that the Second Circuit had rejected common law aiding and abetting claims under the ATA in *Rothstein v. UBS AG*, 708 F.3d 82, 97-98 (2d Cir. 2013). Order, *Linde v. Arab Bank, Plc*, No. 04-cv-2799 (NG)(VVP) (E.D.N.Y. Apr. 24, 2013), ECF No. 937. Thus, the Court of Appeals in *Linde* expressly noted that plaintiffs "commenced their ATA actions . . . before JASTA's enactment. Accordingly, so much of their claim as charged Arab Bank as an aider and abettor of Hamas acts of terrorism was dismissed." 882 F.3d at 320. Judge Gershon's prior dismissal of the common law claim did not preclude, and had no bearing on, the Court of Appeals' holding that the *Linde* plaintiffs were entitled to invoke aiding and abetting liability under §2333(d). The same is true here. Plaintiffs therefore do not seek to "reinstate" their previously-dismissed common law claims. They are asserting the newly-created statutory aiding and abetting claims approved by the Second Circuit.[20]

---

[19]      *Weiss*, 453 F. Supp. 2d at 621-22.

[20]      Nor are Plaintiffs asking this Court to reconsider or overrule the law of the case, although they would be so entitled because of the "intervening change of controlling law," as this Court noted in *Strauss*. 925 F. Supp. 2d at 427

**C.**     **Whether Defendant Provided Substantial Assistance to Hamas Raises a Genuine Dispute of Material Fact for the Jury.**

Defendant asserts that Judge Sifton's 2006 dismissal of the common law aiding and abetting claims requires the Court to grant it summary judgment. But Judge Sifton exclusively applied New York and Second Circuit common law to summarily conclude in a single paragraph that Defendant's banking services did not qualify as substantial assistance. *Weiss*, 453 F. Supp. 2d at 621. He ruled that the complaint was insufficient as a matter of law to support common law aiding and abetting claims because the six in-Circuit cases he cited held that banks' provision of routine (and legal) banking services on their pleaded allegations did not substantially assist acts of fraud or breaches of a fiduciary duty. In four of these cases, the courts had held that the bank defendants' knowledge was not sufficiently pled.

The only ATA case that Judge Sifton cited on common law aiding and abetting also relied on a failure to allege defendant's knowledge. *In re Terrorist Attacks*, 349 F. Supp. 2d at 832-33, found that the plaintiffs failed to show that defendants *knew* that the undesignated entities they provided services to were linked to the 9/11 attacks or to Al Qaeda. *In re Terrorist Attacks* did *not* address whether "routinely" providing financial services to what defendants knew was a terrorist group is insufficient, as a matter of law, to support an aiding and abetting claim. Instead, it asserted that "[p]roviding routine banking services, *without having knowledge of the terrorist activities*, cannot subject Arab Bank to liability." *Id.* at 835 (emphasis added). *See also Weiss*, 453 F. Supp. 2d at 625 ("In holding that there could be no liability on the basis of 'routine banking business' [the *Terrorist Attacks*] court did not mean that the provision of basic banking services could never give rise to bank liability. Rather the court relied on the routine nature of the banking services to

_____

(quoting *Official Comm. of Unsecured Creditors of Color Tile, Inc., v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)).

18

conclude that *the defendant bank had no knowledge of the client's terrorist activities*.") (emphasis added).

Pre-JASTA New York case law, in any case, is no longer controlling. In JASTA, Congress expressly found that *Halberstam* "provides the proper legal framework for how such liability should function in the context of Chapter 113B of title 18, United States Code," where §2333(d) appears. 18 U.S.C. §2333 (note), §2(a)(5). The Court of Appeals followed this directive in *Linde*. 882 F.3d at 329 ("we are mindful that Congress, in enacting JASTA, instructed that the 'proper legal framework for how [aiding and abetting] liability should function' under the ATA is that identified in *Halberstam*"). As a result, *Linde* applied the *Halberstam* framework, rather than the common law of New York or the prior New York district court decisions on which Judge Sifton relied. It asserted that *Halberstam* "*requires* consideration of multiple factors" for deciding whether assistance is substantial, and twice listed those factors:

> (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Id.* at 329, 330 (emphasis added).

Judge Sifton considered none of these factors; nor did any of the New York banking cases on which he relied. Recognizing this, Defendant half-heartedly argues that five of the six factors suggest that its conduct fails to satisfy the substantial assistance requirement. NW23-24. In fact, however, the evidence Plaintiffs discuss below presents triable issues concerning these factors, a result consistent with the *Linde* court's recognition that the substantial assistance question will normally present an issue of fact the jury must resolve. *Linde*, 882 F.3d at 330.

**The nature of the act encouraged.** "[T]he *nature of the act* involved dictates what aid might matter, *i.e.,* be substantial." *Halberstam*, 705 F.2d at 484. *Halberstam* found that the "long-

19

running burglary enterprise [was] heavily dependent" on laundering the goods, *id*. at 488, which was assisted by defendant Hamilton who served as her boyfriend's "banker, bookkeeper, recordkeeper, and secretary," *id.* at 487.

Moreover, "[u]nder the 'nature of the act' criterion, a court might also apply a proportionality test to particularly bad or opprobrious acts, *i.e.,* a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Id.*, at 484 n.13. Thus, the *Halberstam* court found that "[a]lthough Hamilton's own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.,* a five-year-long burglary campaign against private homes." *Id*. at 488. Here, even if Defendant's banking activities were "neutral standing alone" (which is the essence of its "routine banking" refrain), they must be evaluated in the context of the terrorist organization they aided and the "blameworthiness" of the horrific acts it perpetrated over a four-year period, as well as the "seriousness" of the eminently foreseeable consequences of providing substantial, contemporaneous support for such an organization. [21]

**The amount of the assistance**. "The *amount [and kind] of assistance given* the wrongdoer is also a significant factor . . . ." *Id.* at 484. Money is the lifeblood of terrorism,[22] and as in *Halberstam*, "integral" to its operation. *Id.* Further, the amount of assistance is "influence[d]" by the duration of the assistance provided." *Id.* (emphasis omitted). Thus, in *Halberstam*, "although the *amount of assistance* [chiefly money laundering and tax preparation] Hamilton gave Welch

---

[21]    The executive branch has found, and the Supreme Court has agreed, that "'[m]aterial support' is a valuable resource by definition." *Holder*, 561 U.S. at 30. "[I]t is highly likely that any material support to these organizations will ultimately inure to the benefit of their criminal, terrorist functions—regardless of whether such support was ostensibly intended to support non-violent, non-terrorist activities." *Id.* at 33 (quoting government affidavit setting out the Executive Branch's view, to which the Court deferred).

[22]    *See, e.g.*, Hearing on S.2465 [what became the ATA], Before the S. Comm. on the Judiciary, 101st Cong. at 79, 84-85 (1990) (Statement of Joseph A. Morris).

[her burglar boyfriend] may not have been overwhelming as to any given burglary in the five-year life of this criminal operation, it added up over time to an essential part of the pattern." *Id.* at 488. Defendant's substantial assistance involved providing Hamas with significant amounts of support, collected internationally, pooled and laundered through the Bank's accounts, and transferred continually to Hamas for years in the midst of the organization's ongoing terror campaign during the Second Intifada. Pls. 56.1 ¶¶ 13-22, Schlanger Decl. Exs. 4, 10-22.

*Presence at the time of the tort.* In *Halberstam,* "Hamilton was admittedly not *present at the time* of the murder or even at the time of any burglary," but "the success of the tortious enterprise clearly required expeditious and unsuspicious disposal of the goods, and Hamilton's role in that side of the business was substantial." *Id.* at 488. Here, Defendant was also not "present at the scene," but Hamas's terror campaign clearly required significant funding, Pls. 56.1 ¶ 23, Schlanger Decl. Ex. 30, and Defendant's role in that aspect of Hamas's business was substantial. Pls. 56.1 ¶¶ 16-20, Schlanger Decl. Exs. 15, 16, 22.

*Relationship to the tortious actor.* The *Halberstam* court warned "we must be cautious not to overemphasize the relationship. Hence, we accord it a low priority in our calculus." 705 F.2d at 488. Still, Defendant willingly served as well-compensated bankers for Hamas's fundraising coordinator (Interpal) and global fundraising network (the Union of Good). By soliciting funds for Hamas, those entities engaged in what were defined as "terrorist activities" by the Immigration and Nationality Act, incorporated into §2339B(a)(1). *See, infra,* at 24 & n.24. The relationship was intimate, because a banker must know its customer, communicate with its customer, approve transfers in and out of the customer's accounts, and apply regulatory requirements to such transfers. The record amply confirms the continuing nature of the relationship Defendant formed, and then took considerable time in ending long after it knew its customers' roles in financing

Hamas's operations and its own role in aiding and abetting those activities. Schlanger Decl. Ex. 1 at 3-8, 67-82.

**_Defendant's state of mind._** *Halberstam* emphasized that Hamilton's assistance was knowing, long-term, and continuous, not some "passing fancy or impetuous act." 705 F.2d at 488. Defendant's assistance to Interpal and the Union of Good was likewise knowing, long-term, and continuous, reflecting its intentional, considered decision to render that assistance.[23] Schlanger Decl. Ex. 1 at 3-8, 67-82. That it did not particularly intend (or want) people to be killed in terror attacks is irrelevant; Hamilton never knew or intended that her boyfriend would murder anyone during a burglary either, but she knew that he was engaged in some illicit venture at night, in which murder was a foreseeable risk. This Court and the Court of Appeals have already ruled that there is a genuine dispute concerning Defendant's state of mind, and it is indisputable that terror attacks are a foreseeable risk of providing support for a terrorist organization in the midst of its years-long terror campaign.

Furthermore, *Halberstam* held that "[t]he particularly offensive nature of an underlying offense might also factor in the fifth criterion, the 'state of mind' of the defendant." 705 F.2d at 484 n.13. Nothing is more offensive than mass killings and maiming of innocent civilians, including children, and U.S. counter-terror financing laws also reflect the offensive nature of terror financing. A jury would be entitled to weigh these factors.

**_Duration of assistance._** The *Halberstam* court added this "important" factor to those delineated in the Restatement (Second) of Torts §876 (1979), because it "almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Id.* at 484. In

---

[23]     Defendant need not independently intend to support terrorism. *See, infra,* at 24.

*Halberstam*, this factor "strongly influenced [the court's] weighing of Hamilton's assistance. It affected [the court's] sense of how Hamilton perceived her role and of the value of her assistance to Welch." *Id.* Defendant assisted the Hamas "sub-organizations" for *years*, repeatedly debating the merits of providing ongoing support and deciding to continue assisting Hamas. Pls. 56.1 ¶¶ 8-12, Schlanger Decl. Ex. 1 at 3-8, 67-82, Exs. 5-9.

Defendant did not impulsively approve a single errant transaction or demonstrate episodic bad judgment. Its conduct was continuous, extensive, and critical to the success of Hamas's terror campaign. Minimally, therefore, the record demonstrates the existence of material factual issues that preclude summary judgment regarding the substantial assistance element.

### D. Whether Defendant Was Generally Aware of Its Role Raises a Disputed Issue of Fact for the Jury.

The Court of Appeals emphasized in *Weiss* that it should apply "the 'lenient' standard we have approved for ruling on the sufficiency of evidence for scienter issues." 768 F.3d at 211 (citation omitted). This Court likewise recognized that "whether a given state of mind existed 'is generally a question of fact, appropriate for resolution by the trier of fact . . . .'" *Strauss*, 925 F. Supp. 2d at 429 n. 8 (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)). Defendant nevertheless contends that the legal standard is whether it provided assistance "knowing that the defendant itself is *participating* in such terrorist *acts*." NW3 (emphasis added). However, Hamilton, the burglar's girlfriend in *Halberstam,* provided her "banker [and] bookkeeper" assistance neither participating in nor even knowing about the killing of Dr. Halberstam. In fact, *Halberstam* held that plaintiff did not even have to prove that "Hamilton knew specifically that Welch was committing burglaries," as long as she knew he was involved "in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises." 705 F.2d at 488.

23

Accordingly, *Linde* interpreted *Halberstam* to require "aware[ness]" that by assisting the principal, defendant was "assuming a 'role' in terrorist activities." *Id*. at 329. It expressly rejected any requirement that this necessitates proof of specific intent "*to participate* in a criminal scheme as 'something that [defendant] wishes to bring about and seek by his action to make it succeed.'" *Id.* (emphasis added). Nor did *Linde* require awareness of the specific acts at issue. *Id.*

In short, *Linde* merely restated *Halberstam*'s elements (as Congress required it to do):

(1) the party whom the defendant aids must perform a wrongful act that causes an injury;

(2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and

(3) the defendant must knowingly and substantially assist the principal violation.

*Id.* (quoting *Halberstam*, 705 F.2d at 487).

*Halberstam* held that "[t]he district court's conclusions that Hamilton *knew about* and acted to support *Welch's illicit enterprise* [not the killing] establish that Hamilton had a general awareness of her *role in a continuing criminal enterprise*. The second element is thus satisfied." 705 F.2d at 488 (emphasis added). There is ample evidence that NatWest knew about and acted to support its customer's enterprises by facilitating massive, illicit funds transfers, and that it was generally aware of its role as repository and distribution mechanism for (SDGTs) Interpal's and the Union of Goods' continuing criminal enterprise, which carried a foreseeable and enormous – if not inevitable – risk of terror attacks. Pls. 56.1 ¶ 22, Schlanger Decl. Exs. 25-29.

As the *Linde* court made clear, it is at least possible for a jury to find that certain forms of material support to a terrorist organization do not evince general awareness of a defendant's role in terrorist activities. Examples may include transfers of small amounts of money, food or school books ("tangible property," 18 U.S.C. §2339A(b)(1)) knowingly provided to a terrorist organization. Conversely, a jury could easily find that knowingly and illegally funneling *millions*

24

of dollars to one of the world's foremost terrorist groups does evidence a general awareness of one's role in terrorist activities.

Moreover, there is substantial evidence that Defendant's direct customers, Interpal and the Union of Good, engaged in "terrorist activity" under §2339B(a)(1) by "solicit[ing] things of value for … a terrorist organization…."[24] The Court of Appeals in *Weiss* expressly held that "if [NatWest's customer] Interpal solicited funds for Hamas, then Interpal engaged in terrorist activity within the meaning of Section 212(a)(3)(B) of the Immigration and Nationality Act." *Weiss*, 768 F.3d at 209. Defendant's knowledge of its role in such terrorist activities also satisfies the general awareness prong of §2333(d), as the Court of Appeals ruled in *Linde*. 882 F.3d at 329 ("Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in *terrorist activities*." (quoting *Halberstam*, 705 F.2d at 477) (emphasis added).

## IV.    CONCLUSION

The Court of Appeals in *Linde* expressly held that a jury had to decide whether conduct that closely parallels Defendant's actions satisfied the §2331(1) requirements that a defendant's activities (1) "involve" violence or acts dangerous to human life and (2) exhibit objective apparent terroristic intent. *Linde* also expressly held that a jury had to decide whether transferring millions of dollars to Hamas demonstrated (1) substantial assistance to Hamas and (2) general awareness of the defendant's respective role as part of an overall illegal or tortious activity, as required by §2333(d) and *Halberstam*. This Court should deny Defendant's third round of summary judgment motions and finally let the jury decide these questions.

---

[24]     Section 2339B(a)(1) incorporates the meaning of "engage[] in terrorist activity" from §212(a)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. §1182(a)(3)(B)(iv)(IV). The activity that §2339B(a)(1) prohibits therefore includes "solicit[ing] funds or things of value for … (bb) a terrorist organization…." *Weiss*, 768 F.3d at 208-209 (quoting 8 U.S.C. §1182). *See also Goldberg v. UBS AG*, 690 F. Supp. 2d 92, 114 (E.D.N.Y. 2010).

Dated: May 8, 2018

**OSEN LLC**

By      /s/ Gary M. Osen
         Gary M. Osen, Esq.
         Ari Ungar, Esq.
         Peter Raven-Hansen, Esq., Of Counsel
         Aaron Schlanger, Esq.
         2 University Plaza, Suite 402
         Hackensack, NJ 07601
         (201) 265-6400

**ZUCKERMAN SPAEDER LLP**
Shawn Naunton, Esq.
485 Madison Avenue, 10th Floor
New York, NY 10022
(646) 746-8655

**KOHN, SWIFT & GRAF, P.C.**
Steven M. Steingard, Esq.
Stephen Schwartz, Esq.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700

**TURNER & ASSOCIATES, P.A.**
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

**Attorneys for *Weiss* Plaintiffs**

**SAYLES WERBNER P.C.**

By      /s/ Mark S. Werbner
         Mark S. Werbner, Esq.
         1201 Elm Street, Suite 4400
         Dallas, TX 75270
         (214) 939-8700

**STONE BONNER & ROCCO LLP**
James P. Bonner, Esq.
Patrick L. Rocco, Esq.
Susan M. Davies, Esq.
145 West 45th Street, Suite 701
New York, NY 10036
(212) 239-4340

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles, Esq.
Edward MacAllister, Esq.
1146 19th Street, NW, 5th Floor
Washington, DC 20036
(202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David, Esq.
10655 Six Pines Drive, Suite 260
Woodlands, TX 77380
(281) 296-9090

**Attorneys for *Applebaum* Plaintiffs**